**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MEDICAL IMAGING &
TECHNOLOGY ALLIANCE, *et al.*,

       Plaintiffs,

v.

THE LIBRARY OF CONGRESS, *et al.*,

       Defendants.

CASE NO.: 1:22-cv-00499-BAH

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' COMBINED MOTION TO DISMISS, OR IN THE
ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

STATUTORY AND REGULATORY BACKGROUND ...................................................... 3

I.      Digital Millennium Copyright Act ("DMCA")............................................... 3

II.     DMCA's Triennial Rulemaking Requirement ................................................. 5

III.    Eigth Triennial Rulemaking Proceeding ........................................................ 8

PROCEDURAL BACKGROUND....................................................................................14

STANDARD OF REVIEW ..............................................................................................15

ARGUMENT ...................................................................................................................16

I.      The Library of Congress is Exempt from the APA.......................................16

II.     Even if the Court Holds the Library of Congress to Be Subject to the APA, the Library Complied with Its Procedural and Substantive Requirements ...........................23

      A.     The Librarian's Determination that Repair is Likely Noninfringing is Consistent with the Copyright Act and Based on Reasoned Decisionmaking.........................23

      B.     The Librarian Responded to All Significant Comments by Adopting the Register's Recommendation ...............................................................33

III.    The Librarian Did Not Violate, Nor Have Plaintiffs Properly Alleged a Violation of, a Specific Prohibition in the DMCA that Is Clear and Mandatory. ...................................37

IV.    The DMCA Rulemaking Scheme Does Not Violate the Constitutional Separation of Powers................................................................................................................40

V.     If the Court Awards Summary Judgment to Plaintiffs, Vacatur of the Entire Exemption Would Be Inappropriate. ..........................................................................43

CONCLUSION................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*Advanced Computer Services of Michigan v. MAI Systems*,
   845 F. Supp. 356 (E.D. Va. 1994) ..............................................................28

*Alaska Dep't of Envtl. Conservation v. EPA*,
   540 U.S. 461 (2004) ....................................................................................24

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ..................................................................44

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. NLRB*,
   No. 20-cv-0675, 2020 WL 3041384 (D.D.C. June 7, 2020) ......................44

*Am. Iron & Steel Institute v. EPA*,
   115 F.3d 979 (D.C. Cir. 1997) ....................................................................37

*Am. Road & Transp. Builders Ass'n v. E.P.A.*,
   No. 12-5244, 2013 WL 599474 (D.C. Cir. 2013) ..................................37, 38

*American Society for Testing and Materials, et al. v. Public.Resource.Org, Inc.*,
   896 F.3d 437 (D.C. Cir. 2018) ................................................................29, 39

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................15

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012) ....................................................................34

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council*,
   462 U.S. 87 (1983) ......................................................................................24

*Bates v. Donley*,
   935 F. Supp. 2d 14 (D.D.C. 2013) ..............................................................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................15

*Bennett v. Spear*,
   520 U.S. 154 (1997) ....................................................................................18

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ..............................................................................41, 43

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ..................................................................................42, 43

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ................................................................................................*passim*

*Carlson v. Postal Regulatory Comm'n*,
    938 F.3d 337 (D.C. Cir. 2019) .........................................................................................45

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ........................................................................................................24

*City of Waukesha v. E.P.A.*,
    320 F.3d 228 (D.C. Cir. 2003) .............................................................................. 34, 35, 37

*Clark v. Library of Congress*,
    750 F.2d 89 (D.C. Cir. 1984) .................................................................. 16, 17, 21, 22

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ........................................................................................................15

*Dalton v. Specter*,
    511 U.S. 462 (1994) ........................................................................................................18

*DCH Regional Medical Center v. Azar*,
    925 F.3d 503 (D.C. Cir. 2019) ....................................................................................38, 40

*Doehla Greeting Cards v. Summerfield*,
    227 F.2d 44 (D.C. Cir. 1955) ..........................................................................................38

*Eltra Corp. v. Ringer*,
    579 F.2d 294 (4th Cir. 1978) ............................................................................... 20, 41, 42

*Ethnic Employees of Library of Congress v. Boorstin*,
    751 F.2d 1405 (D.C. Cir. 1985) ......................................................................................17

*Forrester v. U.S. Parole Comm'n*,
    310 F. Supp. 2d 162 (D.D.C. 2004) ...............................................................................15

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ...................................................................................................44

*Google LLC v. Oracle America, Inc.*,
    141 S. Ct. 1183 (2021) ..............................................................................................*passim*

*Green v. U.S. Dep't of Justice*,
    392 F. Supp. 3d 68 (D.D.C. 2019) .................................................................. 2, 9, 17, 20

*Hohn v. U.S.*,
    524 U.S. 236 (1998) ........................................................................................................18

*Independent Cosmetic Mfrs and Distributors, Inc. v. U.S. Department of Health Education and Welfare*,
574 F.2d 553 (D.C. Cir. 1978) .......................................................................................40

*INS v. Chadha*,
462 U.S. 919 (1983) ........................................................................................................41

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
140 S. Ct. 768 (2020) ......................................................................................................18

*Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Bd.*,
684 F.3d 1332 (D.C. Cir. 2012) ..................................................................................19, 42

*Kissinger v. Reporters Comm. for the Freedom of the Press*,
445 U.S. 136 (1979) ........................................................................................................17

*Larson v. Domestic & Foreign Commerce Corporation*,
337 U.S. 682 (1949) ........................................................................................................37

*Lexmark International, Inc. v. Static Control Components, Inc.*,
387 F.3d 522 (6th Cir. 2004) ......................................................................................29, 31

*Live365, Inc. v. Copyright Royalty Bd.*,
698 F. Supp. 2d 25 (D.D.C. 2010) ...................................................................................20

*Mach Mining*,
575 U.S. 480 (2015) ...................................................................................................22, 23

*Marsh v. Oregon Natural Resource Council*,
490 U.S. 360 (1989) ........................................................................................................24

*Maynard v. Architect of the Capitol*,
544 F. Supp. 3d 64 (D.D.C. 2021) ...................................................................................19

*Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*,
501 U.S. 252 (1991) ........................................................................................................43

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ........................................................................................................16

*Morgan Drexen, Inc. v. Consumer Financial Protection Bureau*,
785 F.3d 684 (D.C. Cir. 2015) .........................................................................................16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ..........................................................................................................24

*North American Butterfly Association v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) ..................................................................................38, 39

*Nyunt v. Chairman, Broad. Bd. of Governors,*
   589 F.3d 445 (D.C. Cir. 2009) ..........................................................................................3, 4

*Patterson v. McLean Credit Union,*
   491 U.S. 164 (1989) ...........................................................................................................20

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   508 F.3d 1146 (9th Cir. 2007) ..........................................................................................26

*Petworth Holdings, LLC v. District of Columbia,*
   531 F. Supp. 3d 271 (D.D.C. 2021) ..................................................................................16

*Pond Constructors, Inc. v. United States Government Accountability Office,*
   No. 17-cv-0881, 2018 WL 3528309 (D.D.C. May 30, 2018) ...........................................19

*Pub. Citizen, Inc. v. FAA,*
   988 F.2d 186 (D.C. Cir. 1993) ..........................................................................................34

*Reiff v. United States,*
   107 F. Supp. 3d 83 (D.D.C. 2015) ....................................................................................15

*Saad v. S.E.C.,*
   980 F.3d 103 (D.C. Cir. 2020) ..........................................................................................20

*Society for Testing and Materials, v. Public.Resource.Org., Inc.,*
   896 F.3d 437 (D.C. Cir. 2018) ..........................................................................................39

*Sega Enterprises Ltd. v. Accolade, Inc.,*
   977 F.2d 1510 (9th Cir. 1992) ..........................................................................................33

*Sierra Club v. Van Antwerp,*
   719 F. Supp. 2d 77 (D.D.C. 2010) ....................................................................................44

*Sony Computer Entertainment, Inc. v. Connectix Corp.,*
   203 F.3d 596 (9th Cir. 2000) ......................................................................................27, 29

*Sony Corp. of America v. Universal City Studios, Inc.,*
   464 U.S. 417 (1984) ...........................................................................................27, 30, 31

*Texas Mun. Power Agency v. EPA,*
   89 F.3d 858 (D.C. Cir. 1996) ......................................................................................34, 35

*Triad Systems v. Southeastern Express,*
   64 F.3d 1330 (9th Cir. 1995) ............................................................................................28

*Troy Corp. v. Browner,*
   120 F.3d 277 (D.C. Cir. 1997) ..........................................................................................23

*United Food and Commercial Workers Union, Local No. 663 v. U.S.D.A.*,
　532 F. Supp. 3d 741 (D. Mn. 2021) ...................................................................45

*United States v. Burwell*,
　690 F.3d 500 (D.C. Cir. 2012) ........................................................................20

*Wash. Legal Foundation v. U.S. Sentencing Comm'n*,
　17 F.3d 1446 (D.C. Cir. 1994) ........................................................................17

*Williams v. Glickman*,
　936 F. Supp. 1 (D.D.C. 1996) .........................................................................21

**Statutes**

2 U.S.C. § 131 ..................................................................................................18

2 U.S.C. § 136 ..................................................................................................41

5 U.S.C. § 551(1) ............................................................................................17

5 U.S.C. § 551(13) ..........................................................................................44

5 U.S.C. § 552(f) .............................................................................................17

5 U.S.C. § 702 .............................................................................................16, 17

5 U.S.C. § 704 ..................................................................................................18

5 U.S.C. § 706(2)(A) ......................................................................................24

5 U.S.C § 701(b)(1) .....................................................................................17, 22

17 U.S.C. § 107 ................................................................................................11

17 U.S.C. § 107(1) ..........................................................................................25

17 U.S.C. § 701(a) ...........................................................................................41

17 U.S.C. § 701(e) .....................................................................................18, 43

17 U.S.C. § 1201 ....................................................................................4, 5, 9, 18

17 U.S.C. § 1201(a)(1)(A) ...............................................................................4

17 U.S.C. § 1201(a)(1)(C) ........................................................................*passim*

17 U.S.C. § 1201(a)(1)(D) ..............................................................................18

17 U.S.C. § 1201(d) .....................................................................................5, 6

17 U.S.C. § 1203 ................................................................................................. 5

17 U.S.C. § 1204 ................................................................................................. 5

44 U.S.C. § 1501 ...............................................................................................22

Pub. L. No. 94-553, 90 Stat. 2541 (1976) .......................................................43

**The Constitution**

U.S. Const. art. I, § 7 .......................................................................................41

U.S. Const. art. II, § 2, cl. 2 .......................................................................42, 43

**Rules**

Fed. R. Civ. P. 56(a) .........................................................................................16

**Legislative Materials**

144 Cong. Rec. S12985-01 (daily ed. Nov. 12, 1998).......................................4

H.R. Rep. No. 94-1476 (1976) .........................................................................18

H.R. Rep. No. 105-551 (1998) .....................................................................6, 21

H.R. Rep. No. 105-796 (1998) ...........................................................................7

S. Rep. No. 105-190 (1998) ...............................................................................4

**Regulations**

37 C.F.R. § 201.40 ..............................................................................................7

37 C.F.R. § 201.40(b)(15) ................................................................................13

65 Fed. Reg. 64,556 (Oct. 27, 2000) .................................................................7

68 Fed. Reg. 62,011 (Oct. 31, 2003) .................................................................7

71 Fed. Reg. 68,472 (Nov. 27, 2006) .................................................................8

75 Fed. Reg. 43,825 (July 27, 2010) .................................................................8

77 Fed. Reg. 65,260 (Oct. 26, 2012) .................................................................8

80 Fed. Reg. 65,944 (Oct. 28, 2015) .................................................................8

83 Fed. Reg. 54,010 (Oct. 26, 2018) .................................................................8

85 Fed. Reg. 37,399 (June 22, 2020) .......................................................................... 8

85 Fed. Reg. 65,293 (Oct. 15, 2020) ................................................................... 8, 9, 10

86 Fed. Reg. 8560 (Feb. 8, 2021) ..................................................................... 10, 11, 12

86 Fed. Reg. 59,627 (Oct. 28, 2021) ..................................................................... 7, 8, 13

**Other Authorities**

WIPO Copyright Treaty,
    Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11 (1997) ...................................... 4

**INTRODUCTION**

Exercising her triennial rulemaking authority under a provision of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201(a)(1)(C), the Librarian of Congress exempted parties accessing copyrighted software for the purpose of diagnosis, maintenance, and repair of medical devices from the DMCA's provision prohibiting the circumvention of technological protection measures that control access to copyrighted works, sometimes referred to as "TPMs." Building on several previously granted exemptions for repair of other software controlled devices, such as cars, household appliances, and cell phones, the Librarian's exemption for repair of medical devices was granted in accordance with the requirements of the DMCA, which permits her to exempt certain copyrighted works from the DMCA's provisions on a triennial basis. This exemption, in particular, was also granted in light of the substantial public benefit that accrues when hospitals are able to hire Independent Service Operators ("ISOs") to repair crucial medical equipment, such as sonograms and MRI machines, or repair such equipment themselves, rather than rely solely on the original manufacturer of the product, who may charge higher rates or be unavailable for immediate repairs.

Plaintiffs, two organizations representing these Original Equipment Manufacturers ("OEMs"), claim that the Librarian's exemption for repair of medical devices ("the Repair Exemption") violates the Administrative Procedure Act ("APA") on procedural and substantive grounds. However, Plaintiffs also plead two additional claims in the alternative, arguing that the Librarian acted ultra vires in taking action that was purportedly outside the scope of her statutory authority and that the Library of Congress, if not an agency under the APA, acted in a legislative capacity that violated the constitutional separation of powers.

It is unsurprising that Plaintiffs have included these additional claims because, as the D.C.

1

Circuit has repeatedly held, APA claims may not run against the Library because it is explicitly excluded from the APA's reach. Indeed, as another court in this district recently concluded, dismissal of APA claims against the Library was warranted because "the Library of Congress is not an 'agency' as that term is defined in the APA." *Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 100 (D.D.C. 2019). Plaintiffs' APA claims must therefore be dismissed at the threshold before ever reaching the merits.

In light of the fact that the APA has no application to the Librarian's actions, it makes little sense to apply those standards to the challenged exemption. Nevertheless, if the Court were to engage in that theoretical exercise, judgment should still be entered for Defendants. Plaintiffs claim that the Librarian's grant of the Repair Exemption is arbitrary and capricious because diagnosis, maintenance, and repair of medical equipment infringes OEMs' copyrights and therefore is ineligible for an exemption under the DMCA. The Librarian reasonably determined, however, that the proposed uses were likely noninfringing "fair uses." As the record evidence demonstrates: (1) use of copyrighted software for the purpose of diagnosis, maintenance, and repair of medical of medical devices constitutes a transformative use of the copyrighted work because it put the work to a different purpose than it was originally intended; (2) computer software is further from the heart of copyrighted protection than works of art or fiction; (3) only the amount of copyrighted work necessary for repair would be used; and (4) allowing repair of medical equipment would not disrupt the market for the medical equipment itself. The Register of Copyright even consulted with the Food & Drug Administration ("FDA") to make sure that there was no risk to patients or security by proposing the repair exemption, and the FDA agreed that the Repair Exemption would actually impart a public benefit by improving the functioning of the healthcare system and preventing additional cybersecurity threats.

Plaintiffs next claim that that the Librarian violated the procedural requirements of the APA by failing to respond to significant comments. But the record demonstrates that the Librarian considered all relevant factors and put forth a reasoned basis for her conclusion. What Plaintiffs proffer as a procedural APA claim is in fact a repetition of their substantive disagreement with the Librarian's conclusions, which fails for all of the reasons previously discussed.

In tacit acknowledgement that they have no avenue for redress against the Library under the APA, Plaintiffs argue that the Library's actions are *ultra vires* under the *Larson-Dugan* doctrine. This argument, like so many other *ultra vires* claims, "is essentially a Hail Mary pass— and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). Here the attempt fails because Plaintiffs do not identify a clear and mandatory statutory duty that the Librarian purportedly violated. Plaintiffs' *ultra vires* claim is no more than an attempt to argue that the Librarian should have reached a different conclusion.

Finally, Plaintiffs' constitutional claim lacks merit because the DMCA's grant of rulemaking authority does not violate the constitutional separation of powers, as the Library of Congress performs its rulemaking functions independently, not as an agent of Congress subject to the direct control of Congress or its members, despite being included in the statutory definition of "Congress" for the purpose of the APA.

For all these reasons, Plaintiffs' claims should be dismissed, or, in the alternative, summary judgment should be entered in favor of Defendants.

## STATUTORY AND REGULATORY BACKGROUND

### I.   Digital Millennium Copyright Act ("DMCA")

Congress enacted the DMCA in 1998 in order to facilitate electronic commerce,

communications, research, development, and education while addressing new challenges stemming from the rise of digital technology. S. Rep. No. 105-190 (1998), at 1–2. While technology allows artists and authors to make their work available online, it also makes possible digital piracy, through unauthorized access to and distribution of copyrighted works. *Id.*

Amidst growing concerns by the late 1990s regarding such piracy and its effect on domestic and international markets, the United States joined other nations in entering into the World Intellectual Property Organization ("WIPO") Copyright Treaty. S. Rep. No. 105-190, at 2.[1] The WIPO treaty requires contracting nations to "provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors" to protect their rights. *See* WIPO Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11 (1997), 1997 WL 447232, at *13. Congress carried out its treaty obligations in the DMCA. In enacting the DMCA, Congress understood that "the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials" and that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy." S. Rep. No. 105-190, at 2, 8. Thus, Congress intended the DMCA to provide this protection and thereby to "create[] the legal platform for launching the global digital on-line marketplace for copyrighted works." *Id.* at 2.

The DMCA sets forth three prohibitions, codified at 17 U.S.C. § 1201, to address digital piracy. As relevant in this case, the DMCA prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected under" the Copyright Act. 17 U.S.C. § 1201(a)(1)(A) ("the anti-circumvention provision"). The anti-circumvention provision addresses

---

[1] The United States signed the WIPO Copyright Treaty on April 2, 1997, and the Senate ratified it on October 21, 1998. 144 Cong. Rec. S12985-01 (daily ed. Nov. 12, 1998) (Resolution of Ratification of Treaties), 1998 WL 785674 (Cong. Rec.).

circumvention of technology that blocks *access* to a copyrighted work—such as technology that prevents people from viewing an article on an Internet website unless they have a password or pay a fee. *See id.* § 1201(a)(3)(A) (explaining that to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner"). These measures meant to restrict access are commonly referred to as technological protection measures ("TPMs").

The DMCA sets forth several permanent exemptions to the § 1201 prohibitions, including the anti-circumvention provision. The statute permits circumvention of an access control on a copyrighted work, or in certain limited circumstances, the sharing of circumvention technology, in the following instances: (1) in order for a school or library to determine whether to acquire a copyrighted product; (2) for law enforcement purposes; (3) to identify and analyze elements necessary to achieve interoperability of computer programs; (4) to engage in encryption research; (5) as necessary to limit the Internet access of minors; (6) as necessary to protect personally identifying information; or (7) to engage in security testing of a computer, computer system, or computer network. *See* 17 U.S.C. § 1201(d)–(j).

The Government may bring criminal charges against those who violate the DMCA's anti-circumvention and anti-trafficking provisions pursuant to 17 U.S.C. § 1204. Persons injured by violations of these provisions may also seek civil remedies pursuant to 17 U.S.C. § 1203.

## II.    DMCA's Triennial Rulemaking Requirement

The DMCA also directs the Librarian of Congress to make a determination every three years, through a rulemaking proceeding, regarding categories of copyrighted materials that should be exempted for the next three-year period from the anti-circumvention provision in §

1201(a)(1)(A). *See id.* § 1201(a)(1)(C). This triennial rulemaking is intended to serve as a "'fail-safe' mechanism" to account for possible changes in the online marketplace after the DMCA's enactment. *See* H.R. Rep. No. 105-551(II), at 35–37 (1998).

Such a mechanism was originally proposed by the House Commerce Committee when considering an earlier version of the bill that became the DMCA. The Committee raised a concern that "marketplace realities" might evolve in a manner that would unjustifiably diminish access for lawful purposes to copyrighted materials. *See id.* at 36. The Committee thus proposed a "'fail-safe' mechanism" to "monitor developments in the marketplace for copyrighted materials," and to allow the prohibition on circumvention of access controls in § 1201(a)(1)(A) "to be selectively waived, for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials." *Id.* at 36.

As enacted, this "fail-safe mechanism" directs the Librarian of Congress to determine, through the triennial rulemaking, whether users of certain categories of copyrighted works should be exempted from the anti-circumvention provision set forth in § 1201(a)(1)(A) because the restriction adversely affects their ability to make noninfringing use of copyrighted material. 17 U.S.C. § 1201(a)(1)(C). The Librarian's determination is made "upon the recommendation of the Register of Copyrights," who in turn must "consult with the Assistant Secretary for Communications and Information of the Department of Commerce." *Id.*

In conducting the rulemaking, the statute directs the Librarian to examine "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of [access controls] has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of [access controls] on the market for or

value of copyrighted works; and (v) such other factors as the Librarian considers appropriate." *Id.* In order to grant an exemption through this process, the Librarian must conclude "(1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of [a TPM], the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses." Final Rule, Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 86 Fed. Reg. 59,627, 59,628 (Oct. 28, 2021), codified at 37 C.F.R. § 201.40, LOC_AR_70–84. A proponent of an exemption must establish these requirements "by a preponderance of the evidence." *Id.*

The final conference report before the DMCA's enactment describes the intended procedure for the rulemaking described in § 1201(a)(1)(C). The report states that, "in recognition of the expertise of the Copyright Office, the Register of Copyrights will conduct the rulemaking, including providing notice of the rulemaking, seeking comments from the public, consulting with the Assistant Secretary for Communications and Information of the Department of Commerce and any other agencies that are deemed appropriate." H.R. Rep. No. 105-796, at 64 (1998). The Register will then "recommend[] final regulations in the report to the Librarian." *Id.* "To aid in this process, the Register develops a comprehensive administrative record using information submitted by interested members of the public, and makes recommendations to the Librarian concerning whether exemptions are warranted based on that record." 86 Fed. Reg. at 59,628.

After the Register issues recommendations, the Librarian then determines whether to accept or reject the Register's recommendations and issues a Final Rule setting forth this determination and promulgating the temporary exemptions for the next three-year period at 37 C.F.R. § 201.40. *E.g.*, 86 Fed. Reg. 59,627. Thus far, the Librarian has issued eight Final Rules pursuant to this procedure. *See* 65 Fed. Reg. 64,556 (2000 Final Rule); 68 Fed. Reg. 62,011 (2003

7

Final Rule); 71 Fed. Reg. 68,472 (2006 Final Rule); 75 Fed. Reg. 43,825 (2010 Final Rule); 77

Fed. Reg. 65,260 (2012 Final Rule); 80 Fed. Reg. 65,944 (2015 Final Rule); 83 Fed. Reg. 54,010

(2018 Final Rule); 86 Fed. Reg. 59,627 (2021 Final Rule).

During the first three-year period beginning October 28, 2000, the Librarian adopted two

exemptions for classes of copyrighted works. *See* 65 Fed. Reg. 64574. Most recently, the Librarian

adopted twenty-six exemptions for classes of copyrighted works during the three-year period

beginning October 28, 2021. *See* 86 Fed. Reg 59,627. Examples of classes of copyrighted works

that have been granted exemptions through this process include "computer programs that control

motorized land vehicles" and "computer programs that control smartphones, home appliances, or

home systems" for diagnosis, maintenance, or repair, *id.* at 59,631; excerpts of audiovisual works

for criticism and comment, *id.* at 59,632; and literary works for use with assistive technologies for

disabled individuals, *id.* at 59,630.

## III.   Eighth Triennial Rulemaking Proceeding[2]

The U.S. Copyright Office ("the Office") commenced the eighth triennial rulemaking

proceeding with a notice of inquiry on June 22, 2020, requesting petitions for renewals of existing

exemptions and proposals for new exemptions. Notice of Inquiry, Exemptions to Permit

Circumvention of Access Controls on Copyrighted Works ("Notice of Inquiry"), 85 Fed. Reg.

37,399 (June 22, 2020), LOC_AR_45–49. The Office received 27 petitions for new or expanded

exemptions, which it organized into seventeen proposed classes outlined in its Notice of Proposed

Rulemaking ("NPRM"). NPRM, Exceptions to Permit Circumvention of Access Controls on

Copyrighted Works ("NPRM"), 85 Fed. Reg., 65,293, 65,302 (Oct. 15, 2020), LOC_AR_50–67.

---

[2] Pursuant to Local Civil Rule 7(h)(2), this brief includes a statement of facts with references to
the administrative record.

As relevant here, two independent service organizations ("ISOs"), non-manufacturer companies hired by hospitals and other medical professionals to repair and maintain complex, computer-controlled medical equipment, petitioned for an exemption to allow circumvention of TPMs for the purposes of diagnosing, maintaining, and repairing such equipment. Petition for New Exemption under 17 U.S.C. § 1201, Summit Imaging, Inc., LOC_AR_2356–2358 ("Summit Petition"); Petition for New Exemption under 17 U.S.C. § 1201, Transtate Equipment Company, LOC_AR_2362–2365 ("Transtate Petition").[3] Among other reasons to permit the requested exemption, the ISOs explained that there is a strong public health interest in "maintain[ing] and repair[ing] lifesaving equipment," particularly in light of the "current COVID-19 pandemic." Summit Petition 2, LOC_AR_2357; *see also* Transtate Petition 4, LOC_AR_2365 ("The ability to diagnose, maintain, and repair medical equipment is a public health priority, particularly in the midst of a global health crisis. . . .).

The Office combined several petitions relating to repair of software-enabled devices, including the Summit and Transtate petitions, into a single proposed class, noting that the current exemptions already include repair-related exemptions to access computer programs in automobiles, smartphones, and home systems and appliances for repair-related purposes. *Id.* 85 Fed. Reg. at 65,307; LOC_AR_64. The proposed classes in the NPRM were "subject to further refinement" based on the comments and evidence received, and the Office declined to propose "precise regulatory language" at the NPRM stage because any language the Register ultimately

---

[3] Petitions from the Electronic Frontier Foundation and iFixit and Repair Association sought exemptions that would have extended to all types of software-enabled devices. LOC_AR_2317–2319; LOC_AR_2305–2307. In defining the scope of the class, however, the Register determined that the proposals relating to diagnosis, maintenance, and repair of medical devices and systems should be evaluated separately from the petitions seeking a broader exemption for all software-enabled devices. LOC_AR_1772.

recommended to the Librarian would "depend on the full record" from the proceedings. *Id.* at 65,302, LOC_AR_59. The Office sought three rounds of comments, the first for proponents of petitions or neutral parties, the second for opponents of petitions, and the third for proponents or neutral parties replying to arguments or facts raised in other comments. *Id.* Transtate and Summit both submitted comments in support of their petitions. LOC_AR_2909–2916; LOC_AR_2917–3453. Plaintiffs MITA and AdvaMed, as well as their joint member, Phillips, filed opposing comments. LOC_AR_4010–4024; LOC_AR_4095–4130; LOC_AR_4131–4156. Transtate further submitted reply comments. LOC_AR_4507–4712.

After the close of the comment period, the Office notified the public that it would hold series of public hearings to collect testimony on the proposed exemptions. Notice of Public Hearings, Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 86 Fed. Reg. 8560 (Feb. 8, 2021), LOC_AR_68–69. One such hearing was held on the proposed exemption for repair to computer software, at which a representative from Transtate and a representative from the International Association of Medical Equipment Remarketers and Servicers testified. LOC_AR_5627–5763. Plaintiffs did not participate.

The Office also sent a letter to the Food and Drug Administration ("FDA") making it aware of the proposed exemption at issue here. Letter from Regan A. Smith to Mark Raza re: Section 1201 Rulemaking–Proposed Exemptions Pertaining to Medical Devices (May 4, 2021), LOC_AR_6168–6197. The FDA responded, squarely refuting claims by opponents of the requested exemption that the proposal would "facilitate device servicing by unregulated entities, with the potential to increase cybersecurity risks and result in harm to both patients and providers." Letter from Suzanne B. Schwartz to Kevin R. Amer re: Section 1201 Rulemaking–Proposed Exemptions Pertaining to Medical Devices (Aug. 13, 2021), LOC_AR_6160–6163. The FDA

relied on the conclusions in a prior FDA report that many ISOs "provide high quality, safe, and effective medical device servicing," that "evidence did not justify" regulating ISOs further, and that ISOs are "critical to the functioning of the healthcare system in the United States." *Id.* at LOC_AR_6162. The FDA further stated it did not "share the view" that the proposed exemption would "jeopardize[] the safety and effectiveness of medical devices in the United States with respect to cybersecurity." *Id.* In fact, the FDA noted that ISOs may actually help in the identification of security vulnerabilities and "may play an important role" in maintaining safety and quality standards of medical devices. *Id.*

Based on all of the evidence submitted and gathered throughout the rulemaking process, the Register submitted her recommendation to the Librarian in October 2021. Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Register of Copyrights (Oct. 2021), LOC_AR_1571– 1926. The Recommendation concluded that "the prohibition on circumvention of TPMs is causing, or is likely to cause, an adverse impact on the noninfringing diagnosis, repair, and maintenance of medical devices and systems." LOC_AR_1802.

In reaching this conclusion, the Register first considered whether diagnosis, maintenance, and repair was likely to be a noninfringing use of the copyrighted software under the fair use doctrine.[4] LOC_AR_1781. With respect to the first of four factors in that analysis, "purpose and character of the use," the Register concluded that, although device repair can be commercialized,

---

[4] 17 U.S.C. § 107 provides that "fair use of a copyrighted work" is "not an infringement of copyright." The statute lays out four factors "to be considered" in making a fair use determination that "shall include:" (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;" (2) "the nature of the copyrighted work;" (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole;" and (4) "the effect of the use upon the potential market for or value of the copyrighted work." *Id.*

the proposed repair activities were intended to "restore" a device's "functionality, not to commercialize the embedded copyrighted software." LOC_AR_1782. Referencing her prior conclusions that diagnosis, maintenance, and repair of other software-enabled devices "are likely to be transformative uses," the Register found that the first factor weighed in favor of fair use. *Id.* On the second factor, the nature of the copyrighted work, the Register found that it also favored fair use because the copyrighted software is not used for "expressive qualities," but rather for "functional and informational" purposes allowing users to operate the medical equipment. LOC_AR_1783. The Register concluded that the third factor, the amount and substantiality of the copyrighted work used, also weighed in favor of fair use because the use is "necessary to accomplish the transformative purpose[] of diagnosis, maintenance, and repair," which was "reasonable" under the circumstances. LOC_AR_1784. Finally, the Register considered the fourth factor, the effect of the use on the market value of the copyrighted work, and determined that diagnosis, repair, and maintenance of software-enabled medical devices and systems would have a "minimal effect on the market for or value of the copyrighted works because medical device and system software and data files are sold with the equipment and have no independent value separate from the devices," weighing in favor of fair use. *Id.* The Register specifically noted that if a user, such as a hospital or ISO technician, was to "reproduce and retain additional copies of any copyrighted materials for use with other devices, or enable permanent access to subscription-only services, those activities would remain prohibited because they fall outside the scope of the proposed exemption." LOC_AR_1785.

After determining that the proposed uses of the copyrighted software were likely to be noninfringing, the Register considered whether the prohibition against circumvention was "adversely affecting" the repair of medical devices using the statutory criteria laid out in 17 U.S.C.

§ 1201(a)(1)(C). LOC_AR_1797. First, the Register concluded that the prohibition on circumvention "makes medical equipment software and manuals less available for use in noninfringing diagnosis, maintenance, and repair." LOC_AR_1799. The Register also concluded that the narrow scope of the exemption and proposed uses "limit[s] any potential market harm" because repair of medical equipment "support[s] rather than displace[s] the embedded computer programs" and the device software has "no independent value separate from the equipment [it] operate[s] or explain[s]." LOC_AR_1800. The Register also found relevant that the exemption could help address competitive concerns related to OEMs dominating the repair market and the FDA's determination that the exemption did not pose a substantial safety or security concern. LOC_AR_1801–1802.

The Librarian considered the Register's recommendation and decided to adopt it in a final rule on October 28, 2021. 86 Fed. Reg. 59,627 (Oct. 28, 2021), LOC_AR_70–84. As relevant here, the final rule exempts from the prohibition against circumvention "computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system." 37 C.F.R. § 201.40(b)(15) ("the Repair Exemption"). The Repair Exemption defines "maintenance" as the "servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system." *Id*. at § 201.40(b)(15)(i). It defines "repair" as "the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system." *Id*. at § 201.40(b)(15)(ii). Notably, the Repair Exemption does not exempt circumvention of TPMs for uses other than repair, diagnosis, and maintenance, and does not exempt ISOs or other users from liability under other

provisions of the DMCA.

## PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on February 25, 2022, raising four claims challenging the Repair Exemption. *See* Compl. for Decl. and Inj. Relief, ECF No. 1 ("Compl."). First, Plaintiffs argue that the Librarian violated the substantive requirements of the APA because the Repair Exemption is arbitrary and capricious, not in accordance with the law, and in excess of statutory authority. *Id.* ¶¶ 78–85. Second, Plaintiffs argue that the Repair Exemption violates the procedural requirements of the APA because the Librarian failed to respond to critical comments. *Id.* ¶¶ 86–91. Third, in the alternative to their substantive APA claim, Plaintiffs claim that the Librarian acted *ultra vires* in issuing the Repair Exemption. *Id.* ¶¶ 92–96. Finally, Plaintiffs argue that the Librarian acted unconstitutionally by violating separation of powers principles. *Id.* ¶¶ 97–101. In addition to declaratory relief, Plaintiffs ask the Court to "set aside the challenged exemption" and "enjoin defendants from enforcing, implementing, or otherwise carrying out the challenged exemption." *Id.* at Prayer for Relief.

On March 29, 2022, barely a month after the filing of their Complaint, Plaintiffs filed a motion for summary judgment. ECF No. 10 (Pls.' Mot.). On the same day, Plaintiffs filed a motion to set a briefing schedule. ECF No. 11. On April 5, 2022, Defendants filed their opposition to Plaintiffs' scheduling motion, and moved to stay briefing on Plaintiffs' motion for summary judgment pending resolution of an anticipated motion to dismiss or, in the alternative, for an extension of both the deadline to respond to Plaintiffs' Complaint and the deadline to respond to Plaintiffs' motion for summary judgment until May 24, 2022. ECF Nos. 13 & 14. On April 7, 2022, the Court entered a minute order granting in part and denying in part Plaintiffs' scheduling motion and Defendants' stay motion, and setting May 24, 2022 as the deadline to "file any motion

to dismiss, consolidated with any opposition to plaintiffs' . . . motion for summary judgment, and any cross-motion for summary judgment."

On May 24, 2022, Defendants served Plaintiffs with a copy of the administrative record and filed a certified list of the contents of the administrative record on the docket in accordance with Local Civil Rule 7(n)(1). ECF No. 15.

## STANDARD OF REVIEW

Defendants move to dismiss Plaintiffs' APA claims under Rule 12(b)(1) because sovereign immunity has not been waived. It is "presume[d] that federal courts lack jurisdiction," *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (internal quotation omitted), and where, as here, Plaintiffs seek to invoke this Court's jurisdiction to resolve the merits of their claims, the Court has "an affirmative obligation . . . to ensure that it is acting within the scope of its jurisdictional authority[.]" *Forrester v. U.S. Parole Comm'n*, 310 F. Supp. 2d 162, 167 (D.D.C. 2004) (internal quotation omitted). In undertaking this inquiry, the Court "need not accept factual inferences drawn by [P]laintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept [P]laintiffs' legal conclusions." *Reiff v. United States*, 107 F. Supp. 3d 83, 85-86 (D.D.C. 2015) (internal quotation omitted).

Defendants move to dismiss Plaintiffs' *ultra vires* and constitutional claims under Rule 12(b)(6) for failure to state a claim. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court generally may not rely on material outside the pleadings under Rule 12(b)(6), "when faced with a motion to dismiss in the APA context, a court may

consider the administrative record and public documents without converting the motion into a motion for summary judgment." *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (internal citation omitted).

Summary judgment is appropriate on a showing "that there is no genuine [issue] as to any material fact" and that the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When faced with cross-motions for summary judgment, the Court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Petworth Holdings, LLC v. District of Columbia*, 531 F. Supp. 3d 271, 276 (D.D.C. 2021) (internal citation and quotation omitted). A permanent injunction is an "extraordinary remedy" and "if a less drastic remedy is sufficient to redress the injury, no recourse to the additional and extraordinary relief of an injunction is warranted." *Morgan Drexen, Inc. v. Consumer Financial Protection Bureau*, 785 F.3d 684, 694 (D.C. Cir. 2015) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010)) (cleaned up).

## ARGUMENT

### I.     The Library of Congress is Exempt from the APA.

Because the Library of Congress is exempted from the APA's definition of "agency," Plaintiffs' APA claims must be dismissed. The APA clearly exempts "the Congress" from its reach, 5 U.S.C. § 702 (limiting review to "agency action"); *id.* at § 701(b)(1)(A) (excluding "the Congress" from the definition of "agency"), and binding precedent interprets this exclusion to include the Library of Congress. *See, e.g., Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984) ("[T]he Library of Congress is not an 'agency' as defined under the Administrative Procedure Act."). Beyond this binding precedent, indicia of congressional intent, longstanding government practice, and courts' decisions with respect to other entities included in the legislative

branch all support the same conclusion—that the APA's exclusion of "the Congress" extends to the Library of Congress, even when the Library is engaged in a rulemaking proceeding.

The Supreme Court first recognized in *Kissinger v. Reporters Comm. for the Freedom of the Press*, 445 U.S. 136 (1979), that the Library of Congress "is not an 'agency'" within the meaning of the term used in the Freedom of Information Act ("FOIA"), *id.* at 145, which is the same definition that applies to the APA, *see* 5 U.S.C. § 552(f) (incorporating APA definition of agency that appears in 5 U.S.C. § 551(1) and 5 U.S.C. § 701(b)(1)). Indeed, the Court granted certiorari in that case to determine whether a FOIA requester could obtain Kissinger's notes through a FOIA request to the State Department, even though the notes were then "wrongfully in the possession of a party not an 'agency'"—namely, the Library of Congress. *See Kissinger*, 445 U.S. at 139. Since *Kissinger*, the D.C. Circuit and lower courts have repeatedly made clear that the APA does not apply to the Library of Congress. *Wash. Legal Foundation v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) ("[W]e have held that the Library of Congress (part of the legislative branch but a separate entity from, 'the Congress,' narrowly defined) is exempt from the APA because its provisions do not apply to 'the Congress'—that is, the legislative branch."); *Ethnic Employees of Library of Congress v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985) ("[T]he Library is not an agency under the Administrative Procedure Act."); *Clark*, 720 F.2d at 102 ("[T]he Library of Congress is not an 'agency' as defined under the Administrative Procedure Act."); *Green*, 392 F. Supp. at 99.

The plain text of the APA and other indications of congressional intent also support the conclusion reached by the D.C. Circuit—that the Library of Congress is exempt from the APA. Beginning with the text, the APA excludes "the Congress" from judicial review, 5 U.S.C. § 702 (providing for review of "agency action"), *id.* at § 701(b)(1)(A) (removing "the Congress" from

definition of "agency"), and the Library of Congress is a part of "the Congress." 2 U.S.C. § 131, *et seq.* (organizing the Library of Congress under Title II ("The Congress") of the U.S. Code.). *See Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct 768, 776 (2020) ("We must enforce plain and unambiguous statutory language . . . according to its terms.") (internal quotation omitted). Subsequent congressional action further confirms that Congress intended to exclude the Library of Congress from the APA, as Congress later amended U.S. copyright law to make the Copyright Office, a subsidiary of the Library of Congress, subject to the APA. *See* 17 U.S.C. § 701(e); H.R. Rep. No. 94-1476 at 171 (1976) *reprinted in* 1976 U.S.C.C.A.N. 5659 ("Under an amendment to section 701 adopted by the Committee, the Copyright Office is made fully subject to the [APA] . . .").[5] If the APA already provided for review of the Library of Congress and all of its subsidiaries, there would have been no need for this amendment and the later enacted statutory provision would be superfluous. *See Hohn v. U.S.*, 524 U.S. 236, 249 (1998) ("We are reluctant to adopt a construction making another statutory provision superfluous."). Moreover, the longstanding practice and public understanding of the Library is that its triennial rulemaking under the DMCA is not subject to the APA, further suggesting that Congress did not intend for the APA to apply. U.S. Copyright Office, Section 1201 of Title 17: A Report of the Register of Copyrights 150 n.806 (June 2017), LOC_AR_9379 (noting that the "Librarian of Congress" is "exempt from the APA").

---

[5] The statute subjecting the Register of Copyrights to the APA, 17 U.S.C. § 701(e), does not make the APA applicable in this case because review under the APA is limited to "final agency action." 5 U.S.C. § 704. It is the Librarian's final decision, not the Register's recommendation, that "mark[s] the 'consummation'" of the rulemaking process and actually establishes an exemption from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted) (explaining "final agency action" for purposes of the APA); *see also* 17 U.S.C. § 1201(a)(1)(D) (providing that an exemption takes effect upon the Librarian's publication of the exemption). As the Supreme Court made clear in *Dalton v. Specter*, 511 U.S. 462 (1994), interim recommendations, even if they play a vital role in the regulatory process, are not "final agency action" subject to review under the APA. *See id.* at 468–71.

Given the language of the statute and the other indicators of congressional intent, it is no surprise, then, that courts routinely hold that other non-legislating entities within "the Congress" are exempt from the APA. *See, e.g., Maynard v. Architect of the Capitol*, 544 F. Supp. 3d 64, 79–80 (D.D.C. 2021) (citation omitted) (rejecting argument that "only agencies of the Congress that perform congressional functions should be covered by the exemptions included in the APA" in holding that Architect of the Capitol was exempt from APA challenge to workplace conditions); *Pond Constructors, Inc. v. United States Government Accountability Office*, No. 17-cv-0881, 2018 WL 3528309 at *1 (D.D.C. May 30, 2018) (citations omitted) (Although the APA "does not explicitly exclude an entity like [the Government Accountability Office] that is considered a 'legislative branch agency,'" it is "part of the legislative branch" and "[t]he APA, therefore, does not waive sovereign immunity for suits against GAO.").

Contrary to the binding precedent and indications of legislative intent discussed above, Plaintiffs argue that the Library of Congress should only be exempt from the APA when it is acting in a "legislative" capacity, as opposed to its role in the triennial rulemaking process under the DMCA. Pls.' Mot. 28–34. This position is unpersuasive, as it is unmoored from the text of the APA and unsupported by the precedent on which Plaintiffs rely.

Plaintiffs' argument is premised on dicta from a series of cases analyzing the Library of Congress' structure under the Appointments Clause. In those cases, as Plaintiffs note, the courts acknowledged that some of the Library's functions were associated with the executive branch. Pls.' Mot. 28–29. The courts did so, however, for the purpose of determining whether the Librarian was a "Head of Department" as defined by Supreme Court precedent interpreting the Appointments Clause, or otherwise in compliance with the Appointments Clause. *See Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C.

19

Cir. 2012) ("We too hold that the Librarian is a Head of Department. . . ."); *Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25, 43 (D.D.C. 2010) ("[E]ven though the Library is codified under Title II and is a free standing entity that operates independently from the Executive Branch in conducting its daily operations, the Librarian appears to nonetheless qualify as a Head of Department. . . ."); *Eltra Corp. v. Ringer*, 579 F.2d 294, 301 (4th Cir. 1978) (holding that Library is "operating in conformity with the Appointments Clause"). Whether or not courts subsequently determined (long after the enactment of the APA) that the Appointments Clause is implicated with respect to the Library has no bearing on the meaning of the APA or congressional intent in excluding "the Congress" from the APA. *See Green*, 392 F. Supp. 3d at 99 ("[P]laintiffs have pointed to nothing in the text of the APA, its legislative history, or legal precedent that suggests that Congress did not intend to include the Library of Congress when engaging in Executive Branch functions in 'the Congress' that it exempted from the APA's definition of 'agency.'").

Plaintiffs essentially ask the Court to read these Appointments Clause cases as "impliedly overturning" years of established precedent in *Clark*, *Washington Legal Foundation*, and *Ethnic Employees of Library of Congress. See Saad v. S.E.C.*, 980 F.3d 103, 107 (D.C. Cir. 2020). But the D.C. Circuit recently confirmed that it "imposes a substantial burden on a party advocating the abandonment of an established precedent," *Id.* (quoting *United States v. Burwell*, 690 F.3d 500, 515 (D.C. Cir. 2012), particularly where, as here, Plaintiffs effectively ask the Court to "overrule a point of statutory construction" by finding the Library subject to the APA. *Burwell*, 690 F.3d at 504 (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 172–73 (1989)). Indeed, if the D.C. Circuit intended to overturn years of precedent acknowledging the Library's exclusion from the APA, surely it would have grappled with that line of cases in its Appointments Clause

decisions.[6]

Neither the text nor the legislative history of the DMCA identified by Plaintiffs supports a different conclusion. *See* Pls.' Mot. 29–30. Although the DMCA contemplates a "rulemaking," nowhere does § 1201(a) mention the procedural requirements of the APA, or even reference the APA. The only relevant mention of the APA in the legislative history is in an outdated House Report discussing a prior version of the bill, under which the Secretary of Commerce, not the Librarian, would have conducted the rulemaking. *See Williams v. Glickman*, 936 F. Supp. 1, 4 n.5 (D.D.C. 1996) (finding House Report that was "prepared in connection with a prior version" of the statute "not entitled to great weight" because it was not "prepared in connection with the statute at issue"). Even in the report, the drafters only suggest a rulemaking, "consistent with the requirements" of the APA, and make no mention of the application of the application of the APA's requirements to the Library. H.R. Rep. No. 105-551(II) at 37 (1998). This procedural guidance from an old version of the DMCA under which the Secretary of Commerce, who undoubtedly is subject to the APA, was responsible for the rulemaking, has little relevance to determining whether the APA permits suit against the Librarian.

Plaintiffs' reliance on the Federal Register Act ("FRA") to support their textual argument is also misplaced. *See* Pls.' Mot. 30–31. While Plaintiffs argue that "agency" carries the same

---

[6] Plaintiffs also attempt to read limitations into the holding of *Clark* that do not exist. According to Plaintiffs, the D.C. Circuit held in *Clark* that "the Library's routine employment actions are undertaken in its role as a component of Congress and thus not subject to APA review." Pls.' Mot. 30 n.4. But this text appears nowhere in *Clark* and, in fact, the opinion holds broadly that the plaintiff "may not take advantage of [the APA's] broad waiver of sovereign immunity since the Library of Congress is not an 'agency' as defined under the Administrative Procedure Act," with no limitation based on the nature of the action undertaken by the Library. *Clark*, 750 F.2d at 102. Confusingly, Plaintiffs attempt to use *Eltra*, a 1970s-era Fourth Circuit Appointments Clause case that, as discussed above, has no relevance to interpreting the text of the APA, to support their argument that *Clark* is not applicable here, despite the fact that the D.C. Circuit did not once mention *Eltra* or the Appointments Clause in *Clark*.

meaning in both the FRA and the APA, they overlook the fact that Congress chose to define the term differently in each statute, and offer no reason why Congress would have intended courts to read these definitions interchangeably. The FRA defines "agency" as "the President of the United States, or an executive department, independent board, establishment, bureau, agency, institution, commission, or separate office of the administrative branch of the Government of the United States but not the *legislative or judicial branches* of the Government," 44 U.S.C. § 1501 (emphasis added), while the APA defines agency as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include," as relevant here, "*the Congress*," 5 U.S.C § 701(b)(1) (emphasis added). As a threshold matter, it is conceivable that Congress could have intended "*legislative . . . branch[]*" and "*the Congress*" to have different meanings, and Congress did not define "agency" in either statute by reference to the other. No canon of construction supports conflating the definitions of "agency" under these circumstances.

Plaintiffs' invocation of canons of statutory construction, which have little relevance in a circumstance where the D.C. Circuit has already construed the relevant language, is also misguided. As an initial matter, their reliance on a presumption in favor of judicial review (as expressed in cases such as *Mach Mining*, 575 U.S. 480 (2015)) misses the mark by conflating all "judicial review of administrative action," *id.* at 486, with judicial review under the APA. Indeed, as Plaintiffs' own argument, and the D.C. Circuit in *Clark*, acknowledge, the Library is subject to judicial review for *ultra vires* action in particular circumstances where such review is appropriate. *Clark*, 750 F.2d at 102 ("It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority."). In any event, the "presumption favoring

judicial review" is not a presumption that the APA must apply. Indeed, in *Mach Mining*, the primary case upon which Plaintiffs rely, the court recognized that only "limited review" with a "narrow" scope was appropriate under the statutory scheme. *Mach Mining*, 575 U.S. at 489, 495.

Finally, Plaintiffs' constitutional avoidance argument fails for the simple reason that the legislative scheme set forth in the DMCA satisfies all constitutional requirements, as explained *infra* Part IV. Congress has chosen not to include the Library of Congress within the APA, and Plaintiffs have identified no meritorious reason for this Court to set aside binding circuit precedent and other clear indications of congressional intent to conclude otherwise.

## II. Even if the Court Holds the Library of Congress to Be Subject to the APA, the Library Complied with Its Procedural and Substantive Requirements.

Because D.C. Circuit authority establishes that actions of the Librarian, including final rules issued under the DMCA's triennial rulemaking process, are not subject to APA review, the Court may end its analysis without evaluating the merits of Plaintiffs' APA claims. However, even aside from that jurisdictional bar, Plaintiffs' APA challenges lack merit.

### A. The Librarian's Determination that Repair is Likely Noninfringing is Consistent with the Copyright Act and Based on Reasoned Decisionmaking.

The Librarian's determination that individuals seeking to engage in the diagnosis, maintenance, and repair of medical equipment software were adversely affected in their ability to engage in a noninfringing use is consistent with the Copyright Act and amply meets the "minimal standards of rationality" required by the APA. *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997).[7]

_____

[7] Because Plaintiffs argue only that the uses contemplated by the Repair Exemption are not likely to be noninfringing because they are not a fair use of the copyrighted software, the Librarian's adverse effects analysis is not addressed here. *See* Pls.' Mot. 24 (arguing the Repair Exemption is arbitrary and capricious because the Librarian "misconstrued the fair-use doctrine").

The APA requires that an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B). The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id.* The Court's review of the Librarian's noninfringement determination is "narrow," *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377-78 (1989), and the Court should uphold a "decision [of] less than ideal clarity… if the agency's path may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004). The question for this Court is only whether the Librarian's decision was "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983).

In promulgating the Repair Exemption, the Librarian accepted and adopted the Register's Recommendation in full, incorporating the Register's conclusion that diagnosis, maintenance, and repair of medical equipment software "are likely to be noninfringing fair uses." LOC_AR_1785. The "fair use" doctrine is an "equitable rule of reason that "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183, 1196 (2021) (internal

quotations omitted). The Copyright Act "embodies" this court-made doctrine and "indicates, rather

than dictates," how courts should apply it. *Id*. Although the Supreme Court has been clear that the

factors provided in the Copyright Act are "not exhaustive," *id*. at 1197, the statutory factors are:

(1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;"

(2) "the nature of the copyrighted work;"

(3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole;" and

(4) "the effect of the use upon the potential market for or value of the copyrighted work."

17 U.S.C. § 107(1)–(4). With respect to the diagnosis, maintenance, and repair of medical device

software, the Register, as detailed further below, concluded that all of these factors, taken together,

"indicate that the proposed uses are likely to be noninfringing fair uses." LOC_AR_1785. The

Register's conclusion, as adopted by the Librarian, is well reasoned and consistent with binding

precedent, and Plaintiffs' arguments to the contrary are unavailing.

*1*. Considering the first statutory factor, "the purpose and character of the use," the Register

reasoned that the primary purpose of the proposed activities was to "restore a medical device or

system's functionality, not to commercialize the embedded copyrighted software and other

servicing materials," which weighed in favor of fair use. LOC_AR_1782. Noting this purpose, the

Register also concluded that diagnosis, maintenance, and repair were "likely transformative" uses,

as she had previously concluded in other contexts involving the repair of other software-controlled

devices. Section 1201 Rulemaking: Sixth Triennial Rulemaking to Determine Exemptions to the

Prohibition on Circumvention: Recommendation of the Register of Copyrights 234–35 (Oct.

2015), LOC_AR_1059–1060 (finding that some uses of vehicle computer programs were likely to

be transformative because they "facilitate functionalities such as diagnosis, modification and

repair" that "enhance the intended use of [vehicle] computer programs"); Section 1201 Rulemaking: Seventh Triennial Rulemaking to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Acting Register of Copyrights 203 (Oct. 2018), LOC_AR_1434 (recommending exemption for repair of home appliances, computers, and smartphones, and noting that "because the fundamental purpose of repair is to restore the functionality of a device so that it may be used, 'repair supports—rather than displaces—the purpose of the embedded programs').

In evaluating the "purpose and character of the use," the "central" investigation is whether the use "merely supersedes the objects of original creation" or "adds something new, with a further purpose or different character," asking whether the use is "transformative." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). "Transformative use is not absolutely necessary for a finding of fair use," but weighs in favor of a fair use determination. *Id.* A use can be transformative even if it makes "an exact copy of a work . . . so long as the copy serves a different function than the original work." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (holding that use of photographs in a search engine was transformative because the purpose was to create an electronic reference tool, which differed from the purpose of the original photographs).

Here, the Register concluded that use of the copyrighted materials for the purpose of diagnosis, maintenance, and repair of medical equipment was likely transformative because these uses serve an entirely "different function" than the original code. *Id.* Rather than "supersed[ing]" the medical equipment software for the purpose of developing identical medical equipment or rendering the software obsolete, *see Campbell*, 510 U.S. at 579, the Register concluded that copying necessary for diagnosis, maintenance, and repair would serve to "restore a medical device or system's functionality," a purpose that enhanced the use of the embedded software.

26

LOC_AR_1782. The Repair Exemption "seeks to expand the use and usefulness" of the medical equipment, rather than replacing the software that operates such equipment. *Google*, 141 S. Ct. at 1203. Plaintiffs' insistence, then, that ISOs must "alter" the software, something which all parties acknowledge is outside the scope of the Repair Exemption, in order to transform the use of the software, is misplaced. Pls.' Mot. 19.

Plaintiffs essentially argue that the very fact ISOs stand to make a profit from repair of medical equipment is a death knell to a fair use finding, but their argument relies on outdated cases that are not supported by current and binding precedent, a point made in the Recommendation. Plaintiffs read *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) to create a bright line rule that "every commercial use of copyrighted materials" is presumptively infringing. Pls.' Mot. 17. But the Supreme Court has since clarified its meaning in *Sony*, making clear, as the Register noted, that "commerciality is not fatal to a fair use determination" and "there is no hard evidentiary presumption against commercial uses." LOC_AR_1782. In *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), for example, the court acknowledged lower courts' misreading of *Sony* as creating a bright line rule and stated that "if, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listen in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities are generally conducted for profit in this country." *Id.* at 584–85; *see also Sony Computer Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 606 (9th Cir. 2000) (acknowledging that *Campbell* clarified *Sony* and that the Supreme Court has "rejected" a presumption of unfairness stemming from commerciality). More recently, in *Google*, the court stated again that "many common fair uses are indisputably commercial," and that commercial endeavors are "not dispositive of the first factor," particularly, when as here, the

use is likely also transformative. *Google*, 141 S.Ct. at 1204.

Commerciality, like all relevant factors in the fair use analysis, is to be analyzed by a "sensitive balancing of interests," *Campbell*, 510 U.S. at 585, which the Register did here in concluding that repair of medical equipment software is focused on restoring functionality, and not commercializing the software, although ISOs may profit from their repair business. LOC_AR_1782. Thus, while Plaintiffs contend that the Librarian "dismissed" their commerciality point "with virtually no analysis," the Librarian's decision, in fact, was based on the correct treatment of commerciality, as set out in binding precedent.

The two lower-court cases cited by Plaintiffs, *Advanced Computer Services of Michigan v. MAI Systems*, 845 F. Supp. 356 (E.D. Va. 1994) and *Triad Systems v. Southeastern Express*, 64 F.3d 1330 (9th Cir. 1995), do not compel a different conclusion. The opinion in *MAI Systems* was issued a month before the Supreme Court's decision in *Campbell*, and read *Sony* to create a bright line rule against commerciality, which, as discussed above, is incorrect, and did address transformative use. 845 F. Supp. at 365. The court in *Triad Systems* similarly made no mention of *Campbell* and concluded only that repair is "commercial in nature," a fact which no party here disputes. Thus neither case has relevance to this court's analysis of whether the Librarian's grant of the Repair Exemption was arbitrary or capricious.

*2.* Turning to the second fair use factor, "the nature of the copyrighted work," the Register correctly found that it favored fair use because "the computer programs and data embedded in medical devices and systems are not used for their expressive qualities, but rather for their functional and informational aspects that enable users to control and understand the operation of the equipment." LOC_AR_1783. As the Register noted, "some works are closer to the core of intended copyright protection than others." *Id.* (quoting *Campbell*, 510 U.S. at 586). Works "closer

to the core" include fictional short stories, soon-to-be-published memoirs, motion pictures, and other creative works, while works further from the core include factual works, published speeches, news broadcasts, and factual compilations. *Campbell*, 510 U.S. at 586; *see also American Society for Testing and Materials, et al. v. Public.Resource.Org, Inc.*, 896 F.3d 437, 451 (D.C. Cir. 2018) ("All of the works at issue here fall at the factual end of the fact-fiction spectrum, which counsels in favor of finding fair use.").

Here, the Register pointed to several cases finding fair use when computer programs were used for their functional aspects rather than as expressive works. LOC_AR_1783 (citing *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1202, 1208–09 (2021); *Lexmark International, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 536 (6th Cir. 2004); and *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000)). In response, Plaintiffs argue only that the fact that computer programs serve functional purposes "alone does not deprive them of copyright protection." Pls.' Mot. 23. But Plaintiffs' argument misses the point of the second factor. Consideration of the "nature of the copyrighted work" assumes that the work is eligible for copyright and, indeed, the Register clearly agrees that the software at issue is copyrighted. Fair use is a defense to infringement of copyrighted work, and the "nature of the copyrighted work" inquiry is relevant only because "fair use is more difficult to establish" when highly creative works and expressive works are copied. *Campbell*, 510 U.S. at 586.

*3.* With respect to the third fair use factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," the Register found that "the amount used is reasonable relative to the purpose of the use." LOC_AR_1784. The Register also found, as in previous recommendations, that this factor should be given less weight in the repair context "because the use is necessary to accomplish the transformative purposes of diagnosis,

maintenance, and repair." *Id.*; *see also, e.g.* 2015 Recommendation, LOC_AR_1061 ("[C]ourts have been willing to permit extensive copying of the original work where it is necessary to accomplish a transformative purpose."); 2018 Recommendation, LOC_AR_1435 ("[T]he fact that the entirety of the work is used is not dispositive."). Indeed, as the Supreme Court recently explained, "copying a large[] amount of material can fall within the scope of fair use where the material copied . . . is central to a copier's valid purpose." *Google*, 141 S. Ct. at 1205.

Contrary to Plaintiffs' accusation that the Register "acknowledged that ISOs intended to copy the entirety of OEMs' works," Pls.' Mot. 19, the Register specifically recounted ISOs' comments that "[t]he servicing computer programs and data files involved can be but a small portion of the entire software package." LOC_AR_1783 (internal quotation omitted). The Register also noted Plaintiffs' disagreement with the ISOs' position, but rather than concluding that one side was right or wrong in every circumstance, the Register explained that, "even if" accessing device software to perform a repair entailed the use of the entire work "for some equipment," courts have permitted such broad use when necessary. LOC_AR_1783–84; *see, e.g., Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 449–50 (1984) (copying of entire work did not preclude fair use). The Register thus reasonably concluded that the third factor did not militate against fair use.

*4.* Finally, the Register concluded that the fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work," weighed in favor of fair use. The Register determined that "most medical device and system software and data files generally have no independent value separate from being used with the equipment." LOC_AR_1785. And even if some features on certain medical devices were "separately licensed through a subscription service," the Register noted that the "purpose of the proposed uses is not to enable ongoing

unauthorized access to enhanced features, but merely to restore functionality so the equipment performs as intended." *Id.* The Register also determined that, "[e]ven where the software could be installed on another 'standalone' computer, there is no indication that the software serves any function, or has any value, except for use with the medical device or system for which it was designed." *Id.* Taking all of this into account, the Register found that "diagnosis, maintenance, and repair of medical devices and systems is unlikely to harm the market for the embedded software and this factor favors fair use." *Id.*

In considering the fourth factor, the "relevant question" is whether the infringement impact[s] the market for the copyrighted work itself," here, the embedded software for medical equipment. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004); *see also Campbell*, 510 U.S. at 590 (considering whether use of copyrighted materials "would result in a substantially adverse impact of the potential market for the *original*") (emphasis added). As the Register concluded, "most medical device and system software and data filed generally have no independent value separate from being used with the equipment," LOC_AR_1785, and use of the software for diagnosis, maintenance, and repair of a medical device would not impair the market the original work—the embedded software. Plaintiffs' focus on the market for *repair* of the underlying software is thus misplaced, because the market at issue here is the market for the software itself, a market that there is no indication that potential users of the exemption—ISOs and medical facilities—seek to enter. Pls.' Mot. 21; *see also Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004) (holding that district court focused "on the wrong market" and noting that alternate markets are "not the sort of market or value that copyright law protects"). Moreover, Plaintiffs' reliance on *Advanced Computer Services* for the proposition that commercial use of copyrighted material presumptively has adverse market impacts is misplaced,

as the Supreme Court has clarified that such presumption, if it exists at all, is limited to circumstances when a "commercial use amounts to mere duplication of the entirety of an original," serving as a "market replacement for it." *Campbell*, 510 U.S. at 591.

Plaintiffs also raise a host of unsubstantiated concerns about patient safety, device reliability, and cybersecurity risks that they suggest will diminish the market value for their medical equipment. The Register requested the FDA's position on these concerns during the rulemaking process, and the FDA's response directly controverts Plaintiffs' concerns. LOC_AR_6168. For example, Plaintiffs say that "the ISOs' circumvention of TPMs to carry out certain repairs creates unnecessary technical vulnerabilities that put patient safety in jeopardy." Pls.' Mot. 21. But the FDA concluded that ISOs "provide high quality, safe, and effective medical device servicing," and that "the evidence did not justify imposing additional regulatory requirements on ISOs." LOC_AR_6162. Plaintiffs similarly argue that the Repair Exemption will result in "cybersecurity attacks" that will decrease the value of their software. The FDA not only disagreed with Plaintiffs' conclusion, but it instead noted that ISOs may help prevent cybersecurity attacks because they are "well positioned to help identify and address security vulnerabilities." LOC_AR_6162. Thus, the FDA determined that "ISOs may play an important role in maintaining the overall quality, safety, and efficacy of medical devices." *Id*. The FDA's input in the rulemaking process not only shows that Plaintiffs' theories are substantively incorrect, but the Register's involvement of the FDA and reliance on the FDA's conclusions surely indicate that the Recommendation adopted by the Libraraian properly considered Plaintiffs' concerns and did not reach an arbitrary or capricious conclusion. *See* LOC_AR_1802 (discussing FDA's input).

The FDA also noted that "the continued availability of ISOs to service and repair medical devices is critical to the functioning of the healthcare system in the United States."

LOC_AR_6162. The Register similarly acknowledged the importance of how TPMs adversely affect ISOs that have sought to repair medical devices for facilities that have been "unable to use equipment due to inadequate repair options, particularly during the COVID-19 pandemic." LOC_AR_1797–1798. It is well established that courts also take into account "the public benefits the copying will likely produce," in addressing the fourth fair-use factor. *Google*, 141 S.Ct. at 1203; *see also Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992) ("We further note that we are free to consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially."). Because the ISOs' use of the embedded software for diagnosis, maintenance, and repair "serves a public interest" in supporting the healthcare system, the public benefit further supports the Register's conclusions with respect to effects on the market value of the original software.

Finally, Plaintiffs posit that the Repair Exemption will have a "significant chilling effect on further innovations, including derivative works." Pls.' Mot. 21. While it is true that the fourth factor requires courts to "take account . . . of harm to the market for derivative works," diagnosis, maintenance, and repair of medical device software does not create a derivative of such software and thus cannot conceivably chill further innovation by competing with the market for derivative works. *Campbell*, 510 U.S. at 590.

In opposing the Repair Exemption, Plaintiffs essentially "attempt to monopolize the market," which "runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine." *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523–24 (9th Cir. 1992). Because the Librarian's determination, based on the Register's Recommendation, that diagnosis, maintenance, and repair of medical equipment software was likely noninfringing is consistent with the fair use

doctrine and supported by the record, Plaintiffs' substantive APA challenge should be rejected.

**B.      The Librarian Responded to All Significant Comments by Adopting the Register's Recommendation.**

In addition to challenging the substance of the Librarian's determination, Plaintiffs bring a procedural challenge based on the Librarian's purported failure to respond to significant comments. This argument is meritless. An agency's "obligation to respond to comments related to proposed rulemaking is not particularly demanding." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441-42 (D.C. Cir. 2012) (internal formatting omitted) (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)). The "agency's response to public comments need only 'enable [the court] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Public Citizen*, 988 F.2d at 197. The agency need not respond to every comment, but need only respond "in a reasoned manner to those that raise significant problems." *City of Waukesha v. E.P.A.*, 320 F.3d 228, 257-58 (D.C. Cir. 2003) (citations omitted). "[T]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996) (citation and internal quotation marks omitted). Plaintiffs fail to demonstrate anything of the sort.

Plaintiffs first argue that the Librarian, in adopting the Register's Recommendation, failed to respond to Plaintiffs' comments that a categorical fair-use determination was inappropriate and that she improperly grouped medical equipment with consumer equipment. Pls.' Mot. 25–26. The Register, however, clearly laid out the legal standard for determining a class, noting that Congress directed the classes not to be drawn too "narrowly." LOC_AR_1582 (quoting Staff of H. Comm. On The Judiciary, 105th Cong., Section-By-Section Analysis of H.R. 2281 As Passed By the United States House of Representatives on August 4, 1998, at 7 (Comm. Print 1998)). Relying on

the Congressional Record, the Register explained that "while the category of 'motion pictures and other audiovisual works," for example, "may appropriately be subdivided . . . into classes such as 'motion pictures,' or 'television programs,' it would be inappropriate 'to subdivide overly narrowly into particular genres of motion pictures, such as Westerns, comedies, or live action dramas." *Id.* (internal quotation omitted). The Register thus ventilated the concerns raised by Plaintiffs, but chose not to credit them. And while Plaintiffs baldly assert that the Librarian "adopted the [Repair] Exemption after inexplicably grouping complex and sensitive medical devices with cell phones and game consoles," she actually credited the Register's determination that proposals for repair of medical devices and systems "should be evaluated separately," and evaluated them as such. LOC_AR_1772. The Recommendation specifically agreed that most medical devices are "not 'consumer devices'" and noted specific concerns relevant to medical equipment, which even led to the separate involvement of the FDA. *Id.*

Next, Plaintiffs argue that the Librarian did not consider their comments highlighting the ISOs' for-profit interests in OEM's copyrighted material and Plaintiffs' conclusions about whether ISOs would be engaging in a transformative use. Pls.' Mot. 26. As explained in further detail, *supra* Part I.B.i., the Recommendation not only considered Plaintiffs' comments about commerciality, but explicitly rejected them by citation to binding Supreme Court precedent. LOC_AR_1782 (quoting *Campbell v. Acuff-Rose*, 510 U.S. 569, 584–85 (1994) (internal quotations omitted)) ("Commerciality is not fatal to a fair use determination; the Supreme Court has clarified that there is no 'hard evidentiary presumption' against commercial uses. . . ."). "This is all that the APA requires." *City of Waukesha*, 320 F.3d at 258 (finding response to comments adequate when agency "cited support" for its position). The Librarian considered transformative use in the context of diagnosis, maintenance, and repair, crediting the Register's determination that

35

those engaged in medical device repair used copyrighted material for a different and transformative purpose than OEMs intended, *i.e.,* to "restore a medical device or system's functionality." LOC_AR_1782. That Plaintiffs rely on a different understanding of "transformative use" does not undercut the Register's understanding and discussion of the issue.

Third, Plaintiffs suggest that the Librarian did not consider their comments that the ISOs' proposed uses did not serve a nonprofit purpose. Pls.' Mot. 26. The Recommendation specifically addressed these concerns, however, in the analysis of the section 1201 statutory factors, summarizing Plaintiffs' argument and responding that some ISO repair services may very well serve a nonprofit purpose by "arguably preserv[ing] the availability for use" of medical equipment no longer supported by OEMs. LOC_AR_1799. In any event, the Register concluded that "these factors [were] not especially relevant to the determination." LOC_AR_1800. Contrary to Plaintiffs' argument, the statute does not require the Librarian to conclude that every statutory factor favors an exemption—it requires only that the Librarian "examine" the factors, and allows the Librarian to consider any "other factors" she "considers appropriate." 17 U.S.C. § 1201(a)(1)(C).

Fourth, Plaintiffs argue that the Librarian did not respond to their argument that exposing copyrighted materials to ISOs would diminish the value of the materials and damage the overall market, "thwarting future innovation." Pls.' Mot. 26. The Recommendation explained, however, that the software had no independent value "except for use with the medical device or system for which it was designed," so access to the materials would not impact the market for medical equipment. LOC_AR_1785. Moreover, the Register concluded that "if a user were to reproduce and retain additional copies of any copyrighted materials for use with other devices, or enable permanent access to subscription-only services, those activities would remain prohibited because

they fall outside the scope of the proposed exemption," meaning that OEMs would still have recourse under section 1201, as well as potentially for copyright infringement, to protect against such misuse. *Id.*

Finally, Plaintiffs repeat their argument that the Repair Exemption will decrease the value of their products by harming patients and creating cybersecurity risks, claiming that the Librarian ignored these concerns. Pls.' Mot. 27. But not only did the Register explicitly address these concerns, LOC_AR_1802, she proactively reached out to the FDA for further information about them. LOC_AR_6168. The FDA then roundly rejected Plaintiffs' suppositions about supposed safety risks. LOC_AR_6160–6163.

Because the Librarian "considered the 'relevant factors'" in deciding to grant the Repair Exemption, Plaintiffs' procedural APA challenge lacks merit. *Am. Iron & Steel Institute v. EPA,* 115 F.3d 979, 1005 (D.C. Cir. 1997).

## III.    The Librarian Did Not Violate, Nor Have Plaintiffs Properly Alleged a Violation of, a Specific Prohibition in the DMCA that Is Clear and Mandatory.

Unable to evade Congress' exclusion of the Library of Congress from the APA, Plaintiffs seek to invalidate the Repair Exemption by reference to the limited historical waiver of sovereign immunity for *ultra vires* action, or action taken in excess of statutory authority, as recognized in cases such as *Larson v. Domestic & Foreign Commerce Corporation,* 337 U.S. 682 (1949). Pls.' Mot. 37–39. Although this exception to sovereign immunity exists against the Librarian in certain cases that meet the high bar for *ultra vires* claims, Plaintiffs fail to establish that this is the rare instance in which this Court "should . . . invoke[] its equity jurisdiction." *Am. Road & Transp. Builders Ass'n v. E.P.A.,* No. 12-5244, 2013 WL 599474.

*Ultra vires* claims are only permitted in the absence of "express" statutory preclusion of review, when there is no "alternative procedure" available for judicial review, and the agency or

official "plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Id.* At the threshold, Plaintiffs cannot show that the Librarian's determination that repair-related uses are likely noninfringing violates a "specific prohibition in the statute that is clear and mandatory" because the analysis required by the Librarian is inherently fact-specific and predictive. *Id.* And even if Plaintiffs overcame this initial hurdle, the Librarian's determination that reproduction of copyrighted medical device software for the purposes of diagnosis, maintenance, and repair was likely a fair use does not contain the "kind of extreme error" required to undergird an *ultra vires* claim. *Id.*; *see also Doehla Greeting Cards v. Summerfield*, 227 F.2d 44 (D.C. Cir. 1955) ("Erroneous action taken in the exercise of an admittedly validly delegated power is 'inescapably the action of the United States and the effort to enjoin it must fail as an effort to enjoin the United States.'").

*Ultra vires* claims are not available when, as here, Plaintiffs simply wish that the Librarian exercised her discretion differently, or think she reached the wrong conclusion in a fact-specific determination. *See id.* Rather, they require argument that the decision maker violated a "clear statutory command," *DCH Regional Medical Center v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019), sometimes framed as a "nondiscretionary" requirement, *North American Butterfly Association v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020). Here, Plaintiffs suggest that the Librarian violated 17 U.S.C. § 1201(a)(1)(C), which provides that the Librarian "shall make the determination in a rulemaking proceeding . . . of whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the [anti-circumvention prohibition] in their ability to make noninfringing uses under this title of a particular class of copyrighted works." *See* Pls.' Mot. 38. Plaintiffs do not argue that the Librarian completely abdicated her responsibility by failing to make the required determination or by making a different determination than the one

required by statute. Instead, they assert that the Librarian substantively erred in one aspect of the statutorily required determination by concluding that proposed uses of the copyrighted software for diagnosis, maintenance, and repair of that software are likely to be "noninfringing" fair uses. *Id*. But whether or not the fair use doctrine actually applies as a defense to any suit for copyright infringement is a highly fact-specific determination, and the statute vests substantial discretion to the Librarian in granting exemptions under the DMCA. *See Society for Testing and Materials, et al. v. Public.Resource.Org, Inc.*, 896 F.3d 437, 448 (D.C. Cir. 2018) ("Each case raising a fair use defense must be decided on its own facts."). Thus, the Librarian's determination is limited to an analysis of whether a category of uses is "likely" noninfringing. LOC_AR_9256 (interpreting statute as requiring exemption proponents to demonstrate "that uses affected by the prohibition on circumvention are or are likely to be noninfringing"). Though the Librarian is clearly required to make this determination as a part of the rulemaking, the statute does not provide a "clear statutory command" or "nondiscretionary" requirement that the Librarian come to the same conclusion as Plaintiffs on the fact-specific and predictive question of whether the fair use doctrine is likely to apply.

The D.C. Circuit has recently rejected two attempts, such as the one here, to create an *ultra vires* claim by challenging a purported error in executing the overall statutory command. In *North American Butterfly Association v. Wolf*, the court considered whether the Secretary of Homeland Security complied with a "nondiscretionary consultation requirement" before exercising statutory authority to waive certain environmental analyses. 977 F.3d at 1262. Rejecting the plaintiffs' argument that the Secretary was required to engage in a different level of stakeholder engagement than he had, the court held that "in casting [the Secretary's] consultation as too narrow," the plaintiffs had failed to show that the "scope" of the consultation "violated a specific prohibition in

the statute that is clear and mandatory, was obviously beyond the terms of the statute, or was far outside the scope of the task that Congress gave it." *Id.* 1262–63. Likewise, here, there is no dispute that the Librarian made the required statutory determination for an exemption to the anti-circumvention prohibition. Plaintiffs simply disagree with the Librarian's analysis, like the *American Butterfly* plaintiffs' disagreement with the scope of the Secretary's consultation, which does not give rise to a violation of a clear statutory command.

The court in *DCH Regional Medical Center v. Azar* reached a similar conclusion. 925 F.3d at 509. In addressing whether the Secretary of Health and Human Services chose "appropriate data" to calculate a particular statutory payment, it rejected the plaintiffs' attempt to challenge which data the Secretary considered. *Id.* The court found that plaintiffs "at most" suggested that the Secretary's treatment of data was "arbitrary and capricious," but that its objection was "worlds apart from the obvious violation of the clear statutory command" required for *ultra vires* claims. *Id.* at 509–10. In the same way, here, Plaintiffs' challenge to the Librarian's exercise of her statutorily-delegated authority does not give rise to an *ultra vires* claim. The Librarian made the statutorily-required determination, published the rule as required, and Plaintiffs cannot evade the Librarian's exclusion from APA review by relabeling a claim for arbitrary or capricious decisionmaking as an *ultra vires* violation.

Even if the Court disagrees, however, with the premise that Plaintiffs have not identified a "clear statutory command" as required for an *ultra vires* claim, the Librarian's determination of likely noninfringement was hardly a "patent violation of agency authority," for the same reasons it is not arbitrary and capricious, *see supra*, Part I.B.i, which independently defeats Plaintiffs' claim. *See Independent Cosmetic Mfrs and Distributors, Inc. v. U.S. Department of Health Education and Welfare*, 574 F.2d 553 (D.C. Cir. 1978).

## IV.   The DMCA Rulemaking Scheme Does Not Violate the Constitutional Separation of Powers.

Plaintiffs' final claim is that the rulemaking provisions of the DMCA violate the constitutional separation of powers because the statute places an executive function in the hands of an agent of Congress. Pls.' Mot. 32–35. This argument fails to state a claim because the Librarian is appointed by the President in accord with the Appointments Clause, and there is therefore no concern that she has somehow exercised Executive authority outside the control of the Executive Branch.

The Constitution does place some constraints on Congress's design of regulatory institutions. Congress may exercise legislative authority itself only through the procedures outlined in Article I, section 7 of the Constitution: passage by both Houses of Congress and presentment to the President. U.S. Const. art. I, § 7; *see, e.g.*, *INS v. Chadha*, 462 U.S. 919, 951 (1983). In addition, Congress may not vest executive powers in an officer answerable only to Congress. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 726 (1986).

Plaintiffs' Complaint and Motion for Summary Judgment assume that these constraints must have been violated in this case because either the Library is an "agency" under the APA or it is a body of Congress exercising Executive authority. But this is a false dichotomy. The D.C. Circuit may interpret the statutory language of the APA to exclude the Library of Congress from its ambit without simultaneously deciding that it has no authority to engage in rulemaking. That is due, in large part, to the unique character of the Library itself. Although the Librarian of Congress assists the Legislative Branch in many ways, the Librarian is in fact appointed by the President with the advice and consent of the Senate, 2 U.S.C. § 136, and the Register of Copyrights is in turn appointed by the Librarian of Congress, 17 U.S.C. § 701(a).

This is not the first time that someone has challenged the Library's authority to engage in

functions that may be considered Executive in nature. In *Eltra*, the Fourth Circuit rejected a separation-of-powers challenge against the Copyright Office's authority to perform the administrative function of registering copyrights. 579 F.2d at 301. The *Eltra* court noted that the Librarian is appointed by the President, and the Register is appointed by the Librarian. *Id.* at 300. Ultimately, the *Eltra* court concluded, for purposes of the Appointments Clause, that the Librarian was an "Officer[] of the United States," U.S. Const. art. II, § 2, cl. 2, and the Register of Copyrights was a "inferior Officer[]," *id. Eltra*, 579 F.2d at 300; *see also Intercollegiate Broadcasting*, 684 F.3d at 416–17. The Librarian was appointed by the President, and the Register by the Librarian, so the organization of the Copyright Office did not trigger the same concerns as the commission in *Buckley v. Valeo*, 424 U.S. 1 (1976), some of whose members were appointed by Congress. *Eltra*, 579 F.2d at 300. The *Eltra* court observed that the Librarian performed certain functions that assist Congress, such as obtaining information relevant to the legislative process, but it concluded that those functions did not make the Librarian a purely legislative officer any more than the Librarian's assistance to the judiciary made him a judicial officer. *Id.* at 301; *see also Intercollegiate Broadcasting*, 684 F.3d at 416 (acknowledging that the Library of Congress "performs a range of different functions, including some, such as the Congressional Research Service, that are exercised primarily for legislative purposes"). Moreover, the *Eltra* court observed, "The Supreme Court has properly assumed over the decades since 1909 that the Copyright Office is an executive office, operating under the direction of an Officer of the United States . . . ." *Id.* at 301. The Copyright Act's constitutionality, the court observed, "has been generally assumed, including the power of the Register to issue rules and regulations." *Id.* at 299.

Plaintiffs do not provide any basis to understand why the actions of the Librarian here would be any more constitutionally suspect. The section 1201 rulemaking scheme is wholly unlike

the schemes that courts have held invalid based on separation of powers in the past. Such schemes involved direct participation by Congress or members of Congress in the exercise of executive or administrative powers or the appointment or removal of officers who perform administrative functions. *See, e.g.*, *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276–77 (1991) (invalidating a scheme that created a review board partly composed of members of Congress); *Bowsher*, 478 U.S. at 733–34 (invalidating investment of executive powers in an officer removable by Congress); *Buckley v. Valeo*, 424 U.S. 1, 140–41 (1976) (per curiam) (holding that Congress could not vest administrative powers in a commission whose members were not appointed pursuant to the Appointments Clause, U.S. Const. art. II, § 2, cl. 2). The section 1201 rulemaking scheme does not raise these concerns, because members of Congress do not participate in the rulemaking, and the Librarian of Congress and the Register of Copyrights are subject to the control of the Chief Executive in carrying out these responsibilities.

The fact that the D.C. Circuit has interpreted the APA not to include the Library of Congress, *see supra* Part I, has no bearing on the constitutional question. The classification made by the APA instead reflects Congress's decision to exclude certain government authorities from the scope of a particular statute. Congress could of course change this decision at any time by amending the APA; in fact, Congress took just such a step when it enacted the 1976 amendments to the Copyright Act, making the provisions of the APA applicable to certain actions by the Register of Copyrights, though not to actions of the Librarian of Congress. See Pub. L. No. 94-553, § 701(d), 90 Stat. 2541, 2591 (1976) (codified as amended at 17 U.S.C. § 701(e)).

Thus, because the Librarian and the Register are subject to the control of the Chief Executive in carrying out their functions, and neither Congress nor its members exercise any direct control over the DMCA rulemaking process, Plaintiffs fail to state a claim based on the separation

of powers.

## V.   If the Court Awards Summary Judgment to Plaintiffs, Vacatur of the Entire Exemption Would Be Inappropriate.

It is well established that, if a Court invalidates an agency action under the APA, the remedy is vacatur. *See, e.g., Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1111 (D.C. Cir. 2014). However, any vacatur should be limited to the Repair Exemption specifically. "[N]othing in the text of the APA suggests that a court *has* to proceed to invalidate the *entire* rule on the basis of the unlawfulness of any of its parts." *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. NLRB*, No. 20-cv-0675, 2020 WL 3041384, at *20 (D.D.C. June 7, 2020), *order amended on other grounds upon reconsideration*, No. 20-cv-0675, 2020 WL 3605656 (D.D.C. July 1, 2020). To the contrary, the APA specifically authorizes a reviewing court to vacate "the whole *or a part* of an agency rule." 5 U.S.C. § 551(13) (emphasis added). That being so, the severability analysis that courts routinely apply to federal statutes "is not warranted in a case such as this one—*i.e.*, where the plaintiff specifically challenges only certain parts of a regulation on the grounds that the defendant has violated the APA's procedural requirements." *Id.* at *19. "[T]he most prudent course of action is for the Court to . . . set[] aside those parts of the rule that cannot be maintained due to the established APA violation." *Id.* at *21; *see also Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 79 (D.D.C. 2010) (ordering partial vacatur of an agency's arbitrary and capricious action).

This approach comports with the well-established principle that "a plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Plaintiffs here purport only to be injured by the Repair Exemption, not the thirteen other new classes of exemptions, including two other separate repair-related exemptions for vehicles and software-enabled consumer devices, adopted by the Librarian, nor the twelve classes of renewed exemptions. This alleged injury can be fully redressed by a judicial order setting aside

the Repair Exemption; therefore, any vacatur should be limited to that specific exemption, which would fully redress Plaintiffs' alleged injuries.

If the Court engages in a severability analysis, it should find that the Repair Exemption is severable from the rest of the Exemption. A portion of a rule is severable if (1) "the agency would have adopted the same disposition regarding the unchallenged portion of the regulation if the challenged portion were subtracted"; and (2) the unchallenged portion can "function sensibly without the stricken provision." *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (quotations and alterations omitted).

There is little, if any, doubt that the Librarian would have adopted the unchallenged provisions of the rule without the Repair Exemption, as she considered the comments for each class of exemptions separately, and analyzed them as such. And because each class of exemptions operates entirely independently from the other classes, the rule could continue to "function sensibly" even without the Repair Exemption. *Id.* Therefore, even if the Court grants Plaintiffs' motion for summary judgment and decides that vacatur is the appropriate remedy, it should not vacate portions of the rule that Plaintiffs have not challenged or lack standing to challenge. *See United Food and Commercial Workers Union, Local No. 663 v. U.S.D.A.*, 532 F. Supp. 3d 741, 777–78 (D. Mn. 2021).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied, and the Librarian's motion to dismiss or, in the alternative, motion for summary judgment should be granted. If the Court awards summary judgment to Plaintiffs, however, it should vacate and remand the Repair Exemption to the Librarian, without vacating and remanding the entire rule.

Dated: May 24, 2022                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       ERIC WOMACK
                                       Assistant Branch Director

                                        */s/ Rachael L. Westmoreland*
                                       RACHAEL L. WESTMORELAND
                                       Trial Attorney (GA Bar No. 539498)
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, NW
                                       Washington, DC 20001
                                       Tel: (202) 514-1280
                                       E-mail: rachael.westmoreland@usdoj.gov