**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MEDICAL IMAGING & TECHNOLOGY ALLIANCE, et al., *Plaintiffs*, *v.* LIBRARY OF CONGRESS, et al., *Defendants*. | No. 1:22-cv-499 (BAH) |

**PLAINTIFF'S CONSOLIDATED REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
THE GOVERNMENT'S MOTION TO DISMISS**

Peter Tolsdorf
   NATIONAL ELECTRICAL
      MANUFACTURERS ASSOCIATION
   1300 17th Street North, No. 900
   Arlington, VA 22209
   (703) 841-3200

*Counsel for Medical Imaging &
Technology Alliance*

Terry Chang
   ADVANCED MEDICAL
      TECHNOLOGY ASSOCIATION
   701 Pennsylvania Avenue NW, Ste. 800
   Washington, DC 20004
   (202) 783-8700

*Counsel for Advanced Medical
Technology Association*

Michael B. Kimberly (No. 991549)
Alex C. Boota (*pro hac vice*)
   MCDERMOTT WILL & EMERY LLP
   500 North Capitol Street NW
   Washington, DC 20001
   (202) 756-8000
   mkimberly@mwe.com

*Counsel for Plaintiffs*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................... ii

Glossary ................................................................................................................... vi

Introduction.................................................................................................................1

Argument ....................................................................................................................2

    A.    The Library is a hybrid body that was exercising executive authority and thus acting in its role as an executive "agency" under the APA ............................................. 2

    B.    The government's cases do not support a different result ............................................... 8

    C.    The Exemption is not for a "fair use" and thus violates the DMCA ............................. 9

        1.    The uses covered by the Exemption are not transformative ................................. 10

        2.    The uses covered by the Exemption harm the market for and value of the copyrighted works .................................................................................................. 14

    D.    The Exemption was adopted without observance of required procedures .................. 17

    E.    Alternatively, the Exemption should be vacated as an exercise of authority in excess of delegated power and as a violation of the Constitution................................. 20

        1.    The Library arrogated to itself powers not granted by Congress.......................... 21

        2.    If the Library is a component of "the Congress" for purposes of its triennial DMCA rulemakings, its actions are constitutionally ultra vires ........... 23

    F.    The Court should vacate 37 C.F.R. § 201.40(b)(15).................................................... 23

Conclusion .................................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner,*
   387 U.S. 136 (1967) ........................................................................................................6

*\*Advanced Computer Services of Michigan v. MAI Systems,*
   845 F. Supp 356 (E.D. Va. 1994).  ...............................................................................14

*Aid Association for Lutherans v. U.S. Postal Service,*
   321 F.3d 1166 (D.C. Cir. 2003) ....................................................................................20

*American Clinical Laboratory Association v. Azar,*
   931 F.3d 1195 (D.C. Cir. 2019) ....................................................................................23

*American Road & Transportation Builders Association v. EPA,*
   2013 WL 599474 (D.C. Cir. 2013) ................................................................................20

*Authors Guild v. Google,*
   804 F.3d 202 (2d Cir. 2015) ..........................................................................................17

*Bowen v. Michigan Academy of Family Physicians,*
   476 U.S. 667 (1986) ........................................................................................................5

*Burlington Truck Lines, Inc. v. United States,*
   371 U.S. 156 (1962) ......................................................................................................12

*\*Campbell v. Acuff-Rose Music,*
   510 U.S. 569 (1994) ........................................................................................12, 13, 14

*Carlson v. Postal Regulatory Commission,*
   938 F.3d 337 (D.C. Cir. 2019) ......................................................................................24

*Citizens to Preserve Overton Park v. Volpe,*
   401 U.S. 402 (1971) ......................................................................................................17

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ...................................................................................................3, 25

*\*Clark v. Library of Congress,*
   750 F.2d 89 (D.C. Cir. 1984) ................................................................................. *passim*

*Collins v. Yellen,*
   141 S. Ct. 1761 (2021) ..................................................................................................23

*Crowell v. Benson,*
   285 U.S. 22 (1932) ..........................................................................................................6

*DCH Regional Medical Center v. Azar,*
   925 F.3d 503 (D.C. Cir. 2019) ................................................................................22, 23

*Doehla Greeting Cards v. Summerfield,*
   227 F.2d 44 (D.C. Cir. 1955) ........................................................................................21

*Eltra Corp. v. Ringer,*
   579 F.2d 294 (4th Cir. 1978) ..........................................................................................3

**Cases—continued**

*Ethnic Employees of Library of Congress v. Boorstin*,
   751 F.2d 1405 (D.C. Cir. 1985) ................................................................8

*In re Fidelity Mortgage Investors*,
   690 F.2d 35 (2d Cir. 1982) ......................................................................4

*Fox Television Stations, Inc. v. FCC*,
   280 F.3d 1027 (D.C. Cir. 2002) ............................................................20

*Free Enterprise Fund v. PCAOB*,
   561 U.S. 477 (2010) ................................................................................3

*Google LLC v. Oracle America*,
   141 S. Ct. 1183 (2021) ..........................................................11, 13, 16

*Green v. Department of Justice*,
   392 F. Supp. 3d 68 (D.D.C. 2019) (Sullivan, J.) ....................................9

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
   471 U.S. 539 (1985) ..............................................................................14

*HBO v. FCC*,
   567 F.2d 9 (D.C. Cir. 1977) ..................................................................20

*Independent Producers Group v. Library of Congress*,
   759 F.3d 100 (D.C. Cir. 2014) ................................................................9

*INS v. St. Cyr*,
   533 U.S. 289 (2001) ................................................................................6

*Intercollegiate Broadcasting System v. Copyright Royalty Board*,
   684 F.3d 1332 (D.C. Cir. 2012) ..........................................................2, 3

*Judicial Watch, Inc. v. Schiff*,
   474 F. Supp. 3d 305 (D.D.C. 2020) ......................................................21

*Kissinger v. Reporters Committee*,
   445 U.S. 136 (1979) ................................................................................9

*Larson v. Domestic & Foreign Commerce Corporation*,
   337 U.S. 682 (1949) ............................................................20, 21, 23, 24

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ............................................................20, 21, 22, 23

*Live365, Inc. v. Copyright Royalty Board*,
   698 F. Supp. 2d 25 (D.D.C. 2010) ......................................................2, 3

*Mach Mining, LLC v. EEOC*,
   575 U.S. 480 (2015) ................................................................................5

*Make the Road New York v. Wolf*,
   962 F.3d 612 (D.C. Cir. 2020) ................................................................6

**Cases—continued**

*Maynard v. Architect of the Capitol,*
  544 F. Supp. 3d 64 (D.D.C. 2021) ...................................................................8

*\*Metropolitan Washington Airports Authority v. Citizens for Abatement of
  Aircraft Noise, Inc.,*
  501 U.S. 252 (1991) ......................................................................................6

*Mistretta v. United States,*
  488 U.S. 361 (1989) ....................................................................................23

*Nielsen v. Preap,*
  139 S. Ct. 954 (2019) ....................................................................................6

*North American Butterfly Association v. Wolf,*
  977 F.3d 1244 (D.C. Cir. 2020) ..............................................................21, 22

*Northeastern Maryland Waste Disposal Authority v. EPA,*
  358 F.3d 936 (D.C. Cir. 2004) ...................................................................19

*Nyunt v. Chairman, Broadcasting Board of Governors,*
  589 F.3d 445 (D.C. Cir. 2009) ...................................................................20

*Perez v. Mortgage Bankers Association,*
  575 U.S. 92 (2015) ......................................................................................17

*Perfect 10 v. Amazon.com,*
  508 F.3d 1146 (9th Cir. 2007) ....................................................................12

*Pond Constructors, Inc. v. U.S. Government Accountability Office,*
  2018 WL 3528309 (D.D.C. 2018) ..................................................................8

*PPG Industries, Inc. v. United States,*
  52 F.3d 363 (D.C. Cir. 1995) ........................................................................9

*Texas Alliance for Home Care Services v. Sebelius,*
  681 F.3d 402 (D.C. Cir. 2012) ......................................................................6

*\*Triad Systems v. Southeastern Express,*
  64 F.3d 1330 (9th Cir. 1995) .............................................................. *passim*

*Washington Legal Foundation v. U.S.S.C.,*
  17 F.3d 1446 (D.C. Cir. 1994) ..............................................................4, 8, 25

**Statutes, rules and regulations**

U.S. Const. Art. I, § 1 ....................................................................1, 7, 23

2 U.S.C.
  § 1...............................................................................................................7
  § 7...............................................................................................................7

**Statutes, rules and regulations—continued**

5 U.S.C.

§ 551(1)............................................................................4, 7, 8, 20, 23

§ 551(13)...........................................................................................24

§ 553(b)..............................................................................................4

§ 702.................................................................................................19

§ 706(2).......................................................................................10, 17

17 U.S.C.

§ 107.................................................................................................18

§ 107(1).............................................................................................10

§ 107(3).............................................................................................14

§ 107(4).............................................................................................14

§ 701(e)..............................................................................................5

§ 1201(a)(1)(C)..............................................................................10, 21

44 U.S.C. § 1501...............................................................................4, 5

37 C.F.R. § 201.40(b)(15).............................................................23, 24

**Other authorities**

Letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, FDA,
   to Gail M. Rodriguez Ph.D., Executive Director, MITA (Jan. 30, 2014)...............................16

**GLOSSARY**

APA:  Administrative Procedure Act

DMCA:  Digital Millennium Copyright Act

FDA:  Food and Drug Administration

ISO:  independent service operator

OEM:  original equipment manufacturer

TPM:  technological protective measure

## INTRODUCTION

We demonstrated in the opening brief that the Library of Congress violated the APA in two respects when it adopted an exemption granting a waiver from DMCA liability for the circumvention of TPMs that protect copyrighted software used for servicing and repairing medical devices (the Exemption). Most obviously, the proposed uses of the copied materials and software are not fair use. Because fulsome copyright protection would not stifle any transformative creations in this context, and because the Exemption merely props up the commercial interests of freeriding competitors of the copyright holders, the uses covered by the Exemption are plainly infringing. Beyond that, the Library failed to address several, significant comments, all of which called the validity of the Exemption seriously into question. Grounds for vacatur under the APA are rarely as firm and clear-cut as these.

As anticipated, the government's principal response is not to defend the Exemption on its merits, but instead to contend that the Library is not an "agency" within the meaning of the APA, and therefore that the Court lacks power to do anything about the Library's glaring errors. That position is not defensible. It depends on the implausible notions that the word "Congress" appearing in the APA has an entirely different meaning from the word "Congress" appearing in Article I, section 1 of the Constitution, and also from the words "legislative branch" appearing in the Federal Register Act. The government cannot account for how or why that would make any sense—because it does not. The Library is a hybrid agency that at times exercises traditional executive rulemaking authority; when it does so, it assumes the status of an "agency" (and is not a part of "the Congress") within the meaning of the APA. Any other conclusion offends the canons in favor of judicial review and against constitutional dilemmas.

On the merits, the government has no persuasive defense of the Exemption. And that would be true even if the Court concluded that the APA does not apply. As we showed in the opening brief, the Librarian, in adopting the Exemption, arrogated to herself policymaking authority that

she does not have. The Library also exercised quintessentially executive power, which would violate separation of powers principles if the Court finds that it is part of the Congress. No matter how the Court slices it, the Exemption is unlawful and must be invalidated.

## ARGUMENT

### A.    The Library is a hybrid body that was exercising executive authority and thus acting in its role as an executive "agency" under the APA

On the question whether the Library of Congress is an "agency" within the meaning of the APA when it engages in DMCA rulemakings, the parties' dispute boils down to whether the Library can assume the status of an "agency" in some circumstances while shedding it in others, so that some of its actions are subject to APA review and others are not. Without ever saying so expressly, the government answers with a *no*. In its view, a governmental body can only ever be an "agency" under the APA if it is so at all times, for all purposes. From this strictly all-or-nothing perspective, it points to *Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984), where the D.C. Circuit held—in a case involving an adverse employment action, and not the promulgation of a regulation—that "the Library of Congress is not an 'agency' as defined under the Administrative Procedure Act." *Id*. at 102. Describing *Clark* as "binding precedent" that resolves this case (Opp. 16-17), the government suggests that our contrary position would require the Court to construe intervening cases as "overturn[ing] years of precedent" (Opp. 20).

That simply is not so. As we explained in the opening brief (at 28-35), courts have long recognized (and Congress in 1946 surely understood) that the Library has a "hybrid character," meaning that it acts sometimes as an executive agency and other times as a component of the legislature. *Live365, Inc. v. Copyright Royalty Board*, 698 F. Supp. 2d 25, 42-43 (D.D.C. 2010). For example, the Librarian is denominated a "Head of Department" within the meaning of the Appointments Clause—which is to say, she heads an executive agency. *Intercollegiate Broadcasting System v. Copyright Royalty Board*, 684 F.3d 1332, 1342 (D.C. Cir. 2012). Thus, although the D.C. Circuit has "referred to the Library of Congress as a 'congressional agency,'" it also has

recognized that "the Library of Congress is a freestanding entity" that sometimes functions "undoubtedly [as] a 'component of the Executive Branch.'" *Id.* at 1341-1342 (quoting *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 511 (2010)). In no context is that function more apparent than when the Library promulgates regulations that implement the statutory schemes entrusted to it by Congress (*id.*), which is quintessentially an "exercise of the executive Power" (*City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (cleaned up)).

To be sure, the Library in other respects undertakes "functions which may be regarded as legislative," such as its support of the lawmaking process through the Congressional Research Service. *Eltra Corp. v. Ringer*, 579 F.2d 294, 301 (4th Cir. 1978). And "in conducting its daily operations" (those rote activities that do not implement laws), it is best understood as a component of the Congress, having been "codified under Title II" of the United States Code, which governs the Congress. *Live365*, 698 F. Supp. 2d at 43.

Our position is that when the Library functions as a classic executive agency (such as when it promulgates regulations that implement statutes it has been tasked with executing), it qualifies as an "agency" for purposes of the APA; and when it functions as a legislative authority (such as when it makes day-to-day workforce management decisions), it does not.

As we explained in the opening brief (at 29)—and the government does not disagree—to determine the capacity in which the Library is acting, courts "consider each [of its] function[s] . . . separately and . . . determine the character of each, whether legislative or executive." *Eltra*, 579 F.2d at 301. That explains the outcome in *Clark*. With respect to its employment decisions, the character of the Library's actions are legislative. *See Live365*, 698 F. Supp. 2d at 43. Thus, given the particular facts at issue in *Clark*, the court held that "the Library of Congress [was] not an 'agency' as defined under the Administrative Procedure Act." 750 F.2d at 102.

But the facts here are different, and therefore so is the legal question. It is whether the Library assumes the status of an "agency" within the meaning of the APA when it promulgates, through traditional notice-and-comment rulemaking, a regulation that implements a statutory

3

scheme that it has been tasked with executing. And as we demonstrated in the opening brief (at 28-35), there are at least two compelling reasons to hold that the Library *does* assume the status of an "agency" in this context. None of the government's rejoinders is persuasive.

1.    When undertaking DMCA rulemakings, the Library issues notices and publishes its final rules in the Federal Register, ultimately codifying its DMCA exemptions in the Code of Federal Regulations. *See* Opening Br. 30. Under the Federal Register Act, only an "agency" can do such things. 44 U.S.C. § 1501. The government does not deny that the Library was acting as an "agency" within the meaning of the Federal Register Act. And an "agency" for purposes of the Federal Register Act is a governmental body "of the administrative branch" and "not the legislative or judicial branches." *Id*. As the government knows firsthand, rulemakings under the APA depend inextricably on the Federal Register and the Code of Federal Regulations. *See, e.g.*, 5 U.S.C. § 553(b) ("notice[s] of proposed rule making shall be published in the Federal Register"). Given the close relatedness of the two statutes, it is inconceivable that Congress would have intended the Library to constitute an "agency" and not a component of the "legislative" branch for purposes of the Federal Register Act (44 U.S.C. § 1501), while not also constituting an "agency" but rather a component to "the Congress" for purposes of the APA (5 U.S.C. § 551(1)).

That is especially so because, as the D.C. Circuit has noted, "the legislative history of the APA . . . indicates that the term 'agency' was supposed to have substantially the same meaning in the APA as in . . . the Federal Register Act." *Washington Legal Foundation v. U.S.S.C.*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) (citing *In re Fidelity Mortgage Investors*, 690 F.2d 35, 38 (2d Cir. 1982) (in turn citing S. Doc. No. 248, 79th Cong., 2d Sess. (1946))).

Against that background, the government's only response—that "it is conceivable that Congress could have intended 'legislative branch' and 'the Congress' to have different meanings" (Opp. 22 (alterations incorporated))—is not only unexplained, but also inexplicable. Having employed the Federal Register and the C.F.R. in the rulemaking here, the Library was necessarily functioning as an "agency" and not a component of the "legislative branch" for Federal Register

4

Act purposes. 44 U.S.C. § 1501. It follows ineluctably that it was functioning as an "agency" and not a component of "the Congress" for APA purposes, as well. The government gives no reason for concluding otherwise.[1]

   **2.a.**   At least two canons of construction confirm this conclusion. *See* Opening Br. 31-34. Take first the presumption in favor of judicial review. Because "Congress rarely intends to prevent courts from enforcing its directives to federal agencies," the Supreme Court "applies a 'strong presumption' favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (quoting *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986)). Only if "a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct" is the presumption rebutted. *Id.* But the government must provide "clear and convincing evidence of [such] intent." *Bowen*, 476 U.S. at 671. Here, there is no express evidence that Congress openly intended to preclude judicial review of the Library's DMCA rulemakings, let alone clear and convincing evidence of it. Rather, Congress circumscribed the Librarian's discretion and required her to promulgate exemptions in traditional rulemaking proceedings, all of which is consistent with (and naturally calls to mind) APA review.

   The government devotes a mere paragraph in response (Opp. 22-23), asserting that the canon is inapplicable because "the Library is subject to judicial review for *ultra vires* action in particular circumstances where such review is appropriate." But that is a baseline rule against which all judicial-review provisions are construed; if it were a ground for refusing to apply the pro-judicial-review canon, the canon would be meaningless.

   In fact, the "'strong presumption' in favor of judicial review" means simply that courts should construe statutes that provide for judicial review broadly, while construing statutes that

---

[1]   Saying so does not render 17 U.S.C. § 701(e) superfluous, as the government contends (Opp. 18). That provision specifies that "all actions taken by the Register of Copyrights under this title are subject to the provisions of the Administrative Procedure Act." It thus reflects Congress's determination that orders and decisions of the Copyright Office should be subject to APA review without regard for whether the Office is performing executive functions.

limit judicial review narrowly. *Make the Road New York v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020). The APA itself therefore "embodies the basic presumption of judicial review" and must be construed broadly. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967); *see also Texas Alliance for Home Care Services v. Sebelius*, 681 F.3d 402, 408 (D.C. Cir. 2012) (discussing "the APA's basic presumption of judicial review" (quotation marks omitted)). Applied in this context, the presumption means that, if the word "agency" appearing in the APA can reasonably be read to cover the Library of Congress when the Library is engaged in executive rulemakings, it must be. We have shown that it can be.

      **b.**  Take next the constitutional avoidance canon. "[W]hen a serious doubt is raised about the constitutionality of an act of Congress, [courts should] first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Nielsen v. Preap*, 139 S. Ct. 954, 971 (2019) (cleaned up); *see INS v. St. Cyr*, 533 U.S. 289, 300 (2001) ("[W]here an alternative interpretation of the statute is 'fairly possible,' [courts] are obligated to construe the statute to avoid such problems." (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932))). As we demonstrated in the opening brief (at 32-34), the government's insistence that the Library is a component of "the Congress" for purposes of the APA raises significant structural constitutional problems: "If the power [being exercised] is executive, the Constitution does not permit an agent of Congress to exercise it," and "[i]f the power is legislative, Congress must exercise it in conformity with the bicameralism and presentment requirements of Art. I, § 7." *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276 (1991). These constitutional problems are easily avoided by construing the Library to function as a component of the executive branch, and thus an "agency" within the meaning of the APA, for purposes of its DMCA rulemakings.

      In response, the government argues against its own interests. It says (Opp. 41) that there is no constitutional problem because, although the Librarian admittedly "exercise[s] Executive authority" when she promulgates exemptions under the DMCA, she does so under "the control of

the Executive Branch." That is because "the Librarian is in fact appointed by the President with the advice and consent of the Senate" (*id.*) and "members of Congress do not participate in [DMCA] rulemaking[s]" (Opp. 43). Thus, "the Librarian of Congress and the Register of Copyrights are subject to the control of the Chief Executive in carrying out [their executive] responsibilities," including DMCA rulemakings. *Id.*

That is, of course, precisely *our* point—sometimes, as in *Clark*, the Library acts as a legislative body, but other times, as here, it acts as an executive body. There is no reason to think that Congress, in enacting the APA, would have intended the Library—a statutorily-created governmental authority subject to the control of the President—to count as a component of "the Congress" and not as an "agency" when it exercises classically executive powers through traditional notice-and-comment rulemaking, culminating in a regulation codified in the C.F.R. As we have shown, Congress's definition of "agency" under the Federal Register Act (which the government does not deny covers the Library here) demonstrates that it could *not* have had that intent.

The government suggests in response (Opp. 43) that the drafters of the APA, in distinguishing executive agencies from "the Congress" (5 U.S.C. § 551(1)), may have intended a meaning of "the Congress" different from its constitutional one. That beggars belief. When lawmakers in 1946 referred to "the Congress" in 5 U.S.C. § 551(1), they could only have meant the "Congress of the United States," established by Article I, section 1 of the Constitution. That conclusion is borne out elsewhere in Title II of the U.S. Code, where the word "Congress" is used uniformly and exclusively to refer to the "Congress" in the constitutional sense. *See, e.g.*, 2 U.S.C. § 1 (referring to Senators "elected to represent [each] State in Congress"); 2 U.S.C. § 7 (establishing the day of election for "Representatives and Delegates to the Congress"). That is the point of our constitutional avoidance argument: "the Congress" in Section 551(1) is one-and-the-same as the "Congress" in Article I, section 1. After all, what other "Congress" is there?

The government admits (Opp. 41-43) that the Library is not a component of the "Congress" in the constitutional sense when it engages in DMCA rulemakings. It follows perforce that the

Library is not a component of the "Congress" within the meaning of 5 U.S.C. § 551(1), either. Any other conclusion would offend principle, precedent, and simple logic. Ruling for the government thus would invite serious constitutional problems. Opening Br. 32-34.

**B.   The government's cases do not support a different result**

In resisting these points, the government relies principally on citations to caselaw, but none is helpful to it. Aside from *Clark*, the government points (Opp. 17, 20) to *Washington Legal Foundation*. But that was a case about whether the U.S. Sentencing Commission is an "agency" for APA purposes, not the Library of Congress. The Sentencing Commission is plainly distinct from the Library, implicating different issues; whatever the D.C. Circuit said about the Library in *Washington Legal* was at best passing dictum. Moreover, *Washington Legal*'s dictum merely quoted a footnote from *Ethnic Employees of Library of Congress v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985), which the government likewise cites at pages 17 and 20 of its brief. *Ethnic Employees* is also inapposite. Like *Clark*, it was an employment discrimination case, which does not implicate the Library's execution or implementation of laws.

At page 19 of its brief, the government cites to *Maynard v. Architect of the Capitol*, 544 F. Supp. 3d 64 (D.D.C. 2021). That case concerned an employment dispute by a painter against the Architect of the Capitol, who is not entrusted with authority to implement laws in rulemakings as is the Librarian, and was not exercising any such authority in any event. Much the same goes for *Pond Constructors, Inc. v. U.S. Government Accountability Office*, 2018 WL 3528309 (D.D.C. 2018). There, the court held that the Government Accountability Office, which performs only legislative functions and not any executive functions, is a "legislative branch agency" and thus a component of "the Congress" within the meaning of 5 U.S.C. § 551(1). *Id.* at *1. Neither of these cases sheds any light on the question whether the Library is an "agency" within the meaning of the APA when it promulgates a regulation that implements a statutory scheme that Congress has tasked it with executing. As we have shown, the answer is that it *is*.

Citing *Kissinger v. Reporters Committee*, 445 U.S. 136 (1979), the government implies the Supreme Court has held that "the Library of Congress 'is not an agency' within the meaning of" FOIA, which incorporates the APA's definition. Opp. 17 (quoting *Kissinger*, 445 U.S. at 145). That is highly misleading. In fact, the language quoted by the government was a mere description of the district court's rationale, appearing in the procedural history section of the Court's opinion. The Court did not later decide the correctness of that rationale or otherwise purport to address the question whether or when the Library is an "agency" for FOIA (or APA) purposes.

Finally, it bears noting that the government does not place any significant weight on *Green v. Department of Justice*, 392 F. Supp. 3d 68 (D.D.C. 2019) (Sullivan, J.). Little wonder why not, given that the parties there did not address, and the court did not examine or resolve, the arguments that we have made here. *See* Opening Br. 34-35. In fact, if *Green* demonstrates anything, it is that neither *Clark* nor any of the other cases cited by the government resolves the question whether the APA applies to the Library in this context. Otherwise, *Green* would have said as much, rather than treating the issue as an open one that it declined fully to address. *Cf. Independent Producers Group v. Library of Congress*, 759 F.3d 100, 109 (D.C. Cir. 2014) (declining to "decide today whether review of the Royalty Judges' determination of no controversy may ever lie in the district court under the Administrative Procedure Act").

At bottom, the government's cases do not answer the question presented here, which must be resolved in plaintiffs' favor as a matter of basic principles of statutory construction.

**C.    The Exemption is not for a "fair use" and thus violates the DMCA**

As we have shown, the APA applies to the Library with respect to its DMCA rulemakings. "Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end." *PPG Industries, Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995). That is this case.

As we explained in the opening brief (at 16-24), the Librarian's determination that the ISOs' uses were noninfringing is unsupportable under the fair-use doctrine. The DMCA permits

the Librarian to issue exemptions to the anticircumvention rule only when "noninfringing uses . . . of a particular class of copyrighted works" are at stake. 17 U.S.C. § 1201(a)(1)(C). Here, the Librarian disregarded that requirement, granting an exemption based instead on her preference to help lower the costs of service contracts. AR1801. That is not a ground for granting an exemption for infringing uses. The proposed uses covered by the Exemption are purely commercial and not transformative. And they threaten to undermine the market for and value of the copyrighted works. The Exemption was thus "not in accordance with law" and must be set aside. 5 U.S.C. § 706(2).

### 1.    *The uses covered by the Exemption are not transformative*

We demonstrated (Opening Br. 17-19) that the first fair-use factor weighs decidedly against the Exemption. This factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). As the Ninth Circuit has explained, ISOs' use of OEM software to provide competing maintenance services is "entirely commercial in nature" and is not transformative. *Triad Systems v. Southeastern Express*, 64 F.3d 1330, 1337 (9th Cir. 1995).

The government admits (Opp. 28) that "ISOs may profit from their repair business" and thus impliedly acknowledges the purely commercial purposes to which the copied materials are put. It nonetheless points (Opp. 25) to the Librarian's bizarre assertion that "the proposed activities are intended to restore a medical device or system's functionality, not to commercialize the embedded copyrighted software and other servicing materials." AR1782. That is like saying that, when someone illegally copies a motion picture and sells tickets to watch the bootlegged movie in his home, he is engaged only in the activity of entertaining his guests and cannot be accused of commercializing the copied film. That is nonsense. For an ISO to sell services "to restore a medical device or system's functionality" (AR1782)—for it to sell a ticket to the movie—is necessarily to commercialize the copyrighted materials that are essential to providing those services.

Perhaps appreciating the indefensibility of the Librarian's reasoning on that front, the government devotes most of its attention (Opp. 25-27) to the Librarian's declaration that the first fair-

use factor "favors fair use" because the ISOs' proposed uses are "likely transformative." AR1782. But as we explained (Opening Br. 17-18), the Librarian offered no justification for that unadorned conclusion, other than stating that "[t]he Register has previously concluded that diagnosis and repair are likely to be transformative uses." *Id.* There are two problems with that explanation.

*First*, at a general level, the fair-use doctrine must be applied "to particular situations on a case-by-case basis." *Google LLC v. Oracle America*, 141 S. Ct. 1183, 198 (2021). That is why the Librarian herself acknowledged that "fair use analysis is ultimately a fact-specific inquiry that can vary based on the type of device," and that it is not possible to make a categorical fair-use determination with respect to maintenance and repair of "all software-enabled devices." AR1775. Thus, what the Librarian may have reasoned or concluded in some other rulemaking with respect to some other device category, is irrelevant to its decision in *this* rulemaking. Plaintiffs and their members were entitled to a decision concerning their facts, their evidence, and their arguments, with respect to their devices; they did not get it. We made this point in the opening brief (at 22-23), but the government does not respond.

*Second*, the error in the Library's blind extrapolation from prior rulemakings is demonstrated beyond doubt by the fact that the prior rulemakings concerned *admittedly* transformative uses, which is plainly not the case here. In particular, the 2015 rulemaking cited in the Register's recommendation (AR1784 n.1167) concerned "diagnosis, *modification*, and repair" of electronic control units (ECUs) in automobiles. *See* AR1059-60 (emphasis added); *see also* Opp. 25 (quoting same). The Librarian thus observed in 2015 that "copying the work" embedded in automobile ECUs would often lead to "creat[ing] new applications" and "modification of ECU computer programs" to allow new modes of "interoperation" among auto parts. AR1059. It concluded, therefore, that "at least some of the proposed uses of ECU computer programs are likely to be transformative." *Id*. Later, in the 2018 rulemaking, the Librarian unthinkingly cited to its 2015 analysis, but without acknowledging this crucial factor. *See* AR1433-35 & nn. 1254, 1262.

The Register's analysis of ECUs in 2015 is obviously inapplicable here. As we explained

11

in the opening brief (at 12 & n.1, 19), the ISOs in this case expressly disclaimed modification of any software code or the creation of new applications. The Exemption here covers only maintenance—and expressly *not* modification—as did the 2015 exemption. The Librarian acknowledged this explicitly, observing that "'modification' is not part of the proposed exemption for medical devices," and "no changes [will] be made" by ISOs to device software for uses under the Exemption. AR1802. The government admits the same in its brief (Opp. 27), and the FDA grounded its position on that understanding (AR6162). The single most important fact that drove the Librarian's reasoning in 2015 with respect to "transformative use" is therefore absent here, and any reliance on the 2015 rationale is insupportable. Yet that is all the Librarian offered.

The government appears to miss this crucial distinction. Instead, it attempts to backfill the Librarian's absence of reasoning, developing (Opp. 26-28) new arguments based on the Supreme Court's opinion in *Campbell v. Acuff-Rose Music*, 510 U.S. 569 (1994), and the Ninth Circuit's opinion in *Perfect 10 v. Amazon.com*, 508 F.3d 1146 (9th Cir. 2007). But the government's newly developed rationale was not supplied by the Librarian herself, who did nothing more than point to her inapt 2015 decision. AR1784 & n.1167. It is hornbook law that an agency action may "be upheld, if at all, [only] on the same basis articulated in the order by the agency itself," and "post hoc rationalizations" are not permitted. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-169 (1962).

Even on its own terms, the government's post hoc reasoning is unpersuasive. To commandeer a copyright holder's software and use it to diagnose and repair a machine in which the software is embedded is not at all to put the software to some "enhanced" use, serving a "different function than the original code" (Opp. 26). Quite the contrary, it is to use "it for the very purpose for which, and in precisely the manner in which, it was designed to be used." *Triad Systems*, 64 F.3d at 1337. Much of the code at issue exists precisely for the purpose of performing servicing and maintenance, including "electronic manuals." AR1784. Even general operational code is used also only for its purpose: To operate the machine being serviced. And, again, "'modification' is

not part of the proposed exemption for medical devices," and "no changes [will] be made" by ISOs to device software for uses under the Exemption. AR1802. It bears emphasis on this point that the government in many instances misstates the scope of the Exemption as covering the "diagnosis, maintenance, and repair of medical equipment *software*." Opp. 23-24, 28, 33 (emphasis added). That description suggests that the ISOs' activities are making some change to the software to allow its continued use. That is flat wrong. Again, the Exemption permits circumvention of TPMs only *to use* the copyrighted software *without modification of any kind* to diagnose, maintain, or repair the *device*. The use of a copyrighted work for its intended purpose is not transformative.

As the opening brief explained (at 17-19), to be transformative, a use of the copyrighted material must add to, alter, or create something, which is the whole purpose of the fair use exception—to ensure that copyright law does not stifle further creations. *Campbell*, 510 U.S. at 579. The ISOs' uses do nothing of the sort. *See Triad Systems*, 64 F.3d at 1336 (ISOs' uses of copied software are "neither creative nor transformative" because they "invent[] nothing [new] of their own"). They merely access and reproduce copyrighted material to boost their own profits, which is precisely the freeriding behavior that copyright law is supposed to prevent. Thus, our position is that the exempted uses are not transformative, not because they stop short of "alter[ing]" the software, as the government asserts (Opp. 27), but because they do not by *any* means "add something new, with a further purpose or different character," producing some "new expression, meaning or message." *Google*, 141 S. Ct. at 1202.

That is also why the government is wrong to characterize (Opp. 27) us as arguing that commercial use sounds "a death knell to a fair use finding," all by itself. We acknowledge here, as we did in the opening brief, that profit motive can be overcome with evidence of transformative use, as the Supreme Court held in *Google*. But here, because the ISOs' uses are plainly *not* transformative, there is nothing to offset the purely commercial nature of the exempted uses.

For the same reason, the government's attempt to brush aside *Triad Systems* and *Advanced Computer Services* fails. It notes (Opp. 28) that those cases predate *Campbell* and asserts that they

13

rest on a "bright line rule against commerciality." But that simply is not so; each court carefully balanced the full range of fair-use factors and concluded (correctly) that there is nothing in an ISOs' use of copyrighted software to justify undermining OEMs' "entitle[ment] to rely on service fees to recoup [their] investment costs in developing the software." *Advanced Computer Services of Michigan v. MAI Systems,* 845 F. Supp 356, 365 (E.D. Va. 1994). The government has no persuasive response to these cases.

The Librarian's unreasoned "transformative use" finding also led to her dismissal of the third fair-use factor: "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The Librarian gave "little weight" to the ISOs' "use of the entirety of [the software]" because, in her view, it was "necessary to achieve a transformative purpose." AR1784. But as the Ninth Circuit has recognized, the fact that an ISO must "copy[] programs in their entirety" to perform their third-party maintenance services weighs strongly against fair use. *Triad Systems,* 64 F.3d at 1337 (citing *Advanced Computer Services*, 845 F. Supp. at 366 n.13). And as we have just shown, the ISOs here do not make transformative use of the underlying code. The government has no meaningful response on this point, except to repeat the Librarian's contrary *ipse dixit*. Opp. 29-30.

### 2. *The uses covered by the Exemption harm the market for and value of the copyrighted works*

The Librarian sidestepped the fourth fair-use factor, which considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As the opening brief demonstrated (at 20-23), this factor calls for "courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of [that] sort . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quotation omitted). Importantly, courts must account "also of the harm to the market for derivative works." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 568 (1985).

Again, the Librarian barely engaged with these considerations, asserting without explanation that, like "other types of software-enabled devices," the copyrighted software has "no independent value separate from being used with the equipment." AR1785. She thus concluded that unrestricted access to "software and manuals to diagnose, maintain, or repair the device or system" will "support rather than [undercut the value of] the embedded computer programs." AR1800.

The government unthinkingly parrots back this flawed reasoning (Opp. 31), asserting that the "market at issue here is the market for the software itself," and because the software has "no independent value," there is no harm. But the government cannot seriously contend that the only market that matters is a market that does not exist. The copyrighted software may be licensed as a bundle with the machines—as we explained (Opening Br. 7), the software "guide[s] the device's operability" and is critical to its ability to "deliver . . . advanced capabilities." One typically does not buy the machine without licensing the software needed to run it. In other words, sales of the medical devices *are* the principle market for the software licenses.[2]

The Exemption manifestly will harm the market for medical devices and their embedded software. OEMs rely in part on downstream service contracts to recoup their investment in developing these sophisticated machines. If they cannot do that, then prices for the machines will go up, as OEMs will have little incentive to innovate derivate works without assurances they can cover their substantial research and development costs. AR4097 (MITA Comments); AR4147 (Philips Comments). And that is not the only harm to the market: ISOs' circumventions of TPMs needlessly create technical vulnerabilities that put patient safety in jeopardy, decreasing confidence in the

---

[2]    The government also mischaracterizes our position as "focus[ing] on the market for *repair* of the underlying software." Opp. 31. To be sure, the Exemption disrupts that market by increasing the share of the service-and-repair market held by ISOs. AR4012 (AdvaMed Comments); AR4104 (MITA Comments). But the point is that the Exemption inevitably "lower[s] returns on [OEMs'] copyrighted software investment," which harms the market for medical devices generally. *Triad Systems*, 64 F.3d at 1337.

functioning of serviced medical devices and thus diminishing their market value. *See* AR4020-24 (AdvaMed Comments); AR4112-30 (MITA Comments).

The government attempts to minimize this concern, asserting (Opp. 32) that the FDA has "disagreed with [our] conclusion" concerning threats to cybersecurity. For starters, that once again is not a reason supplied by the Librarian, and it therefore is not a basis for sustaining her decision. Beyond that, it is a stunning misrepresentation. In fact, the FDA stated that it could not agree with comments made by plaintiffs here only because "the available evidence was insufficient to conclude whether or not there is a widespread public health concern relating to medical device servicing" by ISOs. AR6162. The FDA thus could not agree that "circumvention conducted solely for the purposes of diagnosis, maintenance, or repair of medical devices would *necessarily*" harm the market. *Id*. (emphasis added). And it explained that it had "sought stakeholder input on this topic" and is continuing to develop an evidence-based position. *Id*.

That is hardly the rejection of our arguments that the government makes it out to be. And the government does not deny that the FDA's letter "acknowledge[d] the cybersecurity challenges related to ISO servicing of medical devices" (AR6162) or that the FDA elsewhere recommended that OEMs "limit[] privileged access to operating systems and applications" precisely to mitigate such "cybersecurity challenges." Letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, FDA, to Gail M. Rodriguez Ph.D., Executive Director, MITA 2 (Jan. 30, 2014), perma.cc/BX3V-3U5B. In all events, the *Librarian's* reasoning on this score is manifestly inadequate—she reasoned only that there is no market for the software at issue, and therefore that she need not worry about market impact. AR 1784-1785. That is indefensible.

At bottom, the Exemption undercuts the objectives of copyright law. The purpose of copyright is "to stimulate creativity for public illumination," including the creation of computer programs. *Google*, 141 S. Ct. at 1203 (cleaned up). But that is not—and logically cannot be—the rationale underlying the Librarian's promulgation of the Exemption. Her true reasoning, instead, was that "an exemption to facilitate repair of medical devices and systems could help to address

the broader competitive concerns recently highlighted by the Executive Branch." AR1801. As we explained in the opening brief (at 14, 24, 38), it turns copyright law upside down to declare a competitor's copying of computer code to be a "fair use" because it will help the competitor take business from the copyright holder by offering lower prices. Copyright protection is a statutory grant of monopoly privileges, "a commercial right, intended to protect the ability of authors to profit from the exclusive right to merchandise their own work." *Authors Guild v. Google*, 804 F.3d 202, 214 (2d Cir. 2015).

Here, because copyright protection would not stifle any transformative creations, and because the Exemption merely props up the commercial interests of freeriding competitors, the uses covered by the Exemption are plainly infringing. The Exemption is thus "not in accordance with law" and "in excess of statutory . . . authority" (5 U.S.C. § 706(2)) and must be vacated.

### D.    The Exemption was adopted without observance of required procedures

The Librarian's incomplete reasoning renders the Exemption procedurally defective, too. *See* Opening Br. 25-27. The APA requires agencies to "consider and respond to significant comments received during the period for public comment." *Perez v. Mortgage Bankers Association*, 575 U.S. 92, 96 (2015) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). We showed that the Librarian failed to consider and respond adequately to many comments pertaining to matters of central relevance to the rule. The government's opposition (at 34-37) merely repeats the Librarian's incomplete reasoning, without addressing its shortcomings.

***First*,** the Librarian did not address comments calling for a device-specific analysis of the fair-use doctrine. Opening Br. 25-26. In response, the government observes (Opp. 34-35) that the Librarian laid out general legal principles concerning movies and TV shows. Without explanation, the government asserts (Opp. 35) that the Librarian thus "ventilated the concerns raised by Plaintiffs, but chose not to credit them." But she did nothing of the sort—commenters called for an *application* of the general principles identified by the Librarian *to the facts of this particular case*. Merely reciting a general legal standard without applying it to the circumstances before the agency

17

is not responsive to anything.

Nor is the government's citation to page 1772 of the administrative record any help. *See* Opp. 34. To be sure, the Librarian there concluded that medical devices "should be evaluated separately" from "consumer devices." But she did not actually furnish any such separate evaluation; instead, she concluded without any explanation that, "[a]s in previous rulemakings" *that concerned consumer devices*, commerciality "should be given little weight here because the use is necessary to accomplish the transformative purposes of diagnosis, maintenance, and repair." AR1784 (citing 2015 and 2018 rulemakings, concerning automobile and consumer-device software); *accord* AR1782 (similar); AR1785 (relying blindly on "findings in prior rulemakings" and analyses of "other types of software-enabled devices"). An agency's express acknowledgement that it must undertake a particular analysis amounts to nothing if the agency declines ever actually to undertake the required analysis.

**Second**, the Librarian failed to address comments pertaining to whether the exemption (1) served "nonprofit . . . purposes" or (2) would impact "criticism, comment, news reporting, teaching . . . scholarship, or research" (17 U.S.C. § 107). *See* Opening Br. 26. The government says (Opp. 35) that the Librarian adequately addressed these concerns when she blithely observed that "[c]ommerciality is not fatal to a fair use determination" and "there is no 'hard evidentiary presumption' against commercial uses." But, again, merely reciting a legal truism without applying it to the facts of the case is not responsive. While it is true that commerciality does not categorically rule out a fair-use finding (a point we have never disputed), the Librarian did not address *why*, in this case, the purely commercial nature of the ISOs' proposed uses is overcome by other considerations. The closest she came was to say (yet again) that she has "previously concluded that diagnosis and repair are likely to be transformative uses." *Id*. But that is at best a reference back to another failure to address comments, as just discussed.

**Finally**, the Librarian did not address opponents' concern for the Exemption's chilling effect on innovation or its negative impact on the value of the copyrighted software and medical

devices. Opening Br. 26-27. The government says (Opp. 36) that the Librarian did respond to these comments when she opined that "most medical device and system software and data files generally have no independent value separate from being used with the equipment." AR1785. But that merely talks past the comments at issue, which explained that depriving OEMs of servicing and licensing revenues would reduce return on investment and thus chill innovation. On that topic, the Librarian said nothing at all. Nor is it meaningfully responsive (Opp. 36-37) for the Librarian to have observed that further reproductions or retentions of copyrighted materials "are prohibited." AR1785. Whether prohibited or not, the point is that authorizing circumventions of TPMs *will* expose OEMs' intellectual property and copyrighted works to unauthorized use, regardless of whether OEMs can expend resources attempting to protect their legal rights later on (Opp. 37). That inevitably will hurt the market for medical devices and the software on which they run—a point that the Librarian simply did not address.

We also showed in the opening brief (at 27) that increased circumventions would introduce cybersecurity and privacy risks, further damaging the market for medical devices and their embedded software. The government asserts (Opp. 37) that the Librarian "explicitly address[ed] these concerns," pointing to AR1802. In fact, she did the opposite—she said she would "*not* consider other regulatory schemes as part of the adverse effects analysis." AR1802 (emphasis added). She then concluded that because the ISOs seeking the Exemption had disclaimed any "modification" to the software, OEMs' "concerns, while significant, do not provide a basis for denying the requested exemption." *Id*. That is not responsive at all; the point of the underlying comments was that circumvention, in and of itself, would introduce cybersecurity and privacy risks, having a direct and negative impact on the market. Modification was entirely beside the point. On the actual topic of the comments, the Librarian again had nothing to say.

In sum, the Librarian's reasoning fell short of the APA's procedural requirements. 5 U.S.C. § 702. She failed to respond to many comments concerning the agency's "key assumption[]" that the ISOs' intended uses were noninfringing. *Northeastern Maryland Waste Disposal Authority v.*

19

*EPA*, 358 F.3d 936, 948 (D.C. Cir. 2004). This procedural defect, in addition to "cast[ing] doubt on the reasonableness of [the Library's] position," is an independent reason to set aside the Exemption. *HBO v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977); *see Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1051 (D.C. Cir. 2002) ("These failings alone require that we reverse as arbitrary and capricious.").

> **E.**   **Alternatively, the Exemption should be vacated as an exercise of authority in excess of delegated power and as a violation of the Constitution**

All that we have said so far and in the opening brief is more than sufficient to vacate the Exemption under the APA—the Library was functioning as an "agency" in every relevant respect, and the Exemption is both substantively and procedurally defective. But even if the Court were to determine that the APA does not apply, it still would have to vacate the Exemption as having been adopted in excess of statutory and constitutional authority.

Although the government does not deny that plaintiffs may (at least in theory) be entitled to relief under the doctrine of *Larson v. Domestic & Foreign Commerce Corporation*, 337 U.S. 682 (1949), it insists (Opp. 37) that such relief is available only for an "extreme error," such as a violation of a "specific prohibition in the statute that is clear and mandatory." As support for that proposition, the government points to an unpublished decision of the D.C. Circuit—*American Road & Transportation Builders Association v. EPA*, 2013 WL 599474 (D.C. Cir. 2013). In fact, none of the government's quotations appear in that decision, which is nonbinding in any event. The government seems, in actuality, to be quoting from *Nyunt v. Chairman, Broadcasting Board of Governors*, 589 F.3d 445 (D.C. Cir. 2009). But that case concerns a different judicial-review doctrine—that of *Leedom v. Kyne*, 358 U.S. 184 (1958), which applies "when a statute precludes review" affirmatively. *Nyunt*, 589 F.3d at 449; *accord Aid Association for Lutherans v. U.S. Postal Service*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (*Leedom* doctrine applies when there is a "statutory preclusion of judicial review"). There is no such preclusion here; at most, if the Library is deemed a component of "the Congress" within the meaning of 5 U.S.C. 551(1), a cause of action would be

20

unavailable under the APA only, not altogether. That is why *Clark*, after its APA holding, turned to review under *Larson*, not *Leedom*.

The government's description of the governing framework is therefore wrong. In fact, we must show only that the Library's promulgation of the Exemption was "unconstitutional or *ultra vires* conduct outside the scope of the [its] authority" or otherwise "contrary to statute." *Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 311 (D.D.C. 2020) (Howell, C.J.), *aff'd* 998 F.3d 989 (D.C. Cir. 2021). To be sure, that is more demanding than arbitrary-and-capricious review under the APA. *North American Butterfly Association v. Wolf*, 977 F.3d 1244, 1262 (D.C. Cir. 2020) ("*Ultra vires* review is intended to be of extremely limited scope, and it represents a more difficult course than would review under the [APA]." (quotation marks omitted)). But it is not the insurmountable standard the government makes it out to be. We must show simply that the Librarian's "action [was] not within [her] statutory powers" or that her "powers or their exercise . . . [were] constitutionally void." *Doehla Greeting Cards v. Summerfield*, 227 F.2d 44, 46 (D.C. Cir. 1955) (citing *Larson*); *accord Clark*, 750 F.2d at 102. Both conditions are present here, and either is independently sufficient to enter relief for plaintiffs.

### 1.    The Library arrogated to itself powers not granted by Congress

Congress conferred on the Librarian the authority to promulgate DMCA exemptions, but only for "noninfringing uses . . . of a particular class of copyrighted works." 17 U.S.C. § 1201-(a)(1)(C). As we have shown both above and in the opening brief, the proposed uses underlying the Exemption here do not remotely meet that statutory requirement. In fact, to suggest that the uses covered by the Exemption are noninfringing is to turn copyright law on its head. *See* Opening Br. 24, 38-39.

The Librarian's reasoning in fact rests on an arrogation of power that Congress did not confer: She promulgated the Exemption because, in her view, it "could help to address . . . broader competitive concerns recently highlighted by the Executive Branch," and thus help to prevent OEMs from charging "higher prices" than ISOs. AR1801. That reasoning is not a simple misap-

plication of copyright law; rather, it is a rejection of it. To adopt it as the reason for the Exemption is to cast aside settled copyright doctrine in favor of an executive branch economic policy that calls for an end to the statutory monopoly rights granted to OEMs by the Copyright Act and DMCA. The DMCA does not authorize the Librarian to grant exemptions on that ground, and to do so is plainly *ultra vires*. We made this point repeatedly in the opening brief (at 2, 24, 38-39), but the government offers no response, electing (Opp. 40) instead to mischaracterize our arguments as "simply disagree[ing] with the Librarian's analysis."

Neither of the two cases cited by the government suggests a different outcome. In *North American Butterfly Association*, for starters, the plaintiff acknowledged that the government official had followed the procedures and issued the report required by law, but argued nonetheless that "the statute required the Secretary to do more"—in particular, to engage in a "more procedurally and substantively robust level of stakeholder engagement." 977 F.3d at 1262. As the D.C. Circuit recognized, that is not an argument that the department had undertaken duties "outside the scope of the task that Congress gave it." *Id*. at 1263. Rather, it was a mere assertion that, although the department had done its job, it had not done it well enough. The circumstances here are completely different. The contention in this case is not that the Librarian could have done a better job executing her duties. It is, instead, that she assumed for herself policymaking powers that Congress did not grant. Opening Br. 38-39. That is a textbook *ultra vires* argument—the Library is not empowered to grant exemptions for infringing uses to serve economic policies independent of copyright law.

Nor is *DCH Regional Medical Center v. Azar*, 925 F.3d 503 (D.C. Cir. 2019), helpful to the government. That case involved an express bar on judicial review. *See id*. at 509 ("Here, the bar on judicial review is express."). It thus implicated the *Leedom* doctrine, which is not applicable here. And in rejecting the plaintiff's arguments, the court explained that, "at most," they suggested the Health and Human Services Secretary's actions "may have been arbitrary and capricious." *Id*. at 510. The facts of that case were "worlds apart from the obvious violation of the clear statutory

command at issue in [*Leedom v.*] *Kyne*." *Id.* That fact-bound holding has no relevance here, where *Larson* applies rather than *Leedom*, and the Librarian exercised policymaking authority that was "outside the scope of the task that Congress gave [her]." *American Clinical Laboratory Association v. Azar*, 931 F.3d 1195, 1208 (D.C. Cir. 2019). Again, that is a textbook *ultra vires* argument, and it warrants relief no matter what the Court concludes about the APA.

> **2.    If the Library is a component of "the Congress" for purposes of its triennial DMCA rulemakings, its actions are constitutionally ultra vires**

We showed also that, if the Library is held to be an element of "the Congress" with respect to its DMCA rulemakings, such that the APA does not apply, then its exercise of admittedly executive authority represents a clear constitutional violation. *See* Opening Br. 32-35, 39.

The government agrees (Opp. 41-43) that the Library exercises executive authority in DMCA rulemakings. It could not do otherwise. *See Collins v. Yellen*, 141 S. Ct. 1761, 1785 (2021) ("[I]mplementing [a] legislative mandate is the very essence of 'execution' of the law."). As we explained (*supra*, at 7), moreover, when Congress used the word "Congress" in 5 U.S.C. § 551(1), it could only have meant to give it the same meaning as the word "Congress" appearing in Article I, section 1 of the Constitution. It thus follows that the only circumstance in which the Court could hold that the APA does not apply is one in which it also holds that the Library, as an agency of the "Congress" in the constitutional sense, had unlawfully exercised executive authority.

Of course, that is foremost a reason to hold that the Library in fact functions as an executive "agency" when it engages in DMCA rulemakings, and therefore that the APA *does* apply. But if the Court is not persuaded, it can and should instead strike the Exemption as having been adopted in violation of basic separation-of-powers principles. *See* Opening Br. 32-33; *Mistretta v. United States*, 488 U.S. 361, 382 (1989). The government does not respond to this point.

**F.    The Court should vacate 37 C.F.R. § 201.40(b)(15)**

The government concludes its opposition (at 44) with an assertion that relief should be limited to a vacatur of the "Repair Exemption" only, and not the "entire rule." Opp. 44. If the Court

concludes that the APA applies, we agree that severance of 37 C.F.R. § 201.40(b)(15) alone would be appropriate. As the government rightly observes (Opp. 44), the APA authorizes a reviewing court to vacate "the whole or a part of an agency rule." 5 U.S.C. § 551(13). "Thus, the APA permits a court to sever a rule by setting aside only the offending parts of the rule." *Carlson v. Postal Regulatory Commission*, 938 F.3d 337, 351 (D.C. Cir. 2019). Here, because plaintiffs' APA claims challenge only 37 C.F.R. § 201.40(b)(15)—*see* Compl. ¶¶ 85, 91, 96—and because the remaining exemptions codified in Section 201.40(b) can continue to function without (b)(15), severability would be appropriate.

That said, plaintiffs' constitutional claim under *Larson* would call the entirety of Section 201.40(b) into question. Plaintiffs take no position on the question of whether severability is possible with respect to their *Larson* claims. We do agree, however, that vacatur of (b)(15) alone "would fully redress" plaintiffs' injuries. *See* Opp. 44-45.

## CONCLUSION

The Court should grant summary judgment to plaintiffs and enter a final judgment setting aside the Exemption, declaring the Exemption to be unlawful and void, and enjoining defendants from enforcing, implementing, or otherwise carrying out the Exemption.

June 15, 2022

Peter Tolsdorf
  NATIONAL ELECTRICAL
    MANUFACTURERS ASSOCIATION
  *1300 17th Street North, No. 900*
  *Arlington, VA 22209*
  *(703) 841-3200*

*Counsel for Medical Imaging &*
*Technology Alliance*

Terry Chang
  ADVANCED MEDICAL
    TECHNOLOGY ASSOCIATION
  *701 Pennsylvania Ave. NW, Ste. 800*
  *Washington, DC 20004*
  (202) 783-8700

*Counsel for Advanced Medical*
*Technology Association*

Respectfully submitted,

/s/ *Michael B. Kimberly*

Michael B. Kimberly (Bar No. 991549)
Alex C. Boota (*pro hac vice*)
  MCDERMOTT WILL & EMERY LLP
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*
  *mkimberly@mwe.com*

*Counsel for Plaintiffs*

25