**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MEDICAL IMAGING &
TECHNOLOGY ALLIANCE, *et al.*,

        Plaintiffs,

v.

THE LIBRARY OF CONGRESS, *et al.*,

        Defendants.

CASE NO.: 1:22-cv-00499-BAH

<u>**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE
ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**</u>

## **TABLE OF CONTENTS**

INTRODUCTION................................................................................................................1

ARGUMENT....................................................................................................................2

I.   The Library of Congress is Exempt from the APA. ..........................................................2

II.   Even if the Court Determines that the Library of Congress is Subject to the APA, Promulgation of the Repair Exemption Satisfies all Procedural and Substantive Requirements of the APA.............................................................................................8

    A.   Concluding that Diagnosis, Maintenance, and Repair of Medical Devices Are Likely Noninfringing Fair Uses Was Reasonable..................................................................8

    B.   The Librarian Responded to All Significant Comments by Adopting the Register's Recommendation.............................................................................................18

III.   The Librarian Did Not Violate a Clear and Mandatory Statutory Command such that Plaintiffs' *Ultra Vires* Claim Can Survive.........................................................................21

IV.   The APA's Exclusion of the Library of Congress Does Not Create a Constitutional Separation of Powers Violation....................................................................................24

CONCLUSION..............................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*A.V. ex rel Vanderhye v. iParadigms, LLC,*
  562 F.3d 630 (4th Cir. 2009) ............................................................. 10

*Advanced Computer Services of Michigan, Inc. v. MAI Systems Corporation,*
  845 F. Supp. 356 (E.D. Va. 1994) ...................................................... 14

*Am. Iron & Steel Institute v. EPA,*
  115 F.3d 979 (D.C. Cir. 1997) ............................................................ 21

*Am. Soc'y for Testing and Materials v. Public.Resource.Org, Inc.,*
  896 F.3d 437 (D.C. Cir. 2018) ............................................................ 23

*Am. Transp. Builders Ass'n v. EPA,*
  No. 12-5244, 2013 WL 599474 (D.C. Cir. Jan. 28, 2013) .................... 22

*Ass'n of Private Sector Coll. & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012) ............................................................ 18

*Authors Guild v. Google, Inc.,*
  804 F.3d 202 (2d Cir. 2015) ............................................................... 10

*Authors Guild, Inc. v. HathiTrust,*
  755 F.3d 87 (2d Cir. 2014) ................................................................. 15

*Bowsher v. Synar,*
  478 U.S. 714 (1986) ........................................................................... 24

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ............................................................................... 24

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994) ..................................................................... *passim*

*Cavanaugh v. Wainstein,*
  No. 05-123 (GK), 2007 WL 1601723, n.12 (D.D.C. June 4, 2007) ...... 11

*City of Waukesha v. EPA,*
  320 F.3d 228 (D.C. Cir. 2003) ................................................. 18, 20, 21

*Clark v. Library of Congress,*
  750 F.2d 89 (D.C. Cir. 1984) ..................................................... 3, 8, 21

*Conservation Law Foundation v. Pritzker,*
  37 F. Supp. 3d 234 (D.D.C. 2014) ........................................................ 4

*DCH Regional Medical Center v. Azar*,
    925 F.3d 503 (D.C. Cir. 2019) .................................................................. 23

*Doehla Greeting Cards v. Summerfield*,
    227 F.2d 44 (D.C. Cir. 1955) ............................................................. 22, 23

*Eltra Corp. v. Ringer*,
    579 F.2d 294 (4th Cir. 1978) ..................................................................... 5

*Ethnic Empls. of Library of Cong. v. Boorstin*,
    751 F.2d 1405 (D.C. Cir. 1985) ................................................................. 3

*Gabbs Exploration Co. v. Udall*,
    315 F.2d 37 (D.C. Cir. 1963) ..................................................................... 3

*Google LLC v. Oracle Am., Inc.*,
    141 S. Ct. 1183 (2021) ......................................................................... 9, 15

*Green v. DOJ*,
    392 F. Supp. 3d 68 (D.D.C. 2019) ........................................................ 4, 5

*Griffith v. FLRA*,
    842 F.2d 487 (D.C. Cir. 1988) ................................................................ 22

*Hohn v. United States*,
    524 U.S. 236 (1998) .................................................................................. 6

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
    684 F.3d 1332 (D.C. Cir. 2012) ................................................................ 5

*Kialegee Tribal Town v. Zinke*,
    330 F. Supp. 3d 255 (D.D.C. 2018) ....................................................... 21

*Kissinger v. Reporters Committee for the Freedom of the Press*,
    445 U.S. 136 (1980) .................................................................................. 3

*Larson v. Domestic & Foreign Commerce Corporation*,
    337 U.S. 682 (1949) ................................................................................ 21

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ................................................................................ 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ............................................................ 15, 16

*Live365, Inc. v. Copyright Royalty Bd.*,
    698 F. Supp. 2d 25 (D.D.C. 2010) ........................................................... 5

*Make the Road N.Y. v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020) ........................................................... 8

*Maynard v. Architect of the Cap.*,
    544 F. Supp. 3d 64 (D.D.C. 2021) ..................................................... 4

*Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991) ........................................................................... 24

*Nat'l Oilseed Processors Ass'n v. Browner*,
    924 F. Supp. 1193 (D.D.C. 1996) ..................................................... 11

*North American Butterfly Association v. Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020) ......................................................... 22

*Nunez v. Caribbean Int'l News Corp.*,
    235 F.3d 18 (1st Cir. 2000) ........................................................ 10, 20

*Nyunt v. Chairman, Broadcasting Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ........................................................... 22

*Oceana v. Bureau of Energy Management*,
    37 F. Supp. 3d 147 (D.D.C. 2014) ..................................................... 11

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ........................................................... 10

*Pond Const., Inc. v. U.S. Gov't Accountability Off.*,
    No. 17-cv-0881, 2018 WL 3528309 (D.D.C. May 30, 2018) ............... 4

*Public Citizen, Inc. v. F.A.A.*,
    988 F.2d 186 (D.C. Cir. 1993) ........................................................... 18

*Sega Enterprises Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) ........................................................... 18

*SOFA Ent., Inc. v. Dodger Prod., Inc.*,
    709 F.3d 1273 (9th Cir. 2013) ........................................................... 15

*Triad Systems Corporation v. Southeastern Express Company*,
    64 F.3d 1330 (9th Cir. 1995) ............................................................. 14

*Troy Corp. v. Browner*,
    120 F.3d 277 (D.C. Cir. 1997) ........................................................... 8

*Trudeau v. Fed. Trade Comm'n*,
    456 F.3d 178 (D.C. Cir. 2006) ................................................ 21, 22, 23

*United States v. Burwell*,
  690 F.3d 500 (D.C. Cir. 2012)...........................................................................7

*Wash. Legal Found. v. U.S. Sentencing Comm'n*,
  17 F.3d 1446 (D.C. Cir. 1994)......................................................................3, 7

**Statutes**

5 U.S.C. § 551(1).................................................................................................3

5 U.S.C. § 552(f).................................................................................................3

5 U.S.C. § 701(b)(1)........................................................................................3, 7

5 U.S.C. § 701(b)(1)(A).....................................................................................3

5 U.S.C. § 702..............................................................................................3, 21

17 U.S.C. § 701(e)..............................................................................................6

17 U.S.C. § 1201(a)(1)(C)(v)...........................................................................24

44 U.S.C. § 1501................................................................................................7

**The Constitution**

U.S. Const. art. II, § 2, cl. 2.............................................................................25

**Legislative Matierials**

*Administrative Procedure Act, Legislative History, 79th Cong. 1944-46*,
  S. Doc. No. 248, 79th Cong., 2d Sess. (1946)..................................................7

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5787............................6

## INTRODUCTION

For nearly forty years, it has been an established proposition in this Circuit that the Library of Congress is exempt from the Administrative Procedure Act ("APA"). Plaintiffs, unhappy with how the Librarian exercised her statutory authority under the Digital Millennium Copyright Act ("DMCA") in granting an exemption to the Act's anti-circumvention prohibition for repair of medical devices ("the Repair Exemption"), now invite this Court to revisit that settled issue and fundamentally disrupt how the Library exercises its statutory duties. Defendants respectfully ask this Court to reject Plaintiffs' invitation to create an unworkable shifting definition of "agency" under the APA.

In any event, promulgation of the Repair Exemption was an eminently reasonable exercise of the Librarian's statutory authority and satisfies all substantive and procedural requirements of the APA. The Librarian reasonably predicted that the fair use doctrine would apply to diagnosis, maintenance, and repair of medical devices, and explained so thoroughly, responding to all of Plaintiffs' significant comments along the way. Moreover, the Repair Exemption will have obvious positive effects in the healthcare industry, allowing hospitals the flexibility to repair medical equipment in the most cost-effective and efficient way. Indeed, the FDA cited a report that "concluded that the continued availability of ISOs to service and repair medical devices is critical to the functioning of the healthcare system in the United States." LOC_AR_6162.

In some recognition of the D.C. Circuit's prior decisions regarding the application of the APA to the Library, Plaintiffs also raise a nonstatutory cause of action alleging that the Librarian acted *ultra vires*. Although Plaintiffs conflate waivers of sovereign immunity with causes of action in their argument, all parties agree that nonstatutory review imposes a higher burden for Plaintiffs than the APA. Plaintiffs have identified no persuasive reason why the Librarian's reasoned grant

1

of the Repair Exemption is so egregious that it should be overturned under that stringent standard.

Finally, Plaintiffs' amorphous constitutional separation of powers claim, which Plaintiffs appear to raise primarily as a statutory constitutional avoidance argument, fails to articulate a violation of separation of powers principles, and this Court should reject Plaintiffs' attempt to conflate Appointments Clause precedent with the principles of statutory interpretation necessary to interpret the statutory definitions in the APA.

For all the reasons set forth in Defendants' opening brief, and as explained further herein, Defendants ask the Court to grant their motion to dismiss or, in the alternative, for summary judgment and deny Plaintiffs' motion for summary judgment.

## ARGUMENT

### I.    The Library of Congress is Exempt from the APA.

As Defendants explained in their opening brief, binding precedent, indicia of congressional intent, and longstanding government practice dictate that the Library of Congress is exempt from the APA, full stop. Defs.' Mem. in Support of Mot. to Dismiss or, in the Alternative, for Summ. J. 16–23, ECF No. 16-1 ("Defs." Mot."). Faced with this overwhelming evidence to the contrary, Plaintiffs resort to creating their own theory of congressional intent, reading a gaping loophole into the APA's text as interpreted by the D.C. Circuit that would fundamentally reshape the Library's operations. According to Plaintiffs, in certain situations, the Library may be subject to the procedural and substantive requirements of the APA; in other unspecified situations, they may not. Defendants are unaware of another circumstance where a definition in the APA is read to have such a shifting meaning. This Court should reject Plaintiffs' invitation to ignore binding precedent and place the Library into a new, and entirely uncertain, regulatory context.

Plaintiffs argue that the APA applies to the Library of Congress when it engages in

rulemaking, but that the APA excludes the Library of Congress when it "functions as a legislative authority." Pls.' Consolidated Reply in Support of their Mot. for Summ. J. and Opp'n to the Govt.'s Mtn. to Dismiss 3, ECF No. 18 ("Pls.' Opp'n"). The text of the APA, however, does not support such a distinction. The APA applies only to "agency action," 5 U.S.C. § 702, and excludes "the Congress" from its definition of "agency," 5 U.S.C. § 701(b)(1)(A). Plaintiffs admit that the Library of Congress is organized under Title II of the United States Code, which governs "The Congress" and that, defined as such, the Library of Congress is exempt from the APA. Pls.' Opp'n 3. Like other enumerated entities listed in that definition, either the Library of Congress is an "agency," or it is not.

The D.C. Circuit has answered this question multiple times, concluding that the Library of Congress is, in fact, a part of "The Congress" as defined in the APA.[1] *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984) ("[T]he Library of Congress is not an 'agency' as defined under the Administrative Procedure Act."); *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) ("[W]e have held that the Library of Congress (part of the legislative branch but a separate entity from, 'the Congress,' narrowly defined) is exempt from the APA because its provisions do not apply to 'the Congress'—that is, the legislative branch.")[2]; *Ethnic*

---

[1] The Supreme Court also recognized in *Kissinger v. Reporters Committee for the Freedom of the Press*, 445 U.S. 136 (1980), that the Library of Congress "is not an 'agency'" within the meaning of the term used in the Freedom of Information Act ("FOIA"), *id.* at 145, which is the same definition that applies to the APA, *see* 5 U.S.C. § 552(f) (incorporating APA definition of agency that appears in 5 U.S.C. § 551(1) and 5 U.S.C. § 701(b)(1)). Plaintiffs accuse Defendants of being "highly misleading" by acknowledging that the Supreme Court recognized that the Library of Congress is not an agency for the purpose of FOIA. Pls.' Opp'n 9. But Defendants never characterized the Supreme Court's statement as anything other than that—a statement. While not a holding of the case, "certainly dicta of the United States Supreme Court should be very persuasive." *Gabbs Exploration Co. v. Udall*, 315 F.2d 37, 39 (D.C. Cir. 1963).

[2] Plaintiffs attempt to write off the court's statements in *Washington Legal Services* as "passing dictum," Pls.' Opp'n 8. Although that characterization is debatable, the D.C. Circuit has explained that dictum deserves "serious consideration," *Udall*, 315 F.2d at 39. Dictum is often accepted by

*Empls. of Library of Cong. v. Boorstin*, 751 F.2d 1405, 1416 n.15 (D.C. Cir. 1985) ("[T]he Library is not an agency under the Administrative Procedure Act."). Not a single one of these cases, or their blanket conclusions, rested on the nature of the action that the Library was performing each case. Plaintiffs' hybrid approach also finds no foothold in the decisions of courts that have reached similar conclusions with respect to other entities that are part of Congress. *See, e.g., Maynard v. Architect of the Cap.*, 544 F. Supp. 3d 64, 79–80 (D.D.C. 2021) (citation omitted) (rejecting argument that "only agencies of the Congress that perform congressional functions should be covered by the exemptions included in the APA" in holding that Architect of the Capitol was exempt from APA challenge to workplace conditions); *Pond Const., Inc. v. U.S. Gov't Accountability Off.*, No. 17-cv-0881, 2018 WL 3528309 at *1 (D.D.C. May 30, 2018) (citations omitted) (Although the APA "does not explicitly exclude an entity like [the Government Accountability Office] that is considered a 'legislative branch agency,'" it is "part of the legislative branch" and "[t]he APA, therefore, does not waive sovereign immunity for suits against GAO.").

Indeed, just a few years ago, a court in this district followed these precedents in concluding that "the Library of Congress is not an 'agency' as that term is defined in the APA," noting that the plaintiffs in that case had "pointed to nothing in the text of the APA, its legislative history, or legal precedent that suggests that Congress did not intend to include the Library of Congress when engaging in Executive Branch functions in 'the Congress' that it exempted from the APA's definition of 'agency.'" *Green v. DOJ*, 392 F. Supp. 3d 68, 99, 100 (D.D.C. 2019). Although the *Green* court declined to consider a separation of powers argument because it was not alleged in the Complaint, the court did not treat the issue of statutory interpretation as "an open one that it

---

Courts when persuasive, as it is here in summarizing binding D.C. Circuit precedent, *see, e.g. Conservation Law Foundation v. Pritzker*, 37 F. Supp. 3d 234, 248 (D.D.C. 2014) (finding analysis in dicta "persuasive").

declined to fully address," as Plaintiffs suggest.[3] Pls.' Opp'n 9. Rather, the Court plainly held that "the Library of Congress is not an 'agency' as that term is defined in the APA" and that "Congress did not expressly apply the APA to the DMCA." *Green*, 392 F. Supp. 3d at 100. This holding leaves little room for interpretation.

The singular way in which Plaintiffs attempt to distinguish these cases is by using language from an out-of-circuit constitutional case to create a test for APA review. Pls.' Opp'n 3 (quoting *Eltra Corp. v. Ringer*, 579 F.2d 294, 301 (4th Cir. 1978)). According to Plaintiffs, courts should "determine the capacity in which the Library is acting" by "'consider[ing] each [of its] function[s] . . . separately and . . . determin[ing] the character of each, whether legislative or executive.'" *Id.* (quoting *Eltra*, 579 F.2d at 301). Plaintiffs then conclude that this test "explains the outcome in *Clark*." *Id.* The problem with Plaintiffs' approach is that *Eltra* itself does not mention the APA, much less provide any basis for interpreting the APA's text. It is also difficult to see how this approach could explain *Clark*, which concerned an employment dispute that was neither inherently legislative nor executive in nature, or other similar cases.

To be sure, the D.C. Circuit and at least one lower court have acknowledged, as the Fourth Circuit does in *Eltra*, that some of the Library's functions were associated with the executive branch for the purpose of determining whether the Librarian was a "Head of Department" as defined by Supreme Court precedent interpreting the Appointments Clause, or otherwise in compliance with the Appointments Clause. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012) ("We too hold that the Librarian is a Head of Department. . . ."); *Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25, 43 (D.D.C. 2010)

---

[3] Plaintiffs also argue that "the government does not place any significant weight" on *Green*, Pls.' Opp'n 9, a proposition belied by the fact that the government cited to *Green* on pages 2, 17, and 20 of its opening brief.

("[E]ven though the Library is codified under Title II and is a free standing entity that operates independently from the Executive Branch in conducting its daily operations, the Librarian appears to nonetheless qualify as a Head of Department. . . ."). But, given the complete lack of intersection between these constitutional decisions and the D.C. Circuit's binding precedent interpreting the text of the APA, there is no reason to believe that the constitutional test has meaning for statutory review. Indeed, the courts in the constitutional cases were undertaking entirely different enquiries from statutory interpretation.

Moreover, and as explained in Defendants' opening brief, other indicia of Congressional intent support the D.C. Circuit's interpretation of the APA's text. Defs.' Mot. 17–18. Tellingly, Plaintiffs barely acknowledge these points in their opposition. For example, Plaintiffs gloss over the fact that Congress amended U.S. copyright law to make the Copyright Office, a subsidiary of the Library of Congress, subject to the APA. *See* 17 U.S.C. § 701(e); H.R. Rep. No. 94-1476 at 171 (1976) *reprinted in* 1976 U.S.C.C.A.N. 5659, 5787 ("Under an amendment to section 701 adopted by the Committee, the Copyright Office is made fully subject to the [APA] . . . ."). According to Plaintiffs, this provision would not be superfluous under their reading of the APA because it "reflects Congress's determination that orders and decisions of the Copyright Office should be subject to APA review without regard for whether the Office is performing executive functions." Pls.' Opp'n 5 n.1. If that were Congress's intent, however, this revision would have been an opportune time for it to say so. Instead, Congress provided no indication at all that the specific actions being performed by the Office were at all relevant to its inclusion in the APA. Plaintiffs offer no reason why the Court should accept such a strained interpretation of both the text of the APA and the amendment to copyright law when the canon against surplusage offers a more cogent explanation of Congress's action. *See Hohn v. United States*, 524 U.S. 236, 249

(1998) ("We are reluctant to adopt a construction making another statutory provision superfluous."). Plaintiffs also offer no response to Defendants' point that the longstanding practice and public understanding of the Library is that its triennial rulemaking under the DMCA is not subject to the APA, further suggesting that Congress did not intend for the APA to apply. U.S. Copyright Office, Section 1201 of Title 17: A Report of the Register of Copyrights 150 n.806 (June 2017), LOC_AR_9379 (noting that the "Librarian of Congress" is "exempt from the APA").

Plaintiffs' remaining arguments regarding statutory interpretation are misguided. First, Plaintiffs continue to conflate the Federal Register Act's ("FRA") definition of "agency" with the APA's definition of "agency," despite the fact that Congress defined them differently and did not define one by reference to the other. *C.f.* 44 U.S.C. § 1501 (defining "agency" to exclude "the legislative or judicial branches of the Government") with 5 U.S.C. § 701(b)(1) (defining "agency" to exclude "the Congress"). Moreover, Congress provided additional flexibility in interpreting the definitions in the FRA than it did in the APA, adding a disclaimer that the FRA's definitions should be given the stated meaning "unless the context otherwise requires." 44 U.S.C. § 1501. And while Plaintiffs cite to a case quoting a Senate Judiciary Committee Report stating that "the term 'agency' is defined "substantially as in . . . the Federal Register Act," Congress in enacting the APA in fact chose different language, and even the Senate Report does not suggest that the statutes define the term "agency" identically. Pls.' Opp'n 4 (quoting *Wash. Legal Found.*, 17 F.3d at 1449); *Administrative Procedure Act, Legislative History 79th Cong., 1944-46*, S. Doc. No. 248, 79th Cong., 2d Sess. (1946). Nothing in Plaintiffs' argument asking the Court to conflate two different statutes provides enough basis to overturn years of precedent interpreting "a point of statutory construction." *See United States v. Burwell*, 690 F.3d 500, 504, 515 (D.C. Cir. 2012) (internal quotation omitted).

7

Second, although the D.C. Circuit has already interpreted the APA to exclude the Library of Congress, Plaintiffs argue that the presumption in favor of judicial review is cause for this Court to reconsider the D.C. Circuit's interpretation. Pls.' Opp'n 5–6. However, the presumption only applies when "a statutory provision is reasonably susceptible to divergent interpretation." *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020) (internal quotation omitted). For all the reasons already explained, the APA's definition of "the Congress" as including the Library of Congress is not "reasonably susceptible" to a different interpretation. *Id.* In any event, as all parties and the D.C. Circuit acknowledge, some manner of judicial review remains for *ultra vires* action in particular circumstances where such review is appropriate. *Clark*, 750 F.2d at 102 ("It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority.").

Finally, as discussed *infra*, Part IV, the constitutional avoidance canon has no applicability here, where the statutory scheme satisfies all constitutional requirements.

II.   **Even if the Court Determines that the Library of Congress is Subject to the APA, Promulgation of the Repair Exemption Satisfies all Procedural and Substantive Requirements of the APA.**

   A.   **Concluding that Diagnosis, Maintenance, and Repair of Medical Devices Are Likely Noninfringing Fair Uses Was Reasonable.**

The Librarian's conclusion that diagnosis, maintenance, and repair of medical devices are likely noninfringing fair uses of copyrighted software easily meets the "minimal standards of rationality" required by the APA, *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997), as explained in Defendants' opening brief. Defs.' Mot. 23–34. Plaintiffs' lone attack on the Librarian's decision is to argue that the decision is "not in accordance with law" because it is "unsupportable under the fair use-doctrine." Pls.' Opp'n 9–10. Plaintiffs' argument faces an uphill

battle because of the very nature of that doctrine. The fair use doctrine is a court-made "equitable rule of reason" that allows courts to "avoid rigid application of the copyright statute" when strict applications would be contrary to the goals of copyright law. *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1196 (2021). Although the Copyright Act "embodies" the fair use doctrine in four statutory factors, the factors are "not exhaustive" and do not "dictate[]" how the doctrine will be necessarily applied. *Id.* at 1196–97. The Librarian, by adopting the Register's Recommendation, can thus only predict how courts are likely to apply the discretionary fair use doctrine in determining that certain uses are likely noninfringing fair uses. And because no one factor is strictly determinative in the analysis, Plaintiffs would have to show that the Librarian's decision was such an unreasonable prediction of the judge-made fair use doctrine that it defies the bounds of rationality and reason. Plaintiffs have failed to make this showing.

Continuing to rely on outdated cases and ignoring key parts of the Register's analysis, Plaintiffs argue that the first statutory fair use factor, the purpose and character of the use, cannot possibly support a fair use finding. Plaintiffs' conclusion is simply not supported by the record, and Plaintiffs have not persuasively argued that the Register's recommendation, as adopted by the Librarian is "not in accordance with law." Pls.' Opp'n 10. First, Plaintiffs take issue with the Register's conclusion that diagnosis, maintenance, and repair of medical devices is "likely" a "transformative" use, LOC_AR_1782, arguing that the only support for this finding is the Register's statement that she "previously concluded that diagnosis and repair are likely to be transformative uses," Pls.' Opp'n 10–11. This is belied by the Recommendation itself. In the same paragraph of the Recommendation, directly before the Register's statement about her prior conclusions, the Register explains that diagnosis, maintenance, and repair "are intended to restore a medical device or system's functionality, not to commercialize the embedded copyrighted

software and other servicing materials." LOC_AR_1782.

As Defendants demonstrated in their opening brief, Defs.' Mot. 25–27, this statement is key to understanding why diagnosis, maintenance, and repair are transformative uses. A use can be transformative even if it makes "an exact copy of a work . . . so long as the copy serves a different function than the original work." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (holding that use of photographs in a search engine was transformative because the purpose was to create an electronic reference tool, which differed from the purpose of the original photographs); *see also Authors Guild v. Google, Inc.*, 804 F.3d 202, 216 (2d Cir. 2015) ("We have no difficulty concluding that Google's making of a digital copy of Plaintiffs' books for the purpose of enabling a search for identification of books containing a term of interest to the searcher involves a highly transformative purpose. . . ."); *A.V. ex rel Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639–40 (4th Cir. 2009) (finding that archiving student papers for plagiarism detection program was transformative even though work was "unaltered and in its entirety" because the program's use "had an entirely different function and purpose than the original works"); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) (finding that printing works "originally intended to appear in modeling portfolios" in newspaper with commentary was transformative use that weighed in favor of fair use). Rather than "supersed[ing]" the medical equipment software for the purpose of developing identical medical equipment or rendering the software obsolete, *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994), the Register concluded that copying necessary for diagnosis, maintenance, and repair would serve to "restore a medical device or system's functionality," a purpose that enhanced the use of the embedded software. LOC_AR_1782.

Plaintiffs dismiss these arguments as "post hoc rationalizations," Pls.' Opp'n 12, but they

can only be characterized as such if one willfully ignores, as Plaintiffs have, the Register's focus on the restoration of a device's functionality in her Recommendation. Given the fact that the Register produced a 356-page recommendation addressing a myriad of complex copyright issues, it is unsurprising that she would not have addressed this issue in as much detail as the Government's opening brief. But that additional explanation, based on the Register's original conclusion, does not constitute an impermissible post-hoc rationalization. *See Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1204 (D.D.C. 1996); *Oceana v. Bureau of Energy Management*, 37 F. Supp. 3d 147, 159 n.11 (D.D.C. 2014); *Cavanaugh v. Wainstein*, No. 05-123 (GK), 2007 WL 1601723 at *11, n.12 (D.D.C. June 4, 2007).

Alternatively, Plaintiffs attempt to dismiss the Register's reasoning on its merits, arguing that restoring functionality to medical equipment is the same purpose for which the medical equipment's software was designed.[4] Pls.' Opp'n 12–13. Presumably, manufacturers develop medical equipment (and the software that controls such equipment) for the purpose of using such equipment. Take an MRI machine for example—the purpose of the software that controls the MRI machine is to take MRIs that allow medical professionals to use the images for treating patients. The purpose cannot be to restore that MRI machine's functionality, otherwise the manufacturers would be assuming that their machine is already non-functional. Thus, by copying software for the purpose of repairing, maintaining, and diagnosing broken MRI machines or other medical equipment, users are attempting to restore the machine to the same functionality that it possessed

---

[4] Plaintiffs correctly note that the Government inadvertently misstated the scope of the Repair Exemption five times, Defs.' Mot. 23, 24, 28, 33, as "diagnosis, maintenance, and repair of medical equipment software" rather than "diagnosis, maintenance, and repair" of medical equipment or medical devices. The Government correctly defined the Repair Exemption throughout the majority of its brief, however, and specifically acknowledged that "alter[ing]" the software "is outside the scope of the Repair Exemption." Defs.' Mot. 27. Importantly, none of the Government's arguments rested on its inadvertent error, and there is no prejudice to any party's position from it.

prior to the need for repair, not to make medical images for the purpose of diagnosing medical conditions.

As explained in Defendants' opening brief, the Register also based her conclusion on prior recommendations concluding that diagnosis, maintenance, and repair are likely transformative uses for other software-enabled devices such as cars, smartphones, and household appliances. Defs.' Mot. 25–26. Plaintiffs take issue with this reasoning by saying that it is inappropriate to make categorical determinations of fair use. Pls.' Opp'n 11. Defendants agree that fair use is a fact-specific inquiry, but the Register is not violating this principle by referencing two prior exemptions that share commonalities. The Register also spends several pages examining the facts specific to the analysis of medical devices. LOC_AR_1781–1785.

Plaintiffs also mis-read these prior decisions to apply only to "modification," a use not at issue here, by once again ignoring the plain language and analysis of the Register's recommendations. In the 2015 Recommendation, for example, the Register considered whether "diagnosis, modification, and repair" of automobile computer programs was likely transformative. LOC_AR_1059–1060. In addition to discussing modification with diagnosis and repair, however, the Register singled out diagnosis and repair separately, noting that "the proposed uses for diagnosis and repair would presumably enhance the intended use of ECU computer programs," which supported a fair use finding under the first factor. *Id.* This analysis closely tracks the Register's reasoning in recommending the Repair Exemption at issue here. Moreover, and contrary to Plaintiffs' characterization, the Register did not base her finding that some "proposed uses" of ECU computer programs are "likely transformative," solely on modification of computer programs. *Id.* Rather, she concluded that copying the software would "facilitate functionalities such as diagnosis, modification, and repair." LOC_AR_1059. The Register said that such uses

"*may also* extend to modification" but did not suggest that modification was required, *id.*, as Plaintiffs suggest. Pls.' Opp'n 11–12.

When the Register later relied on her 2015 analysis in recommending a 2018 exception for repair of certain consumer products, she did not "unthinkingly cite" to the 2015 Recommendation, as Plaintiffs posit. Pls.' Opp'n 11. Instead, the Register reasonably explained that "because the fundamental purpose of repair is to restore the functionality of a device so that it may be used, repair supports—rather than displaces—the purpose of the embedded programs." LOC_AR_1434 (internal quotation omitted). She then referenced the 2015 Recommendation's conclusion that diagnosis and repair would "enhance the intended use of the vehicle programs" and cited an internal report observing "an emerging general understanding that bona fide repair and maintenance activities are typically noninfringing." *Id.* (internal quotations omitted). At no point in this analysis did the Register mention modification. Indeed, she separately analyzed modification of consumer devices later in the same Recommendation. *See* LOC_AR_1439–1440. The 2015 and 2018 analyses focusing on the function and purpose of repair versus the standalone value of the software itself thus closely track the Register's analysis in recommending the Repair Exemption, where she specifically reasoned that diagnosis, maintenance, and repair "are intended to restore a medical device or system's functionality, not to commercialize the embedded copyrighted software and other servicing materials." LOC_AR_1782.

Second, Plaintiffs fall back on their argument that commerciality negates the Register's analysis, arguing that commerciality controls when, as Plaintiffs contend, there is no transformative use. Pls.' Opp'n 10, 13–14. Plaintiffs' argument relies on a misunderstanding of the governing precedent. Transformative use is not an absolute requirement for application of the fair use doctrine, *Campbell*, 510 U.S. at 579, and there is no presumption that commercial use of

copyrighted materials is not fair, regardless of whether the proposed uses are transformative, *id.* 584–85.[5]

Plaintiffs also continue to rely on two non-binding cases that do not undertake the fair use analysis as contemplated by current Supreme Court precedent, *Triad Systems Corporation v. Southeastern Express Company*, 64 F.3d 1330 (9th Cir. 1995), and *Advanced Computer Services of Michigan, Inc. v. MAI Systems Corporation*, 845 F. Supp. 356 (E.D. Va. 1994). Although Plaintiffs claim that the courts in *Triad Systems* and *MAI Systems* "carefully balanced the full range of fair-use factors," the opinions themselves suggest otherwise. Pls.' Opp'n 14. The Court in *MAI Systems* did not evaluate whether the proposed use was transformative at all, instead relying solely on the commercial nature of the use, which the Supreme Court has since clarified is not dispositive in fair use analysis. 845 F. Supp. at 365, *cf. Campbell*, 510 U.S. at 584–85. The Court in *Triad* also relied on commerciality, conducting its limited transformative use analysis without reference to the standard set forth in *Campbell*. *Triad Sys. Corp.*, 64 F.3d at 1336–37.

The Register also reasonably concluded that the second and third statutory fair use factors weighed in favor of a fair use determination. Plaintiffs offer little meaningful response to that conclusion. With respect to the second factor, "the nature of the copyrighted work," the Register relied on legal precedent favoring fair use when computer programs were used for their functional aspects rather than as expressive works. LOC_AR_1783 (collecting cases). In tacit acknowledgement that the second statutory factor indeed favors fair use, Plaintiffs fail to offer any opposition to Defendants' arguments in their brief. Similarly, with respect to the third statutory

---

[5] Under Plaintiffs' own theory of the relevance of commerciality, however, Plaintiffs would appear to concede that the first statutory fair use factor favors the Repair Exemption if the Court agrees that the proposed use is transformative. Pls.' Opp'n 13 ("We acknowledge here . . . that profit motive can be overcome with evidence of transformative use. . . .").

factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," Plaintiffs do not disagree that "copying a large[] amount of material can fall within the scope of fair use where the material copied . . . is central to a copier's valid purpose." *Google*, 141 S. Ct. at 1205. Instead they merely repeat their argument that repair is not a transformative use. Pls.' Opp'n 14.

With respect to the fourth statutory fair use factor, effect on the market for the copyrighted work, Plaintiffs advance an expansive view of market harm that is inconsistent with how courts analyze this factor by urging this court to look beyond sales and licensing of software installed on medical devices to the service contracts for repair of the devices themselves. In analyzing market harm, courts only consider harms that result because of market substitution, where the secondary use market (here, the repair market) is substituting for the original (here, the software market). *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004) (noting that "relevant question" in fourth factor analysis was whether the infringement "impact[s] the market for the copyrighted work itself"); *Campbell*, 510 U.S. at 590 (considering whether use of copyrighted materials "would result in a substantially adverse impact of the potential market for the original"); *SOFA Ent., Inc. v. Dodger Prod., Inc.*, 709 F.3d 1273, 1280 (9th Cir. 2013) ("Where the secondary use is not a substitute for the original . . . the fourth factor weighs in favor of fair use."); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99 (2d Cir. 2014) ("[T]he Factor Four analysis is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work.").

Here, the original market is that of the software itself, typically sold with the device that it runs on. By Plaintiffs' own admission, "one typically does not buy the machine without licensing the software needed to run it." Pls.' Opp'n 15. Thus, the market for sale of the software is upfront

at the time of purchase of the device, such that the software can "guide the device's operability" and "deliver . . . advanced capabilities" as Plaintiffs' proffer. *Id.* Accessing and copying that software to repair the medical devices that it is designed to control does not usurp the original market for the software itself because "there is no indication that the software serves any function, or has any value, except for use with the medical device or system for which it was designed." LOC_AR_1785.

Plaintiffs' arguments to the contrary are unavailing. Plaintiffs argue that prices for medical devices will go up, causing them to lose money, if they cannot recoup costs by monopolizing downstream servicing contracts for medical devices. Pls.' Opp'n 15. But the market for repair of medical devices is not the same as the market for software operating medical devices and the repair market does not give rise to harm by market substitution. *See Lexmark Int'l, Inc.*, 387 F.3d at 545 (holding that district court focused "on the wrong market" and noting that alternate markets are "not the sort of market or value that copyright law protects"). That Plaintiffs may need to recalibrate their business model to account for competition on the medical device repair market should not render use of software for repair an infringing use.

Plaintiffs further argue that they will "have little incentive to innovate [by creating] derivative works,"[6] but that is similarly irrelevant to market harm analysis because, as the Supreme Court stated in *Campbell*, "the only harm to derivative works that need concern us . . . is the harm of market substitution." 510 U.S. at 593. Plaintiffs do not allege that ISOs intend to use the software other than in association with their repair services, and thus Plaintiffs cannot conceivably

---

[6] As an aside, the validity of this argument is debatable. For example, derivative works in the form of free or low-cost software upgrades are ubiquitous with many consumer products, including smartphones. The manufacturer of a medical device would similarly have ample incentive to improve its product (and fix known issues) in order to maintain brand reputation and customer loyalty, as well as encourage professional recommendations.

suffer market substitution harms for future derivative works they may create.

Plaintiffs also conclude, without support, that diagnosis, maintenance, and repair of medical devices would "create technical vulnerabilities that put patient safety in jeopardy, decreasing the confidence in the functioning of serviced medical devices and thus diminishing their market value." Pls.' Opp'n 15–16. Again, this is not a claim of market substitution. But even if it were, the underlying claim is meritless. The Repair Exemption defines "maintenance" as the "servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system." *Id.* at § 201.40(b)(15)(i). It similarly defines "repair" as "the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system." *Id.* at § 201.40(b)(15)(ii). In other words, the software used for maintenance or repair of the medical devices must in all respects be functionally the same as that which was installed on the device before the user engages in maintenance or repair. It is thus unclear how maintenance or repair could "create technical vulnerabilities" or decrease confidence in the functioning of the machine. Indeed, the FDA concluded that many ISOs "provide high quality, safe, and effective medical device servicing" and did not find sufficient evidence to "justify imposing additional regulatory requirements on ISOs." LOC_AR_6162. Moreover, any use outside of diagnosis, maintenance, and repair as defined by the Repair Exemption would be outside the scope of the Librarian's action and not relevant to the fair use analysis.

Plaintiffs also repeat their prophetic harms about impacts on cybersecurity, accusing Defendants of making a "stunning misrepresentation" about the FDA's statements. Pls.' Opp'n 16. But it is Plaintiffs who disregard the FDA's conclusion that that the Repair Exemption would not "necessarily and materially jeopardize the safety and effectiveness of medical devices in the United

States with respect to cybersecurity" by suggesting that the FDA agrees with Plaintiffs' statement of possible harms. LOC_AR_6162. Plaintiffs ignore the FDA's statements that ISOs may help prevent cybersecurity attacks because they are "well positioned to help identify and address security vulnerabilities" and that "ISOs may play an important role in maintaining the overall quality, safety, and efficacy of medical devices." LOC_AR_6162.

At bottom, in opposing the Repair Exemption, Plaintiffs essentially "attempt to monopolize the market" for repair, which "runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine." *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523–24 (9th Cir. 1992). Because the Librarian's determination, based on the Register's Recommendation, that use of medical equipment software for diagnosis, maintenance, and repair of medical equipment was likely a fair use supported by the record, Plaintiffs' substantive APA challenge should be rejected.

### B.    The Librarian Responded to All Significant Comments by Adopting the Register's Recommendation.

The Librarian more than adequately responded to all significant comments by adopting the Register's Recommendation. While an agency must address "significant comments raised during the rulemaking," the "obligation to respond . . . is not particularly demanding." *Ass'n of Private Sector Coll. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012) (internal quotation omitted). Plaintiffs appear to concede that the Librarian in fact responded to each of these comments but contest the sufficiency of the responses. However, an agency is also "not required to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking," *Public Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 197 (D.C. Cir. 1993) (internal quotation omitted), and the Librarian's explanations demonstrate her consideration of the "relevant factors." *City of Waukesha v. EPA*, 320 F.3d 228, 258 (D.C. Cir. 2003).

18

First, Plaintiffs argue that the Librarian, in adopting the Register's Recommendation, "did not address comments calling for a device-specific analysis of the fair-use doctrine." Pls.' Opp'n 17–18. But the Register explained her basis for grouping classes, noting that Congress directed the classes not to be drawn too "narrowly." LOC_AR_1582 (quoting Staff of H. Comm. On The Judiciary, 105th Cong., Section-By-Section Analysis of H.R. 2281 As Passed By the United States House of Representatives on August 4, 1998, at 7 (Comm. Print 1998)). In any event, the Librarian agreed that medical devices should be evaluated separately from other devices in conducting the statutory analysis. LOC_AR_1772. This analysis did not simply parrot earlier findings on consumer devices, as Plaintiffs suggest. Pls.' Opp'n 17–18. To the contrary, the Librarian explained that "most medical devices cited in the record are not 'consumer devices' and vary in terms of their function, TPMs, and software licenses." LOC_AR_1772. Plaintiffs also appear to argue that, even though the Librarian said she would analyze repair of medical devices separately, she did not actually do so. Pls.' Opp'n 18. But while Plaintiffs rely on isolated references to other repair exemptions to support their claim, the Recommendation actually engages in a complex and thorough fair use analysis on all relevant fair use factors, as explained *infra*, Part II.A, and does not rest entirely on previous exemptions.

Second, Plaintiffs argue that the Librarian failed to address comments highlighting ISOs' for-profit interests in OEM's copyrighted material because she did not address "why, in this case, the purely commercial nature of the ISOs' proposed uses is overcome by other considerations." Pls.' Opp'n 18. But, as explained in Defendants' opening brief, Defs.' Mot. 35–36, the Librarian considered commerciality in the context of the first fair use factor. Plaintiffs repeatedly ignore the Register's conclusion that, although the use is commercial, those engaged in medical device repair use copyrighted material for a different and transformative purpose than OEMs intended, *i.e.,* to

"restore a medical device or system's functionality." LOC_AR_1782. Regardless of whether Plaintiffs agree with the Register's substantive analysis, it cannot be argued that the Register failed to identify a basis for that analysis.

Finally, Plaintiffs argue that "the Librarian did not address opponents' concern for the Exemption's chilling effect on innovation or its negative impact on the value of the copyrighted software and medical devices." Pls.' Opp'n 18–19. Plaintiffs are clear that their argument is specific to "depriving OEMs of servicing and licensing revenues," and not from actual competition for medical devices or the software that operates such devices. *Id.* at 19. As explained, *infra*, Part II.A., however, the only market that is relevant to fair use analysis is the market for the copyrighted work, which does not include downstream service contracts. To the extent that Plaintiffs are commenting on a factor not relevant to the fair use analysis, the Register's failure to respond would be insignificant because "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *City of Waukesha*, 320 F.3d at 258 (internal quotation omitted).

With respect to their comments regarding potential security vulnerabilities, Plaintiffs misstate the Register's response. Rather than saying that she "would not" consider these concerns, Pls.' Opp'n 19, she said, in fact, that she "generally does not" consider non-copyright related concerns but, here, noted the FDA's comments regarding the Repair Exemption. LOC_AR_1802. As explained further, *infra* Part II.A., the FDA did not conclude that Plaintiffs' dire cybersecurity predictions were in fact true. Indeed, the Register quoted the conclusion "that the available evidence was insufficient to conclude whether or not there is a widespread public health concern relating to medical device servicing." LOC_AR_1802. The Register also emphasized that "modification" is not part of the proposed exemption, reducing security risks to underlying

firmware. *Id.* Having determined that there is no valid security risk, there was no need to evaluate the further impact of this speculative risk.

Because the Librarian "considered the 'relevant factors'" in deciding to grant the Repair Exemption, Plaintiffs' procedural APA challenge lacks merit. *Am. Iron & Steel Institute v. EPA*, 115 F.3d 979, 1005 (D.C. Cir. 1997).

### III. The Librarian Did Not Violate a Clear and Mandatory Statutory Command such that Plaintiffs' *Ultra Vires* Claim Can Survive.

Recognizing that their APA claim is unlikely to succeed, Plaintiffs plead an alternative *ultra vires* claim alleging that the Librarian acted so far outside of her statutory authority that this Court should imply a cause of action to review the Repair Exemption. Plaintiffs' arguments are unpersuasive, as they rely on an incorrect understanding of the legal framework for *ultra vires* claims and fail to identify a purported statutory violation sufficient to undergird such a claim.

Plaintiffs create a false dichotomy between review under *Larson v. Domestic & Foreign Commerce Corporation*, 337 U.S. 682 (1949) and *Leedom v. Kyne*, 358 U.S. 184 (1958) by conflating waivers of sovereign immunity with causes of action. It is axiomatic that a plaintiff must identify a "(1) a source of subject matter jurisdiction; (2) a waiver of sovereign immunity; and (3) a cause of action" when bringing suit against the United States. *Kialegee Tribal Town v. Zinke*, 330 F. Supp. 3d 255, 263 (D.D.C. 2018). For "agencies" as defined under the APA, the APA provides, with some other exceptions not relevant here, both the required waiver of sovereign immunity and cause of action. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187 (D.C. Cir. 2006); *see also* 5 U.S.C. § 702. But because the Library of Congress is not an "agency" for the purpose of the APA, *see supra* Part I, Plaintiffs must identify a different waiver of sovereign immunity and cause of action.

*Larson* provides the required waiver of sovereign immunity. *See Clark v. Library of Cong.*,

750 F.2d 89, 103 (1984). For a nonstatutory ultra vires claim to succeed, however, Plaintiffs must

also assert a cause of action. *See Trudeau*, 456 F.3d at 190; *Am. Transp. Builders Ass'n v. EPA*,

No. 12-5244, 2013 WL 599474 at *1 (D.C. Cir. Jan. 28, 2013). *Leedom* articulates one such cause

of action. *See Trudeau*, 456 F.3d at 190 (describing the nonstatutory cause of action by reference

to *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988), which calls the cause of action the

"*Leedom v. Kyne* exception"). As traditionally formulated, this cause of action requires that "the

statutory preclusion of review is implied rather than express," "there is no alternative procedure

for review of the statutory claim," and the "agency plainly acts in excess of its delegated powers

and contrary to a specific prohibition in the statute that is clear and mandatory." *Nyunt v.

Chairman, Broadcasting Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (internal quotation

omitted).

      In any event, it is incorrect to suggest, as Plaintiffs do, that Plaintiffs' burden is "simply to

show that the Librarian's action was not within her statutory powers or that her powers or their

exercise were constitutionally void." Pls.' Opp'n 21 (internal quotation omitted). That is the test

to determine whether the *Larson* waiver of sovereign immunity exists at all. Indeed, the primary

cases Plaintiffs cite for their incorrect proposition make this distinction clear. The court in *Doehla

Greeting Cards v. Summerfield*, 227 F.2d 44, 46–47 (D.C. Cir. 1955), for example, emphasized

that "[a] claim of error" in the exercise of delegated power "is not sufficient" to support an *ultra

vires* claim, and further explained that "[n]ot every statutory prescription of elements requisite to

administrative action is jurisdictional." In *North American Butterfly Association*, which Plaintiffs

cite approvingly for the proposition that "*[u]ltra vires* review is intended to be of extremely limited

scope, and it represents a more difficult course than would review under the [APA]," Pls.' Opp'n

21, the D.C. Circuit recently described the test for an *ultra vires* cause of action as requiring

violation of "a specific prohibition in the statute that is clear and mandatory," a violation that was "obviously beyond the terms of the statute," or action that "was far outside the scope of the task that Congress gave it." 977 F.3d. 1244, 1263 (D.C. Cir. 2020).[7] If Plaintiffs' view to the contrary were the law, the it is unclear what purposes the APA even serves, as *ultra vires* review would not represent a "more difficult course than the APA," which Plaintiffs admit that it must. Pls.' Opp'n 21.

To state an *ultra vires* cause of action, then, Plaintiffs must allege that the Librarian violated a "clear statutory command," *DCH Regional Medical Center v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019), sometimes framed as a "nondiscretionary" requirement, *North American Butterfly Association*, 977 F.3d at 1262. As explained in Defendants' opening brief, Defs.' Mot. 37–40, Plaintiffs have not met this burden because the Librarian's determination that the Repair Exemption was based on noninfringing fair uses is an inherently fact specific determination. *See Am. Soc'y for Testing and Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 448 (D.C. Cir. 2018). The statutory requirement that uses be likely noninfringing is thus "merely" an "element[s] necessary to a sound ruling" and not a "jurisdictional prerequisite" that may be enforced through *ultra vires* review. *Doehla*, 227 F.2d at 47. Plaintiffs do not meaningfully contest this point, arguing only in substance that the Librarian was wrong to determine that the uses covered by the Repair Exemption are noninfringing. Pls.' Opp'n 21.

Perhaps recognizing the weakness of their claim, Plaintiffs suggest that the Librarian "arrogat[ed] . . . power" to herself that Congress did not confer by adopting the Register's

---

[7] The Court in *North American Butterfly Association* also explicitly relied on *DCH Regional Medical Center v. Azar*, 925 F.3d 503 (D.C. Cir. 2019). *N. Am. Butterfly*, 977 F.3d at 1263 (quoting *DCH Regional*, 925 F.3d at 509). *DCH Regional*, in turn, described the doctrine providing for nonstatutory review as "trac[ing] to *Leedom v. Kyne*," further highlighting the arbitrary distinction in precedent that Plaintiffs try to create. *See DCH Regional*, 925 F.3d at 509.

Recommendation "to address the broader competitive concerns recently highlighted by the Executive Branch," LOC_AR_1801. Pls.' Opp'n 21–22. It is difficult to see how this one sentence, which was not even a part of the fair use analysis but rather a part of the DMCA statutory analysis, could be an action outside of the Librarian's statutory jurisdiction when the DMCA expressly permits the Librarian to consider "such other factors as the Librarian considers appropriate" in deciding to grant an exception. 17 U.S.C. § 1201(a)(1)(C)(v). For that reason, Plaintiffs' attempt to distinguish *North American Butterfly Association* is unpersuasive.

At bottom, Plaintiffs' *ultra vires* claim is simply an attempt to restate their APA claim in light of the Library's exemption from the APA. This attempt should be rejected.

## IV.    The APA's Exclusion of the Library of Congress Does Not Create a Constitutional Separation of Powers Violation.

Plaintiffs fail to articulate a colorable claim that interpreting the APA's reference to "the Congress" to include the Library of Congress violates the constitutional separation of powers. In their opposition, Plaintiffs give little attention to the constitutional argument other than repeating it as a reason to construe the definition of "agency" in the APA to include the Library (at least in some instances).

As discussed in the Government's opening brief, the DMCA's rulemaking scheme does not unlawfully confer executive authority on the legislative branch. Unlike in schemes that courts have held unconstitutional in the past, the Librarian of Congress and the Register of Copyrights are subject to the control of the Chief Executive in carrying out these responsibilities, which resolves any constitutional concerns. *Cf. Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276–77 (1991) (invalidating a scheme that created a review board partly composed of members of Congress); *Bowsher v. Synar*, 478 U.S. 714, 733–34 (1986) (invalidating investment of executive powers in an officer removable by Congress); *Buckley v.*

*Valeo*, 424 U.S. 1, 140–41 (1976) (per curiam) (holding that Congress could not vest administrative powers in a commission whose members were not appointed pursuant to the Appointments Clause, U.S. Const. art. II, § 2, cl. 2). Plaintiffs do not meaningfully contend otherwise and, as explained *infra* Part I, because there is no conflict between courts' constitutional decisions and binding D.C. Circuit precedent interpreting the APA, there is no reason to interpret the APA to create a constitutional problem that does not exist.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss or, in the alternative, motion for summary judgment should be granted. If the Court awards summary judgment to Plaintiffs, however, it should vacate and remand the Repair Exemption to the Librarian, without vacating and remanding the entire rule.[8]

Dated: June 30, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ERIC WOMACK
Assistant Branch Director

 */s/ Rachael L. Westmoreland*
RACHAEL L. WESTMORELAND
Trial Attorney (GA Bar No. 539498)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20001
Tel: (202) 514-1280
E-mail: rachael.westmoreland@usdoj.gov

---

[8] Defendants presented more fulsome argument on the appropriate remedy in their opening brief at 44–45. Because Plaintiffs either agree or take no position on Defendants' requested remedy, Pls.' Opp'n 22–23, Defendants do not elaborate further here.