**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MEDICAL IMAGING &
TECHNOLOGY ALLIANCE, et al.,

*Plaintiffs*,

*v.*

LIBRARY OF CONGRESS, et al.,

*Defendants*.

No. 1:22-cv-499 (BAH)

**JOINT APPENDIX**

**VOLUME 4 OF 6
(page excerpts AR 2927-3318)**

Rachael Westmoreland
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, D.C., DC 20530
   (202) 514-1280
   rachael.westmoreland@usdoj.gov

*Counsel for Defendants*

Michael B. Kimberly
   McDermott Will & Emery LLP
   500 North Capitol Street NW
   Washington, DC 20001
   (202) 756-8000
   mkimberly@mwe.com

*Counsel for Plaintiffs*

troubleshooting of the medical equipment (when a clinical technician could instead readily access the error logs), medical personnel are prone to retry use of the equipment to confirm that the equipment is malfunctioning.[48] Thus, for example, if an error occurs partway through an X-ray scan, the patient might get rescanned, thereby being subjected to extra X-ray dosing.[49]

In that regard, restrictions placed on the repair of medical devices is a risk to public safety.[50] Particularly at the height of the COVID-19 pandemic, repair and maintenance issues have increased on essential medical devices like ventilators.[51] Providing access to repair medical equipment safely and efficiently is a matter of life and death.[52]

More specifically, medical systems and devices play a pivotal role in the screening and diagnosis of COVID-19. For example, reverse-transcription polymerase chain reaction (RT-PCR), which is an essential tool for medical laboratories, and chest computerized tomography (CT) are used as diagnostic tests for COVID-19.[53] Additionally, chest X-ray machines are integral to the treatment of COVID-19 positive patients and the study of the long-term effects. Given the ubiquitous nature of COVID-19, there exists a need for hospitals, medical schools, and other medical providers to allow unfettered diagnosis, repair, and maintenance of these life-saving tools without having to wait for the limited resources of the OEMs.[54]

In an area where properly functioning machines can literally be a matter of life and death to patients, hospital and other machine owners need as many quality options as possible to keep the machines functioning properly. Petitioner's business model as an ISO, as well as the business models of other ISOs, is dependent upon the ability to quickly and efficiently respond to service requests from these owners and lessees, which significantly enhances patient safety.[55] As noted

---

[48] Kahler Decl. at ¶ 13.

[49] *Id.*

[50] *See, e.g.,* Rona Bahreini, Leila Doshmangir, and Ali Imani, Influential factors on medical maintenance management In search of a framework, Journal of Quality in Maintenance Engineering, Volume 25, Issue 1 (June 12, 2018) ("Lack of proper maintenance of medical equipment leads to equipment downtime, reduces the level of device performance, and wastes costs and resources . . . If preventive maintenance [on a medical device] is not well monitored in a hospital, patients' lives are in grave danger") provided herein as Exhibit 20; *see also* Lane-Savage Decl. at ¶ 15-18; *see also* Peloso Decl. at ¶ 10

[51] *See, e.g.,* Lauren Goode, Right-to-Repair Groups Fire Shots at Medical Device Manufacturers, Wired, *available at* https://www.wired.com/story/right-to-repair-medical-equipment-ifixit/ (May 19, 2020) ("COVID-19 has exposed not only our biological vulnerabilities but also our structural, society, and political shortcomings. Producing, procuring, and distributing all kinds of medical equipment is a complicated labyrinth outside of a pandemic; within the context of a global pandemic, every move or maneuver has the potential for more dire consequences.") provided herein as Exhibit 21; *see also* Lane-Savage Decl. at ¶ 18.

[52] *See* FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, *available at* https://www.fda.gov/media/113431/download ("The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system.") provided herein as Exhibit 22; *see also* ¶ Peloso Decl. at ¶ 16-17.

[53] *See* Tao Ai, et al., *Correlation of Chest CT and RT-PCR Testing for Coronavirus Disease 2019 (COVID-19) in China: A Report of 1014 Cases,* 296 Radiology E32-E40 (Aug. 2020); *see also* Youxin Wang, et al., *Combination of CT and RT-PCR in screening and diagnosis of COVID-19,* 10 J. Global Health 1-3 (June 2020) provided herein as Exhibits 23-24, respectively.

[54] Peloso Decl. at ¶¶ 16-18; *see also* Lane-Savage Decl. at ¶ 15; *see also* Melvin Decl. at ¶ 7; *see also* Kahler Decl. at ¶ 15.

[55] *See* FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, *available at* https://www.fda.gov/media/113431/download (provided herein as Exhibit 25; *see also* Peloso Decl. at ¶¶ 11-13.

LOC_AR_00002927

above, without the exemption, OEMs will continue to hamper, if not outright prohibit, the legitimate service and maintenance activities of medical equipment, devices, and imaging systems by owners, lessees, and ISOs. And, even if certain limited access is provided by OEMs, it is provided at undue expense in time and money and is lacking essential information and capabilities required for proper maintenance. In short, failure to provide this exemption will continue to allow OEMs to improperly harm legitimate competition and cause unnecessary death or injury to countless patients by using TPMs to block access to portions of customer-owned medical devices needed to repair and maintain such devices in the field.

**The Copyright Office's Earlier Policy Studies**

In two policy studies, the Copyright Office previously considered the core issues this petition raises. In 2016, the Copyright Office considered the issues in connection with software enabled consumer products. *See*, U.S. Copyright Office, Software-Enabled Consumer Products (2016), https://www.copyright.gov/policy/software/software-ful-report.pdf ("**Software Study**"). In 2017, the Registrar considered the issues in connection with its policy review of Section 1201. Section 1201 of Title 17-A Report of the Registrar of Copyrights (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf ("**1201 Report**").

In the Software Study, the Office considered how to allow repair of and tinkering with consumer products with software. The Office recognized that repair activities are often protected from infringement claims by multiple copyright law provisions, including the fair use doctrine and Section 117.[56]

In the 1201 Report, the Office examined statutory exemptions to permit circumvention to fix obsolete, damaged, or malfunctioning TPMs, to engage in diagnosis, maintenance, and repair of a device protected by a TPM, noting that software has become central to the repair of many devices.[57] The 1201 Report noted The Repair Ass'n & iFixit comments that the "'use of electronic locks that prevent repair' are really 'about protecting the competitive position of the manufacturers for repair services' and outside the purpose of copyright."[58] . The Office concluded that:

> ... a properly-tailored exemption for repair activities could alleviate concerns regarding section 1201's effect on consumers' ability to engage in legitimate activities that did not previously implicate copyright law, without creating a material risk of harm to the market for or value of copyrighted works. As discussed above, virtually all agree that section 1201 was not intended to facilitate manufacturers' use of TPMs to facilitate product tying or to achieve a lock-in effect under which consumers are effectively limited to repair services offered by the manufacturer.[59]

---

[56] *See* Software Study at 33, 39-41, which is provided herein as Exhibit 26.
[57] *See* 1201 Study at 88.
[58] *Id*. at 89
[59] *Id*. at 92.

LOC_AR_00002928

**Other Policy Considerations**

ISOs like Petitioner and OEMs are required to comply with safety or regulatory requirements set by the Food and Drug Administration ("**FDA**").[60]

The FDA's authority to regulate the servicing of medical devices by any entity, including ISOs, is grounded in the agency's authority to regulate medical devices and radiation-emitting electronic products under the Federal Food, Drug, and Cosmetic Act ("FD&C"). Notably, the FDA has concluded that third-party service providers such as Petitioner and other ISOs "provide high quality, safe, and effective servicing of medical devices." *See*, FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, *available at* https://www.fda.gov/media/113431/download. *See also*, Conor Hale, FDA Passes On Setting New Regulations For Medical Device Servicing, Fierce Biotech, (Published May 17, 2018; Last Accessed July 20, 2020) *available at* https://www.fiercebiotech.com/medtech/fda-passes-setting-new-regulations-for-medical-device-servicing) (describing the FDA's decision not to require formal regulatory action, including obligatory registration and reporting of adverse events, of third party service providers of medical devices despite the Medical Imaging and Technology Alliances' urging Congress to pass legislation that would require the same).[61]

The FDA specifically recognizes and provides for third party servicing of medical imaging devices. The FDA refers to this as AIAT (assembly, installation, adjustment, and testing) servicing activities of medical imaging equipment.[62] Per the FDA, "**assembly**" refers to fitting together the parts or pieces of a component or system; "**installation**" refers to setting up for use by verifying that proper assembly and adjustments are made to assure compliance with federal performance specification; "**adjustment**" refers to bringing various component parts up to a true or more effective relative position for performance purposes; and "**testing**" refers to critical examination, observation, or observation of such conditions and operations through procedures provided by the manufacturer that will prove the unit meets specifications.[63]

Manufacturers of ionizing radiation emitting medical imaging systems are subject to information disclosure obligations by the FDA so that AIAT servicers or other interested parties may obtain, upon request, information regarding the assembly, installation, adjustment, and testing of a medical imaging system to ensure it meets federal performance standards. To that end, the FDA requires at 21 C.F.R. § 1020.30(g) that:

> Manufacturers of components listed in paragraph (a)(1) of this section shall provide to assemblers subject to paragraph (d) of this section and, upon request, to others at a cost not to exceed the cost of publication and distribution, instructions

---

[60] The FDA is required to protect the public health from unnecessary exposure to electronic product radiation by, among other things, requiring that electronic products meet performance standards. *See* Section 532 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §360ii. The standards for ionizing radiation emitting devices are set forth at 21 C.F.R. § 1020. The standards for ionizing radiation emitting medical imaging devices are set forth at 21 C.F.R. §§ 1020.30-1020.33.

[61] Attached herein as Exhibit 27.

[62] *See* 21 C.F.R. § 1020.

[63] *See* Guidance Document--*Information Disclosure by Manufacturers to Assemblers for Diagnostic X-ray Systems - Guidance for Industry and FDA Staff* (September 2003), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/information-disclosure-manufacturers-assemblers-diagnostic-x-ray-systems-guidance-industry-and-fda. Attached herein as Exhibit 28.

LOC_AR_00002929

> for assembly, installation, adjustment, and testing of such components adequate to assure that the products will comply with applicable provisions of this section and §§ 1020.31 [Radiographic equipment], 1020.32 [Fluoroscopic equipment], and 1020.33 [Computed tomography (CT) equipment], when assembled, installed, adjusted, and tested as directed. Such instructions shall include specifications of other components compatible with that to be installed when compliance of the system or subsystem depends on their compatibility. Such specifications may describe pertinent physical characteristics of the components and/or may list by manufacturer model number the components which are compatible.

Bundling of AIAT information with allegedly other proprietary software does not relieve an OEM from having to readily disclose the AIAT information. The aforementioned FDA Guidelines are quite explicit on this point: "Some manufacturers bundle AIAT information covered by § 1020.30(g) with other types of proprietary software; in some instances the proprietary software cannot be deleted from the bundled information. Nothing in § 1020.30 prohibits bundling software information or programs; however, the practice does not relieve manufacturers of their responsibilities under the performance standard to provide AIAT documentation or the AIAT software at cost." Moreover, the FDA regulations further provide that "[t]he owner of a diagnostic X-ray system who uses the system in a professional or commercial capacity may modify the system, provided the modification does not result in the failure of the system or component to comply with the applicable requirements of this section or of 1020.31, 1020.32, or 1020.33."[64] However, as noted above, the OEMs still place the unprotected AIAT material behind TPMs, thereby forcing owners, lessees, and ISOs to go through cumbersome, time consuming and unnecessarily expensive procedures to gain access to this information. Further, OEMs often fail or refuse to classify all relevant software and information as AIAT information.

**The Proposed Exemption is for Noninfringing Uses[65]**

The execution of computer programs and access to related data files and manuals by owners of medical systems and devices, or those acting at their behest, such as ISOs, for the purpose of diagnosing, repairing, or maintaining their systems and devices, does not constitute copyright infringement for at least three reasons. First, such activities constitute fair use under 17 U.S.C. § 107. Second, such activities are exempted from infringement as an essential step in the utilization of a computer program in conjunction with a machine under 17 U.S.C. §117 (a)(1). Third, such activities are exempted as permitted machine maintenance and repair under 17 U.S.C. § 117(c).

**1. Fair Use**

The Copyright Act sets forth four factors to consider when determining whether a use of a copyrighted work is noninfringing fair use.[66] :

---

[64] *See* 21 C.F.R. § 1020.30(q)(2).
[65] Petitioner is engaged in litigation with Philips and the arguments expressed herein should not be construed or interpreted as limiting arguments that may be applicable to that litigation depending on the specific facts and laws at issue in the pending action(s).
[66] *See* 17 U.S.C. § 107

LOC_AR_00002930

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

In prior and current exemptions, the Librarian has recognized the fair use of computer programs for the diagnosis, repair, and modification of motorized land vehicles both in 2015 and 2018 for many of the same reasons Petitioner relies upon. In 2018, the Librarian also recognized the fair use of computer programs for the maintenance and repair of appliances:[67]

(9) Computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle such as a personal automobile, commercial vehicle, or mechanized agricultural vehicle, except for programs accessed through a separate subscription service, when circumvention is a necessary step to allow the diagnosis, repair, or lawful modification of a vehicle function, where such circumvention does not constitute a violation of applicable law, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works.

(10) Computer programs that are contained in and control the functioning of a lawfully acquired smartphone or home appliance or home system, such as a refrigerator, thermostat, HVAC, or electrical system, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system, and is not accomplished for the purpose of gaining access to other copyrighted works. For purposes of this paragraph (b)(10):

(i) The "maintenance" of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and

(ii) The "repair" of a device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.

The 2015 Recommendation of the Registrar of Copyrights for Rule Making: Sixth Triennial Proceeding to Determine Exemptions on the Prohibition on Circumvention (Oct. 2015) ("**2015 Recommendation**") and the 2018 Recommendation of the Acting Registrar of Copyrights for Rule Making: Seventh Triennial Proceeding to Determine Exemptions on the Prohibition on

---

[67] *See* 37 C.F.R. § 201.40(b)(9) & (10)

15

Circumvention (Oct. 2018) ("**2018 Recommendation**")[68] contain extensive discussions of these factors in the contexts of ECUs for land motor vehicles and software for appliances and other devices.

The 2018 Recommendation is particularly instructive.

> With respect to the first factor, the purpose and character of the use of the computer programs and data files by or on behalf of an owner is clear. The computer programs and data files are used to either (i) assemble and install their new systems and devices, or (ii) repair and maintain their existing systems and devices.

From page 203 of the 2018 Recommendation (footnotes omitted):

> In analyzing the first fair use factor, the Acting Register notes that the Copyright Office' Software Study observed that, because the fundamental purpose of repair is to restore the functionality of a device so that it may be used, "repair supports— rather than displaces—the purpose of the embedded programs." Applying similar logic, the 2015 rulemaking concluded that the first factor favored an exemption for vehicle repair because the activities were personal, noncommercial, and would "enhance the intended use" of the vehicle programs. Moreover, the Office's Section 1201 Report observed an emerging "general understanding that bona fide repair and maintenance activities are typically noninfringing." Because proponents express the same desire to engage in these bona fide repair activities with respect to other devices, the Acting Register concludes that this factor favors proponents.

With respect to medical systems and devices generally, it is equally true that "repair supports— rather than displaces—the purpose of the embedded programs." The systems and devices continue to be useful after repair and provide the intended functions in a safe and reliable manner. Further, it ensures patient and medical personnel safety and well-being. Indeed, it can be the difference between life and death for some individuals.

With respect to diagnostic X-ray systems in particular, as noted above, those systems are subject to information disclosure obligations so that AIAT servicers or other interested parties may obtain, upon request, information regarding the assembly, installation, adjustment, and testing of an X-ray system to ensure it meets federal performance standards.[69] In its guidance for compliance with this rule, the FDA requires that when OEMs supply the AIAT information in the system software, that software must be made available to those performing AIAT servicing activities. Moreover, the federal regulations further provide that "[t]he owner of a diagnostic X-ray system who uses the system in a professional or commercial capacity may modify the system, provided the modification does not result in the failure of the system or component to comply with the applicable requirements of this section or of 1020.31, 1020.32, or 1020.33."[70] Thus, the first factor weighs in favor of fair use.

---

[68] Attached herein as Exhibit 29.
[69] 21 C.F.R. § 1020.30(g).
[70] 21 C.F.R. § 1020.30(q)(2).

LOC_AR_00002932

Regarding the second factor, the nature of the computer programs and data files involved is that they are entirely functional or essentially functional works used to control operation of the systems and the diagnosis, repair, and maintenance of the systems. They are used to support operation, mechanical, and electronic processes of the medical systems. If computer programs and data files are expressive at all, the expressiveness is *de minimis*. For example, error logs are computer files containing lists of noted faults that occur during use of a medical device. Event logs are lists of other non-fault events, such as tasks computer calls and internet connections, to name two. Configuration files simply have set up the configuration of the machine at a very base level. For the sake of argument, while such files do not express any human creativity or, to the extent this copyright protection may be warranted, the equipment owner, such as a hospital, owns these automatically generated files.[71] The equipment owner requires access to such programs and files for maintenance and repair. There is no conceptual difference between these types of computer programs and data files and those used, *e.g.*, in modern-day land-based vehicles or appliances. The manuals are technical and contain data, namely information of the functions of the systems or devices and the operating specifications. These are not novels or highly creative works. The creativity, if any, is *de minimis*. Thus, the second factor weighs in favor of fair use for the same reasons the Office articulated in the 2018 Recommendation.

Regarding the third factor, it is necessary, i.e., required, to execute the computer programs and access the data files during servicing activities to understand system or device performance and, in several instances, update the data files such as service logs. As noted above, the machines are, for all intents and purposes, specialized computers in which the software is inseparable from the hardware and the machines cannot function without the computer programs and data files. The servicing computer programs and data files involved can be but a small portion of the entire software package used to operate and service the medical imaging system and are integrated into the machine. For instance, the software on a Philips Allura system comprises various modules used to control different portions of the system or to perform different functions, only some of which are involved in the servicing activities. In the Allura software, the Field Service Framework and associated service logs are invoked for servicing of an X-ray diagnostic system. Simply put, no "copies" of the Allura code—or even portions of the code—are ever made other than what is necessarily executed when using the particular customer-owned machine. Moreover, any "copies" of service logs should not constitute infringement.

Further, manuals are needed to understand the manufacturers specifications for the systems and devices, and to correctly identify replacement parts. With this understanding, an owner or its agent can ensure the medical system or device is operating safely and in compliance with the specifications. Thus, the third factor also weighs in favor of a finding of fair use.

Regarding the fourth factor, the effect of the use upon the potential market for or value of the copyrighted work is minimal.[72] The computer programs and data files are necessary for the

---

[71] *See Lexmark International, Inc. v. Static Control Components, Inc.*, 3877 F.3d 522, 536 (6th Cir. 2004) (configuration files and lock-out codes generally "fall on the functional-side rather than the original-expression side of the copyright line"); *Sony Comput. Entm't, Inc. v. Connectix Cor.*, 203 F.3d 596,603 (9th Cir. 2000) ("[T]he fair use doctrine preserves public access to the ideas and functional elements embedded in copyright computer software programs.")

[72] Although OEMs will argue that their investments in computer software enable them to better serve customers, this is not so. According to the FDA Report conducted in 2018, twenty-nine complaints alleged inadequate servicing by OEMs in addition to others that complained about OEMs not providing service manuals, not providing critical

LOC_AR_00002933

operation and control of the medical equipment, including the basic servicing of the equipment, and are sold together with the equipment in which they are employed. They have no other use. Thus, the OEMs must include them or make them available to enable operation, control, and servicing of medical equipment. Although OEMs might sell or make available updates to their software, there is no independent market for the computer programs and data files outside of the purchase of new equipment because the software is not of any value outside of use on this equipment.[73]

The electronic manuals merely provide technical information. They too have no value or use other than to provide information for the servicing of the systems and devices. Moreover, manuals used to be provided freely by OEMs and thus have a demonstrated neutral effect on the market.

The value to OEMs is in the TPMs that restrict access to the computer programs and data files. The value is not in the computer programs or data files themselves. That is to say, the computer programs and data files must be included for anyone to operate or perform any servicing activities on the systems and devices, given the replacement of electrical and mechanical parts by software-based components. There is no need to otherwise copy or access the computer programs and data files. But, as recognized in the 1201 Study, the TPMs allow the OEMs to maintain a monopoly or near monopoly on the servicing of the systems and devices they sell because they can control the equipment even after its sale.

Because the use by ISOs does not affect the market for or value of the computer programs and data files involved, the fourth factor also weighs in favor of a finding of fair use.

## 2.    Use is an Essential Step under 17 U.S.C. § 117(a)(1)

Congress exempted from infringement certain executions of computer programs in connection with the repair and maintenance of machines.

Title 17 U.S.C. §117 (a)(1) provides:

> (a)(1) Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner.

Access, use and/or adaptation of the computer programs and data files embedded in medical equipment is undeniably an essential step in the servicing and repair activities associated with the medical equipment and in maintaining the usefulness of the systems and devices. As mentioned above, the software is integrated into and is inseparable from the machines if the machines are to operate. Owners, including refurbishers like Petitioner, pay substantial consideration in

---

replacement parts, providing poor technician training, knowingly falsifying service records and device serial numbers, and conducting repairs using broken replacement parts. *See* FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 15, 2018, *available at* https://www.fda.gov/media/113431/download.

[73] Wheeler Decl. at ¶ 35.

LOC_AR_00002934

exchange for ownership of medical equipment (*i.e.*, hardware) that invariably includes—due to the complex nature of modern medical systems—software embedded within the equipment. The equipment is useless without the software embedded by the OEMs. Some OEMs attempt to only "license" the embedded software. However, there is no alternative to the software as it is tailored to the equipment, and there are no market alternatives. But licenses are only for the intellectual property rights. The copies of the software are included as part of the purchase of the machines. Accordingly, the equipment owners are "owners" of copies of computer programs copies of which are "created as an essential step in the use of the computer program in conjunction with a machine," and "used in no other manner." [74] To conduct repair and maintenance of the medical equipment they own, hospitals and other medical care providers, and ISOs like Petitioner, use the computer software embedded in the medical equipment as an essential step in the utilization of the equipment in order to repair, diagnose, and maintain the equipment. Thus, use of the servicing computer programs and data files is exempt from infringement under Section 117.

Petitioner and ISOs like it are lawful possessors of diagnostic medical equipment, and the right of possession to the hardware they own is perpetual. That some OEMs may claim they only "license" the software is not relevant. [75] Licensing is a concept relating only to intellectual property rights. Thus, the "licensing" is only relevant to how an OEM attempts to control use of the software. It does not control who owns the copy of the software on a machine, which is included in purchase of the machine. Additionally, and because use of the software is an essential step in the use of the machine, as explained above, Section 117 provides an exception as to any controls attempted by the licensing terms.

---

[74] *See, e.g.*, *Krause v. Titleserv, Inc.*, 402 F.3d 119 (2nd Cir. 2005) (holding company's modification of copyrighted computer programs created for it by former consultant, after consultant declined to turn over source code, was "essential step" in their utilization, within meaning of Copyright Act's safe harbor provision; modifications, which fixed bugs, allowed company to add new client information, adapted program so it would function on company's new system, and added new features, were necessary if company was to make use of programs on its machines); *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32 (2nd Cir. 2019) (holding that modifications made by licensee, a medical device company, to server software customized by software developer for licensee's multi-phased test handling system project that allowed existing server software to interact with additional systems in manner intended when source code was developed for licensee was essential step in utilization of computer programs in conjunction with machine).

[75] *See e.g.*, Raymond Nimmer, The Law of Computer Technology § 1.18[1] p. 1–103 (1992) ("Ownership of a copy should be determined based on the actual character, rather than the label, of the transaction by which the user obtained possession. Merely labeling a transaction as a lease or license does not control. If a transaction involves a single payment giving the buyer an unlimited period in which it has a right to possession, the transaction is a sale. In this situation, the buyer owns the copy regardless of the label the parties use for the contract. Course of dealing and trade usage may be relevant, since they establish the expectations and intent of the parties. The pertinent issue is whether, as in a lease, the user may be required to return the copy to the vendor after the expiration of a particular period. If not, the transaction conveyed not only possession, but also transferred ownership of the copy."); *Compare, e.g.*, *Philips Med. Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al.*, Case No: 3:20-cv-00021-MOC-DCK (W.D.N.C.), Second Amended Complaint, ¶ 33 (alleging that when Philips sells medical equipment, "the agreement establishes that the presence of Proprietary Service Materials will not give the customer any right or title to such property or any license or other rights to access or use such property").

LOC_AR_00002935

**3.    Hardware Maintenance and Repair 17 U.S.C. § 117(c).**

Congress exempted from infringement certain executions of computer programs in connection with the repair and maintenance of machines.

Title 17 U.S.C. §117 (c) provides:

> (c) Machine Maintenance or Repair.—Notwithstanding the provisions of section 106, it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if—
>
> > (1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and
> >
> > (2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine.

To perform the servicing activities, it is necessary to activate the central controlling computer to operate the various components of the medical system or device, and simply to obtain diagnosis information. When performing the servicing activities, the diagnostic and testing modules are used to diagnose the operating conditions and to determine if the system or device is performing according to specifications. Data files such as event logs and error logs may be opened to diagnose system or device issues, confirm operating information, or to otherwise update servicing information for proper record keeping. Configuration files may be reviewed for proper configuration of the machines.

Following a servicing activity, except for any updated data reflecting servicing information, the computer programs and data files are left in their original condition. There are no copies to be destroyed. However, deactivation or reactivation of the medical imaging systems will automatically "destroy" any "new" copy of the modules and data files. Thus, use of the servicing computer programs and data files is exempt from infringement under Section 117.

**ISOs Working at the Direction of the Owners and Lessees Should Not be Excluded From the Exemption**

In its 2018 Recommendation for making the exemptions for land vehicles and appliances noted above, the Copyright Office specifically declined to exclude third party assistance and declined to include language that the circumvention be "undertaken by the authorized owner."[76] The proposed exemption for servicing materials for medical devices is similarly fashioned and will enable owners and lessees who do not have the ability to service their medical equipment or skills and equipment to circumvent TPMs. This would be in concert with the Office's 2018

---

[76] Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention ("**2018 Recommendation**") at 224-225.

LOC_AR_00002936

position that in future rulemakings it would "seek to avoid recommending unduly narrow definitions of exemption beneficiaries."[77]  Further, the proposed exemption is easily understood that it would apply to the extent it does not implicate the anti-trafficking provisions Section 1201(a)(2) as it would be limited to circumvention where such circumvention does not constitute a violation of any other applicable law.

**Conclusion**

For all of the reasons set forth above, the Librarian should determine that the non-infringing uses described above are, and are likely to be, adversely affected by the anti-circumvention prohibitions of Section 1201(a), and therefore approve the proposed exemptions for the period 2021-2024.

DOCUMENTARY EVIDENCE

Copies of the Exhibits referred to in this comment, including declarations, are attached hereto.

---

[77] Section 1201 Report at 62.

LOC_AR_00002937

# EXHIBIT 1

LOC_AR_00002938

Attorney Docket No. 15259128-000007

In Support of Petition of:
Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

*Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging*

# DECLARATION OF ROBERT A. WHEELER

I, Robert A. Wheeler, am over 21 years old and hereby declare as follows:

1) I am the President of the Imaging and Oncology Division at Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging ("Transtate"), a position I have held since 2018. Transtate Equipment Company, Inc. began business during April, 2017. Before 2018, I served as Vice President of Transtate. From 2008 to 2017, I was Vice President of TEC Holdings, Inc., which until April, 2017 was known as Transtate Equipment Company, Inc. In approximately March 2017, TEC Holdings, Inc. sold substantially all of its assets to Transtate.

Background:

2) Transtate is a member of the Avante Health Solutions group of companies that provide high quality refurbished medical systems and devices; provide post warranty repair, diagnosis, and maintenance of medical systems and devices; and sell new and used parts, all manufactured by Original Equipment Manufacturers ("OEMs").

3) Transtate is an independent service organization ("ISO") that focuses on medical imaging systems, namely catheterization and angioplasty X-ray systems, magnetic resonance imaging ("MRI") systems, and computed tomography ("CT") systems.

4) Transtate operates nationwide and services medical equipment on a daily basis, including by responding to service calls each day.

LOC_AR_00002939

5) Transtate's sister companies include Dre Medical, Inc. d/b/a Avante Medical Surgical, Pacific Medical, Inc. d/b/a Avante Patient Monitoring, Global Medical Imaging, Inc. d/b/a Avante Ultrasound, and Oncology Services International, Inc. d/b/a Avante Oncology Services. Avante Medical Surgical focuses on surgical equipment including C-Arm fluoroscopy devices, anesthesia machines, and electrosurgical units.  Avante Patient Monitoring focuses on monitoring systems including patient monitors, telemetry systems, gas analyzers, and fetal monitors. Avante Ultrasound focuses on ultrasound machines.  Avante Oncology Services focuses on linear accelerators and CT simulators.

6) Transtate performs sales and servicing activities for x-ray and diagnostic imaging systems, including catheterization labs, CT systems, and MRI systems (collectively "medical equipment"). I also have experience servicing catherization systems myself.

7) Transtate services machines manufactured by OEMs including Siemens, Phillips, GE and Canon (formerly Toshiba).[1]

Brief History of Servicing Activities:

8) Medical devices and systems used to be composed only of mechanical and electrical parts, i.e., hardware. Over time, some hardware functions were replaced by software.  For example, at some point, film used in X-ray systems was replaced by digital image capturing devices rendering them digital devices.

9) In the past, the specifications and other information relating to the functions of the devices and systems were provided freely by OEMs in hard copy manuals. These devices and systems could be serviced by technicians with access to the manuals and with the relevant mechanical and electrical knowledge, experience, and tools.

10) More recently, hardware components are being and have been replaced by computing processors and software. As computers have developed, computerized functions have become integrated into the medical equipment. As a result, more and more functions are being controlled or performed by computers, and the computers have become integrated into the devices such that the devices, computers and software are inseparable. Now, large sophisticated systems such as MRI and catheterization and angioplasty X-ray systems (often referred to as "cath lab" systems) are completely controlled by computers integrated into the systems and can only be serviced with software integrated into the systems.

---

[1] GE refers to GE Healthcare, a subsidiary of General Electric Company.
Siemens refers to Siemens Healthineers AG (formerly Siemens Healthcare, Siemens Medical Solutions, Siemens Medical Systems), a subsidiary of Siemens AG.
Philips refers to Koninklijke Philips N.V., including its subsidiaries Philips Electronics and Philips Healthcare.
Cannon refers to Canon Medical Systems Corporation, formerly Toshiba Medical, and a subsidiary of Canon, Inc.
Toshiba refers to Toshiba Medical, now Canon Medical Systems Corporation.

LOC_AR_00002940

11) OEMs are also less likely to provide manuals these days. They are only being provided by certain OEMs some of the time. Even when we do receive manuals, they are often incomplete.

12) Manuals are sometimes provided by OEMs electronically, as data files installed on the medical equipment or through DVD/compact discs. As a result, many servicing activities require access to and use of computer programs and electronic manuals.

13) Medical device servicing is handled in a variety of ways. Consumers such as hospitals and other medical providers may have one or more in-house departments fully staffed by employees, fully staffed by third party contractors, or a mixture of the two. Other providers might enter into servicing contracts with ISOs. If there is more than one in-house department, they tend to specialize in different types of equipment. The most specialized departments tend to be those which manage medical imaging equipment. While some servicing such as troubleshooting and calibration might be undertaken by the in-house department, much servicing is contracted out given the complexity of the systems involved. Third parties like Sodexo Group are hired to manage some of these functions for medical providers.

14) In-house departments will often call in outside service entities such as OEMs or ISOs to  repair malfunctions. Among other information, diagnosis, maintenance, and repairs often require access to event logs, error logs, and configuration files.

15) OEMs also offer post warranty services and compete with ISOs for the post warranty servicing work. My experience is that ISOs often charge much less than OEMs and are about 30% to 50% less expensive for this work.

Technological Protective Measures ("TPMs") and ISO Servicing Activities:

16) OEMs equip modern medical systems and devices with TPMs such as encryption, embedded software, and challenge-response mechanisms[2], involving access codes, passwords, keys, or digital signatures.

17) TPMs hinder and prevent medical equipment owners and their agents from repairing, diagnosing, and maintaining the medical systems and devices they own by restricting or denying access to necessary electronic service materials installed in the medical equipment or otherwise provided via electronic media.

18) Servicing medical equipment, particularly large medical systems such as medical imaging devices, often requires access to software that is integrated with the medical equipment because this is the only way to service the machines due to the integration of the hardware and the software.

---

[2] Challenge–response mechanisms involve protocols in which one party presents a question (i.e., a "challenge") and another party must provide a valid answer (i.e. a "response" such as a password) to be authenticated.

LOC_AR_00002941

19) Existing medical equipment must be calibrated and configured in order to work properly. Often times when medical equipment is calibrated, access to the software that is integrated with that machine is required.

20) In addition to the operating software and servicing programs, OEMs place data files including event logs, error logs, and configuration files behind the same TPMs. As a result of the co-mingling of the software and the data files, OEMs restrict access to the data files in an attempt to thwart even the most basic servicing, particularly troubleshooting, of medical equipment.

Specific OEMs and Adversity Caused:

21) There are several TPMs used by OEMs that restrict, limit, or deny access to medical equipment. Most typically, access to the software requires a keyed-in access code or an access key such as a dongle (e.g., a USB flash drive with a code). For example, Siemens uses 256 bit hexadecimal access codes that must be keyed-in, while GE and Philips use dongles.

22) The amount of access technicians such as Transtate's engineers and technicians have to conduct servicing activities on medical equipment varies depending on the manufacturer of the machine.

23) Philips is the most egregious OEM that Transtate has encountered in my experience. Philips charges a fee for its dongle keys and requires keys to be renewed every thirty days.  Technicians and engineers servicing equipment also have to register for InCenter to access some or all of the information on its website.[3]

24) Siemens requires a technician to either (i) call for a one-time access code each time medical equipment requires servicing, or (ii) pay an exorbitant yearly fee that can cost between $20,000.00 and $25,000.00 USD per device.

25) GE will provide dongles for a fee.

26) Additionally, certain OEMs will also only sell and provide ISOs access to certain limited tiers of information. Often the tier of access provided by certain OEMs is inadequate to fully service the medical equipment.

27) Other times, OEMs will only provide access to some of what is necessary to configure, calibrate, or test the machine for a limited time (e.g., the code will not function after a certain number of hours).

28) By OEMs refusing appropriate access to ISOs that is required to service a machine, the OEMs are forcing the medical equipment owner and lessees to use the OEMs to service the medical equipment directly. Using an OEM to service medical equipment can increase the cost of each service event by thousands of dollars.

---

[3] InCenter is an eSupport system provided by Philips. According to Philips' website, InCenter provides an enhanced document distribution platform including "a majority of the service information you will need to support your Philips medical systems and devices."

LOC_AR_00002942

29) Additionally, OEMs will often refuse to support older versions of medical equipment because the OEMs deem the medical equipment to have reached the end of its commercial life. OEMs will either not service the machines or not provide renewed access codes and keys either to the consumers or to ISOs, even though with the appropriate access codes and keys, the ISOs would be able to continue to service and repair the medical equipment.

30) Despite the fact that older models of medical equipment can still function well and continue to be used, thereby saving healthcare providers and in turn patients significant sums of money, OEMs refuse to provide the requisite support and access needed to service that medical equipment.

31) Transtate's engineers, technicians, and professionals have the skill, training and expertise to service medical equipment from a wide variety of OEMs, however, the limited access provided by OEMs hinders our ability to do so.

32) In addition to restricting access to necessary software required to service medical equipment, Philips currently refuses to train ISO technicians.

33) TPMs hinder our professionals and servicing engineers from accessing diagnostic error codes that provide critical information about what part of the machine is not functioning properly. To properly diagnose faults and errors in the operation of a device, it is often necessary to access error logs to decipher causes of errors, and this requires access to the software.

34) OEMs have previously said that these types of event and error logs and programs are their proprietary, copyrightable information. However, this is disputed and the subject of litigation.

35) The computer programs and data files have no other use. Although OEMs might sell or make available updates to their software, there is no independent market for the computer programs and data files outside of the purchase of new or used equipment because the software is not of any value outside of use on this equipment. The software is specific to the machine on which it is sold.

36) The medical provider consumers are hurt by the TPM practices of OEMs because they cannot take advantage of the lower prices offered by purchasing services from ISOs like Transtate. For example, OEM's typically charge 30% to 50% more for service calls to diagnose and repair medical equipment than ISOs, in my experience. I understand these higher costs must be passed along to patients.

37) The TPM practices of OEMs have also contributed to limited competition from and amongst ISOs. At the time of this declaration's execution, I only know of a very small number of ISOs, including Transtate, that provide post-warranty maintenance services for Philips-manufactured systems within the United States.

38) The undersigned being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001. The undersigned declares that all statements made of his/her own knowledge are true; and all statements made on information and belief are believed to be true.

LOC_AR_00002943

Date:     12/11/2020

Robert A. Wheeler

US_Active\116086645\V-1

LOC_AR_00002944

# EXHIBIT 2

LOC_AR_00002945

# Your One Source
# To Maximize Capital
# Equipment Performance

ISO Certified Services    Equipment Choice
On-Time Parts & Supplies

Avante Health Solutions is a single source provider of
medical, surgical, diagnostic imaging, and radiation
oncology equipment, including sales, service, repair,
parts, refurbishing, and installation. Avante is making it
easier and more affordable for every hospital, clinic,
and medical practice to have the very best equipment,
supplies and service



Quick Video Tour

## Medical Surgical



One source for operating, critical care, procedure, and exam equipment

Avante Medical Surgical is a premier supplier of surgical equipment for the modern operating room. Surgical facilities of any size or
specialty can rely on Avante equipment experts to help them find the perfect combination of factory new and professionally
refurbished products for their unique needs.

VIEW MEDICAL SURGICAL HOME  >

## Patient Monitoring



One source for patient monitoring service, parts, and equipment

Avante Patient Monitoring provides hospitals and medical facilities worldwide a reliable source for repair and refurbishment of patient
monitoring equipment, as well as OEM compatible accessories and parts.

VIEW PATIENT MONITORING HOME  >

## Diagnostic Imaging



One source for cath/angio, CT, and MRI equipment solutions

Avante Diagnostic Imaging is a leading provider of high-quality new and refurbished cath/angio, CT and MRI equipment. Our
equipment is supported by a wide range of technical support and repair services from experienced engineers.

LOC_AR_00002946

Ultrasound




## One source for complete ultrasound service, parts, and equipment

Avante Ultrasound provides a reliable choice for customers seeking effective solutions to rising costs in the healthcare marketplace. We provide new and refurbished systems, advanced probe repair, have a large inventory of OEM parts, and support our clients with certified engineers nationwide.

VIEW ULTRASOUND HOME  >

## Oncology Services



## One source for linear accelerator service, parts, and equipment solutions

As a partner to hospitals and cancer centers around the world, Avante Oncology Services is focused on delivering extraordinary reliability, improved productivity, simplified procedures and greater economy to cancer care providers so they can provide the same to their patients.

VIEW ONCOLOGY SERVICES HOME  >

## Rental Services



## One source for equipment rentals from the brands you trust

Avante Rental Services is a leading provider of rental medical equipment. We are ready (24 x 7 x 365) to help clients meet the changing demands of their operations. Our team provides short or long term solutions for service shut downs, seasonal changes, and equipment evaluation scenarios.

VIEW RENTAL SERVICES HOME  >



Global | English

LOC_AR_00002947

# EXHIBIT 3

LOC_AR_00002948

Attorney Docket No. 15259128-000007

In Support of Petition of:
Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

*Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging*

## DECLARATION OF MICHAEL SPENCER

I, Michael Spencer, am over 21 years old and hereby declare as follows:

1) I am the founder of DRE Medical, Inc. ("DRE Medical"), now d/b/a/ as Avante Medical Surgical ("AMS"), which is a sister company of petitioner and commenter Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging ("Transtate"). I founded DRE Medical in 1984 and sold the company in 2015. I am the President of Corporate Sourcing at Avante Medical Surgical and have held this position since March 2020.

2) AMS's business focuses on a mix of surgical equipment including a number of devices that require software to operate and to service them. Devices requiring software to operate and service include C-Arm fluoroscopy devices, anesthesia machines, intravenous pumps, electrosurgical machines, and syringe pumps. Other products we sell and rent include incubators, radiant warmers, ventilators, oxygen stretchers and patient examination rooms, among others.

3) A large part of our business, about sixty percent (60%), is the sale of private label machines. AMS also sells and rents refurbished machines.

4) AMS sells its own private label patient examination monitors, lights, tables, anesthesia machines, electrosurgical units, and ultrasound units. The private label syringe pumps and RT ventilators sold by AMS are for export only. AMS has access codes, where applicable, for all private label units.

5) AMS sells refurbished anesthesia machines from Dräger, GE, and Penlon, electrical surgical generators from Covidian, and respiratory ventilators from a number of manufacturers including Puritan Bennett and Pulmonetic.[1] AMS also sells I.V. pumps from a variety of manufacturers.

6) Some of the Dräger, GE, and Penlon machines require access codes in the form of passwords to access the software integrated in the machines. It would be difficult to diagnose malfunctions or to maintain these machines without access to the integrated software. For some of the machines, it is not possible to access any configuration files, error logs, or event logs without using an access code.

7) Since AMS sells a very limited amount of service contracts, we hire OEM technicians to service some of the OEM branded devices during the refurb process.

8) OEMs often make technicians participate in trainings on the machines before the OEMs will provide the required access codes. The cost to send our technicians for training on the machines can range between $10,000.00 USD to $20,000.00 USD per student. As a result, we must make a cost-benefit analysis concerning for which medical devices to purchase trainings and which of our technicians will attend.

9) In addition to challenges related to the high cost of training, we also struggle with the retention of our technicians following their participation in trainings. This is due to the high market value for technicians that have attended an OEM's medical device training.

10) While I am aware that access codes can be obtained via vendors on the Internet, AMS uses service technicians who have their own access codes.

11) The undersigned being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001. The undersigned declares that all statements made of his/her own knowledge are true; and all statements made on information and belief are believed to be true.

Date: ___12/11/20___            _____
                                Michael Spencer

---

[1] Dräger refers to Draeger Medical Inc. and is a natural segment of Drägerwerk AG & Co. KGaA.
GE refers to GE Healthcare, a subsidiary of General Electric Company.
Penlon refers to Penlon Ltd.
Covidien refers to the subsidiary of Medtronic plc.
Puritan Bennett is a division of Covidien, formerly TYCO Healthcare.
Pulmonetic refers to Pulmonetic Systems Inc., acquired by VIASYS Healthcare Inc. and d/b/a CareFusion.

LOC_AR_00002950

# EXHIBIT 4

LOC_AR_00002951

## Reduce repair restrictions to aid hospitals during COVID-19

COVID-19 has underscored the need for a more cooperative relationship between Original Equipment Manufacturers (OEMS) of medical technology, hospital-based BMETs, and independent medical device service providers.

As the FDA found in 2018, "the continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system," and all three "provide high quality, safe, and effective servicing of medical devices." This is especially true as a pandemic stress tests our medical system. However, hospital-based and third-party technicians often struggle to access the repair information needed to service equipment.

We, the undersigned clinical engineers and health technology managers, support requiring service materials (repair documentation, schematics, parts, tools and diagnostics) be made available immediately. We support the following changes:

- Manufacturers must meet the goals of 2012 NFPA 99 Health Care Facilities Code requirements around providing service information, and post their service materials in a manner that consistently allows hospitals to decide for themselves whom to hire for repair.
- Access to all service materials (all information, software, replacement parts and tools necessary to perform corrective and preventive maintenance actions in accordance with the manufacturers recommendations, such as repair documentation, schematics and diagnostics), available to the device owner even when equipment changes hands, on fair and reasonable terms.
- Product-specific training for repair must be made available online, on fair and reasonable terms, to biomedical engineering technicians, imaging service engineers, and other parties responsible for operation of medical equipment under CMS rules.


Sincerely,

Aaron Telesz, Clinical Engineering, BMET I, Biomedical Engineering Technician
Abigail Lane-Savage, Biomedical Engineering Project Manager, Sodexo CTM
Abron Mullings, Service Technician/Chamber Cleaner, HSS Inc.
Adam Kohl, Sr. Biomedical Imaging Technician, ProHealth Care
Alex Gaufman, Service Engineer and Owner, National Instrument Service Corp
Alex Peterman, Operations Manager of Clinical Engineering, University of Washington Medical Center
Allan Morgan, Clinical Engineering / BMET, Catholic Health Initiatives
Allan Prunty, BMET Supervisor, ISS solutions
Amber Tucker, Biomed and biomedical tech 3, Spectrum health Lakeland
Andrew Dunlap, BIOMED, Senior BMET, CHI
Andrew Ibey, Senior Manager, CHEO

Andrew Schadegg, Operations Manager, Independent Medical Device Service Provider
Andrew Stephen Gagne, Clinical Engineering Biomedical Equipment Technician, ABM
Andrew Strong, Clinical Engineer, Yale New Haven Hospital
Andy Armenta, VP of Enhanced Biomedical Infection Control Division, ERD LLC
Anthony Dutra, Clinical Engineering, Diagnostic Imaging Service, Hospital Based BMET
Anthony Masseur, Equipment Specialist , ACT - Paragon
Anthony Scavella, Biomedical Electronics Technician, Sinai-Grace Hospital
Austin Feagins, Clinical Technology Dept. /Area Service Mgr, Kaiser Permanente
Austin Otto, President, OB Healthcare Corporation
Averil Calambro, Biomed, Common Spirit Health
Barbara Maguire, Vice President, Healthcare Technology Management, ISS Solutions/Geisinger
Bashar mahanweh, Biomed, HSS
Bassam Tabshouri, Medical Engineering, Director, American University of Beirut
Beau Butts, Service - BMET 1, FOBI Medical
Benjamin Kuchar, Regional Manager, Third Party Vendor
Benjamin Riley, Biomed - Senior Biomedical Technician, Nebraska Methodist Hospital
Benny Rodriguez , Biomedical Engineering: Biomedical technician , Brookdale Medical Center
Beverly Kupiszewski , Biomed Site Manager, Trimedx
Bhaskar Iduri, VP, Healthcare Technology Management & QA, RENOVO SOLUTIONS LLC
Bill Barley, HTM Security, Healthcare Technology Management
Bill Putz, Clinical Engineering, Common Spirit Health
Bill Summers, CEO , Anchor Medical Company
Blake Collins, Clinical Engineering, Delaware Hospital
Blake Rother, MEM - BMET II, HSS
Bob Turk, Clinical Engineering Supervisor, McLaren Northern Michigan Hospital
Bobbie DeBord, Clinical Engineering CBET, Michigan Medicine
Boyd Campbell, VP, Southeastern Biomedical Associates, Inc
Brad Motes, Clinical Engineering Senior Biomedical Technician, UCHealth Greeley Hospital
Brandi L. Rosenau, Section Chief, Medical Maintenance, USAF
Brandon Howard, CE BMET II, CHI
Brendan Gribbons, Regional Engineering Team Manager, Lower Mainland Biomedical
Engineering
Brenna Sanchez, Cabmet Member, Cabmet
Brent Rankin, COO, Rankin Biomedical Corporation
Brian Kelly, Clinical Engineering Manager, St. James Healthcare
Brian Lefler, Director Biomedical Services, FirstHealth of the Carolinas
Brian McLaughlin, Manager, Perioperative Clinical Engineering, Massachusetts General
Hospital
Bruno Piccin, Biomedical Engineering Tech II, The Ottawa Hospital
Bryan Rhoades, FSS III, CHI-CE / CSH / Centura Health Corp
Bryant Chang, Healthcare Technology Management, Biomedical Equipment Technician, ISS
Solutions, Inc.
Candace England, Director of Quality & Compliance, Modern Biomedical & Imaging

Carlos Villafane , Clinical Engineering/ BMET 3, Baycare Health

Carol Garibaldi, CBET, Sr. Lead Biomedical Equipment Technician , Washington Hospital Healthcare System

Cass Holland, Clinical Engineering Lead Tech., Biomed Tech.at littleton Adventist Hosp.

Catherine Weitenbeck, Clinical Technologies, Clinical Engineer, UCSF Medical Center

Charles Connor, Clinical Engineering, Manager, Karmanos Cancer Institute

Charles E Cowles Jr, Physician - Anesthesiology, University of Texas

Charles Mifsud, Biomed II, Beaumont hospital

Chokri Baalouche, Biomed, CBET3, St John Hospital and Medical Center

Chris Ellis, Industrial Hygienist, HSS

Chris Gutmann, Executive Director, Clinical Engineering, Yale New Haven Health

Chris Stanosheck, Biomed Tech ll CBET, Saint Elizabeth's Hospital

Christine Pirillo, Analyst II Project Mgr, Diagnostics

Christopher DiNapoli, Clinical Engineering BMET Senior, CommonSpirit

Christopher Endres, VP, Atlantic Biomedical Company, Inc.

Christopher G. Leger, Principal Consultant, CLeger Consulting

Christopher Greer, Field Service/ Territory Manager, Prescott's Inc

Christopher Ney , Biomedical Engineering- BMET, AAMI

Christopher Thomas, Technician, Tyler Bio-Engineering

Clinton Anderson, Clinical Technology/Lead Technician, Kaiser Hospital

Conroy D. Victorine, Biomedical Engineering / Chief, Department of Defense

Corey Andrews, Special Equipment Tech, ISS Solutions

Corey Bialkowski, Clinical Engineering Project Manager, University of Michigan Michigan Medicine

Corey Robinson, Clinical Eng/ BMET II, Ascension Providence Hospital

Courtney Nanney, National Quality Manager, Clinical Engineering, CommonSpirit Health

Craig Bakuzonis, Clinical Engineering, Director of Clinical Engineering, UF Health Shands Hospital

Craig V. Virzi, Clinical Engineering Dept., Regulatory Compliance Specialist, Henry Ford Health System

Curtis R Shaw, Biomed III, ISS Solutions Biomed

Curtis Stump, Biomedical Network Engineer, Common Spirit Health

Dale Crakes, Clinical Engineering Manager, Dignity Health

Dale Mattison, Clinical Engineering, FSS, CHI & CABMET

Damion Aiello, Biomed/ PACS Admin, Ultimate Biomedical Solutions

Dan Blaisdell, Biomedical Engineering, Supervisor, ProHealth Care

Dan Cutshall, Biomed - Field Service Specialist 2, In House CE

Dan Dinh, Clinical Engineering /Biomedical Equipment Technician, Try Touch Service

Dan Harper, Clinical Engineering, CBET, St. Mary's Hospital and Regional Medical Center

Dan Hoffart, Engineering Technician, DHA

Daniel Adams, Director of Imaging Service, Renovo Solutions

Daniel Elias, Clinical Engineering Dept., CBET, McLaren Flint

Daniel Hauer, Clinical Engineering - Senior Biomed, Catholic Health Initiatives

Daniel M Hooper, Asset Manager - Technical Analyst, ISS Solutions
Daniel Munson, Clinical Engineering, Imaging Specialist, Trinity Health
Daniel Penticoff, Clinical Engineering; Imaging Tech I, CommonSpirit Health
Daniel Ritter, CE/ Director Clinical Engineering, System, SCL Health System
Daren Kneeland, President, MultiMedical Systems, LLC (MMS)
Darren Maas, Clinical Engineering/Biomed Lead Technician, CHI Clinical Engineering
Darren Vianueva , SVP, Trinity Health
Dave Johnston, Clinical Engineering Mgr, Clinical Engineering Mgr
David Banister, Field Service Engineer, HSS, Inc,
David Campbell, Clinical Engineering, Biomed Specialist, ISSSolutions
David L. Smith, Field Service Engineer, National Jewish Health via HSS, Inc.
David McBratney, Healthcare Technology Management BMET III, ISS Solutions
David Orozco, BioMedical Technician, Try Touch Service, Inc.
David Selig, Anesthesiology, Brigham and Women's Hospital
David Simpson, Clinical Engineering Medical Device Security, Catholic Health Initiatives
David Singer, Biomedical Equipment Technician, ISS Solutions
David Stiles, Director, Biomedical Engineering, Long Beach Medical Center
David Thorman, Clinical Engineering/IS Specialist, Common Spirit Health
Dean Skillicorn, Certified Biomedical Equipment Technician , Allina Health
Dennis Brant, Southern Region, Field Service Engineer, HSS Inc
Diana Upton, President, IAMERS
Domenique Livingston , NA, Veteran Biomedical Equipment Technician
Don McCarty, Clinical Engineering Director,
Don Whitebread, GMC-CE / BMET, ISS Solutions
Donald McMillion II, Senior BMET, CommonSpirit
Donald Savard, Biomedical engineering, technologist, Biomedical engineering technologist
Dorothy Hodges, CTBE Clinical Systems Analyst, LPCH
Dorothy M Cubrich, Biomed , Sodexo-Biomed Department
Doug Carroll  CISSP , Information Service CISO, Mount Nittany Health
Doug Lafko, Lead BMET, Common Spirit Health
Dr.Robert Loeb, Professor, Anesthesiology, University of Florida
Dustin Telford, Clinical Engineering Manager, Children's Hospital & Medical Center Omaha
Dylan DiJulio, CEO, Prescott's, Inc.
Edward Gomez , Biomedical technician , Western Arizona Regional Medical Center
Edward Raeke, Director, Materials Management, Massachusetts General Hospital
Edward Ravenkamp, President, ISO
Eliud Tejada, Biomedical Technician , Try Touch Service Inc.
Elizabeth Rickerson, Anesthesia, MD, BWH
Elkin Lara-Mejia, Biomedical Engineering, Manager, Zuckerberg San Francisco General
Hospital
Emmanuel Sherman, Director of Clinical Engineering, Crothall Healthcare
Engr. Naveed Ahmed Khan, Sr. Biomedical Engineer, Saudi German Hospital, Riyadh
Eric Levac, Biomed Biomed Technologist, TOH

Eric Perez, Biomed and Field service Multi Vendor Biomed Tech, Philips
Eric W Armocida, Clinical Engineering / Sr. Service Specialist, Hospital Staff; Medical Equipment Repair
Ernie Rau, Supervisor of Biomedical Services, NovaMed Corp.
Eron Gailey, Clinical Eng. Imaging Tech 3, SCL Health
F. Mike Busdicker, System Director, Clinical Engineering, Intermountain Healthcare
Felicity Billings, Anesthesiology, M.D., Brigham and Women's Hospital
Frank Oltman, Clinical Engineering, BMET III, AAMI, MSCE
Frank West , Owner, Equipment Trac ( Biomedical Services )
Freddy Matamoros , Maintenance Engineering , ACCE
Fredrick Fugate, Clinical Engineering BMET Intermediate , ISS Solutions
Gary Barkov, Vice President, Healthcare Technology Management  , Advocate Aurora Health
Gary Nop, Biomedical Clinical Engineer, Try Touch Service, Inc.
Georgy Philip, BMET 2, Ascension macomb Oakland hospital
Gerald Lay, Biomed, Detroit Medical Center
Gerald McNeil, Clinical Engineering/CE Operations Manager, EMMC
Gerald R McDaniel, Biomedical Equipment Technician , Trinity Health
Giovanni Viscusi, Medical Equipment Technician, Tualatin Valley Fire & Rescue
Glenn Havens, Jr. CBET, Healthcare Technology Management Site Coordinator, ISS Solutions
Gordon Holder, Clinical Engineering Division Director, CommonSpirit Health
Greg Boots, Clinical Engineering - Field Svc. Spec III, CHI Memorial Hospital, Chattanooga, TN
Greg Chappel, Biomedical Equipment Technician, Repair technician
Greg Czajka, Clinical Engineering, Manager, Advocate Aurora Health
Greg Williams, Biomed  Imaging Engineer, FirstHealth of the Carolinas  NCBA member
Gregory Phillips , Manager, HTM, US Military
Gregory Zoucha, CBET, Clinical engineering, Imaging service, Common Spirit Health, Immanuel Hospital Omaha
Hajarat Rasheed , Engineering , St Clair College
Hank Ly, Clinical Technology (Biomed Manager), LASH (Los Angeles Surge Hospital)
Harvey Fortune, Biomedical Eng., Biomed Technician , Washington Hospital
Helen Cheong, Supervisor, First Health of Carolinas
Hezam Alsubari, Biomed Tech, St. John Hospital, Detroit, MI
Horace B Hunter, Executive Director, Georgia Biomedical Instrumentation Society (GBIS)
Ian Garcia, Clinical Engineer - Department of Biomedical Engineering, Brigham and Women's Hospital
Ilir Kullolli, President, American College of Clinical Engineering (ACCE)
J Scot Mackeil CBET, Senior Anesthesia Biomed, Mass General Hospital Anesthesia Clinical Engineering Dept
Jack McAuliffe, Service Manager, Sonodepot, Inc.
Jacob Hunter, CE- Field Service Specialist II, CHI
Jacob Urben, Field Service Engineer, HSS
Jacqueline Boehme, Dept of Anesthesiology - Senior Resident Anesthesiologist, Brigham and Women's Hospital

Jaime Krueger-Gomez, Asset Manager, Nebraska Medicine
Jake Smith CBET, Clinical Engineering, Senior BMET, CommonSpirit Health
James Ciaramitaro, Sr Service Specialist, McLaren Healthcare Corp.
James Fowler, HSS-Biomedical Technician III, Aspen Valley Hospital
James H. Philip, Anesthesiology, Anesthesiologist and Clinical and Biomedical Engineer,
Brigham & Women's Hospital, Harvard Medical School
James Helton, Clinical Engineering, Sr BMET, Catholic Health Initiatives
James J Toma, Clinical Engineering, ISS Solutions
James Leonard, Lead Technician of CHI's Physical Asset Services-Clinical Engineering,
Common Spirit Health  St. Anthony Hospital Pendleton, OR
James Linton MiM, PmP, Cmbb, AAMIF, Biomedical engineering coordinator/ professor, St.
Clair College
James R Knight, Clinical Engineering Sr. Clinical Systems Engineer, Renown Healthcare Reno
NV
James Vaughan ,CBET, Biomed.  CBET II, CBET
James Whitaker, Clinical Engineering, Senior BMET, Catholic Health Initiatives
James Z. Rider, Senior Biomedical Equipment Technician, ISS Solutions
Jared Wilson, Co-owner and CTO, Insight HTM
Jason Chaffin, Clinical Engineering   BMET Senior , Common Spirit
Jason Dobbs, Biomed / SR BMET., CHI
Jason Hoffer, Clinical Engineering / Lead Tech, Common Spirit Health
Jason Lucas, Biomedical Services/BMET II, FirstHealth of the Carolinas
Jason Warner, BMET III, HSS-US , San Luis Valley Regional Medical Center
Jay W. Hall, MS,PE, Owner/Principal , Biomedical Consulting Services
Jean roberts, Technical services partnership - BMET III, University of vermont
Jean Sydney Humes, Director of Business Development and Board Member, ZRG Medical and
California Medical Instrumentation Association
Jeff Alvarado, Medical Equipment Management: FS-1, Health Shared Services (HSS)
Jeff Gibson, Clinical Engineering / Biomedical Tech, Common Spirit/CHI Clinical Engineering
Fargo ND
Jeff Hooper, PhD, Director, Biomedical Engineering and Medical Instrumentation, Children's
National Health System
Jeff Kelly, Biomedical Services Manager, Moberly Regional Medical Center
Jeff Ross, Owner, ACT Biomed
Jeffery P. Semple, Clinical Engineering  CE Program Manager, McLaren Healthcare
Jeffrey C Lagrutta, Chief Compliance Officer, MultiMedical Systems, LLC.
Jeffrey Feldman, MD, Anesthesiology, Prof of Clinical Anesthesia, Children's Hospital of
Philadelphia
Jeffrey L. Berry, Clinical Engineering / Senior Biomed, Common Spirit Health
Jeffrey Ruiz, Biomedical Engineering/Site Manager, Trimedx/Holland Hospital
Jeffrey Shier, BMET, Argo Biomedical Services
Jeffrey Smith, Clinical Engineering Senior Service Specialist , McLaren
Jeffrey Wicks, Business Manager of Surgical Services, ProHealth Care

Jenn Nichols, Chair, California Medical Instrumentation Association (CMIA)
Jennifer Ackles, Vice President of Operations, HHs
Jennifer Gentry, Clinical Engineering, BMET II, Common Spirit Health
Jennifer Long, BMET 1, Trimedx
Jennifer Romer, Planning Design and Construction, RN, Senior Program Manager, Medical
Equipment, Stanford Health Care
Jeremy Spencer, Biomed, FirstHealth of the Carolinas
Jerome J. Henehan, BMET II (Intermediate), ISS Solutions Inc.
Jerry Pack, Biomed Imaging Technician II , CHI
Jesse Cabrera, State Board Member, California Medical Instrumentation Association
Jesse Smith, Clinical Engineering BMET I, Common Spirit Health
Jewel C. Newell, Clinical Engineering - Director, JPS Health Network
Jim Elhard, Biomed - Manager, TRIMEDX
Jim Hollingdale, CBET, Clinical Engineering, Supervisor, MaineGeneral Medical Center
Jim Miller, Clinical Engineering Manager , CommonSpirit Health, Good Samaritan Hospital,
Cincinnati
Jodi Sherman, Associate Professor of Anesthesiology, Yale University
Joe Castanon , Supply Chain , Texas Children's Hospital
Joe Kaminski, AVP HTM, Geisinger Health System
Joel McIntyre, Biomed Supervisor, ISS Solutions
Joel Wirtz, Clinical Engineering, BMET II, Trimedx
John (Mike) Danford, Biomed Tech III, Biomed Tech
John Chamberlain, Clinical Engineering, BMET, CommonSpirit Health
John Crissman CBET, Biomedical Engineering Dept Manager, retired, Beaumont Health, retired
John Cude, Manager Clinical Engineering , Yale New Haven Health
John Dregne, Biomedical Engineering,  Biomedical Imaging Technician, ProHealth Care, Inc.
John DuBuc, Clinical Engineering  CBET, Mclaren Flint
John Duffy, Biomed Manager, NY Presbyterian Hospital
John Eidson, Clinical Engineering CBET, CHI
John Grace, BMET III, Michigan Medicine
John Kirias, Senior Imaging Tech, Clinical Engineering
John Petersen, Sr. Director Clinical Engineering, Trinity Health
John Pritchard, President, Venture Medical ReQuip
John S. Moore, Jr., BSBE, CCE, Senior Medical Equipment Planner, DeltaStrac LLC
John Shore, Clinical Engineering, Director, Trimedx/Tanner Health System
Johnny Hogg, ENTECH Technology Management Sr Manager, Banner Health ENTECH
Jojo Gonzales, Clinical Technology / Lead BMET,
Jon Bolles, Clinical Engineering Area Manager, ISS Solutions
Jon F Mickletz, HTM Dept, Retired Sr BMET, Guthrie Cortland Medical Center/ISS Solutions
Jon Gross, Clinical Engineering Project Manager, Henry Ford
Jon P Cloutier, President, EMStat Biomedical, INc.
Jonathan Egan, Clinical Engineer, Department of Biomedical Engineering, Brigham and
Women's Hospital

Jonathan Lee, Senior Consultant, HTM Consulting Network

Jordan Stansbury, Clinical Engineering, Manager, SCL Health

Jose Antillon, Biomedical Engineering, Technician, Biomed

Jose Banuelos, ENS/DPT   Equip Support Tech, San Diego State University

Jose Sabas, Clinical Technologies, Associate Director, UCSF Health

Joseph C Deater, Clinical Engineering, BMET III, Munson Healthcare

Joseph Chamakala, Healthcare Technology Management / Biomed Tech II, Advocate Health Care

Joseph Dorchuck, Clinical Engineering - BMET III, GE Healthcare

Joseph Ouellette, Clinical Systems Engineer, Yale New Haven Health System

Joseph Parmentier, Clinical Engineering, Sr. Service Specialist, McLaren Healthcare

Joseph Pirillo, HTM , Supervisor, ISS Solutions

Joshua Gorman, Healthcare Technology Management - Section Head, Mayo Clinic

Joshua Sepulvida, Biomedical Equipment Technician, ERD LLC

Joshua Yang, Clinical Technology - Lead Biomed Technician, Kaiser

Juan Escobar, Clinical Engineering Field Service Specialist, Common Spirit Health

Julio Barrionuevo, Ingenieria Clinica Hospital Italiano de Buenos Aires-- Técnico en Electromedicina, Sociedad Argentina de Bioingeniería

Justin Cozadd, Biomed   Associate System Engineer, Spectrum Health Lakeland

Justin S. Grissom, Clinical Engineering - Senior Biomedical Technician, Biomedical Technician

Karen Ancona, Biomedical Engineering, Washington Hospital Healthcare System

Karen Harris, Clinical Engineering / Administrative Assistant, CHI St. Vincent Infirmary

Karen Taborda-Marin, Perioperative Clinical Engineering. Clinical Systems Lead, MGH

Keith Gilliam, BMET ll, Firsthealth of the Carolina NCBA member

Keith Miller, Clinical Engineering, Lead Tech, St. Mary Mercy Hospital, Livonia Michigan

Keith R. Whitby, Healthcare Technology Management--Section Head, Mayo Clinic

Kelly Langley, CBET III, DOD US Air Force

Ken Ottenberg, Medical Equipment Management, HSS

Kenneth Lewis, Clinical Engineering, ISS Solutions

Kent Brull, Biomedical Technician II, Trimedx

Kent Miller, CBET, RRT, Respiratory Care Supervisor, Michigan Medicine/University of Michigan Hospitals

Kerry McLaughlin, Biomedical Engineering - Senior Technologist - Alert Recall Co-ord., The Ottawa Hospital - Ottawa Canada

Kevin Davis, Field service BMET and ISO owner operator, ISO

Kevin Heck, Imaging Engineer, Trimedx

Kevin McPeek, Biomedical Engineering Clinical Systems Technician, Brigham and Women's Hospital

Kevin Melvin, Biomedical Lead Technician, Legacy Health System of Oregon

Kevin Rivera, Clinical Engineering , The Metrohealth System

Kim Greenwood, Director, Clinical Engineering, The Children's Hospital of Eastern Ontario

Kimuel Villanova, Clinical Engineering Biomedical Technician, R/Bmet

Kristina Read, CE Coordinator, CommonSpirit Health

Kristofer Caluya, Biomedical Equipment Technician Supervisor, Try Touch Service, Inc.
Kristofer Hall, Medical Equipment Management Field Service Engineer III , HSS Inc.
Kristopher Lieber, Clinical Engineering/BMET II, Ascension St. John Hospital
Larry Barton, biomed Tech, V.A. Healthcare
Larry Hamilton, Service Department: Lead Biomedical Technician, Venture Medical
Lauren Ebejer, Business Development, ARGO Biomedical Services
Lawrence R. Ossege, Clinical Engineering, Manager
Lawrence Rochowicz, Biomedical Engineering, Tower Health System
Leehans Tang, BMET Manager, BMET
Lenny Jordan, Product Management, Director of Corporate Product Management, STERIS IMS
Leticia Reynolds, President, CABMET
Levi Graw, Biomedical technician , Biomedical Services
Lisa Crossley, M.D., Anesthesiology, Perioperative and Pain Medicine, Brigham and Women's Hospital
Liz Calhoun, Clinical Engineering Account Manager II, Common Spirit Health
Lori Allocca, HTM / Site Coordinator, ISS Solutions
Luis Reyes, biomed , biomed
Luis Velazquez, Biomed , Bmet II, GE healthcare
M. Scott Fishman, MA, CRES, PNW HTM Associates
Mack Crabtree , Certified Biomedical Equipment Technician , ISS Solutions
Maggie Berkey, Clinical Engineering, Senior BMET, CommonSpirit Health
Maluisa OJEDA, Medical Equipment Planning - Biomedical Engineer, IMEG CORP
Mandie Hunter, Biomedical Operations Specialist, Vikand
Manuel C Dalayoan Jr, Biomed Technician, Seton Medical Center
Manuel E Solano, Clinical technology , Kaiser Permanente
Marc Heroux, Biomedical Technologist, Tech 2, Ottawa Hospital
Mark Anthony Johnson, BMET Student, St. Philip's College
Mark F. Wakefield, Clinical Engineering, Account Manager II, CommonSpirit Health
Mark J. Manning, Healthcare Technology Management - Division Chair, Mayo Clinic
Mark Mrozek, Biomedical Engineering (Manager), Weirton Medical Center
Mark Slater, Supervisor, Biomedical Electronics,
Matt Steele, Third Party - Operations Manager, Biomed
Matthew C. Oetker CHTM, CBET, Medical Equipment Management, Technician III, HSS Inc.
Matthew Cunningham, NG HTM, District Operations Manager, ISS Solutions
Matthew F. Baretich, P.E., Ph.D., President, Baretich Engineering, Inc.
Matthew Keyes, CBET, BMET III, Trimedx
Mauricio Lopez, Clinical technology Biomedical equip tech, Kaiser Permanente
Maximo Nicolas, Periop Clinical Engineering/Clinical Engineer, Hospital based BMET
Melvin Pfirman Jr., Program Manager, EAM, ISS Solutions
Mercedes Merchant, EH&S Service Manager, HSS
Michael Ashmore, Clinical Engineering , Common Spirit Health
Michael Brown, Account Manager, Common Spirit Health
Michael C Nesbitt, Biomed, ISS Solutions

Michael Calhoun, Clinical Engineering Director, CommonSpirit Health
Michael Cavanaugh Sr cBET(e), Senior Biomed Tech, Retired former technician with Trinity Health
Michael Flood, Clinical Engineering Account Manager, CHI Health Good Samaritan
Michael Harakas, BMET, Beaumont Health
Michael Howell, Biomedical Engineer Senior, ProHealth Care Inc.
Michael Keddie, Clinical Engineering, Lead Technician, CHI St Vincent Little Rock, AR
Michael Kelley, Medical Equipment Management - Vice President , HSS
Michael L. Tassler, Biomed / CBET-E, COVID-19 self-isolator
Michael Lane, Director, University of Vermont
Michael Mace , Biomed Radiology Service Tech, Nebraska Methodist Health System
Michael Maggio, Biomedical, Senior Biomed Tech , Methodist Hospital
Michael McCauley, BMET, Third Party Contract
Michael Nott, Biomed, ISS Solutions
Michael P McRoberts, SVP Business Development , MultiMedical Systems
Michael Pruitt, MERC, Biomedical Technician , USAF
Michael Schilling, Clinical Engineering, Biomedical Electronic Technician, DMC Children's Hospital of Michigan
Michael Sturgis, Clinical engineering Coordinator, Munson Healthcare
Michael Szabo, Clinical Engineering, BMET II, CommonSpirit Health
Miguel Ardila, General Manager, Venture Medical
Mike Brockhaus, Field Service, CBET, Bio-Electronics
Mike Cobb, Clinical Engineering Lead Tech, Common Spirit
Mike Johnson, Lead Technician Clinical Engineering, CHI St Gabriel's Hospital
Mike Powell, Clinical Engineering Director, Community Medical Center
Mimi Lively, CEO, ZRG Medical
Mitchell Spillane, Biomedical Technician II Clinical Engineering, Hospital Employee McLaren Northern Michigan
Muhammad.Aleem uddin , Clinical Engineer , Repairs and maintenance
Nader Hammoud , Manager of Biomedical Engineering , ACCE and CMIA
Najeeb Haddad, Vice President, EndocorpUSA
nathan bell, BMET, Manager, HSS
Nathan Howard, Biomedical Equipment Tech, USAF
Nathan Swartzendruber, International Service & Sales Director, Prescott's, Inc
Nathanael Thayer, Biomedical Equipment Technician II, McLaren Central Michigan
Neil Feldmeier, Clinical Engineering - Director , Member
Neil Stock, CBET, System Director, Clinical Engineering, CommonSpirit Health
Nicholas Hillis, Biomed Dept. / Technician, Washington Hospital
Nicholas Petrossi, BioMed Tech LVL I, Common Spirit Health
Nicolas Melendez, Biomed Tech, CHOA
Nicole Marsh, Biomed, NA
Nilesh Modi, Biomedical engineer, Biomedical engineer
Norm Rhode CBET, CRES, Senior Service Specialist, Clinical Engineering, Mclaren Health Care

Norman Ramirez, Service Department Manager, Venture Medical Requip, Inc.
Oem Dave, Biomedical Engineering Technologist, Children's Hospital of Eastern Ontario
Oliver Howe, Technology Specialist, C Change Surgical
Oliver Howe, Veteran of the USAF and Biomedical DoD Training Graduate, Former Biomedical Equipment Technician
Paul A Neher, Biomed Teal Lead, Lutheran Health Network
Paul C. Monahan, Jr., Healthcare Technology Management/Director of Quality, ISS Solutions, Inc.
Paul Gudenau, Manager, Clinical Eng., McLaren Healthcare
Paul Kelley, Director of Biomedical Engineering and the Green Initiative , Washington Hospital
Paul Mashack, Imaging Technology Manager, ISS Solutions
Paul R Collett Jr, CBET, Biomedical Engineering/Biomed Risk Compliance Officer, Nebraska Methodist Health System
Paul R Sherman CCE, FACCE, President, Sherman Engineering
Payal Mandot, Biomedical Engineering department- Clinical Engineer, The Ottawa Hospital
Perry B Kirwan, Vice President, ENTECH Biomedical
Peter M Keenan, Senior BMET, Geisinger Healthcare / Nathan Littauer Hospital
Phu Ly, ERD, Technician supervisor, Biomed Field service technician
Priyanka Upendra , Technology Management - Quality & Compliance Program Director , Banner Health
Rafael Ramirez , Clinical Engineering Manager, Franciscan Health
Rakesh K. Sood, Clinical Technology CBET, Kaiser Foundation Hospitals
Ramakrishna Parchuri, Periop Clinical Engineer/Clinical Engineer-Systems Lead, Massachusetts General Hospital
Randall Cowens, VP Clinical Engineering, University Health System, Regional Director of Clinical Engineering, Sodexo
Randy Starr, Clinical Eng.  Sr.Bio-Med. Tech., Geisinger / ISS Solutions
Rao Bankuru, MS, CHTM, Senior Clinical Engineer, Renovo Solutions LLC
Ray Brewster, Clinical Engineering Technician, McLaren Northern Michigan
Ray Marden CBET, CHTM, CEO and CO-Founder, Insight HTM, LLC
Raymond M Kates, Clinical Engineering - Service Specialist Senior, McLaren Northern Michigan Hospital
Raymundo Enrique Acatl Cadena Espinosa, Biomedical engineer at Clinical engineering department, Hospital Santo Tomás
Renee Myers, VP, Venture Medical ReQuip, Inc.
Reynolds Acker, Service Engi. Er Front Range Imaging Team, Sisters of Charity Leavenworth Health
Rhiannon Thurmond , Biomed Supervisor , Ultimate Biomedical Solutions
Ricardo Ortiz, Biomed/Manager, United Regional
Rich Belan, Area Manager, ISS Solutions
Rich Reamer, Regional Manager of Clinical Engineering, McLaren Healthcare
Richard Chamberlain, Regional Field Service Specialist, Catholic Health Initiatives
Richard Collins , Biomedical technician , DHBIOMEDICAL

Richard Foster, Biomed Tech III, SCLHS
Richard Gustman, Coil repair manager, Avante Health Solutions
Richard Marshall, Medical Equipment Management Regional Operations Manager, HSS
Richard P Walston, Product Specialist, Biomedical Test Equipment Manufacturing
Richard Palmer, Clinical Engineering, Systems Manager, Munson Healthcare
Richard Salagovich, Clinical Engineering   Radiology Service Engineer, Munson Medical Center
Richard Tevis, System Director, Trimedx
Rick Bauman, Clinical Engineering, CBET, McLaren Macomb
Rick Boudreau, Clinical Engineering Director, MaineGeneral Health
Rick Schrenker, Systems Engineering Manager. Biomedical Engineering, Massachusetts General Hospital
Robert Bagwill, Clinical Engineering Manager, AdventHealth
Robert Bundick, Director HTM and Biomedical Engineering, Hospital
Robert Jarden, Biomed, CHI
Robert Milward, Biomedical Services, Hospital Service
Robert Myers, Director, Biomedical Engineering, Biomedical Engineering Administration
Robert Nix, Biomed/Senior Biomedical Imaging Technician, ProHealthCare Inc
Robert Pfister, Supervisor of Biomedical Services, Crothall HTS
Robert Rankin, CEO, Rankin Biomedical Corporation
Robert Stephens, Senior Biomedical Technician, Alegent
Robert Toeller, HTM - Biomedical Equipment Technician IV, Saint Luke's Hospital
Robert Wentworth, Sr. Director, Biomedical Operations, ISO
Roberto Torres, Manager, Clinical Engineering, Cedars Sinai Medical Center
Rod Zalesky, Clinical Engineering Sr. BMET, Common Spirit Health
Rodney Nolen, Senior Director of Clinical Engineering , Penn State Health
Rodrigo Rivas, Area Manager, imaging service & support, Kaiser Permanente
Roger Wobig, Clinical Engineering, University of Michigan Hospital
RON DERU, Biomed technician and owner, Northwest Supply
Ron Midlick Jr, BioMed Site Lead, BMET
Ronald C. Baumann, MAJ, USA (RET), Medical Equipment Planning / Senior Medical Equipment Planner, IMEG Corporation
Ross A. Ward, Clinical Engineering SR Tech., Common Spirit Health
Rothtana Thoek, Biomed, Try Touch Service
Russell Furst, Sr. Director Healthcare Tech Management, ISS Solutions
Ryan Bird, Biomedical Electronics Technician, Children's Hospital of Michigan
Ryan Flynn, Senior Imaging Technician, ISS Solutions
Ryan Leteff, Biomedical Technician, ERD LLC
Ryan Motl, Healthcare Technology Management - Section Head, Mayo Clinic
Ryan Newgard, Biomed, Radiology Equipment Technician, MaineGeneral Medical Center
Salim Kai, Senior Director, Information Services-Biomedical Engineering, Children's Hospital of Philadelphia
Sam Nathan, Vice President, Dignatel.com
Samantha Jacques, PhD, FACHE, Vice President, Clinical Engineering, McLaren Health

Santosh Dhakal, Director, Himshikhar Biomedicals Pvt. Ltd.
Scott Dille, Biomed, Biomed Tech III, CBET
Scott Irwin, HTM Area Manager, ISS Solutions
Scott Mazure, Biomed,  imaging engineer , Trimedx
Scott Ostrand, Clinical Engineering, Manager, Common Spirit Health
Scott Read, Clinical engineering finance, Accountant II, CommonSpirit Health
Scott V Newman, Biomedical Services, Director, AAMI
Sean Bowden, Clinical Engineering - Field Service Specialist III, Common Spirit Health
Sergey Kontsimal, BMET II, Catholic Health Initiatives
Shafin Ali CBET, Chief Biomedical Engineer,
Shana Ryker, Clinical Engineering ASG, CHI Saint Joseph Health
Shelby Johns, HTM, Clinical Engineer, Geisinger
Sheri Ward, Clinical Engineering, Biomedical Equipment Technician II, CHI Baylor St. Luke's
Sherrie Williams, Purchasing, Advanced Clinical Technology
Spencer Graw, Equipment Specialist , ACT Paragon
Stan Gordon, Clinical Engineering,  BMET, St Joseph Hospital,  Ann Arbor
Stephanie Polk, Business Development Associate for Medical Equipment Management, HSS, Inc.
Steve Anthony, Sales Manager , ACT-Paragon
Steve Erdosy, CBET, Quality and Regulatory Compliance, Analyst, TRIMEDX
Steve Hoffmaster, Special Equipment Technician, ISSSolutions
Steve Martin, Biomedical engineer II , Cer Technology
Steven Hegel, Biomed BMET II, CHI
Sue Jones, Biomed, Supervisor, Nebraska Methodist Hospital
Susan R Ramonat, CEO, Spiritus Partners (Exton, PA)
Svetlana Montarroyos, Clinical Engineer, Hospital
Syed Zain Hasan, Biomedical, Clinical Engineer, Try Touch Services
Sylvia Knittel, Clinical Engineering, BMET I, Catholic Health Initiatives
Takeo Kushida, Wisconsin territory representative , Prescott surgical microscope
Ted Schreur, Clinical Engineering--Field Service Specialist, Common Spirit Health
Terry Stephan, SrBMET, CHI St. Vincent
Thomas Bauld Ph.D., CCE, President, Biomedical Safety Systems
Thomas Brown, Biomed, ACT - Paragon
Thomas DeNoville, Sr. Director, HTM NG-CE , Healthcare Technology Management
Thomas H Pelletier, Clinical Engineering / Biomedical Technician III, McLaren Macomb
Thomas Hulscher, Sr. Director Clinical Engineering, Trinity Health
Thomas J. McKillip, Biomedical Network Engineer, Cyber Security, CommonSpirit
Thomas Pokorny, BMET II, CHI Health Mercy Council Bluffs
Thomas Prich, Clinical Engineering / Senior CBET, Common Spirit Health
Thomas Roberts, Senior Biomedical Imaging Technician, ProHealth Care, Waukesha, Wi.
Tim Gifford, Equipment Specialist, ACT. Advanced Clinical Technology
Tim Keefe, Biomed supervisor , ISS Solutions
Tim LeCuyer, Consultant, various Medical Equipment operations, Consultant

Timothy Hutchison, Clinical Engineering Manager, CommonSpirit Health
Timothy K Clements, President and CEO, Tidewater medical Sales & Service Inc
Timothy Reitz, Director of Clinical Engineering , Unm Hospital
Tobey Clark, Technical Services Partnership, University of Vermont
Todd G. Schmechel, Director of Inside Sales, FOBI Medical
Todd W. Lowe, Technology Management Senior Director, Banner Health
Tom Fullford, Clinical Engineering/BIOMED,  Prefer not to say
Tom Nirschl, Quality Manager, HSS Inc, independent service organization
Tommy Lobato, Clinical Engineering, Manager, Good Samaritan Medical Center
Tony Cody, Technology Management Director, Banner Health
Tony Lively, President, ZRG Medical
Tracei Stover, Biomedical Electronic Technician I, Ascension
Tracy Horton, Production Supervision , HSS
Travis Jeffries, Clinical Engineering System Manager, CommonSpirit Health
Travis Reilly, Clinical Engineering Imaging Tech 2, SCL Health St. Joseph Hospital
Trisa Workma, Supervisor Clinical Engineering , OhioHealth
Trish Payne, OEM & FDA Liaison , Independent Service Provider of Medical Devices
Troy Schmidt, Clinical Engineering - Field Service Specialist II, Common Spirit Health
Tyler Harris, Biomedical Technician in Clinical Engineering, McLaren Northern Michigan
Hospital
Victor L Faignant Jr., Healthcare Technology Management/Regional Direct Mid-Atlantic West,
ISS Solutions
Victoria Reyes, School of Anesthesia - Asst. Program Director, APSF and STA
Wayne E. Howell, Jr., Clinical Engineering, Director Medical Equipment Technology &
Cybersecurity, Trinity Health
Wendy Wolfe, HTM - Administrative Supervisor, ISS Solutions
Wesley Reid CHTM, CBET, Healthcare Technology Manager, Healthcare Technology
Management Consultant
William Foster , Equipment Specialist , LMI
William Gleason, Clinical Engineering - Clinical Engineering Tech 2, Hospital Clinical
Engineering
William H. McCarty, Senior Equipment Service Coordinator, Spectrum Health
William Hine, Safety, Institutional Safety Manager, PA DHS
William Kyle Marks, Clinical Engineering, Account Manager, CommonSpirit Health
William L. Johnson, Clinical Engineering - Field Service Specialist II, Common Spirit Health -
CHI St. Luke's Health Memorial - Lufkin, TX
William Lobsinger, Clinical Engineering, Radiology Engineering Specialist II, Munson Medical
Center
William McSharry, Clinical Engineering FSS II, Common Spirit Health
William Michael Oldstein, Clinical Engineering , laboratory specialist
Yofrey Contreras , Biomedical engineering II , Biomedical engineering
Zach Scott, Biomed Supervisor, HSS Inc
Zachary Burns, Lead Biomed, Indiana Regional Medical Center

LOC_AR_00002965

Zella M. Daniel, Clinical Engineering Supervisor, McLaren Health Care Facilities

LOC_AR_00002966

# EXHIBIT 5

LOC_AR_00002967

Attorney Docket No. 15259128-000007

In Support of Petition of:
Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

*Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging*

## DECLARATION OF KEVIN MELVIN

I, Kevin Melvin, am over 18 years old and, based on my personal knowledge, hereby declare as follows:

(1)     I am the Clinical Engineering Lead at a large hospital system.  I have been with my current employer since May 2006.  I have been a Clinical Engineering Lead for the past two (2) years.  My previous job title was Biomedical Electronics Technician (BMET).  I have experience working as a BMET for an independent service organization (ISO).  In my opinion there are no significant differences in job duties between in house BMETs and ISO BMETs and both encounter the same impediments to servicing of medical equipment.

(2)     I am an expert in servicing medical equipment such as anesthesia machines, respiratory therapy machines, endoscopy machines, cardiac rehabilitation  monitoring machines, and medical laboratory equipment.  I previously taught how to service respiratory therapy machines, i.e., ventilators, and was an invited speaker at a national conference on respiratory therapy machines.

(3) In my 22 years of experience, I personally witnessed the evolution of medical equipment and the increase of use of technical protective measures (TPMs) to prevent access to medical equipment software required for servicing of the medical equipment. Today, access to most of the software is prevented by a TPM, especially in connection with machines made by large OEMs.

US_Active\115746170\V-2
US_Active\115993155\V-2

(4)     In addition to servicing machines that have experienced a malfunction or anomaly, I and my department also perform preventative maintenance.  Preventative maintenance can also require access to the software on a machine.  For example, ventilators require annual  calibration

(5)     Some preventative maintenance measures relate to the machine's mechanical and electrical components  which are not protected by software measures.  But, it is still essential to review the service manual for this type of preventative maintenance and repair.  However, larger OEMs that use TPMs do it to protect the service manual and access to the error logs, which are required to properly diagnose faults and errors in the operation of the medical device.  In other words, the TPMs prevent me from being able to repair, diagnose, and maintain the medical devices at my hospital.  The OEMs are using TPMs to place  data files, including error logs, configuration files, and other protected work behind the same TPMs.

(6)     Through these practices, hospitals are forced to rely on the OEMs for all repairs and routine maintenance.  Generally, the OEMs charge about $300 for travel expenses and between $1,000 to $,5000 for repair costs.  In my estimation, my employer could save about $1,000 per equipment repair and significantly shorten the medical equipment repair time, if we could bypass the TPMs for our preventative maintenance and repair needs.

(7)     The current COVID-19 pandemic has exasperated our servicing problems.  During the current COVID-19 pandemic, increases to equipment repair time have become an issue.  Prior to the COVID-19 pandemic, the OEMs would take about two (2) weeks to send a technician out to the hospital for machine servicing, and the OEM technicians use about 24 hours to deliver parts to my employer.  However, as a result of the current pandemic,  service times have  increased from an average of two (2) weeks to a month, and part delivery average time has increased from 24 hours to one (1) week.  The OEMs have also changed their service model.  Now, instead of being able to speak to an operator, servicing and repair calls to the OEM are rerouted to an answering machine.  These service and repair calls are placed in a queue to receive a return call from one of the OEM's technicians.  My understanding is that a lot of the OEM technicians are working from home, and it takes even the OEMs a few days to reach their own technicians.  Additionally, the OEMs seem to have a high turnover for their technicians and they do not readily replace the outgoing technicians.  This lack of available technicians is detrimental to our ability to fulfill all of our maintenance and servicing needs, especially during this pandemic.  In some cases, OEMs may have one technician that is responsible for servicing machines for three

(3) to six (6) different states, and, as can be appreciated, this means that this hampers their ability to travel quickly and perform service calls.  In this uncertain time, it's unclear how long the OEMs' new COVID-19 procedures are going to continue, but this hinders the hospital's ability to provide proper medical care to its patients.

(8)     If in house BMETs were able access the service manuals and the software to service and repair medical devices, With planning and parts on the shelf we could repair the medical equipment within 30 minutes to several hours, not the average wait time during the pandemic which has ranged from two weeks to one month.

(9)     There are also a few third party manufacturers that are able to send replacement parts, such as batteries, faster than the OEMs.  In my opinion, a healthy third party equipment and service/repair market would encourage the OEMs to provide better service packages.  OEMs exploit the current regulations to offer fewer services at higher prices.  Hospitals have no choice but to accept these inflated service packages out of fear of retaliation and other consequences.

(10)    My understanding is my hospital owns or leases the medical equipment, and the OEM controls the software on the medical equipment.  The OEMs place a proprietary chip in the computer board and an access code is required to gain access to the TPMs.  For example, ventilator machines usually have about 15 modes of mechanical ventilation, including a neonatal mode.  All of the different modes are preinstalled in the ventilator machine, and an access code is needed to unlock each mode.  If the computer board needs to be replaced, the OEM has to provide new codes or pull the proprietary chip from the old board and insert it into the new board.

(11)Many     OEMs implement TPMs, and larger OEMs tend to be far more stringent in what they make accessible .  At my hospital, we include access to the service manual in the purchase order, but some of the OEMs still do not provide it when they deliver the medical equipment.

(12)    The undersigned being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001.  The undersigned declares that all statements made of his/her own knowledge are true; and all statements made on information and belief are believed to be true.

Date: __12/8/2020_____     *Kevin Melvin*
                                 _____
                                 Kevin Melvin

# EXHIBIT 6

LOC_AR_00002971

Attorney Docket No. 15259128-000007

In Support of Petitioner of:
Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

*Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging*

## DECLARATION OF JOHN KAHLER

I, John Kahler, am over 21 years old and, based on my personal knowledge, hereby declare as follows:

(1)    I am a manager of biomedical imaging for a large urban hospital network, and I have three technicians that report to me. My hospital network spans seven (7) counties, has over 7,000 employees, and has 1,200 hospital beds. I specialize in servicing medical equipment used in the catheterization-angioplasty laboratory, which is commonly referred to as the "cath lab." I am familiar with servicing and repairing various types of medical equipment including vascular C-arm machines, medical imaging radiology machines, ultrasound machines, and all other imaging modalities.

(2)    I have been working as a biomedical electronics technician for over 35 years. I started circa 1984 while serving in the United States Air Force where I became trained in this field. After 8 years in the Air Force, then worked for nine (9) years as a technician for two different independent service organizations (ISOs). At ISO Med Imaging, I became the supervisor for the Washington, D.C. territory. I then moved to Premier which was acquired by Aramark, which was later acquired by TriMedx. At Aramark, I was permanently assigned to work onsite at my present hospital network. I eventually became an employee of my hospital network.

(3)    In addition to my military training, I received formal training from both independent service organizations (ISOs) and original equipment manufacturers (OEMs).

LOC_AR_00002972

DMCA Petition
Attorney Docket No. 15259128-000007
Page 2 of 4

(4)    My understanding is that my hospital network owns its medical equipment. We use in-house technicians, like myself, for some servicing. In-house service technicians provide financial benefits to the hospital network, including reduced service costs and service times as compared to OEMs. We also provide a service benefit by maintaining continuous operation of the medical devices.

(5)    Due to the current technical protective measures (TPMs) in many devices, without purchasing access, we are unable to access basic service on the hospital network's newest equipment. More specifically, the TPMs prevent access to all data files, including error logs and configuration files.

(6)    Our in-house service group is mainly concerned with being able to diagnose malfunctions and to identify parts that need replacing. However, with the service and error logs, especially on newer equipment, placed behind the TPMs, this is not possible for us with those devices employing the TPMs.

(7)    On machines that are about five (5) years old and older, we are able to successfully service the machines and access the service manuals because they typically do not have TPMs. However, even when purchasing keys for machines that are less than five years old, we have trouble servicing machines due, in large part, due to expiring keys and dongles. Further, the OEMs are constantly changing the documentation and even the level of support provided by the OEMs' technical support. With the current TPMs, often times even the technical support staff of the OEMs do not have copies of the support manuals. These tactics ensure that my technicians cannot service the equipment themselves, and we have to rely on the OEMs for much of our servicing needs for these newer devices.

(8)    The OEMs that use aggressive TPMs are Philips, Siemens, GE, and Hologic. Cannon and Fuji do not use aggressive TPMs.[1]

(9)    My hospital network does buy licenses for access keys and service materials out of necessity. The access keys expire annually. I have purchasing power in my role as manager of biomedical imaging, and in my estimation my hospital spends about $20,000 annually per machine for licensing keys. Without these keys, the in-house technicians

---

[1] Philips refers to Koninklijke Philips N.V., including its subsidiaries Philips Electronics and Philips Healthcare.
Siemens refers to Siemens Healthineers AG (formerly Siemens Healthcare, Siemens Medical Solutions, Siemens Medical Systems), a subsidiary of Siemens AG.
GE refers to GE Healthcare, a subsidiary of General Electric Company.
Hologic refers to Hologic, Inc.
Cannon refers to Canon Medical Systems Corporation, formerly Toshiba Medical, and a subsidiary of Canon, Inc.
Fujifilm refers to Fujifilm Healthcare which is a part of Fujifilm Holdings Corporation.

LOC_AR_00002973

DMCA Petition
Attorney Docket No. 15259128-000007
Page 3 of 4

cannot see descriptive error and diagnostic codes in the machines that are necessary to properly diagnose faults and errors in the operation of the medical devices.

(10)    I am aware of outside vendors that will make unlicensed keys, and we have had to resort to such a vendor on several occasions to be able to quickly diagnose malfunctions.

(11)    I try to leverage my purchasing power to reduce the annual costs of the access codes.  However, the OEMs are continuing to increase the prices for their licenses and service contracts.

(12)    The OEMs license different levels of access to the machines.  GE, for example, has three levels of access, A, B, and C.  Level A allows access only to some basic information and does not enable deep troubleshooting. Level C allows access to the most tools and deeper trouble shooting.

(13)    The lack of access to data files, error logs cause various health concerns for hospital patients.  For example, at my hospital when a CT scanner shuts down in the middle of a patient scan, Technologists often rerun the CT scan hoping that the machine will self-correct.  Unfortunately, this also means that the patient gets a double exposure to radiation from the scanner.  This increased level of radiation exposure is dangerous to the patient. This health risk could be avoided if in house technicians have access to the error codes, so we can quickly repair the device in minutes; and avoid the excessive wait time for diagnosis by the OEM's technician.

(14)    Under the current agreements we have with several OEMs, based on the diagnostic access, my hospital network must rely on the OEM technicians for servicing. But, this servicing invariably takes a longer time than if an in-house service technician can service the machines.  This increased servicing time can cause actual harm to patients. Again, physicians are double dosing patients with radiation when a faulty CT scan occurs to avoid having to shut down the machine for many hours to wait for an OEM's technician.

(15)    Generally, OEMs have limited service technicians, and this means that even their same day servicing contracts are insufficient.  One OEM has one service technician that is located about three (3) hours away from my hospital.  For another, it can take up eight (8) hours for the service technician to reach the hospital.  Due to this delay in service, my hospital has had to turn down and/or reschedule patients for some procedures because we cannot obtain timely servicing from the OEMs.  In my experience, the OEMs need an average of four (4) hours to respond to a request for service.  In contrast, in house service technicians often respond to service medical equipment within one hour, but only if we have access to the service manuals and error codes.

US_Active\115872067\V-2

DMCA Petition
Attorney Docket No. 15259128-000007
Page 4 of 4

(16)    Service times and delays have only increased with the current COVID-19 pandemic.  During the pandemic, the response times for the OEMs' technicians have increased, which, in turn, increases the times to properly diagnose medical devices.  My hospital has attempted to mitigate some of the down time and servicing problems by pre-ordering parts that we suspect are causing the machines to malfunction.  The OEMs have an ordering cutoff time, so if we do not order the parts by the cutoff time, the parts will not be delivered in time and the medical device can be inoperable for a whole day.  This means that the hospital must reschedule its patients until the problem is resolved.  If we order the wrong part, the OEMs charge my hospital restocking fees.  Again, these costs are part of the hospital's overhead that gets added to medical bills.

(17)    In my opinion, ISOs provide a huge benefit to the field of medical devices.  ISOs improve the quality of service because they seem to have more of an interest in satisfying the customer.  This in turn seems to cause the OEMs to provide better service packages.  Additionally, ISOs do often send better quality replacement parts.  I have had experiences in which the OEMs sent repackaged parts, and even broken or inoperable parts.  The OEMs are currently operating with minimal competition, so they do not have any motivation to provide quality services.

(18)    The undersigned being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001.  The undersigned declares that all statements made of his/her own knowledge are true; and all statements made on information and belief are believed to be true.

Date: 12/14/2020

John Kahler

LOC_AR_00002975

# EXHIBIT 7

LOC_AR_00002976

Attorney Docket No. 15259128-000007

In Support of Petition of:
Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

*Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging*

# DECLARATION OF ABIGAIL LANE-SAVAGE

I, Abigail Lane-Savage, am over 21 years old and, based on my personal knowledge, hereby declare as follows:

Background and Information

(1)      I am a Director of Imaging for Sodexo, Inc.'s Healthcare Technology Management division.  Sodexo has contract to manage the servicing of imaging devices for a large hospital network with facilities in three counties in North Carolina (sometimes "the hospital network" or "my hospital network").  I am the Operations Manager for the hospital networks' Imaging Services.

(2)      I have been servicing medical devices for 20 years.  I spent the first 18 years of my career as an employee at various hospitals in their technical services departments where I would service Biomedical devices.  At one such hospital I also managed the implementation of electronical medical records software.  For the last two years I have worked for what now is Sodexo, a Fortune 500 company that offers management services in many areas.

(3)      In my current position, I am responsible for managing the daily operation of the imaging services throughout the hospital network. I oversee  the purchase of medical imaging devices and service contracts. I manage a team of technicians, who like me, are employed by Sodexo, but who work in my department under contract with the hospital network.   My experience is that most hospitals predominantly purchase the imaging

LOC_AR_00002977

devices of one manufacturer.  In the hospital network, we use Philips,  GE and Siemens devices, with the Siemens devices predominating.

Servicing Activities and Experience with Technological Protective Measures ("TPMs")

(4)      My team manages the extended servicing, including maintenance schedules, of medical imaging devices after the manufacturer's warranty expires.  My hospital network utilizes our technical service technicians in lieu of purchasing the Original Equipment Managers' ("OEMs") extended service plans, whenever possible .  My hospital network is hesitant to allow the OEM technicians access to the hospital due to legitimate safety and privacy concerns.  In addition, our services cost much less than the OEM services, and we can deal with service events in a more timely fashion.

(5)      The OEMs use technological protective measures (TPMs) and  place data files, including error logs, configuration files, and event logs behind these TPMs.  These TPMs hinder my team's ability to properly and quickly diagnose faults and errors in the operation of a device.  We need the error logs to decipher the causes of errors.

(6)      My hospital network purchased their medical imaging devices with the understanding that hospital employees would be given access keys for regular maintenance.  However, the OEMs fail to provide my team with the hospital network's access keys because they see the members of my team as third-party contractors, hence competitors, not hospital network employees.

(7)      The OEMs that I am particularly aware of that use TPMs are Philips, Siemens, and GE.[1]  While GE used to be particularly aggressive in restricting access to the software and data files needed for servicing its equipment, in recent years, they seem to have relented somewhat and will now provide an access key to those who train on their equipment via the Radiological Services Training Institute.  Sodexo will send some technicians for training there, but at a cost.

(8)      Siemens and Philips are still very aggressive in their use of TPMs.  I am aware that Philips has filed lawsuits against some third parties it believes have accessed the software and data files without a key issued to them by Philips.

---

[1] Philips refers to Koninklijke Philips N.V., including its subsidiaries Philips Electronics and Philips Healthcare. Siemens refers to Siemens Healthineers AG (formerly Siemens Healthcare, Siemens Medical Solutions, Siemens Medical Systems), a subsidiary of Siemens AG. GE refers to GE Healthcare, a subsidiary of General Electric Company.

(9)     Siemens will only issue time-limited access codes, and the codes only provide access to restricted levels of software and data files.  For example, error logs are available to those who pay for higher level access.

(10)     Recently, Siemens  updated their software to require stronger access codes. Siemens also changed the access levels and what software and data files are available at a given access level.  Now we are not able to view the event logs and error codes.  Instead, we have to call Siemens and explain to them why we are asking for access to the information before they will provide us with a code.  Siemens then decides whether they will provide an access code or require a Siemens service technician to travel and enter the access code.

(11)     When we get access to a Siemens access code, it takes about 24 hours to receive approved access code, and then the access code only good for about 4 days.  On multiple occasions, Siemens has denied us access to higher level access keys.

(12)     When we cannot get access to the keys, we have to pay the OEMs for tech support.  If the OEM has to send a technician on-site, they charge about $600 to $800 per hour, including travel time, and OEM parts pricing.  For servicing, GE charges $600/hour and Siemens charges $800/hour.

(13)     The OEMs recently have also increased their service response time from 24 hours to 48 hours unless higher priced overtime is pre-approved via a purchase order issued prior to the service call.  This has been detrimental to patient care and public safety as machines requiring the visit of an OEM technician remain unusable for a longer period of time.

(14)     The unavailability of a machine is also very expensive to a hospital.  Each day that a large machine is unusable, the hospital must cancel services at a cost of lost revenue which I understand to be in the hundreds of thousands of dollars, which also impacts patient care.

(15)     The OEMs' field service engineers have the access keys to obtain the error codes.  With the access key, they are able to fix common errors within 15 minutes of coming to the hospital, but the OEMs still charge a minimum of two hours for technical support fees along with hourly travel rates.  My hospital network could greatly reduce the repair time and medical care delays if we have access to the error codes.


Adversity Caused by TPMs

US_Active\116011030\V-2
US_Active\116011030\V-3
US_Active\116011030\V-4

(16)    My hospital network must reschedule patients when a machine is down and waiting for an OEM field service engineer to come on-site and repair the machine. On occasion it can take  several days to get the MRI scanner, CT scanner, or Cath Lab device back in service.

(17)    This problem has only magnified during the COVID-19 pandemic.  My hospital network for many months had one hospital that is solely dedicated to caring for COVID-19 patients.  That hospital had dedicated CT machines in the COVID-19 hospital. More recently, given the increase in Covid-19 cases, my hospital network has dedicated floors in four other hospitals to Covid-19 patients.

(19)    When these critical machines were down, my hospital network had to transport patients from the COVID-19 designated hospital to another campus.  This decision was not taken lightly and potentially compromised my hospital network's ability to minimize the spread of COVID-19.

(20)    The FDA acknowledged medical device shortages from the COVID-19 public health emergency (PHE).[2]  The OEM-caused delays add to the demand for medical devices during the PHE.  My hospital network leases one such medical device for about $22,500 a month because we cannot afford to lose critical time for the OEMs to properly repair the machines.

(21)    TPMs add cost to the purchase of, among others, the MRI, CT, and Cath-Angio labs by as much as $125,000 per machine, just for the access keys.

(22)    In an effort to quickly restore the machines and minimize the adverse effects, we order parts from third party vendors, under their quickened and technical support, which is also limited due to their own lack of access keys.  We try to diagnose faults using our experience and, as needed, the experience of our third party vendors, and then order the parts, hoping that the diagnosis, without access to the error logs and the like is correct.

(23)    Patients are understandably frustrated due to unnecessary delays in medical care, and they express this in their negative feedback to the hospital network.  This frustration then is reflected in the hospital network's view of the performance of my

---

[2] U.S. Food and Drug Administration, *Medical Device Shortages During the COVID-19 Public Health Emergency*, available at https://www.fda.gov/medical-devices/coronavirus-covid-19-and-medical-devices/medical-device-shortages-during-covid-19-public-health-emergency#shortage.
U.S. Food and Drug Administration, Statement on concerns with medical device availability due to concertation sterilization facility closures, available at https://www.fda.gov/news-events/press-announcements/statement-concerns-medical-device-availability-due-certain-sterilization-facility-closures.
Thomas Sullivan, FDA CDRH Issues Guidance on Notifications of Medical Device Shortages, Policy & Medicine (May 19, 2020), https://www.policymed.com/2020/05/fda-cdrh-issues-guidance-on-notifications-of-medical-device-shortages.html.

US_Active\116011030\V-2
US_Active\116011030\V-3
US_Active\116011030\V-4

department. It also impacts Press Gainy Scores, which are customer satisfaction scores that impact reimbursements to the hospital by the Centers for Medicare & Medicaid Services ("CMS").

(24)    In my opinion, removing the OEMs' aggressive TPM practices will increase my hospital network's ability to provide quality medical care while also decreasing medical bills.

(25)    The undersigned being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001.  The undersigned declares that all statements made of his/her own knowledge are true; and all statements made on information and belief are believed to be true.


Date:   12/9/2020                              *Abigail Lane-Savage*
                                               Abigail Lane-Savage

# EXHIBIT 8

LOC_AR_00002982

Attorney Docket No. 15259128-000007

In Support of Petition of:
Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

*Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging*

## DECLARATION OF EUGENE STUART GROGAN

I, Eugene Stuart Grogan, am over 21 years old and hereby declare as follows:

(1)     I am the Enterprise Imaging Servicing Manager at a large academic hospital with over 13,000 employees. I have been with my current employer for about 22 years, about 12 years as the Enterprise Imaging Servicing Manager, and about 10 years as a Service Engineer. Prior to my current position, I worked for 11 years as a field service engineer with General Electric Company (GE), an original equipment manufacturer ("OEM"). I and those in my department service various medical devices including computer axial tomography scan ("CT Scan") systems, magnetic resonance imaging ("MRI") systems, and cyclotron machines.

(2)     My hospital is a branch of a large academic medical center with approximately 850 beds, 4 satellite hospitals of various sizes, and 9 catheterization laboratories.

(3)     My hospital uses medical devices from Philips, GE, and Siemens. It also uses Del Medical X-ray equipment, x-ray devices from Canon and Toshiba, Hologic mammography machines, and Fujifilm ultrasound machines.[1]

-----

[1] GE refers to GE Healthcare, a subsidiary of General Electric Company.
Siemens refers to Siemens Healthineers AG (formerly Siemens Healthcare, Siemens Medical Solutions, Siemens Medical Systems), a subsidiary of Siemens AG.
Philips refers to Koninklijke Philips N.V., including its subsidiaries Philips Electronics and Philips Healthcare.
Del Medical refers to Del Medical, Inc.

LOC_AR_00002983

DMCA Petition
Attorney Docket No. 15259128-000007
Page 2 of 4

(4)     With over 30 years of experience in medical device servicing, I have witnessed the evolution of access to software servicing tools used for diagnosing, repairing, and maintaining medical devices. Software has been used for testing GE medical devices nearly all of my career if not my entire career. However, for many modern medical devices the software is embedded in the devices, and access to software and files needed to service these devices is restricted by technological protective measures (TPMs).

(5)     In addition, starting about 2015, OEM's began migrating service manuals into digital databases saved in cloud-based systems. Currently, many of those systems require an access key or code to access the electronically stored service manuals. My experience is that medical device owners need to make additional purchases for access keys or passwords just to access to these types of service manuals. The service documentation typically is made accessible at a cost of about $1,500 to $25,000 per year, per medical device.

(6)     Even error logs needed to properly diagnose faults and errors in the operation of the medical devices have been placed behind TPMs. Without access to these error logs, I cannot decipher causes of malfunctions in the medical devices. This lack of important information prevents me from repairing, diagnosing, and maintaining the medical devices that my hospital uses. In addition to the error logs, data files, configuration files, and other unprotected work have been placed behind the same TPMs.

(7)     The TPMs typically are challenge-response systems that require access keys in the form of passwords, encrypted codes that the OEMs generate, or encrypted thumb drives to unlock access to the software. Some OEMs provide access to different levels of software depending on the amount paid to them. The highest priced access keys provide access to the most servicing software. Philips keys provide varying levels of access based on the equipment, but typically Philips provides owners up to three levels of access. GE keys provide three levels of access; and Siemens keys provide seven access levels.

(8)     My hospital pays for the highest access key levels available to it, for among other reasons, to also obtain prioritized service calls.

(9)     Philips' use of TPMs on some devices, e.g., catheter/angioplasty labs prevents my hospital from connecting our medical devices to our internal network system without requiring a servicing call to a Philips technician. When my hospital obtains such a medical device, it usually has to place an additional $2,000.00 service call with Philips just

---

Cannon refers to Canon Medical Systems Corporation, formerly Toshiba Medical, and a subsidiary of Canon, Inc.
Toshiba refers to Toshiba Medical, now Canon Medical Systems Corporation.
Hologic refers to Hologic, Inc.
Fujifilm refers to Fujifilm Healthcare which is a part of Fujifilm Holdings Corporation.

LOC_AR_00002984

DMCA Petition
Attorney Docket No. 15259128-000007
Page 3 of 4

to populate an IP address in the medical device. In a multiunit hospital setting, such medical devices are essentially rendered useless unless they are connected to a network to communicate the data they produce.

(10)    In my experience, GE and Siemens provide rudimentary service manuals with some parts diagrams, while Philips uses TPMs to protect their replacement parts catalog. Without access to the Philips replacement parts catalog, one cannot determine part numbers, and thus cannot order replacement parts when needed.

(11)    The Hologic devices I have encountered are so locked down that owner self-servicing is virtually impossible. Hologic does not provide keys or access codes to bypass the TPMs unless one purchases a service contract.

(12)    Del Medical, Cannon, and Toshiba devices currently are relatively unlocked and can be owner self-serviced.

(13)    In my experience, typically, smaller device makers who are trying to grow their market share tend to not lock down their machines and provide ready access to owner manuals and the installed servicing software.

(14)    Some medical devices also seem configured to thwart owners from troubleshooting the devices themselves in other ways. For example, I have experience the triggering of a cooling fan to work at a noisy, high speed after raising the cover of some GE ultrasound imaging devices. The only remedy I know of is to make a service call to GE to have one of their technicians reset the fan.

(15)    I consider the access and use of servicing software embedded in medical devices to be critical to providing fast and efficient patent services.

(16)    The use of TPMs to prevent access to servicing software is troublesome to me due to the delays they can cause. With access to the servicing software, the device repair time by my department is between about 1 to 8 hours. Without access to the servicing software, repair time can increase to 24 hours or more because a service call by an OEM technician is required.

(17)    My hospital owns most if not all of its medical equipment and has licenses to use the software that is installed on the equipment. Each software license is unique to each machine.

(18)    I use independent service organizations ("ISOs") including Transtate Equipment Company, Inc., on occasion, but mostly to order parts for some medical devices. In my experience, the ISOs typically charge 30% to 50% less than OEMs for service calls. However, due to licensing restrictions, ISOs usually are not permitted to access the

LOC_AR_00002985

DMCA Petition
Attorney Docket No. 15259128-000007
Page 4 of 4

software on some of the medical devices, and thus we do not use them for servicing those devices.

(19)    As stated above, during my career, OEMs have increased their use of TPMs in medical devices. In that same time period, the service technicians that assist with TPMs are taking longer to respond to service calls. My understanding is this is due to the OEMs decreasing their employee base, and because servicing engineers are not being replaced after retirement.

(20)    Under penalty of perjury, I affirm that this Declaration accurately reflects my knowledge.

Date: _12/7/2020_    _____
                      Eugene Stuart Grogan

115607680\V-7

LOC_AR_00002986

# EXHIBIT 9

LOC_AR_00002987

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| PHILIPS MEDICAL SYSTEMS NEDERLAND B.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS INDIA LTD., <br><br> Plaintiffs, <br><br> v. <br><br> TEC HOLDINGS, INC., F/K/A TRANSTATE EQUIPMENT COMPANY, INC., TRANSTATE EQUIPMENT COMPANY, INC., F/K/A TRANSTATE HOLDINGS, INC.; and ROBERT A. ("ANDY") WHEELER, individually and in his capacity as executor and personal representative of the Estate of DANIEL WHEELER <br><br> Defendants. | Civil Action No. 1:17-cv-02864-LMM <br><br><br> **JURY TRIAL DEMANDED** |

## SECOND AMENDED COMPLAINT

Plaintiffs Philips Medical Systems Nederland B.V., Philips North America

LLC, and Philips India Ltd. (collectively, "Philips" or "Plaintiffs"), by and through

their undersigned counsel, hereby bring the following Amended Complaint against

TEC Holdings, Inc., formerly known as Transtate Equipment Company, Inc.

("Transtate I"), Transtate Equipment Company, Inc., formerly known as Transtate

Holdings, Inc. ("Transtate II") (collectively, "Transtate"), and Robert A. ("Andy")

Wheeler, individually and in his capacity as executor and personal representative

of the Estate of Daniel Wheeler ("the Estate") (Andy Wheeler and the Estate are

US_ACTIVE-147022893

LOC_AR_00002988

## Count V:  Violations of the Digital Millennium
## Copyright Act (DMCA), 17 U.S.C. § 1201 (Transtate I and II)

193.    Philips reasserts, re-alleges, and incorporates by reference the

allegations in all other paragraphs of this Amended Complaint as if fully set forth

herein under Count V.

194.    Philips' medical imaging systems include Philips' copyrighted and

proprietary software.

195.    Philips' log files on its medical imaging systems are protected by

copyright under Title 17.

- 48 -

LOC_AR_00002989

196.   Philips Internal Software is proprietary software protected by copyright under Title 17.

197.   Philips electronic documentation is protected by copyright under Title 17.

198.   Philips employs numerous technological measures including, but not limited to, its Access Key protection scheme and protocol, in order to protect and control access to and use of its copyrighted proprietary software and/or portions thereof.

199.   Transtate I and II intentionally modified Philips' proprietary software to circumvent a technological measure that controls access to Philips' protected software.  Specifically, Transtate I and II circumvented the access controls to gain access to the USB drive, then used Transtate's software exploit to modify computer files in order to deactivate a requirement for an Access Key to access Philips' proprietary software.  Transtate I and II were thus able to bypass the technological measure and gain unauthorized access to the proprietary software.

200.   Philips' technological measures on the Systems also prevent unauthorized access to Philips' copyrighted log files.  Transtate I and II intentionally circumvent access controls through use of their software exploit and potentially other methods to gain unauthorized access to and copy Philips' copyrighted log files on the Allura systems.

- 49 -

LOC_AR_00002990

201. Philips employs technological measures, including but not limited to, its account authorization and IST Key protection scheme and protocol, in order to protect and control access to and use of its copyright protected Philips Internal Software.

202. Transtate I and II employ the circumvention mechanism in order to bypass or circumvent the requirement for a Philips account and an IST Key to access Philips Internal Software. Transtate I and II were thus able to bypass the technological measure and in each instance gain repeated unauthorized access to the proprietary copyright protected Philips Internal Software by virtue of such bypass or circumvention.

203. Philips employs technological measures, including but not limited to, encryption of its proprietary and copyrighted electronic documentation, in order to protect and control access to and use its copyright protected Philips electronic documentation.

204. Transtate I and II have intentionally modified Philips' encrypted electronic documents by decrypting them in order to make unencrypted copies thereof which Transtate I and II can then distribute. Transtate I and II were thus able to bypass or circumvent the technological measure in order to gain repeated unauthorized access to Philips copyright protected electronic documentation.

- 50 -

LOC_AR_00002991

205.   Transtate I and II have intentionally and/or knowingly circumvented technological measures that effectively control access to a work or works protected under Title 17, in violation of 17 U.S.C. § 1201(a)(1)(A) of the Digital Millennium Copyright Act.

206.   Transtate I and II's unauthorized means of accessing the Systems, including Philips' proprietary software and copyrighted logs, the Philips Internal Software, and Philips electronic documentation has, and does, entail the unauthorized access, copying, and potential alteration of the contents of Philips' copyrighted proprietary software, log files, and electronic documentation.

207.   Philips has been and will continue to be damaged in an amount not presently known with certainty, but that will be proven at trial.

208.   Philips is entitled to the range of relief provided by 17 U.S.C. § 1203, including but not limited to, injunctive relief, compensatory damages or statutory damages, punitive damages, and Philips' costs and attorneys' fees in amounts to be proven at trial.  Transtate I and II's conduct also has caused irreparable and incalculable harm and injuries to Philips, and, unless enjoined, will cause further irreparable and incalculable injury, for which Philips has no adequate remedy at law.

- 51 -

LOC_AR_00002992

## Count VI:  Violations of the Digital Millennium
## Copyright Act (DMCA), 17 U.S.C. § 1202 (Transtate I and II)

209.   Philips reasserts, re-alleges, and incorporates by reference the
allegations in all other paragraphs of this Amended Complaint as if fully set forth
herein under Count VI.

210.   Philips' electronic documentation is protected by the copyright laws,
and Philips owns the copyright in its electronic documentation.

211.   Philips electronic documentation is made available by Philips to
authorized users.

212.   Philips grants authorization to access Philips InCenter database, and
the files therein, to third parties having registered for AIAT level access.

213.   Philips distributes a wide range of documents through the InCenter
database, and controls access to certain electronic documentation by encrypting
such documents.  Philips authorized users are authorized to access documentation
commensurate with their roles, *i.e.* AIAT level authorization grants access to AIAT
level electronic documentation.  Access is facilitated by virtue of Philips IST Keys,
such that a user's valid IST Key will enable decryption of files that a user is
authorized to access.

214.   Philips electronic documentation includes metadata that may identify
the author of the file and that the file originates from Philips, the copyright holder.

- 52 -

LOC_AR_00002993

215.   Philips electronic documentation's metadata thus includes copyright management information ("CMI") pursuant to 17 U.S.C. § 1202.

216.   Employees of Transtate I and Transtate II download encrypted copies of files that they are not authorized to access, and decrypt those files by making use of Transtate decryption and stripping mechanism.

217.   Transtate I and Transtate II's decryption and stripping mechanism first decrypts Philips electronic documentation without authorization, and then removes the metadata, including CMI, from the unauthorized copies of Philips electronic documentation created and distributed by Transtate.

218.   Employees of Transtate I and Transtate II then distribute such decrypted files stripped of their metadata.

219.   Transtate I and II have intentionally and/or knowingly removed and altered the copyright management information contained in Philips' electronic documentation metadata without the authority of the copyright owner or the law knowing, or having reasonable grounds to know, that such behavior will induce, enable, facilitate, or conceal an infringement of Philips rights under Title 17, in violation of 17 U.S.C. § 1202(b)(1) of the Digital Millennium Copyright Act.

220.   Transtate I and II have intentionally and/or knowingly distributed copyright management information knowing that the copyright management information contained in Philips' electronic documentation metadata has been

- 53 -

LOC_AR_00002994

removed or altered without the authority of the copyright owner or the law

knowing, or having reasonable grounds to know, that such behavior will induce,

enable, facilitate, or conceal an infringement of Philips rights under Title 17, in

violation of 17 U.S.C. § 1202(b)(2) of the Digital Millennium Copyright Act.

221.   Transtate I and II have intentionally and/or knowingly distributed

copies of Philips' electronic documentation knowing that the copyright

management information contained in Philips' electronic documentation metadata

has been removed or altered without the authority of the copyright owner or the

law knowing, or having reasonable grounds to know, that such behavior will

induce, enable, facilitate, or conceal an infringement of Philips rights under Title

17, in violation of 17 U.S.C. § 1202(b)(3) of the Digital Millennium Copyright

Act.

222.   Philips has been and will continue to be damaged in an amount not

presently known with certainty, but that will be proven at trial.

223.   Philips is entitled to the range of relief provided by 17 U.S.C. § 1203,

including but not limited to, injunctive relief, compensatory damages or statutory

damages, punitive damages, and Philips' costs and attorneys' fees in amounts to be

proven at trial.  Transtate I and II's conduct also has caused irreparable and

incalculable harm and injuries to Philips, and, unless enjoined, will cause further

- 54 -

LOC_AR_00002995

# EXHIBIT 10

LOC_AR_00002996

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| PHILIPS MEDICAL SYSTEMS PUERTO RICO, INC., PHILIPS MEDICAL SYSTEMS NEDERLAND B.V.; AND PHILIPS INDIA LIMITED,<br><br>    Plaintiff,<br><br>        v.<br><br>ALPHA BIOMEDICAL AND DIAGNOSTIC CORP., COOPERATIVA DE SEGUROS MÚLTIPLES DE PUERTO RICO,<br><br>    Defendant. | CIVIL No. 3:19-cv-01488<br><br>RE: PERMANENT INJUNCTIVE RELIEF PURSUANT TO THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. §1030, COPYRIGHT ACT, 17 U.S.C. § 1201, PUERTO RICO'S INDUSTRIAL AND TRADE SECRET PROTECTION ACT, 10 P.R. LAWS ANN. §§4131-4141; UNFAIR COMPETITION; DIGITAL MILLENNIUM COPYRIGHT ACT, 17 U.S.C. § 1201; COPYRIGHT INFRINGEMENT, 17 U.S.C. § 101, *et seq.* AND DEMAND FOR JURY TRIAL. |

## AMENDED COMPLAINT

### TO THE HONORABLE COURT:

COMES NOW Philips Medical Systems Puerto Rico, Inc. ("Philips PR"), Philips Medical Systems Nederland B.V. ("Philips Nederland") and Philips India Limited ("Philips India") (collectively, "Philips" or "plaintiffs"), through their undersigned attorneys and, in support of this Complaint ("Complaint"), respectfully aver and pray as follows:

### NATURE OF ACTION

1.    This is an action for permanent injunctive relief to prevent defendant from causing irreparable harm to plaintiff and for damages to redress injuries suffered by plaintiffs, all because of the wrongful conduct by defendant, in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030 ("CFAA"), the Copyright Act, 17 U.S.C. § 1201, Puerto Rico's Industrial and Trade Secret Protection Act, 10 P.R. Laws Ann.

LOC_AR_00002997

## TIHRD CAUSE OF ACTION
### 17 U.S.C. § 1201, *et seq.*
### (DMCA)

121.    Plaintiffs repeat and reallege the averments set forth above.

122.    Plaintiffs employ numerous technological measures including, but not limited to, a valid UserID and IST account, a "Smart Card Dongle" – an authentication and service authorization device- the "MR Response Generator Tool" – a protection scheme and protocol- all to protect and control access to copyrighted material in the MRI systems it manufactures.

123.    Alpha Biomedical has engaged in conduct that circumvents a technological measure that effectively controls access to a copyrighted work, including using and/or creating a deactivated and fake UserID and IST account, and reproducing a copy of a circumvented and/or hacked *MR Response Generator Tool*, among other infringing conduct to gain access to protected information.

124.    Defendant intentionally used tools and/or credentials to defeat and circumvent technological measures that control access to Philips's protected software, the *Philips' CSIP* embedded in the MRI systems.

125.    Alpha Biomedical has intentionally and/or knowingly circumvented technological measures that effectively control access to a work or works protected under Title 17, in violation of 17 U.S.C. § 1201(a)(1)(A) of the DMCA.

126.    Defendant has not obtained the right to use or access Philips CSIP from plaintiffs. All of defendant's acts were and are performed without permission, license or consent of plaintiffs.

127.    Upon information and belief, defendant has received substantial benefits, revenues, compensation and/or cost savings as a direct and proximate result of the

25

LOC_AR_00002998

foregoing unfair and wrongful scheme.

128.   Plaintiffs are entitled to the remedies provided by 17 U.S.C. § 1203, including but not limited to, injunctive relief, compensatory damages or statutory damages, punitive damages, and costs and attorneys' fees in amounts to be proven at trial.

129.   Defendant has willfully infringed, and unless enjoined will continue to unlawfully infringe plaintiffs' copyrighted content, as set forth above, by knowingly circumventing access controls to plaintiffs' copyrighted software in violation of 17 U.S.C. § 1201 *et seq.*

LOC_AR_00002999

# EXHIBIT 11

LOC_AR_00003000

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____

PHILIPS NORTH AMERICA LLC, PHILIPS
MEDICAL SYSTEMS NEDERLAND B.V.;
PHILIPS INDIA LTD.; PHILIPS MEDICAL
SYSTEMS (CLEVELAND), INC; PHILIPS
MEDICAL SYSTEM TECHNOLOGIES
LTD.; and KONINKLIJKE PHILIPS N.V.,

Plaintiff,

vs.

626 HOLDINGS, INC., and ALEXANDER
KALISH,

Defendants.

_____/

## COMPLAINT

Plaintiffs Philips North America LLC, Philips Medical Systems (Cleveland), Inc., Philips

India Ltd., Philips Medical Systems Technologies Ltd., Philips Medical Systems Nederland B.V.,

and Koninklijke Philips N.V. (collectively "Philips" or "Plaintiff"), by and through its undersigned

counsel, hereby brings the following Complaint against 626 Holdings, Inc. ("626 Holdings") and

Alex Kalish ("Kalish" or collectively with 626 Holdings, "Defendants"), and pleads as follows:

## NATURE OF THE ACTION

1.      Philips develops, sells, supports, maintains, and services medical imaging systems,

such as computed tomography (CT) systems, X-ray systems, nuclear medicine systems, PET

scanners, magnetic resonance (MR) scanners, ultrasound machines, and the like used at hospitals

and medical centers, including the proprietary hardware, software, and documentation used to

operate, service, and repair such systems.

LOC_AR_00003001

Case 1:22-cv-00499-RAH Document 24-4 Filed 08/29/22 Page 77 of 393

## Count VI:
## Violation of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201

111.    Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count VI.

112.    Philips medical imaging systems include Philips copyright protected proprietary works.

- 22 -

LOC_AR_00003002

113. Philips documents and software obtainable from Philips InCenter service include Philips copyright protected and proprietary works.

114. Philips proprietary works within Philips medical imaging systems and accessible through Philips InCenter service are protected by copyright under Title 17.

115. Philips employs numerous layered technological measures including, but not limited to, Philips access key, username and password combination, access control certificates, and machine specific access controls, to control access to and use of its copyrighted proprietary software and/or portions thereof on Philips medical imaging devices.

116. Philips also employed layers of technological measures, including username and password combinations and access control certificates, in order to protect Philips copyright protected works, including *inter alia* software and documentation, by controlling access to and the duration of such access to Philips protected works available from Philips InCenter system.

117. Defendants have employed software exploit tools to intentionally modify Philips proprietary software to circumvent a technological measure that controls access to Philips' protected software. Specifically, Defendants software exploit tools access Philips medical imaging systems from a USB drive or other external media in order to modify computer files within Philips medical imaging devices to deactivate a requirement for either a Philips generated key code or a Philips issued access key, bearing a current and duly authorized Philips' access control certificate, in order to access Philips proprietary software. Defendants were thus able to bypass technological measures to gain unauthorized access to the proprietary software.

118. Defendants have also employed false, modified, or counterfeit access control certificates to circumvent a technological measure that controls access to Philips' protected software. Specifically, Defendants false, modified, or counterfeit access control certificates enable

- 23 -

LOC_AR_00003003

unauthorized users to access Philips medical imaging systems thereby circumventing technological measures to gain unauthorized access to the proprietary software.

119. Defendants have further employed their false, modified, or counterfeit access control certificates in order to decrypt encrypted Philips proprietary documentation and software accessed by Defendants from Philips InCenter database through Defendants fraudulent scheme of impersonating Philips FSE credentialed users. Philips encrypted documents and software from Philips InCenter database are encrypted by Philips specifically to protect such documents and software from unauthorized access by unlicensed third parties and to prevent further distribution of Philips works to others without license to do so.

120. Defendants multiple methods of bypassing or circumventing access controls protecting Philips' works and controlling access to Philips' works also prevent unauthorized access to Philips' copyright protected log files within Philips medical imaging devices. Upon information and belief Defendants intentionally circumvent access controls using their exploit tools and unlawful certificates and potentially other methods to gain unauthorized access to and copy Philips' copyrighted log files on the Philips medical imaging devices.

121. Thus, Defendants have intentionally and/or knowingly circumvented technological measures that effectively control access to a work or works protected under Title 17, in violation of 17 U.S.C. § 1201(a)(1)(A) of the Digital Millennium Copyright Act.

122. Defendants' unauthorized means of accessing the Philips medical imaging systems, including Philips' proprietary software and copyrighted logs, and Philips encrypted documentation and software has, and does, entail the unauthorized access, copying, and potential alteration of the contents of Philips' copyrighted proprietary software, log files, and electronic documentation.

LOC_AR_00003004

123.    Philips has been and will continue to be damaged in an amount not presently known with certainty, but that will be proven at trial.

124.    Philips is entitled to the range of relief provided by 17 U.S.C. § 1203, including but not limited to, injunctive relief, compensatory damages or statutory damages, punitive damages, and Philips' costs and attorneys' fees in amounts to be proven at trial. Defendants' conduct also has caused irreparable and incalculable harm and injuries to Philips, and, unless enjoined, will cause further irreparable and incalculable injury, for which Philips has no adequate remedy at law.

LOC_AR_00003005

# EXHIBIT 12

LOC_AR_00003006

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

## EASTERN DIVISION

|  |  |  |
|---|---|---|
| PHILIPS MEDICAL SYSTEMS (CLEVELAND), INC.; PHILIPS INDIA LTD.; PHILIPS MEDICAL SYSTEMS TECHNOLOGIES LTD.; KONINKLIJKE PHILIPS N.V.; and PHILIPS NORTH AMERICA LLC, | § § § § § § § | Civil No: 1:17-CV-03425  Judge Robert M. Dow, Jr. |
| Plaintiffs, | § § § | JURY TRIAL DEMANDED |
| v. | § § |  |
| ZETTA MEDICAL TECHNOLOGIES, LLC; and RONALD J. DUNCAN, | § § § § |  |
| Defendants. | § § |  |

## AMENDED COMPLAINT

Plaintiffs Philips Medical Systems (Cleveland), Inc., Philips India Ltd., Philips Medical Systems Technologies Ltd., Koninklijke Philips N.V., and Philips North America LLC (collectively, "Philips" or "Plaintiffs"), by and through their undersigned counsel, hereby bring the following Amended Complaint against Zetta Medical Technologies, LLC ("Zetta") and Ronald J. Duncan ("Mr. Duncan") (collectively, "Defendants"), and now plead as follows:

## Overview

1.      As set forth more fully below: Plaintiffs are collectively, *inter alia*, involved in the business of developing, manufacturing, selling, supporting, maintaining, and servicing medical imaging systems used at hospitals and medical centers, including the proprietary

LOC_AR_00003007

## Count III:  Violations of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201

80.     Philips reasserts, re-alleges, and incorporates by reference the allegations in all other paragraphs of this Complaint as if fully set forth herein under Count III.

81.     As set forth in Count II, Defendants have improperly accessed works protected under Title 17 (copyright).

82.     Philips employs numerous technological measures including, but not limited to, its password and user ID protection scheme and protocol, in order to effectively protect and control access to and use of its copyrighted Philips CSIP and/or portions thereof.

83.     Upon information and belief, Defendants manufacture, import, provide, offer to the public, or otherwise traffic in technology, products, services, devices, components, or parts thereof, that are primarily designed or produced for the purpose of circumventing technological measures and/or protection afforded by technological measures that effectively control access to Philips CSIP and/or portions thereof.

84.     Upon information and belief, Defendants' technology, products, services, devices, components, or parts thereof have limited or no commercially significant purpose or use other than to circumvent technological measures that effectively control access to Philips' CSIP and/or portions thereof.

85.     In the course of doing so, Defendants have intentionally and/or knowingly circumvented technological measures that effectively control access to a work or works protected

- 18 -

LOC_AR_00003008

under Title 17, in violation of 17 U.S.C. § 1201(a)(1)(A)—the Digital Millennium Copyright Act.

86.    Defendants' unauthorized means of accessing the Systems has, and does, entail the unauthorized access, copying, and potential alteration of the contents of Philips' copyrighted CSIP software.

87.    Philips has been and will continue to be damaged in an amount not presently known with certainty, but will be proven at trial.

88.    Philips is entitled to the range of relief provided by 17 U.S.C. §§ 1201-12-3, including but not limited to, injunctive relief, compensatory damages or statutory damages, punitive damages, and Philips' costs and attorneys' fees in amounts to be proven at trial. Defendants' conduct also has caused irreparable and incalculable harm and injuries to Defendants, and, unless enjoined, will cause further irreparable and incalculable injury, for which Philips has no adequate remedy at law.

89.    By engaging in the conduct set forth in the preceding paragraphs of this Complaint, Defendants have exceeded their authorized levels of access to the Systems and the Philips CSIP, in violation of Philips' copyrights and the Digital Millennium Copyright Act, thereby obtaining valuable diagnostic and proprietary maintenance log files, and access to other valuable tools and information, and thereby causing damages to Philips that include business losses, unfair competition, and intrusion upon trade secrets, and that further include the threat of continuing and ongoing harms relating to the same.

- 19 -

LOC_AR_00003009

# EXHIBIT 13

LOC_AR_00003010

Carla M. Wirtschafter (SBN 292142)
Email: cwirtschafter@reedsmith.com
REED SMITH LLP
1901 Avenue of the Stars, Suite 700
Los Angeles, CA 90067-6078
Telephone: (310) 734-5200
Facsimile: (310) 734-5299

Kirsten R. Rydstrom (*Pro hac vice* pending)
Email: krydstrom@reedsmith.com
Richard A. Graham (*Pro hac vice* pending)
Email: rgraham@reedsmith.com
Reed Smith Centre, 225 Fifth Ave
Pittsburgh, PA 15222
Telephone: (412) 288-3131
Facsimile: (412) 288-3063

*Attorneys for Plaintiffs*
*Philips North America LLC and Koninklijke*
*Philips N.V.*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| PHILIPS NORTH AMERICA LLC, a Delaware Company, and KONINKLIJKE PHILIPS N.V., a Company of the Netherlands,<br><br>Plaintiffs,<br><br>vs.<br><br>KPI HEALTHCARE INC., a California Corporation; KPI HEALTHCARE ECOMMERCE, INC., a California Corporation; and DOES 1-10, inclusive,<br><br>Defendants. | Case No.: 8:19-cv-01765<br><br>**COMPLAINT FOR:**<br><br>**(1) TRADEMARK INFRINGEMENT – 15 U.S.C. § 1125(a), 15 U.S.C. 1114;**<br><br>**(2) FALSE DESIGNATION OF ORIGIN – 15 U.S.C. § 1125(a);**<br><br>**(3) FALSE ADVERTISING – 15 U.S.C. § 1125(a);**<br><br>**(4) CIRCUMVENTING A TECHNOLOGICAL MEASURE – 17 U.S.C. § 1201;**<br><br>**(5) MODIFYING COPYRIGHT MANAGEMENT INFORMATION – 17 U.S.C. § 1202; AND**<br><br>**(6) TRADE SECRET MISAPPROPRIATION – 18 U.S.C. § 1836;**<br><br>**(7) VIOLATIONS OF CALIFORNIA'S UNIFORM TRADE SECRET ACT – CALIFORNIA CIVIL CODE § 3426,** |

US_ACTIVE-145776994

LOC_AR_00003011

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**FOURTH CAUSE OF ACTION**

**Circumventing a Technological Measure – 17 U.S.C. § 1201**

**(All Plaintiffs Against All Defendants)**

109.   Philips restates and realleges all of the allegations of all the paragraphs in this complaint as though fully set forth herein this Fourth Cause of Action.

110.   Philips medical imaging systems include Philips' copyrighted and proprietary software, which includes Philips' trade secrets.

111.   The clinical software and diagnostic and service tools software in Philips' Ultrasound Systems are protected by copyright under Title 17, and include without limitation Philips service tools for updating or modifying the licensed options available on a machine, and for modifying identification numbers associated with a machine.

112.   Philips Ultrasound System licensed optional software is also protected by copyright under Title 17.

113.   Philips employs numerous access controls in order to protect and control access to and restrict use of its copyrighted proprietary software and/or portions thereof.

114.   Philips' access controls include technological measures to protect and control access to and limit use of their copyrighted proprietary software and/or portions thereof.

115.   KPI has and continues to intentionally hack one or more of Philips' technological measures to circumvent these access controls to gain unauthorized access to Philips' protected software works, which include Philips trade secrets, and to enable features of these software works which Philips have not licensed or authorized.

LOC_AR_00003012

Through these unlawful means, KPI unlawfully gains access to unlicensed Philips software and provides unfettered access to all subsequent users of KPI's counterfeit machines.

116. KPI's counterfeit ultrasound systems are created by modifying Philips' access controls in order to provide KPI's customers with unrestricted and constant access to Philips' proprietary software without authorization or an appropriate license. Thus, KPI's business of selling modified ultrasound systems, each of which include modified machine specific access controls is manufacturing, offering to the public, and/or trafficking in a product, device, component, or part thereof, that is primarily designed or produced for the purpose of circumventing Philips' access controls that protect Philips proprietary software and trade secrets.

117. KPI has intentionally and/or knowingly illegally hacked Philips' systems to circumvent the technological measures Philips uses to effectively control access to a work or works protected under Title 17, in violation of 17 U.S.C. § 1201(a)(1) of the Digital Millennium Copyright Act.

118. KPI's counterfeit ultrasound systems are systems that provide KPI's customers with constant access to Philips' proprietary software. Thus, KPI's systems are, or at least include, devices, products, components, or parts thereof that are primarily designed or produced for the purpose of circumventing Philips' access controls that protect Philips software. Thus, KPI's business of creating and selling counterfeit systems, is knowingly marketing, manufacturing, offering to the public, and/or trafficking in a product, device, component, or part thereof, that is primarily designed or produced for the purpose of circumventing Philips' access controls that protect Philips software.

119. Upon information and belief, Philips alleges that in order to carry out KPI's unlawful circumvention of Philips' access controls, KPI makes use of tools which have no use but to circumvent access controls.

120. KPI has intentionally and/or knowingly manufactured, offered to the

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

LOC_AR_00003013

public, or otherwise trafficked in technologies, products, services, devices, components, or parts thereof, that are primarily designed or produced for the purpose of circumventing protection afforded by Philips' access controls and/or which have limited commercially significant purpose other than to circumvent Philips' access controls in violation of the DMCA, 17 U.S.C. § 1201(a)(2).

121. Philips has been and will continue to be damaged in an amount not presently known with certainty, but that will be proven at trial.

122. Philips is entitled to the range of relief provided by 17 U.S.C. 1203, including but not limited to, injunctive relief, compensatory damages or statutory damages, punitive damages, and Philips' costs and attorneys' fees in amounts to be proven at trial. KPI's conduct has also caused irreparable and incalculable harm and injuries to Philips, and, unless enjoined, will cause further irreparable and incalculable injury, for which Philips has no adequate remedy at law.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

LOC_AR_00003014

# EXHIBIT 14

LOC_AR_00003015

The Honorable James L. Robart

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

9  PHILIPS NORTH AMERICA LLC, a
   Delaware Company; KONINKLIJKE
10 PHILIPS N.V., a Company of the
   Netherlands; and PHILIPS INDIA, LTD., an
11 Indian Company,

12            Plaintiffs,

13      vs.

14 SUMMIT IMAGING INC., a Washington
   Corporation; LAWRENCE R NGUYEN, an
15 individual; and DOES 1-10, inclusive,

16

17            Defendants.

18

19

20

21

22

23

24

25

26

27

NO.  2:19-cv-01745-JLR

**SECOND AMENDED COMPLAINT FOR:**

**(1) CIRCUMVENTING A
    TECHNOLOGICAL MEASURE –
    17 U.S.C. § 1201;**

**(2) MODIFYING COPYRIGHT
    MANAGEMENT INFORMATION –
    17 U.S.C. § 1202;**

**(3) TRADE SECRET
    MISAPPROPRIATION –
    18 U.S.C. § 1836**

**(4) TRADE SECRET
    MISAPPROPRIATION –
    RCW 19.108, *ET. SEQ***

**(5) FALSE ADVERTISING –
    15 U.S.C. § 1125(a);**

**(6) UNFAIR COMPETITION –
    RCW 19.86.020**

**(7) COPYRIGHT INFRINGEMENT -
    17 U.S.C. §§ 101, 501 *ET. SEQ.***

**JURY DEMAND**

SECOND AMENDED COMPLAINT - 1
No. 2:19-cv-01745-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

LOC_AR_00003016

**FIRST CAUSE OF ACTION**

**Circumventing a Technological Measure – 17 U.S.C. § 1201**

**(All Plaintiffs Against All Defendants)**

77.      Philips restates and re-alleges all of the allegations of all the paragraphs in this complaint as though fully set forth herein this First Cause of Action.

78.      Philips medical imaging systems include Philips' copyrighted and proprietary software, which also include Philips' trade secrets.

79.      The clinical software and diagnostic and service tools software in Philips' Ultrasound Systems are protected by copyright under Title 17, and include without limitation Philips service tools for updating or modifying the licensed options available on a machine, and for modifying identification numbers associated with a machine.

80.      The log file output and user displays of Philips Ultrasound Systems are also respectively protected by copyright under Title 17 as non-literal elements of Philips software installed on and executing on Philips Ultrasound Systems.

SECOND AMENDED COMPLAINT - 21
No. 2:19-cv-01745-JLR

Savitt Bruce & Willey llp
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

LOC_AR_00003017

81.     Philips Ultrasound System licensed optional software is also protected by copyright under Title 17.

82.     Philips employs numerous access controls in order to protect and control access to and restrict use of its copyrighted proprietary software and/or portions thereof.

83.     Philips' access controls include technological measures to protect and control access to and limit use of their copyrighted proprietary software and/or portions thereof.

84.     Summit knowingly and intentionally circumvents Philips' access controls, using either Summit's Adepto hacking tool, or other unlawful means, or other unlawfully obtained means, or a combination of the Adepto hacking tool with such other means. Summit hacks Philips' access controls in order to gain access to Philips' medical imaging system onboard tools for updating, modifying, or adding Philips software options—tools that only Philips authorized personnel are able to access using either Philips generated key codes or Philips authorized access control dongles in order to comply with Philips access controls.

85.     Summit has hacked and continues to intentionally hack one or more of Philips' technological measures to knowingly and intentionally circumvent these access controls to gain unauthorized access to Philips' protected software works, which include Philips trade secrets, and to enable features of these software works which Philips has not licensed or authorized Summit, or its customers, to make use of. Through these unlawful means, Summit unlawfully gains access to unlicensed Philips software and provides unauthorized access to all subsequent users of Philips' machines hacked by Summit.

86.     Summit, furthermore, has hacked and continues to knowingly and intentionally hack one or more of Philips' technological measures to circumvent these access controls to gain unauthorized access to a variety of copyrighted works. Summit does this to

SECOND AMENDED COMPLAINT - 22
No. 2:19-cv-01745-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

LOC_AR_00003018

circumvent Philips controls that limit access to Philips' copyright protected software works in order to enable optional features of these software works which Philips has not licensed or authorized Summit, or its customers, to make use of. Philips has the right to employ technological measures to protect, and control access to, Philips copyright protected works within Philips Ultrasound Systems, the operating system within which Philips copyright protected works are executed, and the files stored within the operating systems' file structure.

87.     Upon information and belief, Summit knowingly and intentionally employs these hacked machines providing unlicensed access to Philips copyright protected software and files to Summit's employees in order to provide a parts repair business, and Summit hacks the Philips machines of Summit's customers in furtherance of both its parts repair business and its service contract business.

88.     Summit further provides training to Summit's customers that include instructions about how to circumvent Philips' access controls with Summit's hacking tools and techniques.

89.     Summit's intentional and knowing circumvention of the technological measures Philips uses to effectively control access to a work or works protected under Title 17, in violation of 17 U.S.C. § 1201(a)(1) of the Digital Millennium Copyright Act.

90.     Summit's techniques, including its Adepto hacking tool, are, or at least include, devices, products, components, or parts thereof that are primarily designed or produced for the purpose of circumventing Philips' access controls that protect Philips software to provide Summit and Summit's customers constant access to Philips' proprietary software. Thus, Summit is in the business of knowingly marketing, manufacturing, offering to the public, and/or trafficking in a product, device, component, or part thereof, that is primarily designed or

SECOND AMENDED COMPLAINT - 23
No. 2:19-cv-01745-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

LOC_AR_00003019

produced for the purpose of circumventing Philips' access controls that protect and control access to Philips software.

91. Upon information and belief, in order to carry out Summit's unlawful circumvention of Philips' access controls, Summit makes use of tools which have no use but to circumvent access controls.

92. Summit has intentionally and/or knowingly manufactured, offered to the public, or otherwise trafficked in technologies, products, services, devices, components, or parts thereof, that are primarily designed or produced for the purpose of circumventing protection afforded by Philips' access controls and/or which have limited commercially significant purpose other than to circumvent Philips' access controls in violation of the DMCA, 17 U.S.C. § 1201(a)(2). Upon information and belief obtained from publicly available sources, Nguyen is a principal owner, Governor, Chief Executive Officer (CEO), and Chief Technology Officer (CTO) of Summit.

93. In his role, Nguyen oversees and has the right and ability to supervise Summit's actions addressed in this complaint, including Summit's use of the Adepto hacking tool, and upon information and belief one or more other hacking tools, in order to circumvent Philips access controls that are technological measures that effectively control access to works protected under Title 17, including Philips proprietary software and logs on at least Philips medical imaging systems, including Philips Ultrasound Systems.

94. Nguyen publicly, personally, promotes use of Summit's hacking tools in Summit's marketing material.

95. Nguyen personally controls and oversees the process of selecting to whom Summit employees distribute the Adepto hacking tool.

SECOND AMENDED COMPLAINT - 24
No. 2:19-cv-01745-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

LOC_AR_00003020

96.     Upon information and belief, Nguyen personally advertises its Adepto hacking tool as available for distribution to Summit's customers, but Summit only distributes its Adepto hacking tool to contracted customers after such customers have been personally interviewed by Nguyen himself.

97.     Upon information and belief obtained from publicly available sources, Nguyen designed and created Summit's Adepto hacking tool and participated in or directed its development.

98.     As a principal owner, Governor, CEO and CTO, Nguyen has, has had, and continues to have an obvious and direct financial interest in Summit's circumvention technology.

99.     Nguyen has, has had, and continues to have the right and ability to supervise the work of Summit's employees.

100.     Because Nguyen had the right and ability to supervise the circumvention actions of Summit, and because Nguyen benefitted financially from Summit's circumvention actions, Nguyen is vicariously liable for Summit's violations of 17 U.S.C. §§ 1201 and 1202 as set forth in this Complaint.

101.     In addition, or in the alternative, as an officer of Summit who personally participated in the Summit's tortious activities, Nguyen is liable for Summit's torts.

102.     Specifically, as both the CEO and CTO, Nguyen oversaw and directly participated in Summit's acts of circumvention of access controls to gain access to copyrighted material that includes Philips' trade secrets.

103.     Nguyen was aware of, participated in the use of, created and/or directly developed, Summit's Adepto hacking tool, and oversees, directs, participates, promotes, and

SECOND AMENDED COMPLAINT - 25
No. 2:19-cv-01745-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

LOC_AR_00003021

participates in the use and distribution of Summit's Adepto hacking tool in order to allow

Summit to circumvent Philips' technological measures protecting Philips copyright and thereby

enable unlicensed software within Philips Ultrasound Systems and access and create copies of

Philips copyright protected log files, and in order to allow Summit's customers to do the same.

104.    Nguyen has also personally trained Summit's employees and Summit's

customers in how to make use of the Adepto hacking tool in order to disable or otherwise

circumvent Philips access controls and create copies of Philips copyrighted software and log

files.

105.    Philips has been and will continue to be damaged by the conduct of Summit

and Nguyen conduct in an amount not presently known with certainty, but that will be proven

at trial.

106.    Philips is entitled to the range of relief provided by 17 U.S.C. § 1203,

including but not limited to, injunctive relief, compensatory damages or statutory damages, and

Philips' costs and attorneys' fees in amounts to be proven at trial. Defendants' conduct has also

caused irreparable and incalculable harm and injuries to Philips, and, unless enjoined, will

cause further irreparable and incalculable injury, for which Philips has no adequate remedy at

law.

SECOND AMENDED COMPLAINT - 26
No. 2:19-cv-01745-JLR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

LOC_AR_00003022

# EXHIBIT 15

LOC_AR_00003023

Attorney Docket No. 15259128-000007

In Support of Petition of:
Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

*Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging*

# DECLARATION OF STERLING PELOSO

I, Sterling Peloso, am over 21 years old and hereby declare as follows:

1) I am the President of Pacific Medical, Inc. d/b/a Avante Patient Monitoring and Ultra Solutions, Inc. d/b/a/ Avante Ultrasound, each of which is a sister company of petitioner and commenter Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging ("Transtate"). I have held this position since September 16, 2013.

2) I have serviced or overseen servicing of medical equipment from several OEMs at Avante Ultrasound and Avante Patient Monitoring including Siemens, Phillips, GE, Stryker, and Canon (formerly Toshiba).[1]

---

[1] Alaris refers to ALARIS Medical Systems, Inc.
Samsung refers to Samsung Ultrasound Systems.
Stryker refers to Stryker Corporation.
Edward Lifesciences refers to Edward Lifesciences Corporation.
Hospira refers to Hospira Inc., a spin-off of Abbott Laboratories.
Welch Alynn refers to Welch Allyn Inc.
Spacelabs refers to Spacelabs Healthcare, a subsidiary of OSI Systems, Inc.
Nihon Koden refers to Nihon Koden Corporation.
GE refers to GE Healthcare, a subsidiary of General Electric Company.
Siemens refers to Siemens Healthineers AG (formerly Siemens Healthcare, Siemens Medical Solutions, Siemens Medical Systems), a subsidiary of Siemens AG.
Philips refers to Koninklijke Philips N.V., including its subsidiaries Philips Electronics and Philips Healthcare.
Toshiba refers to Toshiba Medical, now Canon Medical Systems Corporation.

LOC_AR_00003024

<u>Ultrasound Equipment</u>

3) Several ultrasound devices from various OEMs, including GE, Philips, Siemens, Toshiba, and Samsung, restrict or limit access to software and data files with the use of technological protective measures (TPMs). Examples of the ultrasound devices that use TPMs to restrict or limit access to software and data files include the Logiq E9, Vivid E9, Vivid E95, Logiq E10, Vivid IQ, Loqiq E, Logiq I, Vivid I, Vivid E, Voluson I, Voluson E, Voluson S Series, Voluson E6/8, and Voluson E10 Series from GE; the Epiq, Affiniti, CX50, iU22, iE33, HD- Series, and Volcano IVUS models from Philips; all of the S – Series models, the SC2000, and New Sequoia models from Siemens, and the Aplio300/500 and i800 models from Toshiba.

4) All models of ultrasound medical devices from Samsung include TPMs that restrict or limit access to software and data files necessary to service the equipment.

5) The types of software and data files that OEMs restrict or limit access to through the use of TPMs include service logs, comprehensive diagnostic tests, error codes to identify specific hardware failure, DICOM servers/IP addresses, remote diagnostics, Windows access, touch panel calibration, backup system settings with licensing, and software updates for compatible hardware.

6) The TPMs that are used by OEMs on ultrasound medical devices include service dongles, passwords that change on a daily and/or yearly basis, key generated passwords, and software modules that lock out third party transducer repair.

7) GE service dongles at one time were a purchasable option when we bought some from a distributor. However, the newer service dongles are not available to third parties.

8) There are known workarounds to bypass the TPMs, including reverse engineered key generators, hardware dongles borrowed or purchased from clients, and hardware dongles and/or access codes sold by foreign citizens. Some current and former OEM employees also sell or loan their access dongles.  There are also some medical devices models that have built-in pass/fail tests that, if performed correctly, provide sufficient information to enable a technician, using system behavior, to narrow down a problem to a module level, e.g., a power supply, a front-end module, a back-end module, or a display module.

9) In addition, for some customers, we have provided a package of parts that we call a Hero Kit, that are sent to customer so that they can repair their ultrasound systems.  The Hero Kit includes parts that typically malfunction on that particular system.  The customer will "trial and error" those parts based on the their own experience diagnostics until the system is repaired.

10) Our technicians and engineers have experienced a number of adverse effects resulting from the inability to access software and data files on ultrasound medical devices. Our IT personnel have been unable to change Picture Archiving and Communication System ("PACS") Servers, Digital Imaging and Communication ("DICOM") and IP addresses on medical devices, resulting in the unavailability of electronic medical records ("EMR")that then resulted in delayed patient care. The inability to access software and data files for replacement parts that our technicians needed in

order to operate in a compatible system have also caused delays in patient care due to the inoperability of the machines.

11) Delays in patient care have further resulted from our technicians' inability to access software on medical devices when reloading lawful software on the devices, where as a result the technicians are not able to load the software licenses for the systems to operate normally. Patient safety concerns also occur where technicians cannot access on-board diagnostics when an end user has a complaint concerning imaging anomalies.

12) The ability to access software and data files on medical devices directly impacts our ability to provide critical servicing activities to our customers. Once, when a customer's Report Printer failed and needed to be replaced, our technicians required access to Windows to simply add a new Report Printer. Use of a Hardware Service Dongle was used to access Windows and replace the Report Printer.

13) In another instance our technicians accessed ultrasound equipment diagnostics and discovered that the power supply was not generating the correct power to run the devices. We replaced the power supply and returned the system back to the end user for further patient care.

14) When we are allowed access to the software and data files required to repair and diagnose medical devices, we are able to properly service our clients' systems as well as reduce delay and safety risks associated with patient care.

Patient Monitoring Equipment

15) Service documentation for patient monitoring equipment including for display monitors, tourniquets, scales, and compression units is impossible to get from certain OEMs such as Stryker and Edward Life Science. As a result, with the service manual requirement in place, even simple repairs on medical equipment where a manual or service documentation is not actually needed to complete the repair cannot be performed.

16) OEMs such as GE, Philips, Nihon Koden, Spacelabs, and Welch Alynn do not provide software access, service documentation, or training for monitors and modules to third parties, i.e., parties who are not employees of customers.

17) Philips does not make the MX40 telemetry support tool available to us, which results in higher repair costs for medical centers, longer turnaround times, and equipment that is unavailable for use in situations such as disasters and pandemics like COVID-19.

18) Alaris and Hospira do not make various software updates for Plum A+ pumps available to third parties. This causes delays in getting the Plum A+ pump devices to the hospital. For example, at the onset of COVID-19, we could either not supply Plum A+ pumps to New York hospitals in a timely matter or not supply Plum A+ pumps at all.

19) COVID-19 has worsened the impact of OEM-related delays. At one critical time during the pandemic, an order that took four weeks to complete would have only taken four to five days to

complete if we would have otherwise had the proper software access from the OEMs to service the medical equipment.

20) The undersigned being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001. The undersigned declares that all statements made of his/her own knowledge are true, and all statements made on information and belief are believed to be true.

Date: 12/10/2020

Sterling Peloso

LOC_AR_00003027

# EXHIBIT 16

LOC_AR_00003028

how to clone a dongle at DuckDuckGo                    https://html.duckduckgo.com/html?q=how to clone a dongle



All Regions          Any Time

### How to clone sentinel dongle USB key - YouTube
www.youtube.com/watch?v=DoEbzA8iFQ8

VIP **DONGLE**. • 22 тыс. просмотров 3 года назад. **How to** recover data from a hard drive (stuck heads: buzzing, clicking, etc). **HOW TO** DUPLICATE A USB FLASH DRIVE, **Clone a** usb kodi flash drive.

### (PDF) How to clone a USB key and make a back up of a Dongle?
www.academia.edu/39403989/How_to_clone_a_USB_key_and_make_a_back_up_o

**How to clone a** USB license key with additional software Before starting the process to copy the **Dongle**, you must verify that all the basic requirements necessary to make the copy correctly are met, for this you must confirm the following points: • A computer with a valid operating system for the...

### How to Clone Dongle and Emulation - Request Software Cracking
cracking4you.com/emulator/52-how-to-clone-dongle-request-software-cracking.html

**How to Clone Dongle** and Emulation - Request Software Cracking **How to** Copy and Backup Software **Dongle** - Support window 10 x64 MultiKey Win10 x64 Support, HASP Sentinel Gemalto HL SRM HardLock SuperPro/UltraPro Dinkey Rockey Guardant Wibu CodeMeter Marx Matrix...

### How to clone a Sentinel dongle to work with software and... - Quora
www.quora.com/How-can-I-clone-a-Sentinel-dongle-to-work-with-software-and-witho

But cloning an USB **dongle** would likely be considered a copyright violation. By telling you **how to** do so, I would potentially violate a few laws. Even if you find software tools to make a hardware **clone** of a **dongle**, it might still also contain malware and potentially add the malware to the **clone**.

### How to copy a dongle USB key|Why copy a dongle key | Medium
medium.com/@ViviannSanders/how-to-copy-a-dongle-usb-key-e4811eec7bb

Q: **How** does **a dongle** work? **A**: The security key contains a circuit board that includes a microcontroller, memory and additional components. These items are enclosed in a hard plastic case. Logic is programmed into the **dongle** that enables it to generate blocks of data that can be transmitted...

1 of 5                                                                    11/11/2020, 4:27 PM

LOC_AR_00003029

### Clone a USB Dongle? | Overclock.net

www.overclock.net/threads/clone-a-usb-dongle.933115/

**Clone** a USB **Dongle**? Jump to Latest Follow. Theres a reason you need that **dongle** plugged in and thats to authenticate you as a legitimate user. If there was a way to **clone** the usb drive then there goes there copy protection, along with the iso on TPB will be the iso of the usb drive with instructions on...

### How to share a USB license key. Dongle sharing guide.

www.donglify.net/how-to-share-usb-dongle/

Find out **how to** share a USB **dongle** and get access to your security key from any remote location across the Internet. Donglify is a software application that is extremely useful when faced with the challenge of **how to** share a **dongle** USB key with multiple remote computers.

### how to clone dongle | Forum

www.finetopix.com/showthread.php/4979-how-to-clone-dongle

Cloning is what u try to make a duplicate copy of that **dongle** ! And Kaka is right , NEMO uses sent Emulation, not HASP Emul ! sir,please tell me **how** emulation of the **dongle** can be done.can it be done for **dongle** of tems & **how** it can be done.i am new in this field .please help me...

### how to clone a dongle - Bing

www.windowssearch-exp.com/search?q=how+to+clone+a+dongle&FORM=QSRE8

**How to clone a** Sentinel **dongle to** work with ... 23.08.2014 · WiFi **Dongle** What is the best USB **Dongle to** buy so I can use WiFi on my computer and if I have a **Dongle** running, can I still use my ordinary keyboard and mouse or do I have to buy WiFi ones please> Regards, RonBin79: Hardware...

### Duplicate ( Hardware copy ) of Hasp or Hasp4 or HaspHL or other...

dongleduplicate.nsys.by

**Dongle** is a device to plug in to the LPT (or other) port. It is used to store some information and to communicate with protected software. If software can't find required **dongle**, it will not run properly. It's main purpose copy protection. HASP (R) is a trademark name of **dongles** manufactured by Alladin.

### 2 Best USB Clone Tools Help to Clone USB Drive Without Data Loss

www.minitool.com/backup-tips/usb-clone-tool.html

Do you know **how to clone** USB drive or **how to clone** USB hard disk without losing any your personal data? **How** can you **clone** USB drives or **clone** an external hard drive that

LOC_AR_00003030

connects via USB with ease and would not bring any damage to the original data?

### How to share USB dongle over Network - Sharing dongle 2020 guide

www.flexihub.com/share-usb-dongle.html

Step-by-step for USB **dongle** sharing over the network. **How to** share USB **dongle** 2020 tutorial - TOP tips for **dongle** sharing without hardware and settings. You can **clone a** USB **dongle** and use it as though it was attached to your machine directly. The free Donglify version allows you to send invites...

### [SOLVED] How to clone a USB Dongle or security key? - Discussion...

onehack.us/t/solved-how-to-clone-a-usb-dongle-or-security-key/55275

Please, Give a tutorial on cloning of USB **Dongle** or security key. Dunno the possible ways to **clone a dongle** key, but there are other tricks to share access over network...

### [SOLVED but not for free] How to clone Sentinel... - Linus Tech Tips

linustechtips.com/topic/1115902-solved-but-not-for-free-how-to-clone-sentinel-hasp-h

Is there any way I could **clone** the USB **dongle** myself? Without significant cost and without involving a third party? Thank you very much in advance for your help and advice. It's quite pricey since it's a monthly subscription. **How** is this product different from other options previously mentioned? Tx.

### Xprog 5.3 how to clone dongle? - MHH AUTO - Page 1

mhhauto.com/Thread-Xprog-5-3-how-to-clone-dongle

Does someone have any solution **how to clone** this **dongle** or **how to** read CY mcu? I think that similar **dongle** will be in carprog 4.74. When I connect this **dongle to** USB i have HID interface. hello, the v5.3 is same with others version v5.0, just different software, not the hardware.

### Other - how to clone a hardlock usb key | The FreeBSD Forums

forums.freebsd.org/threads/how-to-clone-a-hardlock-usb-key.70880/

Exactly the **dongle** is just part of the license management scheme. All this tied online now to the software company. In the past even companies cheated on Vince, I tried to **clone a dongle** for employees. The task was to complete the project in a short period, I had to use a third-party program.

### How to clone sentinel dongle USB key

clip-share.net/video/DoEbzA6iFQ8/how-to-clone-sentinel-dongle-usb-key.html

LOC_AR_00003031

Am 20 Nov 2018 veröffentlicht. **How to clone** sentinel **dongle** USB key Dowload Link for Video: www.mediafire.com/folder/1x3jbe6et8cbe/. Hi, did you ever get a **clone** of the **dongle**?. Alberto Carmona Vor 7 Monate. Error: can't Init API Error: Initializing Sentinel SuperPro API.

### Dongle Backup - Emulator Softwares - Vip Dongle Team

vipdongle.com/mp/dongle-backup/

**Dongle** Backup - Emulator Softwares - Hardware **Clone** - Software usb key Tested With Hasp, Sentinel, Hardlock, Wibu, Codemeter, Vip **Dongle** Team. We know **how to** Backup and Virtualize **Dongles** Connected to HASP, Sentinel, Hardlock, Eutron Smartkey, Dinkey, Marx, Deskey, Wibu...

### Clone Dongle | AudioSEX - Professional Audio Forum

audiosex.pro/threads/clone-dongle.28932/

Is there any way to **clone a dongle**? Can I buy a usb **dongle** and copy the one from my friend to use it myself? It would also be a backup copy if you lose or break. Thanks in advance

### A Comprehensive Guide: How to Clone USB Drive

www.ufflone.com/data-recovery/clone-usb.html

Someone may think it very easy to **clone** USB - you just copy the content of the USB to another or to a hard drive. However this works only if there is no boot or special files in the USB, or you cannot As a result, we are often suggested by technicians to **clone a** USB drive with professional USB **clone** tools.

### How To Clone Usb Dongle

trvid.com/w/how+to+clone+usb+dongle

**How to clone** sentinel **dongle** USB key Dowload Link for Video: www.mediafire.com/folder/1x3jbe6et8cbe/. **How to** Create a **Clone** Image of Your USB flash Drive or micro SD Flash Card . This video guide is for people who need to fully or ...

### Eutron Dongle Backup Service - Dongle Emulator - Dongle Clone...

salda.ws/video.php?id=ySn0_J3YBng

Contact us: donglesolutions@gmail.com Eutron Eutron Smartkey Eutron SmartKey 3 **Dongle** copy service **Dongle clone** service **Dongle** emulation service.

### Скачать how to clone sentinel dongle - смотреть онлайн

v-s.mobi/how-to-clone-sentinel-dongle-07:57

...**how to clone** usb flash drive, videotutorial hackear y emular hardlock añadido link,

LOC_AR_00003032

**dongle** 2019 latest tool, emular **dongle** hasp hasp4 hardlock, all **dongle** crack software 100 free download, all in one nck **dongle**, sentinel support sentinel hl keys, edius **dongle** cracker 2 0 2019...

### How to clone sentinel dongle - YouTube
funer.ru/video/qX_KW9KvQes

**How to clone** sentinel **dongle** - cara kloning & menjalankan virtual **dongle** Sentinel Download link: https://drive.google.com/open?id=0BwMlLidNPtFVYkhqdzQ5MnN5N0...

### How To Clone A Dongle License
thclips.com/rev/how+to+clone+a+dongle+license/

**How to clone** sentinel **dongle** - cara kloning & menjalankan virtual **dongle** Sentinel Download link **How to clone** sentinel **dongle** USB key Dowload Link for Video: www.mediafire.com/folder/1x3jbe6et8cbe/.

### Software Dongle Cloning
thexvid.com/rev/software+dongle+cloning/

**How to clone** sentinel **dongle** USB key Dowload Link for Video: www.mediafire.com/folder/1x3jbe6et8cbe/. **How to clone** sentinel **dongle** - cara kloning & menjalankan virtual **dongle** Sentinel Download link

### How to clone sentinel dongle
thclips.com/video/qX_KW9KvQes/how-to-clone-sentinel-dongle.html

**How** can I **clone** computer ID when installing softaware which require cloud registration key (eg. flexistarter 11 cloud edition). please answer it. JR 2 yıl önce +1. I need to **clone** a sentinel c plus b **dongle**. If any body reading this knows **how to** do it, I am willing to buy a solution at reasonable price...

### How to clone sentinel dongle – Видео онлайн
v4k.life/video/qX_KW9KvQes

HASP Sentinel Gemalto SuperPro **Dongle Clone** and Emulator. **How to** make USBTrace log for protection **dongles**. Quy Vlog 2 год. **HOW TO** DUPLICATE A USB FLASH DRIVE, **Clone** a u... Добавлено: 4 год. bloggerdaddy 4 год. Use a bunch of USB Flash drives in a RAID arr...

Next                                                                                                    Feedback

LOC_AR_00003033

# EXHIBIT 17

LOC_AR_00003034

# The fastest way to get Service Password for CT Scanner, MRI Scanner and others

-- You may receive password in ONE hour! *

[ Manufacturers | CT Scanner | MRI Scanner | Other Scanners | Success Stories | FAQ | Contacts ]     (Ask Online)

Select Language    ▼  Powered by Google Translate

Angiography | Magnetic Resonance | Computed Tomography | Cardiology | Mammography | Radiography | Surgery | Ultrasound | Urology

## What is Service Password and Service Key?



**Service Password** (or **Service Key**, or even Service Code) is a special password that used by service engineers and service technicians to get access into Service Menu (or Service Mode). Service Menu contains service functions used for reconfiguration and fixing problems of MRI scanners like MAGNETOM Impact Expert, MAGNETOM Vision Plus, MAGNETOM Verio, MAGNETOM Espree, and CT scanners like SOMATOM Esprit+ (SOMATOM Esprit Plus), SOMATOM Spirit Power, SOMATOM Plus, SOMATOM Spirit, and others. Also Service Menu is used for scanner maintenance or installation, and supporting scanners under service contracts.

To access "Service Menu" engineer must have a site-specific variable Service Password that usually acquired from scanner's manufacturer (Siemens, Philips, GE and Toshiba provides these passwords for special price). If support contract is not expired yet, this variable password is written in scanner's manual or other documents. In other cases service company needs to buy new service password or service key to continue support system. This process takes a long time usually. In particular, if you have no direct business ties and contacts in manufacturer's company. Our experience and business contacts in this area allow us to significantly reduce delivery time and *significantly reduce the cost of the service. We do this work instead of you and we do this work for you! Make your service contract more profitable!*

* All orders for Service Passwords and Codes are proceeded through e-mail. Please specify what is interested and required for you, and we will contact you in 24 hours.

 

These passwords (keys) have a different access levels: low level passwords allow only software diagnostics, scanner tests and view logs; high level password allows to open calibration menues and do all available actions. Also passwords have an expiration date (time period when they are active): one week, one month or one year.

How to request FREE trial Service Password.

## Buy Service Password or Service Key

| | | | |
|---|---|---|---|
| **SIEMENS CT/MRI Scanner Service Password** | **PHILIPS CT/MRI Scanner Service Code** | **GE (General Electric) CT/MRI Scanner Service Password and Options** | **TOSHIBA CT/MRI Scanner Service Password and Service Key** |







GE Healthcare



Order Service Password for SIEMENS SOMATOM Definition, SOMATOM Huan Yue Duo, MAGNETOM Open, and other scanners

Select Siemens Scanner:
— Not found here? Just contact us! —   ▼
Buy SIEMENS Service Password

Order Service Code for PHILIPS CT and MRI scanner

Order License Options and Service Password for GE (General Electric) CT, MRI and Ultrasound scanners

Select General Electric Scanner:
— Not found here? Just contact us! ▼
Buy License Options for GE Scanner

Order Service Password for TOSHIBA CT and MRI scanner

## Request FREE trial Service Password or Service Key

You can easy request a **FREE trial Service Password**. It will be sent to you immediately after required information about scanner system will be received by us. This password will have an expiration date (it will expire in one day or one week - depending on scanner type), and this service key will be restricted to lowest level access, because it is a FREE trial, and it purpose is to show password service quality only.

To request trial service password, please contact us by mail (click on link), and provide following information about scanner and system: scanner manufacturer (vendor) and scanner type (name). All other details will be asked depending on provided information. You can write all details that you know about your scanner, including previously used variable service password or service key (if you know it).

Order trial Service Key.

NOTE: Currently free trial Service Passwords and demo Service Keys available for most of the SIEMENS scanners only.

**ULTRASONIX Ultrasound Scanner Service Password and Options**



Order Service Password and Options for ULTRASONIX SonixTOUCH, SonixOP, SonixMDP and other scanners

Select Scanner:
— Not found here? Just contact us! — ⌄

Buy Ultrasonix License Options

\* Actual for most of the SIFMFNS Service Password and some of SF license Options. Service Keys and Service Passwords for scanners of other manufacturers may be provided in longer time. Delivery time is depend on some parameters that explained before order processing.

Copyright © 1996-2019, Service Password Ltd. All rights reserved.

LOC_AR_00003036

# EXHIBIT 18

LOC_AR_00003037

# Medical Equipment Maintenance Market

marketsandmarkets.com/Market-Reports/medical-equipment-maintenance-market-63695102.html

[202 Pages Report] MarketsandMarkets forecasts the medical equipment maintenance market to grow from USD 28.97 billion in 2018 to USD 47.49 billion by 2023, at a Compound Annual Growth Rate (CAGR) of 10.4% during the forecast period. The major factors that are expected to be driving the medical equipment repair market are rising focus on preventive medical equipment maintenance, growth in associated equipment markets, adoption of innovative funding mechanisms, and the increasing purchase of refurbished medical equipment. The objective of the report is to define, describe, and forecast the medical equipment repair market size based on device type (imaging equipment, Electromedical Equipment, Endoscopic Devices, Surgical Instruments, and Other Medical Equipment), service type, service provider, end user, and region.



Source: Investor Presentation, Secondary Literature, Expert Interviews, and MarketsandMarkets Analysis

## By device type, the imaging equipment segment to witness the highest growth during the forecast period (2018–2023).

Based on device type, the medical equipment repair market is further segmented into imaging equipment, endoscopic devices, surgical instruments, electromedical equipment, and other medical equipment. The imaging equipment segment is expected to grow at the

LOC_AR_00003038

highest CAGR during the forecast period. The high growth of this market segment is attributed to the high demand for maintenance services for imaging equipment, due to high replacement costs and the need for ensuring maximum equipment uptime.

## By service provider, the original equipment manufacturers (OEMs) segment to dominate during the forecast period>

The original equipment manufacturers (OEMs) segment is expected to dominate the market. The large share of the OEMs segment can primarily be attributed to the wide geographic presence and strong technical expertise of OEMs.



MEDICAL EQUIPMENT MAINTENANCE MARKET, BY REGION (USD BILLION)

Source: Investor Presentation, Secondary Literature, Expert Interviews, and MarketsandMarkets Analysis

## North America to account for the largest market size during the forecast period.

North America is expected to hold the largest market size in medical equipment repair market during the forecast period, followed by the European region. Factors such as the growing aging population and rising incidence of lifestyle-related diseases, access to quality healthcare, well-established healthcare infrastructure, high adoption of advanced technology, and the presence of prominent players are driving the North American medical devices industry in this region. This will significantly boost the growth of the market for associated maintenance services in the region. Additionally, the availability of funding to purchase advanced medical technologies—through investments and similar initiatives—for hospitals and healthcare providers is also expected to aid market growth.

Asia is the third-largest market for medical equipment repair market and is slated to register the highest CAGR of during the forecast period. Factors contributing to this growth include increasing patient population, rising awareness on the benefits of early disease

LOC_AR_00003039

diagnosis, increasing public and private funding for the development of healthcare facilities, government initiatives for the modernization of healthcare infrastructure & provision of quality care, and the growing medical tourism in Asian countries.

## Market Dynamics

### Driver: Rising focus on preventive medical equipment maintenance

The focus on preventive maintenance of medical equipment has grown in recent years, as healthcare institutions seek to enhance patient safety and care quality. This involves a carefully designed program where maintenance tasks are performed in a scheduled manner to avoid larger and costly repairs down the line. It also helps in reducing equipment downtime, which enhances day-to-day operations and improves device reliability.

The preventive maintenance approach is gaining prominence as planned inspections and medical device maintenance help avoid adverse incidents and medical device-related accidents. Regular maintenance services ensure safe, efficient, and long-lasting use of medical devices. The growing focus on implementing preventive maintenance strategies among healthcare organizations is expected to offer growth opportunities for service providers in the coming years.

### Restraint: High initial cost and significant maintenance expenditure

Maintenance programs for medical devices enable healthcare providers to track and monitor their condition, and thereby ensure efficient utilization and maximum uptime. This is also essential, given the current focus on preventive maintenance and cost pressures, to control total expenditure against a background of austerity measures. Such programs include the deployment of asset management solutions which use advanced technologies.

However, the deployment of these solutions incurs high initial installation costs and significant maintenance expenditure, while the installation of advanced medical equipment incurs a service contract cost (~12% of the cost of medical equipment) to be paid per year. The service cost thus paid during the lifespan of the equipment is usually more than the cost of the equipment. The high cost associated with the purchase and maintenance of advanced medical equipment is restraining end users from adopting them. This stifles the demand for associated maintenance services and thereby restrains market growth.

### Opportunity: Emergence of ISOs

LOC_AR_00003040

The medical equipment maintenance and services sector was initially dominated by OEMs. However, OEMs typically charge more than third-party vendors, and often take longer for maintenance, resulting in higher associated costs as well as downtime. This situation, especially given the backdrop of continuing austerity measures and the need for cost-curtailment in global healthcare systems, has led to the emergence of ISOs dedicated to solely providing maintenance services.

With a strong team of experts, these organizations can cater to customers in situations where OEMs fail to offer satisfactory and time-efficient solutions. Moreover, ISOs offer services for multiple brands of medical devices, providing end users with a central, independent management platform for uniform service delivery across all asset groups, while reducing maintenance costs. This also helps reduce operating expenses and capital spending. According to hospitals and patient advocacy groups, ISOs typically charge 30–50% less than OEMs for maintaining and repairing equipment. Competition among third-party service companies and insurance brokers has also driven down response times and the cost of services. Additionally, ISO contracts have become highly flexible, with negotiable or varied stipulations for parameters, such as response times and spare part costs (for example, whether they are included in a fixed price or charged separately). Considering their advantages as compared to OEMs, the preference for ISOs has increased among end users. The opportunities presented in the ISOs market is expected to draw a number of companies in this sector in the coming years.

### Challenge: Interoperability Issues Survival of players in a highly fragmented and competitive market

The medical equipment maintenance market is highly fragmented and competitive and comprises a broad range of players, including multinational companies and small local players. With a number of service providers offering similar services, the cost is a major factor that influences end users selecting a vendor. However, it is usually a challenge for service providers to offer the best-in-class services to customers at a lower cost. Also, the emergence of ISOs is increasing the pressure on OEMs to reduce the price of their service contracts. In this situation, it becomes difficult for players to remain competitive in the market; as a result, a number of larger companies look for consolidation. However, smaller companies do not have the same option, which affects their long-term survival in the medical equipment maintenance market.

## Scope of the Report

| Report Metric | Details |
|---|---|
| | |

LOC_AR_00003041

| Market size available for years | 2017–2023 |
|---|---|
| Base year considered | 2017 |
| Forecast period | 2018–2023 |
| Forecast units | Billion (USD) |
| Segments covered | Device Type (Imaging Equipment, Electromedical Equipment, Endoscopic Devices, Surgical Instruments, and Other Medical Equipment), Service Type (Preventive Maintenance, Corrective Maintenance, Operational Maintenance), Service Provider (Original Equipment Manufacturers, Independent Service Organizations, and In-House Maintenance), End User (Public Organizations, and Private Organizations), and Region |
| Geographies covered | North America, Europe, Asia, and Rest of the World |
| Companies covered | GE Healthcare (US), Koninklijke Philips N.V. (Netherlands), Siemens Healthineers (Germany), Toshiba Medical Systems Europe (Germany), and Drägerwerk AG & Co. KGaA (Germany), Aramark (US), BC Technical, Inc. (US), Alliance Medical Group (UK), and Althea Group (Italy). |

The research report categorizes the medical equipment repair market to forecast the revenues and analyze the trends in each of the following sub-segments:

5/8

LOC_AR_00003042



- Imaging Equipment
- Advanced Modalities
  - CT
  - MRI
  - Other Advanced Medical Imaging Modalities (PET-CT, SPECT-CT, PET, Gamma Cameras, and Angiography Systems)
- Primary Modalities
  - Digital X-ray
  - Ultrasound
  - Others Primary Medical Imaging Modalities (General X-ray Systems, Mammography Systems, and Bone Densitometers)
- Endoscopic Devices
- Surgical Instruments
- Electromedical Equipment
- Other Medical Equipment

**On the basis of Service Type, the medical equipment maintenance market has been segmented as follows:**

- Preventive Maintenance
- Corrective Maintenance
- Operational Maintenance

**On the basis of Service Provider, the medical equipment maintenance market has been segmented as follows:**

LOC_AR_00003043

- Original Equipment Manufacturers (OEMs)
  - Multi-vendor OEMs
  - Single-vendor OEMs
- Independent Service Organizations (ISOs)
- In-house Maintenance

## On the basis of End User, the medical equipment maintenance market has been segmented as follows:

- Public-sector Organizations
- Private-sector Organizations

## On the basis of Region, the medical equipment maintenance market has been segmented as follows:

- North America
- Europe
- Asia
- RoW

## Key Market Players

The global medical equipment maintenance market is highly competitive with the presence of both OEMs and ISOs. GE Healthcare (US), Koninklijke Philips N.V. (Netherlands), Siemens Healthineers (Germany), Toshiba Medical Systems Europe (Germany), and Drägerwerk AG & Co. KGaA (Germany) are some of the leading OEMs in this market. Aramark (US), BC Technical, Inc. (US), Alliance Medical Group (UK), and Althea Group (Italy) are some of the leading ISOs operating in the global medical equipment maintenance market.

Siemens Healthineers (Germany) held the second-largest market share in 2017, due to its trend-setting role in the medical imaging, laboratory diagnostics, medical information technology, and hearing aid sectors. The company focuses on putting maximum efforts into its selected growth fields and prioritizes business for resource allocation. Siemens Healthineers also focuses on strengthening its business through partnerships and agreements.

### Recent Developments

- In 2018, Koninklijke Philips N.V. (Netherlands) signed a partnership agreement with Kliniken der Stadt Köln (Germany) to provide continuous modernization and maintenance of imaging systems

LOC_AR_00003044

- In 2018, Koninklijke Philips N.V. (Netherlands) signed a partnership agreement with Städtische Klinikum München (Germany) to provide medical imaging solutions which include healthcare consultancy services
- In 2016, Biomedical Srl sugned an agreement with ASST Orobica (Spain) for provision of integrated services for the management and maintenance of healthcare devices and equipment

**Critical questions the report answers:**

- Where will all these developments take the industry in the long term?
- What are the upcoming trends for the medical equipment repair market?
- Which segment provides the most opportunity for growth?
- Who are the leading vendors operating in this market?
- What are the opportunities for new market entrants?

## Available customizations

With the given market data, MarketsandMarkets offers customizations as per the company's specific needs. The following customization options are available for the report:

To speak to our analyst for a discussion on the above findings, click **<u>Speak to Analyst</u>**

LOC_AR_00003045

# EXHIBIT 19

LOC_AR_00003046

**CMS**.gov

Centers for Medicare & Medicaid Services

## Hospital Outpatient Quality Reporting Program

### Overview

The Hospital Outpatient Quality Reporting Program (Hospital OQR) is a pay for quality data reporting program implemented by the Centers for Medicare & Medicaid Services (CMS) for outpatient hospital services. The Hospital OQR Program was mandated by the Tax Relief and Health Care Act of 2006, which requires subsection (d) hospitals to submit data on measures on the quality of care furnished by hospitals in outpatient settings. Measures of quality may be of various types, including those of process, structure, outcome, and efficiency.

Under the Hospital OQR Program, hospitals must meet administrative, data collection and submission, validation, and publication requirements, or receive a 2 percentage point reduction in payment for failing to meet these requirements, by applying a reporting factor of 0.980 to the Outpatient Prospective Payment System (OPPS) payments and copayments for all applicable services.

In addition to providing hospitals with a financial incentive to report their quality of care measure data, the Hospital OQR Program provides CMS with data to help Medicare beneficiaries make more informed decisions about their healthcare. Hospital quality of care information gathered through the Hospital OQR Program is available on the *Hospital Compare* Web site.

### Outpatient Department Measures

Outpatient care can refer to numerous types of health services, such as emergency department services, observation services, outpatient surgical services, lab tests, and X-rays, provided to those who visit a hospital or other healthcare facility. Outpatient often refers to a patient who leaves the facility after treatment on the same day but may include a patient who spends the night at the hospital for whom a doctor has not written an order for inpatient admission.

*Hospital Compare* provides results on emergency department and outpatient quality measures, which evaluate the quality of care provided to patients. A quality measure converts medical information from patient records into a rate or time that allows facilities to assess their performance and consumers to compare how well patients are being cared for at their local hospitals.

The outpatient measures evaluate the regularity with which a healthcare provider administers the outpatient treatment known to provide the best

LOC_AR_00003047

results for most patients with a particular condition. An example includes patients receiving appropriate fibrinolytic therapy within 30 minutes of arrival to the emergency department.

The Hospital OQR measures include data collected from various methods to measure patient care outcomes, process of care, imaging efficiency patterns, care transitions, ED-throughput efficiency, Health Information Technology use (HIT), care coordination, and patient safety. Data may be collected through chart abstraction, claims volumes, or reporting on a hospital process. Specialty areas were identified by CMS as having common and frequent procedures in the hospital outpatient setting. These procedures were identified as colonoscopies and outpatient imaging procedures. Other areas of future focus are outpatient surgery and chemotherapy.

**Measures for the CY 2021 Payment Determination**

- OP-2: Fibrinolytic Therapy Received Within 30 Minutes of ED Arrival
- OP-3: Median Time to Transfer to Another Facility for Acute Coronary Intervention
- OP-8: MRI Lumbar Spine for Low Back Pain
- OP-10: Abdomen CT—Use of Contrast Material
- OP-13: Cardiac Imaging for Preoperative Risk Assessment for Non-Cardiac, Low-Risk Surgery
- OP-18: Median Time from ED Arrival to ED Departure for Discharged ED Patients
- OP-22: Left Without Being Seen
- OP-23: Head CT or MRI Scan Results for Acute Ischemic Stroke or Hemorrhagic Stroke who Received Head CT or MRI Scan Interpretation Within 45 minutes of ED Arrival
- OP-29: Appropriate Follow-Up Interval for Normal Colonoscopy in Average Risk Patients
- OP-31: Cataracts: Improvement in Patient's Visual Function within 90 Days Following Cataract Surgery*
- OP-32: Facility 7-Day Risk-Standardized Hospital Visit Rate after Outpatient Colonoscopy
- OP-33: External Beam Radiotherapy for Bone Metastases
- OP-35: Admissions and Emergency Department (ED) Visits for Patients Receiving Outpatient Chemotherapy
- OP-36: Hospital Visits after Hospital Outpatient Surgery

* Measure voluntarily collected as set forth in section XIII.D.3.b. of the CY 2015 OPPS/ASC final rule with comment period (79 FR 66946 through 66947).

Read more about the Hospital OQR Program in the most recent final rule found here.

More information regarding the Hospital OQR measures can be found on the QualityNet website here.

**Public Reporting**

Data collected through the Hospital OQR program is publicly reported so people with Medicare and other consumers can find and compare the quality of care provided at ambulatory surgical centers. Publishing these data can improve facility performance by providing benchmarks for selected clinical areas and public view of facility data.

The CMS *Hospital Compare* website publishes information on the quality of care provided to patients; this information is made available to inform consumers and to encourage healthcare facilities to make continued improvements in care quality. *Hospital Compare* is generally refreshed bi-annually for the Hospital OQR program. Information on Public Reporting can be found in Section 1833(t)(17)(E) of the Social Security Act and requires that the Secretary establish procedures to make data collected under the Hospital OQR program available to the public.

**Contact Us**

Submit questions and search for answers on the Hospital OQR Program through the Quality Question and Answer Tool or call the Hospital OQR Support at **(866) 800-8756** weekdays from 7 a.m. to 6 p.m. Eastern Time.

Page Last Modified: 07/28/2020 11:42 AM
Help with File Formats and Plug-Ins

Home **CMS.gov**

A federal government website managed and paid for by the U.S. Centers for Medicare & Medicaid Services. 7500 Security Boulevard, Baltimore, MD 21244





Receive Email Updates



type your email here

Submit

**Connect with CMS**

  

LOC_AR_00003050

# EXHIBIT 20

LOC_AR_00003051

The current issue and full text archive of this journal is available on Emerald Insight at:
www.emeraldinsight.com/1355-2511.htm

JQME
25,1

128

Received 23 November 2017
Revised 17 May 2018
Accepted 12 June 2018

# Influential factors on medical equipment maintenance management

## In search of a framework

Rona Bahreini

*Tabriz Health Services Management Research Center,
Iranian Center of Excellence in Health Management, Student Research Committee,
School of Management and Medical Informatics,
Tabriz University of Medical Sciences, Tabriz, Iran*

Leila Doshmangir

*Tabriz Health Services Management Research Center,
Iranian Center of Excellence in Health Management,
School of Management and Medical Informatics,
Tabriz University of Medical Sciences, Tabriz, Iran, and*

Ali Imani

*Health Economics Department, Tabriz Health Services Management Research Center,
School of Management and Medical Informatics,
Tabriz University of Medical Sciences, Tabriz, Iran*

## Abstract

**Purpose** – Effective maintenance management of medical equipment is one of the major issues for quality of care and cost-effectiveness especially in modern hospitals. An effective medical equipment maintenance management (MEMM) consists of adequate planning, management and implementation. This is essential for providing good health services and saving scarce resources. Considering the importance of the subject, the purpose of this paper is to extract the influential factors on MEMM using a qualitative approach.

**Design/methodology/approach** – Documents review and interviews were main methods for data collection. Semi structured interviews were conducted with a purposive sample of 14 clinical engineers with different degree of education and job levels. Interviews were voice recorded and transcribed verbatim. Qualitative data were analyzed using a content analysis approach (inductive and deductive) to identify the underlying themes and sub-themes.

**Findings** – Factors influencing an effective and efficient MEMM system categorized in seven themes and 19 sub-themes emerged. The themes included: "resources," "quality control," "information bank," "education," "service," "inspection and preventive maintenance" and "design and implementation."

**Originality/value** – The proposed framework provides a basis for a comprehensive and accurate assessment of medical equipment maintenance. The findings of this study could be used to improve the profitability of healthcare facilities and the reliability of medical equipment.

**Keywords** Maintenance management, Hospital, Medical equipment, Medical devices

**Paper type** Research paper



Journal of Quality in Maintenance
Engineering
Vol. 25 No. 1, 2019
pp. 128-143
© Emerald Publishing Limited
1355-2511
DOI 10.1108/JQME-11-2017-0082

## Introduction

Medical equipment is extensively utilized for patients' diagnosis and treatment. Nowadays, providing health services through the use of diagnostic and treatment devices is a fundamental part of health services, especially in hospitals (Wang *et al.*, 2008, 2012). Medical devices are assets that directly improve the quality of life for many people (Painter and Baretich, 2011). Medical devices requiring calibration, maintenance, repair, user training and decommissioning activities are usually managed by clinical engineers. Medical equipment

LOC_AR_00003052

requires scheduled and unscheduled maintenance during its useful life (WHO, 2011). Hospitals should ensure that medical equipment is kept in working condition, and is safe, accurate, and reliable and operates at the required level of performance effectively (Augustýnek et al., 2018). Lack of proper maintenance of medical equipment leads to equipment downtime, reduces the level of device performance, and wastes costs and resources. In this concern, it is essential that hospitals focus on effective and quick maintenance of more critical devices (Bracale and Pepino, 1994; Dyro, 2004; Stiefel, 2009).

Medical equipment maintenance has different types: inspection and preventive maintenance (IPM) and corrective maintenance (WHO, 2011). Effective management of maintenance and repairs (Kinley, 2012) shall be planned and implemented using appropriate maintenance strategies to keep the devices safe and functional according to basic functional specifications (Wang, 2012). In addition to high initial investment, the medical equipment requires continual and costly maintenance during its useful life (Cheng and Dyro, 2004). The maintenance problem is the key discussion point in the management of medical devices (Bracale and Pepino, 1994). Other studies have indicated that the most common cause of medical equipment downtime is poor maintenance, planning, and management (Wang and Levenson, 2000; Wang and Rice, 2003). To solve this problem, it is necessary to establish and regulate a system of proper maintenance and the correct use of medical equipment (Stiefel, 2009). Perfect maintenance is the equation of performance, risk, resource inputs and costs to reach this goal (Campbell and Jardine, 2001).

The ultimate goal of maintenance is reliability and safety. It should always be safe for both patients and users (Wang, 2012). Maintenance management has had an extraordinary impact on the ability of organizations to achieve their objectives (Duffuaa et al., 2002). Hospital management has gradually been perfect, but as far as medical equipment maintenance management (MEMM) is concerned, there still exist some problems and hospital MEMM system is too loose. For example, there is no corresponding maintenance personnel composition, degree requirements and even no maintenance access qualification. Maintenance personnel placement is done most often casually, personnel division of labor is not clear, and the maintenance caters to some surface problems and fails to do finishing repair (Wang, 2014).

Today, medical devices and equipment have become increasingly more complex (Jamshidi et al., 2014), and deals with patient care in a hospital may range from simple thermometers to complex systems such as MRIs (Palesh et al., 2010).

In Iran, in accordance with the law on the organization and functions of the Ministry of Health and Medical Education (MoHME), the medical equipment office was established to monitor the production, supply, consumption and use of medical equipment. Medical equipment in hospitals is purchased through two different channels: The MoHME and Board board of trustees in each hospital. Engineer/technician is responsible for the management and maintenance of medical equipment in the hospital and has different responsibilities such as training, improving patient and personnel safety, installation and repairing cycle management and maintenance management.

## Why this study: aims

Mahady et al. (2002) in his study states, despite the importance of medical equipment maintenance, unfortunately, enough attention has not been paid to this issue, especially in developing countries (Mahady et al., 2002). A number of studies have been conducted on medical equipment until now (Ameriyoon et al., 2006, 2007, 2014). To our best knowledge, no studies have provided a comprehensive framework for MEMM in Iran. This study aimed to explore the views of experts on factors affecting MEMM. This paper presents a framework for MEMM with the purpose of enhancing and improving our understanding of the effective factors in this realm.

LOC_AR_00003053

JQME
25,1

## Methods

### Design

This is a qualitative study based on content analysis approach. Qualitative data were collected through documents review and semi-structured interviews. Qualitative research approaches have an explorative nature and are used to understand people experiences in all its complexity and in all its natural setting (Pope *et al.*, 2000). Health or education policies can be developed using this type of research (Tong *et al.*, 2007). The collected data consisted of the perspectives of medical and biomedical engineers concerning factors influencing MEMM.

**130**

### Sampling

Purposive sampling was used to conduct this study and was continued until data saturation. Participants were selected from different cities of Iran as the most knowledgeable persons about this subject. The research participants included 14 clinical engineers whose education varied from bachelor to PhD degree. The inclusion criteria for interviewees were having at least bachelor's degree with at least two years of work experience in clinical engineering department of hospitals during the study period, being accessible and being willing to participate in the study. As experts in the medical equipment, an equal number of male and female participants ($n = 14$) took part in this study.

### Data collection

Semi-structured interviews and documents review were used for data collection. Related documents were regulations of MEMM, MEMM guidelines and other related regulations or reports developed by MoHME. The time period for data collection was from April to July 2016. The interview questions were asked in an open ended manner. They were based on an interview guide (Boyd, 1989). Interviews lasted approximately 30–90 min and were interviewed in the working place of the participants. The researchers and the participants agreed on an appropriate time before referral. The face-to-face interviews were recorded through voice-recorder and transcribed verbatim. All the research team participated in developing the interview guides (Appendix). Interview guide was lists of demographic questions and questions that covered aims of the study. The interview began with general and simple questions. During the interview, the interviewer added extra questions about unexpected but relevant area that emerged. Data collection continued until saturation was achieved and no new information was discovered in data analysis.

### Data analysis

Morse and Field's qualitative content analysis approach (Morse and Field, 1995a) was adopted for data analysis. Content analysis is a widely used qualitative research technique in health studies in recent years and is used to interpret meaning from the content of text data and, hence, adhere to the naturalistic paradigm (Downe-Wamboldt, 1992; Krippendorff, 2004; Sandelowski, 1995) (Hsieh and Shannon, 2005). Content analysis can also be a useful tool for discovering and describing the focus of individual, group, institutional or social attention allowing researchers to test theoretical issues to enhance data understanding. In this study, content analysis approach (inductive and deductive) was used to analyze the data. Data analysis started with the transcription of interviews and repeated reviews until meaningful themes emerged. Then, data were read word by word to derive codes. Next, the first impressions, thoughts, and initial analyses were noted. Afterwards, codes were generated from participants' words. For example, the code "training on general equipment" was generated by the researcher from a participant's comment that "every nurse who graduated from the university should be trained about the general equipment." MAXQDA 12 (qualitative) software was used to analyze the data. Two researchers (LD and RB)

LOC_AR_00003054

analyzed the data to help minimize bias. All data were transcribed, coded and analyzed by both researchers. The extracted codes, then were sorted into both items and subthemes based on comparisons between similarities and differences. Once the themes had been agreed by the authors, the two researchers read the remaining transcripts. Finally, themes were created as the expression of the hidden content of the text after being identified, reviewed and defined. The member-checking method was used to meet study validity. To address credibility, transcriptions were given to the participants to ensure the accuracy of the transcriptions. Also, the initial codes, subthemes, and major themes were audited by two of the researchers (LD and RB) and the results were confirmed.

### Ethical considerations

All of the participants agreed on recording their voice with the exception of one participant who just allowed the researcher to take notes while she was talking. Moreover, all participants were informed about the objectives of the study and their informed consent was taken. Participation in the study was voluntary and the participants were assured on the confidentiality and anonymity of the provided data.

## Results

Through data analysis, the factors affecting MEMM were categorized in seven main themes and 22 subthemes (Table I). As follows, the definitions of each theme and subtheme are reported using the participants' direct quotations.

### Theme 1: resources

This theme had three categories including "Physical Resources," "Human Resources" and "Financial Resources." In general, the provision of resources is one of the main and effective items in MEMM in this regard. All interviewees underscored the importance of all of the above-cited resources.

| Themes | Sub themes |
|---|---|
| Resources | Physical resources |
| | Human resources |
| | Financial resources |
| Quality control | Safety tests |
| | Performance tests |
| | Adjustment and calibration |
| Documentation | Providing medical devices ID (Identification) |
| | Use of local and global evidence |
| | Providing user manual |
| | Recording executive processes |
| Education | Technical and practical training |
| Service | Corrective maintenance (repair) |
| | Decommissioning |
| | Outsourcing |
| | Reform and improvement system |
| | Reporting adverse events and recall system |
| Inspection and preventive maintenance (IPM) | Periodic, internal, case and practical inspection |
| | Management processes to increase the life of the device |
| Designing and implementation | Knowledge and attitude |
| | Process management |
| | Purchasing management |

Table I.
Themes and
sub-themes of factors
affecting medical
equipment maintenance
management

JQME
25,1

**132**

*Physical resources*

Maintenance management relies on physical resources. These include workspace, tools and test equipment, supplies, replacement parts, and operation and service manuals needed to perform maintenance mechanisms. Workspace is one of the main factors in MEMM. The participants harbored these notions that lack of workspace for repair and maintenance of medical equipment is a great issue. Moreover, they stated that providing a safe and healthy work environment for staff and patients is required. One engineer gave the following explanation:

> "I would say that before the user we prepare our environment for the user." (P9) One of the other participants said: "Now when you go to hospitals, you can see that 90% of hospitals do not have a place for device repair" (P6).

Various tools and test equipment are required to perform maintenance activities, depending on the type of equipment in service. Some participants expressed that the existence of some facilities such as computers, printers and types of software are essential for the unit of biomedical engineering.

Some experts commented on this issue: "Today some companies that work on the preventive maintenance have powerful software, but this software is related to the unit of medical equipment [...] Also, the University of Medical Sciences is required to equip them with the software" (P1):

> Medical engineering unit should have direct telephone line, fax and computer, but, none of them is available (P4).

*Human resources*

Many of the engineers pointed out that developing human resources is necessary to operate an effective maintenance program, so the first step is to identify the number and type of required staff. All participants reported that the provision of trained and skilled human resources was a main factor behind job satisfaction as illustrated by the following quotes:

> Supply of the fixed manpower is one of the factors affecting performance of biomedical engineering unit (P2).

> If the human resources are not expert, companies can abuse regulations (P8).

*Financial resources*

Financial resources for maintenance primarily focus on two tasks: monitoring costs and managing the budget. Furthermore, maintenance program is required for financial planning where the costs and benefits of the current situation and the new proposal can be compared. Therefore, it is better for each medical device in the hospital to have a history of all time and expenses associated with maintaining that device. According to the participants' opinions the budget for the implementation of medical (devices) equipment maintenance program should be estimated and funded. The interviewees commented on this issue:

> Maintenance management has preventive role in costs, while the cost of repair is high (P9).

> The allocation of funds for maintenance should be from hospital policies. For example, funds have been allocated for providing parts, calibration, maintenance and service (P6).

*Theme 2: quality control*

This theme emerged from three subthemes: "safety tests," "performance tests" and "adjustment and calibration." Generally, the quality control tests include tests of safety, performance and calibration.

*Safety tests*

Most of the participants reported that safety is the first and most important step in the design, manufacture, installation, utilization and maintenance of medical equipment. There are various safety aspects to consider when implementing a successful and effective maintenance program, such as the safety of technical personnel. These tests are essential for patient and personnel. This ensures that when working on medical equipment it is essential for technical personnel to work safely in hazardous conditions. According to the interviewees:

> While quality control is easy in practice, if a simple device is impaired, it compromises patient safety (P14).

Another engineer stated:

> If the electrical safety is not guaranteed, the patient may be injured from it and also users can't use the device with confidence (P11).

*Performance tests*

Performance tests of medical equipment require special training and equipment that include technical, functional, laboratory and clinical tests. Technical testing should be performed by authorized companies and agents, and other tests should be carried out by users. During the interview with the participants, none of them referred to performance tests. The study of documentation including guideline MEMM at health centers showed that performance tests are one of the quality control tests.

*Adjustment and calibration*

Calibration measures the outputs of device under test by the tester with accuracy at defined conditions and specified ranges. It includes adjusting medical equipment in order to achieve the desired precision and ensuring its operation based on international metrics. All participants believed that calibration is a principal factor in MEMM. One interviewee commented:

> I think calibration meaning an understanding of proper working of the device is a key element in maintenance management (P5).

Another interviewee pointed out that:

> Calibration is not only to say that a device is calibrated or not [...] calibration is something that says us what is wrong, and it soon returns to standard status (P8).

*Theme 3: documentation*

Documentation was the most dominant concept in this study. One of the fundamental responsibilities of a clinical engineering manager is the documentation of the maintenance processes and activities. Without proper documentation, maintenance and management of equipment will simply lead to inconsistent implementation and unpredictable outcomes. These data provide the inventory database of every maintenance task performed on the device.

This theme consists of four subthemes: "providing ID for medical devices," "the use of local and global evidence," "provision of user manual" and "recording executive processes."

*Providing medical devices ID*

Medical equipment ID was expressed by the participants as another important factor in MEMM. Preparing and updating medical equipment ID is required for their proper management. Having the available information about medical equipment specifications is useful for its proper management. ID includes information such as a device specifications,

JQME
25,1

warranty status, service installations, acceptance tests, preventive maintenance, calibration, etc. An expert commented that:

> We have designed an intelligent system for medical devices for the first time in the country that indicates when the device is repaired, when calibrated, when serviced. This is called ID of a device (P7).

> One of the factors for improving maintenance management is documentation in the form of computer. In this regard, a computerized ID is designed but has not been implemented yet (P4).

*The use of local and global evidence*
Constant communication with scientific standard references is required in order to be informed on international standards and be up to date in the field of medical equipment. According to the ever increasing progress of medical equipment, utilization and mapping with the available scientific evidence can help to improve MEMM. One of the interviewees explained this in these terms:

> We are not connected with standard references scientifically in the world.

> Adequate studies have not been conducted about medical equipment maintenance management in our country (P1).

*Providing user manual*
Ideally, the maintenance program will have an operation (user) manual for each model of medical equipment. The operation manual is essential and valuable for equipment users and for equipment technicians. Unfortunately, operation manuals are not always available, or may be in a language not spoken or understood by equipment technicians. One engineer expressed that:

> After the user training, provision of user manual for equipment is important [...] Also, attachment of the user guide on the device can be regarded as a primary training for users (P9).

Another participant added that:

> One of the influencing factors in maintenance management is labeling and provision of user manual which is among the duties of biomedical engineering unit (P5).

*Recording executive process*
Recording and maintaining information on medical equipment and their classification in the form of an ID according to international standards are essential for hospitals. An archive of related activities is a requisite for the continuity of maintenance program such as: costs associated with repairs, installation, and calibration. These data are typically contained in work order records that provide documentation of every maintenance task performed on the device. For instance, one interviewee commented that:

> Through computerized ID, accurate and updated documentation is available (P7).

Another participant stated:

> All reports about inspections, preventive maintenance or related forms need to be documented (P11).

*Theme 4: education*
This theme refers to user and biomedical engineer training that includes "technical and practical training." For the safety of the patient and the user, proper training is critical for both the user and the technical staff. Engineers or technicians must undergo additional training because medical equipment is highly specialized and if improperly maintained or repaired, it may have adverse consequences on human life.

*Technical and practical training*

User training means implementation, maintenance and presentation of report on the performance of devices. Technical training implies the principles and methods of maintenance, calibration, initial repairs and medical equipment management concepts. Engineers or technicians need to have proper training because medical equipment is highly specialized and if improperly maintained or repaired, it may have adverse consequences on human life. One of the interviewees commented on this issue:

> There are two types of training: ongoing education and training after device installation (P10).

Another participant believed that:

> User training plays an important role in medical equipment maintenance because if users don't learn the proper usage of the device, it may destroy the device (P14).

*Theme 5: service*

This theme emerged from five subthemes which engineers described as factors affecting MEMM: "Repair," "Decommissioning," "Outsourcing," "Reform and improvement system" and "Reporting adverse events and recall system." According to the study documents, it was found that the interviewees did not mention the last two factors.

Service activities refer to report of unpleasant disasters, calling medical devices (equipment), correction or upgrades of medical devices (equipment), repair and maintenance contracts.

*Corrective maintenance (repair)*

A process is used to restore the physical integrity, safety, and/or performance of a device after a failure. In order to return a device to its full functionality, efficient repair is required to verify the failure and determine its origin. Many of the engineers said that repair work on the most sophisticated medical equipment is only accomplished by highly trained specialists or reliable companies. In this regard, an interviewee stated that:

> Whatever more investment in medical equipment maintenance, requirement to repair them becomes less and thereby reduced repair costs (P5).

> Nowadays repair is known completely in hospitals, but still there are deficiencies in the field of maintenance.

> Another participant mentioned that: "Repair is part of maintenance as maintenance is related to before equipment failure and repair refers to after it" (P4).

*Decommissioning*

Decommissioning process is important for decision-making in providing alternative and obtaining the necessary funds. In the process of scrapping, it is essential to report involved costs, future necessary costs, affordable repairs to ensure the safety and performance of the device during use, funding for replacement, the importance of devices, measure of device downtime and disruption created in performance of the medical center and patient's dissatisfaction. One of the engineers stated:

> We found the new equipment in outdated devices stock of hospitals which is a waste of resources (P8).

Another interviewee indicated that: "Clinical engineers should be aware of the decommissioning process […] when residual value of a device is less than 20%, one can scrap it" (P13).

LOC_AR_00003059

JQME
25,1

*Outsourcing*
Service contracts and maintenance are not necessary; however, they are recommended to increase the setup time of devices (up time) and decrease their downtime. In this regard, third-party companies play an important role. One interviewee commented:

> Usually service and maintenance contracts are for vital and capital devices (P12).

136

Also two of the interviewees mentioned: "In order to repair and complete quality control tests, there should be contracts with a company that is qualified and provide exclusive services for the device" (P1, 2).

*Reform and improvement system*
"According to the maintenance guideline, the process of upgrading and reforming the medical device in the treatment center needs to be done under the supervision of the medical engineering unit and by the manufacturer of the device or its legal representative. This factor is applicable through hardware and software by adding new smithereens and tools and through software updating" (Doc2).

*Reporting adverse events and recall system*
"An adverse event is an incident that results in death or serious injury to the patient, the user of the devices or any other person. According to the participants, observing the criteria for reporting incidents and recalling medical equipment are required. Adverse events should be reported to the manufacturer of the medical device or their legal representatives as well as to the medical equipment department. This report should be prepared in written format and according to the framework set by the medical equipment department. The producing company or its legal representative is required to design and implement the supervision system for quality and the performance of medical devices. The users should be made aware of the problem occurrence in the medical equipment in terms of performance, safety, effectiveness and/or non-compliance with the requirements" (Doc 2).

*Theme 6: inspection and preventive maintenance*
This theme comprises three subthemes: "management processes to increase the life of the device" and "periodic, internal, case and practical inspection." Inspection refers to the evaluation and monitoring of all operations that include a variety of quality control tests of medical equipment, study facilities and ancillary facilities related to equipment, different inspections and assessment of the performance of technical personnel. Management processes to increase the life of a device involves maintenance performed to extend its life and prevent failure. These processes are sometimes referred to as "planned maintenance" or "scheduled maintenance." The most appropriate method for scheduling maintenance in a particular health-care facility should be chosen.

*Periodic, internal, case and practical inspection*
Generally, there are two types of inspections, including equipment inspection and practical inspection. Equipment inspection is divided into three types of inspections: periodic, internal and case inspections. Practical inspection includes inspection of space and environment, the use of a medical device, and its storage and transportation. The use of inspection can make the difference between having reliable and properly functioning equipment or not. Almost all participants mentioned the importance of proper inspection,

but most of them had inadequate information about types of inspections. For example, one interviewee commented that:

> When you do not have a guideline [...] a person who inspects biomedical engineering unit will inspect personalization in fact (P1).

> We utilize inspection from self-made and accredited checklists (P2).

*Management processes to increase the life of the device (preventive maintenance)*
Preventive maintenance is performed to extend the life of the device and prevent failure. These processes are usually scheduled at specific intervals and include specific maintenance activities such as lubrication, cleaning (e.g. filters) or replacing parts. Almost all participants noted the importance of this item, for example: "preventive maintenance must be performed properly. "Unfortunately, we can't implement preventive maintenance fully because we don't have adequate knowledge about it" (P3).

Another interviewee added that: "If preventive maintenance is not well monitored in a hospital, patients' lives are in grave danger" (P7).

*Theme 7: designing and implementation*
This concept refers to several management aspects. This theme is composed of three sub-themes: "processes management," "knowledge and attitude" and "purchasing management." Each sub-theme is explained in the following section.

*Process management*
A good number of the participants emphasized various aspects of the activities and management of the processes. In this context, from the perspective of research participants, these are very important items such as specification of access level to medical equipment, development and determination of policy, weakness in management infrastructure, long bureaucratic processes and codification of action plan. According to the interviewees:

> We spent about 20% for maintaining our devices because we do not have appropriate management and planning (P8).

Another participant said: "Heavy workload and long administrative procedures are other factors that they make. Thus, we assign the second priority to maintenance" (P4).

*Knowledge and attitude*
Level of knowledge and attitudes of managers and clinical engineers are significant in decision-making and in the implementation of the processes and maintenance of activities. In fact, all the taken measures reflect the attitude of the owners of the processes. In this regard, an interviewee stated that:

> Clinical engineers and users do not have sufficient knowledge with the term maintenance management (P8).

Another interviewee argued that:

> Maintenance and repair are analogous to prevention and treatment in that treatment is more costly [...] Most medical facilities do not take maintenance seriously (P13).

*Purchasing management*
Effective management in the clinical engineering department primarily requires a correct selection of medical devices. Therefore, purchasing medical equipment must occur following a specific procedure. The purchasing management objective is buying devices and

LOC_AR_00003061

JQME
25,1

equipment of the right quality, in the right quantity, at the right time, at the right price, and from the right source. One of the interviewees stated that:

> One of the objectives of maintenance is to purchase from reliable companies that there are on IMED website and this prevents the contraband (P2).

Another participant mentioned:

**138**

> Purchase of medical equipment should be based on hospital's need (P3).

Our findings showed all the influential factors (mentioned in this study) on MEMM are interrelated to each other Figure 1.

Three factors including quality control, inspection and service are complementary to each other, indicating a mutual relationship among them. As can be observed, inspection includes monitoring quality control tests. Education is relevant to human resource factor, which includes user and clinical engineer training. Preventive maintenance and repair are two types of complementary maintenance programs. Preventive maintenance includes management processes to increase durability of a device and prevent its failure. Repair includes management processes to restore physical conditions, safety, and performance of the systems after failure. Documentation is associated with each factor, meaning that all maintenance administrative processes should be documented and saved. Design and implementation are the setting for this framework. This indicates that all six factors are deployed and implemented through design and implementation.

## Discussion

This study provided an in-depth and rich description of the influential factors on maintenance management. Our findings directly pointed out the importance of factors on affecting maintenance management and the related concepts were extracted. One of the studies concluded in developing countries reported that the useful life of the equipment under regular maintenance programs were on average double the useful life of the equipment that was not covered through this program (Halbwachs, 2000). This study showed that consideration of influential factors on maintenance management results increased patient satisfaction and cost reduction. Our findings are consisting with those of Hasper (1991) who reported that the implementation of medical equipment management program boosts customer satisfaction while minimizing costs (Hasper, 1991).



**Figure 1.**
Framework of medical equipment maintenance management (MEMM)

Almost all participants stated that complete and correct implementation of preventive maintenance is effective in reducing medical device failure. In the study about the influence of maintenance on the survival medical equipment, concluded that preventive maintenance implementation is effective in increasing device longevity (Khalaf *et al.*, 2013).

The first step in the proper management of medical equipment is planning (Aghaei, 2003). According to the findings of this study, poor planning and management infrastructure are the main culprits behind weaknesses in maintenance management.

Conducted in one of the Latin American countries, showed that there is a dire shortage in the number of qualified people to work with medical technical equipment maintenance. He found that 44 percent of medical instruments were lacked even engineering or medical technicians (Maxwell, 1985). Our study showed that inspection and maintenance of medical equipment is effective for its function. Also another study surveyed the medical equipment management systems in developing countries and demonstrated that 60 percent of medical equipment cannot be used for different reasons. In Iran, nearly 60 percent of medical devices in hospitals affiliated to medical sciences universities had not been inspected by the staff (Noori Tajer *et al.*, 2002). Our findings prove that the inspection of medical equipment is essential and a necessary factor for maintenance management. Performance and safety control, activities documentation, using computerized systems for preventive maintenance were among the issues that mentioned in the designing a model of Medical Equipment Management for Iranian hospitals (Nasiripour and Jadidi, 2008). Also, the Walsh's study suggests that by creating an efficient and proper maintenance system, capital equipment can be preserved, and this could improve the effectiveness of hospital facilities (Walsh, 1995). While confirming the above-cited studies, our findings showed that consideration of the factors affecting maintenance management is necessary for reducing costs as well as decreasing amortization and failure of medical devices and disorder in the treatment of patients.

In terms of applicability, repair and maintenance, medical and hospital instruments are not well kept in developing and even developed countries. This negligence leads to waste of resources in the health sector (Boisvert, 1978). The investigated wards in the study failed to meet the expectations and requirements in terms of medical device management. There were not in desirable situations for the usability of devices and use of informational electronic system in these hospitals (Dargahi *et al.*, 2014).

Management of biomedical engineering in hospitals involved experienced and expert staff who takes over the purchase, procurement and distribution of medical and laboratory equipment is instrumental in cost-effectiveness (Remmelzwaal, 1997). In this regard, our findings showed that provision of trained and expert human resources is the first and pivotal step in establishing an effective maintenance program and purchasing management affecting maintenance management. Furthermore, in our findings, most of the participants stated that maintenance is most often ignored. Some of the findings of the present study had already been discussed in the cited studies, but they were striking differences in objectives. Policy makers and managers can provide a context for evidence informed decision making using the results of this study to improve the efficiency of maintenance management in health care system.

*Strengths and limitations*
In our knowledge, this study is the first comprehensive study of its-kind addressing all of the factors affecting an effective and efficient MEMM. It offers a comprehensive structure for evaluating the status of MEMM.

Although interviewees provided in-depth and convincing information on the issue, but lack of enough information concerning the concept of maintenance management was the most notable challenge. Many of the participants similarly defined the concepts of preventive maintenance and maintenance management.

LOC_AR_00003063

JQME
25,1

140

## Recommendations

This study provided insight into which elements of the MEMM the participants found most helpful. The findings demonstrate that implementation of a proper maintenance management depends on resources including financial, human resources, physical, documentation, training and education, IPM, quality control, design and implementation, and service. Moreover, these factors play an important role in developing and adopting the most effective maintenance strategies. A major share of hospital costs is allocated to the procurement of medical equipment annually. However, the related management or maintenance is particularly weak in hospitals. It is essential for any health-care facility to implement a maintenance program for medical equipment. An effective maintenance management of medical devices increases efficiency and productivity of health technology resources, which is especially important when resources are limited. This leads patients to have access to medical equipment that can provide them with an accurate diagnosis, effective treatment or appropriate rehabilitation. The findings of this study underscore the fact that fulfillment of these objectives requires establishing a framework for the development of MEMM. Several factors affect the MEMM considering each of which is important for improving functionality of the devices and providing health care services to the patients. Also, in our context, most medical engineers are less informed about the concept of maintenance management and that explains why there is little attention to maintenance of medical equipment. The extracted factors can help to managers and engineers in evaluating maintenance management systems and offer options and interventions to decision makers or policy makers for the improvement of such systems. This framework provides for the development of national essential health technology programs that will have a positive impact on the burden of disease and ensure effective use of resources. Also, it can help to identify and modify innovative technologies that can have a significant impact on public health. Further research into maintenance management is warranted to improve quality in this field. Themes derived from this study can be subjects for further research in Iran and in other countries.

## References

Aghaei, H.B. (2003), "Study of the state of the maintenance management of medical equipment in NASA hospitals", thesis Master of Health Services Management, Tehran.

Ameriyoon, A., Hamze Aghaei, B. and Mohebi, H. (2007), "Assessing the medical equipment maintenance management at two hospitals military in contery", *Journal of Military Medicine*, Vol. 9 No. 3, pp. 189-195.

Ameriyoon, A., Tofighi, S. and Zaboli, R. (2006), "Assessing the medical equipment maintenance management at selected hospitals affiliated with the medical sciences universities in Tehran (2003-2005)", *Journal of Health Administration*, Vol. 9 No. 23, pp. 17-24.

Ameriyoon, A., Zaboli, R., Shokri, M., Aghighi, A. and Sadeghi, A. (2014), "Study of medical equipment maintenance management in NAJA hospitals", *Journal of Police Medicine*, Vol. 3 No. 2, pp. 107-114.

Augustýnek, M., Laryš, D., Kubiček, J., Marešová, P. and Kuča, K. (2018), "Use effectiveness of medical devices: a case study on the deployment of ultrasonographic devices", *Therapeutic Innovation & Regulatory Science*, Vol. 52 No. 4, pp. 499-506.

Boisvert, F.A. (1978), "Considerations in developing an effective biomedical equipment repair program", *Journal of Clinical Engineering*, Vol. 3 No. 1, pp. 61-63.

Boyd, C.O. (1989), "From practice to grounded theory: qualitative research in Nursing Menlo Park, CA: Addison-Wesley", *Nursing Science Quarterly*, Vol. 2 No. 1, pp. 53-54.

Bracale, M. and Pepino, A. (1994), "Medical technologies in developing countries: a feasibility study on the maintenance of medical equipment in Ethiopia", *Medical and Biological Engineering and Computing*, Vol. 32 No. 2, pp. 131-137.

LOC_AR_00003064

Campbell, J.D. and Jardine, A.K. (2001), *Maintenance Excellence: Optimizing Equipment Life-Cycle Decisions*, CRC Press, Boca Raton, FL.

Cheng, M. and Dyro, J.F. (2004), "Good management practice for medical equipment", in Dyro, J.F. (Ed.), *Handbook of Clinical Engineering*, Chapter 31, Elsevier Academic Press, Cambridge, MA, pp. 108-110.

Dargahi, H., Forouzanfar, F., Bakhtiari, M. and Rajabnejad, Z. (2014), "Study of medical devices management with the approach of evaluation of usability in Tehran University of Medical Sciences Hospitals", *Journal of Hospital*, Vol. 13 No. 1, pp. 43-51.

Downe-Wamboldt, B. (1992), "Content analysis: method, applications, and issues", *Health Care for Women International*, Vol. 13 No. 3, pp. 313-321.

Duffuaa, S., Al-ghamdi, A. and Al-amer, A. (2002), "Quality function deployment in maintenance work planning process", *Proceedings of the 6th Saudi Engineering Conference KFUPM, Vol. 4, Dhahran, Kingdom of Saudi Arabia, December*, pp. 503-512.

Dyro, J.F. (Ed.) (2004), "Equipment control and asset management, computerized maintenance management systems", *Clinical Engineering Handbook*, Chapter 35, Vol. 1, Elsevier Academic Press, Cambridge, MA, pp. 122-130.

Halbwachs, H. (2000), "Maintenance and the life expectancy of healthcare equipment in developing economies", *Health Estate*, Vol. 54 No. 2, pp. 26-31.

Hasper, J.R.K. (1991), "Centralized maintenance responsibilities: a case study", *Journal of Clinical Engineering*, Vol. 16 No. 3, pp. 191-206.

Hsieh, H.-F. and Shannon, S.E. (2005), "Three approaches to qualitative content analysis", *Qualitative Health Research*, Vol. 15 No. 9, pp. 1277-1288.

Jamshidi, A., Rahimi, S.A., Ait-kadi, D. and Bartolome, A.R. (2014), "Medical devices inspection and maintenance; a literature review", *IIE Annual Conference. Proceedings, Institute of Industrial and Systems Engineers (IISE)*, p. 3895.

Khalaf, A., Hamam, Y., Alayli, Y. and Djouani, K. (2013), "The effect of maintenance on the survival of medical equipment", *Journal of Engineering, Design and Technology*, Vol. 11 No. 2, pp. 142-157.

Kinley, C.A. (2012), *Healthcare Technology: A Strategic Approach to Medical Device Management*, East Tennessee State University, Johnson City.

Krippendorff, K. (2004), *Content Analysis: An Introduction to its Methodology*, Sage, New York, NY.

Mahady, J., Mccullaghi, J., Grainger, P.B. and Kinsella, R. (2002), "Equipment management systems for use in developing countries", *IEE Seminar on Appropriate Medical Technology for Developing Countries IEE, London, February 6*.

Maxwell, R.J. (1985), "Resource constraints and the quality", *Lancet*, Vol. 34 No. 2, pp. 936-939.

Morse, J.M. and Field, P.A. (1995a), *Qualitative Research Methods for Health Professionals*, Vol. 2, Sage Publications, Thousand Oaks, CA.

Nasiripour, A.A. and Jadidi, R. (2008), "Designing a model of medical equipment management for Iranian hospitals, 2007", *Arak Medical University Journal*, Vol. 11 No. 1, pp. 97-108.

Noori Tajer, M., Dabaghi, F., Mohamadi, R. and Haghani, H. (2002), "A survey of maintenance and cost of medical equipment in hospitals associated of Iran university of medical sciences and health services (2000-2001)", *Razi Journal of Medical Sciences*, Vol. 9 No. 30, pp. 445-454.

Painter, F. and Baretich, M. (2011), *Medical Equipment Maintenance Programme Overview*, World Health Organization Press, Geneva.

Palesh, M., Tishelman, C., Fredrikson, S., Jamshidi, H., Tomson, G. and Emami, A. (2010), "We noticed that suddenly the country has become full of MRI. Policy makers' views on diffusion and use of health technologies in Iran", *Health Research Policy and Systems*, Vol. 8 No. 9, pp. 1-10.

Pope, C., Ziebland, S. and Mays, N. (2000), "Qualitative research in health care: analysing qualitative data", *British Medical Journal*, Vol. 320 No. 7227, pp. 114-116.

JQME
25,1

Remmelzwaal, B.L. (1997), "The effective management of medical equipment in developing countries", *FAKT–Consult for Management, Training and Technologies GmbH, Project (390)*, available at: www.faktconsult.de/healthcare_tech(1997) (accessed March 29, 2008).

Sandelowski, M. (1995), "Qualitative analysis: what it is and how to begin", *Research in Nursing & Health*, Vol. 18 No. 4, pp. 371-375.

Stiefel, R.H. (2009), *Medical Equipment Management Manual*, 7th ed., AAMI, Annapolis Junction, MD.

Tong, A., Sainsbury, P. and Craig, J. (2007), "Consolidated criteria for reporting qualitative research (COREQ): a 32-item checklist for interviews and focus groups", *International Journal for Quality in Health Care*, Vol. 19 No. 6, pp. 349-357.

Walsh, T.J. (1995), "Total quality management, the ISO 9002 protocol and reconditioned diagnostic imaging equipment", *Proceedings of the National Forum: Military Telemedicine On-Line Today Research, Practice, and Opportunities, IEEE*, pp. 173-177.

Wang, B. (2012), "Medical equipment maintenance: management and oversight", *Synthesis Lectures on Biomedical Engineering*, Vol. 7 No. 2, pp. 1-85.

Wang, B. and Levenson, A. (2000), "PEER REVIEW PAPER: equipment inclusion criteria-a new interpretation of JCAHO's medical equipment management standard", *Journal of Clinical Engineering*, Vol. 25 No. 1, pp. 26-35.

Wang, B. and Rice, W.P. (2003), "JCAHO's equipment inclusion criteria revisited–application of statistical sampling technique", *Journal of Clinical Engineering*, Vol. 28 No. 1, pp. 37-48.

Wang, B., Eliason, R.W., Richards, S.M., Hertzler, L.W. and Koenigshof, S. (2008), "Clinical engineering benchmarking: an analysis of American acute care hospitals", *Journal of Clinical Engineering*, Vol. 33 No. 1, pp. 24-27.

Wang, B., Rui, T., Fedele, J., Balar, S., Alba, T., Hertzler, L.W. and Poplin, B. (2012), "Clinical engineering productivity and staffing revisited: how should it be measured and used?", *Journal of Clinical Engineering*, Vol. 37 No. 4, pp. 135-145.

Wang, Z.H. (2014), "Application research on the internet in the management of medical equipment maintenance", *Applied Mechanics and Materials*, Vols 651-653, pp. 1535-1538.

WHO (2011), "Medical equipment maintenance programme overview", World Health Organization Press, Geneva, available at: www.who.int

**Further reading**

Miles, M.B. and Huberman, A.M. (1994), *Qualitative Data Analysis: An Expanded Sourcebook*, Sage, New York, NY.

Morgan, D.L. (1993), "Qualitative content analysis: a guide to paths not taken", *Qualitative Health Research*, Vol. 3 No. 1, pp. 112-121.

Morse, J.M. and Field, P.-A. (1995b), *Nursing Research: The Application of Qualitative Approaches*, Nelson Thornes, Cheltenham.

National Medical Device Directorate (2009), "N. M. D. medical equipment maintenance management criteria of the Ministry of Health and Medical Education of Iran", available at: www.fda.gov.ir/uploads/59654f7fc6cbc314a8be0776c15f08fe.pdf

**Appendix. Interview guide**

Number of Interviewee:

Date and venue:

Position of interviewee:

1. Please introduce yourself and briefly describe your work experience.
2. Please explain your general perception of medical equipment maintenance management.
3. Please explain the role of medical equipment maintenance management in hospitals?
4. What is the process of medical equipment maintenance in your hospital?
5. How is the medical equipment maintenance management in hospitals currently evaluated? What are the bottlenecks and shortcomings? Is there an instruction for evaluation?
6. What factors affect the assessment of medical equipment maintenance management in hospitals?
7. What do you know about the most important activities and responsibilities associated with the repair and maintenance of medical equipment?
8. Do the clinical engineers and medical equipment users have the necessary training in this area?
9. What are the challenges and obstacles to implementation of the medical equipment maintenance in health centers, in special hospitals?
10. What are your suggestions for improving medical equipment maintenance management?
11. As a final question, is there anything else you would like to say about medical equipment maintenance management?

**About the authors**
Rona Bahreini is MSc Candidate in the School of Health Management and Medical Informatics, Tabriz University of Medical Sciences, Tabriz, Iran. She holds BA in Health Care Administrative from the School of Health Management and Medical Informatics in 2011.The current review is a part of MSc Degree in Management and Medical Informatics.

Dr Leila Doshmangir is PhD in Health Policy. She was born in 1983. She is Graduated BA in Health Care Administrative from Tehran University of Medical Sciences in 2006, MS in Health Care Administrative from Tehran University of Medical Sciences in 2009 and PhD in Health Policy from Tehran/Iran University of Medical Sciences in 2014. Her current research interests are centered on the field of health policy, qualitative research, research methodology, health care administrative, etc. Currently she is working as Teacher at the Tabriz University of Medical Sciences. She is Vice Chancellor, Center of Excellence in Health Management. She is also a member of the Health Policy Council of Tabriz University of Medical Sciences. Dr Leila Doshmangir is the corresponding author and can be contacted at: doshmangirl@tbzmed.ac.ir

Dr Ali Imani is PhD in Pharmacoeconomics and Pharmaceutical Management. He was born in 1980. He graduates MS in Health Economics from School of Health management in 2007, Iran University of Medical Sciences, Tehran, PhD from University of Shahid Beheshti Medical Science, Tehran, Iran in 2012. Currently he is working as Teacher at the Tabriz University of Medical Sciences. He is also a member of the Iranian Association of Pharma Management and Economics, the International Society for Pharmacoeconomics and Outcomes Research, health services management research center, etc. His current research interests are centered in the field of economic evaluation in health care, health economics, managerial finance, etc.

For instructions on how to order reprints of this article, please visit our website:
**www.emeraldgrouppublishing.com/licensing/reprints.htm**
Or contact us for further details: **permissions@emeraldinsight.com**

Reproduced with permission of copyright owner. Further reproduction prohibited without permission.

# EXHIBIT 21

LOC_AR_00003069

LAUREN GOODE     GEAR   05.19.2020 12:00 PM

# Right-to-Repair Groups Fire Shots at Medical Device Manufacturers

A robust resource for DIY smartphone repairs is focusing next on ventilators and other critical medical equipment.



PHOTOGRAPH: BUDA MENDES/GETTY IMAGES

LOC_AR_00003070

**THE WEBSITE IFIXIT** has long been known for its electronics repair kits and for its very public stance that repair manuals should be accessible to everyone. That's one of the foundational arguments of the broader right-to-repair movement, which lobbies that regular consumers should be able to repair the products they've purchased—everything from smartphones to washing machines to farming equipment—without violating a warranty. Now, in the time of Covid-19, iFixit and a prominent consumer interest group are tackling a more immediate concern: access to repair manuals for medical devices.

The company said today it's releasing what it calls the "most comprehensive medical equipment service database in the world." The collection of thousands of files is supposed to help biomedical engineering technicians—the techs who update or fix medical equipment on site at health care facilities—repair everything from imaging equipment to EKG monitors to ventilators. iFixit founder and CEO Kyle Wiens (who also contributes to WIRED's Ideas section) called it an "absolutely massive" undertaking for iFixit, a project that took more than two months to coordinate and required help from 200 volunteers.

The rollout of the iFixit database is also coming on the heels of a letter sent to state legislators by Calpirg, the California arm of the US Public Interest Research Group, with more than 300 signatures from hospital repair experts. In the letter, the group calls for loosened restrictions on repairs of medical equipment and more cooperation from makers of medical devices.

"Covid-19 is putting incredible stress on our medical system, including the work of hospital biomedical repair technicians," says Emily Rusch, Calpirg's executive director. Repair and maintenance issues have increased on devices like ventilators, she said, which are being used around the clock. "While some manufacturers provide service information, other manufacturers make it hard to access manuals, read error logs, or run diagnostics tests."

Many of the arguments that Calpirg and iFixit make are similar to the right-to-repair arguments that have been made against giant tech companies like Apple and Microsoft—and they're likely to rankle medical device makers as much as they have electronics makers. If you own an iPhone or an Xbox, you should be able to repair it yourself or get it repaired by a technician of your choice, goes the thinking of right-to-repair groups; while lobbyists on

behalf of the tech giants maintain that allowing anyone and everyone to tinker with their electronics could pose serious safety and security concerns.

But the debate over medical device repairs is different in that both proponents of the right to repair and the trade groups that argue for stricter repair regulations are ultimately sounding the same alarm: They're concerned about patient safety. Biomedical engineers say they want easier access to repair manuals so that they can better and more quickly fix the medical equipment needed to save lives. Conversely, organizations like the Medical Imaging and Technology Alliance say they want to see more quality control and regulatory requirements put in place around the work medical technicians do because that, they believe, will save lives.

"If the iPhone isn't fixed, you're not going to have a phone," says Nader Hammoud, manager of biomedical engineering at John Muir Health in Walnut Creek, California, and a supporter of the Calpirg initiative to reduce repair restrictions. "If you don't fix a vent, the patient is dead."

---

***Read all of our coronavirus coverage*** here.

Wiens said he had been aware of the needs of biomedical repair technicians for years but had decided not to post anything publicly about it, whether that meant issuing statements or publishing a repair guide on iFixit.com. His thinking changed in mid-March, when scattered stories about the coronavirus suddenly morphed into a full-fledged global pandemic.

"It all crystallized for me when we were seeing ventilators in Italy fail, and a [startup group] was 3D-printing valves for them," Wiens says. "And we started thinking, OK, if ventilators are being used more than normal, they might fail more than normal, and the biomed technicians are going to be on the front lines alongside everyone else."

On March 18, Wiens put out a call to fixers, medical professionals, and biomedical technicians. He asked them to submit model numbers for critical equipment like ventilators, BiPAP machines, and anesthesia machines, as well as fallibility estimates and ideas for what parts might need to be replaced. Essentially, he wanted to crowdsource one of the biggest databases ever for medical-device repair information.

LOC_AR_00003072

Wiens' efforts were not unprecedented. For several years now, a biomedical engineer in Tanzania named Frank Weithoner has maintained a website for medical-device repair manuals, called <u>Frank's Hospital Workshop</u>. But that site was created to support his colleagues in developing countries, Weithoner said in an email to WIRED. It hosts about 4,500 device manuals. In some cases, file downloads have been prohibited by device makers. Frank is also just one guy. Wiens wanted to go bigger.

"There are these apocryphal hard drives floating around the biomed community, filled with PDFs that they've collected over the years," Wiens says. "And they're only as good at doing their job as that folder filled with PDFs is."

Files started flooding into iFixit, with one particular folder containing as many as 50,000 files. Two weeks into the project, iFixit was overwhelmed. The company reached out to researchers at <u>the Maintainers</u> and the <u>American Library Association</u> and solicited volunteers. After two months of work, and with the help of more than 200 archivists and librarians, iFixit launched its searchable collection. The database was deduplicated and consolidated, and it contains more than 13,000 files—repair instruction manuals for everything from ventilators to ultrasound machines to X-ray equipment to anesthesia systems. Wiens says most of the files were shared with iFixit anonymously, but that he believes they were acquired legitimately and that hosting them is legal under the US Copyright Act.

LOC_AR_00003073



## Everything You Need to Know About the Coronavirus

Here's all the WIRED coverage in one place, from how to keep your children entertained to how this outbreak is affecting the economy.

---

Of course, Covid-19 has exposed not only our biological vulnerabilities but also our structural, society, and political shortcomings. Producing, procuring, and distributing all kinds of medical equipment is a complicated labyrinth outside of a pandemic; within the context of a global pandemic, every move or maneuver has the potential for more dire consequences.

The US medical device industry, the largest in the world, is also a multibillion-dollar business and a highly regulated industry, one that is protective of its proprietary equipment. That means repairing a medical device isn't always a simple process of asking a biomedical technician to do a quick fix during surgery, or to run the device down to the lab in the hospital's basement to replace a part. It requires navigating each device's specific requirements for repair, a process that can take days.

Weins tends to position iFixit as a renegade outfit that distances itself from the broader device industry and its trade groups, and has said that preventing access to this kind of information is "particularly morally fraught during a pandemic." Many biomedical technicians agree. And in

LOC_AR_00003074

April, <u>five US state treasurers penned a letter to ventilator manufacturers</u> asking them to make their repair manuals more accessible.

"It's not that it *could* mean life or death—it's definitely life or death, especially during a pandemic," John Muir Health's Hammoud said during a virtual briefing on Monday. "I had situations in the past, before Covid-19, where we had to come into the hospital in the middle of the night and try to pull parts from different devices, different sources, because a patient was waiting on a device. We've had to do this multiple times throughout my career." Hammoud recalled an instance where he sought out a replacement part that would typically cost around $80, only to be told by the original device maker that the manufacturer would have to come in and fix the device at a cost of around $4,000.

Paul Kelley, the director of biomedical engineering at Washington Hospital in Fremont, California, says that in the 40 years he's been in the field, he's seen a notable change. "It's getting more and more frustrating," he says. "We can do less and less work on equipment. We're getting less and less documentation. Training is getting harder, and parts are getting scarcer."

Hammoud, Kelley, and others in support of the Calpirg letter declined to name the specific device manufacturers they believe are the most restrictive when it comes to repairs. Hammoud said that's because he doesn't see their group as "fighting" the device makers, but rather asking for cooperation. Wiens is more candid: He says giants like Medtronic and GE tend to be more restrictive, while other companies, like China-based Mindray, are doing a better job than others in terms of public availability of repair information.

Peter Weems, senior director of strategic operations and policy at the Medical Imaging and Technology Alliance (MITA), made a remark that was eerily similar to Hammoud's: "With other goods, if something like a cell phone is improperly repaired and then it fails to perform, the worst-case scenario is that you have to replace the device. Whereas if a medical device is improperly repaired, there's the risk of injury to the patient or the operator, or death." But Weems is making this case on behalf of the medical device industry, particularly the medical imaging segment, and not the right-to-repair movement. MITA has around 50 member companies, ranging from large multinational companies such as GE, Siemens, and Philips, to smaller companies that make components or singular devices.

LOC_AR_00003075

There are some key distinctions between other right-to-repair initiatives and this one, Weems pointed out. This includes the fact that in the US, manufacturers of medical devices are regulated by the Food and Drug Administration and have to report deaths, serious injuries, or other major malfunctions to a governing body. Third-party repair services aren't necessarily held to the same safety or regulatory requirements.

"What we've been working on with the FDA and Congress is applying consistent requirements for everybody who services a medical device, and these are common sense things such as making yourself known to the FDA via registration," Weems says. Right now the FDA estimates there's anywhere from 16,000 to 20,000 biomedical engineers working in the US. By getting a firmer grasp on how many technicians there are, the agency can start to implement a quality-management system.

It's an effort that goes back to 2016, when MITA lobbied Robert Califf, who was then the FDA's commissioner, for tighter restrictions around third-party repairs of medical devices. It even sought to redefine terms like "repair," "refurbish," or "remanufacture," as the terms were allowing for a gray area in which repair technicians—those who didn't work directly for the device manufacturers—could operate. There's the risk of direct bodily harm to patients if a medical imaging device isn't functioning properly, the alliance argued; but also, there's the risk that device makers would face liabilities or suffer "diminished brand value." Follow-up reports issued by MITA in 2018 and 2019 underscored that inadequate repair services, in some cases described as "remanufacturing," could result in "unsafe environments for patients and users of equipment."

In other words, right-to-repair advocates continue to clamor for looser restrictions and fewer roadblocks around the repair of personal devices, large appliances, and medical equipment; while representatives for the businesses that make these devices will continue to urge lawmakers to put standards and regulations in place that would protect their products. If there's one thing these groups seem to agree on though, it's that the stakes are now suddenly much higher.

# More From WIRED on Covid-19

LOC_AR_00003076

- How much is a human life <u>actually worth</u>?
- The pandemic slams Main Street: <u>"We're trying to stay alive"</u>
- Everything we know about Covid-19 <u>antibody tests (so far)</u>
- Ways to stay calm <u>and relax during quarantine</u>
- FAQs and your guide to <u>all things Covid-19</u>
- Read all of <u>our coronavirus coverage here</u>

---



<u>Lauren Goode</u> is a senior writer at WIRED covering products, apps, services, and consumer tech issues and trends. Prior to WIRED she was a senior editor at The Verge and worked at Recode, AllThingsD, and The Wall Street Journal before that. Goode is a graduate of Clark University and Stanford... <u>Read more</u>

SENIOR WRITER

---

## Featured Video



**5 Mistakes to Avoid as We Try to Stop Covid-19**

LOC_AR_00003077

# EXHIBIT 22

LOC_AR_00003078

**U.S. FOOD & DRUG**
ADMINISTRATION

May 2018

# FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices

In accordance with Section 710 of the Food and Drug Administration Reauthorization Act of 2017 (FDARA)

LOC_AR_00003079



## Executive Summary

The Food and Drug Administration Reauthorization Act (FDARA) became law on August 18, 2017. Section 710 of FDARA charges the Secretary of Health and Human Services, acting through the Commissioner of Food and Drugs, to issue a report on the continued quality, safety, and effectiveness of medical devices with respect to servicing.

FDA has considered information including but not limited to the information presented at a public workshop, responses to a request for comments, and evaluation of objective evidence related to the quality, safety, and effectiveness of medical device servicing in the compilation of this report. Stakeholders have differing views about the quality, safety, and effectiveness of servicing performed by original equipment manufacturers (OEMs) and third party entities, and the need for imposing additional regulation. Based on the available information, we have concluded:

- The currently available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing, including by third party servicers, of medical devices that would justify imposing additional/different, burdensome regulatory requirements at this time;
- Rather, the objective evidence indicates that many OEMs and third party entities provide high quality, safe, and effective servicing of medical devices;
- A majority of comments, complaints, and adverse event reports alleging that inadequate "servicing" caused or contributed to clinical adverse events and deaths actually pertain to "remanufacturing" and not "servicing"; and
- The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system.

We believe the currently available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing of medical devices, including by third party servicers, that would justify imposing additional/different burdensome regulatory requirements at this time. Although we do not believe that additional, formal regulatory action is warranted, based on the available information and findings, we intend to pursue the following actions:

1. Promote the Adoption of Quality Management Principles;
2. Clarify the Difference Between Servicing and Remanufacturing;
3. Strengthen Cybersecurity Practices Associated with Servicing of Medical Devices; and
4. Foster Evidence Development to Assess the Quality, Safety and Effectiveness of Medical Device Servicing.

As part of its 2018-2020 strategic priorities, FDA's Center for Devices and Radiological Health (CDRH) has committed to establishing "Collaborative Communities." The hallmark of a Collaborative Community, is a continuing forum where public and private sector members proactively work together to solve both shared problems and problems unique to other members in an environment of trust and openness, where participants feel safe and respected to communicate their concerns. Members share a collective responsibility to help each other obtain what they need to be successful. We believe there may be value in the creation of a public-private forum, such as a Collaborative Community, to address the challenges associated with delivering high quality, safe, and effective servicing of medical devices. If there is sufficient interest and broad willingness to participate by stakeholder groups, we would facilitate the creation of such a community.

LOC_AR_00003080



## Table of Contents

Preface ............................................................................................................................................... iii

1  Introduction ................................................................................................................................... 1

2  Existing Authorities and Regulations ............................................................................................ 3

   2.1  FDA's Authority and Regulatory History ................................................................................ 3

      2.1.1  Electronic Product and Radiation Control ..................................................................... 5

      2.1.2  Medical Device Reporting ............................................................................................. 6

   2.2  Centers for Medicare and Medicaid Services and the Joint Commission ............................ 8

   2.3  U.S. Federal Trade Commission ........................................................................................... 10

   2.4  State Regulations ................................................................................................................. 10

3  Review of Responses to FDA's March 2016 Federal Register Request for Comments ................ 11

   3.1  Quality Management System ............................................................................................... 12

   3.2  Training ................................................................................................................................ 12

   3.3  Availability and Use of Quality Replacement Parts ............................................................. 13

   3.4  Access to Device-Specific Service Information .................................................................... 13

4  Public Workshop .......................................................................................................................... 14

   4.1  Stakeholder Presentation Summaries ................................................................................. 15

   4.2  Panel Discussion Summaries ............................................................................................... 17

5  Summary of Evidence Pertaining to Medical Device Servicing .................................................... 19

   5.1  Number of Service and Repair Entities ............................................................................... 19

   5.2  Literature Review ................................................................................................................. 19

   5.3  ECRI Institute Analysis ......................................................................................................... 20

   5.4  Medical Device Reports (MDRs) .......................................................................................... 21

   5.5  Complaints ........................................................................................................................... 22

6  Summary of Key Issues and On-Going Activities ......................................................................... 23

   6.1  Promote the Adoption of Quality Management Principles by Medical Device Servicers ........... 23

   6.2  Clarify the Difference Between Servicing and Remanufacturing ........................................ 24

   6.3  Strengthen Cybersecurity Practices Associated with Servicing of Medical Devices ................ 25

   6.4  Foster Evidence Development to Assess the Quality, Safety, and Effectiveness of Medical Device
Servicing ................................................................................................................................ 25

7  Conclusion .................................................................................................................................... 26

LOC_AR_00003081



## Preface

The Food and Drug Administration Reauthorization Act of 2017 (FDARA)[1] became law on August 18, 2017. Not later than 270 days after enactment, section 710 of FDARA charges the Secretary of Health and Human Services, acting through the Commissioner of Food and Drugs, to post on the Food and Drug Administration (FDA) internet website a report on the continued quality, safety, and effectiveness of medical devices with respect to servicing.[2] The report shall contain:

(1) the status of, and findings to date, with respect to, the proposed rule entitled ''Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices Performed by Third-Party Entities and Original Equipment Manufacturers; Request for Comments'' published in the Federal Register by the Food and Drug Administration on March 4, 2016 (81 Fed. Reg. 11477);

(2) information presented during the October 2016 public workshop entitled ''Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices Performed by Third-Party Entities and Original Equipment Manufacturers'';

(3) a description of the statutory and regulatory authority of the Food and Drug Administration with respect to the servicing of devices conducted by any entity, including original equipment manufacturers and third party entities;

(4) details regarding how the Food and Drug Administration currently regulates devices with respect to servicing to ensure safety and effectiveness, how the agency could improve such regulation using the authority described in paragraph (3), and whether additional authority is recommended;

(5) information on actions the Food and Drug Administration could take under the authority described in paragraphs (3) and (4) to assess the servicing of devices, including the size, scope, location, and composition of third party entities;

(6) information on actions the Food and Drug Administration could take to track adverse events caused by servicing errors performed by any entity, including original equipment manufacturers and third party entities;

(7) information regarding the regulation by States, the Joint Commission, or other regulatory bodies of device servicing performed by any entity, including original equipment manufacturers and third party entities; and

(8) any additional information determined by the Secretary (acting through the Commissioner) to be relevant to ensuring the quality, safety, and effectiveness of devices with respect to servicing.

This report is intended to fulfill the requirements of Section 710. Appendix A contains a cross reference between the congressionally mandated report elements and the corresponding sections in this document.

---

[1] Public Law No. 115-52.

[2] Section 710(c) of FDARA defines servicing to include, with respect to a device, refurbishing, reconditioning, rebuilding, remarketing, repairing, remanufacturing, or other servicing of the device. As discussed later in this report (see p. 3), and as set forth in FDA regulations, FDA does not consider remanufacturing to be a type of servicing. Nevertheless, given the definition in section 710(c) of FDARA, unless otherwise specified in this report (e.g., when expressly describing the differences in FDA regulation concerning servicing and remanufacturing), references to "servicing" throughout this report generally include all of the activities identified in section 710(c).

LOC_AR_00003082



# 1 Introduction

Medical devices encompass a vast array of different products, from patient examination gloves, stethoscopes, infant warmers, and powered wheelchairs to implantable cardiac pacing devices, magnetic resonance imaging scanners, large volume infusion pumps, and ventilators. The technologies, product lifecycles, device complexity, intended users, and environment of use are similarly diverse. While many devices are disposable and intended to be used a single time on a single patient, others have long lifespans, are used repeatedly on multiple patients, and necessitate preventive maintenance and repair during their service life. For these device types, such as medical imaging equipment, automated external defibrillators, endoscopes, and ventilators, proper servicing is critical to the continued safe and effective use of these products. The availability of timely, cost effective, quality maintenance, and repair of medical devices is critical both to the successful functioning of the United States (U.S.) healthcare system and to the continued quality, safety, and effectiveness of marketed medical devices in the U.S.

Over the years, some have expressed concerns about the quality of servicing provided by some third party entities who refurbish, recondition, rebuild, remarket, service, and repair medical devices (collectively, referred to as "servicing activities"). These concerns have related to allegations regarding third party entities' use of poor quality replacement parts, inadequately trained personnel, poorly documented servicing, and servicing that fails to restore the device to its specifications. Some have tied these alleged problems to third party entities' difficulty in obtaining necessary device servicing manuals, technical specifications, quality replacement parts, and access to training from original equipment manufacturers. These and other concerns impact the ability of entities to perform high quality, safe, and effective medical device servicing. Poor quality servicing may lead to poor device performance, device malfunction, and clinical adverse events.

Three key entities perform or participate in the servicing of medical devices, each playing an essential role. They are:[3]

> **Manufacturers ("Manufacturers," "Original Equipment Manufacturers," "OEMs" or "Remanufacturers")**: A manufacturer is any person who designs, manufactures, fabricates, assembles, or processes a finished device.[4] A remanufacturer is any person who processes, conditions, renovates, repackages, restores, or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use. Remanufacturers are considered to be manufacturers.[5] Regulatory requirements for medical device manufacturers are covered in Section 2 of this report. Note that, for electronic products, a manufacturer is any person engaged in the business of manufacturing, assembling, or importing electronic products.[6]

> **Healthcare Establishments and Hospital Based Service Providers ("Healthcare Establishments")**: Healthcare establishments are entities that provide clinical care to patients, and receive products and services from OEMs and other entities. Healthcare establishments may directly employ professionals (biomedical and clinical engineers, healthcare technology

---

[3] The definitions contained herein are for the purposes of this report only. They are not intended to imply any specific regulatory requirements and do not replace or supercede existing definitions or requirements.

[4] 21 CFR 830.3(o).

[5] 21 CFR 820.3(w).

[6] 21 CFR 1000.3(n).

LOC_AR_00003083



management professionals, etc.) that perform servicing activities, including maintenance and repair.

Certain healthcare establishments are subject to oversight by other governmental organizations such as the Centers for Medicare and Medicaid Services (CMS), state governments, or independent organizations such as The Joint Commission (TJC). These are described in more detail in Section 2 of this report. In addition, some healthcare establishments are subject to FDA medical device adverse event reporting requirements.

**Third Party Servicers and Independent Service Organizations (ISOs) ("Third Party Servicers," "ISOs," or "Third Party Entities")**:[7] These are entities, other than the manufacturer or healthcare establishments, that maintain, restore, refurbish, or repair a finished device after distribution, for purposes of returning it to the safety and performance specifications established by the manufacturer and to meet its original intended use.

The applicability and enforcement of regulatory requirements by FDA depends on the type of entity and the specific activities performed. An individual entity may be categorized into multiple roles based on the activities it performs. For example, an entity could be both an OEM and a third party servicer by manufacturing their own product, and servicing another company's product, respectively. Specific FDA authorities are described in Section 2 of this report.

Numerous definitions have been used and proposed for key terms associated with servicing, including refurbishing, reconditioning, rebuilding, remarketing, and remanufacturing. FDA used the following working definitions as part of its October 2016 public workshop:[8, 9]

**Recondition/Refurbish/Rebuild**: Restores a medical device to the OEM's original specifications or to be "like new." The device may be brought to current specifications if the change(s) made to the device do not significantly change the finished device's performance or safety specifications, or intended use. These activities include repair of components, installation of software/hardware updates that do not change the intended use of the original device, and replacement of worn parts.

**Service**: Repair and/or preventative or routine maintenance of one or more parts in a finished device, after distribution, for purposes of returning it to the safety and performance specifications established by the OEM and to meet its original intended use. Servicing excludes activities that change the intended use of the device from its original purpose, or change the safety or performance specifications. As FDARA section 710(c) includes "remanufacturing" in its definition of servicing, this report includes discussion of both activities. However, it is important to note that FDA considers remanufacturing to be a distinct activity from servicing that raises different concerns, and is thus regulated differently. See 21 CFR 820.3(w). FDA considers

---

[7] Historically, FDA has included healthcare establishments who service medical devices in its definition of third party servicers. For the purposes of this report, the terms third party servicer and third party entity exclude healthcare establishments.
[8] 81 FR 11477.
[9] Working Definitions; available at: http://wayback.archive-it.org/7993/20171114130552/https://www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM529024.pdf.

LOC_AR_00003084



servicing to include refurbishing, reconditioning, rebuilding, repairing, and remarketing, but not remanufacturing.

**Repair:** A type of servicing that returns a component to original specifications, including replacing non-working components or parts outside of routine or periodic upkeep for the current owner of the device.

**Remanufacture:** Process, condition, renovate, repackage, restore, or any other act done to a finished device that significantly changes the finished device's performance or safety specifications, or intended use.[10]

**Remarket:** The act of facilitating the transfer of a previously owned device from one party to another by sale, donation, gift, or lease.

This report summarizes FDA's existing rules and regulations, the responses to FDA's public outreach, the available evidence pertaining to the quality, safety, and effectiveness of medical device servicing, key issues, and on-going activities. The FDA continues to receive information related to these topics. This report reflects the information received through December 31, 2017.

## 2   Existing Authorities and Regulations

### 2.1 FDA's Authority and Regulatory History

FDA's authority to regulate the servicing of medical devices by any entity, including OEMs and third party servicers, is grounded in the agency's authority to regulate medical devices and radiation-emitting electronic products under the FD&C Act. The Medical Device Amendments (MDA)[11] to the FD&C Act, enacted on May 28, 1976, directed the FDA to issue regulations that classify all devices into one of three regulatory control categories, Class I, II, or III, depending upon the degree of regulation necessary to provide reasonable assurance of the safety and effectiveness of the device. In addition, the Radiation Control provisions of the FD&C Act[12] authorized FDA regulation of electronic products to protect the public health and safety from electronic product radiation. Some products meet both the definition of a "device"[13] and "electronic product."[14]

Under this statutory scheme, the safety and effectiveness of all medical devices is assured at least in part through general controls, which include the adulteration and misbranding provisions of the FD&C Act as well as requirements related to manufacturer registration and device listing, applicable good manufacturing practices, medical device reporting, reports of corrections and removals, unique device identification, and others described in FD&C Act section 513(a)(1)(A). The safety and effectiveness of class II and class III devices is also assured through special controls and premarket approval, respectively. Special controls may include performance standards, postmarket surveillance, patient registries,

---

[10] See 21 CFR 820.3(w).
[11] Public Law 94-295.
[12] These were originally enacted as the Radiation Control for Health and Safety Act of 1968 (Pubic Law 90-602).
[13] FD&C Act § 201(h).
[14] FD&C Act § 531(2). Although FDARA section 710 applies only to devices, FDA includes in this report some discussion of its regulation of electronic products that are also devices as it relates to servicing.

LOC_AR_00003085



guidelines, and other actions deemed necessary by FDA to provide a reasonable assurance of safety and effectiveness of the device.[15]

Thus the FD&C Act mandates that all devices have a reasonable assurance of safety and effectiveness and gives FDA the authority to establish regulatory controls to provide such. As discussed above, proper servicing is critical to the ongoing safety and effectiveness of many devices, particularly those used on numerous patients over long periods of time; poor quality servicing may lead to poor device performance, malfunction, and adverse events. Further, FDA believes it could interpret certain activities to which certain statutory requirements apply to include servicing.[16] Given these, and that the requirements of the FD&C Act continue to apply after a device is sold, for example, to a hospital or other user facility,[17] FDA believes it has statutory authority to regulate device servicing.

Although FDA generally has not enforced FD&C Act requirements with respect to servicing activities, FDA has consistently interpreted FD&C Act provisions to apply or potentially apply to servicing activities. Specifically—

- In 1987, FDA issued a Compliance Policy Guide (CPG) (7124.28) stating that reconditioners and rebuilders of medical devices were subject to requirements for establishment registration, premarket notification, labeling, FDA inspection, good manufacturing practices, and medical device reporting. The CPG identified a "reconditioner/rebuilder" as a person or firm that acquires ownership of a used device and, for purposes of resale or commercial distribution, "restores" or "refurbishes" the device to the manufacturer's original or current specifications or new specifications.[18]

- Following passage of the Safe Medical Devices Act in 1990, FDA began a rulemaking process to amend its regulations to "replace quality assurance program requirements with quality system requirements that include design, purchasing, and servicing controls."[19] At the time, "servicers" and "refurbishers" were included in the proposed rule, which explained: "FDA finds, as a result of reviewing service records, that the data resulting from the maintenance and repair of medical devices provide valuable insight into the adequacy of the performance of devices. Thus, FDA believes that service data must be included among the data manufacturers use to evaluate and monitor the adequacy of the device design, the quality system, and the manufacturing process. Accordingly, FDA is proposing to add general requirements for the maintenance of servicing records and for the review of these records by the manufacturer. Servicing controls will apply to servicing conducted or controlled by or for finished device manufacturers (e.g., conducted by a manufacturer, employee, agent or contractor). Manufacturers must ensure that the performance data is obtained as part of servicing are fed back into the manufacturer's quality system for evaluation as part of the overall device experience data."

---

[15] FD&C Act § 513(a)(1)(B)-(C) and (a)(2).

[16] See, e.g., section 510(a)-(j), establishing registration and listing requirements for those engaged in the manufacture, preparation, propagation, compounding, or processing of a device, and section 520(f), authorizing FDA to promulgate regulations requiring the methods used in, and the facilities and controls used for, the manufacture, design validation, packing, storage, and installation of a device to conform to current good manufacturing practice. But see section 519(g)(3) of the FD&C Act, specifically exempting routine servicing from correction and removal reporting requirements.

[17] See, e.g., section 301(k) of the FD&C Act, prohibiting the adulteration or misbranding of a device while held for sale after shipment in interstate commerce, and section 519(b) of the FD&C Act, requiring device user facilities to submit certain adverse event reports.

[18] 63 FR 67076.

[19] 58 FR 61952.

LOC_AR_00003086



- In 1996, FDA ultimately excluded servicers and refurbishers, as those terms relate to entities outside the control of the original equipment manufacturers, from the final quality system (QS) regulation.[20] In doing so, FDA explained that although "it believes that persons who perform such functions meet the definition of manufacturer," the nature of servicing involved "a number of competitive and other issues" that would be worked through in a separate rulemaking.[21] FDA has not undertaken such rulemaking. However, the 1996 final rule did establish certain requirements for manufacturers with respect to servicing[22] and make "remanufacturers" subject to the QS regulation by including them in the definition of manufacturer.[23] The rule defined remanufacturer as "any person who processes, conditions, renovates, repackages, restores, or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use."[24]
- In 1997, FDA published an advanced notice of proposed rulemaking announcing its intention to consider identifying the used device market, for regulatory purposes, in terms of "refurbishers," "as-is remarketers," and "servicers" whose activities do not significantly change the safety, performance, or use of a device, and to examine alternative approaches for regulating these firms. The Agency explained that it was reconsidering its approach to regulating these activities in light of "evolving industry practices" and "in order to ensure that particular remarketed devices [including refurbished, reconditioned, serviced, and as-is devices] meet suitable performance requirements for their intended uses, and are as safe as the originally marketed finished device." The agency identified certain general controls with which, at a minimum, compliance might be expected including representations of quality,[25] false or misleading labeling,[26] notification and recall,[27] reporting of corrections and removals,[28] medical device reporting,[29] device tracking,[30] and radiological health requirements.[31]
- In 1998, FDA revoked CPG 7124.28, which pertained to "reconditioners/rebuilders" as it overlapped with, and was inconsistent with, the 1996 rulemaking.[32]

Note that, with respect to devices subject to premarket approval, once a device has received marketing authorization, the FD&C Act generally requires changes that affect safety or effectiveness to be submitted to FDA for review and approval.[33]

### 2.1.1    Electronic Product and Radiation Control

The Electronic Product and Radiation Control (EPRC) regulation, issued under authority of the Radiation Control for Health and Safety Act of 1968, applies to electronic products, which include some products that are also medical devices. Per 21 CFR 1000.3(j), an electronic product is defined as (1) any manufactured or assembled product which, when in operation: (i) contains or acts as part of an

---

[20] 61 FR 52602.
[21] 61 FR 52602.
[22] See 21 CFR 820.200.
[23] 21 CFR 820.3(o).
[24] 21 CFR 820.3(w).
[25] FD&C Act § 501(c).
[26] FD&C Act § 502 and 21 CFR 801.
[27] FD&C Act § 518 and 21 CFR 810.
[28] FD&C Act § 519(f) and 21 CFR 806.
[29] FD&C Act § 519(a) and 21 CFR 803 and 804.
[30] FD&C Act § 519(e) and 21 CFR 821.
[31] FD&C Act §§ 532-542.
[32] 63 FR 67076.
[33] FD&C Act § 515(d)(6)(A)(i) and 21 CFR 814.39.

LOC_AR_00003087



electronic circuit and (ii) emits (or in the absence of effective shielding or other controls would emit) electronic product radiation, or (2) any manufactured or assembled article that is intended for use as a component, part, or accessory of a product described in paragraph (j)(1) of this section and which, when in operation, emits (or in the absence of effective shielding or other controls would emit) such radiation. Per 21 CFR 1000.3(k), electronic product radiation is defined as (1) any ionizing or non-ionizing electromagnetic or particulate radiation, or (2) any sonic, infrasonic, or ultrasonic wave, which is emitted from an electronic product as the result of the operation of an electronic circuit in such product.

Some activities regulated under the EPRC regulation may also be considered servicing. 21 CFR 1020.30(b) defines an assembler as any person engaged in the business of assembling, replacing, or installing one or more components into a diagnostic x-ray system or subsystem. The term includes the owner of an x-ray system or his or her employee or agent who assembles components into an x-ray system that is subsequently used to provide professional or commercial services. Under 21 CFR 1020.30(d), assemblers who install certified components are required to follow the instructions of their respective manufacturers. All assemblers who install diagnostic x-ray systems and certified components must submit reports of assembly to FDA, the purchaser, and the State agency, per 21 CFR 1020.30(d)(1). Assemblers are also required to retain these reports of assembly for a period of 5 years from its date, per 21 CFR 1002.1(c)(4).

Manufacturers of diagnostic x-ray systems must provide assemblers with adequate instructions for assembly, installation, adjustment, and testing of their component sufficient to assure the product will comply with all applicable performance standards when their instructions are followed, per 21 CFR 1020.30(c). The instructions must also provide specifications for other components that are compatible with the component to be installed when compliance of the component or system depends on such compatibility. The specifications may describe physical characteristics of compatible components and/or may list, by manufacturer's name and model number/designation, specific components that are compatible, per 21 CFR 1020.30(g).

Under 21 CFR 1020.30(g), manufacturers of diagnostic x-ray systems and components listed in 21 CFR 1020.30(a)(1) are subject to information disclosure obligations so that assemblers or other interested parties may obtain, upon request, information regarding the assembly, installation, adjustment, and testing (AIAT) of an x-ray system to ensure it meets federal performance standards. The AIAT information shall be provided at a cost not to exceed the cost of publication and distribution.

Generally, manufacturers of diagnostic x-ray equipment must provide the purchaser of such equipment and, upon request, others with manuals and instructions describing specific technical specifications of the equipment and any necessary safety precautions and procedures at a cost not to exceed the cost of publication and distribution. This information must include a recommended maintenance schedule required to keep the equipment in compliance with all applicable performance standards.[34]

### 2.1.2   Medical Device Reporting

FDA also has implemented its authority via the Medical Device Reporting (MDR) regulation.[35] Medical device reporting helps FDA assess significant adverse events and detect emerging problems that are associated with the use of medical devices. Medical device reporting requirements apply to

---

[34] 21 CFR 1020.30(h).
[35] 21 CFR part 803.

LOC_AR_00003088

manufacturers, importers of devices manufactured outside the United States, user facilities, and in some instances to distributors.

The MDR regulation requires manufacturers to report to FDA when their devices may have caused or contributed to a death or serious injury, or their device has malfunctioned and would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. A serious injury is an injury or illness that is: (1) life-threatening, (2) results in permanent impairment of a body function or permanent damage to a body structure, or (3) necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure.[36]

Certain malfunctions are also required to be reported by manufacturers. A malfunction means the failure of a device to meet its performance specifications or otherwise perform as intended. Performance specifications include all claims made in the labeling for the device and the intended performance of a device refers to the intended use for which the device is labeled or marketed, as defined in 21 CFR 801.4.[37] A malfunction is reportable when it is likely to cause or contribute to a death or serious injury if the malfunction occurs again.

If any one of the following is true, the malfunction is reportable:[38]

- The chance of a death or serious injury occurring as a result of a recurrence is not remote;
- It affects the device in a catastrophic manner that may lead to a death or serious injury;
- It causes the device to fail to perform its essential function and compromises the therapeutic, monitoring, or diagnostic effectiveness of the device, which could cause or contribute to a death or serious injury;
- The device involves a long-term implant, or a device that is considered to be life-supporting or life-sustaining; or
- The manufacturer takes or would be required to take action to reduce a risk to health as a result of the malfunction.

The MDR regulation requires device user facilities to report to FDA and to the manufacturer when a device may have caused or contributed to a death and to the manufacturer only when their devices may have caused or contributed to a serious injury.[39] A "device user facility" (UF) is a hospital, ambulatory surgical facility, nursing home, outpatient diagnostic facility, or outpatient treatment facility, which is not a physician's office. UF's must also submit an annual summary of death and serious injury reports to FDA.[40] Reports submitted to the FDA are done so using the Form FDA 3500A (MedWatch) for mandatory reports.

There is no obligation for UFs or manufacturers to notify third party entities about adverse events related to the servicing of the device. Manufacturers, UFs, device users, and others may choose to inform third party servicers voluntarily.

---

[36] 21 CFR 803.3(w).
[37] 21 CFR 803.3(k).
[38] FDA Guidance document – Medical Device Reporting for Manufacturers; available at:
https://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm359566.pdf.
[39] 21 CFR 803.10(a).
[40] 21 CFR 803.10(a), 803.33.

LOC_AR_00003089

Most reports do not include detailed information concerning the servicing history of the medical device, such as:

- Who serviced the device and what service was done;
- When the device was serviced;
- How often the device was serviced;
- What parts were replaced or repaired; and
- What testing was completed after the device was serviced.

Without this information, it is difficult to establish a definitive link between the servicing of a device and the reported event. FDA has not applied reporting requirements to third party servicers, though they can submit voluntary reports.

Although medical device reports (MDRs) are a valuable source of information, this passive surveillance system has limitations, including the potential submission of incomplete, inaccurate, untimely, unverified, or biased data. In addition, the incidence or prevalence of an event cannot be determined from this reporting system alone due to potential under-reporting of events and lack of information about frequency of device use.

## 2.2 Centers for Medicare and Medicaid Services and the Joint Commission

The Centers for Medicare and Medicaid Services (CMS) is involved in the regulation of the maintenance and repair of medical devices through requirements regarding conditions for receiving federal payments for health services.[41] For example, 42 CFR 482.41(c)(2) requires that hospital facilities, supplies, and equipment must be maintained to ensure an acceptable level of safety and quality. CMS pronounced in 2011 that alternate equipment maintenance methods were not permitted; hospitals must continue to follow the manufacturer's recommended techniques for maintaining equipment, even if the hospitals alter the frequency of maintenance activities.[42]

In 2013, CMS issued updated guidance to clarify that medical "equipment" refers to all devices intended to be used for diagnostic, therapeutic, or monitoring care provided to a patient by a hospital. Hospitals comply with the regulation when they perform equipment maintenance in accordance with the manufacturer's recommendations. In certain circumstances, it also may be consistent with the CMS regulatory requirements for a hospital to use an alternative maintenance schedule. Specifically, a

---

[41] As noted on TJC public website
(https://www.jointcommission.org/facts_about_federal_deemed_status_and_state_recognition/), in order for a healthcare organization to participate in and receive federal payment from Medicare or Medicaid programs, one of the requirements is that a healthcare organization meet the government requirements for program participation, including a certification of compliance with the health and safety requirements called Conditions of Participation (CoPs) or Conditions for Coverage (CfCs), which are set forth in federal regulations. The certification is achieved based on either a survey conducted by a state agency on behalf of the federal government, such as CMS, or by a national accrediting organization, such as TJC, that has been approved by CMS as having standards and a survey process that meets or exceeds Medicare's requirements. Healthcare Facilities Accreditation Program, Det Norske Veritas Healthcare, and Center for Healthcare Improvement have also been approved by CMS to accredit facilities. Healthcare organizations that achieve accreditation through a "deemed status" survey are determined to meet or exceed Medicare and Medicaid requirements. Accreditation is required for advanced diagnostic imaging services, durable medical equipment, prosthetics, and orthotics and supplies (DMEPOS) suppliers.
[42] CMS Memo: S&C: 12-07-Hospital: Clarification of Hospital Equipment Maintenance Requirements; available at: https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/SCLetter12_07.pdf

LOC_AR_00003090



hospital may adjust its maintenance, inspection, and testing frequency and activities for facility and medical equipment, based on a risk-based assessment by qualified personnel, unless other Federal or state law or hospital Conditions of Participation (CoPs) require adherence to manufacturer's recommendations and/or set specific requirements, the equipment is a medical laser device, or new equipment without a sufficient maintenance history has been acquired.[43]

As stated in the 2013 guidance, hospitals electing to adjust facility or medical equipment maintenance must develop policies and procedures and maintain documentation supporting their alternative equipment management (AEM) program. They must adhere strictly to the AEM activities and/or frequencies they establish. Notably, the determination of whether it is safe to perform facility or medical equipment maintenance in an alternate manner must be made by qualified personnel, regardless of whether they are hospital employees or contractors.[44]

Revised standards for medical equipment maintenance were announced by TJC in 2014,[45] aligning TJC's accreditation with updates from CMS. All medical equipment under 2014 standards had to be on the facility's medical equipment inventory when using TJC accreditation process for CMS deemed status. A risk assessment would first determine whether the medical equipment served a life support function and whether non-life support equipment would be considered "high-risk." In the context of the 2014 EC.02.04.01 standard, the term "high-risk" means those items for which there is a risk of serious injury or even death to a patient or staff member should they fail.

In accordance with standard EC.02.04.01, to determine activities and frequencies of maintenance, organizations had to comply with manufacturers' recommendations or with strategies of an alternative equipment maintenance (AEM) program, as long as the AEM did not reduce safety and was based on accepted standards of practice.[46] Although an AEM strategy could include reduced or altered maintenance tasks, relaxed frequencies of maintenance, run-to-fail strategies, etc., assessments for AEM strategies had to be documented in accordance with EC.02.04.01 and high-risk medical equipment had to be maintained at 100% of schedule. However, in January 2017, TJC interpreted CMS's requirements for hospitals to strictly adhere to manufacturer recommendations or to their AEM policy for scheduled maintenance activities and frequencies to mean a "100 percent completion rate" for all equipment.[47] Recently, TJC enacted a new element of performance (EP) that dictates that hospitals maintain servicing manuals on all devices.[48] This may facilitate access to servicing manuals by ISOs, contracted by these hospitals.

---

[43] CMS Memo: S&C: 12-07-Hospital Superceded: Hospital Equipment Maintenance Requirements; available at: https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-14-07.pdf

[44] Id.

[45] The Joint Commission. Standards Revisions and Clarifications Related to Medical Equipment and Utility System Maintenance. Issued July 1, 2014; available at: http://www.jointcommission.org/assets/1/18/hap_equip_maint_revisions_july2014.pdf

[46] Trade organizations such as American Society for Healthcare Engineering (ASHE), Association for the Advancement of Medical Instrumentation (AAMI), Association of periOperative Registered Nurses (AORN), etc. may provide further information with regard to establishing alternative equipment maintenance strategies. For medical equipment, accepted standards may be found in the American National Standards Institute/Association for the Advancement of Medical Instrumentation handbook ANSI/AAMI EQ56: 2013, Recommended Practice for a Medical Equipment Management Program.

[47] TJC Prepublication Requirements October 2016; available at: https://www.jointcommission.org/assets/1/6/PrepublicationRpt_HAP_LSC.pdf

[48] Changes to Environment of Care and Life Safety Chapters Related to Life Safety Code Updates; available at: https://www.jointcommission.org/assets/1/6/Life_Safety_Code_Prepub_HAP_Jan2018.pdf

LOC_AR_00003091

### 2.3 U.S. Federal Trade Commission

The U.S. Federal Trade Commission (FTC) is a government agency charged with protecting consumers through preventing anticompetitive, deceptive, and unfair business practices, while enhancing informed consumer choice and public understanding of the competitive process. The FTC encourages government agencies to consider the impact on competition when deciding regulatory activities, and avoid unneeded or burdensome barriers to competition that lack compensating benefits. Similar to FDA, FTC aims to complete their mission without unduly burdening legitimate business activity.[49] FTC enforces a number of antitrust laws including the Sherman Act of 1890[50] and the Clayton Antitrust Act of 1914.[51]

Antitrust laws affect a variety of "vertical" relationships — those involving firms at different levels of the supply chain — such as manufacturer-dealer or supplier-manufacturer. Restraints in the supply chain are tested for their reasonableness, by analyzing the market in detail and balancing any harmful competitive effects against offsetting benefits. In general, the law views most vertical arrangements as beneficial overall because they can reduce costs and promote efficient distribution of products. A vertical arrangement may violate the antitrust laws, however, if it reduces competition among firms at the same level (say among retailers or among wholesalers) or prevents new firms from entering the market. This is particularly a concern in markets with few sellers or those dominated by one seller.[52]

### 2.4 State Regulations

Some regulation of medical device servicing at the state level focuses primarily on protecting the public from radiation emitting devices, such as X-Ray machines, medical lasers and fluoroscopy imaging equipment. Generally, states do not regulate servicing of devices that do not emit radiation. Nearly all states have issued specific regulations about servicing radiation emitting equipment. Regulations include state registering of entities that service radiation emitting equipment and/or obtaining a license issued by a state control entity, such as a Radiation Control Board.[53, 54, 55, 56, 57]

As of December, 2017, a number of states have proposed bills to expand access of parts and servicing manuals to non-OEM entities across various manufacturing industries. Several of the "Right to Repair" bills do not specifically call out medical devices however may still apply to them. Others specifically

---

[49] FTC Public Website; available at: https://www.ftc.gov/about-ftc

[50] 15 U.S.C. §§ 1-7.

[51] 15 U.S.C. §§ 12-27.

[52] FTC Public Website; available at: https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-supply-chain

[53] Florida Statutes: 404.22(2) - Radiation machines and components; inspection; available at: http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&Search_String=&URL=0400-0499/0404/Sections/0404.22.html

[54] New Mexico Administrative Code (NMAC) 20.3.2.204 – Application for Registration of Servicing and Services; available at: http://164.64.110.239/nmac/parts/title20/20.003.0002.htm

[55] Illinois Compiled Statutes (ILCS): 420 ILCS 40/25.2 - Radiation Protection Act of 1990; available at: http://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=1622&ChapterID=37

[56] Minnesota Administrative Rules: 4732.0280 - Service Provider's Responsibility; available at: https://www.revisor.mn.gov/rules/?id=4732.0280

[57] Pennsylvania Code § 216.2a. Registration of radiation-producing machine service providers; available at: https://www.pacode.com/secure/data/025/chapter216/chap216toc.html

LOC_AR_00003092



exclude or limit the applicability to medical devices. For example, the Illinois bill[58] would require that OEMs shall "(i) make available to any independent repair provider or owner of equipment manufactured by the original equipment manufacturer the same diagnostic and repair documentation in the same manner as that information is made available to the manufacturer's authorized repair providers; and (ii) make available for purchase by the owner, his or her authorized agent, or any independent repair provider, parts, inclusive of any updates to the embedded software of the parts, upon fair and reasonable terms."

Similarly, the Missouri bill[59] would require OEMs "to openly provide all of their diagnostic repair tools to both consumers and independent repair providers on fair and reasonable terms. Consumer products sold for security-related purposes may not be programed to exclude diagnostic, service, or repair methods to reset a security-related electronic function. Manufacturers are not legally responsible for the content and functionality of such diagnostic repair tools so long as the manufacturers comply with the rest of the bill, but nothing in the bill requires the divulgence of a trade secret."

The New Jersey bill[60] would require that "an OEM of equipment sold, offered for sale, or used in this State shall make available for purchase by independent repair providers and owners all diagnostic repair tools incorporating the same diagnostic, repair, and remote communications capabilities that the OEM makes available to its own repair or engineering staff or any authorized repair provider."

The New York bill[61] "excludes medical devices covered by federal law." Similarly, the Massachusetts bill[62] does "not include a class III medical device as established by 21 U.S.C. § 360c."

## 3   Review of Responses to FDA's March 2016 Federal Register Request for Comments[63]

On March 4, 2016, FDA published in the Federal Register a notice requesting comments from interested persons, such as those engaged or otherwise interested in the "Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices," including radiation-emitting devices subject to EPRC provisions of the FD&C Act.[64] FDA took this action, in part, because of concerns expressed about the quality, safety, and continued effectiveness of medical devices that have been subject to one or more of these activities that are performed by OEMs, third parties, and healthcare establishments. The notice sought comments on proposed definitions of specific terms pertaining to servicing activities, and the evaluation of benefits and risks associated with them.

---

[58] Illinois bill HB3030; available at:
http://www.ilga.gov/legislation/billstatus.asp?DocNum=3030&GAID=14&GA=100&DocTypeID=HB&LegID=104597&SessionID=91

[59] Missouri bill HB 1178; available at: https://house.mo.gov/billtracking/bills171/hlrbillspdf/2172H.01I.pdf

[60] New Jersey bill A4934; available at: http://www.njleg.state.nj.us/2016/Bills/A5000/4934_I1.HTM

[61] New York bill S618B; available at: https://www.nysenate.gov/legislation/bills/2017/s618/amendment/b

[62] Massachusetts bill H.143; available at: https://malegislature.gov/Bills/190/House/H143

[63] Section 710(b)(1) requires FDA to provide the status of, and findings to date, with respect to, the proposed rule entitled "Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices Performed by Third-Party Entities and Original Equipment Manufacturers; Request for Comments" published in the Federal Register by the Food and Drug Administration on March 4, 2016. Although the header in the Federal Register was labeled "Proposed Rules," the action was "Notification; Request for Comments."

[64] 81 FR 11477.

LOC_AR_00003093



FDA received feedback in response to the March 2016 request for comments.[65] Stakeholders that provided input included OEMs, ISOs, healthcare establishments, biomedical and clinical engineers, healthcare technology management (HTM) professionals, and professional and trade associations. In total, FDA received 186 comments through the time the docket closed on June 3, 2016.

Healthcare establishments identified three leading factors that contribute to their decision to use a particular service provider: quality, cost, and timeliness. Comments also identified several common elements that significantly influence the quality of Medical Device Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing. These included, but were not limited to the presence of a quality management system; training of service providers; the availability and use of quality replacement parts; and access to device-specific information.

### 3.1 Quality Management System

Some comments, across all stakeholder groups, provided feedback to FDA that the presence of a quality management system can have a positive influence on service quality. Comments discussed quality systems broadly or suggested that third party entities that are certified to a standard such as ISO 9001[66] or ISO 13485[67] are better suited to perform these services. Other comments focused on specific aspects of a quality management system such as supplier validation, design controls, process validation for servicing procedures, and documentation of the service provided. Some commented that servicing performed under an appropriate quality system can facilitate device servicing, updating, and performance tracking. OEMs also communicated that lack of service history records can negatively impact the ability to troubleshoot or identify the root cause of device performance concerns, provide future servicing, and track device performance. Some third party entities and healthcare establishments communicated that the lack of instructions and procedures for performing service activities can negatively impact a servicer's ability to provide high quality product updates or service to the device.

In total, commenters noted that high quality service under a quality management program can help maintain device conformance with specifications and performance standards. These specifications include mechanical safety, electrical safety, and other functional specifications. Servicing, if performed properly, can address unintended or improper device function and does not contribute to future malfunction.

### 3.2 Training

Medical devices vary considerably with regard to technological complexity, mode of action, materials, and design. As a result, some personnel may not be adequately trained to service certain products or to perform certain types of servicing. FDA received comments from all stakeholder groups indicating that it is critical that personnel performing servicing be adequately trained to recognize the scope of work that needs to be performed and to work only on those devices for which they have adequate knowledge, skill, training, and experience. Some OEMs expressed concerns that third party servicers do not have the adequate knowledge or expertise to provide high quality servicing of their devices. Conversely, some third party servicers stated that their expertise and experience matches and sometimes exceeds that of an OEM servicer. It was also

---

[65] Docket No. FDA-2016-N-0436.

[66] ISO 9001 – Quality management systems -- Fundamentals and vocabulary.

[67] ISO 13485 -- Medical devices -- Quality management systems -- Requirements for regulatory purposes.

LOC_AR_00003094



noted that there is limited access to device-specific training, and that few accredited training programs exist to address the training needs of the ecosystem.

### 3.3 Availability and Use of Quality Replacement Parts

All stakeholders stressed the importance of using quality replacement parts that are reliable and compatible with the product being serviced. The use of out of specification parts may lead to repeated or additional device malfunction, and the need for re-service or repair sooner. While there seems to be a consensus about the importance of using quality replacement parts, some expressed concern about limited availability.

### 3.4 Access to Device-Specific Service Information

Another element identified as influencing the ability to provide high quality service is access to device specifications and service equipment. The availability of device specifications is typically needed by the servicer to ensure that the work being performed returns the device to its proper state. Participants noted that while some product specifications can be obtained from information provided with the original equipment or test records, not all specifications are available in labeling, other publicly available documents, or can be measured with generally available test equipment. In addition, some specifications may require specialized test equipment to assess, and the equipment may not generally be available. Similarly, there may be device-specific test procedures needed to verify that the service performed has in fact resulted in a device that meets its specifications. This issue applies to a number of medical devices that undergo servicing, including radiological devices subject to the EPRC regulation.

In addition to these specific topics, all stakeholders also shared their experiences providing and receiving servicing. These experiences included positive and negative examples of service by OEMs and third party entities. Some emblematic examples of alleged improper servicing include:

- An x-ray film developer began to smoke during use. As the technician unplugged the device, it caught fire. Upon investigation of the incident, it was determined that the internal fan was not functioning and the thermal safety fuse had been improperly wired by a third party servicer to bypass the device's safety feature.[68]
- During an invasive urology procedure, the insulation sleeve from a flexible ureteroscope separated from the device and lodged in the patient's kidney. A resulting investigation revealed that the scope had been repaired by a third party entity using non-OEM materials.[69]
- A malfunctioning ventilator contributed to two deaths outside the U.S. The device's internal components were contaminated with a significant amount of dust and dirt because, after undergoing servicing by a third party entity, the main compressor inlet filter was missing, multiple components were replaced with non-OEM parts, and the device was improperly assembled.[70]
- An infusion pump device was repaired by a non-OEM entity using non-OEM parts. When used on a patient the device delivered unregulated flow (over infusion) causing serious harm to the patient.[71]

---

[68] Docket No. FDA-2016-N-0436-0126.
[69] Docket No. FDA-2016-N-0436-0134.
[70] Docket No. FDA-2016-N-0436-0141.
[71] Docket No. FDA-2016-N-0436-0141.

LOC_AR_00003095



- Multiple anesthesia machines were improperly maintained and serviced by the OEM, contributing to mold growth on the internal breathing circuits.[72]

FDA has not confirmed the veracity of these allegations or the investigative findings.

## 4    Public Workshop

On October 27-28, 2016, FDA held a public workshop – Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices Performed by Third-Party Entities and Original Equipment Manufacturers.[73] The public workshop consisted of introductory stakeholder presentations followed by four sessions covering the general themes pertaining to servicing of medical devices. Specifically, FDA, stakeholder presenters and panel members discussed the benefits and risks of servicing associated with these activities; the characteristics of good servicing entities; the challenges that stakeholders face in performing high quality servicing activities; and best practices and future recommendations.[74]

FDA presented an overview of the Agency's history in regulating remarketers, refurbishers, reconditioners, rebuilders, servicers, and remanufacturers. FDA also presented the working definitions for these terms, and summarized the comments received in advance of the public workshop through the Federal Register.[75] These comments were consistent with the viewpoints expressed during the two-day workshop.

FDA appreciated the broad stakeholder participation and varying perspectives on these topics from OEMs, third party entities, healthcare establishments, and hospital based service providers. The speakers represented a diversity of backgrounds and viewpoints, and included the following presenters (in the order of presentation):[76, 77]

- Peter Weems, Director of Policy and Strategy, Medical Imaging & Technology Alliance (MITA)
- David Anbari, Vice President & General Manager, Mobile Instrument Service and Repair, Inc.
- Tara Federici, Vice President, Technology and Regulatory Affairs, Advanced Medical Technology Association (AdvaMed)
- Barbara Maguire, Vice President, Quality and Geisinger Clinical Engineering, ISS Solutions, representing the American College of Clinical Engineering (ACCE)
- Robert Kerwin, General Counsel, International Association of Medical Equipment Remarketers and Servicers (IAMERS)
- Mark Leahey, President and CEO, Medical Device Manufacturers Association (MDMA)

---

[72] Docket No. FDA-2016-N-0436-0142.
[73] 81 FR 46694.
[74] Workshop Agenda; available at: http://wayback.archive-it.org/7993/20171114130552/https://www.fda.gov/MedicalDevices/NewsEvents/WorkshopsConferences/ucm511411.htm
[75] Issue Overview; available at: http://wayback.archive-it.org/7993/20171114130552/https://www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM525760.pdf
[76] Day 1 Transcript; available at: http://wayback.archive-it.org/7993/20171114130552/https://www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM532679.pdf
[77] Day 2 Transcript; available at: http://wayback.archive-it.org/7993/20171114130552/https://www.fda.gov/downloads/MedicalDevices/NewsEvents/WorkshopsConferences/UCM532680.pdf

LOC_AR_00003096



- Tim McGeath, Senior Vice President and General Counsel, TriMedx
- Katie Ambrogi, Attorney Advisor, Office of Policy Planning, U.S. Federal Trade Commission
- Mary Logan, President, Association for the Advancement of Medical Instrumentation (AAMI)

Stakeholders presented differing views about the quality, safety, and effectiveness of servicing performed by OEMs and third party entities, and the need for imposing additional regulation. OEM representatives emphasized the need for mandatory regulatory requirements on third party entities performing servicing, including portions of the 21 CFR 820 QS regulation. ISO representatives cited a lack of evidence that current voluntary implementation of quality systems and best practices by third party entities were resulting in improper servicing of medical devices. Further, they expressed concerns that the imposition of an FDA QS regulation on ISOs would create a significant financial burden and reduce healthcare providers' choice and availability of medical device servicing. Both OEMs and ISOs presented examples of quality system best practices which have been or could be adopted by entities who perform servicing of medical devices.

The workshop participants expressed general agreement on the importance of quality medical device service. Quality servicing maintains and/or restores device conformance with specifications and performance standards; resolves unintended, inappropriate, or improper device function and does not contribute to a recurrence of problems; and produces sufficient information for the facility and those servicing the device in the future to know the service history and current device configuration. All stakeholders presenting and participating in the panel discussions emphasized the importance of and their commitment to patient safety, and agreed that quality medical device service is essential to ensuring patient safety. Participants also spoke of patients' and healthcare providers' shared interest in ensuring that a medical device continues to perform according to its original design and intended use.

### 4.1 Stakeholder Presentation Summaries

The first workshop day included formal presentations from various stakeholders. Common themes arising from these presentations were: the importance of collaboration amongst stakeholders, the value provided by ISOs, that regulatory decision making should be evidence based, and that patient safety is of primary importance.

Peter Weems (MITA), summarized OEM concerns that improper third party entity servicing may present significant challenges including but not limited to interfering with future OEM servicing activities, presenting a potential for patient harm, and creating difficulties for OEMs to provide future field upgrades if a device has been improperly altered. Mr. Weems also noted that a lack of mandatory adverse event reporting by third party entities and an incomplete device service history impedes tracking and a complete root cause investigation of adverse events. Finally, he expressed concerns that improper servicing could create liability concerns if a device were to cause injury or damage. Mr. Weems presented three cases of alleged improper servicing of medical imaging devices which posed a potential risk to patient or operator safety.

David Anbari spoke as a representative of a company who repairs surgical equipment. He emphasized a commitment to patient safety first. He presented that such safety is achieved in the current paradigm by the FDA, CMS, TJC, in conjunction with standard developing organizations such as AAMI and the International Organization for Standardization. He emphasized that a 2016 ECRI report[78] indicated that there is no evidence of anything other than isolated adverse outcomes arising from improper servicing,

---

[78] Docket No. FDA-2016-N-0436-0126.

LOC_AR_00003097

and that the continued use by hospitals and other healthcare providers of independent servicing entities was evidence of this quality servicing. Advantages to third party entity servicing of medical devices include lower repair and service costs, and the speed and ease of scheduling and performing these activities for medical devices from different vendors using a single service provider.

Tara Federici, AdvaMed, summarized concerns relating to the safe and effective performance of medical devices serviced by third party entities. AdvaMed's concerns included: device repairs may currently be performed by untrained personnel with inappropriate equipment and testing; replacement of parts or components of unknown provenance can result in an adulterated device; and repairs are performed without compliance to servicing standards such as those followed by OEMs. She emphasized that the lack of mandatory MDR reporting by ISOs creates a gap in MDR data, masking adverse events that are caused by improper servicing. AdvaMed supported FDA oversight of medical device repairs performed by any entity, and that these activities should be subject to key portions of the QS regulation.

Barbara Maguire spoke on behalf of ACCE and also as a representative of an organization that provides clinical engineering and IT services to healthcare establishments, including in-house and independent clinical engineering and servicing. She summarized ACCE's efforts to gather evidence and information on the state of independent and in-house servicing of medical devices today. The evidence she cited included: the ECRI Institute's MAUDE analysis (1998),[79] UK MHRA outcomes of adverse event investigation (2008-2010),[80] a survey of the Joint Commission conducted by AAMI (2012),[81] an analysis of the Joint Commission sentinel event data (2013),[82] Aramark's decade incident data analysis (2014),[83] and the ECRI Institute's MAUDE data analysis (1998 and 2016 reports).[84] ACCE concludes that this existing data does not represent a sufficient level of evidence of improper servicing-related patient incidents to justify additional FDA regulation. She noted that most servicers are regulated through CMS and other agencies, and that when servicers work with healthcare establishments, they are indirectly subject to the same requirements of those organizations. Because of existing oversight, it was ACCE's position that further regulation would be redundant and counterproductive to patient safety. Downsides to unnecessary further regulation would be higher healthcare costs, decreased competition, and reduced service choices that could delay patient care from equipment service and repair delay. ACCE instead recommended that FDA encourage collaboration between manufacturers and third party entity servicers on education and training, standardization of maintenance documentation, and voluntary reporting.

Robert Kerwin spoke on IAMERS's unanimous adoption of recommendations for best practices on meeting customer requirements and patient safety. IAMERS encourages all members of the organization to pursue best practices in medical device servicing and compliance with international standards such as ISO 9001 and ISO 13485, and expects the application of quality management principles in their members' organizational structure, policies, procedures, processes, and records. He noted that many healthcare establishments require cost effective options other than the purchasing of new equipment, and that IAMERS members provide options to maintain medical devices and capital equipment which

---

[79] Docket No. FDA-2016-N-0436-0111.

[80] https://www.fdanews.com/ext/resources/files/archives/c/con129234.pdf

[81] Survey not publicly available, but can be obtained from TJC. A presentation summarizing the survey can be found in Docket No. FDA-2016-N-0436-0111.

[82] https://www.ncbi.nlm.nih.gov/pubmed/23432570

[83] Data not publicly available. A presentation by Aramark describing the study can be found in Docket No. FDA-2016-N-0436-0111.

[84] Docket No. FDA-2016-N-0436-0126.

LOC_AR_00003098



does not compromise patient safety or device performance. The continued availability of independent servicing entities therefore was described as a necessary and important part of the healthcare ecosystem.

Mark Leahey represented MDMA, a trade group of small to midsize medical technology companies. He stressed the importance of upholding elements of a quality system for OEMs and third party servicers, and that FDA's decision in this area should be based on safety and efficacy, not market dynamics that are outside the Agency's jurisdiction. He concluded that earlier workshop presentations demonstrated a consensus that high quality servicing, whether by OEMs or third parties, is performed by organizations with an established quality system, where adequate and appropriate training is in place, and where validated parts are used for repair and service.

Tim McGeath of TriMedx emphasized that there is a need in the market for third party service organizations as they are capable of quality service and repair, and increased collaboration amongst all parties is essential to preserving cost effective and high quality care. He stated that TriMedx follows a holistic equipment management and repair program that is provider centric, allowing healthcare providers to work with a single point of contact for device maintenance. TriMedx's position is that in-house service providers and ISOs are more accountable and available because of an onsite presence, and their lower cost is important in maintaining a competitive market to keep down healthcare costs. However, he emphasized that for ISOs and in-house providers to be successful, collaboration on access to training, parts and service manuals/keys must increase.

Katie Ambrogi of the U.S. FTC spoke of the significant benefits of market competition, including lower price, improved access, and better service quality. The FTC primarily acts as a law enforcement agency, but is also concerned with how competition could be effected by the actions of legislators and regulators. She reminded the audience of Presidential Executive Order 13725 signed in April 2016,[85] stating the federal government's priority in promoting competitive markets. Thus, she suggested that FDA consider the impact on competition when deciding regulatory activities, and avoid unneeded or burdensome barriers to competition that lack compensating benefits. Last, she encouraged consideration of alternative actions that might fulfill public health goals without impacting competition or creating burden.

Mary Logan spoke for AAMI, a standards development organization. AAMI submitted a comment to the public docket discussing the results of a survey they performed at the request of TJC. In addition, AAMI has both facilitated the development of standards relating to servicing, and had recently formed a new committee to develop definitions for servicing, refurbishing, and other related terminology.[86] AAMI identified the need for this committee as a result of the Federal Register notice, related public comments, and the observation that their organization could address the need for standardized definitions.

*4.2 Panel Discussion Summaries*

Panel 1 covered the benefits and risks of servicing associated with refurbishing, reconditioning, rebuilding, remarketing, remanufacturing, and servicing activities. The OEM panel representatives stated that if devices receive quality servicing, then the benefits will include extended device lifespans with fewer occurrences of device downtime that could delay patient care. Patient safety hazards and

---

[85] 81 FR 23417.
[86] http://www.aami.org/productspublications/articledetail.aspx?ItemNumber=4160

LOC_AR_00003099



poor product performance are risks that can occur due to inappropriate servicing, incomplete service documentation, the use of improper replacement parts, or unintended design changes. The hospital end user and in-house service representatives mentioned the benefits of quality servicing, including extended device lifespan, but also cited the risks that arise from adverse event reporting systems that fail to cover the entire device lifespan and service ecosystem, and risks that may arise when comprehensive service manuals are unavailable to the parties performing the servicing. Finally, the ISO panel representatives emphasized the benefits of reduced healthcare costs, and that access to timely repair and regular preventative maintenance is essential to patient safety. Meanwhile, they stated that the risk of unnecessary regulation could jeopardize the existence of ISOs and marketplace competitiveness which generates end user and patient benefits.

Panel 2 covered the characteristics of good refurbishing, reconditioning, rebuilding, remarketing, remanufacturing, and servicing entities. The panel members representing hospital end users and engineers emphasized the importance of service engineers with appropriate qualifications, adequate training, appropriate and calibrated test equipment, and the availability of field service reports and maintenance records. They noted the apparent overlap between TJC oversight and FDA QS regulation requirements, in such areas as quality audits, personnel, document control, inspection, acceptance, and records. To maintain quality, the hospital end users rely on support from OEMs to provide service manuals, parts and access to training programs. The panel members from ISOs agreed that high quality servicing entities share the following core characteristics: a patient safety focus, strong quality management system, alignment within users of serviced equipment, commitment to scheduled preventative maintenance, and a local presence important to end users. The panel members representing OEMs spoke of the importance that an appropriate quality management system, such as that described by QS regulation 21 CFR 820, be followed by all OEMs and all independent service providers, not just those parties present at the public workshop who voluntarily implement those systems. Additionally, the closed loop process of continuous improvement of a quality management system is essential.

Panel 3 addressed the challenges faced in performing high quality refurbishing, reconditioning, rebuilding, remarketing, remanufacturing, and servicing activities. The panel representatives from ISOs identified many challenges, such as: OEMs who limit training seminar attendance by ISO employees and charge high fees; lack of access or affordable access to parts, manuals, and service software; and lack of information on recalls and safety information directly from OEMs. The OEM panel representatives, however, explained that their own service activities are challenged by the impact of poor service performed by other entities, which present patient and operator safety hazards, and liability concerns. The panel representatives for end users and clinical engineers stated their biggest challenge was a lack of information about the harms arising from servicing. They suggested a risk-based approach to oversight predicated on servicing complexity. They also requested that more robust data be obtained to allow assessment of the current servicing ecosystem.

Panel 4 covered current best practices and future recommendations. Hospital groups described accounts from several hospital engineers in which repair activities were urgently needed during the delivery of patient care and prevented major health or patient crises. They also described incidents in which device manufacturers refused to provide service manuals or training. Finally, they noted that the required support for clinical engineers is different than in the past due to more complicated and cyber-sensitive equipment and environments. OEM panel members stated that their current best practices are summarized by the QS regulation in 21 CFR 820, but that most also certify to ISO 9001 or ISO 13485. The OEMs do not advocate new, broader regulations by FDA but instead that existing medical device



regulations be extended to apply consistent minimum requirements for all device service providers. The third party entity panel members described an example of quality system best practices in place at one company – certification to ISO 9001 and ISO 13485 – and noted the range of voluntary applicable standards that can apply to third parties. They encouraged the FDA to compel OEMs to provide documentation and better 'after-sale' support needed to service and maintain equipment to all users, which would benefit patient safety.

## 5    Summary of Evidence Pertaining to Medical Device Servicing

### 5.1 Number of Service and Repair Entities

The precise number of entities that perform servicing of medical devices in the U.S. is not known. Therefore, the total number of medical device servicing firms in the U.S. was estimated. Dun and Bradstreet (D&B) is a private company that curates and manages a database of companies and company records worldwide. For each company in the database, D&B assigns a unique identifier and one or several Standard Industrial Classification (SIC) codes based on the industry in which they operate and services/products are offered.

All firms in the D&B database that were classified using at least one of the following SIC codes were identified:

| SIC Code | SIC Description |
|---|---|
| 76990700 | Hospital equipment repair services |
| 76990701 | Medical equipment repair, non-electric |
| 76990702 | Surgical instrument repair |
| 76990703 | X-ray equipment repair |
| 76290101 | Hearing aid repair |
| 76990102 | Dental instrument repair |

In total, this search yielded 4,791 firms in the U.S. Identified firms may also perform original equipment manufacturing or remanufacturing. States with the highest number of servicing firms were California, Florida, Texas, New York, and Pennsylvania.

To determine the capture rate of medical device servicing firms using the SIC codes above, a sample group of 130 medical device servicers was compiled using publicly available information independent of the D&B database. The sample group represented a heterogeneous group of medical device servicers across device types. Using this sample set of firms, 34 out of 130 (26%) were captured by the SIC code search. By extrapolating this rate to the entire U.S. market and estimating the statistical error, we conclude that the estimated total number of firms performing medical device servicing in the U.S. is between 16,520 and 20,830.

### 5.2 Literature Review

FDA conducted a literature review on January 17, 2018 to assess what peer-reviewed published evidence is available on the quality, safety, and effectiveness of medical device servicing. The search was conducted using PubMed and EMBASE and was limited to English language articles published on or after January 1, 2008. The search returned articles that included at least one term from each of the following

LOC_AR_00003101



lists in the title or abstract. Terms listed included hyphenated variants of each and used the truncation symbol "*" to catch all suffixes of the terms.

| List 1 | List 2 | List 3 |
|---|---|---|
| • Furbish* <br> • Servic* <br> • Refurbish* <br> • Recondition* <br> • Rebuil* <br> • Remarket* <br> • Remanufactur* <br> • Device Maint* <br> • Device Repair* <br> • Calibrat* | • "Equipment and supplies"[MeSH Terms] <br> • Medical Device* <br> • Device* | • Third Part* <br> • 3rd Part* <br> • Independent Service Organization* <br> • Equipment Manufacturer* <br> • Device Manufacturer* <br> • OEM |

The review excluded articles if they did not provide quantitative evidence relating to the quality, safety, and effectiveness of third party or original manufacturing servicing. Case reports, review articles, editorials, and animal studies were also excluded. In total, the search strategy identified 502 articles. 476 articles were excluded after reviewing the title and abstract. The remaining 26 articles were reviewed in full. Among them, 25 articles were further excluded because, after further review, they met one of the exclusion criteria listed above or because they did not address the question of interest. Only one study (Worobey, L., et al, 2014) attempted to address the question by assessing the frequency of device repairs (for power wheelchair) and adverse consequences reported among patients with spinal cord injury by device manufacturers. However, this study lacked detailed information on the nature of the repair, who provided the service, and the number and timing of adverse consequences, and thus, did not provide sufficient information to address the quality, safety, and effectiveness of medical device servicing. Based on this literature review, no definitive conclusions can be drawn about the safety and effectiveness of medical device servicing in general or about the servicing of specific medical devices due to the lack of studies with sufficient, high-quality data.

In summary, a systematic literature review did not produce robust quantitative evidence to support an evaluation of the quality, safety, or effectiveness of servicing of medical devices.

*5.3 ECRI Institute Analysis*

In response to FDA's public request for information pertaining to the quality, safety and effectiveness of servicing of medical devices, ECRI Institute submitted a summary of their research and analysis.[87]

ECRI Institute searched:

- FDA's MAUDE database from 2006-2015 (2,114,303 records);
- ECRI Institutes Health Devices Alerts (HDA) Tracker Database 2006-2015 (limited to search of ECRI-generated Hazard Reports and User Experience Network Articles) (528 records); and
- ECRI Institutes confidential contracted accident investigations 2006-2015 (692 investigations).

The search was limited to capital equipment by excluding records that related to prostheses, implants, reagents, in vitro diagnostics, and disposable/single-use medical devices, and the search strategy

---

[87] Docket No. FDA-2016-N-0436-0126.

LOC_AR_00003102



incorporated specific terms and search phrases pertaining to the servicing, repair, and maintenance of medical devices.

Relevant reports were reviewed and excluded if the problem described in the record was caused by:

- Disposables or single use devices;
- Manufacturing errors;
- Operator or use error in setup, assembly, adjustment, or routine use of the device;
- Unauthorized service/repair errors or equipment modifications performed by the patient or lay users;
- Routine maintenance operations performed by the user such as calibration, cleaning, sterilization, lubrication, or battery replacement; or
- No maintenance was performed at all on the incident device.

In total, the analysis identified 86 MDRs (0.004% of MDRs analyzed), 4 ECRI Health Devices Alerts Tracker reports (0.8% of HDA Tracker reports) and 6 ECRI Institute contracted accident investigations (0.9% of investigations). Based on the results of their analysis, ECRI Institute concluded that they do not believe that a safety problem exists with the servicing, maintenance, and repair of medical devices by either third party organizations or OEMs.

*5.4 Medical Device Reports (MDRs)*

Each year, the FDA receives several hundred thousand MDRs of suspected device-associated deaths, serious injuries, and malfunctions submitted by mandatory reporters (manufacturers, importers and device user facilities) and voluntary reporters such as healthcare professionals, patients, and consumers. The FDA uses MDRs to monitor device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments. MDRs can be used effectively to:

- Establish a qualitative snapshot of adverse events for a specific device or device type; and
- Detect actual or potential device problems used in a "real world" setting/environment, including:
  - ○ Rare, serious, or unexpected adverse events;
  - ○ Adverse events that occur during long-term device use;
  - ○ Adverse events associated with vulnerable populations;
  - ○ Off-label use; and
  - ○ Use error.

As previously stated, although MDRs are a valuable source of information, this passive surveillance system has limitations, including the potential submission of incomplete, inaccurate, untimely, unverified, or biased data. In addition, the incidence or prevalence of an event cannot be determined from this reporting system alone due to potential under-reporting of events and lack of information about frequency of device use. Because of this, MDRs comprise only one of the FDA's several important postmarket surveillance data sources. Important limitations of MDRs include:[88]

- The data alone cannot be used to establish rates of events, evaluate a change in event rates over time, or compare event rates between devices. The number of reports cannot be

---

[88] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm

LOC_AR_00003103



interpreted or used in isolation to reach conclusions about the existence, severity, or frequency of problems associated with devices.

- Confirming whether a device actually caused a specific event can be difficult based solely on information provided in a given report. Establishing a cause-and-effect relationship is especially difficult if circumstances surrounding the event have not been verified or if the device in question has not been directly evaluated.
- MDRs are subject to reporting bias, attributable to potential causes such as reporting practice, increased media attention, and/or other agency regulatory actions.
- MDRs do not represent all known safety information for a reported medical device and should be interpreted in the context of other available information when making device-related or treatment decisions.

All MDRs received and publicly posted since March 1992 in the Manufacturer and User Facility Device Experience (MAUDE) database as of June 30, 2017 were evaluated. Text-based searches and manual review of candidate MDRs were performed to identify 4,301 reports that mentioned a third party servicer who repaired a device. This does not include reports of repair by the OEMs or hospital personnel. It only includes reports where it explicitly states that a device or device component was repaired, replaced, or maintained by a third party servicer.

The 4,301 MDRs included 40 deaths, 294 serious injuries, 3,791 malfunction reports, and 176 reports classified as "other." Of these reports, 4,240 came from manufacturers, 16 from distributors, 25 from user facilities, and 20 from voluntary sources.

Device types associated with more than one death report included: automated external defibrillators (6), duodenoscopes (5), ventilators (4), intra-aortic balloon systems (4), and infusion pumps (2). Of the death reports, only 3 contained sufficient information to definitively conclude that servicing caused or contributed to the death:

- A fatality occurred to a Field Service Engineer while servicing a Computed Tomography scanner;
- A fatality occurred to a Field Service Engineer while servicing an MRI scanner; and
- A death occurred after a patient lift rail was reinstalled incorrectly.

A fourth death was due to the malfunction of a remanufactured imaging system that lacked FDA clearance or approval. The camera fell on and killed a patient.

Due to the limited information contained in the 334 MDRs of death or serious injury, we were not able to establish a conclusive relationship between device third party entity servicing and the subsequent adverse event.

### 5.5 Complaints

FDA searched all complaints and allegations of regulatory misconduct (collectively "complaints") received by the Center for Devices and Radiological Health (CDRH) since 2009 for those related to servicing of medical devices and radiation-emitting products. Complaints that did not involve device servicing or remanufacturing, or complaints that were duplicates were excluded. A total of 68 potentially relevant complaints were identified. Of those, 28 were related to device remanufacturing, including the replacement of parts not consistent with OEM specification. The remaining 40 complaints alleged inadequate servicing, ranging from customers being charged for repair services, OEMs not providing service manuals, and OEMs not providing critical replacement parts to poor technician

LOC_AR_00003104

training, knowingly falsifying service records and device serial numbers, and repairs using broken replacement parts. One complaint alleged an end user was neglecting maintenance, 29 complaints alleged inadequate servicing by OEM's, and 10 complaints alleged inadequate servicing by ISOs. Of the 40 complaints, 18 alleged that the inadequate servicing could lead to a serious adverse event. Only one complainant reported that adverse events occurred. In that complaint, two patients were injured due to an ISO repairing an infusion pump with allegedly defective parts.

In total, similar to the anecdotes provided as feedback in response to FDA's March 2016 request for comments, complaints and allegations of regulatory misconduct related to the servicing of medical devices and radiation-emitting products received by FDA demonstrate that there may be isolated instances of poor quality servicing by OEM's or third party entities.

## 6  Summary of Key Issues and On-Going Activities

Based on the available information, including but not limited to the public meeting, response to the request for comments, and evaluation of objective evidence related to the quality, safety, and effectiveness of medical device servicing, we have concluded:

- The currently available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing, including by third party servicers, of medical devices that would justify imposing additional/different, burdensome regulatory requirements at this time;
- Rather, the objective evidence indicates that many OEMs and third party entities provide high quality, safe, and effective servicing of medical devices;
- A majority of comments, complaints, and adverse event reports alleging that inadequate "servicing" caused or contributed to clinical adverse events and deaths actually pertain to "remanufacturing" and not "servicing"; and
- The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system.

However, based on the available information and findings, we intend to pursue the following actions:

1. Promote the Adoption of Quality Management Principles by Medical Device Servicers;
2. Clarify the Difference Between Servicing and Remanufacturing;
3. Strengthen Cybersecurity Practices Associated with Servicing of Medical Devices; and
4. Foster Evidence Development to Assess the Quality, Safety, and Effectiveness of Medical Device Servicing.

Each of these actions is explained in more detail below.

### 6.1 Promote the Adoption of Quality Management Principles by Medical Device Servicers

Quality management principles and processes, as part of a quality system, have been adopted and implemented by more than 1 million companies and organizations worldwide to improve quality, efficiency, safety and reliability.[89] The selective adoption and application of existing quality management principles and processes to medical device servicing has been advocated by OEMs and third party

---

[89] See International Organization for Standardization (ISO), ISO 9000 – Quality Management; available at:
http://www.iso.org/iso/home/standards/management-standards/iso_9000.htm

LOC_AR_00003105

servicers, and some, but not all, medical device servicers already adopt at least some quality management principles.

Different approaches to quality management exist, and they share certain common, underlying principles. Quality management principles help to identify, prevent, track, and monitor safety hazards and to reduce risks. They are flexible, scalable, and adaptable so organizations can tailor the application of these standardized processes to their individual circumstances and needs. Quality management principles provide a quality framework for companies and organizations to ensure that:

- Their services consistently meet their customer's needs and requirements;
- Risk management principles are applied to identify, evaluate, mitigate, and remediate hazards;
- Personnel performing servicing are appropriately qualified and trained;
- Replacement parts meet the design requirements of the initial device design;
- Servicing activities are appropriately documented;
- Technical and service manuals are accurate, understandable, and available to those providing service and maintenance; and
- Overall quality is continually improved.

A number of efforts to create or update existing voluntary consensus standards and best practices pertaining to the quality servicing of medical devices are ongoing.

The selective adoption and application of quality management principles and processes to medical device servicing contributes to the quality, safety, and effectiveness of these activities. FDA intends to work with entities performing medical device servicing to identify the essential elements of a voluntary medical device servicing quality framework, leveraging new and existing quality management standards, best practices and principles, and identifying areas where they can be most impactful. We view this strategy, rather than a formal regulatory approach mandating adoption of FDA's QS regulation by all entities performing medical device servicing, as the appropriate approach at this time for advancing the quality of medical device quality servicing.

### 6.2 Clarify the Difference Between Servicing and Remanufacturing

A significant portion of the comments, complaints, and adverse event reports alleging inadequate servicing pertain to activities more accurately described as remanufacturing. FDA makes an important distinction between these activities. Servicing returns or maintains a finished device's safety and performance specifications and intended use whereas remanufacturing significantly changes the finished device's performance, safety specifications, or intended use.[90, 91] Because remanufacturing can have a significant impact on the safety and effectiveness of the device, FDA has interpreted regulatory requirements such as those under the QS regulation to apply to remanufacturers and has actively regulated them as manufacturers. FDA is currently and will continue to enforce existing requirements for those third parties engaged in remanufacturing.

Because of the apparent confusion we have heard from stakeholders concerning the difference between servicing and remanufacturing activities, FDA intends to publish guidance to assist in differentiating these activities to allow more consistent interpretation and categorization. In turn, this will clarify

---

[90] 21 CFR 820.
[91] Federal Register Vol 81; No. 42; March 4, 2016: 11477-11479.

LOC_AR_00003106



regulatory responsibilities for entities performing these activities and allow FDA to focus its regulatory oversight on those activities that have the greatest impact on the quality, safety, and effectiveness of medical devices. In accordance with good guidance practices,[92] FDA intends to publish the guidance in draft form and accept public comments before issuing final guidance.

### 6.3 Strengthen Cybersecurity Practices Associated with Servicing of Medical Devices

Effective cybersecurity practices are essential for the continued safety and effectiveness of medical devices, particularly with the increasing use of wireless, internet-, and network- connected devices. Failure to maintain cybersecurity can result in compromised device functionality, loss of data (medical or personal) availability or integrity, or exposure of other connected devices or networks to security threats. This in turn may have the potential to result in patient illness, injury, or death. FDA has issued guidance outlining the approaches device manufacturers should follow in the premarket design and development of medical devices, and during their surveillance and response to identified cybersecurity vulnerabilities and exploits of marketed products.[93, 94] FDA has recommended that manufacturers address cybersecurity risks throughout the product lifecycle.

The security industry has established resources including standards, guidelines, best practices, and frameworks to assist in adopting a culture of cybersecurity risk management. Recommended approaches include limiting privileged access to operating systems and applications, instituting user authentication and appropriate controls before permitting software or firmware updates, and ensuring only trusted content is permitted by restricting software or firmware updates to authenticated code only. Best practices also include collaboratively assessing cybersecurity intelligence information for risks to device functionality and clinical risk.

The servicing of medical devices by entities other than the OEM raises specific cybersecurity challenges related to the servicer's need, in many cases, for privileged access to perform the necessary diagnostic, maintenance and repair functions. Servicers may also play an important role in reducing cybersecurity risks by ensuring that the latest security patches and software updates have been successfully installed.

Although FDA has clarified requirements associated with the cybersecurity of medical devices, many OEMs, healthcare establishments, and third party servicers lack the necessary cybersecurity expertise, policies, and practices necessary to ensure the appropriate level of cybersecurity resilience associated with the servicing of medical devices. The development and application of standards and best practices for all entities engaged in the servicing of medical devices could further mitigate cybersecurity risks.

### 6.4 Foster Evidence Development to Assess the Quality, Safety, and Effectiveness of Medical Device Servicing

The creation of an environment of learning and continual improvement is central to a medical device servicing industry that delivers quality, safe, and effective service. Currently, the available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing, including by third party servicers, of medical devices that would justify imposing additional/different, burdensome regulatory requirements. Efforts to systematically collect evidence on

---

[92] 21 CFR 10.115.

[93] FDA Guidance document – Content of Premarket Submissions for Management of Cybersecurity in Medical Devices; available at: https://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm356190.pdf

[94] FDA Guidance document – Postmarket Management of Cybersecurity in Medical Devices; available at: https://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm482022.pdf

LOC_AR_00003107



the number, rate, and type of servicing errors would be of value. However, several factors inhibit the utility of isolated adverse event reporting as the mechanism for identifying and sharing important safety concerns associated with medical device servicing. These include persistent underreporting of patient safety events and device malfunctions even when there are well-established programs in place to encourage adverse event reporting; failure to recognize adverse events as related to the servicing of the medical device at the time of their occurrence; poor documentation of the service history of the device impeding root cause analysis of device malfunctions and adverse events; and difficulty in reaching conclusions about the existence, severity, or frequency of problems associated with the servicing of the devices.

Because of these and other shortcomings related to adverse event reporting, we do not believe that extending MDR reporting to third party servicing entities would be likely to yield the information necessary to assess the quality, safety, or effectiveness of medical device servicing. Therefore, we do not intend to modify our current approach to reporting by third party medical device servicers at this time. FDA continues to encourage voluntary MDR reporting by servicers, patients, and healthcare providers. Similarly, while some have advocated for FDA to use its authority to require registration of entities or persons performing servicing activities, we do not believe this information alone would address the outstanding fundamental questions regarding the quality, safety, and effectiveness of servicing, and we do not intend to apply registration and/or listing requirements to persons or entities engaged solely in servicing at this time.

As noted previously, we have concluded that the available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing, including by third party servicers, of medical devices that would justify additional/different burdensome regulatory action. To evaluate the servicing ecosystem more fully would require more than limited, anecdotal adverse event reports, but robust, systematically-collected, quantitative data addressing the rates of servicing-related errors, malfunctions, and adverse events, across different device types and different servicers.

Entities engaged in servicing activities (including OEMs, healthcare establishments, and ISOs) have access to, or could collect comprehensive information on device types, number of devices serviced, frequency of servicing, frequency of service-related complaints, frequency of service-related adverse events, and characteristics of the servicing entity. FDA believes that any concerted data collection and analysis effort should be a multi-stakeholder enterprise.

## 7  Conclusion

This report includes information and evaluation with respect to the quality, safety, and effectiveness of medical device servicing, as required by Section 710 of the FDA Reauthorization Act of 2017.[95]

We believe the currently available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing of medical devices, including by third party servicers, that would justify imposing additional/different burdensome regulatory requirements at this time. Although we do not believe that additional, formal regulatory action is warranted, based on the available information and findings, we intend to pursue the following actions:

---

[95] A docket has been opened to receive comments regarding this report. Please submit your comments to www.regulations.gov, Docket No. FDA-2018-N-1794.

LOC_AR_00003108

1. Promote the Adoption of Quality Management Principles;
2. Clarify the Difference Between Servicing and Remanufacturing;
3. Strengthen Cybersecurity Practices Associated with Servicing of Medical Devices; and
4. Foster Evidence Development to Assess the Quality, Safety and Effectiveness of Medical Device Servicing.

As part of its 2018-2020 strategic priorities, CDRH has committed to establishing "Collaborative Communities." The hallmark of a Collaborative Community, is a continuing forum where public and private sector members proactively work together to solve both shared problems and problems unique to other members in an environment of trust and openness, where participants feel safe and respected to communicate their concerns. Members share a collective responsibility to help each other obtain what they need to be successful. We believe there may be value in the creation of a public-private forum, such as a Collaborative Community, to address the challenges associated with delivering high quality, safe, and effective servicing of medical devices. If there is sufficient interest and broad willingness to participate by all stakeholder groups, we would facilitate the creation of such a community.

LOC_AR_00003109



Appendix A – Cross Reference between the Congressionally Mandated Report Elements and the Corresponding Section in this Document

| FDARA 710 | Charge | Section(s) in report which address(es) the charge | Page No. |
|---|---|---|---|
| (b)(1) | the status of, and findings to date, with respect to, the proposed rule entitled "Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices Performed by Third-Party Entities and Original Equipment Manufacturers; Request for Comments" published in the Federal Register by the Food and Drug Administration on March 4, 2016 (81 Fed. Reg. 11477) | Section 3 - Review of Responses to FDA's March 2016 Federal Register Request for Comments | 11 |
| (b)(2) | information presented during the October 2016 public workshop entitled "Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices Performed by Third-Party Entities and Original Equipment Manufacturers" | Section 4 - Public Workshop | 14 |
| (b)(3) | a description of the statutory and regulatory authority of the Food and Drug Administration with respect to the servicing of devices conducted by any entity, including original equipment manufacturers and third party entities | Section 2.1 - FDA's Authority and Regulatory History | 3 |
| (b)(4) | details regarding how the Food and Drug Administration currently regulates devices with respect to servicing to ensure safety and effectiveness, how the agency could improve such regulation using the authority described in paragraph (3), and whether additional authority is recommended | Section 2.1 - FDA's Authority and Regulatory History and Section 6 - Summary of Key Issues and On-Going Activities | 3 23 |
| (b)(5) | information on actions the Food and Drug Administration could take under the authority described in paragraphs (3) and (4) to assess the servicing of devices, including the size, scope, location, and composition of third party entities | Section 2.1 - FDA's Authority and Regulatory History and Section 6 - Summary of Key Issues and On-Going Activities | 3 23 |
| (b)(6) | information on actions the Food and Drug Administration could take to track adverse events caused by servicing errors performed by any entity, including original equipment manufacturers and third party entities | Section 2.1 - FDA's Authority and Regulatory History and Section 5.4 - Medical Device Reports (MDRs) | 3 21 |
| (b)(7) | information regarding the regulation by States, the Joint Commission, or other regulatory bodies of device servicing performed by any entity, including original equipment manufacturers and third party entities | Section 2.2 - Centers for Medicare and Medicaid Services and the Joint Commission and Section 2.3 - U.S. Federal Trade Commission and Section 2.4 - State Regulations | 8 10 10 |

LOC_AR_00003110

# EXHIBIT 23

LOC_AR_00003111

# Correlation of Chest CT and RT-PCR Testing for Coronavirus Disease 2019 (COVID-19) in China:
## A Report of 1014 Cases

*Tao Ai, MD, PhD\* • Zhenlu Yang, MD, PhD\* • Hongyan Hou, MD • Chenao Zhan, MD • Chong Chen, MD • Wenzhi Lv, BS • Qian Tao, PhD • Ziyong Sun, PhD • Liming Xia, MD, PhD*

From the Departments of Radiology (T.A., Z.Y., C.Z., C.C., L.X.) and Laboratory Medicine (H.H., Z.S.), Tongji Hospital, Tongji Medical College, Huazhong University of Science and Technology, 1095 Jiefang Ave, Qiaokou District, Wuhan, Hubei 430030, China; Department of Artificial Intelligence, Julei Technology Company, Wuhan, China (W.L.); and Division of Imaging Processing, Department of Radiology, Leiden University Medical Center, Leiden, the Netherlands (Q.T.). Received February 21, 2020; revision requested and received February 24; accepted February 25. **Address correspondence to** L.X. (e-mail: *xialiming2017@outlook.com*).

\* T.A. and Z.Y. contributed equally to this work.

Conflicts of interest are listed at the end of this article.

Radiology 2020; 296:E32–E40 • https://doi.org/10.1148/radiol.2020200642 • Content codes: CH CT

**Background:** Chest CT is used in the diagnosis of coronavirus disease 2019 (COVID-19) and is an important complement to reverse-transcription polymerase chain reaction (RT-PCR) tests.

**Purpose:** To investigate the diagnostic value and consistency of chest CT as compared with RT-PCR assay in COVID-19.

**Materials and Methods:** This study included 1014 patients in Wuhan, China, who underwent both chest CT and RT-PCR tests between January 6 and February 6, 2020. With use of RT-PCR as the reference standard, the performance of chest CT in the diagnosis of COVID-19 was assessed. In addition, for patients with multiple RT-PCR assays, the dynamic conversion of RT-PCR results (negative to positive, positive to negative) was analyzed as compared with serial chest CT scans for those with a time interval between RT-PCR tests of 4 days or more.

**Results:** Of the 1014 patients, 601 of 1014 (59%) had positive RT-PCR results and 888 of 1014 (88%) had positive chest CT scans. The sensitivity of chest CT in suggesting COVID-19 was 97% (95% confidence interval: 95%, 98%; 580 of 601 patients) based on positive RT-PCR results. In the 413 patients with negative RT-PCR results, 308 of 413 (75%) had positive chest CT findings. Of those 308 patients, 48% (103 of 308) were considered as highly likely cases and 33% (103 of 308) as probable cases. At analysis of serial RT-PCR assays and CT scans, the mean interval between the initial negative to positive RT-PCR results was 5.1 days ± 1.5; the mean interval between initial positive to subsequent negative RT-PCR results was 6.9 days ± 2.3. Of the 1014 patients, 60% (34 of 57) to 93% (14 of 15) had initial positive chest CT scans consistent with COVID-19 before (or parallel to) the initial positive RT-PCR results. Twenty-four of 57 patients (42%) showed improvement in follow-up chest CT scans before the RT-PCR results turned negative.

**Conclusion:** Chest CT has a high sensitivity for diagnosis of coronavirus disease 2019 (COVID-19). Chest CT may be considered as a primary tool for the current COVID-19 detection in epidemic areas.

© RSNA, 2020

*Online supplemental material is available for this article.*

*A translation of this abstract is available in the supplement.*

Since December 2019, a number of cases of "unknown viral pneumonia" related to a local seafood wholesale market were reported in Wuhan City, Hubei Province, China (1). A novel coronavirus (severe acute respiratory syndrome coronavirus 2, or SARS-CoV-2) was suspected to be the cause, with Phinolophus bat as the alleged origin (2). In just 2 months, the virus has spread from Wuhan to the rest of China and another 33 countries. By 24:00 on February 24, accumulative 77 658 confirmed cases with 9126 severe cases and 2663 deaths were documented in China (3); 2309 confirmed cases with 33 deaths were reported in other countries (including Japan, Korea, Italy, Singapore, and Iran as the top five countries). As of 24:00 on February 11, a total of 1716 confirmed cases and 1303 clinically diagnosed cases of medical personnel were reported from 422 medical institutions, five of whom died,

accounting for 0.4% of the nationwide deaths during the same time period (4).

In the absence of specific therapeutic drugs or vaccines for coronavirus disease 2019 (COVID-19), it is essential to detect the disease at an early stage and immediately isolate the infected person from the healthy population. According to the latest guideline of Diagnosis and Treatment of Pneumonia Caused by 2019-nCoV (trial sixth version) published by the Chinese government (5), the diagnosis of COVID-19 must be confirmed by means of reverse-transcription polymerase chain reaction (RT-PCR) or gene sequencing for respiratory or blood specimens, as the key indicator for hospitalization. However, with limitations of sample collection and transportation and limitations in kit performance, the total positive rate of RT-PCR for throat swab samples was reported to be approximately 30%–60%

This copy is for personal use only. To order printed copies, contact *reprints@rsna.org*

## Abbreviations

CI = confidence interval, COVID-19 = coronavirus disease 2019, RT-PCR = reverse-transcription polymerase chain reaction

## Summary

Chest CT had higher sensitivity for diagnosis of COVID-19 as compared with initial reverse-transcription polymerase chain reaction from swab samples in the epidemic area of China.

## Key Results

- The positive rates of reverse-transcription polymerase chain reaction (RT-PCR) assay and chest CT in our cohort were 59% (601 of 1014 patients) and 88% (888 of 1014 patients), respectively, for the diagnosis of patients suspected of having coronavirus disease 2019 (COVID-19).
- With RT-PCR as a reference standard, the sensitivity of chest CT for COVID-19 was 97% (580 of 601 patients); in 308 patients with negative RT-PCR results but positive chest CT scans, 147 of 308 (48%) were reconsidered as highly likely cases and 103 of 308 (33%) as probable cases with a comprehensive evaluation.
- With analysis of serial RT-PCR assays and CT scans, 60% (34 of 57) to 93% (14 of 15) of patients had initial positive chest CT scans consistent with COVID-19 before the initial positive RT-PCR results; 42% of patients (24 of 57) showed improvement on follow-up chest CT scans before the RT-PCR results turned negative.

at initial presentation (6). In the current emergency, the low sensitivity of RT-PCR implies that many patients with COVID-19 may not be identified and may not receive appropriate treatment in time; such patients constitute a risk for infecting a larger population given the highly contagious nature of the virus. Chest CT, as a routine imaging tool for pneumonia diagnosis, is relatively easy to perform and can produce fast diagnosis. In this context, chest CT may provide benefit for diagnosis of COVID-19. As recently reported, chest CT demonstrates typical radiologic features in almost all patients with COVID-19, including ground-glass opacities, multifocal patchy consolidation, and/or interstitial changes with a peripheral distribution (7). Those typical features were also observed in patients with negative RT-PCR results but clinical symptoms. It has been noted in small-scale studies that the current RT-PCR testing has limited sensitivity, whereas chest CT may reveal pulmonary abnormalities consistent with COVID-19 in patients with initial negative RT-PCR results (8,9).

To better understand the diagnostic value of chest CT compared with RT-PCR testing, we report the results of chest CT in comparison to the initial and serial RT-PCR results in 1014 patients suspected of having COVID-19. A Farsi translation of the abstract is available in Appendix E1 (online).

## Materials and Methods

### Patients and Data Sources of RT-PCR Results

The institutional review board of our hospital (Tongji Hospital of Tongji Medical College of Huazhong University of Science and Technology, Wuhan, Hubei, China) approved this retrospective study. The requirement to obtain written informed consent was waived. W.L. is an employee of Julei Technology Company. The data from this study were analyzed and controlled by authors who are not employees of medical industry.

From January 6 to February 6, 2020, a total of 1049 patients (mean age ± standard deviation, 51 years ± 15; 467 men [46%]) who were suspected of having severe acute respiratory syndrome coronavirus 2 infection and who underwent both chest CT and laboratory virus nucleic acid testing (RT-PCR assay with throat swab samples) were retrospectively enrolled in our study (Fig 1). The RT-PCR results were extracted from the patients' electronic medical records in our hospital information system. The RT-PCR assays were performed by using TaqMan One-Step RT-PCR Kits (Shanghai Huirui Biotechnology [Shanghai, China] or Shanghai BioGerm Medical Biotechnology [Shanghai, China]), which have approved use by the China Food and Drug Administration. For patients with multiple RT-PCR assays, the repeated testing conducted up to and including 3 days after the initial test was adopted as confirmation of diagnosis. Repeated testing more than 3 days after the initial RT-PCR test was used to analyze conversion of RT-PCR results, in correlation with the chest CT scan(s).

For patients with multiple RT-PCR assays, the diagnosis of COVID-19 was confirmed when any one of the nucleic acid test results was positive. If a patient had multiple chest CT scans, we included the scan with the shortest interval (≤7 days) to compare with the RT-PCR assay for the analysis of diagnostic performance; any other chest CT scans in the same patient were used to assess the temporal change of the disease. Patients were excluded when the time between chest CT and the RT-PCR assay was longer than 7 days.

### Chest CT Protocols

All images were obtained with one of three CT systems (uCT 780 [United Imaging, Shanghai, China], Optima 660 [GE Healthcare, Chicago, Ill], or Somatom Definition AS+ [Siemens Healthineers, Erlangen, Germany]) with patients in the supine position. The main scanning parameters were as follows: tube voltage, 120 kVp; automatic tube current modulation; tube current, 30–70 mAs; pitch, 0.99–1.22 mm; matrix, 512 × 512; slice thickness, 10 mm; and field of view, 350 mm × 350 mm. All images were then reconstructed with a slice thickness of 0.625–1.250 mm with the same increment.

### Image Analysis

Two radiologists (T.A. and Z.Y., with 12 and 3 years of experience in interpreting chest CT images, respectively) who were blinded to RT-PCR results reviewed all chest CT images and decided on positive or negative CT findings by consensus. The epidemiologic history and clinical symptoms (fever and/dry cough) were available for both readers. The radiologists classified the chest CT scan as positive or negative for COVID-19. The radiologists also described main CT features (ground-glass opacity, consolidation, reticulation and/or thickened interlobular septa, nodules) and lesion distribution (left, right, or bilateral lungs).

### Statistical Analysis

The statistical analysis was performed with software (SPSS, version 21.0; SPSS, Chicago, Ill). Continuous variables are displayed as means ± standard deviations and categoric variables as counts and percentages.

LOC_AR_00003113



**Figure 1:** Study flowchart. COVID-19 = coronavirus 2019, RT-PCR = reverse-transcription polymerase chain reaction.

### Table 1: Summary of Patient Characteristics

| Characteristic | Value |
|---|---|
| No. of patients | 1014 |
| Age (y) | |
|   Mean ± standard deviation* | 51 ± 15 (2–95) |
|   <20 | 7 (1) |
|   20–39 | 267 (26) |
|   40–59 | 409 (40) |
|   ≥60 | 331 (33) |
| No. of men | 467 (46) |
| Median time between chest CT and RT-PCR assay (d)* | 1 (0–7) |
| Results of RT-PCR assay | |
|   Positive | 601 (59) |
|   Negative | 413 (41) |
| Findings and manifestations of chest CT | |
|   Consistent with viral pneumonia (positive) | 888 (88) |
|   Ground-glass opacity | 409/888 (46) |
|   Consolidation | 447/888 (50) |
|   Reticulation and/or thickened interlobular septa | 8/888 (1) |
|   Nodular lesions | 24/888 (3) |
|   No CT findings of viral pneumonia | 126 (12) |

Note.—Except where indicated, data are numbers of patients with percentages in parentheses. RT-PCR = reverse-transcription polymerase chain reaction.
* Numbers in parentheses are the range.

With use of RT-PCR results as the reference standard, the sensitivity, specificity, positive predictive value, negative predictive value, and accuracy of chest CT were calculated. A 95% confidence interval was obtained with the Wilson score method. The performance of chest CT in the identification of CO-VID-19 in different age groups (<60 years and ≥60 years) and according to sex was compared with the $\chi^2$ test.

For patients with negative RT-PCR tests but positive CT results, follow-up chest CT images were rereviewed to further confirm the imaging diagnosis if available. Clinical symptoms, typical imaging features on the initial chest CT scan, and dynamic changes on the serial follow-up chest CT scans were combined to classify the patients as highly likely cases, probable cases, and uncertain cases for those without serial CT scans. Highly likely cases were defined as patients with clinical symptoms (fever, cough, fatigue and/or shortness of breath) and typical CT features with dynamic changes (obvious progression or improvement in a short time) on serial CT scans. Probable cases were defined as patients with the aforementioned clinical symptoms and typical CT features but with stable findings on the follow-up CT scans or without follow-up CT scans. Uncertain cases were defined as patients with only one positive chest CT scan indicating viral pneumonia.

As to patients with multiple RT-PCR assays (with time interval of 4 days or more for two consecutive assays), the conversion of RT-PCR test results (negative to positive and positive to negative) was analyzed in correlation with the corresponding serial chest CT scans if available. Change in RT-PCR and CT findings may reflect viral proliferation or clearance in infected patients.

## Results

### General Description

Thirty-five patients were excluded because the time between chest CT and the RT-PCR assay was longer than 7 days. After exclusion of these patients, 1014 patients (mean age, 51 years ± 15; 467 men [46%]) were available for analysis. Figure 1 shows the study flowchart.

Of the 1014 patients, 601 had positive RT-PCR results and 413 had negative RT-PCR results, for a positive rate of 59% (95% confidence interval [CI]: 56%, 62%) (Fig 1). Of the 601 patients with positive RT-PCR results, 580 (97%) had positive chest CT scans. Of the 413 patients with negative RT-PCR result, 308 (75%) had positive chest CT scans.

The median time between the paired chest CT examinations and RT-PCR assays was 1 day (range, 0–7 days). Of the 1014 patients, 888 (88%; 95% CI: 86%, 90%) had positive chest CT

LOC_AR_00003114

Ai et al



**Figure 2:** Axial (top) and coronal (bottom) chest CT images in a 29-year-old man with fever for 6 days. Reverse-transcription polymerase chain reaction assay for severe acute respiratory syndrome coronavirus 2 using a swab sample was performed on February 5, 2020, with a positive result. Dates of examination are shown on images. A, Chest CT scans obtained at onset show normal findings. B, Chest CT scans show minimal ground-glass opacities in bilateral lower lung lobes (arrows). C, Chest CT scans show increased ground-glass opacities (arrowheads). D, Chest CT scans show the progression of pneumonia with mixed ground-glass opacities and linear opacities in the subpleural area. E, Chest CT scans show absorption of both ground-glass opacities and organizing pneumonia.



**Figure 3:** Chest CT images in a 34-year-old man with fever for 4 days. Positive result of reverse-transcription polymerase chain reaction assay for severe acute respiratory syndrome coronavirus 2 using a swab sample was obtained on February 8, 2020. Dates of examination are shown on images. A, Chest CT scan with magnification of lesions in coronal and sagittal planes shows a nodule with reversed halo sign in left lower lobe (box) at the early stage of the pneumonia. B, Chest CT scans in different axial planes and coronal reconstruction show bilateral multifocal ground-glass opacities. The nodular opacity resolved.

findings. The main chest CT findings were ground-glass opacity (409 of 888 patients [46%]) and consolidations (447 of 888 patients [50%]) (Table 1, Figs 2–4). Most patients (801 of 888 [90%]) had bilateral chest CT findings.

### Performance of Chest CT in Diagnosing COVID-19

There were 888 patients with positive chest CT findings (<60 years, $n = 587$; ≥60 years, $n = 301$; 420 men, 468 women). With RT-PCR results as the reference standard, the sensitivity, specificity, and accuracy of chest CT in indicating COVID-19 infection were 97% (95% CI: 95%, 98%; 580 of 601 patients), 25% (95% CI: 22%, 30%; 105 of 413 patients), and 68% (95% CI: 65%, 70%; 685 of 1014 patients), respectively.

The performance of chest CT in diagnosing COVID-19 in different age and sex groups is reported in Table 2. The positive predictive values and accuracy of chest CT in diagnosing CO-VID-19 were higher in patients aged 60 years or older than in

**E35**

LOC_AR_00003115



**Figure 4:** Chest CT images in a 46-year-old woman with fever for 4 days. The result of reverse-transcription polymerase chain reaction assay for severe acute respiratory syndrome coronavirus 2 using a swab sample was positive on February 4, 2020, and was negative on February 12. Chest CT scans obtained on, A, January 27, 2019, B, February 2, 2020, and, C, February 09, 2020, show gradual absorption of bilateral ground-glass opacities and linear consolidation.

**Table 2: Performance of Chest CT in the Diagnosis of COVID-19**

| Parameter | Results* | | | | Test Performance | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | TP | TN | FP | FN | Sensitivity (%) | Specificity (%) | PPV (%) | NPV (%) | Accuracy (%) |
| Overall | 580 | 105 | 308 | 21 | 97 (580/601) [95, 98] | 25 (105/413) [22, 30] | 65 (580/888) [62, 68] | 83 (105/126) [76, 89] | 68 (685/1014) [65, 70] |
| Age | | | | | | | | | |
| <60 y | 362 | 81 | 225 | 15 | 96 (362/377) [94, 98] | 27 (81/306) [22, 32] | 62 (362/587) [58, 66] | 84 (81/96) [76, 90] | 65 (443/683) [61, 68] |
| ≥60 y | 218 | 24 | 83 | 6 | 97 (218/224) [94, 99] | 22 (24/107) [16, 31] | 72 (218/301) [67, 77] | 80 (24/30) [63, 91] | 73 (242/331) [68, 78] |
| Sex | | | | | | | | | |
| M | 272 | 35 | 148 | 12 | 96 (272/284) [93, 98] | 19 (35/183) [14, 25] | 65 (272/420) [60, 69] | 75 (35/47) [61, 85] | 66 (307/467) [61, 70] |
| F | 308 | 70 | 160 | 9 | 97 (308/317) [95, 99] | 30 (70/230) [25, 37] | 66 (308/468) [61, 70] | 89 (70/79) [80, 94] | 69 (378/547) [65, 73] |

Note.—Results of RT-PCR were used as the reference standard. Data in parentheses are numbers of patients used to calculate percentages. Data in brackets are 95% confidence intervals. COVID-19 = coronavirus disease 2019, FN = false negative, FP = false positive, NPV = negative predictive value, PPV = positive predictive value, RT-PCR = reverse-transcription polymerase chain reaction, TN = true negative, TP = true positive.

* Data are numbers of patients.

LOC_AR_00003116



**Figure 5:**  Chest CT images in a 62-year-old man with fever for 2 weeks and dyspnea for 1 day. Negative results of reverse-transcription polymerase chain reaction assay for severe acute respiratory syndrome coronavirus 2 using a swab samples were obtained on February 3 and 11, 2020, respectively. Dates of examination are shown on images. A, Axial chest CT images show multiple ground-glass opacities in bilateral lungs. B, Axial chest CT images show enlarged multiple ground-glass opacities. C, Axial chest CT images show progression of disease from ground-glass opacities to multifocal organizing consolidation. D, Axial chest CT scans show partial absorption of the organizing consolidation.

those younger than 60 years ($P$ = .001 and .009, respectively); and no difference existed for sensitivity, specificity, and negative predictive value ($P$ = .40, .41, and .58, respectively). The specificity and negative predictive value of chest CT in diagnosing COVID-19 were greater for women than for men ($P$ = .009 and .04, respectively); no difference existed for sensitivity, positive predictive value, and accuracy ($P$ = .36, .74, and .25, respectively).

### Discrepant Findings between Chest CT and RT-PCR

Twenty-one patients (mean age, 46 years ± 24; 12 men [57%]) had positive RT-PCR results but without lesions at initial chest CT. The chest CT images in 308 patients (mean age, 47 years ± 14; 148 men [48%]) were suggestive of COVID-19, while their RT-PCR assays from throat swab samples were negative (Figs 5, 6). Of these 308 patients, 256 (83%) had bilateral lung lesions consisting of ground-glass opacities (126 of 308 patients [41%]) and consolidations (172 of 308 patients [56%]) at chest CT.

On the basis of the analysis of clinical symptoms, CT features, and serial CT scans if available, 147 of the 308 patients (48%) were considered as highly likely cases, 103 (33%) as probable cases, and 58 (19%) as uncertain cases.

### Analysis of Multiple RT-PCR Assays and Serial Chest CT Scans

A total of 258 patients underwent multiple RT-PCR assays (Table 3). For patients with follow-up RT-PCR testing (with time interval >3 days for two consecutive assays), the mean interval between initial negative to positive RT-PCR results was

5.1 days ± 1.5, with a range of 4–8 days and a median of 4 days ($n$ = 15). The mean time between initial positive RT-PCR testing and subsequent negative change was 6.9 days ± 2.3, with a range of 4–15 days and a median of 7 days ($n$ = 57). In the subgroup of patients with negative to positive RT-PCR results, 67% (10 of 15 patients) showed initial positive chest CT findings before the initial negative RT-PCR results and 93% (14 of 15 patients) showed that the initial chest CT scan had typical imaging features consistent with COVID-19 before (or parallel to) the initial positive RT-PCR results, with a median lead time of 8 days (range, 0–21 days). In the subgroup of patients with positive to negative RT-PCR results, 60% (34 of 57 patients) showed the initial chest CT scan had typical imaging features consistent with COVID-19 before (or parallel to) the initial positive RT-PCR results, with a median lead time of 6 days (range, 0–27 days); almost all patients (56 of 57) had initial positive chest CT scans before or within 6 days of the initial positive RT-PCR results. In addition, 42% (24 of 57 patients) showed improvement on follow-up chest CT scans before the RT-PCR results turned negative; only 3.5% (two of 57 patients) showed disease progression on the follow-up CT scans after the RT-PCR results turned negative (Fig 7).

### Discussion

Early diagnosis of coronavirus disease 2019 (COVID-19) is crucial for disease treatment and control. Compared with reverse-transcription polymerase chain reaction (RT-PCR), chest

LOC_AR_00003117



**Figure 6:** Chest CT images in a 63-year-old woman with fever for 11 days. Negative results of reverse-transcription polymerase chain reaction assay for severe acute respiratory syndrome coronavirus 2 using swab samples were obtained on February 2 and 11, 2020, respectively. Chest CT scans obtained on, A, January 28, 2020, B, February 6, and, C, February 13 show typical mixed ground-glass opacities and multifocal consolidation shadows in bilateral lungs without evidence of resolution over 16 days.

**Table 3: Details of Multiple RT-PCR Assays in 258 Patients**

| Characteristic | Patients | Pairs of Consecutive Tests |
|---|---|---|
| No. of tests performed | | |
| 2 | 205 (80) | ... |
| 3 | 45 (17) | ... |
| 4 | 8 (3) | ... |
| Time between consecutive tests (d) | | |
| 0–3 | | 178 (56, n = 158) |
| ≥4 | | 141 (44, n = 129) |
| Dynamic change* | | |
| From positive to negative results | 57 (44) | 57/129 |
| From negative to positive results | 15 (12) | 15/129 |

Note.—Data are numbers of patients, with percentages in parentheses. The mean interval between initial positive RT-PCR test result and subsequent negative change was 6.9 days ± 2.3 (range, 4–15 days; median, 7 days). The mean interval between initial negative RT-PCR test result and subsequent positive change was 5.1 days ± 1.5 (range, 4–8 days; median, 4 days). RT-PCR = reverse-transcription polymerase chain reaction.
* Dynamic change of two consecutive tests with time interval of 4 days or more.

CT may be a more reliable, practical, and rapid method to diagnose and assess COVID-19, especially in the area affected by the epidemic. With RT-PCR results as the reference standard in 1014 patients, the sensitivity, specificity, and accuracy of chest CT in indicating COVID-19 infection were 97% (580 of 601 patients), 25% (105 of 413 patients), and 68% (685 of 1014 patients), respectively. The positive predictive value and negative predictive value were 65% (580 of 888 patients) and 83% (105 of 126 patients), respectively.

According to current diagnostic criteria, viral nucleic acid tests by means of RT-PCR assay play a vital role in determining hospitalization and isolation for individual patients. However, its lack of sensitivity, insufficient stability, and relatively long processing time were detrimental to the control of the disease epidemic. In our study, the positive rate of RT-PCR assay for throat swab samples was 59% (95% CI: 56%, 62%), which was consistent with that in a previous report (95% CI: 30%, 60%)

(6). In addition, a number of any external factors may affect RT-PCR testing results, including sampling operations, specimen source (upper or lower respiratory tract), sampling timing (different periods of the disease development) (6), and performance of detection kits. As such, the results of RT-PCR tests must be interpreted with caution.

Chest CT is a conventional, noninvasive imaging modality with high accuracy and speed. On the basis of available data published in recent literature, almost all patients with CO-VID-19 had characteristic CT features in the disease process (8,10–13), such as different degrees of ground-glass opacities with and/or without crazy-paving sign, multifocal organizing pneumonia, and architectural distortion in a peripheral distribution. From our study, in addition, about 60% of patients (34 of 57) had typical CT features consistent with COVID-19 before (or parallel to) the initial positive RT-PCR results, and almost all patients (56 of 57) had initial positive chest CT scans before or within 6 days of the initial positive RT-PCR results. This indicates that CT can be very useful in the early detection of suspected cases.

In this study, 97% of patients confirmed to have COVID-19 with RT-PCR assays showed positive findings at chest CT, which was higher than that reported by Guan et al (86.2%) (14). A likely explanation is that patients in this study were all from the largest hospital in Wuhan, China, the central area of the outbreak of COVID-19. In this context, radiologists were more likely to make a diagnosis of COVID-19 when typical CT features were found. Given the sensitivity of chest CT (hence its value in preventing further spread of disease), clinical diagnosis criteria based on typical CT imaging features were temporarily adopted in the revised 5th edition of the Guideline of Diagnosis and Treatment, which was only applicable in Hubei Province, China (15). In addition, Pan et al (12) demonstrated that multiple repeat chest CT examinations can accurately reflect disease evolution and monitor the treatment effect. We also observed that 42% of patients (24 of 57) showed improvement on follow-up chest CT scans, which was earlier than the RT-PCT results turning negative. Only two of 57 patients (3.5%) showed progression on follow-up chest CT scans after RT-PCR test results turned negative.

For patients with negative RT-PCR tests, more than 70% had typical CT manifestations. On one hand, due to the overlap of CT imaging features between COVID-19 and other viral

LOC_AR_00003118

Ai et al





**Figure 7:** Analysis of serial reverse-transcription polymerase chain reaction (RT-PCR) assays in correlation with serial chest CT scans. A, Chart shows subgroup with positive to negative RT-PCR results (n = 57). B, Chart shows subgroup with negative to positive RT-PCR results (n = 15). Horizontal axis is the time point of initial chest CT and follow-up chest CT scans relative to the time point of the consecutive two RT-PCR tests (before positive RT-PCR, negative numbers; after RT-PCR, positive numbers).

pneumonia, false-positive cases of COVID-19 can be identified with chest CT. Nevertheless, considering the rapidly spreading epidemic of COVID-19, the priority was to identify any CT case suspicious for COVID-19 to isolate the patients and administer appropriate treatment. In the context of emergency disease control, some false-positive cases may be acceptable. On the other hand, given the relatively low positive rate of RT-PCR assay, some "false-positive" cases at CT may indeed be "true-positive" if RT-PCR assay is an imperfect standard of reference. In fact, from the results of this study, about 81% of the patients with negative RT-PCR results but positive chest CT scans were

reclassified as highly likely or probable cases of COVID-19 by means of the comprehensive analysis of clinical symptoms, typical CT manifestations, and dynamic CT follow-up. On the basis of serial RT-PCR tests and CT scans, 90% of patients (14 of 15) had initial positive chest CT consistent with COVID-19 before (or parallel to) the initial positive RT-PCR results. As such, it can be speculated that those negative RT-PCR results could be problematic. In patients with negative RT-PCR tests, a combination of exposure history, clinical symptoms, typical CT imaging features, and dynamic changes should be used to identify COVID-19 with higher sensitivity.

LOC_AR_00003119

Our study has several limitations. First, by using RT-PCR assays with a relatively low positive rate as the reference standard, the sensitivity of chest CT for COVID-19 may be overestimated and the specificity underestimated. In an area affected by epidemic, negative RT-PCR findings but positive CT features can still be highly suggestive of COVID-19. This has important clinical and societal implications; rapid detection with high sensitivity of viral infection may allow better control of viral spread. A second limitation is that clinical and laboratory data were limited during this urgent period when regional hospitals were overloaded. Nevertheless, the results reported herein from the center of the epidemic area should supply important information regarding the value of CT and RT-PCR in combating the prevalent disease.

In conclusion, chest CT has high sensitivity for the diagnosis of COVID-19. Our data and analysis suggest that chest CT should be considered for COVID-19 screening, comprehensive evaluation, and follow-up, especially in epidemic areas with high pretest probability for disease.

**Author contributions:** Guarantors of integrity of entire study, Z.Y., H.H., C.Z., C.C., Z.S., L.X.; study concepts/study design or data acquisition or data analysis/interpretation, all authors; manuscript drafting or manuscript revision for important intellectual content, all authors; approval of final version of submitted manuscript, all authors; agrees to ensure any questions related to the work are appropriately resolved, all authors; literature research, T.A., Z.Y., H.H., C.C., Z.S., L.X.; clinical studies, T.A., Z.Y., H.H., C.Z., C.C., Z.S., L.X.; experimental studies, H.H., C.C., Q.T., Z.S.; statistical analysis, T.A., Z.Y., H.H., C.Z., C.C., W.L., Z.S.; and manuscript editing, T.A., Z.Y., H.H., C.C., Q.T., Z.S., L.X.

**Disclosures of Conflicts of Interest: T.A.** disclosed no relevant relationships. **Z.Y.** disclosed no relevant relationships. **H.H.** disclosed no relevant relationships. **C.Z.** disclosed no relevant relationships. **C.C.** disclosed no relevant relationships. **W.L.** disclosed no relevant relationships. **Q.T.** disclosed no relevant relationships. **Z.S.** disclosed no relevant relationships. **L.X.** disclosed no relevant relationships.

## References

1. Huang C, Wang Y, Li X, et al. Clinical features of patients infected with 2019 novel coronavirus in Wuhan, China. Lancet 2020;395(10223):497–506 [Published correction appears in Lancet 2020;395(10223):496.].
2. World Health Organization. Clinical management of severe acute respiratory infection when novel coronavirus (nCoV) infection is suspected: interim guidance. January 11, 2020. Geneva, Switzerland: World Health Organization, 2020.
3. National Health Commission of the People's Republic of China. http://www.nhc.gov.cn. Accessed February 25, 2020.
4. Novel Coronavirus Pneumonia Emergency Response Epidemiology Team. The epidemiological characteristics of an outbreak of 2019 novel coronavirus diseases (COVID-19) in China [in Chinese]. Zhonghua Liu Xing Bing Xue Za Zhi 2020;41(2):145–151.
5. General Office of National Health Committee. Notice on the issuance of a program for the diagnosis and treatment of novel coronavirus (2019-nCoV) infected pneumonia (trial sixth edition). http://www.nhc.gov.cn/yzygj/s7653p/202002/8334a8326dd94d329df351d7da8aefc2.shtml?from=timeline. Published February 18, 2020. Accessed February 24, 2020.
6. Yang Y, Yang M, Shen C, et al. Evaluating the accuracy of different respiratory specimens in the laboratory diagnosis and monitoring the viral shedding of 2019-nCoV infections. medRxiv. https://doi.org/10.1101/2020.02.11.20021493. Published February 17, 2020. Accessed DATE.
7. Chung M, Bernheim A, Mei X, et al. CT imaging features of 2019 novel coronavirus (2019-nCoV). Radiology 2020 Feb 4:200230 [Epub ahead of print].
8. Huang P, Liu T, Huang L, et al. Use of chest CT in combination with negative RT-PCR assay for the 2019 novel coronavirus but high clinical suspicion. Radiology 2020 Feb 12:200330 [Epub ahead of print].
9. Xie X, Zhong Z, Zhao W, Zheng C, Wang F, Liu J. Chest CT for typical 2019-nCoV pneumonia: relationship to negative RT-PCR testing. Radiology 2020 Feb 12:200343 [Epub ahead of print].
10. Lei J, Li J, Li X, Qi X. CT imaging of the 2019 novel coronavirus (2019-nCoV) pneumonia. Radiology 2020 Jan 31:200236 [Epub ahead of print].
11. Shi H, Han X, Zheng C. Evolution of CT manifestations in a patient recovered from 2019 novel coronavirus (2019-nCoV) pneumonia in Wuhan, China. Radiology 2020 Feb 7:200269 [Epub ahead of print].
12. Pan F, Ye T, Sun P, et al. Time course of lung changes on chest CT during recovery from 2019 novel coronavirus (COVID-19) pneumonia. Radiology 2020 Feb 13:200370 [Epub ahead of print].
13. Pan Y, Guan H, Zhou S, et al. Initial CT findings and temporal changes in patients with the novel coronavirus pneumonia (2019-nCoV): a study of 63 patients in Wuhan, China. Eur Radiol 2020 Feb 13 [Epub ahead of print].
14. Guan WJ, Ni ZY, Hu Y, et al. Clinical Characteristics of Coronavirus Disease 2019 in China. N Engl J Med doi: 10.1056/NEJMoa2002032. Published online February 28, 2020.
15. General Office of National Health Committee. Notice on the issuance of a program for the diagnosis and treatment of novel coronavirus (2019-nCoV) infected pneumonia (trial revised fifth edition). http://www.nhc.gov.cn/yzygj/s7653p/202002/d4b895337e19445f8d728fcaf1e3e13a.shtml. Published February 8, 2020. Accessed February 24, 2020.

LOC_AR_00003120

# EXHIBIT 24

LOC_AR_00003121

# Combination of CT and RT-PCR in the screening or diagnosis of COVID-19

**Youxin Wang[1,2], Haifeng Hou[3], Wenrui Wang[2], Wei Wang[1,4]**

[1] Beijing Key Laboratory of Clinical Epidemiology, School of Public Health, Capital Medical University, Beijing, China
[2] Inner Mongolia Comprehensive Center for Disease Control and Prevention, Hohhot, Inner Mongolia Autonomous Region, China
[3] School of Public Health, Shandong First Medical University & Shandong Academy of Medical Sciences, Taian, Shandong Province, China
[4] School of Medical and Health Sciences, Edith Cowan University, Perth, Australia

> Neither chest CT nor RT-PCR testing alone is accurate enough for the diagnosis of COVID-19 infection.

Coronavirus Disease 2019 (COVID-19), emerged in Wuhan, China, in December 2019. As of 10 March 2020, COVID-19 cases have been reported in 114 countries from all Continents except Antarctica, with accumulative 80 932 cases in China and 29 432 in other countries [1]. The transmission potential of COVID-19, determined by reproduction number (R0) of 3.28, is much higher that of severe acute respiratory syndrome (SARS) [2]. Bold measures taken by China have effectively curbed the rapid spread of this new respiratory disease source and changed the dangerous process of rapid spread of the epidemic [3]. The world is not yet ready to organize and implement the measures that have been proved to be efficient and effective by China to block or minimize the spread of new coronavirus [3]. The crude case-fatality rate (CFR) of COVID-19 is reported to be 2.3% in all patients [4], while higher to be 61.5% in critically ill patients [5]. Therefore, early screening and quarantining mild or asymptomatic cases and early diagnosis of sever patients for intensive treatment are urgent to avoid the pandemic of COVID-19.

Reverse Transcription-Polymerase Chain Reaction (RT-PCR) testing was recommended to confirm COVID-19 cases by China medical authority [6], however the total positive rate of RT-PCR for throat swab samples was about 30% to 60% at initial presentation. Chest Computed Tomography (CT), a routine imaging method, has also been applied to diagnose COVID-19 infection [7]. A study on the correlation of chest CT and RT-PCR testing of COVID-19 based on 1014 cases demonstrated that the sensitivity of chest CT imaging for COVID-19 was 97% (580/601), and the specificity was 25% (105/413), with RT-PCR as a diagnosis criterion [8]. As a new emerging infectious disease, there is no gold criteria for the diagnosis of COVID-19. Our current study showed that if chest CT was taken as a reference of diagnosis standard, the sensitivity of RT-PCR

> Parallel tests with CT and RT-PCT are recommended to be applied in the screening of COVID-19 for isolation, while series test with CT or RT-PCT should be used in COVID-19 diagnosis confirmation for treatment.

LOC_AR_00003122

**Table 1.** The performance of RT-PCR for COVID-19 infection with chest CT result as reference

| | positive | NEGATIVE | Sensitivity (95% CI) | Specificity (95% CI) |
|---|---|---|---|---|
| Positive | 580 | 308 | 65% (62%-68%) | 83% (76%-89%) |
| Negative | 21 | 105 | | |

CT – computed tomography, RT-PCR – reverse transcriptase polymerase chain reaction, CI – confidence interval

testing for COVID-19 was 65% (580/888), and the specificity is 83% (105/126) (Table 1). Thus, if both sensitivity and specificity were taken into account simultaneously, neither chest CT nor RT-PCR testing alone is accurate enough for the diagnosis of COVID-19 infection.

Considering that asymptomatic cases are also of higher transmission potential, sensitivity should be first considered for the screening purpose of COVID-19 infection. When confirmation for intensive treatment, specificity should be first considered to avoid false treatment. Parallel tests and serial test are needed to increase both sensitivity and specificity. Parallel tests perform RT-PCR and CT imaging at the same time and the results are cross-referenced to make the diagnosis [9]. Serial test employs as a secondary screening test which is performed only if the result of initial screening test is positive [9]. For screening purposes, parallel tests, ie, positive in either RT-PCR or chest CT is used to clinically diagnose COVID-19, can improve sensitivity and decrease false negative cases. For therapy purposes serial tests should be used to improve specificity and decrease false positive cases. Consequently, we recommend that parallel tests are used in screening, while series tests should be used for diagnosis confirmation of COVID-19. The proposed strategic approach for screening and diagnosis confirmation of COVID-19 infection might also be of reference significance for other countries or other emerging infectious disease.



Photo: Parallel or serial test (from the authors' own collection, used with permission).



**Funding:** The study is supported by the National Natural Science Foundation of China (81673247, 81703317 and 81872682).

**Authorship contributions:** Youxin Wang & Wei Wang: design, draft, and revise the manuscript. Haifeng Hou & Wenrui Wang: data analysis.

**Conflict of interest:** The authors completed the ICMJE Unified Competing Interest form (available upon request from the corresponding author), and declare no conflicts of interest.

LOC_AR_00003123

1  National epidemic situation. [In Chinese].Available: https://news.qq.com/zt2020/page/feiyan.htm. Accessed: 10 March 2020.

2  Liu Y, Gayle AA, Wilder-Smith A, Rocklov J. The reproductive number of COVID-19 is higher compared to SARS coronavirus. J Travel Med. 2020;27:taaa021. Medline:32052846 doi:10.1093/jtm/taaa021

3  China-WHO Joint Expert Team. Joint investigation report on Novel coronavirus pneumonia (COVID-19). Available: http://www.nhc.gov.cn/jkj/s3578/202002/87fd92510d094e4b9bad597608f5cc2c/files/e73a238d8eff45d5ab855fa078f4c0dd.pdf. Accessed: 10 March 2020.

4  Ebrahim SH, Ahmed QA, Gozzer E, Schlangenhauf P, Memish YA. Covid-19 and community mitigation strategies in a pandemic. BMJ. 2020;368:m1066. Medline:32184233 doi:10.1136/bmj.m1066

5  Yang X, Yu Y, Xu J, Shu H, Xia J, Liu H, et al. Clinical course and outcomes of critically ill patients with SARS-CoV-2 pneumonia in Wuhan, China: a single-centered, retrospective, observational study. Lancet Respir Med. 2020; pii: S2213-2600(20)30079-5. [Epub ahead of print]. Medline:32105632 doi:10.1016/S2213-2600(20)30079-5.

6  General Office of National Health Committee. Notice on the issuance of a program for the diagnosis and treatment of novel coronavirus (2019-nCoV) infected pneumonia (trial sixth edition) (2020-02-18). Available: http://www.nhc.gov.cn/yzygj/s7653p/202002/8334a8326dd94d329df351d7da8aefc2/files/b218efeb1bc54639af227f922bf6b817.pdf. Accessed: 24 February 2020.

7  Yang Y, Yang M, Shen C, Wang F, Yuan J, Li J, et al. Evaluating the accuracy of different respiratory specimens in the laboratory diagnosis and monitoring the viral shedding of 2019-nCoV infections. MedRxiv. 2020. doi:10.1101/2020.02.11.2 0021493.

8  Ai T, Yang Z, Hou H, Zhan C, Chen C, Lv W, et al. Correlation of chest CT and RT-PCR testing in coronavirus disease 2019 (COVID-19) in China: A report of 1014 cases. Radiology. 2020. 200642. Epub ahead of print. Medline:32101510 doi:10.1148/radiol.2020200642

9  Lei X, Wang J, Yang Z, Zhou S, Xu Z. Diagnostic value of pleural effusion mononuclear cells count and adenosine deaminase for tuberculous pleurisy patients in China: A case-control study. Front Med (Lausanne). 2019;6:301. Medline:31921874 doi:10.3389/fmed.2019.00301

Correspondence to:
Wei Wang, MD, PhD, FFPH, FRSB, FRSM
School of Medical and Health Sciences
Edith Cowan University
270 Joondalup Drive
Perth 60127
Australia
wei.wang@ecu.edu.au

LOC_AR_00003124

# EXHIBIT 25

LOC_AR_00003125

UNITED STATES COPYRIGHT OFFICE



# Software-Enabled Consumer Products

A REPORT OF THE REGISTER OF COPYRIGHTS                    DECEMBER 2016



LOC_AR_00003126

UNITED STATES COPYRIGHT OFFICE

# Software-Enabled Consumer Products

A REPORT OF THE REGISTER OF COPYRIGHTS                    DECEMBER 2016

LOC_AR_00003127



The Register of Copyrights of the United States of America
United States Copyright Office · 101 Independence Avenue SE · Washington, DC 20559-6000 · (202) 707-8350

December 15, 2016

Dear Chairman Grassley and Ranking Member Leahy:

On behalf of the United States Copyright Office, I am pleased to deliver this Report, *Software-Enabled Consumer Products*, in response to your October 22, 2015 request. In requesting the Report, you noted the ubiquity of software and how it plays an ever-increasing role in our lives. As you noted in your request, the expanding presence of software embedded in everyday products requires careful evaluation of copyright's role in shaping interactions with the devices we own. The Report details how copyright law applies to software-enabled consumer products and enables creative expression and innovation in the software industry.

For many innovators, copyright's incentive system is the engine that drives creation and innovation. But the spread of copyrighted software also raises particular concerns about consumers' right to make legitimate use of those works—including resale, repair, and security research. As the Report explains, the Office believes that the proper application of existing copyright doctrines to software embedded in everyday products should allow users to engage in these and other legitimate uses of works, while maintaining the strength and stability of the copyright system. The Office thus is not recommending any legislative changes at this time.

Thank you for the opportunity to prepare this Report.

Respectfully,

Karyn Temple Claggett
Acting Register of Copyrights and Director
U.S. Copyright Office

Enclosure

Hon. Charles E. Grassley, Chairman
U.S. Senate, Committee on the Judiciary
224 Dirksen Senate Office Building
Washington, D.C. 20510-6050

Hon. Patrick Leahy, Ranking Member
U.S. Senate, Committee on the Judiciary
224 Dirksen Senate Office Building
Washington, D.C. 20510-6050

CHARLES E. GRASSLEY, IOWA, CHAIRMAN

ORRIN G. HATCH, UTAH
JEFF SESSIONS, ALABAMA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
JEFF FLAKE, ARIZONA
DAVID VITTER, LOUISIANA
DAVID A. PERDUE, GEORGIA
THOM TILLIS, NORTH CAROLINA

PATRICK J. LEAHY, VERMONT
DIANNE FEINSTEIN, CALIFORNIA
CHARLES E. SCHUMER, NEW YORK
RICHARD J. DURBIN, ILLINOIS
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
AL FRANKEN, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT

Kolan L. Davis, Chief Counsel and Staff Director
Kristine J. Lucius, Democratic Chief Counsel and Staff Director

United States Senate

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

October 22, 2015

The Honorable Maria A. Pallante
Register of Copyrights
U.S. Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20540

Dear Ms. Pallante:

Over the past few decades, digital technologies have revolutionized our world. Our intellectual property laws have helped to enable these developments, promoting creativity and innovation, as well as dissemination of, and consumer access to, creative works. One result of recent technological developments is that copyrighted software is ubiquitous in our daily lives. Copyrighted software is now essential to the operation of our refrigerators, our cars, our farm equipment, our wireless phones, and virtually any other device you can think of.

As software plays an ever-increasing role in defining consumer interactions with devices and products, many questions are being asked about how consumers can lawfully use products that rely on software to function. The public is rightly seeking clarity. This is a complex field, and how we interact with software in our products touches on numerous important policy arenas, including intellectual property, privacy, consumer protection, public safety, cybersecurity, competition, and the evolution of the digital marketplace. Our laws should work together to promote the public interest in each of these areas, including the interests of consumers, creators, and technology companies wishing to engage in lawful behavior.

We write to you in an effort to better understand and evaluate how our copyright laws enable creative expression, foster innovative business models, and allow legitimate uses in this software-enabled environment. Some of the issues raised relating to restrictions on use of software-enabled devices may not be driven primarily by copyright issues and, to the extent action is called for we may need to look outside of copyright law. But there is undoubtedly a need to understand how copyright is implicated.

To help us make informed policymaking choices in this area, we request that the Copyright Office undertake a comprehensive review of the role of copyright in the complex set of relationships at the heart of these issues. The Office's longstanding interest and expertise in the intersection of copyright law and technology is essential to understanding how copyright shapes our interactions with software in the things we own. Specifically, we would like you to study and report on the following topics:

The Honorable Maria A. Pallante
October 22, 2015
Page 2 of 2

- the provisions of the copyright law that are implicated by the ubiquity of copyrighted software in everyday products;
- whether, and to what extent, the design, distribution, and legitimate uses of products are being enabled and/or frustrated by the application of existing copyright law to software in everyday products;
- whether, and to what extent, innovative services are being enabled and/or frustrated by the application of existing copyright law to software in everyday products;
- whether, and to what extent, legitimate interests or business models for copyright owners and users could be undermined or improved by changes to the copyright law in this area; and
- identify key issues in how the copyright law intersects with other areas of law in establishing how products that rely on software to function can be lawfully used.

This list of topics is not exhaustive. Please examine any other topic that the Office determines is relevant to our inquiry. To the extent that the Office believes legislative, or other, changes are necessary, please make appropriate recommendations.

In performing this review, we request that the Office seek public input, including from interested industry stakeholders, consumer advocacy groups, and relevant federal agencies. We also ask that you complete the report no later than December 15, 2016 and that you keep our staff updated on your progress during its completion.

This is a serious matter, deserving of the careful assessment and expert assistance that the Copyright Office can provide. We look forward to receiving your analysis.

Sincerely,

CHARLES E. GRASSLEY
Chairman
Committee on the Judiciary

PATRICK LEAHY
Ranking Member
Committee on the Judiciary

## Acknowledgements

This Report reflects the efforts of many people within the U.S. Copyright Office. General Counsel and Associate Register of Copyrights Sarang (Sy) Damle, Senior Advisor to the Register Catherine Rowland, and Deputy Director of Registration Policy and Practice Erik Bertin were the primary authors of this Report. They managed and oversaw the complex research, public hearings, writing, and recommendations. Without their efforts, this Report would not have been possible.

I am grateful as well for the contributions of Assistant General Counsel Anna Chauvet, Attorney-Advisor John Riley, and Barbara A. Ringer Copyright Honors Program Fellows Michelle Choe and Emma Raviv, all of whom authored significant portions of the Report.

Deputy Director of Policy and International Affairs Maria Strong, Senior Advisor to the Register Stephanie Moore, and Senior Counsels for Policy and International Affairs Kevin Amer and Kimberley Isbell reviewed the Report and provided important suggestions and recommendations during its drafting. Law clerks Sara Gates, Cassidy Grunninger, Nouran Sedaghat, Lauren Shapiro, and Katie Witwer all provided valuable research support.

The Copyright Office received helpful support from colleagues outside of Washington, D.C. In particular, I am grateful to Professors David Faigman and Ben Depoorter of the University of California, Hastings College of the Law for facilitating the roundtable held in Hasting's Alumni Reception Center in San Francisco.

Finally, I would like to sincerely thank the organizations, law students, and other individuals who provided written commentary and shared their perspectives and experiences in the roundtable discussions.

Karyn Temple Claggett
Acting Register of Copyrights and Director
U.S. Copyright Office

# TABLE OF CONTENTS

EXECUTIVE SUMMARY

I.  BACKGROUND AND STUDY HISTORY ........................................................... 1

   A.  Legal Background ...................................................................................... 1

   B.  Study History ............................................................................................ 5

II.  DEFINING "SOFTWARE EMBEDDED IN EVERYDAY PRODUCTS" ......................... 8

III.  RELEVANT LEGAL DOCTRINES ................................................................ 12

   A.  Basics of Copyright Protection ................................................................ 12

   B.  Limits on the Scope of Copyright Protection ............................................ 13

      1.  Idea / Expression Dichotomy ........................................................ 13

      2.  Merger and *Scènes à Faire* ......................................................... 14

      3.  Fair Use ........................................................................................ 17

      4.  First Sale Doctrine ........................................................................ 18

      5.  Section 117 ................................................................................... 18

      6.  *De Minimis* Uses ......................................................................... 20

   C.  Ownership versus Licensing ..................................................................... 21

   D.  Other Areas of Law .................................................................................. 25

IV.  ANALYSIS OF SPECIFIC CONCERNS RAISED BY SOFTWARE-ENABLED
CONSUMER PRODUCTS ............................................................................... 27

   A.  Resale ....................................................................................................... 27

   B.  Repair and Tinkering ............................................................................... 31

   C.  Security Research ..................................................................................... 42

   D.  Interoperability and Competition ............................................................. 51

   E.  Licensing of Embedded Software ............................................................. 60

V.  CONCLUSION ........................................................................................... 69

APPENDICES

Appendix A:  Federal Register Notices
Appendix B:  Commenting Parties and Roundtable Participants

# Executive Summary

U.S. copyright laws have protected computer software for many years, and today that regime of legal protection supports an industry that is a major engine of economic growth. In the last quarter century, the software industry has added millions of jobs and increased the U.S. gross domestic product by hundreds of billions of dollars. Software has transformed our way of life, paving the way for personal computers, video games, digital photography, the internet, music and movie streaming services, smartphones, the Internet of Things, cryptocurrencies, and self-driving cars. In the near future, software will be behind even more innovations, like artificial intelligence and advanced robotics. In short, as one software entrepreneur famously put it, "software is eating the world."[1]

One result of the spread of software is that consumers now routinely use software-enabled products for everything from adjusting the thermostats in their homes, to driving to work, to getting a midnight snack from the fridge. This near-ubiquity has led some to question whether current copyright laws provide adequate guidance regarding the sometimes complex copyright issues arising in relation to software embedded in consumer products. These concerns span a wide range of uses, including resale, repair, research, and beyond. For example, to the extent that repairing a software-enabled device requires copying or altering a copyrighted computer program, does the law limit consumers' right to engage in such activity? How might consumers' ability to sell or convey such a device be affected if the embedded software is subject to a licensing agreement?

In light of these and other concerns, in October 2015, Chairman Chuck Grassley and Ranking Member Patrick Leahy of the Senate Judiciary Committee (the "Committee") requested that the Copyright Office provide its expert advice, in "an effort to better understand and evaluate how our copyright laws enable creative expression, foster innovative business models, and allow legitimate uses in this software-enabled environment."[2] Among other issues, the Committee requested that the Office study and report on: (1) the provisions of the copyright law that are implicated by the ubiquity of copyrighted software in everyday products; (2) the law's effect on the design, distribution, and legitimate uses of such products, as well as on innovative services related thereto; (3) the effects that statutory changes in this area could have on stakeholder interests and business models; and (4) the intersection of copyright provisions with other areas of law in this context.[3] The Committee also asked the Office

---

[1] Marc Andreessen, *Why Software Is Eating The World*, WALL ST. J. (Aug. 20, 2011), http://www.wsj.com/articles/SB10001424053111903480904576512250915629460.

[2] Letter from Chairman Chuck Grassley and Ranking Member Patrick Leahy, S. Comm. on the Judiciary, to Maria A. Pallante, Register of Copyrights & Dir., U.S. Copyright Office, at 1 (Oct. 22, 2015) ("Grassley/Leahy Letter"), http://www.copyright.gov/policy/software/grassley_leahy-software-study-request-10222015.pdf.

[3] *Id.* at 1-2.

i

to make appropriate legislative or other recommendations, if it believed changes were necessary.

The Committee's request was limited to embedded software in everyday products. The Committee did *not* ask the Office to review copyright law as applied to software and computer programs generally. Accordingly, a foundational issue in this Report is how to define the specific subset of software that is the subject of this study. As discussed in Part II, the Office found a general consensus that it would be a mistake to statutorily distinguish between software in everyday products and other kinds of software. At the same time, there is no question that the spread of software in everyday products raises unique issues. These products share certain common characteristics, and since the Office's focus is on products with these shared traits, the Office does not analyze software generally.

The Copyright Office endeavored to examine how existing copyright law doctrines might address the particular issues that arise with respect to these products. In Part III, the Report describes the relevant copyright law doctrines potentially operating in the context of software-enabled consumer products. In addition, the Report briefly identifies some of the complex issues outside of copyright—including privacy and cybersecurity—that have arisen in this context. These issues are being investigated by a number of other components of the federal government, including the Federal Trade Commission, the Department of Homeland Security, and the Department of Commerce. The Copyright Office's analysis is thus limited to the *copyright* issues presented by the spread of software-enabled consumer products.

Part IV then addresses how software-enabled consumer products can be resold, repaired or improved, researched for security flaws, or made to interoperate with other products or software. In each case, the Office finds that faithful application of existing copyright law doctrines should provide no barrier to legitimate uses. In short:

- The Office's study did not reveal evidence that consumers have been prevented from reselling or otherwise disposing of their software-enabled consumer products. The Office does not see a current need for legislative change relating to resale, so long as courts properly apply the first-sale right embodied in section 109 of the Copyright Act.

- The Office recognizes the value of allowing the public to freely repair defective consumer products and tinker with products to improve their function. But establishing a new statutory framework explicitly permitting repair and tinkering does not appear to be necessary at this time. Properly understood, existing copyright law doctrines—including the idea/expression dichotomy, fair use, merger, *scènes à faire*, and section 117—should continue to facilitate these types of activities.

LOC_AR_00003134

- Similarly, the Office recognizes the value of allowing the public to engage in good-faith security research of software-enabled consumer products. Again, however, statutory changes (at least outside the context of the anticircumvention provisions in section 1201) do not appear to be necessary at present. Existing copyright law doctrines should protect this legitimate activity.

- The Office recognizes the significance of preserving the ability to develop products and services that can interoperate with software-enabled consumer products, and the related goal of preserving competition in the marketplace. While a new statutory framework might help reduce some uncertainty in this area, such action does not appear to be necessary at this time. Again, faithful application of existing copyright law doctrines can preserve the twin principles of interoperability and competition.

The Copyright Office also examined the reach and scope of licensing practices for embedded software, an issue that implicates several subsidiary issues, including: the relationship of the Copyright Act to state contract law; whether, and in what circumstances, violations of the terms of software licenses would constitute copyright infringement; and confusion among consumers regarding licensing terms for embedded software. The Office's study found that, in certain circumstances, such as resale, there is only limited evidence regarding real-world restrictions. Accordingly, the Office believes that the question of ownership versus licensing, while very important, is one that can be resolved with the proper application of existing case law.

The Copyright Office acknowledges that relying on flexible doctrines like merger, *scènes à faire*, and fair use brings less certainty than bright-line legislative fixes would; in some cases, clarification may only come after litigation. But formal application of copyright law to software-enabled consumer products is still relatively recent. In the context of the technologically driven products at issue in this Report, legislation carries its own risks, including that it might address the technologies of today but may fail to anticipate the different technologies—and distinct concerns—of tomorrow. In that respect, established copyright doctrines benefit from the ability to adapt more deftly to specific situations. As this Report demonstrates, copyright doctrines such as fair use, merger, and *scènes à faire* have regularly been extended and applied to new technologies as they have developed. And the Office offers this Report as a roadmap of sorts for those seeking to make legitimate use of embedded software.

In sum, the Copyright Office believes that existing copyright law is, at least at this time, well-suited to handle this new age of embedded software, so that innovators can continue to improve our lives and revolutionize our world.

LOC_AR_00003135

# I.    Background and Study History[4]

## A.    *Legal Background*

When Congress passed the first federal copyright law in 1790, it protected only books, maps, and charts.[5]  As time and technology marched on, however, Congress expanded protection to additional categories of works, from photographs to film, to sound recordings, and eventually, computer programs.[6]  The earliest attempts to protect computer programs in the 1960s were somewhat inelegant, with the Copyright Office registering the first computer programs as "books" under the "Rule of Doubt."[7]

The United States has traveled far from the time of that first registration, to an age in which computer programs and software are major drivers of the economy and the distribution of information.  Indeed, in the last quarter century, the software industry has added millions of jobs and increased the value of the U.S. gross domestic product ("GDP") by hundreds of billions of dollars.[8]  The industry attributes much of this growth directly to copyright law.[9]

---

[4] All references to written comments submitted by participants in the Copyright Office's study are by party name (abbreviated where appropriate), followed by "Initial Comments" or "Reply Comments" (*e.g.*, "iFixit Initial Comments," "Copyright Alliance Reply Comments").  References to the transcripts of the Office's two hearings are by page and line number, date, and name and affiliation of speaker (*e.g.*, Tr. at 8:21-24 (May 24, 2016) (Sy Damle, U.S. Copyright Office)).  Both written comments and transcripts of the roundtable hearings are available on the study website at http://www.copyright.gov/policy/software/.

[5] Act of May 31, 1790, ch. 15, § 1, 1 Stat. 124, 124.

[6] 17 U.S.C. §§ 101, 102(a), 106; U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES §§ 102.7, 503.1(B) (3d ed. 2014) ("COMPENDIUM (THIRD)").

[7] The first Office registration was for two computer programs—one on magnetic tape and the other printed on paper—as "books."  *See Computer Program Copyrighted for First Time*, N.Y. TIMES 43, May 8, 1964, at 43, 51; *see also* U.S. COPYRIGHT OFFICE, CIRCULAR 31D (1965).  For more information on the "Rule of Doubt," *see* COMPENDIUM (THIRD) § 607.

[8] BUS. SOFTWARE ALL., THE $1 TRILLION ECONOMIC IMPACT OF SOFTWARE 3 (2016), http://softwareimpact.bsa.org/pdf/Economic_Impact_of_Software_Report.pdf (finding that, in 2014, the software industry added $475.3 billion dollars to the GDP and employed 2.5 million people); ROBERT J. SHAPIRO, SOFTWARE & INFO. INDUS. ASS'N, THE U.S. SOFTWARE INDUSTRY: AN ENGINE FOR ECONOMIC GROWTH AND EMPLOYMENT 2 (2014), https://www.siia.net/Admin/FileManagement.aspx/LinkClick.aspx?fileticket=yLPW0SrBfk4%3D&portalid=0 (noting that between 1997 and 2012, software industry production increased from $149 billion to $425 billion, and that direct employment in the software industry also increased from 778,000 jobs in 1990 to 2.5 million jobs in 2014).

[9] *See* BSA Initial Comments at 2-3 ("The existing U.S. copyright framework for software has given rise to the most innovative and diverse software industry in the world," and "we are on the cusp of an era of even greater software-driven innovation, due in large measure to strong and comprehensive copyright protection for software."); Copyright Alliance Initial Comments at 2 (noting that "copyright drives innovation in the software industry, an industry that is flourishing in the digital age under the current legal framework"); ESA Initial Comments at 2 (asserting that "strong copyright protection for software (embedded and

LOC_AR_00003136

Today, the law is well-settled that computer programs generally are protected by copyright law, and are governed by the same doctrines as other types of works. In the Copyright Act of 1976, Congress acknowledged that copyright law covers computer programs, while simultaneously removing from protection "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."[10] Congress also created the National Commission on New Technological Uses of Copyrighted Works ("CONTU") to study issues raised by new technologies, including computers.[11] Congress eventually followed CONTU's recommendations to define "computer programs" in the Act and to amend section 117 to allow copies or adaptations of computer programs to be made either "as an essential step" of using the computer, or for archival purposes.[12]

Over subsequent years, Congress has addressed computer programs periodically by, among other things, passing the Computer Software Rental Amendments Act of 1990 ("CSRAA"),[13] which created a narrow exception to the first-sale doctrine by prohibiting the rental, lease, or lending of computer programs, and by amending section 117 yet again in the Digital Millennium Copyright Act ("DMCA") to preserve independent repair.[14] Throughout this period, Congress has continually maintained a robust copyright regime for software.

Though the scope of copyright protection for software has been relatively stable over time, the marketplace is changing; some would say radically. The reach of software is almost infinite. In the past, "consumer software was typically found in standalone applications and operating systems that ran primarily on desktop or laptop computers."[15] It could also be found in "[l]imited categories of software-enabled consumer products . . ., including early video game consoles, calculators, and microwaves, but these were the exception rather than the rule."[16] By contrast, "[t]oday's

---

otherwise) has been a tremendous policy success that has enabled decades of innovation and creativity in product design and functionality"); Microsoft Initial Comments at 5 (stating that "software developers have relied on copyright protection for over four decades to justify massive investments in software innovation"); SIIA Initial Comments at 5 (stating that the "market ecosystem [for software] has spawned frenetically paced innovation and development while maintaining the incentives to create that the copyright law provides").

[10] 17 U.S.C. § 102(b).

[11] Pub. L. No. 93-573, § 201, 88 Stat. 1873, 1873-74 (1974); *see also* CONTU, FINAL REPORT 9 (1978) ("CONTU Report").

[12] *See* CONTU Report at 12-13; Act of Dec. 12, 1980, Pub. L. No. 96-517, § 10, 94 Stat. 3015, 3028-29.

[13] Pub. L. No. 101-650, tit.8, 104 Stat. 5089, 5134-37 (1990) (codified at 17 U.S.C. § 109(b)).

[14] 144 CONG. REC. S11,890 (daily ed. Oct. 8, 1998) (statement of Sen. Leahy).

[15] Engine Advocacy Initial Comments at 1.

[16] *Id.*

LOC_AR_00003137

consumer products and devices—from smartphones and home appliances to vehicles and medical devices—integrate software code. That code doesn't just offer new bells and whistles that improve on existing products; it is essential to the basic functionality of many devices."[17] Software is now nearly ubiquitous and, "[a]s parts increasingly incorporate computer software, functions that used to be performed by hardware components now are controlled by software embedded in those parts."[18] The incorporation of networking capabilities into consumer products has led to the "Internet of Things."[19] Indeed, "we are in the midst of a transformational new generation of software innovation. Smartphones, tablets, and other mobile devices not only provide computing 'on the go,' they also are bringing billions of new users online."[20]

This boom in technology embedded in everyday products is not altogether unanticipated. Including software in "consumer devices is hardly a new phenomenon; a huge number of 'everyday products,' including microwave ovens and handheld calculators, have since the early-1970s featured embedded software."[21] As noted, copyright law has been credited by some as paving the way for these new technological advances,[22] and the public has benefited greatly from the new and creative ways that everyday products enhance their lives, and will continue to benefit from the possibility of further innovation.[23]

Nevertheless, the spread of software in recent years has led some to question whether the current state of copyright law is sufficient to handle the sometimes complex

---

[17] Aaron Perzanowski et al. Initial Comments at 1.

[18] Auto Care Ass'n Initial Comments at 3 (noting also that "[t]oday's engines, transmissions, oxygen sensors, ignitions, brakes, emissions systems, electric windows, air blowers, air bags, and even windshield wipers are just a few of the systems in which manufacturers have replaced purely electro-mechanical parts with microprocessors and software controls. The function of these parts is the same regardless of whether implemented in hardware or software.").

[19] *See* Afua Bruce, Dan Correa & Suhas Subramanyam, *Internet of Things: Examining Opportunities and Challenges*, WHITE HOUSE: BLOG (Aug. 30, 2016), https://www.whitehouse.gov/blog/2016/08/30/internet-things-examining-opportunities-and-challenges.

[20] Microsoft Initial Comments at 2.

[21] BSA Initial Comments at 1; *see also* ESA Initial Comments at 3-4.

[22] Copyright Alliance Initial Comments at 13 ("Copyright plays a significant role in this innovation boom. It is a critical driver of technological innovation and economic competitiveness."); ESA Initial Comments at 7 ("Copyright law is largely responsible for providing necessary incentives for both game and game device makers – ensuring they have the ability to expand features and access and still protect their innovation.").

[23] BSA Initial Comments at 3 ("Consumers now have access to a range of IoT [Internet of Things] products capable of improving 'conservation, efficiency, productivity, public safety, health, education and more.'" (citation omitted)); CCIA Initial Comments at 1 ("As the Office's notice observes, the omnipresence of software in modern consumer products has greatly improved features and functions for users."); Engine Advocacy Initial Comments at 1 ("The increasing prevalence of software-enabled products and the rise of the Internet of Things offers great value to consumers, businesses, and other users of the vast array of innovative products in which such software will be found.").

LOC_AR_00003138

copyright issues that arise. While copyright infringement is always a concern,[24] there also have been challenges relating to how consumers access their devices, and questions regarding how existing law can be applied fairly to this specific subset of everyday products. For example, some have expressed concern over the impact of embedded software on consumers' expectation of ownership of their personal property. Noting that the embedded software in a number of devices is licensed, rather than sold, to the device purchaser, they have argued that the current law allows manufacturers to exercise undue control over secondary markets by restricting transfers of the software to third parties.[25] Others have argued that the law does not adequately address the need of many parties to copy or modify embedded software for legitimate purposes, such as repair, security research, or the development of interoperable products.[26]

Members of Congress have introduced legislation to respond to some of these challenges. To address issues surrounding licensing of embedded software, in 2014 and again in 2015, Representatives Blake Farenthold and Jared Polis introduced the You Own Devices Act ("YODA"), which would extend the first-sale doctrine to allow the owner of a "machine or other product" that uses a computer program to transfer a copy of the computer program when the machine or other product is sold, leased, or otherwise transferred to another person.[27] The right to transfer would not be waivable by contract.[28] Additionally, in 2013 and 2015, Representative Zoe Lofgren introduced the Unlocking Technology Act, which addresses the copyright implications of copying or

---

[24] *See, e.g.*, ESA Initial Comments at 10 ("[I]n the absence of strong copyright protection for software, potential competitors can and will discern and copy embedded software, because that is an easier path to getting to market with a software-enabled product than creating original software. As a result, copyright infringement is a concern for embedded software as well as for software intended to be used on a general-purpose computer.") (citation omitted); ACT Initial Comments at 2 ("Piracy presents a major threat to the success of ACT members and the billions of consumers who rely on digital products and services.").

[25] *See First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intell. Prop., and the Internet of the H. Comm. on the Judiciary*, 113th Cong. 47 (2014) (testimony of Jonathan Band, Owners' Rights Initiative) ("[By] interfering with resale, . . . license terms harm both the consumers who want to sell the products and the secondary consumers, often government agencies, that want to buy them.").

[26] *See, e.g.*, Perzanowski et al. Initial Comments at 5-6 ( "[The law] give[s] rights holders the power to control whether and how consumers use the devices they own; when and under what conditions they can lend, resell, or give them away; who can repair them; what interoperable products, replacement parts, and components can be used with them; the degree to which those products can be researched and tested; the possibility of tinkering and user innovation; and the availability of interoperable products." (citation omitted)); Engine Advocacy Initial Comments at 9-10 ("As licensees of the copyrighted software in their products, consumers may be lawfully unable to copy, modify, and resell the software in their devices," particularly in order "to tinker with, improve, repair and/or sell devices and other property they have purchased."); Public Knowledge/OTI Initial Comments at 11 ("Copyright law can, at times, frustrate consumer expectations about product interoperability and make it impossible for third parties to produce interoperable products.").

[27] *See* H.R. 862, 114th Cong.§ 2(a) (2015); H.R. 5586, 113th Cong. § 2(a) (2014).

[28] H.R. 862, 114th Cong. § 2(a) (2015); H.R. 5586, 113th Cong. § 2(a) (2014).

LOC_AR_00003139

adapting the software of mobile communications devices to connect to wireless networks.[29]  It would amend section 117 to allow such copying or adapting if initiated by or with the consent of the owner of the device, and if the owner is in legal possession of that device and has permission to connect to the wireless network.[30]

## B.    Study History

In October 2015, Chairman Chuck Grassley and Ranking Member Patrick Leahy of the Senate Judiciary Committee requested that the Copyright Office provide expert input on software-embedded consumer products.  The request noted that "[a]s software plays an ever-increasing role in defining consumer interactions with devices and products, many questions are being asked about how consumers can lawfully use products that rely on software to function."[31]  The letter explained that the request was "an effort to better understand and evaluate how our copyright laws enable creative expression, foster innovative business models, and allow legitimate uses in this software-enabled environment."[32]  The request specifically asked that the Office study and report on the following:

- The provisions of the copyright law that are implicated by the ubiquity of copyrighted software in everyday products;

- Whether, and to what extent, the design, distribution, and legitimate uses of products are being enabled and/or frustrated by the application of existing copyright law to software in everyday products;

- Whether, and to what extent, innovative services are being enabled and/or frustrated by the application of existing copyright law to software in everyday products;

- Whether, and to what extent, legitimate interests or business models for copyright owners and users could be undermined or improved by changes to the copyright law in this area; and

---

[29] H.R. 1892, 113th Cong. § 3 (2013); H.R. 1587, 114th Cong. § 3 (2015).  If passed, this legislation would also amend 17 U.S.C. § 1201(a) to allow for circumvention of technological measures if the purpose of such circumvention was to engage in a use that does not infringe copyright.  H.R. 1892, 113th Cong. § 2 (2013); H.R. 1587, 114th Cong. § 2 (2015)

[30] H.R. 1892, 113th Cong. § 3 (2013); H.R. 1587, 114th Cong. § 3 (2015).

[31] Grassley/Leahy Letter at 1.

[32] *Id.*

5

LOC_AR_00003140

- The key issues in how copyright law intersects with other areas of law in establishing how products that rely on software to function can be lawfully used.[33]

The Committee also asked the Office whether legislative changes are necessary. This request was limited to embedded software in everyday products, which, as described in detail below, is a category rather resistant to clear definitions. The Committee did *not* ask the Office to look into copyright law as applied to software and computer programs generally.[34]

Over the course of a little more than a year, the Copyright Office studied the Committee's questions by soliciting public comments and holding roundtable hearings on both coasts. The Office began this process by publishing a Notice of Inquiry in the Federal Register in December 2015,[35] which requested public comment on the five topics listed in the Committee's letter. The Notice of Inquiry also suggested that, when responding to the Committee's questions, commenters also consider the following points:

- Whether copyright law should distinguish between software embedded in "everyday products" and other types of software, and, if so, how such a distinction might be drawn in an administrable manner.

---

[33] *Id.* at 2.

[34] A number of commenters also noted the interrelationship between the issues studied here and those raised by the anti-circumvention provisions in section 1201. *See, e.g.*, R Street Institute Initial Comments at 1. The issues raised by section 1201, however, are at once broader and narrower than the issues raised by this study. They are broader, in part, because section 1201 applies to *all* copyrighted works, not just software, and thus raises additional issues that are beyond the scope of this study. At the same time, section 1201 deals with a narrower range of legal issues: it has no relevance to the scope of consumer rights in products that do not have technological protection measures attached to them, or to issues like resale that do not require circumvention of such measures. Accordingly, the Office is studying issues related to section 1201 as part of a separate and concurrent study. For more information on that study, *see* http://copyright.gov/policy/1201/.

In addition, The Committee did not ask for the Office's views on issues involving the registration of computer programs, and none of the participants raised this issue in their comments or at the roundtables. That said, the Office has initiated an academic partnership with Professor Paul Goldstein, Professor Luciana Herman, and students at Stanford Law School to gather information from relevant stakeholders on software registration issues. The Stanford team will use this information to develop recommendations for the Office, which can potentially be used in preparing a formal notice of inquiry or notice of proposed rulemaking. *See Copyright Policy Practicum: Revising the Requirements for Computer Software Registration*, STANFORD LAW SCHOOL LAW & POLICY LAB, https://law.stanford.edu/education/only-at-sls/law-policy-lab/practicums-2016-2017/copyright-policy-practicum-revising-the-requirements-for-computer-software-registration/.

[35] Software-Enabled Consumer Products Study: Notice and Request for Public Comment, 80 Fed. Reg. 77,668 (Dec. 15, 2015) ("2015 Notice of Inquiry"). This Notice of Inquiry and the Office's additional Federal Register Notice are attached as Appendix A.

6

- o Whether "everyday products" can be distinguished from other products that contain software, such as general purpose computers—essentially how to define "everyday products."

  - o If distinguishing between software embedded in "everyday products" and other types of software is impracticable, whether there are alternative ways the Office can distinguish between categories of software.

- The rationale for and proper scope of copyright protection for software embedded in everyday products, including the extent to which copyright infringement is a concern with respect to such software.

- The need to enable interoperability with software-embedded devices, including specific examples of ways in which the law frustrates or enables such interoperability.

- Whether current limitations on and exceptions to copyright protection adequately address issues concerning software embedded in everyday products, or whether amendments or clarifications would be useful. Specific areas of interest include:

  - o The idea/expression dichotomy (codified in 17 U.S.C. § 102(b))

  - o The merger doctrine

  - o The *scènes à faire* doctrine

  - o Fair use (codified in 17 U.S.C. § 107)

  - o The first-sale doctrine (codified in 17 U.S.C. § 109)

  - o Statutory limitations on exclusive rights in computer programs (codified in 17 U.S.C. § 117)

- The state of contract law *vis-à-vis* software embedded in everyday products, and how contracts such as end user license agreements impact investment in and the dissemination and use of everyday products, including whether any legislative action in this area is needed.[36]

The Office received twenty-six initial written comments in response to its notice from a wide range of interested parties, including representatives from the software industry, legal scholars, and public interest groups.[37]  The Office also received six reply comments

---

[36] *Id.* at 77,671-72.

[37] A list of participants in the study—both those who provided written comments and those who participated in roundtable hearings—is attached as Appendix B.

LOC_AR_00003142

responding to issues raised by the initial written comments.  In May 2016, the Office conducted public roundtables in Washington, D.C. and San Francisco, California.[38] During these roundtables, interested parties representing a variety of viewpoints discussed the topics identified in the Notice of Inquiry and other issues pertaining to software in consumer products, and whether the Copyright Act might be improved in this area.

During the study, the Office identified a number of notable issues.  One foundational issue is how to define the specific subset of software that is the focus of the Committee's request.  Most commenters declared that it would be nearly impossible to agree on an explicit definition of software embedded in everyday products,[39] and there was concern about how findings limited to a specific set of software could spill over, or not, into how copyright law applies to other types of software.  Moreover, there was extensive discussion of copyright law and how it interacts with a consumer's ability to repair or resell an everyday product, or how researchers may conduct security testing. Interoperability and innovation were key concerns, with commenters on all sides weighing in on how copyright law interacts with embedded software in everyday devices.  And, underlying much of this discussion was the reach and scope of licensing practices for software regarding these products, an issue that is intertwined with state law.

## II.    Defining "Software Embedded in Everyday Products"

The Committee's letter reflected a basic—and correct—intuition that, as copyrighted software is embedded into a greater diversity of products, careful thought must be given to how copyright affects consumers' ability to engage in traditional uses of those products.  These concerns are particularly acute with respect to products that have not required software to operate in the past.  The Committee highlighted "our refrigerators, our cars, our farm equipment, [and] our wireless phones."[40]  Other examples identified by commenters included kitchen appliances, thermostats, light bulbs, power tools, rice cookers, smoke alarms, dolls and toys, and similar types of consumer products.[41]  At the same time, the Copyright Office understands that the Committee is *not* questioning the

---

[38] Software-Enabled Consumer Products Study and Section 1201 Study: Announcement of Public Roundtables, 81 Fed. Reg. 17,206 (Mar. 28, 2016).

[39] *But see* Public Knowledge/OTI Initial Comments at 1-2 (urging that the "distinction is not difficult to make" and distinguishing between "[a] consumer who buys software on magnetic, optical, or flash media" and one "who buys a laptop computer, tablet, car, health device, thermostat, or any other product that may contain software").

[40] Grassley/Leahy Letter at 1.

[41] Public Knowledge/OTI Initial Comments at 1, 2; Engine Advocacy Initial Comments at 1; Tr. at 25:21-26:02 (May 18, 2016) (Jonathan Bergmayer, Public Knowledge).  ESA contended video game platforms should be excluded from this study, because they do not qualify as everyday devices.  ESA Initial Comments at 1.

LOC_AR_00003143

value of copyright protection of software in general. Thus, as the Notice of Inquiry stressed, the Office undertook "a highly specific study not intended to examine or address more general questions about software and copyright protection."[42]

The Office agrees with the Committee that copyright law's application to embedded software in certain kinds of products raises particular issues, including the relationship of copyright law in this context to resale, repair, tinkering, security research, and interoperability. The products affected by these concerns appear to share some common characteristics. To begin with, they are consumer-grade, rather than industrial devices, the latter of which may be subject to contractual and licensing agreements between parties with similar bargaining power. Further, the embedded software within the product often is specifically created for a particular product to control that product's basic operation. It may be that the embedded software is, at least to some degree, ancillary to the non-software (*e.g.*, mechanical or electrical) components of the product. The software may be distributed along with the product itself without payment of a separate charge or fee. It may be that the software is also not readily copied, thus presenting somewhat diminished concerns about widespread infringement.[43] The Office thus focused its study—and the analysis provided in this Report—on types of software that share these traits.[44]

---

[42] 2015 Notice of Inquiry at 77,668.

[43] Public Knowledge/OTI Initial Comments at 2; *cf.* 17 U.S.C. § 109(b)(1)(B)(i) (permitting rental of software-embedded products where the software cannot be copied during the ordinary operation or use of the device). This is not to say that infringement is not a concern in the context of embedded software. But the record suggests that such infringement may occur at the corporate, rather than the consumer, level. For instance, to the extent that embedded software is so creative that it gives a developer an advantage in the marketplace, other competitors may have an incentive to copy that software for use in their own products. Tr. at 36:15-37:06 (May 18, 2016) (Steve Tepp, GIPC); *see also* Tr. at 56:17-19 (May 18, 2016) (Jonathan Zuck, ACT) (stating that commoditization "can undermine investment in innovation" if it occurs too soon in the product development cycle); Tr. at 15:18-21 (May 24, 2016) (Evan Cox, BSA) ("People who have introduced products in th[e hoverboard] market have been swamped instantly by people who copy the software, take it apart, copy it, make it in China, re-import it [into the United States]."). BSA explained that, in such a situation, unauthorized copying by "low-cost competitors" poses a significant threat to software developers. Tr. at 15:01-06 (May 24, 2016) (Evan Cox, BSA). Concerns about commercial piracy, however, can be addressed on a case-by-case basis, applying existing doctrines of copyright law.

[44] The Copyright Office evaluated a number of other possible ways to distinguish these kinds of embedded software from software in general, but found them to be not particularly helpful. For example, the Office considered whether a distinction could be drawn between consumer products and commercial products. *See* Tr. at 24:01-09 (May 18, 2016) (Jonathan Bergmayer, Public Knowledge). Commenters, however, generally agreed that this differentiation would not be helpful, because consumer products can be used for commercial purposes (and *vice versa*). Tr. at 10:11-16 (May 18, 2016) (Jonathan Band, Owners' Rights Initiative) (stating that this is not "a helpful distinction"); Tr. at 29:19-22 (May 24, 2016) (Cathy Gellis, Digital Age Defense) (stating that "there's no real way of delineating which objects would get protection and which objects would get different sorts of protection or none whatsoever"). Another suggestion was to focus on the functional nature of some software as a potential differentiating tool for embedded software. Auto Care Ass'n Initial Comments at 8-9 (noting that a "bright line distinction [that] can be drawn for software that

LOC_AR_00003144

The Copyright Office, however, was unable to distill the universe of embedded software into a simple legislative definition, which also precludes the Office from offering specific legislative text addressing this type of embedded software.  The comments and roundtable testimony revealed a consensus that drawing a legislative distinction would be unworkable in practice.[45]  Indeed, as several commenters observed, drawing such distinctions as a matter of copyright law is complicated by the evolving nature of the universe of these items.  Any such attempt inevitably would be based on software-enabled devices currently existing in the marketplace, and based on Congress's understanding of the current state of the art.  But technology is constantly changing, and new products likely will continue to enter the market at an increasingly rapid rate.[46]  For example, today's consumer products such as wristwatches or smoke alarms "contain more computing power and more sophisticated software than personal computers did

---

controls the physical operation of a product"); Tr. at 28:07-09 (May 18, 2016) (Shaun Bockert, Dorman Products, Inc.) (distinguishing "software that serves a primarily functional role in a product").  In the Office's view, however, these distinctions would be impracticable.  Relying on whether the software controls the *physical* operation of a product seems underinclusive, as it excludes many types of software that do not control mechanical processes but might nevertheless raise the kinds of concerns that motivated the Committee's letter.  For instance, such a distinction could exclude software in "smart home" devices that simply communicate with and control other devices.  Moreover, a test focused on the "functionality" of software is likely to be extremely overinclusive, since all software is functional to some degree.  *See* 17 U.S.C. § 101 (defining "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result").

[45] *See, e.g.*, BSA Initial Comments at 2 ("[T]he entire software industry is highly dynamic and interconnected, which makes it virtually impossible to draw any principled distinction between embedded and non-embedded software."); ACT Initial Comments at 5 (explaining that it "strongly discourages Congress and the USCO from attempting to distinguish between software embedded in 'everyday products' and other types of software . . . because such an exercise is impractical and would multiply confusion around the application of copyright law"); Aaron Perzanowski et al. Initial Comments at 12 ("[I]t would be unwise to distinguish software embedded in everyday products from software installed on traditional computers."); Microsoft Initial Comments at 9 (urging "the Copyright Office not to recommend changes to copyright protection for software embedded in consumer products"); Tr. at 9:22-23 (May 24, 2016) (Andrew Shore, Owners' Rights Initiative) ("[W]e shouldn't balkanize the code by drawing these distinctions."); Tr. at 23:01-04 (May 18, 2016) (Ben Golant, ESA) ("[T]here can't be any line drawing because that would be regulatory chaos to say this kind of software is not protected or this kind of software should be treated differently.").

[46] ACT Initial Comments at 5 ("[T]he exponential growth of the mobile app economy (and the 'Internet of Things' [IoT]) gives rise to a wider application of copyright law to many 'everyday' products."); CDT Initial Comments at 6 (attempting to distinguish everyday products "does not make much sense at the outset, and is changing every day owing to [the] pace of growth of the Internet of Things"); ESA Initial Comments at 2-3 (noting that "it would be unwise" to define everyday products, given "the pace of change").

LOC_AR_00003145

20 years ago."[47]  Thus, there is the very real concern that definitions based on an understanding of the current ecosystem would become quickly obsolete.[48]

Creating separate legislative categories for different types of products or software may also have unintended consequences.[49]  If the law provides more expansive legal benefits for certain types of products or software, manufacturers may have an incentive to reengineer their products to fit within those definitions.[50]  Conversely, if the law limits or eliminates legal benefits for other products or software, manufacturers may have an incentive to remove features benefiting consumers, or to add extraneous features that increase costs without providing corresponding benefits for the consumer.[51]  Creating these types of distinctions may discourage manufacturers from developing enhancements that could improve the efficiency of their products.

Although the Copyright Office has concluded that copyright law should not formally differentiate between types of software and the products in which software may be found, copyright law's application to certain software does raise the particular issues mentioned above.  In the following sections, the Report examines how existing copyright law doctrines might address these concerns.  This Report, however, should be understood as focusing on embedded software sharing the common characteristics described above, rather than opining on software more generally.  The Office is not suggesting a new test or rule to be applied by courts when analyzing or assessing software with these characteristics.  Rather, the Office recognizes that certain doctrines such as fair use, merger, and *scènes à faire*, should be applied in a manner that is mindful of the overall context that is unique to this type of software.

---

[47] Public Knowledge/OTI Initial Comments at 2; BSA Initial Comments at 3; Tr. at 12:05-09 (May 18, 2016) (Christian Troncoso, BSA) ("10 years ago, we would never have imagined . . . that the phones in our pockets now have the computing power that . . . exceeds that which NASA used to land people on the moon in the '60s.").

[48] *See* ACT Initial Comments at 5 (cautioning that "technological innovation consistently outpaces legislative and regulatory processes, virtually assuring that any statutory articulation of a distinction will quickly become outdated, leading to more confusion and frustration in the marketplace").

[49] BSA Initial Comments at 2; Copyright Alliance Initial Comments at 3; ESA Initial Comments at 2-3; SIIA Initial Comments at 6.

[50] Public Knowledge/OTI Initial Comments at 2 ("Creating different legal rules for general-purpose computing platforms and single-purpose devices could create a perverse incentive for manufacturers or developers to conform their products to one category or the other."); Tr. at 19:12-14 (May 18, 2016) (Jonathan Zuck, ACT) (predicting that "you will change artificially the way that people implement their technology in order to find ways to get protection for what they're doing as opposed to actually creating more innovation").

[51] Copyright Alliance Reply Comments at 2 (noting that attempting to differentiate everyday products "could adversely affect incentives, investment, and innovation across many differ sectors of the economy—leading to numerous and substantial unintended consequences"); Public Knowledge/OTI Initial Comments at 2 ("Consumer demand, creative vision, and business considerations should factor into what new products come to market—not arcane copyright distinctions.").

LOC_AR_00003146

# III.    Relevant Legal Doctrines

As discussed above, the Committee asked the Copyright Office to discuss "the provisions of the copyright law that are implicated by the ubiquity of copyrighted software in everyday products."[52]  In addition, the Committee requested that the Office "identify key issues in how copyright law intersects with other areas of law in establishing how products that rely on software to function can be lawfully used."[53]

## A.    Basics of Copyright Protection

Although defining the universe of software-enabled everyday products may be somewhat fluid, the underlying principles of copyright law applying to the software in such products are well-established and well-known.  As explained above, software generally has been protected by copyright law for decades, and is subject to a variety of familiar doctrines.

It is well-settled that computer code can be copyrightable as a "literary work."[54]  The Copyright Act defines a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."[55]  Copyright protects both the "source code," which consists of words, numbers, and symbols typed by a programmer, as well as the compiled "object code," which is used by the computer to carry out the instructions, but generally cannot be read by a human being.[56]

To qualify for copyright protection, a computer program—like any other work of authorship—must be original.  The Supreme Court has explained that the originality requirement is "not particularly stringent."[57]  The work must be independently created by the author (not be copied from another work) and must possess "at least some minimal degree of creativity."[58]  The vast majority of works satisfy this requirement easily because most "possess some creative spark, 'no matter how crude, humble or obvious' it might be."[59]  But the fact that a computer program is original and therefore *eligible* for copyright protection under section 102(a) does not necessarily mean that every aspect of the program is protected.  The copyright in a computer program—or any

---

[52] Grassley/Leahy Letter at 2.

[53] *Id.*

[54] 1-2A MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT § 2A.10 (2015) ("NIMMER ON COPYRIGHT").

[55] 17 U.S.C. § 101.

[56] *See Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1248-49 (3d Cir. 1983).

[57] *Feist Publ'ns v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991).

[58] *Id.* at 345.

[59] *Id.* (citation omitted).

LOC_AR_00003147

other work of authorship—protects only the original expression that the author contributed to that work.

The Copyright Act provides the owner of copyright in an original work of authorship, the "exclusive rights to do and to authorize" specified things with that work.[60]  As most relevant here, these include the rights to (1) reproduce the work in copies, (2) prepare derivative works based on the original work, (3) distribute copies of the work to the public "by sale or other transfer of ownership, or by rental, lease, or lending," and (4) display the work publicly.[61]  Those exclusive rights are the same for a computer program as they are for a book or a song; they are not diminished simply because the software code has some functional purpose.

## B.    Limits on the Scope of Copyright Protection

The scope of the exclusive rights discussed above are subject to exceptions and limitations set forth in the Copyright Act and various judicial doctrines.  In the specific factual circumstances where they apply, these doctrines serve to limit protection for software code, or even exclude it from protection entirely.

### 1.    Idea / Expression Dichotomy

Section 102(b) of the Copyright Act provides that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."[62]  This provision codifies a long-standing principle of copyright law known as the idea/expression dichotomy.[63] "Taken literally, 'idea' refers to the work's animating concept—the idea, for example, of a drama about two star-crossed lovers—while 'expression' refers to the precise words in which the playwright wrote the drama."[64]  Thus, properly read, section 102(b) draws a line between non-expressive intellectual concepts—whether considered ideas, principles, procedures, processes, etc.—which are *not* subject to copyright protection, and the expression that embodies them, which is.[65]

---

[60] *See* 17 U.S.C. § 106.

[61] *Id.*

[62] 17 U.S.C. § 102(b).

[63] *Golan v. Holder*, 565 U.S. 302, 328 (2012) ("The idea/expression dichotomy is codified at 17 U.S.C. § 102(b).").

[64] Paul Goldstein, Goldstein on Copyright § 2.3.1 (2015).

[65] 1-2 Nimmer on Copyright § 2.03[D][1] ("[A]lthough Section 102(b) denies that copyright may 'extend to' an 'idea, procedure, process,' as contained in a given work, it does not deny copyright to the work itself, merely because it consists of an 'idea, procedure, process,' etc.").

LOC_AR_00003148

This interpretation of the statutory text is buttressed by the legislative history of the Act, which illustrates that the purpose of section 102(b) was to codify the dichotomy between abstract idea and concrete expression. The House Report on the 1976 Act, considered an authoritative source for the meaning of the Act,[66] stated expressly that "[s]ection 102(b) in no way enlarges or contracts the scope of copyright protection under the present law," but "[i]ts purpose is to restate, in the context of the new single Federal system of copyright, that the basic dichotomy between expression and idea remains unchanged."[67] Particularly notable is the House Report's discussion of the relevance of section 102(b) to the scope of protection for computer programs under the Act:

> Some concern has been expressed lest copyright in computer programs should extend protection to the methodology or processes adopted by the programmer, rather than merely to the "writing" expressing his ideas. Section 102(b) is intended, among other things, to make clear that the expression adopted by the programmer is the copyrightable element in a computer program, and that the actual processes or methods embodied in the program are not within the scope of the copyright law.[68]

Thus, the idea/expression dichotomy, as applied to software, excludes from copyright protection the abstract "methodology or processes adopted by the programmer" in creating the code.[69] It makes clear that the copyright law does not prevent anyone from studying the code for an existing program for the purpose of identifying the underlying ideas or processes embodied in that program. Nor does it prevent them from writing new routines or entirely new programs performing those same functions. They are free to use any of the ideas, methods, or other insights that make the program work—so long as they do not copy the specific lines of code from the existing program.

The applicability of section 102(b) in the context of embedded software is addressed in greater depth in Parts IV.B, C, and D, below.

## 2.    Merger and *Scènes à Faire*

The merger doctrine—which is closely related to the idea/expression dichotomy—recognizes that there may be situations in which there is only one way or a limited number of ways to convey the idea that an author seeks to express.[70] In such a case, the author's expression may be inseparable from the idea embodied therein and cannot be protected by copyright law, because that would give the author a monopoly over the

---

[66] *See, e.g., Feist Publ'ns*, 499 U.S. at 355.

[67] H.R. REP. NO. 94-1476, at 57 *reprinted in* 1976 U.S.C.C.A.N. 5659, 5670.

[68] *Id.*; *see also* CONTU Report at 22 ("[C]opyright leads to the result that anyone is free to make a computer carry out any unpatented process, but not to misappropriate another's writing to do so.").

[69] H.R. REP. NO. 94-1476, at 57 *reprinted in* 1976 U.S.C.C.A.N. 5659, 5670.

[70] 1-2 NIMMER ON COPYRIGHT § 13.03[B][3].

LOC_AR_00003149

idea itself, thereby preventing others from using that same idea in other works.[71] Conversely, "if a work's idea can be expressed in more than one way, courts will protect the copyright owner's expression even though the nature of the underlying idea closely circumscribes the variety of other possible expressions."[72]

Merger principles have been applied to computer software, for example, where efficiency concerns narrow the "practical range of choice."[73] If a "particular set of modules is necessary efficiently to implement that part of the program's process being implemented . . . then the expression represented by the programmer's choice of a specific module or group of modules has merged with their underlying idea and is unprotected."[74] It may be that there is only one or a limited number of ways to optimally write code to carry out a particular process—for example, a "bubble sort" algorithm.[75] In those cases, the expression merges with the method, and the expression cannot be copyrighted. If, however, there are multiple ways to carry out that process, the merger doctrine would not apply and the author could claim copyright in the expression used to capture the ideas even though the idea itself remained a public good.[76]

Another limitation on copyright is the common law doctrine of *scènes à faire*, which provides that the expressive elements of a work are not entitled to protection if they are standard, stock, or common to a particular topic, or if they necessarily follow from a common theme or setting. Courts have recognized that extending copyright protection to the necessary incidents of a particular theme or setting would grant a monopoly to the first person who adopted that form of expression.[77] In that sense, *scènes à faire* and

---

[71] *Id.* § 13.03[B][3].

[72] GOLDSTEIN ON COPYRIGHT § 2.3.2.

[73] *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 708 (2d Cir. 1992).

[74] *Id.* (emphasis omitted).

[75] A "bubble sort" algorithm is a simple sorting algorithm that, as applied to a list of numbers, makes repeated passes through a list, swapping adjacent numbers if they are in the wrong order. Waldemar Dos Passos, NUMERICAL METHODS, ALGORITHMS AND TOOLS IN C#, at 175 (2010) (describing ways to code a bubble sort algorithm in the C# programming language, of varying degrees of efficiency).

[76] CONTU Report at 20 ("When other means *is* available programmers are free to read copyrighted programs and use the ideas embodied in them in preparing their own works," "but one is not free to take another's program."). There is a divide in the courts—that the Copyright Office does not here express a view on—regarding whether merger goes to the copyrightability of a work or whether it constitutes a defense to infringement. *See Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1358 (Fed. Cir. 2015) (describing circuit court disagreement); *see also* 4-13 NIMMER ON COPYRIGHT § 13.03[B][3] (concluding that "the better view is to treat the merger doctrine under the rubric of substantial similarity, evaluating the inseparability of idea and expression in the context of a particular dispute, rather than attempting to disqualify certain expressions from protection *per se*").

[77] *See, e.g., CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1522 n.25 (1st Cir. 1996) (noting that *scènes à faire* is "concerned with preventing a monopoly on commonplace ideas").

LOC_AR_00003150

merger both serve the same purpose by limiting the scope of an author's copyright where there are limited ways to express a particular idea.

For both merger and *scènes à faire*, courts must focus on the options available to the author at the time a work is initially created, rather than the choices available to users after the fact.[78]  Indeed, this view is compelled by section 302(a) of the Copyright Act, which provides that copyright in a work created on or after January 1, 1978 "subsists from its creation and . . . endures" during the term prescribed by the statute.[79]

Although courts first applied *scènes à faire* in cases involving dramatic works, the doctrine has been extended to computer programs.  For example, courts have recognized that *scènes à faire* may limit or even eliminate protection for elements of a program that are dictated by external factors, such as: the mechanical specifications of the computer running the program; compatibility requirements of other programs with which the program is intended to operate; hardware design standards that have been adopted by computer manufacturers; widely accepted programming techniques within the computer industry; as well as the demands of the industry that is expected to use the program.[80]

In *Lexmark International, Inc. v. Static Control Components, Inc.*, a case concerning interoperability of software contained in printer toner cartridges, the Sixth Circuit employed elements of both merger and *scènes à faire* analysis in assessing the copyrightability of a "toner loading" program.[81]  The court concluded that the program lacked sufficient originality to qualify for protection, given the uncontested evidence that the program "as it [was] written [was] the most straightforward, efficient, natural way to express the program,"[82] "that functionality and efficiency considerations

---

[78] *See Oracle Am., Inc.*, 750 F.3d at 1361 ("It is well-established that copyrightability and the scope of protectable activity are to be evaluated at the time of creation, not at the time of infringement."); *id.* at 1364 (explaining that "the focus of the [*scènes à faire*] doctrine is on the circumstances presented to the creator, not the copier"); *Dun & Bradstreet Software v. Grace Consulting*, 307 F.3d 197, 215 (3d Cir. 2002) ("[I]n determining whether certain aspects of an allegedly infringed software are not protected by copyright law [under *scènes à faire*], the focus is on external factors that influenced the choice of the creator of the infringed product."); *see also Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1375 (10th Cir. 1997) (finding that the district court's application of the *scènes à faire* doctrine "should have remained upon the external factors that dictated [the plaintiff's]" creation of the work, instead of focusing on "external factors such as market forces and efficiency considerations" justifying the defendant's copying).

[79] 17 U.S.C. § 302.

[80] *See, e.g.*, *Comput. Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 401-02 (5th Cir. 2000) (considering stock industry demands in connection with program for tracking orders, inventory, and promotional pricing); *Mitel, Inc.*, 124 F.3d at 1374-75 (addressing hardware compatibility requirements and industry practices); *Comput. Assocs. Int'l*, 982 F.2d at 709, 715 (outlining doctrine in context of programmed organizational charts).

[81] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 537-43 (6th Cir. 2004).

[82] *Id.* at 540 (citation omitted).

LOC_AR_00003151

precluded any material changes,"[83] and that the program was "a no-thought translation of the formulas to the language that the internal loading program must be written in."[84] In short, the court concluded that these constraints left the programmer without "much choice" in how to write the program.[85]

As commenters acknowledged, application of these doctrines may be difficult in practice.[86] The toner loading program at issue in *Lexmark* was an exceedingly short program[87] that Lexmark had included with its printer toner cartridges, and the program's brevity and simplicity may have contributed substantially to the court's findings. Nonetheless, these doctrines are likely to have particular force with respect to the kinds of highly functional embedded software described in Part II above.

The applicability of the merger and *scènes à faire* in the context of embedded software is addressed in greater depth in Parts IV.B, C, and D below.

### 3.    Fair Use

Fair use was initially a judicial creation, but in 1978 Congress codified it in section 107 of the Copyright Act, providing general guidance flexible enough to handle a wide variety of factual scenarios. Section 107 allows for the fair use of copyrighted works, and provides a list of paradigmatic fair use purposes, specifically "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."[88] To aid the determination of whether a use is fair, the Copyright Act provides four non-exhaustive factors: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.[89]

Courts have regularly applied the fair use doctrine in the context of software. For example, courts have permitted uses of software ensuring interoperability with new products and devices. In *Sega Enterprises Ltd. v. Accolade, Inc.*, the court held that

---

[83] *Id.* at 539.

[84] *Id.* at 540 (citation omitted).

[85] *Id.*

[86] *See, e.g.*, Tr. at 21:23-22:06 (May 24, 2016) (Ashley Ailsworth, SEMA) (explaining that it is hard to distinguish expressive elements from non-expressive elements).

[87] The court noted that the two versions of the program were 37 and 55 bytes each, which is less than the space needed to store "the phrase 'Lexmark International, Inc. vs. Static Control Components, Inc.'" *Lexmark*, 387 F.3d at 529-30.

[88] 17 U.S.C. § 107.

[89] *Id.* Section 107 of the Copyright Act also provides that "[t]he fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors." *Id.*

LOC_AR_00003152

copying a video game console's computer program to decompile and reverse engineer the object code to make it interoperable with the defendant's video games was a fair use.[90]  Similarly, in *Sony Computer Entertainment, Inc. v. Connectix Corp.*, the court held that reverse engineering the operating system of a PlayStation gaming console to develop a computer program allowing users to play PlayStation video games on a desktop computer, as well as making copies in the course of such reverse engineering, was a fair use.[91]

Specific applications of the fair use doctrine are addressed in Parts IV.B, C, and D below.

### 4.    First Sale Doctrine

Codified in section 109 of the Copyright Act, the first sale doctrine states that "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."[92]  This language is subject to additional conditions, including a restriction on renting, leasing, or lending computer programs in certain situations.[93]  Importantly, section 109(a) is limited to the "*owner* of a particular copy."  Software companies often use licensing models for distribution of their software, which can call into question whether the possessor of a copy of a computer program would be considered the "owner" under the first sale doctrine in practice.[94]

The applicability of the first sale doctrine in the context of embedded software is addressed in greater depth in Part IV.A below.

### 5.    Section 117

In section 117, the Copyright Act provides a number of limitations on exclusive rights for computer programs.  Section 117(a) allows copies or adaptations of computer programs to be made either "as an essential step in the utilization of the computer program in conjunction with a machine" or for archival purposes.[95]  It also allows for the

---

[90] 977 F.2d 1510, 1527-28 (9th Cir. 1992), *amended by* 1993 U.S. App. LEXIS 78 (9th Cir. Jan. 6, 1993).

[91] 203 F.3d 596, 608 (9th Cir. 2000).

[92] 17 U.S.C. § 109.

[93] For an extensive discussion of the history of section 109, *see* U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 19-25 (2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf ("DMCA SECTION 104 REPORT").  Additionally, section 109 limits the first sale doctrine regarding restored works under the Uruguay Round Agreements Act.  17 U.S.C. § 109(a); *see also* Uruguay Round Agreements Act, Pub. L. No. 103-465, § 514, 108 Stat. 4809, 4981 (1994).

[94] *See* DEP'T OF COMMERCE INTERNET POLICY TASK FORCE, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES 64-65 (2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf ("INTERNET POLICY TASK FORCE WHITE PAPER").

[95] 17 U.S.C. § 117(a)(1)-(2).

LOC_AR_00003153

transfer of any copies prepared in accordance with the exceptions, though adaptations may only be transferred with the authorization of the copyright owner.[96]  Section 117(a), like the provision regarding first sale, may only be invoked by "the owner of a copy of a computer program."[97]  This raises complex questions regarding whether a consumer owns a copy of software installed on a device or machine for purposes of section 117(a) when formal title is lacking or a license purports to impose restrictions on the use of the computer program.[98]  The general legal principles involving the ownership versus licensing question are addressed in detail in the following section.  In addition, section 117(b) places some limitations on the subsequent lease, sale, or transfer of copies made lawfully under section 117.[99]

Congress enacted sections 117(c) and (d) to provide a specific defense to "ensure that independent service organizations do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components."[100]  Congress enacted these provisions after the Ninth Circuit, in *MAI Systems Corp. v. Peak Computer, Inc.*, held that a computer repair technician who loaded software programs into random access memory ("RAM") without authorization committed copyright infringement.[101]

---

[96] Act of Dec. 12, 1980, Pub. L. No. 96-517,§ 10, 94 Stat. 3015, 3029 (1980).

[97] 17 U.S.C. § 117(a).  In enacting this provision, Congress largely adopted the language proposed by CONTU, with one exception.  The original report would have made the section 117(a) exception available to any "rightful possessor" of a copy.  CONTU Report at 12.  Congress changed the language from "rightful possessor" to "owner," without explanation. *See* H.R. REP. NO. 96-1307(I), at 23 (1980) *reprinted in* 1980 U.S.C.C.A.N. 6460, 6482.  Courts have attached varying degrees of significance to this change. *See generally Krause v. Titleserv, Inc.*, 402 F.3d 119, 122-23 (2d Cir. 2005).

[98] *See Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010); *Krause*, 402 F.3d at 124.

[99] 17 U.S.C. § 117(b) (providing that "exact copies" made lawfully under section 117 may be "leased, sold, or otherwise transferred . . . only as part of the lease, sale, or other transfer of all rights in the program" and that "[a]daptations" made under the section "may be transferred only with the authorization of the copyright owner").  Sections 117(a) and (b) were added to the Copyright Act as part of 1980 amendments implementing CONTU's recommendations.  Act of Dec. 12, 1980, Pub. L. No. 96-517, § 10, 94 Stat. 3015, 3028-29.

[100] *See* H.R. REP. NO. 105-551 at 27.

[101] 991 F.2d 511, 519 (9th Cir. 1993).  The "RAM copy doctrine" was subject to significant critique in this study.  *See, e.g.*, Aaron Perzanowski et al. Initial Comments at 3 (urging that the RAM copy doctrine "has cast the shadow of infringement liability over nearly every use—personal and commercial, private and public—of a digital work").  This issue was addressed in detail by the Copyright Office in a 2001 report, which recommended "against the adoption of a general exception from the reproduction right to render noninfringing all temporary copies that are incidental to lawful uses."  DMCA SECTION 104 REPORT 141.  It appears that the RAM copy doctrine is today firmly established as a matter of case law.  *See, e.g., MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 938-39 (9th Cir. 2011); *Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 101-02 (D.C. Cir. 1998).  Reconsideration of the doctrine—which applies to all software, not just software embedded in consumer products—is beyond the scope of this study.

LOC_AR_00003154

Thus, section 117(c) states that "the owner or lessee of a machine . . . that lawfully contains an authorized copy of a computer program" may make (or authorize a third party to make) a copy of a computer program "if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program," provided that the copy is made for purposes "of maintenance or repair of that machine."[102]  Notably, section 117(c) applies regardless of whether the owner of the device "owns" the copy of the programs that are embedded within that device.

Section 117(d), in turn, specifies that "maintenance" of a machine is the "servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine," while "repair" of a machine "is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine."[103]

The applicability of these provisions in the context of embedded software is addressed in greater depth in Parts IV.B and C below.

### 6.    *De Minimis* Uses

A number of courts have recognized that *de minimis* uses of copyrighted computer programs are not infringing.  Though difficult to define in the abstract, a *de minimis* use is one that is trivial.[104]  As the Second Circuit observed, "[b]ecause of the *de minimis* doctrine, in trivial instances of copying, we are in fact not breaking the law . . . because trivial copying is not an infringement."[105]  It is important to note, however, that the "de minimis defense does not apply where the qualitative value of the copying is material."[106]

Similarly, although modifying code may implicate the derivative work right in section 106(2), it may be that the changes are so minimal that the new works do not implicate that right at all.[107]

---

[102] 17 U.S.C. § 117(c).

[103] *Id.* § 117(d)

[104] *Davis v. Gap, Inc.*, 246 F.3d 152, 173 (2d Cir. 2001).

[105] *Id.*

[106] *Dun & Bradstreet Software Servs., Inc.*, 307 F.3d at 208.

[107] *See generally* COMPENDIUM (THIRD) § 311.2.  *See also Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 969 (9th Cir. 1992) (holding the GameGenie system, which simply modified the output of a computer program, did not result in a derivative work).  *Compare Midway Mfg. Co. v. Arctic Int'l, Inc.*, 704 F.2d 1009, 1014 (7th Cir. 1983) (holding that a modified version of a video game constituted a derivative work).

20

LOC_AR_00003155

## C.    *Ownership versus Licensing*

A significant issue arising in the context of software in general, and software-enabled consumer products in particular, is the question of when copies of software are "owned" or, instead, "licensed" for purposes of the Copyright Act. As explained above, section 117(a) and the first sale doctrine in section 109 both turn on whether one is the "owner of a particular copy," meaning that licensees cannot take advantage of the exceptions provided by section 117(a) and the first sale doctrine.[108]

Copies of software are commonly distributed subject to the purchaser's consent to the terms of a written agreement, particularly when sold as standalone products.[109] Those terms can vary greatly based on the kind of software at issue. Some software is accompanied by what is called an "end-user license agreement," or "EULA," which imposes restrictive terms on the use of the software. Although the practice of requiring consent to a license agreement is virtually uniform with respect to software that is sold as a standalone product, it appears to be less common with respect to many kinds of software-enabled consumer products.[110] In those cases, the consumer can often be said to "own" the copy of the software.[111] As discussed in Part IV.E below, however, there are at least some software-enabled consumer products that are sold with a license.

As an initial matter, some commenters argued that copies of software can *never* be licensed. They reached that conclusion on two somewhat different statutory grounds. First, a group of law professors argued that section 106(3) exclusively defines "the types of transactions available to copyright holders under the exclusive right to distribution,"

---

[108] *See* 17 U.S.C. §§ 109(a), 117(a).

[109] *See, e.g.*, Copyright Alliance Initial Comments at 9 ("The software industry has relied for decades on a licensing model for the distribution, maintenance, and updating of its software products and services to and for its customers . . . . [S]oftware is virtually always licensed and not sold . . . ."); ACT Initial Comments at 9 ("Many copyrighted products, including apps, are distributed subject to license agreements that use 'click-through' agreements facilitated by the app store platform (*e.g.*, iOS).");  ESA Initial Comments at 12 ("Software is commonly licensed, including sometimes, embedded software."); SIIA Initial Comments at 4 & n.3 ("Most SIIA members license their products . . . . Licensing is the dominant method of software distribution."). *See also Apple, Inc. v. Psystar Corp.*, 658 F.3d 1150, 1155 (9th Cir. 2011) (noting that "[s]oftware license agreements . . . have become ubiquitous in the software industry").

[110] *See* U.S. COPYRIGHT OFFICE, SECTION 1201 RULEMAKING: SIXTH TRIENNIAL PROCEEDING TO DETERMINE EXEMPTIONS TO THE PROHIBITION ON CIRCUMVENTION 287 (Oct. 2015), https://www.copyright.gov/1201/2015/ registers-recommendation.pdf ("2015 SECTION 1201 RECOMMENDATION") (discussing lack of written license agreements involving vehicle ECU software).

[111] When formal title is lacking and a copyright owner transfers a product containing a copyrighted work, the circumstances of that transaction will dictate whether the transferee is an "owner" of the copy of the work. The two leading precedents both reflect in their separate tests that the possessor of that product would likely be considered an "owner" of the software copy if the copyright owner places no restrictions on the consumers' use or resale of that work. *See Vernor*, 621 F.3d at 1111; *Krause*, 402 F.3d. at 124. For a further discussion of this issue regarding ownership, *see* Part IV.A.

21

LOC_AR_00003156

because the provision only describes distributions "by sale or other transfer of ownership, or by rental, lease, or lending."[112]  Thus, in this view, because "every distribution of a copy is either a transfer of ownership or it's a rental, a lease or a lending," "[t]he idea of a licensed copy is really a myth."[113]  Second, in a joint comment, two public advocacy organizations asserted that the concept of "licensing" software is undermined by the fact that the Copyright Act defines copies to be "'material objects . . . in which a work is fixed . . . .'"[114]  Thus, they reason, "[a] person who owns the material object in which a copy is embedded necessarily owns a copy of the copyrighted work."[115]

These arguments, at present, run counter to a uniform line of case law recognizing that copies of software can be "licensed" within the meaning of the Copyright Act.[116]  Thus, in the Copyright Office's view, the more critical issue is how courts should assess the question of ownership versus licensing under the existing case law.

The two leading cases, *Krause v. Titleserv, Inc.*[117] and *Vernor v. Autodesk, Inc.*,[118] describe tests that provide some guidance in determining whether a transaction can be characterized as a sale or a license.

In *Krause*, the plaintiff Krause wrote computer programs for the defendant Titleserv that were installed on Titleserv's computer network to be accessible to employees.[119]  Krause terminated his relationship with Titleserv, leaving copies of the source code for some of the programs and executable versions of all of the programs on Titleserv's file servers.[120]  Titleserv's employees modified the source code to fix bugs, add new customers, and

---

[112] Aaron Perzanowski et al. Initial Comments at 4 (quoting 17 U.S.C. § 106(3)).

[113] Tr. at 98:05-14 (May 18, 2016) (Aaron Perzanowski, Case Western Reserve University School of Law).  *See also* Aaron Perzanowski et al. Initial Comments at 4 ("[T]here is no free-standing transactional form called a 'license' when it comes to the transfer of particular copies, such as those embedded in a phone, watch, or tractor.").

[114] Public Knowledge/OTI Initial Comments at 3 (quoting 17 U.S.C. § 101 (definition of "copies")).

[115] *Id.*

[116] *See, e.g., Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1077-79 (9th Cir. 2015) (discussing the issue at length); *Vernor*, 621 F.3d at 1110-11; *DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*, 170 F.3d 1354, 1361-62 (Fed. Cir. 1999).  Indeed, the Supreme Court appears to have validated this understanding of the Act.  *See Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135, 147 (1998) (noting that "because the protection afforded by § 109(a) is available only to the 'owner' of a lawfully made copy (or someone authorized by the owner), the first sale doctrine would not provide a defense . . . against any nonowner such as a bailee, *a licensee*, a consignee, or one whose possession of the copy was unlawful") (emphasis added).

[117] 402 F.3d 119 (2d Cir. 2005).

[118] 621 F.3d 1102 (9th Cir. 2010).

[119] *Krause*, 402 F.3d at 120.

[120] *Id.* at 120-21.

LOC_AR_00003157

change customer addresses "to keep the old programs functional."[121]  Krause subsequently brought suit against Titleserv alleging copyright infringement, and Titleserv defended by arguing that its modifications of Krause's programs were noninfringing under section 117(a).[122]

On appeal, the Second Circuit held that "formal title in a program copy is not an absolute prerequisite to qualifying for § 117(a)'s affirmative defense," but rather that "courts should inquire into whether the party exercises sufficient incidents of ownership over a copy of the program to be sensibly considered the owner of the copy."[123]  The court concluded that Titleserv owned the copies of the program, reaching its conclusion after considering the following factors in the aggregate:

> Titleserv paid Krause substantial consideration to develop the programs for its sole benefit.  Krause customized the software to serve Titleserv's operations.  The copies were stored on a server owned by Titleserv.  Krause never reserved the right to repossess the copies used by Titleserv and agreed that Titleserv had the right to continue to possess and use the programs forever, regardless whether its relationship with Krause terminated.  Titleserv was similarly free to discard or destroy the copies any time it wished.[124]

Notably, there was no evidence of a *written* license agreement; rather, Krause's claim was that Titleserv "possessed the copies as a licensee pursuant to an oral agreement."[125]  The court, however, found that none of the oral statements Krause pointed to showed the existence of a license arrangement; rather, the statements "relate[d] to the ownership and/or right to use of the copyright, and not to ownership of the copies."[126]

In *Vernor*, Autodesk produced a piece of software called AutoCAD Release 14 software ("Release 14"), a "computer-aided design software used by architects, engineers, and manufacturers."[127]  Autodesk offered Release 14 to its customers pursuant to a written license agreement requiring acceptance before installation.[128]  The license agreement had various detailed restrictions:  providing that Autodesk retained title to all copies; stating that the customer had a nonexclusive and nontransferable license to use the software; restricting transfer of the software without Autodesk's prior consent; imposing use

---

[121] *Id.* at 121.

[122] *Id.*

[123] *Id.* at 124.

[124] *Id.*

[125] *Id.* at 122.

[126] *Id.* at 124.

[127] *Vernor*, 621 F.3d at 1104.

[128] *Id.*

LOC_AR_00003158

restrictions, such as prohibiting modification, translation or reverse-engineering; and providing for license termination where the user copied the software without authorization or otherwise did not comply with the license.[129]

Vernor purchased used copies of Release 14 from a variety of unauthorized sellers, including one of Autodesk's direct customers, Cardwell/Thomas & Associates ("CTA"). Vernor subsequently resold the copies on eBay.[130] After Autodesk was made aware of the fact that copies of Release 14 were being sold on eBay, it filed DMCA take-down notices with eBay and directed Vernor to stop selling the software.[131] In response, Vernor brought a declaratory judgment action against Autodesk, arguing that his resale of copies of Release 14 was protected by the first sale doctrine in section 109 and the essential step defense in section 117(a).[132]

On appeal, the Ninth Circuit determined that the affirmative defenses provided by the first sale doctrine and the essential step defense are "unavailable to those who are only licensed to use their copies of copyrighted works," and that the salient inquiry in this case was "whether Autodesk sold Release 14 copies to its customers or licensed the copies to its customers."[133] After considering Ninth Circuit precedent, the court determined that "a software user is a licensee rather than an owner of a copy where the copyright owner: (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions."[134] Using these factors, the court held that "CTA was a licensee rather than an owner of copies of Release 14 and thus was not entitled to invoke the first sale doctrine or the essential step defense,"[135] because "Autodesk reserved title to Release 14 copies and imposed significant transfer and use restrictions."[136] Consequently, "Vernor [also] did not receive title to the copies from CTA and accordingly could not pass ownership on to others."[137]

Some commenters have asserted that *Krause* and *Vernor* present two very different and, more importantly, conflicting tests,[138] and in some cases have indicated that one is more

---

[129] *Id.*

[130] *Id.* at 1103.

[131] *Id.* at 1105-06.

[132] *Id.* at 1106.

[133] *Id.* at 1107.

[134] *Id.* at 1111.

[135] *Id.*

[136] *Id.* at 1112.

[137] *Id.*

[138] *See, e.g.,* EFF Initial Comments at 7 (asserting that "[t]he split between *Krause* and *Vernor* could lead to very different results in the context of software-enabled devices"); Owners' Rights Initiative Initial

LOC_AR_00003159

correct than the other.[139]  *Krause* and *Vernor*, however, ultimately both turn on the courts' differing assessments of the nature of the transaction between the parties, including the level of control the copyright owner asserted over the copy of software.  Ultimately, the Copyright Office believes that the opposing outcomes in *Krause* and *Vernor* are the result of the significantly different facts and circumstances presented in those cases, rather than the somewhat different contours of the courts' analyses.

## D.    Other Areas of Law

The Committee also asked the Copyright Office to "identify key issues in how the copyright law intersects with other areas of law in establishing how products that rely on software to function can be lawfully used."[140]  State contract law is of particular salience here, as software-enabled everyday products are sometimes distributed with licenses restricting the use of the included software.  This issue is addressed in detail in Part IV.E below.

Commenters and the Copyright Office identified a number of other non-copyright laws that may affect the use of software-enabled everyday products, although further analysis of the scope and propriety of their reach is generally beyond the scope of this study.  For instance, patent, trademark, and unfair competition law may be relevant to assessing the scope of legal protection of embedded software.[141]  Laws prohibiting false advertising may also be relevant.  Commenters expressed the concern that manufacturers of software-enabled consumer products may be engaging in false advertising and "misleading consumers about the fundamental nature of the transaction," by "characterizing transactions as sales or purchases [in advertising or labeling] when, in fact, the fine print imposes significant and unexpected limitations."[142]

Additionally, commenters raised concerns about the effectiveness of consumer protection laws and, in particular, the ability for vendors in the software industry to "disclaim liability for defects in their products through boilerplate language in sales contracts and licensing agreements . . . . [allowing them] to exempt themselves from

---

Comments at 6 (citing *Krause* and *Vernor*, and pointing out that "U.S. circuit courts are split on . . . . whether a person who acquires a copy of a computer program is an owner or a licensee of the copy").

[139] *See, e.g.,* EFF Initial Comments at 7 (stating that the "*Vernor* approach should be repudiated at the national level"); Aaron Perzanowski et al. Initial Comments at 11 (arguing that the court in *Krause* "look[ed] to the economic reality of a transaction rather than the self-serving language of license terms drafted by copyright holders").

[140] Grassley/Leahy Letter at 2.

[141] *See, e.g., Alice Corp. Pty. Ltd. v. CLS Bank Int'l,* 134 S. Ct. 2347 (2014) (patent); *Checkpoint Sys. v. Check Point Software Techs. Inc.,* 269 F.3d 270 (3d Cir. 2001) (trademark).

[142] Aaron Perzanowski et al. Initial Comments at 11.  *See also* Tr. at 131:04-07 (May 18, 2016) (Aaron Perzanowski, Case Western Reserve University School of Law) (asserting that "these kind of false advertising concerns that I've raised are legally distinct from the kinds of question that we're trying to answer here").

LOC_AR_00003160

consumer protection laws that are otherwise universally applicable."[143]  There also were concerns over such language being used by manufacturers to evade tort liability.[144]

Finally, some commenters identified privacy concerns, either as a reason for allowing manufacturers to impose licenses on consumers to ensure data protection,[145] or as a reason for nullifying such licenses to provide consumers more control over whether and how manufacturers collect their personal information.[146]

The Copyright Office notes that many of these issues also arise with respect to the Internet of Things, a subset of software-enabled products that "connect, communicate or transmit information with or between each other through the Internet."[147]  Like the software at issue in this study, the Internet of Things raises a variety of privacy and security issues, which have been studied by other components of the U.S. government, including the Federal Trade Commission, the Department of Homeland Security, and Department of Commerce's Internet Policy Task Force.[148]

---

[143] Public Knowledge/OTI Initial Comments at 10.  *See also* Tr. at 26:02-04 (May 18, 2016) (John Bergmayer, Public Knowledge) ("I don't think that it is copyright law that should really be part of the discussion in terms of those sorts of consumer protection.").

[144] *See, e.g.,* Public Knowledge/OTI Initial Comments at 10 (asserting that, with respect to tort liability, "[a] manufacturer or seller should not be able to evade what would otherwise be their responsibilities under the law merely because their products now contain software," as doing so would "nullify decades of statutory and common law protections that were designed to protect consumers from poorly-designed or defective products and negligent commercial practices").  *But see* Tr. at 40:06-14 (May 18, 2016) (Chris Mohr, SIIA) ("Product liability is a tort and it's a tort under state law. . . . [A tort] is not going to be governed by the terms of a license agreement because . . . that's a very different type of analysis.").

[145] *See* ACT Initial Comments at 9 (asserting that "[a]dherence to licensing terms, for example, is crucial to ensuring data integrity and resiliency, as well as end user privacy"); Tr. at 17:06-12 (May 24, 2016) (Evan Cox, BSA) (stating that with these devices, "you're dealing more with a service relationship, which there's ongoing updating and interacting with software, a lot of liability and burdens on the provider of that software as a service, including liability concerns, security concerns, privacy breach concerns").

[146] *See* KEI Initial Comments at 4 (asserting that licenses attached to software-enabled consumer products "allow businesses to set the terms of what information is collected about users, and how that information is distributed and used," and that "[t]here are legitimate concerns that consumer privacy may be abused by third parties that have access to data collected in the course of use of a software-enabled consumer product, or that such data may be compromised by other malicious parties").

[147] FEDERAL TRADE COMMISSION, INTERNET OF THINGS, PRIVACY AND SECURITY IN A CONNECTED WORLD 6 (2015), *available at* https://www.ftc.gov/system/files/documents/reports/federal-trade-commission-staff-report-november-2013-workshop-entitled-internet-things-privacy/150127iotrpt.pdf.

[148] *Internet of Things*, NAT'L TELECOMM. & INFO. ADMIN., https://www.ntia.doc.gov/category/internet-things; *Securing the Internet of Things*, DEP'T OF HOMELAND SECURITY, https://www.dhs.gov/securingtheIoT; INTERNET OF THINGS: PRIVACY AND SECURITY IN A CONNECTED WORLD, *supra* note 147. .

LOC_AR_00003161

# IV. Analysis of Specific Concerns Raised by Software-Enabled Consumer Products

The Committee asked the Copyright Office to study the extent to which "the design, distribution, and legitimate uses of products" and "innovative services" are being "enabled and/or frustrated by the application of existing copyright law to software in everyday products."[149]  In addition, the Committee asked the Office to analyze how such products "can be lawfully used" in light of the ways "copyright law intersects with other areas of law."[150]

Software-enabled consumer products, while subject to general copyright law, can pose a range of special challenges in these areas.  These include issues related to resale and repair, security research, interoperability, and the licensing of embedded software.  As discussed below, because existing legal doctrines—including the idea/expression dichotomy, merger, *scènes à faire*, section 117, and fair use—are well-suited to address some of these concerns, the Copyright Office does not believe any legislative changes are necessary at this time.

To be sure, to those seeking to engage in these legitimate activities, relying on these somewhat indeterminate doctrines brings less certainty than would bright-line legislative fixes.  Indeed, some of these issues may have to be resolved through litigation, which carries obvious risks.  But legislation carries its own risks in the specific context of the products at issue in this Report because, among other things, the technology in these products is evolving so rapidly.  Legislation thus can be underinclusive—addressing the technologies of today but failing to anticipate the different technologies of tomorrow.  In that respect, what the established legal doctrines lack in determinacy, they make up for in flexibility; they can be—and have been—extended and applied to new technologies as they have developed.  Furthermore, this Report itself can serve as a roadmap of sorts for those seeking to make legitimate use of embedded software.  For these reasons, the Copyright Office is confident that U.S. copyright law can maintain an appropriate balance and guide the lawful use of embedded software.

## A. Resale

The increased inclusion of embedded software in consumer products raises the issue of whether and how consumers can resell or otherwise transfer such products.[151]  Some

---

[149] Grassley/Leahy Letter at 2.

[150] *Id.*

[151] To be clear, this analysis is limited to embedded software like that described in Part II; the Office is not here assessing questions of when a device containing other copyrighted works—like music, movies, or apps—can be resold under section 109.  The Department of Commerce's Internet Policy Task Force observed

LOC_AR_00003162

products traditionally resold without restriction, such as cars, now include embedded software, and consumer groups have voiced concerns over whether section 109's first sale doctrine permits the resale of that software when the product itself is resold.[152]

As noted above, the first sale right only applies to the "owner of a particular copy."[153] Does the owner of a car also "own" the particular copies of software that are embedded in that car for purposes of exercising the first sale right? A number of commenters expressed concern that, under current law, the answer to that question might be "no," especially in light of licensing practices for standalone software.[154] Another concern was that license agreements may only provide software updates such as security patches to the original licensee, and will withhold them from downstream purchasers.[155] As a result, these commenters worried about the use of copyright law to encroach on established consumer rights and expectations.[156]

As an initial matter, as noted in Part III.C above, many software-enabled consumer products are not sold with written license agreements at all. For instance, during the most recent section 1201 triennial rulemaking proceeding, representatives of auto manufacturers "conceded . . . that with the exception of the software controlling the entertainment and telematics systems, ECU [electronic control unit] software is not subject to written licensing agreements."[157] In such cases, there should be no question

---

earlier this year: "In the case of devices containing downloads of copies of works, when the downloading is performed under a license, there may be policy reasons not to allow resale. . . . [I]t is common for licenses for music, books, and movies to permit the licensee to make multiple copies on multiple devices for her own personal use, or to share copies with others. Such licenses may also forbid the licensee to transfer the downloaded copy, even as part of a transfer of the consumer product onto which the copy was downloaded." INTERNET POLICY TASK FORCE WHITE PAPER at 64.

[152] *See, e.g.*, CCIA Initial Comments at 2 ("Product licensing agreements for goods with embedded software may attempt to restrict lawful transfers or resale of lawfully acquired products, impairing economically desirable transactions between consumers and secondary buyers.").

[153] 17 U.S.C. § 109.

[154] *See* Auto Care Ass'n Initial Comments at 6 (noting that original equipment managers make "extravagant claims [in the press] that the first sale doctrine cannot apply because consumers merely 'license' and do not own the copy of the software embedded in vehicle parts").

[155] Owners' Rights Initiative Initial Comments at 4 (asserting that "Oracle refuses to supply routine updates to the purchasers of used hardware products containing essential Oracle software, unless they make an additional payment").

[156] Engine Advocacy Initial Comments at 10 ("Owners have almost always enjoyed the right and ability to . . . sell devices and other property they have purchased."); Aaron Perzanowski et al. Initial Comments at 9 (noting that "when a consumer buys a car, a phone, or a pacemaker, they expect to own it . . . includ[ing] the software that is equally, if not more, responsible for the device's characteristics, features, and performance"); EFF Initial Comments at 2 ("Traditionally, once a person has purchased a product, she has been free to use it however she sees fit."); Consumers Union Reply Comments at 2 ("A consumer who purchases a product or otherwise lawfully acquires it should own it, and be able to use it—as he or she sees fit.").

[157] 2015 SECTION 1201 RECOMMENDATION at 287.

LOC_AR_00003163

that the purchaser of that product also "owns" the copy of the software embedded in the product, and would be entitled to dispose of the product consistent with the requirements of the first sale doctrine.[158]

Furthermore, even where there is a written license agreement accompanying the sale of a software-enabled consumer product, the owner of the product may also be deemed to "own" the copy of the software embedded in that product for purposes of section 109. As discussed above, the determination of whether the software copy is owned or licensed turns on the nature of the transaction between the parties. Under both the *Vernor* and *Krause* decisions, a key part of the inquiry is whether the purchaser has the right to possess and use the product and its embedded software indefinitely and without restriction.[159] In cases where license agreements do not impose *any* restrictions on resale or transfer of the software-enabled product, it seems likely that a court would conclude that the software was owned rather than licensed.[160]

Although commenters made various claims regarding the prevalence of licensing terms restricting the ability for consumers to resell or transfer their copies of software or the products in which such software are embedded, the Copyright Office saw little evidence to substantiate those claims. The Department of Commerce's Internet Policy Task Force reached the same conclusion earlier this year.[161] And while the Office agrees that the ability of downstream purchasers of software-enabled consumer products to obtain security updates after transfer is important, the Copyright Office again did not find evidence that the kinds of products that are the focus of this Report are subject to such limitations. The evidence provided to support the assertion that manufacturers are restricting the resale of software-enabled products involved licenses for enterprise-level products (such as the products of NetApp, Oracle, Palo Alto Networks, and EMC),

---

[158] *See id*. at 304 (discussing effect of lack of written license agreements involving vehicle ECU software).

[159] *See Vernor*, 621 F.3d at 1111 (asking whether the copyright owner "significantly restricts the user's ability to transfer the software" and "imposes notable use restrictions"); *Krause*, 402 F.3d. at 124 (noting that "Krause never reserved the right to repossess the copies used by Titleserv and agreed that Titleserv had the right to continue to possess and use the programs forever, regardless whether its relationship with Krause terminated" and that "Titleserv was similarly free to discard or destroy the copies any time it wished").

[160] *See, e.g., Princeton Payment Sols., LLC v. ACI Worldwide, Inc.*, No. 1:13-CV-852, 2014 WL 4104170, at *7 (E.D. Va. Aug. 15, 2014) (holding that defendant was the owner of copy of software installed on defendant's servers where contracts "do not restrict [defendant's] use of the copies" and defendant "was free to discard or destroy the copies any time it wished to do so"); *ZilYen, Inc. v. Rubber Mfrs. Ass'n*, 935 F. Supp. 2d 211, 220 (D.D.C. 2013) (holding that defendant was owner of copies of software where there was "no language in the agreement restricting the defendant's use of the [copies]").

[161] INTERNET POLICY TASK FORCE WHITE at 64 ("The Task Force did not hear evidence that licenses purporting to restrict a consumer's ability to resell have been used with respect to embedded software that operates a functional product, other than a computer or related equipment. Thus, the record before us does not establish that the kinds of consumer products identified above are currently sold subject to such licenses.").

LOC_AR_00003164

rather than consumer products.[162]  These types of products are not purchased by the average consumer, and do not raise the same concerns about the inequality of bargaining power or the enforcement of contracts of adhesion.[163]

Some commenters made the claim that—even if manufacturers of software-enabled products do not currently impose restrictions on resale as part of software licensing agreements—they may do so in the future in an attempt to eliminate secondary markets for software-enabled products.[164]  The Copyright Office agrees that if license agreements in the future interfere with consumers' ability to resell or otherwise dispose of their software-enabled products, such a practice would be a concern worthy of legislative attention.[165]  One possible solution is YODA,[166] mentioned above, a bill that several commenters supported as a good starting point to resolve concerns regarding the resale or transfer of software-enabled consumer products.[167]  At the same time, there may be reasons to think that this issue is unlikely to arise, including that market forces—such as the efforts of consumer advocacy groups to shed light on abusive practices—are a barrier to engaging in behavior of this sort.[168]

Consequently, in light of the present lack of evidence that consumers are unable to resell or otherwise dispose of their software-enabled consumer products, the Copyright Office does not see any need for legislative action on the issue of resale at this time.  This is

---

[162] *See* Owners' Rights Initiative Initial Comments at 4-6; Tr. at 47:02-48:08 (May 18, 2016) (Sarang Damle, U.S. Copyright Office and Jonathan Band, Owners' Rights Initiative) (confirming that the relevant products are identified as enterprise-level products).

[163] *Cf.* GIPC Initial Comments at 6 (asserting that "in the business-to-business context, software licenses are commonly the subject of detailed and extensive negotiation between sophisticated parties, including circumstances in which the final product is destined for sale to the public"); *see also* Tr. at 74:15-20 (May 24, 2016) (Kit Walsh, EFF) ("But to honor freedom of contract, if you have parties who are engaging in an actual negotiation, then that's the kind of scenario where you could engage in trading, freedom to operate, as long as it's conspicuous and transparent.").

[164] *See, e.g.*, Aaron Perzanowski et al. Initial Comments at 3 ("[I]f Mattel decides to clamp down on the secondary market for used toys, it could quite simply refuse to grant permission to aftermarket purchasers to load the software that runs the device.  For that matter, so could Ford and Volkswagen.").

[165] INTERNET POLICY TASK FORCE WHITE PAPER at 64 ("We do believe . . . that the alienability of everyday functional products is an important issue for consumers.  If the market develops so that such devices are commonly sold with restrictions on subsequent purchasers' use of necessary software, further attention would be warranted.").

[166] H.R. 862, 114th Cong. (2015).

[167] *See, e.g.*, CDT Initial Comments at 5; Engine Advocacy Initial Comments at 13; Owners' Rights Initiative Initial Comments at 8; Aaron Perzanowski et al. Initial Comments at 12; Public Knowledge/OTI Initial Comments at 12.

[168] *Cf.* Brian Barrett, *Keurig's My K-Cup Retreat Shows We Can Beat DRM*, WIRED (May 8, 2015), https://www.wired.com/2015/05/keurig-k-cup-drm/ (noting that consumer complaints and consumer advocacy efforts led Keurig to back away from efforts to enforce digital rights management in its coffee machines).

LOC_AR_00003165

consistent with the recent conclusion of the Internet Policy Task Force with respect to the extension of the first sale doctrine to digitally transmitted goods.[169]

## B.    *Repair and Tinkering*

Another concern raised during the study was the potentially negative impact of copyright law on a consumer's ability to repair or tinker with his or her own products. This concern covered a wide swath of potential uses, from individuals who fix or modify their own devices for their personal use, to individuals who want to share their insights on a non-commercial basis, to those who are in the business of repairing embedded software and/or software-enabled products.[170]

Repair and tinkering activities potentially implicate four of the exclusive rights set forth under section 106 of the Copyright Act:

- Section 106(1)'s reproduction right is implicated when a copy of a program is made and transferred into a test environment where it can be further evaluated, as is customary in repair and tinkering.

- Section 106(2)'s right to prepare derivative works potentially is implicated if a user decides to modify the existing code in some respect, add new lines of code, or develop entirely new programs that interoperate with the existing program.

- Section 106(3)'s distribution right is implicated by a user's decision to sell a newly-modified device or replacement part to a third party.

- Section 106(5)'s display right potentially is implicated if a user decides to post code for an embedded program on a website or other public forum (either with or without any modifications that have been made), even if the user posted the information as a way to share insights with consumers who would like to make similar repairs or modifications to their own devices.[171]

---

[169] *See* INTERNET POLICY TASK FORCE WHITE PAPER at 4 (stating that "[a]mending the law to extend the first sale doctrine to digital transmissions of copyrighted works is not advisable at this time" because there was "insufficient evidence to show that there has been a change in circumstances in markets or technology, and the risks to copyright owners' primary markets do not appear to have diminished").

[170] Issues involving the development and distribution of interoperable products and services that interact with existing software-enabled devices are discussed in more detail in Part IV.D.

[171] *See, e.g.,* SEMA Initial Comments at 2-3 ("In the case of reverse engineering vehicle software, analyzing the entire software program may be critical to understand the functionality of the vehicle and, in addition, to determine how much storage is available to support additional functionality.  Importantly, access to the entire work is necessary to ensure that modifications in one part of the code will not negatively impact other functionality."); Tr. at 145:14-19, 146:01-03 (May 24, 2016) (Kyle Wiens, iFixit and Repair.org) ("[I]f you have an issue [with a car], the first thing that you might do is re-flash the firmware, . . . take a copy of firmware from another vehicle and put it on that vehicle to see if you can isolate the problem. . . . [But with some

LOC_AR_00003166

A number of commenters asserted that restrictive licenses prevent consumers from repairing or tinkering with software-enabled products or using independent third parties (as opposed to the manufacturer or authorized repair technician) to do so.[172] During the study, the Copyright Office heard of copyright infringement lawsuits, or threatened lawsuits, against those engaging in repairs.[173]  To reduce the risk of suit for copyright infringement, one commenter noted that more expensive repair options may be pursued instead of less expensive—but "riskier"—options.[174]

But the expression of these concerns was not unanimous.  Some commenters claimed that the issues raised during the roundtables were hypotheticals and without sufficient evidentiary support to warrant a change to title 17.[175]  Others urged against using copyright law to interfere with established "loss leader" business models, where companies sell a product at a loss to stimulate other sales of more profitable goods or services.[176]  In addition to disagreement over the factual and policy basis for concern, some commenters urged against legislative action regarding repair and tinkering because Congress already considered many of the existing complexities in 1998 when it amended section 117,[177] and because existing provisions in the Copyright Act, judicial

---

vehicles,] you actually have to extract the firmware from the vehicle, modify the byte code and then re-flash the car with it.").

[172] *See, e.g.*, Static Control Components Initial Comments at 3 ("By the clever use of labels, or packaging instructions, copyright holders can attempt to use their copyrights (or patent holders their patent rights) to prevent the . . . repair of products."); Engine Advocacy Initial Comments at 10-11 ("Where licenses prohibit users from accessing or tinkering with the embedded software in their devices . . . individuals may be frustrated in their ability to explore and make these sorts of valuable improvements to their devices and to achieve new interoperability with other devices.").

[173] *See, e.g.*, Auto Care Ass'n Initial Comments at 5 (stating that "vehicle parts manufacturers and servicers have been sued and threatened with suit for copyright infringement merely for engaging in repairs of software-controlled parts"); Tr. at 49:04-10 (May 18, 2016) (Shaun Bockert, Dorman Products, Inc.) (referencing lawsuit involving Dorman, *see* Am. Compl. and Jury Demand, *General Motors LLC v. Dorman Prods., Inc.*, No. 2:15-cv-12917 (E.D. Mich. Aug. 18, 2015)).

[174] Tr. at 156:04-18 (May 24, 2016) (Kyle Wiens, iFixit and Repair.org) ("[B]ecause we're afraid of the risk . . . we're selling a $300 repair option instead of $100 repair option that we could provide to consumers because of the murkiness of being able to modify hardware that we own.").

[175] *See, e.g.*, Tr. at 34:13-16 (May 18, 2016) (Steve Tepp, GIPC) ("[T]he concerns that are being raised are often hypothetical. . . . Very little of it is traceable actually to copyright law as the problem."); Copyright Alliance Reply Comments at 2 (same).

[176] Tr. at 59:22-60:03 (May 24, 2016) (Evan Cox, BSA) ("[Y]ou got that [product] for a couple hundred dollars because it's a business model that sells that thing as a loss leader.  Most of the console game[] makers have sold their consoles at a loss on the presumption that they can use their constellation of legal rights around that device to make money on the back end.").

[177] Copyright Alliance Reply Comments at 6-7 ("These issues are not new ones.  Congress considered the issues back in 1998 when it added section 117 and section 1201.  The concerns raised by commenters about repair and modifying software seem to be directed to section 1201, and not section 117.").

LOC_AR_00003167

interpretations, and rulemaking currently strike the correct balance in copyright law regarding repair of software-enabled consumer products.[178]

As discussed more fully below, the Copyright Office finds that current copyright law, properly interpreted, may provide relief for many repair and tinkering activities. Traditional copyright doctrines such as the idea/expression dichotomy, merger, *scènes à faire*, and fair use provide a combined and reasonable defense for many tinkering and repair activities. At this time, the Office is not recommending any modifications to the Copyright Act to address concerns regarding repair and tinkering. Although some commenters pointed to particular license agreements that purport to restrict the purchaser's ability to freely repair or refurbish their product, as more fully discussed in Part IV.E below, such terms may only be enforceable as a matter of contract. If repair activities are authorized as a matter of fair use, or under section 117, it seems likely that users can engage in them without fear of copyright infringement. In addition, market forces may discourage copyright owners from attempting to prevent independent repair activities.[179] Moreover, creating a statutory exception for tinkering or repair would require Congress to create a precise definition of what these types of activities involve and identify the precise situations where "tinkering" and "repair" should be permitted. Given the pace of technological change, there is a risk that any such exception may soon be obsolete.

---

[178] Microsoft Initial Comments at 9 ("This is not to say that tensions in the system never arise. But when they do, existing provisions in the Copyright Act, combined with agency rulemaking, judicial interpretations, and voluntary private-sector efforts, have proven up to the task of maintaining the right balance."); SIIA Initial Comments at 6 ("Issues relating to so-called 'rights to tinker,' the 'right to repair' and other related issues are beyond the scope of this rulemaking as they assume ownership of a copy. Such concerns (to the extent they legitimately exist) are best addressed within the context of the Office's examination of section 1201.").

[179] For example, there has been no shortage of public outcry about John Deere's practices with respect to their tractors. *See, e.g.,* Dan Nosowitz, *Farmers Demand Right to Right to Fix Their Own Dang Tractors*, MODERN FARMER (July 18, 2016), http://modernfarmer.com/2016/07/right-to-repair/; Laura Sydell, *DIY Tractor Repair Runs Afoul of Copyright Law*, NPR (Aug. 17, 2015), http://www.npr.org/sections/alltechconsidered/2015/08/17/432601480/diy-tractor-repair-runs-afoul-of-copyright-law. In addition, there have been efforts at the state level to enact "right to repair" statutes. Massachusetts enacted such a law in 2013, and similar legislation has been considered by other states. *See Legislation*, REPAIR.ORG, http://repair.org/legislation/. Automakers also have entered into a voluntary agreement allowing independent repair shops to more readily repair automobiles. *See* Gabe Nelson, *Automakers agree to 'right to repair' deal*, AUTOMOTIVE NEWS (Jan. 25, 2014), http://www.autonews.com/article/20140125/RETAIL05/301279936/automakers-agree-to-right-to-repair-deal. As the Copyright Office noted in its most recent 1201 rulemaking recommendation, however, this voluntary arrangement is limited in certain ways. 2015 SECTION 1201 RECOMMENDATION at 240 (noting that the agreement "does not apply to a significant portion of the vehicles that would be covered by the proposed exemption, including pre-2002 models and mechanized agricultural vehicles").

LOC_AR_00003168

### 1.    Idea/Expression Dichotomy, Merger, and *Scènes à Faire*

The idea/expression dichotomy codified in section 102(b) of the Copyright Act preserves the ability of a repair technician or hobbyist to identify embedded software's underlying processes and methods of operation, replicate those methods using their own code, and add to those methods as necessary.  It also preserves the ability to share those methods and techniques with other consumers, hobbyists, or technicians.  Section 102(b) permits the use of those ideas described or embodied in software, so long as no lines of code are actually copied.

But even if a user borrows portions of code from an embedded program to effectuate a repair, for use in a replacement part, or to tinker with the product's existing capabilities, there are circumstances where those portions would not be eligible for copyright protection.  As noted above in Part III.B, the merger and *scènes à faire* doctrines can play an important role.  Thus, where there is one way or a limited number of ways to implement an idea, process, procedure, or method of operation, the merger doctrine may limit the scope of the copyright in that program.  And where the expressive elements of the embedded program may be influenced by external factors, such as the mechanical specifications for the device or part, or relevant industry standards, the *scènes à faire* doctrine may likewise limit the scope of the copyright.

### 2.    *De Minimis* Uses

In cases where the idea/expression dichotomy and the doctrines of merger and *scènes à faire* do not apply, a consumer, repair technician, or software enthusiast may be able to copy, distribute, or display specific portions of an embedded program if the court determines that the user borrowed a *de minimis* portion of the code.  A finding of *de minimis* infringement may be based on whether the user borrowed a relatively small amount of code when compared to the program as a whole.  Alternatively, the finding could conceivably be based on whether the user borrowed portions of the code accounting for relatively minor features of the program, or portions controlling relatively mundane features of the software-enabled device.

Similarly, users may be able to modify the code for an embedded program if the court concludes that the modified version does not contain a sufficient amount of new material to qualify as a derivative work.[180]  In such cases, the minor modification could be excused as a *de minimis* infringement of the copyright owner's right to create derivative works based on the original program.[181]

---

[180] *See generally* COMPENDIUM (THIRD) § 311.2.

[181] For example, one commenter noted that after Nest bought Revolv—a company making a smart hub used to control a home's devices such as lights, alarms, and doors—it shut down the cloud service to which the hub connected, essentially "shutting off" customers' homes.  Tr. at 149:20-150:14 (May 24, 2016) (Kyle Wiens,

LOC_AR_00003169

### 3.    Section 117

Sections 117(a) and (c) of the Copyright Act provide additional protection that may allow consumers, repair technicians, and software enthusiasts to fix or tinker with their software-enabled devices.  Properly construed, section 117 "should adequately protect most repair and maintenance activities."[182]

As noted above, section 117(a) only applies to the "owner of a copy of a computer program."[183]  Based on that limitation, some commenters were concerned that consumers cannot rely on section 117(a) because "they aren't considered owners" or because the exceptions "are simply too narrow."[184]  As discussed above, however, many software-enabled products are sold without any license agreement, in which case a purchaser of that device should be considered the owner of both the device itself and the software embedded therein, and should be entitled to repair or maintain that program consistent with section 117(a).

In cases where these devices are sold with a written license agreement, the owner of the device may nevertheless be deemed to own both the device itself and the copy of the software embedded within that device.  Again, the determination of whether the software copy is owned or licensed turns on the nature of the transaction between the parties.  The *Vernor* and *Krause* decisions explain that a key part of the inquiry is whether the purchaser has the right to possess and use the product and its embedded software indefinitely and without restriction.[185]  A licensing term prohibiting repair or tinkering would not, standing alone, compel the result that the software is licensed, rather than owned, for purposes of section 117; for instance, such a term would not itself "significantly restrict[] the user's ability to transfer the software" under the *Vernor* test.[186]

---

iFixit and Repair.org).  According to this commenter, a consumer could repair his or her Revolv smart hub "without either rewiring the entire house and replacing all the devices" simply by "modify[ing] the [Revolv] firmware and [loading] some software that excludes the cloud check."  Tr. at 150:15-19 (May 24, 2016) (Kyle Wiens, iFixit and Repair.org).  It may be that these changes were sufficiently limited so as not to implicate the derivative work right.

[182] Auto Care Ass'n Initial Comments at 11; *see also* Tr. at 155:16-20 (May 18, 2016) (Aaron Perzanowski, Case Western Reserve University School of Law) ("If the standard for what counts as ownership is clarified and people can rely on 117, . . . that addresses many, although not all of the circumstances where we might otherwise be telling clients to focus their efforts on fair use.").

[183] 17 U.S.C. § 117(a).

[184] Tr. at 189:10-14 (May 24, 2016) (Erica Sollazzo, Engine Advocacy) ("[O]ne of the big problems right now is that consumers aren't able to take advantage of the limitations in . . . section 117 because they aren't considered owners."); iFixit Initial Comments at 8-9 ("The few carve-outs in the law are simply too narrow and do not effectively safeguard hardware repair for software-enabled devices.").

[185] *See Vernor*, 621 F.3d at 1111; *Krause*, 402 F.3d at 124.

[186] *Vernor*, 621 F.3d at 1110.

LOC_AR_00003170

In addition, when assessing the nature of the transaction with a consumer, it may also be appropriate to consider the software's relationship to the product being sold. For instance, in *Krause*, the court assessed whether substantial consideration was paid for the copy of the software at issue in that case.[187] Although that question can be complex in the context of embedded software,[188] it would be appropriate to focus on whether the software components of the product are ancillary or supplementary to non-software components of the product. For example, specialized software controlling certain mechanical components of an automobile, like windshield wipers or transmission, may essentially be invisible to the consumer. In such cases, it would be unusual to characterize the sale of the automobile as involving the licensing of that software for purposes of the Copyright Act. In contrast, it is very likely that a different result would obtain with respect to the operating system software in a personal computer, which—from the consumer's perspective—will be a more significant element of the transaction.

If the embedded software copy is owned, section 117(a) provides broad protections for repair and tinkering activities. As noted, that provision states that the owner of the copy of a computer program may make a new copy of that program or may create an adaptation of that program if the "new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine," and "is used in no other manner."[189] It also states that the owner may authorize a third party—such as a repair technician—to make an additional copy or create an adaptation on his or her behalf.[190]

Accordingly, section 117(a) has been interpreted to permit a broad range of activities, including fixing bugs, transferring programs to a new operating system, and adding new features to make the software more useful to its owner.[191] Thus, the provision should allow the owner to make an "intermediate" copy of his or her program and transfer that copy into a test environment for the purpose of studying the code for errors

---

[187] *Krause*, 402 F.3d at 124.

[188] *See* Copyright Alliance Initial Comments at 14 ("Today, more products are moving toward an approach that combines hardware with software to improve the functionality of traditional and newer product lines. Often, the software component is one of the most valuable aspects of the product.").

[189] 17 U.S.C. § 117(a).

[190] *Id.*

[191] *Krause*, 402 F.3d at 125 (finding that "correcting programming errors or 'bugs,' which interfered with the proper functioning of the programs" and "adaptation of the programs so that they would function on Titleserv's new Windows-based system," was protected under 117(a)); *id.* at 128 (finding that "modest alterations" such as adding features to improve the functionality of software for which it was created were protected under 117(a), and noting that the CONTU Report "specifically contemplate[d] protection for modifications adding features, rather than merely securing continued functioning of what was originally created").

LOC_AR_00003171

that may prevent the program from working properly.[192]  It also should enable the owner to make changes to the code that are necessary to ensure that the program functions properly, or to add features to improve the functionality of software for which it was created.  Section 117(a) further should allow the owner to make an archival copy of the original program in case it is necessary to compare the source code for the original version and the adapted version.[193]  Additionally, section 117(a) should allow the owner to transfer the copy of the original program or the adapted program (as the case may be) from the test environment back onto the software-enabled device, provided that the "intermediate" copy and any archival copies are deleted from the test environment.  The provision also should enable the owner to transfer the original code or the adapted code (as the case may be) onto a replacement part that may be needed for the software-enabled device, provided that any "intermediate" and archival copies are deleted from the test environment, and provided that the original copy of the program is deleted from the part that has been replaced.[194]  Most importantly, section 117(a) should allow the owner of the copy to authorize a third party to engage in any of these activities on his or her behalf, such as an independent repair technician.[195]

Section 117(c) covers a somewhat narrower range of activities.  This provision principally was aimed at protecting independent repair technicians from copyright liability when they turned on a machine and made a reproduction of the software into RAM.[196]  In the context of software-enabled products, this provision should allow the owner of a device (or his or her designee) to make a RAM copy of any programs that are stored within the device, and are necessary for the machine to be activated, to the extent that those copies are needed to service, repair, or restore that device "in order to make it work in accordance with its original specifications."[197]  In addition, section 117(c) would shield the owner (or his or her designee) from infringement liability for making RAM copies to the extent that the owner may want to enhance the capabilities of his or her device, as the definitions of "maintenance" and "repair" in section 117(d) encompass

---

[192] *Cf.* 2015 SECTION 1201 RECOMMENDATION at 304-305 ("In order to understand the functionality of a computer program, one may need to make a copy to use it in conjunction with a 'machine,' such as a general-purpose computer, on which the program will be analyzed.").

[193] *See* 17 U.S.C. § 117(a)(2).

[194] *Aymes v. Bonnelli*, 47 F.3d 23, 26 (2d Cir. 1995) (internal citation omitted) (noting that "[t]his right of adaptation includes 'the right to add features to the program that were not present at the time of rightful acquisition,'" such as modifying an existing program to run on "successive generations" of hardware).

[195] 17 U.S.C. § 117(a)(2) (authorizing "the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program" for archival purposes).

[196] *See* H.R. REP. NO. 105-551 at 27.

[197] 17 U.S.C. § 117(d)(1)-(2); *see also Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1314 (Fed. Cir. 2005) (discussing these provisions).

LOC_AR_00003172

servicing or restoring the machine to make it work "in accordance with . . . any *changes* to those specifications authorized for that machine."[198]

Although sections 117(a) and (c) may allow consumers, repair technicians, and software enthusiasts to fix or tinker with their software-enabled devices, section 117(b) places some limitations on the subsequent lease, sale, or transfer of copies made lawfully under section 117.  While section 117(b) allows for *exact* copies" made lawfully under section 117 to be "leased, sold, or otherwise transferred . . . only as part of the lease, sale, or other transfer of *all* rights in the program," *adaptations* so made may be "transferred only with the authorization of the copyright owner."[199]  The first sale doctrine is "thus rendered totally inapplicable to the transfer of adaptations made pursuant to Section 117."[200]  Accordingly, there may be limits on a consumer's ability to freely sell a device with modified embedded software.

## 4.    Fair Use

A number of commenters stated that repairing or tinkering with a software-enabled consumer product should be considered a fair use under section 107,[201] though there also was concern about the uncertainty of the defense.[202]

The Copyright Office heard several suggestions for clarifying the scope of the fair use doctrine, such as:  (1) requiring copyright owners to make a good faith determination that the defendant's conduct does not qualify as a fair use before filing suit;[203] (2) shifting

---

[198] 17 U.S.C. § 117(d)(1)-(2) (emphasis added).

[199] *Id.* § 117(b) (emphasis added).

[200] 2 NIMMER ON COPYRIGHT § 8.08[B][3].

[201] *See, e.g.*, Auto Care Ass'n Initial Comments at 11 ("Fair use also can assure that the scope of repair under patent law is not diminished by copyright law, and can fill gaps where the existing copyright statutory framework provides no explicit guidance."); Engine Advocacy Initial Comments at 13 ("Fair use also protects tinkering with or copying for the purpose of repairs or testing software embedded in devices. Making such uses is transformative and poses no risk of market substitution or harm to the underlying software work."); Tr. at 148:21-149:04 (May 24, 2016) (Ashley Ailsworth, SEMA) ("[I]f you are just interacting . . . with the parameters on the ECUs and not changing the really hardcore software and the firmware, . . . [t]here's a general understanding that that is a fair use . . . .").

[202] *See, e.g.*, Tr. at 149:13-18 (May 24, 2016) (Kyle Wiens, iFixit and Repair.org) ("[R]epair or modification of a vehicle that you own is a fair use . . . . And that's not the case now.  That's not the perception in the market."); Tr. at 152:25-153:04 (May 24, 2016) (Kit Walsh, EFF) ("[T]he chilling effect both of 1201 but also on the expense and unpredictability of fair use . . . is manifested in the marketplace . . . people don't know if it's lawful under copyright to repair their car . . . ."); Tr. at 158:08-11 (May 18, 2016) (Shaun Bockert, Dorman Products, Inc.) ("We want to clarify that certain things qualify as non-infringing uses and we don't want to rely on just advising clients that this is probably a fair use . . . .").

[203] SEMA Initial Comments at 4 ("Another option would be to require a copyright owner to perform a subjective good faith analysis to determine whether the conduct at issue is for a purpose that constitutes fair use before . . . enforcing the DMCA's anti-circumvention provision.").

LOC_AR_00003173

the burden of proof onto copyright owners to show a particular use was not fair;[204] (3) requiring a minimum threshold of commercial activity to sustain a finding of infringement;[205] or (4) increasing the availability of attorney's fees for prevailing defendants.[206]  Others urged Congress or the Copyright Office to provide more specific guidance on fair use because it is so fact-specific,[207] expensive to litigate, difficult to communicate to a jury, and rarely presented until late in a judicial proceeding.[208]

The Copyright Office appreciates that fair use is a fact-intensive inquiry, and that the outcome of a particular lawsuit does not guarantee a similar outcome in cases involving other types of products.  Although some suggested that Congress could address these concerns by adding "tinkering" or "repair" to the list of paradigmatic fair uses set forth in the preamble to section 107, such a change is not necessary.  Even without a statutory amendment, the Office believes that, properly applied, the fair use factors—together with the existing case law—should ensure that consumers, repair technicians, and other interested parties will be able to engage in most traditional repair and tinkering activities without fear of copyright infringement liability.  To assist courts and the public in applying the fair use doctrine, the Office offers the following generally applicable points regarding fair use analysis in the context of software-enabled everyday products.  The Office cautions, however, that fair use analysis is ultimately a fact-specific inquiry, and the following analysis would not necessarily dictate the outcome of any particular case.

The first factor focuses on the purpose and character of the use, including whether the use is commercial in nature or for nonprofit educational purposes.  To the extent that a repair is conducted by an individual for his or her own personal use, that activity would likely be considered a noncommercial use (albeit not a nonprofit educational use).  Repairs conducted by a company or a technician engaged in the business of repairing embedded software or software-enabled devices would likely be considered a commercial use.  But that does not necessarily mean that the repair is presumptively

---

[204] Tr. at 165:09-10 (May 24, 2016) (Cathy Gellis, Digital Age Defense) ("Right now, all the burdens seem to be on the fair user, and that's debilitating.").

[205] Tr. at 54:10-12 (May 24, 2016) (Kit Walsh, EFF).

[206] Auto Care Ass'n Initial Comments at 10.

[207] *See, e.g.*, Tr. at 157:18-25 (May 24, 2016) (Stephen Liu, Engine Advocacy) ("[T]he issue with fair use right now is that it's a defense and it's not very predictable.  And the main reason for that is because every case is different.  It's a fact-dependent analysis.  The best way to resolve that, at least maybe the easiest way to resolve a lot of the problems that come from that is by creating carve-outs.").

[208] Tr. at 161:12-162:01 (May 24, 2016) (Cathy Gellis, Digital Age Defense) ("[F]air use is [assessed] way too late in the process . . . .  How you even present that question to the jury is extremely problematic.  It's massively expensive and very, very difficult to communicate."); Tr. at 171:23-172:11 (May 24, 2016) (Ashley Ailsworth, SEMA) ("[Fair use] case law is sufficiently clear actually.  But the problem is . . . when you have companies, especially smaller companies that are having to operate in this space, and you really can't predict what a court's going to do and you never want to have to make that jump.").

LOC_AR_00003174

ineligible for the fair use defense.[209]  Instead, courts should also consider other aspects of the purpose and character of the use, as well as the three remaining factors.

In evaluating the purpose and character of the use, one important factor is that the fundamental purpose of any repair is to preserve or restore the functionality of a software-enabled device so that it may continue to be used.  In this respect, repair supports—rather than displaces—the purpose of the embedded programs that control that device.  Indeed, the Copyright Office made this same point in recommending in favor of an exemption for vehicle repair, diagnosis, and modification in the most-recent section 1201 rulemaking proceeding.[210]

In some cases, repair could be considered a "transformative" use under the first factor, because it often encourages the creation of new creative works.  For instance, users may need to create diagnostic programs to study an embedded program and to identify potential issues with the code.  If the problems are significant the user may need to modify or adapt the existing code.  If those changes are sufficiently creative, the modified or adapted code may qualify as a new work based on the original version of the program.[211]

The second factor focuses on the nature of the copyrighted work.  Courts and the Copyright Office have recognized that, in some instances, software may be entitled to less protection than other types of expressive works, such as music or films, because they are functional works.[212]  In the repair context, the code for an embedded program is even further removed from traditionally expressive works.  The user is typically interested in the portions of the code that are broken, rather than the portions that are capable of providing instructions to a software-enabled device.  The fact that the program is damaged often means that it cannot be used for any purpose (expressive or otherwise).  Even if the program contains both functioning and non-functioning elements, the user may need to transfer the entire program onto a test environment.  Because embedded programs have no function when removed from a software-enabled device, the user may not be able to exploit the expressive elements of the program (if any) until the repair is complete.

---

[209] *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994) (stating that "the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character").

[210] 2015 SECTION 1201 RECOMMENDATION at 234-35 ("[T]he proposed uses for diagnosis and repair would presumably enhance the intended use of ECU computer programs.").

[211] *See id.* at 234 (noting that, in the context of automotive software, transformative uses "include copying the work to create new applications and/or tools that can interoperate with ECU software and facilitate functionalities such as diagnosis, modification and repair" or "modification of ECU computer programs to 'interoperate' with different auto parts").

[212] *See, e.g., id.* at 235 (noting "the Register's established position that computer programs such as those contained in ECUs are essentially functional works used to operate a device").

LOC_AR_00003175

The third factor focuses on the amount and substantiality of the portion that has been used relative to the copyrighted work as a whole.  The fact that a user may need to copy the entire program is not dispositive, particularly if the other factors weigh in favor of fair use.  As the Copyright Office has elsewhere explained, "courts have been willing to permit extensive copying of the original work where it is necessary to accomplish a transformative purpose."[213]  As mentioned above, such copying is often necessary to complete a repair:  most computer programs do not have a specific beginning, middle, or end, which can make it difficult to identify the source of the problem within the code.  Users often address this issue by making a copy of the entire program and transferring it onto a test environment.  When the repair is complete, they typically transfer the program back onto the software-enabled device.

The fourth factor focuses on the effect on the potential market for or value of the copyrighted work.  Repairing a software-enabled device is less likely to have an adverse impact on the potential market for the software embedded within that device.  It is important in the context of software used to operate a particular device to focus on the market *for the relevant copyrighted work*—the software itself.[214]  As discussed above, these types of computer programs are not distributed as standalone works.  They are distributed with a specific device and their sole purpose is to operate or control that device.  Because there is no market for the programs themselves and because the programs have no value apart from the devices that they operate, repairing these programs is not likely to interfere with any market likely exploited by the copyright owner.  In the most recent section 1201 rulemaking, the Copyright Office made this same point in recommending the grant of an exemption for vehicle repair, diagnosis, and modification.[215]  Although copyright owners may argue that repair activities effectively prevent them from offering authorized repair services for their own products, that is not the relevant issue:  that market is not one that the copyright law was intended to protect.[216]

---

[213] *Id.* at 236.

[214] *See Lexmark*, 387 F.3d at 545.

[215] 2015 SECTION 1201 RECOMMENDATION at 236 (finding that, under the fourth fair-use factor, "[p]roponents have thus established that there is not a significant independent market for ECU computer programs that can be harmed").

[216] *See Lexmark*, 387 F.3d at 545 ("Lexmark's market for its toner cartridges and the profitability of its Prebate program may well be diminished by the SMARTEK chip, but that is not the sort of market or value that copyright law protects."); *Sony Comput. Entm't*, 203 F.3d at 607 ("Sony understandably seeks control over the market for devices that play games Sony produces or licenses.  The copyright law, however, does not confer such a monopoly.").

LOC_AR_00003176

## C.    Security Research

Another area of inquiry was whether existing copyright law enables or frustrates the public's ability to engage in security research involving software-enabled consumer products. Researchers may study embedded software to identify potential flaws that may cause a device to malfunction or may allow the device to be compromised by third parties. In addition, academics as well as entities engaged in the business of conducting security research may want to share their discoveries with the public on a non-commercial basis.

Security research potentially implicates the following exclusive rights[217]:

- When studying an existing program for potential vulnerabilities, it is customary to make a copy of that program and transfer it into a test environment where it can be studied. This type of intermediate copying implicates the reproduction right under section 106(1).

- To correct a particular flaw the researcher may decide to change the existing code in some respect, add new code or remove existing lines of code, or develop new routines or entirely new programs that interoperate with the existing program. This type of activity potentially implicates the right to create derivative works under section 106(2). If the researcher decides to distribute copies of these derivative works, it may also implicate the distribution right under section 106(3).

- The researcher may decide to copy the program back onto the original device to determine if the patch was successful. This activity implicates the reproduction right under section 106(1).

- Often times, the researcher will publish his or her findings to alert the public about a flaw in a particular device. In some cases, the researcher may distribute an article or other written documentation that describes the problem and explains how to fix it. In other cases, the researcher may post his or her findings on a website or other public forum. If the researcher includes portions of the code for the embedded program, this may implicate the rights to reproduce, distribute, and publicly display that work under sections 106(1), 106(3), and 106(5). If the researcher includes any modifications that have been made to the program, it also may implicate the right to create derivative works under section 106(2).

---

[217] *See, e.g.*, Engine Advocacy Initial Comments at 11 (noting that security research "frequently requires that the software be copied first and then analyzed," which "may require copying, manipulation, or other engagement with the software").

LOC_AR_00003177

Several commenters stated that these types of activities should be permitted because security research protects the general public against flaws in embedded software that could have dangerous consequences.[218]  For example, "security researchers uncovered a loophole in the infotainment system of a Jeep Cherokee that allowed them to remotely disable its transmission and brakes."[219]  This research "led Fiat Chrysler to issue an unprecedented recall for 1.4 million vehicles, mailing out USB drives with a patch for the vulnerable infotainment systems and blocking the attack on the Sprint network that connected its cars and trucks."[220]

While some manufacturers affirmatively test their own products and provide their customers with patches when appropriate, the Copyright Office learned that many manufacturers do not.[221]  In such cases, it was urged that professional security researchers should be allowed "to audit and analyze the features of the device in order to detect these vulnerabilities," and, if necessary, share their findings with the government and the general public to "put pressure on the company" to address these flaws.[222]

The Office also was told that some software-enabled products are subject to license agreements that limit security research.[223]  For instance, one public advocacy organization reported that the EULA for the Nest thermostat prohibits the user from "sharing the results of functional and performance tests" involving the product, without prior authorization from Nest.[224]  Copyright owners were also said to discourage researchers from disclosing the results of their research by issuing DMCA take-down

---

[218] *See, e.g.*, Engine Advocacy Initial Comments at 2 ("[S]ecurity researchers should be able to explore and analyze the embedded software to detect . . . flaws, security vulnerabilities, [and] hidden privacy risks . . . ."); Tr. at 116:24-25, 117:01-07 (May 24, 2016) (Kit Walsh, EFF) (citing a study conducted by Hewlett-Packard finding vulnerabilities in "60 percent of the most common internet of things devices").

[219] Engine Advocacy Initial Comments at 2.

[220] Andy Greenberg & Kim Zetter, *How the Internet of Things Got Hacked*, WIRED (Dec. 28, 2015), http://www.wired.com/2015/12/2015-the-year-the-internet-of-things-got-hacked/.  Engine Advocacy commented that similar problems were discovered through security research on a Tesla Model S, a Chevrolet Corvette, a BMW, and a Mercedes Benz.  *See* Engine Advocacy Initial Comments at 11.

[221] *See, e.g.*, Tr. at 117:23-25, 118:01-12 (May 24, 2016) (Kit Walsh, EFF) (stating that "security is often not a sort of a high investment priority for people who are deploying internet of things devices").

[222] Tr. at 118:19-119:01, 119:06-10 (May 24, 2016) (Kit Walsh, EFF).

[223] *See, e.g.*, CDT Initial Comments at 4 ("[S]ome software licenses expressly prohibit customers from reverse engineering software code, even to look for or patch vulnerabilities in the code."); Engine Advocacy Initial Comments at 11 ("[T]hese activities may require copying, manipulation, or other engagement with the software that may be prohibited by the license under which it is distributed.").

[224] Tr. at 67:25, 68:01-05 (May 24, 2016) (Kit Walsh, EFF); *see End User License Agreement*, NEST, https://nest.com/legal/eula/ ("You may not release the results of any performance or functional evaluation of any of the Product Software to any third party without prior written approval of Nest Labs for each such release.").

LOC_AR_00003178

notices or threatening infringement actions,[225] and it was asserted that even a potential legal challenge may effectively prevent researchers from conducting this type of work.[226] These commenters suggested that establishing a broad statutory exemption for security research or by clarifying the scope of the fair use doctrine would address these concerns.[227]

There are significant benefits to allowing security researchers to study software-enabled consumer products for potential vulnerabilities and to share their findings with the general public.  In addition, as the Office has previously stated, rules governing security research "hardly seem the province of copyright, since the considerations of how safely to encourage such investigation are fairly far afield from copyright's core purpose of promoting the creation and dissemination of creative works."[228]  In many cases, it may be more appropriate for these issues to be "considered by those responsible for our national security and for regulating the consumer products and services at issue."[229] Indeed, cybersecurity issues relating to software-enabled consumer products are being studied by other parts of the government, including the Department of Commerce's Internet Policy Task Force, which "is conducting a comprehensive review of the nexus between cybersecurity challenges in the commercial sector and innovation in the Internet economy."[230]

As will be discussed below, after reviewing the record, the Copyright Office does not see a need for legislative action with respect to the role of copyright law and security research at this time, for several reasons.[231]  First, while there was some isolated evidence to suggest that software-enabled devices are subject to license agreements that would limit security research, as addressed in detail in Part IV.E below, it seems likely that the remedies for breach of such agreements would be found in state contract law, not copyright.[232]

---

[225] Tr. at 166:18-19 (May 18, 2016) (John Bergmayer, Public Knowledge); Tr. at 119:02-05 (May 24, 2016) (Kit Walsh, EFF); Aaron Perzanowski et al. Initial Comments at 7 ("Concerns about potential infringement liability can also discourage research and testing of consumer devices.").

[226] Tr. at 167:12-16 (May 18, 2016) (Aaron Perzanowski, Case Western Reserve University School of Law) ("[W]hile security researchers themselves might be willing to take risks, university general counsels are not known for being big risk takers.  And their willingness to back researchers who are engaging in work that might draw litigation is rather limited.").

[227] Tr. at 164:06-08 (May 18, 2016) (John Bergmayer, Public Knowledge) (noting, in response to a question on fair use, "security research ought to categorically be non-infringing . . . [through] statute").

[228] 2015 SECTION 1201 RECOMMENDATION at 316.

[229] *Id.*

[230] *Cybersecurity*, U.S. DEP'T OF COMMERCE, https://www.ntia.doc.gov/category/cybersecurity.

[231] As noted, this study is not addressing the effects of section 1201, which are the topic of a separate study.

[232] The Copyright Office believes that the other components of the government, working together with industry, have an important role to play in encouraging and facilitating independent good faith security

LOC_AR_00003179

In addition, the Office notes that industry practices regarding security research are rapidly developing.  A growing number of copyright owners *encourage* users to conduct security research, and some companies even offer monetary incentives for those who identify problems and potential solutions.  For example, Google has offered a "Vulnerability Reward Program" since 2010 to encourage security researchers to identify technical vulnerabilities in its system,[233] and it offers $500 to $100,000 for researchers who identify qualifying bugs through its "Chrome Reward Program."[234]  Other companies such as Facebook,[235] Microsoft,[236] and Mozilla[237] offer similar security research rewards programs, while companies such as Oracle[238] and Apple[239] encourage security research without providing financial incentives.

Finally, a new statutory copyright framework for security research does not appear to be necessary, because—as addressed in detail below—existing copyright law doctrines, properly interpreted, should protect this legitimate activity from infringement liability.

## 1.    Idea/Expression Dichotomy, Merger, and *Scènes à Faire*

As discussed above in the context of tinkering and repair, section 102(b) of the Copyright Act gives researchers the ability to examine code for the purpose of studying its basic processes and methods of operation.  Although this provision would not, in and of itself, shield a researcher from liability for making copies or derivative works in the course of their research, it would give researchers the ability to share these discoveries and insights with others.

But even where it may be necessary to copy, distribute, or display actual portions of the code, that does not necessarily mean that the researcher has violated the copyright

---

research.  Tr. at 118:13-18, 119:06-10 (May 24, 2016) (Kit Walsh, EFF) (suggesting that government and public advocacy groups can play a constructive role in encouraging companies to disclose and remedy defects in their products).

[233] *Google Vulnerability Reward Program (VRP) Rules*, GOOGLE, https://www.google.com/about/appsecurity/reward-program/.

[234] *Chrome Reward Program Rules*, GOOGLE, https://www.google.com/about/appsecurity/chrome-rewards/.

[235] *Information*, FACEBOOK (May 11, 2016), https://www.facebook.com/whitehat.

[236] *Microsoft Bounty Programs*, MICROSOFT, https://technet.microsoft.com/en-us/library/dn425036.aspx.

[237] *Client Bug Bounty Program*, MOZILLA, https://www.mozilla.org/en-US/security/client-bug-bounty/.

[238] *How to Report Security Vulnerabilities to Oracle*, ORACLE, https://www.oracle.com/support/assurance/vulnerability-remediation/reporting-security-vulnerabilities.html.  One commenter cited a blog post written by Oracle's chief security officer that discouraged third parties from conducting security research.  CDT Initial Comments at 4 n.18.  But Oracle reportedly removed the post from its website the day after it was published.  *See* Sean Gallagher, *Oracle security chief to customers: Stop checking our code for vulnerabilities*, ARS TECHNICA (Aug. 11, 2015), http://arstechnica.com/information-technology/2015/08/oracle-security-chief-to-customers-stop-checking-our-code-for-vulnerabilities/.

[239] *Apple Web Server Notifications*, APPLE (July 11, 2016), https://support.apple.com/en-us/HT201536.

LOC_AR_00003180

owner's exclusive rights.  Where the vulnerability relates to purely functional code, the operation of which is dictated by external factors, or by the processes or algorithms the code embodies, copyright law would not prohibit the copying of that code, under the merger and *scènes à faire* doctrines, which are discussed in greater detail above.

### 2.    *De Minimis* Uses

Even where the idea/expression dichotomy, or the merger and *scènes à faire* doctrines do not apply, a security researcher copying protected expression from an embedded program may not be liable for copyright infringement if the court determines that the researcher only used a *de minimis* portion of the code.

For instance, if the researcher copied, distributed, or displayed a few (qualitatively unimportant) lines of code from a program containing thousands of routines, a court may conclude that the use was *de minimis* when compared to the program as a whole. The court may reach the same conclusion if the researcher only borrowed the flawed portions of the code that do not work at all, or the defective portions that undermine the basic functionality or integrity of the device.  Likewise, if the researcher corrected these issues by modifying portions of the original code, the court may permit that use if it concludes that the modified version does not contain a sufficient amount of new material to qualify as a derivative work.

### 3.    **Section 117**

Sections 117(a) and (c) of the Copyright Act provide additional options that may allow security researchers to identify vulnerabilities in software-enabled devices, although these sections would not allow the researcher to share his or her findings with third parties without permission from the copyright owner.

As mentioned above, section 117(a) may be invoked by the "owner of a copy of a computer program," while section 117(c) may be invoked by "the owner or lessee of a machine . . . that lawfully contains an authorized copy of the computer program."[240]  In many cases, the security researcher would likely be the owner of the device that he or she is studying.  The researcher may also be considered the owner of any programs that are embedded within that device if it was sold without any license agreement. Moreover, in cases where the device was sold with a written license agreement, the researcher may be deemed to own both the device and the copy of the embedded software.  As discussed in the repair and tinkering section above, that determination turns on the nature of the transaction between the manufacturer and the consumer, including the terms of the license.

---

[240] 17 U.S.C. § 117(a), (c).

46

As a preliminary matter, section 117(c) should allow a security researcher to make a RAM copy of any program stored within the device, to the extent that the program is needed to activate the device for the purpose of maintaining or repairing the machine to make it work "in accordance with its original specifications."[241] Likewise, the researcher should be able to make a RAM copy of any programs necessary for activation and stored within the device for the purpose of making the machine work "in accordance with . . . any changes to those specifications authorized for that machine."[242] This may be useful in cases where the researcher needs to modify a device's default specifications to identify errors in the code or to test potential fixes for the problem.

As noted in the context of tinkering and repair, section 117(a) has been interpreted to permit such activities as fixing bugs, transferring programs to a new operating system, and adding new features to make the software more useful to its owner.[243] Indeed, in the context of the section 1201 rulemaking, the Copyright Office has concluded that "reproduction and alteration of computer programs is often an 'essential step' in the process of identifying potential flaws."[244] Thus, section 117(a) should allow the researcher to engage in a broader range of activities (assuming he or she qualifies as an "owner" of a copy of the program). First, it should allow the researcher to make an "intermediate" copy and transfer that copy into a test environment for the purpose of identifying vulnerabilities in the code that may put that device at risk.[245] Second, it should allow the researcher to fix the problem by adding, removing, or modifying the code, as needed.[246] Third, it should allow the researcher to make an archival copy of the original program to compare the modified version of the program with the source code for the original version.[247] Fourth, it should allow the researcher to transfer the program (including any modifications that have been made) from the test environment onto the software-enabled device, provided that the researcher deletes any "intermediate" copies and archival copies from the test environment.[248] Fifth, section 117(a) should allow the

---

[241] 17 U.S.C. § 117(d)(1)-(2).

[242] *Id.*

[243] *Krause*, 402 F.3d at 125, 128-29 (finding that section 117(a) authorized owner to fix bugs, adapt program to work with a new operating system, and make "modest alterations" to add functionality).

[244] 2015 SECTION 1201 RECOMMENDATION at 304.

[245] *Id.* at 304-05 ("In order to understand the functionality of a computer program, one may need to make a copy to use it in conjunction with a 'machine,' such as a general-purpose computer, on which the program will be analyzed.").

[246] *Krause*, 402 F.3d at 125, 128.

[247] 2015 SECTION 1201 RECOMMENDATION at 305 ("[T]he creation of backup copies of computer programs may be important for security research—whether to serve as a baseline for comparison during experiments, or to restore a vehicle ECU to its original state after research is completed. These activities may well be covered by the provision permitting creation of archival-purpose copies, addressed in section 117(a)(2).").

[248] *Cf. Krause*, 402 F.3d at 126-29 (holding that the addition of new features was authorized under section 117(a)).

LOC_AR_00003182

researcher to authorize a third party to conduct any of these activities on his or her behalf, such as a teaching assistant.[249]

That said, section 117(b) may impose some limitations on the researcher's ability to disseminate the results of his or her research. If the researcher modified the code for the original program, he or she would be allowed to share those modifications with third parties "only with the authorization of the copyright owner" of the original program.[250] While there is evidence to suggest that copyright owners actually encourage security researchers to study their code for potential flaws, and invite them to share their findings, to the extent that copyright owners withhold their consent, the researcher may have to rely on one of the other legal doctrines discussed in this section.

### 4. Fair Use

Many commenters held the view that security research is clearly protected under the fair use doctrine,[251] although some expressed concern that this view is not widely shared among security researchers.[252] Indeed, there was significant concern about the lack of certainty that fair use alone would permit security researchers to pursue and disclose their work.[253] While it was noted that the Copyright Office's decisions in the 1201 rulemaking process may provide some guidance on these issues,[254] the Office was informed that stakeholders could not comfortably rely on the Office's conclusions regarding fair use in a litigation setting.[255] Proposals to address this concern included requiring a minimum threshold of commercial activity to sustain a finding of infringement.[256]

To be sure, there is little case law on the issue of whether security research constitutes fair use, and the reasoning in a section 1201 rulemaking proceeding does not guarantee a

---

[249] 17 U.S.C. § 117(a) (permitting the software copy owner to "make or authorize the making" of copies and adaptations).

[250] Id. § 117(b).

[251] See, e.g., Tr. at 152:12-16 (May 24, 2016) (Kit Walsh, EFF) ("In the software context, . . . it's pretty clear that . . . security research is within the scope of what ultimately would be found to be a fair use by a court.").

[252] Tr. at 149:18-19 (May 24, 2016) (Kyle Wiens, iFixit and Repair.org); Tr. at 139:04-08 (May 18, 2016) (John Bergmayer, Public Knowledge) ("[W]e really do need to sort of have a robust understanding that security researchers[,] through whatever copyright doctrine, including fair use, are entitled to inspect software, to ensure that it is not putting people at risk.").

[253] Tr. at 152:15-21 (May 18, 2016) (Aaron Perzanowski, Case Western Reserve University School of Law).

[254] During the sixth triennial 1201 rulemaking, the Office concluded that the "overall record support[ed] proponents' claim that accessing and reproducing computer programs for purposes of facilitating good-faith security research and identification of defects are likely to be fair uses of the programs under section 107." 2015 SECTION 1201 RECOMMENDATION at 300.

[255] Tr. at 153:14-19 (May 18, 2016) (Aaron Perzanowski, Case Western Reserve University School of Law).

[256] Tr. at 54:10-12 (May 24, 2016) (Kit Walsh, EFF).

LOC_AR_00003183

similar outcome in an actual litigated dispute involving security research. Nevertheless, the Copyright Office believes that, if properly applied, the four factors set forth in section 107, together with the existing case law in analogous areas, will likely ensure that legitimate security researchers will be able to engage in traditional, good-faith research activities without fear of liability. Although the determination of whether a particular use is fair ultimately depends on a fact-specific inquiry, the Office offers the following generally applicable points on how the factors may be applied in this context.

As an initial matter, the preamble to section 107 mentions "criticism," "comment," "news reporting," "scholarship," and "research" as examples of activities that are traditionally considered to be fair use.[257] These terms are likely broad enough to cover the types of activities that are traditionally associated with good-faith security research.[258]

The first factor focuses on the purpose and character of the use, including whether the use is commercial in nature or for nonprofit educational purposes. Security research is often conducted by academics, and in that context, it would likely be considered a noncommercial use. Research conducted by a company or an individual engaged in the business of security testing would likely be considered a commercial use. But it does not necessarily follow that the researcher would be ineligible for the fair use defense.[259] Again, courts would have to evaluate the other aspects of the purpose and character of the use and the three other fair use factors.

The primary purpose of any security research is to study an existing program to identify flaws in the code, and to share that information with users who may be adversely affected by those defects. This type of activity may result in comment or criticism about the program itself or the device that it operates. If the researcher shares his or her discoveries with the public, it also could be considered a form of news reporting. In some cases, the researcher may include portions of the actual code in his or her research, but the researcher may not be using those portions for the same purpose as the copyright owner. In other words, the researcher may not be using the code within a computing environment to control the operation of a software-enabled device. Instead, the researcher may be using the code as factual evidence of the errors that he or she discovered. And the researcher may be using those excerpts in an entirely different context, such as an article, blog post, or other written document that explains the nature

---

[257] 17 U.S.C. § 107.

[258] The Office reached a similar conclusion during the sixth triennial rulemaking. 2015 SECTION 1201 RECOMMENDATION at 300 ("[G]ood-faith security research encompasses several of the favored activities listed in the preamble of section 107.").

[259] *Campbell*, 510 U.S. at 584 ("If . . . commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including . . . research . . . .").

LOC_AR_00003184

or the defect and the proposed solution. Fair use is likely to protect publication of research findings, including the relevant code.[260]

Another important purpose of security research is to eliminate the flaws in the code that may prevent the device from performing its intended function. In this respect, security research supports the purpose of the embedded programs that control that device. Security research could also be considered a "transformative" use under the first factor, because it often results in the creation of new creative works. For example, researchers may need to create diagnostic routines to identify the errors in an embedded program. To correct these errors the researcher may decide to modify or adapt the existing code, and if those changes are sufficiently creative, they may qualify as a new work of authorship.[261] Researchers may also publish articles describing their findings, or use their findings as the basis for other research.

The second factor focuses on the nature of the copyrighted work. As mentioned above, software may be entitled to less protection than other types of expressive works, because it is primarily functional in nature.[262] In the context of security research, the researcher often focuses on the defective lines of code, rather than the code that is actually capable of controlling or operating the software-enabled device. As a result, the code is even further removed from traditionally expressive works.

As discussed above, the third factor focuses on the amount and substantiality of the portion that has been used relative to the copyrighted work as a whole. The fact that a researcher may need to copy the entire program is not dispositive, particularly if the other factors weigh in favor of fair use. As the Copyright Office noted during the sixth triennial 1201 rulemaking, "where functional elements of a computer program cannot be investigated or assessed without some intermediate reproduction of the works, courts have held that the third factor is not of significant weight,"[263] and in such cases, the Office noted that the weight assigned to third factor "is slight."[264]

---

[260] *Id.* at 300 (noting that security research is likely to be a transformative use, because the "purpose of the use is to engage in academic inquiry" and "may result in criticism or comment about the work and the devices in which it is incorporated, including potential flaws and vulnerabilities").

[261] *See* 2015 SECTION 1201 RECOMMENDATION at 234 (noting that, in the context of automotive software, transformative uses "include copying the work to create new applications and/or tools that can interoperate with ECU software and facilitate functionalities such as diagnosis, modification and repair" or "modification of ECU computer programs to 'interoperate' with different auto parts").

[262] *See Oracle Am., Inc.*, 750 F.3d at 1375 ("[W]here the nature of the work is such that purely functional elements exist in the work and it is necessary to copy the expressive elements in order to perform those functions, consideration of this second factor arguably supports a finding that the use is fair."); *see also* 2015 SECTION 1201 RECOMMENDATION at 301 ("When a computer program is being used to operate a device, the work is likely to be largely functional in nature.").

[263] 2015 SECTION 1201 RECOMMENDATION at 301.

[264] *Id.*

LOC_AR_00003185

The fourth factor focuses on the effect on the potential market for or value of the copyrighted work. Conducting security research on an embedded program is not likely to have an adverse impact on the potential market for that program, since it does not exist separately from the device. As with tinkering and repair, it is important to focus on the market *for the relevant copyrighted work.* In this case the relevant work is the embedded program itself, rather than discrete "bug fixes" that may be needed to correct the errors within that program.[265]

As discussed above, these programs are distributed with a specific device and often their sole purpose is to control that device. Security research is not likely to interfere with any market that the copyright owner is likely to exploit, because there is no market for the programs themselves, and they have no value apart from the device they operate. Moreover, security research is intended to prolong the useful life of these devices, rather than replacing them with a new program or a new device. Some commenters suggested that copyright owners may want to quash security research[266] as it may damage their reputation and the goodwill of their products. Reputational harm, however, is not the type of injury that the copyright law is intended to prevent, and so is irrelevant to the fair use analysis.[267]

## D.    Interoperability and Competition

Another subject of the Committee's request is the examination of whether, and the extent to which, "the design, distribution, and legitimate uses of products" and "innovative services" are "being enabled and/or frustrated by the application of copyright law to software in everyday products."[268] The Copyright Office's inquiry focused on whether the copyright law furthers or hinders development of interoperable products and services and competition in the area of software-enabled consumer products.

The development of interoperable products and services may implicate a number of the exclusive rights set forth under section 106 of the Copyright Act:

- Section 106(1)'s reproduction right is implicated when intermediate copies of a program are made and transferred for purposes of "reverse engineering" the

---

[265] *See Lexmark,* 387 F.3d at 545; *Sony Comput. Entm't,* 203 F.3d at 607.

[266] *See, e.g.,* Tr. at 118:19–119:04 (May 24, 2016) (Kit Walsh, EFF) ("You heard from a whole bunch of security researchers about the need for members of the public, without permission, to be able to audit and analyze the features of the device in order to detect these vulnerabilities and put pressure on the company. . . . Sometimes the company will respond by threatening you, trying to silence your disclosure of that research using copyright law or DMCA . . . .").

[267] *See, e.g., Campbell,* 510 U.S. at 591-92 (noting that, like a parody, a scathing review "does not produce a harm cognizable under the Copyright Act").

[268] Grassley/Leahy Letter at 2.

LOC_AR_00003186

program to determine compatibility requirements, and may be implicated when pieces of code needed to enable interoperability are copied from the original program into other software or devices.

- Section 106(2)'s right to prepare derivative works potentially is implicated by modification of the code on the product to facilitate interoperability, or development of new programs that interoperate with the existing program.

- Section 106(3)'s distribution right is implicated when the new software, device, or replacement part is transferred to a third party.

Commenters raised concerns about whether current law contains adequate safeguards to enable interoperability and preserve competition. For example, there may be challenges in applying somewhat indeterminate doctrines such as fair use to software, and while the Copyright Act includes various doctrines to address these concerns, "in the software world, they continue to be litigated and re-litigated, keeping them in legal limbo."[269] To remedy this situation, some urged legislation to "clarify that companies cannot use copyright law coupled with lockout codes to restrict competition in replacement parts."[270] At the same time, the Copyright Office heard that the current law already effectively enables interoperability and competition through the application of existing exceptions and limitations, and that no statutory changes are presently needed.[271]

The Copyright Office recognizes the importance of preserving the ability to develop products and services that can interoperate with software-enabled consumer products, and the goal of preserving competition in the marketplace.[272] At this time, however, the Office believes that statutory change is not warranted. First, while a new statutory framework might initially help reduce some uncertainty in this area, the risk is that any framework will become outdated in light of the rapid pace of technological development. Second, as even some public advocacy organizations suggested, faithful application of existing copyright law doctrines can preserve the twin principles of interoperability and competition.[273]

---

[269] Consumers Union Reply Comments at 4.

[270] Static Control Components Initial Comments at 2.

[271] ESA Initial Comments at 8 (urging that "[s]oftware is also subject to the generally-applicable limitations on the scope of copyright protection" and that "these limitations have proven flexible enough to accommodate innovation through development of products interoperable with those containing embedded software").

[272] *See* 2015 SECTION 1201 RECOMMENDATION 163 (noting that "interoperability is favored under the law").

[273] *See* Tr. at 42:17-43:03 (May 18, 2016) (John Bergmayer, Public Knowledge) ("I think there are existing copyright law doctrines that have been around for a really long time that . . . could already apply to at least prevent the use of copyright to limit competition by people making other competing products.");

LOC_AR_00003187

## 1.    Idea/Expression Dichotomy, Merger and *Scènes à Faire*

Section 102(b) of the Copyright Act ensures that the ideas, processes, or methods of operation *embodied or described* in computer code cannot be protected by copyright. As a result, the Act does not prevent a competitor from studying code to determine the underlying methods it teaches, and from implementing those methods using *different* code than the original, to create an interoperable or competitive software-enabled consumer product.[274]

Indeed, "clean room" implementations using exactly this process have long been used by the computer hardware and software industries to ensure development of competitive products. One famous example of this involves Phoenix Technologies, which wanted to produce a new BIOS for personal computers that was compatible with the BIOS produced by the dominant market player, IBM. To achieve that objective, Phoenix engineers "studied the IBM BIOS—about 8KB of code—and described everything it did as completely as possible without using or referencing any actual code."[275] Then, "Phoenix brought in a second team of programmers who had no prior knowledge of the IBM BIOS and had never seen its code" and "[w]orking only from the first team's functional specifications . . . wrote a new BIOS that operated as specified."[276] "The resulting Phoenix BIOS was different from the IBM code, but for all intents and purposes, it operated identically."[277] As a result, "Phoenix began selling its BIOS to companies that then used it to create the first IBM-compatible PCs."[278] As this example demonstrates, section 102(b) has served a critical function in preserving competition.

Even though computer code is considered expression, that expression still may be copied if it is subject to the limiting doctrines of merger or *scènes à faire*. These doctrines are a promising avenue to permit copying for purposes of interoperability, at least in the narrow circumstances in which they may apply. As noted, merger and *scènes à faire*

---

Consumers Union Reply Comments at 4 (noting that "in an ideal world, these clarifications might be accomplished in the courts").

[274] Several commenters urged that if a portion of computer code—such as an application programming interface, or API—is essential to achieve interoperability, that portion is unprotectable as a "system" or "method of operation" within the meaning of section 102(b). *See, e.g.*, Aaron Perzanowski et al. Initial Comments at 8-9; CDT Initial Comments at 1-2 (suggesting this area of law is "unclear"); EFF Initial Comments at 9-10; Engine Advocacy Initial Comments at 5-8. The U.S. government, however, has expressly taken a contrary view in litigation before the Supreme Court. Brief for the United States as Amicus Curiae at 15-16, *Google, Inc. v. Oracle Am., Inc.*, 135 S. Ct. 2887 (2016) (No. 14-410), 2015 WL 2457656. This study does not provide the occasion to reconsider that position.

[275] Matthew Schwartz, *Reverse-Engineering*, Computerworld (Nov. 12, 2001), http://www.computerworld.com/article/2585652/app-development/reverse-engineering.html.

[276] *Id.*

[277] *Id.*

[278] *Id.*

LOC_AR_00003188

appear to be especially relevant to the sorts of software-enabled consumer products discussed in Part II above. In such products, software may be constrained by the mechanical or functional requirements of the product. For instance, software used to operate car windshield wipers may be dictated by fairly constrained specifications on how such wipers are supposed to work. In such cases, the merger and *scènes à faire* doctrines will ensure that copyright law does not prevent a competitor from making identical software based on those same constraints.

## 2.    Fair Use

Courts repeatedly have used the fair use doctrine to permit copying necessary to enable the creation of interoperable software and products.[279]  *Sega Enterprises v. Accolade, Inc.* and *Sony Computer Entertainment v. Connectix* are two of the leading cases addressing the issue of fair use for purposes of interoperability. In *Sega*, the Ninth Circuit found that a competitor in the video game market, who copied Sega's software to reverse-engineer the code and determine how to make its own game cartridges interoperable with Sega's console, was engaged in fair use.[280]  The court considered such use to be transformative because the copying was done to create new works—video games—that interoperated with existing works.[281]

Similarly, in *Sony v. Connectix*,[282] the Ninth Circuit found that the making of intermediate copies of the PlayStation video game console's operating system to create a console emulator that did not duplicate the copyrighted code in the new work, but allowed a PC to play console games, was a fair use.[283]  As in *Sega*, the court emphasized that the purpose of this reverse engineering was to create a new creative work—in this case, a gaming platform "that would be compatible with games designed for the Sony PlayStation."[284]

---

[279] *See, e.g., Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 842-44 (Fed. Cir. 1992) (holding that reverse engineering of a competitor's computer chips to "learn their unprotected ideas and processes" was a fair use).

[280] *Sega Enters. Ltd.*, 977 F.2d at 1514-15, 1520.  *Sega* is considered a seminal case on fair use and interoperability of computer programs. *See, e.g.,* Aaron Perzanowski at 2; Auto Care Ass'n at 5; SEMA Initial Comments at 2. *Sega* was crucial for Congress in creating a reverse-engineering exception to anticircumvention rule in section 1201, 17 U.S.C. § 1201(f), as Congress specifically highlighted *Sega* in explaining that it did not want to hinder interoperability. *See* STAFF OF H. COMM. ON THE JUDICIARY, 105TH CONG., SECTION-BY-SECTION ANALYSIS OF H.R. 2281 AS PASSED BY THE UNITED STATES HOUSE OF REPRESENTATIVES ON AUGUST 4, 1998, at 14 (Comm. Print 1998).

[281] *Sega Enters. Ltd.*, 977 F.2d 1510, 1523 (9th Cir. 1992); *see also Sony Comput. Entm't*, 203 F.3d at 599-600.

[282] 203 F.3d 596 (9th Cir. 2000).

[283] *Sony Comput. Entm't*, 203 F.3d at 599, 602-08.

[284] *Id.* at 606-07.

LOC_AR_00003189

Although not a case ultimately decided on fair use grounds, *Lexmark International, Inc. v. Static Control Components, Inc.*, discussed above, also offers some helpful guidance on fair use, particularly as it involved a competitor copying the relevant code into its own product.[285]  The district court in *Lexmark* concluded that the fair use defense did not apply.[286]  On appeal, the Sixth Circuit criticized two aspects of the district court's decision.  First, with respect to the first fair use factor—the purpose of the use—the Sixth Circuit concluded that it was "far from clear that [the defendant] copied the Toner Loading Program for its commercial value *as a copyrighted work*."[287]  Instead, the defendant was not "seeking to exploit or unjustly benefit from any creative energy that Lexmark devoted to writing the program code," but simply "to permit printer functionality."[288]  Second, with respect to the fourth factor—the effect of the use on the value of the copyrighted material—the Sixth Circuit regarded the relevant question as being "whether the infringement impacted the market for the copyrighted work itself" rather than the product in which it was embedded.[289]  The court found that Lexmark had failed to "introduce[] any evidence showing that an independent market exists for a program as elementary as its Toner Loading Program."[290]

The Copyright Office also has addressed fair use in the context of software-enabled consumer products during the section 1201 triennial rulemaking proceedings.  For instance, the Office has in several prior rulemakings recommended adoption of an exemption to allow the "jailbreaking" of devices like smartphones, so that such devices can interoperate with a wide variety of third-party software applications, on the ground that such uses are likely to be fair.[291]

Based on the case law and the Office's prior statements, many commenters asserted that the fair use doctrine is working well to enable the creation of interoperable products, software, and services.[292]  As other commenters noted, however, fair use is a highly fact-specific inquiry,[293] and thus a conclusive determination that a particular use is fair can

---

[286] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 253 F. Supp. 2d 943, 960-62 (E.D. Ky. 2003).

[287] *Lexmark Int'l, Inc.*, 387 F.3d at 544.

[288] *Id.*

[289] *Id.*

[290] *Id.* at 545.

[291] *See* 2015 SECTION 1201 RECOMMENDATION 188-92.

[292] Tr. at 171:23-172:04 (May 24, 2016) (Ashley Ailsworth, SEMA) (stating that "the case law is sufficiently clear"); Tr. at 135:21-136:01 (May 18, 2016) (Jonathan Zuck, ACT) ("[F]air use, to the limited degree we have data at this point about its use in embedded devices, has been effective."); Tr. at 173:21-22 (May 24, 2016) (Kit Walsh, EFF) ("[F]or the most part we feel that the cases are pretty good.").

[293] Tr. at 135:10-12 (May 18, 2016) (Jonathan Zuck, ACT); Tr. at 168:16-18 (May 18, 2016) (Keith Kupferschmid, Copyright Alliance) ("[W]henever you talk about fair use, it's very, very context-specific, fact-specific.  And we have to be very, very cautious if we move in any particular direction in that area.").

only come after litigation, which can make the fair use defense too expensive, unpredictable, or risky to rely on.[294]  Some commenters called fair use "a fallback doctrine"[295] or a defense of last resort.[296]  One commenter said this uncertainty in fair use law is chilling innovation and competition.[297]  Some even suggested that the law surrounding fair use in the context of software-enabled everyday products is not more developed because of the fear of separate liability under section 1201 of the Copyright Act for circumventing technological protection measures.[298]

The Copyright Office also received suggestions for statutory changes regarding interoperability.  Some commenters noted that the preamble for the Copyright Act's fair use provision includes paradigmatic examples—"criticism, comment, news reporting, teaching . . . scholarship, or research"[299]—that do not fit neatly into the software context, and suggested that new language addressing interoperability should be inserted into the fair use preamble.[300]  Other commenters suggested that the Copyright Act should include a specific statutory carve-out, outside of the section 107 fair use defense, permitting copying of software for purposes of enabling interoperability,[301] or an interoperability exception that parallels the reverse-engineering exception in section 1201(f).[302]  At the same time, commenters urged that any statutory carve-out should operate as "a floor on permitted activity rather than a ceiling."[303]

---

[294] Tr. at 56:17-19 (Kit Walsh, EFF) ("Fair use is a very important catchall measure.  But it can't be the first line of defense for people."); Tr. at 171:23-172:11 (May 24, 2016) (Ashley Ailsworth, SEMA) (case law is "sufficiently clear," but there is a risk that a court does not find fair use); Tr. at 158:03-14 (May 18, 2016) (Shaun J. Bockert, Dorman Products, Inc.) (fair use is not sufficiently clear to advise clients that reverse engineering of software is permitted).

[295] Tr. at 138:04-05 (May 18, 2016) (John Bergmayer, Public Knowledge).

[296] Tr. at 140:11-12 (May 18, 2016) (Shaun J. Bockert, Dorman Products, Inc.); Tr. at 155:14-15 (May 18, 2016) (Aaron Perzanowski, Case Western Reserve University School of Law).

[297] Tr. at 147:08-12 (May 24, 2016) (Kyle Wiens, iFixit) ("We have seen very little innovation around farm equipment in the United States, even though there's a huge amount of interest, because of . . . locked down interfaces and the fear that people have [of violating copyright law]."); *see also* Tr. at 148:06-11 (May 24, 2016) (Kyle Wiens, iFixit and Repair.org).

[298] Tr. at 152:12-18 (May 24, 2016) (Kit Walsh, EFF) ("[I]t's pretty clear that research for interoperability . . . is within the scope of what ultimately would be found to be a fair use by a court," but "[t]here are places where that case law hasn't . . . develop[ed] in large part because [technological protection measures] are chilling people.").

[299] 17 U.S.C. § 107.

[300] Tr. at 160:11-161:03 (May 24, 2016) (Stephen Liu, Engine Advocacy); Tr. at 170:20-25 (May 24, 2016) (Ashley Ailsworth, SEMA).

[301] Tr. at 28:7-17 (May 18, 2016) (Shaun J. Bockert, Dorman Products, Inc.).

[302] Tr. at 171:14-16 (May 24, 2016) (Ashley Ailsworth, SEMA).

[303] Tr. at 56:24-57:01 (May 24, 2016) (Kit Walsh, EFF).

LOC_AR_00003191

Given the current state of the law, the Copyright Office does not believe that a specific statutory exemption permitting use of embedded software for purposes of enabling interoperability is necessary.[304] The case law generally holds that intermediate copying for purposes of reverse engineering and creation of interoperable software is, in most cases, a fair use.[305] Moreover, the Office believes that, in many cases, copying of appropriately limited amounts of code from one software-enabled product into a competitive one for purposes of compatibility and interoperability should also be found to be a fair use.[306]

To be sure, the Copyright Office appreciates the concerns raised by commenters regarding the uncertainty and fact-bound nature of the fair use doctrine. But fair use also has the benefit of being a flexible doctrine that can be used in a wide-variety of circumstances. Although Congress could address some of the concerns regarding the uncertain application of the fair use doctrine by adding the purpose of "enabling interoperability" to the list of paradigmatic fair uses in section 107 of the Copyright Act, the Office believes that such a change is not necessary at this time because existing law provides sufficient flexibility to protect interoperability.

Again, although fair use is ultimately a fact-specific inquiry, some general points can be made regarding the fair use analysis in this context. In assessing "the purpose and character of the use," the commercial nature of the use is not a bar to a finding of fair use.[307] Instead, in this context, it is more important to focus on whether the use is principally for the purpose of exploiting the creativity of the original author of the code,[308] or for some purpose "unrelated to copyright protection."[309] Under this analysis, intermediate copying for the purpose of studying the methods and functioning of code,

---

[304] Were Congress to create a specific statutory exception to enable interoperability, the Copyright Office would caution against using section 1201(f) as a model. As the Office has explained in the context of a section 1201 rulemaking, the "apparent purpose of [section 1201(f)] does not appear precisely to match its language." U.S. COPYRIGHT OFFICE, U.S. COPYRIGHT OFFICE, SECTION 1201 RULEMAKING: FIFTH TRIENNIAL PROCEEDING TO DETERMINE EXEMPTIONS TO THE PROHIBITION ON CIRCUMVENTION, RECOMMENDATION OF THE REGISTER OF COPYRIGHT 71 (2012) ("2012 SECTION 1201 RECOMMENDATION").

[305] See, e.g., Sony Comput. Entm't, 203 F.3d at 609; Sega Enters. Ltd., 977 F.2d at 1514, 1520; Atari Games Corp., 975 F.2d at 842-44; see also 2015 SECTION 1201 RECOMMENDATION at 188 (stating in the context of granting a jailbreaking exemption "allow[ing] [a] operating system on a device to interoperate with other programs [is] a favored purpose under the law.").

[306] Cf. Lexmark Int'l, Inc., 387 F.3d at 545-46.

[307] Campbell, 510 U.S. at 584 (holding that the commercial nature of a work is alone not dispositive of fair use, but an interest to balance); Sega Enters., 977 F.2d at 1522 (finding fair use and noting "the use at issue was an intermediate one only and thus any commercial 'exploitation' was indirect or derivative").

[308] As one commenter suggested, if the code at issue is a "distinguishing characteristic" of a product and that software "gives it a competitive advantage," then a second-comer's copying of that software for a competing product may be a factor cutting against fair use. Tr. at 36:18-22 (May 18, 2016) (Steve Tepp, GIPC).

[309] Lexmark Int'l, Inc., 387 F.3d at 544; Sega Enters., 977 F.2d at 1522-23 (noting that "Accolade copied Sega's code for a legitimate, essentially non-exploitative purpose").

LOC_AR_00003192

so that those methods and functions can be embodied in new code, is likely to be a favored purpose.[310]  And in some cases, even literal copying of code may be favored, if the purpose is simply to "permit . . . functionality" of a software-enabled device, and not to exploit the creativity of the original author.[311]  Indeed, as the Copyright Office repeatedly has recognized, interoperability is "a favored purpose" under the first fair use factor.[312]

Courts also favor software interoperability when considering the second fair use factor, which concerns "the nature of the copyrighted work."[313]  As noted above, works that are functional—like software embedded in and critical to the functioning of a consumer product—are entitled to lesser protection under the Copyright Act.[314]

The "amount and substantiality of the portion used" in many cases is likely to weigh against a finding of fair use, since it is often necessary to copy significant portions of the code to engage in reverse engineering activities.  But this factor is also unlikely to be of significant relevance, where the other factors point in favor of fair use.[315]

Regarding the effect on the market or potential market for or value of the work, as already noted, it is important to focus on the market *for copyrighted works*.[316]  For most software-enabled consumer products like those mentioned in Part II, there will not be a market for the software separate and apart from the consumer product.  In such cases, the fourth factor is likely to favor fair use.[317]  In the context of software-enabled

---

[310] *Sony Comput. Entm't*, 203 F.3d at 606-07; *Sega Enters.*, 977 F.2d at 1522.

[311] *Lexmark Int'l, Inc.*, 387 F.3d at 544.

[312] *See, e.g.*, 2015 SECTION 1201 RECOMMENDATION at 162, 163, 188; 2012 SECTION 1201 RECOMMENDATION at 163 (2012).

[313] 17 U.S.C. § 107(2).

[314] *Sega Enters.*, 977 F.2d at 1524; *Sony Comput. Entm't*, 203 F.3d at 603; 2015 SECTION 1201 RECOMMENDATION at 188.

[315] *See, e.g.*, *Sony Comput. Entm't*, 203 F.3d at 606 ("[I]n a case of intermediate infringement when the final product does not itself contain infringing material, this factor is of 'very little weight.'" (quoting *Sega Enters.*, 977 F.2d at 1526-27)); 2015 SECTION 1201 RECOMMENDATION at 188-89 ("[W]hile jailbreaking often requires making a complete reproduction of the firmware, in light of the *de minimis* nature of the modifications ultimately made to the firmware to enable jailbreaking, this factor, while not favorable to fair use, is of limited relevance.").

[316] *See Lexmark Int'l, Inc.*, 387 F.3d at 544-45.

[317] Where, however, software provides a secure platform for other copyrighted works for which there is such a market, courts should examine carefully the impact on that market.  *See, e.g.*, 2015 SECTION 1201 RECOMMENDATION at 199-200 (discussing video game console firmware); *id.* at 214-15 (discussing smart TV firmware).

LOC_AR_00003193

consumer products in particular, the fourth factor also is likely to favor fair use where the purpose of the use is to create a "legitimate competitor in the market."[318]

As noted above, proper application of these principles should ensure that copyright law preserves the ability to create interoperable products and services.[319]

### 3.    Misuse

A number of commenters pointed to the equitable doctrine of "copyright misuse" as a potential means of ensuring that copyright protection for embedded software is not used for purely anticompetitive ends.[320]  Copyright misuse is relatively unexamined among copyright defenses.  It is a common law defense that initially developed in the context of overly restrictive licensing terms, that has "outgrown such antitrust like roots and now applies, *inter alia*, to efforts to misrepresent or extend rights beyond the scope of one's copyright."[321]

The leading case addressing the copyright misuse defense is the Fourth Circuit's decision in *Lasercomb America, Inc. v. Reynolds*.[322]  There, the plaintiff included license terms for computer-aided design software preventing any licensee from making a competing software product.[323]  The Fourth Circuit found that the plaintiff had misused the copyright, and barred the plaintiff from bringing an infringement action.  The court noted that, while "much uncertainty engulfs the 'misuse of copyright' defense," at its core it prevents a copyright owner from "us[ing] its copyright in a particular expression . . . to control competition in an area outside the copyright."[324]  Importantly, the court emphasized that "a misuse need not be a violation of antitrust law in order to comprise an equitable defense to an infringement action."[325]

Another illustrative case is *DSC Communications Corp. v. DGI Technologies, Inc.*, in which the manufacturer of a phone switching system, which utilized microprocessor cards containing copyrighted software, licensed those cards to customers with a restriction on

---

[318] *Sony Comput. Entm't*, 203 F.3d at 607; *cf. Sega Enters.*, 977 F.2d at 1523 ("Accolade did not attempt to 'scoop' Sega's release of any particular game or games, but sought only to become a legitimate competitor in the field of Genesis-compatible video games.").

[319] *Sega Enters.*, 977 F.2d at 1523-24 ("[A]n attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine.").

[320] *See, e.g.*, CCIA Initial Comments at 3-4 ("A more robust doctrine of copyright misuse would alleviate pressures arising from the improper assertion of rights.").

[321] 5 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 17:128 (2016).

[322] 911 F.2d 970 (4th Cir. 1990).

[323] *Id.* at 972-73.

[324] *Id.* at 973, 979.

[325] *Id.* at 978.

LOC_AR_00003194

copying the software for any purpose.[326]  A competitor wanted to create competing, interoperable microprocessor cards despite the restriction.[327]  Reviewing the scope of a preliminary injunction, the Fifth Circuit found the misuse defense would likely be successful, as the plaintiff appeared to be "attempting to use its copyright to obtain a patent-like monopoly over unpatented microprocessor cards."[328]  The court reasoned that if the plaintiff were allowed to prevent copying in this manner, "then it can prevent anyone from developing a competing microprocessor card, even though it has not patented the card."[329]

Cases like *Lasercomb* and *DSC Communications*, as well as others outside the software context,[330] pave a path for a misuse defense to prevent anticompetitive behavior regarding copyright in embedded software.  While there has been some suggestion that Congress codify a misuse defense in the Copyright Act,[331] such a change is likely premature; copyright misuse is not yet a firmly established area of law, and codification could ossify the defense rather than allowing it to develop through the exercise of courts' equitable discretion as new circumstances arise.[332]

## E.    Licensing of Embedded Software

Another major area of debate in the study related to the general practice of requiring consent to the terms of a written agreement as part of the sale of a software-enabled product, particularly how such a practice would affect the lawful use of everyday products.  A number of commenters raised concerns about the use of license agreements to restrict the ability of consumers to engage in legitimate activities involving their software-enabled products.  In particular, these commenters expressed concern that while copyright law may authorize certain uses of embedded software, license agreements can be used to prevent those same uses.[333]  These concerns, however, are not necessarily specific to embedded software.[334]

---

[326] 81 F.3d 597, 598-99 (5th Cir. 1996).

[327] *Id.* at 598-99.

[328] *Id.* at 601.

[329] *Id.*

[330] *See, e.g., Practice Mgm't Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520-21 (9th Cir. 1997).

[331] CCIA Initial Comments at 4 ("Congress should consider codifying a copyright misuse provision that creates meaningful penalties that deter the willful misuse of copyrights, including in relation to exclusive rights, anticircumvention rights, and notice and takedown.").

[332] Notably, Congress recognized the equitable doctrine of patent misuse in 1988, but also created limitations to the doctrine, including a requirement that any patent misuse defense show that the patent owner has "market power," an antitrust-related condition that is not necessarily required for a finding of copyright misuse.  35 U.S.C. § 271(d); *see also* Pub. L. No. 100-703, tit. II, § 201, 102 Stat. 4674, 4676 (1988).

[333] *See, e.g.,* Aaron Perzanowski et al. Initial Comments at 5-8 (stating that licenses may frustrate acts that are otherwise legitimate under the Copyright Act, including competition, transferability, and repair); Auto Care

LOC_AR_00003195

A common justification for imposing restrictive contractual terms in the sale of software is that it allows software companies to efficiently engage in price differentiation among different categories of purchasers.[335]  As the Seventh Circuit has noted, licensing agreements allow creators to "control arbitrage" in the software industry, for example, by preventing a purchaser who obtains a consumer discount from reselling his or her copy to a commercial entity who would not be entitled to such a discount.[336]  The alternative would be to modify the product—perhaps by selling consumers versions of software with lesser functionality—or to not sell to consumers at all.[337]

Many groups representing software companies echoed these points during the Office's study.  One stressed that "[t]hrough licensing, software companies are able to meet the needs of a variety of different customers—whether the general public or discrete customer groups—while also protecting themselves against misuse of their rights."[338]  Another observed that "[l]icensing permits a software publisher to offer a fully functional 'academic' version of its product to students at a deeply reduced price, but the rights granted do not permit use for commercial purposes."[339]  In a similar vein, that group also noted that "'OEM [original equipment manufacturer] licenses' bundle software with, or install software directly on scanners or desktop computers, and require the software to be used and distributed with that hardware," in exchange for "a deep discount as part of the OEM license terms."[340]  These justifications for licensing practices, however, apply across all software.

In addition, software also is increasingly being distributed under a variety of "open-source" licenses such as the GNU General Public License ("GPL")[341] or the Apache License.[342]  As one commenter observed about open-source licenses, "some rightsholders . . . have determined that fewer restrictions on their software will make that software—

---

Ass'n Initial Comments at 3, 6 (noting concerns that vehicles cannot be repaired and manufacturers cannot create replacement parts, due to license-related restrictions).

[334] *See* MLA Initial Comments at 2 ("[C]ommon licensing models for software are in no way limited to software for these consumer products, or even to software on its own.  Similar licensing models, including non-negotiable end user licensing agreements (EULAs) are very commonly used for electronic books, audiovisual works, digital sheet music, and digital sound recordings to name a few.").

[335] *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1449 (7th Cir. 1996).

[336] *Id.* at 1450.

[337] *See id.* at 1449-50 (explaining that "[i]f because of high elasticity of demand in the consumer segment of the market the only way to make a profit turned out to be a price attractive to commercial users alone, then all consumers would lose out—and so would the commercial clients, who would have to pay more").

[338] Copyright Alliance Initial Comments at 9.

[339] SIIA Initial Comments at 2.

[340] *Id.*

[341] *GNU General Public License,* GNU.ORG (June 29, 2016), https://www.gnu.org/licenses/gpl-3.0.en.html.

[342] *Licenses,* APACHE SOFTWARE FOUND., http://apache.org/licenses/.

LOC_AR_00003196

and the devices that incorporate it—more valuable," and that "[a]s much as licensing may lead us into thorny copyright questions raised by software-enabled devices, open source licensing may lead us out of them."[343]  At the same time, although open-source licenses authorize a broader range of uses than proprietary licenses, they are not wholly without restrictions.  For example, while the GNU GPL gives users, among other things, the "freedom to change the software to suit [their] needs,"[344] it also requires users who make those changes to share them with the public, and to distribute the modified software under the terms of the GNU GPL.[345]  Thus, even distributors of open-source software rely to some degree on the ability to enforce the terms of private agreements.[346]

Although, as noted, the practice of requiring purchasers of software-enabled consumer products to agree to certain written license terms is not uniform today, it is fair to expect that it will increase in the future.  Even today there are a number of software-enabled consumer products sold under a written license containing terms regarding use of the embedded software.  For instance, the Copyright Office has also found such terms applied to consumer products as thermostats[347] and security cameras.[348]

Given the apparent trend, it is appropriate for the Copyright Office to assess the various issues commenters have raised relating to EULAs and other software agreements.  To the extent those concerns have particular importance in the context of embedded software, the discussion below offers views on potential avenues for resolution.

## 1.    Relationship to State Contract Law

A number of commenters observed that "since license terms that purport to prevent a transfer of ownership are often characterized by licensors—and interpreted by courts—

---

[343] CDT Initial Comments at 7.

[344] Brett Smith, *A Quick Guide to GPLv3*, GNU.ORG (2007), https://www.gnu.org/licenses/quick-guide-gplv3.pdf.

[345] *See GNU General Public License*, GNU.ORG (June 29, 2007), https://www.gnu.org/licenses/gpl-3.0.en.html.

[346] *See Jacobsen v. Katzer*, 535 F.3d 1373, 1381-82 (Fed. Cir. 2008) ("Copyright licenses are designed to support the right to exclude; money damages alone do not support or enforce that right.  The choice to exact consideration in the form of compliance with the open source requirements of disclosure and explanation of changes, rather than as a dollar-denominated fee, is entitled to no less legal recognition.").

[347] *End User License Agreement*, NEST, https://nest.com/legal/eula/; *Smart Si Thermostat User Manual*, ECOBEE, https://www.ecobee.com/wp-content/uploads/2014/05/ecobeeSmartSi_User_Manual.pdf.

[348] *See, e.g., Myfox Final User License Contract (FULC) for Hardware, Applications and Integrated Software*, MYFOX (Apr. 5, 2016), https://www.getmyfox.com/us_en/end-user-licence-agreement.html; *End User License Agreement*, CANARY (May 19, 2016), https://canary.is/legal/eula/; *see also* MLA Initial Comments at 3 (observing, outside the context of embedded software, that "non-negotiable end user licensing agreements (EULAs) are very commonly used for electronic books, audiovisual works, digital sheet music, and digital sound recordings").

LOC_AR_00003197

as contracts, the intersection of copyright and contract law is a necessary consideration."[349]

As these commenters appear to acknowledge, agreements accompanying the sale of software-enabled consumer products can exist regardless of copyright law. Such agreements can be understood as "ordinary contracts accompanying the sale of products . . . governed by the common law of contracts and the Uniform Commercial Code."[350] And violations of the terms of those agreements typically would constitute breach of contract, regardless of whether those violations also constituted copyright infringement.

Thus, any concerns about EULAs for embedded software cannot be fully resolved through copyright. For instance, many commenters raised concerns about license restrictions preventing consumers from freely repairing their products[351] or using interoperable products.[352] As discussed below, any *copyright* concerns regarding such activities can be resolved (as appropriate) through application of the existing copyright law—*i.e.*, a proper understanding of what constitutes "ownership" of software under the Copyright Act, and proper application of existing doctrines such as fair use. But the terms of the written contract may be enforced as a matter of state contract law regardless of the resolution of those copyright issues. And it may be that such concerns about restrictive license terms can be resolved through application of established state contract law principles. For example, commenters raised concerns about whether consumers can fairly be understood to have agreed to the terms of software licensing agreements, given their length and complexity, and the fact that they are generally "shrinkwrap" or "clickwrap" agreements.[353] Courts appear to have addressed these concerns, however, by applying standard state-law requirements for contract formation.[354] Courts also have

---

[349] *See, e.g.*, Aaron Perzanowski et al. Initial Comments at 10; *see also* CDT Initial Comments at 7; Copyright Alliance Initial Comments at 15 ("It is therefore essential that copyright law not be changed to upset basic tenets of freedom of contract.").

[350] *ProCD, Inc.*, 86 F.3d at 1450; *see also, e.g.*, *Hill v. Gateway 2000*, 105 F.3d 1147, 1149 (7th Cir. 1997) ("*ProCD* did not depend on the fact that the seller characterized the transaction as a license rather than as a contract; we treated it as a contract for the sale of goods and reserved the question whether for other purposes a 'license' characterization might be preferable."); *Moore v. Microsoft Corp.*, 293 A.D.2d 587, 587 (N.Y. 2d Dep't 2002) (enforcing the EULA under state contract law).

[351] *See* Aaron Perzanowski et al. Initial Comments at 9.

[352] *See* Public Knowledge/OTI Initial Comments at 11-12.

[353] *See, e.g.*, Tr. at 82:08-84:03 (Kit Walsh, EFF) (May 24, 2016) (noting that consumers rarely read such agreements).

[354] *See, e.g.*, *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002) (holding that "where consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms"); *cf. Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1036 (7th Cir. 2016) (declining to enforce a clickwrap agreement on website where it failed to provide "reasonable notice that his use of the site or click on a button constitutes assent to an agreement"); *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1178-79 (9th Cir.

LOC_AR_00003198

addressed questions of unconscionability of contractual terms in software license agreements.[355]

Some commenters also suggested that state contract law might be preempted to the extent "copyright licenses reach beyond the conventional bounds of copyright (including foreclosing established limitations and exceptions such as first sale)."[356]  The Copyright Office briefly addressed this issue in its *DMCA Section 104 Report* in 2001.[357]  The Office noted that "copyright has long coexisted with contract law, providing a background of default provisions against which parties are generally free to order their own commercial dealings to suit their needs and the realities of the marketplace."[358]  At the same time, the Office expressed concern "that right holders [sic], and not the copyright policies established by Congress, will determine the landscape of consumer privileges in the future."[359]  Ultimately, the Office noted that "the issue of preemption of contractual provisions is outside the scope of the Report," but suggested that the issue "may be worthy of further consideration at some point in the future."[360]  In the ensuing years, courts have continued to grapple with these issues, although the majority of them have declined to preempt state contract law with respect to such license agreements, even when these agreements touch on issues under the Copyright Act.[361]

The question of when preemption would be appropriate is a complex one that implicates *all* software licenses—and, indeed, any sort of contractual arrangement limiting the use of copyrighted works—not simply those related to embedded software.[362]  As such, as in 2001, the Office believes this narrowly focused study is not the proper place to address

---

2014) (holding that there was a lack of constructive notice of a "browsewrap" agreement where the website "provide[d] no notice to users nor prompt[ed] them to take any affirmative action to demonstrate assent").

[355] *See, e.g.*, *M.A. Mortenson Co. v. Timberline Software Corp.*, 998 P.2d 305 (Wash. 2000) (addressing unconscionability of shrinkwrap software license under state law); *cf. Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1165, 1177 (N.D. Cal. 2002) (declining to enforce arbitration clause in user agreement for online service, on unconscionability grounds); *see also ProCD, Inc.*, 86 F.3d at 1449 ("Shrinkwrap licenses are enforceable unless their terms are objectionable on grounds applicable to contracts in general (for example, if they violate a rule of positive law, or if they are unconscionable).").

[356] CCIA Initial Comments at 5; *see also* Owners' Rights Initiative Initial Comments at 10-13.

[357] *See* DMCA SECTION 104 REPORT 162-64.

[358] *Id.* at 164.

[359] *Id.*

[360] *Id.* at 163-64.

[361] *Compare* Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 268-70 (5th Cir. 1988) (preempting state contract law), *with Davidson & Assoc. v. Jung*, 422 F.3d 630 (8th Cir. 2005) (finding license agreements not preempted and thus enforceable under state contract law), *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317 (Fed. Cir. 2003) (same), *and ProCD, Inc.*, 86 F.3d at 1453-55 (same).

[362] *See, e.g.*, MLA Initial Comments at 2.

LOC_AR_00003199

these broader questions of preemption. Ultimately, this is a matter best left to the courts to address on a case-by-case basis, applying standard preemption analysis.[363]

## 2.    Breach of Contract versus Copyright Infringement

A related issue in this study is whether, and in what circumstances, violations of the terms of software licenses would constitute copyright infringement, as opposed to a mere breach of contract. For example, a group of law professors urged that "license agreements imposing restrictions on the use of a device or its embedded software should be enforced not with copyright remedies, but with contractual ones—subject to internal contract law limitations and copyright preemption."[364] This issue is particularly important in the context of software-enabled consumer products, given the significance of issues regarding resale, repair, tinkering, and interoperability of such products, discussed above.

This issue has been addressed by the courts repeatedly outside the context of software-enabled consumer products.[365] A leading case is the Ninth Circuit's decision in *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, in which the court assessed whether the breach of a EULA and terms of use for a popular online role-playing game constituted copyright infringement.[366] The court began its analysis with the fundamental point that "[a] copyright owner who grants a nonexclusive, limited license ordinarily waives the right to sue licensees for copyright infringement, and it may sue only for breach of contract."[367] At the same time, the court acknowledged that "if the licensee acts *outside the scope of the license*, the licensor may sue for copyright infringement."[368] The court thus distinguished between "conditions," which it described as "contractual terms that limit a

---

[363] Aside from the express preemption provision in section 301, courts can assess whether enforcement of an agreement would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330 (2011). For instance, while rejecting an argument that state law enforcement of a shrinkwrap software license was preempted by the Copyright Act, the court in *ProCD* "refrain[ed] from adopting a rule that anything with the label 'contract' is necessarily outside the preemption clause" of the Copyright Act, because "the variations and possibilities are too numerous to foresee." *ProCD, Inc.*, 86 F.3d at 1455. Indeed, that court expressly noted the "possibility that some applications of the law of contract could interfere with the attainment of national objectives" under the Copyright Act. *Id.*

[364] Aaron Perzanowski et al. Initial Comments at 10–11; *see also* Static Control at 3 ("Agreements with end users are not bad per se, but both parties to the agreement must know and understand the terms to which they are agreeing. Breaches of these agreements should be enforceable in contract law only, not patent or copyright law.").

[365] *See, e.g., Jacobsen*, 535 F.3d at 1380-81; *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999).

[366] *See MDY Indus., LLC*, 629 F.3d at 939-41.

[367] *Id.* at 939.

[368] *Id.* (emphasis added).

LOC_AR_00003200

license's scope," and "covenants," which are "all other license terms."[369]  Breaches of conditions constitute copyright infringement, if the "licensee's action (1) exceeds the license's scope (2) in a manner that implicates one of the licensor's exclusive statutory rights."[370]  Breaches of covenants, in contrast, are actionable only under state contract law.  The *MDY* court explained that, in a given case, one must "distinguish between conditions and covenants according to state contract law, to the extent consistent with federal copyright law and policy."[371]

Another important question in this area is whether activities that Congress has expressly deemed to be "not an infringement" under the Copyright Act—such as fair use,[372] or copying or adaptation permitted under section 117[373]—can be made subject to infringement liability through private contract.[374]  For instance, some EULAs for software-enabled consumer products prohibit modification or reverse engineering.[375]  If a security researcher violates these restrictions in a manner that would otherwise constitute fair use, is the licensor limited to breach of contract remedies?  Or can the licensor also sue for copyright infringement, even though Congress has expressly deemed that activity to be noninfringing?[376]

On the one hand, there may be an argument that private contracts should not be able to render infringing as a matter of copyright law those activities that Congress, in the Copyright Act, has determined to be noninfringing as a matter of law; it may be that the

---

[369] *Id.*

[370] *Id.* at 940.

[371] *Id.* at 939.

[372] *See* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . is not an infringement of copyright.").

[373] *See id.* § 117 (providing that "[n]otwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program" under specified circumstances).

[374] As one roundtable participant explained the issue:

> [O]ne of the most harmful practices that emerges is companies essentially writing their own law of copyright infringement . . . in a private contract[.]  [O]ne means of doing this is saying you're waiving defenses to copyright infringement.  You're waiving your right to reverse engineer.  You're waiving your right to circumvent lawfully, to prepare lawful derivative works. . . . [N]ot all of the courts have gotten it right in saying we should treat that just as a contractual violation[.]

Tr. at 76:16-77:02 (May 24, 2016) (Kit Walsh, EFF).

[375] *See, e.g., End User License Agreement*, NEST, https://nest.com/legal/eula/ ("You agree not to . . . modify, make derivative works of, disassemble, reverse compile or reverse engineer any part of the Product Software (except to the extent applicable laws specifically prohibit such restriction for interoperability purposes . . .).").

[376] *See, e.g., Sega Enters. Ltd.*, 977 F.2d at 1520 ("Where there is good reason for studying or examining the unprotected aspects of a copyrighted computer program, disassembly for purposes of such study or examination constitutes a fair use.").

LOC_AR_00003201

violation of such a private agreement would be actionable, at most, as a breach of contract. Allowing form agreements that are not subject to individual negotiation to extend copyright liability to activities that would otherwise be noninfringing could disrupt carefully balanced legislative policy choices, including about what kinds of activities should trigger potentially large statutory damages or attorney's fee awards.[377] On the other hand, there may be an argument that the breach of any material term of a license renders the license a nullity, such that subsequent use of the work could be infringing.[378] This is not an issue that appears to have been directly addressed in litigation,[379] and it raises complex issues that extend beyond the scope of the present study.

### 3.    Confusion Among Consumers Regarding Licensing Terms

Another common theme raised by commenters regarding the practice of software licensing involves a consumer's lack of understanding of the terms of EULAs, and the use of complex and opaque EULAs to frustrate reasonable consumer expectations. For example, one public advocacy organization observed that "[e]ach product comes with thousands of words of legal text," and that it is "*impossible* for the typical purchaser to read all of the contracts of adhesion attached to modern products and services."[380] A copyright owner organization noted in response that "[t]here is nothing specifically problematic or different about agreements for embedded software . . . than any other

---

[377] *Cf. MDY Indus., LLC*, 629 F.3d at 941 (concluding that allowing a software copyright holder to use a license to "designate any disfavored conduct during software use as copyright infringement . . . would allow software copyright owners far greater rights than Congress has generally conferred on copyright owners"); Tr. at 78:01-05 (May 18, 2016) (Keith Kupferschmid, Copyright Alliance) (suggesting—in response to a hypothetical violation of a contract that barred reverse engineering—that if a court found that activity to be fair use, it would be difficult to support an infringement claim).

[378] *See* 3 NIMMER ON COPYRIGHT § 10.15[A][2] (Matthew Bender rev. ed. 2015) (noting circumstances where "by reason of the breach of covenant, the grantor has the power to recapture the rights granted so that any further use of the work by the grantee is without authority and, hence, infringing"); 1 PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 5.3.5.1 (3d ed. Supp. 2011) (noting that in some cases a contract "obligation will be economically so material to the contract relationship that a court will treat it as a condition even though its breach does not of itself entail infringement of a right").

[379] One roundtable participant referred to the Eighth Circuit's decision in *Davidson & Assoc. v. Jung*, 422 F.3d 630 (8th Cir. 2005), as a case addressing this issue. *See* Tr. at 77:10-22 (May 24, 2016) (Kit Walsh, EFF). The Copyright Office, however, reads that case instead to have addressed the different question of whether a contractual provision prohibiting a party from engaging in certain noninfringing activities was preempted by the Copyright Act, and thus unenforceable through *contract* law. *Davidson*, 422 F.3d at 638-39. There was no claim of copyright infringement before the court of appeals, as that claim was settled at an earlier stage of the litigation. *Id.* at 637.

[380] EFF Initial Comments at 5.

LOC_AR_00003202

type of agreement," noting that many other services impose similarly long agreements, and that such agreements "are simply a necessity of functioning in everyday society."[381]

Indeed, this is a topic arising in areas well beyond the software-enabled consumer products that are the focus of this study. In January 2016, the Department of Commerce's Internet Policy Task Force issued a White Paper addressing these issues in the context of all digital goods, including software, books, and music.[382] In examining the application of the first sale doctrine to such goods, the Internet Policy Task Force noted that online services "often" employ EULAs that "set[] forth what rights the consumer will enjoy with respect to the work, including whether he owns the copy that is transmitted and what he may do with it."[383]

The Internet Policy Task Force highlighted concerns about consumer confusion regarding the terms of the EULAs, observing that "commenters and participants on all sides agreed that consumers are entitled to clarity and that more should be done to communicate what rights they are or are not getting when they enter into a transaction involving digital transmissions of copies."[384] It concluded that "consumers would benefit from more information on the nature of the transactions they enter into, including whether they are paying for access to content or for ownership of a copy, in order to instill greater confidence and enhance participation in the online marketplace."[385] Accordingly, the Task Force recommended "the creation of a multistakeholder process to establish best practices in communications to consumers in connection with online transactions involving creative works," including "on how to inform consumers clearly and succinctly about the terms of EULAs regarding whether they 'own' the copies provided and what they may do with them."[386]

Like the Internet Policy Task Force, the Copyright Office agrees that it would be beneficial if manufacturers, as part of the sale of software-enabled consumer products, made clear what rights consumers had in the goods they were buying, including the right to resell, repair, and improve the device. As one commenter in this study noted, "rightsholders should ensure that any license that restricts the copying or use of

---

[381] Copyright Alliance Reply Comments at 5-6 ("Software licenses are no more complex or lengthy than any other agreement that consumers routinely encounter in their everyday activities. Conducting a simple Google search? That involves reading their 2,000-word agreement. Buying something on Amazon? The agreement is 3,500 words long. Purchasing a ticket on United Airlines? That agreement is about 40,000 words and close to 50 pages long."); *see also* INTERNET POLICY TASK FORCE WHITE PAPER at 68 ("This situation is hardly unique to content delivery services; consumers encounter lengthy EULAs in a wide variety of activities.").

[382] INTERNET POLICY TASK FORCE WHITE PAPER at 55-58, 68-69.

[383] *Id.* at 55.

[384] *Id.* at 57.

[385] *Id.* at 68.

[386] *Id.* at 69.

LOC_AR_00003203

software embedded on a device is prominent to the user and that its terms are easily understood."[387]  To that end, the Office believes that the multistakeholder process recommended by the Internet Policy Task Force might be productively leveraged to establish best practices for EULAs in the context of software-enabled consumer products.

# V.    Conclusion

The development of software embedded in everyday products is unique and promising, and has helped usher in an era in which consumers have products offering new functionality and convenience.  Although these uses of software are new, that software benefits from the same existing rights and limitations as all software.  This use of software does raise new issues, but the Copyright Office believes that the existing, flexible structure of the Copyright Act will serve well the needs of both copyright owners and users of software embedded in everyday products.  For that reason, the Office does not recommend any legislative changes at this time.  Nevertheless, the Office will continue to monitor the technological and legal landscape for further developments to ensure that copyright law moves forward and continues to promote the progress of science as envisioned in the Constitution.

---

[387] CDT Initial Comments at 7.

LOC_AR_00003204

**APPENDIX A**     FEDERAL REGISTER NOTICES

LOC_AR_00003205

**SUPPLEMENTARY INFORMATION:** Written comments and suggestions from the public and affected agencies concerning the proposed collection of information are encouraged. Your comments should address one or more of the following four points:

—Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

—Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

—Enhance the quality, utility, and clarity of the information to be collected; and

—Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Overview of This Information Collection**

(1) *Type of Information Collection:* Revision to Currently Approved Collection.

(2) *Title of the Form/Collection:* Annual Progress Report for STOP Violence Against Women Formula Grant Program.

(3) *Agency form number, if any, and the applicable component of the Department of Justice sponsoring the collection:* Form Number: 1122–0003. U.S. Department of Justice, Office on Violence Against Women.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract:* The affected public includes the 56 STOP state administrators (from 50 states, the District of Columbia and five territories and commonwealths (Guam, Puerto Rico, American Samoa, Virgin Islands, Northern Mariana Islands)) and their subgrantees. The STOP Violence Against Women Formula Grants Program was authorized through the Violence Against Women Act of 1994 (VAWA) and reauthorized and amended in 2000, 2005, and 2013. Its purpose is to promote a coordinated, multi-disciplinary approach to improving the criminal justice system's response to violence against women. The STOP Formula Grants Program envisions a partnership among law enforcement, prosecution, courts, and victim advocacy organizations to enhance victim safety and hold offenders accountable for their crimes of violence against women. OVW administers the STOP Formula Grants Program. The grant funds must be distributed by STOP state administrators to subgrantees according to a statutory formula (as amended).

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond/reply:* It is estimated that it will take the 56 respondents (STOP administrators) approximately one hour to complete an annual progress report. It is estimated that it will take approximately one hour for roughly 2500 subgrantees [1] to complete the relevant portion of the annual progress report. The Annual Progress Report for the STOP Formula Grants Program is divided into sections that pertain to the different types of activities that subgrantees may engage in and the different types of subgrantees that receive funds, *i.e.* law enforcement agencies, prosecutors' offices, courts, victim services agencies, etc.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total annual hour burden to complete the annual progress report is 2,556 hours.

If additional information is required contact: Jerri Murray, Department Clearance Officer, United States Department of Justice, Justice Management Division, Policy and Planning Staff, Two Constitution Square, 145 N Street NE., Room 3E.405B, Washington, DC 20530.

Dated: December 9, 2015.

**Jerri Murray,**

*Department Clearance Officer for PRA, U.S. Department of Justice.*

[FR Doc. 2015–31468 Filed 12–14–15; 8:45 am]

**BILLING CODE 4410–FX–P**

---

**LIBRARY OF CONGRESS**

**U.S. Copyright Office**

**[Docket No. 2015–6]**

**Software-Enabled Consumer Products Study: Notice and Request for Public Comment**

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of inquiry.

**SUMMARY:** The U.S. Copyright Office is undertaking a study at the request of Congress to review the role of copyright law with respect to software-enabled consumer products. The topics of public inquiry include whether the application of copyright law to software in everyday products enables or frustrates innovation and creativity in the design, distribution and legitimate uses of new products and innovative services. The Office also is seeking information as to whether legitimate interests or business models for copyright owners and users could be improved or undermined by changes to the copyright law in this area. This is a highly specific study not intended to examine or address more general questions about software and copyright protection.

**DATES:** Written comments must be received no later than February 16, 2016 at 11:59 p.m. Eastern Time. Written reply comments must be received no later than March 18, 2016 at 11:59 p.m. Eastern Time. The Office will be announcing one or more public meetings, to take place after written comments are received, by separate notice in the future.

**ADDRESSES:** All comments must be submitted electronically. Specific instructions for submitting comments will be posted on the Copyright Office Web site at *http://www.copyright.gov/policy/software* on or before February 1, 2016. To meet accessibility standards, all comments must be provided in a single file not to exceed six megabytes (MB) in one of the following formats: Portable Document File (PDF) format containing searchable, accessible text (not an image); Microsoft Word; WordPerfect; Rich Text Format (RTF); or ASCII text file format (not a scanned document). Both the web form and face of the uploaded comments must include the name of the submitter and any organization the submitter represents. The Office will post all comments publicly in the form that they are received. If electronic submission of comments is not feasible, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Sarang V. Damle, Deputy General Counsel, *sdam@loc.gov;* Catherine Rowland, Senior Advisor to the Register of Copyrights, *crowland@loc.gov;* or Erik Bertin, Deputy Director of Registration Policy and Practice, *ebertin@loc.gov.* Each can be reached by telephone at (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** Copyrighted software can be found in a wide range of everyday consumer products—from cars, to refrigerators, to cellphones, to thermostats, and more. Consumers have benefited greatly from this development: Software brings new

---

[1] Each year the number of STOP subgrantees changes. The number 2,500 is based on the number of reports that OVW has received in the past from STOP subgrantees.

**Federal Register** / Vol. 80, No. 240 / Tuesday, December 15, 2015 / Notices

qualities to ordinary products, making them safer, more efficient, and easier to use. At the same time, software's ubiquity raises significant policy issues across a broad range of subjects, including privacy, cybersecurity, and intellectual property rights. These include questions about the impact of existing copyright law on innovation and consumer uses of everyday products and innovative services that rely on such products. In light of these concerns, Senators Charles E. Grassley and Patrick Leahy (the Chairman and Ranking Member, respectively, of the Senate Committee on the Judiciary) have asked the U.S. Copyright Office to "undertake a comprehensive review of the role of copyright in the complex set of relationships at the heart" of the issues raised by the spread of software in everyday products.[1] The Senators called on the Office to seek public input from "interested industry stakeholders, consumer advocacy groups, and relevant federal agencies," and make appropriate recommendations for legislative or other changes.[2] The report must be completed no later than December 15, 2016.[3]

This study is not the proper forum for issues arising under section 1201 of the Copyright Act, which addresses the circumvention of technological protection measures on copyrighted works. Earlier this year, the Register of Copyrights testified that certain aspects of the section 1201 anticircumvention provisions of the Digital Millennium Copyright Act ("DMCA") were unanticipated when enacted almost twenty years ago, and would benefit from further review. These issues include, for example, the application of anticircumvention rules to everyday products, as well as their impact on encryption research and security testing. If you wish to submit comments about section 1201, please do so through the forthcoming section 1201 study, information on which will be available shortly at *www.copyright.gov*.

## I. Background

Copyright law has expressly protected computer programs,[4] whether used in general purpose computers or embedded in everyday consumer products, since the enactment of the 1976 Copyright Act ("1976 Act"). Though the 1976 Act did not expressly list computer programs as copyrightable subject matter, the Act's legislative history makes it evident that Congress intended for them to be protected by copyright law as literary works.[5] At the same time, in the 1976 Act, Congress recognized that "the area of computer uses of copyrighted works" was a "major area [where] the problems are not sufficiently developed for a definitive legislative solution."[6] Accordingly, as originally enacted, 17 U.S.C. 117 "preserve[d] the status quo" as it existed in 1976 with respect to computer uses,[7] by providing that copyright owners had no "greater and lesser rights with respect to the use of the work in conjunction with automatic systems capable of storing, processing, retrieving, or transferring information, or in conjunction with any similar device, machine, or process, than those afforded to works under the law" as it existed prior to the effective date of the 1976 Act.[8]

Since the 1976 Act's enactment, the scope of copyright protection for computer programs has continued to be refined by Congress through legislation and by the courts through litigation. At least some of that attention has focused on the precise problem presented here: The presence of software in everyday products.

### A. CONTU Report

In the mid-1970s, Congress created the National Commission on New Technological Uses of Copyrighted Works ("CONTU") to study and report on the complex issues raised by extending copyright protection to computer programs.[9] In its 1978 Report, CONTU recommended that Congress continue to protect computer programs under copyright law, specifically by amending section 101 of the 1976 Act to include a definition of computer programs and by replacing section 117 as enacted in the 1976 Act with a new provision providing express limitations on the exclusive rights of reproduction and adaptation of computer programs

under certain conditions.[10] Congress adopted CONTU's legislative recommendations in 1980.[11]

While CONTU did not specifically anticipate that software would become embedded in everyday products, CONTU did recognize some general issues resulting from the fact that computer programs need a machine to operate. Specifically, CONTU recognized that the process by which a machine operates a computer program necessitates the making of a copy of the program and that adaptations are sometimes necessary to make a program interoperable with the machine.[12] CONTU preliminarily addressed these issues by including in its recommended revisions to section 117 a provision permitting the reproduction or adaptation of a computer program when created as an essential step in using the program in conjunction with a machine, finding that "[b]ecause the placement of a work into a computer is the preparation of a copy, the law should provide that persons in rightful possession of copies of programs be able to use them freely without fear of exposure to copyright liability."[13] CONTU's recommendations for the new section 117 also included a provision permitting the making of copies and adaptations for archival purposes.[14]

At the same time, CONTU foresaw that the issues surrounding copyright protection for software would have to be examined again by Congress and the Copyright Office:

[T]he Commission recognizes that the dynamics of computer science promise changes in the creation and use of authors' writings that cannot be predicted with any certainty. The effects of these changes should have the attention of Congress and its appropriate agencies to ensure that those who are the responsible policy makers maintain an awareness of the changing impact of computer technology on both the needs of authors and the role of authors in the information age. To that end, the Commission recommends that Congress, through the appropriate committees, and the Copyright Office, in the course of its administration of copyright registrations and other activities, continuously monitor the impact of computer applications on the creation of works of authorship.[15]

### B. Computer Software Rental Amendments Act of 1990

A decade later, in response to concerns that commercial rental of

---

[1] Letter from Sen. Charles E. Grassley, Chairman, Senate Committee on the Judiciary, and Sen. Patrick Leahy, Ranking Member, Senate Committee on the Judiciary, to Maria A. Pallante, Register of Copyrights, U.S. Copyright Office, at 1 (Oct. 22, 2015), *available at http://www.copyright.gov/ policy/software*.

[2] *Id.* at 2.

[3] *Id.*

[4] Although the Copyright Act uses the term "computer program," *see* 17 U.S.C. 101 (definition of "computer program"), the terms "software" and "computer program" are used interchangeably in this notice.

[5] *See* H.R. Rep. No. 94–1476, at 55 (1976); *see also* National Commission on New Technological Uses of Copyrighted Works, Final Report of the National Commission on New Technological Uses of Copyrighted Works 16 (1978) ("CONTU Report").

[6] H.R. Rep. No. 94–1476, at 55.

[7] *Id.*

[8] Public Law 94–553, sec. 117, 90 Stat. 2541, 2565 (1976).

[9] *See* CONTU Report at 3–4.

[10] *Id.* at 12.

[11] *See* Act of Dec. 12, 1980, Public Law 96–517, sec. 10, 94 Stat. 3015, 3028–29.

[12] *See* CONTU Report at 12–14.

[13] *Id.* at 12–13.

[14] *Id.*

[15] *Id.* at 46.

computer programs would encourage illegal copying of such programs, Congress passed the Computer Software Rental Amendments Act of 1990 ("Computer Software Rental Act"), which amended section 109 of the Copyright Act to prohibit the rental, lease or lending of a computer program for direct or indirect commercial gain unless authorized by the copyright owner of the program.[16] Notably, Congress also expressly provided an exception to this prohibition for "a computer program which is embodied in a machine or product and which cannot be copied during the ordinary operation or use of the machine or product." [17] In doing so, Congress recognized that computer programs can be embedded in machines or products and tailored the rental legislation to avoid interference with the ordinary use of such products.[18]

*C. DMCA*

Congress revisited the issues surrounding software and copyright law with the DMCA.[19] As particularly relevant here, the DMCA amended section 117 of the Copyright Act to permit the reproduction of computer programs for the purposes of machine maintenance or repair following a court of appeals decision [20] that cast doubt on the ability of independent service organizations to repair computer hardware.[21] This provision foreshadows the more general concerns raised by the spread of software in everyday products—namely, that maintaining or repairing a software-enabled product often will require copying of the software. Section 104 of the DMCA also directed the Office to study the effects of the DMCA amendments and the development of electronic commerce and associated technology on the operation of sections 109 and 117 of the Copyright Act, as well as "the relationship between existing and emergent technology and the operation of sections 109 and 117." [22] The Office subsequently published a report detailing its findings and recommendations in August 2001 ("Section 104 Report").[23]

The Section 104 Report discussed a number of issues relevant to the discussion of software in everyday products. For instance, it addressed proposals to add a "digital first sale" right to section 109 of the Copyright Act to explicitly grant consumers the authority to resell works in digital format. Although the Office concluded that no legislative changes to section 109 were necessary at the time, it recognized that "[t]he time may come when Congress may wish to consider further how to address these concerns." [24] In particular, the Office anticipated some of the issues presented here when it highlighted "the operation of the first sale doctrine in the context of works tethered to a particular device"—an example of which would be software embedded in everyday products—as an issue worthy of continued monitoring.[25] Additionally, the Office noted the concern that unilateral contractual provisions could be used to limit consumers' ability to invoke exceptions and limitations in copyright law. Although the Office concluded that those issues were outside the scope of the study, and that "market forces may well prevent right holders from unreasonably limiting consumer privileges," it also recognized that "it is possible that at some point in the future a case could be made for statutory change." [26]

*D. Developments in Case Law*

In the meantime, courts, too, have weighed in on a number of issues concerning copyright protection of software, including copyrightability, the application of the fair use doctrine, and ownership of software by consumers. In analyzing these issues, however, courts have not generally distinguished between software installed on general purpose computers and that embedded in everyday products.

Courts have helped define the scope of copyright protection for software and address questions of infringement through application of doctrines such as the idea/expression dichotomy (codified in 17 U.S.C. 102(b)), merger, and *scènes à faire*.[27] The idea/expression dichotomy, as applied to software, excludes from copyright protection the abstract "methodology or processes adopted by the programmer" in creating the code.[28] In the context of software, the merger doctrine excludes certain otherwise creative expression from copyright protection when it is the only way, or one of a limited number of ways, to perform a given computing task.[29] The *scènes à faire* doctrine has been used to limit or eliminate copyright protection for elements of a program that are dictated by external factors or by efficiency concerns, such as the mechanical specifications of the computer on which the program runs.[30]

The fair use doctrine, codified in 17 U.S.C. 107, is also relevant here. Courts have applied the fair use doctrine to permit uses of software that ensure interoperability of software with new products and devices. For example, in *Sega Enterprises Ltd.* v. *Accolade, Inc.,* the Court of Appeals for the Ninth Circuit held that copying a video game console's computer program to decompile and reverse engineer the object code to make it interoperable with video games created by the defendant was a fair use.[31] Similarly, in *Sony Computer Entertainment, Inc.* v. *Connectix Corp.,* the court held that reverse engineering the operating system of a PlayStation gaming console to develop a computer program allowing users to play PlayStation video games on a desktop computer, as well as making copies in the course of such reverse engineering, was a fair use.[32]

Another important issue courts have tackled involves the scope of section 117's limitations on exclusive rights in computer programs. Section 117(a) allows copies or adaptations of

---

[16] *See* Public Law 101–650, 104 Stat. 5089, 5134–35 (1990); 17 U.S.C. 109(b)(1)(A).

[17] 17 U.S.C. 109(b)(1)(B)(i).

[18] *See Computer Software Rental Amendments Act (H.R. 2740, H.R. 5297, and S. 198): Hearing Before the Subcomm. on Courts, Intellectual Prop., and the Admin. of Justice of the H. Comm. on the Judiciary,* 101st Cong. 15–16 (1990) (statement of Rep. Mike Synar) ("Some parties have interpreted the [Computer Software Rental Act] as potentially affecting computer programs which may be contained as a component of another machine, such as a program which drives a mechanized robot or runs a microwave or a household kitchen utensil. Such a result was not intended and will be addressed in this legislation.").

[19] Public Law 105–304, 112 Stat. 2860 (1998).

[20] *MAI Sys. Corp.* v. *Peak Computer,* 991 F.2d 511 (9th Cir. 1993).

[21] *See* DMCA, sec. 302, 112 Stat. 2860, 2887 (1998); S. Rep. No. 105–190, at 21–22 (1998).

[22] DMCA, sec. 104, 112 Stat. 2860, 2876 (1998).

[23] *See generally* U.S. Copyright Office, DMCA Section 104 Report (2001).

[24] *Id.* at 96–97.

[25] *Id.* at xvi–xvii.

[26] *Id.* at 162–64.

[27] *See, e.g., Lexmark International, Inc.* v. *Static Control Components, Inc.,* 387 F.3d 522, 534–36 (6th Cir. 2004); *Apple Computer, Inc.* v. *Franklin Computer Corp.,* 714 F.2d 1240, 1252–53 (3d Cir. 1983); *Computer Management Assistance Co.* v. *DeCastro,* 220 F.3d 396, 400–02 (5th Cir. 2000).

[28] H.R. Rep. No. 94–1476, at 9; *see also* CONTU Report at 22 ("[C]opyright leads to the result that anyone is free to make a computer carry out any unpatented process, but not to misappropriate another's writing to do so.").

[29] *See* CONTU Report at 20 ("[C]opyrighted language may be copied without infringing when there is but a limited number of ways to express a given idea. . . . In the computer context, this means that when specific instructions, even though previously copyrighted, are the only and essential means of accomplishing a given task, their later use by another will not amount to an infringement.").

[30] *See, e.g., Lexmark,* 387 F.3d at 535–36 (outlining applicability of doctrine to computer programs).

[31] 977 F.2d 1510, 1527–28 (9th Cir. 1992), *amended by* 1993 U.S. App. LEXIS 78 (9th Cir. 1993).

[32] 203 F.3d 596, 602–08 (9th Cir. 2000).

computer programs to be made either "as an essential step in the utilization of the computer program in conjunction with a machine" or for archival purposes, but this provision may only be invoked by "the owner of a copy of a computer program." [33] This raises difficult questions regarding whether a consumer owns a copy of software installed on a device or machine for purposes of section 117 when formal title is lacking or a license purports to impose restrictions on the use of the computer program. Courts have provided somewhat conflicting guidance regarding this issue, and the application of the law can be unclear in many contexts. [34]

*E. Recent Legislation*

Issues associated with the spread of copyrighted software in everyday products have prompted legislative action in an attempt to address some of the copyright issues created by the spread of such works. [35] In the context of section 1201—which, as explained, is the subject of a separate Copyright Office study—Congress enacted legislation in August 2014 to broaden the regulatory exemption permitting the circumvention of technological measures for the purpose of connecting wireless telephone handsets to wireless communication networks (a process commonly known as "cellphone unlocking"). [36]

The Unlocking Technology Act of 2015, as most pertinent to this study, would amend section 117 of the Copyright Act to permit the reproduction or adaptation of "the software or firmware of a user-purchased mobile communications device for the sole purpose of . . . connect[ing] to a wireless communications network" if the reproduction or adaptation is initiated by or with the consent of the owner of the device, the owner is in legal possession of the device, and the owner has the consent of the authorized operator of the wireless communications network to use the network. [37] The legislation would also limit the prohibition on circumvention in section 1201 of title 17 to circumstances where circumvention is carried out in order to infringe or facilitate the infringement of a copyrighted work, and would permit the use of or trafficking in circumvention devices unless the intent of such use or trafficking is to infringe or facilitate infringement. [38]

In addition, the You Own Devices Act ("YODA") would amend section 109 of the Copyright Act to allow the transfer of ownership of a copy of a computer program embedded on a machine or other product "if [the] computer program enables any part of [that] machine or other product to operate," as well as any right to receive software updates or security patches from the manufacturer. [39] This right of transfer could not be waived by any contractual agreement. [40] In addition, the original owner of the device would be prohibited from retaining an unauthorized copy of the computer program after transferring the device and the computer program to another person. [41]

*F. Relationship to Questions About Section 1201*

Some issues related to software embedded in everyday products have come to the forefront in recent years through the 1201 rulemaking process. As the Copyright Office has frequently noted, the 1201 rulemaking can serve as a barometer for larger public policy questions, including issues that may merit or would require legislative change. The public should not submit concerns about section 1201 through this software study, but rather through the Copyright Office's forthcoming study on section 1201, information about which will be available shortly at *http://www.copyright.gov/*.

## II. Subjects of Inquiry

In response to the letter from Senators Grassley and Leahy, the Office is seeking public comment on the following five topics. A party choosing to respond to this Notice of Inquiry need not address every subject, but the Office requests that responding parties clearly identify and separately address each subject for which a response is submitted.

1. The provisions of the copyright law that are implicated by the ubiquity of copyrighted software in everyday products;

2. Whether, and to what extent, the design, distribution, and legitimate uses of products are being enabled and/or frustrated by the application of existing copyright law to software in everyday products;

3. Whether, and to what extent, innovative services are being enabled and/or frustrated by the application of existing copyright law to software in everyday products;

4. Whether, and to what extent, legitimate interests or business models for copyright owners and users could be undermined or improved by changes to the copyright law in this area; and

5. Key issues in how the copyright law intersects with other areas of law in establishing how products that rely on software to function can be lawfully used.

When addressing these topics, respondents should consider the following specific issues:

1. Whether copyright law should distinguish between software embedded in "everyday products" and other types of software, and, if so, how such a distinction might be drawn in an administrable manner.

a. Whether "everyday products" can be distinguished from other products that contain software, such as general purpose computers—essentially how to define "everyday products."

b. If distinguishing between software embedded in "everyday products" and other types of software is impracticable, whether there are alternative ways the Office can distinguish between categories of software.

2. The rationale and proper scope of copyright protection for software embedded in everyday products, including the extent to which copyright infringement is a concern with respect to such software.

3. The need to enable interoperability with software-embedded devices, including specific examples of ways in which the law frustrates or enables such interoperability.

4. Whether current limitations on and exceptions to copyright protection

[33] 17 U.S.C. 117(a).

[34] *Compare Krause* v. *Titleserv, Inc.*, 402 F.3d 119, 124 (2d Cir. 2005), *with Vernor* v. *Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010).

[35] Bills have also been introduced addressing related issues outside copyright law stemming from the spread of software in everyday products. The Spy Car Act of 2015 would direct the National Highway Traffic Safety Administration to conduct a rulemaking and issue motor vehicle cybersecurity regulations protecting against unauthorized access to electronic systems in vehicles or driving data, such as information about a vehicle's location, speed or owner, collected by such systems. SPY Car Act of 2015, S. 1806, 114th Cong. sec. 2 (2015). A discussion draft introduced in the Commerce, Manufacturing, and Trade Subcommittee of the House of Representatives would prohibit access to electronic control units or critical systems in a motor vehicle. A Bill to provide greater transparency, accountability, and safety authority to the National Highway Traffic Safety Administration, and for other purposes [Discussion Draft], 114th Cong. sec. 302 (2015), *available at http://docs.house.gov/meetings/IF/IF17/20151021/104070/BILLS-114pih-DiscussionDraftonVehicleandRoadwaySafety.pdf*.

[36] *See* Unlocking Consumer Choice and Wireless Competition Act, Public Law 113–144, 128 Stat. 1751 (2014).

[37] Unlocking Technology Act, H.R. 1587, 114th Cong. sec. 3 (2015).

[38] *Id.* sec. 2.

[39] YODA, H.R. 862, 114th Cong. sec. 2 (2015).

[40] *Id.*

[41] *Id.*

adequately address issues concerning software embedded in everyday products, or whether amendments or clarifications would be useful. Specific areas of interest include:

a. The idea/expression dichotomy (codified in 17 U.S.C. 102(b))

b. The merger doctrine

c. The *scènes à faire* doctrine

d. Fair use (codified in 17 U.S.C. 107)

e. The first-sale doctrine (codified in 17 U.S.C. 109)

f. Statutory limitations on exclusive rights in computer programs (codified in 17 U.S.C. 117)

5. The state of contract law *vis-à-vis* software embedded in everyday products, and how contracts such as end user license agreements impact investment in and the dissemination and use of everyday products, including whether any legislative action in this area is needed.

6. Any additional relevant issues not raised above.

Dated: December 9, 2015.

**Maria A. Pallante,**

*Register of Copyrights, U.S. Copyright Office.*

[FR Doc. 2015–31411 Filed 12–14–15; 8:45 am]

**BILLING CODE 1410–30–P**

## NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

### Information Security Oversight Office

[NARA–2016–007]

### State, Local, Tribal, and Private Sector Policy Advisory Committee (SLTPS– PAC) Meeting

**AGENCY:** National Archives and Records Administration (NARA).

**ACTION:** Notice of Advisory Committee Meeting.

**SUMMARY:** In accordance with the Federal Advisory Committee Act (5 U.S.C. app 2) and implementing regulation 41 CFR 101–6, NARA announces the following committee meeting.

**DATES:** The meeting will be on January 27, 2016, from 10:00 a.m. to 12:00 p.m. EDT.

**ADDRESSES:** National Archives and Records Administration; 700 Pennsylvania Avenue NW.; Jefferson Room; Washington, DC 20408.

**FOR FURTHER INFORMATION CONTACT:** Robert J. Skwirot, Senior Program Analyst, by mail at ISOO, National Archives Building; 700 Pennsylvania Avenue NW.; Washington, DC 20408, by telephone number at (202) 357–5398, or by email at *robert.skwirot@nara.gov.* Contact ISOO at *ISOO@nara.gov.*

**SUPPLEMENTARY INFORMATION:** The purpose of this meeting is to discuss matters relating to the Classified National Security Information Program for State, Local, Tribal, and Private Sector Entities. The meeting will be open to the public. However, due to space limitations and access procedures, you must submit the name and telephone number of individuals planning to attend to the Information Security Oversight Office (ISOO) no later than Friday, January 22, 2016. ISOO will provide additional instructions for accessing the meeting's location.

Dated: December 8, 2015.

**Patrice Little Murray,**

*Committee Management Officer.*

[FR Doc. 2015–31526 Filed 12–14–15; 8:45 am]

**BILLING CODE 7515–01–P**

## NATIONAL LABOR RELATIONS BOARD

### Notice of Appointments of Individuals To Serve as Members of Performance Review Boards; Correction

**Authority:** 5 U.S.C. 4314(c)(4).

**AGENCY:** National Labor Relations Board.

**ACTION:** Notice; correction.

**SUMMARY:** The National Labor Relations Board published a document in the **Federal Register** of November 25, 2015, giving notice that certain named individuals had been appointed to serve as members of performance review boards in the National Labor Relations Board for the rating year beginning October 1, 2014 and ending September 30, 2015. The document failed to list one of the individuals so appointed.

**FOR FURTHER INFORMATION CONTACT:** Gary Shinners, Executive Secretary, National Labor Relations Board, 1099 14th Street NW., Washington, DC 20570, (202) 273– 3737 (this is not a toll-free number), 1– 866–315–6572 (TTY/TDD).

### Correction

In the **Federal Register** of November 25, 2015, in FR Doc. 2015–30031, on page 73836, in the third column, correct the list of names of individuals appointed to serve as members of performance review boards by adding the following individual:

### Name and Title

Deborah Yaffee—Director, Office of Appeals

Dated: December 9, 2015.

By Direction of the Board.

**William B. Cowen,**

*Solicitor.*

[FR Doc. 2015–31421 Filed 12–14–15; 8:45 am]

**BILLING CODE 7545–01–P**

## NUCLEAR REGULATORY COMMISSION

[Docket Nos. 50–275, 50–323, and 72–26; NRC–2015–0244]

### Pacific Gas and Electric Company; Diablo Canyon Power Plant, Units 1 and 2, and Diablo Canyon Independent Spent Fuel Storage Installation

**AGENCY:** Nuclear Regulatory Commission.

**ACTION:** Finding of no significant impact with associated environmental assessment; final issuance.

**SUMMARY:** The U.S. Nuclear Regulatory Commission (NRC) is issuing an environmental assessment (EA) and finding of no significant impact (FONSI) related to a request to amend the Facility Operating License Nos. DPR–80, DPR–82, and SNM–2511 issued to Pacific Gas and Electric Company (PG&E), for operation of the Diablo Canyon Power Plant, Units 1 and 2, including the specific-license Independent Spent Fuel Storage Installation (hereinafter DCPP or the facility), located in San Luis Obispo County, California. The requested amendments would permit licensee security personnel to use certain firearms and ammunition feeding devices not previously permitted, notwithstanding State, local, and certain Federal firearms laws or regulations that otherwise prohibit such actions.

**ADDRESSES:** Please refer to Docket ID NRC–2015–0244 when contacting the NRC about the availability of information regarding this document. You may obtain publicly-available information related to this document using any of the following methods:

• Federal Rulemaking Web site: Go to *http://www.regulations.gov* and search for Docket ID NRC–2015–0244. Address questions about NRC dockets to Carol Gallagher; telephone: 301–415–3463; email: *Carol.Gallagher@nrc.gov.* For technical questions, contact the individual listed in the **FOR FURTHER INFORMATION CONTACT** section of this document.

• NRC's Agencywide Documents Access and Management System (ADAMS): You may obtain publicly-available documents online in the ADAMS Public Documents collection at

estimated for an average respondent to respond: Of the approximately 18,000 government law enforcement agencies that are eligible to submit cases, it is estimated that thirty to fifty percent will actually submit cases to ViCAP. The time burden of the respondents is less than 60 minutes per form.

6. *An estimate of the total public burden (in hours) associated with the collection:* 5,000 annual burden hours.

If additional information is required contact: Jerri Murray, Department Clearance Officer, United States Department of Justice, Justice Management Division, Policy and Planning Staff, Two Constitution Square, 145 N Street NE., 3E.405B, Washington, DC 20530.

Dated: March 23, 2016.

**Jerri Murray,**

*Department Clearance Officer for PRA, U.S. Department of Justice.*

[FR Doc. 2016–06900 Filed 3–25–16; 8:45 am]

**BILLING CODE 4410–02–P**

## LIBRARY OF CONGRESS

### Copyright Office

**[Docket Nos. 2015–6, 2015–8]**

### Software-Enabled Consumer Products Study and Section 1201 Study: Announcement of Public Roundtables

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of public roundtables.

**SUMMARY:** The United States Copyright Office has issued Notices of Inquiry ("NOIs") announcing separate public studies on software-enabled consumer products and section 1201 of title 17. In addition to soliciting written comments on these issues, the Office is now announcing public roundtables for these studies to provide forums for interested members of the public to address the issues set forth in the NOIs.

DATES AND ADDRESSES: Public roundtables for the above-referenced Copyright Office studies will be held on the dates and at the locations provided below. The roundtables for the two studies are being held on consecutive dates in each location to accommodate parties who may have an interest in attending both.

*Software-Enabled Consumer Products Study:* For its study on software-enabled consumer products, the Office will hold public roundtables in Washington, DC and San Francisco, CA. The roundtable in Washington will take place on May 18, 2016, at the Library of Congress's Madison Building, 101 Independence Avenue SE., Washington, DC 20540, from 9:00 a.m. to approximately 5:00 p.m. The roundtable in San Francisco will take place on May 24, 2016, at Hastings School of Law, 200 McAllister Street, San Francisco, CA 94102, from 9:00 a.m. to approximately 5:00 p.m.

*Section 1201 Study:* Likewise, for its study on section 1201, the Office will hold public roundtables in Washington, DC and San Francisco, CA. The roundtable in Washington will take place on May 19 and May 20, 2016, at the Library of Congress's Madison Building, 101 Independence Avenue SE., Washington, DC 20540, from 9:00 a.m. to approximately 5:00 p.m. on the first day, and from 9:00 a.m. to approximately 1:00 p.m. on the second day. The roundtable in San Francisco will take place on May 25 and May 26, 2016, at Hastings School of Law, 200 McAllister Street, San Francisco, CA 94102, from 9:00 a.m. to approximately 5:00 p.m. on the first day, and from 9:00 a.m. to approximately 1:00 p.m. on the second day.

Additional information, including instructions for submitting requests to participate in the roundtables, is available on the Copyright Office Web site at *http://copyright.gov/policy/software/* (software-enabled consumer products) and *http://copyright.gov/policy/1201/* (section 1201). Requests to participate in the roundtables must be received by the Copyright Office by April 18, 2016. If you are unable to access a computer or the internet, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** *Software-Enabled Consumer Products Study:* Sarang V. Damle, Deputy General Counsel, *sdam@loc.gov;* Catherine Rowland, Senior Advisor to the Register of Copyrights, *crowland@loc.gov;* or Erik Bertin, Deputy Director of Registration Policy and Practice, *ebertin@loc.gov.*

*Section 1201 Study:* Regan A. Smith, Associate General Counsel, *resm@loc.gov;* or Kevin Amer, Senior Counsel for Policy and International Affairs, *kamer@loc.gov.*

Each of these persons can be reached by telephone at (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** The Copyright Office is conducting separate studies concerning software-enabled consumer products and section 1201 of title 17.

### Software-Enabled Consumer Products Study

On December 15, 2015, the Copyright Office issued an NOI announcing a study on the role of copyright law with respect to the design, distribution, and use of consumer products that include embedded software. 80 FR 77668. This study is being done at the request of the United States Senate Committee on the Judiciary. Consistent with the Committee's request, the focus of the study is on software contained in consumer products; it is not intended to address more general questions about software and copyright.

### Section 1201 Study

Enacted in 1998 as part of the Digital Millennium Copyright Act ("DMCA"), section 1201 prohibits the circumvention of technological measures employed by or on behalf of copyright owners to control access to their works (also known as "access controls"), as well as the trafficking in technologies or services that facilitate such circumvention. In addition, section 1201 codifies a triennial rulemaking process through which the Librarian of Congress, upon the recommendation of the Register of Copyrights, can grant exemptions to the prohibition on the circumvention of access controls. The Copyright Office issued an NOI soliciting comments on the operation and effectiveness of section 1201 on December 29, 2015. 80 FR 81369.

### Roundtable Subjects of Inquiry

At this time, the Copyright Office is providing notice of its intention to seek further input for these studies through public roundtables to be held on the dates and at the addresses set forth above. The public roundtables will offer an opportunity for interested parties to comment on topics set forth in the NOIs.

For the software-enabled consumer products study, the roundtables at each location will consist of sessions on the following topics: (1) The proper role of copyright in protecting software-enabled consumer products; (2) ownership and contractual issues; (3) fair use; and (4) the first sale doctrine, section 117, and other limitations and exceptions. After the final session, the Office will also provide participants and observers with an opportunity to offer additional comments for the record.

For the section 1201 study, roundtables at each location will consist of sessions on the following topics: (1) The relationship of section 1201 to copyright infringement, consumer issues, and competition; (2) the rulemaking process—evidentiary and procedural issues; (3) the rulemaking process—renewal of previously granted exemptions; (4) the anti-trafficking prohibitions and third-party assistance for permitted circumvention of technological measures; and (5)

permanent exemptions to the prohibition on circumvention. After the final session, the Office will also provide participants and observers with an opportunity to offer additional comments for the record.

Each of the roundtable hearing rooms will have a limited number of seats for participants and observers. Public seating for observers will be provided on a first-come, first-served basis on the days of the roundtables.

Dated: March 23, 2016.

**Maria A. Pallante,**

*Register of Copyrights, U.S. Copyright Office.*

[FR Doc. 2016–06925 Filed 3–25–16; 8:45 am]

**BILLING CODE 1410–30–P**

---

## LIBRARY OF CONGRESS

### Copyright Royalty Board

**[Docket No. 2008–2 CRB CD 2000–2003 (Phase II)]**

### Distribution of the 2000, 2001, 2002 and 2003 Cable Royalty Funds

**AGENCY:** Copyright Royalty Board, Library of Congress.

**ACTION:** Final distribution order.

**SUMMARY:** The Copyright Royalty Judges announce the final Phase II distribution of cable royalty funds for the years 2000, 2001, 2002 and 2003 for the Program Suppliers programming category.

**DATES:** Effective March 28, 2016.

**ADDRESSES:** The final distribution order also is posted on the Copyright Royalty Board Web site at *http://www.loc.gov/ crb.*

**FOR FURTHER INFORMATION CONTACT:** Kimberly Whittle, Attorney Advisor. Telephone: (202) 707–7658; Email: *crb@ loc.gov.*

**SUPPLEMENTARY INFORMATION:** The captioned consolidated royalty distribution proceeding concluded on August 14, 2015, when the United States Court of Appeals for the DC Circuit issued a mandate relating to their June 30, 2015, order affirming the distribution shares for claimants in the Program Suppliers category as determined by the Copyright Royalty Judges (Judges). After the mandate, the Judges received filings from Worldwide Subsidy Group dba Independent Producers Group (IPG) and the Motion Picture Association of America (MPAA) contesting the appropriate methodology for distribution of the remaining royalty funds on deposit.

By order dated November 25, 2015, the Judges directed MPAA to provide historical context from which the Judges and the Licensing Division of the

Copyright Office could distribute accurately the funds, taking into account prior partial distributions, fund growth through accrued interest, and deductions for Licensing Division costs. MPAA provided the necessary information on December 7, 2015. The Licensing Division staff provided accounting services to assure accurate distribution in accordance with the Judges' orders.

The Licensing Division calculated that, as of February 17, 2016, the total distribution to IPG for each royalty year should be:

| | |
|---|---:|
| 2000 | $617,719 |
| 2001 | 164,203 |
| 2002 | 197,725 |
| 2003 | 125,884 |
| Total | 1,105,531 |

Now, therefore, the Judges hereby *order* that the Licensing Division make final distribution to IPG from the Program Suppliers category for the years 2000 through 2003, inclusive, in the amounts listed, adjusted if necessary to reflect interest accrued or costs incurred from and after February 17, 2016, to the date of distribution.

The Judges *further order* that the Licensing Division distribute simultaneously the remaining funds in the Program Suppliers category for royalty years 2000 through 2003, inclusive, to MPAA, adjusted if necessary to reflect interest accrued or costs incurred from and after February 17, 2016.

The Judges *further order* that IPG and MPAA provide to the Licensing Division all necessary and pertinent information to facilitate the transfer by March 31, 2016.

Dated: March 23, 2016.

**Suzanne M. Barnett,**

*Chief Copyright Royalty Judge.*

[FR Doc. 2016–06923 Filed 3–25–16; 8:45 am]

**BILLING CODE 1410–72–P**

---

## NUCLEAR REGULATORY COMMISSION

**[NRC–2016–0001]**

### Sunshine Act Meeting Notice

**DATE:** March 28, April 4, 11, 18, 25, May 2, 2016.

**PLACE:** Commissioners' Conference Room, 11555 Rockville Pike, Rockville, Maryland.

**STATUS:** Public and Closed.

### Week of March 28, 2016

*Tuesday, March 29, 2016*

9:30 a.m. Briefing on Project Aim (Public Meeting); (Contact: Janelle Jessie: 301–415–6775).

This meeting will be webcast live at the Web address—*http://www.nrc.gov/.*

*Wednesday, March 30, 2016*

9:30 a.m. Briefing on Security Issues (Closed Ex. 1).

### Week of April 4, 2016—Tentative

*Tuesday, April 5, 2016*

9:30 a.m. Briefing on Threat Environment Assessment (Closed Ex. 1).

### Week of April 11, 2016—Tentative

There are no meetings scheduled for the week of April 11, 2016.

### Week of April 18, 2016—Tentative

*Tuesday, April 19, 2016*

9:30 a.m. Meeting with the Organization of Agreement States and the Conference of Radiation Control Program Directors (Public Meeting); (Contact: Paul Michalak: 301–415–5804).

This meeting will be webcast live at the Web address—*http://www.nrc.gov/.*

### Week of April 25, 2016—Tentative

There are no meetings scheduled for the week of April 25, 2016.

### Week of May 2, 2016—Tentative

There are no meetings scheduled for the week of May 2, 2016.

\* \* \* \* \*

The schedule for Commission meetings is subject to change on short notice. For more information or to verify the status of meetings, contact Denise McGovern at 301–415–0681 or via email at *Denise.McGovern@nrc.gov.*

\* \* \* \* \*

The NRC Commission Meeting Schedule can be found on the Internet at: *http://www.nrc.gov/public-involve/ public-meetings/schedule.html.*

\* \* \* \* \*

The NRC provides reasonable accommodation to individuals with disabilities where appropriate. If you need a reasonable accommodation to participate in these public meetings, or need this meeting notice or the transcript or other information from the public meetings in another format (*e.g.* braille, large print), please notify Kimberly Meyer, NRC Disability Program Manager, at 301–287–0739, by videophone at 240–428–3217, or by email at Kimberly.Meyer-Chambers@

**APPENDIX B**    COMMENTING PARTIES AND
ROUNDTABLE PARTICIPANTS

LOC_AR_00003213

# Parties Who Responded to Notice of Inquiry

# Initial Comments

1.      ACT | The App Association (ACT)

2.      Author Services, Inc.

3.      Auto Care Association (Auto Care Ass'n)

4.      BSA | The Software Alliance (BSA)

5.      Center for Democracy & Technology (CDT)

6.      Computer & Communications Industry Association (CCIA)

7.      Copyright Alliance

8.      Devorah, Carrie

9.      Electronic Frontier Foundation (EFF)

10.     Engine Advocacy

11.     Entertainment Software Association (ESA)

12.     Global Intellectual Property Center, U.S. Chamber of Commerce (GIPC)

13.     iFixit

14.     Knowledge Ecology International (KEI)

15.     Microsoft Corporation (Microsoft)

16.     Mitchell, John

17.     Motor & Equipment Manufacturers Association (MEMA)

18.     Music Library Association (MLA)

19.     Owners' Rights Initiative

20.     Perzanowski, Aaron; Armstrong, Timothy K; Fairfield, Joshua; Ghosh, Shubha; Katz, Ariel; Lantagne, Stacey M.; Lemley, Mark A.; Madison, Michael J.; Rosenblatt, Betsy; Rustad, Michael L.; Samuelson, Pamela; Tushnet, Rebecca (Aaron Perzanowski, et al.)

LOC_AR_00003214

21.    Public Knowledge and New America's Open Technology Institute (Public Knowledge/OTI)

22.    R Street Institute

23.    Software and Information Industry Association (SIIA)

24.    Specialty Equipment Market Association (SEMA)

25.    Static Control Components, Inc.

26.    Tata Consultancy Services Limited

LOC_AR_00003215

# Parties Who Responded to Notice of Inquiry

# Reply Comments

1.      Consumers Union

2.      Copyright Alliance

3.      Engine Advocacy

4.      Motion Picture Association of America (MPAA)

5.      Owners' Rights Initiative

6.      Software and Information Industry Association (SIIA)

LOC_AR_00003216

# Participants in Washington, D.C. Hearings

# May 18, 2016

1. Band, Jonathan (Owners' Rights Initiative)

2. Bergmayer, John (Public Knowledge)

3. Bockert, Shaun (Dorman Products, Inc.)

4. Golant, Ben (ESA)

5. Harbeson, Eric (MLA)

6. Kupferschmid, Keith (Copyright Alliance)

7. Lowe, Aaron (Auto Care Ass'n)

8. Mohr, Chris (SIIA)

9. Perzanowski, Aaron (Case Western Reserve University School of Law)

10. Tepp, Steve (GIPC)

11. Troncoso, Christian (BSA)

12. Zuck, Jonathan (ACT)

LOC_AR_00003217

# Participants in San Francisco Hearings

# May 24, 2016

1.  Ailsworth, Ashley (SEMA)

2.  Cox, Evan (BSA)

3.  Gellis, Cathy (Digital Age Defense)

4.  Liu, Stephen (Juelsgaard IP & Innovation Clinic, representing Engine Advocacy)

5.  McClure, Sam (Juelsgaard IP & Innovation Clinic, representing Engine Advocacy)

6.  Sheffner, Ben (MPAA)

7.  Shore, Andrew (Owners' Rights Initiative)

8.  Sollazzo, Erica (Juelsgaard IP & Innovation Clinic, representing Engine Advocacy)

9.  Walsh, Kit (EFF)

10. Wiens, Kyle (iFixit and Repair.org)

LOC_AR_00003218

U.S. COPYRIGHT OFFICE · LIBRARY OF CONGRESS · 101 INDEPENDENCE AVENUE SE · WASHINGTON, DC 20559-6000 · WWW.COPYRIGHT.GOV

# EXHIBIT 26

LOC_AR_00003220

UNITED STATES COPYRIGHT OFFICE

# Section 1201 of Title 17

A REPORT OF THE REGISTER OF COPYRIGHTS                    JUNE 2017



LOC_AR_00003221



# SECTION 1201 OF TITLE 17

A REPORT OF THE REGISTER OF COPYRIGHTS                                    JUNE 2017

LOC_AR_00003222

ACKNOWLEDGEMENTS

This Report reflects the efforts of many people within the U.S. Copyright Office.  Deputy General Counsel Regan Smith and Senior Counsel for Policy and International Affairs Kevin Amer were the primary authors of this Report.  They managed and oversaw the complex research, public roundtables, writing, and recommendations.  Without their efforts, this Report would not have been possible.

I am grateful as well for the contributions of Assistant General Counsel Cindy Abramson; Attorney-Advisors Abioye Mosheim, John Riley, and Jason Sloan; and Barbara A. Ringer Copyright Honors Program Fellow Andrew Moore, all of whom researched and drafted significant portions of the Report.  In addition, Ms. Mosheim coordinated the scheduling, transcription, and video recording of the public roundtables in Washington, D.C. and San Francisco.

General Counsel and Associate Register of Copyrights Sarang (Sy) Damle, Senior Advisor to the Register Catherine Rowland, and Deputy Director of Policy and International Affairs Maria Strong reviewed the Report and provided important insights and suggestions during its drafting.  Counsels Brad Greenberg and Emily Lanza and Ringer Fellows Rachel Fertig and Emma Raviv provided helpful citation assistance. Law clerks Adelaide Dunn, Sara Gates, Nouran Sedaghat, Olga Susuni, and Giulio Yaquinto provided valuable research support.

The Copyright Office also benefitted from assistance provided by colleagues outside of Washington, D.C.  In particular, I am grateful to Chancellor and Dean David Faigman and Professor Ben Depoorter of the University of California, Hastings College of the Law for facilitating the roundtable held in Hasting's Alumni Reception Center in San Francisco.

Finally, I would like to sincerely thank the organizations, law students, and other individuals who provided written commentary and shared their perspectives and experiences in the roundtable discussions.

Karyn Temple Claggett
Acting Register of Copyrights and Director
U.S. Copyright Office

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ............................................................................................. i

I.    INTRODUCTION AND STUDY HISTORY .................................................... 1

II.   CURRENT LEGAL FRAMEWORK ................................................................ 4

    A.   Historical Background ...................................................................... 4

    B.   Statutory Structure ........................................................................... 6

        1.   Prohibition on Circumvention ................................................... 8

        2.   Prohibitions on Trafficking ...................................................... 10

        3.   Permanent Exemptions ............................................................. 14

            a.   1201(d) Exemption for Nonprofit Libraries, Archives, and Educational Institutions ............................................................. 14

            b.   1201(e) Exemption for Law Enforcement, Intelligence, and Other Government Activities .................................................. 15

            c.   1201(f) Exemption for Reverse Engineering ................................. 15

            d.   1201(g) Exemption for Encryption Research ............................... 16

            e.   1201(h) Exceptions Regarding Minors ...................................... 18

            f.   1201(i) Exemption for Protection of Personally Identifying Information ............................................................................. 18

            g.   1201(j) Exemption for Security Testing ...................................... 19

        4.   Certain Analog Devices and Technological Measures ..................... 20

        5.   Triennial Rulemaking ............................................................. 20

            a.   Legislative History ................................................................. 22

            b.   Rulemaking Structure ............................................................ 24

            c.   Public Interest in Rulemaking ................................................. 25

            d.   Evidentiary Standards ........................................................... 26

    C.   Case Law Developments ................................................................. 30

   **D.  Unlocking Consumer Choice and Wireless Competition Act** ............................... 34

   **E.  International Obligations** ......................................................................... 35

**III. PROPOSED STATUTORY REFORM** ................................................................ 36

   **A.  Scope of Section 1201(a)** ......................................................................... 36

      1.  Policy Considerations ....................................................................... 36

         a.  Effect on Marketplace ............................................................. 36

         b.  Effect on Speech ..................................................................... 40

         c.  Effect on Library, Archival, and Educational Activities ........................... 41

      2.  Proposed Changes ............................................................................. 42

         a.  Statutory Nexus Requirement ..................................................... 42

         b.  Exclusion of Device- or Machine-Enabling Computer Programs ........... 47

   **B.  Anti-Trafficking Provisions** ................................................................... 50

      1.  Overall Effectiveness ....................................................................... 50

      2.  Proposed Changes ............................................................................. 52

         a.  Manufacture and Distribution of Tools ......................................... 52

         b.  Third-Party Assistance ............................................................. 56

   **C.  Permanent Exemptions** ......................................................................... 62

      1.  Existing Permanent Exemptions ......................................................... 63

         a.  1201(f) Exemption for Reverse Engineering ................................... 63

         b.  1201(j) Exemption for Security Testing ......................................... 71

         c.  1201(g) Exemption for Encryption Research ................................... 80

         d.  1201(i) Exemption for Protection of Personally Identifying
            Information ........................................................................... 82

      2.  Proposed New Permanent Exemptions ................................................. 84

         a.  Assistive Technologies ............................................................. 84

         b.  Obsolescence, Repair, and Modification ....................................... 88

         c.  Device Unlocking ................................................................... 97

         d.  Library and Archival Uses ......................................................... 99

e.   Educational and Derivative Uses of Audiovisual Works ....................... 101

f.   All Lawful or Fair Uses ......................................................................... 102

3.   International Considerations .................................................................... 104

4.   Alternative Approach of Expanding Statutory Rulemaking Factors ........... 105

IV.   THE RULEMAKING PROCESS ............................................................................... 105

A.   *Administrative Law Considerations* .......................................................... 106

B.   *Defining an Exemption Class* .................................................................... 108

C.   *Burden of Proof* ........................................................................................ 110

D.   *Applicable Evidentiary Standards* ............................................................ 112

1.   Copyrightable Works at Issue ................................................................. 115

2.   Noninfringing Uses ................................................................................. 115

3.   Causation ................................................................................................ 117

4.   Adverse Effects and the Statutory Factors ............................................. 118

a.   Degree of Adverse Effects Required ................................................. 119

b.   Statutory Factors .............................................................................. 121

c.   Merged Access and Copy Controls ................................................... 126

E.   *Streamlined Process to Renew Exemptions* ............................................... 127

1.   The Need for a Renewal Process ............................................................. 128

2.   Proposals for Reform .............................................................................. 132

a.   "Burden-Shifting" Model ................................................................. 133

b.   "Streamlining" Model ...................................................................... 135

c.   Presumptive Rejection Model ........................................................... 139

3.   Office's Recommendations ...................................................................... 140

F.   *Other Rulemaking Process Considerations* .............................................. 147

V.   CONCLUSION ......................................................................................................... 152

LOC_AR_00003226

**APPENDICES**

**Appendix A: Federal Register Notices**

**Appendix B: Commenting Parties and Roundtable Participants**

**Appendix C: Abbreviations**

LOC_AR_00003227

# EXECUTIVE SUMMARY

Among the many changes to the copyright system spurred by digital technologies, perhaps the most fundamental has been the development of new platforms and formats for delivering creative works to the public.  In addition to physical media such as compact discs and DVDs, copyright owners and consumers alike have a broad and expanding array of online options to conveniently disseminate, access, and use creative works.  Many of these options emerged after essential updates to the copyright law were made to accommodate rapid technological change and foster digital innovations.  In 1998, as part of the Digital Millennium Copyright Act ("DMCA"), and in compliance with two newly adopted international treaties, Congress added a new section 1201 to title 17 to provide greater legal protection for copyright owners in the emerging digital environment.

In enacting section 1201, Congress aimed to create a legal foundation to launch the global digital online marketplace for copyrighted works.  Congress recognized that the same features that make digital technology a valuable delivery mechanism—the ability to quickly create and distribute near-perfect copies of works on a vast scale—also carry the potential to enable piracy to a degree unimaginable in the analog context.  As a result, Congress sought to support copyright owners' use of mechanisms known as "technological protection measures," or "TPMs," when offering their works in digital form.  TPMs include both measures protecting against unauthorized access to a copyrighted work (*e.g.*, a password requirement) as well as measures protecting against unauthorized uses (*e.g.*, prevention of digital copying).[1]  By providing independent legal protection for technologies used by copyright owners to prevent piracy, Congress sought to bolster rightsholders' willingness to make their works available to the public in a variety of digital formats.

Accordingly, section 1201 supplements the preexisting rights of copyright owners under the Copyright Act of 1976 by establishing separate and distinct legal remedies against the circumvention of certain types of TPMs, as well as against trafficking in devices and services primarily designed for circumvention.[2]  At the same time, Congress recognized that there are many lawful purposes for which individuals may have a legitimate need to engage in circumvention—activities that have little to do with facilitating piracy.  Congress therefore included within section 1201 a series of permanent exemptions to one or more of the statute's prohibitions.  Among others, these include exemptions for

---

[1] *See* 17 U.S.C. § 1201(a)(3)(B), (b)(2)(B).

[2] As defined in the statute, to "circumvent" generally refers to acts such as avoiding, bypassing, removing, deactivating, or impairing a TPM.  *See id.* § 1201(a)(3)(A), (b)(2)(A).

i

certain activities of libraries, archives, and educational institutions, law enforcement activities, reverse engineering, encryption research, and security testing.

In addition to these exemptions, Congress also created a procedure to grant exemptions on a temporary basis. Every three years, the Librarian of Congress, upon the recommendation of the Register of Copyrights, determines through a rulemaking proceeding whether the bar on circumvention is having, or is likely to have, an adverse effect on users' ability to make noninfringing uses of a particular class of copyrighted works. The Librarian may adopt a temporary exemption waiving the prohibition for such users for the ensuing three-year period. Congress established this rulemaking as a "'fail-safe' mechanism" to ensure that the new protection against circumvention would not be used to diminish the public's access to copyrighted works for lawful uses, including activities protected by the fair use doctrine.

Over the years, section 1201 has become a source of deep and widespread debate among copyright stakeholders. Many copyright owners argue that the statute has worked just as Congress intended, laying the legal foundation for the explosion in legitimate digital dissemination models over the past two decades. At the time of its enactment, DVDs were not yet the "predominant medium" for the distribution of motion pictures in the home video market,[3] and the first iPod would not be invented for three more years. Today, DVDs, Blu-ray, and 4K Ultra HD Blu-ray discs compete with streaming services such as Hulu, Netflix, Amazon Instant Video, and Google Play, while millions of consumers have "cut the cord" with traditional cable services in favor of over-the-top subscription services. In the music industry, the majority of revenues now come from streaming services like Spotify, Pandora, and Apple Music, displacing download revenues, which in turn previously displaced compact disc revenues. Likewise, cloud computing has become standard, and software as a service is now a leading licensing and delivery model for businesses and individuals. These platforms, copyright owners argue, have given consumers more lawful options to access creative works than ever before, and all rely on TPMs to effectively operate in the marketplace. Copyright owners also credit the statute's anti-trafficking provisions with keeping circumvention technologies out of the mainstream.

Others, including many user groups, argue that section 1201 does little to prevent digital piracy, while chilling a wide range of otherwise lawful activities. In their view, the statutory language sweeps far beyond the concerns Congress had in mind when it adopted the DMCA and has given rise to anticompetitive and other claims unrelated to legitimate copyright interests. They point to cases in which manufacturers of products such as garage door openers and printer toner cartridges have invoked section 1201 to

---

[3] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 65 Fed. Reg. 64,556, 64,567–68 (Oct. 27, 2000).

LOC_AR_00003229

prevent competitors from marketing compatible products, including replacement parts, because of the TPM-protected software in those products. These challenges will only become more commonplace, these users argue, as the Internet of Things expands and growing numbers of everyday products—automobiles, refrigerators, medical devices, and so on—operate using software protected by TPMs. While consumers historically have been free to repair, modify, or tinker with their own goods without implicating copyright, such activities now may require circumvention of a TPM to access the software that enables the device to function. For many, it is not clear why copyright law should apply at all in these contexts.

User groups argue that these concerns are only partially remedied by the permanent exemptions and the triennial rulemaking. Many contend that the permanent exemptions cover only a handful of legitimate circumvention activities and have been outpaced by technological change in the areas they do address. And while some stakeholders praise the rulemaking as a flexible means of responding to marketplace developments, noting that it consistently yields large numbers of exemptions, others argue that it imposes substantial costs and burdens on participants, especially for individuals and public interest organizations with limited resources. They urge that the process be streamlined, particularly when evaluating whether to renew an exemption granted in the previous rulemaking that encounters no meaningful opposition. Others have noted the proceeding's substantive limitations. For example, the Librarian is not authorized to grant exemptions to the anti-trafficking provisions, and many argue that the right to circumvent can be effectively meaningless absent assistance from third parties, such as service technicians.

In light of all of these issues, and at the request of the Ranking Member of the House Judiciary Committee, the Copyright Office has completed the first comprehensive public study on the operation of section 1201 since its enactment nearly twenty years ago. In some instances, the Office does not propose statutory changes. Rather, the Office believes that the application of existing law, which the Office has described in this Report, will sufficiently address some of the concerns raised by stakeholders. In other instances, the Office proposes a combination of targeted legislative updates and changes to the Office's administration of the triennial rulemaking to improve section 1201's overall operation and effectiveness. The Office believes that legislative reform is most appropriate where there is significant evidence that the current statute is not achieving Congress' objectives, or where it appears that a statutory exemption may be preferable to evaluating new or expanded temporary exemptions through the triennial rulemaking. The Office's conclusions and recommendations are summarized as follows:

*__Basic Framework.__* The Copyright Office does not propose altering the basic framework of section 1201. The Office believes that the statute's overall structure and scope—including its treatment of circumvention as a standalone violation independent of copyright infringement—remain sound.

LOC_AR_00003230

_**Anti-Trafficking Provisions**_.  The Office agrees with the many copyright owners who maintain that the anti-trafficking provisions provide critical enforcement tools against digital piracy.  At the same time, the Office recognizes that uncertainty over the reach of those provisions may prevent some users from taking full advantage of exemptions to which they are entitled pursuant to the rulemaking.  In response to this concern, the Office concludes:

- Beneficiaries of exemptions should themselves be able to develop necessary tools solely for their own use in carrying out exempted circumventions.  We do not believe, however, that legislative change is currently needed to effectuate that right.  Such action appears premature, as no court has suggested that the bar on the "manufacture" of circumvention tools extends to beneficiaries engaging in self-help.  More fundamentally, the statutory text and structure indicate that this provision was not intended to cover such activity; instead, the language is best read to apply only in connection with trafficking conduct.

- In cases where beneficiaries cannot themselves make use of an exemption, the Office believes that it is important to allow users to seek assistance in making use of that exemption.  As raised in the most recent rulemaking, the Office _**does**_ recommend amending section 1201 to expressly grant the Librarian discretion to adopt temporary regulatory exemptions that permit third-party assistance "at the direction of" an intended user.  This change would extend to the entire rulemaking the authority to adopt exemptions similar in scope to exemptions for the unlocking of wireless devices, as mandated by Congress in the Unlocking Consumer Choice and Wireless Competition Act.[4]  Prior to a legislative solution, the Office will seek to avoid defining classes of persons eligible for exemptions overly narrowly in future rulemaking proceedings, which may allow for more effective use of the granted exemptions.

_**Permanent Exemptions**_.  Both this study and the experience of past rulemakings suggest that, in certain cases, the existing permanent exemptions have not been sufficiently flexible to keep pace with evolving technologies.  The Office makes the following recommendations:

- As the Register has previously testified, to accommodate a broader range of legitimate security research, the Office recommends that Congress consider

---

[4] _See_ Unlocking Consumer Choice and Wireless Competition Act, Pub. L. No. 113-144, § 2(c), 128 Stat. 1751, 1751–52 (2014) (providing that circumvention "may be initiated . . . by another person at the direction of the owner, or by a provider of a commercial mobile radio service or a commercial mobile data service at the direction of such owner or other person, solely in order to enable such owner or a family member of such owner to connect to a wireless telecommunications network").

LOC_AR_00003231

expanding the exemption for security testing under section 1201(j). This could include expanding the definition of security testing, easing the requirement that researchers obtain authorization, and abandoning or clarifying the exemption's multifactor test for eligibility.

- The exemption for encryption research under section 1201(g) may benefit from similar revision, including removal of the requirement to seek authorization and clarification or removal of the multifactor test.

- In some cases, it may make sense to consider the adoption of new permanent exemptions to provide certainty for noninfringing activities that have repeatedly received exemptions in past triennial rulemakings, or where there is a particularly broad-based need. Specifically, the Office recommends legislative consideration of the following as new permanent exemptions:

    o An exemption permitting circumvention to enable blind or visually impaired persons to utilize assistive technologies. The exemption for such purposes granted in the most recent triennial rulemaking could provide an appropriate starting point for legislative language.

    o An exemption to allow circumvention solely for purposes of diagnosis, repair, or maintenance of a computer program, including to circumvent obsolete access controls. The Office does not, however, recommend that such an exemption extend to circumvention for purposes of making other lawful modifications to software, or "tinkering."

    o An exemption for the unlocking of used mobile devices, based on the language of exemptions adopted in prior rulemakings.

- In other cases, the views received suggest that the rulemaking already provides an adequate forum to address needs for circumvention, or that legislative reform is otherwise premature:

    o The Office previously has noted that the exemption under section 1201(f) for reverse engineering is somewhat ambiguous with respect to whether it permits end users to circumvent for purposes of making computer programs interoperable, or instead is limited to circumvention done solely for certain analytical purposes. Based on the statutory text, legislative history, and relevant case law, the Office concludes that the stronger interpretation is that section 1201(f) does permit circumvention to enable interoperability in certain circumstances, and subject to various statutory safeguards. Therefore, the Office does not believe that amendment of section 1201(f) is currently necessary to allow consumers to engage in legitimate activity of this type.

LOC_AR_00003232

- o The Office does not currently recommend adopting a permanent exemption to facilitate the lawful preservation, replacement, and research activities of libraries and archives. We believe such an exemption to be premature in light of the Office's ongoing review of the copyright exceptions for such institutions under section 108 of the Copyright Act, but are hopeful that the recommended exemption for obsolete access controls noted above can accommodate many of these activities.

- o The Office does not currently recommend adopting a permanent exemption for educational and derivative uses of audiovisual works. Although exemptions for such purposes have been granted in prior rulemakings, their language and scope has changed over time, suggesting that adoption on a permanent basis may be premature.

- o In light of the Office's conclusion that a circumvention violation is and should continue to be independent of copyright infringement, the Office does not recommend adoption of a permanent exemption permitting circumvention for any lawful or noninfringing use. In addition, the Office does not see a sufficient basis for abandoning Congress' considered decision to establish the triennial rulemaking as the forum for consideration of exemptions for activities protected by fair use.

- Any revisions to the permanent exemptions should take into account international obligations, including applicable trade agreements. The Office expresses no view on any potential trade implications, but reaches its conclusions and recommendations solely for purposes of domestic copyright policy and advising Congress.

***Triennial Rulemaking.*** Apart from the question of whether the current statute should be adjusted, the Copyright Office expects growing numbers of copyright owners and users to continue to rely upon the triennial rulemaking. After careful consideration, the Office has identified ways the rulemaking process may be improved or clarified to facilitate administrability and ensure that the rulemaking continues to function as a useful fail-safe mechanism to prevent a diminishment in the public's ability to access copyrighted works.

First, the study revealed broad consensus in favor of streamlining the process for renewing exemptions to which there is no meaningful opposition. While the Office continues to support legislation providing for presumptive renewal of existing exemptions where there is no opposition, the Office concludes that under its existing regulatory authority, it can implement some changes in this regard independently. In particular, the Office believes that the statutory language permits rulemaking determinations to be based upon evidence drawn from prior proceedings, where there is a showing that the prior record is still a relevant reflection of the legal or factual concerns at issue in the succeeding rulemaking. The Office intends to implement such

LOC_AR_00003233

changes in the next rulemaking, for example by allowing petitioners to seek renewal through submission of a short declaration stating that there has been no material change to the facts and circumstances supporting the exemption since the previous triennial period.

Second, the Office is providing guidance clarifying the applicable evidentiary standards that must be satisfied to obtain an exemption. The Office's evidentiary inquiry is derived directly from the statute, and its application is guided by legislative history. The Office hopes that this articulation will be useful to future rulemaking participants.

Finally, the Office will undertake further efforts to make the rulemaking process clear and accessible to the public, consistent with its statutory obligations. These will include educational outreach in the form of a tutorial or webinar for the upcoming seventh rulemaking, adjusting the schedule to maximize participation from legal clinics, exploring the use of webcasting and/or remote participation technology, and greater efforts to use simplified regulatory language.

LOC_AR_00003234

# I.   INTRODUCTION AND STUDY HISTORY

The Digital Millennium Copyright Act ("DMCA")[5] has played a pivotal role in the development of the modern digital economy.  Enacted by Congress in 1998 to implement the United States' obligations under two international treaties,[6] the DMCA was intended to foster the growth and development of a thriving, innovative, and flexible digital marketplace by making digital networks safe places to disseminate and use copyrighted materials.[7]  It did so most notably by limiting the liability of online service providers[8] and, as this Report addresses, by ensuring adequate legal protections for copyrighted content to "support new ways of disseminating copyrighted materials to users, and to safeguard the availability of legitimate uses of those materials by individuals."[9]

Members of Congress have recognized that these latter protections, codified in section 1201 of title 17, United States Code, have been integral to discouraging piracy and infringement, facilitating innovation, and providing consumers with a wide range of content delivery options.[10]  As envisioned by Congress, section 1201 seeks to balance the

---

[5] Pub. L. No. 105-304, 112 Stat. 2860 (1998).

[6] WIPO Copyright Treaty, Dec. 20, 1996, 36 I.L.M. 65 (1997) ("WCT"); WIPO Performances and Phonograms Treaty, Dec. 20, 1996, 36 I.L.M. 76 (1997) ("WPPT").

[7] *See* STAFF OF H. COMM. ON THE JUDICIARY, 105TH CONG., SECTION-BY-SECTION ANALYSIS OF H.R. 2281 AS PASSED BY THE UNITED STATES HOUSE OF REPRESENTATIVES ON AUGUST 4TH, 1998, at 2 (Comm. Print 1998) ("HOUSE MANAGER'S REPORT"); H.R. REP. NO. 105-551, pt. 2, at 21, 23 (1998) ("COMMERCE COMMITTEE REPORT"); H.R. REP. NO. 105-551, pt. 1, at 10 (1998) ("HOUSE JUDICIARY COMMITTEE REPORT"); S. REP. NO. 105-190, at 1–2, 8–9 (1998) ("SENATE JUDICIARY COMMITTEE REPORT").

[8] Pub. L. No. 105-304, tit. II, § 202, 112 Stat. 2860, 2877–86 (1998) (codified as amended at 17 U.S.C. § 512).

[9] HOUSE MANAGER'S REPORT at 6.

[10] *See, e.g., Chapter 12 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop. & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 2 (2014) (statement of Rep. Tom Marino, Vice-Chairman, Subcomm. on Courts, Intellectual Prop. & the Internet) ("The digital economy has enabled wide distribution of movies, music, eBooks and other digital content.  Chapter 12 seems to have a lot to do with [that] economic growth . . . ."); *id.* at 2–3 (statement of Rep. Jerrold Nadler, Ranking Member, Subcomm. on Courts, Intellectual Prop. & the Internet) ("The DMCA has been effective and has worked to encourage the creation of new digital works and has allowed authors a way to protect against copyright infringement while also helping to promote the development of new and innovative business models. . . .  Section 1201 has proven to be extremely helpful to creators because it has helped creators to have the confidence to provide video content over the internet despite the risk of piracy.  And Section 1201 has helped deter . . . unauthorized access by prohibiting circumvention of protection measures and trafficking tools designed for

1

LOC_AR_00003235

interests of copyright owners and users, including the personal interests of consumers, in the digital environment.[11]  It does so by protecting the use of technological measures (also called "technological protection measures" or "TPMs") used by copyright owners to prevent unauthorized access to or use of their works.[12]  Section 1201 contains three separate protections for TPMs.  First, it prohibits circumvention of technological measures employed by or on behalf of copyright owners to protect access to their works (also known as "access controls").  Second, the statute prohibits trafficking in devices or services primarily designed to circumvent access controls.  Finally, it prohibits trafficking in devices or services primarily designed to circumvent TPMs used to protect the copyright rights of the owner of a work (also known as "copy controls").  Copy controls protect against unauthorized uses of a copyrighted work once access has been lawfully obtained.  Because title 17 already forbids copyright infringement, there is no corresponding ban on the act of circumventing a copy control.[13]

At the same time, section 1201 contains a number of discrete exemptions to these prohibitions, to avoid curtailing legitimate activities such as security testing, law enforcement activities, or the protection of personally identifying information.[14]  In addition, to accommodate changing marketplace realities and ensure that access to copyrighted works for lawful purposes is not unjustifiably diminished,[15] the statute provides for a rulemaking proceeding whereby additional, temporary exemptions to the prohibition on circumventing access controls may be adopted by the Librarian of Congress, upon the recommendation of the Register of Copyrights in consultation with the Assistant Secretary for Communications and Information of the Department of Commerce.[16]  In contrast to the permanent exemptions set out by statute, exemptions adopted pursuant to the rulemaking must be reconsidered every three years.[17]

---

circumvention."); *id.* at 4 (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary) ("Chapter 12 encourages the use of technology protection measures to protect copyright by making it unlawful to circumvent these measures or to assist others in doing so. This strengthens our copyright system by cultivating innovative business models that encourage the lawful dissemination of copyrighted works to the public.  This in turn discourages piracy and infringement.").

[11] *See* COMMERCE COMMITTEE REPORT at 26.

[12] Pub. L. No. 105-304, tit. I, § 103, 112 Stat. 2860, 2863–72 (1998) (codified as amended at 17 U.S.C. § 1201).

[13] SENATE JUDICIARY COMMITTEE REPORT at 12.

[14] 17 U.S.C. § 1201 (d)–(j).

[15] COMMERCE COMMITTEE REPORT at 35–36.

[16] 17 U.S.C. § 1201(a)(1)(C); *see also id.* § 1201(a)(1)(B)–(D).

[17] *Id.* § 1201(a)(1)(C).

LOC_AR_00003236

Since the enactment of the DMCA, the Copyright Office has conducted six rulemakings, which have grown in both public interest and scope.[18]  In the most-recently concluded rulemaking, the Office received many proposals seeking to access copyrighted computer code that now pervades consumer devices, and the rulemaking correspondingly touched upon a wide range of activities, from accessing personal data in medical devices to tractor repair, not previously implicated by copyright.[19]  The Office also received many requests for the renewal of previously granted and uncontested temporary exemptions, raising the question whether, in such cases, the rulemaking has become unnecessarily burdensome.[20]  Finally, the growth of specialized computer code serving as technological protection measures yielded concerns that members of the general public are unable to make use of these exemptions without assistance from third parties (such as service technicians), and that the anti-trafficking prohibitions might prevent such aid.[21]

In light of these issues, and as part of its comprehensive review of the nation's copyright law, the House of Representatives Committee on the Judiciary's Subcommittee on Courts, Intellectual Property, and the Internet held a hearing on section 1201 in September of 2014.[22]  During a subsequent hearing before the full Judiciary Committee in April of 2015, the Register of Copyrights testified that the impact and efficacy of section 1201 merit analysis, and Ranking Member John Conyers, Jr. requested that the Office complete a report studying section 1201.[23]

This Report is the result of that request.  On December 29, 2015, the Copyright Office published a notice of inquiry in the Federal Register ("First Notice") announcing the

---

[18] *See infra* p. 25 (discussing significant increase in number of comments received).

[19] Register of Copyrights, Section 1201 Rulemaking:  Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 2–3 (2015) ("2015 Recommendation").

[20] *Id.* at 4.

[21] *Id.* at 4–5.

[22] *See Chapter 12 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop. & the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014).

[23] *See Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 6 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office) ("For [certain] aspects of section 1201, we are recommending a comprehensive study, including the permanent exemptions for security, encryption, and privacy research."); *id.* at 49 (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary) ("[T]here are policy issues that warrant studies and analysis, including . . . section 1201. . . .  I would like the Copyright Office to conduct and complete reports on those policy issues . . . .").

LOC_AR_00003237

study and soliciting public input.[24]  The Office received sixty-eight initial comments and sixteen reply comments in response from a broad spectrum of interested parties, including creators and copyright owners, service providers, technology and cybersecurity companies, device manufacturers, libraries, legal scholars, public interest groups, and individual members of the public.[25]  In May 2016, the Office conducted three days of public roundtables in Washington, D.C. and San Francisco.[26]  Following the roundtables, the Office published a second notice of inquiry in the Federal Register ("Second Notice") requesting additional comments on a number of significant issues raised in earlier comments and discussed at the roundtables.[27]  The Office received forty-three comments and fourteen reply comments in response to the Second Notice.[28]

## II.   CURRENT LEGAL FRAMEWORK

### A. Historical Background

The United States' effort to update its laws to ensure protection of copyrighted works in the digital age began in February 1993 with the formation of the Information Infrastructure Task Force, which established a working group to investigate the effects of emerging digital technology on intellectual property rights and recommend appropriate

---

[24] Section 1201 Study:  Notice and Request for Public Comment, 80 Fed. Reg. 81,369 (Dec. 29, 2015).  This notice is attached in Appendix A.

[25] The comments received in response to the First Notice are available online at https://www.regulations.gov/docketBrowser?rpp=25&po=0&dct=PS&D=COLC-2015-0012. References to these comments are by party name (abbreviated where appropriate) followed by either "Initial Comments" or "Initial Reply Comments," as appropriate.  A list of the parties who responded to the First Notice is attached in Appendix B.

[26] See Software-Enabled Consumer Products Study and Section 1201 Study:  Announcement of Public Roundtables, 81 Fed. Reg. 17,206 (Mar. 28, 2016).  The Federal Register notice announcing the roundtables is attached in Appendix A.  A list of those who participated in the Office's public roundtables is attached in Appendix B.  Transcripts of the Washington, D.C. roundtables are available at http://www.copyright.gov/policy/1201/public-roundtable/transcript_05-19-2016.pdf and http://www.copyright.gov/policy/1201/public-roundtable/transcript_05-20-2016.pdf.  A transcript of the San Francisco roundtable is available at https://www.copyright.gov/policy/1201/public-roundtable/transcript_05-25-2016.pdf.

[27] Section 1201 Study:  Request for Additional Comments, 81 Fed. Reg. 66,296 (Sept. 27, 2016). This notice is attached in Appendix A.

[28] The comments received in response to the Second Notice are available online at https://www.regulations.gov/docketBrowser?rpp=25&po=0&dct=PS&D=COLC-2015-0012. References to these comments are by party name (abbreviated where appropriate) followed by either "Additional Comments" or "Additional Reply Comments."  A list of the parties who responded to the Second Notice is attached in Appendix B.

4

LOC_AR_00003238

changes to U.S. law and policy.[29]  This working group ultimately published a White Paper in 1995, which recommended that the United States adopt, among other things, measures to prevent the circumvention of TPMs.[30]  These recommendations resulted in legislation introduced in September 1995,[31] which ultimately stalled when negotiations failed to resolve core issues.[32]

During this time, however, an effort to ensure that copyrighted works would be adequately protected online was proceeding internationally.  In December 1996, the World Intellectual Property Organization ("WIPO"), of which the United States is a member state, held a diplomatic conference, which resulted in the adoption of two treaties—the WIPO Copyright Treaty ("WCT") and the WIPO Performances and Phonograms Treaty ("WPPT"), collectively known as the "WIPO Internet Treaties."[33] The WCT is a special agreement[34] under the Berne Convention for the Protection of Literary and Artistic Works;[35] it deals with the protection of works and the rights of their authors in the digital environment.  Relevant to this Report, Article 11 of the WCT obligates member states to:

> provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restrict acts, in respect of their works, which are not authorized by the authors concerned or permitted by law.[36]

The WPPT, which provides protection for performances and sound recordings, has a provision that is nearly identical to Article 11 of the WCT.[37]

---

[29] SENATE JUDICIARY COMMITTEE REPORT at 2.

[30] INFO. INFRASTRUCTURE TASK FORCE, WORKING GRP. ON INTELLECTUAL PROP. RIGHTS, INTELLECTUAL PROPERTY AND THE NATIONAL INFORMATION INFRASTRUCTURE:  THE REPORT OF THE WORKING GROUP ON INTELLECTUAL PROPERTY RIGHTS 230–35 (1995).

[31] NII Copyright Protection Act of 1995, H.R. 2441, 104th Cong. (1995); NII Copyright Protection Act of 1995, S. 1284, 104th Cong. (1995).

[32] SENATE JUDICIARY COMMITTEE REPORT at 2–4.

[33] WCT, *supra* note 6; WPPT, *supra* note 6.

[34] WCT, *supra* note 6, art. 1(1).

[35] Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as revised July 24, 1971, and as amended Sept. 28, 1979, S. Treaty Doc. 99-27, 1161 U.N.T.S. 3.

[36] WCT, *supra* note 6, art. 11.

[37] WPPT, *supra* note 6, art. 18.

LOC_AR_00003239

The Clinton Administration submitted the WIPO Internet Treaties to the Senate for ratification in July 1997, and draft implementing legislation was introduced in both the House and Senate.[38]  These bills became the basis for title I of the DMCA, which includes the provisions eventually codified in 17 U.S.C. § 1201.[39]  Throughout 1997 and 1998, the draft legislation for the DMCA, including title I, went through a number of changes before being enacted on October 28, 1998.[40]  Since enactment, section 1201 has been amended once, in 1999, to make a technical correction.[41]

## B. Statutory Structure

Section 1201 has six primary components.  First, section 1201(a)(1)(A) prohibits the circumvention of technological measures employed by or on behalf of copyright owners to control access to their works (*i.e.*, access controls).[42]  Access controls include, for example, a password requirement limiting access to a website to paying customers, or authentication codes in video game consoles to prevent the playing of pirated copies.  Second, section 1201(a)(2) prohibits manufacturing of or otherwise trafficking in technologies, products, or services that are primarily designed or produced for circumventing access controls.[43]  Third, section 1201(b) prohibits manufacturing of or otherwise trafficking in technologies, products, or services that are primarily designed or produced for circumventing technological measures that protect the exclusive rights granted to copyright owners under title 17 (*i.e.*, copy controls).[44]  Copy controls include, for example, technology preventing the copying of an e-book after it has been downloaded to a user's device.

---

[38] SENATE JUDICIARY COMMITTEE REPORT at 5; *see also* WIPO Copyright and Performances and Phonograms Treaty Implementation Act of 1997, S. 1121, 105th Cong. (as introduced, July 31, 1997); WIPO Copyright Treaties Implementation Act, H.R. 2281, 105th Cong. (as introduced, July 29, 1997).

[39] *See* SENATE JUDICIARY COMMITTEE REPORT at 5.

[40] Pub. L. No. 105-304, 112 Stat. 2860 (1998).  The WIPO treaties were ratified by the Senate shortly before passage of the DMCA.  *See* 144 CONG. REC. S12,972, 12,972–73 (daily ed. Oct. 21, 1998).

[41] *See* Intellectual Property and Communications Omnibus Reform Act of 1999, Pub. L. No. 106-113, app. I, tit. V, § 5006, 113 Stat. 1501, 1501A-594 (1999); H.R. REP. NO. 106-464, at 149 (1999) (Conf. Rep.).

[42] 17 U.S.C. § 1201(a)(1)(A).

[43] *Id*. § 1201(a)(2).

[44] *Id*. § 1201(b).

LOC_AR_00003240

| 17 U.S.C. § 1201 | Circumvention Prohibition? | Trafficking Prohibition? |
| --- | --- | --- |
| Access Controls | Yes § 1201(a)(1) | Yes § 1201(a)(2) |
| Copy Controls | No | Yes § 1201(b) |

Fourth, sections 1201(d)–(j) describe various permanent exemptions to one or more of these prohibitions, and subsection (k) prescribes conditions for the use of specific TPMs on analog video cassette recorders.[45]



Fifth, section 1201(a)(1)(C) provides for a rulemaking proceeding whereby additional, temporary exemptions to the prohibition on circumventing access controls may be adopted by the Librarian of Congress, upon the recommendation of the Register of Copyrights in consultation with the Assistant Secretary for Communications and Information of the Department of Commerce.[46]  Finally, section 1201(c) contains a savings clause that was "intended to ensure that none of the provisions in section 1201

---

[45] *Id.* § 1201(d)–(k).

[46] *Id.* § 1201(a)(1)(C); *see also id.* § 1201(a)(1)(B)–(D).

LOC_AR_00003241

affect the existing legal regime established in the Copyright Act and case law interpreting that statute," including the fair use doctrine.[47]

## 1. Prohibition on Circumvention

Section 1201(a)(1)(A) mandates that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title."[48]  As used in section 1201(a), "to 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."[49]  A technological measure "'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work."[50]

Congress intended section 1201(a)(1)(A) to establish a new legal protection for copyright owners against the circumvention of TPMs controlling access to their works, as required by the WIPO Internet Treaties.  Both the House and Senate Judiciary Committees

---

[47] SENATE JUDICIARY COMMITTEE REPORT at 30; HOUSE JUDICIARY COMMITTEE REPORT at 20 (same); *see also* COMMERCE COMMITTEE REPORT at 26 ("[F]air use principles certainly should not be extended beyond their current formulation.").  Section 1201(c) states that:

> (1) Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

> (2) Nothing in this section shall enlarge or diminish vicarious or contributory liability for copyright infringement in connection with any technology, product, service, device, component, or part thereof.

> (3) Nothing in this section shall require that the design of, or design and selection of parts and components for, a consumer electronics, telecommunications, or computing product provide for a response to any particular technological measure, so long as such part or component, or the product in which such part or component is integrated, does not otherwise fall within the prohibitions of subsection (a)(2) or (b)(1).

> (4) Nothing in this section shall enlarge or diminish any rights of free speech or the press for activities using consumer electronics, telecommunications, or computing products.

The legislative history makes clear that a violation of section 1201(a) should be considered entirely separate from a violation of copyright law.  *See infra* pp. 43–44.

[48] 17 U.S.C. § 1201(a)(1)(A).

[49] *Id.* § 1201(a)(3)(A).

[50] *Id.* § 1201(a)(3)(B).

LOC_AR_00003242

concluded that the Treaties required a prohibition on circumvention, which was unavailable under then-existing U.S. law.  The House Judiciary Committee Report explains that while "[t]he treaties do not require any change in the substance of copyright rights or exceptions in U.S. law[, t]hey do . . . require . . . technological adjuncts to the copyright law, intended to ensure a thriving electronic marketplace for copyrighted works on the Internet."[51]  Thus, "[t]o comply with the treaties, the U.S. must make it unlawful to defeat technological protections used by copyright owners to protect their works."[52]  The Senate Judiciary Committee agreed that "to adhere to the WIPO treaties," anticircumvention legislation "is necessary," noting that "prior to this Act, the conduct of circumvention was never before made unlawful."[53]  Congress described such conduct as "the electronic equivalent of breaking into a locked room in order to obtain a copy of a book."[54]

In enacting the new provision, Congress highlighted a key policy goal:  facilitating the development of a lawful online marketplace for copyrighted works.[55]  The Senate Judiciary Committee Report notes that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy."[56]  By providing legal protection for access controls,

---

[51] HOUSE JUDICIARY COMMITTEE REPORT at 9–10.

[52] *Id.* at 10.

[53] SENATE JUDICIARY COMMITTEE REPORT at 11–12.

[54] HOUSE JUDICIARY COMMITTEE REPORT at 17.  The Senate Judiciary Committee Report uses a similar analogy in describing the relationship between section 1201(a)(1) and the prohibition on the manufacture of circumvention tools under section 1201(a)(2):

> For example, if unauthorized access to a copyrighted work is effectively prevented through use of a password, it would be a violation of this section to defeat or bypass the password and to make the means to do so, as long as the primary purpose of the means was to perform this kind of act.  This is roughly analogous to making it illegal to break into a house using a tool, the primary purpose of which is to break into houses.

SENATE JUDICIARY COMMITTEE REPORT at 11.

[55] *See* COMMERCE COMMITTEE REPORT at 23 ("The debate on this legislation highlighted two important priorities: promoting the continued growth and development of electronic commerce; and protecting intellectual property rights.  These goals are mutually supportive.  A thriving electronic marketplace provides new and powerful ways for the creators of intellectual property to make their works available to legitimate consumers in the digital environment.  And a plentiful supply of intellectual property . . . drives the demand for a more flexible and efficient electronic marketplace."); SENATE JUDICIARY COMMITTEE REPORT at 1–2 ("The [DMCA] is designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age.").

[56] SENATE JUDICIARY COMMITTEE REPORT at 8.

9

Congress hoped to encourage copyright owners to make their works available to consumers through flexible and cost-effective online platforms.[57]  As the House Manager's Report[58] observes, "[t]he technological measures—such as encryption, scrambling, and electronic envelopes—that this bill protects can be deployed, not only to prevent piracy and other economically harmful unauthorized uses of copyrighted materials, but also to support new ways of disseminating copyrighted materials to users . . . ."[59]  Congress envisioned dissemination models that "allow access during a limited time period, such as during a period of library borrowing," or that "allow[] a consumer to purchase a copy of a single article from an electronic database, rather than having to pay more for a subscription to a journal containing many articles the consumer does not want."[60]  Congress thus anticipated that the legislation would "creat[e] the legal platform for launching the global digital on-line marketplace for copyrighted works."[61]

## 2. Prohibitions on Trafficking

Although the WIPO Internet Treaties do not contain express language regarding trafficking in products used for circumvention of TPMs, Congress concluded that the adoption of such prohibitions was required for U.S. compliance.[62]  This view accorded

---

[57] *See* HOUSE MANAGER'S REPORT at 2 ("[T]he law must adapt in order to make digital networks safe places to disseminate and exploit material in which American citizens have rights in an unregulated and beneficial environment."); HOUSE JUDICIARY COMMITTEE REPORT at 10 ("When copyrighted material is adequately protected in the digital environment, a plethora of works will be distributed and performed over the Internet.  To protect the owner, copyrighted works will most likely be encrypted and made available to consumers once payment is made for access to a copy of the work.").

[58] The "House Manager's Report" refers to the committee print issued by the House Judiciary Committee following passage by the House of Representatives of a Manager's Amendment to the bill that would become the DMCA.  *See* HOUSE MANAGER'S REPORT at 1–2.

[59] *Id.* at 6.

[60] *Id.* at 6–7 ("These technological measures may make more works more widely available, and the process of obtaining permissions easier."); *see also* COMMERCE COMMITTEE REPORT at 23 ("[A]n increasing number of intellectual property works are being distributed using a 'client-server' model, where the work is effectively 'borrowed' by the user (e.g., infrequent users of expensive software purchase a certain number of uses, or viewers watch a movie on a pay-per-view basis).").

[61] SENATE JUDICIARY COMMITTEE REPORT at 8.

[62] *See* HOUSE JUDICIARY COMMITTEE REPORT at 10 ("To comply with the treaties, the U.S. must make it unlawful to defeat technological protections used by copyright owners to protect their works.  This would include preventing unauthorized access as well as the manufacture and sale of devices primarily designed to decode encrypted copyrighted material."); *id.* ("There will be

10

LOC_AR_00003244

with advice given by then-Register Marybeth Peters to the Committee.[63]  Section 1201 contains two provisions prohibiting manufacturing of or trafficking in technologies, products, services, or devices that are primarily designed or produced for purposes of circumventing TPMs.  Section 1201(a)(2) applies to access controls, while section 1201(b) applies to copy controls.[64]

Section 1201(a)(2) provides:

> No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

---

those who will try to profit from the works of others by decoding the encrypted codes protecting copyrighted works, or engaging in the business of providing devices or services to enable others to do so.  A new 'Section 1201' to the Copyright Act is required by both WIPO Treaties to make it unlawful to engage in such activity."); SENATE JUDICIARY COMMITTEE REPORT at 28.

[63] *WIPO Copyright Treaties Implementation Act; and Online Copyright Liability Limitation Act: Hearing Before the Subcomm. on Courts and Intellectual Prop. of the H. Comm. on the Judiciary*, 105th Cong., 48 (1997) (statement of Marybeth Peters, Register of Copyrights, U.S. Copyright Office) ("Because of the difficulty involved in discovering and obtaining meaningful relief from individuals who engage in acts of circumvention, a broader protection extending to those in the business of providing the means of circumvention appears to be necessary to make the protection adequate and effective.  It is the conduct of commercial suppliers that will enable and result in large-scale circumvention.").  The weight of academic authority agrees that the treaties require protections against trafficking.  *See, e.g.,* JÖRG REINBOTHE & SILKE VON LEWINSKI, THE WIPO TREATIES ON COPYRIGHT:  A COMMENTARY ON THE WCT, THE WPPT, AND THE BTAP 173, ¶ 7.11.36 (2d ed. 2015) ("[T]he obligation to provide for 'adequate protection' under the WCT would seem to require that rightsholders enjoy protection also against preparatory acts on top of protection against the acts of circumvention themselves.  The domestic law of Contracting Parties would have to proscribe devices, products, components, or the provision of services which are produced or distributed for the purpose of circumventing protection technologies.") (emphasis omitted); SAM RICKETSON & JANE C. GINSBURG, INTERNATIONAL COPYRIGHT AND NEIGHBOURING RIGHTS:  THE BERNE CONVENTION AND BEYOND, ¶ 15.17, at 976–77 (2d ed. 2006) ("An interpretation that disfavors effective protection against circumvention by limiting the prohibited conduct to the sole act of circumvention, rather than encompassing the provision of devices as well, would be inconsistent with article 11's direction that member states 'shall provide adequate legal protection and effective legal remedies against the circumvention.'"); MIHALY FICSOR, THE LAW OF COPYRIGHT AND THE INTERNET:  THE 1996 WIPO INTERNET TREATIES, THEIR INTERPRETATION AND IMPLEMENTATION, C11.12, at 549 (2002) ("[I]f legislation tries only to cover the acts of circumvention themselves, it cannot provide adequate legal protection and effective legal remedies against acts which, in spite of the treaty obligations, would continue uncontrolled.").

[64] 17 U.S.C. § 1201(a)(2); *id.* § 1201(b)(1).

LOC_AR_00003245

> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;
>
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or
>
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.[65]

Section 1201(b) contains similar language, but refers to circumventing "protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof."[66]  It provides:

> No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—
>
> (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;
>
> (B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or
>
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a

---

[65] Id. § 1201(a)(2).

[66] Id. § 1201(b)(1).

LOC_AR_00003246

> technological measure that effectively protects a right
> of a copyright owner under this title in a work or a
> portion thereof.[67]

For purposes of section 1201(b), to "circumvent protection afforded by a technological measure" means "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure."[68]  A technological measure "'effectively protects a right of a copyright owner under this title' if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title."[69]

The Senate Judiciary Committee Report emphasizes that the two anti-trafficking provisions "are designed to protect two distinct rights and to target two distinct classes of devices."[70]  It explains that "if an effective technological protection measure does nothing to prevent access to the plain text of the work, but is designed to prevent that work from being copied," then a potential cause of action for trafficking in devices designed to circumvent the measure would be available under section 1201(b), but not under section 1201(a)(2).[71]  By contrast, if a TPM limits access to a work but does nothing to prevent unauthorized copying, display, performance, or distribution, a potential cause of action for trafficking in circumvention devices would be available under section 1201(a)(2), but not under section 1201(b).[72]

The Senate Judiciary Committee Report further notes that, while section 1201(a) prohibits both circumventing an access control and related trafficking activity, "there is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1)."[73]  Prohibiting the act of circumventing a copy control was unnecessary, the Committee reasoned, because most such acts "will occur in the course of conduct which itself implicates the copyright owner[']s rights under title 17."[74]  Thus, the anti-trafficking provisions in section 1201(b) were intended to "enforce[] the longstanding prohibitions on infringements," while those in section 1201(a)(2) were intended to "enforce[] [the] new prohibition on conduct" under section 1201(a)(1)(A).[75]

---

[67] *Id.* § 1201(b)(1).

[68] *Id.* § 1201(b)(2)(A).

[69] *Id.* § 1201(b)(2)(B).

[70] SENATE JUDICIARY COMMITTEE REPORT at 12.

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.* at 29.

[75] *Id.* at 12.

LOC_AR_00003247

In drafting the anti-trafficking provisions, Congress recognized the need to avoid prohibiting legitimate multipurpose devices designed for uses other than circumvention. The House Commerce Committee Report ("Commerce Committee Report") specifically notes that section 1201(a)(2) "is aimed fundamentally at outlawing so-called 'black boxes' that are expressly intended to facilitate circumvention of technological protection measures for purposes of gaining access to a work," rather than "products that are capable of commercially significant noninfringing uses, such as consumer electronics, telecommunications, and computer products."[76]

### 3. Permanent Exemptions

Congress established a discrete set of statutory exemptions to the prohibition on circumvention, generally out of recognition of the importance of these activities.[77] Unlike exemptions adopted through the triennial rulemaking, these exemptions are permanent. In some cases, these provisions also exempt activities from one or both of the prohibitions on trafficking.

#### a. 1201(d) Exemption for Nonprofit Libraries, Archives, and Educational Institutions

Section 1201(d), referred to in the legislative history as the "shopping privilege,"[78] establishes an exemption from anticircumvention liability for nonprofit libraries, archives, and educational institutions, allowing them, under specific circumstances, to circumvent technological protection measures to "make a good faith determination of whether to acquire a copy of [a] work for the sole purpose of engaging in conduct permitted under this title."[79] Qualifying institutions may not keep a copy of the work "longer than necessary to make [the] good faith determination."[80] The work cannot be used for any purpose other than to determine whether it will be acquired,[81] and must not be "reasonably available in another form."[82] Finally, these institutions may not

---

[76] COMMERCE COMMITTEE REPORT at 38; *see also id.* at 39–40 (same language regarding paragraph (b)(1)); SENATE JUDICIARY COMMITTEE REPORT at 29 (paragraph (a)(2) "is drafted carefully to target 'black boxes,' and to ensure that legitimate multipurpose devices can continue to be made and sold"); HOUSE JUDICIARY COMMITTEE REPORT at 18 (similar); HOUSE MANAGER'S REPORT at 9 (similar).

[77] *See, e.g.,* COMMERCE COMMITTEE REPORT at 41–45; SENATE JUDICIARY COMMITTEE REPORT at 13–16, 31–34.

[78] 144 CONG. REC. E1207–08 (daily ed. June 23, 1998) (correspondence submitted by Rep. Coble).

[79] *Id.* § 1201(d).

[80] *Id.* § 1201(d)(1)(A).

[81] *Id.* § 1201(d)(1)(B).

[82] *Id.* § 1201(d)(2).

LOC_AR_00003248

"manufacture, import, offer to the public, provide, or otherwise traffic in" circumvention tools.[83]  An institution that willfully violates the exemption for purposes of commercial advantage or financial gain is subject to civil remedies for the first offense, and to forfeiture of the exemption for repeated or subsequent offenses.[84]

### b.  1201(e) Exemption for Law Enforcement, Intelligence, and Other Government Activities

Section 1201(e) exempts from both the anticircumvention and anti-trafficking provisions "any lawfully authorized investigative, protective, information security, or intelligence activity of an officer, agent, or employee of the United States, a state, or a political subdivision of a state, or of a person acting pursuant to a contract with" one of those entities.[85]  This provision was intended to "permit the continuation of information security activities that protect the country against one of the greatest threats to our national security as well as to our economic security," namely "cyber attacks against government computers, computer systems, and computer networks."[86]

### c.  1201(f) Exemption for Reverse Engineering

Section 1201(f) exempts certain reverse engineering activities undertaken for the purpose of achieving software interoperability from liability under section 1201(a)(1)(A), (a)(2), and (b).  While parts of section 1201(f) are limited to reverse engineering activities of identifying and analyzing parts of a computer program, the Commerce Committee Report notes more broadly that interoperability "is the touchstone of the exceptions contained in section [1201(f)]."[87]  The House and Senate Judiciary Committee reports both suggest that the overall goal of section 1201(f) was to preserve the ability to engage in the activities found to be noninfringing by the Ninth Circuit in the *Sega Enterprises Ltd. v. Accolade, Inc.* decision.[88]

---

[83] *Id.* § 1201(d)(4).

[84] *Id.* § 1201(d)(3).

[85] *Id.* § 1201(e).

[86] H.R. REP. NO. 105-796, at 65–66 (1998) (Conf. Rep.).

[87] COMMERCE COMMITTEE REPORT at 43.

[88] *See* SENATE JUDICIARY COMMITTEE REPORT at 13 ("The objective is to ensure that the effect of current case law interpreting the Copyright Act is not changed by enactment of this legislation for certain acts of identification and analysis done in respect of computer programs.  *See, Sega Enterprises Ltd.* v *Accolade, Inc.*, 977 F.2d 1510[] (9th Cir. 1992.)."); HOUSE MANAGER'S REPORT at 14 (same); *see also* COMMERCE COMMITTEE REPORT at 42 ("[T]he goal of this section is to ensure that current law is not changed, and not to encourage or permit infringement.").

LOC_AR_00003249

Section 1201(f)(1), which provides an exemption to subsection (a)(1)(A), allows a person to circumvent access controls "for the sole purpose of identifying and analyzing those elements of [a] program that are necessary to achieve interoperability of an independently created computer program with other programs."[89]  The legislative history notes that "[t]he resulting product must also be a new and original work" that does not infringe the original work.[90]  The sole "objective of the analysis must be to identify and extract such elements as are necessary to achieve interoperability which are not otherwise available to the person."[91]  "Interoperability" means "the ability of computer programs to exchange information, and of such programs mutually to use the information which has been exchanged."[92]

Section 1201(f)(2) provides an exemption to the trafficking prohibitions of subsections (a)(2) and (b), so that a person may "develop and employ technological means" to circumvent a TPM for the purpose of enabling the permitted identification and analysis, or, separately, for the purpose of enabling interoperability of an independently created computer program with other programs, provided that "such means are necessary to achieve such interoperability," and that doing so does not constitute infringement.[93]

Section 1201(f)(3) allows information acquired pursuant to these provisions, as well as the permitted circumvention tools, to be made available to third parties, so long as the sole purpose is to achieve interoperability of an independently created computer program with other programs and such acts do not constitute infringement or violate other applicable law.[94]  Unlike the above provisions, section 1201(f)(3) does not explicitly specify whether it serves as a circumvention exemption, a trafficking exemption, or both.

### d.  1201(g) Exemption for Encryption Research

Section 1201(g) exempts from section 1201(a)(1)(A) and (2)—but not section 1201(b)—certain circumvention activities done for purposes of "encryption research," *i.e.*, "activities necessary to identify and analyze flaws and vulnerabilities of encryption technologies applied to copyrighted works, if these activities are conducted to advance the state of knowledge in the field of encryption technology or to assist in the development of encryption products."[95]  Congress adopted section 1201(g) to ensure that

---

[89] 17 U.S.C. § 1201(f)(1).

[90] COMMERCE COMMITTEE REPORT at 42.

[91] *Id.*

[92] 17 U.S.C. § 1201(f)(4).

[93] *Id.* § 1201(f)(2).

[94] *Id.* § 1201(f)(3).

[95] *Id.* § 1201(g)(1)(A).

LOC_AR_00003250

the anticircumvention laws would not have "the undesirable and unintended consequence of chilling legitimate research activities in the area of encryption."[96]  The statute defines "encryption technology" as "the scrambling and descrambling of information using mathematical formulas or algorithms."[97]

The exemption to subsection (a)(1)(A) allows circumvention of a TPM "in the course of an act of good faith encryption research," provided (1) the copy was lawfully obtained, (2) the act is "necessary to conduct" the research, (3) the researcher made a good faith effort to obtain authorization before the circumvention, and (4) the act does not constitute infringement or a violation of other applicable law.[98]  The statute includes a "non-exhaustive list of factors a court shall consider in determining whether a person properly qualifies"[99] for this exemption, including whether and how the information derived from the encryption research was distributed, whether the researcher has been trained or experienced, or is engaged in a legitimate course of study, in the field of encryption technology, and whether the researcher provided the copyright owner with the results of the research.[100]

With respect to subsection (a)(2), section 1201(g)(4) permits a person to develop and employ technological means to circumvent a TPM for the sole purpose of performing the permitted acts of encryption research.[101]  In addition, that person may provide such means "to another person with whom he or she is working collaboratively" for the purpose of conducting the permitted research, "or for the purpose of having that other person verify his or her acts of good faith encryption research."[102]  The legislative history notes, however, that "generally available encryption testing tools" would not be prohibited in the first place by subsection (a)(2).[103]

---

[96] Commerce Committee Report at 27.

[97] 17 U.S.C. § 1201(g)(1)(B).

[98] Id. § 1201(g)(2).

[99] Commerce Committee Report at 44.

[100] 17 U.S.C. § 1201(g)(3).  Note that "[t]here is no requirement that legitimate encryption researchers disseminate their findings in order to qualify for" this exemption.  H.R. Rep. No. 105-796, at 66 (1998) (Conf. Rep.).

[101] 17 U.S.C. § 1201(g)(4)(A).

[102] Id. § 1201(g)(4)(B).

[103] Senate Judiciary Committee Report at 15–16 (providing as examples password-recovery utilities, commercial "key-cracker" products, and network and website management and security tools).

LOC_AR_00003251

### e.  1201(h) Exceptions Regarding Minors

Section 1201(h) permits courts, in applying section 1201(a)(1) and (2) to a "component or part," to consider whether the component or part is needed to "prevent the access of minors to material on the Internet."[104]  It was added in response to concerns "that 1201(a) might inadvertently make it unlawful for parents to protect their children from pornography and other harmful material available on the Internet, or have unintended legal consequences for manufacturers of products designed solely to enable parents to protect their children in this fashion."[105]

### f.  1201(i) Exemption for Protection of Personally Identifying Information

Congress recognized that "[d]igital technology is robust and versatile enough that it can surreptitiously gather consumers' personal information, and do so through the use of software that is protected, or 'cloaked,' by a technological protection measure."[106]  To the extent copyright owners disclosed their "personal data gathering practices," however, Congress concluded that consumers would feel confident that their personal privacy was protected and therefore not feel the need to disable TPMs.[107]  Therefore, Congress developed a targeted exemption allowing consumers to protect their personally identifiable information by exempting from section 1201(a)(1)(A) certain limited acts of circumvention carried out "solely for the purpose of preventing the collection or dissemination of personally identifying information about a natural person who seeks to gain access to the work protected."[108]  This exemption, in section 1201(i), applies only when the copyright owner does not disclose to the user whether or not it is collecting his or her personally identifying information[109] and "where consumers are left without the capability to disable the gathering of personal information."[110]  Further, an act of circumvention must have "the sole effect of identifying and disabling the capability" for collecting and distributing personally identifying information.[111]

---

[104] 17 U.S.C. § 1201(h).

[105] SENATE JUDICIARY COMMITTEE REPORT at 32.

[106] COMMERCE COMMITTEE REPORT at 27.

[107] *Id.* at 27–28.

[108] 17 U.S.C. § 1201(i)(1)(D).

[109] *Id.* § 1201(i)(1)(B), (i)(2).

[110] COMMERCE COMMITTEE REPORT at 45; *see also* 17 U.S.C. § 1201(i)(1)(B) (TPM or work must collect or disseminate personally identifying information "without providing . . . the capability to prevent or restrict such collection or dissemination").

[111] 17 U.S.C. § 1201(i)(1)(C).

18

LOC_AR_00003252

### g.  1201(j) Exemption for Security Testing

Section 1201(j) exempts certain acts of "security testing" from section 1201(a)(1)(A) and (a)(2).[112]  Security testing is defined as "accessing a computer, computer system, or computer network, solely for the purpose of good faith testing, investigating, or correcting, a security flaw or vulnerability, with the authorization of the owner or operator of such computer, computer system, or computer network."[113]

Congress enacted section 1201(j) out of concern that "[s]ection 1201(a) could be construed to inhibit legitimate forms of security testing,"[114] and intended this exemption to complement section 1201(g), as "[s]ection 1201(g)'s exclusive focus on encryption-related research does not encompass the entire range of legitimate information security activities."[115]  Certain members of Congress recognized that security testing "strengthen[s the nation's] ability to keep [its] computer systems, digital networks and systems applications private, protected and secure."[116]  The legislative history also states that:

> the scope of permissible security testing under the Act should be the same as permissible testing of a simple door lock:  a prospective buyer may test the lock at the store with the store's consent, or may purchase the lock and test it at home in any manner that he or she sees fit—for example, by installing the lock on the front door and seeing if it can be picked.  What that person may not do, however, is test the lock once it has been installed on someone else's door, without the consent of the person whose property is protected by the lock.[117]

Section 1201(j)(2) provides that it is not a violation of subsection (a)(1)(A) "for a person to engage in an act of security testing, if such act does not constitute infringement under this title or a violation of applicable law other than this section, including section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act

---

[112] *Id.* § 1201(j).

[113] *Id.* § 1201(j)(1).

[114] H.R. REP. NO. 105-796, at 67 (1998) (Conf. Rep.).

[115] *Id.* at 66 (noting "an individual who is legitimately testing a security technology may be doing so not to advance the state of encryption research or to develop encryption products, but rather to ascertain the effectiveness of that particular security technology.").

[116] 144 Cong. Rec. E1640-02, 2 (daily ed. Aug. 4, 1998) (statement of Rep. Tauzin); *see also* 144 Cong. Rec. H10048-01, 59–60 (daily ed. Oct. 8, 1998) (statement of Rep. Coble) (discussing rationale for security testing exemption).

[117] H.R. REP. NO. 105-706, at 67 (1998) (Conf. Rep.).

LOC_AR_00003253

of 1986."[118]  This exemption provides a list of non-exclusive factors to guide the eligibility analysis, related to the use of the results of the security testing, namely:[119]

> (A) whether the information derived from the security testing was used solely to promote the security of the owner or operator of such computer, computer system or computer network, or shared directly with the developer of such computer, computer system, or computer network; and

> (B) whether the information derived from the security testing was used or maintained in a manner that does not facilitate infringement under this title or a violation of applicable law other than this section, including a violation of privacy or breach of security.[120]

Section 1201(j)'s trafficking exemption provides that, notwithstanding subsection (a)(2), a person may "develop, produce, distribute or employ technological means" to circumvent TPMs for the sole purpose of performing the permitted acts of security testing, "provided such technological means do not otherwise violate section (a)(2)."[121]

### 4.  Certain Analog Devices and Technological Measures

Finally, section 1201(k) "deal[s] with a very specific situation" that is today somewhat moot, requiring that analog video cassette recorders prevalent in 1998 (*e.g.*, VHS, Beta, 8mm) "conform to the two forms of copy control technology that are in wide use in the market today" to ensure content protection while accommodating existing "recording capabilities of ordinary consumer analog video cassette recorders."[122]  The legislative history emphasizes that distribution of circumvention tools for these TPMs would be in violation of section 1201(b)(2).[123]

### 5.  Triennial Rulemaking

In addition to the permanent exemptions, section 1201 includes a mechanism to provide limited temporary exemptions to the prohibition on circumvention.  These exemptions are adopted by the Librarian of Congress upon the recommendation of the Register of

---

[118] 17 U.S.C. § 1201(j)(2).

[119] H.R. REP. NO. 105-706, at 67 (1998) (Conf. Rep.).

[120] 17 U.S.C. § 1201(j)(3).

[121] *Id.* § 1201(j)(4).

[122] H.R. REP. NO. 105-796, at 67–68, 70 (1998) (Conf. Rep.) (specifically referencing the automatic gain control and the colorstripe copy control technologies; suggesting these TPMs could be used to prevent making copies of pay-per-view or video-on-demand programming).

[123] *Id.* at 67–68.

LOC_AR_00003254

Copyrights pursuant to a public rulemaking proceeding conducted every three years by the Register, in consultation with the National Telecommunications and Information Administration of the Department of Commerce ("NTIA").[124]  By statute, this triennial rulemaking process only addresses section 1201(a)(1)(A)'s prohibition on circumvention; the statute does not grant the authority to adopt exemptions to the anti-trafficking provisions of sections 1201(a)(2) and 1201(b).[125]  Specifically, the statute provides:

> (B) The prohibition contained in subparagraph (A) shall not apply to persons who are users of a copyrighted work which is in a particular class of works, if such persons are, or are likely to be in the succeeding 3-year period, adversely affected by virtue of such prohibition in their ability to make noninfringing uses of that particular class of works under this title, as determined under subparagraph (C).

> (C) During the 2-year period described in subparagraph (A), and during each succeeding 3-year period, the Librarian of Congress, upon the recommendation of the Register of Copyrights, who shall consult with the Assistant Secretary for Communications and Information of the Department of Commerce and report and comment on his or her views in making such recommendation, shall make the determination in a rulemaking proceeding for purposes of subparagraph (B) of whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition under subparagraph (A) in their ability to make noninfringing uses under this title of a particular class of copyrighted works.  In conducting such rulemaking, the Librarian shall examine—

>> (i) the availability for use of copyrighted works;
>> (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes;
>> (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;

---

[124] *See* 17 U.S.C. § 1201(a)(1)(C).  The Assistant Secretary for Communications and Information of the Department of Commerce referenced in the statute is the head of NTIA.

[125] *Id.* § 1201(a)(1)(E) ("Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.").

LOC_AR_00003255

(iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and

(v) such other factors as the Librarian considers appropriate.[126]

### a.  Legislative History

As originally introduced, section 1201 did not provide any avenue to adopt additional exemptions to the prohibition on circumvention.[127]  The House Commerce Committee was concerned, however, that the lack of an ability to waive the prohibition "would undermine Congress' longstanding commitment to the principle of fair use," recognizing that "[t]hroughout our history, the ability of individual members of the public to access and to use copyrighted materials has been a vital factor in the advancement of America's economic dynamism, social development, and educational achievement."[128]  Although the Commerce Committee acknowledged that the "growth and development of the Internet has already had a significant positive impact on the access of American students, researchers, consumers, and the public at large to informational resources," the Committee, at the same time, was "concerned that marketplace realities may someday dictate a different outcome, resulting in less access, rather than more, to copyrighted materials that are important to education, scholarship, and other socially vital endeavors."[129]

The Commerce Committee determined that "a 'fail-safe' mechanism is required . . . [to] monitor developments in the marketplace for copyrighted materials, and allow the enforceability of the prohibition against the act of circumvention to be selectively waived, for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials."[130]  It therefore created "a rulemaking proceeding in which the issue of whether enforcement of the [prohibition on circumvention] should be temporarily waived with regard to particular categories of works can be fully considered and fairly decided on the basis of real marketplace developments that may diminish otherwise lawful access to works."[131]

---

[126] *Id.* § 1201(a)(1)(B)–(C); *see also id.* § 1201(a)(1)(D) (requiring Librarian to publish exempted classes of works).

[127] *See* WIPO Copyright Treaties Implementation Act, H.R. 2281, 105th Cong. (as introduced, July 29, 1997); WIPO Copyright and Performances and Phonograms Treaty Implementation Act of 1997, S. 1121, 105th Cong. (as introduced, July 31, 1997).

[128] COMMERCE COMMITTEE REPORT at 35–36.

[129] *Id.* at 35–36.

[130] *Id.*

[131] *Id.*

LOC_AR_00003256

As the Commerce Committee described it, the rulemaking proceeding's "primary goal" is to "assess whether the prevalence of . . . technological protections, with respect to particular categories of copyrighted materials, is diminishing the ability of individuals to use these works in ways that are otherwise lawful."[132]  The addition of the rulemaking process "ensure[s] that the concept of fair use remains firmly established in the law" and "extends into the digital environment the bedrock principle of 'balance' in American intellectual property law for the benefit of both copyright owners and users."[133]  Individual statements in the legislative history also make clear that the rulemaking "represents an agreed upon compromise by the content community and the fair use community."[134]

In the version of the DMCA reported by the Commerce Committee, the rulemaking was to be conducted "on the record" every two years by the Secretary of Commerce, in consultation with the Assistant Secretary of Commerce for Communications and Information, the Commissioner of Patents and Trademarks, and the Register of Copyrights.[135]  These provisions were subsequently modified by a House Manager's Amendment, which was the version contained in the bill passed by the House.[136]  The Manager's Amendment, among other things, changed the biennial proceeding to a triennial one.[137]

In conference between the House and Senate, the DMCA assumed its enacted form, and responsibility for the rulemaking shifted to the Librarian, based upon "the recommendation of the Register of Copyrights, who shall consult with the Assistant Secretary for Communications and Information of the Department of Commerce."[138]  Although section 1201(a)(1)(C) calls only for the Register's "recommendation,"

---

[132] *Id*. at 37.

[133] *Id*. at 26.

[134] 144 CONG. REC. S9935, 9935 (daily ed. Sept. 3, 1998) (statement of Sen. Ashcroft); *see also* 144 CONG. REC. H7074, 7099 (daily ed. Aug. 4, 1998) (statement of Rep. Dingell) ("This key compromise between content and 'fair use' communities is reflected in the bill on the floor today.").

[135] Digital Millennium Copyright Act of 1998, H.R. 2281, 105th Cong., tit. I, § 102(a) (as reported by H. Comm. on Commerce, July 22, 1998).

[136] Digital Millennium Copyright Act, H.R. 2281, 105th Cong. (as passed by H.R., Aug. 4, 1998); HOUSE MANAGER'S REPORT at 1.

[137] Digital Millennium Copyright Act, H.R. 2281, 105th Cong., tit. I, § 103(a) (as passed by H.R., Aug. 4, 1998) (making other adjustments to the rulemaking process that were ultimately reflected in the statute).

[138] Pub. L. No. 105-304, tit. I, § 103, 112 Stat. 2860, 2863–72 (1998) (codified as amended at 17 U.S.C. § 1201).

LOC_AR_00003257

legislative history makes clear that, "as is typical with other rulemaking under title 17, and in recognition of the expertise of the Copyright Office," the Office is tasked with conducting the rulemaking.[139]  After Congress passed the bill, a technical correction was made to strike the phrase "on the record" to clarify Congress' intent that the rulemaking be conducted as an informal rulemaking proceeding pursuant to the Administrative Procedure Act ("APA").[140]

### b. Rulemaking Structure

The statute does not mandate specific processes that the Register must follow, but the legislative history states that Congress' "intent is to permit interested persons an opportunity to participate through the submission of written statements, oral presentations at one or more of the public hearings, and the submission of written responses to the submissions or presentations of others."[141]  Beyond this, the Copyright Office has implemented procedures to help ensure open, fair, and efficient proceedings. While each rulemaking has included written comments from interested parties in response to a notice of inquiry, followed by public hearings, as interest has grown over time, the Office has adjusted its rules regarding public participation in hearings and the timely submission of comments to improve the rulemaking process.

Most relevantly, in the sixth proceeding, the Office adjusted its procedures by inviting interested parties to submit petitions setting forth only the essential elements of proposed exemptions, rather than all pertinent factual and legal information in support of an exemption.[142]  To ensure a clear and definite administrative record, the Office grouped the proposed exemptions into proposed classes and required commenters to provide separate submissions for each proposed class.  The Office divided these separate comment submissions into three rounds, where the first and third rounds were limited

---

[139] H.R. REP. NO. 105-796, at 64 (1998) (Conf. Rep.) ("It is the intention of the conferees that . . . the Register of Copyrights will conduct the rulemaking, including providing notice of the rulemaking, seeking comments from the public, consulting with the Assistant Secretary for Communications and Information of the Department of Commerce and any other agencies that are deemed appropriate, and recommending final regulations in the report to the Librarian."); *see also* H.R. REP. NO. 106-464, at 149 (1999) (Conf. Rep.) ("[T]he Copyright Office shall conduct the rulemaking under section 1201(a)(1)(C) . . . .").

[140] Intellectual Property and Communications Omnibus Reform Act of 1999, Pub. L. No. 106-113, app. I, tit. V, § 5006, 113 Stat. 1501, 1501A–594 (1999); H.R. REP. NO. 106-464, at 149 (1999) (Conf. Rep.) ("[T]he Copyright Office shall conduct the rulemaking under section 1201(a)(1)(C) as an informal rulemaking proceeding pursuant to section 553 of Title 5.").

[141] H.R. REP. NO. 106-464, at 149 (1999) (Conf. Rep.).

[142] 2015 Recommendation at 19.

LOC_AR_00003258

to those supporting an exemption (or neutral commenters sharing pertinent information about a specific proposal) and the second round to those opposing an exemption.[143]

### c. Public Interest in Rulemaking

Since the first rulemaking commenced in 1999, a wide variety of stakeholders have expressed continual interest in the triennial proceedings. While the first rulemaking garnered 392 comments, the number has increased exponentially in recent years to nearly 40,000 comments in the last rulemaking.



As public interest has grown, so too have the number of granted exemptions. In the first rulemaking, the Office recommended only two exemptions, for lists of websites blocked by filtering software applications, and literary works (including computer programs) protected by TPMs that fail to permit access due to malfunction, damage, or obsoleteness.[144] In contrast, the most recent rulemaking yielded a set of exemptions covering 22 types of uses, ranging from use of motion pictures for educational, documentary, and noncommercial purposes and jailbreaking and unlocking smartphones, tablets, and other devices, to accessing computer programs controlling motorized land vehicles for purposes of diagnosis, repair, and modification and

---

[143] *Id.* at 21–22.

[144] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 65 Fed. Reg. 64,556, 64,574 (Oct. 27, 2000) ("2000 Recommendation and Final Rule").

LOC_AR_00003259

accessing computer programs operating medical devices for purposes of security research.[145]

### d. Evidentiary Standards

In conducting the triennial rulemaking, the Copyright Office has applied certain evidentiary standards that emanate from the statute itself, as well as the legislative history.

*Classes of Works.* Exemptions adopted through the triennial rulemaking only apply to "users of a copyrighted work which is in a particular class of works."[146]  As a starting point, each class of works must be a subset of one of the "broad categories of works . . . identified in section 102 [of title 17]."[147]  The Office then further refines classes by other criteria, including TPMs used, distribution platforms, and, in particular, types of uses or users.[148]  For example, in the most recent rulemaking, one proposed class was "software in 3D printers."[149]

*Burden of Proof.*  The Office consistently has placed the burden of proof on the proponent of an exemption to make the case for why it should be granted.[150]  This burden must be satisfied by a preponderance of the evidence (*i.e.*, that the harm alleged by an exemption proponent is more likely than not to be true).[151]

*No Presumption of Renewal.*  The Commerce Committee Report states that "the assessment of adverse impacts on particular categories of works is to be determined de novo."[152]  The Office has interpreted this statement to mean that "the fact that an exemption has been previously adopted creates no presumption that readoption is

---

[145] 2015 Recommendation at 57.

[146] 17 U.S.C. § 1201(a)(1)(B); *see also id.* § 1201(a)(1)(C) (adverse effects inquiry should consider a user's ability to make noninfringing uses of "a particular class of copyrighted works").

[147] COMMERCE COMMITTEE REPORT at 38.  Section 102(a) states that "[w]orks of authorship include the following categories: (1) literary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works."  17 U.S.C. § 102(a).

[148] *See, e.g.*, 2015 Recommendation at 17–18.

[149] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 79 Fed. Reg. 73,856, 73,871 (Dec. 12, 2014) ("2015 NPRM").

[150] *See, e.g.*, 2015 Recommendation at 13–14 & n.48; 2000 Recommendation and Final Rule at 64,558 (quoting COMMERCE COMMITTEE REPORT at 37).

[151] *See, e.g.*, 2015 Recommendation at 13–14.

[152] COMMERCE COMMITTEE REPORT at 37.

LOC_AR_00003260

appropriate," explaining that "a proponent may not simply rely on the fact that the Register has recommended an exemption in the past, but must instead produce relevant evidence in each rulemaking to justify the continuation of the exemption."[153]  On the other hand, the Office has noted that proponents "seeking the readoption of an existing exemption" may satisfy this burden "by demonstrating that the conditions that led to the adoption of the prior exemption continue to exist today."[154]  Additionally, the Office has stated that "where a legal analysis has previously been developed and no new law or arguments have been presented, the earlier legal determination can serve to support a renewed exemption, provided that the evidence in the present record supports it."[155]

*Adverse Effects on Noninfringing Uses.*  To adopt an exemption, section 1201(a)(1)(C) requires a determination "[that] persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses under [title 17] of a particular class of copyrighted works."[156]  The Office has viewed this as requiring exemption proponents to demonstrate two separate elements:  "(1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an adverse impact on

---

[153] 2015 Recommendation at 14; *see also* Register of Copyrights, Section 1201 Rulemaking:  Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 2, 6 (2012) ("2012 Recommendation"); Recommendation of the Register of Copyrights in RM 2008-8, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 18 (2010) ("2010 Recommendation"); Recommendation of the Register of Copyrights in RM 2005-11, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 8–9 (2006) ("2006 Recommendation"); Recommendation of the Register of Copyrights in RM 2002-4, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 11 (Oct. 27, 2003) ("2003 Recommendation").

[154] 2015 Recommendation at 14 ("This could include, for instance, a showing that the cessation of an exemption will adversely impact users' ability to make noninfringing uses of the class of works covered by the existing exemption.").

[155] *Id.* at 188 (internal quotation marks omitted); *see also* 2010 Recommendation at 115 ("[T]he Register's prior determinations have some precedential value and, unless persuaded otherwise, the Register is likely to reach a similar conclusion *when similar facts have been presented.*").

[156] 17 U.S.C. § 1201(a)(1)(C); *see also id.* § 1201(a)(1)(B) ("The prohibition [on circumvention] shall not apply to persons who are users of a copyrighted work which is in a particular class of works, if such persons are, or are likely to be in the succeeding 3-year period, adversely affected by virtue of such prohibition in their ability to make noninfringing uses of that particular class of works under [title 17], as determined under subparagraph (C).").

LOC_AR_00003261

those uses."[157]  In determining whether a use is likely noninfringing, the Office has stated that "[t]he statutory language requires that the use *is* or *is likely* to be noninfringing, not merely that the use might plausibly be considered noninfringing."[158] The Office "will look to the Copyright Act and relevant judicial precedents when analyzing whether a proposed use is likely to be noninfringing," but the lack of any controlling precedent directly on point does not, in itself, require a finding that the use is not noninfringing.[159]

The legislative history provides significant detail concerning how to determine whether a sufficient showing of adverse effects has been made.[160]  Throughout the six rulemakings, the Office has equated the House Manager's Report's characterization of the necessary showing being one of "substantial adverse impact" or "substantial diminution of [the availability of works in the marketplace for noninfringing uses]," to the standard articulated by the Commerce Committee, that "the rulemaking proceeding should focus on distinct verifiable and measurable impacts" and "not . . . *de minimis* impacts."[161]  The Office has explained that "[s]tating that there is a requirement of 'substantial' adverse impact is another way of saying that a showing of more than 'de minimis impacts' is required."[162]  Likely adverse impacts must be more than speculative or theoretical harms, and the Office has noted the House Manager's Report statement that "mere inconveniences, or individual cases . . . do not rise to the level of a substantial adverse impact."[163]  The Office has also noted the report's statement that "the determination should be based upon anticipated, rather than actual, adverse impacts, only in extraordinary circumstances in which the evidence of likelihood of future adverse impact during that time period is highly specific, strong, and persuasive."[164] Thus, the Office evaluates whether there are adverse effects on noninfringing uses based

---

[157] 2015 Recommendation at 14–15; 2012 Recommendation at 7.

[158] 2015 Recommendation at 15 (citing 17 U.S.C. § 1201(a)(1)(C)); *see also* 2012 Recommendation at 7; 2010 Recommendation at 11–12.

[159] 2015 Recommendation at 15; 2012 Recommendation at 7; 2010 Recommendation at 12.

[160] *See* COMMERCE COMMITTEE REPORT at 36–38; HOUSE MANAGER'S REPORT at 6–7.

[161] COMMERCE COMMITTEE REPORT at 37; HOUSE MANAGER'S REPORT at 6; *see also* 2012 Recommendation at 7; 2010 Recommendation at 10; 2006 Recommendation at 8; 2003 Recommendation at 16–18; 2000 Recommendation and Final Rule at 64,558 n.4.

[162] 2003 Recommendation at 16–17; *see also* 2012 Recommendation at 7; 2010 Recommendation at 10; 2006 Recommendation at 8.

[163] HOUSE MANAGER'S REPORT at 6; *see also* 2012 Recommendation at 8 & n.37; 2003 Recommendation at 17.

[164] HOUSE MANAGER'S REPORT at 6.

LOC_AR_00003262

"on the totality of the evidence, including market alternatives to circumvention that enable noninfringing uses."[165]

*Statutory Factors.*  The statute sets forth a list of factors that must be examined during the rulemaking,[166] and the Office has characterized these factors as delineating the "nature of the inquiry for the rulemaking process as a whole"[167] and "reflect[ing] some of the significant considerations that must be balanced" in reaching a determination to grant or deny an exemption.[168]  As explained in the first proceeding, "[u]ltimately, the task [of the] rulemaking proceeding is to balance the benefits of technological measures that control access to copyrighted works against the harm caused to users of those works, and to determine, with respect to any particular class of works, whether an exemption is warranted because users of that class of works have suffered significant harm in their ability to engage in noninfringing uses."[169]

While the first four factors are more circumscribed and echo other provisions in the Copyright Act,[170] the fifth factor has been described as a "'catchall' provision."[171]  By way of example, the Register, NTIA, and the Librarian have previously considered such additional issues as interoperability, consumer choice, competition, and cybersecurity under this factor.[172]  In the sixth rulemaking, in connection with petitions to exempt new circumvention activities relating to vehicles, security research, and medical and other consumer devices, participants submitted comments raising a wide variety of significant safety, security, environmental, and health concerns under the fifth factor.[173]  While noting "this rulemaking is principally focused on the copyright concerns implicated by any proposed exemption," due to the "serious policy concerns" raised in discussion of these classes, the Register recommended, and the Librarian adopted, a delayed

---

[165] 2010 Recommendation at 13.

[166] 17 U.S.C. § 1201(a)(1)(C).

[167] 2006 Recommendation at 5; 2003 Recommendation at 6.

[168] 2000 Recommendation and Final Rule at 64,563; *see also* 2012 Recommendation at 9; 2010 Recommendation at 7; 2003 Recommendation at 6.

[169] 2000 Recommendation and Final Rule at 64,563.

[170] *See, e.g.*, 17 U.S.C. § 108 (limitation on exclusive rights for uses by libraries or archives); *id.* § 107 (providing that the fair use of a work for "purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright" and directing consideration of "the effect of the use upon the potential market for or value of the copyrighted work").

[171] 2015 Recommendation at 311.

[172] *See, e.g.*, *id.* at 168; 2010 Recommendation at 205; 2006 Recommendation at 52.

[173] *See* 2015 Recommendation at 241–44, 311–15.

LOC_AR_00003263

implementation of twelve months for these exemptions so that other regulatory agencies with expertise in these relevant areas could take action if necessary.[174]

## C. Case Law Developments

Several aspects of section 1201 have been the subject of litigation over the past two decades.  Many of these cases have addressed the meaning and scope of the protections for access controls under section 1201(a), while others have considered the anti-trafficking provisions, permanent exemptions, and constitutional issues.

Although the United States has consistently interpreted section 1201 as creating a cause of action separate and independent from copyright infringement, courts construing the statute to date have divided over its relationship to the traditional rights of copyright owners.  There currently is a circuit split as to whether a violation of the access-control provisions under section 1201(a) requires a "nexus" to infringement—*i.e.*, that the circumvention be done for the purpose of, or otherwise relate to, infringing an exclusive right under section 106 of the Copyright Act.  This issue has particular significance in the context of copyrighted computer programs embedded in everyday consumer products.

In 2004, the Federal Circuit held in *Chamberlain Group, Inc. v. Skylink Technologies, Inc.* that there must be a "reasonable relationship" between the access gained by the circumvention and the protections conferred by section 106.[175]  Chamberlain's garage door openers contained copyrighted software controlling operation of the motor.  The software included a "rolling code," which prevented the system from activating unless it received a signal from an authorized transmitter.[176]  Chamberlain alleged that Skylink's manufacture and sale of "universal transmitters," which circumvented the rolling code and accessed the copyrighted software, violated the anti-trafficking provisions of section 1201(a)(2).[177]  The court, however, rejected that claim, holding that section 1201 did not create a new property right, but rather, "introduce[d] new grounds for liability in the context of the unauthorized access of copyrighted material."[178]  The court further stated that "circumvention *is not* a new form of infringement but rather a new violation prohibiting actions or products that facilitate infringement."[179]  The court also expressed

---

[174] *See id.* at 248, 317–18 ("The Register also recommends a delay of twelve months before the exemption goes into effect to allow other agencies with expertise in vehicle safety, environmental issues, and other relevant areas an opportunity to consider and react to the new rule.").

[175] 381 F.3d 1178, 1202 (Fed. Cir. 2004).

[176] *Id.* at 1183.

[177] *Id.* at 1186–87.

[178] *Id.* at 1192, 1194.

[179] *Id.* at 1197.

LOC_AR_00003264

policy concerns, including the view that without an infringement nexus requirement, section 1201(a) would result in anticompetitive conduct unrelated to copyright concerns.[180]  The court ultimately held that the Copyright Act granted consumers "the right to use the copy of Chamberlain's embedded software that they purchased" and, therefore, in the absence of copyright infringement or facilitating copyright infringement, the defendant could not be liable for a section 1201(a)(2) trafficking violation.[181]

In 2010, the Fifth Circuit in *MGE UPS Systems, Inc. v. GE Consumer & Industrial, Inc.*, relied on *Chamberlain* to conclude that "[t]he DMCA prohibits only forms of access that would violate or impinge on the protections that the Copyright Act otherwise affords copyright owners."[182]  The United States, however, urged rehearing on the ground that that construction was "inconsistent with the text, structure, and legislative history of the DMCA."[183]  Such a reading, the United States argued, "threatens to frustrate Congress's purpose in section 1201(a)(1), which was to provide a federal prohibition against bypassing passwords, encryption, and other technologies that regulate access to a copyrighted work in circumstances in which the copyright owner would *not* otherwise have a remedy under the Copyright Act."[184]  The court subsequently withdrew its opinion and substituted an opinion omitting the challenged portion of the original.[185]

Later that year, the Ninth Circuit expressly declined to follow *Chamberlain* and instead rejected a nexus requirement as "contrary to the plain language of the statute."[186]  In *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, the court held MDY liable under section 1201(a)(2) for trafficking in technology in the form of a self-playing bot, which was designed to circumvent a technological control on a video game sold by Blizzard.[187]  In rejecting the reasoning of *Chamberlain*, the Ninth Circuit looked to both the statutory text and its legislative history.  Among other textual considerations, the court noted that section 1201(a) refers to technological measures protecting access to "a work protected under this title," while section 1201(b) refers to measures protecting "a right of a

---

[180] *Id.* at 1200–01.

[181] *Id.* at 1203–04.

[182] 612 F.3d 760, 765 (5th Cir. 2010) (citing *Chamberlain*, 381 F.3d at 1202).

[183] Brief for the United States as Amicus Curiae Supporting Rehearing at 3, *MGE UPS Sys., Inc. v. GE Consumer and Indus., Inc.*, 622 F.3d 361 (5th Cir. 2010) (No. 08-10521).

[184] *Id.*

[185] *MGE UPS Sys., Inc. v. GE Consumer and Indus., Inc.*, 622 F.3d 361, 363 (5th Cir. 2010).

[186] *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 950 (9th Cir. 2010).

[187] *Id.* at 954.

LOC_AR_00003265

copyright owner under this title."[188]  The court read this distinction to indicate that Congress intended section 1201(a) to "extend[] a new form of protection, i.e., the right to prevent circumvention of access controls, broadly to . . . copyrighted works."[189]  Section 1201(b), meanwhile, was intended "to reinforce copyright owners' traditional exclusive rights under § 106 by granting them an additional cause of action against those who traffic in circumventing devices that facilitate infringement."[190]

With respect to legislative history, the court highlighted the Senate Judiciary Committee's statement that it would violate section 1201(a) to bypass a password to access a copyrighted work—an act that the court said "would not infringe on any of the copyright owner's exclusive rights under § 106."[191]  The court acknowledged the policy concerns that the *Chamberlain* court discussed, but found those concerns to be overstated and that, in any event, they could not trump the statute's plain language and structure.[192]

The Sixth Circuit also has considered section 1201(a), but resolved the case before it on a separate question, holding that a TPM on software controlling printer functionality was not an access control as contemplated by section 1201.[193]  In *Lexmark International, Inc. v. Static Control Components, Inc.*, Lexmark brought section 1201(a)(2) claims against the manufacturer of a microchip used to make third-party toner cartridges compatible with Lexmark printers.  The microchip accomplished this by satisfying an authentication sequence used to prevent the printer's software from operating with non-authorized cartridges.[194]  The court rejected Lexmark's claims, holding that because a purchaser of the printer could read the relevant code directly from the printer memory without circumventing the authentication sequence, there was no effective technological measure controlling access to the program.[195]  The court emphasized that its decision did not turn on "the *degree* to which a measure controls access to a work," noting that an access control need not amount to an "impervious shield" to be "effective[]" under the statute.[196]  Instead, its decision was based "on the textual requirement that the

---

[188] *Id.* at 944–45.

[189] *Id.* at 945.

[190] *Id.*

[191] *Id.* at 947 (citing SENATE JUDICIARY COMMITTEE REPORT at 12).

[192] *MDY*, 629 F.3d at 950–51.

[193] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 546–47, 549 (6th Cir. 2004).

[194] *Id.* at 530–31.

[195] *Id.* at 547 ("Just as one would not say that a lock on the back door of a house 'controls access' to a house whose front door does not contain a lock . . . it does not make sense to say that this provision of the DMCA applies to otherwise-readily accessible copyrighted works.").

[196] *Id.* at 549.

LOC_AR_00003266

challenged circumvention device must indeed circumvent *something*, which did not happen with the Printer Engine Program."[197]

Turning to other enforcement efforts, in *Universal City Studios v. Reimerdes*, film studios brought suit to enjoin websites from posting or linking to a computer program, DeCSS, that circumvented an encryption system, CSS, employed to prohibit access to motion pictures contained on DVDs.[198]  The district court examined a number of issues, including whether CSS effectively controlled access to copyrighted works,[199] whether DeCSS was designed primarily to circumvent CSS,[200] whether linking could constitute trafficking,[201] whether any statutory exemptions or the fair use doctrine applied,[202] and whether section 1201, as applied to posting and linking to DeCSS, was in violation of the First Amendment.[203]  In the end, the court upheld the statute and found that the defendants' activities violated the anti-trafficking provisions of section 1201.[204]  On appeal, the Second Circuit, focusing on the constitutional challenges, affirmed.[205] Notably, in disposing of the defendants' argument that section 1201 effectively eliminated fair use, the court, among other points, stated that "[f]air use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original."[206]

Additionally, after the Office commenced this study, past rulemaking participants including the Electronic Frontier Foundation ("EFF") filed a lawsuit challenging the constitutionality of section 1201(a) and (b) on First Amendment grounds and under the

---

[197] *Id.*  In a separate concurrence, Judge Merritt advocated a reading similar to that adopted in *Chamberlain*.  Citing section 1201(a)(2)'s reference to circumvention technology "primarily designed or produced for the purpose of circumventing," he argued that the statute was intended to reach only "those who circumvented protective measures 'for the purpose' of pirating works protected by the copyright statute" and that "[u]nless a plaintiff can show that a defendant circumvented protective measures for such a purpose, its claim should not be allowed to go forward."  *Id.* at 551–52 (Merritt, J., concurring) (citing 17 U.S.C. § 1201(a)(2)).

[198] *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 303 (S.D.N.Y. 2000), *judgment entered*, 111 F. Supp. 2d 346 (S.D.N.Y. 2000), *aff'd sub nom. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

[199] *Reimerdes*, 111 F. Supp. 2d at 317–18.

[200] *Id.* at 318–19.

[201] *Id.* at 324–25.

[202] *Id.* at 319–24.

[203] *Id.* at 325–41.

[204] *Id.* at 317–25, 346.

[205] *Corley*, 273 F.3d at 434–35.

[206] *Id.* at 459.

33

LOC_AR_00003267

APA.[207]  That lawsuit remains pending as the court considers a motion to dismiss the complaint filed by the Department of Justice.

## D. Unlocking Consumer Choice and Wireless Competition Act

In addition to case law, there also has been a recent legislative change to section 1201.  In 2014, in response to public calls for a broader exemption to allow the circumvention of technological measures controlling access to computer programs that allow wireless telephone handsets to connect to wireless communication networks ("cellphone unlocking"),[208] Congress passed the Unlocking Consumer Choice and Wireless Competition Act ("Unlocking Act").[209]  The Unlocking Act reinstated the cellphone unlocking exemption adopted by the Librarian in 2010,[210] replacing the narrower version adopted in 2012,[211] and directed the Librarian to consider in the 2015 rulemaking whether to "extend" the exemption "to include any other category of wireless devices in addition to wireless telephone handsets."[212]

The Unlocking Act also permanently established that circumvention under any exemption to permit a wireless telephone handset or other wireless device to connect to a different telecommunications network may be initiated by the owner of the handset or device, "by another person at the direction of the owner, or by a provider of a

---

[207] *See* Compl. for Declaratory and Injunctive Relief, *Green v. Lynch*, No. 16-cv-1492 (D.D.C. July 21, 2016), ECF No. 1.

[208] *See* Ezra Mechaber, *Here's How Cell Phone Unlocking Became Legal*, THE WHITE HOUSE: PRESIDENT BARACK OBAMA (Aug. 15, 2014), https://obamawhitehouse.archives.gov/blog/2014/08/15/heres-how-cell-phone-unlocking-became-legal.

[209] Pub. L. No. 113-144, 128 Stat. 1751 (2014).  Subsequently, the Librarian adopted regulatory amendments to reflect the new legislation.  Exemption to Prohibition on Circumvention of Copyright Protection Systems for Wireless Telephone Handsets, 79 Fed. Reg. 50,552 (Aug. 25, 2014).

[210] *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 75 Fed. Reg. 43,825, 43,828–32 (July 27, 2010) ("2010 Final Rule").

[211] *See* Unlocking Act § 2(a), 128 Stat. at 1751.  Based on the insufficient record in the 2012 rulemaking proceeding, the Librarian permitted the unlocking of older, or "legacy" phones, but did not extend the exemption with respect to new phones acquired 90 days after the rule went into effect.  Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 77 Fed. Reg. 65,260, 65,264–66 (Oct. 26, 2012) ("2012 Final Rule").

[212] Unlocking Act § 2(b), 128 Stat. at 1751.  On the Register's recommendation, the Librarian granted additional exemptions for tablets and other types of wireless devices in the 2015 proceeding.  *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 80 Fed. Reg. 65,944, 65,952, 65,962–63 (Oct. 28, 2015) ("2015 Final Rule").

LOC_AR_00003268

commercial mobile radio service or a commercial mobile data service at the direction of such owner or other person," so long as the purpose is to enable the owner or a family member to connect to a wireless network in an authorized manner.[213]

## E. International Obligations

Beyond the WIPO Internet Treaties discussed above, multiple free trade agreements ("FTA"s) to which the United States is a party require signatory countries to provide legal protections against both circumvention conduct and trafficking.[214]  Several of these agreements require that a violation of such a protection constitute a separate cause of action that is independent of any infringement that might occur under the party's copyright law.[215]  All but two address the adoption of exceptions and limitations to such protections, and most contain language providing that contracting parties "shall confine" exceptions and limitations to a list of specified activities.  That list tracks the current U.S. statutory framework; it includes the categories covered by the permanent exemptions under section 1201(d)–(j), as well as temporary exemptions to the anticircumvention provision that are adopted in a legislative or administrative proceeding.[216]

More recently, the Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled ("Marrakesh Treaty") seeks to guarantee appropriate limitations on member states' anticircumvention provisions.  It requires contracting parties to "take appropriate measures, as necessary," to ensure that any legal protection they establish for TPMs does not prevent enjoyment of the copyright exceptions and limitations provided for in the treaty, which include permitting the reproduction, distribution, and making available of works in formats accessible to print-disabled persons, as well as the cross-border exchange of such works.[217]  The United States is a signatory to the treaty, which entered into force in September 2016,[218] but it has not yet been ratified by the Senate.

---

[213] Unlocking Act § 2(c), 128 Stat. at 1751–52; *see also* 37 C.F.R. § 201.40(b)(3) (2012).

[214] *See, e.g.*, United States-Korea Free Trade Agreement, U.S.-S. Kor., art. 18.4.7, June 30, 2007, 46 I.L.M. 642 ("KORUS FTA"); United States-Panama Trade Promotion Agreement, U.S.-Pan., art. 15.5.7, June 28, 2007 ("Panama TPA").

[215] *See, e.g.*, KORUS FTA, art. 18.4.7(c); Panama TPA, art. 15.5.7(c).

[216] *See, e.g.*, KORUS FTA, art. 18.4.7(d), (e) (allowing temporary exemptions "when an actual or likely adverse impact on those noninfringing uses" is demonstrated in a proceeding).

[217] Marrakesh Treaty, art. 7, June 27, 2013, 52 I.L.M. 1312.

[218] *Marrakesh Notification No. 21*, WIPO (Sept. 30, 2016), http://www.wipo.int/treaties/en/notifications/marrakesh/treaty_marrakesh_21.html.

LOC_AR_00003269

# III.   PROPOSED STATUTORY REFORM

Stakeholders suggested a number of potential statutory reforms to section 1201 relating to the overall scope of the protections for access controls, the anti-trafficking provisions, and the permanent exemptions.  The Copyright Office has carefully considered these proposals, as discussed below.  Issues relating to the triennial rulemaking, including potential statutory reforms relating to that process, are discussed separately in section IV.

## A. Scope of Section 1201(a)

Section 1201(a) establishes the statute's protections for access controls, with section 1201(a)(1) barring the act of circumventing such measures and section 1201(a)(2) proscribing trafficking in circumvention devices and services.  In the years since the DMCA's enactment, there has been substantial disagreement over whether the scope of these provisions is properly drawn.  Pointing to the dramatic rise in the number and variety of internet-based content dissemination platforms, copyright owners have argued that section 1201(a) has succeeded in encouraging rightsholders to make their works available to consumers online, as Congress intended.  At the same time, other stakeholders have contended that the statute sweeps in circumvention activities that do not implicate any legitimate copyright interest.  In their view, the result of this overbreadth has been to chill numerous desirable activities, including market competition, free speech, and access to copyrighted works for preservation and educational purposes.

### 1.  Policy Considerations

#### a.  Effect on Marketplace

##### i.   *Development of New Dissemination Models*

Commenters representing creative industries argued that section 1201 has contributed significantly to the explosive growth in legitimate digital content delivery services.  In joint comments, the Association of American Publishers ("AAP"), the Motion Picture Association of America ("MPAA"), and the Recording Industry Association of America ("RIAA") provided several examples of business models developed after the enactment of section 1201 that provide consumers with a variety of flexible options for accessing creative works.  For example, they noted that in the movie and television industries, consumers can now access content on a multitude of devices via services such as Amazon Prime, Hulu, iTunes, and Netflix.[219]  They also cited the development of

---

[219] AAP, MPAA & RIAA Initial Comments at 4–6.

LOC_AR_00003270

numerous services in the music industry—including Apple Music, AmazonMP3, Google Play, Pandora, and Spotify—that have resulted in a significant increase in digital dissemination of music through authorized platforms.[220]  Likewise, the Entertainment Software Association ("ESA") observed that the video game industry has grown exponentially in recent years and that game publishers rely on TPMs to enable distribution through physical media, downloadable files, and live streaming while protecting against infringement.[221]

Other commenters questioned whether section 1201 truly has had a meaningful impact on the copyright marketplace.  Some argued that copyright owners who attribute market benefits to section 1201 "mistake[] correlation for causation" and suggested that "[j]ust because TPMs are important for a particular business model doesn't mean that the TPMs would be ineffective absent legal protection for those TPMs."[222]  A few called into question the importance of TPMs themselves, citing examples of successful digital platforms that disseminate content without such protections.[223]  Some also suggested that section 1201's purported effectiveness is questionable in light of copyright owners' complaints that "online infringement is devastating their industries."[224]

In response, copyright industries argued that the legal protections afforded by section 1201 have played a critical role in their decisions to enter emerging digital markets.  As one entertainment company representative noted, "[w]hen we make decisions about what products to make available in the marketplace, either in the United States or in

---

[220] *Id.* at 8–9; *see also* Tr. at 15:05–08 (May 25, 2016) (Chertkof, RIAA) ("It's been well publicized in the music industry that the industry is shifting from an ownership model to an access model and that access is really kind of where all the growth is.").

[221] ESA Initial Comments at 3–5.

[222] Library Copyright Alliance ("LCA") Initial Comments at 2; *see also, e.g.,* Tr. at 20:10–12 (May 25, 2016) (Lerner, Int'l Documentary Ass'n, Film Indep. & Kartemquin Educ. Films ("Joint Filmmakers I")) ("I don't see a correlation between the legal protections of 1201 and the models that [the MPAA] and [RIAA are] talking about . . . .").

[223] *See, e.g.,* EFF Initial Reply Comments at 4 ("For example, music downloads from Apple's iTunes store are unencrypted, as are videos and music streamed from YouTube and Bandcamp. Humble Bundle and Vodo sell games, ebooks, fonts, and other creative content without TPMs."); Tr. at 24:13–17 (May 25, 2016) (Riley, Mozilla) (noting that in the music industry, "user frustration with DRM [digital rights management] led to more and more non-DRM, non-encrypted downloads being made available subject to the same legal prohibitions on redistribution").

[224] Public Knowledge Initial Comments at 1–2; *see also* Tr. at 20:15–17 (May 25, 2016) (Lerner, Joint Filmmakers I) ("I think it's important to look also at whether 1201 has created a dent in online infringement, and I would argue that it has not.").

LOC_AR_00003271

foreign countries, we're looking at not only the technology that's available . . . but also the efficacy of the legal regime in that space as well."[225]

### ii. Consumer Issues

Notwithstanding these potential market benefits, many stakeholders expressed concern over section 1201's effect on competition and traditional consumer expectations. In their view, efforts to enforce access controls on products such as garage door openers and printer cartridges are aimed not at protecting any copyright interest in those products' operating software, but at excluding competitors from the market for compatible parts and repair services.[226] Such uses, they argued, are far removed from the piracy concerns that Congress had in mind when it enacted section 1201.[227] Some commenters further opined that the use of section 1201 for these purposes is of particular concern at a time when software has become a common feature in all manner of everyday products. As the Consumers Union opined, "[t]hese anti-consumer effects will take on a new, breathtaking order of magnitude as more and more consumer products become part of the Internet of Things."[228]

Other commenters expressed a related concern over the statute's effect on consumers' traditional expectation of control over their personal property. In the automotive

---

[225] Tr. at 204:02–08 (May 25, 2016) (Reed, Fox Entm't Grp.); *see also, e.g.*, Tr. at 22:23–25 (May 19, 2016) (Dow, Walt Disney Co.) ("I can tell you that the availability of these legal tools has been directly relevant to the decisions to get into these markets, whether it was the development of AACS as a next-generation standard for the protection of high definition digital content, whether it's the willingness to get into the market for 4K, whether it's the willingness to get into the market for over-the-top television and authenticated television to allow people to do streaming, the DMCA has been a factor in the willingness to engage in all of those things.").

[226] *See, e.g.*, Auto Care Ass'n ("Auto Care") Initial Comments at 2 (stating that *Chamberlain* and *Lexmark* plaintiffs "misue[d] Section 1201 . . . by invoking laws intended to protect copyrighted works for the purpose of locking out competition for non-copyrightable parts and services"); EFF Initial Comments at 6 ("Lawsuits, and the threat of lawsuits, under Section 1201 are often misused for anti-competitive purposes, such as to enforce incompatibility between electronic devices that must interact with one another . . . ."); New America's Open Tech. Inst. ("OTI") Initial Comments at 3–4 ("There are numerous examples of companies using Section 1201 for this type of anti-competitive behavior . . . .") (citing *Lexmark*, 387 F.3d 522, *Chamberlain*, 381 F.3d 1178, and *Datel Holdings, Ltd. v. Microsoft Corp.*, 2010–2 Trade Cas. (CCH) P77, 192 (N.D. Cal. 2010)).

[227] Ctr. for Democracy and Tech. ("CDT") Initial Comments at 2–3; OTI Initial Comments at 3–4.

[228] Consumers Union Initial Comments at 1; *see also* Kernochan Ctr. for Law, Media & the Arts ("Kernochan Center") Initial Comments at 3 ("[I]t is unlikely that [Congress] anticipated the vast range of products now governed by computer programs or the potential for products manufacturers to use the DMCA to control the markets for replacement parts or repair services.").

LOC_AR_00003272

context, for example, consumer groups noted that a large and increasing number of functions in modern vehicles are controlled by onboard computer systems, making it necessary to access those programs to perform various diagnostic, repair, and modification activities.[229]  By prohibiting circumvention even for these purposes, they argued, section 1201(a)(1) deters consumers from engaging in activities long understood to be within the scope of their personal property rights.[230]

Few copyright owners disputed that applying section 1201 to activities like these could expand the statute's reach beyond the conduct that Congress intended to target.  They argued, however, that this concern is overstated as a practical matter and does not justify legislative change.  Several noted that the courts in *Chamberlain* and *Lexmark* ultimately rejected the plaintiffs' attempts to rely on section 1201 to control markets in consumer devices.[231]  Beyond that, they argued, the permanent exemptions for reverse engineering, encryption research, and security testing, together with the triennial rulemaking process, adequately accommodate circumvention activities in which there is a substantial consumer interest.[232]  One commenter further suggested that the market itself mitigates against anticompetitive uses, citing an example in which a manufacturer backed away

---

[229] *See* 2015 Recommendation at 218 ("As modern vehicles have become more reliant on software to operate, a wide variety of diagnostic, repair and modification activities now require access to and sometimes alteration of those computer programs, including identifying malfunctions, installing replacement parts, and customizing vehicles for specialized uses.") (citing 2015 Rulemaking EFF Vehicle Software – Modification & Repair Pet. at 2, https://www.copyright.gov/1201/2014/petitions/Electronic_Frontier_Foundation_3_1201_Initial_Submission_2014.pdf).

[230] *See, e.g.*, Am. Auto. Ass'n ("AAA") Initial Reply Comments at 2 (contending section 1201 interferes with the "do-it-yourself repair and personalization" that is "a critical element of the American car culture"); iFixit Initial Comments at 1–2; Owners' Rights Initiative ("ORI") Initial Comments at 2; Tr. at 34:12–21 (May 19, 2016) (Band, LCA) ("[T]here's no policy reason within the confines of . . . Title 17 for there to be any restrictions on a person's ability to access their own property, their own copies."); *see also* Pamela Samuelson, *Freedom to Tinker* 23, THEORETICAL INQUIRES IN LAW (forthcoming), https://ssrn.com/abstract=2800362 ("Oddly enough, tinkerers who plan to make non-infringing uses of technically protected works are more likely to be deterred by the anti-circumvention laws than those who tinker to infringe.").

[231] *See* ESA Initial Comments at 8 (noting that "the courts have found sufficient flexibility in Section 1201 to address competitive concerns expressed as to cases arising from factual scenarios outside the usual core of copyright protection"); Software & Info. Indus. Ass'n ("SIIA") Initial Comments at 6 (noting that "attempts to apply the DMCA to secondary markets in printer cartridges [*Lexmark*], garage door openers [*Chamberlain*], and similar devices have failed"); Tr. at 69:10–15 (May 25, 2016) (Chertkof, RIAA) ("[S]o far it seems like the courts have gotten it right and so a lot of the worry of the over-reaching seems a little bit like a solution in search of a problem because the courts are coming to the right answers so far.").

[232] *See* ESA Initial Comments at 7–8; SIIA Initial Comments at 6; AAP, MPAA & RIAA Initial Reply Comments at 1.

LOC_AR_00003273

from efforts to use DRM in its coffee makers following "almost universal condemnation" of the proposal, including "consumer complaints and press scrutiny."[233]

Others disagreed, contending that manufacturers continue to employ section 1201(a) as a tool to protect non-copyright-related business interests. Two commenters mentioned that the prepaid wireless service provider TracFone has brought section 1201 actions against companies engaged in the bulk unlocking and resale of its unused handsets.[234] User groups also pointed to statements in the 2015 rulemaking by manufacturers in opposition to proposed exemptions for vehicle repair[235] and the use of third-party feedstock for 3D printers.[236] Such statements, EFF argued, "suggest that . . . anti-competitive misuse of the statute will continue."[237]

### b. Effect on Speech

Some commenters argued that section 1201(a) burdens their ability to utilize copyrighted works for purposes of criticism, commentary, or other speech protected under the fair use doctrine. They expressed particular concern over this effect in the context of "merged" access and copy controls, or TPMs that serve the dual function of restricting access to a work and preventing acts within the copyright owner's exclusive rights, such as copying. For example, the Content Scramble System ("CSS"), which is used to encrypt material on DVDs, both controls access to works—by requiring the use of an appropriately configured player or computer drive to decrypt and play back the content—and prevents them from being copied.[238]

---

[233] Tr. at 81:09–12 (May 25, 2016) (Sheffner, MPAA); *see also* Alex Hern, *Keurig Takes Steps Towards Abandoning Coffee-Pod DRM*, THE GUARDIAN (May 11, 2015), https://www.theguardian.com/technology/2015/may/11/keurig-takes-steps-towards-abandoning-coffee-pod-drm.

[234] Inst. of Scrap Recycling Indus., Inc. ("ISRI") Initial Comments at 5; EFF Additional Comments at 3–4 (citing *TracFone Wireless v. GSM Group*, 555 F. Supp. 2d 1331 (S.D. Fla. 2008)).

[235] EFF Initial Comments at 6 & n.24 (citing 2015 Rulemaking Eaton Corp. Class 21 Opp'n at 2, https://www.copyright.gov/1201/2015/comments-032715/class%2021/Eaton_Corporation_Class21_1201_2014.pdf, 2015 Rulemaking Ass'n of Global Automakers Class 21 Opp'n at 7, and 2015 Rulemaking John Deere Class 21 Opp'n at 4, https://www.copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf).

[236] Tr. at 75:23–76:05 (May 19, 2016) (Panjwani, Public Knowledge); *see also* 2015 Rulemaking Stratasys, Ltd., Class 25 Opp'n, https://www.copyright.gov/1201/2015/comments-032715/class%2026/STRATASYS_Class26_1201_2014.pdf.

[237] EFF Initial Comments at 6.

[238] *See, e.g.*, *Reimerdes*, 111 F. Supp. 2d at 308 ("CSS . . . is an access control and copy prevention system for DVDs . . . .").

LOC_AR_00003274

These commenters reported that copyright owners employ merged TPMs to make it unlawful for users to engage in circumvention for purposes of making copies of works to which they already have lawful access, even where the copying constitutes fair use. Documentary filmmakers, for example, noted that they "have sought not to circumvent access controls in the sense of a password or control that affects playback, but to make copies in order to engage in a lawful use."[239]  In the view of these groups, the use of merged TPMs thwarts Congress' determination that the act of circumventing a copy control should remain permissible.[240]

### c.  Effect on Library, Archival, and Educational Activities

Representatives of libraries, archives, and educational institutions contended that section 1201(a) impedes circumvention activities that are central to their public service missions, notwithstanding the express exemption of certain activities by such entities in section 1201(d).  Library groups noted that their work increasingly involves the preservation of "born digital" materials (*e.g.*, video games) stored in older computer formats.  MIT Libraries, MIT Press, and the MIT Office of Digital Learning (collectively, "MIT") stated that "when using widely deployed tools for copying digital media" for use in such programs, "it is often very difficult to detect whether technological protection measures . . . exist, so it is not always clear when one could be violating the DMCA."[241]  Similarly, a group of higher education associations reported that this uncertainty has led online education providers to forego use of materials that they otherwise would have made available to students.[242]

---

[239] Joint Filmmakers I Initial Comments at 16; *see also* Org. for Transformative Works ("OTW") Initial Comments at 5 ("Remixers . . . don't circumvent to get access they would otherwise lack; they circumvent so that they can make short clips for their communicative purposes . . . .").

[240] *See, e.g.*, Joint Filmmakers I Initial Comments at 16 ("Such controls allow rightsholders to undermine Congress's statutory scheme, because by simply combining use controls with access controls, they can prevent other users from making lawful use of a work."); Tr. at 138:06–11 (May 19, 2016) (Tushnet, OTW) ("So I think we have to recognize that at this point, access and rights controls have been merged by actors making strategic use of 1201 so that the balance that Congress did intend in distinguishing access from rights controls is now gone."); Tr. at 43:03–07 (May 19, 2016) (Panjwani, Public Knowledge).

[241] MIT Initial Comments at 3.

[242] Ass'n of Am. Univs., the Am. Council on Educ., the Ass'n of Pub. and Land-Grant Univs. & EDUCAUSE ("AAU, ACE, APLU & EDUCAUSE") Initial Comments at 8; *see also* MIT Initial Comments at 3 ("Although it is difficult to quantify missed opportunities, at MIT we have had to set aside materials from educational sharing due to the ambiguities regarding the existence of TPMs and, for faculty and researchers, the threat of criminal penalty looming over even the best-intended and well-informed use of digital media.").

LOC_AR_00003275

### 2. Proposed Changes

#### a. Statutory Nexus Requirement

Many commenters argued that the simplest and most effective way to address the foregoing concerns would be for Congress to amend section 1201(a) to expressly require a nexus between circumvention of an access control and copyright infringement.[243]  This approach essentially would codify the Federal Circuit's holding in *Chamberlain*—that the statute "prohibits only forms of access that bear a reasonable relationship to the protections that the Copyright Act otherwise affords copyright owners."[244]  One specific proposal to implement such a requirement is the Unlocking Technology Act, a bill introduced in recent Congresses.[245]  It would provide that it is not a violation of section 1201 to circumvent an access control "if the purpose of such circumvention is to engage in a use that is not an infringement of copyright under this title."[246]  Supporters contended that this categorical approach "would eliminate the need for" statutory or regulatory exemptions for specific lawful uses, "whether for repair, for security research, for fair uses, or for accessibility."[247]

The Copyright Office shares the concern that section 1201(a)'s protections for access controls have the potential to implicate activities far outside the traditional scope of copyright law.[248]  The Office does not, however, believe enacting an infringement nexus requirement to be advisable, as it could severely weaken the right of copyright owners

---

[243] *See, e.g.,* AAU, ACE, APLU & EDUCAUSE Initial Comments at 13; EFF Initial Comments at 2–3; Public Knowledge Additional Comments at 1.

[244] *Chamberlain*, 381 F.3d at 1202.  As noted, the United States disagrees with that construction of section 1201(a).  *See supra* p. 31.

[245] Unlocking Technology Act of 2015, H.R. 1587, 114th Cong. (2015); Unlocking Technology Act of 2013, H.R. 1892, 113th Cong. (2013).

[246] Unlocking Technology Act of 2015, H.R. 1587, 114th Cong. § 2(a)(1)(B) (2015); Unlocking Technology Act of 2013, H.R. 1892, 113th Cong. § 2(a)(1)(B) (2013).

[247] Public Knowledge Additional Comments at 1; *accord* Univ. of Va. Libraries Initial Comments at 2; EFF Additional Comments at 2; Repair Ass'n & iFixit Additional Comments at 5.

[248] *See* 2015 Recommendation at 2 ("While it is clear that section 1201 has played a critical role in the development of secure platforms for the digital distribution of copyrighted works, it is also the case that the prohibition on circumvention impacts a wide range of consumer activities that have little to do with the consumption of creative content or the core concerns of copyright."); *Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 29–30 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office) ("[C]onsumers have voiced discomfort that Section 1201 prevents them from engaging in activities, such as the repair of their automobiles and farm equipment, which previously had no implications under copyright law.").

LOC_AR_00003276

to exercise meaningful control over the terms of access to their works online—a right that both Congress and the Executive Branch have properly recognized as essential to the development of the digital marketplace for creative content.

In adopting section 1201(a), Congress intended to provide copyright owners with a new and independent right to prohibit the circumvention of TPMs used to prevent unauthorized access to their works.  The legislative history explains that section 1201(a) was designed to protect "the copyright owner's right to control access to his or her copyrighted work,"[249] and that that right was meant to be "distinct" from "the traditional copyright rights of the copyright owner" under section 106.[250]  The latter rights received protection not from section 1201(a) but from section 1201(b)'s prohibition on trafficking in devices and services primarily designed to circumvent copy controls.[251]  Underscoring this distinction, the House Judiciary Committee Report analogizes a section 1201(a)(1) violation to the act of "breaking into a locked room in order to obtain a copy of a book."[252]  As the Ninth Circuit in *MDY* correctly observed, "breaking into a locked room in order to read or view a copyrighted work would not infringe on any of the copyright owner's exclusive rights under § 106,"[253] as it would not necessarily involve an unauthorized reproduction, distribution, public performance or display, or derivative use of the work.[254]  The legislative history thus illustrates Congress' deliberate decision to make a section 1201(a)(1) violation complete upon circumvention of an access control, regardless of whether the circumventing party has committed or intends to commit an act that would infringe copyright.  In the words of the Department of Justice in opposing a nexus requirement on behalf of the United States, "[t]he entire point of that provision was to provide a federal prohibition against bypassing passwords, encryption, and other technologies that regulate access to a copyrighted work in circumstances in which the act of obtaining access would not by itself violate the copyright laws."[255]

Congress created this independent anticircumvention right for two principal reasons.  First, it determined that such a right was required by the WIPO Internet Treaties.  The

---

[249] SENATE JUDICIARY COMMITTEE REPORT at 28 (1998).

[250] *Id.* at 12.

[251] *Id.*

[252] HOUSE JUDICIARY COMMITTEE REPORT at 17; *see also* SENATE JUDICIARY COMMITTEE REPORT at 11 (describing the prohibition as "roughly analogous to making it illegal to break into a house using a tool, the primary purpose of which is to break into houses").

[253] *MDY*, 629 F.3d at 947.

[254] *See* 17 U.S.C. § 106.

[255] Brief for the United States as Amicus Curiae Supporting Rehearing at 8–9, *MGE*, 622 F.3d 361 (No. 08–10521).

LOC_AR_00003277

DMCA's legislative history clearly indicates Congress' view that compliance with the treaties would require adopting a prohibition on the act of circumventing access controls—conduct that was not previously unlawful under U.S. law.[256]  And as noted, Congress understood that activity to include circumventions lacking a nexus to infringement.

Second, as noted above, Congress recognized that the growth of the digital marketplace depends on copyright owners having the ability to enforce the terms they establish for online access to their works.[257]  In particular, Congress sought to facilitate the development of online content delivery platforms in which the consumer pays for *access* to copyrighted material rather than for possession of a copy.[258]  Section 1201(a) reflects Congress' understanding that such models will succeed only if copyright owners have the legal right to prohibit persons from evading electronic paywalls or other technical measures used to limit access to users who satisfy the rightsholder's specified terms.[259]  It also indicates Congress' recognition that in the online context, unauthorized access by itself poses a significant threat to the value of copyrighted works.

This understanding has been repeatedly endorsed by successive Administrations and subsequent Congresses.  The United States has concluded—and Congress has ratified[260]—several FTAs with other nations expressly requiring that a violation of a TPM

---

[256] *See supra* pp. 8–9.

[257] SENATE JUDICIARY COMMITTEE REPORT at 8; *see also* Brief for the United States as Amicus Curiae Supporting Rehearing at 9, *MGE*, 622 F.3d 361 (No. 08-10521) ("Congress determined that by prohibiting unauthorized access—separate from and in addition to unauthorized copying—it could give copyright owners the confidence to distribute their works in new and powerful ways (*e.g.*, streaming video over the internet, digital 'rentals' that expire after predetermined periods of time, music files playable only on certain devices, and so on).").

[258] *See* COMMERCE COMMITTEE REPORT at 23 ("[A]n increasing number of intellectual property works are being distributed using a 'client-server' model, where the work is effectively 'borrowed' by the user (e.g., infrequent users of expensive software purchase a certain number of uses, or viewers watch a movie on a pay-per-view basis).  To operate in this environment, content providers will need both the technology to make new uses possible and the legal framework to ensure they can protect their work from piracy.").

[259] *See* HOUSE JUDICIARY COMMITTEE REPORT at 10 ("In order to protect the owner, copyrighted works will most likely be encrypted and made available to consumers once payment is made for access to a copy of the work.  There will be those who will try to profit from the works of others by decoding the encrypted codes protecting copyrighted works, or engaging in the business of providing devices or services to enable others to do so.").

[260] *See* United States-Colombia Trade Promotion Agreement Implementation Act, Pub. L. No. 112-42, 125 Stat. 462 (2011); United States-Korea Free Trade Agreement Implementation Act, Pub. L. No. 112-41, 125 Stat. 428 (2011); United States-Panama Trade Promotion Agreement Implementation Act, Pub. L. No. 112-43, 125 Stat. 497 (2011); United States-Peru Trade Promotion

44

LOC_AR_00003278

protection be treated as a separate cause of action independent of any infringement of copyright.[261]  And as noted, the United States has also taken this position in litigation on this subject.[262]  Thus, providing distinct legal protection for access controls not only reflects the consistent policy judgment of both the Legislative and Executive Branches, but also constitutes a longstanding requirement under U.S. international agreements.

The Office sees no basis for departing from this obligation through adoption of an infringement nexus requirement.  Such a rule would substantially diminish copyright owners' ability to prevent widespread unauthorized access to their works.  Again, the *MDY* opinion is instructive:  "Descrambling or decrypting only enables someone to watch or listen to a work without authorization, which is not necessarily an infringement of a copyright owner's traditional exclusive rights under § 106."[263]  Yet this activity unquestionably harms the value of the work, and the damage compounds exponentially when the dissemination of circumvention tools enables it to occur on a vast scale.  Limiting section 1201(a) to circumvention or trafficking activity undertaken for the purpose of infringing or facilitating infringement could place such conduct beyond the statute's reach.[264]

This outcome would seem especially ill-advised now that access-based platforms have come to represent a major component of the copyright marketplace.  The dramatic growth of streaming services like Netflix, Spotify, Hulu, and many others suggests that

---

Agreement Implementation Act, Pub. L. No. 110-138, 121 Stat. 1455 (2007); United States-Oman Free Trade Agreement Implementation Act, Pub. L. No. 109-283, 120 Stat. 1191 (2006); United States-Bahrain Free Trade Agreement Implementation Act, Pub. L. No. 109-169, 119 Stat. 3581 (2006); Dominican Republic-Central America-United States Free Trade Agreement Implementation Act, Pub. L. No. 109-53, 119 Stat. 462 (2005); United States-Australia Free Trade Agreement Implementation Act, Pub. L. No. 108-286, 118 Stat. 919 (2004); United States-Morocco Free Trade Agreement Implementation Act, Pub. L. No. 108-302, 118 Stat. 1103 (2004); United States-Singapore Free Trade Agreement Implementation Act, Pub. L. No. 108-78, 117 Stat. 948 (2003).

[261] *See supra* note 215.

[262] *See supra* p. 31.

[263] 629 F.3d at 945.

[264] *See, e.g.*, AAP, MPAA & RIAA Initial Comments at 10 ("Someone who circumvents access controls (such as password protection or other forms of authentication) to watch . . . movies for free violates section 1201(a)(1)—even if circumvention does not facilitate copying because, for example, copy controls remain in place to prevent reproducing the movie."); Copyright Alliance Initial Reply Comments at 2 ("Prohibiting the circumvention of access controls is necessary since, in many cases, circumventing access controls like encryption or password protection may not amount to copyright infringement itself, yet can lead to the same type of harm as infringement . . . .").

LOC_AR_00003279

for both copyright owners and consumers, the offering of access—whether through subscriptions, *à la carte* purchases, or ad-supported services—has become a preferred method of delivering copyrighted content. As a representative of mobile app developers recently testified to Congress, "[t]he explosive growth in technological innovations and content delivery options prove that the DMCA has created an environment in which these things are possible."[265] In the Office's view, the law should continue to foster the development of such models. By reducing legal protection for the access controls upon which they rely, a nexus requirement could well have the opposite effect.

Some commenters responded to this concern by arguing that other laws would adequately protect copyright owners against circumvention for pure consumption purposes. The Office is not convinced, however, that these laws would fill the gap left by a narrowed section 1201(a). Some contended that circumvention for purposes of streaming a work might support a section 1201(a) claim even under a nexus requirement because the creation of a temporary RAM copy on the recipient's computer or device may constitute an infringing reproduction under section 106(1).[266] But while a RAM copy may qualify as a "copy" within the meaning of the Copyright Act, there are likely situations where no RAM copies are made.[267] Others maintained that accessing copyrighted material on a computer server without authorization could be actionable under the Computer Fraud and Abuse Act ("CFAA")—which provides a private right of action for unauthorized access to a computer—or state computer crime or commercial tort laws.[268] The CFAA, however, requires a plaintiff to prove an annual loss aggregating at least $5,000,[269] which would exclude all but high-volume streaming activities; it also limits damages to economic damages.[270] And it seems doubtful that a

---

[265] *Chapter 12 of Title 17: Hearing Before the H. Comm. on the Judiciary*, 113th Cong. 21 (2014) (statement of Jonathan Zuck, President, ACT | The App Ass'n ("ACT")).

[266] Tr. at 38:16–39:05 (May 19, 2016) (Band, LCA) (suggesting a hypothetical where the creation of a RAM copy of an e-book on a device with a circumvented TPM could constitute a nexus to trigger section 1201(a) liability); Tr. at 62:10–18 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) (predicting that copyright owners would argue that access to a film beyond its authorized rental period would constitute infringement).

[267] The Second Circuit has held that buffer copies of fleeting duration were not copies for purposes of the Act. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 127–30 (2d Cir. 2008) (holding that buffer copy data that "is rapidly and automatically overwritten as soon as it is processed" does not constitute making a copy as defined in the Copyright Act).

[268] LCA Reply Comments at 3 (citing 18 U.S.C. § 1030(a)(2)); Tr. at 31:08–16 (May 25, 2016) (Stoltz, EFF) (citing survey finding that 48 out of 50 cases under section 1201 involved other claims); Tr. at 13:17–22 (Band, LCA) (Mar. 19, 2016).

[269] 18 U.S.C. § 1030 (a)(5)(A)(B), (c)(4)(A)(i)(I), (g).

[270] *Id.* § 1030(g).

LOC_AR_00003280

patchwork of state laws can offer the certainty currently provided by section 1201(a), particularly given the interstate nature of transactions in this area.

### b. Exclusion of Device- or Machine-Enabling Computer Programs

As a narrower alternative, ORI suggested that Congress could exclude from the scope of section 1201(a) "computer programs that enable the operation of a device or machine."[271] Although recognizing that in practical terms, this outcome could also be achieved through a new permanent exemption, ORI suggested it may be better to revise the language of section 1201(a).[272]  It argued that circumventing access controls on such programs presents a "low probability of infringing activity" and that excluding them categorically is preferable to adopting piecemeal statutory exemptions because they "inevitably will be under-inclusive."[273]

ORI's recommendation presents a more targeted approach than a nexus requirement in that it aims to address the specific concern regarding section 1201(a)'s application to everyday products.  The Office, however, does not recommend this model because we agree with the commenters who argued that it would present considerable line-drawing problems.[274]  In particular, creative industry representatives questioned whether such legislation could be drawn to exclude operating software in devices like garage door

---

[271] ORI Additional Comments at 3.

[272] *Compare id.* at 3 ("ORI believes the better approach would be to categorically exclude computer programs that enable the operation of a device or machine from the scope of Section 1201."), *with* ORI Initial Comments at 3 (Congress "could adopt a permanent exception for the circumvention of TPMs on software essential to the operation of hardware.").

[273] ORI Additional Comments at 3.

[274] Tr. at 50:07–12 (May 19, 2016) (Zuck, ACT) ("It would have to be a much more complicated wording in order to get at the distinctions that people want to make so that you are excluding, you know, printer cartridges but you're including the ability to have flexible hardware subsidy models, et cetera, that are pretty prevalent in this market."); Tr. at 51:13–24 (May 19, 2016) (Panjwani, Public Knowledge) ("[A]ny attempt to create a permanent exemption on software-enabled devices would instead turn into a fight over what exactly is a software-enabled device. . . .  The end result of litigation would be not whether a copyright interest has been violated but is the thing at dispute in this particular litigation a device within the meaning of the statute.  And that opens up a whole can of worms, I think."); *see also* Author Services, Inc. Additional Comments at 1; Alliance of Auto. Mfrs. ("Auto Alliance") Initial Comments at 3 (suggesting that "access controls [that] are 'outside of core copyright concerns'" is "itself a label whose boundaries would be difficult to define"); Copyright Alliance Initial Comments at 10 ("[P]hrases like 'core copyright concerns' may be associated with efforts to undermine protection for copyrighted works by casting certain forms of access controls as falling outside the realm of what Section 1201 was designed to protect.").

LOC_AR_00003281

openers and printer cartridges from section 1201's reach, but to retain anticircumvention protection for software in devices that communicate expressive content, such as DVD players and video game consoles. In the latter devices, they noted, operating software often includes authentication systems that prevent the playing of material from unauthorized sources.[275] Therefore, any legislation excluding device-enabling software runs the risk of allowing bad actors to circumvent access controls on those systems, and thus could significantly weaken legal protections against piracy.

The Office reached substantially the same conclusion in its recent report on *Software-Enabled Consumer Products*. There, the Office considered several potential options to distinguish device-embedded software from software generally, and found each of them unworkable in practice, particularly given "the very real concern that definitions based on an understanding of the current ecosystem would become quickly obsolete."[276]

* * *

The Copyright Office recognizes and shares the concern that section 1201 should not be used to deter legitimate consumer activities unrelated to Congress' goal of facilitating secure platforms for the digital dissemination of copyrighted works. While the legislative history, as discussed, demonstrates that Congress did not intend for section 1201(a) to be limited to a copyright owner's traditional exclusive rights under section 106, it also does not show an expectation that section 1201 would serve as a sword to inhibit market entrants from offering competing consumer products.[277] Nor does it seem

---

[275] AAP, ESA, MPAA & RIAA Additional Reply Comments at 6–7 ("For example, manufacturers of video game consoles use access controls to prevent piracy not only by restricting access to computer programs that render video games perceptible, but also by restricting access to the software that operates the consoles and authenticates games. Circumvention of such access controls leads to play of pirated games."); Tr. at 52:19–23 (May 19, 2016) (Pierre-Louis, ESA) ("So we have to tread very carefully as we think about what that means because it implicates more than just thinking about a tractor. We're talking about the very devices that consumers are using to consume the content that we're making."); Tr. at 56:14–16 (May 19, 2016) (Dow, Walt Disney Co.) ("If you want to use a DVD player, that drive has to authenticate itself to ensure that it's playing by the rules before you access the content.").

[276] U.S. COPYRIGHT OFFICE, SOFTWARE-ENABLED CONSUMER PRODUCTS 9–11 (2016) ("SOFTWARE STUDY"), https://www.copyright.gov/policy/software/software-full-report.pdf ("[D]rawing a legislative distinction [between software and software embedded in devices] would be unworkable in practice. . . . Any such attempt inevitably would be based on software-enabled devices currently existing in the marketplace, and based on Congress's understanding of the current state of the art.").

[277] *See* Kernochan Center Initial Comments at 3 (noting "it is unlikely that [Congress] anticipated the vast range of products now governed by computer programs"); *see also* Letter from Chairman Chuck Grassley and Ranking Member Patrick Leahy, S. Comm. on the Judiciary, to Maria A.

LOC_AR_00003282

likely that Congress expected issues concerning the repair and modification of such products to be a focus of the rulemaking to the degree they have been in recent years.[278]

The Office is not persuaded, however, that the answer to these concerns is a fundamental alteration of section 1201(a)'s scope. Although the case law on this question is neither harmonized nor voluminous, opinions to date indicate that the statute in its current form does not leave courts powerless to consider issues of competition where appropriate. Even the *MDY* opinion, in rejecting an infringement nexus requirement, explicitly noted that there was "no clear issue of anti-competitive behavior" in that case and suggested that consideration of such issues would be proper where "a § 1201(a)(2) defendant . . . claims that a plaintiff is attempting to enforce its DMCA anti-circumvention right in a manner that violates antitrust law."[279] Indeed, principles underlying existing doctrines of antitrust law or misuse, and the permanent exemptions, such as section 1201(f)'s exception for interoperability, may accommodate many anti-competitive concerns. Further, the Office also notes that at least two manufacturers have recently backed away from some proposed uses of DRM in consumer devices in the face of consumer pressure.[280]

Accordingly, the Office concludes that the preferable approach is to address these issues through the application of existing legal doctrines, and through targeted updates to the permanent exemption framework and to the triennial rulemaking process. These recommended changes are discussed below.

---

Pallante, Register of Copyrights and Dir., U.S. Copyright Office 1 (Oct. 22, 2015), http://www.copyright.gov/policy/software/grassley_leahy-software-study-request-10222015.pdf ("One result of recent technological developments is that copyrighted software is ubiquitous in our daily lives . . . [and] many questions are being asked about how consumers can lawfully use products that rely on software to function.").

[278] *See* SIIA Initial Comments at 6 ("During the last rulemaking, disputes arose over software in tractors, automobiles, and the like—situations that Congress did not envision when passing the law eighteen years ago."); Tr. at 53:18–55:01 (May 19, 2016) (Band, LCA) ("Congress, when it was talking about 1201 . . . [was] not thinking about tractors. And the fact that we're talking about tractors and . . . automobiles and that's where it's gone to, does suggest that there is a serious problem here.").

[279] *MDY*, 629 F.3d at 951.

[280] *See* Alex Hern, *Keurig Takes Steps Towards Abandoning Coffee-Pod DRM*, THE GUARDIAN (May 11, 2015), https://www.theguardian.com/technology/2015/may/11/keurig-takes-steps-towards-abandoning-coffee-pod-drm (noting that consumer complaints and consumer advocacy efforts led Keurig to back away from efforts to enforce digital rights management in its coffee machines); Cory Doctrorow, *Tell HP: Still a long way to go to make up for breaking our printers* (Oct. 3, 2016), https://www.eff.org/deeplinks/2016/09/hps-run-keep-pressure (noting that Hewlett-Packard issued an update removing a feature that configured its printers to accept only proprietary ink).

LOC_AR_00003321

## B. Anti-Trafficking Provisions

The anti-trafficking provisions in section 1201(a)(2) and (b) were the subject of much disagreement among study participants. While some championed these provisions as incentivizing the creation of new avenues for content distribution and providing an essential enforcement mechanism, others argued that the trafficking prohibitions have had little meaningful impact on preventing infringement, and instead have served to restrict legitimate uses of copyrighted works, including activities exempted under the triennial rulemaking.

### 1. Overall Effectiveness

As discussed above, Congress enacted the anti-trafficking provisions "to provide meaningful protection and enforcement of the copyright owner's rights to control access to his or her copyrighted work."[281] Many stakeholders argued that these provisions have been effective in stemming the development of a marketplace for circumvention tools and in minimizing mass piracy.[282]

Several commenters indicated that these provisions are effective in large part because they provide a more efficient enforcement mechanism than the anticircumvention bar under section 1201(a)(1). For example, ESA observed that "the actions of distributors of circumvention technology are comparatively easy to detect, and targeting them is the

---

[281] SENATE JUDICIARY COMMITTEE REPORT at 28; HOUSE JUDICIARY COMMITTEE REPORT at 18; COMMERCE COMMITTEE REPORT at 38; HOUSE MANAGER'S REPORT at 8.

[282] *See, e.g.*, BSA | The Software Alliance ("BSA") Initial Comments at 1; Copyright Alliance Initial Comments at 13 (without anti-trafficking protections, rightsholders would be forced to engage in an "'arms race' of encryption and circumvention technologies, diverting resources away from more beneficial uses like the creation and dissemination of copyrighted works"); Kernochan Center Initial Comments at 6 ("[W]ithout the ban against trafficking, circumvention devices useable by even the most technolog[ically]-challenged of consumers would undoubtedly be readily available, and TPMs would be largely ineffective."); SIIA Initial Comments at 4 ("In the United States, [section 1201] has prevented capital formation around 'black box' businesses dedicated to circumvention or the sale of circumvention devices . . . ."); Tr. at 165:13–17 (May 25, 2016) (Reed, Fox Entm't Grp.) ("[T]he anti-trafficking provisions have prevented the tools to engage in . . . piracy from becoming mainstream in a way that we think is beneficial ultimately to maintaining a robust market for creative content."); Tr. at 169:21–170:02 (May 25, 2016) (Wolfe, Authors Alliance) ("[T]he anti-trafficking provisions have at least had some measure of success in keeping the tools out of end user hands that enable those kinds of infringements."); Tr. at 26:20–27:04 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) ("[T]he thing that [section] 1201 has done most effectively is kill any market for circumvention tools.").

LOC_AR_00003284

most effective and efficient way to protect the rights provided by Section 1201."[283] Absent the ability to target traffickers, these commenters argued, the need to identify and pursue claims against individual circumventers would dramatically increase the cost of enforcement.[284]

Copyright owners also emphasized the anti-trafficking provisions' role in preventing circumvention tools from becoming available in legitimate outlets such as Best Buy or Amazon. In their view, even if some tools remain accessible through illicit sources, the anticircumvention provisions have prevented such tools from acquiring the legitimacy in the public mind that would result from their availability in mainstream markets.[285] The Copyright Alliance argued that this "reduces the attractiveness of commercial business models that are based on enabling access to infringing works" and "helps prevent . . . capital formation around the black box business dedicated to . . . sales of circumvention devices."[286]

Other commenters, however, expressed doubt as to whether the anti-trafficking provisions in fact prevent any unauthorized circumvention or infringement from

---

[283] ESA Initial Comments at 14; *see also* DVD Copy Control Ass'n & Access Content Sys. Licensing Adm'r, LLC ("DVD CCA & AACS LA") Initial Comments at 4 (stating that their litigation efforts are spent "enforcing the anti-trafficking prohibitions as those products posed the greatest harm").

[284] *See, e.g.*, Tr. at 205:16–206:08 (May 25, 2016) (Metalitz, AAP, MPAA & RIAA) (noting that the "vast majority of enforcement" efforts are based on 1201(a)(2) violations, and "the fact that a person may be committing an act of circumvention that only affects their access to a particular copyrighted work, it's got to be a much lower priority."); Tr. at 14:17–15:01, 81:13–20 (May 20, 2016) (Kupferschmid, Copyright Alliance) ("Being able to target trafficking is also important because actions of distributors . . . of circumvention technologies is . . . comparatively easy to detect and targeting them is the most efficient and effective way to actually enforce 1201"; also noting the important role the anti-trafficking provisions play in deterring piracy for small business owners).

[285] *See, e.g.*, AAP, MPAA & RIAA Initial Comments at 14 ("If the distribution of hacking tools . . . becomes legal and widespread, the public's perception of what these products can legitimately be used for could become confused, resulting in frustration and abuse."); Tr. at 21:08–20 (May 20, 2016) (Besek, Kernochan Center) ("You can't argue a system isn't effective just because some people can bypass it. There's always been some degree of infringement. There always will be. The real goal is to reduce it to the level where you still have a viable market. . . . [Y]ou don't want it just available at Best Buy. . . . And so, it's really important that . . . the circumvention means not be so generally available."); Tr. at 14:05–12 (May 20, 2016) (Kupferschmid, Copyright Alliance) ("[T]he ultimate purpose is to keep this hacking software out of the mainstream and limit its availability to the infringers so you can't just walk into Best Buy, for instance, and get a copy.").

[286] Tr. at 14:15–17, 15:02–05 (May 20, 2016) (Kupferschmid, Copyright Alliance).

LOC_AR_00003285

occurring.[287]  Several pointed to the large-scale proliferation of illegal circumvention tools online, arguing that the statute has done little to slow the dissemination of such devices.[288]  OTW contended that "[c]lear copies of almost any work are available through unauthorized sources, in significant part because, once copy protection is broken once, that copy can seed other copies with no further need for anticircumvention [*sic*] tools."[289]

## 2.  Proposed Changes

Several user groups expressed concern regarding the effect of the anti-trafficking provisions on their ability to engage in circumvention activity authorized through the triennial rulemaking.  They proposed legislative changes to enable exemption beneficiaries to make or obtain necessary circumvention tools for that purpose, and to allow third parties to assist users in carrying out the exempted activity.

### a.  Manufacture and Distribution of Tools

Subsections (a)(2) and (b) make it unlawful to "manufacture" a circumvention device.[290]  Some commenters noted that that language could be read to prohibit the beneficiary of an exemption from making a tool for his or her own use in engaging in the exempted circumvention activity.[291]  Most user groups believed such a reading would be erroneous:  as Public Knowledge contended, "[t]o suggest that exemptions come with no right to create or acquire tools to effectuate those exemptions would render them superfluous, a flatly illogical outcome to be avoided as a matter of statutory

---

[287] *See, e.g.*, Public Knowledge Initial Comments at 7 ("[R]eports of massive online infringement by copyright owners, if they are to be believed, suggests that § 1201 has failed at curbing infringement."); Soc'y of Am. Archivists ("SAA") Initial Comments at 4 ("SAA is not aware that the anti-trafficking provisions of section 1201(a)(2) and 1201(b) have had any impact in deterring copyright infringement.").

[288] LCA Initial Reply Comments at 2 ("[Rightsholders] overlook the fact that TPMs remain effective notwithstanding the widespread availability of circumvention tools on the Internet (and the relative dearth of section 1201 enforcement actions)."); *see also* AAU, ACE, APLU & EDUCAUSE Initial Comments at 12 ("[T]he technology necessary to circumvent the TPMs on DVDs and other storage media is widely available via the Internet and simple to use.").

[289] OTW Initial Comments at 6.

[290] 17 U.S.C. § 1201(a)(2), (b).

[291] *See, e.g.*, LCA Additional Comments at 4 ("On the face of the statute, a person granted an exemption to circumvent would not be able to manufacture a circumvention tool, and could not obtain such a tool from a third party.  This makes no sense."); ORI Additional Comments at 5 (similar).

LOC_AR_00003286

construction."[292]  Nevertheless, a few users suggested that the uncertainty on this issue has dissuaded them from exercising exemptions granted via the rulemaking.  In the words of a group of college and university associations, "[n]o educational institution granted an exemption wants to assume that a temporary exemption implicitly includes the right to develop the necessary circumvention tools to take advantage of that exemption."[293]

Several participants supported legislative change to explicitly allow the making of necessary circumvention tools in these circumstances.[294]  In considering this proposal, the Office notes at the outset that many tools that can be used for circumvention are not subject to section 1201's prohibitions:  in addition to programs specifically designed for circumvention, which section 1201 is aimed at, common software can also be employed for circumvention purposes.[295]  The legislative history of section 1201 explicitly demonstrates Congress' intent to exclude such generally available software tools, including compilers, disassemblers, password-recovery utilities, and commercial "key-cracker" products, from the reach of the prohibition.[296]

To a large and increasing degree, however, circumvention requires the use of specialized software, such as code to convert protected e-books into formats usable with assistive technologies[297] or to bypass encryption on DVDs.[298]  To the extent the law prohibits the development of such software, many users would be unable to engage in activities expressly permitted by the relevant exemption, unless they rely on circumvention programs produced unlawfully.  The Office accordingly agrees that exemption

---

[292] Public Knowledge Additional Comments at 4–5; *accord* Authors Alliance Additional Comments at 4–5 ("[A]ny reading of Section 1201 that would prohibit beneficiaries of exemptions from creating the tools necessary in order to exercise these exemptions is an absurd result that renders the entirety of the Section 1201(a)(1) exemption process futile.").

[293] AAU, ACE, APLU & EDUCAUSE Initial Comments at 12.

[294] *See, e.g.*, ISRI Additional Comments at 6; ORI Additional Comments at 5; LCA Additional Comments at 4.

[295] In addition, some TPMs can be defeated without using software.  *See, e.g.*, Jamie Condliffe, *You Can Hack Keurig's DRM With Scotch Tape to Use Knock-Off Coffee Pods*, GIZMODO (Dec. 11, 2014), http://gizmodo.com/you-can-hack-keurigs-drm-with-scotch-tape-to-use-knock-1669713772; *CD Crack: Magic Marker Indeed*, WIRED (May 20, 2002), http://archive.wired.com/science/discoveries/news/2002/05/52665.

[296] COMMERCE COMMITTEE REPORT at 42–43 (referencing compilers, trace analyzers, and dissemblers); SENATE JUDICIARY COMMITTEE REPORT at 16 (referencing password utilities and "'key-cracker products,' . . . for the purpose of quick data recovery of encrypted data").

[297] *See* 2012 Rulemaking at 20.

[298] *See* 2015 Rulemaking at 29.

LOC_AR_00003287

beneficiaries should be able to make necessary tools solely for their own use in carrying out exempted circumventions.

The Office is not convinced, however, that statutory change is necessary to effectuate this right. To begin with, legislation may be premature. The scope of the "manufactur[ing]" language in section 1201(a)(2) and (b) has yet to be resolved by the courts; in fact, the Office is aware of no case in which a court has considered whether the manufacturing bar applies to exemption beneficiaries making a tool for personal use. Nor is it clear that these provisions are, as a practical matter, preventing beneficiaries from creating or utilizing circumvention tools to a significant degree. While the dearth of case law and enforcement actions is not determinative—indeed, we recognize that statutory ambiguity itself can have a deterrent effect[299]—it does suggest that there is not yet a pressing need for legislative action.

Second, there are strong reasons to conclude that Congress did not intend to apply the manufacturing bar to exemption beneficiaries from producing their own circumvention tools for personal use. As several commenters noted, such a reading would render the rulemaking process effectively meaningless for many users.[300] Moreover, the term "manufacture" appears in a list of activities defined as forms of trafficking: "No person shall manufacture, import, offer to the public, provide, or otherwise traffic in . . . ."[301] "Traffic" is not defined in the statute, but it is commonly associated with trade or commercial activity.[302] Under the interpretive canon of *noscitur a sociis,* manufacture should be understood by reference to surrounding words, suggesting that Congress intended the prohibition to apply to activities involving a wider distribution of circumvention tools, and not to activities done solely for purposes of self-help.[303]

---

[299] *See* AAU, ACE, APLU & EDUCAUSE Initial Comments at 12.

[300] *See* Authors Alliance Additional Comments at 4–5; Repair Ass'n & iFixit Additional Comments at 16.

[301] 17 U.S.C. § 1201(a)(2), (b). The legislative history contains no relevant discussion of the term "manufacture."

[302] *See, e.g., Traffic,* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/traffic ("a: import and export trade[;] b: the business of bartering or buying and selling[;] c: illegal or disreputable usually commercial activity[;] . . . to carry on traffic"); *Traffic,* BLACK'S LAW DICTIONARY 1725 (10th ed.) ("To trade or deal in (goods, esp. illicit drugs or other contraband) <trafficking in heroin>").

[303] *See* Authors Alliance Additional Comments at 5 ("[A] plain reading of the statute clearly demonstrates the provisions are about the provision of tools and services *to others,* and not about the self-help that is the baseline necessity of an effective exemption process."); Repair Ass'n & iFixit Additional Comments at 15–16 ("[T]he phrase 'or otherwise traffic' in 1201(a)(2) clearly

LOC_AR_00003288

It is true, as some copyright owners noted, that the presence of explicit authorization for the making of tools in some of the permanent exemptions—specifically, those for encryption research, reverse engineering, and security testing—could be read to suggest that there is no corresponding right appurtenant to the other exemptions, including those adopted through the rulemaking.[304] But the Office is not persuaded that this inconsistency is determinative. By including the ability to develop means for circumvention within these permanent exemptions, Congress may simply have wished to avoid any ambiguity as to whether such activity is permitted, particularly since encryption research, reverse engineering, and security testing in at least some cases may involve distribution activity more commonly associated with trafficking. Indeed, each of these exemptions expressly contemplates a user sharing circumvention means with others.[305] Given that the alternative reading could undermine much of the statute's overall design, the Office believes that this is the preferred construction.

For these reasons, the Office does not believe any legislative change to the manufacturing provision is currently necessary and that section 1201 should not be interpreted to prohibit permitted beneficiaries from creating a circumvention tool for personal use. In the event, however, that Congress wishes to provide clarification, it could consider adding language to the statute providing that, notwithstanding subsections (a)(2) and (b), a person entitled to an exemption to subsection (a)(1) may develop a circumvention tool solely for his or her own use in engaging in the exempted activity.

---

indicates that 'manufacture' should be interpreted as large-scale production for the purposes of *trafficking* to the public, not mere creation of a tool for personal use.").

[304] *See* Copyright Alliance Additional Comments at 4 ("If Congress intended such a right, it would have included it expressly as it did in the provisions for permanent exemptions for reverse engineering, encryption research, and security testing.") (citations omitted). The Copyright Alliance also noted that section 1201(a)(1)(E) expressly bars any exemption granted under the triennial rulemaking from serving as a defense to the anti-trafficking provisions, and thus argued that the rulemaking cannot excuse any activity to the extent it is deemed "manufacturing." *Id.* at 3–4.

[305] 17 U.S.C. § 1201(f)(3) ("[T]he means permitted under paragraph (2), may be made available to others" under certain conditions), § 1201(g)(4) ("Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to . . . provide the technological means to another person with whom he or she is working collaboratively for the purpose of conducting the acts of good faith encryption research described in paragraph (2) or for the purpose of having that other person verify his or her acts of good faith encryption research described in paragraph (2)."), § 1201(j)(4) ("Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to develop, produce, distribute or employ technological means for the sole purpose of performing the acts of security testing described in subsection (2), provided such technological means does not otherwise violate section (a)(2).").

LOC_AR_00003289

Should Congress pursue statutory amendment, the Office does not recommend that it take the additional step of allowing the *distribution* of necessary tools to exemption beneficiaries.[306]  As an initial matter, the Office does not understand such activity to be permitted under current law.  Moreover, the Office agrees with the commenters who argued that it would be impossible to control the downstream uses of any circumvention tools once distributed, even if they were produced with the intent that they be used only to assist authorized circumvention.[307]  Proponents responded that circumvention tools are already widely available online and that other laws would adequately protect against illicit uses.[308]  But, as several commenters noted, perhaps the primary value of the anti-trafficking provisions has been to prevent the development of mainstream business models based around the production and sale of circumvention tools.[309]  Permitting the distribution of such tools could significantly erode that important benefit.

### b.  Third-Party Assistance

Subsections (a)(2) and (b) make it unlawful to "offer to the public, provide, or otherwise traffic in any . . . service . . . or part thereof" that is primarily designed for the purpose of circumvention, has only limited commercially significant purpose other than circumvention, or is marketed for use in circumvention.[310]  The Librarian is not authorized to adopt exemptions to those provisions.  Many commenters expressed concern that these prohibitions may prevent third parties from offering assistance to those entitled to engage in exempted circumvention activities.  They noted that ordinary consumers often lack the skills or technical knowledge to circumvent independently.[311]

---

[306] *See, e.g.*, Mozilla Initial Comments at 5; Rico Robbins Initial Comments at 1–2; Auto Care Additional Reply Comments at 8; Public Knowledge Additional Reply Comments at 4–5; Tr. at 56:02–07 (May 20, 2016) (Greenstein, Auto Care) (noting that consumers "need to rely on others who can create the tools that make [circumvention] possible" and agreeing that there needs to be a market for those tools).

[307] *See, e.g.*, AAP, MPAA & RIAA Initial Comments at 14; Alliance of Auto. Mfrs. ("Auto Alliance") Initial Comments at 9; Copyright Alliance Initial Comments at 13; Kernochan Center Initial Comments at 7.

[308] *See, e.g.*, LCA Additional Comments at 4 ("Circumvention tools already are widely available on the internet."); Mozilla Additional Comments at 4 ("Some commenters oppose allowing technical assistance on the grounds that such tools could be misused for illicit purposes. . . .  Copyright law and law enforcement have the authority and ability to penalize those who act illegally, including those who misuse circumvention technologies.").

[309] *See supra* pp. 51–52 and notes 285–86.

[310] 17 U.S.C. § 1201(a)(2), (b)(1).

[311] *See, e.g.*, ACM U.S. Pub. Policy Council ("USACM") Initial Comments at 3 ("[M]any consumers lack the knowledge and expertise to develop tools that would enable them to benefit from

LOC_AR_00003290

Others pointed to the difficulty of obtaining or developing one's own tools for circumventing (assuming that is itself legal, as discussed above).[312]  Commenters also noted the disproportionate impact a ban on third-party assistance has on beneficiaries with disabilities.[313]

While most participants recognized some need for such assistance, a few suggested that this concern may be overstated.  The Kernochan Center stated, "[w]e suspect that this occurs less frequently than it might appear on the surface, as in many cases circumvention tools are available (e.g., for DVDs) and in other cases, it can be assumed that the beneficiaries of the exception have the technical expertise to circumvent (e.g., where the underlying work is sought for the purpose of reverse engineering)."[314]  The American Intellectual Property Law Association ("AIPLA") requested a study into whether third-party assistance is, in fact, needed.[315]

The Copyright Office has previously suggested that exemption beneficiaries may have a legitimate interest in circumvention assistance in at least some circumstances, and has said that Congress may wish to consider legislative clarification in this area.[316]  In this proceeding, many commenters supported amending section 1201 to explicitly authorize

---

granted exemptions."); Jay Freeman Initial Comments at 1 ("The reality is that modifying an iPhone to strip away the software encryption locks that prevent this kind of functionality is extremely complex."); iFixit Initial Comments at 3 ("Without third-party assistance, many of these exemptions are useless in the real world."); Mozilla Initial Comments at 5 ("In practice, omitting [third-party assistance], as currently happens, risks worsening a social divide—technically savvy users would have even more advantages over non-savvy users, as they are the only ones who have the skills to engage in the socially beneficial exempted action without help."); Int'l Imaging Tech. Council & Static Control Components, Inc. Additional Comments at 5–6.

[312] *See, e.g.,* Authors Alliance Initial Comments at 3; Auto Care Initial Comments at 9.

[313] *See* DIYAbility Initial Comments at 7; Learning Disabilities Ass'n of Am. ("LDAA") Initial Comments at 2; Marjorie Anderson Initial Comments at 1.

[314] Kernochan Center Initial Comments at 6–7; *see also* ESA Initial Comments at 15; Tr. at 33:17–34:02 (May 20, 2016) (Sheffner, MPAA).

[315] AIPLA Initial Comments at 2–3.

[316] *See Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary,* 114th Cong. 29–30 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office); 2015 Recommendation at 4–5.

LOC_AR_00003291

such assistance.[317]  Others advocated a narrower change to allow the Librarian to adopt exemptions for third-party assistance through the rulemaking on a case-by-case basis.[318]

To assess the need for legislation, the Office first addresses the threshold question of whether, or to what extent, third-party assistance is prohibited under current law.  Case law to date offers little guidance on this question, and commenters were sharply divided.  Some user groups argued that a service whose "primary purpose" is something other than circumvention falls outside the scope of the service bar, even if it incidentally involves circumvention.  EFF explained:

> For example, a comprehensive auto repair service may incidentally require circumvention of access controls on vehicle software in order to access diagnostic data or adjust settings.  Such a service would not be "primarily designed or produced for the purpose of circumventing a technological measure," as the primary purpose of the service is the repair, not the circumvention.  Likewise, such a service would have a "commercially significant purpose" other than circumvention and would not likely be "marketed . . . for use in circumvention."[319]

While acknowledging that auto repair may be a unique circumstance, copyright owners generally disagreed, pointing out that the ultimate purpose of any circumvention service will always be something beyond circumvention itself.[320]  They further argued that any implied right to third-party assistance for exemption beneficiaries is expressly precluded by section 1201(a)(1)(E), which prohibits an exemption granted in the rulemaking from serving as a defense in an action to enforce any other provision of title 17.[321]  Some also suggested that the prohibition on the trafficking of "any . . . service . . . *or part thereof, that . . . is primarily designed or produced for the purpose of circumventing*"[322]

---

[317] *See, e.g.*, ISRI Initial Comments at 15; Am. Ass'n of Law Libraries ("AALL") Additional Comments at 3; Mozilla Additional Comments at 4.

[318] *See, e.g.*, Authors Alliance Initial Comments at 3–4; Maryna Koberidze Initial Comments at 3.

[319] EFF Initial Comments at 10–11 (citations omitted); *see also* Consumer Tech. Ass'n ("CTA") Initial Comments at 3–6 (suggesting that Congress did not intend the DMCA "to in any way limit the authority of manufacturers and retailers to address the legitimate concerns of their customers").

[320] *See* AAP, ESA, MPAA & RIAA Additional Reply Comments at 14 ("[V]ery few people engage in circumvention for its own sake.  If a customer is attracted to a service not because she is interested in circumvention, but because she wants to create copes of Blu-ray Discs or play pirated copies of video games on a console, that service is of course prohibited by Section 1201 (as it should be).").

[321] AAP, ESA, MPAA & RIAA Additional Reply Comments at 13.

[322] 17 U.S.C. § 1201(a)(2), (b)(1) (emphasis added).

LOC_AR_00003292

demonstrates that the statute covers services involving only incidental circumvention.[323] Others noted that some of the permanent exemptions extend to the anti-trafficking provisions, arguing that where Congress intended to create an exception to those provisions, it did so expressly.[324]

There is also some question concerning the relevance, if any, of the Unlocking Act to this analysis. As discussed, that legislation provides that circumvention under any exemption granted by the Librarian to permit cellphone unlocking may "be initiated . . . by another person at the direction of the [device] owner, or by a provider of a commercial mobile radio service or a commercial mobile data service at the direction of such owner or other person."[325] In the sixth triennial rulemaking recommendation, the Office read that language to indicate that Congress did not understand third-party assistance to be permitted outside that specific context: "The fact that Congress felt compelled to take this action in connection with unlocking indicates that Congress believed it was necessary to amend the law to permit circumvention 'at the direction of' the owner."[326] Some commenters however, disputed that the Unlocking Act created a negative inference against the lawfulness of third-party assistance generally.[327]

Ultimately, the Office concludes that there is, at a minimum, substantial uncertainty as to whether there are types of third-party assistance that would fall outside the reach of the "service" bar. The Office appreciates that amending the anti-trafficking provisions themselves to address third-party assistance might prove to be a difficult exercise in line-drawing, while posing risk to the digital platforms incentivized by the statute. But the legal doubt on whether users can seek out assistance presents a legitimate concern for exemption beneficiaries, many of whom may be increasingly frustrated by a lack of access to the tools or skills required to make use of exemptions, particularly when trying to engage in activities, such as automobile repair, that simply did not implicate copyright in the analog world. The Office believes it is important that intended users of

---

[323] Tr. at 190:08–18 (May 25, 2016) (Metalitz, AAP, MPAA & RIAA). This echoes a holding in *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, which found DVD copying software to be an illicit circumvention tool because one feature of the software was to unlock CSS protected DVDs, in violation of the "part thereof" aspect of the prohibition. 307 F. Supp. 2d 1085, 1098 (N.D. Cal. 2004). The court also found that the software at issue was expressly marketed as a circumvention tool. *Id.* at 1098–99.

[324] SIIA Initial Comments at 3; Copyright Alliance Additional Comments at 4.

[325] Unlocking Act § 2(c), 128 Stat. at 1751–52.

[326] 2015 Recommendation at 247.

[327] *See, e.g.*, CTA Initial Comments at 9 ("[I]n reporting out the final version of the bill that reversed the Librarian's denial, the Senate Judiciary Committee was emphatic that it intended *no positive or negative inference* with respect to the Librarian's authority in other exemption proceedings.") (citations omitted); EFF Initial Comments at 11.

LOC_AR_00003293

exemptions can take full advantage of them even if this requires aid from third parties. Accordingly, the Office believes that a targeted statutory amendment authorizing the provision of assistance to exemption beneficiaries in appropriate circumstances is advisable.[328]

As the Office has suggested previously,[329] one approach would be for Congress to adopt legislation giving the Librarian the discretion, as part of the triennial rulemaking, to explicitly permit circumvention performed "at the direction of" intended beneficiaries of a temporary regulatory exemption.[330] This limited amendment, focused on service providers, may avoid concerns over downstream control issues associated with authorizing the distribution of circumvention tools. The Office acknowledges that some commenters opposed even this expansion of the rulemaking. But most of these concerns appear primarily directed at the development and distribution of tools, and not the ability to use a service technician to engage in an otherwise exempted activity on behalf of an exemption beneficiary.[331] While the Office does not recommend amending the anti-trafficking provisions to allow the broad provision of circumvention services outside the scope of the rulemaking, it remains optimistic that a targeted amendment to section 1201(a)(1)(C), based on the language in the Unlocking Act, might be worthwhile to facilitate the usability of exemptions supported by the rulemaking record. To

---

[328] See 2015 Recommendation at 4 ("Congress may wish to consider clarifications to section 1201 to ensure that the beneficiaries of exemptions are able to take full advantage of them even if they need assistance from third parties.").

[329] See id. at 5 ("Congress may wish to consider [an] amendment to section 1201 to address these sorts of situations, for example, by expressly allowing the Librarian to adopt exemptions that permit third-party assistance when justified by the record.").

[330] Because allowing circumvention "at the direction" of a user may not be necessary for all exemptions, the Office recommends a narrow statutory change permitting individual consideration of such exemptions as part of the triennial rulemaking, rather than a broader statutory change establishing a blanket exemption.

[331] See, e.g., AAP, MPAA & RIAA Initial Comments at 14 ("AAP, MPAA, and RIAA oppose amending the statute to allow the Librarian to grant exemptions to the anti-trafficking prohibitions. As stated above, tools designed to enable lawful uses would inevitably also enable unlawful uses as there is no way to effectively control the application of such tools once they are in the stream of commerce."); Copyright Alliance Initial Comments at 13 ("There is no justification for amending Section 1201 to allow the adoption of exemptions to the prohibition on circumvention that can extend to exemptions to the anti-trafficking prohibitions. . . . Once [circumvention] tools are available in the marketplace, even for ostensibly lawful purposes, they will inevitably become useful for unlawful purposes, making them virtually impossible to police, and very likely leading to an even more aggressive 'arms race' as described above."); DVD CCA & AACS LA Initial Comments at 16 ("DVD CCA and AACS LA object to any proposal that would encourage the development of a legitimate marketplace for circumvention tools or circumventing products.").

LOC_AR_00003294

effectuate this authority, Congress may need to consider the amendment's interaction with the anti-trafficking provisions.[332]  Additionally, and as discussed further below, consideration of such a change would need to take into account any potential interactions with U.S. trade obligations.

In the meantime, the Office will consider changes to the administration of the rulemaking that could lead to clarification of the law in this area.  In the past, the Office has declined to recommend exemptions allowing circumvention on behalf of another person, noting that such exemptions "may implicate the anti-trafficking provision set forth in section 1201(a)(2) and (b)."[333]  For example, in the most recent rulemaking, the Office did not recommend an exemption for circumvention for vehicle repair or modification activity done "on behalf of" the vehicle owner.[334]  Even if such circumvention might itself qualify as a noninfringing use, the Office declined to recommend an exemption because it might separately constitute an unlawful service under subsections (a)(2) and (b).

Given the uncertain scope of the service bar, one approach may be for the Office in the future to consider exemptions that define the class of eligible users less restrictively.[335]  The Office has previously taken this approach in other instances.  For example, the current regulatory exemption for assistive technology requires that a blind person or other person with disabilities, as defined under section 121, must lawfully acquire a literary work, but does not specify who may engage in the actual circumvention.[336]  This practice need not alter the Office's decision that it could not endorse circumvention "on behalf of" the vehicle owner, or other phrasing that could implicate the statutory prohibition on services; the Office continues to believe that it cannot affirmatively recommend exemption language that is likely to be read to authorize unlawful

---

[332] *See* 17 U.S.C. § 1201(a)(1)(E) ("Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.").

[333] 2015 Recommendation at 246–47.

[334] *Id.*

[335] This approach appears supported by section 1201(a)(1)(C)'s reference to permitting "users of a copyrighted work" to engage in circumvention, as opposed to "owners" of a work.  17 U.S.C. § 1201(a)(1)(C).

[336] 37 C.F.R. § 201.40(b)(2) (2015) (referring to works "lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121," while not specifying the parties able to engage in the underlying circumvention); *see also* DVD CCA & AACS LA Additional Reply Comments at 5 (suggesting that prior exemptions "at least implicitly authorized librarians to assist professors and other exemption beneficiaries" in circumventing access controls on DVDs for instructional purposes).

LOC_AR_00003295

trafficking activity.[337]  Nor is the Office expressing a view on the legal question of whether there are certain forms of third-party assistance that may not rise to the level of prohibited "service[s]."  But because that question is both untested and outside the scope of the rulemaking, the Office, where appropriate, will seek to avoid recommending unduly narrow definitions of exemption beneficiaries.  This may provide greater opportunity for the courts to provide guidance on the proper construction of the anti-trafficking provisions.[338]

The Office also considered additional approaches raised in this proceeding, including the use of voluntary initiatives to facilitate cooperation between rightsholders and end users,[339] and the establishment of a regulatory scheme for the licensing of circumvention service providers (the so-called "locksmith" system).[340]  At this time, however, the Office finds the record on these proposals insufficient to issue a specific recommendation.  The Office encourages discussion between stakeholders on these proposals and will continue to monitor any developments.

### C. Permanent Exemptions

As explained above, the circumvention and anti-trafficking prohibitions exist in concert with a list of activities that are permanently exempted from these prohibitions.  In the written comments and during the roundtables, there was considerable discussion about whether the existing permanent exemptions have kept up with evolving technologies, or

[337] Thus, the Office does not agree with commenters to the extent they argued that the Librarian is authorized to adopt such language.  *See, e.g.*, EFF Initial Comments at 11; USC Intellectual Prop. & Tech. Law Clinic ("IPT USC") Initial Comments at 11; AAA Initial Reply Comments at 4.

[338] *See* Tr. at 68:20–69:19 (May 20, 2016) (Schwartz, CTA) (stating that courts will not hesitate to allow actions against parties violating the trafficking provisions even if the Copyright Office grants exemptions that arguably extend to certain prohibited trafficking activities).

[339] *See* Auto Alliance Initial Comments at 8–9 (citing the Memorandum of Understanding used in the auto industry to facilitate the distribution of circumvention tools and the provision of services and parts by third-party repair shops and aftermarket producers); DVD CCA & AACS Initial Comments at 15 ("DVD CCA and AACS LA have repeatedly stated a willingness to discuss issues with bona fide proponents to ascertain whether a voluntary solution could be reached."); Tr. at 60:09–62:19 (May 20, 2016) (Kupferschmid, Copyright Alliance) (suggesting that voluntary initiatives are more flexible than legislation).

[340] *See* Tr. at 23:08–24:15 (May 20, 2016) (Adler, AAP); Tr. at 41:15–42:13 (May 20, 2016) (Love, Knowledge Ecology Int'l ("KEI")).  For an example of a voluntary initiative, see Jason Koebler, *Apple Has Quietly Made its Secretive 'iPhone Calibration Machine' Available to Repair Shops*, MOTHERBOARD (June 5, 2017), https://motherboard.vice.com/en_us/article/apple-has-quietly-made-its-secretive-iphone-calibration-machine-available-to-repair-shops (reporting that Apple recently initiated a pilot program to provide some authorized, independent repair companies a proprietary tool that is necessary to repair newer iPhone home buttons).

LOC_AR_00003296

whether legislative reform is warranted to update the existing exemptions or to add new categories of permitted activities. While most commenters favored some reform of the permanent exemption framework, others opposed any statutory change, arguing that changes in technology are best addressed in the triennial rulemaking, which, they stated, was created for just that purpose.[341] In the following section, the Office analyzes these viewpoints and provides interpretative guidance regarding the operation of the statute. It also offers legislative recommendations in those cases where there is evidence that the current statute is not achieving Congress' objectives, or where it appears that legislative reform may be preferable to evaluating new or expanded temporary exemptions through the triennial rulemaking.

## 1. Existing Permanent Exemptions

### a. 1201(f) Exemption for Reverse Engineering

The Copyright Office studied whether section 1201(f), which exempts certain reverse engineering activities from the anti-trafficking prohibitions as well as the anticircumvention ban, is sufficiently robust to accommodate emerging technology. As explained above, section 1201(f) has three interconnected parts:

- 1201(f)(1) provides an exemption to section 1201(a)(1) under which a person may circumvent an access control on a computer program "for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs."[342]

- 1201(f)(2) provides that a person may "develop and employ" circumvention tools for either of two purposes: "[1] in order to enable the identification and analysis under paragraph (1), or [2] for the purpose of enabling operability of an independently created computer program with other programs."[343]

- 1201(f)(3) provides that the information and tools referred to in the preceding paragraphs "may be made available to others . . . solely for the purpose of

---

[341] See, e.g., AAP, MPAA & RIAA Initial Comments at 15 (stating that the joint commenters "are not aware of any circumstances that would rise to the level of justifying legislative revision of section 1201," that "[v]ery little litigation has touched on the scope and interpretation of the existing statutory exceptions to the anti-circumvention and anti-trafficking prohibitions," and "[i]f they were not serving their purpose, litigation in the areas addressed by the statute likely would be more common"); see also BSA Initial Comments at 1–2; Copyright Alliance Initial Comments at 13–14; ESA Reply Comments at 2; SIIA Additional Comments at 3.

[342] 17 U.S.C. § 1201(f)(1).

[343] Id. § 1201(f)(2) (numbers in brackets added).

LOC_AR_00003297

enabling interoperability of an independently created computer program with other programs" so long as doing so does not constitute infringement or violate other applicable law.[344]

The main question is the extent to which section 1201(f) allows the circumvention of access controls to achieve interoperability generally, with many expressing concern that section 1201(f) is too restrictive and overly limited to circumvention for purposes of conducting identification and analysis related to interoperability.[345]  Conversely, many copyright owners opined that limiting circumvention to purposes of identification and analysis of programmatic elements necessary to achieve interoperability is consistent with congressional intent, and suggested that concerns are "overstated," particularly as the triennial rulemaking is available as a failsafe to address additional uses.[346]  ORI, however, argued that paragraphs (f)(2) and (f)(3) "make clear that software that enables interoperability can be developed and distributed to users, who can then use that software."[347]

The few cases in which courts have addressed section 1201(f) have not resolved this ambiguity.  In *Lexmark*, the Sixth Circuit reversed the dismissal of a section 1201(f)-based interoperability defense by a competitor who allegedly circumvented TPMs to enable interoperability with its own printing cartridges.[348]  The Eighth Circuit subsequently

---

[344] *Id.* § 1201(f)(3).

[345] *See, e.g.*, Consumers Union Additional Reply Comments at 4 (proposing an amendment to "cover not only analyzing the software in a product that would enable interoperability with other products, but also adapting the software to enable interoperability"); EFF Initial Comments at 12 (proposing expanding the exemption to codify the Office's conclusions in recent rulemakings that "modifying software as necessary to render it compatible with other software is likely to be non-infringing"); Mozilla Initial Comments at 3.

[346] AAP, ESA, MPAA & RIAA Additional Reply Comments at 12 ("By limiting the scope of the exemption to identification and analysis, Congress conveyed that circumvention to gain access to software for the purpose of copying and adapting it and including it in a new product, or merely for the purpose of obtaining access to a work beyond that which has been purchased or licensed, is not necessarily fair use."); *see also* SIIA Initial Reply Comments at 5 ("[T]he exemption in 1201(f), combined with the rulemaking function, sufficiently handles any needs of interoperability.").

[347] ORI Additional Comments at 3–4; *see also* CTA Additional Comments at 4 (stating that section 1201 "was not meant to restrict interoperability in a post-sale, aftermarket environment").

[348] *Lexmark*, 387 F.3d at 550–51. While the Sixth Circuit dismissed Lexmark's section 1201(a) claim on the ground that Static Control had not circumvented an effective TPM, thus eliminating the need for a section 1201(f) defense, it also explained its disagreement with the district court's dismissal of that defense, reasoning that "the issue could become relevant at the permanent injunction stage."  *Id.*

LOC_AR_00003298

identified four elements required to prevail on a section 1201(f) defense.[349]  Neither opinion, however, addressed whether section 1201(f) could more generally be read to permit circumvention for the purpose of *enabling* interoperability, or whether it is limited to identification and analysis of elements necessary to achieve interoperability. In another case, the Southern District of New York rejected a section 1201(f) defense, finding that code developed to circumvent technological measures protecting DVDs was not developed "for the sole purpose" of achieving interoperability and that the defendants did not engage in reverse engineering themselves, but only disseminated the code after the fact.[350]  While that court did not also address whether section 1201(f) could exempt activities for interoperability that did not involve identification and analysis, in an earlier opinion, the court stated that, "[s]ection 1201(f) permits reverse engineering of copyrighted computer programs only and does not authorize circumvention of technological systems that control access to other copyrighted works, such as movies."[351] Some copyright owners relied upon this litigation to express concern that a broader exemption could enable bad actors to exploit the exemption for piracy purposes.[352]

The Copyright Office has noted "the importance of preserving the ability to develop products and services that can interoperate with software-enabled consumer products."[353]  The Office's recent study on *Software-Enabled Consumer Products* (which expressly did not address section 1201) concluded that "statutory change [to the Copyright Act] is not warranted" because, *inter alia*, courts have regularly applied the fair use doctrine to permit uses of software ensuring interoperability with new products and devices.[354]

---

[349] *Davidson & Assocs. v. Jung*, 422 F.3d 630, 641–42 (8th Cir. 2005) ("To successfully prove the interoperability defense under § 1201(f), [defendants] must show:  (1) they lawfully obtained the right to use a copy of a computer program; (2) the information gathered as a result of the reverse engineering was not previously readily available to the person engaging in the circumvention; (3) the sole purpose of the reverse engineering was to identify and analyze those elements of the program that were necessary to achieve interoperability of an independently created computer program with other programs; and (4) the alleged circumvention did not constitute infringement.").

[350] *Reimerdes*, 111 F. Supp. 2d at 320.

[351] *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 218 (S.D.N.Y. 2000).

[352] *See* Tr. at 133:16–135:02 (May 20, 2016) (Dow, Walt Disney Co.) (citing *Corley*, 273 F.3d 429).

[353] SOFTWARE STUDY at 52; *see also* 2015 Recommendation at 159–64 (recommending unlocking exemption and noting "interoperability is favored under the law").

[354] SOFTWARE STUDY at 51–52, 59–60 (citing *Sega*, 977 F.2d at 1527–28 (holding that reverse engineering to make a video game console interoperable with defendant's video games was a fair use) and *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir. 2000) (holding

As explained above, however, violations of section 1201(a) must be evaluated separately from questions of copyright infringement.  In prior rulemakings, the Office has suggested that section 1201(f) is unclear whether a person may circumvent for interoperability purposes if that person does not also perform an identification and analysis of the programmatic elements necessary to achieve interoperability.  In other words, even though paragraphs (f)(2) and (f)(3) contemplate the creation and distribution of information or circumvention tools to others "for the purpose of enabling interoperability," they do not provide an express exemption to the circumvention bar under section 1201(a)(1).[355]  Paragraph (f)(1), however, does provide an express exemption from liability under paragraph (a)(1), but only if circumvention is "for the sole purpose" of performing identification and analysis.[356]  For example, when recommending an exemption for jailbreaking smartphones in 2010, the Register remarked that

> [i]n enacting Section 1201(f), Congress provided that one who created a circumvention tool (a "means") to enable an independently created computer program to interoperate with a computer program (including a bootloader or an operating system) would be permitted to provide that circumvention tool to others so that they may use the tool to enable an independently created computer program to interoperate with another computer program when such activity is noninfringing.  Since Congress determined that it is lawful to make such tools and provide them to others for such purposes, it is difficult to imagine why Congress would nevertheless have wished to make it unlawful for others to use the tools for the purposes for which they were lawfully provided.[357]

The Register continued to note ambiguity in the statutory language when recommending multiple exemptions related to interoperability purposes, including cellphone unlocking and jailbreaking, in 2012[358] and 2015.[359]

---

that reverse engineering to allow playing of PlayStation video games on a desktop computer was a fair use)).

[355] 17 U.S.C. § 1201(f)(2)–(3).

[356] *Id.* § 1201(f)(1).

[357] 2010 Recommendation at 92.

[358] 2012 Recommendation at 71, 92 (noting that the Register was "confronted with an arguably ambiguous statute, the apparent purpose of which does not appear precisely to match its language").

[359] 2015 Recommendation at 337 n.2295 (recommending exemption for preserving video games and noting that ambiguity creates "significant doubt" regarding the applicability of section 1201(f)); *id.* at 206 n.1339 (jailbreaking smart televisions); *id.* at 368 n.2481 (3D printers); *id.* at 160

LOC_AR_00003300

After considering the legislative history and purpose of the exemption, however, the Office now believes that section 1201(f)'s meaning is fairly clear. In establishing an exemption for reverse engineering,[360] Congress aimed to "foster competition and innovation in the computer and software industry"[361] by allowing "legitimate software developers to continue engaging in certain activities for the purpose of achieving interoperability" to the extent permitted by prior law.[362] Multiple legislative history reports state that section 1201(f) was intended to preserve the effect of existing case law in this area, including specifically the Ninth Circuit's decision in *Sega Enterprises Ltd. v. Accolade, Inc.*[363] In that case, Sega, a video game manufacturer, brought copyright and trademark claims against Accolade, a manufacturer of games compatible with Sega's Genesis console. Accolade used a device called a decompiler to "transform[] the machine-readable object code contained in . . . Sega's game cartridges into human-readable source code," which it used to determine the interface specifications for the Genesis.[364] Then, Accolade copied into its game cartridges a small segment of initialization code contained in Sega cartridges used to prevent the playing of pirated games. By doing so, Accolade enabled its games to interoperate with the Genesis console.

The Ninth Circuit rejected Sega's claims. As to its copyright claim, the court held that because "disassembly is the only means of gaining access to those unprotected aspects of the program, and because Accolade has a legitimate interest in gaining such access (in order to determine how to make its cartridges compatible with the Genesis console)," Accolade's use of Sega's code, including "the code which 'unlocks' the . . . console," was

---

n.1028 (unlocking smartphones); *id.* at 307–08 (security research); *see also id.* at 192 (jailbreaking smartphones).

[360] In a separate context, the Supreme Court has defined reverse engineering as "starting with the known product and working backward to divine the process which aided in its development or manufacture." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974).

[361] SENATE JUDICIARY COMMITTEE REPORT at 13; *see also* HOUSE MANAGER'S REPORT at 13 (stating that section 1201(f) is intended to "avoid hindering competition and innovation in the computer and software industry").

[362] SENATE JUDICIARY COMMITTEE REPORT at 13; HOUSE MANAGER'S REPORT at 14.

[363] *See* SENATE JUDICIARY COMMITTEE REPORT at 13 ("The objective is to ensure that the effect of current case law interpreting the Copyright Act is not changed by enactment of this legislation for certain acts of identification and analysis done in respect of computer programs. *See, Sega Enterprises Ltd.* v *Accolade, Inc.*, 977 F.2d 1510[] (9th Cir. 1992.)."); HOUSE MANAGER'S REPORT at 14 ("[T]he goal of this section is to ensure that current law is not changed, and not to encourage or permit infringement."); COMMERCE COMMITTEE REPORT at 42 (same).

[364] *Sega*, 977 F.2d at 1514.

LOC_AR_00003301

a fair use.[365]  The court also rejected Sega's Lanham Act-based challenges to Accolade's use of code to bypass Sega's authentication sequence—an act which, if considered through the lens of section 1201, might reasonably be considered a circumvention of Sega's access control.  The court held that although Accolade's use of the initialization code resulted in the display of Sega's trademark on the user's screen, Sega could not prevail on its claims of trademark infringement and false designation of origin.  Because the initialization code had "the effect of regulating access to" the Genesis console, and because there was no industry awareness of "any feasible alternate method of gaining access," the court held that Sega was primarily responsible for any resulting consumer confusion and that Accolade should be permitted to continue its activities.[366]  In reaching that conclusion, the court noted that Accolade's objective—"to make its video game programs compatible with" the Genesis—"was a legitimate and a lawful one."[367]

Section 1201(f) reflects Congress' determination that activities such as Accolade's would continue to be permissible notwithstanding the new protections for TPMs.  First, section 1201(f)(1) preserves the court's holding that reverse engineering for legitimate interoperability analysis is a noninfringing use.  In *Sega*, the Ninth Circuit held that "disassembly of copyrighted object code is, as a matter of law, a fair use of the copyrighted work if such disassembly provides the only means of access to those elements of the code that are not protected by copyright and the copier has a legitimate reason for seeking such access."[368]  Accordingly, section 1201(f)(1) permits circumvention "for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs, and that have not previously been readily available to the person engaging in the circumvention."[369]

Second, section 1201(f)(2) reflects Congress' acknowledgement that reverse engineering activities similar to Accolade's may require the development and use of circumvention tools.  Although the legislative history states that decompilers and other "generally available" computer-programming tools are not covered by the anti-trafficking provisions, it notes that "[i]n certain instances, it is possible that a person may have to develop special tools to achieve the permitted purpose of interoperability."[370]  Section 1201(f)(2) thus creates an exemption to the anti-trafficking provisions allowing a person to "develop and employ technological means to circumvent a technological measure . . .

---

[365] *Id.* at 1520, 1524 n.7.

[366] *Id.* at 1528.

[367] *Id.* at 1529.

[368] *Id.* at 1518.

[369] 17 U.S.C. § 1201(f)(1).

[370] HOUSE MANAGER'S REPORT at 15.

LOC_AR_00003302

in order to enable the identification and analysis" set out in paragraph (f)(1).[371]  In addition, Accolade included code in its games to render them interoperable with Sega's console.[372]  The second clause of section 1201(f)(2) accommodates this scenario, permitting the development and use of circumvention tools "for the purpose of enabling interoperability of an independently created computer program with other programs."[373]

Third, section 1201(f)(3)—which, unlike the earlier subparts of section 1201(f), is not limited to either the anticircumvention or the anti-trafficking provisions—recognizes that the effect of the *Accolade* decision, in protecting Accolade's inclusion of circumvention code in games offered to consumers,[374] also implicitly authorized consumers to use this code to play Accolade games on Sega consoles.  As noted, Accolade "added the [initialization] code to . . . all games,"[375] thus giving consumers the means to circumvent the access control on the Genesis console.  Congress codified this result in section 1201(f)(3), which authorizes persons qualifying under sections 1201(f)(1) or (f)(2) to make "available to others" the information acquired during the reverse engineering process and the "means" for enabling interoperability "solely for the purpose of enabling interoperability of an independently created computer program with other programs."[376]  Thus, while the statute is not free from ambiguity, the Office believes that section 1201(f)(3)'s authorization to make circumvention tools and information available to others for the purpose of achieving interoperability must be read to correspondingly authorize recipients—including individual consumers—to use the tools for that purpose, provided the other statutory requirements are satisfied.  The

---

[371] 17 U.S.C. § 1201(f)(2); *see also* COMMERCE COMMITTEE REPORT at 42–43 (discussing the need to "develop special tools to achieve the permitted interoperability").

[372] *Sega*, 977 F.2d at 1515–16.

[373] 17 U.S.C. § 1201(f)(2).

[374] As noted, the relevant code included the SEGA trademark, and, in disposing of Lanham Act claims, the court noted that the code "has the effect of regulating access to the Genesis III console," which "serves to limit competition in the market for Genesis-compatible games."  *Sega*, 977 F.2d at 1528–30.

[375] *Id.* at 1516.

[376] 17 U.S.C. § 1201(f)(3).  The Senate Judiciary Committee Report refers to section 1201(f)(3) as a means to allow third parties to assist reverse engineers in their efforts.  *See* SENATE JUDICIARY COMMITTEE REPORT at 33 ("This subsection allows developers of independently created software to rely on third parties either to develop the necessary circumvention tools or to identify the necessary information to achieve interoperability.").  But the statutory language does not limit that provision to sharing information with third-party developers.  Moreover, the *Sega* opinion—which the same report describes as unaffected by the statute, *see id.* at 13—contemplates use of the relevant tools by consumers.

LOC_AR_00003303

Office therefore agrees that under certain circumstances sections 1201(f)(2) and (3) already allow "circumvention after reverse engineering has been performed."[377]

While section 1201(f) therefore permits legitimate user acts of creating, distributing, and using circumvention tools for interoperability purposes, it also contains a series of important safeguards to protect the legitimate interests of copyright owners.[378] To start, the exempted activities may not constitute infringement or, with respect to section 1201(f)(3), violate other applicable law.[379] Next, circumvention must be "solely for the purpose of enabling interoperability."[380] Both case law and past rulemakings suggest that evidence of market alternatives to circumvention can be used to infer that a purpose is for reasons other than interoperability.[381] In addition, the statute requires that "an independently created computer program" be made interoperable with other computer programs.[382] Thus, in the 2015 rulemaking, the Register concluded that section 1201(f) would not cover cellphone unlocking, because circumvention in that context is done "to allow a device to connect to an alternate wireless network," not to make the device interoperable with an independently created computer program.[383] Finally,

---

[377] ORI Additional Comments at 4. An example may be remanufacturing print cartridges to make them interoperable with a competitor's printers, which the Office previously noted "could have been lawfully achieved by taking advantage of the defense found in §1201(f)." 2003 Recommendation at 176. It may also allow jailbreaking smartphones, for example, "in order to make the operating system on that phone interoperable with an independently created application . . . [when] the modifications . . . are made purely for the purpose of such interoperability." 2010 Recommendation at 100 (citations omitted). That being said, the Office will continue to grant exemptions where there is a sufficient evidentiary record in cases where there may be reasonable disagreement as to whether section 1201(f) applies.

[378] *See* HOUSE MANAGER'S REPORT at 15 ("[T]he goal of this section is to ensure that current law is not changed, and not to encourage or permit infringement. Thus, each of the acts undertaken must fall within the scope of fair use o[r] otherwise avoid infringing the copyright of the author of the underlying computer program.").

[379] 17 U.S.C. § 1201(f)(1)–(3); *see also* 2015 Recommendation at 197–201 (noting that jailbreaking of video consoles was highly correlated to piracy of games).

[380] 17 U.S.C. § 1201(f)(3).

[381] *See, e.g., Reimerdes*, 111 F. Supp. 2d at 320 (rejecting argument that DVD decryption was created to achieve interoperability); 2015 Recommendation at 197–201 (declining to recommend exemption for jailbreaking of video game consoles in part due to existence of market alternatives); 2000 Recommendation and Final Rule at 64,569 (discussing *Reimerdes* and noting "evidence that Linux players are currently being developed" under license).

[382] 17 U.S.C. § 1201(f)(1)–(3).

[383] 2015 Recommendation at 160 n.1028.

LOC_AR_00003304

circumvention under section 1201(f)(3) requires there to have been antecedent acts of reverse engineering under section 1201(f)(1) or 1201(f)(2).[384]

In light of this construction, the Office is not convinced that amendment of section 1201(f) is currently necessary to allow software engineers or consumers to engage in the legitimate activities to enable the interoperability that Congress intended.  The Office hopes that the interpretive guidance provided in this Report will be helpful to some users otherwise hesitant to rely upon the exemption absent clear case law.  That said, if Congress wishes to do so, the Office would also welcome legislative clarification of the circumstances under which persons may (or may not) engage in circumvention for interoperability purposes, apart from analyzing elements necessary to achieve interoperability.[385]  In the meantime, stakeholders can continue to rely on the triennial rulemaking process to obtain exemptions for activities that arguably may fall outside of those covered by section 1201(f).

Finally, the Copyright Office considered requests to expand section 1201(f) to permit reverse engineering for purposes of security research, unrelated to interoperability concerns.[386]  Although prior rulemakings have addressed the need to engage in reverse engineering for security research,[387] as discussed below, the Office concludes that that need is better addressed through the separate exemption for security testing set out in section 1201(j), or the triennial rulemaking, rather than through reform to section 1201(f).

### b.  1201(j) Exemption for Security Testing

Since passage of the DMCA in 1998, the unprecedented reliance upon software and digital networks in all facets of American life has brought with it a corresponding explosion of cybersecurity challenges.  The statutory exemption for security testing is both a testament to Congress' foresight in accommodating the relationship between

---

[384] 17 U.S.C. § 1201(f)(3); *see also Reimerdes*, 111 F. Supp. 2d at 320 ("Section 1201(f)(3) permits information acquired through reverse engineering to be made available to others only by the person who acquired it through reverse engineering.  But these defendants did not do any reverse engineering. They simply took DeCSS off someone else's web site and posted it on their own.").

[385] One such model is provided in the Breaking Down Barriers to Innovation Act of 2015, which, among other changes, would broaden paragraph (f)(1) to permit circumvention for the purpose of "undertaking activities aimed at achieving interoperability."  H.R. 1883, 114th Cong. § 3(b)(1) (2015); S. 990, 114th Cong. § 3(b)(1) (2015).

[386] *See, e.g.*, Rapid7, Bugcrowd & HackerOne Initial Comments at 4 (suggesting that paragraph (f)(1)'s "sole purpose" language "hinders security research" because "interoperability is not necessarily the purpose of security research"); *see also* Timothy Pearson Initial Comments at 1.

[387] *See, e.g.*, 2015 Recommendation at 307 (citing 2015 Rulemaking Green Class 25 Supp. at 19–20, https://www.copyright.gov/1201/2015/comments-020615/InitialComments_LongForm_Green_Class25.pdf).

LOC_AR_00003305

copyright and good-faith security research, and the product of a time when the current digital landscape could not possibly have been anticipated.

As the Office has repeatedly noted, "rules governing security research 'hardly seem the province of copyright, since the considerations of how safely to encourage such investigation are fairly far afield from copyright's core purpose of promoting the creation and dissemination of creative works.'"[388]  Moreover, "[t]here are significant benefits to allowing security researchers to study software-enabled consumer products for potential vulnerabilities and to share their findings with the general public."[389] Indeed, many parts of the government have a vested interest in improving the nation's cybersecurity, including the Department of Commerce's Internet Policy Task Force, which "is conducting a comprehensive review of the nexus between cybersecurity challenges in the commercial sector and innovation in the Internet economy."[390]  Most recently, the Office's 2016 report on *Software-Enabled Consumer Products* examined "whether existing copyright law enables or frustrates the public's ability to engage in security research involving software-enabled consumer products."[391]  While the study did not examine section 1201, it concluded that "existing copyright law doctrines, properly interpreted, should protect this legitimate activity from infringement liability."[392]

While the Office concluded that existing copyright law doctrines are likely to immunize researchers from infringement concerns, it is less clear that the framework of chapter 12 is similarly accommodating.  The constraints of section 1201(j) flow from its original purpose.  As noted above, and as the Register explained in 2010, in enacting 1201(j), "Congress appeared to be addressing firewalls and antivirus software that were used on computers, computer systems and networks to protect their respective contents" and "wanted to encourage independent evaluation of such security systems."[393]  But, as past rulemakings, congressional testimony, and comments received in this study reveal, there is a growing need for independent security research that falls outside these bounds. Since 1998, three temporary exemptions have been granted for various security research activities.[394]  As a result, the two former Registers who have issued recommendations in

---

[388] SOFTWARE STUDY at 44 (quoting 2015 Recommendation at 316).

[389] *Id.*; *see also* 2010 Recommendation at 205.

[390] *Cybersecurity*, NTIA, U.S. DEP'T OF COMMERCE, https://www.ntia.doc.gov/category/cybersecurity (last visited June 8, 2017).

[391] SOFTWARE STUDY at 42.

[392] *Id.* at 45; *see also id.* at 45–51 (analyzing the idea/expression dichotomy, merger, and *scènes à faire* doctrines, *de minimis* uses, section 117 of title 17, and fair use).

[393] 2010 Recommendation at 196; *see also* 2015 Recommendation at 308 (quoting same).

[394] *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 71 Fed. Reg. 68,472, 68,477 (Nov. 27, 2006) ("2006 Final Rule") (sound

LOC_AR_00003306

the 1201 rulemakings since section 1201's enactment in 1998 have supported congressional review of 1201(j).[395]  Others echoed this recommendation, including NTIA[396] and a stakeholder who testified in the recent copyright review hearing on chapter 12.[397]

Against this backdrop, several commenters called for an overhaul of the permanent exemption for security testing under section 1201(j), characterizing the statutory language as insufficient to insulate good-faith security researchers from the reach of the circumvention and trafficking prohibitions.  Some noted that security researchers have petitioned for exemptions in the past several rulemakings due to uncertainty over whether section 1201(j) would cover their activities, arguing, for instance, "[t]he fact that it was necessary to petition for exemptions covering security research of medical devices and automobiles, even though security research is already a hardcoded exemption in Section 1201, shows why a much more definitive solution . . . is needed."[398]  Comments received were not uniform, however, with others arguing that the statutory language generally strikes an appropriate balance between the interests of researchers and

---

recordings and audiovisual works); 2010 Final Rule at 43,832–33 (video games); 2015 Final Rule at 65,955–56 (computer programs on a device or machine designed for use by individual consumers).

[395] *See Register's Perspective on Copyright Review: Hearing Before H. Comm. on the Judiciary*, 114th Cong. 29 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office); 2010 Recommendation at 205–06.

[396] NTIA, Recommendations of the National Telecommunications and Information Administration to the Register of Copyrights 76 (Sept. 18, 2015) ("2015 NTIA Letter"), https://www.copyright.gov/1201/2015/2015_NTIA_Letter.pdf (expressing support for a "broad good faith security exemption"); *see also* Letter from Lawrence E. Strickling, NTIA, to Marybeth Peters, Register of Copyrights 12 (Nov. 4, 2009), https://www.copyright.gov/1201/2010/NTIA.pdf (supporting a "limited exemption that permits research by academic, government, and private entities and individuals").

[397] *Chapter 12 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop. & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 80–81 (2014) (statement of Corynne McSherry, EFF) ("[T]he problem with 1201 is that it has inhibited things like security testing which is all the more important with the proliferation of DRM.").

[398] R Street Institute Initial Comments at 7; *see also* CDT Initial Comments at 10 ("[R]esearchers have asked for triennial exemptions to allow security research three times, each time citing uncertainty as to the applicability of 1201(j) to their proposed areas of research."); Tr. at 27:12–19 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) ("[C]omputer security researchers . . . made an effort this year to get exemptions and . . . we were all happy, those of us who care about cyber security, to see that the Office did recognize that there are some legitimate reasons to circumvent that the Office might recognize.").

73

LOC_AR_00003307

copyright owners,[399] and suggesting that additional activities are more properly considered through the triennial rulemaking, which can more flexibly respond to marketplace changes.[400]  But the majority supported making 1201(j) more useful, and even some stakeholders content with the current statute acknowledged the legitimate interests of good-faith security researchers.[401]

In light of stakeholder comments and the past experiences of the triennial rulemaking, the Copyright Office recommends that Congress consider reforming this exemption to better accommodate a broader range of legitimate security research, without compromising copyright's core objectives.  Specifically, as described below, the Office recommends that Congress consider expanding the reach of this exemption, easing the strict authorization requirement for researchers and restrictions on the use of information generated from the research, and abandoning or clarifying the multifactor test.  The Office believes that this measured approach will help accommodate critical cybersecurity concerns while preserving the copyright objectives in the anticircumvention provisions.  While the Office is not at this time proposing statutory language for reform, it continues to believe that the exemption adopted in 2015 can be a useful starting point, and notes that most of the security researchers who petitioned for that exemption, as well as other commenters, agree.[402]

---

[399] *See, e.g.*, AAP, ESA, MPAA & RIAA Additional Comments at 2; Copyright Alliance Additional Comments at 2; SIIA Additional Comments at 3.

[400] *See* AAP, ESA, MPAA & RIAA Additional Reply Comments at 9–10; DVD CCA & AACS LA Additional Comments at 4.

[401] *See* SIIA Initial Comments at 3 (noting that the security testing exemption was the result of "careful negotiation" which "successfully balance[d the] legitimate interest [in security testing] against risks of infringement"); BSA Additional Comments at 2–3 (endorsing a "measured approach . . . with respect to existing security research exemptions").  While AAP, ESA, MPAA, and RIAA, filing jointly, oppose legislative reform and suggest that the failure to renew past exemptions allowing for research on TPMs protecting copyrighted works suggests that "those circumstances changed," it is not clear that as a general rule they oppose otherwise appropriate exemptions, such as to allow for security research on access controls themselves.  AAP, ESA, MPAA & RIAA Additional Reply Comments at 9.

[402] *See* Prof. Andrea M. Matwyshyn on behalf of Profs. Steven Bellovin, Matt Blaze, Alex Halderman & Nadia Heninger ("Security Researchers") Additional Comments at 1 ("[T]he language of the granted exemption is suitable for adoption as a permanent exemption"); BSA Additional Comments at 2–3 ("The [2015] security research language . . . reflects the careful consideration that is necessary in evaluating potential changes to Section 1201(j)."); Repair Ass'n & iFixit Additional Comments at 11 ("[W]e urge the Copyright Office and the Congress to make this exemption permanent, while expanding it to cover any goods which contain a computer program."); *see also* Tr. at 109:16–19 (May 20, 2016) (Geiger, Rapid7) ("The temporary exemption is a big deal for us.  It is extremely helpful."); Tr. at 27:11–19 (May 25, 2016) (Samuelson, Univ. of

LOC_AR_00003308

1. *Definition of security testing.* One area for reform that has repeatedly surfaced in the last three rulemakings is the definition of security testing, which the statute limits to "accessing a computer, computer system, or computer network."[403] The issue is that modern security research may involve testing software or the actual access controls protecting a copyrighted work, and it is not clear that the exemption covers such research. For that reason, Register Peters twice recommended an exemption for security research related to TPMs themselves.[404] She further noted that the rulemaking structure limited the nature of the exemptions that could be granted: "While it may be socially beneficial to permit security testing and research in relation to all classes of works, neither the record nor the statute provide the Librarian with any basis to do so."[405] More recently, in 2015, Register Pallante recommended an exemption for security research on computer programs, finding "there is some uncertainty regarding whether section 1201(j) encompasses security research that is primarily focused on testing and identifying flaws in computer programs rather than security systems that protect computer systems."[406] Because it has become clear that there is a need for good-faith security researchers to access computer programs and TPMs protecting copyrighted works, the Office recommends that Congress expand the kinds of activities that a security researcher is permitted to perform under sections 1201(j)(1) and 1201(j)(3)(A).

The Office believes that the current temporary exemption for good-faith security research is a good starting point for discussion.[407] To be sure, some commenters found the scope of even this exemption—which limits the scope of security research to certain devices or machines, namely consumer-facing devices like voting machines, motorized land vehicles, and medical devices—too narrow,[408] while others characterized it as overbroad.[409] But as noted above, a group of professors in computer science and related

---

Cal. Berkeley Sch. of Law) (stating that at a recent "all day workshop with computer security researchers" she learned that they "were all happy . . . to see that [in the 2015 rulemaking] the Office did recognize that there are some legitimate reasons to circumvent").

[403] 17 U.S.C. § 1201(j)(1).

[404] *See* 2010 Recommendation at 196 ("Had Congress foreseen the problem, it is reasonable to conclude that it might have addressed the issue in more precise terms. But it appears that Congress did not envision protection measures themselves becoming the source of a security flaw or vulnerability."); *id.* at 203 n.666 (similar); 2006 Recommendation at 59 (similar).

[405] 2010 Recommendation at 205.

[406] 2015 Recommendation at 308.

[407] *See* 2015 Final Rule at 65,956; 2015 Recommendation at 319–20.

[408] *See, e.g.*, Rapid7, Bugcrowd, HackerOne & Luta Security Additional Comments at 4–5; CERT Coordination Ctr. ("CERT") Additional Comments at 2; EFF Additional Comments at 6–7.

[409] *See, e.g.*, AAP, ESA, MPAA & RIAA Additional Reply Comments at 9 ("[T]he record before the Copyright Office at that time had focused on cars, medical devices, and voting machines, not on

LOC_AR_00003309

fields, many of whom had participated in the rulemaking process, opined that the adoption of this exemption "would further buttress security researchers' ability to engage in good-faith testing, investigation and/or correction of security flaws and vulnerabilities aimed at consumer protection and national security enhancement."[410]

2.  *Authorization.*  Section 1201(j) requires researchers to obtain "authorization of the owner or operator of [the] computer, computer system, or computer network."[411] Independent security testing, however, appears to be an important component of current cybersecurity practices; a recent NTIA report found that a little more than fifty percent of security researchers work independently.[412]  In fact, the Copyright Office recently noted that a growing number of copyright owners, including Google, Facebook, Microsoft, Mozilla, Oracle, and Apple, encourage users to conduct security research, in many cases providing monetary incentives for those who identify problems and potential solutions.[413]

While growing industry practices may encourage independent security research, some companies see value in the authorization requirement in preventing "compromised systems" and the release of proprietary material.[414]  But a greater number of commenters urged reform of this requirement, noting that research could be chilled if the owner cannot be located, does not respond, or refuses permission when located.[415]  In the past

---

devices used by consumers to view and listen to expressive works.  Thus, the exemption should have been tailored accordingly."); DVD CCA & AACS LA Additional Comments at 4–5.

[410] Security Researchers Additional Comments at 1.

[411] 17 U.S.C. § 1201(j)(1).

[412] *See* NTIA, Vulnerability Disclosure Attitudes and Actions:  A Research Report from the NTIA Awareness and Adoption Group 4 (2016) ("NTIA Vulnerability Disclosure Report").

[413] Software Study at 45.

[414] BSA Additional Comments at 2–3 (recognizing that "it may be helpful to provide greater clarity in situations with multiple owners," but opposing eliminating this provision entirely, because "[u]nsanctioned, unauthorized system access under the guise of 'security research' can not only result in compromised systems, but also risks revealing to malefactors sensitive trade secrets, private consumer data, and other proprietary material").

[415] *See, e.g.*, CDT Initial Comments at 11 ("Due to the interconnected nature of many devices, systems, and networks, . . . determining *which* owner or owners must authorize the research is an increasingly complex task that may not always be possible."); Rapid7, Bugcrowd & HackerOne Initial Comments at 5 (arguing that "[i]f security research only takes place under circumstances dictated by the owner of the software, it may be difficult for the research to remain impartial, and the owner may prevent or delay publication of research that reflects negatively on the owner's software," which "can chill independent security research"); Yifan Lu Additional Reply Comments at 1 (stating that repeated attempts to gain authorization go unacknowledged); Tr. at 110:08–111:09 (May 20, 2016) (Geiger, Rapid7) (noting that "a lot of independent security

LOC_AR_00003310

rulemaking, the Office recognized that "[i]n some cases, it may be difficult to identify the relevant owner, such as when the focus of the research is on general-purpose software that runs on a wide range of devices, or where the owner of software on a particular device is not known.  Moreover, it may not be feasible to obtain authorization even where there is an identifiable owner."[416]  In part due to these concerns, the Register has recommended, and the Librarian granted, multiple exemptions for security research that do not require the researcher to first obtain authorization of the owner of the object being studied.[417]

For these reasons, the Copyright Office recommends that Congress add greater flexibility to the current authorization requirement, such as an exception in cases where the owner cannot be reached or is unresponsive, or remove it entirely, similar to the current temporary exemption.  While concerns over compromised systems and disclosure of sensitive information should not be minimized, these fears may be already accommodated through other parts of the exemption, including, but not limited to, requirements that research be conducted in good faith, and that information be disclosed without facilitating infringement, impairing security, disclosing trade secrets or business confidential information, or contravening privacy laws.[418]  Again, the Office believes that past rulemaking exemptions can be helpful in demonstrating alternate ways to address these concerns without imposing a blanket authorization requirement that may stymie the public policy goal of promoting security research.

3. *Multifactor test.*  Section 1201(j)(3) conditions eligibility upon "factors to be considered," including whether the information derived from the testing is "used solely to promote the security of the owner or operator" or "used or maintained in a manner that does not facilitate infringement under this title or a violation of applicable law other than this section, including a violation of privacy or breach of security."[419]  Many commenters found these provisions confusing because, as CDT put it, the statute "gives

---

researchers . . . actually receive cease-and-desist letters that reference the DMCA" and stating that the authorization requirement "means that manufacturers themselves get to control completely how the security research takes place and what the publication is like"); Tr. at 128:07–09, 129:01–02 (May 20, 2016) (Geiger, Rapid7) (stating that some manufacturers are difficult to contact); Tr. at 220:17–19 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) (noting "there are . . . times where the firm whose software is being tested is somebody that has reason to not want you to do it").

[416] 2015 Recommendation at 309 (citing 2015 Rulemaking Green Class 25 Supp. at 21–22, https://www.copyright.gov/1201/2015/comments-020615/InitialComments_LongForm_Green_Class25.pdf).

[417] *See, e.g.*, 2015 Final Rule at 65,963; 2010 Final Rule at 43,839; 2006 Final Rule at 68,480.

[418] 17 U.S.C. § 1201(j)(1)–(3).

[419] *Id.* § 1201(j)(3).

LOC_AR_00003311

no signal as to how those factors should be weighed."[420]  SIIA, a group representing many rightsholders in this space, noted that these factors are intended to be "non-exclusive," and urged the Office to suggest that industry custom and trade usages could also be considered in determining eligibility for the exemption.[421]

Others objected to the specific language of one or both factors.  Rapid7, Bugcrowd, and HackerOne argued, in joint comments, that the first factor—which looks to "whether the information derived from the security testing was used solely to promote the security" of the relevant owner or operator[422]—is overly restrictive because "security research may appropriately be undertaken for the benefit of software users or the broader public."[423]  As to the second factor—which considers "whether the information derived from the security testing was used or maintained in a manner that does not facilitate infringement under this title or a violation of applicable law other than this section"[424]—EFF suggested that it provides inadequate protection because it "threaten[s] liability based upon the actions of third parties outside of the researcher's control."[425]  More generally, CDT observed that regulating the disclosure of security information can implicate First Amendment concerns.[426]  It noted that disclosure norms "are still evolving" and urged that any statutory changes "leave room for these efforts to comprehensively address disclosure practices."[427]

In rulemakings, the Register has acknowledged concerns over these requirements, stating "the multifactor standard in section 1201(j) may be difficult to apply [in cases where] . . . the security research sought would be aimed in part at advancing the state of knowledge in the field, and not 'solely' aimed at promoting the security of the owner or operator of the computer, computer system, or computer network (assuming such an

---

[420] CDT Initial Comments at 11; *accord* Repair Ass'n & iFixit Additional Comments at 13.

[421] SIIA Additional Reply Comments at 2–3 (quoting H.R. REP. NO. 105-796, at 67 (1998) (Conf. Rep.)).

[422] 17 U.S.C. § 1201(j)(3)(A).

[423] Rapid7, Bugcrowd & HackerOne Initial Comments at 4.

[424] 17 U.S.C. § 1201(j)(3)(B).

[425] EFF Additional Comments at 6.

[426] CDT Initial Comments at 11 (citing 2015 Recommendation at 311); *see also* Tr. at 228:01–18 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law).

[427] CDT Initial Comments at 11; *see also Multistakeholder Process: Cybersecurity Vulnerabilities*, NTIA, https://www.ntia.doc.gov/other-publication/2016/multistakeholder-process-cybersecurity-vulnerabilities; Tr. at 128:03–20 (May 20, 2016) (Geiger, Rapid7) (referencing the multistakeholder process and noting that disclosure "is not really the norm among industries right now").

LOC_AR_00003312

owner could be identified)," and that "determining the relevant 'developer' to whom information must be disclosed could be difficult if not impossible in some instances."[428]

The Office recommends amending the statute to remove the "sole purpose" language and minimize uncertainty created by the multifactor test.  The Office agrees that the two factors may be intended to be non-exclusive and have commonsense applications in many cases.[429]  But in light of emerging industry practices, marketplace reality, and the lack of case law, these two factors are not always the only considerations relevant in evaluating responsible security research, and at any rate, it is not always feasible to consider *ex ante* how these factors will be applied to research.  One option would be to replace these factors with language similar to that of the 2015 security research rulemaking exemption:  "where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates . . . ."[430]  An alternative proposed by the Breaking Down Barriers to Innovation Act of 2015, and endorsed by some commenters, would simply eliminate this provision entirely.[431]  Absent legislative reform, the Office agrees with SIIA that it may be helpful to interpret the current provision to also require consideration of industry custom and trade usages, such as the National Institute of Standards and Technology's (NIST's) indices or ISO/IEC standards regarding disclosure of security vulnerabilities.[432]

4.  *Compliance with other applicable laws.*  Section 1201(j) exempts security testing only "if such act does not constitute infringement under this title or a violation of applicable law other than this section, including section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986."[433]  Some commenters suggested this clause should be removed because it "compounds both uncertainty and

---

[428] 2015 Recommendation at 309 (citations omitted).

[429] *See* SIIA Additional Reply Comments at 2–3 (citing H.R. Rep. No. 106-464, at 67 (1999) (Conf. Rep.)); AAP, ESA, MPAA & RIAA Additional Reply Comments at 11.

[430] 2015 Final Rule at 65,944.

[431] H.R. 1883, 114th Cong. § 3(a)(1)(F)(iii), (2015); S. 990, 114th Cong. § 3(a)(1)(F)(iii) (2015); *see* CDT Initial Comments at 11; EFF Initial Comments at 11–12; OTI Initial Comments at 13–15; Repair Ass'n & iFixit Additional Comments at 13 & n.18.

[432] SIIA Additional Reply Comments at 3; *see also Common Vulnerabilities and Exposures*, MITRE, https://cve.mitre.org (last visited June 9, 2017); 2015 Recommendation at 250 n.1667 (citing comments of Bellovin et al.) (suggesting that a temporary exemption should allow researchers to publicly disclose research results when "a copyright holder fails to comply with the standards set forth in ISO 29147 and 30111"); Rapid7, Bugcrowd, HackerOne & Luta Security Additional Comments at 5 (referencing NIST NVD/CVE); NTIA Vulnerability Disclosure Report at 4.

[433] 17 U.S.C. § 1201(j)(2).

LOC_AR_00003313

risk without changing researchers' legal obligations," in light of ambiguity regarding liability standards under the CFAA.[434]  Similarly, commenters questioned the adoption of similar language in the 2015 temporary exemption.[435]  While the Copyright Office welcomes further discussion regarding whether a similar clause should continue to be included in an exemption granted through the triennial rulemaking,[436] it was not clear from this study that the requirement to comply with other laws impedes legitimate security research; other laws still apply even if the activity is permitted under section 1201.  Therefore, the Office does not recommend legislative reform of this provision.

### c.  1201(g) Exemption for Encryption Research

Congress adopted section 1201(g), which provides exemptions to both the circumvention and trafficking prohibitions for certain acts of encryption research, to ensure that the anticircumvention laws would not have "the undesirable and unintended consequence of chilling legitimate research activities in the area of encryption."[437]  Some commenters contended that section 1201(g) does not adequately serve the needs of persons engaged in good-faith encryption research,[438] while copyright industry representatives generally disagreed that section 1201(g) warrants legislative change.[439]  For the reasons outlined below, the Copyright Office suggests that this exemption, like the exemption for security testing, might benefit from revision, specifically the current authorization requirement and multifactor test.  In addition, further study, including by involving a broader range of participants, may be worthwhile in formulating concrete legislative proposals.

*1.  Authorization.*  While section 1201(g)'s requirement of a "a good faith effort to obtain authorization" is more forgiving than the authorization requirement under the security testing exemption, there is a similar concern that it is not always possible to locate and

---

[434] EFF Initial Comments at 6–7; CDT Additional Comments at 4–5; *see also* CDT Initial Comments at 11 ("Alternately, CDT supports simply striking the portions of the statute requiring compliance with other laws and the unspecified consideration of factors, as proposed by the Breaking Down Barriers to Innovation Act."); Rapid7, Bugcrowd & HackerOne Initial Comments at 5 (stating that this requirement "creates additional ambiguity and risks for researchers" because the CFAA has been applied inconsistently by courts in different jurisdictions).

[435] *See* Rapid7, Bugcrowd, HackerOne & Luta Security Additional Comments at 4; CDT Additional Comments at 4–5; CERT Additional Comments at 1; EFF Additional Comments at 7.

[436] *See* 37 C.F.R. § 201.40(b)(7)(i).

[437] COMMERCE COMMITTEE REPORT at 27.

[438] *See, e.g.,* USACM Initial Comments at 3–4; Public Knowledge Additional Reply Comments at 1; OTI Initial Comments at 12–15.

[439] *See* DVD CCA & AACS LA Additional Comments at 6; SIIA Additional Comments at 3; AAP, ESA, MPAA & RIAA Additional Reply Comments at 11.

LOC_AR_00003314

request permission before engaging in fruitful research, and that projects are abandoned out of fear that efforts will be found to fall short of the good-faith requirement.[440] While AAP, ESA, MPAA, and RIAA emphasized that "[a]ll that is required is a good faith effort to obtain permission"[441]—a burden that they regard as reasonable given the expressed willingness of some TPM owners to consider license requests from researchers—others shared instances where security researchers were denied permission to engage in encryption research.[442] In the 2015 rulemaking, the Office found that, for cryptologists, "obtain[ing] authorization from copyright holders . . . may not always be feasible."[443] In light of these comments, and the growing industry customs and practices described above, the Office recommends removing or amending the authorization requirement.

2. *Multifactor Test.* As is true of section 1201(j), the encryption research exemption includes a list of statutory factors to be considered in determining whether a person qualifies for the circumvention exemption, which include whether and in what manner information derived from the research was disseminated; whether the person is engaged in a legitimate course of study, is employed, or is appropriately trained or experienced, in the field; and whether the person provides the copyright owner with notice of the findings and documentation of the research.[444] The comments for this study revealed concern that this list creates uncertainty among researchers as to whether their actions would be protected, including concerns that researchers lack sufficient control over the downstream distribution of information derived from the encryption research.[445] Commenters pointed out that the second factor unfairly penalizes researchers outside of the "field of encryption technology,"[446] and that the third factor, concerning whether the researcher provides notice to the "copyright owner of the work to which the

---

[440] *See, e.g.,* EFF Additional Comments at 6 (arguing that this "means the researcher must invite a potentially negative response from the manufacturer at an early stage, without being given any guarantee that their conduct will be considered lawful"); CDT Additional Comments at 6.

[441] AAP, ESA, MPAA & RIAA Additional Reply Comments at 11; *see also* DVD CCA & AACS LA Additional Comments at 6 ("DVD CCA and AACS LA . . . remain open to the possibility of licensing any reasonable non-infringing use such as security research, security testing, encryption research, and interoperability.").

[442] *See, e.g.,* Tr. at 220:17–19 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law); Tr. at 110:04–18 (May 20, 2016) (Geiger, Rapid7).

[443] 2015 Recommendation at 307.

[444] *See* 17 U.S.C. § 1201(g)(3).

[445] EFF Additional Comments at 6.

[446] 17 U.S.C. § 1201(g); *see* EFF Additional Comments at 6.

LOC_AR_00003315

technological measure is applied" does not apply in all situations.[447]  For many of the same reasons discussed in connection with section 1201(j), the Office believes it is advisable to amend the statute to minimize uncertainty.

*3.  Limited definition of encryption research.*  One academic commenter expressed concern that the current exemption does not cover other types of research, including circumventing encryption to study a computer virus, detect infringement, or determine whether an item is child pornography.[448]  While the Office agrees that these other activities may be socially beneficial, it is not clear that circumvention aimed at detecting infringement, for example, is best addressed within the confines of an exemption directed at fostering encryption research, rather than through a separate exemption, and so the Office does not see a current need to amend this definition.

*4.  Need for study.*  Some commenters suggested that it might be beneficial for additional security and encryption researchers to opine as to ways the current exemption may be modernized.[449]  While the Copyright Office believes that the issues identified above, regarding the authorization requirement and multifactor test, are sufficiently ripe for legislative consideration,  it agrees that further input that takes into account additional viewpoints as to the needs of modern research could be beneficial when moving forward with concrete legislative proposals.

### d.  1201(i) Exemption for Protection of Personally Identifying Information

Despite commenters expressing non-specific concerns regarding section 1201's relationship to technologies involving the collection of consumer information,[450] the

---

[447] *See* NTIA VULNERABILITY DISCLOSURE REPORT 6 ("Though . . . fear of legal action is not a barrier per se, it may cause researchers to deviate from their default choices on disclosure.  Increasing legal certainty, therefore, is a method that may improve adoption of best practices."); *see also* Mozilla Initial Comments at 3–4 (noting a case where a researcher was "threatened with legal action under Section 1201 for attempting to engage with the device manufacturers to report and resolve [discovered security concerns]"); EFF Additional Comments at 6 (stating that, under the current exemption for encryption research, "[a] researcher may be penalized . . . if they publish information in a way that can be used by independent third parties to violate copyright or other laws, or if they fail to communicate with the copyright owner").

[448] Pamela Samuelson, *Towards More Sensible Anti-Circumvention Regulations*, 5 NO. 5 CYBERSPACE LAW. 2, 5–6 (2000); *see* Tr. at 221:14–222:05 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law).

[449] *See* Tr. at 227:01–12 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law); *see also* Tr. at 232:18–233:01 (May 25, 2016) (Stoltz, EFF).

[450] *See* Tr. at 240:21–241:06 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) ("I think it is time to rethink [section 1201(i)] and see whether we can make it something that's

LOC_AR_00003316

Office received few substantive comments on section 1201(i), which exempts certain acts of circumvention "solely for the purpose of preventing the collection or dissemination of personally identifying information about a natural person who seeks to gain access to the work protected," provided that the circumvention does not violate any other law.[451] Practically speaking, one commenter suggested that consumers may lack incentive to use this exemption because this kind of circumvention is "fairly technically challenging" and "device specific."[452]

The Office notes that the growing prevalence of internet-connected devices in all facets of life may give rise to privacy concerns far beyond those contemplated at the time of the DMCA's enactment.[453]  However, in light of the lack of discussion and the dearth of case law regarding section 1201(i), this provision appears premature for legislative reform. That being said, the Office notes that section 1201(i) includes language requiring that circumvention be "solely for the purpose of" and have the "sole effect" of disabling the collection or dissemination of personally identifying information.  As noted above, the Office has recommended amending similar clauses in the security testing and reverse engineering exemptions, based on concerns that this language inhibits circumvention that has other purposes or effects, such as increasing security or promoting research; further study may reveal whether similar reform is advisable for this exemption.[454]

---

meaningful in this era when we're all scared about our private information leaking out there and we don't want people to have access to some of our information and hide it behind some sort of encryption wall that then means that we can't get our own information."); Tr. at 158:08–12 (May 20, 2016) (Koberidze) ("All those devices, smartphones, TVs and medical devices.  Now we will have Amazon Alexa and then we will have smart homes.  And everything will be connected. . . . A lot of privacy issues will arise.").

[451] 17 U.S.C. § 1201(i)(1)(D).  While one commenter suggested that this exemption should be amended to allow for circumvention of access controls on game consoles "to determine if [his or her] personal and non-personal data is being tracked or transmitted to third parties," *see* starelikemckeehen poker club Initial Comments at 1, ESA responded that this request appears already to be covered under section 1201(i).  ESA Reply Comments at 7.

[452] Tr. at 241:07–21 (May 25, 2016) (Wiens, iFixit).

[453] For example, the Federal Trade Commission recently settled a lawsuit with a smart TV manufacturer alleged to have surreptitiously transmitted and sold data related to individual user viewing habits.  *See* Lesley Fair, *What Vizio was doing behind the TV screen*, FTC BUS. BLOG (Feb. 6, 2017, 11:05 AM), https://www.ftc.gov/news-events/blogs/business-blog/2017/02/what-vizio-was-doing-behind-tv-screen; *see also* Andrew Meola, *How the Internet of Things will affect security & privacy*, BUS. INSIDER (Dec. 19, 2016, 2:43 PM), http://www.businessinsider.com/internet-of-things-security-privacy-2016–8.

[454] The Breaking Down Barriers to Innovation Act would broaden section 1201(i) by removing the requirement that the circumvention be "solely" for the authorized purpose, as well as the requirement that it not violate another law.  It also would allow circumvention to protect

LOC_AR_00003317

## 2. Proposed New Permanent Exemptions

### a. Assistive Technologies

One broadly endorsed potential new exemption was to make permanent an exemption to facilitate access to literary works (*e.g.*, e-books, digital textbooks, and PDF articles) by persons who are blind, visually-impaired, or print-disabled.  As adopted in 2015, this exemption permits circumvention of TPMs applied to literary works distributed electronically, where the access controls "either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies."[455]  It applies in the following circumstances:

> (i) When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels, or

> (ii) When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.[456]

An assistive technologies exemption has been adopted as a temporary exemption in the past five triennial rulemakings.[457]  Stakeholders testified that the repeated participation in the rulemaking process has become especially burdensome and time-consuming for the blind and print-disabled community, who must rely upon this exemption to access much printed material, without certainty that it will remain in place.[458]  AALL contended that "absent legislation mandating accessible versions of every work, there will always be a gap between the works available for those with and those without print

---

information about *any* natural person, not just one who seeks to gain access to the work protected.  H.R. 1883, 114th Cong. § 3(d); S. 990, 114th Cong. § 3(d).

[455] 2015 Final Rule at 65,950.

[456] *Id.*

[457] 2015 Final Rule at 65,950; 2012 Final Rule, at 65,262; 2010 Final Rule at 43,839; 2006 Final Rule at 68,475; Copyright Office, Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 68 Fed. Reg. 62,011, 62,014 (Oct. 31, 2003) ("2003 Final Rule").  This exemption has been virtually unchanged, except for 2012, when it was slightly altered, including to encompass literary works that are not in e-book format.

[458] AFB Initial Comments at 9 (estimating that law students spent 527.2 hours supporting its petition for a renewed exemption); LDAA Initial Comments at 1–2 ("[H]aving to repeat the regulatory process every three years represents an unfair burdening of disability advocacy organizations who must submit comments . . . .").

LOC_AR_00003318