**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MEDICAL IMAGING &
TECHNOLOGY ALLIANCE, et al.,

*Plaintiffs,*

*v.*

LIBRARY OF CONGRESS, et al.,

*Defendants.*

No. 1:22-cv-499 (BAH)

**JOINT APPENDIX**

**VOLUME 5 OF 6
(page excerpts AR 3319-4686)**

Rachael Westmoreland
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, D.C., DC 20530
  (202) 514-1280
  rachael.westmoreland@usdoj.gov

*Counsel for Defendants*

Michael B. Kimberly
  McDermott Will & Emery LLP
  500 North Capitol Street NW
  Washington, DC 20001
  (202) 756-8000
  mkimberly@mwe.com

*Counsel for Plaintiffs*

disabilities."[459]  This gap, the American Foundation for the Blind ("AFB") noted, "can make it more difficult for [blind, visually impaired, and print-disabled] individuals to meaningfully participate in all aspects of social and democratic dialogue."[460]  In joint comments, AFB, the American Council of the Blind, the National Federation of the Blind, Learning Ally, and the Samuelson-Glushko Technology Law & Policy Clinic noted that "[t]he record has consistently supported the need for the exemption to help people who are blind, visually impaired, or print disabled access e-books on equal terms" and argued that this exemption "is the quintessential example of an exemption category that should be made permanent."[461]

The study record did not reveal a substantive value to keeping this exemption in the rulemaking cycle, particularly in light of the burdens placed upon proponents.  While a limited number of commenters suggested that an assistive technologies exemption should remain subject to the rulemaking in case emerging technology lessens the need for an exemption,[462] overall, there was widespread support for the adoption of a permanent exemption.  The Office also notes that in past cycles, the temporary exemption has received no opposition and that even some rightsholders supported a permanent amendment.[463]  Further, even those commenters opposing the addition of a new permanent exemption endorsed the importance of accessibility.[464]

While some copyright owners predicted that the widespread adoption of EPUB 3.0 and HTML5 formats—both released in recent years—"could result in an amelioration or disappearance of the concerns related to disabled read-aloud functionality,"[465] these

---

[459] AALL Additional Comments at 2.

[460] AFB Initial Comments at 11.

[461] AFB, the Am. Council of the Blind, the Nat'l Fed'n of the Blind, Learning Ally & Samuelson-Glushko Tech. Law & Policy Clinic Additional Comments at 2.

[462] AAP, ESA, MPAA & RIAA Additional Reply Comments at 4–5 (opining that although they "support in principle that the marketplace must provide accessibility to copyrighted materials for the blind, visually impaired and print disabled," this exemption should remain a part of the rulemaking process); *see also* DVD CAA & AACS LA Initial Comments at 18 (stating they "are not aware of any additional categories of permanent exemptions that Congress should consider establishing").

[463] *See* Microsoft Corp. ("Microsoft") Initial Comments at 7–8.

[464] AAP, ESA, MPAA & RIAA Additional Reply Comments at 4 ("[W]hile AAP, ESA, MPAA and RIAA support in principle that the marketplace must provide accessibility to copyrighted materials for the blind, visually impaired and print disabled, they do not support amending Section 1201 to add a permanent exemption.").

[465] *Id*.  *But cf.* Microsoft Initial Comments at 7 (expressing support for making exemption permanent and stating, "Microsoft and other technology companies have taken some steps to facilitate the creation of accessible electronic content, but we know we need to do more.").

LOC_AR_00003319

industry efforts have not yet staved off the need for a dependable exemption.  Indeed, groups representing individuals making use of the temporary exemptions argued that such measures are not a substitute for a permanent exemption.  AFB argued that "[i]mposing further civic burdens on disabled individuals and requiring them or their representatives to repeatedly apply for exemptions as a precondition for equal access is deeply insensitive and harmful."[466]  Further, it was noted that although the rulemaking has granted an assistive technologies exemption since 2003, over 90 percent of books remain unavailable in formats for the print-disabled.[467]

The Copyright Office has previously stated that it "continues to support congressional attention aimed at crafting a digital age update to exceptions in copyright law for persons who are blind or visually impaired."[468]  In light of the repeated granting of the temporary exemption and the underling public policy of reducing burdens on people who are blind or print-disabled,[469] the Office believes that it would be appropriate to make this exemption permanent.

This exemption also would be appropriate in light of the recent adoption of the Marrakesh Treaty.[470]  Under that agreement, contracting parties must provide "a limitation or exception to the right of reproduction, the right of distribution, and the right of making available . . . to facilitate the availability of works in accessible format copies for [the blind, visually impaired, or otherwise print disabled]."[471]  Further, any protection against circumvention of TPMs may not prevent beneficiaries from enjoyment of such exceptions or limitations.[472]  While the United States can satisfy these requirements through continued adoption of an exemption via the rulemaking, the Office agrees with some commenters that enactment on a permanent basis would advance the Treaty's goals.[473]

---

[466] AFB Initial Comments at 12; *see also, e.g.*, LDAA Initial Comments at 2–3; Microsoft Initial Comments at 7–8; Victoria Maciulski Additional Comments at 2.

[467] Tr. at 184:01–10 (May 20, 2016) (Koberidze).

[468] *Register's Perspective on Copyright Review: Hearing Before H. Comm. on the Judiciary*, 114th Cong. 26 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

[469] *See* USACM Initial Comments at 4.

[470] As noted, the United States has not yet ratified the Marrakesh Treaty.

[471] Marrakesh Treaty, art. 4(1)(a).

[472] *Id*. art. 7.

[473] *See, e.g.*, AALL Additional Comments at 1–2 (suggesting that a permanent exemption would be beneficial in demonstrating compliance with the Marrakesh Treaty, rather than relying on the triennial rulemaking to grant continued exemptions); AFB Initial Comments at 11; KEI Initial Comments at 9; *see also* Univ. of Ill. at Urbana-Champaign Additional Comments at 2 (noting 57 other nations have adopted an exception for assistive technologies).  *But see* Tr. at 177:17–22 (May

Should Congress move forward in this area, the Office believes that the 2015 exemption could serve as an appropriate model.[474]  The Office acknowledges, however, that there may be some merit to commenters' concerns that the remuneration requirement may cause confusion in some circumstances.  This provision, which requires that the owner of the copyright in the accessed work be "remunerated, as appropriate . . . through customary channels,"[475] was added in 2012 out of proponents' recognition that "it was not their intent to create a situation where publishers are not getting paid for their works."[476]  Some commenters suggested that this requirement causes confusion because the exemption separately requires that the copy of the relevant work be "lawfully obtained," and suggested its removal.[477]  The Office recommends that any consideration of legislation include an assessment whether such a requirement is necessary.

The Office does not currently recommend a broader exemption to facilitate the use of assistive technology for non-literary works, an approach advocated by Public Knowledge, due to the lack of evidence that the triennial rulemaking cannot adequately accommodate the needs for such an exemption.[478]  The Office agrees with some commenters that "outside the narrow context of literary works" there has been "very

---

20, 2016) (Adler, AAP) (suggesting that the United States already complies with this aspect of the Marrakesh Treaty based in part on the adoption of the exemption via repeated rulemakings coupled with the Chafee Amendment).  The Chafee Amendment consists of exceptions and limitations for the blind or other people with disabilities, as well as "authorized entities," and is found in section 121 of the Copyright Act.  It does not include exceptions to the anticircumvention provisions of section 1201.  *See* 17 U.S.C. § 121.

[474] *See, e.g.*, Kernochan Center Additional Reply Comments at 2 (noting the 2015 exemption "is an appropriate formulation" for any new permanent exemption); EFF Additional Comments at 2–3 (supporting 2015 exemption language as "an improvement over the status quo," while also supporting a broader exemption).

[475] 37 C.F.R. § 201.40(b)(2).

[476] 2012 Final Rule at 65,263.

[477] LCA Additional Comments at 2–3 ("[I]f a sighted person purchases and reads an e-book, then gives it to her blind brother, could the brother circumvent the technological measure disabling the screen reader function without paying an additional fee to the publisher?  Would such an additional fee be 'appropriate?'  The answer is unclear.  If a blind person lawfully obtains a copy, the blind person should be able to read it, regardless of whether he obtained it by purchase or operation of the first sale or fair use doctrines."); *see also* Authors Alliance Additional Comments at 3; EFF Additional Comments at 3; NYIPLA Additional Reply Comments at 3.

[478] Public Knowledge Additional Comments at 2–3 (suggesting that this would "track the [Marrakesh] Treaty requirements")*; see also* Repair Ass'n & iFixit Additional Comments at 6 (advocating exemption that allows "software modifications that improve accessibility for Americans with other forms of disability").

LOC_AR_00003321

little in the records from prior rulemaking proceedings regarding other entertainment products" such as "video games, motion pictures or recorded music."[479]

## b. Obsolescence, Repair, and Modification

The Copyright Office received numerous comments advocating for statutory exemptions to permit circumvention to fix obsolete, damaged, or malfunctioning TPMs, to engage in diagnosis, maintenance, and repair of a device protected by a TPM, and to modify the software in such devices.[480]  As the Office understands, the first two categories aim to restore or maintain the status quo, by returning either the TPM or the device to a workable state.  Modification does not necessarily aim to restore the status quo, but would include enhancing or customizing a device.

The large volume of comments received—both in this study and in prior rulemakings—reflects the increasing use of access controls on a wide range of consumer devices containing copyrighted software.  As the Repair Association put it, "[e]ssentially all categories of manufactured products, from lightbulbs to toothbrushes, now contain software that is central to their functionality.  As a result, software has also become central to their repair."[481]  Consumer groups, particularly those representing automobile and tractor owners, expressed concern about copyright liability and their rights as an owner to maintain their vehicle.[482]  Growing public interest in repair activities is further reflected by the right-to-repair bills currently pending in several states, which would require manufacturers to sell the parts and software required to fix their products, as well as to publish repair manuals, providing consumers with the ability to fix their own products or bring them to a local repair shop.[483]

The Office has previously recognized section 1201's potential effect on legitimate repair activities.  In 2015 testimony to Congress, the Register noted that "consumers have voiced discomfort that Section 1201 prevents them from engaging in activities, such as

---

[479] AAP, ESA, MPAA & RIAA Additional Reply Comments at 4.

[480] *See, e.g.*, Auto Care Initial Comments at 3; EFF Initial Comments at 12; iFixit Initial Comments at 1–2; Static Control Components, Inc. Initial Comments at 2; AALL Additional Comments at 2; Authors Alliance Additional Comments at 4; John Josephs Additional Comments at 1; Kevin Kenney Additional Comments at 1; LCA Additional Comments at 3; ORI Additional Comments at 2–3; SAA Additional Comments at 2; Edward Matthews Additional Comments at 1; Consumers Union Additional Reply Comments at 3; Eleni Kalfus Additional Comments at 1; Public Knowledge Additional Comments at 3; Misha Cohen Additional Comments at 1.

[481] Repair Ass'n & iFixit Additional Comments at 4.

[482] Auto Care Additional Comments at 3; iFixit Initial Comments at 1–2.

[483] *See* Kyle Wiens, *You Bought That Gadget, And Damnit, You Should be Able to Fix It*, WIRED (Mar. 22, 2017) https://www.wired.com/2017/03/right-to-repair-laws/.

the repair of their automobiles and farm equipment, which previously had no implications under copyright law."[484]  In the most recent rulemaking, the Register found that TPMs protecting computer programs on vehicle electronic control units have a substantial effect on owners' ability to engage in lawful diagnosis and repair of their vehicles.[485]

And in this study, many commenters testified as to the impact of section 1201 on repair activities or obsolete TPMs.[486]  For example:

- a Nebraska Farm Bureau member explained that the addition of TPMs have made it impossible to employ mechanical repair and diagnostic methods to tractors and combines, adding time and expense to agricultural work;[487]

- a consumer voiced frustration with a combination ink-jet printer, copier, and scanner, where the scanner stopped working because the printer "was out of yellow ink and [there was] no way to bypass it;"[488] and

- AALL explained that libraries increasingly face issues with obsolete access controls blocking preservation efforts with respect to born-digital materials.[489]

In addition, some argued that the "use of electronic locks that prevent repair" are really "about protecting the competitive position of manufacturers for repair services" and are outside the purpose of copyright.[490]

---

[484] *Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 23–24 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

[485] 2015 Recommendation at 240.

[486] *See, e.g.*, IPT USC Initial Comments at 3 (arguing that farmers who want to repair their equipment "face the impractical challenge of seeking renewals for exemptions while simultaneously managing the specific and time-sensitive needs of their farms"); Brian Ehrhart Additional Comments at 1 (suggesting consumers should be empowered "to address their own problems, rather than being forced to wait on arbitrary decisions by software developers as to what is or is not a priority."); Free Software Foundation Additional Comments at 3 ("The ability to research or repair devices should likewise not be impaired by DRM."); Kevin Kenney Additional Reply Comments at 1 (suggesting section 1201 "prevents farmers [and] ranchers like myself from fixing our own equipment"); EFF Additional Comments at App'x 1 (advocating "strong, practical, and permanent exemptions" "to protect repair, security research, and other lawful activity" and including a petition with 11,334 signatures).

[487] Kevin Kenney Additional Reply Comments at 1.

[488] Michael Oeth Additional Comments at 1.

[489] AALL Initial Comments at 3.

LOC_AR_00003323

The growing demand for relief under section 1201 has coincided with a general understanding that bona fide repair and maintenance activities are typically noninfringing. The Copyright Office's recent study on *Software-Enabled Consumer Products* recognizes that repair activities are often protected from infringement claims by multiple copyright law provisions, including the fair use doctrine and section 117.[491] As the report explained, "the fundamental purpose of any repair is to preserve or restore the functionality of a software-enabled device so that it may continue to be used. In this respect, repair supports—rather than displaces—the purpose of the embedded programs that control that device."[492] Similarly, the Office concluded that "section 117 'should adequately protect most repair and maintenance activities'" for software-enabled devices.[493]

As described in detail below, to the extent section 1201 precludes diagnosis, repair, and maintenance activities otherwise permissible under title 17, the Office finds that a limited and properly-tailored permanent exemption for those purposes, including circumventing obsolete access controls for continued functioning of a device, would be consistent with the statute's overall policy goals. The Office does not, however, recommend that such a permanent exemption extend to circumvention for purposes of making other lawful modifications to software, or "tinkering." Instead, the Office recommends that these activities continue to be addressed through the rulemaking process, which is able to tailor exemptions to specific classes of works, based on the evidentiary record.

*Obsolete, Damaged, or Malfunctioning TPMs.* In part because past rulemakings have demonstrated both a repeated need for this exemption and the limited reach of the rulemaking to adequately address this issue, the Office recommends a permanent exemption for obsolete, damaged, or malfunctioning access controls, where circumvention is necessary for continued functionality. The types of TPMs that historically have become obsolete or damaged include "dongles," described as "hardware locks attached to a computer that interact with software programs to prevent unauthorized access to that software."[494] Such TPMs may also include server- or

---

[490] Repair Ass'n & iFixit Additional Reply Comments at 7.

[491] SOFTWARE STUDY at 33, 39–41 (also addressing the idea/expression dichotomy, merger, *scènes à faire*, and *de minimis* uses).

[492] *Id*. at 40.

[493] *Id*. at 35 (citation omitted).

[494] 2000 Recommendation and Final Rule at 64,565.

LOC_AR_00003324

hardware-checks, where a TPM connects to a different device, locally or remotely, to authenticate the work at issue as being a legitimate copy.[495]

This category has been the topic of multiple prior rulemakings, whose records are replete with descriptions of abandoned or otherwise no-longer-supported access controls preventing a user from the continued lawful use of a work.[496] In fact, each time there has been a sufficient evidentiary record to evaluate a requested exemption related to obsolete access controls, the Register has recommended, and the Librarian adopted, an exemption for such uses.[497] In this study, several commenters, including those representing libraries or archives, argued there was a need to accommodate concerns about obsolescence.[498] For example, Authors Alliance argued that there is a real "[c]oncern about the difficulty of preserving born-digital works" and that obsolete TPMs silence "born-digital works [that] suffer from digital locks that have rusted shut."[499] On the other hand, others suggested that the rulemaking may be able to accommodate these needs.[500]

---

[495] *See* 2015 Recommendation at 321 (addressing video games that "connect to an 'authentication server' to verify that the game is a legitimate copy. This connection or 'check' may be made once, at initial installation, or periodically throughout gameplay.").

[496] *See, e.g.*, 2010 Final Rule at 43,833–34; 2006 Final Rule at 68,475; 2003 Final Rule at 62,013–14; 2000 Recommendation and Final Rule at 64,565–66.

[497] In many instances, the exemptions also considered whether the TPM was damaged or malfunctioning. *See, e.g.*, 2015 Recommendation at 352 (abandoned video games); 2006 Final Rule at 68,475 (for "[c]omputer programs protected by dongles that prevent access due to malfunction or damage and which are obsolete"); 2003 Final Rule at 62,013–14; 2000 Recommendation and Final Rule at 64,564–66 (for "[l]iterary works, including computer programs and databases, protected by access control mechanisms that fail to permit access because of malfunction, damage or obsoleteness"). *But see* 2015 Recommendation at 355 (denying request for exemption to circumvent obsolete TPM on music recording software due to absence of any substantive submission supporting the exemption).

[498] *See, e.g.*, Consumers Union Additional Reply Comments at 3 (recommending a permanent exemption "for addressing obsolete or discontinued technologies" including "circumvention to address malfunction or damage as well"); AALL Initial Comments at 3–4; EFF Additional Comments at 5; LCA Additional Comments at 3.

[499] Authors Alliance Additional Comments at 4.

[500] AAP, ESA, MPAA & RIAA Additional Reply Comments at 7 (stating "there has been no consistency with respect to the petitions submitted, the exemptions granted, or the perceived problems articulated by proponents"; noting exemption for "accessing video games where authentication servers were no longer supported" was done so "for the first time" and was limited to "a specific market sector and included several limitations on its exercise").

LOC_AR_00003325

But as former Register Peters testified in 2001, the 1201 rulemaking process is a "somewhat ill-fitting regulatory approach," as damaged, malfunctioning, or obsolete TPMs potentially affect all classes of works, which could, "paradoxically, result in the conclusion that the problem is not one that can be resolved pursuant to [the rulemaking process], which anticipates exemptions only for 'a particular class of works.'"[501]  For that reason, the Register previously recommended that Congress adopt a permanent exemption for obsolete, damaged, or malfunctioning TPMs.[502]  The Office continues to support this permanent exemption for such access controls.

The definition of "obsolete" in section 108 may be a good starting point for defining obsolete access controls.[503]  Multiple rulemakings have imported the definition into regulatory language stating:  "'Obsolete' shall mean 'no longer manufactured or reasonably available in the commercial marketplace.'"[504]  The Office believes that this approach would be equally appropriate as statutory language, and suggests circumvention be permitted where it is necessary for continued lawful use of a work.

*Diagnosis, Maintenance, and Repair.*  The Office concludes that a properly-tailored exemption for repair activities could alleviate concerns regarding section 1201's effect on consumers' ability to engage in legitimate activities that did not previously implicate copyright law, without creating a material risk of harm to the market for or value of copyrighted works.  As discussed above, virtually all agree that section 1201 was not intended to facilitate manufacturers' use of TPMs to facilitate product tying or to achieve a lock-in effect under which consumers are effectively limited to repair services offered by the manufacturer.  Further, while temporary exemptions are necessarily limited to

---

[501] *U.S. Copyright Office: Hearing Before the Subcomm. on Courts, the Internet, and Intell. Prop. of the H. Comm. on the Judiciary*, 107th Cong. 12 (2001) (statement of Marybeth Peters, Register of Copyrights and Dir., U.S. Copyright Office) (citing 2000 Recommendation and Final Rule at 64,565).

[502] *Id.* at 12 (statement of Marybeth Peters, Register of Copyrights and Dir., U.S. Copyright Office) ("I recommended that Congress consider amending Section 1201 to provide a statutory exemption for all works . . . that are protected by access control mechanisms that fail to permit access because of malfunction, damage or obsoleteness."); *see also* 2000 Recommendation and Final Rule at 64,565.

[503] 17 U.S.C. § 108(c)(2) ("[A] format shall be considered obsolete if the machine or device necessary to render perceptible a work stored in that format is no longer manufactured or is no longer reasonably available in the commercial marketplace.").

[504] 2003 Recommendation at 198; *see* 2006 Final Rule at 68,475; 2000 Recommendation and Final Rule at 64,565–66; *see also* NYIPLA Additional Reply Comments at 5 (recommending this approach).  *But see* Public Knowledge Additional Reply Comments at 1 (arguing it was not necessary to tie exemption to section 108, although not offering alternative language).

LOC_AR_00003326

specific classes of works,[505] a limited permanent exemption for repair activities could provide greater certainty to users across classes of works, including software-enabled products.  It may also help restore the focus of the rulemaking to users seeking "to access and make noninfringing uses of expressive copyrighted works such as motion pictures, video games and e-books, as Congress undoubtedly had in mind when it created" that process.[506]

The Office recognizes that many copyright owners have expressed concern over an exemption for these purposes,[507] although some appeared to recognize that section 1201 may have room to accommodate legitimate repair activities, particularly of motor vehicles.[508]  SIIA noted that its members "routinely spend millions in providing technical support to their customers" and argued that the "mere existence of an extensive support network does not justify unfettered and harmful access to our members' intellectual property."[509]  ESA argued that "a permanent repair exemption as to video game devices" could threaten "[t]echnological measures . . . critical to the protection of creative works on consoles and other gaming devices," because "circumvention of those measures is closely linked to infringement."[510]  Other copyright owners expressed general opposition to adoption of any additional permanent exemptions, but did not comment specifically on whether Congress should establish a permanent exemption for diagnosis, maintenance, or repair.[511]  The Office notes that in the most recent rulemaking, these stakeholders did not oppose exemptions for vehicle repair.[512]

---

[505] *See* 17 U.S.C. § 1201(a)(1)(C).

[506] 2015 Recommendation at 2.

[507] *See, e.g.*, BSA Additional Comments at 2; Ass'n of Equip. Mfrs. & Equip. Dealers Ass'n ("AEM & EDA") Additional Comments at 2.

[508] AAP, ESA, MPAA & RIAA Additional Reply Comments at 14 (disagreeing with need for amendment to anti-trafficking provisions but "acknowledg[ing] that circumvention in the context of automobile repair or other forms of repair might present a unique and distinguishable set of circumstances"); *see also* Tr. at 37:22–38:03 (May 25, 2016) (Chertkof, RIAA) (acknowledging RIAA's concerns are not with automobile circumvention but expressing concern over line-drawing); Tr. at 56:01–57:03 (May 25, 2016) (Sheffner, MPAA).

[509] SIIA Initial Comments at 6.

[510] ESA Initial Reply Comments at 5–6.

[511] *See* Copyright Alliance Additional Comments at 2; DVD CCA & AACS LA Additional Comments at 2–3 (in response to question regarding obsolete access controls, stating "DVD CCA and AACS LA have no additional comments at this time"); AAP, ESA, MPAA & RIAA Additional Reply Comments at 5–6 (addressing only "modification" prong of the study's Second Notice).

[512] *See* 2015 Recommendation at 228 (describing opposition comments received regarding vehicle repair exemption).

LOC_AR_00003327

To the extent that rightsholders are concerned that an exemption to accommodate diagnosis, repair, maintenance, and obsolescence would be overbroad or misused,[513] the Office believes that these concerns can be adequately addressed with appropriately drafted statutory language. While the Copyright Office is not suggesting specific legislative text, believing instead that continued stakeholder discussion would be beneficial to any legislative process, it offers a few guidelines for consideration. First, as both rightsholders and user groups recognized,[514] Congress anticipated the need to accommodate repair and maintenance activities in section 117, which contains definitions of "repair" and "maintenance" in section 117(d).[515] These definitions may provide a reasonable starting point for future legislation.[516] Linking an exemption to section 117(d) would seem to address vagueness concerns, while still providing meaningful relief to many consumers and repair technicians.[517] Second, the Office also recommends that any permanent exemption also require that circumvention be a necessary step to allow the diagnosis, repair, or maintenance, as is required under the

---

[513] *See, e.g.*, AAP, ESA, MPAA & RIAA Additional Reply Comments at 6.

[514] *See, e.g.*, Public Knowledge Additional Comments at 3–4 ("While modification may raise concerns about infringing uses, by tying the exemption to the existing Section 117 exceptions, rights holders will still have recourse in enforcing their copyrights under existing case law. We believe that an exemption limited strictly to Section 117 would be inadequate, as the Office itself has granted related exemptions on the basis of both Section 117 and fair use."); AAP, ESA, MPAA & RIAA Additional Reply Comments at 6 (noting that "'maintenance and repair' can be tied to Section 117 activity"); Motor & Equip. Mfrs. Ass'n ("MEMA") Additional Comments at 4. *But see* Repair Ass'n & iFixit Additional Reply Comments at 8 (urging a broader exemption); Auto Care Additional Comments at 4–5 (suggesting an exemption "cover[ing] all activities necessary for the repair or customization of a motor vehicle"; listing activities).

[515] 17 U.S.C. § 117(d) states:

> For purposes of this section: (1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and (2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.

[516] The Office did not receive comments in support of its inquiry whether existing legal doctrines of repair and reconstruction in patent law, or "right to repair" bills introduced in state legislatures, could be helpful on this issue. *See also* Public Knowledge Additional Comments at 5 ("We do not think it is appropriate to look to patent, trademark, or state law in determining the contours of an exemption from circumvention liability."); NYIPLA Additional Reply Comments at 4 (rejecting analogy to repair/refurbishment doctrine).

[517] For example, remanufacturing processes may fit within section 117(d)'s scope. *See* MEMA Additional Comments at 3 ("Remanufacturing processes incorporate technical specifications (including engineering, quality and testing standards) to yield fully warranted products.").

LOC_AR_00003328

current exemption for motor vehicle software.[518]  Third, the Office recommends against limiting an exemption to specific technologies or devices, such as motor vehicles, as any statutory language would likely be soon outpaced by technology.  Fourth, to the extent that commenters oppose an exemption for repair out of non-copyright related concerns, such as public safety, the Office believes these matters are better addressed through laws or regulations outside of the Copyright Act.[519]

*Lawful Modification.*  Modification or "tinkering," however, raises significantly different issues from repair.  Colloquial uses of tinkering may refer to activities related to diagnosis, analysis, maintenance, repair, and modifications to facilitate interoperability, but also include a broader range of practices related to customization, experimentation, and improvement.[520]  An exemption of this type might permit, for example, circumvention of access controls on a car's electronic control unit to make software modifications that would improve a vehicle function.[521]

Many commenters representing user interests supported such an exemption.[522]  EFF argued that while "[d]iagnosis, maintenance, and repair of personal devices are important, and in need of greater legal certainty . . . . [t]here are . . . many other

---

[518] 2015 Final Rule at 65,954; *cf.* 17 U.S.C. § 117(a) (conditioning exception for making copy or adaptation of computer program on requirement that it is "an essential step in the utilization of the computer program in conjunction with a machine").

[519] *See, e.g.,* AEM & EDA Additional Comments at 2 ("AEM and EDA oppose the enactment of any permanent exemption to circumvention for diagnosis, repair, maintenance or modification that would pose unnecessary risks to public safety, the environment and the economy."); BSA Additional Comments at 2 ("With self-driving cars on the horizon, it is not difficult to imagine how mere 'diagnoses' or 'repairs' that might seem appropriate could create software modifications resulting in safety hazards and unknown consequences to third parties.").

[520] *See, e.g.,* ORI Additional Comments at 3 ("Those engaged in the secondary market for such products should be allowed to circumvent the TPM on the software for the purpose of changing the authenticated user."); Consumers Union Additional Reply Comments at 2 (suggesting that section 1201 prevents consumers from "being able to tinker with the product, to customize or adapt it, to improve its utility or performance, to get it repaired, or to remove its parts and use them in some other product"); Tr. at 258:15–18 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) ("I'm trying to make [a] device, whether it's software or an actual gadget, do something that I want it to do better than the device that I bought, is that repair?  Is that tinkering?").

[521] *See* 2015 Recommendation at 218–49.

[522] *See, e.g.,* Tr. at 27:10–11 (May 25, 2016) (Samuelson, Univ. of Cal., Berkeley Sch. of Law) ("Much user innovation actually comes out of tinkering with technologies."); Public Knowledge Initial Reply Comments at 5; John Josephs Additional Comments at 1; Repair Ass'n & iFixit Additional Comments at 4; *see also* Pamela Samuelson, *Freedom to Tinker* 2, THEORETICAL INQUIRES IN LAW (forthcoming), https://ssrn.com/abstract=2800362.

LOC_AR_00003329

important and lawful reasons to modify copies of computer programs."[523]  Similarly, the Repair Association and iFixit contended that "[w]ith computer software providing key parts of the functionality of many devices bought by American consumers and businesses, repair and improvement of those devices will depend on their ability to modify software, just as they currently have the ability to modify hardware they've purchased."[524]

Copyright owners strongly opposed an exemption for "tinkering" on the ground that it would be vague and overbroad.  AAP, ESA, MPAA, and RIAA opined that "[t]his type of broad-brush approach was rejected by Congress when the DMCA was drafted because creating such vaguely-defined exemptions without specific instructions . . . is a recipe for misuse and confusion."[525]  Moreover, they indicated that an exemption for modification would present substantially greater risk of infringement than one limited to diagnosis, repair, and maintenance:  "[W]hile 'maintenance and repair' can be tied to Section 117 activity, going beyond that to cover all 'modifications' or 'customizations' or efforts to 'improve the functionality' of computer programs would invite the creation of infringing derivative works."[526]  In their view, these concerns would not be mitigated by, for example, prohibiting unauthorized use of works other than the accessed computer program, or by limiting the exemption to programs that "do 'not in turn create any protected expression' when executed," similar to the United Kingdom's anticircumvention law.[527]

These concerns of copyright owners are valid, and the comments received in response to this study suggest that tinkering is hard to define, and that there is no accepted meaning or limitations on what it involves.  To be sure, in many cases modification activities may not implicate significant copyright interests.  On the other hand, some tinkering activities may result in the creations of new works in ways that implicate the copyright owner's exclusive right to prepare derivative works.[528]  Commenters have suggested no reliable way to define with any precision a category of lawful adaptations, generally, for

---

[523] EFF Additional Comments at 4.

[524] Repair Ass'n & iFixit Additional Comments at 9.

[525] AAP, ESA, MPAA & RIAA Additional Reply Comments at 6.

[526] *Id.*

[527] *Id.* at 6–7 (citation omitted) (quoting Section 1201 Study:  Request for Additional Comments, 81 Fed. Reg. at 66,297 (citing example of TPMs used to protect access to the operating software in video game consoles and suggesting that plaintiffs in a legal system like the UK's "face additional, unnecessary hurdles in litigation against pirate enterprises"); *see* Copyright, Designs and Patents Act 1988, c. 48, § 296ZA (UK) (circumvention bar that specifically excludes TPMs applied to computer programs).

[528] *See* 17 U.S.C. § 106(2).

LOC_AR_00003330

purposes of section 1201.  Accordingly, in contrast to diagnosis, repair, and maintenance, the Office cannot say that lawful modification of software is categorically unlikely to result in harm to the legitimate interests of copyright owners.[529]

The Office therefore concludes that such activity does not provide an appropriate basis for a permanent exemption at this time.  The triennial rulemaking process, however, will continue to provide a means to obtain exemptions for these uses,[530] and the Office is hopeful that the streamlining changes outlined below will lessen the burden of renewing exemptions found to satisfy the statutory requirements.  Moreover, as described above, the Office believes that section 1201(f) should be available to accommodate many concerns related to software interoperability.[531]  Collectively, these exemptions may cover a substantial portion of circumvention activities involving software-enabled products in which there is a legitimate consumer interest.

### c.  Device Unlocking

Since 2006, the triennial rulemaking has involved consideration of exemptions for unlocking cellphones, *i.e.*, enabling them to connect to the network of a different mobile wireless carrier.  In the 2015 rulemaking—as directed by the Unlocking Act[532]—the Register considered whether to extend the exemption to other categories of wireless devices.  The Unlocking Act's legislative history notes that consumers have "a legitimate interest in unlocking" their used cellphones to connect to an alternate network.[533]  In recommending the 2015 exemption the Register similarly concluded that, as a general matter, the unlocking of certain types of used mobile devices is likely to be a fair and noninfringing use, and that absent an exemption, consumers would be adversely

---

[529] *See, e.g.*, AAP, ESA, MPAA & RIAA Additional Reply Comments at 6–7 ("[M]anufacturers of video game consoles use access controls to prevent piracy not only by restricting access to computer programs that render video games perceptible, but also by restricting access to the software that operates the consoles and authenticates games.  Circumvention of such access controls leads to play of pirated games."); *see also* 2015 Recommendation at 241 (recommending that the exemption permitting lawful modification of motor vehicle software exclude programs controlling telematics or entertainment systems, to avoid "a diminution in the value of copyrighted works if those systems could no longer reliably protect the content made available through them").

[530] *See* 2015 Final Rule at 65,963 (adopting exemption for, *inter alia*, lawful modification of a vehicle function).

[531] For example, as discussed above, section 1201(f) may separately exempt certain activities related to replacement parts.  *See also Lexmark,* 387 F.3d at 550–51 (disagreeing with district court's rejection of section 1201(f) defense).

[532] *See* Unlocking Act § 2(b), 128 Stat. at 1751.

[533] H.R. REP. NO. 113-356, at 3 (2014).

LOC_AR_00003331

affected in their ability to engage in such activity.[534]  Based on that recommendation, the Librarian adopted an unlocking exemption that applies to used wireless devices of the following types:

> (A) Wireless telephone handsets (*i.e.*, cellphones);
>
> (B) All-purpose tablet computers;
>
> (C) Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and
>
> (D) Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.[535]

Some commenters supported adopting a permanent exemption in substantially the same form as the 2015 exemption.[536]  Others urged the Office to recommend a broader exemption applicable to "all devices that connect to a wireless network, rather than freezing a list of categories of devices into the statute."[537]

Some copyright owners, on the other hand, were skeptical of the need to make any unlocking exemption permanent through legislation, stating, for example, that although they "have no objection in principle to the notion that consumers should be able to connect their devices to the mobile wireless network(s) of their choosing," they see no reason to revisit Congress' determination in the Unlocking Act that such requests would continue to be addressed through the triennial rulemaking.[538]

The Unlocking Act, recent rulemaking proceedings, and comments received in this study collectively reflect a broad level of agreement that device unlocking provides an appropriate basis for an exemption in at least certain circumstances.  Significantly, the

---

[534] 2015 Recommendation at 169–71.

[535] 2015 Final Rule at 65,952.

[536] *See, e.g.*, Competitive Carriers Ass'n Additional Comments at 3; ISRI Additional Comments at 2; *see also* Kernochan Center Additional Reply Comments at 2 ("[I]t is preferable to use the exemption as formulated in the 2015 rulemaking proceeding, and add devices pursuant to the triennial proceeding, to the extent justified by the evidence presented.").

[537] Consumers Union Additional Reply Comments at 3; *see also* Mozilla Additional Comments at 2 (urging the Office to "craft language that achieves the underlying purpose in a way that adapts to current and future technologies"); Repair Ass'n & iFixit Additional Comments at 6–7 ("[T]he language of the existing exemption is too specific.").

[538] AAP, ESA, MPAA & RIAA Additional Reply Comments at 5; *see also* NYIPLA Additional Reply Comments at 4 ("[M]aking the unlocking exemption of 2015 permanent would be premature.").

LOC_AR_00003332

2015 exemption generated only minimal opposition from stakeholders, and those complaints were directed to relatively narrow definitional concerns.[539]  And in this study, even those opposed to addressing this issue through legislation did not dispute the public's interest in unlocking mobile devices or suggest that it threatens the value of copyrighted works.  On the other hand, commenters in favor of a statutory exemption did not demonstrate a strong demand to make this exemption permanent, as opposed to repeat adoption through the triennial rulemaking process, and rightsholders suggested that the rulemakings will continue to accommodate the need for renewed exemptions.

In light of these considerations, if Congress wishes to provide more certainty to users, the Office recommends the adoption of a permanent unlocking exemption, based upon the regulatory language repeatedly granted in the rulemakings.  At the same time, the Office recognizes that Congress considered this issue in 2014 and elected not to follow that approach.  Further, the Office believes that the streamlining changes outlined below will serve as a useful alternative to legislation for purposes of renewing exemptions to which there is no opposition.

### d.  Library and Archival Uses

Libraries and archives advocated a new permanent exemption allowing them to circumvent for broader purposes than the existing permanent exemption set out in section 1201(d).  While section 1201(d) allows nonprofit libraries, archives, and educational institutions to circumvent access controls for the sole purpose of making a good-faith determination of whether to acquire a copy of the protected work, participants representing these institutions uniformly expressed the view that this exemption does not serve any of their practical needs.[540]  Instead, they supported a new permanent exemption for all activities permitted under section 108, which authorizes libraries and archives to reproduce and distribute certain copyrighted works on a limited basis for purposes of preservation, replacement, and research.[541]  As an example,

---

[539] *See* 2015 Recommendation at 156–64 (addressing request to limit exemption to exclude "certain illicit unlocking practices," such as "the unlocking of new, carrier-subsidized prepaid cellphones").

[540] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 6–7 (noting that vendors of copyrighted works typically provide trial access to institutions considering potential purchases, making it unnecessary for such users to engage in circumvention for that purpose); LCA Initial Comments at 9 (stating it is unaware of any instance since the DMCA's enactment in which a covered institution has made use of this exemption); MIT Initial Comments at 4–5; SAA Initial Comments at 5; Univ. of Va. Libraries Initial Comments at 3; Tr. at 88:07–11 (May 20, 2016) (Cox, ARL).

[541] *See, e.g.*, AALL Initial Comments at 4; *see* 17 U.S.C. § 108 (permitting reproduction and distribution of works for the purposes of preservation and security, deposit for research, replacement, and user requests).

LOC_AR_00003333

while libraries rely on section 108(c)'s exception allowing reproduction of certain works stored in obsolete formats in certain circumstances, section 1201 "currently does not allow for circumvention of access controls for preservation."[542] This is a particular concern, the AALL argued, given the need to "circumvent or permanently remove obsolete TPMs" to gain access to "older born-digital materials."[543]

Others questioned the need for an additional permanent exemption for libraries and archives. The Kernochan Center noted that libraries have requested exemptions in past rulemakings "to a limited extent," which, in the Center's view, is inconsistent with "the assertion that the current statutory structure is inadequate."[544] AAP suggested that issues of digital preservation are more properly addressed through updates to section 108 itself, and questioned whether such an exemption could be tailored to ensure that it did not give rise to access other than for legitimate preservation activities.[545]

The Office appreciates that TPMs can affect legitimate interests of libraries, archives, and other memory institutions and believes that a permanent exemption tied to activities authorized by section 108 is worthy of consideration and debate, but finds it is premature to recommend specific legislative reforms. As the Office previously noted when recommending a temporary exemption for the preservation of video games, "section 108 provides useful and important guidance as to Congress' intent regarding the nature and scope of legitimate preservation activities."[546] That said, the Office also has long expressed concern that section 108 is in some ways inadequate to address the needs of institutions in the digital age.[547] For example, section 108 does not address museums, but the past rulemaking record included many examples of museum-based video game preservation activities.[548] These and other changes could be addressed in future updates to section 108. Indeed, the Office is in the midst of a review of section 108, addressing provisions concerning copies for users, security measures, public access,

---

[542] AALL Initial Comments at 3–4.

[543] *Id*. at 3. SAA proposed a broader exemption that also would permit libraries and archives to circumvent TPMs for activities protected by the fair use doctrine. SAA Additional Comments at 4. Because other stakeholders suggested a similar exemption, this proposal is discussed separately in section III.C.3.f.

[544] Kernochan Center Initial Comments at 8.

[545] Tr. at 51:04–52:10 (May 20, 2016) (Adler, AAP).

[546] 2015 Recommendation at 341.

[547] *See, e.g., id*. at 7 ("[T]he exceptions for preservation activities set forth in section 108 appear inadequate to address institutional needs in relation to digital works."); *The Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 20–21 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

[548] *See* 2015 Recommendation at 342.

LOC_AR_00003334

and third-party outsourcing.[549]  In light of this, and because this Report could not study the interaction of any potential legislative changes to section 108 with section 1201, the Office believes that broad reform of section 1201 in this area is premature.  Moreover, as many of the comments from library associations focused on the specific problem of obsolete access controls, the Office believes that the more targeted proposed exemption for obsolete TPMs discussed above is a preferable first step.[550]  The triennial rulemaking, however, remains a vehicle to evaluate requests for a broader exemption for preservation activities by classes of works by memory institutions.

### e.  Educational and Derivative Uses of Audiovisual Works

The past four rulemakings have granted various exemptions for educational uses for audiovisual works.[551]  As adopted in 2015, the exemption permits circumvention to make use of short portions of motion pictures for purposes of criticism and comment in various contexts, including documentary filmmaking, noncommercial videos, multimedia e-books, and education.[552]  A few commenters expressed support for making this exemption permanent.  LCA argued that

> [a]s audiovisual works have become increasing[ly] more central to education, this exemption has become even more critical to effective instruction at all levels.  At the same time, rights holders have never demonstrated that the exemption has led to any infringing activity.  Thus, making the exemption permanent would eliminate the burden of seeking an exemption every three years without causing rights holders any harm.[553]

While not mentioning audiovisual works specifically, AAU, ACE, APLU, and EDUCAUSE offered that any permanent exemption for "nonprofit educational uses or

---

[549] *See* Section 108:  Draft Revision of the Library and Archives Exceptions in U.S. Copyright Law, 81 Fed. Reg. 36,594, 36,598 (June 7, 2016); *Revising Section 108: Copyright Exceptions for Libraries and Archives*, U.S. COPYRIGHT OFFICE, https://www.copyright.gov/policy/section108/ (last visited June 15, 2017).

[550] *See supra* pp. 90–92.

[551] 2015 Final Rule at 65,946–47; 2012 Final Rule at 65,266; 2010 Final Rule at 43,827–28; 2006 Final Rule at 68,473–74.

[552] 2015 Final Rule at 65,961–62.

[553] LCA Additional Comments at 1; *see also* Tr. at 172:03–09 (May 19, 2016) (Butler, Univ. of Va. Libraries) (advocating a permanent exemption for educational uses for audiovisual classes); Tr. at 96:01–10 (May 20, 2016) (Cox, ARL) (same).

LOC_AR_00003335

for certain 'per se' educational works" should be drafted broadly, "so they are sufficiently adaptable to accommodate evolving technologies."[554]

The Copyright Office recognizes the burdens associated with the need to request this exemption on a recurring basis. The language and scope of this exemption has changed with each rulemaking, however, suggesting that adopting it as permanent would be premature.[555] In this respect, the exemption differs from the assistive technologies exemption. The Office expects that a new streamlined process for repeat exemptions, as discussed below, should facilitate the process of renewal, enabling proponents to focus on expanding the exemption's scope to include new technologies and/or on eliminating obsolete technologies.

### f.  All Lawful or Fair Uses

Finally, commenters representing various user interests urged adoption of a broad permanent exemption that would permit circumvention for any lawful or noninfringing use.[556] Although framed as an exemption, this suggestion is substantially identical to the proposal discussed above to limit the activities covered by section 1201(a) in the first instance to those bearing a nexus to infringement. For the same reasons addressed in reference to that proposal, the Office does not recommend such an exemption. As discussed, conditioning section 1201 liability on a violation of another law would fail to account for the independent harm to the value of copyrighted works caused by unauthorized digital access.

Some also suggested a similar, though somewhat narrower, exemption allowing circumvention for any activity protected by the fair use doctrine.[557] In response, others

---

[554] AAU, ACE, APLU & EDUCAUSE Initial Comments at 13.

[555] In this regard, the Office agrees that, in general, "[n]ew or expanded permanent exemptions should be recommended where, and only to the extent that, parties have consistently sought and been granted exemptions in the past through the rulemaking process." Kernochan Center Additional Reply Comments at 2.

[556] *See, e.g.,* Authors Alliance Initial Comments at 4 (suggesting that an "exemption . . . to enable noninfringing use of a technically protected copyright work . . . would remedy the persistent under-inclusiveness of the existing statute's exemption process"); OTW Initial Comments at 8 ("The best result would be a permanent exemption for noninfringing uses . . . ."); Univ. of Va. Libraries Initial Comments at 3 ("A more useful permanent exemption for libraries (and others) would be a blanket exception for any lawful use . . . ."); SAA Additional Comments at 2 ("[T]here should be a blanket exemption . . . that would allow anyone to circumvent an access mechanism for a lawful purpose.").

[557] Public Knowledge Additional Comments at 1–2 ("[W]e note the absence [in the Second Notice] of a proposal to permanently exempt fair uses made under Section 107, although exemptions grounded in that exception are routinely granted to filmmakers and educators."); *see also* AAU,

LOC_AR_00003336

argued that a general exemption of this type "would generate widespread mistakes regarding when circumvention is permissible."[558] As they put it, "one person's notion of fair use is another person's infringement."[559] At a minimum, however, such an exemption would constitute a fundamental departure from Congress' considered decision to establish the triennial rulemaking as the forum for consideration of specific exemption requests grounded in fair use.[560] As the Commerce Committee explained in adding the rulemaking proceeding to the legislation:

> [T]he Committee was mindful of the need to honor the United States' commitment to effectively implement the two WIPO treaties, as well as the fact that fair use principles certainly should not be extended beyond their current formulation. The Committee has struck a balance that is now embodied in . . . the bill, as reported by the Committee on Commerce. The Committee has endeavored to specify, with as much clarity as possible, how the right against anti-circumvention [*sic*] would be qualified to maintain balance between the interests of content creators and information users. The Committee considers it particularly important to ensure that the concept of fair use remains firmly established in the law. Consistent with the United States' commitment to implement the two WIPO treaties, H.R. 2281, as reported by the Committee on Commerce, fully respects and extends into the digital environment the bedrock principle of "balance" in American intellectual property law for the benefit of both copyright owners and users.[561]

Accordingly, Congress created the rulemaking as a "mechanism . . . [to] monitor developments in the marketplace for copyrighted materials" and to ensure that circumvention activities implicating fair use "can be fully considered and fairly decided on the basis of real marketplace developments that may diminish otherwise lawful

---

ACE, APLU & EDUCAUSE Initial Comments at 9 ("[W]e urge that any changes to section 1201 explicitly state that section 1201 should in no way hinder uses that may fall within the ambit of 17 USC § 107.").

[558] AAP, ESA, MPAA & RIAA Additional Reply Comments at 6; *see also* Int'l Assoc. Sci. Tech. & Med. Pub. Initial Reply Comments at 2–3 (opposing a blanket fair use exemption); Kernochan Center Additional Reply Comments at 1 ("[T]he broad amendments offered by some commenters should be rejected, as they would unquestionably undermine the goals and effect of the law. (We refer, for example, to the suggestion[] . . . that circumvention for any non-infringing purpose be allowed, etc.).").

[559] AAP, ESA, MPAA & RIAA Additional Reply Comments at 6.

[560] *See* COMMERCE COMMITTEE REPORT at 35 (stating that the addition of the rulemaking proceeding "responds to [the] concern" regarding prior legislation's effect on fair use).

[561] *Id*. at 26.

LOC_AR_00003337

access to works."[562]  The Office sees no basis for abandoning that basic framework, although, as discussed below, it does intend to implement reforms to improve the rulemaking process.

### 3.  International Considerations

As noted, multiple FTAs to which the United States is a party address the categories of exceptions and limitations that signatory countries may adopt in this area.  These trade obligations may be relevant to any consideration of a change to the current domestic permanent exemption framework.  To the extent there is interest in implementing the Office's recommendations, there are a number of ways to pursue potential reforms with these considerations in mind.  First, Congress could adopt legislation implementing these proposals and address any potential international concerns, including any changes it believes appropriate, in the legislative text.[563]  The Office is not providing proposed legislative language, and accordingly expresses no view as to possible trade implications.[564]  Second, the Office has offered interpretive guidance to facilitate broader reliance on existing exemption language, as in the case of the provisions under section 1201(f) concerning interoperability.  Third, the Office has tried to identify statutory and regulatory changes that can be accomplished within the current trade framework, as in the case of legislation that would expand the factors to be considered by the Librarian in conducting the triennial rulemaking.[565]  Finally, the existing triennial rulemaking framework provides an avenue to evaluate whether some proposals may be appropriately adopted as temporary exemptions.

---

[562] *Id*. at 36.

[563] *Cf.* Unlocking Technology Act of 2015, H.R. 1587, 114th Cong. § 4 (2015) ("The President shall take the necessary steps to secure modifications to applicable bilateral and multilateral trade agreements to which the United States is a party in order to ensure that such agreements are consistent with the amendments made by this Act."); Unlocking Technology Act of 2013, H.R. 1892, 113th Cong. § 4 (2013) (same).

[564] The Office notes that the Trans-Pacific Partnership Agreement ("TPP") contains a more flexible structure in that it neither confines TPM exceptions to enumerated activities nor limits their duration.  *See* TPP art. 18.68.4, Feb. 4, 2016, *available at* https://ustr.gov/trade-agreements/free-trade-agreements/trans-pacific-partnership/tpp-full-text.  The United States has withdrawn from that agreement.  *See* Letter from María L. Pagán, Acting United States Trade Representative, to Trans-Pacific Partnership Depositary (Jan. 30, 2017), *available at* https://ustr.gov/sites/default/files/files/Press/Releases/1-30-17%20USTR%20Letter%20to%20TPP%20Depositary.pdf.

[565] *See, e.g., infra* section III.C.4 (discussing the proposed Breaking Down Barriers to Innovation Act).

LOC_AR_00003338

### 4. Alternative Approach of Expanding Statutory Rulemaking Factors

Finally, should Congress decline to pursue new or updated permanent exemptions, it could consider adding to the list of statutory factors the Librarian shall consider in the rulemaking. This approach was proposed by the Breaking Down Barriers to Innovation Act, which would add factors addressing security research, "the impact that the prohibition on the circumvention of technological measures has on the accessibility of works and technologies for persons with disabilities," and consideration of "repair, recycling, research, or other fair uses, and . . . access to information not subject to copyright protection."[566]

From a matter of copyright policy, the Office believes that a preferable approach may be to adopt or amend a permanent exemption in the limited cases described above. The current statute already empowers the Office and Librarian to consider all appropriate factors,[567] and expanding the list of enumerated factors for the rulemaking would appear to provide less certainty to users than a permanent exemption.

## IV.  THE RULEMAKING PROCESS

The triennial rulemaking established by section 1201(a)(1)(C) generated much discussion among those who participated in the study, as it is an area where the Office itself can take action pursuant to its rulemaking authority without needing Congress to amend section 1201. Many participants acknowledged that the rulemaking process is "working reasonably well."[568] As detailed below, others urged various reforms, whether through statutory or regulatory changes. Notably, while the comments revealed a variety of perspectives on almost all issues, there was extraordinary consensus that the Office should exercise its existing regulatory authority to streamline the process for renewing previously granted exemptions.

---

[566] H.R. 1883, 114th Cong. § 3(a)(1)(B)(iii)–(v) (2015); S. 990, 114th Cong. § 3(a)(1)(B)(iii)–(v) (2015).

[567] 17 U.S.C. § 1201(a)(1)(C)(v).

[568] Kernochan Center Initial Comments at 5; *see also* Tr. at 96:09–13 (May 19, 2016) (Decherney, Univ. of Pa.) ("[I]n some ways, the rulemaking has I think really been effective and . . . thousands of educators and students have been able to engage in non-infringing uses as a result."); AAP, MPAA & RIAA Initial Comments at 11 (noting that "the current ground rules for the triennial rulemaking proceeding are fair, practical, and consistent with Congress' instructions," and that the proceeding "regularly results in the issuance of a large number of exemptions " and stating that "continued complaints regarding the proceeding, and calls for a dramatic reorganization to lessen the burdens on proponents of exemptions, ignore the reality of the prior processes").

LOC_AR_00003339

The Copyright Office believes that any shortcomings in the rulemaking process can largely be addressed without legislative changes, although the Office would continue to support amending the statute to allow for burden-shifting in the case of repeat exemptions.[569]  In some instances, stakeholder concerns are addressed below by clarifying the Office's position on issues such as allocation of the burden of proof and the relevant evidentiary standards applied by the Register in forming a recommendation to grant or deny an exemption.  In addition, in light of the stakeholder consensus noted above, the Office also proposes to undertake specific changes to streamline the process for renewing previously granted exemptions.  Finally, this section also outlines additional steps the Office intends to take to further improve the rulemaking process, such as implementing educational outreach, adjusting the timeframe for the rulemaking to facilitate participation, and investigating ways to improve access to and participation in public hearings.

## A. Administrative Law Considerations

In prior rulemakings, the Copyright Office has adopted certain standards and procedures beyond the minimum required for informal rulemaking by section 553 of the APA.  The Office adopted some of these in its discretion, such as limiting consideration to the evidentiary record submitted by participants and adopting a quasi-adversarial format—categorizing participants as either proponents or opponents of a specific class of exemption.  The Office has previously found other elements, such as the application of the preponderance of the evidence standard, to be mandated by section 1201's statutory language.[570]  The Office has found still other elements, such as the public hearings the Office holds, to be mandated by Congress' clearly expressed intent.[571] While some commenters praised this approach as "correctly proceed[ing] with caution to develop specific exemptions on a case-by-case basis" and generally "consistent with

---

[569] *See Register's Perspective on Copyright Review: Hearing Before H. Comm. on the Judiciary*, 114th Cong. 5 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

[570] *See* 2015 Recommendation at 14 ("This requirement stems from the statute, which requires a demonstration that users '*are*, or *are likely to be*,' adversely affected by the prohibition on circumvention.") (quoting 17 U.S.C. § 1201(a)(1)(B)).  In the sixth rulemaking, the Office also noted that the preponderance standard is in accord with general principles of formal agency rulemakings under the APA.  *See id*. at 14 & n.50 (citing 5 U.S.C. § 556(d); *Steadman v. Sec. & Exch. Comm'n*, 450 U.S. 91, 102 (1981)).

[571] *See* H.R. REP. NO. 106-464, at 149 (1999) (Conf. Rep.) ("The intent is to permit interested persons an opportunity to participate through the submission of written statements, oral presentations at one or more of the public hearings, and the submission of written responses to the submissions or presentations of others.").

LOC_AR_00003340

the statute, its legislative history and principles of administrative law,"[572] others found this approach overly restrictive, suggesting "that procedures that artificially limit what kinds of evidence the Office may consider . . . or otherwise arbitrarily limit the record before the Office could violate the Administrative Procedures Act."[573]  Such commenters suggested that a less adjudicatory format would enable the Office "to more effectively conduct the fact-finding process," as the Office's approach "places too much of a burden on commenters and unnecessarily restricts the Register's factual inquiry."[574]  Instead, they suggested that the Register "should conduct her own fact-finding investigation, informed by the comments but not reliant solely on those who have the resources to participate."[575]

After considering this feedback, the Office has concluded that a reassessment of the rulemaking process is appropriate.  The following sections discuss specific ways that process may be improved.  As an initial matter, section 1201 appears to give the Office considerable flexibility to define and tailor the rulemaking process.[576]  The Office will continue to exercise its flexibility to improve that process while maintaining procedural rules necessary for it to administer the rulemaking efficiently within the statutorily mandated period.  For example, in the upcoming seventh rulemaking, the Office plans to take advantage of its ability to take administrative notice of facts outside the public record where appropriate, but, particularly given its limited resources, does not assume an affirmative obligation to independently seek out or raise additional materials not presented by the parties.[577]

---

[572] DVD CCA & AACS LA Initial Reply Comments at 9.

[573] Public Knowledge Initial Reply Comments at 9.

[574] Joint Filmmakers I Initial Comments at 11–12; *see also* OTW Initial Comments at 4 ("In part, the difficulty is because the Office combines repeated rounds of submissions on an administrative law model with an adversarial approach that treats factual development as solely the job of the contending participants.").

[575] Joint Filmmakers I Initial Comments at 11–13 ("As the leading treatise *Administrative Law and Practice* observes, it is well-accepted that in a rulemaking, '[t]he agency and its staff cannot sit by passively and let interested persons develop a record.'").  *But see* Tr. at 102:09–103:07 (May 25, 2016) (Lerner, Joint Filmmakers I) ("I do think that the Copyright Office has wide latitude to set this rulemaking up under the APA.").

[576] The Office draws this conclusion both from section 1201 itself and the APA.  *See, e.g., Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015) (stating that it is a "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure" and that the APA "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures").

[577] *See, e.g., Baka v. INS*, 963 F.2d 1376, 1379 (10th Cir. 1992) ("An agency . . . may take official notice of commonly acknowledged facts, and technical or scientific facts that are within the

LOC_AR_00003341

As a separate question of administrative law, it was not clear to some commenters whether determinations made by the Librarian are subject to challenge under the APA.[578] Although the Register of Copyrights issues a recommendation based on the information generated in the rulemaking proceeding, it is the Librarian who adopts the final rule. The Library of Congress is not subject to the APA,[579] and the Department of Justice has taken this position in ongoing litigation concerning section 1201.[580]

## B. Defining an Exemption Class

Some study participants questioned the way the Copyright Office and the Librarian have previously constructed the "class[es] of copyrighted works"[581] for which a temporary exemption has been granted or denied. On the side of classes being too narrow, the Cyberlaw Clinic at Harvard Law School ("Cyberlaw Clinic") said that "the heavily qualified exemptions issued by this Office are out of step with the intent of Congress, which asked the Register and Librarian to identify 'a narrow and focused subset' of works, but only compared to the very broad categories of authorship in 17 U.S.C. § 102."[582] Others argued the classes have been defined too broadly, with Auto Alliance stating that for the recently considered exemption for vehicle repair, "[i]t [did] not appear that the Register considered 'refining' the proposed class of works to exclude vehicles covered by" a memorandum of understanding "entered into by virtually the entire U.S. automobile industry," "thereby 'limiting the adverse consequences' of an

---

agency's area of expertise," but "[t]he taking of such notice is committed to the broad discretion of the agency.") (internal quotation marks, citations, and alterations omitted); *Fleming Cos., Inc. v. U.S. Dep't of Agric.*, 322 F. Supp. 2d 744, 764 (E.D. Tex. 2004) (holding that the agency was not required to "have conducted an independent investigation" or to "have sought additional information" during its informal rulemaking; giving interested parties thirty days to comment on new rule "satisfies the APA's procedural requirements" and "[n]othing more is required").

[578] AAP, MPAA & RIAA Initial Comments at 14.

[579] In *Kissinger v. Reporters Comm. for the Freedom of the Press*, 445 U.S. 136 (1979), the Court noted that the Library of Congress "is not an 'agency'" as that term is defined for purposes of the Freedom of Information Act ("FOIA"). *Id.* at 145. The same definition applies to the APA. *See* 5 U.S.C. § 552(f).

[580] *See* Mem. in Supp. of Mot. to Dismiss at 42–45, *Green v. Lynch*, No. 16-cv-1492, (D.D.C. Sept. 29, 2016), ECF No. 15-1.

[581] 17 U.S.C. § 1201(a)(1)(C).

[582] Cyberlaw Clinic Initial Comments at 13; *see also* Tr. at 102:11–24 (May 19, 2016) (Tushnet, OTW) (proposing that the Office employ a "level of generality, similar to what you see in fair use cases"); LCA Initial Comments at 31–32; Tr. at 86:16–87:04 (May 19, 2016) (Panjwani, Public Knowledge).

LOC_AR_00003342

overbroad exemption that covers many situations in which circumvention is not required."[583]

Still others defended the current approach, stating that "the way the categories are defined has in fact enabled the granting of certain exemptions that in a broader category would not have been granted."[584]  For example, DVD CCA and AACS LA suggested that limiting an exemption for uses of Blu-ray and DVD clips to K-12 and higher education users allowed the overall record to support granting the exemption, whereas the exemption may have been difficult to justify for a broader category.[585]  Similarly, AAP, MPAA, and RIAA "have come to find that [limiting a class to specific uses or users] has been helpful,"[586] and Professor Decherney, a media studies professor who has obtained an exemption in multiple past rulemakings, noted that doing so "brings the idea of a class much more in line with fair use, which is about use and users."[587]

Past approaches to defining a class of works are well documented in the rulemaking records, and largely emanate from the statute and legislative history.  In general, commenters did not necessarily challenge this overall framework, so much as question its application in specific instances.  While this Report is intended to be forward-looking, the Office examined concerns that the rulemaking has been unduly atomized[588] or has neglected to exclude works for which the evidentiary record did not support an exemption.[589]  The Office agrees that, in some cases, it can make a greater effort to group similar classes together, and will do so going forward.  For example, in the upcoming seventh rulemaking, the Office will consider consolidating some of the separate classes related to motion pictures into broader categories, such as one related to educational uses.[590]  But in other cases, the Office's ability to narrowly define the class is what enabled it to recommend the exemption at all, and so the Office will continue to refine classes when merited by the record.[591]  For example, in the last rulemaking, the Register could not recommend a broad exemption for jailbreaking video game consoles for the

---

[583] Auto Alliance Initial Comments at 8–9.

[584] Tr. at 103:01–104:05 (May 19, 2016) (Turnbull, DVD CCA & AACS LA); Tr. at 104:07–16 (May 19, 2016) (Williams, AAP, MPAA & RIAA) (accord).

[585] Tr. at 103:01–104:05 (May 19, 2016) (Turnbull, DVD CCA & AACS LA).

[586] Tr. at 93:07–13 (May 19, 2016) (Williams, AAP, MPAA & RIAA).

[587] Tr. at 95:13–96:07 (May 19, 2016) (Decherney, Univ. of Pa.).

[588] See Cyberlaw Clinic Initial Comments at 13.

[589] See Auto Alliance Initial Comments at 8–9.

[590] Compare 2015 Recommendation at 103–06 (breaking out into seven separate classes).

[591] See Tr. at 99:22–100:02 (May 19, 2016) (Panjwani, Public Knowledge) (noting difficulty for the Office in defining classes of works when exemptions must be granted for noninfringing uses).

LOC_AR_00003343

general public because of evidence that the consoles' TPMs prevented video game piracy, but the Register was able to recommend a narrower exemption for preservationists, finding that "[t]he risk of piracy . . . appear[s] to be greatly diminished in the preservation context."[592]

## C. Burden of Proof

Some commenters suggested that the burden of proof should not be borne by exemption proponents, but rather that it should fall to the Office, or even opponents in certain circumstances, to ensure there is an adequate record.[593]  Others contended that the Office has properly placed the burden on proponents.[594]  The Supreme Court has noted that "the term 'burden of proof' is one of the slipperiest members of the family of legal terms."[595]  The term can be understood to encompass "two distinct burdens:  the 'burden of persuasion,' *i.e.*, which party loses if the evidence is closely balanced, and the 'burden of production,' *i.e.*, which party bears the obligation to come forward with evidence at different points in the proceeding."[596]

The Office noted during the first rulemaking that the statute "does not offer much guidance as to the respective burdens of proponents and opponents" of proposed exemptions.[597]  But regardless of what the statute provides, as a practical matter, the burden of *production* will effectively be on exemption proponents, simply because they have greater knowledge of and access to evidence demonstrating adverse effects on noninfringing uses.  Although the Office has discretion to engage in independent fact-finding and take administrative notice of evidence, the primary way that most evidence supporting an exemption will get into the record will continue to be through the submissions of proponents, who are usually in the best position to provide it.

---

[592] 2015 Recommendation at 344.

[593] *See, e.g.*, CDT Initial Comments at 6–7 ("Although administrative law generally places the burden of proof on the proponent of a rule or order, the plain text of section 1201 requires the Librarian to make a triennial determination as to the provision's adverse effect or likely adverse effect on users making noninfringing uses of particular classes of works, regardless whether any parties step forward."); CTA Initial Comments at 7 ("Where opponents are in a better position to come forward with evidence, they should be obliged to do so.").

[594] *See, e.g.*, DVD CCA & AACS LA Initial Reply Comments at 7–8 ("A hearing setting where the proponents bear the burden of proof allows a careful examination of each claim of noninfringing use that may vary widely.") (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294–95 (1974)).

[595] *Shaffer v. Weast*, 546 U.S. 49, 56 (2005) (quotation marks and alterations omitted).

[596] *Id.*

[597] 2000 Recommendation and Final Rule at 64,558.

LOC_AR_00003344

As for the burden of persuasion, most commenters speaking to the issue agreed that exemptions should be recommended based upon the preponderance of the evidence.[598] A few commenters specifically opposed applying a preponderance standard in connection with the noninfringing use prong of the analysis. Joint Filmmakers I, for example, proposed using a "some likelihood"[599] standard, explaining that such a standard is "more reasonable" because "[t]here's [a] built in backstop if the Copyright Office were to get it wrong and turn it over to the court and say, this isn't a non-infringing use."[600]

The Office continues to believe that the sounder approach is to grant exemptions only when the preponderance of the evidence in the record shows that the conditions for granting an exemption have been met. The preponderance-of-the-evidence standard is the traditional standard used in administrative proceedings[601] and comports with the specific language of section 1201, which requires a determination as to whether users "*are, or are likely to be* in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses."[602] This conclusion is also supported by the legislative history, which explains that the granting

---

[598] *See, e.g.*, AAP, MPAA & RIAA Initial Reply Comments at 5; Cyberlaw Clinic Initial Comments at 2; Kernochan Center Initial Comments at 5; Tr. at 111:12–18 (May 19, 2016) (Panjwani, Public Knowledge); Tr. at 118:02–06 (May 19, 2016) (Greene, OTI).

[599] Joint Filmmakers I Initial Comments at 13–15 ("[T]he Register should refrain from imposing a restrictive 'preponderance of the evidence' standard.").

[600] Tr. at 138:01–13 (May 25, 2016) (Lerner, Joint Filmmakers I); *see also* Tr. at 135:02–136:06 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) (suggesting "if it's a plausible non-infringing use . . . that should be enough."). *But see* Tr. at 142:18–143:18 (May 25, 2016) (Metalitz, AAP, MPAA & RIAA) (arguing that "[p]lausible" is "not the same thing" as "likely," the standard set forth in the statute).

[601] *Steadman*, 450 U.S. at 101 n.21 (noting that "[t]he use of the 'preponderance of evidence' standard is the traditional standard in civil and administrative proceedings") (quoting *Sea Island Broad. Corp. v. FCC*, 627 F.2d 240, 243 (D.C. Cir. 1980)); *see also Yzaguirre v. Barnhart*, 58 Fed. App'x 460, 463 (10th Cir. 2003) (finding an ALJ erroneously "engraft[ed] a standard of appellate review upon the fact finding process" by applying a "substantial evidence" rather than a preponderance-of-the-evidence standard); *Charlton v. FTC*, 543 F.2d 903, 907 (D.C. Cir. 1976) (analyzing the different standards for judicial review and agency fact-finding; explaining that "the yardstick by which the agency itself is to initially ascertain the facts" cannot be "something less than the weight of the evidence" and that "preponderance of the evidence is rock bottom at the factfinding level").

[602] 17 U.S.C. § 1201(a)(1)(C) (emphasis added); *see also* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 70 Fed. Reg. 57,526, 57,528 (Oct. 3, 2005); 2015 Recommendation at 15; 2012 Recommendation at 6; 2003 Recommendation at 19–20.

LOC_AR_00003345

of an exemption requires the production of a minimum quantity of evidence: the Commerce Committee Report explains that "[i]f the rulemaking has produced insufficient evidence to determine whether there have been adverse impacts with respect to particular classes of copyrighted materials, the circumvention prohibition should go into effect with respect to those classes."[603]  The preponderance standard also fits the nature of the section 1201 proceeding, which requires the Register to make a binary choice whether to recommend, or not, a requested exemption, after considering the evidence marshalled on both sides in favor or against a proposal.[604]  In this context, it is appropriate to require the evidence, on balance, to support the requested exemption.[605]  Indeed, the preponderance standard is used by courts in evaluating fair use cases.[606]  For the same reasons, the Office disagrees with those commenters who proposed using a standard other than preponderance specifically in examining noninfringing uses.

In sum, it is the totality of the rulemaking record (*i.e.*, the evidence provided by commenters or administratively noticed by the Office) that must, on balance, reflect the need for an exemption by a preponderance of the evidence.  Such evidence must, on the whole, show that it is more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a particular class of copyrighted works.

## D. Applicable Evidentiary Standards

The Office received many comments addressing the application of evidentiary standards in past rulemakings.  While some suggested that "a way to keep triennial proceedings manageable in scope is to rigorously enforce the current standards of proof for new

---

[603] COMMERCE COMMITTEE REPORT at 38.

[604] While the rulemakings have provided an avenue for persons to submit comments "that neither support nor oppose an exemption but seek to share pertinent information about a proposal," in practice the Office receives few such comments.  *See* 2015 NPRM at 73,856.

[605] *Cf. Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1758 (2014) (preponderance of the evidence "is the standard generally applicable in civil actions, because it allows both parties to share the risk of error in roughly equal fashion") (internal quotation marks omitted).

[606] *See, e.g., Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984) (under the fourth factor, "[w]hat is necessary is a showing by a preponderance of the evidence that some meaningful likelihood of future harm exists"); *Balsley v. LFP, Inc.*, No. 1:08 CV 491, 2011 WL 1298180, at *8 (N.D. Ohio Mar. 31, 2011) (noting that the jury must consider whether the defendant proved fair use by a preponderance of the evidence), *aff'd*, 691 F.3d 747 (6th Cir. 2012); *Haberman v. Hustler Magazine, Inc.*, 626 F. Supp. 201, 208 (D. Mass. 1986) (noting that fair use is "established by a preponderance of the evidence" standard).

112

LOC_AR_00003346

exemptions (and changes to existing exemptions),"[607] others suggested that the Register has, to the detriment of exemption proponents, been inconsistent and overly rigid in the interpretation and application of the standards.[608] More generally, they expressed concern that the Register has not predictably applied a single set of standards from one proceeding to the next.[609]

A number of stakeholders who had previously sought or represented proponents for an exemption agreed with a proposal by the Cyberlaw Clinic for the Office to realign the way it applies the statute to the evidentiary record.[610] According to the Cyberlaw Clinic, in prior rulemakings, the Office has effectively required proponents to satisfy nine separate factors, several of which the Clinic regards as beyond the statute's requirements, and others of which it believes are redundant.[611] For example, it contended that the Office has looked to extra-statutory considerations such as "[h]ow the [TPM] in question works, and how it is circumvented," whether "the TPM is the 'clearly attributable' cause of the claimed adverse impact," and the existence of "potential alternatives" to circumvention.[612]

As an alternative, the Cyberlaw Clinic proposed what it describes as "a simple four-factor inquiry" whereby a proponent should be required to show that:

- At least some works in the . . . class of works the proponent seeks to access are protected under copyright. . . .

---

[607] ESA Initial Comments at 11–12; *see also* DVD CCA & AACS LA Initial Comments at 14.

[608] Cyberlaw Initial Comments at 2, 5–8 ("The current rulemaking requires substantive showings that are not required under the statutory framework, and presents proponents with evidentiary requirements far beyond the scope of the statutory authority granted by Congress."); *see also, e.g.,* Authors Alliance Initial Comments at 3; ISRI Initial Comments at 11; OTI Initial Comments at 9–10; OTW Initial Comments at 3–4.

[609] *See, e.g.,* AFB Initial Comments at 8 (detailing the Office's treatment of the assistive technology exemption through successive rulemakings, stating that "parties like AFB are largely unable to anticipate the Office's cycle-to-cycle requirements with any certainty and prepare an appropriate evidentiary record"); Cyberlaw Clinic Initial Comments at 2; Int'l Documentary Ass'n, Film Independent, Kartemquin Educ. Films, Indep. Filmmaker Project, Indie Caucus, The Nat'l Alliance for Media Arts and Culture, New Media Rights & Women in Film and Video ("Joint Filmmakers II") Reply Comments at 8.

[610] *See, e.g.,* Joint Filmmakers II Initial Reply Comments at 7 & n.19; Public Knowledge Additional Comments at 2; Tr. at 118:07–11 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law); Tr. at 83:06–09, 137:25–138:03 (May 19, 2016) (Tushnet, OTW).

[611] Cyberlaw Clinic Initial Comments at 3–5. The Clinic acknowledged that some of these factors reflect the Office's questions to develop a record to conduct an evaluation of the statutory factors.

[612] *Id*. at 4.

LOC_AR_00003347

- An activity that the proponent seeks to do with regard to a class of works is likely to be noninfringing under copyright law, but for this anticircumvention provision. . . .

- The presence or planned presence of a technological protection measure makes this activity unlawful under 17 U.S.C. § 1201(a)(1)(A). . . .

- The proponent is "adversely affected" under the factors articulated in 17 U.S.C. § 1201(a)(1)(C).[613]

The Cyberlaw Clinic argued that the statute directs that adverse effects and the statutory factors in section 1201(a)(1)(C) should be "examined in reference to the other."[614] The Clinic explained that "a use should be found to be 'adversely affected' whenever the harm to the planned noninfringing use is not outweighed by the harm to the market for or value of a work that would occur by allowing the particular use."[615]

The Copyright Office does not agree that the rulemaking has ever required exemption proponents to demonstrate nine separate factors, and notes that the Cyberlaw Clinic admits some of the "factors" it identified are "redundant" of each other.[616] For example, the Office has previously sought information regarding how the TPM at issue works and how it is circumvented.[617] This information is sought because it is helpful to facilitate the development of the administrative record and for all participants to understand how to comment and what to comment on; it is not an evidentiary hurdle that must be satisfied. Going forward, the Office will continue to ask proponents for such information, and the Office will also be clearer in encouraging exemption opponents to provide it as well.

The Office does, however, believe it is prudent to provide regulatory guidance clarifying the applicable evidentiary standards that must be satisfied to obtain an exemption. The Office believes its application of the statute is similar to many commenters' preferred approaches, including the Cyberlaw Clinic. At bottom, under section 1201(a)(1)(C), the Office must inquire: *Are users of a copyrighted work adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a class of copyrighted works, or are users likely to be so adversely affected in the next three years?* This inquiry derives directly

---

[613] *Id*. at 8; *see also* Joint Filmmakers II Initial Reply Comments at 2, 7–9 (proposing an alternative four-factor test).

[614] Cyberlaw Clinic Initial Comments at 8.

[615] *Id*. at 2, 9–10 (elaborating on proposed balancing of factors).

[616] *See id*. at 7.

[617] *See* 2015 NPRM at 73,871 (listing information the Office "encourages commenters . . . to address").

LOC_AR_00003348

from the statute, and its application is guided by legislative history. Practically speaking, it breaks down into these elements:

- The proposed class includes at least some works protected by copyright.

- The uses at issue are noninfringing under title 17.

- Users are adversely affected in their ability to make such noninfringing uses or, alternatively, users are likely to be adversely affected in their ability to make such noninfringing uses during the next three years. This element is analyzed in reference to section 1201(a)(1)(C)'s five statutory factors.

- The statutory prohibition on circumventing access controls is the cause of the adverse effects.

The Office hopes that participants who expressed confusion over the evidentiary standards applied by the Office find this articulation helpful. In practice, this approach is not substantively different from that employed in past rulemakings.

## 1. Copyrightable Works at Issue

The first element under the Office's test is a straightforward matter of ascertaining whether at least some works included in a class are protected by copyright. This requirement comes directly from the statute, which refers to a "class of copyrighted works"[618] and provides that the circumvention ban only applies to a TPM that controls access to "a work protected under this title."[619]

## 2. Noninfringing Uses

The second element emanates directly from the statute as well, which references users' "ability to make noninfringing uses" of a class of works.[620] As the Office has explained:

> The Register will look to the Copyright Act and relevant judicial precedents when analyzing whether a proposed use is likely to be noninfringing. . . . [T]here is no "rule of doubt" favoring an exemption when it is unclear that a particular use is a fair or otherwise noninfringing use. Thus, a proponent must show more than that a particular use *could*

---

[618] *See* 17 U.S.C. § 1201(a)(1)(C).

[619] *See id*. § 1201(a)(1)(A).

[620] *See id*. § 1201(a)(1)(C).

LOC_AR_00003349

be noninfringing.  Rather, the proponent must establish that the proposed use is likely to qualify as noninfringing under relevant law.[621]

The Office continues to emphasize that this standard does not require "controlling precedent directly on point."[622]  Rather, as it has done in the past, the Office will look to analogous case law in assessing whether a use is likely to be noninfringing.

Some commenters, including Public Knowledge, seemed to advocate that the Librarian should grant an exemption even where it is unclear whether uses are "likely" to be noninfringing, stating that "barring affirmative case law saying that that activity is in fact infringing . . . the tie goes to a determination of non-infringement."[623]  It suggested that "reasonable experts can disagree as to whether the case law indicates that an act is infringing or not" and that "[i]n such cases, it would be best to grant the exemption, and allow the question to be properly resolved by a federal court if a copyright owner feels aggrieved."[624]  In the absence of an exemption, it explained, a court presented with such a case would be compelled to find a section 1201(a)(1) violation based on the circumvention, even if it believed that the use of the underlying work may constitute fair use.[625]

But a permissive approach to finding noninfringing uses in the absence of an established basis in the statute or case law would be contrary to the overall statutory scheme, which, as explained above, requires the production of sufficient evidence that there have been or are likely to be adverse impacts on noninfringing uses.[626]  The Office also disagrees that the denial of exemptions based on a "dearth of case law" "effectively depriv[es] the courts of . . . critical jurisdiction" to determine whether certain uses are noninfringing.[627]

---

[621] 2015 Recommendation at 15; *see* 2012 Recommendation at 7; 2010 Recommendation at 11–12.

[622] *See* 2010 Recommendation at 12.

[623] Tr. at 120:23–121:07 (May 19, 2016) (Panjwani, Public Knowledge).

[624] Public Knowledge Initial Comments at 5–6; *see also* Joint Filmmakers II Reply Comments at 7 ("[A]n unduly restrictive standard runs counter to Congress's intend not to disturb the natural development of case law with respect to fair and other lawful uses.").

[625] Public Knowledge Initial Comments at 6 (citing *RealNetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 641 F. Supp. 2d 913 (N.D. Cal. 2009)).

[626] COMMERCE COMMITTEE REPORT at 38 ("If the rulemaking has produced insufficient evidence to determine whether there have been adverse impacts with respect to particular classes of copyrighted materials, the circumvention prohibition should go into effect with respect to those classes.").

[627] *See* Public Knowledge Initial Comments at 6.

LOC_AR_00003350

Nothing in section 1201 prevents a user from seeking declaratory judgment as appropriate, or engaging in litigation involving works not protected by TPMs.[628]

Moreover, the rulemaking is not an appropriate venue for breaking new ground in fair use jurisprudence, and the Office is hesitant to place itself in the position of making fair use findings in a rulemaking context—potentially subject to some degree of judicial deference—that might have influence beyond the current state of the law.  The Office's approach in this regard has some support in the statute:  section 1201(c) states that nothing in the rest of section 1201 "shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title,"[629] and legislative history states that this provision was "intended to ensure that none of the provisions in section 1201 affect the existing legal regime established in the Copyright Act and case law interpreting that statute."[630]  This suggests that Congress did not intend for the Office to expand or contract the contours of fair use through the rulemaking proceeding.

### 3.  Causation

This requirement comes directly from the statute, which requires that users be "adversely affected by the prohibition [on circumvention]."[631]  Legislative history confirms what the statute makes clear:  "[a]dverse impacts that flow from other sources . . . are outside the scope of the rulemaking."[632]  Examples of potential sources of non-cognizable harms include "marketplace trends, other technological developments, or changes in the roles of libraries, distributors or other intermediaries."[633]  In the past, the Office said adverse effects must be "clearly attributable to implementation of a technological protection measure,"[634] but "clearly attributable" does not imply a heightened causation requirement above preponderance of the evidence.

---

[628] To be clear, there is no actual deprivation of jurisdiction:  copyright infringement and section 1201 violations are separate causes of action, and a court entertaining both claims would be called on to resolve both issues, including the merits of any asserted fair use defense to the infringement claim.

[629] 17 U.S.C. § 1201(c).

[630] Senate Judiciary Committee Report at 30; *see also* Commerce Committee Report at 20, 26 ("[F]air use principles certainly should not be extended beyond their current formulation.").

[631] 17 U.S.C. § 1201(a)(1)(C).

[632] Commerce Committee Report at 37; House Manager's Report at 6.

[633] House Manager's Report at 6.

[634] *See* 2015 Recommendation at 16 (quoting Commerce Committee Report at 37); *see also* House Manager's Report at 6 ("Adverse impacts . . . that are not clearly attributable to such a prohibition, are outside the scope of the rulemaking.").

LOC_AR_00003351

## 4. Adverse Effects and the Statutory Factors

The Office agrees with the Cyberlaw Clinic that the adverse effects analysis is connected to the statutory factors. Congress has explained that the factors "are illustrative of the questions that the rulemaking proceeding should ask," and in examining them, "the focus must remain on whether the implementation of technological protection measures . . . has caused adverse impact on the ability of users to make lawful uses."[635] As the Office has previously noted, these factors delineate the "nature of the inquiry for the rulemaking process as a whole,"[636] and "[t]hese statutory considerations require examination and careful balancing" in reaching a determination to grant or deny an exemption.[637]

Although the Office has sometimes laid out these factors themselves separately for clarity or administrability, in practice, the Office generally balances "[t]he harm identified by a proponent of an exemption . . . with the harm that would result from an exemption."[638] As the Office explained in the first rulemaking:

> Ultimately, the task [of the] rulemaking proceeding is to balance the benefits of technological measures that control access to copyrighted works against the harm caused to users of those works, and to determine, with respect to any particular class of works, whether an exemption is warranted because users of that class of works have suffered significant harm in their ability to engage in noninfringing uses. The four factors specified in section 1201(a)(1)(C) reflect some of the significant considerations that must be balanced . . . .[639]

---

[635] COMMERCE COMMITTEE REPORT at 37.

[636] 2006 Recommendation at 5; 2003 Recommendation at 6.

[637] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 76 Fed. Reg. 60,398, 60,403 (Sept. 29, 2011); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 73 Fed. Reg. 58,073, 58,078 (Oct. 6, 2008); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 70 Fed. Reg. at 57,530; Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 67 Fed. Reg. 63,578, 63,581 (Oct. 15, 2002).

[638] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 76 Fed. Reg. at 60,403; Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 73 Fed. Reg. at 58,078; Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 70 Fed. Reg. at 57,530; Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 67 Fed. Reg. at 63,581.

[639] 2000 Recommendation and Final Rule at 64,563 (internal citations omitted).

LOC_AR_00003352

### a. Degree of Adverse Effects Required

While rightsholders generally praised the Office's past analysis of adverse effects,[640] some commenters questioned the Office's reliance on various committee reports that they believe articulate standards beyond what is statutorily required, specifically: that the "main focus" of the rulemaking is on whether "a substantial diminution of" the availability of works for noninfringing uses "is *actually occurring* in the market";[641] that adverse impacts should be "distinct, verifiable and measurable" and "not . . . *de minimis*";[642] that "mere inconveniences, or individual cases, that do not rise to the level of a substantial adverse impact" are insufficient;[643] and that a "determination should be based upon anticipated, rather than actual, adverse impacts only in extraordinary circumstances in which the evidence of likelihood of future adverse impact during that time period is highly specific, strong and persuasive."[644] These requirements, such commenters argued, are not required by the statute's text[645] and are largely the result of the Office placing undue weight on the House Manager's Report.[646] They asserted that such statements serve as *de facto* heightened evidentiary standards, noting that the statute requires "[n]o further evidence of harm other than that inability to make noninfringing uses."[647]

The Office does not believe that by referencing statements from the legislative history, it has applied a heightened standard beyond preponderance of the evidence.[648] Rather, the

---

[640] AAP, MPAA & RIAA Initial Comments at 13; AAP, MPAA & RIAA Initial Reply Comments at 5–6; SIIA Initial Reply Comments at 3–4.

[641] HOUSE MANAGER'S REPORT at 6.

[642] COMMERCE COMMITTEE REPORT at 37.

[643] HOUSE MANAGER'S REPORT at 6.

[644] HOUSE MANAGER'S REPORT at 6.

[645] *See, e.g.*, Authors Alliance Initial Comments at 3; CDT Initial Comments at 6–7; Consumers Union Initial Comments at 4–5; New Media Rights ("NMR") Initial Comments at 16; OTW Initial Comments at 3–4.

[646] *See, e.g.*, Cyberlaw Clinic Initial Comments at 5–6; ISRI Initial Comments at 12 (noting that the report was issued after the bill passed the House, and that the report is "the handiwork of one legislator after the fact") (quoting DAVID NIMMER, COPYRIGHT: SACRED TEXT, TECHNOLOGY, AND THE DMCA 426 (2003)); Tr. at 117:14–19 (May 19, 2016) (Greene, OTI).

[647] OTW Initial Comments at 3–4; *see also* Consumers Union Initial Comments at 5; Cyberlaw Clinic Initial Comments at 12–13; ISRI Initial Comments at 12; OTI Initial Comments at 9–10.

[648] The Office declines some commenters' suggestions to ignore section 1201's legislative history on this topic. While the Office appreciates that the DMCA went through various changes, and that the statute speaks most plainly for itself, on many issues, including the degree of adverse

LOC_AR_00003353

legislative history merely confirms the statutory standard.  When read together, the Commerce Committee and House Manager's Reports make clear that the "burden of proof is not more stringent than the statutory text, but rather is a clarification that any showing must be based on real, verifiable, and reasonable evidence."[649]  As the Office has explained, the House Manager's Report's characterization of the necessary showing as being one of "substantial adverse impact" or "substantial diminution" is "equivalent" to the standard articulated by the Commerce Committee:  that the rulemaking proceeding should focus on "distinct, verifiable, and measurable impacts" compared to "*de minimis* impacts."[650]  In other words, "[s]tating that there is a requirement of 'substantial' adverse impact is another way of saying that a showing of more than 'de minimis impacts' is required."[651]  Similarly, reference to "distinct . . . impacts," requires only "more than a vague or generalized claim unrelated to a particular class."[652]

With regard to the House Manager's Report's statement that a "determination should be based upon anticipated, rather than actual, adverse impacts only in extraordinary circumstances in which the evidence of likelihood of future adverse impact during that time period is highly specific, strong and persuasive,"[653] the Office has similarly found, and now reaffirms, that "the statutory language enacted does not specify a standard beyond . . . the traditional preponderance of the evidence standard."[654]

To the extent these legislative history statements have relevance beyond restating the statutory standard, it is in confirming that evidence cannot be hypothetical, theoretical, or speculative, but must be real, tangible, and concrete.[655]

---

effects required, the bicameral legislative history paints a cohesive picture and can illuminate congressional intent.

[649] *See* 2003 Recommendation at 17–18.

[650] *Id*. at 16–18 (citing both legislative reports); *see also* 2012 Recommendation at 7; 2010 Recommendation at 10; 2006 Recommendation at 8; 2000 Recommendation and Final Rule at 64,558 n.4.

[651] *See* 2003 Recommendation at 16–17; *see also* 2012 Recommendation at 7; 2010 Recommendation at 10; 2006 Recommendation at 8.

[652] *See* 2010 Recommendation at 10.

[653] HOUSE MANAGER'S REPORT at 6.

[654] *See* 2003 Recommendation at 19–20 (internal quotation marks and alterations omitted); *see also* 2012 Recommendation at 8; 2010 Recommendation at 10; 2006 Recommendation at 8.

[655] Many commenters agreed with this interpretation.  *See, e.g.,* NMR Initial Comments at 16 (suggesting legislative history should be interpreted to only require a "measurable" impact); Joint Filmmakers II Initial Reply Comments at 8 ("[T]he Register should define 'adverse' as 'more than de minimis,' meaning that if real cases exist which are emblematic of a broader impact, an adverse effect has been shown."); Tr. at 115:23–117:07,126:02–07 (May 19, 2016) (Williams, AAP,

LOC_AR_00003354

Ultimately, the evidence must show that adverse effects are not merely possible, but probable (*i.e.*, more likely than not to be occurring or likely to occur in the next three years).

Regarding references to denying exemptions where the exemption would affect "individual cases,"[656] it certainly may be appropriate to weed out edge cases where permitting circumvention broadly may impact the market for copyrighted works. But to be clear, the Register does not decline to recommend exemptions solely because only a small number of individuals would benefit from it. The Office also notes that the admonition against crediting "mere inconveniences"[657] relates to the availability for use of works under the first statutory factor. As discussed below, whether or not something is an adverse effect or a mere inconvenience can depend upon the costs and burdens involved in making use of reasonable alternatives.[658]

### b.  Statutory Factors

Many commenters offered views regarding the proper examination of the factors that the statute requires be considered. In evaluating the first factor, "the availability for use of copyrighted works,"[659] some stakeholders suggested that the Office has placed too much emphasis on whether there are reasonable alternatives to an exemption, and that "[a]lternatives to circumvention need to be realistic."[660] On the other hand, rightsholders asserted that "[i]t is also essential that the Register continue to consider 'the positive as

---

MPAA & RIAA) (noting that the Office has previously explained that these statements simply require proponents to come forward with "a real-world issue" rather than a "hypothetical" or a "philosophical objection [to] the law").

[656] *See* HOUSE MANAGER'S REPORT at 6.

[657] *See id.*

[658] *See* Public Knowledge Initial Comments at 7 ("Being required to spend money, when the alternative would not infringe a copyright, should by any sensible definition be considered an adverse effect on the public."); ISRI Initial Comments at 14–15 (providing example of phone unlocking exemption and stating that "[t]he Register rejected NTIA's common-sense conclusion that it is not an appropriate alternative for a current device owner to be required to purchase another device to switch carriers") (internal quotation marks omitted).

[659] 17 U.S.C. § 1201(a)(1)(C)(i).

[660] OTW Initial Comments at 5–6; *see also, e.g.*, AFB Initial Comments at 8 (arguing the standard should not require a "print-disabled reader to engage in burdensome or costly searches for different formats of works or to abandon their current eBook reader and invest in a different eBook platform (or several) to take advantage of a work accessible only in that format"); Tr. at 155:03–17 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) ("[H]ardship of the alternatives . . . should be taken into account.").

LOC_AR_00003355

well as the adverse effects of [TPMs] on the availability of copyrighted materials.'"[661] The Office agrees that alternatives to circumvention should be realistic and not merely theoretical,[662] but does not believe that establishing bright-line rules as to availability would aid this analysis. Instead, the Office will continue to evaluate the burdens or costs involved with an alternative and, depending on the circumstances, find them to either rise to the level of an adverse effect or to just be a mere inconvenience. The Office will also continue to consider both the positive and adverse effects of the prohibition on the availability of copyrighted materials.

The study received few substantive comments concerning the second and third factors, respectively, "the availability for use of works for nonprofit archival, preservation, and educational purposes" and "the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research."[663] Since these factors harken to exceptions for libraries and archives in section 108 and the paradigmatic fair uses set forth in section 107, the Office will continue to rely on those statutes and relevant case law to inform its consideration of these factors, as appropriate.

With regard to the fourth factor, "the effect of circumvention of technological measures on the market for or value of copyrighted works,"[664] Joint Filmmakers II argued that "[t]o qualify as a real threat of market substitution, there should be concrete evidence to that effect; mere assertions should not be sufficient."[665] For works providing commentary on the original work, they added that "this inquiry should not include effects on the licensing market, because it is well-established that rights holders have no claim to the derivative market for criticisms of their works."[666] The Office agrees that claims of a threat of market substitution should be more than bare assertions. The Office also agrees that the effect of noninfringing uses on licensing markets should be excluded, although the Office also notes that the effect on such markets may be relevant

---

[661] AAP, MPAA & RIAA Initial Comments at 13 (quoting HOUSE MANAGER'S REPORT at 6); *see also* Tr. at 177:08–15 (May 19, 2016) (Geiger, Rapid7) (suggesting that "protecting the availability of copyrighted works" should be considered when evaluating proposed exemptions).

[662] *See* OTW Initial Comments at 5–6.

[663] 17 U.S.C. § 1201(a)(1)(C)(ii),(iii).

[664] *Id*. § 1201(a)(1)(C)(iv).

[665] Joint Filmmakers II Initial Reply Comments at 9.

[666] *Id*.

LOC_AR_00003356

to assessing whether the use is infringing in the first place (*e.g.*, under the fourth fair use factor).[667]  Otherwise, the study received little comment on the application of this factor.

Many commenters were critical of the Office's consideration in the last rulemaking of non-copyright issues, such as public safety and environmental concerns, under the fifth statutory factor, "such other factors as the Librarian considers appropriate."[668]  There was particular concern over the Office's recommendation that the implementation of certain exemptions for vehicle repair, security research, and medical devices be delayed a year "to provide . . . potentially interested agencies an opportunity to consider and prepare for the lifting of the DMCA prohibition."[669]  For example, Public Knowledge stated that "Congress, agencies, or the courts have adopted appropriate statutes, regulations, and legal doctrines to address any concerns beyond the scope of copyright law" and that "[a]ny concern that those measures are inadequate to serve their intended purposes should be addressed by the appropriate subject matter authorities."[670]  EFF questioned whether the Office's solicitation of comments on non-copyright issues "led to better exemptions,"[671] suggesting that it may instead have "encourage[d] the opportunistic use of Section 1201 by corporations with an interest in suppressing competition and independent research."[672]  These commenters argued that the fifth

---

[667] With respect to Joint Filmmakers II's comment specifically, the Office notes that in considering whether to recommend an exemption for narrative filmmaking, the sixth rulemaking took into account the effect of potentially *infringing* uses on the relevant licensing market.  *See* 2015 Recommendation at 79–81 (noting that such uses "do not necessarily appear to be related to criticism or comment or otherwise transformative").

[668] 17 U.S.C. § 1201(a)(1)(C)(iv).

[669] 2015 Final Rule at 65,954; *see, e.g.*, Auto Care Initial Comments at 7 ("[T]he Librarian of Congress and the Copyright Office, by delaying implementation of the [2015 Rulemaking's] Class 21 and 22 exemptions, exceeded their authority and committed clear error.").  *But see* ISRI Initial Comments at 7 (noting that such a delay is "problematic," but "better than a denial").

[670] Public Knowledge Initial Comments at 3–4; *see also, e.g.*, CDT Initial Comments at 4; Consumers Union Initial Comments at 3–4; EFF Initial Comments at 7 (stating that "[n]o exemption granted by the Copyright Office creates a license to violate" such laws, making consideration of such matters as part of the rulemaking unnecessary in its view); OTW Initial Comments at 2; R Street Institute Initial Comments at 8.

[671] EFF Initial Reply Comments at 5–6.

[672] EFF Initial Comments at 6–7.  EFF offered evidence showing that, a day after the Copyright Office solicited views from the EPA, Auto Alliance asked the EPA to voice its concern that allowing consumer modifications to these programs would cause environmental and safety problems.  *Id*. at Attachment B.

LOC_AR_00003357

statutory factor "must be understood within the scope of copyright interests reflected in the body of subparagraph (C) and clauses (i)–(iv)."[673]

But many other commenters opined that the Office properly exercised its authority in seeking input from other agencies and recommending delayed implementation of an exemption in appropriate circumstances.[674]  As Consumers Union put it, "[t]here may be times when delaying the availability of a new exemption is warranted, to give the regulatory agency prior notice and a reasonable opportunity to establish appropriate conditions on accessing and altering a product's software, in keeping with the need to ensure safety."[675]  Looking forward, Microsoft and others asked that the Office "facilitate inter-agency consultation and dialogue as early in the process as possible."[676]

The Office appreciates commenters' discussion of the sixth rulemaking which, in light of significant and novel public policy concerns, took certain non-copyright issues into account and implemented a twelve-month delay for certain exemptions relating to security research and automobile repair to allow other agencies to react to the new rule. The Office believes that the open-ended nature of this statutory factor permits broad consideration of a wide variety of factors.  As both the Office and NTIA noted in the last rulemaking, it is not always possible to draw a line at "copyright concerns."[677] Moreover, certain non-copyright concerns have been consistently relevant to proposed exemptions in past rulemakings, such as competition and telecommunications policies supporting past cellphone unlocking exemptions.[678]  Indeed, the statute itself makes relevant certain non-copyright concerns, such as interoperability, encryption research,

---

[673] Auto Care Initial Comments at 7–8; *see also* Cyberlaw Clinic Initial Comments at 14–15 ("The Supreme Court has endorsed this formulation, holding in a case concerning a judge's power to consider 'such other factors as the court deems appropriate' under a statute to be 'understood in light of the specific terms that surround it.'") (quoting *Hughey v. United States*, 495 U.S. 411, 419 (1990)).

[674] *See, e.g.,* ACT Initial Comments at 5; Copyright Alliance Initial Comments at 11; ISRI Initial Comments at 8; Kernochan Center Initial Comments at 4; Auto Alliance Initial Comments at 3–6; Microsoft Initial Comments at 6–7.

[675] Consumers Union Initial Comments at 3.

[676] Microsoft Initial Comments at 6–7 ("The analysis, data and other evidence of expertise from these agencies can inform the Office's recommendations and increase stakeholder and public confidence in the outcome of the rulemaking process."); *see also* Auto Alliance Initial Comments at 3–6; Consumers Union Initial Comments at 3; CDT Initial Comments at 4 ("CDT also shares NTIA's confidence that when triennial exemptions raise substantial concerns outside the scope of copyright, clear and transparent communication can provide notice to other agencies . . . .").

[677] *See, e.g.,* 2015 Recommendation at 244-45 (noting that the Copyright Office and NTIA agree that both copyright and non-copyright concerns are relevant to some proposed exemptions).

[678] *See, e.g., id.* at 168.

LOC_AR_00003358

security testing, and protection of minors and personally identifying information.[679] And the statute directs NTIA, an agency principally responsible by law for advising the President on telecommunications and information policy issues, to provide its views, suggesting Congress wanted certain non-copyright concerns to play a role in the rulemaking process.[680]

But while the Office declines to categorically exclude "non-copyright" concerns from the fifth statutory factor, the Office also reiterates that the rulemaking must be "principally focused on the copyright concerns implicated by any proposed exemption," and that it is not typical for safety and environmental concerns to play a significant role in the Register's recommendation.[681] The sixth rulemaking presented the Office with multiple and novel classes that included devices like tractors and medical devices, which but for the software contained within them would have no place in the rulemaking. Confronted with concerns that have "at best a very tenuous nexus to copyright protection," but "are serious issues nevertheless," the Register recommended, and the Librarian adopted, a delayed implementation for certain exemptions to provide adequate time for other agencies to examine and update their own rules and guidance if needed.[682] Going forward, now that agencies, consumers, and businesses alike have had the opportunity to consider these issues and react to the many exemptions related to embedded software that were granted in the past rulemaking,[683] the Office expects its future recommendations will be able to factor this into account. For example, while the Office

---

[679] *See* 17 U.S.C. § 1201(c)(3) (nothing in the statute shall affect product design for components unless otherwise prohibited), § 1201(f) (reverse engineering for interoperability), § 1201(g) (encryption research), § 1201(h) (protection of minors), § 1201(i) (personally identifying information), § 1201(j) (security testing). While these provisions broadly look to non-copyright concerns for purposes of establishing exemptions to section 1201, in many cases they also limit the availability of those exemptions based on non-copyright concerns. *See, e.g., id.* § 1201(g)(2), (j)(2) (conditioning respective exemptions on circumvention not violating "section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986"), § 1201(j)(3)(B) (factors in determining exemption include whether information obtained was used in "violation of privacy or breach of security").

[680] 17 U.S.C. § 1201(a)(1)(C).

[681] *See* 2015 Recommendation at 248.

[682] *See e.g., id.* at 3, 241–49, 311–20.

[683] While it appears that the EPA's participation in the previous rulemaking may have been initiated by concerns voiced by copyright stakeholders, *see* EFF Initial Comments at 6–7, the FDA's cybersecurity guidance on medical devices issued last year, in contrast, suggests the implementation delay may have been beneficial to them. *See* FDA, POSTMARKET MANAGEMENT OF CYBERSECURITY IN MEDICAL DEVICES—GUIDANCE FOR INDUSTRY AND FOOD AND DRUG ADMINISTRATION STAFF (Dec. 28, 2016), http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM482022.pdf.

LOC_AR_00003359

might take note of market competition issues, it will generally decline to consider health, safety, and environmental concerns.  Likewise, the Office does not anticipate the Register recommending additional delays for implementation of exemptions unless necessitated by a grave or unusual situation.  The Office agrees that other agencies should not rely on section 1201 to help enforce or cover gaps in their own health, safety, environmental, or other regulations and reiterates that the granting of an exemption provides no defense to those who use it as an excuse to violate other laws and regulations.[684]

Finally, some commenters put forward additional items that the Office should consider under this factor, such as the purpose for which a TPM was adopted or how the statute broadly affects uses of copyrighted works.[685]  The Office is open to considering these issues in the upcoming rulemaking, while noting that "the Section 1201 rulemaking process is not the forum in which to break new ground on the scope of fair use."[686]

### c.  Merged Access and Copy Controls

A few commenters proposed that in the many cases where access controls and copy controls are merged, the rulemaking should treat the inquiry into adverse effects on noninfringing uses differently, favoring a finding of adverse effects over cases where TPMs operate solely as an access control.[687]  This is because, as OTW put it, "the balance that Congress did intend in distinguishing access from rights controls is now gone."[688]  The encryption protocols used for DVDs and Blu-rays were used as a prime example, with Joint Filmmakers I explaining that "[m]ost participants in the triennial rulemakings who have suggested exemptions" to circumvent DVDs or Blu-rays have sought to do so "to make copies in order to engage in a lawful use."[689]  Rightholders objected, stating that they did not see any basis in the statute or legislative history for this approach, and

---

[684] *See* 2015 Recommendation at 11 ("[W]hile an exemption may specifically reference other laws of particular concern, any activities conducted under an exemption must be otherwise lawful.").

[685] Joint Filmmakers II Initial Reply Comments at 8–9 (asking Register to consider general effect on fair or other lawful uses); *see* Tr. at 154:05–15 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) (suggesting that if a TPM was "adopted for non-copyright reasons," this should weigh in favor of an exemption).

[686] 2015 Recommendation at 109 (quoting 2012 Recommendation at 163).

[687] OTW Initial Comments at 5 ("The fact that, from the perspective of rights controls, their acts are perfectly lawful should itself indicate an adverse impact on noninfringing uses."); Joint Filmmakers II Initial Reply Comments at 6–7 ("[T]he Register should strongly favor exemptions involving merged access and use controls where the merged control prevents a use such as copying and the user does not seek to access the material unlawfully.").

[688] Tr. at 138:06–11 (May 19, 2016) (Tushnet, OTW).

[689] Joint Filmmakers I Initial Comments at 16.

126

noting, "[j]ust because an access control may have aspects of copy control merged with it doesn't make it any less of an access control."[690]

The Copyright Office does not find statutory support for the idea that obtaining an exemption should be easier where the TPM at issue is merged.  The Office appreciates the desire for accommodation, given that section 1201 does not prohibit circumvention of copy controls.  As discussed above, however, the Office believes that section 1201(a)(1) is best read as protecting the integrity of access controls even where prohibited conduct would not be infringing.  Additionally, at least in the anti-trafficking context, courts have found that where a TPM acts as both an access control and a copy control, it is independently subject to both section 1201(a)(2) and section 1201(b).[691]  The Office will continue to evaluate the effect of access controls, independent of whether the TPM also functions as a copy control.  That being said, the Office notes that it has frequently granted exemptions permitting circumvention of merged access and copy controls where the record supported them, as has been the case for the exemptions for circumvention of the TPMs on DVDs and Blu-ray discs.[692]

## E. Streamlined Process to Renew Exemptions

While viewpoints differed as to whether legislative changes regarding the section 1201 rulemaking were warranted and if so, what those changes should look like, there was "a remarkable degree of consensus"[693] among otherwise polarized stakeholders that the Copyright Office should take steps within its existing regulatory authority to streamline

---

[690] Tr. at 151:02–16 (May 25, 2016) (Metalitz, AAP, MPAA & RIAA); *see also* Maryna Koberidze Initial Comments Ex. A, at 231 (noting that bypassing an access control would remain prohibited, even if the same TPM acted as a copy control).

[691] *See 321 Studios.*, 307 F. Supp. 2d at 1094–99 (finding DVD encryption controls to independently be both access controls and copy controls, and finding trafficking violations under both sections 1201(a)(2) and (b)).

[692] *See, e.g.*, 2015 Recommendation at 29–30, 99–106 (description of TPMs on DVDs and Blu-ray discs and Register's recommendation for exemptions involving works protected by these TPMs).

[693] Tr. at 155:14–22 (May 19, 2016) (Sheffner, MPAA); *see also* EFF Initial Reply Comments at 3 ("There is strong consensus among the commenters that exemptions granted in a triennial rulemaking should be renewed in subsequent three-year periods with little or no burden on proponents."); DVD CCA & AACS LA Additional Reply Comments at 3 ("There is significant consensus that the rulemaking should be streamlined to permit previously granted exemptions to be more easily renewed.").

LOC_AR_00003361

the process for recommending renewal of previously adopted exemptions to the Librarian.[694]

## 1. The Need for a Renewal Process

Prior participants in the rulemaking process generally characterized it as burdensome for both users and rightsholders of copyrighted works.[695]  For example, the Cyberlaw Clinic estimated that in the most recent rulemaking, its attorneys, students, and interns "logged approximately 575 hours of work" to obtain an exemption to circumvent medical devices,[696] and AFB estimated that law students spent 527.2 hours supporting its petition for a renewed exemption.[697]  The commitment was keenly felt by individuals, such as documentary filmmakers and farmers, where participation in the rulemaking process competed with demands of their occupations,[698] and by other communities,

---

[694] *See, e.g.*, AAP, MPAA & RIAA Initial Comments at 11–12; AAU, ACE, APLU & EDUCAUSE Initial Comments at 14; Auto Alliance Initial Comments at 6–7; AIPLA Initial Comments at 2; AFB Initial Comments at 3; Authors Alliance Initial Comments at 2–3; Auto Care Initial Comments at 8–9; CDT Initial Comments at 5–6;  Competitive Carriers Ass'n Initial Comments at 5–11; CTA Initial Comments at 7; Consumers Union Initial Comments at 4; Copyright Alliance Initial Comments at 11–12; David Oster Initial Comments at 1; DIYAbility Initial Comments at 4–6; DVD CCA & AACS LA Initial Comments at 10–14; EFF Initial Comments at 8–9; ESA Initial Comments at 8–11; iFixit Initial Comments at 3; ISRI Initial Comments at 8–11; Joint Filmmakers I Initial Comments at 9–10; Kernochan Center Initial Comments at 4–5; KEI Initial Comments at 4–5; LDAA Initial Comments at 1–2; LCA Initial Comments at 33–34; Maryna Koberidze Initial Comments at 2–3; MIT Initial Comments at 3–4; Microsoft Initial Comments at 6; Mozilla Initial Comments at 5; OTI Initial Comments at 7–9; NMR Initial Comments at 17–18; OTW Initial Comments at 2, 4–5; ORI Initial Comments at 3; Peter Decherney Initial Comments at 6–13; Peter Hunt Initial Comments at 3; Public Knowledge Initial Comments at 4–5; R Street Institute Initial Comments at 7; Rapid7, Bugcrowd & HackerOne Initial Comments at 4; Rico Robbins Initial Comments at 1; SAA Initial Comments at 3; SIIA Initial Comments at 7; SIIA Initial Reply Comments at 5; UVA Initial Comments at 2–3; IPT USC Initial Comments at 7–9; USACM Initial Comments at 2; AAA Initial Reply Comments at 6 (all expressing general support).

[695] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 10; Copyright Alliance Initial Comments at 12.

[696] Cyberlaw Clinic Initial Comments at 1.

[697] AFB Initial Comments at 9; *see also* Tr. at 82:22–83:05 (May 19, 2016) (Tushnet, OTW) (noting that OTW spent 500–600 hours on petition to circumvent for remix artists); Joint Filmmakers II Initial Reply Comments at 3 (noting that law clinic and pro bono counsel spent "nearly 2000 hours advocating for an exemption").

[698] IPT USC Initial Comments at 3 ("[F]armers face the impractical challenge of seeking renewals for exemptions while simultaneously managing the specific and time-sensitive needs of their farms."); Joint Filmmakers I Initial Comments at 10 ("The requirement to reapply *de novo* for the

128

including the blind, visually impaired, and print-disabled, which have come to rely upon an exemption but must go through the process again each rulemaking.[699]  As a result, stakeholders suggested that "this cost and the difficulty of securing pro bono representation deters some individuals and organizations from participating in the triennial rulemaking process."[700]

As described above, the sixth rulemaking process instituted procedural changes designed to make the process more accessible, to facilitate participation and the development of the factual record, and to reduce administrative burdens on participants and the Office.[701]  While some praised the Office for these improvements,[702] others found the petition process and subsequent filing periods "repetitive" and in need of shortening.[703]

There was a particular focus on the need for the Office to expedite the process for considering requests to readopt or "renew" a previously granted exemption. Commenters said the needs of many of the users of an exemption, including the blind, visually impaired, and print disabled, documentary filmmakers, or universities and libraries, has "remained fairly constant."[704]  Given the reliance these users have come to place upon the exemptions relevant to them, stakeholders expressed concern over the overall lack of certainty that an exemption, even one lacking opposition, would be

---

same previously granted exemptions detracts from our time, attention, and resources to enriching society with documentary films.").

[699] Tr. at 162:25–163:15 (May 19, 2016) (Cazares, AFB).

[700] *See, e.g.,* AFB Initial Comments at 9; Tr. at 88:10–89:07 (May 19, 2016) (Cox, ARL) ("[The process] is just an extraordinary amount of time for something that is proposed by public interest groups that often don't have the time and resources . . . ."); Tr. at 106:01–09 (May 25, 2016) (Lerner, Joint Filmmakers I) ("[F]ew people can afford to participate in a proceeding without this unique animal called law clinics . . . ."); Tr. at 111:05–10 (May 25, 2016) (Wiens, iFixit & Repair.org) ("[W]e had a list of about 50 exemptions that we wanted to file.  And we whittled that down to about the six that we were able to work on and file because that was the number of clinics that we had."); Tr. at 119:21–120:13 (May 25, 2016) (Wolfe, Authors Alliance).

[701] *See* Section 1201 Study:  Notice and Request for Public Comment, 80 Fed. Reg. at 81,371.

[702] *See, e.g.,* Microsoft Initial Comments at 5 ("We applaud the Copyright Office for the creative ways in which it streamlined the process for identifying, categorizing, and obtaining feedback on proposed exemptions in the 2015 rulemaking."); Kernochan Center Initial Comments at 6 (stating that grouping proposed exemptions into categories for comment "benefited the rulemaking process and should be retained").

[703] *See* AAU, ACE, APLU & EDUCAUSE Initial Comments at 14–15; Joint Filmmakers II Initial Reply Comments at 3 (requesting this change).

[704] MIT Initial Comments at 4.

LOC_AR_00003363

granted in subsequent rulemaking cycles.[705]  Stakeholders who had previously opposed the initial grant of such exemptions also recognized the benefits of a expediting the process for renewal.  Such stakeholders generally expressed the view that they "are not opposed in principle to the Register recommending renewal of existing exemptions to the Librarian so long as there is no meaningful opposition to renewal."[706]

The Office's prior requirement that a factual record to support an exemption be developed *de novo* each rulemaking[707] was seen as placing significant and unnecessary requirements on parties and the Office—especially when there is little to no opposition to the renewal of the exemption.[708]  Specifically, commenters pointed out that once an exemption has been granted, it can be more difficult to develop a factual record demonstrating the need for the exemption.[709]  As one stakeholder described it, "it becomes more difficult to empirically demonstrate adverse impact resulting from a

---

[705] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 11; IPT USC Initial Comments at 6; Tr. at 171:02–07 (May 19, 2016) (Butler, Univ. of Va. Libraries) (noting that many universities have built up DVD libraries under the "value proposition" that "we will be able to cut clips").

[706] AAP, MPAA & RIAA Initial Comments at 11–12; *see also* Auto Alliance Initial Comments at 6 ("Auto Alliance would not oppose reasonable procedural changes that could expedite consideration of uncontested requests for the 'renewal' of specific exemptions."); Copyright Alliance Initial Comments at 11 ("The Copyright Alliance is willing to consider supporting an appropriately focused solution to reduce administrative burdens on the Copyright Office, such as those which may facilitate the renewal of exemptions for which there is no meaningful opposition."); DVD CCA & AACS LA Comments at 11 ("[T]hey would not oppose a streamlined process for meeting the burden for renewal of an existing exemption under the conditions noted below"); ESA Initial Comments at 9 ("ESA is open to the possibility of adjustments in the Copyright Office's procedures to streamline the triennial proceedings within the current statutory framework.").

[707] *See* 2015 Recommendation at 14.

[708] *See, e.g.*, AFB Initial Comments at 3 ("The de novo review process . . . has become a never-ending exemptions treadmill, even when the exemption occasions little to no opposition."); ISRI Initial Comments at 8–9 ("Eliminating the de novo requirement would vastly reduce much of the unnecessary burden on proponents to reestablish the evidentiary and legal justifications for their exemptions every three years, as well as the burden on the office to review ever-expending [*sic*] records for already-granted exceptions."); LCA Initial Comments at 3 ("The requirement that an exemption be renewed *de novo* every three years is enormously burdensome."); USACM Comments at 2 ("The current requirements to provide the factual and legal evidence anew each time can result in significant inefficiencies and duplication of effort by all parties and [the Copyright Office].").

[709] *See* Peter Decherney Initial Comments at 7 (stating "it is difficult, if not impossible, to show continued harm after one has been granted an effective exemption whose very purpose is to preclude such harm"); IPT USC Initial Comments at 5 (describing the process as "placing a stringent requirement for a new, fully developed record that is impossible to create").

130

LOC_AR_00003364

technological protection measure when an existing exemption is succeeding in addressing that very problem."[710]

Several commenters argued that section 1201 does not require *de novo* review, or at least not the *de novo* presentation of evidence by exemption proponents in each proceeding.[711] Under this view, commenters questioned the Office's reliance upon the Commerce Committee Report's statement that "the assessment of adverse impacts on particular categories of works is to be determined de novo"[712] and contended that this statement should not preclude the Office from adopting a more forgiving standard than it has in the past.[713] Many read the language as suggesting that the Office at most must make a new evaluation of the evidence during each proceeding—not necessarily that new evidence must be presented by proponents.[714] These stakeholders explained that under this approach, the Office could rely on evidence from prior proceedings to make its determination.[715] Multiple commenters offered ways in which the Office could facilitate the re-use of evidence submitted in prior rulemakings by participants, such as "forming a database to preserve the evidence from past rulemakings so that all parties may utilize

---

[710] AFB Initial Comments at 5, 10 (noting that even though the 2010 exemption was unopposed and the Register acknowledged the importance of broad accessibility for the blind and print disabled, she concluded that there was insufficient evidence to support granting the exemption).

[711] *See, e.g.*, Authors Alliance Initial Comments at 3 ("Current requirements that proponents provide a renewed evidentiary record for each rulemaking are particularly burdensome and do not appear to be statutorily mandated."); Peter Decherney Initial Comments at 7 ("The statute itself does not address how evidence and legal analysis from rulemakings should be employed in subsequent rulemakings.").

[712] COMMERCE COMMITTEE REPORT at 37.

[713] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 14 n.7 ("[T]he *de novo* standard is set out only in the report of one committee that considered the DMCA."); EFF Initial Comments at 9 ("Legislative history is not law and does not bind the Copyright Office.") (citing *Blanchard v. Bergeron*, 489 U.S. 87, 99 (1989) (Scalia, J., concurring)); ISRI Initial Comments at 9–10 ("[T]he rulemaking section of the statute described in the Report underwent so many substantive changes that there simply is no basis for giving the Report's mention of *de novo* review any weight whatsoever."); NMR Initial Comments at 17.

[714] *See, e.g.*, CDT Initial Comments at 6 ("Even if the statute does require *de novo* review of a requested exemption, that review does not foreclose consideration of or reliance on evidence adduced in prior rulemakings.") (citing *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1004 (9th Cir. 2006)); DVD CCA & AACS LA Initial Reply Comments at 6; Joint Filmmakers I Initial Comments at 10.

[715] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 14 n.7; Authors Alliance Initial Comments at 3; LCA Initial Comments at 34.

LOC_AR_00003365

[it], when appropriate, in future proceedings"[716] or automatically "porting" evidence from prior rulemakings for each docket "into the next cycle, for all classes, regardless of whether exemptions were approved or denied."[717]

While generally agreeing that the Office has some latitude to adjust the rulemaking framework in light of the statute and legislative history, some commenters noted that "[t]here were good reasons why the rulemaking requires proponents to put on their case and meet their burden of proof de novo."[718]  As Auto Alliance put it:

> Since the inception of the rulemaking process, the concept that the case for exemptions must be demonstrated de novo in each cycle has been a core feature. . . .  Most of the markets relevant to proposed exemptions are dynamic and fast-changing (most assuredly this is the case for the automotive marketplace).  Issues such as whether technological changes or market developments have created new alternatives to circumvention that did not exist three years previously, or have made circumvention less (or more) necessary to carry out specified non-infringing uses, inevitably require determinations on the proposed renewal of existing exemptions to be made de novo.[719]

## 2.  Proposals for Reform

Despite general consensus over the desirability of expediting the rulemaking process for repeat exemptions, views differed regarding what that should entail, and, correspondingly, whether statutory amendment was required.  Suggestions for methods of improving the process for renewing exemptions generally fell into two camps:  first, a "burden-shifting" model where exemptions would be automatically renewed unless opponents met an evidentiary burden for denial, and second, a "streamlined" process that would allow for readoption of exemptions upon short affidavits, absent some showing of meaningful opposition.  Some commenters were only "open to considering proposals for steps that can be taken short of amending the statute that could help alleviate these burdens without adversely affecting the objectives of the process or the statute, which remain sound."[720]

---

[716] Peter Decherney Initial Comments at 14–15 ("If the evidence is out of date, the Office can disregard it, but if it is still relevant, the Office can consider it.").

[717] Public Knowledge Initial Comments at 5; *see also* Tr. at 167:04–21 (May 19, 2016) (Turnbull, DVD CCA & AACS LA).

[718] DVD CCA & AACS LA Initial Comments at 10–11.

[719] Auto Alliance Initial Comments at 6.

[720] Copyright Alliance Initial Comments at 12.

LOC_AR_00003366

### a. "Burden-Shifting" Model

The Copyright Office has previously recommended "that the process of renewing existing exemptions should be adjusted to create a regulatory presumption in favor of renewal," and that "it would be beneficial for Congress to amend Section 1201 to provide that existing exemptions will be presumptively renewed during the ensuing triennial period in cases where there is no opposition."[721]  Most commenters agreed that the Copyright Office could not, under the current statute, implement such changes.[722]  Others, however, suggested that the Office already possesses authority to implement a system of "presumptive renewal," although it was not always clear whether the phrase "presumptive renewal" would include an explicit shifting of the burdens between potential seekers of an exemption and those who might oppose it.[723]

The Office received several comments in support of this approach,[724] although they were of limited number compared to those supporting a streamlined process for renewal, discussed below.  Under the burden-shifting model, "once the exemption exists, the burden should shift to the copyright holder."[725]  Opinions differed as to whether this burden-shifting should apply to "*all* previously granted exemptions"[726] or be limited by

---

[721] *Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 27 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

[722] *See, e.g.*, AIPLA Initial Comments at 2 ("AIPLA endorses, in principle, an amendment to the Copyright Act that would adjust the triennial process by which exemptions are renewed."); Peter Decherney Initial Comments at 8 ("The purpose behind reconsidering existing exemptions on a triennial basis is to account for that fact that changes in technology, patterns of consumption, and the marketplace may make some existing exemptions obsolete.  Thus, the creation of a hard presumption of renewability might well violate Congressional preference expressed through legislative history."); KEI Initial Comments at 4 ("[T]he statute should be amended to . . . allow for a presumptive renewal of granted exemptions . . . .").

[723] *See, e.g.*, ISRI Initial Comments at 11 ("[T]he Copyright Office currently possesses the authority to make such a change without legislative action . . . ."); Tr. at 132:03–09 (May 25, 2016) (McClure, AFB) (suggesting that such authority can be found in the fifth statutory factor).

[724] AAU, ACE, APLU & EDUCAUSE Initial Comments at 14; *see also* AFB Initial Comments at 10 ("[T]he Office should presume that the exemption is still needed and working."); DIYAbility Initial Comments at 5 ("The most effective for filing groups would be to amend Section 1201 to allow the Library of Congress to automatically renew an exemption granted in the previous rulemaking if no opposition is raised."); OTI Initial Comments at 8.

[725] Tr. at 158:01–06 (May 19, 2016) (Goldman, KEI); *see also* LCA Initial Comments at 3.

[726] Authors Alliance Initial Comments at 2.

LOC_AR_00003367

a threshold, such as "[e]xemptions which encounter no substantive opposition, or which are granted twice in succession over objections."[727]

On the other hand, representatives of copyright owners objected to the burden-shifting model, with one stakeholder explaining "that the opponent doesn't necessarily have all the evidence necessary to show that the exemption is no longer necessary."[728]  Another noted that the Copyright Office had previously rejected burden-shifting as incompatible with a statutory scheme to provide exemptions to a statute, and argued that those reasons remain valid.[729]

Even those who supported a burden-shifting model disagreed as to what showing would be needed to overcome the presumption of renewal.  Mozilla suggested that objections should "demonstrate that the balance of interests favors nonrenewal" by "demonstrat[ing] what circumstances have changed" and "identify[ing] actual harm (cognizable under copyright law) as a result of the exemption" that is not speculative in nature.[730]  AAA suggested that the presumption could be rebutted "by a showing of materially changed circumstances," which would allow objectors to raise "[i]ssues such as whether technological changes or market developments have created new alternatives to circumvention that did not exist three years previously, or have made circumvention less (or more) necessary to carry out specified non-infringing uses."[731]  Similarly, Public Knowledge suggested that opponents must present "compelling" evidence "that shows

---

[727] Mozilla Initial Comments at 5.

[728] Tr. at 174:05–17 (May 19, 2016) (Castillo, AAP); *see also* AAP, MPAA & RIAA Initial Reply Comments at 6 n.6 (explaining that "Congress intended for proponents, who are better positioned than opponents, to present evidence regarding the purported need for exemptions"); Auto Alliance Initial Comments at 6 (rejecting presumptive renewal as "inconsistent with the fundamental character of the proceeding as a fact-based inquiry that depends on specific evidence of the concrete, real-world impact of the anti-circumvention prohibition on actual non-infringing uses of works"); Copyright Alliance Initial Reply at 3 (objecting to a statutory presumption of renewal); DVD CCA & AACS LA Initial Comments at 10 ("DVD CCA and AACS LA would oppose the creation of a presumption of renewal for an exemption, as it would not be consistent with the principles of administrative law."); Tr. at 87:15–88:03 (May 25, 2016) (Reed, Fox Entm't Grp.) (opposing "outright burden shifting").

[729] Tr. at 178:04–179:03 (May 19, 2016) (Sheffner, MPAA) (stating that "rules of statutory construction and administrative law" dictate that exemptions should be construed narrowly and that the burden for an exemption should be on proponents) (citing 2000 Recommendation and Final Rule at 64,558–59).

[730] Mozilla Initial Comments at 5.

[731] AAA Initial Reply Comments at 6.

LOC_AR_00003368

that a previously granted exemption should not be automatically renewed because of a change in legal or factual circumstances since the granting of the exemption."[732]

### b. "Streamlining" Model

An alternate model, endorsed by a wider group of commenters, including many who also supported a burden-shifting approach,[733] would be for the Copyright Office to implement a streamlined process for renewal under its existing regulatory authority. As commenters seemed to generally understand it, under this approach:

> [A] proponent of the exemption should be required to file a simple request for renewal, affirming that the exemption is still warranted and that there have been no material substantive changes in the circumstances that supported the earlier determination to grant an exemption. A party who opposes the exemption would have the obligation to come forth with evidence that there has been a change in circumstances, *e.g.*, evidence that there is greater ability to make fair uses without circumvention than there was when the earlier exemption was granted, or evidence that the circumvention of technological access controls is having an adverse effect on the market for or value of copyrighted works. At that point, the Copyright Office should consider the application for the exemption *de novo*, and the burden of proof should be on the proponent.[734]

Commenters widely agreed that the Office already has sufficient statutory authority to implement this streamlining model.[735] As one commenter explained, an agency has

---

[732] Public Knowledge Initial Comments at 4.

[733] *See, e.g.*, EFF Initial Comments at 8 ("[W]hile we support and encourage legislative efforts to address this problem, the Copyright Office can take meaningful steps without waiting for Congressional action.").

[734] Kernochan Center Initial Comments at 4; *see also, e.g.*, DVD CCA & AACS LA Initial Reply Comments at 6 (endorsing the model and stating "[w]e see no reason, however, that a *de novo* determination would necessarily require submission of entirely new evidence").

[735] *See, e.g.*, Peter Decherney Initial Comments at 5 (noting that a model based upon an affidavit of continued use "fits within the statutory framework as it exists now without needing Congressional action"); Joint Filmmakers I Initial Comments at 4 ("[T]he statute affords the Librarian substantial discretion to structure the burden of proof, burden of persuasion, and standard of proof in ways that maximize fairness and efficiency."); DVD CCA & AACS LA Initial Reply Comments at 6 ("DVD CCA and AACS LA believe that a renewal procedure can be achieved under existing statutory authority, through a streamlined procedure where, following a request for a renewed exemption (on terms identical to the one already in effect), the record reveals no meaningful objection."); SIIA Initial Reply Comments at 5 ("[W]e share the general

LOC_AR_00003369

discretion to change its interpretation of a statute upon providing a reasoned explanation, and "[h]ere, evidence of the need for change is abundant."[736] Supporters of this model also suggested that the Office could adopt this procedure while still establishing the basis for each exemption *de novo* in each triennial proceeding.[737]

Some rightsholders believed that by requiring affirmative requests for renewal of exemptions, the streamlining model would prevent "the renewal of exemptions for which there is no demand, which would run counter to the design of the proceeding as a triennial review of the marketplace."[738] ESA expressed concern that "the regulations implementing Section 1201 . . . not become a repository for outmoded and unnecessary exemptions that continue only because nobody cares enough to address them one way or the other" and urged the Office "to retain some form of periodic review to ensure that only exemptions that are current and important remain on the books."[739] On the other hand, some past participants noted that petitioners are often nonprofits, and/or are represented by law clinics that change personnel each semester, and expressed concern that otherwise relied-upon exemptions might fall through the cracks.[740] It was also proposed that "it would be better for the Copyright Office to . . . look . . . at the conditions even if people don't show up" asking for renewal.[741]

*Content of Request.* In terms of the specific mechanics of the streamlining model, commenters generally envisioned the required affidavit as "a very simple one- or two-page filing"[742] that would include a "summary of reasons underlying a renewal, and not requiring . . . full submissions or hearings."[743] Some suggested that the Office should

---

consensus that the statute provides discretion to streamline the proof required to renew previously granted exemptions . . . .").

[736] EFF Initial Comments at 9.

[737] DVD CCA & AACS LA Initial Reply Comments at 6 ("[D]e novo simply means that the determination must be newly made in each successive rulemaking," and not that "submission of entirely new evidence" is required.); *see also* Tr. at 160:03–10 (May 19, 2016) (Band, LCA) (same).

[738] AAP, MPAA & RIAA Initial Comments at 11–12.

[739] ESA Initial Comments at 10.

[740] Tr. at 169:12–170:24 (May 19, 2016) (Butler, Univ. of Va. Libraries).

[741] Tr. at 123:12–22 (May 25, 2016) (Lerner, Joint Filmmakers I).

[742] Tr. at 156:14–15 (May 19, 2016) (Sheffner, MPAA); *see also* Tr. at 160:15–17 (May 19, 2016) (Band, LCA) (suggesting "we can just do maybe not even a page, even maybe a paragraph or a sentence"); Tr. at 180:08–23 (May 19, 2016) (Turnbull, DVD CCA & AACS LA) (noting "it could be a checkbox on a form"). *But see* Tr. at 175:04–21 (May 19, 2016) (Geiger, Rapid7) ("[T]he idea that it would be just one page I'm not sure is going to hold for very long" because "every word on that page is going to get litigated.").

[743] Microsoft Initial Comments at 6.

LOC_AR_00003370

request evidence of use or reliance on the exemption to determine whether "in the absence of an exemption, users would be harmed."[744]  Another approach would be to "require that a proponent file an assertion that the need for a particular exemption persists and that there has been no material change to the facts and circumstances surrounding the exemption since the previous triennial rulemaking."[745]  Similarly, others suggested that a declaration that "the conditions present in a previous rulemaking continue to exist" would be sufficient, with the Copyright Office taking notice of the underlying administrative record that originally gave rise to that exemption.[746]

In terms of timing, commenters largely agreed that the Office should solicit affidavits prior to initiating the next rulemaking cycle.[747]  One commenter proposed having the Office establish an email alert to notify previous participants that an exemption was about to expire and asking them whether they wished to request renewal.[748]  Another suggested that the Office could establish a renewal form, similar to a statement of incontestability established by the U.S. Patent and Trademark Office for trademark renewals.[749]

*Requests to Expand an Existing Exemption.*  Given that the sixth rulemaking concerned several requests for renewal of exemptions where the proponents also sought to expand the breadth of the previously granted exemption, commenters debated the proper treatment where requests to "renew" also sought to "expand" an exemption.  As DVD CCA and AACS LA pointed out, for most renewal requests, "the 'burden' on the parties and the Copyright Office has come from the fact that actual deliberations over the proposed exemptions are not simply to extend past exemptions but rather determining whether the exemption should be expanded as the proponents request."[750]  Accordingly, they suggested that "proponents of a renewal could choose either to use the streamlined process to renew previously granted exemptions without any modifications or to proceed through the normal deliberations of the rulemaking to determine if a modified

---

[744] Peter Decherney Initial Comments at 12 (emphasis omitted); *see also* SIIA Initial Comments at 7 ("[T]he person seeking that presumption should have to demonstrate specific evidence of use in the triennial after the exemption issued.").

[745] Copyright Alliance Initial Comments at 12; *see also* ESA Initial Comments at 9.

[746] Joint Filmmakers I Initial Comments at 10; *see* Tr. at 183:20–184:08 (May 19, 2016) (Band, LCA) (suggesting that, in light of the existing record, the Office could act after a person checked a box that "says do you want to renew this exemption because you are being harmed or likely to be harmed over the next three years").

[747] *See, e.g.*, Tr. at 214:14–22 (May 19, 2016) (Band, LCA); *id.* at 216:01–08 (Sheffner, MPAA).

[748] Tr. at 170:04–20 (May 19, 2016) (Butler, Univ. of Va. Libraries).

[749] Tr. at 185:01–16 (May 19, 2016) (Tushnet, OTW).

[750] DVD CCA & AACS LA Initial Comments at 13.

137

exemption is warranted."[751]  Others agreed that "[t]he presumption should only apply to the exemption exactly as it issued the first time."[752]

But while there was tentative agreement that expansions of exemptions should be addressed outside the streamlined process for renewal, there was some concern as to how these requests should be treated.  Some suggested that parties submit "evidence only to the extent relevant to the expansion," with the proceeding taking into account the prior underlying record.[753]  One repeat participant noted that it was often necessary to expand, or update, an exemption because "technology doesn't stand still" and so "we [need to] start where we left off last time" in those cases.[754]  Another suggested that the Office hold an informal discussion, similar to a pre-hearing conference, to determine whether the expansion is likely to be opposed.[755]  However, one commenter noted that some "evidence is relevant to both the existing and proposed expansions," suggesting there may be tension with ignoring such evidence with respect to the existing (technically unopposed) exemption under a rulemaking model.[756]

*Opposition to Renewal.*  Much discussion concerned how the Office should treat statements in opposition to renewal of exemptions.  Multiple commenters suggested that "if there is meaningful opposition, the petitioner would have to go through the review process and meet the standards applied to new applicants, without the benefit of the presumption."[757]  But OTW argued that "'[m]eaningful' is a subjective term that

---

[751] *Id.* at 11.

[752] SIIA Initial Comments at 7; *see also* Auto Alliance Initial Comments at 7 (stating "any 'fast-track' procedures should not apply whenever material changes to an existing exemption are proposed"); Tr. at 157:03–23 (May 19, 2016) (Sheffner, MPAA).

[753] Microsoft Initial Comments at 6; *see also* DIYAbility Initial Comments at 5 ("Adopting by reference the factual record from previous rulemakings would greatly reduce the length of comments filed in the triennial rulemaking process" allowing parties to "focus their comments on addressing relevant changes to the law and marketplace that have occurred since the previous rulemaking."); Tr. at 200:04–07 (May 19, 2016) (Sheffner, MPAA) ("[W]e would not oppose the ability of proponents to incorporate by reference evidence that has been submitted in prior rulemakings.").

[754] Tr. at 161:19–162:12 (May 19, 2016) (Decherney, U. Penn.).

[755] Tr. at 205:02–19 (May 19, 2016) (Band, LCA); *see* Tr. at 117:15–118:06 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) (suggesting there should be "maybe not quite so heavy a burden for the modification of an existing exemption").

[756] Tr. at 186:01–15 (May 19, 2016) (Tushnet, OTW).

[757] AIPLA Initial Comments at 2; *see also* Tr. at 156:16–22 (May 19, 2016) (Sheffner, MPAA) (accord); Joint Filmmakers II Initial Reply Comments at 6 ("[A]n opposition requirement any more lenient than that would likely render the presumption ineffectual, because anyone could extinguish a presumption merely by expressing opposition.").

LOC_AR_00003372

invites further strife" and suggested that some participants "could be expected to argue in every case that their opposition is 'meaningful,' creating yet another issue the Office would have to seek submissions on and then resolve."[758]

Others tried to define "meaningful opposition" in useful ways that would preserve the underlying goal of facilitating renewal of uncontroversial exemptions. One prior participant noted, "[b]y meaningful opposition, we mean that the opponent of an exemption would have to demonstrate that there was a change of circumstance that justified no longer granting an exemption."[759] Many tied the standard for opposition to an inquiry into adverse impacts, with one commenter suggesting that opponents must proffer "convincing evidence showing that adverse impact on non-infringing uses has ceased"[760] and another proposing that opponents submit "concrete evidence that no adverse effects would result if the previously granted exemption were withdrawn."[761]

From its perspective, MPAA suggested it is only likely to oppose a previously granted exemption if there were a change in relevant case law, business models, or technology.[762] In those cases, it suggested that the administrative record may have become stale such that additional evidence demonstrating the need for the exemption would be valuable.[763] Finally, it was suggested that the Office should allow proponents to dispute whether the opposition was meaningful before moving the request for renewal into the next triennial rulemaking.[764]

### c. Presumptive Rejection Model

Some stakeholders expressed frustration that the rulemaking process is equally burdensome when evaluating proposals where a similar proposed exemption has previously been *rejected*. ESA pointed out that the fifth and sixth rulemakings both involved requests to "create an exemption for circumvention of access controls on video game consoles"; it contended that the sixth rulemaking in large part rehashed

---

[758] OTW Initial Comments at 2.

[759] Peter Decherney Initial Reply Comments at 5; *see also* Tr. at 166:05–17 (May 19, 2016) (McClure, ISRI); Rapid7, Bugcrowd & HackerOne Initial Comments at 4.

[760] EFF Initial Reply Comments at 3.

[761] Joint Filmmakers II Initial Reply Comments at 5; *see also* AFB Initial Comments at 3 (arguing that renewal should proceed "provided opponents do not show that the adverse impacts that initially justified the exemption are no longer relevant").

[762] Tr. at 200:19–201:10 (May 19, 2016) (Sheffner, MPAA).

[763] *Id.*

[764] Tr. at 221:07–15 (May 19, 2016) (Geiger, Rapid7).

139

LOC_AR_00003373

arguments that the Office and the Librarian had previously rejected.[765]  To avoid wasting resources by revisiting issues that had been previously decided, ESA proposed that "proponents of an exemption that has previously been rejected should be required to show what conditions have changed that would compel a contrary decision in a subsequent rulemaking."[766]  Certain other rightsholders supported this proposal,[767] while other stakeholders strongly objected to this model, considering that both proposed exemption language and proponents' circumstances change over time.[768]

### 3.  Office's Recommendations

The Copyright Office realizes that the triennial rulemaking process set up by statute imposes some burdens on its participants—including the NTIA and the Office itself. Since 1998, the number of participants in the rulemaking has successively expanded, and the most recent rulemaking saw the Office receive nearly 40,000 comments and testimony from sixty-three witnesses.[769]  During that rulemaking, a number of petitions essentially sought renewal of existing exemptions, some of them—including a petition that would continue to allow persons who are blind, visually impaired, or print disabled to circumvent literary works distributed electronically—unopposed.  There is little to suggest this trend will reverse by itself.  The Office also appreciates the concern from some that without alteration to the current process, it may become increasingly difficult to develop fresh evidence each cycle demonstrating the need to renew an exemption.[770] Moreover, this study revealed a broad consensus from stakeholders on all sides supporting a streamlined process for the renewal of exemptions.

---

[765] ESA Initial Comments at 12.

[766] *Id.*

[767] *See* AAP, MPAA & RIAA Initial Reply Comments at 6 (supporting "ESA's suggestion that the Copyright Office should require exemption proponents to demonstrate significant changes in the marketplace or the case law before any exemption that has been previously denied will be reconsidered").

[768] Tr. at 210:16–211:16 (May 19, 2016) (Band, LCA) (noting that circumstances change for petitioners over time); Tr. at 210:02–210:11 (May 19, 2016) (Tushnet, OTW) (noting that proposed exemptions have changed over time); *see also id.* at 209:18–210:01 (opposing streamlined system for rejection, arguing the rulemaking is already "structurally unequal," since copyright owners have more chances at defeating an exemption, as they can bring infringement claims even after a section 1201 exemption was granted, which could effectively "end the exemption").

[769] 2015 Recommendation at 2.

[770] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 10; Univ. of Va. Libraries Initial Comments at 2–3; *see also* 2015 Recommendation at 4 ("When there is an existing exemption, however, the evidence may be weak, incomplete or otherwise inadequate to support the request for renewal.").

LOC_AR_00003374

In analyzing the concerns of study participants, the Copyright Office considered the feasibility and merit of both legislative reforms and actions that the Office might take under its existing regulatory authority. After reviewing the current framework and stakeholders' views, the Office concludes that under existing regulatory authority it can pursue some changes to streamline the process to readopt exemptions for which there is no meaningful opposition, although it cannot adopt a presumption of renewal for those exemptions without legislative change.

*Burden-Shifting Model.* The Copyright Office reaffirms its view, shared by many stakeholders, that the current statute does not empower the Librarian or Register to implement a burden-shifting model providing for the presumptive or automatic renewal of exemptions, whereby opponents would have the burden of showing why an exemption should be removed, as opposed to proponents demonstrating why the exemption should be renewed.[771]

As noted, this Report was requested by the House Judiciary Committee's Ranking Member, in part, to evaluate former Register Pallante's recommendation that Congress consider "a legislative change to provide a presumption in favor of renewal in cases where there is no opposition."[772] When the Office asked about this approach as part of this study, many favored this change, but there was no clear consensus supporting statutory reform, despite a strong overall demand for some mechanism to ease the process by which exemptions are continued. Instead, public input generally revealed a stronger preference for non-statutory reform, with some sharply opposing legislation and others merely agnostic as to how any change should be put in place. In addition, some expressed concern that a statutory mechanism could allow outmoded exemptions to linger in the regulations.

Given the large demand to simplify the process for readopting exemptions, the Copyright Office remains committed to its support of a statutory amendment to shift the burdens associated with the renewal, or removal, of previously adopted temporary exemptions. To be clear, the Office is hopeful that its regulatory reforms described below will alleviate many unnecessary burdens associated with renewal of existing exemptions. But an amendment to provide for burden-shifting or presumptive renewal could introduce even greater efficiencies when addressing somewhat perennial, uncontested exemptions, such as cellphone unlocking, by avoiding the need for the public to request, and the Office to evaluate the need for, renewal. At the same time,

---

[771] *See* 2015 Recommendation at 13–14 (discussing statutory requirements).

[772] *See Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 5 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office); *accord id.* at 49 (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary).

LOC_AR_00003375

stakeholders would retain the ability to object to exemptions that have become outmoded by changing technological or legal developments. To the extent that Congress pursues the other statutory reforms discussed elsewhere in this Report, the Office recommends consideration of statutory changes to allow for presumptive or automatic renewal of exemptions while preserving the flexibility of the rulemaking process to take into account changing technology and market developments.

*Streamlining Model.* In the meantime, the Copyright Office plans to focus on immediate changes it can make within the existing regulatory framework. The following section outlines guiding principles, rather than a blueprint, from which subsequent rulemakings can implement and adapt administrative processes. The Office concludes that there is some regulatory flexibility in how it may establish a process for streamlining the rulemaking, and that experience suggests specific procedures may need to remain flexible from rulemaking to rulemaking to accommodate changing technologies and public demands. The Office does intend to implement a streamlined renewal process in the upcoming seventh rulemaking, and further specifics will be provided shortly in a notice of inquiry.

As a threshold matter, the Copyright Office concludes that the statute itself requires that exemptions cannot be renewed automatically, presumptively, or otherwise, without a fresh determination concerning the next three-year period. The relevant statutory provision requires the Librarian, upon the recommendation of the Register of Copyrights, to make a determination whether "users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition" on circumvention.[773] That is, a determination must be made specifically for each triennial period. In addition, while legislative history itself is not law, it can serve as a useful aid in statutory interpretation, and the Commerce Committee's report unequivocally states that "the assessment of adverse impacts on particular categories of works is to be determined de novo."[774] In this way, these determinations are qualitatively different from an appellate court's review of the factual record established by a lower court,[775] as

---

[773] 17 U.S.C. § 1201(a)(1)(B).

[774] COMMERCE COMMITTEE REPORT at 37 ("[T]he . . . prohibition [on circumvention] is presumed to apply to any and all kinds of works, including those as to which a waiver of applicability was previously in effect, unless, and until, the Secretary makes a new determination that the adverse impact criteria have been met with respect to a particular class and therefore issues a new waiver.").

[775] *Cf.* CDT Initial Comments at 6 ("Just as appellate courts may rely on the record developed below when reviewing a lower court's decision *de novo*, the Office is entitled to rely on evidence from a prior rulemaking when conducting a subsequent one."); DIYAbility Initial Comments at 5 ("This type of *de novo* review based on an existing factual record is common—circuit courts of

LOC_AR_00003376

appellate courts do not have to determine whether the record retains reliability when applied to a new set of circumstances.

That said, the statutory language appears to be broad enough to permit determinations to be based upon evidence drawn from prior proceedings, but only upon a conclusion that this evidence remains reliable to support granting an exemption in the current proceeding. Adopting an approach of *de novo* assessment of evidence—compared to *de novo* submission—would allow future rulemakings to consider the appropriate weight to afford to previously submitted evidence when evaluating renewal requests.[776] The relatively quick three-year turnover of the exemptions was put in place by Congress to allow the rulemaking to be "fully considered and fairly decided on the basis of real marketplace developments,"[777] and any streamlined process for recommending renewed exemptions must provide flexibility to accommodate changes in the marketplace that affect the required rulemaking analysis. But at the same time, where there is little evidence of marketplace or technological changes, the Office believes it is statutorily permissible to establish a framework that expedites the recommendation to renew perennially sought exemptions.

*Mechanics of streamlined process.* As noted, the Office intends to implement a streamlined process for evaluating proposals to readopt exemptions in the upcoming seventh rulemaking, with further details to be provided in a notice of inquiry. That notice will request parties seeking renewal of an exemption to submit a short declaration outlining the continuing need for an exemption.[778] Here, again, the law appears to permit

---

appeal, for example, review questions of law *de novo* based on the factual record established by the district court.").

[776] The Office recognizes that historically it has required *de novo* submission of evidence, which remains a reasonable interpretation of the statute and legislative history. The Office agrees, however, that this standard may have become overly restrictive as the rulemaking has grown. *De novo* assessment of evidence is another reasonable interpretation that may better accommodate current demands, so long as parties provide a basis for the Office to ascertain the ripeness of the prior record from which a new determination can be made, such as through the proposed streamlining process, as discussed further below.

[777] Commerce Committee Report at 36.

[778] *See, e.g.,* Peter Decherney Initial Comments at 12 ("Under our proposal, a proponent seeking renewal of an exemption would be required establish a prima facie showing of reliance."); Kernochan Center Initial Comments at 4 ("[A] proponent of the exemption should be required to file a simple request for renewal, affirming that the exemption is still warranted and that there have been no material substantive changes in the circumstances that supported the earlier determination to grant an exemption."); Tr. at 180:10–17 (May 19, 2016) (Turnbull, DVD CCA & AACS LA) ("[I]f the Copyright Office emails that form to the prior proponent and says do you want to renew exactly what you got before, and you check the box . . . as far as I'm concerned, that would be a sufficient filing.").

143

flexibility. A declaration could include a statement that there has been no material change to the facts and circumstances necessitating the exemption since the previous triennial period. The Copyright Office could also require a statement that the proponent is being harmed, or will likely be harmed over the next three-year period, accompanied by a description of use or reliance upon the current exemption in support for this statement. The Office believes that the evidentiary showing required in a declaration can be minimal, as the aim is only to show that the harm that existed when the exemption was first granted continues to occur or would return but for the exemption, thus providing a sufficient justification for the Office to rely upon the prior rulemaking record in making a new recommendation supporting renewal of the exemption. Moreover, this approach appears consistent with relevant case law upholding determinations based upon a single sworn affidavit.[779] While some stakeholders expressed wariness that, in practice, a short-form filing might recreate the requirements of the current rulemaking, the Office is optimistic that this can be avoided with appropriate guidance, including by providing forms for petitioners to use—which the Office plans to use for the next rulemaking.

A streamlined process may include outreach to promote awareness of the relevant deadline. Many existing exemptions have been obtained through efforts led by student legal clinics that have rapid turnover,[780] or laypersons unlikely to monitor the Office's website or the Federal Register. Similar to the process for trademark renewal, in the upcoming rulemaking, the Copyright Office intends to issue renewal reminder emails to dedicated addresses on file. The Register will also allow any person to submit a request for renewal; given the strong public interest taken in the rulemaking process to date, this may minimize the risk that a significantly relied-upon exemption is overlooked. At the same time, the lack of an affidavit seeking renewal of an exemption would provide an avenue for outdated exemptions to be pruned from the regulations. Finally, while theoretically the Office itself can propose renewal of an existing exemption for renewal, because the Register must have a reasonable basis for recommending that the Librarian

---

[779] *See, e.g., EchoStar Comm'ns Corp. v. FCC*, 92 F.3d 749, 752–53 (D.C. Cir. 2002) (holding FCC did not err in relying upon an employee affidavit to dismiss a complaint, noting it was "well settled" that a sworn declaration, although hearsay, could constitute "substantial evidence" supporting a decision made under the APA so long as it was "reliable and trustworthy"); *Aero Mayflower Transit Co., Inc. v. Interstate Commerce Comm'n*, 686 F.2d 1, 9 (D.C. Cir. 1982) (upholding procedure for granting transport certificates whereby an applicant filed an affidavit, followed by a published period of opposition); *California ex rel. Lockyer v. FERC*, 329 F.3d 700, 714 (9th Cir. 2003) (holding that FERC properly relied upon a single affidavit in concluding that substantial evidence supported a determination that reorganization was not harmful to the public interest).

[780] Tr. at 169:12–170:24 (May 19, 2016) (Butler, Univ. of Va. Libraries) ("[I]n my clinic, it's a different student team every three years. And the way that we structure our retainers with our clients is that representation ends the minute . . . this process ends.").

LOC_AR_00003378

adopt an exemption, in almost all circumstances it would still be necessary for a participant to take up the cause and make the required showing for renewal.[781]

A streamlined process must also include an opportunity for stakeholders to raise objections to renewal, and for the Register to consider these objections in determining whether to recommend renewal of an exemption. The public process preceding this Report revealed a fair amount of support for a procedure whereby the Copyright Office first evaluates whether there is "meaningful opposition" to the renewal of an exemption, even if some were wary to what extent this would, in practice, simplify requirements under the current process. Here, again, the statute is helpful. The Register must apply the same evidentiary standards in recommending the renewal of exemptions as for first-time exemption requests. Accordingly, oppositions raising concerns that address these standards would be more likely to prevent the Register from recommending renewal of an exemption. For example, a change in case law might affect whether a particular use is noninfringing, new technological developments might affect the availability for use of copyrighted works, or new business models might affect the market for or value of copyrighted works.[782] Such evidence, if credible, could cause the Office to conclude that the prior evidentiary record is too stale to rely upon for an assessment affecting the subsequent three-year period.

Procedurally, the statutory framework gives the Copyright Office flexibility in structuring the rulemaking so long as there is a reasoned basis for the Register's ultimate recommendation. For the seventh rulemaking, for reasons of administrability, the Office intends to place any repeat exemptions facing meaningful opposition in the normal, more comprehensive notice and comment process.[783] Alternatively, the Office believes it would be equally permissible for future rulemakings to determine, in the interest of administrative convenience, to separately seek comment on any oppositions to renewal, in an effort to resolve potentially more targeted questions than those typically presented by requests for an exemption of first instance.[784]

In sum, the Copyright Office concludes that it is empowered to implement a streamlined process to recommend the renewal of previously granted exemptions, based upon a sufficient showing that the prior record is still a relevant reflection of the legal and factual concerns at issue in the succeeding rulemaking. Such a process, as requested by

---

[781] *Compare* Tr. at 123:12–22 (May 25, 2016) (Lerner, Joint Filmmakers I) (suggesting that "it would be better for the Copyright Office to . . . look . . . at the conditions even if people don't show up" to request renewal).

[782] *See* Tr. at 200:19–201:10 (May 19, 2016) (Sheffner, MPAA).

[783] *See, e.g.*, AIPLA Initial Comments at 2; *see also* Tr. at 156:11–22 (May 19, 2016) (Sheffner, MPAA) (both suggesting same).

[784] Tr. at 220:24–221:15 (May 19, 2016) (Geiger, Rapid7) (suggesting same).

LOC_AR_00003379

a consensus of stakeholders, could incorporate the use of a short form for proponents to request renewal and attest to the continuing need for an exemption. While this process would also take into account objections to the renewal of an exemption, rightsholders' comments suggest that they are unlikely to oppose the renewal of many frequently granted exemptions, such as exemptions for assistive technology and cell phone unlocking, which were unopposed in the last rulemaking.[785] In practical terms, it will be seen shortly in the upcoming seventh rulemaking to what extent this approach succeeds in alleviating the burdens the rulemaking imposes on its repeat participants.

*Modifications to an exemption.* The public process raised a few additional issues, including how a streamlined process should treat petitions to alter an exemption. Again, section 1201 and the APA afford the Copyright Office some flexibility to define its process. Any process, however, must take care to ensure that requests for changed exemptions are evaluated pursuant to a fully developed administrative record. Accordingly, in cases where the circumstances are unchanged, a party asking the Office to rely upon a preexisting record to alter a previously granted exemption faces a greater lift than a party seeking renewal of the exemption as previously granted. For the upcoming seventh rulemaking, the Office intends to limit renewal requests to cases where no material changes to an existing exemption are sought, while evaluating potential modifications within the main notice and comment process.[786] That said, the Office will consider other ways to minimize unnecessary requirements on participants. The Office concludes it has authority to conduct a more limited inquiry regarding a proposed modification where "as-is" renewal is unopposed, and to allow a participant to explain whether the prior record remains relevant to the request for a changed exemption.[787] Finally, considering stakeholder requests for more accessible regulatory

---

[785] *See* DVD CCA & AACS LA Initial Comments at 11 ("Historically, DVD CCA has generally not opposed the continuation of the same CSS-related exemptions."); Tr. at 179:04–180:06 (May 19, 2016) (Ben Sheffner, MPAA) (noting "[in] practice, there is virtually no opposition to previously granted exemptions").

[786] *See, e.g.*, DVD CCA & AACS LA Initial Comments at 11–12; SIIA Initial Comments at 7; Auto Alliance Initial Comments at 7.

[787] The Office acknowledges that some evidence submitted in opposition to a request for an expanded exemption may also be relevant to the renewal of an existing exemption. *See, e.g.*, Tr. at 186:12–24 (May 19, 2016) (Tushnet, OTW) (suggesting the Office "might not" be able to disregard evidence of a "new screen cap program" submitted in response to a different proposed class, while evaluating an unopposed request for renewal). But this hypothetical concern need not block all streamlined processes, given that the Office is afforded considerable discretion in establishing the timing and procedures for the rulemaking, and that the hypothetical lack of opposition to renewal may itself serve as an admission that the evidence should not tip the balances against renewal. The statutory requirement that the rulemaking be held every three years necessitates timely procedures and courts routinely give substantial deference to agencies

language and more transparency in adoption of such language, the Office notes that it is also empowered to address the need for technical changes to regulatory language separately.[788]

*Presumptive rejection.*  Another suggestion was that the Copyright Office should establish a streamlined procedure to recommend against previously denied exemptions.  While in theory the same rationale supporting the creation of a streamlined renewal process also lends support to a fast-track for rejections, there was no consensus about the need for presumptive rejection, and some users strongly objected to this proposal.[789]  Further, the Office is mindful that the rulemaking is intended to "ensure that access for lawful purposes is not unjustifiably diminished" by TPMs.[790]  As such, the Office does not at this time intend to implement such a process.  But where an exemption request resurrects legal or factual arguments that have been previously rejected, the Office will continue to rely on past reasoning to dismiss such arguments in the absence of new information.[791]

## F.  Other Rulemaking Process Considerations

In addition to establishing a process for streamlined renewal of exemptions, several commenters suggested other changes aimed at making the rulemaking process more transparent and easily accessible.  The Copyright Office supports these goals, and previously implemented procedural adjustments for the sixth triennial rulemaking to "enhance public understanding of the rulemaking process, including its legal and

---

to define the procedural requirements of their rulemakings.  *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549 (1978) ("The court should . . . not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good."); *see also Fla. Inst. of Tech. v. FCC*, 952 F.2d 549, 550–54 (D.C. Cir. 1992) (affirming FCC's strict "cut-off" rules regarding broadcast licenses to allow the "orderly processing" of applications); *Crawford v. FCC*, 417 F.3d 1289, 1296–97 (D.C. Cir. 2005) (similar).

[788] For example, changes the Register makes to recommended regulatory language made solely to improve readability may not qualify as material.

[789] *See, e.g.*, Tr. at 209:18–210:14 (May 19, 2016) (Tushnet, OTW); Tr. at 210:16–211:21 (May 19, 2016) (Band, LCA).

[790] COMMERCE COMMITTEE REPORT at 36.

[791] *See, e.g.*, 2015 Recommendation at 107–126 (declining again to recommend proposed classes for "Audiovisual Works and Literary Works Distributed Electronically—Space-Shifting and Format-Shifting," noting that the continued "absence of clear supporting precedent" meant that "the fair use analysis [in 2015] largely follow[ed] the 2012 analysis"); 2006 Recommendation at 72–73 (declining a class for "DVDs that cannot be viewed on Linux operating systems" for "the same reasons as in 2000 and 2003").

147

evidentiary requirements, and facilitate more effective participation."[792] As outlined below, the Office is undertaking further efforts to make the rulemaking process clear and accessible to the public, consistent with its statutory obligations.

1. *Educational Outreach.* The Office will dedicate further resources to educating interested parties about the section 1201 rulemaking process.[793] The Office understands that it can be difficult for the public, especially for those not versed in copyright law or the rulemaking process, to participate in such a complex and resource-intensive process. For example, in connection with the upcoming seventh rulemaking, the Office plans to provide a tutorial or webinar to explain the rulemaking process.

2. *Timing Considerations.* The Copyright Office empathizes with parties who find the scheduling and rapid pace of the rulemaking difficult.[794] It is difficult, however, to accommodate every scheduling interest given the three-year statutory mandate.[795] The Office will continue to try to accommodate scheduling needs of participants, including law school clinics. For the seventh rulemaking, the Office intends to move up the schedule for written comments, to better align with academic calendars.

Relatedly, the Office believes it would be premature for Congress to alter the statutory three-year cycle of the rulemaking, although this subject may be worthy of further study should Congress pursue legislative reforms. While some suggested that the rulemaking should be amended to allow a process to evaluate "out-of-cycle" exemptions,[796] overall, there was not a strong demand for such a change. Commenters did not comment substantively on a proposal in the Breaking Down Barriers to Innovation Act that would provide the Librarian with discretion to conduct a rulemaking outside of the triennial review process.[797] While the Office recognizes the current cycle is an imperfect fit for

---

[792] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 79 Fed. Reg. 55,687, 55,687 (Sept. 17, 2014).

[793] *See, e.g.*, Mozilla Initial Comments at 6 ("[T]he Copyright Office should also undertake education, advocacy, and media efforts regarding the rulemaking process" to encourage participation from 'non-copyright experts.'").

[794] *See, e.g.*, Joint Filmmakers II Initial Reply Comments at 4.

[795] The Office welcomes informal input concerning parties' different needs, including suggestions how to best accommodate the differing schedules of law school clinics, as many operate on different schedules (*e.g.*, semester, trimester, or quarterly terms with differing start dates).

[796] *See, e.g.*, DIYAbility Initial Comments at 1–2 ("The triennial rulemaking process provides only a brief opportunity every three years to petition for an exemption. This is not frequent enough to . . . effectively serve the needs of disabled users."); SAA Initial Comments at 3 ("[I]n many cases the three-year window is too long" for grant-funded preservation projects and the rapid pace of technological change).

[797] H.R. 1883, 114th Cong. § 3 (2015); S. 990, 114th Cong. § 3 (2015).

LOC_AR_00003382

some needs, reforms would seem to also fall short. A longer cycle would not be as responsive to the pressing needs of proponents. A shorter cycle would be more demanding of participants and would make it difficult to determine whether any exceptions were working as intended.

3. *Phased Comment Structure and Administrative Record.* Though some criticized the procedural changes implemented for the sixth triennial rulemaking,[798] others praised the Copyright Office's efforts.[799] Notably, NTIA applauded the Office for "implementing constructive process changes," and noted specifically that "the three-round public comment phase and requirement that each comment submission address one specific proposed exemption facilitated the development of a clear and comprehensive record."[800] The Office's (and NTIA's) limited resources require a clear and efficient comment process so that recommendations can be issued in time for the Librarian to meet the statutory deadline. In the next rulemaking, the Office does not anticipate changing the overall framework of the phased comment structure, but will explore ways to ensure that the record is properly balanced, such as by allowing additional submissions or continuing to ask post-hearing questions as needed to create a more complete record. The Office will also attempt to lessen demands by considering relevant evidence across classes when appropriate and providing a mechanism for testimony to count for multiple classes to avoid necessitating travel to two cities,[801] while maintaining its requirement for submission of written evidence by classes for administrative convenience.

4. *Confidential information.* Some commenters expressed a desire to submit confidential business information, attorney-client privileged information, or evidence of ongoing circumvention activity without increasing their risk of legal liability.[802] The APA does

---

[798] *See, e.g.*, Auto Alliance Initial Comments at 7 (suggesting "rebalancing [the commenting] ratio in future rulemaking cycles, in order to develop a more complete and balanced record"); DVD CCA & AACS LA Initial Comments at 14 (noting that the "new procedural approach . . . gave the proponents three opportunities to make written submissions . . . [but that o]pponents however only had one"); Tr. at 105:01–08 (May 25, 2016) (Lerner, Joint Filmmakers I) ("The petition really ended up being a huge amount of work.").

[799] *See, e.g.*, Kernochan Center Initial Comments at 5 (stating that the changes made in the sixth rulemaking "benefited the rulemaking process and should be retained").

[800] 2015 NTIA Letter at 3.

[801] AAP, MPAA & RIAA Initial Comments at 13 ("Witnesses, whether they be executives of large corporations or individual consumers, should not have to appear multiple times, or on multiple coasts, when their testimony is relevant to multiple proposals.").

[802] *See, e.g.*, OTI Initial Comments at 2–3, 9–11; NMR Initial Comments at 19–20.

LOC_AR_00003383

not prohibit the submission of such materials[803] and other agencies have created rules governing the submission and disclosure of such information.[804] The need for such a rule here, however, is less clear, and the Office is disinclined at this time to adopt procedures to allow submission of comments that cannot be shared publicly.

5.  *Accessibility.*  Following the successful webcast of the San Francisco hearings for this study, the Office will explore making hearings available via webcast as well as allowing for remote participation, including for the upcoming seventh rulemaking.  The Office acknowledges that budget and technology constraints may pose hurdles, but is encouraged by offers of schools and other venues to host future rulemaking roundtables and hearings.  The Office will continue to archive past proceedings on its website in an organized manner.

6.  *Increased Opportunities for Participant Input.*  Some commenters suggested that the Office should make the recommended regulatory language available for comment prior to the Librarian's final determination.[805]  While previewing regulatory language is not required by section 1201, the Office recognizes that it is a typical agency practice.[806]  In this case, however, while the Office is committed to encouraging public participation, it may not always be feasible to add another round of comments on a proposed rule.  Such a process would involve a notice period, possible reply comments, and time for analysis, which would add months to an already lengthy process.  Further, in most cases, parties can, and do, already address existing or proposed regulatory language.  In addition to post-hearing questions targeted at shaping proposed regulatory language,[807] the Office

---

[803] The APA only requires that an agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

[804] *See, e.g.*, 14 C.F.R. § 11.35 (FAA); 46 C.F.R. § 502.5 (Maritime Administration).  *But see* 26 C.F.R. § 601.601(b)(1) (IRS does not accept any confidential information in rulemakings).

[805] AAP, MPAA & RIAA Initial Comments at 13; Auto Alliance Initial Comments at 7.

[806] While the APA generally requires the publication of final rules at least 30 days prior to their effective date, it excepts "substantive rule[s] which grant or recognize[] an exemption or relieve[] a restriction." 5 U.S.C. § 553(d).  This is because rules that relieve restrictions do not require parties "to adjust their behavior before the final rule takes effect."  *San Diego Navy Broadway Complex Coal. v. U.S. Coast Guard*, No. 10-cv-2565, 2011 WL 1212888, at *3 n.3 (S.D. Cal. 2011).  As noted above, while Congress directed the Copyright Office to conduct the rulemaking pursuant to the APA, the Librarian of Congress, who is exempt from the APA, issues the final rule.

[807] *See, e.g.*, Letter from Jacqueline Charlesworth, Gen. Counsel and Assoc. Register of Copyrights, U.S. Copyright Office, to Andrea Matwyshyn, et al. (June 3, 2015), https://www.copyright.gov/1201/2015/post-hearing/Post%20hearing%20questions%20for%20class%2025-signed.pdf (regarding proposed security research exemption); Letter from U.S. Copyright Office to Catherine Gellis, et al. (June 3, 2015), https://www.copyright.gov/1201/2015/post-hearing/Post%20

will consider whether to utilize informal meetings to discuss proposed language or address discrete issues prior to issuing a recommendation, including by establishing guidelines for *ex parte* communications.[808]

7.  *Simplified Regulatory Language.*  The Office agrees with some commenters[809] that drafting the section 1201 regulatory language in plain language is a worthy goal, echoing efforts from the Legislative and Executive Branches to promote clear communication to the public.[810]  Congress recently heard testimony that copyright law has become more opaque and technical over time,[811] and section 1201 is no exception—the proposed exemptions in the triennial rulemakings have steadily increased both in complexity and number.  Nevertheless, the Office will make a greater effort to use plain language in regulations, while accurately reflecting what is supported in the evidentiary record.

---

hearing%20questions%20for%20class%2022-signed.pdf (regarding proposed automobile exemption); Letter from Jacqueline Charlesworth, Gen. Counsel and Assoc. Register of Copyrights, U.S. Copyright Office to Jack Lerner, et al. (June 3, 2015), https://www.copyright.gov/1201/2015/post-hearing/Letter%20to%20Class%206%20Witnesses-signed.pdf (regarding proposed filmmaking exemption).

[808] Tr. at 204:19–206:14 (May 19, 2016) (Band, LCA) (recommending conferences with interested parties to resolve issues related to exemption renewals).

[809] *See, e.g.*, LCA Initial Comments at 32 ("The increasing complexity of the exemptions issued by the Library of Congress make them harder for their beneficiaries to understand and use."); AAU, ACE, APLU & EDUCAUSE Initial Comments at 10–11; Univ. of Va. Libraries Initial Comments at 3–4; Tr. at 130:21-131:06 (May 25, 2016) (LaBarre, NFB).

[810] *See* Plain Writing Act of 2010, Pub. L. No. 111-274, §§ 3(3), 4(b), 124 Stat. 2861, 2861–62 (2010) (while exempting regulations, generally requiring that agencies communicate to the public in a "clear, concise, [and] well-organized" manner); Exec. Order No. 13,563, Improving Regulations and Regulatory Review, 3 C.F.R. pt. 100 (2011), https://obamawhitehouse.archives.gov/the-press-office/2011/01/18/executive-order-13563-improving-regulation-and-regulatory-review ("Our regulatory system . . . must ensure that regulations are accessible, consistent, written in plain language, and easy to understand.").

[811] *A Case Study for Consensus Building: The Copyright Principles Project: Hearing Before the Subcomm. on Courts, Intellectual Prop. & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 58 (2013) (testimony of Pamela Samuelson, Professor, Univ. of Cal. Berkeley Sch. of Law and Dir., Berkeley Ctr. for Law and Tech.) ("[T]he [copyright] statute has become much longer than it was in 1976, and the longer it has become, the more technical it has become."); *see also id.* at 82 (statement of Rep. Melvin Watt, Ranking Member, H. Comm. on the Judiciary) ("[O]ur problem here in Congress is that we either have to write a law that covers every eccentricity, every nuance, or we have to write a general principle and delegate responsibility for the nuances to regulators.").

LOC_AR_00003385

8. *Relationship with NTIA.*  Finally, though one commenter suggested transferring rulemaking responsibilities to the Department of Commerce,[812] the Copyright Office believes the current structure is preferable as it can take advantage of the Copyright Office's and NTIA's respective subject matter expertise and experience in past rulemakings.  The Office anticipates continued productive consultations with NTIA.

## V.    CONCLUSION

The past twenty years have witnessed the rise of an array of new platforms and formats for delivering creative works to the public, and in this respect, section 1201 has succeeded in fostering a thriving, innovative, and flexible digital marketplace, as Congress envisioned.  The basic framework of section 1201—including its treatment of circumvention as a standalone violation independent of copyright infringement and robust anti-trafficking provisions—remains sound, and the Copyright Office does not recommend broad changes to the statute's overall scope.  Within this existing framework, however, it may be appropriate to recalibrate provisions in section 1201 to better reflect changes in technology since the DMCA's enactment nearly two decades ago.  Specifically, the Office recommends amending section 1201 to permit third-party assistance for exemption beneficiaries, expand the scope of the security testing and encryption research exemptions, and establish new permanent exemptions to allow uses of assistive technology for e-books, certain repair, diagnosis, and maintenance activities, and cellphone unlocking.  The Office continues to support establishing a statutory presumption of renewal for exemptions adopted through the triennial rulemaking process.  Meanwhile, it intends to implement changes within existing regulatory authority to streamline the process for evaluating and renewing previously adopted exemptions.  These changes include establishing a short form declaration and abbreviated opposition period for repeat exemptions, to allow the Register to recommend renewed exemptions based on the prior administrative record, in cases where that record remains a reliable reflection of the legal and factual concerns at issue.  Moreover, the Office hopes that the interpretive guidance provided here will prove useful to courts and stakeholders as they consider section 1201's possible application to both current and emerging uses of copyrighted works.

---

[812] *See* LCA Initial Comments at 32–33.

LOC_AR_00003386

**APPENDIX A**        FEDERAL REGISTER NOTICES

LOC_AR_00003387

Signed at Washington, DC, this 22nd day of December 2015.

**Kimberly D. Hill,**

*Chief, Division of Management Systems, Bureau of Labor Statistics.*

[FR Doc. 2015–32664 Filed 12–28–15; 8:45 am]

**BILLING CODE 4510–24–P**

---

## LIBRARY OF CONGRESS

## U.S. Copyright Office

[Docket No. 2015–8]

## Section 1201 Study: Notice and Request for Public Comment

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of inquiry.

**SUMMARY:** The United States Copyright Office is undertaking a public study to assess the operation of section 1201 of Title 17, including the triennial rulemaking process established under the DMCA to adopt exemptions to the prohibition against circumvention of technological measures that control access to copyrighted works. To aid this effort, and to ensure thorough assistance to Congress, the Office is seeking public input on a number of key questions.

**DATES:** Written comments must be received no later than 11:59 p.m. Eastern Time on February 25, 2016. Written reply comments must be received no later than 11:59 p.m. Eastern Time on March 25, 2016. The Office will be announcing one or more public meetings, to take place after written comments are received, by separate notice in the future.

**ADDRESSES:** All comments must be submitted electronically. Specific instructions for submitting comments will be posted on the Copyright Office Web site at *http://www.copyright.gov/policy/1201* on or before February 1, 2016. To meet accessibility standards, all comments must be provided in a single file not to exceed six megabytes (MB) in one of the following formats: Portable Document File (PDF) format containing searchable, accessible text (not an image); Microsoft Word; WordPerfect; Rich Text Format (RTF); or ASCII text file format (not a scanned document). All comments must include the name of the submitter and any organization the submitter represents. The Office will post all comments publicly in the form that they are received. If electronic submission of comments is not feasible, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, Associate General Counsel, by email at *resm@loc.gov* or by telephone at 202–707–8350; or Kevin Amer, Senior Counsel for Policy and International Affairs, by email at *kamer@loc.gov* or by telephone at 202–707–8350.

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Digital Millennium Copyright Act ("DMCA") has played a pivotal role in the development of the modern digital economy. Enacted in 1998 to implement the United States' obligations under two international treaties,[1] it is intended to foster the growth of the digital marketplace by ensuring adequate legal protections for copyrighted content.[2] As envisioned by Congress, the DMCA seeks to balance the interests of copyright owners and users, including the personal interests of consumers, in the digital environment.[3] In addition to provisions limiting the liability of online service providers,[4] the DMCA includes provisions prohibiting the circumvention of technological measures used to protect copyrighted works as well as trafficking in anticircumvention devices.[5] These anticircumvention provisions, codified in section 1201 of the Copyright Act, were the subject of a 2014 hearing held by the House Judiciary Committee's Subcommittee on Courts, Intellectual Property and the Internet as part of its comprehensive review of the nation's copyright law,[6] and, as discussed below, a recently concluded rulemaking conducted by the Copyright Office. In accordance with the request from the House Judiciary Committee's Ranking Member to the Register of Copyrights at the April 2015 House Judiciary Committee hearing on copyright review, and consistent with the Register's testimony in that hearing that the impact and efficacy of section 1201 merit analysis at this time, the Office is undertaking a study and soliciting public input.[7]

---

[1] *See* WIPO Copyright Treaty art. 11, Dec. 20, 1996, 36 I.L.M. 65 (1997); WIPO Performances and Phonograms Treaty art. 18, Dec. 20, 1996, 36 I.L.M. 76 (1997).

[2] *See* H.R. Rep. No. 105–551, pt. 2, at 23 (1998).

[3] *See id.* at 26.

[4] *See* 17 U.S.C. 512.

[5] The DMCA also established protections for the integrity of copyright management information. *See id.* 1202.

[6] *See Chapter 12 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop., and the Internet of the H. Comm. on the Judiciary,* 113th Cong. (2014) ("*Chapter 12 of Title 17 Hearing*").

[7] *See Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary,* 114th Cong. 6 (2015) ("*Register's Perspective on*

### A. Overview of Section 1201

Prohibitions on Circumvention and Trafficking

Section 1201 prohibits the circumvention of technological measures employed by or on behalf of copyright owners to control access to their works (also known as "access controls"), as well as the trafficking in technologies or services that facilitate such circumvention.[8] It also prohibits trafficking in technologies or services that facilitate circumvention of technological measures that protect the exclusive rights granted to copyright owners under Title 17 (also known as "copy controls").[9] In enacting section 1201, Congress recognized that technological measures can be deployed "not only to prevent piracy and other economically harmful unauthorized uses of copyrighted material, but also to support new ways of disseminating copyrighted materials to users," as well as to make "the process of obtaining permissions easier."[10] Violations of

---

*Copyright Review Hearing*") (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office) ("For [certain] aspects of section 1201, we are recommending a comprehensive study, including the permanent exemptions for security, encryption, and privacy research."); *id.* at 49 (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary) ("[T]here are policy issues that warrant studies and analysis, including section 512, section 1201, mass digitization, and moral rights. I would like the Copyright Office to conduct and complete reports on those policy issues . . . ."). Separately, as discussed below, the Register has also proposed amending the triennial rulemaking process to ease the burden of renewing existing exemptions. *See id.* at 5 (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office) ("We are therefore recommending a legislative change to provide a presumption in favor of renewal in cases where there is no opposition.").

[8] 17 U.S.C. 1201(a); *see* Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4th, 1998, at 5–9 (Comm. Print 1998) ("House Manager's Report").

[9] 17 U.S.C. 1201(b); *see* House Manager's Report at 12–13. While section 1201 does not prohibit the circumvention of copy controls, in some cases access control and copy control measures are merged, and thus circumvention of such measures is prohibited by section 1201(a)(1). U.S. Copyright Office, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 4 n.13 (2015), *http://copyright.gov/1201/2015/registers-recommendation.pdf* ("2015 Recommendation"); U.S. Copyright Office, Recommendation of the Register of Copyrights in RM 2008–8, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 44–47 (June 11, 2010), *http://www.copyright.gov/1201/2010/initialed-registers-recommendation-june-11-2010.pdf* ("2010 Recommendation").

[10] House Manager's Report at 6.

**81370**     **Federal Register** / Vol. 80, No. 249 / Tuesday, December 29, 2015 / Notices

section 1201 are subject to both civil and criminal penalties.[11]

## Rulemaking Process

Section 1201 includes a triennial rulemaking process through which the Librarian of Congress, following a public proceeding conducted by the Register of Copyrights in consultation with the National Telecommunications and Information Administration of the Department of Commerce ("NTIA"), may grant limited exceptions to section 1201(a)(1)'s bar on the circumvention of access controls. By statute, the triennial rulemaking process addresses only the prohibition on the act of circumvention itself; section 1201 does not provide a mechanism to grant exceptions to the anti-trafficking provisions of sections 1201(a)(2) or 1201(b).[12] The section 1201 rulemaking is intended to serve as a "fail-safe" mechanism through which the Copyright Office can monitor developments in the copyright marketplace and recommend limited exemptions as needed to prevent the unnecessary restriction of fair and other noninfringing uses.[13] In keeping with that goal, the primary responsibility of the Office in the rulemaking proceeding is to assess whether the implementation of access controls impairs the ability of individuals to make noninfringing uses of copyrighted works within the meaning of section 1201(a)(1). To do this, the Register solicits proposals from the public, develops a comprehensive administrative record using information submitted by interested parties, and makes recommendations to the Librarian concerning whether exemptions are warranted based on that record. While the first triennial rulemaking completed in the year 2000 considered nearly 400 comments, resulting in the adoption of two exemptions,[14] the process has grown such that the recently concluded sixth triennial rulemaking considered nearly 40,000 comments, resulting in exemptions for twenty-two types of uses.[15]

Those seeking an exemption from the prohibition on circumvention must establish that "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition . . . in their ability to make noninfringing uses under this title of a particular class of copyrighted works."[16] To meet the statutory standard, a proponent must show: (1) That uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses.[17] With respect to the first requirement, proponents in prior rulemakings have pointed to several types of noninfringing uses that could be affected by the prohibition of section 1201(a)(1), including fair use (codified in section 107 of the Copyright Act), certain educational uses (section 110), and certain uses of computer programs (section 117).[18] The second requirement asks whether technological measures are "diminishing the ability of individuals to use these works in ways that are otherwise lawful."[19] Congress stressed that proponents must establish that a "substantial diminution" of the availability of works for noninfringing uses is "*actually occurring*" in the marketplace—or, in "extraordinary circumstances," may establish the "likelihood of future adverse impact during that time period" where such evidence is "highly specific, strong and persuasive."[20]

In considering a proposed exemption, the Librarian—and hence the Register—must also weigh the statutory factors listed in section 1201(a)(1)(C), namely: "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate."[21]

In addition, section 1201(a)(1) specifies that exemptions adopted through the triennial rulemaking must be defined based on "a particular *class* of works."[22] The legislative history explains that "the 'particular class of copyrighted works' [is intended to] be a narrow and focused subset of the broad categories of works" appearing in section 102 of Title 17, such as literary works, musical works, and sound recordings.[23] In the course of prior rulemakings, the Register has concluded that, based on the record presented, a "class of works" defined initially by reference to a section 102 category or subcategory of works may be additionally refined by reference to the medium in which the works are distributed, the particular access controls at issue, or the particular type of use and/or user to which the exemption will apply.[24]

Exemptions adopted via the rulemaking process are to remain in effect for three years. Congress made clear that the basis for an exemption must be established *de novo* in each triennial proceeding.[25] Accordingly, even if the same exemption is sought

---

[11] 17 U.S.C. 1203–1204.

[12] *Id.* 1201(a)(1)(C).

[13] H.R. Rep. No. 105–551, pt. 2, at 36.

[14] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Final Rule, 65 FR 64556, 64557 (Oct. 27, 2000).

[15] 2015 Recommendation at 2–7 (2015).

[16] 17 U.S.C. 1201(a)(1)(C); *see* 2015 Recommendation at 13–14; 2010 Recommendation at 10. Under the APA, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. 556(d). The Breaking Down Barriers to Innovation Act of 2015, introduced in both the House and the Senate, would shift the burden of proof away from proponents of exemptions and provide discretion to the Librarian to conduct a rulemaking proceeding outside the triennial process. H.R. 1883, 114th Cong. sec. 3(a)(1)(E) (2015); S. 990, 114th Cong. sec. 3(a)(1)(E) (2015).

[17] 17 U.S.C. 1201(a)(1)(B).

[18] *See, e.g.,* Transcript, U.S. Copyright Office, Hearing on Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 10:17–11:9 (May 2, 2000) (statement of Peter Jaszi, Digital Future Coalition) (discussing adverse effects of section 1201(a)(1) on noninfringing uses under sections 107 and 110); Internet Archive, Creative Commons, and Berkman Center for Internet & Society, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 15, 2002 Notice of Inquiry at 7–9 (2002) (seeking an exemption to allow software archiving as allowed under sections 117 and 107); National Association of Independent Schools, Initial Comments Submitted in Response to U.S. Copyright Office's Nov. 24, 1999 Notice of Inquiry (2000) (discussing fair use for educational purposes).

[19] H.R. Rep. No. 105–551, pt. 2, at 37.

[20] House Manager's Report at 6.

[21] 17 U.S.C. 1201(a)(1)(C). In the latest triennial rulemaking, due to the increasing prevalence of technological measures employed in connection with embedded computer software, many participants urged the Register and Librarian to consider non-copyright issues relating to health, safety, and environmental concerns under the rubric of "other factors" appropriate for consideration. *See* 2015 Recommendation at 2–3. The Breaking Down Barriers to Innovation Act of 2015 would add two additional factors to the list to be considered by the Librarian when deciding whether to grant an exemption: (1) Whether the prohibition on circumvention impacts accessibility for persons with disabilities, and (2) whether the prohibition impacts the furtherance of security research. H.R. 1883 sec. 3(a)(1)(B)(v); S. 990 sec. 3(a)(1)(B)(v).

[22] *See* 17 U.S.C. 1201(a)(1)(B) (emphasis added).

[23] H.R. Rep. No. 105–551, pt. 2, at 38.

[24] U.S. Copyright Office, Recommendation of the Register of Copyrights in RM 2005–11, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 9–10 (Nov. 17, 2006), *http://www.copyright.gov/1201/docs/1201_recommendation.pdf.*

[25] *See* H.R. Rep. No. 105–551, pt. 2, at 37 (explaining that for every rulemaking, "the assessment of adverse impacts on particular categories of works is to be determined de novo").

again, it cannot be granted unless its proponents establish a new record that satisfies the statutory criteria.

Permanent Exemptions

In addition to the temporary exemptions adopted pursuant to the triennial rulemaking process, section 1201 provides eight permanent exemptions to the prohibition on circumvention, namely for certain activities of nonprofit libraries, archives, and educational institutions (section 1201(d)) and law enforcement (section 1201(e)); for reverse engineering (section 1201(f)); encryption research (section 1201(g)); the protection of personally identifying information (section 1201(i)); security testing (section 1201(j)); the prevention of access by minors to the internet (section 1201(h)); and relating to certain analog devices such as VHS and Beta format cassettes (section 1201(k)). Separately, section 112 includes a limited permanent exception to section 1201 for purposes of making ephemeral recordings.[26] As discussed below, the applicability and usefulness of the existing permanent exemptions has been questioned by some.[27]

Unlocking Consumer Choice and Wireless Competition Act

In 2014, Congress addressed certain issues relating to section 1201 by passing the Unlocking Consumer Choice and Wireless Competition Act ("Unlocking Act"), which primarily concerned the circumvention of technological measures that control access to computer programs that enable wireless telephone handsets to connect to wireless communication networks ("cellphone unlocking").[28] The Unlocking Act reinstated the cellphone unlocking exemption adopted by the Librarian in 2010,[29] replacing the

narrower version adopted in 2012,[30] and directed the Librarian to consider in the 2015 rulemaking whether to "extend" the exemption "to include any other category of wireless devices in addition to wireless telephone handsets." [31] (On the Register's recommendation, the Librarian granted additional exemptions for tablets and other types of wireless devices in the 2015 proceeding.[32])

The Unlocking Act also permanently established that circumvention under any exemption to permit a wireless telephone handset or other wireless device to connect to a different telecommunications network may be initiated by the owner of the handset or device, by another person at the direction of the owner, or by a provider of commercial mobile radio or data service, so long as the purpose is to enable the owner or a family member to connect to a wireless network in an authorized manner.[33] The legislation served to clarify that the owner of a device or the owner's family member can obtain assistance with the circumvention from another party notwithstanding the anti-trafficking provisions of section 1201.[34]

B. Areas of Concern

Rulemaking Process

As the number of participants in the triennial rulemaking has expanded with each successive cycle, the Office has done what it can within the existing statutory framework to streamline the proceedings. For the recent sixth triennial rulemaking proceeding, the Register (in consultation with NTIA and past proceeding participants) adjusted the administrative procedures to make the process more accessible and understandable; facilitate participation, coordination, and the development of the factual record; and reduce administrative burdens on both the participants and the Copyright Office.[35]

The Office solicited initial petitions setting forth only the essential elements of proposed exemptions and then issued a Notice of Proposed Rulemaking that reviewed and grouped the proposals and provided detailed guidance on the submission of written comments.[36] The Office also refined the comment phase to encourage a more organized and complete administrative record, including by instituting three distinct rounds of comments to allow participants to better respond to issues raised by other commenters.[37] The Office instituted procedures to encourage advance submission of multimedia evidence where appropriate.[38]

Even with these improvements, however, the rulemaking procedure, as enacted by Congress, is resource-intensive for both participants and the Office. An area of particular concern is the requirement that previously granted exemptions be reviewed anew. During the most recent rulemaking, a number of petitions essentially sought renewal of existing exemptions—for example, unlocking of cellphones and jailbreaking of smartphones. Some of these petitions—including a petition to permit circumvention so that literary works distributed electronically could continue to be accessed by persons who are blind, visually impaired, or print disabled—were unopposed.[39] In testimony, the Register has recommended that Congress amend the rulemaking process to create a presumption in favor of renewal when there is no meaningful opposition to the continuation of an exemption.[40]

[26] 17 U.S.C. 112(a)(2).

[27] See Register's Perspective on Copyright Review Hearing at 29 (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office) ("The permanent exemptions in Section 1201 relating to reverse engineering, encryption research, and security testing are an ongoing issue, with some stakeholders suggesting that they are too narrow in scope and others of the view that they strike an appropriate balance. For its part, the Office has previously highlighted the limited nature of the existing security testing exemptions and supported congressional review of the problem.") (citations omitted).

[28] Unlocking Consumer Choice and Wireless Competition Act, Public Law 113–144, 128 Stat. 1751 (2014). Subsequently, the Librarian adopted regulatory amendments to reflect the new legislation. See Exemption to Prohibition on Circumvention of Copyright Protection Systems for Wireless Telephone Handsets, Final Rule, 79 FR 50552 (Aug. 25, 2014).

[29] See Exemption to Prohibition on Circumvention of Copyright Protection Systems for

Access Control Technologies, Final Rule, 75 FR 43825, 43828–32 (July 27, 2010).

[30] See Unlocking Consumer Choice and Wireless Competition Act sec. 2(a), 128 Stat. at 1751.

[31] Id. 2(b), 128 Stat. at 1751.

[32] See Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Final Rule, 80 FR 65944, 65952, 65962–63.

[33] Unlocking Consumer Choice and Wireless Competition Act sec. 2(a), (c), 128 Stat. at 1751–52; see also 37 CFR 201.40(b)(3) (2012).

[34] Other bills have recently been introduced that would alter the operation of section 1201. Recent examples include the Unlocking Technology Act of 2015, H.R. 1587, 114th Cong. (2015); and the Breaking Down Barriers to Innovation Act of 2015, H.R. 1883, S. 990, 114th Cong. (2015).

[35] See generally Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Notice of Inquiry, 79

FR 55687 (Sept. 17, 2014) ("Sixth Triennial Rulemaking NOI"); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Notice of Proposed Rulemaking, 79 FR 73856 (Dec. 12, 2014) ("Sixth Triennial Rulemaking NPRM"); cf. Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Notice of Inquiry, 76 FR 60398 (Sept. 29, 2011).

[36] Sixth Triennial Rulemaking NPRM, 79 FR 73856, 73858–71.

[37] See Sixth Triennial Rulemaking NPRM, 79 FR 73856, 73857–58; see also Sixth Triennial Rulemaking NOI, 79 FR 55687, 55693.

[38] See Sixth Triennial Rulemaking NPRM, 79 FR 73856, 73858.

[39] See 2015 Recommendation at 127–37.

[40] In her testimony, the Register noted this issue is ripe for legislative process. See Register's Perspective on Copyright Review Hearing at 27 (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office); 2015 Recommendation at 4. The Breaking Down Barriers to Innovation Act of 2015 would require the renewal of previously-granted exemptions unless "changed circumstances" justify revoking the exemption. H.R. 1883 sec. 3(a)(1)(F)(iii); S. 990 sec. 3(a)(1)(F)(iii).

### Consumer Issues

Since the enactment of section 1201, the use of technological measures has been useful in expanding consumer choice and the avenues for dissemination of creative works, for example, movies and video games.[41] At the same time, as the Copyright Office has stated, it is also apparent that the prohibition on circumvention impacts a wide range of consumer activities that have little to do with the consumption of creative content or the core concerns of copyright.[42] Considering these impacts, some stakeholders have expressed concern over the effect of section 1201 on competition and innovation in the marketplace. In their view, technological measures are often deployed to "lock in" particular business models by inhibiting the development of interoperable products, such as printer cartridges, or to prevent individuals from engaging in otherwise legitimate pursuits, such as the repair of automobiles and farm equipment—despite the fact that these sorts of activities seem far removed from piracy of copyrighted works.[43]

These concerns were highlighted throughout the recently completed sixth triennial proceeding. In the 2015 rulemaking, some of the proposed exemptions concerned the ability to access and make noninfringing uses of expressive copyrighted works, such as motion pictures, video games, and e-books, which Congress undoubtedly had in mind when it created the triennial review process. But others concerned the ability to circumvent access controls on copyrighted computer code in consumer devices. Proponents of these latter classes sought to access the computer code not for its creative content, but rather to enable greater functionality and interoperability of devices ranging from cellphones, tablets, and smart TVs to 3–D printers, automobiles, tractors, and pacemakers.[44] As the Register has

testified, the effect of section 1201 on a wide range of consumer goods that today contain copyrighted software merits review.[45]

### Third-Party Assistance

A related issue is whether section 1201 should be clarified to ensure that intended beneficiaries of exemptions are able to engage in the permitted circumvention activities.[46] For example, a vehicle owner may require assistance from a repair shop technician to take advantage of an exemption that allows circumvention of access controls on automobile software to make a repair.[47] The anti-trafficking provisions of section 1201, however, prevent the adoption of exemptions that permit third parties to offer circumvention services.[48] While the Unlocking Act clarified section 1201 to permit specified third parties to circumvent technological measures on behalf of device owners in the case of cellphones and other wireless devices, the statute does not extend to other types of uses or allow the Librarian to grant an exemption that provides for third-party assistance in other circumstances.

### Permanent Exemptions

Another concern is that section 1201's permanent exemptions have failed to keep up with changing technologies. In testimony, the Register has identified the limited nature of the existing security testing exemptions and supported congressional review of this problem.[49] Based on the record in the most recent section 1201 rulemaking, the Register concluded that commenting parties had made a "compelling case that the current permanent exemptions in section 1201, specifically section 1201(f) for reverse engineering, section 1201(g) for encryption research, and section 1201(j) for security testing, are inadequate to accommodate their intended purposes." [50] For example,

when considering a requested exemption for good-faith security research, the Register noted that "the existing permanent exemptions . . . do not cover the full range of proposed security research activities, many of which . . . are likely [to] be noninfringing." [51] Separately, others have suggested that section 1201(d)'s exemption for activities of nonprofit entities is inadequate to meet the legitimate archiving and preservation needs of libraries and archives.[52]

### International Issues

As noted above, section 1201 was adopted in 1998 to implement the United States' obligations under two international treaties.[53] Those treaties—the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty—require signatory countries to provide "adequate legal protection and effective legal remedies against the circumvention of effective technological measures" that are used by authors, performers, and phonogram producers in connection with the exercise of their rights, and that restrict acts, in respect of their works, performances, or phonograms, which are not authorized by rightsholders or permitted by law.[54] Since then, the United States has included anticircumvention provisions in a number of bilateral and regional agreements entered into with other nations.[55] Therefore, any proposals to

---

[41] *See, e.g., Chapter 12 of Title 17 Hearing* at 28–29 (statement of Christian Genetski, Senior Vice-President and General Counsel, Entertainment Software Association).

[42] 2015 Recommendation at 2.

[43] *See, e.g., Chapter 12 of Title 17 Hearing* at 43–44 (statement of Corynne McSherry, Intellectual Property Director, Electronic Frontier Foundation); *Unintended Consequences: Fifteen Years under the DMCA,* Electronic Frontier Foundation, *https://www.eff.org/pages/unintended-consequences-fifteen-years-under-dmca* (last updated March 2013). The proposed Unlocking Technology Act of 2015 would amend both the anticircumvention and anti-trafficking provisions of section 1201(a) to prohibit such conduct only when done with the intent to facilitate the infringement of a copyrighted work. H.R. 1587 sec. 2(a).

[44] 2015 Recommendation at 2; *Register's Perspective on Copyright Review Hearing* at 29–30

(statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office).

[45] *Register's Perspective on Copyright Review Hearing* at 29–30 (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office).

[46] *Id.* at 29 (noting that intended beneficiaries of exemptions lack the practical ability to engage in the permitted circumvention themselves and suggesting the need for further study).

[47] *See* 2015 Recommendation at 4–5.

[48] *Id.*

[49] *Register's Perspective on Copyright Review Hearing* at 29 (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office).

[50] 2015 Recommendation at 307. Legislation recently introduced in Congress would increase exemptions for reverse engineering, encryption research, the protection of personally identifying information, and security testing. *See* Breaking

Down Barriers to Innovation Act of 2015, H.R. 1883 sec. 3(b)–(e); Breaking Down Barriers to Innovation Act of 2015, S. 990 sec. 3(b)–(e).

[51] 2015 Recommendation at 299. The Breaking Down Barriers to Innovation Act of 2015 would increase exemptions for reverse engineering, encryption research, the protection of personally identifying information, and security testing. H.R. 1883 sec. 3(b)–(e); S. 990 sec. 3(b)–(e).

[52] *See, e.g.,* 2015 Recommendation at 327 (discussing proposal for exemption for video game preservationists); Pan C. Lee et al., Samuelson Law, Technology & Public Policy Clinic, University of California, Berkeley School of Law, on behalf of Public Knowledge, Updating 17 U.S.C. 1201 for Innovators, Creators, and Consumers in the Digital Age 52 (2010), *https://www.publicknowledge.org/assets/uploads//2_Circumvention.pdf.*

[53] *See* H.R. Rep. No. 105–551, pt. 2, at 20.

[54] WIPO Copyright Treaty art. 11, Dec. 20, 1996, 36 I.L.M. 65 (1997); WIPO Performances and Phonograms Treaty art. 18, Dec. 20, 1996, 36 I.L.M. 76 (1997).

[55] *See* United States-Australia Free Trade Agreement, U.S.-Austl., art. 17.4.7, May 18, 2004, 43 I.L.M. 1248, *http://www.ustr.gov/trade-agreements/free-trade-agreements/australian-fta/final-text;* United States-Bahrain Free Trade Agreement, U.S.-Bahr., art. 14.4.7, Sept. 14, 2004, 44 I.L.M. 544, *http://www.ustr.gov/trade-agreements/free-trade-agreements/bahrain-fta/final-text;* United States-Chile Free Trade Agreement, U.S.-Chile, art. 17.7.5, June 6, 2003, 42 I.L.M. 1026, *http://www.ustr.gov/trade-agreements/free-trade-agreements/chile-fta/final-text;* United States-Colombia Trade Promotion Agreement, U.S.-Colom., art. 16.7.4, Nov. 22, 2006, *http://www.ustr.gov/trade-agreements/free-trade-*

modify or amend Section 1201 would require consideration of the United States' international obligations.

### C. Relationship to Software Study

The scope of this study is limited to the operation and effectiveness of section 1201. It is not intended to focus on broader issues concerning the role of copyright with respect to software embedded in everyday products. Those issues are the subject of a separate and concurrent Copyright Office study.[56] Although, as noted, section 1201 certainly has implications for the use of such products, members of the public who wish to address the impact of other provisions of copyright law on embedded software are encouraged to submit comments in that separate process. More information about the Software-Enabled Consumer Products Study may be found at *http://www.copyright.gov/policy/software/*.

### II. Subjects of Inquiry

The Office invites written comments on the specific subjects below. A party choosing to respond to this Notice of Inquiry need not address every subject, but the Office requests that responding parties clearly identify and separately address each subject for which a response is submitted.

### General

1. Please provide any insights or observations regarding the role and effectiveness of the prohibition on

---

*agreements/colombia-fta/final-text;* Dominican Republic-Central America-United States Free Trade Agreement, U.S.-Costa Rica-Dom. Rep.-El Sal.-Guat.-Hond.-Nicar., art 15.5.7, Aug. 5, 2004, 43 I.L.M. 514, *https://ustr.gov/trade-agreements/free-trade-agreements/cafta-dr-dominican-republic-central-america-fta/final-text;* United States-Jordan Free Trade Agreement, U.S.-Jordan, art. 4(13), Oct. 24, 2000, 41 I.L.M. 63, *http://www.ustr.gov/trade-agreements/free-trade-agreements/jordan-fta/final-text;* United States-Korea Free Trade Agreement, U.S.-S. Kor. art. 18.4.7, June 30, 2007, 46 I.L.M. 642, *https://ustr.gov/trade-agreements/free-trade-agreements/korus-fta/final-text;* United States-Morocco Free Trade Agreement, U.S.-Morocco, art. 15.5.8, June 15, 2004, 44 I.L.M. 544, *http://www.ustr.gov/trade-agreements/free-trade-agreements/morocco-fta/final-text;* United States-Oman Free Trade Agreement, U.S.-Oman, art. 15.4.7, Jan. 19, 2006, *http://www.ustr.gov/trade-agreements/free-trade-agreements/oman-fta/final-text;* United States-Panama Trade Promotion Agreement, U.S.-Pan., art 15.5.7, June 28, 2007, *http://www.ustr.gov/trade-agreements/free-trade-agreements/panama-tpa/final-text;* United States-Peru Trade Promotion Agreement, U.S.-Peru, art. 16.7.4, Apr. 12, 2006, *http://www.ustr.gov/trade-agreements/free-trade-agreements/peru-tpa/final-text;* United States-Singapore Free Trade Agreement, U.S.-Sing., art. 16.4.7, May 6, 2003, 42 I.L.M. 1026, *https://ustr.gov/trade-agreements/free-trade-agreements/singapore-fta/final-text.*

[56] *See* Software-Enabled Consumer Products Study: Notice and Request for Public Comment, 80 FR 77668 (Dec. 15, 2015).

---

circumvention of technological measures in section 1201(a).

2. How should section 1201 accommodate interests that are outside of core copyright concerns, for example, in cases where circumvention of access controls protecting computer programs implicates issues of product interoperability or public safety?

### Rulemaking Process

3. Should section 1201 be adjusted to provide for presumptive renewal of previously granted exemptions—for example, when there is no meaningful opposition to renewal—or otherwise be modified to streamline the process of continuing an existing exemption? If so, how?

4. Please assess the current legal requirements that proponents of an exemption must satisfy to demonstrate entitlement to an exemption. Should they be altered? If so, how? In responding, please comment on the relationship to traditional principles of administrative law.

5. Please provide additional suggestions to improve the rulemaking process.

### Anti-Trafficking Prohibitions

6. Please assess the role of the anti-trafficking provisions of sections 1201(a)(2) and 1201(b) in deterring copyright infringement, and address whether any amendments may be advisable.

7. Should section 1201 be amended to allow the adoption of exemptions to the prohibition on circumvention that can extend to exemptions to the anti-trafficking prohibitions, and if so, in what way? For example, should the Register be able to recommend, and the Librarian able to adopt, exemptions that permit third-party assistance when justified by the record?

### Permanent Exemptions

8. Please assess whether the existing categories of permanent exemptions are necessary, relevant, and/or sufficient. How do the permanent exemptions affect the current state of reverse engineering, encryption research, and security testing? How do the permanent exemptions affect the activities of libraries, archives, and educational institutions? How might the existing permanent exemptions be amended to better facilitate such activities?

9. Please assess whether there are other permanent exemption categories that Congress should consider establishing—for example, to facilitate access to literary works by print-disabled persons?

### Other

10. To what extent and how might any proposed amendments to section 1201 implicate the United States' trade and treaty obligations?

11. Please identify any pertinent issues not referenced above that the Copyright Office should consider in conducting its study.

Dated: December 22, 2015.

**Maria A. Pallante,**
*Register of Copyrights, U.S. Copyright Office.*
[FR Doc. 2015–32678 Filed 12–28–15; 8:45 am]

**BILLING CODE 1410–30–P**

---

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

**[Notice (15–122)]**

### Privacy Act of 1974; Privacy Act System of Records

**AGENCY:** National Aeronautics and Space Administration (NASA).

**ACTION:** Notice of proposed revisions to existing Privacy Act systems of records.

**SUMMARY:** Pursuant to the provisions of the Privacy Act of 1974 (5 U.S.C. 552a), the National Aeronautics and Space Administration is issuing public notice its proposal to modify a previously noticed system of records and rescind another previously noticed system. This notice publishes details of the proposed updates as set forth below under the caption **SUPPLEMENTARY INFORMATION**.

**DATES:** Submit comments within 30 calendar days from the date of this publication. The changes will take effect at the end of that period, if no adverse comments are received.

**ADDRESSES:** Patti F. Stockman, Privacy Act Officer, Office of the Chief Information Officer, National Aeronautics and Space Administration Headquarters, Washington, DC 20546–0001, (202) 358–4787, *NASA-PAOfficer@nasa.gov*.

**FOR FURTHER INFORMATION CONTACT:** NASA Privacy Act Officer, Patti F. Stockman, (202) 358–4787, *NASA-PAOfficer@nasa.gov*.

**SUPPLEMENTARY INFORMATION:** Pursuant to the provisions of the Privacy Act of 1974, 5 U.S.C. 552a, and as part of its biennial System of Records review, NASA is making the following minor modifications of its system of records Exchange Records on Individuals/NASA 10XROI: Inclusion of a statement of purpose for the system of records; updates of system and subsystem managers; clarification of routine uses; and correction of previous typographical errors. Further, NASA

In accordance with sections 201.16(c) and 207.3 of the rules, each document filed by a party to the investigations must be served on all other parties to the investigations (as identified by either the public or BPI service list), and a certificate of service must be timely filed. The Secretary will not accept a document for filing without a certificate of service.

**Authority:** These investigations are being conducted under authority of title VII of the Tariff Act of 1930; this notice is published pursuant to section 207.12 of the Commission's rules.

By order of the Commission.

Issued: February 12, 2016.

**Lisa R. Barton,**
*Secretary to the Commission.*
[FR Doc. 2016–03434 Filed 2–18–16; 8:45 am]
**BILLING CODE 7020–02–P**

## LIBRARY OF CONGRESS

### Copyright Office

[Docket No. 2015–8]

### Section 1201 Study: Extension of Comment Period

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Extension of comment period.

**SUMMARY:** The United States Copyright Office is extending the deadlines for the submission of written comments in response to its December 29, 2015 Notice of Inquiry regarding the operation of section 1201 of Title 17.

**DATES:** Initial written comments are now due no later than 11:59 p.m. Eastern Time on March 3, 2016. Written reply comments are due no later than 11:59 p.m. Eastern Time on April 1, 2016.

**ADDRESSES:** The Copyright Office is using the regulations.gov system for the submission and posting of public comments in this proceeding. All comments are therefore to be submitted electronically through regulations.gov. Specific instructions for submitting comments are available on the Copyright Office Web site at *http://copyright.gov/policy/1201/comment-submission/*. If electronic submission of comments is not feasible, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:**
Regan A. Smith, Associate General Counsel, *resm@loc.gov;* or Kevin R. Amer, Senior Counsel for Policy and International Affairs, *kamer@loc.gov.* Each can be reached by telephone at (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** The United States Copyright Office is undertaking a public study to assess the operation of section 1201 of Title 17. On December 29, 2015, the Office issued a Notice of Inquiry seeking public input on several questions relating to that topic. *See* 80 FR 81369 (Dec. 29, 2015). To ensure that commenters have sufficient time to respond, the Office is extending the deadline for the submission of initial comments in response to the Notice to March 3, 2016, at 11:59 p.m. Eastern Time, and the deadline for the submission of reply comments to April 1, 2016, at 11:59 p.m. Eastern Time. Please note that in light of the expected time frame for this study, the Office is unlikely to grant further extensions for these comments.

Dated: February 16, 2016.

**Maria A. Pallante,**
*Register of Copyrights, U.S. Copyright Office.*
[FR Doc. 2016–03515 Filed 2–18–16; 8:45 am]
**BILLING CODE 1410–30–P**

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

[Notice: (16–012)]

### Notice of Information Collection

**AGENCY:** National Aeronautics and Space Administration (NASA).

**ACTION:** Notice of information collection.

**SUMMARY:** The National Aeronautics and Space Administration, as part of its continuing effort to reduce paperwork and respondent burden, invites the general public and other Federal agencies to take this opportunity to comment on proposed and/or continuing information collections, as required by the Paperwork Reduction Act of 1995 (Pub. L. 104–13, 44 U.S.C. 3506(c)(2)(A)).

**DATES:** All comments should be submitted within 60 calendar days from the date of this publication.

**ADDRESSES:** All comments should be addressed to Frances Teel, National Aeronautics and Space Administration, Mail Code JF000, 300 E Streets SW., Washington, DC 20546–0001.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information or copies of the information collection instrument(s) and instructions should be directed to Frances Teel, NASA Clearance Officer, NASA Headquarters, 300 E Street SW., JF0000, Washington, DC 20546, (202) 358–2225.

**SUPPLEMENTARY INFORMATION:**

### I. Abstract

NASA hosts/sponsors numerous events on federally owned/leased property which are open to NASA affiliates and members of the public. The events include but are not limited to meetings, conferences, briefings, public outreach activities, tours, focus groups, etc. Visitor access is substantiated by a credentialed NASA sponsor who validates the visitor's need to access a building/area, guest networking services, etc. for a specific event/purpose. Information is collected to validate identity and enable intermittent access to activities.

Currently, visitor registration is accomplished via several electronic and paper processes. The NASA Office of Protective Services is transitioning to a one-NASA process to manage access for visitors with an affiliation less than 30-days.

NASA may collect event registration information to include but not limited to a visitor's name, address, citizenship, biometric data, purpose of visit, the location to be visited, escort/sponsor name with contact data, and preferred meeting/event sessions when options are available. When parking is provided on federal owned/leased space, driver's license information as well as vehicle make/model/tag information will be collected.

When visitors/vendors are permitted to bring equipment and/or event set-up materials such as booths and displays, information will be collected to issue property passes and coordinate equipment/property delivery. Information will also be collected, when applicable, to include other associated requirements such as electrical power needs, internet access, etc.

NASA collects, stores, and secures information from individuals requiring routine and intermittent access in a manner consistent with the Constitution and applicable laws, including the Privacy Act (5 U.S.C. 552a) and the Paperwork Reduction Act.

### II. Method of Collection

Electronic.

### III. Data

*Title:* The NASA Visitor Management System for Intermittent Access to NASA Hosted/Sponsored Events and Activities.

*OMB Number:* 2700–XXXX.

*Type of review:* Active Information Collection In Use Without OMB Approval.

*Affected Public:* Individuals.

*Estimated Number of Respondents:* 400,000.

*estimated for an average respondent to respond:* Of the approximately 18,000 government law enforcement agencies that are eligible to submit cases, it is estimated that thirty to fifty percent will actually submit cases to ViCAP. The time burden of the respondents is less than 60 minutes per form.

6. *An estimate of the total public burden (in hours) associated with the collection:* 5,000 annual burden hours.

If additional information is required contact: Jerri Murray, Department Clearance Officer, United States Department of Justice, Justice Management Division, Policy and Planning Staff, Two Constitution Square, 145 N Street NE., 3E.405B, Washington, DC 20530.

Dated: March 23, 2016.

**Jerri Murray,**

*Department Clearance Officer for PRA, U.S. Department of Justice.*

[FR Doc. 2016–06900 Filed 3–25–16; 8:45 am]

**BILLING CODE 4410–02–P**

## LIBRARY OF CONGRESS

### Copyright Office

**[Docket Nos. 2015–6, 2015–8]**

### Software-Enabled Consumer Products Study and Section 1201 Study: Announcement of Public Roundtables

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of public roundtables.

**SUMMARY:** The United States Copyright Office has issued Notices of Inquiry ("NOIs") announcing separate public studies on software-enabled consumer products and section 1201 of title 17. In addition to soliciting written comments on these issues, the Office is now announcing public roundtables for these studies to provide forums for interested members of the public to address the issues set forth in the NOIs.

DATES AND ADDRESSES: Public roundtables for the above-referenced Copyright Office studies will be held on the dates and at the locations provided below. The roundtables for the two studies are being held on consecutive dates in each location to accommodate parties who may have an interest in attending both.

*Software-Enabled Consumer Products Study:* For its study on software-enabled consumer products, the Office will hold public roundtables in Washington, DC and San Francisco, CA. The roundtable in Washington will take place on May 18, 2016, at the Library of Congress's Madison Building, 101 Independence Avenue SE., Washington, DC 20540, from 9:00 a.m. to approximately 5:00 p.m. The roundtable in San Francisco will take place on May 24, 2016, at Hastings School of Law, 200 McAllister Street, San Francisco, CA 94102, from 9:00 a.m. to approximately 5:00 p.m.

*Section 1201 Study:* Likewise, for its study on section 1201, the Office will hold public roundtables in Washington, DC and San Francisco, CA. The roundtable in Washington will take place on May 19 and May 20, 2016, at the Library of Congress's Madison Building, 101 Independence Avenue SE., Washington, DC 20540, from 9:00 a.m. to approximately 5:00 p.m. on the first day, and from 9:00 a.m. to approximately 1:00 p.m. on the second day. The roundtable in San Francisco will take place on May 25 and May 26, 2016, at Hastings School of Law, 200 McAllister Street, San Francisco, CA 94102, from 9:00 a.m. to approximately 5:00 p.m. on the first day, and from 9:00 a.m. to approximately 1:00 p.m. on the second day.

Additional information, including instructions for submitting requests to participate in the roundtables, is available on the Copyright Office Web site at *http://copyright.gov/policy/ software/* (software-enabled consumer products) and *http://copyright.gov/ policy/1201/* (section 1201). Requests to participate in the roundtables must be received by the Copyright Office by April 18, 2016. If you are unable to access a computer or the internet, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** *Software-Enabled Consumer Products Study:* Sarang V. Damle, Deputy General Counsel, *sdam@loc.gov;* Catherine Rowland, Senior Advisor to the Register of Copyrights, *crowland@loc.gov;* or Erik Bertin, Deputy Director of Registration Policy and Practice, *ebertin@loc.gov.*

*Section 1201 Study:* Regan A. Smith, Associate General Counsel, *resm@ loc.gov;* or Kevin Amer, Senior Counsel for Policy and International Affairs, *kamer@loc.gov.*

Each of these persons can be reached by telephone at (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** The Copyright Office is conducting separate studies concerning software-enabled consumer products and section 1201 of title 17.

### Software-Enabled Consumer Products Study

On December 15, 2015, the Copyright Office issued an NOI announcing a study on the role of copyright law with respect to the design, distribution, and use of consumer products that include embedded software. 80 FR 77668. This study is being done at the request of the United States Senate Committee on the Judiciary. Consistent with the Committee's request, the focus of the study is on software contained in consumer products; it is not intended to address more general questions about software and copyright.

### Section 1201 Study

Enacted in 1998 as part of the Digital Millennium Copyright Act ("DMCA"), section 1201 prohibits the circumvention of technological measures employed by or on behalf of copyright owners to control access to their works (also known as "access controls"), as well as the trafficking in technologies or services that facilitate such circumvention. In addition, section 1201 codifies a triennial rulemaking process through which the Librarian of Congress, upon the recommendation of the Register of Copyrights, can grant exemptions to the prohibition on the circumvention of access controls. The Copyright Office issued an NOI soliciting comments on the operation and effectiveness of section 1201 on December 29, 2015. 80 FR 81369.

### Roundtable Subjects of Inquiry

At this time, the Copyright Office is providing notice of its intention to seek further input for these studies through public roundtables to be held on the dates and at the addresses set forth above. The public roundtables will offer an opportunity for interested parties to comment on topics set forth in the NOIs.

For the software-enabled consumer products study, the roundtables at each location will consist of sessions on the following topics: (1) The proper role of copyright in protecting software-enabled consumer products; (2) ownership and contractual issues; (3) fair use; and (4) the first sale doctrine, section 117, and other limitations and exceptions. After the final session, the Office will also provide participants and observers with an opportunity to offer additional comments for the record.

For the section 1201 study, roundtables at each location will consist of sessions on the following topics: (1) The relationship of section 1201 to copyright infringement, consumer issues, and competition; (2) the rulemaking process—evidentiary and procedural issues; (3) the rulemaking process—renewal of previously granted exemptions; (4) the anti-trafficking prohibitions and third-party assistance for permitted circumvention of technological measures; and (5)

permanent exemptions to the prohibition on circumvention. After the final session, the Office will also provide participants and observers with an opportunity to offer additional comments for the record.

Each of the roundtable hearing rooms will have a limited number of seats for participants and observers. Public seating for observers will be provided on a first-come, first-served basis on the days of the roundtables.

Dated: March 23, 2016.

**Maria A. Pallante,**

*Register of Copyrights, U.S. Copyright Office.*

[FR Doc. 2016–06925 Filed 3–25–16; 8:45 am]

**BILLING CODE 1410–30–P**

## LIBRARY OF CONGRESS

### Copyright Royalty Board

**[Docket No. 2008–2 CRB CD 2000–2003 (Phase II)]**

### Distribution of the 2000, 2001, 2002 and 2003 Cable Royalty Funds

**AGENCY:** Copyright Royalty Board, Library of Congress.

**ACTION:** Final distribution order.

**SUMMARY:** The Copyright Royalty Judges announce the final Phase II distribution of cable royalty funds for the years 2000, 2001, 2002 and 2003 for the Program Suppliers programming category.

**DATES:** Effective March 28, 2016.

**ADDRESSES:** The final distribution order also is posted on the Copyright Royalty Board Web site at *http://www.loc.gov/ crb.*

**FOR FURTHER INFORMATION CONTACT:** Kimberly Whittle, Attorney Advisor. Telephone: (202) 707–7658; Email: *crb@ loc.gov.*

**SUPPLEMENTARY INFORMATION:** The captioned consolidated royalty distribution proceeding concluded on August 14, 2015, when the United States Court of Appeals for the DC Circuit issued a mandate relating to their June 30, 2015, order affirming the distribution shares for claimants in the Program Suppliers category as determined by the Copyright Royalty Judges (Judges). After the mandate, the Judges received filings from Worldwide Subsidy Group dba Independent Producers Group (IPG) and the Motion Picture Association of America (MPAA) contesting the appropriate methodology for distribution of the remaining royalty funds on deposit.

By order dated November 25, 2015, the Judges directed MPAA to provide historical context from which the Judges and the Licensing Division of the

Copyright Office could distribute accurately the funds, taking into account prior partial distributions, fund growth through accrued interest, and deductions for Licensing Division costs. MPAA provided the necessary information on December 7, 2015. The Licensing Division staff provided accounting services to assure accurate distribution in accordance with the Judges' orders.

The Licensing Division calculated that, as of February 17, 2016, the total distribution to IPG for each royalty year should be:

| | |
|---|---:|
| 2000 | $617,719 |
| 2001 | 164,203 |
| 2002 | 197,725 |
| 2003 | 125,884 |
| Total | 1,105,531 |

Now, therefore, the Judges hereby *order* that the Licensing Division make final distribution to IPG from the Program Suppliers category for the years 2000 through 2003, inclusive, in the amounts listed, adjusted if necessary to reflect interest accrued or costs incurred from and after February 17, 2016, to the date of distribution.

The Judges *further order* that the Licensing Division distribute simultaneously the remaining funds in the Program Suppliers category for royalty years 2000 through 2003, inclusive, to MPAA, adjusted if necessary to reflect interest accrued or costs incurred from and after February 17, 2016.

The Judges *further order* that IPG and MPAA provide to the Licensing Division all necessary and pertinent information to facilitate the transfer by March 31, 2016.

Dated: March 23, 2016.

**Suzanne M. Barnett,**

*Chief Copyright Royalty Judge.*

[FR Doc. 2016–06923 Filed 3–25–16; 8:45 am]

**BILLING CODE 1410–72–P**

## NUCLEAR REGULATORY COMMISSION

**[NRC–2016–0001]**

### Sunshine Act Meeting Notice

**DATE:** March 28, April 4, 11, 18, 25, May 2, 2016.

**PLACE:** Commissioners' Conference Room, 11555 Rockville Pike, Rockville, Maryland.

**STATUS:** Public and Closed.

### Week of March 28, 2016

*Tuesday, March 29, 2016*

9:30 a.m.  Briefing on Project Aim (Public Meeting); (Contact: Janelle Jessie: 301–415–6775).

This meeting will be webcast live at the Web address—*http://www.nrc.gov/.*

*Wednesday, March 30, 2016*

9:30 a.m.  Briefing on Security Issues (Closed Ex. 1).

### Week of April 4, 2016—Tentative

*Tuesday, April 5, 2016*

9:30 a.m.  Briefing on Threat Environment Assessment (Closed Ex. 1).

### Week of April 11, 2016—Tentative

There are no meetings scheduled for the week of April 11, 2016.

### Week of April 18, 2016—Tentative

*Tuesday, April 19, 2016*

9:30 a.m. Meeting with the Organization of Agreement States and the Conference of Radiation Control Program Directors (Public Meeting); (Contact: Paul Michalak: 301–415–5804).

This meeting will be webcast live at the Web address—*http://www.nrc.gov/.*

### Week of April 25, 2016—Tentative

There are no meetings scheduled for the week of April 25, 2016.

### Week of May 2, 2016—Tentative

There are no meetings scheduled for the week of May 2, 2016.

\*    \*    \*    \*    \*

The schedule for Commission meetings is subject to change on short notice. For more information or to verify the status of meetings, contact Denise McGovern at 301–415–0681 or via email at *Denise.McGovern@nrc.gov.*

\*    \*    \*    \*    \*

The NRC Commission Meeting Schedule can be found on the Internet at: *http://www.nrc.gov/public-involve/ public-meetings/schedule.html.*

\*    \*    \*    \*    \*

The NRC provides reasonable accommodation to individuals with disabilities where appropriate. If you need a reasonable accommodation to participate in these public meetings, or need this meeting notice or the transcript or other information from the public meetings in another format (*e.g.* braille, large print), please notify Kimberly Meyer, NRC Disability Program Manager, at 301–287–0739, by videophone at 240–428–3217, or by email at *Kimberly.Meyer-Chambers@*

**66296**    **Federal Register** / Vol. 81, No. 187 / Tuesday, September 27, 2016 / Notices

On August 29, 2016, Creative filed a petition for review and on September 1, 2016, Respondents, Intervenor, and OUII filed replies in opposition to Creative's petition.

The Commission has determined not to review the ID. The investigation is terminated.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR part 210).

By order of the Commission.

Issued: September 21, 2016.

**Lisa R. Barton,**

*Secretary to the Commission.*

[FR Doc. 2016–23243 Filed 9–26–16; 8:45 am]

**BILLING CODE 7020–02–P**

---

## LIBRARY OF CONGRESS

## U.S. Copyright Office

**[Docket No. 2015–8]**

## Section 1201 Study: Request for Additional Comments

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of Inquiry.

---

**SUMMARY:** The United States Copyright Office is requesting additional written comments in connection with its ongoing study on the operation of the statutory provisions regarding the circumvention of copyright protection systems. This request provides an opportunity for interested parties to address certain issues raised by various members of the public in response to the Office's initial Notice of Inquiry.

**DATES:** Written comments must be received no later than 11:59 p.m. Eastern Time on October 27, 2016. Written reply comments must be received no later than 11:59 p.m. Eastern Time on November 16, 2016.

**ADDRESSES:** The Copyright Office is using the *regulations.gov* system for the submission and posting of public comments in this proceeding. All comments are therefore to be submitted electronically through *regulations.gov*. Specific instructions for submitting comments are available on the Copyright Office Web site at *http:// copyright.gov/policy/1201/ commentsubmission/*. If electronic submission of comments is not feasible, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Kevin R. Amer, Senior Counsel for Policy and International Affairs, by email at *kamer@loc.gov* or by telephone at 202–707–8350; or Regan A. Smith, Associate General Counsel, by email at *resm@loc.gov* or by telephone at 202–707–8350.

**SUPPLEMENTARY INFORMATION:**

### I. Background

At the request of the Ranking Member of the House Committee on the Judiciary, the Copyright Office is conducting a study to assess the operation of section 1201 of title 17. In December 2015, the Office issued a Notice of Inquiry identifying several aspects of the statutory and regulatory framework that the Office believes are ripe for review, and inviting public comment on those and any other pertinent issues.[1] The Notice provided for two rounds of written comments. In response, the Office received sixty-eight initial comments and sixteen reply comments.[2] The Office then announced public roundtables on the topics addressed in the Notice and comments.[3] These sessions, held in Washington, DC and San Francisco, California in May 2016, involved participation by more than thirty panelists, representing a wide range of interests and perspectives. Transcripts of the roundtables are available at *http://copyright.gov/policy/ 1201/*, and video recordings will be available at that location at a later date.

In the written comments and during the roundtables, parties expressed a variety of views regarding whether legislative amendments to section 1201 may be warranted. Among other suggested changes, commenters discussed proposals to update the statute's permanent exemption framework and to amend the anti-trafficking provisions to permit third-party assistance with lawful circumvention activities. At this time, as explained below, the Office is interested in receiving additional stakeholder input on particular aspects of those proposals. In addition, parties submitted numerous and varied views regarding the triennial rulemaking process under section 1201(a)(1)(C); while the Office continues to thoroughly evaluate these comments in conducting its study, this second Notice of Inquiry does not specifically address those issues.

A party choosing to respond to this Notice of Inquiry need not address every topic below, but the Office requests that responding parties clearly identify and separately address those subjects for which a response is submitted. Parties also are invited to address any other pertinent issues that the Office should consider in conducting its study.

### II. Subjects of Inquiry

*1. Proposals for New Permanent Exemptions*

a. *Assistive Technologies for Use by Persons Who Are Blind, Visually Impaired, or Print Disabled.* The written comments and roundtable discussions revealed widespread support for adoption of a permanent exemption to facilitate access to works in electronic formats by persons who are blind, visually impaired, or print disabled. The Office invites comment regarding specific provisions that commenters believe should be included in legislation proposing such an exemption. For example, the exemption for this purpose granted in the 2015 rulemaking permits circumvention of access controls applied to literary works distributed electronically, where the access controls "either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies."[4] The exemption applies in the following circumstances:

(i) When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels, or

(ii) When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.[5]

The Office is interested in commenters' views on whether this language would be appropriate for adoption as a permanent exemption, or whether there are specific changes or additional provisions that Congress may wish to consider.

b. *Device Unlocking.* Some commenters advocated the adoption of a permanent exemption to permit circumvention of access controls on wireless devices for purposes of

---

[1] Section 1201 Study: Notice and Request for Public Comment, 80 FR 81369 (Dec. 29, 2015).

[2] All comments may be accessed from the Copyright Office Web site at *http://copyright.gov/ policy/1201/* by clicking the "Public Comments" tab, followed by the "Comments" link.

[3] Software-Enabled Consumer Products Study and Section 1201 Study: Announcement of Public Roundtables, 81 FR 17206 (Mar. 28, 2016).

[4] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 80 FR 65944, 65950 (Oct. 28, 2015) ("2015 Final Rule").

[5] *Id.*

**Federal Register** / Vol. 81, No. 187 / Tuesday, September 27, 2016 / Notices    **66297**

"unlocking" such devices—*i.e.,* enabling them to connect to the network of a different mobile wireless carrier. Since 2006, the rulemaking process has involved consideration of exemptions permitting unlocking of cellphones, and in the 2015 rulemaking, pursuant to Congress's direction,[6] the Register considered whether to extend the exemption to other categories of wireless devices. At the conclusion of the 2015 proceeding, the Librarian, upon the Register's recommendation, adopted an unlocking exemption that applies to used wireless devices of the following types:

(A) Wireless telephone handsets (*i.e.,* cellphones);

(B) All-purpose tablet computers;

(C) Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and

(D) Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.[7]

The Office invites comment on whether an unlocking exemption would be appropriate for adoption as a permanent exemption or whether such activities are more properly considered as part of the triennial rulemaking. For commenters who favor consideration of a permanent exemption, the Office is interested in commenters' views on whether the language of the 2015 unlocking exemption would be appropriate for adoption as a permanent exemption, or whether there are specific changes or additional provisions that Congress may wish to consider.

c. *Computer Programs.* Several commenters expressed concern over the scope of section 1201 in the context of copyrighted computer programs that enable the operation of a machine or device. These commenters suggested that by prohibiting the circumvention of access controls on such programs, the statute prevents the public from engaging in legitimate activities, such as the repair of automobiles or the use of third-party device components, that seem far removed from the protection of creative expression that section 1201 was intended to address. To respond to this concern, some commenters argued that Congress should establish a statutory exemption that would permit circumvention of technological protection measures ("TPM"s) controlling access to such software in appropriate circumstances. The Office is interested in additional views on such proposals.

For purposes of focusing the discussion, the Office invites comment on whether there are specific formulations of such an exemption that could serve as helpful starting points for further consideration of legislation. For example, Congress could consider adoption of a permanent exemption for purposes of diagnosis, maintenance, and repair. Such legislation could provide that a person who has lawfully obtained the right to use a computer program may circumvent a TPM controlling access to that program, so long as the circumvention is undertaken for purposes of diagnosis, maintenance, or repair. Are existing legal doctrines or statutes, such as the current language addressing machine maintenance and repair in section 117(c),[8] the doctrine of repair and reconstruction in patent law,[9] case law addressing refurbishment under trademark law,[10] or "right to repair" bills introduced into various state legislatures,[11] helpful to inform the appropriate scope of repair in this context? To what extent would the combination of such an exemption with the current language of 1201(f)[12]—which allows circumvention for purposes of facilitating interoperability under certain circumstances—adequately address users' concerns regarding section 1201's impact on consumer activities?

Please also comment upon whether it would be advisable to consider, in addition to diagnosis, maintenance, or repair, an exemption to explicitly permit circumvention for purposes of engaging in any lawful modification of a computer program. Such an exemption could allow circumventions undertaken to make non-infringing adaptations, including, for example, uses permitted under section 117(a) and/or the fair use doctrine.[13] Please address whether this broader formulation would, or would not, be

likely to result in economically harmful unauthorized uses of copyrighted works.

With either formulation, would concerns over enabling unauthorized uses be mitigated by conditioning the exemption on the circumventing party not engaging in any unauthorized use of a copyrighted work other than the accessed computer program, or by limiting the exemption to computer programs that are "not a conduit to protectable expression"—*i.e.,* those that do "not in turn create any protected expression" when executed?[14] In the United Kingdom, for example, the prohibition on circumvention specifically excludes TPMs applied to computer programs, but does apply in at least some circumstances where copyrighted content is generated by a computer program (*e.g.,* graphical content in video games).[15] The Office is particularly interested in any information or perspectives on the impact of the UK law and how operating under it contrasts or not with the U.S. experience. Alternatively, should the exemption be limited to computer programs in particular categories of devices?

The Office is interested in commenters' views on the advisability of these various approaches. Which of these models, if any, would facilitate users' ability to engage in permissible uses of software, while preserving congressional intent in supporting new ways of disseminating copyrighted materials to users?[16] Responding parties are also encouraged to suggest alternate formulations, keeping in mind the Office's goal of focusing discussion on this topic.

d. *Obsolete Technologies.* In prior rulemakings, the Copyright Office and the Librarian of Congress have considered multiple petitions to permit circumvention of an access control mechanism protecting a given class of works that fails to permit access because of malfunction, damage, or obsoleteness.[17] The Office has

---

[6] *See* Unlocking Consumer Choice and Wireless Competition Act, Public Law 113–144, sec. 2(b), 128 Stat. 1751, 1751 (2014).

[7] 2015 Final Rule, 80 FR at 65952.

[8] 17 U.S.C. 117(c).

[9] *See Aro Mfg. Co.* v. *Convertible Top Replacement Co.,* 365 U.S. 336 (1961); *see also Aro Mfg. Co.* v. *Convertible Top Replacement Co.,* 377 U.S. 476 (1964).

[10] *See Champion Spark Plug Co.* v. *Sanders,* 331 U.S. 125 (1947); *see also Karl Storz Endoscopy-America, Inc.* v. *Fiber Tech Med., Inc.,* 4 F. App'x 128, 131–32 (4th Cir. 2001) ("[T]he Lanham Act does not apply in the narrow category of cases where a trademarked product is repaired, rebuilt or modified at the request of the product's owner," so long as "the owner is not, to the repairer's knowledge, merely obtaining modifications or repairs for purposes of resale.").

[11] *See, e.g.,* H.R. 3383, 189th Gen. Ct. (Mass. 2015); S. 3998B, 2015 Leg., Reg. Sess. (N.Y. 2015); Assemb. 6068A, 2015 Leg., Reg. Sess. (N.Y. 2015); Legis. B. 1072, 104th Leg., 2d Sess. (Neb. 2016); H.R. 1048, 89th Leg., Reg. Sess. (Minn. 2015); *see also* Mass. Gen. Laws ch. 93K (2013).

[12] 17 U.S.C. 1201(f).

[13] *See* 17 U.S.C. 117(a), 107.

[14] *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.,* 387 F.3d 522, 548 (6th Cir. 2004).

[15] Copyright, Designs and Patents Act 1988, c. 48, § 296ZA (UK); *see Nintendo Co. Ltd.* v. *Playables Ltd.* [2010] EWHC 1932 (Ch) (Eng.) (construing related anti-trafficking provision).

[16] *See* Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4th, 1998, at 6 (Comm. Print 1998).

[17] *See, e.g.,* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 65 FR 64556, 64564–66, 64574 (Oct. 27, 2000) ("2000 Recommendation and Final Rule"); Exemption to Prohibition on Circumvention of Copyright Protection Systems for
Continued

**66298**   **Federal Register** / Vol. 81, No. 187 / Tuesday, September 27, 2016 / Notices

recommended, and the Librarian has adopted, multiple exemptions after finding that the definition of "obsolete" in section 108 captures the circumstances under which such an exemption was justified, *i.e.,* where the access control "is no longer manufactured or is no longer reasonably available in the commercial marketplace." [18] The Office is interested in commenters' views on whether Congress should consider a legislative amendment to permit circumvention of such faulty access controls, or whether there are other specific changes or additional provisions that Congress may wish to consider to address this issue.

e. *International Considerations.* In addition to the questions on specific proposals provided above, please discuss the interaction of these proposals with existing international obligations of the United States, including free trade agreements.

*2. Proposed Amendments to Existing Permanent Exemptions*

Some parties expressed the view that the existing permanent exemptions for security testing, encryption research, and reverse engineering [19] do not adequately accommodate good-faith research into malfunctions, security flaws, and vulnerabilities in computer programs.[20] The Office invites comment on whether legislation to address this concern may be warranted, and if so, on specific changes that should be considered. In particular, the Office

requests commenters' views on the following topics:

a. In the 2015 rulemaking, the Register recommended, and the Librarian of Congress adopted, an exemption that permits circumvention of TPMs controlling access to computer programs in the following circumstances:

(i) . . . the circumvention is undertaken on a lawfully acquired device or machine on which the computer program operates solely for the purpose of good-faith security research and does not violate any applicable law, including without limitation the Computer Fraud and Abuse Act of 1986, as amended and codified in title 18, United States Code; . . . and the device or machine is one of the following:

(A) A device or machine primarily designed for use by individual consumers (including voting machines);

(B) A motorized land vehicle; or

(C) A medical device designed for whole or partial implantation in patients or a corresponding personal monitoring system, that is not and will not be used by patients or for patient care.

(ii) For purposes of this exemption, "good-faith security research" means accessing a computer program solely for purposes of good-faith testing, investigation and/or correction of a security flaw or vulnerability, where such activity is carried out in a controlled environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.[21]

The Office is interested in commenters' views on whether this language would be appropriate for adoption as a permanent exemption, or whether there are specific changes or additional provisions that Congress may wish to consider.

b. The exemption for security testing under section 1201(j) is limited to activities undertaken "with the authorization of the owner or operator of [the] computer, computer system, or computer network." [22] In the 2015 rulemaking, the Register noted that in some cases "it may be difficult to identify the relevant owner" for purposes of this requirement and that "it may not be feasible to obtain authorization even where there is an identifiable owner." [23] Echoing those concerns, one group of commenters argued that the authorization requirement should be eliminated, while another urged Congress to provide

greater clarity in situations involving multiple owners. Please assess whether legislation may be appropriate in this area and discuss any specific legislative proposals that you believe should be considered.

c. Section 1201(j) provides a two-factor framework to determine whether a person qualifies for the security testing exemption.[24] In the 2015 rulemaking, the Register noted that these factors "would appear to be of uncertain application to at least some" security research activities.[25] Some commenters advocated the removal of one or both of these factors from the statute.[26] Please assess the advisability of such changes, or discuss any other specific legislative proposals you believe should be considered.

d. The exemption for encryption research in section 1201(g) is similarly limited to activities qualifying under a four-factor framework that includes making "a good faith effort to obtain authorization" before the circumvention.[27] In the 2015 rulemaking, the Register noted that meeting these requirements "may not always be feasible" for researchers.[28] Please assess whether legislation may be appropriate in this area and discuss any specific legislative proposals that you believe should be considered.

e. Section 1201(f) permits circumvention for the "sole purpose" of identifying and analyzing elements of computer programs necessary to achieve interoperability.[29] In the 2015 rulemaking, the Register noted that "section 1201(f)(1) is limited to circumvention solely for the identification and analysis of program elements necessary for interoperability, and does not address circumvention after that analysis has been performed." [30] Please assess whether legislation may be appropriate in this area and discuss any specific legislative proposals that you believe should be considered.

*3. Anti-Trafficking Provisions*

Commenters offered differing views regarding the role of the anti-trafficking provisions under sections 1201(a)(2) and 1201(b). User groups expressed

---

Access Control Technologies, Final Rule, 68 FR 62011, 62013–16 (Oct. 31, 2003) ("2003 Final Rule"); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 71 FR 68472, 68474–75, 68480 (Nov. 27, 2006) ("2006 Final Rule"); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 75 FR 43825, 43833–34, 43839 (July 27, 2010) ("2010 Final Rule"); 2015 Final Rule, 80 FR at 65955, 65961.

[18] 17 U.S.C. 108(c); *see, e.g.,* 2000 Recommendation and Final Rule, 65 FR at 64565–66; Recommendation of the Register of Copyrights in RM 2002–4; Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 40 (Oct. 27, 2003); 2003 Final Rule, 68 FR at 62013–14; Recommendation of the Register of Copyrights in RM 2005–11; Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 36 & n.105 (Nov. 17, 2006); 2006 Final Rule, 71 FR at 68475.

[19] 17 U.S.C. 1201(f), (g), (j).

[20] Similarly, in the 2015 rulemaking, the Register noted that section 1201(j) "does not seem sufficiently robust in light of the perils of today's connected world." U.S. Copyright Office, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention 3 (2015), *http://copyright.gov/1201/ 2015/registersrecommendation.pdf* ("2015 Recommendation").

[21] 2015 Recommendation at 319–20; 2015 Final Rule, 80 FR at 65956.

[22] 17 U.S.C. 1201(j)(1).

[23] 2015 Recommendation at 309.

[24] 17 U.S.C. 1201(j)(3).

[25] 2015 Recommendation at 309.

[26] The proposed Breaking Down Barriers to Innovation Act of 2015 would eliminate the two-factor framework, as well as the multifactor framework under section 1201(g)(3). H.R. 1883, 114th Cong. sec. 3(c)(3), 3(e)(2) (2015); S. 990, 114th Cong. sec. 3(c)(3), 3(e)(2) (2015).

[27] 17 U.S.C. 1201(g)(2)(C).

[28] 2015 Recommendation at 307.

[29] 17 U.S.C. 1201(f).

[30] 2015 Recommendation at 337 n.2295.

concern that, to the extent these provisions prohibit third parties from providing assistance to beneficiaries of exemptions, or prohibit the making and distribution of necessary tools, they undermine beneficiaries' practical ability to engage in the permitted conduct. Copyright owners, however, cautioned against amendment of the anti-trafficking provisions, arguing that because circumvention tools may be used for lawful and unlawful purposes alike, it would be impossible to ensure that tools manufactured and distributed pursuant to an exemption, once available in the marketplace, would be employed solely for authorized uses. The Office is interested in receiving additional views on this topic, and specifically invites comment on the following issues:

a. A few parties argued that section 1201 contains an implied right permitting a beneficiary of a statutory or administrative exemption to make a tool for his or her own use in engaging in the permitted circumvention. What are commenters' views regarding this interpretation of the statute? To what extent, if any, does the statutory prohibition on the "manufacture" of circumvention tools affect the analysis? [31] If such a right is not currently implied, or the question is uncertain, should Congress consider amending the statute to expressly permit such activity, while maintaining the prohibition against trafficking in such tools?

b. Some parties suggested that, in certain circumstances, third-party assistance may fall outside the scope of the anti-trafficking provisions and therefore may be permissible under current law. What are commenters' views regarding this interpretation of the statute? Are there forms of third-party assistance that do not qualify as a "service" within the meaning of sections 1201(a)(2) and 1201(b)(1)? If so, what considerations are relevant to this analysis?

Dated: September 21, 2016.

**Maria A. Pallante,**
*Register of Copyrights, U.S. Copyright Office.*
[FR Doc. 2016–23167 Filed 9–26–16; 8:45 am]
**BILLING CODE 1410–30–P**

---

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION**

**[Notice: (16–068)]**

**NASA International Space Station Advisory Committee; Meeting**

**AGENCY:** National Aeronautics and Space Administration (NASA).

**ACTION:** Notice of meeting.

---

**SUMMARY:** In accordance with the Federal Advisory Committee Act, Public Law 92–463, as amended, the National Aeronautics and Space Administration announces a meeting of the NASA International Space Station (ISS) Advisory Committee. The purpose of the meeting is to review all aspects related to the safety and operational readiness of the ISS, and to assess the possibilities for using the ISS for future space exploration.

**DATES:** Monday, October 31, 2016, 2:00–3:00 p.m., Local Time.

**ADDRESSES:** NASA Headquarters, Glennan Conference Room (1Q39), 300 E Street SW., Washington, DC 20546. Note: 1Q39 is located on the first floor of NASA Headquarters.

**FOR FURTHER INFORMATION CONTACT:** Mr. Patrick Finley, Office of International and Interagency Relations, (202) 358–5684, NASA Headquarters, Washington, DC 20546–0001.

**SUPPLEMENTARY INFORMATION:** This meeting will be open to the public up to the seating capacity of the room. This meeting is also accessible via teleconference. To participate telephonically, please contact Mr. Finley at (202) 358–5684 before 4:30 p.m., Local Time, October 26, 2016. You will need to provide your name, affiliation, and phone number.

Attendees will be requested to sign a register and to comply with NASA security requirements, including the presentation of a valid picture ID to Security before access to NASA Headquarters. Due to the Real ID Act, Public Law 109–13, any attendees with driver's licenses issued from non-compliant states/territories must present a second form of ID. [Federal employee badge; passport; active military identification card; enhanced driver's license; U.S. Coast Guard Merchant Mariner card; Native American tribal document; school identification accompanied by an item from LIST C (documents that establish employment authorization) from the "List of the Acceptable Documents" on Form I–9]. Non-compliant states/territories are: American Samoa, Minnesota, Missouri, and Washington. Foreign nationals attending this meeting will be required

to provide a copy of their passport and visa in addition to providing the following information no less than 10 working days prior to the meeting: Full name; gender; date/place of birth; citizenship; passport information (number, country, telephone); visa information (number, type, expiration date); employer/affiliation information (name of institution, address, country, telephone); title/position of attendee; and home address to Mr. Finley via email at *patrick.t.finley@nasa.gov* or by telephone at (202) 358–5684. U.S. citizens and Permanent Residents (Green Card holders) can provide full name and citizenship status 3 working days prior to the meeting to Mr. Finley. It is imperative that the meeting be held on this date to accommodate the scheduling priorities of the key participants.

**Patricia D. Rausch,**
*Advisory Committee Management Officer, National Aeronautics and Space Administration.*
[FR Doc. 2016–23242 Filed 9–26–16; 8:45 am]
**BILLING CODE 7510–13–P**

---

**NATIONAL SCIENCE FOUNDATION**

**Agency Information Collection Activities: Comment Request**

**AGENCY:** National Science Foundation.

**ACTION:** Submission for OMB review; comment request.

---

**SUMMARY:** The National Science Foundation (NSF) has submitted the following information collection requirement to OMB for review and clearance under the Paperwork Reduction Act of 1995, Public Law 104–13. This is the second notice for public comment; the first was published in the **Federal Register** at 81 FR 36962, and no comments were received. NSF is forwarding the proposed renewal submission to the Office of Management and Budget (OMB) for clearance simultaneously with the publication of this second notice. The full submission (including comments) may be found at: *http://www.reginfo.gov/public/do/PRAMain.* Comments regarding (a) whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (b) the accuracy of the agency's estimate of burden including the validity of the methodology and assumptions used; (c) ways to enhance the quality, utility and clarity of the information to be collected; (d) ways to minimize the burden of the collection of information on those who are to

---

[31] *See* 17 U.S.C. 1201(a)(2), (b)(1).

**APPENDIX B**    COMMENTING PARTIES AND
ROUNDTABLE PARTICIPANTS

LOC_AR_00003400

**Parties Who Submitted Initial Comments in Response**
**to the December 29, 2015 Notice of Inquiry**

1. ACM US Public Policy Council

2. ACT | The App Association

3. Alliance of Automobile Manufacturers

4. American Association of Law Libraries

5. American Foundation for the Blind

6. American Intellectual Property Law Association

7. Anderson, Marjorie

8. Anonymous, Anonymous

9. Anonymous, Brandon

10. Association of American Publishers, Motion Picture Association of America & Recording Industry Association of America

11. Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities & Educause 1

12. Authors Alliance

13. Auto Care Association 1

14. Brickel, Joshua

15. BSA | The Software Alliance

16. Center for Democracy & Technology

17. Competitive Carriers Association

18. Consumer Technology Association

19. Consumers Union

20. Copyright Alliance

21. Cyberlaw Clinic at Harvard Law School

22. Decherney, Peter

LOC_AR_00003401

23. Devorah, Carrie

24. DIYAbility

25. Dulaney, John

26. DVD Copy Control Association & Advanced Access Content System Licensing Administrator, LLC

27. Electronic Frontier Foundation

28. Entertainment Software Association

29. Freeman, Jay

30. Ganivet, Nicolas

31. Howes, Timothy

32. Hunt, Otto

33. Hunt, Peter

34. iFixit

35. Institute of Scrap Recycling Industries, Inc.

36. International Documentary Association, Film Independent & Kartemquin Educational Films

37. Kernochan Center for Law, Media and the Arts

38. Knowledge Ecology International

39. Koberidze, Maryna

40. Learning Disabilities Association of America

41. Library Copyright Alliance

42. Massachusetts Institute of Technology Libraries, Massachusetts Institute of Technology Press & Massachusetts Institute of Technology Office of Digital Learning

43. Microsoft Corporation

44. Mozilla

45. New America's Open Technology Institute

46. New Media Rights

LOC_AR_00003402

47. Olivo, Peter

48. Organization for Transformative Works

49. Oster, David

50. Owners' Rights Initiative

51. Pearson, Timothy

52. Public Knowledge

53. R Street Institute

54. R Street Institute, FreedomWorks & Niskanen Center

55. Rapid7, Bugcrowd & HackerOne

56. Robbins, Rico

57. Rocha, Matias

58. Romeo, Dominic

59. Silas, Shelia

60. Society of American Archivists

61. Software and Information Industry Association 1

62. Static Control Components, Inc. 1

63. Starelikemckeehen Poker Club

64. University of Virginia Library

65. USC Intellectual Property and Technology Law Clinic

66. Westbay, Michael

67. Yeates, Nick

68. Ymous, Anon

Appendix B–3 1

**Parties Who Submitted Reply Comments in Response**

**to the December 29, 2015 Notice of Inquiry**

1.  Alliance of Automobile Manufacturers

2.  American Automobile Association

3.  Association of American Publishers, Motion Picture Association & Recording Institute Association of America

4.  Blocher-Smith, Ethan

5.  Copyright Alliance

6.  Decherney, Peter

7.  Duan, Charles

8.  DVD Copy Control Association & Advanced Access Content System Licensing Administrator, LLC

9.  Electronic Frontier Foundation

10. Entertainment Software Association

11. International Association of Scientific Technical and Medical Publishers

12. International Documentary Association, Film Independent, Kartemquin 1 Filmmaker Project, Indie Caucus, The National Alliance for Media Arts and Culture, New Media Rights & Women in Film & Video

13. Library Copyright Alliance

14. Public Knowledge

15. Software and Information Industry Association

16. USC Intellectual Property and Technology Law Clinic

LOC_AR_00003404

## Parties Who Submitted Additional Comments in Response
## to the September 27, 2016 Notice of Inquiry

1. American Association of Law Libraries

2. American Foundation for the Blind, American Council of the Blind, National Federation of the Blind, Learning Ally & Samuelson-Glushko Technology Law & Policy Clinic

3. Anonymous, Anonymous

4. Association of American Publishers, Entertainment Software Association, Motion Picture Association of America & Recording Institute Association of America

5. Association of Equipment Manufacturers & Equipment Dealers Association

6. Author Services, Inc.

7. Authors Alliance

8. Auto Care Association

9. BSA | The Software Alliance

10. Center for Democracy & Technology

11. CERT Coordination Center

12. Cohen, Misha

13. Competitive Carriers Association

14. Consumer Technology Association

15. Copyright Alliance

16. DVD Copy Control Association & Advanced Access Content System Licensing Administrator, LLC

17. Ehrhart, Brian

18. Electronic Frontier Foundation

19. Eshom, Jeff

20. Flit, Mike 1

LOC_AR_00003405

21. <u>Free Software Foundation</u>

22. <u>Hawley, Andy</u>

23. <u>Institute of Scrap Recycling Industries, Inc.</u>

24. <u>International Imaging Technology Council & Static Control Components, Inc.</u>

25. <u>Izquierdo, Cecilio</u>

26. <u>Josephs, John</u>

27. <u>Kalfus, Eleni</u>

28. <u>Library Copyright Alliance</u>

29. <u>Maciulski, Victoria</u>

30. <u>Matthews, Edward</u>

31. <u>Motor & Equipment Manufacturers Association</u>

32. <u>Mozilla</u>

33. <u>Oeth, Michael</u>

34. <u>Owners' Rights Initiative</u>

35. <u>Public Knowledge</u>

36. <u>Rapid7, Bugcrowd, HackerOne & Luta Security</u>

37. <u>Repair Association & iFixit</u>

38. <u>Schechter, Michael</u>

39. <u>Security Researchers</u>

40. <u>Society of American Archivists</u>

41. <u>Software and Information Industry Association</u> 1

42. <u>Software Preservation Network</u>

43. <u>University Library of the University of Illinois at Urbana-Champaign</u>

LOC_AR_00003406

**Parties Who Submitted Reply Comments in Response**

**to the September 27, 2016 Notice of Inquiry**

1. Association of American Publishers, Entertainment Software Association, Motion Picture Association of America & Recording Institute Association of America

2. Auto Care Association

3. Consumers Union

4. Copyright Alliance

5. DVD Copy Control Association & Advanced Access Content System Licensing Administrator, LLC

6. Electronic Frontier Foundation

7. Horton, Michael

8. Kenney, Kevin

9. Kernochan Center for Law, Media and the Arts

10. Lu, Yifan

11. New York Intellectual Property Law Association

12. Public Knowledge

13. Repair Association & iFixit

14. Software and Information Industry Association 1

LOC_AR_00003407

## Participants in the Washington, DC Hearings
### (May 19–20, 2016)

1.  Adler, Allan (Association of American Publishers)

2.  Band, Jonathan (Library Copyright Alliance)

3.  Besek, June M. (Kernochan Center for Law, Media & the Arts)

4.  Butler, Brandon (University of Virginia Library)

5.  Castillo, Sofia (Association of American Publishers)

6.  Cazares, Gabe (National Federation of the Blind)

7.  Cox, Krista L. (Association of Research Libraries)

8.  Decherney, Peter (University of Pennsylvania)

9.  Dow, Troy (The Walt Disney Company)

10. Geiger, Harley (Rapid7)

11. Goldman, Andrew (Knowledge Ecology International)

12. Greene, Robyn (New America's Open Technology Institute)

13. Greenstein, Seth (Auto Care Association)

14. Koberidze, Maryna (LL.M. Graduate (IP Law))

15. Kupferschmid, Keith (Copyright Alliance)

16. Love, James (Knowledge Ecology International)

17. Lowe, Aaron (Auto Care Association)

18. Manners, Derek (National Federation for the Blind)

19. McClure, Sam (Institute of Scrap Recycling Industries, Inc.)

20. Mohr, Chris (Software & Information Industry Association)

21. Panjwani, Raza (Public Knowledge)

22. Perry, David M. (Blank Rome LLP)

23. Pierre-Louis, Stanley (Entertainment Software Association)

LOC_AR_00003408

24. Schwartz, Robert S. (Consumer Technology Association)

25. Sheffner, Ben (Motion Picture Association of America)

26. Slover, George P. (Consumers Union)

27. Turnbull, Bruce H. (DVD Copy Control Association & Advanced Access Licensing Administration, LLC)

28. Tushnet, Rebecca (Organization for Transformative Works)

29. Weissenberg, Brian (Institute of Scrap Recycling Industries, Inc.)

30. Williams, Matthew (Association of American Publishers, Motion Picture Association of America & Recording Industry Association of America)

31. Zuck, Jonathan (ACT | The App Association)

LOC_AR_00003409

## Participants in the San Francisco, CA Hearings
## (May 25, 2016)

1. Chertkof, Susan (Recording Industry Association of America)

2. Gellis, Cathy (Digital Age Defense)

3. Golant, Ben (Entertainment Software Association)

4. LaBarre, Scott (National Federation of the Blind)

5. Lerner, Jack I. (International Documentary Association, Film Independent & Kartemquin Educational Films)

6. McClure, Sam (American Federation for the Blind)

7. Metalitz, Steve (Association of American Publishers, Motion Picture Association of America & Recording Industry Association of America)

8. Quinn, Brian (American Foundation for the Blind)

9. Reed, Chris (Fox Entertainment Group)

10. Riley, Chris (Mozilla)

11. Samuelson, Pamela (UC Berkeley School of Law)

12. Sheffner, Ben (Motion Picture Association of America)

13. Stoltz, Mitch (Electronic Frontier Foundation)

14. Wiens, Kyle (iFixit & Repair.org)

15. Wolfe, Michael (Authors Alliance)

LOC_AR_00003410

**APPENDIX C**      ABBREVIATIONS

LOC_AR_00003411

# Abbreviations

| | |
|---|---|
| AAA | American Automobile Association |
| AALL | American Association of Law Libraries |
| AAP | Association of American Publishers |
| AAP, MPAA & RIAA | Association of American Publishers, Motion Picture Association of America, Inc. & Recording Industry Association of America |
| AAP, ESA, MPAA & RIAA | Association of American Publishers, Entertainment Software Association, Motion Picture Association of America, Inc. & Recording Industry Association of America |
| AAU, ACE, APLU & EDUCAUSE | Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities & EDUCAUSE |
| ACT | ACT | The App Association |
| AEM & EDA | Association of Equipment Manufacturers & Equipment Dealers Association |
| AFB | American Foundation for the Blind |
| AIPLA | American Intellectual Property Law Association |
| Auto Alliance | Alliance of Automobile Manufacturers |
| Auto Care | Auto Care Association |
| BSA | BSA | The Software Alliance |
| CDT | Center for Democracy & Technology |
| CERT | CERT Coordination Center |
| CTA | Consumer Technology Association |
| Cyberlaw Clinic | Cyberlaw Clinic at Harvard Law School |
| DVD CCA & AACS LA | DVD Copy Control Association & Access Content System Licensing Administrator, LLC |
| EFF | Electronic Frontier Foundation |

Appendix C–1

LOC_AR_00003412

| ESA | Entertainment Software Association |
|---|---|
| IPT USC | USC Intellectual Property and Technology Law Clinic |
| ISRI | Institute of Scrap Recycling Industries, Inc. |
| Joint Filmmakers I | International Documentary Association, Film Independent & Kartemquin Educational Films |
| Joint Filmmakers II | International Documentary Association, Film Independent, Kartemquin Educational Films, Independent Filmmaker Project, Indie Caucus, The National Alliance for Media Arts and Culture, New Media Rights & Women in Film and Video |
| KEI | Knowledge Ecology International |
| Kernochan Center | Kernochan Center for Law, Media and the Arts at Columbia Law School |
| LCA | Library Copyright Alliance |
| LDAA | Learning Disabilities Association of America |
| MEMA | Motor and Equipment Manufacturers Association |
| Microsoft | Microsoft Corporation |
| MIT | Massachusetts Institute of Technology Libraries, Massachusetts Institute of Technology Press & Massachusetts Institute of Technology Office of Digital Learning |
| MPAA | Motion Picture Association of America, Inc. |
| NMR | New Media Rights |
| NYIPLA | The New York Intellectual Property Law Association |
| ORI | Owners' Rights Initiative |
| OTI | New America's Open Technology Institute |
| OTW | Organization for Transformative Works |
| RIAA | Recording Industry Association of America |
| SAA | Society of American Archivists |
| Security Researchers | Andrea Matwyshyn, Steve Bellovin, Matt Blaze, Alex Halderman & Nadia Heninger |

Appendix C–2

LOC_AR_00003413

SIIA                          Software and Information Industry Association

USACM                         ACM U.S. Public Policy Council

LOC_AR_00003414

U.S. COPYRIGHT OFFICE · LIBRARY OF CONGRESS · 101 INDEPENDENCE AVENUE SE · WASHINGTON, DC 20559-6000 · WWW.COPYRIGHT.GOV

# EXHIBIT 27

LOC_AR_00003416

*Free Webinar*

## How United Therapeutics Increases Confidence in Clinical Trial Decisions by Leveraging Metabolomics

Monday, December 14
12pm ET / 9am PT

Learn how metabolomics helped United Therapeutics enhance its multi-omics platform and improve decision-making across all phases of drug development.

Save Your Spot

LOC_AR_00003417



by Conor Hale | May 17, 2018 1:59pm



*Free Webinar*

**How United Therapeutics Increases Confidence in Clinical Trial Decisions by Leveraging Metabolomics**

*Monday, December 14*
*12pm ET / 9am PT*

*Learn how metabolomics helped United Therapeutics enhance its multi-omics platform and improve decision-making across all phases of drug development.*

Save Your Spot

*...ncy will work to promote quality management principles, strengthen cybersecurity practices, and foster quality assessments. (The Innovation Institute)*

The FDA said it could not find reason to impose new regulations on the servicing of medical devices, whether performed by original equipment manufacturers (OEMs), hospital systems or third-party providers.

Instead, the agency found that many OEMs and third parties provided high-quality, safe and effective servicing, such as refurbishing and reselling more durable equipment including imaging machines, automated external defibrillators, endoscopes and ventilators.

"We believe the currently available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing of medical devices, including by third party servicers, that would justify imposing additional/different burdensome regulatory requirements at this time," the FDA said in its report.

Instead of pursuing formal regulatory action, the agency will work to promote quality management principles, strengthen cybersecurity practices, foster quality assessments and clarify the difference between servicing and remanufacturing—that is, making changes to a device's performance or specifications, instead of simply returning it to service.

The FDA also floated the idea of creating a public-private forum to address any challenges in the field.

Stakeholders, including manufacturers, have raised concerns about the quality of servicing and repairs, including the use of inferior replacement parts, inadequately trained personnel and poor documentation. Others have cited difficulty accessing servicing manuals, technical specifications and proper training.

"If there is sufficient interest and broad willingness to participate by all stakeholder groups, we would facilitate the creation of such a community," the FDA said.

 

The Medical Imaging and Technology Alliance strongly supported the FDA's decision to promote quality management principles but urged Congress to pass legislation that would require third-party services to register with the FDA and report adverse events.

"To ensure patient safety, the FDA needs to know who is servicing all medical devices so that if adverse events occur, the agency is alerted and can take appropriate action." said Patrick Hope, MITA's executive director.

*Free Webinar*

How United Therapeutics Increases Confidence in Clinical Trial Decisions by Leveraging Metabolomics

Monday, December 14
12pm ET / 9am PT

Learn how metabolomics helped United Therapeutics enhance its multi-omics platform and improve decision-making across all phases of drug development.

Save Your Spot

tion    quality management    Food and Drug Administration (FDA)

:h

**en launches coronavirus T-cell test for immunity irch**

r Hale
)20 11:24am



:h

**j CRISPR & a smartphone to detect COVID-19 in 30 tes**

by Conor Hale
Dec 7, 2020 11:18am



MedTech

**Olympus to boost respiratory portfolio with $340M Veran buyout**

by Conor Hale
Dec 7, 2020 7:52am



*Free Webinar*

How United Therapeutics Increases Confidence in Clinical Trial Decisions by Leveraging Metabolomics

Monday, December 14
12pm ET / 9am PT

Learn how metabolomics helped United Therapeutics enhance its multi-omics platform and improve decision-making across all phases of drug development.

Save Your Spot

GET THE NEWSLETTER

FierceBiotech to get industry news and updates delivered to your inbox.

SIGN UP

FierceBiotech and on behalf of their trusted partners.

About the Author

Conor Hale





*Free Webinar*

## How United Therapeutics Increases Confidence in Clinical Trial Decisions by Leveraging Metabolomics

Monday, December 14
12pm ET / 9am PT

Learn how metabolomics helped United Therapeutics enhance its multi-omics platform and improve decision-making across all phases of drug development.

Save Your Spot

NEWSLETTERS

Subscribe

Manage Subscriptions

CONNECT

Questutic Publishing © Questutic Media, LLC All rights reserved. Reproduction in whole or in part is prohibited.

# EXHIBIT 28

LOC_AR_00003422

GUIDANCE DOCUMENT

# Information Disclosure by Manufacturers to Assemblers for Diagnostic X-ray Systems - Guidance for Industry and FDA Staff

## SEPTEMBER 2003

Final

**Docket Number:**

FDA-2020-D-0957 (https://www.regulations.gov/docket?D=FDA-2020-D-0957)

**Issued by:**

(/regulatory-information/search-fda-guidance-documents/information-disclosure-manufacturers-assemblers-diagnostic-x-ray-systems-guidance-industry-and-fda)
Center for Devices and Radiological Health

**Document issued on: September 5, 2003**

PDF Printer Version
(42 KB) (/media/76019/download)

**This document supersedes: "Information Disclosure by Manufacturers to Assemblers for Diagnostic X-ray Systems" issued on April 2, 2001**

For questions regarding this document contact Sean Boyd at 301-796-5895 or sean.boyd@fda.hhs.gov (mailto:sean.boyd@fda.hhs.gov)



**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Devices and Radiological Health**

**Diagnostic Devices Branch**
**Division of Enforcement B**
**Office of Compliance**

# Preface

## Public Comment:

Written comments and suggestions may be submitted at any time for Agency consideration to Dockets Management Branch, Division of Management Systems and Policy, Office of Human Resources and Management Services, Food and Drug Administration, 5630 Fishers Lane, Room

1061, (HFA-305), Rockville, MD, 20852. Alternatively, electronic comments may be submitted to

http://www.fda.gov/RegulatoryInformation/Dockets/Comments/default.htm (http://www.fda.gov/RegulatoryInformation/Dockets/Comments/default.htm). Please identify your comments with the docket number listed in the notice of availability that publishes in the *Federal Register* announcing the availability of this guidance document. Comments may not be acted upon by the Agency until the document is next revised or updated.

## Additional Copies

Additional copies are available from the Internet. You may also send an e-mail request to CDRH-Guidance@fda.hhs.gov (mailto:CDRH-Guidance@fda.hhs.gov) to receive a copy of the guidance. Please use the document number (2619) to identify the guidance you are requesting.

*Contains Nonbinding Recommendations*

# Guidance for Industry and FDA Staff

# Information Disclosure by Manufacturers to Assemblers for Diagnostic X-ray Systems

*This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.*

# Introduction

This document provides guidance to assemblers and manufacturers of diagnostic x-ray systems regarding the disclosure of specifications for assembly, installation, adjustment, and testing (AIAT). The guidance clarifies the scope and terms of the information disclosure provision and explains how affected parties should view cost and software issues. This revision further clarifies that manufacturers should provide, upon request, AIAT information for each certified component used for the controlled production of x-rays.

LOC_AR_00003424

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## The Least Burdensome Approach

The issues identified in this guidance document represent those that we believe need to be addressed before your device can be marketed. In developing the guidance, we carefully considered the relevant statutory criteria for Agency decision-making. We also considered the burden that may be incurred in your attempt to comply with the guidance and address the issues we have identified. We believe that we have considered the least burdensome approach to resolving the issues presented in the guidance document. If, however, you believe that there is a less burdensome way to address the issues, you should follow the procedures outlined in the "A Suggested Approach to Resolving Least Burdensome Issues (/media/109942/download)" document.

## SUMMARY:

Manufacturers of diagnostic x-ray systems are subject to information disclosure obligations so that assemblers or other interested parties may obtain, upon request, information regarding the assembly, installation, adjustment, and testing (AIAT) of an x-ray system to ensure it meets federal performance standards. (21 Code of Federal Regulations sec. 1020.30(g) (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?FR=1020.30)) The AIAT information should be provided at a cost not to exceed the cost of publication and distribution. The information helps to ensure compliance with performance standards that are intended to reduce unnecessary x-ray exposure to the patient and operator. With the evolution of new technology for x-ray systems and related major components, the Food and Drug Administration (FDA) has received new questions about the scope of the information disclosure obligation for manufacturers, and whether computerization of that information affects the disclosure provision and how to calculate its cost.

## Background

FDA protects the public health from unnecessary exposure to electronic product radiation by, among other things, requiring that electronic products meet performance standards. (Section 532 of the Federal Food, Drug, and Cosmetic Act (the act) (21 U.S.C. 360ii)) Federal regulations regarding the disclosure of AIAT information protect the public health by preventing unnecessary exposure to x-rays from diagnostic x-ray systems. This disclosure obligation

became effective on August 1, 1974. (38 Federal Register 15444) During that time, AIAT documentation for operational activities has evolved from the use of written manuals to computer software programs.

## Assembly of Components

Assembly procedures can affect whether a diagnostic x-ray system complies with federal performance standards. Accordingly, the manufacturing process is not complete until the assembler has installed the component(s) into an x-ray system. The standard defines "manufacturer" to include "assembler." This means that the component manufacturer can only certify to a component's ability to function in compliance with the standard when the system is properly assembled and installed according to the manufacturer's instructions. A manufacturer's labeled certification of a component, coupled with adequate and complete assembly, installation, adjustment, and testing (AIAT) instructions, should provide the assembler with all of the information necessary to ensure the products will comply with applicable performance standards when assembled, installed, adjusted and tested, as directed by the instructions. Delivering a diagnostic x-ray system fully assembled does not relieve manufacturers of their obligations under 21 CFR 1020.30(g (http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?FR=1020.30)) to provide assemblers and others with AIAT materials.

## Installation of Components

The component manufacturer should also provide AIAT instructions that describe how to install the assembled components so the unit meets applicable performance standards. For example, in order to install components properly as part of a system, the assembler needs to fix and align the relationship between the x-ray source and the related components of the diagnostic system. This activity involves adjustment and testing to ensure compliance with performance standards. If the assembler follows the AIAT instructions and the certified component does not meet the performance standard, the component manufacturer should, at no cost to the user, repair or replace the violative component(s), or refund the cost of the component.

## Legal Responsibility

Manufacturers and assemblers each bear legal responsibility for their roles in the manufacture and commerce of products subject to section 1020.30. (See sections 535(e) and 538 of the act (21 U.S.C. 360ll(e), 360oo).) As a practical matter, close cooperation between the manufacturer and the assembler furthers the interests of both parties by controlling legal liability for noncompliant or defective x-ray equipment.

# Guidance

The manufacturer can certify that the components or system manufactured meet the applicable federal performance standard only when they are assembled, installed, adjusted, and tested according to instructions. The assembler certifies that the system and its components were assembled, installed, adjusted, and tested according to the manufacturer's instructions. Reliable certification, then, depends upon the manufacturer's providing adequate and complete instructions to the assembler.

An x-ray system is an assemblage of components for the controlled production of x-rays. The information disclosure obligation applies to each individually certified component produced by a manufacturer and is independent of the manufacturer's decision to deliver a fully assembled x-ray system or subsystem. The regulation establishes that manufacturers of certified components should provide to assemblers and others, upon request, AIAT information for the certified components of a diagnostic x-ray system. (21 CFR 1020.30(a)(1)) This means that AIAT information should exist for each certified component produced by a manufacturer and be available to others upon request.

## Explanation of Terms

The agency would like to explain the meaning of four terms that comprise AIAT to help manufacturers and assemblers establish clear expectations about what information is subject to disclosure.

**Assembly:** To fit together the parts or pieces of a component or system.

Discussion: New x-ray components and accessories are shipped to a final destination in various boxes and crates. These components must be unpacked and properly assembled before the unit can be used to make x-rays. The typical major component of a diagnostic x-ray system cannot simply be removed from the box and used by the operator. For example, various parts, such as printed circuit boards and switches, may require assembly into the control console of an x-ray control unit in a medical facility. Assembly also includes the re-assembly of components that were not replaced but must be re-connected to the new component. Correct electrical and hardware connections with all of the equipment must be made before using the system. Such connections are considered assembly. Complete assembly instructions in written form or software programs that automate the assembly process should be disclosed to the assembler to the extent they are part of the assembly procedures.

Software programs may incorporate information that does not relate to assembly or re-assembly activities. Such programs are not subject to disclosure. For example, the console's central processing unit may include unrevealed, protected software programs that create a log of assembly activities related to computer operations. Should the manufacturer wish to check the assembly history on a particular system, this log would provide information, independent of the assembler's report, about when activities occurred and perhaps about the identity of the replaced components. This information does not fall within the scope of the AIAT disclosure

requirements. However, the incorporation of non-AIAT information or software does not change obligation of the manufacturer to release the required AIAT information. It is incumbent upon the manufacturer to provide adequate AIAT information to the assembler.

It is important to note that the term "assembly" and "installation" should not be used interchangeably. The term "installation" includes other activity not covered in the assembly activity.

**Installation**: To set up for use by verifying that proper assembly and adjustments were made to assure compliance with federal performance specifications.

Discussion: The unit should not be used on humans until the installation is completed in accordance with the manufacturer's instructions, including any additional adjustments and testing needed to verify compliance with performance specifications. For example, to complete the installation of an x-ray system, the assembler combines (or assembles) the various certified components, e.g., tube housing assembly, beam-limiting device, and x-ray control, into an interdependent operating system. The assembler should be sure that the components work in coordination with each other and do not cause any of the interdependent components to operate outside of the equipment manufacturer's specified tolerances or outside of applicable federal performance specifications, which are detailed in the regulations. (21 CFR 1020.30 - 1020.33)

The manufacturer's documentation or software programs provide information on how the major components should be configured to meet applicable federal performance standards. However, a manufacturer may also have software programs that operate with specifications that are narrower than federal performance standards, which they use for internal quality assurance purposes. In addition, the firm may have developed a particular sequencing of installation that operates in conjunction with system accessories that do not directly or indirectly impact electronic radiation emissions specifications. This information does not fall within the scope of AIAT disclosure requirements.

**Adjustment:** To bring various component parts up to a true or more effective relative position for performance purposes.

Discussion: Adjustment covers activities performed on various components to make sure they work as a system within applicable federal performance standards. For example, adjustments to the electrical circuitry are often needed to ensure the system does not operate outside of its performance specifications. Calibration of the equipment's operational parameters is achieved by adjusting the electrical or mechanical features of the component.

The manufacturer's documentation or software that provides adjustment information also serves a critical function so assemblers can ensure the component(s) will comply with the applicable performance standards. Adjustment information would include any relevant calibration references. However, the manufacturer may have incorporated a proprietary

software program that continuously monitors the performance of the system and alerts the manufacturer if the system may need adjustment in the future, even though it is currently operating within the performance standard. This information does not fall within the scope of AIAT disclosure requirements.

**Testing:** A critical examination, observation, or evaluation of such conditions or operations through procedures provided by the manufacturer that will prove the unit meets specifications.

Discussion: The regulations define the performance requirements for diagnostic radiographic exposure reproducibility such that the coefficient of variation of radiation exposures shall not exceed 0.05. (21 CFR §1020.31(b)(1)) A test method for determining compliance with this performance standard is identified in the regulations. (21 CFR §1020.31(b)(2)) A test of x-ray equipment should produce data to verify the proper operation or performance of the x-ray system or component. For example, information on how to test for radiation leakage or proper beam alignment is important when the assembler needs to use a special technique due to the special design of the component or when the beam alignment procedures are so complex that a computer program is needed.

The manufacturer's documentation or basic software programs provide critical information about testing for applicable federal performance standards that correspond to the manufacturer's AIAT specifications. However, the manufacturer may have additional enhanced software programs, with privileged access codes, that conduct the required tests more quickly to save time. The enhanced software programs may operate in conjunction with other proprietary accessories or functions, such as a daily test trend analysis that is relayed to the manufacturer in order to schedule advanced service calls. This helps the user avoid any interruption in the clinical use of the system. Such proprietary functions may increase the value of the system to the user, but the accessories and the software programs used in conjunction with these functions do not fall within the scope of AIAT for purposes of meeting applicable federal performance standards, provided they are not required by the AIAT instructions.

Manufacturers should provide all informational materials needed for assembly, installation, adjustment, and testing, as described above, regardless of the format in which those materials exist. Manufacturers may provide assemblers and other members of the public hard copies of instructional software, as long as the package made generally available contains adequate, complete, and useable instructions for assembly, installation, adjustment, and testing.

## Software

Some manufacturers bundle AIAT information covered by 1020.30(g) with other types of proprietary software; in some instances the proprietary software cannot be deleted from the bundled information. Nothing in section 1020.30 prohibits bundling software information or programs; however, the practice does not relieve manufacturers of their responsibilities under

the performance standard to provide AIAT documentation or the AIAT software at cost. Manufacturers who bundle their AIAT software with other software may comply with 1020.30(g) by providing the entire bundle at the cost of the AIAT software. Alternatively, the manufacturer may, by parceling the software domains, provide only the AIAT software to assemblers and others. Manufacturers may also satisfy the performance standard by providing printed materials, or by any other means that result in the provision of adequate, complete, and useable instructional materials.

## Cost

Manufacturers may recover from assemblers and others the "cost" of providing required instructional materials. Manufacturers should, in negotiation with purchasers, assemblers, and others, determine the dollar amount for any instructional package. Although private parties can and should set the exact price for materials provided under subsection (g), the performance standard establishes limits on what costs manufacturers may recover in determining that price.

The agency has explained that manufacturers may charge for the cost of producing each additional package or unit of instructions. The charge can incorporate factors such as the cost of paper, labor, use of a copying machine, or other costs associated with each package the manufacturer provides under the performance standard. This principle should govern the calculation of the costs for all information subject to disclosure, whether printed, encoded in software, or any other format. For software, recoverable charges equivalent to printed materials would include such factors as the cost of the technical labor of producing such additional package or unit, computer disks, and packaging materials used to produce each additional unit of software. Using a reasonable set of factors should govern the calculation of the costs for any materials that are provided.

Although the question concerning cost has arisen primarily in the context of disclosing AIAT information, the same principle should also apply to the cost of disclosure of safety and technical information to the user of diagnostic x-ray systems or computed tomography equipment. In any scenario involving AIAT information disclosure, the factors that constitute a recoverable cost should not create a profit or loss for the manufacturer.

## Closing Summary

The public health need to provide AIAT information to assemblers and users since the Radiation Control for Health and Safety Act was passed in 1968 has not changed. If the information is not available, the public may be exposed to unnecessary radiation hazards from electronic products. Without this information, FDA, manufacturers, assemblers, users, and consumers could not make reasonable determinations or decisions associated with the safe and effective use of diagnostic x-ray systems and computed tomography components and systems in their health care.

For further information regarding compliance with the information disclosure requirements for diagnostic x-ray systems and their major component systems, please contact Sean Boyd at 301-796-5895 or sean.boyd@fda.hhs.gov (mailto:sean.boyd@fda.hhs.gov)

# Submit Comments

Submit Comments Online (https://www.regulations.gov/docket?D=FDA-2020-D-0957)

You can submit online or written comments on any guidance at any time (see 21 CFR 10.115(g)(5))

If unable to submit comments online, please mail written comments to:

Dockets Management
Food and Drug Administration
5630 Fishers Lane, Rm 1061
Rockville, MD 20852

All written comments should be identified with this document's docket number: FDA-2020-D-0957 (https://www.regulations.gov/docket?D=FDA-2020-D-0957).

◉ Search for FDA
Guidance Documents (/regulatory-information/search-fda-guidance-documents)

# EXHIBIT 29

LOC_AR_00003432

UNITED STATES COPYRIGHT OFFICE

# SECTION 1201 RULEMAKING:
## Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention

INTRODUCTION AND RECOMMENDED REGULATORY LANGUAGE            OCTOBER 2018



LOC_AR_00003433

# I.  Introduction

Enacted in 1998 as part of the Digital Millennium Copyright Act ("DMCA"), section 1201 of Title 17 plays a critical role in fostering the dissemination and enjoyment of creative works online.  In adopting section 1201, Congress recognized that the development of the online marketplace for copyrighted works required a legal framework that adequately addressed the harm of internet piracy and encouraged copyright owners to make their works available to the public in emerging digital formats.[1]  Section 1201 accordingly affords copyright owners important legal protections against those who circumvent technological measures used to prevent unauthorized access to their works.  Many have credited section 1201 as a key factor in the growth of the vast array of content delivery platforms available to consumers today, which offer more lawful options to access expressive material than ever existed previously.[2]

In adopting these new protections, however, Congress also recognized the need to ensure that legitimate uses of copyrighted works not be inhibited unnecessarily.  The triennial section 1201 rulemaking is a key part of the statutory scheme, striking a balance between copyright and digital technologies.  Every three years, the Librarian of Congress, upon the recommendation of the Register of Copyrights, determines whether the prohibition on circumvention is having, or is likely to have, an adverse effect on users' ability to make noninfringing uses of a particular class of copyrighted works.[3]  Upon such a determination, the Librarian may adopt a temporary exemption waiving the prohibition for such users for the ensuing three-year period.[4]

The rulemaking occurs through a formal public process administered by the Register of Copyrights, who consults with the National Telecommunications and Information Administration of the Department of Commerce ("NTIA").  The first rulemaking was completed in 2000, and subsequent rulemakings have taken place every three years since then.

---

[1] *See* U.S. COPYRIGHT OFFICE, SECTION 1201 OF TITLE 17 9–10 (2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf ("Section 1201 Report").

[2] *See, e.g., Chapter 12 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop. & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 2 (2014) (statement of Rep. Tom Marino, Vice-Chairman, Subcomm. on Courts, Intellectual Prop. & the Internet) ("The digital economy has enabled wide distribution of movies, music, eBooks and other digital content.  Chapter 12 seems to have a lot to do with [that] economic growth . . . ."); *id.* at 3 (statement of Rep. Jerrold Nadler, Ranking Member, Subcomm. on Courts, Intellectual Prop. & the Internet) ("Section 1201 has proven to be extremely helpful to creators because it has helped creators to have the confidence to provide video content over the internet despite the risk of piracy.").

[3] 17 U.S.C. § 1201(a)(1)(C).

[4] *Id.* § 1201(a)(1)(D).

LOC_AR_00003434

*Revised Rulemaking Procedures*

For this seventh triennial proceeding, following a comprehensive policy study,[5] the Copyright Office implemented new streamlining procedures to facilitate the renewal of previously adopted exemptions to which there is no meaningful opposition. This process proved successful, allowing stakeholders to seek renewal of noncontroversial exemptions—some of which had been repeatedly granted over multiple rulemakings—without the need to provide wholly new evidentiary showings in support. For example, in 2015, the American Foundation for the Blind participated in three rounds of comments and sent two affiliates to a hearing regarding an unopposed exemption to facilitate assistive technology for e-books. This time, the same exemption was renewed through a brief four-paragraph statement.

In fact, the Office did not receive meaningful opposition to renewal of any of the exemptions granted in the 2015 rulemaking, which enabled the Acting Register to announce her intention to recommend readoption of those exemptions at the early stages of this proceeding. This in turn allowed participants to concentrate their energies on new proposals, including requested expansions of existing exemptions. Indeed, the significant number of petitions received in this cycle indicates that stakeholders now are able to devote resources to a broad range of additional issues.

The Acting Register expects that the streamlining process likewise will benefit the records in future proceedings. In this regard, the new procedures underscore the importance of ensuring that exemption proposals are supported by sufficient evidence, as the same record can now be relied upon in multiple subsequent proceedings. At the same time, the process gives opponents the opportunity to demonstrate that the factual or legal grounds supporting an exemption in a prior cycle have changed to the point that the renewal petition should be considered as part of the full rulemaking process. The Acting Register continues to believe that a legislative change providing for presumptive renewal of existing exemptions would introduce even greater efficiencies by eliminating the need for parties to petition for, and the Office to consider, readoption of uncontested exemptions.[6] Nevertheless, the streamlining procedures appear to have accomplished their goal of reducing unnecessary burdens on both participants and the Office.

*Policy Considerations*

This proceeding involves many of the same proposed uses of copyrighted works that the Office has frequently considered in prior rulemakings. Several exemption petitions seek

---

[5] *See* Section 1201 Report at 141.

[6] *See id.* at 141; *The Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary,* 114th Cong. 27 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

LOC_AR_00003435

to access traditional forms of expressive content for purposes such as teaching and facilitating use by persons with disabilities—activities that Congress undoubtedly had in mind when it created the triennial review process and that have long been a focus of the rulemaking. This cycle also saw an increased focus on ensuring that preservation activities undertaken by libraries, archives, and museums can reach a wide and increasing range of digital works, including computer software and video games.

At the same time, the landscape for the seventh section 1201 rulemaking differs in important ways from that of its inception in 1998, and even from 2008. A significant portion of the exemption proposals received in this cycle reflect a new consumer reality resulting from the growing pervasiveness of the Internet of Things. Like the 2015 rulemaking, this proceeding saw numerous requests to access copyrighted software contained in consumer products and other devices and systems. Proponents of these exemptions do not wish to access such software for its creative content, but instead are seeking to study, repair, or modify the functionality of the device or system itself. In the written comments and public hearings, many of these stakeholders expressed frustration at the notion that copyright should prevent owners of devices from repairing, tinkering with, or otherwise exercising control over their own property. In the words of one individual, "[i]t's my own damn car, I paid for it, I should be able to repair it or have the person of my choice do it for me."[7]

Several of these proposals seek to extend exemptions granted in the last rulemaking to a broader range of products. For example, security researchers currently authorized to circumvent technological measures in consumer devices, vehicles, and medical devices petition to apply that exemption to software-enabled devices generally. Similarly, other petitioners seek to broaden the current exemption for repair and modification of motor vehicles to encompass other devices ranging from smartphones to home appliances to consumables. In considering these proposals, the Office again notes that many of these activities seem to "have little to do with the consumption of creative content or the core concerns of copyright."[8] It should be emphasized, however, that section 1201 does not permit the Acting Register to recommend, or the Librarian to grant, exemptions on that basis alone. They may do so only where specific evidence demonstrates that the statute

---

[7] DeVolve Class 7 Reply. Comments received in this rulemaking are available at http://copyright.gov/1201/2018. References to these comments in this Recommendation are by party name (abbreviated where appropriate), followed by class number and "Initial," "Opp'n," or "Reply" for comments submitted in the first, second, or third round, respectively.

[8] REGISTER OF COPYRIGHTS, SECTION 1201 RULEMAKING: SIXTH TRIENNIAL PROCEEDING TO DETERMINE EXEMPTIONS TO THE PROHIBITION ON CIRCUMVENTION, RECOMMENDATION OF THE REGISTER OF COPYRIGHTS 2 (2015). References to the Register's Recommendations in prior rulemakings are cited by the year of publication followed by "Recommendation" (*e.g.*, "2015 Recommendation"). Prior Recommendations are available on the Copyright Office website at https://www.copyright.gov/1201/.

LOC_AR_00003436

Case 1:22-cv-00499-BAH    Document 24-5    Filed 08/29/22    Page 120 of 393

**Section 1201 Rulemaking: Seventh Triennial Proceeding**                    October 2018
**Recommendation of the Acting Register of Copyrights**

is causing, or is likely to cause, an adverse impact on noninfringing uses of copyrighted works.  Moreover, the Acting Register's ability to consider broad exemptions in these categories, encompassing wide and varied assortments of devices, is limited by the statutory rulemaking standard, which restricts the inquiry to "particular class[es] of copyrighted works" for which there is evidence of adverse effects.[9]

It is also important to acknowledge the significant countervailing interests that could be implicated by overbroad exemptions.  Copyright owners participating in this proceeding emphasized the substantial investments they have made in distributing their creative works through subscription streaming services and other protected ways to lawfully access music, movies, games, books, and more.  These platforms provide a critical revenue source for modern artists and authors, and are supplanting more traditional avenues for users to access a wide variety of cultural works.  And they all rely on ensuring that the devices and formats used to access this content remain secure and are not used to facilitate infringement.  Confronting a very real history of massive piracy of music, movies, and other creative works, rightsholders have concerns over what they characterize as a perfunctory dismissal of serious infringement risks and the blurring of important nuances in the copyright law.

Given these competing policy interests, as well as the inherent constraints of the rulemaking process, the Acting Register recently has advised Congress that many of these issues would be appropriate subjects for legislation.  Specifically, in its 2017 Section 1201 Report, the Office recommended that Congress consider expanding the permanent exemption under section 1201(j) permitting circumvention for purposes of security testing.[10]  Additionally, the Office recommended congressional consideration of new permanent exemptions for diagnosis, repair, and maintenance of software-enabled devices,[11] and for unlocking of wireless devices.[12]  While the Acting Register has attempted to appropriately balance stakeholder interests to the extent permitted under the regulatory framework, legislative review would enable Congress and interested parties to address these issues in a more comprehensive manner.

This rulemaking also echoes the 2015 proceeding in that some proposed exemptions potentially involve activities subject to legal or regulatory regimes outside of copyright.  In 2015, the Environmental Protection Agency, the Department of Transportation, and the Food and Drug Administration expressed concerns over the impact that the proposed exemptions for security research and vehicle modification could have on health and safety matters within their jurisdictions.  While recognizing that such

---

[9] 17 U.S.C. § 1201(a)(1)(C).

[10] Section 1201 Report at 71–80.

[11] *Id.* at 88–95.

[12] *Id.* at 97–99.

4

LOC_AR_00003437

concerns did not directly implicate copyright, the Register concluded that they were sufficiently serious that other agencies should have the opportunity to prepare for any potential impacts. Therefore, the Register recommended, and the Librarian implemented, a one-year delay in the effective date of those exemptions.[13] Subsequently, however, the Office noted that it did not anticipate the need for future delays now that those agencies have had time to respond, and that going forward it "will generally decline to consider health, safety, and environmental concerns" as part of the rulemaking.[14] Consistent with those statements, the Acting Register in this proceeding did not accord significant weight to such considerations, despite the urging of some participants. While the Acting Register certainly appreciates the seriousness of these issues, they generally are best addressed through other legal frameworks and by agencies with expertise in those areas. Indeed, in contrast to 2015, only one additional federal agency submitted comments in this proceeding, and that agency—the U.S. Department of Justice's Computer Crime and Intellectual Property Section ("CCIPS")—agrees with this view.

Finally, this proceeding again raises the question of whether, or to what extent, third parties, such as independent automobile repair shops, may provide assistance to persons entitled to exercise an exemption. In 2015 the Register declined requests to recommend an exemption for circumvention "on behalf of the owner" of a motor vehicle, finding that such assistance could run afoul of the prohibition on trafficking in circumvention "service[s]" under section 1201(a)(2) and (b). The anti-trafficking provisions provide vital protections to copyright owners, and Congress did not authorize the Librarian to grant exemptions from them. In this proceeding, proponents of the vehicle repair exemption again request provision for third-party assistance, arguing that limiting the exemption to individual owners threatens to render it effectively meaningless for those who lack the technical knowledge to access and manipulate increasingly complex embedded computer systems. The Acting Register is sympathetic to these concerns and has attempted to draft the exemption language in a manner that accommodates such assistance to the extent it does not implicate the anti-trafficking provisions. As the Office has recently noted, however, the scope of those provisions is uncertain,[15] and it is beyond the scope of the rulemaking for the Acting Register to opine on that issue. The Office continues to believe that legislation permitting third-party assistance in appropriate circumstances would benefit stakeholders and provide valuable clarity to the overall statutory scheme.[16]

[13] See 2015 Recommendation at 3.

[14] Section 1201 Report at 125–26.

[15] See id. at 56–59.

[16] See id. at 59–61.

5

*Summary of Recommendations*

The Librarian has previously adopted six sets of exemptions under section 1201 based upon prior Recommendations of the Register.[17]  In this seventh triennial proceeding, as discussed more fully below, the Acting Register recommends that the Librarian adopt another set of exemptions covering the following types of uses:

- Excerpts of motion pictures (including television programs and videos) for criticism and comment:
    - For educational uses,
        - By college and university or K-12 faculty and students
        - By faculty of massive open online courses ("MOOCs")
        - By educators and participants in digital and literacy programs offered by libraries, museums and other nonprofits
    - For nonfiction multimedia e-books
    - For uses in documentary films and other films where the use is in parody or for a biographical or historically significant nature
    - For uses in noncommercial videos

- Motion pictures (including television programs and videos), for the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students with disabilities

- Literary works distributed electronically (*i.e.*, e-books), for use with assistive technologies for persons who are blind, visually impaired or have print disabilities

- Literary works consisting of compilations of data generated by implanted medical devices and corresponding personal monitoring systems

- Computer programs that operate the following types of devices, to allow connection of a new or used device to an alternative wireless network ("unlocking"):

---

[17] Each of these Final Rules and the Register's Recommendations can be found at http://www.copyright.gov/1201.

LOC_AR_00003439

Case 1:22-cv-00499-BAH    Document 24-5    Filed 08/29/22    Page 123 of 393

**Section 1201 Rulemaking: Seventh Triennial Proceeding**                    October 2018
**Recommendation of the Acting Register of Copyrights**

- Cellphones

- Tablets

- Mobile hotspots

- Wearable devices (*e.g.*, smartwatches)

- Computer programs that operate the following types of devices, to allow the device to interoperate with or to remove software applications ("jailbreaking"):

  - Smartphones

  - Tablets and other all-purpose mobile computing devices

  - Smart TVs

  - Voice assistant devices

- Computer programs that control motorized land vehicles, including farm equipment, for purposes of diagnosis, repair, or modification of the vehicle, including to access diagnostic data

- Computer programs that control smartphones, home appliances, or home systems, for diagnosis, maintenance, or repair of the device or system

- Computer programs for purposes of good-faith security research

- Computer programs other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums

- Video games for which outside server support has been discontinued, to allow individual play by gamers and preservation of games by libraries, archives, and museums (as well as necessary jailbreaking of console computer code for preservation uses only), and preservation of discontinued video games that never required server support

- Computer programs that operate 3D printers, to allow use of alternative feedstock

The Register declines to recommend the following requested exemptions:

- Audiovisual works, for broad-based space-shifting and format-shifting (declined due to lack of legal and factual support for exemption)

LOC_AR_00003440

- Audiovisual works protected by HDCP/HDMI, for non-infringing uses (declined due to lack of legal and factual support for exemption)

- Access to avionics data (declined due to lack of factual support that access controls were protecting copyrighted works)

LOC_AR_00003441

**APPENDIX** RECOMMENDED REGULATORY LANGUAGE

LOC_AR_00003442

# Recommended Regulatory Language

(a) *General.* This section prescribes the classes of copyrighted works for which the Librarian of Congress has determined, pursuant to 17 U.S.C. 1201(a)(1)(C) and (D), that noninfringing uses by persons who are users of such works are, or are likely to be, adversely affected. The prohibition against circumvention of technological measures that control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A) shall not apply to such users of the prescribed classes of copyrighted works.

(b) *Classes of copyrighted works.* Pursuant to the authority set forth in 17 U.S.C. 1201(a)(1)(C) and (D), and upon the recommendation of the Register of Copyrights, the Librarian has determined that the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A) shall not apply to persons who engage in noninfringing uses of the following classes of copyrighted works:

> (1) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, and the person engaging in circumvention under paragraph (b)(1)(i) and (b)(1)(ii)(A) and (B) of this section reasonably believes that non-circumventing alternatives are unable to produce the required level of high-quality content, or the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, where circumvention is undertaken solely in order to make use of short portions of the motion pictures in the following instances:

>> (i) For the purpose of criticism or comment:

>>> (A) For use in documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature;

>>> (B) For use in noncommercial videos (including videos produced for a paid commission if the commissioning entity's use is noncommercial); or

>>> (C) For use in nonfiction multimedia e-books.

9

Case 1:22-cv-00499-BAH    Document 24-5    Filed 08/29/22    Page 127 of 393

**Section 1201 Rulemaking: Seventh Triennial Proceeding**                    October 2018
**Recommendation of the Acting Register of Copyrights**

(ii) For educational purposes:

(A) By college and university faculty and students or kindergarten through twelfth-grade (K-12) educators and students (where the K-12 student is circumventing under the direct supervision of an educator), including of accredited general educational development (GED) programs, for the purpose of criticism, comment, teaching, or scholarship;

(B) By faculty of massive open online courses (MOOCs) offered by accredited nonprofit educational institutions to officially enrolled students through online platforms (which platforms themselves may be operated for profit), in film studies or other courses requiring close analysis of film and media excerpts, for the purpose of criticism or comment, where the MOOC provider through the online platform limits transmissions to the extent technologically feasible to such officially enrolled students, institutes copyright policies and provides copyright informational materials to faculty, students, and relevant staff members, and applies technological measures that reasonably prevent unauthorized further dissemination of a work in accessible form to others or retention of the work for longer than the course session by recipients of a transmission through the platform, as contemplated by 17 U.S.C. 110(2); or

(C) By educators and participants in nonprofit digital and media literacy programs offered by libraries, museums, and other nonprofit entities with an educational mission, in the course of face-to-face instructional activities, for the purpose of criticism or comment, except that such users may only circumvent using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted.

(2)

(i) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, where:

(A) Circumvention is undertaken by a disability services office or other unit of a kindergarten through twelfth-grade educational

10

LOC_AR_00003444

institution, college, or university engaged in and/or responsible for the provision of accessibility services to students, for the purpose of adding captions and/or audio description to a motion picture to create an accessible version as a necessary accommodation for a student or students with disabilities under an applicable disability law, such as the Americans With Disabilities Act, the Individuals with Disabilities Education Act, or Section 504 of the Rehabilitation Act;

(B) The educational institution unit in paragraph (b)(2)(i)(A) of this section has, after a reasonable effort, determined that an accessible version cannot be obtained at a fair price or in a timely manner; and

(C) The accessible versions are provided to students or educators and stored by the educational institution in a manner intended to reasonably prevent unauthorized further dissemination of a work.

(ii) For purposes of this paragraph(b)(2), "audio description" means an oral narration that provides an accurate rendering of the motion picture.

(3) Literary works, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies:

(i) When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels; or

(ii) When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.

(4) Literary works consisting of compilations of data generated by medical devices that are wholly or partially implanted in the body or by their corresponding personal monitoring systems, where such circumvention is undertaken by a patient for the sole purpose of lawfully accessing the data generated by his or her own device or monitoring system and does not constitute a violation of applicable law, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration, and is accomplished through the passive monitoring of wireless transmissions that are already being produced by such device or monitoring system.

11

(5) Computer programs that enable the following types of lawfully acquired wireless devices to connect to a wireless telecommunications network, when circumvention is undertaken solely in order to connect to a wireless telecommunications network and such connection is authorized by the operator of such network:

>    (i) Wireless telephone handsets (i.e., cellphones);

>    (ii) All-purpose tablet computers;

>    (iii) Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and

>    (iv) Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.

(6) Computer programs that enable smartphones and portable all-purpose mobile computing devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smartphone or device, or to permit removal of software from the smartphone or device. For purposes of this paragraph (b)(6), a "portable all-purpose mobile computing device" is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is equipped with an operating system primarily designed for mobile use, and is intended to be carried or worn by an individual.

(7) Computer programs that enable smart televisions to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smart television.

(8) Computer programs that enable voice assistant devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the device, or to permit removal of software from the device, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For purposes of this paragraph (b)(8), a "voice assistant device" is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is designed to take user input primarily by voice, and is designed to be installed in a home or office.

LOC_AR_00003446

(9) Computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle such as a personal automobile, commercial vehicle, or mechanized agricultural vehicle, except for programs accessed through a separate subscription service, when circumvention is a necessary step to allow the diagnosis, repair, or lawful modification of a vehicle function, where such circumvention does not constitute a violation of applicable law, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works.

(10) Computer programs that are contained in and control the functioning of a lawfully acquired smartphone or home appliance or home system, such as a refrigerator, thermostat, HVAC, or electrical system, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system, and is not accomplished for the purpose of gaining access to other copyrighted works. For purposes of this paragraph (b)(10):

> (i) The "maintenance" of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and

> (ii) The "repair" of a device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.

(11)

> (i) Computer programs, where the circumvention is undertaken on a lawfully acquired device or machine on which the computer program operates, or is undertaken on a computer, computer system, or computer network on which the computer program operates with the authorization of the owner or operator of such computer, computer system, or computer network, solely for the purpose of good-faith security research and does not violate any applicable law, including without limitation the Computer Fraud and Abuse Act of 1986.

> (ii) For purposes of this paragraph (b)(11), "good-faith security research" means accessing a computer program solely for purposes of good-faith testing, investigation, and/or correction of a security flaw or vulnerability, where such activity is carried out in an environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the

13

LOC_AR_00003447

class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.

(12)

(i) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, when the copyright owner or its authorized representative has ceased to provide access to an external computer server necessary to facilitate an authentication process to enable gameplay, solely for the purpose of:

(A) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game for personal, local gameplay on a personal computer or video game console; or

(B) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game on a personal computer or video game console when necessary to allow preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, that do not require access to an external computer server for gameplay, and that are no longer reasonably available in the commercial marketplace, solely for the purpose of preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(iii) Computer programs used to operate video game consoles solely to the extent necessary for an eligible library, archives, or museum to engage in the preservation activities described in paragraph (b)(12)(i)(B) or (b)(12)(ii) of this section.

14

LOC_AR_00003448

(iv) For purposes of this paragraph (b)(12), the following definitions shall apply:

(A) For purposes of paragraph (b)(12)(i)(A) and (b)(12)(ii) of this section, "complete games" means video games that can be played by users without accessing or reproducing copyrightable content stored or previously stored on an external computer server.

(B) For purposes of paragraph (b)(12)(i)(B) of this section, "complete games" means video games that meet the definition in paragraph (b)(12)(iv)(A) of this section, or that consist of both a copy of a game intended for a personal computer or video game console and a copy of the game's code that was stored or previously stored on an external computer server.

(C) "Ceased to provide access" means that the copyright owner or its authorized representative has either issued an affirmative statement indicating that external server support for the video game has ended and such support is in fact no longer available or, alternatively, server support has been discontinued for a period of at least six months; provided, however, that server support has not since been restored.

(D) "Local gameplay" means gameplay conducted on a personal computer or video game console, or locally connected personal computers or consoles, and not through an online service or facility.

(E) A library, archives, or museum is considered "eligible" when the collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum.

(13)

(i) Computer programs, except video games, that have been lawfully acquired and that are no longer reasonably available in the commercial marketplace, solely for the purpose of lawful preservation of a computer program, or of digital materials dependent upon a computer program as a condition of access, by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the program is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

15

(ii) For purposes of the exemption in paragraph (b)(13)(i) of this section, a library, archives, or museum is considered "eligible" if—

(A) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(B) The library, archives, or museum has a public service mission;

(C) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(D) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(E) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by this paragraph (b)(13).

(14) Computer programs that operate 3D printers that employ microchip-reliant technological measures to limit the use of feedstock, when circumvention is accomplished solely for the purpose of using alternative feedstock and not for the purpose of accessing design software, design files, or proprietary data.

(c) *Persons who may initiate circumvention.* To the extent authorized under paragraph (b) of this section, the circumvention of a technological measure that restricts wireless telephone handsets or other wireless devices from connecting to a wireless telecommunications network may be initiated by the owner of any such handset or other device, by another person at the direction of the owner, or by a provider of a commercial mobile radio service or a commercial mobile data service at the direction of such owner or other person, solely in order to enable such owner or a family member of such owner to connect to a wireless telecommunications network, when such connection is authorized by the operator of such network.

LOC_AR_00003450

U.S. COPYRIGHT OFFICE    ·    LIBRARY OF CONGRESS    ·    101 INDEPENDENCE AVENUE SE    ·    WASHINGTON, DC 20559    WWW.COPYRIGHT.GOV

LOC_AR_00003451

## EXHIBIT LIST

| Exhibit | Brief Description |
|---------|-------------------|
| Exhibit 1 | Declaration of Robert A. Wheeler |
| Exhibit 2 | Avante Diagnostic Imaging Website<br><br>exemplary medical devices are (link to the specific ones) |
| Exhibit 3 | Declaration of Michael Spencer |
| Exhibit 4 | Final Exhibit to Letters for Right to Repair |
| Exhibit 5 | Declaration of Kevin Melvin |
| Exhibit 6 | Declaration of John Kahler |
| Exhibit 7 | Declaration of Abigail Lane-Savage |
| Exhibit 8 | Declaration of E. Stuart Grogan |
| Exhibit 9 | *Philips Med. Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al.*, Case No: 3:20-cv-00021-MOC-DCK (W.D.N.C.) (Only the relevant portions included.) |
| Exhibit10 | *Philips Med. Sys. Puerto Rico, Inc., et al. v. Alpha Biomedical and Diagnostic Corp.*, Case No: 3:19-cv-01488-CCC (D.P.R.) (Only the relevant portions included.) |
| Exhibit 11 | *Philips N. Am. LLC et al v. 626 Holdings, Inc. et al.*, Case No: 9:19-cv-81263 RS (S.D. Fla.) (Only the relevant portions included.) |
| Exhibit 12 | *Philips, et al. v. Zetta Med. Techs. LLC, et al.*, C.A. No. 17-3425 (N.D. Ill.) (Only the relevant portions included.) |
| Exhibit 13 | *Philips N. Am. LLC v. KPI Healthcare Inc.*, C.A. No. 19-1765 (C.D. Cal.) (Only the relevant portions included.) |
| Exhibit 14 | *Philips N. Am. LLC et al. v. Summit Imaging Inc., et al.*, Case No.: 2:19-cv-01745-JLR (W.D.W.) (Only the relevant portions included.) |
| Exhibit 15 | Declaration of Sterling Peloso |
| Exhibit 16 | Dongle cloning<br>- https://www.donglify.net/<br>- https://www.academia.edu/39403989/<br>How_to_clone_a_USB_key_and_make_a_back_up__of_a_Dongle_Step_by_step_guide<br>- http://dongleduplicate.nsys.by/ |
| Exhibit 17 | Passcode generating |
| Exhibit 18 | Medical Equipment Maintenance Report - Forecast to 2023 (publically available pages only) |
| Exhibit 19 | www.CMS.gov Hospital Outpatient Quality Reporting Program |
| Exhibit 20 | Rona Bahreini, et al., *Influential factors on medical maintenance management in search of the framework*, J. of Quality in Maintenance Engineering, Vol. 25, Issue 1 (June 12, 2018) |
| Exhibit 21 | Lauren Goode, *Right-to-Repair Groups Fire Shots at Medical Device Manufacturers*, Wired, available at https://www.wired.com/story/right-to-repair-medical-equipment-ifixit/ (May 19, 2020) |
| Exhibit 22 | *FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices*, Published May 15, 2018, available at https://www.fda.gov/media/113431/download |

| Exhibit 23 | Tao Ai, et al., *Correlation of Chest CT and RT-PCR Testing for Coronavirus Disease 2019 (COVID-19) in China: A Report of 1014 Cases*, 296 Radiology E32-E40 (Aug 2020) |
| Exhibit 24 | Youxin Wang, et al., *Combination of CT and RT-PCR in screening and diagnosis of COVID-19*, 10 J. Global Health 1-3 (June 2020) |
| Exhibit 25 | U.S. Copyright Office, Software-Enabled Consumer Products (2016) "Software **Study**" |
| Exhibit 26 | Section 1201 of Title 17-A Report of the Registrar of Copyrights (June 2017) "2017 **Report**" |
| Exhibit 27 | Conor Hale, FDA Passes On Setting New Regulations For Medical Device Servicing, Fierce Biotech |
| Exhibit 28 | Guidance Document--Information Disclosure by Manufacturers to Assemblers for Diagnostic X-ray Systems - Guidance for Industry and FDA Staff (September 2003) |
| Exhibit 29 | Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention ("2018 Recommendation") |

LOC_AR_00003453



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

**[  ] Check here if multimedia evidence is being provided in connection with this comment**

## ITEM A.  COMMENTER INFORMATION

The Advanced Medical Technology Association (AdvaMed) is a trade association representing the world's leading innovators and manufacturers of medical devices, diagnostic products, digital health technologies, and health information systems. Together, our members manufacture much of the life-enhancing and life-saving health care technology purchased annually in the United States and globally. AdvaMed members range from the largest to the smallest medical technology producers and include hundreds of small companies with fewer than 20 employees. Our members are committed to developing new technologies and services that allow patients to lead longer, healthier, and more productive lives. The devices made by AdvaMed members help patients stay healthier longer and recover more quickly after treatment and enable clinicians to detect disease earlier and treat patients as effectively and efficiently as possible.  Strong intellectual property protections, including copyright protection for source code and device outputs, are essential to developing and bringing medical technologies to market.

Christopher L. White
Chief Operating Officer and General Counsel
Advanced Medical Technology Association (AdvaMed)
701 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20004
cwhite@advamed.org
202-783-8700

## ITEM B.  PROPOSED CLASS ADDRESSED

Proposed Class 12: Computer Programs—Repair and the proposed expansion to Medical Devices

**Privacy Act Advisory Statement** Required by the Privacy Act of 1974 (PL. 93-579)

The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

LOC_AR_00004010

ITEM C.  OVERVIEW

For the reasons stated below, we respectfully request that the Copyright Office oppose the inclusion of medical devices in Proposed Class 12.

Position Summary

- Allowing unauthorized circumvention of Technological Protection Measures (TPMs) in medical devices can harm patients, compromise patient privacy, and place valuable intellectual property at risk.

- Permitting unauthorized circumvention to maintain, repair, or modify a medical device without FDA oversight and without the manufacturer's consultation will endanger patients.

  - AdvaMed is aware of at least 281 adverse events (also referred to as Medical Device Reports or MDRs) from 2012 to 2017 associated with third party servicing. For some devices (e.g., imaging devices), up to 38,500 patients and/or operators were exposed to the potential for harm.

- No exemption should be granted to permit modification of a medical device

  - Under FDA regulations, modifications to a medical device, including changes to service parts and servicing instructions, must be evaluated to determine if the changes trigger a new FDA review or approval for safety and efficacy.

  - Unauthorized Independent Service Organizations (ISOs), which are commercial organizations in the business of providing maintenance and repair services, are not regulated by the FDA.  As a result, there is no awareness or oversight if an unauthorized ISO intentionally or unintentionally modifies a medical device during servicing.  For example, it was reported that an unauthorized ISO used replacement parts from a hardware store instead of Original Equipment Manufacturer (OEM) verified parts, which are required to be tested for biocompatibility, toxicity, strength, and other specifications essential to the safety and efficacy of the device.

- No exemption should be granted for medical device diagnosis, maintenance, or repair by Unauthorized ISOs.

  - Robust service and repair offerings already exist through OEMs and *authorized* ISOs (third-party service/repair organizations that the OEM authorizes, trains, and ensures has the necessary equipment to perform maintenance and repair services on OEM devices).  These entities can ensure that the necessary protections for patient safety, patient privacy, and intellectual property are in place and maintained.

2

- These protections include obligations to adhere to FDA Quality System Regulation (QSR) requirements, which include the following (among others):

  - the obligation to develop and preserve proper records regarding servicing of each device;

  - training – including documentation of training – and maintenance of certification for service personnel;

  - calibration of equipment used to repair devices;

  - use of appropriately tested and validated replacement parts;

  - reporting of serious adverse events and injuries to FDA regarding devices they have repaired; and

  - registration of facilities to enable FDA inspection of compliance to these FDA QSR regulations.

  o Unauthorized ISOs have no obligation to follow rigorous QSR requirements.

  o 17 USC 117(c) limitations do not apply to the use of some medical device embedded diagnostic software accessed by unauthorized ISOs through TPM circumvention and utilized to diagnose maintenance and repair issues.

    - This diagnostic software embedded in the medical devices is both (1) not necessary for the activation or routine operation of the device and (2) neither sold/leased nor licensed to the owner/lessee of the medical device.

      - Such embedded diagnostic software is specifically excluded from what is sold, leased, or licensed to the device owner/lessee, and only authorized servicers are permitted to access it.

      - The sales/lease agreements for these medical devices also include provisions that control how and who may service the device.

  o An exemption for medical device diagnosis, maintenance, and repair has the potential to embolden piracy of accessory/add-on functionality, subscription-based functionality, and standalone software on medical devices.

- An exemption that includes medical devices may also negatively impact medical technology innovation, health care costs, and supply chain integrity.

3

LOC_AR_00004012

**ITEM D.  TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION**

The following are examples of the Technical Protection Measures (TPMs) used on medical devices and/or how they may be circumvented.  This list is not exhaustive, and not all TPMs may be applicable or required for each device type.

<u>Limit Access to Trusted Users Only</u>

- TPMs that ensure secure communications with the device using strong encryption and authentication.

- Limit access to use or communicate with devices through the authentication of users (e.g., user ID and password, smartcard, biometric, or digital certificates).  If digital certificates used for strong authentication are not stored in a highly secure manner, it may be possible to compromise and use them to gain access to the device improperly.

- Use automatic timed methods to terminate sessions within the system where appropriate for the use environment;

- Controlling and limiting the times that the device is able to communicate to reduce the window for possible attacks. Through observation and monitoring of the device through circumvention activities, an actor could determine when or under what conditions the device is available for communications.

- Encryption data on the device. If the schema for encrypting data on the device is not sufficiently complex, or that schema has been compromised by others before, circumvention activities may be possible to "un-encrypt" and view the data.   Additionally, if the digital key that contains the encryption details is not sufficiently protected or is exposed by circumvention activities, encryption can be bypassed.

- Where appropriate, a layered authorization model is employed by differentiating privileges based on the user role (e.g., caregiver, system administrator) or device role;

- Use appropriate authentication (e.g., multi-factor authentication to permit privileged device access to system administrators, service technicians, maintenance personnel);

- Strengthen password protection by preventing the use of a "hardcoded" password or common words (i.e., passwords which are the same for each device, difficult to change, and vulnerable to public disclosure) and limit public access to passwords used for privileged device access;

- Where appropriate, providing physical locks on devices and their communication ports to minimize tampering; and

LOC_AR_00004013

- Require user authentication or other appropriate controls before permitting software or firmware updates, including those affecting the operating system, applications, and anti-malware.

Limit Access to Purchased or Leased Functionality/Services and Prevent Unauthorized Copies

- TPMs, such as a layered authorization model, are used to limit access to only those functionalities or services that were purchased or leased.

  - Additional functionalities, analytics, and integrations are made available for purchase, lease, or subscription and are often provided for, at least in part, by copyrighted software.

  - In some medical devices, the copyrighted software code can perform certain operations on another independent computer (e.g., personal computer with a Unix operating system) that was not purchased or leased with the medical device.

  - Some copyrighted software in medical devices is owned by an entity that is not the medical device manufacturer and is licensed to certain specified entities that do not include the owner/lessee of the device.  In some of these instances, the medical device manufacturer is contractually obligated to protect the software code from unauthorized access and copying.

  - TPMs are also used to protect some diagnostic software embedded in medical devices that is both (1) _not_ necessary for the activation of the device and (2) neither sold/leased nor licensed to the owner/lessee of the medical device.  Such diagnostic software is only licensed for access and use by specified authorized servicers.

Ensure Trusted Content

- Restrict software or firmware updates to authenticated code. One authentication method manufacturers may utilize is code signature verification;

- Use systematic procedures for authorized users to download version-identifiable software and firmware from the manufacturer; and

- Ensure capability of secure data transfer to and from the device, and when appropriate, use methods for encryption.

Detect, Respond, Recover

- TPMs (security software) on the device to ensure that the security and integrity of the device source code is protected.    If the security software is not configured correctly or a new vulnerability is discovered in that software, it may be possible to compromise the security software and access the device source code.

5

- Technical Protection Measures that protect the device from malicious code via regular software updates and/or malware protection software. If new security vulnerabilities are discovered in a particular type of device, and the device software and/or the malware software on the device has not been updated to eliminate the vulnerability, malicious actors could engage in circumvention activities that exploit the vulnerability to inject malicious code into a device, and take control of it.

- Implement features that allow for security compromises to be detected, recognized, logged, timed, and acted upon during normal use;

- Develop and provide information to the end-user concerning appropriate actions to take upon detection of a cybersecurity event;

- Implement device features that protect critical functionality, even when the device's cybersecurity has been compromised; and

- Provide methods for retention and recovery of device configuration by an authenticated privileged user.

## ITEM E.  ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

*Whether the proposed class includes at least some works protected by copyright.*

### 1.  The Extension of Proposed Class 12 to Cover Computer Programs that are Contained in and Control the Function of Medical Devices Includes At least Some Works Protected by Copyright

While such determinations are fact-specific, copyright protection generally extends to computer programs on medical devices. The source code and object code in a medical device can include protectable original expressions under copyright law.[1] Copyright protection may extend beyond the literal code to the software's structure, sequence, and organization.

Outputs from a medical device can also constitute copyrightable subject matter. While such a determination is also fact-specific, copyright protection in device outputs may extend to, for example, the structure, format, and arrangement of the output data.[2]

---

[1] See *Apple Comput., Inc. v. Franklin Comput. Corp.*, 714 F.2d 1240, 1248-49 (3d Cir. 1983) ("[A] computer program, whether in object code or source code, is a "literary work" and is protected from unauthorized copying, whether from its object or source code version.")

[2] *See Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1345 (5th Cir. 1994) (holding that user input/output formats are protectable); *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 259 F. Supp. 2d 531, 535 (N.D. Tex. 2003) (holding that SQL data structures meet the requisite degree of creative expression).

LOC_AR_00004015

*Whether the uses at issue are noninfringing under title 17.*

## 2. Uses at Issue are Infringing Under Title 17

### (a) Fair Use

In determining whether the use made of a copyrighted work in any particular case is a noninfringing fair use, the following four factors are considered: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.[3]

#### (i) The Purpose and Character of the Use is Commercial in Nature

Repairs conducted by a company or a technician engaged in the business of repairing embedded software or software-enabled devices would likely be considered a commercial use.[4] The primary proponents are for-profit Independent Service Organizations (ISOs) who are in the business of providing maintenance and repair services for medical devices. They seek the inclusion of medical devices in Proposed Class 12 to expand their commercial offerings to also include the diagnosis, maintenance, repair, and modification of medical devices without an OEM's authorization. The commercial nature of this use weighs against considering this use to be fair.

Some unauthorized ISOs have circumvented TPMs on medical devices and accessed copyrighted software to utilize software programs that were not sold/leased/licensed to the device's owner/lessee. This includes embedded software that is not necessary for the activation of the device. Examples of such embedded software are programs that diagnose maintenance and repair issues, collect and transmit certain data, perform analytics that are not essential to the device's operation, aid in planning medical treatments, and enhance or reconstruct images.

Similar unauthorized ISOs have circumvented TPMs and cloned the software on a medical device they serviced for one client and copied that software onto another client's devices. In one case, embedded treatment planning software, which is sold as an entitlement and not enabled unless separately purchased, was purchased by one client for a single device. An unauthorized ISO cloned the software in its enabled form and copied it onto 40 devices owned by

---

[3] 17 U.S.C. §107

[4] U.S. Copyright Office, Software-Enabled Consumer Products 39 (2016), https://www.copyright.gov/policy/software/software-full-report.pdf

LOC_AR_00004016

unrelated entities that did not purchase the treatment planning software.
While this use is outside the scope of Proposed Class 12, there are legitimate
concerns that granting the proposed exemption would embolden such acts of
piracy.

There is also a commercial benefit to offering maintenance and repair services
without authorization. Unauthorized ISOs have fewer costs relative to
authorized ISOs who are contractually obligated to undergo OEM approved
training, adhere to FDA Quality System Regulation (QSR) requirements,
protect patient privacy, and protect intellectual property. Authorized ISOs are
provided with a license and an authorized means to access copyright-protected
software on medical devices that includes software that is involved in the
function of the device (e.g., software to enter settings) and software that is not
necessary for the function of the device (e.g., software that diagnoses
maintenance and repair issues), which is not sold/leased/licensed to the device
owner/lessee.

**(ii) Some Copyright Work on Medical Devices is Unpublished in Nature.**

The use of unpublished work is less likely to be considered fair. Some
copyright protected software on medical devices is not published.

**(iii) Diagnosis, Maintenance, Repair, and Modification of Medical Devices
Often Involve Using All or Substantial Portions of the Copyrighted
Work.**

Using all or substantial portions of a copyrighted work weighs against
considering this use to be fair.

**(iv) Uses at Issue Have the Potential to Harm the Value of the Copyrighted
Work**

Unlike software-enabled consumer products, there is a market for some
medical device software modules as standalone works. Some software on
medical devices is activated and maintained through a subscription model.
Other software in medical devices can also function on independent, unrelated
computers (e.g., a personal computer with a Unix operating system can run
certain analytical and image processing software installed in some diagnostic
imaging workstations).

In some instances, the medical device manufacturer is not the owner of the
copyright of certain software modules integrated into a medical device. For
example, some medical devices are developed through a collaboration
between a medical device manufacturer and a robotics and software company.
In certain instances, some limitations in the software license are due to
constraints imposed by a third-party collaborator (in the above example, the
robotics and software company that owns the copyright to certain software
modules), which are distributed with the device via written licensing

8

LOC_AR_00004017

agreements. In such instances, there are contractually obligated limitations specifying that maintenance and repair of certain aspects of the device may only be performed by the third-party robotics and software developer (i.e., the device manufacturer itself may not perform the maintenance or repair on certain aspects of the device).

The use at issue is the diagnosis, maintenance, repair, or modification of a medical device by an ISO that is not authorized by the OEM. Such uses can result in patient injury, compromise patient privacy, and place valuable intellectual property at risk, all of which can harm the value of the copyrighted work. Unauthorized ISOs have no obligation to follow rigorous FDA Quality System Regulation (QSR) requirements. These patient safety concerns are not hypothetical. Please see the section covering the fifth statutory factor below for a more fulsome discussion with examples.

**(b) Section 117 Limitations of Exclusive Rights**

**(i) The section 117(a)(1) limitation on exclusive rights does not apply to a number of medical devices where the owner of the device is not an owner of a copy of one or more software modules that control certain functions of the device.**

Section 117(a) only applies to the "owner of a copy of a computer program."[5] The software on numerous medical devices is provided through a written license agreement.

Some software program modules and associated functionalities are activated and maintained through a time-based subscription service. Where software is integrated into a device that is sold, the *Vernor* test can be used to determine whether a transaction should be characterized as a sale or a license. Under *Vernor*, "a software user is a licensee rather than an owner of a copy where the copyright owner: (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions."[6] For some software modules, a nontransferable license is provided, or transfer of the license requires the copyright owner's consent. Such licenses generally prohibit modification, translation, and reverse-engineering and may impose use restrictions. For example, the medical device discussed above in 2(a)(iv) above contractually limits maintenance and repair to the third-party robotics and software company that co-developed the medical device with the manufacturer.

---

[5] 17 U.S.C. § 117(a)

[6] *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010)

LOC_AR_00004018

Other software embedded in medical devices is not sold/leased/licensed to the owner/lessee of the medical device. This includes software that is not necessary for the operation or function of the device. Examples of this include software that diagnoses maintenance and repair issues, data collection software, and data analytics software, among others.

**(ii) The section 117(c) limitation on exclusive rights for maintenance and repair does not apply to the proposed use of modifying a medical device.**

One of the uses at issue for Proposed Class 12 is the modification of a medical device. The section 117(c) defense is limited to maintenance and repair as defined in section 117(d). Although the definition includes "any changes to those specifications authorized for that machine," the lessee of a medical device would generally violate a contractual obligation by modifying or authorizing a third party to modify the device without the authorization of the lessor. A similar violation occurs in analogous situations where the software is provided under a written licensing agreement, which generally prohibits modification of the device.

**(iii) The section 117(c) limitation on exclusive rights for maintenance and repair does not apply to embedded diagnostics software that is not necessary for the machine to be activated.**

Some software embedded in medical devices is not sold/leased/licensed to the owner/lessee of the medical device. This includes software that is not necessary for the activation of the medical device, which is excluded from the limitation on rights for maintenance and repair under 17 USC 117(c)(2). Examples include embedded software that diagnoses maintenance and repair issues, collects data, and performs analytics. Unauthorized ISOs circumvent TPMs to utilize embedded software programs during unauthorized servicing.

**3. Users are Not Likely to be Adversely Affected in their Ability to Make Noninfringing Uses.**

In assessing the adverse effect, the following five statutory factors in 17 USC §1201(a)(1)(C) must be balanced: (i) The availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate.

**(i) The availability for use of copyrighted works is not impacted**

Proponents offer that access to copyrighted works is diminished because unauthorized ISOs are deterred due to the prohibition on circumventing TPMs and claim that the situation has worsened because of the pandemic. However, there is no evidence that hospitals are having any difficulty finding properly trained servicers for their devices,

10

either from the original manufacturer or their authorized repair technicians. These authorized servicers are conducting on-site repairs, providing remote technical assistance, and delivering necessary replacement parts without interruption to patient care. Medical technology companies are successfully working hand-in-glove with hospitals, clinics, and other health care institutions to service, repair, and maintain crucial medical devices. Ultimately, to ensure patient safety, unauthorized ISOs need more than just access to a repair manual to fix and maintain these sophisticated, life-saving medical technologies properly. They need the same knowledge, training, and expertise the OEMs and authorized ISOs have. Even one minor miscalculation could lead to catastrophic injury—to the patient or the device user. Until there is evidence of an actual shortage of properly trained service technicians, the movement to lower medical device repair standards remains a solution in search of a problem. Alternatives that do not require circumvention exist to diagnose, maintain, and repair medical devices. Authorized ISOs have OEM-granted access mechanisms to diagnose, maintain, and repair devices and are a preferred alternative for patient safety. Owner or lessee users of medical devices can also have their staff become authorized to diagnose, maintain, and repair devices through training programs and undertaking certain QSR obligations.

**(ii) The availability for use of works for nonprofit archival, preservation, and educational purposes is not especially relevant to the use at issue.**

**(iii) The impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research is also not particularly relevant to the use at issue.**

**(iv) The circumvention of technological measures has the potential to affect the value of copyrighted works negatively.**

The circumvention of access controls on medical devices could result in a diminution in the value of copyrighted works if those medical devices could no longer reliably protect the computer programs, patient data, and analytics operating on and produced by the medical devices. There are also concerns about accessing and activating software modules that are purchased or licensed separately following an additional purchase or subscription model. Activating such software modules without authorization would obviously negatively affect the value of that copyrighted work.

**(v) Such other factors as the Librarian considers appropriate.**

Patient safety should be the highest priority concern and substantially outweigh other factors. Medical device manufacturers are highly regulated to ensure that devices continue to be safe and effective for patients for their intended use. OEMs are required by regulation to qualify or validate service instructions and parts for new medical devices to ensure there is no impact on the safety and effectiveness of their devices during OEM servicing. Additionally, by regulation, design changes to a medical device, including changes to service parts and servicing instructions, must be

LOC_AR_00004020

evaluated to determine if the changes trigger a new FDA review or approval before they can be implemented.

ISOs are not regulated by the FDA. As a result, there is no awareness or oversight if an unauthorized ISO intentionally or unintentionally modifies a device during servicing. For example, in one instance, an unauthorized ISO used replacement parts from a hardware store instead of the OEM verified parts, which are required to be tested for biocompatibility, toxicity, strength, etc. The result is that unauthorized ISO serviced devices may no longer be as safe and effective as the original device, with the potential for serious patient or user injuries.

In contrast, OEMs are required by regulation to qualify or validate service instructions and parts for new medical devices to ensure there is no impact on the safety and effectiveness of their devices during OEM servicing. Additionally, OEMs must follow other regulatory requirements, including those from the FDA Quality System Regulation (QSR), which require the following (among others):

- the development and preservation of proper records regarding servicing of each medical device;

- training – including documentation of training – and maintenance of certification for service personnel;

- calibration of equipment used to repair devices;

- use of appropriately tested and validated replacement parts;

- reporting of serious adverse events and injuries to FDA regarding devices they have repaired; and

- registration of facilities to enable FDA inspection of compliance to FDA regulations.

Under the QSR, OEMs are required to update and maintain strict revision control on servicing documentation and device software, and to ensure that their trained and authorized service representatives are utilizing the most up-to-date information. OEMs are also required to audit their service representatives to ensure they are using appropriate servicing documentation for the model of the device they are servicing. Failure to do so could have serious implications for patient safety.

ISOs authorized by OEM are contractually obligated to implement these requirements.

These patient safety concerns are not hypothetical. AdvaMed is aware of at least 281 adverse events (also referred to as Medical Device Reports or MDRs) from 2012 to 2017 associated with third party servicing. For some devices (e.g., imaging devices), up to 38,500 patients and/or operators were exposed to the potential for harm.

12

***Actual or potential patient and/or operator impacts from these reports include:***

- Screwdriver tip lodged in a patient;

- Operator injury, counterpoise support system arm (80-93 pounds) struck operator;

- Potential for repeat CT scans and contrast administration with the concomitant risk of additional radiation exposure;

- Potential for burns including internal or oral 3rd-degree burns, which may not be apparent until burning tissue is sensed;

- Delayed surgery (potential for worsening patient condition);

- Prolonged surgery (may result in longer exposure to anesthesia, a greater potential for infection, and more blood loss);

- Potential for concussions and/or fractures;

- Infusion therapy - Air in System – potential harms include death, neurological changes, stroke, seizures, cardiac and/or respiratory arrest, pain, decreased oxygenation, arrhythmia, pulmonary hypertension;

- Delays in infusion therapy with the delay of pharmacological effects and/or worsening of condition including death;

- Insufficient or excessive infusion therapy or interruption of therapy and/or worsening of condition including death; and

- Temporary hearing loss; ringing in ears.

- Below are examples of unauthorized ISO "servicing" (which should actually be deemed remanufacturing under FDA regulations).



*Figure 1. The angle cover on an endoscope was replaced with a material resembling plastic wrap.*

13



*Figure 2. The shaft adapter on an endoscope was repaired using a putty-like material of questionable provenance.*

In these examples, unauthorized ISOs clearly used components that are not likely biocompatible and likely would not withstand the reprocessing and sterilization process. It is also likely that these repairs, particularly Figure 1, compromised the device's ability to perform its key function of accessing a patient's anatomy.



*Figure 3. An Olympus component was inserted into a KARL STORZ endoscope shaft.*



*Figure 4. Broken image fibers in an endoscope.*

Examples in Figure 3 and Figure 4 are equally if not more concerning than the previous examples because they show that a device can be modified such that the physician or patient cannot see the change.

14

LOC_AR_00004023

Granting an exemption to allow circumventing TPMs to diagnose, maintain, or repair medical devices also raises concerns about whether the TPMs will be safely restored. Critical design details and software code could be accessed more easily by entities with malicious intent who could use the information to develop counterfeit devices, counterfeit software (for the software modules that stand alone), or who could intentionally modify devices in order to harm patients. Lastly, if an exception is granted for medical devices, there may be a negative impact on medical technology innovation, health care costs, and supply chain integrity.

15



UNITED STATES COPYRIGHT OFFICE
## Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

### ITEM A. COMMENTER INFORMATION

As the leading trade association representing the manufacturers of medical imaging equipment, contrast agents, radiopharmaceuticals, and focused ultrasound devices, the Medical Imaging & Technology Alliance (MITA) is writing in response to the eighth triennial rulemaking proceeding under the Digital Millennium Copyright Act. Commenter may be reached through the following individuals:

Holly Grosholz
Senior Manager, Government Relations, MITA
Office Phone: 703.841.3228
Email: hgrosholz@medicalimaging.org

Peter Weems
Senior Director, Policy & Strategic Operations, MITA
Office Phone: 703.841.3283
Email: pweems@medicalimaging.org

Peter Tolsdorf
General Counsel and Secretary
National Electrical Manufacturers Association (NEMA)
Office Phone: 703.841.3204
Email: peter.tolsdorf@nema.org

### ITEM B. PROPOSED CLASS ADDRESSED

Proposed Class 12: Computer Programs—Repair.

### ITEM C. OVERVIEW

Petitioners Transtate Equipment Company and Summit Imaging, Inc., seek an exemption under 17 U.S.C. § 1201 to allow the circumvention of technological protective measures (TPMs) for purposes of diagnosis, modification, and repair of medical imaging devices. These petitions come within Proposed Class 12: Computer Programs—Repair. The below comments submitted by MITA address the proposed exemption regarding medical imaging devices, including magnetic resonance imaging (MRI) scanners, computed tomography (CT) scanners, and X-Ray machines.

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)

The authority for requesting this information is 17 U.S.C. §§ 120(1)(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 120(1)(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission

LOC_AR_00004095

**ITEM D. TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION**

Medical imaging device manufacturers (OEMs) use a range of TPMs to protect copyrighted material from being accessed and copied without authorization from the copyright holder. These TPMs include passwords, encryption, access codes, physical access keys with embedded authorization codes, and digital signatures. The methods currently used to circumvent TPMs include copying or cloning physical access keys, "brute force" password cracking, improperly accessing passwords or access keys from authorized users, and the use of passcode-generating algorithms.

**ITEM E. ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES**

**I.    The users of the copyrighted works are not adversely affected by the prohibition in their ability to make noninfringing uses of the copyrighted works**

Under 17 U.S.C. § 1201(a)(1)(C), the Librarian of Congress and Register of Copyrights shall consider whether "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition under subparagraph (A) in their ability to make noninfringing uses under this title of a particular class of copyrighted works." In conducting such rulemaking, the Librarian shall examine—

(i)    the availability for use of copyrighted works;

(ii)    the availability for use of works for nonprofit archival, preservation, and educational purposes;

(iii)    the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;

(iv)    the effect of circumvention of technological measures on the market for or value of copyrighted works; and

(v)    such other factors as the Librarian considers appropriate.

These criteria apply only with respect to "noninfringing uses." For the reasons discussed below, the intended uses are broadly infringing. Even assuming such uses were non-infringing, the petitioners fail to establish any of these elements, and several of these elements weigh strongly against the petitioners.

In applying these factors, the Register "balances '[t]he harm identified by a proponent of an exemption . . . with the harm that would result from an exemption.'" Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights, October 2018, at 15. The rulemaking should consider the positive as well as the adverse effects of TPMs on the availability of copyrighted materials. *Id.*

As a threshold matter, MITA encourages the Register to construe the phrase "users of a copyrighted work" in its appropriate breadth. Medical service providers operate medical imaging equipment, but the ultimate "users" are the patients themselves undergoing the medical imaging

LOC_AR_00004096

procedures. This consideration is appropriate because considering "adverse effects" solely with regard to the operator of a medical imaging device but without regard to the actual user of that device—the patient—would fail to take full and appropriate account of the adverse effects of granting the petition.

The petitioners fail to establish the first factor of adverse harm because the availability for use of the copyrighted works is not impacted by the TPMs. The medical imaging device software is broadly licensed and available to medical service providers. A TPM does not restrict medical service providers from using the medical imaging device software, it simply limits what aspects of the device software may be viewed and copied. If a hardware component needs maintenance or repair, an unregulated independent service operator (unregulated ISO) may have an interest in accessing that software to more readily determine how to repair the device hardware, but that interest extends beyond "the availability for use" of the copyrighted work. The copyrighted work itself remains usable even though a physical component of the medical imaging device needs maintenance or repair.

The petitioners cannot establish the second factor of adverse harm because the copyrighted works do not implicate nonprofit archival, preservation, and educational purposes. Similarly, with respect to the third factor, the proposed exemption would not impact criticism, comment, news reporting, teaching, scholarship or research. These factors highlight the degree of incompatibility between the statutory factors and the commercial nature of the interest of the petitioners in seeking this exemption.

Regarding the fourth statutory factor of adverse harm, an exemption would damage the market for or value of medical imaging device software and materials. Disabling of TPMs would expose intellectual property, including valuable know-how in addition to the copyrighted information, to competitors and the general public. That itself would severely harm OEMs by allowing competitors to view and replicate valuable innovations. Although patented innovations could be defended, replication of uncovered intellectual property protected by copyright would be extremely difficult to detect in copycat products. Such exposure would also chill future innovation because the innovations themselves would be unprotected. There is a massive cost to develop and secure premarket clearance from the U.S. Food and Drug Administration (FDA) for medical imaging devices. If innovators are not able to recoup those costs by protecting their valuable intellectual property embodied in software and related materials, the incentives for future innovations will be weakened.

The value of medical imaging device software and materials would also be harmed because the disabling of TPMs would lead to an increase in medical imaging device repairs by unregulated ISOs, thereby increasing patient risk and contributing to a loss of public confidence in the safety and reliability of medical imaging devices and the constituent software. As discussed in more depth below, unregulated ISOs are not subject to the FDA regulations that apply to OEMs, and they are not subject to the same training and quality control measures. Together, this disparate level of FDA regulation, training, and quality control will risk patient safety and public confidence in medical imaging procedures. A representative sample of faulty repairs appears in

LOC_AR_00004097

Appendix 1. These negative impacts will extend to medical imaging devices and the market for the embedded device software and related materials that allow those devices to function.

The fact that there is no independent market for the medical imaging device software beyond the devices themselves undermines the basis for the requested exemption. In considering whether to grant a Section 1201 exemption for motor vehicles in 2015, the Register concluded that the lack of an independent market for the vehicle's software weighed in favor of granting the exemption. Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation to the Register of Copyrights, October 2015 (2015 Register Report) at 236. That reasoning does not extend to medical imaging devices because harm to patients and loss of public confidence in the safety and efficacy of medical imaging harms the market for the integrated software to the same extent as the market for the device itself.

The fifth statutory factor provides for consideration of "such other factors as the Librarian considers appropriate." MITA asks the Register to consider the patient safety aspects of unregulated ISO repair that this exemption would implicate. MITA also asks the Register to consider the regulatory implications to this proposed exemption. MITA recommends that the Register communicate with the FDA Center for Devices and Radiological Health on the relevant regulatory and policy issues governing medical devices, particularly medical imaging device software.

Improper repair or servicing of a medical imaging device presents a wide range of risks for patients and medical service providers. These risks would be exacerbated by granting the petitions and allowing unregulated ISOs and the general public to access medical device software and related materials protected by TPMs. There are numerous risks associated with improper servicing of medical imaging devices, depending on the imaging modality in question.

- **Electrical shock.** All medical imaging devices require electricity to function. If, after servicing, the device has not been properly rewired or has unvalidated parts installed, there is an increased risk of shock to patients and those operating the device.

- **Overexposure to ionizing radiation.** Some imaging devices, including X-Ray and CT scanners, emit ionizing radiation, resulting in potential over-exposure if not properly calibrated or maintained. Improper servicing can inadvertently bypass internal safeguards and severely harm or kill patients.

- **Mechanical failure.** If a medical imaging device suffers a mechanical failure due to improper servicing, significant and irreversible harm to the patient or user can occur, including pinching or crushing.

- **Air embolism.** In the case of injection devices (such as imaging contrast agent power injectors), if the device has undergone improper servicing, the patient could experience a potentially fatal air embolism.

LOC_AR_00004098

- **Improper dosing.** For injection devices, if the device has undergone improper servicing, a patient could experience a potentially fatal underdose or overdose of medication.

- **Infection.** For ultrasound probes and other patient contact devices, if the device has not been properly sterilized or disinfected as specified by the OEM requirements and instructions, transfer of infection or disease between patients could result.

- **Burns.** Incorrect replacement materials or parts in an MRI system may disrupt the path of radiofrequency energy, causing excessive heating and potentially resulting in significant and irreversible patient burns.

- **Interference with other equipment.** If a device's electromagnetic interference shielding has undergone improper servicing, operation of the device could potentially interfere or degrade the proper operation of other equipment in the surrounding area.

- **Cybersecurity.** Whenever software is installed or adjusted for a medical imaging device, or if software tools are used to access a device for diagnostic and maintenance purposes, the integrity of the software may be compromised. Unvalidated software without confirmed authenticity or system integration may present significant potential security vulnerabilities and operational issues. Expanded and uncontrolled access to medical imaging device operating systems and software applications creates the potential for increased cybersecurity risks, as the opportunity to intentionally or unintentionally introduce security vulnerabilities to the device and to any networks to which the device is connected (e.g. hospital) also expands.

- **Delay in patient care.** Any failure in a device to perform when needed as a result of improper servicing, or to provide accurate results, may result in a delay of care, including incorrect diagnosis, resulting in delayed or incorrect treatment of a patient's condition.

- **Misdiagnosis.** Improper servicing could cause a medical imaging device to perform in a manner that does not produce diagnostic-quality images. This could lead to a missed diagnosis or a misdiagnosis.

OEMs have difficulty upgrading medical imaging devices if the service history is unknown, improper parts have been used, or if the device has otherwise been altered. The lack of required regulatory reporting by unregulated ISOs can impair the tracking of significant events for the device and can complicate root cause investigations of device malfunctions. Unauthorized repair can also void electrical safety certifications.

Because of these patient risks, the FDA requires OEMs to comply with a range of regulatory requirements. ***These requirements do not, however, extend to unregulated ISOs***. The regulatory requirements that apply to OEMs include the following.

- Establishment Registration (21 CFR Part 807)

LOC_AR_00004099

- o Manufacturers (both domestic and foreign), remanufacturers, and initial distributors (importers) of medical imaging devices must register their establishments with the FDA.

- Medical Device Listing (21 CFR Part 807)

  - o Manufacturers must list their devices with the FDA. Establishments required to list their devices include: manufacturers; contract manufacturers that commercially distribute the device; contract sterilizers that commercially distribute the device; repackagers and relabelers; specification developers; reprocessors of single-use devices; remanufacturers; manufacturers of accessories and components sold directly to the end user; and U.S. manufacturers of "export only" devices.

- Premarket Notification (21 CFR Part 807 Subpart E) or Premarket Approval (21 CFR Part 814)

  - o Devices requiring the submission of a Premarket Notification 510(k) cannot be commercially distributed until the manufacturer receives a letter of substantial equivalence from FDA authorizing it to do so. A 510(k) must demonstrate that the device is substantially equivalent to one legally in commercial distribution in the United States: (1) before May 28, 1976; or (2) to a device that has been determined by FDA to be substantially equivalent.

  - o Devices requiring Premarket Approval (PMA) are high risk devices that pose a significant risk of illness or injury, or devices found not substantially equivalent to Class I and II predicate through the 510(k) process.

  - o Modifications to devices that impact the safety or performance specifications of the device require the manufacturer to file a 510(k) or PMA.

  - o Servicing activities that significantly change the safety or performance of the device cross over into remanufacturing require submission of a 510(k) or PMA. As noted in the FDA May 2018 report (https://www.fda.gov/media/113431/download) on device servicing, many instances of improper servicing appear to cross the line into remanufacturing.

- Quality System Regulation (21 CFR Part 820)

  - o Includes requirements related to designing, purchasing, manufacturing, packaging, labeling, storing, installing and servicing of medical imaging devices.

  - o Manufacturing facilities undergo periodic FDA inspections to assure compliance with the quality system requirements.

  - o Manufacturers develop training curricula for employees to then implement and maintain training records subject to internal audits by qualified auditors.

6

- o The entire quality system is audited periodically, and the results are reviewed by the Management Review process in a predetermined interval.

- Labeling (21 CFR Part 801)

  - o Labeling includes labels on the device as well as descriptive and informational literature that accompanies the device.

- Medical Device Reporting (21 CFR Part 803)

  - o Incidents in which a device malfunction has caused or may have caused or contributed to a death or serious injury must to be reported to FDA under the Medical Device Reporting program. The MDR regulation is a mechanism for FDA and manufacturers to identify and monitor significant adverse events involving medical imaging devices. The goals of the regulation are to detect and correct problems in a timely manner.

The application of these requirements to OEMs but not to unregulated ISOs leads to greater regulatory control, oversight, and accountability for OEMs as compared to unregulated ISOs. This in turn leads to a higher degree of quality in the repair and maintenance activity and a corresponding risk to patients and the public in the use of unregulated ISOs.

## II.    The intended uses broadly infringe the copyrights of OEMs

To obtain the requested exemption, the petitioners must demonstrate that users of a copyrighted work are adversely affected by the prohibition on circumvention in their ability to make *noninfringing* uses of a class of copyrighted works or are likely to be so adversely affected in the next three years. The intended uses that the granting of this petition would allow would nearly uniformly infringe. The petitioners have a high burden of proof to establish noninfringing uses:

> The Register will look to the Copyright Act and relevant judicial precedents when analyzing whether a proposed use is likely to be noninfringing. The statutory language requires that the use is or is likely to be noninfringing, not merely that the use might plausibly be considered noninfringing. As the Register has indicated previously, there is no "rule of doubt" favoring an exemption when it is unclear that a particular use is a fair or otherwise noninfringing use. Thus, [the record] must show more than that a particular use could be noninfringing. Rather, the [record] must establish that the proposed use is *likely to qualify* as noninfringing under relevant law.

Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights, October 2018 (2018 Register Report), at 15 (emphasis added).

7

LOC_AR_00004101

The petitioners argue that the fair use doctrine, codified at 17 U.S.C. § 107, would allow unauthorized ISOs to access and copy the full range of medical imaging device software and materials currently protected by TPMs. For the reasons described below, fair use will almost never permit such copying and use.

As a threshold matter, however, a fair use determination is a richly fact-specific inquiry and is therefore fundamentally incompatible with a categorical application. The plain text of the statute requires its application in a "particular case." 17 U.S.C. § 107. In litigation, fair use claims can prevail or fall based on slender contextual nuances. The factors that courts apply in individual cases before them do not lend themselves to categorical application, especially considering the complexity and varied applications of medical imaging devices. "[F]air use analysis must always be tailored to the individual case. The nature of the interest at stake is highly relevant to whether a given use is fair." *Harper & Row v. Nation Enterprises, Inc.*, 471 U.S. 539, 553 (1985) (internal citations omitted). The U.S. Copyright Office itself has recognized that "fair use is a fact-intensive inquiry, and [] the outcome of a particular lawsuit does not guarantee a similar outcome in cases involving other types of products." United States Copyright Office, Software-Enabled Consumer Products, A Report of the Register of Copyrights (December 2016) (2016 Software Report) at 39 (available at https://www.copyright.gov/policy/software/software-full-report.pdf).

It would therefore not be appropriate to base the requested exemption on fair use grounds in these circumstances. Even if, however, it were appropriate to apply a fair use analysis to the access and copying of medical imaging device software and materials, nearly all cases would fail the test. The statute provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107. Critically, the fair use must be "for purposes such as criticism, comment, news reporting, teaching … scholarship, or research." That provision, standing alone, is fatal to the fair

8

LOC_AR_00004102

use argument for these petitions. The petitioners are not political or social critics, news reporters, teachers, scholars, or researchers. They are for-profit companies seeking to use the copyright laws to promote their commercial interests.

Because the petitioners do not satisfy the purposes of the fair use exception, the remaining four statutory factors are inapposite. Nonetheless, even if those factors were to apply, they do not support a fair use determination. First, the "purpose and character of the use" is clearly of a commercial nature rather than for a nonprofit educational purpose. The purpose of disabling the TPMs and copying the information protected by the TPMs is to further the business interests of unregulated ISOs. The "character of the use" is inherently commercial. Petitioner Summit Imaging, for example, advertises on its website homepage: "Lowering healthcare facilities' total cost of ownership." https://www.mysummitimaging.com/. Transtate asserts that it is making it "more affordable for every hospital, clinic and medical practice to have the very best equipment, supplies and service." https://avantehs.com/.

In examining fair use arguments in this very context, the U.S. Copyright Office itself has recognized that "[r]epairs conducted by a company or a technician engaged in the business of repairing embedded software or software-enabled devices would likely be considered a commercial use." 2016 Software Report at 40.

In considering the "purpose and character of the use," courts in individual cases consider whether the use of the copyrighted work is transformative in some manner. There is nothing transformative about an unregulated ISO accessing and copying medical imaging device software and materials for a commercial purpose. No new intellectual property is created. For this reason, the Register's prior finding of fair use for "transformative" changes to motor vehicle computer programs does not extend to medical imaging devices. The 2015 recommendations for motor vehicle computer programs noted: "These uses include copying the work to create new applications and/or tools that can interoperate with ECU software and facilitate functionalities such as diagnosis, modification and repair. Such uses may also extend to modification of ECU computer programs to "interoperate" with different auto parts." 2015 Register Report at 234. Such tinkering would be dangerous with respect to medical imaging devices. Given the nature of medical imaging devices, the repair must *not* be transformative because it would remove the device from its FDA-approved function and performance and would risk patient safety. Crowd-sourced coding, while innovative and useful in some contexts, has no place in medical imaging device repair and maintenance.

The nature of the copyrighted work as a whole is also protected as a creative expression. Courts consider "whether the work is imaginative and original, or whether it represented a substantial investment of time and labor made in anticipation of a financial return." *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1154 (9th Cir. 1986). The petitioners take an unreasonably narrow view of "creative expression." Such a concept is not limited to musical or artistic works. It extends to the creativity inherent in animating and controlling devices that create medical images and other diagnostic information to support human life and health. Each developer of medical imaging device software approaches the challenges of aiding the diagnoses of patients in its own way, based on its unique set of institutional learnings, preferences,

9

inventiveness, and look-and-feel elements. Even if, for the sake of argument, the medical imaging device software and related materials fall closer to the informational-side of the spectrum rather than the expressive side, such software and materials reflect a substantial investment of time and labor in anticipation of a final return. *See Allen-Myland, Inc. v. IBM*, 746 F. Supp. 520, 534 (E.D. Pa. 1990) (reversed on other grounds) (finding that copying of computer code, including portions that were purely informational in nature, was not fair use because the code overall was the product of the substantial creative effort of the copyright holder in anticipation of financial returns).

The third factor—the amount and substantiality of the portion used in relation to the copyrighted work—also weighs against the petition because granting a TPM exemption would expose the full range of programs, manuals, computer code, logs, and other intellectual property to public view. Under this third factor, courts in individual cases consider both the quantity and quality of the copyrighted material used. If the use includes a large portion of the copyrighted work, fair use is less likely to be found; if the use employs only a small amount of copyrighted material, fair use is more likely when the other factors also support fair use. Here, allowing unauthorized third parties to bypass TPMs would expose medical imaging device software and the related materials to public view.

The fourth fair use factor considers the impact of the use upon the potential market for or value of the copyrighted work. This captures "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the [user] . . . would result in a substantially adverse impact on the potential market.'" 2018 Register Report at 198 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994)). By disabling TPMs on medical imaging devices, the valuable intellectual property of medical imaging device innovators will be exposed to the general public and to competitors. Once certain intellectual property is exposed to the market and to competitors, the value that intellectual property will be compromised.

Moreover, given the breadth of the requested exemption, there could also be confidential patient information within the materials accessed by the unregulated ISO. The legal and reputational risk that the disclosure of such information could produce would harm the market for medical imaging devices and erode public trust and confidence in medical imaging procedures.

Although there is no separate market for the medical imaging device software beyond the medical imaging devices containing that software, disabling of TPMs would damage the market for the medical imaging devices *and* the software contained therein. That is because, as the petitioners themselves recognize, the hardware and software are an integrated whole. One cannot function without the other. If the petition is granted, repair and maintenance by regulated ISOs would likely increase. That would risk patient safety and undermine public confidence in the safety and efficacy of medical imaging procedures. The resulting harm to the medical imaging device market would impact the embedded software in equal measure.

In manner and degree, this risk differs from the disabling of TPMs for motor vehicle operating software. The 2015 Register Report noted: "Vehicle owners have long repaired and modified

10

their automobiles and farm equipment— adjusting brakes and enhancing suspensions, for example—including before the advent of computerized vehicle systems. It is thus not readily apparent these activities would cause unusual or undue harm." 2015 Register Report at 236. The long history of vehicular self-repair does not translate to medical imaging device self-repair, and the risks of faulty repair are far graver in the medical imaging device context. A faulty vehicle repair usually only risks the safety of the vehicle owner and any passengers (and, to a lesser degree, other motorists and pedestrians). By contrast, a faulty repair of an CT scanner or X-ray machine by an unregulated ISO poses far greater risk to the general public. A botched repair may expose hundreds or even thousands of patients to excessive levels of radiation. Other faulty repairs may instead compromise the visual or other informational outputs from the scan. That misinformation could contribute to missed diagnoses or incorrect diagnoses, leading to unnecessary medical procedures and even death.

## III.    An exemption is not warranted under 17 U.S.C. § 117(a)(1)

Section 117(a)(1) does not support an exemption allowing the circumvention of TPMs for medical imaging devices. Under 17 U.SC. § 117(a)(1), "it is not an infringement for the owner of a copy of a computer program to make or authorize the making of any other copy or adaptation that computer program provided: (1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." A categorical exemption under this provision is not available because OEMs generally license the operating software and related materials to medical service providers rather than convey ownership of the software and materials. The licensing agreements also generally impose substantial restrictions on the allowed uses for such programs and materials.

The legislative history makes clear that Section 117(a)(1) is intended simply to allow the owner of a computer program to activate the computer program on a computer—and thereby cause a copy of the program to be made between the computer's hard drive and the computer's RAM—without triggering a copyright infringement. See Final Report on the National Commission on New Technological Uses of Copyrighted Works, National Commission on New Technological Uses of Copyrighted Works (1981) at 13 (available at https://repository.law.uic.edu/cgi/viewcontent.cgi?article=1573&context=jitpl).[1] Under this provision, it would not be an act of copyright infringement for the owner of a computer program contained within a medical imaging device to simply activate the medical imaging device, whereby the activation of the device causes copyrighted software to be copied within the device itself from the hard drive to the RAM.

---

[1] Congress established the National Commission on New Technological Uses of Copyright Works (CONTU) in 1974 to consider and make recommendations concerning, among other matters, the extent to which computer programs should be protected by copyright law. Because Congress adopted the recommendations of the majority of CONTU virtually unchanged, courts look to the CONTU final report as the legislative history of provisions recommended by CONTU. *Allen-Myland, Inc. v. IBM*, 746 F. Supp. 520, 532 n.8 (E.D. Pa. 1990).

LOC_AR_00004105

Critically, this exemption extends only to owners of copies of the copyrighted material. In considering the application of Section 117(a)(1), courts scrutinize whether the entity copying the computer program is in fact the "owner" of the copyright program. In the Ninth Circuit, "a software user is a licensee rather than an owner of a copy [under Section 117(a)(1)] where the copyright owner (1) specified that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions." *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010); *see also MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 938 (9th Cir., 2010) (applying the *Vernor* factors to conclude that software users were licensees rather than owners because the copyright owner held title, provided a non-exclusive and limited license to the licensee, imposed transfer restrictions, and imposed a variety of use restrictions).

In *Krause v. Titleserv, Inc.*, 402 F.3d 119 (2d Cir. 2005), the Second Circuit, in determining whether a software user was a licensee or owner under Section 117(a)(1), considered: (1) whether substantial consideration was paid for the copy; (2) whether the copy was created for the sole benefit of the purchaser; (3) whether the copy was customized to serve the purchaser's use; (4) whether the copy was stored on property owned by the purchaser; (5) whether the creator reserved the right to repossess the copy; (6) whether the creator agreed that the purchaser had the right to possess and use the programs forever regardless of whether the relationship between the parties terminated; and (7) whether the purchaser was free to discard or destroy the copy anytime it wished. *Id.* at 124.

In *DSC Communications Corporation v. Pulse Communications*, 170 F.3d 1354 (Fed. Cir., 1999), the Federal Circuit scrutinized the legal relationship between a copyright holder and a licensee under Section 117(a)(1). The court concluded that ownership was not established—and therefore the defense to infringement under Section 117(a)(1) was unavailable—because of the restrictions on the software user's rights in the program, which included restrictions on disclosing or making the software available to any third parties and using the software on hardware other than that provided by the copyright holder. *Id.* at 1362. Because the license "substantially limit[ed] the rights" of the licensee, the court did not consider the licensee an "owner" for purposes of Section 117(a)(1). *Id.*

The U.S. Copyright Office itself has recognized the "ownership" requirement under Section 117(a):

> In section 117, the Copyright Act provides a number of limitations on exclusive rights for computer programs. Section 117(a) allows copies or adaptations of computer programs to be made either "as an essential step in the utilization of the computer program in conjunction with a machine" or for archival purposes. It also allows for the transfer of any copies prepared in accordance with the exceptions, though adaptations may only be transferred with the authorization of the copyright owner. Section 117(a), like the provision regarding first sale, may only be invoked by "the owner of a copy of a computer program." This raises complex questions

12

> regarding whether a consumer owns a copy of software installed
> on a device or machine for purposes of section 117(a) when formal
> title is lacking or a license purports to impose restrictions on the
> use of the computer program.

2016 Software Report at 19. The variability and fact-specific nature of this inquiry makes a general exemption to TPMs inappropriate. Although in some cases a court might find that the relevant factors support ownership under the copyright laws, in many other cases a court may find that the license is simply a license and therefore Section 117(a)(1) is unavailable.

Medical imaging device manufacturers generally license the operating software and other materials to medical providers rather than sell copies of the software and convey ownership of the copy. Certain diagnostic tools may be licensed together with or separately from the operating software, or not licensed at all. Medical imaging device manufacturers impose a range of significant use restrictions on that software and other materials. A blanket exemption pursuant to Section 117(a)(1) would therefore not be supported because the ownership requirement is generally not satisfied.

## IV.    An exemption is not warranted under 17 U.S.C. § 117(c)

The statutory defense to copyright infringement under Section 117(c) for "machine maintenance and repair" provides that it is not a copyright violation for the owner of a machine to make or authorize the making of a copy of a computer program: (1) if the copy is made "solely by virtue of the activation of a machine" that contains an authorized copy of the program; (2) if the copy is made "for purposes only of maintenance or repair of the machine;" (3) if the new copy is not used in any other manner and is destroyed immediately after the maintenance or repair is completed; and (4) with respect to any computer program or part of the program that is not "necessary for [the] machine to be activated," the program "is not accessed or used other than to make a new copy by virtue of the activation of the machine." 17 U.S.C. § 117(c).

This provision is principally aimed at protecting independent repair technicians from copyright liability when they turn on a machine that results in the automatic copying of software from the machine's hard drive onto the machine's RAM. 2016 Software Report at 37. By its plain terms, the statute authorizes making copies only upon "activation" of a machine, and therefore would not extend to any copying after initially turning on a machine.

The legislative history of this provision makes clear that the scope of protection is far narrower than the petitioners argue. The full relevant provisions of the Senate report are reproduced below, with key language emphasized.

> Title III of the bill amends section 117 of the Copyright Act (17 U.S.C. 117) to ensure
> that independent service organizations do not inadvertently become liable for copyright
> infringement *merely because they have turned on a machine in order to service its
> hardware components*. When a computer is activated, that is when it is turned on, certain
> software or parts thereof (generally the machine's operating system software) is
> automatically copied into the machine's random access memory, or ''RAM.' During the

13

LOC_AR_00004107

course of activating the computer, different parts of the operating system may reside in the RAM at different times because the operating system is sometimes larger than the capacity of the RAM. Because such copying has been held to constitute a ''reproduction'' under section 106 of the Copyright Act (17 U.S.C. 106), a person who activated the machine without the authorization of the copyright owner of that software could be liable for copyright infringement. ***This legislation has the narrow and specific intent of relieving independent service providers, persons unaffiliated with either the owner or lessee of the machine, from liability under the Copyright Act when, solely by virtue of activating the machine in which a computer program resides, they inadvertently cause an unauthorized copy of that program to be made. This title is narrowly crafted to achieve the foregoing objective without prejudicing the rights of copyright owners of computer software***. Thus, for example, 1201(k) does not relieve from liability persons who make unauthorized adaptations, modifications, or other changes to the software. ***This title also does not relieve from liability persons who make any unauthorized copies of software other than those caused solely by activation of the machine***.

S. Rep. No. 105-190, at 21-22 (1998) (emphasis added).

This section effects a minor, yet important clarification in section 117 of the Copyright Act (17 U.S.C. 117) to ensure that the lawful owner or lessee of a computer machine may authorize an independent service provider—a person unaffiliated with either the owner or lessee of the machine—to activate the machine for the sole purpose of servicing its hardware components. When a computer is activated, certain software or parts thereof is automatically copied into the machine's random access memory, or ''RAM.''A clarification in the Copyright Act is necessary in light of judicial decisions holding that such copying is a ''reproduction'' under section 106 of the Copyright Act (17 U.S.C. 106), thereby calling into question the right of an independent service provider who is not the licensee of the computer program resident on the client's machine to even activate that machine for the purpose of servicing the hardware components. This section does not in any way alter the law with respect to the scope of the term ''reproduction'' as it is used in the Copyright Act. ***Rather, this section it is narrowly crafted to achieve the objectives just described—namely, ensuring that an independent service provider may turn on a client's computer machine in order to service its hardware components, provided that such service provider complies with the provisions of this section designed to protect the rights of copyright owners of computer software***.

S. Rep. No. 105-190, at 56-57 (1998) (emphasis added).

Subsection (c)—Machine maintenance or repair.—The bill creates a new subsection (c) in section 117 of the Copyright Act (17 U.S.C. 117), which delineates the specific circumstances under which a reproduction of a computer program would not constitute infringement of copyright. The goal is to maintain undiminished copyright protection afforded under the Copyright Act to authors of computer programs, while making it possible for third parties to perform servicing of the hardware. This new subsection states

14

LOC_AR_00004108

that it is not an infringement of copyright for the owner or lessee of a machine to make or authorize the making of a copy of a computer program provided that the following conditions are met:

> First, subsection (c) itself makes clear that the copy of the computer program must have been made *solely and automatically by virtue of turning on the machine* in order to perform repairs or maintenance on the hardware components of the machine. Moreover, the copy of the computer program which is reproduced as a direct and sole consequence of activation must be an authorized copy that has lawfully been installed in the machine. Authorized copies of computer programs are only those copies that have been made available with the consent of the copyright owner. Also, the acts performed by the service provider must be authorized by the owner or lessee of the machine.

> Second, in accordance with paragraph (c)(1), the resulting copy may not be used by the person performing repairs or maintenance of the hardware components of the machine in any manner other than to effectuate the repair or maintenance of the machine. Once these tasks are completed, the copy of the program must be destroyed, which generally will happen automatically once the machine is turned off.

> Third, as is made clear in paragraph (c)(2), *the amendment is not intended to diminish the rights of copyright owners of those computer programs, or parts thereof, that also may be loaded into RAM when the computer is turned on, but which did not need to be so loaded in order for the machine to be turned on*. A hardware manufacturer or software developer might, for example, provide diagnostic and utility programs that load into RAM along with or as part of the operating system, even though they market those programs as separate products—either as freestanding programs, or pursuant to separate licensing agreements. Indeed, *<u>a password or other technical access device is sometimes required for the owner of the machine to be able to gain access to such programs</u>*. In other cases, it is not the hardware or software developer that has arranged for certain programs automatically to be reproduced when the machine is turned on; rather, the owner of the machine may have configured its computer to load certain applications programs into RAM as part of the boot-up process (such as a word processing program on a personal computer). *<u>This subsection is not intended to derogate from the rights of the copyright owners of such programs. In order to avoid inadvertent copyright infringement, these programs need to be covered by subsection (c), <u>but only to the extent that they are automatically reproduced when the machine is turned on</u>. This subsection is not intended to legitimize unauthorized access to and use of such programs just because they happen to be resident in the machine itself and are reproduced with or as a part of the operating system when the machine is turned on. According to paragraph (c)(2), if such a program is accessed or used without the authorization of the</u>*

15

*copyright owner, the initial reproduction of the program shall not be deemed exempt from infringement by this subsection.*

S. Rep. No. 105-190, at 57-58 (1998) (emphasis added).

The leading case that interprets the scope of Section 117(c) illustrates exactly why a categorical exemption to TPMs for medical imaging devices is not supported by the law and why its application would result in widespread copyright infringement. *Storage Tech Corp. v. Custom Hardware Engineering and Consulting*, 421 F.3d 307 (Fed. Cir., 2005) involved a company, StorageTek, that manufactures automated tape cartridge libraries that store large amounts of computer data. The tape backup and management system are controlled by a computer program. Upon computer startup, a "maintenance code" and "functional code" are automatically copied from the computer's hard drive to the computer's RAM, thereby allowing the computer to perform its programmed tasks.

Custom Hardware Engineering & Consulting, Inc. (CHE), is an independent business that repairs data tape libraries manufactured by StorageTek. In order to diagnose problems with the libraries, CHE intercepts and interprets error codes produced by the maintenance code. StorageTek protects those error codes through password protection to disallow unauthorized access to the error codes. CHE uses technologies to "crack" the password and to mimic functions of the system to generate error codes that can be intercepted.

StorageTek sued CHE, alleging that CHE committed copyright infringement when CHE rebooted and reconfigured the computer program to reveal and generate the error codes that CHE then used to repair the systems. StorageTek sought a preliminary injunction, which a federal district court granted. On appeal to the Federal Circuit, CHE defended against the copyright infringement claims by arguing that its actions are protected by 117(c) because the owners of the tape libraries authorize CHE to turn on the computer program to maintain and repair the tape libraries, and the duplication of the software into RAM is necessary for the machine to function. StorageTek responded that CHE's activities fail to satisfy 117(c) because the maintenance code is not "necessary for the machine to be activated."

The court considered whether the copying of the maintenance code—in addition to the functional code—into RAM at computer startup violated Section 117(c)'s requirement that "with respect to any computer program or part therof that is not necessary for the machine to be activated, such program or part thereof is not accessed or used." StorageTek argued that the copying of the maintenance file onto the computer system's RAM at startup was not necessary for the machine to be activated, and therefore the access and use of that program violated StorageTek's copyright and was not exempted by Section 117(c). The court disagreed, finding that "[i]n this case, however, both parties agree that the maintenance code is so entangled with the functional code that the entire code must be loaded onto RAM for the machine to function at all. That is, loading the maintenance code into RAM is necessary for [the machine] 'to be turned on.'" 421 F.3d at 1314. The court further held that an anti-circumvention claim under Section 1201 would be foreclosed because the underlying copying itself was not copyright infringement. *Id.* at 1318.

16

LOC_AR_00004110

This holding does not, however, establish the general proposition that any file that is loaded from a computer system's hard drive to RAM during system startup is subject to access and copying by a third-party repair company. Quite the contrary, the court was careful to explain that its holding was grounded in the fact that the part of the system code necessary for the machine to turn on was entangled with other code that did more than simply allow the computer to turn on.

In that regard, the court noted that "separate, 'freestanding programs' that load into RAM upon startup *clearly may not be accessed* under section 117(c)(2)." *Id.* (emphasis added) Additionally, "[a]ccessing software programs, such as freestanding diagnosis and utility programs, that are not needed to boot up the computer and make that determination, *goes too far*...." *Id.* (emphasis added). The court also noted that "[i]n some instances, it may be difficult to determine whether particular software is necessary to make the computer function and to ascertain whether the computer is working properly." *Id.*

As this decision makes clear, an analysis of whether copies made by reason of turning on a computer are covered by Section 117(c) is a fact-based inquiry that turns on the specific nature of the program at issue and how the programs may interrelate or not with other programs that may also be activated at system startup. This decision also makes clear, however, that Section 117(c) does not authorize access to any program or part of a program that is not required to turn on the machine.

This fact-based and case-specific inquiry is fundamentally incompatible with the blanket exemption to TPMs that the petitioners seek. A blanket exemption to allow circumvention of TPMs would only be appropriate if Section 117(c) were uniformly available to unauthorized ISOs for the vast array and diversity of medical imaging devices that they seek to repair. As the *StorageTek* court made clear, the application of Section 1201 depends on whether the underlying copying itself is infringement. That fact-dependent inquiry would be vitiated by a categorical exemption under Section 1201.

## V.    Conclusion

In conclusion, the requested exemption is not warranted because users of the copyrighted works are not adversely affected by the TPMs and the legal arguments under fair use and Sections 117(a)(1) and 117(c) are without merit.

- **Users of the copyrighted works are not, under the factors of Section 1201, adversely affected by the prohibition on circumvention and are not likely to be adversely affected.** Medical imaging device software is widely available and broadly licensed to medical service providers. Medical imaging device software and the related materials protected by TPMs do not implicate nonprofit archival, preservation, and educational purposes because such software is used in a commercial setting among commercial parties. An exemption is not necessary for criticism, comment, news reporting, teaching, scholarship, or research because medical imaging device software is unrelated to those endeavors. An exemption would also negatively impact the market value for medical imaging device software because it would undermine the intellectual property protections that lead to innovation and would lead to greater use of unregulated ISOs that are not

LOC_AR_00004111

required to implement the same quality, safety, and regulatory requirements as OEMs, thereby risking patient safety and contributing to a public loss of confidence in medical imaging devices. The risks to patient safety weigh against granting the exemption.

- **The proposed exemption would infringe the protected works and is not supported by the fair use doctrine.** The fair use doctrine generally allows transformational use of copyrighted works for purposes of criticism, comment, news reporting, teaching, scholarship, or research. The petitioners seek to access and copy medical imaging device software and related materials to better sell their repair services to customers. Applying the individual fair use factors also demonstrates why the exemption does not apply: the purpose and character of the use is purely commercial; medical imaging device software and related materials are protected works; the petitioners seek to access and copy the full range of medical imaging device software and materials protected by TPMs rather than a minor part; and the impact of the copying will negatively impact the market for medical imaging device software by disincentivizing innovation, risking patient safety, and undermining the public's confidence in medical imaging devices.

- **The proposed exemption is not supported by 17 U.S.C. § 117(a)(1).** Section 117(a)(1) provides simply that the owner of a computer program is not liable for a copyright violation if the owner turns on his or her computer and thereby causes a software copy to be made as certain programs are loaded from the computer hard drive to the computer's RAM to enable the computer to function. That provision does not support the proposed exemption because nearly all users of medical imaging device software license, rather than own, the software and related materials.

- **The proposed exemption is not supported by 17 U.S.C. § 117(c).** Section 117(c) protects third party repair technicians from copyright liability when they turn on a computer and thereby cause software to be automatically copied from the computer's hard drive to the computer's RAM. This provision does not apply to the proposed exemption because by its plain terms Section 117(c) does not extend beyond computer code that is automatically copied from a computer's hard drive to RAM during system startup. Moreover, the legislative history makes clear that this provision is not intended to undermine TPMs and allow copying of software beyond those aspects that are necessary to start a computer.

**DOCUMENTARY EVIDENCE**

Appendix 1: Examples of Improper Servicing by Unregulated Third Parties

Hole drilled into X-Ray system
A third-party servicer drilled out the holes on an X-Ray system in order to get a replacement X-Ray tube to fit, creating a patient safety issue if the tube had fallen out.

LOC_AR_00004112



19

LOC_AR_00004113

High voltage cables wrapped in hardware store vacuum hose

These high voltage cables for an X-Ray system had been wrapped in vacuum hose from a local hardware store. Use of this kind of unqualified part created infection control issues and increased the risk that the cables could have been damaged, resulting in fire or electrocution hazards.



20

LOC_AR_00004114

Improper venting of MR system

A third-party servicer installed an MRI ventilation system such that it ventilated into the attic above the imaging suite. If the MR magnet had quenched, liquid helium would have ventilated into the attic, creating an asphyxiation hazard and potentially resulting in structural damage to the building.



21



22

LOC_AR_00004116

Power injector duct taped to IV pole

A third-party servicer removed a power injector from its usually support system and duct taped it to an IV pole. This jerry-rigged system could fall apart mid-procedure, delaying patient care or causing improper dosing.



23

LOC_AR_00004117

Overhead Counterpoise System held together with zip ties. This product suspends power injectors, often over patients while they are getting scanned. If these zip ties broke, the power injector could fall onto the patient, causing serious injury.



24

LOC_AR_00004118

Aluminum Foil Used for Shielding

A third-party servicer used aluminum foil to shield some of an MRI system's cables in the scan room. This can present safety and electrical issues when used within the MRI filter panel that contains high voltage.



25

Shoulder Coil Serviced with Tape
This MRI shoulder coil was found damaged with several attempted repairs using a white tape.
The use of tape would prevent proper cleaning of the coil and could have resulted in the coil
failing to perform as specified.



26

LOC_AR_00004120

Improper Part in an Angiographic Power Injector System
A third-party service vendor inappropriately replaced an OEM steel pin with a simple wood
screw to hold a syringe turret in place.

Angiographic power injectors can inject fluid at pressures of up to 1200 psi. If this wood screw
were to fail during a procedure, the turret could break free, potentially causing the turret and
connected syringe to act as dangerous projectiles. Additionally, this improper part could cause
vibrations during the injection, thereby leading to issues such as delay of procedure and
diagnosis due to unexpected equipment behavior.



27

LOC_AR_00004121

Improper Servicing of an MRI System

This 0.3T permanent magnet MRI had ghosting on multiple images as a result of improper wiring. The healthcare provider had been experiencing machine downtime due to the inability to properly scan patients. Poor image quality could have resulted in misdiagnosis or need for repeat scans. Rewiring a device with non-qualified parts could have resulted in electrocution or fire.



Speaker wire connecting power supply to unknown points and terminated with wire nuts



Example of ghosting on medical images

*(Continued on next page)*

28



The primary power supply cables lacked strain relief and protection from abrasion

LOC_AR_00004123

Improper Servicing of a Nuclear Medicine Camera
This nuclear medicine camera had numerous masked adjacent pixels in the detector which could obscure any heart defects in the image. Further, the cooling unit was improperly connected to external power, bypassing the system's isolated power and grounding system, potentially compromising patient safety and device performance.

When adjacent pixels are removed, a portion of the imaging detector is lost, meaning parts of the heart might not be imaged and a defect could go undetected.

The improper power connection of the cooling system violated the manufacturer's power and grounding isolation scheme, creating risks of fire and electrocution



Remote chiller installed outside the unit on the floor with the cover of the unit off, exposing the camera internals

LOC_AR_00004124



Remote chiller installed outside the unit on the floor with the cover of the unit off, exposing the camera internals



Masked pixels



Masked pixels

31

LOC_AR_00004125

Improper Repair of an MRI Coil
In a 0.3T permanent magnet MRI RF coil, the signal cable had been pulled out of a connector
housing and was repaired with zip ties and plastic tubing. This could have resulted in:
Misdiagnosis or need for additional scans due to lost signal or imaging artifacts
Electrical arcing, resulting in electrocution or burns



Coil with plastic tubing and zip
ties used to cover damaged
cable



Example of failed coil that was
hidden using zip ties and plastic
tubing

32

LOC_AR_00004126

Improper Servicing of a CT Scanner

A facility reported to the OEM that it had been having issues with a CT table, workstation, and tube for approximately six months. An OEM service engineer identified table cabling connections that were modified to be non-standard, exposed wiring, non-OEM fuses installed, improperly exposed and non-OEM soldering connections, cable connections routed and repaired using electrical tape, bent table bolt, and defective transmit cable. Excessive oil was also found in the device, creating risk for fire or other kind of device failure.



1. The bank of black fuses is not connected to cables, per OEM design and manufacturing specifications
2. Cables have been field repaired with fuses taped to the cable
3. Grease identified in cabling area

*(Continued on next page)*

33

LOC_AR_00004127



4. Non-qualified fuse, with field repair to reform connector to fit around non-qualified



5. Transmit wire connection repaired previously and taped and visible and exposed at joint of green wire

*(Continued on next page)*

34



6. Bent screw found, preventing table from full range of horizontal motion

7. OEM service engineer identified horizontal travel distance blocked by bent screw



*(Continued on next page)*

35



8. Excessive oil identified



9. Oil and debris identified in back corners of gantry

36

LOC_AR_00004130

*This is a Word document that allows users to type into the spaces below. The comment may be single-spaced, but should be in at least 12-point type. The italicized instructions on this template may be deleted.*



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

**Please submit a <u>separate</u> comment for each proposed class.**

*NOTE: This form must be used in all three rounds of comments by all commenters not submitting short-form comments directly through regulations.gov, whether the commenter is supporting, opposing, or merely providing pertinent information about a proposed exemption.*

*When commenting on a proposed expansion to an existing exemption, you should focus your comments only on those issues relevant to the proposed expansion.*

**[  ] Check here if multimedia evidence is being provided in connection with this comment**

*Commenters can provide relevant multimedia evidence to support their arguments. Please note that such evidence must be separately submitted in conformity with the Office's instructions for submitting multimedia evidence, available on the Copyright Office website at https://www.copyright.gov/1201/2021.*

**ITEM A. COMMENTER INFORMATION**

Philips North America, LLC
2000 Minuteman Road
M/S 109
Andover, MA 01810

Counsel:

James C. Martin
David A. Bender
Daniel E. Alperstein
REED SMITH LLP
K Street, N.W.
1000, East Tower
Washington, D.C. 20005

Privacy Act Advisory Statement: Required by the Privacy Act of 1974 (P.L. 93-579)

The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

LOC_AR_00004131

Philips is well known in the healthcare industry as a trusted provider of electronic medical imaging devices for use in in-patient and outpatient hospital care throughout the United States. Philips' high quality products include ultrasound systems, computed tomography ("CT") scanners, positron emission tomography ("PET") scanners, X-ray machines, magnetic resonance ("MR") scanners, and nuclear medicine scanners. Importantly for this process, Philips supports, maintains, repairs and services these medical imaging devices using authorized repair technicians who know the devices and are regulated by statute, through oversight provided by the Food and Drug Administration ("FDA"). Building on years of innovation, Philips' medical devices are highly sophisticated and relied upon by medical professionals for diagnosis, treatment, and life-saving support of patient lives.

Given their complexity and the necessity that they operate precisely as designed, the FDA's regulations extend to every aspect of the medical devices, including their maintenance and repair, to protect the public health and safety. Philips' supervision of its authorized repair technicians complies with and furthers these paramount regulatory goals. For purposes of device repair, access to Philips' copyrighted software on medical devices is protected so that the functionality and integrity of the devices is maintained.

The Proponents of proposed exemption Class 12 fit into two categories. The first group is comprised of multiple organizations – such as the Electronic Frontier Foundation – that petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices, generally, or types of software-enabled devices that bear no relation to medical devices. The second group is comprised of two organizations – Summit Imaging, Inc. and Transtate Equipment Co., Inc. – that separately petition for an exemption allowing circumvention of technological protection measures ("TPMs") for purposes of diagnosis, modification, and repair of *medical devices*, specifically.

While the former category of Proponents seek an overbroad exemption of almost limitless scope, the latter category of Proponents have purely commercial motivations. They seek to circumvent Philips' and other medical device manufacturers' access controls in order to obtain copyrighted materials far in excess of that which is necessary to perform basic repair or maintenance. The granting of the exemption they seek would improperly allow them to circumvent Philips' security measures to access Philips' copyright-protected software installed on its medical devices. It also would threaten the functionality, integrity, safety and security of Philips' and other OEMs' medical devices by compromising the devices and making them susceptible to hacking by cybercriminals and other threat actors (i.e., a result antithetical to the longstanding efforts of OEMs and a host of federal agencies that work aggressively to reduce the threat of cybersecurity to medical devices).

With respect to the medical devices involved here, the proposed exemptions do not build off prior exemptions in any colorable respect. No prior exemptions have involved FDA-regulated devices implicating public health and safety. No prior exemptions have been sought for commercial purposes or facilitated the copying of protected software and information unnecessary to equipment repair. None of these results, moreover, align with the purpose or goals of the exemption process.

2

LOC_AR_00004132

Finally, there is no demonstrable non-commercial need for the proposed exemptions. Philips does not prevent access to any of its devices for purposes of basic repairs with copyright assertions. There likewise is no real, or even imagined, repair market crisis for the devices. Rather, as the FDA has concluded, the repair market, on analysis, appears to be adequately served by independent and licensed repair personnel.

Philips accordingly submits the following comments in opposition to proposed exemption Class 12.

## ITEM B. PROPOSED CLASS ADDRESSED

Proposed Class 12: Computer Programs – Repair

Philips' comments in opposition are specifically made with respect to the petitions for an exemption that would allow circumvention of technological protection measures ("TPMs") for purposes of diagnosis, modification, and repair of medical devices.

## ITEM C. OVERVIEW

Philips is a well-known leader in the business of developing, manufacturing, selling, supporting, maintaining, and servicing medical imaging systems used at hospitals and medical centers. Philips medical imaging systems include Philips' proprietary hardware and software, encompassing Philips' trade secrets, which are necessary to operate, service, and repair Philips' systems. Philips' proprietary software enables certain functions on Philips medical imaging systems, which can only be modified by Philips, thereby allowing Philips to control, update, and track the use of its medical device software in the marketplace. Philips' high quality products and proprietary software have made Philips a trusted producer, manufacturer, and supplier of medical imaging systems worldwide.

In particular, Philips medical imaging systems include Philips' copyrighted software that Philips technicians can use to service the equipment. Philips includes access controls – described in greater detail below – on its medical imaging systems to protect its copyright-protected software and to restrict access to its proprietary software to authorized personnel. Its proprietary Philips' Integrated Security Tool is a suite of applications designed to secure Philips' Customer Service Intellectual Property—including Philips' copyrighted documents, service software, and other proprietary information created for the purpose of servicing Philips' products—from unauthorized access or use. The Proponents seek to circumvent these access controls.

As noted above, the Proponents fit into two categories. The first group is comprised of several organizations – such as the Electronic Frontier Foundation – that petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices, generally. Such a request is facially impermissible, as it is overly broad and fails to account for any of the unique characteristics of medical devices. The Registrar previously has declined to consider broad categories of devices grouped together, and has instead considered each class of device on an incremental, case-by-case basis.[1] Since the breadth of device categories

---

[1] *See* Section 1201 Rulemaking:  Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation Of The Register Of Copyrights (Oct. 2018) ("2018 Recommendation") 191-92.

LOC_AR_00004133

encompassed by proposed exemption Class 12 is exceedingly broad, and the circumvention of access controls on certain devices (such as medical devices) carry significant ramifications, Philips strongly believes that the Copyright Office should decline any invitation to consider software-enabled devices as a general class.

The second group is comprised of two organizations – Summit Imaging, Inc. and Transtate Equipment Co., Inc. – who separately seek an exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices, specifically. But their motivations are commercially driven and their request should have no place in the Triennial Rulemaking Process. Summit and Transtate (and other ISOs) already have access to extensive documentation and software sufficient to perform basic servicing of Philips medical imaging systems.[2] They simply want *more* access; and they have a track record of circumventing Philips' access controls – without an exemption – for their own commercial gain. Summit and Transtate, as they admit, are defendants in ongoing litigation in which Philips has alleged DMCA violations against both companies due to their having modified files on Philips' systems to gain unauthorized access to Philips' copyrighted software and files that they cannot access with their legitimate repair and maintenance accounts.[3] Since Summit and Transtate seek to use the exemption process to achieve their purely commercial ends and facilitate their unlawful conduct, their request for an exemption should be rejected summarily.

Finally, as explained below, proponents of a petitioned exemption carry a significant evidentiary burden. To establish a case for an exemption, "proponents must show *at a minimum* (1) that uses affected by the prohibition on circumvention *are or are likely to be noninfringing*; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an *adverse impact* on those uses."[4] As the following sections demonstrate, Proponents have not met that burden, and their requested exemptions should be denied for this independent reason.

**ITEM D.  TECHNOLOGICAL PROTECTION MEASURE(S) AND METHOD(S) OF CIRCUMVENTION**

*Describe the technological protection measure(s) that control access to the work and the relevant method(s) of circumvention. It would be most helpful to the Office if sufficient information is provided to allow the Office to understand the nature and basic operation of the relevant technologies, as well as how they are disabled or bypassed.*

---

[2] Letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance 2 (Jan. 30, 2014), https://www.fda.gov/downloads/MedicalDevices/ResourcesforYou/Industry/UCM385149.pdf ("[T]here are limits on the information that 21 CFR 1020.30(g) and 21 CFR 1020.30(h) require the manufacturer of the original system to provide. The manufacturer of the original system is not required to disclose trade secrets or confidential information. Also, the manufacturer of the original system may provide the user or its own service personnel with additional documentation or enhanced software programs, with privileged access codes. This additional documentation or enhanced software programs may operate in conjunction with other proprietary accessories or functions.")

[3] *See, e.g., Philips Med Sys. Nederland B.V. et al. v. TEC Holdings, Inc. et al.*, No. 3:20-cv-00021-MOC-DCK (W.D.N.C.) and *Philips N. Am. LLC et al. v. Summit Imaging Inc. et al.*, No: 2:19-cv-01745-JLR (W.D. Wash.).

[4] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg. 54,010, 54,011 (Oct. 26, 2018).

LOC_AR_00004134

Philips' Integrated Security Tool ("IST") is a suite of applications designed to secure Philips' Customer Service Intellectual Property ("CSIP"), including documents, service software, and other proprietary information created by Philips for servicing Philips Healthcare products, from unauthorized access or use.[5] Philips' IST solution provides a mechanism to manage user entitlements to access CSIP. Individual users may register with Philips to open an IST account. A Philips IST administrator then assigns entitlements to the user's account specifying the CSIP materials the user can access. Users may then install Philips IST client on their personal computer and request Philips to issue an encrypted IST certificate to enable the user to access Philips' proprietary CSIP information. Upon receiving such a request, Philips' IST system generates a user-specific and computer-specific encrypted IST certificate with information including the user's entitlements and sends the certificate to the user.[6] The user can then use his or her IST certificate and password to access CSIP materials Philips authorizes the user to access.

In the United States, Philips provides an account with CSIP Level 0 entitlements at cost to anyone who requests such an account. CSIP Level 0 entitlements provides access to materials that Philips makes available upon request to comply with regulatory requirements as well as other basic service documentation and software.[7] Philips provides CSIP Level 1 entitlements to customers who have a current contract that provides CSIP Level 1 access and have received any requisite training.[8] Philips provides CSIP Level 2 entitlements to its employees and to certain trade partners under contract.[9]

Philips' IST solution uses multi-factor authentication to confirm that only authorized users can access Philips' proprietary CSIP materials. For example, to access Philips' proprietary CSIP materials on a medical imaging system, a user must present his or her IST certificate and password to the system.[10] If the user has the correct password, the system will decrypt the certificate and provide the user with access to software and files according to the entitlements in the user's certificate.[11] Thus, engineers employed by independent service providers may log into Philips' medical imaging systems with their IST certificates and have complete access to Philips' CSIP Level 0 materials. They cannot, however, access the software and files that Philips reserves for its licensees or its own employees. Licensees with CSIP Level 1 access can log into Philips medical imaging systems with their IST certificates and they will receive access to additional CSIP materials, but not materials that Philips reserves for only its employees or trade partners. Philips employees and trade partners with CSIP Level 2 access receive even greater access to specialized service tools and files.[12]

Through their Philips-issued accounts, the vast majority of the thousands of ISOs in the U.S. have sufficient access to service Philips' medical imaging systems. Philips provides ISOs with access to the CSIP Level 0 materials that allow them to setup and service Philips' medical

---

[5] Declaration of Jacqueline Dickson, attached hereto as Exhibit A, at ¶ 6.
[6] *Id.*
[7] *Id.* at ¶ 3.
[8] *Id.* at ¶¶ 4, 8.
[9] *Id.* at ¶¶ 5, 9.
[10] *Id.* at ¶ 10.
[11] *Id.*
[12] *See id.*

LOC_AR_00004135

imaging systems, but restricts them from accessing more advanced unlicensed features and service functionalities.[13]

Nevertheless, through its policing efforts, Philips has learned of a few ISOs that use methods to circumvent Philips' IST multi-factor authentication security to gain unauthorized access to Philips' copyrighted CSIP materials. The specific methods used by those ISOs vary, but their circumvention methods achieve a common result of providing the ISOs with unlicensed access to Philips' copyrighted software. The ISOs use that unlicensed access to sell advanced services for Philips' medical imaging systems. Philips has pending lawsuits against several ISOs that circumvent Philips' access controls to gain unauthorized access to its copyrighted CSIP. For example, Robert A. Wheeler, the CEO of Transtate Equipment Company, developed exploit software that Transtate uses to modify files within Philips medical imaging systems to effectively disable their access controls and allow Transtate employees to gain access unlicensed access to Philips' copyrighted materials.[14] Summit Imaging developed a different software program designed to circumvent Philips' access controls and provide unauthorized access to Philips' proprietary copyright protected software within Philips medical imaging systems.[15]

## ITEM E. ASSERTED ADVERSE EFFECTS ON NONINFRINGING USES

## I. No Exemption is Permissible Because The Uses Are Not Noninfringing

### A. Legal Standards

Section 1201(a)(1)(A) of the Digital Millennium Copyright Act provides that "No person shall circumvent a technological measure that effectively controls access to a work protected under this rule." The Register will recommend granting an exemption *only when* the "preponderance of the evidence in the record shows that the conditions for granting an exemption have been met."[16] Such evidence must show that it is "*more likely than not*" that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make *noninfringing uses* of a particular class of copyrighted works." *Id.* at 112 (emphasis added).

To establish a case for an exemption, "proponents must show *at a minimum* (1) that uses affected by the prohibition on circumvention *are or are likely to be noninfringing*; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an *adverse impact* on those uses."[17] More particularly, "[i]t is not enough that a particular use *could be* noninfringing. Rather, the Register

---

[13] *Id.* at ¶ 7.

[14] Second Amended Complaint at ¶¶ 59-65, *Philips Med. Sys. Nederland B.V.,* No. 3:20-cv-00021-MOC-DCK (May 23, 2019), ECF No. 139.

[15] Third Amended Complaint at ¶¶ 6, 40-44, *Philips N. Am. LLC,* No. 2:19-cv-01745-JLR (Dec. 28, 2020), ECF No. 99.

[16] U.S. Copyright Office, Section 1201 of Title 17 at 111 (June 2017), https://www.copyright.gov/policy/1201/section-1201-full-report.pdf.

[17] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 83 Fed. Reg. at 54,011.

LOC_AR_00004136

will assess whether the use is ***likely to be*** noninfringing based on current law."[18] "There is no 'rule of doubt' favoring an exemption when it is unclear that a particular use is noninfringing." *Id.*

## B.    The Requested Uses Do Not Satisfy the "Fair Use" Test of 17 U.S.C. § 107

Proponents of proposed exemption Class 12 argue—by conclusion only—that the petitioned uses are likely to be noninfringing under 17 U.S.C. § 107 (fair use). These conclusory contentions are, however, unsubstantiated and flawed.

In determining whether the use of a copyrighted work is likely to be a noninfringing "fair use" under 17 U.S.C. § 1201, the Register considers: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. On balance, these factors weigh conclusively against the proposed Class 12 exemption for medical devices.

### i.    The Purpose and Character of the Requested Use Weighs Against an Exemption

The first factor in the fair use analysis – the purpose and character of the use – evaluates whether the use is of a commercial nature or is for nonprofit educational purposes, and examines "to what extent the new work is transformative" and does not simply "'supplant'" the original work.[19] "Commercial use of copyrighted material is '***presumptively*** an ***unfair*** exploitation of the monopoly privilege that belongs to the owner of the copyright.'"[20] This factor unquestionably weighs against Proponents.

Here, the requested uses under Class 12 with respect to medical devices are purely commercial and are thus "presumptively . . . unfair."[21] Both Transtate Equipment Company, Inc. d/b/a/ Avante Diagnostic Imaging ("Transtate") and Summit Imaging, Inc. ("Summit") are independent service providers ("ISOs") who seek to circumvent the access controls installed on Philips' medical devices for purely commercial (i.e., business) purposes. That is, Transtate's and Summit's motivations are financial, plain and simple. Their businesses stand to profit from an exemption that would allow them to circumvent Philips' and other medical device manufacturers' access controls that protect the integrity and security of their medical devices. But the Triennial Rulemaking Process is not a means of regulating competitive markets or promoting commercial outcomes. Nor should the Triennial Rulemaking Process

---

[18]    U.S. Copyright Office, "The Triennial Rulemaking Process for Section 1201," at 6, https://cdn.loc.gov/copyright/1201/1201_rulemaking_slides.pdf (last visited Feb. 5, 2021) (emphasis added).
[19] *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).
[20] *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F.Supp.3d 957, 972 (C.D. Cal. 2016) (quoting *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008) (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)) (emphasis added).
[21] *See Leadsinger*, 512 F.3d at 530 (quoting *Sony Corp.*, 464 U.S. at 451).

7

be used as a means of promoting unlawful conduct or avoiding liability for past unlawful conduct – the other motivations underlying Transtate's and Summit's unfair use.

Transtate indicates in its comments in support of proposed exemption Class 12 "that it likely will be the only ISO or one of very few ISOs to provide comments with respect to the medical device servicing issues. However, the limited number of ISO Petitioners should not be taken as a lack of interest in this exemption or the desire of others for the requested exemption."[22] But there is more to the story of what motivated Transtate's and Summit's petitions for an exemption: both companies – along with several others – are defendants in ongoing federal litigation in which they have been accused of violating the anti-circumvention provisions of the DMCA.[23] Because the requested uses of copyrighted material are commercial – and thus, presumptively *unfair* – and because the requested uses would not transform the copyrighted material, the first "fair use" factor weighs conclusively against Proponents.[24]

### ii.     The Nature of the Original Work Weighs Against an Exemption

The second factor in the fair use analysis – the nature of the copyrighted work – evaluates the "value of the materials used."[25] In relation to the other fair use factors, some federal courts have recognized that this second factor is relatively insignificant in the overall balancing analysis.[26] In the specific context of medical devices, however, this factor weighs just as heavily against Proponents.

Philips' IST – i.e., the access controls installed on Philips' medical devices – is designed to secure Philips' CSIP, including documents, service software, and other proprietary information created by Philips for servicing Philips Healthcare products from unauthorized access or use. Philips' copyrighted service software is complex, highly expressive content designed to protect the integrity and efficacy of Philips' life-saving medical devices.

Although the Copyright Office has previously found access controls on video games to be primarily functional, and some aspects of telematics software on motorized land vehicles to

---

[22] Transtate Class 12 Comments at 4.

[23] *See, e.g., Philips Med Sys. Nederland B.V.* No. 3:20-cv-00021-MOC-DCK; *Philips Med. Sys. Puerto Rico, Inc., et al v. Alpha Biomedical and Diagnostic Corp.,* No. 3:19-cv-01488-BJM (D.P.R.); *Philips N. Am. LLC et al. v. 626 Holdings, LLC et al.,* No. 9:19-cv-81263 RS (S.D. Fla.); *Philips Med. Sys. (Cleveland), Inc., et al. v. Zetta Med. Techs. LLC, et al,* No. 1:17-cv-03425 (N.D. Ill.); *Philips N. Am. LLC v. KPI Healthcare Inc.,* No. 8:19-cv-01765-JVS-JDE (C.D. Cal.), and *Philips N. Am. LLC* No. 2:19-cv-01745-JLR.

[24] *See Campbell.,* 510 U.S. at 569, 579 (recognizing that in addressing the first factor of the "fair use" test, one considers "whether the new work merely 'supersedes the objects' of the original creation,…or instead adds something new, with a further purpose or different character . . . [;] in other words, whether and to what extent the new work is 'transformative.'" (brackets and citations omitted).

[25] *Campbell,* 510 U.S. at 586 (quoting *Folsom v. Marsh,* 9 F.Cas. 342, 348 (C.C.D. Mass. 1841)).

[26] *Oracle Am., Inc. v. Google LLC,* 886 F.3d 1179, 1205 (Fed. Cir. 2018) (Federal Circuit noting that the "Ninth Circuit has recognized . . . that this second factor 'typically has not been terribly significant in the overall fair use balancing.'") (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1402 (9th Cir. 1997); *see also Fox News Network, LLC v. TVEyes, Inc.,* 883 F.3d 169, 178 (2d Cir. 2018) ("This factor 'has rarely played a significant role in the determination of a fair use dispute,' and it plays no significant role here.") (quoting *Authors Guild v. Google, Inc.,* 804 F.3d 202, 220 (2d Cir. 2015)).

LOC_AR_00004138

be functional, the service software designed by OEMs and installed on medical devices are of comparatively much higher value and complexity and invoke patient safety and information security concerns. That is because with their medical devices, OEMs make every decision about service software – from the types to create, to the functions it will perform, to its design and implementation.

Controls restricting access to such proprietary software are essential to preserving the functionality, integrity, safety and security of those devices. Without them, the sophisticated and complex medical devices involved are unsecure, susceptible to alteration, a loss of data, or availability, and vulnerable to hacking and misuse. In the specific context of health care, in which patient lives often depend upon the safety and efficacy of medical devices – some of which are designed for implantation in the human body – the OEM developed software on a device is fundamental and inextricably tied to the value of the device itself.

### iii. The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole Weighs Against an Exemption

The third factor in the fair use analysis – the amount and substantiality of the portion used in relation to the copyrighted work as a whole – evaluates "both the quantity of the work taken and the quality and importance of the portion taken."[27] "[T]his factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too."[28] This factor also weighs decidedly against Proponents.

First, Philips uses multiple layers of technological controls to protect its copyright-protected works from unauthorized access. These controls include user specific access codes and hardware keys, which enable the software access and control features for a particular user. These user-specific access controls permit access to enabled Philips tools and features based on a user's registered access authorization level. Philips provides ISOs with access to Philips' copyrighted software and information necessary for basic repair and maintenance of medical imaging systems. By circumventing Philips' access controls, ISOs gain unauthorized access to Philips' copyrighted advanced service software. ISOs then copy and use those *entire copyrighted* works to service Philips systems more efficiently or modify Philips systems for commercial gain.

Second, Philips' ability to control access to its copyrighted software not only provides Philips with a means of protecting its valuable intellectual property, but it also protects the public from the dangers associated with modification or alteration of Philips' medical devices by unauthorized or insufficiently trained users. Unlimited access to Philips' copyrighted software would allow untrained—and unregulated—individuals to make unauthorized changes to Philips' medical devices, potentially rendering the devices ineffective or unavailable for clinical use or dangerous when used. That is, the requested exemption not only would open attempts to repair or modify medical devices without device-specific training, but circumvention of the access controls would essentially give such ISOs unfettered access Philips' *entire copyrighted* works, as well as other proprietary information within the medical devices.

---

[27] *Disney Enters.*, 224 F.Supp.3d at 973 (citing *Campbell*, 510 U.S. at 586).
[28] *Campbell*, 510 U.S. at 587.

LOC_AR_00004139

Third, as discussed more fully in Section E(I)(B)(iii) below, Philips already provides domestic ISOs with extensive documentation and software that enables them to perform basic servicing of Philips' medical imaging systems, including documentation and software required by relevant FDA regulations.[29] This information enables ISOs, including Transtate and Summit, to perform repair and maintenance on Philips' medical devices. Neither Transtate nor Summit have explained – much less provided evidence – showing why it would be necessary to circumvent Philips' security access controls in order to perform repair and maintenance on Philips' devices. By comparison, allowing them unfettered access to enhance their business objectives would defeat the lawful copyright protection properly afforded to Philips' operating software and create safety and security risks that are avoided without the exemption.

Given that the requested exemption would give ISOs access to information that goes well beyond that which would be necessary for repair and maintenance, and would effectively grant ISOs access to the medical device manufacturers' entire copyrighted works and other proprietary information and trade secrets contained in the medical devices for purely commercial use, the third "fair use" factor weighs just as heavily against an exemption as the first two.

### iv.     The Effect of the Requested Use Upon the Potential Market for or Value of the Copyrighted Work Weighs Against an Exemption

The fourth factor in the fair use analysis – the effect of the use upon the potential market for or value of the copyrighted work – requires the Office to consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the [user] . . . would result in a substantially adverse impact on the potential market....'"[30] At least one federal circuit court of appeals has held that when "the intended use is for commercial gain," the likelihood of market harm "may be presumed."[31] Here, as to Transtate and Summit, there is no question that the requested exemption as applied to medical devices is sought for commercial purposes, and thus, market harm will result.

Circumvention of access controls on Philips' and other medical devices is of significant commercial value because it permits ISOs to modify such medical devices, and to attempt to provide maintenance and support services (without appropriate training or regulatory oversight) on such devices. Moreover, allowing untrained and unregulated third parties unfettered access to make modifications to such devices could result in improper operation, lack of reliability, or potentially even safety or hacking risks, all of which would create market harm for the medical devices, including their copyrighted software.

### v.     Fair Use Summary

On analysis, each fair use factor plainly tips against granting the proposed Class 12 exemption and, when taken together, an analysis of those factors compels that the proposed exemption should be rejected. The factorial analysis must weigh strongly in favor for an

---

[29] *See, e.g.,* 21 C.F.R. § 1020.30.
[30] *Campbell*, 510 U.S. at 590 (citation omitted).
[31] *Leadsinger*, 512 F.3d at 531 (quoting *Sony*, 464 U.S. at 451).

LOC_AR_00004140

exemption to be granted. Whatever else might be said, that is not the case for proposed Class 12 as related to the medical devices addressed by these comments.

### C.    The Uses Do Not Fall Under the Exception for Essential Steps in the Utilization of a Computer Program

Proponents assert, in a conclusory manner, that their intended uses are protected by 17 U.S.C. § 117(a)(1). That provision permits "the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program" provided that the copy or adaptation "is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner." *Id.* Proponents cannot meet the requirements set forth in this provision.

First, it is well established that Section 117(a)(1) shelters only those who *own* the copy of the computer program—not mere licensees of the copy. Federal courts have explained that one is a licensee rather than a user—and thus unprotected by Section 117(a)(1)—if the copyright owner "'(1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use' restrictions."[32] In that regard, courts have held that facts demonstrating that a customer is a licensee include (1) the copyright owner's retention of title in the software and grant of a non-exclusive license,[33] (2) the imposition of transfer restrictions on the licensed software,[34] (3) the imposition of use restrictions specifying ways in which the software must (or cannot) be used,[35] (4) the ability of the copyright owner to terminate the license,[36] and (5) the requirement that the customer destroy or relinquish copies of the software upon termination.[37] All of these factors are present here, and demonstrate that Philips' customers are licensees, not owners, of the software Proponents seek to access.

Specifically, Philips' standard terms and conditions of sale for all medical imaging products makes explicit that: (1) Philips grants only a "nonexclusive and non-transferable right and license to use the computer software" and that Philips retains "exclusive ownership" of the software;[38] (2) the Customer is restricted in its ability to transfer the software and give access to the software;[39] (3) the Customer is restricted in how it may use the software, including being prohibited from using the software on any devices other than the device it comes with or for any purposes other than the operation of that device;[40] (4) Philips retains the ability to terminate the

---

[32] *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 938 (9th Cir. 2010) (quoting *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111 (9th Cir. 2010)); *see also Vernor*, 621 F.3d at 1110-11; *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 44-45 (2d Cir. 2019).

[33] *MDY Indus.*, 629 F.3d at 938; *Vernor*, 621 F.3d at 1111.

[34] *MDY Indus.*, 629 F.3d at 938; *Vernor*, 621 F.3d at 1111.

[35] *MDY Indus.*, 629 F.3d at 938-39; *Vernor*, 621 F.3d at 1111.

[36] *MDY Indus.*, 629 F.3d at 939; *Vernor*, 621 F.3d at 1112.

[37] *MDY Indus.*, 629 F.3d at 939; *Universal Instruments*, 924 F.3d at 45.

[38] Philips Standard Terms and Conditions of Sale (Nov. 2020), Licensed Software, §§ 1.1, 1.3, https://www.usa.philips.com/c-dam/b2bhc/us/terms-conditions/philips-standard-terms-and-conditions-of-sale-all-products-112420.pdf.

[39] *Id.* §§ 1.2, 1.4; *see also id.*, Philips Proprietary Service Materials, § 9.1.

[40] *Id.*, Licensed Software, §§ 1.2, 1.5; *see also id.* § 2.2 (requiring the Customer to maintain the configuration of the device as it was originally designed and manufactured).

LOC_AR_00004141

license if the Customer does not comply with the terms and conditions of sale;[41] and (5) the Customer must "return the Licensed Software and any authorized copies thereof to Philips immediately upon expiration or termination of this License."[42] As a result, controlling law dictates that Section 117(a)(1) is unavailable to Proponents, and their efforts to amend what Section 117 otherwise requires through this process should be rejected.

By the same token, the Registrar previously has applied these principles in rejecting proposed exemptions. For instance, the Registrar has concluded that motor vehicle telematics and entertainment system software was licensed rather than owned by the vehicle owner, thus failing to qualify for Section 117(a)(1).[43] And the Registrar has emphasized that the question of ownership is a fact-intensive one requiring consideration on a case-by-case basis—yet another reason the generalized, overbroad exemption sought by proponents like EFF should be rejected.[44]

Second, section 117(a)(1) is applicable only if the copy of the computer program "is created as an essential step in the utilization of the computer program in conjunction with a machine." Proponents cannot satisfy this requirement either. There is, of course, clinical software installed on the devices and licensed by Philips that is necessary to use the device.[45] But it is not that software that proponents seek an exemption to access. Rather, proponents seek to go *beyond* that software and instead access additional, unlicensed software—or unlicensed service functionalities—that has not been purchased by the device purchaser.[46] Because none of *that* software is necessary to use the devices in their standard configurations, section 117(a)(1) does not shelter Proponents.

### D.    The Uses Do Not Fall Under The Exception for Machine Maintenance and Repair

Proponents claim protection under 17 U.S.C. § 117(c), which provides that "it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine." The copy must be used in no other manner and destroyed immediately after the completion of the maintenance or repair, and any portion of the program not necessary for the activation of the machine cannot be accessed or used.[47] Contrary to Proponents' arguments, this exception has no application here.

Congress' purpose in passing Section 117(c) was to ensure that servicers "'do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components.'"[48] And Congress was clear that this

---

[41] *Id.* § 1.1.
[42] *Id.*
[43] 2018 Recommendation at 201.
[44] 2018 Recommendation at 200, 209.
[45] Declaration of Jacqueline Dickson, Ex. A, at ¶ 11.
[46] *Id.*
[47] *Id.*
[48] *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1311-12 (Fed. Cir. 2005) (quoting H.R. Rep. No. 105-551, pt. 1, at 27 (1998)).

LOC_AR_00004142

exception is narrow; only software actually "necessary for the machine to be activated"—that is, software that "needs to be so loaded in order for the machine to be turned on"—qualifies for the exception.[49] For this reason, the Federal Circuit has held that "[a]ccessing software programs, such as freestanding diagnosis and utility programs, that are not needed to boot up the [machine]…, goes too far because access to those programs is not strictly necessary to verify that the [machine] is 'working in accordance with its original specifications.'"[50] Proponents, however, seek to do exactly that.

The software that Summit and Transtate seek to copy are additional, unlicensed software and unlicensed service functionalities. But as explained in Part I(C), *supra*, none of this software is necessary to activate the machine, and thus by definition cannot be copied "solely by virtue of the activation of a machine."[51] To the contrary, this software consists of "freestanding…programs, that are not needed to boot up the [machine]"—precisely the sort of software that the Federal Circuit has squarely held to be outside the scope of section 117(c).[52]

Indeed, Proponents essentially concede the point. Transtate, in making a perfunctory argument that section 117(c) applies, argues only that accessing Philips' diagnostic and testing software is necessary "[t]o perform the servicing activities."[53] Summit similarly—and also perfunctorily—argues that diagnostic software and data files must be accessed to "perform[] service."[54] But the question under section 117(c) is not whether the software is necessary *to perform servicing of the machine*; rather, the only question is whether the software "needs to be so loaded in order for the machine to be turned on." Proponents do not dispute that the answer to this question is "no." And that answer is dispositive; section 117(c) does not apply.

## II.    The Adverse Impact Factors Do Not Support An Exemption Here

The Librarian of Congress, on recommendation of the Register, must determine whether "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [against circumventing a TPM] in their ability ***to make noninfringing uses*** … of a particular class of copyrighted works." 17 U.S.C. § 1201(1)(C) (emphasis added). As explained above, because Proponents seek to use Philips' copyrighted works for *infringing* uses, they are barred categorically from using this Triennial Rulemaking Process to obtain an exemption for their conduct.

Apart from that, Section 1201(1)(C) sets out five factors for the Librarian to consider in determining whether to grant an exemption: (1) "the availability for use of copyrighted works"; (2) "the availability for use of works for nonprofit archival, preservation, and educational purposes;" (3) "the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research"; (4) "the effect of circumvention of technological measures on the market for or

---

[49] *Id.* at 1314 (quoting H.R. Rep. No. 105-551, pt. 1, at 28) (brackets omitted).
[50] *Id.* (quoting 17 U.S.C. § 117(d)).
[51] 17 U.S.C. § 117(c).
[52] *Storage Tech.*, 421 F.3d at 1314.
[53] Transtate Class 12 Comments at 20.
[54] Summit Class 12 Comments at 8.

13

value of copyrighted works"; and (5) "such other factors as the Librarian considers appropriate." *Id.* All five of these factors demonstrate that the proposed exemption should be rejected.

## A.    The Availability for Use of Copyrighted Works

Proponents argue that owners of medical devices are currently unable to obtain timely repair and servicing of the devices, necessitating an exemption permitting independent repairers to access copyrighted material to service such devices. But Proponents offer no credible evidence that the market for servicing and repair of medical devices is not adequately served by existing resources. A close look at the issue shows why.

To start with, the 2018 FDA Servicing Report evaluation involving all stakeholders declined to conclude that there was a prevalent health or safety concern presented by the servicing in the medical device market.[55] That same report noted that there is a robust market for independent servicing of medical devices, with an estimated number of medical device servicing firms numbering between 16,520 and 20,830.[56] And these independent servicing firms are organized and participate in trade associations such as the International Association of Medical Equipment Remarketers and Servicers (IAMERS).[57] The COVID crisis has not generated any credible evidence that this has changed so that equipment repairs are not being made or that public health and safety is threatened with respect to lack of servicing of lifesaving or life-enhancing healthcare devices. That lack of evidence is conclusive here.[58]

Going beyond the FDA requirements, Philips provides independent servicers with extensive documentation, software, and instructions sufficient to perform basic servicing of Philips medical imaging systems.[59] Many of these instructions refer to CSIP Level 0 service software that independent servicers can access with their Philips-issued certificates. The CSIP Level 0 documentation and software—which Philips provides to independent servicers at cost—allows for basic servicing of the systems. Proponents are fully aware of this; indeed, Transtate has an account with Philips to receive and use these materials.[60] Therefore, the argument that independent servicers are cut off from the repair market is fiction.

The companion argument that the proposed exemption is necessary for independent servicers to perform repair and servicing of medical devices is just as flawed. No exemption is

---

[55] U.S. Food and Drug Administration, FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices (May 2018), at i.

[56] *Id.* at 19.

[57] *See* International Association of Medical Equipment Remarketers and Servicers, "IAMERS Campaigning for Healthcare Providers Right to Choose," https://iamers.org/ (last visited Feb. 8, 2021).

[58] Proponents offer a few isolated and undocumented incidents where delays allegedly occurred in obtaining OEM servicing. Philips, for its part, has no record of any reduction in service capabilities or customer inability to obtain service during the COVID crisis. *See* Declaration of James Salmons, attached hereto as Exhibit B, at ¶¶ 7-8. Medical device maintenance services were not materially delayed even with customers' reporting an overall increase in volume of service. *Id.* at ¶ 8. Notably, the handful of incidents identified by Proponents does not establish any *systemic* problem of access to OEM servicing in the marketplace – the only relevant issue for the Copyright Office. Finally, unlike Proponents, the FDA has looked at the marketplace and did not find any systemic evidence of inadequate servicing or repairs for medical devices.

[59] 21 C.F.R. § 1020.30(g).

[60] Declaration of Jacqueline Dickson, Ex. A, at ¶ 7.

14

needed to permit basic repair and servicing of Philips medical devices because Philips already provides independent servicers with all the information they need to conduct such servicing—and will continue to do so, as required by FDA regulations. In fact, Philips routinely acts as a third-party servicer in repairing and servicing non-Philips medical devices—and has always managed to do so perfectly well with the materials made available to all independent servicers, without the circumvention Proponents insist is necessary for third-party servicers to do their jobs.[61] Accordingly, what proponents really seek through this exemption is the ability to go *beyond* essential repair and servicing of the devices and to access additional, copyright-protected options and features for commercial gain.

To that end, the pending litigation against Summit and Transtate revolves around their modification of files on Philips systems to gain unauthorized access to Philips' proprietary service software and files that they cannot access with their legitimate CSIP Level 0 accounts. They exploit this heightened access for commercial gain by utilizing Philips' proprietary documents and software to provide services that only Philips and its authorized licensees are permitted to provide. Proponents' attempt to use the need for repair and servicing as a vehicle to pursue their commercial interests provides no justification for granting this exemption and should not be entertained.

In support of their position, Proponents offer a handful of declarations that existing servicing options cause increased cost and delay. But this meager showing—a handful of declarants claiming that the exemption would lower costs—cannot compete with the clear evidence described above, including FDA conclusions and regulations, that demonstrates otherwise. This is especially true given the heavy burden Proponents bear to establish the appropriateness of the exemption, *see* Part I(A), *supra*. Simply put, there is no market vacuum or crisis requiring this exemption. For these reasons, it is clear that the medical devices at issue here differ fundamentally from other categories of devices that the Registrar previously has found lack adequate servicing through manufacturer-approved channels—such as vehicle telematics systems[62] and smartphones.[63] Proponents have failed to demonstrate that Philips' copyrighted works will be unavailable to medical device owners unless proponents obtain an exemption allowing them to access Philips' protected intellectual property. In reality, the opposite is true.

Finally, Proponents press the argument that an exemption is necessary to permit servicing of older equipment that has reached the end of its commercial life and thus does not receive servicing from OEMs.[64] But Proponents misrepresent the status of this equipment and omit the substantial risks inherent in their proposed exemption.

First of all, there is no reason why "older" and "newer" equipment should be treated differently when it comes to the need to protect proprietary software contained in the devices. As discussed above and below, Philips medical devices contain proprietary software protected by copyright, and Proponents' attempts to gain access to that software for their own commercial gain (and to the detriment of public safety) through this exemption process is flatly

---

[61] Declaration of James Salmons, Ex. B, at ¶¶ 3-4.
[62] 2018 Recommendation at 213-14.
[63] 2018 Recommendation at 216.
[64] Summit Class 12 Comments at 2; Transtate Class 12 Comments at 6.

LOC_AR_00004145

inappropriate. This remains just as true for "older" devices as it does for "newer" devices, and Proponents cannot show otherwise.

As for certain medical devices that have received an End of Service (EOS) designation from the OEMs, Proponents argue that an exemption is needed to permit independent servicers to repair and service these devices because OEMs will phase out their servicing. But Proponents fail to point out that servicing can be phased out for a variety of reasons, specifically including that the equipment is no longer safe and effective to operate. Apart from that prevalent safety concern, the Proponents' hypothesized claim of purported service inadequacies related to EOS equipment certainly does not support the categorical exemption Proponents demand for all devices under all circumstances. Finally, Proponents do not provide support for any market-wide problem as related to older equipment either. Without that substantiation, there is no basis to even consider the exemption.

### B.    The Availability for Use of Works for Nonprofit Archival, Preservation, and Educational Purposes

Proponents advance no argument whatsoever that independent servicers must be permitted to circumvent Philips' protective measures for purposes of nonprofit archival, preservation, or educational purposes; to the contrary, they seek to use Philips' software in a commercial setting. Because Proponents bear the burden to establish the propriety of an exemption, their failure to do so here must weigh against them.

The Electronic Frontier Foundation does advance an argument on this factor, claiming that "tinkering is itself educational and is a common path for young people to become interested in studying science and engineering."[65] But the Foundation's arguments are aimed at its desired (and overbroad) exemption for virtually all software-enabled devices.[66] Whatever the persuasiveness of such arguments in the context of a "smart litterbox,"[67] they clearly have no application to Philips' FDA-regulated medical devices. It should go without saying that the "educational" benefits of tinkering with expensive, life-sustaining medical devices cannot justify the enormous accordant risks to human life. This factor therefore does not support the proposed exemption.

### C.    The Impact that the Prohibition on the Circumvention of Technological Measures Applied to Copyrighted Works Has on Criticism, Comment, News Reporting, Teaching, Scholarship, or Research

Proponents do not argue that prohibiting unauthorized parties from obtaining the copyrighted software in medical devices such as Philips' unduly hinders free speech, criticism, news reporting, teaching, or research. Again, the Electronic Frontier Foundation advances such an argument for software-enabled devices generally.[68] But no such argument is made or can

---

[65] Electronic Frontier Foundation Class 12 Comments at 16.
[66] Id. at 1-2.
[67] Id. at 22.
[68] Id. at 16.

LOC_AR_00004146

seriously be made for medical devices. Therefore, this factor weighs against the proposed exemption as well.

### D.    The Effect of Circumvention of Technological Measures on the Market for or Value of Copyrighted Works

This factor does not support an exemption because the proposed exemption would severely harm the value of Philips' (and other manufacturers') copyrighted works or harm the market for those works. As explained in Part I(B)(iii), *supra*, the access requested by the Proponents is extensive. They seek to give independent servicers full access to the entire copyrighted works and other proprietary information contained within the medical devices. This wholesale invasion of intellectual property rights would destroy the value of those copyrighted works and undermine the incentive for Philips and other OEMs to produce medical devices with their related software in the first instance—an endeavor that requires substantial time and expense as OEMs develop and secure regulatory clearance for medical devices.

The fact that this access is being requested for purely commercial purposes—meaning that the likelihood of market harm "may be presumed,"[69] Part I(B)(iv), *supra*—further demonstrates that the effect (and perhaps the intention) of the exemption would be to devalue OEMs' intellectual property interests and increase the economic prospects of those seeking to exploit that intellectual property for their own gain. Once again, Proponents cannot demonstrate that this factor supports an exemption; the opposite is true.

### E.    Such Other Factors as the Librarian Considers Appropriate

Proponents argue that an exemption is warranted—indeed, required—for reasons of public and health and safety. But there is reason to pause on their unsupported assertion. As explained above, *see* Part II(A), Philips already provides enough information and resources to allow independent servicers to repair and service Philips medical devices. The proposed exemption, therefore, cannot be justified by appealing to the health and safety benefits of the servicing activities Proponents are perfectly capable of conducting. Beyond that, permitting this additional access would jeopardize, not protect, health and safety.

Philips, as a manufacturer of medical imaging equipment, is acutely aware of the impact that the proper—or improper—use of sensitive medical equipment has on public health and safety. So is the FDA, which has recognized the serious ramifications for health and safety that this area poses, and which for that reason extensively regulates the medical-device arena. Medical equipment manufacturers, like Philips, are subject to an extensive array of regulations designed to ensure that medical devices consistently meet safety and quality requirements. They are, for instance, subject to registration, listing, premarket notification and approval, quality system, labeling, and reporting requirements.[70] By comparison, independent servicers are not

---

[69] *Leadsinger*, 512 F.3d at 531.

[70] *See* 21 C.F.R. §§ 801 (labeling), 803 (incident reporting), 807 (registration, listing, and premarket notification), 814 (premarket approval), 820 (quality system regulation). These regulations also extend to the provision of information by OEMs to customers on assembly, installation and adjustment of certain devices to protect their functionality, integrity and availability. The FDA can intervene if the information provided is inadequate. *See* 21

17

registered, not obligated to make reports, and not subject to regulated quality management systems or product training. Nor are they obligated to keep up with changes in equipment specifications, to use customized diagnostic tools, or to stay up to date on device history.

In addition, approved servicers are extensively regulated and must comply with a host of requirements; independent servicers are not. Approved servicers are trained to service and repair the specific medical device at issue and possess the latest diagnostic tools and device records and histories; independent servicers are not and do not. And approved servicers have up-to-date knowledge of device specifications and compatible products and parts, while independent servicers do not. Proponents' attempts to paint approved servicers—regulated, trained, and licensed to deal with the specific machinery at issue—as equivalent to independent servicers who are not subject to reporting, quality management, or other requirements, and who do not have the latest product knowledge, training, and tools, is wrong.

Beyond that, the profound difference between approved and independent servicers relates directly to the quality of the repairs and the proper functioning of the medical equipment. These concerns are magnified as one moves from the more basic repairs and servicing that independent servicers already conduct to the more advanced modifications and alterations—possible only by using Philips' proprietary tools—that Proponents seek an exemption to conduct. Permitting unapproved servicers to perform these advanced alterations on medical devices could lead to, for example, incomplete equipment records (which OEMs are required to maintain), assembly of the device without the proper tools or parts, a lack of up-to-date product calibration, a lack of ongoing market surveillance (which OEMs conduct), and a failure to report adverse events (which OEMs are required to report). There is no guarantee that the modified medical device will function as originally intended.

Finally, these potential malfunctions have serious ramifications for public health and safety. Improperly modifying life-saving medical equipment could cost human lives. Improper repair of diagnostic and treatment devices could lead to misdiagnoses of patients' conditions, ineffective or counterproductive treatment, and a host of other problems seriously jeopardizing patient health and safety. And circumvention of the access controls that Philips and other OEMs install on their medical devices also renders the devices susceptible to cybersecurity threats that OEMs and several federal agencies already work to protect against. Indeed, the FDA already "works aggressively to reduce cybersecurity risks [to medical devices]," a responsibility it shares with "device manufacturers, hospitals, health care providers, patients, security researchers, and other government agencies, including the U.S. Department of Homeland Security's Cybersecurity & Infrastructure Security Agency (CISA) and U.S. Department of Commerce."[71] These concerns, which threaten the safety and security of the medical devices upon which human

---

U.S.C. § 337(a); 21 C.F.R. §§ 10.30(g), (h). These regulations do not require the disclosure of trade secrets and they permit OEMs to provide their own employees with more advanced software.

[71] U.S. Food and Drug Administration, "Medical Device Cybersecurity: What You Need to Know," https://www.fda.gov/consumers/consumer-updates/medical-device-cybersecurity-what-you-need-know (last visited Feb. 5, 2021); *see also* U.S. Food and Drug Administration, "FDA Fact Sheet: The FDA's Role in Medical Device Cybersecurity," https://www.fda.gov/media/103696/download (last visited Feb. 5, 2021).

18

LOC_AR_00004148

lives depend, cannot be justified by the exemption's alleged benefit of saving money on repairs.[72]

This is precisely why Proponents are wrong to equate the exemptions recommended in the Registrar's 2018 Recommendation with their proposed exemption here.[73] Modifying a medical imaging machine used to diagnose patients in need is not the same as repairing someone's smartphone. These devices do not exist in the "do it yourself" space, where modification and tinkering carry no collateral consequences except to the device's owner. The Registrar has emphasized the need to follow an incremental approach that considers each class of device on its own terms, precluding such a comparison between highly different classes of devices.[74] There is no reason to abandon that approach now. The FDA has considered and analyzed the servicing issues and will continue to do so.[75] Congress has taken up right-to-repair exemptions, and a comprehensive public debate can be held in that forum. The copyright exemption process should not be used to supplant either the regulatory oversight or broader public debate. There is no "lawful" right to modify the medical devices implicated in this analysis. By statute and under existing case law, the unlicensed copying of OEMs' proprietary works to perform repairs as championed by Proponents is unlawful, and absent action by Congress it should stay that way.

## DOCUMENTARY EVIDENCE

*Commenters are encouraged to submit documentary evidence to support their arguments or illustrate pertinent points concerning the proposed exemption. Any such documentary evidence should be attached to this form and uploaded as one document through regulations.gov.*

---

[72] *See* Transtate Class 12 Comments at 9-10 (requesting the exemption because it would supposedly lower the cost of repairs and protect the income of independent servicers); Summit Class 12 Comments at 3 (urging the exemption out of concern that manufacturers may charge higher prices for servicing).

[73] *See* Transtate Class 12 Comments at 7.

[74] 2018 Recommendation at 191-92.

[75] The FDA's regulatory oversight is pervasive where medical devices are involved. This includes with respect to Proponents' rewriting of code (to bypass TPMs) that would be facilitated by the grant of the blanket exemption Proponents seek. The FDA does not directly regulate third-party servicers, which, as noted, creates its own set of security and safety risks in this context. But the FDA does regulate those who, like certain of the Proponents, would seek to rewrite code and place an adulterated system into the stream of commerce. *See* 21 C.F.R. § 820.3(o), (w) (subjecting to FDA quality-system-regulation requirements those who "significantly change[] the finished device's performance or safety specifications, or intended use"). These considerations are ignored by Proponents in urging that the exemption purportedly is needed to promote public health and safety. The FDA is unlikely to hold that view.

19

**EXHIBIT A**

**Declaration of Jacqueline Dickson**

LOC_AR_00004150

Declaration submitted in support of Comments from:
    Philips North America, LLC
    2000 Minuteman Road
    M/S 109
    Andover, MA 01810

## <u>DECLARATION OF JACQUELINE DICKSON</u>

I, Jacqueline Dickson, hereby declare as follows based on my personal knowledge:

    1.    I have held the position of Program Manager for Customer Service Intellectual Property Governance with Philips North America, LLC since 2016. In that position, I work with Philips' businesses and markets to ensure that Philips operates in compliance with its customer service intellectual property ("CSIP") policies and strategies. My work also involves CSIP enforcement, including coordinating with security groups to ensure the business takes appropriate actions to secure CSIP and supporting investigations and lawsuits when third parties breach Philips' security to gain unauthorized access to Philips' restricted CSIP materials.

    2.    Philips' CSIP includes service software, service documentation, training materials, and other proprietary materials that Philips creates for servicing Philips medical imaging systems. Philips assigns CSIP "levels" to these materials to specify those authorized to access the materials.

    3.    Philips makes its CSIP Level 0 materials available to equipment owners, Independent Service Organizations ("ISOs"), and any other individuals in the United States who request such access. These CSIP materials include materials and service tools that Philips makes available to comply with regulatory requirements (such as 21 CFR 1020.30), as well as other documentation and software for performing basic maintenance and servicing on Philips imaging systems, including manufacturer's specifications for what planned maintenance activities need to be conducted at various intervals.

    4.    Philips restricts access to its proprietary CSIP Level 1 materials to certain customers who contract for such access, subject to terms and conditions for the use of such materials. Those customers purchase a limited license to use Philips' CSIP materials to service their own Philips imaging systems. CSIP Level 1 materials include certain training materials as well as additional documentation and software to support planned maintenance activities and to execute common corrective maintenance activities.

    5.    Philips reserves its proprietary CSIP Level 2 materials and tools for only its own employees and limited trade partners, such as subcontractors and manufacturing partners,

US_ACTIVE-158092444.1

pursuant to contractual terms. CSIP Level 2 materials include Philips' internal information about changes to medical imaging systems (some of which may be part of campaigns required by regulatory bodies), as well as advanced training materials, documents, and software for advanced troubleshooting and advanced configuration of imaging systems (such as changes that may impact x-ray dosage).

6.    Philips developed its Integrated Security Tool ("IST") solution to secure its CSIP materials. Philips' IST solution provides a mechanism to manage entitlements to access CSIP materials and tools. Individual users may register with Philips to open an IST account. A Philips IST administrator then assigns to each user entitlements that specify the CSIP Materials the user can access, based on the CSIP rules as described above and subject to any pertinent contractual terms. Philips creates an encrypted IST certificate for each user containing various information, including the user's CSIP entitlements. Philips also offers, at cost, IST smartcards that can be used to access CSIP materials on its medical imaging systems in accordance with user entitlements.

7.    The default CSIP access level for IST accounts in the United States is CSIP Level 0 access. This includes individuals employed by ISOs, like petitioners Summit Imaging, Inc. and Transtate Equipment Co., Inc. I searched our IST records and observed that individuals from Transtate in fact have created IST accounts with Philips that provide them with CSIP Level 0 entitlements. They can use their existing accounts to access Philips' CSIP Level 0 materials. Summit does not have IST accounts and it appears they have not requested Level 0 access.

8.    Philips assigns CSIP Level 1 entitlements to accounts for employees of licensed customers once those employees have satisfied the prerequisites for such access, such as entering into confidentiality agreements and completing any training necessary to safely and effectively use the materials.

9.    Philips assigns CSIP Level 2 entitlements primarily to its own employees once they complete necessary training.

10.    Philips' IST solution includes an IST client application for installation on a field service engineer's computer. The IST client application requires a user to enter his or her IST certificate password. If the password is entered correctly and the individual has a valid IST certificate on their computer, IST will allow the user to access CSIP materials according to the user's entitlements in the IST certificate. A user with CSIP Level 0 access will be able to read Philips' CSIP Level 0 documents and run Philips CSIP Level 0 software, but would be restricted from accessing any CSIP Level 1 or 2 materials. A user with CSIP Level 1 access will be able to decrypt Philips' CSIP Level 1 documents and run Philips' CSIP level 1 software as well. Both the CSIP Level 0 and 1 users would be unable to decrypt or read Philips' CSIP Level 2 documents or to execute software requiring CSIP Level 2 entitlements. A Philips employee with CSIP Level 2 access would be able to access CSIP Level 0 and 1 materials.

11.    Philips' IST solution also includes an IST application that runs on Philips medical imaging systems, including ultrasound systems, computed tomography scanners, positron emission tomography scanners, X-ray machines, magnetic resonance scanners, and nuclear medicine scanners. When started, Philips medical imaging systems load software for clinical use

- 2 -

LOC_AR_00004152

of the system. To access Philips' field service software and information, a field service engineer may plug an IST smartcard charged with his or her IST certificate into a USB drive on the imaging system, provide his or her certificate password, and then choose to run field service software or access other field service information. The imaging system will then provide the user with access to software and information according to his or her entitlements. A CSIP Level 0 user, such as an ISO employee, would get access to various programs and information that allow them to set up and service Philips medical imaging systems, but restricts them from accessing more advanced unlicensed features and service functionalities. Philips' licensees and employees in turn receive higher levels of access based on their entitlements.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and corrected. Executed on February 5, 2021 in Northfield, Ohio.

Jacqueline Dickson

LOC_AR_00004153

**EXHIBIT B**

**Declaration of James Salmons**

LOC_AR_00004154

Declaration submitted in support of Comments from:
    Philips North America, LLC
    2000 Minuteman Road
    M/S 109
    Andover, MA 01810

## <u>DECLARATION OF JAMES SALMONS</u>

I, James Salmons, hereby declare as follows based on my personal knowledge:

1.      I have held the position of Head, Global Multivendor Services at Philips North America, LLC since 2019.  This includes overseeing Philips' companies AllParts Medical and AGITO Medical.

2.      Philips' multivendor services provide vendor-agnostic, multi-modality solutions for maintenance, lifecycle, and performance services for imaging systems and other biomedical assets.  Philips multivendor services range from traditional maintenance services to comprehensive solutions that incorporate a portfolio of added capabilities, such as data driven tools to identify equipment usage and replacement opportunities.

3.      Philips' multivendor group services medical imaging systems from a variety of Original Equipment Manufacturers ("OEMs"), including systems from GE and Siemens.

4.      Philips' multivendor group accesses software and information on systems according to OEM specifications.  OEMs typically make service specifications available to Independent Service Organizations ("ISOs"), such as Philips' multivendor group, to enable ISOs to perform authorized services.  For example, Siemens makes service documentation and information available through an "Online Library."  GE similarly provides a "Customer Documentation Portal" where ISOs can access service documentation and other information.

5.      If a medical imaging system that Philips' multivendor group is servicing lacks necessary system software or if there is an issue that Philips cannot resolve with its level of access to the OEM's service documentation and software, the customer or Philips will contract the appropriate OEM to acquire the necessary software or access.

6.      If Philips cannot acquire authorized access to OEM software or information necessary to perform a particular service on a medical imaging system, then the customer or Philips can contact the appropriate OEM to provide the necessary service.

7.      Philips saw no extended reduction in service capabilities or reduction in customers' ability to access maintenance services due to COVID.

US_ACTIVE-158093220.2

LOC_AR_00004155

8.      From the perspective of Philips' multivendor services, medical device maintenance services were not materially delayed due to the COVID crisis.  Service companies that we materially supported reported an overall increase in volume of service in 2020.  This includes increased activity from Siemens, GE, and major ISOs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and corrected.  Executed on February 8, 2021 in Tennessee.

James Salmons

LOC_AR_00004156



UNITED STATES COPYRIGHT OFFICE

# Long Comment Regarding a Proposed Exemption Under 17 U.S.C. § 1201

*Please submit a <u>separate</u> comment for each proposed class.*

*NOTE: This form must be used in all three rounds of comments by all commenters not submitting short-form comments directly through regulations.gov, whether the commenter is supporting, opposing, or merely providing pertinent information about a proposed exemption.*

*When commenting on a proposed expansion to an existing exemption, you should focus your comments only on those issues relevant to the proposed expansion.*

**[  ] Check here if multimedia evidence is being provided in connection with this comment**

*Commenters can provide relevant multimedia evidence to support their arguments. Please note that such evidence must be separately submitted in conformity with the Office's instructions for submitting multimedia evidence, available on the Copyright Office website at https://www.copyright.gov/1201/2021.*

## ITEM A. COMMENTER INFORMATION

Petitioner and Contact Information

Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging
1040 Derita Rd.
Suite A
Concord, NC 28027
Robert A. Wheeler, President
Telephone: 800-710-9996

Of counsel:
Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
David R. Metzger
Email: david.metzger@dentons.com
Telephone: 312-867-2578
Taaj Reaves
Email: taaj.reaves@dentons.com
Telephone: 312-867-8176

**Privacy Act Advisory Statement:** Required by the Privacy Act of 1974 (P.L. 93-579)
The authority for requesting this information is 17 U.S.C. §§ 1201(a)(1) and 705. Furnishing the requested information is voluntary. The principal use of the requested information is publication on the Copyright Office Web site and use by Copyright Office staff for purposes of the rulemaking proceeding conducted under 17 U.S.C. § 1201(a)(1). NOTE: No other advisory statement will be given in connection with this submission. Please keep this statement and refer to it if we communicate with you regarding this submission.

LOC_AR_00004507

*Attorneys for Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging*

## ITEM B.  PROPOSED CLASS ADDRESSED

Class 12: Computer Programs—Repair, and, in particular, the subset of Electronic Servicing Materials for Diagnosis, Maintenance, Repair of Medical Equipment

The Librarian of Congress is requested to exempt from the anti-circumvention provision of the Digital Millennium Copyright Act (17 U.S.C. § 1201) ("DMCA"), the circumvention of technological measures (also referred to herein as technological protective measures ("TPMs"))[1] undertaken by or on behalf of the owners or lessees of the medical systems and devices, for the purpose of accessing and using medical equipment servicing materials in the form of computer programs and data files (including databases and manuals) that are necessary for servicing (diagnosis, repair, and maintenance) of the medical devices and systems, thereby ensuring proper operation and compliance with manufacturer and governmental specifications; and where such circumvention does not constitute a violation of any other applicable law.

This exemption will allow owners and lessees of medical systems and medical devices, and their authorized agents, to access and use the servicing materials and perform servicing activities that are essential to the repair, diagnosis, and maintenance of their own medical equipment, without the threat of legal action should the need arise to actually or allegedly circumvent TPMs.  This exemption will also alleviate the unintended consequences of the application of copyright law enacted for developers of software applications for stand-alone computers, to specialty medical equipment integrated with software.

## ITEM C.  REPLY COMMENT

## I.    Introduction

The Period 2 comments by Philips, MITA, and AdvaMed (hereinafter, collectively, "OEM Commenters") are the only comments filed in direct opposition to Transtate's (and Summit Imaging's) comments in support of an exemption under the anti-circumvention provisions of the DMCA for accessing medical device electronic servicing materials.[2,3]  All three comments actually support the need for an exemption.  Critically, the comments focus not on the purpose of the DMCA, but rather underscore that (a) original equipment manufacturers ("OEMs") believe that they are entitled to be the arbiters of who, if any one at all, gets to service their medical

---

[1] In using the terms "technological protective measure" and "TPM," Petitioner does not admit or concede that the technological measures discussed herein meet the definition of a "technological measure" that "effectively controls access to a protected work," as defined in 17 USC § 1201(a)(3)(B).

[2] "Transtate" refers to Petitioner Transtate Equipment Company, Inc. d/b/a Avante Diagnostic Imaging. "Summit Imaging" refers to Petitioner Summit Imaging, Inc.
"Philips" refers to Opponent Philips North America LLC.
"MITA" refers to Opponent Medical Imaging & Technology Alliance.
"AdvaMed" refers to Opponent Advanced Medical Technology Association.

[3] "Electronic service materials" are defined in Transtate's Period 1 comments at 5 as "computer programs or modules thereof, electronic data files, including databases, and electronic manuals"

LOC_AR_00004508

devices, as well as when, and under what conditions, and (b) the purpose of the OEMs' TPMs is to allow the OEMs to be the arbiters.

There is no dispute that the electronic servicing materials embedded or stored on medical devices and hidden behind TPMs include uncopyrightable (and hence unprotected) materials and works subject to fair use.[4]  Even Philips acknowledges that it is obligated to make electronic service materials available for what it calls "basic servicing of Philips medical imaging systems,"[5] yet hides them behind TPMs, and thus, they are not available unless one obtains an Integrated Security Tool ("IST") key, at undue expense and with other burdens.[6]

To be clearer, Transtate's petition and Period 1 comments distinguish between two types of electronic servicing materials.[7]  The **necessary electronic service materials** are those necessary for servicing (diagnosis, repair, and maintenance) of the medical devices and systems, **thereby ensuring proper operation and compliance with manufacturer and governmental specifications**.[8]  The **unnecessary electronic service materials** are those **specialized materials OEMs include for their own benefit**.  Transtate is seeking for all lawful possessors of medical devices and third party servicers working on behalf of the lawful possessors to be relieved of the DMCA guillotine should the need arise to circumvent the TPMs to access the necessary electronic service materials.[9]  Further, no one is seeking access to remanufacture or modify the

---

[4] Petitioner does not admit that any particular work is "protected" as that term is used in the DMCA, or that any particular work enjoys enforceable rights.

[5] Philips Period 2 comments at 4.

[6] The FDA mandates that Assembly, Installation, Adjustment, and Testing ("AIAT") information be made available "at a cost not to exceed the cost of publication and distribution."  21 U.S.C. § 1020.30(g).  In its 2003 Guidance, the FDA elaborated:

> The agency has explained that manufacturers may charge for the cost of producing each additional package or unit of instructions. The charge can incorporate factors such as the cost of paper, labor, use of a copying machine, or other costs associated with each package the manufacturer provides under the performance standard. This principle should govern the calculation of the costs for all information subject to disclosure, whether printed, encoded in software, or any other format. For software, recoverable charges equivalent to printed materials would include such factors as the cost of the technical labor of producing such additional package or unit, computer disks, and packaging materials used to produce each additional unit of software. Using a reasonable set of factors should govern the calculation of the costs for any materials that are provided.  *See* Ex. 28

Despite this, there are financial burdens far greater than the cost of "publication and distribution" placed on lawful possessors and third-party assistants by OEMs in order to access even its "basic" Level 0 access keys. *See*, declarations of Michael Spencer (Ex. 3 at ¶ 8), Abigail Lane Savage (Ex. 7 at ¶7),and Jacqueline Dickson (attached in Philips Period 2 comments at ¶¶ 7-9).

[7] Transtate Period 1 comments at 1-2.

[8] Maintenance and repair are similarly defined at 17 USC §§ 117(d)(1) and (2) as follows:

> (1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and
> (2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.

[9] 21 C.F.R. § 1020.30(b): "Assembler means any person engaged in the business of assembling, replacing, or installing one or more components into a diagnostic x-ray system or subsystem."

LOC_AR_00004509

devices.  The exemption can be easily tailored, as proposed by Petitioner, to not exempt those situations.

The Copyright Office is not requested to determine what electronic service materials should be considered necessary electronic materials required for the purposes of servicing medical devices. However, it should concern the Copyright Office that TPMs and the DMCA are purposefully being used to restrict access to unprotected materials, fair use materials, and information the FDA mandates be made available.[10]

Philips' self-serving statement that it makes materials available for "basic service" is misleading in several respects.[11]  First, Philips alone determines what should be considered "basic service." Second, Philips alone determines what materials are needed for such "basic service."  Third, Philips alone determines who has access to even these "basic" materials.  Fourth, Philips does not explain or address the hurdles it places on non-Philips' persons and entities to obtain access, such as the short expiration times of access keys, the expense for the access keys, and the refusal to train.  Fifth, the AIAT mandate to which Philips alleges it complies, applies only to ionizing radiation emitting devices, not all medical imaging devices, much less all medical devices. Regarding this last point, at footnote 2 of its Period 2 comments, Philips misrepresents the facts and fails to completely quote the January 2, 2014 letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance.  The letter concludes that (emphasis added): "The manufacturer of the original system is not required to disclose proprietary accessories or functions, additional documentation or enhanced software programs to third parties unless this information is part of the AIAT instructions specified in 21 CFR 1020.30(g) or part of the user information specified in 21 CFR 1020.30(h)."  Thus, the Deputy Director is clarifying that in fact OEMs must disclose and make available proprietary accessories or functions, additional documentation and enhanced software programs to third parties if they are covered by the AIAT disclosure requirements.  Tellingly, this is the opposite of the impression Philips attempts to make in its' footnote.

The OEM Commenters argue that providing lawful possessors and third-party assistants with CSIP Level 0 access allows for "basic servicing of the systems". This is not accurate. First, Level 0 documentation and software is not available on all medical systems and modalities. Further still, many medical systems are not properly set up to use Level 0 documentation and software without prior configuration. Even when Level 0 is available, it requires the purchase of thousands of dollars in hardware per engineer in order to properly service medical equipment. As a result, and in contradiction to the FDA mandate that certain information be made available "at a cost not to exceed the cost of publication and distribution," lawful possessors, independent

---

[10] 21 C.F.R. § 1020.30(g).  *See also*, FDA Guidance Document (attached in Transtate Period 1 comments as Exhibit 28).
[11] Philips Period 2 comments at 5.

LOC_AR_00004510

service organizations ("ISOs"), and third-party assistants are forced to expend financial resources even before they are granted a limited amount of access and information to service medical equipment. [12] This "basic" level access also requires a tedious multistep process and certificates expire on a monthly basis, requiring lawful possessors, ISOs, and third-party assistants to endure the process at least twelve times per year and often more. Accordingly, and despite what the OEM Commenters state, Level 0 documentation and software is not sufficient.

Further, the OEM Commenters completely ignore that they do not always make keys for devices they deem to have reached end of life. This is an obvious impediment to servicing older medical devices.

OEMS could eliminate the TPMs for these materials and use TPMs only for the specialized unnecessary electronic servicing materials, but they have not done so because the threat of liability for violation of the DMCA to access the necessary electronic servicing materials gives the OEMs (undue) control over the medical device servicing market and makes lawful possessors beholden to the OEMs, as discussed below.

The concerns raised by the OEM Commenters regarding safety and cybersecurity also are not a concern in connection with this exemption seeking process, and, in any event, are based on speculation.[13]  The incidences noted by AdvaMed and MITA relate to hardware issues, not use of software issues.  Cybersecurity is already the subject of many other laws[14] and is an area addressed by the FDA.[15]  More importantly, the OEM Commenters' self-serving concerns are unwarranted. The FDA also looked at the issues of patient safety and regulation of ISO's in 2017, and concluded in its 2018 report that there was <u>no</u> evidence to warrant further regulation of ISO's.[16]  Again, the OEM comments are based on speculation.  They provide no evidence of an ISO modifying software or otherwise committing a malicious or even reckless act via software. And, in any event, whether or not ISO's are regulated has nothing to do with the fact that TPMs are being used to hide non-protectable and necessary electronic servicing materials that are subject to non-infringing uses[17], and information the FDA has mandated be made available.

Accordingly, the requested exemption for medical devices is warranted.

## II.    The OEM Commenters Confirm That TPMs Are Not Being Used, Or At Least Used Primarily, By OEMs To Protect Copyrighted Material

### A.    All Three OEM Commenters Make Similar Arguments

---

[12] *See* supra fn. 6.
[13] Philips Period 2 comments at 2, 18; MITA Period 2 comments at 5; and AdvaMed Period 2 comments at 6.
[14] The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, is one example.
[15] 21 C.F.R. § 11.10.
[16] Ex. 22 at 25-26.
[17] Such infringing uses are Fair Use, Essential Steps, and Machine Maintenance and Repair, as discussed in Transtate's Period 1 Comments at 14-19, and infra in Sections E(1)-(2).

LOC_AR_00004511

Philips, MITA, and AdvaMed raise the specter of "unregulated" and "untrusted" ISOs servicing medical devices, insinuating that ISOs are presumed untrustworthy, and cannot be entrusted with servicing of medical devices unless they pass some approval process imposed by the OEMs and/or the FDA.[18]  The OEM Commenters also raise the specter that granting the exemption would endanger "patient safety."[19]  They also raise the specter of an exemption enabling "hacking" and compromising cybersecurity of the medical devices.[20]  But, these issues have already been addressed by the FDA, and, in any event, are irrelevant to the DMCA exemption request process.

### B.    The OEM Comments Are Not Relevant To The Purpose Of TPMs

The anti-circumvention provision of the DMCA was enacted for the purpose of protecting digital works in the then new digital media, *e.g.*, the Internet and storage devices, given the much greater ease with which digital works could be easily reproduced and distributed.  The provision was not enacted to regulate servicing of devices, be a mechanism for the OEMs to vet the technical qualifications of device servicing entities, to address patient safety concerns, for the OEMs to protect patient privacy, or to protect trade secrets.  All of the OEMs' arguments regarding these issues are irrelevant and only serve to lay bare that the OEMs' main intent is to act as marketplace controllers and to be the sole arbiters regarding who should be allowed to service medical devices.  And if this is not telling enough, the OEM Commenters direct all of their arguments against ISOs and do not mention any of these concerns with respect to the device owners and other lawful possessors who are in the same position as ISOs. The OEM Commenters do not explain why it is that the lawful possessors are somehow "trustworthy" but ISOs are not.  It is clear the TPMs are used primarily, if not solely, to keep lawful medical device possessors beholden to the OEMs for servicing their devices and to eliminate ISOs from assisting the lawful possessors of the medical devices.

Indeed, the market for servicing medical devices is more accurately divided into OEMs and non-OEMs.  The non-OEMs include (a) the lawful possessors such as hospitals and other medical facilities as well as refurbishers/remarketers, and (b) ISOs.  The lack of or burdensome access to necessary electronic servicing materials is foremost an issue for the lawful possessors with in house servicing departments, whether they are staffed by employees or contractors, because of the unnecessary delays and costs in needing to rely on the OEMs for servicing, as outlined by Transtate's Period 1 declarants.[21]

Further, and as noted in Transtate's Period 1 comments, although some lawful possessors of medical devices can obtain some degree of access to the embedded servicing materials, it is at an

---

[18] Philips Period 2 Comments at 2 and 9-10.
[19] Philips Period 2 comments at  7; MITA Period 2 comments at 3-4, 9-10, 18, and 30; and AdvaMed Period 2 comments at 2, 9, and 11-12.
[20] Philips Period 2 comments at 2 and 9-10.
[21] *See* declarations of Melvin (Ex. 5 at ¶ 8); Kahler Ex. 6 at ¶¶ 13-16); and Grogan (Ex. 8 at ¶ 16).

6

undue expense, and the access is insufficient. And, the electronic servicing materials to which access is given are entirely within the discretion of the OEMs.

What the OEM Commenters fail to mention, is the fact that there are other OEMs, such as Del Medical, Cannon, and Toshiba[22] that do not use TPMs, and who do not prevent non-OEM servicing of their devices. There is no mention by the OEM Commenters that there is any, much less a significant, concern for privacy breaches, safety incidences, cybersecurity issues, or copyright infringement in connection with non-OEM servicing of such devices without TPMs. This is because these issues are overblown and unsupported in the record.

> **C.    The Safety And ISO Regulation Issues Are The Purview Of The FDA Which, Already Determined Not To Regulate ISOs Because ISOs Are Not Only Trusted, But Vital.**

The patient safety and regulation of non-OEM servicing of medical devices is the purview of the FDA. Even the OEM Commenters recognize this. In its May 2018 Report,[23] the FDA noted that (emphasis added):

- The currently available objective evidence is not sufficient to conclude whether or not there is a widespread public health concern related to servicing, including by third party servicers, of medical devices that would justify imposing additional/different, burdensome regulatory requirements at this time;
- Rather, the objective evidence indicates that many OEMs **and third party entities provide high quality, safe, and effective servicing of medical devices**;
- A majority of comments, complaints, and adverse event reports alleging that inadequate "servicing" caused or contributed to clinical adverse events and deaths actually pertain to "remanufacturing" **and not "servicing"**; and
- **The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system**.

If the FDA, the agency responsible for patient safety and regulation of the manufacture and servicing of medical devices has determined that third party entities provide high quality, safe, and effective servicing of medical devices and that the availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system, it is to that agency that the OEM Commenters should raise their concerns. The OEM Commenters' attempt to involve the Copyright Office and the Registrar in these issues is simply inappropriate and an improper attempt to raise irrelevant issues for the sole purpose of maintaining their exclusionary behavior.

---

[22] Grogan Decl., Ex. 8 at ¶ 12.
[23] FDA Report on the Quality, Safety,and Effectiveness of Servicing of Medical Devices (May 2018), Ex. 22 at pg. i.

LOC_AR_00004513

Further, patient and operator safety is covered by a myriad of laws and regulations. It is in no one's interest to jeopardize patient or operator safety. The OEM comments in that regard are simply without any basis in fact. If anything, access to the necessary electronic servicing materials will enhance such safety because it will enable lawful possessors and their trusted third party assistants to address problems quickly.[24] The exemption will enable access when the need arises and the OEMs refuse or greatly hinder access.

Indeed, the OEMs have their own safety issues. The Department of Health and Human Services reviews complaints and tracks responses to complaints. Attached as **Exhibit 30**, are a sampling of issues raised by the HHS with respect to complaints against Philips. Many involve software issues. This further underscores that the OEMs' invocation of patient safety is nothing more than a smokescreen.

## D.    The Cybersecurity Issues Raised By The OEM Commenters Are Covered By Other Statutes

The OEM Commenters arguments regarding the risk of malicious cybersecurity breaches or hacking to modify medical devices by exempting access to necessary electronic servicing materials is not relevant. Cybersecurity is both subject to multiple laws such as the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration, and various criminal statutes. The FDA also is active in this area.[25]

Aside from the fact that the OEM Commenters provide no evidence of malicious cybersecurity breaches committed by a non-OEM servicing entity, the exemption sought is for diagnosis, maintenance and repair, not remanufacture or alteration. One would still remain liable under all relevant laws for circumvention to perform acts other than servicing. Further, an exemption would not remove the TPMs, only liability for circumvention to service the medical devices under lawful conditions.

Bad actors will commit bad acts regardless of the laws meant to deter them. Circumvention of a TPM is a minimal concern for someone wishing to commit a malicious act. All the TPMs do in the present situation is make it more difficult and more expensive for lawful possessors to have

---

[24] As an example, after performing certain types of service on Philips' cath lab machines, including service permitted under Philips' "basic" access, you are required to calibrate the Interventional Work Station ("IWS"). Philips' "basic" access level does not permit access to this calibration. If IWS is not calibrated, it puts the patient's health and safety at risk. For example, without calibration, the images displayed through IWS may not be clear, necessitating taking multiple images, exposing the patient to unnecessary radiation. More significantly, lack of calibration may result in "image misregistration," where for example the location of a catheter that is being placed in a patient's body is not being accurately shown in the IWS image. This could cause major issues during surgery, resulting in injury or even death to the patient.

[25] *See* https://www.fda.gov/medical-devices/digital-health-center-excellence/cybersecurity.

LOC_AR_00004514

their medical devices serviced.  It also makes the lawful possessors more reliant on the OEMs for their servicing needs.[26]

### E.    Arguments Regarding the Commercial Motive of ISOs Are Misplaced

The OEM Commenters make much ado about the commercial motivation of ISOs.  But that is easily dispensed with.

First, the petition requests an exemption for lawful possessors of the medical devices and the third party servicers performing services requested by the lawful possessors.  As set forth in the declarations provided with Petitioner's Period 1 comments, lawful possessors such as hospitals invariably have in-house staff to perform the servicing to the extent they are able to do so.[27]  This reduces cost and delays.  Lawful possessors such as hospitals and medical facilities do rely on outside parties, whether OEMs or ISOs for some servicing.  Some contract out of their in-house departments, i.e., they are staffed by contractors, not direct employees.  These lawful possessors experience the same issues with the impediments imposed by the TPMs, namely high costs to obtain keys, higher servicing costs by OEMs, and no access to needed information such as error/failure codes and the like.  Ultimately, the benefit of allowing circumvention is for the lawful possessors to get faster and more affordable services from ISOs.

To focus exclusively on ISOs, while ignoring hospitals and other lawful possessors, is a clear indication that the OEM Commenters are intent on trying to persuade the Copyright Office using unwarranted scare tactics rather than to focus on the merits of TPMs and access to protected works.

### F.    The Failure to Separate the Necessary and Unnecessary Electronic Servicing Materials is the OEM's Achilles' Heel

To the limited extent that the OEM Commenters mention a concern for protecting copyright protectable material, they conveniently fail to separate out the necessary electronic servicing materials from the unnecessary electronic service materials, which presumably are materials for the benefit of the OEMs.  Because by definition there would be no need for anyone other than an OEM to access the unnecessary electronic servicing materials materials, there would be no risk of exposure of these materials because a non-OEM would not have a need to access these materials.  At the same time, the lawful possessors and those assisting them would be able to more easily, quickly, and with less expense ensure compliance of the medical devices with governmental and manufacturer specifications.

### IV.    The Making Of Copies Of Necessary Servicing Materials In Order To Conduct Servicing Of Medical Devices Indeed Is Exempt From Infringement

---

[26] *See* declarations of Melvin (Ex. 5 at ¶ 8), Kahler (Ex. 6 at ¶¶ 13-16); and Grogan ( Ex. 8 at ¶ 16).
[27] *Id.*

LOC_AR_00004515

A.    **The Making Of A Copy Of A Computer Program Or Database In Order To Service A Medical Device Is Fair Use**

i.    **The Purpose and Character of the Requested Use Supports Exemption**

OEM Commenters argue that the lawful possessors, ISOs, and third-party assistants' requested uses are purely commercial and thus presumptively unfair,[28] however, they ignore the underlying non-commercial "purpose and character" of the proposed use, *i.e.*, that Transtate, lawful possessors and other third-party assistants' require access to the necessary electronic servicing materials for the purpose of adequately servicing medical devices used in furtherance of public health. The OEM Commenters also conveniently fail to mention that other lawful possessors (*i.e.,* hospitals and medical facilities) share similar "commercial" qualities.[29]

The OEM Commenters mischaracterize the emphasis on commercial use involved in consideration of the first factor for fair use.  As articulated by Nimmer on Copyright, a less stark formulation of the same principle is that "commercial motivation and fair use can exist side by side," and considerations include "whether the alleged infringing use was primarily for public benefit or for private commercial gain"—which inclines against fair use in a commercial context, but leaves wide latitude for consideration of all the other factors that may outweigh this single fact under appropriate circumstances.[30]  In other words, labeling a use as "commercial," should not end the analysis.[31] Accordingly, the mere fact that a use is educational and not for profit does not insulate it from a finding of infringement, any more than the commercial character of a use bars a finding of fairness."  Because the fact that a given use is commercial does not necessarily negate fair use, any presumption that a commercial use is *ipso facto* unfair should be regarded as "rebutt[able] by the characteristics of a particular commercial use."[32]

---

[28] *See* Phillips Period 2 Comments at pg. 7 citing *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) and *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F.Supp.3d 957, 972 (C.D. Cal. 2016), for the conclusion that commercial use is presumptively unfair. However, the facts that represent "commercial use" in each of these cases are distinguishable from the facts at hand. In *Leadsinger, Inc. v. BMG Music Pub.,* a manufacturer of karaoke devices brought an action against music publishers seeking declaratory judgment that it was authorized to display lyrics to songs, either in print or displayed on a video screen, under the fair use doctrine. The court held that plaintiff's basic purpose—to sell its karaoke device for profit—was a commercial one. Similarly, in *Disney Enters., Inc. v. VidAngel, Inc.*, the plaintiffs were companies in the business of producing and distributing motion pictures and television programs and brought an action against an unauthorized provider of companies' copyrighted movies and television programs. Neither of these cases, nor the purposes for use of copyright protected materials articulated therein, is analogous to the type of use contemplated by Petitioner, that of service and repair of medical devices that directly impact the quality of public health.

[29] *See* supra at § E.

[30] *See* 4 Nimmer on Copyright § 13.05 (2020).

[31] *See* 4 Nimmer on Copyright § 13.05 (2020); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994) ("The language of the statute makes clear that the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character. Section 107(1) uses the term 'including' to begin the dependent clause referring to commercial use, and the main clause speaks of a broader investigation into 'purpose and character'. . .).

[32] *See* 4 Nimmer on Copyright § 13.05 (2020).

LOC_AR_00004516

In determining the purpose and character of the use, "the crux of the profit/non-profit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *See, e.g., Harper & Row, Publrs. v. Nation Enters.,* 471 U.S. 539, 562, 105 S. Ct. 2218, 2231, 85 L. Ed. 2d 588, 608, 1985 U.S. LEXIS 17, *43, 225 U.S.P.Q. (BNA) 1073, 1081, 53 U.S.L.W. 4562, 11 Media L. Rep. 1969; *Weissmann v. Freeman,* 868 F.2d 1313, 1315, 1989 U.S. App. LEXIS 2387, *1, 10 U.S.P.Q.2D (BNA) 1014, 1015, Copy. L. Rep. (CCH) P26,390, 101 A.L.R. Fed. 91 (one academic's use of another academic's materials was a for-profit use); *Society of Holy Transfiguration Monastery, Inc.,* 689 F.3d 29, 61 (1st Cir. 2012) ("In effect, the commercial-noncommercial distinction the law draws centers not on whether a user intends to line his own pockets, but rather on whether the user stands to profit from exploitation of the copyrighted material without paying the customary price. Profit, in this context, is thus not limited simply to dollars and coins; instead, it encompasses other non-monetary calculable benefits or advantages.").

Here, the request to access fair use of the necessary electronic servicing materials would involve a commercial setting only to ensure that the medical equipment complies with OEM and regulatory specifications.[33] Petitioner is not aware of anyone in the business of selling access to such servicing materials. Moreover, remarketers, such as Petitioner, pay in full for the medical equipment at issue, and are lawful owners of the medical devices with the software integrated in them. Servicing the medical equipment owned by lawful possessors is primarily for public benefit, as access to materials required for servicing is imperative in treating patients, and is especially critical during a pandemic such as the current COVID-19 crisis.[34] Petitioner does not and is not seeking to provide, or for others to provide, the copyrighted works to third-parties, but instead seeks access to effectively service products that are lawfully owned. Accordingly, the Petitioner's proposed use of copyrighted works is not commercial in the ordinary sense.

Petitioner does not dispute that it is a for-profit entity. However, the commercial nature of Petitioner's business model does not outweigh the noncommercial nature of its servicing and repair work.

## ii.    The Nature of the Original Work Supports Exemption

OEM Commenters seek to downplay this factor precisely because it weighs in favor of exemption. The more informational or functional the work, the broader the scope of the fair use defense. *See, e.g.,* 4 Nimmer on Copyright § 13.05[A][2][a]; *Leadsinger, Inc. v. BMG Music Pub.,* 512 F.3d 522, 531 (9th Cir. 2008) *Leadsinger, Inc. v. BMG Music Publ'g,* 512 F.3d 522, 531 (9th Cir. 2007); *Stern v. Does,* 978 F. Supp. 2d 1031, 1046 (C.D. Cal. 2012), *aff'd,* 512 Fed. Appx. 701 (9th Cir.), *cert. denied,* 134 S. Ct. 423 (2013); *Cambridge Univ. Press v. Becker,* 863

---

[33] 21 C.F.R. §§ 1020.30(g)-(h)
[34] *See* declarations of Melvin (Ex. 5 at ¶ 7), Kahler ( Ex. 6 at ¶ 16), and Lane-Savage (Ex. 7 at ¶¶ 17-19).

LOC_AR_00004517

F. Supp. 2d 1190, 1225 (N.D. Ga. 2012), *rev'd on other grounds sub nom.*, *Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014); *See Diamond v. Am-Law Corp*., 745 F.2d 142 (2d Cir. 1984) ("informational works may be more freely published"); *Consumers Union of U.S., Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) ("Since the risk of restraining the free flow of information is more significant with informational work, the scope of permissible fair use is greater."), *cert. denied*, 469 U.S. 823, 105 S. Ct. 100, 83 L. Ed. 2d 45 (1984) (*but see later opinion*, 664 F. Supp. 753 (S.D.N.Y. 1987)).

The service software designed and blocked by OEMs is not creative nor fictional, expression; it is functional information required to safely service medical equipment. The software itself is not dictated by any creative expression, but by the specific technical needs of the machine. Indeed, because the copyrighted works held hostage by OEMs are integrated with functional medical equipment (*i.e.*, the hardware), access to this information is necessary to engage in diagnosis, repair, and lawful modification of medical device functions.[35] Petitioner seeks access and use of this functional information in order to obtain diagnostic data. Accordingly, the second factor supports fair use.

### iii. The Amount And Substantiality Of The Portion Used In Relation To The Copyrighted Work As A Whole Weighs In Favor Of An Exemption

The amount of use of the servicing materials would not be substantial and would be limited to those instances where circumvention was essential for critical diagnoses, maintenance, and repairs. As explained above, only the portion of the works containing necessary electronic service materials are at issue under the proposed exemption. Accordingly, granting Petitioner's proposed exemption does not require use of the entire copyrighted works.

OEM Commenters argue that granting Petitioner's exemption requires use of its entire copyrighted works, providing little evidence to support this assertion, but the OEM Commenters do not address the fact that use of its works are part and parcel of a lawful possessor's ownership of the medical equipment it services. The OEM Commenters also do not admit that in certain instances, access to proprietary information, additional documentation or enhanced software programs is required.[36] OEM Commenters also falsely state that the current access level provides

---

[35] Opponent Medical Imaging & Technology Alliance ("MITA") cites *Allen-Myland, Inc. v. IBM* as an exemplar where copying computer code was not found to be fair use despite the computer code's informational nature, however the facts and holding are distinguishable from the facts at hand. In *Allen-Myland, Inc. v. IBM*, the court declined to find a fair use of computer code because the plaintiff copied code to build a library of different versions of the microcode in order to discover how to support various configurations and learn how to use IBM's system to achieve its commercial purposes without paying IBM. In this instance, Petitioner's purpose is not to create an internal inventory, it is to repair, service, and diagnose the medical equipment it owns.

[36] *See., e.*g., January 2, 2014 letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance.

LOC_AR_00004518

information necessary for basic repair and maintenance, but the OEM Commenters do not define, extrapolate, or provide evidence of their interpretation of "basic."[37]

The attempt to drag safety and cybersecurity cautions into their arguments also fail, given that the FDA has weighed in and concluded ISOs like Petitioner are "critical" to a safe and functioning medical care industry. Moreover, Petitioner and other ISOs like it already receive some degree of training directly from OEMs, and are skilled and trained in repair and diagnosis of medical equipment, so long as they are empowered with the appropriate level of access needed to do so. If the OEMs cared solely about safety, they would provide even more training, not less. The OEM Commenters arguments that granting the exemption requires use of its entire copyrighted works is misleading and misses the point. The third fair use factor supports an exemption.

### iv.    The Effect Of The Use Upon The Potential Market For Or Value Of The Copyrighted Work Is Minimal

The OEM Commenters argue that the fourth factor weighs against Petitioner because as a third-party ISO it is inherently commercial.[38]  Instead, of responding to the valid concerns provided from lawful possessors, and those acting at their behest, the OEM Commenters attempt to focus on the potential for safety and hacking harm by allowing **third parties** access to service medical devices.  This argument ignores the plight of in-house hospital employees attempting to service their own medical equipment.[39]

Medical equipment software is effectively useless outside of the equipment it inhabits, with no separate market for reselling or distributing the software apart from the devices.  The servicing materials required are only useful for the particular medical equipment in which they are embedded.  Moreover, OEM Commenters concede that they already license some of their copyrighted materials to some ISOs,[40] which causes no harm to the secondary market.  Petitioner is seeking access for lawful possessors, and those acting at their behest, to the necessary electronic servicing materials to ensure proper operation and servicing activities on medical systems and devices.  Access to the computer programs and data files comprising the necessary electronic servicing materials is needed to replace the unprotected electrical and mechanical parts on the medical device.  Again, the TPMs do not provide a means for maintaining the device's hardware without also accessing the software.  There is no other need to otherwise copy or access the computer programs and data files.

OEMs would still be free to sell medical devices and computer programs.  Accordingly, the necessary servicing materials used by lawful possessors, ISOs, and third-party assistants does not

---

[37] *See also* supra at pg. 5.
[38] Philips Period 2 comments at 10; AdvaMed Period 2 comments at 7; and MITA Period 2 comments at 8.
[39] *See* declarations of Melvin (Ex. 5 at ¶ 4), Kahler (Ex. 6 at ¶ 5), and Grogan (Ex. 8 at ¶¶ 6-7).
[40] Dickson Decl. at para. 4.

LOC_AR_00004519

affect the market for or value of the computer programs and data files involved. Therefore, the fourth factor weighs in favor of a finding of fair use.

### B.    The Making Of A Copy Of A Computer Program Or Database In Order To Service A Medical Device At The Request Of An Owner Of The Device Is An Essential Step In The Use Of The Device

OEM Commenters raise the issue that a copy of the computer program or data base is not necessary for the activation of the medical device, but it is necessary to service or diagnose the medical device.[41] The OEM Commenters also claim that the owners of the medical devices are not the owners of the copies of the electronic materials embedded in the devices stating the software is only licensed. However, this ignores that the issue of ownership is a fact-based inquiry.[42] The Copyright Act provides for two basic manners for distributing copies of works: (a) by sale or other transfer of ownership, or (b) by rental, lease, or lending.[43] Yet the OEM Commenters nowhere describe how they are distributing their works via the rental, lease, or lending, or that the machine sale documents include these words or concepts. Rather, they rely on "licensing" which is an intellectual property right concept, not a concept associated with the transfer of tangible property, and in this case, the copies of sofware and data files stored or embedded on a machine.

Indeed, even assuming that the software in the owned machines was only considered rented, leased, or lent, there is no sensical explanation as to how one returns the embedded copies of the works. Presumably they could, if they knew how, delete all of the software by somehow reimaging the drives of the machines, but then the machines would cease to function. They would no longer constitute the purchased machine. This surely is not contemplated by anyone in the purchase of the medical devices. Rather, the expectation is that the medical devices can be maintained and repaired thoughout their useful lives.

Philips even concedes that its "customers purchase a limited license to use Philips' CSIP materials **to service their own Philips imaging systems**."[44] Yet, Philips fails to address why these materials, which include "documentation and software to support planned maintenance activities and to execute common corrective maintenance activities," are not essential in the use

---

[41] AdvaMed Period 2 comments at 7-8; MITA Period 2 comments at 13; and Philips Period 2 comments at 12-13.
[42] *See* Raymond Nimmer, The Law of Computer Technology § 1.18[1] p. 1–103 (1992) ("Ownership of a copy should be determined based on the actual character, rather than the label, of the transaction by which the user obtained possession. Merely labeling a transaction as a lease or license does not control. If a transaction involves a single payment giving the buyer an unlimited period in which it has a right to possession, the transaction is a sale. In this situation, the buyer owns the copy regardless of the label the parties use for the contract. Course of dealing and trade usage may be relevant, since they establish the expectations and intent of the parties. The pertinent issue is whether, as in a lease, the user may be required to return the copy to the vendor after the expiration of a particular period. If not, the transaction conveyed not only possession, but also transferred ownership of the copy.")
[43] 17 U.S.C. §106(3).
[44] Dickson Decl. at para. 4.

LOC_AR_00004520

of the medical device.[45]  Instead Philips misconstrues Petitioner's comments relating to use as an essential step by relying on the 2018 Recommendation regarding motor vehicle telematics and entertainment system to assert that software is licensed, not owned.[46]

Philips' arguments ignores the nature and context of the Register's concerns in its 2018 Recommendation.  First, the Recommendations noted that most of the concerns "primarily relate to accessing entertainment works through vehicle entertainment systems and related subscription services, not to repairing more functional software installed to facilitate vehicle operation."[47]  In its 2018 Recommendation, the Register also distinguished the 2015 rulemaking favoring exemption for vehicle repair "because the activities were personal, noncommercial, and would 'enhance the intended use' of the vehicle programs."[48]  Again, Philips does not address how the TPM protected necessary electronic servicing materials do not enhance the use of the medical devices.  Instead, Philips is attempting to categorize its software licenses with subscription services such as Sirius XM, which were of concern in the 2018 Recommendation.[49]  These arguments also ignore that a potential harm from medical devices that are not properly serviced and maintained is loss of human life.

To rebut Petitioner's evidence of servicing harm during the COVID-19 pandemic, Philips (the only OEM to address this issue) provides that its own records do not show a reduction in service capabilities.[50]  This over-simplification of the argument ignores the potential harm to life from medical equipment that is not properly maintained.[51]  It also avoids addressing the current effect to taxpayers and patients resulting from costs for maintaining medical devices from purchasing access keys and paying higher service charges by OEMs.[52]  By ignoring the current harms to both patient safety and medical costs, OEM Commenters are minimizing the current market harm from its broadly applied use of TPMs.

Petitioner is not seeking an exemption to access the same types of software that were of concern in the 2018 Recommendation.  Rather, Petitioner is seeking access to fairly use the necessary electronic servicing materials embedded in medical equipment as an essential step in the servicing and repair activities associated with the medical equipment.  This software cannot be separated from the medical equipment.  The medical device is rendered useless without the software.  This is distinguishable from motor vehicle telematics and entertainment system software where, as the Register notes, "diagnostic data is still available through the online

---

[45] *Id*.
[46] Philips Period 2 comments at 12.
[47] 2018 Recommendation, Ex. 29 at 215.
[48] *Id*. at 203.
[49] *Id*. at 216.
[50] Philips Period 2 comments at pg. 14.
[51] *See* FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, Published May 2018, Ex. 25; *see also* Peloso Decl., Ex. 15 at ¶¶ 11-13.
[52] Kahler Decl., Ex. 6 at ¶ 16; *see also* Lane-Savage Decl., Ex. 7 at ¶ 21.

LOC_AR_00004521

diagnostics port."[53]  Here, OEMs are using TPMs to prevent both ISOs and medical device owners from accessing diagnostic data.[54]

## C.    Hardware Maintenance And Repair 17 U.S.C. § 117(C) Is Applicable To Effect Maintenance Or Repair Of A Medical Device

The necessary electronic servicing materials are not "additional"—they are an included and necessary part of the medical equipment.

In relying on *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc*,[55] the OEM Commenters mischaracterize and cherry pick their supporting arguments. In this case, the court stated that "Congress's clearest indication of what it considered to be 'necessary for the machine to be activated,' is found not in section 117(c), but in section 117(d) which defines repair and maintenance in terms of allowing the system to work "in accordance with its original specifications and any changes to those specifications authorized for that machine." The court continued, stating that "the service provider must be able to cause the machine to boot up <u>in order to determine if it 'works in accordance with its original specifications.</u>'"  The court concluded that "in some instances, it may be difficult to determine whether particular software is necessary to make the computer function and to ascertain whether the computer is working properly." Accordingly, it found that where the maintenance code was "so entangled with the functional code that the entire code must be loaded into RAM for the machine to function at all", loading the maintenance code was necessary for the Management or Control Unit "to be turned on."[56]

The OEM Commenters conflate the concepts and incorrectly emphasize the element of turning on the device with the underlying purpose of the statute: function. The necessary electronic servicing materials on medical equipment are so entangled with the devices, that they must be accessible in order to conduct diagnosis and repair in a safe manner. In order to determine if the medical equipment functions in accordance with its original and updated specifications, use of servicing computer programs and data files comprising the necessary electronic servicing materials is required.

Indeed, attached as **Exhibits 31 and 32**, are copies of the certified registrations for two versions of the Allura software embedded in Philips x-ray machines.  Each registration is for a complete software package that includes aspects of the code for both running and maintaining the machines.  The entire package is invoked when operating and maintaining the machines.

---

[53] *Id*. at 213.
[54] *See* declarations of Spencer (Ex. 3 at ¶ 6), Melvin (Ex. 5 at ¶ 5), Kahler (Ex. 6 at ¶ 6), Lane-Savage (Ex. 7 at ¶ 22), and Grogan (Ex. 8 at ¶ 6).
[55] *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1314 (Fed. Cir. 2005).
[56] Notably, the court in *Storage Tech. Corp.* held that the Defendant-Appellant service company came within the safe harbor for software copying done solely for purposes of maintenance or repair and found the district court erred in finding that it was unlikely to prevail on its defense to copyright infringement. *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.,* 421 F.3d 1307, 1317 (Fed. Cir. 2005).

16

Transtate is not aware of any ISO or lawful possessor that modifies the necessary servicing computer programs and data. Instead, they simply seek to access and use them for repair and servicing activities. Transtate is not aware of anyone who makes copies of the necessary electronic materials, outside of fair use loading of them into random access memory for execution purposes. Accordingly, and because the necessary electronic servicing materials are necessary to conduct servicing activities, the proposed use is exempt from infringement under Section 117.

**CONCLUSION**

The OEM Commenters' argument that granting Petitioner's exemption will expose the public to serious dangers associated with the modification of medical devices has already been dispelled by the FDA. The OEM Commenters' further argument that the current access and use of documentation and software is sufficient to perform servicing activities is self-serving and not supported. As concluded by the many declarants supporting Petitioner's Period 1 comments and the proposed exemption, this is not the case. Finally, the OEM Commenters' argument that the Copyright Office granting the proposed exemption will threaten entire copyrighted works, proprietary information and trade secrets is not supported. The Petitioner seeks a tailored exemption, which would grant access only to the electronic service materials necessary for servicing (diagnosis, repair, and maintenance) of medical devices and systems. As a result, the OEM Commenters arguments fail.

For the aforementioned reasons, Petitioner's proposed exemption should be granted.

LOC_AR_00004523

# EXHIBIT 30

LOC_AR_00004524

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

This document lists observations made by the FDA representative(s) during the inspection of your facility. They are inspectional observations, and do not represent a final Agency determination regarding your compliance. If you have an objection regarding an observation, or have implemented, or plan to implement, corrective action in response to an observation, you may discuss the objection or action with the FDA representative(s) during the inspection or submit this information to FDA at the address above. If you have any questions, please contact FDA at the phone number and address above.

*The observations noted in this Form FDA-483 are not an exhaustive listing of objectionable conditions. Under the law, your firm is responsible for conducting internal self-audits to identify and correct any and all violations of the quality system requirements.*

DURING AN INSPECTION OF YOUR FIRM WE OBSERVED:

## OBSERVATION 1

Complaints involving the possible failure of a device to meet any of its specifications were not reviewed, evaluated and investigated where necessary.

Specifically, you are not adequately investigating complaints. For example:

A.) Out of 133,845 complaints received from July 2016-July 2017, 129,736 complaints were closed based only on the assigned HHM (hazard/harm) symptom code and not further investigated (97%). From January 2016 to present, there were 3,623 complaints (representing 33 HHM symptom codes) that received a low HHM severity level of (b) (4) (less than moderate or no injury), but had a high RMM (risk matrix) severity level (b) (4) potential serious injury or (b) (4) potential death).

Of these 3,623 complaints, 1,792 should have been escalated based upon your "Service Record Reviewer Team (SRRT) Monitoring Work Instruction", #CNV-073105-01 and forwarded to the Complaint Handling Unit (CHU) for further investigation.

Additionally, a query of complaints from Feb 2014 to present for HMM codes related to rescan or reinjection of patients found that codes which meet the criteria for escalation are not always forwarded to the CHU. For example:

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|
| | | X Benjamin J Dastoli<br>Investigator<br>Digitally signed by Benjamin J. Dastoli -S<br>Date Signed 8/18/2017 | |

LOC_AR_00004525

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED | |
|---|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |

| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
|---|---|
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

- There were 104 complaints with HHM symptom code (b) (4)
  Only 51of these complaints (49%) were actually escalated.

The remaining 1,831 complaints were closed with no further evaluation or investigation and no documentation explaining the reason no investigation was necessary.

The following are examples of complaints that were closed and not forwarded to the CHU:

(1) Complaint #5161859, dated 2/24/16: BrightView SPECT imaging system: Table continued to move after letting go of buttons.
(2) Complaint #5108381, dated 2/9/16: BrightView SPECT imaging system: Table is stuck and estop not working
(3) Complaint #5176332, dated 2/29/16: SPECT Skylight: unrequested motion error on table
(4) Complaint #4997407, dated 1/8/16: BR 16 Water: table is free floating
(5) Complaint #6070916, dated 11/14/16: BrightView SPECT XCT: emergency stop switch "pinged off"

Out of the 1,831 complaints that were not further evaluated or investigated, there were 1,246 complaints that were related to table problems (68%). This data was not analyzed to determine whether further investigation is necessary or if potential corrective/preventive actions are necessary.

B.) The following complaints are examples of incomplete investigations that were escalated to the CHU:

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|
| | | Benjamin J. Dastoli<br>Signed by Benjamin J. Dastoli -S<br>Date Signed 8/18/2017<br>X | |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 2 OF 11 PAGES |
|---|---|---|---|

| DEPARTMENT OF HEALTH AND HUMAN SERVICES | |
|---|---|
| FOOD AND DRUG ADMINISTRATION | |
| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |
| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED | |
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | |
| FIRM NAME | STREET ADDRESS |
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

(b1) Complaint #6772839, dated 5/30/17: Ingenuity TF PET/CT imaging System: The user reported a reconstruction failure that resulted in a rescan and reinjection. The complainant stated that this is occurring monthly. The firm concluded that no MDR was required (based upon your Position Papers: "(b) (4)                    " dated 12/16/14 and "(b) (4)                              " dated 12/22/14) and is low risk, and thus no further evaluation or investigation is required and the issue will be monitored through trending. The same location reported this problem on 7/7/14 (Complaint #3139910) and on 7/8/2014 (Complaint #3141512). You stated that the defect was found to be a software defect and will be fixed internally in a future software update. You stated that this update is not planned to be released to the field until(b) (4) (estimated) as a mandatory software upgrade. This site still has not had any corrective action for this reconstruction issue. Since the RMM was deemed "Acceptable", the issue was not forwarded to CAPA and not assessed by your Product Safety Committee (PSC) for potential Correction or Removal. From1/22/2013 to present, you have received 22 complaints with the same failure mode.

(b2) Complaint #6700539, dated 5/11/17: Brilliance iCT imaging system. The user reported saving incorrect patient images. You investigated the issue by reviewing system log files. No issue was found and the complaint was closed. However, the complaint stated that engineering should be contacted for a deeper investigation. This was never done. Complaint was closed on 5/18/17 with no further action taken.

(b3) Complaint #6629122, dated 4/21/17: Ingenuity CT imaging system. A customer reported on the CT viewer 2 examinations of 2 different patients are mixed and is happening 2-3 times a year. Your FSE resolved the issue by restarting the host PC. The complaint was not investigated further and was closed based only the resolution of the customer complaint. The complaint was closed on 4/26/17.

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|
| | | X | |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 3 OF 12 PAGES |
|---|---|---|---|

LOC_AR_00004527

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

## OBSERVATION 2

Procedures for receiving, reviewing, and evaluating complaints by a formally designated unit have not been adequately established.

Specifically, the following are examples of how your complaint processing procedures ["Complaint Handling Standard Operating Procedure", #CNW-073103-00, and "Complaint Handling Work Instruction", #CNV-073103-05, "Service Record Reviewer Team (SRRT) Monitoring Work Instruction", #CNV-073105-01] are not complete and adequately established:

A.) Your procedures for entering complaints do not describe how and when failure codes are entered during the complaint process. You do not have any procedure that defines these failure codes. During complaint processing, you enter a HHM symptom code for all complaints, but only enter a failure code for those complaints that are escalated to the Complaint Handling Unit (CHU). Therefore, you have not entered failure codes for the 97% of complaints received since January 2016 (129,736 complaints).

- From January 1, 2016 to present you have 855 complaints that have received an "(b) (4)" "(b) (4) failure code. The (b) (4) failure code defines the category of the complaint (i.e.: console, gantry, couch). The Tier 2 codes further defines the failure. These codes are used for data analysis and to determine if further actions are needed (i.e.: CAPA). In your recent "Complaint Trending Report June 2017", your top failure code for "Console Acquisition" was "(b) (4)". The "(b) (4)" code does not provide sufficient detail on what the defect was in order to analyze this data to determine if further action is necessary.

  Additionally, there is no procedure on when to add a code or when an "(b) (4)" code should be further defined and additional codes added.

AMENDMENT 2

| | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| **SEE REVERSE OF THIS PAGE** | Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X _Benjamin J. Dastoli_<br>_Signed By: Benjamin J. Dastoli -S_<br>_Date Signed: 8/18/2017_ | 8/18/2017 |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 4 OF 11 PAGES |
|---|---|---|---|

LOC_AR_00004528

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |

| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
|---|---|
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

B.) Your complaint procedures are not clear on when a complaint requires investigation and what level of investigation is needed. Section 5.1.1 of the Complaint Handling SOP states that the SRRT (Service Record Review Team) assigns symptom codes (also called HHM ID #). These codes are based on the severity of actual harm occurring, not the potential severity of the hazard. All HHM symptom codes which are assigned a severity level of "2" or greater are automatically forwarded to the CHU for further evaluation or investigation. Symptom codes assigned a severity of "1" (306 of 412 codes (74%)) are then divided into one of three categories: 1) close, no further evaluation, 2) close, no further evaluation but meets an escalation criteria (per "Service Record Reviewer Team (SRRT) Monitoring Work Instruction", #CNV-073105-01, Rev 05 dated 6/14/17 procedure) to be forwarded to the CHU, 3) forward to the CHU.

C.) Revision 04 of the SRRT Work Instructions (dated 11/12/2015) removed nine (9) HHM symptoms codes which required escalation to the CHU for further evaluation and investigation. These nine (9) codes included issues relating to: electric shock, patient leakage current, motorized movement issues or falling parts. Since 11/12/2015, there have been 4,251 complaints which were not escalated to the CHU for further evaluation or investigation because these codes were removed. You have no documented rationale why these codes were removed.

**OBSERVATION 3**

Procedures for corrective and preventive action have not been adequately established.

Specifically, you have not adequately established your "Corrective and Preventive Action Standard Operating Procedure", CNW-073100-00 Rev 08, dated 3/1/17. For example:

AMENDMENT 2

| | EMPLOYEE(S) SIGNATURE | | DATE ISSUED |
|---|---|---|---|
| **SEE REVERSE**<br>**OF THIS PAGE** | Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X | 8/18/2017 |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 5 OF 11 PAGES |
|---|---|---|---|

LOC_AR_00004529

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| | |
|---|---|
| DISTRICT ADDRESS AND PHONE NUMBER<br>6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | DATE(S) OF INSPECTION<br>7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED
Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI

| | |
|---|---|
| FIRM NAME<br>Philips Medical Systems (Cleveland) Inc | STREET ADDRESS<br>595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY<br>Cleveland, OH 44143-2131 | TYPE ESTABLISHMENT INSPECTED<br>Medical Device Manufacturer |

A.) Complaints and non-conformances (QNs & CTUDTs) are only evaluated for potential corrective/preventive actions when an escalation criteria is met. These criteria are incomplete & vague and do not ensure consistent escalation of your data sources. For example:

(a1) Item #2 of section 4.3.3 states that one reason to escalate is because of a "*violation of an applicable regulation*", e.g: 21 CFR 820. Most of your data sources would appear to meet these criteria, but have not escalated to a CAPA.

(a2) Item #4 defines another escalation criteria as: "*As a result of Product and Process Metrics Management*". This "Product and Process Metrics Management Standard Operating Procedure" does not provide triggers on when a CAPA should be considered. For example:

Your data analyses (trending) does not contain sufficient information to allow consideration into your CAPA System. For example, your following two data analysis reports are not complete or adequate:

- Complaint Data Analysis: You only analyze the (b) (4) symptom codes and failure codes (by number of occurrences) for the (b) (4) for CAPA consideration per "Complaints Trending Work Instruction". This is not based upon the risk level associated with the symptom or failure code, but only upon total numbers.

  Your analysis of these (b) (4) complaints is not based upon an appropriate statistical methodology. You have not established acceptable levels for these (b) (4) codes or symptoms. For example, you base your decision to further evaluate issues based on a two standard deviation from the mean of occurrences over a (b) (4) period. Your statistical methodology allows for an upward trend in the mean value which may not trigger further action.

- Non-conformances (QN) Data Analysis: Your QN Trend Report (data gathered from June 2016-June 2017) does not include meaningful data that could generate corrective actions.

AMENDMENT 2

| | | | |
|---|---|---|---|
| **SEE REVERSE OF THIS PAGE** | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X  Benjamin J. Dastoli<br>0000502302<br>Signed By Benjamin J. Dastoli -D<br>Date Signed 8/18/2017 | DATE ISSUED<br>8/18/2017 |

| | | |
|---|---|---|
| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | **INSPECTIONAL OBSERVATIONS** | PAGE 6 OF 12 PAGES |

LOC_AR_00004530

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |

| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
|---|---|
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

For example, you assign "*cause codes*" for each QN per your "Nonconforming Product Control Standard Operating Procedure", #CNW-073114-00. section 4.3.1.10. However, you do not use this data to monitor and analyze as a potential data source to CAPA.

This QN Trend Report noted an "(b) (4)" trend of "QN Closure Timeliness". The documented action planned was "*Evaluate QNs for a path forward*". There has been no further action taken.   Your data analysis for the "Top System QN Descriptions" (compiled from a (b) (4)) indicated that there were "(b) (4)" trends found related to the iCT Systems and Ingenuity Systems. This was an upward trend of your (b) (4) QNs opened against these systems. You have not taken any actions to address these trends.

Additionally, you are not following your " Product and Process Metrics Management Standard Operating Procedure" section 4.1.1, in that you have not defined any "*Action/Alert limits*" for non-conformances that could trigger further action.

B.) In January 2017, you updated your "(b) (4) Quality Notification (QN) Material Review Board (MRB) Evaluation & Disposition Work Instruction, #CNV-073406-00, Rev 11 to remove a failure/occurrence metric for non-conformances which would trigger a CAPA Request.   This metric was: "*Three or more similar component failures/occurrences in 30 days or six in six months*".   You do not have any documented rationale why this metric was removed and why it is no longer used as a CAPA trigger.

C.) The following CAPAs reviewed were not complete and were closed before adequate corrective actions were taken:

(c1) CAPA #3668989, dated 9/2/15:  This CAPA was opened as a result of a complaint that reported: "*Brain CT data exhibited ring artifact which were initially misintrepreteted as a brain hemmorage*". An MDR #1525965-2012-00122 was submitted, dated 12/5/2012. The CAPA

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | X Benjamin J Dastoli [signature] | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 7 OF 11 PAGES |
|---|---|---|---|

LOC_AR_00004531

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br><br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED | | |
|---|---|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | | |
| FIRM NAME<br>Philips Medical Systems (Cleveland) Inc | STREET ADDRESS<br>595 Miner Rd | |
| CITY, STATE, ZIP CODE, COUNTRY<br>Cleveland, OH 44143-2131 | TYPE ESTABLISHMENT INSPECTED<br>Medical Device Manufacturer | |

concluded that this is a known issue due to embrittlement of the (b) (4) within the (b) (4) (b) (4) over time due to long-term radiation exposure. You concluded in your CAPA investigation that this was an "*acceptable*" failure (b) (4) 1) and no further product corrective actions were needed. You also concluded that the PM schedule was appropriate to detect these failures. However, your (b) (4) analysis conducted as part of the CAPA investigation found 59 similar complaints related to this issue. You have no documented rationale why these are acceptable even though you believe the PM schedule is adequate to detect this failure. After you closed the CAPA, you reran your data analysis on 8/11/17 for complaints and found from 2/4/16-8/11/17 that there were an additional 117 complaints related to this failure mode.

During the course of your CAPA investigation, you decided to open a SCAR because you found that your (b) (4) suppliers of the (b) (4) were using different control checklists for evaluating and repairing this part [SCAR, #(b) (4) , dated 1/27/16]. The CAPA was closed on 2/5/16 and the SCAR was closed on 2/29/16 with no further actions taken.

(c2) CAPA #4702449, dated 10/12/2015: This CAPA was opened due to "*software anomaly escapes*" relating to software versions 4.1.3 and 4.1.4. You concluded that after you implemented all your remediation corrective actions (1/2015), your complaint rate of software defects decreased by 60% and you closed the CAPA based upon "*the premise that there was a statistical difference in the pre and post test groups*". You did not investigate into the root cause why the defects were not caught during design and development or even what specifically changed in your remediation process that caused this improvement. After remediation activities were implemented in 1/2015, you reported 23 recalls related to software defects.

D.) From February 2014 to the present, you have reported to the FDA 30 recalls (all Class II) related to software defects and you concluded that the cause of these were due to "*software design controls*".

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | X | *Benjamin J Dastoli*<br>(digitally signed) | DATE ISSUED<br>8/18/2017 |

| FORM FDA 483 (09/08) | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 8 OF 11 PAGES |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |  |
|---|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

You have not initiated any further corrective action to identify the problem with design controls and if your (b) (4) testing is adequate and robust enough to detect defects prior to market release.  You have recalled every version of the 4.1.x software (4.1.0, 4.1.1, 4.1.2, 4.1.3, 4.1.4, 4.1.5 and 4.1.6) which is used on your iCT and Ingenuity CT imaging systems.

➢ This is a repeat observation from the FDA-483 issued on 1/28/2014.

---

**OBSERVATION 4**
Risk analysis is inadequate and is incomplete.

Specifically.

A.) Your firm uses a Hazard Harm Matrix (HHM) to determine if complaints originating from service orders (SOs) are forwarded to the complaint handling unit (CHU) for potential investigation. The HHM uses "symptom codes", based on actual events occurring, and only assigns a severity level (no probability).

Per your Risk Management Periodic Review procedures (CNW-073106-03, Rev 2), you perform an annual review of the Risk Management Matrix (RMM) and the HHM to confirm the hazards are aligned.

   (a1) Data extracted from the 2016 Risk Management Periodic (b) (4) reviews for the Brilliance iCT and Ingenuity systems found 56 discrepancies between the HHM and RMM regarding the assigned severity levels. Thirty three (33) of the discrepancies were assigned an HHM severity of (b) (4) (less then moderate or no injury) and the associated RMM had assigned a potential severity of (b) (4) (serious injury) or (b) (4) (death).  Twenty four (24) of the thirty three (33) symptom codes are not forwarded to the CHU for further evaluation or investigation.

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|
| | | X | |

LOC_AR_00004533

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive Cincinnati, OH 45237-3097 (513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017* |
| | FEI NUMBER 1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY Cleveland, OH 44143-2131 | TYPE ESTABLISHMENT INSPECTED Medical Device Manufacturer |

(a2) According to RMM-HHM Alignment (b) (4) all RMM hazards which have a severity of (b) (4) (serious injury or death), must have at least 1 HHM entry which would require escalation to the CHU (complaint handling unit). In the report, you concluded that this criteria was met. This inspection found 11 entries which did NOT have a corresponding HHM entry which would require escalation to the CHU.

(a3) It is unclear why some of the symptom codes which are assigned a severity level of (b)(4) are forwarded to the CHU and why some are not.

B.) A review of 36 complaint records and associated MDR files found:

(b1) Not all hazards associated with the complaints were identified in the records. Out of the 36 complaint/MDR files reviewed, 21 complaint files (representing 28 different hazards) did not have all the possible associated hazards. These hazards are used as part of your data analyses in order to initiate potential corrective/preventive actions. For example, complaint 2599340 only listed hazard 0266 2.11.11 (loose set screws holding the spline hub) as part of the file where hazard 0266 2.7.1.1 (uncontrolled up/down motion due to mechanical failure) is also applicable. Both hazards are assigned a potential severity of (b)(4) or serious injury.

(b2) Per your Senior Systems Engineer and Risk Management Procedures, the same hazard risk identification for similar systems should have the same risk factors. This inspection found that not all hazards associated with the 36 complaint files were fully aligned (potential severity and or probability) with similar imaging systems. There were a total of 75 hazards which were not (b) (4) implemented" to other systems. If properly aligned, you identified twenty three (23) hazards would now be considered "unacceptable" and would require further analyses/mitigation.

(b3) Not all complaint records had an associated RMM hazard assigned. Two complaints (numbers 2637836 and 4074943) had no associated hazard documented in the complaint file. This RMM

AMENDMENT 2

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE Benjamin J Dastoli, Investigator Teresa K Kastner, Investigator Christina L Bigham, Investigator Laureen M Geniusz, Investigator | | DATE ISSUED 8/18/2017 |
|---|---|---|---|
| | | X Benjamin J Dastoli 0100601307 Signed By Benjamin J Dastoli -S Date Signed 8/18/2017 | |

| FORM FDA 483 (09/08) PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 10 OF 18 |
|---|---|---|
| PAGES | | |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive Cincinnati, OH 45237-3097 (513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017* |
| | FEI NUMBER 1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

assignment is used by the complaint handling unit to perform data analyses (trending) for possible corrective/preventive actions.

C.) According to your Risk Management procedure, CNW-073106-00, Rev 09, risk levels are assigned using severity and probability. To determine the residual probability in your Risk Management Matrix (RMM) documents, you (b) (4) (b) (4) Therefore, if an actual injury has never occurred, you assign your (b) (4) The implication being that the number of occurrences (P1) for hazards which have an assigned (b) (4) value of (b) (4) will always be "0". No hazards with residual (b) (4) probability ratings ((b) (4) (b) (4), would result in an unacceptable risk level.

For example, your 2016 Periodic Review of Complaints & Human factors (b) (4), identifies 16 complaints in the past year regarding uncontrolled vertical couch motion. These complaints were indicated as linked to RMM hazard number 2.7.1.1. with an assigned potential severity level of (b)(4) (serious injury: life threatening or permanent impairment). None of the complaints involved actual injury, as such, none counted towards the probability score.

  ➢ This is a repeat observation from the FDA-483 issued on 1/28/2014.

**OBSERVATION 5**
Procedures to ensure that all purchased or otherwise received product and services conform to specified requirements have not been adequately established.

AMENDMENT 2

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE Benjamin J Dastoli, Investigator Teresa K Kastner, Investigator Christina L Bigham, Investigator Laureen M Geniusz, Investigator | X | DATE ISSUED 8/18/2017 |
|---|---|---|---|

| FORM FDA 483 (09/08) PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 11 OF 18 |

LOC_AR_00004535

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED | | |
|---|---|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | | |
| FIRM NAME | STREET ADDRESS | |
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd | |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED | |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer | |

Specifically, your procedure, "Supplier Selection, Classification and Approval Standard Operating Procedure," CNW-140100-00, Revision 11, does not ensure control of your suppliers.

Your procedure states if a supplier is on probation, the Risk Assessment form must be completed. For example, Supplier A is a Class I (highest risk) contract manufacturer of your patient supports and partial gantry for the iCT and CT product lines. This supplier has been on probation since June 1, 2015 and a Supplier Risk Mitigation Form has been completed, per your SOP "Supplier Oversight and Monitoring Process Standard Operating Procedure," CNW-140101-00, Revision 11. However, this supplier currently has been issued 12 of (b) (4) of the open SCARs, spanning January 2016 to present, and 683 of (b) (4) of non-conformances, or Quality Notices, since 2016 were created for their products. Additionally, on May 27, 2016, you reported a recall to the FDA, where the root cause was found to be supplier controls over this supplier. Prior to that, this part has been recalled 3 times since February 2014, due to supplier controls over Supplier A.

  ➤ This is a repeat observation from the FDA-483 issued on 1/28/2014.

---

**OBSERVATION 6**
Procedures for acceptance of incoming product have not been adequately established.

Specifically, your "Receiving Inspection Plan (RIP) for (b) (4) ," (b) (4) , Revision 02 and "Receiving Inspection Plan (RIP) for (b) (4) , Revision 02, is inadequate.

The (b) (4) is used to conduct receiving inspections for 82 of (b) (4) risk components, (b) (4) . The RIP includes only visual inspection, and verifying shipping and part numbers and the Certificate of Analysis. Additionally, at least (b) (4) of your suppliers

AMENDMENT 2

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE | DATE ISSUED |
|---|---|---|
| | Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | 8/18/2017 |
| | X  Benjamin J Dastoli<br>Signed By Benjamin J. Dastoli -S<br>Date Signed: 8/18/2017 | |

| FORM FDA 483 (99/98) PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 12 OF 18 |
|---|---|---|---|

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED | |
|---|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | |
| FIRM NAME | STREET ADDRESS |
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

of the (b) (4) risk components, including Supplier A in Observation 5, are currently on probationary status and use the (b) (4) RIP. The partial gantry, a (b)(4) risk part on the (b) (4) RIP, from Supplier A had (b)(4) non-conformances, or Quality Notices, in 2016. (b) (4) of those Quality Notices were created during production, after passing receiving inspection.

The (b) (4) RIP is used to conduct receiving inspections for 223 (b) (4) (b) (4) risk components, which is your (b) (4) risk category. The RIP includes only visual inspection, and verifying shipping and part numbers and the Certificate of Analysis. There are no requirements for performing incoming testing or measurements. Additionally, at least (b) (4) of your suppliers of the (b)(4) risk components are currently on probationary status, including Supplier B, and use the (b) (4) Risk Class RIP. The (b) (4) system, an (b)(4) risk part on the (b) (4) RIP, from Supplier B had (b)(4) non-conformances, or Quality Notices, in 2016. All of these Quality Notices were created during production, after passing receiving inspection.

During the incoming inspection, I observed a receiving technician when receiving an Ingenuity Extended Patient Support from Supplier A. Per the receiving inspection plan, the receiving technician did not use the vendor specification "(b) (4) ," (b) (4) , to check 2 of (b)(4) Critical To Quality elements (CTQs) on the Certificate of Analysis from Supplier A.

**OBSERVATION 7**
Process control procedures that describe any process controls necessary to ensure conformance to specifications have not been adequately established.

Specifically,

AMENDMENT 2

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|

| FORM FDA 483 (09/08)<br>PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 13 OF 18 |
|---|---|---|---|

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive Cincinnati, OH 45237-3097 (513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017* |
| | FEI NUMBER 1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED |
|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI |

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |

| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
|---|---|
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

Your pFMEA work instructions, CNV-073143-01, Rev 6., describe inputs including post market data (associated defects, CAPA, complaints and service work orders) which are to be reviewed (b) (4) for potential pFMEA updates.

Your most recent annual review for the Ingenuity CT system ((b) (4) pFMEA Review (b) (4), (b) (4) ) did not include complaints/post market data as a data source for the potential updates to the pFMEA.

**OBSERVATION 8**
Procedures for design change have not been adequately established.

Specifically, your procedure "Defect Management Standard Operating Procedure," CNW-030700-01, Revision 05, has not been adequately implemented. For example,

A.) Your process for handling duplicate Anomaly Reports is not clearly defined. Section 3.4, step 1.1 of your procedure states "Check For Duplicates… If a duplicate record is found skip this entry." However, there is no further definition of updating the duplicate record to include information about the recurrence of the anomaly report. Step 2.4, 7.3, 10.4 and 12.3 all outline the closing of records, if duplicates are found, but do not further define updating the duplicate record. You were unable to provide me with a procedure that defines this process, but your Senior Manager of the Systems Group stated it routinely occurs and is one of the methods for anomaly reports that have been postponed to be reopened and reinvestigated or fixed.

B.) Your Senior Manager of the Systems Group stated your History Review Technical Review Records use a time frame (b) (4) for considering ARs for inclusion in the software updates. However, there are currently 101 ARs not closed that were submitted earlier than (b) (4), which would not be considered for inclusion in a software update.

AMENDMENT 2

| | EMPLOYEE(S) SIGNATURE | DATE ISSUED |
|---|---|---|
| **SEE REVERSE OF THIS PAGE** | Benjamin J Dastoli, Investigator Teresa K Kastner, Investigator Christina L Bigham, Investigator Laureen M Geniusz, Investigator | 8/18/2017 |
| | X Benjamin J Dastoli 0305551207 Signed By Benjamin J Dastoli -S Date Signed 8/18/2017 | |

| FORM FDA 483 (09/08) PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 14 OF 18 |
|---|---|---|---|

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br><br>FEI NUMBER<br>1525965 |

| NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED | | |
|---|---|---|
| Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI | | |
| FIRM NAME | STREET ADDRESS | |
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd | |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED | |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer | |

C.) Your firm currently uses the terms "Anomaly Report" and "Provisionally Unacceptable." However, neither of these terms are adequately defined in this procedure.

**OBSERVATION 9**

The written MDR procedure does not include an internal system which provides for a standardized review process/procedure for determining when an event meets the criteria for reporting.

Specifically, your "Adverse Event Reporting Standard Operating Procedure", #CNW-073108-00 (MDR SOP) does not clearly define when malfunction events are reportable under 21 CFR 803. Section 4.3.2 of this procedure states if the malfunction did not cause or contribute to a death or serious injury, but could possibly cause or contribute to a death of serious injury if the malfunction were to recur, you have to *"Review Risk RMM"*. There are no further procedures on what you are looking for in the RMM or what data in the RMM would require an MDR submission.

Additionally, your "Hazard Harm Matrix Standard Operating Procedure" #CNW-073107-01 states that the CHU is to utilize this HHM as guidance to assist with regulatory reporting. However, your Manager of the Complaint Handling Unit stated that you do not use the HHM to determine if an MDR is required. Also, your MDR SOP does not address the HHM or how it's used for regulatory reporting.

**Annotations to Observations**

Observation 1:    Under consideration

AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|
| | | X  Benjamin J Dastoli<br>0305612027<br>Signed By Benjamin J Dastoli -S<br>Date Signed 8/18/2017 | |

| FORM FDA 483 (9/98)<br>PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 15 OF 18 |
|---|---|---|---|

LOC_AR_00004539

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive Cincinnati, OH 45237-3097 (513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017* |
| | FEI NUMBER 1525965 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED
Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct~~
~~Promised to correct~~
~~Promised to correct within 90 Days~~
~~Promised to correct~~
Observation 2:      Under consideration
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct~~
~~Promised to correct~~
~~Promised to correct within 90 Days~~
~~Promised to correct~~
Observation 3:      Annotation Intentionally Left Blank
~~Under consideration~~
~~Under consideration~~
~~Promised to correct~~
~~Promised to correct~~
~~Promised to correct within 90 Days~~
~~Promised to correct~~
Observation 4:      Annotation Intentionally Left Blank
~~Under consideration~~
~~Under consideration~~
~~Promised to correct~~
~~Promised to correct~~
~~Promised to correct within 90 Days~~
~~Promised to correct~~

AMENDMENT 2

| | EMPLOYEE(S) SIGNATURE | DATE ISSUED |
|---|---|---|
| SEE REVERSE OF THIS PAGE | Benjamin J Dastoli, Investigator Teresa K Kastner, Investigator Christina L Bigham, Investigator Laureen M Geniusz, Investigator | 8/18/2017 |

| FORM FDA 483 (99/98) PAGES | PREVIOUS EDITION OBSOLETE | INSPECTIONAL OBSERVATIONS | PAGE 16 OF 18 |
|---|---|---|---|

DEPARTMENT OF HEALTH AND HUMAN SERVICES
FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive Cincinnati, OH 45237-3097 (513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017* |
| | FEI NUMBER 1525965 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED
Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

Observation 5:    Annotation Intentionally Left Blank
~~Under consideration~~
~~Under consideration~~
~~Promised to correct~~
~~Promised to correct~~
~~Promised to correct within 90 Days~~
~~Promised to correct~~
Observation 6:    Promised to correct
~~Under consideration~~
~~Under consideration~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct within 90 Days~~
Observation 7:    Promised to correct
~~Under consideration~~
~~Under consideration~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct within 90 Days~~
Observation 8:    Promised to correct by 12/22/2017
~~Under consideration~~
~~Under consideration~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct~~
~~Promised to correct~~

AMENDMENT 2

| SEE REVERSE OF THIS PAGE | EMPLOYEE(S) SIGNATURE Benjamin J Dastoli, Investigator Teresa K Kastner, Investigator Christina L Bigham, Investigator Laureen M Geniusz, Investigator | X Benjamin J Dastoli 608893082 Signed By Benjamin J Dastoli -O Date Signed 8/31/2017 | DATE ISSUED 8/18/2017 |
|---|---|---|---|

FORM FDA 483 (99/98)    PREVIOUS EDITION OBSOLETE    INSPECTIONAL OBSERVATIONS    PAGE 17 OF 18
PAGES

LOC_AR_00004541

### DEPARTMENT OF HEALTH AND HUMAN SERVICES
#### FOOD AND DRUG ADMINISTRATION

| DISTRICT ADDRESS AND PHONE NUMBER | DATE(S) OF INSPECTION |
|---|---|
| 6751 Steger Drive<br>Cincinnati, OH 45237-3097<br>(513)679-2700 Fax:(513)679-2772 | 7/17/2017-8/18/2017*<br>FEI NUMBER<br>1525965 |

NAME AND TITLE OF INDIVIDUAL TO WHOM REPORT ISSUED

Lakshmi N. Gudapakkam , Business Leader and Senior VP CT/AMI

| FIRM NAME | STREET ADDRESS |
|---|---|
| Philips Medical Systems (Cleveland) Inc | 595 Miner Rd |
| CITY, STATE, ZIP CODE, COUNTRY | TYPE ESTABLISHMENT INSPECTED |
| Cleveland, OH 44143-2131 | Medical Device Manufacturer |

~~Promised to correct within 90 Days~~
~~Promised to correct~~
Observation 9:        Promised to correct
~~Under consideration~~
~~Under consideration~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Annotation Intentionally Left Blank~~
~~Promised to correct within 90 Days~~

---

**\*DATES OF INSPECTION**
7/17/2017(Mon),7/18/2017(Tue),7/19/2017(Wed),7/20/2017(Thu),7/21/2017(Fri),7/24/2017(Mon),7/25/2017(Tue),7/26/2017(Wed),7/27/2017(Thu),7/28/2017(Fri),7/31/2017(Mon),8/01/2017(Tue),8/02/2017(Wed),8/03/2017(Thu),8/04/2017(Fri),8/07/2017(Mon),8/08/2017(Tue),8/09/2017(Wed),8/10/2017(Thu),8/11/2017(Fri),8/14/2017(Mon),8/15/2017(Tue),8/16/2017(Wed),8/17/2017(Thu),8/18/2017(Fri)




AMENDMENT 2

| SEE REVERSE<br>OF THIS PAGE | EMPLOYEE(S) SIGNATURE<br>Benjamin J Dastoli, Investigator<br>Teresa K Kastner, Investigator<br>Christina L Bigham, Investigator<br>Laureen M Geniusz, Investigator | | DATE ISSUED<br>8/18/2017 |
|---|---|---|---|

FORM FDA 483 (09/08)    PREVIOUS EDITION OBSOLETE    **INSPECTIONAL OBSERVATIONS**    PAGE 18 OF 18
PAGES

LOC_AR_00004542

# EXHIBIT 31

LOC_AR_00004543



*LIBRARY OF CONGRESS*

*Copyright Office*
*of the United States*

*WASHINGTON, D.C.*

**THIS IS TO CERTIFY** that the attached photocopies are a true representation of the work entitled **ALLURA XPER VERSION 7.8.0** deposited in the Copyright Office with claim of copyright registered under number **TX 8-377-568**.

**THIS IS TO CERTIFY ALSO,** beginning October 1, 2006 the Copyright Office discontinued the practice of stamping incoming deposits with accession stamp dates and registration numbers. Incoming deposits are now identified with barcodes labels.

**IN WITNESS WHEREOF,** the seal of this Office is affixed hereto on June 14, 2018.

Karyn A. Temple
Acting United States Register of Copyrights and Director

By:    Jarletta Walls
Supervisory Copyright Specialist
Records Research and Certification Section
Office of Public Records and Repositories

Use of this material is governed by the U.S. copyright law 17 U.S.C. 101 et seq.

LOC_AR_00004544

# ALLURA XPER VERSION 7.8.0

# DEPOSIT – FIRST 10 PAGES

# (COMPUTER PROGRAM

# CONTAINING TRADE SECRETS)

NOTE: The computer program which is the subject of the copyright claim contains trade secret material.

LOC_AR_00004545

```
; Project specific build tooling to run the GBE for POS
;
; History:
;     2008-01-17    v0.1    Roel Kersten         - Initial version
;     2008-04-18 v0.2    Roel Kersten          - GBE v1.2.0, RemovePrivatePOSFiles.pl deleted
;     2008-09-30 v0.3    Sebastiaan van der Hoest - Removed 4NT wrapper

; POS specific tool that generates 'gc_version.def'
[GenGcVersionDef]
ActionTool=GenGcVersionDef.pl

@echo off
rem ####################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### CheckMappedDrive
rem ###
rem ### Checks whether the current working directory is a mapped drive letter
rem ### by looking if "uPOS" exists in the root.
rem ### If this is run from t:\<viewtag> this check will fail
rem ###
rem ### returns: 0 if mapped
rem ###          1 otherwise
rem ###
rem ####################################################################

setlocal

FOR /F "usebackq" %%i IN (`clearTool pwv -s`) DO set ViewTag=%%i


if not exist "\uPOS" (

  echo Error: Build should be run from a mapped drive.
  echo       Map your view first and start this script from there.
  echo       E.g., "subst y: t:\%ViewTag%"
  exit /b 1
)

exit /b 0

; This ini-file is a template of settings needed for
; setting up builds for your project
; Copy this file into your project's Build directory
```

- 1 -

LOC_AR_00004546

```
; and change settings for your project
;
[settings]
;
; Required by Engine
;
ContinueOnError=false
DebugStep=false
;
; Global ActionTool settings
;
ScmExecToolTrace=0
Preview=false
;
; Declarations (these settings need to be overwritten)
;
SubSystemRoot=
ViewTag=
MsiVersion=
;
; Project variables
;
ProjectName=Innova
SubsysName=POS
BodyComponent=POS-uPOS@\projCIS
InterfaceComponent=POS-uCompPublic@\projCIS
;
; TICS
;
TicsDatabase=POS_Innova
TicsEmailSuccess=rob.schreurs@philips.com,sander.mathijssen@philips.com
TicsEmailFail=rob.schreurs@philips.com,sander.mathijssen@philips.com,dl_BST_CV_DCM@
philips.com
TicsBuildConfiguration=
;
; Logging and publishing
;
BuildDir=D:\buildresults\[ProjectName]\[ViewTag]
LogDir=[BuildDir]\Logging
DeliverDir=[BuildDir]\Binaries
RequiredFreeMB=500
PublishRoot=\\nlybstqvp4ms038\Publish
;
; Compile settings for Visual Studio
;
BuildAction=rebuild
```

- 2 -

LOC_AR_00004547

```
BuildConfiguration=release
;
; For CreateMsiFile
;
BinRoot=c:
DataRoot=[SubSystemRoot]
MsiTargetFolder=[DeliverDir]
SimulateCreateMsiFile=false
SubSystemName=PMS_POS
SubSystemVersion=[MsiVersion]
;
; For NotifyUsers
;
ToListOnSuccess=dl_BST_iXR_Positioning_Flexmove_SW@philips.com,rob.schreurs@philips
.com
ToListOnFailed=dl_BST_iXR_Positioning_Flexmove_SW@philips.com,rob.schreurs@philips.c
om,dl_BST_CV_DCM@philips.com
SmtpMailRelay=mailhub.best.ms.philips.com:25
FromAddress=Generic.Build.Environment@philips.com
;
; Team stream build settings
;
TeamPublishRoot=D:\Publish
TeamReqFreeMB=[RequiredFreeMB]
TeamToSuccess=dl_BST_iXR_Positioning_Flexmove_SW@philips.com,rob.schreurs@philips.
com
TeamToFailed=dl_BST_iXR_Positioning_Flexmove_SW@philips.com,rob.schreurs@philips.co
m
;
; Custom settings
;
C_GENERIC_DIR=c:\generic
; Specify free disk space for d:\buildresults
RequiredFreeMBBuild=2000
; Specific copy location to start automated test from
NIGHTJOB_DIR="\\proj3\P-cisontw\NightJob (Joris Eijsackers)\SyncDir\[StreamName]"
; define directory to store gc_version.def
GC_VERSION_DIR=[SubSystemRoot]\GeoCVEmb\id
;
;
; Use custom path settings
;
UseEnv=[SubSystemRoot]\Build\setvspath.cmd

@echo off
```

- 3 -

LOC AR 00004548

```
rem ###############################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### SAP build script
rem ###
rem ### This script runs a SAP build using the GBE
rem ### Typically a non ClearCase archive
rem ###
rem ### The following GBE::Blackboard settings are overwritten by this script:
rem ###  o [MsiVersion]     : Set to %1.%2.%3.%4
rem ###  o [SubSystemRoot]    : Set to %dp0\.. (i.e. parent dir of script dir)
rem ###  o [BuildDir]        : D:\buildresults\[ProjectName]\SAP_[MsiVersion]_%DATE%
rem ###
rem ### Scenario: dev_build.scm
rem ### Settings: GBE.ini
rem ###
rem ### Arguments:
rem ###  %1 MSI_VERSION_PRODUCT
rem ###  %2 MSI_VERSION_INTERFACE
rem ###  %3 MSI_VERSION_BODY
rem ###  %4 MSI_VERSION_WEEKNR
rem ###
rem ### History:
rem ###  2008-03-12  Roel Kersten  Initial version
rem ###  2008-03-21  Roel Kersten  Added %CDM_TOOLS% and %SRT_TOOLS% for
Rocket projects
rem ###  2008-05-28  Roel Kersten  CIS00079790: Implement GBE 1.2 for Sojourner
rem ###############################################################

setlocal

rem ## Are we running from a mapped drive?
call CheckMappedDrive.cmd
if %ERRORLEVEL% NEQ 0 ( goto :ErrorBuild )

rem ###
rem ### Verify that all needed arguments to start the SCM build are supplied
rem ###
@if "%4"=="" @(
  @echo You invoked ths script with the following command line parameters: %*
  rem %
  @echo Missing commandline parameters.
  @echo Please invoke this script with these command line parameters:
  @echo Product Interface Body Weeknr
```

- 4 -

```
  @echo.
  @goto :ErrorBuild
)

rem #########################################################################
rem ### Generic environment variables
rem #########################################################################

rem SCM_ID is necessary for embedded code
set SCM_ID=(%1,%2,%3,0)
rem %

rem Overwrite MsiVersion in Blackboard
set GBE_MsiVersion=%1.%2.%3.%4

rem Overwrite SubSystemRoot
set GBE_SubSystemRoot=%~dp0..
rem %

rem Next EV's are necessary for projects that use
rem Tools-CVPub, i.e. "Rocket" projects
set CMD_TOOLS=U:\tools\commands
set SRT_TOOLS=U:\tools\tabledriven

rem Overwrite BuildDir
set GBE_BuildDir=D:\buildresults\[ProjectName]\SAP_[MsiVersion]_%DATE%

set toolpath=..\..\..\uCompScmDev\Build\Engine\Src

rem #########################################################################
rem ### Start the build
rem #########################################################################
:Startbuild
perl -w "%toolpath%\ScmExec.pl" dev_build.scm
if %ERRORLEVEL% EQU 0 (
  goto :FinishBuild
) ELSE (
  goto :ErrorBuild
)

REM
#########################################################################
REM ### Error handler(s)
REM
#########################################################################
:ErrorBuild
```

- 5 -

LOC_AR_00004550

```
echo.
echo Developer build script finished with errors!
exit /b 1
echo.

:FinishBuild
echo.
echo Developer build script finished successfully
exit /b 0
echo.
endlocal

REM
#############################################################################
REM ### End of script
REM
#############################################################################

@echo off

rem #############################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### TICS build script
rem ###
rem ### This script runs a TICS build using the GBE
rem ###
rem ### Options:
rem ###        /Force          Forces a build + TICS run (regardless of reconfigure)
rem ###                                /Recalc         Forces a build + TICS
recalculate run
rem ###
rem ### The following GBE::Blackboard settings are overwritten by this script:
rem ###  o [ViewTag]          : Set to the current view
rem ###  o [SubSystemRoot]       : Set to %dp0\.. (i.e. parent dir of script dir)
rem ###  o [MsiVersion]        : Set to 0.0.0.0
rem ###  o [SimulateCreateMsiFile] : Set to TRUE (Simulate MSI creation)
rem ###  o [TicsReconfigureIgnore] : Set to TRUE if '/Force' or '/Recalc'
rem ###  o [TicsRecalculate]     : Set to TRUE if '/Recalc'
rem ###
rem ### Note: This script runs only on a read-only stream
rem ###
rem ### Scenario: TICS_build.scm
rem ### Settings: GBE.ini
```

- 6 -

LOC_AR_00004551

```
rem ###
rem ### Arguments:
rem ###   None
rem ###
rem ### History:
rem ###   2008-03-12  Roel Kersten  Initial version
rem ###   2008-03-21  Roel Kersten  Added %CDM_TOOLS% and %SRT_TOOLS% for
Rocket projects
rem ###   2008-08-05  Roel Kersten  CIS00085680: GBE: Support for snapshot views in generic
build scripts
rem ###   2008-08-25  Roel Kersten  CIS00087478: GBE: TicsStreamReconfigures should
rebase to recommended baseline
rem ##############################################################################

setlocal

rem ## Are we running from a mapped drive?
call CheckMappedDrive.cmd
if %ERRORLEVEL% NEQ 0 ( goto :ErrorBuild )

rem ##############################################################################
rem ### Generic environment variables
rem ##############################################################################

rem ## /Recalc mode
if /I "%1" == "/Recalc" (
  shift /1
  set GBE_TicsReconfigureIgnore=true
  set GBE_TicsRecalculate=true
) else if /I "%1" == "/Force" (
rem ## /Force mode
  shift /1
  set GBE_TicsReconfigureIgnore=true
)

rem no other arguments
if NOT "%1" == "" (
  echo syntax^: TICS_build.cmd ^[/Force ^| /Recalc^]
  exit /b 1
)

rem Overwrite SubSystemRoot
set GBE_SubSystemRoot=%~dp0..
rem %

rem SCM_ID is necessary for embedded code
```

- 7 -

LOC_AR_00004552

```
set SCM_ID=(0,0,0,0)
rem %

rem Overwrite MsiVersion in Blackboard
set GBE_MsiVersion=0.0.0.0

rem Overwrite SimulateCreateMsiFile in Blackboard
rem Developers do not have to create an MSI
set GBE_SimulateCreateMsiFile=true

rem Next EV's are necessary for projects that use
rem Tools-CVPub, i.e. "Rocket" projects
set CMD_TOOLS=U:\tools\commands
set SRT_TOOLS=U:\tools\tabledriven

FOR /F "usebackq" %%i IN (`ClearTool pwv -s`) DO set GBE_ViewTag=%%i
rem %

set toolpath=..\..\..\uCompScmDev\Build\Engine\Src

rem ####################################################################
rem ### Start the build
rem ####################################################################
:Startbuild
perl -w "%toolpath%\ScmExec.pl" TICS_build.scm
if %ERRORLEVEL% EQU 0 (
  goto :FinishBuild
) ELSE (
  goto :ErrorBuild
)

REM
####################################################################
REM ### Error handler(s)
REM
####################################################################
:ErrorBuild
echo.
echo TICS build script finished with errors!
exit /b 1
echo.

:FinishBuild
echo.
echo TICS build script finished successfully
exit /b 0
```

- 8 -

LOC_AR_00004553

```
echo.
endlocal

REM
######################################################################
REM ### End of script
REM
######################################################################

##########################################################
##
## TICS_build.scm
##
## Generic scenario that performs all actions that are necessary
## for a "TICS build".
##
## History:
##   2008-03-12  Roel Kersten   Initial version
##   2008-03-25  Roel Kersten   CIS00074798: Add optional parameter to TICS action tool
##   2008-08-04  Roel Kersten   CIS00085677: GBE: DCM builds shall check owner of stream.
##   2008-08-25  Roel Kersten   CIS00087478: GBE: TicsStreamReconfigures should rebase to
## recommended baseline
##   2009-09-28  Roel Kersten   CIS00125673: GBE: Think of way to perform a more efficient
## TICS run
##########################################################

## Only the owner of stream shall modify stream
.CheckStreamOwner

## Reconfigure the read-only TICS stream
.TicsStreamReconfigure [ViewTag]

## Update the TICS view
.UpdateView [ViewTag]

## Remove private elements in view
.RemovePrivateElements [SubSystemRoot]

## execute all developer build actions
dev_build.scm

## Run TICS
.tics [ViewTag] [TicsDatabase], ExecuteAlways=true

## Disable e-mail notification in [TicsFinalizeOnly] mode
## (A workaround for GBE Engine's shortcoming regarding conditional flows)
```

- 9 -

LOC_AR_00004554

.DisableNotify4TicsFinalizeOnly, ExecuteAlways=true

## Notify TICS users
.NotifyUsers [TicsEmailSuccess] [TicsEmailFail] [SmtpMailRelay], ExecuteAlways=true


```
############################################################
##
## auto_build.scm
##
## Generic scenario that performs all actions that are necessary
## for an "automatic build".
##
## History:
##   2008-03-12  Roel Kersten   Initial version
############################################################

## Are there any new deliveries?
.DetectNewDeliveries

## Call the clustered SCM build actions
## if previous action failed, it is skipped
scm_build.scm

:: This script is a wrapper script to build
:: The 'embedded' part of POS
:: It merely calls 'gc_all.cmd' and exits with the ERRORLEVEL of that script
::
:: History:
::            2008-01-17   v0.1   Roel Kersten          - Initial version
::    2008-09-29  v0.2  Sebastiaan van der Hoest  - Calls .cmd instead of .btm (4NT) script


@echo off
setlocal

:: Build embedded
cd \uPOS\POS\tools\bt\cmd\
call gc_all.cmd

:: exit and return the error code
exit /B ERRORLEVEL

:: This script is a wrapper script to build
:: The 'host' part of POS
:: It merely calls 'bt_proj.cmd All' and exits with the ERRORLEVEL of that script
```

- 10 -

LOC_AR_00004555

# ALLURA XPER VERSION 7.8.0 DEPOSIT – FIRST 10 PAGES (COMPUTER PROGRAM CONTAINING TRADE SECRETS)

**NOTE:** The computer program which is the subject of the copyright claim contains trade secret material.

LOC_AR_00004556

```
; Project specific build tooling to run the GBE for POS
;
; History:
;     2008-01-17     v0.1   Roel Kersten        - Initial version
;     2008-04-18 v0.2   Roel Kersten        - GBE v1.2.0, RemovePrivatePOSFiles.pl deleted
;     2008-09-30 v0.3   Sebastiaan van der Hoest - Removed 4NT wrapper

; POS specific tool that generates 'gc_version.def'
[GenGcVersionDef]
ActionTool=GenGcVersionDef.pl

@echo off
rem ######################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### CheckMappedDrive
rem ###
rem ### Checks whether the current working directory is a mapped drive letter
rem ### by looking if "uPOS" exists in the root.
rem ### If this is run from t:\<viewtag> this check will fail
rem ###
rem ### returns: 0 if mapped
rem ###          1 otherwise
rem ###
rem ######################################################################

setlocal

FOR /F "usebackq" %%i IN (`clearTool pwv -s`) DO set ViewTag=%%i


if not exist "\uPOS" (

  echo Error: Build should be run from a mapped drive.
  echo     Map your view first and start this script from there.
  echo     E.g., "subst y: t:\%ViewTag%"
  exit /b 1
)

exit /b 0


; This ini-file is a template of settings needed for
; setting up builds for your project
; Copy this file into your project's Build directory
```

- 1 -

LOC_AR_00004557

```
; and change settings for your project
;
[settings]
;
; Required by Engine
;
ContinueOnError=false
DebugStep=false
;
; Global ActionTool settings
;
ScmExecToolTrace=0
Preview=false
;
; Declarations (these settings need to be overwritten)
;
SubSystemRoot=
ViewTag=
MsiVersion=
;
; Project variables
;
ProjectName=Innova
SubsysName=POS
BodyComponent=POS-uPOS@\projCIS
InterfaceComponent=POS-uCompPublic@\projCIS
;
; TICS
;
TicsDatabase=POS_Innova
TicsEmailSuccess=rob.schreurs@philips.com,sander.mathijssen@philips.com
TicsEmailFail=rob.schreurs@philips.com,sander.mathijssen@philips.com,dl_BST_CV_DCM@
philips.com
TicsBuildConfiguration=
;
; Logging and publishing
;
BuildDir=D:\buildresults\[ProjectName]\[ViewTag]
LogDir=[BuildDir]\Logging
DeliverDir=[BuildDir]\Binaries
RequiredFreeMB=500
PublishRoot=\\nlybstqvp4ms038\Publish
;
; Compile settings for Visual Studio
;
BuildAction=rebuild
```

LOC_AR_00004558

```
BuildConfiguration=release
;
; For CreateMsiFile
;
BinRoot=c:
DataRoot=[SubSystemRoot]
MsiTargetFolder=[DeliverDir]
SimulateCreateMsiFile=false
SubSystemName=PMS_POS
SubSystemVersion=[MsiVersion]
;
; For NotifyUsers
;
ToListOnSuccess=dl_BST_iXR_Positioning_Flexmove_SW@philips.com,rob.schreurs@philips
.com
ToListOnFailed=dl_BST_iXR_Positioning_Flexmove_SW@philips.com,rob.schreurs@philips.c
om,dl_BST_CV_DCM@philips.com
SmtpMailRelay=mailhub.best.ms.philips.com:25
FromAddress=Generic.Build.Environment@philips.com
;
; Team stream build settings
;
TeamPublishRoot=D:\Publish
TeamReqFreeMB=[RequiredFreeMB]
TeamToSuccess=dl_BST_iXR_Positioning_Flexmove_SW@philips.com,rob.schreurs@philips.
com
TeamToFailed=dl_BST_iXR_Positioning_Flexmove_SW@philips.com,rob.schreurs@philips.co
m
;
; Custom settings
;
C_GENERIC_DIR=c:\generic
; Specify free disk space for d:\buildresults
RequiredFreeMBBuild=2000
; Specific copy location to start automated test from
NIGHTJOB_DIR="\\proj3\P-cisontw\NightJob (Joris Eijsackers)\SyncDir\[StreamName]"
; define directory to store gc_version.def
GC_VERSION_DIR=[SubSystemRoot]\GeoCVEmb\id
;
;
; Use custom path settings
;
UseEnv=[SubSystemRoot]\Build\setvspath.cmd

@echo off
```

- 3 -

LOC_AR_00004559

```
rem #################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### SAP build script
rem ###
rem ### This script runs a SAP build using the GBE
rem ### Typically a non ClearCase archive
rem ###
rem ### The following GBE::Blackboard settings are overwritten by this script:
rem ###   o [MsiVersion]      : Set to %1.%2.%3.%4
rem ###   o [SubSystemRoot]   : Set to %dp0\.. (i.e. parent dir of script dir)
rem ###   o [BuildDir]        : D:\buildresults\[ProjectName]\SAP_[MsiVersion]_%DATE%
rem ###
rem ### Scenario: dev_build.scm
rem ### Settings: GBE.ini
rem ###
rem ### Arguments:
rem ###   %1 MSI_VERSION_PRODUCT
rem ###   %2 MSI_VERSION_INTERFACE
rem ###   %3 MSI_VERSION_BODY
rem ###   %4 MSI_VERSION_WEEKNR
rem ###
rem ### History:
rem ###   2008-03-12  Roel Kersten  Initial version
rem ###   2008-03-21  Roel Kersten  Added %CDM_TOOLS% and %SRT_TOOLS% for
Rocket projects
rem ###   2008-05-28  Roel Kersten  CIS00079790: Implement GBE 1.2 for Sojourner
rem #################################################################

setlocal

rem ## Are we running from a mapped drive?
call CheckMappedDrive.cmd
if %ERRORLEVEL% NEQ 0 ( goto :ErrorBuild )

rem ###
rem ### Verify that all needed arguments to start the SCM build are supplied
rem ###
@if "%4"=="" @(
  @echo You invoked ths script with the following command line parameters: %*
  rem %
  @echo Missing commandline parameters.
  @echo Please invoke this script with these command line parameters:
  @echo Product Interface Body Weeknr
```

- 4 -

LOC_AR_00004560

```
    @echo.
    @goto :ErrorBuild
)

rem ################################################################
rem ### Generic environment variables
rem ################################################################

rem SCM_ID is necessary for embedded code
set SCM_ID=(%1,%2,%3,0)
rem %

rem Overwrite MsiVersion in Blackboard
set GBE_MsiVersion=%1.%2.%3.%4

rem Overwrite SubSystemRoot
set GBE_SubSystemRoot=%~dp0..
rem %

rem Next EV's are necessary for projects that use
rem Tools-CVPub, i.e. "Rocket" projects
set CMD_TOOLS=U:\tools\commands
set SRT_TOOLS=U:\tools\tabledriven

rem Overwrite BuildDir
set GBE_BuildDir=D:\buildresults\[ProjectName]\SAP_[MsiVersion]_%DATE%

set toolpath=..\..\..\uCompScmDev\Build\Engine\Src

rem ################################################################
rem ### Start the build
rem ################################################################
:Startbuild
perl -w "%toolpath%\ScmExec.pl" dev_build.scm
if %ERRORLEVEL% EQU 0 (
  goto :FinishBuild
) ELSE (
  goto :ErrorBuild
)

REM
################################################################
REM ### Error handler(s)
REM
################################################################
:ErrorBuild
```

- 5 -

LOC_AR_00004561

```
echo.
echo Developer build script finished with errors!
exit /b 1
echo.

:FinishBuild
echo.
echo Developer build script finished successfully
exit /b 0
echo.
endlocal

REM
##################################################################
REM ### End of script
REM
##################################################################

@echo off

rem ###################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### TICS build script
rem ###
rem ### This script runs a TICS build using the GBE
rem ###
rem ### Options:
rem ###       /Force          Forces a build + TICS run (regardless of reconfigure)
rem ###                                  /Recalc          Forces a build + TICS
recalculate run
rem ###
rem ### The following GBE::Blackboard settings are overwritten by this script:
rem ###   o [ViewTag]          : Set to the current view
rem ###   o [SubSystemRoot]       : Set to %dp0\.. (i.e. parent dir of script dir)
rem ###   o [MsiVersion]        : Set to 0.0.0.0
rem ###   o [SimulateCreateMsiFile] : Set to TRUE (Simulate MSI creation)
rem ###   o [TicsReconfigureIgnore] : Set to TRUE if '/Force' or '/Recalc'
rem ###   o [TicsRecalculate]      : Set to TRUE if '/Recalc'
rem ###
rem ### Note: This script runs only on a read-only stream
rem ###
rem ### Scenario: TICS_build.scm
rem ### Settings: GBE.ini
```

- 6 -

LOC_AR_00004562

```
rem ###
rem ### Arguments:
rem ###   None
rem ###
rem ### History:
rem ###   2008-03-12  Roel Kersten  Initial version
rem ###   2008-03-21  Roel Kersten  Added %CDM_TOOLS% and %SRT_TOOLS% for
Rocket projects
rem ###   2008-08-05  Roel Kersten  CIS00085680: GBE: Support for snapshot views in generic
build scripts
rem ###   2008-08-25  Roel Kersten  CIS00087478: GBE: TicsStreamReconfigures should
rebase to recommended baseline
rem ##################################################################

setlocal

rem ## Are we running from a mapped drive?
call CheckMappedDrive.cmd
if %ERRORLEVEL% NEQ 0 ( goto :ErrorBuild )

rem ##################################################################
rem ### Generic environment variables
rem ##################################################################

rem ## /Recalc mode
if /I "%1" == "/Recalc" (
  shift /1
  set GBE_TicsReconfigureIgnore=true
  set GBE_TicsRecalculate=true
) else if /I "%1" == "/Force" (
rem ## /Force mode
  shift /1
  set GBE_TicsReconfigureIgnore=true
)

rem no other arguments
if NOT "%1" == "" (
  echo syntax^: TICS_build.cmd ^[/Force ^| /Recalc^]
  exit /b 1
)

rem Overwrite SubSystemRoot
set GBE_SubSystemRoot=%~dp0..
rem %

rem SCM_ID is necessary for embedded code
```

- 7 -

LOC AR 00004563

```
set SCM_ID=(0,0,0,0)
rem %

rem Overwrite MsiVersion in Blackboard
set GBE_MsiVersion=0.0.0.0

rem Overwrite SimulateCreateMsiFile in Blackboard
rem Developers do not have to create an MSI
set GBE_SimulateCreateMsiFile=true

rem Next EV's are necessary for projects that use
rem Tools-CVPub, i.e. "Rocket" projects
set CMD_TOOLS=U:\tools\commands
set SRT_TOOLS=U:\tools\tabledriven

FOR /F "usebackq" %%i IN (`ClearTool pwv -s`) DO set GBE_ViewTag=%%i
rem %

set toolpath=..\..\..\uCompScmDev\Build\Engine\Src

rem ####################################################################
rem ### Start the build
rem ####################################################################
:Startbuild
perl -w "%toolpath%\ScmExec.pl" TICS_build.scm
if %ERRORLEVEL% EQU 0 (
  goto :FinishBuild
) ELSE (
  goto :ErrorBuild
)

REM
####################################################################
REM ### Error handler(s)
REM
####################################################################
:ErrorBuild
echo.
echo TICS build script finished with errors!
exit /b 1
echo.

:FinishBuild
echo.
echo TICS build script finished successfully
exit /b 0
```

- 8 -

LOC_AR_00004564

```
echo.
endlocal

REM
########################################################################
REM ### End of script
REM
########################################################################


############################################################
##
## TICS_build.scm
##
## Generic scenario that performs all actions that are necessary
## for a "TICS build".
##
## History:
##   2008-03-12  Roel Kersten    Initial version
##   2008-03-25  Roel Kersten    CIS00074798: Add optional parameter to TICS action tool
##   2008-08-04  Roel Kersten    CIS00085677: GBE: DCM builds shall check owner of stream.
##   2008-08-25  Roel Kersten    CIS00087478: GBE: TicsStreamReconfigures should rebase to
## recommended baseline
##   2009-09-28  Roel Kersten    CIS00125673: GBE: Think of way to perform a more efficient
## TICS run
############################################################

## Only the owner of stream shall modify stream
.CheckStreamOwner

## Reconfigure the read-only TICS stream
.TicsStreamReconfigure [ViewTag]

## Update the TICS view
.UpdateView [ViewTag]

## Remove private elements in view
.RemovePrivateElements [SubSystemRoot]

## execute all developer build actions
dev_build.scm

## Run TICS
.tics [ViewTag] [TicsDatabase], ExecuteAlways=true

## Disable e-mail notification in [TicsFinalizeOnly] mode
## (A workaround for GBE Engine's shortcoming regarding conditional flows)
```

- 9 -

LOC_AR_00004565

.DisableNotify4TicsFinalizeOnly, ExecuteAlways=true

## Notify TICS users
.NotifyUsers [TicsEmailSuccess] [TicsEmailFail] [SmtpMailRelay], ExecuteAlways=true


```
############################################################
##
## auto_build.scm
##
## Generic scenario that performs all actions that are necessary
## for an "automatic build".
##
## History:
##   2008-03-12  Roel Kersten    Initial version
############################################################

## Are there any new deliveries?
.DetectNewDeliveries

## Call the clustered SCM build actions
## if previous action failed, it is skipped
scm_build.scm

:: This script is a wrapper script to build
:: The 'embedded' part of POS
:: It merely calls 'gc_all.cmd' and exits with the ERRORLEVEL of that script
::
:: History:
::            2008-01-17  v0.1   Roel Kersten          - Initial version
::   2008-09-29  v0.2  Sebastiaan van der Hoest  - Calls .cmd instead of .btm (4NT) script


@echo off
setlocal

:: Build embedded
cd \uPOS\POS\tools\bt\cmd\
call gc_all.cmd

:: exit and return the error code
exit /B ERRORLEVEL

:: This script is a wrapper script to build
:: The 'host' part of POS
:: It merely calls 'bt_proj.cmd All' and exits with the ERRORLEVEL of that script
```

- 10 -

LOC_AR_00004566

# ALLURA XPER VERSION 7.8.0

# DEPOSIT – LAST 10 PAGES

# (COMPUTER PROGRAM

# CONTAINING TRADE SECRETS)

NOTE:  The computer program which is the subject of the copyright claim contains trade secret material.

LOC_AR_00004567

```
                "XDDSServiceTypeImageDetectionLateral",

                "XDDSServiceTypeImageProcessingFrontal",

                "XDDSServiceTypeImageProcessingLateral",

                "XDDSServiceTypeSequencing"
                                                    };
```

```
using namespace std;
/// Connects to XDDS service and reports a list of all XDDS devices that it has found. At the
same time a
/// check against the test IP is made to see whether the XDDS service has found the device under
test.
/// @param strTestIP - The IP address of the XDDS device to search for. If nullstring then no test
is performed.
/// @returns - true if the test IP is found (or if strTestIP is empty), else false.
bool RunTest(string strTestIP)
{
        bool bRet = false;
        wstring wstrTestIP(L"");
        IXDDS *pXDDS = NULL;
        IXDDSFieldService *pXDDSFieldService = NULL;
        HRESULT hr = NULL;

        if (strTestIP == "")
                bRet = true;
        else
        {
                //convert to wstring
                wstrTestIP.assign(strTestIP.begin(),strTestIP.end());
        }
        hr = CoCreateInstance(CLSID_COXDDSService, NULL, CLSCTX_ALL, IID_IXDDS,
(void**)&pXDDS);
        if (!SUCCEEDED(hr))
        {
                stringstream strstrError;
                strstrError << "Failed to create XDDS Service COM object (" <<
_com_error(hr).ErrorMessage() << ")";
                throw runtime_error(strstrError.str());
        }

        hr = pXDDS->QueryInterface(IID_IXDDSFieldService,
(void**)&pXDDSFieldService);
```

- 1 -

LOC_AR_00004568

```
        if (!SUCCEEDED(hr))
        {
                stringstream strstrError;
                strstrError << "Failed to create XDDS Service COM object (" <<
_com_error(hr).ErrorMessage() << ")";
                pXDDS->Release();
                throw runtime_error(strstrError.str());
        }

        try
        {
                //query XDDS service for device list
                BSTR bstrDeviceID = NULL;
                XDDSResultEnum eXDDSResult = XDDSResultUndefined;

                hr = pXDDSFieldService->GetFirstDeviceID(&bstrDeviceID, &eXDDSResult);
                if (!SUCCEEDED(hr))
                        throw runtime_error(string("Failed to query XDDS service (") +
_com_error(hr).ErrorMessage() + ")");

                if (eXDDSResult != XDDSResultSuccess)
                {
                        cout << "No devices found" << endl;
                }
                else
                {
                        while(eXDDSResult == XDDSResultSuccess)
                        {
                                BSTR bstrTemp = NULL;
                                XDDSDeviceTypeEnum eXDDSDeviceType =
XDDSDeviceTypeUndefined;
                                XDDSServiceTypeEnum *peXDDSServiceTypes = NULL;
                                long lNofServices = 0;

                                wstring wstrDeviceID = bstrDeviceID;
                                wstring wstrMACAddr;
                                wstring wstrIPAddr;

                                //Get device type
                                hr = pXDDS->GetDeviceType(bstrDeviceID,
&eXDDSDeviceType, &eXDDSResult);
                                if (!(SUCCEEDED(hr) && eXDDSResult ==
XDDSResultSuccess))
                                        throw runtime_error("Error retrieving MAC Address");

                                //Get device IP
```

- 2 -

LOC_AR_00004569

```
                          hr = pXDDS->GetIPAddress(bstrDeviceID, &bstrTemp,
&eXDDSResult);
                          if (!(SUCCEEDED(hr) && eXDDSResult ==
XDDSResultSuccess))
                                  throw runtime_error("Error retrieving IP Address");

                          wstrIPAddr = bstrTemp;
                          ::SysFreeString(bstrTemp);

                          //Get device MAC
                          hr = pXDDS->GetMACAddress(bstrDeviceID, &bstrTemp,
&eXDDSResult);
                          if (!(SUCCEEDED(hr) && eXDDSResult ==
XDDSResultSuccess))
                                  throw runtime_error("Error retrieving MAC Address");

                          wstrMACAddr = bstrTemp;
                          ::SysFreeString(bstrTemp);

                          wcout << L"Device ID   : " << wstrDeviceID << endl;
                          cout <<  "Device Type : " <<
g_ppchDeviceTypeNames[eXDDSDeviceType] << endl;
                          wcout << L"MAC Address : " << wstrMACAddr << endl;
                          wcout << L"IP Address  : " << wstrIPAddr << endl << endl;

                          if ((wstrIPAddr == wstrTestIP) && (eXDDSDeviceType ==
XDDSDeviceTypeID))
                                  bRet = true;
                          //get next device
                          hr = pXDDSFieldService->GetNextDeviceID(&bstrDeviceID,
&eXDDSResult);
                          if (!SUCCEEDED(hr))
                                  throw runtime_error(string("Failed to query XDDS service
(") + _com_error(hr).ErrorMessage() + ")");

                  }
              }
        }
        catch (runtime_error &e)
        {
                //release reference before rethrowing exception
                pXDDSFieldService->Release();
                pXDDS->Release();
                throw e;
        }
        //release references before returning
```

- 3 -

LOC_AR_00004570

```
        pXDDSFieldService->Release();
        pXDDS->Release();

        return bRet;
}

/// Application entry point
/// One command line parameter is accpeted. This is the expected IP address of the FlashLite OS
int main(int argc, char *argv[])
{
        int iRet = 0;
        string strExpectedIP("");
        if (argc == 2)
                strExpectedIP = argv[1];
        HRESULT hr = CoInitializeEx((void*) NULL, COINIT_MULTITHREADED);
        if (!SUCCEEDED(hr))
        {
                cout << "Error initiliazing COM (errno: " << hr << ")" << endl;
        }

        try
        {
                iRet = RunTest(strExpectedIP)?0:1;
        }
        catch (runtime_error &e)
        {
                cout << "Error: " << e.what() << endl;
                CoUninitialize();
                cin.get();
                return 1;
        }
        catch (...)
        {
                cout << "Unhandled error" << endl;
                CoUninitialize();
//              cin.get();
                return 1;
        }
        //cin.get();
        CoUninitialize();

        return iRet;
}


@echo off
```

LOC_AR_00004571

```
rem ################################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### Build script for Flashlite OS
rem ###
rem ### This script is used to initiate a build of the Pegasus OS.
rem ### The script is called from a Windows SDE and does the following:
rem ### 1. Copies the neccessary files to a remote Linux build server
rem ### 2. Initiates a build on the remote server
rem ### 3. Copies the resulting files back to the Windows SDE
rem ### Usage:
rem ### scm_build.cmd [version_string]
rem ### where version_string that contains the neccessary SCM version information of the build.
This
rem ### will ultiamtely be stored in a file called version.txt on the root partition of the resulting
OS image.
rem ### If no version info is provided the version information will result in a file with "test
version" as the contents
rem ###
rem ###
rem ### Arguments:
rem ###     None
rem ###
rem ################################################################################


setlocal
rem GLOBALS
set REMOTE_HOST=130.144.249.107
set REMOTE_USER=dev2
set REMOTE_PASS=L1nuVdev2
set PLINK=..\3rdparty\plink.exe
set PSCP=..\3rdparty\pscp.exe -scp
set LAYER_NAME=etx-target-HW-layer-b49
set OUTPUT_DIR=..\build


rem Create version file
echo %1% > version.txt
if %1%.==. echo test version > version.txt

rem prepare output directory
if exist %OUTPUT_DIR% rmdir /s /q %OUTPUT_DIR%
md %OUTPUT_DIR%
```

LOC_AR_00004572

```
echo --Creating remote build environment
set REMOTE_BUILD_DIR=pegasus_build_%Date%_%Time: =0%
rem substitute all illegal linux file characters with legal ones.
set REMOTE_BUILD_DIR=%REMOTE_BUILD_DIR::=.%
set REMOTE_BUILD_DIR=%REMOTE_BUILD_DIR: = _%
set REMOTE_BUILD_DIR=%REMOTE_BUILD_DIR:/=-%

rem init plink to create remote SSH key in registry
echo y | %PLINK% -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST%
"echo"
if %ERRORLEVEL% NEQ 0 goto FailExit

echo --Creating remote build tree at
%REMOTE_USER%@%REMOTE_HOST%:~/%REMOTE_BUILD_DIR%/
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST%
"mkdir %REMOTE_BUILD_DIR%; cd %REMOTE_BUILD_DIR%; mkdir Builds Layers
Results Scripts"
if %ERRORLEVEL% NEQ 0 goto FailExit

echo --Copying build files to remote host
rem copy layer tarball
%PSCP% -batch -pw %REMOTE_PASS% ..\ETX-LX800\%LAYER_NAME%.tar.gz
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Layers/
if %ERRORLEVEL% NEQ 0 goto FailExit

rem and unpack it
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "cd
%REMOTE_BUILD_DIR%/Layers; tar -xvzpf %LAYER_NAME%.tar.gz"
if %ERRORLEVEL% NEQ 0 goto FailExit
rem Copy remote script and 3rdparty tools
%PSCP% -batch -pw %REMOTE_PASS% buildPegasus.sh h_*.sh ..\3rdparty\tools.tar.gz
version.txt %REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Scripts/
if %ERRORLEVEL% NEQ 0 goto FailExit
rem and 'unixify" the script
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "cd
%REMOTE_BUILD_DIR%/Scripts; dos2unix h_*.sh buildPegasus.sh version.txt; chmod a+x
*"
if %ERRORLEVEL% NEQ 0 goto FailExit
rem unpack tools
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "cd
%REMOTE_BUILD_DIR%/Scripts; tar -xzf tools.tar.gz"
if %ERRORLEVEL% NEQ 0 goto FailExit
```

- 6 -

LOC_AR_00004573

```
rem %PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST%
"cd %REMOTE_BUILD_DIR%; find ."

echo --Running remote build script
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "cd
%REMOTE_BUILD_DIR%/Scripts; sh buildPegasus.sh --version_file=version.txt"
if %ERRORLEVEL% NEQ 0 goto FailExit
echo --Retrieving results
rem First zip Results up -- SCP link is slow so it is faster to compress and decompress either side
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "cd
%REMOTE_BUILD_DIR%/Results; zip -r results.zip *"
if %ERRORLEVEL% NEQ 0 goto FailExit
%PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Results/results.zip
%OUTPUT_DIR%
if %ERRORLEVEL% NEQ 0 goto FailExit
pushd %OUTPUT_DIR%
unzip results.zip
del results.zip
popd

rem Also retrieve log file
%PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Scripts/build.log
%OUTPUT_DIR%
rem Also retrieve licenses file
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Builds/%LAYER_
NAME%/export/*pkg_licenses.txt %OUTPUT_DIR%

copy readme.txt %OUTPUT_DIR%\oss_export\

rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Results/target-
logfs.img %OUTPUT_DIR%
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Results/target-
rootfs.img %OUTPUT_DIR%
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Results/devel-
logfs.img %OUTPUT_DIR%
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Results/devel-
rootfs.img %OUTPUT_DIR%
```

- 7 -

LOC_AR_00004574

```
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Scripts/build.log
%OUTPUT_DIR%


echo --Cleaning up remote build directory
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "rm
-rf %REMOTE_BUILD_DIR%"

endlocal
exit /B 0

:FailExit
endlocal
exit /B 1

@echo off

rem ######################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### Verification script for Flashlite OS
rem ###
rem ### This script runs a series of tests on a Flashlite Unit in order to verify
rem ### the requirements of the OS. The script creates a report that is used to be
rem ### embedded in the Flashlite MVR
rem ###
rem ###
rem ### Arguments:
rem ###    None
rem ###
rem ### Assumptions: Assumes that the
rem ### History:
rem ###   2008-12-09  Francois Louw Initial version
rem ######################################################################

setlocal

rem ######################################################################
rem ### Global environment variables
rem ######################################################################
set FLASHLITE_IP=192.168.132.100
set USERNAME=root
set PASSWORD=P3g@zus
```

- 8 -

LOC_AR_00004575

```
set LOG_FILE=Flashlite_OS_MVR.txt
set PLINK=..\3rdparty\plink.exe -l %USERNAME% -pw %PASSWORD%
set PSCP=..\3rdparty\pscp.exe -l %USERNAME% -pw %PASSWORD%

echo Flashlite OS Module Verification Report: Automatic Test Report > %LOG_FILE%

echo ============================================================ >>
%LOG_FILE%
echo . >> %LOG_FILE%
echo Checking network connectivity... >> %LOG_FILE%
ping -n 1 -w 100 %FLASHLITE_IP%
if %ERRORLEVEL% EQU 0 (
        echo    PASS: Ping to %FLASHLITE_IP% successful >> %LOG_FILE%
) ELSE (
  echo    FAIL: Ping to %FLASHLITE_IP% failed >> %LOG_FILE%
  goto fatalexit
)
echo . >> %LOG_FILE%
echo ^<MRS.OS.Service.Tools:SSH^> >> %LOG_FILE%
echo Checking SSH connection ... >> %LOG_FILE%
echo y | %PLINK% %FLASHLITE_IP% ls
if %ERRORLEVEL% EQU 0 (
        echo    PASS: SSH connection to %FLASHLITE_IP% successful >> %LOG_FILE%
) ELSE (
  echo    FAIL: SSH connection to %FLASHLITE_IP% failed >> %LOG_FILE%
  goto fatalexit
)

echo . >> %LOG_FILE%
set XDDS_TEST_RESULT=0
echo ^<MRS.OS.Upnp^> >> %LOG_FILE%
echo Checking XDDS functionality ... >> %LOG_FILE%
XDDS_Test\Release\XDDS_Test %FLASHLITE_IP%
if %ERRORLEVEL% EQU 0 (
        echo        PASS: FlashLite correctly detected through XDDS protocol >>
%LOG_FILE%
) ELSE (
  echo        FAIL: Failed to find FlashLite through XDDS protocol >> %LOG_FILE%
  set XDDS_TEST_RESULT=1
)

echo . >> %LOG_FILE%
echo Checking whether writable area on remote OS ... >> %LOG_FILE%
%PLINK% %FLASHLITE_IP% touch /tmp/os_test.stamp
if %ERRORLEVEL% EQU 0 (
        echo    PASS: /tmp on DUT is writable >> %LOG_FILE%
```

- 9 -

LOC_AR_00004576

```
) ELSE (
  echo     FAIL: /tmp on DUT is not writable >> %LOG_FILE%
  goto fatalexit
)

echo . >> %LOG_FILE%
echo Copying remote test script to remote OS ... >> %LOG_FILE%
%PSCP% FlashliteOSVerify.sh %FLASHLITE_IP%:/tmp/
if %ERRORLEVEL% EQU 0 (
        echo    PASS: script copied to %FLASHLITE_IP%:/tmp/ >> %LOG_FILE%
) ELSE (
  echo     FAIL: failed to copy script to %FLASHLITE_IP%:/tmp/ >> %LOG_FILE%
  goto fatalexit
)

rem Pre-conditions for running remote test are met so now execute remote script
echo . >> %LOG_FILE%
echo Running remote script ... >> %LOG_FILE%
%PLINK% %FLASHLITE_IP% "cd /tmp/; sh FlashliteOSVerify.sh"
set REMOTE_EXIT_LVL=%ERRORLEVEL%
if %REMOTE_EXIT_LVL% EQU 0 (
        echo     PASS: remote script completed without errors >> %LOG_FILE%
) ELSE (
  echo     FAIL: remote script completed with errors >> %LOG_FILE%
)

echo . >> %LOG_FILE%
echo Appending log of remote test script: >> %LOG_FILE%
%PLINK% %FLASHLITE_IP% "cd /tmp/; cat FlashliteOSVerify.log" >> %LOG_FILE%

if %ERRORLEVEL% NEQ 0 (
        echo FAIL: Failed to cat remote log file
        goto fatalexit
)

if %XDDS_TEST_RESULT% EQU 0 (
        exit /B %REMOTE_EXIT_LVL%
) ELSE (
        exit /B %XDDS_TEST_RESULT%
)

:fatalexit
echo Fatal error cannot continue test ... exiting
echo Fatal error cannot continue test ... exiting >> %LOG_FILE%
exit /B 1
```

- 10 -

LOC_AR_00004577

# ALLURA XPER VERSION 7.8.0

# DEPOSIT – LAST 10 PAGES

# (COMPUTER PROGRAM

# CONTAINING TRADE SECRETS)

NOTE:  The computer program which is the subject of the copyright claim contains trade secret material.

LOC_AR_00004578

```
        "XDDSServiceTypeImageDetectionLateral",

        "XDDSServiceTypeImageProcessingFrontal",

        "XDDSServiceTypeImageProcessingLateral",

        "XDDSServiceTypeSequencing"
                                                        };


using namespace std;
/// Connects to XDDS service and reports a list of all XDDS devices that it has found. At the
same time a
/// check against the test IP is made to see whether the XDDS service has found the device under
test.
/// @param strTestIP - The IP address of the XDDS device to search for. If nullstring then no test
is performed.
/// @returns - true if the test IP is found (or if strTestIP is empty), else false.
bool RunTest(string strTestIP)
{
        bool bRet = false;
        wstring wstrTestIP(L"");
        IXDDS *pXDDS = NULL;
        IXDDSFieldService *pXDDSFieldService = NULL;
        HRESULT hr = NULL;

        if (strTestIP == "")
                bRet = true;
        else
        {
                //convert to wstring
                wstrTestIP.assign(strTestIP.begin(),strTestIP.end());
        }
        hr = CoCreateInstance(CLSID_COXDDSService, NULL, CLSCTX_ALL, IID_IXDDS,
(void**)&pXDDS);
        if (!SUCCEEDED(hr))
        {
                stringstream strstrError;
                strstrError << "Failed to create XDDS Service COM object (" <<
_com_error(hr).ErrorMessage() << ")";
                throw runtime_error(strstrError.str());
        }

        hr = pXDDS->QueryInterface(IID_IXDDSFieldService,
(void**)&pXDDSFieldService);
```

- 1 -

LOC AR 00004579

```
if (!SUCCEEDED(hr))
{
        stringstream strstrError;
        strstrError << "Failed to create XDDS Service COM object (" <<
_com_error(hr).ErrorMessage() << ")";
        pXDDS->Release();
        throw runtime_error(strstrError.str());
}

try
{
        //query XDDS service for device list
        BSTR bstrDeviceID = NULL;
        XDDSResultEnum eXDDSResult = XDDSResultUndefined;

        hr = pXDDSFieldService->GetFirstDeviceID(&bstrDeviceID, &eXDDSResult);
        if (!SUCCEEDED(hr))
                throw runtime_error(string("Failed to query XDDS service (") +
_com_error(hr).ErrorMessage() + ")");

        if (eXDDSResult != XDDSResultSuccess)
        {
                cout << "No devices found" << endl;
        }
        else
        {
                while(eXDDSResult == XDDSResultSuccess)
                {
                        BSTR bstrTemp = NULL;
                        XDDSDeviceTypeEnum eXDDSDeviceType =
XDDSDeviceTypeUndefined;
                        XDDSServiceTypeEnum *peXDDSServiceTypes = NULL;
                        long lNofServices = 0;

                        wstring wstrDeviceID = bstrDeviceID;
                        wstring wstrMACAddr;
                        wstring wstrIPAddr;

                        //Get device type
                        hr = pXDDS->GetDeviceType(bstrDeviceID,
&eXDDSDeviceType, &eXDDSResult);
                        if (!(SUCCEEDED(hr) && eXDDSResult ==
XDDSResultSuccess))
                                throw runtime_error("Error retrieving MAC Address");

                        //Get device IP
```

- 2 -

LOC_AR_00004580

```
                                    hr = pXDDS->GetIPAddress(bstrDeviceID, &bstrTemp,
        &eXDDSResult);
                                    if (!(SUCCEEDED(hr) && eXDDSResult ==
        XDDSResultSuccess))
                                            throw runtime_error("Error retrieving IP Address");

                                    wstrIPAddr = bstrTemp;
                                    ::SysFreeString(bstrTemp);

                                    //Get device MAC
                                    hr = pXDDS->GetMACAddress(bstrDeviceID, &bstrTemp,
        &eXDDSResult);
                                    if (!(SUCCEEDED(hr) && eXDDSResult ==
        XDDSResultSuccess))
                                            throw runtime_error("Error retrieving MAC Address");

                                    wstrMACAddr = bstrTemp;
                                    ::SysFreeString(bstrTemp);

                                    wcout << L"Device ID   : " << wstrDeviceID << endl;
                                    cout <<  "Device Type : " <<
        g_ppchDeviceTypeNames[eXDDSDeviceType] << endl;
                                    wcout << L"MAC Address : " << wstrMACAddr << endl;
                                    wcout << L"IP Address  : " << wstrIPAddr << endl << endl;

                                    if ((wstrIPAddr == wstrTestIP) && (eXDDSDeviceType ==
        XDDSDeviceTypeID))
                                            bRet = true;
                                    //get next device
                                    hr = pXDDSFieldService->GetNextDeviceID(&bstrDeviceID,
        &eXDDSResult);
                                    if (!SUCCEEDED(hr))
                                            throw runtime_error(string("Failed to query XDDS service
        (") + _com_error(hr).ErrorMessage() + ")");

                            }
                        }
                }
                catch (runtime_error &e)
                {
                        //release reference before rethrowing exception
                        pXDDSFieldService->Release();
                        pXDDS->Release();
                        throw e;
                }
                //release references before returning
```

- 3 -

LOC_AR_00004581

```
        pXDDSFieldService->Release();
        pXDDS->Release();

    return bRet;
}

/// Application entry point
/// One command line parameter is accpeted. This is the expected IP address of the FlashLite OS
int main(int argc, char *argv[])
{
        int iRet = 0;
        string strExpectedIP("");
        if (argc == 2)
                strExpectedIP = argv[1];
        HRESULT hr = CoInitializeEx((void*) NULL, COINIT_MULTITHREADED);
        if (!SUCCEEDED(hr))
        {
                cout << "Error initiliazing COM (errno: " << hr << ")" << endl;
        }

        try
        {
                iRet = RunTest(strExpectedIP)?0:1;
        }
        catch (runtime_error &e)
        {
                cout << "Error: " << e.what() << endl;
                CoUninitialize();
                cin.get();
                return 1;
        }
        catch (...)
        {
                cout << "Unhandled error" << endl;
                CoUninitialize();
//              cin.get();
                return 1;
        }
        //cin.get();
        CoUninitialize();

        return iRet;
}


@echo off
```

LOC_AR_00004582

```
rem ###################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### Build script for Flashlite OS
rem ###
rem ### This script is used to initiate a build of the Pegasus OS.
rem ### The script is called from a Windows SDE and does the following:
rem ### 1. Copies the neccessary files to a remote Linux build server
rem ### 2. Initiates a build on the remote server
rem ### 3. Copies the resulting files back to the Windows SDE
rem ### Usage:
rem ### scm_build.cmd [version_string]
rem ### where version_string that contains the neccessary SCM version information of the build. This
rem ### will ultiamtely be stored in a file called version.txt on the root partition of the resulting OS image.
rem ### If no version info is provided the version information will result in a file with "test version" as the contents
rem ###
rem ###
rem ### Arguments:
rem ###     None
rem ###
rem ###################################################################

setlocal
rem GLOBALS
set REMOTE_HOST=130.144.249.107
set REMOTE_USER=dev2
set REMOTE_PASS=L1nuVdev2
set PLINK=..\3rdparty\plink.exe
set PSCP=..\3rdparty\pscp.exe -scp
set LAYER_NAME=etx-target-HW-layer-b49
set OUTPUT_DIR=..\build


rem Create version file
echo %1% > version.txt
if %1%==. echo test version > version.txt

rem prepare output directory
if exist %OUTPUT_DIR% rmdir /s /q %OUTPUT_DIR%
md %OUTPUT_DIR%
```

- 5 -

LOC_AR_00004583

```
echo --Creating remote build environment
set REMOTE_BUILD_DIR=pegasus_build_%Date%_%Time: =0%
rem substitute all illegal linux file characters with legal ones.
set REMOTE_BUILD_DIR=%REMOTE_BUILD_DIR::=.%
set REMOTE_BUILD_DIR=%REMOTE_BUILD_DIR: =_%
set REMOTE_BUILD_DIR=%REMOTE_BUILD_DIR:/=-%

rem init plink to create remote SSH key in registry
echo y | %PLINK% -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST%
"echo"
if %ERRORLEVEL% NEQ 0 goto FailExit

echo --Creating remote build tree at
%REMOTE_USER%@%REMOTE_HOST%:~/%REMOTE_BUILD_DIR%/
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST%
"mkdir %REMOTE_BUILD_DIR%; cd %REMOTE_BUILD_DIR%; mkdir Builds Layers
Results Scripts"
if %ERRORLEVEL% NEQ 0 goto FailExit

echo --Copying build files to remote host
rem copy layer tarball
%PSCP% -batch -pw %REMOTE_PASS% ..\ETX-LX800\%LAYER_NAME%.tar.gz
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Layers/
if %ERRORLEVEL% NEQ 0 goto FailExit

rem and unpack it
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "cd
%REMOTE_BUILD_DIR%/Layers; tar -xvzpf %LAYER_NAME%.tar.gz"
if %ERRORLEVEL% NEQ 0 goto FailExit
rem Copy remote script and 3rdparty tools
%PSCP% -batch -pw %REMOTE_PASS% buildPegasus.sh h_*.sh ..\3rdparty\tools.tar.gz
version.txt %REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Scripts/
if %ERRORLEVEL% NEQ 0 goto FailExit
rem and 'unixify" the script
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "cd
%REMOTE_BUILD_DIR%/Scripts; dos2unix h_*.sh buildPegasus.sh version.txt; chmod a+x
*"
if %ERRORLEVEL% NEQ 0 goto FailExit
rem unpack tools
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "cd
%REMOTE_BUILD_DIR%/Scripts; tar -xzf tools.tar.gz"
if %ERRORLEVEL% NEQ 0 goto FailExit
```

- 6 -

LOC AR 00004584

```
rem %PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST%
"cd %REMOTE_BUILD_DIR%; find ."

echo --Running remote build script
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "cd
%REMOTE_BUILD_DIR%/Scripts; sh buildPegasus.sh --version_file=version.txt"
if %ERRORLEVEL% NEQ 0 goto FailExit
echo --Retrieving results
rem First zip Results up -- SCP link is slow so it is faster to compress and decompress either side
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "cd
%REMOTE_BUILD_DIR%/Results; zip -r results.zip *"
if %ERRORLEVEL% NEQ 0 goto FailExit
%PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Results/results.zip
%OUTPUT_DIR%
if %ERRORLEVEL% NEQ 0 goto FailExit
pushd %OUTPUT_DIR%
unzip results.zip
del results.zip
popd

rem Also retrieve log file
%PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Scripts/build.log
%OUTPUT_DIR%
rem Also retrieve licenses file
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Builds/%LAYER_
NAME%/export/*pkg_licenses.txt %OUTPUT_DIR%

copy readme.txt %OUTPUT_DIR%\oss_export\

rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Results/target-
logfs.img %OUTPUT_DIR%
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Results/target-
rootfs.img %OUTPUT_DIR%
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Results/devel-
logfs.img %OUTPUT_DIR%
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Results/devel-
rootfs.img %OUTPUT_DIR%
```

- 7 -

LOC_AR_00004585

```
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Scripts/build.log
%OUTPUT_DIR%


echo --Cleaning up remote build directory
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "rm
-rf %REMOTE_BUILD_DIR%"

endlocal
exit /B 0

:FailExit
endlocal
exit /B 1

@echo off

rem #####################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### Verification script for Flashlite OS
rem ###
rem ### This script runs a series of tests on a Flashlite Unit in order to verify
rem ### the requirements of the OS. The script creates a report that is used to be
rem ### embedded in the Flashlite MVR
rem ###
rem ###
rem ### Arguments:
rem ###    None
rem ###
rem ### Assumptions: Assumes that the
rem ### History:
rem ###   2008-12-09  Francois Louw Initial version
rem #####################################################################

setlocal

rem #####################################################################
rem ### Global environment variables
rem #####################################################################
set FLASHLITE_IP=192.168.132.100
set USERNAME=root
set PASSWORD=P3g@zus
```

- 8 -

LOC_AR_00004586

```
rem %PSCP% -batch -pw %REMOTE_PASS%
%REMOTE_USER%@%REMOTE_HOST%:%REMOTE_BUILD_DIR%/Scripts/build.log
%OUTPUT_DIR%


echo --Cleaning up remote build directory
%PLINK% -batch -pw %REMOTE_PASS% %REMOTE_USER%@%REMOTE_HOST% "rm
-rf %REMOTE_BUILD_DIR%"

endlocal
exit /B 0

:FailExit
endlocal
exit /B 1

@echo off

rem ####################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### Verification script for Flashlite OS
rem ###
rem ### This script runs a series of tests on a Flashlite Unit in order to verify
rem ### the requirements of the OS. The script creates a report that is used to be
rem ### embedded in the Flashlite MVR
rem ###
rem ###
rem ### Arguments:
rem ###    None
rem ###
rem ### Assumptions: Assumes that the
rem ### History:
rem ###   2008-12-09  Francois Louw Initial version
rem ####################################################################

setlocal

rem ####################################################################
rem ### Global environment variables
rem ####################################################################
set FLASHLITE_IP=192.168.132.100
set USERNAME=root
set PASSWORD=P3g@zus
```

- 8 -

LOC AR 00004587

```
set LOG_FILE=Flashlite_OS_MVR.txt
set PLINK=..\3rdparty\plink.exe -l %USERNAME% -pw %PASSWORD%
set PSCP=..\3rdparty\pscp.exe -l %USERNAME% -pw %PASSWORD%

echo Flashlite OS Module Verification Report: Automatic Test Report > %LOG_FILE%

echo ========================================================= >>
%LOG_FILE%
echo . >> %LOG_FILE%
echo Checking network connectivity... >> %LOG_FILE%
ping -n 1 -w 100 %FLASHLITE_IP%
if %ERRORLEVEL% EQU 0 (
        echo     PASS: Ping to %FLASHLITE_IP% successful >> %LOG_FILE%
) ELSE (
  echo     FAIL: Ping to %FLASHLITE_IP% failed >> %LOG_FILE%
  goto fatalexit
)
echo . >> %LOG_FILE%
echo ^<MRS.OS.Service.Tools:SSH^> >> %LOG_FILE%
echo Checking SSH connection ... >> %LOG_FILE%
echo y | %PLINK% %FLASHLITE_IP% ls
if %ERRORLEVEL% EQU 0 (
        echo     PASS: SSH connection to %FLASHLITE_IP% successful >> %LOG_FILE%
) ELSE (
  echo     FAIL: SSH connection to %FLASHLITE_IP% failed >> %LOG_FILE%
  goto fatalexit
)

echo . >> %LOG_FILE%
set XDDS_TEST_RESULT=0
echo ^<MRS.OS.Upnp^> >> %LOG_FILE%
echo Checking XDDS functionality ... >> %LOG_FILE%
XDDS_Test\Release\XDDS_Test %FLASHLITE_IP%
if %ERRORLEVEL% EQU 0 (
        echo         PASS: FlashLite correctly detected through XDDS protocol >>
%LOG_FILE%
) ELSE (
  echo         FAIL: Failed to find FlashLite through XDDS protocol >> %LOG_FILE%
  set XDDS_TEST_RESULT=1
)

echo . >> %LOG_FILE%
echo Checking whether writable area on remote OS ... >> %LOG_FILE%
%PLINK% %FLASHLITE_IP% touch /tmp/os_test.stamp
if %ERRORLEVEL% EQU 0 (
        echo     PASS: /tmp on DUT is writable >> %LOG_FILE%
```

- 9 -

LOC_AR_00004588

```
) ELSE (
  echo    FAIL: /tmp on DUT is not writable >> %LOG_FILE%
  goto fatalexit
)

echo . >> %LOG_FILE%
echo Copying remote test script to remote OS ... >> %LOG_FILE%
%PSCP% FlashliteOSVerify.sh %FLASHLITE_IP%:/tmp/
if %ERRORLEVEL% EQU 0 (
        echo    PASS: script copied to %FLASHLITE_IP%:/tmp/ >> %LOG_FILE%
) ELSE (
  echo    FAIL: failed to copy script to %FLASHLITE_IP%:/tmp/ >> %LOG_FILE%
  goto fatalexit
)

rem Pre-conditions for running remote test are met so now execute remote script
echo . >> %LOG_FILE%
echo Running remote script ... >> %LOG_FILE%
%PLINK% %FLASHLITE_IP% "cd /tmp/; sh FlashliteOSVerify.sh"
set REMOTE_EXIT_LVL=%ERRORLEVEL%
if %REMOTE_EXIT_LVL% EQU 0 (
        echo    PASS: remote script completed without errors >> %LOG_FILE%
) ELSE (
  echo    FAIL: remote script completed with errors >> %LOG_FILE%
)

echo . >> %LOG_FILE%
echo Appending log of remote test script: >> %LOG_FILE%
%PLINK% %FLASHLITE_IP% "cd /tmp/; cat FlashliteOSVerify.log" >> %LOG_FILE%

if %ERRORLEVEL% NEQ 0 (
        echo FAIL: Failed to cat remote log file
        goto fatalexit
)

if %XDDS_TEST_RESULT% EQU 0 (
        exit /B %REMOTE_EXIT_LVL%
) ELSE (
        exit /B %XDDS_TEST_RESULT%
)

:fatalexit
echo Fatal error cannot continue test ... exiting
echo Fatal error cannot continue test ... exiting >> %LOG_FILE%
exit /B 1
```

- 10 -

LOC_AR_00004589

LC COPYRIGHT
0 047 078 623 1

# EXHIBIT 32

LOC_AR_00004591



LIBRARY OF CONGRESS

Copyright Office
of the United States
WASHINGTON, D.C.

**THIS IS TO CERTIFY** that the attached photocopies are a true representation of the work entitled **ALLURA XPER VERSION 8.2.0** deposited in the Copyright Office with claim of copyright registered under number **TX 8-377-555**.

**THIS IS TO CERTIFY ALSO,** beginning October 1, 2006 the Copyright Office discontinued the practice of stamping incoming deposits with accession stamp dates and registration numbers. Incoming deposits are now identified with barcodes labels.

**IN WITNESS WHEREOF,** the seal of this Office is affixed hereto on June 14, 2018.

Karyn A. Temple
Acting United States Register of Copyrights and Director

By:    Jarletta Walls
Supervisory Copyright Specialist
Records Research and Certification Section
Office of Public Records and Repositories

Use of this material is governed by the U.S. copyright law 17 U.S.C. 101 et seq.

LOC_AR_00004592

# ALLURA XPER VERSION 8.2.0 DEPOSIT – FIRST 10 PAGES (COMPUTER PROGRAM CONTAINING TRADE SECRETS)

NOTE: The computer program which is the subject of the copyright claim contains trade secret material.

LOC_AR_00004593

```
; Project specific build tooling to run the GBE for POS
;
; History:
;    2008-01-17    v0.1    Roel Kersten        - Initial version
;    2008-04-18 v0.2    Roel Kersten        - GBE v1.2.0, RemovePrivatePOSFiles.pl deleted
;    2008-09-30 v0.3    Sebastiaan van der Hoest - Removed 4NT wrapper
;    2012_06-20 v0.4    Peer Bruin        - Add PATH extension

; POS specific tool that generates 'gc_version.def'
[GenGcVersionDef]
ActionTool=GenGcVersionDef.pl

# Install POS
[InstallPOS]
ActionTool=InstallPOS.cmd

# UnInstall POS
[UnInstallPOS]
ActionTool=UnInstallPOS.cmd
[PubToolsInPath]
ActionTool=.\PubToolsInPath.cmd

@echo off
rem #######################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### CheckMappedDrive
rem ###
rem ### Checks whether the current working directory is a mapped drive letter
rem ### by looking if "uPOS" exists in the root.
rem ### If this is run from t:\<viewtag> this check will fail
rem ###
rem ### returns: 0 if mapped
rem ###        1 otherwise
rem ###
rem #######################################################################

setlocal

FOR /F "usebackq" %%i IN (`clearTool pwv -s`) DO set ViewTag=%%i


if not exist "\uPOS" (
```

- 1 -

LOC_AR_00004594

```
      echo Error: Build should be run from a mapped drive.
      echo     Map your view first and start this script from there.
      echo     E.g., "subst y: t:\%ViewTag%"
      exit /b 1
)

exit /b 0

; This ini-file is a template of settings needed for
; setting up builds for your project
; Copy this file into your project's Build directory
; and change settings for your project
;
[settings]
;
; Required by Engine
;
ContinueOnError=false
DebugStep=false
;
; Global ActionTool settings
;
ScmExecToolTrace=0
Preview=false
;
; Declarations (these settings need to be overwritten)
;
SubSystemRoot=
ViewTag=
MsiVersion=
;
; Project variables
;
ProjectName=Aditi
SubsysName=POS
BodyComponent=POS-uPOS@\projCIS
InterfaceComponent=POS-uCompPublic@\projCIS
;
; TICS
;
TicsDatabase=POS_Aditi
TicsEmailSuccess=DCMservicedesk@philips.com
TicsEmailFail=DCMservicedesk@philips.com
TicsBuildConfiguration=
;
; Logging and publishing
```

- 2 -

```
;
BuildDir=D:\buildresults\[ProjectName]\[ViewTag]
LogDir=[BuildDir]\Logging
DeliverDir=[BuildDir]\Install
RequiredFreeMB=500
;
; Compile settings for Visual Studio
;
BuildAction=rebuild
BuildConfiguration=release
;
; For CreateMsiFile
;
BinRoot=c:
DataRoot=[SubSystemRoot]
MsiTargetFolder=[DeliverDir]
SimulateCreateMsiFile=false
SubSystemName=PMS_POS
SubSystemVersion=[MsiVersion]
;
; For NotifyUsers
;
ToListOnSuccess=DCMservicedesk@philips.com,dl_bst_ixr_rd_adigit_fe_bld@philips.com
ToListOnFailed=DCMservicedesk@philips.com,dl_bst_ixr_rd_adigit_fe_bld@philips.com
SmtpMailRelay=mailhub.best.ms.philips.com:25
FromAddress=Generic.Build.Environment@philips.com
;
; Custom settings
;
C_GENERIC_DIR=c:\generic
; Specify free disk space for d:\buildresults
RequiredFreeMBBuild=2000
; Specific copy location to start automated test from
NIGHTJOB_DIR="\\proj3\P-cisontw\NightJob (Joris Eijsackers)\SyncDir\[StreamName]"
; define directory to store gc_version.def
GC_VERSION_DIR=[SubSystemRoot]\GeoCVEmb\id
;
;Use custom path settings
;
UseEnv=[SubSystemRoot]\Build\setvspath.cmd
;
; Nunit tool
;
NunitTool=[SubSystemRoot]\tools\NUnit_dotNetFW2_0\bin\nunit-console.exe

:: This script is a wrapper script to build
```

- 3 -

LOC_AR_00004596

```
:: The 'embedded' part of POS
:: It merely calls 'gc_all.cmd' and exits with the ERRORLEVEL of that script
::
:: History:
::              2008-01-17   v0.1    Roel Kersten        - Initial version
::   2008-09-29  v0.2 Sebastiaan van der Hoest  - Calls .cmd instead of .btm (4NT) script


@echo off
setlocal

:: Build embedded
cd \uPOS\POS\tools\bt\cmd\
call gc_all.cmd

:: exit and return the error code
exit /B ERRORLEVEL

:: This script is a wrapper script to build
:: The 'host' part of POS
:: It merely calls 'bt_proj.cmd All' and exits with the ERRORLEVEL of that script
::
:: History:
::              2008-01-17  v0.1      Roel Kersten        - Initial version
::   2008-09-29  v0.2 Sebastiaan van der Hoest  - Calls .cmd instead of .btm (4NT) script
::              2009-09-03  v0.3  Stefan van Gorkom              - Added ASTE build files for
Visual Studio 2005
::   2011-02-24  v0.3  Clemens van Kempen      - Added EDOC zipper (copied from
POS_RoC3_maint_AD7NT)
::   2012-02-16  v0.4  Sebastiaan van der Hoest  - Added unzip of 3rd party tools + WebBased
FieldService

@echo off
setlocal

set BUILD_HOST_FAILED=0

:: By default, we continue when we find errors.
:: At the end we check if any failures were found.
::
:: To make this script stop on the first failure,
:: use '-stop'.
::

if not "%1"=="" (
  if "%1"=="-stop" (
```

- 4 -

LOC_AR_00004597

```
  set STOP_ON_FIRST_ERROR=1
) else (
  echo [BUILD_HOST] Unknown option '%1'
  echo [BUILD_HOST] Use -stop to make me stop on the first error I see
  exit /B 1
)
)


cd \uPOS\POS\tools\bt\cmd\

call :RUN_COMMAND "call bt_unzip_tools.cmd" || goto P_QUIT_FAILURE

call :RUN_COMMAND "call bt_projects.cmd projects_host.txt         vs2003 /rebuild" %1 ||
goto P_QUIT_FAILURE
call :RUN_COMMAND "call bt_projects.cmd projects_fieldsvc.txt       vs2005 /rebuild" %1 ||
goto P_QUIT_FAILURE
call :RUN_COMMAND "call bt_projects.cmd projects_ASTE.txt         vs2005 /rebuild" %1
|| goto P_QUIT_FAILURE
call :RUN_COMMAND "call bt_projects.cmd projects_fieldsvc_web_vs2008.txt vs2008
/rebuild" %1 || goto P_QUIT_FAILURE
call :RUN_COMMAND "call bt_projects.cmd projects_fieldsvc_web_vs2003.txt vs2003
/rebuild" %1 || goto P_QUIT_FAILURE

call :RUN_COMMAND "call bt_edoc.cmd" || goto P_QUIT_FAILURE

goto :P_QUIT_SUCCESS


:P_QUIT_FAILURE
  echo [BUILD_HOST] FAILED!
  exit /B 1


:P_QUIT_SUCCESS

  :: check that we did not find an error on the way
  if "%BUILD_HOST_FAILED%"=="1" goto P_QUIT_FAILURE
  exit /B 0

::
:: Runs the command and sets the failed-flag.
:: Based on the settting 'STOP_ON_FIRST_ERROR'
:: it quits or lets the script continue
::
:RUN_COMMAND
```

- 5 -

LOC_AR_00004598

```
  :: run the command
%~1

:: check the error level
if ERRORLEVEL 1 (

  set BUILD_HOST_FAILED=1

  REM :: log to screen
  echo.
  echo [BUILD_HOST] FAILED running %1

  REM :: only stop when specifically asked to
  if defined STOP_ON_FIRST_ERROR (
    exit /B 1
  )
)
exit /B 0

:: This script is a wrapper script to build
:: The 'remoting' part of POS
::
:: History:
::              2008-01-17    v0.1    Roel Kersten          - Initial version
::    2008-09-29  v0.2  Sebastiaan van der Hoest  - Calls .cmd instead of .btm (4NT) script
::

@echo off
setlocal

:: Build what is required for POS Remoting
cd \uPOS\POS\Geointerface\GeoRemoting\src\cmd\
call GeoRemoting_all

:: exit and return the error code
exit /B ERRORLEVEL

set INCLUDE=%INCLUDE%;C:\Program Files\Platform SDK\Include\.
set INCLUDE=%INCLUDE%;C:\Program Files\Microsoft SDK\Include\.
set INCLUDE=%INCLUDE%;C:\Program Files\Microsoft SDK XPSP2\Include\.
set INCLUDE=%INCLUDE%;C:\Program Files\Microsoft SDKs\Windows\v5.0\Include\.
set PATH=%PATH%;\uPOS\POS\Pub\Tools\Commands

@echo off
```

- 6 -

LOC_AR_00004599

```
rem ###################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### developer build script
rem ###
rem ### This script checks if all the files as defined in the package definitions
rem ### (.ini files) are available.
rem ###
rem ### In order to use this scr
rem ### Precondition:
rem ### Â      All content has been build (gc_all was executed)
rem ###
rem ### Postconcidion:
rem ### Â      Logfile with results available:
rem ###    D:\buildresults\<project>\<stream>\Logging\msi_check_trace.txt
rem ###
rem ### Scenario: msi_check.scm
rem ### Settings: GBE.ini
rem ###
rem ### Options:
rem ###    None
rem ###
rem ### Arguments:
rem ###    None
rem ###
rem ### History:
rem ###   2009-05-29  R. Schelkers  Initial version
rem ###################################################################

setlocal

rem ## Are we running from a mapped drive?
call CheckMappedDrive.cmd
if %ERRORLEVEL% NEQ 0 ( goto :ErrorBuild )

rem ###################################################################
rem ### Generic environment variables
rem ###################################################################

rem Check '/CreateMSI' flag. If set the MSI will be created.
rem By default, developers do not have to create an MSI
set GBE_SimulateCreateMsiFile=true
if /I "%1" == "/CreateMSI" (
  set GBE_SimulateCreateMsiFile=false
```

- 7 -

LOC_AR_00004600

```
)
rem SCM_ID is necessary for embedded code
set SCM_ID=(0,0,0,0)
rem %

rem Set subsystem root to support building from a mapped drive
set GBE_SubSystemRoot=%~dp0.\..
rem %

rem Overwrite MsiVersion in Blackboard
set GBE_MsiVersion=0.0.0.0

rem Next EV's are necessary for projects that use
rem Tools-CVPub, i.e. "Rocket" projects
set CMD_TOOLS=U:\tools\commands
set SRT_TOOLS=U:\tools\tabledriven

FOR /F "usebackq" %%i IN (`ClearTool pwv -s`) DO set GBE_ViewTag=%%i
rem %

set toolpath=..\..\..\uCompScmDev\Build\Engine\Src

rem ###################################################################
rem ### Start the build
rem ###################################################################
:Startbuild
perl -w "%toolpath%\ScmExec.pl" msi_check.scm
if %ERRORLEVEL% EQU 0 (
  goto :FinishBuild
) ELSE (
  goto :ErrorBuild
)

REM
####################################################################
REM ### Error handler(s)
REM
####################################################################
:ErrorBuild
echo.
echo Developer build script finished with errors!
exit /b 1
echo.

:FinishBuild
```

- 8 -

LOC_AR_00004601

```
echo.
echo Developer build script finished successfully
exit /b 0
echo.
endlocal

REM
####################################################################
REM ### End of script
REM
####################################################################

## Create MSI file
.CreateMsiFile


@echo off
rem Create a tracing directory 'c:\temp\tracing' if the directory already exist skip mkdir
set TRACINGDIR=c:\temp\tracing
if EXIST %TRACINGDIR% echo %TRACINGDIR% Already exist, no creation needed
if NOT EXIST %TRACINGDIR% (
  mkdir %TRACINGDIR%
  echo Create %TRACINGDIR%
)
exit /B 0

##############################################################
##
## exec_generate.scm
##
## Project specific scenario that performs the actual generate actions that are necessary
## for a CI generate.
##
## Project: <fill-in-your-UCM-project-here>
##
## History:
##   2012-02-23  Peer Bruin   Initial version
##   2012-05-18  Peer Bruin   Host part build with GBE
##   2012-11-30  Peer Bruin   Remove unwanted execute always additions
##   2012-12-06  Peer Bruin   Build error in gtest; gtest has been replaced by gmock
##############################################################

## Build 'embedded' part
.\..\build_embedded.bat > [TempLogFile] 2>&1

## Build 'remoting' part
```

- 9 -

LOC_AR_00004602

```
.\..\build_remoting.bat

## Build 'host' part
.ChangeBlackBoard UseEnv [SubSystemRoot]\Build\setvs2003path.cmd
..\Solutions\GeoCommon.sln
..\Solutions\GeoFSUtility.sln
..\Solutions\FSCGeoCV.sln
..\Solutions\GeoInterface.sln
..\Solutions\GeoCommonGeoIniFile.sln
..\Solutions\GeometryCV_Test_GeoHostLITELib.sln
..\Solutions\GeometryCV.sln
..\Solutions\GscInterfaceStub.sln
..\Solutions\GscCallbackInterfaceProxy.sln
..\Solutions\GeometryCVTest.sln
..\Solutions\GeoCVEmb.sln
#Gsu ExecFromMSI
..\Solutions\ExecFromMsi.sln

#GeoCVUI
.ChangeBlackBoard UseEnv [SubSystemRoot]\Build\setvs2005path.cmd
..\Solutions\GeoCVUI.sln
..\Solutions\ASTE.sln

#FSCWeb
.ChangeBlackBoard UseEnv [SubSystemRoot]\Build\setvs2008path.cmd
..\Solutions\FSCWeb.sln

#FSWeb
#..\Solutions\Gtest.sln
..\Solutions\Gmock.sln
..\Solutions\FSWeb.sln
..\Solutions\FSWebTest.sln

.ChangeBlackBoard UseEnv [SubSystemRoot]\Build\setvs2003path.cmd
..\Solutions\FSWebGeoWrapper.sln

#Unzip edoc
..\..\tools\bt\cmd\bt_edoc.cmd

## Create MSI file
.CreateMsiFile

###########################################################
##
## post_generate.scm
##
```

- 10 -

LOC_AR_00004603

# ALLURA XPER VERSION 8.2.0

# DEPOSIT – FIRST 10 PAGES

# (COMPUTER PROGRAM

# CONTAINING TRADE SECRETS)

NOTE:  The computer program which is the subject of the copyright claim contains trade
secret material.

LOC_AR_00004604

```
; Project specific build tooling to run the GBE for POS
;
; History:
;     2008-01-17      v0.1     Roel Kersten        - Initial version
;     2008-04-18 v0.2    Roel Kersten          - GBE v1.2.0, RemovePrivatePOSFiles.pl deleted
;     2008-09-30 v0.3    Sebastiaan van der Hoest - Removed 4NT wrapper
;     2012_06-20 v0.4    Peer Bruin             - Add PATH extension

; POS specific tool that generates 'gc_version.def'
[GenGcVersionDef]
ActionTool=GenGcVersionDef.pl

# Install POS
[InstallPOS]
ActionTool=InstallPOS.cmd

# UnInstall POS
[UnInstallPOS]
ActionTool=UnInstallPOS.cmd
[PubToolsInPath]
ActionTool=.\PubToolsInPath.cmd

@echo off
rem ####################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### CheckMappedDrive
rem ###
rem ### Checks whether the current working directory is a mapped drive letter
rem ### by looking if "uPOS" exists in the root.
rem ### If this is run from t:\<viewtag> this check will fail
rem ###
rem ### returns: 0 if mapped
rem ###        1 otherwise
rem ###
rem ####################################################################

setlocal

FOR /F "usebackq" %%i IN (`clearTool pwv -s`) DO set ViewTag=%%i


if not exist "\uPOS" (
```

- 1 -

LOC_AR_00004605

```
    echo Error: Build should be run from a mapped drive.
    echo     Map your view first and start this script from there.
    echo     E.g., "subst y: t:\%ViewTag%"
    exit /b 1
)

exit /b 0


; This ini-file is a template of settings needed for
; setting up builds for your project
; Copy this file into your project's Build directory
; and change settings for your project
;
[settings]
;
; Required by Engine
;
ContinueOnError=false
DebugStep=false
;
; Global ActionTool settings
;
ScmExecToolTrace=0
Preview=false
;
; Declarations (these settings need to be overwritten)
;
SubSystemRoot=
ViewTag=
MsiVersion=
;
; Project variables
;
ProjectName=Aditi
SubsysName=POS
BodyComponent=POS-uPOS@\projCIS
InterfaceComponent=POS-uCompPublic@\projCIS
;
; TICS
;
TicsDatabase=POS_Aditi
TicsEmailSuccess=DCMservicedesk@philips.com
TicsEmailFail=DCMservicedesk@philips.com
TicsBuildConfiguration=
;
; Logging and publishing
```

- 2 -

LOC_AR_00004606

```
;
BuildDir=D:\buildresults\[ProjectName]\[ViewTag]
LogDir=[BuildDir]\Logging
DeliverDir=[BuildDir]\Install
RequiredFreeMB=500
;
; Compile settings for Visual Studio
;
BuildAction=rebuild
BuildConfiguration=release
;
; For CreateMsiFile
;
BinRoot=c:
DataRoot=[SubSystemRoot]
MsiTargetFolder=[DeliverDir]
SimulateCreateMsiFile=false
SubSystemName=PMS_POS
SubSystemVersion=[MsiVersion]
;
; For NotifyUsers
;
ToListOnSuccess=DCMservicedesk@philips.com,dl_bst_ixr_rd_adigit_fe_bld@philips.com
ToListOnFailed=DCMservicedesk@philips.com,dl_bst_ixr_rd_adigit_fe_bld@philips.com
SmtpMailRelay=mailhub.best.ms.philips.com:25
FromAddress=Generic.Build.Environment@philips.com
;
; Custom settings
;
C_GENERIC_DIR=c:\generic
; Specify free disk space for d:\buildresults
RequiredFreeMBBuild=2000
; Specific copy location to start automated test from
NIGHTJOB_DIR="\\proj3\P-cisontw\NightJob (Joris Eijsackers)\SyncDir\[StreamName]"
; define directory to store gc_version.def
GC_VERSION_DIR=[SubSystemRoot]\GeoCVEmb\id
;
;Use custom path settings
;
UseEnv=[SubSystemRoot]\Build\setvspath.cmd
;
; Nunit tool
;
NunitTool=[SubSystemRoot]\tools\NUnit_dotNetFW2_0\bin\nunit-console.exe

:: This script is a wrapper script to build
```

- 3 -

LOC_AR_00004607

```
:: The 'embedded' part of POS
:: It merely calls 'gc_all.cmd' and exits with the ERRORLEVEL of that script
::
:: History:
::              2008-01-17   v0.1   Roel Kersten          - Initial version
::    2008-09-29  v0.2  Sebastiaan van der Hoest  - Calls .cmd instead of .btm (4NT) script


@echo off
setlocal

:: Build embedded
cd \uPOS\POS\tools\bt\cmd\
call gc_all.cmd

:: exit and return the error code
exit /B ERRORLEVEL

:: This script is a wrapper script to build
:: The 'host' part of POS
:: It merely calls 'bt_proj.cmd All' and exits with the ERRORLEVEL of that script
::
:: History:
::          2008-01-17  v0.1      Roel Kersten         - Initial version
::    2008-09-29  v0.2  Sebastiaan van der Hoest  - Calls .cmd instead of .btm (4NT) script
::          2009-09-03  v0.3  Stefan van Gorkom            - Added ASTE build files for
Visual Studio 2005
::    2011-02-24  v0.3  Clemens van Kempen       - Added EDOC zipper (copied from
POS_RoC3_maint_AD7NT)
::    2012-02-16  v0.4  Sebastiaan van der Hoest  - Added unzip of 3rd party tools + WebBased
FieldService

@echo off
setlocal

set BUILD_HOST_FAILED=0

:: By default, we continue when we find errors.
:: At the end we check if any failures were found.
::
:: To make this script stop on the first failure,
:: use '-stop'.
::

if not "%1"=="" (
  if "%1"=="-stop" (
```

- 4 -

LOC_AR_00004608

```
    set STOP_ON_FIRST_ERROR=1
  ) else (
    echo [BUILD_HOST] Unknown option '%1'
    echo [BUILD_HOST] Use -stop to make me stop on the first error I see
    exit /B 1
  )
)


cd \uPOS\POS\tools\bt\cmd\

call :RUN_COMMAND "call bt_unzip_tools.cmd" || goto P_QUIT_FAILURE

call :RUN_COMMAND "call bt_projects.cmd projects_host.txt          vs2003 /rebuild" %1 ||
goto P_QUIT_FAILURE
call :RUN_COMMAND "call bt_projects.cmd projects_fieldsvc.txt          vs2005 /rebuild" %1 ||
goto P_QUIT_FAILURE
call :RUN_COMMAND "call bt_projects.cmd projects_ASTE.txt          vs2005 /rebuild" %1
|| goto P_QUIT_FAILURE
call :RUN_COMMAND "call bt_projects.cmd projects_fieldsvc_web_vs2008.txt vs2008
/rebuild" %1 || goto P_QUIT_FAILURE
call :RUN_COMMAND "call bt_projects.cmd projects_fieldsvc_web_vs2003.txt vs2003
/rebuild" %1 || goto P_QUIT_FAILURE

call :RUN_COMMAND "call bt_edoc.cmd" || goto P_QUIT_FAILURE

goto :P_QUIT_SUCCESS


:P_QUIT_FAILURE
  echo [BUILD_HOST] FAILED!
  exit /B 1


:P_QUIT_SUCCESS

  :: check that we did not find an error on the way
  if "%BUILD_HOST_FAILED%"=="1" goto P_QUIT_FAILURE
  exit /B 0

::
:: Runs the command and sets the failed-flag.
:: Based on the settting 'STOP_ON_FIRST_ERROR'
:: it quits or lets the script continue
::
:RUN_COMMAND
```

- 5 -

LOC_AR_00004609

```
:: run the command
%~1

:: check the error level
if ERRORLEVEL 1 (

  set BUILD_HOST_FAILED=1

  REM :: log to screen
  echo.
  echo [BUILD_HOST] FAILED running %1

  REM :: only stop when specifically asked to
  if defined STOP_ON_FIRST_ERROR (
    exit /B 1
  )
)
exit /B 0

:: This script is a wrapper script to build
:: The 'remoting' part of POS
::
:: History:
::            2008-01-17   v0.1    Roel Kersten          - Initial version
::   2008-09-29  v0.2  Sebastiaan van der Hoest  - Calls .cmd instead of .btm (4NT) script
::

@echo off
setlocal

:: Build what is required for POS Remoting
cd \uPOS\POS\Geointerface\GeoRemoting\src\cmd\
call GeoRemoting_all

:: exit and return the error code
exit /B ERRORLEVEL

set INCLUDE=%INCLUDE%;C:\Program Files\Platform SDK\Include\.
set INCLUDE=%INCLUDE%;C:\Program Files\Microsoft SDK\Include\.
set INCLUDE=%INCLUDE%;C:\Program Files\Microsoft SDK XPSP2\Include\.
set INCLUDE=%INCLUDE%;C:\Program Files\Microsoft SDKs\Windows\v5.0\Include\.
set PATH=%PATH%;\uPOS\POS\Pub\Tools\Commands

@echo off
```

- 6 -

LOC_AR_00004610

```
rem #########################################################################
rem ###
rem ### Philips Medical Systems B.V. (C) 2008
rem ### All rights reserved
rem ###
rem ### developer build script
rem ###
rem ### This script checks if all the files as defined in the package definitions
rem ### (.ini files) are available.
rem ###
rem ### In order to use this scr
rem ### Precondition:
rem ### Â     All content has been build (gc_all was executed)
rem ###
rem ### Postconcidion:
rem ### Â     Logfile with results available:
rem ###    D:\buildresults\<project>\<stream>\Logging\msi_check_trace.txt
rem ###
rem ### Scenario: msi_check.scm
rem ### Settings: GBE.ini
rem ###
rem ### Options:
rem ###     None
rem ###
rem ### Arguments:
rem ###     None
rem ###
rem ### History:
rem ###   2009-05-29  R. Schelkers  Initial version
rem #########################################################################

setlocal

rem ## Are we running from a mapped drive?
call CheckMappedDrive.cmd
if %ERRORLEVEL% NEQ 0 ( goto :ErrorBuild )

rem #########################################################################
rem ### Generic environment variables
rem #########################################################################

rem Check '/CreateMSI' flag. If set the MSI will be created.
rem By default, developers do not have to create an MSI
set GBE_SimulateCreateMsiFile=true
if /I "%1" == "/CreateMSI" (
  set GBE_SimulateCreateMsiFile=false
```

- 7 -

LOC_AR_00004611

```
)
rem SCM_ID is necessary for embedded code
set SCM_ID=(0,0,0,0)
rem %

rem Set subsystem root to support building from a mapped drive
set GBE_SubSystemRoot=%~dp0.\..
rem %

rem Overwrite MsiVersion in Blackboard
set GBE_MsiVersion=0.0.0.0

rem Next EV's are necessary for projects that use
rem Tools-CVPub, i.e. "Rocket" projects
set CMD_TOOLS=U:\tools\commands
set SRT_TOOLS=U:\tools\tabledriven

FOR /F "usebackq" %%i IN (`ClearTool pwv -s`) DO set GBE_ViewTag=%%i
rem %

set toolpath=..\..\..\uCompScmDev\Build\Engine\Src

rem ##################################################################
rem ### Start the build
rem ##################################################################
:Startbuild
perl -w "%toolpath%\ScmExec.pl" msi_check.scm
if %ERRORLEVEL% EQU 0 (
  goto :FinishBuild
) ELSE (
  goto :ErrorBuild
)

REM
##############################################################
REM ### Error handler(s)
REM
##############################################################
:ErrorBuild
echo.
echo Developer build script finished with errors!
exit /b 1
echo.

:FinishBuild
```

- 8 -

LOC_AR_00004612

```
echo.
echo Developer build script finished successfully
exit /b 0
echo.
endlocal

REM
#####################################################################
REM ### End of script
REM
#####################################################################

## Create MSI file
.CreateMsiFile


@echo off
rem Create a tracing directory 'c:\temp\tracing' if the directory already exist skip mkdir
set TRACINGDIR=c:\temp\tracing
if EXIST %TRACINGDIR% echo %TRACINGDIR Already exist, no creation needed
if NOT EXIST %TRACINGDIR% (
  mkdir %TRACINGDIR%
  echo Create %TRACINGDIR%
)
exit /B 0


############################################################
##
## exec_generate.scm
##
## Project specific scenario that performs the actual generate actions that are necessary
## for a CI generate.
##
## Project: <fill-in-your-UCM-project-here>
##
## History:
##   2012-02-23  Peer Bruin    Initial version
##   2012-05-18  Peer Bruin    Host part build with GBE
##   2012-11-30  Peer Bruin    Remove unwanted execute always additions
##   2012-12-06  Peer Bruin    Build error in gtest; gtest has been replaced by gmock
############################################################

## Build 'embedded' part
.\..\build_embedded.bat > [TempLogFile] 2>&1


## Build 'remoting' part
```

- 9 -

LOC_AR_00004613

.\..\build_remoting.bat

```
## Build 'host' part
.ChangeBlackBoard UseEnv [SubSystemRoot]\Build\setvs2003path.cmd
..\Solutions\GeoCommon.sln
..\Solutions\GeoFSUtility.sln
..\Solutions\FSCGeoCV.sln
..\Solutions\GeoInterface.sln
..\Solutions\GeoCommonGeoIniFile.sln
..\Solutions\GeometryCV_Test_GeoHostLITELib.sln
..\Solutions\GeometryCV.sln
..\Solutions\GscInterfaceStub.sln
..\Solutions\GscCallbackInterfaceProxy.sln
..\Solutions\GeometryCVTest.sln
..\Solutions\GeoCVEmb.sln
#Gsu ExecFromMSI
..\Solutions\ExecFromMsi.sln

#GeoCVUI
.ChangeBlackBoard UseEnv [SubSystemRoot]\Build\setvs2005path.cmd
..\Solutions\GeoCVUI.sln
..\Solutions\ASTE.sln

#FSCWeb
.ChangeBlackBoard UseEnv [SubSystemRoot]\Build\setvs2008path.cmd
..\Solutions\FSCWeb.sln

#FSWeb
#..\Solutions\Gtest.sln
..\Solutions\Gmock.sln
..\Solutions\FSWeb.sln
..\Solutions\FSWebTest.sln

.ChangeBlackBoard UseEnv [SubSystemRoot]\Build\setvs2003path.cmd
..\Solutions\FSWebGeoWrapper.sln

#Unzip edoc
..\..\tools\bt\cmd\bt_edoc.cmd

## Create MSI file
.CreateMsiFile

############################################################
##
## post_generate.scm
##
```

- 10 -

LOC_AR_00004614

# ALLURA XPER VERSION 8.2.0

# DEPOSIT – LAST 10 PAGES

# (COMPUTER PROGRAM

# CONTAINING TRADE SECRETS)

**NOTE: The computer program which is the subject of the copyright claim contains trade secret material.**

LOC_AR_00004615

```
// History       :
// - Date: 1999-08-31, Author: John Knappers
//   Reason for change: Bug Report Rob Smorenburg dd 12-07-1999
//   Details of change: InitTestCaseLine and FinalizeTestCaseLine
//   changed from pure virtual to virtual
// - Date: 1999-03-15, Author: Andy Michaelides
//   Reason for change: Creation
//   Details of change: n.a.
//
// Description  : This class contains pure virtual
//          methods
//             GotoInitialState()
//             HandleInputs()
//             CheckFinalStates()
//             CheckOutputs()
//          that must be implemented in a derived call
//          in order to handle a specified test case approach.
//          Note: The methods of this class are called in the order
//          shown above by the aggregating CTestEngine.
//
//
//
//------------------------------------------------------------------
// INCLUDES & FORWARD CLASS DECLARATIONS
//

class CTestEngine;

//
// CLASS DECLARATION
//
class CTestMapper
{
public: // METHODS


        // Constructor

        CTestMapper(
              CTestCase& rTestCase);

        // Destructor
        virtual
        ~CTestMapper();

    // Meant to check if this line is to be run
```

- 1 -

```
// The entire Test Case line is provided so that
// implementer can decide which attribute of the
// line means 'dont run'.
virtual BOOL
      RunTestCaseLine(
   const CString& rsTestCaseLine) = 0;


      //Meant for initialization and finilization
virtual void
      InitTestCaseLine(
   const CString& rsTestCaseLine);
virtual void
      FinalizeTestCaseLine(
   const CString& rsTestCaseLine);


// Meant to set InitialState for a test case
      virtual BOOL
      GotoInitialState(
   // array of desired states/commands
   // that will, in totality, set the intial state for
   // the test case
   const CStringArray& rInitialStates) = 0;

// Meant to handle the desired events/inputs once in the
// initial State
virtual BOOL
      HandleInputs(
   // Array of inputs
   const CStringArray& rInputs) = 0;

// Meant to Check the resultant outputs
virtual BOOL
      CheckOutputs(
   // Array of outputs to check
   const CStringArray& rOutputs,
   // Array of inputs as possible reference
   const CStringArray& rInputs) = 0;

// Meant to check the final state of the test case
virtual BOOL
      CheckFinalState(
   // array of final states to check
   const CStringArray& rFinalStates) = 0;
```

- 2 -

LOC_AR_00004617

```cpp
// returns whether the run was stopped
virtual BOOL
    MustStopRun();

// Set private variable to stop run
virtual void
    StopRunNow();


    // Set Reference to engine
    void
    SetRefToEngine(CTestEngine* pTestEngine);

protected: // METHODS
    BOOL
    OpenTraceFile(
const CString& rsTraceFileName);

    void
    WriteToTraceFile(
const CString& rsMsg);

    // Member function to return Total Nr Of columns with witch this engine operates
    // on a testcase line
    ULONG
    GetNrOfColumns();

    // Member function to retrieve a string in a given column from a testcase line

    BOOL
    GetValueOfColumn(
        const ULONG& rulNrOfColumn,
        CString& rsColumnValue);

    void
    CloseTraceFile();

    void
    Report(
        const CString& rsData);
    void
    Check(
        const BOOL bCheckResult,
        const CString& rsCheckId,
    TestFailBehavior eBehavior=TESTFAILBEHAVIOR_BREAK);
```

- 3 -

LOC_AR_00004618

```
protected: // DATA

        CTestCase& m_rTestCase;

private: // METHODS
        // Copy Constructor
        CTestMapper(const CTestMapper& ref);
        // Assignment operator
        CTestMapper& operator = (const CTestMapper& ref);


private: //DATA
        // Trace file
    CStdioFile m_TraceFile;

    // If stopping the run is desired - see method StopRun() - derived class
    // MUST set this in its constructor
        BOOL m_bStopRun;
        // Keep a reference to the Engine that is related to this mapper
        CTestEngine* m_pTestEngine;


};

#endif // TESTMAPPER_H
//==== end of file: w:\uAUI\AUI\Pub\Infra\IncTest\TestMapper.h

//==== start of file: w:\uAUI\AUI\Pub\Infra\IncTest\TestULONGMap.h
#ifndef TESTULONGMAP_H
#define TESTULONGMAP_H

#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000

//
//----------------------------------------------------------------
// Copyright   : Copyright(c) 1999, Philips Electronics N.V.
//
// File        : TestULONG.h
//
// Class       : CTestULONGMap
//
// History   :
// - Date: 1999-06-28, Author: J.B. Knappers
//   Reason for change: Initial version
```

- 4 -

```
//  Details of change: Not applicable
//
// Hierarchy  :
//
// Description :  Definition of Map for ULONGs
//                              Map is defined using a template class
//                              Key -->String
//          Mapped Item --> ULONG
//---------------------------------------------------------------
//

class CTestULONGMap : public CMap < LPCTSTR, LPCTSTR, ULONG, const ULONG& >
{
};

#endif // TESTULONGMAP_H

// TstInfTDMdl.h: interfaces for table driven testing
//
/////////////////////////////////////////////////////////////////

//
//--------------------------------------------------------------------
// Copyright   : Copyright (c) 1999,
//          Philips Medical Systems Nederland B.V.
//
// File              : TstInfTDMdl.h
//
// Class       : -
//
//
// Requirements:
//
// Design:
//
// History          :
// - Date: 1999-04-23, Author: Ivo Canjels
//   Reason for change: Creation
//   Details of change: n.a.
//
// Hierarchy  :
//
// Description  : This header file is the published interface of the TestTableDriven module
//                              See for detailed class descriptions the class header files.
//
//--------------------------------------------------------------------
```

- 5 -

LOC_AR_00004620

```
#include "TestEngine.h"
#include "TestMapper.h"
#include "TestLineTranslator.h"


// Link stuff
#ifdef _DEBUG
        #ifdef _UNICODE
                #pragma comment (lib, "TstInfTD_ud.lib")
        #else
                #pragma comment (lib, "TstInfTD_ad.lib")
        #endif // _UNICODE
#else
        #ifdef _UNICODE
                #pragma comment (lib, "TstInfTD_ur.lib")
        #else
                #pragma comment (lib, "TstInfTD_ar.lib")
        #endif // _UNICODE
#endif // _DEBUG

// TestTableDrivenUnit.h: interfaces for table driven testing
//
////////////////////////////////////////////////////////////

//
//-------------------------------------------------------------------
// Copyright    : Copyright (c) 1999,
//          Philips Medical Systems Nederland B.V.
//
// File                    : TestTableDrivenUnit.h
//
// Class        : -
//
//
// Requirements:
//
// Design:
//
// History                 :
// - Date: 1999-04-23, Author: Ivo Canjels
//   Reason for change: Creation
//   Details of change: n.a.
//
// Hierarchy    :
//
```

- 6 -

LOC_AR_00004621

```
// Description  : This header file is the published interface of the TestTableDriven module
//                         See for detailed class descriptions the class header files.
//
//-----------------------------------------------------------------

#include "TstInfTDMdl.h"

// TstInfTHMdl.h: interfaces for Testharness testing
//
/////////////////////////////////////////////////////////////////

//
//-----------------------------------------------------------------
// Copyright    : Copyright (c) 1999,
//               Philips Medical Systems Nederland B.V.
//
// File              : TstInfTHMdl.h
//
// Class        : -
//
//
// Requirements:
//
// Design:
//
// History          :
// - Date: 1999-05-26, Author: John Knappers
//   Reason for change: Creation
//   Details of change: n.a.
//
// Hierarchy    :
//
// Description  : This header file is the published interface of the TestHarness module
//                         See for detailed class descriptions the class header files.
//
//-----------------------------------------------------------------

#include "TestHarness.h"
#include "TestCase.h"
#include "TestGeneral.h"

// Link stuff
#ifdef _DEBUG
        #ifdef _UNICODE
                #pragma comment (lib, "TstInfTH_ud.lib")
        #else
```

- 7 -

LOC_AR_00004622

```
// Description  : This header file is the published interface of the TestTableDriven module
//                          See for detailed class descriptions the class header files.
//
//---------------------------------------------------------------

#include "TstInfTDMdl.h"

// TstInfTHMdl.h: interfaces for Testharness testing
//
////////////////////////////////////////////////////////////////

//
//---------------------------------------------------------------
// Copyright    : Copyright (c) 1999,
//               Philips Medical Systems Nederland B.V.
//
// File              : TstInfTHMdl.h
//
// Class         : -
//
//
// Requirements:
//
// Design:
//
// History             :
// - Date: 1999-05-26, Author: John Knappers
//   Reason for change: Creation
//   Details of change: n.a.
//
// Hierarchy   :
//
// Description  : This header file is the published interface of the TestHarness module
//                          See for detailed class descriptions the class header files.
//
//---------------------------------------------------------------

#include "TestHarness.h"
#include "TestCase.h"
#include "TestGeneral.h"

// Link stuff
#ifdef _DEBUG
        #ifdef _UNICODE
                #pragma comment (lib, "TstInfTH_ud.lib")
        #else
```

- 7 -

LOC_AR_00004623

```
                    #pragma comment (lib, "TstInfTH_ad.lib")
         #endif // _UNICODE
#else
         #ifdef _UNICODE
                    #pragma comment (lib, "TstInfTH_ur.lib")
         #else
                    #pragma comment (lib, "TstInfTH_ar.lib")
         #endif // _UNICODE
#endif // _DEBUG

// TstInfTHUnit.h: interfaces for Testharness testing
//
//////////////////////////////////////////////////////////////

//
//------------------------------------------------------------------
// Copyright    : Copyright (c) 1999,
//          Philips Medical Systems Nederland B.V.
//
// File                  : TstInfTHUnit.h
//
// Class        : -
//
//
// Requirements:
//
// Design:
//
// History              :
// - Date: 1999-05-26, Author: John Knappers
//   Reason for change: Creation
//   Details of change: n.a.
//        Initial version: directory structure migration
//
// Hierarchy    :
//
// Description  : This header file is the published interface of the TestHarness module
//                          See for detailed class descriptions the class header files.
//
//------------------------------------------------------------------

#include "TstInfTHMdl.h"


ï»¿#region Copyright Koninklijke Philips Electronics N.V. 2012
// All rights are reserved. Reproduction or transmission in whole or in part, in
```

- 8 -

LOC_AR_00004624

```csharp
// any form or by any means, electronic, mechanical or otherwise, is prohibited
// without the prior written consent of the copyright owner.
#endregion

using System;
using System.IO;

namespace Philips.PmsIxr.Aui.DevTools.CheckViewDriveLetter
{
  /// <summary>
  /// Outer class, containing the Main entry of the application
  /// </summary>
  class Program
  {
    private Program()
    {
    }

    static int Main(string[] args)
    {
      int retVal = 0;

      string fullPath = Directory.GetCurrentDirectory();

      //-------------------------------------
      // fullPath shall be like X:\uAUI\AUI\...
      //-------------------------------------
      const string expectedRoot = @"\uAUI\AUI\";

      if (fullPath.Substring(2, expectedRoot.Length) != expectedRoot)
      {
        retVal = 1;

        Console.WriteLine(@"--------------------------------------------------------------------------------");
        Console.WriteLine(@"Error: Use a 'subst' for your view and build from the substituted drive letter.");
        Console.WriteLine(@"--------------------------------------------------------------------------------");
        Console.WriteLine(@"  e.g: subst X: T:\AUI_Bright_TEAM_vs2008_int");
        Console.WriteLine(@"       cd /d X:\uAIU\AUI\build");
        Console.WriteLine(@"       dev_build");
        Console.WriteLine(@"--------------------------------------------------------------------------------");
        Console.WriteLine(@" note: when running from EC, add viewDriveLetter to the job parameters");
```

- 9 -

LOC_AR_00004625

```
        Console.WriteLine(@"-------------------------------------------------------------
--");
    }

        return retVal;
    }
  }
}
```

```
ï»¿using System.Reflection;
using System.Runtime.CompilerServices;
using System.Runtime.InteropServices;

// General Information about an assembly is controlled through the following
// set of attributes. Change these attribute values to modify the information
// associated with an assembly.
[assembly: AssemblyTitle("CheckViewDriveLetter")]
[assembly: AssemblyDescription("")]
[assembly: AssemblyConfiguration("")]
[assembly: AssemblyCompany("TA-CASE")]
[assembly: AssemblyProduct("CheckViewDriveLetter")]
[assembly: AssemblyCopyright("Copyright Â© TA-CASE 2012")]
[assembly: AssemblyTrademark("")]
[assembly: AssemblyCulture("")]

// Setting ComVisible to false makes the types in this assembly not visible
// to COM components.  If you need to access a type in this assembly from
// COM, set the ComVisible attribute to true on that type.
[assembly: ComVisible(false)]

// The following GUID is for the ID of the typelib if this project is exposed to COM
[assembly: Guid("017b924d-9990-4d8f-b3a8-c72becb0b6af")]

// Version information for an assembly consists of the following four values:
//
//    Major Version
//    Minor Version
//    Build Number
//    Revision
//
// You can specify all the values or you can default the Build and Revision Numbers
// by using the '*' as shown below:
// [assembly: AssemblyVersion("1.0.*")]
[assembly: AssemblyVersion("1.0.0.0")]
[assembly: AssemblyFileVersion("1.0.0.0")]
```

- 10 -

LOC_AR_00004626

# ALLURA XPER VERSION 8.2.0

# DEPOSIT – LAST 10 PAGES

# (COMPUTER PROGRAM

# CONTAINING TRADE SECRETS)

NOTE:  The computer program which is the subject of the copyright claim contains trade secret material.

LOC_AR_00004627

```
// History                          :
// - Date: 1999-08-31, Author: John Knappers
//   Reason for change: Bug Report Rob Smorenburg dd 12-07-1999
//   Details of change: InitTestCaseLine and FinalizeTestCaseLine
//   changed from pure virtual to virtual
// - Date: 1999-03-15, Author: Andy Michaelides
//   Reason for change: Creation
//   Details of change: n.a.
//
// Description  : This class contains pure virtual
//          methods
//            GotoInitialState()
//            HandleInputs()
//            CheckFinalStates()
//            CheckOutputs()
//          that must be implemented in a derived call
//          in order to handle a specified test case approach.
//          Note: The methods of this class are called in the order
//          shown above by the aggregating CTestEngine.
//
//
//
//-----------------------------------------------------------------
// INCLUDES & FORWARD CLASS DECLARATIONS
//

class CTestEngine;

//
// CLASS DECLARATION
//
class CTestMapper
{
public: // METHODS


        // Constructor

        CTestMapper(
                CTestCase& rTestCase);

        // Destructor
        virtual
        ~CTestMapper();

    // Meant to check if this line is to be run
```

- 1 -

LOC_AR_00004628

```
// The entire Test Case line is provided so that
// implementer can decide which attribute of the
// line means 'dont run'.
virtual BOOL
    RunTestCaseLine(
const CString& rsTestCaseLine) = 0;


    //Meant for initialization and finilization
virtual void
    InitTestCaseLine(
const CString& rsTestCaseLine);
virtual void
    FinalizeTestCaseLine(
const CString& rsTestCaseLine);


// Meant to set InitialState for a test case
    virtual BOOL
    GotoInitialState(
// array of desired states/commands
// that will, in totality, set the intial state for
// the test case
const CStringArray& rInitialStates) = 0;

// Meant to handle the desired events/inputs once in the
// initial State
virtual BOOL
    HandleInputs(
// Array of inputs
const CStringArray& rInputs) = 0;

// Meant to Check the resultant outputs
virtual BOOL
    CheckOutputs(
// Array of outputs to check
const CStringArray& rOutputs,
// Array of inputs as possible reference
const CStringArray& rInputs) = 0;

// Meant to check the final state of the test case
virtual BOOL
    CheckFinalState(
// array of final states to check
const CStringArray& rFinalStates) = 0;
```

- 2 -

LOC_AR_00004629

```
// returns whether the run was stopped
virtual BOOL
    MustStopRun();

// Set private variable to stop run
virtual void
    StopRunNow();


    // Set Reference to engine
    void
    SetRefToEngine(CTestEngine* pTestEngine);

protected: // METHODS
    BOOL
    OpenTraceFile(
const CString& rsTraceFileName);

    void
    WriteToTraceFile(
const CString& rsMsg);

    // Member function to return Total Nr Of columns with witch this engine operates
    // on a testcase line
    ULONG
    GetNrOfColumns();

    // Member function to retrieve a string in a given column from a testcase line

    BOOL
    GetValueOfColumn(
        const ULONG& rulNrOfColumn,
        CString& rsColumnValue);

    void
    CloseTraceFile();

    void
    Report(
        const CString& rsData);
    void
    Check(
        const BOOL bCheckResult,
        const CString& rsCheckId,
      TestFailBehavior eBehavior=TESTFAILBEHAVIOR_BREAK);
```

- 3 -

LOC_AR_00004630

```
protected: // DATA

        CTestCase& m_rTestCase;

private: // METHODS
        // Copy Constructor
        CTestMapper(const CTestMapper& ref);
        // Assignment operator
        CTestMapper& operator = (const CTestMapper& ref);


private: //DATA
        // Trace file
    CStdioFile m_TraceFile;

    // If stopping the run is desired - see method StopRun() - derived class
    // MUST set this in its constructor
        BOOL m_bStopRun;
        // Keep a reference to the Engine that is related to this mapper
        CTestEngine* m_pTestEngine;


};

#endif // TESTMAPPER_H
//==== end of file: w:\uAUI\AUI\Pub\Infra\IncTest\TestMapper.h

//==== start of file: w:\uAUI\AUI\Pub\Infra\IncTest\TestULONGMap.h
#ifndef TESTULONGMAP_H
#define TESTULONGMAP_H

#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000

//
//-------------------------------------------------------------
// Copyright   : Copyright(c) 1999, Philips Electronics N.V.
//
// File        : TestULONG.h
//
// Class       : CTestULONGMap
//
// History     :
// - Date: 1999-06-28, Author: J.B. Knappers
//   Reason for change: Initial version
```

- 4 -

LOC_AR_00004631

```
//   Details of change: Not applicable
//
// Hierarchy   :
//
// Description :  Definition of Map for ULONGs
//                               Map is defined using a template class
//                               Key -->String
//          Mapped Item --> ULONG
//-------------------------------------------------------------
//

class CTestULONGMap : public CMap < LPCTSTR, LPCTSTR, ULONG, const ULONG& >
{
};

#endif // TESTULONGMAP_H

// TstInfTDMdl.h: interfaces for table driven testing
//
///////////////////////////////////////////////////////////////

//
//-------------------------------------------------------------------
// Copyright    : Copyright (c) 1999,
//          Philips Medical Systems Nederland B.V.
//
// File              : TstInfTDMdl.h
//
// Class         : -
//
//
// Requirements:
//
// Design:
//
// History            :
// - Date: 1999-04-23, Author: Ivo Canjels
//   Reason for change: Creation
//   Details of change: n.a.
//
// Hierarchy    :
//
// Description  : This header file is the published interface of the TestTableDriven module
//                               See for detailed class descriptions the class header files.
//
//-------------------------------------------------------------
```

- 5 -

```
#include "TestEngine.h"
#include "TestMapper.h"
#include "TestLineTranslator.h"


// Link stuff
#ifdef _DEBUG
        #ifdef _UNICODE
                #pragma comment (lib, "TstInfTD_ud.lib")
        #else
                #pragma comment (lib, "TstInfTD_ad.lib")
        #endif // _UNICODE
#else
        #ifdef _UNICODE
                #pragma comment (lib, "TstInfTD_ur.lib")
        #else
                #pragma comment (lib, "TstInfTD_ar.lib")
        #endif // _UNICODE
#endif // _DEBUG

// TestTableDrivenUnit.h: interfaces for table driven testing
//
/////////////////////////////////////////////////////////////////

//
//------------------------------------------------------------------
// Copyright    : Copyright (c) 1999,
//                Philips Medical Systems Nederland B.V.
//
// File                   : TestTableDrivenUnit.h
//
// Class        : -
//
//
// Requirements:
//
// Design:
//
// History             :
// - Date: 1999-04-23, Author: Ivo Canjels
//   Reason for change: Creation
//   Details of change: n.a.
//
// Hierarchy    :
//
```

- 6 -

LOC_AR_00004633

```
// Description   : This header file is the published interface of the TestTableDriven module
//                                  See for detailed class descriptions the class header files.
//
//-------------------------------------------------------------------

#include "TstInfTDMdl.h"

// TstInfTHMdl.h: interfaces for Testharness testing
//
////////////////////////////////////////////////////////////////////

//
//-------------------------------------------------------------------
// Copyright    : Copyright (c) 1999,
//               Philips Medical Systems Nederland B.V.
//
// File              : TstInfTHMdl.h
//
// Class         : -
//
//
// Requirements:
//
// Design:
//
// History            :
// - Date: 1999-05-26, Author: John Knappers
//   Reason for change: Creation
//   Details of change: n.a.
//
// Hierarchy    :
//
// Description   : This header file is the published interface of the TestHarness module
//                                  See for detailed class descriptions the class header files.
//
//-------------------------------------------------------------------

#include "TestHarness.h"
#include "TestCase.h"
#include "TestGeneral.h"

// Link stuff
#ifdef _DEBUG
        #ifdef _UNICODE
                #pragma comment (lib, "TstInfTH_ud.lib")
        #else
```

- 7 -

LOC_AR_00004634

```
                #pragma comment (lib, "TstInfTH_ad.lib")
        #endif // _UNICODE
#else
        #ifdef _UNICODE
                #pragma comment (lib, "TstInfTH_ur.lib")
        #else
                #pragma comment (lib, "TstInfTH_ar.lib")
        #endif // _UNICODE
#endif // _DEBUG

// TstInfTHUnit.h: interfaces for Testharness testing
//
/////////////////////////////////////////////////////////////

//
//------------------------------------------------------------------
// Copyright    : Copyright (c) 1999,
//          Philips Medical Systems Nederland B.V.
//
// File                 : TstInfTHUnit.h
//
// Class        : -
//
//
// Requirements:
//
// Design:
//
// History              :
// - Date: 1999-05-26, Author: John Knappers
//   Reason for change: Creation
//   Details of change: n.a.
//          Initial version: directory structure migration
//
// Hierarchy    :
//
// Description  : This header file is the published interface of the TestHarness module
//                               See for detailed class descriptions the class header files.
//
//------------------------------------------------------------------

#include "TstInfTHMdl.h"


ï»¿#region Copyright Koninklijke Philips Electronics N.V. 2012
// All rights are reserved. Reproduction or transmission in whole or in part, in
```

- 8 -

LOC_AR_00004635

```csharp
// any form or by any means, electronic, mechanical or otherwise, is prohibited
// without the prior written consent of the copyright owner.
#endregion

using System;
using System.IO;

namespace Philips.PmsIxr.Aui.DevTools.CheckViewDriveLetter
{
  /// <summary>
  /// Outer class, containing the Main entry of the application
  /// </summary>
  class Program
  {
    private Program()
    {
    }

    static int Main(string[] args)
    {
      int retVal = 0;

      string fullPath = Directory.GetCurrentDirectory();

      //--------------------------------------
      // fullPath shall be like X:\uAUI\AUI\...
      //--------------------------------------
      const string expectedRoot = @"\uAUI\AUI\";

      if (fullPath.Substring(2, expectedRoot.Length) != expectedRoot)
      {
        retVal = 1;

        Console.WriteLine(@"---------------------------------------------------------------------------
--");
        Console.WriteLine(@"Error: Use a 'subst' for your view and build from the substituted
drive letter.");
        Console.WriteLine(@"---------------------------------------------------------------------------
--");
        Console.WriteLine(@"  e.g: subst X: T:\AUI_Bright_TEAM_vs2008_int");
        Console.WriteLine(@"      cd /d X:\uAIU\AUI\build");
        Console.WriteLine(@"      dev_build");
        Console.WriteLine(@"---------------------------------------------------------------------------
--");
        Console.WriteLine(@" note: when running from EC, add viewDriveLetter to the job
parameters");
```

- 9 -

LOC_AR_00004636

```
        Console.WriteLine(@"---------------------------------------------------------------------
--");
      }

      return retVal;
    }
  }
}

ï»¿using System.Reflection;
using System.Runtime.CompilerServices;
using System.Runtime.InteropServices;

// General Information about an assembly is controlled through the following
// set of attributes. Change these attribute values to modify the information
// associated with an assembly.
[assembly: AssemblyTitle("CheckViewDriveLetter")]
[assembly: AssemblyDescription("")]
[assembly: AssemblyConfiguration("")]
[assembly: AssemblyCompany("TA-CASE")]
[assembly: AssemblyProduct("CheckViewDriveLetter")]
[assembly: AssemblyCopyright("Copyright Â© TA-CASE 2012")]
[assembly: AssemblyTrademark("")]
[assembly: AssemblyCulture("")]

// Setting ComVisible to false makes the types in this assembly not visible
// to COM components.  If you need to access a type in this assembly from
// COM, set the ComVisible attribute to true on that type.
[assembly: ComVisible(false)]

// The following GUID is for the ID of the typelib if this project is exposed to COM
[assembly: Guid("017b924d-9990-4d8f-b3a8-c72becb0b6af")]

// Version information for an assembly consists of the following four values:
//
//      Major Version
//      Minor Version
//      Build Number
//      Revision
//
// You can specify all the values or you can default the Build and Revision Numbers
// by using the '*' as shown below:
// [assembly: AssemblyVersion("1.0.*")]
[assembly: AssemblyVersion("1.0.0.0")]
[assembly: AssemblyFileVersion("1.0.0.0")]
```

- 10 -

# ALLURA XPER VERSION 8.2.0 DEPOSIT – PORTIONS OF SOURCE CODE INCLUDING COPYRIGHT NOTICES PERTAINING TO THIS VERSION (COMPUTER PROGRAM CONTAINING TRADE SECRETS)

NOTE:  The computer program which is the subject of the copyright claim contains trade secret material.

LOC_AR_00004638

```
/------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File        : GeoGSCTraceCleaner.cpp
/
/ Class       : CGeoGSCTraceCleaner
ifndef GEOGSCTRACECLEANER_H
define GEOGSCTRACECLEANER_H
/------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File        : GeoGSCTraceCleaner.h
/
/ Class       : CGeoGSCTraceCleaner

/-----------------------------------------------------------
/ Copyright   : Copyright(c) 2013,
/          Philips Medical Systems Nederland B.V.
/
/ File        : WinMemUsed.cpp
/
/ Class       :

/------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/          Philips Healthcare Best
/
/ File        : GeoPSGFDPASlave.cpp
/
/ Class       : CGeoPSGFDPASlave
/------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File        : GeoPSGFDPASlave.h
/
/ Classes     : CGeoPSGFDPASlave

/------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/          Koninklijke Philips Electronics N.V.
/          Philips Healthcare B.V.
/
```

- 1 -

LOC_AR_00004639

```
/-----------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File       : GeoGSCTraceCleaner.cpp
/
/ Class      : CGeoGSCTraceCleaner
ifndef GEOGSCTRACECLEANER_H
define GEOGSCTRACECLEANER_H
/-----------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File       : GeoGSCTraceCleaner.h
/
/ Class      : CGeoGSCTraceCleaner
```

```
/-----------------------------------------------------------
/ Copyright  : Copyright(c) 2013,
/          Philips Medical Systems Nederland B.V.
/
/ File       : WinMemUsed.cpp
/
/ Class      :
```

```
/-----------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Philips Healthcare Best
/
/ File       : GeoPSGFDPASlave.cpp
/
/ Class      : CGeoPSGFDPASlave
/-----------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File       : GeoPSGFDPASlave.h
/
/ Classes    : CGeoPSGFDPASlave
```

```
/-----------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Koninklijke Philips Electronics N.V.
/          Philips Healthcare B.V.
/
```

- 1 -

LOC_AR_00004640

```
/ File      : GeoAxsCtrlGeo.cpp
/
/--------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/           Koninklijke Philips Electronics N.V.
/           Philips Healthcare B.V.
/
/ File      : GeoAxsCtrlGeo.h
/


/--------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/           Philips Healthcare Best
/
/ File      : GeoAXSForceSensorMonitor.cpp
/
/ Class     : CAXSForceMonitor
ifndef GEOAXSMISCMONITOR_H
define GEOAXSMISCMONITOR_H


/--------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/           Philips Healthcare Best
/
/ File      : GeoAXSMiscMonitor.h
/
/ Class     : CAXSMiscMonitor


/====================================================================
==========
/ Copyright   : Copyright(c) 2013
/           Koninklijke Philips Electronics N.V.
/           Philips Healthcare B.V.
/
/ File      : GeoDARSlave.cpp
/


/====================================================================
==========
/ Copyright   : Copyright(c) 2013
/           Koninklijke Philips Electronics N.V.
/           Philips Healthcare B.V.
/
/ File      : GeoDARSlave.h
/
```

- 2 -

LOC_AR_00004641

```
/ File        : GeoAxsCtrlGeo.cpp
/

/---------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/             Koninklijke Philips Electronics N.V.
/             Philips Healthcare B.V.
/
/ File        : GeoAxsCtrlGeo.h
/

/---------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/             Philips Healthcare Best
/
/ File        : GeoAXSForceSensorMonitor.cpp
/
/ Class       : CAXSForceMonitor
ifndef GEOAXSMISCMONITOR_H
define GEOAXSMISCMONITOR_H

/---------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/             Philips Healthcare Best
/
/ File        : GeoAXSMiscMonitor.h
/
/ Class       : CAXSMiscMonitor

/===========================================================================
==========
/ Copyright   : Copyright(c) 2013
/             Koninklijke Philips Electronics N.V.
/             Philips Healthcare B.V.
/
/ File        : GeoDARSlave.cpp
/

/===========================================================================
==========
/ Copyright   : Copyright(c) 2013
/             Koninklijke Philips Electronics N.V.
/             Philips Healthcare B.V.
/
/ File        : GeoDARSlave.h
/
```

LOC_AR_00004642

```
/==================================================================
==========
/ Copyright  : Copyright(c) 2013
/           Koninklijke Philips Electronics N.V.
/           Philips Healthcare B.V.
/
/ File      : GeoDARSlaveUtil.cpp
/


/==================================================================
==========
/ Copyright  : Copyright(c) 2013
/           Koninklijke Philips Electronics N.V.
/           Philips Healthcare B.V.
/
/ File      : GeoDARSlaveUtil.h
/
endif
/==================================================================
==========
/ Copyright  : Copyright(c) 2013
/           Koninklijke Philips Electronics N.V.
/           Philips Healthcare B.V.
/
/ File      : GeoDARSlaveTest.cpp
/


/==================================================================
==========
/ Copyright  : Copyright(c) 2013
/           Koninklijke Philips Electronics N.V.
/           Philips Healthcare B.V.
/
/ File      : GeoDARSlaveTest.h
/


/------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/           Philips Medical Systems Nederland B.V.
/
/ File      : GeoFSBodyGuardEnableParameter.cpp
/
/ Class     : CGeoFSBodyGuardEnableParameter

/------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
```

- 3 -

LOC_AR_00004643

```
/          Philips Medical Systems Nederland B.V.
/
/ File     : GeoFSBodyGuardEnableParameter.h
/
/ Class    : CGeoFSBodyGuardEnableParameter

/-------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File     : GeoFSHighSpeedEnableParameter.cpp
/
/ Class    : CGeoFSHighSpeedEnableParameter

/-------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File     : GeoFSHighSpeedEnableParameter.h
/
/ Class    : CGeoFSHighSpeedEnableParameter
ifndef IFSCGENSERVICEMDL_IDL
define IFSCGENSERVICEMDL_IDL

/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

include "FSCGenServiceFactoryInterface.idl"

include "IFSCGenConfig.idl"

ifndef IFSCGENDFARESULT_IDL
define IFSCGENDFARESULT_IDL
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

/
/ INTERFACE INCLUDES
/
ifndef MIOMPDTYPES_IF
define MIOMPDTYPES_IF
/
/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
```

- 4 -

LOC_AR_00004644

```
/
/ File        : MioMPDTypes.idl
/
/ Interface   :
/
/-----------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/              Koninklijke Philips Electronics N.V.
/              Philips Healthcare B.V.
/
include "StdAfx.h"
include "FootSwitchFacade.h"
/-----------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/              Koninklijke Philips Electronics N.V.
/              Philips Healthcare B.V.
/

include "StdAfx.h"

/-----------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/              Koninklijke Philips Electronics N.V.
/              Philips Healthcare B.V.
/
/ File        : FrontalStandAdjustmentPart.cpp
/
/-----------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/              Koninklijke Philips Electronics N.V.
/              Philips Healthcare B.V.
/
/ File        : FrontalStandAdjustmentPart.h
/
;
/-----------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/              Koninklijke Philips Electronics N.V.
/              Philips Healthcare B.V.
/
/ File        : FrontalStandAdjustmentPresetPage.cpp
/

/-----------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/              Koninklijke Philips Electronics N.V.
```

- 5 -

LOC_AR_00004645

```
/          Philips Healthcare B.V.
/
/ File      : FrontalStandAdjustmentPresetPage.h
/
/------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Koninklijke Philips Electronics N.V.
/          Philips Healthcare B.V.
/
/ File      : FrontalStandAdjustmentProcedure.cpp
/
/------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Koninklijke Philips Electronics N.V.
/          Philips Healthcare B.V.
/
/ File      : FrontalStandAdjustmentProcedure.h
/
;
w:\uPOS\POS\FieldService\FSWebGeo\src\FrontalStandAdjustmentStaticOutputPage.cpp
/------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Koninklijke Philips Electronics N.V.
/          Philips Healthcare B.V.
/
/ File      : FrontalStandAdjustmentStaticOutputPage.cpp
/
/------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Koninklijke Philips Electronics N.V.
/          Philips Healthcare B.V.
/
/ File      : FrontalStandAdjustmentStaticOutputPage.h
/
/------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Koninklijke Philips Electronics N.V.
/          Philips Healthcare B.V.
/
/ File      : FSWebGeoNumberUtility.cpp
/
/------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/          Koninklijke Philips Electronics N.V.
/          Philips Healthcare B.V.
/
```

- 6 -

LOC_AR_00004646

```
/ File        : PositionAdjustmentSelectionPage.cpp
/
/--------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/               Koninklijke Philips Electronics N.V.
/               Philips Healthcare B.V.
/
/ File        : PositionAdjustmentSelectionPage.h
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif  // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
if _MSC_VER >= 1000
pragma once
endif  // _MSC_VER >= 1000

/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
```

- 7 -

LOC_AR_00004647

```
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
pragma once
endif   // _MSC_VER >= 1000
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000

/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
```

- 8 -

LOC_AR_00004648

```
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/ INCLUDES
/
include "FSCSysCompStdAfx.h"
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/==== start of file: w:\uFSSys\FSSys\Pub\FSSys\Inc\IFSCGenServiceMdl.idl
ifndef IFSCGENSERVICEMDL_IDL
define IFSCGENSERVICEMDL_IDL
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
include "FSCGenServiceFactoryInterface.idl"

include "IFSCGenConfig.idl"

ifndef IFSCGENDFARESULT_IDL
define IFSCGENDFARESULT_IDL
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INTERFACE INCLUDES
/
ifndef MIOMPDTYPES_IF
define MIOMPDTYPES_IF
/
/--------------------------------------------------------------------------
```

- 9 -

LOC_AR_00004649

```
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioMPDTypes.idl
/
/ Interface  :
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
endif // UCSDEGHOSTINGCALIBRATION_H
```

- 10 -

LOC_AR_00004650

```
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ MACRO DEFINITIONS
/
/
```

- 11 -

LOC_AR_00004651

```
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
ifndef MIOMPDTYPES_IF
define MIOMPDTYPES_IF
/
/----------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File      : MioMPDTypes.idl
/
/ Interface  :
/
ifndef MIOMPDTYPES_IF
define MIOMPDTYPES_IF
/
/----------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File      : MioMPDTypes.idl
/
/ Interface  :
/


/----------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File      : MioMPDPowerTaps.cpp
/
/ Class     : CMioMPDPowerTaps
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
```

- 12 -

LOC_AR_00004652

```
/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioMPDPowerTaps.h
/
/ Class      : CMioMPDPowerTaps
/
endif // MIOFSPDUBACKUPRESTORECALLBACKATL_H
/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioGPDUConfig.cpp
/
/ Class      : CMioGPDUConfig
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000


/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioGPDUConfig.h
/
/ Class      : CMioGPDUConfig
/
/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioGPDUPR.cpp
/
/ Class      : CMioGPDUPR
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000


/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioGPDUPR.h
/
/ Class      : CMioGPDUPR
/
endif
/-------------------------------------------------------------------------
```

- 13 -

LOC_AR_00004653

```
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPRFactory.cpp
/
/ Class       : CMioMPDPRFactory
/

/--------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPdsAdapterProxy.cpp
/
/ Class       : CMioMPDPdsAdapterProxy
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000

/--------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPdsAdapterProxy.h
/
/ Class       : CMioMPDPdsAdapterProxy
/

/--------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPdsAdapterSink.cpp
/
/ Class       : CMioMPDPdsAdapterSink
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000

/--------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPdsAdapterSink.h
/
/ Class       : CMioMPDPdsAdapterSink
/

/--------------------------------------------------------------------------
```

- 14 -

LOC_AR_00004654

```
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioMPDUPR.cpp
/
/ Class      : CMioMPDUPR
/


/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioMPDUtilities.cpp
/
/ Class      : CMioMPDUtilities
/

ifndef MIOMPDUTILITIES_H
define MIOMPDUTILITIES_H
/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioMPDUtilities.h
/
/ Class      : CMioMPDUtilities
/
ifndef IFSCGENSERVICEMDL_IDL
define IFSCGENSERVICEMDL_IDL

/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

include "FSCGenServiceFactoryInterface.idl"

include "IFSCGenConfig.idl"

ifndef IFSCGENDFARESULT_IDL
define IFSCGENDFARESULT_IDL
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/


/
/ INTERFACE INCLUDES
/
ifndef IFSCGENSERVICEMDL_IDL
define IFSCGENSERVICEMDL_IDL
```

- 15 -

LOC_AR_00004655

```
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

include "FSCGenServiceFactoryInterface.idl"

include "IFSCGenConfig.idl"

ifndef IFSCGENDFARESULT_IDL
define IFSCGENDFARESULT_IDL
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

/
/ INTERFACE INCLUDES
/
ifndef MIOMPDTYPES_IF
define MIOMPDTYPES_IF
/
/------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File      : MioMPDTypes.idl
/
/ Interface  :
/

//--------------------------------------------------------------
// Copyright  : Copyright(c) 2013
//          Philips Medical Systems Nederland B.V.
//
// File      : DmtDicomSrItemPool.cpp
//
// Class     : CDmtDicomSrItemPool
#pragma once
#endif // _MSC_VER >= 1000

//
//--------------------------------------------------------------
// Copyright  : Copyright(c) 2013
//          Philips Medical Systems Nederland B.V.
//
// File      : DmtDicomSrItemPool.h
//
```

- 16 -

LOC_AR_00004656

```
// Class    : CDmtDicomSrItemPool
//---------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013
//          Philips Medical Systems Nederland B.V.
//
// File      : PBFuncMagnusLatLock.cpp
//
// Class    : CPBFuncMagnusLatLock
}
//---------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013
//          Philips Medical Systems Nederland B.V.
//
// File      : PBFuncMagnusLatLock.h
//
// Class    : CPBFuncMagnusLatLock
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//---------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File      : MioMPDTypes.idl
//
// Interface  :
//
#ifndef IFSCGENSERVICEMDL_IDL
#define IFSCGENSERVICEMDL_IDL

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

#include "FSCGenServiceFactoryInterface.idl"

#include "IFSCGenConfig.idl"

#ifndef IFSCGENDFARESULT_IDL
#define IFSCGENDFARESULT_IDL
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INTERFACE INCLUDES
```

- 17 -

```
//
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//-----------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File        : MioMPDTypes.idl
//
// Interface   :
//
END_LITE_COMMANDS
//-----------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : IpRthlSink.cpp
// Description : -
//-----------------------------------------------------------------
//TICS -NAM#004 Underscore is necessary for LITE commands


//-----------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : IpRthlSink.h
// Description : -
//-----------------------------------------------------------------
//TICS -NAM#004: Underscore necessary due to class versioning and LiteWrapper usage
//TICS -NAM#015: camelCase not possible due to LITE commands
//-----------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : ModuleEvents.h
// Description : -
//-----------------------------------------------------------------


#ifndef MODULEEVENTS_H

//-----------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : ModuleState.cpp
// Description : -
//-----------------------------------------------------------------
//TICS -CON#003: explicit cast required

} } } } } } // End of namespaces
//-----------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : ModuleState.h
```

- 18 -

LOC_AR_00004658

```
// Description : -
//----------------------------------------------------------------------
//TICS -NAM#015: keep naming for enumeration


//----------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : RthlErrorLogger.h
// Description : -
//----------------------------------------------------------------------

#include "Rthl/IErrorLogger.h"

//----------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : RthlErrorLogger.h
// Description : -
//----------------------------------------------------------------------

#ifndef RTHLERRORLOGGER_H

//----------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Error logging interface.
// Filename    : IErrorLogger.h
//----------------------------------------------------------------------

#ifndef IERRORLOGGER_H

//----------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Connection class
// Filename    : RthlConnection.h
//----------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//----------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Critical Section class
// Filename    : RthlCriticalSection.h
//----------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//----------------------------------------------------------------------
```

- 19 -

LOC_AR_00004659

```
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Data Buffer class
// Filename    : RthlDataBuffer.h
//---------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.



//---------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link defines
// Filename    : RthlDefines.h
//---------------------------------------------------------------------------


#ifndef RTHLDEFINES_H

//---------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link helper class
// Filename    : RthlHelper.h
//---------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.
//TICS -PRE#004: Functionality implemented as a combination of macro and function.

//---------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Image Administration class
// Filename    : RthlImageAdmin.h
//---------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//---------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link ImageData link class
// Filename    : RthlImageDataLink.h
//---------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//---------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link ImageSync link class
// Filename    : RthlImageSyncLink.h
//---------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.
```

- 20 -

LOC_AR_00004660

```
//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link metadata class
// Filename    : RthlMetaData.h
//-------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link OS includes.
// Filename    : RthlOperatingSystemIncludes.h
//-------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.

//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Receiver class
// Filename    : RthlReceiver.h
//-------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Socket class
// Filename    : RthlSocket.h
//-------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.

//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Transmitter class
// Filename    : RthlTransmitter.h
//-------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link connection class
// Filename    : RthlConnection.cpp
//-------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.
//TICS -CFL#016: Ignore warnings about too complex functions.
```

- 21 -

LOC_AR_00004661

```
//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Critical Section class
// Filename   : RthlCriticalSection.cpp
//-----------------------------------------------------------------------

#include "RthlOperatingSystemIncludes.h"

//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Data Buffer class
// Filename   : RthlDataBuffer.cpp
//-----------------------------------------------------------------------

#include "RthlOperatingSystemIncludes.h"

//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link helper class
// Filename   : RthlHelper.cpp
//-----------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.

//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Image Administration class
// Filename   : RthlImageAdmin.h
//-----------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.

//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link ImageData link class
// Filename   : RthlImageDataLink.cpp
//-----------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.
//TICS -OLC#006: Avoid TICS false positives.
//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link ImageSync link class
// Filename   : RthlImageSyncLink.cpp
//-----------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.
//TICS -CON#007: BOOL to bool conversion issues.
```

- 22 -

LOC_AR_00004662

```
//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link metadata class
// Filename    : RthlMetaData.cpp
//-------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.


//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Receiver class
// Filename    : RthlReceiver.cpp
//-------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.


//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link socket class
// Filename    : RthlSocket.cpp
//-------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.


//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-Time Host Link Transmitter class
// Filename    : RthlTransmitter.cpp
//-------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.


//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link error logger class wrapper
// Filename    : RthlErrorLoggerWrapper.h
//-------------------------------------------------------------------------

#pragma once
}}}}}}
//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link metadata class wrapper
// Filename    : RthlMetaDataWrapper.h
//-------------------------------------------------------------------------

#pragma once
} } } } } } // End of namespaces
//-------------------------------------------------------------------------
```

- 23 -

LOC_AR_00004663

```
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description :
// Filename   : RthlMetaDataWrapperExceptions.h
//-----------------------------------------------------------------------

#pragma once
}}}}}};
//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link metadata class wrapper
// Filename   : RthlReceiverWrapper.h
//-----------------------------------------------------------------------

#pragma once
} } } } } } // End of namespaces
//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description :
// Filename   : RthlReceiverWrapperExceptions.h
//-----------------------------------------------------------------------

#pragma once
}}}}}};
//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description :
// Filename   : RthlTransmitterWrapper.h
//-----------------------------------------------------------------------

#pragma once
} } } } } } // End of namespaces
//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description :
// Filename   : RthlTransmitterWrapperExceptions.h
//-----------------------------------------------------------------------

#pragma once
}}}}}};
//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link error logger class wrapper
// Filename   : RthlErrorLoggerWrapper.cpp
//-----------------------------------------------------------------------

#include "RthlErrorLoggerWrapper.h"
```

- 24 -

LOC_AR_00004664

```
}}}}}}
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link metadata class wrapper
// Filename    : RthlMetaDataWrapper.cpp
//--------------------------------------------------------------------------

#include "RthlMetaDataWrapper.h"
} } } } }} // End of namespaces
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link receiver class wrapper
// Filename    : RthlReceiverWrapper.h
//--------------------------------------------------------------------------

#include "Rthl\RthlOperatingSystemIncludes.h"
} } } } }} // End of namespaces
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link transmitter class wrapper
// Filename    : RthlTransmitterWrapper.cpp
//--------------------------------------------------------------------------

#include "Rthl\RthlOperatingSystemIncludes.h"

//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Rthl module test cases.
// Filename    : RthlTestCases.h
//--------------------------------------------------------------------------

#ifndef RTHLTESTCASES_H

//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Simple test interface .
// Filename    : Test.h
//--------------------------------------------------------------------------
// TICS -STY#020, -OLC#009, -PCA#009, -PRE#001

//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Rthl module test cases.
// Filename    : RthlTestCases.cpp
//--------------------------------------------------------------------------
```

- 25 -

LOC_AR_00004665

```
//TICS -OLC#009, -PRE#001, -PRE#004, -PCA#009, -STY#004, -CFL#016, -PCA#005, -
CFL#011, -POR#006

//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Rthl module test cases.
// Filename    : Test.cpp
//--------------------------------------------------------------------------
//TICS -CFL#013, -POR#028, -PCA#005, -STY#020

//TICS -3@102, -3@107, -3@503: Quality Center expects testcase names to be in format
Tc_xxx.
//TICS -10@301: Magic numbers are normal to be used in Test Code.

// Copyright      : Copyright(c) 2013, Philips Medical Systems Nederland B.V.

using System;
using System.Collections.Generic;
using NUnit.Framework;
using Philips.PmsComp.IP.Interfaces;
//===== start of file: w:\uUIM\UIM\Pub\Host\Inc\MioMPDTypes.idl
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File        : MioMPDTypes.idl
//
// Interface   :
//

//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013,
//             Philips Medical Systems Nederland B.V.
//
// File        : AcqPersistencyTest.cpp
//
// Class       : CAcqPersistencyTest

//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013,
//             Philips Medical Systems Nederland B.V.
//
// File        : AcqPersistencyTest.h
//
```

- 26 -

LOC_AR_00004666

```
// Class     : CAcqPersistencyTest
#endif // FSCXGNACQUISITIONPROXY_H
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#ifndef IFSCGENSERVICEMDL_IDL
#define IFSCGENSERVICEMDL_IDL

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

#include "FSCGenServiceFactoryInterface.idl"

#include "IFSCGenConfig.idl"

#ifndef IFSCGENDFARESULT_IDL
#define IFSCGENDFARESULT_IDL
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INTERFACE INCLUDES
//
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//---------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File       : MioMPDTypes.idl
//
// Interface  :
//
//
//---------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Electronics N.V.
//
// Class       : CRevSession
//
// Description :
```

- 27 -

LOC_AR_00004667

```
//
//
//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Electronics N.V.
//
// Class   : CRevSession
//
// Description : The implementation for CRevSession it too large to handle
//              with a single file. This file contains part of the implementation
//==== start of file: w:\uView\View\Pub\Host\Inc\MioMPDTypes.idl
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//-----------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File      : MioMPDTypes.idl
//
// Interface  :
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#if _MSC_VER > 1000
#pragma once
#endif // _MSC_VER > 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#endif // FSCIDCONFIGTECHNICALEVENTDESCRIPTIONTABLE_H
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//
```

- 28 -

LOC_AR_00004668

Case 1:22-cv-08424-GHW    Documents 74-5    Filed 06/26/22    Page 374 of 393

```
//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#endif // !defined(FSCIDDFATUNABLEITEMS_H)
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES
//


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//
```

- 29 -

LOC_AR_00004669

```
//·
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#endif //FSCIDLOOPBACKAURORATECHNICALEVENTDESCRIPTIONTABLE_H
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000
```

- 30 -

```
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#endif // !defined FSCIDLOOPBACKAURORACABLETESTPART_H
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#endif // !defined FSCIDLOOPBACKAURORACONNECTORTESTPART_H
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
//
```

- 31 -

LOC_AR_00004671

```
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#if _MSC_VER > 1000
#pragma once
#endif // _MSC_VER > 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//

\FSCID\Src\FSCIDLoopBackAurora\FSCIDLoopBackBiplaneLinkTestPart.cpp
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#if _MSC_VER >= 1000
```

- 32 -

```
#pragma once
#endif // _MSC_VER >= 1000

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
//
//----------------------------------------------------------------
// Copyright  : Copyright(c) 2013
//           Philips Medical Systems Nederland B.V.
//
// File       : IIDFSBiplaneLinkLoopBack.idl
//
// Interface  : IIDFSBiplaneLinkLoopBack
//
//----------------------------------------------------------------
// Copyright  : Copyright(c) 2013
//           Philips Medical Systems Nederland B.V.
//
// File       : IIDFSBiplaneLinkDetectorLoopBack.idl
//
// Interface  : IIDFSBiplaneLinkDetectorLoopBack
#ifndef IFSCGENSERVICEMDL_IDL
#define IFSCGENSERVICEMDL_IDL

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

#include "FSCGenServiceFactoryInterface.idl"

#include "IFSCGenConfig.idl"

#ifndef IFSCGENDFARESULT_IDL
#define IFSCGENDFARESULT_IDL
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INTERFACE INCLUDES
//
```

- 33 -

LOC_AR_00004673

```
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//-----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File      : MioMPDTypes.idl
//
// Interface   :
//
#ifndef DMTRACECATEGORIES_H
#define DMTRACECATEGORIES_H
//
//-----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013 Philips Electronics N.V.
//
// File      : DmTraceCategories.h
//
// History     :
// - Date: 2013-04-25, Jeyaprabhu J
#ifndef IFSCGENSERVICEMDL_IDL
#define IFSCGENSERVICEMDL_IDL

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

#include "FSCGenServiceFactoryInterface.idl"

#include "IFSCGenConfig.idl"

#ifndef IFSCGENDFARESULT_IDL
#define IFSCGENDFARESULT_IDL
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INTERFACE INCLUDES
//

//-------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File      : EpxtEngineLibGlobalCollections.cpp
//
```

- 34 -

```
// Class     : CEpxtEngineLibGlobalCollections
//
#ifndef EPXTENGINELIBGLOBALCOLLECTIONS_H
#define EPXTENGINELIBGLOBALCOLLECTIONS_H

//----------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File       : EpxtEngineLibGlobalCollections.h
//
// Class      : CEpxtEngineLibGlobalCollections
```

- 35 -

LOC_AR_00004675

# ALLURA XPER VERSION 8.2.0 DEPOSIT – PORTIONS OF SOURCE CODE INCLUDING COPYRIGHT NOTICES PERTAINING TO THIS VERSION (COMPUTER PROGRAM CONTAINING TRADE SECRETS)

NOTE: The computer program which is the subject of the copyright claim contains trade secret material.

LOC AR 00004676

```
/--------------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File        : GeoGSCTraceCleaner.cpp
/
/ Class       : CGeoGSCTraceCleaner
ifndef GEOGSCTRACECLEANER_H
define GEOGSCTRACECLEANER_H
/--------------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File        : GeoGSCTraceCleaner.h
/
/ Class       : CGeoGSCTraceCleaner


/------------------------------------------------------------
/ Copyright   : Copyright(c) 2013,
/          Philips Medical Systems Nederland B.V.
/
/ File        : WinMemUsed.cpp
/
/ Class       :


/--------------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/          Philips Healthcare Best
/
/ File        : GeoPSGFDPASlave.cpp
/
/ Class       : CGeoPSGFDPASlave
/--------------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/          Philips Medical Systems Nederland B.V.
/
/ File        : GeoPSGFDPASlave.h
/
/ Classes     : CGeoPSGFDPASlave


/--------------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/          Koninklijke Philips Electronics N.V.
/          Philips Healthcare B.V.
/
```

- 1 -

LOC_AR_00004677

Case 1:22-cv-00499-BAH   Document 24-5   Filed 08/29/22   Page 385 of 393

```
/ File      : GeoAxsCtrlGeo.cpp
/

/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/         Koninklijke Philips Electronics N.V.
/         Philips Healthcare B.V.
/
/ File      : GeoAxsCtrlGeo.h
/

/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/         Philips Healthcare Best
/
/ File      : GeoAXSForceSensorMonitor.cpp
/
/ Class     : CAXSForceMonitor
ifndef GEOAXSMISCMONITOR_H
define GEOAXSMISCMONITOR_H

/-------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/         Philips Healthcare Best
/
/ File      : GeoAXSMiscMonitor.h
/
/ Class     : CAXSMiscMonitor

/=========================================================================
==========
/ Copyright  : Copyright(c) 2013
/         Koninklijke Philips Electronics N.V.
/         Philips Healthcare B.V.
/
/ File      : GeoDARSlave.cpp
/

/=========================================================================
==========
/ Copyright  : Copyright(c) 2013
/         Koninklijke Philips Electronics N.V.
/         Philips Healthcare B.V.
/
/ File      : GeoDARSlave.h
/
```

- 2 -

LOC_AR_00004678

```
/======================================================================
============
/ Copyright   : Copyright(c) 2013
/               Koninklijke Philips Electronics N.V.
/               Philips Healthcare B.V.
/
/ File        : GeoDARSlaveUtil.cpp
/


/======================================================================
============
/ Copyright   : Copyright(c) 2013
/               Koninklijke Philips Electronics N.V.
/               Philips Healthcare B.V.
/
/ File        : GeoDARSlaveUtil.h
/
endif
/======================================================================
============
/ Copyright   : Copyright(c) 2013
/               Koninklijke Philips Electronics N.V.
/               Philips Healthcare B.V.
/
/ File        : GeoDARSlaveTest.cpp
/


/======================================================================
============
/ Copyright   : Copyright(c) 2013
/               Koninklijke Philips Electronics N.V.
/               Philips Healthcare B.V.
/
/ File        : GeoDARSlaveTest.h
/


/------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
/               Philips Medical Systems Nederland B.V.
/
/ File        : GeoFSBodyGuardEnableParameter.cpp
/
/ Class       : CGeoFSBodyGuardEnableParameter

/------------------------------------------------------------
/ Copyright   : Copyright(c) 2013
```

- 3 -

LOC_AR_00004679

```
/       Philips Medical Systems Nederland B.V.
/
/ File      : GeoFSBodyGuardEnableParameter.h
/
/ Class     : CGeoFSBodyGuardEnableParameter


/---------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/       Philips Medical Systems Nederland B.V.
/
/ File      : GeoFSHighSpeedEnableParameter.cpp
/
/ Class     : CGeoFSHighSpeedEnableParameter


/---------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/       Philips Medical Systems Nederland B.V.
/
/ File      : GeoFSHighSpeedEnableParameter.h
/
/ Class     : CGeoFSHighSpeedEnableParameter
ifndef IFSCGENSERVICEMDL_IDL
define IFSCGENSERVICEMDL_IDL

/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

include "FSCGenServiceFactoryInterface.idl"

include "IFSCGenConfig.idl"

ifndef IFSCGENDFARESULT_IDL
define IFSCGENDFARESULT_IDL
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

/
/ INTERFACE INCLUDES
/
ifndef MIOMPDTYPES_IF
define MIOMPDTYPES_IF
/
/-----------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
```

- 4 -

```
/
/ File      : MioMPDTypes.idl
/
/ Interface  :
/
/-------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/            Koninklijke Philips Electronics N.V.
/            Philips Healthcare B.V.
/
include "StdAfx.h"
include "FootSwitchFacade.h"
/-------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/            Koninklijke Philips Electronics N.V.
/            Philips Healthcare B.V.
/

include "StdAfx.h"

/-------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/            Koninklijke Philips Electronics N.V.
/            Philips Healthcare B.V.
/
/ File      : FrontalStandAdjustmentPart.cpp
/
/-------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/            Koninklijke Philips Electronics N.V.
/            Philips Healthcare B.V.
/
/ File      : FrontalStandAdjustmentPart.h
/
;
/-------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/            Koninklijke Philips Electronics N.V.
/            Philips Healthcare B.V.
/
/ File      : FrontalStandAdjustmentPresetPage.cpp
/

/-------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/            Koninklijke Philips Electronics N.V.
```

- 5 -

LOC_AR_00004681

```
/       Philips Healthcare B.V.
/
/ File    : FrontalStandAdjustmentPresetPage.h
/
/-----------------------------------------------------------------------------
/ Copyright : Copyright(c) 2013
/       Koninklijke Philips Electronics N.V.
/       Philips Healthcare B.V.
/
/ File    : FrontalStandAdjustmentProcedure.cpp
/
/-----------------------------------------------------------------------------
/ Copyright : Copyright(c) 2013
/       Koninklijke Philips Electronics N.V.
/       Philips Healthcare B.V.
/
/ File    : FrontalStandAdjustmentProcedure.h
/
;
w:\uPOS\POS\FieldService\FSWebGeo\src\FrontalStandAdjustmentStaticOutputPage.cpp
/-----------------------------------------------------------------------------
/ Copyright : Copyright(c) 2013
/       Koninklijke Philips Electronics N.V.
/       Philips Healthcare B.V.
/
/ File    : FrontalStandAdjustmentStaticOutputPage.cpp
/
/-----------------------------------------------------------------------------
/ Copyright : Copyright(c) 2013
/       Koninklijke Philips Electronics N.V.
/       Philips Healthcare B.V.
/
/ File    : FrontalStandAdjustmentStaticOutputPage.h
/
/-----------------------------------------------------------------------------
/ Copyright : Copyright(c) 2013
/       Koninklijke Philips Electronics N.V.
/       Philips Healthcare B.V.
/
/ File    : FSWebGeoNumberUtility.cpp
/
/-----------------------------------------------------------------------------
/ Copyright : Copyright(c) 2013
/       Koninklijke Philips Electronics N.V.
/       Philips Healthcare B.V.
/
```

- 6 -

LOC_AR_00004682

```
/ File      : PositionAdjustmentSelectionPage.cpp
/
/---------------------------------------------------------------------------
/ Copyright  : Copyright(c) 2013
/             Koninklijke Philips Electronics N.V.
/             Philips Healthcare B.V.
/
/ File      : PositionAdjustmentSelectionPage.h
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000

/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
```

- 7 -

LOC_AR_00004683

```
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
pragma once
endif   // _MSC_VER >= 1000
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000

/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
```

- 8 -

LOC_AR_00004684

```
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/ INCLUDES
/
include "FSCSysCompStdAfx.h"
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/==== start of file: w:\uFSSys\FSSys\Pub\FSSys\Inc\IFSCGenServiceMdl.idl
ifndef IFSCGENSERVICEMDL_IDL
define IFSCGENSERVICEMDL_IDL
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
include "FSCGenServiceFactoryInterface.idl"

include "IFSCGenConfig.idl"

ifndef IFSCGENDFARESULT_IDL
define IFSCGENDFARESULT_IDL
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INTERFACE INCLUDES
/
ifndef MIOMPDTYPES_IF
define MIOMPDTYPES_IF
/
/-----------------------------------------------------------------
```

- 9 -

LOC_AR_00004685

```
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDTypes.idl
/
/ Interface   :
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
endif // UCSDEGHOSTINGCALIBRATION_H
```

- 10 -

LOC_AR_00004686