**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MEDICAL IMAGING &
TECHNOLOGY ALLIANCE, et al.,

*Plaintiffs*,

*v.*

LIBRARY OF CONGRESS, et al.,

*Defendants*.

No. 1:22-cv-499 (BAH)

**JOINT APPENDIX**

**VOLUME 6 OF 6
(page excerpts AR 4687-9410)**

Rachael Westmoreland
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C., DC 20530
(202) 514-1280
rachael.westmoreland@usdoj.gov

*Counsel for Defendants*

Michael B. Kimberly
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
mkimberly@mwe.com

*Counsel for Plaintiffs*

```
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ MACRO DEFINITIONS
/
/
```

- 11 -

LOC_AR_00004687

```
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES
/
if _MSC_VER >= 1000
pragma once
endif   // _MSC_VER >= 1000
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/
/
/ INCLUDES & FORWARD CLASS DECLARATIONS
/
ifndef MIOMPDTYPES_IF
define MIOMPDTYPES_IF
/
/-----------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDTypes.idl
/
/ Interface   :
/
ifndef MIOMPDTYPES_IF
define MIOMPDTYPES_IF
/
/-----------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDTypes.idl
/
/ Interface   :
/


/-----------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPowerTaps.cpp
/
/ Class       : CMioMPDPowerTaps
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000
```

- 12 -

LOC AR 00004688

```
/-------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioMPDPowerTaps.h
/
/ Class      : CMioMPDPowerTaps
/
endif // MIOFSPDUBACKUPRESTORECALLBACKATL_H
/-------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioGPDUConfig.cpp
/
/ Class      : CMioGPDUConfig
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000


/-------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioGPDUConfig.h
/
/ Class      : CMioGPDUConfig
/
/-------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioGPDUPR.cpp
/
/ Class      : CMioGPDUPR
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000


/-------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File       : MioGPDUPR.h
/
/ Class      : CMioGPDUPR
/
endif
/-------------------------------------------------------------------------
```

- 13 -

LOC_AR_00004689

```
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPRFactory.cpp
/
/ Class       : CMioMPDPRFactory
/


/------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPdsAdapterProxy.cpp
/
/ Class       : CMioMPDPdsAdapterProxy
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000


/------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPdsAdapterProxy.h
/
/ Class       : CMioMPDPdsAdapterProxy
/


/------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPdsAdapterSink.cpp
/
/ Class       : CMioMPDPdsAdapterSink
/
if _MSC_VER >= 1000
pragma once
endif // _MSC_VER >= 1000

/------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDPdsAdapterSink.h
/
/ Class       : CMioMPDPdsAdapterSink
/

/------------------------------------------------------------------------
```

- 14 -

LOC_AR_00004690

```
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDUPR.cpp
/
/ Class       : CMioMPDUPR
/


/--------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDUtilities.cpp
/
/ Class       : CMioMPDUtilities
/

ifndef MIOMPDUTILITIES_H
define MIOMPDUTILITIES_H
/--------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDUtilities.h
/
/ Class       : CMioMPDUtilities
/
ifndef IFSCGENSERVICEMDL_IDL
define IFSCGENSERVICEMDL_IDL


/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

include "FSCGenServiceFactoryInterface.idl"

include "IFSCGenConfig.idl"

ifndef IFSCGENDFARESULT_IDL
define IFSCGENDFARESULT_IDL
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

/
/ INTERFACE INCLUDES
/
ifndef IFSCGENSERVICEMDL_IDL
define IFSCGENSERVICEMDL_IDL
```

- 15 -

LOC_AR_00004691

```
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

include "FSCGenServiceFactoryInterface.idl"

include "IFSCGenConfig.idl"

ifndef IFSCGENDFARESULT_IDL
define IFSCGENDFARESULT_IDL
/
/ Copyright(C) 2013, Koninklijke Philips Electronics N.V.
/

/
/ INTERFACE INCLUDES
/
ifndef MIOMPDTYPES_IF
define MIOMPDTYPES_IF
/
/---------------------------------------------------------------------------
/ Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
/
/ File        : MioMPDTypes.idl
/
/ Interface   :
/

//--------------------------------------------------------------
// Copyright   : Copyright(c) 2013
//              Philips Medical Systems Nederland B.V.
//
// File        : DmtDicomSrItemPool.cpp
//
// Class       : CDmtDicomSrItemPool
#pragma once
#endif // _MSC_VER >= 1000

//
//--------------------------------------------------------------
// Copyright   : Copyright(c) 2013
//              Philips Medical Systems Nederland B.V.
//
// File        : DmtDicomSrItemPool.h
//
```

- 16 -

LOC_AR_00004692

```
// Class     : CDmtDicomSrItemPool

//-----------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013
//             Philips Medical Systems Nederland B.V.
//
// File       : PBFuncMagnusLatLock.cpp
//
// Class      : CPBFuncMagnusLatLock
}
//-----------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013
//             Philips Medical Systems Nederland B.V.
//
// File       : PBFuncMagnusLatLock.h
//
// Class      : CPBFuncMagnusLatLock
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//--------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File       : MioMPDTypes.idl
//
// Interface  :
//
#ifndef IFSCGENSERVICEMDL_IDL
#define IFSCGENSERVICEMDL_IDL

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

#include "FSCGenServiceFactoryInterface.idl"

#include "IFSCGenConfig.idl"

#ifndef IFSCGENDFARESULT_IDL
#define IFSCGENDFARESULT_IDL
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INTERFACE INCLUDES
```

- 17 -

LOC_AR_00004693

```
//
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File        : MioMPDTypes.idl
//
// Interface   :
//
END_LITE_COMMANDS
//-------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : IpRthlSink.cpp
// Description : -
//-------------------------------------------------------------------
//TICS -NAM#004 Underscore is necessary for LITE commands


//-------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : IpRthlSink.h
// Description : -
//-------------------------------------------------------------------
//TICS -NAM#004: Underscore necessary due to class versioning and LiteWrapper usage
//TICS -NAM#015: camelCase not possible due to LITE commands
//-------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : ModuleEvents.h
// Description : -
//-------------------------------------------------------------------

#ifndef MODULEEVENTS_H

//-------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : ModuleState.cpp
// Description : -
//-------------------------------------------------------------------
//TICS -CON#003: explicit cast required

} } } } } } // End of namespaces
//-------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : ModuleState.h
```

- 18 -

LOC AR 00004694

```
// Description : -
//----------------------------------------------------------------
//TICS -NAM#015: keep naming for enumeration


//----------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : RthlErrorLogger.h
// Description : -
//----------------------------------------------------------------

#include "Rthl/IErrorLogger.h"

//----------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Koninklijke Philips Electronics N.V.
// File        : RthlErrorLogger.h
// Description : -
//----------------------------------------------------------------

#ifndef RTHLERRORLOGGER_H

//----------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Error logging interface.
// Filename    : IErrorLogger.h
//----------------------------------------------------------------------

#ifndef IERRORLOGGER_H

//----------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Connection class
// Filename    : RthlConnection.h
//----------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//----------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Critical Section class
// Filename    : RthlCriticalSection.h
//----------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//----------------------------------------------------------------------
```

- 19 -

LOC_AR_00004695

```
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Data Buffer class
// Filename    : RthlDataBuffer.h
//----------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//----------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link defines
// Filename    : RthlDefines.h
//----------------------------------------------------------------------------

#ifndef RTHLDEFINES_H

//----------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link helper class
// Filename    : RthlHelper.h
//----------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.
//TICS -PRE#004: Functionality implemented as a combination of macro and function.

//----------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Image Administration class
// Filename    : RthlImageAdmin.h
//----------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//----------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link ImageData link class
// Filename    : RthlImageDataLink.h
//----------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//----------------------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link ImageSync link class
// Filename    : RthlImageSyncLink.h
//----------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.
```

- 20 -

```
//---------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link metadata class
// Filename    : RthlMetaData.h
//---------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//---------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link OS includes.
// Filename    : RthlOperatingSystemIncludes.h
//---------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//---------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Receiver class
// Filename    : RthlReceiver.h
//---------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//---------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Socket class
// Filename    : RthlSocket.h
//---------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//---------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Transmitter class
// Filename    : RthlTransmitter.h
//---------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.


//---------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link connection class
// Filename    : RthlConnection.cpp
//---------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.
//TICS -CFL#016: Ignore warnings about too complex functions.
```

- 21 -

LOC_AR_00004697

```
//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Critical Section class
// Filename    : RthlCriticalSection.cpp
//-------------------------------------------------------------------------

#include "RthlOperatingSystemIncludes.h"

//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Data Buffer class
// Filename    : RthlDataBuffer.cpp
//-------------------------------------------------------------------------

#include "RthlOperatingSystemIncludes.h"

//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link helper class
// Filename    : RthlHelper.cpp
//-------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.

//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Image Administration class
// Filename    : RthlImageAdmin.h
//-------------------------------------------------------------------------
//TICS -NAM#015: Used lower-case prefix to identify member variables.
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.

//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link ImageData link class
// Filename    : RthlImageDataLink.cpp
//-------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.
//TICS -OLC#006: Avoid TICS false positives.
//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link ImageSync link class
// Filename    : RthlImageSyncLink.cpp
//-------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.
//TICS -CON#007: BOOL to bool conversion issues.
```

- 22 -

LOC_AR_00004698

```
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link metadata class
// Filename    : RthlMetaData.cpp
//--------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.


//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link Receiver class
// Filename    : RthlReceiver.cpp
//--------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.


//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time Host Link socket class
// Filename    : RthlSocket.cpp
//--------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.


//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-Time Host Link Transmitter class
// Filename    : RthlTransmitter.cpp
//--------------------------------------------------------------------------
//TICS -CFL#011: Existence of logging object must be tested prior to writing log message.


//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link error logger class wrapper
// Filename    : RthlErrorLoggerWrapper.h
//--------------------------------------------------------------------------

#pragma once
}}}}}}
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link metadata class wrapper
// Filename    : RthlMetaDataWrapper.h
//--------------------------------------------------------------------------

#pragma once
} } } } } }  // End of namespaces
//--------------------------------------------------------------------------
```

- 23 -

LOC_AR_00004699

```
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description :
// Filename    : RthlMetaDataWrapperExceptions.h
//----------------------------------------------------------------------------

#pragma once
}}}}};
//----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link metadata class wrapper
// Filename    : RthlReceiverWrapper.h
//----------------------------------------------------------------------------

#pragma once
} } } } } } // End of namespaces
//----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description :
// Filename    : RthlReceiverWrapperExceptions.h
//----------------------------------------------------------------------------

#pragma once
}}}}};
//----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description :
// Filename    : RthlTransmitterWrapper.h
//----------------------------------------------------------------------------

#pragma once
} } } } } } // End of namespaces
//----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description :
// Filename    : RthlTransmitterWrapperExceptions.h
//----------------------------------------------------------------------------

#pragma once
}}}}};
//----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link error logger class wrapper
// Filename    : RthlErrorLoggerWrapper.cpp
//----------------------------------------------------------------------------

#include "RthlErrorLoggerWrapper.h"
```

- 24 -

LOC_AR_00004700

```
}}}}}}
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link metadata class wrapper
// Filename    : RthlMetaDataWrapper.cpp
//--------------------------------------------------------------------------

#include "RthlMetaDataWrapper.h"
} } } } }} // End of namespaces
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link receiver class wrapper
// Filename    : RthlReceiverWrapper.h
//--------------------------------------------------------------------------

#include "Rthl\RthlOperatingSystemIncludes.h"
} } } } }} // End of namespaces
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Real-time host link transmitter class wrapper
// Filename    : RthlTransmitterWrapper.cpp
//--------------------------------------------------------------------------

#include "Rthl\RthlOperatingSystemIncludes.h"

//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Rthl module test cases.
// Filename    : RthlTestCases.h
//--------------------------------------------------------------------------

#ifndef RTHLTESTCASES_H

//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Simple test interface .
// Filename    : Test.h
//--------------------------------------------------------------------------
// TICS -STY#020, -OLC#009, -PCA#009, -PRE#001

//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Rthl module test cases.
// Filename    : RthlTestCases.cpp
//--------------------------------------------------------------------------
```

- 25 -

LOC_AR_00004701

```
//TICS -OLC#009, -PRE#001, -PRE#004, -PCA#009, -STY#004, -CFL#016, -PCA#005, -
CFL#011, -POR#006

//-----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
// Description : Rthl module test cases.
// Filename    : Test.cpp
//-----------------------------------------------------------------------------
//TICS -CFL#013, -POR#028, -PCA#005, -STY#020

//TICS -3@102, -3@107, -3@503: Quality Center expects testcase names to be in format
Tc_xxx.
//TICS -10@301: Magic numbers are normal to be used in Test Code.

// Copyright       : Copyright(c) 2013, Philips Medical Systems Nederland B.V.

using System;
using System.Collections.Generic;
using NUnit.Framework;
using Philips.PmsComp.IP.Interfaces;
//==== start of file: w:\uUIM\UIM\Pub\Host\Inc\MioMPDTypes.idl
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//-----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File        : MioMPDTypes.idl
//
// Interface   :
//

//-----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013,
//            Philips Medical Systems Nederland B.V.
//
// File        : AcqPersistencyTest.cpp
//
// Class       : CAcqPersistencyTest

//-----------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013,
//            Philips Medical Systems Nederland B.V.
//
// File        : AcqPersistencyTest.h
//
```

- 26 -

LOC_AR_00004702

```
// Class      : CAcqPersistencyTest
#endif // FSCXGNACQUISITIONPROXY_H
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#ifndef IFSCGENSERVICEMDL_IDL
#define IFSCGENSERVICEMDL_IDL

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

#include "FSCGenServiceFactoryInterface.idl"

#include "IFSCGenConfig.idl"

#ifndef IFSCGENDFARESULT_IDL
#define IFSCGENDFARESULT_IDL
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INTERFACE INCLUDES
//
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//-------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File        : MioMPDTypes.idl
//
// Interface   :
//
//
//-------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Electronics N.V.
//
// Class       : CRevSession
//
// Description :
```

LOC_AR_00004703

```
//
//
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Electronics N.V.
//
// Class   : CRevSession
//
// Description : The implementation for CRevSession it too large to handle
//               with a single file. This file contains part of the implementation
//==== start of file: w:\uView\View\Pub\Host\Inc\MioMPDTypes.idl
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File      : MioMPDTypes.idl
//
// Interface   :
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#if _MSC_VER > 1000
#pragma once
#endif // _MSC_VER > 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#endif // FSCIDCONFIGTECHNICALEVENTDESCRIPTIONTABLE_H
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//
```

- 28 -

```
//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#endif // !defined(FSCIDDFATUNABLEITEMS_H)
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES
//


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//
```

- 29 -

LOC_AR_00004705

```
//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000


//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#endif //FSCIDLOOPBACKAURORATECHNICALEVENTDESCRIPTIONTABLE_H
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//


//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000
```

- 30 -

LOC_AR_00004706

```
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#endif // !defined FSCIDLOOPBACKAURORACABLETESTPART_H
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
#endif // !defined FSCIDLOOPBACKAURORACONNECTORTESTPART_H
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
//
```

- 31 -

LOC_AR_00004707

```
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#if _MSC_VER > 1000
#pragma once
#endif // _MSC_VER > 1000

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#if _MSC_VER >= 1000
#pragma once
#endif // _MSC_VER >= 1000

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//

\FSCID\Src\FSCIDLoopBackAurora\FSCIDLoopBackBiplaneLinkTestPart.cpp
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES
//
#if _MSC_VER >= 1000
```

- 32 -

LOC_AR_00004708

```
#pragma once
#endif // _MSC_VER >= 1000

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INCLUDES & FORWARD CLASS DECLARATIONS
//
//
//---------------------------------------------------------------
// Copyright   : Copyright(c) 2013
//          Philips Medical Systems Nederland B.V.
//
// File      : IIDFSBiplaneLinkLoopBack.idl
//
// Interface  : IIDFSBiplaneLinkLoopBack
//
//---------------------------------------------------------------
// Copyright   : Copyright(c) 2013
//          Philips Medical Systems Nederland B.V.
//
// File      : IIDFSBiplaneLinkDetectorLoopBack.idl
//
// Interface  : IIDFSBiplaneLinkDetectorLoopBack
#ifndef IFSCGENSERVICEMDL_IDL
#define IFSCGENSERVICEMDL_IDL

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

#include "FSCGenServiceFactoryInterface.idl"

#include "IFSCGenConfig.idl"

#ifndef IFSCGENDFARESULT_IDL
#define IFSCGENDFARESULT_IDL
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INTERFACE INCLUDES
//
```

LOC_AR_00004709

```
#ifndef MIOMPDTYPES_IF
#define MIOMPDTYPES_IF
//
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File        : MioMPDTypes.idl
//
// Interface   :
//
#ifndef DMTRACECATEGORIES_H
#define DMTRACECATEGORIES_H
//
//--------------------------------------------------------------------------
// Copyright   : Copyright(c) 2013 Philips Electronics N.V.
//
// File        : DmTraceCategories.h
//
// History     :
// - Date: 2013-04-25, Jeyaprabhu J
#ifndef IFSCGENSERVICEMDL_IDL
#define IFSCGENSERVICEMDL_IDL

//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

#include "FSCGenServiceFactoryInterface.idl"

#include "IFSCGenConfig.idl"

#ifndef IFSCGENDFARESULT_IDL
#define IFSCGENDFARESULT_IDL
//
// Copyright(C) 2013, Koninklijke Philips Electronics N.V.
//

//
// INTERFACE INCLUDES
//

//--------------------------------------------------------------
// Copyright   : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File        : EpxtEngineLibGlobalCollections.cpp
//
```

- 34 -

LOC_AR_00004710

```
// Class    : CEpxtEngineLibGlobalCollections
//
#ifndef EPXTENGINELIBGLOBALCOLLECTIONS_H
#define EPXTENGINELIBGLOBALCOLLECTIONS_H

//--------------------------------------------------------------
// Copyright  : Copyright(c) 2013, Philips Medical Systems Nederland B.V.
//
// File    : EpxtEngineLibGlobalCollections.h
//
// Class    : CEpxtEngineLibGlobalCollections
```

- 35 -

LOC_AR_00004711

LC COPYRIGHT

0  047  078  625  5

LOC AR 00004712

# LIBRARY OF CONGRESS

IN THE MATTER OF:                    )
                                     )
SECTION 1201                         )
RULEMAKING HEARING                   )

Pages:    730 through 850

Place:    Washington, D.C.

Date:     April 20, 2021

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C. 20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

LOC_AR_00005627

730

LIBRARY OF CONGRESS

IN THE MATTER OF:            )
                            )
SECTION 1201                )
RULEMAKING HEARING          )

                                    Remote Roundtable
                                    Suite 206
                                    Heritage Reporting Corporation
                                    1220 L Street, N.W.
                                    Washington, D.C.

                                    Tuesday,
                                    April 20, 2021

        The parties met remotely, pursuant to notice, at

10:35 a.m.

        PARTICIPANTS:

        Government Representatives:

        REGAN SMITH, General Counsel of the U.S. Copyright
          Office
        KEVIN AMER, U.S. Copyright Office
        NICHOLAS BARTELT, U.S. Copyright Office
        STACEY CHENEY, National Telecommunications and
          Information Administration
        BRAD GREENBERG, U.S. Copyright Office

        Panelists:

        MICHAEL AYERS, DVD CCA and ACS LA
        KATHLEEN BURKE, Public Knowledge
        CARA GAGLIANO, Electronic Frontier Foundation
        STEVE INACKER, Transtate Equipment Company and
          Avante Health Solutions
        ROBERT KERWIN, International Association of
          Medical Equipment Remarketers and Servicers
        MARK McHARGUE, Nebraska Farm Bureau
        MORGAN REED, ACT | The App Association
        KEVIN M. ROSENBAUM, Auto Innovators
        KERRY MAEVE SHEEHAN, iFixit
        KYLE WIENS, Repair Association
        J. MATTHEW WILLIAMS, Joint Creators and Copyright
          Owners

                Heritage Reporting Corporation
                     (202) 628-4888

LOC_AR_00005628

1              P R O C E E D I N G S

2                                          (10:35 a.m.)

3              MS. SMITH:  I'm Reagan Smith, General

4    Counsel of the Copyright Office, and this is our sixth

5    day of hearings for our Section 1201 rulemaking.

6    Today we are focused on Class 12, which concerns

7    various adjustments or proposed expansions to

8    exemptions for purposes of repair.

9              We're really excited that we have a big

10   group today.  Thank you for coming.  We think we'll

11   have a productive discussion.

12             So to go through logistics for those who

13   might be new, my colleagues and I will moderate this

14   session by posing specific questions.  If you wish to

15   respond, probably the easiest way is to use the Zoom

16   "raise hand" button, and we'll try to get through to

17   people in turn.  If you're having issues -- some

18   people have been having issues -- you can literally

19   wave your hand or signal in the chat.

20             For anyone in the audience or a panelist who

21   has an issue communicating in the chat or the Q&A,

22   we'll alert someone at the Copyright Office to reach

23   out to you to provide technical assistance.

24             For those who are listening or watching as

25   an S-M-B, I guess this is the only session for today,

LOC_AR_00005629

1    but there is also a link in the chat if you wish to

2    sign up for audience participation for tomorrow.  That

3    is the time for those who maybe didn't sign up for a

4    specific panel but wish to provide perhaps up to three

5    minutes of their own views as to any of the proposed

6    exemptions, and that will be concluding our hearings

7    tomorrow.

8         And today's event is being recorded.  The

9    video will be posted to the Copyright Office website.

10   I think it's also being livestreamed.  We have a court

11   reporter transcribing the proceedings, so please try

12   to speak slowly and clearly.  I know we're all experts

13   in virtual communication, so mute yourself if you're

14   not speaking.

15        And I think before we get started, I'd like

16   to ask those from the Government to introduce

17   themselves, so maybe Mr. Amer, Mr. Bartelt, and Mr.

18   Greenberg from the Copyright Office.

19        MR. AMER:  Good morning.  Kevin Amer, Deputy

20   General Counsel.

21        MR. BARTELT:  Good morning.  Nick Bartelt,

22   Attorney-Advisor.

23        MR. GREENBERG:  Good morning.  Brad

24   Greenberg, Assistant General Counsel.

25        MS. SMITH:  And, Mr. Cheney, could you

LOC_AR_00005630

1    please introduce yourself?

2            MR. CHENEY:  Sure.  Thank you and good

3    morning.  My name is Stacey Cheney.  I'm a Senior

4    Attorney Advisor in the Office of Chief Counsel at

5    NTIA, Department of Commerce.

6            MS. SMITH:  So next, we're just going to do

7    short introductions of where you are and what

8    organization you may be representing.  So I'm going to

9    try to go alphabetically, starting with those who are

10   here in support of seeing expanded exemptions in some

11   form or the other.

12           So, Ms. Burke?

13           MS. BURKE:  I'm Kathleen Burke, and I'm

14   representing Public Knowledge.

15           MS. SMITH:  Thank you.

16           Ms. Gagliano?

17           MS. GAGLIANO:  Cara Gagliano, and I'm

18   representing the Electronic Frontier Foundation.

19           MS. SMITH:  Mr. Inacker?

20           MR. INACKER:  Steve Inacker, and I'm

21   representing Transtate Equipment Company and Avante

22   Health Solutions in the medical segment.

23           MS. SMITH:  Mr. Kerwin?

24           MR. KERWIN:  Robert Kerwin, General Counsel

25   to IAMERS, the International Association of Medical

LOC_AR_00005631

1    Equipment Remarketers and Servicers.

2          MS. SMITH:  Mr. McHargue?

3          MR. McHARGUE:  Good morning.  Mark McHargue.

4    I'm a farmer in Central City, Nebraska representing

5    American Farm Bureau.

6          MS. SMITH:  Ms. Sheehan?

7          MS. SHEEHAN:  Kerry Sheehan.  I am the head

8    of U.S. policy at iFixit.

9          MS. SMITH:  Mr. Wiens?

10          MR. WIENS:  Kyle Wiens, and I am speaking on

11    behalf of The Repair Association.

12          MS. SMITH:  And now we'll have those who

13    have filed in opposition to some or all of the

14    proposed adjustments to the exemptions.

15          So, Mr. Ayers?

16          MR. AYERS:  Thank you.  Good morning.  My

17    name is Michael Ayers, and I'm representing the

18    Advanced Access Content System Licensing Administrator

19    LLC, usually referred to as AACS LA, and DVD CCA --

20    DVD Copy Control Association, usually referred to as

21    DVD CCA.

22          MS. SMITH:  Thank you.

23          Mr. Reed?

24          MR. REED:  Hi.  My name is Morgan Reed.  I'm

25    the President of The App Association, and the

LOC_AR_00005632

1    Executive Director of The Connected Health Initiative.

2            MS. SMITH:  Mr. Rosenbaum?

3            MR. ROSENBAUM:  Hi.  I'm Kevin Rosenbaum,

4    and I'm here today representing The Alliance for

5    Automotive Innovation, Auto Innovators.

6            MS. SMITH:  Thank you.

7            And, Mr. Williams?

8            MR. WILLIAMS:  Good morning.  Matthew

9    Williams, Mitchell, Silberberg & Knupp, representing

10   the Joint Creators and Copyright Owners.

11           MS. SMITH:  Thank you.

12           So we have a lot of people here on kind of a

13   bigger record for this proposed class, so I want to

14   give a short road map of some of the issues, the order

15   in which we are hoping to get through some of the

16   issues, to make sure we have time to get to it all.

17           So first, we are going to address questions

18   of the proposed scope of the class, whether it should

19   be one exemption or multiple exemptions, which it

20   currently is.

21           Secondly, some of the proposals to make it

22   device-agnostic as well as permit modification of

23   devices.

24           Next, issues specific to DVD or Blu-Ray

25   players, as well as video game consoles.

LOC_AR_00005633

1           We have a couple of questions specific to

2    causation; then turning to medical devices; and then,

3    finally, issues related to vehicles.

4           So we'll try to get to everything, and

5    certainly some issues are going to be cross-cutting,

6    but I thought that might be helpful.

7           So I guess to begin, it would be helpful to

8    hear either from proponents or opponents with respect

9    to some of the proposals by EFF, or iFixit, or The

10   Repair Association to sort of broaden and condense the

11   two existing regulatory exemptions into a single one

12   that is agnostic as to device.

13          So we have some precedent for this in an

14   exemption for security research, where the Office

15   concluded that computer programs can constitute a

16   proper class because the use was so tailored.

17          Is that helpful for us to look at that in

18   connection with repair, or are there different issues

19   going on that we should be cognizant of with respect

20   to the areas at issue in this exemption?  So I saw Ms.

21   Sheehan first.

22          Please go ahead.

23          MS. SHEEHAN:  So I think that's a great

24   analogy.  I think similar to how we think about

25   security research, where we're talking about repair,

LOC_AR_00005634

1    the purpose of the use is consistently non-infringing,

2    and the use of the software is virtually identical.

3    If the purpose of repair is to restore the device to

4    functionality and all of that, that's a fair use, and

5    it's non-infringing also under 117.

6          Continuing with the Office's path of limited

7    exemption categories that are kind of device

8    restricted or limited to certain narrow categories of

9    devices really makes it difficult for these exemptions

10   to keep up with the increasing number of software-

11   enabled devices with technological protection

12   measures.

13         So from a purely practical level, if we

14   continue on this route, we're going to be -- us,

15   iFixit, The Repair Association, EFF, and other

16   individual users and organizations and advocates are

17   going to be coming back every three years with a new

18   roster of devices as the world of software-enabled

19   devices continues to explode.

20         And part of the problem that we see with

21   some of these narrow categories is that sometimes it's

22   unclear whether a device sits in one category or

23   another.  Is a headphone a wearable?  Is it something

24   else?  What about a smart watch?

25         So the categories don't kind of keep up with

LOC_AR_00005635

1     market realities, or how products are marketed, or how

2     many functions they have, and we just have a

3     proliferation of these devices.  So three years ago,

4     we weren't really looking at a bunch of smart light

5     bulbs, but now we are, and that's just going to

6     increase going forward.

7          And I'll say that similarly to the exemption

8     for encryption research and security research, when

9     we're talking about looking at this broad category of

10    devices, for each of these devices, the purpose is

11    still non-infringing, and the copyright analysis is

12    the same.  The purpose is repair.  Repair is non-

13    infringing.  And that doesn't differ between whether

14    it's a phone, or a tractor, or a light bulb, or a

15    smart litter box.

16         MS. SMITH:  Thank you.

17         So I'll call on you next, Ms. Gagliano, but

18    one thing to pick out -- I thought Ms. Sheehan is

19    stressing the purpose being shared, but I wonder if

20    you could also address whether there is a similar

21    causation effect.  So do the TPMs work in the same

22    way?

23         And another element, of course, for

24    considering is the effect on the market for

25    copyrighted works and whether or not there's

LOC_AR_00005636

1    sufficient commonalities to assume they're all going

2    to have a similar effect.

3         MS. GAGLIANO:  Yeah.  Thank you.  So I agree

4    with everything that Ms. Sheehan just said, and to

5    some of your points would add that, yes, I think that

6    the causation issues are very much the same, and the

7    effect on the market, and part of that is because like

8    security research and that exemption, we're already

9    limited to a subcategory of literary works and have

10   this specific purpose.

11        But not only that, we're limited further.

12   It's not all computer programs.  It's just firmware,

13   embedded software that's controlling the operation of

14   physical devices.

15        And that unifying feature is what really

16   unites the entire class in terms of common issues with

17   all of the statutory factors, including market

18   effects, because the thing about firmware that's

19   unique relative to a lot of other kinds of computer

20   programs is that there really isn't a separate market

21   for firmware outside of the physical devices it's

22   attached to.  That is just inherent to the nature of

23   firmware.  It's what makes it firmware, it is attached

24   to, sold with, a specific device.

25        And any kind of modified firmware, repaired

Heritage Reporting Corporation
(202) 628-4888

1    firmware, that's being produced through this exemption

2    isn't something that is going to act as a market

3    substitute for firmware, because you would still have

4    to buy the physical device or otherwise acquire the

5    physical device in the first place with that original

6    firmware already on it.

7         So the copyright owner has already been

8    compensated.  They aren't selling any fewer copies of

9    the firmware, because the number of firmware copies is

10   inherently tied to the number of devices sold, and

11   modified firmware is useless without that.

12        MS. SMITH:  Let me ask you one question, and

13   then I think I'll move on to make sure everyone has an

14   opportunity to wave in.  You're using this word

15   "firmware," and the two exemptions now discuss

16   computer programs that are contained in and control

17   the functioning of a lawfully acquired "blah" -- with

18   "blah" being what's in dispute.

19        Do you think that "contained in" and "control the

20   functioning" is synonymous with firmware?  Or are you

21   sort of narrowing the description a bit more?

22        MS. GAGLIANO:  I think it is essentially

23   synonymous.  You know, to the extent that the

24   definition you mentioned, "contained in" and

25   "controlling the operation of" could be understood to

LOC_AR_00005638

1    be broader.  You know, that's really not what we mean.

2         We're not talking about like apps.  Even if

3    you could think in some sense, "Well, an app in some

4    way controls the operation of the product," but that's

5    not what we're talking about.  We're talking about

6    what is the industry term of firmware or embedded

7    software.

8         MS. SMITH:  Okay.  So it sounds like you

9    might not object to an effort to sort of clarify that

10   to the extent that might put Mr. Reed, for example, at

11   The App Association -- give him a little bit more

12   comfort.  Is that right?

13        MS. GAGLIANO:  Sure.

14        MS. SMITH:  Okay.

15        So I think to keep going in order, we'll go

16   to Mr. Wiens and Mr. Williams.

17        But, Mr. Wiens, I want to press and give you

18   the same question I asked Ms. Gagliano, because I

19   still think one area -- to take the analogy to other

20   exemptions, is we similarly concluded in the unlocking

21   process there just weren't other examples of devices

22   that needed to be unlocked.  There were not TPMs

23   effectively controlling access.

24        And so that is a question we have here,

25   whether there is the same showing of causation or

LOC_AR_00005639

1    adverse effects across these categories, because if

2    there's not TPMs, it doesn't make sense to have a

3    regulatory proceeding and sort of make it seem like an

4    exemption is needed if one is not, for example.

5         And we also want to see whether there are

6    other alternatives, even where there may be TPMs.  So

7    can you provide a little bit more color about the

8    other types of devices you think are not being able to

9    be accessed, notwithstanding the current exemptions?

10        MR. WIENS:  Absolutely.  Great question.

11   What I think is interesting about this is we're

12   talking about all of these devices, all kinds of

13   different devices.  What's sort of amusing to me

14   technically about this is that the software, the work

15   that we're talking about, is substantially precisely

16   the same in all of these cases, even though they're

17   different devices.  It's Linux.

18        Linux is the work that is being protected in

19   almost all of these cases, whether it is a nanny cam,

20   or a smart coaster, or a industrial SCADA system.

21   They are running on Linux.  And I like to call the

22   internet of things "the internet of outdated Linux

23   distributions."

24        And what's happening is you hear about all

25   of the kind of security problems that we have with the

LOC_AR_00005640

1    internet of things.  It's because these devices are

2    outdated and not patched.  And in response to all of

3    the security vulnerabilities that have been found,

4    manufacturers are locking these devices down.

5          It's interesting that like traditionally,

6    the Copyright Office is focused on TPMs, where you

7    have a DVD.  You have copy protection put on the DVD.

8    The copy protection is there to protect the work from

9    being copied.  In this case, it's generally there to

10   prevent malware.

11         And so are there TPMs on all of these

12   devices?  There should be.  If a manufacturer is doing

13   their job, if it's a nanny cam, you don't want that

14   stream ending up on the public internet.  You want it

15   locked down.  If it's a building automation system,

16   you don't want anyone on the internet to be able to

17   log in and unlock the doors.  You need to lock it.

18         So I would say the default case is, yeah,

19   there are locks.  The locks are not intended to

20   prevent owners from accessing and modifying and

21   unlocking a door in a building automation system.  The

22   locks are there to prevent unauthorized third parties.

23         So if you look at the world of internet-

24   connected devices going forward, if I was designing

25   them all, if I had sort of my druthers, I would put

LOC_AR_00005641

1    locks on all of them.  And I think that you will see,

2    sort of the security best practices, that there should

3    and will continue to be locks on these devices.

4         MS. SMITH:  Is there an issue, for example,

5    with the SCADA systems of not being able to repair

6    them or even lawfully modify them because there's an

7    inability to get permission?

8         I mean, we had a specific record on that,

9    for example, with the security research classes, that

10   there was a need to have good-faith security

11   researchers on those types of systems, and I don't

12   know if we have a similar record in this class of the

13   effect of 1201 on non-infringing uses for some of

14   these types of devices.

15        MR. WIENS:  Yeah, we -- so one story that we

16   mentioned on the record was a school.  This was, I

17   think, an elementary school.  And the facility's

18   maintenance person passed away, and he had the

19   password to the whole system.  And it turned out that

20   this particular system, there was no way to reset that

21   password.

22        What you had to do was wipe out the

23   programming for the entire system and reprogram it,

24   which if -- so I've configured some of these building

25   systems, and like for our office, it took like a month

LOC_AR_00005642

745

1    of programming to set it up.  It controls the lawn

2    sprinklers.  It controls timing on the doors, who can

3    go in and out.  There's different timing settings.  If

4    someone unlocks the door at 3:00 a.m., different

5    security settings go off, and otherwise.  It controls

6    the air conditioning.  In a larger -- like in a

7    school, it might control a water treatment system.

8         So it is a huge amount of work, so in that

9    case, where you need to be able to basically break

10   into your own system to change the password, if they

11   couldn't do that, you're talking about like probably

12   not the kind of repair that could happen in a weekend.

13   It might take a professional or someone really good at

14   this a week to go in and reprogram everything.  So the

15   ability to circumvent that would be very important.

16        Another example that's personal to me, we

17   have a building automation system that only supports

18   99 key cards, and we have more than 99 people.  We

19   need to change it.

20        MS. SMITH:  Do you know why it only supports

21   99 key cards?  Is that part of a license?

22        MR. WIENS:  No, there's no way to pay more.

23   The company just doesn't support it.  I think it was

24   an artificial limit put in by some software engineer.

25   I want to find that person and smack them upside the

LOC_AR_00005643

746

1    head, because it's very frustrating.  But it's a

2    limit, and I've asked.  There's no amount of money

3    that we can pay to change it.

4           And another thing that I would mention,

5    because we're talking about sort of third parties you

6    sort of have the branded folks, the folks who maybe

7    have been trained by manufacturers to come in and do

8    some of this work.  We've had extensive experience

9    with a lot of these folks and have had repair problems

10   with our building automation system that the trained

11   service technician from the factory can't figure out.

12   They've been out a dozen times and can't figure out

13   problems.

14           MS. SMITH:  And just to make sure I run down

15   your example that you provided of the school, you

16   can't call someone and say, "You know, the guy who had

17   the password has left, can you reset it?"  Because I

18   think that's something we find ourselves having to do

19   with a variety of technology now.

20           MR. WIENS:  Right.  In this case, the system

21   just wasn't designed that way.  And I think that you

22   will find that is fairly common.  A lot of these -- I

23   mean, particularly -- we're kind of in the early days

24   of all of these technologies.  A lot of them are

25   relatively primitive.  And so in this case, the

LOC_AR_00005644

1    software just didn't have that feature.  And so the

2    factory technician is going to come out and say, "Your

3    option is to wipe all the settings or cough up the

4    password."

5         MS. SMITH:  Okay, thank you.  So I know you

6    talked for a little bit.

7         Mr. Williams, you've had your hand up for a

8    while.  So please feel free to comment on the past

9    speakers or any of the issues I've posed.

10        MR. WILLIAMS:  Yeah, thank you.  I mean, I'm

11   glad to hear Mr. Wiens acknowledge that the use of

12   locks is a best practice, really, with devices across

13   industries and is not something to be critical of in

14   the abstract.

15        And I think your question goes to whether

16   all devices are the same or there are distinctions,

17   and I think the records over the past few cycles have

18   demonstrated that there are distinctions, and you put

19   your finger on a few of them with your questioning.

20        For video game consoles, for example,

21   there's an established consistent record that those

22   TPMs are in place to protect security of the devices,

23   privacy of users, prevent cheating, but also

24   primarily, and importantly, to prevent infringement,

25   and that the value of the device firmware is decreased

Heritage Reporting Corporation
(202) 628-4888

LOC_AR_00005645

1    by circumvention of these access controls, which

2    impacts the fair use analysis and also the 1201

3    factors analysis.

4            In addition, you've determined there are

5    alternatives to circumvention in certain respects with

6    respect to repairing video game consoles, and that's

7    not consistent across all of the devices that you've

8    looked at here.  And I think Mr. Wiens's examples just

9    show you the wide variety of questions that can come

10   up when you go from one device to the other device, or

11   to a system.

12           Your question was quite good about, "Is that

13   a license?  Could you pay more for 200 users instead

14   of 99 users?"  The answer may be very different for

15   different situations.  And so just focusing on the

16   video game console space, I don't think there's

17   anything in the record to deviate from prior

18   decisions, and I think you've been wise to go at least

19   device by device in terms of categories.

20           I mean, you haven't been myopically focused

21   on individual devices.  You have acknowledged that

22   there are distinctions between categories of devices,

23   and those distinctions can have a lot of import,

24   whether it's under 117, or 107, or alternatives to

25   circumvention, and so I think that's been the right

LOC_AR_00005646

1    approach.

2         And I don't see it as analogous to security

3    research.  In part, I feel the security research

4    exemption has been granted because there's a statutory

5    provision that you were building off of, and you felt

6    that over time that provision was no longer doing its

7    job.  You know, whether I agree with that or not, I

8    think that's how that progressed in the way it did.

9    And I think this is a distinct situation.

10        MS. SMITH:  Okay.  Can I stand you with two

11   follow-up questions that are rather pointed and then

12   get to everyone?

13        So why or why not was it helpful to hear

14   suggestions that the proposed exemption is limited to

15   so-called firmware or something, Linux specifically?

16   Does that help address your concerns at all, or not?

17   And if not, why?

18        MR. WILLIAMS:  No, I don't think limiting it

19   to circumventing access controls on firmware would fix

20   our concerns, especially in the video game console

21   space.  When you circumvent those access controls, you

22   undermine the security scheme that's in place to do a

23   lot of different jobs but, importantly, protect the

24   copyright integrity of the system, and so that would

25   not fix our concern there.

LOC_AR_00005647

1          Perhaps if you're in another space --

2    printers or litter boxes -- maybe the firmware doesn't

3    have any other copyright purpose, but I think you've

4    been right to acknowledge in the past that in the

5    video game consoles it does.

6          MS. SMITH:  Okay, thank you.

7          Mr. Rosenbaum?

8          MR. ROSENBAUM:  Thank you very much.  I know

9    we're going to get to vehicles in a different segment,

10    but I just wanted to make the point, sort of following

11    on Matt's point, that there are distinctions,

12    particularly with the automobile industry.  My

13    comments address only that industry.  We don't have

14    any position on any other devices here.

15          But just, for example, there's no evidence

16    that users of automobiles are having any difficulty

17    getting their automobiles repaired.  There's a

18    thriving aftermarket going on.  Seventy percent of

19    post-warranty repair work is done by independent

20    repair shops.

21          There's, of course, the MOU under which auto

22    manufacturers are required to provide automobile

23    owners and independent repair shops with the same

24    repair and diagnostic information and tools that are

25    provided to franchise dealers.

LOC_AR_00005648

1         And then, of course, the other distinction

2    is the auto industry is very highly regulated, and the

3    access controls also protect software that relates to

4    safety and environmental regulations, and those are

5    critical, which the Office recognized in its

6    promulgation of the existing exemption.

7         And so what's at issue here is relaxing some

8    of these important restrictions on the existing

9    exemptions, so I just wanted to point out that there

10   are some real distinctions here with the auto

11   industry.

12        MS. SMITH:  Thank you.

13        And I see we have a lot of hands raised.

14   I'm going to keep moving on.

15        So I think, Mr. Ayers, I will go to you

16   next.  The one question I'm wondering, and it's maybe

17   part of what you're already prepared to comment upon,

18   is piggybacking off Mr. Rosenbaum bringing vehicles

19   into this, the current exemption for vehicle repair,

20   accepts TPMs protecting works that are accessed on a

21   subscription service such as radio, sort of

22   expressible content, and that's an approach the Office

23   has taken to some exemptions, including also saying

24   that circumvention -- for example, in the jail-

25   breaking context of audio speakers -- cannot be

LOC_AR_00005649

1    accomplished for the purpose of gaining access to

2    other copyrighted works.

3         And so I think sort of anticipating what you

4    might be saying, and also listening to what Mr.

5    Williams said, is that an approach that is useful for

6    the Office to consider, to sort of carve out the video

7    game consoles or DVD or Blu-Ray players, or things

8    where the TPM circumvention -- if the record shows it

9    will be more likely to have an adverse effect on the

10   unlawful distribution of copyrighted works and,

11   perhaps the nanny cam?

12        MR. AYERS:  Thank you.  Well, certainly, to

13   the extent there's an inclination to grant the

14   requested expansions to the exception or to the

15   exemption, it's better to have limits than no limits,

16   and the concern of my clients is geared towards those

17   devices with optical disk drives that play back

18   expressive content like DVDs and Blu-Rays, so

19   including game consoles.

20        So certainly, we still continue to maintain

21   our position, but to the extent that there's an

22   inclination to go that way, carving out those devices

23   certainly relieves the pressure, to a certain extent,

24   on my clients.

25        And I would just note that a couple of other

Heritage Reporting Corporation
(202) 628-4888

LOC_AR_00005650

1    issues that have come up in the comments we've talked

2    about that we've had today -- one is what we keep

3    calling as a repair exemption.  A number of the

4    examples in the conversation today and in the comments

5    received so far have actually gone well beyond repair

6    and have included modification of devices beyond their

7    original functionality.

8         And one of the concerns that we would have

9    would be the extent to which a repair is then geared

10   towards changing the functionality of a device, which

11   uses AACS or CSS to circumvent those technologies and

12   present pirated content in a manner in which it's not

13   authorized.

14        I would also note that there was also the

15   comment that I thought was a very salient one, that

16   locks are not always bad, as has already been said,

17   and that, certainly, to a large extent, the

18   protections on firmware and devices are often to

19   protect the users of those devices against intrusions

20   by malicious third parties, and that's certainly a

21   good thing.

22        But also, to piggyback a little bit on other

23   comments that have been made, there are other purposes

24   for the firmware, and so for instance, in the context

25   of DVD and Blu-Ray, the firmware is used to protect

LOC_AR_00005651

754

1    the decryption -- cryptographic values, and device

2    keys, and certificates that are used to render the

3    device a good citizen in the entertainment content

4    world, making sure that it's a secure platform that's

5    available for a content owner to release high-value

6    content in that format.

7         And to the extent that the ability of the

8    device to protect those cryptographic values is

9    rendered less, is rendered less effective, it reduces

10   the attractiveness of the formats to content owners.

11        MS. SMITH:  Okay, thank you, Mr. Ayers.

12        So I'm going to try to get to everyone who

13   hasn't spoken yet, but then go back to you Ms.

14   Sheehan, Ms. Gagliano, I understand this is something

15   that you wish to respond to.

16        So, Ms. Burke, can we piggyback on what Mr.

17   Ayers brought up, which is modification?  And what are

18   your thoughts?  You can comment on what some of the

19   prior commenters have said, but with respect to video

20   game consoles in particular, do you see a need for

21   modifications?  I'm not sure that's part of what

22   Public Knowledge is supporting with respect to video

23   game consoles for this exemption.

24        MS. BURKE:  Yeah.  So with respect to

25   modification, to the extent that you might need to

LOC_AR_00005652

1    modify the software in order to like repair or relock

2    the optical drive once you change it out, I think that

3    modification would be potentially necessary, depending

4    on what the anti-circumvention technology ends up

5    doing.

6            I know as an analogy, there are some times

7    when you might need to reprogram like in the software,

8    like how -- what the function of a button is, and so

9    that might require modification.  But in terms of

10   modification for a functional purpose, not

11   modification to allow you to play pirated DVDs.

12           And I just want to address that concern

13   there, that somehow allowing these -- changing out the

14   optical drive and being able to repair that optical

15   drive is going to jeopardize the security of the whole

16   system: the lock that pairs an optical drive to the

17   motherboard exists on the daughterboard connection

18   between the two devices.  And it's my understanding

19   that unlocking that so that you can pair a new optical

20   drive is not going to then jeopardize the whole

21   ecosystem of a video game console and its security

22   protocols.

23           So I think that that's something that's

24   particularly relevant here, since this idea that all

25   of a sudden changing out an optical drive is going to

LOC_AR_00005653

1    make it easier to pirate content.  It just doesn't

2    seem like that works within the realities of how these

3    systems are constructed.

4              MS. SMITH:  Thank you.

5              Mr. Reed?

6              MR. REED:  Hi, hopefully your cat is getting

7    out of the way.

8              I think there are a couple things.  I want

9    to actually note, I agree with Kyle Wiens.  I thought

10   his use of the concept of unpatched Linux is great,

11   and I just think about the GRUB bootloader and the

12   problems we've had there.

13             But it actually points to the problem,

14   Regan, that you hit on exactly, which is any tools

15   that you build to go against the TPMs open up a case

16   for infringement that's pretty significant.

17             You asked a great question, which is if that

18   house software or that building software uses as part

19   of its marketing "pay this much for 99 users, pay this

20   much for 200," in Mr. Wiens's example, there wasn't

21   that option.  But the tools have to be created in a

22   way that would make access to it.

23             All of the software that my members are

24   making now, we're doing a lot of products that are

25   essentially by the sip, right?  You right-size your

LOC_AR_00005654

1    product.  You right-size the price of your product.

2              If the TPMs can be violated, and tools are

3    widely available that allow that to be broken through,

4    then of course the other modifications that can be

5    made are, "Well, I don't want to pay for 200 licenses.

6    I'll buy one for one license and I'll use TPM-breaking

7    tools to increase that number to 99."

8              Our entire app ecosystem business model

9    essentially exists on these concepts of right-sizing

10   an in-app purchase, a purchase that you make to get

11   exactly what you want and not pay more for it.  The

12   TPMs that are in place, as he noted, for safety and

13   security also secure the framework that allow for the

14   appropriate licensing and right-sizing of the

15   products.

16             I think the one other comment that goes

17   along with it, though, on the comment we just heard

18   about the daughterboard and where the technology

19   exists, is valid, but at its core, she's essentially

20   saying, "Hey, guys, you need to rewrite your software.

21   If you're not doing it this way, then you as an

22   industry need to change the way you behave."

23             And I don't think that meets the test that

24   the Copyright Office is setting.  Those of us who are

25   writing the products should not be forced to modify

Heritage Reporting Corporation
(202) 628-4888

LOC_AR_00005655

1    our software to meet this change that they want.  So

2    the fact that in some cases the connection is on the

3    daughterboard or on the physical device may be

4    something that software refers to when checking other

5    things.

6         So the request here is not just, "We'd like

7    to hack it ourselves."  Her point was, "Well, you can

8    make this real easy change to your software, and if

9    you do that, then there won't be a problem."  That's a

10   bar that the Copyright Office shouldn't be making,

11   shouldn't be telling us to change our software in

12   order to accommodate someone else's ability to break

13   into it.

14        MS. SMITH:  Can I ask you, while I have you,

15   so the way we've structured the current vehicle

16   exemption does not extend to TPMs protecting

17   subscription services, and you could see sort of a

18   similar description of --

19        MR. REED:  Yep.

20        MS. SMITH:  -- you know, exceeding terms of

21   use, and some of the issues you're talking to.  Is

22   that a helpful way we can think about these internet

23   of things software-embedded devices?  Or is there a

24   technological reason to suspect that enabling repair

25   to the --

LOC_AR_00005656

759

1          MR. REED:  Right.

2          MS. SMITH:  -- original state is --

3          MR. REED:  It's a great question.

4          MS. SMITH:  -- going to somehow -- yeah, go

5     ahead.

6          MR. REED:  Yeah, so I'll give an example.

7     One of the problems that we're running into right now

8     is -- and this gets into TPMs -- is we can't actually

9     avoid piracy by giving our products away for free.

10          So to your question about can you isolate it

11    into these camps because, well, a TPM that's strictly

12    for this use is bad, we're actually seeing a situation

13    right now where software is developed and distributed

14    for free, ad-supported, where the TPMs are being

15    broken, and then that software is being hijacked and

16    an additional ad network is placed underneath it.

17          So literally, I give my software away for

18    free, and it is being pirated and an additional ad

19    network is being installed underneath it.  So your

20    point about well, can we isolate it into a copyright

21    infringing use, that's an example that violates my

22    copyright, but it's not one that has to do with how

23    much I'm charging or where I'm doing it.

24          I'm literally giving my software away for

25    free, and people are still going to break it and use

LOC_AR_00005657

760

1    it in a way that disadvantages me.  So I think to your

2    point, I think that obviously what you've done so far

3    has worked, but I would be very concerned about any

4    expansion of that across multiple sectors, because I

5    think it's hard to keep that from breaking into

6    harmful uses.

7            MS. SMITH:  Okay.  Thank you, Mr. Reed.

8            So, Ms. Gagliano, I think you've had your

9    hand up for a while, so whatever -- okay, thank you.

10   If you would like to comment on what you had your hand

11   raised for as well as particular -- how the Office can

12   think about modification as a lawful use across these

13   devices, and maybe address some of the comments raised

14   about distinguishing between lawful modification on

15   the one hand, and the derivative right on the other.

16           MS. GAGLIANO:  Yeah.  So I think in

17   particular, responding to what we've been hearing a

18   lot of from opponents about how "look, if you let

19   people get past these TPMs, they're going to

20   infringe," infringement is going to happen, even if

21   that means having to bypass another TPM, which the

22   exemption would not permit, even if that means having

23   to go another step and do the exemption for purposes

24   that the TPM does not permit.  I don't think it is

25   appropriate for the Office to consider in deciding is

LOC_AR_00005658

761

1    this an appropriate exemption to consider whether

2    people will then break the law and actually go beyond

3    the scope of that exemption.

4         I mean, you could have said the exact same

5    thing about the security research exemption, and I

6    think many opponents did.  The security research

7    exemption applies even to video game consoles, to DVD

8    and Blu-Ray players.  We haven't heard anything from

9    opponents about increased infringement since 2018

10   attributable to granting that exemption.

11        So when people are using these exemptions,

12   it is to do the -- make the non-infringing uses that

13   were being adversely affected.  And the fact that

14   someone might go further and try to say, "Well, this

15   exemption protected part of what I did" isn't really

16   relevant.  It's still assuming that someone is going

17   to violate 1201 either way.

18        And in terms of the concern that someone

19   would -- that a possible modification of the firmware

20   would be to make the device changed in a way that

21   would enable piracy, one simple tweak to our language

22   that would get maybe more at what we actually had in

23   mind is saying, for -- it would be circumvention not

24   only for purpose of non-infringing modification, in

25   which case we mean the actual creation of the

LOC_AR_00005659

1    modification would be non-infringing, but it could

2    also be for a non-infringing purpose.

3           So the exemption doesn't have to cover

4    modifications that would be for the purpose of

5    enabling piracy, getting access to other copyrighted

6    works.  But either way, the exemption is not giving

7    anyone permission to circumvent TPMs on any work other

8    than software.  It's not giving permission to

9    circumvent TPMs for the purpose of infringement.

10           And we have heard the same argument in every

11    rulemaking cycle against many of the exemptions that

12    have already been granted, like all the jail-breaking

13    exemptions, the past exemptions for vehicles.  Last

14    year, it was the exemption for repair of certain

15    consumer devices and home appliances.  Every time,

16    opponents say, "This is going to make everyone

17    infringe."  There's still absolutely no evidence of

18    that, and I think the absence of that evidence --

19           MS. SMITH:  Okay.

20           MS. GAGLIANO:  -- is a form of evidence

21    itself.

22           MS. SMITH:  Thank you.

23           I'm going to try to just keep our comments a

24    little bit shorter if we can going forward, to make

25    sure we have time to get through everything.

Heritage Reporting Corporation
(202) 628-4888

1           Ms. Sheehan, did you want to speak to the

2     question of lawful modification?  I know the Office

3     has had some hesitancy in the past to conclude that

4     that's the right defining phrase for that, with level

5     of specificity.  We would welcome your thoughts.

6           MS. SHEEHAN:  Absolutely.  Do you mind if I

7     also address a couple of your earlier questions?  So

8     I'll start with your first question about the

9     causation issue, your question about whether there are

10    TPMs in every software-enabled device, and to the

11    extent that those obstruct repair.

12          And I would say that if there's not a TPM in

13    a device, it's not part of this conversation about the

14    exemption.  So the scope of the exemption is only for

15    circumvention of TPMs that exist in a software-enabled

16    device and that obstruct repair.  Right?  So the fact

17    that some devices might not have TPMs, the fact that

18    those devices exist, doesn't obviate the need for

19    circumvention where TPMs do obstruct repair.  So,

20    first question.

21          Second, I'd like to address what some of the

22    other panelists have talked about in terms of devices

23    that play back A/V or expressive content, and I'll say

24    that as Ms. Gagliano very correctly identified, that

25    the subject of this exemption is the software.  It's

LOC_AR_00005661

1    the embedded software in the device.  It is the

2    firmware.  It is not the copy controls on the content,

3    and it is not the TPMs that protect that content from

4    infringement.

5           Furthermore, repair of devices that play

6    lawfully acquired copies of expressive content

7    increases the accessibility to both the functionality

8    of the software and the lawful performance of those

9    lawfully acquired works.  And the only purpose for the

10   circumvention that is acknowledged and permitted

11   within the exemption is for repair.

12          So an exemption like this, as Ms. Burke, as

13   Ms. Gagliano said, would not authorize circumvention

14   for the purposes of piracy, so on and so forth.  And I

15   think the Office itself has acknowledged that in the

16   2018 Recommendation when it addressed expressive

17   content on vehicle infotainment and telematics

18   systems.

19          And so the concerns about piracy in those

20   contexts related primarily to abuses of circumvention

21   that are outside the scope of the proposed exemption,

22   and I'd say that's true here as well.

23          In terms of alternatives, Mr. Williams

24   raised the specter of alternatives to circumvention,

25   and I'll say that the existence of alternatives to

1    circumvention is not fatal to prior exemptions and

2    shouldn't be fatal here.  The Office granted the

3    motorized land vehicle exemption despite the existence

4    of other alternatives, and we know that those

5    alternatives often prove inadequate.  That's fully

6    documented in our record.

7        But I'll also state that in *Chamberlain*, the

8    Federal Circuit decided that section 1201 did not

9    grant copyright holders another exclusive right.  It

10   only protected the exclusive rights that they already

11   had under 106.  And so section 1201 does not give

12   copyright holders the right to control the market for

13   repair services, and the right to require that you use

14   their own branded repair services.

15       To deny an exemption on the basis of the

16   existence of those manufacturer-branded alternatives

17   would be to grant a new right, would be a grant of new

18   right to exercise anti-competitive practices and

19   control an entire market.

20       Moving on to the question of --

21       MS. SMITH:  Can I ask you, just on that one

22   --

23       MS. SHEEHAN:  Yeah.

24       MS. SMITH:  Just on that one point before we

25   get to modification, do you think it's relevant

LOC_AR_00005663

1    whether there's an additional charge or terms or

2    something connected to repair, or whether it's sort of

3    open in terms of the purchase for the initial license?

4            MS. SHEEHAN:  I don't understand your

5    question.  Do you mind rephrasing?

6            MS. SMITH:  Well, I guess you've expressed

7    concern about a branded repair market, and I guess

8    we're looking at this through the 1201 lens and

9    whether there's an adverse effect created by TPMs. Did

10   you think it's relevant whether there's conditions

11   imposed upon the manufacturer-provided repair, or --

12           MS. SHEEHAN:  Absolutely.

13           MS. SMITH:  -- or it doesn't matter?

14           MS. SHEEHAN:  No, absolutely.  And I think

15   that goes to the kind of tangible, practical adverse

16   impact on users of software-enabled devices.  You

17   know, in our experience, we talk to repair shops,

18   we're kind of deep into the repair industry over at

19   iFixit and the Repair Association.

20           And our experience with manufacturer-branded

21   repair is that the types of repairs that they can

22   carry out are limited, meaning if I take a tractor to

23   the John Deere dealership, they can only do certain

24   repairs.  If I take my iPhone to an Apple-authorized

25   repair provider or an Apple IRP provider, they can

LOC_AR_00005664

1    only do simple, basic repairs before they either

2    encourage me to buy a new device or have to send it

3    back to Apple.

4         Some manufacturer-branded services may be

5    extremely costly, more expensive than an independent,

6    and in the medical device sector, it was found that

7    manufacturer-branded medical device repair could cost

8    30 to 50 percent more than an independent service

9    organization's repair.  It can also involve long

10    delays if you have to schedule or ship a product back

11    to a manufacturer, and in some circumstances, you

12    might not be able to get a repair at all.

13         So Kyle mentioned earlier our kind of

14    industrial premises control systems.  We are

15    completely outside of a service network for our

16    manufacturer on some of those systems, and so if we

17    were to depend on manufacturer-branded repair

18    services, we would be completely out of luck.

19         MS. SMITH:  Okay, thank you.

20         MS. SHEEHAN:  Is it okay if I address

21    modification?

22         MS. SMITH:  And modification.

23         MS. SHEEHAN:  Ok yeah.  So I just wanted to

24    say briefly, I think Ms. Gagliano addressed that

25    pretty well, extremely well, and I would just say that

LOC_AR_00005665

1    in *Sega v. Accolade*, the Court found that modification

2    of a software-enabled device is not infringing,

3    especially when it is a reasonable step to a

4    transformative use such as repair.

5              So when a modification is carried out for

6    the purposes of repair or for other non-infringing

7    uses, then it should also be understood as non-

8    infringing.

9              Can I say one --

10             MS. SMITH:  Okay.

11             MS. SHEEHAN:  -- more thing?  Just one more

12   quick -- I'll be quick, I promise.

13             MS. SMITH:  Extremely limited, because I do

14   see a lot of hands raised and we've got to move on.

15             MS. SHEEHAN:  Okay.

16             MS. SMITH:  Extremely quickly.

17             MS. SHEEHAN:  I just wanted to respond

18   really briefly to both Mr. Williams's and Mr. Reed's

19   comments about the necessity of TPMs to prevent

20   cheating, to protect privacy, or to protect safety and

21   emissions, and I would say that absolutely none of

22   those things are part of the Copyright Office's very

23   copyright-based inquiry on whether a 1201 exemption

24   should be granted.

25             And I'd actually be interested to know

Heritage Reporting Corporation
(202) 628-4888

1    whether the clients that Mr. Williams and Mr. Reed

2    represent are actually using 1201 to go after people

3    for cheating, or violating emissions controls, or

4    violating a user's privacy, because I'm unaware of any

5    cases like that.

6            MS. SMITH:  Okay, thank you.

7            Mr. McHargue?

8            MR. McHARGUE:  Well, thank you.  I just want

9    to remind people that I am a farmer.  I'm not an

10    attorney.  So this is a very interesting conversation

11    to me.  You know, on our farm, one of the things that

12    we're really concerned about -- someone mentioned the

13    use of tools.

14            And as our ag equipment gets more

15    complicated -- every day, it seems like -- there's an

16    increasing need to have users, or I'd say third-party

17    experts, develop a tool that can work on my tractor.

18    I know there's difficulties, in our area anyway, that

19    the dealerships or the authorized dealerships say they

20    will provide tools, but they're really not the tools

21    to the extent that we can come in and actually fix our

22    equipment back to actually operating state.  And so I

23    just wanted to say that that was one of the things

24    that we're concerned about in the ag sector.

25            The other thing is there was a conversation

LOC_AR_00005667

1    about modification that may not quite fit into this

2    category, but we're clear at American Farm Bureau that

3    if there's modification that involves environmental or

4    safety issues, I think we have to be very careful when

5    we start going down that route.  If we're talking

6    about things that we can improve potentially -- but we

7    have to be very careful when it gets into

8    environmental and safety issues.

9         MS. SMITH:  Thank you.  I appreciate your

10    thoughts.

11        So I think the next person who had their

12    hand raised is Mr. Ayers, but given our time, I'm also

13    going to shift some of the questioning to my

14    colleague, Mr. Amer, so that we can wrap up

15    modification discussion but segue into some of the

16    device-specific categories of the media players or the

17    video game consoles.

18        So, I don't know, Mr. Amer, if you wanted to

19    pose any additional questions, but I do think it is

20    Mr. Ayers's turn to respond.

21        MR. AMER:  Yes.  Well, actually, my first

22    question was going to be about DVD players anyway.

23        So maybe, Mr. Ayers, you could speak to

24    this.  So I wanted to sort of make sure I understand

25    what seems to be kind of a factual dispute,

LOC_AR_00005668

1    potentially, about what the TPMs protecting firmware

2    in DVD players controls access to.

3            So I know that the proponents have said that

4    their proposed exemption would apply only to software

5    that controls the operation of the device and would

6    not permit circumvention of separate TPMs that protect

7    access to the DRM-protected media.

8            Now, today, earlier on, you talked about, I

9    think, the cryptographic values that exist in DVD

10   players, and I think you said something about if those

11   are altered, that makes the device sort of a less

12   attractive platform for manufacturers.  Could you sort

13   of elaborate and explain a little more, explain sort

14   of what these cryptographic values protect and what

15   they don't protect?

16           MR. AYERS:  Sure.  Thank you.  So the

17   concept with content protection technology in consumer

18   electronics devices in the entertainment content space

19   is that the content owner and the device manufacturer

20   are both engaged in an ecosystem where the content

21   owner is sufficiently trustful, finds the target

22   device sufficiently trustworthy, that the content

23   owner will release its high-value content in the

24   format played by that device.

25           In the context of movies on optical disk,

LOC_AR_00005669

1    that includes authoring and manufacturing the movie

2    and the disk with certain cryptographic values that

3    are used to encrypt the movie.  Corresponding

4    cryptographic values such as device keys are embedded

5    in the device by the manufacturer during the

6    manufacturing process that are then used to decrypt

7    the content on those disks.

8             So you put the disk in the machine.  The

9    machine has decryption keys that allow it to decrypt

10   the content on the disk that has been encrypted with

11   the encryption keys.  So this provides a benefit for

12   consumers, as has been mentioned in other hearings.

13   DVD was one of the most successful consumer

14   electronics products in history, in the history of

15   consumer products, and it certainly laid the

16   groundwork for commercial success for multiple

17   industries since then.

18             But to the extent that those devices become

19   compromised and are no longer able to be trusted, it

20   presents a problem for the content owners in investing

21   a ton of money in very high-value content such that

22   it's no longer as good an investment, because the

23   content is less secure.

24             And certainly folks might look at, "Well,

25   they're movie studios.  They have a lot of money

LOC_AR_00005670

1    anyway."  And I think the idea here is look, these are

2    investments of significant resources both on the

3    device side and on the content side to make sure that

4    this all works together, so that the end result is an

5    extremely attractive proposition for the consumer.

6    And so to the extent that this compromises it, we have

7    less of an attractive setting.

8            And just a quick follow up on an earlier

9    comment.

10            MR. AMER:  Well could I just follow up on

11    that --

12            MR. AYERS:  Sure.

13            MR. AMER:  -- first, though?  So are you

14    saying that if someone were to circumvent TPMs

15    protecting the firmware on a DVD player, that would

16    necessarily expose these cryptographic keys you're

17    talking about, and it would therefore allow people to

18    play unauthorized DVDs?

19            MR. AYERS:  That's essentially the concern.

20    I mean, the exact way that each device manufacturer

21    implements the storage of the applicable cryptographic

22    values is somewhat flexible to allow for the realities

23    of device manufacturing in different contexts, but

24    that's the essential concern.

25            And in that case, what you've done is when

LOC_AR_00005671

1    the key is exposed, you're no longer looking at

2    onesie-twosie situation where you may be compromising

3    a movie at a time, which is itself not desirable at

4    all, but because it's a decryption key that could

5    decrypt any DVD or any Blu-Ray disk, it potentially

6    endangers the entire ecosystem, because now you've

7    enabled a circumvention tool for the high-value

8    entertainment content.

9            MR. AMER:  Okay.

10           Ms. Burke, could you respond to that?

11           MS. BURKE:  Yes.  It's our understanding

12   that the limited request that we've asked for, which

13   is the exemption to unlock an optical drive, replace

14   it, and then relock that pairing, would not cause that

15   kind of decryption of what protects the Blu-rays and

16   the DVDs at question here.

17           Rather, I think it's important to note that

18   this TPM that locks and pairs an optical drive to the

19   rest of the video game console is unique to these

20   optical-drive-driven video game consoles.  Other

21   devices that have optical drives don't necessarily

22   have these same locks.  So if you wanted to replace

23   your optical drive in your computer, you could go get

24   a new optical drive, put it in your computer, and plug

25   it in, and change it out pretty simply, without having

LOC_AR_00005672

1    to circumvent this kind of TPM.

2            So these optical drives, being able to

3    change them out doesn't really implicate the same

4    concerns when it comes to that type of a situation,

5    with being able to change out your optical drive.  So

6    what makes a video game console so unique?  It's our

7    understanding that these TPMs that are protecting the

8    optical drive don't actually protect the content that

9    could be played on an optical drive.  Rather, it just

10   protects this particular pairing.

11           And so the TPMs that need to be circumvented

12   here they're really just protecting or preventing

13   people from being able to repair an optical drive,

14   which is a harm to consumers, because optical drives

15   are the most frequent thing to fail in a video game

16   console.  Replacing one is fairly cheap, as opposed to

17   having to purchase a whole new device.

18           And so it's our understanding that these

19   TPMs really aren't protecting content so much as they

20   are preventing these types of repairs which consumers

21   have a right to do.  When you own a device, you should

22   be able to repair it, and copyright should not be a

23   tool that prevents you from being able to do that.

24   It's not intuitive, and it doesn't make sense with

25   regard to what copyright is intended to protect.

LOC_AR_00005673

1           MR. AMER:  Okay, thank you.

2           I think, Mr. Cheney, do you have a question?

3           MR. CHENEY:  Thank you.  I think this has

4    been a helpful discussion, and I think it's been

5    helpful for me to hear this a little bit on these game

6    systems and DVD players.

7           For example, one of the questions I had with

8    these cryptographic values that potentially are

9    exposed or may be misused, can you describe what that

10   might be like in the sort of repair that has just been

11   described?

12          I think, Mr. Ayers, you may have the best

13   answer here.  Are they allowed to be copied and

14   reproduced?  I mean, what is the possible path to

15   piracy here if they are, indeed, exposed in this

16   repair?  Is it on the device itself, or is it

17   something that would be a broader piracy possibility?

18          Can you describe that a little bit more?

19   Because I'm not sure I'm getting where that value gets

20   exposed here.  Can you help me out here?  Thanks.

21          MR. AYERS:  Yes, thank you.  So it is in the

22   broader context that we're most concerned about this.

23   So when the device key, we'll call it, is extracted,

24   is exposed and extracted from a particular device,

25   that key can then be incorporated into, for instance,

LOC_AR_00005674

1    a software circumvention tool, and that is essentially

2    how various of the current unauthorized circumvention

3    tools operate today.

4            They use stolen keys that have been taken

5    out of otherwise legitimate products, and then those

6    device keys are incorporated into a circumvention

7    tool, usually a software product.  That then we're now

8    not talking about one device being able to play back

9    any movie that it wants to, which it was already able

10    to do because it had a device key in it in the first

11    place, but it's now enabling a whole market full of

12    circumvention tools in the form of software that

13    provides a much bigger avenue for piracy than might

14    have been possible with that single device.

15            MR. CHENEY:  Thank you, Mr. Ayers.

16            Does anyone else have some input on that

17    particular question?  And particularly, does this

18    repair on those players expose those cryptographic

19    keys?  And I understand potentially how it might get

20    out there, but if that can help direct the question.

21    Thanks.

22            Mr. Reed, I think I see your hand, if that's

23    okay.

24            MR. REED:  Yeah.  I'll just add this.  So

25    while everyone was talking, I just put into my Google

LOC_AR_00005675

1    search engine "hack my Xbox drive."  Here's the one

2    that comes up first: "Flash the light on disk drive

3    used by some Xbox consoles for hacking.  If you're

4    tired of paying $60 for a new Xbox game or waiting

5    years for them to get cheaper, you should probably mod

6    your system."

7            That's literally the first thing that comes

8    up, and it goes through and has a video of how you

9    actually flash the drive by installing a different DVD

10   player into your box, and flash the drive to allow you

11   to play disks that violate the copyright.

12           So at the core of your question, "Is this a

13   vector by which people can use it," well, literally

14   that's the first thing that comes up on your Google

15   search when you put in "hack your Xbox drive."  So

16   whether or not we can talk about which case law

17   applies, the search engine bar will tell you how

18   quickly and easily it's there and why that is a

19   primary vector.

20           So you know, in this case, Google is your

21   friend.  Find the answer, hack your drive, flash it,

22   and run disks that you want to play for less than 60

23   bucks.  It's right there.  First output.

24           MR. AMER:  Okay.

25           So we have lots of hands up.  So I'm going

LOC_AR_00005676

1    to try to get to everybody, and I would ask everybody

2    to just be relatively brief.

3           Mr. Wiens, maybe you could go next.

4           MR. WIENS:  Sure.  I would encourage Mr.

5    Reed to go ahead and give that site $60, and then

6    they're going to sell your credit card number on the

7    black net.  It's a scam.  There isn't such a hack.

8           There are a lot of wonderful sites that will

9    like trick you and make you think that they will help

10   you hack your Xbox.  They will happily take your

11   credit card number and then not help you hack your

12   Xbox.  The Xbox One, the PlayStation 4, PlayStation 5

13   haven't been cracked, so that's a non-issue.

14          I think that if you think about this in the

15   context of what you can do with a P.C., a Blu-ray

16   drive on a P.C., we have the ability to do the work on

17   those.  It's not implicating or creating any

18   challenges.

19          You know, those encryption keys are on the

20   drive.  They're fine.  That's not what we want to

21   access.  All we want to be able to do is restore the

22   device back to functionality.  And I would note that

23   functionality -- from my perspective, the device isn't

24   repaired unless the copy protection is restored.  Like

25   we don't want to remove the copy protection.  We want

LOC_AR_00005677

1    to get the device working exactly as it did from the

2    factory.

3         So when these devices are provisioned in the

4    factory, in the Xbox or the PlayStation factory, they

5    take an off-the-shelf drive, install it in the

6    machine.  They run a software tool that pairs that

7    optical drive to the machine.  That's all that we want

8    to do, is just do that pairing.  You know, I think

9    that this has gotten more complicated than it really

10   is.  We just want to fix the thing.

11        MR. AMER:  Okay.

12        Mr. Inacker, I think you've been waiting.

13        MR. INACKER:  Thank you.  Similar to Mr.

14   McHargue, I am not a lawyer, and I have found this

15   conversation very, very interesting.  But talk about

16   Xboxes and DVDs and everything else is very

17   interesting, but we are all consumers of health care.

18        Our businesses that we have within Avante

19   Health Solutions -- we repair vital medical equipment,

20   and we do it as independent service organizations.

21   And as all of us as consumers of health care, it

22   should be of great value for you to understand that we

23   do it much more responsibly, much more safely, and, in

24   many cases, much, much more cost effectively than the

25   original equipment manufacturers do.

LOC_AR_00005678

1          Yet they have put restrictions in place

2    through these TPMs to prevent us from being able to

3    service it.  No different than your automobile, no

4    different than your agriculture equipment.  We need to

5    have the right to repair the equipment for our

6    customers and have access to do so on a readily

7    available basis.

8          This is a patient safety issue.  When we

9    can't get access to the equipment that we need to

10   service, patients wait.  When an MRI is down, or a

11   C.T. is down, or a cath lab is down, or a piece of

12   diagnostic equipment is not working, patients have to

13   wait, and that harms their care.

14          MR. AMER:  I just want to --

15          MR. INACKER:  Vital issue for our industry.

16          MR. AMER:  I appreciate it.  I want to stop

17   you there because I wanted to ask about DVDs and video

18   game consoles.  We're going to get to medical devices

19   in just a little bit.  So hold that thought, if you

20   would.

21          Let's go to Mr. Williams.

22          MR. WILLIAMS:  Thank you very much.  A lot's

23   been said, but I'll try to stay brief.  So the video

24   game consoles, as Mr. Ayers mentioned, have some of

25   the same concerns with respect to keys, because they

LOC_AR_00005679

1    play disks with motion pictures on them.  But they

2    also have the concerns that you've identified in

3    previous proceedings related to either installing and

4    playing illegal copies of games or using illegal

5    disks, and I appreciate Mr. Reed's comments on that.

6         You know, one difficulty from the comments

7    that we have is that there's no real specifics about

8    the procedures that they say they can implement to

9    repair or replace the optical drives.  They seem to

10   lay out two scenarios.  One is using an application of

11   some sort to flash the device, and one is a more

12   manual procedure.

13        Going back to, I believe, all the way to

14   2012, the Office has concluded that there has not been

15   evidence that you cannot replace or repair an optical

16   drive without circumvention, and so depending on the

17   different approaches that they take, there may be

18   alternatives to circumvention here.

19        The other issue is they say that they will

20   restore all of the functionality of the TPMs, but

21   there's no explanation of exactly how that's going to

22   happen either, and my understanding is that this is of

23   concern to the console manufacturers, not only whether

24   they can actually restore the functionality to its

25   original state, but also that the use of an

LOC_AR_00005680

1    application to open up the system for the purpose of

2    replacing or repairing the optical disk drive could

3    lead to the use of unauthorized applications or disks.

4            Just very quickly, Ms. Sheehan asked about

5    cases where the industries have pursued issues under

6    1201.  I think you know there are quite a number, but

7    in the video game space two of the biggest names are

8    the *MDY* case and *Davidson v. Jung.*  They go all the

9    way to the appellate level.  And so 1201 has been

10   enforced, including by the Department of Justice, and

11   there's a case in our comments on that.

12           MR. AMER:  Let me just jump in.

13           MR. WILLIAMS:  The harm to consumers here is

14   not from the manufacturers.

15           MR. AMER:  Mr. Williams, could I just jump

16   in?  Could I just jump in?  Because I wanted to ask

17   about something you said earlier.  Because there does

18   seem to be, again, this factual question about

19   restoring the TPMs.

20           So I believe it was Public Knowledge's reply

21   comments that said a video game console will only

22   function if the two portions of the console unlocked

23   by repair, the motherboard and the optical drive, are

24   relocked.  Is there any dispute about that?  They seem

25   to be saying that in order for a repaired video game

LOC_AR_00005681

784

1    console, at least with respect to the optical drive,

2    to work at all going forward, you have to restore the

3    TPMs.  Do you have any information on that?

4              MR. WILLIAMS:  So to my understanding, it

5    may depend on what your definition of "function" is.

6    If you want to restore it to full functionality, to

7    where it is capable of interacting with authentication

8    servers, et cetera, that may be true.

9              Without repairing those TPMs, whether you

10   could still play offline infringing games, I think's a

11   different question.  If you gave me a post-hearing

12   letter on that, I could probably give you more

13   specifics, and it may be different from console to

14   console, the exact answer.  But that's my

15   understanding.

16             MR. AMER:  Okay.

17             Ms. Gagliano, I think you've been waiting.

18             MS. GAGLIANO:  Yeah.  I just wanted to

19   respond to a point Mr. Ayers was making about the DVD

20   and Blu-ray context, saying that even if the exemption

21   itself doesn't permit piracy within its scope, that

22   the movie studies, the content providers just knowing

23   that people are allowed to circumvent the TPM, and

24   that that would make the system less secure, would be

25   less willing to license their content for release on

LOC_AR_00005682

1  DVD and Blu-ray, which is a little confusing to me,

2  because I think we all know DVD CCA and AACS LA even

3  brought up in their opposition comments DeCSS, the

4  still widely available program for decrypting DVDs.

5      And since at least 2007, the decryption keys

6  for Blu-Ray encryption have also been out there widely

7  publicly available, you know.  It may be not be legal

8  to distribute and use these, but it also would not be

9  legal to be bypassing the content protection TPMs

10  under the proposed exemption.

11      And I have not seen or heard any evidence

12  that since those keys have become publicly available

13  through various means that there actually has been any

14  decrease in content providers' willingness to license

15  their works for release on DVD and Blu-ray.  So I just

16  don't think that point really seems to hold up based

17  on what we know from the real world.

18      MR. AMER:  Mr. Ayers, do you have a

19  response?

20      MR. AYERS:  Thank you very much.  And

21  actually, part of why I had my hand up was to address

22  the earlier comment that was made, that there's no

23  evidence of increased piracy.  Just I would note that

24  specifically in the game console space, one of the

25  most popular platforms for the playback of

LOC_AR_00005683

1    unauthorized content is an application that's a direct

2    descendant of early efforts to hack and modify the

3    Xbox console.

4         And similar to the Google search we were

5    introduced to a little earlier in the conversation, a

6    similar search regarding this product will yield the

7    result that yes, the distribution of the playback

8    platform itself is -- we'll make comments about not

9    pirating content.  However, every single reference you

10   find in association with that platform in a Google

11   search talks about getting free movies and T.V.  And

12   so we see the technical compliance effort versus the

13   real world in that case.

14        And to address the more recent comment about

15   what action has been taken, actually, action has been

16   taken.  And while certainly my clients are not ones to

17   seek the limelight and do perp walks, for instance, in

18   cases like this, there are certainly efforts that are

19   taken.  A successful content protection effort

20   involves technical elements as well as legal elements,

21   and my clients have pursued both in a number of cases.

22        And then to look at the content industry as

23   "because it still continues to release Blu-rays as

24   therefore it must not be a problem," I think is a

25   gross oversimplification of how the market works in

LOC_AR_00005684

1    this case, and the realities of content distribution.

2              MR. AMER:  Mr. Wiens?

3              MR. WIENS:  I just wanted to make myself

4    available if you have additional technical questions

5    on like where the encryption keys are stored and how

6    that works.

7              MR. AMER:  Well, do you have any information

8    that you could offer on this question of the need to

9    relock video game consoles if you're repairing the

10   optical drive?

11             MR. WIENS:  Yeah, the game console would not

12   work to play off-the-shelf games unless you restore

13   the TPM, unless you restore its ability to have those

14   keys and to have that communication, right?  Because

15   if I buy Call of Duty, it's encrypted.  So that's all

16   we want to do, is keep it in place.

17             And I think that the point that the Blu-ray

18   keys have already been leaked is poignant, because

19   we're talking about not allowing people to get in and

20   access something.  Well, that secret is already out

21   there.  The criminals are doing the criminal activity.

22   What we're saying is we just want to be able to do the

23   legal activity.

24             And I would say like the market harm here is

25   real.  I have an entire shelf full of about a hundred

LOC_AR_00005685

1    PS4 optical drives and main boards, and we have to

2    sell those together.  So I have to take main board and

3    an optical drive, sell it as an expensive part.  We

4    are completely supply constrained.  The number of

5    people out there that can fix their game consoles is

6    completely limited to the number of game consoles that

7    end up at recyclers.

8         Then those two pieces together both work,

9    and we can get out there.  So it's like there are

10   maybe hundreds of people a quarter that can fix their

11   own game consoles when, in the market, there are

12   millions of people that potentially have these

13   problems.  So this is a very real and kind of dire

14   problem.  Every time I talk with a repair

15   professional, I mention the game console thing.  They

16   just get sad.

17        MR. AMER:  Okay.  Thank you.

18        Let's go to Ms. Sheehan and Ms. Burke

19   quickly, and then I think we'll move to another

20   question.

21        MS. SHEEHAN:  I just wanted to endorse what

22   Ms. Gagliano and Mr. Wiens had said.  On one side of

23   the scale, it's a little bit late for hand-wringing

24   over access to decryption keys, as Ms. Gagliano and

25   Mr. Wiens said.  The horse is kind of out the barn

LOC_AR_00005686

789

1    door with that.  They're widely available.  And

2    restricting people from being able to repair their

3    consoles isn't going to protect them any more.

4           I think one thing to note, to recognize

5    there, is that people who are going to infringe

6    copyright deliberately or who are going to hack their

7    consoles in order to infringe copyright are already

8    doing that.  They're not waiting for a 1201 repair

9    exemption to be able to do that.

10          The lack of a repair exemption to 1201 only

11    really impacts people who are interested in doing the

12    lawful activity of repair.  And in this case, we're

13    talking about really just replacing an optical drive

14    on a machine where the optical drive is broken, and

15    then reenabling the TPM protection there.  So we just

16    want to fix our consoles.

17          And as I mentioned before, we talk to repair

18    shops all around the country and all around the world,

19    and we talk to folks who specialize in video game

20    repair, and they tell us that they have storage rooms

21    full of hundreds of consoles that they've been unable

22    to fix for their customers, because without the

23    ability to replace a broken optical drive on its own,

24    the repairs are too costly, too risky, and the parts

25    are too hard to find.

LOC_AR_00005687

1          MR. AMER:  Thank you.

2          Ms. Burke?

3          MS. BURKE:  Yeah.  I just wanted to echo

4     what Ms. Sheehan and Mr. Wiens and Ms. Gagliano have

5     said here today.  What's interesting here is that the

6     conversation that Mr. Reed had earlier about people

7     pirating games even that they had given away for free,

8     and the wide availability of these decryption keys,

9     kind of demonstrates that these locks aren't

10    preventing pirates from pirating.  They're not

11    preserving the copyright of these creative works.

12         What they are actually doing is they are

13    preventing law-abiding citizens who want to do law-

14    abiding things such as repair their devices.  And so I

15    think like that's particularly relevant when looking

16    at this exemption request, that what we're asking for

17    is an exemption for a limited purpose, to perform a

18    repair.  We are not asking for an exemption to pirate

19    content.

20         And the underlying work that is being

21    protected by this TPM, it isn't the movies on the Blu-

22    rays or the DVDs, or even on the video game disks.

23    It's the software, the firmware that is controlling

24    this lock itself.  So I think that's also particularly

25    relevant here when we're talking about like what

Heritage Reporting Corporation
(202) 628-4888

1    copyright work is actually being protected here with

2    this lock on the optical drive to the motherboard.

3           So there's just this over -- the concerns

4    about piracy here feel more like fearmongering as

5    opposed to actual realities of what is at stake.

6           MR. AMER:  Okay.  So thank you.

7           That raises an issue that I wanted to follow

8    up on quickly, and then I think we'll move to the next

9    topic, and it's this idea of sort of the relevance of

10   what the purpose of the circumvention is, and I'm

11   interested in particularly the opponents' response to

12   this.

13          So I mean one argument that I think we've

14   heard today from the proponents is that the existing

15   temporary exemptions, for example, for security

16   research and jail-breaking, and also the permanent

17   exemptions for things like security testing and

18   encryption research, all refer to the purpose of the

19   circumvention, right?

20          They turn on whether the circumvention is

21   undertaken for an accepted purpose.  So you know,

22   certainly with the vehicle repair portion of this

23   exemption, we've included language that tries to state

24   clearly that the circumvention may not be undertaken

25   for the purpose of gaining access to other types of

LOC_AR_00005689

1    works.

2         I wonder if that approach -- the opponents

3    seem to be saying that approach is not sufficient here

4    and that DVD players and video game consoles are sort

5    of an entirely separate category.

6         But I wonder if you could speak to this

7    question of well they certainly aren't immune from the

8    statutory exemptions that already exist, which are

9    based on the purpose of the activity.  So I wonder if

10   you could speak to that apparent discrepancy, Mr.

11   Williams?

12        MR. WILLIAMS:  Yeah, thank you.  And I'll

13   just say quickly, some of the comments made it sound

14   like video game consoles can't be repaired at all,

15   ever, and that's just not true.  If you take a look at

16   our comments, you'll see that there is still warranty

17   repair and post-warranty repair available for

18   consoles.

19        On this question of the limiting language

20   that you mentioned, I mean, of course, that language

21   is helpful to an extent, and we prefer exemptions that

22   have it, but it doesn't really solve the problem.  And

23   I think if you look back at the records on video game

24   consoles specifically, there's been a lot of evidence

25   that jail-breaking a console almost inevitably leads

LOC_AR_00005690

1    to piracy, that infringement is the number-one reason

2    to open up a console.

3          And so just saying in an exemption that it

4    doesn't apply unless -- as long as they -- no one

5    intends at the time to access content illegally,

6    that's very difficult to police, number one.  And

7    number two, there's all kinds of questions about

8    timing.  So when you put that language in there if

9    someone makes a repair, say, and then a year later

10   they start using it for infringement, how does that

11   work?

12         So the language, while helpful, while I

13   appreciate your efforts to try to rein in some of

14   these exemptions, it really doesn't address our

15   overall big picture concerns that the 1201 statute

16   really sets a marketplace expectation for typical

17   consumers.  And when you alter that underlying

18   marketplace expectation, bad things tend to happen,

19   even if you've got language of that sort in the

20   exemption itself.

21         MR. AMER:  Okay, thank you.

22         I want to, Mr. Ayers, give you a chance to

23   respond, too, and then I do, just in the interest of

24   time, want to move to the next topic.

25         I think we've had some comments on this

LOC_AR_00005691

1    point before, so I think we'd like to wrap it up after

2    -- oh, Mr. Ayers, did you no longer --

3            MR. AYERS:  No, I'm sorry.  I was just

4    removing my hand just in -- it's still up.

5            MR. AMER:  Okay.

6            MR. AYERS:  It's still up.  Sorry.

7            MR. AMER:  So let's go to you, and then

8    we'll go to the next topic.

9            MR. AYERS:  Thank you, and I'll be very

10   brief.  Just to note that, again, limitations are

11   better than no limitations in this context, and

12   certainly, if there's an inclination to grant the

13   request, properly bounding them is important.

14           But I would note that, again, we've got

15   multiple situations where the word "repair" has been

16   used in relation to activities which are arguably

17   modifications or expanding the functionality of

18   devices.

19           Also a little bit concerned about restoring

20   a device to its original condition.  Does that include

21   if the device had a revoked device key because it's

22   been inappropriately used?  Does that mean restoring

23   that device with an unauthorized device key that's

24   been retrieved from another source?

25           And again, to note that the difference

LOC_AR_00005692

1    between other contexts and the optical disk drive

2    context here is that we've already seen, for years

3    now, the proliferation of piracy that occurs.  And

4    again, noting specifically in the game console space

5    that the most used and popular platform today for

6    playing unauthorized content is a direct result of

7    original efforts to hack and modify the Xbox.

8              MR. AMER:  Thank you.

9              And I see that we do have a couple of other

10   hands up, and so you can potentially incorporate your

11   answers here into the next questions, but I'd like to

12   turn it over to my colleague Mr. Bartelt to ask about

13   some other types of devices.

14             MR. BARTELT:  Thanks.

15             Hi, everyone.  Following up on some of what

16   Ms. Smith alluded earlier about questions concerning

17   causation, in the 2018 rulemaking there were some

18   device types that, in the recommendation that the

19   Office issued or the acting register issued, we had

20   found out there was an insufficient causal link.

21             So I wanted to probe a little bit about

22   maybe what's changed since the 2018 rulemaking and see

23   if there's an additional record supporting the

24   causation that relates to these devices.

25             The first one I'd mention is a category that

LOC_AR_00005693

796

1     we refer to as consumables.  There, we found that the

2     prohibition against circumvention -- it was not clear

3     from the record whether the prohibition against TPMs

4     was causing adverse effects on non-infringing

5     activities relating to replacement cartridges for ink,

6     coffee, litter boxes.  I think we had a few other

7     examples.  I believe this came up primarily in the EFF

8     submission.

9          So I'd like to first, I guess, direct my

10    question to Ms. Gagliano, whether there's the

11    additional record in this rulemaking that you can

12    point to that shows a causal link between the TPMs

13    inhibiting repair activities as it relates to these

14    devices that use consumables.

15          And then maybe after that, I can turn to

16    you, Ms. Burke, to see if you have additional

17    comments.

18          Ms. Gagliano?

19          MS. GAGLIANO:  Sure.  Yeah.  If you look at

20    our initial longform comment, I'd say that both the

21    CatGenie cat litter box example that you mentioned and

22    the printer example both go to consumables.

23          And you know, as opposed to last time my

24    understanding then was that the Office was not saying

25    so much, "Well, that's not enough examples," as it

Heritage Reporting Corporation
(202) 628-4888

1    was, "You didn't give us enough detail about what the

2    TPMs are, whether they actually are access controls,"

3    you know, "how the circumventions would work and," you

4    know, "what's the full fair use analysis, statutory

5    analysis?"

6              So this time we have given you all of that

7    in perhaps excruciating detail, so I think if you look

8    there, you'll see for both of those examples and for

9    printers it's not just one printer, but we discuss

10   multiple kinds, including H.P., I believe, also

11   Lexmark, and a couple others that are using TPMs.

12             And we discuss in more detail what those

13   TPMs are, how they are actually access controls, and

14   how 1201 adversely affects modifications that people

15   want to be able to make.

16             MR. BARTELT:  Thank you.

17             Ms. Burke?  I'm not sure if your comments

18   are specific to these causation issues, but --

19             MS. BURKE:  As far as to the changed

20   circumstances question, with -- well, first, as a

21   matter of just -- I know opposition replies to our

22   comments with regard to the video game console had

23   suggested that we should be barred from bringing such

24   a petition because it had been denied in the past.

25             And as a matter of course, I want to point

LOC_AR_00005695

1    out that there are no pseudo-standing kind of

2    threshold issues at play with regard to this 1201

3    hearing.  It's not in the statute.  It's not in the

4    legislative intent.  And so I just think, as a matter

5    of course that that's -- it just not in keeping with

6    what this hearing is about.

7         Congress intended for these reviews to

8    happen every three years because it understood that

9    technology changes quickly, and the context and

10   circumstances of our understanding of when an

11   exemption might be necessary could change with those

12   times.

13        Now, to the extent that it's something that

14   the Librarian would want to consider under the fifth

15   factor of the 1201 statutory analysis with regard to

16   video game consoles, there have been significant

17   changes since the 2018 review.  Most notably, one of

18   the reasons that the video game console exemption was

19   denied in 2018 was because of the availability of

20   official repair channels.

21        And I know that Mr. Williams had kind of

22   gotten into this a little bit, but the facts there

23   simply aren't true.  In 2019, Microsoft announced that

24   it was no longer going to repair devices that didn't

25   have in active production, and the Xbox 360, the Xbox

LOC_AR_00005696

1    One, the Xbox One X can no longer be repaired through

2    Microsoft.  So there are no official warranty repair

3    options or even outside of warranty repair options

4    with regard to many of these consoles, so consumers

5    have no choice but to either buy a completely new

6    console or to just throw it out, basically.

7          Then as far as like other things that have

8    changed, I think with regard to not just to video game

9    consoles, but with regard to all devices, when it

10   comes to the necessity of repair, over the last 13

11   months our understanding of global supply chains and

12   the availability of devices has definitely shown that

13   it's much more vulnerable than we could have possibly

14   believed before, not just from COVID but our

15   relationships with China when it comes to trade and

16   the recent incident in the Suez Canal demonstrates

17   that our ability to get devices, new devices, when we

18   need them and to get even official repair parts, et

19   cetera, can be significantly challenging.

20          And when there's a crisis at hand, it's

21   really important to be able to repair what we have,

22   given some of --

23          MR. BARTELT:  Okay.

24          MS. BURKE:  -- the increased concerns.

25          MR. BARTELT:  Sure.  Thank you, Ms. Burke.

LOC_AR_00005697

1          I do have a question for Mr. Wiens that also

2    sort of relates to this question of changed

3    circumstances and from 2018 where the -- in the

4    recommendation, the Office had found that for

5    computing peripherals, I think the instance that was

6    before us then was related to a hard drive that people

7    were trying to access, that it wasn't actually

8    inhibiting the ability to circumvent.

9          And I just was curious if there were any

10   examples that you could provide relating to computing

11   peripherals that would show that TPMs are, in fact,

12   inhibiting access or are effectively controlling

13   access to these types of devices.  The hard drive

14   would be, of course, one example.  But if you have

15   others, please provide those.

16          MR. WIENS:  Absolutely.  You know, you think

17   back over the last three years, it's hard to think

18   about what the world was like almost before 2020.

19   Like so much has changed, and so much has changed in

20   this sphere.  I like to say if something can't have

21   software added to it, it will.  And the kind of new

22   adage is if something can have a lithium battery in

23   it, then they're going to add a battery.

24          And so the whole world of gizmos have

25   consumables, have batteries.  I'll get to the

Heritage Reporting Corporation
(202) 628-4888

LOC_AR_00005698

1    peripheral question in a second, but an example of a

2    consumable that we haven't discussed before is robot

3    vacuums.  So the iRobot vacuums have batteries in

4    them.  The batteries have a TPM that ties the

5    manufacturer sort of branded batteries, and if you

6    install an after-market battery, the vacuum won't

7    recognize it.

8           And that's not just the case there.  I mean,

9    we see that -- Apple does this with the batteries in

10   the iPhone.  Increasingly, these battery consumables

11   are being tied to the device purely to monopolize

12   sales of after-market parts, just like we see in

13   inkjets.

14          You know, it's also interesting to think

15   about, like we all -- we do this every three years.

16   Man, it would sure be nice if this was more often than

17   every three years, because the technology world

18   changes so quickly.  I think we realized about a month

19   after the last kind of hearing that as we were talking

20   about all the things that we could repair, nobody

21   asked for an exemption for computers, for laptops.

22          And like all the computers and everything

23   that we're talking to now, we don't have a repair

24   exemption for them.  And we were all kind of shaking

25   our heads, like how did we not think about that?  And

LOC_AR_00005699

1    the answer is that historically, computers haven't had

2    TPMs.  You know, your bog-standard P.C. you can get

3    in.  You can access.  You can replace anything.

4         But what we're starting to see now is Apple

5    has taken the T2 security chip from iOS devices --

6    this is maybe the thing we have to jailbreak in iOS

7    devices -- and they've put it on their computers.  And

8    we're seeing more secure boot techniques across the

9    board in all kind of general purpose computers.

10        So where historically there wasn't a

11   circumvention needed to do service, now overwhelmingly

12   it is, and that's been a huge sea change in the last

13   three years.  There have been lots of other changes to

14   areas where -- go ahead.

15        MR. BARTELT:  Okay.  No, I was just going to

16   say, I was going to give Mr. Williams an opportunity

17   to respond, and then what we'll do after that is where

18   we're going to change -- as Ms. Smith mentioned

19   earlier, we're going to discuss medical devices.  I

20   believe we have some comments on that.  But we'll

21   focus a little bit more on that and then conclude with

22   discussing vehicles.

23        So, Mr. Williams?

24        MR. WILLIAMS:  Yes, thank you.  I wanted to

25   respond quickly to what Ms. Burke was saying.  If you

1    go to support.xbox.com, you'll see that the Xbox One

2    S, the Xbox One X, they're still being repaired by

3    Microsoft.  And we said in our comments their policy

4    is to continue repairing consoles up to four years

5    after they are no longer selling those consoles.  So

6    some of what was said is inaccurate with respect to

7    what Microsoft is currently offering with respect to

8    console repair.

9         All of the console manufacturers also have

10   pretty robust e-recycling efforts where people can,

11   for free, get their consoles recycled to avoid e-waste

12   and some of the other issues that were implicated

13   there.

14        On peripherals, I don't recall in the record

15   seeing anyone targeting video game consoles

16   peripherals, but you can see in some of the websites

17   that we provided that those peripherals are also

18   repaired by console manufacturers in warranty and out

19   of warranty.  And so I'd need more specifics, I guess,

20   to know the answer on any given device.

21        But my understanding is those can be

22   repaired by the manufacturers, and I don't know that

23   circumvention is always required with respect to

24   peripherals.  I do know some peripherals can inter-

25   operate with other devices, as we discussed in the

LOC_AR_00005701

1    disability-related exemption classes, without any need

2    to circumvent.  So I would need more specifics to

3    answer that question.

4            MR. BARTELT:  Thank you, Mr. Williams.

5            As I said, I'm going to turn now to some

6    questions focused on medical device repair, so I know

7    you've spoken a little bit to this earlier, but maybe

8    I could get a little bit more insight about how TPMs

9    are actually inhibiting access to repair devices.

10           I think what we saw in the written comments

11   was that the opponents were saying that the original

12   equipment manufacturers in this instance were

13   providing access and servicing information as required

14   by the FDA regulations, and that that was sufficient

15   to perform basic maintenance and repair services.

16           So I guess to both Mr. McHargue and Mr.

17   Kerwin, maybe you could both elaborate a little bit

18   for us about what FDA-mandated access and servicing

19   materials that OEMs are failing to provide and why

20   what you're receiving is maybe inadequate or TPMs are

21   preventing access to basic maintenance and repair

22   activities.

23           I guess, Mr. Kerwin, I see your mike's off,

24   so please go ahead, and then we'll turn to Mr.

25   McHargue.

LOC_AR_00005702

1          MR. KERWIN:  Well, thank you for the

2    opportunity to speak.  We appreciate that.  It would

3    not simply be FDA that we would be speaking to.  There

4    are applicable regulations from the Center for

5    Medicare and Medicaid Devices, particularly 42 C.F.R.

6    482, which requires that hospitals maintain adequate

7    information on equipment to have an acceptable level

8    of safety and quality.

9          But to speak to your point on AIAT FDA,

10   first, that only pertains to radiation-emitting

11   devices such as x-ray, and that has to do with

12   information pertaining to assembly installation.  And

13   what we're seeing -- and let me just back up and say

14   that at IAMERS what we're seeing is that independent

15   servicers in the secondary market may well become like

16   the watch repair people to the extent that they're

17   adversely impacted by this exemption.

18          We treat rural and regional hospitals

19   located everywhere from Eastern Appalachia in West

20   Virginia to Kansas, and we are conducting a survey of

21   some of these hospitals and, unfortunately, were not

22   able to complete it, but what we do know is that all

23   of them are having zero capital budgets and are unable

24   to undertake only the basic work.

25          And in this connection, the independent

LOC_AR_00005703

1    servicer, whose rates are substantially lower than the

2    original equipment manufacturer, is a preferred model.

3    In addition, the turn time when equipment breaks down

4    is easier.  So the AIAT is providing assembly

5    information -- is also something, sadly, with a right

6    but no remedy.

7            That is to say that the FDA has widely

8    acknowledged that if there's non-compliance, there is

9    no remedy for that.  And we now see the DMCA and other

10    federal and state causes of action being used to

11    thwart the ability of independent and in-house

12    diagnostic imaging services by claiming that the use

13    of these manuals is a violation of the law, and I know

14    there are several cases coming to trial this year.

15            And if there's an issue, retaliation is

16    alive and well.  That is to say, many of the members

17    are fearful that if they speak as to these issues,

18    they'll see a slowdown of parts.  They potentially

19    will have a refusal to deal, notwithstanding that some

20    of these same manufacturers no longer own the

21    machines, the equipment, that they are selling to

22    hospitals, group medical practices, and to some

23    independent servicers.

24            We have witnessed since the last hearing a

25    massive consolidation in diagnostic imaging, with

1    three manufacturers occupying 70 percent of the

2    diagnostic imaging market, with manufacturers

3    controlling all but nine percent of the servicing of

4    equipment.

5         Few hospitals, group purchasing

6    arrangements, and rural hospitals possess the market

7    power to insist upon providing information to fix

8    their own equipment.  Without this information, it is

9    difficult to conduct a root cause analysis of a

10   problem with equipment.

11        And as you may know, many of our members are

12   ISO 13485 qualified, and in the ecosystem of medical

13   device care you have many HDOs, health delivery

14   organizations, and they're well-established clinical

15   engineers in an oversight capacity.  This is not an

16   area where fearmongering really should have a place.

17        And one can only look to the FDA MAUDE

18   reports, which are the manufacturer and user facility

19   reports which must be filed by the manufacturer or the

20   hospital where an adverse event to look at is found,

21   and you would see that under one percent adverse

22   events have been occurring with respect to this.

23        So the conduct that we're speaking of is

24   causing a problem for those who have lawful possession

25   of the equipment and those who would service it,

LOC_AR_00005705

1    because the price differential can be $150 to $250 an

2    hour for an independent servicer versus six to $800 an

3    hour for a manufacturer with a minimum four-hour time

4    cap.

5         So this exemption is causing adverse events,

6    and we do feel that a new exemption needs to be

7    undertaken.  I should say this TPM.  And we are asking

8    to take this into account.  I wish I could bring many

9    members with me, but a number of them are just

10   painfully worried that if they contribute to this

11   conversation that they could potentially suffer a loss

12   in delayed equipment or refusal to deal and other

13   activities.

14        MR. BARTELT:  Thanks, Mr. Kerwin.

15        MR. KERWIN:  Let's make sure --

16        MR. BARTELT:  Oh, and I'm sorry, I do want

17   to give others enough opportunity.  I know we don't

18   have a tremendous amount of time today.  I do

19   appreciate your remarks here.  And we may be able to

20   circle back again yet.

21        But I just wanted to give Mr. McHargue, as I

22   said, a chance, and then I believe Mr. Cheney has a

23   question, and we can get to some of the other people

24   with their hands raised.  Thank you.

25        Mr. McHargue?

LOC_AR_00005706

1          MR. McHARGUE:  Thank you, Nicholas.

2          So relative to our ability to seek service

3    and manuals, there has been, I would say, improvement

4    --

5          MR. BARTELT:  Oh, and I'm sorry, Mr.

6    McHargue, could I jump in one -- I'm not sure if this

7    is best directed to you, too, but maybe as part of

8    your response, could you clarify -- you had just

9    mentioned manuals, and I think -- are you seeking

10   access not just to the computer programs but -- I

11   wasn't sure if there were -- if the original equipment

12   manufacturers were claiming copyright in works besides

13   the programs themselves, but also in like the manuals

14   or other literary works or ancillary materials?

15         If you have any insight there, we'd

16   appreciate it, and then whatever else you want to

17   comment on concerning the TPMs that are preventing

18   access.

19         MR. McHARGUE:  Yeah, I'd say in general, we

20   have access to manuals for the most part, but now the

21   manuals are digital.  We're told that we can access

22   all of them for a particular fee.  What we're really

23   bumping into is the fact that we are told by the

24   original manufacturers that we can buy a service

25   advisor or something that can help us get in,

LOC_AR_00005707

1    potentially read the codes, read the errors.

2           We can go and buy the parts to actually

3    install, but the issue is once we install, we cannot

4    get the last bit of software to have that vehicle,

5    whether it be a tractor or a combine, recognize that

6    new piece of equipment and actually make it

7    functional.

8           So in the details of how this all works,

9    again, I'm not a software engineer, but what I know

10   for sure is that we can get all the way to the end,

11   and if I have a combine sitting out to field, and the

12   rain is coming, and my independent repair tech comes

13   out, installs the part, gets it up, and says, "Well,

14   that's as far as I can go.  You're going to have to

15   have a tech from the equipment manufacturer come out,

16   finish that repair."  And so from that aspect, that's

17   not working for us.

18          And to be clear, agriculture is not seeking

19   an additional exemption from the Copyright Office.  We

20   appreciate what was done in 2018.  But those are some

21   of the issues we're still dealing with, though,

22   relative to --  since 2018.

23          MR. BARTELT:  Okay.  Thank you.

24          Mr. Cheney, you had a question?  And then

25   we'll move on.

LOC_AR_00005708

 1          MR. CHENEY:  Yeah, thank you.

 2          MR. BARTELT:  Yeah.

 3          MR. CHENEY:  Oh, I appreciate it.  Thank you

 4    for giving me a moment here.  I just want to clarify

 5    one thing.  I don't think it was very clear from part

 6    of your question.  And then I want to ask an

 7    additional question.

 8          The manuals that you're talking about, in

 9    order to access those, do you have to break a TPM to

10    get access to those manuals?  And how is that done?

11    Can you describe that a little bit?

12          The other thing that I want folks to get

13    into a little bit here and talk about is this system

14    of what the opponents are calling unauthorized

15    independent providers, and what that system looks

16    like, and why would hospitals and clinics and others

17    that have these devices be having those folks on

18    staff?  And what are the qualifications in order to do

19    that?

20          Just a little bit more detail there, I

21    think, and some of that may have come up in these Cal

22    State Senate hearings, and some of that -- so

23    whatever's relevant from those hearings that were

24    happening last week that maybe, brought in, might be

25    helpful, so including like ISOs qualified and some of

LOC_AR_00005709

1    that kind of stuff I think I heard you mention.  So I

2    hope that's helpful for this conversation.  Thank you.

3              MR. BARTELT:  Okay.  Thanks, Mr. Cheney.

4              I realize I should have called on Mr.

5    Inacker earlier, and then maybe we'll go to Mr.

6    Inacker, Mr. Reed, Mr. Wiens, and Ms. Sheehan.

7              Go ahead, Mr. Inacker.  Oh, I believe you're

8    still on mute.  Very good.

9              MR. INACKER:  Thank you for that.  Just a

10    couple of quick points of clarification.  So the TPMs

11    would not be removed by the exemption that we are

12    requesting.  We just don't want to have the penalties

13    associated or the consequences associated with

14    circumventing.  "Basic service" is defined by the OEM.

15    It's not defined by an independent service

16    organization.  They define what you're allowed to have

17    access to.

18              "Basic service" is insufficient to do what

19    we need to do to get our customers -- hospitals, care

20    givers, imaging centers -- the type of service that

21    they need to have their equipment be fully functional.

22    "Basic service" is insufficient in order to do that.

23              That's why we have to be able to go around

24    the TPMs in order to make the equipment as functional

25    as possible, especially when it comes to removing and

LOC_AR_00005710

1      replacing high-end pieces of equipment like glassware

2      in imaging devices.  It is essential for what we do as

3      an organization.

4           And it's unconscionable to me as a consumer

5      of health care, where we can provide a service that

6      offers a 30 to 50 percent reduction in cost to what an

7      OEM is capable of doing, that we're not all standing

8      up and saying we need to have access in order to be

9      able to do this.

10          MR. BARTELT:  Thank you, Mr. Inacker.

11          Mr. Reed, I'm not sure if you want to

12     continue in --

13          MR. REED:  Yeah.

14          MR. BARTELT:  -- speaking to this, go for

15     it.

16          MR. REED:  Yeah.  So I think we heard a

17     little bit of that old line, "lies, damn lies, and

18     statistics."  It was interesting to say that when Mr.

19     Kerwin said, "Oh, well, it's only one percent."  Well,

20     that one percent, according to the FDA's MDR review

21     from 2017, was 40 deaths, 294 serious injury, 38,500

22     patients and/or operators exposed to potential harm.

23     So when one says, "One percent, oh, gee, it's not that

24     many," it's actually a lot.

25          The second part of that's important.  Again,

LOC_AR_00005711

1    within the scope of what you're looking at, the FDA

2    already has requirements called the Quality System

3    Regulation, or QSR, that governs OEMs.  So if you look

4    at the section 710 of FDA's Reauthorization Act, we

5    already have all of those things in effect.

6         The specific language is, "Quality systems

7    help ensure that products consistently meet applicable

8    requirements and specifications."  So when Mr. Inacker

9    says, "Well, we should be able to reduce cost," part

10    of what he's trying to overcome is he doesn't want to

11    pay for or do the necessary things to meet the FDA's

12    requirements as a QSR.

13         So right now, we fully support and think

14    it's a great idea if OEMs or others can provide

15    service and support and meet the FDA's requirements

16    for QSR.  Then that's probably a way to go for it.

17    Right now, the third-party servicers kind of don't

18    have the same transparency or accountability, and

19    don't necessarily submit adverse event reports in the

20    same way that the others do.

21         So I think that it's a little glib to say,

22    "Gee, we save you 30 percent," but if it results in 40

23    deaths, 294 serious injuries, and 38,500 patients and

24    operators exposed, then I'm not sure it's something

25    that we wave off with a hand.

LOC_AR_00005712

1         So I would encourage the Copyright Office to

2    be very cautious for over interpreting the cost

3    reduction as something that should drive this forward,

4    especially since the market exists.

5         MR. INACKER:  May I please respond to Mr.

6    Reed?

7         Mr. Reed, all of our organizations are ISO

8    13485 certified, the same certification as the OEMs.

9    Your numbers -- if you look at how many of the OEM

10   organizations have caused issues with imaging

11   equipment because of their delays and lack of

12   responsiveness, those numbers will be a heck of a lot

13   higher than they are for the independent service

14   organizations.

15        MR. REED:  And, Steve, I'd be happy to go to

16   the FDA and talk with you about some of those

17   failures.  The Copyright Office is not the place --

18        MR. INACKER:  The FDA -- the FDA -- the FDA

19   --

20        MR. REED:  -- to have that discussion.

21        MR. INACKER:  The FDA --

22        MR. REED:  This is not --

23        MR. INACKER:  -- clearly --

24        MR. BARTELT:  I'm sorry, gentlemen,

25   gentlemen, for the sake of the discussion --

LOC_AR_00005713

1            MR. INACKER:  The FDA clearly said in 2018

2    that --

3            MR. BARTELT:  -- speaking over each other.

4            MR. INACKER:  -- independent service

5    organizations provide a valuable service to the health

6    care providers, and no difference between what an OEM

7    is doing and a qualified --

8            MR. BARTELT:  Yeah, so again --

9            MS. SMITH:  Just a moment.

10           MR. INACKER:  servicer --

11           MS. SMITH:  Just a moment.  Just a moment.

12   Just a moment.  Just a moment.  Thank you.  Everyone

13   is going to get an opportunity to speak, but we cannot

14   have cross talk over this, and we cannot have going

15   back and forth without the moderator.  That will not

16   work for the court reporter, and we want to make sure

17   everyone gets a chance to speak.

18           So we're going to go a little bit over time

19   because we know there's a lot of issues.  We do want

20   to cover them.  But I have to ask you to respect my

21   colleague who's moderating.

22           So I think, just to take some of the tension

23   off of that issue, and also I think some of these

24   issues might be going a little bit beyond, I want to

25   make sure we're centered on the 1201 rulemaking.  I

 1    think let's give Ms. Sheehan a chance to weigh in.

 2    Thank you.

 3         MS. SHEEHAN:  Thank you.  I just wanted to

 4    respond really quickly to what Mr. Reed mentioned

 5    about the FDA, and I'll say that it's possible Mr.

 6    Reed is not familiar with the FDA's 2018 study

 7    reporting on the quality, safety, and effectiveness of

 8    servicing of medical devices.

 9         In that study, the FDA issued a report

10    which, in part, sought to determine how valid these

11    concerns were about the quality of servicing provided

12    by the original equipment manufacturers versus third-

13    party independent entities.  And the report found that

14    the objective evidence indicates that many OEMs,

15    original equipment manufacturers, and third-party

16    entities provide high quality, safe, and effective

17    servicing of medical devices, and in fact, that the

18    continued availability of third-party entities,

19    including independent service organizations, to

20    service and repair medical devices is critical to the

21    functioning of the U.S. health care system.  So just

22    to address some of those FDA concerns that Mr. Reed

23    raised.

24         But moving on and refocusing on really the

25    core inquiry here, if Mr. Reed would contain his

LOC_AR_00005715

818

1    emotional responses, that would be delightful.

2          But also just this is a Copyright Office

3    hearing.  This isn't an FDA regulatory proceeding.

4    And so the Copyright Office is concerned with whether

5    or not there should be an exemption issued to section

6    1201 for the purpose of medical device repair.

7          And I'll say again, as I said throughout

8    this hearing, that repair is a non-infringing

9    activity.  The absence of an exemption to permit

10   repair on medical devices as well as other software-

11   enabled devices causes real tangible harms.  In

12   medical devices, that's very prescient.

13         We have people who are left without a

14   functioning wheelchair for months at a time, waiting

15   for original equipment manufacturers to send out a

16   qualified repair technician.

17         We have hospitals unable to repair rooms

18   full of ventilators because they can't get access --

19   they have to wait months for manufacturer-branded

20   repair services to come out and provide them with a

21   special dongle which is needed in order to get access

22   to the device to do the repair, or to provide the

23   service keys -- again, another TPM -- that's used to

24   lock out hospitals and technicians as well as

25   independent service technicians and privilege

LOC_AR_00005716

1       manufacturer technicians.

2               And as I said before, the Federal Circuit

3       found in *Chamberlain* -- and this has not been -- this

4       has not been disputed -- that 1201 doesn't give new

5       exclusive rights to copyright holders.  So that means

6       that 1201 does not give a right to medical device

7       manufacturers or medical device app manufacturers to

8       control the market for repair or to exclude

9       independent repair providers.

10              MR. BARTELT:  Okay.  Thank you, Ms. Sheehan.

11      I do have a question about maybe how these TPMs would

12      work and how the -- you know, just hypothesizing, that

13      if the circumvent -- this is maybe directed to Mr.

14      Wiens.

15              I don't know if you have any technical

16      background that you could help with -- or maybe Mr.

17      Kerwin -- that once the TPMs would be circumvented on

18      these types of devices, would the copyrighted works --

19      would the software programs or the data remain on the

20      machine afterwards?  Would they need to be put onto

21      another device?

22              I'm just curious about sort of the actual

23      mechanics of circumventing on these medical devices.

24      I think we've heard about a lot of other devices over

25      the years.  But I'm not sure, maybe you could provide

LOC_AR_00005717

820

1    specific examples of how circumvention works in these
2    instances and if it could be restored in such a way
3    that it would be sort of to the original
4    specifications.
5         First I'll let Mr. Wiens -- I see you've had
6    your hand raised for a little while -- then maybe Mr.
7    Kerwin.
8         And we can maybe come back to you, then,
9    after that, Mr. Reed.
10        MR. WIENS:  Sure.  Thanks for the question.
11   These are relatively -- oftentimes, like with the
12   wheelchair, there is a service password that you need
13   to enter, and so if you don't have the service
14   password to get into additional menus, then you're out
15   of luck.
16        So really, the goal is just to bypass the
17   password so then you can get in.  There are very
18   common settings, like traction settings, that you
19   might want to change on a wheelchair.  And kind of the
20   same thing with the ventilators and other equipment.
21   You know, you plug the service dongle in.
22        So, no, the software should remain on the
23   device.  The data should remain on the device.  The
24   goal isn't to exfiltrate the firmware from the device.
25   It's simply to bypass whatever check is there to see

LOC_AR_00005718

 1    if a branded manufacturer representative is sitting in

 2    the chair.

 3            In many cases, the larger hospitals have

 4    been given these service passwords, and it's the

 5    smaller hospitals that aren't given the passwords.

 6    And I'll defer to Mr. Kerwin to share the situation on

 7    the ground.

 8            MR. BARTELT:  Thank you, Mr. Wiens.

 9            MR. KERWIN:  I, I --

10            MR. BARTELT:  Mr. Kerwin, go ahead.

11            MR. KERWIN:  I quite agree.  The CMS has

12    issued various bulletins consistent with the laws

13    cited that require you to keep your equipment in

14    accordance with the original equipment manufacturer

15    specifications or, for certain types of non-diagnosed

16    equipment, to maintain alternative maintenance

17    activities with a risk analysis.

18            So that information will stay with the

19    hospital and is expected to be there because, as we

20    know, the Joint Commission has oversight of these

21    hospitals and is the delegated authority for many of

22    the states.

23            And in addition to your earlier point about

24    vendor management, unauthorized independent providers,

25    the hospitals will undertake their own vendor

LOC_AR_00005719

1    management programs.  Some have formalized

2    departments.  Some are much smaller.  And they do like

3    to see members ISO 13485 qualified, which is the ISO

4    standard.

5         So the risk is minimal, and I also affirm

6    the other speaker's reference to the 2018 report,

7    which I believe addresses some of the concerns raised.

8         MR. BARTELT:  Okay.  Thank you, Mr. Kerwin.

9         Mr. Reed, I had a specific -- well, two

10   specific questions to you, maybe that you could -- and

11   then any other things that you needed to respond to.

12        One was to what extent are the existing

13   other types of laws that -- maybe the Computer Fraud

14   and Abuse Act, HIPAA, FDA regulations, other existing

15   things -- alleviate any sort of safety concerns here?

16        And the second was -- I don't know how much

17   particular insight you have as you're not directly

18   representing -- one of the opposition comments that we

19   had received was a lot of -- some of the examples that

20   were cited were -- seemed to relate to physical issues

21   rather than issues resulting from circumvention of a

22   TPM.

23        I was curious if you have any examples or

24   maybe I can't --

25        MR. REED:  Yeah.

LOC_AR_00005720

1           MR. BARTELT:  Where circumvention of TPMs

2     has led to the types of instances that you've referred

3     to.  But go ahead.

4           MR. REED:  Right.  I think the long and the

5     short of it is, interestingly enough, I think all of

6     this talk about the FDA and Ms. Sheehan's comment

7     directed at me kind of points to the reality.  The FDA

8     actually has structures in place to do this the right

9     way.  The Copyright Office and the 1201 proceeding is

10    not the right place to do so.

11          By the way, HIPAA doesn't apply in any of

12    these instances.  Just so you all understand, HIPAA

13    actually deals with portability of electronic

14    information.  The section that you might be referring

15    to is the privacy rule, which came separately.  HIPAA

16    actually only covers what are called covered entities,

17    and covered entities are organizations that file

18    electronic insurance claims or their business

19    associates.

20          So HIPAA doesn't actually have any

21    constrains around this.  OCR, the Office of Civil

22    Rights, doesn't have any oversight over this space at

23    all, unless a covered entity is engaging in a practice

24    that exposes someone's PHI.  So it's really, really

25    separate.

LOC_AR_00005721

1           But you hit the nail on the head.  The

2  agency that does have oversight over this is the FDA,

3  and I'm very familiar with the 2018 report.  I

4  actually think that the work that's being done in this

5  conference on this call right now is kind of

6  misdirected.

7           Our efforts should really be at how do we

8  ensure that the FDA and its Quality Systems Regulation

9  moves forward in a way that appropriately allows for

10  repairs in a way that actually keeps patients safe.

11  I'm not sure why we're talking about medical devices

12  at a 1201 hearing which was more around protecting

13  people's movies and music.  So I think that --

14           MR. AMER:  Well --

15           MR. REED:  -- part of the problem we're

16  running into is --

17           MS. SMITH:  Well, Mr. --

18           MR. REED:  But -- sorry, Regan.  Did I --

19           MS. SMITH:  I bet Mr. Amer and I have the

20  same question, which is does that also cut the other

21  way, which is if we're looking at whether the

22  copyright law should be playing a role in this field

23  --

24           MR. REED:  Yeah.

25           MS. SMITH:  -- where what we're looking at

LOC_AR_00005722

1    is whether it's likely to be a non-infringing use, and

2    we don't -- we haven't really necessarily seen, I

3    think, a reliant interest from the FDA on the

4    copyright law for the discussion.

5           MR. REED:  Yeah.  I think that's a great

6    question.  It was exactly where I was going.  So you

7    heard a little hint about it, about on the manuals

8    part of it.  The reality is the manuals are protected

9    intellectual property, and so if breaching TPMs is a

10   way to have access to the manual, the manual is

11   copyrighted material.

12          So there are some instances where copyright

13   does come into play, and I do know that has been an

14   area of significant dispute, which is access to the

15   manuals, which is copyrighted material.  So where the

16   tools are -- where the infringing tools are -- or I'm

17   sorry, the tools are intended to allow access to the

18   manual, it is intended to allow access to material

19   that the owner of the copyright doesn't want to

20   provide access to, and that the use would be

21   infringing in terms of the purpose of what their

22   product is.

23          But I think those are kind of two separate

24   questions, so the first question that I was asked was,

25   "Is this the right venue?"  My argument is no, FDA has

LOC_AR_00005723

1      these things in place.  Let's look there.  Your second

2      question was, "Are there infringing or potential

3      infringing uses?"  And I would say you hit it earlier

4      when we heard the discussion about manuals and access

5      to the IP.

6            So I think that's a place that is, in fact,

7      in dispute, and there are conflicts about access to

8      the IP.

9            MR. BARTELT:  Thank you, Mr. Reed.

10           MR. AMER:  Well, what is the --

11           MR. BARTELT:  Go ahead, Mr. Amer.

12           MR. AMER:  Is the concern about access to

13     the manuals a copyright-related concern?  I mean, it

14     doesn't seem to me that you're concerned about people

15     getting access to the manuals so they can read them in

16     the way that movie manufacturers or makers are worried

17     about people seeing a movie without paying for it.  I

18     mean --

19           MR. REED:  I -- the --

20           MR. AMER:  -- are you worried about people

21     copying of the manuals that --

22           MR. REED:  Well, yeah, and --

23           MR. AMER:  -- seems like a --

24           MR. REED:  Yes.  Yeah.  I don't want to

25     stick up for the manual manufacturers, but what I do

LOC_AR_00005724

1    know is, yeah, manuals actually contain an enormous

2    amount of very specific proprietary information.  They

3    may include information about pin-outs.  They may

4    include information about access to specific

5    information.

6            Now, there are questions that we all have to

7    answer about whether or not that limits repair, but

8    the reality is yes, absolutely, manuals contain

9    information that is protected, proprietary, and, in

10    fact, again, not speaking for that industry, it's my

11    understanding that that's part of what they provide to

12    licensed OEM repair shops, is they license access to

13    all of that copyrighted material to enable the repairs

14    to take place, and that's part of their license

15    agreement with those third-party repair shops.

16            So I think it's considered a valuable

17    resource to them.  It's adjacent to my industry.  I

18    don't represent -- you know, they're not part of my

19    membership.  But yeah, I do know that they definitely

20    license access to those repair manuals, and that's a

21    key part of their control and income stream and value

22    for the IP that they're creating.

23            MR. AMER:  Okay.

24            So I think we're going to go to Mr. Inacker

25    and Ms. Sheehan, and then I think we're going to have

LOC_AR_00005725

1    to move on to vehicles.

2          MR. INACKER:  All right, thank you.  And I

3    just wanted to answer Mr. Bartelt's question directly.

4    So for a medical device, after TPM circumvention, the

5    data remains on the device.  The software remains

6    intact.  The device is left in its original state

7    after the repair is complete.  This is all about fair

8    and equitable access.

9          MR. AMER:  Thank you.

10         Ms. Sheehan?

11         MS. SHEEHAN:  So first off, I want to say

12    I'm kind of unaware of the circumstance where a TPM

13    would protect access to the service manual, but in the

14    case where it would, I just wanted to address Mr.

15    Reed's claims that that would be infringement.  I

16    would say that if the purpose is repair, and the use

17    of the manual -- again, the purpose is repair -- this

18    is a non-infringing purpose.

19         Also if you have a license to use the

20    machine and the manual, you have a license to use it,

21    to read it, to use the instructions.

22         And then I also want to address just one of

23    the fair use factors here, weighing in on whether that

24    would be infringing, whether the use of a manual in

25    this case would be infringing, and just say that the

LOC_AR_00005726

1    nature of the copyrighted work at issue with a manual

2    is highly functional, right?

3          So copyright will protect the expressive

4    content in that manual, but it's not going to protect

5    the instructions, the set of steps, the information

6    contained within that manual, and so we're not talking

7    here about a movie or a novel.  Most service manuals

8    are, indeed, a set of instructions.

9          Refocusing on kind of what we're really

10   concerned with her, which is technological protection

11   measures that keep certified biomedical engineers that

12   work in hospitals or that work with independent

13   service organizations, independent repair people, or

14   people who own take-home medical devices --

15   encountering TPMs that prevent them from repairing

16   their device.

17         And most often, we see those occurring

18   through the existence of passwords, or security keys

19   that someone has to use to get into the service

20   terminal for those devices, or to authorize a

21   replacement part, or to calibrate with a new part, or

22   kind of dongle-based security mechanisms.  And so --

23         MR. AMER:  Okay, thank you.

24         MS. SHEEHAN:  -- beyond the manual it's --

25         MR. AMER:  I'm sorry, could I just --

LOC_AR_00005727

1          MS. SHEEHAN:  -- largely irrelevant here.

2     We're really focused on the TPMs that are obstructing

3     repair of the medical device itself.  Thank you.

4          MR. AMER:  Could I just stop you there?  And

5     I'm sorry to interrupt.

6          And, Mr. Kerwin, I see your hand up, so I

7     don't want to leave you out, but if you could be

8     brief, and then we're going to turn to our last topic.

9          And thanks for everybody's patience.

10          MR. KERWIN:  Well, thank you.  And could I

11     just, on behalf of IAMERS, thank you. What I was going

12     to say is that relative to the cyber issue that was

13     inquired about, the FDA has issued its own guidances,

14     and those of us who are participatory in the joint

15     public-private partnership of HSCC with 600 members

16     are working on quality and white papers.

17          But the HHS, the Health and Human Services,

18     is where people record in the civil rights division

19     when a cyber issue has happened, and I urge you to

20     look to see that there is very few that are related to

21     servicing, if any at all.  So it's important to

22     realize that the FDA is not in the business of

23     intellectual property.  They have publicly indicated

24     such.  And it's entirely appropriate to have it here

25     today.  Thank you.

LOC_AR_00005728

1          MR. BARTELT:  Thank you, Mr. Kerwin.

2          As Mr. Amer said, we're going to turn to our

3    last topic, which is vehicles.  We heard briefly from

4    Mr. McHargue and Mr. Rosenbaum earlier.  I think we

5    are going to -- I have just basically one question for

6    you each, maybe a little bit more.

7          First, Mr. McHargue, you had mentioned

8    earlier issues with access to tools, but my question

9    is going to be a little bit different.  It's under the

10   current existing exemption for vehicles, there's a few

11   different limitations, one that it not violate other

12   laws.  There was a comment about gaining access to

13   vehicle user data.

14         I'm just wondering, under the existing

15   exemption, how repairers or potential users of the

16   exemption are being inhibited from making necessary

17   repairs.  If you have examples that you could provide

18   us, or where the existing language you would suggest

19   be modified in order to accommodate those users.

20         MR. McHARGUE:  Well, I appreciate that

21   question and I probably can't get into, again, the

22   technical side.  Probably where I think the need for

23   additional repair people in our area -- there's been a

24   proliferation of expert third-party repairs groups in

25   the ag equipment sector, and so I think possibly

LOC_AR_00005729

832

1    because of the 2018 ruling, I think that has given

2    credence to allowing that possibility.

3          What, again, has been difficult is even the

4    third-party experts can't get access to -- if I'm the

5    owner, have access to, say, a service advisor from

6    John Deere, they're having difficulty getting access

7    to that same software that I could use to repair, but

8    yet I can infer that to my expert, and they're having

9    difficulty getting the same amount of tech that, say,

10   an OEM can provide.

11         And even if they could do that, there's

12   still these issues relative to the final repair that

13   was mentioned, whether it be the dongle or the

14   payload, that's needed.  So again, I don't know if

15   that's technically within the copyright part.  I think

16   there are other laws.  When it comes to EPA, safety,

17   some of those things are probably outside this

18   conversation.

19         But just from on the ground, that's kind of

20   what's going on in the equipment repair side of the

21   equation.  I don't know if I answered your question.

22         MR. BARTELT:  Okay, sure.  No, thank you.

23         I do see that we have a few other hands

24   raised that may be able to -- that may be responsive

25   to this question, so I'm going to turn to Mr. Wiens,

LOC_AR_00005730

1    Ms. Sheehan.  I see Mr. Cheney has a question.

2            And then, Mr. Rosenbaum, I have a question

3    for you, too that we'll get back to after those

4    comments.

5            So, Mr. Wiens first?

6            MR. WIENS:  Sure, and just to share the

7    specific challenge that the farmers are having, if you

8    are familiar with the case *Dorman v. G.M.*, the part

9    that you get from the factory -- let's say you get a

10   new transmission or a new ECU.  It comes without

11   firmware, and so you need to move your copy of the

12   firmware from your existing ECU onto the new part.

13           And in the ag industry, these are called

14   payload files.  The payloads are the firmware.  And a

15   circumvention would be exactly what Dorman did in the

16   *G.M.* case, where you basically move your copy onto the

17   new one.

18           What the branded kind of the John Deere reps

19   are doing is they're downloading from John Deere's

20   servers a copy of that firmware and loading it onto

21   the device, so just to clarify the farm situation.

22           Did you --

23           MR. BARTELT:  Oh, no, I just wanted to see

24   -- I was going to turn to Ms. Sheehan, but if you had

25   one more point you wanted to make, we can do that, and

1    then --

2              MR. WIENS:  Sure.

3              MR. BARTELT:  move on.

4              MR. WIENS:  Well, yeah, and real fast to

5    talk about the auto industry and what's different,

6    because things have changed so much in the last three

7    years in the car world.  Three years ago, when we were

8    talking about circumventing -- or the telematic system

9    and the infotainment system, the state was new cars

10   were coming with Blu-ray drives, right?

11             I was looking this morning.  I couldn't find

12   a single new 2021 model year car that comes with a

13   Blu-ray drive.  I think that kind of -- like that has

14   passed.  And instead, the media is played from your

15   phone, so I take my phone, and I use Apple CarPlay or

16   I use Android Auto, and so the media -- any sort of

17   concern that we have about piracy is centered around

18   these mobile devices and not actually the car itself.

19   So media has moved off of cars.

20             And then in the other direction, all of the

21   data that you need for repair has moved into the

22   telematic system, has moved into telematics.  And

23   that's where you've seen the most recent Massachusetts

24   auto Right to Repair bill, which was introduced

25   because of all of the problems that the mechanics are

1    having because the data, instead of being passed to

2    the service technician via the wired port, it's coming

3    wirelessly.

4           And as we talked about three years ago, that

5    wireless telematic system and the infotainment system

6    on the car is one and the same.  It's the same ECU.

7           MR. BARTELT:  Okay.  Thank you, Mr. Wiens.

8           Ms. Sheehan?

9           MS. SHEEHAN:  I'd like to reiterate what

10   Kyle said.  So in 2018, the Register passed on the

11   opportunity to recommend an exemption for vehicle

12   telematic systems.  But as we're seeing these

13   telematic systems are increasingly ubiquitous.

14          If I have a Tesla right now, and I need to

15   repair it, the current exemption from 2018 doesn't

16   cover my repair because my mechanic would need access

17   to the telematic system in order to complete that

18   repair.

19          And again, as Kyle said the politics are

20   changing around this, and we've seen a ballot

21   initiative pass in Massachusetts with over 75 percent

22   of people who are recognizing the need to access these

23   wireless telematic systems and the need for their

24   independent repair providers to be able to access

25   those wireless telematic systems.  So that's one area

LOC_AR_00005733

1    where we'd like to see this exemption expanded.

2            In addition, we'd like to see the removal of

3    the kind of duplicate liability for violating another

4    law.  So to the extent that the current language of

5    the exemption imposes an obligation to follow other

6    laws, we think that compounds liability in a way that

7    really doesn't add any extra deterrent effect and is

8    just kind of hammering on, and adding complexity and

9    risk of litigation, to people using the exemption.

10           We'd be open to phrasing that in a different

11   way that, again clarified that the exemption is not

12   authorizing or making lawful any activity that

13   violates another law, but this compounding of

14   liability we think is an extra burden on the people

15   who benefit from the exemption that should be trimmed.

16           MR. BARTELT:  Okay.  Thank you, Ms. Sheehan,

17   and I'm actually going to ask Mr. Rosenbaum about that

18   in a second, but I wanted to turn to Mr. Cheney first,

19   because he had his hand raised.

20           Please go ahead, Mr. Cheney.

21           MR. CHENEY:  Thank you.

22           And my line of questions actually followed

23   the same line of reasoning here, because you brought

24   that up originally, and so I just wanted to pivot just

25   a little bit on what Ms. Sheehan said.

LOC_AR_00005734

1          And so this has come up a little bit in

2    other exemption discussions.  In Class 13, Rapid7

3    proposed some language, and this language has been

4    talked about in other exceptions, possibly to replace

5    "this does not violate any other applicable law."

6          So let me read what they proposed, and this

7    has been endorsed in that space, good faith security

8    research, by the Department of Justice and others, so

9    let me read what they propose here and just sort of

10   substitute the words in.

11          In this case, it says, "Good faith security

12   research that qualifies for the exemption under

13   Paragraph A," whatever we write there, "may

14   nevertheless incur liability under other applicable

15   laws, including, without limitation," and in this

16   case, they list Computer Fraud and Abuse Act, et

17   cetera.

18          So would that be acceptable modification

19   language, Ms. Sheehan and others, both opponents and

20   proponents, in sort of finding a middle ground on that

21   change?  Just if you think.

22          MS. SHEEHAN:  I think that would absolutely

23   be acceptable.

24          MR. BARTELT:  Okay.  And, Mr. Rosenbaum, go

25   ahead.

838

```
 1            MS. SMITH:  Can I --

 2            MR. BARTELT:  Oh, go ahead, Regan.

 3            MS. SMITH:  Just a second, Mr. Bartelt.

 4    Yeah.  I might have missed it, but either I need to

 5    clarify for myself what was said, or we need to

 6    clarify the record.

 7            I think in 2018, the Register recommended

 8    removing the limitation that excluded access to

 9    telematics and made it when it is necessary for

10    repair, so I think I'm still a little confused as to

11    what the proposed scope of the change is, because it

12    seems like some of what you're saying about modern

13    cars is already being addressed.  If I'm missing

14    something, let --

15            MS. SHEEHAN:  Sorry, Ms. Smith.  You said

16    the 2018 exemption covers access to wireless telematic

17    systems for the purpose of repair?

18            MS. SMITH:  That's right.  We considered

19    that, and we granted that adjustment and removed the

20    limitation that had been put in place in 2015.  So

21    it's broader.  That was a change made in 2018.  That

22    is --

23            MS. SHEEHAN:  Then I must --

24            MS. SMITH:  -- we are recommending renewal

25    for.  That's fine.  I just -- glad that we just --
```

LOC_AR_00005736

839

1    we're making progress and getting things clear.  Okay.

2           Mr. Bartelt?

3           MR. BARTELT:  Sure.

4           I wanted to -- I guess that my question was

5    similar to Mr. Cheney's, so I was going to ask Mr.

6    Rosenbaum about this sort of -- the removal of the

7    language concerning -- or modification of the language

8    concerning that the exemption not violate any other

9    applicable law and any concerns that he might have

10   about that.  And he may have wanted to respond to some

11   of the other comments that were made.

12          Please go ahead, Mr. Rosenbaum.

13          MR. ROSENBAUM:  Yeah, thank you.  Thank you

14   very much.  I'll start with what I call the illegality

15   limitation, which is the limitation in the existing

16   vehicle exemption that circumvention does not

17   constitute a violation of applicable law.  We would

18   not support any relaxation of that.  That is a

19   critical limitation.

20          The 2015 record was replete with information

21   on automotive vehicle software which controls complex

22   aspects of motor vehicle performance and ensures that

23   vehicles meet stringent regulatory standards for

24   safety, fuel efficiency, and emissions control.

25          You know, the Copyright Office rightly

LOC_AR_00005737

1    recognized this in crafting the vehicle exemption in

2    the 2015 rulemaking, that the automotive industry is

3    highly regulated, and so they took into account --

4    rejecting arguments that these risks were unrelated to

5    copyright concerns, finding that these were of

6    overriding importance, basing it on letters received

7    from the EPA, the Department of Transportation, and

8    California's Air Resources Board finding the

9    illegality limitation was necessary.

10            There's nothing in this record that would

11    mitigate anything that was provided in 2015.

12    Expanding the exemption would risk public safety and

13    cause environmental harms, potentially.  So again, we

14    would not support any relaxation of the illegality

15    limitation.

16            Sort of getting to the -- you know, I don't

17    want to get too much into telematics, since, as Regan

18    pointed out, that was at issue in 2018.

19            You can see from our 2018 filing that

20    telematics, all -- again, back to the MOU, but not

21    just the MOU, state and federal regulations going back

22    to 2002 requires automobile manufacturers to provide

23    repair and diagnostic tools and information to

24    independent repair shops to the same extent as

25    dealers.

LOC_AR_00005738

1          And whether that information is in

2    telematics or not, that information needs to be

3    provided to the independent repair shops.  So it's

4    just simply not an issue.  And our view here is that

5    the existing language of the exemption does not cover

6    third-party repair, commercial repair, shops.

7          And to the extent that there's any

8    suggestion that there should be some affirmative

9    language that would cover them, we would oppose that,

10   and we don't believe there's anything in this record

11   that would support that.

12         You know, as we've said, and you can look at

13   our filing, again, the MOU obviates any need for that

14   sort of thing.  Anyone who needs their car repaired is

15   able to get it repaired.  There's nothing on the

16   record suggesting otherwise.  And of course, the

17   statutory framework doesn't permit it.  So I don't

18   want to get -- I could go into depth on each of those

19   things, even further.

20         I guess one thing that was a reply -- and

21   this might be my only opportunity to reply to this --

22   there was a reply from the Auto Care Association on

23   the MOU that was extremely misleading, suggesting that

24   it does not apply to all users and to all independent

25   repair shops.  In fact, it does.  You know, under the

LOC_AR_00005739

1    MOU, manufacturers make the tools and information

2    available to everyone.

3          And also, there's a provision in the MOU

4    requiring standardized tools so it's not -- the

5    suggestion was that independent repair shops are

6    forced to buy tools from the manufacturer.  That is

7    not the case.

8          And finally the issue of whether they're

9    prohibitively expensive, which we've heard -- the MOU

10   includes provisions that these tools and information

11   are provided on fair and reasonable terms, and this

12   language goes back to regulatory language back to

13   2002.

14         There's never been any dispute brought under

15   either regulation or the MOU suggesting that these are

16   not being provided on fair and reasonable terms.  You

17   know, and this just simply isn't the forum to litigate

18   that.  You know, there should be the MOU.  There are

19   other places if there's a dispute.

20         So with that I appreciate the opportunity to

21   say my piece.  Thank you.

22         MS. SMITH:  Thank you, Mr. Rosenbaum.  And

23   thank you for your patience, because I understand on

24   the road map, this came to the end, so we're glad

25   you're here, and we know this is a tremendous amount

1    of issues.  We've got the benefit of your briefing.

2        We also went a little bit over.  I think

3    this is sort of last call for comments, and people

4    could try to keep it a little bit short, because we've

5    got a lot here.

6        But, Ms. Gagliano?

7        MS. GAGLIANO:  Sure.  So first, I wanted to

8    share one quick point in response to what Mr.

9    Rosenbaum was saying about the safety and emissions

10    regulations.

11        EFF actually sent FOIA requests to the EPA

12    and Department of Transportation, and their responses

13    confirmed that they have never actually used 1201 or

14    relied on it in any way to help enforce these

15    standards.

16        They aren't actually making use of it, which

17    I think reinforces Ms. Sheehan's point that it's

18    really superfluous, second layer, and draw attention

19    to the distinction only the Copyright Office can grant

20    exemptions.  FDA and then --

21        MS. SMITH:  Can I ask you --

22        MS. GAGLIANO:  Okay.

23        MS. SMITH:  -- is that response in the

24    record?  It might be, but have you provided that to

25    us?

Heritage Reporting Corporation
(202) 628-4888

1           MS. GAGLIANO:  I don't think that we have.

2           MS. SMITH:  Okay.  Thanks.

3           MS. GAGLIANO:  Probably not.  And then in

4     terms of just --

5           MS. SMITH:  Okay, thank you.

6           MS. GAGLIANO:  -- the closing comment

7     quickly is that on modification, which was really the

8     focus of our request, especially want to reiterate

9     that the question is not whether there are infringing

10    modifications that are prevented by TPMs in 1201, but

11    that the question is whether there are non-infringing

12    modifications that are being adversely affected and

13    prevented by 1201.  And we have shown that there are.

14          And these include modifications that promote

15    the creation of new copyrighted works, including new

16    photographic works by modifying digital cameras, new

17    software works by building on what's come before.  And

18    I think the recent decision in *Google v. Oracle* really

19    reinforces the importance and transformative nature of

20    that purpose, the purpose of expanding the utility of

21    software.  So I think that is the point that I wanted

22    to leave you all with.

23          MS. SMITH:  Thank you.

24          Mr. McHargue?

25          MR. McHARGUE:  Well, I appreciate this

LOC_AR_00005742

1    conversation.  Unfortunately, the ag exemption isn't

2    quite the same as the auto sector, because we do not

3    have a national MOU, and so we still are constrained

4    by a lot of necessary tools having to go back to the

5    original OEM to get that service.

6         And we desperately need access to those

7    third-party experts on a broad scale, because, again,

8    we don't have an MOU nationally that is kind of

9    putting in place these standards, nor do we have a

10    dispute arena that we can go back and we can say, "We

11    need to be playing together in a certain form or

12    fashion."

13         But again, thank you for allowing me to be

14    here.  I appreciate the work of the Office.

15         MS. SMITH:  Thank you.  We appreciate you

16    coming and bringing your perspective, too.

17         Ms. Sheehan, I saw you sort of nodding

18    during the last comment.  If you wanted at all to

19    comment on -- obviously, this rulemaking is limited to

20    the anti-circumvention provision and not the anti-

21    trafficking provision.  But that was a question that

22    just sparked me about the ag market.

23         MS. SHEEHAN:  Absolutely.  We completely

24    agree with the Office's interpretation of the statute,

25    that Congress, in using the term "user," deliberately

LOC_AR_00005743

846

1    chose not to use the term "owner."  And therefore, the
2    exemption is not limited to the owner of the device.
3    It's to anyone who is using the device, including
4    potentially a third-party provider of repair services.
5         And so we fully endorse that, and we would
6    request that permission for third-party assistance
7    extend to all exempted categories.
8         I just wanted to say a couple of things, one
9    in response to Mr. Rosenbaum and one kind of wrapping
10   up our testimony as a whole, and just say that Mr.
11   Rosenbaum put a lot of weight on the existence of
12   alternatives and the existence of branded repair
13   services.
14        But this office has never found the
15   existence of alternatives sufficient to defeat an
16   exemption where adverse impact exists.  And to do so
17   in this case would, as I've said before in this
18   hearing, give copyright holders a new right that they
19   don't have under the Copyright Act, that they don't
20   have under section 106, which is the right to control
21   the market for repair services.
22        And you know, we know from *Chamberlain* that
23   that right does not exist.  And so I would argue that
24   even though there might be alternatives, in some cases
25   those alternatives are going to be inadequate.  In

LOC_AR_00005744

1    some cases, they might not exist at all.  But even

2    when they are there, that itself is not determinative.

3              And then I just want to close by just

4    summing up whether we're talking about medical

5    devices, or tractors, or cars, or software-enabled

6    litter boxes, we're essentially talking about the same

7    functional software, the same copyright analysis, the

8    same purpose of the use.

9              And so in our perspective, the proper scope

10   for an exemption here is an exemption for the repair

11   of all software-enabled devices.  We just want to fix

12   stuff.

13             MS. SMITH:  Thank you.

14             Mr. Wiens?

15             MR. WIENS:  Thank you.  One thing I thought

16   that I would mention is -- you think about how to

17   craft this -- is John Deere's Service ADVISOR is a

18   subscription repair service.  And in the existing

19   rule, you separated out subscription services.  I

20   think that it was thinking of Spotify or SiriusXM, or

21   something.

22             But imagine a world where like OnStar, you

23   may be paying the manufacturer for a repair service,

24   and that may implicate whatever decision that you

25   make.  Thank you very much.

LOC_AR_00005745

1          MS. SMITH:  Okay.  Thank you.

2          And, Mr. Williams, I think you're usually

3    the last to be introduced as a "W," so it's kind of

4    fitting for you to get the last word so go ahead.

5          MR. WILLIAMS:  Yeah, thank you.  Just

6    quickly, on the question that's mostly been related to

7    medical devices and vehicles but is coming up as a

8    general proposition of how far the Office should go

9    with respect to third-party services, I just wanted to

10   reemphasize that it's extremely important to my

11   clients that the Office remain cognizant of that line

12   between trafficking and 1201(a)(1).  And so I just

13   wanted to reiterate that.

14         And then a couple of points that Ms. Sheehan

15   made a couple of times that I did want to respond to.

16   One is that she said "alternatives to circumvention

17   has never been a basis to deny a proposal."  That's

18   not correct.  It's consistently been a basis to deny

19   proposals.  And where there are alternatives to

20   circumvention, exemptions should not be granted.

21         Another point was just that -- and I know

22   the Office staff is aware of this, but I wanted to get

23   it on the record, because it came up a few times.  I

24   believe she said that *Chamberlain* has never been

25   challenged.  *Chamberlain* is wrong.  The Office has

LOC_AR_00005746

849

1    said it's wrong.  *MDY* says it's wrong.  *Chamberlain* is
2    not good law at this point, in my view, and we
3    shouldn't be granting exemptions -- or you should not
4    be, excuse me, based on the reasoning in *Chamberlain*.
5             There is a new exclusive right.  It's the
6    right of access.  It's in 1201(a)(1).  And it's a good
7    thing.  Thank you.
8             MS. SMITH:  All right.
9             Thank you, everybody.  Thank you for your
10   patience and willingness to go over as we help develop
11   the record through this discussion.  If we think we
12   need anything further, we'll be issuing letters for
13   post-hearing comments.  And there will also be
14   opportunity to participate through ex parte meetings
15   subject to transparency disclosures once we initiate
16   that.
17            So thanks again, and then tomorrow will be
18   our last day of hearings, in which we will address
19   proposed classes for jail-breaking and unlocking.
20   Thank you.  Bye bye.
21            (Whereupon, at 1:08 p.m., the meeting in the
22   above-entitled matter was adjourned, to reconvene at
23   10:30 a.m. April 21, 2021, the following day.)
24   //
25   //

Heritage Reporting Corporation
(202) 628-4888

850

### REPORTER'S CERTIFICATE

CASE TITLE:   Copyright Office Section 1201 Hearing

HEARING DATE: April 20, 2021

LOCATION:     Washington, D.C.

       I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the Library of Congress.

            Date:  April 20, 2021

John Gillen
Official Reporter
Heritage Reporting Corporation
Suite 206
1220 L Street, N.W.
Washington, D.C.  20005-4018

LOC_AR_00005748

Section 1201 Rulemaking Hearing                    April 20, 2021

**$**

$150 [1] 808:1
$250 [1] 808:1
$60 [2] 778:4 779:5
$800 [1] 808:2

**/**

// [2] 849:24,25

**1**

1:08 [1] 849:21
10:30 [1] 849:23
10:35 [1] 731:2
106 [2] 765:11 846:20
107 [1] 748:24
117 [2] 737:5 748:24
12 [1] 731:6
1201 [26] 731:5 744:13 748:2 761:
17 765:8,11 766:8 768:23 769:2
783:6,9 789:8,10 793:15 797:14
798:2,15 816:25 818:6 819:4,6
823:9 824:12 843:13 844:10,13
1201(a)(1 [2] 848:12 849:6
13 [1] 799:10 837:2
13485 [3] 807:12 815:8 822:3

**2**

200 [3] 748:13 756:20 757:5
2002 [2] 840:22 842:13
2007 [1] 785:5
2012 [1] 782:14
2015 [4] 838:20 839:20 840:2,11
2017 [1] 813:21
2018 [21] 761:9 764:16 795:17,22
798:17,19 800:3 810:20,22 816:1
817:6 822:6 824:3 832:1 835:10,
15 838:7,16,21 840:18,19
2019 [1] 798:23
2020 [1] 800:18
2021 [2] 834:12 849:23
21 [1] 849:23
294 [2] 813:21 814:23

**3**

3:00 [1] 745:4
30 [3] 767:8 813:6 814:22
360 [1] 798:25
38,500 [2] 813:21 814:23

**4**

4 [1] 779:12
40 [2] 813:21 814:22
42 [1] 805:5
482 [1] 805:6

**5**

5 [1] 779:12
50 [2] 767:8 813:6

**6**

60 [1] 778:22
600 [1] 830:15

**7**

70 [1] 807:1
710 [1] 814:4
75 [1] 835:21

**9**

99 [6] 745:18,18,21 748:14 756:19
757:7

**A**

a.m [2] 731:2 745:4 849:23
A/V [1] 763:23
AACS [3] 734:19 753:11 785:2
abiding [1] 790:14
ability [10] 745:15 754:7 758:12
779:16 787:13 789:23 799:17 800:
8 806:11 809:2
able [7] 742:8 743:16 744:5 745:9
755:14 767:12 772:19 775:2,5,13,
22,23 777:8,9 779:21 781:2 787:
22 789:2,9 797:15 799:21 805:22
808:19 812:23 813:9 814:9 832:
24 835:24 841:15
above-entitled [1] 849:22
absence [2] 762:18 818:9
Absolutely [10] 742:10 762:17
763:6 766:12,14 768:21 800:16
827:8 837:22 845:23
abstract [1] 747:14
Abuse [2] 822:14 837:16
acceptable [3] 805:7 837:18,23
accepted [1] 791:21
accepts [1] 751:20
Access [64] 734:18 741:23 748:1
749:19,21 751:3 752:1 756:22
762:5 771:2,7 779:21 781:6,9 787:
20 788:24 791:25 793:5 797:2,13
800:7,12,13 802:3 804:9,13,18,21
809:10,18,20,21 811:9,10 812:17
813:8 818:18,21 825:10,14,17,18,
20 826:4,7,12,15 827:4,12,20 828:
8,13 831:8,12 832:4,5,6 835:16,22,
24 838:8,16 845:6 849:6
accessed [2] 742:9 751:20
accessibility [1] 764:7
accessing [1] 743:20
Accolade [1] 768:1
accommodate [2] 758:12 831:19
accomplished [1] 752:1
accordance [1] 821:14
according [1] 813:20
account [2] 808:8 840:3
accountability [1] 814:18
acknowledge [2] 747:11 750:4
acknowledged [4] 748:21 764:10,
15 806:8
acquire [1] 740:4
acquired [2] 740:17 764:6,9
across [6] 742:1 747:12 748:7 760:
4,12 802:8
act [5] 740:2 814:4 822:14 837:16
846:19
acting [1] 795:19

action [3] 786:15,15 806:10
active [1] 798:25
activities [4] 794:16 796:5,13 804:
22 808:13 821:17
activity [6] 787:21,23 789:12 792:
9 818:9 836:12
actual [3] 761:25 791:5 819:22
actually [40] 753:5 756:9,13 759:8,
12 761:2,22 768:25 769:2,21,22
770:21 775:8 778:9 782:24 785:
13,21 786:15 790:12 791:1 797:2,
13 800:7 804:9 810:2,6 813:24
823:8,13,16,20 824:14,10 827:1
834:18 836:17,22 843:11,13,16
ad [2] 759:16,18
ad-supported [1] 759:14
adage [1] 800:22
add [7] 739:5 777:24 800:23 836:7
added [1] 800:21
adding [1] 836:8
addition [4] 748:4 806:3 821:23
836:2
additional [12] 759:16,18 766:1
770:19 787:4 795:23 796:11,16
810:19 811:7 820:14 831:23
address [18] 735:17 738:20 749:
16 750:13 755:12 760:13 763:7,
21 767:20 785:21 786:14 793:14
817:22 828:14,22 849:18
addressed [3] 764:16 767:24 838:
13
addresses [1] 822:7
adequate [1] 805:6
adjacent [1] 827:17
adjourned [1] 849:22
adjustment [1] 838:19
adjustments [2] 731:7 734:14
Administrator [1] 734:18
Advanced [1] 734:18
adverse [10] 742:1 752:9 766:9,15
796:4 807:20,21 808:5 814:19
845:18
adversely [4] 761:13 797:14 805:
17 844:12
Advisor [4] 733:4 809:25 832:5
847:17
advocates [1] 737:16
affected [2] 761:13 844:12
affects [1] 797:14
affirm [1] 822:5
affirmative [1] 841:8
after-market [2] 801:6,12
aftermarket [1] 750:18
afterwards [1] 819:20
ag [6] 769:14,24 831:25 833:13
845:1,22
agency [1] 824:2
agnostic [1] 736:12
ago [3] 738:3 834:7 835:4
agree [5] 739:3 749:7 756:9 821:
11 845:24
agreement [1] 827:15

agriculture [2] 781:4 810:18
ahead [14] 736:22 759:5 779:5 802:
14 804:24 812:7 821:10 823:3
826:11 836:20 837:25 838:2 839:
12 848:4
AIAT [2] 805:9 806:4
air [2] 745:6 840:8
alert [1] 731:22
alive [1] 806:16
alleviate [1] 822:15
Alliance [1] 735:4
allow [9] 755:11 757:3,13 772:9
773:17,22 778:10 825:17,18
allowed [3] 776:13 784:23 812:16
allowing [4] 755:13 787:19 832:2
845:13
allows [1] 824:9
alluded [1] 795:16
almost [3] 742:19 792:25 800:18
alphabetically [1] 733:9
already [6] 739:8 740:6,7 751:17
753:16 762:12 765:10 777:9 787:
18,20 789:7 792:8 795:2 814:2,5
838:13
alter [1] 793:17
altered [1] 771:11
alternative [1] 821:16
alternatives [14] 742:6 748:5,24
764:23,24,25 765:4,5,16 782:18
846:12,15,24,25 848:16,19
Amer [40] 732:17,19,19 770:14,18,
21 773:10,13 774:9 776:1 778:24
780:11 781:14,16 783:12,15 784:
16 785:18 787:2,7 788:17 790:1
791:6 793:21 794:5,7 795:8 824:
14,19 826:10,11,12,20,23 827:23
828:9 829:23,25 830:4 831:2
American [2] 734:5 770:2
amount [6] 745:8 746:2 808:18
827:2 832:9 842:25
amusing [1] 742:13
analogous [1] 749:2
analogy [3] 736:24 741:19 755:6
analysis [9] 738:11 748:2,3 797:4,
5 798:13 807:9 821:17 847:7
ancillary [1] 809:14
and/or [1] 813:22
Android [1] 834:16
announced [1] 798:23
another [19] 737:23 738:23 745:16
746:4 750:1 760:21,23 765:9 788:
19 794:24 818:23 819:21 836:3,
13 848:21
answer [9] 748:14 776:13 778:21
784:14 802:1 803:20 804:3 827:7
828:3
answered [1] 832:21
answers [1] 795:11
anti [1] 845:20
anti-circumvention [2] 755:4
845:20
anti-competitive [1] 765:18

Section 1201 Rulemaking Hearing                    April 20, 2021

anticipating [1] 752:3
anyway [3] 769:18 770:22 773:1
App [5] 734:25 741:3,11 757:8 819: 7
Appalachia [1] 805:19
apparent [1] 792:10
appellate [1] 783:9
Apple [5] 766:25 767:3 801:9 802: 4 834:15
Apple-authorized [1] 766:24
appliances [1] 762:15
applicable [7] 773:21 805:4 814:7 837:5,14 839:9,17
application [3] 782:10 783:1 786: 1
applications [1] 783:3
applies [2] 761:7 778:17
apply [4] 771:4 793:4 823:11 841: 24
appreciate [14] 770:9 781:16 782: 5 793:13 805:2 808:19 809:16 810:20 811:3 831:20 842:20 844: 25 845:14,15
approach [5] 749:1 751:22 752:5 792:2,3
approaches [1] 782:17
appropriate [5] 757:14 760:25 761:1 830:24
appropriately [1] 824:9
apps [1] 741:2
April [1] 849:23
area [6] 741:19 769:18 807:16 825: 14 831:23 835:25
areas [2] 736:20 802:14
aren't [7] 740:8 775:19 790:9 792: 7 798:23 821:5 843:16
arena [1] 845:10
arguably [1] 794:16
argue [1] 846:23
argument [3] 762:10 791:13 825: 25
arguments [1] 840:4
around [7] 789:18,18 812:23 823: 21 824:12 834:17 835:20
arrangements [1] 807:6
artificial [1] 745:24
aspect [1] 810:16
aspects [1] 839:22
assembly [2] 805:12 806:4
assistance [2] 731:23 846:6
Assistant [1] 732:24
associated [2] 812:13,13
associates [1] 823:19
Association [10] 733:25 734:11, 20,25 736:10 737:15 741:11 766: 19 786:10 841:22
assume [1] 739:1
assuming [1] 761:16
attached [2] 739:22,23
attention [1] 843:18
Attorney [2] 733:4 769:10
Attorney-Advisor [1] 732:24

attractive [3] 771:12 773:5,7
attractiveness [1] 754:10
attributable [1] 761:10
audience [2] 731:20 732:2
audio [1] 751:25
authentication [1] 784:7
authoring [1] 772:1
authority [1] 821:21
authorize [2] 764:13 829:20
authorized [2] 753:13 769:19
authorizing [1] 836:12
Auto [9] 735:5 750:21 751:2,10 834:5,16,24 841:22 845:2
automation [4] 743:15,21 745:17 746:10
automobile [4] 750:12,22 781:3 840:22
automobiles [2] 750:16,17
Automotive [3] 735:5 839:21 840: 2
availability [4] 790:8 798:19 799: 12 817:18
available [10] 754:5 757:3 781:7 785:4,7,12 787:4 789:1 792:17 842:2
Avante [2] 733:21 780:18
avenue [1] 777:13
avoid [2] 759:9 803:11
aware [1] 848:22
away [5] 744:18 759:9,17,24 790:7
Ayers [4] 734:15,16,17 751:15 752:12 754:11,17 770:12,23 771: 16 773:12,19 776:12,21 777:15 781:24 784:19 785:18,20 793:22 794:2,3,6,9
Ayers's [1] 770:20

## B

back [23] 737:17 752:17 754:13 763:23 767:3,10 769:22 777:8 779:22 782:13 792:23 800:17 805: 13 808:20 816:15 820:8 833:3 840:20,21 842:12,12 845:4,10
background [1] 819:16
bad [3] 753:16 759:12 793:18
ballot [1] 835:20
bar [2] 758:10 778:17
barn [1] 788:25
barred [1] 797:23
Bartlett [39] 732:17,21,21 795:12, 14 797:16 799:23,25 802:15 804: 4 808:14,16 809:5 810:23 811:2 812:3 813:10,14 815:24 816:3,8 819:10 821:8,10 822:8 823:1 826: 9,11 831:1 832:22 833:23 834:3 835:7 836:16 837:24 838:2,3 839: 2,3
Bartlett's [1] 828:3
based [3] 785:16 792:9 849:4
basic [7] 767:1 804:15,21 805:24 812:14,18,22
basically [4] 745:9 799:6 831:5 833:16

basing [1] 840:6
basis [4] 765:15 781:7 848:17,18
batteries [5] 800:25 801:3,4,5,9
battery [4] 800:22,23 801:6,10
become [3] 772:18 785:12 805:15
begin [1] 736:7
behalf [2] 734:11 830:11
behave [1] 757:22
believe [10] 782:13 783:20 796:7 797:10 802:20 808:22 812:7 822: 7 841:10 848:24
believed [1] 799:14
benefit [3] 772:11 836:15 843:1
besides [1] 809:12
best [4] 744:2 747:12 776:12 809: 7
bet [1] 824:19
better [2] 752:15 794:11
between [3] 738:13 748:22 755:18 760:14 795:1 796:12 816:6 848: 12
beyond [5] 753:5,6 761:2 816:24 829:24
big [2] 731:9 793:15
bigger [2] 735:13 777:13
biggest [1] 783:7
bill [1] 834:24
biomedical [1] 829:11
bit [30] 740:21 741:11 742:7 747:6 753:22 762:24 776:5,18 781:19 788:23 794:19 795:21 798:22 802: 21 804:7,8,17 810:4 811:11,13,20 813:17 816:18,24 831:6,9 836:25 837:1 843:2,4
black [1] 779:7
blah [2] 740:17,18
Blu [1] 790:21
Blu-Ray [13] 735:24 752:7 753:25 761:8 774:5 779:15 784:20 785:1, 6,15 787:17 834:10,13
Blu-Rays [3] 752:18 774:15 786: 23
board [3] 788:2 802:9 840:8
boards [1] 788:1
bog-standard [1] 802:2
boot [1] 802:8
bootloader [1] 756:11
both [10] 764:7 768:18 771:20 773: 2 786:21 788:8 796:20,22 797:8 804:16,17 837:19
bounding [1] 794:13
box [3] 738:15 778:10 796:21
boxes [3] 750:2 796:6 847:6
Brad [1] 732:23
branded [7] 746:6 765:14 766:7 801:5 821:1 833:18 846:12
breaching [1] 825:9
break [5] 745:9 758:12 759:25 761: 2 811:9
breaking [2] 751:25 760:5
breaks [1] 806:3
brief [4] 759:2 781:23 794:10 830:

8
briefing [1] 843:1
briefly [3] 767:24 768:18 831:3
bring [1] 808:8
bringing [3] 751:18 797:23 845:16
broad [2] 738:9 845:7
broaden [1] 736:10
broader [4] 741:1 776:17,22 838: 21
broken [4] 757:3 759:15 789:14,23
brought [5] 754:17 785:3 811:24 836:23 842:14
bucks [1] 778:23
budgets [1] 805:23
build [1] 756:15
building [3] 743:15,21 744:24 745: 17 746:10 749:5 756:18 844:17
bulb [1] 738:14
bulbs [1] 738:5
bulletins [1] 821:12
bumping [1] 809:23
bunch [1] 738:4
burden [1] 836:14
Bureau [2] 734:5 770:2
Burke [5] 732:12,13,13 754:16,24 764:12 774:10,11 788:18 790:2,3 796:16 797:17,19 799:24,25 802: 25
business [3] 757:8 823:18 830:22
businesses [1] 780:18
button [2] 731:16 755:8
buy [6] 740:4 757:6 762:7 787:15 799:5 809:24 810:2 842:6
Bye [2] 849:20,20
bypass [3] 760:21 820:16,25
bypassing [1] 785:9

## C

C.F.R. [1] 805:5
C.T [1] 781:11
Cal [1] 811:21
calibrate [1] 829:21
California's [1] 840:8
call [8] 738:17 742:21 746:16 776: 23 787:15 824:5 839:14 843:3
called [4] 812:4 814:2 823:16 833: 13
calling [2] 753:3 811:14
cam [2] 742:19 743:13 752:11
came [4] 796:7 823:15 842:24 848: 23
cameras [1] 844:16
camps [1] 759:11
Canal [1] 799:16
cannot [5] 751:25 782:15 810:3 816:13,14
cap [1] 808:4
capable [2] 784:7 813:7
capacity [1] 807:15
capital [1] 805:23
car [5] 834:7,12,18 835:6 841:14
Cara [1] 733:17
card [2] 779:6,11

Section 1201 Rulemaking Hearing April 20, 2021

cards [2] 745:18,21
care [9] 780:17,21 781:13 807:13 812:19 813:5 816:6 817:21 841:22
careful [2] 770:4,7
CarPlay [1] 834:15
carried [1] 768:5
carry [1] 766:22
cars [4] 834:9,19 838:13 847:5
cartridges [1] 796:5
carve [1] 752:6
carving [1] 752:22
case [24] 743:9,18 745:9 746:20, 25 756:15 761:25 773:25 778:16, 20 783:8,11 786:13 787:1 789:12 801:8 828:14,25 833:8,16 837:11, 16 842:7 846:17
cases [12] 742:16,19 758:2 769:5 780:24 783:5 786:18,21 806:14 821:3 846:24 847:1
cat [2] 756:6 796:21
categories [9] 737:7,8,21,25 742:1 748:19,22 770:16 846:7
category [5] 737:22 738:9 770:2 792:5 795:25
CatGenie [1] 796:21
cath [1] 781:11
causal [2] 795:20 796:12
causation [8] 736:2 738:21 739:6 741:25 763:9 795:17,24 797:18
cause [3] 774:14 807:9 840:13
caused [1] 815:10
causes [2] 806:10 818:11
causing [3] 796:4 807:24 808:5
cautious [1] 815:2
CCA [3] 734:19,21 785:2
Center [1] 805:4
centered [2] 816:25 834:17
centers [1] 812:20
Central [1] 734:4
certain [8] 737:8 748:5 752:23 762:14 766:23 772:2 821:15 845:11
certainly [13] 736:5 752:12,20,23 753:17,20 772:15,24 786:16,18 791:22 792:7 794:12
certificates [1] 754:2
certification [1] 815:8
certified [2] 815:8 829:11
cetera [1] 784:8 799:19 837:17
chains [1] 799:11
chair [1] 821:2
challenge [1] 833:7
challenged [1] 848:25
challenges [1] 779:18
challenging [1] 799:19
Chamberlain [7] 765:7 819:3 846:22 848:24,25 849:1,4
chance [4] 793:22 808:22 816:17 817:1
change [18] 745:10,19 746:3 755:2 757:22 758:1,8,11 774:25 775:3,5 798:11 802:12,18 820:19 837:

21 838:11,21
changed [8] 761:20 795:22 797:19 799:8 800:2,19,19 834:6
changes [4] 798:9,17 801:18 802:13
changing [4] 753:10 755:13,25 835:20
channels [1] 798:20
charge [1] 766:1
charging [1] 759:23
chat [3] 731:19,21 732:1
cheap [1] 775:16
cheaper [1] 778:5
cheating [4] 747:23 768:20 769:3
check [1] 820:25
checking [1] 758:4
Cheney [15] 732:25 733:2,3 776:2,3 777:15 808:22 810:24 811:1,3 812:3 833:1 836:18,20,21
Cheney's [1] 839:5
Chief [1] 733:4
China [1] 799:15
chip [1] 802:5
choice [1] 799:5
chose [1] 846:1
circle [1] 808:20
Circuit [2] 765:8 819:2
circumstance [1] 828:12
circumstances [4] 767:11 797:20 798:10 800:3
circumvent [11] 745:15 749:21 753:11 762:7,9 773:14 775:1 784:23 800:8 804:2 819:13
circumvented [2] 775:11 819:17
circumventing [4] 749:12,14 819:23 834:8
circumvention [36] 748:1,5,25 751:24 752:8 761:23 763:15,19 764:10,13,20,24 765:1 771:6 774:7 777:1,2,6,12 782:16,18 791:10, 19,20,24 796:2 802:11 803:23 820:1 822:21 823:1 828:4 833:15 839:16 848:16,20
circumventions [1] 797:3
cited [2] 821:13 822:20
citizen [1] 754:3
citizens [1] 790:13
City [1] 734:4
Civil [2] 823:21 830:18
claiming [2] 806:12 809:12
claims [2] 823:18 828:15
clarification [1] 812:10
clarified [1] 836:11
clarify [6] 741:9 809:8 811:4 833:21 838:5,6
Class [7] 731:6 735:13,18 736:16 739:16 744:12 837:2
classes [3] 744:9 804:1 849:19
clear [5] 770:2 796:2 810:18 811:5 839:1
clearly [4] 732:12 791:24 815:23 816:1

clients [6] 752:16,24 769:1 786:16, 21 848:11
clinical [1] 807:14
clinics [1] 811:16
close [1] 847:3
closing [1] 844:6
CMS [1] 821:11
coaster [1] 742:20
codes [1] 810:1
coffee [1] 796:6
cognizant [2] 736:19 848:11
colleague [3] 770:14 795:12 816:21
colleagues [1] 731:13
color [1] 742:7
combine [2] 810:5,11
come [12] 746:7 747:2 748:9 753:1 769:21 810:15 811:21 818:20 820:8 825:13 837:1 844:17
comes [11] 775:4 778:2,7,14 799:10,15 810:12 812:25 832:16 833:10 834:12
comfort [1] 741:12
coming [8] 731:10 737:17 806:14 810:12 834:10 835:2 845:16 848:7
comment [7] 747:8 751:17 753:15 754:18 757:16,17 760:10 773:9 785:22 786:14 796:20 809:17 823:6 831:12 844:6 845:18,19
commenters [1] 754:19
comments [27] 750:13 753:1,4,23 760:13 762:23 768:19 782:5,6 783:11,21 785:3 786:8 792:13,16 793:25 796:17 797:17,22 802:20 803:3 804:10 822:18 833:4 839:11 843:3 849:13
Commerce [1] 733:5
commercial [2] 772:16 841:6
Commission [1] 821:20
common [3] 739:16 746:22 820:18
commonalities [1] 739:1
communicating [1] 731:21
communication [2] 732:13 787:14
Company [2] 733:21 745:23
compensated [1] 740:8
complete [3] 805:22 828:7 835:17
completely [6] 767:15,18 788:4,6 799:5 845:23
complex [1] 839:21
complexity [1] 836:8
compliance [1] 786:12
complicated [2] 769:15 780:9
compounding [1] 836:13
compounds [1] 836:6
compromised [1] 772:19
compromises [1] 773:6
compromising [1] 774:2
computer [9] 736:15 739:12,19 740:16 774:23,24 809:10 822:13

837:16
computers [5] 801:21,22 802:1,7,9
computing [2] 800:5,10
concept [2] 756:10 771:17
concepts [1] 757:9
concern [17] 749:25 752:16 755:12 761:18 766:7 773:19,24 782:23 826:12,13 834:17
concerned [6] 760:3 769:12,24 776:22 794:19 818:4 826:14 829:10
concerning [4] 795:16 809:17 839:7,8
concerns [17] 731:6 749:16,20 753:8 764:19 775:4 781:25 782:2 791:3 793:15 799:24 817:11,22 822:7,15 839:9 840:5
conclude [2] 763:3 802:21
concluded [3] 736:15 741:20 782:14
concluding [1] 732:6
condense [1] 736:10
condition [1] 794:20
conditioning [1] 745:6
conditions [1] 766:10
conduct [2] 807:9,23
conducting [1] 805:20
conference [1] 824:5
configured [1] 744:24
confirmed [1] 843:13
conflicts [1] 826:7
confused [1] 838:10
confusing [1] 785:1
Congress [2] 798:7 845:25
Connected [3] 735:1 743:24 766:2
connection [4] 736:18 755:17 758:2 805:25
consequences [1] 812:13
consider [4] 752:6 760:25 761:1 798:14
considered [2] 827:16 838:18
considering [1] 738:24
consistent [3] 747:21 748:7 821:12
consistently [3] 737:1 814:7 848:18
console [25] 748:16 749:20 755:21 774:19 775:6,16 782:23 783:21,22 784:1,13,14 785:24 786:3 787:11 788:15 792:25 793:2 795:4 797:22 798:18 799:6 803:8,9,18 consoles [33] 735:25 747:20 748:6 750:5 752:7,19 754:20,23 761:7 770:17 774:20 778:3 781:18,24 787:9 788:5,6,11 789:3,7,16,21 792:4,14,18,24 798:16 799:4,9 803:4,5,11,15
consolidation [1] 806:25
constitute [2] 736:15 839:17
constrained [2] 788:4 845:3

constrains [1] 823:21
constructed [1] 756:3
consumable [1] 801:2
consumables [5] 796:1,14,22
  800:25 801:10
consumer [6] 762:15 771:17 772:
  13,15 773:5 813:4
consumers [8] 772:12 775:14,20
  780:17,21 783:13 793:17 799:4
contain [3] 817:25 827:1,8
contained [4] 740:16,19,24 829:6
Content [42] 734:18 751:22 752:
  18 753:12 754:3,5,6,10 756:1 763:
  23 764:2,3,6,17 771:17,18,19,20,
  22,23 772:7,10,20,21,23 773:3
  774:8 775:8,19 784:22,25 785:9,
  14 786:1,9,19,22 787:1 790:19
  793:5 795:6 829:4
context [4] 751:25 753:24 771:25
  776:22 779:15 784:20 794:11 795:
  2 798:9
contexts [3] 764:20 773:23 795:1
continue [4] 737:14 744:3 752:20
  803:4 813:12
continued [1] 817:18
continues [2] 737:19 786:23
Continuing [1] 737:6
contribute [1] 808:10
Control [11] 734:20 740:16,19 745:
  5 765:12,19 767:14 819:8 827:21
  839:24 846:20
controlling [6] 739:13 740:25 741:
  23 790:23 800:12 807:3
controls [15] 741:4 745:1,2,5 748:
  1 749:19,21 751:3 764:2 769:3
  771:2,5 797:2,13 839:21
conversation [11] 753:4 763:13
  769:10,25 780:15 786:5 790:6
  808:11 812:2 832:18 845:1
copied [2] 743:9 776:13
copies [4] 740:8,9 764:6 782:4
Copy [9] 734:20 743:7,8 764:2 779:
  24,25 833:11,16,20
copying [1] 826:21
Copyright [44] 731:4,22 732:9,18
  735:10 738:11 740:7 743:6 749:
  24 750:3 757:24 758:10 759:20,
  22 765:9,12 768:22 775:22,25
  778:11 789:6,7 790:11 791:1 809:
  12 810:19 815:1,17 818:2,4 819:5
  823:9 824:22 825:4,12,19 829:3
  832:15 839:25 840:5 843:19 846:
  18,19 847:7
copyright-based [1] 768:23
copyright-related [1] 826:13
copyrighted [10] 738:25 752:2,10
  762:5 819:18 825:11,15 827:13
  829:1 844:15
core [3] 757:19 778:12 817:25
correct [1] 848:18
correctly [1] 763:24
Corresponding [1] 772:3

cost [5] 767:7 780:24 813:6 814:9
  815:2
costly [1] 767:5 789:24
cough [1] 747:3
couldn't [2] 745:11 834:11
Counsel [5] 731:4 732:20,24 733:
  4,24
country [1] 789:18
couple [10] 736:1 752:25 756:8
  763:7 795:9 797:11 812:10 846:8
  848:14,15
course [9] 738:23 750:21 751:1
  757:4 792:20 797:25 798:5 800:
  14 841:16
court [3] 732:10 768:1 816:16
cover [5] 762:3 816:20 835:16 841:
  5,9
covered [3] 823:16,17,23
covers [2] 823:16 838:16
COVID [1] 799:14
cracked [1] 779:13
craft [1] 847:17
crafting [1] 840:1
created [2] 756:21 766:9
creating [2] 779:17 827:22
creation [2] 761:25 844:15
creative [1] 790:11
Creators [1] 735:10
credence [1] 832:2
credit [2] 779:6,11
criminal [1] 787:21
criminals [1] 787:21
crisis [1] 799:20
critical [4] 747:13 751:5 817:20
  839:19
cross [1] 816:14
cross-cutting [1] 736:5
cryptographic [10] 754:1,8 771:9,
  14 772:2,4 773:16,21 776:8 777:
  18
CSS [1] 753:11
curious [3] 800:9 819:22 822:23
current [7] 742:9 751:19 758:15
  777:2 831:10 835:15 836:4
currently [2] 735:20 803:7
customers [3] 781:6 789:22 812:
  19
cut [1] 824:20
cyber [2] 830:12,19
cycle [1] 762:11
cycles [1] 747:17

**D**

damn [1] 813:17
data [6] 819:19 820:23 828:5 831:
  13 834:21 835:1
daughterboard [3] 755:17 757:18
  758:3
Davidson [1] 783:8
day [4] 731:5 769:15 849:18,23
days [1] 746:23
deal [2] 806:19 808:12
dealers [2] 750:25 840:25

dealership [1] 766:23
dealerships [2] 769:19,19
dealing [1] 810:21
deals [1] 823:13
deaths [2] 813:21 814:23
decided [1] 765:8
deciding [1] 760:25
decision [2] 844:18 847:24
decisions [1] 748:18
decrease [1] 785:14
decreased [1] 747:25
decrypt [3] 772:6,9 774:5
decrypting [1] 785:4
decryption [7] 754:1 772:9 774:4,
  15 785:5 788:24 790:8
DeCSS [1] 785:3
deep [1] 766:18
Deere [3] 766:23 832:6 833:18
Deere's [2] 833:19 847:17
default [1] 743:18
defeat [1] 846:15
defer [1] 821:6
define [1] 812:16
defined [2] 812:14,15
defining [1] 763:4
definitely [2] 799:12 827:19
definition [2] 740:24 784:5
delayed [1] 808:12
delays [2] 767:10 815:11
delegated [1] 821:21
deliberately [2] 789:6 845:25
delightful [1] 818:1
delivery [1] 807:13
demonstrated [1] 747:18
demonstrates [2] 790:9 799:16
denied [2] 797:24 798:19
deny [3] 765:15 848:17,18
Department [5] 733:5 783:10 837:
  8 840:7 843:12
departments [1] 822:2
depend [2] 767:17 784:5
depending [2] 755:3 782:16
depth [1] 841:18
Deputy [1] 732:19
derivative [1] 760:15
descendant [1] 786:2
describe [3] 776:9,18 811:11
described [1] 776:11
description [2] 740:21 758:18
designed [1] 746:21
designing [1] 743:24
desirable [1] 774:3
desperately [1] 845:6
despite [1] 765:3
detail [4] 797:1,7,12 811:20
details [1] 810:8
determinative [1] 847:2
determine [1] 817:10
determined [1] 748:4
deterrent [1] 836:7
develop [2] 769:17 849:10
developed [1] 759:13

deviate [1] 748:17
device [75] 736:12 737:3,7,22 739:
  24 740:4,5 747:25 748:10,10,19,
  19 753:10 754:1,3,8 758:3 761:20
  763:10,13,16 764:1 767:2,6,7 768:
  2 771:5,11,19,22,24 772:4,5 773:3,
  20,23 775:17,21 776:16,23,24 777:
  6,8,10,14 779:22,23 780:7 782:11
  794:20,21,21,23,23 795:18 801:11
  803:20 804:6 807:13 818:6,22
  819:6,7,21 820:23,23,24 828:4,5,6
  829:16 830:3 833:21 846:2,3
device-agnostic [1] 735:22
device-specific [1] 770:16
devices [85] 735:23 736:3 737:9,
  11,18,19 738:3,10,10 739:14,21
  740:10 741:21 742:8,12,13,17
  743:1,4,12,24 744:3,14 747:12,16,
  22 748:7,21,22 750:14 752:17,22
  753:6,18,19 755:18 758:23 760:
  13 762:15 763:17,18,22 764:5
  766:16 771:18 772:18 774:21 780:
  3 781:18 790:14 794:18 795:13,
  24 796:14 798:24 799:9,12,17,17
  800:13 802:5,7,19 803:25 804:9
  805:5,11 811:17 813:2 817:8,17,
  20 818:10,11,12 819:18,23,24 824:
  11 829:14,20 834:18 847:5,11
  848:7
diagnostic [6] 750:24 781:12 806:
  12,25 807:2 840:23
differ [1] 738:13
difference [2] 794:25 816:6
different [20] 736:18 742:13,17
  745:3,4 748:14,15 749:23 750:9
  773:23 778:9 781:3,4 782:17 784:
  11,13 831:9,11 834:5 836:10
differential [1] 808:1
difficult [4] 737:9 793:6 807:9 832:
  3
difficulties [1] 769:18
difficulty [4] 750:16 782:6 832:6,9
digital [2] 809:21 844:16
dire [1] 788:13
direct [2] 777:20 786:1 795:6 796:
  9
directed [3] 809:7 819:13 823:7
direction [1] 834:20
directly [2] 822:17 828:3
Director [1] 735:1
disability-related [1] 804:1
disadvantages [1] 760:1
disclosures [1] 849:15
discrepancy [1] 792:10
discuss [4] 740:15 797:9,12 802:
  19
discussed [2] 801:2 803:25
discussing [1] 802:22
discussion [8] 731:11 770:15 776:
  4 815:20,25 825:4 826:4 849:11
discussions [1] 837:2
disk [9] 752:17 771:25 772:2,8,10

LOC_AR_00005752

Section 1201 Rulemaking Hearing                    April 20, 2021

774:5 778:2 783:2 795:1
disks [7] 772:7 778:11,22 782:1,5 783:3 790:22
dispute [8] 740:18 770:25 783:24 825:14 826:7 842:14,19 845:10
disputed [1] 819:4
distinct [1] 749:9
distinction [2] 751:1 843:19
distinctions [6] 747:16,18 748:22,23 750:11 751:10
distinguishing [1] 760:14
distribute [1] 785:8
distributed [1] 759:13
distribution [3] 752:10 786:7 787:1
distributions [1] 742:23
division [1] 830:18
DMCA [1] 806:9
documented [1] 765:6
doing [3] 743:12 749:6 755:5 756:24 757:21 759:23 787:21 789:8,11 790:12 813:7 816:7 833:19
done [8] 750:19 760:2 773:25 810:20 811:10 824:4
dongle [3] 818:21 820:21 832:13
dongle-based [1] 829:2
door [3] 743:21 745:4 789:1
doors [2] 743:17 745:2
Dorman [2] 833:8,15
down [8] 743:4,15 746:14 770:5 781:10,11,11 806:3
downloading [1] 833:19
dozen [1] 746:12
draw [1] 843:18
drive [39] 755:2,14,15,16,20,25 774:13,18,23,24 775:5,8,9,13 778:1,2,9,10,15,21 779:16,20 780:5,7 782:16 783:2,23 784:1 787:10 788:3 789:13,14,23 791:2 795:1 800:6,13 815:3 834:13
drives [7] 752:17 774:21 775:2,14 782:9 788:1 834:10
DRM-protected [1] 771:7
druthers [1] 743:25
duplicate [1] 836:3
during [2] 772:5 845:18
Duty [1] 787:15
DVD [22] 734:19,20,21 735:24 743:7,7 752:7 753:25 761:7 770:22 771:2,9 772:13 773:15 774:5 776:6 778:9 784:19 785:1,2,15 792:4
DVDs [8] 752:18 755:11 773:18 774:16 780:16 781:17 785:4 790:22

## E

e-recycling [1] 803:10
e-waste [1] 803:11
each [5] 738:10 773:20 816:3 831:6 841:18
earlier [16] 763:7 767:13 771:8 773:8 783:17 785:22 786:5 790:6 795:16 802:19 804:7 812:5 821:

23 826:3 831:4,8
early [2] 746:23 786:2
easier [1] 756:1 806:4
easiest [1] 731:15
easily [1] 778:18
Eastern [1] 785:19
easy [1] 765:8
echo [1] 790:3
ecosystem [2] 755:21 757:8 771:20 774:6 807:12
ECU [3] 833:10,12 835:6
EFF [4] 736:9 737:15 796:7 843:11
effect [9] 738:21,24 739:2,7 744:13 752:9 766:9 814:5 836:7
effective [2] 754:9 817:16
effectively [3] 741:23 780:24 800:12
effectiveness [1] 817:7
effects [3] 739:18 742:1 796:4
efficiency [1] 839:24
effort [3] 741:9 786:12,19
efforts [6] 786:2,18 793:13 795:7 803:10 824:7
either [9] 736:8 761:17 762:6 767:1 782:3,22 799:5 838:4 842:15
elaborate [2] 771:13 804:17
Electronic [3] 733:18 823:13,18
electronics [3] 771:18 772:14
element [1] 738:23
elementary [1] 744:17
elements [2] 786:20,20
else's [1] 758:12
embedded [4] 739:13 741:6 764:1 772:4
emissions [4] 768:21 769:3 839:24 843:9
emotional [1] 818:1
enable [2] 761:21 827:13
enabled [3] 737:11 774:7 818:11
enabling [3] 758:24 762:5 777:11
encountering [1] 829:15
encourage [3] 767:2 779:4 815:1
encrypt [1] 772:3
encrypted [2] 772:10 787:15
encryption [6] 738:8 772:11 779:19 785:6 787:5 791:18
end [13] 743:4 788:7 810:10 842:24
endangers [1] 774:6
ending [1] 743:14
endorse [2] 788:21 846:5
endorsed [1] 837:7
ends [1] 755:4
enforce [1] 843:14
enforced [1] 783:10
engaged [1] 771:20
engaging [1] 823:23
engine [2] 778:1,17
engineer [2] 745:24 810:9
engineers [2] 807:15 829:11
enormous [1] 827:1
enough [4] 796:25 797:1 808:17 823:5

ensure [2] 814:7 824:8
ensures [1] 839:22
enter [1] 820:13
entertainment [3] 754:3 771:18 774:8
entire [9] 739:16 744:23 757:8 765:19 774:6 787:25
entirely [2] 792:5 830:24
entities [3] 817:13,16,18 823:16,17
entity [1] 823:23
environmental [4] 751:4 770:3,8 840:13
EPA [3] 832:16 840:7 843:11
equation [1] 832:21
Equipment [36] 733:21 734:1 769:14,22 780:19,25 781:4,5,9,12 804:12 805:7 806:2,3,21 807:4,8,10,25 808:12 809:11 810:6,15 812:21,24 813:1 815:11 817:12,15 818:15 820:20 821:13,14,16 831:25 832:20
equitable [1] 828:8
errors [1] 810:1
especially [5] 749:20 768:3 812:25 815:4 844:8
essential [2] 773:24 813:2
essentially [7] 740:22 756:25 757:9,19 773:19 777:1 847:6
established [1] 747:21
et [3] 784:8 799:18 837:16
Even [9] 741:2 742:6,16 744:6 760:20,22 761:7 784:20 785:2 790:7,22 793:19 799:3,18 832:3,11 841:19 846:24 847:1
event [3] 732:8 807:20 814:19
events [2] 807:22 808:5
everybody [3] 779:1,1 849:9
everybody's [1] 830:9
everyone [9] 740:13 749:12 754:12 762:16 777:25 795:15 816:12,17 842:2
everything [8] 736:4 739:4 745:14 762:25 780:16 801:22
everywhere [1] 805:19
evidence [9] 750:15 762:17,18,20 782:15 785:11,23 792:24 817:14
ex [1] 849:14
exact [3] 761:4 773:20 784:14
exactly [6] 746:14 757:11 780:1 782:21 825:6 833:15
example [19] 741:10 742:4 744:4,9 745:16 746:15 747:20 750:15 751:24 756:20 759:6,21 776:7 791:15 796:21,22 800:14 801:1
examples [18] 741:21 748:8 753:4 796:7,25 797:8 800:10 820:1 822:19,23 831:17
exceeding [1] 758:20
exception [1] 752:14
exceptions [1] 837:4
excited [1] 731:9

exclude [1] 819:8
excluded [1] 838:8
exclusive [4] 765:9,10 819:5 849:5
excruciating [1] 797:7
excuse [1] 849:4
Executive [1] 735:1
exempted [1] 846:7
exemption [8] 735:19 736:14,20 737:7 738:7 739:8 740:1 742:4 749:4,14 751:6,19 752:15 753:3 754:23 758:16 760:22,23 761:1,3,5,7,10,15 762:3,6,14 763:14,14,25 764:11,12,21 765:3,15 768:23 771:4 774:13 784:20 785:10 789:9,10 790:16,17,18 791:23 793:3,20 798:11,18 801:21,24 804:1 805:17 808:5,6 810:19 812:11 818:5,9 831:10,15,16 835:11,15 836:1,5,9,11,15 837:2,12 838:16 839:8,16 840:1,12 841:5 845:1 846:2,16 847:10,10
exemptions [25] 731:8 732:6 733:10 734:14 735:19 736:11 737:9 740:15 741:20 742:9 751:9,23 761:11 762:11,13,13 765:1 791:15,17 792:8,21 793:14 843:20 848:20 849:3
exercise [1] 765:18
exfiltrate [1] 820:24
exist [6] 763:15,18 771:9 792:8 846:23 847:1
existence [7] 764:25 765:3,16 829:18 846:11,12,15
existing [3] 736:11 751:6,8 791:14 822:12,14 831:10,14,18 833:12 839:15 841:5 847:18
exists [5] 755:17 757:9,19 815:4 846:16
expanded [2] 733:10 836:1
expanding [3] 794:17 840:12 844:20
expansion [1] 760:4
expansions [2] 731:7 752:14
expectation [2] 793:16,18
expected [1] 821:19
expensive [3] 767:5 788:3 842:9
experience [3] 746:8 766:17,20
expert [2] 831:24 832:8
experts [4] 732:12 769:17 832:4 845:7
explain [2] 771:13,13
explanation [1] 782:21
explode [1] 737:19
expose [2] 773:16 777:18
exposed [7] 774:1 776:9,15,20,24 813:22 814:24
exposes [1] 823:24
expressed [1] 766:6
expressible [1] 751:22
expressive [5] 752:18 763:23 764:6,16 829:3

Heritage Reporting Corporation
(202) 628-4888

LOC_AR_00005753

Section 1201 Rulemaking Hearing                    April 20, 2021

extend [2] 758:16 846:7
extensive [1] 746:8
extent [23] 740:23 741:10 752:13,
21,23 753:9,17 754:7,25 763:11
769:21 772:18 773:6 792:21 798:
13 805:16 822:12 836:4 840:24
841:7
extra [2] 836:7,14
extracted [2] 776:23,24
extremely [7] 767:5,25 768:13,16
773:5 841:23 848:10

**F**

facility [1] 807:18
facility's [1] 744:17
fact [10] 758:2 761:13 763:16,17
800:11 809:23 817:17 826:6 827:
10 841:25
factor [1] 798:15
factors [3] 739:17 748:3 828:23
factory [6] 746:11 747:2 780:2,4,4
833:9
facts [1] 798:22
factual [2] 770:25 783:18
fail [1] 775:15
failing [1] 804:19
failures [1] 815:17
fair [7] 737:4 748:2 797:4 828:7,23
842:11,16
fairly [2] 746:22 775:16
faith [2] 837:7,11
familiar [3] 817:6 824:3 833:8
far [8] 753:5 760:2 797:19 799:7
810:14 848:8
Farm [4] 734:5 769:11 770:2 833:
21
farmer [2] 734:4 769:9
farmers [1] 833:7
fashion [1] 845:12
fast [1] 834:4
fatal [2] 765:1,2
FDA [26] 804:14 805:3,9 806:7 807:
17 814:1 815:16,18,18,18,21 816:
1 817:5,9,22 818:3 822:14 823:6,
7 824:2,8 825:3,25 830:13,22 843:
20
FDA's [5] 813:20 814:4,11,15 817:
6
FDA-mandated [1] 804:18
fearful [1] 806:17
fearmongering [2] 791:4 807:16
feature [2] 739:15 747:1
Federal [4] 765:8 806:10 819:2
840:21
fee [1] 809:22
feel [4] 747:8 749:3 791:4 808:6
felt [1] 749:5
few [6] 747:17,19 796:6 807:5 830:
20 831:10 832:23 848:23
fewer [1] 740:8
field [2] 810:11 824:22
fifth [1] 798:14
figure [2] 746:11,12

file [1] 823:17
filed [2] 734:13 807:19
files [1] 833:14
filing [2] 840:19 841:13
final [1] 832:12
finally [2] 736:3 842:8
find [7] 745:25 746:18,22 778:21
786:10 789:25 834:11
finding [3] 837:20 840:5,8
finds [1] 771:21
fine [2] 779:20 838:25
finger [1] 747:19
finish [1] 810:16
firmware [32] 739:12,18,21,23,23,
25 740:1,3,6,9,9,11,15,20 741:6
747:25 749:15,19 750:2 753:18,
24,25 761:19 764:2 771:1 773:15
790:23 820:24 833:11,12,14,20
first [23] 735:17 736:21 740:5 763:
8,20 770:21 773:13 777:10 778:2,
7,14,23 795:25 796:9 797:20 805:
10 820:5 825:24 828:11 831:7
833:5 836:18 843:7
fit [1] 770:1
fitting [1] 848:4
fix [10] 749:19,25 769:21 780:10
788:5,10 789:16,22 807:7 847:11
Flash [5] 778:2,9,10,21 782:11
flexible [1] 773:22
focus [2] 802:21 844:8
focused [5] 731:6 743:6 748:20
804:6 830:2
focusing [1] 748:15
FOIA [1] 843:11
folks [7] 746:6,6,9 772:24 789:19
811:12,17
follow [4] 773:8,10 791:7 836:5
follow-up [1] 749:11
followed [1] 836:22
following [5] 750:10 795:15 849:
23
forced [2] 757:25 842:6
form [4] 733:11 762:20 777:12 845:
11
formalized [1] 822:1
format [2] 754:6 771:24
formats [1] 754:10
forth [2] 764:14 816:15
forum [1] 842:17
forward [6] 738:6 743:24 762:24
784:2 815:3 824:9
found [11] 743:3 767:6 768:1 780:
14 795:20 796:1 800:4 807:20
817:13 819:3 846:14
Foundation [1] 733:18
four [1] 803:4
four-hour [1] 808:3
framework [2] 757:13 841:17
franchise [1] 750:25
Fraud [2] 822:13 837:16
free [8] 747:8 759:9,14,18,25 786:
11 790:7 803:11

frequent [1] 775:15
friend [1] 778:21
Frontier [1] 733:18
frustrating [1] 746:1
fuel [1] 839:24
full [5] 777:11 784:6 787:25 789:21
797:4 818:18
fully [4] 765:5 812:21 814:13 846:5
function [3] 755:8 783:22 784:5
functional [6] 755:10 810:7 812:
21,24 829:2 847:7
functionality [10] 737:4 753:7,10
764:7 779:22,23 782:20,24 784:6
794:17
functioning [4] 740:17,20 817:21
818:14
functions [1] 738:2
further [4] 739:11 761:14 841:19
849:12
Furthermore [1] 764:5

**G**

G.M [2] 833:8,16
Gagliano [29] 733:16,17,17 738:
17 739:3 740:22 741:13,18 754:
14 760:8,16 762:20 763:24 764:
13 767:24 784:17,18 788:22,24
790:4 796:10,18,19 843:6,7,22
844:1,3,6
gaining [3] 752:1 791:25 831:12
game [42] 735:25 747:20 748:6,16
749:20 750:5 752:7,19 754:20,23
755:21 761:7 770:17 774:19,20
775:6,15 776:5 778:4 781:18,24
783:7,21,25 785:24 787:9,11 788:
5,6,11,15 789:19 790:22 792:4,14,
23 795:4 797:22 798:16,18 799:8
803:15
games [3] 782:4 784:10 787:12
790:7
gave [1] 784:11
geared [2] 752:16 753:9
gee [2] 813:23 814:22
General [7] 731:3 732:20,24 733:
24 802:9 809:19 848:8
generally [1] 743:9
gentlemen [2] 815:24,25
gets [6] 759:8 769:14 770:7 776:
19 810:13 816:17
getting [10] 750:17 756:6 762:5
776:19 786:11 826:15 832:6,9
839:1 840:16
give [17] 735:14 741:11,17 759:6,
17 765:11 779:5 784:12 792:3
797:1 802:16 808:17,21 817:1
819:4,6 846:18
given [8] 770:12 790:7 797:6 799:
22 803:20 821:4,5 832:1
givers [1] 812:20
giving [5] 759:9,24 762:6,8 811:4
gizmos [1] 800:24
glad [3] 747:11 838:25 842:24
glassware [1] 813:1

glib [1] 814:21
global [1] 799:11
goal [2] 820:16,24
good-faith [1] 744:10
Google [6] 777:25 778:14,20 786:
4,10 844:18
got [5] 768:14 793:19 794:14 843:1,
5
gotten [2] 780:9 798:22
Government [1] 732:16
governs [1] 814:3
grant [6] 752:13 765:9,17,17 794:
12 843:19
granted [6] 749:4 762:12 765:2
768:24 838:19 848:20
granting [2] 761:10 849:3
great [6] 736:23 742:10 756:10,17
759:3 780:22 814:14 825:5
Greenberg [3] 732:18,23,24
gross [1] 786:25
ground [3] 821:7 832:19 837:20
groundwork [1] 772:16
group [3] 731:10 806:22 807:5
groups [1] 831:24
GRUB [1] 756:11
guess [5] 731:25 736:7 766:6,7
796:9 803:19 804:16,23 839:4
841:20
guidances [1] 830:13
guy [1] 746:16
guys [1] 757:20

**H**

H.P [1] 797:10
hack [6] 758:7 778:1,15,21 779:7,
10,11 786:2 789:6 795:7
hacking [1] 778:3
hammering [1] 836:8
hand [5] 731:16,19 747:7 760:9,
10,15 770:12 777:22 785:21 794:
4 799:20 814:25 820:6 830:6 836:
19
hand-wringing [1] 788:23
hands [4] 751:13 768:14 778:25
795:10 808:24 832:23
happen [5] 745:12 760:20 782:22
793:18 798:8
happened [1] 830:19
happening [2] 742:24 811:24
happily [1] 779:10
happy [1] 815:15
hard [5] 760:5 789:25 800:6,13,17
harm [4] 775:14 783:13 787:24
813:22
harmful [1] 760:6
harms [3] 781:13 818:11 840:13
HDOs [1] 807:13
head [3] 734:7 746:1 824:1
headphone [1] 737:23
heads [1] 801:25
Health [10] 733:22 735:1 780:17,
19,21 807:13 813:5 816:5 817:21
830:17

Heritage Reporting Corporation
(202) 628-4888

Section 1201 Rulemaking Hearing        April 20, 2021

hear [5] 736:8 742:24 747:11 749:13 776:5
heard [12] 757:17 761:8 762:10 785:11 791:14 812:1 813:16 819:24 825:7 826:4 831:3 842:9
hearing [9] 760:17 798:3,6 801:19 806:24 818:3,8 824:12 846:18
hearings [6] 731:5 732:6 772:12 811:22,23 849:18
heck [1] 816:12
help [10] 749:16 776:20 777:20 779:9,11 809:25 814:7 819:16 843:14 849:10
helpful [11] 736:6,7,17 749:13 758:22 776:4,5 792:21 793:12 811:25 812:2
hesitancy [1] 763:3
HHS [1] 830:17
Hi [4] 734:24 735:3 756:6 795:15
high [1] 817:16
high-end [1] 813:1
high-value [4] 754:5 771:23 772:21 774:7
higher [1] 815:13
highly [5] 751:2 829:2 840:3
hijacked [1] 759:15
hint [1] 825:7
HIPAA [5] 822:14 823:11,12,15,20
historically [1] 802:1,10
history [2] 772:14,14
hit [3] 756:14 824:1 826:3
hold [2] 781:19 785:16
holders [4] 765:9,12 819:5 846:18
home [1] 762:15
hope [1] 812:2
hopefully [1] 756:6
hoping [1] 735:15
horse [1] 788:25
hospital [2] 807:20 821:19
hospitals [12] 805:6,18,21 806:22 807:5,6 811:16 812:19 818:17,24 821:3,5,21,25 829:12
hour [2] 808:2,3
house [1] 756:18
However [1] 786:9
HSCC [1] 830:15
huge [2] 745:8 802:12
Human [1] 830:17
hundred [1] 787:25
hundreds [2] 788:10 789:21
hypothesizing [1] 819:12

**I**

IAMERS [3] 733:25 805:14 830:11
idea [4] 755:24 773:1 791:9 814:14
identical [1] 737:2
identified [2] 763:24 782:2
iFixit [4] 734:8 736:9 737:15 766:19
illegal [2] 782:4,4
illegality [3] 839:14 840:9,14
illegally [1] 793:5
imagine [1] 847:22

imaging [6] 806:12,25 807:2 812:20 813:2 815:10
immune [1] 792:7
impact [2] 766:16 846:16
impacted [1] 805:17
impacts [2] 748:2 789:11
implement [1] 782:8
implements [1] 773:21
implicate [2] 775:3 847:24
implicated [1] 803:12
implicating [1] 779:17
import [1] 748:23
importance [2] 840:6 844:19
important [12] 745:15 751:8 774:17 794:13 799:21 813:25 830:21 848:10
importantly [2] 747:24 749:23
imposed [1] 766:11
imposes [1] 836:5
improve [1] 770:6
improvement [1] 809:3
in-app [1] 757:10
in-house [1] 806:11
inability [1] 744:7
inaccurate [1] 803:6
Inacker [4] 733:19,20,20 780:12, 13 781:15 812:5,6,7,9 813:10 814:8 815:5,18,21,23 816:1,4,10 827:24 828:2
inadequate [3] 765:5 804:20 846:25
inappropriately [1] 794:22
incident [1] 799:16
inclination [3] 752:13,22 794:12
include [4] 794:20 827:3,4 844:14
included [2] 753:6 791:23
includes [2] 772:1 842:10
including [10] 739:17 751:23 752:19 783:10 797:10 811:25 817:19 837:15 844:15 846:3
income [1] 827:21
incorporate [1] 795:10
incorporated [2] 776:25 777:6
increase [2] 738:6 757:7
increased [3] 761:9 785:23 799:24
increases [1] 764:7
increasing [2] 737:10 769:16
Increasingly [2] 801:10 835:13
incur [1] 837:14
indeed [2] 776:15 829:8
independent [7] 750:19,23 767:5, 8 780:20 805:14,25 806:11,23 808:2 810:12 811:15 812:15 815: 13 816:4 817:13,19 818:25 819:9 821:24 829:12,13 835:24 840:24 841:3,24 842:5
indicated [1] 830:23
indicates [1] 817:14
individual [2] 737:16 748:21
industrial [2] 742:20 767:14
industries [2] 747:13 772:17 783:

5
industry [14] 741:6 750:12,13 751: 2,11 757:22 766:18 781:15 786: 22 827:10,17 833:13 834:5 840:2
inevitably [1] 792:25
infer [1] 832:8
information [23] 750:24 784:3 787:7 804:13 805:7,12 806:5 807: 7,8 821:18 823:14 827:2,3,4,5,9 829:5 839:20 840:23 841:1,2 842: 1,10
infotainment [3] 764:17 834:9 835:5
infringe [4] 760:20 762:17 789:5,7
infringement [7] 747:24 756:16 760:20 761:9 762:9 764:4 793:1, 10 828:15
infringing [12] 738:13 759:21 768: 2,8 784:10 825:16,21 826:2,3 828: 24,25 844:9
inherent [1] 739:22
inherently [1] 740:10
inhibited [1] 831:16
inhibiting [4] 796:13 800:8,12 804: 9
initial [2] 766:3 796:20
initiate [1] 849:15
Initiative [2] 735:1 835:21
injuries [1] 814:23
injury [1] 813:21
ink [1] 796:5
inkjets [1] 801:13
Innovation [1] 735:5
Innovators [1] 735:5
input [1] 777:16
inquired [1] 830:13
inquiry [2] 768:23 817:25
insight [3] 804:8 809:15 822:17
insist [1] 807:7
install [4] 780:5 801:6 810:3,3
installation [1] 805:12
installed [1] 759:19
installing [2] 778:9 782:3
installs [1] 810:13
instance [5] 753:24 776:25 786:17 800:5 804:12
instances [4] 820:2 823:2,12 825: 12
instead [3] 748:13 834:14 835:1
instructions [3] 828:21 829:5,8
insufficient [3] 795:20 812:18,22
insurance [1] 823:18
intact [1] 828:6
integrity [1] 749:24
intellectual [2] 825:9 830:23
intended [5] 743:19 775:25 798:7 825:17,18
intends [1] 793:5
intent [1] 798:4
inter [1] 803:24
interacting [1] 784:7
interest [2] 793:23 825:3

interested [3] 768:25 789:11 791:11
interesting [8] 742:11 743:5 769:10 780:15,17 790:5 801:14 813:18
interestingly [1] 823:5
International [1] 733:25
internet [7] 742:22,22 743:1,14,16,23 758:22
interpretation [1] 845:24
interpreting [1] 815:2
interrupt [1] 830:5
introduce [2] 732:16 733:1
introduced [3] 786:5 834:24 848:3
introductions [1] 733:7
intrusions [1] 753:19
intuitive [1] 775:24
investing [1] 772:20
investment [1] 772:22
investments [1] 773:2
involve [1] 767:9
involves [2] 770:3 786:20
iOS [2] 802:5,6
IP [3] 826:5,8 827:22
iPhone [2] 766:24 801:10
iRobot [1] 801:3
IRP [1] 766:25
irrelevant [1] 830:1
isn't [11] 739:20 740:2 761:15 779: 7,23 789:3 790:21 818:3 820:24 842:17 845:1
ISO [4] 807:12 815:7 822:3,3
isolate [2] 759:10,20
ISOs [1] 811:25
issue [15] 731:21 736:20 744:4 751:7 763:9 781:8,15 782:19 791: 7 806:15 810:3 816:23 829:1 830: 12,19 840:18 841:4 842:8
issued [6] 795:19,19 817:9 818:5 821:12 830:13
issues [29] 731:17,18 735:14,16, 24 736:3,5,18 739:6,16 747:9 753: 1 758:21 770:4,8 783:5 797:18 798:2 803:12 806:17 810:21 815: 10 816:19,24 822:20,21 831:8 832:12 843:1
issuing [1] 849:12
itself [11] 762:21 764:15 774:3 776: 16 784:21 786:8 790:24 793:20 830:3 834:18 847:2

**J**

jail [1] 751:24
jail-breaking [4] 762:12 791:16 792:25 849:19
jailbreak [1] 802:6
jeopardize [2] 755:15,20
job [2] 743:13 749:7
jobs [1] 749:23
John [5] 766:23 832:6 833:18,19 847:17
Joint [3] 735:10 821:20 830:14

Section 1201 Rulemaking Hearing                April 20, 2021

**jump** [4] 783:12,15,16 809:6
**Jung** [1] 783:8
**Justice** [2] 783:10 837:8

## K

**Kansas** [1] 805:20
**Kathleen** [1] 733:13
**keep** [11] 737:10,25 741:15 751:14 753:2 760:5 762:23 787:16 821:13 829:11 843:4
**keeping** [1] 798:5
**keeps** [1] 824:10
**Kerry** [1] 734:7
**Kerwin** [19] 733:23,24,24 804:17, 23 805:1 808:14,15 813:19 819: 17 820:7 821:6,9,10,11 822:8 830: 6,10 831:1
**Kevin** [2] 732:19 735:3
**key** [10] 745:18,21 774:1,4 776:23, 25 777:10 794:21,23 827:21
**keys** [19] 754:2 772:4,9,11 773:16 777:4,6,19 779:19 781:25 785:5, 12 787:5,14,18 788:24 790:8 818: 23 829:18
**kind** [39] 735:12 737:7,25 739:25 742:25 745:12 746:23 766:15,18 767:13 770:25 774:15 775:1 788: 13,25 790:9 798:1,21 800:21 801: 19,24 802:9 812:1 814:17 820:19 823:7 824:5 825:23 828:12 829:9, 22 832:19 833:18 834:13 836:3,8 845:8 846:9 848:3
**kinds** [4] 739:19 742:12 793:7 797: 10
**knowing** [1] 784:22
**Knowledge** [2] 733:14 754:22
**Knowledge's** [1] 783:20
**Knupp** [1] 735:9
**Kyle** [5] 734:10 756:9 767:13 835: 10,19

## L

**LA** [2] 734:19 785:2
**lab** [1] 781:11
**lack** [2] 789:10 815:11
**laid** [1] 772:15
**land** [1] 765:3
**language** [19] 761:21 791:23 792: 19,20 793:8,12,19 814:6 831:18 836:4 837:3,3,19 839:7,7 841:5,9 842:12,12
**laptops** [1] 801:21
**large** [1] 753:17
**largely** [1] 830:1
**larger** [2] 745:6 821:3
**Last** [17] 762:13 796:23 799:10 800:17 801:19 802:12 806:24 810: 4 811:24 830:8 831:3 834:6 843:3 845:18 848:3,4 849:18
**late** [1] 788:23
**later** [1] 793:9
**law** [12] 761:2 778:16 790:13 806: 13 824:22 825:4 836:4,13 837:5

**839:**9,17 **849:**2
**law-abiding** [1] 790:13
**lawful** [7] 760:12,14 763:2 764:8 789:12 807:24 836:12
**lawfully** [4] 740:17 744:6 764:6,9
**lawn** [1] 745:1
**laws** [7] 821:12 822:13 831:12 832: 16 836:6 837:15
**lawyer** [1] 780:14
**lay** [1] 782:10
**layer** [1] 843:18
**lead** [1] 783:3
**leads** [1] 792:25
**leaked** [1] 787:18
**least** [3] 748:18 784:1 785:5
**leave** [2] 830:7 844:22
**led** [1] 823:2
**left** [3] 746:17 818:13 828:6
**legal** [4] 785:7,9 786:20 787:23
**legislative** [1] 798:4
**legitimate** [1] 777:5
**lens** [1] 766:8
**less** [6] 754:9,9 771:11 772:23 773: 7 778:22 784:24,25
**letter** [1] 784:12
**letters** [2] 840:6 849:12
**level** [4] 737:13 763:4 783:9 805:7
**Lexmark** [1] 797:11
**liability** [4] 836:3,6,14 837:14
**Librarian** [1] 798:14
**license** [11] 745:21 748:13 757:6 766:3 784:25 785:14 827:12,14, 20 828:19,20
**licensed** [1] 827:12
**licenses** [1] 757:5
**Licensing** [2] 734:18 757:14
**lies** [2] 813:17,17
**light** [3] 738:4,14 778:2
**likely** [2] 752:9 825:1
**limelight** [1] 786:17
**limit** [2] 745:24 746:2
**limitation** [8] 837:15 838:8,20 839: 15,15,19 840:9,15
**limitations** [3] 794:10,11 831:11
**limited** [12] 737:6,8 739:9,11 749: 14 766:22 768:13 774:12 788:6 790:17 845:19 846:2
**limiting** [2] 749:18 792:19
**limits** [3] 752:15,15 827:7
**line** [4] 813:17 836:22,23 848:11
**link** [3] 732:1 795:20 796:12
**Linux** [5] 742:17,18,21,22 749:15 756:10
**list** [1] 837:16
**listening** [3] 731:24 752:4
**literally** [5] 731:18 759:17,24 778: 7,13
**literary** [2] 739:9 809:14
**lithium** [1] 800:22
**litigate** [1] 842:17
**litigation** [1] 836:9
**litter** [5] 738:15 750:2 796:6,21

**847:**6
**little** [35] 741:11 742:7 747:6 753: 22 762:24 771:13 776:5,18 781: 19 785:1 786:5 788:23 794:19 795:21 798:22 802:21 804:7,8,17 811:11,13,20 813:17 814:21 816: 18,24 820:6 825:7 831:6,9 836:25 837:1 838:10 843:2,4
**livestreamed** [1] 732:10
**LLC** [1] 734:19
**loading** [1] 833:20
**located** [1] 805:19
**lock** [5] 743:17 755:16 790:24 791: 2 818:24
**locked** [1] 743:15
**locking** [1] 743:4
**locks** [10] 743:19,19,22 744:1,3 747:12 753:16 774:18,22 790:9
**log** [1] 743:17
**logistics** [1] 731:12
**long** [3] 767:9 793:4 823:4
**longer** [6] 749:6 772:19,22 774:1 794:2 798:24 799:1 803:5 806:20
**longform** [1] 796:20
**look** [17] 736:17 743:23 760:18 772:24 773:1 786:22 792:15,23 796:19 797:7 807:17,20 814:3 815:9 826:1 830:20 841:12
**looked** [1] 748:8
**looking** [8] 738:4,9 766:8 774:1 790:15 814:1 824:21,25 834:11
**looks** [1] 811:15
**loss** [1] 808:11
**lot** [21] 735:12 739:19 746:9,22,24 748:23 749:23 751:13 756:24 760: 18 768:14 772:25 779:8 792:24 813:24 815:12 816:19 819:24 822: 19 843:5 845:4 846:11
**lot's** [1] 781:22
**lots** [2] 778:25 802:13
**lower** [1] 806:1
**luck** [2] 767:18 820:15

## M

**machine** [7] 772:8,9 780:6,7 789: 14 819:20 828:20
**machines** [1] 806:21
**made** [8] 753:23 757:5 785:22 792: 13 838:9,21 839:11 848:15
**main** [2] 788:1,2
**maintain** [3] 752:20 805:6 821:16
**maintenance** [4] 744:18 804:15, 21 821:16
**makers** [1] 826:16
**malicious** [1] 753:20
**malware** [1] 743:10
**Man** [1] 801:16
**management** [2] 821:24 822:1
**manner** [1] 753:12
**manual** [13] 782:12 825:10,10,18 826:25 828:13,17,20,24 829:1,4,6, 24
**manuals** [19] 806:13 809:3,9,13,

**20,21 811:**8,10 **825:**7,8,15 **826:**4, 13,15,21 **827:**1,8,20 **829:**7
**manufacturer** [17] 743:12 767:11, 16 771:19 772:5 773:20 801:5 806:2 807:18,19 808:3 810:15 819:1 821:1,14 842:6 847:23
**manufacturer-branded** [6] 765: 16 766:20 767:4,7,17 818:19
**manufacturer-provided** [1] 766: 11
**manufacturers** [25] 743:4 746:7 750:22 771:12 780:25 782:23 783: 14 803:9,18,22 804:12 806:20 807:1,2 809:12,24 817:12,15 818: 15 819:7,7 826:16,25 840:22 842: 1
**manufacturing** [3] 772:1,6 773: 23
**many** [14] 738:2 761:6 762:11 780: 24 799:4 806:16 807:11,13 808:8 813:24 815:9 817:14 821:3,21
**map** [2] 735:14 842:24
**Mark** [1] 734:3
**market** [20] 738:1,24 739:7,17,20 740:2 765:12,19 766:7 777:11 786:25 787:24 788:11 805:15 807: 2,6 815:4 819:8 845:22 846:21
**marketed** [1] 738:1
**marketing** [1] 756:19
**marketplace** [2] 793:16,18
**Massachusetts** [2] 834:23 835: 21
**massive** [1] 806:25
**material** [6] 825:11,15,18 827:13
**materials** [2] 804:19 809:14
**Matt's** [1] 750:11
**matter** [5] 766:13 797:21,25 798:4 849:22
**Matthew** [1] 735:8
**MAUDE** [1] 807:17
**McHargue** [18] 734:2,3,3 769:7,8 785:17 797:16,25 808:21,25 809: 1,6,19 831:4,7,20 844:24,25
**MDR** [1] 813:20
**MDY** [2] 783:8 849:1
**mean** [15] 741:1 744:8 746:23 747: 10 748:20 761:4,25 773:20 776: 14 791:13 792:20 794:22 801:8 826:13,18
**meaning** [1] 766:22
**means** [4] 760:21,22 785:13 819:5
**measures** [2] 737:12 829:11
**mechanic** [1] 835:16
**mechanics** [2] 819:23 834:25
**mechanisms** [1] 829:22
**media** [5] 770:16 771:7 834:14,16, 19
**Medicaid** [1] 805:5
**medical** [33] 732:22,25 736:2 767: 6,7 780:19 781:18 802:19 804:6 806:22 807:12 817:8,17,20 818:6, 10,12 819:6,7,23 824:11 828:4

Section 1201 Rulemaking Hearing    April 20, 2021

829:14 830:3 847:4 848:7
Medicare [1] 805:5
meet [5] 758:1 814:7,11,15 839:23
meeting [1] 849:21
meetings [1] 849:14
meets [1] 757:23
members [8] 756:23 806:16 807:
11 808:9 822:3 830:15
membership [1] 827:19
mention [6] 746:4 788:15 795:25
812:1 847:16
mentioned [14] 740:24 744:16
767:13 769:12 772:12 781:24 788:
17 792:20 796:21 802:18 809:9
817:4 831:7 832:13
menus [1] 820:14
Michael [1] 734:17
Microsoft [4] 798:23 799:2 803:3,
7
middle [1] 837:20
might [28] 731:13 736:6 741:9,10
745:7,13 752:4 754:25 755:7,9
761:14 763:17 767:12 772:24 776:
10 777:13,19 798:11 811:24 816:
24 820:19 823:14 838:4 839:9
841:21 843:24 846:24 847:1
mike's [1] 804:23
millions [1] 788:12
mind [3] 761:23 763:6 766:5
minimal [1] 822:5
minimum [1] 808:3
minutes [1] 732:5
misdirected [1] 824:6
misleading [1] 841:23
missed [1] 838:4
missing [1] 838:13
misused [1] 776:9
Mitchell [1] 735:9
mitigate [1] 840:11
mobile [1] 834:18
mod [1] 778:5
model [3] 757:8 806:2 834:12
moderate [1] 731:13
moderating [1] 816:21
moderator [1] 816:15
modern [1] 838:12
modification [25] 735:22 753:6
754:17,25 759:3,9,10,11 760:12,
14 761:19,24 762:1 763:2 765:25
767:21,22 768:1,5 770:1,3,15 837:
18 839:7 844:7
modifications [8] 754:21 757:4
762:4 794:17 797:14 844:10,12,
14
modified [3] 739:25 740:11 831:
19
modify [5] 744:6 755:1 757:25 786:
2 795:7
modifying [2] 743:20 844:16
moment [6] 811:4 816:9,11,11,12,
12
money [3] 746:2 772:21,25

monopolize [1] 801:11
month [2] 744:25 801:18
months [3] 799:11 818:14,19
Morgan [1] 734:24
morning [8] 732:19,21,23 733:3
734:3,16 735:8 834:11
most [6] 772:13 775:15 776:22
785:25 795:5 798:17 809:20 829:
7,17 834:23
mostly [1] 848:6
motherboard [3] 755:17 783:23
791:2
motion [1] 782:1
motor [1] 839:22
motorized [1] 765:3
MOU [12] 750:21 840:20,21 841:13,
23 842:1,3,9,15,18 845:3,8
move [10] 740:13 768:14 788:19
791:8 793:24 810:25 828:1 833:
11,16 834:3
moved [3] 834:19,21,22
moves [1] 824:9
movie [9] 772:1,3,25 774:3 777:9
784:22 826:16,17 829:7
movies [4] 771:25 786:11 790:21
824:13
moving [3] 751:14 765:20 817:24
MRI [1] 781:10
MS [157] 731:3 732:25 733:6,12,13,
15,16,17,19,23 734:2,6,6,7,9,12,
22 735:2,6,11 736:20,23 738:16,
17,18 739:3,4 740:12,22 741:8,13,
14,18 744:4 745:20 746:14 747:5
749:10 750:6 751:12 754:11,13,
14,16,24 756:4 758:14,20 759:2,4
760:7,8,16 762:19,20,22 763:1,6,
24 764:12,13 765:21,23,24 766:4,
6,12,13,14 767:19,20,22,23,24
768:10,11,13,15,16,17 769:6 770:
9 774:10,11 783:4 784:17,18 788:
18,18,21,22,24 790:2,3,4,4 795:16
796:10,16,18,19 797:17,19 799:24
25 802:18,25 812:6 816:9,11 817:
1,3 819:10 823:6 824:17,19,25
827:25 828:10,11 829:24 830:1
833:1,24 835:8,9 836:16,25 837:
19,22 838:1,3,15,15,18,23,24 842:
22 843:6,7,17,21,22,23 844:1,2,3,
5,6,23 845:15,17,23 847:13 848:1,
14 849:8
much [23] 739:6 760:8 756:19,20
759:23 775:19 777:13 780:23,23,
24,24 781:22 785:20 796:25 799:
13 800:19,19 822:2,16 834:6 839:
14 840:17 847:25
multiple [5] 735:19 760:4 772:16
794:15 797:10
music [1] 824:13
must [9] 786:24 807:19 838:23
mute [2] 732:13 812:8
myopically [1] 748:20
myself [2] 787:3 838:5

# N

nail [1] 824:1
name [3] 733:3 734:17,24
names [1] 783:7
nanny [2] 742:19 743:13 752:11
narrow [2] 737:8,21
narrowing [1] 740:21
national [1] 845:3
nationally [1] 845:8
nature [3] 739:22 829:1 844:19
Nebraska [1] 734:4
necessarily [4] 773:16 774:21
814:19 825:2
necessary [7] 755:3 798:11 814:
11 831:16 838:9 840:9 845:4
necessity [2] 768:19 799:10
need [37] 743:17 744:10 745:9,19
754:20,25 755:7 757:20,22 763:
18 769:16 775:11 781:4,9 787:8
799:18 803:19 804:1,2 812:19,21
813:8 819:20 820:12 831:22 833:
11 834:21 835:14,16,22,23 838:4,
5 841:13 845:6,11 849:12
needed [6] 741:22 742:4 802:11
818:21 822:11 832:14
needs [3] 808:6 841:2,14
net [1] 779:7
network [3] 769:16,19 767:15
never [6] 842:14 843:13 846:14
848:17,24
nevertheless [1] 837:14
new [27] 731:13 737:17 755:19
765:17,17 767:2 774:24 775:17
778:4 799:5,17 800:21 808:6 810:
6 819:4 829:21 833:10,10,12,17
834:9,12 844:15,15,16 846:18
849:5
next [10] 733:6 735:24 738:17 751:
16 770:11 779:3 791:8 793:24
794:8 795:11
nice [1] 801:16
Nicholas [1] 809:1
Nick [1] 732:21
nine [1] 807:3
nobody [1] 801:20
nodding [1] 845:17
non [2] 738:12 768:7
non-compliance [1] 806:8
non-diagnosed [1] 821:15
non-infringing [14] 737:1,5 738:
11 744:13 761:12,24 762:1,2 768:
6 796:4 818:8 825:1 828:18 844:
11
non-issue [1] 779:13
none [1] 768:21
nor [1] 845:9
notably [1] 798:17
note [10] 752:25 753:14 756:9 774:
17 779:22 785:23 789:4 794:10,
14,25
noted [1] 757:12
nothing [2] 840:10 841:15

noting [1] 795:4
notwithstanding [2] 742:9 806:
19
novel [1] 829:7
NTIA [1] 733:5
number [14] 737:10 740:9,10 753:
3 757:7 779:6,11 783:6 786:21
788:4,6 793:6,7 808:9
number-one [1] 793:1
numbers [2] 815:9,12

# O

object [1] 741:9
objective [1] 817:14
obligation [1] 836:5
obstruct [2] 763:11,16,19
obstructing [1] 830:2
obviate [1] 763:18
obviates [1] 841:13
obviously [2] 760:2 845:19
occupying [1] 807:1
occurring [2] 807:22 829:17
occurs [1] 795:3
OCR [1] 823:21
OEM [12] 812:14 813:7 815:9 816:6
827:12 832:10 845:5
OEMs [5] 804:19 814:3,14 815:8
817:14
off-the-shelf [2] 780:5 787:12
offer [1] 787:8
offering [1] 803:7
offers [1] 813:6
Office [31] 731:4,22 732:9,18 733:
4 736:14 743:6 744:25 751:5,22
752:6 757:24 758:10 760:11,25
763:2 764:15 765:2 782:14 795:
19 796:24 800:4 810:19 815:1,17
818:2,4 823:9,21 839:25 843:19
845:14 846:14 848:8,11,22,25
Office's [3] 737:6 768:22 845:24
official [3] 798:20 799:2,18
offline [1] 784:10
often [4] 753:18 765:5 801:16 829:
17
oftentimes [1] 820:11
Ok [1] 767:23
Okay [41] 741:8,14 747:5 749:10
750:6 754:11 760:7,9 762:19 767:
19,20 768:10,15 769:6 774:9 776:
1 777:23 778:24 780:11 784:16
788:17 791:6 793:21 794:5 799:
23 802:15 810:23 812:3 819:10
822:8 827:23 829:23 832:22 835:
7 836:16 837:24 839:1 843:22
844:2,5 848:1
old [1] 813:17
once [4] 755:2 810:3 819:17 849:
15
one [72] 735:19 736:11 737:22 738:
18 740:12 741:19 742:4 744:15
743:10 751:16 753:2,8,15 757:6,6,
16 759:7,22 760:15 761:21 765:
21,24 768:9,11 769:11,23 772:13

Section 1201 Rulemaking Hearing                                        April 20, 2021

775:16 776:7 777:8 778:1 779:12
782:6,10,11 785:24 788:22 789:4
791:13 793:4,6 795:25 797:9 798:
17 799:1,1 800:14 803:1,2 807:17,
21 809:6 811:5 813:19,20,23,23
822:12,18 828:22 831:5,11 833:
17,25 835:6,25 841:20 843:8 846:
8,9 847:15 848:16
ones [1] 786:16
onesie-twosie [1] 774:2
only [22] 731:25 739:11 745:17,20
750:13 761:24 763:14 764:9 765:
10 766:23 767:1 771:4 782:23
783:21 789:10 805:10,24 807:17
813:19 823:16 841:21 843:19
OnStar [1] 847:22
open [5] 756:15 766:3 783:1 793:2
836:10
operate [2] 777:3 803:25
operating [1] 769:22
operation [4] 739:13 740:25 741:4
771:5
operators [1] 813:22 814:24
opponents [9] 736:8 760:18 761:
6,9 762:16 792:2 804:11 811:14
837:19
opponents' [1] 791:11
opportunity [4] 740:14 802:16
805:2 808:17 816:13 835:11 841:
21 842:20 849:14
oppose [1] 841:9
opposed [3] 776:16 791:5 796:23
opposition [4] 734:13 785:3 797:
21 822:18
optical [3] 752:17 755:2,14,14,16,
19,25 771:25 774:13,18,21,23,24
775:2,5,8,9,13,14 780:7 782:9,15
783:2,23 784:1 787:10 788:1,3
789:13,14,23 791:2 795:1
optical-drive-driven [1] 774:20
option [2] 747:3 756:21
options [2] 799:3,3
Oracle [1] 844:18
order [14] 735:14 741:15 755:1
758:12 783:25 789:7 811:9,18
812:22,24 813:8 818:21 831:19
835:17
organization [3] 733:8 812:16
813:3
organization's [1] 767:9
organizations [10] 737:16 780:20
807:14 815:7,10,14 816:5 817:19
823:17 829:13
original [18] 740:5 753:7 759:2
780:25 782:25 794:20 795:7 804:
11 806:2 809:11,24 817:12,15
818:15 820:3 821:14 828:6 845:5
originally [1] 836:24
other [63] 733:11 737:15 739:19
741:19,21 742:6,8 748:10 750:3,
14 751:1 752:2,25 753:22,23 757:
4,16 758:4 760:15 762:5,7 763:22

765:4 768:6 769:25 772:12 774:
20 782:19 791:25 795:1,9,13 796:
6 799:7 802:13 803:12,25 806:9
808:12,23 809:14 811:12 816:3
818:10 819:24 820:20 822:6,11,
13,14 824:20 831:11 832:16,23
834:20 836:5 837:2,4,5,14 839:8,
11 842:19
others [8] 797:11 800:15 808:17
811:16 814:14,20 837:8,19
otherwise [4] 740:4 745:5 777:5
841:16
ourselves [2] 746:18 758:7
out [45] 731:23 738:18 744:19,22
745:3 746:11,12,12 747:2 751:9
752:6,22 755:2,13,25 756:7 766:
22 767:18 768:5 774:25 775:3,5
776:20 777:5,20 782:10 785:6
787:20 788:5,9,25 795:20 798:1
799:6 803:18 810:11,13,15 818:
15,20,24 820:14 830:7 840:18
847:19
outdated [2] 742:22 743:2
output [1] 778:23
outside [5] 739:21 764:21 767:15
799:3 832:17
over [18] 747:17 749:6 766:18 788:
24 791:3 795:12 799:10 800:17
815:2 816:3,14,18 819:24 823:22
824:2 835:21 843:2 849:10
overall [1] 793:15
overcome [1] 814:10
overriding [1] 840:6
oversight [4] 807:15 821:20 823:
22 824:2
oversimplification [1] 786:25
overwhelmingly [1] 802:11
own [12] 732:5 745:10 765:14 775:
21 788:11 789:23 806:20 807:8
821:25 829:14 830:13
owner [4] 740:7 754:5 771:19,21,
23 825:19 832:5 846:1,2
Owners [5] 735:10 743:20 750:23
754:10 772:20

## P

P.C [3] 779:15,16 802:2
p.m [1] 849:21
painfully [1] 808:10
pair [1] 755:19
pairing [3] 774:14 775:10 780:8
pairs [3] 755:16 774:18 780:6
panel [1] 732:4
panelist [1] 731:20
panelists [1] 763:22
papers [1] 830:16
Paragraph [1] 837:13
part [30] 737:20 739:7 745:21 749:
3 751:17 754:21 756:18 761:15
763:13 768:22 785:21 788:3 809:
7,20 810:13 811:5 813:25 814:9
817:10 824:15 825:8 827:11,14,
18,21 829:21,21 832:15 833:8,12

parte [1] 849:14
participate [1] 849:14
participation [1] 732:2
participatory [1] 830:14
particular [17] 744:20 754:20 760:
11,17 775:10 776:24 777:17 809:
22 822:17
particularly [8] 746:23 750:12
755:24 777:17 790:15,24 791:11
805:5
parties [3] 743:22 746:5 753:20
partnership [1] 830:15
parts [5] 789:24 799:18 801:12
806:18 810:2
party [1] 817:13
pass [1] 835:21
passed [4] 744:18 834:14 835:1,
10
password [8] 744:19,21 745:10
746:17 747:4 820:12,14,17
passwords [2] 821:4,5 829:18
past [7] 747:8,17 750:4 760:19
762:13 763:3 797:24
patched [1] 743:2
path [2] 737:6 776:14
patience [3] 830:9 842:23 849:10
patient [1] 781:8
patients [5] 781:10,12 813:22 814:
23 824:10
pay [8] 745:22 746:3 748:13 756:
19,19 757:5,11 814:11
paying [3] 778:4 826:17 847:23
payload [2] 832:14 833:14
payloads [1] 833:14
penalties [1] 812:12
people [39] 731:17,18 735:12 745:
18 759:25 760:19 761:2,11 769:2,
9 773:17 775:13 778:13 784:23
787:19 788:5,10,12 789:2,5,11
790:6 797:14 800:6 803:10 805:
16 808:23 818:13 826:14,17,20
829:13,14 830:18 831:23 835:22
836:9,14 843:3
people's [1] 824:13
percent [11] 750:18 767:8 807:1,3,
21 813:6,19,20,23 814:22 835:21
perform [2] 790:17 804:15
performance [2] 764:8 839:22
perhaps [4] 732:4 750:1 752:11
797:7
peripheral [1] 801:1
peripherals [7] 800:5,11 803:14,
16,17,24,24
permanent [1] 791:16
permission [4] 744:7 762:7,8 846:
6
permit [7] 735:22 760:22,24 771:6
784:21 818:9 841:17
permitted [1] 764:10
perp [1] 786:17
person [3] 744:18 745:25 770:11
personal [1] 745:16

perspective [3] 779:23 845:16
847:9
pertaining [1] 805:12
pertains [1] 805:10
petition [1] 797:24
PHI [1] 823:24
phone [3] 738:14 834:15,15
photographic [1] 844:16
phrase [1] 763:4
phrasing [1] 836:10
physical [6] 739:14,21 740:4,5
758:3 822:20
pick [1] 738:18
picture [1] 793:15
pictures [1] 782:1
piece [3] 781:11 810:6 842:21
pieces [2] 788:8 813:1
piggyback [2] 753:22 754:16
piggybacking [1] 751:16
pin-outs [1] 827:3
piracy [14] 759:9 761:21 762:5 764:
14,19 776:15,17 777:13 784:21
785:23 791:4 793:1 795:3 834:17
pirate [2] 756:1 790:18
pirated [3] 753:12 755:11 759:18
pirates [1] 790:10
pirating [3] 786:9 790:7,10
pivot [1] 836:24
place [16] 740:5 747:22 749:22
757:12 777:11 781:1 787:16 807:
16 815:17 823:8,10 826:1,6 827:
14 838:20 845:9
placed [1] 759:16
places [1] 842:19
platform [5] 754:4 771:12 786:8,
10 795:5
platforms [1] 785:25
play [13] 752:17 755:11 763:23
764:5 773:18 777:8 778:11,22
782:1 784:10 787:12 798:2 825:
13
playback [2] 785:25 786:7
played [3] 771:24 775:9 834:14
player [2] 773:15 778:10
players [10] 735:25 752:7 761:8
770:16,22 771:2,10 776:6 777:18
792:4
playing [4] 782:4 795:6 824:22
845:11
PlayStation [3] 779:12,12 780:4
please [9] 732:11 733:1 736:22
740:8 800:15 804:24 815:5 836:
20 839:12
plug [2] 774:24 820:21
poignant [1] 787:18
point [21] 750:10,11 751:9 758:7
759:20 760:2 765:24 784:19 785:
16 787:17 794:1 796:12 797:25
805:9 821:23 833:25 843:8,17
844:21 848:21 849:2
pointed [2] 749:11 840:18
points [5] 739:5 756:13 812:10

Section 1201 Rulemaking Hearing                    April 20, 2021

823:7 848:14
police [1] 793:6
policy [2] 734:8 803:3
politics [1] 835:19
popular [2] 785:25 795:5
port [1] 835:2
portability [1] 823:13
portion [1] 791:22
portions [1] 783:22
pose [1] 770:19
posed [1] 747:9
posing [1] 731:14
position [2] 750:14 752:21
possess [1] 807:6
possession [1] 807:24
possibility [2] 776:17 832:2
possible [5] 761:19 776:14 777:14
  812:25 817:5
possibly [3] 799:13 831:25 837:4
post-hearing [2] 784:11 849:13
post-warranty [2] 750:19 792:17
posted [1] 732:9
potential [3] 813:22 826:2 831:15
potentially [13] 755:3 770:6 771:1
  774:5 776:8 777:19 788:12 795:
  10 806:18 808:11 810:1 840:13
  846:4
power [1] 807:7
practical [2] 737:13 766:15
practice [2] 747:12 823:23
practices [3] 744:2 765:18 806:22
precedent [1] 736:13
precisely [1] 742:15
prefer [1] 792:21
preferred [1] 806:2
premises [1] 767:14
prepared [1] 751:17
prescient [1] 818:12
present [1] 753:12
presents [1] 772:20
preserving [1] 790:11
President [1] 734:25
press [1] 741:17
pressure [1] 752:23
pretty [4] 756:16 767:25 774:25
  803:10
prevent [8] 743:10,20,22 747:23,
  24 768:19 781:2 829:15
prevented [2] 844:10,13
preventing [6] 775:12,20 790:10,
  13 804:21 809:17
prevents [1] 775:23
previous [1] 782:3
price [2] 757:1 808:1
primarily [3] 747:24 764:20 796:7
primary [1] 778:19
primitive [1] 746:25
printer [2] 796:22 797:9
printers [2] 750:2 797:9
prior [3] 748:17 754:19 765:1
privacy [4] 747:23 768:20 769:4
  823:15

privilege [1] 818:25
probably [9] 731:15 745:11 778:5
  784:12 814:16 831:21,22 832:17
  844:3
probe [1] 795:21
problem [10] 737:20 756:13 758:9
  772:20 786:24 788:14 792:22 807:
  10,24 824:15
problems [7] 742:25 746:9,13 756:
  12 759:7 788:13 834:25
procedure [1] 782:12
procedures [1] 782:8
proceeding [3] 742:3 818:3 823:9
proceedings [2] 732:11 783:3
process [2] 741:21 772:6
produced [1] 740:1
product [7] 741:4 757:1,1 767:10
  777:7 786:6 825:22
production [1] 798:25
productive [1] 731:11
products [9] 738:1 756:24 757:15,
  25 759:9 772:14,15 777:5 814:7
professional [2] 745:13 788:15
program [1] 785:4
programming [2] 744:23 745:1
programs [8] 736:15 739:12,20
  740:16 809:10,13 819:19 822:1
progress [1] 839:1
progressed [1] 749:8
prohibition [2] 796:2,3
prohibitively [1] 842:9
proliferation [3] 738:3 795:3 831:
  24
promise [1] 768:12
promote [1] 844:14
promulgation [1] 751:6
proper [2] 736:16 847:9
properly [1] 794:13
property [2] 825:9 830:23
proponents [4] 736:8 771:3 791:
  14 837:20
proposal [1] 848:17
proposals [3] 735:21 736:9 848:
  19
propose [1] 837:9
proposed [13] 731:7 732:5 734:14
  735:13,18 749:14 764:21 771:4
  785:10 837:3,6 838:11 849:19
proposition [2] 773:5 848:8
proprietary [1] 827:2,9
protect [19] 743:8 747:22 749:23
  751:3 753:19,25 754:8 764:3 768:
  20,20 771:6,14,15 775:8,25 789:3
  828:13 829:3,4
protected [7] 742:18 761:15 765:
  10 790:21 791:1 825:8 827:9
protecting [5] 751:20 758:16 771:
  1 773:15 775:7,12,19 824:12
protection [10] 737:11 743:7,8
  771:17 779:24,25 785:9 786:19
  789:15 829:10
protections [1] 753:18

protects [2] 774:15 775:10
protocols [1] 755:22
prove [1] 765:5
provide [20] 731:23 732:4 742:7
  750:22 769:20 800:10,15 804:19
  813:5 814:14 816:5 817:16 818:
  20,22 819:25 825:20 827:11 831:
  17 832:10 840:22
provided [9] 746:15 750:25 803:
  17 817:11 840:11 841:3 842:11,
  16 843:24
provider [2] 766:25,25 846:4
providers [6] 784:22 811:15 816:6
  819:9 821:24 835:24
providers' [1] 846:4
provides [2] 772:11 777:13
providing [4] 804:13 806:4 807:7
provision [5] 749:5,6 842:3 845:
  20,21
provisioned [1] 780:3
provisions [1] 842:10
PS4 [1] 788:1
pseudo-standing [1] 798:1
Public [5] 733:14 743:14 754:22
  783:20 840:12
public-private [1] 830:15
publicly [3] 785:7,12 830:25
purchase [4] 757:10,10 766:3 775:
  17
purchasing [1] 807:5
purely [2] 737:13 801:11
purpose [17] 737:1,3 738:10,12,19
  739:10 750:3 752:1 755:10 761:
  24 762:2,4,9 764:9 783:1 790:17
  791:10,18,21,25 792:9 802:9 818:
  6 825:21 828:16,17,18 838:17
  844:20,20 847:8
purposes [5] 731:8 753:23 760:23
  764:14 768:6
pursued [2] 783:5 786:21
put [15] 741:10 743:7,25 745:24
  747:18 772:8 774:24 777:25 778:
  15 781:1 793:8 802:7 819:20 838:
  20 846:11
putting [1] 845:9

## Q

Q&A [1] 731:21
QSR [3] 814:3,12,16
qualifications [1] 811:18
qualified [5] 807:12 811:25 816:7
  818:16 822:3
qualifies [1] 837:12
quality [8] 805:8 814:2,6 817:7,11,
  16 824:8 830:16
quarter [1] 788:10
question [57] 740:12 741:18,24
  742:10 747:14 748:12 751:16 756:
  17 759:3,10 763:2,8,9,20 765:20
  766:5 770:22 774:16 776:2 777:
  17,20 778:12 788:1 784:11 787:
  8 788:20 792:7,19 796:10 797:20
  800:1,2 801:1 804:3 808:23 810:

24 811:6,7 819:11 820:10 824:20
  825:6,24 826:2 828:3 831:5,8,21
  832:21,25 833:1,2 839:4 844:9,11
  845:21 848:6
questioning [2] 747:19 770:13
questions [17] 731:14 735:17 736:
  1 748:9 749:11 763:7 770:19 776:
  7 787:4 793:7 795:1,16 804:6
  822:10 825:24 827:6 836:22
quick [5] 768:12,12 773:8 812:10
  843:8
quickly [12] 768:16 778:18 783:4
  788:19 791:8 792:13 798:9 801:
  18 802:25 817:4 844:7 848:6
quite [5] 748:12 770:1 783:6 821:
  11 845:2

## R

radiation-emitting [1] 805:10
radio [1] 751:21
rain [1] 810:12
raise [1] 731:16
raised [12] 751:13 760:11,13 764:
  24 768:14 770:12 808:24 817:23
  820:6 822:7 832:24 836:19
raises [1] 791:7
Rapid7 [1] 837:2
rates [1] 806:1
rather [4] 749:11 774:17 775:9
  822:21
rays [1] 790:22
reach [1] 731:22
read [6] 810:1,1 826:15 828:21
  837:6,9
readily [1] 781:6
Reagan [1] 731:3
real [9] 751:10 758:8 782:7 785:17
  786:13 787:25 788:13 818:11 834:
  4
realities [5] 738:1 756:2 773:22
  787:1 791:5
reality [2] 823:7 825:8 827:8
realize [2] 812:4 830:22
realized [1] 801:18
really [38] 731:9 737:9 738:4 739:
  15,20 741:1 745:13 747:12 761:
  15 768:18 769:12,20 775:3,12,19
  780:9 785:16 789:11,13 792:22
  793:14,16 799:21 807:16 809:22
  817:4,24 820:16 823:24,24 824:7
  825:2 829:9 830:2 836:7 843:18
  844:7,18
reason [2] 758:24 793:1
reasonable [3] 768:3 842:11,16
reasoning [2] 836:23 849:4
reasons [1] 798:13
Reauthorization [1] 814:4
recall [1] 803:14
received [3] 753:5 822:19 840:6
receiving [1] 804:20
recent [4] 786:14 799:16 834:23
  844:18
recognize [1] 789:4 801:7 810:5

Section 1201 Rulemaking Hearing                    April 20, 2021

**recognized** [2] 751:5 840:1
**recognizing** [1] 835:22
**recommend** [1] 835:11
**Recommendation** [3] 764:16 795:18 800:4
**recommended** [1] 838:7
**recommending** [1] 838:24
**reconvene** [1] 849:22
**record** [21] 735:13 744:8,12,16 747:21 748:17 752:8 765:6 795:23 796:3,11 803:14 830:18 838:6 839:20 840:10 841:10,16 843:24 848:23 849:11
**recorded** [1] 732:8
**records** [2] 747:17 792:23
**recycled** [1] 803:11
**recyclers** [1] 788:7
**reduce** [1] 814:9
**reduces** [1] 754:9
**reduction** [2] 813:6 815:3
**Reed** [41] 734:23,24,24 741:10 756:5,6 758:19 759:1,3,6 760:7 769:1 777:22,24 779:5 790:6 812:6 813:11,13,16 815:6,7,15,20,22 817:4,6,22,25 820:9 822:9,25 823:4 824:15,18,24 825:5 826:9,19,22,24
**Reed's** [1] 768:18 782:5 828:15
**reemphasize** [1] 848:10
**reenabling** [1] 789:15
**refer** [2] 791:18 796:1
**reference** [2] 786:9 822:6
**referred** [4] 734:19,20 823:2
**referring** [1] 823:14
**refers** [1] 758:4
**refocusing** [2] 817:24 829:9
**refusal** [2] 806:19 808:12
**Regan** [4] 756:14 824:18 838:2 840:17
**regard** [4] 775:25 797:22 798:2,15 799:4,8,9
**regarding** [1] 786:6
**regional** [1] 805:18
**register** [3] 795:19 835:10 838:7
**regulated** [2] 751:2 840:3
**Regulation** [3] 814:3 824:8 842:15
**regulations** [6] 751:4 804:14 805:4 822:14 840:21 843:10
**regulatory** [5] 736:11 742:3 818:3 839:23 842:12
**rein** [1] 793:13
**reinforces** [2] 843:17 844:19
**reiterate** [1] 835:9 844:8 848:13
**rejecting** [1] 840:4
**relate** [1] 822:20
**related** [6] 736:3 764:20 782:3 800:6 830:20 848:6
**relates** [4] 751:3 795:24 796:13 800:2
**relating** [2] 796:5 800:10
**relation** [1] 794:16
**relationships** [1] 799:15

**relative** [5] 739:19 809:2 810:22 830:12 832:12
**relatively** [3] 746:25 779:2 820:11
**relaxation** [2] 839:18 840:14
**relaxing** [1] 751:7
**release** [5] 754:5 771:23 784:25 785:15 786:23
**relevance** [1] 791:9
**relevant** [7] 755:24 761:16 765:25 766:10 790:15,25 811:23
**reliant** [1] 825:3
**relied** [1] 843:14
**relieves** [1] 752:23
**relock** [2] 755:1 774:14 787:9
**relocked** [1] 783:24
**remain** [4] 819:19 820:22,23 848:11
**remains** [2] 828:5,5
**Remarketers** [1] 734:1
**remarks** [1] 808:19
**remedy** [2] 806:6,9
**remind** [1] 769:9
**removal** [2] 836:2 839:6
**remove** [1] 779:25
**removed** [2] 812:11 838:19
**removing** [3] 794:4 812:25 838:8
**render** [1] 754:2
**rendered** [2] 754:9,9
**renewal** [1] 838:24
**repair** [33] 731:8 734:11 736:10,18,25 737:3,15 738:12,12 744:5 745:12 746:9 750:19,20,23,24 751:19 753:3,5,9 755:1,14 758:24 762:14 763:11,16,19 764:5,11 765:13,14 766:2,7,11,17,18,19,21,25 767:7,9,12,17 768:4,6 775:13,22 776:10,16 777:18 780:19 781:5 782:9,15 783:23 788:14 789:2,8,10,12,17,20 790:14,18 791:22 792:17,17 793:9 794:15 796:13 798:20,24 799:2,3,10,18,21 801:20,23 803:8 804:6,9,15,21 805:16 810:12,16 817:20 818:6,8,10,16,17,20,22 819:8,9 827:7,12,15,20 828:7,16,17 829:13 830:3 831:23 832:7,12,20 834:21,24 835:15,16,18,24 838:10,17 840:23,24 841:3,6,6,25 842:5 846:4,12,21 847:10,18,23
**repaired** [11] 739:25 750:17 779:24 783:25 792:14 799:1 803:2,18,22 841:14,15
**repairers** [1] 831:15
**repairing** [6] 748:6 783:2 784:9 787:9 803:4 829:15
**repairs** [9] 766:21,24 767:1 775:20 789:24 824:10 827:13 831:17,24
**rephrasing** [1] 766:5
**replace** [7] 774:13,22 782:9,15 789:23 802:3 837:4
**replacement** [2] 796:5 829:21
**Replacing** [4] 775:16 783:2 789:13 813:1

**replete** [1] 839:20
**replies** [1] 797:21
**reply** [4] 783:20 841:20,21,22
**report** [4] 817:9,13 822:6 824:3
**reporter** [2] 732:11 816:16
**reporting** [1] 817:7
**reports** [3] 807:18,19 814:19
**represent** [2] 769:2 827:18
**representative** [1] 821:1
**representing** [9] 733:8,14,18,21 734:4,17 735:4,9 822:18
**reproduced** [1] 776:14
**reprogram** [3] 744:23 745:14 755:7
**reps** [1] 833:18
**request** [6] 758:6 774:12 790:16 794:13 844:8 846:6
**requested** [1] 752:14
**requesting** [1] 812:12
**requests** [1] 843:11
**require** [3] 755:9 765:13 821:13
**required** [5] 750:22 803:23 804:13
**requirements** [4] 814:2,8,12,15
**requires** [3] 805:6 840:22
**requiring** [1] 842:4
**research** [7] 736:14,25 738:8,8 739:8 744:9 749:3,3 761:5,6 791:16,18 837:8,12
**researchers** [1] 744:11
**reset** [2] 744:20 746:17
**resource** [1] 827:17
**resources** [2] 773:2 840:8
**respect** [7] 736:8,19 748:6 754:19,22,24 781:25 784:1 803:6,7,23 807:22 816:20 848:9
**respects** [1] 748:5
**respond** [14] 731:15 754:15 768:17 770:20 774:10 784:19 793:23 802:17,25 815:5 817:4 822:11 839:10 848:15
**responding** [1] 760:17
**response** [7] 743:2 785:19 791:11 809:8 843:8,23 846:9
**responses** [2] 818:1 843:12
**responsibly** [1] 780:23
**responsive** [1] 832:24
**responsiveness** [1] 815:12
**rest** [1] 774:19
**restore** [6] 737:3 779:21 782:20,24 784:2,6 787:12,13
**restored** [2] 779:24 820:2
**restoring** [3] 783:19 794:19,22
**restricted** [1] 737:8
**restricting** [1] 789:2
**restrictions** [2] 751:8 781:1
**result** [3] 773:4 786:7 795:6
**resulting** [1] 822:21
**results** [1] 814:22
**retaliation** [1] 806:15
**retrieved** [1] 794:24
**review** [2] 798:17 813:20
**reviews** [1] 798:7

**revoked** [1] 794:21
**rewrite** [1] 757:20
**right-size** [2] 756:25 757:1
**right-sizing** [2] 757:9,14
**rightly** [1] 839:25
**rights** [4] 765:10 819:5 823:22 830:18
**risk** [4] 821:17 822:5 836:9 840:12
**risks** [1] 840:4
**risky** [1] 789:24
**road** [2] 735:14 842:24
**Robert** [1] 733:24
**robot** [1] 801:2
**robust** [1] 803:10
**role** [1] 824:22
**rooms** [2] 789:20 818:17
**root** [1] 807:9
**Rosenbaum** [17] 735:2,3,3 750:7,8 751:18 831:4 833:2 836:17 837:24 839:6,12,13 842:22 843:9 846:9,11
**roster** [1] 737:18
**route** [2] 737:14 770:5
**rule** [2] 823:15 847:19
**rulemaking** [8] 731:5 762:11 795:17,22 796:11 816:25 840:2 845:19
**ruling** [1] 832:1
**run** [3] 746:14 778:22 780:6
**running** [3] 742:21 759:7 824:16
**rural** [2] 805:18 807:6

---

## S

**S-M-B** [1] 731:25
**sad** [1] 788:16
**sadly** [1] 806:5
**safe** [2] 817:16 824:10
**safely** [1] 780:23
**safety** [13] 751:4 757:12 768:20 770:4,8 781:8 805:8 817:7 822:15 832:16 839:24 840:12 843:9
**sake** [1] 815:25
**sales** [1] 801:12
**salient** [1] 753:15
**same** [29] 738:12,21 739:6 741:18,25 742:16 747:16 750:23 761:4 762:10 774:22 775:3 781:25 806:20 814:18,20 815:8 820:20 824:20 832:7,9 835:6,6 836:23 840:24 845:2 847:6,7,8
**save** [1] 814:22
**saw** [3] 736:20 804:10 845:17
**saying** [16] 751:23 752:4 757:20 761:23 773:14 783:25 784:20 787:22 792:3 793:3 796:24 802:25 804:11 813:8 838:12 843:9
**says** [5] 810:13 813:23 814:9 837:11 849:1
**SCADA** [2] 742:20 744:5
**scale** [2] 788:23 845:7
**scam** [1] 779:7
**scenarios** [1] 782:10
**schedule** [1] 767:10

Section 1201 Rulemaking Hearing                              April 20, 2021

**scheme** [1] 749:22
**school** [4] 744:16,17 745:7 746:15
**scope** [6] 735:18 761:3 763:14
764:21 784:21 814:1 838:11 847:
9
**sea** [1] 802:12
**search** [6] 778:1,15,17 786:4,6,11
**Second** [8] 763:21 801:1 813:25
822:16 826:1 836:18 838:3 843:
18
**secondary** [1] 805:15
**Secondly** [1] 735:21
**secret** [1] 787:20
**Section** [7] 731:5 765:8,11 814:4
818:5 823:14 846:20
**sector** [4] 767:6 769:24 831:25
845:2
**sectors** [1] 760:4
**secure** [5] 754:4 757:13 772:23
784:24 802:8
**security** [26] 736:14,25 738:8 739:
8 742:25 743:3 744:2,9,10 745:5
747:22 749:2,3,22 755:15,21 757:
13 761:5,6 791:15,17 802:5 829:
18,22 837:7,11
**see** [36] 737:20 742:5 744:1 749:2
751:13 754:20 758:17 768:14 777:
22 786:12 792:16 795:9,22 796:
16 797:8 801:9,12 802:4 803:1,16
804:23 806:9,18 807:21 820:5,25
822:3 829:17 830:6,20 832:23
833:1,23 836:1,2 840:19
**seeing** [8] 733:10 759:12 802:8
803:15 805:13,14 826:17 835:12
**seek** [2] 786:17 809:2
**seeking** [2] 809:9 810:18
**seem** [7] 742:3 756:2 782:9 783:
18,24 792:3 826:14
**seemed** [1] 822:20
**seems** [6] 769:15 770:25 785:16
826:23 838:12
**seen** [5] 785:11 795:2 825:2 834:
23 835:20
**Sega** [1] 768:1
**segment** [2] 733:22 750:9
**segue** [1] 770:15
**sell** [2] 779:6 788:2,3
**selling** [3] 740:8 803:5 806:21
**Senate** [1] 811:22
**send** [2] 767:2 818:15
**Senior** [1] 733:3
**sense** [3] 741:3 742:2 775:24
**sent** [1] 843:11
**separate** [5] 739:20 771:6 792:5
823:25 826:23
**separated** [1] 847:19
**separately** [1] 823:15
**serious** [2] 813:21 814:23
**servers** [2] 784:8 833:20
**service** [39] 746:11 751:21 767:8,
15 780:20 781:3,10 802:11 807:
25 809:2,24 812:14,15,18,20,22

813:5 814:15 815:13 816:4,5 817:
19,20 818:23,25 820:12,13,21 821:
4 828:13 829:7,13,19 832:5 835:2
845:5 847:17,18,23
**servicer** [3] 806:1 808:2 816:10
**Servicers** [4] 734:1 805:15 806:23
814:17
**services** [14] 758:17 765:13,14
767:4,18 804:15 806:12 818:20
830:17 846:4,13,21 847:19 848:9
**servicing** [7] 804:13,18 807:3 817:
8,11,17 830:21
**session** [2] 731:14,25
**set** [3] 745:1 829:5,8
**sets** [1] 793:16
**setting** [2] 757:24 773:7
**settings** [5] 745:3,5 747:3 820:18,
18
**Seventy** [1] 750:18
**several** [1] 806:14
**shaking** [1] 801:24
**share** [3] 821:6 833:6 843:8
**shared** [1] 738:19
**she's** [1] 757:19
**Sheehan** [34] 736:6,7,7 736:21,23
738:18 739:4 754:14 763:1,6 765:
23 766:4,12,14 767:20,23 768:11,
15,17 783:4 788:18,21 790:4 812:
6 817:1,3 819:10 827:25 828:10,
11 829:24 830:1 833:1,24 835:8,9
836:16,25 837:19,22 838:15,23
845:17,23 848:14
**Sheehan's** [2] 823:6 843:17
**shelf** [1] 787:25
**shift** [1] 770:13
**ship** [1] 767:10
**shops** [5] 750:20,23 766:17 789:
18 827:12,15 840:24 841:3,6,25
842:5
**short** [4] 733:7 735:14 823:5 843:4
**shorter** [1] 762:24
**shouldn't** [4] 758:10,11 765:2 849:
3
**show** [2] 748:9 800:11
**showing** [1] 741:25
**shown** [2] 799:12 844:13
**shows** [2] 752:8 796:12
**side** [5] 773:3,3 788:22 831:22 832:
20
**sign** [2] 732:2,3
**signal** [1] 731:19
**significant** [4] 756:16 773:2 798:
16 825:14
**significantly** [1] 799:19
**Silberberg** [1] 735:9
**similar** [9] 736:24 738:20 739:2
744:12 758:18 780:13 786:4,6
839:5
**similarly** [2] 738:7 741:20
**simple** [2] 761:21 767:1
**simply** [6] 774:25 798:23 805:3
820:25 841:4 842:17

**since** [11] 755:24 761:9 772:17
785:5,12 795:22 798:17 806:24
810:22 815:4 840:17
**single** [4] 736:11 777:14 786:9
834:12
**sip** [1] 756:25
**SiriusXM** [1] 847:20
**site** [1] 779:5
**sites** [1] 779:8
**sits** [1] 737:22
**sitting** [2] 810:11 821:1
**situation** [6] 749:9 759:12 774:2
775:4 821:6 833:21
**situations** [2] 748:15 794:15
**six** [1] 808:2
**sixth** [1] 731:4
**slowdown** [1] 806:18
**slowly** [1] 732:12
**smack** [1] 745:25
**smaller** [2] 821:5 822:2
**smart** [4] 737:24 738:4,15 742:20
**SMITH** [68] 731:3,3 732:25 733:6,
15,19,23 734:2,6,9,12,22 735:2,6,
11 738:16 740:12 741:8,14 744:4
745:20 746:14 747:5 749:10 750:
6 751:12 754:11 756:4 758:14,20
759:2,4 760:7 762:19,22 765:21,
24 766:6,13 767:19,22 768:10,13,
16 769:6 770:9 795:16 802:18
816:9,11 824:17,19,25 833:1,3,15,
18,24 842:22 843:21,23 844:2,5,
23 845:15 847:13 848:1 849:8
**so-called** [1] 749:15
**software** [44] 737:2,10 739:13 741:
7 742:14 745:24 747:1 751:3 755:
1,7 756:18,18,23 757:20 758:1,4,8,
11 759:13,15,17,24 762:8 763:25
764:1,8 771:4 777:1,7,12 780:6
790:23 800:21 810:4,9 818:10
819:19 820:22 828:5 832:7 839:
21 844:17,21 847:7
**software-embedded** [1] 758:23
**software-enabled** [7] 737:18 763:
10,15 766:16 768:2 847:5,11
**sold** [2] 739:24 740:10
**Solutions** [2] 733:22 780:19
**solve** [1] 792:22
**somehow** [2] 755:13 759:4
**someone** [3] 731:22 745:4,13
746:16 758:12 761:14,16,18 769:
12 773:14 793:9 829:19
**someone's** [1] 823:24
**sometimes** [1] 737:21
**somewhat** [1] 773:22
**sorry** [10] 794:3,6 808:16 809:5
815:24 824:18 825:17 829:25 830:
5 838:15
**sort** [37] 736:10 740:21 741:9 742:
3,13 743:25 744:2 746:5,6 750:10
751:21 752:3,6 758:17 766:2 770:
24 771:11,12,13 776:10 782:11
791:9 792:4 793:19 800:2 801:5

819:22 820:3 822:15 834:16 837:
9,20 839:6 840:16 841:14 843:3
845:17
**sought** [1] 817:10
**sound** [1] 792:13
**sounds** [1] 741:8
**source** [1] 794:24
**space** [9] 748:16 749:21 750:1
771:18 783:7 785:24 795:4 823:
22 837:7
**sparked** [1] 845:22
**speaker's** [1] 822:6
**speakers** [2] 747:9 751:25
**speaking** [7] 732:14 734:10 805:3
807:23 813:14 816:3 827:10
**special** [1] 818:21
**specialize** [1] 789:19
**specific** [15] 731:14 732:4 735:24
736:1 739:10,24 744:8 797:14
814:6 820:1 822:9,10 827:2,4 833:
7
**specifically** [4] 749:15 785:24
792:24 795:4
**specifications** [3] 814:8 820:4
821:15
**specificity** [1] 763:5
**specifics** [4] 782:7 784:13 803:19
804:2
**specter** [1] 764:24
**sphere** [1] 800:20
**spoken** [2] 754:13 804:7
**Spotify** [1] 847:20
**sprinklers** [1] 745:2
**Stacey** [1] 733:3
**staff** [3] 811:18 848:22
**stake** [1] 791:5
**stand** [1] 749:10
**standard** [1] 822:4
**standardized** [1] 842:4
**standards** [3] 839:23 843:15 845:
9
**standing** [1] 813:7
**start** [4] 763:8 770:5 793:10 839:
14
**started** [1] 732:15
**starting** [2] 733:9 802:4
**state** [10] 759:2 765:7 769:22 782:
25 791:23 806:10 811:22 828:6
834:9 840:21
**states** [1] 821:22
**statistics** [1] 813:18
**statute** [3] 793:15 798:3 845:24
**statutory** [8] 739:17 749:4 792:8
797:4 798:15 841:17
**stay** [2] 781:23 821:18
**step** [2] 760:23 768:3
**steps** [1] 829:5
**Steve** [2] 733:20 815:15
**stick** [1] 826:25
**still** [10] 738:11 740:3 741:19 752:
20 759:25 761:16 762:17 784:10
785:4 786:23 792:16 794:4,6 803:

Section 1201 Rulemaking Hearing                    April 20, 2021

**2** 810:21 812:8 832:12 838:10
845:3
**stolen** [1] 777:4
**stop** [2] 781:16 830:4
**storage** [2] 773:21 789:20
**stored** [1] 787:5
**story** [1] 744:15
**stream** [2] 743:14 827:21
**stressing** [1] 738:19
**strictly** [1] 759:11
**stringent** [1] 839:23
**structured** [1] 758:15
**structures** [1] 823:8
**studies** [1] 784:22
**studios** [1] 772:25
**study** [2] 817:6,9
**stuff** [2] 812:1 847:12
**subcategory** [1] 739:9
**subject** [2] 763:25 849:15
**submission** [1] 796:8
**submit** [1] 814:19
**subscription** [4] 751:21 758:17
847:18,19
**substantially** [2] 742:15 806:1
**substitute** [2] 740:3 837:10
**success** [1] 772:16
**successful** [2] 772:13 786:19
**sudden** [1] 755:25
**Suez** [1] 799:16
**suffer** [1] 808:11
**sufficient** [4] 739:1 792:3 804:14
846:15
**sufficiently** [2] 771:21,22
**suggest** [1] 831:18
**suggested** [1] 797:23
**suggesting** [3] 841:16,23 842:15
**suggestion** [2] 841:8 842:5
**suggestions** [1] 749:14
**summing** [1] 847:4
**superfluous** [1] 843:18
**supply** [2] 788:4 799:11
**support** [7] 733:10 745:23 814:13,
15 839:18 840:14 841:11
**support.xbox.com** [1] 803:1
**supporting** [2] 754:22 795:23
**supports** [2] 745:17,20
**survey** [1] 805:20
**suspect** [1] 758:24
**synonymous** [2] 740:20,23
**System** [28] 734:18 742:20 743:15,
21 744:19,20,23 745:7,10,17 746:
10,20 748:11 749:24 755:16 778:
6 783:1 784:24 811:13,15 814:2
817:21 834:8,9,22 835:5,5,17
**systems** [15] 744:5,11,25 756:3
764:18 767:14,16 776:6 814:6
824:8 835:12,13,23,25 838:17

**T**

T.V [1] 786:11
**T2** [1] 802:5
**tailored** [1] 736:16
**take-home** [1] 829:14

**talked** [6] 747:6 753:1 763:22 771:
8 835:4 837:4
**talks** [1] 786:11
**tangible** [2] 766:15 818:11
**target** [1] 771:21
**targeting** [1] 803:15
**tech** [3] 810:12,15 832:9
**technical** [6] 731:23 786:12,20
787:4 819:15 831:22
**technically** [2] 742:14 832:15
**technician** [4] 746:11 747:2 818:
16 835:2
**technicians** [3] 818:24,25 819:1
**techniques** [1] 802:8
**technological** [2] 737:11 758:24
829:10
**technologies** [2] 746:24 753:11
**technology** [8] 746:19 755:4 757:
18 771:17 798:9 801:17
**telematic** [9] 834:8,22 835:5,12,13,
17,23,25 838:16
**telematics** [6] 764:17 834:22 838:
9 840:17,20 841:2
**temporary** [1] 791:15
**tend** [1] 793:18
**tension** [1] 816:22
**term** [3] 741:6 845:25 846:1
**terminal** [1] 829:20
**terms** [13] 739:16 748:19 755:9
758:20 761:18 763:22 764:23 766:
1,3 825:21 842:11,16 844:4
**Tesla** [1] 835:14
**test** [1] 757:23
**testimony** [1] 846:10
**testing** [1] 791:17
**Thanks** [9] 776:20 777:21 795:14
808:14 812:3 820:10 830:9 844:2
849:17
**themselves** [2] 732:17 809:13
**there's** [46] 738:25 742:2 744:6
745:3,22 746:2 747:21 748:16
749:4 750:15,17,21 752:13,21
762:17 763:12 766:1,9,10 769:15,
18 770:3 782:7,21 783:11 785:22
791:3 792:24 793:7 794:12 795:
23 796:10 799:20 806:8,15 816:
19 831:10,23 832:11 840:10 841:
7,10,15 842:3,14,19
**therefore** [3] 773:17 786:24 846:1
**they'll** [1] 806:18
**They've** [3] 746:12 789:21 802:7
**think's** [1] 784:10
**thinking** [1] 847:20
**third** [4] 743:22 746:5 753:20 817:
12
**third-party** [12] 769:16 814:17 817:
15,18 827:15 831:24 832:4 841:6
845:7 846:4,6 848:9
**though** [5] 742:16 757:17 773:13
810:21 846:24
**thoughts** [3] 754:18 763:5 770:10
**three** [7] 732:4 737:17 738:3 798:

**8** 800:17 801:15,17 802:13 807:1
834:6,7 835:4
**threshold** [1] 798:2
**thriving** [1] 750:18
**throughout** [1] 818:7
**throw** [1] 799:6
**thwart** [1] 806:11
**tied** [2] 740:10 801:11
**ties** [1] 801:4
**timing** [2] 745:2,3 793:8
**tired** [1] 778:4
**Today** [13] 731:6,10,25 735:4 753:
2,4 771:8 777:3 790:5 791:14 795:
5 808:18 830:25
**today's** [1] 732:8
**together** [4] 773:4 788:2,8 845:11
**tomorrow** [3] 732:2,7 849:17
**ton** [1] 772:21
**took** [2] 744:25 840:3
**tool** [6] 769:17 774:7 775:23 777:1,
7 780:6
**tools** [20] 750:24 756:14,21 757:2,
7 769:13,20,20 777:3,12 825:16,
16,17 831:8 840:23 842:1,4,6,10
845:4
**topic** [5] 791:9 793:24 794:8 830:8
831:3
**towards** [2] 752:16 753:10
**TPM** [18] 752:8 759:11 760:21,24
761:12 774:18 775:1 784:23 787:
13 789:15 790:21 801:4 808:7
811:9 818:23 822:22 828:4,12
**TPM-breaking** [1] 757:6
**TPMs** [55] 738:21 741:22 742:2,6
743:6,11 747:22 751:20 756:15
757:2,12 758:16 759:8,14 760:19
762:7,9 763:10,15,17,19 764:3
766:9 768:19 771:1,6 773:14 775:
7,11,19 781:2 782:20 783:19 784:
3,9 785:9 786:3,12 797:2,11,13
800:11 802:2 804:8,20 809:17
812:10,24 819:11,17 823:1 825:9
829:15 830:2 844:10
**traction** [1] 820:18
**tractor** [3] 738:14 766:22 769:17
810:5
**tractors** [1] 847:5
**trade** [1] 799:15
**traditionally** [1] 743:5
**trafficking** [2] 845:21 848:12
**trained** [2] 746:7,10
**transcribing** [1] 732:11
**transformative** [2] 768:4 844:19
**transmission** [1] 833:10
**transparency** [2] 814:18 849:15
**Transportation** [2] 840:7 843:12
**Transtate** [1] 733:21
**treat** [1] 805:18
**treatment** [1] 745:7
**tremendous** [2] 808:18 842:25
**trial** [1] 806:14
**trick** [1] 779:9

**tries** [1] 791:23
**trimmed** [1] 836:15
**true** [4] 764:22 784:8 792:15 798:
23
**trusted** [1] 772:19
**trustful** [1] 771:21
**trustworthy** [1] 771:22
**try** [11] 731:16 732:11 733:9 736:4
754:12 761:14 762:23 779:1 781:
23 793:13 843:4
**trying** [2] 800:7 814:10
**turn** [13] 731:17 770:20 791:20
795:12 796:15 804:5,24 806:3
830:8 831:2 832:25 833:24 836:
18
**turned** [1] 744:19
**turning** [1] 736:2
**tweak** [1] 761:21
**two** [11] 736:11 740:15 749:10 755:
18 782:10 783:7,22 788:8 793:7
822:9 825:23
**type** [2] 775:4 812:20
**types** [13] 742:8 744:11,14 766:21
775:20 791:25 795:13,18 800:13
819:18 821:15 822:13 823:2
**typical** [1] 793:16

**U**

U.S [2] 734:8 817:21
**ubiquitous** [1] 835:13
**unable** [3] 789:21 805:23 818:17
**unauthorized** [9] 743:22 773:18
777:2 783:3 786:1 794:23 795:6
811:14 821:24
**unaware** [2] 769:4 828:12
**unclear** [1] 737:22
**unconscionable** [1] 813:4
**under** [19] 737:5 748:24 750:21
765:11 783:5 785:10 798:14 807:
21 831:9,14 837:12,14 841:25
842:14 846:19,20
**underlying** [2] 790:20 793:17
**undermine** [1] 749:22
**underneath** [2] 759:16,19
**understand** [7] 754:14 766:4 770:
24 777:19 780:22 823:12 842:23
**understanding** [12] 755:18 774:
11 775:7,18 782:22 784:4,15 796:
24 798:10 799:11 803:21 827:11
**understood** [3] 740:25 768:7 798:
8
**undertake** [2] 805:24 821:25
**undertaken** [3] 791:21,24 808:7
**unfortunately** [2] 805:21 845:1
**unifying** [1] 739:15
**unique** [3] 739:19 774:19 775:6
**unites** [1] 739:16
**unlawful** [1] 752:10
**unless** [5] 779:24 787:12,13 793:4
823:23
**unlock** [2] 743:17 774:13
**unlocked** [2] 741:22 783:22
**unlocking** [4] 741:20 743:21 755:

Heritage Reporting Corporation
(202) 628-4888

LOC_AR_00005762

Section 1201 Rulemaking Hearing                April 20, 2021

19 **849**:19

**unlocks** [1] **745**:4

**unpatched** [1] **756**:10

**unrelated** [1] **840**:4

**up** [48] **732**:2,3,4 **737**:10,25 **743**:14 **745**:1 **747**:3,7 **748**:10 **753**:1 **754**: 17 **755**:4 **756**:15 **760**:9 **770**:14 **773**:8,10 **778**:2,8,14,25 **783**:1 **785**: 3,16,21 **788**:7 **791**:8 **793**:2 **794**:1, 4,6 **795**:10,15 **796**:7 **803**:4 **805**:13 **810**:13 **811**:21 **813**:8 **826**:25 **830**: 6 **836**:24 **837**:1 **846**:10 **847**:4 **848**: 7,23

**upside** [1] **745**:25

**urge** [1] **830**:19

**useful** [1] **752**:5

**useless** [1] **740**:11

**user** [1] **807**:18 **831**:13 **845**:25

**user's** [1] **769**:4

**users** [12] **737**:16 **747**:23 **748**:13, 14 **750**:16 **753**:19 **756**:19 **766**:16 **769**:16 **831**:15,19 **841**:24

**uses** [7] **744**:13 **753**:11 **756**:18 **760**: 6 **761**:12 **768**:7 **826**:3

**using** [10] **740**:14 **761**:11 **769**:2 **782**:4,10 **793**:10 **797**:11 **836**:9 **845**:25 **846**:3

**utility** [1] **844**:20

## V

**vacuum** [1] **801**:6

**vacuums** [2] **801**:3,3

**valid** [2] **757**:19 **817**:10

**valuable** [2] **816**:5 **827**:16

**value** [4] **747**:25 **776**:19 **780**:22 **827**:21

**values** [8] **754**:1,8 **771**:9,14 **772**:2, 4 **773**:22 **776**:8

**variety** [2] **746**:19 **748**:9

**various** [4] **731**:7 **777**:2 **785**:13 **821**:12

**vector** [2] **778**:13,19

**vehicle** [12] **751**:19 **758**:15 **764**:17 **765**:3 **791**:22 **810**:4 **831**:13 **835**: 11 **839**:16,21,22 **840**:1

**vehicles** [10] **736**:3 **750**:9 **751**:18 **762**:13 **802**:22 **828**:1 **831**:3,10 **839**:23 **848**:7

**vendor** [2] **821**:24,25

**ventilators** [2] **818**:18 **820**:20

**venue** [1] **825**:25

**versus** [3] **786**:12 **808**:2 **817**:12

**via** [1] **835**:2

**video** [34] **732**:9 **735**:25 **747**:20 **748**:6,16 **749**:20 **750**:5 **752**:6 **754**: 19,22 **755**:21 **761**:7 **770**:17 **774**: 19,20 **775**:6,15 **778**:8 **781**:17,23 **783**:7,21,25 **787**:9 **789**:19 **790**:22 **792**:4,14,23 **797**:22 **798**:16,18 **799**:8 **803**:15

**view** [2] **841**:4 **849**:2

**views** [1] **732**:5

**violate** [5] **761**:17 **778**:11 **831**:11

**837**:5 **839**:8

**violated** [1] **757**:2

**violates** [2] **759**:21 **836**:13

**violating** [3] **769**:3,4 **836**:3

**violation** [2] **806**:13 **839**:17

**Virginia** [1] **805**:20

**virtual** [1] **732**:13

**virtually** [1] **737**:2

**vital** [2] **780**:19 **781**:15

**vulnerabilities** [1] **743**:3

**vulnerable** [1] **799**:13

## W

**wait** [3] **781**:10,13 **818**:19

**waiting** [4] **778**:4 **780**:12 **784**:17 **789**:8 **818**:14

**walks** [1] **786**:17

**wanted** [34] **750**:10 **751**:9 **767**:23 **768**:17 **769**:23 **770**:18,24 **774**:22 **781**:17 **783**:16 **784**:18 **787**:3 **788**: 21 **790**:3 **791**:7 **795**:21 **802**:24 **808**:21 **817**:3 **828**:3,14 **833**:23,25 **836**:18,24 **839**:4,10 **843**:7 **844**:21 **845**:18 **846**:8 **848**:9,13,22

**wants** [1] **777**:9

**warranty** [5] **792**:16 **799**:2,3 **803**: 18,19

**watch** [2] **737**:24 **805**:16

**watching** [1] **731**:24

**water** [1] **745**:7

**wave** [3] **731**:19 **740**:14 **814**:25

**way** [35] **731**:15 **738**:22 **741**:4 **744**: 20 **745**:22 **746**:21 **749**:8 **752**:22 **756**:7,22 **757**:21,22 **758**:15,22 **760**:1 **761**:17,20 **762**:6 **773**:20 **782**:13 **783**:9 **810**:10 **814**:16,20 **820**:2 **823**:9,11 **824**:9,10,21 **825**: 10 **826**:16 **836**:6,11 **843**:14

**wearable** [1] **737**:23

**website** [1] **732**:9

**websites** [1] **803**:16

**week** [2] **745**:14 **811**:24

**weekend** [1] **745**:12

**weigh** [1] **817**:1

**weighing** [1] **828**:23

**weight** [1] **846**:11

**welcome** [1] **763**:5

**well-established** [1] **807**:14

**West** [1] **805**:19

**whatever** [5] **760**:9 **809**:16 **820**:25 **837**:13 **847**:24

**whatever's** [1] **811**:23

**wheelchair** [3] **818**:14 **820**:12,19

**Whereupon** [1] **849**:21

**whether** [28] **735**:18 **737**:22 **738**: 13,20,25 **741**:25 **742**:5,19 **747**:15 **748**:24 **749**:7 **761**:1 **763**:9 **766**:1,2, 9,10 **768**:23 **769**:1 **778**:16 **782**:23 **784**:9 **791**:20 **796**:3,10 **797**:2 **810**: 5 **818**:4 **824**:21 **825**:1 **827**:7 **828**: 23,24 **832**:13 **841**:1 **842**:8 **844**:9, 11 **847**:4

**white** [1] **830**:16

**who's** [1] **816**:21

**whole** [4] **744**:19 **755**:15,20 **775**: 17 **777**:11 **800**:24 **846**:10

**wide** [2] **748**:9 **790**:8

**widely** [5] **757**:3 **785**:4,6 **789**:1 **806**: 7

**Wiens** [34] **734**:9,10,10 **741**:16,17 **742**:10 **744**:15 **745**:22 **746**:20 **747**: 11 **756**:9 **779**:3,4 **787**:2,3,11 **788**: 22,25 **790**:4 **800**:1,16 **812**:6 **819**: 14 **820**:5,10 **821**:8 **832**:25 **833**:5,6 **834**:2,4 **835**:7 **847**:14,15

**Wiens's** [2] **748**:8 **756**:20

**will** [33] **731**:13 **732**:6,9 **744**:1,3 **746**:22 **751**:15 **752**:9 **761**:2 **769**: 20 **771**:23 **778**:17 **779**:8,9,10 **782**: 19 **783**:21 **786**:6 **800**:21 **806**:19 **815**:12 **816**:15 **821**:18,25 **829**:3 **849**:13,17,18

**Williams** [24] **735**:7,8,9 **741**:16 **747**:7,10 **749**:18 **752**:5 **764**:23 **769**:1 **781**:21,22 **783**:13,15 **784**:4 **792**:11,12 **798**:21 **802**:16,23,24 **804**:4 **848**:2,5

**Williams's** [1] **768**:18

**willing** [1] **784**:25

**willingness** [2] **785**:14 **849**:10

**wipe** [2] **744**:22 **747**:3

**wired** [1] **835**:2

**wireless** [4] **835**:5,23,25 **838**:16

**wirelessly** [1] **835**:3

**wise** [1] **748**:18

**wish** [5] **731**:14 **732**:1,4 **754**:15 **808**:8

**within** [7] **756**:2 **764**:11 **780**:18 **784**:21 **814**:1 **829**:6 **832**:15

**without** [14] **740**:11 **774**:25 **782**:16 **784**:9 **789**:22 **804**:1 **807**:8 **816**:15 **818**:13 **826**:17 **833**:10 **837**:15

**witnessed** [1] **806**:24

**wonder** [4] **738**:19 **792**:2,6,9

**wonderful** [1] **779**:8

**wondering** [2] **751**:16 **831**:14

**word** [3] **740**:14 **794**:15 **848**:4

**words** [1] **837**:10

**work** [25] **738**:21 **742**:14,18 **743**:8 **745**:8 **746**:8 **750**:19 **762**:7 **769**:17 **779**:16 **784**:2 **787**:12 **788**:8 **790**: 20 **791**:1 **793**:11 **797**:3 **805**:24 **816**:16 **819**:12 **824**:4 **829**:1,12,12 **845**:14

**worked** [1] **760**:3

**working** [4] **780**:1 **781**:12 **810**:17 **830**:16

**works** [22] **738**:25 **739**:9 **751**:20 **752**:2,10 **756**:2 **762**:6 **764**:9 **773**:4 **785**:15 **786**:25 **787**:6 **790**:11 **792**: 1 **809**:12,14 **810**:8 **819**:18 **820**:1 **844**:15,16,17

**world** [11] **737**:18 **743**:23 **754**:4 **785**:17 **786**:13 **789**:18 **800**:18,24 **801**:17 **834**:7 **847**:22

**worried** [3] **808**:10 **826**:16,20

**wrap** [2] **770**:14 **794**:1

**wrapping** [1] **846**:9

**write** [1] **837**:13

**writing** [1] **757**:25

**written** [1] **804**:10

## X

**x-ray** [1] **805**:11

**Xbox** [15] **778**:1,3,4,15 **779**:10,12, 12 **780**:4 **786**:3 **795**:7 **798**:25,25 **799**:1 **803**:1,2

**Xboxes** [1] **780**:16

## Y

**year** [4] **762**:14 **793**:9 **806**:14 **834**: 12

**years** [14] **737**:17 **738**:3 **778**:5 **795**: 2 **798**:8 **800**:17 **801**:15,17 **802**:13 **803**:4 **819**:25 **834**:7,7 **835**:4

**Yep** [1] **758**:19

**yield** [1] **786**:6

**yourself** [2] **732**:13 **733**:1

## Z

**zero** [1] **805**:23

**Zoom** [1] **731**:15



August 13, 2021

Kevin R. Amer
Acting General Counsel and Associate Register of Copyrights
United States Copyright Office
Library of Congress
101 Independence Avenue SE
Washington, DC 20559

Sent via email: kamer@copyright.gov

Re:  Section 1201 Rulemaking – Proposed Exemptions Pertaining to Medical Devices


Dear Mr. Amer:

On May 4, 2021, Regan A. Smith, General Counsel and Associate Register of Copyrights for the United States Copyright Office, sent a letter to FDA's Acting Chief Counsel to inform FDA of a rulemaking proceeding pending before the Copyright Office that relates to, among other things, medical devices.  We understand that this proceeding pertains to 17 U.S.C. § 1201 and potential exemptions to the general prohibition on the circumvention of technological protection measures (TPMs) that control access to copyrighted works, including software.  Ms. Smith stated that participants in the rulemaking process had referenced FDA's regulatory authority in this area as relates to the safety and effectiveness of medical devices, and the Copyright Office therefore sought to make FDA aware of the rulemaking proceeding.

Ms. Smith drew FDA's attention to two proposed exemptions being considered in this proceeding.  The first of these proposed exemptions, designated the "Class 9" proposal, seeks to expand an existing exemption under 37 C.F.R. § 201.40(b)(4), pursuant to which the prohibition on circumventing TPMs does not apply to a patient who accesses compilations of data generated by the patient's own medical device or corresponding personal monitoring system, provided that the device is wholly or partially implanted in the patient's body; the circumvention is undertaken by the patient; the access is accomplished through the passive monitoring of wireless transmissions already being produced by the device or monitoring system; and the circumvention does not constitute a violation of applicable law.  The Class 9 proposal would remove these four limitations.

Under the second proposed exemption, designated the "Class 12" proposal, the prohibition on circumventing TPMs would not apply to circumvention that is conducted to access computer programs and data files that are contained in and control the functioning of medical devices (among other things) for the purpose of diagnosis, maintenance, or repair of such devices.  Ms. Smith stated that opponents of both proposals have expressed concerns regarding potential impacts to health and safety should the exemptions be granted.

FDA would like to thank the Copyright Office for informing FDA of this proceeding.  The following are

LOC_AR_00006160



our views with respect to both the Class 9 and Class 12 proposals, as they relate to devices within the meaning of section 201(h) of the Federal Food, Drug, and Cosmetic Act (referred to as "medical devices" herein). We offer no opinion at this time on any existing exemptions or proposed exemptions to the general prohibition on the circumvention of TPMs that control access to copyrighted works other than as specifically discussed below.

## Class 9

It is FDA's understanding that the proposed expansion of the current exemption under 37 C.F.R. § 201.40(b)(4) would broaden opportunities for patients to access data generated by their own medical devices without potential liability under 17 U.S.C. § 1201, but would impose no requirements on, or in any way limit the actions of, the manufacturers of those devices. FDA does not believe that further exempting patients (or those acting on their behalf) from potential liability in this fashion is likely to significantly impact the safety or effectiveness of medical devices, or to impair the ability of medical device manufacturers to comply with applicable regulatory requirements enforced by FDA. We are aware that opponents of the proposed expansion have raised concerns that the expansion may jeopardize the cybersecurity of affected devices, and may require greater effort from manufacturers to ensure that their devices remain secure. FDA believes that an exemption from liability expressly limited to circumvention conducted for the sole purpose of lawfully accessing data generated by a patient's own device or associated monitoring system, whether or not such device is implanted and/or such access is accomplished through the passive monitoring of existing wireless transmissions, is unlikely to undermine the cybersecurity of affected devices, other than as intentionally undertaken by the patient and as may impact only such patient's own device. FDA further believes that the proposed expansion of the exemption under 37 C.F.R. § 201.40(b)(4) is broadly consistent with the existing exemption for good-faith security research under 37 C.F.R. § 201.40(b)(11). FDA therefore does not view the proposed expansion of the exemption at 37 C.F.R. § 201.40(b)(4) as likely to undermine or impede efforts to ensure an appropriate degree of cybersecurity for medical devices.

FDA notes that the Class 9 proposal includes modifications to 37 C.F.R. § 201.40(b)(4) that would remove the current regulatory language expressly limiting the exemption to circumvention that "does not constitute a violation of applicable law, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration." To the extent this language is removed from the regulation, FDA recommends that the final rule clarify that nothing in the rule affects the application of other federal laws and regulations, and remind interested parties that the exemption continues to apply only where circumvention is undertaken "for the sole purpose of *lawfully* accessing the data generated by [the patient's] own device or monitoring system" (emphasis added).

## Class 12

As a preliminary matter, FDA understands that the proposed exemption would apply to circumvention that is conducted solely to obtain data access for the purpose of diagnosis,

LOC_AR_00006161



maintenance, or repair of medical devices, and not for the purpose of device modification that may significantly change the performance or safety specifications of the device or its intended use.[1] FDA further understands that opponents of the Class 12 proposal have expressed concerns that the exemption may facilitate device servicing by unregulated entities, with the potential to increase cybersecurity risks and result in harm to both patients and providers.

In May 2018, FDA issued a report that evaluated the available evidence pertaining to the quality, safety, and effectiveness of medical device servicing in the United States.[2]  Based on an assessment of complaints, peer-reviewed published literature, medical device reports describing suspected device-associated deaths, serious injuries, and malfunctions, and research and analysis provided by third parties, the report concluded that many entities that perform or participate in the servicing of medical devices – including both original equipment manufacturers (OEMs) and independent service organization (ISOs) – provide high quality, safe, and effective medical device servicing.[3] The report determined that the available evidence was insufficient to conclude whether or not there is a widespread public health concern relating to medical device servicing, and therefore concluded that the evidence did not justify imposing additional regulatory requirements on ISOs.[4]  The report further concluded that the continued availability of ISOs to service and repair medical devices is critical to the functioning of the healthcare system in the United States.[5]

With respect to cybersecurity concerns in particular, FDA recently issued a discussion paper that is intended to guide future assessment of both the challenges and opportunities related to cybersecurity and the servicing of medical devices.[6]  The discussion paper acknowledges the cybersecurity challenges related to ISO servicing of medical devices, but also notes that device servicing entities may be well positioned to help identify and address security vulnerabilities, and observes that ISOs may play an important role in maintaining the overall quality, safety, and efficacy of medical devices.  FDA therefore does not share the view that an exemption from liability under 17 U.S.C. § 1201 for circumvention conducted solely for the purpose of diagnosis, maintenance, or repair of medical devices would necessarily and materially jeopardize the safety and effectiveness of medical devices in the United States with respect to cybersecurity; however, FDA has sought stakeholder input on this topic and is evaluating FDA's approach to cybersecurity and medical device servicing.

---

[1] FDA notes that if the proposed exemption were to cover device modification that may significantly change the performance or safety specifications of the device or its intended use, such exemption could raise safety and effectiveness concerns not addressed in this letter, and may have implications with respect to the application of FDA regulatory requirements pertaining to device marketing authorization, registration/listing, quality system regulations, and medical device reporting, among other requirements.
[2] "FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices," available at https://www.fda.gov/media/113431/download.
[3] *See id.* at 23.
[4] *Id.*
[5] *Id.*
[6] "Strengthening Cybersecurity Practices Associated with Servicing of Medical Devices: Challenges and Opportunities," available at https://www.fda.gov/media/150144/download.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

3

LOC_AR_00006162



Please let us know if you have any questions regarding these comments, or if FDA can be of any further assistance to the Copyright Office in connection with this rulemaking proceeding.

Sincerely,

Suzanne B. Schwartz -S

Digitally signed by Suzanne B.
Schwartz -S
Date: 2021.08.13 11:12:55 -04'00'

Suzanne B. Schwartz, MD, MBA
Director, Office of Strategic Partnerships and Technology Innovation
Center for Devices and Radiological Health
U.S. Food and Drug Administration

LOC_AR_00006163



**United States Copyright Office**
Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

May 4, 2021

Mark Raza
Acting Chief Counsel
U.S. Food and Drug Administration
Mark.Raza@fda.hhs.gov

Re:    Section 1201 Rulemaking – Proposed Exemptions Pertaining to Medical Devices

Dear Mr. Raza:

I am writing to inform you of a regulatory proceeding pending before the U.S. Copyright Office that relates to medical devices.

Section 1201 of title 17, United States Code generally prohibits the circumvention of technological protection measures that control access to copyrighted works, including software. Section 1201, however, allows the Librarian of Congress, upon the recommendation of the Register of Copyrights, to exempt certain classes of works from the prohibition, based upon a rulemaking proceeding held every three years.  The statute requires the Copyright Office to consult with the National Telecommunications and Information Administration of the Department of Commerce, which represents the Administration in the rulemaking.  Because, however, certain participants in the current rulemaking have specifically noted the FDA's regulatory authority in this area, and because the FDA provided views to the Copyright Office in a prior section 1201 rulemaking, we wanted to reach out to you directly to make you aware of the pendency of this proceeding.

Under consideration in the current rulemaking are two proposed exemptions that involve medical devices.  The first proposal seeks to expand an existing exemption under which a patient may, under certain circumstances, access compilations of data generated by medical devices that are wholly or partially implanted in the body or by their corresponding personal monitoring systems.[1]  This exemption was first adopted in the 2015 rulemaking, during which the Copyright Office advised the FDA of the proposal and the FDA provided its views (see Attachments A and B).  The current proposal seeks to remove certain restrictions in the current regulation,

---

[1] 37 C.F.R. § 201.40(b)(4).

1

specifically (1) the limitation to wholly or partially implanted devices, (2) the prohibition against circumvention by persons other than the patient, (3) the requirement that access be accomplished solely through passive monitoring of wireless transmissions that are already being produced by the device or system, and (4) the requirement that circumvention not constitute a violation of other applicable laws.

The second proposed exemption would allow access to computer programs and data files that are contained in and control the functioning of medical devices for the purpose of diagnosis, maintenance, or repair of such devices. The parties seeking this exemption have indicated that covered devices would include, but not be limited to, ventilators, CT scanners, ultrasound devices, and x-ray systems.

The Office has received comments in opposition to both proposed exemptions. Opponents have noted the FDA's regulatory authority for ensuring that medical devices are safe and effective and have expressed concern over potential impacts on health and safety. Although any exemptions granted under section 1201 have no effect on the applicability of other laws or regulations, and the Copyright Office ordinarily limits its analysis to copyright-related concerns, we believe it is appropriate to make the FDA aware of this proceeding in light of opponents' specific reference to its regulatory authority and its past participation in the section 1201 rulemaking.

I have included as Attachment C the notice of proposed rulemaking, which describes the proposed exemptions in this proceeding. The two proposals at issue are identified as Class 9 and Class 12. The full record of the rulemaking to date, including public comments related to these proposed exemptions, are available at https://www.copyright.gov/1201/2021/.

Please do not hesitate to contact me if you have any questions. Please submit any responses to me at regans@copyright.gov, and to Nick Bartelt at niba@copyright.gov and Melinda Kern at mkern@copyright.gov.


Sincerely,


Regan A. Smith
General Counsel and Associate Register of Copyrights


cc:    Stacy M. Cheney, Senior Attorney Advisor, Office of the General Counsel, National
       Telecommunications and Information Administration

2

**Attachment A**

LOC_AR_00006170



**United States Copyright Office**
Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

May 12, 2015

Elizabeth H. Dickinson
Chief Counsel
U.S. Food and Drug Administration
elizabeth.dickinson@fda.hhs.gov

Re:    Section 1201 Rulemaking – Proposed Exemption for Medical Devices

Dear Ms. Dickinson:

I am writing to inform you of a regulatory proceeding pending before the U.S.
Copyright Office that relates to medical devices.

Section 1201 of title 17, United States Code (added as part of the Digital
Millennium Copyright Act) generally prohibits the circumvention of
technological protection measures ("TPMs") that control access to copyrighted
works, including software. Section 1201, however, allows the Librarian of
Congress, upon the recommendation of the Register of Copyrights, to exempt
certain classes of works from that prohibition, based upon a rulemaking
proceeding held every three years. The statute requires the Copyright Office, in
formulating its recommendation to the Librarian, to consult with the National
Telecommunications & Information Administration of the Department of
Commerce, which represents the Administration in the rulemaking. Because the
Copyright Office oversees the rulemaking process, however, we thought it might
be helpful to reach out to you directly.

The Office is currently engaged in the sixth triennial rulemaking proceeding
under section 1201. One of the proposed exemptions that is under consideration
addresses access to software in "networked medical devices." This proposal, filed
by a coalition of medical device patients and researchers, would allow
circumvention of TPMs in the firmware or software of medical devices and their
corresponding monitoring systems. The proposal covers devices such as
pacemakers, implantable cardioverter defibrillators, insulin pumps, and
continuous glucose monitors. This potential exemption has been opposed by
other rulemaking participants, who have noted the FDA's regulatory authority for
ensuring that medical devices are safe and effective, and suggested that the FDA
may have views concerning this matter. This letter is to ensure that you are aware
of the pendency of the proceeding.

I have attached to this letter the notice of proposed rulemaking, which describes the proposed exemption.[1]  The full record of the rulemaking proceeding to date, including comments by participants and an agenda of upcoming public hearings to take place later this month, can be found at *http://copyright.gov/1201/*.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Jacqueline C. Charlesworth
General Counsel and
  Associate Register of Copyrights
jcharlesworth@loc.gov
202-707-8772

cc:    John B. Morris, Associate Administrator and Director of Internet Policy,
       National Telecommunications & Information Administration

---

[1] *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 79 Fed. Reg. 73,856, 73,871 (Dec. 12, 2014) ("Proposed Class 27: Software—Networked Medical Devices").

**Attachment B**

LOC_AR_00006173

DEPARTMENT OF HEALTH & HUMAN SERVICES          Public Health Service



Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

August 18, 2015

Ms. Jacqueline C. Charlesworth
General Counsel and Associate Register of Copyrights
United States Copyright Office
Library of Congress
101 Independence Avenue SE
Washington, DC 20559

Re: Section 1201 Rulemaking – Proposed Exemption for Medical Devices

Dear Ms. Charlesworth:

You sent a letter May 12, 2015, to FDA's Chief Counsel to inform FDA of a regulatory
proceeding pending before the U.S. Copyright Office that relates to, among other things, medical
devices. This is a rulemaking proceeding under 17 U.S.C. 1201 regarding potential exemptions
to the general prohibition on circumvention of technological protection measures. You
explained that one of the potential exemptions, relating to software in "networked medical
devices," had been opposed by other rulemaking participants, who noted the FDA's regulatory
authority for ensuring that medical devices are safe and effective. The potential exemption, filed
by a coalition of medical device patients and researchers, would allow circumvention of TPMs in
the firmware or software of medical devices and their corresponding monitoring systems. It
covers devices such as pacemakers, implantable cardioverter defibrillators, insulin pumps, and
continuous glucose monitors. You suggested that the FDA may have views concerning this
matter.

Because this pertains to technical considerations for devices, my office was asked to respond.
To the extent relevant to your regulatory proceeding, here are our views, which were prepared in
consultation with FDA's Office of the Chief Counsel.

We note that while allowing circumvention of TPMs will not affect FDA's jurisdiction over
products that continue to meet the device definition under 201(h) of the Federal Food, Drug, and
Cosmetic Act (the FDCA) (21 USC 321(h)), and the entities that manufacture them, granting
such an exemption for such devices could potentially create regulatory confusion for FDA,
medical device manufacturers, and third party software developers that choose to modify
medical devices.

1. Modifying or adding new software/firmware to a medical device already in commercial distribution may require the submission of a new premarket notification or premarket approval application.

Under the FDCA, products that meet the 201(h) definition of a device are required to have marketing authorization from FDA before being commercially distributed.  Depending on the class of the device, which is based on risk, a person wishing to market a new device is, unless exempt, required to either submit a premarket notification under section 510(k) of the FDCA, 21 USC 360(k), or a premarket approval application (PMA) under section 515(a) of the FDCA, 21 USC 360e(a). The exemption, as we understand it, would allow third parties to circumvent the TPMs of devices that are within FDA's jurisdiction and are legally in commercial distribution. However, under FDA's regulations, a new premarket notification is required when a change or modification is made to a legally marketed device that that could significantly affect the safety or effectiveness of the device or changes/modifies the intended use of a device.  See 21 CFR 807.81(a)(3)(i)-(ii).  Similarly, a new PMA or PMA supplement is required when, among other things, changes are made to an approved device that affect safety and effectives or change the intended uses of the device.  See 21 CFR 814.39(a).

From our discussion with Library of Congress staff, we understand the potential exemption to allow, among other things, third parties to access the software of medical devices that are currently on the market.  From the discussion, it appears that it would be very difficult for third parties to fundamentally change the source code of the existing software, but it would be possible to add or modify software that expands and/or changes the intended uses of the device in ways that would, under the regulations cited above, require a new premarket notification or PMA be submitted to FDA before the modified device could be distributed.

Circumvention in this way may put third party developers in a position where, by virtue of modifying/adding device software, they would become the person responsible for obtaining marketing authorization (or an investigational device exemption (IDE) under section 520(g) of the FDCA, 21 U.S.C. § 360j(g)) before the modified device is distributed or used on patients.  While it appears that, at least partially, the intent of exempting networked medical devices is to do lab/bench testing and research that does not involve or impact patients, the proposed rule specifically states that the exemption seeks to allow "circumvention of TPMs in the firmware or software of medical devices and their corresponding monitoring systems at *patient discretion.*" 79 FR 73871 (emphasis added).

The proposed rule asks whether a third party—rather than the owner of the device—may lawfully offer or engage in the proposed circumvention activities with respect to that device pursuant to an exemption granted under 17 U.S.C. 1201(a)(1).  If FDA's understanding of the potential exemption is correct, it would appear that the answer could be no, at least in some circumstances.  For example, if a third party were to modify the software of a device in a way that expands or otherwise modifies the intended uses or significantly affects safety and effectiveness of the device, and then offers the modified software to consumers without FDA marketing authorization, the third party would be in violation of sections 501(f)(1)(B) and 502(o) of the FDCA.

From a public health perspective, modified devices in distribution will cause confusion to users (patients, health care providers and caregivers) who may not be able to tell the difference between a modified device and an original device. Additionally, the users may have a difficult time in identifying the appropriate entity when attempting to obtain support and maintenance for such devices. Lack of clarity in determining the manufacturer and the functionality of the medical device can cause delays in timely resolution of malfunctions with a device and potentially lead to patient harm.

2. If a patient is injured by a device whose software has been modified, it may be difficult for FDA to determine responsibility from a medical device reporting standpoint.

Under section 519 of the FDCA, both manufacturers and user facilities[1] are required to submit a report to FDA when they receive or become aware of information that reasonably suggests that a device may have caused or contributed to a death or serious injury, or has malfunctioned in a way that similar devices are likely to cause or contribute to a death or serious injury. If the device's software has been modified by a third party, it may be much more difficult to understand how or why the device malfunctioned, and who is responsible for submitting a report to the FDA.

Similar to concerns expressed in the first point, third party developers may not understand that by modifying the functionality of a device, they have potentially stepped into the role of a device manufacturer[2] such that they would be required to meet not only the premarket authorization requirements described above, but postmarket ones as well, including reporting (21 CFR Part 803, Subpart E), quality system regulations (21 CFR Part 820), registration/listing (21 CFR Part 807 Subpart B), unique device identification (21 CFR Part 830), etc. These regulations are intended to, for example, correct adverse events and prevent adverse impact to public health. If a third party developer is not complying with these requirements, particularly premarket authorization and registration/listing requirements, device user facilities may submit the name of the original manufacturer in a report to FDA without knowing that the device had been modified. Furthermore, if a third party is subject to and not complying with the "unique device identifier" requirements (which provide for unique identification of each new version or model of a device), adverse events associated with the third party's new version or model may be improperly assigned to the previous version or model. From FDA's perspective, if the agency becomes aware that serious injuries are occurring from the use of particular device without knowing it has been modified, it may be difficult for the agency to ascertain the cause of the problem and to take appropriate actions to protect the public health.

---

[1] Device user facility means a hospital, ambulatory surgical facility, nursing home, outpatient diagnostic facility, or outpatient treatment facility as defined in this section, which is not a physician's office, as defined in this section. School nurse offices and employee health units are not device user facilities. 21 CFR 803.3.

[2] Manufacturer means any person who designs, manufactures, fabricates, assembles, or processes a finished device. Manufacturer includes but is not limited to those who perform the functions of contract sterilization, installation, relabeling, remanufacturing, repacking, or specification development, and initial distributors of foreign entities performing these functions. 21 CFR 820.3(o).

3. The exemption for software security research can have implications on human subject protections and related regulatory requirements.

Section III(G)(1) "Proposed Class 25: Software-Security Research" does not seem to make a distinction between bench top testing of device security and testing of a device in clinical use (i.e., an implant in an actual patient, a device in a hospital, etc.). These latter situations carry greater risk to patients and public health and may present challenges to FDA with respect to devices that have been manipulated (i.e., issues related to FDA's ability to hold manufacturers responsible once their device has been manipulated).

On October 1, 2014, the FDA released a final guidance for the Content of Premarket Submissions for Management of Cybersecurity in Medical Devices. The guidance recommends that manufacturers consider cybersecurity risks as part of the design and development of a medical device, and submit documentation to the FDA about the risks identified and controls in place to mitigate those risks. Based on the discussion with Library of Congress staff, one could interpret that including controls as part of the design can be considered TPMs. Circumventing these TPMs through the exemptions raises concerns from both regulatory expectations and public health perspective. The FDA notes that there could be risks and benefits of enabling "good-faith" research for the purpose of identifying, disclosing, and fixing malfunctions, security flaws, or vulnerabilities. For example, it could better harness the power of collaboration, in that if multiple stakeholders employ a common approach to identifying and mitigating cybersecurity vulnerabilities, the community at-large might benefit from a more efficient and thorough resolution of vulnerabilities. However, a risk to opening technology in this way is the difficulty for regulators and others to distinguish "good-faith" research efforts from malevolent third-party actors. In other words, leveraging the exemptions in the proposed rule could allow persons to gain unilateral access to proprietary software/source code to achieve objectives that might cause harm to public health, harm to specific patients, or compromise the data and systems that support these products in a healthcare setting.

In addition, from a regulatory perspective, this exemption may cause confusion for stakeholders that have been advised through FDA guidance to put appropriate cybersecurity controls in place to prevent third parties from manipulating the software of the device.

4. Other unintended public health concerns related to 3D printing, personal health information, and unlocking.

Regarding 3D Printing, manufacturers who utilize 3D printing to ultimately manufacture medical devices need to ensure that their products are safe and effective for their intended use. For example, if a 3D printed medical device is intended for insertion into the body, then the manufacturer under FDA regulations would have to demonstrate that the products are safe and effective for that intended use.

The proposed rule also refers to the term "data." If this term alludes to Patient Health Information (PHI), or Personal Identifiable Information (PII), then such information is regulated

LOC_AR_00006177

by other Federal Institutions and Agencies. FDA strongly urges that these Institutions and Agencies are actively sought after for comment on the proposed rule.

Additionally, FDA would like to highlight Section III(c)(4) titled "Proposed Class 14: Unlocking – Wearable Computing Devices," which references the term "health monitoring devices," and Section III(c)(5) titled "Proposed Class 15: Unlocking – Consumer Machines," which references the terms "consumer machines" and "Internet of Things." Based on the information in the proposed rule, the FDA is unclear whether any of these terms include devices as defined in the FDCA (section 201(h), 21 USC 321(h)). Exemptions for such devices may have unintended public health consequences. For example, mobile phones and tablet computers appear to benefit from "unlocking" to provide consumers with access to the wireless networking marketplace. Conversely, by "unlocking" a medical device, one might actually modify the intended use of the product beyond the product's intended use, ultimately impacting the safety and effectiveness of the device.

We offer the following recommendations if the potential exemptions are finalized:

A. FDA recommends that the final rule explain that nothing in the rule will affect the regulation of products that fall within the jurisdiction of other federal agencies. As stated above, third parties that modify medical devices may become regulated manufacturers under the FDCA. As such, it may be useful for those who might circumvent TPMs to understand that other federal laws may apply and that the circumvention exemption is not an exemption from other applicable regulations.

B. We recommend that any final rule make a distinction between bench top testing of devices (where the unit tested is not in clinical use and will not be in clinical use in the future) and testing of devices during clinical use unless, for the latter, institutional review board (IRB) oversight is provided and investigational device exemptions (IDE) regulations are followed, as appropriate.

Thank you for informing FDA of this proceeding. Please let us know if you have any questions.

Sincerely yours,

Digitally signed by Bakul Patel -S
DN: c=US, o=U.S. Government, ou=HHS,
ou=FDA, ou=People, cn=Bakul Patel -S,
0.9.2342.19200300.100.1.1=2000534643
Date: 2015.08.18 09:47:49 -04'00'

Bakul Patel
Associate Director for Digital Health
Center for Devices and
    Radiological Health

**Attachment C**

LOC_AR_00006179

Federal Register/Vol. 85, No. 200/Thursday, October 15, 2020/Proposed Rules **65293**

the kind of public notice given, and other information the Lead Executive finds pertinent to the analysis of the referendum and its results.

### §1500.107  Confidential information.

The ballots and other information or reports that reveal, or tend to reveal, the vote of any person covered under the order and the voter list shall be strictly confidential and shall not be disclosed.

### §1500.108  OMB control number.

The control number assigned to the information collection requirement in this subpart by the Office of Management and Budget pursuant to the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.,* is OMB control number xxxx.

Dated: September 4, 2020.

**Kenneth White,**
*Senior Policy Analyst, Under Secretary for Economic Affairs.*

[FR Doc. 2020–20035 Filed 10–14–20; 8:45 am]
**BILLING CODE 3510–20–P**

---

### LIBRARY OF CONGRESS

**U.S. Copyright Office**

**37 CFR Part 201**

**[Docket No. 2020–11]**

**Exemptions To Permit Circumvention of Access Controls on Copyrighted Works**

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The United States Copyright Office is conducting the eighth triennial rulemaking proceeding under the Digital Millennium Copyright Act ("DMCA"), concerning possible temporary exemptions to the DMCA's prohibition against circumvention of technological measures that control access to copyrighted works. In this proceeding, the Copyright Office is considering petitions for renewal of exemptions that were granted during the seventh triennial rulemaking along with petitions for new exemptions to engage in activities not currently permitted by existing exemptions. On June 22, 2020, the Office published a notification of inquiry requesting petitions to renew existing exemptions and comments in response to those petitions, as well as petitions for new exemptions. Having carefully considered the comments received in response to that notification, in this notice of proposed rulemaking ("NPRM"), the Office announces its intention to recommend each of the

existing exemptions for readoption. This NPRM also initiates three rounds of public comment on the newly-proposed exemptions. Interested parties are invited to make full legal and evidentiary submissions in support of or in opposition to the proposed exemptions, in accordance with the requirements set forth below.

**DATES:** Initial written comments (including documentary evidence) and multimedia evidence from proponents and other members of the public who support the adoption of a proposed exemption, as well as parties that neither support nor oppose an exemption but seek to share pertinent information about a proposal, are due December 14, 2020. Written response comments (including documentary evidence) and multimedia evidence from those who oppose the adoption of a proposed exemption are due February 9, 2021. Written reply comments from supporters of particular proposals and parties that neither support nor oppose a proposal are due March 10, 2021. Commenting parties should be aware that rather than reserving time for potential extensions of time to file comments, the Office has already established what it believes to be the most generous possible deadlines consistent with the goal of concluding the triennial proceeding in a timely fashion.

**ADDRESSES:** The Copyright Office is using the *regulations.gov* system for the submission and posting of comments in this proceeding. All comments are therefore to be submitted electronically through *regulations.gov*. The Office is accepting two types of comments. First, commenters who wish briefly to express general support for or opposition to a proposed exemption may submit such comments electronically by typing into the comment field on regulations.gov. Second, commenters who wish to provide a fuller legal and evidentiary basis for their position may upload a Word or PDF document, but such longer submissions must be completed using the long-comment form provided on the Office's website at *https://www.copyright.gov/1201/2021.* Specific instructions for submitting comments, including multimedia evidence that cannot be uploaded through regulations.gov, are also available on that web page. If a commenter cannot meet a particular submission requirement, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, General Counsel and Associate Register of Copyrights, by

email at *regans@copyright.gov,* Kevin R. Amer, Deputy General Counsel, by email at *kamer@copyright.gov,* or Terry Hart, Assistant General Counsel, by email at *tehart@copyright.gov.* Each can be contacted by telephone by calling (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** On June 22, 2020, the Office published a notification of inquiry requesting petitions to renew current exemptions, oppositions to the renewal petitions, and petitions for newly proposed exemptions in connection with the eighth triennial section 1201 rulemaking.[1] In response, the Office received thirty-two renewal petitions, eight comments in opposition to renewal of a current exemption, and seven comments supporting renewal of a current exemption.[2] These comments are discussed further below. In addition, the Office received twenty-six petitions for new exemptions or expansion of previously granted exemptions.

With this NPRM, the Office sets forth the exemptions that it intends to recommend for readoption without the need for further development of the administrative record, and outlines the proposed classes for new exemptions for which the Office initiates three rounds of public comment.

### I. Standard for Evaluating Proposed Exemptions

As the notification of inquiry explained, for a temporary exemption from the prohibition on circumvention to be granted through the triennial rulemaking, it must be established that "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition . . . in their ability to make noninfringing uses under [title 17] of a particular class of copyrighted works."[3] To define an appropriate class of copyrighted works, the Office begins with the broad

---

[1] 85 FR 37399 (June 22, 2020).

[2] The comments received in response to the notification of inquiry are available at *https://www.regulations.gov/docketBrowser?rpp=25&so=DESC&sb=commentDueDate&po=0&dct=PS&D=COLC-2020-0010* and on the Copyright Office website. Renewal petitions are available at *https://www.copyright.gov/1201/2021/petitions/renewal/,* and petitions for new exemptions are available at *https://www.copyright.gov/1201/2021/petitions/proposed/.* References to renewal petitions and comments are by party name (abbreviated where appropriate) and a brief identification of the previously granted exemption, followed by either "Renewal Pet.," "Supp." (for comments supporting an exemption), or "Opp." (for comments opposing an exemption). References to petitions for new exemptions are by party name (abbreviated where appropriate), the Office's proposed class number, and "Pet."

[3] 17 U.S.C. 1201(a)(1)(C).

**65294**    **Federal Register**/Vol. 85, No. 200/Thursday, October 15, 2020/Proposed Rules

categories of works identified in 17 U.S.C. 102 and then refines them by other criteria, such as the technological protection measures ("TPMs") used, distribution platforms, and/or types of uses or users.[4]

In evaluating the evidence, the statutory factors listed in section 1201(a)(1)(C) are weighed: (i) The availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate.[5] After developing a comprehensive administrative record, the Register makes a recommendation to the Librarian of Congress concerning whether exemptions are warranted based on that record.

The Office has previously articulated the substantive legal and evidentiary standard for the granting of an exemption under section 1201(a)(1) multiple times, including in video and PowerPoint tutorials, its 2017 policy study for Congress on section 1201, and in prior recommendations of the Register concerning proposed classes of exemptions, each of which is accessible from the Office's section 1201 rulemaking web page at *https://www.copyright.gov/1201/*. In considering whether to recommend an exemption, the Office must inquire: *"Are users of a copyrighted work adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a class of copyrighted works, or are users likely to be so adversely affected in the next three years?"*[6] This inquiry breaks down into the following elements:

• The proposed class includes at least some works protected by copyright.

• The uses at issue are noninfringing under title 17.

• Users are adversely affected in their ability to make such noninfringing uses or, alternatively, users are likely to be adversely affected in their ability to make such noninfringing uses during the next three years. This element is analyzed in reference to section 1201(a)(1)(C)'s five statutory factors.

• The statutory prohibition on circumventing access controls is the cause of the adverse effects.[7]

The Register will consider the Copyright Act and relevant judicial precedents when analyzing whether a proposed use is likely to be noninfringing.[8] When considering whether such uses are being adversely impacted by the prohibition on circumvention, the rulemaking focuses on "distinct, verifiable, and measurable impacts" compared to "*de minimis* impacts."[9] Taking the administrative record as a whole, the Office will consider whether the preponderance of the evidence shows that the conditions for granting an exemption have been met.[10]

## II. Review of Petitions To Renew Existing Exemptions

As with the previous rulemaking proceeding, the Office is using a streamlined process for recommending readoption of previously-adopted exemptions to the Librarian. As the

Office explained in its 2017 policy study, the "Register must apply the same evidentiary standards in recommending the renewal of exemptions as for first-time exemption requests," and the statute requires that "a determination must be made specifically for each triennial period."[11] The Office further determined that "the statutory language appears to be broad enough to permit determinations to be based upon evidence drawn from prior proceedings, but only upon a conclusion that this evidence remains reliable to support granting an exemption in the current proceeding."[12] The Office first instituted this streamlined renewal process in the seventh triennial rulemaking, which concluded in 2018.[13] The process elicited requests to renew each of the exemptions that had been previously exempted, none of which were meaningfully contested.[14] As a result, the Office was able to recommend renewal of all previously granted exemptions.[15] The streamlined renewal process was praised by participants during the ensuing rulemaking phases.[16]

Following the same procedure that was successfully implemented in the last cycle, for this rulemaking, the Office solicited petitions for the renewal of exemptions as they are currently formulated, without modification. As noted, streamlined renewal is based upon a determination that, due to a lack of legal, marketplace, or technological changes, the factors that led the Office to recommend adoption of the exemption in the prior rulemaking will continue into the forthcoming triennial period.[17] That is, the same facts and circumstances underlying the previously-adopted regulatory exemption may be relied on to renew the exemption. Accordingly, to the extent that any renewal petition proposed uses beyond the current exemption, the Office disregarded those portions of the petition for purposes of considering the renewal of the exemption, and instead focused on whether it provided sufficient information to warrant readoption of the exemption in its current form.

The Office received thirty-two petitions to renew existing exemptions, including at least one petition to renew each currently-adopted exemption. Each

---

[4] *See* H.R. Rep. No. 105–551, pt. 2, at 38 (1998) ("Commerce Comm. Report"); U.S. Copyright Office, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights 13–14 (2018) ("2018 Recommendation"); U.S. Copyright Office, Section 1201 of Title 17, at 26, 108–10 (2017), *https://www.copyright.gov/policy/1201/section-1201-full-report.pdf* ("Section 1201 Study"); *see also* 82 FR 49550, 49551 (Oct. 26, 2017) (same).

[5] 17 U.S.C. 1201(a)(1)(C).

[6] Section 1201 Study at 114.

[7] *Id.* at 115; *see also id.* at 115–27.

[8] *Id.* at 115–17. While controlling precedent directly on point is not required to justify an exemption, there is no "rule of doubt" favoring an exemption when it is unclear that a particular use is fair or otherwise noninfringing. *See* U.S. Copyright Office, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 15 (2015) ("2015 Recommendation").

[9] Commerce Comm. Report at 37; *see also* Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4th, 1998, at 6 (Comm. Print 1998) (using the equivalent phrase "substantial adverse impact") ("House Manager's Report"); *see also, e.g.,* Section 1201 Study at 119–21 (discussing same and citing application of this standard in five prior rulemakings).

[10] *See* 17 U.S.C. 1201(a)(1)(C) (asking whether users "*are, or are likely to be* in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses") (emphasis added); Section 1201 Study at 111–12; *see also Sea Island Broad. Corp.* v. *FCC,* 627 F.2d 240, 243 (D.C. Cir. 1980) (noting that "[t]he use of the 'preponderance of evidence' standard is the traditional standard in civil and administrative proceedings"); 70 FR 57526, 57528 (Oct. 3, 2005); 2018 Recommendation at 18; 2015 Recommendation at 13–14; U.S. Copyright Office, Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 6 (2012) ("2012 Recommendation"); U.S. Copyright Office, Section 1201 Rulemaking: Second Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 19–20 (2003).

[11] Section 1201 Study at 142, 145.

[12] *Id.* at 143.

[13] 2018 Recommendation at 17.

[14] *Id.* at 22.

[15] *Id.* at 19.

[16] *See, e.g., id.* at 19 n.80 (collecting transcript testimony from 2018 rulemaking).

[17] Section 1201 Study at 143–44.

petition to renew an existing exemption included an explanation summarizing the basis for claiming a continuing need and justification for the exemption. In each case, petitioners also signed a declaration stating that, to the best of their personal knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified.

The Office received fifteen comments in response to the renewal petitions; seven of these supported renewal of a specific exemption. Eight raised discrete concerns with specific petitions, but none opposed the verbatim readoption of an existing regulatory exemption. Rather, many of these comments address whether the petitions received were sufficient for the Office to consider renewal of the full scope of an exemption, rather than themselves disputing the reliability of the previously-analyzed administrative record.[18] These comments are specifically addressed in the context of the relevant exemption below.

The Office has generally not required petitions to speak to each and every type of use, but rather generally aver that the overall conditions persist.[19] Requiring a fulsome showing would undermine the goal of the streamlined process. The impetus for instituting the streamlined process was to create a

more efficient process for unopposed exemptions, and the Office was mindful in shaping the streamlined renewal process to avoid recreating the requirements of the full rulemaking process.[20] In outlining potential mechanics in its Section 1201 Study, the Office envisioned brief filings,[21] with a "minimal" evidentiary showing required.[22] The Office has previously advised that it is sufficient for petitioners to declare that "there had not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified."[23] In the current proceeding, the Office explained that it expects petitioners would need only "a paragraph or two" to explain the need for renewal and that documentary evidence at this stage of the process is accepted but not necessary.[24] Petitioners must also "sign a declaration attesting to the continued need for the exemption and the truth of the explanation provided in support" and attest that "there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record . . . that originally demonstrated the need for the selected exemption, such that renewal of the exemption would not be justified."[25] That attestation also serves as a basis for the Office to evaluate whether the entirety of the prior administrative record supporting a given exemption continues to obtain. The Office thus concludes that the petitions received are formally and substantively sufficient for the Office to consider in evaluating whether renewal of the existing exemptions is appropriate.

To the extent a commenter questions whether there is a continued need for a specific exempted use or otherwise believes that the scope of an exemption should be narrowed, that commenter should come forward and oppose the exemption. As explained in the notification of inquiry, opposition to a renewal request asks opponents to provide evidence that would make it "reasonable for the Office to conclude that the prior rulemaking record and

any further information provided in the renewal petition are insufficient to support recommending renewal of an exemption."[26] The Office will then consider such statements and, as appropriate, will notice the issue for subsequent comment phases to ensure the administrative record remains reliable in light of current developments. But in this rulemaking, the Office has not received comments actually disputing whether there is a continued basis for any exemptions.

In the next rulemaking, the Office may consider whether to include a mechanism for petitioners to disclaim types of uses or other aspects of an exemption if they believe only partial renewal is appropriate. As detailed below, after reviewing the petitions for renewal and comments in response, the Office concludes that it has received a sufficient petition to renew each existing exemption, and it does not find any meaningful opposition to such renewal. Accordingly, the Office intends to recommend readoption of all existing exemptions in their current form.

### A. Audiovisual Works—Criticism and Comment—Universities and K–12 Educational Institutions

Multiple organizations petitioned to renew the exemption for motion pictures[27] for educational purposes by college and university or K–12 faculty and students (codified at 37 CFR 201.40(b)(1)(ii)(A)).[28] The petitions demonstrated the continuing need and justification for the exemption, stating that educators and students continue to rely on excerpts from digital media for class presentations and coursework. Peter Decherney, Katherine Sender, John Jackson, Console-ing Passions, the American Association of University Professors ("AAUP"), International Communication Association ("ICA"), Library Copyright Alliance ("LCA"), and Society for Cinema and Media Studies ("SCMS") (collectively "Joint Educators I") provide several examples of professors using DVD clips in the classroom; for example, "Cornell University Communication professor Lee Humphreys samples short segments of movies and television shows for her lectures in her 'Media Communication' class" and has "shifted from using clips from YouTube because she wants to show higher quality clips and to avoid

---

[18] See, e.g., DVD Copy Control Ass'n ("DVD CCA") & Advanced Access Content Sys. Licensing Adm'r ("AACS LA") AV Educ. Opp'n at 4 ("the failure of any proponent to provide any example of use by K–12 students should result in the Copyright Office finding in this streamlined renewal process that the exemption may not be renewed as to such uses"); DVD CCA & AACS LA Nonfiction Multimedia Ebooks Opp'n at 2 ("To the extent the proponents are requesting renewal of the full exemption, the failure to provide any example of use of this expansion to all nonfiction works beyond film analysis should render the exemption's expanded nonfiction uses ineligible for the streamlined renewal process"); ESA, MPA & RIAA Noncom. Video Opp'n at 1 ("the Register should . . . carefully scrutinize OTW's petition, and all of the streamlined renewal petitions, to consider whether the examples of alleged exemption use provided in the petitions fall within the parameters of the existing exemptions").

[19] See 85 FR at 37401 ("The petitioner must provide a brief explanation summarizing the basis for claiming a continuing need and justification for the exemption. The required showing is meant to be minimal."); Section 1201 Study at 144 ("The Office believes that the evidentiary showing required in a declaration can be minimal, as the aim is only to show that the harm that existed when the exemption was first granted continues to occur or would return but for the exemption, thus providing a sufficient justification for the Office to rely upon the prior rulemaking record in making a new recommendation supporting renewal of the exemption. Moreover, this approach appears consistent with relevant case law upholding determinations based upon a single sworn affidavit.").

[20] Section 1201 Study at 144 (also noting that "some stakeholders expressed wariness that, in practice, a short-form filing might recreate the requirements of the current rulemaking").

[21] See id. at 143 (Office will request "parties seeking renewal of an exemption to submit a short declaration outlining the continuing need for an exemption"); see also id. at 144 (referring to "a short-form filing").

[22] Id. at 144.

[23] 2018 Recommendation at 18.

[24] 85 FR at 37401.

[25] Id.

[26] Id. at 37402; see also 2018 Recommendation at 18.

[27] Unless otherwise noted, all references to motion pictures as a category include television programs and videos.

[28] Joint Educators I AV Educ. Renewal Pet.; Brigham Young Univ. & Brigham Young Univ.— Idaho (collectively, "BYU") AV Educ. Renewal Pet.

showing the attached advertisements to her students."[29] In addition, co-petitioner Peter Decherney declares that he "continues to teach a course on Multimedia Criticism" where his students "produce short videos analyzing media."[30] Indeed, Joint Educators I broadly suggest that the "entire field" of video essays or multimedia criticism "could not have existed in the United States without fair use and the 1201 educational exemption."[31] Through these submissions, petitioners demonstrated personal knowledge and experience with regard to this exemption based on their representation of thousands of digital and literacy educators and/or members supporting educators and students, combined with past participation in the section 1201 triennial rulemaking.

DVD CCA and AACS LA filed comments that do not object to the renewal of this exemption but ask the Office to address several purported deficiencies in the renewal petitions.[32] Because DVD CCA and AACS LA expressly disclaim opposition to streamlined renewal of this exemption, the Office does not treat the concerns raised as meaningful opposition. It does, however, provide brief additional comment on the points raised by DVD CCA and AACS LA regarding the sufficiency of the petition. Regarding the lack of evidence of use of the exemption by K–12 educators or students, DVD CCA and AACS LA argue that "the failure of any proponent to provide any example of use by K–12 students should result in the Copyright Office finding in this streamlined renewal process that the exemption may not be renewed as to such uses."[33] As explained above, petitioners need not address every possible use covered by an exemption when seeking to renew an exemption, and the Office has concluded that the petition was submitted in a sufficient manner.[34]

A similar conclusion applies to DVD CCA and AACS LA's complaint that "the users ignore the threshold requirement to consider alternatives to

circumvention."[35] DVD CCA and AACS LA are correct in noting that, although the 2018 rulemaking eliminated prior language limiting the exemption to circumstances where "close analysis" of video is required, it retained the requirement that the user "reasonably believe[ ] that non-circumventing alternatives are unable to produce the required level of high-quality content."[36] From their comment, it appears that DVD CCA and AACS LA believe that the "close analysis" requirement should be reinstated, but wish to reiterate a "lack of opposition" to the exemption in light of recognition that schools are currently "wrestling with implementing distance learning."[37]

The Office has examined the record and finds the petitions sufficient. As explained above, it does not follow that petitioners seeking renewal must provide an "explanation why screen capture technology could not suffice to capture and show" for each and every one of the film clips they seek to use.[38] Petitioners made that showing in the prior rulemaking, and their renewal petition attests that there has been no material change in the facts. Indeed, Joint Educators I reference the need of a communication professor to embed clips in PowerPoint rather than played from YouTube "because she wants to show higher quality clips and to avoid showing the attached advertisements to her students."[39] The same petition also provides multiple examples asserting a continued need to make use of the exemption for purposes of engaging in film analysis, precisely the kind of pedagogy that has been discussed in connection with the prior "close analysis" limitation.[40] This is sufficient. It then becomes opponents' burden to establish a basis for concluding that the prior findings no longer obtain. DVD CCA and AACS LA AV have provided no such evidence here.

Based on the information provided in the renewal petitions and the lack of

meaningful opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*B. Audiovisual Works—Criticism and Comment—Massively Open Online Courses ("MOOCs")*

Brigham Young University and Peter Decherney, Katherine Sender, John Jackson, Console-ing Passions, ICA, LCA, and SCMS (collectively "Joint Educators II") petitioned to renew the exemption for motion pictures for educational uses in MOOCs (codified at 37 CFR 201.40(b)(1)(ii)(B)).[41] No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, stating that instructors continue to rely on the exemption to develop, provide, and improve MOOCs, as well as increase the number of (and therefore access to) MOOCs in the field of film and media studies—with Joint Educators II noting that the "exemption has never been so relevant as it is now during the COVID–19 pandemic and the universal shift of our education systems to online learning."[42]

In response to the renewal petition, DVD CCA and AACS LA filed a comment noting that they did not oppose renewal of the exemption but asking the Office to address what they described as the "apparent failure of the proponents" to employ technological measures preventing retention and redistribution of MOOC content.[43] The comment suggests that this does not reflect any changed circumstances, and notes that the Office suggested in the seventh rulemaking that the proper method to air DVD CCA and AACS LA's concerns would be to oppose the renewal.[44] Again, they have not done so. The Office declines to address whether any user's activities may or may not be consistent with the exemption. The relevant exemption language is not in dispute, and interpreting compliance with or eligibility for the exemption is outside the scope of this proceeding. If DVD CCA and AACS LA believe that the exemption should be adjusted or eliminated in light of abuse or difficulty in complying with the condition that

---

[29] Joint Educators I AV Educ. Renewal Pet. at 3.
[30] *Id.*
[31] *Id.*
[32] DVD CCA & AACS LA AV Educ. Opp'n.
[33] *Id.* at 4.
[34] To the extent the eighth rulemaking has received information relating to whether the exemption remains necessary for K–12 educational activities, Joint Educator's petition for expansion of this exemption also suggests it continues to be necessary, especially in light of the ongoing pandemic. *See* Decherney, Sender, Jackson, Stein, Gaglani, Wisbauer, Berg, Siddiqui, Robertson, Console-ing Passions, AAUP, ICA, LCA & SCMS (collectively "Joint Educators III) Class 1 Pet. at 2.

[35] DVD CCA & AACS LA AV Educ. Opp'n at 7.
[36] 37 CFR 201.40(b)(1).
[37] DVD CCA & AACS LA AV Educ. Opp'n at 6–7.
[38] *Id.* at 6.
[39] Joint Educators I AV Educ. Renewal Pet. at 3.
[40] *See also, e.g.,* 2015 Recommendation at 92 (citing examples where high-definition quality is necessary, including close analysis of *"The Wizard of Oz* (to highlight prop wires and other 'stage-like' elements), *Citizen Kane* (to appreciate depth of field, chiaroscuro effects, and subtle narrative elements), Jacques Tati's *Playtime* (to better approximate the intended 70mm viewing experience and appreciate the film's very detailed and complex composition), and *Saving Private Ryan* (to experience the enhanced color and contrast effect of bleach bypass film processing, hyper-realism, and complex soundscapes)").

[41] BYU AV Educ. MOOCS Renewal Pet.; Joint Educators AV Educ. MOOCs Renewal Pet.
[42] Joint Educators II AV Educ. MOOCs Renewal Pet. at 3.
[43] DVD CCA & AACS LA AV Educ. MOOCs Opp'n at 1.
[44] *Id.* at 2 n.3.

exemption beneficiaries reasonable technological measures, the proper response would be to submit an opposition to this exemption so the Office can determine whether fuller airing through notice and comment to evaluate this issue is appropriate.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*C. Audiovisual Works—Criticism and Comment—Digital and Media Literacy Programs*

LCA and Professor Renee Hobbs petitioned to renew the exemption for motion pictures for educational uses in nonprofit digital and media literacy programs offered by libraries, museums, and other nonprofits (codified at 37 CFR 201.40(b)(1)(ii)(C)).[45] No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, and petitioners demonstrated personal knowledge and experience with regard to this exemption. For example, the petition stated that librarians across the country have relied on the current exemption and will continue to do so for their digital and media literacy programs.[46]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*D. Audiovisual Works—Criticism and Comment—Multimedia E-Books*

Multiple petitioners jointly sought to renew the exemption for the use of motion picture excerpts in nonfiction multimedia e-books (codified at 37 CFR 201.40(b)(1)(ii)(C)).[47] The petition demonstrated the continuing need and justification for the exemption. In addition, the petitioners demonstrated personal knowledge through Professor Buster's continued work on an e-book series based on her lecture series, "Deconstructing Master Filmmakers: The Uses of Cinematic Enchantment," which, they said, "relies on the availability of high-resolution video not

available without circumvention of technological protection measures."[48]

In response, DVD CCA and AACS LA filed a comment that did not object to renewal of an exemption limited to "e-books offering filming analysis," but did object to renewing the existing exemption as it is currently formulated.[49] DVD CCA and AACS LA asserted that the renewal petition failed to "provide any example of use of this expansion to all nonfiction works beyond film analysis."[50] As a result, they argue that the evidence is only sufficient to support an exemption for use in e-books offering film analysis.

As noted above, however, in making a petition to renew an exemption, it is sufficient for petitioners to declare that to their knowledge, "there had not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified."[51] Petitioners are not required to provide examples that pertain to every type of use covered by the exemption. To the extent an opponent of renewal seeks to narrow an exemption, it should "provide evidence that would allow the Acting Register to reasonably conclude that the prior rulemaking record and any further information provided in the petitions are insufficient for her to recommend renewal without the benefit of a further developed record."[52]

In this case, the Office determined in the 2018 proceeding that the record was sufficient to justify recommending an exemption that includes nonfiction uses beyond film analysis.[53] The Office concludes that the renewal petition, which seeks renewal of the exemption as previously adopted, is sufficient to support renewal. Although DVD CCA and AACS LA note that the statements in the renewal petition are limited to examples related to e-books offering film analysis, this opposition does not amount to evidence in the form of legal, marketplace, or technological changes that render the prior rulemaking record insufficient to support recommending renewal.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly,

the Office intends to recommend renewal of this exemption.

*E. Audiovisual Works—Criticism and Comment—Filmmaking*

Multiple organizations petitioned to renew the exemption for motion pictures for uses in documentary films or other films where use is in parody or for a biographical or historically significant nature (codified at 37 CFR 201.40(b)(1)(i)(A)).[54] The petitions summarized the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience with regard to this exemption. For example, the International Documentary Association, Film Independent, and Kartemquin Educational Films (collectively "Joint Filmmakers")—which represent thousands of independent filmmakers across the nation—stated that TPMs such as encryption continue to prevent filmmakers from accessing needed material, and that this is "especially true for the kind of high fidelity motion picture material filmmakers need to satisfy both distributors and viewers."[55] Petitioners state that they personally know many filmmakers who have found it necessary to rely on this exemption and will continue to do so.[56]

DVD CCA and AACS LA filed comments that did not oppose renewal of the exemption but did object to the characterization of the exemption filed by the filmmaking proponents.[57] Specifically, DVD CCA and AACS LA noted that the exemption is limited to criticism or comment, documentary filmmaking, or any filmmaking that would make use of a clip in a parody or for its biographical or historical nature; in their view, petitioners suggest the exemption covers all fair use or noninfringing uses.[58] The Office does not find it necessary to opine on the characterization of the petitions by DVD CCA and AACS LA and believes that petitioners' declarations have met the minimal showing sufficient to support renewal of the exemption without modification.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during

---

[45] LCA & Hobbs AV Educ. Nonprofits Renewal Pet.

[46] *Id.*

[47] Buster, Authors Alliance & AAUP Nonfiction Multimedia E-Books Renewal Pet.

[48] *Id.* at 3.

[49] DVD CCA & AACS LA Nonfiction Multimedia E-Books Opposition Pet.

[50] *Id.* at 2.

[51] 2018 Recommendation at 18.

[52] *Id.*

[53] *Id.* at 64.

[54] Joint Filmmakers Documentary Films Renewal Pet.; New Media Rights ("NMR") Documentary Films Renewal Pet.

[55] Joint Filmmakers Documentary Films Renewal Pet. at 3.

[56] *Id.*; NMR Documentary Films Renewal Pet. at 3.

[57] DVD CCA & AACS LA Documentary Filmmaking Opp'n.

[58] *Id.* at 2.

**65298**    **Federal Register** / Vol. 85, No. 200 / Thursday, October 15, 2020 / Proposed Rules

the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### F. Audiovisual Works—Criticism and Comment—Noncommercial Videos

Two organizations petitioned to renew the exemption for motion pictures for uses in noncommercial videos (codified at 37 CFR 201.40(b)(1)(i)(B)).[59] The petitions demonstrated the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience with regard to this exemption. For example, one of the petitioners, the Organization for Transformative Works ("OTW"), has advocated for the noncommercial video exemption in past triennial rulemakings, and has heard from "a number of noncommercial remix artists" who have used the exemption and anticipate needing to use it in the future.[60] OTW included an account from an academic stating that footage ripped from DVDs and Blu-ray was preferred for "vidders" (noncommercial remix artists) because "it is high quality enough to bear up under the transformations that vidders make to it."[61] Similarly, NMR stated that its staff personally knows "many video creators that have found it necessary to rely on this exemption during the current triennial period" and who intend to make these types of uses in the next triennial period.[62]

OTW contends that "the exemption should be renewed using the relatively simple language defining the exempted class from the 2008 rulemaking, covering both DVDs and Blu-Ray (and streaming where necessary) 'when circumvention is accomplished solely in order to accomplish the incorporation of short portions of motion pictures into new works for the purpose of criticism or comment, and where the person engaging in circumvention believes and has reasonable grounds for believing that circumvention is necessary to fulfill the purpose of the use.'"[63] OTW asserts that this change would not constitute "an expansion of the existing exemption, but a more understandable restatement."[64] Two comments, one from DVD CCA and AACS LA and the other from the Entertainment Software Association ("ESA"), Motion Picture Association ("MPA"), and Recording Industry Association of America

("RIAA") did not object to the renewal of the exemption for noncommercial videos but did object to the proposed change in the language sought by OTW, arguing that it involves a modification of the current exemption.[65] The Office agrees that OTW's proposed modifications are appropriately addressed as part of the full rulemaking proceeding, and therefore the Office has included this request with the proposed classes discussed below.[66]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### G. Audiovisual Works—Accessibility

Multiple organizations petitioned to renew the exemption for motion pictures for the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students with disabilities (codified at 37 CFR 201.40(b)(2)(i)(A)).[67] No oppositions were filed against readoption of this exemption.

The petition demonstrated the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience. For example, Brigham Young University asserts that its disability services offices "sometimes need to create accessible versions of motion pictures" to accommodate its students with disabilities.[68] Both petitions stated that there is a need for the exemption going forward; indeed, one group of petitioners states that "the need is likely to increase significantly in light of the ongoing COVID–19 pandemic as many educational institutions shift to online learning and the use of digital multimedia by faculty increases."[69]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### H. Literary Works—Accessibility

Multiple organizations petitioned to renew the exemption for literary works distributed electronically (i.e., e-books), for use with assistive technologies for persons who are blind, visually impaired, or have print disabilities (codified at 37 CFR 201.40(b)(3)).[70] No oppositions were filed against readoption of this exemption. The petitions demonstrated the continuing need and justification for the exemption, stating that individuals who are blind, visually impaired, or print disabled are significantly disadvantaged with respect to obtaining accessible e-book content because TPMs interfere with the use of assistive technologies.[71] Petitioners noted that the record underpinning this exemption "has stood and been re-established in the past six triennial reviews, dating back to 2003," and that the "accessibility of ebooks is frequently cited as a top priority" by its members.[72] In addition, petitioners noted the unique challenges COVID–19 poses to the blind, visually impaired, and print disabled due to limited physical access to libraries and the shift to virtual learning.[73] Finally, the petitioners demonstrated personal knowledge and experience with regard to the assistive technology exemption; they are all organizations that advocate for the blind, visually impaired, and print disabled.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### I. Literary Works—Medical Device Data

Hugo Campos petitioned to renew the exemption covering access to patient data on networked medical devices (codified at 37 CFR 201.40(b)(4)).[74] No oppositions were filed, and Consumer

---

[59] NMR Noncom. Videos Renewal Pet.; OTW Noncom. Videos Renewal Pet.

[60] OTW Noncom. Videos Renewal Pet. at 3.

[61] Id.

[62] NMR Noncom. Videos Renewal Pet. at 3.

[63] OTW Noncom. Videos Renewal Pet. at 4.

[64] Id.

[65] DVD CCA & AACS LA Noncom. Videos Opp'n; ESA, MPA & RIAA Noncom. Videos Opp'n.

[66] The Office notes that much of the language that has been added to the exemption since 2008 was sought by proponents of the exemption, e.g., the addition of a reference to the statutory definition of motion pictures was sought by EFF. See 2012 Recommendation at 105. In some cases, the addition of such language was supported by OTW itself. See, e.g., id. at 110 (adding clarification that commissioned videos are included within exemption if ultimate use is noncommercial, a proposal that was supported by OTW).

[67] Ass'n of Transcribers and Speech-to-Text Providers ("ATSP"), Ass'n on Higher Educ. and Disability ("AHEAD") & LCA Captioning Renewal Pet.; BYU Captioning Renewal Pet.

[68] BYU Captioning Renewal Pet. at 3.

[69] ATSP, AHEAD & LCA Captioning Renewal Pet. at 3.

[70] Am. Council for the Blind ("ACB"), Am. Fed'n for the Blind ("AFB"), Nat'l Fed'n of the Blind ("NFB"), LCA, American Association of Law Libraries ("AALL"), Benetech/Bookshare, and HathiTrust Assistive Technologies Renewal Pet.

[71] Id. at 3.

[72] Id. at 3–4.

[73] Id. at 4.

[74] Campos Medical Devices Renewal Pet.

LOC_AR_00006185

**Federal Register**/Vol. 85, No. 200/Thursday, October 15, 2020/Proposed Rules     **65299**

Reports submitted a comment in support.[75] Mr. Campos's petition demonstrated the continuing need and justification for the exemption, stating that patients continue to need access to data output from their medical device to manage their health.[76] Mr. Campos demonstrated personal knowledge and experience with regard to this exemption, as he is a patient needing access to the data output from his medical device and is a member of a coalition whose members research, comment on, and examine the effectiveness of networked medical devices.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*J. Computer Programs—Unlocking*

Multiple organizations petitioned to renew the exemption for computer programs that operate cellphones, tablets, mobile hotspots, or wearable devices (*e.g.,* smartwatches), to allow connection of a new or used device to an alternative wireless network ("unlocking") (codified at 37 CFR 201.40(b)(5)).[77] No oppositions were filed against the petitions seeking to renew this exemption; Consumer Reports filed in support of renewal.[78] The petitions demonstrate the continuing need and justification for the exemption, stating that consumers of the enumerated products continue to need to be able to unlock the devices so they can switch network providers. For example, ISRI stated that its members continue to purchase or acquire donated cell phones, tablets, and other wireless devices and try to reuse them, but that wireless carriers still lock devices to prevent them from being used on other carriers.[79] In addition, the petitioners demonstrated personal knowledge and experience with regard to this exemption. CCA and ISRI represent companies that rely on the ability to unlock cellphones. Both petitioners also participated in past 1201 triennial rulemakings relating to unlocking lawfully-acquired wireless devices.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*K. Computer Programs—Jailbreaking*

Multiple organizations petitioned to renew the exemptions for computer programs that operate smartphones, tablets and other portable all-purpose mobile computing devices, smart TVs, or voice assistant devices to allow the device to interoperate with or to remove software applications ("jailbreaking") (codified at 37 CFR 201.40(b)(6)–(8)).[80] The petitions demonstrate the continuing need and justification for the exemption, and that petitioners had personal knowledge and experience with regard to this exemption. For example, regarding smart TVs specifically, the Software Freedom Conservancy ("SFC") asserts that it has "reviewed the policies and product offerings of major Smart TV manufacturers (Sony, LG, Samsung, etc.) and they are substantially the same as those examined during the earlier rulemaking process."[81] The petitions state that, absent an exemption, TPMs applied to the enumerated products would have an adverse effect on noninfringing uses, such as being able to install third-party applications on a smartphone or download third-party software on a smart TV to enable interoperability.[82] For example, EFF's petition outlined its declarant's experience with instances where it was necessary to replace the software on a smartphone, smart TV, and tablet.[83] Consumer Reports filed a comment in support of the exemption,[84] and no one opposed renewal.

Based on the information provided in the renewal petitions and the lack of meaningful opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*L. Computer Programs—Repair of Motorized Land Vehicles*

Multiple organizations petitioned to renew the exemption for computer programs that control motorized land

vehicles, including farm equipment, for purposes of diagnosis, repair, or modification of a vehicle function (codified at 37 CFR 201.40(b)(9)).[85] The petitions demonstrated the continuing need and justification for the exemption. For example, the Motor & Equipment Manufacturers Association ("MEMA") stated that over the past three years, its membership "has seen firsthand that the exemption is helping protect consumer choice and a competitive market, while mitigating risks to intellectual property and vehicle safety."[86] The Auto Care Association ("ACA") stated that "[u]nless this exemption is renewed, the software measures manufacturers deploy for the purpose of controlling access to vehicle software will prevent Auto Care members from lawfully assisting consumers in the maintenance, repair, and upgrade of their vehicles."[87] SEMA stated that it "is unaware of any factor, incident or reason to change the exemption and the need for the exemption remains valid and imperative."[88] The petitioners demonstrated personal knowledge and experience with regard to this exemption; each either represents or gathered information from individuals conducting repairs or businesses that manufacture, distribute, and sell motor vehicle parts, and perform vehicle service and repair. Consumer Reports filed in support of the petition.[89]

Although not opposing readoption of this exemption, the Alliance for Automotive Innovation ("AAI") submitted comments raising concerns with the ACA and MEMA petitions.[90] Specifically, the AAI argued that the two petitions "mischaracterize the scope of the existing exemption and appear to argue for an expanded exemption, rather than for renewal of the existing exemption as it is 'currently formulated, without modification.'"[91] It states that both ACA and MEMA suggest "that the existing exemption permits third party repair shops to circumvent access controls on vehicle software in order to provide commercial repair services."[92] AAI asserts that "[p]roviding a commercial service that

---

[75] Consumer Reports Medical Devices Supp.

[76] Campos Medical Devices Renewal Pet. at 3.

[77] Competitive Carriers Ass'n ("CCA") Unlocking Renewal Pet.; Inst. of Scrap Recycling Industries ("ISRI") Unlocking Renewal Pet.

[78] Consumer Reports Unlocking Supp.

[79] ISRI Unlocking Renewal Pet. at 3.

---

[80] EFF Jailbreaking Renewal Pet.; NMR Jailbreaking Renewal Pet.; SFC Jailbreaking Renewal Pet.

[81] SFC Jailbreaking Renewal Pet. at 3.

[82] EFF Jailbreaking Renewal Pet. at 3; NMR Jailbreaking Renewal Pet. at 3; SFC Jailbreaking Renewal Pet. at 3.

[83] EFF Jailbreaking Renewal Pet. at 3–4.

[84] Consumer Reports Jailbreaking Supp.

---

[85] ACA Vehicle Repair Renewal Pet.; Am. Farm Bureau Fed'n Vehicle Repair Renewal Pet.; Consumer Tech. Ass'n Vehicle Repair Renewal Pet.; MEMA Vehicle Repair Renewal Pet.; Specialty Equip. Mkt. Ass'n ("SEMA") Vehicle Repair Renewal Pet.

[86] MEMA Vehicle Repair Renewal Pet. at 3.

[87] ACA Vehicle Repair Renewal Pet. at 3.

[88] SEMA Vehicle Repair Renewal Pet. at 3.

[89] Consumer Reports Vehicle Repair Supp.

[90] AAI Vehicle Repair Opp'n.

[91] *Id.* at 1.

[92] *Id.* at 2.

**65300**    **Federal Register** / Vol. 85, No. 200 / Thursday, October 15, 2020 / Proposed Rules

requires circumventing access controls or copy controls (*e.g.*, using or providing certain engine tuning software) is indisputably trafficking in an unlawful service under Sections 1201(a)(2) and (b) and, therefore, is clearly outside the scope of the existing exemption." [93]

The Office addressed the relationship of this exemption to the anti-trafficking provisions in some detail in the 2018 Recommendation. In response to petitioners' requests, the Office recommended removal of the language in the prior repair exemption requiring that circumvention be "undertaken by the authorized owner." [94] That change, the Office explained, was intended to "account[] for the possibility that certain third parties may qualify as 'user[s]' eligible for an exemption from liability under section 1201(a)(1)." [95] In making this recommendation, which the Librarian accepted, the Office declined to express any "view as to whether particular examples of assistance do or do not constitute unlawful circumvention services"—specifically, "whether vehicle or other repair services may run afoul of the anti-trafficking provisions when engaging in circumvention on behalf of customers." [96] The Office adheres to this position and accordingly expresses no view as to the activities described by ACA and MEMA.

Based on the information provided in the renewal petitions and the lack of opposition to the specific exemption, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*M. Computer Programs—Repair of Smartphones, Home Appliances, and Home Systems*

Multiple organizations petitioned to renew the exemption for computer programs that control smartphones, home appliances, or home systems, for diagnosis, maintenance, or repair of the device or system (codified at 37 CFR 201.40(b)(10)). [97] The petitions demonstrated the continuing need and justification for the exemption. For example, EFF, the Repair Association, and iFixit asserted that "[m]anufacturers of these devices continue to implement technological protection measures that inhibit lawful repairs, maintenance, and

diagnostics, and they show no sign of changing course. [98] Consumer Reports filed in support of the petition. [99]

In comments filed in response to the petitions, DVD CCA and AACS LA did not object to renewal of the exemption, but did request that the Office "expressly . . . reject the implied assertion that some of the activity used as examples in the renewal petition . . . is permitted under the current exemption." [100] Specifically, they pointed to an example in which petitioners stated a purported need to "repair any disrupted functionality" in Sonos smart speakers for which the manufacturer had ceased to provide software updates. [101] DVD CCA and AACS LA contend that such activity does not constitute "repair" under the exemption because, under relevant licensing schemes, a manufacturer "may outright deactivate one or more functions due to the product's TPM being compromised. These results are not the consequences of the product falling out of repair or breaking." [102]

DVD CCA and AACS LA do not appear to be arguing that the use of this example renders the renewal petitions insufficient with respect to home systems. The Office agrees that the sufficiency of the petitions do not depend on whether this specific example qualifies under the current exemption. Even if this example were excluded, the petitions attest to a continuing need for the exemption and the continued validity of the prior record. [103] To the extent DVD CCA and AACS LA are asking the Office to opine on examples of particular uses, such a request is beyond the scope of the renewal phase, though they are free to raise such concerns in the comment phase to the extent they relate to proposed expansions of the current rule.

Based on the information provided in the renewal petitions and the lack of opposition to renewal, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends

to recommend renewal of this exemption.

*N. Computer Programs—Security Research*

Multiple organizations and security researchers petitioned to renew the exemption permitting circumvention for purposes of good-faith security research (codified at 37 CFR 201.40(b)(11)). [104] The petitioners demonstrated the continuing need and justification for the exemption, as well as personal knowledge and experience with regard to this exemption. For example, the petition from Professor J. Alex Halderman, the Center for Democracy and Technology ("CDT"), and the U.S. Technology Policy Committee of the Association for Computing Machinery ("ACM") highlighted a number of concerns justifying the continuing need for the exemption, including the need to find and detect vulnerabilities in voting machines and other election systems, the increased proliferation of consumer Internet of Things devices, and the increasing reliance on digital systems combined with greater aggressiveness on the part of threat actors, including other nation states. [105] The petition from Professors Matt Blaze and Steven Bellovin asserted that in the past three years "one of us has received threats of litigation from copyright holders in connection with his security research on software in voting systems." [106] Finally, MEMA stated that its membership "experienced firsthand that the exemption is helping encourage innovation in the automotive industry while mitigating risks to intellectual property and vehicle safety." [107]

No oppositions were filed against readoption of this exemption, while Consumer Reports filed in support of renewal. [108] A petition seeking renewal of a separate exemption submitted by Hugo Campos, a member of a coalition of medical device patients and researchers, also noted support for this exemption. [109]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly,

---

[93] *Id.*

[94] 2018 Recommendation at 223–25.

[95] *Id.* at 225.

[96] *Id.*

[97] EFF Device Repair Renewal Pet.; EFF, Repair Ass'n & iFixit Device Repair Renewal Pet.

[98] EFF Device Repair Renewal Pet. at 3; EFF, Repair Ass'n & iFixit Device Repair Renewal Pet. at 3.

[99] Consumer Reports Device Repair Supp.

[100] DVD CCA & AACS LA Device Repair Opp'n at 1.

[101] *Id.* at 3.

[102] DVD CCA & AACS LA Device Repair Opp'n at 4.

[103] *See, e.g.*, EFF Device Repair Renewal Pet. at 3 ("Manufacturers of these devices continue to implement technological protection measures that inhibit lawful repairs, maintenance, and diagnostics, and they show no sign of changing course.").

[104] Blaze & Bellovin Security Research Renewal Pet.; Halderman, CDT & ACM Security Research Renewal Pet.; MEMA Security Research Renewal Pet.

[105] Halderman, CDT & ACM Security Research Renewal Pet. at 4.

[106] Blaze & Bellovin Security Research Renewal Pet. at 3.

[107] MEMA Security Research Renewal Pet. at 3.

[108] Consumer Reports Security Research Supp.

[109] Campos Medical Device Renewal Pet. at 4.

the Office intends to recommend renewal of this exemption.

### O. Computer Programs—Software Preservation

The Software Preservation Network ("SPN") and LCA petitioned to renew the exemption for computer programs other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums (codified at 37 CFR 201.40(b)(13)).[110] The petitions state that libraries, archives, and museums continue to need the exemption to preserve and curate software and materials dependent on software. For example, the petition asserts that "researchers at UVA designed a project in order to access the 'Peter Sheeran papers'—a collection of drawings and plans from a local Charlottesville architecture firm," and that without the exemption, "the outdated Computer Aided Design ("CAD") software used to create many of the designs in the Sheeran papers may have remained inaccessible to researchers, rendering the designs themselves inaccessible, too." [111] In addition, the petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the section 1201 triennial rulemaking relating to access controls on software, and/or representing major library associations with members that have relied on this exemption. Readoption of this exemption was unopposed.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### P. Computer Programs—Video Game Preservation

SPN and LCA petitioned to renew the exemption for preservation of video games for which outside server support has been discontinued (codified at 37 CFR 201.40(b)(12)).[112] Consumer Reports supported the petition.[113] The petitions state that libraries, archives, and museums continue to need the exemption to preserve and curate video games in playable form. For example, the petition highlights the Georgia Tech

University Library's Computing Lab, retroTECH, which has a significant collection of recovered video game consoles, made accessible for research and teaching uses pursuant to the exemption.[114] In addition, the Museum of Digital Arts and Entertainment in Oakland, California, relied on the exemption to restore a recent PC game, in collaboration with Microsoft and the original developers, despite potential DRM issues.[115] The petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the section1201 triennial rulemaking, and/or through their representation of members that have relied on this exemption. Readoption of this exemption was unopposed.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### Q. Computer Programs—3D Printing

Michael Weinberg petitioned to renew the exemption for computer programs that operate 3D printers to allow use of alternative feedstock (codified at 37 CFR 201.40(b)(14)).[116] No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, and the petitioner demonstrated personal knowledge and experience. Specifically, Mr. Weinberg declared he is a member of the 3D printing community and has been involved with this exemption request during each cycle it has been considered by the Office.[117] In addition, the petition states that 3D printers continue to limit the types of materials used, and new companies and printers may consider implementing similar restrictions in the future, thereby requiring renewal of the exemption.[118]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

### III. Analysis and Classification of Proposed New or Expanded Exemptions

Having addressed the petitions to renew existing exemptions, the Office now turns to the petitions for new or expanded exemptions. The Office received twenty-six petitions,[119] which it has organized into seventeen proposed classes, as described below. Before discussing those classes, the Office first explains the process and standards for submission of written comments.

### A. Submission of Written Comments

Persons wishing to address proposed exemptions in written comments should familiarize themselves with the substantive legal and evidentiary standards for the granting of an exemption under section 1201(a)(1), which are also described in more detail on the Office's form for submissions of longer comments, available on its website. In addressing factual matters, commenters should be aware that the Office favors specific, "real-world" examples supported by evidence over speculative, hypothetical observations. In cases where the technology at issue is not apparent from the requested exemption, it can be helpful for commenters to describe the TPM(s) that control access to the work and method of circumvention.

Commenters' legal analysis should explain why the proposal meets or fails to meet the criteria for an exemption under section 1201(a)(1), including, without limitation, why the uses sought are or are not noninfringing as a matter of law. The legal analysis should also discuss statutory or other legal provisions that could impact the necessity for or scope of the proposed exemption. Legal assertions should be supported by statutory citations, relevant case law, and other pertinent authority. In cases where a class proposes to expand an existing exemption, participants should focus their comments on the legal and evidentiary bases for modifying the exemption, rather than the underlying exemption; as discussed above. the Office intends to recommend each current temporary exemption for renewal.

To ensure a clear and definite record for each of the proposals, commenters are required to provide a separate submission for each proposed class during each stage of the public comment period. Although a single comment may

---

[110] SPN & LCA Software Preservation Renewal Pet.

[111] Id. at 3.

[112] SPN & LCA Abandoned Video Game Renewal Pet.

[113] Consumer Reports Abandoned Video Game Supp.

[114] SPN & LCA Abandoned Video Game Renewal Pet. at 3.

[115] Id.

[116] Weinberg 3D Printers Renewal Pet.

[117] Id. at 3.

[118] Id.

[119] In addition, as noted, OTW's renewal petition seeks to amend the current regulatory language. The Office is treating that request as a petition for expansion.

not address more than one proposed class, the same party may submit multiple written comments on different proposals. The Office acknowledges that the requirement of separate submissions may require commenters to repeat certain information across multiple submissions, but the Office believes that the administrative benefits of creating a self-contained, separate record for each proposal will be worth the modest amount of added effort.

The first round of public comment is limited to submissions from proponents (*i.e.*, those parties who proposed new exemptions during the petition phase) and other members of the public who support the adoption of a proposed exemption, as well as any members of the public who neither support nor oppose an exemption but seek only to share pertinent information about a specific proposal.

Proponents of exemptions should present their complete affirmative case for an exemption during the initial round of public comment, including all legal and evidentiary support for the proposal. Members of the public who oppose an exemption should present the full legal and evidentiary basis for their opposition in the second round of public comment. The third round of public comment will be limited to supporters of particular proposals and those who neither support nor oppose a proposal, who, in either case, seek to reply to points made in the earlier rounds of comments. Reply comments should not raise new issues, but should instead be limited to addressing arguments and evidence presented by others.

## B. The Proposed Classes

As noted above, the Office has reviewed and classified the proposed exemptions set forth in the twenty-seven petitions received in response to its notification of inquiry. Any exemptions adopted must be based on "a particular class of works,"[120] and each class is intended to "be a narrow and focused subset of the broad categories of works . . . identified in Section 102 of the Copyright Act."[121] As explained in the Notice of Inquiry, the Office consolidates or groups related and/or overlapping proposed exemptions where possible to simplify

the rulemaking process and encourage joint participation among parties with common interests (though collaboration is not required). Accordingly, the Office has categorized the petitions into seventeen proposed classes of works.

Each proposed class is briefly described below; additional information can be found in the underlying petitions posted on the Office website. As explained in the notification of inquiry, the proposed classes "represent only a starting point for further consideration in the rulemaking proceeding, and will be subject to further refinement based on the record."[122] The Office further notes that it has not put forward precise regulatory language for the proposed classes, because any specific language for exemptions that the Register ultimately recommends to the Librarian will depend on the full record developed during this rulemaking. Indeed, in the case of proposed modifications to existing exemptions, as stated above, the Register may propose altering current regulatory language to expand the scope of an exemption, where the record suggests such a change is appropriate.

After examining the petitions, the Office has preliminarily identified some initial legal and factual areas of interest with respect to certain proposed classes. The Office stresses, however, that these areas are not exhaustive, and commenters should consider and offer all legal argument and evidence they believe necessary to create a complete record. These early observations are offered without prejudice to the Office's ability to raise other questions or concerns at later stages of the proceeding. Finally, "where an exemption request resurrects legal or factual arguments that have been previously rejected, the Office will continue to rely on past reasoning to dismiss such arguments in the absence of new information."[123]

## Proposed Class 1: Audiovisual Works—Criticism and Comment

Three petitions seek to expand the existing exemptions for circumvention of access controls protecting motion pictures on DVDs, Blu-ray discs, and digitally transmitted video for purposes of criticism and comment, including for educational purposes by certain users. Because these petitions raise some shared concerns, the Office has grouped them into one class, as it did during the seventh triennial proceeding. This grouping is without prejudice to

possible further refinement of this class, including dividing it into subclasses based on specific uses.

First, as noted, OTW filed a renewal petition requesting that the exemption regarding the creation of noncommercial videos be amended to incorporate the language of the exemption for such uses adopted in the 2010 rulemaking.[124] That exemption permitted circumvention undertaken "solely in order to accomplish the incorporation of short portions of motion pictures into new works for the purpose of criticism or comment, and where the person engaging in circumvention believes and has reasonable grounds for believing that circumvention is necessary to fulfill the purpose of the use."[125] Noting that the current exemption is longer than this formulation, OTW contends that "the complexity of [the current] provisions substantially increases the difficulty of communicating and implementing the exemptions in practice."[126] In OTW's view, reverting to the 2010 language would not expand the scope of the existing rule but merely would help "clarify the exemption for ordinary users."[127] The exemption, however, has been expanded since 2010, including by encompassing works on a Blu-ray disc or received via a digital transmission, and by including language clarifying that the exemption includes "videos produced for a paid commission if the commissioning entity's use is noncommercial."[128] The Office seeks comment on whether, or to what extent, commenters believe the suggested language would alter the substance of the current provision. As part of that analysis, commenters should discuss the extent to which the evidence submitted in the prior rulemaking may be relied upon to support the proposed change.

Second, Joint Educators III seek to expand the current exemption for educational uses to allow a greater number of users to engage in "online instructional learning."[129] They acknowledge that the existing exemption already covers the use of short clips in distance learning by certain users—college and university faculty and students, K–12 educators

---

[120] 17 U.S.C. 1201(a)(1)(B).

[121] Commerce Comm. Report at 38; *see also* Section 1201 Study at 109–10 (noting that while "in some cases, [the Office] can make a greater effort to group similar classes together, and will do so going forward," "in other cases, the Office's ability to narrowly define the class is what enabled it to recommend the exemption at all, and so the Office will continue to refine classes when merited by the record").

[122] 85 FR at 37403.

[123] Section 1201 Study at 147; *see also* 79 FR 55687, 55690 (Sept. 17, 2014).

[124] OTW Noncomm. Videos Renewal Pet. at 3. OTW's petition refers to that proceeding as the "2008 rulemaking," but the Office generally identifies each proceeding by its year of completion.

[125] 75 FR 43825, 43827 (2010).

[126] OTW Noncomm. Videos Renewal Pet. at 3.

[127] Id.

[128] 37 CFR 201.40(b)(1). *See* 2015 Recommendation at 103–06 (expanding exemption to include Blu-ray and digital transmission).

[129] Joint Educators III Class 1 Pet. at 2.

and students, and faculty of accredited massive open online courses (MOOCs).[130] Indeed, the 2018 Recommendation specifically described the exemption language pertaining to college and university and K–12 users as "broad enough to encompass exempted uses under sections 110(1) and 110(2) (*i.e.*, face-to-face and distance teaching)."[131] Joint Educators III, however, seek to expand the exemption to other online learning platforms that offer "supplemental education, upskilling, retraining, recharging, and lifelong learning," such as Khan Academy, LinkedIn Learning, Osmosis.org and Code.org.[132] To enable these providers to exercise the exemption, they propose an expansion allowing "educators and preparers of online learning materials to use short portions of motion pictures (including television shows and videos), as defined in 17 U.S.C. 101. for the purpose of criticism, comment, illustration and explanation in offerings for registered learners on online learning platforms when use of the film and media excerpts will contribute significantly to learning."[133]

Third, BYU requests to expand the class of eligible users to include "college and university employees," instead of "college and university faculty."[134] In addition, it seeks to broaden the permitted uses from "criticism, comment, teaching, or scholarship" to "a noninfringing use under 17 U.S.C. 107, 110(1), 110(2), or 112(f)."[135] BYU's proposal also would remove the current reference to screen-capture technology and the requirement that the exempted use be limited to "short portions" of motion pictures.[136]

With respect to both BYU's and Joint Educators III's petitions, the Office notes that certain proposals to remove the limitations on eligible users of this exemption were considered during the 2015 and 2018 rulemakings, and invites comment on any changed legal or factual circumstances with respect to these provisions.[137] In particular, the Office seeks specific examples where the presence of TPMs is resulting in an adverse effect on users who are not already included in the existing regulatory language. Further, with respect to BYU's request to expand the types of permitted uses, the Office notes

that it has previously rejected similar proposed classes as overbroad.[138] And in the previous rulemaking, the Office declined a proposed exemption by BYU that would permit circumvention for nonprofit educational purposes in accordance with sections 110(1) and 110(2) and eliminate the "criticism and comment" limitation and references to screen-capture technology.[139] The Office invites comment on whether any changed circumstances warrant altering that determination.

Proposed Class 2: Audiovisual Works—Texting

SolaByte Corp. petitions for a new exemption to access "licensed audio/video works stored on optical disc media for the purpose of creating short (10 seconds or less) A/V clips that enhance communication effectiveness and understanding when using TEXTing messages."[140] The proposed class "[i]ncludes movies, TV shows, music video, other copyrighted works" that are stored on "[p]ackaged and replicated DVD or Blu-ray discs playable on computer or CE player hardware."[141] Eligible users would include persons "who want to create expressive clips that convey their thoughts when texting."[142]

Because these proposed activities do not appear to be limited to criticism and comment or educational uses, the Office has classified this proposal as a separate proposed class. The Office seeks additional detail about the scope of the proposed exemption from SolaByte or others, such as whether the exemption would be available for commercial services. Commenters should describe with specificity the relevant TPMs and whether their presence is adversely affecting noninfringing uses, including identifying whether eligible users may access expressive clips through alternate channels that do not require circumvention and the legal basis for concluding that the proposed uses are likely to be noninfringing. Similarly, commenters should address any anticipated effect that circumvention of TPMs would have on the market for or value of the relevant copyrighted works, which appears to extend to the same

broad swatch of motion pictures as Class 1.

Proposed Class 3: Audiovisual Works—Accessibility

ATSP, AHEAD, and LCA petition to expand the existing exemption relating to the creation of accessible versions of motion pictures for students with disabilities. They propose several changes to the existing exemption language, which includes the following requirements:

• Circumvention is undertaken by a disability services office or other unit of a kindergarten through twelfth-grade educational institution, college, or university engaged in and/or responsible for the provision of accessibility services to students, for the purpose of adding captions and/or audio description to a motion picture to create an accessible version as a necessary accommodation for a student or students with disabilities under an applicable disability law, such as the Americans With Disabilities Act, the Individuals with Disabilities Education Act, or Section 504 of the Rehabilitation Act;

• The educational institution unit has, after a reasonable effort, determined that an accessible version cannot be obtained at a fair price or in a timely manner; and

• The accessible versions are provided to students or educators and stored by the educational institution in a manner intended to reasonably prevent unauthorized further dissemination of a work.[143]

First, petitioners seek to expand the exemption "to allow for the remediation of video for faculty and staff, as well as students."[144] They recommend that the current language be revised to read: "to create an accessible version as a necessary accommodation for students, faculty, and staff with disabilities."[145] Second, to clarify that a covered educational institution unit ("EIU") may create accessible versions "proactively," petitioners suggest removing the phrase "as a necessary accommodation" and requiring only that the creation of an accessible version be "consistent with" an applicable disability law.[146] Third, petitioners ask the Office to clarify that the "reasonable effort" requirement applies "only where an 'accessible version' is available that contains captions and descriptions of sufficient quality to satisfy applicable disability

---

[130] *Id.* at 2–3.

[131] 2018 Recommendation at 86.

[132] Joint Educators III Class 1 Pet. at 2.

[133] *Id.*

[134] BYU Class 1 Pet. at 2.

[135] *Id.*

[136] *Id.*

[137] 2018 Recommendation at 53–55; 2015 Recommendation at 102.

[138] *See* 2015 Recommendation at 100 (citing Recommendation of the Register of Copyrights in RM 2005–11, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies at 17–19 (Nov. 17, 2006) ("2006 Recommendation")).

[139] 2018 Recommendation at 32, 52–53.

[140] SolaByte Class 2 Pet. at 2.

[141] *Id.*

[142] *Id.*

[143] 37 CFR 201.40(b)(2)(i).

[144] ATSP, AHEAD & LCA Class 3 Pet. at 2.

[145] *Id.*

[146] *Id.* at 3.

law." [147] The Office notes that in recommending the existing regulatory language, it stated that an EIU may proceed after reaching a conclusion "that it must create an accessible version as a necessary accommodation for a student with disabilities." [148] Fourth, petitioners recommend qualifying the "reasonable effort" requirement in circumstances where "no accessible version of a video included with a textbook exists, but a publisher might be willing to generate an accessible version of the video at extra cost," by eliminating this requirement when a publisher does not include an accessible version of materials with purchased materials.[149] The Office would welcome comment upon whether petitioners believe that the extra costs should be of an unreasonable amount, or whether they contend that every offer carrying additional cost should be dismissed, along with any thoughts from copyright owners or licensors on this issue. Finally, petitioners recommend "altering the current exemption language to make clear that an EIU can reuse stored accessible versions instead of re-circumventing and re-remediating inaccessible media when complying with an accommodation request." [150]

The Office seeks comment on whether this exemption, including petitioners' suggested regulatory language, should be adopted.

Proposed Class 4: Audiovisual Works— Livestream Recording

FloSports, Inc. petitions for an exemption "for circumvention of technology used in the digital storage of audiovisual works originating as a livestream of sports and other competitive events." [151] The exemption "would enable a livestreaming service to provide individual viewers, via a virtual digital video recorder ('vDVR'), with access to a recording on a server for fair use purposes." [152]

The petition indicates that circumvention is necessary to alter the functioning of HTTP Live Streaming ("HLS"), "a live-video streaming technique that enables high quality streaming of media content over the internet from web servers." [153] According to FloSports, the use of HLS

to stream content "results in only an ephemeral copy in addition to the live broadcast." [154] FloSports seeks to enable "copies of the audio and video data files [to] be stored on a longer-term basis and synchronized for later replay by the viewer." [155] It states that "[t]he cost and practical difficulty of obtaining synchronization licenses, combined with the cost and technical challenges of creating individualized audio and visual stored files for each viewer seeking to access the stored files, effectively control viewers access to the material for fair use purposes." [156]

FloSports contends that the recording of such material constitutes fair use on the following basis:

Individual recordings of audiovisual performances, historically, had been used by directors of the groups in such recordings to instruct, teach, and otherwise educated [sic] the participants in the recordings on what went right, what went wrong, and how each could improve. Generally, the individual performances in the audiovisual streams this petition considers are a very small percentage of the entire copyrighted work (e.g., all individual performances combined for an entire copyrighted broadcast). Further, there is no current market for educational recordings at the moment. Granting this exemption, or the performance of such a recording, would not adversely affect the market for the copyrighted recordings.[157]

The Office invites comment on this proposal but notes at the outset that the description of the proposed class in the petition is insufficiently clear to meet the statutory requirement to identify "a *particular class* of copyrighted works." [158] While the petition generally describes the class as covering livestreams of "sports and other competitive events," elsewhere it states that the relevant works are "audiovisual recordings of musical performances as identified in 17 U.S.C. 102(a)(6) and 17 U.S.C. 106(a)(5)." [159] It then states that the proposed class "incorporates any and all works for which audiovisual recordings may be made and used as fair use. This includes individual school performances." [160] Given this inconsistent information, the Office is unable to determine whether, for example, the petition is intended to cover the use of copyrighted broadcasts owned by another party or simply musical or other works that may be captured in broadcasts owned by

FloSports. Without further clarification, the petition does not seem to relate to a particular class of works.

Nor is it apparent to what extent the asserted adverse effects are attributable to "[t]he cost and practical difficulty of obtaining synchronization licenses," [161] as opposed to TPMs. As noted, the Office will only recommend an exemption where causation has been established; that is, where the Office can conclude that the statutory prohibition on circumventing access controls is the cause of the adverse effects.[162]

Finally, the Office seeks additional information regarding the intended noninfringing uses, including whether it would be appropriate to clarify that the petition is directed at facilitating educational, noncommercial uses. Petitioner appears to operate a commercial livestreaming service,[163] and it is unclear whether this exemption is intended to facilitate growth in that market. In addition to factual development regarding the intended uses, the Office welcomes information on the legal basis for finding that such uses would be fair. For example, in connection with petitioner's statement that "the individual performances in the audiovisual streams this petition considers are a very small percentage of the entire copyrighted work," [164] commenters should address the well-established principle that copying even a quantitatively "insubstantial portion" of a work may weigh against fair use where the material is qualitatively significant to that work.[165] These factual and legal issues should be described with sufficient particularity to enable the Office to determine whether the specific uses are likely to be fair. As it has done in the past, the Office is inclined to reject overbroad proposed classes such as "fair use works" or "educational fair use works." [166] Absent such clarification, the Office will decline further consideration of the petition.[167]

[147] Id.

[148] 2018 Recommendation at 109–10.

[149] Id. The petition refers to a purchased textbook, but the Office queries if that was petitioner's intent, since the exemption concerns access to audiovisual works.

[150] Id.

[151] FloSports Class 4 Pet. at 2.

[152] Id.

[153] Id.

[154] Id.

[155] Id.

[156] Id.

[157] Id. at 3.

[158] 17 U.S.C. 1201(a)(1)(C) (emphasis added); see supra Section I.

[159] FloSports Class 4 Pet. at 2.

[160] Id.

[161] Id.

[162] See Section 1201 Study at 115 ("The statutory prohibition on circumventing access controls [must be] the cause of the adverse effects.").

[163] See Flosports, https://www.flosports.tv/join-now/ (advertising "plans starting from $12.49/mo") (last visited Oct. 8, 2020).

[164] FloSports Class 4 Pet. at 3.

[165] See Harper & Row Publrs., Inc. v. Nation Enters., 471 U.S. 539, 564–65 (1985).

[166] See 2015 Recommendation at 100 (citing 2006 Recommendation at 17–19].

[167] Cf. 79 FR 73856, 73859 (Dec. 12, 2014) (declining to put forward exemption proposals that could not be granted as a matter of law).

LOC_AR_00006191

**Proposed Class 5: Audiovisual Works—Preservation**

LCA proposes a new exemption to facilitate preservation of audiovisual works stored on DVDs or Blu-ray discs. a class that would include "[m]otion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, or on a Blu-ray disc protected by the Advanced Access Content System, and is no longer reasonably available in the commercial marketplace, for the purpose of lawful preservation of the motion picture, by a library, archives, or museum."[168] The petition is quite terse, consisting of a single sentence, and so the Office encourages proponents to develop the legal and factual administrative record in their initial submissions.

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language.

**Proposed Class 6: Audiovisual Works—Space-Shifting**

Somewhat related to LCA's petition, but not cabined to preservation activities conducted by libraries, archives, or museums, SolaByte proposes a broader exemption that would be available to "[t]he legitimate owner of the DVD or blu-ray disc and licensee of the content" for the purpose of "making a usable personal back up copy."[169] The exemption "would apply to any title of audio/visual works 5 years after its public release date."[170] SolaByte notes that "[i]ncomplete licensing of titles by internet media service providers requires the owner of the disc to subscribe to multiple service providers at high personal cost to cover a fraction of their library titles."[171]

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language. The Office notes that in the 2006, 2012, 2015, and 2018 rulemakings, the Librarian rejected proposed exemptions for space-shifting or format-shifting, finding that the proponents had failed to establish under applicable law that space-shifting is a noninfringing use.[172] The Office invites comment on whether, in the past three years, there has been any change in the legal or factual circumstances bearing upon that issue.

**Proposed Classes 7(a): Motion Pictures and 7(b): Literary Works—Text and Data Mining**

Authors Alliance. AAUP, and LCA petition for an exemption "for researchers to circumvent technological protection measures on lawfully accessed literary works distributed electronically as well as on lawfully accessed motion pictures, in order to deploy text and data mining techniques."[173] Petitioners believe that these two categories of works "should be grouped together in a single exemption because they involve the same petitioners, the same proposed use, and implicate the same arguments for an exemption."[174] The proposed class includes both works embodied in physical discs and those transmitted digitally.[175] The users seeking access include "researchers engaged in text and data mining in the humanities, social sciences, and sciences."[176]

For reasons of administrative efficiency, the Office has grouped these proposals into one category that encompasses two proposed classes pertaining to motion pictures and literary works, respectively (*i.e.*, Classes 7(a) and 7(b)). Commenters therefore may submit a single comment addressing one or both aspects of the petition. It is important to emphasize, however, that proponents are required to make the statutorily required showing with respect to each category of works. As discussed above, the statute requires that exemptions describe "a *particular class* of copyrighted works."[177] Congress made clear that such a class may not encompass more than one of the categories of works set out in section 102; to the contrary, the "particular class" language refers to "a *narrow and focused subset*" of the section 102 categories.[178] This means that for each type of work for which an exemption is sought, petitioners must demonstrate an actual or likely adverse impact on a noninfringing use as a result of the statutory prohibition on circumvention. In the case of this proposal, to the extent proponents believe the relevant factual and legal issues are similar as to the two classes of works, the supporting comments should describe those matters in detail. For example, commenters may wish to address the extent to which there is overlap with respect to the types of TPMs applied to these works, the nature of the proposed research activities, the relevant markets for the works, and the availability of potential alternatives to circumvention.

**Proposed Class 8: Literary Works—Accessibility**

ACB, AFB, NFB, LCA, AALL, Benetech/Bookshare, and HathiTrust petition to expand the current exemption for the use of assistive technologies by visually impaired persons in connection with electronically distributed literary works. The current regulatory language applies to literary works, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies:

• When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels; or

• When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.[179]

The proposed exemption would amend this language to reflect recent changes to U.S. law to implement the Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled ("Marrakesh Treaty").[180] These include updates to the Chaffee Amendment, codified at section 121 of title 17, and the newly adopted section 121A, which pertains to the import and export of works in accessible formats. Petitioners propose the following changes:

• Updating the description of eligible users from "blind or other person with a disability" to "eligible person, as such a person is defined in 17 U.S.C. 121";

• Updating the description of eligible works to "literary works and previously published musical works that have been fixed in the form of text or notation"; and

• Adding the phrase "or 121A" to the end of 37 CFR 201.40(b)(3)(ii). As an

---

[168] LCA Class 5 Pet. at 2.
[169] SolaByte Class 6 Pet. at 2.
[170] *Id.*
[171] *Id.*
[172] *See* 83 FR 54010, 54026–27 (Oct. 26, 2018); 80 FR 65944, 65960 (Oct. 28, 2015); 77 FR 65260, 65276–77 (Oct. 26, 2012); 71 FR 68472, 68478 (Nov. 27, 2006).

[173] Authors Alliance. AAUP & LCA Class 6 Pet. at 2.
[174] *Id.*
[175] *Id.* at 3.
[176] *Id.*
[177] 17 U.S.C. 1201(a)(1)(C) (emphasis added); *see supra* Section I.
[178] Commerce Comm. Report at 38 (emphasis added).

[179] 37 CFR 201.40(b)(3).
[180] Marrakesh Treaty, art. 7, June 27, 2013, 52 I.L.M. 1312.

alternative, petitioners request clarification that exercising the rights described in section 121A does not implicate section 1201.[181]

In addition, petitioners request that the Office "eliminate the reference to the price of 'mainstream' copies of works . . . and replace this term with a more inclusive phrase such as 'market price of an inaccessible copy.'"[182]

The Office seeks comment on whether this proposed exemption, including petitioners' suggested regulatory language, should be adopted.

## Proposed Class 9: Literary Works—Medical Device Data

Hugo Campos, a member of a coalition of medical device patients and researchers, requests two modifications to the current exemption permitting circumvention to access compilations of data generated by medical devices or corresponding personal monitoring systems. First, he seeks removal of the language limiting the exemption to devices "that are wholly or partially implanted in the body."[183] He notes that "[m]any current and upcoming devices obtain medical data about a patient without the need to be fully or partially implanted in the body," including smart watches, personal EKG monitors, and non-implanted glucose meters.[184] And he argues that "there is no relevant difference between implanted and non-implanted devices with respect to copyright."[185]

Second, Mr. Campos requests that the exemption "permit third parties to perform the circumvention, with permission, on behalf of the patient."[186] He notes that the Office and the Library "have structured other exemptions so that the identity of the person doing the circumvention does not matter."[187]

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language. With respect to the request to permit third-party assistance, the Office notes that it has addressed this issue on several occasions, most recently in the 2018 Recommendation's discussion of the current exemptions for repair of software-enabled motor vehicles and devices. There, the Office recommended removal of the prior requirement that circumvention be "undertaken by the authorized owner"

of the vehicle or device, noting participants' concern that such language "improperly excludes other users with a legitimate interest in engaging in noninfringing diagnosis, repair, or modification activities."[188] But the Office emphasized the limited nature of the change:

> To be clear, removal of the "authorized owner" language should in no way be understood to suggest that the exemption extends to conduct prohibited by the anti-trafficking provisions; such an exemption is beyond the Librarian's authority to adopt. . . . The recommended revision simply accounts for the possibility that certain third parties may qualify as "user[s]" eligible for an exemption from liability under section 1201(a)(1). Such parties still will be required to consider whether their activities could separately give rise to liability under section 1201(a)(2) or (b). Given the legal uncertainty in this area, services electing to proceed with circumvention activity pursuant to the exemption do so at their peril.[189]

The Office invites comment on the extent to which this analysis may be relevant to the current proposal.

## Proposed Class 10: Computer Programs—Unlocking

ISRI submitted two separate petitions to expand the current exemption for "unlocking"—*i.e.,* connecting a wireless device to an alternative wireless network. The current exemption permits circumvention of the following lawfully acquired devices for unlocking purposes:

- Wireless telephone handsets (*i.e.,* cellphones);
- All-purpose tablet computers;
- Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and
- Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.[190]

In its first petition, ISRI seeks to add "laptop computers (including chromebooks) with 4G LTE or 5G or other cellular connection capabilities" to the list of covered devices.[191] In its second petition, ISRI seeks to remove the enumeration of devices altogether and extend the exemption to "any other devices with 4G LTE or 5G or other cellular connection capabilities," including, but not limited to, "Smart TVs, Internet of Things (IoT) devices, immersive extended reality (XR) headsets, desktop computers, and drones."[192]

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language. The Office notes that in the seventh triennial rulemaking it considered a similar petition to remove the list of enumerated device categories, but concluded that the proponents had failed to carry their burden of demonstrating adverse effects on noninfringing uses with respect to all types of wireless devices with cellular connection capability.[193] Comments responding to this petition should address the extent to which factual and legal issues pertaining to certain categories of devices may be relevant to wireless devices more generally.

## Proposed Class 11: Computer Programs—Jailbreaking

Two petitions seek to expand or clarify the categories of devices covered by the exemptions for jailbreaking, which currently include smartphones and portable all-purpose mobile computing devices, smart televisions, and voice assistant devices.[194] SFC petitions for a new exemption to enable the installation of alternative firmware in "routers and other networking devices."[195] EFF proposes a clarification of the current exemption regarding smart televisions. In EFF's view, it is "unclear whether that exemption includes hardware devices that enable the viewing of video streams, along with other software applications, when such devices are not physically integrated into a television."[196] The petition refers to such hardware as "streaming devices" and cites "the Roku line of products, the Amazon Fire TV Stick, and the Apple TV" as examples.[197]

The Office seeks comment on whether these proposed exemptions should be adopted, including any proposed regulatory language to define the types of devices that would be covered.

## Proposed Class 12: Computer Programs—Repair

Multiple organizations petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices. As noted, the current regulations include two repair-related exemptions, covering (1) computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle, when circumvention is a

---

[181] ACB, AFB, NFB, LCA, AALL, Benetech/Bookshare & HathiTrust Class 8 Pet. at 4.

[182] *Id.*

[183] Campos Class 9 Pet. at 2 (citing 37 CFR 201.40(b)(4)).

[184] *Id.* at 2.

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] 2018 Recommendation at 229.

[189] *Id.* at 225.

[190] 37 CFR 201.40(b)(5).

[191] ISRI Class 10 Pet. #1 at 2.

[192] ISRI Class 10 Pet. #2 at 2.

[193] 2018 Recommendation at 162.

[194] 37 CFR 201.40(b)(6)–(8).

[195] SFC Class 11 Pet. at 2.

[196] EFF Class 11 Pet. at 2.

[197] *Id.*

LOC_AR_00006193

**Federal Register**/Vol. 85, No. 200/Thursday, October 15, 2020/Proposed Rules   **65307**

necessary step to allow the diagnosis, repair, or lawful modification of a vehicle function; and (2) computer programs that are contained in and control the functioning of a lawfully acquired smartphone or home appliance or home system, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system.[198]

Three petitions seek to expand the current exemptions to include additional types of devices. Summit Imaging, Inc. and Transtate Equipment Co., Inc. separately petition for an exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices.[199] iFixit and Public Knowledge jointly petition for an exemption permitting circumvention "to repair video game consoles and replace damaged hardware."[200] With respect to the latter petition, the Office notes that in prior rulemakings it has declined to recommend exemptions for jailbreaking and repair of video game consoles in light of evidence that circumvention of TPMs in such devices may adversely affect the value of the affected software, as well as a lack of evidence of adverse effects on noninfringing uses.[201] The Office invites comment on whether, in the past three years, there has been any change in the legal or factual circumstances bearing upon these issues.

Two additional petitions request removal of the limitation to specific categories of devices, along with further changes to the current regulatory text.[202] EFF seeks to expand the exemption to permit circumvention for purposes of *modification* of a device, in addition to repair-related activities. iFixit and the Repair Association propose to remove the current requirement that circumvention of TPMs protecting software in motor vehicles not constitute a violation of applicable law.[203] The Office notes that it considered similar requests regarding these issues in the 2018 rulemaking.[204] Therefore, as with the above petitions, comments addressing these proposals

should include discussion of any relevant changed circumstances.

Finally, the Office notes that all of the petitions in this class appear to request that the users eligible to exercise these exemptions include third-party service providers.[205] As above, the Office invites comment on the extent to which its prior analysis of that issue may be applicable here.[206]

### Proposed Class 13: Computer Programs—Security Research

Two petitions seek to expand the current exemption permitting circumvention for purposes of good-faith security research. Professor J. Alex Halderman, CDT, and ACM propose removal of several limitations in the current regulation: (1) The requirement that circumvention be undertaken on a "lawfully acquired device or machine on which the computer program operates" and "not violate any applicable law"; (2) both instances of the term "solely" (*i.e.*, "solely for the purpose of good-faith security research" and "solely for purposes of good-faith testing, investigation, and/or correction of a security flaw or vulnerability"); and (3) the requirement that the information derived from the activity be used "primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement."[207] As petitioners note, the Office considered these proposed changes in the 2018 rulemaking and provided interpretive guidance as to the regulatory language's intended scope.[208] Petitioners state, however, that they "intend to further develop the record in favor of these changes in the current rulemaking period."[209]

SFC petitions for an expansion to "clarify that the definition of 'good faith security research' . . . includes good-faith testing, investigation, and/or correction of privacy issues (including flaws or functionality that may expose personal information) and permits the owner of the device to remove software or disable functionality that may expose personal information."[210] Eligible users under this proposal would include

"privacy and security researchers who investigate and publish information about privacy flaws in computing devices; and individual consumers and hobbyists who wish to prevent their private data from being disclosed by the devices they own."[211]

The Office seeks comment on whether these proposed changes should be adopted. With respect to SFC's petition, comments should include discussion of the extent to which the proposed activities may or may not be addressed by permanent statutory exemptions or current regulatory exemptions.

### Proposed Classes 14(a): Computer Programs and 14(b): Video Games—Preservation

SPN and LCA filed two petitions to expand the current exemptions for preservation of software and video games by eligible libraries, archives, and museums.[212] Both of these exemptions currently require that the covered works not be "distributed or made available outside of the physical premises of the eligible library, archives, or museum."[213] The proposed exemptions would remove those requirements.[214] The Office welcomes further elaboration on how proponents of the exemptions would envision these works to be distributed or made available in a manner likely to be noninfringing, respectively. For example, the current exemptions are focused on circumvention to enable preservation uses, in contrast to enabling provision of lending copies for users, a preliminary distinction that the Office has found critical in the past when analyzing potential legislative reforms to the section 108 exception for libraries and archives.[215] Would the proposed modification maintain this distinction, and if so, how? Would there be conditions on access restrictions to registered users of an eligible library, archives, or museum or would material be made available more generally to members of the public? The Office notes that in the 2018 rulemaking, it declined to recommend a proposal to expand the video game preservation exemption to allow circumvention by affiliate archivists outside the premises of a covered institution, concluding that the

---

[198] 37 CFR 201.40(b)(9)–(10).

[199] Summit Imaging, Inc. Class 12 Pet. at 2; Transtate Equip. Co. Class 12 Pet. at 2.

[200] iFixit & Public Knowledge Class 12 Pet. at 2.

[201] *See* 2018 Recommendation at 206, 219–20; 2015 Recommendation at 199–201; 2012 Recommendation at 44, 47.

[202] EFF Class 12 Pet. at 2–3; iFixit & Repair Ass'n Class 12 Pet. at 2–3.

[203] iFixit & Repair.org Class 12 Pet. at 3.

[204] *See* 2018 Recommendation at 189–94, 206–09, 310–11.

[205] Summit Imaging, Inc. Class 12 Pet. at 3; Transtate Equip. Co. Class 12 Pet. at 2; iFixit & Public Knowledge Class 12 Pet. at 2; EFF Class 12 Pet. at 2–3; iFixit & Repair Ass'n Class 12 Pet. at 2.

[206] *See* 2018 Recommendation at 225.

[207] Halderman, CDT & ACM Class 13 Pet. at 3.

[208] *See* 2018 Recommendation at 283–314.

[209] Halderman, CDT & ACM Class 13 Pet. at 3.

[210] SFC Class 13 Pet. at 2.

[211] *Id.*

[212] 37 CFR 201.40(b)(12), (13).

[213] *Id.* at § 201.40(b)(12)(ii), (b)(13)(i).

[214] SPN & LCA Class 14(a) Pet. at 2; SPN & LCA Class 14(b) Pet. at 2.

[215] U.S. Copyright Office, Revising Section 108: Copyright Exceptions for Libraries and Archives at 24–34 (addressing preservation uses), 35–41 (addressing user copies) (2017), *https://www.copyright.gov/policy/section108/discussion-document.pdf.*

proponents had failed to establish that such activity was likely noninfringing.[216] Commenters responding to these petitions should address the extent to which the legal and factual issues relevant to this class may differ from those considered previously.

Although these proposed classes both involve computer programs (which constitute literary works under the Copyright Act), the petition regarding video games involves an additional category of works insofar as video games also constitute audiovisual works.[217] Therefore, the Office is following the same procedure discussed above in relation to the proposed TDM exemption: the Office has grouped these petitions into a single category encompassing two proposed classes. Commenters addressing these proposals may submit a single comment addressing both computer programs and video games, but the supporting evidence must be sufficient to establish an adverse effect on noninfringing uses with respect to each category of works. In particular, the Office is interested in the extent to which licensing markets for video games may be similar or different from those for software more generally, and whether any such differences may be relevant under the fair use analysis or the expected effect of circumvention of technological measures on the market for or value of copyrighted works.[218] The Office seeks comment on these and other relevant issues, including any proposed regulatory language.

### Proposed Class 15: Computer Programs—3D Printing

Michael Weinberg petitions to amend the current exemption permitting circumvention to enable the use of alternative feedstock in 3D printers. The current exemption allows access to "[c]omputer programs that operate 3D printers that employ microchip-reliant technological measures to limit the use of feedstock, when circumvention is accomplished solely for the purpose of using alternative feedstock and not for the purpose of accessing design software, design files, or proprietary data." [219] Mr. Weinberg seeks two changes to this language. First, he proposes to "replace the term 'feedstock' . . . with the term

'material,' " stating that the latter "is more commonly used to describe the substances used by 3D printers within the 3D printing community and industry." [220] Second, he proposes to remove the term "microchip-reliant." In his view, there is no "justification to narrow the scope of the exemption to a specific subset of technological measures tied to microchip-based verifications," and "the inclusion of the limiting language creates unnecessary ambiguity." [221] As noted, to recommend an exemption, the Office requires a showing that the statutory prohibition on circumventing access controls is yielding adverse effects on non-infringing uses. The current reference to "microchip-reliant" was based on the record of relevant TPMs submitted in connection with the exemption request.[222] In particular, the Office now solicits descriptions and examples of the prevalence of TPMs that are not microchip-based verifications, and descriptions of adverse effects stemming from such TPMs.[223]

In general, the Office seeks comment on whether these proposed changes should be adopted.

### Proposed Class 16: Computer Programs—Copyright License Investigation

SFC petitions for a new exemption to permit circumvention of TPMs protecting computer programs for purposes of "(a) investigating potential copyright infringement of the computer programs; and (b) making lawful use of computer programs (e.g., copying, modifying, redistributing, and updating free and open source software (FOSS))." [224] The proposed exemption does not appear to be limited to particular users or types of devices. SFC states that the users seeking access include:

software authors and publishers, including the authors of FOSS computer programs (which are frequently incorporated in embedded computing devices in an infringing manner); and individual consumers who are lawful owners of embedded computing devices and licensees of the computer programs embedded therein, and who wish to make lawful use of computer programs protected by technological protection measures (e.g. the right granted by certain FOSS licenses to

install modified versions of the FOSS computer programs).[225]

It is somewhat unclear whether the requested exemption for "lawful use of computer programs" would apply to *any* lawful use or seeks merely to allow licensed uses of FOSS software. To the extent the former is intended, the proposed exemption appears beyond the Librarian's authority to grant. As the Office has consistently noted, the rulemaking requires a showing of "distinct, verifiable and measurable" adverse impacts on noninfringing uses.[226] Such evidence "cannot be hypothetical, theoretical, or speculative, but must be real, tangible, and concrete." [227] In light of that requirement, "the Register has previously rejected broad proposed categories such as 'fair use works' or 'educational fair use works' as inappropriate." [228] SFC and any other proponents of this request therefore must narrow or clarify the specific uses of computer programs that the proposed exemption seeks to permit, so that participants and the Office may fairly assess whether they are likely to be noninfringing and adversely affected by the prohibition on circumvention. The Office also welcomes additional detail regarding the first subpart of SFC's intended uses "investigating potential copyright infringement of the computer programs, including the statement 'FOSS computer programs ([ ] are frequently incorporated in embedded computing devices in an infringing manner)."

### Proposed Class 17: All Works—Accessibility Uses

Multiple organizations representing persons with disabilities ("Accessibility Petitioners") jointly filed a petition proposing "a more comprehensive exemption to resolve the shortcomings of the current, piecemeal approach to Section 1201 exemptions for accessibility." [229] The proposed exemption would permit circumvention to access "all cognizable classes of works under Section 102 (a) of the Copyright Act" to facilitate accessibility for persons with disabilities. Accessibility Petitioners state that this

---

[216] 2018 Recommendation at 271–75.

[217] U.S. Copyright Office, Compendium of U.S. Copyright Office Practices sec. 807.7(A)(1) (3d ed. 2017) ("Generally, a videogame contains two major components: the audiovisual material and the computer program that runs the game.").

[218] *See* 17 U.S.C. 107; 1201(1)(1)(C)(iv).

[219] 37 CFR 201.40(b)(14).

[220] Weinberg Class 15 Pet. at 2.

[221] *Id.*

[222] 2015 Recommendation at 376.

[223] *See Lexmark Int'l Inc.* v. *Static Control Components, Inc.,* 387 F.3d 522, 547 (6th Cir. 2004) ("Because the statute refers to 'control[ling] access to a work protected under this title,' it does not naturally apply when the 'work protected under this title' is otherwise accessible.").

[224] SFC Class 16 Pet. at 2.

[225] *Id.*

[226] Commerce Committee Report at 37; *see also* Section 1201 Study at 119–21.

[227] Section 1201 Study at 120.

[228] 2015 Recommendation at 100 (citing 2006 Recommendation at 17–19).

[229] ACB, AFB, Ass'n of Late-Deafened Adults, ATSP, AHEAD, Benetech/Bookshare, Gallaudet U., HathiTrust, Hearing Loss Ass'n of Am., LCA, Nat'l Ass'n of the Deaf, Nat'l Fed'n of the Blind, Telecomm. for the Deaf and Hard of Hearing, Inc. (collectively "Accessibility Petitioners") Class 17 Pet. at 4.

exemption would allow such users, as well as "advocates[ ] and organizations that produce accessible versions of copyrighted works protected by technological protection measures[,] to press ahead on accessibility without the burden of engaging in a complex, situation-specific analysis." [230] They state that the relevant barriers to access include "(1) the access controls that inhibit accessibility and (2) failures of producers, publishers, and other rightsholders to authorize access for accessibility purposes or to produce accessible versions of their works." [231]

As presently suggested, this proposed exemption is beyond the Librarian's authority to adopt because it does not meet the statutory requirement to describe "a *particular class* of copyrighted works." [232] As discussed above, the legislative history confirms that this language is intended to refer to "a *narrow and focused subset* of the broad categories of works . . . identified in section 102 of the Copyright Act." [233] Therefore, the Office uses the section 102 categories as a starting point and refines the proposed classes by other criteria, such as the types of TPMs used or the types of uses. [234] For example, while the category of "literary works" under section 102(a)(1) "embraces both prose creations such as journals, periodicals or books, and computer programs of all kinds," Congress explained that "[i]t is exceedingly unlikely that the impact of the prohibition on circumvention of access control technologies will be the same for scientific journals as it is for computer operating systems." [235] Thus, "these two categories of works, while both 'literary works,' do not constitute a single 'particular class' for purposes of" section 1201(a)(1). [236]

Further, petitioners are required to establish "distinct, verifiable and measurable impacts" on noninfringing uses, [237] and those impacts must be caused by the statutory prohibition on circumvention. [238] While TPMs undoubtedly have such impacts with respect to many accessibility uses (as

reflected by the exemptions adopted for such uses in prior rulemakings), it is not clear to what extent various TPMs are effectively applied to every category of work in section 102, some of which may not readily lend themselves to such measures (*e.g.*, sculptural works). In addition, the availability of accessible-format versions of works in the marketplace is a relevant consideration in determining adverse effects, [239] and it is not clear that that factor applies equally to all categories of works.

The Office notes its continuing discretion to decline to put forward proposals for public comment that are unlikely to yield consideration of exemptions consistent with the standards of section 1201(a)(1). [240] In light of the important public policy considerations raised by this request and past exemptions adopted with respect to facilitating accessibility uses, however, the Office is noticing this category for public comment while flagging the need to further develop and refine petitioners' request into separate proposed classes. Accordingly, Accessibility Petitioners and any other proponents in this category must provide evidence and legal analysis sufficient to enable the Office to make a particularized assessment as to each class of works for which an exemption is sought. Based on prior exemptions adopted, the Office anticipates Accessibility Petitioners to be seeking exemptions related to TPMs protecting literary works as well as motion pictures distributed electronically, and proponents should provide evidence and proposed regulatory language with respect to these and any other relevant classes, and clearly identify and propose contours for each such class. For example, the Office is not inclined to recommend an exemption for printed copies of literary works, for which no TPMs are employed. Nor is the Office empowered to recommend regulatory language that extends to sound recordings, musical works, architectural works, etc. without development of an adequate administrative record demonstrating that an exemption is appropriate for each of these classes. [241]

Accessibility Petitioners should also include, with respect to each class, evidence of an actual or likely adverse effect on accessibility uses resulting from TPMs applied to that type of work. While the Office recognizes the vital importance of ensuring accessibility for persons with disabilities, and indeed has recommended legislation to make permanent the current exemption regarding assistive technologies for electronically-distributed literary works, [242] its authority in this proceeding is bound by the provisions of the statute. Subject to these requirements, the Office invites comment on this proposed class(es).

## IV. Future Phases of the Eighth Triennial Rulemaking

As in prior rulemakings, after receipt of written comments, the Office will continue to solicit public engagement to create a comprehensive record. Described below are the future phases of the administrative process that will be employed for this rulemaking, so that parties may use this information in their planning.

### A. Public Hearings

The Copyright Office intends to hold public hearings in spring 2021 following the last round of written comments. The hearings will allow for participation by videoconference and will be streamed online. In addition, the Office will determine at a later date, based on applicable public health guidelines, whether in-person participation will be possible. A separate notice providing details about the hearings and how to participate will be published in the **Federal Register** at a later date. The Office will identify specific items of inquiry to be addressed during the hearings.

### B. Post-Hearing Questions

As with previous rulemakings, following the hearings, the Copyright Office may request additional information with respect to particular classes from rulemaking participants. The Office may rely on this process in cases where it would be useful for participants to supply missing information for the record or otherwise resolve issues that the Office believes are material to particular exemptions. Such requests for information will take the form of a letter from the Copyright Office and will be addressed to individual parties involved in the proposal as to which more information is sought. While responding to such a request will be voluntary, any response

---

[230] *Id.* at 5.

[231] *Id.*

[232] 17 U.S.C. 1201(a)(1)(C) (emphasis added).

[233] Commerce Committee Report at 38 (emphasis added).

[234] *See supra* Section I.

[235] House Manager's Report at 7.

[236] *Id.* As noted, the Office has repeatedly declined to recommend proposed exemptions that have failed to define the class of works to be covered with sufficient particularity. *See, e.g.*, 2018 Recommendation at 131–32; 79 FR at 73859; 2006 Recommendation at 17–19.

[237] Commerce Committee Report at 37.

[238] 17 U.S.C. 1201(a)(1)(C); *see also* Section 1201 Study at 115, 117.

[239] *See, e.g.*, 2018 Recommendation at 110 (including market check requirement in exemption for accessibility uses of audiovisual works "to prevent copies being made of works already available in accessible formats, while supporting the motion picture industry's effort to further expand the availability of accessible versions in the marketplace").

[240] 79 FR at 73859 (declining to notice three proposals for public comment).

[241] *See supra* Section I (outlining four elements to the evidentiary standard applied by the Office in evaluating requests).

[242] *See* Section 1201 Study at 84–88.

will need to be supplied by a specified deadline. After the receipt of all responses, the Office will post the questions and responses on the Office's website as part of the public record.

*C. Ex Parte Communication*

In the seventh triennial rulemaking, in response to stakeholder requests, the Office issued written guidelines under which interested non-governmental participants could request informal communications with the Office during the post-hearing phase of the proceeding. The Office expects to follow substantially the same process in this proceeding. To ensure transparency, participating parties will be required to submit a list of attendees and a written summary of any oral communications, which will be posted on the Office's website. Specific guidelines for this proceeding will be made available following the public hearings. No *ex parte* communications with the Office regarding this proceeding will be permitted prior to the post-hearing phase.

Dated: October 9, 2020.

**Regan A. Smith,**

*General Counsel and Associate Register of Copyrights.*

[FR Doc. 2020–22893 Filed 10–14–20; 8:45 am]

**BILLING CODE 1410–30–P**

## POSTAL SERVICE

### 39 CFR Part 20

### International Mailing Services: Proposed Product and Price Changes—CPI

**AGENCY:** Postal Service™.

**ACTION:** Proposed rule; request for comments.

**SUMMARY:** The Postal Service proposes to revise *Mailing Standards of the United States Postal Service, International Mail Manual (IMM®),* to reflect changes coincident with the recently announced mailing services price adjustments.

**DATES:** We must receive your comments on or before November 16, 2020.

**ADDRESSES:** Mail or deliver comments to the manager, Product Classification, U.S. Postal Service®, 475 L'Enfant Plaza SW, RM 4446, Washington, DC 20260–5015. You may inspect and photocopy all written comments at USPS® Headquarters Library, 475 L'Enfant Plaza SW, 11th Floor N, Washington DC by appointment only between the hours of 9 a.m. and 4 p.m., Monday through Friday by calling 1–202–268–2906 in advance. Email comments, containing the name and address of the commenter, to: *PCFederalRegister@usps.gov,* with a subject line of ''January 2021 International Mailing Services Price

Change—CPI.'' Faxed comments are not accepted.

**FOR FURTHER INFORMATION CONTACT:** Kathy Frigo at 202–268–4178.

**SUPPLEMENTARY INFORMATION:**

**International Price and Service Adjustments**

On October 9, 2020, the Postal Service filed a notice of mailing services price adjustments with the Postal Regulatory Commission (PRC), effective on January 24, 2021. The Postal Service proposes to revise Notice 123, *Price List,* available on Postal Explorer® at *https://pe.usps.com,* to reflect these new price changes. The new prices are or will be available under Docket Number R2021–1 on the Postal Regulatory Commission's website at *www.prc.gov.*

This proposed rule describes the price changes for the following market dominant international services:

• International extra services and fees.

*International Extra Services and Fees*

The Postal Service plans to increase prices for certain market dominant international extra services including:

• Certificate of Mailing
• Registered Mail™
• Return Receipt
• Customs Clearance and Delivery Fee
• International Business Reply™ Mail Service

|  | Fee |
|---|---|
| **Individual pieces** | |
| Individual article (PS Form 3817) | $1.55 |
| Duplicate copy of PS Form 3817 or PS Form 3665 (per page) | 1.55 |
| Firm mailing sheet (PS Form 3665), per piece (minimum 3), First-Class Mail International only | 0.44 |
| **Bulk quantities** | |
| For first 1,000 pieces (or fraction thereof) | $8.80 |
| Each additional 1,000 pieces (or fraction thereof) | 1.10 |
| Duplicate copy of PS Form 3606 | 1.55 |

Registered Mail

*Fee:* $16.30.

Return Receipt

*Fee:* $4.25.

Customs Clearance and Delivery

*Fee:* per piece $6.65.

International Business Reply Service

*Fee:* Cards $1.55; Envelopes up to 2 ounces $2.05

Following the completion of Docket No. R2021–1, the Postal Service will adjust the prices for products and

services covered by the International Mail Manual. These prices will be on Postal Explorer at *pe.usps.com.*

Accordingly, although exempt from the notice and comment requirements of the Administrative Procedure Act (5 U.S.C. 553(b), (c)) regarding proposed rulemaking by 39 U.S.C. 410(a), the Postal Service invites public comment on the following proposed changes to *Mailing Standards of the United States Postal Service,* International Mail Manual (IMM®), which is incorporated by reference in the *Code of Federal Regulations* in accordance with 39 CFR

20.1, and to associated changes to Notice 123, *Price List.*

**List of Subjects in 39 CFR Part 20**

Foreign relations, International postal services.

Accordingly, 39 CFR part 20 is proposed to be amended as follows:

**PART 20—[AMENDED]**

■ 1. The authority citation for 39 CFR part 20 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 13 U.S.C. 301–307; 18 U.S.C. 1692–1737; 39 U.S.C. 101,

UNITED STATES COPYRIGHT OFFICE



# Section 1201 of Title 17

A REPORT OF THE REGISTER OF COPYRIGHTS                    JUNE 2017



LOC_AR_00009216

UNITED STATES COPYRIGHT OFFICE



# SECTION 1201 OF TITLE 17

A REPORT OF THE REGISTER OF COPYRIGHTS                    JUNE 2017

LOC_AR_00009217

ACKNOWLEDGEMENTS

This Report reflects the efforts of many people within the U.S. Copyright Office. Deputy General Counsel Regan Smith and Senior Counsel for Policy and International Affairs Kevin Amer were the primary authors of this Report. They managed and oversaw the complex research, public roundtables, writing, and recommendations. Without their efforts, this Report would not have been possible.

I am grateful as well for the contributions of Assistant General Counsel Cindy Abramson; Attorney-Advisors Abioye Mosheim, John Riley, and Jason Sloan; and Barbara A. Ringer Copyright Honors Program Fellow Andrew Moore, all of whom researched and drafted significant portions of the Report. In addition, Ms. Mosheim coordinated the scheduling, transcription, and video recording of the public roundtables in Washington, D.C. and San Francisco.

General Counsel and Associate Register of Copyrights Sarang (Sy) Damle, Senior Advisor to the Register Catherine Rowland, and Deputy Director of Policy and International Affairs Maria Strong reviewed the Report and provided important insights and suggestions during its drafting. Counsels Brad Greenberg and Emily Lanza and Ringer Fellows Rachel Fertig and Emma Raviv provided helpful citation assistance. Law clerks Adelaide Dunn, Sara Gates, Nouran Sedaghat, Olga Susuni, and Giulio Yaquinto provided valuable research support.

The Copyright Office also benefitted from assistance provided by colleagues outside of Washington, D.C. In particular, I am grateful to Chancellor and Dean David Faigman and Professor Ben Depoorter of the University of California, Hastings College of the Law for facilitating the roundtable held in Hasting's Alumni Reception Center in San Francisco.

Finally, I would like to sincerely thank the organizations, law students, and other individuals who provided written commentary and shared their perspectives and experiences in the roundtable discussions.

Karyn Temple Claggett
Acting Register of Copyrights and Director
U.S. Copyright Office

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ............................................................................................... i

I.    INTRODUCTION AND STUDY HISTORY ............................................................. 1

II.   CURRENT LEGAL FRAMEWORK ........................................................................ 4

      A.  *Historical Background* ................................................................................. 4

      B.  *Statutory Structure* ...................................................................................... 6

            1.  Prohibition on Circumvention ................................................................. 8

            2.  Prohibitions on Trafficking ................................................................... 10

            3.  Permanent Exemptions .......................................................................... 14

                  a.  1201(d) Exemption for Nonprofit Libraries, Archives, and Educational
                      Institutions ..................................................................................... 14

                  b.  1201(e) Exemption for Law Enforcement, Intelligence, and Other
                      Government Activities ................................................................... 15

                  c.  1201(f) Exemption for Reverse Engineering ................................. 15

                  d.  1201(g) Exemption for Encryption Research ................................ 16

                  e.  1201(h) Exceptions Regarding Minors ......................................... 18

                  f.  1201(i) Exemption for Protection of Personally Identifying
                      Information ..................................................................................... 18

                  g.  1201(j) Exemption for Security Testing ....................................... 19

            4.  Certain Analog Devices and Technological Measures ......................... 20

            5.  Triennial Rulemaking ............................................................................ 20

                  a.  Legislative History ......................................................................... 22

                  b.  Rulemaking Structure .................................................................... 24

                  c.  Public Interest in Rulemaking ....................................................... 25

                  d.  Evidentiary Standards .................................................................... 26

      C.  *Case Law Developments* ............................................................................ 30

LOC_AR_00009219

*D. Unlocking Consumer Choice and Wireless Competition Act*................................ 34

*E. International Obligations*........................................................................... 35

III. **PROPOSED STATUTORY REFORM** ............................................................ 36

    *A. Scope of Section 1201(a)*....................................................................... 36

        1. Policy Considerations ......................................................................... 36

            a. Effect on Marketplace........................................................... 36

            b. Effect on Speech................................................................... 40

            c. Effect on Library, Archival, and Educational Activities............................ 41

        2. Proposed Changes............................................................................. 42

            a. Statutory Nexus Requirement.................................................. 42

            b. Exclusion of Device- or Machine-Enabling Computer Programs............ 47

    *B. Anti-Trafficking Provisions*..................................................................... 50

        1. Overall Effectiveness......................................................................... 50

        2. Proposed Changes............................................................................. 52

            a. Manufacture and Distribution of Tools...................................... 52

            b. Third-Party Assistance........................................................... 56

    *C. Permanent Exemptions* ......................................................................... 62

        1. Existing Permanent Exemptions............................................................ 63

            a. 1201(f) Exemption for Reverse Engineering ................................ 63

            b. 1201(j) Exemption for Security Testing ...................................... 71

            c. 1201(g) Exemption for Encryption Research................................ 80

            d. 1201(i) Exemption for Protection of Personally Identifying Information ........................................................................... 82

        2. Proposed New Permanent Exemptions .................................................. 84

            a. Assistive Technologies........................................................... 84

            b. Obsolescence, Repair, and Modification .................................... 88

            c. Device Unlocking................................................................. 97

            d. Library and Archival Uses....................................................... 99

   e. Educational and Derivative Uses of Audiovisual Works........................ 101

   f. All Lawful or Fair Uses ............................................................... 102

  3. International Considerations ................................................................. 104

  4. Alternative Approach of Expanding Statutory Rulemaking Factors........... 105

IV. THE RULEMAKING PROCESS ................................................................ 105

 A. *Administrative Law Considerations* ...................................................... 106

 B. *Defining an Exemption Class* ............................................................... 108

 C. *Burden of Proof* ................................................................................... 110

 D. *Applicable Evidentiary Standards* ......................................................... 112

  1. Copyrightable Works at Issue .............................................................. 115

  2. Noninfringing Uses ............................................................................. 115

  3. Causation ............................................................................................ 117

  4. Adverse Effects and the Statutory Factors ............................................ 118

   a. Degree of Adverse Effects Required .............................................. 119

   b. Statutory Factors ......................................................................... 121

   c. Merged Access and Copy Controls ................................................ 126

 E. *Streamlined Process to Renew Exemptions* ........................................... 127

  1. The Need for a Renewal Process .......................................................... 128

  2. Proposals for Reform .......................................................................... 132

   a. "Burden-Shifting" Model .............................................................. 133

   b. "Streamlining" Model ................................................................... 135

   c. Presumptive Rejection Model ....................................................... 139

  3. Office's Recommendations ................................................................... 140

 F. *Other Rulemaking Process Considerations* ........................................... 147

V. CONCLUSION ....................................................................................... 152

**APPENDICES**

**Appendix A: Federal Register Notices**

**Appendix B: Commenting Parties and Roundtable Participants**

**Appendix C: Abbreviations**

# EXECUTIVE SUMMARY

Among the many changes to the copyright system spurred by digital technologies, perhaps the most fundamental has been the development of new platforms and formats for delivering creative works to the public. In addition to physical media such as compact discs and DVDs, copyright owners and consumers alike have a broad and expanding array of online options to conveniently disseminate, access, and use creative works. Many of these options emerged after essential updates to the copyright law were made to accommodate rapid technological change and foster digital innovations. In 1998, as part of the Digital Millennium Copyright Act ("DMCA"), and in compliance with two newly adopted international treaties, Congress added a new section 1201 to title 17 to provide greater legal protection for copyright owners in the emerging digital environment.

In enacting section 1201, Congress aimed to create a legal foundation to launch the global digital online marketplace for copyrighted works. Congress recognized that the same features that make digital technology a valuable delivery mechanism—the ability to quickly create and distribute near-perfect copies of works on a vast scale—also carry the potential to enable piracy to a degree unimaginable in the analog context. As a result, Congress sought to support copyright owners' use of mechanisms known as "technological protection measures," or "TPMs," when offering their works in digital form. TPMs include both measures protecting against unauthorized access to a copyrighted work (*e.g.*, a password requirement) as well as measures protecting against unauthorized uses (*e.g.*, prevention of digital copying).[1] By providing independent legal protection for technologies used by copyright owners to prevent piracy, Congress sought to bolster rightsholders' willingness to make their works available to the public in a variety of digital formats.

Accordingly, section 1201 supplements the preexisting rights of copyright owners under the Copyright Act of 1976 by establishing separate and distinct legal remedies against the circumvention of certain types of TPMs, as well as against trafficking in devices and services primarily designed for circumvention.[2] At the same time, Congress recognized that there are many lawful purposes for which individuals may have a legitimate need to engage in circumvention—activities that have little to do with facilitating piracy. Congress therefore included within section 1201 a series of permanent exemptions to one or more of the statute's prohibitions. Among others, these include exemptions for

---

[1] *See* 17 U.S.C. § 1201(a)(3)(B), (b)(2)(B).

[2] As defined in the statute, to "circumvent" generally refers to acts such as avoiding, bypassing, removing, deactivating, or impairing a TPM. *See id.* § 1201(a)(3)(A), (b)(2)(A).

i

LOC_AR_00009223

certain activities of libraries, archives, and educational institutions, law enforcement activities, reverse engineering, encryption research, and security testing.

In addition to these exemptions, Congress also created a procedure to grant exemptions on a temporary basis. Every three years, the Librarian of Congress, upon the recommendation of the Register of Copyrights, determines through a rulemaking proceeding whether the bar on circumvention is having, or is likely to have, an adverse effect on users' ability to make noninfringing uses of a particular class of copyrighted works. The Librarian may adopt a temporary exemption waiving the prohibition for such users for the ensuing three-year period. Congress established this rulemaking as a "'fail-safe' mechanism" to ensure that the new protection against circumvention would not be used to diminish the public's access to copyrighted works for lawful uses, including activities protected by the fair use doctrine.

Over the years, section 1201 has become a source of deep and widespread debate among copyright stakeholders. Many copyright owners argue that the statute has worked just as Congress intended, laying the legal foundation for the explosion in legitimate digital dissemination models over the past two decades. At the time of its enactment, DVDs were not yet the "predominant medium" for the distribution of motion pictures in the home video market,[3] and the first iPod would not be invented for three more years. Today, DVDs, Blu-ray, and 4K Ultra HD Blu-ray discs compete with streaming services such as Hulu, Netflix, Amazon Instant Video, and Google Play, while millions of consumers have "cut the cord" with traditional cable services in favor of over-the-top subscription services. In the music industry, the majority of revenues now come from streaming services like Spotify, Pandora, and Apple Music, displacing download revenues, which in turn previously displaced compact disc revenues. Likewise, cloud computing has become standard, and software as a service is now a leading licensing and delivery model for businesses and individuals. These platforms, copyright owners argue, have given consumers more lawful options to access creative works than ever before, and all rely on TPMs to effectively operate in the marketplace. Copyright owners also credit the statute's anti-trafficking provisions with keeping circumvention technologies out of the mainstream.

Others, including many user groups, argue that section 1201 does little to prevent digital piracy, while chilling a wide range of otherwise lawful activities. In their view, the statutory language sweeps far beyond the concerns Congress had in mind when it adopted the DMCA and has given rise to anticompetitive and other claims unrelated to legitimate copyright interests. They point to cases in which manufacturers of products such as garage door openers and printer toner cartridges have invoked section 1201 to

---

[3] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 65 Fed. Reg. 64,556, 64,567–68 (Oct. 27, 2000).

LOC_AR_00009224

prevent competitors from marketing compatible products, including replacement parts, because of the TPM-protected software in those products. These challenges will only become more commonplace, these users argue, as the Internet of Things expands and growing numbers of everyday products—automobiles, refrigerators, medical devices, and so on—operate using software protected by TPMs. While consumers historically have been free to repair, modify, or tinker with their own goods without implicating copyright, such activities now may require circumvention of a TPM to access the software that enables the device to function. For many, it is not clear why copyright law should apply at all in these contexts.

User groups argue that these concerns are only partially remedied by the permanent exemptions and the triennial rulemaking. Many contend that the permanent exemptions cover only a handful of legitimate circumvention activities and have been outpaced by technological change in the areas they do address. And while some stakeholders praise the rulemaking as a flexible means of responding to marketplace developments, noting that it consistently yields large numbers of exemptions, others argue that it imposes substantial costs and burdens on participants, especially for individuals and public interest organizations with limited resources. They urge that the process be streamlined, particularly when evaluating whether to renew an exemption granted in the previous rulemaking that encounters no meaningful opposition. Others have noted the proceeding's substantive limitations. For example, the Librarian is not authorized to grant exemptions to the anti-trafficking provisions, and many argue that the right to circumvent can be effectively meaningless absent assistance from third parties, such as service technicians.

In light of all of these issues, and at the request of the Ranking Member of the House Judiciary Committee, the Copyright Office has completed the first comprehensive public study on the operation of section 1201 since its enactment nearly twenty years ago. In some instances, the Office does not propose statutory changes. Rather, the Office believes that the application of existing law, which the Office has described in this Report, will sufficiently address some of the concerns raised by stakeholders. In other instances, the Office proposes a combination of targeted legislative updates and changes to the Office's administration of the triennial rulemaking to improve section 1201's overall operation and effectiveness. The Office believes that legislative reform is most appropriate where there is significant evidence that the current statute is not achieving Congress' objectives, or where it appears that a statutory exemption may be preferable to evaluating new or expanded temporary exemptions through the triennial rulemaking. The Office's conclusions and recommendations are summarized as follows:

***Basic Framework.*** The Copyright Office does not propose altering the basic framework of section 1201. The Office believes that the statute's overall structure and scope—including its treatment of circumvention as a standalone violation independent of copyright infringement—remain sound.

LOC_AR_00009225

***Anti-Trafficking Provisions****.*  The Office agrees with the many copyright owners who maintain that the anti-trafficking provisions provide critical enforcement tools against digital piracy.  At the same time, the Office recognizes that uncertainty over the reach of those provisions may prevent some users from taking full advantage of exemptions to which they are entitled pursuant to the rulemaking.  In response to this concern, the Office concludes:

- Beneficiaries of exemptions should themselves be able to develop necessary tools solely for their own use in carrying out exempted circumventions.  We do not believe, however, that legislative change is currently needed to effectuate that right.  Such action appears premature, as no court has suggested that the bar on the "manufacture" of circumvention tools extends to beneficiaries engaging in self-help.  More fundamentally, the statutory text and structure indicate that this provision was not intended to cover such activity; instead, the language is best read to apply only in connection with trafficking conduct.

- In cases where beneficiaries cannot themselves make use of an exemption, the Office believes that it is important to allow users to seek assistance in making use of that exemption.  As raised in the most recent rulemaking, the Office ***does*** recommend amending section 1201 to expressly grant the Librarian discretion to adopt temporary regulatory exemptions that permit third-party assistance "at the direction of" an intended user.  This change would extend to the entire rulemaking the authority to adopt exemptions similar in scope to exemptions for the unlocking of wireless devices, as mandated by Congress in the Unlocking Consumer Choice and Wireless Competition Act.[4]  Prior to a legislative solution, the Office will seek to avoid defining classes of persons eligible for exemptions overly narrowly in future rulemaking proceedings, which may allow for more effective use of the granted exemptions.

***Permanent Exemptions.***  Both this study and the experience of past rulemakings suggest that, in certain cases, the existing permanent exemptions have not been sufficiently flexible to keep pace with evolving technologies.  The Office makes the following recommendations:

- As the Register has previously testified, to accommodate a broader range of legitimate security research, the Office recommends that Congress consider

---

[4] *See* Unlocking Consumer Choice and Wireless Competition Act, Pub. L. No. 113-144, § 2(c), 128 Stat. 1751, 1751–52 (2014) (providing that circumvention "may be initiated . . . by another person at the direction of the owner, or by a provider of a commercial mobile radio service or a commercial mobile data service at the direction of such owner or other person, solely in order to enable such owner or a family member of such owner to connect to a wireless telecommunications network").

expanding the exemption for security testing under section 1201(j). This could include expanding the definition of security testing, easing the requirement that researchers obtain authorization, and abandoning or clarifying the exemption's multifactor test for eligibility.

- The exemption for encryption research under section 1201(g) may benefit from similar revision, including removal of the requirement to seek authorization and clarification or removal of the multifactor test.

- In some cases, it may make sense to consider the adoption of new permanent exemptions to provide certainty for noninfringing activities that have repeatedly received exemptions in past triennial rulemakings, or where there is a particularly broad-based need. Specifically, the Office recommends legislative consideration of the following as new permanent exemptions:

    o An exemption permitting circumvention to enable blind or visually impaired persons to utilize assistive technologies. The exemption for such purposes granted in the most recent triennial rulemaking could provide an appropriate starting point for legislative language.

    o An exemption to allow circumvention solely for purposes of diagnosis, repair, or maintenance of a computer program, including to circumvent obsolete access controls. The Office does not, however, recommend that such an exemption extend to circumvention for purposes of making other lawful modifications to software, or "tinkering."

    o An exemption for the unlocking of used mobile devices, based on the language of exemptions adopted in prior rulemakings.

- In other cases, the views received suggest that the rulemaking already provides an adequate forum to address needs for circumvention, or that legislative reform is otherwise premature:

    o The Office previously has noted that the exemption under section 1201(f) for reverse engineering is somewhat ambiguous with respect to whether it permits end users to circumvent for purposes of making computer programs interoperable, or instead is limited to circumvention done solely for certain analytical purposes. Based on the statutory text, legislative history, and relevant case law, the Office concludes that the stronger interpretation is that section 1201(f) does permit circumvention to enable interoperability in certain circumstances, and subject to various statutory safeguards. Therefore, the Office does not believe that amendment of section 1201(f) is currently necessary to allow consumers to engage in legitimate activity of this type.

LOC_AR_00009227

- The Office does not currently recommend adopting a permanent exemption to facilitate the lawful preservation, replacement, and research activities of libraries and archives. We believe such an exemption to be premature in light of the Office's ongoing review of the copyright exceptions for such institutions under section 108 of the Copyright Act, but are hopeful that the recommended exemption for obsolete access controls noted above can accommodate many of these activities.

- The Office does not currently recommend adopting a permanent exemption for educational and derivative uses of audiovisual works. Although exemptions for such purposes have been granted in prior rulemakings, their language and scope has changed over time, suggesting that adoption on a permanent basis may be premature.

- In light of the Office's conclusion that a circumvention violation is and should continue to be independent of copyright infringement, the Office does not recommend adoption of a permanent exemption permitting circumvention for any lawful or noninfringing use. In addition, the Office does not see a sufficient basis for abandoning Congress' considered decision to establish the triennial rulemaking as the forum for consideration of exemptions for activities protected by fair use.

- Any revisions to the permanent exemptions should take into account international obligations, including applicable trade agreements. The Office expresses no view on any potential trade implications, but reaches its conclusions and recommendations solely for purposes of domestic copyright policy and advising Congress.

***Triennial Rulemaking.*** Apart from the question of whether the current statute should be adjusted, the Copyright Office expects growing numbers of copyright owners and users to continue to rely upon the triennial rulemaking. After careful consideration, the Office has identified ways the rulemaking process may be improved or clarified to facilitate administrability and ensure that the rulemaking continues to function as a useful fail-safe mechanism to prevent a diminishment in the public's ability to access copyrighted works.

First, the study revealed broad consensus in favor of streamlining the process for renewing exemptions to which there is no meaningful opposition. While the Office continues to support legislation providing for presumptive renewal of existing exemptions where there is no opposition, the Office concludes that under its existing regulatory authority, it can implement some changes in this regard independently. In particular, the Office believes that the statutory language permits rulemaking determinations to be based upon evidence drawn from prior proceedings, where there is a showing that the prior record is still a relevant reflection of the legal or factual concerns at issue in the succeeding rulemaking. The Office intends to implement such

LOC_AR_00009228

changes in the next rulemaking, for example by allowing petitioners to seek renewal through submission of a short declaration stating that there has been no material change to the facts and circumstances supporting the exemption since the previous triennial period.

Second, the Office is providing guidance clarifying the applicable evidentiary standards that must be satisfied to obtain an exemption. The Office's evidentiary inquiry is derived directly from the statute, and its application is guided by legislative history. The Office hopes that this articulation will be useful to future rulemaking participants.

Finally, the Office will undertake further efforts to make the rulemaking process clear and accessible to the public, consistent with its statutory obligations. These will include educational outreach in the form of a tutorial or webinar for the upcoming seventh rulemaking, adjusting the schedule to maximize participation from legal clinics, exploring the use of webcasting and/or remote participation technology, and greater efforts to use simplified regulatory language.

LOC_AR_00009229

# I.   INTRODUCTION AND STUDY HISTORY

The Digital Millennium Copyright Act ("DMCA")[5] has played a pivotal role in the development of the modern digital economy.  Enacted by Congress in 1998 to implement the United States' obligations under two international treaties,[6] the DMCA was intended to foster the growth and development of a thriving, innovative, and flexible digital marketplace by making digital networks safe places to disseminate and use copyrighted materials.[7]  It did so most notably by limiting the liability of online service providers[8] and, as this Report addresses, by ensuring adequate legal protections for copyrighted content to "support new ways of disseminating copyrighted materials to users, and to safeguard the availability of legitimate uses of those materials by individuals."[9]

Members of Congress have recognized that these latter protections, codified in section 1201 of title 17, United States Code, have been integral to discouraging piracy and infringement, facilitating innovation, and providing consumers with a wide range of content delivery options.[10]  As envisioned by Congress, section 1201 seeks to balance the

---

[5] Pub. L. No. 105-304, 112 Stat. 2860 (1998).

[6] WIPO Copyright Treaty, Dec. 20, 1996, 36 I.L.M. 65 (1997) ("WCT"); WIPO Performances and Phonograms Treaty, Dec. 20, 1996, 36 I.L.M. 76 (1997) ("WPPT").

[7] *See* STAFF OF H. COMM. ON THE JUDICIARY, 105TH CONG., SECTION-BY-SECTION ANALYSIS OF H.R. 2281 AS PASSED BY THE UNITED STATES HOUSE OF REPRESENTATIVES ON AUGUST 4TH, 1998, at 2 (Comm. Print 1998) ("HOUSE MANAGER'S REPORT"); H.R. REP. NO. 105-551, pt. 2, at 21, 23 (1998) ("COMMERCE COMMITTEE REPORT"); H.R. REP. NO. 105-551, pt. 1, at 10 (1998) ("HOUSE JUDICIARY COMMITTEE REPORT"); S. REP. NO. 105-190, at 1–2, 8–9 (1998) ("SENATE JUDICIARY COMMITTEE REPORT").

[8] Pub. L. No. 105-304, tit. II, § 202, 112 Stat. 2860, 2877–86 (1998) (codified as amended at 17 U.S.C. § 512).

[9] HOUSE MANAGER'S REPORT at 6.

[10] *See, e.g., Chapter 12 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop. & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 2 (2014) (statement of Rep. Tom Marino, Vice-Chairman, Subcomm. on Courts, Intellectual Prop. & the Internet) ("The digital economy has enabled wide distribution of movies, music, eBooks and other digital content.  Chapter 12 seems to have a lot to do with [that] economic growth . . . ."); *id.* at 2–3 (statement of Rep. Jerrold Nadler, Ranking Member, Subcomm. on Courts, Intellectual Prop. & the Internet) ("The DMCA has been effective and has worked to encourage the creation of new digital works and has allowed authors a way to protect against copyright infringement while also helping to promote the development of new and innovative business models. . . .  Section 1201 has proven to be extremely helpful to creators because it has helped creators to have the confidence to provide video content over the internet despite the risk of piracy.  And Section 1201 has helped deter . . . unauthorized access by prohibiting circumvention of protection measures and trafficking tools designed for

1

LOC_AR_00009230

interests of copyright owners and users, including the personal interests of consumers, in the digital environment.[11]  It does so by protecting the use of technological measures (also called "technological protection measures" or "TPMs") used by copyright owners to prevent unauthorized access to or use of their works.[12]  Section 1201 contains three separate protections for TPMs.  First, it prohibits circumvention of technological measures employed by or on behalf of copyright owners to protect access to their works (also known as "access controls").  Second, the statute prohibits trafficking in devices or services primarily designed to circumvent access controls.  Finally, it prohibits trafficking in devices or services primarily designed to circumvent TPMs used to protect the copyright rights of the owner of a work (also known as "copy controls").  Copy controls protect against unauthorized uses of a copyrighted work once access has been lawfully obtained.  Because title 17 already forbids copyright infringement, there is no corresponding ban on the act of circumventing a copy control.[13]

At the same time, section 1201 contains a number of discrete exemptions to these prohibitions, to avoid curtailing legitimate activities such as security testing, law enforcement activities, or the protection of personally identifying information.[14]  In addition, to accommodate changing marketplace realities and ensure that access to copyrighted works for lawful purposes is not unjustifiably diminished,[15] the statute provides for a rulemaking proceeding whereby additional, temporary exemptions to the prohibition on circumventing access controls may be adopted by the Librarian of Congress, upon the recommendation of the Register of Copyrights in consultation with the Assistant Secretary for Communications and Information of the Department of Commerce.[16]  In contrast to the permanent exemptions set out by statute, exemptions adopted pursuant to the rulemaking must be reconsidered every three years.[17]

---

circumvention."); *id.* at 4 (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary) ("Chapter 12 encourages the use of technology protection measures to protect copyright by making it unlawful to circumvent these measures or to assist others in doing so. This strengthens our copyright system by cultivating innovative business models that encourage the lawful dissemination of copyrighted works to the public.  This in turn discourages piracy and infringement.").

[11] *See* COMMERCE COMMITTEE REPORT at 26.

[12] Pub. L. No. 105-304, tit. I, § 103, 112 Stat. 2860, 2863–72 (1998) (codified as amended at 17 U.S.C. § 1201).

[13] SENATE JUDICIARY COMMITTEE REPORT at 12.

[14] 17 U.S.C. § 1201 (d)–(j).

[15] COMMERCE COMMITTEE REPORT at 35–36.

[16] 17 U.S.C. § 1201(a)(1)(C); *see also id.* § 1201(a)(1)(B)–(D).

[17] *Id.* § 1201(a)(1)(C).

LOC_AR_00009231

Since the enactment of the DMCA, the Copyright Office has conducted six rulemakings, which have grown in both public interest and scope.[18]  In the most-recently concluded rulemaking, the Office received many proposals seeking to access copyrighted computer code that now pervades consumer devices, and the rulemaking correspondingly touched upon a wide range of activities, from accessing personal data in medical devices to tractor repair, not previously implicated by copyright.[19]  The Office also received many requests for the renewal of previously granted and uncontested temporary exemptions, raising the question whether, in such cases, the rulemaking has become unnecessarily burdensome.[20]  Finally, the growth of specialized computer code serving as technological protection measures yielded concerns that members of the general public are unable to make use of these exemptions without assistance from third parties (such as service technicians), and that the anti-trafficking prohibitions might prevent such aid.[21]

In light of these issues, and as part of its comprehensive review of the nation's copyright law, the House of Representatives Committee on the Judiciary's Subcommittee on Courts, Intellectual Property, and the Internet held a hearing on section 1201 in September of 2014.[22]  During a subsequent hearing before the full Judiciary Committee in April of 2015, the Register of Copyrights testified that the impact and efficacy of section 1201 merit analysis, and Ranking Member John Conyers, Jr. requested that the Office complete a report studying section 1201.[23]

This Report is the result of that request.  On December 29, 2015, the Copyright Office published a notice of inquiry in the Federal Register ("First Notice") announcing the

---

[18] *See infra* p. 25 (discussing significant increase in number of comments received).

[19] Register of Copyrights, Section 1201 Rulemaking:  Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 2–3 (2015) ("2015 Recommendation").

[20] *Id.* at 4.

[21] *Id.* at 4–5.

[22] *See Chapter 12 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop. & the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014).

[23] *See Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 6 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office) ("For [certain] aspects of section 1201, we are recommending a comprehensive study, including the permanent exemptions for security, encryption, and privacy research."); *id.* at 49 (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary) ("[T]here are policy issues that warrant studies and analysis, including . . . section 1201. . . .  I would like the Copyright Office to conduct and complete reports on those policy issues . . . .").

LOC_AR_00009232

study and soliciting public input.[24]  The Office received sixty-eight initial comments and sixteen reply comments in response from a broad spectrum of interested parties, including creators and copyright owners, service providers, technology and cybersecurity companies, device manufacturers, libraries, legal scholars, public interest groups, and individual members of the public.[25]  In May 2016, the Office conducted three days of public roundtables in Washington, D.C. and San Francisco.[26]  Following the roundtables, the Office published a second notice of inquiry in the Federal Register ("Second Notice") requesting additional comments on a number of significant issues raised in earlier comments and discussed at the roundtables.[27]  The Office received forty-three comments and fourteen reply comments in response to the Second Notice.[28]

# II.   CURRENT LEGAL FRAMEWORK

## A. Historical Background

The United States' effort to update its laws to ensure protection of copyrighted works in the digital age began in February 1993 with the formation of the Information Infrastructure Task Force, which established a working group to investigate the effects of emerging digital technology on intellectual property rights and recommend appropriate

---

[24] Section 1201 Study:  Notice and Request for Public Comment, 80 Fed. Reg. 81,369 (Dec. 29, 2015).  This notice is attached in Appendix A.

[25] The comments received in response to the First Notice are available online at https://www.regulations.gov/docketBrowser?rpp=25&po=0&dct=PS&D=COLC-2015-0012. References to these comments are by party name (abbreviated where appropriate) followed by either "Initial Comments" or "Initial Reply Comments," as appropriate.  A list of the parties who responded to the First Notice is attached in Appendix B.

[26] *See* Software-Enabled Consumer Products Study and Section 1201 Study:  Announcement of Public Roundtables, 81 Fed. Reg. 17,206 (Mar. 28, 2016).  The Federal Register notice announcing the roundtables is attached in Appendix A.  A list of those who participated in the Office's public roundtables is attached in Appendix B.  Transcripts of the Washington, D.C. roundtables are available at http://www.copyright.gov/policy/1201/public-roundtable/transcript_05-19-2016.pdf and http://www.copyright.gov/policy/1201/public-roundtable/transcript_05-20-2016.pdf.  A transcript of the San Francisco roundtable is available at https://www.copyright.gov/policy/1201/public-roundtable/transcript_05-25-2016.pdf.

[27] Section 1201 Study:  Request for Additional Comments, 81 Fed. Reg. 66,296 (Sept. 27, 2016). This notice is attached in Appendix A.

[28] The comments received in response to the Second Notice are available online at https://www.regulations.gov/docketBrowser?rpp=25&po=0&dct=PS&D=COLC-2015-0012. References to these comments are by party name (abbreviated where appropriate) followed by either "Additional Comments" or "Additional Reply Comments."  A list of the parties who responded to the Second Notice is attached in Appendix B.

LOC_AR_00009233

changes to U.S. law and policy.[29]  This working group ultimately published a White Paper in 1995, which recommended that the United States adopt, among other things, measures to prevent the circumvention of TPMs.[30]  These recommendations resulted in legislation introduced in September 1995,[31] which ultimately stalled when negotiations failed to resolve core issues.[32]

During this time, however, an effort to ensure that copyrighted works would be adequately protected online was proceeding internationally.  In December 1996, the World Intellectual Property Organization ("WIPO"), of which the United States is a member state, held a diplomatic conference, which resulted in the adoption of two treaties—the WIPO Copyright Treaty ("WCT") and the WIPO Performances and Phonograms Treaty ("WPPT"), collectively known as the "WIPO Internet Treaties."[33] The WCT is a special agreement[34] under the Berne Convention for the Protection of Literary and Artistic Works;[35] it deals with the protection of works and the rights of their authors in the digital environment.  Relevant to this Report, Article 11 of the WCT obligates member states to:

> provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restrict acts, in respect of their works, which are not authorized by the authors concerned or permitted by law.[36]

The WPPT, which provides protection for performances and sound recordings, has a provision that is nearly identical to Article 11 of the WCT.[37]

---

[29] SENATE JUDICIARY COMMITTEE REPORT at 2.

[30] INFO. INFRASTRUCTURE TASK FORCE, WORKING GRP. ON INTELLECTUAL PROP. RIGHTS, INTELLECTUAL PROPERTY AND THE NATIONAL INFORMATION INFRASTRUCTURE: THE REPORT OF THE WORKING GROUP ON INTELLECTUAL PROPERTY RIGHTS 230–35 (1995).

[31] NII Copyright Protection Act of 1995, H.R. 2441, 104th Cong. (1995); NII Copyright Protection Act of 1995, S. 1284, 104th Cong. (1995).

[32] SENATE JUDICIARY COMMITTEE REPORT at 2–4.

[33] WCT, *supra* note 6; WPPT, *supra* note 6.

[34] WCT, *supra* note 6, art. 1(1).

[35] Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as revised July 24, 1971, and as amended Sept. 28, 1979, S. Treaty Doc. 99-27, 1161 U.N.T.S. 3.

[36] WCT, *supra* note 6, art. 11.

[37] WPPT, *supra* note 6, art. 18.

LOC_AR_00009234

The Clinton Administration submitted the WIPO Internet Treaties to the Senate for ratification in July 1997, and draft implementing legislation was introduced in both the House and Senate.[38]  These bills became the basis for title I of the DMCA, which includes the provisions eventually codified in 17 U.S.C. § 1201.[39]  Throughout 1997 and 1998, the draft legislation for the DMCA, including title I, went through a number of changes before being enacted on October 28, 1998.[40]  Since enactment, section 1201 has been amended once, in 1999, to make a technical correction.[41]

## B. Statutory Structure

Section 1201 has six primary components.  First, section 1201(a)(1)(A) prohibits the circumvention of technological measures employed by or on behalf of copyright owners to control access to their works (*i.e.*, access controls).[42]  Access controls include, for example, a password requirement limiting access to a website to paying customers, or authentication codes in video game consoles to prevent the playing of pirated copies. Second, section 1201(a)(2) prohibits manufacturing of or otherwise trafficking in technologies, products, or services that are primarily designed or produced for circumventing access controls.[43]  Third, section 1201(b) prohibits manufacturing of or otherwise trafficking in technologies, products, or services that are primarily designed or produced for circumventing technological measures that protect the exclusive rights granted to copyright owners under title 17 (*i.e.*, copy controls).[44]  Copy controls include, for example, technology preventing the copying of an e-book after it has been downloaded to a user's device.

---

[38] SENATE JUDICIARY COMMITTEE REPORT at 5; *see also* WIPO Copyright and Performances and Phonograms Treaty Implementation Act of 1997, S. 1121, 105th Cong. (as introduced, July 31, 1997); WIPO Copyright Treaties Implementation Act, H.R. 2281, 105th Cong. (as introduced, July 29, 1997).

[39] *See* SENATE JUDICIARY COMMITTEE REPORT at 5.

[40] Pub. L. No. 105-304, 112 Stat. 2860 (1998).  The WIPO treaties were ratified by the Senate shortly before passage of the DMCA.  *See* 144 CONG. REC. S12,972, 12,972–73 (daily ed. Oct. 21, 1998).

[41] *See* Intellectual Property and Communications Omnibus Reform Act of 1999, Pub. L. No. 106-113, app. I, tit. V, § 5006, 113 Stat. 1501, 1501A-594 (1999); H.R. REP. NO. 106-464, at 149 (1999) (Conf. Rep.).

[42] 17 U.S.C. § 1201(a)(1)(A).

[43] *Id*. § 1201(a)(2).

[44] *Id*. § 1201(b).

LOC_AR_00009235

| 17 U.S.C. § 1201 | Circumvention Prohibition? | Trafficking Prohibition? |
|---|---|---|
| **Access Controls** | **Yes** **§ 1201(a)(1)** | **Yes** **§ 1201(a)(2)** |
| **Copy Controls** | **No** | **Yes** **§ 1201(b)** |

Fourth, sections 1201(d)–(j) describe various permanent exemptions to one or more of these prohibitions, and subsection (k) prescribes conditions for the use of specific TPMs on analog video cassette recorders.[45]



Fifth, section 1201(a)(1)(C) provides for a rulemaking proceeding whereby additional, temporary exemptions to the prohibition on circumventing access controls may be adopted by the Librarian of Congress, upon the recommendation of the Register of Copyrights in consultation with the Assistant Secretary for Communications and Information of the Department of Commerce.[46]  Finally, section 1201(c) contains a savings clause that was "intended to ensure that none of the provisions in section 1201

---

[45] *Id*. § 1201(d)–(k).

[46] *Id*. § 1201(a)(1)(C); *see also id*. § 1201(a)(1)(B)–(D).

LOC_AR_00009236

affect the existing legal regime established in the Copyright Act and case law interpreting that statute," including the fair use doctrine.[47]

## 1. Prohibition on Circumvention

Section 1201(a)(1)(A) mandates that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title."[48]  As used in section 1201(a), "to 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."[49]  A technological measure "'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work."[50]

Congress intended section 1201(a)(1)(A) to establish a new legal protection for copyright owners against the circumvention of TPMs controlling access to their works, as required by the WIPO Internet Treaties.  Both the House and Senate Judiciary Committees

---

[47] SENATE JUDICIARY COMMITTEE REPORT at 30; HOUSE JUDICIARY COMMITTEE REPORT at 20 (same); *see also* COMMERCE COMMITTEE REPORT at 26 ("[F]air use principles certainly should not be extended beyond their current formulation.").  Section 1201(c) states that:

> (1) Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

> (2) Nothing in this section shall enlarge or diminish vicarious or contributory liability for copyright infringement in connection with any technology, product, service, device, component, or part thereof.

> (3) Nothing in this section shall require that the design of, or design and selection of parts and components for, a consumer electronics, telecommunications, or computing product provide for a response to any particular technological measure, so long as such part or component, or the product in which such part or component is integrated, does not otherwise fall within the prohibitions of subsection (a)(2) or (b)(1).

> (4) Nothing in this section shall enlarge or diminish any rights of free speech or the press for activities using consumer electronics, telecommunications, or computing products.

The legislative history makes clear that a violation of section 1201(a) should be considered entirely separate from a violation of copyright law.  *See infra* pp. 43–44.

[48] 17 U.S.C. § 1201(a)(1)(A).

[49] *Id.* § 1201(a)(3)(A).

[50] *Id.* § 1201(a)(3)(B).

LOC_AR_00009237

concluded that the Treaties required a prohibition on circumvention, which was unavailable under then-existing U.S. law. The House Judiciary Committee Report explains that while "[t]he treaties do not require any change in the substance of copyright rights or exceptions in U.S. law[, t]hey do . . . require . . . technological adjuncts to the copyright law, intended to ensure a thriving electronic marketplace for copyrighted works on the Internet."[51] Thus, "[t]o comply with the treaties, the U.S. must make it unlawful to defeat technological protections used by copyright owners to protect their works."[52] The Senate Judiciary Committee agreed that "to adhere to the WIPO treaties," anticircumvention legislation "is necessary," noting that "prior to this Act, the conduct of circumvention was never before made unlawful."[53] Congress described such conduct as "the electronic equivalent of breaking into a locked room in order to obtain a copy of a book."[54]

In enacting the new provision, Congress highlighted a key policy goal: facilitating the development of a lawful online marketplace for copyrighted works.[55] The Senate Judiciary Committee Report notes that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy."[56] By providing legal protection for access controls,

---

[51] HOUSE JUDICIARY COMMITTEE REPORT at 9–10.

[52] Id. at 10.

[53] SENATE JUDICIARY COMMITTEE REPORT at 11–12.

[54] HOUSE JUDICIARY COMMITTEE REPORT at 17. The Senate Judiciary Committee Report uses a similar analogy in describing the relationship between section 1201(a)(1) and the prohibition on the manufacture of circumvention tools under section 1201(a)(2):

> For example, if unauthorized access to a copyrighted work is effectively prevented through use of a password, it would be a violation of this section to defeat or bypass the password and to make the means to do so, as long as the primary purpose of the means was to perform this kind of act. This is roughly analogous to making it illegal to break into a house using a tool, the primary purpose of which is to break into houses.

SENATE JUDICIARY COMMITTEE REPORT at 11.

[55] See COMMERCE COMMITTEE REPORT at 23 ("The debate on this legislation highlighted two important priorities: promoting the continued growth and development of electronic commerce; and protecting intellectual property rights. These goals are mutually supportive. A thriving electronic marketplace provides new and powerful ways for the creators of intellectual property to make their works available to legitimate consumers in the digital environment. And a plentiful supply of intellectual property . . . drives the demand for a more flexible and efficient electronic marketplace."); SENATE JUDICIARY COMMITTEE REPORT at 1–2 ("The [DMCA] is designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age.").

[56] SENATE JUDICIARY COMMITTEE REPORT at 8.

LOC_AR_00009238

Congress hoped to encourage copyright owners to make their works available to consumers through flexible and cost-effective online platforms.[57]  As the House Manager's Report[58] observes, "[t]he technological measures—such as encryption, scrambling, and electronic envelopes—that this bill protects can be deployed, not only to prevent piracy and other economically harmful unauthorized uses of copyrighted materials, but also to support new ways of disseminating copyrighted materials to users . . . ."[59]  Congress envisioned dissemination models that "allow access during a limited time period, such as during a period of library borrowing," or that "allow[] a consumer to purchase a copy of a single article from an electronic database, rather than having to pay more for a subscription to a journal containing many articles the consumer does not want."[60]  Congress thus anticipated that the legislation would "creat[e] the legal platform for launching the global digital on-line marketplace for copyrighted works."[61]

## 2.  Prohibitions on Trafficking

Although the WIPO Internet Treaties do not contain express language regarding trafficking in products used for circumvention of TPMs, Congress concluded that the adoption of such prohibitions was required for U.S. compliance.[62]  This view accorded

---

[57] *See* HOUSE MANAGER'S REPORT at 2 ("[T]he law must adapt in order to make digital networks safe places to disseminate and exploit material in which American citizens have rights in an unregulated and beneficial environment."); HOUSE JUDICIARY COMMITTEE REPORT at 10 ("When copyrighted material is adequately protected in the digital environment, a plethora of works will be distributed and performed over the Internet.  To protect the owner, copyrighted works will most likely be encrypted and made available to consumers once payment is made for access to a copy of the work.").

[58] The "House Manager's Report" refers to the committee print issued by the House Judiciary Committee following passage by the House of Representatives of a Manager's Amendment to the bill that would become the DMCA.  *See* HOUSE MANAGER'S REPORT at 1–2.

[59] *Id.* at 6.

[60] *Id.* at 6–7 ("These technological measures may make more works more widely available, and the process of obtaining permissions easier."); *see also* COMMERCE COMMITTEE REPORT at 23 ("[A]n increasing number of intellectual property works are being distributed using a 'client-server' model, where the work is effectively 'borrowed' by the user (e.g., infrequent users of expensive software purchase a certain number of uses, or viewers watch a movie on a pay-per-view basis).").

[61] SENATE JUDICIARY COMMITTEE REPORT at 8.

[62] *See* HOUSE JUDICIARY COMMITTEE REPORT at 10 ("To comply with the treaties, the U.S. must make it unlawful to defeat technological protections used by copyright owners to protect their works.  This would include preventing unauthorized access as well as the manufacture and sale of devices primarily designed to decode encrypted copyrighted material."); *id.* ("There will be

LOC_AR_00009239

with advice given by then-Register Marybeth Peters to the Committee.[63]  Section 1201 contains two provisions prohibiting manufacturing of or trafficking in technologies, products, services, or devices that are primarily designed or produced for purposes of circumventing TPMs.  Section 1201(a)(2) applies to access controls, while section 1201(b) applies to copy controls.[64]

Section 1201(a)(2) provides:

> No person shall manufacture, import, offer to the public, provide, or
> otherwise traffic in any technology, product, service, device, component,
> or part thereof, that—

---

those who will try to profit from the works of others by decoding the encrypted codes protecting copyrighted works, or engaging in the business of providing devices or services to enable others to do so.  A new 'Section 1201' to the Copyright Act is required by both WIPO Treaties to make it unlawful to engage in such activity."); SENATE JUDICIARY COMMITTEE REPORT at 28.

[63] *WIPO Copyright Treaties Implementation Act; and Online Copyright Liability Limitation Act: Hearing Before the Subcomm. on Courts and Intellectual Prop. of the H. Comm. on the Judiciary*, 105th Cong., 48 (1997) (statement of Marybeth Peters, Register of Copyrights, U.S. Copyright Office) ("Because of the difficulty involved in discovering and obtaining meaningful relief from individuals who engage in acts of circumvention, a broader protection extending to those in the business of providing the means of circumvention appears to be necessary to make the protection adequate and effective.  It is the conduct of commercial suppliers that will enable and result in large-scale circumvention.").  The weight of academic authority agrees that the treaties require protections against trafficking.  *See, e.g.*, JÖRG REINBOTHE & SILKE VON LEWINSKI, THE WIPO TREATIES ON COPYRIGHT:  A COMMENTARY ON THE WCT, THE WPPT, AND THE BTAP 173, ¶ 7.11.36 (2d ed. 2015) ("[T]he obligation to provide for 'adequate protection' under the WCT would seem to require that rightsholders enjoy protection also against preparatory acts on top of protection against the acts of circumvention themselves.  The domestic law of Contracting Parties would have to proscribe devices, products, components, or the provision of services which are produced or distributed for the purpose of circumventing protection technologies.") (emphasis omitted); SAM RICKETSON & JANE C. GINSBURG, INTERNATIONAL COPYRIGHT AND NEIGHBOURING RIGHTS:  THE BERNE CONVENTION AND BEYOND, ¶ 15.17, at 976–77 (2d ed. 2006) ("An interpretation that disfavors effective protection against circumvention by limiting the prohibited conduct to the sole act of circumvention, rather than encompassing the provision of devices as well, would be inconsistent with article 11's direction that member states 'shall provide adequate legal protection and effective legal remedies against the circumvention.'"); MIHALY FICSOR, THE LAW OF COPYRIGHT AND THE INTERNET: THE 1996 WIPO INTERNET TREATIES, THEIR INTERPRETATION AND IMPLEMENTATION, C11.12, at 549 (2002) ("[I]f legislation tries only to cover the acts of circumvention themselves, it cannot provide adequate legal protection and effective legal remedies against acts which, in spite of the treaty obligations, would continue uncontrolled.").

[64] 17 U.S.C. § 1201(a)(2); *id.* § 1201(b)(1).

LOC_AR_00009240

**Section 1201 of Title 17**

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

**Trafficking in Devices or Services to Circumvent Access Controls**

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.[65]

Section 1201(b) contains similar language, but refers to circumventing "protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof."[66] It provides:

No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

**Trafficking in Devices or Services to Circumvent Copy Controls**

(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a

---

[65] *Id*. § 1201(a)(2).

[66] *Id*. § 1201(b)(1).

LOC_AR_00009241

> technological measure that effectively protects a right
> of a copyright owner under this title in a work or a
> portion thereof.[67]

For purposes of section 1201(b), to "circumvent protection afforded by a technological measure" means "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure."[68] A technological measure "'effectively protects a right of a copyright owner under this title' if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title."[69]

The Senate Judiciary Committee Report emphasizes that the two anti-trafficking provisions "are designed to protect two distinct rights and to target two distinct classes of devices."[70] It explains that "if an effective technological protection measure does nothing to prevent access to the plain text of the work, but is designed to prevent that work from being copied," then a potential cause of action for trafficking in devices designed to circumvent the measure would be available under section 1201(b), but not under section 1201(a)(2).[71] By contrast, if a TPM limits access to a work but does nothing to prevent unauthorized copying, display, performance, or distribution, a potential cause of action for trafficking in circumvention devices would be available under section 1201(a)(2), but not under section 1201(b).[72]

The Senate Judiciary Committee Report further notes that, while section 1201(a) prohibits both circumventing an access control and related trafficking activity, "there is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1)."[73] Prohibiting the act of circumventing a copy control was unnecessary, the Committee reasoned, because most such acts "will occur in the course of conduct which itself implicates the copyright owner[']s rights under title 17."[74] Thus, the anti-trafficking provisions in section 1201(b) were intended to "enforce[] the longstanding prohibitions on infringements," while those in section 1201(a)(2) were intended to "enforce[] [the] new prohibition on conduct" under section 1201(a)(1)(A).[75]

---

[67] *Id.* § 1201(b)(1).

[68] *Id.* § 1201(b)(2)(A).

[69] *Id.* § 1201(b)(2)(B).

[70] SENATE JUDICIARY COMMITTEE REPORT at 12.

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.* at 29.

[75] *Id.* at 12.

LOC_AR_00009242

In drafting the anti-trafficking provisions, Congress recognized the need to avoid prohibiting legitimate multipurpose devices designed for uses other than circumvention. The House Commerce Committee Report ("Commerce Committee Report") specifically notes that section 1201(a)(2) "is aimed fundamentally at outlawing so-called 'black boxes' that are expressly intended to facilitate circumvention of technological protection measures for purposes of gaining access to a work," rather than "products that are capable of commercially significant noninfringing uses, such as consumer electronics, telecommunications, and computer products."[76]

### 3. Permanent Exemptions

Congress established a discrete set of statutory exemptions to the prohibition on circumvention, generally out of recognition of the importance of these activities.[77] Unlike exemptions adopted through the triennial rulemaking, these exemptions are permanent. In some cases, these provisions also exempt activities from one or both of the prohibitions on trafficking.

#### a. 1201(d) Exemption for Nonprofit Libraries, Archives, and Educational Institutions

Section 1201(d), referred to in the legislative history as the "shopping privilege,"[78] establishes an exemption from anticircumvention liability for nonprofit libraries, archives, and educational institutions, allowing them, under specific circumstances, to circumvent technological protection measures to "make a good faith determination of whether to acquire a copy of [a] work for the sole purpose of engaging in conduct permitted under this title."[79] Qualifying institutions may not keep a copy of the work "longer than necessary to make [the] good faith determination."[80] The work cannot be used for any purpose other than to determine whether it will be acquired,[81] and must not be "reasonably available in another form."[82] Finally, these institutions may not

---

[76] COMMERCE COMMITTEE REPORT at 38; *see also id.* at 39–40 (same language regarding paragraph (b)(1)); SENATE JUDICIARY COMMITTEE REPORT at 29 (paragraph (a)(2) "is drafted carefully to target 'black boxes,' and to ensure that legitimate multipurpose devices can continue to be made and sold"); HOUSE JUDICIARY COMMITTEE REPORT at 18 (similar); HOUSE MANAGER'S REPORT at 9 (similar).

[77] *See, e.g.*, COMMERCE COMMITTEE REPORT at 41–45; SENATE JUDICIARY COMMITTEE REPORT at 13–16, 31–34.

[78] 144 CONG. REC. E1207–08 (daily ed. June 23, 1998) (correspondence submitted by Rep. Coble).

[79] *Id.* § 1201(d).

[80] *Id.* § 1201(d)(1)(A).

[81] *Id.* § 1201(d)(1)(B).

[82] *Id.* § 1201(d)(2).

LOC_AR_00009243

"manufacture, import, offer to the public, provide, or otherwise traffic in" circumvention tools.[83]  An institution that willfully violates the exemption for purposes of commercial advantage or financial gain is subject to civil remedies for the first offense, and to forfeiture of the exemption for repeated or subsequent offenses.[84]

### b. 1201(e) Exemption for Law Enforcement, Intelligence, and Other Government Activities

Section 1201(e) exempts from both the anticircumvention and anti-trafficking provisions "any lawfully authorized investigative, protective, information security, or intelligence activity of an officer, agent, or employee of the United States, a state, or a political subdivision of a state, or of a person acting pursuant to a contract with" one of those entities.[85]  This provision was intended to "permit the continuation of information security activities that protect the country against one of the greatest threats to our national security as well as to our economic security," namely "cyber attacks against government computers, computer systems, and computer networks."[86]

### c. 1201(f) Exemption for Reverse Engineering

Section 1201(f) exempts certain reverse engineering activities undertaken for the purpose of achieving software interoperability from liability under section 1201(a)(1)(A), (a)(2), and (b).  While parts of section 1201(f) are limited to reverse engineering activities of identifying and analyzing parts of a computer program, the Commerce Committee Report notes more broadly that interoperability "is the touchstone of the exceptions contained in section [1201(f)]."[87]  The House and Senate Judiciary Committee reports both suggest that the overall goal of section 1201(f) was to preserve the ability to engage in the activities found to be noninfringing by the Ninth Circuit in the *Sega Enterprises Ltd. v. Accolade, Inc.* decision.[88]

---

[83] *Id.* § 1201(d)(4).

[84] *Id.* § 1201(d)(3).

[85] *Id.* § 1201(e).

[86] H.R. REP. NO. 105-796, at 65–66 (1998) (Conf. Rep.).

[87] COMMERCE COMMITTEE REPORT at 43.

[88] *See* SENATE JUDICIARY COMMITTEE REPORT at 13 ("The objective is to ensure that the effect of current case law interpreting the Copyright Act is not changed by enactment of this legislation for certain acts of identification and analysis done in respect of computer programs. *See, Sega Enterprises Ltd.* v *Accolade, Inc.*, 977 F.2d 1510[] (9th Cir. 1992.)."); HOUSE MANAGER'S REPORT at 14 (same); *see also* COMMERCE COMMITTEE REPORT at 42 ("[T]he goal of this section is to ensure that current law is not changed, and not to encourage or permit infringement.").

LOC_AR_00009244

Section 1201(f)(1), which provides an exemption to subsection (a)(1)(A), allows a person to circumvent access controls "for the sole purpose of identifying and analyzing those elements of [a] program that are necessary to achieve interoperability of an independently created computer program with other programs."[89]  The legislative history notes that "[t]he resulting product must also be a new and original work" that does not infringe the original work.[90]  The sole "objective of the analysis must be to identify and extract such elements as are necessary to achieve interoperability which are not otherwise available to the person."[91]  "Interoperability" means "the ability of computer programs to exchange information, and of such programs mutually to use the information which has been exchanged."[92]

Section 1201(f)(2) provides an exemption to the trafficking prohibitions of subsections (a)(2) and (b), so that a person may "develop and employ technological means" to circumvent a TPM for the purpose of enabling the permitted identification and analysis, or, separately, for the purpose of enabling interoperability of an independently created computer program with other programs, provided that "such means are necessary to achieve such interoperability," and that doing so does not constitute infringement.[93]

Section 1201(f)(3) allows information acquired pursuant to these provisions, as well as the permitted circumvention tools, to be made available to third parties, so long as the sole purpose is to achieve interoperability of an independently created computer program with other programs and such acts do not constitute infringement or violate other applicable law.[94]  Unlike the above provisions, section 1201(f)(3) does not explicitly specify whether it serves as a circumvention exemption, a trafficking exemption, or both.

### d.  1201(g) Exemption for Encryption Research

Section 1201(g) exempts from section 1201(a)(1)(A) and (2)—but not section 1201(b)—certain circumvention activities done for purposes of "encryption research," *i.e.*, "activities necessary to identify and analyze flaws and vulnerabilities of encryption technologies applied to copyrighted works, if these activities are conducted to advance the state of knowledge in the field of encryption technology or to assist in the development of encryption products."[95]  Congress adopted section 1201(g) to ensure that

---

[89] 17 U.S.C. § 1201(f)(1).

[90] COMMERCE COMMITTEE REPORT at 42.

[91] *Id.*

[92] 17 U.S.C. § 1201(f)(4).

[93] *Id.* § 1201(f)(2).

[94] *Id.* § 1201(f)(3).

[95] *Id.* § 1201(g)(1)(A).

LOC_AR_00009245

the anticircumvention laws would not have "the undesirable and unintended consequence of chilling legitimate research activities in the area of encryption."[96] The statute defines "encryption technology" as "the scrambling and descrambling of information using mathematical formulas or algorithms."[97]

The exemption to subsection (a)(1)(A) allows circumvention of a TPM "in the course of an act of good faith encryption research," provided (1) the copy was lawfully obtained, (2) the act is "necessary to conduct" the research, (3) the researcher made a good faith effort to obtain authorization before the circumvention, and (4) the act does not constitute infringement or a violation of other applicable law.[98] The statute includes a "non-exhaustive list of factors a court shall consider in determining whether a person properly qualifies"[99] for this exemption, including whether and how the information derived from the encryption research was distributed, whether the researcher has been trained or experienced, or is engaged in a legitimate course of study, in the field of encryption technology, and whether the researcher provided the copyright owner with the results of the research.[100]

With respect to subsection (a)(2), section 1201(g)(4) permits a person to develop and employ technological means to circumvent a TPM for the sole purpose of performing the permitted acts of encryption research.[101] In addition, that person may provide such means "to another person with whom he or she is working collaboratively" for the purpose of conducting the permitted research, "or for the purpose of having that other person verify his or her acts of good faith encryption research."[102] The legislative history notes, however, that "generally available encryption testing tools" would not be prohibited in the first place by subsection (a)(2).[103]

---

[96] COMMERCE COMMITTEE REPORT at 27.

[97] 17 U.S.C. § 1201(g)(1)(B).

[98] Id. § 1201(g)(2).

[99] COMMERCE COMMITTEE REPORT at 44.

[100] 17 U.S.C. § 1201(g)(3). Note that "[t]here is no requirement that legitimate encryption researchers disseminate their findings in order to qualify for" this exemption. H.R. REP. NO. 105-796, at 66 (1998) (Conf. Rep.).

[101] 17 U.S.C. § 1201(g)(4)(A).

[102] Id. § 1201(g)(4)(B).

[103] SENATE JUDICIARY COMMITTEE REPORT at 15–16 (providing as examples password-recovery utilities, commercial "key-cracker" products, and network and website management and security tools).

LOC_AR_00009246

### e.  1201(h) Exceptions Regarding Minors

Section 1201(h) permits courts, in applying section 1201(a)(1) and (2) to a "component or part," to consider whether the component or part is needed to "prevent the access of minors to material on the Internet."[104]  It was added in response to concerns "that 1201(a) might inadvertently make it unlawful for parents to protect their children from pornography and other harmful material available on the Internet, or have unintended legal consequences for manufacturers of products designed solely to enable parents to protect their children in this fashion."[105]

### f.  1201(i) Exemption for Protection of Personally Identifying Information

Congress recognized that "[d]igital technology is robust and versatile enough that it can surreptitiously gather consumers' personal information, and do so through the use of software that is protected, or 'cloaked,' by a technological protection measure."[106]  To the extent copyright owners disclosed their "personal data gathering practices," however, Congress concluded that consumers would feel confident that their personal privacy was protected and therefore not feel the need to disable TPMs.[107]  Therefore, Congress developed a targeted exemption allowing consumers to protect their personally identifiable information by exempting from section 1201(a)(1)(A) certain limited acts of circumvention carried out "solely for the purpose of preventing the collection or dissemination of personally identifying information about a natural person who seeks to gain access to the work protected."[108]  This exemption, in section 1201(i), applies only when the copyright owner does not disclose to the user whether or not it is collecting his or her personally identifying information[109] and "where consumers are left without the capability to disable the gathering of personal information."[110]  Further, an act of circumvention must have "the sole effect of identifying and disabling the capability" for collecting and distributing personally identifying information.[111]

---

[104] 17 U.S.C. § 1201(h).

[105] Senate Judiciary Committee Report at 32.

[106] Commerce Committee Report at 27.

[107] Id. at 27–28.

[108] 17 U.S.C. § 1201(i)(1)(D).

[109] Id. § 1201(i)(1)(B), (i)(2).

[110] Commerce Committee Report at 45; see also 17 U.S.C. § 1201(i)(1)(B) (TPM or work must collect or disseminate personally identifying information "without providing . . . the capability to prevent or restrict such collection or dissemination").

[111] 17 U.S.C. § 1201(i)(1)(C).

LOC_AR_00009247

### g.  1201(j) Exemption for Security Testing

Section 1201(j) exempts certain acts of "security testing" from section 1201(a)(1)(A) and (a)(2).[112]  Security testing is defined as "accessing a computer, computer system, or computer network, solely for the purpose of good faith testing, investigating, or correcting, a security flaw or vulnerability, with the authorization of the owner or operator of such computer, computer system, or computer network."[113]

Congress enacted section 1201(j) out of concern that "[s]ection 1201(a) could be construed to inhibit legitimate forms of security testing,"[114] and intended this exemption to complement section 1201(g), as "[s]ection 1201(g)'s exclusive focus on encryption-related research does not encompass the entire range of legitimate information security activities."[115]  Certain members of Congress recognized that security testing "strengthen[s the nation's] ability to keep [its] computer systems, digital networks and systems applications private, protected and secure."[116]  The legislative history also states that:

> the scope of permissible security testing under the Act should be the same as permissible testing of a simple door lock:  a prospective buyer may test the lock at the store with the store's consent, or may purchase the lock and test it at home in any manner that he or she sees fit—for example, by installing the lock on the front door and seeing if it can be picked.  What that person may not do, however, is test the lock once it has been installed on someone else's door, without the consent of the person whose property is protected by the lock.[117]

Section 1201(j)(2) provides that it is not a violation of subsection (a)(1)(A) "for a person to engage in an act of security testing, if such act does not constitute infringement under this title or a violation of applicable law other than this section, including section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act

---

[112] *Id.* § 1201(j).

[113] *Id.* § 1201(j)(1).

[114] H.R. REP. NO. 105-796, at 67 (1998) (Conf. Rep.).

[115] *Id.* at 66 (noting "an individual who is legitimately testing a security technology may be doing so not to advance the state of encryption research or to develop encryption products, but rather to ascertain the effectiveness of that particular security technology.").

[116] 144 Cong. Rec. E1640-02, 2 (daily ed. Aug. 4, 1998) (statement of Rep. Tauzin); *see also* 144 Cong. Rec. H10048-01, 59–60 (daily ed. Oct. 8, 1998) (statement of Rep. Coble) (discussing rationale for security testing exemption).

[117] H.R. REP. NO. 105-706, at 67 (1998) (Conf. Rep.).

LOC_AR_00009248

of 1986."[118]  This exemption provides a list of non-exclusive factors to guide the eligibility analysis, related to the use of the results of the security testing, namely:[119]

> (A) whether the information derived from the security testing was used solely to promote the security of the owner or operator of such computer, computer system or computer network, or shared directly with the developer of such computer, computer system, or computer network; and

> (B) whether the information derived from the security testing was used or maintained in a manner that does not facilitate infringement under this title or a violation of applicable law other than this section, including a violation of privacy or breach of security.[120]

Section 1201(j)'s trafficking exemption provides that, notwithstanding subsection (a)(2), a person may "develop, produce, distribute or employ technological means" to circumvent TPMs for the sole purpose of performing the permitted acts of security testing, "provided such technological means do not otherwise violate section (a)(2)."[121]

### 4.  Certain Analog Devices and Technological Measures

Finally, section 1201(k) "deal[s] with a very specific situation" that is today somewhat moot, requiring that analog video cassette recorders prevalent in 1998 (*e.g.*, VHS, Beta, 8mm) "conform to the two forms of copy control technology that are in wide use in the market today" to ensure content protection while accommodating existing "recording capabilities of ordinary consumer analog video cassette recorders."[122]  The legislative history emphasizes that distribution of circumvention tools for these TPMs would be in violation of section 1201(b)(2).[123]

### 5.  Triennial Rulemaking

In addition to the permanent exemptions, section 1201 includes a mechanism to provide limited temporary exemptions to the prohibition on circumvention.  These exemptions are adopted by the Librarian of Congress upon the recommendation of the Register of

---

[118] 17 U.S.C. § 1201(j)(2).

[119] H.R. REP. NO. 105-706, at 67 (1998) (Conf. Rep.).

[120] 17 U.S.C. § 1201(j)(3).

[121] *Id.* § 1201(j)(4).

[122] H.R. REP. NO. 105-796, at 67–68, 70 (1998) (Conf. Rep.) (specifically referencing the automatic gain control and the colorstripe copy control technologies; suggesting these TPMs could be used to prevent making copies of pay-per-view or video-on-demand programming).

[123] *Id.* at 67–68.

LOC_AR_00009249

Copyrights pursuant to a public rulemaking proceeding conducted every three years by the Register, in consultation with the National Telecommunications and Information Administration of the Department of Commerce ("NTIA").[124]  By statute, this triennial rulemaking process only addresses section 1201(a)(1)(A)'s prohibition on circumvention; the statute does not grant the authority to adopt exemptions to the anti-trafficking provisions of sections 1201(a)(2) and 1201(b).[125]  Specifically, the statute provides:

> (B) The prohibition contained in subparagraph (A) shall not apply to persons who are users of a copyrighted work which is in a particular class of works, if such persons are, or are likely to be in the succeeding 3-year period, adversely affected by virtue of such prohibition in their ability to make noninfringing uses of that particular class of works under this title, as determined under subparagraph (C).

> (C) During the 2-year period described in subparagraph (A), and during each succeeding 3-year period, the Librarian of Congress, upon the recommendation of the Register of Copyrights, who shall consult with the Assistant Secretary for Communications and Information of the Department of Commerce and report and comment on his or her views in making such recommendation, shall make the determination in a rulemaking proceeding for purposes of subparagraph (B) of whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition under subparagraph (A) in their ability to make noninfringing uses under this title of a particular class of copyrighted works.  In conducting such rulemaking, the Librarian shall examine—

> (i) the availability for use of copyrighted works;
> (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes;
> (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research;

---

[124] *See* 17 U.S.C. § 1201(a)(1)(C).  The Assistant Secretary for Communications and Information of the Department of Commerce referenced in the statute is the head of NTIA.

[125] *Id.* § 1201(a)(1)(E) ("Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.").

LOC_AR_00009250

(iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and

(v) such other factors as the Librarian considers appropriate.[126]

### a. Legislative History

As originally introduced, section 1201 did not provide any avenue to adopt additional exemptions to the prohibition on circumvention.[127]  The House Commerce Committee was concerned, however, that the lack of an ability to waive the prohibition "would undermine Congress' longstanding commitment to the principle of fair use," recognizing that "[t]hroughout our history, the ability of individual members of the public to access and to use copyrighted materials has been a vital factor in the advancement of America's economic dynamism, social development, and educational achievement."[128]  Although the Commerce Committee acknowledged that the "growth and development of the Internet has already had a significant positive impact on the access of American students, researchers, consumers, and the public at large to informational resources," the Committee, at the same time, was "concerned that marketplace realities may someday dictate a different outcome, resulting in less access, rather than more, to copyrighted materials that are important to education, scholarship, and other socially vital endeavors."[129]

The Commerce Committee determined that "a 'fail-safe' mechanism is required . . . [to] monitor developments in the marketplace for copyrighted materials, and allow the enforceability of the prohibition against the act of circumvention to be selectively waived, for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials."[130]  It therefore created "a rulemaking proceeding in which the issue of whether enforcement of the [prohibition on circumvention] should be temporarily waived with regard to particular categories of works can be fully considered and fairly decided on the basis of real marketplace developments that may diminish otherwise lawful access to works."[131]

---

[126] *Id.* § 1201(a)(1)(B)–(C); *see also id.* § 1201(a)(1)(D) (requiring Librarian to publish exempted classes of works).

[127] *See* WIPO Copyright Treaties Implementation Act, H.R. 2281, 105th Cong. (as introduced, July 29, 1997); WIPO Copyright and Performances and Phonograms Treaty Implementation Act of 1997, S. 1121, 105th Cong. (as introduced, July 31, 1997).

[128] COMMERCE COMMITTEE REPORT at 35–36.

[129] *Id.* at 35–36.

[130] *Id.*

[131] *Id.*

LOC_AR_00009251

As the Commerce Committee described it, the rulemaking proceeding's "primary goal" is to "assess whether the prevalence of . . . technological protections, with respect to particular categories of copyrighted materials, is diminishing the ability of individuals to use these works in ways that are otherwise lawful."[132]  The addition of the rulemaking process "ensure[s] that the concept of fair use remains firmly established in the law" and "extends into the digital environment the bedrock principle of 'balance' in American intellectual property law for the benefit of both copyright owners and users."[133]  Individual statements in the legislative history also make clear that the rulemaking "represents an agreed upon compromise by the content community and the fair use community."[134]

In the version of the DMCA reported by the Commerce Committee, the rulemaking was to be conducted "on the record" every two years by the Secretary of Commerce, in consultation with the Assistant Secretary of Commerce for Communications and Information, the Commissioner of Patents and Trademarks, and the Register of Copyrights.[135]  These provisions were subsequently modified by a House Manager's Amendment, which was the version contained in the bill passed by the House.[136]  The Manager's Amendment, among other things, changed the biennial proceeding to a triennial one.[137]

In conference between the House and Senate, the DMCA assumed its enacted form, and responsibility for the rulemaking shifted to the Librarian, based upon "the recommendation of the Register of Copyrights, who shall consult with the Assistant Secretary for Communications and Information of the Department of Commerce."[138]  Although section 1201(a)(1)(C) calls only for the Register's "recommendation,"

---

[132] *Id.* at 37.

[133] *Id.* at 26.

[134] 144 CONG. REC. S9935, 9935 (daily ed. Sept. 3, 1998) (statement of Sen. Ashcroft); *see also* 144 CONG. REC. H7074, 7099 (daily ed. Aug. 4, 1998) (statement of Rep. Dingell) ("This key compromise between content and 'fair use' communities is reflected in the bill on the floor today.").

[135] Digital Millennium Copyright Act of 1998, H.R. 2281, 105th Cong., tit. I, § 102(a) (as reported by H. Comm. on Commerce, July 22, 1998).

[136] Digital Millennium Copyright Act, H.R. 2281, 105th Cong. (as passed by H.R., Aug. 4, 1998); HOUSE MANAGER'S REPORT at 1.

[137] Digital Millennium Copyright Act, H.R. 2281, 105th Cong., tit. I, § 103(a) (as passed by H.R., Aug. 4, 1998) (making other adjustments to the rulemaking process that were ultimately reflected in the statute).

[138] Pub. L. No. 105-304, tit. I, § 103, 112 Stat. 2860, 2863–72 (1998) (codified as amended at 17 U.S.C. § 1201).

LOC_AR_00009252

legislative history makes clear that, "as is typical with other rulemaking under title 17, and in recognition of the expertise of the Copyright Office," the Office is tasked with conducting the rulemaking.[139]  After Congress passed the bill, a technical correction was made to strike the phrase "on the record" to clarify Congress' intent that the rulemaking be conducted as an informal rulemaking proceeding pursuant to the Administrative Procedure Act ("APA").[140]

### b.  Rulemaking Structure

The statute does not mandate specific processes that the Register must follow, but the legislative history states that Congress' "intent is to permit interested persons an opportunity to participate through the submission of written statements, oral presentations at one or more of the public hearings, and the submission of written responses to the submissions or presentations of others."[141]  Beyond this, the Copyright Office has implemented procedures to help ensure open, fair, and efficient proceedings. While each rulemaking has included written comments from interested parties in response to a notice of inquiry, followed by public hearings, as interest has grown over time, the Office has adjusted its rules regarding public participation in hearings and the timely submission of comments to improve the rulemaking process.

Most relevantly, in the sixth proceeding, the Office adjusted its procedures by inviting interested parties to submit petitions setting forth only the essential elements of proposed exemptions, rather than all pertinent factual and legal information in support of an exemption.[142]  To ensure a clear and definite administrative record, the Office grouped the proposed exemptions into proposed classes and required commenters to provide separate submissions for each proposed class.  The Office divided these separate comment submissions into three rounds, where the first and third rounds were limited

---

[139] H.R. REP. NO. 105-796, at 64 (1998) (Conf. Rep.) ("It is the intention of the conferees that . . . the Register of Copyrights will conduct the rulemaking, including providing notice of the rulemaking, seeking comments from the public, consulting with the Assistant Secretary for Communications and Information of the Department of Commerce and any other agencies that are deemed appropriate, and recommending final regulations in the report to the Librarian."); *see also* H.R. REP. NO. 106-464, at 149 (1999) (Conf. Rep.) ("[T]he Copyright Office shall conduct the rulemaking under section 1201(a)(1)(C) . . . .").

[140] Intellectual Property and Communications Omnibus Reform Act of 1999, Pub. L. No. 106-113, app. I, tit. V, § 5006, 113 Stat. 1501, 1501A–594 (1999); H.R. REP. NO. 106-464, at 149 (1999) (Conf. Rep.) ("[T]he Copyright Office shall conduct the rulemaking under section 1201(a)(1)(C) as an informal rulemaking proceeding pursuant to section 553 of Title 5.").

[141] H.R. REP. NO. 106-464, at 149 (1999) (Conf. Rep.).

[142] 2015 Recommendation at 19.

LOC_AR_00009253

to those supporting an exemption (or neutral commenters sharing pertinent information about a specific proposal) and the second round to those opposing an exemption.[143]

### c. Public Interest in Rulemaking

Since the first rulemaking commenced in 1999, a wide variety of stakeholders have expressed continual interest in the triennial proceedings. While the first rulemaking garnered 392 comments, the number has increased exponentially in recent years to nearly 40,000 comments in the last rulemaking.



As public interest has grown, so too have the number of granted exemptions. In the first rulemaking, the Office recommended only two exemptions, for lists of websites blocked by filtering software applications, and literary works (including computer programs) protected by TPMs that fail to permit access due to malfunction, damage, or obsoleteness.[144] In contrast, the most recent rulemaking yielded a set of exemptions covering 22 types of uses, ranging from use of motion pictures for educational, documentary, and noncommercial purposes and jailbreaking and unlocking smartphones, tablets, and other devices, to accessing computer programs controlling motorized land vehicles for purposes of diagnosis, repair, and modification and

---

[143] *Id.* at 21–22.

[144] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 65 Fed. Reg. 64,556, 64,574 (Oct. 27, 2000) ("2000 Recommendation and Final Rule").

LOC_AR_00009254

accessing computer programs operating medical devices for purposes of security research.[145]

### d. Evidentiary Standards

In conducting the triennial rulemaking, the Copyright Office has applied certain evidentiary standards that emanate from the statute itself, as well as the legislative history.

*Classes of Works.*  Exemptions adopted through the triennial rulemaking only apply to "users of a copyrighted work which is in a particular class of works."[146]  As a starting point, each class of works must be a subset of one of the "broad categories of works . . . identified in section 102 [of title 17]."[147]  The Office then further refines classes by other criteria, including TPMs used, distribution platforms, and, in particular, types of uses or users.[148]  For example, in the most recent rulemaking, one proposed class was "software in 3D printers."[149]

*Burden of Proof.*  The Office consistently has placed the burden of proof on the proponent of an exemption to make the case for why it should be granted.[150]  This burden must be satisfied by a preponderance of the evidence (*i.e.*, that the harm alleged by an exemption proponent is more likely than not to be true).[151]

*No Presumption of Renewal.*  The Commerce Committee Report states that "the assessment of adverse impacts on particular categories of works is to be determined de novo."[152]  The Office has interpreted this statement to mean that "the fact that an exemption has been previously adopted creates no presumption that readoption is

---

[145] 2015 Recommendation at 57.

[146] 17 U.S.C. § 1201(a)(1)(B); *see also id.* § 1201(a)(1)(C) (adverse effects inquiry should consider a user's ability to make noninfringing uses of "a particular class of copyrighted works").

[147] COMMERCE COMMITTEE REPORT at 38.  Section 102(a) states that "[w]orks of authorship include the following categories: (1) literary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works."  17 U.S.C. § 102(a).

[148] *See, e.g.*, 2015 Recommendation at 17–18.

[149] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 79 Fed. Reg. 73,856, 73,871 (Dec. 12, 2014) ("2015 NPRM").

[150] *See, e.g.*, 2015 Recommendation at 13–14 & n.48; 2000 Recommendation and Final Rule at 64,558 (quoting COMMERCE COMMITTEE REPORT at 37).

[151] *See, e.g.*, 2015 Recommendation at 13–14.

[152] COMMERCE COMMITTEE REPORT at 37.

LOC_AR_00009255

appropriate," explaining that "a proponent may not simply rely on the fact that the Register has recommended an exemption in the past, but must instead produce relevant evidence in each rulemaking to justify the continuation of the exemption."[153]  On the other hand, the Office has noted that proponents "seeking the readoption of an existing exemption" may satisfy this burden "by demonstrating that the conditions that led to the adoption of the prior exemption continue to exist today."[154]  Additionally, the Office has stated that "where a legal analysis has previously been developed and no new law or arguments have been presented, the earlier legal determination can serve to support a renewed exemption, provided that the evidence in the present record supports it."[155]

*Adverse Effects on Noninfringing Uses.*  To adopt an exemption, section 1201(a)(1)(C) requires a determination "[that] persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses under [title 17] of a particular class of copyrighted works."[156]  The Office has viewed this as requiring exemption proponents to demonstrate two separate elements:  "(1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an adverse impact on

---

[153] 2015 Recommendation at 14; *see also* Register of Copyrights, Section 1201 Rulemaking:  Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 2, 6 (2012) ("2012 Recommendation"); Recommendation of the Register of Copyrights in RM 2008-8, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 18 (2010) ("2010 Recommendation"); Recommendation of the Register of Copyrights in RM 2005-11, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 8–9 (2006) ("2006 Recommendation"); Recommendation of the Register of Copyrights in RM 2002-4, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 11 (Oct. 27, 2003) ("2003 Recommendation").

[154] 2015 Recommendation at 14 ("This could include, for instance, a showing that the cessation of an exemption will adversely impact users' ability to make noninfringing uses of the class of works covered by the existing exemption.").

[155] *Id.* at 188 (internal quotation marks omitted); *see also* 2010 Recommendation at 115 ("[T]he Register's prior determinations have some precedential value and, unless persuaded otherwise, the Register is likely to reach a similar conclusion *when similar facts have been presented*.").

[156] 17 U.S.C. § 1201(a)(1)(C); *see also id.* § 1201(a)(1)(B) ("The prohibition [on circumvention] shall not apply to persons who are users of a copyrighted work which is in a particular class of works, if such persons are, or are likely to be in the succeeding 3-year period, adversely affected by virtue of such prohibition in their ability to make noninfringing uses of that particular class of works under [title 17], as determined under subparagraph (C).").

LOC_AR_00009256

those uses."[157]  In determining whether a use is likely noninfringing, the Office has stated that "[t]he statutory language requires that the use *is* or *is likely* to be noninfringing, not merely that the use might plausibly be considered noninfringing."[158]  The Office "will look to the Copyright Act and relevant judicial precedents when analyzing whether a proposed use is likely to be noninfringing," but the lack of any controlling precedent directly on point does not, in itself, require a finding that the use is not noninfringing.[159]

The legislative history provides significant detail concerning how to determine whether a sufficient showing of adverse effects has been made.[160]  Throughout the six rulemakings, the Office has equated the House Manager's Report's characterization of the necessary showing being one of "substantial adverse impact" or "substantial diminution of [the availability of works in the marketplace for noninfringing uses]," to the standard articulated by the Commerce Committee, that "the rulemaking proceeding should focus on distinct verifiable and measurable impacts" and "not . . . *de minimis* impacts."[161]  The Office has explained that "[s]tating that there is a requirement of 'substantial' adverse impact is another way of saying that a showing of more than 'de minimis impacts' is required."[162]  Likely adverse impacts must be more than speculative or theoretical harms, and the Office has noted the House Manager's Report statement that "mere inconveniences, or individual cases . . . do not rise to the level of a substantial adverse impact."[163]  The Office has also noted the report's statement that "the determination should be based upon anticipated, rather than actual, adverse impacts, only in extraordinary circumstances in which the evidence of likelihood of future adverse impact during that time period is highly specific, strong, and persuasive."[164]  Thus, the Office evaluates whether there are adverse effects on noninfringing uses based

---

[157] 2015 Recommendation at 14–15; 2012 Recommendation at 7.

[158] 2015 Recommendation at 15 (citing 17 U.S.C. § 1201(a)(1)(C)); *see also* 2012 Recommendation at 7; 2010 Recommendation at 11–12.

[159] 2015 Recommendation at 15; 2012 Recommendation at 7; 2010 Recommendation at 12.

[160] *See* COMMERCE COMMITTEE REPORT at 36–38; HOUSE MANAGER'S REPORT at 6–7.

[161] COMMERCE COMMITTEE REPORT at 37; HOUSE MANAGER'S REPORT at 6; *see also* 2012 Recommendation at 7; 2010 Recommendation at 10; 2006 Recommendation at 8; 2003 Recommendation at 16–18; 2000 Recommendation and Final Rule at 64,558 n.4.

[162] 2003 Recommendation at 16–17; *see also* 2012 Recommendation at 7; 2010 Recommendation at 10; 2006 Recommendation at 8.

[163] HOUSE MANAGER'S REPORT at 6; *see also* 2012 Recommendation at 8 & n.37; 2003 Recommendation at 17.

[164] HOUSE MANAGER'S REPORT at 6.

LOC_AR_00009257

"on the totality of the evidence, including market alternatives to circumvention that enable noninfringing uses."[165]

*Statutory Factors.* The statute sets forth a list of factors that must be examined during the rulemaking,[166] and the Office has characterized these factors as delineating the "nature of the inquiry for the rulemaking process as a whole"[167] and "reflect[ing] some of the significant considerations that must be balanced" in reaching a determination to grant or deny an exemption.[168] As explained in the first proceeding, "[u]ltimately, the task [of the] rulemaking proceeding is to balance the benefits of technological measures that control access to copyrighted works against the harm caused to users of those works, and to determine, with respect to any particular class of works, whether an exemption is warranted because users of that class of works have suffered significant harm in their ability to engage in noninfringing uses."[169]

While the first four factors are more circumscribed and echo other provisions in the Copyright Act,[170] the fifth factor has been described as a "'catchall' provision."[171] By way of example, the Register, NTIA, and the Librarian have previously considered such additional issues as interoperability, consumer choice, competition, and cybersecurity under this factor.[172] In the sixth rulemaking, in connection with petitions to exempt new circumvention activities relating to vehicles, security research, and medical and other consumer devices, participants submitted comments raising a wide variety of significant safety, security, environmental, and health concerns under the fifth factor.[173] While noting "this rulemaking is principally focused on the copyright concerns implicated by any proposed exemption," due to the "serious policy concerns" raised in discussion of these classes, the Register recommended, and the Librarian adopted, a delayed

---

[165] 2010 Recommendation at 13.

[166] 17 U.S.C. § 1201(a)(1)(C).

[167] 2006 Recommendation at 5; 2003 Recommendation at 6.

[168] 2000 Recommendation and Final Rule at 64,563; *see also* 2012 Recommendation at 9; 2010 Recommendation at 7; 2003 Recommendation at 6.

[169] 2000 Recommendation and Final Rule at 64,563.

[170] *See, e.g.*, 17 U.S.C. § 108 (limitation on exclusive rights for uses by libraries or archives); *id.* § 107 (providing that the fair use of a work for "purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright" and directing consideration of "the effect of the use upon the potential market for or value of the copyrighted work").

[171] 2015 Recommendation at 311.

[172] *See, e.g., id.* at 168; 2010 Recommendation at 205; 2006 Recommendation at 52.

[173] *See* 2015 Recommendation at 241–44, 311–15.

LOC_AR_00009258

implementation of twelve months for these exemptions so that other regulatory agencies with expertise in these relevant areas could take action if necessary.[174]

## C. Case Law Developments

Several aspects of section 1201 have been the subject of litigation over the past two decades. Many of these cases have addressed the meaning and scope of the protections for access controls under section 1201(a), while others have considered the anti-trafficking provisions, permanent exemptions, and constitutional issues.

Although the United States has consistently interpreted section 1201 as creating a cause of action separate and independent from copyright infringement, courts construing the statute to date have divided over its relationship to the traditional rights of copyright owners. There currently is a circuit split as to whether a violation of the access-control provisions under section 1201(a) requires a "nexus" to infringement—*i.e.*, that the circumvention be done for the purpose of, or otherwise relate to, infringing an exclusive right under section 106 of the Copyright Act. This issue has particular significance in the context of copyrighted computer programs embedded in everyday consumer products.

In 2004, the Federal Circuit held in *Chamberlain Group, Inc. v. Skylink Technologies, Inc.* that there must be a "reasonable relationship" between the access gained by the circumvention and the protections conferred by section 106.[175] Chamberlain's garage door openers contained copyrighted software controlling operation of the motor. The software included a "rolling code," which prevented the system from activating unless it received a signal from an authorized transmitter.[176] Chamberlain alleged that Skylink's manufacture and sale of "universal transmitters," which circumvented the rolling code and accessed the copyrighted software, violated the anti-trafficking provisions of section 1201(a)(2).[177] The court, however, rejected that claim, holding that section 1201 did not create a new property right, but rather, "introduce[d] new grounds for liability in the context of the unauthorized access of copyrighted material."[178] The court further stated that "circumvention *is not* a new form of infringement but rather a new violation prohibiting actions or products that facilitate infringement."[179] The court also expressed

---

[174] *See id.* at 248, 317–18 ("The Register also recommends a delay of twelve months before the exemption goes into effect to allow other agencies with expertise in vehicle safety, environmental issues, and other relevant areas an opportunity to consider and react to the new rule.").

[175] 381 F.3d 1178, 1202 (Fed. Cir. 2004).

[176] *Id.* at 1183.

[177] *Id.* at 1186–87.

[178] *Id.* at 1192, 1194.

[179] *Id.* at 1197.

LOC_AR_00009259

policy concerns, including the view that without an infringement nexus requirement, section 1201(a) would result in anticompetitive conduct unrelated to copyright concerns.[180]  The court ultimately held that the Copyright Act granted consumers "the right to use the copy of Chamberlain's embedded software that they purchased" and, therefore, in the absence of copyright infringement or facilitating copyright infringement, the defendant could not be liable for a section 1201(a)(2) trafficking violation.[181]

In 2010, the Fifth Circuit in *MGE UPS Systems, Inc. v. GE Consumer & Industrial, Inc.*, relied on *Chamberlain* to conclude that "[t]he DMCA prohibits only forms of access that would violate or impinge on the protections that the Copyright Act otherwise affords copyright owners."[182]  The United States, however, urged rehearing on the ground that that construction was "inconsistent with the text, structure, and legislative history of the DMCA."[183]  Such a reading, the United States argued, "threatens to frustrate Congress's purpose in section 1201(a)(1), which was to provide a federal prohibition against bypassing passwords, encryption, and other technologies that regulate access to a copyrighted work in circumstances in which the copyright owner would *not* otherwise have a remedy under the Copyright Act."[184]  The court subsequently withdrew its opinion and substituted an opinion omitting the challenged portion of the original.[185]

Later that year, the Ninth Circuit expressly declined to follow *Chamberlain* and instead rejected a nexus requirement as "contrary to the plain language of the statute."[186]  In *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, the court held MDY liable under section 1201(a)(2) for trafficking in technology in the form of a self-playing bot, which was designed to circumvent a technological control on a video game sold by Blizzard.[187]  In rejecting the reasoning of *Chamberlain*, the Ninth Circuit looked to both the statutory text and its legislative history.  Among other textual considerations, the court noted that section 1201(a) refers to technological measures protecting access to "a work protected under this title," while section 1201(b) refers to measures protecting "a right of a

---

[180] *Id.* at 1200–01.

[181] *Id.* at 1203–04.

[182] 612 F.3d 760, 765 (5th Cir. 2010) (citing *Chamberlain*, 381 F.3d at 1202).

[183] Brief for the United States as Amicus Curiae Supporting Rehearing at 3, *MGE UPS Sys., Inc. v. GE Consumer and Indus., Inc.*, 622 F.3d 361 (5th Cir. 2010) (No. 08-10521).

[184] *Id.*

[185] *MGE UPS Sys., Inc. v. GE Consumer and Indus., Inc.*, 622 F.3d 361, 363 (5th Cir. 2010).

[186] *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 950 (9th Cir. 2010).

[187] *Id.* at 954.

LOC_AR_00009260

copyright owner under this title."[188]  The court read this distinction to indicate that Congress intended section 1201(a) to "extend[] a new form of protection, i.e., the right to prevent circumvention of access controls, broadly to . . . copyrighted works."[189]  Section 1201(b), meanwhile, was intended "to reinforce copyright owners' traditional exclusive rights under § 106 by granting them an additional cause of action against those who traffic in circumventing devices that facilitate infringement."[190]

With respect to legislative history, the court highlighted the Senate Judiciary Committee's statement that it would violate section 1201(a) to bypass a password to access a copyrighted work—an act that the court said "would not infringe on any of the copyright owner's exclusive rights under § 106."[191]  The court acknowledged the policy concerns that the *Chamberlain* court discussed, but found those concerns to be overstated and that, in any event, they could not trump the statute's plain language and structure.[192]

The Sixth Circuit also has considered section 1201(a), but resolved the case before it on a separate question, holding that a TPM on software controlling printer functionality was not an access control as contemplated by section 1201.[193]  In *Lexmark International, Inc. v. Static Control Components, Inc.*, Lexmark brought section 1201(a)(2) claims against the manufacturer of a microchip used to make third-party toner cartridges compatible with Lexmark printers.  The microchip accomplished this by satisfying an authentication sequence used to prevent the printer's software from operating with non-authorized cartridges.[194]  The court rejected Lexmark's claims, holding that because a purchaser of the printer could read the relevant code directly from the printer memory without circumventing the authentication sequence, there was no effective technological measure controlling access to the program.[195]  The court emphasized that its decision did not turn on "the *degree* to which a measure controls access to a work," noting that an access control need not amount to an "impervious shield" to be "effective[]" under the statute.[196]  Instead, its decision was based "on the textual requirement that the

---

[188] *Id*. at 944–45.

[189] *Id.* at 945.

[190] *Id.*

[191] *Id.* at 947 (citing SENATE JUDICIARY COMMITTEE REPORT at 12).

[192] *MDY*, 629 F.3d at 950–51.

[193] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 546–47, 549 (6th Cir. 2004).

[194] *Id.* at 530–31.

[195] *Id.* at 547 ("Just as one would not say that a lock on the back door of a house 'controls access' to a house whose front door does not contain a lock . . . it does not make sense to say that this provision of the DMCA applies to otherwise-readily accessible copyrighted works.").

[196] *Id.* at 549.

LOC_AR_00009261

challenged circumvention device must indeed circumvent *something*, which did not happen with the Printer Engine Program."[197]

Turning to other enforcement efforts, in *Universal City Studios v. Reimerdes*, film studios brought suit to enjoin websites from posting or linking to a computer program, DeCSS, that circumvented an encryption system, CSS, employed to prohibit access to motion pictures contained on DVDs.[198] The district court examined a number of issues, including whether CSS effectively controlled access to copyrighted works,[199] whether DeCSS was designed primarily to circumvent CSS,[200] whether linking could constitute trafficking,[201] whether any statutory exemptions or the fair use doctrine applied,[202] and whether section 1201, as applied to posting and linking to DeCSS, was in violation of the First Amendment.[203] In the end, the court upheld the statute and found that the defendants' activities violated the anti-trafficking provisions of section 1201.[204] On appeal, the Second Circuit, focusing on the constitutional challenges, affirmed.[205] Notably, in disposing of the defendants' argument that section 1201 effectively eliminated fair use, the court, among other points, stated that "[f]air use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original."[206]

Additionally, after the Office commenced this study, past rulemaking participants including the Electronic Frontier Foundation ("EFF") filed a lawsuit challenging the constitutionality of section 1201(a) and (b) on First Amendment grounds and under the

---

[197] *Id.* In a separate concurrence, Judge Merritt advocated a reading similar to that adopted in *Chamberlain*. Citing section 1201(a)(2)'s reference to circumvention technology "primarily designed or produced for the purpose of circumventing," he argued that the statute was intended to reach only "those who circumvented protective measures 'for the purpose' of pirating works protected by the copyright statute" and that "[u]nless a plaintiff can show that a defendant circumvented protective measures for such a purpose, its claim should not be allowed to go forward." *Id.* at 551–52 (Merritt, J., concurring) (citing 17 U.S.C. § 1201(a)(2)).

[198] *Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 303 (S.D.N.Y. 2000), *judgment entered*, 111 F. Supp. 2d 346 (S.D.N.Y. 2000), *aff'd sub nom. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

[199] *Reimerdes*, 111 F. Supp. 2d at 317–18.

[200] *Id.* at 318–19.

[201] *Id.* at 324–25.

[202] *Id.* at 319–24.

[203] *Id.* at 325–41.

[204] *Id.* at 317–25, 346.

[205] *Corley*, 273 F.3d at 434–35.

[206] *Id.* at 459.

LOC_AR_00009262

**Section 1201 of Title 17**

APA.[207]  That lawsuit remains pending as the court considers a motion to dismiss the complaint filed by the Department of Justice.

## D. Unlocking Consumer Choice and Wireless Competition Act

In addition to case law, there also has been a recent legislative change to section 1201.  In 2014, in response to public calls for a broader exemption to allow the circumvention of technological measures controlling access to computer programs that allow wireless telephone handsets to connect to wireless communication networks ("cellphone unlocking"),[208] Congress passed the Unlocking Consumer Choice and Wireless Competition Act ("Unlocking Act").[209]  The Unlocking Act reinstated the cellphone unlocking exemption adopted by the Librarian in 2010,[210] replacing the narrower version adopted in 2012,[211] and directed the Librarian to consider in the 2015 rulemaking whether to "extend" the exemption "to include any other category of wireless devices in addition to wireless telephone handsets."[212]

The Unlocking Act also permanently established that circumvention under any exemption to permit a wireless telephone handset or other wireless device to connect to a different telecommunications network may be initiated by the owner of the handset or device, "by another person at the direction of the owner, or by a provider of a

---

[207] *See* Compl. for Declaratory and Injunctive Relief, *Green v. Lynch*, No. 16-cv-1492 (D.D.C. July 21, 2016), ECF No. 1.

[208] *See* Ezra Mechaber, *Here's How Cell Phone Unlocking Became Legal*, THE WHITE HOUSE: PRESIDENT BARACK OBAMA (Aug. 15, 2014), https://obamawhitehouse.archives.gov/blog/2014/08/15/heres-how-cell-phone-unlocking-became-legal.

[209] Pub. L. No. 113-144, 128 Stat. 1751 (2014).  Subsequently, the Librarian adopted regulatory amendments to reflect the new legislation.  Exemption to Prohibition on Circumvention of Copyright Protection Systems for Wireless Telephone Handsets, 79 Fed. Reg. 50,552 (Aug. 25, 2014).

[210] *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 75 Fed. Reg. 43,825, 43,828–32 (July 27, 2010) ("2010 Final Rule").

[211] *See* Unlocking Act § 2(a), 128 Stat. at 1751.  Based on the insufficient record in the 2012 rulemaking proceeding, the Librarian permitted the unlocking of older, or "legacy" phones, but did not extend the exemption with respect to new phones acquired 90 days after the rule went into effect.  Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 77 Fed. Reg. 65,260, 65,264–66 (Oct. 26, 2012) ("2012 Final Rule").

[212] Unlocking Act § 2(b), 128 Stat. at 1751.  On the Register's recommendation, the Librarian granted additional exemptions for tablets and other types of wireless devices in the 2015 proceeding.  *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 80 Fed. Reg. 65,944, 65,952, 65,962–63 (Oct. 28, 2015) ("2015 Final Rule").

34

commercial mobile radio service or a commercial mobile data service at the direction of such owner or other person," so long as the purpose is to enable the owner or a family member to connect to a wireless network in an authorized manner.[213]

## E. *International Obligations*

Beyond the WIPO Internet Treaties discussed above, multiple free trade agreements ("FTA"s) to which the United States is a party require signatory countries to provide legal protections against both circumvention conduct and trafficking.[214] Several of these agreements require that a violation of such a protection constitute a separate cause of action that is independent of any infringement that might occur under the party's copyright law.[215] All but two address the adoption of exceptions and limitations to such protections, and most contain language providing that contracting parties "shall confine" exceptions and limitations to a list of specified activities. That list tracks the current U.S. statutory framework; it includes the categories covered by the permanent exemptions under section 1201(d)–(j), as well as temporary exemptions to the anticircumvention provision that are adopted in a legislative or administrative proceeding.[216]

More recently, the Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled ("Marrakesh Treaty") seeks to guarantee appropriate limitations on member states' anticircumvention provisions. It requires contracting parties to "take appropriate measures, as necessary," to ensure that any legal protection they establish for TPMs does not prevent enjoyment of the copyright exceptions and limitations provided for in the treaty, which include permitting the reproduction, distribution, and making available of works in formats accessible to print-disabled persons, as well as the cross-border exchange of such works.[217] The United States is a signatory to the treaty, which entered into force in September 2016,[218] but it has not yet been ratified by the Senate.

---

[213] Unlocking Act § 2(c), 128 Stat. at 1751–52; *see also* 37 C.F.R. § 201.40(b)(3) (2012).

[214] *See, e.g.*, United States-Korea Free Trade Agreement, U.S.-S. Kor., art. 18.4.7, June 30, 2007, 46 I.L.M. 642 ("KORUS FTA"); United States-Panama Trade Promotion Agreement, U.S.-Pan., art. 15.5.7, June 28, 2007 ("Panama TPA").

[215] *See, e.g.*, KORUS FTA, art. 18.4.7(c); Panama TPA, art. 15.5.7(c).

[216] *See, e.g.*, KORUS FTA, art. 18.4.7(d), (e) (allowing temporary exemptions "when an actual or likely adverse impact on those noninfringing uses" is demonstrated in a proceeding).

[217] Marrakesh Treaty, art. 7, June 27, 2013, 52 I.L.M. 1312.

[218] *Marrakesh Notification No. 21*, WIPO (Sept. 30, 2016), http://www.wipo.int/treaties/en/notifications/marrakesh/treaty_marrakesh_21.html.

LOC_AR_00009264

# III.   PROPOSED STATUTORY REFORM

Stakeholders suggested a number of potential statutory reforms to section 1201 relating to the overall scope of the protections for access controls, the anti-trafficking provisions, and the permanent exemptions.  The Copyright Office has carefully considered these proposals, as discussed below.  Issues relating to the triennial rulemaking, including potential statutory reforms relating to that process, are discussed separately in section IV.

## A. Scope of Section 1201(a)

Section 1201(a) establishes the statute's protections for access controls, with section 1201(a)(1) barring the act of circumventing such measures and section 1201(a)(2) proscribing trafficking in circumvention devices and services.  In the years since the DMCA's enactment, there has been substantial disagreement over whether the scope of these provisions is properly drawn.  Pointing to the dramatic rise in the number and variety of internet-based content dissemination platforms, copyright owners have argued that section 1201(a) has succeeded in encouraging rightsholders to make their works available to consumers online, as Congress intended.  At the same time, other stakeholders have contended that the statute sweeps in circumvention activities that do not implicate any legitimate copyright interest.  In their view, the result of this overbreadth has been to chill numerous desirable activities, including market competition, free speech, and access to copyrighted works for preservation and educational purposes.

### 1.  Policy Considerations

#### a.  Effect on Marketplace

##### i.   *Development of New Dissemination Models*

Commenters representing creative industries argued that section 1201 has contributed significantly to the explosive growth in legitimate digital content delivery services.  In joint comments, the Association of American Publishers ("AAP"), the Motion Picture Association of America ("MPAA"), and the Recording Industry Association of America ("RIAA") provided several examples of business models developed after the enactment of section 1201 that provide consumers with a variety of flexible options for accessing creative works.  For example, they noted that in the movie and television industries, consumers can now access content on a multitude of devices via services such as Amazon Prime, Hulu, iTunes, and Netflix.[219]  They also cited the development of

---

[219] AAP, MPAA & RIAA Initial Comments at 4–6.

36

numerous services in the music industry—including Apple Music, AmazonMP3, Google Play, Pandora, and Spotify—that have resulted in a significant increase in digital dissemination of music through authorized platforms.[220]  Likewise, the Entertainment Software Association ("ESA") observed that the video game industry has grown exponentially in recent years and that game publishers rely on TPMs to enable distribution through physical media, downloadable files, and live streaming while protecting against infringement.[221]

Other commenters questioned whether section 1201 truly has had a meaningful impact on the copyright marketplace.  Some argued that copyright owners who attribute market benefits to section 1201 "mistake[] correlation for causation" and suggested that "[j]ust because TPMs are important for a particular business model doesn't mean that the TPMs would be ineffective absent legal protection for those TPMs."[222]  A few called into question the importance of TPMs themselves, citing examples of successful digital platforms that disseminate content without such protections.[223]  Some also suggested that section 1201's purported effectiveness is questionable in light of copyright owners' complaints that "online infringement is devastating their industries."[224]

In response, copyright industries argued that the legal protections afforded by section 1201 have played a critical role in their decisions to enter emerging digital markets.  As one entertainment company representative noted, "[w]hen we make decisions about what products to make available in the marketplace, either in the United States or in

---

[220] Id. at 8–9; see also Tr. at 15:05–08 (May 25, 2016) (Chertkof, RIAA) ("It's been well publicized in the music industry that the industry is shifting from an ownership model to an access model and that access is really kind of where all the growth is.").

[221] ESA Initial Comments at 3–5.

[222] Library Copyright Alliance ("LCA") Initial Comments at 2; see also, e.g., Tr. at 20:10–12 (May 25, 2016) (Lerner, Int'l Documentary Ass'n, Film Indep. & Kartemquin Educ. Films ("Joint Filmmakers I")) ("I don't see a correlation between the legal protections of 1201 and the models that [the MPAA] and [RIAA are] talking about . . . .").

[223] See, e.g., EFF Initial Reply Comments at 4 ("For example, music downloads from Apple's iTunes store are unencrypted, as are videos and music streamed from YouTube and Bandcamp. Humble Bundle and Vodo sell games, ebooks, fonts, and other creative content without TPMs."); Tr. at 24:13–17 (May 25, 2016) (Riley, Mozilla) (noting that in the music industry, "user frustration with DRM [digital rights management] led to more and more non-DRM, non-encrypted downloads being made available subject to the same legal prohibitions on redistribution").

[224] Public Knowledge Initial Comments at 1–2; see also Tr. at 20:15–17 (May 25, 2016) (Lerner, Joint Filmmakers I) ("I think it's important to look also at whether 1201 has created a dent in online infringement, and I would argue that it has not.").

LOC_AR_00009266

foreign countries, we're looking at not only the technology that's available . . . but also the efficacy of the legal regime in that space as well."[225]

### ii. Consumer Issues

Notwithstanding these potential market benefits, many stakeholders expressed concern over section 1201's effect on competition and traditional consumer expectations. In their view, efforts to enforce access controls on products such as garage door openers and printer cartridges are aimed not at protecting any copyright interest in those products' operating software, but at excluding competitors from the market for compatible parts and repair services.[226] Such uses, they argued, are far removed from the piracy concerns that Congress had in mind when it enacted section 1201.[227] Some commenters further opined that the use of section 1201 for these purposes is of particular concern at a time when software has become a common feature in all manner of everyday products. As the Consumers Union opined, "[t]hese anti-consumer effects will take on a new, breathtaking order of magnitude as more and more consumer products become part of the Internet of Things."[228]

Other commenters expressed a related concern over the statute's effect on consumers' traditional expectation of control over their personal property. In the automotive

---

[225] Tr. at 204:02–08 (May 25, 2016) (Reed, Fox Entm't Grp.); *see also, e.g.*, Tr. at 22:23–25 (May 19, 2016) (Dow, Walt Disney Co.) ("I can tell you that the availability of these legal tools has been directly relevant to the decisions to get into these markets, whether it was the development of AACS as a next-generation standard for the protection of high definition digital content, whether it's the willingness to get into the market for 4K, whether it's the willingness to get into the market for over-the-top television and authenticated television to allow people to do streaming, the DMCA has been a factor in the willingness to engage in all of those things.").

[226] *See, e.g.*, Auto Care Ass'n ("Auto Care") Initial Comments at 2 (stating that *Chamberlain* and *Lexmark* plaintiffs "misue[d] Section 1201 . . . by invoking laws intended to protect copyrighted works for the purpose of locking out competition for non-copyrightable parts and services"); EFF Initial Comments at 6 ("Lawsuits, and the threat of lawsuits, under Section 1201 are often misused for anti-competitive purposes, such as to enforce incompatibility between electronic devices that must interact with one another . . . ."); New America's Open Tech. Inst. ("OTI") Initial Comments at 3–4 ("There are numerous examples of companies using Section 1201 for this type of anti-competitive behavior . . . .") (citing *Lexmark,* 387 F.3d 522, *Chamberlain*, 381 F.3d 1178, and *Datel Holdings, Ltd. v. Microsoft Corp.*, 2010–2 Trade Cas. (CCH) P77, 192 (N.D. Cal. 2010)).

[227] Ctr. for Democracy and Tech. ("CDT") Initial Comments at 2–3; OTI Initial Comments at 3–4.

[228] Consumers Union Initial Comments at 1; *see also* Kernochan Ctr. for Law, Media & the Arts ("Kernochan Center") Initial Comments at 3 ("[I]t is unlikely that [Congress] anticipated the vast range of products now governed by computer programs or the potential for products manufacturers to use the DMCA to control the markets for replacement parts or repair services.").

LOC_AR_00009267

context, for example, consumer groups noted that a large and increasing number of functions in modern vehicles are controlled by onboard computer systems, making it necessary to access those programs to perform various diagnostic, repair, and modification activities.[229] By prohibiting circumvention even for these purposes, they argued, section 1201(a)(1) deters consumers from engaging in activities long understood to be within the scope of their personal property rights.[230]

Few copyright owners disputed that applying section 1201 to activities like these could expand the statute's reach beyond the conduct that Congress intended to target. They argued, however, that this concern is overstated as a practical matter and does not justify legislative change. Several noted that the courts in *Chamberlain* and *Lexmark* ultimately rejected the plaintiffs' attempts to rely on section 1201 to control markets in consumer devices.[231] Beyond that, they argued, the permanent exemptions for reverse engineering, encryption research, and security testing, together with the triennial rulemaking process, adequately accommodate circumvention activities in which there is a substantial consumer interest.[232] One commenter further suggested that the market itself mitigates against anticompetitive uses, citing an example in which a manufacturer backed away

---

[229] *See* 2015 Recommendation at 218 ("As modern vehicles have become more reliant on software to operate, a wide variety of diagnostic, repair and modification activities now require access to and sometimes alteration of those computer programs, including identifying malfunctions, installing replacement parts, and customizing vehicles for specialized uses.") (citing 2015 Rulemaking EFF Vehicle Software – Modification & Repair Pet. at 2, https://www.copyright.gov/ 1201/2014/petitions/Electronic_Frontier_Foundation_3_1201_Initial_Submission_2014.pdf).

[230] *See, e.g.*, Am. Auto. Ass'n ("AAA") Initial Reply Comments at 2 (contending section 1201 interferes with the "do-it-yourself repair and personalization" that is "a critical element of the American car culture"); iFixit Initial Comments at 1–2; Owners' Rights Initiative ("ORI") Initial Comments at 2; Tr. at 34:12–21 (May 19, 2016) (Band, LCA) ("[T]here's no policy reason within the confines of . . . Title 17 for there to be any restrictions on a person's ability to access their own property, their own copies."); *see also* Pamela Samuelson, *Freedom to Tinker* 23, Theoretical Inquires in Law (forthcoming), https://ssrn.com/abstract=2800362 ("Oddly enough, tinkerers who plan to make non-infringing uses of technically protected works are more likely to be deterred by the anti-circumvention laws than those who tinker to infringe.").

[231] *See* ESA Initial Comments at 8 (noting that "the courts have found sufficient flexibility in Section 1201 to address competitive concerns expressed as to cases arising from factual scenarios outside the usual core of copyright protection"); Software & Info. Indus. Ass'n ("SIIA") Initial Comments at 6 (noting that "attempts to apply the DMCA to secondary markets in printer cartridges [*Lexmark*], garage door openers [*Chamberlain*], and similar devices have failed"); Tr. at 69:10–15 (May 25, 2016) (Chertkof, RIAA) ("[S]o far it seems like the courts have gotten it right and so a lot of the worry of the over-reaching seems a little bit like a solution in search of a problem because the courts are coming to the right answers so far.").

[232] *See* ESA Initial Comments at 7–8; SIIA Initial Comments at 6; AAP, MPAA & RIAA Initial Reply Comments at 1.

LOC_AR_00009268

from efforts to use DRM in its coffee makers following "almost universal condemnation" of the proposal, including "consumer complaints and press scrutiny."[233]

Others disagreed, contending that manufacturers continue to employ section 1201(a) as a tool to protect non-copyright-related business interests. Two commenters mentioned that the prepaid wireless service provider TracFone has brought section 1201 actions against companies engaged in the bulk unlocking and resale of its unused handsets.[234] User groups also pointed to statements in the 2015 rulemaking by manufacturers in opposition to proposed exemptions for vehicle repair[235] and the use of third-party feedstock for 3D printers.[236] Such statements, EFF argued, "suggest that . . . anti-competitive misuse of the statute will continue."[237]

### b. Effect on Speech

Some commenters argued that section 1201(a) burdens their ability to utilize copyrighted works for purposes of criticism, commentary, or other speech protected under the fair use doctrine. They expressed particular concern over this effect in the context of "merged" access and copy controls, or TPMs that serve the dual function of restricting access to a work and preventing acts within the copyright owner's exclusive rights, such as copying. For example, the Content Scramble System ("CSS"), which is used to encrypt material on DVDs, both controls access to works—by requiring the use of an appropriately configured player or computer drive to decrypt and play back the content—and prevents them from being copied.[238]

---

[233] Tr. at 81:09–12 (May 25, 2016) (Sheffner, MPAA); *see also* Alex Hern, *Keurig Takes Steps Towards Abandoning Coffee-Pod DRM*, The Guardian (May 11, 2015), https://www.theguardian.com/technology/2015/may/11/keurig-takes-steps-towards-abandoning-coffee-pod-drm.

[234] Inst. of Scrap Recycling Indus., Inc. ("ISRI") Initial Comments at 5; EFF Additional Comments at 3–4 (citing *TracFone Wireless v. GSM Group*, 555 F. Supp. 2d 1331 (S.D. Fla. 2008)).

[235] EFF Initial Comments at 6 & n.24 (citing 2015 Rulemaking Eaton Corp. Class 21 Opp'n at 2, https://www.copyright.gov/1201/2015/comments-032715/class%2021/Eaton_Corporation_Class21_1201_2014.pdf, 2015 Rulemaking Ass'n of Global Automakers Class 21 Opp'n at 7, and 2015 Rulemaking John Deere Class 21 Opp'n at 4, https://www.copyright.gov/1201/2015/comments-032715/class%2021/John_Deere_Class21_1201_2014.pdf).

[236] Tr. at 75:23–76:05 (May 19, 2016) (Panjwani, Public Knowledge); *see also* 2015 Rulemaking Stratasys, Ltd., Class 25 Opp'n, https://www.copyright.gov/1201/2015/comments-032715/class%2026/STRATASYS_Class26_1201_2014.pdf.

[237] EFF Initial Comments at 6.

[238] *See, e.g., Reimerdes*, 111 F. Supp. 2d at 308 ("CSS . . . is an access control and copy prevention system for DVDs . . . .").

LOC_AR_00009269

These commenters reported that copyright owners employ merged TPMs to make it unlawful for users to engage in circumvention for purposes of making copies of works to which they already have lawful access, even where the copying constitutes fair use. Documentary filmmakers, for example, noted that they "have sought not to circumvent access controls in the sense of a password or control that affects playback, but to make copies in order to engage in a lawful use."[239]  In the view of these groups, the use of merged TPMs thwarts Congress' determination that the act of circumventing a copy control should remain permissible.[240]

### c.  Effect on Library, Archival, and Educational Activities

Representatives of libraries, archives, and educational institutions contended that section 1201(a) impedes circumvention activities that are central to their public service missions, notwithstanding the express exemption of certain activities by such entities in section 1201(d).  Library groups noted that their work increasingly involves the preservation of "born digital" materials (*e.g.*, video games) stored in older computer formats.  MIT Libraries, MIT Press, and the MIT Office of Digital Learning (collectively, "MIT") stated that "when using widely deployed tools for copying digital media" for use in such programs, "it is often very difficult to detect whether technological protection measures . . . exist, so it is not always clear when one could be violating the DMCA."[241]  Similarly, a group of higher education associations reported that this uncertainty has led online education providers to forego use of materials that they otherwise would have made available to students.[242]

---

[239] Joint Filmmakers I Initial Comments at 16; *see also* Org. for Transformative Works ("OTW") Initial Comments at 5 ("Remixers . . . don't circumvent to get access they would otherwise lack; they circumvent so that they can make short clips for their communicative purposes . . . .").

[240] *See, e.g.*, Joint Filmmakers I Initial Comments at 16 ("Such controls allow rightsholders to undermine Congress's statutory scheme, because by simply combining use controls with access controls, they can prevent other users from making lawful use of a work."); Tr. at 138:06–11 (May 19, 2016) (Tushnet, OTW) ("So I think we have to recognize that at this point, access and rights controls have been merged by actors making strategic use of 1201 so that the balance that Congress did intend in distinguishing access from rights controls is now gone."); Tr. at 43:03–07 (May 19, 2016) (Panjwani, Public Knowledge).

[241] MIT Initial Comments at 3.

[242] Ass'n of Am. Univs., the Am. Council on Educ., the Ass'n of Pub. and Land-Grant Univs. & EDUCAUSE ("AAU, ACE, APLU & EDUCAUSE") Initial Comments at 8; *see also* MIT Initial Comments at 3 ("Although it is difficult to quantify missed opportunities, at MIT we have had to set aside materials from educational sharing due to the ambiguities regarding the existence of TPMs and, for faculty and researchers, the threat of criminal penalty looming over even the best-intended and well-informed use of digital media.").

LOC_AR_00009270

## 2. Proposed Changes

### a. Statutory Nexus Requirement

Many commenters argued that the simplest and most effective way to address the foregoing concerns would be for Congress to amend section 1201(a) to expressly require a nexus between circumvention of an access control and copyright infringement.[243]  This approach essentially would codify the Federal Circuit's holding in *Chamberlain*—that the statute "prohibits only forms of access that bear a reasonable relationship to the protections that the Copyright Act otherwise affords copyright owners."[244]  One specific proposal to implement such a requirement is the Unlocking Technology Act, a bill introduced in recent Congresses.[245]  It would provide that it is not a violation of section 1201 to circumvent an access control "if the purpose of such circumvention is to engage in a use that is not an infringement of copyright under this title."[246]  Supporters contended that this categorical approach "would eliminate the need for" statutory or regulatory exemptions for specific lawful uses, "whether for repair, for security research, for fair uses, or for accessibility."[247]

The Copyright Office shares the concern that section 1201(a)'s protections for access controls have the potential to implicate activities far outside the traditional scope of copyright law.[248]  The Office does not, however, believe enacting an infringement nexus requirement to be advisable, as it could severely weaken the right of copyright owners

---

[243] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 13; EFF Initial Comments at 2–3; Public Knowledge Additional Comments at 1.

[244] *Chamberlain*, 381 F.3d at 1202.  As noted, the United States disagrees with that construction of section 1201(a).  *See supra* p. 31.

[245] Unlocking Technology Act of 2015, H.R. 1587, 114th Cong. (2015); Unlocking Technology Act of 2013, H.R. 1892, 113th Cong. (2013).

[246] Unlocking Technology Act of 2015, H.R. 1587, 114th Cong. § 2(a)(1)(B) (2015); Unlocking Technology Act of 2013, H.R. 1892, 113th Cong. § 2(a)(1)(B) (2013).

[247] Public Knowledge Additional Comments at 1; *accord* Univ. of Va. Libraries Initial Comments at 2; EFF Additional Comments at 2; Repair Ass'n & iFixit Additional Comments at 5.

[248] *See* 2015 Recommendation at 2 ("While it is clear that section 1201 has played a critical role in the development of secure platforms for the digital distribution of copyrighted works, it is also the case that the prohibition on circumvention impacts a wide range of consumer activities that have little to do with the consumption of creative content or the core concerns of copyright."); *Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 29–30 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office) ("[C]onsumers have voiced discomfort that Section 1201 prevents them from engaging in activities, such as the repair of their automobiles and farm equipment, which previously had no implications under copyright law.").

LOC_AR_00009271

to exercise meaningful control over the terms of access to their works online—a right that both Congress and the Executive Branch have properly recognized as essential to the development of the digital marketplace for creative content.

In adopting section 1201(a), Congress intended to provide copyright owners with a new and independent right to prohibit the circumvention of TPMs used to prevent unauthorized access to their works. The legislative history explains that section 1201(a) was designed to protect "the copyright owner's right to control access to his or her copyrighted work,"[249] and that that right was meant to be "distinct" from "the traditional copyright rights of the copyright owner" under section 106.[250] The latter rights received protection not from section 1201(a) but from section 1201(b)'s prohibition on trafficking in devices and services primarily designed to circumvent copy controls.[251] Underscoring this distinction, the House Judiciary Committee Report analogizes a section 1201(a)(1) violation to the act of "breaking into a locked room in order to obtain a copy of a book."[252] As the Ninth Circuit in *MDY* correctly observed, "breaking into a locked room in order to read or view a copyrighted work would not infringe on any of the copyright owner's exclusive rights under § 106,"[253] as it would not necessarily involve an unauthorized reproduction, distribution, public performance or display, or derivative use of the work.[254] The legislative history thus illustrates Congress' deliberate decision to make a section 1201(a)(1) violation complete upon circumvention of an access control, regardless of whether the circumventing party has committed or intends to commit an act that would infringe copyright. In the words of the Department of Justice in opposing a nexus requirement on behalf of the United States, "[t]he entire point of that provision was to provide a federal prohibition against bypassing passwords, encryption, and other technologies that regulate access to a copyrighted work in circumstances in which the act of obtaining access would not by itself violate the copyright laws."[255]

Congress created this independent anticircumvention right for two principal reasons. First, it determined that such a right was required by the WIPO Internet Treaties. The

---

[249] SENATE JUDICIARY COMMITTEE REPORT at 28 (1998).

[250] *Id.* at 12.

[251] *Id.*

[252] HOUSE JUDICIARY COMMITTEE REPORT at 17; *see also* SENATE JUDICIARY COMMITTEE REPORT at 11 (describing the prohibition as "roughly analogous to making it illegal to break into a house using a tool, the primary purpose of which is to break into houses").

[253] *MDY*, 629 F.3d at 947.

[254] *See* 17 U.S.C. § 106.

[255] Brief for the United States as Amicus Curiae Supporting Rehearing at 8–9, *MGE*, 622 F.3d 361 (No. 08–10521).

LOC_AR_00009272

DMCA's legislative history clearly indicates Congress' view that compliance with the treaties would require adopting a prohibition on the act of circumventing access controls—conduct that was not previously unlawful under U.S. law.[256]  And as noted, Congress understood that activity to include circumventions lacking a nexus to infringement.

Second, as noted above, Congress recognized that the growth of the digital marketplace depends on copyright owners having the ability to enforce the terms they establish for online access to their works.[257]  In particular, Congress sought to facilitate the development of online content delivery platforms in which the consumer pays for *access* to copyrighted material rather than for possession of a copy.[258]  Section 1201(a) reflects Congress' understanding that such models will succeed only if copyright owners have the legal right to prohibit persons from evading electronic paywalls or other technical measures used to limit access to users who satisfy the rightsholder's specified terms.[259]  It also indicates Congress' recognition that in the online context, unauthorized access by itself poses a significant threat to the value of copyrighted works.

This understanding has been repeatedly endorsed by successive Administrations and subsequent Congresses.  The United States has concluded—and Congress has ratified[260]—several FTAs with other nations expressly requiring that a violation of a TPM

---

[256] *See supra* pp. 8–9.

[257] SENATE JUDICIARY COMMITTEE REPORT at 8; *see also* Brief for the United States as Amicus Curiae Supporting Rehearing at 9, *MGE*, 622 F.3d 361 (No. 08-10521) ("Congress determined that by prohibiting unauthorized access—separate from and in addition to unauthorized copying—it could give copyright owners the confidence to distribute their works in new and powerful ways (*e.g.*, streaming video over the internet, digital 'rentals' that expire after predetermined periods of time, music files playable only on certain devices, and so on).").

[258] *See* COMMERCE COMMITTEE REPORT at 23 ("[A]n increasing number of intellectual property works are being distributed using a 'client-server' model, where the work is effectively 'borrowed' by the user (e.g., infrequent users of expensive software purchase a certain number of uses, or viewers watch a movie on a pay-per-view basis).  To operate in this environment, content providers will need both the technology to make new uses possible and the legal framework to ensure they can protect their work from piracy.").

[259] *See* HOUSE JUDICIARY COMMITTEE REPORT at 10 ("In order to protect the owner, copyrighted works will most likely be encrypted and made available to consumers once payment is made for access to a copy of the work.  There will be those who will try to profit from the works of others by decoding the encrypted codes protecting copyrighted works, or engaging in the business of providing devices or services to enable others to do so.").

[260] *See* United States-Colombia Trade Promotion Agreement Implementation Act, Pub. L. No. 112-42, 125 Stat. 462 (2011); United States-Korea Free Trade Agreement Implementation Act, Pub. L. No. 112-41, 125 Stat. 428 (2011); United States-Panama Trade Promotion Agreement Implementation Act, Pub. L. No. 112-43, 125 Stat. 497 (2011); United States-Peru Trade Promotion

LOC_AR_00009273

protection be treated as a separate cause of action independent of any infringement of copyright.[261]  And as noted, the United States has also taken this position in litigation on this subject.[262]  Thus, providing distinct legal protection for access controls not only reflects the consistent policy judgment of both the Legislative and Executive Branches, but also constitutes a longstanding requirement under U.S. international agreements.

The Office sees no basis for departing from this obligation through adoption of an infringement nexus requirement.  Such a rule would substantially diminish copyright owners' ability to prevent widespread unauthorized access to their works.  Again, the *MDY* opinion is instructive:  "Descrambling or decrypting only enables someone to watch or listen to a work without authorization, which is not necessarily an infringement of a copyright owner's traditional exclusive rights under § 106."[263]  Yet this activity unquestionably harms the value of the work, and the damage compounds exponentially when the dissemination of circumvention tools enables it to occur on a vast scale.  Limiting section 1201(a) to circumvention or trafficking activity undertaken for the purpose of infringing or facilitating infringement could place such conduct beyond the statute's reach.[264]

This outcome would seem especially ill-advised now that access-based platforms have come to represent a major component of the copyright marketplace.  The dramatic growth of streaming services like Netflix, Spotify, Hulu, and many others suggests that

---

Agreement Implementation Act, Pub. L. No. 110-138, 121 Stat. 1455 (2007); United States-Oman Free Trade Agreement Implementation Act, Pub. L. No. 109-283, 120 Stat. 1191 (2006); United States-Bahrain Free Trade Agreement Implementation Act, Pub. L. No. 109-169, 119 Stat. 3581 (2006); Dominican Republic-Central America-United States Free Trade Agreement Implementation Act, Pub. L. No. 109-53, 119 Stat. 462 (2005); United States-Australia Free Trade Agreement Implementation Act, Pub. L. No. 108-286, 118 Stat. 919 (2004); United States-Morocco Free Trade Agreement Implementation Act, Pub. L. No. 108-302, 118 Stat. 1103 (2004); United States-Singapore Free Trade Agreement Implementation Act, Pub. L. No. 108-78, 117 Stat. 948 (2003).

[261] *See supra* note 215.

[262] *See supra* p. 31.

[263] 629 F.3d at 945.

[264] *See, e.g.*, AAP, MPAA & RIAA Initial Comments at 10 ("Someone who circumvents access controls (such as password protection or other forms of authentication) to watch . . . movies for free violates section 1201(a)(1)—even if circumvention does not facilitate copying because, for example, copy controls remain in place to prevent reproducing the movie."); Copyright Alliance Initial Reply Comments at 2 ("Prohibiting the circumvention of access controls is necessary since, in many cases, circumventing access controls like encryption or password protection may not amount to copyright infringement itself, yet can lead to the same type of harm as infringement . . . .").

LOC_AR_00009274

for both copyright owners and consumers, the offering of access—whether through subscriptions, *à la carte* purchases, or ad-supported services—has become a preferred method of delivering copyrighted content.  As a representative of mobile app developers recently testified to Congress, "[t]he explosive growth in technological innovations and content delivery options prove that the DMCA has created an environment in which these things are possible."[265]  In the Office's view, the law should continue to foster the development of such models.  By reducing legal protection for the access controls upon which they rely, a nexus requirement could well have the opposite effect.

Some commenters responded to this concern by arguing that other laws would adequately protect copyright owners against circumvention for pure consumption purposes.  The Office is not convinced, however, that these laws would fill the gap left by a narrowed section 1201(a).  Some contended that circumvention for purposes of streaming a work might support a section 1201(a) claim even under a nexus requirement because the creation of a temporary RAM copy on the recipient's computer or device may constitute an infringing reproduction under section 106(1).[266]  But while a RAM copy may qualify as a "copy" within the meaning of the Copyright Act, there are likely situations where no RAM copies are made.[267]  Others maintained that accessing copyrighted material on a computer server without authorization could be actionable under the Computer Fraud and Abuse Act ("CFAA")—which provides a private right of action for unauthorized access to a computer—or state computer crime or commercial tort laws.[268]  The CFAA, however, requires a plaintiff to prove an annual loss aggregating at least $5,000,[269] which would exclude all but high-volume streaming activities; it also limits damages to economic damages.[270]  And it seems doubtful that a

---

[265] *Chapter 12 of Title 17: Hearing Before the H. Comm. on the Judiciary*, 113th Cong. 21 (2014) (statement of Jonathan Zuck, President, ACT | The App Ass'n ("ACT")).

[266] Tr. at 38:16–39:05 (May 19, 2016) (Band, LCA) (suggesting a hypothetical where the creation of a RAM copy of an e-book on a device with a circumvented TPM could constitute a nexus to trigger section 1201(a) liability); Tr. at 62:10–18 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) (predicting that copyright owners would argue that access to a film beyond its authorized rental period would constitute infringement).

[267] The Second Circuit has held that buffer copies of fleeting duration were not copies for purposes of the Act.  *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 127–30 (2d Cir. 2008) (holding that buffer copy data that "is rapidly and automatically overwritten as soon as it is processed" does not constitute making a copy as defined in the Copyright Act).

[268] LCA Reply Comments at 3 (citing 18 U.S.C. § 1030(a)(2)); Tr. at 31:08–16 (May 25, 2016) (Stoltz, EFF) (citing survey finding that 48 out of 50 cases under section 1201 involved other claims); Tr. at 13:17–22 (Band, LCA) (Mar. 19, 2016).

[269] 18 U.S.C. § 1030 (a)(5)(A)(B), (c)(4)(A)(i)(I), (g).

[270] *Id.* § 1030(g).

LOC_AR_00009275

patchwork of state laws can offer the certainty currently provided by section 1201(a), particularly given the interstate nature of transactions in this area.

### b. Exclusion of Device- or Machine-Enabling Computer Programs

As a narrower alternative, ORI suggested that Congress could exclude from the scope of section 1201(a) "computer programs that enable the operation of a device or machine."[271] Although recognizing that in practical terms, this outcome could also be achieved through a new permanent exemption, ORI suggested it may be better to revise the language of section 1201(a).[272] It argued that circumventing access controls on such programs presents a "low probability of infringing activity" and that excluding them categorically is preferable to adopting piecemeal statutory exemptions because they "inevitably will be under-inclusive."[273]

ORI's recommendation presents a more targeted approach than a nexus requirement in that it aims to address the specific concern regarding section 1201(a)'s application to everyday products. The Office, however, does not recommend this model because we agree with the commenters who argued that it would present considerable line-drawing problems.[274] In particular, creative industry representatives questioned whether such legislation could be drawn to exclude operating software in devices like garage door

---

[271] ORI Additional Comments at 3.

[272] *Compare id.* at 3 ("ORI believes the better approach would be to categorically exclude computer programs that enable the operation of a device or machine from the scope of Section 1201."), *with* ORI Initial Comments at 3 (Congress "could adopt a permanent exception for the circumvention of TPMs on software essential to the operation of hardware.").

[273] ORI Additional Comments at 3.

[274] Tr. at 50:07–12 (May 19, 2016) (Zuck, ACT) ("It would have to be a much more complicated wording in order to get at the distinctions that people want to make so that you are excluding, you know, printer cartridges but you're including the ability to have flexible hardware subsidy models, et cetera, that are pretty prevalent in this market."); Tr. at 51:13–24 (May 19, 2016) (Panjwani, Public Knowledge) ("[A]ny attempt to create a permanent exemption on software-enabled devices would instead turn into a fight over what exactly is a software-enabled device. . . . The end result of litigation would be not whether a copyright interest has been violated but is the thing at dispute in this particular litigation a device within the meaning of the statute. And that opens up a whole can of worms, I think."); *see also* Author Services, Inc. Additional Comments at 1; Alliance of Auto. Mfrs. ("Auto Alliance") Initial Comments at 3 (suggesting that "access controls [that] are 'outside of core copyright concerns'" is "itself a label whose boundaries would be difficult to define"); Copyright Alliance Initial Comments at 10 ("[P]hrases like 'core copyright concerns' may be associated with efforts to undermine protection for copyrighted works by casting certain forms of access controls as falling outside the realm of what Section 1201 was designed to protect.").

LOC_AR_00009276

openers and printer cartridges from section 1201's reach, but to retain anticircumvention protection for software in devices that communicate expressive content, such as DVD players and video game consoles.  In the latter devices, they noted, operating software often includes authentication systems that prevent the playing of material from unauthorized sources.[275]  Therefore, any legislation excluding device-enabling software runs the risk of allowing bad actors to circumvent access controls on those systems, and thus could significantly weaken legal protections against piracy.

The Office reached substantially the same conclusion in its recent report on *Software-Enabled Consumer Products*.  There, the Office considered several potential options to distinguish device-embedded software from software generally, and found each of them unworkable in practice, particularly given "the very real concern that definitions based on an understanding of the current ecosystem would become quickly obsolete."[276]

* * *

The Copyright Office recognizes and shares the concern that section 1201 should not be used to deter legitimate consumer activities unrelated to Congress' goal of facilitating secure platforms for the digital dissemination of copyrighted works.  While the legislative history, as discussed, demonstrates that Congress did not intend for section 1201(a) to be limited to a copyright owner's traditional exclusive rights under section 106, it also does not show an expectation that section 1201 would serve as a sword to inhibit market entrants from offering competing consumer products.[277]  Nor does it seem

---

[275] AAP, ESA, MPAA & RIAA Additional Reply Comments at 6–7 ("For example, manufacturers of video game consoles use access controls to prevent piracy not only by restricting access to computer programs that render video games perceptible, but also by restricting access to the software that operates the consoles and authenticates games.  Circumvention of such access controls leads to play of pirated games."); Tr. at 52:19–23 (May 19, 2016) (Pierre-Louis, ESA) ("So we have to tread very carefully as we think about what that means because it implicates more than just thinking about a tractor.  We're talking about the very devices that consumers are using to consume the content that we're making."); Tr. at 56:14–16 (May 19, 2016) (Dow, Walt Disney Co.) ("If you want to use a DVD player, that drive has to authenticate itself to ensure that it's playing by the rules before you access the content.").

[276] U.S. COPYRIGHT OFFICE, SOFTWARE-ENABLED CONSUMER PRODUCTS 9–11 (2016) ("SOFTWARE STUDY"), https://www.copyright.gov/policy/software/software-full-report.pdf ("[D]rawing a legislative distinction [between software and software embedded in devices] would be unworkable in practice. . . .  Any such attempt inevitably would be based on software-enabled devices currently existing in the marketplace, and based on Congress's understanding of the current state of the art.").

[277] *See* Kernochan Center Initial Comments at 3 (noting "it is unlikely that [Congress] anticipated the vast range of products now governed by computer programs"); *see also* Letter from Chairman Chuck Grassley and Ranking Member Patrick Leahy, S. Comm. on the Judiciary, to Maria A.

LOC_AR_00009277

likely that Congress expected issues concerning the repair and modification of such products to be a focus of the rulemaking to the degree they have been in recent years.[278]

The Office is not persuaded, however, that the answer to these concerns is a fundamental alteration of section 1201(a)'s scope. Although the case law on this question is neither harmonized nor voluminous, opinions to date indicate that the statute in its current form does not leave courts powerless to consider issues of competition where appropriate. Even the *MDY* opinion, in rejecting an infringement nexus requirement, explicitly noted that there was "no clear issue of anti-competitive behavior" in that case and suggested that consideration of such issues would be proper where "a § 1201(a)(2) defendant . . . claims that a plaintiff is attempting to enforce its DMCA anti-circumvention right in a manner that violates antitrust law."[279] Indeed, principles underlying existing doctrines of antitrust law or misuse, and the permanent exemptions, such as section 1201(f)'s exception for interoperability, may accommodate many anti-competitive concerns. Further, the Office also notes that at least two manufacturers have recently backed away from some proposed uses of DRM in consumer devices in the face of consumer pressure.[280]

Accordingly, the Office concludes that the preferable approach is to address these issues through the application of existing legal doctrines, and through targeted updates to the permanent exemption framework and to the triennial rulemaking process. These recommended changes are discussed below.

---

Pallante, Register of Copyrights and Dir., U.S. Copyright Office 1 (Oct. 22, 2015), http://www.copyright.gov/policy/software/grassley_leahy-software-study-request-10222015.pdf ("One result of recent technological developments is that copyrighted software is ubiquitous in our daily lives . . . [and] many questions are being asked about how consumers can lawfully use products that rely on software to function.").

[278] *See* SIIA Initial Comments at 6 ("During the last rulemaking, disputes arose over software in tractors, automobiles, and the like—situations that Congress did not envision when passing the law eighteen years ago."); Tr. at 53:18–55:01 (May 19, 2016) (Band, LCA) ("Congress, when it was talking about 1201 . . . [was] not thinking about tractors. And the fact that we're talking about tractors and . . . automobiles and that's where it's gone to, does suggest that there is a serious problem here.").

[279] *MDY*, 629 F.3d at 951.

[280] *See* Alex Hern, *Keurig Takes Steps Towards Abandoning Coffee-Pod DRM*, THE GUARDIAN (May 11, 2015), https://www.theguardian.com/technology/2015/may/11/keurig-takes-steps-towards-abandoning-coffee-pod-drm (noting that consumer complaints and consumer advocacy efforts led Keurig to back away from efforts to enforce digital rights management in its coffee machines); Cory Doctorow, *Tell HP: Still a long way to go to make up for breaking our printers* (Oct. 3, 2016), https://www.eff.org/deeplinks/2016/09/hps-run-keep-pressure (noting that Hewlett-Packard issued an update removing a feature that configured its printers to accept only proprietary ink).

## B. *Anti-Trafficking Provisions*

The anti-trafficking provisions in section 1201(a)(2) and (b) were the subject of much disagreement among study participants. While some championed these provisions as incentivizing the creation of new avenues for content distribution and providing an essential enforcement mechanism, others argued that the trafficking prohibitions have had little meaningful impact on preventing infringement, and instead have served to restrict legitimate uses of copyrighted works, including activities exempted under the triennial rulemaking.

### 1. Overall Effectiveness

As discussed above, Congress enacted the anti-trafficking provisions "to provide meaningful protection and enforcement of the copyright owner's rights to control access to his or her copyrighted work."[281] Many stakeholders argued that these provisions have been effective in stemming the development of a marketplace for circumvention tools and in minimizing mass piracy.[282]

Several commenters indicated that these provisions are effective in large part because they provide a more efficient enforcement mechanism than the anticircumvention bar under section 1201(a)(1). For example, ESA observed that "the actions of distributors of circumvention technology are comparatively easy to detect, and targeting them is the

---

[281] SENATE JUDICIARY COMMITTEE REPORT at 28; HOUSE JUDICIARY COMMITTEE REPORT at 18; COMMERCE COMMITTEE REPORT at 38; HOUSE MANAGER'S REPORT at 8.

[282] *See, e.g.*, BSA | The Software Alliance ("BSA") Initial Comments at 1; Copyright Alliance Initial Comments at 13 (without anti-trafficking protections, rightsholders would be forced to engage in an "'arms race' of encryption and circumvention technologies, diverting resources away from more beneficial uses like the creation and dissemination of copyrighted works"); Kernochan Center Initial Comments at 6 ("[W]ithout the ban against trafficking, circumvention devices useable by even the most technolog[ically]-challenged of consumers would undoubtedly be readily available, and TPMs would be largely ineffective."); SIIA Initial Comments at 4 ("In the United States, [section 1201] has prevented capital formation around 'black box' businesses dedicated to circumvention or the sale of circumvention devices . . . ."); Tr. at 165:13–17 (May 25, 2016) (Reed, Fox Entm't Grp.) ("[T]he anti-trafficking provisions have prevented the tools to engage in . . . piracy from becoming mainstream in a way that we think is beneficial ultimately to maintaining a robust market for creative content."); Tr. at 169:21–170:02 (May 25, 2016) (Wolfe, Authors Alliance) ("[T]he anti-trafficking provisions have at least had some measure of success in keeping the tools out of end user hands that enable those kinds of infringements."); Tr. at 26:20–27:04 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) ("[T]he thing that [section] 1201 has done most effectively is kill any market for circumvention tools.").

LOC_AR_00009279

most effective and efficient way to protect the rights provided by Section 1201."[283] Absent the ability to target traffickers, these commenters argued, the need to identify and pursue claims against individual circumventers would dramatically increase the cost of enforcement.[284]

Copyright owners also emphasized the anti-trafficking provisions' role in preventing circumvention tools from becoming available in legitimate outlets such as Best Buy or Amazon. In their view, even if some tools remain accessible through illicit sources, the anticircumvention provisions have prevented such tools from acquiring the legitimacy in the public mind that would result from their availability in mainstream markets.[285] The Copyright Alliance argued that this "reduces the attractiveness of commercial business models that are based on enabling access to infringing works" and "helps prevent . . . capital formation around the black box business dedicated to . . . sales of circumvention devices."[286]

Other commenters, however, expressed doubt as to whether the anti-trafficking provisions in fact prevent any unauthorized circumvention or infringement from

---

[283] ESA Initial Comments at 14; *see also* DVD Copy Control Ass'n & Access Content Sys. Licensing Adm'r, LLC ("DVD CCA & AACS LA") Initial Comments at 4 (stating that their litigation efforts are spent "enforcing the anti-trafficking prohibitions as those products posed the greatest harm").

[284] *See, e.g.*, Tr. at 205:16–206:08 (May 25, 2016) (Metalitz, AAP, MPAA & RIAA) (noting that the "vast majority of enforcement" efforts are based on 1201(a)(2) violations, and "the fact that a person may be committing an act of circumvention that only affects their access to a particular copyrighted work, it's got to be a much lower priority."); Tr. at 14:17–15:01, 81:13–20 (May 20, 2016) (Kupferschmid, Copyright Alliance) ("Being able to target trafficking is also important because actions of distributors . . . of circumvention technologies is . . . comparatively easy to detect and targeting them is the most efficient and effective way to actually enforce 1201"; also noting the important role the anti-trafficking provisions play in deterring piracy for small business owners).

[285] *See, e.g.*, AAP, MPAA & RIAA Initial Comments at 14 ("If the distribution of hacking tools . . . becomes legal and widespread, the public's perception of what these products can legitimately be used for could become confused, resulting in frustration and abuse."); Tr. at 21:08–20 (May 20, 2016) (Besek, Kernochan Center) ("You can't argue a system isn't effective just because some people can bypass it. There's always been some degree of infringement. There always will be. The real goal is to reduce it to the level where you still have a viable market. . . . [Y]ou don't want it just available at Best Buy. . . . And so, it's really important that . . . the circumvention means not be so generally available."); Tr. at 14:05–12 (May 20, 2016) (Kupferschmid, Copyright Alliance) ("[T]he ultimate purpose is to keep this hacking software out of the mainstream and limit its availability to the infringers so you can't just walk into Best Buy, for instance, and get a copy.").

[286] Tr. at 14:15–17, 15:02–05 (May 20, 2016) (Kupferschmid, Copyright Alliance).

LOC_AR_00009280

occurring.[287]  Several pointed to the large-scale proliferation of illegal circumvention tools online, arguing that the statute has done little to slow the dissemination of such devices.[288]  OTW contended that "[c]lear copies of almost any work are available through unauthorized sources, in significant part because, once copy protection is broken once, that copy can seed other copies with no further need for anticircumvention [sic] tools."[289]

## 2. Proposed Changes

Several user groups expressed concern regarding the effect of the anti-trafficking provisions on their ability to engage in circumvention activity authorized through the triennial rulemaking.  They proposed legislative changes to enable exemption beneficiaries to make or obtain necessary circumvention tools for that purpose, and to allow third parties to assist users in carrying out the exempted activity.

### a. Manufacture and Distribution of Tools

Subsections (a)(2) and (b) make it unlawful to "manufacture" a circumvention device.[290]  Some commenters noted that that language could be read to prohibit the beneficiary of an exemption from making a tool for his or her own use in engaging in the exempted circumvention activity.[291]  Most user groups believed such a reading would be erroneous:  as Public Knowledge contended, "[t]o suggest that exemptions come with no right to create or acquire tools to effectuate those exemptions would render them superfluous, a flatly illogical outcome to be avoided as a matter of statutory

---

[287] See, e.g., Public Knowledge Initial Comments at 7 ("[R]eports of massive online infringement by copyright owners, if they are to be believed, suggests that § 1201 has failed at curbing infringement."); Soc'y of Am. Archivists ("SAA") Initial Comments at 4 ("SAA is not aware that the anti-trafficking provisions of section 1201(a)(2) and 1201(b) have had any impact in deterring copyright infringement.").

[288] LCA Initial Reply Comments at 2 ("[Rightsholders] overlook the fact that TPMs remain effective notwithstanding the widespread availability of circumvention tools on the Internet (and the relative dearth of section 1201 enforcement actions)."); see also AAU, ACE, APLU & EDUCAUSE Initial Comments at 12 ("[T]he technology necessary to circumvent the TPMs on DVDs and other storage media is widely available via the Internet and simple to use.").

[289] OTW Initial Comments at 6.

[290] 17 U.S.C. § 1201(a)(2), (b).

[291] See, e.g., LCA Additional Comments at 4 ("On the face of the statute, a person granted an exemption to circumvent would not be able to manufacture a circumvention tool, and could not obtain such a tool from a third party.  This makes no sense."); ORI Additional Comments at 5 (similar).

LOC_AR_00009281

construction."[292]  Nevertheless, a few users suggested that the uncertainty on this issue has dissuaded them from exercising exemptions granted via the rulemaking.  In the words of a group of college and university associations, "[n]o educational institution granted an exemption wants to assume that a temporary exemption implicitly includes the right to develop the necessary circumvention tools to take advantage of that exemption."[293]

Several participants supported legislative change to explicitly allow the making of necessary circumvention tools in these circumstances.[294]  In considering this proposal, the Office notes at the outset that many tools that can be used for circumvention are not subject to section 1201's prohibitions:  in addition to programs specifically designed for circumvention, which section 1201 is aimed at, common software can also be employed for circumvention purposes.[295]  The legislative history of section 1201 explicitly demonstrates Congress' intent to exclude such generally available software tools, including compilers, disassemblers, password-recovery utilities, and commercial "key-cracker" products, from the reach of the prohibition.[296]

To a large and increasing degree, however, circumvention requires the use of specialized software, such as code to convert protected e-books into formats usable with assistive technologies[297] or to bypass encryption on DVDs.[298]  To the extent the law prohibits the development of such software, many users would be unable to engage in activities expressly permitted by the relevant exemption, unless they rely on circumvention programs produced unlawfully.  The Office accordingly agrees that exemption

---

[292] Public Knowledge Additional Comments at 4–5; *accord* Authors Alliance Additional Comments at 4–5 ("[A]ny reading of Section 1201 that would prohibit beneficiaries of exemptions from creating the tools necessary in order to exercise these exemptions is an absurd result that renders the entirety of the Section 1201(a)(1) exemption process futile.").

[293] AAU, ACE, APLU & EDUCAUSE Initial Comments at 12.

[294] *See, e.g.*, ISRI Additional Comments at 6; ORI Additional Comments at 5; LCA Additional Comments at 4.

[295] In addition, some TPMs can be defeated without using software.  *See, e.g.*, Jamie Condliffe, *You Can Hack Keurig's DRM With Scotch Tape to Use Knock-Off Coffee Pods*, GIZMODO (Dec. 11, 2014), http://gizmodo.com/you-can-hack-keurigs-drm-with-scotch-tape-to-use-knock-1669713772; *CD Crack: Magic Marker Indeed*, WIRED (May 20, 2002), http://archive.wired.com/science/discoveries/news/2002/05/52665.

[296] COMMERCE COMMITTEE REPORT at 42–43 (referencing compilers, trace analyzers, and dissemblers); SENATE JUDICIARY COMMITTEE REPORT at 16 (referencing password utilities and "'key-cracker products,' . . . for the purpose of quick data recovery of encrypted data").

[297] *See* 2012 Rulemaking at 20.

[298] *See* 2015 Rulemaking at 29.

LOC_AR_00009282

beneficiaries should be able to make necessary tools solely for their own use in carrying out exempted circumventions.

The Office is not convinced, however, that statutory change is necessary to effectuate this right. To begin with, legislation may be premature. The scope of the "manufactur[ing]" language in section 1201(a)(2) and (b) has yet to be resolved by the courts; in fact, the Office is aware of no case in which a court has considered whether the manufacturing bar applies to exemption beneficiaries making a tool for personal use. Nor is it clear that these provisions are, as a practical matter, preventing beneficiaries from creating or utilizing circumvention tools to a significant degree. While the dearth of case law and enforcement actions is not determinative—indeed, we recognize that statutory ambiguity itself can have a deterrent effect[299]—it does suggest that there is not yet a pressing need for legislative action.

Second, there are strong reasons to conclude that Congress did not intend to apply the manufacturing bar to exemption beneficiaries from producing their own circumvention tools for personal use. As several commenters noted, such a reading would render the rulemaking process effectively meaningless for many users.[300] Moreover, the term "manufacture" appears in a list of activities defined as forms of trafficking: "No person shall manufacture, import, offer to the public, provide, or otherwise traffic in . . . ."[301] "Traffic" is not defined in the statute, but it is commonly associated with trade or commercial activity.[302] Under the interpretive canon of *noscitur a sociis*, manufacture should be understood by reference to surrounding words, suggesting that Congress intended the prohibition to apply to activities involving a wider distribution of circumvention tools, and not to activities done solely for purposes of self-help.[303]

---

[299] *See* AAU, ACE, APLU & EDUCAUSE Initial Comments at 12.

[300] *See* Authors Alliance Additional Comments at 4–5; Repair Ass'n & iFixit Additional Comments at 16.

[301] 17 U.S.C. § 1201(a)(2), (b). The legislative history contains no relevant discussion of the term "manufacture."

[302] *See, e.g., Traffic*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/traffic ("a: import and export trade[;] b: the business of bartering or buying and selling[;] c: illegal or disreputable usually commercial activity[;] . . . to carry on traffic"); *Traffic*, BLACK'S LAW DICTIONARY 1725 (10th ed.) ("To trade or deal in (goods, esp. illicit drugs or other contraband) <trafficking in heroin>").

[303] *See* Authors Alliance Additional Comments at 5 ("[A] plain reading of the statute clearly demonstrates the provisions are about the provision of tools and services *to others*, and not about the self-help that is the baseline necessity of an effective exemption process."); Repair Ass'n & iFixit Additional Comments at 15–16 ("[T]he phrase 'or otherwise traffic' in 1201(a)(2) clearly

LOC_AR_00009283

It is true, as some copyright owners noted, that the presence of explicit authorization for the making of tools in some of the permanent exemptions—specifically, those for encryption research, reverse engineering, and security testing—could be read to suggest that there is no corresponding right appurtenant to the other exemptions, including those adopted through the rulemaking.[304] But the Office is not persuaded that this inconsistency is determinative. By including the ability to develop means for circumvention within these permanent exemptions, Congress may simply have wished to avoid any ambiguity as to whether such activity is permitted, particularly since encryption research, reverse engineering, and security testing in at least some cases may involve distribution activity more commonly associated with trafficking. Indeed, each of these exemptions expressly contemplates a user sharing circumvention means with others.[305] Given that the alternative reading could undermine much of the statute's overall design, the Office believes that this is the preferred construction.

For these reasons, the Office does not believe any legislative change to the manufacturing provision is currently necessary and that section 1201 should not be interpreted to prohibit permitted beneficiaries from creating a circumvention tool for personal use. In the event, however, that Congress wishes to provide clarification, it could consider adding language to the statute providing that, notwithstanding subsections (a)(2) and (b), a person entitled to an exemption to subsection (a)(1) may develop a circumvention tool solely for his or her own use in engaging in the exempted activity.

---

indicates that 'manufacture' should be interpreted as large-scale production for the purposes of *trafficking* to the public, not mere creation of a tool for personal use.").

[304] *See* Copyright Alliance Additional Comments at 4 ("If Congress intended such a right, it would have included it expressly as it did in the provisions for permanent exemptions for reverse engineering, encryption research, and security testing.") (citations omitted). The Copyright Alliance also noted that section 1201(a)(1)(E) expressly bars any exemption granted under the triennial rulemaking from serving as a defense to the anti-trafficking provisions, and thus argued that the rulemaking cannot excuse any activity to the extent it is deemed "manufacturing." *Id.* at 3–4.

[305] 17 U.S.C. § 1201(f)(3) ("[T]he means permitted under paragraph (2), may be made available to others" under certain conditions), § 1201(g)(4) ("Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to . . . provide the technological means to another person with whom he or she is working collaboratively for the purpose of conducting the acts of good faith encryption research described in paragraph (2) or for the purpose of having that other person verify his or her acts of good faith encryption research described in paragraph (2)."), § 1201(j)(4) ("Notwithstanding the provisions of subsection (a)(2), it is not a violation of that subsection for a person to develop, produce, distribute or employ technological means for the sole purpose of performing the acts of security testing described in subsection (2), provided such technological means does not otherwise violate section (a)(2).").

LOC_AR_00009284

Should Congress pursue statutory amendment, the Office does not recommend that it take the additional step of allowing the *distribution* of necessary tools to exemption beneficiaries.[306]  As an initial matter, the Office does not understand such activity to be permitted under current law.  Moreover, the Office agrees with the commenters who argued that it would be impossible to control the downstream uses of any circumvention tools once distributed, even if they were produced with the intent that they be used only to assist authorized circumvention.[307]  Proponents responded that circumvention tools are already widely available online and that other laws would adequately protect against illicit uses.[308]  But, as several commenters noted, perhaps the primary value of the anti-trafficking provisions has been to prevent the development of mainstream business models based around the production and sale of circumvention tools.[309]  Permitting the distribution of such tools could significantly erode that important benefit.

### b.  Third-Party Assistance

Subsections (a)(2) and (b) make it unlawful to "offer to the public, provide, or otherwise traffic in any . . . service . . . or part thereof" that is primarily designed for the purpose of circumvention, has only limited commercially significant purpose other than circumvention, or is marketed for use in circumvention.[310]  The Librarian is not authorized to adopt exemptions to those provisions.  Many commenters expressed concern that these prohibitions may prevent third parties from offering assistance to those entitled to engage in exempted circumvention activities.  They noted that ordinary consumers often lack the skills or technical knowledge to circumvent independently.[311]

---

[306] *See, e.g.*, Mozilla Initial Comments at 5; Rico Robbins Initial Comments at 1–2; Auto Care Additional Reply Comments at 8; Public Knowledge Additional Reply Comments at 4–5; Tr. at 56:02–07 (May 20, 2016) (Greenstein, Auto Care) (noting that consumers "need to rely on others who can create the tools that make [circumvention] possible" and agreeing that there needs to be a market for those tools).

[307] *See, e.g.*, AAP, MPAA & RIAA Initial Comments at 14; Alliance of Auto. Mfrs. ("Auto Alliance") Initial Comments at 9; Copyright Alliance Initial Comments at 13; Kernochan Center Initial Comments at 7.

[308] *See, e.g.*, LCA Additional Comments at 4 ("Circumvention tools already are widely available on the internet."); Mozilla Additional Comments at 4 ("Some commenters oppose allowing technical assistance on the grounds that such tools could be misused for illicit purposes. . . . Copyright law and law enforcement have the authority and ability to penalize those who act illegally, including those who misuse circumvention technologies.").

[309] *See supra* pp. 51–52 and notes 285–86.

[310] 17 U.S.C. § 1201(a)(2), (b)(1).

[311] *See, e.g.*, ACM U.S. Pub. Policy Council ("USACM") Initial Comments at 3 ("[M]any consumers lack the knowledge and expertise to develop tools that would enable them to benefit from

LOC_AR_00009285

Others pointed to the difficulty of obtaining or developing one's own tools for circumventing (assuming that is itself legal, as discussed above).[312]  Commenters also noted the disproportionate impact a ban on third-party assistance has on beneficiaries with disabilities.[313]

While most participants recognized some need for such assistance, a few suggested that this concern may be overstated.  The Kernochan Center stated, "[w]e suspect that this occurs less frequently than it might appear on the surface, as in many cases circumvention tools are available (e.g., for DVDs) and in other cases, it can be assumed that the beneficiaries of the exception have the technical expertise to circumvent (e.g., where the underlying work is sought for the purpose of reverse engineering)."[314]  The American Intellectual Property Law Association ("AIPLA") requested a study into whether third-party assistance is, in fact, needed.[315]

The Copyright Office has previously suggested that exemption beneficiaries may have a legitimate interest in circumvention assistance in at least some circumstances, and has said that Congress may wish to consider legislative clarification in this area.[316]  In this proceeding, many commenters supported amending section 1201 to explicitly authorize

---

granted exemptions."); Jay Freeman Initial Comments at 1 ("The reality is that modifying an iPhone to strip away the software encryption locks that prevent this kind of functionality is extremely complex."); iFixit Initial Comments at 3 ("Without third-party assistance, many of these exemptions are useless in the real world."); Mozilla Initial Comments at 5 ("In practice, omitting [third-party assistance], as currently happens, risks worsening a social divide— technically savvy users would have even more advantages over non-savvy users, as they are the only ones who have the skills to engage in the socially beneficial exempted action without help."); Int'l Imaging Tech. Council & Static Control Components, Inc. Additional Comments at 5–6.

[312] *See, e.g.,* Authors Alliance Initial Comments at 3; Auto Care Initial Comments at 9.

[313] *See* DIYAbility Initial Comments at 7; Learning Disabilities Ass'n of Am. ("LDAA") Initial Comments at 2; Marjorie Anderson Initial Comments at 1.

[314] Kernochan Center Initial Comments at 6–7; *see also* ESA Initial Comments at 15; Tr. at 33:17– 34:02 (May 20, 2016) (Sheffner, MPAA).

[315] AIPLA Initial Comments at 2–3.

[316] *See Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary,* 114th Cong. 29–30 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office); 2015 Recommendation at 4–5.

LOC_AR_00009286

such assistance.[317]  Others advocated a narrower change to allow the Librarian to adopt exemptions for third-party assistance through the rulemaking on a case-by-case basis.[318]

To assess the need for legislation, the Office first addresses the threshold question of whether, or to what extent, third-party assistance is prohibited under current law.  Case law to date offers little guidance on this question, and commenters were sharply divided.  Some user groups argued that a service whose "primary purpose" is something other than circumvention falls outside the scope of the service bar, even if it incidentally involves circumvention.  EFF explained:

> For example, a comprehensive auto repair service may incidentally require circumvention of access controls on vehicle software in order to access diagnostic data or adjust settings.  Such a service would not be "primarily designed or produced for the purpose of circumventing a technological measure," as the primary purpose of the service is the repair, not the circumvention.  Likewise, such a service would have a "commercially significant purpose" other than circumvention and would not likely be "marketed . . . for use in circumvention."[319]

While acknowledging that auto repair may be a unique circumstance, copyright owners generally disagreed, pointing out that the ultimate purpose of any circumvention service will always be something beyond circumvention itself.[320]  They further argued that any implied right to third-party assistance for exemption beneficiaries is expressly precluded by section 1201(a)(1)(E), which prohibits an exemption granted in the rulemaking from serving as a defense in an action to enforce any other provision of title 17.[321]  Some also suggested that the prohibition on the trafficking of "any . . . service . . . *or part thereof, that . . . is primarily designed or produced for the purpose of circumventing*"[322]

---

[317] *See, e.g.*, ISRI Initial Comments at 15; Am. Ass'n of Law Libraries ("AALL") Additional Comments at 3; Mozilla Additional Comments at 4.

[318] *See, e.g.*, Authors Alliance Initial Comments at 3–4; Maryna Koberidze Initial Comments at 3.

[319] EFF Initial Comments at 10–11 (citations omitted); *see also* Consumer Tech. Ass'n ("CTA") Initial Comments at 3–6 (suggesting that Congress did not intend the DMCA "to in any way limit the authority of manufacturers and retailers to address the legitimate concerns of their customers").

[320] *See* AAP, ESA, MPAA & RIAA Additional Reply Comments at 14 ("[V]ery few people engage in circumvention for its own sake.  If a customer is attracted to a service not because she is interested in circumvention, but because she wants to create copes of Blu-ray Discs or play pirated copies of video games on a console, that service is of course prohibited by Section 1201 (as it should be).").

[321] AAP, ESA, MPAA & RIAA Additional Reply Comments at 13.

[322] 17 U.S.C. § 1201(a)(2), (b)(1) (emphasis added).

LOC_AR_00009287

demonstrates that the statute covers services involving only incidental circumvention.[323] Others noted that some of the permanent exemptions extend to the anti-trafficking provisions, arguing that where Congress intended to create an exception to those provisions, it did so expressly.[324]

There is also some question concerning the relevance, if any, of the Unlocking Act to this analysis.  As discussed, that legislation provides that circumvention under any exemption granted by the Librarian to permit cellphone unlocking may "be initiated . . . by another person at the direction of the [device] owner, or by a provider of a commercial mobile radio service or a commercial mobile data service at the direction of such owner or other person."[325]  In the sixth triennial rulemaking recommendation, the Office read that language to indicate that Congress did not understand third-party assistance to be permitted outside that specific context:  "The fact that Congress felt compelled to take this action in connection with unlocking indicates that Congress believed it was necessary to amend the law to permit circumvention 'at the direction of' the owner."[326]  Some commenters however, disputed that the Unlocking Act created a negative inference against the lawfulness of third-party assistance generally.[327]

Ultimately, the Office concludes that there is, at a minimum, substantial uncertainty as to whether there are types of third-party assistance that would fall outside the reach of the "service" bar.  The Office appreciates that amending the anti-trafficking provisions themselves to address third-party assistance might prove to be a difficult exercise in line-drawing, while posing risk to the digital platforms incentivized by the statute.  But the legal doubt on whether users can seek out assistance presents a legitimate concern for exemption beneficiaries, many of whom may be increasingly frustrated by a lack of access to the tools or skills required to make use of exemptions, particularly when trying to engage in activities, such as automobile repair, that simply did not implicate copyright in the analog world.  The Office believes it is important that intended users of

---

[323] Tr. at 190:08–18 (May 25, 2016) (Metalitz, AAP, MPAA & RIAA).  This echoes a holding in *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, which found DVD copying software to be an illicit circumvention tool because one feature of the software was to unlock CSS protected DVDs, in violation of the "part thereof" aspect of the prohibition.  307 F. Supp. 2d 1085, 1098 (N.D. Cal. 2004).  The court also found that the software at issue was expressly marketed as a circumvention tool.  *Id.* at 1098–99.

[324] SIIA Initial Comments at 3; Copyright Alliance Additional Comments at 4.

[325] Unlocking Act § 2(c), 128 Stat. at 1751–52.

[326] 2015 Recommendation at 247.

[327] *See, e.g.*, CTA Initial Comments at 9 ("[I]n reporting out the final version of the bill that reversed the Librarian's denial, the Senate Judiciary Committee was emphatic that it intended *no positive or negative inference* with respect to the Librarian's authority in other exemption proceedings.") (citations omitted); EFF Initial Comments at 11.

LOC_AR_00009288

exemptions can take full advantage of them even if this requires aid from third parties. Accordingly, the Office believes that a targeted statutory amendment authorizing the provision of assistance to exemption beneficiaries in appropriate circumstances is advisable.[328]

As the Office has suggested previously,[329] one approach would be for Congress to adopt legislation giving the Librarian the discretion, as part of the triennial rulemaking, to explicitly permit circumvention performed "at the direction of" intended beneficiaries of a temporary regulatory exemption.[330] This limited amendment, focused on service providers, may avoid concerns over downstream control issues associated with authorizing the distribution of circumvention tools. The Office acknowledges that some commenters opposed even this expansion of the rulemaking. But most of these concerns appear primarily directed at the development and distribution of tools, and not the ability to use a service technician to engage in an otherwise exempted activity on behalf of an exemption beneficiary.[331] While the Office does not recommend amending the anti-trafficking provisions to allow the broad provision of circumvention services outside the scope of the rulemaking, it remains optimistic that a targeted amendment to section 1201(a)(1)(C), based on the language in the Unlocking Act, might be worthwhile to facilitate the usability of exemptions supported by the rulemaking record. To

---

[328] *See* 2015 Recommendation at 4 ("Congress may wish to consider clarifications to section 1201 to ensure that the beneficiaries of exemptions are able to take full advantage of them even if they need assistance from third parties.").

[329] *See id.* at 5 ("Congress may wish to consider [an] amendment to section 1201 to address these sorts of situations, for example, by expressly allowing the Librarian to adopt exemptions that permit third-party assistance when justified by the record.").

[330] Because allowing circumvention "at the direction" of a user may not be necessary for all exemptions, the Office recommends a narrow statutory change permitting individual consideration of such exemptions as part of the triennial rulemaking, rather than a broader statutory change establishing a blanket exemption.

[331] *See, e.g.,* AAP, MPAA & RIAA Initial Comments at 14 ("AAP, MPAA, and RIAA oppose amending the statute to allow the Librarian to grant exemptions to the anti-trafficking prohibitions. As stated above, tools designed to enable lawful uses would inevitably also enable unlawful uses as there is no way to effectively control the application of such tools once they are in the stream of commerce."); Copyright Alliance Initial Comments at 13 ("There is no justification for amending Section 1201 to allow the adoption of exemptions to the prohibition on circumvention that can extend to exemptions to the anti-trafficking prohibitions. . . . Once [circumvention] tools are available in the marketplace, even for ostensibly lawful purposes, they will inevitably become useful for unlawful purposes, making them virtually impossible to police, and very likely leading to an even more aggressive 'arms race' as described above."); DVD CCA & AACS LA Initial Comments at 16 ("DVD CCA and AACS LA object to any proposal that would encourage the development of a legitimate marketplace for circumvention tools or circumventing products.").

LOC_AR_00009289

effectuate this authority, Congress may need to consider the amendment's interaction with the anti-trafficking provisions.[332]  Additionally, and as discussed further below, consideration of such a change would need to take into account any potential interactions with U.S. trade obligations.

In the meantime, the Office will consider changes to the administration of the rulemaking that could lead to clarification of the law in this area.  In the past, the Office has declined to recommend exemptions allowing circumvention on behalf of another person, noting that such exemptions "may implicate the anti-trafficking provision set forth in section 1201(a)(2) and (b)."[333]  For example, in the most recent rulemaking, the Office did not recommend an exemption for circumvention for vehicle repair or modification activity done "on behalf of" the vehicle owner.[334]  Even if such circumvention might itself qualify as a noninfringing use, the Office declined to recommend an exemption because it might separately constitute an unlawful service under subsections (a)(2) and (b).

Given the uncertain scope of the service bar, one approach may be for the Office in the future to consider exemptions that define the class of eligible users less restrictively.[335]  The Office has previously taken this approach in other instances.  For example, the current regulatory exemption for assistive technology requires that a blind person or other person with disabilities, as defined under section 121, must lawfully acquire a literary work, but does not specify who may engage in the actual circumvention.[336]  This practice need not alter the Office's decision that it could not endorse circumvention "on behalf of" the vehicle owner, or other phrasing that could implicate the statutory prohibition on services; the Office continues to believe that it cannot affirmatively recommend exemption language that is likely to be read to authorize unlawful

---

[332] *See* 17 U.S.C. § 1201(a)(1)(E) ("Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.").

[333] 2015 Recommendation at 246–47.

[334] *Id.*

[335] This approach appears supported by section 1201(a)(1)(C)'s reference to permitting "users of a copyrighted work" to engage in circumvention, as opposed to "owners" of a work.  17 U.S.C. § 1201(a)(1)(C).

[336] 37 C.F.R. § 201.40(b)(2) (2015) (referring to works "lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121," while not specifying the parties able to engage in the underlying circumvention); *see also* DVD CCA & AACS LA Additional Reply Comments at 5 (suggesting that prior exemptions "at least implicitly authorized librarians to assist professors and other exemption beneficiaries" in circumventing access controls on DVDs for instructional purposes).

LOC_AR_00009290

trafficking activity.[337]  Nor is the Office expressing a view on the legal question of whether there are certain forms of third-party assistance that may not rise to the level of prohibited "service[s]."  But because that question is both untested and outside the scope of the rulemaking, the Office, where appropriate, will seek to avoid recommending unduly narrow definitions of exemption beneficiaries.  This may provide greater opportunity for the courts to provide guidance on the proper construction of the anti-trafficking provisions.[338]

The Office also considered additional approaches raised in this proceeding, including the use of voluntary initiatives to facilitate cooperation between rightsholders and end users,[339] and the establishment of a regulatory scheme for the licensing of circumvention service providers (the so-called "locksmith" system).[340]  At this time, however, the Office finds the record on these proposals insufficient to issue a specific recommendation.  The Office encourages discussion between stakeholders on these proposals and will continue to monitor any developments.

## C. Permanent Exemptions

As explained above, the circumvention and anti-trafficking prohibitions exist in concert with a list of activities that are permanently exempted from these prohibitions.  In the written comments and during the roundtables, there was considerable discussion about whether the existing permanent exemptions have kept up with evolving technologies, or

---

[337] Thus, the Office does not agree with commenters to the extent they argued that the Librarian is authorized to adopt such language.  *See, e.g.,* EFF Initial Comments at 11; USC Intellectual Prop. & Tech. Law Clinic ("IPT USC") Initial Comments at 11; AAA Initial Reply Comments at 4.

[338] *See* Tr. at 68:20–69:19 (May 20, 2016) (Schwartz, CTA) (stating that courts will not hesitate to allow actions against parties violating the trafficking provisions even if the Copyright Office grants exemptions that arguably extend to certain prohibited trafficking activities).

[339] *See* Auto Alliance Initial Comments at 8–9 (citing the Memorandum of Understanding used in the auto industry to facilitate the distribution of circumvention tools and the provision of services and parts by third-party repair shops and aftermarket producers); DVD CCA & AACS Initial Comments at 15 ("DVD CCA and AACS LA have repeatedly stated a willingness to discuss issues with bona fide proponents to ascertain whether a voluntary solution could be reached."); Tr. at 60:09–62:19 (May 20, 2016) (Kupferschmid, Copyright Alliance) (suggesting that voluntary initiatives are more flexible than legislation).

[340] *See* Tr. at 23:08–24:15 (May 20, 2016) (Adler, AAP); Tr. at 41:15–42:13 (May 20, 2016) (Love, Knowledge Ecology Int'l ("KEI")).  For an example of a voluntary initiative, see Jason Koebler, *Apple Has Quietly Made its Secretive 'iPhone Calibration Machine' Available to Repair Shops,* Motherboard (June 5, 2017), https://motherboard.vice.com/en_us/article/apple-has-quietly-made-its-secretive-iphone-calibration-machine-available-to-repair-shops (reporting that Apple recently initiated a pilot program to provide some authorized, independent repair companies a proprietary tool that is necessary to repair newer iPhone home buttons).

LOC_AR_00009291

whether legislative reform is warranted to update the existing exemptions or to add new categories of permitted activities. While most commenters favored some reform of the permanent exemption framework, others opposed any statutory change, arguing that changes in technology are best addressed in the triennial rulemaking, which, they stated, was created for just that purpose.[341] In the following section, the Office analyzes these viewpoints and provides interpretative guidance regarding the operation of the statute. It also offers legislative recommendations in those cases where there is evidence that the current statute is not achieving Congress' objectives, or where it appears that legislative reform may be preferable to evaluating new or expanded temporary exemptions through the triennial rulemaking.

## 1. Existing Permanent Exemptions

### a. 1201(f) Exemption for Reverse Engineering

The Copyright Office studied whether section 1201(f), which exempts certain reverse engineering activities from the anti-trafficking prohibitions as well as the anticircumvention ban, is sufficiently robust to accommodate emerging technology. As explained above, section 1201(f) has three interconnected parts:

- 1201(f)(1) provides an exemption to section 1201(a)(1) under which a person may circumvent an access control on a computer program "for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs."[342]

- 1201(f)(2) provides that a person may "develop and employ" circumvention tools for either of two purposes: "[1] in order to enable the identification and analysis under paragraph (1), or [2] for the purpose of enabling operability of an independently created computer program with other programs."[343]

- 1201(f)(3) provides that the information and tools referred to in the preceding paragraphs "may be made available to others . . . solely for the purpose of

---

[341] *See, e.g.*, AAP, MPAA & RIAA Initial Comments at 15 (stating that the joint commenters "are not aware of any circumstances that would rise to the level of justifying legislative revision of section 1201," that "[v]ery little litigation has touched on the scope and interpretation of the existing statutory exceptions to the anti-circumvention and anti-trafficking prohibitions," and "[i]f they were not serving their purpose, litigation in the areas addressed by the statute likely would be more common"); *see also* BSA Initial Comments at 1–2; Copyright Alliance Initial Comments at 13–14; ESA Reply Comments at 2; SIIA Additional Comments at 3.

[342] 17 U.S.C. § 1201(f)(1).

[343] *Id.* § 1201(f)(2) (numbers in brackets added).

LOC_AR_00009292

enabling interoperability of an independently created computer program with other programs" so long as doing so does not constitute infringement or violate other applicable law.[344]

The main question is the extent to which section 1201(f) allows the circumvention of access controls to achieve interoperability generally, with many expressing concern that section 1201(f) is too restrictive and overly limited to circumvention for purposes of conducting identification and analysis related to interoperability.[345]  Conversely, many copyright owners opined that limiting circumvention to purposes of identification and analysis of programmatic elements necessary to achieve interoperability is consistent with congressional intent, and suggested that concerns are "overstated," particularly as the triennial rulemaking is available as a failsafe to address additional uses.[346]  ORI, however, argued that paragraphs (f)(2) and (f)(3) "make clear that software that enables interoperability can be developed and distributed to users, who can then use that software."[347]

The few cases in which courts have addressed section 1201(f) have not resolved this ambiguity.  In *Lexmark*, the Sixth Circuit reversed the dismissal of a section 1201(f)-based interoperability defense by a competitor who allegedly circumvented TPMs to enable interoperability with its own printing cartridges.[348]  The Eighth Circuit subsequently

---

[344] *Id.* § 1201(f)(3).

[345] *See, e.g.*, Consumers Union Additional Reply Comments at 4 (proposing an amendment to "cover not only analyzing the software in a product that would enable interoperability with other products, but also adapting the software to enable interoperability"); EFF Initial Comments at 12 (proposing expanding the exemption to codify the Office's conclusions in recent rulemakings that "modifying software as necessary to render it compatible with other software is likely to be non-infringing"); Mozilla Initial Comments at 3.

[346] AAP, ESA, MPAA & RIAA Additional Reply Comments at 12 ("By limiting the scope of the exemption to identification and analysis, Congress conveyed that circumvention to gain access to software for the purpose of copying and adapting it and including it in a new product, or merely for the purpose of obtaining access to a work beyond that which has been purchased or licensed, is not necessarily fair use."); *see also* SIIA Initial Reply Comments at 5 ("[T]he exemption in 1201(f), combined with the rulemaking function, sufficiently handles any needs of interoperability.").

[347] ORI Additional Comments at 3–4; *see also* CTA Additional Comments at 4 (stating that section 1201 "was not meant to restrict interoperability in a post-sale, aftermarket environment").

[348] *Lexmark*, 387 F.3d at 550–51.  While the Sixth Circuit dismissed Lexmark's section 1201(a) claim on the ground that Static Control had not circumvented an effective TPM, thus eliminating the need for a section 1201(f) defense, it also explained its disagreement with the district court's dismissal of that defense, reasoning that "the issue could become relevant at the permanent injunction stage."  *Id.*

LOC_AR_00009293

identified four elements required to prevail on a section 1201(f) defense.[349]  Neither opinion, however, addressed whether section 1201(f) could more generally be read to permit circumvention for the purpose of *enabling* interoperability, or whether it is limited to identification and analysis of elements necessary to achieve interoperability. In another case, the Southern District of New York rejected a section 1201(f) defense, finding that code developed to circumvent technological measures protecting DVDs was not developed "for the sole purpose" of achieving interoperability and that the defendants did not engage in reverse engineering themselves, but only disseminated the code after the fact.[350]  While that court did not also address whether section 1201(f) could exempt activities for interoperability that did not involve identification and analysis, in an earlier opinion, the court stated that, "[s]ection 1201(f) permits reverse engineering of copyrighted computer programs only and does not authorize circumvention of technological systems that control access to other copyrighted works, such as movies."[351] Some copyright owners relied upon this litigation to express concern that a broader exemption could enable bad actors to exploit the exemption for piracy purposes.[352]

The Copyright Office has noted "the importance of preserving the ability to develop products and services that can interoperate with software-enabled consumer products."[353]  The Office's recent study on *Software-Enabled Consumer Products* (which expressly did not address section 1201) concluded that "statutory change [to the Copyright Act] is not warranted" because, *inter alia,* courts have regularly applied the fair use doctrine to permit uses of software ensuring interoperability with new products and devices.[354]

---

[349] *Davidson & Assocs. v. Jung*, 422 F.3d 630, 641–42 (8th Cir. 2005) ("To successfully prove the interoperability defense under § 1201(f), [defendants] must show:  (1) they lawfully obtained the right to use a copy of a computer program; (2) the information gathered as a result of the reverse engineering was not previously readily available to the person engaging in the circumvention; (3) the sole purpose of the reverse engineering was to identify and analyze those elements of the program that were necessary to achieve interoperability of an independently created computer program with other programs; and (4) the alleged circumvention did not constitute infringement.").

[350] *Reimerdes*, 111 F. Supp. 2d at 320.

[351] *Universal City Studios, Inc. v. Reimerdes*, 82 F. Supp. 2d 211, 218 (S.D.N.Y. 2000).

[352] *See* Tr. at 133:16–135:02 (May 20, 2016) (Dow, Walt Disney Co.) (citing *Corley*, 273 F.3d 429).

[353] SOFTWARE STUDY at 52; *see also* 2015 Recommendation at 159–64 (recommending unlocking exemption and noting "interoperability is favored under the law").

[354] SOFTWARE STUDY at 51–52, 59–60 (citing *Sega*, 977 F.2d at 1527–28 (holding that reverse engineering to make a video game console interoperable with defendant's video games was a fair use) and *Sony Comput. Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir. 2000) (holding

LOC_AR_00009294

As explained above, however, violations of section 1201(a) must be evaluated separately from questions of copyright infringement.  In prior rulemakings, the Office has suggested that section 1201(f) is unclear whether a person may circumvent for interoperability purposes if that person does not also perform an identification and analysis of the programmatic elements necessary to achieve interoperability.  In other words, even though paragraphs (f)(2) and (f)(3) contemplate the creation and distribution of information or circumvention tools to others "for the purpose of enabling interoperability," they do not provide an express exemption to the circumvention bar under section 1201(a)(1).[355]  Paragraph (f)(1), however, does provide an express exemption from liability under paragraph (a)(1), but only if circumvention is "for the sole purpose" of performing identification and analysis.[356]  For example, when recommending an exemption for jailbreaking smartphones in 2010, the Register remarked that

> [i]n enacting Section 1201(f), Congress provided that one who created a circumvention tool (a "means") to enable an independently created computer program to interoperate with a computer program (including a bootloader or an operating system) would be permitted to provide that circumvention tool to others so that they may use the tool to enable an independently created computer program to interoperate with another computer program when such activity is noninfringing.  Since Congress determined that it is lawful to make such tools and provide them to others for such purposes, it is difficult to imagine why Congress would nevertheless have wished to make it unlawful for others to use the tools for the purposes for which they were lawfully provided.[357]

The Register continued to note ambiguity in the statutory language when recommending multiple exemptions related to interoperability purposes, including cellphone unlocking and jailbreaking, in 2012[358] and 2015.[359]

---

that reverse engineering to allow playing of PlayStation video games on a desktop computer was a fair use)).

[355] 17 U.S.C. § 1201(f)(2)–(3).

[356] *Id*. § 1201(f)(1).

[357] 2010 Recommendation at 92.

[358] 2012 Recommendation at 71, 92 (noting that the Register was "confronted with an arguably ambiguous statute, the apparent purpose of which does not appear precisely to match its language").

[359] 2015 Recommendation at 337 n.2295 (recommending exemption for preserving video games and noting that ambiguity creates "significant doubt" regarding the applicability of section 1201(f)); *id*. at 206 n.1339 (jailbreaking smart televisions); *id*. at 368 n.2481 (3D printers); *id*. at 160

LOC_AR_00009295

After considering the legislative history and purpose of the exemption, however, the Office now believes that section 1201(f)'s meaning is fairly clear. In establishing an exemption for reverse engineering,[360] Congress aimed to "foster competition and innovation in the computer and software industry"[361] by allowing "legitimate software developers to continue engaging in certain activities for the purpose of achieving interoperability" to the extent permitted by prior law.[362] Multiple legislative history reports state that section 1201(f) was intended to preserve the effect of existing case law in this area, including specifically the Ninth Circuit's decision in *Sega Enterprises Ltd. v. Accolade, Inc.*[363] In that case, Sega, a video game manufacturer, brought copyright and trademark claims against Accolade, a manufacturer of games compatible with Sega's Genesis console. Accolade used a device called a decompiler to "transform[] the machine-readable object code contained in . . . Sega's game cartridges into human-readable source code," which it used to determine the interface specifications for the Genesis.[364] Then, Accolade copied into its game cartridges a small segment of initialization code contained in Sega cartridges used to prevent the playing of pirated games. By doing so, Accolade enabled its games to interoperate with the Genesis console.

The Ninth Circuit rejected Sega's claims. As to its copyright claim, the court held that because "disassembly is the only means of gaining access to those unprotected aspects of the program, and because Accolade has a legitimate interest in gaining such access (in order to determine how to make its cartridges compatible with the Genesis console)," Accolade's use of Sega's code, including "the code which 'unlocks' the . . . console," was

---

n.1028 (unlocking smartphones); *id.* at 307–08 (security research); *see also id.* at 192 (jailbreaking smartphones).

[360] In a separate context, the Supreme Court has defined reverse engineering as "starting with the known product and working backward to divine the process which aided in its development or manufacture." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974).

[361] SENATE JUDICIARY COMMITTEE REPORT at 13; *see also* HOUSE MANAGER'S REPORT at 13 (stating that section 1201(f) is intended to "avoid hindering competition and innovation in the computer and software industry").

[362] SENATE JUDICIARY COMMITTEE REPORT at 13; HOUSE MANAGER'S REPORT at 14.

[363] *See* SENATE JUDICIARY COMMITTEE REPORT at 13 ("The objective is to ensure that the effect of current case law interpreting the Copyright Act is not changed by enactment of this legislation for certain acts of identification and analysis done in respect of computer programs. *See, Sega Enterprises Ltd. v Accolade, Inc.*, 977 F.2d 1510[] (9th Cir. 1992.)."); HOUSE MANAGER'S REPORT at 14 ("[T]he goal of this section is to ensure that current law is not changed, and not to encourage or permit infringement."); COMMERCE COMMITTEE REPORT at 42 (same).

[364] *Sega*, 977 F.2d at 1514.

LOC_AR_00009296

a fair use.[365]  The court also rejected Sega's Lanham Act-based challenges to Accolade's use of code to bypass Sega's authentication sequence—an act which, if considered through the lens of section 1201, might reasonably be considered a circumvention of Sega's access control.  The court held that although Accolade's use of the initialization code resulted in the display of Sega's trademark on the user's screen, Sega could not prevail on its claims of trademark infringement and false designation of origin.  Because the initialization code had "the effect of regulating access to" the Genesis console, and because there was no industry awareness of "any feasible alternate method of gaining access," the court held that Sega was primarily responsible for any resulting consumer confusion and that Accolade should be permitted to continue its activities.[366]  In reaching that conclusion, the court noted that Accolade's objective—"to make its video game programs compatible with" the Genesis—"was a legitimate and a lawful one."[367]

Section 1201(f) reflects Congress' determination that activities such as Accolade's would continue to be permissible notwithstanding the new protections for TPMs.  First, section 1201(f)(1) preserves the court's holding that reverse engineering for legitimate interoperability analysis is a noninfringing use.  In *Sega*, the Ninth Circuit held that "disassembly of copyrighted object code is, as a matter of law, a fair use of the copyrighted work if such disassembly provides the only means of access to those elements of the code that are not protected by copyright and the copier has a legitimate reason for seeking such access."[368]  Accordingly, section 1201(f)(1) permits circumvention "for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs, and that have not previously been readily available to the person engaging in the circumvention."[369]

Second, section 1201(f)(2) reflects Congress' acknowledgement that reverse engineering activities similar to Accolade's may require the development and use of circumvention tools.  Although the legislative history states that decompilers and other "generally available" computer-programming tools are not covered by the anti-trafficking provisions, it notes that "[i]n certain instances, it is possible that a person may have to develop special tools to achieve the permitted purpose of interoperability."[370]  Section 1201(f)(2) thus creates an exemption to the anti-trafficking provisions allowing a person to "develop and employ technological means to circumvent a technological measure . . .

---

[365] *Id.* at 1520, 1524 n.7.

[366] *Id.* at 1528.

[367] *Id.* at 1529.

[368] *Id.* at 1518.

[369] 17 U.S.C. § 1201(f)(1).

[370] HOUSE MANAGER'S REPORT at 15.

LOC_AR_00009297

in order to enable the identification and analysis" set out in paragraph (f)(1).[371]  In addition, Accolade included code in its games to render them interoperable with Sega's console.[372]  The second clause of section 1201(f)(2) accommodates this scenario, permitting the development and use of circumvention tools "for the purpose of enabling interoperability of an independently created computer program with other programs."[373]

Third, section 1201(f)(3)—which, unlike the earlier subparts of section 1201(f), is not limited to either the anticircumvention or the anti-trafficking provisions—recognizes that the effect of the *Accolade* decision, in protecting Accolade's inclusion of circumvention code in games offered to consumers,[374] also implicitly authorized consumers to use this code to play Accolade games on Sega consoles.  As noted, Accolade "added the [initialization] code to . . . all games,"[375] thus giving consumers the means to circumvent the access control on the Genesis console.  Congress codified this result in section 1201(f)(3), which authorizes persons qualifying under sections 1201(f)(1) or (f)(2) to make "available to others" the information acquired during the reverse engineering process and the "means" for enabling interoperability "solely for the purpose of enabling interoperability of an independently created computer program with other programs."[376]  Thus, while the statute is not free from ambiguity, the Office believes that section 1201(f)(3)'s authorization to make circumvention tools and information available to others for the purpose of achieving interoperability must be read to correspondingly authorize recipients—including individual consumers—to use the tools for that purpose, provided the other statutory requirements are satisfied.  The

---

[371] 17 U.S.C. § 1201(f)(2); *see also* COMMERCE COMMITTEE REPORT at 42–43 (discussing the need to "develop special tools to achieve the permitted interoperability").

[372] *Sega*, 977 F.2d at 1515–16.

[373] 17 U.S.C. § 1201(f)(2).

[374] As noted, the relevant code included the SEGA trademark, and, in disposing of Lanham Act claims, the court noted that the code "has the effect of regulating access to the Genesis III console," which "serves to limit competition in the market for Genesis-compatible games."  *Sega*, 977 F.2d at 1528–30.

[375] *Id.* at 1516.

[376] 17 U.S.C. § 1201(f)(3).  The Senate Judiciary Committee Report refers to section 1201(f)(3) as a means to allow third parties to assist reverse engineers in their efforts.  *See* SENATE JUDICIARY COMMITTEE REPORT at 33 ("This subsection allows developers of independently created software to rely on third parties either to develop the necessary circumvention tools or to identify the necessary information to achieve interoperability.").  But the statutory language does not limit that provision to sharing information with third-party developers.  Moreover, the *Sega* opinion— which the same report describes as unaffected by the statute, *see id.* at 13—contemplates use of the relevant tools by consumers.

Office therefore agrees that under certain circumstances sections 1201(f)(2) and (3) already allow "circumvention after reverse engineering has been performed."[377]

While section 1201(f) therefore permits legitimate user acts of creating, distributing, and using circumvention tools for interoperability purposes, it also contains a series of important safeguards to protect the legitimate interests of copyright owners.[378] To start, the exempted activities may not constitute infringement or, with respect to section 1201(f)(3), violate other applicable law.[379] Next, circumvention must be "solely for the purpose of enabling interoperability."[380] Both case law and past rulemakings suggest that evidence of market alternatives to circumvention can be used to infer that a purpose is for reasons other than interoperability.[381] In addition, the statute requires that "an independently created computer program" be made interoperable with other computer programs.[382] Thus, in the 2015 rulemaking, the Register concluded that section 1201(f) would not cover cellphone unlocking, because circumvention in that context is done "to allow a device to connect to an alternate wireless network," not to make the device interoperable with an independently created computer program.[383] Finally,

---

[377] ORI Additional Comments at 4. An example may be remanufacturing print cartridges to make them interoperable with a competitor's printers, which the Office previously noted "could have been lawfully achieved by taking advantage of the defense found in §1201(f)." 2003 Recommendation at 176. It may also allow jailbreaking smartphones, for example, "in order to make the operating system on that phone interoperable with an independently created application . . . [when] the modifications . . . are made purely for the purpose of such interoperability." 2010 Recommendation at 100 (citations omitted). That being said, the Office will continue to grant exemptions where there is a sufficient evidentiary record in cases where there may be reasonable disagreement as to whether section 1201(f) applies.

[378] See HOUSE MANAGER'S REPORT at 15 ("[T]he goal of this section is to ensure that current law is not changed, and not to encourage or permit infringement. Thus, each of the acts undertaken must fall within the scope of fair use o[r] otherwise avoid infringing the copyright of the author of the underlying computer program.").

[379] 17 U.S.C. § 1201(f)(1)–(3); see also 2015 Recommendation at 197–201 (noting that jailbreaking of video consoles was highly correlated to piracy of games).

[380] 17 U.S.C. § 1201(f)(3).

[381] See, e.g., Reimerdes, 111 F. Supp. 2d at 320 (rejecting argument that DVD decryption was created to achieve interoperability); 2015 Recommendation at 197–201 (declining to recommend exemption for jailbreaking of video game consoles in part due to existence of market alternatives); 2000 Recommendation and Final Rule at 64,569 (discussing Reimerdes and noting "evidence that Linux players are currently being developed" under license).

[382] 17 U.S.C. § 1201(f)(1)–(3).

[383] 2015 Recommendation at 160 n.1028.

LOC_AR_00009299

circumvention under section 1201(f)(3) requires there to have been antecedent acts of reverse engineering under section 1201(f)(1) or 1201(f)(2).[384]

In light of this construction, the Office is not convinced that amendment of section 1201(f) is currently necessary to allow software engineers or consumers to engage in the legitimate activities to enable the interoperability that Congress intended.  The Office hopes that the interpretive guidance provided in this Report will be helpful to some users otherwise hesitant to rely upon the exemption absent clear case law.  That said, if Congress wishes to do so, the Office would also welcome legislative clarification of the circumstances under which persons may (or may not) engage in circumvention for interoperability purposes, apart from analyzing elements necessary to achieve interoperability.[385]  In the meantime, stakeholders can continue to rely on the triennial rulemaking process to obtain exemptions for activities that arguably may fall outside of those covered by section 1201(f).

Finally, the Copyright Office considered requests to expand section 1201(f) to permit reverse engineering for purposes of security research, unrelated to interoperability concerns.[386]  Although prior rulemakings have addressed the need to engage in reverse engineering for security research,[387] as discussed below, the Office concludes that that need is better addressed through the separate exemption for security testing set out in section 1201(j), or the triennial rulemaking, rather than through reform to section 1201(f).

### b. 1201(j) Exemption for Security Testing

Since passage of the DMCA in 1998, the unprecedented reliance upon software and digital networks in all facets of American life has brought with it a corresponding explosion of cybersecurity challenges.  The statutory exemption for security testing is both a testament to Congress' foresight in accommodating the relationship between

---

[384] 17 U.S.C. § 1201(f)(3); *see also Reimerdes*, 111 F. Supp. 2d at 320 ("Section 1201(f)(3) permits information acquired through reverse engineering to be made available to others only by the person who acquired the information.  But these defendants did not do any reverse engineering.  They simply took DeCSS off someone else's web site and posted it on their own.").

[385] One such model is provided in the Breaking Down Barriers to Innovation Act of 2015, which, among other changes, would broaden paragraph (f)(1) to permit circumvention for the purpose of "undertaking activities aimed at achieving interoperability."  H.R. 1883, 114th Cong. § 3(b)(1) (2015); S. 990, 114th Cong. § 3(b)(1) (2015).

[386] *See, e.g.*, Rapid7, Bugcrowd & HackerOne Initial Comments at 4 (suggesting that paragraph (f)(1)'s "sole purpose" language "hinders security research" because "interoperability is not necessarily the purpose of security research"); *see also* Timothy Pearson Initial Comments at 1.

[387] *See, e.g.*, 2015 Recommendation at 307 (citing 2015 Rulemaking Green Class 25 Supp. at 19–20, https://www.copyright.gov/1201/2015/comments-020615/InitialComments_LongForm_Green_Class25.pdf).

copyright and good-faith security research, and the product of a time when the current digital landscape could not possibly have been anticipated.

As the Office has repeatedly noted, "rules governing security research 'hardly seem the province of copyright, since the considerations of how safely to encourage such investigation are fairly far afield from copyright's core purpose of promoting the creation and dissemination of creative works.'"[388] Moreover, "[t]here are significant benefits to allowing security researchers to study software-enabled consumer products for potential vulnerabilities and to share their findings with the general public."[389] Indeed, many parts of the government have a vested interest in improving the nation's cybersecurity, including the Department of Commerce's Internet Policy Task Force, which "is conducting a comprehensive review of the nexus between cybersecurity challenges in the commercial sector and innovation in the Internet economy."[390] Most recently, the Office's 2016 report on *Software-Enabled Consumer Products* examined "whether existing copyright law enables or frustrates the public's ability to engage in security research involving software-enabled consumer products."[391] While the study did not examine section 1201, it concluded that "existing copyright law doctrines, properly interpreted, should protect this legitimate activity from infringement liability."[392]

While the Office concluded that existing copyright law doctrines are likely to immunize researchers from infringement concerns, it is less clear that the framework of chapter 12 is similarly accommodating. The constraints of section 1201(j) flow from its original purpose. As noted above, and as the Register explained in 2010, in enacting 1201(j), "Congress appeared to be addressing firewalls and antivirus software that were used on computers, computer systems and networks to protect their respective contents" and "wanted to encourage independent evaluation of such security systems."[393] But, as past rulemakings, congressional testimony, and comments received in this study reveal, there is a growing need for independent security research that falls outside these bounds. Since 1998, three temporary exemptions have been granted for various security research activities.[394] As a result, the two former Registers who have issued recommendations in

---

[388] SOFTWARE STUDY at 44 (quoting 2015 Recommendation at 316).

[389] *Id.*; *see also* 2010 Recommendation at 205.

[390] *Cybersecurity*, NTIA, U.S. DEP'T OF COMMERCE, https://www.ntia.doc.gov/category/cybersecurity (last visited June 8, 2017).

[391] SOFTWARE STUDY at 42.

[392] *Id.* at 45; *see also id.* at 45–51 (analyzing the idea/expression dichotomy, merger, and *scènes à faire* doctrines, *de minimis* uses, section 117 of title 17, and fair use).

[393] 2010 Recommendation at 196; *see also* 2015 Recommendation at 308 (quoting same).

[394] *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 71 Fed. Reg. 68,472, 68,477 (Nov. 27, 2006) ("2006 Final Rule") (sound

LOC_AR_00009301

the 1201 rulemakings since section 1201's enactment in 1998 have supported congressional review of 1201(j).[395]  Others echoed this recommendation, including NTIA[396] and a stakeholder who testified in the recent copyright review hearing on chapter 12.[397]

Against this backdrop, several commenters called for an overhaul of the permanent exemption for security testing under section 1201(j), characterizing the statutory language as insufficient to insulate good-faith security researchers from the reach of the circumvention and trafficking prohibitions.  Some noted that security researchers have petitioned for exemptions in the past several rulemakings due to uncertainty over whether section 1201(j) would cover their activities, arguing, for instance, "[t]he fact that it was necessary to petition for exemptions covering security research of medical devices and automobiles, even though security research is already a hardcoded exemption in Section 1201, shows why a much more definitive solution . . . is needed."[398]  Comments received were not uniform, however, with others arguing that the statutory language generally strikes an appropriate balance between the interests of researchers and

---

recordings and audiovisual works); 2010 Final Rule at 43,832–33 (video games); 2015 Final Rule at 65,955–56 (computer programs on a device or machine designed for use by individual consumers).

[395] *See Register's Perspective on Copyright Review: Hearing Before H. Comm. on the Judiciary*, 114th Cong. 29 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office); 2010 Recommendation at 205–06.

[396] NTIA, Recommendations of the National Telecommunications and Information Administration to the Register of Copyrights 76 (Sept. 18, 2015) ("2015 NTIA Letter"), https://www.copyright.gov/1201/2015/2015_NTIA_Letter.pdf (expressing support for a "broad good faith security exemption"); *see also* Letter from Lawrence E. Strickling, NTIA, to Marybeth Peters, Register of Copyrights 12 (Nov. 4, 2009), https://www.copyright.gov/1201/2010/NTIA.pdf (supporting a "limited exemption that permits research by academic, government, and private entities and individuals").

[397] *Chapter 12 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop. & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 80–81 (2014) (statement of Corynne McSherry, EFF) ("[T]he problem with 1201 is that it has inhibited things like security testing which is all the more important with the proliferation of DRM.").

[398] R Street Institute Initial Comments at 7; *see also* CDT Initial Comments at 10 ("[R]esearchers have asked for triennial exemptions to allow security research three times, each time citing uncertainty as to the applicability of 1201(j) to their proposed areas of research."); Tr. at 27:12–19 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) ("[C]omputer security researchers . . . made an effort this year to get exemptions and . . . we were all happy, those of us who care about cyber security, to see that the Office did recognize that there are some legitimate reasons to circumvent that the Office might recognize.").

LOC_AR_00009302

copyright owners,[399] and suggesting that additional activities are more properly considered through the triennial rulemaking, which can more flexibly respond to marketplace changes.[400]  But the majority supported making 1201(j) more useful, and even some stakeholders content with the current statute acknowledged the legitimate interests of good-faith security researchers.[401]

In light of stakeholder comments and the past experiences of the triennial rulemaking, the Copyright Office recommends that Congress consider reforming this exemption to better accommodate a broader range of legitimate security research, without compromising copyright's core objectives.  Specifically, as described below, the Office recommends that Congress consider expanding the reach of this exemption, easing the strict authorization requirement for researchers and restrictions on the use of information generated from the research, and abandoning or clarifying the multifactor test.  The Office believes that this measured approach will help accommodate critical cybersecurity concerns while preserving the copyright objectives in the anticircumvention provisions.  While the Office is not at this time proposing statutory language for reform, it continues to believe that the exemption adopted in 2015 can be a useful starting point, and notes that most of the security researchers who petitioned for that exemption, as well as other commenters, agree.[402]

---

[399] *See, e.g.*, AAP, ESA, MPAA & RIAA Additional Comments at 2; Copyright Alliance Additional Comments at 2; SIIA Additional Comments at 3.

[400] *See* AAP, ESA, MPAA & RIAA Additional Reply Comments at 9–10; DVD CCA & AACS LA Additional Comments at 4.

[401] *See* SIIA Initial Comments at 3 (noting that the security testing exemption was the result of "careful negotiation" which "successfully balance[d the] legitimate interest [in security testing] against risks of infringement"); BSA Additional Comments at 2–3 (endorsing a "measured approach . . . with respect to existing security research exemptions").  While AAP, ESA, MPAA, and RIAA, filing jointly, oppose legislative reform and suggest that the failure to renew past exemptions allowing for research on TPMs protecting copyrighted works suggests that "those circumstances changed," it is not clear that as a general rule they oppose otherwise appropriate exemptions, such as to allow for security research on access controls themselves.  AAP, ESA, MPAA & RIAA Additional Reply Comments at 9.

[402] *See* Prof. Andrea M. Matwyshyn on behalf of Profs. Steven Bellovin, Matt Blaze, Alex Halderman & Nadia Heninger ("Security Researchers") Additional Comments at 1 ("[T]he language of the granted exemption is suitable for adoption as a permanent exemption"); BSA Additional Comments at 2–3 ("The [2015] security research language . . . reflects the careful consideration that is necessary in evaluating potential changes to Section 1201(j)."); Repair Ass'n & iFixit Additional Comments at 11 ("[W]e urge the Copyright Office and the Congress to make this exemption permanent, while expanding it to cover any goods which contain a computer program."); *see also* Tr. at 109:16–19 (May 20, 2016) (Geiger, Rapid7) ("The temporary exemption is a big deal for us.  It is extremely helpful."); Tr. at 27:11–19 (May 25, 2016) (Samuelson, Univ. of

LOC_AR_00009303

1. *Definition of security testing.* One area for reform that has repeatedly surfaced in the last three rulemakings is the definition of security testing, which the statute limits to "accessing a computer, computer system, or computer network."[403] The issue is that modern security research may involve testing software or the actual access controls protecting a copyrighted work, and it is not clear that the exemption covers such research. For that reason, Register Peters twice recommended an exemption for security research related to TPMs themselves.[404] She further noted that the rulemaking structure limited the nature of the exemptions that could be granted: "While it may be socially beneficial to permit security testing and research in relation to all classes of works, neither the record nor the statute provide the Librarian with any basis to do so."[405] More recently, in 2015, Register Pallante recommended an exemption for security research on computer programs, finding "there is some uncertainty regarding whether section 1201(j) encompasses security research that is primarily focused on testing and identifying flaws in computer programs rather than security systems that protect computer systems."[406] Because it has become clear that there is a need for good-faith security researchers to access computer programs and TPMs protecting copyrighted works, the Office recommends that Congress expand the kinds of activities that a security researcher is permitted to perform under sections 1201(j)(1) and 1201(j)(3)(A).

The Office believes that the current temporary exemption for good-faith security research is a good starting point for discussion.[407] To be sure, some commenters found the scope of even this exemption—which limits the scope of security research to certain devices or machines, namely consumer-facing devices like voting machines, motorized land vehicles, and medical devices—too narrow,[408] while others characterized it as overbroad.[409] But as noted above, a group of professors in computer science and related

---

Cal. Berkeley Sch. of Law) (stating that at a recent "all day workshop with computer security researchers" she learned that they "were all happy . . . to see that [in the 2015 rulemaking] the Office did recognize that there are some legitimate reasons to circumvent").

[403] 17 U.S.C. § 1201(j)(1).

[404] *See* 2010 Recommendation at 196 ("Had Congress foreseen the problem, it is reasonable to conclude that it might have addressed the issue in more precise terms. But it appears that Congress did not envision protection measures themselves becoming the source of a security flaw or vulnerability."); *id.* at 203 n.666 (similar); 2006 Recommendation at 59 (similar).

[405] 2010 Recommendation at 205.

[406] 2015 Recommendation at 308.

[407] *See* 2015 Final Rule at 65,956; 2015 Recommendation at 319–20.

[408] *See, e.g.,* Rapid7, Bugcrowd, HackerOne & Luta Security Additional Comments at 4–5; CERT Coordination Ctr. ("CERT") Additional Comments at 2; EFF Additional Comments at 6–7.

[409] *See, e.g.,* AAP, ESA, MPAA & RIAA Additional Reply Comments at 9 ("[T]he record before the Copyright Office at that time had focused on cars, medical devices, and voting machines, not on

LOC_AR_00009304

fields, many of whom had participated in the rulemaking process, opined that the adoption of this exemption "would further buttress security researchers' ability to engage in good-faith testing, investigation and/or correction of security flaws and vulnerabilities aimed at consumer protection and national security enhancement."[410]

2.  *Authorization.*  Section 1201(j) requires researchers to obtain "authorization of the owner or operator of [the] computer, computer system, or computer network."[411] Independent security testing, however, appears to be an important component of current cybersecurity practices; a recent NTIA report found that a little more than fifty percent of security researchers work independently.[412]  In fact, the Copyright Office recently noted that a growing number of copyright owners, including Google, Facebook, Microsoft, Mozilla, Oracle, and Apple, encourage users to conduct security research, in many cases providing monetary incentives for those who identify problems and potential solutions.[413]

While growing industry practices may encourage independent security research, some companies see value in the authorization requirement in preventing "compromised systems" and the release of proprietary material.[414]  But a greater number of commenters urged reform of this requirement, noting that research could be chilled if the owner cannot be located, does not respond, or refuses permission when located.[415]  In the past

---

devices used by consumers to view and listen to expressive works.  Thus, the exemption should have been tailored accordingly."); DVD CCA & AACS LA Additional Comments at 4–5.

[410] Security Researchers Additional Comments at 1.

[411] 17 U.S.C. § 1201(j)(1).

[412] *See* NTIA, Vulnerability Disclosure Attitudes and Actions:  A Research Report from the NTIA Awareness and Adoption Group 4 (2016) ("NTIA Vulnerability Disclosure Report").

[413] Software Study at 45.

[414] BSA Additional Comments at 2–3 (recognizing that "it may be helpful to provide greater clarity in situations with multiple owners," but opposing eliminating this provision entirely, because "[u]nsanctioned, unauthorized system access under the guise of 'security research' can not only result in compromised systems, but also risks revealing to malefactors sensitive trade secrets, private consumer data, and other proprietary material").

[415] *See, e.g.,* CDT Initial Comments at 11 ("Due to the interconnected nature of many devices, systems, and networks, . . . determining *which* owner or owners must authorize the research is an increasingly complex task that may not always be possible."); Rapid7, Bugcrowd & HackerOne Initial Comments at 5 (arguing that "[i]f security research only takes place under circumstances dictated by the owner of the software, it may be difficult for the research to remain impartial, and the owner may prevent or delay publication of research that reflects negatively on the owner's software," which "can chill independent security research"); Yifan Lu Additional Reply Comments at 1 (stating that repeated attempts to gain authorization go unacknowledged); Tr. at 110:08–111:09 (May 20, 2016) (Geiger, Rapid7) (noting that "a lot of independent security

LOC_AR_00009305

rulemaking, the Office recognized that "[i]n some cases, it may be difficult to identify the relevant owner, such as when the focus of the research is on general-purpose software that runs on a wide range of devices, or where the owner of software on a particular device is not known.  Moreover, it may not be feasible to obtain authorization even where there is an identifiable owner."[416]  In part due to these concerns, the Register has recommended, and the Librarian granted, multiple exemptions for security research that do not require the researcher to first obtain authorization of the owner of the object being studied.[417]

For these reasons, the Copyright Office recommends that Congress add greater flexibility to the current authorization requirement, such as an exception in cases where the owner cannot be reached or is unresponsive, or remove it entirely, similar to the current temporary exemption.  While concerns over compromised systems and disclosure of sensitive information should not be minimized, these fears may be already accommodated through other parts of the exemption, including, but not limited to, requirements that research be conducted in good faith, and that information be disclosed without facilitating infringement, impairing security, disclosing trade secrets or business confidential information, or contravening privacy laws.[418]  Again, the Office believes that past rulemaking exemptions can be helpful in demonstrating alternate ways to address these concerns without imposing a blanket authorization requirement that may stymie the public policy goal of promoting security research.

*3. Multifactor test.*  Section 1201(j)(3) conditions eligibility upon "factors to be considered," including whether the information derived from the testing is "used solely to promote the security of the owner or operator" or "used or maintained in a manner that does not facilitate infringement under this title or a violation of applicable law other than this section, including a violation of privacy or breach of security."[419]  Many commenters found these provisions confusing because, as CDT put it, the statute "gives

---

researchers . . . actually receive cease-and-desist letters that reference the DMCA" and stating that the authorization requirement "means that manufacturers themselves get to control completely how the security research takes place and what the publication is like"); Tr. at 128:07–09, 129:01–02 (May 20, 2016) (Geiger, Rapid7) (stating that some manufacturers are difficult to contact); Tr. at 220:17–19 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) (noting "there are . . . times where the firm whose software is being tested is somebody that has reason to not want you to do it").

[416] 2015 Recommendation at 309 (citing 2015 Rulemaking Green Class 25 Supp. at 21–22, https://www.copyright.gov/1201/2015/comments-020615/InitialComments_LongForm_Green_Class25.pdf).

[417] *See, e.g.*, 2015 Final Rule at 65,963; 2010 Final Rule at 43,839; 2006 Final Rule at 68,480.

[418] 17 U.S.C. § 1201(j)(1)–(3).

[419] *Id.* § 1201(j)(3).

LOC_AR_00009306

no signal as to how those factors should be weighed."[420] SIIA, a group representing many rightsholders in this space, noted that these factors are intended to be "non-exclusive," and urged the Office to suggest that industry custom and trade usages could also be considered in determining eligibility for the exemption.[421]

Others objected to the specific language of one or both factors. Rapid7, Bugcrowd, and HackerOne argued, in joint comments, that the first factor—which looks to "whether the information derived from the security testing was used solely to promote the security" of the relevant owner or operator[422]—is overly restrictive because "security research may appropriately be undertaken for the benefit of software users or the broader public."[423] As to the second factor—which considers "whether the information derived from the security testing was used or maintained in a manner that does not facilitate infringement under this title or a violation of applicable law other than this section"[424]—EFF suggested that it provides inadequate protection because it "threaten[s] liability based upon the actions of third parties outside of the researcher's control."[425] More generally, CDT observed that regulating the disclosure of security information can implicate First Amendment concerns.[426] It noted that disclosure norms "are still evolving" and urged that any statutory changes "leave room for these efforts to comprehensively address disclosure practices."[427]

In rulemakings, the Register has acknowledged concerns over these requirements, stating "the multifactor standard in section 1201(j) may be difficult to apply [in cases where] . . . the security research sought would be aimed in part at advancing the state of knowledge in the field, and not 'solely' aimed at promoting the security of the owner or operator of the computer, computer system, or computer network (assuming such an

---

[420] CDT Initial Comments at 11; *accord* Repair Ass'n & iFixit Additional Comments at 13.

[421] SIIA Additional Reply Comments at 2–3 (quoting H.R. REP. NO. 105-796, at 67 (1998) (Conf. Rep.)).

[422] 17 U.S.C. § 1201(j)(3)(A).

[423] Rapid7, Bugcrowd & HackerOne Initial Comments at 4.

[424] 17 U.S.C. § 1201(j)(3)(B).

[425] EFF Additional Comments at 6.

[426] CDT Initial Comments at 11 (citing 2015 Recommendation at 311); *see also* Tr. at 228:01–18 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law).

[427] CDT Initial Comments at 11; *see also Multistakeholder Process: Cybersecurity Vulnerabilities*, NTIA, https://www.ntia.doc.gov/other-publication/2016/multistakeholder-process-cybersecurity-vulnerabilities; Tr. at 128:03–20 (May 20, 2016) (Geiger, Rapid7) (referencing the multistakeholder process and noting that disclosure "is not really the norm among industries right now").

owner could be identified)," and that "determining the relevant 'developer' to whom information must be disclosed could be difficult if not impossible in some instances."[428]

The Office recommends amending the statute to remove the "sole purpose" language and minimize uncertainty created by the multifactor test.  The Office agrees that the two factors may be intended to be non-exclusive and have commonsense applications in many cases.[429]  But in light of emerging industry practices, marketplace reality, and the lack of case law, these two factors are not always the only considerations relevant in evaluating responsible security research, and at any rate, it is not always feasible to consider *ex ante* how these factors will be applied to research.  One option would be to replace these factors with language similar to that of the 2015 security research rulemaking exemption:  "where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates . . . ."[430]  An alternative proposed by the Breaking Down Barriers to Innovation Act of 2015, and endorsed by some commenters, would simply eliminate this provision entirely.[431]  Absent legislative reform, the Office agrees with SIIA that it may be helpful to interpret the current provision to also require consideration of industry custom and trade usages, such as the National Institute of Standards and Technology's (NIST's) indices or ISO/IEC standards regarding disclosure of security vulnerabilities.[432]

4.  *Compliance with other applicable laws.*  Section 1201(j) exempts security testing only "if such act does not constitute infringement under this title or a violation of applicable law other than this section, including section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986."[433]  Some commenters suggested this clause should be removed because it "compounds both uncertainty and

---

[428] 2015 Recommendation at 309 (citations omitted).

[429] *See* SIIA Additional Reply Comments at 2–3 (citing H.R. REP. NO. 106-464, at 67 (1999) (Conf. Rep.)); AAP, ESA, MPAA & RIAA Additional Reply Comments at 11.

[430] 2015 Final Rule at 65,944.

[431] H.R. 1883, 114th Cong. § 3(a)(1)(F)(iii), (2015); S. 990, 114th Cong. § 3(a)(1)(F)(iii) (2015); *see* CDT Initial Comments at 11; EFF Initial Comments at 11–12; OTI Initial Comments at 13–15; Repair Ass'n & iFixit Additional Comments at 13 & n.18.

[432] SIIA Additional Reply Comments at 3; *see also Common Vulnerabilities and Exposures*, MITRE, https://cve.mitre.org (last visited June 9, 2017); 2015 Recommendation at 250 n.1667 (citing comments of Bellovin et al.) (suggesting that a temporary exemption should allow researchers to publicly disclose research results when "a copyright holder fails to comply with the standards set forth in ISO 29147 and 30111"); Rapid7, Bugcrowd, HackerOne & Luta Security Additional Comments at 5 (referencing NIST NVD/CVE); NTIA VULNERABILITY DISCLOSURE REPORT at 4.

[433] 17 U.S.C. § 1201(j)(2).

LOC_AR_00009308

risk without changing researchers' legal obligations," in light of ambiguity regarding liability standards under the CFAA.[434]  Similarly, commenters questioned the adoption of similar language in the 2015 temporary exemption.[435]  While the Copyright Office welcomes further discussion regarding whether a similar clause should continue to be included in an exemption granted through the triennial rulemaking,[436] it was not clear from this study that the requirement to comply with other laws impedes legitimate security research; other laws still apply even if the activity is permitted under section 1201.  Therefore, the Office does not recommend legislative reform of this provision.

### c.    1201(g) Exemption for Encryption Research

Congress adopted section 1201(g), which provides exemptions to both the circumvention and trafficking prohibitions for certain acts of encryption research, to ensure that the anticircumvention laws would not have "the undesirable and unintended consequence of chilling legitimate research activities in the area of encryption."[437]  Some commenters contended that section 1201(g) does not adequately serve the needs of persons engaged in good-faith encryption research,[438] while copyright industry representatives generally disagreed that section 1201(g) warrants legislative change.[439]  For the reasons outlined below, the Copyright Office suggests that this exemption, like the exemption for security testing, might benefit from revision, specifically the current authorization requirement and multifactor test.  In addition, further study, including by involving a broader range of participants, may be worthwhile in formulating concrete legislative proposals.

*1.  Authorization.*  While section 1201(g)'s requirement of a "good faith effort to obtain authorization" is more forgiving than the authorization requirement under the security testing exemption, there is a similar concern that it is not always possible to locate and

---

[434] EFF Initial Comments at 6–7; CDT Additional Comments at 4–5; *see also* CDT Initial Comments at 11 ("Alternately, CDT supports simply striking the portions of the statute requiring compliance with other laws and the unspecified consideration of factors, as proposed by the Breaking Down Barriers to Innovation Act."); Rapid7, Bugcrowd & HackerOne Initial Comments at 5 (stating that this requirement "creates additional ambiguity and risks for researchers" because the CFAA has been applied inconsistently by courts in different jurisdictions).

[435] *See* Rapid7, Bugcrowd, HackerOne & Luta Security Additional Comments at 4; CDT Additional Comments at 4–5; CERT Additional Comments at 1; EFF Additional Comments at 7.

[436] *See* 37 C.F.R. § 201.40(b)(7)(i).

[437] COMMERCE COMMITTEE REPORT at 27.

[438] *See, e.g.,* USACM Initial Comments at 3–4; Public Knowledge Additional Reply Comments at 1; OTI Initial Comments at 12–15.

[439] *See* DVD CCA & AACS LA Additional Comments at 6; SIIA Additional Comments at 3; AAP, ESA, MPAA & RIAA Additional Reply Comments at 11.

LOC_AR_00009309

request permission before engaging in fruitful research, and that projects are abandoned out of fear that efforts will be found to fall short of the good-faith requirement.[440] While AAP, ESA, MPAA, and RIAA emphasized that "[a]ll that is required is a good faith effort to obtain permission"[441]—a burden that they regard as reasonable given the expressed willingness of some TPM owners to consider license requests from researchers—others shared instances where security researchers were denied permission to engage in encryption research.[442] In the 2015 rulemaking, the Office found that, for cryptologists, "obtain[ing] authorization from copyright holders . . . may not always be feasible."[443] In light of these comments, and the growing industry customs and practices described above, the Office recommends removing or amending the authorization requirement.

2. *Multifactor Test.* As is true of section 1201(j), the encryption research exemption includes a list of statutory factors to be considered in determining whether a person qualifies for the circumvention exemption, which include whether and in what manner information derived from the research was disseminated; whether the person is engaged in a legitimate course of study, is employed, or is appropriately trained or experienced, in the field; and whether the person provides the copyright owner with notice of the findings and documentation of the research.[444] The comments for this study revealed concern that this list creates uncertainty among researchers as to whether their actions would be protected, including concerns that researchers lack sufficient control over the downstream distribution of information derived from the encryption research.[445] Commenters pointed out that the second factor unfairly penalizes researchers outside of the "field of encryption technology,"[446] and that the third factor, concerning whether the researcher provides notice to the "copyright owner of the work to which the

---

[440] *See, e.g.,* EFF Additional Comments at 6 (arguing that this "means the researcher must invite a potentially negative response from the manufacturer at an early stage, without being given any guarantee that their conduct will be considered lawful"); CDT Additional Comments at 6.

[441] AAP, ESA, MPAA & RIAA Additional Reply Comments at 11; *see also* DVD CCA & AACS LA Additional Comments at 6 ("DVD CCA and AACS LA . . . remain open to the possibility of licensing any reasonable non-infringing use such as security research, security testing, encryption research, and interoperability.").

[442] *See, e.g.,* Tr. at 220:17–19 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law); Tr. at 110:04–18 (May 20, 2016) (Geiger, Rapid7).

[443] 2015 Recommendation at 307.

[444] *See* 17 U.S.C. § 1201(g)(3).

[445] EFF Additional Comments at 6.

[446] 17 U.S.C. § 1201(g); *see* EFF Additional Comments at 6.

LOC_AR_00009310

technological measure is applied" does not apply in all situations.[447]  For many of the same reasons discussed in connection with section 1201(j), the Office believes it is advisable to amend the statute to minimize uncertainty.

3.  *Limited definition of encryption research.*  One academic commenter expressed concern that the current exemption does not cover other types of research, including circumventing encryption to study a computer virus, detect infringement, or determine whether an item is child pornography.[448]  While the Office agrees that these other activities may be socially beneficial, it is not clear that circumvention aimed at detecting infringement, for example, is best addressed within the confines of an exemption directed at fostering encryption research, rather than through a separate exemption, and so the Office does not see a current need to amend this definition.

4.  *Need for study.*  Some commenters suggested that it might be beneficial for additional security and encryption researchers to opine as to ways the current exemption may be modernized.[449]  While the Copyright Office believes that the issues identified above, regarding the authorization requirement and multifactor test, are sufficiently ripe for legislative consideration,  it agrees that further input that takes into account additional viewpoints as to the needs of modern research could be beneficial when moving forward with concrete legislative proposals.

### d.  1201(i) Exemption for Protection of Personally Identifying Information

Despite commenters expressing non-specific concerns regarding section 1201's relationship to technologies involving the collection of consumer information,[450] the

---

[447] *See* NTIA VULNERABILITY DISCLOSURE REPORT 6 ("Though . . . fear of legal action is not a barrier per se, it may cause researchers to deviate from their default choices on disclosure.  Increasing legal certainty, therefore, is a method that may improve adoption of best practices."); *see also* Mozilla Initial Comments at 3–4 (noting a case where a researcher was "threatened with legal action under Section 1201 for attempting to engage with the device manufacturers to report and resolve [discovered security concerns]"); EFF Additional Comments at 6 (stating that, under the current exemption for encryption research, "[a] researcher may be penalized . . . if they publish information in a way that can be used by independent third parties to violate copyright or other laws, or if they fail to communicate with the copyright owner").

[448] Pamela Samuelson, *Towards More Sensible Anti-Circumvention Regulations*, 5 NO. 5 CYBERSPACE LAW. 2, 5–6 (2000); *see* Tr. at 221:14–222:05 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law).

[449] *See* Tr. at 227:01–12 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law); *see also* Tr. at 232:18–233:01 (May 25, 2016) (Stoltz, EFF).

[450] *See* Tr. at 240:21–241:06 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) ("I think it is time to rethink [section 1201(i)] and see whether we can make it something that's

LOC_AR_00009311

Office received few substantive comments on section 1201(i), which exempts certain acts of circumvention "solely for the purpose of preventing the collection or dissemination of personally identifying information about a natural person who seeks to gain access to the work protected," provided that the circumvention does not violate any other law.[451] Practically speaking, one commenter suggested that consumers may lack incentive to use this exemption because this kind of circumvention is "fairly technically challenging" and "device specific."[452]

The Office notes that the growing prevalence of internet-connected devices in all facets of life may give rise to privacy concerns far beyond those contemplated at the time of the DMCA's enactment.[453] However, in light of the lack of discussion and the dearth of case law regarding section 1201(i), this provision appears premature for legislative reform. That being said, the Office notes that section 1201(i) includes language requiring that circumvention be "solely for the purpose of" and have the "sole effect" of disabling the collection or dissemination of personally identifying information. As noted above, the Office has recommended amending similar clauses in the security testing and reverse engineering exemptions, based on concerns that this language inhibits circumvention that has other purposes or effects, such as increasing security or promoting research; further study may reveal whether similar reform is advisable for this exemption.[454]

---

meaningful in this era when we're all scared about our private information leaking out there and we don't want people to have access to some of our information and hide it behind some sort of encryption wall that then means that we can't get our own information."); Tr. at 158:08–12 (May 20, 2016) (Koberidze) ("All those devices, smartphones, TVs and medical devices. Now we will have Amazon Alexa and then we will have smart homes. And everything will be connected. . . . A lot of privacy issues will arise.").

[451] 17 U.S.C. § 1201(i)(1)(D). While one commenter suggested that this exemption should be amended to allow for circumvention of access controls on game consoles "to determine if [his or her] personal and non-personal data is being tracked or transmitted to third parties," *see* starelikemckeehen poker club Initial Comments at 1, ESA responded that this request appears already to be covered under section 1201(i). ESA Reply Comments at 7.

[452] Tr. at 241:07–21 (May 25, 2016) (Wiens, iFixit).

[453] For example, the Federal Trade Commission recently settled a lawsuit with a smart TV manufacturer alleged to have surreptitiously transmitted and sold data related to individual user viewing habits. *See* Lesley Fair, *What Vizio was doing behind the TV screen*, FTC BUS. BLOG (Feb. 6, 2017, 11:05 AM), https://www.ftc.gov/news-events/blogs/business-blog/2017/02/what-vizio-was-doing-behind-tv-screen; *see also* Andrew Meola, *How the Internet of Things will affect security & privacy*, BUS. INSIDER (Dec. 19, 2016, 2:43 PM), http://www.businessinsider.com/internet-of-things-security-privacy-2016–8.

[454] The Breaking Down Barriers to Innovation Act would broaden section 1201(i) by removing the requirement that the circumvention be "solely" for the authorized purpose, as well as the requirement that it not violate another law. It also would allow circumvention to protect

LOC_AR_00009312

## 2. Proposed New Permanent Exemptions

### a. Assistive Technologies

One broadly endorsed potential new exemption was to make permanent an exemption to facilitate access to literary works (*e.g.*, e-books, digital textbooks, and PDF articles) by persons who are blind, visually-impaired, or print-disabled. As adopted in 2015, this exemption permits circumvention of TPMs applied to literary works distributed electronically, where the access controls "either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies."[455] It applies in the following circumstances:

> (i) When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels, or

> (ii) When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.[456]

An assistive technologies exemption has been adopted as a temporary exemption in the past five triennial rulemakings.[457] Stakeholders testified that the repeated participation in the rulemaking process has become especially burdensome and time-consuming for the blind and print-disabled community, who must rely upon this exemption to access much printed material, without certainty that it will remain in place.[458] AALL contended that "absent legislation mandating accessible versions of every work, there will always be a gap between the works available for those with and those without print

---

information about *any* natural person, not just one who seeks to gain access to the work protected. H.R. 1883, 114th Cong. § 3(d); S. 990, 114th Cong. § 3(d).

[455] 2015 Final Rule at 65,950.

[456] *Id.*

[457] 2015 Final Rule at 65,950; 2012 Final Rule, at 65,262; 2010 Final Rule at 43,839; 2006 Final Rule at 68,475; Copyright Office, Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 68 Fed. Reg. 62,011, 62,014 (Oct. 31, 2003) ("2003 Final Rule"). This exemption has been virtually unchanged, except for 2012, when it was slightly altered, including to encompass literary works that are not in e-book format.

[458] AFB Initial Comments at 9 (estimating that law students spent 527.2 hours supporting its petition for a renewed exemption); LDAA Initial Comments at 1–2 ("[H]aving to repeat the regulatory process every three years represents an unfair burdening of disability advocacy organizations who must submit comments . . . .").

LOC_AR_00009313

disabilities."[459]  This gap, the American Foundation for the Blind ("AFB") noted, "can make it more difficult for [blind, visually impaired, and print-disabled] individuals to meaningfully participate in all aspects of social and democratic dialogue."[460]  In joint comments, AFB, the American Council of the Blind, the National Federation of the Blind, Learning Ally, and the Samuelson-Glushko Technology Law & Policy Clinic noted that "[t]he record has consistently supported the need for the exemption to help people who are blind, visually impaired, or print disabled access e-books on equal terms" and argued that this exemption "is the quintessential example of an exemption category that should be made permanent."[461]

The study record did not reveal a substantive value to keeping this exemption in the rulemaking cycle, particularly in light of the burdens placed upon proponents.  While a limited number of commenters suggested that an assistive technologies exemption should remain subject to the rulemaking in case emerging technology lessens the need for an exemption,[462] overall, there was widespread support for the adoption of a permanent exemption.  The Office also notes that in past cycles, the temporary exemption has received no opposition and that even some rightsholders supported a permanent amendment.[463]  Further, even those commenters opposing the addition of a new permanent exemption endorsed the importance of accessibility.[464]

While some copyright owners predicted that the widespread adoption of EPUB 3.0 and HTML5 formats—both released in recent years—"could result in an amelioration or disappearance of the concerns related to disabled read-aloud functionality,"[465] these

---

[459] AALL Additional Comments at 2.

[460] AFB Initial Comments at 11.

[461] AFB, the Am. Council of the Blind, the Nat'l Fed'n of the Blind, Learning Ally & Samuelson-Glushko Tech. Law & Policy Clinic Additional Comments at 2.

[462] AAP, ESA, MPAA & RIAA Additional Reply Comments at 4–5 (opining that although they "support in principle that the marketplace must provide accessibility to copyrighted materials for the blind, visually impaired and print disabled," this exemption should remain a part of the rulemaking process); *see also* DVD CAA & AACS LA Initial Comments at 18 (stating they "are not aware of any additional categories of permanent exemptions that Congress should consider establishing").

[463] *See* Microsoft Corp. ("Microsoft") Initial Comments at 7–8.

[464] AAP, ESA, MPAA & RIAA Additional Reply Comments at 4 ("[W]hile AAP, ESA, MPAA and RIAA support in principle that the marketplace must provide accessibility to copyrighted materials for the blind, visually impaired and print disabled, they do not support amending Section 1201 to add a permanent exemption.").

[465] *Id*.  *But cf.* Microsoft Initial Comments at 7 (expressing support for making exemption permanent and stating, "Microsoft and other technology companies have taken some steps to facilitate the creation of accessible electronic content, but we know we need to do more.").

LOC_AR_00009314

industry efforts have not yet staved off the need for a dependable exemption. Indeed, groups representing individuals making use of the temporary exemptions argued that such measures are not a substitute for a permanent exemption. AFB argued that "[i]mposing further civic burdens on disabled individuals and requiring them or their representatives to repeatedly apply for exemptions as a precondition for equal access is deeply insensitive and harmful."[466] Further, it was noted that although the rulemaking has granted an assistive technologies exemption since 2003, over 90 percent of books remain unavailable in formats for the print-disabled.[467]

The Copyright Office has previously stated that it "continues to support congressional attention aimed at crafting a digital age update to exceptions in copyright law for persons who are blind or visually impaired."[468] In light of the repeated granting of the temporary exemption and the underling public policy of reducing burdens on people who are blind or print-disabled,[469] the Office believes that it would be appropriate to make this exemption permanent.

This exemption also would be appropriate in light of the recent adoption of the Marrakesh Treaty.[470] Under that agreement, contracting parties must provide "a limitation or exception to the right of reproduction, the right of distribution, and the right of making available . . . to facilitate the availability of works in accessible format copies for [the blind, visually impaired, or otherwise print disabled]."[471] Further, any protection against circumvention of TPMs may not prevent beneficiaries from enjoyment of such exceptions or limitations.[472] While the United States can satisfy these requirements through continued adoption of an exemption via the rulemaking, the Office agrees with some commenters that enactment on a permanent basis would advance the Treaty's goals.[473]

---

[466] AFB Initial Comments at 12; *see also, e.g.*, LDAA Initial Comments at 2–3; Microsoft Initial Comments at 7–8; Victoria Maciulski Additional Comments at 2.

[467] Tr. at 184:01–10 (May 20, 2016) (Koberidze).

[468] *Register's Perspective on Copyright Review: Hearing Before H. Comm. on the Judiciary*, 114th Cong. 26 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

[469] *See* USACM Initial Comments at 4.

[470] As noted, the United States has not yet ratified the Marrakesh Treaty.

[471] Marrakesh Treaty, art. 4(1)(a).

[472] *Id.* art. 7.

[473] *See, e.g.*, AALL Additional Comments at 1–2 (suggesting that a permanent exemption would be beneficial in demonstrating compliance with the Marrakesh Treaty, rather than relying on the triennial rulemaking to grant continued exemptions); AFB Initial Comments at 11; KEI Initial Comments at 9; *see also* Univ. of Ill. at Urbana-Champaign Additional Comments at 2 (noting 57 other nations have adopted an exception for assistive technologies). *But see* Tr. at 177:17–22 (May

Should Congress move forward in this area, the Office believes that the 2015 exemption could serve as an appropriate model.[474]  The Office acknowledges, however, that there may be some merit to commenters' concerns that the remuneration requirement may cause confusion in some circumstances.  This provision, which requires that the owner of the copyright in the accessed work be "remunerated, as appropriate . . . through customary channels,"[475] was added in 2012 out of proponents' recognition that "it was not their intent to create a situation where publishers are not getting paid for their works."[476]  Some commenters suggested that this requirement causes confusion because the exemption separately requires that the copy of the relevant work be "lawfully obtained," and suggested its removal.[477]  The Office recommends that any consideration of legislation include an assessment whether such a requirement is necessary.

The Office does not currently recommend a broader exemption to facilitate the use of assistive technology for non-literary works, an approach advocated by Public Knowledge, due to the lack of evidence that the triennial rulemaking cannot adequately accommodate the needs for such an exemption.[478]  The Office agrees with some commenters that "outside the narrow context of literary works" there has been "very

---

20, 2016) (Adler, AAP) (suggesting that the United States already complies with this aspect of the Marrakesh Treaty based in part on the adoption of the exemption via repeated rulemakings coupled with the Chafee Amendment).  The Chafee Amendment consists of exceptions and limitations for the blind or other people with disabilities, as well as "authorized entities," and is found in section 121 of the Copyright Act.  It does not include exceptions to the anticircumvention provisions of section 1201.  *See* 17 U.S.C. § 121.

[474] *See, e.g.,* Kernochan Center Additional Reply Comments at 2 (noting the 2015 exemption "is an appropriate formulation" for any new permanent exemption); EFF Additional Comments at 2–3 (supporting 2015 exemption language as "an improvement over the status quo," while also supporting a broader exemption).

[475] 37 C.F.R. § 201.40(b)(2).

[476] 2012 Final Rule at 65,263.

[477] LCA Additional Comments at 2–3 ("[I]f a sighted person purchases and reads an e-book, then gives it to her blind brother, could the brother circumvent the technological measure disabling the screen reader function without paying an additional fee to the publisher?  Would such an additional fee be 'appropriate?'  The answer is unclear.  If a blind person lawfully obtains a copy, the blind person should be able to read it, regardless of whether he obtained it by purchase or operation of the first sale or fair use doctrines."); *see also* Authors Alliance Additional Comments at 3; EFF Additional Comments at 3; NYIPLA Additional Reply Comments at 3.

[478] Public Knowledge Additional Comments at 2–3 (suggesting that this would "track the [Marrakesh] Treaty requirements"); *see also* Repair Ass'n & iFixit Additional Comments at 6 (advocating exemption that allows "software modifications that improve accessibility for Americans with other forms of disability").

LOC_AR_00009316

little in the records from prior rulemaking proceedings regarding other entertainment products" such as "video games, motion pictures or recorded music."[479]

### b. Obsolescence, Repair, and Modification

The Copyright Office received numerous comments advocating for statutory exemptions to permit circumvention to fix obsolete, damaged, or malfunctioning TPMs, to engage in diagnosis, maintenance, and repair of a device protected by a TPM, and to modify the software in such devices.[480]  As the Office understands, the first two categories aim to restore or maintain the status quo, by returning either the TPM or the device to a workable state.  Modification does not necessarily aim to restore the status quo, but would include enhancing or customizing a device.

The large volume of comments received—both in this study and in prior rulemakings— reflects the increasing use of access controls on a wide range of consumer devices containing copyrighted software.  As the Repair Association put it, "[e]ssentially all categories of manufactured products, from lightbulbs to toothbrushes, now contain software that is central to their functionality.  As a result, software has also become central to their repair."[481]  Consumer groups, particularly those representing automobile and tractor owners, expressed concern about copyright liability and their rights as an owner to maintain their vehicle.[482]  Growing public interest in repair activities is further reflected by the right-to-repair bills currently pending in several states, which would require manufacturers to sell the parts and software required to fix their products, as well as to publish repair manuals, providing consumers with the ability to fix their own products or bring them to a local repair shop.[483]

The Office has previously recognized section 1201's potential effect on legitimate repair activities.  In 2015 testimony to Congress, the Register noted that "consumers have voiced discomfort that Section 1201 prevents them from engaging in activities, such as

---

[479] AAP, ESA, MPAA & RIAA Additional Reply Comments at 4.

[480] See, e.g., Auto Care Initial Comments at 3; EFF Initial Comments at 12; iFixit Initial Comments at 1–2; Static Control Components, Inc. Initial Comments at 2; AALL Additional Comments at 2; Authors Alliance Additional Comments at 4; John Josephs Additional Comments at 1; Kevin Kenney Additional Comments at 1; LCA Additional Comments at 3; ORI Additional Comments at 2–3; SAA Additional Comments at 2; Edward Matthews Additional Comments at 1; Consumers Union Additional Reply Comments at 3; Eleni Kalfus Additional Comments at 1; Public Knowledge Additional Comments at 3; Misha Cohen Additional Comments at 1.

[481] Repair Ass'n & iFixit Additional Comments at 4.

[482] Auto Care Additional Comments at 3; iFixit Initial Comments at 1–2.

[483] See Kyle Wiens, You Bought That Gadget, And Damnit, You Should be Able to Fix It, WIRED (Mar. 22, 2017) https://www.wired.com/2017/03/right-to-repair-laws/.

LOC_AR_00009317

the repair of their automobiles and farm equipment, which previously had no implications under copyright law."[484]  In the most recent rulemaking, the Register found that TPMs protecting computer programs on vehicle electronic control units have a substantial effect on owners' ability to engage in lawful diagnosis and repair of their vehicles.[485]

And in this study, many commenters testified as to the impact of section 1201 on repair activities or obsolete TPMs.[486]  For example:

- a Nebraska Farm Bureau member explained that the addition of TPMs have made it impossible to employ mechanical repair and diagnostic methods to tractors and combines, adding time and expense to agricultural work;[487]

- a consumer voiced frustration with a combination ink-jet printer, copier, and scanner, where the scanner stopped working because the printer "was out of yellow ink and [there was] no way to bypass it;"[488] and

- AALL explained that libraries increasingly face issues with obsolete access controls blocking preservation efforts with respect to born-digital materials.[489]

In addition, some argued that the "use of electronic locks that prevent repair" are really "about protecting the competitive position of manufacturers for repair services" and are outside the purpose of copyright.[490]

---

[484] *Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 23–24 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

[485] 2015 Recommendation at 240.

[486] *See, e.g.*, IPT USC Initial Comments at 3 (arguing that farmers who want to repair their equipment "face the impractical challenge of seeking renewals for exemptions while simultaneously managing the specific and time-sensitive needs of their farms"); Brian Ehrhart Additional Comments at 1 (suggesting consumers should be empowered "to address their own problems, rather than being forced to wait on arbitrary decisions by software developers as to what is or is not a priority."); Free Software Foundation Additional Comments at 3 ("The ability to research or repair devices should likewise not be impaired by DRM."); Kevin Kenney Additional Reply Comments at 1 (suggesting section 1201 "prevents farmers [and] ranchers like myself from fixing our own equipment"); EFF Additional Comments at App'x 1 (advocating "strong, practical, and permanent exemptions" "to protect repair, security research, and other lawful activity" and including a petition with 11,334 signatures).

[487] Kevin Kenney Additional Reply Comments at 1.

[488] Michael Oeth Additional Comments at 1.

[489] AALL Initial Comments at 3.

LOC_AR_00009318

The growing demand for relief under section 1201 has coincided with a general understanding that bona fide repair and maintenance activities are typically noninfringing. The Copyright Office's recent study on *Software-Enabled Consumer Products* recognizes that repair activities are often protected from infringement claims by multiple copyright law provisions, including the fair use doctrine and section 117.[491] As the report explained, "the fundamental purpose of any repair is to preserve or restore the functionality of a software-enabled device so that it may continue to be used. In this respect, repair supports—rather than displaces—the purpose of the embedded programs that control that device."[492] Similarly, the Office concluded that "section 117 'should adequately protect most repair and maintenance activities'" for software-enabled devices.[493]

As described in detail below, to the extent section 1201 precludes diagnosis, repair, and maintenance activities otherwise permissible under title 17, the Office finds that a limited and properly-tailored permanent exemption for those purposes, including circumventing obsolete access controls for continued functioning of a device, would be consistent with the statute's overall policy goals. The Office does not, however, recommend that such a permanent exemption extend to circumvention for purposes of making other lawful modifications to software, or "tinkering." Instead, the Office recommends that these activities continue to be addressed through the rulemaking process, which is able to tailor exemptions to specific classes of works, based on the evidentiary record.

*Obsolete, Damaged, or Malfunctioning TPMs.* In part because past rulemakings have demonstrated both a repeated need for this exemption and the limited reach of the rulemaking to adequately address this issue, the Office recommends a permanent exemption for obsolete, damaged, or malfunctioning access controls, where circumvention is necessary for continued functionality. The types of TPMs that historically have become obsolete or damaged include "dongles," described as "hardware locks attached to a computer that interact with software programs to prevent unauthorized access to that software."[494] Such TPMs may also include server- or

---

[490] Repair Ass'n & iFixit Additional Reply Comments at 7.

[491] SOFTWARE STUDY at 33, 39–41 (also addressing the idea/expression dichotomy, merger, *scènes à faire*, and *de minimis* uses).

[492] *Id.* at 40.

[493] *Id.* at 35 (citation omitted).

[494] 2000 Recommendation and Final Rule at 64,565.

LOC_AR_00009319

hardware-checks, where a TPM connects to a different device, locally or remotely, to authenticate the work at issue as being a legitimate copy.[495]

This category has been the topic of multiple prior rulemakings, whose records are replete with descriptions of abandoned or otherwise no-longer-supported access controls preventing a user from the continued lawful use of a work.[496]  In fact, each time there has been a sufficient evidentiary record to evaluate a requested exemption related to obsolete access controls, the Register has recommended, and the Librarian adopted, an exemption for such uses.[497]  In this study, several commenters, including those representing libraries or archives, argued there was a need to accommodate concerns about obsolescence.[498]  For example, Authors Alliance argued that there is a real "[c]oncern about the difficulty of preserving born-digital works" and that obsolete TPMs silence "born-digital works [that] suffer from digital locks that have rusted shut."[499]  On the other hand, others suggested that the rulemaking may be able to accommodate these needs.[500]

---

[495] See 2015 Recommendation at 321 (addressing video games that "connect to an 'authentication server' to verify that the game is a legitimate copy.  This connection or 'check' may be made once, at initial installation, or periodically throughout gameplay.").

[496] See, e.g., 2010 Final Rule at 43,833–34; 2006 Final Rule at 68,475; 2003 Final Rule at 62,013–14; 2000 Recommendation and Final Rule at 64,565–66.

[497] In many instances, the exemptions also considered whether the TPM was damaged or malfunctioning.  See, e.g., 2015 Recommendation at 352 (abandoned video games); 2006 Final Rule at 68,475 (for "[c]omputer programs protected by dongles that prevent access due to malfunction or damage and which are obsolete"); 2003 Final Rule at 62,013–14; 2000 Recommendation and Final Rule at 64,564–66 (for "[l]iterary works, including computer programs and databases, protected by access control mechanisms that fail to permit access because of malfunction, damage or obsoleteness").  But see 2015 Recommendation at 355 (denying request for exemption to circumvent obsolete TPM on music recording software due to absence of any substantive submission supporting the exemption).

[498] See, e.g., Consumers Union Additional Reply Comments at 3 (recommending a permanent exemption "for addressing obsolete or discontinued technologies" including "circumvention to address malfunction or damage as well"); AALL Initial Comments at 3–4; EFF Additional Comments at 5; LCA Additional Comments at 3.

[499] Authors Alliance Additional Comments at 4.

[500] AAP, ESA, MPAA & RIAA Additional Reply Comments at 7 (stating "there has been no consistency with respect to the petitions submitted, the exemptions granted, or the perceived problems articulated by proponents"; noting exemption for "accessing video games where authentication servers were no longer supported" was done so "for the first time" and was limited to "a specific market sector and included several limitations on its exercise").

LOC_AR_00009320

But as former Register Peters testified in 2001, the 1201 rulemaking process is a "somewhat ill-fitting regulatory approach," as damaged, malfunctioning, or obsolete TPMs potentially affect all classes of works, which could, "paradoxically, result in the conclusion that the problem is not one that can be resolved pursuant to [the rulemaking process], which anticipates exemptions only for 'a particular class of works.'"[501]  For that reason, the Register previously recommended that Congress adopt a permanent exemption for obsolete, damaged, or malfunctioning TPMs.[502]  The Office continues to support this permanent exemption for such access controls.

The definition of "obsolete" in section 108 may be a good starting point for defining obsolete access controls.[503]  Multiple rulemakings have imported the definition into regulatory language stating:  "'Obsolete' shall mean 'no longer manufactured or reasonably available in the commercial marketplace.'"[504]  The Office believes that this approach would be equally appropriate as statutory language, and suggests circumvention be permitted where it is necessary for continued lawful use of a work.

*Diagnosis, Maintenance, and Repair.*  The Office concludes that a properly-tailored exemption for repair activities could alleviate concerns regarding section 1201's effect on consumers' ability to engage in legitimate activities that did not previously implicate copyright law, without creating a material risk of harm to the market for or value of copyrighted works.  As discussed above, virtually all agree that section 1201 was not intended to facilitate manufacturers' use of TPMs to facilitate product tying or to achieve a lock-in effect under which consumers are effectively limited to repair services offered by the manufacturer.  Further, while temporary exemptions are necessarily limited to

---

[501] *U.S. Copyright Office: Hearing Before the Subcomm. on Courts, the Internet, and Intell. Prop. of the H. Comm. on the Judiciary*, 107th Cong. 12 (2001) (statement of Marybeth Peters, Register of Copyrights and Dir., U.S. Copyright Office) (citing 2000 Recommendation and Final Rule at 64,565).

[502] *Id.* at 12 (statement of Marybeth Peters, Register of Copyrights and Dir., U.S. Copyright Office) ("I recommended that Congress consider amending Section 1201 to provide a statutory exemption for all works . . . that are protected by access control mechanisms that fail to permit access because of malfunction, damage or obsoleteness."); *see also* 2000 Recommendation and Final Rule at 64,565.

[503] 17 U.S.C. § 108(c)(2) ("[A] format shall be considered obsolete if the machine or device necessary to render perceptible a work stored in that format is no longer manufactured or is no longer reasonably available in the commercial marketplace.").

[504] 2003 Recommendation at 198; *see* 2006 Final Rule at 68,475; 2000 Recommendation and Final Rule at 64,565–66; *see also* NYIPLA Additional Reply Comments at 5 (recommending this approach).  *But see* Public Knowledge Additional Reply Comments at 1 (arguing it was not necessary to tie exemption to section 108, although not offering alternative language).

LOC_AR_00009321

specific classes of works,[505] a limited permanent exemption for repair activities could provide greater certainty to users across classes of works, including software-enabled products. It may also help restore the focus of the rulemaking to users seeking "to access and make noninfringing uses of expressive copyrighted works such as motion pictures, video games and e-books, as Congress undoubtedly had in mind when it created" that process.[506]

The Office recognizes that many copyright owners have expressed concern over an exemption for these purposes,[507] although some appeared to recognize that section 1201 may have room to accommodate legitimate repair activities, particularly of motor vehicles.[508] SIIA noted that its members "routinely spend millions in providing technical support to their customers" and argued that the "mere existence of an extensive support network does not justify unfettered and harmful access to our members' intellectual property."[509] ESA argued that "a permanent repair exemption as to video game devices" could threaten "[t]echnological measures . . . critical to the protection of creative works on consoles and other gaming devices," because "circumvention of those measures is closely linked to infringement."[510] Other copyright owners expressed general opposition to adoption of any additional permanent exemptions, but did not comment specifically on whether Congress should establish a permanent exemption for diagnosis, maintenance, or repair.[511] The Office notes that in the most recent rulemaking, these stakeholders did not oppose exemptions for vehicle repair.[512]

---

[505] *See* 17 U.S.C. § 1201(a)(1)(C).

[506] 2015 Recommendation at 2.

[507] *See, e.g.*, BSA Additional Comments at 2; Ass'n of Equip. Mfrs. & Equip. Dealers Ass'n ("AEM & EDA") Additional Comments at 2.

[508] AAP, ESA, MPAA & RIAA Additional Reply Comments at 14 (disagreeing with need for amendment to anti-trafficking provisions but "acknowledg[ing] that circumvention in the context of automobile repair or other forms of repair might present a unique and distinguishable set of circumstances"); *see also* Tr. at 37:22–38:03 (May 25, 2016) (Chertkof, RIAA) (acknowledging RIAA's concerns are not with automobile circumvention but expressing concern over line-drawing); Tr. at 56:01–57:03 (May 25, 2016) (Sheffner, MPAA).

[509] SIIA Initial Comments at 6.

[510] ESA Initial Reply Comments at 5–6.

[511] *See* Copyright Alliance Additional Comments at 2; DVD CCA & AACS LA Additional Comments at 2–3 (in response to question regarding obsolete access controls, stating "DVD CCA and AACS LA have no additional comments at this time"); AAP, ESA, MPAA & RIAA Additional Reply Comments at 5–6 (addressing only "modification" prong of the study's Second Notice).

[512] *See* 2015 Recommendation at 228 (describing opposition comments received regarding vehicle repair exemption).

LOC_AR_00009322

To the extent that rightsholders are concerned that an exemption to accommodate diagnosis, repair, maintenance, and obsolescence would be overbroad or misused,[513] the Office believes that these concerns can be adequately addressed with appropriately drafted statutory language.  While the Copyright Office is not suggesting specific legislative text, believing instead that continued stakeholder discussion would be beneficial to any legislative process, it offers a few guidelines for consideration.  First, as both rightsholders and user groups recognized,[514] Congress anticipated the need to accommodate repair and maintenance activities in section 117, which contains definitions of "repair" and "maintenance" in section 117(d).[515]  These definitions may provide a reasonable starting point for future legislation.[516]  Linking an exemption to section 117(d) would seem to address vagueness concerns, while still providing meaningful relief to many consumers and repair technicians.[517]  Second, the Office also recommends that any permanent exemption also require that circumvention be a necessary step to allow the diagnosis, repair, or maintenance, as is required under the

---

[513] *See, e.g.*, AAP, ESA, MPAA & RIAA Additional Reply Comments at 6.

[514] *See, e.g.*, Public Knowledge Additional Comments at 3–4 ("While modification may raise concerns about infringing uses, by tying the exemption to the existing Section 117 exceptions, rights holders will still have recourse in enforcing their copyrights under existing case law.  We believe that an exemption limited strictly to Section 117 would be inadequate, as the Office itself has granted related exemptions on the basis of both Section 117 and fair use."); AAP, ESA, MPAA & RIAA Additional Reply Comments at 6 (noting that "'maintenance and repair' can be tied to Section 117 activity"); Motor & Equip. Mfrs. Ass'n ("MEMA") Additional Comments at 4.  *But see* Repair Ass'n & iFixit Additional Reply Comments at 8 (urging a broader exemption); Auto Care Additional Comments at 4–5 (suggesting an exemption "cover[ing] all activities necessary for the repair or customization of a motor vehicle"; listing activities).

[515] 17 U.S.C. § 117(d) states:

> For purposes of this section: (1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and (2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.

[516] The Office did not receive comments in support of its inquiry whether existing legal doctrines of repair and reconstruction in patent law, or "right to repair" bills introduced in state legislatures, could be helpful on this issue.  *See also* Public Knowledge Additional Comments at 5 ("We do not think it is appropriate to look to patent, trademark, or state law in determining the contours of an exemption from circumvention liability."); NYIPLA Additional Reply Comments at 4 (rejecting analogy to repair/refurbishment doctrine).

[517] For example, remanufacturing processes may fit within section 117(d)'s scope.  *See* MEMA Additional Comments at 3 ("Remanufacturing processes incorporate technical specifications (including engineering, quality and testing standards) to yield fully warranted products.").

LOC_AR_00009323

current exemption for motor vehicle software.[518]  Third, the Office recommends against limiting an exemption to specific technologies or devices, such as motor vehicles, as any statutory language would likely be soon outpaced by technology.  Fourth, to the extent that commenters oppose an exemption for repair out of non-copyright related concerns, such as public safety, the Office believes these matters are better addressed through laws or regulations outside of the Copyright Act.[519]

*Lawful Modification.*  Modification or "tinkering," however, raises significantly different issues from repair.  Colloquial uses of tinkering may refer to activities related to diagnosis, analysis, maintenance, repair, and modifications to facilitate interoperability, but also include a broader range of practices related to customization, experimentation, and improvement.[520]  An exemption of this type might permit, for example, circumvention of access controls on a car's electronic control unit to make software modifications that would improve a vehicle function.[521]

Many commenters representing user interests supported such an exemption.[522]  EFF argued that while "[d]iagnosis, maintenance, and repair of personal devices are important, and in need of greater legal certainty . . . . [t]here are . . . many other

---

[518] 2015 Final Rule at 65,954; *cf.* 17 U.S.C. § 117(a) (conditioning exception for making copy or adaptation of computer program on requirement that it is "an essential step in the utilization of the computer program in conjunction with a machine").

[519] *See, e.g.*, AEM & EDA Additional Comments at 2 ("AEM and EDA oppose the enactment of any permanent exemption to circumvention for diagnosis, repair, maintenance or modification that would pose unnecessary risks to public safety, the environment and the economy."); BSA Additional Comments at 2 ("With self-driving cars on the horizon, it is not difficult to imagine how mere 'diagnoses' or 'repairs' that might seem appropriate could create software modifications resulting in safety hazards and unknown consequences to third parties.").

[520] *See, e.g.*, ORI Additional Comments at 3 ("Those engaged in the secondary market for such products should be allowed to circumvent the TPM on the software for the purpose of changing the authenticated user."); Consumers Union Additional Reply Comments at 2 (suggesting that section 1201 prevents consumers from "being able to tinker with the product, to customize or adapt it, to improve its utility or performance, to get it repaired, or to remove its parts and use them in some other product"); Tr. at 258:15–18 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) ("I'm trying to make [a] device, whether it's software or an actual gadget, do something that I want it to do better than the device that I bought, is that repair?  Is that tinkering?").

[521] *See* 2015 Recommendation at 218–49.

[522] *See, e.g.*, Tr. at 27:10–11 (May 25, 2016) (Samuelson, Univ. of Cal., Berkeley Sch. of Law) ("Much user innovation actually comes out of tinkering with technologies."); Public Knowledge Initial Reply Comments at 5; John Josephs Additional Comments at 1; Repair Ass'n & iFixit Additional Comments at 4; *see also* Pamela Samuelson, *Freedom to Tinker* 2, THEORETICAL INQUIRES IN LAW (forthcoming), https://ssrn.com/abstract=2800362.

LOC_AR_00009324

important and lawful reasons to modify copies of computer programs."[523]  Similarly, the Repair Association and iFixit contended that "[w]ith computer software providing key parts of the functionality of many devices bought by American consumers and businesses, repair and improvement of those devices will depend on their ability to modify software, just as they currently have the ability to modify hardware they've purchased."[524]

Copyright owners strongly opposed an exemption for "tinkering" on the ground that it would be vague and overbroad.  AAP, ESA, MPAA, and RIAA opined that "[t]his type of broad-brush approach was rejected by Congress when the DMCA was drafted because creating such vaguely-defined exemptions without specific instructions . . . is a recipe for misuse and confusion."[525]  Moreover, they indicated that an exemption for modification would present substantially greater risk of infringement than one limited to diagnosis, repair, and maintenance: "[W]hile 'maintenance and repair' can be tied to Section 117 activity, going beyond that to cover all 'modifications' or 'customizations' or efforts to 'improve the functionality' of computer programs would invite the creation of infringing derivative works."[526]  In their view, these concerns would not be mitigated by, for example, prohibiting unauthorized use of works other than the accessed computer program, or by limiting the exemption to programs that "do 'not in turn create any protected expression' when executed," similar to the United Kingdom's anticircumvention law.[527]

These concerns of copyright owners are valid, and the comments received in response to this study suggest that tinkering is hard to define, and that there is no accepted meaning or limitations on what it involves.  To be sure, in many cases modification activities may not implicate significant copyright interests.  On the other hand, some tinkering activities may result in the creations of new works in ways that implicate the copyright owner's exclusive right to prepare derivative works.[528]  Commenters have suggested no reliable way to define with any precision a category of lawful adaptations, generally, for

---

[523] EFF Additional Comments at 4.

[524] Repair Ass'n & iFixit Additional Comments at 9.

[525] AAP, ESA, MPAA & RIAA Additional Reply Comments at 6.

[526] *Id.*

[527] *Id.* at 6–7 (citation omitted) (quoting Section 1201 Study:  Request for Additional Comments, 81 Fed. Reg. at 66,297 (citing example of TPMs used to protect access to the operating software in video game consoles and suggesting that plaintiffs in a legal system like the UK's "face additional, unnecessary hurdles in litigation against pirate enterprises"); *see* Copyright, Designs and Patents Act 1988, c. 48, § 296ZA (UK) (circumvention bar that specifically excludes TPMs applied to computer programs).

[528] *See* 17 U.S.C. § 106(2).

LOC_AR_00009325

purposes of section 1201. Accordingly, in contrast to diagnosis, repair, and maintenance, the Office cannot say that lawful modification of software is categorically unlikely to result in harm to the legitimate interests of copyright owners.[529]

The Office therefore concludes that such activity does not provide an appropriate basis for a permanent exemption at this time. The triennial rulemaking process, however, will continue to provide a means to obtain exemptions for these uses,[530] and the Office is hopeful that the streamlining changes outlined below will lessen the burden of renewing exemptions found to satisfy the statutory requirements. Moreover, as described above, the Office believes that section 1201(f) should be available to accommodate many concerns related to software interoperability.[531] Collectively, these exemptions may cover a substantial portion of circumvention activities involving software-enabled products in which there is a legitimate consumer interest.

### c. Device Unlocking

Since 2006, the triennial rulemaking has involved consideration of exemptions for unlocking cellphones, *i.e.*, enabling them to connect to the network of a different mobile wireless carrier. In the 2015 rulemaking—as directed by the Unlocking Act[532]—the Register considered whether to extend the exemption to other categories of wireless devices. The Unlocking Act's legislative history notes that consumers have "a legitimate interest in unlocking" their used cellphones to connect to an alternate network.[533] In recommending the 2015 exemption the Register similarly concluded that, as a general matter, the unlocking of certain types of used mobile devices is likely to be a fair and noninfringing use, and that absent an exemption, consumers would be adversely

---

[529] *See, e.g.*, AAP, ESA, MPAA & RIAA Additional Reply Comments at 6–7 ("[M]anufacturers of video game consoles use access controls to prevent piracy not only by restricting access to computer programs that render video games perceptible, but also by restricting access to the software that operates the consoles and authenticates games. Circumvention of such access controls leads to play of pirated games."); *see also* 2015 Recommendation at 241 (recommending that the exemption permitting lawful modification of motor vehicle software exclude programs controlling telematics or entertainment systems, to avoid "a diminution in the value of copyrighted works if those systems could no longer reliably protect the content made available through them").

[530] *See* 2015 Final Rule at 65,963 (adopting exemption for, *inter alia*, lawful modification of a vehicle function).

[531] For example, as discussed above, section 1201(f) may separately exempt certain activities related to replacement parts. *See also Lexmark*, 387 F.3d at 550–51 (disagreeing with district court's rejection of section 1201(f) defense).

[532] *See* Unlocking Act § 2(b), 128 Stat. at 1751.

[533] H.R. Rep. No. 113-356, at 3 (2014).

LOC_AR_00009326

affected in their ability to engage in such activity.[534]  Based on that recommendation, the Librarian adopted an unlocking exemption that applies to used wireless devices of the following types:

> (A) Wireless telephone handsets (*i.e.*, cellphones);

> (B) All-purpose tablet computers;

> (C) Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and

> (D) Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.[535]

Some commenters supported adopting a permanent exemption in substantially the same form as the 2015 exemption.[536]  Others urged the Office to recommend a broader exemption applicable to "all devices that connect to a wireless network, rather than freezing a list of categories of devices into the statute."[537]

Some copyright owners, on the other hand, were skeptical of the need to make any unlocking exemption permanent through legislation, stating, for example, that although they "have no objection in principle to the notion that consumers should be able to connect their devices to the mobile wireless network(s) of their choosing," they see no reason to revisit Congress' determination in the Unlocking Act that such requests would continue to be addressed through the triennial rulemaking.[538]

The Unlocking Act, recent rulemaking proceedings, and comments received in this study collectively reflect a broad level of agreement that device unlocking provides an appropriate basis for an exemption in at least certain circumstances.  Significantly, the

---

[534] 2015 Recommendation at 169–71.

[535] 2015 Final Rule at 65,952.

[536] *See, e.g.*, Competitive Carriers Ass'n Additional Comments at 3; ISRI Additional Comments at 2; *see also* Kernochan Center Additional Reply Comments at 2 ("[I]t is preferable to use the exemption as formulated in the 2015 rulemaking proceeding, and add devices pursuant to the triennial proceeding, to the extent justified by the evidence presented.").

[537] Consumers Union Additional Reply Comments at 3; *see also* Mozilla Additional Comments at 2 (urging the Office to "craft language that achieves the underlying purpose in a way that adapts to current and future technologies"); Repair Ass'n & iFixit Additional Comments at 6–7 ("[T]he language of the existing exemption is too specific.").

[538] AAP, ESA, MPAA & RIAA Additional Reply Comments at 5; *see also* NYIPLA Additional Reply Comments at 4 ("[M]aking the unlocking exemption of 2015 permanent would be premature.").

LOC_AR_00009327

2015 exemption generated only minimal opposition from stakeholders, and those complaints were directed to relatively narrow definitional concerns.[539]  And in this study, even those opposed to addressing this issue through legislation did not dispute the public's interest in unlocking mobile devices or suggest that it threatens the value of copyrighted works.  On the other hand, commenters in favor of a statutory exemption did not demonstrate a strong demand to make this exemption permanent, as opposed to repeat adoption through the triennial rulemaking process, and rightsholders suggested that the rulemakings will continue to accommodate the need for renewed exemptions.

In light of these considerations, if Congress wishes to provide more certainty to users, the Office recommends the adoption of a permanent unlocking exemption, based upon the regulatory language repeatedly granted in the rulemakings.  At the same time, the Office recognizes that Congress considered this issue in 2014 and elected not to follow that approach.  Further, the Office believes that the streamlining changes outlined below will serve as a useful alternative to legislation for purposes of renewing exemptions to which there is no opposition.

### d.  Library and Archival Uses

Libraries and archives advocated a new permanent exemption allowing them to circumvent for broader purposes than the existing permanent exemption set out in section 1201(d).  While section 1201(d) allows nonprofit libraries, archives, and educational institutions to circumvent access controls for the sole purpose of making a good-faith determination of whether to acquire a copy of the protected work, participants representing these institutions uniformly expressed the view that this exemption does not serve any of their practical needs.[540]  Instead, they supported a new permanent exemption for all activities permitted under section 108, which authorizes libraries and archives to reproduce and distribute certain copyrighted works on a limited basis for purposes of preservation, replacement, and research.[541]  As an example,

---

[539] *See* 2015 Recommendation at 156–64 (addressing request to limit exemption to exclude "certain illicit unlocking practices," such as "the unlocking of new, carrier-subsidized prepaid cellphones").

[540] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 6–7 (noting that vendors of copyrighted works typically provide trial access to institutions considering potential purchases, making it unnecessary for such users to engage in circumvention for that purpose); LCA Initial Comments at 9 (stating it is unaware of any instance since the DMCA's enactment in which a covered institution has made use of this exemption); MIT Initial Comments at 4–5; SAA Initial Comments at 5; Univ. of Va. Libraries Initial Comments at 3; Tr. at 88:07–11 (May 20, 2016) (Cox, ARL).

[541] *See, e.g.*, AALL Initial Comments at 4; *see* 17 U.S.C. § 108 (permitting reproduction and distribution of works for the purposes of preservation and security, deposit for research, replacement, and user requests).

LOC_AR_00009328

while libraries rely on section 108(c)'s exception allowing reproduction of certain works stored in obsolete formats in certain circumstances, section 1201 "currently does not allow for circumvention of access controls for preservation."[542]  This is a particular concern, the AALL argued, given the need to "circumvent or permanently remove obsolete TPMs" to gain access to "older born-digital materials."[543]

Others questioned the need for an additional permanent exemption for libraries and archives.  The Kernochan Center noted that libraries have requested exemptions in past rulemakings "to a limited extent," which, in the Center's view, is inconsistent with "the assertion that the current statutory structure is inadequate."[544]  AAP suggested that issues of digital preservation are more properly addressed through updates to section 108 itself, and questioned whether such an exemption could be tailored to ensure that it did not give rise to access other than for legitimate preservation activities.[545]

The Office appreciates that TPMs can affect legitimate interests of libraries, archives, and other memory institutions and believes that a permanent exemption tied to activities authorized by section 108 is worthy of consideration and debate, but finds it is premature to recommend specific legislative reforms.  As the Office previously noted when recommending a temporary exemption for the preservation of video games, "section 108 provides useful and important guidance as to Congress' intent regarding the nature and scope of legitimate preservation activities."[546]  That said, the Office also has long expressed concern that section 108 is in some ways inadequate to address the needs of institutions in the digital age.[547]  For example, section 108 does not address museums, but the past rulemaking record included many examples of museum-based video game preservation activities.[548]  These and other changes could be addressed in future updates to section 108.  Indeed, the Office is in the midst of a review of section 108, addressing provisions concerning copies for users, security measures, public access,

---

[542] AALL Initial Comments at 3–4.

[543] *Id*. at 3.  SAA proposed a broader exemption that also would permit libraries and archives to circumvent TPMs for activities protected by the fair use doctrine.  SAA Additional Comments at 4.  Because other stakeholders suggested a similar exemption, this proposal is discussed separately in section III.C.3.f.

[544] Kernochan Center Initial Comments at 8.

[545] Tr. at 51:04–52:10 (May 20, 2016) (Adler, AAP).

[546] 2015 Recommendation at 341.

[547] *See, e.g., id*. at 7 ("[T]he exceptions for preservation activities set forth in section 108 appear inadequate to address institutional needs in relation to digital works."); *The Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 20–21 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

[548] *See* 2015 Recommendation at 342.

LOC_AR_00009329

and third-party outsourcing.[549]  In light of this, and because this Report could not study the interaction of any potential legislative changes to section 108 with section 1201, the Office believes that broad reform of section 1201 in this area is premature.  Moreover, as many of the comments from library associations focused on the specific problem of obsolete access controls, the Office believes that the more targeted proposed exemption for obsolete TPMs discussed above is a preferable first step.[550]  The triennial rulemaking, however, remains a vehicle to evaluate requests for a broader exemption for preservation activities by classes of works by memory institutions.

### e.  Educational and Derivative Uses of Audiovisual Works

The past four rulemakings have granted various exemptions for educational uses for audiovisual works.[551]  As adopted in 2015, the exemption permits circumvention to make use of short portions of motion pictures for purposes of criticism and comment in various contexts, including documentary filmmaking, noncommercial videos, multimedia e-books, and education.[552]  A few commenters expressed support for making this exemption permanent.  LCA argued that

> [a]s audiovisual works have become increasing[ly] more central to education, this exemption has become even more critical to effective instruction at all levels.  At the same time, rights holders have never demonstrated that the exemption has led to any infringing activity.  Thus, making the exemption permanent would eliminate the burden of seeking an exemption every three years without causing rights holders any harm.[553]

While not mentioning audiovisual works specifically, AAU, ACE, APLU, and EDUCAUSE offered that any permanent exemption for "nonprofit educational uses or

---

[549] *See* Section 108:  Draft Revision of the Library and Archives Exceptions in U.S. Copyright Law, 81 Fed. Reg. 36,594, 36,598 (June 7, 2016); *Revising Section 108: Copyright Exceptions for Libraries and Archives*, U.S. COPYRIGHT OFFICE, https://www.copyright.gov/policy/section108/ (last visited June 15, 2017).

[550] *See supra* pp. 90–92.

[551] 2015 Final Rule at 65,946–47; 2012 Final Rule at 65,266; 2010 Final Rule at 43,827–28; 2006 Final Rule at 68,473–74.

[552] 2015 Final Rule at 65,961–62.

[553] LCA Additional Comments at 1; *see also* Tr. at 172:03–09 (May 19, 2016) (Butler, Univ. of Va. Libraries) (advocating a permanent exemption for educational uses for audiovisual classes); Tr. at 96:01–10 (May 20, 2016) (Cox, ARL) (same).

LOC_AR_00009330

for certain 'per se' educational works" should be drafted broadly, "so they are sufficiently adaptable to accommodate evolving technologies."[554]

The Copyright Office recognizes the burdens associated with the need to request this exemption on a recurring basis. The language and scope of this exemption has changed with each rulemaking, however, suggesting that adopting it as permanent would be premature.[555] In this respect, the exemption differs from the assistive technologies exemption. The Office expects that a new streamlined process for repeat exemptions, as discussed below, should facilitate the process of renewal, enabling proponents to focus on expanding the exemption's scope to include new technologies and/or on eliminating obsolete technologies.

### f.  All Lawful or Fair Uses

Finally, commenters representing various user interests urged adoption of a broad permanent exemption that would permit circumvention for any lawful or noninfringing use.[556] Although framed as an exemption, this suggestion is substantially identical to the proposal discussed above to limit the activities covered by section 1201(a) in the first instance to those bearing a nexus to infringement. For the same reasons addressed in reference to that proposal, the Office does not recommend such an exemption. As discussed, conditioning section 1201 liability on a violation of another law would fail to account for the independent harm to the value of copyrighted works caused by unauthorized digital access.

Some also suggested a similar, though somewhat narrower, exemption allowing circumvention for any activity protected by the fair use doctrine.[557] In response, others

---

[554] AAU, ACE, APLU & EDUCAUSE Initial Comments at 13.

[555] In this regard, the Office agrees that, in general, "[n]ew or expanded permanent exemptions should be recommended where, and only to the extent that, parties have consistently sought and been granted exemptions in the past through the rulemaking process." Kernochan Center Additional Reply Comments at 2.

[556] *See, e.g.,* Authors Alliance Initial Comments at 4 (suggesting that an "exemption . . . to enable noninfringing use of a technically protected copyright work . . . would remedy the persistent under-inclusiveness of the existing statute's exemption process"); OTW Initial Comments at 8 ("The best result would be a permanent exemption for noninfringing uses . . . ."); Univ. of Va. Libraries Initial Comments at 3 ("A more useful permanent exemption for libraries (and others) would be a blanket exception for any lawful use . . . ."); SAA Additional Comments at 2 ("[T]here should be a blanket exemption . . . that would allow anyone to circumvent an access mechanism for a lawful purpose.").

[557] Public Knowledge Additional Comments at 1–2 ("[W]e note the absence [in the Second Notice] of a proposal to permanently exempt fair uses made under Section 107, although exemptions grounded in that exception are routinely granted to filmmakers and educators."); *see also* AAU,

LOC_AR_00009331

argued that a general exemption of this type "would generate widespread mistakes regarding when circumvention is permissible."[558]  As they put it, "one person's notion of fair use is another person's infringement."[559]  At a minimum, however, such an exemption would constitute a fundamental departure from Congress' considered decision to establish the triennial rulemaking as the forum for consideration of specific exemption requests grounded in fair use.[560] As the Commerce Committee explained in adding the rulemaking proceeding to the legislation:

> [T]he Committee was mindful of the need to honor the United States' commitment to effectively implement the two WIPO treaties, as well as the fact that fair use principles certainly should not be extended beyond their current formulation.  The Committee has struck a balance that is now embodied in . . . the bill, as reported by the Committee on Commerce.  The Committee has endeavored to specify, with as much clarity as possible, how the right against anti-circumvention [*sic*] would be qualified to maintain balance between the interests of content creators and information users.  The Committee considers it particularly important to ensure that the concept of fair use remains firmly established in the law.  Consistent with the United States' commitment to implement the two WIPO treaties, H.R. 2281, as reported by the Committee on Commerce, fully respects and extends into the digital environment the bedrock principle of "balance" in American intellectual property law for the benefit of both copyright owners and users.[561]

Accordingly, Congress created the rulemaking as a "mechanism . . . [to] monitor developments in the marketplace for copyrighted materials" and to ensure that circumvention activities implicating fair use "can be fully considered and fairly decided on the basis of real marketplace developments that may diminish otherwise lawful

---

ACE, APLU & EDUCAUSE Initial Comments at 9 ("[W]e urge that any changes to section 1201 explicitly state that section 1201 should in no way hinder uses that may fall within the ambit of 17 USC § 107.").

[558] AAP, ESA, MPAA & RIAA Additional Reply Comments at 6; *see also* Int'l Assoc. Sci. Tech. & Med. Pub. Initial Reply Comments at 2–3 (opposing a blanket fair use exemption); Kernochan Center Additional Reply Comments at 1 ("[T]he broad amendments offered by some commenters should be rejected, as they would unquestionably undermine the goals and effect of the law.  (We refer, for example, to the suggestion[] . . . that circumvention for any non-infringing purpose be allowed, etc.).").

[559] AAP, ESA, MPAA & RIAA Additional Reply Comments at 6.

[560] *See* COMMERCE COMMITTEE REPORT at 35 (stating that the addition of the rulemaking proceeding "responds to [the] concern" regarding prior legislation's effect on fair use).

[561] *Id.* at 26.

LOC_AR_00009332

**Section 1201 of Title 17**

access to works."[562]  The Office sees no basis for abandoning that basic framework, although, as discussed below, it does intend to implement reforms to improve the rulemaking process.

### 3. International Considerations

As noted, multiple FTAs to which the United States is a party address the categories of exceptions and limitations that signatory countries may adopt in this area.  These trade obligations may be relevant to any consideration of a change to the current domestic permanent exemption framework.  To the extent there is interest in implementing the Office's recommendations, there are a number of ways to pursue potential reforms with these considerations in mind.  First, Congress could adopt legislation implementing these proposals and address any potential international concerns, including any changes it believes appropriate, in the legislative text.[563]  The Office is not providing proposed legislative language, and accordingly expresses no view as to possible trade implications.[564]  Second, the Office has offered interpretive guidance to facilitate broader reliance on existing exemption language, as in the case of the provisions under section 1201(f) concerning interoperability.  Third, the Office has tried to identify statutory and regulatory changes that can be accomplished within the current trade framework, as in the case of legislation that would expand the factors to be considered by the Librarian in conducting the triennial rulemaking.[565]  Finally, the existing triennial rulemaking framework provides an avenue to evaluate whether some proposals may be appropriately adopted as temporary exemptions.

---

[562] *Id*. at 36.

[563] *Cf.* Unlocking Technology Act of 2015, H.R. 1587, 114th Cong. § 4 (2015) ("The President shall take the necessary steps to secure modifications to applicable bilateral and multilateral trade agreements to which the United States is a party in order to ensure that such agreements are consistent with the amendments made by this Act."); Unlocking Technology Act of 2013, H.R. 1892, 113th Cong. § 4 (2013) (same).

[564] The Office notes that the Trans-Pacific Partnership Agreement ("TPP") contains a more flexible structure in that it neither confines TPM exceptions to enumerated activities nor limits their duration.  *See* TPP art. 18.68.4, Feb. 4, 2016, *available at* https://ustr.gov/trade-agreements/free-trade-agreements/trans-pacific-partnership/tpp-full-text.  The United States has withdrawn from that agreement.  *See* Letter from María L. Pagán, Acting United States Trade Representative, to Trans-Pacific Partnership Depositary (Jan. 30, 2017), *available at* https://ustr.gov/sites/default/files/files/Press/Releases/1-30-17%20USTR%20Letter%20to%20TPP%20Depositary.pdf.

[565] *See, e.g., infra* section III.C.4 (discussing the proposed Breaking Down Barriers to Innovation Act).

LOC_AR_00009333

### 4. Alternative Approach of Expanding Statutory Rulemaking Factors

Finally, should Congress decline to pursue new or updated permanent exemptions, it could consider adding to the list of statutory factors the Librarian shall consider in the rulemaking. This approach was proposed by the Breaking Down Barriers to Innovation Act, which would add factors addressing security research, "the impact that the prohibition on the circumvention of technological measures has on the accessibility of works and technologies for persons with disabilities," and consideration of "repair, recycling, research, or other fair uses, and . . . access to information not subject to copyright protection."[566]

From a matter of copyright policy, the Office believes that a preferable approach may be to adopt or amend a permanent exemption in the limited cases described above. The current statute already empowers the Office and Librarian to consider all appropriate factors,[567] and expanding the list of enumerated factors for the rulemaking would appear to provide less certainty to users than a permanent exemption.

## IV.  THE RULEMAKING PROCESS

The triennial rulemaking established by section 1201(a)(1)(C) generated much discussion among those who participated in the study, as it is an area where the Office itself can take action pursuant to its rulemaking authority without needing Congress to amend section 1201. Many participants acknowledged that the rulemaking process is "working reasonably well."[568] As detailed below, others urged various reforms, whether through statutory or regulatory changes. Notably, while the comments revealed a variety of perspectives on almost all issues, there was extraordinary consensus that the Office should exercise its existing regulatory authority to streamline the process for renewing previously granted exemptions.

---

[566] H.R. 1883, 114th Cong. § 3(a)(1)(B)(iii)–(v) (2015); S. 990, 114th Cong. § 3(a)(1)(B)(iii)–(v) (2015).

[567] 17 U.S.C. § 1201(a)(1)(C)(v).

[568] Kernochan Center Initial Comments at 5; *see also* Tr. at 96:09–13 (May 19, 2016) (Decherney, Univ. of Pa.) ("[I]n some ways, the rulemaking has I think really been effective and . . . thousands of educators and students have been able to engage in non-infringing uses as a result."); AAP, MPAA & RIAA Initial Comments at 11 (noting that "the current ground rules for the triennial rulemaking proceeding are fair, practical, and consistent with Congress' instructions," and that the proceeding "regularly results in the issuance of a large number of exemptions" and stating that "continued complaints regarding the proceeding, and calls for a dramatic reorganization to lessen the burdens on proponents of exemptions, ignore the reality of the prior processes").

LOC_AR_00009334

The Copyright Office believes that any shortcomings in the rulemaking process can largely be addressed without legislative changes, although the Office would continue to support amending the statute to allow for burden-shifting in the case of repeat exemptions.[569] In some instances, stakeholder concerns are addressed below by clarifying the Office's position on issues such as allocation of the burden of proof and the relevant evidentiary standards applied by the Register in forming a recommendation to grant or deny an exemption. In addition, in light of the stakeholder consensus noted above, the Office also proposes to undertake specific changes to streamline the process for renewing previously granted exemptions. Finally, this section also outlines additional steps the Office intends to take to further improve the rulemaking process, such as implementing educational outreach, adjusting the timeframe for the rulemaking to facilitate participation, and investigating ways to improve access to and participation in public hearings.

## A. Administrative Law Considerations

In prior rulemakings, the Copyright Office has adopted certain standards and procedures beyond the minimum required for informal rulemaking by section 553 of the APA. The Office adopted some of these in its discretion, such as limiting consideration to the evidentiary record submitted by participants and adopting a quasi-adversarial format—categorizing participants as either proponents or opponents of a specific class of exemption. The Office has previously found other elements, such as the application of the preponderance of the evidence standard, to be mandated by section 1201's statutory language.[570] The Office has found still other elements, such as the public hearings the Office holds, to be mandated by Congress' clearly expressed intent.[571] While some commenters praised this approach as "correctly proceed[ing] with caution to develop specific exemptions on a case-by-case basis" and generally "consistent with

---

[569] See Register's Perspective on Copyright Review: Hearing Before H. Comm. on the Judiciary, 114th Cong. 5 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

[570] See 2015 Recommendation at 14 ("This requirement stems from the statute, which requires a demonstration that users '*are, or are likely to be*,' adversely affected by the prohibition on circumvention.") (quoting 17 U.S.C. § 1201(a)(1)(B)). In the sixth rulemaking, the Office also noted that the preponderance standard is in accord with general principles of formal agency rulemakings under the APA. *See id.* at 14 & n.50 (citing 5 U.S.C. § 556(d); *Steadman v. Sec. & Exch. Comm'n*, 450 U.S. 91, 102 (1981)).

[571] See H.R. REP. NO. 106-464, at 149 (1999) (Conf. Rep.) ("The intent is to permit interested persons an opportunity to participate through the submission of written statements, oral presentations at one or more of the public hearings, and the submission of written responses to the submissions or presentations of others.").

LOC_AR_00009335

the statute, its legislative history and principles of administrative law,"[572] others found this approach overly restrictive, suggesting "that procedures that artificially limit what kinds of evidence the Office may consider . . . or otherwise arbitrarily limit the record before the Office could violate the Administrative Procedures Act."[573] Such commenters suggested that a less adjudicatory format would enable the Office "to more effectively conduct the fact-finding process," as the Office's approach "places too much of a burden on commenters and unnecessarily restricts the Register's factual inquiry."[574] Instead, they suggested that the Register "should conduct her own fact-finding investigation, informed by the comments but not reliant solely on those who have the resources to participate."[575]

After considering this feedback, the Office has concluded that a reassessment of the rulemaking process is appropriate. The following sections discuss specific ways that process may be improved. As an initial matter, section 1201 appears to give the Office considerable flexibility to define and tailor the rulemaking process.[576] The Office will continue to exercise its flexibility to improve that process while maintaining procedural rules necessary for it to administer the rulemaking efficiently within the statutorily mandated period. For example, in the upcoming seventh rulemaking, the Office plans to take advantage of its ability to take administrative notice of facts outside the public record where appropriate, but, particularly given its limited resources, does not assume an affirmative obligation to independently seek out or raise additional materials not presented by the parties.[577]

---

[572] DVD CCA & AACS LA Initial Reply Comments at 9.

[573] Public Knowledge Initial Reply Comments at 9.

[574] Joint Filmmakers I Initial Comments at 11–12; *see also* OTW Initial Comments at 4 ("In part, the difficulty is because the Office combines repeated rounds of submissions on an administrative law model with an adversarial approach that treats factual development as solely the job of the contending participants.").

[575] Joint Filmmakers I Initial Comments at 11–13 ("As the leading treatise *Administrative Law and Practice* observes, it is well-accepted that in a rulemaking, '[t]he agency and its staff cannot sit by passively and let interested persons develop a record.'"). *But see* Tr. at 102:09–103:07 (May 25, 2016) (Lerner, Joint Filmmakers I) ("I do think that the Copyright Office has wide latitude to set this rulemaking up under the APA.").

[576] The Office draws this conclusion both from section 1201 itself and the APA. *See, e.g., Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015) (stating that it is a "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure" and that the APA "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures").

[577] *See, e.g., Baka v. INS*, 963 F.2d 1376, 1379 (10th Cir. 1992) ("An agency . . . may take official notice of commonly acknowledged facts, and technical or scientific facts that are within the

LOC_AR_00009336

As a separate question of administrative law, it was not clear to some commenters whether determinations made by the Librarian are subject to challenge under the APA.[578] Although the Register of Copyrights issues a recommendation based on the information generated in the rulemaking proceeding, it is the Librarian who adopts the final rule. The Library of Congress is not subject to the APA,[579] and the Department of Justice has taken this position in ongoing litigation concerning section 1201.[580]

## B. Defining an Exemption Class

Some study participants questioned the way the Copyright Office and the Librarian have previously constructed the "class[es] of copyrighted works"[581] for which a temporary exemption has been granted or denied.  On the side of classes being too narrow, the Cyberlaw Clinic at Harvard Law School ("Cyberlaw Clinic") said that "the heavily qualified exemptions issued by this Office are out of step with the intent of Congress, which asked the Register and Librarian to identify 'a narrow and focused subset' of works, but only compared to the very broad categories of authorship in 17 U.S.C. § 102."[582]  Others argued the classes have been defined too broadly, with Auto Alliance stating that for the recently considered exemption for vehicle repair, "[i]t [did] not appear that the Register considered 'refining' the proposed class of works to exclude vehicles covered by" a memorandum of understanding "entered into by virtually the entire U.S. automobile industry," "thereby 'limiting the adverse consequences' of an

---

agency's area of expertise," but "[t]he taking of such notice is committed to the broad discretion of the agency.") (internal quotation marks, citations, and alterations omitted); *Fleming Cos., Inc. v. U.S. Dep't of Agric.*, 322 F. Supp. 2d 744, 764 (E.D. Tex. 2004) (holding that the agency was not required to "have conducted an independent investigation" or to "have sought additional information" during its informal rulemaking; giving interested parties thirty days to comment on new rule "satisfies the APA's procedural requirements" and "[n]othing more is required").

[578] AAP, MPAA & RIAA Initial Comments at 14.

[579] In *Kissinger v. Reporters Comm. for the Freedom of the Press*, 445 U.S. 136 (1979), the Court noted that the Library of Congress "is not an 'agency'" as that term is defined for purposes of the Freedom of Information Act ("FOIA").  *Id.* at 145.  The same definition applies to the APA.  *See* 5 U.S.C. § 552(f).

[580] *See* Mem. in Supp. of Mot. to Dismiss at 42–45, *Green v. Lynch*, No. 16-cv-1492, (D.D.C. Sept. 29, 2016), ECF No. 15-1.

[581] 17 U.S.C. § 1201(a)(1)(C).

[582] Cyberlaw Clinic Initial Comments at 13; *see also* Tr. at 102:11–24 (May 19, 2016) (Tushnet, OTW) (proposing that the Office employ a "level of generality, similar to what you see in fair use cases"); LCA Initial Comments at 31–32; Tr. at 86:16–87:04 (May 19, 2016) (Panjwani, Public Knowledge).

LOC_AR_00009337

overbroad exemption that covers many situations in which circumvention is not required."[583]

Still others defended the current approach, stating that "the way the categories are defined has in fact enabled the granting of certain exemptions that in a broader category would not have been granted."[584]  For example, DVD CCA and AACS LA suggested that limiting an exemption for uses of Blu-ray and DVD clips to K–12 and higher education users allowed the overall record to support granting the exemption, whereas the exemption may have been difficult to justify for a broader category.[585]  Similarly, AAP, MPAA, and RIAA "have come to find that [limiting a class to specific uses or users] has been helpful,"[586] and Professor Decherney, a media studies professor who has obtained an exemption in multiple past rulemakings, noted that doing so "brings the idea of a class much more in line with fair use, which is about use and users."[587]

Past approaches to defining a class of works are well documented in the rulemaking records, and largely emanate from the statute and legislative history.  In general, commenters did not necessarily challenge this overall framework, so much as question its application in specific instances.  While this Report is intended to be forward-looking, the Office examined concerns that the rulemaking has been unduly atomized[588] or has neglected to exclude works for which the evidentiary record did not support an exemption.[589]  The Office agrees that, in some cases, it can make a greater effort to group similar classes together, and will do so going forward.  For example, in the upcoming seventh rulemaking, the Office will consider consolidating some of the separate classes related to motion pictures into broader categories, such as one related to educational uses.[590]  But in other cases, the Office's ability to narrowly define the class is what enabled it to recommend the exemption at all, and so the Office will continue to refine classes when merited by the record.[591]  For example, in the last rulemaking, the Register could not recommend a broad exemption for jailbreaking video game consoles for the

---

[583] Auto Alliance Initial Comments at 8–9.

[584] Tr. at 103:01–104:05 (May 19, 2016) (Turnbull, DVD CCA & AACS LA); Tr. at 104:07–16 (May 19, 2016) (Williams, AAP, MPAA & RIAA) (accord).

[585] Tr. at 103:01–104:05 (May 19, 2016) (Turnbull, DVD CCA & AACS LA).

[586] Tr. at 93:07–13 (May 19, 2016) (Williams, AAP, MPAA & RIAA).

[587] Tr. at 95:13–96:07 (May 19, 2016) (Decherney, Univ. of Pa.).

[588] *See* Cyberlaw Clinic Initial Comments at 13.

[589] *See* Auto Alliance Initial Comments at 8–9.

[590] *Compare* 2015 Recommendation at 103–06 (breaking out into seven separate classes).

[591] *See* Tr. at 99:22–100:02 (May 19, 2016) (Panjwani, Public Knowledge) (noting difficulty for the Office in defining classes of works when exemptions must be granted for noninfringing uses).

LOC_AR_00009338

general public because of evidence that the consoles' TPMs prevented video game piracy, but the Register was able to recommend a narrower exemption for preservationists, finding that "[t]he risk of piracy . . . appear[s] to be greatly diminished in the preservation context."[592]

## C. Burden of Proof

Some commenters suggested that the burden of proof should not be borne by exemption proponents, but rather that it should fall to the Office, or even opponents in certain circumstances, to ensure there is an adequate record.[593]  Others contended that the Office has properly placed the burden on proponents.[594]  The Supreme Court has noted that "the term 'burden of proof' is one of the slipperiest members of the family of legal terms."[595]  The term can be understood to encompass "two distinct burdens:  the 'burden of persuasion,' *i.e.*, which party loses if the evidence is closely balanced, and the 'burden of production,' *i.e.*, which party bears the obligation to come forward with evidence at different points in the proceeding."[596]

The Office noted during the first rulemaking that the statute "does not offer much guidance as to the respective burdens of proponents and opponents" of proposed exemptions.[597]  But regardless of what the statute provides, as a practical matter, the burden of *production* will effectively be on exemption proponents, simply because they have greater knowledge of and access to evidence demonstrating adverse effects on noninfringing uses.  Although the Office has discretion to engage in independent fact-finding and take administrative notice of evidence, the primary way that most evidence supporting an exemption will get into the record will continue to be through the submissions of proponents, who are usually in the best position to provide it.

---

[592] 2015 Recommendation at 344.

[593] *See, e.g.*, CDT Initial Comments at 6–7 ("Although administrative law generally places the burden of proof on the proponent of a rule or order, the plain text of section 1201 requires the Librarian to make a triennial determination as to the provision's adverse effect or likely adverse effect on users making noninfringing uses of particular classes of works, regardless whether any parties step forward."); CTA Initial Comments at 7 ("Where opponents are in a better position to come forward with evidence, they should be obliged to do so.").

[594] *See, e.g.*, DVD CCA & AACS LA Initial Reply Comments at 7–8 ("A hearing setting where the proponents bear the burden of proof allows a careful examination of each claim of noninfringing use that may vary widely.") (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294–95 (1974)).

[595] *Shaffer v. Weast*, 546 U.S. 49, 56 (2005) (quotation marks and alterations omitted).

[596] *Id.*

[597] 2000 Recommendation and Final Rule at 64,558.

LOC_AR_00009339

As for the burden of persuasion, most commenters speaking to the issue agreed that exemptions should be recommended based upon the preponderance of the evidence.[598] A few commenters specifically opposed applying a preponderance standard in connection with the noninfringing use prong of the analysis. Joint Filmmakers I, for example, proposed using a "some likelihood"[599] standard, explaining that such a standard is "more reasonable" because "[t]here's [a] built in backstop if the Copyright Office were to get it wrong and turn it over to the court and say, this isn't a non-infringing use."[600]

The Office continues to believe that the sounder approach is to grant exemptions only when the preponderance of the evidence in the record shows that the conditions for granting an exemption have been met. The preponderance-of-the-evidence standard is the traditional standard used in administrative proceedings[601] and comports with the specific language of section 1201, which requires a determination as to whether users "*are, or are likely to be* in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses."[602] This conclusion is also supported by the legislative history, which explains that the granting

---

[598] *See, e.g.,* AAP, MPAA & RIAA Initial Reply Comments at 5; Cyberlaw Clinic Initial Comments at 2; Kernochan Center Initial Comments at 5; Tr. at 111:12–18 (May 19, 2016) (Panjwani, Public Knowledge); Tr. at 118:02–06 (May 19, 2016) (Greene, OTI).

[599] Joint Filmmakers I Initial Comments at 13–15 ("[T]he Register should refrain from imposing a restrictive 'preponderance of the evidence' standard.").

[600] Tr. at 138:01–13 (May 25, 2016) (Lerner, Joint Filmmakers I); *see also* Tr. at 135:02–136:06 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) (suggesting "if it's a plausible non-infringing use . . . that should be enough."). *But see* Tr. at 142:18–143:18 (May 25, 2016) (Metalitz, AAP, MPAA & RIAA) (arguing that "[p]lausible" is "not the same thing" as "likely," the standard set forth in the statute).

[601] *Steadman*, 450 U.S. at 101 n.21 (noting that "[t]he use of the 'preponderance of evidence' standard is the traditional standard in civil and administrative proceedings") (quoting *Sea Island Broad. Corp. v. FCC*, 627 F.2d 240, 243 (D.C. Cir. 1980)); *see also Yzaguirre v. Barnhart,* 58 Fed. App'x 460, 463 (10th Cir. 2003) (finding an ALJ erroneously "engraft[ed] a standard of appellate review upon the fact finding process" by applying a "substantial evidence" rather than a preponderance-of-the-evidence standard); *Charlton v. FTC*, 543 F.2d 903, 907 (D.C. Cir. 1976) (analyzing the different standards for judicial review and agency fact-finding; explaining that "the yardstick by which the agency itself is to initially ascertain the facts" cannot be "something less than the weight of the evidence" and that "preponderance of the evidence is rock bottom at the factfinding level").

[602] 17 U.S.C. § 1201(a)(1)(C) (emphasis added); *see also* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 70 Fed. Reg. 57,526, 57,528 (Oct. 3, 2005); 2015 Recommendation at 15; 2012 Recommendation at 6; 2003 Recommendation at 19–20.

LOC_AR_00009340

of an exemption requires the production of a minimum quantity of evidence: the Commerce Committee Report explains that "[i]f the rulemaking has produced insufficient evidence to determine whether there have been adverse impacts with respect to particular classes of copyrighted materials, the circumvention prohibition should go into effect with respect to those classes."[603]  The preponderance standard also fits the nature of the section 1201 proceeding, which requires the Register to make a binary choice whether to recommend, or not, a requested exemption, after considering the evidence marshalled on both sides in favor or against a proposal.[604]  In this context, it is appropriate to require the evidence, on balance, to support the requested exemption.[605]  Indeed, the preponderance standard is used by courts in evaluating fair use cases.[606]  For the same reasons, the Office disagrees with those commenters who proposed using a standard other than preponderance specifically in examining noninfringing uses.

In sum, it is the totality of the rulemaking record (*i.e.*, the evidence provided by commenters or administratively noticed by the Office) that must, on balance, reflect the need for an exemption by a preponderance of the evidence.  Such evidence must, on the whole, show that it is more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a particular class of copyrighted works.

## D. Applicable Evidentiary Standards

The Office received many comments addressing the application of evidentiary standards in past rulemakings.  While some suggested that "a way to keep triennial proceedings manageable in scope is to rigorously enforce the current standards of proof for new

---

[603] COMMERCE COMMITTEE REPORT at 38.

[604] While the rulemakings have provided an avenue for persons to submit comments "that neither support nor oppose an exemption but seek to share pertinent information about a proposal," in practice the Office receives few such comments.  *See* 2015 NPRM at 73,856.

[605] *Cf. Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1758 (2014) (preponderance of the evidence "is the standard generally applicable in civil actions, because it allows both parties to share the risk of error in roughly equal fashion") (internal quotation marks omitted).

[606] *See, e.g., Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984) (under the fourth factor, "[w]hat is necessary is a showing by a preponderance of the evidence that some meaningful likelihood of future harm exists"); *Balsley v. LFP, Inc.*, No. 1:08 CV 491, 2011 WL 1298180, at *8 (N.D. Ohio Mar. 31, 2011) (noting that the jury must consider whether the defendant proved fair use by a preponderance of the evidence), *aff'd*, 691 F.3d 747 (6th Cir. 2012); *Haberman v. Hustler Magazine, Inc.*, 626 F. Supp. 201, 208 (D. Mass. 1986) (noting that fair use is "established by a preponderance of the evidence" standard).

LOC_AR_00009341

exemptions (and changes to existing exemptions),"[607] others suggested that the Register has, to the detriment of exemption proponents, been inconsistent and overly rigid in the interpretation and application of the standards.[608] More generally, they expressed concern that the Register has not predictably applied a single set of standards from one proceeding to the next.[609]

A number of stakeholders who had previously sought or represented proponents for an exemption agreed with a proposal by the Cyberlaw Clinic for the Office to realign the way it applies the statute to the evidentiary record.[610] According to the Cyberlaw Clinic, in prior rulemakings, the Office has effectively required proponents to satisfy nine separate factors, several of which the Clinic regards as beyond the statute's requirements, and others of which it believes are redundant.[611] For example, it contended that the Office has looked to extra-statutory considerations such as "[h]ow the [TPM] in question works, and how it is circumvented," whether "the TPM is the 'clearly attributable' cause of the claimed adverse impact," and the existence of "potential alternatives" to circumvention.[612]

As an alternative, the Cyberlaw Clinic proposed what it describes as "a simple four-factor inquiry" whereby a proponent should be required to show that:

- At least some works in the . . . class of works the proponent seeks to access are protected under copyright. . . .

---

[607] ESA Initial Comments at 11–12; *see also* DVD CCA & AACS LA Initial Comments at 14.

[608] Cyberlaw Initial Comments at 2, 5–8 ("The current rulemaking requires substantive showings that are not required under the statutory framework, and presents proponents with evidentiary requirements far beyond the scope of the statutory authority granted by Congress."); *see also, e.g.*, Authors Alliance Initial Comments at 3; ISRI Initial Comments at 11; OTI Initial Comments at 9–10; OTW Initial Comments at 3–4.

[609] *See, e.g.*, AFB Initial Comments at 8 (detailing the Office's treatment of the assistive technology exemption through successive rulemakings, stating that "parties like AFB are largely unable to anticipate the Office's cycle-to-cycle requirements with any certainty and prepare an appropriate evidentiary record"); Cyberlaw Clinic Initial Comments at 2; Int'l Documentary Ass'n, Film Independent, Kartemquin Educ. Films, Indep. Filmmaker Project, Indie Caucus, The Nat'l Alliance for Media Arts and Culture, New Media Rights & Women in Film and Video ("Joint Filmmakers II") Reply Comments at 8.

[610] *See, e.g.*, Joint Filmmakers II Initial Reply Comments at 7 & n.19; Public Knowledge Additional Comments at 2; Tr. at 118:07–11 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law); Tr. at 83:06–09, 137:25–138:03 (May 19, 2016) (Tushnet, OTW).

[611] Cyberlaw Clinic Initial Comments at 3–5. The Clinic acknowledged that some of these factors reflect the Office's questions to develop a record to conduct an evaluation of the statutory factors.

[612] *Id.* at 4.

LOC_AR_00009342

- An activity that the proponent seeks to do with regard to a class of works is likely to be noninfringing under copyright law, but for this anticircumvention provision. . . .

- The presence or planned presence of a technological protection measure makes this activity unlawful under 17 U.S.C. § 1201(a)(1)(A). . . .

- The proponent is "adversely affected" under the factors articulated in 17 U.S.C. § 1201(a)(1)(C).[613]

The Cyberlaw Clinic argued that the statute directs that adverse effects and the statutory factors in section 1201(a)(1)(C) should be "examined in reference to the other."[614] The Clinic explained that "a use should be found to be 'adversely affected' whenever the harm to the planned noninfringing use is not outweighed by the harm to the market for or value of a work that would occur by allowing the particular use."[615]

The Copyright Office does not agree that the rulemaking has ever required exemption proponents to demonstrate nine separate factors, and notes that the Cyberlaw Clinic admits some of the "factors" it identified are "redundant" of each other.[616] For example, the Office has previously sought information regarding how the TPM at issue works and how it is circumvented.[617] This information is sought because it is helpful to facilitate the development of the administrative record and for all participants to understand how to comment and what to comment on; it is not an evidentiary hurdle that must be satisfied. Going forward, the Office will continue to ask proponents for such information, and the Office will also be clearer in encouraging exemption opponents to provide it as well.

The Office does, however, believe it is prudent to provide regulatory guidance clarifying the applicable evidentiary standards that must be satisfied to obtain an exemption. The Office believes its application of the statute is similar to many commenters' preferred approaches, including the Cyberlaw Clinic. At bottom, under section 1201(a)(1)(C), the Office must inquire: *Are users of a copyrighted work adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a class of copyrighted works, or are users likely to be so adversely affected in the next three years?* This inquiry derives directly

---

[613] *Id*. at 8; *see also* Joint Filmmakers II Initial Reply Comments at 2, 7–9 (proposing an alternative four-factor test).

[614] Cyberlaw Clinic Initial Comments at 8.

[615] *Id*. at 2, 9–10 (elaborating on proposed balancing of factors).

[616] *See id*. at 7.

[617] *See* 2015 NPRM at 73,871 (listing information the Office "encourages commenters . . . to address").

LOC_AR_00009343

from the statute, and its application is guided by legislative history. Practically speaking, it breaks down into these elements:

- The proposed class includes at least some works protected by copyright.

- The uses at issue are noninfringing under title 17.

- Users are adversely affected in their ability to make such noninfringing uses or, alternatively, users are likely to be adversely affected in their ability to make such noninfringing uses during the next three years. This element is analyzed in reference to section 1201(a)(1)(C)'s five statutory factors.

- The statutory prohibition on circumventing access controls is the cause of the adverse effects.

The Office hopes that participants who expressed confusion over the evidentiary standards applied by the Office find this articulation helpful. In practice, this approach is not substantively different from that employed in past rulemakings.

## 1. Copyrightable Works at Issue

The first element under the Office's test is a straightforward matter of ascertaining whether at least some works included in a class are protected by copyright. This requirement comes directly from the statute, which refers to a "class of copyrighted works"[618] and provides that the circumvention ban only applies to a TPM that controls access to "a work protected under this title."[619]

## 2. Noninfringing Uses

The second element emanates directly from the statute as well, which references users' "ability to make noninfringing uses" of a class of works.[620] As the Office has explained:

> The Register will look to the Copyright Act and relevant judicial precedents when analyzing whether a proposed use is likely to be noninfringing. . . . [T]here is no "rule of doubt" favoring an exemption when it is unclear that a particular use is a fair or otherwise noninfringing use. Thus, a proponent must show more than that a particular use *could*

---

[618] *See* 17 U.S.C. § 1201(a)(1)(C).

[619] *See id*. § 1201(a)(1)(A).

[620] *See id*. § 1201(a)(1)(C).

LOC_AR_00009344

be noninfringing.  Rather, the proponent must establish that the proposed use is likely to qualify as noninfringing under relevant law.[621]

The Office continues to emphasize that this standard does not require "controlling precedent directly on point."[622]  Rather, as it has done in the past, the Office will look to analogous case law in assessing whether a use is likely to be noninfringing.

Some commenters, including Public Knowledge, seemed to advocate that the Librarian should grant an exemption even where it is unclear whether uses are "likely" to be noninfringing, stating that "barring affirmative case law saying that that activity is in fact infringing . . . the tie goes to a determination of non-infringement."[623]  It suggested that "reasonable experts can disagree as to whether the case law indicates that an act is infringing or not" and that "[i]n such cases, it would be best to grant the exemption, and allow the question to be properly resolved by a federal court if a copyright owner feels aggrieved."[624]  In the absence of an exemption, it explained, a court presented with such a case would be compelled to find a section 1201(a)(1) violation based on the circumvention, even if it believed that the use of the underlying work may constitute fair use.[625]

But a permissive approach to finding noninfringing uses in the absence of an established basis in the statute or case law would be contrary to the overall statutory scheme, which, as explained above, requires the production of sufficient evidence that there have been or are likely to be adverse impacts on noninfringing uses.[626]  The Office also disagrees that the denial of exemptions based on a "dearth of case law" "effectively depriv[es] the courts of . . . critical jurisdiction" to determine whether certain uses are noninfringing.[627]

---

[621] 2015 Recommendation at 15; *see* 2012 Recommendation at 7; 2010 Recommendation at 11–12.

[622] *See* 2010 Recommendation at 12.

[623] Tr. at 120:23–121:07 (May 19, 2016) (Panjwani, Public Knowledge).

[624] Public Knowledge Initial Comments at 5–6; *see also* Joint Filmmakers II Reply Comments at 7 ("[A]n unduly restrictive standard runs counter to Congress's intend not to disturb the natural development of case law with respect to fair and other lawful uses.").

[625] Public Knowledge Initial Comments at 6 (citing *RealNetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 641 F. Supp. 2d 913 (N.D. Cal. 2009)).

[626] Commerce Committee Report at 38 ("If the rulemaking has produced insufficient evidence to determine whether there have been adverse impacts with respect to particular classes of copyrighted materials, the circumvention prohibition should go into effect with respect to those classes.").

[627] *See* Public Knowledge Initial Comments at 6.

LOC_AR_00009345

Nothing in section 1201 prevents a user from seeking declaratory judgment as appropriate, or engaging in litigation involving works not protected by TPMs.[628]

Moreover, the rulemaking is not an appropriate venue for breaking new ground in fair use jurisprudence, and the Office is hesitant to place itself in the position of making fair use findings in a rulemaking context—potentially subject to some degree of judicial deference—that might have influence beyond the current state of the law.  The Office's approach in this regard has some support in the statute:  section 1201(c) states that nothing in the rest of section 1201 "shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title,"[629] and legislative history states that this provision was "intended to ensure that none of the provisions in section 1201 affect the existing legal regime established in the Copyright Act and case law interpreting that statute."[630]  This suggests that Congress did not intend for the Office to expand or contract the contours of fair use through the rulemaking proceeding.

### 3.  Causation

This requirement comes directly from the statute, which requires that users be "adversely affected by the prohibition [on circumvention]."[631]  Legislative history confirms what the statute makes clear:  "[a]dverse impacts that flow from other sources . . . are outside the scope of the rulemaking."[632]  Examples of potential sources of non-cognizable harms include "marketplace trends, other technological developments, or changes in the roles of libraries, distributors or other intermediaries."[633]  In the past, the Office said adverse effects must be "clearly attributable to implementation of a technological protection measure,"[634] but "clearly attributable" does not imply a heightened causation requirement above preponderance of the evidence.

---

[628] To be clear, there is no actual deprivation of jurisdiction:  copyright infringement and section 1201 violations are separate causes of action, and a court entertaining both claims would be called on to resolve both issues, including the merits of any asserted fair use defense to the infringement claim.

[629] 17 U.S.C. § 1201(c).

[630] SENATE JUDICIARY COMMITTEE REPORT at 30; *see also* COMMERCE COMMITTEE REPORT at 20, 26 ("[F]air use principles certainly should not be extended beyond their current formulation.").

[631] 17 U.S.C. § 1201(a)(1)(C).

[632] COMMERCE COMMITTEE REPORT at 37; HOUSE MANAGER'S REPORT at 6.

[633] HOUSE MANAGER'S REPORT at 6.

[634] *See* 2015 Recommendation at 16 (quoting COMMERCE COMMITTEE REPORT at 37); *see also* HOUSE MANAGER'S REPORT at 6 ("Adverse impacts . . . that are not clearly attributable to such a prohibition, are outside the scope of the rulemaking.").

LOC_AR_00009346

## 4. Adverse Effects and the Statutory Factors

The Office agrees with the Cyberlaw Clinic that the adverse effects analysis is connected to the statutory factors. Congress has explained that the factors "are illustrative of the questions that the rulemaking proceeding should ask," and in examining them, "the focus must remain on whether the implementation of technological protection measures . . . has caused adverse impact on the ability of users to make lawful uses."[635] As the Office has previously noted, these factors delineate the "nature of the inquiry for the rulemaking process as a whole,"[636] and "[t]hese statutory considerations require examination and careful balancing" in reaching a determination to grant or deny an exemption.[637]

Although the Office has sometimes laid out these factors themselves separately for clarity or administrability, in practice, the Office generally balances "[t]he harm identified by a proponent of an exemption . . . with the harm that would result from an exemption."[638] As the Office explained in the first rulemaking:

> Ultimately, the task [of the] rulemaking proceeding is to balance the benefits of technological measures that control access to copyrighted works against the harm caused to users of those works, and to determine, with respect to any particular class of works, whether an exemption is warranted because users of that class of works have suffered significant harm in their ability to engage in noninfringing uses. The four factors specified in section 1201(a)(1)(C) reflect some of the significant considerations that must be balanced . . . .[639]

---

[635] COMMERCE COMMITTEE REPORT at 37.

[636] 2006 Recommendation at 5; 2003 Recommendation at 6.

[637] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 76 Fed. Reg. 60,398, 60,403 (Sept. 29, 2011); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 73 Fed. Reg. 58,073, 58,078 (Oct. 6, 2008); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 70 Fed. Reg. at 57,530; Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 67 Fed. Reg. 63,578, 63,581 (Oct. 15, 2002).

[638] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 76 Fed. Reg. at 60,403; Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 73 Fed. Reg. at 58,078; Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 70 Fed. Reg. at 57,530; Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 67 Fed. Reg. at 63,581.

[639] 2000 Recommendation and Final Rule at 64,563 (internal citations omitted).

118

LOC_AR_00009347

### a. Degree of Adverse Effects Required

While rightsholders generally praised the Office's past analysis of adverse effects,[640] some commenters questioned the Office's reliance on various committee reports that they believe articulate standards beyond what is statutorily required, specifically: that the "main focus" of the rulemaking is on whether "a substantial diminution of" the availability of works for noninfringing uses "is *actually occurring* in the market";[641] that adverse impacts should be "distinct, verifiable and measurable" and "not . . . *de minimis*";[642] that "mere inconveniences, or individual cases, that do not rise to the level of a substantial adverse impact" are insufficient;[643] and that a "determination should be based upon anticipated, rather than actual, adverse impacts only in extraordinary circumstances in which the evidence of likelihood of future adverse impact during that time period is highly specific, strong and persuasive."[644] These requirements, such commenters argued, are not required by the statute's text[645] and are largely the result of the Office placing undue weight on the House Manager's Report.[646] They asserted that such statements serve as *de facto* heightened evidentiary standards, noting that the statute requires "[n]o further evidence of harm other than that inability to make noninfringing uses."[647]

The Office does not believe that by referencing statements from the legislative history, it has applied a heightened standard beyond preponderance of the evidence.[648] Rather, the

---

[640] AAP, MPAA & RIAA Initial Comments at 13; AAP, MPAA & RIAA Initial Reply Comments at 5–6; SIIA Initial Reply Comments at 3–4.

[641] HOUSE MANAGER'S REPORT at 6.

[642] COMMERCE COMMITTEE REPORT at 37.

[643] HOUSE MANAGER'S REPORT at 6.

[644] HOUSE MANAGER'S REPORT at 6.

[645] *See, e.g.*, Authors Alliance Initial Comments at 3; CDT Initial Comments at 6–7; Consumers Union Initial Comments at 4–5; New Media Rights ("NMR") Initial Comments at 16; OTW Initial Comments at 3–4.

[646] *See, e.g.*, Cyberlaw Clinic Initial Comments at 5–6; ISRI Initial Comments at 12 (noting that the report was issued after the bill passed the House, and that the report is "the handiwork of one legislator after the fact") (quoting DAVID NIMMER, COPYRIGHT: SACRED TEXT, TECHNOLOGY, AND THE DMCA 426 (2003)); Tr. at 117:14–19 (May 19, 2016) (Greene, OTI).

[647] OTW Initial Comments at 3–4; *see also* Consumers Union Initial Comments at 5; Cyberlaw Clinic Initial Comments at 12–13; ISRI Initial Comments at 12; OTI Initial Comments at 9–10.

[648] The Office declines some commenters' suggestions to ignore section 1201's legislative history on this topic. While the Office appreciates that the DMCA went through various changes, and that the statute speaks most plainly for itself, on many issues, including the degree of adverse

LOC_AR_00009348

legislative history merely confirms the statutory standard.  When read together, the Commerce Committee and House Manager's Reports make clear that the "burden of proof is not more stringent than the statutory text, but rather is a clarification that any showing must be based on real, verifiable, and reasonable evidence."[649]  As the Office has explained, the House Manager's Report's characterization of the necessary showing as being one of "substantial adverse impact" or "substantial diminution" is "equivalent" to the standard articulated by the Commerce Committee:  that the rulemaking proceeding should focus on "distinct, verifiable, and measurable impacts" compared to "*de minimis* impacts."[650]  In other words, "[s]tating that there is a requirement of 'substantial' adverse impact is another way of saying that a showing of more than 'de minimis impacts' is required."[651]  Similarly, reference to "distinct . . . impacts," requires only "more than a vague or generalized claim unrelated to a particular class."[652]

With regard to the House Manager's Report's statement that a "determination should be based upon anticipated, rather than actual, adverse impacts only in extraordinary circumstances in which the evidence of likelihood of future adverse impact during that time period is highly specific, strong and persuasive,"[653] the Office has similarly found, and now reaffirms, that "the statutory language enacted does not specify a standard beyond . . . the traditional preponderance of the evidence standard."[654]

To the extent these legislative history statements have relevance beyond restating the statutory standard, it is in confirming that evidence cannot be hypothetical, theoretical, or speculative, but must be real, tangible, and concrete.[655]

---

effects required, the bicameral legislative history paints a cohesive picture and can illuminate congressional intent.

[649] *See* 2003 Recommendation at 17–18.

[650] *Id*. at 16–18 (citing both legislative reports); *see also* 2012 Recommendation at 7; 2010 Recommendation at 10; 2006 Recommendation at 8; 2000 Recommendation and Final Rule at 64,558 n.4.

[651] *See* 2003 Recommendation at 16–17; *see also* 2012 Recommendation at 7; 2010 Recommendation at 10; 2006 Recommendation at 8.

[652] *See* 2010 Recommendation at 10.

[653] House Manager's Report at 6.

[654] *See* 2003 Recommendation at 19–20 (internal quotation marks and alterations omitted); *see also* 2012 Recommendation at 8; 2010 Recommendation at 10; 2006 Recommendation at 8.

[655] Many commenters agreed with this interpretation.  *See, e.g.*, NMR Initial Comments at 16 (suggesting legislative history should be interpreted to only require a "measurable" impact); Joint Filmmakers II Initial Reply Comments at 8 ("[T]he Register should define 'adverse' as 'more than de minimis,' meaning that if real cases exist which are emblematic of a broader impact, an adverse effect has been shown."); Tr. at 115:23–117:07,126:02–07 (May 19, 2016) (Williams, AAP,

LOC_AR_00009349

Ultimately, the evidence must show that adverse effects are not merely possible, but probable (*i.e.*, more likely than not to be occurring or likely to occur in the next three years).

Regarding references to denying exemptions where the exemption would affect "individual cases,"[656] it certainly may be appropriate to weed out edge cases where permitting circumvention broadly may impact the market for copyrighted works. But to be clear, the Register does not decline to recommend exemptions solely because only a small number of individuals would benefit from it. The Office also notes that the admonition against crediting "mere inconveniences"[657] relates to the availability for use of works under the first statutory factor. As discussed below, whether or not something is an adverse effect or a mere inconvenience can depend upon the costs and burdens involved in making use of reasonable alternatives.[658]

### b. Statutory Factors

Many commenters offered views regarding the proper examination of the factors that the statute requires be considered. In evaluating the first factor, "the availability for use of copyrighted works,"[659] some stakeholders suggested that the Office has placed too much emphasis on whether there are reasonable alternatives to an exemption, and that "[a]lternatives to circumvention need to be realistic."[660] On the other hand, rightsholders asserted that "[i]t is also essential that the Register continue to consider 'the positive as

---

MPAA & RIAA) (noting that the Office has previously explained that these statements simply require proponents to come forward with "a real-world issue" rather than a "hypothetical" or a "philosophical objection [to] the law").

[656] *See* HOUSE MANAGER'S REPORT at 6.

[657] *See id.*

[658] *See* Public Knowledge Initial Comments at 7 ("Being required to spend money, when the alternative would not infringe a copyright, should by any sensible definition be considered an adverse effect on the public."); ISRI Initial Comments at 14–15 (providing example of phone unlocking exemption and stating that "[t]he Register rejected NTIA's common-sense conclusion that it is not an appropriate alternative for a current device owner to be required to purchase another device to switch carriers") (internal quotation marks omitted).

[659] 17 U.S.C. § 1201(a)(1)(C)(i).

[660] OTW Initial Comments at 5–6; *see also, e.g.*, AFB Initial Comments at 8 (arguing the standard should not require a "print-disabled reader to engage in burdensome or costly searches for different formats of works or to abandon their current eBook reader and invest in a different eBook platform (or several) to take advantage of a work accessible only in that format"); Tr. at 155:03–17 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) ("[H]ardship of the alternatives . . . should be taken into account.").

LOC_AR_00009350

well as the adverse effects of [TPMs] on the availability of copyrighted materials.'"[661] The Office agrees that alternatives to circumvention should be realistic and not merely theoretical,[662] but does not believe that establishing bright-line rules as to availability would aid this analysis. Instead, the Office will continue to evaluate the burdens or costs involved with an alternative and, depending on the circumstances, find them to either rise to the level of an adverse effect or to just be a mere inconvenience. The Office will also continue to consider both the positive and adverse effects of the prohibition on the availability of copyrighted materials.

The study received few substantive comments concerning the second and third factors, respectively, "the availability for use of works for nonprofit archival, preservation, and educational purposes" and "the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research."[663] Since these factors harken to exceptions for libraries and archives in section 108 and the paradigmatic fair uses set forth in section 107, the Office will continue to rely on those statutes and relevant case law to inform its consideration of these factors, as appropriate.

With regard to the fourth factor, "the effect of circumvention of technological measures on the market for or value of copyrighted works,"[664] Joint Filmmakers II argued that "[t]o qualify as a real threat of market substitution, there should be concrete evidence to that effect; mere assertions should not be sufficient."[665] For works providing commentary on the original work, they added that "this inquiry should not include effects on the licensing market, because it is well-established that rights holders have no claim to the derivative market for criticisms of their works."[666] The Office agrees that claims of a threat of market substitution should be more than bare assertions. The Office also agrees that the effect of noninfringing uses on licensing markets should be excluded, although the Office also notes that the effect on such markets may be relevant

---

[661] AAP, MPAA & RIAA Initial Comments at 13 (quoting HOUSE MANAGER'S REPORT at 6); *see also* Tr. at 177:08–15 (May 19, 2016) (Geiger, Rapid7) (suggesting that "protecting the availability of copyrighted works" should be considered when evaluating proposed exemptions).

[662] *See* OTW Initial Comments at 5–6.

[663] 17 U.S.C. § 1201(a)(1)(C)(ii),(iii).

[664] *Id.* § 1201(a)(1)(C)(iv).

[665] Joint Filmmakers II Initial Reply Comments at 9.

[666] *Id.*

122

LOC_AR_00009351

to assessing whether the use is infringing in the first place (*e.g.*, under the fourth fair use factor).[667] Otherwise, the study received little comment on the application of this factor.

Many commenters were critical of the Office's consideration in the last rulemaking of non-copyright issues, such as public safety and environmental concerns, under the fifth statutory factor, "such other factors as the Librarian considers appropriate."[668] There was particular concern over the Office's recommendation that the implementation of certain exemptions for vehicle repair, security research, and medical devices be delayed a year "to provide . . . potentially interested agencies an opportunity to consider and prepare for the lifting of the DMCA prohibition."[669] For example, Public Knowledge stated that "Congress, agencies, or the courts have adopted appropriate statutes, regulations, and legal doctrines to address any concerns beyond the scope of copyright law" and that "[a]ny concern that those measures are inadequate to serve their intended purposes should be addressed by the appropriate subject matter authorities."[670] EFF questioned whether the Office's solicitation of comments on non-copyright issues "led to better exemptions,"[671] suggesting that it may instead have "encourage[d] the opportunistic use of Section 1201 by corporations with an interest in suppressing competition and independent research."[672] These commenters argued that the fifth

---

[667] With respect to Joint Filmmakers II's comment specifically, the Office notes that in considering whether to recommend an exemption for narrative filmmaking, the sixth rulemaking took into account the effect of potentially *infringing* uses on the relevant licensing market. *See* 2015 Recommendation at 79–81 (noting that such uses "do not necessarily appear to be related to criticism or comment or otherwise transformative").

[668] 17 U.S.C. § 1201(a)(1)(C)(iv).

[669] 2015 Final Rule at 65,954; *see, e.g.,* Auto Care Initial Comments at 7 ("[T]he Librarian of Congress and the Copyright Office, by delaying implementation of the [2015 Rulemaking's] Class 21 and 22 exemptions, exceeded their authority and committed clear error."). *But see* ISRI Initial Comments at 7 (noting that such a delay is "problematic," but "better than a denial").

[670] Public Knowledge Initial Comments at 3–4; *see also, e.g.,* CDT Initial Comments at 4; Consumers Union Initial Comments at 3–4; EFF Initial Comments at 7 (stating that "[n]o exemption granted by the Copyright Office creates a license to violate" such laws, making consideration of such matters as part of the rulemaking unnecessary in its view); OTW Initial Comments at 2; R Street Institute Initial Comments at 8.

[671] EFF Initial Reply Comments at 5–6.

[672] EFF Initial Comments at 6–7. EFF offered evidence showing that, a day after the Copyright Office solicited views from the EPA, Auto Alliance asked the EPA to voice its concern that allowing consumer modifications to these programs would cause environmental and safety problems. *Id.* at Attachment B.

123

statutory factor "must be understood within the scope of copyright interests reflected in the body of subparagraph (C) and clauses (i)–(iv)."[673]

But many other commenters opined that the Office properly exercised its authority in seeking input from other agencies and recommending delayed implementation of an exemption in appropriate circumstances.[674]  As Consumers Union put it, "[t]here may be times when delaying the availability of a new exemption is warranted, to give the regulatory agency prior notice and a reasonable opportunity to establish appropriate conditions on accessing and altering a product's software, in keeping with the need to ensure safety."[675]  Looking forward, Microsoft and others asked that the Office "facilitate inter-agency consultation and dialogue as early in the process as possible."[676]

The Office appreciates commenters' discussion of the sixth rulemaking which, in light of significant and novel public policy concerns, took certain non-copyright issues into account and implemented a twelve-month delay for certain exemptions relating to security research and automobile repair to allow other agencies to react to the new rule. The Office believes that the open-ended nature of this statutory factor permits broad consideration of a wide variety of factors.  As both the Office and NTIA noted in the last rulemaking, it is not always possible to draw a line at "copyright concerns."[677] Moreover, certain non-copyright concerns have been consistently relevant to proposed exemptions in past rulemakings, such as competition and telecommunications policies supporting past cellphone unlocking exemptions.[678]  Indeed, the statute itself makes relevant certain non-copyright concerns, such as interoperability, encryption research,

---

[673] Auto Care Initial Comments at 7–8; *see also* Cyberlaw Clinic Initial Comments at 14–15 ("The Supreme Court has endorsed this formulation, holding in a case concerning a judge's power to consider 'such other factors as the court deems appropriate' under a statute to be 'understood in light of the specific terms that surround it.'") (quoting *Hughey v. United States*, 495 U.S. 411, 419 (1990)).

[674] *See, e.g.*, ACT Initial Comments at 5; Copyright Alliance Initial Comments at 11; ISRI Initial Comments at 8; Kernochan Center Initial Comments at 4; Auto Alliance Initial Comments at 3–6; Microsoft Initial Comments at 6–7.

[675] Consumers Union Initial Comments at 3.

[676] Microsoft Initial Comments at 6–7 ("The analysis, data and other evidence of expertise from these agencies can inform the Office's recommendations and increase stakeholder and public confidence in the outcome of the rulemaking process."); *see also* Auto Alliance Initial Comments at 3–6; Consumers Union Initial Comments at 3; CDT Initial Comments at 4 ("CDT also shares NTIA's confidence that when triennial exemptions raise substantial concerns outside the scope of copyright, clear and transparent communication can provide notice to other agencies . . . .").

[677] *See, e.g.*, 2015 Recommendation at 244-45 (noting that the Copyright Office and NTIA agree that both copyright and non-copyright concerns are relevant to some proposed exemptions).

[678] *See, e.g.*, *id.* at 168.

LOC_AR_00009353

security testing, and protection of minors and personally identifying information.[679] And the statute directs NTIA, an agency principally responsible by law for advising the President on telecommunications and information policy issues, to provide its views, suggesting Congress wanted certain non-copyright concerns to play a role in the rulemaking process.[680]

But while the Office declines to categorically exclude "non-copyright" concerns from the fifth statutory factor, the Office also reiterates that the rulemaking must be "principally focused on the copyright concerns implicated by any proposed exemption," and that it is not typical for safety and environmental concerns to play a significant role in the Register's recommendation.[681]   The sixth rulemaking presented the Office with multiple and novel classes that included devices like tractors and medical devices, which but for the software contained within them would have no place in the rulemaking.  Confronted with concerns that have "at best a very tenuous nexus to copyright protection," but "are serious issues nevertheless," the Register recommended, and the Librarian adopted, a delayed implementation for certain exemptions to provide adequate time for other agencies to examine and update their own rules and guidance if needed.[682]   Going forward, now that agencies, consumers, and businesses alike have had the opportunity to consider these issues and react to the many exemptions related to embedded software that were granted in the past rulemaking,[683] the Office expects its future recommendations will be able to factor this into account.  For example, while the Office

---

[679] *See* 17 U.S.C. § 1201(c)(3) (nothing in the statute shall affect product design for components unless otherwise prohibited), § 1201(f) (reverse engineering for interoperability), § 1201(g) (encryption research), § 1201(h) (protection of minors), § 1201(i) (personally identifying information), § 1201(j) (security testing).  While these provisions broadly look to non-copyright concerns for purposes of establishing exemptions to section 1201, in many cases they also limit the availability of those exemptions based on non-copyright concerns.  *See, e.g., id.* § 1201(g)(2), (j)(2) (conditioning respective exemptions on circumvention not violating "section 1030 of title 18 and those provisions of title 18 amended by the Computer Fraud and Abuse Act of 1986"), § 1201(j)(3)(B) (factors in determining exemption include whether information obtained was used in "violation of privacy or breach of security").

[680] 17 U.S.C. § 1201(a)(1)(C).

[681] *See* 2015 Recommendation at 248.

[682] *See e.g., id.* at 3, 241–49, 311–20.

[683] While it appears that the EPA's participation in the previous rulemaking may have been initiated by concerns voiced by copyright stakeholders, *see* EFF Initial Comments at 6–7, the FDA's cybersecurity guidance on medical devices issued last year, in contrast, suggests the implementation delay may have been beneficial to them.  *See* FDA, POSTMARKET MANAGEMENT OF CYBERSECURITY IN MEDICAL DEVICES—GUIDANCE FOR INDUSTRY AND FOOD AND DRUG ADMINISTRATION STAFF (Dec. 28, 2016), http://www.fda.gov/downloads/MedicalDevices/ DeviceRegulationandGuidance/GuidanceDocuments/UCM482022.pdf.

LOC_AR_00009354

might take note of market competition issues, it will generally decline to consider health, safety, and environmental concerns. Likewise, the Office does not anticipate the Register recommending additional delays for implementation of exemptions unless necessitated by a grave or unusual situation. The Office agrees that other agencies should not rely on section 1201 to help enforce or cover gaps in their own health, safety, environmental, or other regulations and reiterates that the granting of an exemption provides no defense to those who use it as an excuse to violate other laws and regulations.[684]

Finally, some commenters put forward additional items that the Office should consider under this factor, such as the purpose for which a TPM was adopted or how the statute broadly affects uses of copyrighted works.[685] The Office is open to considering these issues in the upcoming rulemaking, while noting that "the Section 1201 rulemaking process is not the forum in which to break new ground on the scope of fair use."[686]

### c. Merged Access and Copy Controls

A few commenters proposed that in the many cases where access controls and copy controls are merged, the rulemaking should treat the inquiry into adverse effects on noninfringing uses differently, favoring a finding of adverse effects over cases where TPMs operate solely as an access control.[687] This is because, as OTW put it, "the balance that Congress did intend in distinguishing access from rights controls is now gone."[688] The encryption protocols used for DVDs and Blu-rays were used as a prime example, with Joint Filmmakers I explaining that "[m]ost participants in the triennial rulemakings who have suggested exemptions" to circumvent DVDs or Blu-rays have sought to do so "to make copies in order to engage in a lawful use."[689] Rightholders objected, stating that they did not see any basis in the statute or legislative history for this approach, and

---

[684] *See* 2015 Recommendation at 11 ("[W]hile an exemption may specifically reference other laws of particular concern, any activities conducted under an exemption must be otherwise lawful.").

[685] Joint Filmmakers II Initial Reply Comments at 8–9 (asking Register to consider general effect on fair or other lawful uses); *see* Tr. at 154:05–15 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) (suggesting that if a TPM was "adopted for non-copyright reasons," this should weigh in favor of an exemption).

[686] 2015 Recommendation at 109 (quoting 2012 Recommendation at 163).

[687] OTW Initial Comments at 5 ("The fact that, from the perspective of rights controls, their acts are perfectly lawful should itself indicate an adverse impact on noninfringing uses."); Joint Filmmakers I Initial Reply Comments at 6–7 ("[T]he Register should strongly favor exemptions involving merged access and use controls where the merged control prevents a use such as copying and the user does not seek to access the material unlawfully.").

[688] Tr. at 138:06–11 (May 19, 2016) (Tushnet, OTW).

[689] Joint Filmmakers I Initial Comments at 16.

126

noting, "[j]ust because an access control may have aspects of copy control merged with it doesn't make it any less of an access control."[690]

The Copyright Office does not find statutory support for the idea that obtaining an exemption should be easier where the TPM at issue is merged. The Office appreciates the desire for accommodation, given that section 1201 does not prohibit circumvention of copy controls. As discussed above, however, the Office believes that section 1201(a)(1) is best read as protecting the integrity of access controls even where prohibited conduct would not be infringing. Additionally, at least in the anti-trafficking context, courts have found that where a TPM acts as both an access control and a copy control, it is independently subject to both section 1201(a)(2) and section 1201(b).[691] The Office will continue to evaluate the effect of access controls, independent of whether the TPM also functions as a copy control. That being said, the Office notes that it has frequently granted exemptions permitting circumvention of merged access and copy controls where the record supported them, as has been the case for the exemptions for circumvention of the TPMs on DVDs and Blu-ray discs.[692]

## E. Streamlined Process to Renew Exemptions

While viewpoints differed as to whether legislative changes regarding the section 1201 rulemaking were warranted and if so, what those changes should look like, there was "a remarkable degree of consensus"[693] among otherwise polarized stakeholders that the Copyright Office should take steps within its existing regulatory authority to streamline

---

[690] Tr. at 151:02–16 (May 25, 2016) (Metalitz, AAP, MPAA & RIAA); *see also* Maryna Koberidze Initial Comments Ex. A, at 231 (noting that bypassing an access control would remain prohibited, even if the same TPM acted as a copy control).

[691] *See 321 Studios.*, 307 F. Supp. 2d at 1094–99 (finding DVD encryption controls to independently be both access controls and copy controls, and finding trafficking violations under both sections 1201(a)(2) and (b)).

[692] *See, e.g.,* 2015 Recommendation at 29–30, 99–106 (description of TPMs on DVDs and Blu-ray discs and Register's recommendation for exemptions involving works protected by these TPMs).

[693] Tr. at 155:14–22 (May 19, 2016) (Sheffner, MPAA); *see also* EFF Initial Reply Comments at 3 ("There is strong consensus among the commenters that exemptions granted in a triennial rulemaking should be renewed in subsequent three-year periods with little or no burden on proponents."); DVD CCA & AACS LA Additional Reply Comments at 3 ("There is significant consensus that the rulemaking should be streamlined to permit previously granted exemptions to be more easily renewed.").

LOC_AR_00009356

the process for recommending renewal of previously adopted exemptions to the Librarian.[694]

## 1. The Need for a Renewal Process

Prior participants in the rulemaking process generally characterized it as burdensome for both users and rightsholders of copyrighted works.[695]  For example, the Cyberlaw Clinic estimated that in the most recent rulemaking, its attorneys, students, and interns "logged approximately 575 hours of work" to obtain an exemption to circumvent medical devices,[696] and AFB estimated that law students spent 527.2 hours supporting its petition for a renewed exemption.[697]  The commitment was keenly felt by individuals, such as documentary filmmakers and farmers, where participation in the rulemaking process competed with demands of their occupations,[698] and by other communities,

---

[694] *See, e.g.,* AAP, MPAA & RIAA Initial Comments at 11–12; AAU, ACE, APLU & EDUCAUSE Initial Comments at 14; Auto Alliance Initial Comments at 6–7; AIPLA Initial Comments at 2; AFB Initial Comments at 3; Authors Alliance Initial Comments at 2–3; Auto Care Initial Comments at 8–9; CDT Initial Comments at 5–6;  Competitive Carriers Ass'n Initial Comments at 5–11; CTA Initial Comments at 7; Consumers Union Initial Comments at 4; Copyright Alliance Initial Comments at 11–12; David Oster Initial Comments at 1; DIYAbility Initial Comments at 4–6; DVD CCA & AACS LA Initial Comments at 10–14; EFF Initial Comments at 8–9; ESA Initial Comments at 8–11; iFixit Initial Comments at 3; ISRI Initial Comments at 8–11; Joint Filmmakers I Initial Comments at 9–10; Kernochan Center Initial Comments at 4–5; KEI Initial Comments at 4–5; LDAA Initial Comments at 1–2; LCA Initial Comments at 33–34; Maryna Koberidze Initial Comments at 2–3; MIT Initial Comments at 3–4; Microsoft Initial Comments at 6; Mozilla Initial Comments at 5; OTI Initial Comments at 7–9; NMR Initial Comments at 17–18; OTW Initial Comments at 2, 4–5; ORI Initial Comments at 3; Peter Decherney Initial Comments at 6–13; Peter Hunt Initial Comments at 3; Public Knowledge Initial Comments at 4–5; R Street Institute Initial Comments at 7; Rapid7, Bugcrowd & HackerOne Initial Comments at 4; Rico Robbins Initial Comments at 1; SAA Initial Comments at 3; SIIA Initial Comments at 7; SIIA Initial Reply Comments at 5; UVA Initial Comments at 2–3; IPT USC Initial Comments at 7–9; USACM Initial Comments at 2; AAA Initial Reply Comments at 6 (all expressing general support).

[695] *See, e.g.,* AAU, ACE, APLU & EDUCAUSE Initial Comments at 10; Copyright Alliance Initial Comments at 12.

[696] Cyberlaw Clinic Initial Comments at 1.

[697] AFB Initial Comments at 9; *see also* Tr. at 82:22–83:05 (May 19, 2016) (Tushnet, OTW) (noting that OTW spent 500–600 hours on petition to circumvent for remix artists); Joint Filmmakers II Initial Reply Comments at 3 (noting that law clinic and pro bono counsel spent "nearly 2000 hours advocating for an exemption").

[698] IPT USC Initial Comments at 3 ("[F]armers face the impractical challenge of seeking renewals for exemptions while simultaneously managing the specific and time-sensitive needs of their farms."); Joint Filmmakers I Initial Comments at 10 ("The requirement to reapply *de novo* for the

LOC_AR_00009357

including the blind, visually impaired, and print-disabled, which have come to rely upon an exemption but must go through the process again each rulemaking.[699]  As a result, stakeholders suggested that "this cost and the difficulty of securing pro bono representation deters some individuals and organizations from participating in the triennial rulemaking process."[700]

As described above, the sixth rulemaking process instituted procedural changes designed to make the process more accessible, to facilitate participation and the development of the factual record, and to reduce administrative burdens on participants and the Office.[701]  While some praised the Office for these improvements,[702] others found the petition process and subsequent filing periods "repetitive" and in need of shortening.[703]

There was a particular focus on the need for the Office to expedite the process for considering requests to readopt or "renew" a previously granted exemption. Commenters said the needs of many of the users of an exemption, including the blind, visually impaired, and print disabled, documentary filmmakers, or universities and libraries, has "remained fairly constant."[704]  Given the reliance these users have come to place upon the exemptions relevant to them, stakeholders expressed concern over the overall lack of certainty that an exemption, even one lacking opposition, would be

---

same previously granted exemptions detracts from our time, attention, and resources to enriching society with documentary films.").

[699] Tr. at 162:25–163:15 (May 19, 2016) (Cazares, AFB).

[700] *See, e.g.*, AFB Initial Comments at 9; Tr. at 88:10–89:07 (May 19, 2016) (Cox, ARL) ("[The process] is just an extraordinary amount of time for something that is proposed by public interest groups that often don't have the time and resources . . . ."); Tr. at 106:01–09 (May 25, 2016) (Lerner, Joint Filmmakers I) ("[F]ew people can afford to participate in a proceeding without this unique animal called law clinics . . . ."); Tr. at 111:05–10 (May 25, 2016) (Wiens, iFixit & Repair.org) ("[W]e had a list of about 50 exemptions that we wanted to file.  And we whittled that down to about the six that we were able to work on and file because that was the number of clinics that we had."); Tr. at 119:21–120:13 (May 25, 2016) (Wolfe, Authors Alliance).

[701] *See* Section 1201 Study:  Notice and Request for Public Comment, 80 Fed. Reg. at 81,371.

[702] *See, e.g.*, Microsoft Initial Comments at 5 ("We applaud the Copyright Office for the creative ways in which it streamlined the process for identifying, categorizing, and obtaining feedback on proposed exemptions in the 2015 rulemaking."); Kernochan Center Initial Comments at 6 (stating that grouping proposed exemptions into categories for comment "benefited the rulemaking process and should be retained").

[703] *See* AAU, ACE, APLU & EDUCAUSE Initial Comments at 14–15; Joint Filmmakers II Initial Reply Comments at 3 (requesting this change).

[704] MIT Initial Comments at 4.

LOC_AR_00009358

granted in subsequent rulemaking cycles.[705]  Stakeholders who had previously opposed the initial grant of such exemptions also recognized the benefits of a expediting the process for renewal.  Such stakeholders generally expressed the view that they "are not opposed in principle to the Register recommending renewal of existing exemptions to the Librarian so long as there is no meaningful opposition to renewal."[706]

The Office's prior requirement that a factual record to support an exemption be developed *de novo* each rulemaking[707] was seen as placing significant and unnecessary requirements on parties and the Office—especially when there is little to no opposition to the renewal of the exemption.[708]  Specifically, commenters pointed out that once an exemption has been granted, it can be more difficult to develop a factual record demonstrating the need for the exemption.[709]  As one stakeholder described it, "it becomes more difficult to empirically demonstrate adverse impact resulting from a

---

[705] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 11; IPT USC Initial Comments at 6; Tr. at 171:02–07 (May 19, 2016) (Butler, Univ. of Va. Libraries) (noting that many universities have built up DVD libraries under the "value proposition" that "we will be able to cut clips").

[706] AAP, MPAA & RIAA Initial Comments at 11–12; *see also* Auto Alliance Initial Comments at 6 ("Auto Alliance would not oppose reasonable procedural changes that could expedite consideration of uncontested requests for the 'renewal' of specific exemptions."); Copyright Alliance Initial Comments at 11 ("The Copyright Alliance is willing to consider supporting an appropriately focused solution to reduce administrative burdens on the Copyright Office, such as those which may facilitate the renewal of exemptions for which there is no meaningful opposition."); DVD CCA & AACS LA Comments at 11 ("[T]hey would not oppose a streamlined process for meeting the burden for renewal of an existing exemption under the conditions noted below"); ESA Initial Comments at 9 ("ESA is open to the possibility of adjustments in the Copyright Office's procedures to streamline the triennial proceedings within the current statutory framework.").

[707] *See* 2015 Recommendation at 14.

[708] *See, e.g.*, AFB Initial Comments at 3 ("The de novo review process . . . has become a never-ending exemptions treadmill, even when the exemption occasions little to no opposition."); ISRI Initial Comments at 8–9 ("Eliminating the de novo requirement would vastly reduce much of the unnecessary burden on proponents to reestablish the evidentiary and legal justifications for their exemptions every three years, as well as the burden on the office to review ever-expending [*sic*] records for already-granted exceptions."); LCA Initial Comments at 3 ("The requirement that an exemption be renewed *de novo* every three years is enormously burdensome."); USACM Initial Comments at 2 ("The current requirements to provide the factual and legal evidence anew each time can result in significant inefficiencies and duplication of effort by all parties and [the Copyright Office].").

[709] *See* Peter Decherney Initial Comments at 7 (stating "it is difficult, if not impossible, to show continued harm after one has been granted an effective exemption whose very purpose is to preclude such harm"); IPT USC Initial Comments at 5 (describing the process as "placing a stringent requirement for a new, fully developed record that is impossible to create").

LOC_AR_00009359

technological protection measure when an existing exemption is succeeding in addressing that very problem."[710]

Several commenters argued that section 1201 does not require *de novo* review, or at least not the *de novo* presentation of evidence by exemption proponents in each proceeding.[711] Under this view, commenters questioned the Office's reliance upon the Commerce Committee Report's statement that "the assessment of adverse impacts on particular categories of works is to be determined de novo"[712] and contended that this statement should not preclude the Office from adopting a more forgiving standard than it has in the past.[713] Many read the language as suggesting that the Office at most must make a new evaluation of the evidence during each proceeding—not necessarily that new evidence must be presented by proponents.[714] These stakeholders explained that under this approach, the Office could rely on evidence from prior proceedings to make its determination.[715] Multiple commenters offered ways in which the Office could facilitate the re-use of evidence submitted in prior rulemakings by participants, such as "forming a database to preserve the evidence from past rulemakings so that all parties may utilize

---

[710] AFB Initial Comments at 5, 10 (noting that even though the 2010 exemption was unopposed and the Register acknowledged the importance of broad accessibility for the blind and print disabled, she concluded that there was insufficient evidence to support granting the exemption).

[711] *See, e.g.*, Authors Alliance Initial Comments at 3 ("Current requirements that proponents provide a renewed evidentiary record for each rulemaking are particularly burdensome and do not appear to be statutorily mandated."); Peter Decherney Initial Comments at 7 ("The statute itself does not address how evidence and legal analysis from rulemakings should be employed in subsequent rulemakings.").

[712] COMMERCE COMMITTEE REPORT at 37.

[713] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 14 n.7 ("[T]he *de novo* standard is set out only in the report of one committee that considered the DMCA."); EFF Initial Comments at 9 ("Legislative history is not law and does not bind the Copyright Office.") (citing *Blanchard v. Bergeron*, 489 U.S. 87, 99 (1989) (Scalia, J., concurring)); ISRI Initial Comments at 9–10 ("[T]he rulemaking section of the statute described in the Report underwent so many substantive changes that there simply is no basis for giving the Report's mention of *de novo* review any weight whatsoever."); NMR Initial Comments at 17.

[714] *See, e.g.*, CDT Initial Comments at 6 ("Even if the statute does require *de novo* review of a requested exemption, that review does not foreclose consideration of or reliance on evidence adduced in prior rulemakings.") (citing *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1004 (9th Cir. 2006)); DVD CCA & AACS LA Initial Reply Comments at 6; Joint Filmmakers I Initial Comments at 10.

[715] *See, e.g.*, AAU, ACE, APLU & EDUCAUSE Initial Comments at 14 n.7; Authors Alliance Initial Comments at 3; LCA Initial Comments at 34.

LOC_AR_00009360

[it], when appropriate, in future proceedings"[716] or automatically "porting" evidence from prior rulemakings for each docket "into the next cycle, for all classes, regardless of whether exemptions were approved or denied."[717]

While generally agreeing that the Office has some latitude to adjust the rulemaking framework in light of the statute and legislative history, some commenters noted that "[t]here were good reasons why the rulemaking requires proponents to put on their case and meet their burden of proof de novo."[718]  As Auto Alliance put it:

> Since the inception of the rulemaking process, the concept that the case for exemptions must be demonstrated de novo in each cycle has been a core feature. . . .  Most of the markets relevant to proposed exemptions are dynamic and fast-changing (most assuredly this is the case for the automotive marketplace).  Issues such as whether technological changes or market developments have created new alternatives to circumvention that did not exist three years previously, or have made circumvention less (or more) necessary to carry out specified non-infringing uses, inevitably require determinations on the proposed renewal of existing exemptions to be made de novo.[719]

## 2.  Proposals for Reform

Despite general consensus over the desirability of expediting the rulemaking process for repeat exemptions, views differed regarding what that should entail, and, correspondingly, whether statutory amendment was required.  Suggestions for methods of improving the process for renewing exemptions generally fell into two camps:  first, a "burden-shifting" model where exemptions would be automatically renewed unless opponents met an evidentiary burden for denial, and second, a "streamlined" process that would allow for readoption of exemptions upon short affidavits, absent some showing of meaningful opposition.  Some commenters were only "open to considering proposals for steps that can be taken short of amending the statute that could help alleviate these burdens without adversely affecting the objectives of the process or the statute, which remain sound."[720]

---

[716] Peter Decherney Initial Comments at 14–15 ("If the evidence is out of date, the Office can disregard it, but if it is still relevant, the Office can consider it.").

[717] Public Knowledge Initial Comments at 5; *see also* Tr. at 167:04–21 (May 19, 2016) (Turnbull, DVD CCA & AACS LA).

[718] DVD CCA & AACS LA Initial Comments at 10–11.

[719] Auto Alliance Initial Comments at 6.

[720] Copyright Alliance Initial Comments at 12.

LOC_AR_00009361

### a. "Burden-Shifting" Model

The Copyright Office has previously recommended "that the process of renewing existing exemptions should be adjusted to create a regulatory presumption in favor of renewal," and that "it would be beneficial for Congress to amend Section 1201 to provide that existing exemptions will be presumptively renewed during the ensuing triennial period in cases where there is no opposition."[721]  Most commenters agreed that the Copyright Office could not, under the current statute, implement such changes.[722] Others, however, suggested that the Office already possesses authority to implement a system of "presumptive renewal," although it was not always clear whether the phrase "presumptive renewal" would include an explicit shifting of the burdens between potential seekers of an exemption and those who might oppose it.[723]

The Office received several comments in support of this approach,[724] although they were of limited number compared to those supporting a streamlined process for renewal, discussed below.  Under the burden-shifting model, "once the exemption exists, the burden should shift to the copyright holder."[725]  Opinions differed as to whether this burden-shifting should apply to "*all* previously granted exemptions"[726] or be limited by

---

[721] *Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 27 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office).

[722] *See, e.g.*, AIPLA Initial Comments at 2 ("AIPLA endorses, in principle, an amendment to the Copyright Act that would adjust the triennial process by which exemptions are renewed."); Peter Decherney Initial Comments at 8 ("The purpose behind reconsidering existing exemptions on a triennial basis is to account for that fact that changes in technology, patterns of consumption, and the marketplace may make some existing exemptions obsolete.  Thus, the creation of a hard presumption of renewability might well violate Congressional preference expressed through legislative history."); KEI Initial Comments at 4 ("[T]he statute should be amended to . . . allow for a presumptive renewal of granted exemptions . . . .").

[723] *See, e.g.*, ISRI Initial Comments at 11 ("[T]he Copyright Office currently possesses the authority to make such a change without legislative action . . . ."); Tr. at 132:03–09 (May 25, 2016) (McClure, AFB) (suggesting that such authority can be found in the fifth statutory factor).

[724] AAU, ACE, APLU & EDUCAUSE Initial Comments at 14; *see also* AFB Initial Comments at 10 ("[T]he Office should presume that the exemption is still needed and working."); DIYAbility Initial Comments at 5 ("The most effective for filing groups would be to amend Section 1201 to allow the Library of Congress to automatically renew an exemption granted in the previous rulemaking if no opposition is raised."); OTI Initial Comments at 8.

[725] Tr. at 158:01–06 (May 19, 2016) (Goldman, KEI); *see also* LCA Initial Comments at 3.

[726] Authors Alliance Initial Comments at 2.

LOC_AR_00009362

a threshold, such as "[e]xemptions which encounter no substantive opposition, or which are granted twice in succession over objections."[727]

On the other hand, representatives of copyright owners objected to the burden-shifting model, with one stakeholder explaining "that the opponent doesn't necessarily have all the evidence necessary to show that the exemption is no longer necessary."[728]  Another noted that the Copyright Office had previously rejected burden-shifting as incompatible with a statutory scheme to provide exemptions to a statute, and argued that those reasons remain valid.[729]

Even those who supported a burden-shifting model disagreed as to what showing would be needed to overcome the presumption of renewal.  Mozilla suggested that objections should "demonstrate that the balance of interests favors nonrenewal" by "demonstrat[ing] what circumstances have changed" and "identify[ing] actual harm (cognizable under copyright law) as a result of the exemption" that is not speculative in nature.[730]  AAA suggested that the presumption could be rebutted "by a showing of materially changed circumstances," which would allow objectors to raise "[i]ssues such as whether technological changes or market developments have created new alternatives to circumvention that did not exist three years previously, or have made circumvention less (or more) necessary to carry out specified non-infringing uses."[731]  Similarly, Public Knowledge suggested that opponents must present "compelling" evidence "that shows

---

[727] Mozilla Initial Comments at 5.

[728] Tr. at 174:05–17 (May 19, 2016) (Castillo, AAP); *see also* AAP, MPAA & RIAA Initial Reply Comments at 6 n.6 (explaining that "Congress intended for proponents, who are better positioned than opponents, to present evidence regarding the purported need for exemptions"); Auto Alliance Initial Comments at 6 (rejecting presumptive renewal as "inconsistent with the fundamental character of the proceeding as a fact-based inquiry that depends on specific evidence of the concrete, real-world impact of the anti-circumvention prohibition on actual non-infringing uses of works"); Copyright Alliance Initial Reply at 3 (objecting to a statutory presumption of renewal); DVD CCA & AACS LA Initial Comments at 10 ("DVD CCA and AACS LA would oppose the creation of a presumption of renewal for an exemption, as it would not be consistent with the principles of administrative law."); Tr. at 87:15–88:03 (May 25, 2016) (Reed, Fox Entm't Grp.) (opposing "outright burden shifting").

[729] Tr. at 178:04–179:03 (May 19, 2016) (Sheffner, MPAA) (stating that "rules of statutory construction and administrative law" dictate that exemptions should be construed narrowly and that the burden for an exemption should be on proponents) (citing 2000 Recommendation and Final Rule at 64,558–59).

[730] Mozilla Initial Comments at 5.

[731] AAA Initial Reply Comments at 6.

LOC_AR_00009363

that a previously granted exemption should not be automatically renewed because of a change in legal or factual circumstances since the granting of the exemption."[732]

### b. "Streamlining" Model

An alternate model, endorsed by a wider group of commenters, including many who also supported a burden-shifting approach,[733] would be for the Copyright Office to implement a streamlined process for renewal under its existing regulatory authority. As commenters seemed to generally understand it, under this approach:

> [A] proponent of the exemption should be required to file a simple request for renewal, affirming that the exemption is still warranted and that there have been no material substantive changes in the circumstances that supported the earlier determination to grant an exemption. A party who opposes the exemption would have the obligation to come forth with evidence that there has been a change in circumstances, *e.g.*, evidence that there is greater ability to make fair uses without circumvention than there was when the earlier exemption was granted, or evidence that the circumvention of technological access controls is having an adverse effect on the market for or value of copyrighted works. At that point, the Copyright Office should consider the application for the exemption *de novo*, and the burden of proof should be on the proponent.[734]

Commenters widely agreed that the Office already has sufficient statutory authority to implement this streamlining model.[735] As one commenter explained, an agency has

---

[732] Public Knowledge Initial Comments at 4.

[733] *See, e.g.*, EFF Initial Comments at 8 ("[W]hile we support and encourage legislative efforts to address this problem, the Copyright Office can take meaningful steps without waiting for Congressional action.").

[734] Kernochan Center Initial Comments at 4; *see also, e.g.*, DVD CCA & AACS LA Initial Reply Comments at 6 (endorsing the model and stating "[w]e see no reason, however, that a *de novo* determination would necessarily require submission of entirely new evidence").

[735] *See, e.g.*, Peter Decherney Initial Comments at 5 (noting that a model based upon an affidavit of continued use "fits within the statutory framework as it exists now without needing Congressional action"); Joint Filmmakers I Initial Comments at 4 ("[T]he statute affords the Librarian substantial discretion to structure the burden of proof, burden of persuasion, and standard of proof in ways that maximize fairness and efficiency."); DVD CCA & AACS LA Initial Reply Comments at 6 ("DVD CCA and AACS LA believe that a renewal procedure can be achieved under existing statutory authority, through a streamlined procedure where, following a request for a renewed exemption (on terms identical to the one already in effect), the record reveals no meaningful objection."); SIIA Initial Reply Comments at 5 ("[W]e share the general

LOC_AR_00009364

discretion to change its interpretation of a statute upon providing a reasoned explanation, and "[h]ere, evidence of the need for change is abundant."[736]  Supporters of this model also suggested that the Office could adopt this procedure while still establishing the basis for each exemption *de novo* in each triennial proceeding.[737]

Some rightsholders believed that by requiring affirmative requests for renewal of exemptions, the streamlining model would prevent "the renewal of exemptions for which there is no demand, which would run counter to the design of the proceeding as a triennial review of the marketplace."[738]  ESA expressed concern that "the regulations implementing Section 1201 . . . not become a repository for outmoded and unnecessary exemptions that continue only because nobody cares enough to address them one way or the other" and urged the Office "to retain some form of periodic review to ensure that only exemptions that are current and important remain on the books."[739]  On the other hand, some past participants noted that petitioners are often nonprofits, and/or are represented by law clinics that change personnel each semester, and expressed concern that otherwise relied-upon exemptions might fall through the cracks.[740]  It was also proposed that "it would be better for the Copyright Office to . . . look . . . at the conditions even if people don't show up" asking for renewal.[741]

*Content of Request.*  In terms of the specific mechanics of the streamlining model, commenters generally envisioned the required affidavit as "a very simple one- or two-page filing"[742] that would include a "summary of reasons underlying a renewal, and not requiring . . . full submissions or hearings."[743]  Some suggested that the Office should

---

consensus that the statute provides discretion to streamline the proof required to renew previously granted exemptions . . . .").

[736] EFF Initial Comments at 9.

[737] DVD CCA & AACS LA Initial Reply Comments at 6 ("[*D*]*e novo* simply means that the determination must be newly made in each successive rulemaking," and not that "submission of entirely new evidence" is required.); *see also* Tr. at 160:03–10 (May 19, 2016) (Band, LCA) (same).

[738] AAP, MPAA & RIAA Initial Comments at 11–12.

[739] ESA Initial Comments at 10.

[740] Tr. at 169:12–170:24 (May 19, 2016) (Butler, Univ. of Va. Libraries).

[741] Tr. at 123:12–22 (May 25, 2016) (Lerner, Joint Filmmakers I).

[742] Tr. at 156:14–15 (May 19, 2016) (Sheffner, MPAA); *see also* Tr. at 160:15–17 (May 19, 2016) (Band, LCA) (suggesting "we can just do maybe not even a page, even maybe a paragraph or a sentence"); Tr. at 180:08–23 (May 19, 2016) (Turnbull, DVD CCA & AACS LA) (noting "it could be a checkbox on a form").  *But see* Tr. at 175:04–21 (May 19, 2016) (Geiger, Rapid7) ("[T]he idea that it would be just one page I'm not sure is going to hold for very long" because "every word on that page is going to get litigated.").

[743] Microsoft Initial Comments at 6.

LOC_AR_00009365

request evidence of use or reliance on the exemption to determine whether "in the absence of an exemption, users would be harmed."[744]  Another approach would be to "require that a proponent file an assertion that the need for a particular exemption persists and that there has been no material change to the facts and circumstances surrounding the exemption since the previous triennial rulemaking."[745]  Similarly, others suggested that a declaration that "the conditions present in a previous rulemaking continue to exist" would be sufficient, with the Copyright Office taking notice of the underlying administrative record that originally gave rise to that exemption.[746]

In terms of timing, commenters largely agreed that the Office should solicit affidavits prior to initiating the next rulemaking cycle.[747]  One commenter proposed having the Office establish an email alert to notify previous participants that an exemption was about to expire and asking them whether they wished to request renewal.[748]  Another suggested that the Office could establish a renewal form, similar to a statement of incontestability established by the U.S. Patent and Trademark Office for trademark renewals.[749]

*Requests to Expand an Existing Exemption.*  Given that the sixth rulemaking concerned several requests for renewal of exemptions where the proponents also sought to expand the breadth of the previously granted exemption, commenters debated the proper treatment where requests to "renew" also sought to "expand" an exemption.  As DVD CCA and AACS LA pointed out, for most renewal requests, "the 'burden' on the parties and the Copyright Office has come from the fact that actual deliberations over the proposed exemptions are not simply to extend past exemptions but rather determining whether the exemption should be expanded as the proponents request."[750]  Accordingly, they suggested that "proponents of a renewal could choose either to use the streamlined process to renew previously granted exemptions without any modifications or to proceed through the normal deliberations of the rulemaking to determine if a modified

---

[744] Peter Decherney Initial Comments at 12 (emphasis omitted); *see also* SIIA Initial Comments at 7 ("[T]he person seeking that presumption should have to demonstrate specific evidence of use in the triennial after the exemption issued.").

[745] Copyright Alliance Initial Comments at 12; *see also* ESA Initial Comments at 9.

[746] Joint Filmmakers I Initial Comments at 10; *see* Tr. at 183:20–184:08 (May 19, 2016) (Band, LCA) (suggesting that, in light of the existing record, the Office could act after a person checked a box that "says do you want to renew this exemption because you are being harmed or likely to be harmed over the next three years").

[747] *See, e.g.,* Tr. at 214:14–22 (May 19, 2016) (Band, LCA); *id.* at 216:01–08 (Sheffner, MPAA).

[748] Tr. at 170:04–20 (May 19, 2016) (Butler, Univ. of Va. Libraries).

[749] Tr. at 185:01–16 (May 19, 2016) (Tushnet, OTW).

[750] DVD CCA & AACS LA Initial Comments at 13.

LOC_AR_00009366

exemption is warranted."[751]  Others agreed that "[t]he presumption should only apply to the exemption exactly as it issued the first time."[752]

But while there was tentative agreement that expansions of exemptions should be addressed outside the streamlined process for renewal, there was some concern as to how these requests should be treated.  Some suggested that parties submit "evidence only to the extent relevant to the expansion," with the proceeding taking into account the prior underlying record.[753]  One repeat participant noted that it was often necessary to expand, or update, an exemption because "technology doesn't stand still" and so "we [need to] start where we left off last time" in those cases.[754]  Another suggested that the Office hold an informal discussion, similar to a pre-hearing conference, to determine whether the expansion is likely to be opposed.[755]  However, one commenter noted that some "evidence is relevant to both the existing and proposed expansions," suggesting there may be tension with ignoring such evidence with respect to the existing (technically unopposed) exemption under a rulemaking model.[756]

*Opposition to Renewal.*  Much discussion concerned how the Office should treat statements in opposition to renewal of exemptions.  Multiple commenters suggested that "if there is meaningful opposition, the petitioner would have to go through the review process and meet the standards applied to new applicants, without the benefit of the presumption."[757]  But OTW argued that "'[m]eaningful' is a subjective term that

---

[751] *Id.* at 11.

[752] SIIA Initial Comments at 7; *see also* Auto Alliance Initial Comments at 7 (stating "any 'fast-track' procedures should not apply whenever material changes to an existing exemption are proposed"); Tr. at 157:03–23 (May 19, 2016) (Sheffner, MPAA).

[753] Microsoft Initial Comments at 6; *see also* DIYAbility Initial Comments at 5 ("Adopting by reference the factual record from previous rulemakings would greatly reduce the length of comments filed in the triennial rulemaking process" allowing parties to "focus their comments on addressing relevant changes to the law and marketplace that have occurred since the previous rulemaking."); Tr. at 200:04–07 (May 19, 2016) (Sheffner, MPAA) ("[W]e would not oppose the ability of proponents to incorporate by reference evidence that has been submitted in prior rulemakings.").

[754] Tr. at 161:19–162:12 (May 19, 2016) (Decherney, U. Penn.).

[755] Tr. at 205:02–19 (May 19, 2016) (Band, LCA); *see* Tr. at 117:15–118:06 (May 25, 2016) (Samuelson, Univ. of Cal. Berkeley Sch. of Law) (suggesting there should be "maybe not quite so heavy a burden for the modification of an existing exemption").

[756] Tr. at 186:01–15 (May 19, 2016) (Tushnet, OTW).

[757] AIPLA Initial Comments at 2; *see also* Tr. at 156:16–22 (May 19, 2016) (Sheffner, MPAA) (accord); Joint Filmmakers II Initial Reply Comments at 6 ("[A]n opposition requirement any more lenient than that would likely render the presumption ineffectual, because anyone could extinguish a presumption merely by expressing opposition.").

LOC_AR_00009367

invites further strife" and suggested that some participants "could be expected to argue in every case that their opposition is 'meaningful,' creating yet another issue the Office would have to seek submissions on and then resolve."[758]

Others tried to define "meaningful opposition" in useful ways that would preserve the underlying goal of facilitating renewal of uncontroversial exemptions.  One prior participant noted, "[b]y meaningful opposition, we mean that the opponent of an exemption would have to demonstrate that there was a change of circumstance that justified no longer granting an exemption."[759]  Many tied the standard for opposition to an inquiry into adverse impacts, with one commenter suggesting that opponents must proffer "convincing evidence showing that adverse impact on non-infringing uses has ceased"[760] and another proposing that opponents submit "concrete evidence that no adverse effects would result if the previously granted exemption were withdrawn."[761]

From its perspective, MPAA suggested it is only likely to oppose a previously granted exemption if there were a change in relevant case law, business models, or technology.[762] In those cases, it suggested that the administrative record may have become stale such that additional evidence demonstrating the need for the exemption would be valuable.[763] Finally, it was suggested that the Office should allow proponents to dispute whether the opposition was meaningful before moving the request for renewal into the next triennial rulemaking.[764]

### c.  Presumptive Rejection Model

Some stakeholders expressed frustration that the rulemaking process is equally burdensome when evaluating proposals where a similar proposed exemption has previously been *rejected*.  ESA pointed out that the fifth and sixth rulemakings both involved requests to "create an exemption for circumvention of access controls on video game consoles"; it contended that the sixth rulemaking in large part rehashed

---

[758] OTW Initial Comments at 2.

[759] Peter Decherney Initial Reply Comments at 5; *see also* Tr. at 166:05–17 (May 19, 2016) (McClure, ISRI); Rapid7, Bugcrowd & HackerOne Initial Comments at 4.

[760] EFF Initial Reply Comments at 3.

[761] Joint Filmmakers II Initial Reply Comments at 5; *see also* AFB Initial Comments at 3 (arguing that renewal should proceed "provided opponents do not show that the adverse impacts that initially justified the exemption are no longer relevant").

[762] Tr. at 200:19–201:10 (May 19, 2016) (Sheffner, MPAA).

[763] *Id.*

[764] Tr. at 221:07–15 (May 19, 2016) (Geiger, Rapid7).

LOC_AR_00009368

arguments that the Office and the Librarian had previously rejected.[765]  To avoid wasting resources by revisiting issues that had been previously decided, ESA proposed that "proponents of an exemption that has previously been rejected should be required to show what conditions have changed that would compel a contrary decision in a subsequent rulemaking."[766]  Certain other rightsholders supported this proposal,[767] while other stakeholders strongly objected to this model, considering that both proposed exemption language and proponents' circumstances change over time.[768]

### 3. Office's Recommendations

The Copyright Office realizes that the triennial rulemaking process set up by statute imposes some burdens on its participants—including the NTIA and the Office itself. Since 1998, the number of participants in the rulemaking has successively expanded, and the most recent rulemaking saw the Office receive nearly 40,000 comments and testimony from sixty-three witnesses.[769]  During that rulemaking, a number of petitions essentially sought renewal of existing exemptions, some of them—including a petition that would continue to allow persons who are blind, visually impaired, or print disabled to circumvent literary works distributed electronically—unopposed.  There is little to suggest this trend will reverse by itself.  The Office also appreciates the concern from some that without alteration to the current process, it may become increasingly difficult to develop fresh evidence each cycle demonstrating the need to renew an exemption.[770] Moreover, this study revealed a broad consensus from stakeholders on all sides supporting a streamlined process for the renewal of exemptions.

---

[765] ESA Initial Comments at 12.

[766] *Id.*

[767] *See* AAP, MPAA & RIAA Initial Reply Comments at 6 (supporting "ESA's suggestion that the Copyright Office should require exemption proponents to demonstrate significant changes in the marketplace or the case law before any exemption that has been previously denied will be reconsidered").

[768] Tr. at 210:16–211:16 (May 19, 2016) (Band, LCA) (noting that circumstances change for petitioners over time); Tr. at 210:02–210:11 (May 19, 2016) (Tushnet, OTW) (noting that proposed exemptions have changed over time); *see also id.* at 209:18–210:01 (opposing streamlined system for rejection, arguing the rulemaking is already "structurally unequal," since copyright owners have more chances at defeating an exemption, as they can bring infringement claims even after a section 1201 exemption was granted, which could effectively "end the exemption").

[769] 2015 Recommendation at 2.

[770] *See, e.g.,* AAU, ACE, APLU & EDUCAUSE Initial Comments at 10; Univ. of Va. Libraries Initial Comments at 2–3; *see also* 2015 Recommendation at 4 ("When there is an existing exemption, however, the evidence may be weak, incomplete or otherwise inadequate to support the request for renewal.").

LOC_AR_00009369

In analyzing the concerns of study participants, the Copyright Office considered the feasibility and merit of both legislative reforms and actions that the Office might take under its existing regulatory authority. After reviewing the current framework and stakeholders' views, the Office concludes that under existing regulatory authority it can pursue some changes to streamline the process to readopt exemptions for which there is no meaningful opposition, although it cannot adopt a presumption of renewal for those exemptions without legislative change.

*Burden-Shifting Model.* The Copyright Office reaffirms its view, shared by many stakeholders, that the current statute does not empower the Librarian or Register to implement a burden-shifting model providing for the presumptive or automatic renewal of exemptions, whereby opponents would have the burden of showing why an exemption should be removed, as opposed to proponents demonstrating why the exemption should be renewed.[771]

As noted, this Report was requested by the House Judiciary Committee's Ranking Member, in part, to evaluate former Register Pallante's recommendation that Congress consider "a legislative change to provide a presumption in favor of renewal in cases where there is no opposition."[772] When the Office asked about this approach as part of this study, many favored this change, but there was no clear consensus supporting statutory reform, despite a strong overall demand for some mechanism to ease the process by which exemptions are continued. Instead, public input generally revealed a stronger preference for non-statutory reform, with some sharply opposing legislation and others merely agnostic as to how any change should be put in place. In addition, some expressed concern that a statutory mechanism could allow outmoded exemptions to linger in the regulations.

Given the large demand to simplify the process for readopting exemptions, the Copyright Office remains committed to its support of a statutory amendment to shift the burdens associated with the renewal, or removal, of previously adopted temporary exemptions. To be clear, the Office is hopeful that its regulatory reforms described below will alleviate many unnecessary burdens associated with renewal of existing exemptions. But an amendment to provide for burden-shifting or presumptive renewal could introduce even greater efficiencies when addressing somewhat perennial, uncontested exemptions, such as cellphone unlocking, by avoiding the need for the public to request, and the Office to evaluate the need for, renewal. At the same time,

---

[771] *See* 2015 Recommendation at 13–14 (discussing statutory requirements).

[772] *See Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 5 (2015) (statement of Maria A. Pallante, Register of Copyrights and Dir., U.S. Copyright Office); *accord id.* at 49 (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary).

LOC_AR_00009370

stakeholders would retain the ability to object to exemptions that have become outmoded by changing technological or legal developments. To the extent that Congress pursues the other statutory reforms discussed elsewhere in this Report, the Office recommends consideration of statutory changes to allow for presumptive or automatic renewal of exemptions while preserving the flexibility of the rulemaking process to take into account changing technology and market developments.

*Streamlining Model.* In the meantime, the Copyright Office plans to focus on immediate changes it can make within the existing regulatory framework. The following section outlines guiding principles, rather than a blueprint, from which subsequent rulemakings can implement and adapt administrative processes. The Office concludes that there is some regulatory flexibility in how it may establish a process for streamlining the rulemaking, and that experience suggests specific procedures may need to remain flexible from rulemaking to rulemaking to accommodate changing technologies and public demands. The Office does intend to implement a streamlined renewal process in the upcoming seventh rulemaking, and further specifics will be provided shortly in a notice of inquiry.

As a threshold matter, the Copyright Office concludes that the statute itself requires that exemptions cannot be renewed automatically, presumptively, or otherwise, without a fresh determination concerning the next three-year period. The relevant statutory provision requires the Librarian, upon the recommendation of the Register of Copyrights, to make a determination whether "users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition" on circumvention.[773] That is, a determination must be made specifically for each triennial period. In addition, while legislative history itself is not law, it can serve as a useful aid in statutory interpretation, and the Commerce Committee's report unequivocally states that "the assessment of adverse impacts on particular categories of works is to be determined de novo."[774] In this way, these determinations are qualitatively different from an appellate court's review of the factual record established by a lower court,[775] as

---

[773] 17 U.S.C. § 1201(a)(1)(B).

[774] COMMERCE COMMITTEE REPORT at 37 ("[T]he . . . prohibition [on circumvention] is presumed to apply to any and all kinds of works, including those as to which a waiver of applicability was previously in effect, unless, and until, the Secretary makes a new determination that the adverse impact criteria have been met with respect to a particular class and therefore issues a new waiver.").

[775] *Cf.* CDT Initial Comments at 6 ("Just as appellate courts may rely on the record developed below when reviewing a lower court's decision *de novo*, the Office is entitled to rely on evidence from a prior rulemaking when conducting a subsequent one."); DIYAbility Initial Comments at 5 ("This type of *de novo* review based on an existing factual record is common—circuit courts of

LOC_AR_00009371

appellate courts do not have to determine whether the record retains reliability when applied to a new set of circumstances.

That said, the statutory language appears to be broad enough to permit determinations to be based upon evidence drawn from prior proceedings, but only upon a conclusion that this evidence remains reliable to support granting an exemption in the current proceeding. Adopting an approach of *de novo* assessment of evidence—compared to *de novo* submission—would allow future rulemakings to consider the appropriate weight to afford to previously submitted evidence when evaluating renewal requests.[776] The relatively quick three-year turnover of the exemptions was put in place by Congress to allow the rulemaking to be "fully considered and fairly decided on the basis of real marketplace developments,"[777] and any streamlined process for recommending renewed exemptions must retain flexibility to accommodate changes in the marketplace that affect the required rulemaking analysis. But at the same time, where there is little evidence of marketplace or technological changes, the Office believes it is statutorily permissible to establish a framework that expedites the recommendation to renew perennially sought exemptions.

*Mechanics of streamlined process.* As noted, the Office intends to implement a streamlined process for evaluating proposals to readopt exemptions in the upcoming seventh rulemaking, with further details to be provided in a notice of inquiry. That notice will request parties seeking renewal of an exemption to submit a short declaration outlining the continuing need for an exemption.[778] Here, again, the law appears to permit

---

appeal, for example, review questions of law *de novo* based on the factual record established by the district court.").

[776] The Office recognizes that historically it has required *de novo* submission of evidence, which remains a reasonable interpretation of the statute and legislative history. The Office agrees, however, that this standard may have become overly restrictive as the rulemaking has grown. *De novo* assessment of evidence is another reasonable interpretation that may better accommodate current demands, so long as parties provide a basis for the Office to ascertain the ripeness of the prior record from which a new determination can be made, such as through the proposed streamlining process, as discussed further below.

[777] COMMERCE COMMITTEE REPORT at 36.

[778] *See, e.g.*, Peter Decherney Initial Comments at 12 ("Under our proposal, a proponent seeking renewal of an exemption would be required establish a prima facie showing of reliance."); Kernochan Center Initial Comments at 4 ("[A] proponent of the exemption should be required to file a simple request for renewal, affirming that the exemption is still warranted and that there have been no material substantive changes in the circumstances that supported the earlier determination to grant an exemption."); Tr. at 180:10–17 (May 19, 2016) (Turnbull, DVD CCA & AACS LA) ("[I]f the Copyright Office emails that form to the prior proponent and says do you want to renew exactly what you got before, and you check the box . . . as far as I'm concerned, that would be a sufficient filing.").

LOC_AR_00009372

flexibility. A declaration could include a statement that there has been no material change to the facts and circumstances necessitating the exemption since the previous triennial period. The Copyright Office could also require a statement that the proponent is being harmed, or will likely be harmed over the next three-year period, accompanied by a description of use or reliance upon the current exemption in support for this statement. The Office believes that the evidentiary showing required in a declaration can be minimal, as the aim is only to show that the harm that existed when the exemption was first granted continues to occur or would return but for the exemption, thus providing a sufficient justification for the Office to rely upon the prior rulemaking record in making a new recommendation supporting renewal of the exemption. Moreover, this approach appears consistent with relevant case law upholding determinations based upon a single sworn affidavit.[779] While some stakeholders expressed wariness that, in practice, a short-form filing might recreate the requirements of the current rulemaking, the Office is optimistic that this can be avoided with appropriate guidance, including by providing forms for petitioners to use—which the Office plans to use for the next rulemaking.

A streamlined process may include outreach to promote awareness of the relevant deadline. Many existing exemptions have been obtained through efforts led by student legal clinics that have rapid turnover,[780] or laypersons unlikely to monitor the Office's website or the Federal Register. Similar to the process for trademark renewal, in the upcoming rulemaking, the Copyright Office intends to issue renewal reminder emails to dedicated addresses on file. The Register will also allow any person to submit a request for renewal; given the strong public interest taken in the rulemaking process to date, this may minimize the risk that a significantly relied-upon exemption is overlooked. At the same time, the lack of an affidavit seeking renewal of an exemption would provide an avenue for outdated exemptions to be pruned from the regulations. Finally, while theoretically the Office itself can propose renewal of an existing exemption for renewal, because the Register must have a reasonable basis for recommending that the Librarian

---

[779] *See, e.g., EchoStar Comm'ns Corp. v. FCC*, 92 F.3d 749, 752–53 (D.C. Cir. 2002) (holding FCC did not err in relying upon an employee affidavit to dismiss a complaint, noting it was "well settled" that a sworn declaration, although hearsay, could constitute "substantial evidence" supporting a decision made under the APA so long as it was "reliable and trustworthy"); *Aero Mayflower Transit Co., Inc. v. Interstate Commerce Comm'n,* 686 F.2d 1, 9 (D.C. Cir. 1982) (upholding procedure for granting transport certificates whereby an applicant filed an affidavit, followed by a published period of opposition); *California ex rel. Lockyer v. FERC*, 329 F.3d 700, 714 (9th Cir. 2003) (holding that FERC properly relied upon a single affidavit in concluding that substantial evidence supported a determination that reorganization was not harmful to the public interest).

[780] Tr. at 169:12–170:24 (May 19, 2016) (Butler, Univ. of Va. Libraries) ("[I]n my clinic, it's a different student team every three years. And the way that we structure our retainers with our clients is that representation ends the minute . . . this process ends.").

LOC_AR_00009373

adopt an exemption, in almost all circumstances it would still be necessary for a participant to take up the cause and make the required showing for renewal.[781]

A streamlined process must also include an opportunity for stakeholders to raise objections to renewal, and for the Register to consider these objections in determining whether to recommend renewal of an exemption. The public process preceding this Report revealed a fair amount of support for a procedure whereby the Copyright Office first evaluates whether there is "meaningful opposition" to the renewal of an exemption, even if some were wary to what extent this would, in practice, simplify requirements under the current process. Here, again, the statute is helpful. The Register must apply the same evidentiary standards in recommending the renewal of exemptions as for first-time exemption requests. Accordingly, oppositions raising concerns that address these standards would be more likely to prevent the Register from recommending renewal of an exemption. For example, a change in case law might affect whether a particular use is noninfringing, new technological developments might affect the availability for use of copyrighted works, or new business models might affect the market for or value of copyrighted works.[782] Such evidence, if credible, could cause the Office to conclude that the prior evidentiary record is too stale to rely upon for an assessment affecting the subsequent three-year period.

Procedurally, the statutory framework gives the Copyright Office flexibility in structuring the rulemaking so long as there is a reasoned basis for the Register's ultimate recommendation. For the seventh rulemaking, for reasons of administrability, the Office intends to place any repeat exemptions facing meaningful opposition in the normal, more comprehensive notice and comment process.[783] Alternatively, the Office believes it would be equally permissible for future rulemakings to determine, in the interest of administrative convenience, to separately seek comment on any oppositions to renewal, in an effort to resolve potentially more targeted questions than those typically presented by requests for an exemption of first instance.[784]

In sum, the Copyright Office concludes that it is empowered to implement a streamlined process to recommend the renewal of previously granted exemptions, based upon a sufficient showing that the prior record is still a relevant reflection of the legal and factual concerns at issue in the succeeding rulemaking. Such a process, as requested by

---

[781] *Compare* Tr. at 123:12–22 (May 25, 2016) (Lerner, Joint Filmmakers I) (suggesting that "it would be better for the Copyright Office to . . . look . . . at the conditions even if people don't show up" to request renewal).

[782] *See* Tr. at 200:19–201:10 (May 19, 2016) (Sheffner, MPAA).

[783] *See, e.g.,* AIPLA Initial Comments at 2; *see also* Tr. at 156:11–22 (May 19, 2016) (Sheffner, MPAA) (both suggesting same).

[784] Tr. at 220:24–221:15 (May 19, 2016) (Geiger, Rapid7) (suggesting same).

LOC_AR_00009374

a consensus of stakeholders, could incorporate the use of a short form for proponents to request renewal and attest to the continuing need for an exemption.  While this process would also take into account objections to the renewal of an exemption, rightsholders' comments suggest that they are unlikely to oppose the renewal of many frequently granted exemptions, such as exemptions for assistive technology and cell phone unlocking, which were unopposed in the last rulemaking.[785]  In practical terms, it will be seen shortly in the upcoming seventh rulemaking to what extent this approach succeeds in alleviating the burdens the rulemaking imposes on its repeat participants.

*Modifications to an exemption.*  The public process raised a few additional issues, including how a streamlined process should treat petitions to alter an exemption. Again, section 1201 and the APA afford the Copyright Office some flexibility to define its process.  Any process, however, must take care to ensure that requests for changed exemptions are evaluated pursuant to a fully developed administrative record. Accordingly, in cases where the circumstances are unchanged, a party asking the Office to rely upon a preexisting record to alter a previously granted exemption faces a greater lift than a party seeking renewal of the exemption as previously granted.  For the upcoming seventh rulemaking, the Office intends to limit renewal requests to cases where no material changes to an existing exemption are sought, while evaluating potential modifications within the main notice and comment process.[786]  That said, the Office will consider other ways to minimize unnecessary requirements on participants. The Office concludes it has authority to conduct a more limited inquiry regarding a proposed modification where "as-is" renewal is unopposed, and to allow a participant to explain whether the prior record remains relevant to the request for a changed exemption.[787]  Finally, considering stakeholder requests for more accessible regulatory

---

[785] *See* DVD CCA & AACS LA Initial Comments at 11 ("Historically, DVD CCA has generally not opposed the continuation of the same CSS-related exemptions."); Tr. at 179:04–180:06 (May 19, 2016) (Ben Sheffner, MPAA) (noting "[in] practice, there is virtually no opposition to previously granted exemptions").

[786] *See, e.g.*, DVD CCA & AACS LA Initial Comments at 11–12; SIIA Initial Comments at 7; Auto Alliance Initial Comments at 7.

[787] The Office acknowledges that some evidence submitted in opposition to a request for an expanded exemption may also be relevant to the renewal of an existing exemption.  *See, e.g.*, Tr. at 186:12–24 (May 19, 2016) (Tushnet, OTW) (suggesting the Office "might not" be able to disregard evidence of a "new screen cap program" submitted in response to a different proposed class, while evaluating an unopposed request for renewal).  But this hypothetical concern need not block all streamlined processes, given that the Office is afforded considerable discretion in establishing the timing and procedures for the rulemaking, and that the hypothetical lack of opposition to renewal may itself serve as an admission that the evidence should not tip the balances against renewal.  The statutory requirement that the rulemaking be held every three years necessitates timely procedures and courts routinely give substantial deference to agencies

LOC_AR_00009375

language and more transparency in adoption of such language, the Office notes that it is also empowered to address the need for technical changes to regulatory language separately.[788]

*Presumptive rejection.*  Another suggestion was that the Copyright Office should establish a streamlined procedure to recommend against previously denied exemptions.  While in theory the same rationale supporting the creation of a streamlined renewal process also lends support to a fast-track for rejections, there was no consensus about the need for presumptive rejection, and some users strongly objected to this proposal.[789]  Further, the Office is mindful that the rulemaking is intended to "ensure that access for lawful purposes is not unjustifiably diminished" by TPMs.[790]  As such, the Office does not at this time intend to implement such a process.  But where an exemption request resurrects legal or factual arguments that have been previously rejected, the Office will continue to rely on past reasoning to dismiss such arguments in the absence of new information.[791]

## F.  Other Rulemaking Process Considerations

In addition to establishing a process for streamlined renewal of exemptions, several commenters suggested other changes aimed at making the rulemaking process more transparent and easily accessible.  The Copyright Office supports these goals, and previously implemented procedural adjustments for the sixth triennial rulemaking to "enhance public understanding of the rulemaking process, including its legal and

---

to define the procedural requirements of their rulemakings.  *See Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 549 (1978) ("The court should . . . not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good."); *see also Fla. Inst. of Tech. v. FCC,* 952 F.2d 549, 550–54 (D.C. Cir. 1992) (affirming FCC's strict "cut-off" rules regarding broadcast licenses to allow the "orderly processing" of applications); *Crawford v. FCC,* 417 F.3d 1289, 1296–97 (D.C. Cir. 2005) (similar).

[788] For example, changes the Register makes to recommended regulatory language made solely to improve readability may not qualify as material.

[789] *See, e.g.,* Tr. at 209:18–210:14 (May 19, 2016) (Tushnet, OTW); Tr. at 210:16–211:21 (May 19, 2016) (Band, LCA).

[790] Commerce Committee Report at 36.

[791] *See, e.g.,* 2015 Recommendation at 107–126 (declining again to recommend proposed classes for "Audiovisual Works and Literary Works Distributed Electronically—Space-Shifting and Format-Shifting," noting that the continued "absence of clear supporting precedent" meant that "the fair use analysis [in 2015] largely follow[ed] the 2012 analysis"); 2006 Recommendation at 72–73 (declining a class for "DVDs that cannot be viewed on Linux operating systems" for "the same reasons as in 2000 and 2003").

LOC_AR_00009376

evidentiary requirements, and facilitate more effective participation."[792]  As outlined below, the Office is undertaking further efforts to make the rulemaking process clear and accessible to the public, consistent with its statutory obligations.

1.  *Educational Outreach.*  The Office will dedicate further resources to educating interested parties about the section 1201 rulemaking process.[793]  The Office understands that it can be difficult for the public, especially for those not versed in copyright law or the rulemaking process, to participate in such a complex and resource-intensive process.  For example, in connection with the upcoming seventh rulemaking, the Office plans to provide a tutorial or webinar to explain the rulemaking process.

2.  *Timing Considerations.*  The Copyright Office empathizes with parties who find the scheduling and rapid pace of the rulemaking difficult.[794]  It is difficult, however, to accommodate every scheduling interest given the three-year statutory mandate.[795]  The Office will continue to try to accommodate scheduling needs of participants, including law school clinics.  For the seventh rulemaking, the Office intends to move up the schedule for written comments, to better align with academic calendars.

Relatedly, the Office believes it would be premature for Congress to alter the statutory three-year cycle of the rulemaking, although this subject may be worthy of further study should Congress pursue legislative reforms.  While some suggested that the rulemaking should be amended to allow a process to evaluate "out-of-cycle" exemptions,[796] overall, there was not a strong demand for such a change.  Commenters did not comment substantively on a proposal in the Breaking Down Barriers to Innovation Act that would provide the Librarian with discretion to conduct a rulemaking outside of the triennial review process.[797]  While the Office recognizes the current cycle is an imperfect fit for

---

[792] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 79 Fed. Reg. 55,687, 55,687 (Sept. 17, 2014).

[793] *See, e.g.*, Mozilla Initial Comments at 6 ("[T]he Copyright Office should also undertake education, advocacy, and media efforts regarding the rulemaking process" to encourage participation from 'non-copyright experts.'").

[794] *See, e.g.*, Joint Filmmakers II Initial Reply Comments at 4.

[795] The Office welcomes informal input concerning parties' different needs, including suggestions how to best accommodate the differing schedules of law school clinics, as many operate on different schedules (*e.g.*, semester, trimester, or quarterly terms with differing start dates).

[796] *See, e.g.*, DIYAbility Initial Comments at 1–2 ("The triennial rulemaking process provides only a brief opportunity every three years to petition for an exemption.  This is not frequent enough to . . . effectively serve the needs of disabled users."); SAA Initial Comments at 3 ("[I]n many cases the three-year window is too long" for grant-funded preservation projects and the rapid pace of technological change).

[797] H.R. 1883, 114th Cong. § 3 (2015); S. 990, 114th Cong. § 3 (2015).

LOC_AR_00009377

some needs, reforms would seem to also fall short. A longer cycle would not be as responsive to the pressing needs of proponents. A shorter cycle would be more demanding of participants and would make it difficult to determine whether any exceptions were working as intended.

3.   *Phased Comment Structure and Administrative Record.*  Though some criticized the procedural changes implemented for the sixth triennial rulemaking,[798] others praised the Copyright Office's efforts.[799]  Notably, NTIA applauded the Office for "implementing constructive process changes," and noted specifically that "the three-round public comment phase and requirement that each comment submission address one specific proposed exemption facilitated the development of a clear and comprehensive record."[800]  The Office's (and NTIA's) limited resources require a clear and efficient comment process so that recommendations can be issued in time for the Librarian to meet the statutory deadline.  In the next rulemaking, the Office does not anticipate changing the overall framework of the phased comment structure, but will explore ways to ensure that the record is properly balanced, such as by allowing additional submissions or continuing to ask post-hearing questions as needed to create a more complete record.  The Office will also attempt to lessen demands by considering relevant evidence across classes when appropriate and providing a mechanism for testimony to count for multiple classes to avoid necessitating travel to two cities,[801] while maintaining its requirement for submission of written evidence by classes for administrative convenience.

4.   *Confidential information.*  Some commenters expressed a desire to submit confidential business information, attorney-client privileged information, or evidence of ongoing circumvention activity without increasing their risk of legal liability.[802]  The APA does

---

[798] *See, e.g.,* Auto Alliance Initial Comments at 7 (suggesting "rebalancing [the commenting] ratio in future rulemaking cycles, in order to develop a more complete and balanced record"); DVD CCA & AACS LA Initial Comments at 14 (noting that the "new procedural approach . . . gave the proponents three opportunities to make written submissions . . . [but that o]pponents however only had one"); Tr. at 105:01–08 (May 25, 2016) (Lerner, Joint Filmmakers I) ("The petition really ended up being a huge amount of work.").

[799] *See, e.g.,* Kernochan Center Initial Comments at 5 (stating that the changes made in the sixth rulemaking "benefited the rulemaking process and should be retained").

[800] 2015 NTIA Letter at 3.

[801] AAP, MPAA & RIAA Initial Comments at 13 ("Witnesses, whether they be executives of large corporations or individual consumers, should not have to appear multiple times, or on multiple coasts, when their testimony is relevant to multiple proposals.").

[802] *See, e.g.,* OTI Initial Comments at 2–3, 9–11; NMR Initial Comments at 19–20.

LOC_AR_00009378

not prohibit the submission of such materials[803] and other agencies have created rules governing the submission and disclosure of such information.[804] The need for such a rule here, however, is less clear, and the Office is disinclined at this time to adopt procedures to allow submission of comments that cannot be shared publicly.

5. *Accessibility.* Following the successful webcast of the San Francisco hearings for this study, the Office will explore making hearings available via webcast as well as allowing for remote participation, including for the upcoming seventh rulemaking. The Office acknowledges that budget and technology constraints may pose hurdles, but is encouraged by offers of schools and other venues to host future rulemaking roundtables and hearings. The Office will continue to archive past proceedings on its website in an organized manner.

6. *Increased Opportunities for Participant Input.* Some commenters suggested that the Office should make the recommended regulatory language available for comment prior to the Librarian's final determination.[805] While previewing regulatory language is not required by section 1201, the Office recognizes that it is a typical agency practice.[806] In this case, however, while the Office is committed to encouraging public participation, it may not always be feasible to add another round of comments on a proposed rule. Such a process would involve a notice period, possible reply comments, and time for analysis, which would add months to an already lengthy process. Further, in most cases, parties can, and do, already address existing or proposed regulatory language. In addition to post-hearing questions targeted at shaping proposed regulatory language,[807] the Office

---

[803] The APA only requires that an agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

[804] *See, e.g.*, 14 C.F.R. § 11.35 (FAA); 46 C.F.R. § 502.5 (Maritime Administration). *But see* 26 C.F.R. § 601.601(b)(1) (IRS does not accept any confidential information in rulemakings).

[805] AAP, MPAA & RIAA Initial Comments at 13; Auto Alliance Initial Comments at 7.

[806] While the APA generally requires the publication of final rules at least 30 days prior to their effective date, it excepts "substantive rule[s] which grant or recognize[] an exemption or relieve[] a restriction." 5 U.S.C. § 553(d). This is because rules that relieve restrictions do not require parties "to adjust their behavior before the final rule takes effect." *San Diego Navy Broadway Complex Coal. v. U.S. Coast Guard*, No. 10-cv-2565, 2011 WL 1212888, at *3 n.3 (S.D. Cal. 2011). As noted above, while Congress directed the Copyright Office to conduct the rulemaking pursuant to the APA, the Librarian of Congress, who is exempt from the APA, issues the final rule.

[807] *See, e.g.*, Letter from Jacqueline Charlesworth, Gen. Counsel and Assoc. Register of Copyrights, U.S. Copyright Office, to Andrea Matwyshyn, et al. (June 3, 2015), https://www.copyright.gov/1201/2015/post-hearing/Post%20hearing%20questions%20for%20class%2025-signed.pdf (regarding proposed security research exemption); Letter from U.S. Copyright Office to Catherine Gellis, et al. (June 3, 2015), https://www.copyright.gov/1201/2015/post-hearing/Post%20

LOC_AR_00009379

will consider whether to utilize informal meetings to discuss proposed language or address discrete issues prior to issuing a recommendation, including by establishing guidelines for *ex parte* communications.[808]

7. *Simplified Regulatory Language.* The Office agrees with some commenters[809] that drafting the section 1201 regulatory language in plain language is a worthy goal, echoing efforts from the Legislative and Executive Branches to promote clear communication to the public.[810] Congress recently heard testimony that copyright law has become more opaque and technical over time,[811] and section 1201 is no exception— the proposed exemptions in the triennial rulemakings have steadily increased both in complexity and number. Nevertheless, the Office will make a greater effort to use plain language in regulations, while accurately reflecting what is supported in the evidentiary record.

---

hearing%20questions%20for%20class%2022-signed.pdf (regarding proposed automobile exemption); Letter from Jacqueline Charlesworth, Gen. Counsel and Assoc. Register of Copyrights, U.S. Copyright Office to Jack Lerner, et al. (June 3, 2015), https://www.copyright.gov/1201/2015/post-hearing/Letter%20to%20Class%206%20Witnesses-signed.pdf (regarding proposed filmmaking exemption).

[808] Tr. at 204:19–206:14 (May 19, 2016) (Band, LCA) (recommending conferences with interested parties to resolve issues related to exemption renewals).

[809] *See, e.g.,* LCA Initial Comments at 32 ("The increasing complexity of the exemptions issued by the Library of Congress make them harder for their beneficiaries to understand and use."); AAU, ACE, APLU & EDUCAUSE Initial Comments at 10–11; Univ. of Va. Libraries Initial Comments at 3–4; Tr. at 130:21-131:06 (May 25, 2016) (LaBarre, NFB).

[810] *See* Plain Writing Act of 2010, Pub. L. No. 111-274, §§ 3(3), 4(b), 124 Stat. 2861, 2861–62 (2010) (while exempting regulations, generally requiring that agencies communicate to the public in a "clear, concise, [and] well-organized" manner); Exec. Order No. 13,563, Improving Regulations and Regulatory Review, 3 C.F.R. pt. 100 (2011), https://obamawhitehouse.archives.gov/the-press-office/2011/01/18/executive-order-13563-improving-regulation-and-regulatory-review ("Our regulatory system . . . must ensure that regulations are accessible, consistent, written in plain language, and easy to understand.").

[811] *A Case Study for Consensus Building: The Copyright Principles Project: Hearing Before the Subcomm. on Courts, Intellectual Prop. & the Internet of the H. Comm. on the Judiciary*, 113th Cong. 58 (2013) (testimony of Pamela Samuelson, Professor, Univ. of Cal. Berkeley Sch. of Law and Dir., Berkeley Ctr. for Law and Tech.) ("[T]he [copyright] statute has become much longer than it was in 1976, and the longer it has become, the more technical it has become."); *see also id.* at 82 (statement of Rep. Melvin Watt, Ranking Member, H. Comm. on the Judiciary) ("[O]ur problem here in Congress is that we either have to write a law that covers every eccentricity, every nuance, or we have to write a general principle and delegate responsibility for the nuances to regulators.").

LOC_AR_00009380

8. *Relationship with NTIA.*  Finally, though one commenter suggested transferring rulemaking responsibilities to the Department of Commerce,[812] the Copyright Office believes the current structure is preferable as it can take advantage of the Copyright Office's and NTIA's respective subject matter expertise and experience in past rulemakings.  The Office anticipates continued productive consultations with NTIA.

# V.    CONCLUSION

The past twenty years have witnessed the rise of an array of new platforms and formats for delivering creative works to the public, and in this respect, section 1201 has succeeded in fostering a thriving, innovative, and flexible digital marketplace, as Congress envisioned.  The basic framework of section 1201—including its treatment of circumvention as a standalone violation independent of copyright infringement and robust anti-trafficking provisions—remains sound, and the Copyright Office does not recommend broad changes to the statute's overall scope.  Within this existing framework, however, it may be appropriate to recalibrate provisions in section 1201 to better reflect changes in technology since the DMCA's enactment nearly two decades ago.  Specifically, the Office recommends amending section 1201 to permit third-party assistance for exemption beneficiaries, expand the scope of the security testing and encryption research exemptions, and establish new permanent exemptions to allow uses of assistive technology for e-books, certain repair, diagnosis, and maintenance activities, and cellphone unlocking.  The Office continues to support establishing a statutory presumption of renewal for exemptions adopted through the triennial rulemaking process.  Meanwhile, it intends to implement changes within existing regulatory authority to streamline the process for evaluating and renewing previously adopted exemptions.  These changes include establishing a short form declaration and abbreviated opposition period for repeat exemptions, to allow the Register to recommend renewed exemptions based on the prior administrative record, in cases where that record remains a reliable reflection of the legal and factual concerns at issue.  Moreover, the Office hopes that the interpretive guidance provided here will prove useful to courts and stakeholders as they consider section 1201's possible application to both current and emerging uses of copyrighted works.

---

[812] *See* LCA Initial Comments at 32–33.

LOC_AR_00009381

**APPENDIX A**      FEDERAL REGISTER NOTICES

LOC_AR_00009382

Signed at Washington, DC, this 22nd day of December 2015.

**Kimberly D. Hill,**

*Chief, Division of Management Systems, Bureau of Labor Statistics.*

[FR Doc. 2015–32664 Filed 12–28–15; 8:45 am]

**BILLING CODE 4510–24–P**

---

## LIBRARY OF CONGRESS

### U.S. Copyright Office

**[Docket No. 2015–8]**

### Section 1201 Study: Notice and Request for Public Comment

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of inquiry.

**SUMMARY:** The United States Copyright Office is undertaking a public study to assess the operation of section 1201 of Title 17, including the triennial rulemaking process established under the DMCA to adopt exemptions to the prohibition against circumvention of technological measures that control access to copyrighted works. To aid this effort, and to ensure thorough assistance to Congress, the Office is seeking public input on a number of key questions.

**DATES:** Written comments must be received no later than 11:59 p.m. Eastern Time on February 25, 2016. Written reply comments must be received no later than 11:59 p.m. Eastern Time on March 25, 2016. The Office will be announcing one or more public meetings, to take place after written comments are received, by separate notice in the future.

**ADDRESSES:** All comments must be submitted electronically. Specific instructions for submitting comments will be posted on the Copyright Office Web site at *http://www.copyright.gov/policy/1201* on or before February 1, 2016. To meet accessibility standards, all comments must be provided in a single file not to exceed six megabytes (MB) in one of the following formats: Portable Document File (PDF) format containing searchable, accessible text (not an image); Microsoft Word; WordPerfect; Rich Text Format (RTF); or ASCII text file format (not a scanned document). All comments must include the name of the submitter and any organization the submitter represents. The Office will post all comments publicly in the form that they are received. If electronic submission of comments is not feasible, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, Associate General Counsel, by email at *resm@loc.gov* or by telephone at 202–707–8350; or Kevin Amer, Senior Counsel for Policy and International Affairs, by email at *kamer@loc.gov* or by telephone at 202–707–8350.

**SUPPLEMENTARY INFORMATION:**

## I. Background

The Digital Millennium Copyright Act ("DMCA") has played a pivotal role in the development of the modern digital economy. Enacted in 1998 to implement the United States' obligations under two international treaties,[1] it is intended to foster the growth of the digital marketplace by ensuring adequate legal protections for copyrighted content.[2] As envisioned by Congress, the DMCA seeks to balance the interests of copyright owners and users, including the personal interests of consumers, in the digital environment.[3] In addition to provisions limiting the liability of online service providers,[4] the DMCA includes provisions prohibiting the circumvention of technological measures used to protect copyrighted works as well as trafficking in anticircumvention devices.[5] These anticircumvention provisions, codified in section 1201 of the Copyright Act, were the subject of a 2014 hearing held by the House Judiciary Committee's Subcommittee on Courts, Intellectual Property and the Internet as part of its comprehensive review of the nation's copyright law,[6] and, as discussed below, a recently concluded rulemaking conducted by the Copyright Office. In accordance with the request from the House Judiciary Committee's Ranking Member to the Register of Copyrights at the April 2015 House Judiciary Committee hearing on copyright review, and consistent with the Register's testimony in that hearing that the impact and efficacy of section 1201 merit analysis at this time, the Office is undertaking a study and soliciting public input.[7]

[1] *See* WIPO Copyright Treaty art. 11, Dec. 20, 1996, 36 I.L.M. 65 (1997); WIPO Performances and Phonograms Treaty art. 18, Dec. 20, 1996, 36 I.L.M. 76 (1997).

[2] *See* H.R. Rep. No. 105–551, pt. 2, at 23 (1998).

[3] *See id.* at 26.

[4] *See* 17 U.S.C. 512.

[5] The DMCA also established protections for the integrity of copyright management information. *See id.* 1202.

[6] *See Chapter 12 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop., and the Internet of the H. Comm. on the Judiciary,* 113th Cong. (2014) ("*Chapter 12 of Title 17 Hearing*").

[7] *See Register's Perspective on Copyright Review: Hearing Before the H. Comm. on the Judiciary,* 114th Cong. 6 (2015) ("*Register's Perspective on*

## A. Overview of Section 1201

**Prohibitions on Circumvention and Trafficking**

Section 1201 prohibits the circumvention of technological measures employed by or on behalf of copyright owners to control access to their works (also known as "access controls"), as well as the trafficking in technologies or services that facilitate such circumvention.[8] It also prohibits trafficking in technologies or services that facilitate circumvention of technological measures that protect the exclusive rights granted to copyright owners under Title 17 (also known as "copy controls").[9] In enacting section 1201, Congress recognized that technological measures can be deployed "not only to prevent piracy and other economically harmful unauthorized uses of copyrighted material, but also to support new ways of disseminating copyrighted materials to users," as well as to make "the process of obtaining permissions easier." [10] Violations of

*Copyright Review Hearing*") (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office) ("For [certain] aspects of section 1201, we are recommending a comprehensive study, including the permanent exemptions for security, encryption, and privacy research."); *id.* at 49 (statement of Rep. John Conyers, Jr., Ranking Member, H. Comm. on the Judiciary) ("[T]here are policy issues that warrant studies and analysis, including section 512, section 1201, mass digitization, and moral rights. I would like the Copyright Office to conduct and complete reports on those policy issues . . . ."). Separately, as discussed below, the Register has also proposed amending the triennial rulemaking process to ease the burden of renewing existing exemptions. *See id.* at 5 (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office) ("We are therefore recommending a legislative change to provide a presumption in favor of renewal in cases where there is no opposition.").

[8] 17 U.S.C. 1201(a); *see* Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4th, 1998, at 5–9 (Comm. Print 1998) ("House Manager's Report").

[9] 17 U.S.C. 1201(b); *see* House Manager's Report at 12–13. While section 1201 does not prohibit the circumvention of copy controls, in some cases access control and copy control measures are merged, and thus circumvention of such measures is prohibited by section 1201(a)(1). U.S. Copyright Office, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 4 n.13 (2015), *http://copyright.gov/1201/2015/registers-recommendation.pdf* ("2015 Recommendation"); U.S. Copyright Office, Recommendation of the Register of Copyrights in RM 2008–8, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 44–47 (June 11, 2010), *http://www.copyright.gov/1201/2010/initialed-registers-recommendation-june-11-2010.pdf* ("2010 Recommendation").

[10] House Manager's Report at 6.

**81370**   **Federal Register** / Vol. 80, No. 249 / Tuesday, December 29, 2015 / Notices

section 1201 are subject to both civil and criminal penalties.[11]

Rulemaking Process

Section 1201 includes a triennial rulemaking process through which the Librarian of Congress, following a public proceeding conducted by the Register of Copyrights in consultation with the National Telecommunications and Information Administration of the Department of Commerce ("NTIA"), may grant limited exceptions to section 1201(a)(1)'s bar on the circumvention of access controls. By statute, the triennial rulemaking process addresses only the prohibition on the act of circumvention itself; section 1201 does not provide a mechanism to grant exceptions to the anti-trafficking provisions of sections 1201(a)(2) or 1201(b).[12] The section 1201 rulemaking is intended to serve as a "fail-safe" mechanism through which the Copyright Office can monitor developments in the copyright marketplace and recommend limited exemptions as needed to prevent the unnecessary restriction of fair and other noninfringing uses.[13] In keeping with that goal, the primary responsibility of the Office in the rulemaking proceeding is to assess whether the implementation of access controls impairs the ability of individuals to make noninfringing uses of copyrighted works within the meaning of section 1201(a)(1). To do this, the Register solicits proposals from the public, develops a comprehensive administrative record using information submitted by interested parties, and makes recommendations to the Librarian concerning whether exemptions are warranted based on that record. While the first triennial rulemaking completed in the year 2000 considered nearly 400 comments, resulting in the adoption of two exemptions,[14] the process has grown such that the recently concluded sixth triennial rulemaking considered nearly 40,000 comments, resulting in exemptions for twenty-two types of uses.[15]

Those seeking an exemption from the prohibition on circumvention must establish that "persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition . . . in their ability to make noninfringing uses under this title of a particular class of copyrighted works."[16] To meet the statutory standard, a proponent must show: (1) That uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses.[17] With respect to the first requirement, proponents in prior rulemakings have pointed to several types of noninfringing uses that could be affected by the prohibition of section 1201(a)(1), including fair use (codified in section 107 of the Copyright Act), certain educational uses (section 110), and certain uses of computer programs (section 117).[18] The second requirement asks whether technological measures are "diminishing the ability of individuals to use these works in ways that are otherwise lawful." [19] Congress stressed that proponents must establish that a "substantial diminution" of the availability of works for noninfringing uses is "*actually occurring*" in the marketplace—or, in "extraordinary circumstances," may establish the "likelihood of future adverse impact during that time period" where such evidence is "highly specific, strong and persuasive." [20]

In considering a proposed exemption, the Librarian—and hence the Register—must also weigh the statutory factors listed in section 1201(a)(1)(C), namely: "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate." [21]

In addition, section 1201(a)(1) specifies that exemptions adopted through the triennial rulemaking must be defined based on "a particular *class* of works." [22] The legislative history explains that "the 'particular class of copyrighted works' [is intended to] be a narrow and focused subset of the broad categories of works" appearing in section 102 of Title 17, such as literary works, musical works, and sound recordings.[23] In the course of prior rulemakings, the Register has concluded that, based on the record presented, a "class of works" defined initially by reference to a section 102 category or subcategory of works may be additionally refined by reference to the medium in which the works are distributed, the particular access controls at issue, or the particular type of use and/or user to which the exemption will apply.[24]

Exemptions adopted via the rulemaking process are to remain in effect for three years. Congress made clear that the basis for an exemption must be established *de novo* in each triennial proceeding.[25] Accordingly, even if the same exemption is sought

---

[11] 17 U.S.C. 1203–1204.

[12] *Id.* 1201(a)(1)(C).

[13] H.R. Rep. No. 105–551, pt. 2, at 36.

[14] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Final Rule, 65 FR 64556, 64557 (Oct. 27, 2000).

[15] 2015 Recommendation at 2–7 (2015).

[16] 17 U.S.C. 1201(a)(1)(C); *see* 2015 Recommendation at 13–14; 2010 Recommendation at 10. Under the APA, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. 556(d). The Breaking Down Barriers to Innovation Act of 2015, introduced in both the House and the Senate, would shift the burden of proof away from proponents of exemptions and provide discretion to the Librarian to conduct a rulemaking proceeding outside the triennial process. H.R. 1883, 114th Cong. sec. 3(a)(1)(E) (2015); S. 990, 114th Cong. sec. 3(a)(1)(E) (2015).

[17] 17 U.S.C. 1201(a)(1)(B).

[18] *See, e.g.,* Transcript, U.S. Copyright Office, Hearing on Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 10:17–11:9 (May 2, 2000) (statement of Peter Jaszi, Digital Future Coalition) (discussing adverse effects of section 1201(a)(1) on noninfringing uses under sections 107 and 110); Internet Archive, Creative Commons, and Berkman Center for Internet & Society, Initial Comments Submitted in Response to U.S. Copyright Office's Oct. 15, 2002 Notice of Inquiry at 7–9 (2002) (seeking an exemption to allow software archiving as allowed under sections 117 and 107); National Association of Independent Schools, Initial Comments Submitted in Response to U.S. Copyright Office's Nov. 24, 1999 Notice of Inquiry (2000) (discussing fair use for educational purposes).

[19] H.R. Rep. No. 105–551, pt. 2, at 37.

[20] House Manager's Report at 6.

[21] 17 U.S.C. 1201(a)(1)(C). In the latest triennial rulemaking, due to the increasing prevalence of technological measures employed in connection with embedded computer software, many participants urged the Register and Librarian to consider non-copyright issues relating to health, safety, and environmental concerns under the rubric of "other factors" appropriate for consideration. *See* 2015 Recommendation at 2–3. The Breaking Down Barriers to Innovation Act of 2015 would add two additional factors to the list to be considered by the Librarian when deciding whether to grant an exemption: (1) Whether the prohibition on circumvention impacts accessibility for persons with disabilities, and (2) whether the prohibition impacts the furtherance of security research. H.R. 1883 sec. 3(a)(1)(B)(iv); S. 990 sec. 3(a)(1)(B)(v).

[22] *See* 17 U.S.C. 1201(a)(1)(B) (emphasis added).

[23] H.R. Rep. No. 105–551, pt. 2, at 38.

[24] U.S. Copyright Office, Recommendation of the Register of Copyrights in RM 2005–11, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 9–10 (Nov. 17, 2006), *http:// www.copyright.gov/1201/docs/1201_ recommendation.pdf.*

[25] *See* H.R. Rep. No. 105–551, pt. 2, at 37 (explaining that for every rulemaking, "the assessment of adverse impacts on particular categories of works is to be determined de novo").

again, it cannot be granted unless its proponents establish a new record that satisfies the statutory criteria.

Permanent Exemptions

In addition to the temporary exemptions adopted pursuant to the triennial rulemaking process, section 1201 provides eight permanent exemptions to the prohibition on circumvention, namely for certain activities of nonprofit libraries, archives, and educational institutions (section 1201(d)) and law enforcement (section 1201(e)); for reverse engineering (section 1201(f)); encryption research (section 1201(g)); the protection of personally identifying information (section 1201(i)); security testing (section 1201(j)); the prevention of access by minors to the internet (section 1201(h)); and relating to certain analog devices such as VHS and Beta format cassettes (section 1201(k)). Separately, section 112 includes a limited permanent exception to section 1201 for purposes of making ephemeral recordings.[26] As discussed below, the applicability and usefulness of the existing permanent exemptions has been questioned by some.[27]

Unlocking Consumer Choice and Wireless Competition Act

In 2014, Congress addressed certain issues relating to section 1201 by passing the Unlocking Consumer Choice and Wireless Competition Act ("Unlocking Act"), which primarily concerned the circumvention of technological measures that control access to computer programs that enable wireless telephone handsets to connect to wireless communication networks ("cellphone unlocking").[28] The Unlocking Act reinstated the cellphone unlocking exemption adopted by the Librarian in 2010,[29] replacing the

narrower version adopted in 2012,[30] and directed the Librarian to consider in the 2015 rulemaking whether to "extend" the exemption "to include any other category of wireless devices in addition to wireless telephone handsets."[31] (On the Register's recommendation, the Librarian granted additional exemptions for tablets and other types of wireless devices in the 2015 proceeding.[32])

The Unlocking Act also permanently established that circumvention under any exemption to permit a wireless telephone handset or other wireless device to connect to a different telecommunications network may be initiated by the owner of the handset or device, by another person at the direction of the owner, or by a provider of commercial mobile radio or data service, so long as the purpose is to enable the owner or a family member to connect to a wireless network in an authorized manner.[33] The legislation served to clarify that the owner of a device or the owner's family member can obtain assistance with the circumvention from another party notwithstanding the anti-trafficking provisions of section 1201.[34]

*B. Areas of Concern*

Rulemaking Process

As the number of participants in the triennial rulemaking has expanded with each successive cycle, the Office has done what it can within the existing statutory framework to streamline the proceedings. For the recent sixth triennial rulemaking proceeding, the Register (in consultation with NTIA and past proceeding participants) adjusted the administrative procedures to make the process more accessible and understandable; facilitate participation, coordination, and the development of the factual record; and reduce administrative burdens on both the participants and the Copyright Office.[35]

The Office solicited initial petitions setting forth only the essential elements of proposed exemptions and then issued a Notice of Proposed Rulemaking that reviewed and grouped the proposals and provided detailed guidance on the submission of written comments.[36] The Office also refined the comment phase to encourage a more organized and complete administrative record, including by instituting three distinct rounds of comments to allow participants to better respond to issues raised by other commenters.[37] The Office instituted procedures to encourage advance submission of multimedia evidence where appropriate.[38]

Even with these improvements, however, the rulemaking procedure, as enacted by Congress, is resource-intensive for both participants and the Office. An area of particular concern is the requirement that previously granted exemptions be reviewed anew. During the most recent rulemaking, a number of petitions essentially sought renewal of existing exemptions—for example, unlocking of cellphones and jailbreaking of smartphones. Some of these petitions—including a petition to permit circumvention so that literary works distributed electronically could continue to be accessed by persons who are blind, visually impaired, or print disabled—were unopposed.[39] In testimony, the Register has recommended that Congress amend the rulemaking process to create a presumption in favor of renewal when there is no meaningful opposition to the continuation of an exemption.[40]

---

[26] 17 U.S.C. 112(a)(2).

[27] *See Register's Perspective on Copyright Review Hearing* at 29 (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office) ("The permanent exemptions in Section 1201 relating to reverse engineering, encryption research, and security testing are an ongoing issue, with some stakeholders suggesting that they are too narrow in scope and others of the view that they strike an appropriate balance. For its part, the Office has previously highlighted the limited nature of the existing security testing exemptions and supported congressional review of the problem.") (citations omitted).

[28] Unlocking Consumer Choice and Wireless Competition Act, Public Law 113–144, 128 Stat. 1751 (2014). Subsequently, the Librarian adopted regulatory amendments to reflect the new legislation. *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Wireless Telephone Handsets, Final Rule, 79 FR 50552 (Aug. 25, 2014).

[29] *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for

Access Control Technologies, Final Rule, 75 FR 43825, 43828–32 (July 27, 2010).

[30] *See* Unlocking Consumer Choice and Wireless Competition Act sec. 2(a), 128 Stat. at 1751.

[31] *Id.* 2(b), 128 Stat. at 1751.

[32] *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Final Rule, 80 FR 65944, 65952, 65962–63.

[33] Unlocking Consumer Choice and Wireless Competition Act sec. 2(a), (c), 128 Stat. at 1751–52; *see also* 37 CFR 201.40(b)(3) (2012).

[34] Other bills have recently been introduced that would alter the operation of section 1201. Recent examples include the Unlocking Technology Act of 2015, H.R. 1587, 114th Cong. (2015); and the Breaking Down Barriers to Innovation Act of 2015, H.R. 1883, S. 990, 114th Cong. (2015).

[35] *See generally* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Notice of Inquiry, 79

FR 55687 (Sept. 17, 2014) ("Sixth Triennial Rulemaking NOI"); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Notice of Proposed Rulemaking, 79 FR 73856 (Dec. 12, 2014) ("Sixth Triennial Rulemaking NPRM"); *cf.* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Notice of Inquiry, 76 FR 60398 (Sept. 29, 2011).

[36] Sixth Triennial Rulemaking NPRM, 79 FR 73856, 73858–71.

[37] *See* Sixth Triennial Rulemaking NPRM, 79 FR 73856, 73857–58; *see also* Sixth Triennial Rulemaking NOI, 79 FR 55687, 55693.

[38] *See* Sixth Triennial Rulemaking NPRM, 79 FR 73856, 73858.

[39] *See* 2015 Recommendation at 127–37.

[40] In her testimony, the Register noted this issue is ripe for legislative process. *See Register's Perspective on Copyright Review Hearing* at 27 (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office); 2015 Recommendation at 4. The Breaking Down Barriers to Innovation Act of 2015 would require the renewal of previously-granted exemptions unless "changed circumstances" justify revoking the exemption. H.R. 1883 sec. 3(a)(1)(F)(iii); S. 990 sec. 3(a)(1)(F)(iii).

## Consumer Issues

Since the enactment of section 1201, the use of technological measures has been useful in expanding consumer choice and the avenues for dissemination of creative works, for example, movies and video games.[41] At the same time, as the Copyright Office has stated, it is also apparent that the prohibition on circumvention impacts a wide range of consumer activities that have little to do with the consumption of creative content or the core concerns of copyright.[42] Considering these impacts, some stakeholders have expressed concern over the effect of section 1201 on competition and innovation in the marketplace. In their view, technological measures are often deployed to "lock in" particular business models by inhibiting the development of interoperable products, such as printer cartridges, or to prevent individuals from engaging in otherwise legitimate pursuits, such as the repair of automobiles and farm equipment— despite the fact that these sorts of activities seem far removed from piracy of copyrighted works.[43]

These concerns were highlighted throughout the recently completed sixth triennial proceeding. In the 2015 rulemaking, some of the proposed exemptions concerned the ability to access and make noninfringing uses of expressive copyrighted works, such as motion pictures, video games, and e-books, which Congress undoubtedly had in mind when it created the triennial review process. But others concerned the ability to circumvent access controls on copyrighted computer code in consumer devices. Proponents of these latter classes sought to access the computer code not for its creative content, but rather to enable greater functionality and interoperability of devices ranging from cellphones, tablets, and smart TVs to 3–D printers, automobiles, tractors, and pacemakers.[44] As the Register has

testified, the effect of section 1201 on a wide range of consumer goods that today contain copyrighted software merits review.[45]

### Third-Party Assistance

A related issue is whether section 1201 should be clarified to ensure that intended beneficiaries of exemptions are able to engage in the permitted circumvention activities.[46] For example, a vehicle owner may require assistance from a repair shop technician to take advantage of an exemption that allows circumvention of access controls on automobile software to make a repair.[47] The anti-trafficking provisions of section 1201, however, prevent the adoption of exemptions that permit third parties to offer circumvention services.[48] While the Unlocking Act clarified section 1201 to permit specified third parties to circumvent technological measures on behalf of device owners in the case of cellphones and other wireless devices, the statute does not extend to other types of uses or allow the Librarian to grant an exemption that provides for third-party assistance in other circumstances.

### Permanent Exemptions

Another concern is that section 1201's permanent exemptions have failed to keep up with changing technologies. In testimony, the Register has identified the limited nature of the existing security testing exemptions and supported congressional review of this problem.[49] Based on the record in the most recent section 1201 rulemaking, the Register concluded that commenting parties had made a "compelling case that the current permanent exemptions in section 1201, specifically section 1201(f) for reverse engineering, section 1201(g) for encryption research, and section 1201(j) for security testing, are inadequate to accommodate their intended purposes." [50] For example,

when considering a requested exemption for good-faith security research, the Register noted that "the existing permanent exemptions . . . do not cover the full range of proposed security research activities, many of which . . . are likely [to] be noninfringing." [51] Separately, others have suggested that section 1201(d)'s exemption for activities of nonprofit entities is inadequate to meet the legitimate archiving and preservation needs of libraries and archives.[52]

### International Issues

As noted above, section 1201 was adopted in 1998 to implement the United States' obligations under two international treaties.[53] Those treaties— the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty—require signatory countries to provide "adequate legal protection and effective legal remedies against the circumvention of effective technological measures" that are used by authors, performers, and phonogram producers in connection with the exercise of their rights, and that restrict acts, in respect of their works, performances, or phonograms, which are not authorized by rightsholders or permitted by law.[54] Since then, the United States has included anticircumvention provisions in a number of bilateral and regional agreements entered into with other nations.[55] Therefore, any proposals to

---

[41] See, e.g., Chapter 12 of Title 17 Hearing at 28–29 (statement of Christian Genetski, Senior Vice-President and General Counsel, Entertainment Software Association).

[42] 2015 Recommendation at 2.

[43] See, e.g., Chapter 12 of Title 17 Hearing at 43–44 (statement of Corynne McSherry, Intellectual Property Director, Electronic Frontier Foundation); Unintended Consequences: Fifteen Years under the DMCA, Electronic Frontier Foundation, https:// www.eff.org/pages/unintended-consequences-fifteen-years-under-dmca (last updated March 2013). The proposed Unlocking Technology Act of 2015 would amend both the anticircumvention and anti-trafficking provisions of section 1201(a) to prohibit such conduct only when done with the intent to facilitate the infringement of a copyrighted work. H.R. 1587 sec. 2(a).

[44] 2015 Recommendation at 2; Register's Perspective on Copyright Review Hearing at 29–30

(statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office).

[45] Register's Perspective on Copyright Review Hearing at 29–30 (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office).

[46] Id. at 29 (noting that intended beneficiaries of exemptions lack the practical ability to engage in the permitted circumvention themselves and suggesting the need for further study).

[47] See 2015 Recommendation at 4–5.

[48] Id.

[49] Register's Perspective on Copyright Review Hearing at 29 (statement of Maria A. Pallante, Register of Copyrights and Director, U.S. Copyright Office).

[50] 2015 Recommendation at 307. Legislation recently introduced in Congress would increase exemptions for reverse engineering, encryption research, the protection of personally identifying information, and security testing. See Breaking

Down Barriers to Innovation Act of 2015, H.R. 1883 sec. 3(b)–(e); Breaking Down Barriers to Innovation Act of 2015, S. 990 sec. 3(b)–(e).

[51] 2015 Recommendation at 299. The Breaking Down Barriers to Innovation Act of 2015 would increase exemptions for reverse engineering, encryption research, the protection of personally identifying information, and security testing. H.R. 1883 sec. 3(b)–(e); S. 990 sec. 3(b)–(e).

[52] See, e.g., 2015 Recommendation at 327 (discussing proposal for exemption for video game preservationists); Pan C. Lee et al., Samuelson Law, Technology & Public Policy Clinic, University of California, Berkeley School of Law, on behalf of Public Knowledge, Updating 17 U.S.C. 1201 for Innovators, Creators, and Consumers in the Digital Age 52 (2010), https://www.publicknowledge.org/assets/uploads/2 Circumvention.pdf.

[53] See H.R. Rep. No. 105–551, pt. 2, at 20.

[54] WIPO Copyright Treaty art. 11, Dec. 20, 1996, 36 I.L.M. 65 (1997); WIPO Performances and Phonograms Treaty art. 18, Dec. 20, 1996, 36 I.L.M. 76 (1997).

[55] See United States-Australia Free Trade Agreement, U.S.-Austl., art. 17.4.7, May 18, 2004, 43 I.L.M. 1248, http://www.ustr.gov/trade-agreements/free-trade-agreements/australian-fta/final-text; United States-Bahrain Free Trade Agreement, U.S.-Bahr., art. 14.4.7, Sept. 14, 2004, 44 I.L.M. 544, http://www.ustr.gov/trade-agreements/free-trade-agreements/bahrain-fta/final-text; United States-Chile Free Trade Agreement, U.S.-Chile, art. 17.7.5, June 6, 2003, 42 I.L.M. 1026, http://www.ustr.gov/trade-agreements/free-trade-agreements/chile-fta/final-text; United States-Colombia Trade Promotion Agreement, U.S.-Colom., art. 16.7.4, Nov. 22, 2006, http://www.ustr.gov/trade-agreements/free-trade-

modify or amend Section 1201 would require consideration of the United States' international obligations.

### C. Relationship to Software Study

The scope of this study is limited to the operation and effectiveness of section 1201. It is not intended to focus on broader issues concerning the role of copyright with respect to software embedded in everyday products. Those issues are the subject of a separate and concurrent Copyright Office study.[56] Although, as noted, section 1201 certainly has implications for the use of such products, members of the public who wish to address the impact of other provisions of copyright law on embedded software are encouraged to submit comments in that separate process. More information about the Software-Enabled Consumer Products Study may be found at *http://www.copyright.gov/policy/software/.*

## II. Subjects of Inquiry

The Office invites written comments on the specific subjects below. A party choosing to respond to this Notice of Inquiry need not address every subject, but the Office requests that responding parties clearly identify and separately address each subject for which a response is submitted.

### General

1. Please provide any insights or observations regarding the role and effectiveness of the prohibition on

*agreements/colombia-fta/final-text;* Dominican Republic-Central America-United States Free Trade Agreement, U.S.-Costa Rica-Dom. Rep.-El Sal.-Guat.-Hond.-Nicar., art 15.5.7, Aug. 5, 2004, 43 I.L.M. 514, *https://ustr.gov/trade-agreements/free-trade-agreements/cafta-dr-dominican-republic-central-america-fta/final-text;* United States-Jordan Free Trade Agreement, U.S.-Jordan, art. 4(13), Oct. 24, 2000, 41 I.L.M. 63, *http://www.ustr.gov/trade-agreements/free-trade-agreements/jordan-fta/final-text;* United States-Korea Free Trade Agreement, U.S.-S. Kor. art. 18.4.7, June 30, 2007, 46 I.L.M. 642, *https://ustr.gov/trade-agreements/free-trade-agreements/korus-fta/final-text;* United States-Morocco Free Trade Agreement, U.S.-Morocco, art. 15.5.8, June 15, 2004, 44 I.L.M. 544, *http://www.ustr.gov/trade-agreements/free-trade-agreements/morocco-fta/final-text;* United States-Oman Free Trade Agreement, U.S.-Oman, art. 15.4.7, Jan. 19, 2006, *http://www.ustr.gov/trade-agreements/free-trade-agreements/oman-fta/final-text;* United States-Panama Trade Promotion Agreement, U.S.-Pan., art 15.5.7, June 28, 2007, *http://www.ustr.gov/trade-agreements/free-trade-agreements/panama-tpa/final-text;* United States-Peru Trade Promotion Agreement, U.S.-Peru, art. 16.7.4, Apr. 12, 2006, *http://www.ustr.gov/trade-agreements/free-trade-agreements/peru-tpa/final-text;* United States-Singapore Free Trade Agreement, U.S.-Sing., art. 16.4.7, May 6, 2003, 42 I.L.M. 1026, *https://ustr.gov/trade-agreements/free-trade-agreements/singapore-fta/final-text.*

[56] *See* Software-Enabled Consumer Products Study: Notice and Request for Public Comment, 80 FR 77668 (Dec. 15, 2015).

circumvention of technological measures in section 1201(a).

2. How should section 1201 accommodate interests that are outside of core copyright concerns, for example, in cases where circumvention of access controls protecting computer programs implicates issues of product interoperability or public safety?

### Rulemaking Process

3. Should section 1201 be adjusted to provide for presumptive renewal of previously granted exemptions—for example, when there is no meaningful opposition to renewal—or otherwise be modified to streamline the process of continuing an existing exemption? If so, how?

4. Please assess the current legal requirements that proponents of an exemption must satisfy to demonstrate entitlement to an exemption. Should they be altered? If so, how? In responding, please comment on the relationship to traditional principles of administrative law.

5. Please provide additional suggestions to improve the rulemaking process.

### Anti-Trafficking Prohibitions

6. Please assess the role of the anti-trafficking provisions of sections 1201(a)(2) and 1201(b) in deterring copyright infringement, and address whether any amendments may be advisable.

7. Should section 1201 be amended to allow the adoption of exemptions to the prohibition on circumvention that can extend to exemptions to the anti-trafficking prohibitions, and if so, in what way? For example, should the Register be able to recommend, and the Librarian able to adopt, exemptions that permit third-party assistance when justified by the record?

### Permanent Exemptions

8. Please assess whether the existing categories of permanent exemptions are necessary, relevant, and/or sufficient. How do the permanent exemptions affect the current state of reverse engineering, encryption research, and security testing? How do the permanent exemptions affect the activities of libraries, archives, and educational institutions? How might the existing permanent exemptions be amended to better facilitate such activities?

9. Please assess whether there are other permanent exemption categories that Congress should consider establishing—for example, to facilitate access to literary works by print-disabled persons?

### Other

10. To what extent and how might any proposed amendments to section 1201 implicate the United States' trade and treaty obligations?

11. Please identify any pertinent issues not referenced above that the Copyright Office should consider in conducting its study.

Dated: December 22, 2015.

**Maria A. Pallante,**

*Register of Copyrights, U.S. Copyright Office.*

[FR Doc. 2015–32678 Filed 12–28–15; 8:45 am]

**BILLING CODE 1410–30–P**

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

**[Notice (15–122)]**

### Privacy Act of 1974; Privacy Act System of Records

**AGENCY:** National Aeronautics and Space Administration (NASA).

**ACTION:** Notice of proposed revisions to existing Privacy Act systems of records.

**SUMMARY:** Pursuant to the provisions of the Privacy Act of 1974 (5 U.S.C. 552a), the National Aeronautics and Space Administration is issuing public notice its proposal to modify a previously noticed system of records and rescind another previously noticed system. This notice publishes details of the proposed updates as set forth below under the caption **SUPPLEMENTARY INFORMATION**.

**DATES:** Submit comments within 30 calendar days from the date of this publication. The changes will take effect at the end of that period, if no adverse comments are received.

**ADDRESSES:** Patti F. Stockman, Privacy Act Officer, Office of the Chief Information Officer, National Aeronautics and Space Administration Headquarters, Washington, DC 20546–0001, (202) 358–4787, *NASA–PAOfficer@nasa.gov.*

**FOR FURTHER INFORMATION CONTACT:** NASA Privacy Act Officer, Patti F. Stockman, (202) 358–4787, *NASA–PAOfficer@nasa.gov.*

**SUPPLEMENTARY INFORMATION:** Pursuant to the provisions of the Privacy Act of 1974, 5 U.S.C. 552a, and as part of its biennial System of Records review, NASA is making the following minor modifications of its system of records Exchange Records on Individuals/NASA 10XROI: Inclusion of a statement of purpose for the system of records; updates of system and subsystem managers; clarification of routine uses; and correction of previous typographical errors. Further, NASA

In accordance with sections 201.16(c) and 207.3 of the rules, each document filed by a party to the investigations must be served on all other parties to the investigations (as identified by either the public or BPI service list), and a certificate of service must be timely filed. The Secretary will not accept a document for filing without a certificate of service.

**Authority:** These investigations are being conducted under authority of title VII of the Tariff Act of 1930; this notice is published pursuant to section 207.12 of the Commission's rules.

By order of the Commission.

Issued: February 12, 2016.

**Lisa R. Barton,**

*Secretary to the Commission.*

[FR Doc. 2016–03434 Filed 2–18–16; 8:45 am]

**BILLING CODE 7020–02–P**

## LIBRARY OF CONGRESS

### Copyright Office

**[Docket No. 2015–8]**

### Section 1201 Study: Extension of Comment Period

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Extension of comment period.

**SUMMARY:** The United States Copyright Office is extending the deadlines for the submission of written comments in response to its December 29, 2015 Notice of Inquiry regarding the operation of section 1201 of Title 17.

**DATES:** Initial written comments are now due no later than 11:59 p.m. Eastern Time on March 3, 2016. Written reply comments are due no later than 11:59 p.m. Eastern Time on April 1, 2016.

**ADDRESSES:** The Copyright Office is using the regulations.gov system for the submission and posting of public comments in this proceeding. All comments are therefore to be submitted electronically through regulations.gov. Specific instructions for submitting comments are available on the Copyright Office Web site at *http:// copyright.gov/policy/1201/comment-submission/*. If electronic submission of comments is not feasible, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, Associate General Counsel, *resm@loc.gov;* or Kevin R. Amer, Senior Counsel for Policy and International Affairs, *kamer@loc.gov*. Each can be reached by telephone at (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** The United States Copyright Office is undertaking a public study to assess the operation of section 1201 of Title 17. On December 29, 2015, the Office issued a Notice of Inquiry seeking public input on several questions relating to that topic. *See* 80 FR 81369 (Dec. 29, 2015). To ensure that commenters have sufficient time to respond, the Office is extending the deadline for the submission of initial comments in response to the Notice to March 3, 2016, at 11:59 p.m. Eastern Time, and the deadline for the submission of reply comments to April 1, 2016, at 11:59 p.m. Eastern Time. Please note that in light of the expected time frame for this study, the Office is unlikely to grant further extensions for these comments.

Dated: February 16, 2016.

**Maria A. Pallante,**

*Register of Copyrights, U.S. Copyright Office.*

[FR Doc. 2016–03515 Filed 2–18–16; 8:45 am]

**BILLING CODE 1410–30–P**

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

**[Notice: (16–012)]**

### Notice of Information Collection

**AGENCY:** National Aeronautics and Space Administration (NASA).

**ACTION:** Notice of information collection.

**SUMMARY:** The National Aeronautics and Space Administration, as part of its continuing effort to reduce paperwork and respondent burden, invites the general public and other Federal agencies to take this opportunity to comment on proposed and/or continuing information collections, as required by the Paperwork Reduction Act of 1995 (Pub. L. 104–13, 44 U.S.C. 3506(c)(2)(A)).

**DATES:** All comments should be submitted within 60 calendar days from the date of this publication.

**ADDRESSES:** All comments should be addressed to Frances Teel, National Aeronautics and Space Administration, Mail Code JF000, 300 E Streets SW., Washington, DC 20546–0001.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information or copies of the information collection instrument(s) and instructions should be directed to Frances Teel, NASA Clearance Officer, NASA Headquarters, 300 E Street SW., JF0000, Washington, DC 20546, (202) 358–2225.

**SUPPLEMENTARY INFORMATION:**

### I. Abstract

NASA hosts/sponsors numerous events on federally owned/leased property which are open to NASA affiliates and members of the public. The events include but are not limited to meetings, conferences, briefings, public outreach activities, tours, focus groups, etc. Visitor access is substantiated by a credentialed NASA sponsor who validates the visitor's need to access a building/area, guest networking services, etc. for a specific event/purpose. Information is collected to validate identity and enable intermittent access to activities.

Currently, visitor registration is accomplished via several electronic and paper processes. The NASA Office of Protective Services is transitioning to a one-NASA process to manage access for visitors with an affiliation less than 30-days.

NASA may collect event registration information to include but not limited to a visitor's name, address, citizenship, biometric data, purpose of visit, the location to be visited, escort/sponsor name with contact data, and preferred meeting/event sessions when options are available. When parking is provided on federal owned/leased space, driver's license information as well as vehicle make/model/tag information will be collected.

When visitors/vendors are permitted to bring equipment and/or event set-up materials such as booths and displays, information will be collected to issue property passes and coordinate equipment/property delivery. Information will also be collected, when applicable, to include other associated requirements such as electrical power needs, internet access, etc.

NASA collects, stores, and secures information from individuals requiring routine and intermittent access in a manner consistent with the Constitution and applicable laws, including the Privacy Act (5 U.S.C. 552a) and the Paperwork Reduction Act.

### II. Method of Collection

Electronic.

### III. Data

*Title:* The NASA Visitor Management System for Intermittent Access to NASA Hosted/Sponsored Events and Activities.

*OMB Number:* 2700–XXXX.

*Type of review:* Active Information Collection In Use Without OMB Approval.

*Affected Public:* Individuals.

*Estimated Number of Respondents:* 400,000.

estimated for an average respondent to respond: Of the approximately 18,000 government law enforcement agencies that are eligible to submit cases, it is estimated that thirty to fifty percent will actually submit cases to ViCAP. The time burden of the respondents is less than 60 minutes per form.

6. *An estimate of the total public burden (in hours) associated with the collection:* 5,000 annual burden hours.

If additional information is required contact: Jerri Murray, Department Clearance Officer, United States Department of Justice, Justice Management Division, Policy and Planning Staff, Two Constitution Square, 145 N Street NE., 3E.405B, Washington, DC 20530.

Dated: March 23, 2016.

**Jerri Murray,**

*Department Clearance Officer for PRA, U.S. Department of Justice.*

[FR Doc. 2016–06900 Filed 3–25–16; 8:45 am]

**BILLING CODE 4410–02–P**

## LIBRARY OF CONGRESS

### Copyright Office

**[Docket Nos. 2015–6, 2015–8]**

### Software-Enabled Consumer Products Study and Section 1201 Study: Announcement of Public Roundtables

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of public roundtables.

**SUMMARY:** The United States Copyright Office has issued Notices of Inquiry ("NOIs") announcing separate public studies on software-enabled consumer products and section 1201 of title 17. In addition to soliciting written comments on these issues, the Office is now announcing public roundtables for these studies to provide forums for interested members of the public to address the issues set forth in the NOIs.

DATES AND ADDRESSES: Public roundtables for the above-referenced Copyright Office studies will be held on the dates and at the locations provided below. The roundtables for the two studies are being held on consecutive dates in each location to accommodate parties who may have an interest in attending both.

*Software-Enabled Consumer Products Study:* For its study on software-enabled consumer products, the Office will hold public roundtables in Washington, DC and San Francisco, CA. The roundtable in Washington will take place on May 18, 2016, at the Library of Congress's Madison Building, 101 Independence Avenue SE., Washington, DC 20540, from 9:00 a.m. to approximately 5:00 p.m. The roundtable in San Francisco will take place on May 24, 2016, at Hastings School of Law, 200 McAllister Street, San Francisco, CA 94102, from 9:00 a.m. to approximately 5:00 p.m.

*Section 1201 Study:* Likewise, for its study on section 1201, the Office will hold public roundtables in Washington, DC and San Francisco, CA. The roundtable in Washington will take place on May 19 and May 20, 2016, at the Library of Congress's Madison Building, 101 Independence Avenue SE., Washington, DC 20540, from 9:00 a.m. to approximately 5:00 p.m. on the first day, and from 9:00 a.m. to approximately 1:00 p.m. on the second day. The roundtable in San Francisco will take place on May 25 and May 26, 2016, at Hastings School of Law, 200 McAllister Street, San Francisco, CA 94102, from 9:00 a.m. to approximately 5:00 p.m. on the first day, and from 9:00 a.m. to approximately 1:00 p.m. on the second day.

Additional information, including instructions for submitting requests to participate in the roundtables, is available on the Copyright Office Web site at *http://copyright.gov/policy/software/* (software-enabled consumer products) and *http://copyright.gov/policy/1201/* (section 1201). Requests to participate in the roundtables must be received by the Copyright Office by April 18, 2016. If you are unable to access a computer or the internet, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** *Software-Enabled Consumer Products Study:* Sarang V. Damle, Deputy General Counsel, *sdam@loc.gov;* Catherine Rowland, Senior Advisor to the Register of Copyrights, *crowland@loc.gov;* or Erik Bertin, Deputy Director of Registration Policy and Practice, *ebertin@loc.gov.*

*Section 1201 Study:* Regan A. Smith, Associate General Counsel, *resm@loc.gov;* or Kevin Amer, Senior Counsel for Policy and International Affairs, *kamer@loc.gov.*

Each of these persons can be reached by telephone at (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** The Copyright Office is conducting separate studies concerning software-enabled consumer products and section 1201 of title 17.

### Software-Enabled Consumer Products Study

On December 15, 2015, the Copyright Office issued an NOI announcing a study on the role of copyright law with respect to the design, distribution, and use of consumer products that include embedded software. 80 FR 77668. This study is being done at the request of the United States Senate Committee on the Judiciary. Consistent with the Committee's request, the focus of the study is on software contained in consumer products; it is not intended to address more general questions about software and copyright.

### Section 1201 Study

Enacted in 1998 as part of the Digital Millennium Copyright Act ("DMCA"), section 1201 prohibits the circumvention of technological measures employed by or on behalf of copyright owners to control access to their works (also known as "access controls"), as well as the trafficking in technologies or services that facilitate such circumvention. In addition, section 1201 codifies a triennial rulemaking process through which the Librarian of Congress, upon the recommendation of the Register of Copyrights, can grant exemptions to the prohibition on the circumvention of access controls. The Copyright Office issued an NOI soliciting comments on the operation and effectiveness of section 1201 on December 29, 2015. 80 FR 81369.

### Roundtable Subjects of Inquiry

At this time, the Copyright Office is providing notice of its intention to seek further input for these studies through public roundtables to be held on the dates and at the addresses set forth above. The public roundtables will offer an opportunity for interested parties to comment on topics set forth in the NOIs.

For the software-enabled consumer products study, the roundtables at each location will consist of sessions on the following topics: (1) The proper role of copyright in protecting software-enabled consumer products; (2) ownership and contractual issues; (3) fair use; and (4) the first sale doctrine, section 117, and other limitations and exceptions. After the final session, the Office will also provide participants and observers with an opportunity to offer additional comments for the record.

For the section 1201 study, roundtables at each location will consist of sessions on the following topics: (1) The relationship of section 1201 to copyright infringement, consumer issues, and competition; (2) the rulemaking process—evidentiary and procedural issues; (3) the rulemaking process—renewal of previously granted exemptions; (4) the anti-trafficking prohibitions and third-party assistance for permitted circumvention of technological measures; and (5)

LOC_AR_00009389

permanent exemptions to the prohibition on circumvention. After the final session, the Office will also provide participants and observers with an opportunity to offer additional comments for the record.

Each of the roundtable hearing rooms will have a limited number of seats for participants and observers. Public seating for observers will be provided on a first-come, first-served basis on the days of the roundtables.

Dated: March 23, 2016.

**Maria A. Pallante,**

*Register of Copyrights, U.S. Copyright Office.*

[FR Doc. 2016–06925 Filed 3–25–16; 8:45 am]

**BILLING CODE 1410–30–P**

---

## LIBRARY OF CONGRESS

### Copyright Royalty Board

**[Docket No. 2008–2 CRB CD 2000–2003 (Phase II)]**

### Distribution of the 2000, 2001, 2002 and 2003 Cable Royalty Funds

**AGENCY:** Copyright Royalty Board, Library of Congress.

**ACTION:** Final distribution order.

**SUMMARY:** The Copyright Royalty Judges announce the final Phase II distribution of cable royalty funds for the years 2000, 2001, 2002 and 2003 for the Program Suppliers programming category.

**DATES:** Effective March 28, 2016.

**ADDRESSES:** The final distribution order also is posted on the Copyright Royalty Board Web site at *http://www.loc.gov/crb.*

**FOR FURTHER INFORMATION CONTACT:** Kimberly Whittle, Attorney Advisor. Telephone: (202) 707–7658; Email: *crb@loc.gov.*

**SUPPLEMENTARY INFORMATION:** The captioned consolidated royalty distribution proceeding concluded on August 14, 2015, when the United States Court of Appeals for the DC Circuit issued a mandate relating to their June 30, 2015, order affirming the distribution shares for claimants in the Program Suppliers category as determined by the Copyright Royalty Judges (Judges). After the mandate, the Judges received filings from Worldwide Subsidy Group dba Independent Producers Group (IPG) and the Motion Picture Association of America (MPAA) contesting the appropriate methodology for distribution of the remaining royalty funds on deposit.

By order dated November 25, 2015, the Judges directed MPAA to provide historical context from which the Judges and the Licensing Division of the Copyright Office could distribute accurately the funds, taking into account prior partial distributions, fund growth through accrued interest, and deductions for Licensing Division costs. MPAA provided the necessary information on December 7, 2015. The Licensing Division staff provided accounting services to assure accurate distribution in accordance with the Judges' orders.

The Licensing Division calculated that, as of February 17, 2016, the total distribution to IPG for each royalty year should be:

| | |
|---|---|
| 2000 | $617,719 |
| 2001 | 164,203 |
| 2002 | 197,725 |
| 2003 | 125,884 |
| Total | 1,105,531 |

Now, therefore, the Judges hereby *order* that the Licensing Division make final distribution to IPG from the Program Suppliers category for the years 2000 through 2003, inclusive, in the amounts listed, adjusted if necessary to reflect interest accrued or costs incurred from and after February 17, 2016, to the date of distribution.

The Judges *further order* that the Licensing Division distribute simultaneously the remaining funds in the Program Suppliers category for royalty years 2000 through 2003, inclusive, to MPAA, adjusted if necessary to reflect interest accrued or costs incurred from and after February 17, 2016.

The Judges *further order* that IPG and MPAA provide to the Licensing Division all necessary and pertinent information to facilitate the transfer by March 31, 2016.

Dated: March 23, 2016.

**Suzanne M. Barnett,**

*Chief Copyright Royalty Judge.*

[FR Doc. 2016–06923 Filed 3–25–16; 8:45 am]

**BILLING CODE 1410–72–P**

---

## NUCLEAR REGULATORY COMMISSION

**[NRC–2016–0001]**

### Sunshine Act Meeting Notice

**DATE:** March 28, April 4, 11, 18, 25, May 2, 2016.

**PLACE:** Commissioners' Conference Room, 11555 Rockville Pike, Rockville, Maryland.

**STATUS:** Public and Closed.

**Week of March 28, 2016**

*Tuesday, March 29, 2016*

9:30 a.m.   Briefing on Project Aim (Public Meeting); (Contact: Janelle Jessie: 301–415–6775).

This meeting will be webcast live at the Web address—*http://www.nrc.gov/.*

*Wednesday, March 30, 2016*

9:30 a.m.   Briefing on Security Issues (Closed Ex. 1).

**Week of April 4, 2016—Tentative**

*Tuesday, April 5, 2016*

9:30 a.m.   Briefing on Threat Environment Assessment (Closed Ex. 1).

**Week of April 11, 2016—Tentative**

There are no meetings scheduled for the week of April 11, 2016.

**Week of April 18, 2016—Tentative**

*Tuesday, April 19, 2016*

9:30 a.m. Meeting with the Organization of Agreement States and the Conference of Radiation Control Program Directors (Public Meeting); (Contact: Paul Michalak: 301–415–5804).

This meeting will be webcast live at the Web address—*http://www.nrc.gov/.*

**Week of April 25, 2016—Tentative**

There are no meetings scheduled for the week of April 25, 2016.

**Week of May 2, 2016—Tentative**

There are no meetings scheduled for the week of May 2, 2016.

\*   \*   \*   \*   \*

The schedule for Commission meetings is subject to change on short notice. For more information or to verify the status of meetings, contact Denise McGovern at 301–415–0681 or via email at *Denise.McGovern@nrc.gov.*

\*   \*   \*   \*   \*

The NRC Commission Meeting Schedule can be found on the Internet at: *http://www.nrc.gov/public-involve/public-meetings/schedule.html.*

\*   \*   \*   \*   \*

The NRC provides reasonable accommodation to individuals with disabilities where appropriate. If you need a reasonable accommodation to participate in these public meetings, or need this meeting notice or the transcript or other information from the public meetings in another format (*e.g.* braille, large print), please notify Kimberly Meyer, NRC Disability Program Manager, at 301–287–0739, by videophone at 240–428–3217, or by email at *Kimberly.Meyer-Chambers@*

**66296**    **Federal Register** / Vol. 81, No. 187 / Tuesday, September 27, 2016 / Notices

On August 29, 2016, Creative filed a petition for review and on September 1, 2016, Respondents, Intervenor, and OUII filed replies in opposition to Creative's petition.

The Commission has determined not to review the ID. The investigation is terminated.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR part 210).

By order of the Commission.

Issued: September 21, 2016.

Lisa R. Barton,

*Secretary to the Commission.*

[FR Doc. 2016–23243 Filed 9–26–16; 8:45 am]

BILLING CODE 7020–02–P

---

## LIBRARY OF CONGRESS

## U.S. Copyright Office

**[Docket No. 2015–8]**

## Section 1201 Study: Request for Additional Comments

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of Inquiry.

**SUMMARY:** The United States Copyright Office is requesting additional written comments in connection with its ongoing study on the operation of the statutory provisions regarding the circumvention of copyright protection systems. This request provides an opportunity for interested parties to address certain issues raised by various members of the public in response to the Office's initial Notice of Inquiry.

**DATES:** Written comments must be received no later than 11:59 p.m. Eastern Time on October 27, 2016. Written reply comments must be received no later than 11:59 p.m. Eastern Time on November 16, 2016.

**ADDRESSES:** The Copyright Office is using the *regulations.gov* system for the submission and posting of public comments in this proceeding. All comments are therefore to be submitted electronically through *regulations.gov*. Specific instructions for submitting comments are available on the Copyright Office Web site at *http:// copyright.gov/policy/1201/ commentsubmission/*. If electronic submission of comments is not feasible, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Kevin R. Amer, Senior Counsel for Policy and International Affairs, by email at *kamer@loc.gov* or by telephone at 202–707–8350; or Regan A. Smith, Associate General Counsel, by email at *resm@loc.gov* or by telephone at 202–707–8350.

**SUPPLEMENTARY INFORMATION:**

## I. Background

At the request of the Ranking Member of the House Committee on the Judiciary, the Copyright Office is conducting a study to assess the operation of section 1201 of title 17. In December 2015, the Office issued a Notice of Inquiry identifying several aspects of the statutory and regulatory framework that the Office believes are ripe for review, and inviting public comment on those and any other pertinent issues.[1] The Notice provided for two rounds of written comments. In response, the Office received sixty-eight initial comments and sixteen reply comments.[2] The Office then announced public roundtables on the topics addressed in the Notice and comments.[3] These sessions, held in Washington, DC and San Francisco, California in May 2016, involved participation by more than thirty panelists, representing a wide range of interests and perspectives. Transcripts of the roundtables are available at *http://copyright.gov/policy/ 1201/*, and video recordings will be available at that location at a later date.

In the written comments and during the roundtables, parties expressed a variety of views regarding whether legislative amendments to section 1201 may be warranted. Among other suggested changes, commenters discussed proposals to update the statute's permanent exemption framework and to amend the anti-trafficking provisions to permit third-party assistance with lawful circumvention activities. At this time, as explained below, the Office is interested in receiving additional stakeholder input on particular aspects of those proposals. In addition, parties submitted numerous and varied views regarding the triennial rulemaking process under section 1201(a)(1)(C); while the Office continues to thoroughly evaluate these comments in conducting its study, this second Notice of Inquiry does not specifically address those issues.

A party choosing to respond to this Notice of Inquiry need not address every topic below, but the Office requests that responding parties clearly identify and separately address those subjects for which a response is submitted. Parties also are invited to address any other pertinent issues that the Office should consider in conducting its study.

## II. Subjects of Inquiry

*1. Proposals for New Permanent Exemptions*

a. *Assistive Technologies for Use by Persons Who Are Blind, Visually Impaired, or Print Disabled.* The written comments and roundtable discussions revealed widespread support for adoption of a permanent exemption to facilitate access to works in electronic formats by persons who are blind, visually impaired, or print disabled. The Office invites comment regarding specific provisions that commenters believe should be included in legislation proposing such an exemption. For example, the exemption for this purpose granted in the 2015 rulemaking permits circumvention of access controls applied to literary works distributed electronically, where the access controls "either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies."[4] The exemption applies in the following circumstances:

(i) When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels, or

(ii) When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.[5]

The Office is interested in commenters' views on whether this language would be appropriate for adoption as a permanent exemption, or whether there are specific changes or additional provisions that Congress may wish to consider.

b. *Device Unlocking.* Some commenters advocated the adoption of a permanent exemption to permit circumvention of access controls on wireless devices for purposes of

---

[1] Section 1201 Study: Notice and Request for Public Comment, 80 FR 81369 (Dec. 29, 2015).

[2] All comments may be accessed from the Copyright Office Web site at *http://copyright.gov/ policy/1201/* by clicking the "Public Comments" tab, followed by the "Comments" link.

[3] Software-Enabled Consumer Products Study and Section 1201 Study: Announcement of Public Roundtables, 81 FR 17206 (Mar. 28, 2016).

[4] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 80 FR 65944, 65950 (Oct. 28, 2015) ("2015 Final Rule").

[5] *Id.*

"unlocking" such devices—*i.e.,* enabling them to connect to the network of a different mobile wireless carrier. Since 2006, the rulemaking process has involved consideration of exemptions permitting unlocking of cellphones, and in the 2015 rulemaking, pursuant to Congress's direction,[6] the Register considered whether to extend the exemption to other categories of wireless devices. At the conclusion of the 2015 proceeding, the Librarian, upon the Register's recommendation, adopted an unlocking exemption that applies to used wireless devices of the following types:

(A) Wireless telephone handsets (*i.e.,* cellphones);

(B) All-purpose tablet computers;

(C) Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and

(D) Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.[7]

The Office invites comment on whether an unlocking exemption would be appropriate for adoption as a permanent exemption or whether such activities are more properly considered as part of the triennial rulemaking. For commenters who favor consideration of a permanent exemption, the Office is interested in commenters' views on whether the language of the 2015 unlocking exemption would be appropriate for adoption as a permanent exemption, or whether there are specific changes or additional provisions that Congress may wish to consider.

c. *Computer Programs.* Several commenters expressed concern over the scope of section 1201 in the context of copyrighted computer programs that enable the operation of a machine or device. These commenters suggested that by prohibiting the circumvention of access controls on such programs, the statute prevents the public from engaging in legitimate activities, such as the repair of automobiles or the use of third-party device components, that seem far removed from the protection of creative expression that section 1201 was intended to address. To respond to this concern, some commenters argued that Congress should establish a statutory exemption that would permit circumvention of technological protection measures ("TPM"s) controlling access to such software in appropriate circumstances. The Office is interested in additional views on such proposals.

For purposes of focusing the discussion, the Office invites comment on whether there are specific formulations of such an exemption that could serve as helpful starting points for further consideration of legislation. For example, Congress could consider adoption of a permanent exemption for purposes of diagnosis, maintenance, and repair. Such legislation could provide that a person who has lawfully obtained the right to use a computer program may circumvent a TPM controlling access to that program, so long as the circumvention is undertaken for purposes of diagnosis, maintenance, or repair. Are existing legal doctrines or statutes, such as the current language addressing machine maintenance and repair in section 117(c),[8] the doctrine of repair and reconstruction in patent law,[9] case law addressing refurbishment under trademark law,[10] or "right to repair" bills introduced into various state legislatures,[11] helpful to inform the appropriate scope of repair in this context? To what extent would the combination of such an exemption with the current language of 1201(f)[12]— which allows circumvention for purposes of facilitating interoperability under certain circumstances— adequately address users' concerns regarding section 1201's impact on consumer activities?

Please also comment upon whether it would be advisable to consider, in addition to diagnosis, maintenance, or repair, an exemption to explicitly permit circumvention for purposes of engaging in any lawful modification of a computer program. Such an exemption could allow circumventions undertaken to make non-infringing adaptations, including, for example, uses permitted under section 117(a) and/or the fair use doctrine.[13] Please address whether this broader formulation would, or would not, be

likely to result in economically harmful unauthorized uses of copyrighted works.

With either formulation, would concerns over enabling unauthorized uses be mitigated by conditioning the exemption on the circumventing party not engaging in any unauthorized use of a copyrighted work other than the accessed computer program, or by limiting the exemption to computer programs that are "not a conduit to protectable expression"—*i.e.,* those that do "not in turn create any protected expression" when executed?[14] In the United Kingdom, for example, the prohibition on circumvention specifically excludes TPMs applied to computer programs, but does apply in at least some circumstances where copyrighted content is generated by a graphical content in video games).[15] The Office is particularly interested in any information or perspectives on the impact of the UK law and how operating under it contrasts or not with the U.S. experience. Alternatively, should the exemption be limited to computer programs in particular categories of devices?

The Office is interested in commenters' views on the advisability of these various approaches. Which of these models, if any, would facilitate users' ability to engage in permissible uses of software, while preserving congressional intent in supporting new ways of disseminating copyrighted materials to users?[16] Responding parties are also encouraged to suggest alternate formulations, keeping in mind the Office's goal of focusing discussion on this topic.

d. *Obsolete Technologies.* In prior rulemakings, the Copyright Office and the Librarian of Congress have considered multiple petitions to permit circumvention of an access control mechanism protecting a given class of works that fails to permit access because of malfunction, damage, or obsoleteness.[17] The Office has

---

[6] *See* Unlocking Consumer Choice and Wireless Competition Act, Public Law 113–144, sec. 2(b), 128 Stat. 1751, 1751 (2014).

[7] 2015 Final Rule, 80 FR at 65952.

[8] 17 U.S.C. 117(c).

[9] *See Aro Mfg. Co.* v. *Convertible Top Replacement Co.,* 365 U.S. 336 (1961); *see also Aro Mfg. Co.* v. *Convertible Top Replacement Co.,* 377 U.S. 476 (1964).

[10] *See Champion Spark Plug Co.* v. *Sanders,* 331 U.S. 125 (1947); *see also Karl Storz Endoscopy-America, Inc.* v. *Fiber Tech Med., Inc.,* 4 F. App'x 128, 131–32 (4th Cir. 2001) ("[T]he Lanham Act does not apply in the narrow category of cases where a trademarked product is repaired, rebuilt or modified at the request of the product's owner," so long as "the owner is not, to the repairer's knowledge, merely obtaining modifications or repairs for purposes of resale.").

[11] *See, e.g.,* H.R. 3383, 189th Gen. Ct. (Mass. 2015); S. 3998B, 2015 Leg., Reg. Sess. (N.Y. 2015); Assemb. 6068A, 2015 Leg., Reg. Sess. (N.Y. 2015); Legis. B. 1072, 104th Leg., 2d Sess. (Neb. 2016); H.R. 1048, 89th Leg., Reg. Sess. (Minn. 2015); *see also* Mass. Gen. Laws ch. 93K (2013).

[12] 17 U.S.C. 1201(f).

[13] *See* 17 U.S.C. 117(a), 107.

[14] *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.,* 387 F.3d 522, 548 (6th Cir. 2004).

[15] Copyright, Designs and Patents Act 1988, c. 48, § 296ZA (UK); *see Nintendo Co. Ltd.* v. *Playables Ltd.* [2010] EWHC 1932 (Ch) (Eng.) (construing related anti-trafficking provision).

[16] *See* Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4th, 1998, at 6 (Comm. Print 1998).

[17] *See, e.g.,* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 65 FR 64556, 64564–66, 64574 (Oct. 27, 2000) ("2000 Recommendation and Final Rule"); Exemption to Prohibition on Circumvention of Copyright Protection Systems for
Continued

**66298**    **Federal Register** / Vol. 81, No. 187 / Tuesday, September 27, 2016 / Notices

recommended, and the Librarian has adopted, multiple exemptions after finding that the definition of "obsolete" in section 108 captures the circumstances under which such an exemption was justified, *i.e.*, where the access control "is no longer manufactured or is no longer reasonably available in the commercial marketplace." [18] The Office is interested in commenters' views on whether Congress should consider a legislative amendment to permit circumvention of such faulty access controls, or whether there are other specific changes or additional provisions that Congress may wish to consider to address this issue.

e. *International Considerations.* In addition to the questions on specific proposals provided above, please discuss the interaction of these proposals with existing international obligations of the United States, including free trade agreements.

*2. Proposed Amendments to Existing Permanent Exemptions*

Some parties expressed the view that the existing permanent exemptions for security testing, encryption research, and reverse engineering [19] are not adequately accommodate good-faith research into malfunctions, security flaws, and vulnerabilities in computer programs.[20] The Office invites comment on whether legislation to address this concern may be warranted, and if so, on specific changes that should be considered. In particular, the Office

requests commenters' views on the following topics:

a. In the 2015 rulemaking, the Register recommended, and the Librarian of Congress adopted, an exemption that permits circumvention of TPMs controlling access to computer programs in the following circumstances:

(i) . . . the circumvention is undertaken on a lawfully acquired device or machine on which the computer program operates solely for the purpose of good-faith security research and does not violate any applicable law, including without limitation the Computer Fraud and Abuse Act of 1986, as amended and codified in title 18, United States Code; . . . and the device or machine is one of the following:

(A) A device or machine primarily designed for use by individual consumers (including voting machines);

(B) A motorized land vehicle; or

(C) A medical device designed for whole or partial implantation in patients or a corresponding personal monitoring system, that is not and will not be used by patients or for patient care.

(ii) For purposes of this exemption, "good-faith security research" means accessing a computer program solely for purposes of good-faith testing, investigation and/or correction of a security flaw or vulnerability, where such activity is carried out in a controlled environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.[21]

The Office is interested in commenters' views on whether this language would be appropriate for adoption as a permanent exemption, or whether there are specific changes or additional provisions that Congress may wish to consider.

b. The exemption for security testing under section 1201(j) is limited to activities undertaken "with the authorization of the owner or operator of [the] computer, computer system, or computer network." [22] In the 2015 rulemaking, the Register noted that in some cases "it may be difficult to identify the relevant owner" for purposes of this requirement and that "it may not be feasible to obtain authorization even where there is an identifiable owner." [23] Echoing those concerns, one group of commenters argued that the authorization requirement should be eliminated, while another urged Congress to provide

greater clarity in situations involving multiple owners. Please assess whether legislation may be appropriate in this area and discuss any specific legislative proposals that you believe should be considered.

c. Section 1201(j) provides a two-factor framework to determine whether a person qualifies for the security testing exemption.[24] In the 2015 rulemaking, the Register noted that these factors "would appear to be of uncertain application to at least some" security research activities.[25] Some commenters advocated the removal of one or both of these factors from the statute.[26] Please assess the advisability of such changes, or discuss any other specific legislative proposals you believe should be considered.

d. The exemption for encryption research in section 1201(g) is similarly limited to activities qualifying under a four-factor framework that includes making "a good faith effort to obtain authorization" before the circumvention.[27] In the 2015 rulemaking, the Register noted that meeting these requirements "may not always be feasible" for researchers.[28] Please assess whether legislation may be appropriate in this area and discuss any specific legislative proposals that you believe should be considered.

e. Section 1201(f) permits circumvention for the "sole purpose" of identifying and analyzing elements of computer programs necessary to achieve interoperability.[29] In the 2015 rulemaking, the Register noted that "section 1201(f)(1) is limited to circumvention solely for the identification and analysis of program elements necessary for interoperability, and does not address circumvention after that analysis has been performed." [30] Please assess whether legislation may be appropriate in this area and discuss any specific legislative proposals that you believe should be considered.

*3. Anti-Trafficking Provisions*

Commenters offered differing views regarding the role of the anti-trafficking provisions under sections 1201(a)(2) and 1201(b). User groups expressed

---

Access Control Technologies, Final Rule, 68 FR 62011, 62013–16 (Oct. 31, 2003) ("2003 Final Rule"); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 71 FR 68472, 68474–75, 68480 (Nov. 27, 2006) ("2006 Final Rule"); Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 75 FR 43825, 43833–34, 43839 (July 27, 2010) ("2010 Final Rule"); 2015 Final Rule, 80 FR at 65955, 65961.

[18] 17 U.S.C. 108(c); *see, e.g.,* 2000 Recommendation and Final Rule, 65 FR at 64565–66; Recommendation of the Register of Copyrights in RM 2002–4; Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 40 (Oct. 27, 2003); 2003 Final Rule, 68 FR at 62013–14; Recommendation of the Register of Copyrights in RM 2005–11; Rulemaking on Exemptions from Prohibition on Circumvention of Access Control Technologies 36 & n.165 (Nov. 17, 2006); 2006 Final Rule, 71 FR at 68475.

[19] 17 U.S.C. 1201(f), (g), (j).

[20] Similarly, in the 2015 rulemaking, the Register noted that section 1201(j) "does not seem sufficiently robust in light of the perils of today's connected world." U.S. Copyright Office, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention 3 (2015), *http://copyright.gov/1201/2015/registersrecommendation.pdf* ("2015 Recommendation").

[21] 2015 Recommendation at 319–20; 2015 Final Rule, 80 FR at 65956.

[22] 17 U.S.C. 1201(j)(1).

[23] 2015 Recommendation at 309.

[24] 17 U.S.C. 1201(j)(3).

[25] 2015 Recommendation at 309.

[26] The proposed Breaking Down Barriers to Innovation Act of 2015 would eliminate the two-factor framework, as well as the multifactor framework under section 1201(g)(3). H.R. 1883, 114th Cong. sec. 3(c)(3), 3(e)(2) (2015); S. 990, 114th Cong. sec. 3(c)(3), 3(e)(2) (2015).

[27] 17 U.S.C. 1201(g)(2)(C).

[28] 2015 Recommendation at 307.

[29] 17 U.S.C. 1201(f).

[30] 2015 Recommendation at 337 n.2295.

concern that, to the extent these provisions prohibit third parties from providing assistance to beneficiaries of exemptions, or prohibit the making and distribution of necessary tools, they undermine beneficiaries' practical ability to engage in the permitted conduct. Copyright owners, however, cautioned against amendment of the anti-trafficking provisions, arguing that because circumvention tools may be used for lawful and unlawful purposes alike, it would be impossible to ensure that tools manufactured and distributed pursuant to an exemption, once available in the marketplace, would be employed solely for authorized uses. The Office is interested in receiving additional views on this topic, and specifically invites comment on the following issues:

a. A few parties argued that section 1201 contains an implied right permitting a beneficiary of a statutory or administrative exemption to make a tool for his or her own use in engaging in the permitted circumvention. What are commenters' views regarding this interpretation of the statute? To what extent, if any, does the statutory prohibition on the "manufacture" of circumvention tools affect the analysis? [31] If such a right is not currently implied, or the question is uncertain, should Congress consider amending the statute to expressly permit such activity, while maintaining the prohibition against trafficking in such tools?

b. Some parties suggested that, in certain circumstances, third-party assistance may fall outside the scope of the anti-trafficking provisions and therefore may be permissible under current law. What are commenters' views regarding this interpretation of the statute? Are there forms of third-party assistance that do not qualify as a "service" within the meaning of sections 1201(a)(2) and 1201(b)(1)? If so, what considerations are relevant to this analysis?

Dated: September 21, 2016.

**Maria A. Pallante,**
*Register of Copyrights, U.S. Copyright Office.*
[FR Doc. 2016–23167 Filed 9–26–16; 8:45 am]
**BILLING CODE 1410–30–P**

---

[31] *See* 17 U.S.C. 1201(a)(2), (b)(1).

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

**[Notice: (16–068)]**

### NASA International Space Station Advisory Committee; Meeting

**AGENCY:** National Aeronautics and Space Administration (NASA).

**ACTION:** Notice of meeting.

**SUMMARY:** In accordance with the Federal Advisory Committee Act, Public Law 92–463, as amended, the National Aeronautics and Space Administration announces a meeting of the NASA International Space Station (ISS) Advisory Committee. The purpose of the meeting is to review all aspects related to the safety and operational readiness of the ISS, and to assess the possibilities for using the ISS for future space exploration.

**DATES:** Monday, October 31, 2016, 2:00–3:00 p.m., Local Time.

**ADDRESSES:** NASA Headquarters, Glennan Conference Room (1Q39), 300 E Street SW., Washington, DC 20546. Note: 1Q39 is located on the first floor of NASA Headquarters.

**FOR FURTHER INFORMATION CONTACT:** Mr. Patrick Finley, Office of International and Interagency Relations, (202) 358–5684, NASA Headquarters, Washington, DC 20546–0001.

**SUPPLEMENTARY INFORMATION:** This meeting will be open to the public up to the seating capacity of the room. This meeting is also accessible via teleconference. To participate telephonically, please contact Mr. Finley at (202) 358–5684 before 4:30 p.m., Local Time, October 26, 2016. You will need to provide your name, affiliation, and phone number.

Attendees will be requested to sign a register and to comply with NASA security requirements, including the presentation of a valid picture ID to Security before access to NASA Headquarters. Due to the Real ID Act, Public Law 109–13, any attendees with driver's licenses issued from non-compliant states/territories must present a second form of ID. [Federal employee badge; passport; active military identification card; enhanced driver's license; U.S. Coast Guard Merchant Mariner card; Native American tribal document; school identification accompanied by an item from LIST C (documents that establish employment authorization) from the "List of the Acceptable Documents" on Form I–9]. Non-compliant states/territories are: American Samoa, Minnesota, Missouri, and Washington. Foreign nationals attending this meeting will be required to provide a copy of their passport and visa in addition to providing the following information no less than 10 working days prior to the meeting: Full name; gender; date/place of birth; citizenship; passport information (number, country, telephone); visa information (number, type, expiration date); employer/affiliation information (name of institution, address, country, telephone); title/position of attendee; and home address to Mr. Finley via email at *patrick.t.finley@nasa.gov* or by telephone at (202) 358–5684. U.S. citizens and Permanent Residents (Green Card holders) can provide full name and citizenship status 3 working days prior to the meeting to Mr. Finley. It is imperative that the meeting be held on this date to accommodate the scheduling priorities of the key participants.

**Patricia D. Rausch,**
*Advisory Committee Management Officer, National Aeronautics and Space Administration.*
[FR Doc. 2016–23242 Filed 9–26–16; 8:45 am]
**BILLING CODE 7510–13–P**

---

## NATIONAL SCIENCE FOUNDATION

### Agency Information Collection Activities: Comment Request

**AGENCY:** National Science Foundation.

**ACTION:** Submission for OMB review; comment request.

**SUMMARY:** The National Science Foundation (NSF) has submitted the following information collection requirement to OMB for review and clearance under the Paperwork Reduction Act of 1995, Public Law 104–13. This is the second notice for public comment; the first was published in the **Federal Register** at 81 FR 36962, and no comments were received. NSF is forwarding the proposed renewal submission to the Office of Management and Budget (OMB) for clearance simultaneously with the publication of this second notice. The full submission (including comments) may be found at: *http://www.reginfo.gov/public/do/PRAMain.* Comments regarding (a) whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (b) the accuracy of the agency's estimate of burden including the validity of the methodology and assumptions used; (c) ways to enhance the quality, utility and clarity of the information to be collected; (d) ways to minimize the burden of the collection of information on those who are to

**APPENDIX B**    COMMENTING PARTIES AND
ROUNDTABLE PARTICIPANTS

LOC_AR_00009395

**Parties Who Submitted Initial Comments in Response**
**to the December 29, 2015 Notice of Inquiry**

1. ACM US Public Policy Council

2. ACT | The App Association

3. Alliance of Automobile Manufacturers

4. American Association of Law Libraries

5. American Foundation for the Blind

6. American Intellectual Property Law Association

7. Anderson, Marjorie

8. Anonymous, Anonymous

9. Anonymous, Brandon

10. Association of American Publishers, Motion Picture Association of America & Recording Industry Association of America

11. Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities & Educause 1

12. Authors Alliance

13. Auto Care Association 1

14. Brickel, Joshua

15. BSA | The Software Alliance

16. Center for Democracy & Technology

17. Competitive Carriers Association

18. Consumer Technology Association

19. Consumers Union

20. Copyright Alliance

21. Cyberlaw Clinic at Harvard Law School

22. Decherney, Peter

Appendix B–1

LOC_AR_00009396

23. <u>Devorah, Carrie</u>

24. <u>DIYAbility</u>

25. <u>Dulaney, John</u>

26. <u>DVD Copy Control Association & Advanced Access Content System Licensing Administrator, LLC</u>

27. <u>Electronic Frontier Foundation</u>

28. <u>Entertainment Software Association</u>

29. <u>Freeman, Jay</u>

30. <u>Ganivet, Nicolas</u>

31. <u>Howes, Timothy</u>

32. <u>Hunt, Otto</u>

33. <u>Hunt, Peter</u>

34. <u>iFixit</u>

35. <u>Institute of Scrap Recycling Industries, Inc.</u>

36. <u>International Documentary Association, Film Independent & Kartemquin Educational Films</u>

37. <u>Kernochan Center for Law, Media and the Arts</u>

38. <u>Knowledge Ecology International</u>

39. <u>Koberidze, Maryna</u>

40. <u>Learning Disabilities Association of America</u>

41. <u>Library Copyright Alliance</u>

42. <u>Massachusetts Institute of Technology Libraries, Massachusetts Institute of Technology Press & Massachusetts Institute of Technology Office of Digital Learning</u>

43. <u>Microsoft Corporation</u>

44. <u>Mozilla</u>

45. <u>New America's Open Technology Institute</u>

46. <u>New Media Rights</u>

LOC_AR_00009397

47. Olivo, Peter

48. Organization for Transformative Works

49. Oster, David

50. Owners' Rights Initiative

51. Pearson, Timothy

52. Public Knowledge

53. R Street Institute

54. R Street Institute, FreedomWorks & Niskanen Center

55. Rapid7, Bugcrowd & HackerOne

56. Robbins, Rico

57. Rocha, Matias

58. Romeo, Dominic

59. Silas, Shelia

60. Society of American Archivists

61. Software and Information Industry Association 1

62. Static Control Components, Inc. 1

63. Starelikemckeehen Poker Club

64. University of Virginia Library

65. USC Intellectual Property and Technology Law Clinic

66. Westbay, Michael

67. Yeates, Nick

68. Ymous, Anon

LOC_AR_00009398

## Parties Who Submitted Reply Comments in Response
## to the December 29, 2015 Notice of Inquiry

1. Alliance of Automobile Manufacturers

2. American Automobile Association

3. Association of American Publishers, Motion Picture Association & Recording Institute Association of America

4. Blocher-Smith, Ethan

5. Copyright Alliance

6. Decherney, Peter

7. Duan, Charles

8. DVD Copy Control Association & Advanced Access Content System Licensing Administrator, LLC

9. Electronic Frontier Foundation

10. Entertainment Software Association

11. International Association of Scientific Technical and Medical Publishers

12. International Documentary Association, Film Independent, Kartemquin 1 Filmmaker Project, Indie Caucus, The National Alliance for Media Arts and Culture, New Media Rights & Women in Film & Video

13. Library Copyright Alliance

14. Public Knowledge

15. Software and Information Industry Association

16. USC Intellectual Property and Technology Law Clinic

LOC_AR_00009399

## Parties Who Submitted Additional Comments in Response
## to the September 27, 2016 Notice of Inquiry

1.  American Association of Law Libraries

2.  American Foundation for the Blind, American Council of the Blind,
    National Federation of the Blind, Learning Ally & Samuelson-Glushko
    Technology Law & Policy Clinic

3.  Anonymous, Anonymous

4.  Association of American Publishers, Entertainment Software Association,
    Motion Picture Association of America & Recording Institute Association
    of America

5.  Association of Equipment Manufacturers & Equipment Dealers
    Association

6.  Author Services, Inc.

7.  Authors Alliance

8.  Auto Care Association

9.  BSA | The Software Alliance

10. Center for Democracy & Technology

11. CERT Coordination Center

12. Cohen, Misha

13. Competitive Carriers Association

14. Consumer Technology Association

15. Copyright Alliance

16. DVD Copy Control Association & Advanced Access Content System
    Licensing Administrator, LLC

17. Ehrhart, Brian

18. Electronic Frontier Foundation

19. Eshom, Jeff

20. Flit, Mike 1

LOC_AR_00009400

21. Free Software Foundation

22. Hawley, Andy

23. Institute of Scrap Recycling Industries, Inc.

24. International Imaging Technology Council & Static Control Components, Inc.

25. Izquierdo, Cecilio

26. Josephs, John

27. Kalfus, Eleni

28. Library Copyright Alliance

29. Maciulski, Victoria

30. Matthews, Edward

31. Motor & Equipment Manufacturers Association

32. Mozilla

33. Oeth, Michael

34. Owners' Rights Initiative

35. Public Knowledge

36. Rapid7, Bugcrowd, HackerOne & Luta Security

37. Repair Association & iFixit

38. Schechter, Michael

39. Security Researchers

40. Society of American Archivists

41. Software and Information Industry Association 1

42. Software Preservation Network

43. University Library of the University of Illinois at Urbana-Champaign

LOC_AR_00009401

## Parties Who Submitted Reply Comments in Response
## to the September 27, 2016 Notice of Inquiry

1. <u>Association of American Publishers, Entertainment Software Association, Motion Picture Association of America & Recording Institute Association of America</u>

2. <u>Auto Care Association</u>

3. <u>Consumers Union</u>

4. <u>Copyright Alliance</u>

5. <u>DVD Copy Control Association & Advanced Access Content System Licensing Administrator, LLC</u>

6. <u>Electronic Frontier Foundation</u>

7. <u>Horton, Michael</u>

8. <u>Kenney, Kevin</u>

9. <u>Kernochan Center for Law, Media and the Arts</u>

10. <u>Lu, Yifan</u>

11. <u>New York Intellectual Property Law Association</u>

12. <u>Public Knowledge</u>

13. <u>Repair Association & iFixit</u>

14. <u>Software and Information Industry Association</u> 1

LOC_AR_00009402

# Participants in the Washington, DC Hearings
## (May 19–20, 2016)

1. Adler, Allan (Association of American Publishers)

2. Band, Jonathan (Library Copyright Alliance)

3. Besek, June M. (Kernochan Center for Law, Media & the Arts)

4. Butler, Brandon (University of Virginia Library)

5. Castillo, Sofia (Association of American Publishers)

6. Cazares, Gabe (National Federation of the Blind)

7. Cox, Krista L. (Association of Research Libraries)

8. Decherney, Peter (University of Pennsylvania)

9. Dow, Troy (The Walt Disney Company)

10. Geiger, Harley (Rapid7)

11. Goldman, Andrew (Knowledge Ecology International)

12. Greene, Robyn (New America's Open Technology Institute)

13. Greenstein, Seth (Auto Care Association)

14. Koberidze, Maryna (LL.M. Graduate (IP Law))

15. Kupferschmid, Keith (Copyright Alliance)

16. Love, James (Knowledge Ecology International)

17. Lowe, Aaron (Auto Care Association)

18. Manners, Derek (National Federation for the Blind)

19. McClure, Sam (Institute of Scrap Recycling Industries, Inc.)

20. Mohr, Chris (Software & Information Industry Association)

21. Panjwani, Raza (Public Knowledge)

22. Perry, David M. (Blank Rome LLP)

23. Pierre-Louis, Stanley (Entertainment Software Association)

LOC_AR_00009403

24. Schwartz, Robert S. (Consumer Technology Association)

25. Sheffner, Ben (Motion Picture Association of America)

26. Slover, George P. (Consumers Union)

27. Turnbull, Bruce H. (DVD Copy Control Association & Advanced Access Licensing Administration, LLC)

28. Tushnet, Rebecca (Organization for Transformative Works)

29. Weissenberg, Brian (Institute of Scrap Recycling Industries, Inc.)

30. Williams, Matthew (Association of American Publishers, Motion Picture Association of America & Recording Industry Association of America)

31. Zuck, Jonathan (ACT | The App Association)

LOC_AR_00009404

## Participants in the San Francisco, CA Hearings
## (May 25, 2016)

1. Chertkof, Susan (Recording Industry Association of America)

2. Gellis, Cathy (Digital Age Defense)

3. Golant, Ben (Entertainment Software Association)

4. LaBarre, Scott (National Federation of the Blind)

5. Lerner, Jack I. (International Documentary Association, Film Independent & Kartemquin Educational Films)

6. McClure, Sam (American Federation for the Blind)

7. Metalitz, Steve (Association of American Publishers, Motion Picture Association of America & Recording Industry Association of America)

8. Quinn, Brian (American Foundation for the Blind)

9. Reed, Chris (Fox Entertainment Group)

10. Riley, Chris (Mozilla)

11. Samuelson, Pamela (UC Berkeley School of Law)

12. Sheffner, Ben (Motion Picture Association of America)

13. Stoltz, Mitch (Electronic Frontier Foundation)

14. Wiens, Kyle (iFixit & Repair.org)

15. Wolfe, Michael (Authors Alliance)

LOC_AR_00009405

**APPENDIX C** ABBREVIATIONS

U.S. COPYRIGHT OFFICE

LOC_AR_00009406

# Abbreviations

| | |
|---|---|
| AAA | American Automobile Association |
| AALL | American Association of Law Libraries |
| AAP | Association of American Publishers |
| AAP, MPAA & RIAA | Association of American Publishers, Motion Picture Association of America, Inc. & Recording Industry Association of America |
| AAP, ESA, MPAA & RIAA | Association of American Publishers, Entertainment Software Association, Motion Picture Association of America, Inc. & Recording Industry Association of America |
| AAU, ACE, APLU & EDUCAUSE | Association of American Universities, American Council on Education, Association of Public and Land-Grant Universities & EDUCAUSE |
| ACT | ACT | The App Association |
| AEM & EDA | Association of Equipment Manufacturers & Equipment Dealers Association |
| AFB | American Foundation for the Blind |
| AIPLA | American Intellectual Property Law Association |
| Auto Alliance | Alliance of Automobile Manufacturers |
| Auto Care | Auto Care Association |
| BSA | BSA | The Software Alliance |
| CDT | Center for Democracy & Technology |
| CERT | CERT Coordination Center |
| CTA | Consumer Technology Association |
| Cyberlaw Clinic | Cyberlaw Clinic at Harvard Law School |
| DVD CCA & AACS LA | DVD Copy Control Association & Access Content System Licensing Administrator, LLC |
| EFF | Electronic Frontier Foundation |

Appendix C–1

| | |
|---|---|
| ESA | Entertainment Software Association |
| IPT USC | USC Intellectual Property and Technology Law Clinic |
| ISRI | Institute of Scrap Recycling Industries, Inc. |
| Joint Filmmakers I | International Documentary Association, Film Independent & Kartemquin Educational Films |
| Joint Filmmakers II | International Documentary Association, Film Independent, Kartemquin Educational Films, Independent Filmmaker Project, Indie Caucus, The National Alliance for Media Arts and Culture, New Media Rights & Women in Film and Video |
| KEI | Knowledge Ecology International |
| Kernochan Center | Kernochan Center for Law, Media and the Arts at Columbia Law School |
| LCA | Library Copyright Alliance |
| LDAA | Learning Disabilities Association of America |
| MEMA | Motor and Equipment Manufacturers Association |
| Microsoft | Microsoft Corporation |
| MIT | Massachusetts Institute of Technology Libraries, Massachusetts Institute of Technology Press & Massachusetts Institute of Technology Office of Digital Learning |
| MPAA | Motion Picture Association of America, Inc. |
| NMR | New Media Rights |
| NYIPLA | The New York Intellectual Property Law Association |
| ORI | Owners' Rights Initiative |
| OTI | New America's Open Technology Institute |
| OTW | Organization for Transformative Works |
| RIAA | Recording Industry Association of America |
| SAA | Society of American Archivists |
| Security Researchers | Andrea Matwyshyn, Steve Bellovin, Matt Blaze, Alex Halderman & Nadia Heninger |

Appendix C–2

LOC_AR_00009408

SIIA                          Software and Information Industry Association

USACM                         ACM U.S. Public Policy Council

LOC_AR_00009409

U.S. COPYRIGHT OFFICE  ·  LIBRARY OF CONGRESS  ·  101 INDEPENDENCE AVENUE SE  ·  WASHINGTON, DC 20559-6000  ·  WWW.COPYRIGHT.GOV

LOC_AR_00009410