APPEAL,CLOSED,TYPE–C

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:22–cv–00499–BAH</u>

| | |
|---|---|
| MEDICAL IMAGING & TECHNOLOGY ALLIANCE et al v. LIBRARY OF CONGRESS et al<br>Assigned to: Judge Beryl A. Howell<br>Cause: 05:702 Administrative Procedure Act | Date Filed: 02/25/2022<br>Date Terminated: 03/08/2023<br>Jury Demand: None<br>Nature of Suit: 890 Other Statutory Actions<br>Jurisdiction: U.S. Government Defendant |

**Plaintiff**

| **MEDICAL IMAGING & TECHNOLOGY ALLIANCE** | represented by | **Alex Christopher Boota**<br>MCDERMOTT WILL & EMERY<br>500 North Capitol Street NW<br>Washington, DC 20001<br>202–756–8998<br>Email: aboota@mwe.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
|---|---|---|
| | | **Michael Branch Kimberly**<br>MCDERMOTT WILL & EMERY LLP<br>500 N. Capital Street, NW<br>The McDermott Building<br>Washington, DC 20001<br>202–756–8901<br>Email: mkimberly@mwe.com<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| **ADVANCED MEDICAL TECHNOLOGY ASSOCIATION** | represented by | **Alex Christopher Boota**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
|---|---|---|
| | | **Michael Branch Kimberly**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| **LIBRARY OF CONGRESS** | represented by | **Rachael Lynn Westmoreland**<br>U.S. DEPARTMENT OF JUSTICE<br>1100 L St, NW<br>Washington, DC 20005<br>(202) 514–1280 |
|---|---|---|

1

Email: rachael.westmoreland@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CARLA HAYDEN**                                                  represented by   **Rachael Lynn Westmoreland**
*in her official capacity as Librarian of*                                        (See above for address)
*Congress*                                                                        *LEAD ATTORNEY*
                                                                                  *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/25/2022 | 1 | COMPLAINT against CARLA HAYDEN, LIBRARY OF CONGRESS ( Filing fee $ 402 receipt number ADCDC–9066179) filed by MEDICAL IMAGING & TECHNOLOGY ALLIANCE, ADVANCED MEDICAL TECHNOLOGY ASSOCIATION. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Summons, # 6 Summons, # 7 Civil Cover Sheet)(Kimberly, Michael) (Entered: 02/25/2022) |
| 02/25/2022 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by MEDICAL IMAGING & TECHNOLOGY ALLIANCE (Kimberly, Michael) (Entered: 02/25/2022) |
| 02/25/2022 | 3 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION (Kimberly, Michael) (Entered: 02/25/2022) |
| 02/25/2022 | 4 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Alex C. Boota, Filing fee $ 100, receipt number ADCDC–9066585. Fee Status: Fee Paid. by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Kimberly, Michael) (Entered: 02/25/2022) |
| 03/02/2022 | | Case Assigned to Chief Judge Beryl A. Howell. (zsb) (Entered: 03/02/2022) |
| 03/02/2022 | 5 | STANDING ORDER. Signed by Chief Judge Beryl A. Howell on March 2, 2022. (lcbah4) (Entered: 03/02/2022) |
| 03/02/2022 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 4 Motion for Admission *Pro Hac Vice* of Alex C. Boota. Mr. Boota may enter an appearance *pro hac vice* for the purpose of representing plaintiffs in this action. Signed by Chief Judge Beryl A. Howell on March 2, 2022. (lcbah4) (Entered: 03/02/2022) |
| 03/04/2022 | 6 | NOTICE of Appearance by Alex Christopher Boota on behalf of All Plaintiffs (Boota, Alex) (Entered: 03/04/2022) |
| 03/04/2022 | 7 | SUMMONS (2) Issued Electronically as to CARLA HAYDEN, LIBRARY OF CONGRESS. (Attachment: # 1 Notice and Consent)(zeg) (Entered: 03/04/2022) |
| 03/07/2022 | 8 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 3/4/2022. Answer due for ALL FEDERAL DEFENDANTS by 5/3/2022. (Kimberly, Michael) (Entered: 03/07/2022) |

| 03/11/2022 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General March 9, 2022. (Kimberly, Michael) (Entered: 03/11/2022) |
|---|---|---|
| 03/29/2022 | 10 | MOTION for Summary Judgment by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Kimberly, Michael) (Entered: 03/29/2022) |
| 03/29/2022 | 11 | MOTION for Briefing Schedule by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Text of Proposed Order)(Kimberly, Michael) (Entered: 03/29/2022) |
| 03/29/2022 | | MINUTE ORDER (paperless) DIRECTING the government to provide a response, by April 5, 2022, to plaintiffs' 11 Motion to Set a Briefing Schedule for Dispositive Cross−Motions, stating its position regarding plaintiffs' proposed briefing schedule and explaining any opposition. Signed by Chief Judge Beryl A. Howell on March 29, 2022. (lcbah4) (Entered: 03/29/2022) |
| 03/29/2022 | | Set/Reset Deadlines: Government's response to plaintiffs' 11 Motion to Set a Briefing Schedule for Dispositive Cross−Motions due by 4/5/2022. (ztg) (Entered: 03/29/2022) |
| 04/05/2022 | 12 | NOTICE of Appearance by Rachael Lynn Westmoreland on behalf of All Defendants (Westmoreland, Rachael) (Entered: 04/05/2022) |
| 04/05/2022 | 13 | Memorandum in opposition to re 11 MOTION for Briefing Schedule filed by CARLA HAYDEN, LIBRARY OF CONGRESS. (Westmoreland, Rachael) (Entered: 04/05/2022) |
| 04/05/2022 | 14 | MOTION to Stay re 10 MOTION for Summary Judgment by CARLA HAYDEN, LIBRARY OF CONGRESS. (Attachments: # 1 Text of Proposed Order)(Westmoreland, Rachael) (Entered: 04/05/2022) |
| 04/07/2022 | | MINUTE ORDER (paperless) GRANTING IN PART and DENYING IN PART plaintiffs' 11 Motion to Set a Briefing Schedule for Dispositive Cross−Motions; GRANTING IN PART and DENYING IN PART defendants' 14 Motion to Stay Plaintiffs' Motion for Summary Judgment; and ISSUING the following SCHEDULING ORDER: (1) by May 24, 2022, defendants shall file any motion to dismiss, consolidated with any opposition to plaintiffs' 10 Motion for Summary Judgment, and any cross−motion for summary judgment; (2) by June 15, 2022, plaintiffs shall file any reply in support of their 10 Motion for Summary Judgment, and any opposition to defendants' motion to dismiss and cross−motion for summary judgment; and (3) by June 30, 2022, defendants shall file any reply in support of their motion to dismiss and cross−motion for summary judgment. Signed by Chief Judge Beryl A. Howell on April 7, 2022. (lcbah4) (Entered: 04/07/2022) |
| 04/08/2022 | | Set/Reset Deadlines: Defendants' motion to dismiss consolidated with any opposition to plaintiffs' 10 Motion for Summary Judgment, and any cross−motion due by 5/24/2022; plaintiffs' reply in support of their 10 Motion for Summary Judgment, and any opposition to defendants' motion to dismiss and cross−motion due by 6/15/2022; defendants' reply in support of their motion to dismiss and cross−motion due by 6/30/2022. (ztg) (Entered: 04/08/2022) |

| 05/24/2022 | 15 | ADMINISTRATIVE RECORD *Notice of Filing Certified List of Contents* by CARLA HAYDEN, LIBRARY OF CONGRESS. (Attachments: # 1 Exhibit A)(Westmoreland, Rachael) (Entered: 05/24/2022) |
|---|---|---|
| 05/24/2022 | 16 | MOTION to Dismiss *or in the Alternative* MOTION for Summary Judgment by CARLA HAYDEN, LIBRARY OF CONGRESS. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Westmoreland, Rachael). Added MOTION for Summary Judgment on 5/25/2022 (zeg). (Entered: 05/24/2022) |
| 05/24/2022 | 17 | Memorandum in opposition to re 10 MOTION for Summary Judgment filed by CARLA HAYDEN, LIBRARY OF CONGRESS. (Westmoreland, Rachael) (Entered: 05/24/2022) |
| 06/15/2022 | 18 | REPLY to opposition to motion re 10 MOTION to Dismiss filed by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Kimberly, Michael) Modified docket relationship on 6/16/2022 (zeg). (Entered: 06/15/2022) |
| 06/15/2022 | | NOTICE OF ERROR re 18 Reply to opposition to Motion; emailed to mkimberly@mwe.com, cc'd 4 associated attorneys –– The PDF file you docketed contained errors: 1. **Please note the following deficiency and file/refile document as instructed**, 2. Two–part document; second docket entry is required, 3. FYI: Please also file using Memorandum in opposition to event. (zeg, ) (Entered: 06/15/2022) |
| 06/15/2022 | 19 | Memorandum in opposition to re 16 MOTION to Dismiss *or in the Alternative for Summary Judgment* MOTION for Summary Judgment filed by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Kimberly, Michael) (Entered: 06/15/2022) |
| 06/30/2022 | 20 | REPLY to opposition to motion re 16 MOTION to Dismiss *or in the Alternative for Summary Judgment* MOTION for Summary Judgment filed by CARLA HAYDEN, LIBRARY OF CONGRESS. (Westmoreland, Rachael) (Entered: 06/30/2022) |
| 08/03/2022 | 21 | NOTICE OF SUPPLEMENTAL AUTHORITY by CARLA HAYDEN, LIBRARY OF CONGRESS (Westmoreland, Rachael) (Entered: 08/03/2022) |
| 08/23/2022 | 22 | STRICKEN PURSUANT TO MINUTE ORDER ENTERED ON 8/24/2022.....NOTICE *regarding oral argument schedule* by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE (Kimberly, Michael) Modified on 8/25/2022 (hmc). (Entered: 08/23/2022) |
| 08/24/2022 | | MINUTE ORDER (paperless) STRIKING, without prejudice, plaintiffs' 22 Notice Regarding Oral Argument Schedule for failure to comply with this Court's Local Rules, which prohibit the directing of "correspondence...to a judge," D.D.C. LCvR 5.1(a), and require requests for oral hearings to be made in motion form, D.D.C. LCvR 7(f). *See also* 5 Standing Order paras. 6.a & c. Signed by Chief Judge Beryl A. Howell on August 24, 2022. (lcbah4) (Entered: 08/24/2022) |
| 08/25/2022 | 23 | Joint MOTION for Leave to File *granting leave to file appendix out of time* by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Appendix, # 2 Appendix, # 3 Appendix, # 4 Appendix, # 5 Appendix, # 6 Appendix, # 7 Text of Proposed Order)(Kimberly, Michael) Modified event on 8/29/2022 (znmw). (Entered: 08/25/2022) |
| 08/26/2022 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER (paperless) GRANTING the parties' 23 Joint Motion for Leave to File Joint Appendix Out of Time and DIRECTING the parties to file on the docket the joint appendix, submitted as an exhibit to their 23 Joint Motion. Signed by Chief Judge Beryl A. Howell on August 26, 2022. (lcbah4) (Entered: 08/26/2022) |
| 08/29/2022 | 24 | JOINT APPENDIX by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Appendix Volume 1, # 2 Appendix Volume 2, # 3 Appendix Volume 3, # 4 Appendix Volume 4, # 5 Appendix Volume 5, # 6 Appendix Volume 6)(Kimberly, Michael) (Entered: 08/29/2022) |
| 09/06/2022 | 25 | MOTION for Hearing by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. (Attachments: # 1 Text of Proposed Order)(Kimberly, Michael) (Entered: 09/06/2022) |
| 03/07/2023 | 26 | ORDER GRANTING defendants' 16 Cross–Motion to Dismiss and DENYING plaintiffs' 10 Motion for Summary Judgment. See order for further details. Signed by Chief Judge Beryl A. Howell on March 7, 2023. (lcbah4) (Entered: 03/07/2023) |
| 03/07/2023 | 27 | MEMORANDUM OPINION regarding plaintiffs' 10 Motion for Summary Judgment and defendants' 16 Cross–Motion to Dismiss. Signed by Chief Judge Beryl A. Howell on March 7, 2023. (lcbah4) (Entered: 03/07/2023) |
| 03/24/2023 | 28 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 26 Order on Motion for Summary Judgment by ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, MEDICAL IMAGING & TECHNOLOGY ALLIANCE. Filing fee $ 505, receipt number ADCDC–9952570. Fee Status: Fee Paid. Parties have been notified. (Kimberly, Michael) (Entered: 03/24/2023) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MEDICAL IMAGING &
TECHNOLOGY ALLIANCE, et al.,

*Plaintiffs*,

*v.*

LIBRARY OF CONGRESS, et al.,

*Defendants*.

No. 1:22-cv-499 (BAH)

**NOTICE OF APPEAL**

Notice is hereby given that plaintiffs Medical Imaging & Technology Alliance and Advanced Medical Technology Association appeal to the United States Court of Appeals for the District of Columbia Circuit from the March 7, 2023 final order granting the defendants' motion to dismiss, along with all other orders and decisions that merge therein.

Dated: March 24, 2023

Respectfully submitted,

*/s/ Michael B. Kimberly*

Peter Tolsdorf (Bar No. 503476)
   NATIONAL ELECTRICAL
      MANUFACTURERS ASSOCIATION
   *1300 17th Street North, No. 900*
   *Arlington, VA 22209*
   *(703) 841-3200*

*Counsel for Medical Imaging &
Technology Alliance*

Terry Chang (Bar No. 503476)
   ADVANCED MEDICAL
      TECHNOLOGY ASSOCIATION
   *701 Pennsylvania Ave. NW, Ste. 800*
   *Washington, DC 20004*
   (202) 783-8700

*Counsel for Advanced Medical
Technology Association*

Michael B. Kimberly (Bar No. 991549)
Alex C. Boota (*pro hac vice*)
   MCDERMOTT WILL & EMERY LLP
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*
   *mkimberly@mwe.com*

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDICAL IMAGING & TECHNOLOGY ALLIANCE, *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>LIBRARY OF CONGRESS, *et al.*<br><br>                    Defendants. | Civil Action No. 22-499 (BAH)<br><br>Chief Judge Beryl A. Howell |

## <u>ORDER</u>

Upon consideration of the plaintiffs' Motion for Summary Judgment, ECF No. 10, defendants' Cross-Motion to Dismiss, or, in the alternative, Cross-Motion for Summary Judgment, ECF No. 16, the legal memoranda in support and in opposition, and the exhibits attached thereto, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby:

**ORDERED** that defendants' Cross-Motion to Dismiss, ECF No. 16, is **GRANTED**; it is further

**ORDERED** that plaintiffs' Motion for Summary Judgment, ECF No. 10, is **DENIED**; it is further

**ORDERED** that the plaintiffs' Complaint, ECF No. 1, is dismissed with prejudice; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**SO ORDERED**.

Date: March 7, 2023

*This is a final and appealable order.*

_____
BERYL A. HOWELL
CHIEF JUDGE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDICAL IMAGING & TECHNOLOGY ALLIANCE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> LIBRARY OF CONGRESS, *et al.* <br><br> Defendants. | Civil Action No. 22-499 (BAH) <br><br> Chief Judge Beryl A. Howell |

<u>**MEMORANDUM OPINION**</u>

Nearly twenty-five years ago, Congress passed the Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. § 1201 *et seq*., to address the risks that the internet and new digital technology posed to copyrighted works. At the same time, Congress also recognized that changing marketplace realities and ever-evolving digital technologies might make some of the DMCA's tools to combat digital piracy harmful to innovation and non-infringing uses of copyrighted materials. To provide flexibility in accommodating those varied policy interests, Congress authorized the Librarian of Congress ("Librarian") to promulgate exceptions every three years to certain statutory proscriptions, including the DMCA's prohibition on circumvention of technological protection measures used by copyright owners to prevent access to their copyrighted works ("TPMs"). This authority is at issue in this case.

On October 28, 2021, pursuant to her triennial rulemaking authority under the DMCA, the Librarian adopted a final rule, effective the same date, that exempts parties accessing copyrighted software for the purpose of diagnosis, maintenance, and repair of medical devices from the statute's proscription barring the circumvention of TPMs. Final Rule, *Exemption to Prohibition*

1

*on Circumvention of Copyright Protection Systems for Access Control Technologies*, 86 Fed. Reg. 59,627, 59,628 (Oct. 28, 2021) ("Exemption"), codified at 37 C.F.R. § 201.40.  Four months after the Final Rule went into effect, plaintiffs—the Medical Imaging & Technology Alliance and the Advanced Medical technology Association, which are membership-based trade associations for manufacturers of medical imaging equipment manufacturers, *see* Compl. ¶¶ 16-17, ECF No. 1— initiated this lawsuit against defendants, the Library of Congress ("Library") and the Librarian to challenge the Exemption.  Specifically, plaintiffs seek to have the Exemption for repair of medical devices set aside and declared to be unlawful and void, and any enforcement by defendants enjoined, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201, and this Court's inherent equitable powers.  *Id.* ¶ 24, Prayer for Relief.[1]

Now pending are the parties cross-motions for summary judgment.  *See* Pls.' Mot. Summ. J. ("Pls.' Mot."), ECF No. 10; Defs.' Cross-Mot. Dismiss, ECF No. 16; Defs.' Mem. Supp. Cross-Mot. Dismiss ("Defs.' Cross-Mem."), ECF No. 16-1.  For the reasons explained below, defendants' motion to dismiss is granted, and plaintiffs' motion for summary judgment is denied.

# I.    BACKGROUND

The relevant statutory and regulatory scheme is described below, followed by a summary of the factual and procedural background to this case.

## A.  Statutory and Regulatory Scheme

---

[1]    The Administrative Record ("AR") in this case is voluminous and, in accordance with the local rules, the parties filed a Joint Appendix, containing portions of the AR cited or otherwise relied upon for the pending motions.  *See* D.D.C. LCVR 7(n); Joint App'x at 1, ECF No. 24.  The 9,410-page Joint Appendix is docketed in six separate attachments, *see* ECF Nos. 24-1–24-6.  For clarity, "AR" citations herein are to those documents from the administrative record found in the Joint Appendix.

The Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, proscribes the unauthorized reproduction of "original works of authorship fixed in any tangible medium of expression." *Id.* § 102(a). "Works of authorship" covered by the Copyright Act include "literary work[s]," which themselves include "computer program[s]." *Id.* §§ 101, 102(a)(1), 109(b)(1)(A). While the purpose of the Copyright Act is "to encourage the production of works" that, without copyright protection, could be "reproduce[d] more cheaply" by others, this protection is intended to encourage the production of new creative works, not "stand in the way of others exercising their own creative powers." *Google LLC v. Oracle America*, 141 S. Ct. 1183, 1195 (2021). To this end, the Copyright Act codifies the fair use doctrine, which limits copyright protections as necessary to encourage "criticism, comment, news reporting, teaching . . . scholarship, [and] research." 17 U.S.C. § 107.

Anticipating the changing digital landscape, Congress passed the DMCA in 1998 to facilitate electronic commerce, communications, development, and education while simultaneously addressing the threats that the internet and new digital technology posed to copyrighted works. S. Rep. No. 105-190, at 1–2 (1998); *see also Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 112 (D.D.C. 2005) (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001)) ("Congress enacted the DMCA in 1998 'to strengthen copyright protection in the digital age.'"). Observing that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy[,]" S. Rep. No. 105-190, at 8, the Senate Committee Report on the DMCA explained that "the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials." *Id.* at 2. The DMCA accordingly "create[d] the legal platform for launching the global digital on-line marketplace for copyrighted works." *Id.* at 8.

3

To combat digital privacy, the DMCA prohibits, *inter alia*, "circumvent[ing] a technological measure that effectively controls access to a work protected under" the Copyright Act. 17 U.S.C. § 1201(a)(1)(A) ("the anti-circumvention provision"). As defined in the anti-circumvention provision, to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). Exceptions to the anti-circumvention provision are provided to allow circumvention of a TPM (or another form of access control to a copyrighted work) in the following instances: (1) in order for a school or library to determine whether to acquire a copyrighted product; (2) for law enforcement purposes; (3) to identify and analyze elements necessary to achieve interoperability of computer programs; (4) to engage in encryption research; (5) as necessary to limit the Internet access of minors; (6) as necessary to protect personally identifying information; or (7) to engage in security testing of a computer, computer system, or computer network. *See* 17 U.S.C. § 1201(d)–(j).

In addition to these statutory exceptions, the DMCA directs the Librarian to determine, through triennial rulemaking proceedings, any categories of copyrighted materials that should be exempted from the anti-circumvention provision for the next three-year period because the restriction adversely prevents users of copyrighted works from making noninfringing use of copyrighted material. *See id.* § 1201(a)(1)(C). As explained in the House Committee Report on the DMCA, Congress was concerned that evolving "marketplace realities" might make access to copyrighted materials unjustifiably difficult, so the triennial rulemaking requirement created a "'fail-safe' mechanism" that allowed the Library to "monitor developments in the marketplace for copyrighted materials," and "selectively waive[]" the anti-circumvention provision for a particular

4

category of materials for "limited time periods, [as] necessary to prevent a diminution in the availability to individual users of [that] particular category of copyrighted materials." H.R. Rep. No. 105-551(II), at 36 (1998).

When engaging in the statutorily authorized triennial rulemaking authority, the Librarian must comply with several requirements. First, the DMCA obligates the Librarian to make her rulemaking determinations "upon the recommendation of the Register of Copyrights," who in turn must "consult with the Assistant Secretary for Communications and Information of the Department of Commerce." 17 U.S.C. § 1201(a)(1)(C). Second, the DMCA provides that exemptions to the anticircumvention rule are authorized only if users are "adversely affected by" the rule "in their ability to make noninfringing uses." *Id.* In making this assessment during rulemaking, the Librarian must examine the following enumerated factors: "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of [access controls] has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of [access controls] on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate." *Id.* The Librarian must also "assess whether the implementation of access controls impairs the ability of individuals to make noninfringing uses of copyrighted works within the meaning of section 1201(a)(1)." Exemption, 86 Fed. Reg. 59,627, 59,628.

The Librarian is the final decisionmaker, but the Register is tasked with conducting the rulemaking process and making recommendations on exemptions to the Librarian. The House Committee Report explains that, "in recognition of the expertise of the Copyright Office, the Register of Copyrights will conduct the rulemaking, including providing notice of the rulemaking,

seeking comments from the public, consulting with the Assistant Secretary for Communications and Information of the Department of Commerce and any other agencies that are deemed appropriate." H.R. Rep. No. 105-796, at 64. "To aid in this process, the Register develops a comprehensive administrative record using information submitted by interested members of the public, and makes recommendations to the Librarian concerning whether exemptions are warranted based on that record." 86 Fed. Reg. at 59,628. Proponents seeking an exception must demonstrate "(1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of [a TPM], the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses." *Id.* "The Register will recommend granting an exemption only 'when the preponderance of the evidence in the record shows that the conditions for granting an exemption have been met.'" *Id.* Upon receiving these recommendations from the Register, the Librarian then issues a Final Rule promulgating the temporary exemptions for the next three-year period. *See* Exemption, 86 Fed. Reg. 59,627.[2]

**B. Exemption Adopted During Eighth Triennial Rulemaking Proceeding**

The challenged exemption was adopted by the Librarian following a sixteen-month rulemaking process involving formal notices, submission and consideration of proposals, comments, a hearing, and a fulsome explanation by the Register regarding application of the requisite statutory factors, as summarized below.

*1. Notice of Proposed Rulemaking, Petitions and Comments*

---

[2]        During the three-year period beginning October 28, 2021, the Librarian adopted twenty-six exemptions for classes of copyrighted works. *See* 86 Fed. Reg 59,627. Examples of classes of copyrighted works for which the Librarian has granted an exemption include "computer programs that control motorized land vehicles" and "computer programs that control smartphones, home appliances, or home systems" for diagnosis, maintenance, or repair, *id.* at 59,631, excerpts of audiovisual works for criticism and comment, *id.* at 59,632, and literary works for use with assistive technologies for disabled individuals, *id.* at 59,633, 59,634.

6

The eighth triennial rulemaking proceeding began on June 22, 2020, when the U.S. Copyright Office ("the Office") submitted a Notice of Inquiry, published in the Federal Register, U.S. Copyright Office, seeking petitions for renewals of existing exemptions and proposals for new exemptions. Notice of Inquiry, *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg. 37,399 (June 22, 2020) ("Notice"), AR at 45–49.  Upon receipt of twenty-seven petitions for new or expanded exemptions in response to the Notice, the Office organized the petitions into seventeen proposed classes for exceptions, and then requested comment.  Notice of Proposed Rulemaking, *Exceptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg., 65,293, 65,302 (Oct. 15, 2020) ("NPRM"), AR at 50–67.

Two of the petitions noticed for comment were submitted by two so-called independent service organizations ("ISOs"), which are non-manufacturer companies hired by hospitals and other medical professionals to repair and maintain complex, computer-controlled medical equipment.  These ISOs petitioned for an exemption to allow TPMs in computer-controlled medical equipment to be circumvented "for the purpose of diagnosis, maintenance, or repair of such a device."  Summit Imaging, Inc.'s Petition for New Exemption under 17 U.S.C. § 1201, AR at 2357 ("Summit Petition"); *accord* Transtate Equipment Company's Petition for New Exemption under 17 U.S.C. § 1201, AR at 2362 ("Transtate Petition").  The principal justification for the exemption sought by these two ISOs was the strong public health interest in "maintain[ing] and repair[ing] lifesaving equipment," a need that "has been magnified by the current COVID-19 pandemic."    Summit Petition at 2, AR at 2357; *see also* Transtate Petition at 4, AR at 2365 ("The ability to diagnose, maintain, and repair medical equipment is a public health priority, particularly in the midst of a global health crisis. . . .).

Plaintiffs' members are "original equipment manufacturers" ("OEMs"), which develop and manufacture medical devices, such as MRI machines, CT scanners, and defibrillators. Compl. ¶ 37. To allow the medical devices "to deliver their advanced capabilities safely and effectively," OEMs "design and write software embedded within the machines," which software is comprised of computer code that "is original copyrighted work created by the OEM" and protected by the Copyright Act. *Id.* ¶¶ 37-38; *see also* 17 U.S.C. §§ 101, 102(a). These devices also store and relay confidential patient data to providers connected to the network. Compl. ¶ 37. To safeguard their copyrighted material and patient data, OEMs use a wide variety of TPMs to guard against unauthorized access to their copyrighted material. *Id.* ¶¶ 37, 41, 45. According to plaintiffs, OEMs rely on copyright protections to recoup their substantial investments and facilitate further innovations to their medical devices, and absent such protections, they will not be able to continue developing more effective and efficient devices. *Id.* ¶¶ 53-55. Due to the potential risks to patients and providers posed by unauthorized access or release of sensitive patient information, the Food and Drug Administration ("FDA") strictly regulates OEMs and the medical devices they manufacture. *Id.* ¶ 46.

ISOs provide third-party maintenance and repair services for these medical devices, though these services are not necessarily authorized by OEMs. *Id.* ¶¶ 42-43, 47-50. To provide maintenance services for these medical devices, ISOs must circumvent TPMs to access OEM software. As Summit explained, "Unless hospitals or other owners of medical devices purchase expensive service contracts from the manufacturer, they may be unable to repair their own equipment (or have it repaired by an independent service provider) without risking a lawsuit against them or their service provider for allegedly violating the anti-circumvention provisions of the [DMCA]." Summit Petition at 2, AR at 2357; Transtate Petition, AR at 2363 ("This exemption

is sought to allow for timely critical servicing activities required for medical systems and devices . . . used by hospitals and other medical service providers to care for individuals in need of medical attention.").  Plaintiffs counter that the primary reason ISOs circumvent TPMs is to "benefit [their] commercial interests, resulting in greater market share and more profits."  Compl. ¶ 49.[3]

In soliciting comments regarding the submitted petitions, the Office combined several petitions relating to repair of software-enabled devices, including the Summit and Transtate petitions, into a single proposed class, noting that current exemptions already include repair-related exemptions to access computer programs in automobiles, smartphones, and home systems and appliances for repair-related purposes.  85 Fed. Reg. at 65,306, 65,307, AR at 63–64.  The Office scheduled three rounds of comments from: (1) proponents of petitions or neutral parties; (2) opponents of petitions; and (3) proponents or neutral parties replying to arguments or facts raised in other comments.  *Id.* at 65,302, AR at 59.  Transtate and Summit both submitted comments in support of their petitions, AR at 2909–16; AR at 2917–53, while plaintiffs filed opposing comments, AR at 4010–24; AR at 4095–30; AR at 4131–56.  Transtate also submitted reply comments.  AR at 4507–12.

Plaintiffs criticized the Transtate and Summit exemption petitions as violating the basic purposes of copyright law and damaging the market while providing only commercial gain to the ISOs.  As support, plaintiffs explained, first, that the proposed exemptions would only facilitate competing maintenance and repair services, with nothing transformative about the ISOs' intended uses.  *See* Compl., Ex. B, Medical Imaging & Technology Alliance Comments ("MITA Comments") at 8–9, ECF No. 1-2; Compl., Ex. C, Advanced Medical Technology Association Comments ("AdvaMed Comments") at 7–8, ECF No. 1-3; *see also* Compl., Ex. D, Philips North

---

[3]    Many OEMs, nonetheless, "provide service specifications to ISOs to enable them to perform maintenance and repair services."  *Id.* ¶ 51.

America, LLC Comments ("Phillips Comments") at 7–8 & n.24, ECF No. 1-4.  Second, plaintiffs complained that, because the software at issue is innovative and required substantial investment of time and labor made in anticipation of financial return, the proposed exemption would allow ISOs to free-ride off the work of OEMs and discourage the production of further similar work.  MITA Comments 9; AdvaMed Comments 8–9.  Third, plaintiffs asserted that the proposed exemption would decrease the value of the copyrighted software and the medical devices that require the software to function by making circumvention of TPMs protecting these devices more likely, exacerbating cybersecurity risks and putting patient data and OEMs intellectual property at risk of exposure.  MITA Comments 9-10; AdvaMed Comments 8–11; *see also* Phillips Comments 9–10. Finally, according to plaintiffs, by increasing TPM circumvention, the requested exemption could damage the devices themselves and introduce dangers such as electrical shock, mechanical failure, improper dosing, and burns.  AdvaMed Comments 3, 11-15; MITA Comments 3-5; *see also* Philips Comments 17-19.

### 2. Hearing

Following the close of the comment period, the Office held a hearing, after notice, on April 20, 2021, regarding the proposed exemption for repairing computer software.  *See* Notice of Public Hearings, Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 86 Fed. Reg. 8560, 8561 (Feb. 8, 2021), AR at 68–69.  A representative from Transtate and a representative from the International Association of Medical Equipment Remarketers and Servicers testified.  AR at 5627–5763.  Plaintiffs did not participate.  *See id.*

### 3. Register's Recommendation

Based upon the evidence gathered and submitted during the rulemaking process, the Register submitted her recommendation to the Librarian in October 2021. *See Section 1201*

10

*Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Register of Copyrights* (Oct. 2021), AR at 1571–1926. The Recommendation concluded that "the prohibition on circumvention of TPMs is causing, or is likely to cause, an adverse impact on the noninfringing diagnosis, repair, and maintenance of medical devices and systems." AR at 1802.

In explaining this recommendation, the Register considered four statutory factors guiding the analysis of whether diagnosis, maintenance, and repair was likely to be a noninfringing use of the copyrighted software under the fair use doctrine. AR at 1781–85.[4] As to the first factor—"the purpose and character of the use"— the Register concluded that, although device repair can be commercialized, ISOs' repair activities were intended to "restore" a device's "functionality, not to commercialize the embedded copyrighted software." AR at 1782. Referencing her prior conclusions that diagnosis, maintenance, and repair of other software-enabled devices "are likely to be transformative uses," the Register determined that the first factor weighed in favor of fair use. *Id.*

The Register also found that the second factor—the nature of the copyrighted work— favored a finding of fair use because ISOs and hospitals did not seek to use the copyrighted software for its "expressive qualities," but rather for the "functional and informational" purposes of allowing them to operate the medical equipment. AR at 1783. As to the third factor—the amount and substantiality of the copyrighted work used—the Register determined that it also weighed in favor of finding fair use because the ISOs' desired use is "necessary to accomplish the

---

[4]      The Copyright Act provides that "fair use of a copyrighted work" is "not an infringement of copyright," 17 U.S.C. § 107, and outlines four factors "to be considered" in making a fair use determination: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;" (2) "the nature of the copyrighted work;" (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole;" and (4) "the effect of the use upon the potential market for or value of the copyrighted work." *Id.*

transformative purpose[] of diagnosis, maintenance, and repair," which the Register believed was "reasonable" under the circumstances.  AR at 1784.

Finally, the Register evaluated the fourth factor—the effect of the use on the market value of the copyrighted work—and found that it also weighed in favor of finding fair use since diagnosis, repair, and maintenance of software-enabled medical devices and systems would minimally "effect [ ] the market for or value of the copyrighted works because medical device and system software and data files are sold with the equipment and have no independent value separate from the devices[.]"  *Id.*  The Register observed, however, that if an ISO or provider were to "reproduce and retain additional copies of any copyrighted materials for use with other devices, or enable permanent access to subscription-only services, those activities would remain prohibited because they fall outside the scope of the proposed exemption."  AR at 1785.

Upon finding that the proffered uses by ISOs of the OEMs' copyrighted software were likely noninfringing, the Register next found that the prohibition against circumvention here was "adversely affecting" the repair of the at-issue medical devices, pursuant to the statutory criteria for an exception outlined in 17 U.S.C. § 1201(a)(1)(C).  AR at 1802.  With respect to the first statutory factor—the availability for use of copyrighted works—the Register concluded that the prohibition on circumvention for these types of medical devices "makes medical equipment software and manuals less available for use in noninfringing diagnosis, maintenance, and repair," rejecting the plaintiffs' comments that the medical device software is otherwise broadly licensed and available.  AR at 1799.  As to the second and third statutory factors—the availability for use of works for nonprofit purposes and the impact that anti-circumvention provision has on criticism, comment, news reporting, teaching, scholarship, or research—the Register did not find "these factors [ ] especially relevant to the determination."  AR at 1800–01.  The Register accordingly

12

sidestepped an OEM argument that the ISOs' interest here is purely commercial-oriented, observing instead that "repair of medical devices and systems that are no longer supported by OEMs arguably preserves the availability for use of the equipment's software and servicing materials." *Id.* As to the fourth statutory factor, the Register discounted plaintiffs' concerns of harms to the market, concluding that the narrow scope of the exemption and proposed ISO uses "limit[s] any potential market harm" because repair of medical equipment "support[s] rather than displace[s] the embedded computer programs," and the device software has "no independent value separate from the equipment [it] operate[s] or explain[s]." AR at 1800. Finally, as to the fifth statutory factor—granting the Librarian discretion to consider additional factors as she deems appropriate—the Register found relevant that the exemption could help address competitive concerns related to OEMs dominating the repair market and the FDA's determination that the exemption did not pose a substantial safety or security concern. AR at 1801–02. The Register accordingly recommended that the Librarian grant the requested exemption. *Id.* at 1804–06.

#### 4. Librarian's Final Rule Adopting Exemption

After considering the Register's recommendation, the Librarian adopted the Exemption in a final rule on October 28, 2021. Exemption, 86 Fed. Reg. 59,627, AR at 70–84. In relevant part, the final rule exempts "computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system" from the anti-circumvention provision. 37 C.F.R. § 201.40(b)(15), AR at 83. The Exemption defines "maintenance" as the "servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system," *id.* at § 201.40(b)(15)(i), AR at 83, and defines "repair" as "the restoring of the device

or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system." *Id.* at § 201.40(b)(15)(ii), AR at 83. By its terms then, the Exemption is solely limited to repair, diagnosis, and maintenance, and does not exempt ISOs or other users from liability under other provisions of the DMCA. *See id.* § 201.40(b)(15), AR at 83.

### C. Procedural History

On February 25, 2022, plaintiffs filed their Complaint for declaratory and injunctive relief, alleging that the Librarian's adoption in the Final Rule of the Exemption for repair of medical devices violates the APA, as arbitrary and capricious and not in accordance with the law, Compl. ¶¶ 78–85, and contrary to the APA's procedural requirements because the Librarian failed to respond to critical comments, *id.* ¶¶ 86–91. Alternatively, plaintiffs claim that, if the APA is inapplicable to the Library of Congress, the Librarian's action should be deemed *ultra vires* as outside the scope of her statutory authority and in violation of the constitutional separation of powers. *Id.* ¶¶ 92–101 (citing *Larson v. Domestic and Foreign Com. Corp.*, 337 U.S. 682 (1949)).

About one month after instituting this lawsuit, plaintiffs filed their motion for summary judgment, Pls.' Mot., to which defendants have responded by moving to dismiss, under Federal Rule of Civil Procedure 12(b)(6), plaintiffs' *ultra vires* and constitutional claims for failure to state plausible claims, or in the alternative, cross-motion for summary judgment, under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56, because plaintiffs' APA claims are barred under the doctrine of sovereign immunity. *See generally*, Defs.' Cross-Mem.; Defs.' Opp'n Pls.' Mot. Summ. J., ECF No. 17. With the parties having filed their respective oppositions and replies, Pls.' Consolidated Reply Supp. Mot. Summ J. & Opp'n Govt's Mot. Dismiss, ECF No. 18; Defs.' Reply

Supp. Mot. Dismiss, ECF No. 20, and the joint appendix, Joint App'x, ECF No. 24, the parties' cross-motions are ripe for resolution.

## II.    LEGAL STANDARD

"Article III of the Constitution prescribes that '[f]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'"  *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)); *see also Gunn v. Minton*, 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))).  Absent subject-matter jurisdiction over a case, the court must dismiss it.  *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); FED. R. CIV. P. 12(h)(3).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over the claim at issue. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  When considering a motion to dismiss under Rule 12(b)(1), the court must determine jurisdictional questions by accepting as true all uncontroverted material factual allegations contained in the complaint and "'constru[ing] the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'"  *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (second alteration in original) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)).  The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions.  *Id.* at 288 (alteration in original) (quotation marks omitted) (making clear that liberally construing complaint in plaintiff's

favor "does not entail accept[ing] inferences unsupported by facts or legal conclusions cast in the form of factual allegations").

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[a] plaintiff need not make 'detailed factual allegations,'" but the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *VoteVets Action Fund v. McDonough*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *accord Atchley, v. AstraZeneca UK Limited, et al.*, 22 F.4th 204, 214 (D.C. Cir. 2022). In deciding a motion under Rule 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. Courts do not, however, "assume the truth of legal conclusions . . . nor . . . accept inferences that are unsupported by the facts set out in the complaint." *Arpaio*, 797 F.3d at 19 (internal citation omitted).

## III.    DISCUSSION

Defendants' motion to dismiss all four of plaintiffs' claims is predicated on a straightforward three-pronged argument. First, they argue that Congress exempted itself and the Library of Congress from APA review and thus sovereign immunity bars plaintiffs' procedural and substantive APA claims, in Counts I and II, under Rule 12(b)(1). Defs.' Cross-Mem. at 16–23. Second, plaintiffs have failed to plead, in Count III, a plausible statutory *ultra vires* claim because they have not alleged the Librarian violated a specific prohibition in the DMCA that is clear and mandatory. *Id.* at 37–40. Finally, defendants contend that the DMCA rulemaking

16

scheme, challenged in Count IV, does not violate the constitutional separation of powers because the Librarian is appointed by the President in accord with the Appointments Clause, so the regulatory scheme does not place unconstitutional power in Congress to legislate without proper bicameralism and presentment. *Id.* at 41–44.

Defendants are right on all counts. First, plaintiffs' APA claims are barred by sovereign immunity because the Librarian's decisions are not subject to APA review. Second, plaintiffs' *ultra vires* claim fails because the Librarian's promulgation of the Exemption does not amount to the type of extreme statutory error required to state a plausible claim. Third, plaintiffs' constitutional challenge is meritless because members of Congress do not participate in the challenged rulemaking, and the Librarian of Congress and the Register of Copyrights are subject to the control of the Chief Executive in carrying out these responsibilities.

### A.    Plaintiffs' APA Claims Are Barred By Sovereign Immunity

The parties do not dispute that the United States is immune from suit absent express consent to be sued. *See United States v. Sherwood*, 312 U.S. 584, 586 (1941). As noted, defendants contend that the APA does not waive sovereign immunity for the Library, even when the Library is engaging in rulemaking proceedings, requiring dismissal of plaintiffs' APA challenges for lack of jurisdiction. Defs.' Cross-Mem. at 16–23.

This inquiry begins, as it must, with the statute's text. The APA contains an express waiver of sovereign immunity for "[a]n action . . . seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed . . . on the ground that it is against the United States or that the United States is an indispensable party." 5 U.S.C. § 702. The APA defines "agency" as "each authority of the Government of the United States, whether or not it is

17

within or subject to review by another agency, but does not include—(A) the Congress . . . ."  5 U.S.C. §§ 701(b)(1), 551(1).  The Library of Congress is indisputably part of Congress, *see* Pls.' Mot. at 28–29; Defs.' Cross-Mem. at 16–17, and, accordingly, pursuant to the plain text of Section 701(b)(1), the Library is excluded from the definition of an "agency."  *See Kissinger v Reps. Comm'n for the Freedom of the Press*, 445 U.S. 136, 145 (1979) (holding that the Library "is not an 'agency'" within the meaning of the term used in the Freedom of Information Act ("FOIA"), which uses the same definition of "agency" as the APA**)**; *see also Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct 768, 776 (2020) ("We must enforce plain and unambiguous statutory language . . . according to its terms.") (quotation marks omitted).  The result is that the Library does not qualify as an "agency" subject to the APA.

If the plain text were not enough, Congress's decision to make the Copyright Office, which is a component of the Library, subject to the APA—but not the Library of Congress as a whole—confirms that Congress intended to exclude the Library from the APA.  Specifically, after the APA was passed, Congress amended U.S. copyright law to make the Copyright Office subject to the APA.  *See* 17 U.S.C. § 701(e) ("Except as provided by section 706(b) and the regulations issued thereunder, all actions taken by the Register of Copyrights under this title are subject to the provisions of the [APA.]");  H.R. Rep. No. 94-1476 at 171 (1976), reprinted in 1976 U.S.C.C.A.N. 5659 ("Under an amendment to section 701 adopted by the Committee, the Copyright Office is made fully subject to the [APA] . . . .").  If the APA already provided a statutory authorization for review of the Librarian's rulemaking decisions under the Copyright Act or the DMCA, section 706(b)'s addition would have been superfluous.  *See Hohn v. United States*, 524 U.S. 236, 249 (1998) ("We are reluctant to adopt a construction making another statutory provision superfluous.").  Instead, this precise congressional action making the Copyright Office subject to

the APA, but not the Library, reflects a specific choice to decline waiving sovereign immunity under the APA as to the latter.

To put matters to rest, binding D.C. Circuit precedent makes crystal clear that the Library is not an "agency," as that term is defined in the APA and therefore not subject to the APA.  *See Clark v. Libr. of Cong.*, 750 F.2d 89, 102-03 (D.C. Cir. 1984) (citing 5 U.S.C. § 701(b)(1)(A) ("[T]he Library of Congress is not an 'agency' as defined under the [APA]."); *Ethnic Employees of Libr. of Cong. v. Boorstin*, 751 F.2d 1405,1416 n.15 (D.C. Cir. 1985) (observing "that the Library is not an agency under the Administrative Procedure Act"); *Wash. Legal Found. v. U.S. Sent'g Comm.*, 17 F.3d 1446, 1449 (D.C. Cir. 1994) (noting that "the Library of Congress . . . is exempt from the APA because its provisions do not apply to 'the Congress'—that is, the legislative branch").

Notwithstanding this clear textual evidence and binding precedent, plaintiffs assert that the Library of Congress should only be exempt from the APA when acting in a "legislative" capacity, in contrast to its role in the triennial rulemaking process under the DMCA.  Pls.' Mot. at 28–34. Citing to *dicta* in several court decisions analyzing the Library of Congress' structure under the Appointments Clause, U.S. CONST., art. II, § 2, cl., 2, plaintiffs maintain that when exercising functions similar to those of Executive Branch agencies, the Library should be treated like an agency subject to the APA.  *Id.* (citing *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012); *Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25 (D.D.C. 2010); *Eltra Corp. v. Ringer*, 579 F.2d 294 (4th Cir. 1978)).  Plaintiffs also attempt to distinguish *Clark v. Library of Congress* by describing the Library as acting in a *legislative* capacity in that case, whereas when engaging in triennial rulemaking under the DMCA, the Library should qualify as an "agency" for purposes of the APA.  Pls.' Reply at 10 (second and third

19

alterations in original) ("[T]o determine the capacity in which the Library is acting, courts 'consider each [of its] function[s] . . . separately and . . . determine the character of each, whether legislative or executive.' *Eltra*, 579 F.2d at 301.  That explains the outcome in *Clark*.").

Plaintiffs' wishful reading of these cases does not withstand scrutiny.  For starters, the issue addressed in the cases plaintiffs cite concerned the validity of the Library's structure under the Appointments Clause, without touching on whether the Library should be treated as an "agency" for the purposes of the APA when engaging in agency-like activities.  *See, e.g., Intercollegiate Broad. Sys.*, 684 F.3d at 1342 ("We too hold that the Librarian is a Head of Department. . . ."); *Live365*, 698 F. Supp. 2d at 43 ("[E]ven though the Library is codified under Title II and is a free standing entity that operates independently from the Executive Branch in conducting its daily operations, the Librarian appears to nonetheless qualify as a Head of Department. . . ."); *Eltra Corp.*, 579 F.2d at 301 (holding that Library "operat[es] in conformity with the Appointments Clause").  To be sure, the Library does perform both executive and legislative functions.  *Eltra Corp.*, 579 F.2d at 301 ("The Librarian performs certain functions which may be regarded as legislative (i.e., Congressional Research Service) and other functions (such as the Copyright Office) which are executive or administrative.  Because of its hybrid character, it could have been grouped code-wise under either the legislative or executive department.").

Critically, however, none of these cases condition their holdings on whether the challenged activity in question was legislative or executive in nature.  Indeed, in *Clark*, the D.C. Circuit never held that the Library is exempt from the APA based on the specific facts of that case, as plaintiffs mistakenly argue.  *See* Pls.' Reply at 10 ("Thus, given the particular facts at issue in *Clark*, the court held that the Library of Congress [was] not an 'agency' as defined under the Administrative Procedure Act." 750 F.2d at 102.").  Instead, the Court held that Congress did not waive sovereign

immunity with respect to the Library because it is not an "agency" as defined under the APA.
*Clark*, 750 F.2d at 102. [5]

In a last gasp effort, plaintiffs urge that the D.C. Circuit implicitly overturned or modified decades of precedent in *Clark*, *Boorstin*, and *Washington Legal Foundation* in *Intercollegiate Broadcasting Systems v. Copyright Royalty Board*, when the D.C. Circuit held that the appointment of Copyright Royalty Judges by the Librarian violated the Appointments Clause and severed "the restrictions on the Librarian['s] . . . ability to remove the" judges to remedy that violation. 684 F.3d at 1334. Yet, *Intercollegiate* never articulated this "hybrid" framework for evaluating APA challenges to the Librarian's actions as plaintiffs theorize. *See* Pls.' Mot. at 28. This is far too flimsy a basis to sustain the "substantial burden on a party advocating the abandonment of an established precedent," *Saad v. Sec. & Exch. Comm'n*, 980 F.3d 103, 107 (D.C. Cir. 2020) (quotation marks omitted), and, consequently, plaintiffs' invitation to recast decades of D.C. Circuit precedent exempting the Library from APA review is declined. *See Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 99 (D.D.C. 2019) (likewise rejecting argument that *Intercollegiate* changed whether the Library was subject to APA review because plaintiffs "pointed to nothing in the text of the APA, its legislative history, or legal precedent that suggests that Congress did not intend to include the Library of Congress when engaging in Executive Branch functions . . . [when Congress] exempted [itself] from the APA's definition of 'agency'").

For the foregoing reasons, the Library is not subject to the APA since Congress explicitly declined to waive sovereign immunity for APA challenges to the Library's actions. [6] Accordingly,

---

[5]      For the same reason, the fact that "the Library publishes all relevant documents in connection with its DMCA rulemakings in the Federal Register and promulgates its final exemptions in the Code of Federal Regulations," Pls.' Mot. at 38, is immaterial, since such activity alters neither the statutory definition of an "agency," under 5 U.S.C. § 701(b)(1), nor the scope of any APA waiver of sovereign immunity.

[6]      Plaintiffs make two additional textual arguments in support of their foreclosed reading of the definition of "agency," under 5 U.S.C. § 701(b)(1), but neither is persuasive and cannot override binding D.C. Circuit precedent to

the Court lacks jurisdiction to address the merits of plaintiffs' substantive and procedural APA challenges in Count I and II, which must be dismissed.

### B.    Plaintiffs Fail to Plead Plausible *Ultra Vires* and Constitutional Claims

Aside from asserting APA challenges, plaintiffs raise an *ultra vires* statutory challenge to the Exemption and a constitutional challenge to the Library's rulemaking authority under the DMCA, in Counts III and IV, respectively.  Given that the Library of Congress is part of the federal government, however, these claims "must satisfy all the requirements for actions commenced against the United States." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal government and its agencies from suit.").  "'In any suit in which the United States is a defendant, there must be a cause of action, subject matter jurisdiction, and a waiver of sovereign immunity.'" *United Am., Inc. v. N.B.C.-U.S.A. Hous., Inc. Twenty Seven*, 400 F. Supp. 2d 59, 61 (D.D.C. 2005) (quoting *Presidential Gardens Assocs. v. United States*, 175 F.3d 132, 139 (2d Cir. 1999)); *see also First Vir. Bank v. Randolph*, 110 F.3d 75, 77–78 (D.C. Cir. 1997) (outlining these three requirements).  To be sure, plaintiffs have properly asserted that their claims challenging the Librarian's actions raise issues under the DMCA and the U.S. Constitution, and thus are brought pursuant to the court's federal question jurisdiction, 28 U.S.C. § 1331.  *See* Compl. ¶ 25.  That begs the other critical questions, however, whether the United States has waived

---

the contrary.  First, plaintiffs point to the strong presumption of judicial review of administrative action as militating in favor of finding that the Library's DMCA rulemaking actions are subject to APA review.  Pls.' Mot. at 31–32 (citing *Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015)).  This argument fails to grapple with the overwhelming weight of textual evidence favoring reading "the Congress" to include the Library.  *See Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017) (cleaned up) (explaining that the presumption for judicial review of agency action, "like all presumptions used in interpreting statutes, may be overcome by specific language that is a reliable indicator of congressional intent").  Moreover, judicial review of the Librarian's actions remains available under the *Larson-Dugan* doctrine, *Clark*, 750 F.2d at 102 ("It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority."), which plaintiffs concede, Pls.' Mot. at 36.  Second, plaintiffs argue that the canon of constitutional avoidance requires reading "agency" to include the Library because otherwise "tremendous separation of powers problems" are raised, *id.* at 32–35, but this variation on their constitutional attack on the Librarian's DMCA rulemaking authority is meritless, as explained, *infra* in Part III.B.2.

sovereign immunity to permit the claims, and, if so, whether plaintiffs have adequately plead their separate causes of action.

Plaintiffs maintain that sovereign immunity does not bar suit here under the *Larson-Dugan* doctrine. In *Larson v. Domestic & Foreign Commerce Corporation*, the plaintiff sued the head of the War Assets Administration, not for money damages, but for specific performance of the delivery of surplus coal in accordance with plaintiff's contract with the government. 337 U.S. at 684–85. Finding that the Administrator's action in refusing the coal shipment to the plaintiff was not unconstitutional or *ultra vires* conduct outside the scope of the Administrator's authority, nor contrary to statute or order, *id.* at 703, the Supreme Court concluded that the Administrator's action "was, therefore, inescapably the action of the United States and the effort to enjoin it must fail as an effort to enjoin the United States," *id.*; *see also id.* at 688 (noting suit would be barred "not because it is a suit against an officer of the Government, but because it is, in substance, a suit against the Government over which the court, in the absence of consent, has no jurisdiction"). The Court thus articulated, and made explicit in *Dugan v. Rank*, an exception to sovereign immunity in actions seeking specific relief for "(1) action by [government] officers beyond their statutory powers [or] (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void." 372 U.S. 609, 621–22 (1963). "In either of such cases the officer's action 'can be made the basis of a suit for specific relief against the officer as an individual.'" *Id.* at 622 (quoting *Malone v. Bowdoin*, 369 U.S. 643, 647 (1962)); *see also Dalton v. Specter*, 511 U.S. 462, 472 (1994) (quoting *Larson*, 337 U.S. at 691 n.11) (emphasis in original) (summarizing *Larson* as holding "that sovereign immunity would not shield an executive officer from suit if the officer acted either 'unconstitutionally *or* beyond his statutory powers'"); *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (quoting *Larson*, 337

23

U.S. at 689, 693) ("Under [the *Larson-Dugan*] exception, 'suits for specific relief against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign immunity.").

Here, plaintiffs allege both types of *Larson-Dugan* violations. First, they say that the Librarian acted beyond the express limits authorized by the DMCA by promulgating the Exemption. Pls.' Mot. at 38–39. Second, they argue that the Exemption's promulgation was unconstitutional because, in so doing, the Librarian either "unconstitutionally exercise[d] executive authority (running afoul of separation-of-powers principles) or [ ] unconstitutionally exercise[d] legislative authority (running afoul Article I's bicameralism and presentment requirements)." Pls. Mot. at 39. Resolving whether *Larson-Dugan* ultimately applies, however, requires an assessment of the merits of plaintiffs' underlying statutory and constitutional claims and thus "the question of jurisdiction merges with the question on the merits." *Wash. Legal Found. v. U.S. Sent'g Comm'n*, 89 F.3d 897, 901 (D.C. Cir. 1996); *see also Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (determining whether "the *Larson-Dugan* exception would be triggered and hence no waiver of sovereign immunity is required" rested on "discussion of the central merits question in the case, namely whether" challenged government action violated statute); *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1032 (9th Cir. 2013) (quoting *Wash. Legal Found.*, 89 F.3d at 901) (alterations in original) (following D.C. Circuit's practice when finding that "the question of '[w]hether the *Larson-Dugan* exception' applied 'merge[d] with the question on the merits,'" and therefore turning "to address the substantive merits of the mandamus claim before it'"). Each claim is evaluated in turn.

     ***1.     The Librarian Did Not Exceed Her Statutory Authority Under the DMCA.***

Plaintiffs argue that the Librarian's enactment of the Exemption was "well in excess of her delegated authority and contrary to the specific requirements of the DMCA . . . for the same basic reasons that the Exemption is substantively unlawful under the APA." Pls.' Mot. at 38.  In other words, plaintiffs' theory underlying this claim is that the DMCA authorizes the Librarian to promulgate exemptions only for "noninfringing uses . . . of a particular class of copyrighted works," 17 U.S.C. § 1201(a)(1)(C), but the Exemption authorizes uses purportedly failing to meet this requirement because the sole purpose of the Exemption is to allow ISOs to engage in commercial behavior.  Pls.' Mot. 16–20.  Plaintiffs' recycled APA argument falls well short of pleading a plausible *ultra vires* claim.

At the outset, "[j]udicial review for *ultra vires* agency action rests on the longstanding principle that if an agency action is unauthorized by the statute under which the agency assumes to act, the agency has violated the law and the courts generally have jurisdiction to grant relief." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned up); *see also Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (upon finding that the National Labor Relations Board directly contravened a provision in the National Labor Relations Act, thereby making its action unlawful "in excess of its delegated powers and contrary to a specific prohibition in the Act," holding that the district court had jurisdiction to set aside the unlawful agency action). Pleading a plausible *ultra vires* claim is no simple task and has been described as "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *See Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009); *accord N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1262 (D.C. Cir. 2020) (quotation marks omitted) ("*Ultra vires* review is intended to be of extremely limited scope, and it represents a more difficult course than would

review under the [APA]."). With respect to claims, as here, that a government official's action was contrary or in excess of statutory authority, "such a '*Kyne* exception' applies only when three requirements are met: '(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'" *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (quoting *Nyunt,* 589 F.3d at 449); *see also Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (same). Here, given that, absent the availability of review under the APA, no federal statute specifically precludes judicial review, and there is no alternative procedure for review, the critical question—both to state a plausible claim and for the exercise of jurisdiction— is whether the Librarian "plainly act[ed]" outside the scope of her delegated powers in promulgating the Exemption.

Plaintiffs' claim fails to satisfy the third "*Kyne* exception" requirement. "The third requirement covers only extreme agency error, not merely garden-variety errors of law or fact." *DCH Reg'l Med. Ctr.*, 925 F.3d at 509 (cleaned up); *see also Doehla Greeting Cards v. Summerfield*, 227 F.2d 44, 47 (D.C. Cir. 1955) (quoting *Larson*, 337 U.S. at 703) ("Erroneous action taken in the exercise of an admittedly validly delegated power is 'inescapably the action of the United States and the effort to enjoin it must fail as an effort to enjoin the United States.'"). *Ultra vires* claims are accordingly "confined to extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court." *Fed. Express Corp.*, 39 F.4th at 764 (cleaned up). "Only error that is patently a misconstruction of the [statute], that disregards a

specific and unambiguous statutory directive, or that violates some specific command of a statute will support relief." *Id.* (cleaned up).

Plaintiffs merely restate that the Librarian erred in her fair use analysis, which, even if true, would amount to nothing more than a textbook error in statutory interpretation. The D.C. Circuit has given clear instruction that an *ultra vires* claim "must show more than the type of routine error in statutory interpretation or challenged findings of fact that would apply if Congress had allowed APA review." *Fed. Express Corp.*, 39 F.4th at 765 (quotation marks omitted). Moreover, plaintiffs' claim appears even weaker when considering that a fair-use analysis is a highly fact-specific determination involving consideration of four different factors. *See Am. Soc'y for Testing & Materials, et al. v. Public.Resource.Org, Inc.*, 896 F.3d 437, 448 (D.C. Cir. 2018) (explaining that "each case raising the question" concerning "whether a particular use is fair . . . must be decided on its own facts") (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 560 (1985)); *see also supra* n.4. The Librarian's determination that diagnosis, maintenance, and repair was likely to be a noninfringing use of the copyrighted software could not have been "patent[] [ ] misconstruction of the" DMCA, *Fed. Express Corp.*, 39 F.4th at 764, for this exact reason: it was premised on a detailed balancing of the fair use factors to determine that the ISOs' proffered uses of the OEMs' copyrighted software were likely noninfringing, *see* AR at 1780–1785. Even if plaintiffs believe that the Librarian's reasoning was "terse and incomplete[,]" Pls.' Mot. at 25, they have not demonstrated how that the Librarian has patently "disregard[ed] a specific and unambiguous statutory directive" or "violate[d] some specific command of a statute." *Fed. Express Corp.*, 39 F.4th at 764. At most, the Librarian and plaintiffs just have differing views on the outcome of a fair use analysis here.

In short, plaintiffs have fallen well short of completing their "Hail Mary pass" of an *ultra vires* claim, *see Nyunt*, 589 F.3d at 449, because they have not come close to showing that the Librarian has plainly acted "in excess of [her] delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp.*, 39 F.4th at 763 (quotation marks omitted).

### 2. The Librarian's Rulemaking Authority Does Dot Violate the Separation of Powers.

Finally, in Count IV, plaintiffs challenge the Librarian's DMCA rulemaking authority as an unconstitutional violation of the separation of powers. The doctrine of separation of powers emanates from the Framers' decision to separate "powers of the [ ] Federal Government into three defined categories, legislative, executive, and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951 (1983); *see also* U.S. CONST. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States"); U.S. CONST. art. II, § 1 ("The executive Power shall be vested in a President of the United States[.]"); U.S. CONST. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish[.]"). As relevant here, when exercising legislative authority, Congress must follow the procedures outlined in Article I, section 7 of the Constitution: passage by both Houses of Congress and presentment to the President. *Chadha*, 462 U.S. at 951. Moreover, Congress cannot "reserve for itself the power of removal of an [executive branch] officer" because "[t]o permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). Such wielding of executive power is unconstitutional and, conversely, Congress also "may not transfer to another branch 'powers which are strictly and

28

exclusively legislative.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Wayman v. Southard*, 23 U.S. 1, 42–43 (1825)).

At the same time, "the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989).  Thus, Congress "may confer substantial discretion on executive agencies to implement and enforce the laws," *Gundy*, 139 S. Ct. at 2123, so long as it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform," *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001) (alteration in original) (quoting *J.W. Hampton, Jr., & Co. v. United State*s, 276 U.S. 394, 409 (1928)).  Accordingly, assuming Congress "has supplied an intelligible principle to guide the [agency's] use of discretion," *Gundy*, 139 S. Ct. at 2123, the agency's lawful exercise of that authority is an exercise of executive power.  *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1785 (2021) (cleaned up) (quoting *Bowsher*, 478 U.S. at 733) ("'[I]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of execution of the law.'").

Plaintiffs' argument is not that Congress unconstitutionally delegated to the Librarian legislative power by giving her rulemaking authority under Section 1201 of the DMCA, but rather that the Library faces a different Catch-22: "[I]f the Library functions as a component of the legislative branch rather than the executive branch in the course of its DMCA rulemakings, either it is unconstitutionally exercising executive authority (running afoul of separation-of-powers principles) or it is unconstitutionally exercising legislative authority (running afoul [of] Article I's bicameralism and presentment requirements)."  Pls.' Mot. at 39.  "Either way," plaintiffs assert, "the rulemaking is constitutionally *ultra vires*."  *Id.*  Plaintiffs' "either-or" reasoning is flawed.

The Library serves both executive and legislative functions and does not run afoul of separation of powers principles so long as both executive *and* legislative power are not simultaneously wielded when conducting those functions. Considering that the Librarian is appointed and subject to removal by the President, and that plaintiffs do not challenge the Librarian's DMCA rulemaking authority as an unconstitutional delegation of legislative power, the Librarian accordingly lawfully engages in executive power under Article II when promulgating rules under the DMCA.

The Fourth Circuit's decision in *Eltra Corporation v. Ringer* is instructive on this issue. When faced with the argument that "the Office of the Register of Copyrights is . . . violative of the Appointments Clause[,]" the Fourth Circuit concluded that the Clause was not violated because "[t]he Register is appointed by the Librarian of Congress, who in turn is appointed by the President with the advice and consent of the Senate," and the "Librarian is an 'Officer of the United States'" within the meaning of the Clause, *Eltra*, 579 F.2d at 300; *see also Intercollegiate*, 684 F.3d at 1342 (holding that the "Librarian is a Head of Department" within the meaning of the Appointments Clause). The court deemed "irrelevant that the Office of the Librarian of Congress is codified under the legislative branch or that it receives its appropriation as a part of the legislative appropriation" because the "Librarian performs certain functions which may be regarded as legislative (i.e., Congressional Research Service) and other functions (such as the Copyright Office) which are executive or administrative." 579 F.2d at 301; *accord Intercollegiate*, 684 F.3d at 416 (acknowledging that the Library of Congress "performs a range of different functions, including some, such as the Congressional Research Service, that are exercised primarily for legislative purposes"). "Because of its hybrid character," the court continued, "it could have been grouped code-wise under either the legislative or executive department." 579 F.2d at 301. The

30

court concluded, however, that "such code-grouping cannot determine whether a given function is executive or legislative." *Id.*[7]

Just as the *Eltra* plaintiff, plaintiffs have created a false dichotomy here because, even though the Library performs some legislative functions, it also performs executive functions for the purposes of the Constitution when promulgating regulations under the DMCA. *Eltra* correctly concluded that the Librarian can perform both executive and legislative functions while still not raising separation-of-powers problems because of its "hybrid" character. When promulgating regulations under the DMCA and exercising executive functions, the Library thus need not comply with Article I, section 7's bicameralism and presentment requirements.

As defendants aptly point out, Defs.'Cross-Mem at 43, the critical flaw in plaintiffs' argument is that Congress's decision to categorize the Library as part of "the Congress" rather than make this entity subject to APA review, either directly (as with the Copyright Office) or through the definition of "agency" in 5 U.S.C. § 701(b)(1), has no bearing on whether the exercise of authority in triennial rulemaking is either legislative or executive in function. Congress's decision simply reflects its choice to exempt the Librarian's administrative actions from APA review, a choice that Congress could revisit at any time by amending the APA's definition of "agency."

---

[7]    Defendants are correct, *see* Defs.' Cross-Mem. at 42–43, that administrative bodies invalidated on separation-of-powers grounds had direct participation by Congress or Members of Congress in the exercise of executive actions. *See, e.g.*, *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276–77 (1991) (invalidating a review board partly composed of members of Congress); *Bowsher*, 478 U.S. at 733–34 (invalidating investment of executive powers in an officer removable by Congress); *Buckley v. Valeo*, 424 U.S. 1, 140–41 (1976) (per curiam) (holding that Congress could not vest administrative powers in a commission for which members were not appointed pursuant to the Appointments Clause, U.S. Const. art. II, § 2, cl. 2). No such constitutional infirmity is present for the Library of Congress.

III.    **CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is granted, and plaintiffs' motion for summary judgment is denied. An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: March 7, 2023

_Beryl A. Howell_
_____
BERYL A. HOWELL
Chief Judge

32