# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ADVANCED MEDICAL TECHNOLOGY ASSOCIATION; MEDICAL IMAGING & TECHNOLOGY ALLIANCE,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>THE LIBRARY OF CONGRESS; CARLA HAYDEN, *in her official capacity as Librarian of Congress*,<br><br>*Defendants*. | No. 1:22-cv-499 (BAH)<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs the Advanced Medical Technology Association (AdvaMed) and the Medical Imaging & Technology Alliance (MITA)—for their amended complaint against defendants the Library of Congress and Carla Hayden, in her official capacity—allege on knowledge as to the plaintiffs, and on information and belief as to all other matters, as follows.

## INTRODUCTION

1.    This is a challenge pursuant to the Administrative Procedure Act to a final rule of the Library of Congress under the Digital Millennium Copyright Act, or DMCA. The rule is codified at 37 C.F.R. § 201.40 and grants an exemption from DMCA liability for the circum-vention of technological measures that control access to copyrighted digital content when necessary to diagnose, maintain, and repair medical devices, including sophisticated devices like magnetic resonance imaging (MRI) machines, computerized tomography (CT) scanners, ultra-sound systems, positron emission tomography (PET) scanners, X-ray machines, defibrillators, and surgery assisting robots.

2.    Creators of digital content—and the manufacturers of the machines and devices that depend on such content for operation, maintenance, and repair—rely on federal copyright laws to protect their creative works so they can control who uses the content and predictably recover the gains of their labors. As a reliable backstop against unfair exploitation by competitors (for whom

the marginal cost to make perfect digital copies of most digital content is effectively zero), copyright law is vital to the way that modern markets function. Indeed, it drives the licensing negotiations that take place between creators and users.

3.    In the mid-1990s, amidst the growing role of the internet and digital content in the American economy, Congress came to understand the importance of a creator's ability to secure copyrighted digital content from unlawful duplication and tampering. Its answer was the DMCA. Among other things, the DMCA conforms U.S. copyright law to international treaty standards that "require [the United States] to provide effective legal remedies against the circumvention of protective technological measures used by copyright owners." *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 942 (9th Cir. 2010).

4.    In simple terms, the DMCA prohibits users of a copyrighted work from circum-venting a "technological measure that effectively controls access to [the] work." 17 U.S.C. § 1201(a)(1)(A). As the House Judiciary Committee explained at the time of the DMCA's enact-ment, circumventing a technological protective measure (a TPM) "is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book." H.R. Rep. No. 105-551, pt. 1, at 17 (1998) (*House Report*).

5.    At the same time, Congress understood that, with the growing importance of digital content to expression and learning, unchecked use of TPMs might threaten "a diminution of otherwise lawful access to works and information." *House Report* 36. After all, a copyright is not an absolute bar to the copying of a work; Congress has long permitted certain noninfringing "fair uses" of copyrighted works to protect freedom of expression and promote further creation. *See* 17 U.S.C. § 107. Fair uses are generally non-commercial uses that promote the objectives of copyright law, which is to stimulate creation, expression, and learning.

6.    In the DMCA, Congress therefore directed the Register of Copyrights—the head of the Copyright Office within the Library of Congress—to "monitor developments in the marketplace for copyrighted materials" and authorized the Librarian, upon the Register's

recommendation, to grant selective exemptions to the DMCA's anti-circumvention rule "for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials." *House Report* 36.

7.      To that end, the DMCA calls for triennial rulemakings in which "the Librarian of Congress . . . shall make the determination . . . of whether persons who are users of a copyrighted work" qualify for a three-year "exemption" from the DMCA's prohibitions. 17 U.S.C. § 1201-(a)(1)(C). Such exemptions are statutorily authorized only for noninfringing "fair" uses of the copyrighted works at issue. *Id*.

8.      In the Eighth Rulemaking, two independent service operators (ISOs), petitioned for an exemption allowing circumvention of TPMs on software-enabled medical devices for purposes of diagnosis, maintenance, and repair of the devices.

9.      ISOs are companies that provide unregulated third-party maintenance and repair services for sophisticated medical devices (among other machines). They do not create new content or expression as part of their service.

10.     The ISOs sought access to device software and data files, asserting that the materials otherwise available were sometimes inadequate for them to execute certain repairs. The ISOs did not assert that access to the protected materials was necessary to stimulate creation, expression, and learning; rather, they asserted that it was necessary to stimulate their profits.

11.     Original equipment manufacturers (OEMs) manufacture medical devices and hold copyrights to the software useful to diagnose, maintain, and service those devices. OEMs use TPMs to safeguard their machines' software and to ensure patient safety and the privacy of patient information contained on their devices. TPMs are thus vital to the safety and functionality of medical devices. Although OEMs typically make some copyrighted materials useful to service their machines available either for free or for a licensing fee, in light of the technological complexity of some devices, OEM technicians (who are subject to extensive federal regulations that ISOs are not) can more safely use OEM proprietary software.

12.    As part of the eighth triennial rulemaking, plaintiffs submitted comments opposing the proposed exemption. They showed, in particular, that the proposed uses of the copyrighted material, when used by ISOs to make repairs, are not fair use. Rather, ISOs sought to circumvent TPMs to view and use copyrighted material purely for their own commercial benefit, instead of to serve any creative or transformative purpose.

13.    Despite this well-supported opposition, the Register of Copyrights recommended granting an exemption (the "Exemption"), which expressly covers "[c]omputer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files," shielding from DMCA liability circumvention of TPMs when it "is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system." Register of Copyrights, *Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention*, Recommendation of the Register of Copyrights, 233 (Oct. 19, 2021) (*2021 Register's Recommendation*) (attached as Exhibit A). In making that recommendation, the Register failed to engage with numerous significant comments provided by the Exemption's opponents, including plaintiffs.

14.    The Librarian adopted the recommendation without further changes. 86 Fed. Reg. 59627 (Oct. 28, 2021).

15.    Plaintiffs challenged the Librarian's adoption of the Exemption in the eighth triennial rulemaking in this case. The Court initially dismissed the suit, but the court of appeals reversed on appeal. In the meantime, the Library undertook the ninth triennial rulemaking.

16.    In the ninth rulemaking, ISOs petitioned to renew the Exemption. OEMs, including plaintiffs and their members, again submitted comments in opposition showing that the Register's previous analysis was wrong, especially in light of the intervening decision in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), which emphasized that when the "copying use" serves "substantially the same purpose" as the copyrighted work and "is of a commercial nature," it is unlikely to be fair use. *Id.* at 526.

17.    The Register did not alter her position, concluding that her "analysis from the 2021 cycle remains sound" and that "renewal remains appropriate." Register of Copyrights, *Section 1201 Rulemaking: Ninth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention*, Recommendation of the Register of Copyrights, 37-38 (Oct. 18, 2024) (*2024 Register's Recommendation*) (attached as Exhibit E).

18.    As before, the Librarian adopted the recommendation without further changes, renewing the Exemption. *See* 89 Fed. Reg. 85437 (Oct. 28, 2024).

19.    The Exemption is manifestly unlawful. By issuing a rule that enables unregulated, for-profit service providers to piggyback off the creative efforts and intellectual property of medical device manufacturers, it not only thwarts the purpose of the Copyright Act, but also puts patient safety, device integrity, and device cybersecurity at risk. What is more, the process by which the Exemption was adopted was infected with major procedural errors, including a failure to address many of the significant legal concerns raised by plaintiffs and other opponents.

20.    Because the Exemption is not in accordance with law and was adopted without observance of required procedures, it should be set aside.

## PARTIES

21.    Plaintiff AdvaMed is a non-profit, membership-based trade association that represents the world's leading innovators and manufacturers of medical devices, diagnostic products, digital health technologies, and health information systems. It leads the effort to advance medical technology to achieve healthier lives and healthier economies around the world. It is a world leader in advocating for health care policies that support diagnostic testing through robust innovation and the rapid adoption of new, safe, and effective diagnostic tests. It advocates for regulatory and payment policies tailored to the specific issues facing the device and diagnostics industry and that support patient access to innovation. AdvaMed members manufacture much of the life-enhancing and life-saving healthcare technology purchased annually in the United States and abroad. AdvaMed is headquartered in Washington, D.C.

22.    Plaintiff MITA is a non-profit, membership-based trade association. It is the leading voice of medical imaging equipment manufacturers, innovators, and product developers. Its member-companies' sales comprise more than ninety percent of the global market for advanced imaging technologies. MITA's mission is to establish standards and advocate for the medical imaging industry, with the vision that medical imaging drives effective patient care. MITA is a division of the National Electrical Manufacturers Association and is headquartered in Arlington, Virginia.

23.    Plaintiffs' members include companies that manufacture software-enabled medical devices. A complete list of AdvaMed's membership is available at perma.cc/YR53-X9GB. A complete list of MITA's membership is available at perma.cc/PG5E-TN3G.

24.    Both of plaintiffs' members rely on TPMs to protect their intellectual property from unlawful infringement. Consistent with both plaintiffs' missions, each participated in the eighth and ninth triennial exemption rulemaking to try to ensure that exemptions are appropriately limited. *See* Exhibit B (*MITA 2021 Comments*); Exhibit C (*AdvaMed 2021 Comments*); Exhibit F (*MITA 2024 Comments*); Exhibit G (*AdvaMed 2024 Comments*).

25.    AdvaMed's and MITA's members are harmed by the Exemption. The Exemption enables entities to circumvent the protective measures that their members rely on to safeguard their intellectual property. One of their joint members provided its own comments in both rulemakings, elaborating on this harm and urging the Register to recommend denying the proposed exemption and its renewal for a variety of reasons. *See* Exhibit D (*Philips 2021 Comments*); Exhibit H (*Philips 2024 Comments*).

26.    Defendant the Library of Congress is the federal agency charged with overseeing and implementing the DMCA's triennial exemption rulemaking. The Copyright Office, headed by the Register of Copyrights, is located within the Library of Congress.

27.    Defendant Carla Hayden is the Librarian of Congress. She is the official charged with promulgating exemptions through the triennial exemption rulemaking pursuant to

17 U.S.C. § 1201(a)(1). She is sued in her official capacity.

## JURISDICTION AND VENUE

28.    Plaintiffs bring this suit pursuant to the APA and the Declaratory Judgment Act. The D.C. Circuit held that rules promulgated by the Librarian in the DMCA triennial rulemakings "are subject to the APA just like other copyright rules," and "[t]he APA therefore provides the necessary waiver of sovereign immunity." *Medical Imaging & Technology Alliance v. Library of Congress*, 103 F.4th 830, 833 (D.C. Cir. 2024).

29.    This case arises under the laws of the United States. The Court's jurisdiction is invoked under 28 U.S.C. § 1331.

30.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (e) because at least one plaintiff and one defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## LEGAL BACKGROUND

31.    Copyrights trace to the Founding. Their purpose, the Constitution says, is to "promote the Progress of Science and useful Arts." U.S. Const. Art. I, § 8, cl. 8. Copyrights achieve this purpose "by securing for limited Times to Authors . . . the exclusive Right to their respective Writings." *Id.* This exclusive right is not a "special reward," but rather an incentive "to encourage the production of works that others might reproduce more cheaply." *Google LLC v. Oracle America*, 141 S. Ct. 1183, 1195 (2021).

32.    Congress implemented the Copyright Clause with the Copyright Act. *See* 17 U.S.C. §§ 101, *et seq*. It provides protection to "original works of authorship fixed in any tangible medium of expression." *Id.* § 102(a). Congress amended the Act in 1980 explicitly to include computer programs within the statute's ambit. *See* Computer Software Copyright Act of 1980, Pub. L. No. 96-517, § 10, 94 Stat. 3015, 3018 (1980). Software code is therefore treated the same as any other work of authorship—if it is original, it is protectable by copyright. *See* 17 U.S.C. § 101 (defining "computer program").

33.    In enacting the Copyright Act, Congress also recognized that granting exclusive rights could "sometimes stand in the way of others exercising their own creative powers." *Google*, 141 S. Ct. at 1195. Accordingly, it codified the longstanding framework for determining whether a particular use is a noninfringing "fair use." 17 U.S.C. § 107. Congress envisioned noninfringing uses "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." *Id.* It specified four factors for courts to evaluate in determining whether a particular use is a noninfringing fair use (*id.*): (a.) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (b.) the nature of the copyrighted work; (c.) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (d.) the effect of the use upon the potential market for or value of the copyrighted work.

34.    When it comes to digital versions of copyrighted material, a copyright owner may use a TPM, such as password protection or encryption, to control access to the work. In connection with enactment of the DMCA, the House Committee on the Judiciary observed that TPMs can "support new ways of disseminating copyrighted materials to users, and . . . safeguard the availability of legitimate uses of those materials by individuals." Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4, 1998, at 6 (Comm. Print 1998).

35.    The DMCA thus prohibits "circumvent[ing] a technological measure that effectively controls access to a [copyrighted] work." 17 U.S.C. § 1201(a)(1)(A). The statute defines "circumvent a technological measure" to mean "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3).

36.    In parallel with the anti-circumvention rule, Congress directed the Copyright Office to "monitor developments in the marketplace for copyrighted materials" and authorized the Librarian, upon recommendation of the Register of Copyrights, to grant selective waivers of the

anti-circumvention rule "for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials" for noninfringing uses. *House Report* 36.

37.    Congress called for a triennial rulemaking process for the promulgation of such exemptions. The DMCA specifies that "the Librarian of Congress, upon the recommendation of the Register of Copyrights . . . shall make the determination in a rulemaking proceeding . . . of whether persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by" the anti-circumvention law "in their ability to make noninfringing uses." 17 U.S.C. § 1201(a)(1)(C). The Act further directs the Librarian to examine the following factors in making such a determination (*id*.): (i.) the availability for use of copyrighted works; (ii.) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii.) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv.) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v.) such other factors as the Librarian considers appropriate.

*38.*    The DMCA's anti-circumvention exemption process thus entails a two-part inquiry. *First*, the Librarian must determine whether there are noninfringing uses of a particular class of copyrightable works at stake. *Second*, if there are, she must apply the statutory factors to determine whether the DMCA's anti-circumvention bar would "adversely affect[]" users' ability to make those noninfringing uses. 17 U.S.C. § 1201(a)(1)(C).

## FACTUAL BACKGROUND

### A.    Medical devices and the repair industry

39.    Plaintiffs' members develop and manufacture all kinds of sophisticated medical devices, which have revolutionized healthcare. These technologies have transformed patient care by enabling healthcare providers to diagnose disease accurately and promptly. As a result,

patients stay healthier longer and recover more quickly after treatment because clinicians can detect disease earlier.

40.    So these devices can deliver their advanced capabilities safely and effectively, OEMs design and write software embedded within the machines. To function properly, medical devices typically operate on a network (such as a hospital's internal internet) and store large amounts of data, including confidential patient health information. The computer code that drives the functioning of this software—and ultimately the operability of these complex devices—is original copyrighted work created by the OEM.

41.    Separately, the computer software and service materials used for the diagnosis, maintenance, and repair of medical devices also are original works of authorship protected by the Copyright Act. *See 2021 Register's Recommendation* 199-200.

42.    OEMs use a range of TPMs to guard against unauthorized access to, and copying of, copyrighted material. These include passwords, encryption, access codes, physical access keys with embedded authorization codes, and digital signatures.

43.    Unauthorized users employ a variety of methods to circumvent TPMs, such as copying physical access keys, "brute force" password cracking, passcode-generating algorithms, and sometimes simply obtaining access keys or passwords from authorized users.

44.    Medical device software is broadly licensed and available to healthcare providers. TPMs do not restrict healthcare providers from using licensed clinical software on medical devices; they limit only what aspects of the software may be viewed, used, copied, and modified. In this way, TPMs provide critical protection to ensure the privacy of patient data and that appropriate users operate the proprietary OEM software.

45.    The medical device servicing market is large and growing rapidly. Precedence Research, *Medical Equipment Maintenance Market to Hit USD 65 Bn by 2030* (Dec. 6, 2021), perma.cc/N5W2-RY32. The servicing of medical imaging equipment is the leading and fastest-growing segment of the market. Two groups of service providers are relevant here: (1) OEMs

and their authorized agents, and (2) ISOs.

46.    OEMs use their own authorized repair technicians whom they train extensively to service and repair their devices consistent with federal regulations and patient safety demands. They are able to meet the repair demand for their own devices.

47.    Improper use of OEM software for servicing or repairing medical devices presents serious risks to patients and healthcare providers. The devices use advanced technologies that, if not employed according to well-researched and regulated safety standards, can introduce dangers to users. These risks include electrical shock, mechanical failure, improper dosing, infection, and burns. Some imaging devices, including X-Ray machines and CT scanners, emit ionizing radiation which, if not properly calibrated and maintained, could result in overexposure that severely harms or kills patients. Other devices, such as imaging contrast agent power injectors, could potentially cause a fatal air embolism if serviced improperly. In addition to these direct safety risks, failure to maintain or repair these devices properly could cause interference with other equipment, a delay in care, and misdiagnosis.

48.    The act of circumventing TPMs to access medical device operating systems and software applications creates cybersecurity vulnerabilities that risk the functionality of devices and the privacy of confidential patient health information stored on them. Whenever a software hack tool is used to access a device for diagnostic and maintenance purposes, the device is modified, potentially compromising the integrity of the software. This can produce unintended consequences. For example, it may introduce security vulnerabilities to the device and to any networks to which the device is connected. And it may interfere with the device's operability as intended. Thus, circumvention increases the cybersecurity risk of highly regulated and confidential patient data, and it puts the functionality of life-saving medical equipment in jeopardy, raising patient safety concerns. *See FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices* (May 2018), at 25, perma.cc/5QFU-72E4 (*FDA Report*) (explaining that device cybersecurity risks "in turn may have the potential to result in patient

illness, injury, or death").

49.    Because of these risks to patients and providers, the Food and Drug Administration (FDA) strictly regulates the manufacturers of medical equipment. OEMs must register with the FDA (21 C.F.R. Part 807), list their devices with the FDA (*id.*), receive various FDA approvals before commercially distributing certain devices (21 C.F.R. Part 814), receive FDA label approval for devices (21 C.F.R. Part 801), and report serious malfunction incidents (21 C.F.R. Part 803). The FDA also regulates the quality control of medical devices, which includes requirements relating to the design, manufacture, installation, and servicing of medical devices. 21 C.F.R. Part 820. To comply with these important regulatory requirements, OEMs, among other things, periodically audit their quality control systems.

50.    Unlike OEMs, ISOs are unregulated service providers. They are not subject to the FDA regulations that apply to OEMs. Nor are they subject to the same training and quality control measures. As a result, they are not subject to the same regulatory oversight and do not have the same accountability as OEMs, increasing the potential that their circumvention of TPMs will result in faulty repairs that jeopardize patient care and safety. *See MITA 2021 Comments* 18-36. In addition, ISO repairs that circumvent TPMs "raise[] specific cybersecurity challenges related to" circumvention and frustrate FDA recommendations that OEMs "limit[] privileged access to operating systems and applications" and restrict "software or firmware updates to authenticated code only." *FDA Report* 25.

51.    It is more difficult to upgrade medical devices if the service history is unknown, improper parts have been used, or the device has been altered. The lack of regulatory reporting by ISOs can impair the tracking of significant device events and complicate root-cause investigations of device malfunctions.

52.    From the ISOs' perspective, the ability to circumvent TPMs in medical devices allows access to OEM software without internalizing any of the development or investment costs necessary to develop such software. The reason an ISO wants TPM circumvention is to benefit

its commercial interests, resulting in greater market share and more profits, even at the expense of patient safety and device integrity.

53.    ISOs have previously used unauthorized access to copyrighted software and other content to sell advanced services for medical devices that they otherwise would be unable to sell.

54.    The FDA has recognized that OEMs may reserve enhanced software programs for their own employees. *See, e.g.*, Letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, Food & Drug Administration, to Gail M. Rodriguez Ph.D., Executive Director, Medical Imaging & Technology Alliance 2 (Jan. 30, 2014), perma.cc/BX3V-3U5B ("[T]he manufacturer of the original system may provide the user or its own service personnel with additional documentation or enhanced software programs, with privileged access codes. This additional documentation or enhanced software programs may operate in conjunction with other proprietary accessories or functions."). Notwithstanding that right, many OEMs already provide service specifications to ISOs to enable them to perform maintenance and repair services. *Philips 2021 Comments*, Exs. A-B. ISOs are also typically able to access necessary documentation and software by contacting the OEM. *Id*., Ex. B.

55.    The ISOs that petitioned for the Exemption have a track record of circumventing TPMs without authorization for commercial gain.

56.    OEMs must make enormous investments to develop and bring medical devices to market, including investments in creating the software that runs and maintains them. Because of extensive FDA regulation, there are massive costs to ensuring the devices are safe and to securing approval for distribution to the commercial market.

57.    OEMs rely on their ability to recoup these substantial costs by protecting their valuable intellectual property through copyrights and licensing agreements. Without assurance that their intellectual property is adequately protected, OEMs may be unable to cover the costs of developing and improving these life-saving devices. Indeed, this reliance is consistent with the

purpose of the Copyright Act.

58.     It chills innovation when a creator cannot secure the benefit of meaningful copyright protection for its creations. Without that benefit here, OEMs may be unable to justify the costs of researching and developing improved products. Patents do not mitigate this problem because they provide a different scope of protection, and replication of uncovered intellectual property is extremely difficult to detect. Thus, the Exemption significantly reduces the incentives for continued innovation of life-saving medical devices and associated creative expressions.

**B.     The eighth triennial DMCA rulemaking**

59.     The Register of Copyrights commenced the eighth triennial Section 1201 rule-making on June 22, 2020, with the publication of a Notice of Inquiry in the Federal Register. *See* U.S. Copyright Office, *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg. 37,399 (June 22, 2020). The office took comments from proponents and opponents of various exemptions over the next three months.

60.     Two ISOs, Summit Imaging and Transtate Equipment, petitioned for the circum-vention of TPMs for purposes of diagnosis, maintenance, and repair of medical devices. *See* U.S. Copyright Office, *Petitions for Newly Proposed Exemptions*, perma.cc/HDV5-XLWG. The ISOs sought access to device software and data files stored on medical devices and systems.

61.     ISOs do not create new content or expression when they service medical devices. Nor did they assert in their petitions that plaintiffs' members' copyright protections are thwarting "the Progress of Science and useful Arts" (U.S. Const. Art. I, § 8, cl. 8) that the copyright laws are meant to promote. Rather, the ISOs sought an exemption only so that they can freeride off the creative efforts and intellectual property of OEMs.

62.     The Register published an NPRM identifying the exemptions that she proposed to recommend to the Librarian. *See* U.S. Copyright Office, *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg. 65,293 (Oct. 15, 2020). Without elaboration, the NPRM noted that the ISOs "petition for an exemption allowing circumvention of

TPMs for purposes of diagnosis, modification, and repair of medical devices." 85 Fed. Reg. at 65,307. Other than "invit[ing] comment on the extent to which its prior analysis of [third-party service providers] may be applicable here," the Register did not address the content of the proposed rule or request comments regarding the ISOs' petitions in the NPRM. *Id.*

63.    Plaintiffs submitted comments in opposition to the proposed exemption, making several significant arguments that an exemption was unwarranted. At a general level, they argued that the intended uses broadly infringed the copyrights of OEMs, thus foreclosing the possibility of an exemption. *AdvaMed 2021 Comments* 7-9; *MITA 2021 Comments* 7-11. Even if the intended uses were noninfringing, they asserted, the statutory factors weighed strongly in favor of rejecting an exemption due to the commercial nature of the ISOs' desire for an exemption, the consequential increased risk to patient safety and care, and an exemption's deleterious effects on the market for medical devices. *AdvaMed 2021 Comments* 10-15; *MITA 2021 Comments* 2-7.

64.    As to whether the intended uses were noninfringing, MITA argued that a categorical fair use determination here was inappropriate. *MITA 2021 Comments* 8. The Copyright Act demands a fact-specific inquiry to each "particular case," 17 U.S.C. § 107, and the Supreme Court has noted accordingly that "fair use analysis must always be tailored to the individual case." *Harper & Row v. Nation Enterprises, Inc.*, 471 U.S. 539, 552 (1985). Considering the complexity and varied applications of medical devices, and the range of services provided by ISOs, a categorical fair use determination based on the surface-level descriptions in the ISOs' petitions was inappropriate.

65.    Opponents of the exemption asserted further (*AdvaMed 2021 Comments* 7-9; *MITA 2021 Comments* 8-10; *Philips 2021 Comments* 7-10) that the purpose and character of the ISOs' proposed uses, and their effect on the market, weighed strongly against a finding of fair use:

(a.)    Because the ISOs' proposed uses are not for "criticism, comment, news reporting, teaching . . . scholarship, or research" (17 U.S.C. § 107) but instead for promoting the financial interests of for-profit companies who are not engaged in the creation of new works,

opponents explained that the fair use inquiry should end at the first step with a finding of no fair use. *AdvaMed 2021 Comments* 7-8; *MITA 2021 Comments* 8-9; *Philips 2021 Comments* 7-8.

(b.)   Opponents explained that, in addition to their commercial nature, there is nothing transformative about the ISOs' intended uses. Indeed, any alterations to the operability of devices would circumvent FDA regulatory oversight and put patients at risk. *MITA 2021 Comments* 9; *Philips 2021 Comments* 7-8 & n.24.

(c.)   They noted also that the creative nature of the copyrighted materials, which provide for the operation of complex machines and store and protect patient data, are essential to the safety, integrity, and security of medical devices, weighing against a fair use exception. *MITA 2021 Comments* 9; *Philips 2021 Comments* 8-9. Moreover, the unpublished nature of the work cuts against a finding of fair use. *AdvaMed 2021 Comments* 8.

(d.)   Commenters also explained that the broad scope of the proposed exemption meant that their copyrighted software and materials would be exposed in their entireties, again cutting against fair use. *AdvaMed 2021 Comments* 8; *MITA 2021 Comments* 10; *Philips 2021 Comments* 9-10.

(e.)   Opponents argued that the proposed exemption decreased the value of medical device software by increasing the share of the service-and-repair market held by unregulated ISOs. *AdvaMed 2021 Comments* 3; *MITA 2021 Comments* 10. At a general level, it harms OEMs by allowing competitors to view, replicate, and exploit their innovations without bearing the cost of their development. More specifically, because ISOs are not subjected to the same stringent FDA requirements as manufacturers, they face less accountability concerning their servicing of medical devices. Further, the ISOs' circumvention of TPMs to use OEM proprietary software creates unnecessary cybersecurity vulnerabilities that put patient safety in jeopardy. An increase in ISO services would therefore decrease confidence in the functioning of serviced medical devices. *See AdvaMed 2021 Comments* 11-15; *MITA 2021 Comments* 18-36. This diminishes the market value of the devices and their software. *MITA 2021 Comments* 10-11.

(f.)    Finally, plaintiffs argued the copyrighted materials reflected "a substantial investment of time and labor made in anticipation of a financial return." *MITA 2021 Comments* 9 (quoting *Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1154 (9th Cir. 1986)); *see also AdvaMed 2021 Comments* 8-9. They explained that ISOs' unchecked access to copyrighted material in its entirety would threaten the market for medical devices.

66.    Even assuming the intended uses were noninfringing, moreover, opponents argued that the Section 1201 factors also weigh against an exemption in this case:

(a.)    *First*, opponents explained (*AdvaMed 2021 Comments* 4-6, 10-11; *MITA 2021 Comments* 3; *Philips 2021 Comments* 5-6, 14-16) that TPMs do not prevent healthcare providers from using the device software, and OEMs already provide access to their code for most repairs. *MITA 2021 Comments* 3. The repair market was adequately served by authorized providers prior to the Exemption. *Philips 2021 Comments* 3 (citing *FDA Report i* (declining to conclude there was a health or safety concern presented by the medical device servicing market)).

(b.)    *Second*, opponents explained (*MITA 2021 Comments* 3; *Philips 2021 Comments* 16) that the proposed exemption would not serve any "archival, preservation, [or] educational purposes." *See* 17 U.S.C. § 1201(a)(1)(C)(ii).

(c.)    *Third*, opponents noted (*MITA 2021 Comments* 3; *Philips 2021 Comments* 16-17) that an exemption would not impact "criticism, comment, news reporting, teaching, scholarship, or research." *See* 17 U.S.C. § 1201(a)(1)(C)(iii).

(d.)    *Fourth*, opponents demonstrated (*AdvaMed 2021 Comments* 11; *MITA 2021 Comments* 3; *Philips 2021 Comments* 17) that by unveiling valuable intellectual property, an exemption would diminish "the value of copyrighted works" and damage the market for medical device software and materials, thwarting future innovation. *See* 17 U.S.C. § 1201(a)(1)(C)(iv).

(e.)    *Finally*, opponents explained (*AdvaMed 2021 Comments* 11-15; *MITA 2021 Comments* 4-5; *Philips 2021 Comments* 17-19) that an exemption would undermine comprehensive FDA regulations that ensure the devices are safe.

67.   The Register of Copyrights issued a formal recommendation to the Librarian of Congress to grant an exemption when circumvention is a necessary step for the diagnosis, maintenance, and repair of medical devices and systems. *See 2021 Register's Recommendation* 193, 208-212, 224-229, 233.

68.   The recommendation failed to respond, or to respond adequately, to many significant comments. These unaddressed comments related to matters of central relevance to the rule and genuinely cast doubt on the reasonableness of the Register's position:

(a.)   The recommendation did not address MITA's argument that as a threshold matter, a categorical fair use determination as the basis for reasoning the proposed uses are noninfringing is fundamentally incompatible with the fact-specific fair use inquiry demanded by the statute. *MITA 2021 Comments* 8; *see* 17 U.S.C. § 107 (requiring fair use analysis to each "particular case"). The Register's belief that she could categorically sanction the proposed uses as fair use was a key assumption that went unjustified despite this challenge.

(b.)   The recommendation did not address opponents' argument that the ISOs' proposed uses were generally barred from fair use consideration because they were not "for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research." 17 U.S.C. § 107; *see AdvaMed 2021 Comments* 7-8; *MITA 2021 Comments* 8-9; *Philips 2021 Comments* 7-8.

(c.)   The recommendation did not respond adequately to opponents' argument that the proposed uses were entirely commercial in nature, conveniently avoiding response to MITA's point that the Copyright Office itself has recognized that third-party software repairs "would likely be considered a commercial use." *MITA 2021 Comments* 9; *see also AdvaMed 2021 Comments* 7-8; *Philips 2021 Comments* 7-8.

(d.)   The recommendation did not address opponents' argument that the copyrighted software "represented a substantial investment of time and labor made in anticipation of a financial return." *MITA 2021 Comments* 9 (quoting *Hustler*, 796 F.2d at 1154);

*see also AdvaMed 2021 Comments* 8-9.

(e.)   The recommendation did not respond adequately to opponents' argument that once intellectual property is made public, any protection to its value is lost as a practical matter. *MITA 2021 Comments* 10; *see also AdvaMed 2021 Comments* 11; *Philips 2021 Comments* 17. The Register merely remarked that misuse of copyrighted material would not be permissible, but she did not address the simpler point that supposedly permissible uses will lead to impermissible ones, thus affecting the market for medical devices and their software. *2021 Register's Recommendation* 212.

(f.)   The recommendation did not address opponents' numerous significant arguments concerning the statutory factors the Librarian "shall examine" when considering an exemption for a noninfringing use:

(g.)   The recommendation did not address MITA's argument that the "users" of copyrighted medical device software are "the patients themselves undergoing the medical imaging procedures." *MITA 2021 Comments* 2-3. By disregarding this argument and failing to consider patients as the ultimate users, the Register took an unduly narrow view of the scope of users as it pertains to the first statutory factor. *See* 17 U.S.C. § 1201(a)(1)(C)(i).

(h.)   The recommendation did not address MITA's argument that the copyrighted software at issue remains usable even though a physical component of a medical device needs maintenance or repair. *MITA 2021 Comments* 3. The Register instead focused on software being less *accessible* to ISOs. *2021 Register's Recommendation* 224-226. But that interest is independent from the "availability for use of [the] copyrighted [software]." 17 U.S.C. § 1201-(a)(1)(C)(i). The copyrighted works remain available for use, a fact explained by MITA that the Register failed to address. *See MITA 2021 Comments* 3.

(i.)   The recommendation did not respond adequately to opponents' arguments that an exemption would not serve any "nonprofit archival, preservation, and educational purposes," and that it would not "impact . . . criticism, comment, news reporting, teaching, scholarship, or

research." 17 U.S.C. § 1201(a)(1)(C)(ii)-(iii); *see MITA 2021 Comments* 3; *Philips 2021 Comments* 16. The Register's only response was that these factors (which comprise nearly half of the statutorily mandated considerations) were "not especially relevant," *2021 Register's Recommendation* 227, an impermissible (and flatly incorrect) non sequitur. *See City of Vernon v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988).

(j.)    The recommendation did not respond to opponents' argument that the challenged exemption would unduly chill innovation and weaken incentives for further innovation, contrary to the purpose of copyright laws, including the DMCA. *MITA 2021 Comments* 3; *Philips 2021 Comments* 17; *see* 17 U.S.C. § 1201(a)(1)(C)(iv).

(k.)    The recommendation did not respond to opponents' argument that an exemption would result in more ISO repairs consisting of risky TPM circumvention, which places patients at risk and ultimately undermines public confidence in medical devices, thus damaging the market for these devices. *AdvaMed 2021 Comments* 3; *MITA 2021 Comments* 3-4, 10-11; *see* 17 U.S.C. § 1201(a)(1)(C)(iv).

(l.)    The recommendation did not adequately respond to MITA's distinction between medical devices and other consumer electronics—while the software of both has no independent market—there are paramount differences in the botched repairs between the two groups. *MITA 2021 Comments* 4. Instead of addressing this concern, the Register simply lumped sophisticated medical devices with "other software-enabled devices" in its reasoning. *2021 Register's Recommendation* 227.

69.    Without providing additional explanation or analysis, the Librarian adopted the Register's recommendation and issued a final rule published in the Federal Register and codified at 37 C.F.R. § 201.40, granting the Exemption. *See* 86 Fed. Reg. at 59,627. The Librarian's only explanation was to say that she had "duly considered and accepted the recommendation of the Register of Copyrights." *Id*. at 59,637.

### C.    The ninth triennial DMCA rulemaking

70.    Plaintiffs sued to challenge the Exemption as adopted in the Eighth Rulemaking. While this suit has been pending, however, the Library commenced and has since concluded the Ninth Rulemaking.

71.    Four ISOs petitioned for renewal of the Exemption in the Ninth Rulemaking. *See* U.S. Copyright Office, *Petitions to Renew Prior Exemptions*, perma.cc/5EMT-CK2E.

72.    Plaintiffs and others submitted comments opposing renewal of the Exemption. They argued that subsequent legal developments further undermined the Librarian's earlier conclusion that the ISOs' intended use of the copyrighted software was fair use. *See AdvaMed 2024 Comments*; *MITA 2024 Comments*; *Philips 2024 Comments*.

73.    Specifically, opponents noted that the Librarian's earlier conclusion was squarely at odds with the Supreme Court's subsequent holding in *Andy Warhol*, which clarified that commercial use of a copyrighted work for the same purpose as the original work is usually not fair use. *AdvaMed 2024 Comments* 6-8; *MITA 2024 Comments* 2-6; *Philips 2024 Comments* 5-6. That is exactly the case here: the ISOs' use of the copyrighted software is identical to—and serves precisely the same purpose as—the original use for which the copyrighted material was created. As the *Andy Warhol* Court explained, "[a] use that shares the purpose of a copyrighted work" in a purely commercial fashion merely "provide[s] the public with a substantial substitute for matter protected by the copyright owner's interests in the original work or derivatives of it, which undermines the goal of copyright." 598 U.S. at 531.

74.    Plaintiffs also explained that since the Library promulgated the Exemption, Congress and the FDA have set forth new cybersecurity policies directly at odds with the Exemption. *AdvaMed 2024 Comments* 3-5; *MITA 2024 Comments* 6. In the Consolidated Appropriations Act, 2023, Congress enacted a section entitled "Ensuring Cybersecurity of Medical Devices," which, among other new requirements, mandates that OEMs must monitor, identify, and address postmarket cybersecurity vulnerabilities and exploits. Pub. L. No. 117-328,

§ 3305, 136 Stat. 5832-34 (2022). And plaintiffs argued that recent FDA cybersecurity guidance, which instructs OEMs to "identify, assess, and mitigate cybersecurity vulnerabilities as they are identified throughout the supported device lifecycle" by using TPMs, reflected a change in the agency's position since the previous rulemaking. FDA, *Cybersecurity in Medical Devices: Quality System Considerations and Content of Premarket Submissions, Guidance for Industry and FDA Staff* (Sept. 27, 2023), perma.cc/2YZR-XX55.

75.    In addition to plaintiffs, the American Consumer Institute also opposed the Exemption because it "jeopardize[s] patient safety." Exhibit I (*American Consumer Institute 2024 Comments*) at 1. It agreed with plaintiffs that the Exemption "undermines the maintenance and repair standards laid out by the [FDA]" because ISOs "are not required to adhere to the FDA's Quality System Regulations or report adverse repair events." *Id.*

76.    The Register published an NPRM identifying the exemptions that she proposed to recommend to the Librarian. *See* U.S. Copyright Office, *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*, 88 Fed. Reg. 72,013 (Oct. 19, 2023). The Register dismissed opponents' arguments concerning FDA regulation, stating that they "were raised and addressed in the last rulemaking." *Id.* at 72,021. Although the NPRM acknowledged that FDA "has since issued updated cybersecurity guidance" and that "Congress has imposed additional cybersecurity requirements on" OEMs, it concluded, without elaboration, that "these developments do not change the Office's 1201 analysis." *Id.* at 72,022. The NPRM determined also that *Andy Warhol* "does not … substantially change how the Office would analyze the particular uses at issue." *Id.* Therefore, it concluded that "the conditions that led to adoption of this exemption are likely to continue during the next triennial period," and it recommended renewal.

77.    The Register issued a formal recommendation to the Librarian to renew the Exemption. *See 2024 Register's Recommendation* 35-38.

78.    The recommendation failed to respond adequately to plaintiffs' comments that congressional and FDA action since the last rulemaking was at odds with the Exemption. Mirroring

the NPRM, the recommendation brushed aside these comments by inexplicably claiming that it "addressed opponents' arguments concerning FDA regulation of medical devices and congressional policy in the last rulemaking," even though the comments concerned policymaking after the last rulemaking. *2024 Register's Recommendation* 37.

79.    As to plaintiffs' comments concerning *Andy Warhol*, the recommendation simply concluded that its "analysis from the 2021 cycle remains sound" and reiterated the same flawed reasoning that "the purpose of the use of software in repair is to render a non-functional device functional again, while the original purpose of the software is to operate a device that functions as designed." *2024 Register's Recommendation* 37-38. This reasoning, again, was flawed because it compares two different things. The "use of software in repair"—that is, accessing electronic service manuals that exist precisely for the purpose of performing servicing and maintenance—is used by ISOs for the same purpose in which OEMs designed the software to be used: to help fix the machines. The Register's reference to the software that is used "to operate a device that functions as designed" is, quite simply, a different part of the copyrighted work.

80.    The Register's failure to address comments concerning matters of central relevance to the Exemption and the propriety of its renewal casts serious doubt on the reasonableness of the Register's recommendation to renew the Exemption.

81.    That omission is especially notable because in this same rulemaking, the Register recommended denying a proposed exemption for the very reasons that plaintiffs argued the Exemption should be denied, without rational explanation for the different treatment.

82.    For-profit educational groups sought an exemption that would have permitted "preparers of online learning materials" at "qualified online educational entities" to bypass TPMs to access short clips from motion pictures "for the purpose of teaching registered learners . . . in courses requiring close analysis of film and media excerpts." *2024 Register's Recommendation* 52. Proponents asserted that such an exemption would allow online educational entities to use motion picture excerpts for legitimate educational purposes. *Id.* at 55.

83.    The Register nonetheless recommended denying this proposed exemption because they are likely infringing. *See 2024 Register's Recommendation* 59-61. Quoting from *Andy Warhol*, the Register explained that "[i]f an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use," and did in that case because "the for-profit nature" of the proposed uses was similar to the original work's use. *Id.* at 60-61. The Register likewise concluded that "[g]iven the substantial prevalence of commercial uses in the proposal," the fourth factor—the effect of the use upon the potential market for or value of the copyrighted work—also weighed against fair use. *Id.* at 63. Because these proposed uses were infringing, the Register recommended denying the proposed exemption.

84.    Those are the very same conclusions, advanced to analytically similar facts, that the Register recommended rejecting with respect to the Exemption. The Register gave no rational explanation for the disparate treatment of these two proposals.

85.    The Librarian adopted the Register's recommendation and issued a final rule renewing the Exemption. *See Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 89 Fed. Reg. 85,437, 85,441 (Oct. 28, 2024). The Librarian's only explanation was to say that "the Office 'generally does not consider other regulatory schemes as part of the . . . analysis'" and that "the *Warhol* decision does not substantially change the Office's analysis of the uses at issue in this exemption." *Id.* (quoting *2021 Register's Recommendation* 229). At the same time, however, the Librarian adopted, without elaboration, the Register's analysis and recommendation to deny the exemption proposed by the educators. *Id.* at 85,454-85,455.

## CLAIMS FOR RELIEF

### Count I
### Substantive Violation of the Administrative Procedure Act:
### Rule Is Contrary to Statute

86.    Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

87.    Under the APA, courts must set aside agency action that is arbitrary and capricious, not in accordance with law, or in excess of statutory authority. 5 U.S.C. § 706.

88.    The DMCA permits the Librarian to issue exemptions to the anti-circumvention rule only when the evidence shows "that it is more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make *noninfringing* uses of a particular class of copyrighted works." 17 U.S.C. § 1201(a)(1)(C) (emphasis added). Accordingly, "proponents [of an exemption] must show" that the "uses affected by the prohibition on circumvention are or are likely to be noninfringing." 86 Fed. Reg. at 59,628.

89.    The ISOs' unauthorized uses of OEM software are infringing, and the Librarian's grant of the Exemption exceeded her statutory authority and was not in accordance with law. Congress has specified that "the fair use of a copyrighted work" is not infringing only when the factors listed in 17 U.S.C. § 107 indicate a fair use consistent with the purposes of the Copyright Act. None of the Section 107 factors supports the Librarian's fair use determination in this case.

90.    The copyrighted work at issue here is unpublished computer software that reflects cutting-edge innovation and creativity, a product of a substantial investment of labor. It also contains valuable intellectual property.

91.    ISOs are for-profit companies that seek to use plaintiffs' members' copyrighted material for their own commercial interests only, not "for nonprofit educational purposes." 17 U.S.C. § 107(1). The sole purpose of the ISOs' use of the copyrighted software is in connection with the provision of maintenance services, which is a commercial, non-transformative use. Like anyone else who views or copies copyrighted work for strictly commercial benefit, the ISOs' use

is presumptively an unfair exploitation of the copyright holder's privilege because it "share[s] the same purpose" as the original use of the copyrighted work and "is of a commercial nature," with no transformative qualities. *See Andy Warhol*, 598 U.S. at 532-33.

92.    The "nature of the copyrighted work"—software code that drives the operation of complex medical devices and stores and protect patient data—further weighs against a fair use exception because the copyrighted material is essential to the safety, integrity, and security of these life-saving machines. 17 U.S.C. § 107(2).

93.    The breadth of the Exemption exposes the copyrighted work in its entirety. 17 U.S.C. § 107(3). And it authorizes purely non-transformative uses.

94.    The ISOs' use would diminish the value of the copyrights themselves by exposing valuable intellectual property, thus undermining the "value of the copyrighted work." 17 U.S.C. § 107(4). The result is a diminished incentive to create and improve sophisticated, life-saving medical devices.

*95.*    The Library's grant and renewal of the Exemption were not in accordance with law and in excess of the Library's statutory authority because the Exemption concerns infringing uses that are not authorized by copyright law or the DMCA.

*96.*    The Library's grant and renewal of the Exemption was also arbitrary and capricious because they were not grounded in the evidence before the agency. The Library's determination that ISOs are likely to be adversely affected by the anti-circumvention rule, including its consideration of the DMCA statutory factors, disregarded substantial record evidence that compelled the contrary conclusion.

## Count II
## Substantive Violation of the Administrative Procedure Act:
## Arbitrary and Capricious Rulemaking

97.    Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

98.    "[U]nexplained inconsistencies in [a] final rule" are arbitrary and capricious. *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015). Agencies may not, without

sufficient explanation, "treat[] similar situations differently." *City of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) (citation omitted).

99.    In the Ninth Rulemaking, the Librarian denied the educators' proposed exemption "[g]iven the substantial prevalence of commercial uses in the proposal" and the similarities of the original and proposed uses. *2024 Register's Recommendation* 63. The Librarian reasoned that "[i]f an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use." *Id.* at 60-61 (quoting *Andy Warhol*, 598 U.S. at 532). That describes the proposed uses here. Yet in the same rulemaking, when it came to analyzing the Exemption, the Librarian dismissed their pure commercial nature, concluding wrongly and without explanation they were "likely transformative" (*id.* at 37)—despite acknowledging in the Eighth Rulemaking (at 208) that ISOs do not in any way propose to transform or modify the material they are copying.

100. The Librarian correctly characterized and applied *Andy Warhol* in denying the educators' proposed exemption. *2024 Register's Recommendation* 60 (quoting *Andy Warhol*, 598 U.S. at 532). But she did not do this when analyzing the ISOs' uses underlying the Exemption. This kind of "inconsistent treatment is the hallmark of arbitrary agency action." *Catawba County v. EPA*, 571 F.3d 20, 51 (D.C. Cir. 2009).

101.   Because the Librarian treated these similar situations differently without supported explanation, the Exemption is arbitrary and capricious and must be set aside. 5 U.S.C. § 706.

### Count III
### Procedural Violation of the Administrative Procedure Act:
### Failure to Respond to Critical Comments

102.  Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

103.  The APA empowers courts to "hold unlawful and set aside agency action" that is undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2).

104.  Agencies are legally obligated to "consider and respond to significant comments received during the period for public comment." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92,

96 (2015) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S 402, 416 (1971)). In addition, agencies have "a duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule." *Northeastern Maryland Waste Disposal Auth. (NMWDA) v. EPA*, 358 F.3d 936, 948 (D.C. Cir. 2004).

105. The Register of Copyrights, and by extension the Librarian, failed to consider and respond adequately to several significant comments in opposition to the Exemption made during the public comment periods in the 2021 Eighth Rulemaking and in the 2024 Ninth rulemaking. The Ninth Rulemaking largely incorporated the analysis from the 2021 Rulemaking, thus keeping alive the comments made in the Eighth Rulemaking. These unaddressed comments related to matters of central relevance to the Exemption and genuinely cast doubt on the reason-ableness of the Library's position.

106. The Librarian of Congress adopted the Register's recommendation in both 2021 and 2024 without further consideration of plaintiffs' and other commenters' arguments or evidence.

107. The Exemption was therefore adopted without observance of procedure required by law and should be set aside.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs the Advanced Medical Technology Association and the Medical Imaging & Technology Alliance request that the Court enter judgment in their favor and

(a.)    set aside the Exemption;

(b.)    declare the Exemption to be unlawful and void;

(c.)    enjoin defendants from enforcing, implementing, or otherwise carrying out the Exemption;

(d.)    award plaintiffs their attorney's fees and costs as permitted by law; and

(e.)    award such other and further relief as the Court may deem just and proper.

November 8, 2024                          Respectfully submitted,

                                         /s/ *Michael B. Kimberly*

                                         Michael B. Kimberly (Bar No. 991549)
                                         Alex C. Boota (*pro hac vice*)
                                           *McDermott Will & Emery LLP*
                                           *500 North Capitol Street NW*
                                           *Washington, DC 20001*
                                           *(202) 756-8000*
                                           *mkimberly@mwe.com*

                                         *Counsel for Plaintiffs*