**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ADVANCED MEDICAL TECHNOLOGY
ASSOCIATION, et al.,

*Plaintiffs*,

*v.*

LIBRARY OF CONGRESS, et al.,

*Defendants*.

No. 1:22-cv-499 (BAH)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Michael B. Kimberly (No. 991549)
Alex C. Boota (*pro hac vice*)
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
mkimberly@mwe.com

*Counsel for Plaintiffs*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Glossary ........................................................................................................................... vi

Introduction ....................................................................................................................... 1

Background ........................................................................................................................ 3

   Statutory background .................................................................................................... 3

   Factual background ...................................................................................................... 6

   Procedural background ................................................................................................. 9

Argument ......................................................................................................................... 15

   A.   The Exemption is contrary to law because it is not for a "fair use." ......................... 16

      1.   The uses covered by the Exemption are purely commercial and not transformative. ........................................................................................ 17

      2.   The Exemption allows ISOs to use the entirety of the copyrighted software. .................................................................................................. 23

      3.   The uses covered by the Exemption will harm the market for and value of the copyrighted works. ................................................................. 24

      4.   The Exemption undercuts rather than promotes the objectives of copyright. ...................................................................................................... 26

   B.   The Exemption is arbitrary and capricious. ............................................................... 28

   C.   The Exemption is procedurally defective. ................................................................. 31

Conclusion ....................................................................................................................... 37

# TABLE OF AUTHORITIES†

**Page(s)**

**Cases**

*Advanced Computer Services of Michigan v. MAI Systems*,
845 F. Supp. 356 (E.D. Va. 1994) ........................................................2, 18, 23, 24, 27, 28, 29

*American Society for Testing and Materials, et al., v. Public.Resource.Org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018) ........................................................................................26

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ................................................................14, 17–20, 22, 23, 28, 30

*Apple Inc. v. Psystar Corp.*,
658 F.3d 1150 (9th Cir. 2011) ........................................................................................23

*Authors Guild v. Google*,
804 F.3d 202 (2d Cir. 2015) ..........................................................................................27

*Banner Health v. Price*,
867 F.3d 1323 (D.C. Cir. 2017) ......................................................................................32

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ........................................................................19, 20, 24, 26, 27

*Catawba Cnty. v. EPA*,
571 F.3d 20 (D.C. Cir. 2009) ..........................................................................................30

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) ........................................................................................................31

*City of Vernon v. FERC*,
845 F.2d 1042 (D.C. Cir. 1988) ......................................................................................34

*Cnty. of Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) ......................................................................................29

*Delaware Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014) ......................................................................................29

*Dist. Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) ..........................................................................................28

*Egilman v. Keller & Heckman, LLP*,
401 F. Supp. 2d 105 (D.D.C. 2005) ..................................................................................4

*Folsom v. Marsh*,
9. F. Cas. 342 (C.C.D. Mass. 1841) (Story, J.) ................................................................3

*Fox Television Stations, Inc. v. FCC*,
280 F.3d 1027 (D.C. Cir. 2002) ......................................................................................36

---

† Authorities upon which we primarily rely are marked with asterisks.

Cases—continued

*Google LLC v. Oracle America, Inc.,
 593 U.S. 1 (2021)................................................................3, 20, 21, 26, 27

Gyles v. Wilcox,
 26 Eng. Rep 489 (Ch. 1740) ...........................................................................3

Harper & Row Publishers, Inc. v. Nation Enterprises,
 471 U.S. 539 (1985)..............................................................................17, 24

HBO v. FCC,
 567 F.2d 9 (D.C. Cir. 1977)..................................................................31, 36

Lilliputian Systems v. Pipeline Hazardous Materials Safety Admin.,
 741 F.3d 1309 (D.C. Cir. 2014) .....................................................................31

Medical Imaging & Technology Alliance v. Library of Congress,
 103 F.4th 830 (D.C. Cir. 2024)...............................................................13, 14

Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance,
 463 U.S. 29 (1983)........................................................................................31

Northeastern Maryland Waste Disposal Authority v. EPA,
 358 F.3d 936 (D.C. Cir. 2004) .....................................................................36

Oracle Int'l Corp. v. Rimini Street, Inc.,
 2023 WL 4706127 (D. Nev. July 24, 2023) .................................................22

Perez v. Mortgage Bankers Association,
 575 U.S. 92 (2015)........................................................................................31

PPG Industries, Inc. v. United States,
 52 F.3d 363 (D.C. Cir. 1995)........................................................................17

Reiss v. National Quotation Bureau,
 276 F. 717 (S.D.N.Y. 1921)............................................................................3

Rosemont Enters. v. Random House, Inc.,
 366 F.2d 303 (2d Cir. 1966)..........................................................................28

Sega Enterprises, Ltd. v. Accolade, Inc.,
 977 F.2d 1510 (9th Cir. 1992) ......................................................................27

Sony Corp. of America v. Universal City Studios, Inc.,
 464 U.S. 417 (1984)......................................................................................17

Thompson v. Clark,
 741 F.2d 401 (D.C. Cir. 1984) .....................................................................31

*Triad Systems v. Southeastern Express,
 64 F.3d 1330 (9th Cir. 1995) ......................................2, 18, 20, 22, 23, 24, 29

United Video, Inc. v. FCC,
 890 F.2d 1173 (D.C. Cir. 1989) .....................................................................4

**Cases—continued**

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001)........................................................................................4

**Constitutions, Statutes, and Regulations**

U.S. Const. Art. I, § 8, cl. 8........................................................................................3

5 U.S.C.
   § 702............................................................................................................35
   § 706............................................................................................................30
   § 706(2).....................................................................................................2, 16

17 U.S.C.
   § 101.........................................................................................................3, 6
   § 102(a)....................................................................................................3, 6
   § 107.......................................................................3, 4, 10, 16, 24, 25, 32
   § 107(1)..................................................................................................17, 18
   § 107(2)......................................................................................................28
   § 107(3)......................................................................................................23
   § 1201(a)(1)(A)........................................................................................1, 4
   § 1201(a)(1)(C)..................................................................1, 2, 5, 16, 33
   § 1201(a)(3)..................................................................................................4
   § 1204(a).......................................................................................................4

21 C.F.R.
   Part 801........................................................................................................8
   Part 803........................................................................................................8
   Part 814........................................................................................................8
   Part 820.....................................................................................................8, 12

37 C.F.R.
   § 201.40(b)...............................................................................................6, 13
   § 201.40(b)(17)...........................................................................................15

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 3305, 136 Stat.
5832-34 (2022)......................................................................................9, 14, 35

*Exemption to Prohibition on Circumvention of Copyright Protection Systems for
Access Control Technologies*, 86 Fed. Reg. 59,627 (Oct. 28, 2021) ..........6, 13, 16

*Exemption to Prohibition on Circumvention of Copyright Protection Systems for
Access Control Technologies*, 89 Fed. Reg. 85,437 (Oct. 28, 2024) ........15, 16, 30

*Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*,
85 Fed. Reg. 37,399 (June 22, 2020) ...................................................................5, 9

*Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*,
85 Fed. Reg. 65,293 (Oct. 15, 2020).................................................................6, 10

**Other Authorities**

FDA Center for Devices and Radiological Health, *Remanufacturing of Medical
Devices: Draft Guidance for Industry and Food and Drug Administration
Staff* (June 21, 2021) ............................................................................................11

FDA, *Cybersecurity in Medical Devices: Quality System Considerations and
Content of Premarket Submissions, Guidance for Industry and FDA Staff*
(Sept. 27, 2023)............................................................................................14, 35

FDA, *FDA Report on the Quality, Safety, and Effectiveness of Servicing of
Medical Devices* (May 2018).............................................................................9, 25

H.R. Rep. No. 94-1476 (1976)...............................................................................26

H.R. Rep. No. 105-551, pt. 1 (1998).....................................................................1, 4

Letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, FDA,
to Gail M. Rodriguez Ph.D., Executive Director, MITA (Jan. 30, 2014).......................8, 9, 25

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][4]
(1993) ........................................................................................................20, 24

Register of Copyrights, *Section 1201 Rulemaking: Sixth Triennial Proceeding to
Determine Exemptions to the Prohibition on Circumvention*, Recommendation
of the Register of Copyrights (Oct. 8, 2015) ..........................................................21

Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of
H.R. 2281 (Comm. Print 1998)...............................................................................4

U.S. Copyright Office, *Petitions for Newly Proposed Exemptions* (2021) ....................9

U.S. Copyright Office, *Petitions to Renew Prior Exemptions* (2024)..........................14

**GLOSSARY**

APA:    Administrative Procedure Act

DMCA:    Digital Millennium Copyright Act

FDA:    Food and Drug Administration

ISO:    independent service operator

NPRM:    notice of proposed rulemaking

OEM:    original equipment manufacturer

TPM:    technological protective measure

## INTRODUCTION

In today's computer-driven economy, owners of digital copyrighted content frequently use technological protective measures—known as TPMs—to control access to their works. Common examples are password protection and file encryption. As the House Judiciary Committee explained at the time of enactment of the Digital Millennium Copyright Act (DMCA), circumventing a TPM to gain unauthorized access to copyrighted digital content "is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book." H.R. Rep. No. 105-551, pt. 1, at 17 (1998) (*House Report*). The DMCA prohibits users from circumventing any "technological measure that effectively controls access to a work." 17 U.S.C. § 1201(a)(1)(A).

At the same time that Congress made it unlawful to circumvent a copyright holder's TPM, it recognized that the DMCA's anticircumvention rule might be used to prevent "otherwise lawful access to works and information." *House Report* 36. It thus directed the Register of Copyrights to "monitor developments in the marketplace for copyrighted materials" and authorized the Library of Congress, upon the Register's recommendation, to promulgate selective exemptions from the anti-circumvention rule "for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials" for noninfringing purposes. *Id.*; *see* 17 U.S.C. § 1201(a)(1)(C).

This case concerns an exemption adopted under this framework, granting a waiver from DMCA liability for the circumvention of TPMs that protect copyrighted software used for servicing and repairing medical devices (the Exemption). Such devices include sophisticated and complex machines like computerized tomography scanners, ultrasound systems, positron emission tomography scanners, and surgery-assisting robots. Plaintiffs, whose members design and manufacture these life-saving machines, rely on TPMs to safeguard their machines' software and ensure the safety and privacy of patients that use their devices.

The Exemption is contrary to law, principally because it authorizes a manifestly infringing use. It was granted at the behest—and solely for the commercial benefit—of two independent

1

service operators, or ISOs. These are unregulated third-party service providers who freeride on the creative labors of device manufacturers. The Librarian readily admitted the true reason for her decision had nothing to do with protecting fair use. Rather, allowing ISO circumvention would reduce the cost of machine servicing contracts and thus serve a separate executive-branch policy. But the DMCA does not grant the Librarian free-ranging policymaking authority untethered to copyright law; rather, it authorizes the Librarian to promulgate exemptions only for "noninfringing uses . . . of a particular class of copyrighted works." 17 U.S.C. § 1201(a)(1)(C).

The uses underlying the Exemption are not fair use. ISOs expressly disclaim making any change to the copyrighted work. They seek only to use it for the very purpose for which it was designed: to service and repair medical devices. These are textbook examples of infringing commercial exploitations of copyrighted works, which the Ninth Circuit and the Eastern District of Virginia both have not hesitated to declare unlawful. *See Triad Systems v. Southeastern Express*, 64 F.3d 1330, 1337 (9th Cir. 1995); *Advanced Computer Services of Michigan v. MAI Systems*, 845 F. Supp. 356, 364-366 (E.D. Va. 1994). In granting and renewing the Exemption, however, the Librarian has turned copyright law upside down by declaring a competitor's copying of computer code to be a "fair use" because it will help the competitor take business from the copyright holder by offering lower prices.

The Exemption is arbitrary, capricious, and procedurally flawed. The Librarian's reasoning was unsupported by the record, lumping together complex medical devices with simple consumer electronics, without any justification. It was internally inconsistent, offering no rational explanation for the disparate treatment of similar proposals. And in granting and renewing the Exemption, the Librarian failed to address numerous substantial comments that called into question the underlying fair-use analysis and the propriety of an exemption under the DMCA factors.

The Exemption is thus unlawful many times over: It is contrary to the statutory text, it is arbitrary and capricious, and it was promulgated without observance of procedure required by law. *See* 5 U.S.C. § 706(2). It should be set aside.

2

## BACKGROUND

### Statutory background

**1.** At its core, this is a case about copyright law, which traces to the Founding. *See* U.S. Const. Art. I, § 8, cl. 8 (empowering Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries"). Today, the Copyright Act prohibits the unauthorized reproduction of "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Among the "works of authorship" covered by the Act are "literary work[s]," including "computer program[s]." *Id*. §§ 101, 102(a)(1), 109(b)(1)(A). As Judge Learned Hand long ago remarked, even works that "communicate nothing" in natural language still "may be the productions of high ingenuity, even genius" and are fully entitled to the protections of copyright law. *Reiss v. National Quotation Bureau*, 276 F. 717, 719 (S.D.N.Y. 1921).

Copyright law serves practical objectives, foremost "to encourage the production of works" that, without copyright protection, could be "reproduce[d] more cheaply" by freeriders in the marketplace. *Google LLC v. Oracle America, Inc.*, 593 U.S. 1, 16 (2021). But precisely because copyright rules are meant to encourage the production of new creative works, their protections are not limitless, or else they might "stand in the way of others exercising their own creative powers." *Id*. at 17. Courts have thus long recognized that certain "fair" uses of copyrighted materials are noninfringing. *See Gyles v. Wilcox*, 26 Eng. Rep 489 (Ch. 1740) (first recognizing the doctrine of "fair abridgement"); *Folsom v. Marsh*, 9. F. Cas. 342 (C.C.D. Mass. 1841) (Story, J.) (first recognizing the "fair use" doctrine in the United States).

Consistent with copyright law's overall practical objectives, the fair-use doctrine—since codified by Congress (at 17 U.S.C. § 107)—limits copyright protections as necessary to encourage "criticism, comment, news reporting, teaching . . . scholarship, [and] research." *Id*. The statute provides four factors for determining whether a particular use is a noninfringing "fair" use: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for

nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and sub-stantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Id.* Although the fair-use framework calls for carefully calibrated case-by-case determinations, it is well settled that a party's use of a work "to make their own commercial profit" typically does not serve the purposes of copyright and generally "diminishes the potential value of th[e] [copied] work." *United Video, Inc. v. FCC*, 890 F.2d 1173, 1192 (D.C. Cir. 1989).

**2.** The proliferation in the 1990s of digital copyrighted works—and the ease with which they could be reproduced—introduced new challenges for copyright owners. Many creators began using TPMs to control access to their works, including password protection and encryption. To support those efforts, "Congress enacted the DMCA in 1998 'to strengthen copyright protection in the digital age.'" *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 112 (D.D.C. 2005) (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 435 (2d Cir. 2001)); *see also* Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281, at 6 (Comm. Print 1998) (observing that TPMs can "support new ways of disseminating copyrighted materials" while "safeguard[ing] the availability of legitimate uses of those materials").

The DMCA prohibits users of a copyrighted work from "circumvent[ing] a technological measure that effectively controls access to [the] work." 17 U.S.C. § 1201(a)(1)(A). To circumvent a TPM is to "descramble" or "decrypt" a work or otherwise "avoid, bypass, remove, deactivate, or impair [a TPM], without the authority of the copyright owner." *Id.* § 1201(a)(3). Violations of the DMCA's anticircumvention rule are punishable with private civil remedies, and in the case of a willful violation "for purposes of commercial advantage or private financial gain," criminal pen-alties. *Id.* § 1204(a).

**3.** Congress recognized, however, that unchecked use of TPMs might threaten "a diminu-tion of otherwise lawful access to works and information." *House Report* 36. Because it did not intend for the DMCA to inhibit noninfringing uses, Congress directed the Register of Copyrights—

the head of the Copyright Office within the Library of Congress—to "monitor developments in the marketplace for copyrighted materials." *Id*. It further authorized the Librarian, upon the Register's recommendation, to grant selective waivers of the anticircumvention rule "for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials" for noninfringing uses. *Id*.

To implement that directive, the DMCA instructs that "the Librarian of Congress . . . shall make the determination in a rulemaking proceeding . . . of whether persons who are users of a copyrighted work" and who petition for relief should be granted a three-year "exemption" from the DMCA's prohibitions for limited purposes. 17 U.S.C. § 1201(a)(1)(C). But such exemptions are statutorily authorized only if users are "adversely affected by" the anticircumvention rule "in their ability to make *noninfringing* uses." *Id*. (emphasis added).

A DMCA exemption thus requires the Librarian to make two findings: *first*, that the proposed uses of the class of copyrightable works at issue are noninfringing; and *second*, that the DMCA's anticircumvention rule would "adversely affect[]" users' ability to make those noninfringing uses. 17 U.S.C. § 1201(a)(1)(C). The statute directs the Librarian to consider five factors in determining whether users are adversely affected. Those factors—the third and fourth of which are most pertinent here—are: "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate." *Id.*

**4.** The Copyright Office commences the triennial rulemaking processes required by 17 U.S.C. § 1201(a)(1)(C) with a notice of inquiry published in the Federal Register. *See, e.g.*, U.S. Copyright Office, *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg. 37,399 (June 22, 2020).

Following publication of a notice of inquiry, proponents of new or renewed exemptions file petitions and supporting evidence on the regulatory docket. At the conclusion of this process, the Copyright Office publishes in the Federal Register a notice of proposed rulemaking (NPRM) identifying the exemptions that the Office proposes to adopt. *See, e.g.*, U.S. Copyright Office, *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 Fed. Reg. 65,293 (Oct. 15, 2020). The NPRM is subject to staged comments from proponents and opponents of the proposed exemptions, who file argument and evidence in support of their respective views. The Register also holds a public hearing.

At the conclusion of the NPRM comment process, the Register of Copyrights issues a formal recommendation to the Librarian of Congress, who in turn adopts the recommendation in a final rule. *See, e.g.*, Library of Congress, *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 86 Fed. Reg. 59,627 (Oct. 28, 2021). The exemptions are codified at 37 C.F.R. § 201.40(b).

**Factual background**

**1.** Physicians, nurses, and healthcare technicians rely on complex medical devices every day to provide high quality patient care. Advanced medical devices like MRI machines, CT scanners, defibrillators, and surgery-assisting robots have transformed patient care over the past few decades by enabling healthcare providers to diagnose disease accurately and promptly, and by providing safe and often life-saving assistance in treatment. As a result, patients stay healthier longer and recover more quickly.

These sophisticated devices rely on complex software to function properly. *See* Ex. D (*Philips 2021 Comments*) 2-3. Software is a set of instructions and data, powered by computer code, that guide the device's operability. The makers of these devices—known as "original equipment manufacturers," or OEMs—create the innovative computer code embedded in these machines to make them run safely and effectively. *Id.*; *see* Ex. B (*MITA 2021 Comments*) 2. This code is protected by copyright, like any other creative work. *See* 17 U.S.C. §§ 101, 102(a). Without

6

these copyrighted creations, medical devices could not deliver their advanced capabilities.

Many medical devices operate on a network and store large amounts of confidential patient health data. *MITA 2021 Comments* 10. An imaging device, for instance, is typically connected to the internet and linked to a hospital's internal network. *Id*. at 5. And in the process of carrying out their functions, devices capture and store patients' medical data to relay that information to providers connected to the network. Copyrighted software plays a critical role in ensuring this confidential health information remains private. *Id.* at 5, 10. It also safeguards the devices from hackers and other cybersecurity risks, which could impair the devices' safe operation. *Id.*

The importance of software innovations in this space cannot be overstated. Advances in medical technology today are driven just as well by advances in software as they are by advances in hardware engineering and design. And OEMs must make enormous investments of time and money to develop and bring medical devices and their software to market. *MITA 2021 Comments* 9-10. They rely on copyright protections—and the licensing agreements they make possible—to recoup their substantial investments and facilitate further innovations. *MITA 2021 Comments* 11; *Philips 2021 Comments* 10-12. Without those protections, OEMs would not be able to recover their costs or to continue developing more effective and efficient devices. *Id.*

**2.** OEMs use a variety of TPMs, such as passwords and encryption, to guard against unauthorized access to and copying of their copyrighted software. Ex. C (*AdvaMed 2021 Comments*) 4-6. TPMs limit aspects of their software that may be viewed, used, copied, and modified. These limits not only safeguard OEMs' intellectual property, but they also ensure the privacy of patient data and that only appropriate users operate medical device software. *Id.* For example, OEMs license to healthcare providers the clinical software they need to treat patients, and they use TPMs to ensure that only authorized providers have access. *Id.* at 4-5. TPMs are thus vital to the safety and functionality of medical devices.

Accessing (and necessarily copying) a medical device's computer code facilitates its evaluation, maintenance, and repair. *Philips 2021 Comments* 3. But improper use of OEM software for

servicing medical devices creates substantial risks to users, risking serious injury to patients and providers. *MITA 2021 Comments* 4-5. In addition to these direct safety risks, failure to repair devices properly can cause delays and misdiagnoses. *Id.* In light of these risks to patients and providers, the Food and Drug Administration (FDA) strictly regulates OEMs, requiring them to receive various FDA approvals before commercially distributing certain devices (21 C.F.R. Parts 801 & 814) and to report serious malfunction incidents (21 C.F.R. Part 803), among other things. The FDA also regulates the quality control of medical devices, which includes requirements relating to their servicing and maintenance. *See* 21 C.F.R. Part 820.

Given the very serious risks involved in servicing such sophisticated machines, the FDA has recognized the importance of allowing OEMs to train and equip their "own service personnel with additional documentation or enhanced software programs, with privileged access codes" to provide particularly complex services and repairs. *See* Letter from Mary S. Pastel, Sc.D., Deputy Director for Radiological Health, FDA, to Gail M. Rodriguez Ph.D., Executive Director, MITA 2 (Jan. 30, 2014), perma.cc/BX3V-3U5B (*Pastel Letter*).

**3.** Independent service operators provide unregulated third-party maintenance and repair services for medical devices. *AdvaMed 2021 Comments* 2. They are not subject to the FDA regulations that apply to OEMs. *Id.* Nor are they subject to the same training and quality control measures. *Id.* at 2-3. Many OEMs nevertheless provide support to ISOs to enable them to perform basic maintenance and repair services, sometimes including limited licensing of copyrighted documentation and software. *Id.* at 8. But some ISOs have routinely attempted to circumvent TPMs to gain unauthorized access to copyrighted software. *Id.* at 2 ("AdvaMed is aware of at least 281 adverse events" over a five-year period "associated with third party servicing."); *Philips 2021 Comments* 6. Such ISOs use unauthorized access to market advanced maintenance services for medical devices that they otherwise would be unable to sell. *Philips 2021 Comments* 6. Circumventing TPMs for medical-device software thus allows ISOs to copy OEM innovations without internalizing any of the research-and-development costs necessary to produce the software and the

machine it runs.

The act of circumventing TPMs in medical devices itself creates software vulnerabilities. *Philips 2021 Comments* 10. By using passcode-generating algorithms or other technological or physical measures to bypass TPMs, unauthorized users can inadvertently modify the device or its operating systems, thus compromising software integrity. *Id.* This can unintentionally introduce security vulnerabilities to the device and its networks, as well as interfere with the device's intended functionality. Those are serious risks, which for medical devices, "have the potential to result in patient illness, injury, or death." FDA, *FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices*, at 25 (May 2018) perma.cc/5QFU-72E4 (*FDA Report*). For this reason, FDA recommends that OEMs "limit[] privileged access to operating systems and applications" and restrict "software or firmware updates to authenticated code only" in order to mitigate the "specific cybersecurity challenges related to" TPM circumvention. *Id.* And in light of these concerns, Congress also recently imposed new requirements on OEMs to monitor, identify, and address these postmarket cybersecurity vulnerabilities and exploits. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 3305, 136 Stat. 5832-34 (2022) (section entitled "Ensuring Cybersecurity of Medical Devices").

**Procedural background**

**1.**    The Register of Copyrights commenced the eighth triennial DMCA rulemaking (Eighth Rulemaking) with the publication of a notice of inquiry in the Federal Register. *See* 85 Fed. Reg. at 37,399.

Two ISOs petitioned for access to device software and data files stored on medical devices and systems for purposes of diagnosis, maintenance, and repair. *See* U.S. Copyright Office, *Petitions for Newly Proposed Exemptions* (2021), perma.cc/HDV5-XLWG. They did not assert that access to the protected materials was necessary to stimulate creation, expression, or learning; rather, they asserted that it was necessary to stimulate their profits. *See* Summit Imaging Petition 2, perma.cc/3HHR-N9C2 (asserting without explanation that the commercial sale of "diagnosis,

9

repair, and maintenance [services for] medical devices" is a "fair use"); Transtate Equipment Petition 2, perma.cc/V54Y-HBL5 (asserting that repair is "fair use" because "to perform the servicing activities, it is necessary to" copy software code and "data file[s] to obtain specification information").

The Register published an NPRM identifying seventeen proposed exemptions, including the exemption sought by the ISOs. *See* 85 Fed. Reg. at 65,293. Without elaboration, the NPRM noted that the ISOs "petition for an exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices." 85 Fed. Reg. at 65,307. The Register left unaddressed the content of the proposed rule, only "invit[ing] comment on the extent to which its prior analysis of" exemptions for third-party service providers in other contexts "may be applicable here." *Id.*

**2.** Plaintiffs and one of their mutual members submitted comments opposing the proposed exemption, arguing that it was for infringing purposes—not any fair use—and that to grant it would offend the basic purposes of the copyright laws. In particular, they argued:

- **Purely commercial use.** The proposed uses are purely commercial—namely, to facilitate competing maintenance and repair services. The exemption would not in any way promote the creation of new works or the proliferation of "criticism, comment, news reporting, teaching . . . scholarship, or research." 17 U.S.C. § 107. Related, there is nothing trans-formative about the ISOs' intended uses. *See AdvaMed 2021 Comments* 7-8; *MITA 2021 Comments* 8-9; *Philips 2021 Comments* 7-8 & n.24. The proposed uses are thus infringing.

- **Discouragement of further creations.** The software at issue is innovative and essential to the devices' safety, integrity, and security. It also represents a substantial investment of time and labor made in anticipation of a financial return. By permitting ISOs to freeride on OEMs' innovations and investments, the exemption would discourage the production of further creations. *MITA 2021 Comments* 9; *AdvaMed 2021 Comments* 8-9.

- **Damage to the market.** The proposed exemption would decrease the value of the copy-righted software and the medical devices that require the software to function. It also would increase the rate at which medical-device TPMs are circumvented, which would exacerbate cybersecurity risks, thus damaging consumer trust and further reducing the market value of the machines and their software. *AdvaMed 2021 Comments* 3, 11-15; *MITA 2021 Comments* 10-11. It would yet further damage the market for medical device software by broadly exposing OEMs' valuable intellectual property. *MITA 2021 Comments* 3, 10; *see also AdvaMed 2021 Comments* 8, 11; *Philips 2021 Comments* 9-10, 17.

- **Risks to patient safety and privacy.** The requested exemption would expressly invite TPM circumvention, which threatens patient privacy and puts patient and user safety at risk. The devices at issue use advanced technologies that, if not employed according to well-researched and regulated safety standards, can introduce dangers such as electrical shock, mechanical failure, improper dosing, and burns. It also would undermine FDA regulations that protect patient safety. *AdvaMed 2021 Comments* 3, 11-15; *MITA 2021 Comments* 3-5; *Philips 2021 Comments* 17-19.

**3.** Notwithstanding these and other extensive comments, the Register recommended granting an exemption covering "[c]omputer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files." Ex. A (*2021 Register's Recommendation*) 233. We refer to this as the "Exemption," which shields ISOs from DMCA liability when they circumvent TPMs as "necessary . . . to allow the diagnosis, maintenance, or repair of such a device or system." *Id.*

The Register first addressed the fair-use question. *2021 Register's Recommendation* 208-212. As to the commercial nature of the proposed uses, the Register stated without explanation that "[c]ommerciality is not fatal to a fair use determination." *Id*. at 209. Beyond that, she concluded "that proponents' proposed use is likely transformative and so the first factor favors fair use." *Id.* The Register reached this conclusion by reasoning that "the proposed activities are intended to restore a medical device or system's functionality," and in other repair contexts, "[t]he Register has previously concluded that diagnosis and repair are likely to be transformative uses." *Id.* She did not attempt to square her transformative-use finding with her own prior acknowledgement that the ISOs themselves had disclaimed transformative use and thus did "not seek an exemption to *modify* medical devices or systems, or their software." *Id*. at 208 (emphasis added).

The ISOs' omission of a request for an exemption to modify code makes sense because FDA guidance suggests that transformative modifications of medical-device system software, even just for maintenance and repair, may constitute device "remanufacturing," which would be subject to extensive FDA reporting and registration requirements. *See* FDA Center for Devices and Radiological Health, *Remanufacturing of Medical Devices: Draft Guidance for Industry and*

*Food and Drug Administration Staff* (June 21, 2021), perma.cc/M3Q9-WF8C; *see also* 21 C.F.R. § 820.3(w); *2021 Register's Recommendation* 229.

The Register further opined that medical-device system software is entitled to diminished copyright protection because it is "not used for [its] expressive qualities, but rather for [its] functional and informational aspects that enable users to control and understand the operation of the equipment." *2021 Register's Recommendation* 210. The Register concluded, in addition, that ISOs' copying of the entirety of OEMs' works "should be given little weight here because the use is necessary to accomplish the transformative purposes of diagnosis, maintenance, and repair." *Id*. at 211. And concerning harm to the market for the copyrighted software, the Register concluded that "there is no indication that the software serves any function, or has any value, except for use with the medical device or system for which it was designed." *Id*. at 212. The Register declined to take account of downstream effects on the market, including misuse of disclosed code. *Id*.

Moving next to the Section 1201(a)(1)(C) factors, the Register "consider[ed] whether the prohibition against circumventing TPMs on medical devices and systems . . . is adversely affecting the repair of those devices and systems." *2021 Register's Recommendation* 224. In response to plaintiffs' objections concerning the purely commercial nature of ISOs' proposed uses, the Register stated, again without elaboration, that she "[found] these factors not especially relevant to the [Section 1201(a)(1)(C)] determination." *Id*. at 227.

As for plaintiffs' comments concerning harm to the market, the Register analogized sophisticated medical devices like MRI machines and surgery-assisting robots to consumer electronics, stating that "[a]s with other software-enabled devices," unrestricted access to "software and manuals to diagnose, maintain, or repair the device or system" will "support rather than [undercut the value of] the embedded computer programs." *2021 Register's Recommendation* 227. For support, the Register pointed to her 2018 analysis concerning software-enabled consumer devices and video game consoles. *Id*. at 227 n.1260; *see also id*. at 203 (addressing same). But the Register elsewhere acknowledged that the "fair use analysis is ultimately a fact-specific inquiry

that can vary based on the type of device," and thus it is not possible to make a categorical fair-use determination with respect to maintenance and repair of "all software-enabled devices" without a complete factual record and an analysis as to each specific device category. *Id*. at 202. The Register did not explain why a consumer-electronics analogy was appropriate with respect to complex medical devices, which are used in patient-care settings where safety is paramount.

Finally, with respect to her discretion to consider other factors under the Section 1201-(a)(1)(C) framework, the Register observed that "OEMs charge higher prices" than ISOs for maintenance and repair and therefore "medical service providers must spend more to service their equipment" if they use OEM services "than if they were able to engage in self-repair or have an ISO perform repairs on their behalf." *2021 Register's Recommendation* 228. The Register opined that granting the Exemption would "help to address the broader competitive concerns recently highlighted by the Executive Branch" concerning repair and maintenance. *Id.*

"After weighing the statutory factors," the Register concluded that "the prohibition on circumvention of TPMs is causing, or is likely to cause, an adverse impact on the noninfringing diagnosis, repair, and maintenance of medical devices and systems." She accordingly recommended that the Librarian grant the Exemption. *2021 Register's Recommendation* 232-233.

The Librarian adopted the Exemption "based upon the Register's Recommendation" and without further response to comments. *See* 86 Fed. Reg. at 59,627. The Exemption was codified at 37 C.F.R. § 201.40(b) and went into immediate effect.

**4.**    Plaintiffs brought this suit challenging the Exemption as unlawful under the APA, or in the alternative, as an *ultra vires* and unconstitutional action by the Librarian. *See* Dkt. 1.

After cross-motions briefing, this Court dismissed the complaint. *See* Dkt. 26-27. The Court determined that the APA claims were "barred by sovereign immunity because the Librarian's decisions are not subject to APA review." Dkt. 27 at 17. It also rejected plaintiffs' alternative *ultra vires* claims. *Id.*

The D.C. Circuit vacated the dismissal and remanded. *See Medical Imaging & Technology*

*Alliance v. Library of Congress*, 103 F.4th 830, 833 (D.C. Cir. 2024). It held that "DMCA rules are subject to the APA just like other copyright rules," and it remanded for this Court "to assess the APA claims in the first instance." *Id.* Having held that the Exemption was reviewable under the APA, the D.C. Circuit determined that "the *ultra vires* claim is no longer available, and we need not address it." *Id.* at 841 n.7. The mandate was issued on August 2, 2024 (Dkt. 30), and at this Court's direction, the parties submitted a joint proposal for renewed cross-motions for summary judgment after plaintiffs filed an amended complaint, to account for the most recent triennial rulemaking (Dkt. 31).

5.    While this suit has been pending, the Library commenced and has since concluded the Ninth Rulemaking. Four ISOs petitioned for renewal of the Exemption. *See* U.S. Copyright Office, *Petitions to Renew Prior Exemptions* (2024), perma.cc/5EMT-CK2E.

Plaintiffs and others submitted comments opposing renewal of the Exemption. Opponents observed that the fair-use determination undergirding the Exemption was squarely at odds with the Supreme Court's subsequent holding in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 550 (2023), which clarified that commercial use of a copyrighted work for the same purpose as the original work is usually not fair use. *See* Ex. F (*MITA 2024 Comments*) 2-6; Ex. G (*AdvaMed 2024 Comments*) 6-8; Ex. H (*Philips 2024 Comments*) 5-6. They also explained that since the Library promulgated the Exemption, Congress and the FDA had instituted policies conflicting with the Exemption. *See MITA 2024 Comments* 6; *AdvaMed 2024 Comments* 3-5. These laws require OEMs to identify, assess, and mitigate postmarket cybersecurity vulnerabilities and exploits. *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 3305, 136 Stat. 5832-34 (2022) (section entitled "Ensuring Cybersecurity of Medical Devices"); FDA, *Cybersecurity in Medical Devices: Quality System Considerations and Content of Premarket Submissions, Guidance for Industry and FDA Staff* (Sept. 27, 2023), perma.cc/2YZR-XX55. Commenters argued that these intervening legal developments, at a minimum, warranted revisiting the fair-use analysis.

Notwithstanding these comments, the Register issued a formal recommendation to the Librarian to renew the Exemption. *See* Ex. E (*2024 Register's Recommendation*) 35-38. The Register did not substantially engage with opponents' comments.

She determined that the "analysis from the 2021 cycle remains sound," notwithstanding *Andy Warhol*, because "the purpose of the use of software in repair is to render a non-functional device functional again, while the original purpose of the software is to operate a device that functions as designed." *Id.* at 37-38. At the same time, however, in analyzing a different proposed exemption—which concerned analytically similar facts—the Register quoted and directed applied *Andy Warhol* to conclude that "the for-profit nature" of the proposed uses were similar to the original work's use and therefore were not fair use. *Id.* at 60-61.

As to plaintiffs' comments that congressional and FDA action since the last rulemaking was at odds with the Exemption, the Register claimed that she "addressed opponents' arguments concerning FDA regulation of medical devices and congressional policy in the last rulemaking," even though these policies were instituted after the last rulemaking. *Id.* at 37.

The Librarian adopted the Register's recommendation and issued a final rule renewing the Exemption. *See Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies*, 89 Fed. Reg. 85,437, 85,441 (Oct. 28, 2024). It is codified at 37 C.F.R. § 201.40(b)(17).

## ARGUMENT

The Exemption is unlawful several times over and should be vacated. The Librarian erred right out of the gate, determining that the ISOs' proposed uses are categorically "fair use" and thus noninfringing. That is wrong as a matter of law—the proposed uses are *not* fair uses, as the only two courts to consider the issue each have concluded. The Librarian's contrary conclusion is not only legally wrong, but it is also based on illogical and unexplained factual assumptions that are unsupported by evidence. The Librarian's reasoning, which resulted in unexplained internal inconsistencies, is arbitrary and capricious and enough alone to warrant vacatur of the Exemption.

Related, the Librarian failed to consider and respond to significant public comments, thus violating the APA's procedural requirements. Because the Exemption is not in accordance with law, is arbitrary and capricious, and was adopted without complying with procedural requirements, it must be vacated. *See* 5 U.S.C. § 706(2).[1]

A. **The Exemption is contrary to law because it is not for a "fair use."**

The DMCA permits the Librarian to issue exemptions to the anticircumvention rule only when "noninfringing uses . . . of a particular class of copyrighted works" are at stake. 17 U.S.C. § 1201(a)(1)(C). The threshold inquiry is thus whether the proposed uses are noninfringing; if they are instead infringing, the Librarian has no authority to grant an exemption and may not proceed to evaluating the statutory factors to determine whether such uses "are likely to be . . . adversely affected by" the anti-circumvention law. *Id.* It bears emphasis, moreover, that the proponent of an exemption bears the burden of showing by a "preponderance of the evidence in the record . . . that the conditions for granting an exemption have been met." 89 Fed. Reg. at 85,437. That means here that the ISOs had the burden to demonstrate that their uses were noninfringing to qualify for an exemption.

The Librarian determined the ISOs' uses were noninfringing because they were fair use. *See* 17 U.S.C. § 107. She dismissed the commercial nature of the ISOs' uses because, in her view, they were transformative, even though the ISOs expressly make no changes at all to the copyrighted work. And the Register further discounted the harms to the market for medical devices because she concluded the copyrighted materials had no independent value, even thought they are necessarily integral to the proper functioning of the machines.

These conclusions are unsupportable under any plausible conception of the fair-use doctrine, even more so considering intervening Supreme Court precedent that preceded the Librarian's

---

[1]    Because the Librarian effectively adopted the Register's reasoning as her own in granting (86 Fed. Reg. at 59,627 & 59,637) and renewing (89 Fed. Reg. at 85,445) the Exemption, we attribute the Register's analysis to the Librarian.

renewal of the Exemption. In fact, none of the Section 107 factors support the Librarian's fair-use determination. "Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end." *PPG Industries, Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995). Just so here.

### 1. The uses covered by the Exemption are purely commercial and not transformative.

The first fair-use factor weighs decidedly against the Exemption. This factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). There is no dispute that the ISOs' uses are entirely commercial. Nor are they transformative—on the contrary, the ISOs expressly disclaimed that they make *any* changes to the copyrighted work. These two elements thus "both point in the same direction," meaning the first factor weighs against a fair-use finding. *Andy Warhol*, 598 U.S. at 550.

a. As a baseline matter, "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984). Commercial use "tends to weigh against a finding of fair use" because "the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985). Indeed, the central point of copyright is to forestall such an outcome, encouraging the creation of innovative works in the first place.

ISOs are commercial enterprises, and their uses of OEMs' copyrighted software is purely commercial. They petitioned for the Exemption for a single reason: to increase their profits by freeriding on the creative labors of OEMs and increasing their market share. There is no room for fair-minded dispute on this point. Rather than pay for a license of OEMs' copyrighted software or defer certain complex repairs to OEM technicians when necessary, ISOs would prefer to bypass TPMs, hack into the software, and use it for their own commercial gain without paying for it. *See*

17

*Transtate Petition* 4 (complaining that TPMs "hinder competition by ISOs"); *TTG Imaging Solutions, LLC Renewal Petition* 3, perma.cc/ER5P-FACG (seeking renewal of the Exemption to promote "fair competition" with OEMs). An ISO's use of an OEM's software to provide competing maintenance services is therefore "entirely commercial in nature." *Triad Systems*, 64 F.3d at 1337 (holding that use of OEM software by ISOs for device maintenance and service is not fair use). ISOs obviously are not using the copyrighted works at issue "for nonprofit educational purposes." 17 U.S.C. § 107(1). Rather, "the sole purpose of [the ISOs'] use of [the] copyrighted software is in connection with the provision of [device] maintenance services," which "is a commercial use" that "is presumptively an unfair exploitation" of the copyright holder's privilege. *Advanced Computer Services*, 845 F. Supp. at 364-366 (holding that use of OEM software by ISOs for device maintenance and service is not fair use).

The Librarian dismissed this critical point with virtually no analysis because she (wrongly) determined that the ISOs' uses were transformative. *See 2021 Register's Recommendation* 209. Although "the first fair use factor . . . focuses on whether an allegedly infringing use has a further purpose or different character, which is a matter of degree," that "degree of difference must be weighed against . . . commercialism." *Andy Warhol*, 598 U.S. at 525. The Librarian did no such thing. Instead, she asserted that "the proposed activities are intended to restore a medical device or system's functionality, not to commercialize the embedded copyrighted software and other servicing materials." *2021 Register's Recommendation* 209. That is a nonsense assertion, akin to saying that, when someone illegally copies a motion picture and sells tickets to watch the bootlegged movie in his home, he is engaged only in the activity of entertaining his guests and cannot be accused of commercializing the copied film. That is not the law. For an ISO to sell services "to restore a medical device or system's functionality" (*id.*)—for it to sell a ticket to the movie—it is necessarily commercializing the copyrighted materials that are essential to providing those services. The materials ISOs copy include service and maintenance manuals located within the devices. Copying these materials plainly commercializes them, and it does so by putting them

to their intended use.

The Librarian therefore erred in her outright disregard for the commercial nature of the ISOs' use. "[T]he fact that a use is commercial as opposed to nonprofit is an additional 'element of the first factor.'" *Andy Warhol*, 598 U.S. at 531 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994)). Rather than weigh this fact as required by statute, the Librarian instead remarkably concluded that "the first factor *favors* fair use" simply because, in her view, the ISOs' proposed use was "likely transformative." *2021 Register's Recommendation* 209 (emphasis added). Even if that were true (and as we show below, it certainly was not), "new expression … is not, without more, dispositive of the first factor." *Andy Warhol*, 598 U.S. at 525. Transformative use is just one consideration of the first factor; it is not a reason to say that profit-motive is not suggestive of infringement.

**b.**    The Librarian's determination that the ISOs' uses were "likely transformative," more-over, was dead wrong on its own terms. *2021 Register's Recommendation* 209. ISOs—by their own admission—do not modify the copyrighted software *at all*. That is because "[m]odifying the software would likely lead to the system being considered remanufactured," which "is to be avoided" because it would then subject ISOs to a raft of burdensome FDA regulations. *See Avante Health Solutions Renewal Petition* 8, perma.cc/GMH3-NZPC. In addition, as the ISOs themselves admit, "the creation of new software or derivative software is meaningless" in this commercial context "because there is no use for such derivative software." *Id.* They instead use the copyrighted work for precisely the same purpose for which it was originally designed: to assist with the diag-nosis, maintenance, and repair of medical devices.

A transformative use of a copyrighted work is one that "has a further purpose or different character." *Andy Warhol*, 598 U.S. at 528. A parody, for example, "needs to mimic an original to make its point" but in so doing transforms the work in an independently expressive way, imbuing it with a new message. *Campbell*, 510 U.S. at 580-581. Likewise, an Andy Warhol painting might technically replicate a copyrighted logo and yet do so in way that transforms the meaning of the

work into a commentary on consumerism, "a purpose that is orthogonal to advertising soup." *Andy Warhol*, 598 U.S. at 538-539; *see* 4 Nimmer on Copyright § 13.05[A][1][b] (2019). Or in the software context, the use of copyrighted code "to create new products" is transformative when it offers programmers "a highly creative and innovative [new] tool" that broadly expands the creation of expressive content across a new technological platform. *Google*, 593 U.S. at 30; *accord Triad Systems*, 64 F.3d at 1336 (suggesting that a use is transformative and thus fair when "the copying result[s] in the proliferation of independent, creative expression"). The underlying idea, again, is that copyright law should be shaped and applied "to promote science and the arts," not to stifle it. *Campbell*, 510 U.S. at 579.

The ISOs' uses share none of the characteristics of the expression that courts have previously found transformative. Quite the opposite, an ISO "simply commandeer[s]" the copyright holder's "software and us[es] it for the very purpose for which, and in precisely the manner in which, it was designed to be used." *Triad Systems*, 64 F.3d at 1337. An ISO that copies documents and code for purposes of device maintenance and servicing "invent[s] nothing of its own." *Id.* at 1336. And allowing ISOs to copy code to further their own business objectives does not advance the "goal of copyright, to promote science and the arts." *Campbell*, 510 U.S. at 579.

**c.**  Despite the centrality of the "transformative use" finding to her fair-use determination, the Librarian gave no explanation—*none at all*—for her view that an ISO's use of software for maintenance services can be understood in any way to serve "a further purpose or different character" than that for which the software was originally created. *Andy Warhol*, 598 U.S. at 532; *see also Google*, 1 U.S. at 29 (considering whether the new software added "new expression, meaning or message" to the copyrighted work (quoting *Campbell*, 510 U.S. at 579)). It manifestly cannot. As the Librarian herself observed, the ISOs seeking the exemption here very notably did "*not* seek an exemption to *modify* medical devices or systems, or their software" in any way; they wish to copy it only for the same purely instrumental reasons for which it was created. *2021 Register's Recommendation* 208 (emphasis added).

The closest the Librarian came to any sort of reasoning on this point was a statement that "[t]he Register has previously concluded that diagnosis and repair"—generally speaking—"are likely to be transformative uses." *2021 Register's Recommendation* 209. In making this statement, the Register cited to the 2015 rulemaking in which the Register observed that "copying the work" embedded in automobile electronic control units (ECUs) would often lead to "creat[ing] new applications" and "modification of ECU computer programs" to allow new modes of "interoperation" among auto parts. Register of Copyrights, *Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention*, Recommendation of the Register of Copyrights, 234-235 (Oct. 8, 2015) (*2015 Register's Recommendation*).

There are two problems with the Librarian's extrapolation from this previous rulemaking.

**First**, at a general level, the fair-use doctrine must be applied "to particular situations on a case-by-case basis." *Google*, 1 U.S. at 22. What the Librarian may have reasoned or concluded in some other rulemaking with respect to some other device category is irrelevant to her decision in this rulemaking.

**Second**, the prior rulemakings concerned admittedly transformative uses, which is literally the opposite of what we have here. The 2015 rulemaking cited in the Register's recommendation concerned "diagnosis, repair, and *modification*" of electronic control units (ECUs) in automobiles. *See 2015 Register's Recommendation* 234 (emphasis added). The Register's analysis of ECUs in 2015 is inapplicable here, where the ISOs expressly disclaimed modification of any software code or the creation of new applications. The Librarian even acknowledged this explicitly, observing that "'modification' is not part of the proposed exemption for medical devices," and "no changes [will] be made" by ISOs to device software for uses under the Exemption. *2021 Register's Recommendation* 229. The single most important fact that drove the Librarian's reasoning in 2015 with respect to "transformative use" is therefore absent here, and any reliance on the 2015 rationale is insupportable. Yet that is all the Librarian offered.

**d.**  The Librarian offered little elaboration when renewing the Exemption. In echoing the

previous analysis, the Register explained this time that "the purpose of the use of software in repair is to render a non-functional device functional again, while the original purpose of the software is to operate a device that functions as designed." *2024 Register's Recommendation* 38. That makes no sense. The ISOs use the copyrighted software "for the very purpose for which, and in precisely the manner in which, it was designed to be used." *Triad Systems*, 64 F.3d at 1337. Much of the code at issue exists precisely for the purpose of performing servicing and maintenance, including "electronic manuals." *2021 Register's Recommendation* 211. Even general operational code is used also only for its purpose: To operate the machine being serviced. The use of a copyrighted work for its intended purpose is not transformative.

The Supreme Court's decision in *Andy Warhol* makes this critical fact pellucid, but the Librarian disregarded the significance of this intervening precedent when she renewed the Exemption. *Andy Warhol* considered the application of the first fair-use factor to a licensed photograph of Prince that "crops, flattens, traces, and colors the [original] photo but otherwise does not alter it." 598 U.S. at 522. The Court reasoned that because both pictures "are portraits of Prince used in magazines to illustrate stories about Prince," the purposes of the images were "substantially the same" and "shared the [same] objectives": "to illustrate a magazine about Prince." *Id.* at 535-536, 547. It held that, "although a use's transformativeness may outweigh its commercial character, here, both elements point in the same direction," and thus the first factor weighed against fair use. *Id.* at 538. Plaintiffs explained in their comments opposing renewal of the Exemption that *Andy Warhol* is squarely at odds with the Librarian's grant of the Exemption. *See MITA 2024 Comments* 2-6; *AdvaMed 2024 Comments* 6-8. As another court recognized in applying *Andy Warhol*, "there is . . . nothing transformative about . . . copying . . . software" and putting it "to the identical purpose as the original software." *Oracle Int'l Corp. v. Rimini Street, Inc.*, 2023 WL 4706127, at *76 (D. Nev. July 24, 2023). That is exactly what the ISOs are doing here.

Because the ISOs' use of the copyrighted software is purely commercial and serves the same purpose as the original copyrighted work, the first factor weighs against fair use. In

circumstances where the commercial use of a copyrighted work "is so similar to the [original work's] typical use, a particularly compelling justification is needed" to use the copyrighted work. *Andy Warhol*, 598 U.S. at 547. As the remaining factors make clear, there is none here.

>    2.    **The Exemption allows ISOs to use the entirety of the copyrighted software.**

The Librarian's "transformative use" finding also undergirded her dismissal of the third Section 107 factor, concerning "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). On this front, she acknowledged that ISOs intended to copy the entirety of OEMs' works, but baldly concluded that this "should be given little weight here because the use is necessary to accomplish the transformative purposes of diagnosis, maintenance, and repair." *2021 Register's Recommendation* 211.

But the third factor is—by statute—an independent element to be considered in the analysis. The Exemption permits ISOs to bypass TPMs, which exposes the entirety of the copyrighted software. As the Ninth Circuit has noted, the fact that an ISO must "copy[] programs in their entirety" to perform its third-party maintenance services weighs strongly against fair use. *Triad Systems*, 64 F.3d at 1337 (citing *Advanced Computer Services*, 845 F. Supp. at 366 n.13).[2] The Librarian gave no discernable explanation for concluding otherwise.

---

[2]    The Ninth Circuit has suggested in dictum that *Triad Systems* "has been legislatively overruled" by 17 U.S.C. § 117(c). *See Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011). Not so in this context. Section 117(c) authorizes the copying of software code only by the "owner or lessee of a machine," and not by third-party ISOs; and it does not permit access to or use of machine software except as "necessary for that machine to be activated." The Librarian herself observed that "section 117(c) covers a narrower range of activities than those proposed" by the ISOs, inasmuch as some "involve loading or accessing software that are not necessary to activate the machine." *2021 Register's Recommendation* 207. Because at least some proposed uses "would not be protected under the statute," the Librarian expressly disclaimed reliance on Section 117(c). *Id.* And as the Ninth Circuit noted in *Apple*, to the extent Section 117(c) is inapplicable, *Triad Systems* remains good law. 658 F.3d at 1150.

### 3. *The uses covered by the Exemption will harm the market for and value of the copyrighted works.*

The Librarian also sidestepped the fourth Section 107 factor, which calls for consideration of "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (alteration incorporated) (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][4], at 13–102.61 (1993) (footnotes omitted)). In evaluating this factor, the court "must take account not only of harm to the original but also of harm to the market for derivative works." *Harper & Row*, 471 U.S. at 568.

To begin with, courts have held that "[b]ecause [an ISOs' use of] software [is] commercial . . . the likelihood of future harm to the potential market for or to the value of the software may be presumed." *Advanced Computer Services*, 845 F. Supp. at 364-366. That is because, as a matter of common sense, it "likely cause[s] a significant adverse impact on [OEMs'] licensing and service revenues and lower returns on its copyrighted software investment" for ISOs to "freely use[] . . . copyrighted software on a widespread basis to compete with" OEMs for service and maintenance contracts." *Triad Systems*, 64 F.3d at 1337.

That is undeniably the case here. Commenters showed that adoption of the Exemption would decrease the value of medical device software by increasing the share of the service-and-repair market held by unregulated ISOs. *AdvaMed 2021 Comments* 3; *MITA 2021 Comments* 10. At a general level, this harms OEMs by allowing competitors to view, replicate, and exploit their innovations without bearing the cost of their development. The ISOs' circumvention of TPMs to carry out certain repairs, moreover, creates unnecessary technical vulnerabilities that put patient safety in jeopardy. An increase in unregulated ISO circumventions would therefore decrease

confidence in the functioning of serviced medical devices. *See AdvaMed 2021 Comments* 11-15; *MITA 2021 Comments* 18-36. This not only cuts into OEM service revenues, but it also diminishes the market value of the devices themselves and their software. *MITA 2021 Comments* 10-11. None of the proponents of the Exemption provided any evidence or argument for concluding otherwise.

Commenters showed further that the Exemption will have a significant chilling effect on further innovations, including for derivative works. *MITA 2021 Comments* 3; *Philips 2021 Comments* 17. OEMs rely upon recouping their substantial research and development costs by protecting their valuable intellectual property embodied in copyrighted software. Without meaningful copyright protection, OEMs cannot be assured that they will be able to recoup their significant investments in new, software-driven medical-device innovations. *Id*.

ISOs' circumvention of TPMs and subsequent use of copyrighted OEM software also increase the potential for device malfunction and cybersecurity attacks, which undermines the value for medical devices and their software. *See AdvaMed 2021 Comments* 11-15; *MITA 2021 Comments* 18-36. FDA strictly regulates OEMs to ensure that sophisticated medical devices and the software needed to run them operate safely and effectively. *See supra* at 8; *see also MITA 2021 Comments* 5-7. This regulation serves an important purpose: Improper use of OEM software or faulty repairs can result in serious injury or death in the patients and providers that use them. *See MITA 2021 Comments* 3-5, 18-36. Accordingly, FDA has recognized the importance of OEMs reserving certain enhanced software programs for their own employees, safeguarded by TPMs. *See, e.g.*, *Pastel Letter* at 2 (OEMs "may provide . . . its own service personnel with additional documentation or enhanced software programs, with privileged access codes" to provide certain services and repairs); *FDA Report* at 25 (recommending that OEMs "limit[] privileged access to operating systems and applications" and restrict "software or firmware updates to authenticated code only" in order to mitigate the "cybersecurity challenges"). Allowing unregulated ISOs to circumvent TPMs thus further impairs "the potential market for or value of the copyrighted work" by increasing these software vulnerabilities. 17 U.S.C. § 107.

In response to all of this, the Librarian analogized sophisticated medical devices to simple consumer electronics. After reasoning that the copyrighted software "generally [has] no independent value separate from being used with the equipment" (*2021 Register's Recommendation* 212) the Librarian asserted without explanation that "[a]s with other software-enabled devices" like cell phones and gaming consoles, unrestricted access to "software and manuals to diagnose, maintain, or repair the device or system" will "support rather than [undercut the value of] the embedded computer programs," in effect helping rather than hurting the market (*id.* at 227).

That analogy is both unexplained and inapt. "[A]pplication of [the fair-use factors] requires judicial balancing, depending upon relevant circumstances, including [differences] in technology." *Google*, 593 U.S. at 19; *see also id.* at 22 (the fair-use doctrine must be applied "to particular situations on a case-by-case basis") (quoting H.R. Rep. No. 94-1476, 65-66 (1976)); *id.* at 23 ("fair use depends on the context") (citing *Campbell*, 510 U.S. at 577-578). As the D.C. Circuit has put it, "each case raising a fair use [inquiry] must be decided on its own facts" and cannot be resolved by reflexive categorical analyses. *American Society for Testing and Materials, et al., v. Public.Resource.Org, Inc.*, 896 F.3d 437, 448 (D.C. Cir. 2018). Plaintiffs submitted significant evidence showing that circumvention of TPMs for diagnosis, maintenance, and repair of sophisticated medical devices implicates very different considerations even just among different medical devices, let alone compared with diagnosis, maintenance, and repair of iPhones and Nintendos. *E.g.*, *MITA 2021 Comments* 4.

The Librarian's failure to pay heed to those differences bungled her analysis of this factor. As the only evidence in the record shows, the ISOs' uses here harm the market for and value of medical devices and their software, threatening innovation in this critical space.

### 4.    *The Exemption undercuts rather than promotes the objectives of copyright.*

Finally, the Librarian opined with respect to the second Section 107 factor, which considers "the nature of the copyrighted work," that medical-device system software is entitled to diminished

copyright protection because it is "not used for [its] expressive qualities, but rather for [its] functional and informational aspects that enable users to control and understand the operation of the equipment." *2021 Register's Recommendation* 210 (citing *Google*, 593 U.S. at 28). That misses the point entirely. The software at issue here, "although used for a functional purpose, is essentially a creative work" that is "specially designed and crafted" for an innovative use, and it "represents a substantial investment of time and labor." *Advanced Computer Services*, 845 F. Supp. at 365. Furthermore, the software code at issue here drives the operation of complex medical devices and is essential to the safety, integrity, and security of these life-saving machines.

It is true that "some works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586. And "computer programs . . . almost always serve functional purposes." *Google*, 593 U.S. at 21. But that alone does not deprive them of copyright protection. *Id*. On the contrary, Congress thought "long and hard about whether to grant computer programs copyright protection" and decided to do so on the view that "copyright's existing doctrines (*e.g.*, fair use), applied by courts on a case-by-case basis, could prevent holders from using copyright to stifle innovation" with respect to high technology. *Id*.

On that front, the driving consideration is and must always be whether the proposed use "fulfills the objective of copyright law to stimulate creativity for public illumination." *Google*, 593 U.S. at 29. The Librarian lost sight of that objective, promulgating an Exemption that harms rather than serves the purposes of copyright. She did so out of apparent concern that "OEMs charge higher prices" than ISOs "to service their equipment," resulting in supposed "competitive concerns." *2021 Register's Recommendation* 228. That is a bewildering concern in the context of a statutory grant of monopoly privileges. "[C]opyright is a commercial right, intended to protect the ability of authors to profit from the exclusive right to merchandise their own work." *Authors Guild v. Google*, 804 F.3d 202, 214 (2d Cir. 2015).

To be sure, courts "should 'consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially.'" *Advanced Computer*

*Services*, 845 F. Supp. at 365 (quoting *Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992)). But the only relevant public benefit for copyright purposes is "'the devel-opment of art, science, and industry,' and not, as here, the purely financial interests of customers" who all along have been "on notice" of the licensing terms of the software at issue. *Id*. (quoting *Rosemont Enters. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966)). OEMs should be able to "rely on service fees to recoup [their] investment costs in developing the software." *Id*. To con-clude otherwise would discourage OEMs' creative energies by depriving them of the fruits of their investments, with no new, offsetting innovations to show for it. That would be disastrous to the public health and is the reason why the nature of the copyrighted work weighs against fair use here. *See* 17 U.S.C. § 107(2).

*        *        *

Having lost sight of the objectives of copyright, the Librarian badly misconstrued the fair-use doctrine, ultimately granting and renewing the Exemption for uses that are plainly infringing. Copyright protection here does not stifle any transformative creations; instead, the Exemption merely props up the commercial interests of freeriding competitors. Because none of the Section 107 factors support the Librarian's fair-use determination, the Exemption is not in accordance with law. It should be vacated.

### B.    The Exemption is arbitrary and capricious.

The Librarian's deficient and inconsistent reasoning in the rulemaking provides another basis for vacating the Exemption. ***First***, setting aside the ultimate determination of the fair use issue, the glaring deficiencies in the Librarian's reasoning are alone enough to warrant vacatur. ***Second***, in the same rulemaking in which the Librarian declined to consider *Andy Warhol*'s teach-ing that "the fact that a use is commercial . . . is an additional element of the first fair use factor" as applied to the ISOs' uses, she elsewhere reasoned the exact opposite—and expressly applied *Andy Warhol*—as it concerned an analytically identical commercial use. 598 U.S. at 510. This "unexplained inconsistenc[y]" is arbitrary and capricious. *Dist. Hosp. Partners, L.P. v. Burwell*,

786 F.3d 46, 59 (D.C. Cir. 2015). At a minimum, the Exemption should be vacated for the Librarian to address these defects.

**1.**    As we explained, the Librarian's analysis of the fair-use factors was rife with all the hallmarks of an arbitrary agency action. While we will not repeat them in detail, the Librarian's transformative-use finding was contrary to precedent (*see Triad Systems*, 64 F.3d at 1337; *Advanced Computer Services*, 845 F. Supp. at 364-366), factually unexplained, and flatly contradicted by the only relevant evidence in the record, which showed that ISOs did not intend to modify any device code or maintenance materials. *See supra* at 19-22. The Librarian even acknowledged this critical fact explicitly (*2021 Register's Recommendation* 229), yet nonetheless concluded that because she had "previously concluded" in other contexts (where users *were* modifying the copyrighted work) "that diagnosis and repair are likely to be transformative uses," the same must be true here (*2021 Register's Recommendation* 209). This reasoning "runs counter to the evidence before the agency" and is illogical. *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014). It is therefore arbitrary and capricious, warranting vacatur of the Exemption.

**2.**    The Librarian's consideration and application—or lack thereof—of *Andy Warhol* was also arbitrary and capricious. While the Librarian dismissed its relevance to the Exemption, elsewhere in the rule she appropriately applied the case to analytically similar facts and reached the opposite conclusion concerning fair use. The Librarian's failure to provide any explanation for the disparate treatment of these "similar situations" was arbitrary and capricious. *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999).

In the Ninth Rulemaking, for-profit educational groups sought an exemption that would have permitted "preparers of online learning materials" at "qualified online educational entities" to bypass TPMs to access short clips from motion pictures "for the purpose of teaching registered learners . . . in courses requiring close analysis of film and media excerpts." *2024 Register's Recommendation* 52. Proponents argued that an exemption would allow online educational platforms to use motion picture excerpts for legitimate educational purposes, which were of a different

29

character and served a different purpose than the original copyrighted work. *Id.* at 55.

Relying on *Andy Warhol*, however, the Librarian denied this proposed exemption "[g]iven the substantial prevalence of commercial uses in the proposal." *2024 Register's Recommendation* 63. The Librarian reasoned that "[i]f an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use." *Id.* at 60-61 (quoting *Andy Warhol*, 598 U.S. at 532). Because "the for-profit nature" of the proposed uses was similar to the original work's use, she concluded that the first factor weighed against fair use. *Id.* And for that same reason—"the substantial prevalence of commercial uses"—she concluded that the proposed uses would harm the market for and value of the copyrighted work. *Id.* at 63. The Librarian thus denied the proposed exemption because the uses were infringing. 89 Fed. Reg. at 85,454-85,455.

These facts all describe the ISOs' uses here too: the ISOs' uses are *entirely* commercial, and they use the copyrighted work for *precisely the same purpose* for which it was originally designed. Yet when it came to analyzing the ISOs' uses, the Librarian dismissed the relevance of *Andy Warhol* and disregarded the purely commercial nature of the ISOs' uses. *See 2024 Register's Recommendation* 37; *2021 Register's Recommendation* 209.

While the Librarian appropriately characterized and applied *Andy Warhol* in denying the educators' proposed exemption—by balancing the degree of "further purpose or different character" of the secondary use "against the commercial nature of the use" (*2024 Register's Recommendation* 60 (quoting *Andy Warhol*, 598 U.S. at 532)), she did not do this at all when analyzing the ISOs' uses underlying the Exemption. This kind of "inconsistent treatment is the hallmark of arbitrary agency action." *Catawba Cnty. v. EPA*, 571 F.3d 20, 51 (D.C. Cir. 2009). Worse, the Librarian did not even acknowledge this internal inconsistency.

Because the Librarian treated these similar situations differently without any explanation, the Exemption is arbitrary and capricious and must be set aside. 5 U.S.C. § 706.

C.    **The Exemption is procedurally defective.**

The Librarian's terse and incomplete reasoning supports more than just a finding that the Exemption is substantively deficient; it means that it is procedurally unlawful, too.

An agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance*, 463 U.S. 29, 43 (1983). Agencies are therefore obligated by the APA to "consider and respond to significant comments received during the period for public comment." *Perez v. Mortgage Bankers Association*, 575 U.S. 92, 96 (2015) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). "An agency's failure to respond to relevant and significant public comments generally 'demonstrates that the agency's decision was not based on a consideration of the relevant factors.'" *Lilliputian Systems v. Pipeline Hazardous Materials Safety Admin.,* 741 F.3d 1309, 1312 (D.C. Cir. 2014) (quoting *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984)). Although an agency need not "respond to every comment" (*Thompson*, 741 F.2d at 408), it must adequately respond to comments that genuinely "cast doubt on the reasonableness of a position taken by the agency." *HBO v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977).

The Librarian failed these basic requirements. Many of plaintiffs' significant comments concerning matters of central relevance to the Exemption went unaddressed. This provides an independent basis to set aside the Exemption.

**1.**    The Librarian did not address comments calling for a device-specific analysis of the fair-use doctrine. MITA explained that a categorical fair-use determination based upon the surface-level descriptions in the ISOs' petitions was inappropriate because the fair-use analysis must be tailored to the facts of the individual case, which was not possible here considering the varied applications of medical devices and the range of services provided by ISOs. *MITA 2021 Comments* 4, 8. The Librarian did not address this point at all.

31

Worse, she adopted the Exemption after inexplicably grouping complex medical devices with cell phones and gaming consoles. *See 2021 Register's Recommendation* 211 n.1167 & 227 n.1260. Although the Librarian elsewhere concluded that medical devices "should be evaluated separately" from "consumer devices," she did not actually furnish any such separate evaluation; instead, she concluded without any explanation that, "[a]s in previous rulemakings" *that concerned consumer devices*, commerciality "should be given little weight here because the use is necessary to accomplish the transformative purposes of diagnosis, maintenance, and repair." *Id.* at 211 n.1167 (citing 2015 and 2018 rulemakings, concerning automobile and consumer-device software); *accord id.* at 212 (relying blindly on "findings in prior rulemakings" and analyses of "other types of software-enabled devices"). An agency's express acknowledgement that it must undertake a particular analysis amounts to nothing if the agency declines ever actually to undertake the required analysis. This "internally inconsistent" reasoning is arbitrary and capricious. *Banner Health v. Price*, 867 F.3d 1323, 1349 (D.C. Cir. 2017).

**2.**    The Librarian also disregarded commenters' observation that the purpose of the ISOs' proposed uses was not "for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research" (17 U.S.C. § 107), but instead for promoting the financial interests of for-profit companies. *See AdvaMed 2021 Comments* 7-8; *MITA 2021 Comments* 8-9; *Philips 2021 Comments* 7-8. The Librarian's only response was the *ipse dixit* that maintenance and repair of medical devices is somehow transformative, supposedly making the commerciality of ISOs' uses irrelevant. *Register's Recommendation* 209. But even on that score, the Librarian did not respond adequately to opponents' explanation that there is not anything transformative about the ISOs' intended uses. Opponents explained that the ISOs were not creating anything new, and any true alterations to the devices would circumvent FDA regulatory oversight, putting patients at risk. *MITA 2021 Comments* 9; *Philips 2021 Comments* 7-8 & n.24. The Librarian did not address the substance of these observations, simply asserting without explanation that the opposite is true.

Commenters highlighted this point again in light of *Andy Warhol* during the renewal

rulemaking, yet the Librarian still disregarded the comments. *MITA 2024 Comments* 5-6; *Philips 2024 Comments* 6. The Librarian offered no new analysis on this point, even though these comments pertained to an issue of central importance to the rulemaking. Instead, she rested on the analysis in the previous rulemaking, which blithely stated that "[c]ommerciality is not fatal to a fair use determination." *2021 Register's Recommendation* 209. But reciting a legal truism without applying it to the facts of the case is not responsive. And while it is true that commerciality does not categorically rule out a fair-use finding, the Librarian did not address why, in this case, the purely commercial nature of the ISOs' proposed uses is overcome by other considerations.

Relatedly, when it came time to analyze the DMCA statutory factors, the Librarian did not respond adequately to opponents' arguments that an exemption did not serve "nonprofit archival, preservation, and educational purposes," and that it would not "impact . . . criticism, comment, news reporting, teaching, scholarship, or research." 17 U.S.C. §§ 1201(a)(1)(C)(ii)-(iii); *see MITA 2021 Comments* 3; *Philips 2021 Comments* 16. The Librarian's only response was to say that these factors—which comprise nearly half of the statutorily mandated considerations—were "not especially relevant." *2021 Register's Recommendation* 227.

**3.** The Librarian did not address opponents' concern for the Exemption's chilling effect on innovation or its negative impact on the value of the copyrighted software and medical devices. *MITA 2021 Comments* 3; *Philips 2021 Comments* 17. Commenters demonstrated that by unveiling valuable intellectual property, the Exemption would diminish "the value of copyrighted works" and damage the market for medical device software and materials, thwarting future innovation. *AdvaMed 2021 Comments* 11; *MITA 2021 Comments* 3; *Philips 2021 Comments* 17. They explained also that the Exemption would expose the copyrighted work in its entirety to the public, and once intellectual property is made public, any protection to its value is lost as a practical matter. *MITA 2021 Comments* 10; *see also AdvaMed 2021 Comments* 8, 11; *Philips 2021 Comments* 9-10, 17. The Librarian merely remarked that misuse of copyrighted material would not be permissible. *2021 Register's Recommendation* 212. But that is no response at all; the point was that

supposedly permissible uses will lead to impermissible ones, thus affecting the market for medical devices and their software.

Opponents also argued that the proposed exemption would make unregulated circumventions more common, which has a direct and negative impact on the market for medical devices. *AdvaMed 2021 Comments* 3; *MITA 2021 Comments* 10. Because ISOs are not subjected to the same stringent FDA requirements as manufacturers, they face less accountability concerning their servicing of medical devices. *MITA 2021 Comments* 3-7. And the circumvention itself of TPMs creates unnecessary cybersecurity vulnerabilities that put patient privacy and safety in jeopardy. An increase in ISO circumventions would therefore increase patient risk and decrease confidence in the functioning of serviced medical devices. *See AdvaMed 2021 Comments* 11-15; *MITA 2021 Comments* 18-36. This will diminish the market value of the devices and their software. *MITA 2021 Comments* 10-11. The Librarian did not address the substance of these concerns, remarking only—and irrelevantly—that the software had "no independent value separate from being used with the equipment." *2021 Register's Recommendation* 212. But the Librarian "is not entitled under the APA to respond with a non sequitur." *City of Vernon v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988).

**4.**  In the Ninth Rulemaking, the Librarian failed yet again to adequately consider two critical points by opponents of the Exemption's renewal that demonstrated the Exemption's legal foundation was no longer sound.

***First***, the Librarian did not adequately consider opponents' comments that *Andy Warhol* seriously undermined her previous fair use analysis in granting the Exemption. Commenters explained that *Andy Warhol* clarified that commercial use of a copyrighted work for the same purpose as the original work is usually not fair use. *MITA 2024 Comments* 2-6; *AdvaMed 2024 Comments* 6-8; *Philips 2024 Comments* 5-6. They explained that the ISOs here use the copyrighted software "for the exact same purpose as it was created by OEMs—to service medical imaging systems." *Philips 2024 Comments* 1; *see also MITA 2024 Comments* 4 ("The use of the copyrighted work

34

(the medical device software) by third-party ISOs has exactly the same 'purpose and character' as the original copyrighted work: enabling the functionality of the medical device."). Despite these comments, the Librarian disregarded *Andy Warhol*'s impact on the fair use analysis. She simply concluded that this Supreme Court precedent "does not substantially change how the Office would analyze the uses at issue" and that the "analysis from the 2021 cycle remains sound." *2024 Register's Recommendation* 38. This statement is unresponsive and inexplicable on its own terms. But it is even more so because, as we explained earlier, the Librarian elsewhere in the same rule directly applied *Andy Warhol* to another proposed exemption and determined that "the for-profit nature" of the uses underlying that proposed exemption tilted the first and fourth fair-use factors against fair use, ultimately finding the uses infringing. *See supra* at 28-30.

> **Second**, the Librarian disregarded comments showing that Congress and the FDA have set forth new cybersecurity policies squarely at odds with the Exemption. MITA explained that in a recent omnibus bill, Congress enacted provisions that require OEMs to monitor, identify, and address postmarket cybersecurity vulnerabilities and exploits, which necessarily includes the circumvention of TPMs. *MITA 2024 Comments* 6 (citing Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 3305, 136 Stat. 5832-34 (2022) (section entitled "Ensuring Cybersecurity of Medical Devices")). Commenters also explained that, consistent with those new requirements, FDA had issued new guidance instructing OEMs to use TPMs to "identify, assess, and mitigate cybersecurity vulnerabilities as they are identified throughout the supported device lifecycle," marking a change in the agency's position since the previous rulemaking. FDA, *Cybersecurity in Medical Devices: Quality System Considerations and Content of Premarket Submissions, Guidance for Industry and FDA Staff* (Sept. 27, 2023), perma.cc/2YZR-XX55; *see MITA 2024 Comments* 6.

> The Librarian inexplicably stated that she had already "addressed opponents' arguments concerning FDA regulation of medical devices and congressional policy in the last rulemaking." *2024 Register's Recommendation* 37. That is quite literally impossible, however, because the comments concerned policymaking that took place after the previous rulemaking. Indeed, commenters

35

pointed to these new developments to demonstrate that they "undermine the legal foundation" for the Exemption. *MITA 2024 Comments* 1. The Librarian simply did not consider them.

In sum, the Librarian's reasoning fell short of the APA's procedural requirements. 5 U.S.C. § 702. She failed to respond to many comments concerning the agency's "key assumption[]" that the ISOs' intended uses were noninfringing. *Northeastern Maryland Waste Disposal Authority v. EPA*, 358 F.3d 936, 948 (D.C. Cir. 2004). These procedural defects, in addition to "cast[ing] doubt on the reasonableness of [the Library's] position," are independent reasons to set aside the Exemption. *HBO v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977); *see Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1051 (D.C. Cir. 2002) ("These failings alone require that we reverse as arbitrary and capricious.").

## CONCLUSION

The Court should grant summary judgment to plaintiffs and enter a final judgment setting aside the Exemption, declaring the Exemption to be unlawful and void, and enjoining defendants from enforcing, implementing, or otherwise carrying out the Exemption.

November 15, 2024

Respectfully submitted,

/s/ *Michael B. Kimberly*

Michael B. Kimberly (Bar No. 991549)
Alex C. Boota (*pro hac vice*)
   McDermott Will & Emery LLP
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*
   *mkimberly@mwe.com*

*Counsel for Plaintiffs*