## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MEDICAL IMAGING &
TECHNOLOGY ALLIANCE, *et al.*,

      Plaintiffs,

v.

LIBRARY OF CONGRESS, *et al.*,

      Defendants.

CASE NO.: 1:22-cv-00499-BAH

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ............................................. 3

I.    DIGITAL MILLENIUM COPYRIGHT ACT ("DMCA") ............................. 3

II.   DMCA'S TRIENNIAL RULEMAKING REQUIREMENT ........................... 4

III.  EIGHTH AND NINTH TRIENNIAL RULEMAKING PROCEEDINGS ............................ 7

      A.    Eighth Triennial Rulemaking Proceeding ........................................... 7

      B.    Ninth Triennial Rulemaking Proceeding ............................................ 11

PROCEDURAL BACKGROUND ............................................................................ 13

LEGAL STANDARD ................................................................................................ 14

ARGUMENT ............................................................................................................. 15

I.    THE LIBRARIAN'S DETERMINATION THAT ACCESSING COPYRIGHTED
      WORKS IN ORDER TO REPAIR MEDICAL DEVICES IS LIKELY
      NONINFRINGING IS CONSISTENT WITH THE COPYRIGHT ACT AND
      BASED ON REASONED DECISIONMAKING. ............................................ 15

      A.    The Purpose and Character of the Uses Contemplated by the Repair
            Exemption Weigh in Favor of Fair Use. ........................................... 17

      B.    The Nature of Medical Device Software Favors Fair Use. .................. 22

      C.    The Amount of Medical Device Software Used for Repair is Reasonable
            Relative to the Purpose of the Use. .................................................... 24

      D.    The Effect of Repair on the Potential Market for Medical Device Software
            Weighs in Favor of Fair Use. ............................................................. 25

II.   THE LIBRARIAN CONSISTENTLY AND REASONABLY APPLIED SUPREME
      COURT PRECEDENT TO PROPOSED RENEWALS AND EXEMPTIONS. ..................... 30

III.  THE LIBRARIAN RESPONDED TO ALL SIGNIFICANT COMMENTS BY
      ADOPTING THE REGISTER'S RECOMMENDATION FOR THE REPAIR
      EXEMPTION AND SUBSEQUENT RENEWAL. ..................................... 32

IV.   ANY RELIEF AFFORDED BY THIS COURT SHOULD BE LIMITED IN
      ACCORDANCE WITH THE APA AND EQUITABLE PRINCIPLES. ................. 36

CONCLUSION .......................................................................................................... 39

# TABLE OF AUTHORITIES

## CASES

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
562 F.3d 630 (4th Cir. 2009) ...................................................................... 18, 19

*Advanced Computer Services of Michigan v. MAI Systems,*
845 F. Supp. 356 (E.D. Va. 1994) .................................................................... 22

*Alaska Dep't of Env'tl Conservation v. EPA,*
540 U.S. 461 (2004) ......................................................................................... 15

*Am. Iron & Steel Institute v. EPA,*
115 F.3d 979 (D.C. Cir. 1997) ......................................................................... 36

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.,*
896 F.3d 437 (D.C. Cir. 2018) ......................................................................... 23

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith,*
598 U.S. 508 (2023) ......................................................................................... 21

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ............................................................................ 38

*Ass'n of Private Sector Colls. & Univs. v. Duncan,*
681 F.3d 427 (D.C. Cir. 2012) ......................................................................... 32

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015) ....................................................................... 24, 26

*Authors Guild, Inc. v. HathiTrust,*
755 F.3d 87 (2d Cir. 2014) ......................................................................... 18, 25

*Balt. Gas & Elec. Co. v. Nat.Res. Def. Council, Inc.,*
462 U.S. 87 (1983) ........................................................................................... 16

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) ................................................................................. *passim*

*Catawba County v. EPA,*
571 F.3d 20 (D.C. Cir. 2009) ........................................................................... 31

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ................................................................................... 14, 15

*City of Waukesha v. E.P.A.,*
320 F.3d 228 (D.C. Cir. 2003) ..................................................................... 32, 34

*Corson & Gruman Co. v. N.L.R.B.*,
    899 F.2d 47 (D.C. Cir. 1990) ............................................................................................ 15

*County of Los Angeles v. Shalala*,
    192 F.3d 1005 (D.C. Cir. 1999) ................................................................................. 31, 32

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ...................................................................................................... 38

*Google LLC v. Oracle Am., Inc.*,
    593 U.S. 1 (2021) ...................................................................................................... *passim*

*Gulf Restoration Network v. Haaland*,
    47 F. 4th 795 (D.C. Cir. 2022) ........................................................................................ 37

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) .................................................................................................... 22, 23

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) .................................................................................................... 37, 38

*Held v. Am. Airlines, Inc.*,
    13 F. Supp. 2d 20 (D.D.C. 1998) ..................................................................................... 14

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ........................................................................................... 25

*Labrador v. Poe*,
    144 S. Ct. 921 (2024) ....................................................................................................... 38

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ..................................................................................... 23, 26

*Med. Imaging & Tech. All. v. Libr. of Cong.*,
    103 F.4th 830 (D.C. Cir. 2024) ................................................................................. 13, 14

*Marsh v. Or. Natural Res. Council*,
    490 U.S. 360 (1989) ......................................................................................................... 15

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................................... 15

*Nuziard v. Minority Bus. Dev. Agency*,
    No. 4:23-cv-00278-P, 2024 WL 965299 (N.D. Tex. Mar. 5, 2024) ................................ 38

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ......................................................................................... 18

*Pub. Citizen, Inc. v. FAA*,
    988 F.2d 186 (D.C. Cir. 1993) ......................................................................32

*Sega Enters. Ltd. v. Accolade, Inc.*,
    977 F.2d 1510 (9th Cir. 1992) .................................................................29, 30

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
    203 F.3d 596 (9th Cir. 2000) ..................................................................20, 23

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ................................................................................19, 25

*Stewart v. Abend*,
    495 U.S. 207 (1990) ......................................................................................23

*Texas Mun. Power Agency v. EPA*,
    89 F.3d 858 (D.C. Cir. 1996) ........................................................................32

*Triad Systems v. Southeastern Express*,
    64 F.3d 1330 (9th Cir. 1995) ........................................................................22

*Troy Corp. v. Browner*,
    120 F.3d 277 (D.C. Cir. 1997) ......................................................................15

*United States v. Texas*,
    599 U.S. 670 (2023) ......................................................................................37

**STATUTES**

5 U.S.C. § 702 .....................................................................................................38

5 U.S.C. § 703 .....................................................................................................37

5 U.S.C. § 706 .....................................................................................................14

17 U.S.C. § 107 ..........................................................................................9, 10, 16

17 U.S.C. § 1201 ........................................................................................*passim*

17 U.S.C. § 1203 ...................................................................................................4

17 U.S.C. § 1204 ...................................................................................................4

**RULES**

Fed. R. Civ. P. 56 ...............................................................................................14

## REGULATIONS

37 C.F.R. § 201.40 .............................................................................................13

Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access
    Control Technologies,
    65 Fed. Reg. 64,556 (Oct. 27, 2000) ...........................................................7

Copyright Office; Exemption to Prohibition on Circumvention of Copyright Protection
    Systems for Access Control Technologies,|
    68 Fed. Reg. 62,011 (Oct. 31, 2003) ...........................................................7

Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access
    Control Technologies,
    71 Fed. Reg. 68,472 (Nov. 27, 2006) ..........................................................7

Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access
    Control Technologies,
    75 Fed. Reg. 43,825 (July 27, 2010) ...........................................................7

Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access
    Control Technologies,
    77 Fed. Reg. 65,260 (Oct. 26, 2012) ...........................................................7

Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access
    Control Technologies,
    80 Fed. Reg. 65,944 (Oct. 28, 2015) ...........................................................7

Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access
    Control Technologies,
    83 Fed. Reg. 54,010 (Oct. 26, 2018) ...........................................................7

Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access
    Control Technologies,
    86 Fed. Reg. 59,627 (Oct. 28, 2021) .......................................................7, 11

## OTHER AUTHORITIES

144 Cong. Rec. S12,985 (daily ed. Nov. 12, 1998) ....................................................3

H.R. Rep. No. 105-551, pt. 2 (1998)..........................................................................5

H.R. Rep. No. 105-796 (1998) (Conf. Rep.), *reprinted in* 1998 U.S.C.C.A.N. 639 ....................5

S. Doc. No. 79-248 (1946) .......................................................................................37

S. Rep. No. 105-190 (1998).......................................................................................3

Staff of H. Comm. On The Judiciary, 105th Cong., Section-By-Section Analysis of
   H.R. 2281 As Passed By the United States House of Representatives on August 4, 1998
   (Comm. Print 1998)...............................................................................................................33

WIPO Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11 (1997)...................3

**INTRODUCTION**

The Digital Millenium Copyright Act ("DMCA") generally prohibits persons from circumventing technological protection measures that effectively control access to a copyrighted work ("TPMs"). The DMCA, however, provides the Librarian of Congress authority to make temporary exemptions to this provision in a triennial rulemaking proceeding, as set out in 17 U.S.C. § 1201(a)(1)(C). For the first time, in the 2021 proceeding, the Librarian of Congress exempted users who access copyrighted software and data files for the purpose of diagnosis, maintenance, and repair of medical devices from the DMCA's anti-circumvention provision (the "Repair Exemption"). Building on several previously granted temporary exemptions for repair of other software-enabled devices, such as cars, household appliances, and cell phones, the Librarian's exemption for repair of medical devices was granted in accordance with the requirements of the DMCA. The Librarian determined that granting the Repair Exemption would result in substantial public benefit because it would allow hospitals to hire Independent Service Operators ("ISOs") to repair crucial medical equipment, such as sonograms and MRI machines, or repair such equipment themselves, rather than rely solely on the original manufacturer of the product, who may charge higher rates or be unavailable for immediate repairs. In 2024, the Librarian renewed the Repair Exemption.

Plaintiffs, two organizations representing these Original Equipment Manufacturers ("OEMs"), claim that the Repair Exemption the Librarian granted in 2021, and the renewal of the Repair Exemption in 2024, violate the Administrative Procedure Act ("APA") on procedural and substantive grounds. Plaintiffs' challenges are meritless because the Librarian complied with the mandate of the APA. Plaintiffs claim that the Librarian's grant of the Repair Exemption is arbitrary and capricious because diagnosis, maintenance, and repair of medical equipment infringes OEMs'

copyrights and therefore is ineligible for an exemption under the DMCA. The Librarian reasonably determined, however, that the proposed uses were likely noninfringing "fair uses." As the record evidence demonstrates: (1) use of copyrighted software for the purposes of diagnosis, maintenance, and repair of medical devices constitutes a transformative use of the copyrighted work because it uses the works for a different purpose than originally intended; (2) functional computer software is further from the core of copyright protection than more traditionally expressive works of art or fiction; (3) only the amount of the copyrighted works necessary for repair would be used; and (4) allowing repair of medical equipment would not disrupt the market for the copyrighted works installed on medical equipment. The Register of Copyrights further consulted with the Food & Drug Administration ("FDA"). The FDA advised that the Repair Exemption would not pose a risk to patients or security, and it agreed that the Repair Exemption would impart a public benefit by improving the functioning of the healthcare system and preventing cybersecurity threats. Nothing Plaintiffs raised in their comments opposing renewal of the Repair Exemption in 2024 changed this initial analysis, though the Register carefully considered their newly submitted comments.

Plaintiffs next claim that that the Librarian violated the procedural requirements of the APA by failing to respond to significant comments. But the record demonstrates that the Librarian considered all relevant factors and put forth a reasoned basis for her conclusion, including responding to significant issues raised during the comment process. What Plaintiffs proffer as a procedural APA claim is in fact a repetition of their substantive disagreement with the Librarian's conclusions, which fails for all of the reasons previously discussed.

For all these reasons, Plaintiffs' motion for summary judgment should be denied, and summary judgment should be entered in favor of Defendants.

## STATUTORY AND REGULATORY BACKGROUND

## I.    DIGITAL MILLENIUM COPYRIGHT ACT ("DMCA")

Congress enacted the DMCA in 1998 to facilitate electronic commerce, communications, research, development, and education while addressing new challenges stemming from the rise of digital technology. S. Rep. No. 105-190, at 1–2 (1998). While technology allows artists and authors to make their work available online, it also makes possible digital piracy, through unauthorized access to and distribution of copyrighted works. *Id.*

Amidst growing concerns by the mid-1990s regarding such piracy and its effect on domestic and international markets, the United States joined other nations in entering into the World Intellectual Property Organization ("WIPO") Copyright Treaty in 1996. *Id.* at 2.[1] The WIPO treaty requires contracting nations to "provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors" to protect their rights. *See* WIPO Copyright Treaty, Apr. 12, 1997, S. Treaty Doc. No. 105-17, Art. 11 (1997). Congress implemented the United States' treaty obligations in the DMCA. In enacting the DMCA, Congress understood that "the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials" and that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy." S. Rep. No. 105-190, at 2, 8. Thus, Congress intended the DMCA to provide this protection and thereby to "create[] the legal platform for launching the global digital on-line marketplace for copyrighted works." *Id.* at 2.

The DMCA sets forth three prohibitions on circumvention activities, codified at 17 U.S.C.

---

[1] The President signed the WIPO Copyright Treaty on April 2, 1997, and the Senate ratified it on October 21, 1998. 144 Cong. Rec. S12,985 (daily ed. Nov. 12, 1998) (Resolution of Ratification of Treaties).

§ 1201, to address digital piracy. As relevant in this case, the DMCA prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected under" the Copyright Act. 17 U.S.C. § 1201(a)(1)(A) ("the anti-circumvention provision"). The anti-circumvention provision addresses circumvention of technology that blocks *access* to a copyrighted work—such as technology that prevents people from viewing an article on an Internet website unless they have a password or pay a fee. *See id.* § 1201(a)(3)(A) (explaining that to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner"). These measures meant to restrict access are commonly referred to as TPMs.

The DMCA sets forth several permanent statutory exemptions to the § 1201 prohibitions, including the anti-circumvention provision. The statute permits circumvention of an access control on a copyrighted work, or in certain limited circumstances, the sharing of circumvention technology, in the following instances: (1) in order for a school or library to determine whether to acquire a copyrighted product; (2) for law enforcement purposes; (3) to identify and analyze elements necessary to achieve interoperability of computer programs; (4) to engage in encryption research; (5) as necessary to limit the Internet access of minors; (6) as necessary to protect personally identifying information; or (7) to engage in security testing of a computer, computer system, or computer network. *See id.* § 1201(d)–(j).

The Government may bring criminal charges against those who violate the DMCA's anti-circumvention and anti-trafficking provisions pursuant to 17 U.S.C. § 1204. Persons injured by violations of these provisions may also seek civil remedies pursuant to 17 U.S.C. § 1203.

## II.  DMCA'S TRIENNIAL RULEMAKING REQUIREMENT

The DMCA also directs the Librarian of Congress to make a determination every three

years, through a rulemaking proceeding, of classes of copyrighted materials that should be exempted with respect to certain uses for the next three-year period from the anti-circumvention provision in § 1201(a)(1)(A). *See id.* § 1201(a)(1)(C). This triennial rulemaking is intended to serve as a "'fail-safe' mechanism" to account for possible changes in the online marketplace after the DMCA's enactment. *See* H.R. Rep. No. 105-551, pt. 2, at 35–37 (1998).

The triennial rulemaking mechanism was originally proposed by the House Commerce Committee when considering an earlier version of the bill that became the DMCA. The Committee raised a concern that "marketplace realities" might evolve in a manner that would unjustifiably diminish access for lawful purposes to copyrighted materials. *See id.* at 36. The Committee thus proposed a "'fail-safe' mechanism" to "monitor developments in the marketplace for copyrighted materials," and to allow the prohibition on circumvention of access controls in § 1201(a)(1)(A) "to be selectively waived, for limited time periods, if necessary to prevent a diminution in the availability to individual users of a particular category of copyrighted materials." *Id.* at 36.

As enacted, this "fail-safe mechanism" directs the Librarian of Congress to determine, through the triennial rulemaking, whether users of certain classes of copyrighted works should be exempted from the anti-circumvention provision set forth in § 1201(a)(1)(A) because the restriction adversely affects their ability to make noninfringing use of those works. 17 U.S.C. § 1201(a)(1)(C). The Librarian's determination is made "upon the recommendation of the Register of Copyrights," who in turn must "consult with the Assistant Secretary for Communications and Information of the Department of Commerce." *Id.*

In conducting the rulemaking, the statute directs the Librarian to examine "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the

circumvention of [access controls] has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of [access controls] on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate." *Id*. § 1201(a)(1)(C)(i)–(v). In order to grant an exemption through this process, the Librarian must conclude "that it is more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a particular class of copyrighted works." Final Rule, Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 89 Fed. Reg. 85,437, 85,438 (Oct. 28, 2024), codified at 37 C.F.R. § 201.40, LOC_AR_198–211. A proponent of an exemption must establish these requirements "by a preponderance of the evidence." *Id.* at 85,443.

The final conference report before the DMCA's enactment describes the intended procedure for the rulemaking described in § 1201(a)(1)(C). The report states that, "in recognition of the expertise of the Copyright Office, the Register of Copyrights will conduct the rulemaking, including providing notice of the rulemaking, seeking comments from the public, consulting with the Assistant Secretary for Communications and Information of the Department of Commerce and any other agencies that are deemed appropriate." H.R. Rep. No. 105-796, at 64 (1998) (Conf. Rep.), *reprinted in* 1998 U.S.C.C.A.N. 639, 641. The Register will then "recommend[] final regulations in the report to the Librarian." *Id.* To aid in this process, "[t]he Register develops a comprehensive administrative record to support her recommendation." 89 Fed. Reg. at 85,438.

After the Register issues recommendations, the Librarian then determines whether to accept or reject the Register's recommendations and issues a Final Rule setting forth this determination and promulgating the temporary exemptions for the next three-year period at 37

C.F.R. § 201.40. *E.g.*, 89 Fed. Reg. at 85,437. Thus far, the Librarian has issued a total of nine Final Rules pursuant to this procedure. *See* 65 Fed. Reg. 64,556 (2000 Final Rule); 68 Fed. Reg. 62,011 (2003 Final Rule); 71 Fed. Reg. 68,472 (2006 Final Rule); 75 Fed. Reg. 43,825 (2010 Final Rule); 77 Fed. Reg. 65,260 (2012 Final Rule); 80 Fed. Reg. 65,944 (2015 Final Rule); 83 Fed. Reg. 54,010 (2018 Final Rule); 86 Fed. Reg. 59,627 (2021 Final Rule); 89 Fed. Reg. 85,437 (2024 Final Rule).

Examples of classes of copyrighted works that have been granted exemptions through this process include computer programs in consumer devices used for diagnosis, maintenance, or repair, 89 Fed. Reg. at 85,441; excerpts of audiovisual works used for criticism and comment, *id.* at 85,439; and literary works for use with assistive technologies for disabled individuals, *id.* at 85,440.

## III.    EIGHTH AND NINTH TRIENNIAL RULEMAKING PROCEEDINGS[2]

### A.  Eighth Triennial Rulemaking Proceeding

The U.S. Copyright Office ("the Office") commenced the eighth triennial rulemaking proceeding with a notice of inquiry on June 22, 2020, requesting petitions for renewals of existing exemptions and proposals for new exemptions. Notice of Inquiry, Exemptions to Permit Circumvention of Access Controls on Copyrighted Works ("2020 Notice of Inquiry"), 85 Fed. Reg. 37,399 (June 22, 2020), LOC_AR_138–142. The Office received 27 petitions for new or expanded exemptions, which it organized into seventeen proposed classes outlined in its Notice of Proposed Rulemaking ("NPRM"). NPRM, Exceptions to Permit Circumvention of Access Controls on Copyrighted Works ("NPRM"), 85 Fed. Reg., 65,293, 65,302 (Oct. 15, 2020),

---

[2] Pursuant to Local Civil Rule 7(h)(2), this brief includes a statement of facts with references to the administrative record.

LOC_AR_143–160. As relevant here, two ISOs, non-manufacturer companies hired by hospitals and other medical professionals to repair and maintain complex, computer-controlled medical equipment, petitioned for an exemption to allow circumvention of TPMs for the purposes of diagnosing, maintaining, and repairing such equipment. *See* LOC_AR_157.[3]

The Office combined several petitions relating to repair of software-enabled devices into a single proposed class, noting that the current exemptions already include exemptions to access computer programs in automobiles, smartphones, and home systems and appliances for repair-related purposes. LOC_AR_157. The proposed classes in the NPRM were "subject to further refinement" based on the comments and evidence received, and the Office declined to propose "precise regulatory language" at the NPRM stage because any language the Register ultimately recommended to the Librarian would "depend on the full record" from the proceedings. *Id.* at 65,302. The Office sought three rounds of comments, the first for proponents of petitions or neutral parties, the second for opponents of petitions, and the third for proponents or neutral parties replying to arguments or facts raised in other comments. *Id.* Plaintiffs MITA and AdvaMed, as well as their joint member, Phillips, filed comments opposing the medical device petitions. LOC_AR_5490–5525; LOC_AR_5475–5489; LOC_AR_5526–5551.

The Food and Drug Administration ("FDA") also provided input regarding the proposed Repair Exemption. Letter from Suzanne B. Schwartz to Kevin R. Amer re: Section 1201 Rulemaking–Proposed Exemptions Pertaining to Medical Devices (Aug. 13, 2021), LOC_AR_8203–8206. The FDA rejected claims by opponents of the requested exemption that the

---

[3] Petitions from the Electronic Frontier Foundation and iFixit and Repair Association sought exemptions that would have extended to all types of software-enabled devices. LOC_AR_157. In defining the scope of the class, however, the Register determined that the proposals relating to diagnosis, maintenance, and repair of medical devices and systems should be evaluated separately from the petitions seeking a broader exemption for all software-enabled devices. LOC_AR_1899.

proposal would "facilitate device servicing by unregulated entities, with the potential to increase cybersecurity risks and result in harm to both patients and providers." LOC_AR_8205. The FDA relied on the conclusions in a prior FDA report that many ISOs "provide high quality, safe, and effective medical device servicing," that "evidence did not justify" regulating ISOs further, and that ISOs are "critical to the functioning of the healthcare system in the United States." *Id.* The FDA further stated it did not "share the view" that the proposed exemption would "jeopardize[] the safety and effectiveness of medical devices in the United States with respect to cybersecurity." *Id.* In fact, the FDA noted that ISOs may actually help in the identification of security vulnerabilities and "may play an important role" in maintaining safety and quality standards of medical devices. *Id.*

Based on all of the evidence submitted and gathered throughout the rulemaking process, the Register submitted her Recommendation to the Librarian in October 2021. Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Register of Copyrights (Oct. 2021), LOC_AR_1698–2053. The Recommendation concluded that "the prohibition on circumvention of TPMs is causing, or is likely to cause, an adverse impact on the noninfringing diagnosis, repair, and maintenance of medical devices and systems." LOC_AR_1929.

In reaching this conclusion, the Register first considered whether diagnosis, maintenance, and repair was likely to be a noninfringing use of the copyrighted software under the fair use doctrine.[4] LOC_AR_1908. With respect to the first of four factors in that analysis, "purpose and

---

[4] 17 U.S.C. § 107 provides that "fair use of a copyrighted work" is "not an infringement of copyright." The statute lays out four factors "to be considered" in making a fair use determination that "shall include:" (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;" (2) "the nature of the copyrighted work;" (3) "the amount and substantiality of the portion used in relation to the copyrighted work

character of the use," the Register concluded that, although device repair can be commercialized, the proposed repair activities were intended to "restore" a device's "functionality, not to commercialize the embedded copyrighted software." LOC_AR_1909. Referencing her prior conclusions that diagnosis, maintenance, and repair of other software-enabled devices "are likely to be transformative uses," the Register found that the first factor weighed in favor of fair use. *Id.* On the second factor, the nature of the copyrighted work, the Register found that it also favored fair use because the copyrighted software is not used for "expressive qualities," but rather for "functional and informational" purposes allowing users to operate the medical equipment. LOC_AR_1910. The Register concluded that the third factor, the amount and substantiality of the copyrighted work used, also weighed in favor of fair use because the amount of the use is "necessary to accomplish the transformative purpose[] of diagnosis, maintenance, and repair," which was "reasonable" under the circumstances. LOC_AR_1911. Finally, the Register considered the fourth factor, the effect of the use on the market value of the copyrighted work, and determined that diagnosis, repair, and maintenance of software-enabled medical devices and systems would have a "minimal effect on the market for or value of the copyrighted works because medical device and system software and data files are sold with the equipment and have no independent value separate from the devices," weighing in favor of fair use. *Id.* The Register specifically noted that if a user, such as a hospital or ISO technician, was to "reproduce and retain additional copies of any copyrighted materials for use with other devices, or enable permanent access to subscription-only services, those activities would remain prohibited because they fall outside the scope of the proposed exemption." LOC_AR_1912.

---

as a whole;" and (4) "the effect of the use upon the potential market for or value of the copyrighted work." *Id.*

After determining that the proposed uses of the copyrighted software were likely to be noninfringing, the Register considered whether the prohibition against circumvention was "adversely affecting" the repair of medical devices using the statutory criteria laid out in 17 U.S.C. § 1201(a)(1)(C). LOC_AR_1924. First, the Register concluded that the prohibition on circumvention "makes medical equipment software and manuals less available for use in noninfringing diagnosis, maintenance, and repair." LOC_AR_1926. The Register also concluded that the narrow scope of the exemption and proposed uses "limit[s] any potential market harm" because repair of medical equipment "support[s] rather than displace[s] the embedded computer programs" and the device software has "no independent value separate from the equipment [it] operate[s] or explain[s]." LOC_AR_1927. The Register also found relevant that the exemption could help address competitive concerns related to OEMs dominating the repair market and the FDA's determination that the exemption did not pose a substantial safety or security concern. LOC_AR_1928–1929.

The Librarian considered the Register's Recommendation and decided to adopt it in a final rule on October 28, 2021. 86 Fed. Reg. 59,627.

## B. Ninth Triennial Rulemaking Proceeding

The Office commenced the ninth triennial rulemaking proceeding with a notice of inquiry on July 5, 2023, requesting petitions for renewals of existing exemptions as well as proposals for new exemptions. Exemptions to Permit Circumvention of Access Controls on Copyrighted Works: Notice and Request for Public Comment, 88 Fed. Reg. 42,891 (July 5, 2023), LOC_AR_180. The Office received thirty-eight renewal petitions, six comments in opposition to renewal of an exemption, and two comments supporting renewal of an exemption, as well as eleven petitions for new exemptions or expansion of previously granted exemptions. Exemptions to Permit

Circumvention of Access Controls on Copyrighted Works, 88 Fed. Reg. 72,013, 72,014 (Oct. 19, 2023), LOC_AR_181–195.

These petitions and comments included five petitions to renew the Repair Exemption. *See, e.g.*, Renewal Pet., Avante Health Solutions, Avante Diagnostic Imaging, and Avante Ultrasound, LOC_AR_2623–2631; Renewal Pet., Crothall Facilities Management, Inc., LOC_AR_2707–2711. They also included three comments opposing the Repair Exemption. *See*, Opp., Philips North America, LLC, LOC_AR_2782–2820; Opp. Medical Imaging & Technology Alliance, LOC_AR_2821–2826; Opp., American Consumer Institute, LOC_AR_2827–2829.

The Office published a notice of proposed rulemaking including a proposal recommending renewal of the Repair Exemption on October 19, 2023. 88 Fed. Reg. 72,013 (Oct. 19, 2023), LOC_AR_181–195. Consistent with the NPRM, at the close of the comment and public hearing period, the Register submitted a recommendation to the Librarian that recommended renewal of the Repair Exemption. LOC_AR_2054–2292. The Register considered opponents' renewed fair use arguments but determined that "analysis from the 2021 cycle remains sound." LOC_AR_2093. The Register also considered opponents' consumer safety arguments but explained that "opponents' comments do not take into account the FDA's statements regarding the safety of circumvention in this context or the fact that granting an exemption under section 1201 does not absolve any user from compliance with other relevant laws and regulations." *Id.*   The Librarian adopted the Register's 2024 Recommendation in its entirety. 89 Fed. Reg. 85,437.

\*      \*      \*

As relevant here, both the 2021 and 2024 final rules exempted from the prohibition against circumvention "computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step

12

to allow the diagnosis, maintenance, or repair of such a device or system." 37 C.F.R. § 201.40(b)(17) ("the Repair Exemption"). The Repair Exemption defines "maintenance" as the "servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system." *Id.* at § 201.40(b)(17)(i). It defines "repair" as "the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system." *Id.* at § 201.40(b)(17)(ii). Notably, the Repair Exemption does not exempt circumvention of TPMs for uses other than repair, diagnosis, and maintenance, and does not exempt ISOs or other users from liability under other provisions of the DMCA or other laws.

## PROCEDURAL BACKGROUND

Plaintiffs initiated this case in February 2022, raising APA claims, as well as constitutional claims and non-statutory *ultra vires* claims, challenging the Repair Exemption. *See* Compl. for Declaratory and Injunctive Relief, ECF No. 1. Plaintiffs moved early for summary judgment, and Defendants cross-moved to dismiss for failure to state a claim or, in the alternative, summary judgment. *See* Pls.' Mot. for Summ. J., ECF No. 10; Defs.' Mot. to Dismiss or, in the Alternative, Mot. for Summ. J., ECF No. 16. The Court granted Defendants' motion to dismiss, holding that the Library is not an "agency" within the meaning of the APA and that its actions therefore are not subject to judicial review under that statute, and that no *ultra vires* cause of action was available to Plaintiffs. *See* Mem. Op., ECF No. 27. Plaintiffs appealed, and the D.C. Circuit reversed, concluding that "DMCA rules are subject to the APA just like other copyright rules." *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 833 (D.C. Cir. 2024). Having held that the rules promulgated by the Librarian pursuant to Section 1201 are subject to review under the APA,

13

the D.C. Circuit also held that "the *ultra vires* claim is no longer available, and we need not address it." *Id.* at 841 n.7.

The D.C. Circuit's mandate issued on August 2, 2024, just three months before publication of the Final Rule in the Ninth Triennial Rulemaking proceeding. The parties agreed that "defendants should be permitted to complete the Ninth Triennial Rulemaking and that plaintiffs should be permitted to amend their complaint to state additional claims, as they deem warranted, to challenge whatever exemptions may be renewed or adopted in the Ninth Triennial Rulemaking." Joint Status Report at 3, ECF No. 31.

Plaintiffs filed their amended complaint on November 8, 2024, challenging the Repair Exemption under the APA. Am. Compl. for Declaratory Injunctive Relief, ECF No. 32. Pursuant to the Parties' agreed-upon schedule, Plaintiffs moved for summary judgment on November 15, 2024. *See* Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J., ECF No. 33-1 ("Pls.' Mot.").

## LEGAL STANDARD

Summary judgment is appropriate on a showing "that there is no genuine dispute as to any material fact" and that the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When presented with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis." *Held v. Am. Airlines, Inc.*, 13 F. Supp. 2d 20, 23 (D.D.C. 1998).

Under the APA, an agency's decision must be upheld unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or in excess of statutory authority. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B)-(C). The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc.*

*v. Volpe*, 401 U.S. 402, 416 (1971). A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id.*

## ARGUMENT

I. **THE LIBRARIAN'S DETERMINATION THAT ACCESSING COPYRIGHTED WORKS IN ORDER TO REPAIR MEDICAL DEVICES IS LIKELY NONINFRINGING IS CONSISTENT WITH THE COPYRIGHT ACT AND BASED ON REASONED DECISIONMAKING.**

The Librarian's determination that using medical equipment software and manuals to engage in the diagnosis, maintenance, and repair of the equipment is likely noninfringing and that the anti-circumvention provisions adversely affected individuals' ability to engage in these noninfringing uses is consistent with the Copyright Act and amply meets the "minimal standards of rationality" required by the APA. *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997).[5] The Court's review of the Librarian's noninfringement determination is "narrow," *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377-78 (1989), and the Court should uphold a "decision [of] less than ideal clarity… if the agency's path may reasonably be discerned." *Alaska Dep't of Env'tl Conservation v. EPA*, 540 U.S. 461, 497 (2004). The question for this Court is only whether the

---

[5] Because Plaintiffs argue only that the uses contemplated by the Repair Exemption are not likely to be noninfringing because they are not a fair use of the copyrighted software, the Librarian's adverse effects analysis is not addressed here. *See* Pls.' Mot. 28 (arguing the Repair Exemption is arbitrary and capricious because the Librarian "misconstrued the fair-use doctrine"). Any argument regarding adverse effects is therefore waived. *Corson & Gruman Co. v. N.L.R.B.*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990).

Librarian's decision was "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat.Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

In originally promulgating the Repair Exemption, the Librarian accepted and adopted the Register's 2021 Recommendation in full, incorporating the Register's conclusion that diagnosis, maintenance, and repair of medical equipment software "are likely to be noninfringing fair uses." LOC_AR_1912. The "fair use" doctrine is an "equitable rule of reason that permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021) (internal quotations omitted). The Copyright Act "embodies" this court-made doctrine and "indicates, rather than dictates," how courts should apply it. *Id.* Although the Supreme Court has been clear that the factors provided in the Copyright Act are "not exhaustive," *id.* at 19, the statutory factors are:

(1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;"

(2) "the nature of the copyrighted work;"

(3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole;" and

(4) "the effect of the use upon the potential market for or value of the copyrighted work."

17 U.S.C. § 107(1)–(4). With respect to the diagnosis, maintenance, and repair of medical device software, the Register, as detailed further below, concluded that all of these factors, taken together, "indicate that the proposed uses [set out in the Repair Exemption] are likely to be noninfringing fair uses." LOC_AR_1912. In 2024, the Register reiterated this conclusion in recommending renewal of the Repair Exemption. LOC_AR_2093. The Register's conclusions, as adopted by the Librarian, are well reasoned and consistent with binding precedent, and Plaintiffs' arguments to

16

the contrary are unavailing.[6]

One initial note on standard of review in this context. The Supreme Court has made clear that "fair use is a mixed question of law and fact," *Google LLC*, 593 U.S. at 24 (citation omitted), with a number of "subsidiary factual questions," *id.* The Librarian resolved the questions of the purpose of the use, the nature of the copyrighted works, the amount of work used, and the effect upon the potential market (and the nature of the potential market). *See infra*, Background Pt. III. Those factual findings are entitled to deference under the APA's standard of review—and so the question is properly framed as whether the Librarian (1) arbitrarily and capriciously made the relevant findings (2) and, in turn, whether her conclusion that the Repair Exemption was fair use was itself arbitrary and capricious.

## A. The Purpose and Character of the Uses Contemplated by the Repair Exemption Weigh in Favor of Fair Use.

Considering the first statutory factor, "the purpose and character of the use," the Register reasoned in 2021, and re-adopted in 2024, that the primary purpose of the proposed activities was to "restore a medical device or system's functionality, not to commercialize the embedded copyrighted software and other servicing materials," which weighed in favor of fair use. LOC_AR_1909. Noting this restorative purpose, the Register also concluded in 2021 that diagnosis, maintenance, and repair were "likely to be transformative" uses, as she had previously concluded in other contexts involving the repair of other software-enabled devices. *See* Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Register of Copyrights 234–35 (Oct. 2015),

---

[6] Plaintiffs argue that the Repair Exemption is both contrary to law and arbitrary and capricious for the same reason—that diagnosis, maintenance, and repair of medical devices is purportedly not a fair use of the copyrighted software. Because these arguments are entirely overlapping, Defendants address them together, here.

LOC_AR_1186–1187 (finding that some uses of vehicle computer programs were likely to be transformative because they "facilitate functionalities such as diagnosis, modification and repair" that "enhance the intended use of [vehicle] computer programs"); Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention: Recommendation of the Acting Register of Copyrights 203 (Oct. 2018), LOC_AR_1561 (recommending exemption for repair of home appliances, computers, and smartphones, and noting that "because the fundamental purpose of repair is to restore the functionality of a device so that it may be used, 'repair supports—rather than displaces—the purpose of the embedded programs''").

In evaluating the purpose and character of the use, the central investigation is whether the use merely supersedes the objects of original creation or adds something new, with a further purpose or different character, asking whether the use is "transformative." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). "Transformative use is not absolutely necessary for a finding of fair use," but weighs in favor of a fair use determination. *Id.* A use can be transformative even if it makes "an exact copy of a work . . . so long as the copy serves a different function than the original work." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (holding that use of photographs in a search engine was transformative because the purpose was to create an electronic reference tool, which differed from the purpose of the original photographs); *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014) ("[A] transformative work is one that serves a new and different function from the original work and is not a substitute for it."); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) ("The use of a copyrighted work need not alter or augment the work to be transformative in nature. Rather, it can be transformative in function or purpose without altering or actually adding to the original work.").

18

Here, the Register concluded in 2021 that use of the copyrighted materials for the purpose of diagnosis, maintenance, and repair of medical equipment was likely transformative because these uses serve an entirely "different function" than the original code. *Id.* Rather than "supersed[ing]" the medical equipment software for the purpose of developing identical medical equipment or rendering the software obsolete, *see Campbell*, 510 U.S. at 579, the Register concluded that using copyrighted equipment software as necessary for diagnosis, maintenance, and repair would serve to "restore a medical device or system's functionality," a purpose that enhanced the use of the embedded software. LOC_AR_1909. The Repair Exemption "seeks to expand the use and usefulness" of the medical equipment, rather than replacing the software that operates such equipment. *Google*, 593 U.S. at 30. Recommending renewal of the Repair Exemption in 2024, the Register restated this conclusion, explaining that "the purpose of the use of software in repair is to render a non-functional device functional again, while the original purpose of the software is to operate a device that functions as designed." LOC_AR_2093–2094. Thus, Plaintiffs' insistence that ISOs "use the copyrighted work for precisely the same purpose for which it was originally designed," Pls.' Mot. 19, is misplaced, and contrary to the Library's factual findings, *see* LOC_AR_1909.

Plaintiffs essentially argue that the very fact ISOs stand to make a profit from repair of medical equipment is a death knell to a fair use finding. But this is not the law. Even assuming that all users of the Repair Exemption were benefitting commercially, Plaintiffs' argument relies on outdated cases that are not supported by current and binding precedent. Plaintiffs read *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984) to create a bright line rule that "every commercial use of copyrighted materials" is presumptively infringing. Pls.' Mot. 17. But the Supreme Court has since clarified its meaning in *Sony*, making clear, as the Register noted,

that "commerciality is not fatal to a fair use determination" and "there is no hard evidentiary presumption against commercial uses." LOC_AR_1909 (citing, *e.g.*, *Google*, 593 U.S. at 32) ("[M]any common fair uses are indisputably commercial."). In *Campbell*, for example, the court acknowledged lower courts' misreading of *Sony* as creating a bright line rule and stated that "if, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listen in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities are generally conducted for profit in this country." 510 U.S. at 584–85; *see also Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 606 (9th Cir. 2000) (acknowledging that *Campbell* clarified *Sony* and that the Supreme Court has "rejected" a presumption of unfairness stemming from commerciality). More recently, in *Google*, the court stated again that "many common fair uses are indisputably commercial," and that commercial endeavors are "not dispositive of the first factor," particularly, when as here, the use is likely also transformative. *Google*, 593 U.S. at 32.

That said, there is no need to accept the premise of Plaintiffs' argument. They claim that all uses of the Repair Exemption are "purely commercial." *See, e.g.*, Pls.' Mot. 17. But the proposed uses of the works (diagnosis, maintenance, and repair) need not be commercialized. Simply because repair-related activities can be commercialized—as they are by OEMs and ISOs—does not change the fact that some people accessing software or manuals to repair a device are not commercially exploiting that software or manual. The Repair Exemption extends to all users of medical devices seeking to diagnose or repair them, including persons and non-profit medical facilities that own their own devices and repair them for their own personal or institutional use. Furthermore, while ISOs petitioned for the Repair Exemption, the Repair Exemption does not

necessarily extend to all commercial repair activities. The Register acknowledged in the 2021 Recommendation, as she explained in detail in the 2018 Recommendation, that third-party assistance in circumventing TPMs, even to accomplish uses subject to an exemption, may in some cases violate separate anti-trafficking provisions in § 1201(a)(2) and § 1201(b). *See* LOC_AR_1930; LOC_AR_1580–1584.

Commerciality, like all relevant factors in the fair use analysis, is to be analyzed by a "sensitive balancing of interests," *Campbell*, 510 U.S. at 584, which the Register did here in concluding that repair of medical equipment by accessing its software is focused on restoring functionality, and not commercializing the software, although ISOs may profit from their repair business. LOC_AR_1909. Thus, while Plaintiffs contend that the Librarian "dismissed" their commerciality point "with virtually no analysis," Pls.' Mot. 18, the Librarian's decision, in fact, was based on the correct treatment of commerciality, as set out in binding precedent.

Contrary to Plaintiffs' assertions, nothing in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), an intervening case between the 2021 Recommendation and the 2024 Recommendation, changes this analysis. In *Warhol*, the Supreme Court reiterated that "the commercial nature of the use is not dispositive," and cited to its discussion in *Campbell* directing that commerciality is to be weighed against transformative use. *Id.* at 531. Summarizing, the Court held that the "degree of difference" in a transformative use should be "balanced against the commercial nature of the use." *Id.* at 532. As already explained here, use of medical device software for repair is a transformative use with a different purpose. Moreover, not all users of the Repair Exemption are using it for commercial benefit.

The Register's 2024 Recommendation is also consistent with *Warhol*. Far from disregarding it, the Register took pains to address Plaintiffs' interpretation of *Warhol*.

LOC_AR_2094. The Register explained how *Warhol* was consistent with the Supreme Court's earlier decisions in *Campbell* and *Google*, something that the *Warhol* Court itself acknowledged. *Id.* The Register then determined that the decision "does not substantially change how the Office would analyze the uses at issue in [the Repair] [E]xemption." *Id.*

Finally, the two lower-court cases cited by Plaintiffs throughout their argument regarding the first factor, *Advanced Computer Services of Michigan v. MAI Systems*, 845 F. Supp. 356 (E.D. Va. 1994) and *Triad Systems v. Southeastern Express*, 64 F.3d 1330 (9th Cir. 1995), do not compel a different conclusion. The opinion in *MAI Systems* was issued a month before the Supreme Court's decision in *Campbell* and read *Sony* to create a bright line rule against commerciality, which, as discussed above, is incorrect. 845 F. Supp. at 365. The court in *Triad Systems* similarly made no mention of *Campbell* and concluded only that repair in some cases can be "commercial in nature," a fact which no party here disputes. Thus, neither case has relevance to this court's analysis of whether the Librarian's grant of the Repair Exemption was arbitrary or capricious.

### B. The Nature of Medical Device Software Favors Fair Use.

Turning to the second fair use factor, "the nature of the copyrighted work," the Register correctly found that it favored fair use because "the computer programs and data embedded in medical devices and systems are not used for their expressive qualities, but rather for their functional and informational aspects that enable users to control and understand the operation of the equipment." LOC_AR_1910. As the Register noted, "some works are closer to the core of intended copyright protection than others." *Id.* (quoting *Campbell*, 510 U.S. at 586). Works "closer to the core" include fictional short stories, soon-to-be-published memoirs, motion pictures, and other creative works, while works further from the core include factual works, published speeches, news broadcasts, and factual compilations. *Campbell*, 510 U.S. at 586; *see also Harper & Row,*

*Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985) ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."); *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 451 (D.C. Cir. 2018) ("All of the works at issue here fall at the factual end of the fact-fiction spectrum, which counsels in favor of finding fair use."). Here, the Register pointed to several cases finding fair use when computer programs were used for their functional aspects rather than as expressive works. LOC_AR_1910 (citing *Google*, 593 U.S. at 27–28, 40); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 536 (6th Cir. 2004); and *Sony*, 203 F.3d at 603).

In response, Plaintiffs argue only that the fact that computer programs serve functional purposes "alone does not deprive them of copyright protection." Pls.' Mot. 27; *see also id.* at 26-27 (accusing the Librarian of according software "diminished" copyright protection). But Plaintiffs' argument misses the point of the second fair use factor. Consideration of the "nature of the copyrighted work" assumes that the work is eligible for copyright in the first place and, indeed, the Register clearly agrees that the software at issue is copyrighted. Fair use is a defense to infringement of a copyrighted work, and the "nature of the copyrighted work" inquiry is relevant in part because "fair use is more difficult to establish" when highly creative works and expressive works are copied. *Campbell*, 510 U.S. at 586; *see also Stewart v. Abend*, 495 U.S. 207, 237 (1990) (stating that "fair use is more likely to be found in factual works than in fictional works," whereas "[a] use is less likely to be deemed fair when the copyrighted work is a creative product" (citation omitted)).

Plaintiffs also incorrectly suggest that the Librarian disregarded fair use analysis under the second statutory factor by considering the policy benefits of an independent repair market. *See* Pls.' Mot. 27–28. In the 2021 Recommendation, however, the Register made clear that any benefit

to "competitive concerns" highlighted by the Executive Branch, provides only "further support for the proposed exemption," and was not part of the statutory fair use analysis. LOC_AR_1927–1928. Thus, Plaintiffs' reliance on the Register's statements regarding competitive benefit for their fair use analysis are taken out of context by combining them with analysis under the second statutory factor.

### C. The Amount of Medical Device Software Used for Repair is Reasonable Relative to the Purpose of the Use.

With respect to the third fair use factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," the Register found that "the amount used is reasonable relative to the purpose of the use." LOC_AR_1911. The Register also found, as in previous recommendations, that this factor should be given less weight in the repair context "because the use is necessary to accomplish the transformative purposes of diagnosis, maintenance, and repair." *Id.*; *see also, e.g.* 2015 Recommendation, LOC_AR_1188 ("[C]ourts have been willing to permit extensive copying of the original work where it is necessary to accomplish a transformative purpose."); 2018 Recommendation, LOC_AR_1562 ("[T]he fact that the entirety of the work is used is not dispositive."). Indeed, as the Supreme Court explained, "copying a large[] amount of material can fall within the scope of fair use where the material copied . . . is central to a copier's valid purpose." *Google*, 593 U.S. at 33; *see also Campbell*, 510 U.S. at 586–87 (observing that "the extent of permissible copying varies with the purpose and character of the use"); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015) (determining that the third factor favored defendant because "not only is the copying of the totality of the original reasonably appropriate to [defendant's] transformative purpose, it is literally necessary to achieve that purpose.").

Contrary to Plaintiffs' accusation that the Register "acknowledged that ISOs intended to

copy the entirety of OEMs' works," Pls.' Mot. 23, the Register specifically recounted ISOs' comments that "[t]he servicing computer programs and data files involved can be but a small portion of the entire software package." LOC_AR_1910 (internal quotation omitted). The Register also noted Plaintiffs' disagreement with the ISOs' position, but rather than concluding that one side was right or wrong in every circumstance, the Register explained that "even if" accessing device software to perform a repair entailed the use of the entire work "for some equipment," courts have permitted such broad use when necessary. LOC_AR_1910–1911; *see, e.g., Sony,* 464 U.S. at 449–50 (copying of entire work did not preclude fair use); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014) ("Because it was reasonably necessary for [defendant digital library] to make use of the entirety of the works in order to enable the full-text search function, we do not believe the copying was excessive."); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2003) (concluding that the third factor "neither weighs for nor against either party because, although [defendant] did copy each of [plaintiff]'s images as a whole, it was reasonable to do so in light of Arriba's use of the images."). The Register thus reasonably concluded that the third factor did not militate against fair use.

### D. The Effect of Repair on the Potential Market for Medical Device Software Weighs in Favor of Fair Use.

Finally, the Register concluded that the fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work," weighed in favor of fair use. The Register determined that "most medical device and system software and data files generally have no independent value separate from being used with the equipment." LOC_AR_1912. And even if some features on certain medical devices were "separately licensed through a subscription service," the Register noted that the "purpose of the proposed uses is not to enable ongoing unauthorized access to enhanced features, but merely to restore functionality so the equipment

performs as intended." *Id.* The Register also determined that, "[e]ven where the software could be installed on another 'standalone' computer, there is no indication that the software serves any function, or has any value, except for use with the medical device or system for which it was designed." *Id.* Taking all of this into account, the Register found that "diagnosis, maintenance, and repair of medical devices and systems is unlikely to harm the market for the embedded software and this factor favors fair use." *Id.*

In considering the fourth factor, the "relevant question" is whether the infringement impact[s] the market for the copyrighted work itself," here, the embedded software for medical equipment. *Lexmark Int'l.*, 387 F.3d at 544; *see also Campbell*, 510 U.S. at 590 (considering whether use of copyrighted materials "would result in a substantially adverse impact of the potential market for the *original*") (emphasis added). As the Register concluded, "most medical device and system software and data filed generally have no independent value separate from being used with the equipment," LOC_AR_1912, and use of the software for diagnosis, maintenance, and repair of a medical device would not impair the market for the original work—the embedded software. Plaintiffs' focus on the market for *repair* of the underlying software is thus misplaced, because the market at issue here is the market for the software itself, a market that there is no indication that potential users of the exemption—ISOs and medical facilities—seek to enter. Pls.' Mot. 24-25; *see also Google,* 593 U.S. at 35, (noting that when analyzing market harm "a potential loss of revenue is not the whole story" because courts "must consider not just the amount but also the source of the loss"); *Authors Guild*, 804 F.3d at 224 (observing that the fair use market harm analysis does not encompass "the type of loss of sale [that] will generally occur in relation to interests that are not protected by the copyright"); *Lexmark Int'l*, 387 F.3d at 545 (6th Cir. 2004) (holding that district court focused "on the wrong market" and noting that alternate markets are

"not the sort of market or value that copyright law protects"). Plaintiffs' reliance on *Advanced Computer Services* for the proposition that commercial use of copyrighted material presumptively has adverse market impacts is misplaced, as the Supreme Court has clarified that such presumption, if it exists at all, is limited to circumstances when a "commercial use amounts to mere duplication of the entirety of an original," serving as a "market replacement for it." *Campbell*, 510 U.S. at 591.

Plaintiffs also try and shift the focus away from the market at issue by speculating that ISOs will "view, replicate, and exploit their innovations without bearing the cost of their development." Pls.' Mot. 24. In addition to getting the relevant market wrong by focusing on the market for the medical devices themselves rather than the market for the device software, Plaintiffs wrongly assume that users engaged in repair would necessarily make other infringing uses of medical device software. As the Register clearly explained, however, unauthorized copying and other infringing activities that go beyond diagnosis, maintenance, and repair remain subject to liability for infringement. LOC_AR_1912. To illustrate, the Register observed, "if a user were to reproduce and retain additional copies of any copyrighted materials for use with other devices, or enable permanent access to subscription-only services, those activities would remain prohibited because they fall outside the scope of the proposed exemption." *Id.*

Plaintiffs also raise a host of unsubstantiated concerns about patient safety, device reliability, and cybersecurity risks that they suggest will diminish the market value for their medical equipment. The Register requested the FDA's position on these concerns during the rulemaking process, and the FDA's response directly controverts Plaintiffs' concerns. LOC_AR_8203. For example, Plaintiffs say that "the ISOs' circumvention of TPMs to carry out certain repairs, moreover, creates unnecessary technical vulnerabilities that put patient safety in

jeopardy." Pls.' Mot. 24. But the FDA concluded that ISOs "provide high quality, safe, and effective medical device servicing," and that "the evidence did not justify imposing additional regulatory requirements on ISOs." LOC_AR_8205. Plaintiffs similarly argue that the Repair Exemption will result in "cybersecurity attacks" that will decrease the value of their software. Pls.' Mot. 25. The FDA not only disagreed with Plaintiffs' conclusion, but it instead noted that ISOs may help prevent cybersecurity attacks because they are "well positioned to help identify and address security vulnerabilities." LOC_AR_8205. Thus, the FDA determined that "ISOs may play an important role in maintaining the overall quality, safety, and efficacy of medical devices." *Id.* The FDA's input in the rulemaking process not only shows that Plaintiffs' theories are substantively incorrect, but the Register's involvement of the FDA and reliance on the FDA's conclusions surely indicate that the Recommendation adopted by the Librarian properly considered Plaintiffs' concerns and did not reach an arbitrary or capricious conclusion. *See* LOC_AR_1929 (discussing FDA's input).

During the Librarian's consideration of the 2024 renewal petitions, the FDA weighed in again to address stakeholder safety concerns regarding the Repair Exemption. The FDA was clear that it supports the Repair Exemption because circumvention is "not for the purpose of device modification that may significant change the performance or safety specifications of the device or its intended use." LOC_AR_4594. Rather, circumvention is "conducted solely to obtain data access for the purpose of diagnosis, maintenance, or repair." *Id.* The FDA also reiterated that the Repair Exemption would not jeopardize the cybersecurity of medical devices in the United States. *Id.*

The FDA also noted that "the continued availability of ISOs to service and repair medical devices is critical to the functioning of the healthcare system in the United States."

LOC_AR_8205. The Register similarly acknowledged the importance of how TPMs adversely affect ISOs that have sought to repair medical devices for facilities that have been "unable to use equipment due to inadequate repair options, particularly during the COVID-19 pandemic." LOC_AR_1924–1925. It is well established that courts also take into account "the public benefits the copying will likely produce," in addressing the fourth fair-use factor. *Google*, 593 U.S. at 35; *see also Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992) ("We further note that we are free to consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially."). Because the ISOs' use of the embedded software for diagnosis, maintenance, and repair "serves a public interest" in supporting the healthcare system, the public benefit further supports the Register's conclusions with respect to any effect on the market value of the original software.

Plaintiffs also posit that the Repair Exemption will have a "significant chilling effect on further innovations, including derivative works." Pls.' Mot. 25. While it is true that the fourth factor requires courts to "take account . . . of harm to the market for derivative works," diagnosis, maintenance, and repair of medical device software does not create a derivative work of such software since it does not create a new work based on the software and thus cannot conceivably chill further innovation by competing with the market for derivative works. *Campbell*, 510 U.S. at 590.

Finally, Plaintiffs' argument that the Register improperly analogized medical devices to consumer devices is not supportable based on the content of the Register's 2021 Recommendation. In fact, the 2021 Recommendation concluded that medical devices needed to be analyzed separately from consumer devices. LOC_AR_1899. That the Register referenced a principle common to both classes of device repair, simply suggests that the principle is broadly applicable,

not that the classes are coextensive. *See* LOC_AR_1927 (noting that "as with other software-enabled devices, the functional software and manuals for medical devices and systems have no independent value separate from the equipment they operate or explain").

*    *    *

In opposing the Repair Exemption, and its subsequent renewal, Plaintiffs essentially "attempt to monopolize the market," which "runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine." *Sega Enters.*, 977 F.2d at 1523–24. Because the Librarian's determination, based on the Register's Recommendation, that diagnosis, maintenance, and repair of medical equipment software was likely noninfringing is consistent with the fair use doctrine and supported by the record, Plaintiffs' substantive APA challenge should be rejected.

## II.    THE LIBRARIAN CONSISTENTLY AND REASONABLY APPLIED SUPREME COURT PRECEDENT TO PROPOSED RENEWALS AND EXEMPTIONS.

Contrary to Plaintiffs' contention, the Librarian applied the fair use factors, including application of the Supreme Court's decision in *Warhol*, consistently across the 2024 rulemaking classes. Thus, to the extent Plaintiffs argue that the Librarian treated "similar situations differently" in violation of the APA, that claim is without support. Pls.' Mot. 30.

In the 2024 Recommendation, the Register considered whether to expand a pre-existing exemption allowing circumvention of access controls for audiovisual works used for education in massive open online courses. LOC_AR_2108. Specifically, petitioners sought an expansion of the exemption to "for-profit and nonaccredited online educational entities" in addition to the accredited educational institutions already benefitting from the exemption. *Id.*

The Register concluded that the first fair use factor, the "purpose and character" of the use, weighed against expanding that exemption to for-profit entities. In doing so, the Register

concluded that "the nature" of the for-profit users was "unclear based on the evidence submitted." LOC_AR_2116. In the absence of evidence showing a transformative use, the Register turned to commerciality, consistent with the *Warhol* Court's direction to weigh any transformative use against commercial purpose. LOC_AR_2116–2117. Finding a solely commercial benefit for the expanded use, the Register determined that the first factor weighed against a finding of fair use.

As already explained, *supra* Part I.A, the Register reached the opposite conclusion with respect to *Warhol*'s application to the Repair Exemption. But there are two major differences between the for-profit educational proposal and the Repair Exemption, neither of which is acknowledged by Plaintiff. First, the Register explained in 2021, and reiterated again in 2024, that repair of medical devices is a transformative use. *See*, *supra* Part I.A. In contrast, the Register could not determine anything about the transformative "nature" of the use proposed in the for-profit educational space. Second, not all users of the Repair Exemption are gaining a commercial benefit. Although repair of medical devices *may* be commercialized, nothing is necessarily commercial about repairing broken medical equipment. In contrast, for-profit educational institutions are by definition seeking a commercial benefit from using copyrighted works in their courses. *See* LOC_AR_2116–2117.

These stark differences separate the Librarian's decision here from those that the D.C. Circuit has found to be arbitrary and capricious. In *Catawba County v. EPA*, which Plaintiffs rely on, the court found the EPA's use of different tests to determine which counties met specific nonattainment designations between New England and New York to be "arbitrary agency action." 571 F.3d 20, 51 (D.C. Cir. 2009). Here, in contrast, the Register applied the same framework, but application of that framework in different factual contexts led to different conclusions regarding the transformative nature and commercial use of the proposed exemptions. In *County of Los*

*Angeles v. Shalala*, the other case relied upon by Plaintiffs, the court invalidated the agency's determination that certain data was too unreliable for one calculation, when it then used the same data for a different calculation without explaining why the data was reliable enough for that later calculation. 192 F.3d 1005 (D.C. Cir. 1999). Whereas, in that case there were "insufficient reasons for treating similar situations differently," here the differences in transformative use and the nature of the users explain why *Warhol* compelled two different conclusions regarding the first statutory fair use factor. Accordingly, the Register's Recommendation, as adopted by the Librarian, was not arbitrary and capricious.

## III.  THE LIBRARIAN RESPONDED TO ALL SIGNIFICANT COMMENTS BY ADOPTING THE REGISTER'S RECOMMENDATION FOR THE REPAIR EXEMPTION AND SUBSEQUENT RENEWAL.

In addition to challenging the substance of the Librarian's determination, Plaintiffs bring a procedural challenge based on the Librarian's purported failure to respond to significant comments. This argument is meritless. An agency's "obligation to respond to comments related to proposed rulemaking is not particularly demanding." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441-42 (D.C. Cir. 2012) (internal formatting omitted) (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)). The "agency's response to public comments need only 'enable [the court] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Public Citizen*, 988 F.2d at 197. The agency need not respond to every comment, but need only respond "in a reasoned manner to those that raise significant problems." *City of Waukesha v. E.P.A.*, 320 F.3d 228, 257-58 (D.C. Cir. 2003) (citations omitted). "[T]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996) (citation and internal

quotation marks omitted). Plaintiffs fail to demonstrate anything of the sort.

Plaintiffs first argue that the Librarian, in adopting the Register's 2021 Recommendation, failed to respond to Plaintiffs' comments that a categorical fair-use determination was inappropriate and that she improperly grouped medical equipment with consumer equipment. Pls.' Mot. 31–32. The Register, however, clearly laid out the legal standard for determining a class, noting that Congress directed the classes not to be drawn too "narrowly." LOC_AR_1709 (quoting Staff of H. Comm. On The Judiciary, 105th Cong., Section-By-Section Analysis of H.R. 2281 As Passed By the United States House of Representatives on August 4, 1998, at 7 (Comm. Print 1998)). Relying on the legislative history, the Register explained that "while the category of 'motion pictures and other audiovisual works," for example, "may appropriately be subdivided . . . into classes such as 'motion pictures,' or 'television programs,' it would be inappropriate 'to subdivide overly narrowly into particular genres of motion pictures, such as Westerns, comedies, or live action dramas." *Id.* (internal quotation omitted). The Register thus considered the concerns raised about proper class size by Plaintiffs, but chose not to credit them. And while Plaintiffs assert that the Librarian "adopted the [Repair] Exemption after inexplicably grouping complex and sensitive medical devices with cell phones and game consoles," she in fact credited the Register's determination that proposals for repair of medical devices and systems "should be evaluated separately," and evaluated them as such. LOC_AR_1899. The 2021 Recommendation specifically agreed that most medical devices are "not 'consumer devices'" and noted specific concerns relevant to medical equipment, which led to the separate involvement of the FDA. *Id.*

Next, Plaintiffs argue that the Librarian did not consider their comments highlighting the ISOs' for-profit interests in OEMs' copyrighted material and Plaintiffs' conclusions about whether ISOs would be engaging in a transformative use. Pls.' Mot. 32. As explained in further detail,

33

*supra* Part I.A, the 2021 Recommendation not only considered Plaintiffs' comments about commerciality, but explicitly rejected them by citation to binding Supreme Court precedent. LOC_AR_1909 (quoting *Campbell v. Acuff-Rose*, 510 U.S. 569, 584–85 (1994) (internal quotations omitted)) ("Commerciality is not fatal to a fair use determination; the Supreme Court has clarified that there is no 'hard evidentiary presumption' against commercial uses. . . ."). "This is all that the APA requires." *City of Waukesha*, 320 F.3d at 258 (finding response to comments adequate when agency "cited support" for its position). The Librarian considered transformative use in the context of diagnosis, maintenance, and repair, crediting the Register's determination that those engaged in medical device repair used copyrighted material for a different and transformative purpose than OEMs intended, *i.e.,* to "restore a medical device or system's functionality." LOC_AR_1909. That Plaintiffs rely on a different understanding of "transformative use" does not undercut the Register's consideration and discussion of the issue.

Plaintiffs relatedly claim that the Librarian did not consider their comments regarding commerciality during the 2024 renewal process, particularly Plaintiffs' reliance on *Warhol*. Pls.' Mot. 32–35. But while Plaintiffs argue that the Librarian "offered no new analysis on this point," the Register made clear that no "new analysis" was required because "[t]he *Warhol* decision does not substantially change how the Office would analyze the uses at issue in this exemption." LOC_AR_2094. Again, Plaintiffs disagree with the Register's interpretation of *Warhol*. But that does not mean that the Register "disregard[ed]" it in recommending renewal of the Repair Exemption. Pls.' Mot. 35.

Third, Plaintiffs suggest that the Librarian did not consider their comments that the ISOs' proposed uses did not serve a nonprofit purpose. Pls.' Mot. 33. The 2021 Recommendation specifically addressed these concerns, however, in the analysis of the section 1201 statutory

factors, summarizing Plaintiffs' argument and responding that some ISO repair services may very well serve a nonprofit purpose by "arguably preserv[ing] the availability for use" of medical equipment no longer supported by OEMs. LOC_AR_1926. In any event, the Register concluded that "these factors [were] not especially relevant to the determination." LOC_AR_1927. Contrary to Plaintiffs' argument, the statute does not require the Librarian to conclude that every statutory factor favors an exemption—it requires only that the Librarian "examine" the factors, and allows the Librarian to consider any "other factors" she "considers appropriate." 17 U.S.C. § 1201(a)(1)(C).

Fourth, Plaintiffs argue that the Librarian did not respond to their argument that exposing copyrighted materials to ISOs would diminish the value of the materials and damage the overall market, "thwarting future innovation." Pls.' Mot. 33–34. The 2021 Recommendation explained, however, that the software had no independent value "except for use with the medical device or system for which it was designed," so access to the materials would not impact the market for medical equipment. LOC_AR_1912. Moreover, the Register concluded that "if a user were to reproduce and retain additional copies of any copyrighted materials for use with other devices, or enable permanent access to subscription-only services, those activities would remain prohibited because they fall outside the scope of the proposed exemption," meaning that OEMs would still have recourse under section 1201, as well as potentially for copyright infringement, to protect against such misuse. *Id.*

Finally, Plaintiffs repeat their argument that the Repair Exemption will decrease the value of their products by harming patients and creating cybersecurity risks, claiming that the Librarian ignored these concerns in promulgating the Repair Exemption. Pls.' Mot. 35. But not only did the Register explicitly address these concerns, LOC_AR_1929, she proactively reached out to the

FDA for further information about them and the FDA then roundly rejected Plaintiffs' suppositions about supposed safety risks. LOC_AR_8203–8205. Plaintiffs try to rehash this argument by citing to "new cybersecurity policies" that, in Plaintiffs' judgment, are "at odds" with the Repair Exemption. Pls.' Mot. 35. But the FDA, relying on its expert judgment, rejected this concern in a letter to the Register during the 2024 rulemaking proceedings, which the Librarian properly credited. Acknowledging that the "cybersecurity landscape has evolved since 2021," the FDA still determined that the Repair Exemption "would not necessarily and materially jeopardize the safety and effectiveness of medical devices in the United States with respect to cybersecurity." LOC_AR_4594. And because the FDA provided fresh input and expertise during the 2024 rulemaking cycle, Plaintiffs' argument that the Register improperly relied only on stale FDA input from the 2021 rulemaking is indefensible. *See* Pls.' Mot. 35-36.

Because the Librarian "considered the 'relevant factors'" in deciding to grant the Repair Exemption, and subsequently renewing it, Plaintiffs' procedural APA challenge lacks merit. *Am. Iron & Steel Institute v. EPA*, 115 F.3d 979, 1005 (D.C. Cir. 1997).

## IV. ANY RELIEF AFFORDED BY THIS COURT SHOULD BE LIMITED IN ACCORDANCE WITH THE APA AND EQUITABLE PRINCIPLES.

While Defendants dispute that any relief is necessary for the reasons explained in Parts I-III, any relief afforded by this Court should be limited to the parties and consistent with the APA. In their motion, Plaintiffs ask the court to "vacate" the "[Repair] Exemption.[7]" *E.g.*, Mot. 15. The amended complaint further seeks to "set aside the Exemption," "declare the Exemption to be

---

[7] Plaintiffs define "Exemption" coextensively with Defendants' use of the phrase "Repair Exemption," covering "computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files" when circumvention of TPMs is a "necessary step to allow the diagnosis, maintenance, or repair of such a device or system." Am. Compl. 13.

unlawful and void," and "enjoin defendants from enforcing, implementing, or otherwise carrying out the Exemption." Am. Compl., Prayer for Relief.

As a matter of first principles, the "set aside" language in § 706(2) should not be read as authorizing remedies, which are governed by § 703 of the APA. Section 703 states that "[t]he form of proceeding for judicial review" of agency action is either a "special statutory review proceeding" or, in "the absence or inadequacy thereof," any "applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703. Because Plaintiffs do not purport to identify any applicable "special statutory review proceeding," § 703 affords them only traditional equitable relief. *See* S. Doc. No. 79-248, at 36–37 (1946) (referring to § 703 as governing remedies). Section 706(2) does not address remedies at all. Rather, § 706(2) is properly understood as a rule of decision directing the reviewing court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it, consistent with basic principles of judicial review. Vacatur is therefore not an available remedy under the APA. *See United States v. Texas*, 599 U.S. 670, 693–99 (2023) (Gorsuch, J., concurring in the judgment).

Defendants recognize that the D.C. Circuit has described vacatur of an unlawful agency action as the "typical remedy." *Gulf Restoration Network v. Haaland*, 47 F. 4th 795, 804 (D.C. Cir. 2022). But even if the APA authorizes some sort of vacatur, the D.C. Circuit has treated vacatur as a discretionary equitable remedy, not one that is automatic or compelled in every case. *See id.* ("Although vacatur is the typical remedy for an APA violation, it is not inevitable."). Further, the Supreme Court has explained that Congress's authorization for courts to issue a remedy "hardly suggests an absolute duty" to grant such relief "under any and all circumstances." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Rather, a statutory provision authorizing remedies,

especially equitable remedies, should be construed consistent with "the traditions of equity practice." *Id.* ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case."). The APA reinforces that longstanding rule by explicitly stating that its authorization of judicial review does not affect "the power or duty of the court to . . . deny relief on any . . . equitable ground." 5 U.S.C. § 702(1).

Here, under traditional equitable principles, the Court should decline to vacate the Repair Exemption because declaratory judgment or a more limited injunction would suffice. *See Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-cv-00278-P, 2024 WL 965299, at *40–44 (N.D. Tex. Mar. 5, 2024) (rejecting universal vacatur for equitable reasons where injunction would suffice). Plaintiffs do not identify any reason why vacatur of the Repair Exemption is necessary to afford them complete relief in this case, and indeed ask for declaratory relief and an injunction as well. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). The problems caused by overbroad universal remedies are well catalogued and apply whether such a remedy takes the form of a nationwide injunction or universal vacatur. *See, e.g.*, *Labrador v. Poe*, 144 S. Ct. 921, 921–28 (2024) (Gorsuch, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring).

Accordingly, if this Court is inclined to enter relief for the Plaintiffs it should enter a declaratory judgment or, if it finds that Plaintiffs have met their burden to warrant an injunction[8] under the *Winter* standard, enjoin the Library from implementing the Repair Exemption and the Department from considering the Repair Exemption when determining whether to bring enforcement actions against actors circumventing TPMs to access copyrighted materials owned

---

[8] Plaintiffs have not meaningfully attempted to address the standards for issuance of a permanent injunction, and Defendants do not concede that Plaintiffs have met or could meet that standard.

by Plaintiffs' members.

## **CONCLUSION**

For these reasons, Defendants respectfully request that the Court grant their motion for summary judgment and deny Plaintiffs' motion for summary judgment.


Dated: December 20, 2024                    Respectfully submitted,

                                                  BRIAN M. BOYNTON
                                                  Principal Deputy Assistant Attorney General

                                                  JOSEPH E. BORSON
                                                  Assistant Branch Director

                                            */s/ Rachael L. Westmoreland*
                                                  RACHAEL L. WESTMORELAND
                                                  Trial Attorney (GA Bar No. 539498)
                                                  U.S. Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  1100 L Street, NW
                                                  Washington, DC 20001
                                                  Tel: (202) 514-1280
                                                  E-mail: rachael.westmoreland@usdoj.gov