**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, et al., <br><br> *Plaintiffs*, <br><br> *v.* <br><br> LIBRARIAN OF CONGRESS, et al., <br> *Defendants*. | No. 1:22-cv-499 (BAH) |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Michael B. Kimberly (No. 991549)
Charles Seidell (No. 1670893)
Alex C. Boota (*pro hac vice*)
  McDermott Will & Emery LLP
  500 North Capitol Street NW
  Washington, DC 20001
  (202) 756-8000
  mkimberly@mwe.com

*Counsel for Plaintiffs*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii

Introduction ....................................................................................................................... 1

Argument ............................................................................................................................ 3

    I.    The Librarian's approval of the Exemption was contrary to law, arbitrary
        and capricious, and unsupported by evidence .................................................... 3

        A.    First factor: ISOs' use of OEMs' copyrighted works to perform
             maintenance and repair services for a profit is a purely commercial use ................ 4

        B.    First factor: The Exemption is for manifestly non-transformative uses ................... 6

             1.    ISOs use the copyrighted works without altering their character ..................... 7

             2.    ISOs use the copyrighted works for their original intended purposes .............. 8

        C.    Fourth Factor: ISOs' use of OEMs' copyrighted works has
             unquestionably diminished the value of the copyrights ........................................... 15

        D.    The remaining fair-use factors offer no "compelling justification" to
             overcome the purely commercial, directly competitive, non-
             transformative uses to which ISOs are putting the copyrighted works .................... 18

    II.    The Librarian's disparate applications of *Andy Warhol* were arbitrary and
        capricious ..................................................................................................................... 20

    III.   The Library did not adequately respond to comments .................................... 21

    IV.  The court should vacate the exemption, as required by the APA and
        numerous D.C. Circuit precedents ........................................................................ 22

Conclusion ........................................................................................................................ 25

# TABLE OF AUTHORITIES[†]

**Cases**

*A&M Records v. Napster*,
239 F.3d 1004 (9th Cir. 2001) ...........................................................6

*\*Advanced Computer Services v. MAI Systems*,
845 F. Supp. 356 (E.D. Va. 1994) ............................... *passim*

*American Great Lakes Ports Association v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020)...............................................22, 23

*\*Andy Warhol Foundation v. Goldsmith*,
598 U.S. 508 (2023)........................................................ *passim*

*Authors Guild, Inc. v. Google*,
804 F.3d 202 (2d Cir. 2015)...............................................9

*\*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014)...............................................7, 9, 10

*\*Campbell v. Acuff-Rose Music*,
510 U.S. 569 (1994) .................................................... *passim*

*Carr v. United States*,
560 U.S. 438 (2010) (Alito, J., dissenting) ...........................11

*Corner Post v. Federal Reserve System*,
603 U.S. 799 (2024)........................................................24

*EchoStar Satellite LLC v. FCC*,
457 F.3d 31 (D.C. Cir. 2006)...............................................5

*Google LLC v. Oracle America*,
593 U.S. 1 (2021)........................................................19

*Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020)...............................................21

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022)...............................................22, 23

*Hachette Book Group, Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ...........................................7

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985)........................................................4

*Hawaiian Dredging Construction Co. v. NLRB*,
857 F.3d 877 (D.C. Cir. 2017)...............................................3, 13

*Midtec Paper Corp. v. United States*,
857 F.2d 1487 (D.C. Cir. 1988)...............................................22

[†] Authorities upon which we primarily rely are marked with asterisks.

ii

**Cases—continued**

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile*
*Insurance,*
    463 U.S. 29 (1983)......................................................................................3, 5

*Perfect 10, Inc. v. Amazon.com, Inc.,*
    508 F.3d 11146 (9th Cir. 2007) ...........................................................8, 9, 10

*PPL Wallingford Energy LLC v. FERC,*
    419 F.3d 1194 (D.C. Cir. 2005) ....................................................................22

*Public Citizen v. FAA,*
    988 F.2d 186 (D.C. Cir. 1993) ......................................................................21

*Susquehanna International Group, LLP v. SEC,*
    866 F.3d 442 (D.C. Cir. 2017) ........................................................................3

*\*Triad Systems v. Southeastern Express,*
    64 F.3d 1330 (9th Cir. 1995) ............................................................... *passim*

*United States v. Philip Morris USA Inc.,*
    566 F.3d 1095 (D.C. Cir. 2009) ....................................................................23

*United Steel v. Mine Safety & Health Admin.,*
    925 F.3d 1279 (D.C. Cir. 2019) ....................................................................24

*A.V. ex rel. Vanderhye v. iParadigms,*
    LLC, 562 F.3d 630 (4th Cir. 2009)................................................................10

*\*Wall Data Inc. v. Los Angeles County Sheriff's Department,*
    447 F.3d 769 (9th Cir. 2006) ...............................................................9, 10, 14

*Water Quality Insurance Syndicate v. United States,*
    225 F. Supp. 3d 41 (D.D.C. 2016) (Howell, J.) .............................................3

**Statutes, Rules, and Regulations**

5 U.S.C.
    § 706(2)........................................................................................................22
    § 706(2)(A) .............................................................................................3, 22
    § 706(2)(E).....................................................................................................3

17 U.S.C.
    § 106............................................................................................................15
    § 106(3)........................................................................................................16
    § 106(4)........................................................................................................16
    § 107...............................................................................................3, 15, 19
    § 117............................................................................................................19
    § 701............................................................................................................14
    § 1201(a)(1)(C) .............................................................................................6
    § 1201(a)(1)(D) .............................................................................................6

37 C.F.R. § 201.40(b)(17).................................................................................12

Fed. R. Civ. P. 65(d)(2)(C) ...............................................................................23

**Other Authorities**

M. Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L. J. 2304 (2024)....................24

## INTRODUCTION

Independent service organizations (ISOs) are for-profit companies that offer third-party maintenance and repair services for various technologies, including (as relevant here) sophisticated medical devices such as MRI machines and CT scanners. ISOs rely on software and data to do their typically unauthorized work. This includes copyrighted works found on the machines they are servicing, created by the original equipment manufacturers (OEMs). All such works have as an original purpose the facilitation of maintenance and repair, and to use them for that end ordinarily requires a license. Use of copyrighted OEM software, manuals, and data is inseparable from the for-profit maintenance and repair services that depend on it.

Against that background, this case asks whether an ISO's commercial use of an OEM's copyrighted works in the diagnosis, maintenance, and repair of complex medical devices—a use that puts the ISO in direct competition with the maintenance and repair services of the OEM itself and its licensees—is a "fair use" of those works. To ask that question is to answer it: *No*.

It is settled beyond debate that, "[i]f an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature," the secondary use is not a fair use "absent some [particularly compelling] justification" for the copying. *Andy Warhol Foundation v. Goldsmith*, 598 U.S. 508, 532-533 (2023); *accord id*. at 547. Simply putting the work to some "derivative" use "does not suffice." *Id*. at 547.

The Librarian did not pay heed to this basic rule. She wrongly concluded that ISOs' purpose in using the copyrighted works differs from their original purposes and is therefore automatically transformative, overcoming the commercial nature of the use. *Andy Warhol* rejected exactly that reasoning, which alone is enough to reject it here.

The Librarian's transformative-use finding is also simply wrong. A use is transformative if it (1) substantially alters the work itself or (2) puts it to some new use in some new context, so as to give rise to a new creation altogether. An ISO's use of OEM software for diagnosis, maintenance, and repair is neither of those things. Indeed, in petitioning for the Exemption, the ISOs

1

expressly disclaimed alteration of the software or machines, to avoid FDA regulation. AR1929. And commenters explained that all of the copyrighted works at issue have always had among their original purposes the maintenance, diagnosis, and repair of the machine. *E.g.*, AR2785-88, 2825-2826, 2837. Indeed, the works that are actually at issue here were created *exclusively* for that purpose. *Id*. By copying these works to enable their for-profit maintenance businesses, ISOs are putting these works to their precise intended use, and without alteration.

The bottom line is thus simple: The proponents of the Exemption are using OEMs' copyrighted works to compete directly with OEMs and their licensees, for a profit, in the markets for maintenance and repair services. These uses "share the same or highly similar purposes" as the original use and are "of a commercial nature," meaning they are presumptively infringing. *Andy Warhol*, 598 U.S. at 532-533. And because none of the other factors comes close to justifying the ISOs' freeriding on OEMs' creative labors, the exempted uses are not "fair."

In defending the Librarian's contrary decision, the government offers only unthinking repetition of the Register's recommendation. In doing so, it disregards (at 22) the only two cases that have confronted similar claims as ours—*Advanced Computer Services v. MAI Systems*, 845 F. Supp. 356 (E.D. Va. 1994), and *Triad Systems v. Southeastern Express*, 64 F.3d 1330 (9th Cir. 1995)—both of which found that ISOs infringe OEM copyrights in cases like this. Beyond that, the government mostly sidesteps the substance of our objections.

The government's dodges do not work. The Librarian is not free to declare "fair use" simply because she concludes that copying the software at issue will produce "public benefits" that are unrelated to copyright's concern for the creative production of new expression. When a user copies another's work for "substantially the same purpose" as the original creation, "and the use is of a commercial nature," and when there is "no other persuasive justification for its unauthorized use" under the remaining fair-use factors, the use is infringing. *Andy Warhol*, 598 U.S. at 550. That is this case exactly.

## ARGUMENT

The APA "requires [the Court] to hold unlawful" and set aside "agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or that is 'unsupported by substantial evidence.'" *Susquehanna International Group, LLP v. SEC*, 866 F.3d 442, 445 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(A), (E)). In addition to correctly interpreting and applying the law, "the agency must [therefore] examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*. (quoting *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance*, 463 U.S. 29, 43 (1983)). "An agency decision is arbitrary when it 'entirely failed to consider an important aspect of the problem' or 'offered an explanation for its decision that runs counter to the evidence before the agency.'" *Hawaiian Dredging Construction Co. v. NLRB*, 857 F.3d 877, 881 (D.C. Cir. 2017) (quoting same).

For its part, this Court "has not hesitated to reject agency determinations under [the] APA's substantial evidence standard when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action." *Water Quality Insurance Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016) (Howell, J.).

## I.    THE LIBRARIAN'S APPROVAL OF THE EXEMPTION WAS CONTRARY TO LAW, ARBITRARY AND CAPRICIOUS, AND UNSUPPORTED BY EVIDENCE

The parties agree on the general fair-use framework. *See* LOC Br. 16. "To determine whether a particular use is 'fair,' the [Copyright Act] sets out four factors to be considered," including "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Andy Warhol*, 598 U.S. at 527 (quoting 17 U.S.C. § 107).

3

The predominant focus here is on the first and fourth factors, which drove the Librarian's reasoning. As we demonstrated in the opening brief (at 16-28) and support further below, the Exemption authorizes ISOs to make a purely commercial use of OEM's copyrighted works in a manner that is nowise transformative—it does not alter OEM's original works, and it does not put them to any newly expressive and non-derivative purpose. ISOs' use of OEMs' copyrighted works is thus presumptively infringing. In the absence of any compelling justification to conclude otherwise—and here there is none—the Exemption accordingly must be vacated.

### A.    First factor: ISOs' use of OEMs' copyrighted works to perform maintenance and repair services for a profit is a purely commercial use

The first fair-use factor "focuses on whether an allegedly infringing use has a further purpose or different character," which "must be weighed against other considerations, like commercialism." *Andy Warhol*, 598 U.S. at 525. Here, there can be no doubt that the uses to which OEMs' works are being put are purely commercial: ISOs use the copied materials to provide maintenance and repair services for a fee and to earn a profit. ISOs accordingly "stand[] to profit from exploitation of the copyrighted material without paying the customary price," which is prototypical commercial use. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985); *see also Triad Systems*, 64 F.3d at 1337 (explaining the unavoidably commercial nature of ISOs' use of OEM software to provide competing machine maintenance services); *Advanced Computer Services*, 845 F. Supp. at 365 ("Plaintiffs admit that the sole purpose of their use of [the] copyrighted software is in connection with the provision of computer maintenance services," which "is a commercial use").

In the rulemakings here, the Librarian nonetheless resisted that conclusion, instead taking the view that "the proposed activities are intended to restore a medical device or system's functionality, not to commercialize the embedded copyrighted software and other servicing materials." AR1909 (2021 rulemaking); *accord* AR2203 (2024 rulemaking). But as we showed in the opening brief (at 18), that is wrong. True, the proposed use allows ISOs "restore a medical device or

system's functionality," but ISOs provide this restorative service *for a fee*. They thus plainly put the copied works to a commercial, profit-making use. The Librarian's contrary decision failed meaningfully to address comments submitted and straightforwardly "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. It cannot be upheld.

Although the government repeats (at 17) the Librarian's nonsensical reasoning, it does not defend its substance. The government instead concedes (at 20) that "repair-related activities" as practiced by ISOs are "commercialized." From there, it offers two responses, only the first of which is grounded in the decisions under review.

*First*, the government notes (at 19-20) that "[e]ven assuming that all users of the Repair Exemption were benefitting commercially" from the use of OEMs' copyrighted works, that fact is "not dispositive of the first factor" because "the use is likely also transformative." That just shifts attention to the transformative-use analysis, to which we turn in the next section.

*Second*, the government asserts (at 20) that "the proposed uses of the works (diagnosis, maintenance, and repair) need not be commercialized" in *all* cases, speculating that "some people accessing software or manuals to repair a device are not commercially exploiting that software or manual," such as "persons and non-profit medical facilities that own their own devices and repair them for their own personal or institutional use."

There are a number of problems with that newfound contention. To start, it is not one that the Librarian offered in the rulemaking, and it is therefore not a basis upon which the Court may uphold the Exemption. "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *EchoStar Satellite LLC v. FCC*, 457 F.3d 31, 36 (D.C. Cir. 2006) (quoting *State Farm*, 463 U.S. at 50). Thus, the Court "must rely only upon the reasons given by the agency, not counsel's *post hoc* rationalizations" in court. *Id.* (quoting same).

This rule is no mere technicality. The Section 1201 rulemaking process places the burden of proof on the proponents of an exemption. *See* AR1707, 2068. The Librarian did not address any supposedly non-profit uses for OEMs' copyrighted works because the ISOs seeking the Exemption

introduced no evidence of such uses. On the contrary, the ISOs' only interest was to ensure that "the users eligible to exercise these exemptions include third-party service providers" who are in the market to make money, like themselves. AR157.

The government's newfound reasoning is wrong on substance, too. For starters, the premise is wrong. "Direct economic benefit is not required to demonstrate a commercial use." *A&M Records v. Napster*, 239 F.3d 1004, 1015 (9th Cir. 2001). "[R]epeated and exploitative copying of copyrighted works, even if the copies are not offered for sale, may constitute a commercial use," such as when it is used to avoid paying licensing fees that otherwise would be due. *Id.*

In any event, the government's new position could not justify the Exemption as it is written. If purely commercial, non-transformative, exploitative uses are infringing—they are, as even the government must admit—then such uses must be excluded from the scope of the Exemption. After all, the DMCA allows exemptions only for "noninfringing uses." 17 U.S.C. § 1201(a)(1)(C). But ISOs' manifestly infringing for-profit uses are *not* excluded. On the contrary, in defining the contours of the "class of copyrighted works" to be covered by the Exemption (*id.* § 1201(a)(1)(D)), the Librarian concluded that *all* "diagnosis, repair, and maintenance of medical devices and systems" is inherently "noninfringing," even if commercial in nature. AR1928. That is the whole point of the Exemption, given that it was ISOs who sought it in the first place.

### B.    First factor: The Exemption is for manifestly non-transformative uses

ISOs' purely commercial uses of OEMs' copyrighted software "must be balanced against" the question "whether the use of a copyrighted work has a further purpose or different character." *Andy Warhol*, 598 U.S. at 532. Generally speaking, a use of copyrighted material can be considered "transformative" in one of two ways: it can either alter the original, imbuing it with an altogether "different character," or it can put the original to some "further purpose" that transforms its initial meaning. *Andy Warhol*, 598 U.S. at 525. Here, ISOs' use of OEM-created software, data, and other copyrighted works for diagnosis, maintenance, and repair of medical devices meets neither description.

6

### 1.    ISOs use the copyrighted works without altering their character

**a.**   The first way in which an unauthorized use may be transformative is if it somehow creates a novel expressive work that is related to but distinct from the original. The "nub" of this type of transformation "is the use of some elements of a prior author's composition to create a new one" altogether. *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 580 (1994). But it is not enough that a use "adds *some* new expression, meaning, or message." *Andy Warhol*, 598 U.S. at 541 (emphasis added). "Otherwise, 'transformative use' would swallow the copyright owner's exclusive right to prepare derivative works." *Id.* A novelist has a copyright interest in a movie adaptation, for example. *Id*. To qualify as transformative in the first "fair use" sense, the new work must be unique and serve an expressive purpose that is wholly "distinct from the original." *Id.*

Though application of this framework "will [not] be clear cut" in "every instance" (*Andy Warhol*, 598 U.S. 529), it is in this one. ISOs do not purport to change or alter OEMs' copyrighted works in any way. Again, they expressly renounced "an exemption to modify medical devices or systems, or their software." AR1908. The Librarian thus concluded that "'modification' is not part of the proposed exemption for medical devices" and the "exemption requires the device to be restored to normal functionality and no changes be made to the firmware." AR1929.

That resolves the first kind of transformative use against the ISOs and the Library's approval of the Exemption. "To be transformative, a use must do 'something more than repackage or republish the original copyrighted work'" in its original form, using it to compete with the original. *Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163, 181 (2d Cir. 2024) (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014)).

It bears mention that the Librarian reasoned in 2021 "that diagnosis, maintenance, and repair [are] 'likely to be transformative' uses" because "she had previously concluded [as much] in other contexts involving the repair of other software-enabled devices." The Librarian analogized, in particular, to a 2015 rulemaking in which it granted an exemption for software necessary to repair automobiles. *See* AR1186-1187. But as we noted in the opening brief (at 21-22, 32), the

7

ISOs there sought an exemption that explicitly included alteration to accomplish their ends. AR85-86. Here, in contrast, the ISOs did the opposite—they expressly disclaimed alteration of the software or machines, to avoid FDA regulation. AR1929. Commenters observed that relying on the 2015 rulemaking for a "transformative use" finding was therefore illogical (*e.g.*, AR2787, 2825), but the Librarian disregarded the point. The government recites (at 17) but notably does not defend the Librarian's reasoning on this front.

The Librarian also appeared to conclude that an ISO's use of an OEM's copyrighted works for diagnosis, maintenance, and repair is transformative because to maintain or repair a machine is transformative *of the machine*, by "restor[ing]" its "functionality." LOC Br. 19 (quoting AR1909); *see also* AR2094. That position is not legally defensible, either. The fair-use doctrine asks whether the user of a copyrighted work has transformed *the work* into a new creation (or is instead exploiting the original to offer a substitute for the original), not whether the work is used to alter some separate object in a functional way. *See Andy Warhol*, 598 U.S. at 528. This argument, too, was raised in comments (*e.g.*, AR2825), but the Librarian proceeded (AR2094) as if it never had been raised. So too does the government in its brief before this Court (at 17-18), simply repeating statements from prior rulemakings without engaging the substance of the point.

### 2.    *ISOs use the copyrighted works for their original intended purposes*

Unable to rely on the first strand of the transformative-use doctrine, the government spends the bulk of its brief attempting to shoehorn ISOs' for-profit service activities into the second set of uses that may be transformative: those involving a "further purpose." *Andy Warhol*, 508 U.S. at 525. The government is correct that "[a] use can be transformative even if it makes 'an exact copy of a work'" if "'the copy serves a different function than the original work.'" LOC Br. 18 (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 11146, 1165 (9th Cir. 2007)). But there is no basis in either the administrative record or common sense for concluding that the ISOs' use of OEMs' software for diagnosis, maintenance, and repair is the kind of repurposing that courts have recognized as transformative—principally because it is not repurposing at all.

8

**a.**  First, a clarification of the legal standard is warranted. As we explained in the opening brief (at 21-23), the crux of the transformative-use analysis is to ensure that the fair use doctrine continues to advance the "goal of copyright, to promote science and the arts." *Campbell*, 510 U.S. at 579. Thus, under the second strand of the transformative-use analysis, "a transformative work is one that serves a new and different function from the original work and is not a substitute for it." *Authors Guild v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).

For instance, the Second Circuit has found that "Google's making a digital copy of . . . books for the purpose of enabling a search for identification of books containing a term of interest involves a highly transformative purpose" though the content of the books was identical. *Authors Guild, Inc. v. Google*, 804 F.3d 202, 216 (2d Cir. 2015). Similarly, the Ninth Circuit has held that a search engine's use of low-resolution copies of digital images as thumbnails is "highly transformative" because the thumbnails serve a new purpose "in a new work, namely, an electronic reference tool." *Perfect 10*, 608 F.3d at 1165. The common thread running through these cases is that the copier did "something more than repackage or republish the original copyrighted work." *HathiTrust*, 755 F.3d at 96.

In contrast, courts have consistently recognized that merely making an unaltered copy and then using it for the same or a similar purpose as the original is not transformative and cannot support a finding of fair use. The Ninth Circuit has explained, for example, that "[a] use is considered transformative only where a defendant . . . uses the plaintiff's copyrighted work in a different context such that the plaintiff's work is transformed into a new creation." *Wall Data Inc. v. Los Angeles County Sheriff's Department*, 447 F.3d 769, 778 (9th Cir. 2006).

The Supreme Court further elaborated this point in *Andy Warhol*, explaining that a truly transformative purpose will generally resemble the "the purposes listed in the preamble paragraph of § 107," which include "criticism, comment, news reporting, teaching, scholarship, or research." *Id*. (cleaned up). These examples "reflect the sorts of copying that courts and Congress most commonly have found to be fair uses" and thus should "guide the first factor inquiry." *Id*. (cleaned up).

And they "are easily understood, as they contemplate the use of an original work to serve a manifestly different purpose from the work itself." *Id.* (cleaned up). "Criticism of a work, for instance, ordinarily does not supersede the objects of, or supplant, the work" in the marketplace, but rather "uses the work to serve a distinct end," wholly apart from the original. *Id.*

This is all to say that the transformative-use inquiry is not satisfied by only marginal shifts in the purposes to which copied works are put. "[A]n overbroad concept of transformative use, one that includes *any* further purpose, or *any* different character, would narrow the copyright owner's rights excessively by, for example, overriding the "right to create derivative works." *Andy Warhol*, 598 U.S. at 529. For instance, "the adaptation of a book into a movie" is a "substantial" "transformation" in the informal sense, but it is not a transformative use in the copyright sense—it is merely derivative, and the book author thus retains a legal interest in the movie rights. *Id.* "[T]he degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Id.*

The opening brief laid out (at 21-23) this general framework and discussed *Andy Warhol* at length—as did the comments before the Librarian (*e.g.*, AR2786-2787, 2822-2826, 2831). Remarkably, however, the government does not even mention *Andy Warhol* in its discussion of the transformative-use framework. *See* LOC Br. 18-19. Relying only on *Campbell*—together with a small handful of stale, out-of-circuit precedents—it insists that copying a protected work that puts the original to *any* "further purpose" or "different function" qualifies as transformative, no matter what. *See id.* (citing *Perfect 10*, *HathiTrust*, and *A.V. ex rel. Vanderhye v. iParadigms*, LLC, 562 F.3d 630, 639 (4th Cir. 2009)). When the government finally does get to *Andy Warhol* three pages later (at 22), it is only to say (without explanation) that "[t]he Register explained how *Warhol* [is] consistent" with an any-further-purpose-at-all standard and the case "does not substantially change" the analysis (citing AR2094).

Procedurally, that is not a meaningful response to the *Andy Warhol* decision; substantively, it is simply wrong. In fact, *Andy Warhol* expressly rejected the Librarian's approach to the

transformative-use inquiry, making clear that a "concept of transformative use" that treats "any further purpose" as necessarily transformative is "overbroad." 598 U.S. at 529. A truly "transformative use of an original must go beyond that required to qualify as a derivative," by "shedding [new] light on [the original] work, and, in the process, *creating a new one*." *Id*. at 529-530 (emphasis added) (quoting *Campbell*, 510 U.S. at 579). The government does not acknowledge, much less address, this outcome-determining point.

**b.**  Viewed through the lens of *Andy Warhol*, there is no doubt that the ISOs' use of OEMs' copyrighted works is not transformative. They seek to copy works for the same uses that were intended for the original works, and they assuredly have not created anything new.

Throughout its answering brief, the government—parroting the Librarian's own assertions (AR2093-2094)—repeats over and over (at 10, 18-19, 21, 24-25) that ISOs' use of the copyrighted works is "likely transformative" because an ISO's purpose is to render a non-functional device functional again, which is different from an OEM's original purpose of operating a functioning device. But "[a] bad argument does not improve with repetition." *Carr v. United States*, 560 U.S. 438, 462 (2010) (Alito, J., dissenting). And here, the government's argument is both wrong as a matter of fact and irrelevant as a matter of law.

**Take first the facts.** Commenters explained repeatedly and at length that *all* of the copyrighted works at issue have always had among their initial purposes the maintenance, diagnosis, and repair of the machines. *E.g.*, AR2785-2788, 2806, 2825-2826, 2837. Indeed, the software and other works actually at issue here were created exclusively for that purpose. *Id*. These include operating manuals and machine specifications, diagnostic software and service tools, data reports and error logs, and so forth. *Id*.; *see also Triad*, 64 F.3d at 1333 (ISO technicians generally require "diagnostic, and auxiliary software . . . to repair [OEM] software and hardware").

In the rulemaking, there was no dispute about this. In its petition for the Exemption, Summit Imaging, for example, explained that it needed access to "[s]oftware tools and other programs and data files (e.g. data logs) in which OEMs claim copyright used for diagnosing, maintaining,

or repairing the device." Summit Imaging Petition 2, perma.cc/3HHR-N9C2. And Transtate sought "[e]lectronic servicing materials in the form of computer programs and data files that control functions of or store data relating to the functioning of lawfully acquired medical systems and devices," focusing on "manuals and technical data" and "computer programs or modules" written for maintenance and repair tasks. Transtate Equipment Petition 2, perma.cc/V54Y-HBL5. The Librarian thus acknowledged that the Exemption covers maintenance-specific works, such as "manuals and documentation" and "[c]omputer programs" created for the purpose. AR1899-1890, 1927.[1]

The government does not address this point, focusing instead on ISOs' supposed use of general system operating software. But the ISOs never said (or presented evidence) that they need to make unauthorized copies or use of general system operating software for their servicing businesses. And they do not. Again, this case is really only about ISOs' unauthorized use of operating manuals and machine specifications, diagnostic software and service tools, data reports and error logs, and the like. *See* AR2785-2788, 2806, 2825-2826, 2837.

Even if it were otherwise, the Librarian's position still would be unsupportable. As anyone who has used a laptop computer, modern automobile, or even a microwave oven knows well, general system operating software has as an original purpose the restoration of the machine's functionality if the functionality becomes impaired. The Exemption itself makes this clear. It allows the copying of computer programs and other protected works only inasmuch as their reproduction is "a *necessary* step to allow the diagnosis, maintenance, or repair of such a device or system." 37 C.F.R. § 201.40(b)(17) (emphasis added). The Librarian's position thus depends on the bizarre

---

[1]    The Librarian appears to have omitted the original ISO petitions from the administrative record. That is improper. The amended complaint expressly challenges both the "[2021] grant and [2024] renewal of the Exemption." Dkt. 32, at ¶¶ 95-96; *see also id*. at ¶ 106 (challenging "the Register's recommendation in both 2021 and 2024 without further consideration of plaintiffs' and other commenters' arguments or evidence"). The original petitions were assuredly before the Librarian during the rulemaking, and they accordingly should have been included in the record. The Court should deem the petitions, which are publicly available at the hyperlinks recited above, a part of the record.

notion that, although (1) complex medical devices require diagnosis, maintenance, and repair during their lifetimes, (2) OEMs know that such services will be required because they themselves provide those services, and (3) copying the machine's general operating software and data is necessary to perform such tasks, nevertheless no OEM ever designed or intended its operating software to be used for that end.

That is a self-defeating proposition. And, again, commenters said so—they explained that all of the copyrighted works at issue (including general operating software if it is truly necessary) have as an original purpose the diagnosis, maintenance, and repair of a machine when its functionality becomes impaired. *See, e.g.*, AR2782 ("Here, [ISOs] seek to use copyrighted service software authored by [OEMs] for the exact same purpose as it was created by OEMs—to service medical imaging systems."); *see also* AR2785-2788, 2806, 2825-2826, 2837, 3636-3637; *cf. Triad Systems*, 64 F.3d at 1337 (an OEM's software is designed, at least in part, "to enable its customers and its own technicians to service" its machines).

The Librarian ignored these comments, despite that were made by the OEMs and their trade associations, who are closer to the manufacturing process than anyone. She instead adopted the opposite conclusion by pure *ipse dixit* (AR2093), without addressing the substance of the comments or citing an iota of evidence for her contrary position. That is the very definition of arbitrary and capricious decisionmaking. *See Hawaiian Dredging*, 857 F.3d at 881.

Before this Court, the government asserts (at 20) that "there is no need to accept the premise of Plaintiffs' argument," that the software always has been intended for the uses to which ISOs are putting it. But that is just a sly effort to flip the burden. As the Librarian has acknowledged (AR1707, 2068), the burden of proof is on the proponents of a Section 1201 exemption to establish fair use, and not on the opponents to disprove it. Without evidence showing that our premise is wrong (none was ever offered, because the premise is *correct*), the Court must indeed accept the premise as true—or at least, it must treat the inverse as unproven.

**Take next the law.** Even if (contrary to fact) the original works were not intended to be used in the diagnosis, maintenance, or repair of the machines that they help operate, ISOs' use of the works for that purpose still would not be "transformative."

As the government itself frames it (at 19), an ISO's purpose in copying and using the protected works is to restore a machine's functionality, so that it operates as designed; whereas an OEM's purpose in originally creating the works is simply to operate the device as designed, with no restoration required. *See* AR2093-2094. Both of those purposes ensure the operation of the machine. They are so "highly similar" and "substantially similar" that they do not even introduce the *possibility* of transformative use. *Andy Warhol*, 598 U.S. at 524, 532. Recall, a transformative use is one that serves such an entirely distinct end that the work itself "is transformed into a new creation." *Wall Data*, 447 F.3d at 778. That is not remotely the case here.

Even if (again, contrary to fact) the use of the protected works in diagnosis, maintenance, and repair were somehow independently creative, the most it would be is *derivatively* so. A derivative use is one that is "based upon" an original creation and merely "adapts" it or "ebalorat[es]" on it in a manner short of transformation. 17 U.S.C. § 701. As the Court held in *Andy Warhol*, "the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." 598 U.S. at 529. Here, there is no transformation at all—the copyrighted works are not being altered in any way, let alone to such a degree that they are converted into an entirely new expressive creation. They are at most being adapted to a new use that OEMs did not initially intend—or at least so the Librarian (wrongly) concluded. That is not transformative according to any defensible understanding of the law.

As we have previously noted, the only two courts that have addressed the questioned presented here have reached just that conclusion. *See Triad Systems*, 64 F.3d at 1337 ("Southeastern is simply commandeering [OEM] software and using it for the very purpose for which, and in precisely the manner in which, it was designed to be used," and its use is thus "neither creative nor transformative"); *Advanced Computer Services*, 845 F. Supp. at 365 (similar).

14

The government barely acknowledges these cases, brushing them aside (at 22) as irrelevant for not considering *Campbell*. That is an ironic position, coming from an agency that has refused to meaningfully address the Supreme Court's most recent transformative-used precedent in *Andy Warhol*. In all events, the courts' reasoning in those cases has independent persuasive authority and is entirely consistent with prevailing precedent including both *Campbell* and *Andy Warhol*, as we have shown. And it speaks volumes that the government cannot cite any other case confronting the same fact pattern coming out a different way.

**C.    Fourth Factor: ISOs' use of OEMs' copyrighted works has unquestionably diminished the value of the copyrights**

**1.**   We showed in the opening brief (at 24-26) that the Exemption will inflict (and is inflicting) significant harm on "the market for or value of the copyrighted work" (17 U.S.C. § 107), which follows naturally from the fact that ISOs are engaged in commercial, non-transformative copying to put the works to their intended uses. Indeed, the whole point of the Exemption is that it will increase the share of the service-and-repair market held by unlicensed ISOs, thus decreasing the economic value to OEMs of their copyrighted software. AR5482-83, 5492-94.

In response, the government says (at 26) that "the relevant question is whether the infringement [harms] the market for the copyrighted work itself, here, the embedded software for medical equipment" (cleaned up). And because "the market at issue here is the market for the software itself," there cannot be any relevant harm, because "there is no indication that potential users of the exemption—ISOs and medical facilities—seek to enter" that market. *Id.*

The government has confused a copyrighted work with its use or performance. Sometimes a copyrighted work is sold simply as a copy of itself—a physical copy of a book, a poster, or  a computer game to be used in a game console. Other times, a copyrighted work is marketed through a product or service that depends upon a communication or use of the work. *See generally* 17 U.S.C. § 106. For example, a copyrighted stage play is usually marketed through sales of tickets to performances at theaters (an entertainment service). Similarly, operating software is usually

marketed through sales of the machines that it allows to function (a physical product). In either case, the exclusive right to sell tickets to the copyrighted play (*id*. § 106(4)) or to license the use of the copyrighted software (*id*. § 106(3)) remains protected. That is so despite that the written works themselves are being monetized not independently, but through sales of the services or products with which they are bound up. *See* Opening Br. 24-25; *Advanced Computer Services*, 845 F. Supp. at 366.

This is such a case. The works at issue here (diagnostic and service software, machine specifications and manuals, error reports and other data files, etc.) are designed for the singular purpose of diagnosis, maintenance, and repair. The market for those works is the market that puts them to use—that is, the market for maintenance and repair services sold to device owners. And the owners of the copyrights are entitled to monetize the software in that market by charging licensing fees to users of the works. 17 U.S.C. § 106(3). ISOs not only "seek to enter" the market that puts the works to use, but they seek to compete there without having to bear the cost of producing or licensing the works that make the service possible. There is thus no doubting that ISOs' "unauthorized use of [OEMs'] copyrighted software clearly deprives [OEMs] of license fees associated with the use of their software" in the market for maintenance and repair services. *Advanced Computer Services*, 845 F. Supp. at 366. We cited *Advanced Computer Services* for precisely this point in the opening brief (at 24). The government does not respond.

**2.** *Campbell* is helpful to plaintiffs on this point, and not the government. True, *Campbell* held that commerciality is not *independently* sufficient to defeat a fair use claim—a point we have never disputed. But the Court's focus was on whether a commercial use is transformative. Contrary to the government's characterization, *Campbell* confirmed that there remains a "presumption or inference of market harm" in cases "involving . . . mere duplication for commercial purposes," *without* transformation. 510 U.S. at 591. "[W]hen a commercial use amounts to mere duplication of the entirety of an original" and thus "serves as a market replacement for it," a "cognizable market harm to the original [presumptively] will occur." *Id*.

16

Just so here: ISOs are engaged in non-transformative duplication of OEM's protected works to serve the commercial purposes for which those works were designed. By engaging in this copying, moreover, ISOs are able to replace original service that the works make possible. This is not a case in which ISO's duplication and transformation is having only an indirect effect on the demand for the original, as a parody may have on demand for the object it ridicules. *Id*. No, ISOs seek to replace OEMs' sales of maintenance and repair services by using the copyrighted works for the same exact purposes for which they were created, allowing them to compete with OEMs at lower prices by avoiding the costs of creating the software or paying licensing fees. ISOs' free-riding maintenance services "have undoubtedly diminished the value of [the OEM's] copyright." *Triad Systems*, 64 F.3d at 1337; *accord Advanced Computer Services*, 845 F. Supp. at 366.

**3.**   As part of its market-harm analysis, the government asserts (at 29) that the Librarian was free to "consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially." Here, according to the government (*id*.), the "public interest" includes the "benefit" of lowering the cost of machine ownership and thus "supporting the healthcare system." This echoes the Librarian's rationale (AR1928) that "OEMs charge higher prices and [thus] medical service providers must spend more to service their equipment" compared with hiring "an ISO [to] perform [unlicensed] repairs" instead.

As we explained in the opening brief (at 27-28), this line of reasoning, if adopted by the Court, would turn the goal of copyright law upside down. As the court noted in *Advanced Computer Services*, although courts may "consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially," the only relevant public benefit for copyright purposes is "the development of art, science, and industry, and not, as here, the purely financial interests of customers" who have been "on notice" of the licensing terms of the software at issue. 845 F. Supp. at 365. Free-floating public policy rationales are not enough. OEMs should be able to "rely on service fees to recoup [their] investment costs in developing the

software" needed to diagnose, maintain, repair, and run the machine. *Id*. Although we have made this point clearly and repeatedly, the government does not respond.

**D.    The remaining fair-use factors offer no "compelling justification" to overcome the purely commercial, directly competitive, non-transformative uses to which ISOs are putting the copyrighted works**

Because the Exemption authorizes ISOs to put OEMs' copyrighted works to commercial and non-transformative uses for purposes of competing at an unfair advantage against OEMs' themselves, only "a particularly compelling justification" under the remaining fair-use factors could save the Exemption from invalidation. *Andy Warhol*, 598 U.S. at 547. There is nothing close to that under the second and third factors. The most one could say about either is that they do not militate against a finding of fair use, and not that it affirmatively compels such a finding. But in truth, neither does even that and instead favors plaintiffs.

**1.    The nature of the works.** The second fair-use factor inquires into "the nature of the copyrighted work," which the Librarian concluded (AR1910) is "functional and informational" rather than "expressive." *See* LOC Br. 22. As we observed in the opening brief (at 27), the court in *Advanced Computer Services* disagreed with that conclusion, noting that "although [software] is used for a functional purpose, [it] is essentially a creative work" because, beyond "a mere compilation of existing information," it is "a specially designed and crafted work which represents a substantial investment of time and labor." 845 F. Supp. at 365.

The government does not respond to that holding. Instead, it picks nits (at 23) with our framing of the issue, asserting that a finding of "fair use" does not mean that work isn't copyrighted, but only that it may be copied without compensation to the author *despite* the author's copyright. It is unclear what that quibble is meant to prove.

Our point on this score is a simple one: Although it is true that "some works are closer to the core of intended copyright protection than others," that means only that "fair use is [especially] difficult to establish" with respect to "expressive works," as compared with "factual works" like some software code. *Campbell*, 510 U.S. at 586. It does not mean that the Librarian is free to

declare "fair use" simply because she concludes (at 23-24, 29) that copying the software at issue will produce "public benefits" that are in no way "related to copyright's concern for the creative production of new expression." *Google LLC v. Oracle America*, 593 U.S. 1, 35 (2021). Indeed, the Librarian's argument has no logical limits—computer software "almost always serve[s] functional purposes." *Id.* at 21. Yet Congress has affirmatively decided to extend copyright protection to "computer programs." 17 U.S.C. § 117. The Librarian's assertion that the functional character of the materials at issue is dispositive of (or even a weighty consideration in) the fair use inquiry would eviscerate copyright protections for *all* software and contravene Congress's delicately balanced statutory scheme.

The fair use factors are "to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. The mere fact that the works at issue here are stated in computer code does not, and cannot, furnish the "particularly compelling justification" needed to overcome a purely exploitative, non-transformative commercial use. *Andy Warhol*, 598 U.S. at 547.

**2. The relative amount of copyrighted material being used.** As we noted (Opening Br. 23), the Librarian acknowledged that ISOs generally copy the entirety of an OEMs' works stored on the machines they are servicing but dismissed the point as warranting "little weight" because ISOs are pursuing "transformative purposes." AR1911. That analysis undisputably and improperly collapses the third Section 107 factor into the first. Opening Br. 23.

As the Ninth Circuit has noted—and as the Librarian assumed—an ISO must "copy[] programs in their entirety" to perform its third-party maintenance services. *Triad Systems*, 64 F.3d at 1337 (citing *Advanced Computer Services*, 845 F. Supp. at 366 n.13). The Library was not at liberty to disregard that fact, which the Ninth Circuit held weighs strongly against fair use.

The government barely acknowledges this point, electing instead (at 25) simply to repeat the Librarian's reasoning and conclude without evaluating her statements that she "reasonably concluded that the third factor did not militate against fair use." Our original objections, which

have not been addressed by the government, still stand—copying an entire software program and related works weighs strongly against finding any fair use. Either way, and as with respect to the second fair-use factor, the government does not assert that the third factor can affirmatively justify a fair-use determination. It concludes only that this does not foreclose fair use. In the context of a commercial, non-transformative, competitive use, that is fatal. *Andy Warhol*, 598 U.S. at 547; *Campbell*, 510 U.S. at 591.

## II. THE LIBRARIAN'S DISPARATE APPLICATIONS OF *ANDY WARHOL* WERE ARBITRARY AND CAPRICIOUS

For the reasons we gave in the opening brief and have supported further above, the Librarian's renewal of the Exemption is arbitrary and capricious for yet another reason. As the opening brief showed (at 28-30), the Librarian declined to grant an exemption to for-profit universities to use certain movie clips and videos in their online courses. Relying on the precise rationale that we have put forward for vacating the Exemption, the Librarian reasoned that "[i]f an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use." AR2116 (quoting *Andy Warhol*, 598 U.S. at 532). Her selective application of that rational is arbitrary.

In defending these disparate approaches to *Andy Warhol*, the government asserts (at 31) that "there are two major differences between the for-profit educational proposal and the Repair Exemption." First, it says (*id.*), "repair of medical devices is a transformative use." Second, it says (*id.),* "not all users of the Repair Exemption are gaining a commercial benefit" because "nothing is necessarily commercial about repairing broken medical equipment." We have shown the first distinction to be legally and factually wrong. And we have shown the second distinction to be unsupported by evidence and not raised in the rulemaking proceeding. Neither offers any rational basis for treating the two exemption requests differently, meaning that the Librarian's decision to apply *Andy Warhol* differently to like situations is arbitrary and capricious.

### III.    THE LIBRARY DID NOT ADEQUATELY RESPOND TO COMMENTS

The opening brief showed (at 31-36) that many very substantial comments raised by plaintiffs and their members went effectively unanswered in both the 2021 and 2024 rulemakings. The government takes (at 32-36) a single, overarching approach to answering these arguments: It simply repeats the Librarian's own cursory analysis and insists, without further explanation or elaboration, that it's enough.

That is not the law. "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency . . . respond to relevant and significant public comments." *Public Citizen v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (cleaned up). An agency does not meet that burden by "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). Yet that is all the Librarian did in the rulemaking, and it is all the government does now in its brief before this Court.

For example, the *Andy Warhol* decision kicks the legs out from under the Librarian's already dubious transformative-use analysis. Commenters raised this issue with the Librarian in the 2024 Rulemaking. *See* Opening Br. 34-35. Her response was a cursory brush-off: The decision "does not substantially change how the Office would analyze the uses at issue" and that the "analysis from the 2021 cycle remains sound." AR2093. The government now says (at 34) that mere "disagree[ment] with the Register's interpretation of *Warhol*" does not mean that she "disregarded" the comment. But that misses the point, which is that the Librarian did not offer an interpretation *at all*. She merely "nodd[ed] at the case and "dismiss[ed it] in a conclusory manner." *Gresham*, 950 F.3d at 103. With respect to an intervening legal development so central to the case, that is arbitrary and capricious agency conduct.

In another example, the opening brief contended (at 32) that the Librarian did not consider plaintiffs' comments highlighting the ISOs' for-profit interests in OEMs' copyrighted works and the lack of a transformative use. The government asserts (at 33-34) in response that the Librarian "considered Plaintiffs' comments about commerciality" and "explicitly rejected them." That

simplistic response talks past our argument (Opening Br. 32), which is that the Librarian's rejection was based on an unexplained *ipse dixit* that "did not respond adequately to opponents' explanation" for why ISOs' uses are commercial and non-transformative.

That goes for each and every other argument we made in the opening brief on this score, some of which we have addressed earlier in this brief (*e.g.*, at 5, 7-8, 10, 13), and which we do not otherwise belabor and repeat. As to each, the government's brief unthinkingly points to a page in the administrative record where the Librarian inadequately dismissed the corresponding comments, but without showing how or why the Librarian actually discharged her obligation to engage with the substance of the stated concerns. This kind of superficial, ends-driven approach to notice-and-comment rulemaking does not satisfy an agency's obligation to engage in reasoned decision-making. Failure of an agency to "respond meaningfully" to objections and comments and to "answer[] objections that on their face seem legitimate" renders a decision arbitrary and capricious. *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005). This is yet another reason to vacate the Exemption.

## IV.  THE COURT SHOULD VACATE THE EXEMPTION, AS REQUIRED BY THE APA AND NUMEROUS D.C. CIRCUIT PRECEDENTS

The government concludes its brief by inviting the Court to disregard the APA's plain language, which directs courts that have found illegalities in agency decision-making to "set aside" the agency's final action. 5 U.S.C. § 706(2). That, the Court may not do. "Pursuant to the Administrative Procedure Act, courts are instructed always to 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1497 (D.C. Cir. 1988) (quoting 5 U.S.C. § 706(2)(A)).

To be sure, in *Gulf Restoration Network v. Haaland*, 47 F.4th 795 (D.C. Cir. 2022), the D.C. Circuit more recently described vacatur as the "the typical remedy for an APA violation," but "not [an] inevitable" one. *Id*. at 804. That was a reference to the practice of granting a remand without vacatur—which "remains an exceptional remedy." *American Great Lakes Ports*

*Association v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020). A remand without vacatur is generally appropriate only when an APA plaintiff proves a purely procedural violation, meaning that the agency is not substantively barred from re-promulgating the rule under review; when there is reason to think the agency will reach the same substantive decision after correcting the procedural fault; and when vacatur would disrupt a settled transaction or other reliance interests. *Id*.

That was the case in *Gulf Restoration*: The Court there concluded that the agency had improperly declined to consider a particular GAO report in its preparation of an environmental impact statement under NEPA. 47 F.4th at 804. The agency explained that the report "[did] not raise significant concerns" and indicated that its consideration of the report "ultimately [would] not change the bottom line." *Id*. at 804-805. More, the court reasoned that a vacatur would have been "highly disruptive" to substantial reliance interests. *Id*. at 805. In those narrow and exceptional circumstances, a remand without vacatur was warranted.

This case does not call for that kind of relief. If the Court agrees with the merits arguments that we have made here, it means that the Exemption is substantively unlawful because the uses at issue are not fair ones under Section 107. In that event, a remand would serve no purpose, and the Librarian could not lawfully preserve the bottom line.

The government asserts (at 38) that we have not given "any reason why vacatur of the Repair Exemption is necessary to afford [plaintiffs] complete relief in this case." It thus proposes (*id*.) as an alternative that the Court instead issue a declaration that the Exemption is unlawful and otherwise "enjoin the Library from implementing the Repair Exemption." But that more limited form of relief would not suffice on its own. The injuries that are resulting from the Exemption are being worked not by the Librarian or her subordinates "implementing" the Exemption, but by the private third parties who are violating OEMs' copyrights under its apparent authorization. Those third parties are not under the Court's jurisdiction in this suit and thus cannot be bound by any injunction the Court may enter. *See United States v. Philip Morris USA Inc*., 566 F.3d 1095, 1136 (D.C. Cir. 2009) (discussing Fed. R. Civ. P. 65(d)(2)(C)). And as long as the Exemption stands,

there is every reason to believe ISOs will continue to utilize it as rationale for infringing OEMs copyrights.

The government's resort to Section 703 does not support a different result. *See generally Corner Post v. Federal Reserve System*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring) (dismissing as "weak" the government's argument that "the remedies available in APA suits are not governed by § 706(2), . . . but instead are governed by § 703"). Section 703 determines the "form of proceeding" for suits under the APA and identifies the federal actors against whom an "action for judicial review may be brought." But "no court has ever held that Section 703 implicitly delimits the kinds of remedies available in an APA suit." M. Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L. J. 2304, 2337 (2024). Moreover, the ordinary meaning of "set aside" in Section 706(2) has long been understood to refer to the remedy of vacatur. The conclusion that Section 706 governs APA remedies is also supported by Section 706(1), which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed," plainly a remedy. By contrast, the text of Section 703 "speaks to venue and forms of proceedings, not to remedies, and regardless, its listing of the available forms of proceedings is nonexhaustive." Sohoni, *supra*, 133 Yale L.J. at 2337.

When an APA plaintiff succeeds in showing that an agency has undertaken a final action that is inconsistent with law, arbitrary and capricious, or unsupported by evidence, "[t]he ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing Section 706(1)). That ordinary practice is manifestly warranted here.

**CONCLUSION**

The Court should grant summary judgment to plaintiffs and enter a final judgment setting aside and vacating the Exemption, declaring the Exemption to be unlawful and void, and enjoining defendants from enforcing, implementing, or otherwise carrying out the Exemption.

February 28, 2025                                    Respectfully submitted,

                                                    /s/ *Michael B. Kimberly*

                                                    Michael B. Kimberly (No. 991549)
                                                    Charles Seidell (No. 1670893)
                                                    Alex C. Boota (*pro hac vice*)
                                                        McDermott Will & Emery LLP
                                                        *500 North Capitol Street NW*
                                                        *Washington, DC 20001*
                                                        *(202) 756-8000*
                                                        *mkimberly@mwe.com*

                                                    *Counsel for Plaintiffs*