**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ADVANCED MEDICAL TECHNOLOGY ASSOCIATION, et al,

*Plaintiffs*,

v.

LIBRARY OF CONGRESS, et al.,

*Defendants*.

No. 1:22-cv-499 (BAH)

**JOINT APPENDIX**

**VOLUME 1 OF 5**
**(Page Excerpts AR76-211)**

Allison M. Walter
Yaakov M. Roth
Joseph E. Borson
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
(202) 616-8492
allison.m.walter@usdoj.gov

*Counsel for Defendants*

Michael B. Kimberly
Charles Seidell
Alex C. Boota
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
mkimberly@mwe.com

*Counsel for Plaintiffs*

(iv) Foreign relations or foreign activities of the United States, including confidential sources;

(v) Scientific, technological, or economic matters relating to the national security;

(vi) U.S. Government programs for safeguarding nuclear materials or facilities;

(vii) Vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or

(viii) The development, production, or use of weapons of mass destruction.

(b) [Reserved]

Dated: October 22, 2015.

**Aaron Siegel,**

*Alternate OSD Federal Register Liaison Officer, Department of Defense.*

[FR Doc. 2015–27393 Filed 10–27–15; 8:45 am]

BILLING CODE 5001–06–P

---

## LIBRARY OF CONGRESS

### Copyright Office

### 37 CFR Part 201

**[Docket No. 2014–07]**

### Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, the Librarian of Congress adopts exemptions to the provision of the Digital Millennium Copyright Act (''DMCA'') that prohibits circumvention of technological measures that control access to copyrighted works, codified in section 1201(a)(1) of title 17 of the United States Code. As required under the statute, the Register of Copyrights, following a public proceeding, submitted a Recommendation concerning proposed exemptions to the Librarian of Congress. After careful consideration, the Librarian adopts final regulations based upon the Register's Recommendation.

**DATES:** Effective October 28, 2015.

**FOR FURTHER INFORMATION CONTACT:** Jacqueline C. Charlesworth, General Counsel and Associate Register of Copyrights, by email at *jcharlesworth@loc.gov* or by telephone at 202–707–8350; Sarang V. Damle, Deputy General Counsel, by email at *sdam@loc.gov* or by telephone at 202–707–8350; or Stephen Ruwe, Assistant General Counsel, by email at *sruwe@loc.gov* or by telephone at 202–707–8350.

**SUPPLEMENTARY INFORMATION:** The Librarian of Congress, pursuant to section 1201(a)(1) of title 17, United States Code, has determined in this sixth triennial rulemaking proceeding that the prohibition against circumvention of technological measures that effectively control access to copyrighted works shall not apply to persons who engage in noninfringing uses of certain classes of such works. This determination is based upon the Recommendation of the Register of Copyrights, which was transmitted to the Librarian on October 8, 2015.[1]

The below discussion summarizes the rulemaking proceeding and Register's Recommendation, announces the Librarian's determination, and publishes the regulatory text specifying the exempted classes of works. A more complete discussion of the rulemaking process, the evidentiary record, and the Register's analysis can be found in the Register's Recommendation, which is posted at *www.copyright.gov/1201/.*

## I. Background

### *A. Statutory Requirements*

Congress enacted the DMCA in 1998 to implement certain provisions of the WIPO Copyright and WIPO Performances and Phonograms Treaties. Among other things, title I of the DMCA, which added a new chapter 12 to title 17 of the U.S. Code, prohibits circumvention of technological measures employed by or on behalf of copyright owners to protect access to their works. In enacting this aspect of the law, Congress observed that technological protection measures (''TPMs'') can ''support new ways of disseminating copyrighted materials to users, and . . . safeguard the availability of legitimate uses of those materials by individuals.''[2]

Section 1201(a)(1) provides in pertinent part that ''[n]o person shall circumvent a technological measure that effectively controls access to a work protected under [title 17].'' Under the statute, to ''circumvent a technological measure'' means ''to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner.''[3] A technological measure that ''effectively controls access to a work'' is one that ''in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.''[4]

Section 1201(a)(1), however, also includes what Congress characterized as a ''fail-safe'' mechanism,[5] which requires the Librarian of Congress, following a rulemaking proceeding, to publish any class of copyrighted works as to which the Librarian has determined that noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected by the prohibition against circumvention in the succeeding three-year period, thereby exempting that class from the prohibition for that period.[6] The Librarian's determination to grant an exemption is based upon the recommendation of the Register of Copyrights, who conducts the rulemaking proceeding.[7] Congress directed the Register, in turn, to consult with the Assistant Secretary for Communications and Information of the Department of Commerce, who oversees the National Telecommunications and Information Administration (''NTIA''), in the course of formulating her recommendation.[8]

The primary responsibility of the Register and the Librarian in the rulemaking proceeding is to assess whether the implementation of access controls impairs the ability of individuals to make noninfringing uses of copyrighted works within the meaning of section 1201(a)(1). To do this, the Register develops a comprehensive administrative record using information submitted by interested members of the public, and makes recommendations to the Librarian concerning whether exemptions are warranted based on that record.

Under the statutory framework, the Librarian, and thus the Register, must consider ''(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and

---

[1] Register of Copyrights, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights (Oct. 2015) (''Register's Recommendation'').

[2] Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4, 1998, at 6 (Comm. Print 1998).

[3] 17 U.S.C. 1201(a)(3)(A).

[4] 17 U.S.C. 1201(a)(3)(B).

[5] *See* H.R. Rep. No. 105–551, pt. 2, at 36 (1998).

[6] *See* 17 U.S.C. 1201(a)(1).

[7] 17 U.S.C. 1201(a)(1)(C).

[8] *Id.*

(v) such other factors as the Librarian considers appropriate." [9] As noted above, the Register must also consult with the Assistant Secretary who oversees NTIA, and report and comment on his views, in providing her Recommendation. Upon receipt of the Recommendation, the Librarian is responsible for promulgating the final rule setting forth any exempted classes of works.

Significantly, exemptions adopted by rule under section 1201(a)(1) apply only to the conduct of circumventing a technological measure that controls access to a copyrighted work. Other parts of section 1201, by contrast, address the manufacture and provision of—or "trafficking" in—products and services designed for purposes of circumvention. Section 1201(a)(2) bars trafficking in products and services that are used to circumvent technological measures that control access to copyrighted works (for example, a password needed to open a media file),[10] while section 1201(b) bars trafficking in products and services used to circumvent technological measures that protect the exclusive rights of the copyright owner in their works (for example, technology that prevents the work from being reproduced).[11] The Librarian of Congress has no authority to adopt exemptions for the anti-trafficking prohibitions contained in section 1201(a)(2) or (b).[12]

More broadly, activities conducted under the regulatory exemptions must still comply with other applicable laws, including non-copyright provisions. Thus, while an exemption may specifically reference other laws of particular concern, any activities conducted under an exemption must be otherwise lawful.

Also significant is the fact that the statute contains certain permanent exemptions to permit specified uses. These include: Section 1201(d), which exempts certain activities of nonprofit libraries, archives, and educational institutions; section 1201(e), which exempts "lawfully authorized investigative, protective, information security, or intelligence activity" of a state or the federal government; section 1201(f), which exempts certain "reverse engineering" activities to facilitate interoperability; section 1201(g), which exempts certain types of research into encryption technologies; section 1201(h), which exempts certain activities to prevent the "access of minors to material on the Internet"; section 1201(i), which exempts certain activities "solely for the purpose of preventing the collection or dissemination of personally identifying information"; and section 1201(j), which exempts certain acts of "security testing" of computers and computer systems.

*B. The Unlocking Consumer Choice and Wireless Competition Act*

In 2014, Congress enacted the Unlocking Consumer Choice and Wireless Competition Act ("Unlocking Act"), effective as of August 1, 2014.[13] The Unlocking Act did three things. First, it replaced the exemption adopted in the 2012 triennial proceeding to enable certain wireless telephone handsets (*i.e.*, cellphones) to connect to wireless communication networks—a process commonly known as cellphone "unlocking"—with a broader version of the exemption adopted by the Librarian in 2010. Second, the legislation provided that the circumvention permitted under the reinstated 2010 exemption, as well as any future exemptions to permit wireless telephone handsets or other wireless devices to connect to wireless telecommunications networks, may be initiated by the owner of the handset or device, by another person at the direction of the owner, or by a provider of commercial mobile radio or data services to enable such owner or a family member to connect to a wireless network when authorized by the network operator.[14] This directive is permanent, and is now reflected in the relevant regulations.[15] Third, the legislation directed the Librarian of Congress to consider as part of the current triennial proceeding whether to "extend" the cellphone unlocking exemption "to include any other category of wireless devices" based upon the recommendation of the Register, who in turn is to consult with the Assistant Secretary.[16] Accordingly, as part of this rulemaking proceeding, the Copyright Office solicited and evaluated several proposed unlocking exemptions for devices other than cellphones, as addressed in Proposed Classes 12 through 15 below.

*C. Rulemaking Standards*

In adopting the DMCA, Congress imposed legal and evidentiary requirements for the section 1201 rulemaking proceeding, as discussed in greater detail in the Register's Recommendation.[17] Those who seek an exemption from the prohibition on circumvention bear the burden of establishing that the requirements for granting an exemption have been satisfied by a preponderance of the evidence. In addition, the basis for an exemption must be established *de novo* in each triennial proceeding. That said, however, where a proponent is seeking the readoption of an existing exemption, it may attempt to satisfy its burden by demonstrating that the conditions that led to the adoption of the prior exemption continue to exist today (or that new conditions exist to justify the exemption). Assuming the proponent succeeds in making such a demonstration, it is incumbent upon any opponent of that exemption to rebut such evidence by showing that the exemption is no longer justified.

To establish a case for an exemption, proponents must show at a minimum (1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses. In addition, the Librarian must also examine the statutory factors listed in section 1201(a)(1): (1) The availability for use of copyrighted works; (2) the availability for use of works for nonprofit archival, preservation, and educational purposes; (3) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (4) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (5) such other factors as the Librarian considers appropriate. In some cases, weighing these factors requires the consideration of the benefits that the technological measure brings with respect to the overall creation and dissemination of works in the marketplace, in addition to any negative impact.

[9] *Id.*

[10] 17 U.S.C. 1201(a)(2).

[11] 17 U.S.C. 1201(b).

[12] *See* 17 U.S.C. 1201(a)(1)(E) ("Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.").

[13] Public Law 113–144, 128 Stat. 1751 (2014). Subsequently, the Librarian adopted regulatory amendments to reflect the new legislation. *See* Exemption to Prohibition on Circumvention of Copyright Protection Systems for Wireless Telephone Handsets, 79 FR 50552 (Aug. 25, 2014) (codified at 37 CFR 201.40(b)(3), (c)).

[14] Unlocking Act sec. 2(a), (c).

[15] *See* 79 FR at 50554; *see also* 37 CFR 201.40(c).

[16] Unlocking Act sec. 2(b).

[17] *See* Register's Recommendation at 13–18.

Finally, when granting an exemption, section 1201(a)(1) specifies that the exemption adopted as part of this rulemaking must be defined based on "a particular class of works." [18] Among other things, the determination of the appropriate scope of a "class of works" recommended for exemption may also take into account the adverse effects an exemption may have on the market for or value of copyrighted works. Accordingly, "it can be appropriate to refine a class by reference to the use or user in order to remedy the adverse effect of the prohibition and to limit the adverse consequences of an exemption." [19]

### II. History of the Sixth Triennial Proceeding

As the Register explains in the Recommendation, the administrative process employed in the rulemaking was revised for this triennial proceeding. In particular, the Copyright Office implemented certain procedural changes to make the process more accessible and understandable to the public, allow greater opportunity for participants to coordinate their efforts, encourage participants to submit effective factual and legal support for their positions, and reduce administrative burdens on both the participants and the Office. Among other things, the procedural changes included providing commenters with recommended template forms to use when submitting comments, and requiring commenters to submit separate comments for each proposed class.

On September 17, 2014, the Copyright Office published a Notice of Inquiry ("NOI") in the **Federal Register** to initiate the sixth triennial rulemaking proceeding.[20] The NOI invited interested parties to submit petitions for proposed exemptions that set forth the essential elements of the exemption. The Office received forty-four petitions for proposed exemptions in response to the NOI.

Next, on December 12, 2014, the Office issued a Notice of Proposed Rulemaking ("NPRM") that reviewed and grouped the proposed exemptions set forth in the petitions.[21] In the NPRM, the Copyright Office concluded that three of the petitions sought exemptions that could not be granted as a matter of law, and declined to put those proposals forward for public comment.[22] The Office grouped the remaining proposed exemptions into twenty-seven proposed classes of works. In some cases, overlapping proposals were merged into a single combined proposed class. In other cases, individual proposals that encompassed multiple proposed uses were subdivided into multiple classes to aid in the process of review. The Office then provided detailed guidance on the submission of comments, including a number of specific legal and factual areas of interest with respect to each proposed class.

The Office received nearly 40,000 comments in response to the NPRM, the vast majority of which consisted of relatively short statements of support or opposition without substantial legal argument or supporting evidence. A number of the longer submissions included multimedia evidence to illustrate points made in the written comments.

After receiving and studying the written comments, the Office held seven days of public hearings: In Los Angeles, at the UCLA School of Law, from May 19 to 21, 2015; and in Washington, DC, at the Library of Congress, from May 26 to 29, 2015. The Office heard testimony from sixty-three witnesses at the hearings, and received additional multimedia evidence. After the hearings, the Office issued a number of follow-up questions to participants, and received responses that have been made part of the administrative record.

As observed by various commenting parties, certain of the proposed exemptions presented issues potentially of concern to the Department of Transportation ("DOT"), the Environmental Protection Agency ("EPA"), and the Food and Drug Administration ("FDA"), and perhaps other regulatory agencies as well. The Copyright Office therefore sent letters to DOT, EPA and FDA informing them of the pendency of the rulemaking proceeding in case they wished to comment on the proposals. In response to these letters, the Office received responses from those agencies, and also from the California Air Resources Board ("California ARB"), which are also included in the record.

Throughout this triennial proceeding, as required under section 1201(a)(1), the Register has consulted with NTIA. In addition to providing procedural and substantive input throughout the rulemaking process, NTIA was represented along with Copyright Office staff at the public hearings held in Los Angeles and Washington, DC NTIA formally communicated its views on each of the proposed exemptions in recommendations delivered to the Register on September 18, 2015. NTIA's recommendations can be viewed at *copyright.gov/1201/2015/2015_NTIA_Letter.pdf.*

### III. Summary of Register's Recommendation

#### A. Designated Classes

Based upon the record in this proceeding, the Register of Copyrights recommends that the Librarian determine that the classes of works described below be exempt from the prohibition against circumvention of technological measures set forth in section 1201(a)(1):

1. Proposed Classes 1 to 7: Audiovisual Works—Educational and Derivative Uses [23]

Proponents of Proposed Classes 1 through 7 share the desire to circumvent technological protection measures employed on DVDs, Blu-ray discs and/or by various online streaming services to access motion pictures—a category under the Copyright Act that includes television programs and videos—in order to engage in noninfringing uses. Past rulemakings have granted exemptions relating to uses of motion picture excerpts for commentary or criticism by college and university faculty and staff and by kindergarten through twelfth-grade educators, as well as in noncommercial videos, documentary films, and nonfiction multimedia e-books offering film analysis. Past exemptions have been limited to circumvention of DVDs, online distribution services, and as a result of using screen-capture technology.

[18] 17 U.S.C. 1201(a)(1)(B).

[19] Recommendation of the Register of Copyrights in RM 2005–11, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies 19 (Nov. 17, 2006).

[20] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 79 FR 55687 (Sept. 17, 2014) ("NOI").

[21] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 79 FR 73856, 73859 (Dec. 12, 2014) ("NPRM").

[22] NPRM, 79 FR at 73859. Each of these petitions sought to permit circumvention of any and all TPMs that constituted "digital rights management" with respect to unspecified types of copyrighted works for the purpose of engaging in unidentified personal and/or consumer uses. *Id.* The Office explained that these proposed exemptions ran afoul of the statutory requirement that "any exemptions adopted as part of this rulemaking must be defined based on 'a *particular class* of works.'" *Id.* (quoting 17 U.S.C. 1201(a)(1)(B) (emphasis added)). The Office thus concluded that "the sweeping type of exemption proposed by these three petitions" could not be granted consistent with the standards of section 1201(a)(1). *Id.*

[23] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Recommendation at 24–106.

The petitions filed in this rulemaking sought to readopt and to some extent expand the previously granted exemptions, including to encompass Blu-ray discs (on the ground that a high-definition format is required for certain uses), to access audiovisual works that may not be motion pictures (such as video games), to permit the use of more than "short portions" of motion picture excerpts, and to extend to all "fair uses" rather than limiting the uses to criticism or comment. Some proponents sought to expand filmmaking uses to include narrative (or fictional) film, in addition to documentaries. Some proposals were focused on expanding the category of potential users of an exemption, such as to uses by museums, libraries and nonprofits, or by students and faculty participating in massive online open courses ("MOOCs"). The Copyright Office grouped these proposals into seven classes.

Proposed Class 1: This proposed class would allow college and university faculty and students to circumvent access controls on lawfully made and acquired motion pictures and other audiovisual works for purposes of criticism and comment.

Class 1 was proposed by Professor Peter Decherney, the College Art Association, the International Communication Association, and the Society for Cinema and Media Studies (collectively, "Joint Educators") to allow, for example, film studies professors to circumvent DVDs in order to use motion picture clips in class lectures. A class covering such uses was adopted in the 2010 and 2012 rulemakings. Joint Educators asked that the exemption be expanded to include the ability to circumvent Blu-ray discs, to remove the limitation to "short portions" of motion picture excerpts, and to broaden the class to cover all "audiovisual works" for all "educational purposes."

Proposed Class 2: This proposed class would allow kindergarten through twelfth-grade educators and students to circumvent access controls on lawfully made and acquired motion pictures and other audiovisual works for educational purposes.

Petitions for Proposed Class 2 were submitted by Professor Renee Hobbs and the Library Copyright Alliance ("LCA"), to allow, for example, a high school teacher to circumvent DVDs of various adaptations of Shakespeare's works in order to create a compilation of clips demonstrating the lasting influence of these works. Hobbs and LCA requested that the existing exemption for grades K–12 be expanded to include student uses rather than only uses by educators, to allow circumvention of Blu-ray discs, to remove the limitation to "short portions" of works, and to broaden the class to cover all "audiovisual works" for all "educational purposes."

Proposed Class 3: This proposed class would allow students and faculty participating in massive online open courses ("MOOCs") to circumvent access controls on lawfully made and acquired motion pictures and other audiovisual works for purposes of criticism and comment.

Joint Educators proposed Class 3, essentially seeking to expand the exemption for college and university faculty and students in Class 1 to include MOOCs, or online distance education courses offered on a broad scale. The exemption would, for example, allow a professor preparing an online lecture about the evolution of Chinese society to circumvent access controls in order to incorporate video clips documenting Chinese history and geography. Joint Educators' proposal included the ability to circumvent Blu-ray discs, to permit use of more than "short portions" of motion picture excerpts, and to allow use of all "audiovisual works" for all "educational purposes." Joint Educators contended that the prohibition on circumvention of TPMs is inhibiting the introduction of certain types of courses, such as film studies, on MOOC platforms.

Proposed Class 4: This proposed class would allow educators and learners in libraries, museums and nonprofit organizations to circumvent access controls on lawfully made and acquired motion pictures and other audiovisual works for educational purposes.

Professor Hobbs proposed Class 4 to allow, for example, educators in a community center adult education program to circumvent access controls in order to create video clips for purposes of discussing the portrayal of African-American women in a popular television show. The proposal encompassed "audiovisual works" for all "educational uses," as well as the ability to circumvent Blu-ray discs. Hobbs expressed concern that the prohibition on circumvention prevents participants in digital and media literacy programs in informal learning settings from engaging in projects similar to those conducted on college and university campuses.

Proposed Class 5: This proposed class would allow circumvention of access controls on lawfully made and acquired motion pictures used in connection with multimedia e-book authorship.

Class 5 was jointly proposed by Authors Alliance and Bobette Buster to allow, for example, a sound editor and e-book author to circumvent DVDs or Blu-ray discs to incorporate brief film excerpts in an e-book entitled *Listening to Movies*. Proponents requested renewal of the previously granted exemption, and expansion of that exemption to encompass any genre of multimedia e-book (as opposed to uses only in nonfiction multimedia e-books offering film analysis), to allow circumvention of Blu-ray discs, to remove the limitation to "short portions" of motion picture excerpts, and to broaden the class to cover all "audiovisual works." In general, proponents argued that the prohibition on circumvention hinders e-book authors' ability to criticize and comment on audiovisual works, some of which may only be accessible through DVD, Blu-ray or digitally transmitted sources.

Proposed Class 6: This proposed class would allow circumvention of access controls on lawfully made and acquired motion pictures for filmmaking purposes.

Class 6 was proposed by the International Documentary Association, Film Independent, Kartemquin Educational Films, Inc., and National Alliance for Media Arts and Culture (collectively, "Joint Filmmakers") to allow, for example, filmmakers to circumvent access controls on material streamed online in order to incorporate excerpts of news footage into documentaries. The proposal sought readoption of the existing exemption for documentary filmmaking uses, and its expansion to include narrative (or fictional) films, to permit circumvention of Blu-ray discs, and to remove the limitation to short portions of works. Joint Filmmakers stressed that much material is only available on DVD, Blu-ray and digitally transmitted video, and that circumvention of Blu-ray discs is necessary because, among other things, distribution standards require films to incorporate clips of high-definition quality.

Proposed Class 7: This proposed class would allow circumvention of access controls on lawfully made and acquired audiovisual works for the sole purpose of extracting clips for inclusion in noncommercial videos that do not infringe copyright.

Class 7 was proposed by Electronic Frontier Foundation ("EFF") and the Organization for Transformative Works. Proponents sought to permit, for example, a fan of *James Bond* films to circumvent access controls on DVDs of these films in order to incorporate brief excerpts into a noncommercial video commenting on the portrayal of female characters in those films. The proposal

sought renewal of the existing exemption, and expansion of that exemption to Blu-ray discs and all "noninfringing" or "fair" uses. Proponents argued that the existing exemption has resulted in the creation of a wide variety of new, noninfringing works, and expansion of that exemption to Blu-ray discs is necessary because, among other things, there is a significant amount of material that can only be found in that format.

For each exemption, proponents argued that the requested exemption would facilitate fair uses of the accessed works—for example, because of the educational nature of the uses, or because it would permit the creation of a new work of authorship providing commentary on the underlying work. Specifically, Joint Educators argued that teaching, criticism, and commentary are enumerated as favored uses under section 107 and therefore, that the proposed uses in Classes 1 and 3 for colleges, universities, and MOOCs were highly likely to be fair. For Class 2, Hobbs provided examples of educators using film clips as teaching tools in connection with media literacy, history, literature, and film theory, and of students using excerpts in connection with National History Day projects, arguing that these uses were fair. Hobbs also contended that out-of-classroom educational programs should be able to make the same uses in Class 4. Proponents of Class 5 argued that uses of excerpts of motion picture clips in multimedia e-books intended for educational purposes are likely to be fair, citing examples of actual or prospective uses of motion picture excerpts in multimedia e-books for purposes of film criticism or analysis. For Class 6, Joint Filmmakers stated that the proposed uses in both documentary and narrative films are noninfringing fair uses that provide criticism and commentary, education about, and reporting on news and current events—activities that Congress has explicitly identified as fair uses. Finally, Class 7 proponents asserted that the purposes and character of noncommercial videos are highly transformative, and in support, submitted scholarly analysis of remix videos and evidence relating to fan video remixes that purportedly criticize and recontextualize the underlying narrative works.

For all of these audiovisual classes, the Office received no opposition to the renewal of the current exemptions; instead, opponents opposed expansion of those exemptions. The same parties opposed all seven classes—Joint Creators (representing the Motion Picture Association of America, the Entertainment Software Association ("ESA") and the Recording Industry Association of America), DVD Copy Control Association, and the Advanced Access Content System Licensing Administrator ("AACS LA"). Opponents voiced parallel concerns across most of these audiovisual classes. In general, they contended that there are viable alternatives to circumvention that are adequate for many of the proposed uses, including clip licensing, screen-capture technology, streaming platforms such as TV Everywhere, disc-to-digital services, and digital rights libraries like UltraViolet. With respect to proposals to expand the exemptions to include Blu-ray discs, AACS LA and Joint Creators argued that the authorized circumvention of DVDs or online material provides a ready alternative to obtain material of sufficiently high quality for all the proposed uses. Opponents also urged that any expansion of the existing exemptions would likely harm the market for DVDs, Blu-ray discs, and other licensed uses.

Beyond these general points, opponents also made specific arguments concerning the individual proposed classes. In Class 1, opponents urged that alternatives to circumvention, including screen capture, were adequate for classroom uses outside film studies classes. In Class 2, opponents argued that the record lacks persuasive examples of K–12 student projects that require circumvention and that the record did not show a need to access material on Blu-ray discs. Opponents opposed granting any exemption for MOOCs in Class 3 arguing, among other things, that the uses are not likely to be noninfringing because the exemption would allow widespread distribution of works over the internet. With respect to museum, library or nonprofit educational programs in Class 4, opponents argued, among other things, that proponents had failed adequately to demonstrate specific adverse effects flowing from the prohibition on circumvention. In Class 5, opponents urged that no examples were presented to support expanding the exemption to fictional e-books or to circumvention of Blu-ray discs. In Class 6, opponents asserted that an exemption for fictional films would negatively impact the existing market for licensing of film clips. Finally, in Class 7, opponents argued that screen-capture software is an adequate alternative to proposed uses of Blu-ray material in noncommercial remix videos and that the existing regulatory language should be refined so as not to overlap with other classes addressing educational uses.

NTIA recommended renewing the current exemptions for educational and derivative uses, and expanding those exemptions in several respects. As a general matter, NTIA proposed that all of the exemptions should encompass "motion pictures and similar audiovisual works" on DVDs and Blu-ray discs, or obtained via online distribution services. NTIA rejected proposals to encompass all "noninfringing" or "fair uses," instead recommending a more tailored approach. In Class 1, NTIA recommended an exemption for educational uses by college and university faculty and students, without limiting it to film studies and other courses requiring close analysis of works, although it did not explain why elimination of that distinction was warranted. In Class 2, NTIA recommended an exemption for K–12 educators, and for students in grades 6–12 engaging in video projects actively overseen by an instructor. In Class 3, NTIA recommended an exemption for MOOCs involving film and media analysis, but not for students enrolled in such MOOCs. In Class 4, NTIA recommended an exemption for instructors and students engaged in digital media and literacy programs in libraries, museums, and nonprofit organizations with an educational mission. In Classes 5 and 7, NTIA proposed renewing the exemptions for nonfiction or educational multimedia e-books offering film analysis, and for noncommercial videos, respectively, and expanding them to include Blu-ray discs, as with the other classes. Finally, in Class 6, NTIA proposed an exemption both for documentary films and for "[n]arrative films portraying real events, where the prior work is used for its biographical or historically significant nature."

In general, the Register recommended granting exemptions for almost all of these classes; in each case, the Register concluded that the uses are likely to be fair, that alternatives to circumvention were inadequate, and that the statutory factors taken together weighed in favor of the exemption. In each of Classes 1 through 7, the Register recommended retaining the requirement in the current exemptions that only "short portions" of works be used for purposes of "criticism or comment." The Register explained that broader exemptions—covering longer portions for purposes of all "fair" or "noninfringing" uses—were unsupported by the record. The Register also explained that the exemptions should provide reasonable guidance to the public in terms of what uses are

likely to be fair, while at the same time mitigating undue consequences for copyright owners. The Register also found the record to not support an exemption for "audiovisual works," as opposed to the somewhat narrower category of "motion pictures," because proponents had failed to demonstrate a need to circumvent non-motion-picture audiovisual works (such as video games) in any of the proposed classes.

With respect to Class 1 in particular, the Register recommended granting an exemption for circumvention of TPMs on DVDs, Blu-ray discs, and digital transmissions of motion pictures by college and university faculty and students engaged in film studies classes or other courses requiring close analysis of film and media excerpts. The Register recommended an exemption to facilitate use of screen-capture technology for all types of courses, to address the possibility of circumvention when using this technology. The Register reasoned that this class (and Class 2) should continue to distinguish between purposes requiring close analysis of film and media excerpts and more general educational uses, on the ground that screen-capture technology is an adequate substitute for the latter uses.

With respect to Class 2, the Register recommended granting an exemption limited to circumvention of DVDs and digital transmissions for educators in grades K–12, including accredited general educational development ("GED") programs, in film studies or other courses requiring close analysis of film and media excerpts. The Register found, however, that proponents submitted no examples where Blu-ray quality or Blu-ray-unique content was required for uses in K–12 classrooms. The Register also recommended an exemption to facilitate use of screen-capture technologies by educators in all types of courses. The Register found the evidentiary record of proposed uses by K–12 students to be insufficiently well developed to recommend an exemption for DVDs, digital transmissions, or Blu-ray discs because screen-capture software was likely to provide a ready alternative for those uses. Accordingly, the Register recommended a screen-capture exemption to facilitate uses by K–12 students.

With respect to Class 3, the Register recommended granting an exemption for circumvention of TPMs on DVDs, Blu-ray discs, and digital transmissions of motion pictures by faculty of MOOCs involving film studies or other courses requiring close analysis of film and media excerpts, under specified conditions borrowed from the TEACH Act, codified at 17 U.S.C. 110(2). The Register explained that key elements of the TEACH Act—such as the requirements that uses be limited to nonprofit educational institutions and transmissions be limited to enrolled students—should be incorporated into the exemption to ensure that the exemption is appropriately limited. The Register further found that the record did not support an exemption for student uses.

With respect to Class 4, the Register concluded that the record did not support an exemption permitting circumvention of DVDs, Blu-ray discs, or digital transmissions in connection with after-school or adult education media literacy programs (apart from GED programs). The Register found that the proposed uses in the record could be satisfied via screen capture, and thus recommended an exemption to facilitate uses of screen-capture software.

With respect to Classes 5 to 7, the Register recommended granting an exemption for circumvention of TPMs on DVDs, Blu-ray discs, and digital transmissions of motion pictures for use in nonfiction multimedia e-books offering film analysis, in documentary filmmaking, and in noncommercial videos. The Register also recommended an exemption to facilitate use of screen-capture technologies for these uses. For the multimedia e-books exemption (Class 5), the Register recommended maintaining the limitation to e-books offering film analysis, finding that the record did not support an exemption for other uses. With respect to the filmmaking exemption (Class 6), the Register could not conclude, based on the record, that the use of motion picture clips in narrative films was, on balance, likely to be noninfringing, especially in light of the potential effects on existing licensing markets for motion picture excerpts. Finally, in considering the noncommercial video exemption (Class 7), the Register rejected proponents' suggestion to expand the exemption to encompass "primarily noncommercial" videos, as well as opponents' suggestion to narrow the exemption to certain specified categories of noncommercial videos, finding neither change to be necessary.

Accordingly, based on the Register's recommendation, the Librarian adopts the following exemption:

Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where circumvention is undertaken solely in order to make use of short portions of the motion pictures for the purpose of criticism or comment in the following instances:

(i) For use in documentary filmmaking,

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) Where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(ii) For use in noncommercial videos (including videos produced for a paid commission if the commissioning entity's use is noncommercial),

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) Where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(iii) For use in nonfiction multimedia e-books offering film analysis,

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) Where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(iv) By college and university faculty and students, for educational purposes,

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) In film studies or other courses requiring close analysis of film and media excerpts where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(v) By faculty of massive open online courses (MOOCs) offered by accredited

nonprofit educational institutions to officially enrolled students through online platforms (which platforms themselves may be operated for profit), for educational purposes, where the MOOC provider through the online platform limits transmissions to the extent technologically feasible to such officially enrolled students, institutes copyright policies and provides copyright informational materials to faculty, students and relevant staff members, and applies technological measures that reasonably prevent unauthorized further dissemination of a work in accessible form to others or retention of the work for longer than the course session by recipients of a transmission through the platform, as contemplated by 17 U.S.C. 110(2),

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) In film studies or other courses requiring close analysis of film and media excerpts where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(vi) By kindergarten through twelfth-grade educators, including of accredited general educational development (GED) programs, for educational purposes,

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) In film studies or other courses requiring close analysis of film and media excerpts where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(vii) By kindergarten through twelfth-grade students, including those in accredited general educational development (GED) programs, for educational purposes, where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted; and

(viii) By educators and participants in nonprofit digital and media literacy programs offered by libraries, museums and other nonprofit entities with an educational mission, in the course of face-to-face instructional activities for educational purposes, where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted.

2. Proposed Class 9: Literary Works Distributed Electronically—Assistive Technologies [24]

Proponents of Proposed Class 9 seek to allow circumvention of technological measures protecting literary works distributed in electronic form (including e-books, digital textbooks, and PDF articles) so that such works can be accessed by persons who are blind, visually impaired, or print disabled. The Librarian, upon the recommendation of the Register, granted an exemption in 2012 for these purposes.

The American Foundation for the Blind, American Council for the Blind,, Samuelson-Glushko Technology Law & Policy Clinic at Colorado Law, and LCA filed petitions seeking to have the Librarian renew the existing exemption.

Based on these petitions, the Copyright Office proposed the following class:

Proposed Class 9: This proposed class would allow circumvention of access controls on lawfully made and acquired literary works distributed electronically for purposes of accessibility for persons who are print disabled. This exemption has been requested for literary works distributed electronically, including e-books, digital textbooks, and PDF articles.

Proponents argued that reproducing copies in accessible formats is a noninfringing use, and that, while improvements have been made to make literary works more accessible since the last triennial rulemaking, there are still a substantial number of works that cannot be accessed using accessibility technologies such as text-to-speech programs.

There was no opposition to renewing the 2012 exemption. Significantly, the Association of American Publishers, representing book publishers, filed supportive comments indicating that it had no objection to a renewal of the existing exemption, explaining that the market does not yet offer sufficient accessibility to literary works.

NTIA supported renewal of the current exemption, finding that the record regarding the state of accessibility of literary works is not substantially different than it was three years ago.

The Register recommended granting the exemption. According to the Register, the need to ensure that persons who are blind, visually impaired or print disabled are not impeded from accessing books in electronic formats presents a quintessential case for an exemption. The Register determined that converting e-books into accessible formats is likely a noninfringing use both as a matter of fair use and under 17 U.S.C. 121, also known as the "Chafee Amendment," which allows authorized entities to create accessible versions of works exclusively for use by persons who are blind, visually impaired, or print disabled. The Register also found that TPMs are likely to have an adverse effect on noninfringing activities, as many e-book titles and literary works in electronic format (such as electronic textbooks and PDF articles) are currently unavailable in accessible formats. The Register further concluded that all five statutory factors favored the exemption. Finally, like the existing exemption, the recommended exemption allows the intended beneficiaries of section 121 to benefit from the waiver on circumvention.

Accordingly, based on the Register's recommendation, the Librarian adopts the following exemption:

Literary works, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies,

(i) When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels, or

(ii) When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.

3. Proposed Classes 11 to 15: Computer Programs That Enable Devices To Connect to a Wireless Network That Offers Telecommunications and/or Information Services ("Unlocking") [25]

Proposed Classes 11 through 15 would allow circumvention of access controls on wireless devices such as cellphones and all-purpose tablet computers to allow them to connect to the network of a different mobile wireless carrier, a process commonly known as "unlocking." Wireless carriers typically lock wireless devices to their networks when they have subsidized the cost of a device at the time of purchase; carriers then recoup that

[24] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 127–37.

[25] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Recommendation at 138–71.

subsidy through wireless service charges paid by the purchaser.

The Register has recommended, and the Librarian has adopted, exemptions permitting unlocking of cellphones in three prior rulemakings. Based on the evidentiary record in the last triennial proceeding, the 2012 version of the exemption was limited to cellphones obtained on or before January 26, 2013. Congress enacted the Unlocking Act to reinstate the cellphone unlocking exemption that was adopted in 2010, which lacked such a limitation. In the Unlocking Act, Congress also instructed the Librarian to review any future proposal for a cellphone unlocking exemption according to the usual process in this triennial rulemaking, as well as to consider in this rulemaking whether to extend the cellphone unlocking exemption to other categories of wireless devices. As noted above, the Unlocking Act also defines, on a permanent basis, categories of persons and entities that can take advantage of any unlocking exemption.

Consistent with Congress's directive in the Unlocking Act, the Copyright Office invited proposals to continue an unlocking exemption for wireless telephone handsets and/or to extend the exemption to other categories of wireless devices. The petitions received generally asked for continuation of the current cellphone unlocking exemption, and expansion of that exemption to cover additional types of devices.

The Office grouped the petitions into five distinct classes based on the type of device at issue, as described below:

Proposed Class 11: This proposed class would allow the unlocking of wireless telephone handsets. "Wireless telephone handsets" includes all mobile telephones including feature phones, smart phones, and "phablets" that are used for two-way voice communication.

Class 11, covering cellphones, was proposed by Consumers Union, the Competitive Carriers Association ("CCA"), the Institute of Scrap Recycling Industries ("ISRI"), Pymatuning Communications ("Pymatuning"), and the Rural Wireless Association ("RWA").

Proposed Class 12: This proposed class would allow the unlocking of all-purpose tablet computers. This class would encompass devices such as the Apple iPad, Microsoft Surface, Amazon Kindle Fire, and Samsung Galaxy Tab, but would exclude specialized devices such as dedicated e-book readers and dedicated handheld gaming devices.

Class 12, covering all-purpose tablets, was proposed by Consumers Union, CCA, ISRI, Pymatuning, and RWA. As reflected in the proposal, the petitions were limited to "all-purpose" tablet computers—that is, tablet computers that can run a wide variety of programs—as opposed to devices dedicated to the consumption of particular types of content such as e-book readers.

Proposed Class 13: This proposed class would allow the unlocking of mobile connectivity devices. "Mobile connectivity devices" are devices that allow users to connect to a mobile data network through either a direct connection or the creation of a local Wi-Fi network created by the device. The category includes mobile hotspots and removable wireless broadband modems.

Class 13, covering mobile connectivity devices, was proposed CCA and RWA.

Proposed Class 14: This proposed class would allow the unlocking of wearable wireless devices. "Wearable wireless devices" include all wireless devices that are designed to be worn on the body, including smart watches, fitness devices, and health monitoring devices.

Class 14, covering wearable wireless devices, was proposed by CCA and RWA.

Proposed Class 15: This proposed class would allow the unlocking of all wireless "consumer machines," including smart meters, appliances, and precision-guided commercial equipment.

Class 15 was proposed by CCA, and encompassed a broad and diverse range of devices and equipment, including any "smart" device utilizing a data connection to connect to the internet or interact with other smart devices. CCA, however, failed to further define the kinds of "smart" devices the exemption would cover beyond those already encompassed by Classes 11 through 14, let alone the types of TPMs used by such devices, or the methods of circumvention. Indeed, it was not apparent from the record whether any such devices actually exist. For instance, while CCA suggested that smart power meters would be encompassed by the proposal, evidence at the public hearing (at which CCA did not participate) indicated that smart meters generally do *not* have mobile data (*i.e.,* 3G/4G) connections, rendering the concept of "unlocking" irrelevant to that type of device.

In general, proponents argued that unlocking was permitted under section 117 of the Copyright Act, which allows the owners of computer programs to make certain reproductions of or adaptations to those programs, and as a matter of fair use. They explained that the inability to unlock one's wireless device leads to adverse effects by impeding consumers' ability to choose their preferred wireless carriers, harming the resale value of used devices, and harming the environment by encouraging disposal rather than reuse of devices.

No party opposed Proposed Class 12 (all-purpose tablet computers) or Proposed Class 14 (wearable computing devices). Prepaid wireless carrier TracFone nominally filed comments in opposition to the cellphone unlocking exemption in Class 11, though at bottom it was not opposed to renewal of the exemption, so long as it was clear that the exemption did not permit illegitimate phone trafficking—a practice where subsidized prepaid cellphones are purchased, unlocked, and resold (often abroad) at a profit. The Alliance of Automobile Manufacturers ("Auto Alliance") and General Motors LLC ("GM") filed opposition comments in Class 13 solely to stress that any exemption should exclude "mobile" connectivity devices embedded in motor vehicles, and Class 13 proponents agreed that such a limitation would be appropriate. Auto Alliance opposed Class 15 on the ground that it is ill-defined and could inadvertently sweep in cars and trucks.

NTIA proposed adopting an exemption encompassing all used wireless devices, without enumerating the types of devices to which the exemption applies. At the same time, NTIA acknowledged that based on the record in the rulemaking, it would be appropriate to exclude one type of wireless device—vehicle-based hotspots—from the exemption.

The Register recommended adopting an unlocking exemption covering wireless telephone handsets (*i.e.,* cellphones), all-purpose tablet computers, mobile connectivity devices, and wearable wireless devices. According to the Register, the unlocking exemption is likely to facilitate noninfringing uses both under section 117 and as a matter of fair use. The Register further explained that, unlike the section 117 privilege, fair use is not limited to the owner of the computer program, and so there is no need to limit the exemption to the owner of the device software. The Register also found that, as to the devices encompassed by Classes 11 to 14, proponents had provided sufficient evidence of adverse effects flowing from the inability to unlock a device due to a TPM; in contrast, proponents of Class 15, encompassing a broad and undefined range of "consumer machines" and "smart" devices, failed to make a showing of actual adverse effects. In addition, the Register concluded that three of the five statutory factors tended

to favor the proponents, while the other two were neutral.

The recommended exemption is limited to "used" devices. A "used" device is defined as a device that has been lawfully acquired and previously activated on a wireless network. The recommended exemption permits charities and commercial enterprises (including bulk recyclers) to unlock used cellphones, while excluding illegitimate trafficking that seeks to profit from the subsidized phones sold by prepaid wireless carriers. Although some proponents called for elimination of the "used" requirement for cellphones and tablets—which in theory would permit unlocking of new, subsidized devices—the Register concluded that the record did not support extending the exemption in this respect as the evidence did not establish a practical ability to unlock subsidized devices that had never been connected to a carrier. Finally, the recommended exemption excludes devices embedded in motor vehicles from the exemption for mobile connectivity devices by including the condition that the devices be "portable."

Accordingly, based on the Register's recommendation, the Librarian adopts the following exemption:

(i) Computer programs that enable the following types of wireless devices to connect to a wireless telecommunications network, when circumvention is undertaken solely in order to connect to a wireless telecommunications network and such connection is authorized by the operator of such network, and the device is a used device:

(A) Wireless telephone handsets (*i.e.*, cellphones);

(B) All-purpose tablet computers;

(C) Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and

(D) Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.

(ii) A device is considered "used" for purposes of this exemption when it has previously been lawfully acquired and activated on the wireless telecommunications network of a wireless carrier.

4. Proposed Classes 16 and 17: Jailbreaking—Smartphones and All-Purpose Mobile Computing Devices [26]

Proposed Classes 16 and 17 address an activity commonly known as "jailbreaking," which is the process of gaining access to the operating system of a computing device, such as a smartphone or tablet, to install and execute software that could not otherwise be installed or run on that device, or to remove pre-installed software that could not otherwise be uninstalled. The Register has twice before recommended, and the Librarian has twice adopted, an exemption permitting jailbreaking of smartphones.

EFF filed a petition seeking a jailbreaking exemption for all "mobile computing devices," including wireless telephone handsets that are capable of running a wide range of applications (*i.e.*, "smartphones") and tablet computers ("tablets"). EFF explained that its requested exemption is not intended to extend to devices designed primarily for the consumption of a single type of media, such as dedicated e-book readers, or to desktop or laptop computers. Maneesh Pangasa filed a separate petition seeking an exemption for tablet computers. The Copyright Office divided these proposals into two proposed classes to ensure an adequate administrative record on which to make a recommendation. Based on these petitions, the Office included the following proposed exemptions in the NPRM:

Proposed Class 16: This proposed class would permit the jailbreaking of wireless telephone handsets to allow the devices to run lawfully acquired software that is otherwise prevented from running, or to remove unwanted preinstalled software from the device.

Proposed Class 17: This proposed class would permit the jailbreaking of all-purpose mobile computing devices to allow the devices to run lawfully acquired software that is otherwise prevented from running, or to remove unwanted preinstalled software from the device. The category "all-purpose mobile computing device" includes all-purpose non-phone devices (such as the Apple iPod touch) and all-purpose tablets (such as the Apple iPad or the Google Nexus). The category does not include specialized devices such as e-book readers or handheld gaming devices, or laptop or desktop computers.

Relying on case law and prior determinations of the Register, proponents argued that jailbreaking of smartphones and all-purpose mobile computing devices constitutes fair use of the device software. Proponents also pointed to a series of benefits that have resulted from the existing smartphone jailbreaking exemption, such as the ability to install otherwise unsupported operating system upgrades and the rapid growth in the market for legitimate, non-manufacturer-approved apps, and argued that similar benefits would result if the exemption included all-purpose mobile computing devices.

The Business Software Alliance ("BSA") opposed both classes. In neither case, however, did BSA dispute the noninfringing nature of jailbreaking. Instead, BSA argued that the existence of alternatives to jailbreaking, such as "developer editions" of devices that do not need to be jailbroken, obviate the need for an exemption. In addition, with respect to the exemption for all-purpose mobile computing devices in Class 17, BSA disputed EFF's effort to distinguish between all-purpose mobile computing devices on the one hand, and desktops and laptops on the other, arguing that the distinction is not sufficiently clear. In response, EFF offered two further criteria to define these devices: First, that they be portable, in the sense that they are "designed to be carried or worn"; and second, that they "come equipped with an operating system that is primarily designed for mobile use," such as Android, iOS, Blackberry OS or Windows Phone.

Commenters representing automobile manufacturers filed comments under Class 17 raising the concern that the class could arguably encompass computing systems that are embedded in "mobile" automobiles and other vehicles. EFF clarified, however, that Class 17 was not intended to include software running on vehicle electronics, but only portable devices designed to be carried or worn by a person.

NTIA favored a jailbreaking exemption for all "mobile computing devices," a category which (contrary to EFF's proposal) would appear to include devices that are designed primarily for the consumption of a single type of media, including dedicated e-book readers, which are separately addressed in Proposed Class 18 below. Although NTIA asserted that the works and TPMs at issue are strikingly similar and in many cases identical, it cited no evidence to support that claim with respect to dedicated e-book readers, handheld video game consoles, or other dedicated media consumption devices.

The Register recommended continuing the existing jailbreaking exemption for smartphones, and extending it to all-purpose mobile computing devices. As in previous rulemakings, the Register concluded that jailbreaking to facilitate interoperability is likely to constitute a noninfringing fair use, and that the prohibition on circumvention is having an adverse effect on this type of use. Further, the Register concluded that three of the statutory factors (availability for use of copyrighted works, the impact on criticism, comment, news reporting, teaching, scholarship, or research, and the effect of circumvention of technological measures on the market

[26] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Recommendation at 172–92.

for or value of the copyrighted works) favored an exemption, while the other two were not implicated by these classes.

The Register also concluded, based on the overall record, that the category of "all-purpose mobile computing devices" in Class 17 has been meaningfully defined, but that certain refinements were appropriate to address concerns regarding its scope. The recommended exemption thus incorporates EFF's suggestion to specify that the devices be portable, that they be designed to run a wide variety of applications, and that they come equipped with an operating system primarily designed for mobile use. The recommended exemption thus excludes vehicle-embedded systems, devices designed primarily for consumption of a specific type of media (such as e-book readers and handheld gaming devices), and computers confined to desktop or laptop operating systems, such as Windows 8 or Mac OS. If a hybrid device can act either as a laptop or a tablet, the user will need to investigate what type of operating system it contains in order to determine whether the exemption applies.

Accordingly, based on the Register's recommendation, the Librarian adopts the following exemption:

Computer programs that enable smartphones and portable all-purpose mobile computing devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smartphone or device, or to permit removal of software from the smartphone or device. For purposes of this exemption, a "portable all-purpose mobile computing device" is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is equipped with an operating system primarily designed for mobile use, and is intended to be carried or worn by an individual.

5. Proposed Class 20: Jailbreaking—Smart TVs [27]

In addition to their traditional functionality, many modern televisions ("TVs") have built-in software features that can stream content over the internet, interact with other devices in the home, or run applications. These internet-enabled TVs are often referred to as "Smart TVs." Smart TV firmware is often protected by TPMs that prevent owners of those TVs from installing third-party software on them. The Software Freedom Conservancy ("SFC") proposed an exemption to permit circumvention of access controls on firmware (*i.e.*, the operating system) of such smart TVs to enable installation of third-party software.

The Copyright Office included the following proposed exemption in the NPRM:

Proposed Class 20: This proposed class would permit the jailbreaking of computer-embedded televisions ("smart TVs"). Asserted noninfringing uses include accessing lawfully acquired media on external devices, installing user-supplied licensed applications, enabling the operating system to interoperate with local networks and external peripherals, and enabling interoperability with external devices, and improving the TV's accessibility features (*e.g.*, for hearing-impaired viewers). The TPMs at issue include firmware encryption and administrative access controls that prevent access to the TV's operating system.

According to SFC, access to the firmware would allow various noninfringing uses, including improving accessibility features (such as the size of closed captioning), enabling or expanding the TV's compatibility with peripheral hardware and external storage devices, and making changes to display features such as the aspect ratio. SFC argued that the majority of smart TV firmware incorporates the manufacturer's own proprietary applications along with free, libre and open source software ("FLOSS") applications produced by third parties. SFC argued that, under the relevant FLOSS licenses, smart TV owners are authorized to modify the FLOSS applications and to run them without restriction. SFC also argued that fair use permits reproduction and alteration of proprietary applications to the extent necessary to permit interoperability with lawfully acquired programs.

Proposed Class 20 was opposed by Joint Creators and LG Electronics U.S.A. ("LG"), a manufacturer of smart TVs. Opponents argued that an exemption would not facilitate noninfringing uses, and was unnecessary because a laptop can be connected to TV sets to view the output of any applications and because LG smart TVs already provide all of the features that SFC claims can be added only by jailbreaking. In addition, Joint Creators raised concerns that jailbreaking would allow the installation of infringing software as well as software such as "Popcorn Time," an application that facilitates access to and viewing of pirated movies.

NTIA supported the proposed exemption, on the ground that it is not materially different than the exemptions that have been granted in the past for jailbreaking of smartphones.

The Register recommended granting the proposed exemption, explaining that circumvention of access controls on smart TV firmware is likely to enable noninfringing uses of that firmware. First, it appears to be undisputed that smart TV firmware incorporates FLOSS applications, and that modification of those applications would constitute a licensed, and therefore noninfringing, use. Second, with respect to non-FLOSS proprietary software included in the firmware, the Register concluded that modifications to that firmware to enable interoperability with third-party software are likely to constitute a fair use. The Register also found that the prohibition on circumvention is adversely affecting legitimate noninfringing uses of smart TV firmware, and that the proposed alternatives to circumvention, such as connecting a laptop computer to the TV, are inadequate, because they would not allow installation of software on the smart TV to improve its functioning as a TV, such as facilitating more prominent subtitles. The Register also concluded that no evidence was submitted to illustrate opponents' claim that jailbreaking of smart TVs will make it easier to gain unauthorized access to copyrighted content, or that it would otherwise undermine smart TVs as a platform for the consumption of expressive works.

Accordingly, based on the Register's recommendation, the Librarian adopts the following exemption:

Computer programs that enable smart televisions to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smart television.

6. Proposed Class 21: Vehicle Software—Diagnosis, Repair or Modification [28]

Modern automobiles and agricultural vehicles and machinery are equipped with systems of interconnected computers that monitor and control a variety of vehicle functions. These computers are referred to as electronic control units, or "ECUs," which are protected by TPMs. EFF requested an exemption to permit circumvention of TPMs protecting ECU computer programs for the purposes of diagnosis, repair and modification of vehicles. The Intellectual Property & Technology Law Clinic of the University of Southern California Gould School of Law ("IPTC

[27] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 202–17.

[28] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 218–49.

U.S.C.") proposed two similar exemptions for agricultural machinery specifically.

Based on these petitions, the Office included the following proposed exemption in the NPRM:

Proposed Class 21: This proposed class would allow circumvention of TPMs protecting computer programs that control the functioning of a motorized land vehicle, including personal automobiles, commercial motor vehicles, and agricultural machinery, for purposes of lawful diagnosis and repair, or aftermarket personalization, modification, or other improvement. Under the exemption as proposed, circumvention would be allowed when undertaken by or on behalf of the lawful owner of the vehicle.

Proponents explained that circumvention of TPMs protecting copyrighted computer programs in ECUs may be necessary to make noninfringing uses of those programs to diagnose and repair automobiles and agricultural equipment, and to make modifications, such as enhancing a vehicle's suspension or installing a gear with a different radius. They assert that vehicle owners are entitled to use the computer programs in ECUs to diagnose, repair or modify vehicles as a matter of fair use, or under section 117. EFF argues that absent an exemption, vehicle owners must take their cars to authorized repair shops, or purchase expensive manufacturer-authorized tools, to diagnose and repair their vehicles. Similarly, IPTC U.S.C. explained that TPMs restricting access to computer programs that run agricultural vehicles and machinery place the livelihoods of farmers and other business owners at risk, because vehicle owners must sometimes wait significant periods of time before their disabled vehicles can be repaired by an authorized technician.

The proposed exemption was opposed by the Association of Equipment Manufacturers, Association of Global Automakers ("Global Automakers"), Auto Alliance, Eaton Corporation, GM, John Deere, and Motor & Equipment Manufacturers Association ("MEMA"). In general, opponents argued that an exemption would not facilitate noninfringing uses, and was unnecessary in any event because vehicle owners have alternative options, such as manufacturer-authorized repair shops and tools. They also asserted that the proposal presented serious public health, safety and environmental concerns. For example, users might circumvent in order to avoid restrictions on vehicle emissions imposed by federal and state law.

In light of the commenters' observations, the Copyright Office notified DOT and EPA of the pendency of the rulemaking. DOT and EPA, as well as California ARB, responded with varying degrees of concern about the potential impact of an exemption. EPA opposed any exemption, while DOT and California ARB expressed significant reservations. The agencies' concerns were focused on potential adverse effects on safety and the environment. For example, EPA explained that vehicle modifications are often performed to increase engine power or boost fuel economy, but that these modifications increase vehicle emissions and thus violate the Clean Air Act.

In contrast to these other agencies, NTIA fully supported adoption of the proposed exemption. NTIA believed that an exemption was necessary to allow consumers to continue to engage in the longstanding practice of working on their own vehicles, and that the non-copyright concerns raised by opponents and other agencies could be addressed by those agencies in the exercise of their respective regulatory authorities. NTIA acknowledged, however, that a delay in implementation—as recommended by the Register and discussed below—might nonetheless be appropriate to permit other agencies to consider and prepare for the new rule, and urged that any such delay be as short as practicable.

Based on the record, the Register recommended granting an exemption. The Register concluded that reproducing and altering the computer programs on ECUs for purposes of facilitating diagnosis, repair and modification of vehicles may constitute a noninfringing activity as a matter of fair use and/or under the exception set forth in section 117 of the Copyright Act, which permits the owner of a copy of a computer program to make certain copies and adaptations of the program. The Register also concluded that owners of vehicles and agricultural machinery are adversely impacted as a result of TPMs that protect the copyrighted computer programs on the ECUs that control the functioning of their vehicles. The Register further found that while two of the statutory factors weighed in favor of the exemption (availability for use of copyrighted works and impact on criticism, comment, news reporting, teaching, scholarship or research), and two of the factors were neutral (availability for use for nonprofit archival, preservation and educational purposes and the effect on the market for or value of copyrighted works), the fifth factor—under which commenting parties and federal agencies raised serious safety and environmental concerns—tended to weigh against an exemption.

Overall, the Register concluded that while from a copyright perspective proponents had made the case for an exemption, based on the record, the exemption needed to be carefully tailored to address a number of concerns. Accordingly, the recommended exemption excludes computer programs in ECUs that are chiefly designed to operate vehicle entertainment and telematics systems due to insufficient evidence demonstrating a need to access such ECUs, and out of concern that such circumvention might enable unauthorized access to creative or proprietary content. The exemption also excludes circumvention "on behalf of" vehicle owners, as a broader exception allowing third parties to engage in circumvention activities on behalf of others is in tension with the anti-trafficking provisions of section 1201(a)(2) and (b). Moreover, by passing the Unlocking Act—which amended section 1201 to allow unlocking of cellphones and other devices to be carried out by third parties "at the direction of" device owners—Congress indicated its view that extending the reach of an exemption to cover third-party actors requires a legislative amendment. The exemption also expressly excludes acts of circumvention that would violate any other law, including regulations promulgated by DOT or EPA. Finally, in light of the significant concerns raised by DOT and EPA, the recommended exemption will become operative twelve months from the effective date of the new regulation to provide these and other potentially interested agencies an opportunity to consider and prepare for the lifting of the DMCA prohibition. Acknowledging the views of the NTIA, the Register determined that a twelve-month delay was the shortest period that would reasonably permit other agencies to consider appropriate action.

Accordingly, based on the Register's recommendation, the Librarian adopts the following exemption:

Computer programs that are contained in and control the functioning of a motorized land vehicle such as a personal automobile, commercial motor vehicle or mechanized agricultural vehicle, except for computer programs primarily designed for the control of telematics or entertainment systems for such vehicle, when circumvention is a necessary step undertaken by the authorized owner of the vehicle to allow the diagnosis, repair or lawful modification of a vehicle function; and where such circumvention does not constitute a violation of applicable law, including without limitation regulations promulgated by the Department of

Transportation or the Environmental Protection Agency; and provided, however, that such circumvention is initiated no earlier than 12 months after the effective date of this regulation.

7. Proposed Classes To Permit Research of Software Flaws, Proposed Class 25: Software—Security Research; Proposed Class 22: Vehicle Software—Security and Safety Research; Proposed Class 27A: Medical Device Software—Security and Safety Research [29]

The Office received a number of petitions for proposed exemptions to permit circumvention of TPMs for purposes of conducting good-faith testing for and the identification, disclosure and correction of malfunctions, security flaws and vulnerabilities in computer programs. The proponents of these security exemptions observed as a general matter that computer programs are pervasive in modern machines and devices, including vehicles, home appliances and medical devices, and that independent security research is necessary to uncover flaws in those computer programs. The Copyright Office grouped the security-related petitions into three proposed classes. First, the Office received two submissions from academic researchers seeking an exemption to permit good-faith research into malfunctions, security flaws or vulnerabilities in computer programs installed on all types of systems and devices. The NPRM described the proposed class as follows:

Proposed Class 25: This proposed class would allow researchers to circumvent access controls in relation to computer programs, databases, and devices for purposes of good-faith testing, identifying, disclosing, and fixing of malfunctions, security flaws, or vulnerabilities.

Second, EFF filed a petition seeking an exemption to allow the circumvention of TPMs on computer programs that are embedded in motorized land vehicles for purposes of researching the security or safety of that vehicle. The NPRM described the proposed class as follows:

Proposed Class 22: This proposed class would allow circumvention of TPMs protecting computer programs that control the functioning of a motorized land vehicle for the purpose of researching the security or safety of such vehicles. Under the exemption as proposed, circumvention would be allowed when undertaken by or on behalf of the lawful owner of the vehicle.

Third, the Medical Device Research Coalition (''MDRC''), a group of patients and researchers, filed a petition seeking an exemption to allow the circumvention of TPMs on computer programs on implanted medical devices, such as pacemakers, implantable cardioverter defibrillators, insulin pumps, and continuous glucose monitors, and their corresponding personal monitoring systems. MDRC's petition covered two proposed uses—allowing research into software flaws that adversely affect the safety, security and efficacy of medical devices, and allowing a patient to access the information generated by his or her own device. The Office originally categorized the petition into a single class. The NPRM thus described the class as follows:

Proposed Class 27: This proposed class would allow circumvention of TPMs protecting computer programs in medical devices designed for attachment to or implantation in patients and in their corresponding monitoring devices, as well as the outputs generated through those programs. As proposed, the exemption would be limited to cases where circumvention is at the direction of a patient seeking access to information generated by his or her own device, or at the direction of those conducting research into the safety, security, and effectiveness of such devices. The proposal would cover devices such as pacemakers, implantable cardioverter defibrillators, insulin pumps, and continuous glucose monitors.

Based on the record as it developed in the course of the proceeding, the Register came to the conclusion that Proposed Class 27 should be divided into Proposed Class 27A, concerning security research on medical devices, and Proposed Class 27B, concerning access to patient data generated by medical devices. Class 27A is addressed with the other security research classes, while 27B is separately discussed below.

Proponents maintained that the security of software and the devices that execute software is of critical importance because security flaws pose potentially serious threats, including physical injury and death of individuals, property damage, and financial harm. Proponents argued that security research is noninfringing as a matter of fair use and, in the case of vehicle security research, under the exceptions set forth in section 117 as well. They further asserted that the permanent statutory exemptions to section 1201(a)(1)'s prohibition that are directed to reverse engineering (section 1201(f)), encryption research (section 1201(g)), and security testing (section 1201(j)) are inadequate for their purposes, because these provisions do not provide sufficient assurance that the activities in which the researchers seek to engage will be considered exempt.

The Office received comments in opposition to these proposed classes from a wide range of companies and organizations representing copyright owners. The general software security research exemption in Class 25 was opposed by AdvaMed, Auto Alliance, BSA, GM, Intellectual Property Owners Association (''IPO''), LifeScience Alley, Medical Device Innovation Safety and Security Consortium, and Software Information Industry Association. The vehicle software security research exemption in Class 22 was opposed by Global Automakers, Auto Alliance, GM, John Deere, and MEMA. The medical device software security exemption in Class 27A was opposed by AdvaMed, IPO, Jay Schulman, LifeScience Alley, and National Association of Manufacturers (''NAM''). In general, opponents argued that proponents had failed to establish that security research activities encompassed by the exemption are noninfringing, and that, in any event, an exemption was unnecessary both because of the permanent exemptions in sections 1201(f), 1201(g), and 1201(j), and because manufacturers frequently authorize independent security research. Opponents also argued that any exemption for software security research should also include an express disclosure requirement, so that the software developer or product manufacturer has sufficient time to correct any flaw before its existence becomes more widely known and thus more susceptible to exploitation by malicious actors. Relatedly, opponents asserted that the proposal presented serious public health and safety concerns. For example, opponents claimed that information obtained by engaging in security research could be used by bad actors to hack into highly regulated machines and devices, including medical devices and vehicles.

In light of commenters' observations, the Copyright Office notified DOT, EPA and FDA of the pendency of the rulemaking. All three agencies responded and expressed significant reservations. The agencies voiced concerns about the potential effects on public health and safety; for example, DOT expressed concern that independent security researchers may not fully appreciate the potential ramifications of their acts of circumvention on automobile safety or the logistical limitations affecting potential remedial actions.

[29] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Recommendation at 250–320.

By contrast, NTIA fully supported adoption of a broad exemption for all computer programs, regardless of the device on which they are run, so that good-faith security researchers can engage in socially beneficial work. NTIA believed that the concerns of other agencies could adequately be addressed by stating explicitly in the exemption that it does not obviate compliance with other applicable laws. NTIA nonetheless acknowledged the possibility that a delay in implementation—as recommended by the Register and discussed below—could be appropriate to permit other agencies to consider and prepare for the new rule.

The Register found that while the Class 25 proposal to allow research on computer programs generally was very broad (and potentially swallowed the proposals in Class 22 and Class 27A), the record focused primarily on consumer-facing products rather than large-scale industrial or government systems such as power or transit systems. The record also included specific evidence concerning motor vehicles, implanted medical devices such as pacemakers and glucose monitors, and electronic voting machines.

Based on this record, the Register recommended adopting an exemption to enable good-faith security research on computer programs within devices or machines primarily designed for use by individual consumers (including voting machines), motorized land vehicles, and implanted medical devices and their corresponding monitoring systems. At the same time, the Register concluded that the record did not support the open-ended exemption urged by Class 25 proponents, encompassing all computer programs on all systems and devices, including highly sensitive systems such as nuclear power plants and air traffic control systems, and that the exemption should be limited to the consumer-oriented uses that were the focus of proponents' submissions.

The Register concluded that good-faith security research into computer programs used to operate such devices and machines is likely a noninfringing fair use of those programs or, in the case of vehicle software, may be a noninfringing use under section 117. The Register also concluded that the permanent exemptions in sections 1201(f), 1201(g), and 1201(j) are inadequate to accommodate the proposed research activities due to various limitations and conditions contained in those provisions. Further, with respect to computer programs used to operate the types of devices and machines encompassed by the recommended exemption, the Register additionally found that legitimate security research has been hindered by TPMs that limit access to those programs.

The Register also noted that different parts of the Administration appear to hold divergent views on issues surrounding security research and the wisdom of granting an exemption for this purpose, and that the exemption could cover any number of highly regulated products. Accordingly, to give other parts of the government sufficient opportunity to respond, the Register recommended that, as a general matter, the exemption should not go into effect until twelve months after the effective date of the new regulation (as noted above, the Register found that twelve months was the shortest period that would reasonably permit other agencies to respond). The Register, however, recommended immediate implementation of the exemption for voting machines, on the ground that there was no public safety issue or other proffered justification for delay of this aspect of the exemption.

The Register also noted the specific concern expressed by other agencies that acts of security research must not put members of the public at risk. The recommended exemption thus provides that security research must be conducted in a controlled setting designed to avoid harm to individuals or the public. In the case of medical devices specifically, the recommended exemption incorporates FDA's suggestion to exclude research on medical devices that are being used, or could be used, by patients.

As explained above, a significant issue with respect to the security exemptions involves the proper disclosure of security research findings, as the interests of the manufacturer and the public may both be affected by the nature and timing of disclosure of software flaws. Indeed, Congress included disclosure to the system developer as one of the factors to be considered in determining a person's eligibility for the security testing exemption in section 1201(j). Although the Register expressed support for responsible disclosure of security flaws, she acknowledged the difficulty of attempting to define disclosure standards in the context of this rulemaking, as opinions seem sharply divided on this point. Accordingly, rather than incorporating an express disclosure rule, the recommended exemption draws upon what the Register perceives to be the basic intent of section 1201(j) by specifying that the information derived from the research activity be used primarily to promote the security or safety of the devices containing the computer programs on which the research is conducted, or of those who use those devices.

The Register noted that in the interest of adhering to Congress's basic purpose in section 1201(j), where appropriate, the recommended exemption tracks Congress's language rather than alternative formulations suggested by proponents, including by expressly excluding acts that violate any other law, such as the Computer Fraud and Abuse Act of 1986.

Accordingly, based on the Register's recommendation, the Librarian adopts the following exemption:

(i) Computer programs, where the circumvention is undertaken on a lawfully acquired device or machine on which the computer program operates solely for the purpose of good-faith security research and does not violate any applicable law, including without limitation the Computer Fraud and Abuse Act of 1986, as amended and codified in title 18, United States Code; and provided, however, that, except as to voting machines, such circumvention is initiated no earlier than 12 months after the effective date of this regulation, and the device or machine is one of the following:

(A) A device or machine primarily designed for use by individual consumers (including voting machines);

(B) A motorized land vehicle; or

(C) A medical device designed for whole or partial implantation in patients or a corresponding personal monitoring system, that is not and will not be used by patients or for patient care.

(ii) For purposes of this exemption, "good-faith security research" means accessing a computer program solely for purposes of good-faith testing, investigation and/or correction of a security flaw or vulnerability, where such activity is carried out in a controlled environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.

### 8. Proposed Class 23: Abandoned Software—Video Games Requiring Server Communication [30]

Many modern video games—which may be played on a personal computer or a dedicated gaming console—require a network connection to a remote server operated by the game's developer to enable core functionalities. Before some games can be played at all, including in

[30] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 321–53.

single-player mode, the game must connect to an "authentication server" to verify that the game is a legitimate copy. Other games require a connection to a "matchmaking server" to enable users to play the game with other people over the internet in multiplayer mode. In the case of a game that relies on an authentication server, the game may be rendered entirely unplayable if the server connection is lost. When a matchmaking server is taken offline, the game may still be playable, though with online multiplayer play disabled.

EFF and Kendra Albert, a student at Harvard Law School, jointly filed a petition seeking an exemption to enable those who have lawfully acquired copies of video games to access and play those games when authentication or matchmaking servers have been permanently taken offline. As the record developed, it became evident that the proposal focused on two types of use: (1) People who wish to continue to play physical or downloaded copies of video games they have lawfully acquired (referred to in the Recommendation as "gamers"); and (2) those who seek to preserve individual video games and make them available for research and study (referred to in the Recommendation as "preservationists").

The Copyright Office set forth the following proposed exemption in the NPRM:

Proposed Class 23: This proposed class would allow circumvention of TPMs on lawfully acquired video games consisting of communication with a developer-operated server for the purpose of either authentication or to enable multiplayer matchmaking, where developer support for those server communications has ended. This exception would not apply to video games whose audiovisual content is primarily stored on the developer's server, such as massive multiplayer online role-playing games.

Proponents of Class 23 argued that uses to enable continued gameplay or multiplayer play constitute fair use, but that the prohibition on circumvention prevents owners from restoring access to games they have lawfully acquired. They also stressed that the inability to restore access has adverse effects on efforts to preserve video games and make them available for research and study.

The proposed class was opposed by ESA and Joint Creators. They argued that the proposed exemption was too broad, would not facilitate any noninfringing uses, and could adversely impact the market for video games. ESA expressed particular concern about the potential for piracy as a result of circumvention activities, explaining that if the exemption were to permit circumvention of TPMs on video game consoles, those consoles could be used to play pirated video games. Opponents also urged that petitioners had failed to demonstrate cognizable adverse effects, arguing, for example, that the vast majority of games can continue to be played in single-player mode when server support has ended, and that there are other alternative means of playing games in multiplayer mode without a matchmaking server, including by using a local area network. ESA also argued that, at the point of sale, consumers receive ample notice that server support may be discontinued.

NTIA supported adoption of the proposed exemption for continued gameplay and for preservation uses, both for single-player and multiplayer play. NTIA argued that gamers should be permitted to restore access to a work that they had originally been allowed to use. In addition, according to NTIA, consumers receive inconsistent notice at best that developers may discontinue support for multiplayer use, and LAN-enabled multiplayer play is an inadequate substitute to play over the internet.

Based on a review of the evidentiary record, the Register recommended an exemption to allow continued gameplay and preservation activities when developer server support for a video game has ended, though one more circumscribed than that proposed. With respect to gamers, the Register concluded that the record supported granting an exemption for video games that require communication with an authentication server to allow gameplay when the requisite server is taken offline. The Register explained that the inability to circumvent the TPM would preclude all gameplay, a significant adverse effect, and that circumvention to restore access would qualify as a noninfringing fair use. At the same time, the Register determined that proponents had failed to provide persuasive support for an exemption for online multiplayer play, in large part because it is not clear on the current record how the provision of circumvention tools to multiple users to facilitate an alternative matchmaking service could be accomplished without running afoul of the anti-trafficking provision in section 1201(a)(2). The Register also confirmed that the exemption for gamers should not extend to jailbreaking of console software because such jailbreaking is strongly associated with video game piracy.

With respect to preservation uses, looking to certain aspects of section 108 of the Copyright Act for guidance, the Register found that the record supported an exemption for libraries and archives, as well as for museums, to allow circumvention of TPMs so that video games can be preserved in playable condition when authentication servers are discontinued. In accordance with section 108, such institutions must be open to the public and/or to unaffiliated researchers, and the activities at issue must not be for commercial purposes. As with gamers generally, the recommended exemption for preservationists does not extend to circumvention to enable online multiplayer play, which is an activity that would extend beyond the walls of the preserving institution. But because the risk of piracy is much lower in a preservationist setting than with respect to gamers at large, the Register recommended that preservationists have the ability to circumvent TPMs controlling access to video game console software when necessary to maintain a console game in playable form.

Accordingly, based on the Register's recommendation, the Librarian adopts the following exemption:

(i) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, when the copyright owner or its authorized representative has ceased to provide access to an external computer server necessary to facilitate an authentication process to enable local gameplay, solely for the purpose of:

(A) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game for personal gameplay on a personal computer or video game console; or

(B) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game on a personal computer or video game console when necessary to allow preservation of the game in a playable form by an eligible library, archives or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives or museum.

(ii) Computer programs used to operate video game consoles solely to the extent necessary for an eligible library, archives or museum to engage in the preservation activities described in paragraph (i)(B).

(iii) For purposes of the exemptions in paragraphs (i) and (ii), the following definitions shall apply:

(A) "Complete games" means video games that can be played by users without accessing or reproducing copyrightable content stored or previously stored on an external computer server.

(B) "Ceased to provide access" means that the copyright owner or its authorized representative has either issued an affirmative statement indicating that external server support for the video game has ended

and such support is in fact no longer available or, alternatively, server support has been discontinued for a period of at least six months; provided, however, that server support has not since been restored.

(C) "Local gameplay" means gameplay conducted on a personal computer or video game console, or locally connected personal computers or consoles, and not through an online service or facility.

(D) A library, archives or museum is considered "eligible" when the collections of the library, archives or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives or museum.

9. Proposed Class 26: Software—3D Printers [31]

3D printing—also known as "additive" manufacturing—is a technology that translates digital files into physical objects by adding successive layers of material. Some 3D printer manufacturers use TPMs to limit the types of material—or "feedstock"—that can be used in their 3D printers to manufacturer-approved feedstock.

Proponent Public Knowledge sought an exemption to permit the circumvention of access controls on computer programs on 3D printers with chip-based verification systems to enable the use of non-manufacturer-approved feedstock in such printers. The requested exemption would encompass both the modifications necessary to make a 3D printer accept alternative feedstock, and potentially further modifications to allow the use of feedstock consisting of material that is different from what a 3D printer has been designed to use (*e.g.*, metal instead of plastic).

The Copyright Office set forth the following proposed exemption in the NPRM:

Proposed Class 26: This proposed class would allow circumvention of TPMs on firmware or software in 3D printers to allow use of non-manufacturer-approved feedstock in the printer.

According to Public Knowledge, non-manufacturer-approved feedstock is often much less expensive than that provided by the manufacturer. In addition, use of feedstock composed of a different material may require modification of the printer's operating system software, for example, to change preset variables such as the rate at which the heated feedstock is extruded to create the object or the temperature of the extrusion nozzle. According to Public Knowledge, the reproductions and adaptations necessary to engage in these uses are noninfringing under either the fair use doctrine or section 117. Public Knowledge asserts that absent an exemption, 3D printer owners will be forced to pay more for feedstock, and innovation in the 3D printing space will be adversely affected.

This proposed class was opposed by Stratasys, Inc. ("Stratasys"), a 3D printer manufacturer. Among other things, Stratasys contended that the proposed uses do not qualify as noninfringing under section 117 because 3D printer owners license rather than own the software that is installed on the 3D printer. Stratasys also argued that proponents had failed adequately to demonstrate cognizable adverse effects. Stratasys explained that 3D printers are used to produce medical implants, aerospace parts, and other goods that are subject to safety or regulatory guidelines, and expressed concern that an exemption could permit use of inferior materials in such applications. Notably, this concern was reinforced by FDA, which, in a letter to the Office, worried that an exemption for this class might create unintended public health and safety risks in relation to medical devices. Stratasys also expressed the concern that an exemption could be used to access proprietary design software, design files, or data.

NTIA favored granting the proposed exemption, on the ground that it would benefit consumers and fuel innovation by reducing costs of feedstock and by allowing the use of new types of feedstock. Although NTIA acknowledged concerns that 3D-printed parts might use inferior materials, it concluded that the exemption should not attempt to address concerns about quality control.

The Register recommended granting an exemption for 3D printers with chip-based verification systems, explaining that the proposed uses of operating system software to permit the use of alternative feedstock are likely noninfringing as a matter of fair use or under section 117, and that the prohibition on circumvention appears to be adversely affecting the proposed uses. At the same time, the Register observed that proponents' proposal—and the evidence offered in support—was focused largely on nonindustrial uses of printers rather than the sorts of uses that could present the types of safety and regulatory concerns highlighted by Stratasys and FDA. In light of the record, and to address the safety and regulatory issues, the recommended exemption excludes circumvention of TPMs on 3D printers that are used to print objects that are subject to legal or regulatory oversight. The recommended exemption also excludes circumvention for the purpose of accessing design software, design files or proprietary data.

Accordingly, based on the Register's recommendation, the Librarian adopts the following exemption:

Computer programs that operate 3D printers that employ microchip-reliant technological measures to limit the use of feedstock, when circumvention is accomplished solely for the purpose of using alternative feedstock and not for the purpose of accessing design software, design files or proprietary data; provided, however, that the exemption shall not extend to any computer program on a 3D printer that produces goods or materials for use in commerce the physical production of which is subject to legal or regulatory oversight or a related certification process, or where the circumvention is otherwise unlawful.

10. Proposed Class 27B: Networked Medical Devices—Patient Data [32]

Many modern implanted medical devices, such as pacemakers, implantable cardioverter defibrillators, insulin pumps and continuous glucose monitors, measure and record data about physiological developments taking place within the body, and communicate that data wirelessly to a corresponding personal monitoring system. Some personal monitoring systems, in turn, transmit data to a hospital or monitoring company, and ultimately to the patient's physician. Increasingly, these transmissions of data are protected by TPMs, including encryption schemes. MDRC requested an exemption that would allow a patient, or persons acting on behalf of the patient, to circumvent TPMs on these transmissions so that the patient is able to access the data generated by his or her own medical device and any corresponding personal monitoring system, without the need to visit a hospital or doctor's office.

As explained above, MDRC's petition also encompassed security research into medical device software. The Office accordingly set forth the following class in the NPRM:

Proposed Class 27: The proposed class would allow circumvention of TPMs protecting computer programs in medical devices designed for attachment to or implantation in patients and in their corresponding monitoring devices, as well as the outputs generated through those programs. As proposed, the exemption would be limited to cases where circumvention is at the direction of a patient seeking access to information generated by his or her own

[31] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 356–77.

[32] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 378–403.

device, or at the direction of those conducting research into the safety, security, and effectiveness of such devices. The proposal would cover devices such as pacemakers, implantable cardioverter defibrillators, insulin pumps, and continuous glucose monitors.

As also noted above, the Register concluded that Proposed Class 27 should be divided into Proposed Class 27A, concerning security research, and Proposed Class 27B, concerning patient data, to allow the two types of uses to be separately analyzed. Class 27A is addressed with the other security research-related classes above. A discussion of Class 27B follows.

MDRC explained that an exemption to circumvent TPMs protecting medical device data would give patients real-time access to their own health data, allowing them, for example, to immediately detect major health risks or facilitate highly personalized treatment. As framed by MDRC, the exemption would provide access only to TPM-protected data outputs of medical devices, not to computer programs contained within medical devices or their corresponding monitoring systems. Although MDRC explained that such data is uncopyrightable to the extent it merely consists of physiological facts, such as a patient's blood glucose level, it expressed concern that the data outputs of some devices may constitute copyrightable compilations. MDRC asserted that the proposed use of such compilations would be a fair use, and urged the Office to adopt an exemption covering such circumstances. MDRC explained that the prohibition on circumvention adversely affects patients' ability to monitor their own health in real time, and that those adverse effects are likely to increase because FDA has encouraged manufacturers to impose TPMs on data outputs. Responding to concerns about the impact of such an exemption on the battery life of implanted devices, MDRC explained that the exemption could be limited to passive monitoring of data that is already being transmitted by the medical device or monitoring system.

The Office received comments in opposition to the proposed exemption from AdvaMed, IPO, LifeScience Alley, and NAM. AdvaMed agreed with MDRC that in certain circumstances, the selection and arrangement of data generated by a medical device might be copyrightable as a compilation. Opponents, however, provided little argument to counter MDRC's claim that patient access to such medical data constitutes a noninfringing fair use. Indeed, they conceded that patients have an "inherent right" to access their own medical data, but argued that this right is satisfied by obtaining data via authorized means, such as through a patient's health care provider. Opponents also relied heavily on the claim that the exemption would create health and safety concerns. For example, opponents contended that requesting data from implanted devices at an abnormally high rate could reduce the battery life of such devices. Opponents suggested that the Copyright Office allow an opportunity for FDA to provide input on the proposed exemption.

In light of opponents' comments, the Office advised FDA of the pendency of this proceeding. In a responsive letter to the Office, FDA expressed concern about facilitating access to data that includes patient health information or personally identifiable information, noting that the use of such data is subject to government regulation. FDA recommended that any exemption indicate that it was not intended to override the regulations of other federal agencies.

NTIA supported the proposed exemption, explaining among other things that the exemption would allow patients to see and react to data collected by their devices in real time. NTIA also concluded that the exemption is unlikely to adversely affect the operation of the medical device itself, based on MDRC's assertion that data would be passively intercepted as it is wirelessly transmitted from the device or monitoring system.

The Register recommended granting the proposed exemption. The Register observed that in many cases, data outputs generated by devices would likely be uncopyrightable, and that in such cases, section 1201(a)(1)—which is limited to works protected under title 17—would not apply. The Register noted, however, that some data outputs could qualify for protection as literary works if they reflect a sufficiently original selection and presentation of data, and that opponents themselves agreed that such outputs could be subject to copyright. Accordingly, the Register concluded that an exemption would be appropriate to enable patients' access to their own medical data as embodied in protectable data compilations generated by implanted medical devices and corresponding personal monitoring systems. The Register concluded that accessing one's own medical data is likely to be a fair and noninfringing use, and that TPMs on that data are likely to have an adverse impact on such access, especially as TPMs become more prevalent in response to FDA guidance. In addition, the Register concluded that the statutory factors favor an exemption.

In light of concerns about the effect of circumvention on the battery life of implanted medical devices, the Register recommended that the exemption reflect the approach suggested by MDRC, so it is limited to passively accessing data that is already being generated or transmitted by the device. Further, as suggested by FDA, the recommended exemption expressly provides that any actions taken under the exemption must be compliant with all applicable laws and regulations. The recommended exemption does not permit circumvention "at the direction of a patient," as a broader exception allowing third parties to engage in circumvention activities on behalf of others could implicate the anti-trafficking provisions of section 1201(a)(2) and (b). Unlike the recommended exemptions for security research and vehicle diagnosis, repair and modification, the Register recommended that the exemption for access to patient data be effective without delay because the passive monitoring of data transmissions did not appear to present any immediate safety or health concerns.

Accordingly, based on the Register's recommendation, the Librarian adopts the following exemption:

Literary works consisting of compilations of data generated by medical devices that are wholly or partially implanted in the body or by their corresponding personal monitoring systems, where such circumvention is undertaken by a patient for the sole purpose of lawfully accessing the data generated by his or her own device or monitoring system and does not constitute a violation of applicable law, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration, and is accomplished through the passive monitoring of wireless transmissions that are already being produced by such device or monitoring system.

*B. Classes Considered but Not Recommended*

Based upon the record in this proceeding, the Register of Copyrights recommends that the Librarian determine that the following classes of works shall not be exempt from the prohibition against circumvention of technological measures set forth in section 1201(a)(1):

1. Proposed Classes 8 and 10: Audiovisual Works and Literary Works Distributed Electronically—Space-Shifting and Format-Shifting [33]

Proposed Classes 8 and 10 would have permitted circumvention of technological measures protecting motion pictures, e-books, and other audiovisual or literary works to allow users to view the materials on alternate devices for personal use or to create back-up copies. Broadly speaking, this activity is referred to as ''space-shifting'' and, in some cases, ''format-shifting.''

Public Knowledge requested an exemption to engage broadly in noncommercial space-shifting of motion pictures distributed on DVDs, Blu-ray discs, and downloaded files. Alpheus Madsen requested an exemption to allow circumvention of access controls on DVDs specifically in order to play the DVDs on the Linux operating system. These overlapping exemptions were combined into the following class:

> Proposed Class 8: This proposed class would allow circumvention of access controls on lawfully made and acquired audiovisual works for the purpose of noncommercial space-shifting or format-shifting. This exemption has been requested for audiovisual material made available on DVDs protected by CSS, Blu-ray discs protected by AACS, and TPM-protected online distribution services.

Christopher Meadows, in turn, proposed an exemption to engage in noncommercial space- or format-shifting of e-books, to allow consumers to view TPM-protected e-books on alternate viewing platforms and to create back-up copies. The proposed exemption was described as follows:

> Proposed Class 10: This proposed class would allow circumvention of access controls on lawfully made and acquired literary works distributed electronically for the purpose of noncommercial space-shifting or format-shifting. This exemption has been requested for literary works distributed electronically [as] e-books.

For both classes, proponents argued that space- and format-shifting for personal, noncommercial uses are fair uses. In the past four rulemakings, the Register has declined to recommend, and the Librarian has declined to adopt, an exemption for such uses because the proponents had failed to establish a legal or factual record sufficient to establish that the space- or format-shifting of audiovisual works, e-books, and other copyrighted works constitutes a noninfringing use. In this rulemaking, proponents argued that reconsideration of that position was warranted in light of a recent district court decision, *Fox Broadcasting Co.* v. *Dish Network LLC*,[34] as well as certain statements from legislative history of certain aspects of the Copyright Act, including a discussion of how the creation of a limited copyright in sound recordings might impact home audio recording.

Opponents urged that noncommercial space- and format-shifting are not established fair uses under the law. They further argued that, in any event, an exemption is unwarranted in light of the continued growth of licensed digital distribution services that provide meaningful alternatives to circumvention, including digital rights locker services such as UltraViolet and Disney Movies Anywhere and disc-to-digital services such as VUDU and Flixter that allow consumers to convert previously purchased DVDs or Blu-ray discs into high-quality digital files. According to opponents, an exemption that allowed broad-based space- or format-shifting would undermine not only the existing markets for DVDs and Blu-ray discs but also these emerging online distribution models.

NTIA, as it has in the past, supported what it termed a ''narrowed version'' of an exemption to allow circumvention when the work is not accompanied by an additional copy of the work in an alternate digital format. In NTIA's view, the exemption is an issue of consumer protection, although NTIA acknowledged the broader debate about the merits and legality of noncommercial space-shifting.

The Register recommended against the adoption of a proposed exemption, on the ground that the law of fair use, as it stands today, does not sanction broad-based space-shifting or format-shifting. The Register rejected proponents' attempt to rely on the *Dish Network* case, explaining that the uses at issue there were much more circumscribed than the uses proposed for this exemption. In particular, the service at issue in *Dish Network* included many safeguards to prevent unfettered use of the relevant content, including limitations on the length of time content would be available on the device to which a work is transferred. Accordingly, the Register concluded that the case was both factually and legally distinguishable. On the other hand, the recent case of *Fox News Network, LLC* v. *TVEyes Inc.*,[35] reaffirmed judicial reluctance to embrace a general space-shifting privilege.

At the same time, the Register recognized the consumer appeal of the proposals, and marketplace efforts to meet consumer demand for accessing movies and books in a wide variety of formats. According to the Register, the policy judgments surrounding the creation of a novel exception for space- or format-shifting of copyrighted works are complex and thus best left to Congress or the courts.

2. Proposed Class 18: Jailbreaking—Dedicated E-Book Readers [36]

This class would have allowed circumvention of technological measures protecting dedicated e-book readers, such as Amazon's Kindle Paperwhite, to run lawfully acquired third-party applications or software on such devices. Maneesh Pangasa filed a petition seeking this exemption, and the NPRM described the class as follows:

> Proposed Class 18: This proposed class would permit the jailbreaking of dedicated e-book readers to allow those devices to run lawfully acquired software that is otherwise prevented from running.

Pangasa, however, failed to submit further written comments or evidentiary material in support of the petition and did not participate in the public hearings. The written comments that were received in connection with this class were abbreviated and did not offer specific factual information or legal argument in support of the exemption. At the public hearing, proponent Jay Freeman briefly mentioned that people have jailbroken e-book readers to install screen savers or achieve other functionality, but no further evidence was presented in relation to this class. There were no opposition comments filed.

Although, as part of its discussion of the jailbreaking exemptions for smartphones and all-purpose mobile computing devices, NTIA expressed support for a jailbreaking exemption for dedicated e-book readers, NTIA did not point to anything specific in the record to support the requested exemption.

In light of the insufficiency of factual or legal support for the proposed exemption, the Register declined to recommend it.

[33] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Recommendation at 107–26.

[34] No. CV 12–4529 DMG (SHx), 2015 WL 1137593, at *30–31 (C.D. Cal. Jan. 20, 2015).

[35] No. 13 Civ. 5315 (AKH), 2015 WL 5025274 (S.D.N.Y. Aug. 25, 2015).

[36] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 193–94.

3. Proposed Class 19: Jailbreaking—Video Game Consoles [37]

Maneesh Pangasa filed a petition proposing an exemption to permit jailbreaking of home video game consoles for an assortment of asserted noninfringing uses, including installing alternative operating systems. The Librarian rejected a similar exemption in 2012 because of substantial concerns about video game piracy. The Copyright Office set forth the following proposal in the NPRM:

> Proposed Class 19: This proposed class would permit the jailbreaking of home video game consoles. Asserted noninfringing uses include installing alternative operating systems, running lawfully acquired applications, preventing the reporting of personal usage information to the manufacturer, and removing region locks. The requested exemption would apply both to older and currently marketed game consoles.

Pangasa failed to file supporting comments or participate in the public hearings, and the brief written comments filed by other parties provided scant support for the exemption. The limited amount of factual support offered in written comments—concerning academic research projects and "homebrew" video games—largely mirrored factual claims that were not persuasive in the 2012 proceeding. At the public hearing, the representative of commenting party iFixit provided some additional information regarding certain types of video game console repairs for which jailbreaking might be useful. At the same time, however, he acknowledged that the referenced repairs could be undertaken without circumvention.

Class 19 was opposed by ESA and Joint Creators. As in 2012, opponents provided substantial evidence that console jailbreaking is closely tied to video game piracy. In response to iFixit's concerns about console repair, ESA observed that all major console manufacturers offer repair services for consoles still under warranty at no charge, and for out-of-warranty consoles for prices ranging from $99 to $149. iFixit agreed with this assessment.

NTIA supported an exemption limited to repair of malfunctioning hardware for systems that are obsolete or no longer covered by manufacturer warranty, on the ground that to use an authorized repair service, the owner must send the console to the manufacturer and pay a "substantial" fee. At the same time, NTIA concluded that the record did not support a broader exemption, as the record is "significantly less robust and detailed than it was in the last rulemaking."

The Register concluded that the record in this rulemaking did not provide a basis for departing from her 2012 recommendation that an exemption for video game console jailbreaking should be denied. According to the Register, the record was not materially different from that considered in 2012, and included evidence demonstrating that jailbreaking of video game consoles continues to be closely associated with video game piracy, thus undermining the value of console software as a secure distribution platform. The Register also concluded that the need to engage in console repair did not provide a basis for an exemption in light of the availability of authorized repair services and the ability of proponents and others to perform repairs without the need to circumvent.

4. Proposed Class 24: Abandoned Software—Music Recording Software [38]

This proposed exemption would have allowed circumvention of a dongle-like access control that is allegedly no longer supported by the developer or copyright owner and protects a specific type of music recording software, Ensoniq PARIS. Three individuals proposed this exemption, Richard Kelley, James McCloskey, and Michael Yanoska, and the Copyright Office set forth the following proposal in the NPRM:

> Proposed Class 24: This proposed class would allow circumvention of access controls consisting of the PACE content protection system, which restricts access to the full functionality of lawfully acquired Ensoniq PARIS music recording software.

No evidence or argument to support this exemption was submitted after the initial petition phase of the proceeding. The class was opposed by Joint Creators, who raised concerns about the lack of supporting evidence.

In light of the incomplete record, NTIA and the Register declined to recommend granting the exemption.

*C. Conclusion*

Having considered the evidence in the record, the contentions of the commenting parties, and the statutory objectives, the Register of Copyrights has recommended that the Librarian of Congress publish certain classes of works, as designated above, so that the prohibition against circumvention of technological measures that effectively control access to copyrighted works shall not apply to persons who engage in noninfringing uses of those particular classes of works.

Dated: October 20, 2015.

**Maria A. Pallante,**

*Register of Copyrights and Director of the U.S. Copyright Office.*

**Determination of the Librarian of Congress**

Having duly considered and accepted the Recommendation of the Register of Copyrights, which Recommendation is hereby incorporated by reference, the Librarian of Congress, pursuant to 17 U.S.C. 1201(a)(1)(C) and (D), hereby publishes as a new rule the classes of copyrighted works that shall for a three-year period be subject to the exemption provided in 17 U.S.C. 1201(a)(1)(B) from the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A).

**List of Subjects in 37 CFR Part 201**

Copyright, Exemptions to prohibition against circumvention.

**Final Regulations**

For the reasons set forth in the preamble, 37 CFR part 201 is amended as follows:

**PART 201—GENERAL PROVISIONS**

■ 1. The authority citation for part 201 continues to read as follows:

**Authority:** 17 U.S.C. 702

■ 2. Section 201.40 is amended by revising paragraph (b) and removing paragraph (d).

The revision reads as follows:

**§ 201.40 Exemption to prohibition against circumvention.**

* * * * *

(b) *Classes of copyrighted works.* Pursuant to the authority set forth in 17 U.S.C. 1201(a)(1)(C) and (D), and upon the recommendation of the Register of Copyrights, the Librarian has determined that the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A) shall not apply to persons who engage in noninfringing uses of the following classes of copyrighted works:

(1) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where circumvention is undertaken solely in order to make use of short portions of the motion

[37] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 195–201.

[38] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 354–55.

pictures for the purpose of criticism or comment in the following instances:

(i) For use in documentary filmmaking,

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) Where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(ii) For use in noncommercial videos (including videos produced for a paid commission if the commissioning entity's use is noncommercial),

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) Where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(iii) For use in nonfiction multimedia e-books offering film analysis,

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) Where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(iv) By college and university faculty and students, for educational purposes,

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) In film studies or other courses requiring close analysis of film and media excerpts where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(v) By faculty of massive open online courses (MOOCs) offered by accredited nonprofit educational institutions to officially enrolled students through online platforms (which platforms themselves may be operated for profit), for educational purposes, where the MOOC provider through the online platform limits transmissions to the extent technologically feasible to such officially enrolled students, institutes copyright policies and provides copyright informational materials to faculty, students and relevant staff members, and applies technological measures that reasonably prevent unauthorized further dissemination of a work in accessible form to others or retention of the work for longer than the course session by recipients of a transmission through the platform, as contemplated by 17 U.S.C. 110(2),

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) In film studies or other courses requiring close analysis of film and media excerpts where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Control System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(vi) By kindergarten through twelfth-grade educators, including of accredited general educational development (GED) programs, for educational purposes,

(A) Where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, or

(B) In film studies or other courses requiring close analysis of film and media excerpts where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, or via a digital transmission protected by a technological measure, and where the person engaging in circumvention reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content;

(vii) By kindergarten through twelfth-grade students, including those in accredited general educational development (GED) programs, for educational purposes, where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted; and

(viii) By educators and participants in nonprofit digital and media literacy programs offered by libraries, museums and other nonprofit entities with an educational mission, in the course of face-to-face instructional activities for educational purposes, where the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted.

(2) Literary works, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies,

(i) When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels, or

(ii) When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.

(3)(i) Computer programs that enable the following types of wireless devices

to connect to a wireless telecommunications network, when circumvention is undertaken solely in order to connect to a wireless telecommunications network and such connection is authorized by the operator of such network, and the device is a used device:

(A) Wireless telephone handsets (*i.e.*, cellphones);

(B) All-purpose tablet computers;

(C) Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and

(D) Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.

(ii) A device is considered "used" for purposes of this exemption when it has previously been lawfully acquired and activated on the wireless telecommunications network of a wireless carrier.

(4) Computer programs that enable smartphones and portable all-purpose mobile computing devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smartphone or device, or to permit removal of software from the smartphone or device. For purposes of this exemption, a "portable all-purpose mobile computing device" is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is equipped with an operating system primarily designed for mobile use, and is intended to be carried or worn by an individual.

(5) Computer programs that enable smart televisions to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smart television.

(6) Computer programs that are contained in and control the functioning of a motorized land vehicle such as a personal automobile, commercial motor vehicle or mechanized agricultural vehicle, except for computer programs primarily designed for the control of telematics or entertainment systems for such vehicle, when circumvention is a necessary step undertaken by the authorized owner of the vehicle to allow the diagnosis, repair or lawful modification of a vehicle function; and where such circumvention does not constitute a violation of applicable law, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency; and provided, however, that such circumvention is initiated no earlier than 12 months after the effective date of this regulation.

(7)(i) Computer programs, where the circumvention is undertaken on a lawfully acquired device or machine on which the computer program operates solely for the purpose of good-faith security research and does not violate any applicable law, including without limitation the Computer Fraud and Abuse Act of 1986, as amended and codified in title 18, United States Code; and provided, however, that, except as to voting machines, such circumvention is initiated no earlier than 12 months after the effective date of this regulation, and the device or machine is one of the following:

(A) A device or machine primarily designed for use by individual consumers (including voting machines);

(B) A motorized land vehicle; or

(C) A medical device designed for whole or partial implantation in patients or a corresponding personal monitoring system, that is not and will not be used by patients or for patient care.

(ii) For purposes of this exemption, "good-faith security research" means accessing a computer program solely for purposes of good-faith testing, investigation and/or correction of a security flaw or vulnerability, where such activity is carried out in a controlled environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.

(8)(i) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, when the copyright owner or its authorized representative has ceased to provide access to an external computer server necessary to facilitate an authentication process to enable local gameplay, solely for the purpose of:

(A) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game for personal gameplay on a personal computer or video game console; or

(B) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game on a personal computer or video game console when necessary to allow preservation of the game in a playable form by an eligible library, archives or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives or museum.

(ii) Computer programs used to operate video game consoles solely to the extent necessary for an eligible library, archives or museum to engage in the preservation activities described in paragraph (i)(B).

(iii) For purposes of the exemptions in paragraphs (i) and (ii), the following definitions shall apply:

(A) "Complete games" means video games that can be played by users without accessing or reproducing copyrightable content stored or previously stored on an external computer server.

(B) "Ceased to provide access" means that the copyright owner or its authorized representative has either issued an affirmative statement indicating that external server support for the video game has ended and such support is in fact no longer available or, alternatively, server support has been discontinued for a period of at least six months; provided, however, that server support has not since been restored.

(C) "Local gameplay" means gameplay conducted on a personal computer or video game console, or locally connected personal computers or consoles, and not through an online service or facility.

(D) A library, archives or museum is considered "eligible" when the collections of the library, archives or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives or museum.

(9) Computer programs that operate 3D printers that employ microchip-reliant technological measures to limit the use of feedstock, when circumvention is accomplished solely for the purpose of using alternative feedstock and not for the purpose of accessing design software, design files or proprietary data; provided, however, that the exemption shall not extend to any computer program on a 3D printer that produces goods or materials for use in commerce the physical production of which is subject to legal or regulatory oversight or a related certification process, or where the circumvention is otherwise unlawful.

(10) Literary works consisting of compilations of data generated by

medical devices that are wholly or partially implanted in the body or by their corresponding personal monitoring systems, where such circumvention is undertaken by a patient for the sole purpose of lawfully accessing the data generated by his or her own device or monitoring system and does not constitute a violation of applicable law, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration, and is accomplished through the passive monitoring of wireless transmissions that are already being produced by such device or monitoring system.

* * * * *

Dated: October 20, 2015.

**David S. Mao,**

*Acting Librarian of Congress.*

[FR Doc. 2015–27212 Filed 10–27–15; 8:45 am]

BILLING CODE 1410–30–P

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 180

**[EPA–HQ–OPP–2014–0591; FRL–9934–14]**

### Methoxyfenozide; Pesticide Tolerances

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** This regulation establishes tolerances for residues of methoxyfenozide in or on multiple commodities which are identified and discussed later in this document. Interregional Research Project Number 4 (IR–4) requested these tolerances under the Federal Food, Drug, and Cosmetic Act (FFDCA).

**DATES:** This regulation is effective October 28, 2015. Objections and requests for hearings must be received on or before December 28, 2015, and must be filed in accordance with the instructions provided in 40 CFR part 178 (see also Unit I.C. of the **SUPPLEMENTARY INFORMATION**).

**ADDRESSES:** The docket for this action, identified by docket identification (ID) number EPA–HQ–OPP–2014–0591, is available at *http://www.regulations.gov* or at the Office of Pesticide Programs Regulatory Public Docket (OPP Docket) in the Environmental Protection Agency Docket Center (EPA/DC), West William Jefferson Clinton Bldg., Rm. 3334, 1301 Constitution Ave. NW., Washington, DC 20460–0001. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the OPP Docket is (703) 305–5805. Please review the visitor instructions and additional information about the docket available at *http://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Susan Lewis, Registration Division (7505P), Office of Pesticide Programs, Environmental Protection Agency, 1200 Pennsylvania Ave. NW., Washington, DC 20460–0001; main telephone number: (703) 305–7090; email address: *RDFRNotices@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. General Information

### *A. Does this action apply to me?*

You may be potentially affected by this action if you are an agricultural producer, food manufacturer, or pesticide manufacturer. The following list of North American Industrial Classification System (NAICS) codes is not intended to be exhaustive, but rather provides a guide to help readers determine whether this document applies to them. Potentially affected entities may include:

- Crop production (NAICS code 111).
- Animal production (NAICS code 112).
- Food manufacturing (NAICS code 311).
- Pesticide manufacturing (NAICS code 32532).

### *B. How can I get electronic access to other related information?*

You may access a frequently updated electronic version of EPA's tolerance regulations at 40 CFR part 180 through the Government Printing Office's e-CFR site at *http://www.ecfr.gov/cgi-bin/text-idx?&c=ecfr&tpl=/ecfrbrowse/Title40/40tab_02.tpl.*

### *C. How can I file an objection or hearing request?*

Under FFDCA section 408(g), 21 U.S.C. 346a, any person may file an objection to any aspect of this regulation and may also request a hearing on those objections. You must file your objection or request a hearing on this regulation in accordance with the instructions provided in 40 CFR part 178. To ensure proper receipt by EPA, you must identify docket ID number EPA–HQ–OPP–2014–0591 in the subject line on the first page of your submission. All objections and requests for a hearing must be in writing, and must be received by the Hearing Clerk on or before December 28, 2015. Addresses for mail and hand delivery of objections and hearing requests are provided in 40 CFR 178.25(b).

In addition to filing an objection or hearing request with the Hearing Clerk as described in 40 CFR part 178, please submit a copy of the filing (excluding any Confidential Business Information (CBI)) for inclusion in the public docket. Information not marked confidential pursuant to 40 CFR part 2 may be disclosed publicly by EPA without prior notice. Submit the non-CBI copy of your objection or hearing request, identified by docket ID number EPA–HQ–OPP–2014–0591, by one of the following methods:

- *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the online instructions for submitting comments. Do not submit electronically any information you consider to be CBI or other information whose disclosure is restricted by statute.
- *Mail:* OPP Docket, Environmental Protection Agency Docket Center (EPA/DC), (28221T), 1200 Pennsylvania Ave. NW., Washington, DC 20460–0001.
- *Hand Delivery:* To make special arrangements for hand delivery or delivery of boxed information, please follow the instructions at *http://www.epa.gov/dockets/contacts.html.*

Additional instructions on commenting or visiting the docket, along with more information about dockets generally, is available at *http://www.epa.gov/dockets.*

## II. Summary of Petitioned-For Tolerance

In the **Federal Register** of March 4, 2015 (80 FR 11611) (FRL–9922–68), EPA issued a document pursuant to FFDCA section 408(d)(3), 21 U.S.C. 346a(d)(3), announcing the filing of a pesticide petition (PP 4E8298) by IR–4, 500 College Road East, Suite 201W, Princeton, NJ 08540. The petition requested that 40 CFR part 180 be amended by establishing tolerances for residues of the insecticide methoxyfenozide, (3-methoxy-2-methylbenzoic acid 2-(3,5-dimethylbenzoyl)-2-(1,1-dimethylethyl) hydrazide), under paragraph (a) in or on: Chive, fresh leaves at 30.0 parts per million (ppm); fruit, stone, group 12–12, except plum, prune, fresh at 3.0 ppm; and nut, tree, group 14–12 at 0.10 ppm. The petition also proposed the following tolerances under paragraph (a) be removed upon approval of the proposed tolerances listed above: Fruit, stone, group 12, except plum, prune, fresh at 3.0 ppm; nut, tree, group 14 at 0.10 ppm; pistachio at 0.10 ppm; and in paragraph (d), chive at 4.5 ppm be removed. The petition additionally

(8) Labeling must include:

(i) A summary of clinical testing conducted with the device that includes a summary of device-related complications and adverse events;

(ii) Instructions for use;

(iii) A surgical guide for implantation, which includes instructions for imaging to assess bone dimensions;

(iv) A shelf life, for device components provided sterile;

(v) A patient identification card; and

(vi) A patient user manual.

Dated: October 22, 2018.

**Leslie Kux,**

*Associate Commissioner for Policy.*

[FR Doc. 2018–23412 Filed 10–25–18; 8:45 am]

BILLING CODE 4164–01–P

---

## LIBRARY OF CONGRESS

## U.S. Copyright Office

## 37 CFR Part 201

**[Docket No. 2017–10]**

## Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, the Librarian of Congress adopts exemptions to the provision of the Digital Millennium Copyright Act ("DMCA") that prohibits circumvention of technological measures that control access to copyrighted works, codified in the United States Code. As required under the statute, the Acting Register of Copyrights, following a public proceeding, submitted a Recommendation concerning proposed exemptions to the Librarian of Congress. After careful consideration, the Librarian adopts final regulations based upon the Acting Register's Recommendation.

**DATE:** Effective October 28, 2018.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, General Counsel and Associate Register of Copyrights, by email at *regans@copyright.gov*, Anna Chauvet, Assistant General Counsel, by email at *achau@copyright.gov*, or Kevin Amer, Senior Counsel for Policy and International Affairs, by email at *kamer@copyright.gov*. Each can be contacted by telephone by calling (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** The Librarian of Congress, pursuant to section 1201(a)(1) of title 17, United States Code, has determined in this seventh triennial rulemaking proceeding that the prohibition against circumvention of technological measures that effectively control access to copyrighted works shall not apply to persons who engage in noninfringing uses of certain classes of such works. This determination is based upon the Recommendation of the Acting Register of Copyrights, which was transmitted to the Librarian on October 5, 2018.[1]

The below discussion summarizes the rulemaking proceeding and Register's Recommendation, announces the Librarian's determination, and publishes the regulatory text specifying the exempted classes of works. A more complete discussion of the rulemaking process, the evidentiary record, and the Acting Register's analysis can be found in the Acting Register's Recommendation, which is posted at *www.copyright.gov/1201/2018/*.

### I. Background

#### A. Statutory Requirements

Congress enacted the DMCA in 1998 to implement certain provisions of the WIPO Copyright and WIPO Performances and Phonograms Treaties. Among other things, title I of the DMCA, which added a new chapter 12 to title 17 of the U.S. Code, prohibits circumvention of technological measures employed by or on behalf of copyright owners to protect access to their works. In enacting this aspect of the law, Congress observed that technological protection measures ("TPMs") can "support new ways of disseminating copyrighted materials to users, and . . . safeguard the availability of legitimate uses of those materials by individuals."[2]

Section 1201(a)(1) provides in pertinent part that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under [title 17]." Under the statute, to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner."[3] A technological measure that "effectively controls access to a work" is one that "in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work."[4]

Section 1201(a)(1) also includes what Congress characterized as a "fail-safe" mechanism,[5] which requires the Librarian of Congress, following a rulemaking proceeding, to publish any class of copyrighted works as to which the Librarian has determined that noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected by the prohibition against circumvention in the succeeding three-year period, thereby exempting that class from the prohibition for that period.[6] The Librarian's determination to grant an exemption is based upon the recommendation of the Register of Copyrights, who conducts the rulemaking proceeding.[7] The Register, in turn, consults with the Assistant Secretary for Communications and Information of the Department of Commerce, who oversees the National Telecommunications and Information Administration ("NTIA"), in the course of formulating her recommendation.[8]

The primary responsibility of the Register and the Librarian in the rulemaking proceeding is to assess whether the implementation of access controls impairs the ability of individuals to make noninfringing uses of copyrighted works within the meaning of section 1201(a)(1). To do this, the Register develops a comprehensive administrative record using information submitted by interested members of the public, and makes recommendations to the Librarian concerning whether exemptions are warranted based on that record.

Under the statutory framework, the Librarian, and thus the Register, must consider "(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market

---

[1] Acting Register of Copyrights, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights (Oct. 2018) ("Acting Register's Recommendation").

[2] Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4, 1998, at 7 (Comm. Print 1998).

[3] 17 U.S.C. 1201(a)(3)(A).

[4] *Id.* at 1201(a)(3)(B).

[5] *See* H.R. Rep. No. 105–551, pt. 2, at 36 (1998) ("Commerce Comm. Report").

[6] *See* 17 U.S.C. 1201(a)(1).

[7] *Id.* at 1201(a)(1)(C).

[8] *Id.*

for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate." [9]

Significantly, exemptions adopted by rule under section 1201(a)(1) apply only to the conduct of circumventing a technological measure that controls access to a copyrighted work. Other parts of section 1201, by contrast, address the manufacture and provision of—or "trafficking" in—products and services designed for purposes of circumvention. Section 1201(a)(2) bars trafficking in products and services that are used to circumvent technological measures that control access to copyrighted works (for example, a password needed to open a media file),[10] while section 1201(b) bars trafficking in products and services used to circumvent technological measures that protect the exclusive rights of the copyright owner in their works (for example, technology that prevents the work from being reproduced).[11] The Librarian of Congress has no authority to adopt exemptions for the anti-trafficking prohibitions contained in section 1201(a)(2) or (b).[12] More broadly, activities conducted under the regulatory exemptions must still comply with other applicable laws, including non-copyright provisions.

Also significant is the fact that the statute contains certain permanent exemptions to permit specified uses. These include: Section 1201(d), which exempts certain activities of nonprofit libraries, archives, and educational institutions; section 1201(e), which exempts "lawfully authorized investigative, protective, information security, or intelligence activity" of a state or the federal government; section 1201(f), which exempts certain "[r]everse engineering" activities to facilitate interoperability; section 1201(g), which exempts certain types of research into encryption technologies; section 1201(h), which exempts certain activities to prevent the "access of minors to material on the internet"; section 1201(i), which exempts certain activities "solely for the purpose of preventing the collection or dissemination of personally identifying information"; and section 1201(j), which exempts certain acts of "security testing" of computers and computer systems.

*C. Rulemaking Standards*

In adopting the DMCA, Congress imposed legal and evidentiary requirements for the section 1201 rulemaking proceeding, as discussed in greater detail in the Acting Register's Recommendation and the Copyright Office's recent policy study on section 1201.[13] The Register will recommend granting an exemption only "when the preponderance of the evidence in the record shows that the conditions for granting an exemption have been met." [14] "[I]t is the totality of the rulemaking record (*i.e.,* the evidence provided by commenters or administratively noticed by the Office) that must, on balance, reflect the need for an exemption by a preponderance of the evidence. Such evidence must, on the whole, show that it is more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a particular class of copyrighted works." [15]

To establish a case for an exemption, proponents must show at a minimum (1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses. In addition, the Librarian must also examine the statutory factors listed in section 1201(a)(1)(C): "(i) The availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate." In some cases, weighing these factors requires the consideration of the benefits that the technological measure brings with respect to the overall creation and dissemination of works in the marketplace, in addition to any negative impact.

Finally, when granting an exemption, section 1201(a)(1) specifies that the exemption adopted as part of this rulemaking must be defined based on "a particular class of works." [16] Among other things, the determination of the appropriate scope of a "class of works" recommended for exemption may also take into account the adverse effects an exemption may have on the market for or value of copyrighted works. Accordingly, "it can be appropriate to refine a class by reference to the use or user in order to remedy the adverse effect of the prohibition and to limit the adverse consequences of an exemption." [17]

*D. Streamlined Renewal Process*

Following a comprehensive policy study, and in response to stakeholder feedback, for this seventh triennial proceeding, the Office introduced a streamlined process to renew section 1201 exemptions adopted during the 2015 rulemaking.[18] Previously, in recognition of legislative history stating that the basis of an exemption should be established *de novo* in each triennial proceeding,[19] the Office had required the factual record be developed anew in each rulemaking.[20] In its Section 1201 Report, the Office evaluated the possibility of a renewal process, noting a "broad consensus in favor of streamlining the process for renewing exemptions to which there is no meaningful opposition." [21] As described in further detail in that report, the Office ultimately concluded that "the statutory language appears to be broad enough to permit determinations to be based upon evidence drawn from prior proceedings, but only upon a conclusion that this evidence remains reliable to support granting an exemption in the current

[9] *Id.*

[10] *Id.* at 1201(a)(2).

[11] *Id.* at 1201(b).

[12] *See id.* at 1201(a)(1)(E) ("Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.").

[13] Acting Register's Recommendation at 9–19; U.S. Copyright Office, Section 1201 of Title 17 105–15 (2017), *https://www.copyright.gov/policy/1201/section-1201-full-report.pdf* ("Section 1201 Report").

[14] Section 1201 Report at 111; *accord* Register of Copyrights, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 14 (Oct. 2015). References to the Register's Recommendations in prior rulemakings are cited by the year of publication followed by "Recommendation" (*e.g.,* "2015 Recommendation"). Prior Recommendations are available on the Copyright Office website at *https://www.copyright.gov/1201/.*

[15] Section 1201 Report at 112.

[16] 17 U.S.C. 1201(a)(1)(B).

[17] 2006 Recommendation at 19.

[18] Section 1201 Report at 127–28, 145–46.

[19] *See* Commerce Comm. Report at 37 (explaining that for every rulemaking, "the assessment of adverse impacts on particular categories of works is to be determined de novo").

[20] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 82 FR 29804, 29805 (June 30, 2017) ("NOI").

[21] Section 1201 Report at vi.

proceeding."[22] The Office concluded that renewal may be sought only for exemptions in their current form, without modification, and that the Register "must apply the same evidentiary standards in recommending the renewal of exemptions as for first-time exemption requests."[23]

The Office detailed the renewal process in its notices for this proceeding.[24] Streamlined renewal is based upon a determination that, due to a lack of legal, marketplace, or technological changes, the factors that led the Register to recommend adoption of the exemption in the prior rulemaking are expected to continue into the forthcoming triennial period.[25] That is, the same material facts and circumstances underlying the previously-adopted regulatory exemption may be relied on to renew the exemption.[26] Because the statute itself requires that exemptions must be adopted upon a fresh determination concerning the next three-year period, the fact that the Librarian previously adopted an exemption creates no presumption that readoption is appropriate. Instead, the Office first solicited petitions summarizing the continuing need and justification for the exemption, and petitioners signed a declaration stating that, "to the best of their personal knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified."[27] Next, the Office solicited comments from participants opposing the readoption of the exemption. Opponents were required to provide evidence that would allow the Acting Register to reasonably conclude that the prior rulemaking record and any further information provided in the petitions are insufficient for her to recommend renewal without the benefit of a further developed record. For example, "a change in case law might affect whether a particular use is noninfringing, new technological developments might affect the availability for use of copyrighted works, or new business models might affect the market for or value of copyrighted works."[28] If the appropriateness of renewing an exemption is meaningfully contested, that exemption would be fully noticed for written comment and public hearing to generate an updated administrative record for the Register to evaluate whether to recommend readoption, modification, or elimination of that exemption to the Librarian.[29]

The streamlined renewal process elicited favorable responses during the 2018 rulemaking hearings. As detailed below, as a result of this new process, the Acting Register was able to recommend renewal of all exemptions adopted in the 2015 rulemaking, and subsequently consider whether some of them should be modified to accommodate additional new uses through the development of an expanded administrative record.

## II. History of the Seventh Triennial Proceeding

In this rulemaking, the Copyright Office used the phased comment structure introduced in the last proceeding, to best facilitate a clear and thorough record. As promised in its Section 1201 Report,[30] the Office also created video tutorials explaining the rulemaking process, issued the Notice of Proposed Rulemaking ("NPRM") earlier to give parties more time to participate, and offered increased opportunities for participant input, including through an established procedure for transparent *ex parte* meetings.

The Office initiated the seventh triennial rulemaking proceeding through a Notice of Inquiry ("NOI") on June 30, 2017.[31] The NOI requested petitions for renewals, petitions in opposition to renewal, and any petitions for new exemptions. In response, the Office received thirty-nine renewal petitions, five comments regarding the scope of the renewal petitions, and one comment in opposition to renewal of a current exemption.[32] The Office also received twenty-three petitions for new exemptions, including seventeen seeking to expand certain current exemptions, and six petitions for new exemptions.

Next, on October 26, 2017, the Office issued its NPRM identifying the existing exemptions for which the Acting Register intended to recommend renewal, and outlined the proposed classes for new exemptions (including proposed expansions of previously-adopted exemptions) for which three rounds of public comments were initiated.[33] Those classes were organized into twelve classes of works. Seven of the twelve proposed exemptions seek expansions of existing exemptions, while five propose new exemptions. The Office received 181 total submissions in response to the NPRM, substantially less than the approximately 40,000 submissions received in the last rulemaking.

After analyzing the written comments, the Office held seven days of hearings in Washington, DC (April 10–13) and Los Angeles, California (April 23–25). For the first time, the roundtables at both locations held audience participation panels and were live streamed online. Video recordings for these roundtables are available through the Office's website and YouTube pages.[34] In total, the Office heard testimony from seventy-seven individuals. After the hearings, the Office issued questions to hearing participants in four proposed classes and received eighteen responses.[35] Subsequently, the Office received an unsolicited letter from the Computer Crime and Intellectual Property Section of the Criminal Division of the United States Department of Justice ("CCIPS") regarding Proposed Class 10, and the Office solicited comment from Class 10 participants in response.[36]

As noted in its NPRM, the Office determined that further informal communications with non-governmental participants might be beneficial in limited circumstances.[37] The Office thus established guidelines for *ex parte* meetings, noting that the Office will not consider or accept any new documentary materials at these

[22] *Id.* at 143.

[23] *Id.* at 142, 145.

[24] NOI, 82 FR at 29805–07; Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 82 FR 49550, 49552 (Oct. 26, 2017) ("NPRM").

[25] NOI, 82 FR at 29805–06; NPRM, 82 FR at 49552.

[26] Section 1201 Report at 143–44; NOI, 82 FR at 29806; NPRM, 82 FR at 49552.

[27] NPRM, 82 FR at 49552.

[28] Section 1201 Report at 145.

[29] *See* NPRM, 82 FR at 49554 (stating that if a renewal petition is meaningfully opposed, "the exemption would be considered pursuant to the more comprehensive rulemaking process (*i.e.*, three rounds of written comment, followed by public hearings)").

[30] Section 1201 Report at 149–51.

[31] NOI, 82 FR at 29804.

[32] Comments received in this rulemaking are available at *http://copyright.gov/1201/2018*.

[33] NPRM, 82 FR at 49550, 49553–63.

[34] Video recordings of the roundtables are available at *https://www.copyright.gov/1201/2018/* and *https://www.youtube.com/uscopyrightoffice/*.

[35] Participant's post-hearing letter responses are available on the Office's website. Responses to Post-Hearing Questions, U.S. Copyright Office, (last visited Oct 2, 2018), *https://www.copyright.gov/1201/2018/post-hearing/answers/*.

[36] Letter from John T. Lynch, Jr., Chief, Comput. Crime & Intellectual Prop. Section, Criminal Div., U.S. Dep't of Justice, to Regan A. Smith, Gen. Counsel & Assoc. Register of Copyrights, U.S. Copyright Office (June 28, 2018), *https://www.copyright.gov/1201/2018/USCO-letters/USDOJ_Letter_to_USCO.pdf;* Letter from to Regan A. Smith, Gen. Counsel & Assoc. Register of Copyrights, U.S. Copyright Office, to Class 10 Participants (June 29, 2018), *https://www.copyright.gov/1201/2018/additional-correspondence/Proposed_Class_10_Letter.pdf*.

[37] NPRM, 82 FR at 49563; *see* Section 1201 Report at 150–51 (documenting stakeholder desire for such further communication).

meetings, and requiring participants to provide a letter summarizing the meeting for the Office to include in the rulemaking record.[38] The Office held nine *ex parte* meetings with participants concerning five proposed classes.[39]

As required by section 1201(a)(1), the Acting Register consulted with NTIA during this rulemaking. NTIA provided input at various stages and participated in the public hearings held in Washington, DC and Los Angeles. NTIA formally communicated its views on each of the proposed exemptions to the Acting Register on September 25, 2018.[40]

## III. Summary of Register's Recommendation

### *A. Renewal Recommendations*

As set forth in the NPRM, the Acting Register received petitions to renew every one of the exemptions adopted pursuant to the sixth triennial rulemaking. To the extent any renewal petition proposed uses beyond the current exemption, the Office disregarded those portions of the petition for purposes of considering the renewal of the exemption, and instead focused on whether it provided sufficient information to warrant readoption of the exemption in its current form.[41] While a single party filed an opposition to renewal, the Acting Register concluded that its opposition was not sufficiently material to undermine the conclusion that the record and legal reasoning from the prior rulemaking supported renewal.[42] Finding the renewal petitions sufficient under the guidelines outlined above, the Acting Register thus recommended renewal of each of the existing exemptions.[43] The existing exemptions, and the bases for the recommendation to readopt each exemption in accordance with the streamlined renewal process, are summarized below. Where noted, these exemptions served as a baseline for the Acting Register in considering subsequent requests for expansion.

#### 1. Literary Works Distributed Electronically—Assistive Technologies

Multiple organizations petitioned to renew the exemption for literary works distributed electronically (*i.e.*, e-books), for use with assistive technologies for persons who are blind, visually impaired, or have print disabilities. No oppositions were filed against readoption of this exemption. The petitions demonstrated the continuing need and justification for the exemption, stating that individuals who are blind, visually impaired, or print disabled are significantly disadvantaged with respect to obtaining accessible e-book content because TPMs interfere with the use of assistive technologies such as screen readers and refreshable Braille displays. In addition, the petitioners demonstrated personal knowledge and experience with regard to the assistive technology exemption; they are all organizations that advocate for the blind, visually impaired, and print disabled.

Accordingly, the Acting Register recommends renewal of the following exemption:

Literary works, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies:

(i) When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels; or

(ii) When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.

#### 2. Literary Works—Compilations of Data Generated by Implanted Medical Devices—To Access Personal Data

Hugo Campos, member of the Coalition of Medical Device Patients and Researchers, and represented by the Harvard Law School Cyberlaw Clinic, petitioned to renew the exemption covering access to patient data on networked medical devices. No oppositions were filed against the petition to renew this exemption. Mr. Campos's petition demonstrated the continuing need and justification for the exemption, stating that patients continue to need access to data output from their medical devices to manage their health. Mr. Campos himself is a patient needing access to the data output from his medical device.

Accordingly, the Acting Register recommends renewal of the following exemption:

Literary works consisting of compilations of data generated by medical devices that are wholly or partially implanted in the body or by their corresponding personal monitoring systems, where such circumvention is undertaken by a patient for the sole purpose of lawfully accessing the data generated by his or her own device or monitoring system and does not constitute a violation of applicable law, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration, and is accomplished through the passive monitoring of wireless transmissions that are already being produced by such device or monitoring system.

#### 3. Computer Programs—"Unlocking" of Cellphones, Tablets, Mobile Hotspots, or Wearable Devices

Multiple organizations petitioned to renew the exemption for computer programs that operate cellphones, tablets, mobile hotspots, or wearable devices (*e.g.*, smartwatches), to allow connection of a used device to an alternative wireless network ("unlocking"). No oppositions were filed against the petitions seeking to renew this exemption. The petitions demonstrated the continuing need and justification for the exemption, stating that consumers of the enumerated products continue to need to be able to unlock the devices so they can switch network providers. For example, the Institute of Scrap Recycling Industries, Inc. ("ISRI") stated that its members continue to purchase or acquire donated cell phones and tablets, and try to reuse them, but that wireless carriers still lock devices to prevent them from being used on other carriers. In addition, the petitioners demonstrated personal knowledge and experience with regard to this exemption: Competitive Carriers Association, Owners' Rights Initiative ("ORI"), and ISRI represent companies that rely on the ability to unlock cellphones.

Accordingly, the Acting Register recommends renewal of this exemption and will consider proposed expansions below in the discussion on Proposed Class 5.

#### 4. Computer Programs—"Jailbreaking" of Smartphones, Smart TVs, Tablets, or Other All-Purpose Mobile Computing Devices

Multiple organizations petitioned to renew the exemptions for computer programs that operate smartphones, smart TVs, tablets, or other all-purpose mobile computing devices, to allow the

[38] NPRM, 82 FR at 49563; Ex Parte Communications, U.S. Copyright Office (last visited Oct. 2, 2018), *https://www.copyright.gov/1201/2018/ex-parte-communications.html*.

[39] *See* Ex Parte Communications, U.S. Copyright Office, *https://www.copyright.gov/1201/2018/ex-parte-communications.html* (last visited Oct. 2, 2018).

[40] NTIA's recommendations can be viewed at *https://www.copyright.gov/1201/2018/2018_NTIA_Letter.pdf*.

[41] *See, e.g.*, NPRM, 82 FR at 49554.

[42] *Id.*

[43] The Acting Register's analysis and conclusions regarding streamlined renewals can be found in the NPRM. *See id.* at 49552–58.

device to interoperate with or to remove software applications ("jailbreaking"). The petitions demonstrate the continuing need and justification for the exemptions, and that petitioners had personal knowledge and experience with regard to these exemptions. Specifically, the petitions state that, absent the exemptions, TPMs applied to the enumerated products would have an adverse effect on noninfringing uses, such as being able to install third-party applications on a smartphone or to download third-party software on a smart TV to enable interoperability. For example, the Electronic Frontier Foundation's ("EFF's") petition outlined its declarant's experience searching current mobile computing device markets and technologies, working as a software engineer, and participating in four prior 1201 rulemakings. Similarly, the Libiquity petition was submitted by a person who "work[s] with the operating system and many of the system libraries that lie at the core of the firmware systems of a large majority of smartphones, portable all-purpose mobile computing devices, and smart televisions." In a brief two-page comment, BSA √ The Software Alliance ("BSA") opposed the readoption of this exemption, asserting that "alternatives to circumvention exist," and that "jailbreaking can undermine the integrity and security of a platform's operating system in a manner that facilitates copyright infringement and exposes users to heightened risks of privacy violations."

In the NPRM, the Office concluded that BSA's opposition was not sufficient to draw the conclusion that the past rulemaking record is no longer reliable, or that the reasoning adopted in the Register's 2015 Recommendation cannot be relied upon for the next three-year period. Specifically, the Office stated that BSA's comment largely re-articulated a general opposition to a jailbreaking exemption, and noted that the past three rulemakings have adopted some form of an exemption for jailbreaking certain types of mobile computing devices. The Office also noted that BSA had failed to identify any specific circumvention alternatives, changes in case law, new technological developments, or new issues that had not already been considered and evaluated in granting the exemption previously.

Accordingly, the Acting Register recommends renewal of this exemption and will consider proposed expansions below in the discussion on Proposed Class 6.

5. Computer Programs—Diagnosis, Repair, and Lawful Modification of Motorized Land Vehicles

Multiple organizations petitioned to renew the exemption for computer programs that control motorized land vehicles, including farm equipment, for purposes of diagnosis, repair, and modification of the vehicle. The petitions demonstrated the continuing need and justification for the exemption to prevent owners of motorized land vehicles from being adversely impacted in their ability to diagnose, repair, and modify their vehicles as a result of TPMs that protect the copyrighted computer programs on the electronic control units ("ECUs") that control the functioning of the vehicles. Indeed, the Motor & Equipment Manufacturers Association, which during the sixth triennial rulemaking initially opposed any exemption that would impact the software and TPMs in vehicles, now supports the exemption as striking an appropriate balance between encouraging marketplace competition and innovation while mitigating the impact on safety, regulatory, and environmental compliance. The petitioners demonstrated personal knowledge and experience with regard to this exemption; each either represents or gathered information from individuals conducting repairs or businesses that manufacture, distribute, and sell motor vehicle parts, and perform vehicle service and repair.

Accordingly, the Acting Register recommends renewal of this exemption and will consider proposed expansions below in the discussion on Proposed Class 7.

6. Computer Programs—Security Research

Multiple organizations and security researchers petitioned to renew the exemption for purposes of good-faith security research. The petitioners demonstrated the continuing need and justification for the exemption, and personal knowledge and experience with regard to this exemption. For example, Professors Bellovin, Blaze, and Heninger stated that they have conducted their own security research in reliance on the existing exemption, and that they "regularly engage" with other security researchers who have similarly relied on the exemption. They provided an example of a recent computer security conference in which thousands of participants relied on the existing exemption to examine and test electronic voting devices—the results of which were reported to election officials to improve the security of their voting systems.

Accordingly, the Acting Register recommends renewal of this exemption and will consider proposed expansions below in the discussion on Proposed Class 10.

7. Computer Programs—3D Printers

Michael Weinberg and ORI jointly petitioned to renew the exemption for computer programs that operate 3D printers to allow use of alternative feedstock. No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience, in particular, through Mr. Weinberg's experience petitioning for the exemption adopted in 2015. In addition, the petition states that printers continue to restrict the use of third-party feedstock, thereby requiring renewal of the exemption.

Accordingly, the Acting Register recommends renewal of this exemption and will consider proposed expansions below in the discussion on Proposed Class 12.

8. Video Games Requiring Server Communication—for Continued Individual Play and Preservation of Games by Libraries, Archives, and Museums

Multiple organizations petitioned to renew the exemption for video games for which outside server support has been discontinued. The petitions stated that individuals still need the exemption to engage in continued play and libraries and museums continue to need the exemption to preserve and curate video games in playable form. In addition, the petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the 1201 triennial rulemaking relating to access controls on video games and consoles, and/or representing major library associations with members that have relied on this exemption.

Accordingly, the Acting Register recommends renewal of this exemption and will consider proposed expansions below in the discussion on Proposed Class 8.

9. Audiovisual Uses—Educational and Derivative Uses

Multiple individuals and organizations petitioned to renew the exemption consisting of multiple subparts covering use of short portions of motions pictures for various educational and derivative uses. No

oppositions were filed. Petitions to renew the various subparts of the exemption are discussed below.

9a. Audiovisual Uses—Educational Uses—Colleges and Universities

Multiple individuals and organizations petitioned to renew the exemption's subpart covering use of motion picture clips for educational uses by college and university instructors and students (codified at 37 CFR 201.40(b)(1)(iv) (2016)). No oppositions were filed against readoption. The petitions demonstrated the continuing need and justification for the exemption, and personal knowledge and experience with regard to the exempted use. For example, Professors Decherney, Sender, and Carpini, the Department of Communications at the University of Michigan (''DCSUM''), the International Communication Association (''ICA''), the Society for Cinema and Media Studies (''SCMS''), the American Association of University Professors (''AAUP''), and the Library Copyright Alliance (''LCA'') stated that courses on video essays (or multimedia or videographer criticism), now taught at many universities, would not be able to exist without relying on this exemption. Similarly, Professor Hobbs, who represents more than 17,000 digital and media literacy educators, and the National Association for Media Literacy Education (''NAMLE''), an organization devoted to media literacy with more than 3,500 members, stated that teachers must sometimes circumvent a DVD protected by the Content Scramble System (''CSS'') when screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content.

9b. Audiovisual Uses—Educational Uses—Primary and Secondary Schools (K–12)

Multiple organizations petitioned to renew the exemption's subparts covering use of motion picture clips for educational uses by K–12 instructors and students. No oppositions were filed against readoption. The petitions demonstrated the continuing need and justification for the exemption, stating that K–12 instructors and students continue to rely on excerpts from digital media for class presentations and coursework, and must sometimes use screen-capture technology. In addition, the petitioners demonstrated personal knowledge and experience with regard to this exemption through representation of thousands of digital and literacy educators and/or members supporting K–12 instructors and students, combined with past participation in the section 1201 triennial rulemaking.

9c. Audiovisual Uses—Educational Uses—Massive Open Online Courses (''MOOCs'').

Professors Decherney, Sender, and Carpini, DCSUM, ICA, SCMS, and LCA petitioned to renew the exemption's subpart covering use of motion picture clips for educational uses in MOOCs. No oppositions were filed against readoption. The petition demonstrated the continuing need and justification for the exemption, stating that instructors continue to rely on the exemption to develop, provide, and improve MOOCs, as well as increase the number of (and therefore access to) MOOCs in the field of film and media studies. For example, the declarant, Professor Decherney, demonstrated personal knowledge by describing his reliance on the exemption to teach MOOCs on film and media studies.

9d. Audiovisual Uses—Educational Uses—Educational Programs Operated by Libraries, Museums, and Other Nonprofits

Multiple organizations petitioned to renew the subpart of the exemption covering use of motion picture clips for educational uses in digital and literacy programs offered by libraries, museums, and other nonprofits. No oppositions were filed against readoption. The petitions demonstrated the continuing need and justification for the exemption, and demonstrated personal knowledge and experience with regard to the exempted use. For example, LCA stated that librarians across the country have relied on the current exemption and will continue to do so for their digital and literacy programs. In addition, Professor Hobbs and NAMLE stated that librarians will continue to rely on the exemption for their digital and literacy programs, and to advance the digital media knowledge of their patrons.

9e. Audiovisual Uses—Derivative Uses—Multimedia E-Books Offering Film Analysis

A professor and two organizations collectively petitioned to renew the subpart of the exemption covering the use of motion picture clips for multimedia e-books offering film analysis. No oppositions were filed against readoption. The petition demonstrated the continuing need and justification for the exemption, attesting that the availability of video necessary for authors to undertake film analysis in e-books continues to be limited to formats encumbered by technological protection measures. In addition, the petitioners demonstrated personal knowledge through Professor Buster's continued work on an e-book series based on her lecture series, ''Deconstructing Master Filmmakers: The Uses of Cinematic Enchantment,'' and Authors Alliance's feedback that its members continue to desire authoring e-books that incorporate film for the purpose of analysis.

9f. Audiovisual Uses—Derivative Uses—Documentary Filmmaking

Multiple organizations petitioned to renew the subpart of the exemption covering the use of motion picture clips for uses in documentary films. No oppositions were filed against readoption. The petitions summarized the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience with regard to the exempted use. For example, Film Independent (''FI''), the International Documentary Association (''IDA''), Kartemquin Educational Films, Inc. (''KEF''), the Center for Independent Documentary (''CID''), and Women in Film and Video (''WIFV'') stated that TPMs such as encryption continue to prevent filmmakers from accessing needed material in a sufficiently high quality to satisfy demands of distributors and viewers. Petitioners state that they personally know many filmmakers who have found it necessary to rely on this exemption, and will continue to do so.

9g. Audiovisual Uses—Derivative Uses—Noncommercial Remix Videos

Two organizations petitioned to renew the subpart of the exemption covering the use of motion picture clips for uses in noncommercial videos. No oppositions were filed against readoption. The petitions demonstrated the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience with regard to the exempted use. For example, the Organization for Transformative Works (''OTW'') has advocated for the noncommercial video exemption in past triennial rulemakings, and has heard from a number of noncommercial remix artists who have used the exemption and anticipate needing to use it in the future. Similarly, New Media Rights (''NMR'') stated that it has spoken to a number of noncommercial video creators who have relied on this exemption, and intend to do so in the future.

Accordingly, the Acting Register recommends renewal of this exemption, including all of its subparts, and will

consider proposed expansions below in the discussion on Proposed Class 1.

*B. New or Expanded Designations of Classes*

Based upon the record in this proceeding regarding proposed expansions to existing exemptions or newly proposed exemptions, the Acting Register recommends that the Librarian determine that the following classes of works be exempt from the prohibition against circumvention of technological measures set forth in section 1201(a)(1):

1. Proposed Class 1: Audiovisual Works—Criticism and Comment [44]

Several petitions sought expansion of the existing exemption for circumvention of access controls protecting "short portions" of motion pictures on DVDs, Blu-Ray discs, and digitally transmitted video for purposes of criticism and comment by various users, including creators of noncommercial videos, college and university faculty and students, faculty of MOOCs, documentary filmmakers, and for nonfiction multimedia e-books offering film analysis. With the exception of one petition, proponents sought to keep the limitation to circumvention for uses of "short portions" of motion pictures, which the Register has previously found to be "integral" in recommending the current exemption. The proposed expansions implicate the same types of TPMs regardless of proposed noninfringing use, namely CSS-protected DVDs, AACS-protected Blu-ray discs, and various TPMs applicable to online distribution services. Because the new proposals raised some shared concerns, including the impact of TPMs on the alleged noninfringing uses of motion pictures and whether alternative methods of accessing the content could alleviate potential adverse impacts, the Office grouped these petitions into one class. This approach also accounted for a petition which proposed an "overarching exemption that would embrace multiple audiovisual classes" and collapse (essentially) all of the subparts in the existing exemption to eliminate limitations on the types of user or use—and instead allow circumvention so long as the purpose is for criticism and comment.

Screen-Capture Technology

For several of the activities it covers, the current exemption expressly permits the use of screen-capture technology and also allows circumvention only where the user "reasonably believes that screen-capture software or other non-circumventing alternatives are unable to produce the required level of high-quality content." Here, proponents sought to remove references to screen-capture technology, arguing that it is not a viable alternative because it does not permit the proposed uses, or else results in degraded-quality (and thus unusable) content. Others contended that the dual references to screen-capture technology are confusing. In response, opponents argued that screen-capture technology remains an adequate alternative to circumvention.

In the 2015 rulemaking, the Register concluded that certain uses of motion picture clips for criticism and comment do not require access to higher-quality content, and that screen-capture technology may be an alternative to circumvention—but that it can be unclear to users as to whether screen-capture technology may in fact involve circumvention. Accordingly, in this rulemaking the Acting Register recommended retaining a screen-capture provision for these categories to address the possibility of circumvention when using this technology. In addition, the Acting Register found it appropriate to continue to distinguish between purposes requiring high-quality motion picture clips and more general purposes that do not.

AACS2 Technology

Opponents argued that the exemption should not be expanded to include AACS2 technology, which is employed to protect ultra-high-definition or "4K" content distributed on Ultra HD Blu-ray discs. Opponents maintained that none of the petitions expressly sought extension to AACS2, and that the current exemption does not extend to AACS2 on Ultra HD Blu-ray discs, as that technology did not exist at the time of the 2015 rulemaking. In response, proponents asserted that the Acting Register should extend the proposed exemption to AACS2 technology because although AACS2 is different in form, it is fundamentally the same in function.

The Acting Register found the record insufficient to support extending the proposed class to AACS2. Her analysis of this proposed exemption thus addressed only TPMs employed on DVDs and Blu-ray discs, and by various online streaming services to protect motion pictures.

a. Single Overarching Exemption for Purposes of Comment and Criticism

EFF, NMR, and OTW proposed permitting circumvention to make use of motion picture excerpts so long as the purpose is for criticism and comment. They did not provide specific examples of proposed noninfringing uses or analyze such proposed uses under the 1201 statutory factors, but rather focused on "the value of adopting a simple overarching exemption that would embrace multiple audiovisual classes" for purposes of criticism and comment. EFF, NMR, and OTW asserted that the existing language is "practically unreadable" due to their complexities, and "a challenge for clients and attorneys alike to apply in practice."

Opponents contended that the petition to create a single overarching exemption overstates the complexity of the existing exemption, and that the proposed expansion would eliminate carefully drawn distinctions among potential users of motion picture content. Opponents also asserted that to be appropriately narrow, exemptions should identify the specific persons who will be adversely affected in their abilities to make noninfringing uses by the section 1201 prohibition.

NTIA opposed the removal of all limitations on the types of user or use, concluding that "eliminating all of the categories of specific users . . . would stray too far from the statutory requirement of specificity."

The Acting Register declined to recommend adopting EFF, NMR, and OTW's proposed language, finding it overly broad for purposes of section 1201, and inconsistent with the rulemaking record upon which the current exemption has been adopted. She noted that courts evaluate fair use claims on a case-by-case basis, and the context in which use of the work is being made is part of that inquiry (*e.g.*, commercial versus noncommercial use). She found that the proposed language would eliminate these legally important distinctions.

b. Universities and K–12 Educational Institutions

BYU filed a petition to create a single consolidated exemption that would permit circumvention for nonprofit educational purposes in accordance with sections 110(1) and 110(2) of the Copyright Act. BYU proposed eliminating the "criticism and comment" limitation, references to screen-capture technology, and distinctions based on education level and type of educational course.

Opponents argued that although section 110(1) allows certain public

[44] The Acting Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 31–89.

performances of complete motion pictures in classrooms without obtaining licenses, it does not allow those performances to be made from unauthorized copies. Opponents also noted that sections 110(1) and 110(2) provide exceptions only to the public performance and display rights, not to the rights of reproduction or distribution, and that therefore they would not fully cover the proposed uses, which involve making and ''librarying'' copies of full-length films.

NTIA recommended allowing circumvention for colleges and universities to make use of entire motion pictures. In its view, the storage of a copy ''in a central secured server available only for transmission to the institution's classrooms'' is ''not fundamentally different from the uses allowed by the existing exemption'' for purposes of analyzing whether the activity is a fair use.

The Acting Register concluded that section 110 cannot, by itself, establish that BYU's proposed activities are noninfringing because any performances of motion pictures under sections 110(1) and 110(2) must originate from lawfully acquired copies. The Acting Register thus evaluated whether the copies made and used to facilitate the proposed motion picture performances were themselves noninfringing under section 112(f) and/or the fair use doctrine. The Acting Register determined that on its face, section 112(f) does not permit nonprofit educational institutions to make copies to facilitate performances under section 110(1). She found, however, that section 112(f) does support a conclusion that making and temporarily storing digital copies of motion pictures to perform ''reasonable and limited portions'' in distance teaching would be noninfringing, assuming the other requirements of section 110(2) are met. But she determined that such activity appears to be already covered by the existing exemption.

Regarding the use of short motion picture clips in face-to-face teaching, the Acting Register concluded that the record demonstrates that a significant number of the proposed uses are likely to be fair, such as using short film clips to create compilations from foreign language films with and without subtitles. By contrast, based on the relevant case law, the Acting Register could not conclude as a general matter that the contemplated uses of full-length motion pictures are likely to be fair. She found that DVD and Blu-ray players are still widely available on the market and that extending the exemption to such uses could undermine the value of the market for works in those formats. She noted that, although institutions may incur a cost in re-purchasing digital versions of audiovisual works, the section 1201 exemption process is not meant to guarantee consumers the ability to access content through their preferred method or format.

Ultimately, the Acting Register recommended an expansion that allows K–12 and university faculty and students to engage with motion picture excerpts of high quality in contexts other than courses requiring close analysis of film excerpts, as well as for teaching or scholarship more generally. Based upon additional examples provided in this rulemaking cycle, the Acting Register recommended that the exemption retain the requirement that a person must reasonably believe that non-circumventing alternatives are unworkable, but remove the references to ''film studies or other courses requiring close analysis'' and eliminate distinctions between K–12 and universities and colleges, as well as between faculty and students. The Acting Register recommended, however, that the exemption require K–12 students to act under the direct supervision of K–12 educators.

c. Massively Open Online Courses (''MOOCs'')

Professors Decherney, Sender, Carpini, and DCSUM requested an expansion to allow faculty of MOOCs to circumvent for ''all online courses'' (*i.e.,* remove the limitation to ''film studies or other courses requiring close analysis of film and media excerpts''), and for MOOCs offered by unaccredited and for-profit educational institutions. They maintained that without expanding the exempted use of MOOCs, there would be no ability for unaccredited, for-profit, or for-credit online educational offerings to use motion picture clips in MOOCs without licensing. They also argued that because the motion picture clips in this context would be used exclusively for educational purposes, such use would be unlikely to harm the market for motion pictures.

Opponents argued that proponents failed to support their assertion that including for-profit and unaccredited educational institutions likely constitutes fair use, and that the record lacked any examples of for-profit or unaccredited educational institutions wanting, but unable, to offer MOOCs, suggesting the expansion would cover only speculative uses.

Based on its review of the record, NTIA recommended expansion to for-profit educational institutions, but not to unaccredited educational institutions.

The Acting Register concluded that the record lacked examples sufficient to evaluate or recommend expansion to for-profit or unaccredited educational institutions, and did not demonstrate that section 1201 is inhibiting the use of motion pictures in online education offered by for-profit and/or unaccredited educational institutions. The Acting Register also found that proponents' broadly framed proposal seeking to encompass ''all online courses'' would seemingly encompass any online video that could be characterized as an educational experience. The Register therefore recommended that the MOOCs language from the existing exemption be readopted without substantive changes.

d. Filmmaking

FI, IDA, and KEF sought expansion of the current exemption to permit circumvention for use of motion picture clips in all types of films (*i.e.,* remove the ''documentary'' limitation), a request rejected by the Register in 2015. Proponents argued that the exemption should be expanded because defining a ''documentary'' film is difficult, as many films that are not traditionally classified as a ''documentary'' use motion picture excerpts to engage in educational and social commentary. Proponents also asserted that many filmmakers do not know whether they are permitted to use the exemption.

The 2015 rulemaking identified fair use as the noninfringing basis for this exemption, and the Acting Register evaluated the proposed expansion on the same grounds. Proponents provided multiple examples of non-documentary films using short motion picture clips for parody or for the clip's biographical or historical significance, ostensibly to provide criticism or commentary. Proponents also disputed that either clips created using non-circumventing screen capture technology, or clips obtained via licensing are viable alternatives for the proposed uses, and argued that expansion of the exemption to non-documentaries would not affect the market for motion pictures.

Opponents maintained that proponents failed to develop a record of likely noninfringing uses to support extension of the exemption to non-documentary films. Opponents also argued that the proposed uses would negatively impact the clip licensing market for motion pictures, and that licenses are readily available for using short portions of motion pictures. Opponents further contended that screen-capture technologies serve as valid alternatives to circumvention.

NTIA concluded that the existing exemption should be expanded to all

films. It maintained that the record supports a finding that in many instances the use of short portions of motion pictures is likely a noninfringing fair use and that opponents failed to demonstrate the expansion to non-documentaries would cause market harm.

Based on the extensive record, the Acting Register recommended that the existing exemption for documentary films be expanded to include a subset of fictional (*e.g.,* narrative) films for purposes of criticism and comment, where the clip is used for parody or its biographical or historically significant nature. She concluded this limitation would best reflect the examples in the record, many of which appear to involve the use of clips for purposes of criticism and comment, while preserving the requirement that filmmakers continue to seek authorization before using excerpts for general storytelling uses. The Acting Register found that the use of small portions of films for these purposes is consistent with principles of fair use and is unlikely to supplant the market for motion pictures, but cautioned that filmmakers would continue to need to obtain authorization for uses of clips outside of these uses.

e. Multimedia E-Books

The Authors Alliance, AAUP, OTW, the Interactive Fiction Technology Foundation, and Professor Buster (collectively, "Authors Alliance et al.") sought expansion of the current exemption to permit circumvention for use of motion picture clips in all nonfiction multimedia e-books by removing the "offering film analysis" limitation. Authors Alliance et al. also sought expansion to fictional multimedia e-books and removal of references to screen-capture technology.

The 2015 rulemaking identified fair use as the noninfringing basis for this exemption, and the proposed expansion was evaluated on the same grounds. Proponents asserted that the uses of clips for comment or criticism in nonfiction multimedia e-books beyond those offering film analysis, as well as fictional multimedia e-books, are transformative and thus fair. Proponents also argued that expansion will not negatively impact the market for or value of copyrighted works. Proponents asserted that screen capture is an inadequate alternative to circumvention and that licensing remains an unworkable alternative due to high fees, difficulties in locating the rightsholders, and the delays caused by protracted negotiations.

In response, opponents argued that the record lacked evidence of actual use of a motion picture clip in a fictional e-book or in an "other nonfiction" e-book, and that in the absence of actual use, evaluating the proposal is all but impossible. Regarding nonfictional uses, opponents asserted that many of the alleged additional uses would qualify under the current "film analysis" limitation. As to fictional uses, opponents maintained that the creation of fan fiction multimedia e-books would frequently infringe the right to prepare derivative works. Opponents also asserted that as with the proposed filmmaking expansion, there will be harm to the clip licensing market if the proposed e-books uses are exempted.

NTIA recommended expanding the exempted use to include all nonfiction multimedia e-books (*i.e.,* eliminating the "offering film analysis" limitation), but did not recommend expansion to fictional multimedia e-books.

The Acting Register found that the record failed to establish that the proposed uses in fictional e-books would likely be noninfringing, and thus she did not recommend expanding the exemption to such works. She did find, however, that the record supported expansion to all nonfiction multimedia e-books. Such an expansion, she concluded, is unlikely to harm, and may increase, the availability of copyrighted works. In addition, the Acting Register found that the proposed uses will facilitate criticism, comment, teaching and/or scholarship, and that they are unlikely to substitute for the original work in the marketplace.

f. Conclusion for Class 1

Accordingly, the Acting Register recommends that the Librarian adopt the following exemption:

Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, and the person engaging in circumvention under paragraph (b)(1)(i) and (b)(1)(ii)(A) and (B) of this section reasonably believes that non-circumventing alternatives are unable to produce the required level of high-quality content, or the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, where circumvention is undertaken solely in order to make use of short portions of the motion pictures in the following instances:

(i) For the purpose of criticism or comment:

(A) For use in documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature;

(B) For use in noncommercial videos (including videos produced for a paid commission if the commissioning entity's use is noncommercial); or

(C) For use in nonfiction multimedia e-books.

(ii) For educational purposes:

(A) By college and university faculty and students or kindergarten through twelfth-grade (K–12) educators and students (where the K–12 student is circumventing under the direct supervision of an educator), including of accredited general educational development (GED) programs, for the purpose of criticism, comment, teaching, or scholarship;

(B) By faculty of massive open online courses (MOOCs) offered by accredited nonprofit educational institutions to officially enrolled students through online platforms (which platforms themselves may be operated for profit), in film studies or other courses requiring close analysis of film and media excerpts, for the purpose of criticism or comment, where the MOOC provider through the online platform limits transmissions to the extent technologically feasible to such officially enrolled students, institutes copyright policies and provides copyright informational materials to faculty, students, and relevant staff members, and applies technological measures that reasonably prevent unauthorized further dissemination of a work in accessible form to others or retention of the work for longer than the course session by recipients of a transmission through the platform, as contemplated by 17 U.S.C. 110(2); or

(C) By educators and participants in nonprofit digital and media literacy programs offered by libraries, museums, and other nonprofit entities with an educational mission, in the course of face-to-face instructional activities, for the purpose of criticism or comment, except that such users may only circumvent using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted.

2. Proposed Class 2: Audiovisual Works—Accessibility [45]

Proposed Class 2 would allow circumvention of technological measures protecting motion pictures (including television shows and videos) on DVDs, Blu-ray discs, and via digital transmissions, for disability services professionals at educational institutions to create accessible versions for students with disabilities by adding captions and/or audio description.[46] Proponents

[45] The Acting Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 89–111.

[46] "Captioning" is "the process of converting the audio content" of audiovisual material, such as a motion picture, "into text and displaying the text on a screen, monitor, or other visual display system." Nat'l Ass'n of the Deaf, *What is*

explained that nearly all educational institutions are subject to disability laws such as the Americans With Disabilities Act ("ADA"), section 504 of the Rehabilitation Act ("Section 504"), and the Individuals With Disabilities Education Act ("IDEA"), which require accommodations for students with disabilities. Proponents maintained that creating accessible versions by adding captions and/or audio description is necessary because inaccessible motion pictures remain prevalent in the video industry, and copyright owners fail to retroactively make motion pictures accessible or grant permission to disability services offices to make those works accessible, even when contacted directly.

Proponents asserted that adding captions and/or audio description to motion pictures for the purpose of making them accessible to students with disabilities constitutes fair use based on the legislative history of section 107. Proponents also argued that viable alternatives to circumvention do not exist, and that not allowing circumvention will negatively affect the market for the copyrighted motion pictures because educational institutions will not use content that they cannot easily convert into an accessible format.

In response, opponents noted that while accessibility is an important issue, the proposed class was too broad because it did not take into account the extent to which DVDs and Blu-ray discs already include closed captions and audio description. They argued that the result of altering a motion picture—such as by adding captioning and/or audio description—is likely a derivative work that involves a creative interpretation of the underlying work. Opponents generally contended that the wide availability of versions with captioning and/or audio description already in the market constitutes a viable alternative to circumvention.

NTIA recommended that the proposed exemption allow "disability services offices and equivalent units" to "circumvent TPMs on audiovisual works in educational settings to add accessibility features" to motion pictures, including "through the provision of closed and open captions and audio description." In agreement with the Acting Register, NTIA believes that the exemption should apply "regardless of grade level" of the student, and apply to both nonprofit and for-profit educational institutions required to make motion pictures accessible to students under disability laws.

The Acting Register concluded that an exemption should be granted, with a few adjustments to the language outlined in the petition. She recommended that the exemption permit circumvention where the accessible version is created as a necessary accommodation for a student or students with disabilities under a federal or state disability law, such as the ADA, IDEA, or Section 504. In addition, the Acting Register recommended that the exemption apply to for-profit and nonprofit educational institutions, as well as to K–12 institutions, colleges, and universities, because they are subject to such disability laws. The Acting Register also recommended that the exemption allow circumvention only after the educational institution has conducted a reasonable market check and determined that an accessible version is not available, not available at a fair price, or not available in a timely way. The record suggested that these searches are already occurring, and that regardless of whether a decision is made to create an accessible version, outsource the creation of an accessible version, or purchase an accessible version, the educational institution would incur a cost. In this way, the market check requirement seeks to prevent copies being made of works already available in accessible formats, while encouraging the motion picture industry to further expand the availability of accessible versions in the marketplace. Finally, the recommended exemption requires the accessible versions to be provided to students and stored by the educational institution in a manner that reasonably prevents unauthorized further dissemination of the work.

Accordingly, the Acting Register recommends that the Librarian adopt the following exemption:

(i) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, where:

(A) Circumvention is undertaken by a disability services office or other unit of a kindergarten through twelfth-grade educational institution, college, or university engaged in and/or responsible for the provision of accessibility services to students, for the purpose of adding captions and/or audio description to a motion picture to create an accessible version as a necessary accommodation for a student or students with disabilities under an applicable disability law, such as the Americans With Disabilities Act, the Individuals with Disabilities Education Act, or Section 504 of the Rehabilitation Act;

(B) The educational institution unit in paragraph (b)(2)(i)(A) of this section has, after a reasonable effort, determined that an accessible version cannot be obtained at a fair price or in a timely manner; and

(C) The accessible versions are provided to students or educators and stored by the educational institution in a manner intended to reasonably prevent unauthorized further dissemination of a work.

(ii) For purposes of this paragraph (b)(2), "audio description" means an oral narration that provides an accurate rendering of the motion picture.

3. Proposed Class 5: Computer Programs—Unlocking [47]

Proposed Class 5 would expand an existing exemption for activity known as "unlocking," that is, circumvention of access controls on computer programs for the purpose of enabling a wireless device to connect to a different mobile network provider. The Copyright Office has received petitions to permit the unlocking of cellphones since 2006. In 2015, as directed by the Unlocking Consumer Choice and Wireless Competition Act ("Unlocking Act"),[48] the Register considered whether to expand the exemption to additional categories of wireless devices. Based on the record in that proceeding, the Register recommended, and the Librarian granted, an exemption covering cellphones, all-purpose tablet computers, portable mobile connectivity devices such as mobile hotspots, and wearable devices such as smartwatches or fitness devices.

The current exemption also is limited to used devices, *i.e.* those previously activated on a wireless carrier. First adopted in 2010, this limitation was implemented in response to concerns raised by wireless carriers engaged in the business of selling cellphones at substantially discounted prices and recouping that investment through the sale of prepaid wireless service. These companies feared that including new

*Captioning?*, NAD.ORG, *https://www.nad.org/resources/technology/captioning-for-access/what-is-captioning/* (last visited Oct. 2, 2018). By contrast, "audio description" is a narration added to the soundtrack of audiovisual material, such as a motion picture, to describe significant visual details (*e.g.*, descriptions of new scenes, settings, costumes, body language) for individuals with sight impairments. Am. Council of the Blind, *The Audio Description Project*, ACB.ORG, *http://www.acb.org/adp/ad.html* (last visited Oct. 2, 2018). Audio description may also be referred to as "video description" or "descriptive narration." *Id.*

[47] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 145–63.

[48] Public Law 113–144, 128 Stat. 1751 (2014).

phones in the class could foster illegal trafficking activity, which involves "the bulk purchase of unused handsets that have been offered for sale at subsidized prices . . . and then unlocking and reselling those unlocked handsets for a profit." [49]

In this proceeding, ISRI petitioned for expansions that would (1) remove the enumerated device categories and instead permit circumvention to unlock "any wireless device"; and (2) eliminate the requirement that a wireless device be "used." As to the limitation on devices, proponents argued that the owner of any connected device should be able to transfer it to the carrier of his or her choice. Proponents warned that the rapid pace of innovation within the Internet of Things industry makes it impossible to predict the specific categories of wireless devices that consumers may need to unlock. Regarding the "used" limitation, proponents argued that illegal trafficking does not implicate copyright interests and that concerns about such activity therefore are outside the proper scope of this rulemaking. Proponents further suggested that, in contrast to 2015, there now exists a need to unlock unused devices, offering examples of corporations acquiring excess devices that are never activated but that they later seek to recycle. The Office received no comments opposing either of these requested expansions.

NTIA recommended granting both aspects of the petition. As it did in 2015, NTIA concluded that "proponents have provided sufficient evidence to demonstrate that circumvention of TPMs on all lawfully acquired wireless devices is a noninfringing use." In its view, the statutory prohibition "limits consumer choice of wireless network providers, limits recyclers' ability to recycle or resell wireless devices, and limits competition between wireless network providers." NTIA also concluded that proponents met their burden with respect to unused devices, pointing to evidence that since 2015, "business practices have changed, resulting in a need for bulk and individual unlocking of new wireless devices." NTIA proposes replacing the term "used" in the exemption with the phrase "lawfully acquired."

The Acting Register recommended expanding the exemption to unused devices falling within the categories listed in the current exemption. She concluded that unlocking such devices is likely noninfringing under section 117(a) of the Copyright Act for the same reasons noted in the 2015 Recommendation with respect to used devices. She further found that unlocking such devices is likely a fair use, regardless of whether the devices are new or used. With respect to potential cellphone trafficking, the Acting Register found that although such activity limits the network provider's ability to sell devices at a discount, there were no allegations relating to trafficking raised in this proceeding, and it is not clear that the economic harm caused by that activity affects the value of the computer programs allowing devices to connect to wireless networks. She further noted that other causes of action, such as unfair competition or unjust enrichment, may be available to address injury to non-copyright interests. In addition, the Acting Register concluded that absent an exemption, users are likely to be adversely affected in their ability to unlock unused devices of these types. She found that extending the exemption to such devices will increase the availability of the software within them and that the record lacked evidence that doing so would harm the market for copyrighted works.

The Acting Register therefore recommended removal of the provision in the current exemption requiring that a covered device be "used." Consistent with NTIA's recommendation, she proposed adding language requiring that such a device be "lawfully acquired." Because the regulations implementing the Unlocking Act already require that circumvention under this exemption be initiated by the "owner" of the relevant device or by a person or service provider at the direction of the owner, the Acting Register views this as a technical, rather than a substantive, change.[50]

The Acting Register determined, however, that the record was insufficient to support expanding the exemption to additional types of wireless devices. As in 2015, she found the record too sparse to support a finding that unlocking wireless devices of all types is likely to be a fair use. Proponents did provide evidence regarding three specific categories of devices: Home security devices, agricultural equipment, and vehicle GPS trackers. Based on the record, the Acting Register concluded that these devices are similar to those covered by the current exemption in relevant respects, and that unlocking them therefore is likely to be a fair use. But she concluded that proponents failed to establish that they are, or are likely to be, adversely affected by section 1201 in their ability to unlock these types of devices. Proponents did not demonstrate that it would be possible to connect these devices to an alternate wireless network even if an exemption were granted. The Acting Register thus found that they failed to carry their burden to show actual or likely adverse effects resulting from the bar on circumvention. She therefore declined to recommend removal of the exemption's enumerated device categories.

Accordingly, the Acting Register recommends that the Librarian adopt the following exemption:

Computer programs that enable the following types of lawfully acquired wireless devices to connect to a wireless telecommunications network, when circumvention is undertaken solely in order to connect to a wireless telecommunications network and such connection is authorized by the operator of such network:

(i) Wireless telephone handsets (*i.e.*, cellphones);

(ii) All-purpose tablet computers;

(iii) Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and

(iv) Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.

4. Proposed Class 6: Computer Programs—Jailbreaking [51]

Proposed Class 6 would expand an existing exemption for activity known as "jailbreaking"—that is, the process of gaining access to the operating system of a computing device to install and execute software that could not otherwise be installed or run on that device, or to remove pre-installed software that could not otherwise be uninstalled. An existing exemption permits the jailbreaking of smartphones and portable all-purpose mobile computing devices. In this proceeding, EFF filed a petition seeking to expand the current exemption by: (1) Adding voice assistant devices, such as the Amazon Echo and Google Home, to the categories of devices covered by the exemption; and (2) allowing jailbreaking not only to install, run, or remove software, but also for the purpose of enabling or disabling hardware features of the relevant device.

In proponents' view, the fair use analysis relied upon by the Register in recommending the previous jailbreaking exemptions is equally applicable in the context of voice assistant devices. Moreover, regarding the 1201 statutory factors, proponents argued that a

[49] 2015 Recommendation at 145.

[50] 37 CFR 201.40(c) (2016).

[51] The Acting Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 163–85.

jailbreaking exemption will have either no effect or a positive effect on the availability of copyrighted firmware and application software.

Opponents principally argued that jailbreaking is likely to enable voice assistant devices to access pirated content. Opponents asserted that piracy concerns are greater in the context of voice assistant devices than in that of other devices, as the former are relatively simple devices that do not incorporate the same "hardware and software complexity" that exists in personal computers, and therefore they provide more limited security options. Opponents further suggested that jailbreaking would facilitate the installation of counterfeit apps and apps that enable unauthorized access to copyrighted content. Opponents challenged the contention that jailbreaking is necessary to promote the development of new applications.

NTIA recommended granting the exemption in the form requested by proponents.

It agreed that jailbreaking voice assistant devices is unlikely to harm the market for copyrighted works, noting that there is no evidence of market harm for the devices covered by the current exemption. NTIA rejected opponents' argument about unauthorized access to entertainment content on the ground that it "fail[s] to explain why infringement is more likely on voice assistant platforms than on smartphones, tablets, and other devices already subject to the exemption." NTIA further concluded that proponents had demonstrated that users in this class are adversely affected by the statutory prohibition.

The Acting Register found that proponents met their burden of showing that jailbreaking voice assistant devices within the meaning of the current exemption is likely to be a fair use. She concluded that the record failed to show that the prior jailbreaking exemptions have harmed the market for firmware in smartphones or all-purpose mobile devices, and that nothing in the record suggests that a different conclusion is warranted for voice assistant devices. Additionally, the Acting Register found the record insufficient to establish that an expanded exemption is likely to harm the market for copyrighted works streamed to voice assistant devices. While acknowledging that piracy of streamed content is a highly significant concern, the evidence was insufficient to conclude that allowing jailbreaking of voice assistant devices created a greater risk of unauthorized access to streaming content than exists with respect to other devices, and suggested that subscription streaming services typically control access to their content with TPMs separate from those protecting the firmware. The Acting Register thus recommended adoption of an exemption authorizing the jailbreaking of voice assistant devices, which must be "designed to take user input primarily by voice." The recommended exemption excludes video game consoles, set-top boxes, DVD and Blu-Ray players, and similar devices that typically are operated using buttons. To address opponents' serious concerns over the potential use of jailbroken devices as platforms for unauthorized content, the Acting Register recommended including language expressly excluding circumvention undertaken for purpose of accessing such material.

Accordingly, the Acting Register recommends that the Librarian adopt the following exemption:

Computer programs that enable voice assistant devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the device, or to permit removal of software from the device, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For purposes of this paragraph (b)(8), a "voice assistant device" is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is designed to take user input primarily by voice, and is designed to be installed in a home or office.

5. Proposed Class 7: Computer Programs—Repair[52]

Several organizations petitioned to expand the current exemption allowing for circumvention of access controls controlling the functioning of motorized land vehicles for purposes of diagnosis, repair, or lawful modification of a vehicle function to allow an additional range of activities. The Office synthesized these suggestions into Proposed Class 7. Although the commenters' proposals varied in scope, and there was no singular unified proposed exemption, the Acting Register grouped them into the following four categories:

(1) Removing the current limitation prohibiting circumvention of TPMs to access computer programs primarily designed for the control of vehicle telematics and entertainment systems;

(2) expanding the exemption to apply to other types of software-enabled devices, including appliances, computers, toys, and other Internet of Things devices;

(3) extending the exemption to allow circumvention by third-party service providers, and in particular, independent vehicle repair shops, for purposes of diagnosis, repair, and lawful modification; and

(4) allowing the acquisition, use, and dissemination of circumvention tools in furtherance of diagnosis, repair, and modification.

The Acting Register first considered proposed expansions within the context of motorized land vehicles, and then addressed expansion of the exemption to other types of devices.

Regarding motorized land vehicles, proponents asserted that diagnosis, repair, and lawful modification of vehicle telematics and entertainment systems are fair uses and noninfringing under section 117. Proponents contended that, because these systems are increasingly integrated with functional vehicle firmware, access is necessary to engage in diagnosis, repair, and lawful modification of vehicle functions—activities the Register found to be likely noninfringing in recommending the existing exemption. Proponents sought access to telematics systems in order to obtain diagnostic data for the same purposes. Proponents asserted that vehicle firmware is "effectively useless" outside of the vehicle, with essentially no separate market for the software apart from the vehicles. In addition, proponents suggested users should be permitted to access "storage capacity" in vehicle entertainment systems, and to repair infotainment/entertainment modules.

In response, opponents contended that the proposed activities are not favored under fair use because access to entertainment and telematics systems could allow unauthorized access to expressive content. Opponents asserted that telematics and entertainment firmware have value apart from a vehicle, and may be paid for on a continuing basis separate from the vehicle purchase. Opponents also argued that circumvention of telematics is unnecessary because diagnostic data is still available through the onboard diagnostics port and, further, a nationwide Memorandum of Understanding requires manufacturers to make this data available to vehicle owners and independent repair shops.

Commenters seeking to expand the exemption to allow diagnosis, repair, and modification of other software-enabled devices likewise asserted that these activities are noninfringing under the fair use doctrine and section 117. The Acting Register considered these

[52] The Acting Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Recommendation at 185–231.

arguments for those types of devices cognizably reflected in the record, namely home appliances, smartphones, video game consoles, computers and ancillary or peripheral computing devices, and consumables, plus a few examples of specific additional devices.

Opponents maintained that repair of these devices is not a transformative use because it merely causes a device to be used for the same purpose for which it was originally intended. In some cases, opponents also suggested that once the firmware on some devices is accessed, even for repair, it is compromised such that it can no longer prevent piracy; and consequently, these uses diminish the value of and market for the devices and other creative works. Regarding repair of video game consoles specifically, opponents expressed concern that circumvention of TPMs creates the risk of unauthorized access to content and piracy.

Concerning third-party assistance, several proponents requested that the exemption specifically permit third parties, such as repair services, to assist owners in carrying out the authorized activities. Alternatively, proponents suggested removing the current exemption language requiring that circumvention be "undertaken by the authorized owner" of the vehicle. Regarding circumvention tools, proponents asked the Office to recommend language that would allow exemption beneficiaries, including third parties, to not only make, use, and acquire tools, but also to distribute them. Opponents contended that the proposals concerning third-party assistance and circumvention tools would impermissibly expand the exemption to activity that would constitute unlawful trafficking in violation of sections 1201(a)(2) and (b).

NTIA supported expanding the exemption to a "new definable sub-class" of home appliances and mobile handsets (such as cell phones) "when circumvention is a necessary step to allow the diagnosis, repair, or lawful modification of a device function." NTIA concluded that these are noninfringing fair uses, in part because "diagnosis is a critical component of repairing a device" and subsequent modification of devices is transformative. With respect to vehicles, NTIA supported expanding the existing exemption to allow "use of telematics data for diagnostic purposes." It recommended, however, "limiting use to obtaining the *diagnostic* data from the telematics module for purposes of repair and modification of the vehicle, and not repair or modification to the module itself." As to vehicle entertainment systems, NTIA "continue[d] to have reservations about the strength of [the] record and the potential for infringement" and did not recommend an expansion to permit access for the proposed uses, including "storage capacity."

NTIA further recommended removing the current exemption's reference to "the authorized owner of the vehicle"—a change that it characterizes as "extending the current exemption to allow third-party service providers to diagnose, repair and modify software-enabled vehicles on behalf of owners." But NTIA recommended denying the proposals to "permit third-party commercialization of software repair tools for vehicles in this class," concluding that such activity is "likely to constitute trafficking."

The Acting Register recommended expanding the current exemption in areas where there was sufficient record support for such a change, while retaining language to ensure that both the class of works and the permitted uses are appropriately defined. As a result, the Acting Register recommended two separate exemptions, one relating to motorized land vehicles, and one related to the repair and maintenance of additional categories of devices.

Regarding motor vehicles, the recommended exemption removes the requirement that circumvention be "undertaken by the authorized owner" of the vehicle, instead providing that it apply where such items are "lawfully acquired." This change responds to proponents' concerns that the language of the existing exemption improperly excludes other users with a legitimate interest in engaging in noninfringing diagnosis, repair, or modification activities. The Acting Register expressed no view on whether particular types of third-party assistance may or may not implicate the anti-trafficking provisions. Those provisions, found in section 1201(a)(2) and (b), are unchanged and must be separately analyzed to determine whether third-party assistance would be permissible.

The Acting Register also recommended removing the language excluding access to computer programs designed for the control of telematics or entertainment systems. The Acting Register was persuaded that, due to increasing integration of vehicle computer systems since the 2015 rulemaking, retaining this limitation may impede noninfringing uses that can only be accomplished by incidentally accessing these systems. Nonetheless, the Acting Register credited opponents' concerns about unauthorized access to expressive works through subscription services unrelated to vehicle functioning, and accordingly the recommended exemption specifically excludes access to "programs accessed through a separate subscription service." While the broadened exemption permits incidental access to a vehicle infotainment system, it provides that such access is allowed only to the extent it is "a necessary step to allow the diagnosis, repair or lawful modification of a vehicle function" and includes the additional requirement that circumvention may not be "accomplished for the purpose of gaining unauthorized access to other copyrighted works." Because the Acting Register found the record insufficient to support expanding the exemption to permit diagnosis, repair, or lawful modification of the telematics and infotainment systems themselves, the regulatory language does not extend to those activities.

In addition, the Acting Register recommended a new exemption allowing for the circumvention of TPMs restricting access to firmware that controls smartphones and home appliances and home systems for the purposes of diagnosis, maintenance, or repair. In doing so, the Acting Register adopted the definitions of "maintenance" and "repair" in section 117(d). Here again, the recommended text includes the condition that circumvention not be "accomplished for the purpose of gaining unauthorized access to other copyrighted works." The Acting Register did not recommend extending this exemption to circumvention for purposes of modifying a device function, concluding that "modification" was not defined with sufficient precision to conclude as a general category it is likely to be noninfringing.

Accordingly, the Acting Register recommends that the Librarian adopt the following exemptions:

(1) Computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle such as a personal automobile, commercial vehicle or mechanized agricultural vehicle, except for programs accessed through a separate subscription service, when circumvention is a necessary step to allow the diagnosis, repair or lawful modification of a vehicle function, where such circumvention does not constitute a violation of applicable law, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works.

(2) Computer programs that are contained in and control the functioning of a lawfully

acquired smartphone or home appliance or home system, such as a refrigerator, thermostat, HVAC or electrical system, when circumvention is a necessary step to allow the diagnosis, maintenance or repair of such a device or system, and is not accomplished for the purpose of gaining access to other copyrighted works. For purposes of this paragraph (b)(10):

(i) The "maintenance" of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and

(ii) The "repair" of a device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.

6. Proposed Class 9: Computer Programs—Software Preservation [53]

Proposed Class 9 seeks to address concerns that TPMs applied to computer programs can interfere with legitimate preservation activities. The Software Preservation Network ("SPN") and the LCA filed a petition that would allow "libraries, archives, museums, and other cultural heritage institutions" to circumvent TPMs on "lawfully acquired software for the purposes of preserving software and software-dependent materials." SPN and LCA explained that the proposed exemption is intended to enable cultural heritage institutions to preserve both TPM-protected computer programs, as well as "dependent" materials—"writings, calculations, software programs, etc." stored in digital formats that are inaccessible without running the underlying program. Although proposed Class 9 constitutes a new exemption, proponents noted that the Register recommended, and the Librarian granted, exemptions for software preservation in 2003 and 2006, which allowed circumvention of access controls on computer programs and video games distributed in formats that have become obsolete and that require the original media or hardware as a condition of access. Proponents advanced three bases for finding their proposed activities to be noninfringing: (1) The fair use doctrine, (2) the section 108(c) exception for library and archival replacement copies, and (3) the section 117(a) exception for archival copies of computer programs.

Opponents contended that the proposal is overbroad because (1) the exemption would improperly allow circumvention for activities beyond those provided for in the section 108 exceptions for libraries and archives; (2) the term "computer program-dependent materials" might be read to sweep in any category of copyrightable work; and (3) the term "other cultural heritage institutions" within the class of beneficiaries is undefined. Although opponents did not directly contest proponents' fair use arguments, they did assert that section 117(a)(2) does not protect proponents' activities.

NTIA supported adopting the proposed exemption. In its view, the class was appropriately defined because it was limited to "computer programs, to preservation uses, and to preservation-oriented institutional users." It agreed with proponents that the exemption should expressly refer to preservation of "computer program-dependent materials," concluding that "a user would not be able to access those materials without preserving the software protected by a TPM." It also agreed that the exemption should include video games, noting that proponents provided specific examples of games that may not be covered by the current preservation exemption. In addition, it found that there were no reasonable alternatives to circumvention, as the use of software with backwards compatibility "is inadequate and can distort the original work."

The Acting Register recommended granting an exemption that incorporates most of the substance of proponents' request, with certain changes to address opponents' concerns. First, the recommended language limits the eligible users to libraries, archives, and museums, as defined according to the criteria proposed in the Office's recent Section 108 Discussion Document.[54] The Acting Register declined to recommend including "other cultural heritage institutions" within the class of beneficiaries, finding that term to be undefined and potentially far-reaching. In addition, the Acting Register recommended that the exemption incorporate proponents' suggestion that the class be defined as computer programs "that have been lawfully acquired and that are no longer reasonably available in the commercial marketplace." The Acting Register also recommended that in lieu of including the phrase "computer program-dependent materials" as a defined term, the recommended exemption simply provide that circumvention is permitted for the purpose of "lawful preservation . . . of digital materials dependent upon a computer program as a condition of access." Finally, in response to concerns over having video game preservation governed by two separate exemptions, the Acting Register recommended that the portion of this class pertaining to video games be codified in the existing video game preservation exemption. Thus, the recommended exemption for Class 9 will cover computer programs other than video games, while an addition to the prior exemption for video games will provide for preservation of the video games addressed by this class (*i.e.*, those that do not require an external server for gameplay). Preservation of server-based games will continue to be governed by the recommended exemption for Class 8.

Accordingly, the Acting Register recommends that the Librarian adopt the following exemption:

(i) Computer programs, except video games, that have been lawfully acquired and that are no longer reasonably available in the commercial marketplace, solely for the purpose of lawful preservation of a computer program, or of digital materials dependent upon a computer program as a condition of access, by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the program is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) For purposes of the exemption in paragraph (b)(13)(i) of this section, a library, archives, or museum is considered "eligible" if—

(A) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives or museum;

(B) The library, archives, or museum has a public service mission;

(C) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(D) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(E) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by this paragraph (b)(13).

8. Proposed Class 8: Computer Programs—Video Game Preservation [55]

Class 8 proponents sought expansion of the provisions in the existing

[53] Because the issues in this class are relevant to the analysis in Proposed Class 8, which pertains specifically to video games, the Acting Register addresses this class first. The Acting Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 231–56.

[54] *See* U.S. Copyright Office, Section 108 of Title 17 51 (2017), *https://www.copyright.gov/policy/section108/discussion-document.pdf.*

[55] The Acting Register's analysis and conclusions for this class, including citations to the record and

Continued

exemption that allows eligible institutions to circumvent access controls to preserve video games for which external server support has been discontinued. As explained in the 2015 rulemaking, some video games require a network connection to a remote server operated by the game's developer before the video game can be accessed and played. When the developer takes such a server offline, a game can be rendered unplayable or limited to certain functions, such as single-player play or multiplayer play on a local network. The current exemption allows an eligible library, archives, or museum to circumvent this type of authentication mechanism to preserve lawfully acquired games in "complete" form, *i.e.,* those that can be played without accessing or reproducing copyrightable content stored or previously stored on an external computer server. The exemption requires that such games not be distributed or made available outside of the physical premises of the eligible institution.

The Museum of Art and Digital Entertainment ("MADE") filed a petition seeking to expand the exemption to allow for circumvention of access controls on video games that need to access creative content stored on a remote server, which MADE refers to as "online" games. MADE contended that the current exemption, while helpful, does not allow it to preserve the growing number of online video games for future generations to study. Proponents explained that libraries, archives, and museums cannot engage in certain preservation activities involving online games without either copying the game's server code or reconstructing that server's functionality, which would also require an exemption to circumvent TPMs on these works. MADE also sought to broaden the class of users of the exemption to include volunteer "affiliate archivists," who wish to circumvent access controls off-premises, but under the supervision of preservation entities.

Opponents objected to the proposed expansions, arguing that proponents' intended use of the video games is not a true preservation use. Instead, opponents contended that proponents wish to engage in recreational play that could function as a market substitute. In addition, the Entertainment Software Association expressed concern that the server copy proponents wish to recreate is an unpublished work that has never been distributed to the public. Overall, opponents contend that the proposed uses are infringing. Opponents also objected to the use of affiliate archivists, contending that there is a heightened risk of market harm if the public can circumvent access controls on video games in their own homes.

NTIA supported the adoption of an expanded exemption, but one narrower than that requested by proponents. It proposed an expansion to allow preservation "where the user uses the server component—while still not providing any substantial expressive content—for administrative tasks beyond authentication, including command and control functions such as tracking player progress, facilitating communications between players, or storing high scores." To accommodate these uses, it recommended regulatory language that would apply in situations where "all or nearly all of the audiovisual content and gameplay mechanics reside on the player or institution's lawfully acquired local copy of the game." NTIA did not, however, support adding an "affiliate archivist" user class, concluding that adding such a provision risks "introducing confusing language or suggesting that any such preservationists may not need to be answerable to the institutions for which they are volunteering."

The Acting Register found that the record supported granting an expansion in the relatively discrete circumstances where a preservation institution legally possesses a copy of a video game's server code and the game's local code. She concluded that in such circumstances, the preservation activities described by proponents are likely to be fair uses. She further found that proponents demonstrated that such uses would be adversely affected by the statutory prohibition absent an exemption. The record indicated that an exemption would enable future scholarship by enabling researchers to experience games as they were originally played and thereby better understand their design or construction. The Acting Register additionally found such activity unlikely to harm the market for video games.

The Acting Register did not, however, recommend an exemption to allow for instances where the preservation institution lacks lawful possession of the server software. She found the record insufficient to support a finding that the recreation of video game server software as described by proponents is likely to be a fair use. A number of scenarios described by proponents do not involve preserving server software that is already in an institution's collections, but instead appear to involve something more akin to *reconstructing* the remote server. She found that this activity distinguishes proponents' request from the preservation activity at issue in the case law upon which they relied. Moreover, she noted, the reconstruction of a work implicates copyright owners' exclusive right to prepare derivative works.

Additionally, the Acting Register concluded that the record did not support the addition of an "affiliate archivist" user class to the exemption, finding such activity unlikely to constitute fair use. She noted that both the proposed exemption language and the proponents' institutions' practices seemed to lack appropriate protective guidelines to govern such volunteers' use of copyrighted materials.

In light of the foregoing, the Acting Register recommended an exemption for "server-dependent games," defined as video games that can be played by users who lawfully possess both a copy of a game intended for a personal computer or video game console and a copy of the game's code that is stored or was previously stored on an external computer server. The Acting Register continues to recommend an exemption for "complete games," but proposed revising the exemption language to reflect that the exemption for "complete games" applies to both gamers and preservation uses, but the exemption for "server dependent games" applies only to preservation uses. In addition, for the reasons explained above in the discussion of Proposed Class 9, the Acting Register recommended adding a paragraph to the exemption in this class to accommodate preservation of non-server-based video games.

Accordingly, the Acting Register recommends that the Librarian adopt the following exemption:

(i) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, when the copyright owner or its authorized representative has ceased to provide access to an external computer server necessary to facilitate an authentication process to enable gameplay, solely for the purpose of:

(A) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game for personal, local gameplay on a personal computer or video game console; or

(B) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game on a personal computer or video game console when necessary to allow preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without

relevant legal authority, can be found in the Recommendation at 256–84.

any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, that do not require access to an external computer server for gameplay, and that are no longer reasonably available in the commercial marketplace, solely for the purpose of preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(iii) Computer programs used to operate video game consoles solely to the extent necessary for an eligible library, archives, or museum to engage in the preservation activities described in paragraph (b)(12)(i)(B) or (b)(12)(ii) of this section.

(iv) For purposes of this paragraph (b)(12), the following definitions shall apply:

(A) For purposes of paragraph (b)(12)(i)(A) and (b)(12)(ii) of this section, "complete games" means video games that can be played by users without accessing or reproducing copyrightable content stored or previously stored on an external computer server.

(B) For purposes of paragraph (b)(12)(i)(B) of this section, "complete games" means video games that meet the definition in paragraph (b)(12)(iv)(A) of this section, or that consist of both a copy of a game intended for a personal computer or video game console and a copy of the game's code that was stored or previously stored on an external computer server.

(C) "Ceased to provide access" means that the copyright owner or its authorized representative has either issued an affirmative statement indicating that external server support for the video game has ended and such support is in fact no longer available or, alternatively, server support has been discontinued for a period of at least six months; provided, however, that server support has not since been restored.

(D) "Local gameplay" means gameplay conducted on a personal computer or video game console, or locally connected personal computers or consoles, and not through an online service or facility.

(E) A library, archives, or museum is considered "eligible" when the collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum.

7. Proposed Class 10: Computer Programs—Security Research [56]

The Office received multiple petitions to expand the existing exemption allowing circumvention for the purpose of conducting good-faith security research on certain types of software-enabled devices and machines. Proponents argued that the current language contains limitations that unnecessarily restrict its scope, as well as ambiguities that chill legitimate research. These include: (1) A provision limiting the exemption to specified categories of devices ("Device Limitation"); (2) a requirement that a device be "lawfully acquired" ("Lawfully Acquired Limitation"); (3) a requirement that circumvention be "solely" for the purpose of good-faith security research, and the definition of such research as accessing a program "solely" for purposes of good-faith testing, investigation, and/or correction ("Access Limitation"); (4) a requirement that the research be "carried out in a controlled environment designed to avoid any harm to individuals or the public" ("Controlled Environment Limitation"); (5) a requirement that "the information derived from the activity [be] used primarily to promote the security or safety of the class of devices or machines . . . or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement" ("Use Limitation"); and (6) a requirement that the circumvention "not violate any applicable law" ("Other Laws Limitation"). Proponents maintained that the proposed activity is noninfringing on one or both grounds relied upon by the Register in 2015—section 117 and fair use.

Opponents objected to removal of each of these provisions, arguing that the current language appropriately balances the interests of security researchers, copyright owners, and the general public. In their view, the adverse effects asserted by proponents are unsupported by the record and are based on unreasonable readings of the relevant text. Opponents also variously argued that removing the limitations would render the class impermissibly broad, give rise to infringing uses, and jeopardize public safety and national security.

Following the close of the public comment period and the completion of the public hearings, the Office received a letter concerning this class from CCIPS. The CCIPS letter stated that "[m]any of the changes sought in the petition appear likely to promote productive cybersecurity research, and CCIPS supports them," subject to certain limitations. With respect to the Device Limitation, CCIPS advised that it would support eliminating the language confining the exemption to devices "primarily designed for use by individual consumers." It recommended clarification of the Controlled Environment Limitation and said that it "would not object to its removal." As to the Lawfully Acquired Limitation, CCIPS stated concluded that the current language is preferable to conditioning the exemption on ownership of a particular copy of software. CCIPS also addressed the Other Laws Limitation, stating that it would not object to removal of the phrase "any applicable law" were it standing alone, but recommending retaining the express reference to the Computer Fraud and Abuse Act of 1986.

NTIA recommended granting the proposed expansion and proposed the same regulatory text it offered in 2015. That language would allow circumvention "in order to conduct good faith security research" on computer programs, "regardless of the device on which they are run." NTIA further recommended that the Other Laws Limitation be replaced with a statement that the exemption "does not obviate the need to comply with all other applicable laws and regulations." In addition, NTIA recommended removal of the Controlled Environment, Access, and Use Limitations, largely agreeing with proponents that those provisions may chill legitimate research.

The Acting Register found that good-faith security research involving devices beyond those covered by the current exemption is likely to be a fair use. As the Register found in 2015, the Acting Register concluded that good-faith security research promotes several of the activities identified in section 107 as examples of favored purposes, including criticism, comment, teaching, scholarship, and research. In contrast to 2015, the current rulemaking record contained many additional examples of activities security researchers wished to engage in but for the Device Limitation. But the Acting Register did not find that section 117 provides an additional basis for finding such activity to be noninfringing. She found the record insufficient to support the conclusion that security researchers as a general matter are likely to own the copies of the device software, as is required under section 117.

Ultimately, the Acting Register recommended that the exemption remove the Device Limitation, and include a provision allowing circumvention to be undertaken on a "computer, computer system, or computer network on which the computer program operates." The latter provision is intended to address situations in which a researcher seeks

[56] The Acting Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 284–315.

access to a structure, such as a building automation system, that cannot be "acquired" in the sense of obtaining physical possession of it, in contrast to instances where the researcher can lawfully acquire a device or machine. The exemption requires that circumvention in these circumstances be undertaken "with the authorization of the owner or operator of such computer, computer system, or computer network." In addition, to address proponents' concerns over potential ambiguity in the Controlled Environment Limitation, the exemption removes the term "controlled," so that it simply would require the research to be "carried out in an environment designed to avoid any harm to individuals or the public." The Acting Register did not recommend removal of the other limitations challenged by proponents, finding that proponents had failed to demonstrate that those provisions are causing, or are likely to cause, any adverse effect on noninfringing security research.

Accordingly, the Acting Register recommends that the Librarian adopt the following exemption:

(i) Computer programs, where the circumvention is undertaken on a lawfully acquired device or machine on which the computer program operates, or is undertaken on a computer, computer system, or computer network on which the computer program operates with the authorization of the owner or operator of such computer, computer system, or computer network, solely for the purpose of good-faith security research and does not violate any applicable law, including without limitation the Computer Fraud and Abuse Act of 1986.

(ii) For purposes of this paragraph (b)(11), "good-faith security research" means accessing a computer program solely for purposes of good-faith testing, investigation, and/or correction of a security flaw or vulnerability, where such activity is carried out in an environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.

### 8. Proposed Class 12: Computer Programs—3D Printing [57]

3D printing—also known as "additive" manufacturing—is a technology that translates digital files into physical objects by adding successive layers of material. Some 3D printer manufacturers use TPMs to limit the types of material—or "feedstock"—that can be used in their 3D printers to manufacturer-approved feedstock.

Proponents sought to expand a current exemption that permits the circumvention of access controls on computer programs in 3D printers to enable the use of non- manufacturer-approved feedstock. Michael Weinberg filed a petition to eliminate the following language at the end of the exemption: "provided, however, that the exemption shall not extend to any computer program on a 3D printer that produces goods or materials for use in commerce the physical production of which is subject to legal or regulatory oversight or a related certification process, or where the circumvention is otherwise unlawful."

Proponents put forth two arguments as to why the Acting Register should broaden the exemption by dropping this language: (1) The clause creates ambiguity such that the exemption itself cannot be applied or used in the majority of circumstances, and (2) the concerns that the clause seeks to address are more suitably addressed by other agencies. Stratasys, an opponent to the exemption, contended that this expanded range of activities is less likely to constitute fair use and should remain prohibited for reasons of public policy.

NTIA supported renewing the exemption as well as expanding the exemption by removing the relevant limiting language. NTIA's proposed language differed from the current regulatory language in additional ways. For example, NTIA proposed incorporating the restriction that "circumvention is undertaken for the purpose of enabling interoperability of feedstock or filament with the device." NTIA, however, did not provide specific support for altering the regulatory text beyond removing the qualifying language.

The 2015 rulemaking identified fair use as the noninfringing basis for this exemption, and the proposed expansion was evaluated on the same grounds. Because the record indicated that the state of the 3D printing market appears to be substantially the same as in 2015, and case law has not significantly altered the relevant fair use issues, the Acting Register concluded that the copying or modifying of printer software to accept non-manufacturer-approved feedstock is likely to be a fair use.

Because the first four statutory factors do not fit neatly onto this situation, the Acting Register focused most of her analysis on the fifth factor to consider these related concerns. The Acting Register determined that the expanded record now shows that there are situations in which an individual may be complying with relevant law or regulations but still be at risk of violating section 1201 due to the exemption's qualifying language (*e.g.*, individual sellers of homemade wares). The Acting Register concluded that the record established that the qualifying language in the existing exemption may be inhibiting otherwise beneficial or innovative uses of alternate feedstock, which is contrary to the intention of that exemption—and moreover, that there are safeguards outside of the current exemption addressing health and safety concerns associated with 3D printing.

Accordingly, the Acting Register recommends that the Librarian adopt the following exemption:

Computer programs that operate 3D printers that employ microchip-reliant technological measures to limit the use of feedstock, when circumvention is accomplished solely for the purpose of using alternative feedstock and not for the purpose of accessing design software, design files, or proprietary data.

### *C. Classes Considered but Not Recommended*

Based upon the record in this proceeding, the Acting Register of Copyrights recommended that the Librarian determine that the following classes of works shall not be exempt from the prohibition against circumvention of technological measures set forth in section 1201(a)(1):

#### 1. Proposed Class 3: Audiovisual Works—Space-Shifting [58]

Proposed Class 3 would allow circumvention of technical measures protecting motion pictures and other audiovisual works to engage in "space-shifting." As the 2015 rulemaking described, the Copyright Office's understanding is that space-shifting occurs when a work is transferred from one storage medium to another, such as from a DVD to a computer hard drive. Chris De Pretis petitioned for an exemption to allow circumvention by individuals to create a personal digital backup of content for private use, a proposal similar to those sought and rejected in previous rulemakings. The Office also received a petition from OmniQ, a corporate entity, proposing an exemption to allow so-called "non-reproductive" space-shifting, including for commercial uses. A third proponent, SolaByte Corporation, filed a one-page

[57] The Acting Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 319–31.

[58] The Acting Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 111–28.

comment in support of OmniQ and testified at the public hearing.

OmniQ primarily argued that its proposed technology did not result in a reproduction of a copyrighted work, and thus fair use analysis was unnecessary. Proponents also argued that the overall availability of works for public use is shrinking because the hardware and software needed to play disc media are becoming less available in the marketplace. They argued that online content distribution platforms, taken in the aggregate, only offer a small and always-changing fraction of the titles historically available on DVD and Blu-ray disc, and that the costs of these services are unacceptable, especially when users already own the content in disc form.

In response, opponents argued that OmniQ's technology would reproduce works because they would constitute entirely new things (*i.e.*, a copy). Opponents also contended that recent case law developments further demonstrate that space-shifting is not a fair use. In addition, opponents provided evidence of alternatives to circumvention in the form of a substantial number of online distribution platforms for accessing copyrighted audiovisual works, the vast majority of which they claim exist as viable business models only because of the ability to employ TPMs to protect the content from unauthorized uses.

Unlike in prior rulemakings where NTIA "supported limited versions of a noncommercial space-shifting exemption . . . mainly in the interest of consumer protection," NTIA did not support an exemption for this class in the present rulemaking. NTIA acknowledged that the "legal status of the concept of space-shifting remains a matter of dispute among copyright experts" and that it "has not been explicitly established as non-infringing on the basis of the fair use doctrine." NTIA added that "proponents ha[d] not established in this proceeding that their specific proposal would be non-infringing." Moreover, NTIA recognized that "[p]roponents failed to demonstrate that the 'prevalence of [encrypted digital content] is diminishing the ability of individuals to use these works in ways that are otherwise lawful.' "

The Acting Register found that under current law, OmniQ's self-described process is likely to result in an unauthorized reproduction in violation of section 106(1), and that, as in 2015, the case law maintains that transferring digital files from one location to another implicates the reproduction right and is therefore infringing, even where the original copy is contemporaneously or subsequently deleted. With regard to personal space-shifting, in light of the lack of record and in the absence of clear supporting precedent, the Acting Register found no basis to depart from the fair use analysis and ultimate conclusion reached in the 2015 proceeding, where the Register was unable to determine that the proposed uses were noninfringing. She noted that the commercial nature and potential market effects of the OmniQ and SolaByte business models complicate the fair use analysis, and not in their favor. For example, the record included substantial evidence of extensive markets for internet-based distribution services for copyrighted audiovisual works, including digital rentals, online streaming and over-the-top services, on-demand cable and satellite television offerings, disc-to-digital services, and digital locker services, which could be negatively impacted by the proposed exemption. These markets also served as sufficient alternatives to circumvention, as they demonstrated a wide availability of easily accessible copyrighted works that could potentially be negatively affected by an exemption that allowed unauthorized copies to compete with these authorized access models. Based on the record in this proceeding, the Acting Register did not find that the statutory factors supported the proposed exemption.

2. Proposed Class 4: Audiovisual Works—HDCP/HDMI [59]

Proposed Class 4 would allow circumvention "to make noninfringing uses of audiovisual works that are subjected to High-bandwidth Digital Content Protection (HDCP)." Petitioner Andrew "bunnie" Huang described HDCP as "a protocol used to restrict content sent over High-Definition Multimedia Interface (HDMI) cables," or "a standard for video transport from one device to another." He explained that many devices that play video discs and video game software encode their output using HDCP, and that this interferes with capturing the output for subsequent noninfringing uses.

Multiple participants opposed this exemption, arguing that section 1201 does not permit such a broad exemption, noting that HDCP is the industry standard for protecting audiovisual works in transit to a display device and that past Registers have rejected exemptions for "all noninfringing uses." They characterized Huang's discussion of the proposed uses as "cursory," and suggested it was not possible to evaluate the proposed uses under the exemption without further detail. Opponents also suggested that multiple proposed uses would actually be infringing, and highlighted what they see as a significant online infringement risk if the exemption permitted in-the-clear copies of entire works. In addition, opponents set forth a large number of concrete examples of potential alternatives to circumvention that the petitioner failed to meaningfully challenge. Finally, they asserted that "HDCP is a critically important component of the secure ecosystem through which content is delivered for home entertainment" and noted that section 1201 was intended to encourage copyright owners to make their works available digitally and foster new means of distribution by providing reasonable assurances against fears of piracy.

NTIA recommended against this exemption, stating that "[p]roponents did not provide sufficient evidence on the record about the alleged non-infringing uses," and that "[w]hile there are several examples of potential non-infringing uses that could serve as the basis for an exemption, the proponents [had] not developed the argument in the record . . . ." NTIA also observed that the proposed exemption "appear[ed] to be for the HDCP TPM itself, which is not appropriate for this rulemaking process."

The Acting Register also recommended against the exemption, largely agreeing with many of the bases advanced by opponents. Specifically, the Acting Register concluded that the proposed exemption was overly broad, as HDCP is the industry standard for protecting audiovisual works in transit to a display device, and thus limiting the proposal this way did not very meaningfully focus the scope beyond the starting point of all audiovisual works. The Acting Register also determined that some of the proposed uses may potentially be fair use depending upon factual circumstances, but that the record lacked the requisite detail and legal support for the Acting Register to conclude that the proposed uses are or are not likely to be noninfringing. Based upon the record, the Acting Register could not conclude that the overall availability for use of copyrighted works has been diminished or is likely to be in the next three years absent an exemption, noting that the proposed activities may well have a negative effect on the market for or value of copyrighted works. Finally, she concluded that the request was an individual case of *de minimis* impact, as

[59] The Acting Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 128–45.

it was largely made upon a single request of an individual who resides in Singapore for which there appeared to be myriad alternative ways to achieve the proposed uses.

3. Proposed Class 11: Computer Programs—Avionics[60]

Proposed Class 11 would permit circumvention of access controls on electronic systems used in aircraft, *i.e.*, avionics, to enable access to aircraft flight, operations, maintenance and security bulk data collected by third parties upon authorization of the aircraft owner or operator in the course of complying with Federal Aviation Administration (''FAA'') standards, rules, and regulations. Due to reliance upon these electronic systems, proponents asserted that aircraft ''operators have faced a . . . rise in the complexity and scope of work needed to keep their fleet secure and operating efficiently,'' and that the FAA ''has mandated the review of the data, information, logs[,] and other information [by aircraft owners or operators] as a means to ensure safety, security[,] and regulatory compliance.''

In NTIA's view, ''[p]roponents failed to demonstrate that the proposed class includes copyrighted works protected by TPMs.'' Moreover, NTIA continued, ''Air Informatics failed to identify clearly the proposed users of the exemption,'' suggesting that ''the prohibition on circumvention does not adversely affect and is not likely to adversely affect users.'' Lastly, NTIA maintained that ''[r]easonable alternatives to circumvention seem to exist,'' noting that ''the two relevant parties can come to an agreement for access to and use of the data.''

The Acting Register found that the record suggested that the data collected by aircrafts at issue consist of facts, which are not copyrightable. According to the petitioner, the information represents objective details about aircraft, such as flight operations and fuel economy. As Public Knowledge explained, the data inputs and outputs ''are not classifiable as a 'work' protected under Title 17'' and such ''access does not implicate any colorable copyright concerns.'' The Acting Register also concluded that the collected information would not qualify as a copyrightable compilation, because it is formatted and compiled in accordance with an industry-wide standard. The Acting Register accordingly concluded that proponents have not alleged that the data or data compilations they are seeking to access are copyrightable, and thus subject to the prohibition on circumvention. Although petitioner raised some concerns regarding attempts by airplane manufacturers to control the aftermarket for the data in security research and analytics, the Acting Register determined that it was not clear that section 1201 is facilitating those actions, and noted that the security research exemption may potentially be utilized to cover such activities, to the extent applicable.

[60] The Acting Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at 315–19.

*C. Conclusion*

Having considered the evidence in the record, the contentions of the commenting parties, and the statutory objectives, the Acting Register of Copyrights has recommended that the Librarian of Congress publish certain classes of works, as designated above, so that the prohibition against circumvention of technological measures that effectively control access to copyrighted works shall not apply to persons who engage in noninfringing uses of those particular classes of works.

Dated: October 19, 2018.

**Karyn A. Temple,**

*Acting Register of Copyrights and Director of the U.S. Copyright Office.*

**Determination of the Librarian of Congress**

Having duly considered and accepted the Recommendation of the Acting Register of Copyrights, which Recommendation is hereby incorporated by reference, the Librarian of Congress, pursuant to 17 U.S.C. 1201(a)(1)(C) and (D), hereby publishes as a new rule the classes of copyrighted works that shall for a three-year period be subject to the exemption provided in 17 U.S.C. 1201(a)(1)(B) from the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A).

**List of Subjects in 37 CFR Part 201**

Copyright, Exemptions to prohibition against circumvention.

**Final Regulations**

For the reasons set forth in the preamble, 37 CFR part 201 is amended as follows:

**PART 201—GENERAL PROVISIONS**

■ 1. The authority citation for part 201 continues to read as follows:

**Authority:** 17 U.S.C. 702.

■ 2. Section 201.40 is amended by revising paragraphs (b) and (c) to read as follows:

**§ 201.40 Exemptions to prohibition against circumvention.**

* * * * *

(b) *Classes of copyrighted works.* Pursuant to the authority set forth in 17 U.S.C. 1201(a)(1)(C) and (D), and upon the recommendation of the Register of Copyrights, the Librarian has determined that the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A) shall not apply to persons who engage in noninfringing uses of the following classes of copyrighted works:

(1) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, and the person engaging in circumvention under paragraph (b)(1)(i) and (b)(1)(ii)(A) and (B) of this section reasonably believes that non-circumventing alternatives are unable to produce the required level of high-quality content, or the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, where circumvention is undertaken solely in order to make use of short portions of the motion pictures in the following instances:

(i) For the purpose of criticism or comment:

(A) For use in documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature;

(B) For use in noncommercial videos (including videos produced for a paid commission if the commissioning entity's use is noncommercial); or

(C) For use in nonfiction multimedia e-books.

(ii) For educational purposes:

(A) By college and university faculty and students or kindergarten through twelfth-grade (K–12) educators and students (where the K–12 student is circumventing under the direct supervision of an educator), including of accredited general educational development (GED) programs, for the purpose of criticism, comment, teaching, or scholarship;

(B) By faculty of massive open online courses (MOOCs) offered by accredited nonprofit educational institutions to officially enrolled students through online platforms (which platforms themselves may be operated for profit), in film studies or other courses requiring close analysis of film and media excerpts, for the purpose of criticism or comment, where the MOOC provider through the online platform limits transmissions to the extent technologically feasible to such officially enrolled students, institutes copyright policies and provides copyright informational materials to faculty, students, and relevant staff members, and applies technological measures that reasonably prevent unauthorized further dissemination of a work in accessible form to others or retention of the work for longer than the course session by recipients of a transmission through the platform, as contemplated by 17 U.S.C. 110(2); or

(C) By educators and participants in nonprofit digital and media literacy programs offered by libraries, museums, and other nonprofit entities with an educational mission, in the course of face-to-face instructional activities, for the purpose of criticism or comment, except that such users may only circumvent using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted.

(2)(i) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, where:

(A) Circumvention is undertaken by a disability services office or other unit of a kindergarten through twelfth-grade educational institution, college, or university engaged in and/or responsible for the provision of accessibility services to students, for the purpose of adding captions and/or audio description to a motion picture to create an accessible version as a necessary accommodation for a student or students with disabilities under an applicable disability law, such as the Americans With Disabilities Act, the Individuals with Disabilities Education Act, or Section 504 of the Rehabilitation Act;

(B) The educational institution unit in paragraph (b)(2)(i)(A) of this section has, after a reasonable effort, determined that an accessible version cannot be obtained at a fair price or in a timely manner; and

(C) The accessible versions are provided to students or educators and stored by the educational institution in a manner intended to reasonably prevent unauthorized further dissemination of a work.

(ii) For purposes of this paragraph (b)(2), "audio description" means an oral narration that provides an accurate rendering of the motion picture.

(3) Literary works, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies:

(i) When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels; or

(ii) When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.

(4) Literary works consisting of compilations of data generated by medical devices that are wholly or partially implanted in the body or by their corresponding personal monitoring systems, where such circumvention is undertaken by a patient for the sole purpose of lawfully accessing the data generated by his or her own device or monitoring system and does not constitute a violation of applicable law, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986 or regulations of the Food and Drug Administration, and is accomplished through the passive monitoring of wireless transmissions that are already being produced by such device or monitoring system.

(5) Computer programs that enable the following types of lawfully acquired wireless devices to connect to a wireless telecommunications network, when circumvention is undertaken solely in order to connect to a wireless telecommunications network and such connection is authorized by the operator of such network:

(i) Wireless telephone handsets (*i.e.*, cellphones);

(ii) All-purpose tablet computers;

(iii) Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and

(iv) Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.

(6) Computer programs that enable smartphones and portable all-purpose mobile computing devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smartphone or device, or to permit removal of software from the smartphone or device. For purposes of this paragraph (b)(6), a "portable all-purpose mobile computing device" is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is equipped with an operating system primarily designed for mobile use, and is intended to be carried or worn by an individual.

(7) Computer programs that enable smart televisions to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smart television.

(8) Computer programs that enable voice assistant devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the device, or to permit removal of software from the device, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For purposes of this paragraph (b)(8), a "voice assistant device" is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is designed to take user input primarily by voice, and is designed to be installed in a home or office.

(9) Computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle such as a personal automobile, commercial vehicle, or mechanized agricultural vehicle, except for programs accessed through a separate subscription service, when circumvention is a necessary step to allow the diagnosis, repair, or lawful modification of a vehicle function, where such circumvention does not constitute a violation of applicable law, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency, and is not accomplished for the purpose of gaining

unauthorized access to other copyrighted works.

(10) Computer programs that are contained in and control the functioning of a lawfully acquired smartphone or home appliance or home system, such as a refrigerator, thermostat, HVAC, or electrical system, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system, and is not accomplished for the purpose of gaining access to other copyrighted works. For purposes of this paragraph (b)(10):

(i) The ''maintenance'' of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and

(ii) The ''repair'' of a device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.

(11)(i) Computer programs, where the circumvention is undertaken on a lawfully acquired device or machine on which the computer program operates, or is undertaken on a computer, computer system, or computer network on which the computer program operates with the authorization of the owner or operator of such computer, computer system, or computer network, solely for the purpose of good-faith security research and does not violate any applicable law, including without limitation the Computer Fraud and Abuse Act of 1986.

(ii) For purposes of this paragraph (b)(11), ''good-faith security research'' means accessing a computer program solely for purposes of good-faith testing, investigation, and/or correction of a security flaw or vulnerability, where such activity is carried out in an environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.

(12)(i) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, when the copyright owner or its authorized representative has ceased to provide access to an external computer server necessary to facilitate an authentication process to enable gameplay, solely for the purpose of:

(A) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game for personal, local gameplay on a personal computer or video game console; or

(B) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game on a personal computer or video game console when necessary to allow preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, that do not require access to an external computer server for gameplay, and that are no longer reasonably available in the commercial marketplace, solely for the purpose of preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(iii) Computer programs used to operate video game consoles solely to the extent necessary for an eligible library, archives, or museum to engage in the preservation activities described in paragraph (b)(12)(i)(B) or (b)(12)(ii) of this section.

(iv) For purposes of this paragraph (b)(12), the following definitions shall apply:

(A) For purposes of paragraph (b)(12)(i)(A) and (b)(12)(ii) of this section, ''complete games'' means video games that can be played by users without accessing or reproducing copyrightable content stored or previously stored on an external computer server.

(B) For purposes of paragraph (b)(12)(i)(B) of this section, ''complete games'' means video games that meet the definition in paragraph (b)(12)(iv)(A) of this section, or that consist of both a copy of a game intended for a personal computer or video game console and a copy of the game's code that was stored or previously stored on an external computer server.

(C) ''Ceased to provide access'' means that the copyright owner or its authorized representative has either issued an affirmative statement indicating that external server support for the video game has ended and such support is in fact no longer available or, alternatively, server support has been discontinued for a period of at least six months; provided, however, that server support has not since been restored.

(D) ''Local gameplay'' means gameplay conducted on a personal computer or video game console, or locally connected personal computers or consoles, and not through an online service or facility.

(E) A library, archives, or museum is considered ''eligible'' when the collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum.

(13)(i) Computer programs, except video games, that have been lawfully acquired and that are no longer reasonably available in the commercial marketplace, solely for the purpose of lawful preservation of a computer program, or of digital materials dependent upon a computer program as a condition of access, by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the program is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) For purposes of the exemption in paragraph (b)(13)(i) of this section, a library, archives, or museum is considered ''eligible'' if—

(A) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(B) The library, archives, or museum has a public service mission;

(C) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(D) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(E) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by this paragraph (b)(13).

(14) Computer programs that operate 3D printers that employ microchip-reliant technological measures to limit

the use of feedstock, when circumvention is accomplished solely for the purpose of using alternative feedstock and not for the purpose of accessing design software, design files, or proprietary data.

(c) *Persons who may initiate circumvention.* To the extent authorized under paragraph (b) of this section, the circumvention of a technological measure that restricts wireless telephone handsets or other wireless devices from connecting to a wireless telecommunications network may be initiated by the owner of any such handset or other device, by another person at the direction of the owner, or by a provider of a commercial mobile radio service or a commercial mobile data service at the direction of such owner or other person, solely in order to enable such owner or a family member of such owner to connect to a wireless telecommunications network, when such connection is authorized by the operator of such network.

Dated: October 19, 2018.

**Carla D. Hayden,**

*Librarian of Congress*

[FR Doc. 2018–23241 Filed 10–25–18; 8:45 am]

BILLING CODE 1410–30–P

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 9 and 721**

**[EPA–HQ–OPPT–2017–0464; FRL–9985–55]**

**RIN 2070–AB27**

## Significant New Use Rules on Certain Chemical Substances; Withdrawal

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Withdrawal of direct final rule.

**SUMMARY:** EPA is withdrawing significant new use rules (SNURs) promulgated under the Toxic Substances Control Act (TSCA) for 19 chemical substances, which were the subject of premanufacture notices (PMNs). EPA published these SNURs using direct final rulemaking procedures, which requires EPA to take certain actions if an adverse comment is received. EPA received adverse comments and a request to extend the comment period regarding the SNURs identified in the direct final rule. Therefore, the Agency is withdrawing the direct final rule SNURs identified in this document, as required under the direct final rulemaking procedures.

**DATES:** The direct final rule published at 83 FR 43538 on August 27, 2018, is withdrawn effective October 26, 2018.

**ADDRESSES:** The docket for this action, identified by docket identification (ID) number EPA–HQ–OPPT–2017–0464 is available at *http://www.regulations.gov* or at the Office of Pollution Prevention and Toxics Docket (OPPT Docket), Environmental Protection Agency Docket Center (EPA/DC), West William Jefferson Clinton Bldg., Rm. 3334, 1301 Constitution Ave. NW, Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the OPPT Docket is (202) 566–0280. Please review the visitor instructions and additional information about the docket available at *http://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** *For technical information contact:* Kenneth Moss, Chemical Control Division (7405M), Office of Pollution Prevention and Toxics, Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460–0001; telephone number: (202) 564–9232; email address: *moss.kenneth@epa.gov.*

*For general information contact:* The TSCA-Hotline, ABVI-Goodwill, 422 South Clinton Ave., Rochester, NY 14620; telephone number: (202) 554–1404; email address: *TSCA-Hotline@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Does this action apply to me?

A list of potentially affected entities is provided in the **Federal Register** of August 27, 2018 (83 FR 43538) (FRL–9982–24). If you have questions regarding the applicability of this action to a particular entity, consult the technical person listed under **FOR FURTHER INFORMATION CONTACT**.

### II. What direct final SNURs are being withdrawn?

In the **Federal Register** of August 27, 2018 (83 FR 43538) (FRL–9982–24), EPA issued direct final SNURs for 19 chemical substances that are identified in that document. Because the Agency received adverse comments and a request to extend the comment period regarding the SNURs identified in the document, EPA is withdrawing the direct final SNURS issued for these 19 chemical substances, which were the subject of PMNs. In addition to the Direct Final SNURs, elsewhere in the same issue of the **Federal Register** of August 27, 2018 (83 FR 43538) (FRL–9982–24), EPA issued proposed SNURs covering these 19 chemical substances. EPA will address all adverse public comments in a subsequent final rule, based on the proposed rule.

### III. Good Cause Finding

EPA determined that this document is not subject to the 30-day delay of effective date generally required by the Administrative Procedure Act (APA) (5 U.S.C. 553(d)) because of the time limitations for publication in the **Federal Register**. This document must publish on or before the effective date of the direct final rule containing the direct final SNURs being withdrawn.

### IV. Statutory and Executive Order Reviews

This action withdraws regulatory requirements that have not gone into effect and which contain no new or amended requirements and reopens a comment period. As such, the Agency has determined that this action will not have any adverse impacts, economic or otherwise. The statutory and Executive Order review requirements applicable to the direct final rules were discussed in the August 27, 2018 **Federal Register** (83 FR 43538). Those review requirements do not apply to this action because it is a withdrawal and does not contain any new or amended requirements.

### V. Congressional Review Act (CRA)

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2). Section 808 of the CRA allows the issuing agency to make a rule effective sooner than otherwise provided by CRA if the agency makes a good cause finding that notice and public procedure is impracticable, unnecessary, or contrary to the public interest. As required by 5 U.S.C. 808(2), this determination is supported by a brief statement in Unit III.

### List of Subjects

*40 CFR Part 9*

Environmental protection, Reporting and recordkeeping requirements.

*40 CFR Part 721*

Environmental protection, Chemicals, Hazardous substances, Reporting and recordkeeping requirements.

the kind of public notice given, and other information the Lead Executive finds pertinent to the analysis of the referendum and its results.

**§ 1500.107 Confidential information.**

The ballots and other information or reports that reveal, or tend to reveal, the vote of any person covered under the order and the voter list shall be strictly confidential and shall not be disclosed.

**§ 1500.108 OMB control number.**

The control number assigned to the information collection requirement in this subpart by the Office of Management and Budget pursuant to the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.*, is OMB control number xxxx.

Dated: September 4, 2020.

**Kenneth White,**

*Senior Policy Analyst, Under Secretary for Economic Affairs.*

[FR Doc. 2020–20035 Filed 10–14–20; 8:45 am]

BILLING CODE 3510–20–P

## LIBRARY OF CONGRESS

## U.S. Copyright Office

## 37 CFR Part 201

**[Docket No. 2020–11]**

## Exemptions To Permit Circumvention of Access Controls on Copyrighted Works

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The United States Copyright Office is conducting the eighth triennial rulemaking proceeding under the Digital Millennium Copyright Act (''DMCA''), concerning possible temporary exemptions to the DMCA's prohibition against circumvention of technological measures that control access to copyrighted works. In this proceeding, the Copyright Office is considering petitions for the renewal of exemptions that were granted during the seventh triennial rulemaking along with petitions for new exemptions to engage in activities not currently permitted by existing exemptions. On June 22, 2020, the Office published a notification of inquiry requesting petitions to renew existing exemptions and comments in response to those petitions, as well as petitions for new exemptions. Having carefully considered the comments received in response to that notification, in this notice of proposed rulemaking (''NPRM''), the Office announces its intention to recommend each of the existing exemptions for readoption. This NPRM also initiates three rounds of public comment on the newly-proposed exemptions. Interested parties are invited to make full legal and evidentiary submissions in support of or in opposition to the proposed exemptions, in accordance with the requirements set forth below.

**DATES:** Initial written comments (including documentary evidence) and multimedia evidence from proponents and other members of the public who support the adoption of a proposed exemption, as well as parties that neither support nor oppose an exemption but seek to share pertinent information about a proposal, are due December 14, 2020. Written response comments (including documentary evidence) and multimedia evidence from those who oppose the adoption of a proposed exemption are due February 9, 2021. Written reply comments from supporters of particular proposals and parties that neither support nor oppose a proposal are due March 10, 2021. Commenting parties should be aware that rather than reserving time for potential extensions of time to file comments, the Office has already established what it believes to be the most generous possible deadlines consistent with the goal of concluding the triennial proceeding in a timely fashion.

**ADDRESSES:** The Copyright Office is using the *regulations.gov* system for the submission and posting of comments in this proceeding. All comments are therefore to be submitted electronically through *regulations.gov*. The Office is accepting two types of comments. First, commenters who wish briefly to express general support for or opposition to a proposed exemption may submit such comments electronically by typing into the comment field on regulations.gov. Second, commenters who wish to provide a fuller legal and evidentiary basis for their position may upload a Word or PDF document, but such longer submissions must be completed using the long-comment form provided on the Office's website at *https://www.copyright.gov/1201/2021*. Specific instructions for submitting comments, including multimedia evidence that cannot be uploaded through regulations.gov, are also available on that web page. If a commenter cannot meet a particular submission requirement, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Regan A. Smith, General Counsel and Associate Register of Copyrights, by email at *regans@copyright.gov*, Kevin R. Amer, Deputy General Counsel, by email at *kamer@copyright.gov*, or Terry Hart, Assistant General Counsel, by email at *tehart@copyright.gov*. Each can be contacted by telephone by calling (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** On June 22, 2020, the Office published a notification of inquiry requesting petitions to renew current exemptions, oppositions to the renewal petitions, and petitions for newly proposed exemptions in connection with the eighth triennial section 1201 rulemaking.[1] In response, the Office received thirty-two renewal petitions, eight comments in opposition to renewal of a current exemption, and seven comments supporting renewal of a current exemption.[2] These comments are discussed further below. In addition, the Office received twenty-six petitions for new exemptions or expansion of previously granted exemptions.

With this NPRM, the Office sets forth the exemptions that it intends to recommend for readoption without the need for further development of the administrative record, and outlines the proposed classes for new exemptions for which the Office initiates three rounds of public comment.

### I. Standard for Evaluating Proposed Exemptions

As the notification of inquiry explained, for a temporary exemption from the prohibition on circumvention to be granted through the triennial rulemaking, it must be established that ''persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition . . . in their ability to make noninfringing uses under [title 17] of a particular class of copyrighted works.'' [3] To define an appropriate class of copyrighted works, the Office begins with the broad

[1] 85 FR 37399 (June 22, 2020).

[2] The comments received in response to the notification of inquiry are available at *https://www.regulations.gov/docketBrowser?rpp=25&so=DESC&sb=commentDueDate&po=0&dct=PS&D=COLC-2020-0010* and on the Copyright Office website. Renewal petitions are available at *https://www.copyright.gov/1201/2021/petitions/renewal/*, and petitions for new exemptions are available at *https://www.copyright.gov/1201/2021/petitions/proposed/*. References to renewal petitions and comments are by party name (abbreviated where appropriate) and a brief identification of the previously granted exemption, followed by either ''Renewal Pet.,'' ''Supp.'' (for comments supporting an exemption), or ''Opp.'' (for comments opposing an exemption). References to petitions for new exemptions are by party name (abbreviated where appropriate), the Office's proposed class number, and ''Pet.''

[3] 17 U.S.C. 1201(a)(1)(C).

categories of works identified in 17 U.S.C. 102 and then refines them by other criteria, such as the technological protection measures (''TPMs'') used, distribution platforms, and/or types of uses or users.[4]

In evaluating the evidence, the statutory factors listed in section 1201(a)(1)(C) are weighed: (i) The availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the Librarian considers appropriate.[5] After developing a comprehensive administrative record, the Register makes a recommendation to the Librarian of Congress concerning whether exemptions are warranted based on that record.

The Office has previously articulated the substantive legal and evidentiary standard for the granting of an exemption under section 1201(a)(1) multiple times, including in video and PowerPoint tutorials, its 2017 policy study for Congress on section 1201, and in prior recommendations of the Register concerning proposed classes of exemptions, each of which is accessible from the Office's section 1201 rulemaking web page at *https://www.copyright.gov/1201/.* In considering whether to recommend an exemption, the Office must inquire: ''*Are users of a copyrighted work adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a class of copyrighted works, or are users likely to be so adversely affected in the next three years?*'' [6] This inquiry breaks down into the following elements:

- The proposed class includes at least some works protected by copyright.
- The uses at issue are noninfringing under title 17.
- Users are adversely affected in their ability to make such noninfringing uses or, alternatively, users are likely to be adversely affected in their ability to make such noninfringing uses during the next three years. This element is analyzed in reference to section 1201(a)(1)(C)'s five statutory factors.
- The statutory prohibition on circumventing access controls is the cause of the adverse effects.[7]

The Register will consider the Copyright Act and relevant judicial precedents when analyzing whether a proposed use is likely to be noninfringing.[8] When considering whether such uses are being adversely impacted by the prohibition on circumvention, the rulemaking focuses on ''distinct, verifiable, and measurable impacts'' compared to ''*de minimis* impacts.'' [9] Taking the administrative record as a whole, the Office will consider whether the preponderance of the evidence shows that the conditions for granting an exemption have been met.[10]

## II. Review of Petitions To Renew Existing Exemptions

As with the previous rulemaking proceeding, the Office is using a streamlined process for recommending readoption of previously-adopted exemptions to the Librarian. As the Office explained in its 2017 policy study, the ''Register must apply the same evidentiary standards in recommending the renewal of exemptions as for first-time exemption requests,'' and the statute requires that ''a determination must be made specifically for each triennial period.'' [11] The Office further determined that ''the statutory language appears to be broad enough to permit determinations to be based upon evidence drawn from prior proceedings, but only upon a conclusion that this evidence remains reliable to support granting an exemption in the current proceeding.'' [12] The Office first instituted this streamlined renewal process in the seventh triennial rulemaking, which concluded in 2018.[13] The process elicited requests to renew each of the exemptions that had been previously exempted, none of which were meaningfully contested.[14] As a result, the Office was able to recommend renewal of all previously granted exemptions.[15] The streamlined renewal process was praised by participants during the ensuing rulemaking phases.[16]

Following the same procedure that was successfully implemented in the last cycle, for this rulemaking, the Office solicited petitions for the renewal of exemptions as they are currently formulated, without modification. As noted, streamlined renewal is based upon a determination that, due to a lack of legal, marketplace, or technological changes, the factors that led the Office to recommend adoption of the exemption in the prior rulemaking will continue into the forthcoming triennial period.[17] That is, the same facts and circumstances underlying the previously-adopted regulatory exemption may be relied on to renew the exemption. Accordingly, to the extent that any renewal petition proposed uses beyond the current exemption, the Office disregarded those portions of the petition for purposes of considering the renewal of the exemption, and instead focused on whether it provided sufficient information to warrant readoption of the exemption in its current form.

The Office received thirty-two petitions to renew existing exemptions, including at least one petition to renew each currently-adopted exemption. Each

[4] *See* H.R. Rep. No. 105–551, pt. 2, at 38 (1998) (''Commerce Comm. Report''); U.S. Copyright Office, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights 13–14 (2018) (''2018 Recommendation''); U.S. Copyright Office, Section 1201 of Title 17, at 26, 108–10 (2017), *https://www.copyright.gov/policy/1201/section-1201-full-report.pdf* (''Section 1201 Study''); *see also* 82 FR 49550, 49551 (Oct. 26, 2017) (same).

[5] 17 U.S.C. 1201(a)(1)(C).

[6] Section 1201 Study at 114.

[7] *Id.* at 115; *see also id.* at 115–27.

[8] *Id.* at 115–17. While controlling precedent directly on point is not required to justify an exemption, there is no ''rule of doubt'' favoring an exemption when it is unclear that a particular use is fair or otherwise noninfringing. *See* U.S. Copyright Office, Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 15 (2015) (''2015 Recommendation'').

[9] Commerce Comm. Report at 37; *see also* Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4th, 1998, at 6 (Comm. Print 1998) (using the equivalent phrase ''substantial adverse impact'') (''House Manager's Report''); *see also, e.g.,* Section 1201 Study at 119–21 (discussing same and citing application of this standard in five prior rulemakings).

[10] *See* 17 U.S.C. 1201(a)(1)(C) (asking whether users ''*are, or are likely to be* in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses'') (emphasis added); Section 1201 Study at 111–12; *see also Sea Island Broad. Corp.* v. *FCC,* 627 F.2d 240, 243 (D.C. Cir. 1980) (noting that ''[t]he use of the 'preponderance of evidence' standard is the traditional standard in civil and administrative proceedings''); 70 FR 57526, 57528 (Oct. 3, 2005); 2018 Recommendation at 18; 2015 Recommendation at 13–14; U.S. Copyright Office, Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 6 (2012) (''2012 Recommendation''); U.S. Copyright Office, Section 1201 Rulemaking: Second Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 19–20 (2003).

[11] Section 1201 Study at 142, 145.

[12] *Id.* at 143.

[13] 2018 Recommendation at 17.

[14] *Id.* at 22.

[15] *Id.* at 19.

[16] *See, e.g., id.* at 19 n.80 (collecting transcript testimony from 2018 rulemaking).

[17] Section 1201 Study at 143–44.

petition to renew an existing exemption included an explanation summarizing the basis for claiming a continuing need and justification for the exemption. In each case, petitioners also signed a declaration stating that, to the best of their personal knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified.

The Office received fifteen comments in response to the renewal petitions; seven of these supported renewal of a specific exemption. Eight raised discrete concerns with specific petitions, but none opposed the verbatim readoption of an existing regulatory exemption. Rather, many of these comments address whether the petitions received were sufficient for the Office to consider renewal of the full scope of an exemption, rather than themselves disputing the reliability of the previously-analyzed administrative record.[18] These comments are specifically addressed in the context of the relevant exemption below.

The Office has generally not required petitions to speak to each and every type of use, but rather generally aver that the overall conditions persist.[19] Requiring a fulsome showing would undermine the goal of the streamlined process. The impetus for instituting the streamlined process was to create a more efficient process for unopposed exemptions, and the Office was mindful in shaping the streamlined renewal process to avoid recreating the requirements of the full rulemaking process.[20] In outlining potential mechanics in its Section 1201 Study, the Office envisioned brief filings,[21] with a ''minimal'' evidentiary showing required.[22] The Office has previously advised that it is sufficient for petitioners to declare that ''there had not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified.'' [23] In the current proceeding, the Office explained that it expects petitioners would need only ''a paragraph or two'' to explain the need for renewal and that documentary evidence at this stage of the process is accepted but not necessary.[24] Petitioners must also ''sign a declaration attesting to the continued need for the exemption and the truth of the explanation provided in support'' and attest that ''there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record . . . that originally demonstrated the need for the selected exemption, such that renewal of the exemption would not be justified.'' [25] That attestation also serves as a basis for the Office to evaluate whether the entirety of the prior administrative record supporting a given exemption continues to obtain. The Office thus concludes that the petitions received are formally and substantively sufficient for the Office to consider in evaluating whether renewal of the existing exemptions is appropriate.

To the extent a commenter questions whether there is a continued need for a specific exempted use or otherwise believes that the scope of an exemption should be narrowed, that commenter should come forward and oppose the exemption. As explained in the notification of inquiry, opposition to a renewal request asks opponents to provide evidence that would make it ''reasonable for the Office to conclude that the prior rulemaking record and any further information provided in the renewal petition are insufficient to support recommending renewal of an exemption.'' [26] The Office will then consider such statements and, as appropriate, will notice the issue for subsequent comment phases to ensure the administrative record remains reliable in light of current developments. But in this rulemaking, the Office has not received comments actually disputing whether there is a continued basis for any exemptions.

In the next rulemaking, the Office may consider whether to include a mechanism for petitioners to disclaim types of uses or other aspects of an exemption if they believe only partial renewal is appropriate. As detailed below, after reviewing the petitions for renewal and comments in response, the Office concludes that it has received a sufficient petition to renew each existing exemption, and it does not find any meaningful opposition to such renewal. Accordingly, the Office intends to recommend readoption of all existing exemptions in their current form.

*A. Audiovisual Works—Criticism and Comment—Universities and K–12 Educational Institutions*

Multiple organizations petitioned to renew the exemption for motion pictures [27] for educational purposes by college and university or K–12 faculty and students (codified at 37 CFR 201.40(b)(1)(ii)(A)).[28] The petitions demonstrated the continuing need and justification for the exemption, stating that educators and students continue to rely on excerpts from digital media for class presentations and coursework. Peter Decherney, Katherine Sender, John Jackson, Console-ing Passions, the American Association of University Professors (''AAUP''), International Communication Association (''ICA''), Library Copyright Alliance (''LCA''), and Society for Cinema and Media Studies (''SCMS'') (collectively ''Joint Educators I'') provide several examples of professors using DVD clips in the classroom; for example, ''Cornell University Communication professor Lee Humphreys samples short segments of movies and television shows for her lectures in her 'Media Communication' class'' and has ''shifted from using clips from YouTube because she wants to show higher quality clips and to avoid

[18] *See, e.g.*, DVD Copy Control Ass'n (''DVD CCA'') & Advanced Access Content Sys. Licensing Adm'r (''AACS LA'') AV Educ. Opp'n at 4 (''the failure of any proponent to provide any example of use by K–12 students should result in the Copyright Office finding in this streamlined renewal process that the exemption may not be renewed as to such uses''); DVD CCA & AACS LA Nonfiction Multimedia Ebooks Opp'n at 2 (''To the extent the proponents are requesting renewal of the full exemption, the failure to provide any example of use of this expansion to all nonfiction works beyond film analysis should render the exemption's expanded nonfiction uses ineligible for the streamlined renewal process''); ESA, MPA & RIAA Noncom. Video Opp'n at 1 (''the Register should . . . carefully scrutinize OTW's petition, and all of the streamlined renewal petitions, to consider whether the examples of alleged exemption use provided in the petitions fall within the parameters of the existing exemptions'').

[19] *See* 85 FR at 37401 (''The petitioner must provide a brief explanation summarizing the basis for claiming a continuing need and justification for the exemption. The required showing is meant to be minimal.''); Section 1201 Study at 144 (''The Office believes that the evidentiary showing required in a declaration can be minimal, as the aim is only to show that the harm that existed when the exemption was first granted continues to occur or would return but for the exemption, thus providing a sufficient justification for the Office to rely upon the prior rulemaking record in making a new recommendation supporting renewal of the exemption. Moreover, this approach appears consistent with relevant case law upholding determinations based upon a single sworn affidavit.'').

[20] Section 1201 Study at 144 (also noting that ''some stakeholders expressed wariness that, in practice, a short-form filing might recreate the requirements of the current rulemaking'').

[21] *See id.* at 143 (Office will request ''parties seeking renewal of an exemption to submit a short declaration outlining the continuing need for an exemption''); *see also id.* at 144 (referring to ''a short-form filing'').

[22] *Id.* at 144.

[23] 2018 Recommendation at 18.

[24] 85 FR at 37401.

[25] *Id.*

[26] *Id.* at 37402; *see also* 2018 Recommendation at 18.

[27] Unless otherwise noted, all references to motion pictures as a category include television programs and videos.

[28] Joint Educators I AV Educ. Renewal Pet.; Brigham Young Univ. & Brigham Young Univ.—Idaho (collectively, ''BYU'') AV Educ. Renewal Pet.

showing the attached advertisements to her students.'' [29] In addition, co-petitioner Peter Decherney declares that he ''continues to teach a course on Multimedia Criticism'' where his students ''produce short videos analyzing media.'' [30] Indeed, Joint Educators I broadly suggest that the ''entire field'' of video essays or multimedia criticism ''could not have existed in the United States without fair use and the 1201 educational exemption.'' [31] Through these submissions, petitioners demonstrated personal knowledge and experience with regard to this exemption based on their representation of thousands of digital and literacy educators and/or members supporting educators and students, combined with past participation in the section 1201 triennial rulemaking.

DVD CCA and AACS LA filed comments that do not object to the renewal of this exemption but ask the Office to address several purported deficiencies in the renewal petitions.[32] Because DVD CCA and AACS LA expressly disclaim opposition to streamlined renewal of this exemption, the Office does not treat the concerns raised as meaningful opposition. It does, however, provide brief additional comment on the points raised by DVD CCA and AACS LA regarding the sufficiency of the petition. Regarding the lack of evidence of use of the exemption by K–12 educators or students, DVD CCA and AACS LA argue that ''the failure of any proponent to provide any example of use by K–12 students should result in the Copyright Office finding in this streamlined renewal process that the exemption may not be renewed as to such uses.'' [33] As explained above, petitioners need not address every possible use covered by an exemption when seeking to renew an exemption, and the Office has concluded that the petition was submitted in a sufficient manner.[34]

A similar conclusion applies to DVD CCA and AACS LA's complaint that ''the users ignore the threshold requirement to consider alternatives to circumvention.'' [35] DVD CCA and AACS LA are correct in noting that, although the 2018 rulemaking eliminated prior language limiting the exemption to circumstances where ''close analysis'' of video is required, it retained the requirement that the user ''reasonably believe[ ] that non-circumventing alternatives are unable to produce the required level of high-quality content.'' [36] From their comment, it appears that DVD CCA and AACS LA believe that the ''close analysis'' requirement should be reinstated, but wish to reiterate a ''lack of opposition'' to the exemption in light of recognition that schools are currently ''wrestling with implementing distance learning.'' [37]

The Office has examined the record and finds the petitions sufficient. As explained above, it does not follow that petitioners seeking renewal must provide an ''explanation why screen capture technology could not suffice to capture and show'' for each and every one of the film clips they seek to use.[38] Petitioners made that showing in the prior rulemaking, and their renewal petition attests that there has been no material change in the facts. Indeed, Joint Educators I reference the need of a communication professor to embed clips in PowerPoint rather than played from YouTube ''because she wants to show higher quality clips and to avoid showing the attached advertisements to her students.'' [39] The same petition also provides multiple examples asserting a continued need to make use of the exemption for purposes of engaging in film analysis, precisely the kind of pedagogy that has been discussed in connection with the prior ''close analysis'' limitation.[40] This is sufficient. It then becomes opponents' burden to establish a basis for concluding that the prior findings no longer obtain. DVD CCA and AACS LA AV have provided no such evidence here.

Based on the information provided in the renewal petitions and the lack of meaningful opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*B. Audiovisual Works—Criticism and Comment—Massively Open Online Courses (''MOOCs'')*

Brigham Young University and Peter Decherney, Katherine Sender, John Jackson, Console-ing Passions, ICA, LCA, and SCMS (collectively ''Joint Educators II'') petitioned to renew the exemption for motion pictures for educational uses in MOOCs (codified at 37 CFR 201.40(b)(1)(ii)(B)).[41] No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, stating that instructors continue to rely on the exemption to develop, provide, and improve MOOCs, as well as increase the number of (and therefore access to) MOOCs in the field of film and media studies—with Joint Educators II noting that the ''exemption has never been so relevant as it is now during the COVID–19 pandemic and the universal shift of our education systems to online learning.'' [42]

In response to the renewal petition, DVD CCA and AACS LA filed a comment noting that they did not oppose renewal of the exemption but asking the Office to address what they described as the ''apparent failure of the proponents'' to employ technological measures preventing retention and redistribution of MOOC content.[43] The comment suggests that this does not reflect any changed circumstances, and notes that the Office suggested in the seventh rulemaking that the proper method to air DVD CCA and AACS LA's concerns would be to oppose the renewal.[44] Again, they have not done so. The Office declines to address whether any user's activities may or may not be consistent with the exemption. The relevant exemption language is not in dispute, and interpreting compliance with or eligibility for the exemption is outside the scope of this proceeding. If DVD CCA and AACS LA believe that the exemption should be adjusted or eliminated in light of abuse or difficulty in complying with the condition that

[29] Joint Educators I AV Educ. Renewal Pet. at 3.

[30] *Id.*

[31] *Id.*

[32] DVD CCA & AACS LA AV Educ. Opp'n.

[33] *Id.* at 4.

[34] To the extent the eighth rulemaking has received information relating to whether the exemption remains necessary for K–12 educational activities, Joint Educator's petition for expansion of this exemption also suggests it continues to be necessary, especially in light of the ongoing pandemic. *See* Decherney, Sender, Jackson, Stein, Gaglani, Wisbauer, Berg, Siddiqui, Robertson, Console-ing Passions, AAUP, ICA, LCA & SCMS (collectively ''Joint Educators III) Class 1 Pet. at 2.

[35] DVD CCA & AACS LA AV Educ. Opp'n at 7.

[36] 37 CFR 201.40(b)(1).

[37] DVD CCA & AACS LA AV Educ. Opp'n at 6–7.

[38] *Id.* at 6.

[39] Joint Educators I AV Educ. Renewal Pet. at 3.

[40] *See also, e.g.,* 2015 Recommendation at 92 (citing examples where high-definition quality is necessary, including close analysis of ''*The Wizard of Oz* (to highlight prop wires and other 'stage-like' elements), *Citizen Kane* (to appreciate depth of field, chiaroscuro effects, and subtle narrative elements), Jacques Tati's *Playtime* (to better approximate the intended 70mm viewing experience and appreciate the film's very detailed and complex composition), and *Saving Private Ryan* (to experience the enhanced color and contrast effect of bleach bypass film processing, hyper-realism, and complex soundscapes)'').

[41] BYU AV Educ. MOOCS Renewal Pet.; Joint Educators AV Educ. MOOCs Renewal Pet.

[42] Joint Educators II AV Educ. MOOCs Renewal Pet. at 3.

[43] DVD CCA & AACS LA AV Educ. MOOCs Opp'n at 1.

[44] *Id.* at 2 n.3.

exemption beneficiaries reasonable technological measures, the proper response would be to submit an opposition to this exemption so the Office can determine whether fuller airing through notice and comment to evaluate this issue is appropriate.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*C. Audiovisual Works—Criticism and Comment—Digital and Media Literacy Programs*

LCA and Professor Renee Hobbs petitioned to renew the exemption for motion pictures for educational uses in nonprofit digital and media literacy programs offered by libraries, museums, and other nonprofits (codified at 37 CFR 201.40(b)(1)(ii)(C)).[45] No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, and petitioners demonstrated personal knowledge and experience with regard to this exemption. For example, the petition stated that librarians across the country have relied on the current exemption and will continue to do so for their digital and media literacy programs.[46]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*D. Audiovisual Works—Criticism and Comment—Multimedia E-Books*

Multiple petitioners jointly sought to renew the exemption for the use of motion picture excerpts in nonfiction multimedia e-books (codified at 37 CFR 201.40(b)(1)(i)(C)).[47] The petition demonstrated the continuing need and justification for the exemption. In addition, the petitioners demonstrated personal knowledge through Professor Buster's continued work on an e-book series based on her lecture series, "Deconstructing Master Filmmakers: The Uses of Cinematic Enchantment," which, they said, "relies on the availability of high-resolution video not available without circumvention of technological protection measures." [48]

In response, DVD CCA and AACS LA filed a comment that did not object to renewal of an exemption limited to "e-books offering filming analysis," but did object to renewing the existing exemption as it is currently formulated.[49] DVD CCA and AACS LA asserted that the renewal petition failed to "provide any example of use of this expansion to all nonfiction works beyond film analysis." [50] As a result, they argue that the evidence is only sufficient to support an exemption for use in e-books offering film analysis.

As noted above, however, in making a petition to renew an exemption, it is sufficient for petitioners to declare that to their knowledge, "there had not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified." [51] Petitioners are not required to provide examples that pertain to every type of use covered by the exemption. To the extent an opponent of renewal seeks to narrow an exemption, it should "provide evidence that would allow the Acting Register to reasonably conclude that the prior rulemaking record and any further information provided in the petitions are insufficient for her to recommend renewal without the benefit of a further developed record." [52]

In this case, the Office determined in the 2018 proceeding that the record was sufficient to justify recommending an exemption that includes nonfiction uses beyond film analysis.[53] The Office concludes that the renewal petition, which seeks renewal of the exemption as previously adopted, is sufficient to support renewal. Although DVD CCA and AACS LA note that the statements in the renewal petition are limited to examples related to e-books offering film analysis, this opposition does not amount to evidence in the form of legal, marketplace, or technological changes that render the prior rulemaking record insufficient to support recommending renewal.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*E. Audiovisual Works—Criticism and Comment—Filmmaking*

Multiple organizations petitioned to renew the exemption for motion pictures for uses in documentary films or other films where use is in parody or for a biographical or historically significant nature (codified at 37 CFR 201.40(b)(1)(i)(A)).[54] The petitions summarized the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience with regard to this exemption. For example, the International Documentary Association, Film Independent, and Kartemquin Educational Films (collectively "Joint Filmmakers")—which represent thousands of independent filmmakers across the nation—stated that TPMs such as encryption continue to prevent filmmakers from accessing needed material, and that this is "especially true for the kind of high fidelity motion picture material filmmakers need to satisfy both distributors and viewers." [55] Petitioners state that they personally know many filmmakers who have found it necessary to rely on this exemption and will continue to do so.[56]

DVD CCA and AACS LA filed comments that did not oppose renewal of the exemption but did object to the characterization of the exemption filed by the filmmaking proponents.[57] Specifically, DVD CCA and AACS LA noted that the exemption is limited to criticism or comment, documentary filmmaking, or any filmmaking that would make use of a clip in a parody or for its biographical or historical nature; in their view, petitioners suggest the exemption covers all fair use or noninfringing uses.[58] The Office does not find it necessary to opine on the characterization of the petitions by DVD CCA and AACS LA and believes that petitioners' declarations have met the minimal showing sufficient to support renewal of the exemption without modification.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during

[45] LCA & Hobbs AV Educ. Nonprofits Renewal Pet.

[46] *Id.*

[47] Buster, Authors Alliance & AAUP Nonfiction Multimedia E-Books Renewal Pet.

[48] *Id.* at 3.

[49] DVD CCA & AACS LA Nonfiction Multimedia E-Books Opposition Pet.

[50] *Id.* at 2.

[51] 2018 Recommendation at 18.

[52] *Id.*

[53] *Id.* at 64.

[54] Joint Filmmakers Documentary Films Renewal Pet.; New Media Rights ("NMR") Documentary Films Renewal Pet.

[55] Joint Filmmakers Documentary Films Renewal Pet. at 3.

[56] *Id.;* NMR Documentary Films Renewal Pet. at 3.

[57] DVD CCA & AACS LA Documentary Filmmaking Opp'n.

[58] *Id.* at 2.

the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*F. Audiovisual Works—Criticism and Comment—Noncommercial Videos*

Two organizations petitioned to renew the exemption for motion pictures for uses in noncommercial videos (codified at 37 CFR 201.40(b)(1)(i)(B)).[59] The petitions demonstrated the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience with regard to this exemption. For example, one of the petitioners, the Organization for Transformative Works ("OTW"), has advocated for the noncommercial video exemption in past triennial rulemakings, and has heard from "a number of noncommercial remix artists" who have used the exemption and anticipate needing to use it in the future.[60] OTW included an account from an academic stating that footage ripped from DVDs and Blu-ray was preferred for "vidders" (noncommercial remix artists) because "it is high quality enough to bear up under the transformations that vidders make to it." [61] Similarly, NMR stated that its staff personally knows "many video creators that have found it necessary to rely on this exemption during the current triennial period" and who intend to make these types of uses in the next triennial period.[62]

OTW contends that "the exemption should be renewed using the relatively simple language defining the exempted class from the 2008 rulemaking, covering both DVDs and Blu-Ray (and streaming where necessary) 'when circumvention is accomplished solely in order to accomplish the incorporation of short portions of motion pictures into new works for the purpose of criticism or comment, and where the person engaging in circumvention believes and has reasonable grounds for believing that circumvention is necessary to fulfill the purpose of the use.' " [63] OTW asserts that this change would not constitute "an expansion of the existing exemption, but a more understandable restatement." [64] Two comments, one from DVD CCA and AACS LA and the other from the Entertainment Software Association ("ESA"), Motion Picture Association ("MPA"), and Recording Industry Association of America ("RIAA") did not object to the renewal of the exemption for noncommercial videos but did object to the proposed change in the language sought by OTW, arguing that it involves a modification of the current exemption.[65] The Office agrees that OTW's proposed modifications are appropriately addressed as part of the full rulemaking proceeding, and therefore the Office has included this request with the proposed classes discussed below.[66]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*G. Audiovisual Works—Accessibility*

Multiple organizations petitioned to renew the exemption for motion pictures for the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students with disabilities (codified at 37 CFR 201.40(b)(2)(i)(A)).[67] No oppositions were filed against readoption of this exemption.

The petition demonstrated the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience. For example, Brigham Young University asserts that its disability services offices "sometimes need to create accessible versions of motion pictures" to accommodate its students with disabilities.[68] Both petitions stated that there is a need for the exemption going forward; indeed, one group of petitioners states that "the need is likely to increase significantly in light of the ongoing COVID–19 pandemic as many educational institutions shift to online learning and the use of digital multimedia by faculty increases." [69]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*H. Literary Works—Accessibility*

Multiple organizations petitioned to renew the exemption for literary works distributed electronically (*i.e.*, e-books), for use with assistive technologies for persons who are blind, visually impaired, or have print disabilities (codified at 37 CFR 201.40(b)(3)).[70] No oppositions were filed against readoption of this exemption. The petitions demonstrated the continuing need and justification for the exemption, stating that individuals who are blind, visually impaired, or print disabled are significantly disadvantaged with respect to obtaining accessible e-book content because TPMs interfere with the use of assistive technologies.[71] Petitioners noted that the record underpinning this exemption "has stood and been re-established in the past six triennial reviews, dating back to 2003," and that the "accessibility of ebooks is frequently cited as a top priority" by its members.[72] In addition, petitioners noted the unique challenges COVID–19 poses to the blind, visually impaired, and print disabled due to limited physical access to libraries and the shift to virtual learning.[73] Finally, the petitioners demonstrated personal knowledge and experience with regard to the assistive technology exemption; they are all organizations that advocate for the blind, visually impaired, and print disabled.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*I. Literary Works—Medical Device Data*

Hugo Campos petitioned to renew the exemption covering access to patient data on networked medical devices (codified at 37 CFR 201.40(b)(4)).[74] No oppositions were filed, and Consumer

[59] NMR Noncom. Videos Renewal Pet.; OTW Noncom. Videos Renewal Pet.

[60] OTW Noncom. Videos Renewal Pet. at 3.

[61] *Id.*

[62] NMR Noncom. Videos Renewal Pet. at 3.

[63] OTW Noncom. Videos Renewal Pet. at 4.

[64] *Id.*

[65] DVD CCA & AACS LA Noncom. Videos Opp'n; ESA, MPA & RIAA Noncom. Videos Opp'n.

[66] The Office notes that much of the language that has been added to the exemption since 2008 was sought by proponents of the exemption, *e.g.*, the addition of a reference to the statutory definition of motion pictures was sought by EFF. *See* 2012 Recommendation at 105. In some cases, the addition of such language was supported by OTW itself. *See, e.g., id.* at 110 (adding clarification that commissioned videos are included within exemption if ultimate use is noncommercial, a proposal that was supported by OTW).

[67] Ass'n of Transcribers and Speech-to-Text Providers ("ATSP"), Ass'n on Higher Educ. and Disability ("AHEAD") & LCA Captioning Renewal Pet.; BYU Captioning Renewal Pet.

[68] BYU Captioning Renewal Pet. at 3.

[69] ATSP, AHEAD & LCA Captioning Renewal Pet. at 3.

[70] Am. Council for the Blind ("ACB"), Am. Fed'n for the Blind ("AFB"), Nat'l Fed'n of the Blind ("NFB"), LCA, American Association of Law Libraries ("AALL"), Benetech/Bookshare, and HathiTrust Assistive Technologies Renewal Pet.

[71] *Id.* at 3.

[72] *Id.* at 3–4.

[73] *Id.* at 4.

[74] Campos Medical Devices Renewal Pet.

Reports submitted a comment in support.[75] Mr. Campos's petition demonstrated the continuing need and justification for the exemption, stating that patients continue to need access to data output from their medical devices to manage their health.[76] Mr. Campos demonstrated personal knowledge and experience with regard to this exemption, as he is a patient needing access to the data output from his medical device and is a member of a coalition whose members research, comment on, and examine the effectiveness of networked medical devices.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*J. Computer Programs—Unlocking*

Multiple organizations petitioned to renew the exemption for computer programs that operate cellphones, tablets, mobile hotspots, or wearable devices (*e.g.,* smartwatches), to allow connection of a new or used device to an alternative wireless network (''unlocking'') (codified at 37 CFR 201.40(b)(5)).[77] No oppositions were filed against the petitions seeking to renew this exemption; Consumer Reports filed in support of renewal.[78] The petitions demonstrate the continuing need and justification for the exemption, stating that consumers of the enumerated products continue to need to be able to unlock the devices so they can switch network providers. For example, ISRI stated that its members continue to purchase or acquire donated cell phones, tablets, and other wireless devices and try to reuse them, but that wireless carriers still lock devices to prevent them from being used on other carriers.[79] In addition, the petitioners demonstrated personal knowledge and experience with regard to this exemption. CCA and ISRI represent companies that rely on the ability to unlock cellphones. Both petitioners also participated in past 1201 triennial rulemakings relating to unlocking lawfully-acquired wireless devices.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*K. Computer Programs—Jailbreaking*

Multiple organizations petitioned to renew the exemptions for computer programs that operate smartphones, tablets and other portable all-purpose mobile computing devices, smart TVs, or voice assistant devices to allow the device to interoperate with or to remove software applications (''jailbreaking'') (codified at 37 CFR 201.40(b)(6)–(8)).[80] The petitions demonstrate the continuing need and justification for the exemption, and that petitioners had personal knowledge and experience with regard to this exemption. For example, regarding smart TVs specifically, the Software Freedom Conservancy (''SFC'') asserts that it has ''reviewed the policies and product offerings of major Smart TV manufacturers (Sony, LG, Samsung, etc.) and they are substantially the same as those examined during the earlier rulemaking process.'' [81] The petitions state that, absent an exemption, TPMs applied to the enumerated products would have an adverse effect on noninfringing uses, such as being able to install third-party applications on a smartphone or download third-party software on a smart TV to enable interoperability.[82] For example, EFF's petition outlined its declarant's experience with instances where it was necessary to replace the software on a smartphone, smart TV, and tablet.[83] Consumer Reports filed a comment in support of the exemption,[84] and no one opposed renewal.

Based on the information provided in the renewal petitions and the lack of meaningful opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*L. Computer Programs—Repair of Motorized Land Vehicles*

Multiple organizations petitioned to renew the exemption for computer programs that control motorized land vehicles, including farm equipment, for purposes of diagnosis, repair, or modification of a vehicle function (codified at 37 CFR 201.40(b)(9)).[85] The petitions demonstrated the continuing need and justification for the exemption. For example, the Motor & Equipment Manufacturers Association (''MEMA'') stated that over the past three years, its membership ''has seen firsthand that the exemption is helping protect consumer choice and a competitive market, while mitigating risks to intellectual property and vehicle safety.'' [86] The Auto Care Association (''ACA'') stated that ''[u]nless this exemption is renewed, the software measures manufacturers deploy for the purpose of controlling access to vehicle software will prevent Auto Care members from lawfully assisting consumers in the maintenance, repair, and upgrade of their vehicles.'' [87] SEMA stated that it ''is unaware of any factor, incident or reason to change the exemption and the need for the exemption remains valid and imperative.'' [88] The petitioners demonstrated personal knowledge and experience with regard to this exemption; each either represents or gathered information from individuals conducting repairs or businesses that manufacture, distribute, and sell motor vehicle parts, and perform vehicle service and repair. Consumer Reports filed in support of the petition.[89]

Although not opposing readoption of this exemption, the Alliance for Automotive Innovation (''AAI'') submitted comments raising concerns with the ACA and MEMA petitions.[90] Specifically, the AAI argued that the two petitions ''mischaracterize the scope of the existing exemption and appear to argue for an expanded exemption, rather than for renewal of the existing exemption as it is 'currently formulated, without modification.' '' [91] It states that both ACA and MEMA suggest ''that the existing exemption permits third party repair shops to circumvent access controls on vehicle software in order to provide commercial repair services.'' [92] AAI asserts that ''[p]roviding a commercial service that

[75] Consumer Reports Medical Devices Supp.

[76] Campos Medical Devices Renewal Pet. at 3.

[77] Competitive Carriers Ass'n (''CCA'') Unlocking Renewal Pet.; Inst. of Scrap Recycling Industries (''ISRI'') Unlocking Renewal Pet.

[78] Consumer Reports Unlocking Supp.

[79] ISRI Unlocking Renewal Pet. at 3.

[80] EFF Jailbreaking Renewal Pet.; NMR Jailbreaking Renewal Pet.; SFC Jailbreaking Renewal Pet.

[81] SFC Jailbreaking Renewal Pet. at 3.

[82] EFF Jailbreaking Renewal Pet. at 3; NMR Jailbreaking Renewal Pet. at 3; SFC Jailbreaking Renewal Pet. at 3.

[83] EFF Jailbreaking Renewal Pet. at 3–4.

[84] Consumer Reports Jailbreaking Supp.

[85] ACA Vehicle Repair Renewal Pet.; Am. Farm Bureau Fed'n Vehicle Repair Renewal Pet.; Consumer Tech. Ass'n Vehicle Repair Renewal Pet.; MEMA Vehicle Repair Renewal Pet.; Specialty Equip. Mkt. Ass'n (''SEMA'') Vehicle Repair Renewal Pet.

[86] MEMA Vehicle Repair Renewal Pet. at 3.

[87] ACA Vehicle Repair Renewal Pet. at 3.

[88] SEMA Vehicle Repair Renewal Pet. at 3.

[89] Consumer Reports Vehicle Repair Supp.

[90] AAI Vehicle Repair Opp'n.

[91] *Id.* at 1.

[92] *Id.* at 2.

requires circumventing access controls or copy controls (*e.g.,* using or providing certain engine tuning software) is indisputably trafficking in an unlawful service under Sections 1201(a)(2) and (b) and, therefore, is clearly outside the scope of the existing exemption." [93]

The Office addressed the relationship of this exemption to the anti-trafficking provisions in some detail in the 2018 Recommendation. In response to petitioners' requests, the Office recommended removal of the language in the prior repair exemption requiring that circumvention be "undertaken by the authorized owner." [94] That change, the Office explained, was intended to "account[] for the possibility that certain third parties may qualify as 'user[s]' eligible for an exemption from liability under section 1201(a)(1)." [95] In making this recommendation, which the Librarian accepted, the Office declined to express any "view as to whether particular examples of assistance do or do not constitute unlawful circumvention services"—specifically, "whether vehicle or other repair services may run afoul of the anti-trafficking provisions when engaging in circumvention on behalf of customers." [96] The Office adheres to this position and accordingly expresses no view as to the activities described by ACA and MEMA.

Based on the information provided in the renewal petitions and the lack of opposition to the specific exemption, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*M. Computer Programs—Repair of Smartphones, Home Appliances, and Home Systems*

Multiple organizations petitioned to renew the exemption for computer programs that control smartphones, home appliances, or home systems, for diagnosis, maintenance, or repair of the device or system (codified at 37 CFR 201.40(b)(10)).[97] The petitions demonstrated the continuing need and justification for the exemption. For example, EFF, the Repair Association, and iFixit asserted that "[m]anufacturers of these devices continue to implement technological protection measures that inhibit lawful repairs, maintenance, and diagnostics, and they show no sign of changing course.[98] Consumer Reports filed in support of the petition.[99]

In comments filed in response to the petitions, DVD CCA and AACS LA did not object to renewal of the exemption, but did request that the Office "expressly . . . reject the implied assertion that some of the activity used as examples in the renewal petition . . . is permitted under the current exemption." [100] Specifically, they pointed to an example in which petitioners stated a purported need to "repair any disrupted functionality" in Sonos smart speakers for which the manufacturer had ceased to provide software updates.[101] DVD CCA and AACS LA contend that such activity does not constitute "repair" under the exemption because, under relevant licensing schemes, a manufacturer "may outright deactivate one or more functions due to the product's TPM being compromised. These results are not the consequences of the product falling out of repair or breaking." [102]

DVD CCA and AACS LA do not appear to be arguing that the use of this example renders the renewal petitions insufficient with respect to home systems. The Office agrees that the sufficiency of the petitions do not depend on whether this specific example qualifies under the current exemption. Even if this example were excluded, the petitions attest to a continuing need for the exemption and the continued validity of the prior record.[103] To the extent DVD CCA and AACS LA are asking the Office to opine on examples of particular uses, such a request is beyond the scope of the renewal phase, though they are free to raise such concerns in the comment phase to the extent they relate to proposed expansions of the current rule.

Based on the information provided in the renewal petitions and the lack of opposition to renewal, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*N. Computer Programs—Security Research*

Multiple organizations and security researchers petitioned to renew the exemption permitting circumvention for purposes of good-faith security research (codified at 37 CFR 201.40(b)(11)).[104] The petitioners demonstrated the continuing need and justification for the exemption, as well as personal knowledge and experience with regard to this exemption. For example, the petition from Professor J. Alex Halderman, the Center for Democracy and Technology ("CDT"), and the U.S. Technology Policy Committee of the Association for Computing Machinery ("ACM") highlighted a number of concerns justifying the continuing need for the exemption, including the need to find and detect vulnerabilities in voting machines and other election systems, the increased proliferation of consumer Internet of Things devices, and the increasing reliance on digital systems combined with greater aggressiveness on the part of threat actors, including other nation states.[105] The petition from Professors Matt Blaze and Steven Bellovin asserted that in the past three years "one of us has received threats of litigation from copyright holders in connection with his security research on software in voting systems." [106] Finally, MEMA stated that its membership "experienced firsthand that the exemption is helping encourage innovation in the automotive industry while mitigating risks to intellectual property and vehicle safety." [107]

No oppositions were filed against readoption of this exemption, while Consumer Reports filed in support of renewal.[108] A petition seeking renewal of a separate exemption submitted by Hugo Campos, a member of a coalition of medical device patients and researchers, also noted support for this exemption.[109]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly,

[93] *Id.*

[94] 2018 Recommendation at 223–25.

[95] *Id.* at 225.

[96] *Id.*

[97] EFF Device Repair Renewal Pet.; EFF, Repair Ass'n & iFixit Device Repair Renewal Pet.

[98] EFF Device Repair Renewal Pet. at 3; EFF, Repair Ass'n & iFixit Device Repair Renewal Pet. at 3.

[99] Consumer Reports Device Repair Supp.

[100] DVD CCA & AACS LA Device Repair Opp'n at 1.

[101] *Id.* at 3.

[102] DVD CCA & AACS LA Device Repair Opp'n at 4.

[103] *See, e.g.,* EFF Device Repair Renewal Pet. at 3 ("Manufacturers of these devices continue to implement technological protection measures that inhibit lawful repairs, maintenance, and diagnostics, and they show no sign of changing course.").

[104] Blaze & Bellovin Security Research Renewal Pet.; Halderman, CDT & ACM Security Research Renewal Pet.; MEMA Security Research Renewal Pet.

[105] Halderman, CDT & ACM Security Research Renewal Pet. at 4.

[106] Blaze & Bellovin Security Research Renewal Pet. at 3.

[107] MEMA Security Research Renewal Pet. at 3.

[108] Consumer Reports Security Research Supp.

[109] Campos Medical Device Renewal Pet. at 4.

the Office intends to recommend renewal of this exemption.

*O. Computer Programs—Software Preservation*

The Software Preservation Network (''SPN'') and LCA petitioned to renew the exemption for computer programs other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums (codified at 37 CFR 201.40(b)(13)).[110] The petitions state that libraries, archives, and museums continue to need the exemption to preserve and curate software and materials dependent on software. For example, the petition asserts that ''researchers at UVA designed a project in order to access the 'Peter Sheeran papers'—a collection of drawings and plans from a local Charlottesville architecture firm,'' and that without the exemption, ''the outdated Computer Aided Design (''CAD'') software used to create many of the designs in the Sheeran papers may have remained inaccessible to researchers, rendering the designs themselves inaccessible, too.''[111] In addition, the petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the section 1201 triennial rulemaking relating to access controls on software, and/or representing major library associations with members that have relied on this exemption. Readoption of this exemption was unopposed.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*P. Computer Programs—Video Game Preservation*

SPN and LCA petitioned to renew the exemption for preservation of video games for which outside server support has been discontinued (codified at 37 CFR 201.40(b)(12)).[112] Consumer Reports supported the petition.[113] The petitions state that libraries, archives, and museums continue to need the exemption to preserve and curate video games in playable form. For example, the petition highlights the Georgia Tech University Library's Computing Lab, retroTECH, which has a significant collection of recovered video game consoles, made accessible for research and teaching uses pursuant to the exemption.[114] In addition, the Museum of Digital Arts and Entertainment in Oakland, California, relied on the exemption to restore a recent PC game, in collaboration with Microsoft and the original developers, despite potential DRM issues.[115] The petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the section1201 triennial rulemaking, and/or through their representation of members that have relied on this exemption. Readoption of this exemption was unopposed.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

*Q. Computer Programs—3D Printing*

Michael Weinberg petitioned to renew the exemption for computer programs that operate 3D printers to allow use of alternative feedstock (codified at 37 CFR 201.40(b)(14)).[116] No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, and the petitioner demonstrated personal knowledge and experience. Specifically, Mr. Weinberg declared he is a member of the 3D printing community and has been involved with this exemption request during each cycle it has been considered by the Office.[117] In addition, the petition states that 3D printers continue to limit the types of materials used, and new companies and printers may consider implementing similar restrictions in the future, thereby requiring renewal of the exemption.[118]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, the Office intends to recommend renewal of this exemption.

## III. Analysis and Classification of Proposed New or Expanded Exemptions

Having addressed the petitions to renew existing exemptions, the Office now turns to the petitions for new or expanded exemptions. The Office received twenty-six petitions,[119] which it has organized into seventeen proposed classes, as described below. Before discussing those classes, the Office first explains the process and standards for submission of written comments.

*A. Submission of Written Comments*

Persons wishing to address proposed exemptions in written comments should familiarize themselves with the substantive legal and evidentiary standards for the granting of an exemption under section 1201(a)(1), which are also described in more detail on the Office's form for submissions of longer comments, available on its website. In addressing factual matters, commenters should be aware that the Office favors specific, ''real-world'' examples supported by evidence over speculative, hypothetical observations. In cases where the technology at issue is not apparent from the requested exemption, it can be helpful for commenters to describe the TPM(s) that control access to the work and method of circumvention.

Commenters' legal analysis should explain why the proposal meets or fails to meet the criteria for an exemption under section 1201(a)(1), including, without limitation, why the uses sought are or are not noninfringing as a matter of law. The legal analysis should also discuss statutory or other legal provisions that could impact the necessity for or scope of the proposed exemption. Legal assertions should be supported by statutory citations, relevant case law, and other pertinent authority. In cases where a class proposes to expand an existing exemption, participants should focus their comments on the legal and evidentiary bases for modifying the exemption, rather than the underlying exemption; as discussed above, the Office intends to recommend each current temporary exemption for renewal.

To ensure a clear and definite record for each of the proposals, commenters are required to provide a separate submission for each proposed class during each stage of the public comment period. Although a single comment may

[110] SPN & LCA Software Preservation Renewal Pet.

[111] *Id.* at 3.

[112] SPN & LCA Abandoned Video Game Renewal Pet.

[113] Consumer Reports Abandoned Video Game Supp.

[114] SPN & LCA Abandoned Video Game Renewal Pet. at 3.

[115] *Id.*

[116] Weinberg 3D Printers Renewal Pet.

[117] *Id.* at 3.

[118] *Id.*

[119] In addition, as noted, OTW's renewal petition seeks to amend the current regulatory language. The Office is treating that request as a petition for expansion.

not address more than one proposed class, the same party may submit multiple written comments on different proposals. The Office acknowledges that the requirement of separate submissions may require commenters to repeat certain information across multiple submissions, but the Office believes that the administrative benefits of creating a self-contained, separate record for each proposal will be worth the modest amount of added effort.

The first round of public comment is limited to submissions from proponents (*i.e.,* those parties who proposed new exemptions during the petition phase) and other members of the public who support the adoption of a proposed exemption, as well as any members of the public who neither support nor oppose an exemption but seek only to share pertinent information about a specific proposal.

Proponents of exemptions should present their complete affirmative case for an exemption during the initial round of public comment, including all legal and evidentiary support for the proposal. Members of the public who oppose an exemption should present the full legal and evidentiary basis for their opposition in the second round of public comment. The third round of public comment will be limited to supporters of particular proposals and those who neither support nor oppose a proposal, who, in either case, seek to reply to points made in the earlier rounds of comments. Reply comments should not raise new issues, but should instead be limited to addressing arguments and evidence presented by others.

*B. The Proposed Classes*

As noted above, the Office has reviewed and classified the proposed exemptions set forth in the twenty-seven petitions received in response to its notification of inquiry. Any exemptions adopted must be based on ''a particular class of works,'' [120] and each class is intended to ''be a narrow and focused subset of the broad categories of works . . . identified in Section 102 of the Copyright Act.'' [121] As explained in the Notice of Inquiry, the Office consolidates or groups related and/or overlapping proposed exemptions where possible to simplify the rulemaking process and encourage joint participation among parties with common interests (though collaboration is not required). Accordingly, the Office has categorized the petitions into seventeen proposed classes of works.

Each proposed class is briefly described below; additional information can be found in the underlying petitions posted on the Office website. As explained in the notification of inquiry, the proposed classes ''represent only a starting point for further consideration in the rulemaking proceeding, and will be subject to further refinement based on the record.'' [122] The Office further notes that it has not put forward precise regulatory language for the proposed classes, because any specific language for exemptions that the Register ultimately recommends to the Librarian will depend on the full record developed during this rulemaking. Indeed, in the case of proposed modifications to existing exemptions, as stated above, the Register may propose altering current regulatory language to expand the scope of an exemption, where the record suggests such a change is appropriate.

After examining the petitions, the Office has preliminarily identified some initial legal and factual areas of interest with respect to certain proposed classes. The Office stresses, however, that these areas are not exhaustive, and commenters should consider and offer all legal argument and evidence they believe necessary to create a complete record. These early observations are offered without prejudice to the Office's ability to raise other questions or concerns at later stages of the proceeding. Finally, ''where an exemption request resurrects legal or factual arguments that have been previously rejected, the Office will continue to rely on past reasoning to dismiss such arguments in the absence of new information.'' [123]

Proposed Class 1: Audiovisual Works—Criticism and Comment

Three petitions seek to expand the existing exemptions for circumvention of access controls protecting motion pictures on DVDs, Blu-ray discs, and digitally transmitted video for purposes of criticism and comment, including for educational purposes by certain users. Because these petitions raise some shared concerns, the Office has grouped them into one class, as it did during the seventh triennial proceeding. This grouping is without prejudice to possible further refinement of this class, including dividing it into subclasses based on specific uses.

First, as noted, OTW filed a renewal petition requesting that the exemption regarding the creation of noncommercial videos be amended to incorporate the language of the exemption for such uses adopted in the 2010 rulemaking.[124] That exemption permitted circumvention undertaken ''solely in order to accomplish the incorporation of short portions of motion pictures into new works for the purpose of criticism or comment, and where the person engaging in circumvention believes and has reasonable grounds for believing that circumvention is necessary to fulfill the purpose of the use.'' [125] Noting that the current exemption is longer than this formulation, OTW contends that ''the complexity of [the current] provisions substantially increases the difficulty of communicating and implementing the exemptions in practice.'' [126] In OTW's view, reverting to the 2010 language would not expand the scope of the existing rule but merely would help ''clarify the exemption for ordinary users.'' [127] The exemption, however, has been expanded since 2010, including by encompassing works on a Blu-ray disc or received via a digital transmission, and by including language clarifying that the exemption includes ''videos produced for a paid commission if the commissioning entity's use is noncommercial.'' [128] The Office seeks comment on whether, or to what extent, commenters believe the suggested language would alter the substance of the current provision. As part of that analysis, commenters should discuss the extent to which the evidence submitted in the prior rulemaking may be relied upon to support the proposed change.

Second, Joint Educators III seek to expand the current exemption for educational uses to allow a greater number of users to engage in ''online instructional learning.'' [129] They acknowledge that the existing exemption already covers the use of short clips in distance learning by certain users—college and university faculty and students, K–12 educators

[120] 17 U.S.C. 1201(a)(1)(B).

[121] Commerce Comm. Report at 38; *see also* Section 1201 Study at 109–10 (noting that while ''in some cases, [the Office] can make a greater effort to group similar classes together, and will do so going forward,'' ''in other cases, the Office's ability to narrowly define the class is what enabled it to recommend the exemption at all, and so the Office will continue to refine classes when merited by the record'').

[122] 85 FR at 37403.

[123] Section 1201 Study at 147; *see also* 79 FR 55687, 55690 (Sept. 17, 2014).

[124] OTW Noncomm. Videos Renewal Pet. at 3. OTW's petition refers to that proceeding as the ''2008 rulemaking,'' but the Office generally identifies each proceeding by its year of completion.

[125] 75 FR 43825, 43827 (2010).

[126] OTW Noncomm. Videos Renewal Pet. at 3.

[127] *Id.*

[128] 37 CFR 201.40(b)(1). *See* 2015 Recommendation at 103–06 (expanding exemption to include Blu-ray and digital transmission).

[129] Joint Educators III Class 1 Pet. at 2.

and students, and faculty of accredited massive open online courses (MOOCs).[130] Indeed, the 2018 Recommendation specifically described the exemption language pertaining to college and university and K–12 users as "broad enough to encompass exempted uses under sections 110(1) and 110(2) (*i.e.,* face-to-face and distance teaching)." [131] Joint Educators III, however, seek to expand the exemption to other online learning platforms that offer "supplemental education, upskilling, retraining, recharging, and lifelong learning," such as Khan Academy, LinkedIn Learning, Osmosis.org and Code.org.[132] To enable these providers to exercise the exemption, they propose an expansion allowing "educators and preparers of online learning materials to use short portions of motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, for the purpose of criticism, comment, illustration and explanation in offerings for registered learners on online learning platforms when use of the film and media excerpts will contribute significantly to learning." [133]

Third, BYU requests to expand the class of eligible users to include "college and university employees," instead of "college and university faculty." [134] In addition, it seeks to broaden the permitted uses from "criticism, comment, teaching, or scholarship" to "a noninfringing use under 17 U.S.C. 107, 110(1), 110(2), or 112(f)." [135] BYU's proposal also would remove the current reference to screen-capture technology and the requirement that the exempted use be limited to "short portions" of motion pictures.[136]

With respect to both BYU's and Joint Educators III's petitions, the Office notes that certain proposals to remove the limitations on eligible users of this exemption were considered during the 2015 and 2018 rulemakings, and invites comment on any changed legal or factual circumstances with respect to these provisions.[137] In particular, the Office seeks specific examples where the presence of TPMs is resulting in an adverse effect on users who are not already included in the existing regulatory language. Further, with respect to BYU's request to expand the types of permitted uses, the Office notes that it has previously rejected similar proposed classes as overbroad.[138] And in the previous rulemaking, the Office declined a proposed exemption by BYU that would permit circumvention for nonprofit educational purposes in accordance with sections 110(1) and 110(2) and eliminate the "criticism and comment" limitation and references to screen-capture technology.[139] The Office invites comment on whether any changed circumstances warrant altering that determination.

Proposed Class 2: Audiovisual Works—Texting

SolaByte Corp. petitions for a new exemption to access "licensed audio/video works stored on optical disc media for the purpose of creating short (10 seconds or less) A/V clips that enhance communication effectiveness and understanding when using TEXTing messages." [140] The proposed class "[i]ncludes movies, TV shows, music video, other copyrighted works" that are stored on "[p]ackaged and replicated DVD or Blu-ray discs playable on computer or CE player hardware." [141] Eligible users would include persons "who want to create expressive clips that convey their thoughts when texting." [142]

Because these proposed activities do not appear to be limited to criticism and comment or educational uses, the Office has classified this proposal as a separate proposed class. The Office seeks additional detail about the scope of the proposed exemption from SolaByte or others, such as whether the exemption would be available for commercial services. Commenters should describe with specificity the relevant TPMs and whether their presence is adversely affecting noninfringing uses, including identifying whether eligible users may access expressive clips through alternate channels that do not require circumvention and the legal basis for concluding that the proposed uses are likely to be noninfringing. Similarly, commenters should address any anticipated effect that circumvention of TPMs would have on the market for or value of the relevant copyrighted works, which appears to extend to the same broad swatch of motion pictures as Class 1.

Proposed Class 3: Audiovisual Works—Accessibility

ATSP, AHEAD, and LCA petition to expand the existing exemption relating to the creation of accessible versions of motion pictures for students with disabilities. They propose several changes to the existing exemption language, which includes the following requirements:

- Circumvention is undertaken by a disability services office or other unit of a kindergarten through twelfth-grade educational institution, college, or university engaged in and/or responsible for the provision of accessibility services to students, for the purpose of adding captions and/or audio description to a motion picture to create an accessible version as a necessary accommodation for a student or students with disabilities under an applicable disability law, such as the Americans With Disabilities Act, the Individuals with Disabilities Education Act, or Section 504 of the Rehabilitation Act;
- The educational institution unit has, after a reasonable effort, determined that an accessible version cannot be obtained at a fair price or in a timely manner; and
- The accessible versions are provided to students or educators and stored by the educational institution in a manner intended to reasonably prevent unauthorized further dissemination of a work.[143]

First, petitioners seek to expand the exemption "to allow for the remediation of video for faculty and staff, as well as students." [144] They recommend that the current language be revised to read: "to create an accessible version as a necessary accommodation for students, faculty, and staff with disabilities." [145] Second, to clarify that a covered educational institution unit ("EIU") may create accessible versions "proactively," petitioners suggest removing the phrase "as a necessary accommodation" and requiring only that the creation of an accessible version be "consistent with" an applicable disability law.[146] Third, petitioners ask the Office to clarify that the "reasonable effort" requirement applies "only where an 'accessible version' is available that contains captions and descriptions of sufficient quality to satisfy applicable disability

[130] *Id.* at 2–3.

[131] 2018 Recommendation at 86.

[132] Joint Educators III Class 1 Pet. at 2.

[133] *Id.*

[134] BYU Class 1 Pet. at 2.

[135] *Id.*

[136] *Id.*

[137] 2018 Recommendation at 53–55; 2015 Recommendation at 102.

[138] *See* 2015 Recommendation at 100 (citing Recommendation of the Register of Copyrights in RM 2005–11, Rulemaking on Exemptions from Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies at 17–19 (Nov. 17, 2006) ("2006 Recommendation")).

[139] 2018 Recommendation at 32, 52–53.

[140] SolaByte Class 2 Pet. at 2.

[141] *Id.*

[142] *Id.*

[143] 37 CFR 201.40(b)(2)(i).

[144] ATSP, AHEAD & LCA Class 3 Pet. at 2.

[145] *Id.*

[146] *Id.* at 3.

law." [147] The Office notes that in recommending the existing regulatory language, it stated that an EIU may proceed after reaching a conclusion "that it must create an accessible version as a necessary accommodation for a student with disabilities." [148] Fourth, petitioners recommend qualifying the "reasonable effort" requirement in circumstances where "no accessible version of a video included with a textbook exists, but a publisher might be willing to generate an accessible version of the video at extra cost," by eliminating this requirement when a publisher does not include an accessible version of materials with purchased materials.[149] The Office would welcome comment upon whether petitioners believe that the extra costs should be of an unreasonable amount, or whether they contend that every offer carrying additional cost should be dismissed, along with any thoughts from copyright owners or licensors on this issue. Finally, petitioners recommend "altering the current exemption language to make clear that an EIU can reuse stored accessible versions instead of re-circumventing and re-remediating inaccessible media when complying with an accommodation request." [150]

The Office seeks comment on whether this exemption, including petitioners' suggested regulatory language, should be adopted.

Proposed Class 4: Audiovisual Works—Livestream Recording

FloSports, Inc. petitions for an exemption "for circumvention of technology used in the digital storage of audiovisual works originating as a livestream of sports and other competitive events." [151] The exemption "would enable a livestreaming service to provide individual viewers, via a virtual digital video recorder ('vDVR'), with access to a recording on a server for fair use purposes." [152]

The petition indicates that circumvention is necessary to alter the functioning of HTTP Live Streaming ("HLS"), "a live-video streaming technique that enables high quality streaming of media content over the internet from web servers." [153] According to FloSports, the use of HLS to stream content "results in only an ephemeral copy in addition to the live broadcast." [154] FloSports seeks to enable "copies of the audio and video data files [to] be stored on a longer-term basis and synchronized for later replay by the viewer." [155] It states that "[t]he cost and practical difficulty of obtaining synchronization licenses, combined with the cost and technical challenges of creating individualized audio and visual stored files for each viewer seeking to access the stored files, effectively control viewers access to the material for fair use purposes." [156]

FloSports contends that the recording of such material constitutes fair use on the following basis:

> Individual recordings of audiovisual performances, historically, had been used by directors of the groups in such recordings to instruct, teach, and otherwise educated [*sic*] the participants in the recordings on what went right, what went wrong, and how each could improve. Generally, the individual performances in the audiovisual streams this petition considers are a very small percentage of the entire copyrighted work (*e.g.*, all individual performances combined for an entire copyrighted broadcast). Further, there is no current market for educational recordings at the moment. Granting this exemption, or the performance of such a recording, would not adversely affect the market for the copyrighted recordings.[157]

The Office invites comment on this proposal but notes at the outset that the description of the proposed class in the petition is insufficiently clear to meet the statutory requirement to identify "a *particular class* of copyrighted works." [158] While the petition generally describes the class as covering livestreams of "sports and other competitive events," elsewhere it states that the relevant works are "audiovisual recordings of musical performances as identified in 17 U.S.C. 102(a)(6) and 17 U.S.C. 106(a)(5)." [159] It then states that the proposed class "incorporates any and all works for which audiovisual recordings may be made and used as fair use. This includes individual school performances." [160] Given this inconsistent information, the Office is unable to determine whether, for example, the petition is intended to cover the use of copyrighted broadcasts owned by another party or simply musical or other works that may be captured in broadcasts owned by FloSports. Without further clarification, the petition does not seem to relate to a particular class of works.

Nor is it apparent to what extent the asserted adverse effects are attributable to "[t]he cost and practical difficulty of obtaining synchronization licenses," [161] as opposed to TPMs. As noted, the Office will only recommend an exemption where causation has been established; that is, where the Office can conclude that the statutory prohibition on circumventing access controls is the cause of the adverse effects.[162]

Finally, the Office seeks additional information regarding the intended noninfringing uses, including whether it would be appropriate to clarify that the petition is directed at facilitating educational, noncommercial uses. Petitioner appears to operate a commercial livestreaming service,[163] and it is unclear whether this exemption is intended to facilitate growth in that market. In addition to factual development regarding the intended uses, the Office welcomes information on the legal basis for finding that such uses would be fair. For example, in connection with petitioner's statement that "the individual performances in the audiovisual streams this petition considers are a very small percentage of the entire copyrighted work," [164] commenters should address the well-established principle that copying even a quantitatively "insubstantial portion" of a work may weigh against fair use where the material is qualitatively significant to that work.[165] These factual and legal issues should be described with sufficient particularity to enable the Office to determine whether the specific uses are likely to be fair. As it has done in the past, the Office is inclined to reject overbroad proposed classes such as "fair use works" or "educational fair use works." [166] Absent such clarification, the Office will decline further consideration of the petition.[167]

---

[147] *Id.*

[148] 2018 Recommendation at 109–10.

[149] *Id.* The petition refers to a purchased textbook, but the Office queries if that was petitioner's intent, since the exemption concerns access to audiovisual works.

[150] *Id.*

[151] FloSports Class 4 Pet. at 2.

[152] *Id.*

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] *Id.* at 3.

[158] 17 U.S.C. 1201(a)(1)(C) (emphasis added); *see supra* Section I.

[159] FloSports Class 4 Pet. at 2.

[160] *Id.*

[161] *Id.*

[162] *See* Section 1201 Study at 115 ("The statutory prohibition on circumventing access controls [must be] the cause of the adverse effects.").

[163] *See Flosports, https://www.flosports.tv/join-now/* (advertising "plans starting from $12.49/mo") (last visited Oct. 8, 2020).

[164] FloSports Class 4 Pet. at 3.

[165] *See Harper & Row Publrs., Inc.* v. *Nation Enters.*, 471 U.S. 539, 564–65 (1985).

[166] *See* 2015 Recommendation at 100 (citing 2006 Recommendation at 17–19).

[167] *Cf.* 79 FR 73856, 73859 (Dec. 12, 2014) (declining to put forward exemption proposals that could not be granted as a matter of law).

Proposed Class 5: Audiovisual Works—Preservation

LCA proposes a new exemption to facilitate preservation of audiovisual works stored on DVDs or Blu-ray discs. a class that would include "[m]otion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, or on a Blu-ray disc protected by the Advanced Access Content System, and is no longer reasonably available in the commercial marketplace, for the purpose of lawful preservation of the motion picture, by a library, archives, or museum."[168] The petition is quite terse, consisting of a single sentence, and so the Office encourages proponents to develop the legal and factual administrative record in their initial submissions.

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language.

Proposed Class 6: Audiovisual Works—Space-Shifting

Somewhat related to LCA's petition, but not cabined to preservation activities conducted by libraries, archives, or museums, SolaByte proposes a broader exemption that would be available to "[t]he legitimate owner of the DVD or blu-ray disc and licensee of the content" for the purpose of "making a usable personal back up copy."[169] The exemption "would apply to any title of audio/visual works 5 years after its public release date."[170] SolaByte notes that "[i]ncomplete licensing of titles by internet media service providers requires the owner of the disc to subscribe to multiple service providers at high personal cost to cover a fraction of their library titles."[171]

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language. The Office notes that in the 2006, 2012, 2015, and 2018 rulemakings, the Librarian rejected proposed exemptions for space-shifting or format-shifting, finding that the proponents had failed to establish under applicable law that space-shifting is a noninfringing use.[172] The Office invites comment on whether, in the past three years, there has been any change in the legal or factual circumstances bearing upon that issue.

Proposed Classes 7(a): Motion Pictures and 7(b): Literary Works—Text and Data Mining

Authors Alliance, AAUP, and LCA petition for an exemption "for researchers to circumvent technological protection measures on lawfully accessed literary works distributed electronically as well as on lawfully accessed motion pictures, in order to deploy text and data mining techniques."[173] Petitioners believe that these two categories of works "should be grouped together in a single exemption because they involve the same petitioners, the same proposed use, and implicate the same arguments for an exemption."[174] The proposed class includes both works embodied in physical discs and those transmitted digitally.[175] The users seeking access include "researchers engaged in text and data mining in the humanities, social sciences, and sciences."[176]

For reasons of administrative efficiency, the Office has grouped these proposals into one category that encompasses two proposed classes pertaining to motion pictures and literary works, respectively (*i.e.,* Classes 7(a) and 7(b)). Commenters therefore may submit a single comment addressing one or both aspects of the petition. It is important to emphasize, however, that proponents are required to make the statutorily required showing with respect to each category of works. As discussed above, the statute requires that exemptions describe "a *particular class* of copyrighted works."[177] Congress made clear that such a class may not encompass more than one of the categories of works set out in section 102; to the contrary, the "particular class" language refers to "a *narrow and focused subset*" of the section 102 categories.[178] This means that for each type of work for which an exemption is sought, petitioners must demonstrate an actual or likely adverse impact on a noninfringing use as a result of the statutory prohibition on circumvention. In the case of this proposal, to the extent proponents believe the relevant factual and legal issues are similar as to the two classes of works, the supporting comments should describe those matters in detail. For example, commenters may wish to address the extent to which there is overlap with respect to the types of TPMs applied to these works, the nature of the proposed research activities, the relevant markets for the works, and the availability of potential alternatives to circumvention.

Proposed Class 8: Literary Works—Accessibility

ACB, AFB, NFB, LCA, AALL, Benetech/Bookshare, and HathiTrust petition to expand the current exemption for the use of assistive technologies by visually impaired persons in connection with electronically distributed literary works. The current regulatory language applies to literary works, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies:

- When a copy of such a work is lawfully obtained by a blind or other person with a disability, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the price of the mainstream copy of the work as made available to the general public through customary channels; or
- When such work is a nondramatic literary work, lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.[179]

The proposed exemption would amend this language to reflect recent changes to U.S. law to implement the Marrakesh Treaty to Facilitate Access to Published Works for Persons Who Are Blind, Visually Impaired, or Otherwise Print Disabled ("Marrakesh Treaty").[180] These include updates to the Chaffee Amendment, codified at section 121 of title 17, and the newly adopted section 121A, which pertains to the import and export of works in accessible formats. Petitioners propose the following changes:

- Updating the description of eligible users from "blind or other person with a disability" to "eligible person, as such a person is defined in 17 U.S.C. 121";
- Updating the description of eligible works to "literary works and previously published musical works that have been fixed in the form of text or notation"; and
- Adding the phrase "or 121A" to the end of 37 CFR 201.40(b)(3)(ii). As an

[168] LCA Class 5 Pet. at 2.

[169] SolaByte Class 6 Pet. at 2.

[170] *Id.*

[171] *Id.*

[172] *See* 83 FR 54010, 54026–27 (Oct. 26, 2018); 80 FR 65944, 65960 (Oct. 28, 2015); 77 FR 65260, 65276–77 (Oct. 26, 2012); 71 FR 68472, 68478 (Nov. 27, 2006).

[173] Authors Alliance, AAUP & LCA Class 6 Pet. at 2.

[174] *Id.*

[175] *Id.* at 3.

[176] *Id.*

[177] 17 U.S.C. 1201(a)(1)(C) (emphasis added); *see supra* Section I.

[178] Commerce Comm. Report at 38 (emphasis added).

[179] 37 CFR 201.40(b)(3).

[180] Marrakesh Treaty, art. 7, June 27, 2013, 52 I.L.M. 1312.

alternative, petitioners request clarification that exercising the rights described in section 121A does not implicate section 1201.[181]

In addition, petitioners request that the Office "eliminate the reference to the price of 'mainstream' copies of works . . . and replace this term with a more inclusive phrase such as 'market price of an inaccessible copy.' "[182]

The Office seeks comment on whether this proposed exemption, including petitioners' suggested regulatory language, should be adopted.

Proposed Class 9: Literary Works—Medical Device Data

Hugo Campos, a member of a coalition of medical device patients and researchers, requests two modifications to the current exemption permitting circumvention to access compilations of data generated by medical devices or corresponding personal monitoring systems. First, he seeks removal of the language limiting the exemption to devices "that are wholly or partially implanted in the body."[183] He notes that "[m]any current and upcoming devices obtain medical data about a patient without the need to be fully or partially implanted in the body," including smart watches, personal EKG monitors, and non-implanted glucose meters.[184] And he argues that "there is no relevant difference between implanted and non-implanted devices with respect to copyright."[185]

Second, Mr. Campos requests that the exemption "permit third parties to perform the circumvention, with permission, on behalf of the patient."[186] He notes that the Office and the Library "have structured other exemptions so that the identity of the person doing the circumvention does not matter."[187]

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language. With respect to the request to permit third-party assistance, the Office notes that it has addressed this issue on several occasions, most recently in the 2018 Recommendation's discussion of the current exemptions for repair of software-enabled motor vehicles and devices. There, the Office recommended removal of the prior requirement that circumvention be "undertaken by the authorized owner" of the vehicle or device, noting participants' concern that such language "improperly excludes other users with a legitimate interest in engaging in noninfringing diagnosis, repair, or modification activities."[188] But the Office emphasized the limited nature of the change:

> To be clear, removal of the "authorized owner" language should in no way be understood to suggest that the exemption extends to conduct prohibited by the anti-trafficking provisions; such an exemption is beyond the Librarian's authority to adopt. . . . The recommended revision simply accounts for the possibility that certain third parties may qualify as "user[s]" eligible for an exemption from liability under section 1201(a)(1). Such parties still will be required to consider whether their activities could separately give rise to liability under section 1201(a)(2) or (b). Given the legal uncertainty in this area, services electing to proceed with circumvention activity pursuant to the exemption do so at their peril.[189]

The Office invites comment on the extent to which this analysis may be relevant to the current proposal.

Proposed Class 10: Computer Programs—Unlocking

ISRI submitted two separate petitions to expand the current exemption for "unlocking"—*i.e.,* connecting a wireless device to an alternative wireless network. The current exemption permits circumvention of the following lawfully acquired devices for unlocking purposes:

- Wireless telephone handsets (*i.e.,* cellphones);
- All-purpose tablet computers;
- Portable mobile connectivity devices, such as mobile hotspots, removable wireless broadband modems, and similar devices; and
- Wearable wireless devices designed to be worn on the body, such as smartwatches or fitness devices.[190]

In its first petition, ISRI seeks to add "laptop computers (including chromebooks) with 4G LTE or 5G or other cellular connection capabilities" to the list of covered devices.[191] In its second petition, ISRI seeks to remove the enumeration of devices altogether and extend the exemption to "any other devices with 4G LTE or 5G or other cellular connection capabilities," including, but not limited to, "Smart TVs, Internet of Things (IoT) devices, immersive extended reality (XR) headsets, desktop computers, and drones."[192]

The Office seeks comment on whether this proposed exemption should be adopted, including any proposed regulatory language. The Office notes that in the seventh triennial rulemaking it considered a similar petition to remove the list of enumerated device categories, but concluded that the proponents had failed to carry their burden of demonstrating adverse effects on noninfringing uses with respect to all types of wireless devices with cellular connection capability.[193] Comments responding to this petition should address the extent to which factual and legal issues pertaining to certain categories of devices may be relevant to wireless devices more generally.

Proposed Class 11: Computer Programs—Jailbreaking

Two petitions seek to expand or clarify the categories of devices covered by the exemptions for jailbreaking, which currently include smartphones and portable all-purpose mobile computing devices, smart televisions, and voice assistant devices.[194] SFC petitions for a new exemption to enable the installation of alternative firmware in "routers and other networking devices."[195] EFF proposes a clarification of the current exemption regarding smart televisions. In EFF's view, it is "unclear whether that exemption includes hardware devices that enable the viewing of video streams, along with other software applications, when such devices are not physically integrated into a television."[196] The petition refers to such hardware as "streaming devices" and cites "the Roku line of products, the Amazon Fire TV Stick, and the Apple TV" as examples.[197]

The Office seeks comment on whether these proposed exemptions should be adopted, including any proposed regulatory language to define the types of devices that would be covered.

Proposed Class 12: Computer Programs—Repair

Multiple organizations petition for new or expanded exemptions relating to diagnosis, repair, and modification of software-enabled devices. As noted, the current regulations include two repair-related exemptions, covering (1) computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle, when circumvention is a

[181] ACB, AFB, NFB, LCA, AALL, Benetech/Bookshare & HathiTrust Class 8 Pet. at 4.

[182] *Id.*

[183] Campos Class 9 Pet. at 2 (citing 37 CFR 201.40(b)(4)).

[184] *Id.* at 2.

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] 2018 Recommendation at 229.

[189] *Id.* at 225.

[190] 37 CFR 201.40(b)(5).

[191] ISRI Class 10 Pet. #1 at 2.

[192] ISRI Class 10 Pet. #2 at 2.

[193] 2018 Recommendation at 162.

[194] 37 CFR 201.40(b)(6)–(8).

[195] SFC Class 11 Pet. at 2.

[196] EFF Class 11 Pet. at 2.

[197] *Id.*

necessary step to allow the diagnosis, repair, or lawful modification of a vehicle function; and (2) computer programs that are contained in and control the functioning of a lawfully acquired smartphone or home appliance or home system, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system.[198]

Three petitions seek to expand the current exemptions to include additional types of devices. Summit Imaging, Inc. and Transtate Equipment Co., Inc. separately petition for an exemption allowing circumvention of TPMs for purposes of diagnosis, modification, and repair of medical devices.[199] iFixit and Public Knowledge jointly petition for an exemption permitting circumvention ''to repair video game consoles and replace damaged hardware.''[200] With respect to the latter petition, the Office notes that in prior rulemakings it has declined to recommend exemptions for jailbreaking and repair of video game consoles in light of evidence that circumvention of TPMs in such devices may adversely affect the value of the affected software, as well as a lack of evidence of adverse effects on noninfringing uses.[201] The Office invites comment on whether, in the past three years, there has been any change in the legal or factual circumstances bearing upon these issues.

Two additional petitions request removal of the limitation to specific categories of devices, along with further changes to the current regulatory text.[202] EFF seeks to expand the exemption to permit circumvention for purposes of *modification* of a device, in addition to repair-related activities. iFixit and the Repair Association propose to remove the current requirement that circumvention of TPMs protecting software in motor vehicles not constitute a violation of applicable law.[203] The Office notes that it considered similar requests regarding these issues in the 2018 rulemaking.[204] Therefore, as with the above petitions, comments addressing these proposals should include discussion of any relevant changed circumstances.

Finally, the Office notes that all of the petitions in this class appear to request that the users eligible to exercise these exemptions include third-party service providers.[205] As above, the Office invites comment on the extent to which its prior analysis of that issue may be applicable here.[206]

Proposed Class 13: Computer Programs—Security Research

Two petitions seek to expand the current exemption permitting circumvention for purposes of good-faith security research. Professor J. Alex Halderman, CDT, and ACM propose removal of several limitations in the current regulation: (1) The requirement that circumvention be undertaken on a ''lawfully acquired device or machine on which the computer program operates'' and ''not violate any applicable law''; (2) both instances of the term ''solely'' (*i.e.*, ''solely for the purpose of good-faith security research'' and ''solely for purposes of good-faith testing, investigation, and/or correction of a security flaw or vulnerability''); and (3) the requirement that the information derived from the activity be used ''primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.''[207] As petitioners note, the Office considered these proposed changes in the 2018 rulemaking and provided interpretive guidance as to the regulatory language's intended scope.[208] Petitioners state, however, that they ''intend to further develop the record in favor of these changes in the current rulemaking period.''[209]

SFC petitions for an expansion to ''clarify that the definition of 'good faith security research' . . . includes good-faith testing, investigation, and/or correction of privacy issues (including flaws or functionality that may expose personal information) and permits the owner of the device to remove software or disable functionality that may expose personal information.''[210] Eligible users under this proposal would include ''privacy and security researchers who investigate and publish information about privacy flaws in computing devices; and individual consumers and hobbyists who wish to prevent their private data from being disclosed by the devices they own.''[211]

The Office seeks comment on whether these proposed changes should be adopted. With respect to SFC's petition, comments should include discussion of the extent to which the proposed activities may or may not be addressed by permanent statutory exemptions or current regulatory exemptions.

Proposed Classes 14(a): Computer Programs and 14(b): Video Games—Preservation

SPN and LCA filed two petitions to expand the current exemptions for preservation of software and video games by eligible libraries, archives, and museums.[212] Both of these exemptions currently require that the covered works not be ''distributed or made available outside of the physical premises of the eligible library, archives, or museum.''[213] The proposed exemptions would remove those requirements.[214] The Office welcomes further elaboration on how proponents of the exemptions would envision these works to be distributed or made available in a manner likely to be noninfringing, respectively. For example, the current exemptions are focused on circumvention to enable preservation uses, in contrast to enabling provision of lending copies for users, a preliminary distinction that the Office has found critical in the past when analyzing potential legislative reforms to the section 108 exception for libraries and archives.[215] Would the proposed modification maintain this distinction, and if so, how? Would there be conditions on access restrictions to registered users of an eligible library, archives, or museum or would material be made available more generally to members of the public? The Office notes that in the 2018 rulemaking, it declined to recommend a proposal to expand the video game preservation exemption to allow circumvention by affiliate archivists outside the premises of a covered institution, concluding that the

198 37 CFR 201.40(b)(9)–(10).

199 Summit Imaging, Inc. Class 12 Pet. at 2; Transtate Equip. Co. Class 12 Pet. at 2.

200 iFixit & Public Knowledge Class 12 Pet. at 2.

201 *See* 2018 Recommendation at 206, 219–20; 2015 Recommendation at 199–201; 2012 Recommendation at 44, 47.

202 EFF Class 12 Pet. at 2–3; iFixit & Repair Ass'n Class 12 Pet. at 2–3.

203 iFixit & Repair.org Class 12 Pet. at 3.

204 *See* 2018 Recommendation at 189–94, 206–09, 310–11.

205 Summit Imaging, Inc. Class 12 Pet. at 3; Transtate Equip. Co. Class 12 Pet. at 2; iFixit & Public Knowledge Class 12 Pet. at 2; EFF Class 12 Pet. at 2–3; iFixit & Repair Ass'n Class 12 Pet. at 2.

206 *See* 2018 Recommendation at 225.

207 Halderman, CDT & ACM Class 13 Pet. at 3.

208 *See* 2018 Recommendation at 283–314.

209 Halderman, CDT & ACM Class 13 Pet. at 3.

210 SFC Class 13 Pet. at 2.

211 *Id.*

212 37 CFR 201.40(b)(12), (13).

213 *Id.* at § 201.40(b)(12)(ii), (b)(13)(i).

214 SPN & LCA Class 14(a) Pet. at 2; SPN & LCA Class 14(b) Pet. at 2.

215 U.S. Copyright Office, Revising Section 108: Copyright Exceptions for Libraries and Archives at 24–34 (addressing preservation uses), 35–41 (addressing user copies) (2017), *https://www.copyright.gov/policy/section108/discussion-document.pdf.*

proponents had failed to establish that such activity was likely noninfringing.[216] Commenters responding to these petitions should address the extent to which the legal and factual issues relevant to this class may differ from those considered previously.

Although these proposed classes both involve computer programs (which constitute literary works under the Copyright Act), the petition regarding video games involves an additional category of works insofar as video games also constitute audiovisual works.[217] Therefore, the Office is following the same procedure discussed above in relation to the proposed TDM exemption: the Office has grouped these petitions into a single category encompassing two proposed classes. Commenters addressing these proposals may submit a single comment addressing both computer programs and video games, but the supporting evidence must be sufficient to establish an adverse effect on noninfringing uses with respect to each category of works. In particular, the Office is interested in the extent to which licensing markets for video games may be similar or different from those for software more generally, and whether any such differences may be relevant under the fair use analysis or the expected effect of circumvention of technological measures on the market for or value of copyrighted works.[218] The Office seeks comment on these and other relevant issues, including any proposed regulatory language.

Proposed Class 15: Computer Programs—3D Printing

Michael Weinberg petitions to amend the current exemption permitting circumvention to enable the use of alternative feedstock in 3D printers. The current exemption allows access to ''[c]omputer programs that operate 3D printers that employ microchip-reliant technological measures to limit the use of feedstock, when circumvention is accomplished solely for the purpose of using alternative feedstock and not for the purpose of accessing design software, design files, or proprietary data.'' [219] Mr. Weinberg seeks two changes to this language. First, he proposes to ''replace the term 'feedstock' . . . with the term 'material,' '' stating that the latter ''is more commonly used to describe the substances used by 3D printers within the 3D printing community and industry.'' [220] Second, he proposes to remove the term ''microchip-reliant.'' In his view, there is no ''justification to narrow the scope of the exemption to a specific subset of technological measures tied to microchip-based verifications,'' and ''the inclusion of the limiting language creates unnecessary ambiguity.'' [221] As noted, to recommend an exemption, the Office requires a showing that the statutory prohibition on circumventing access controls is yielding adverse effects on non-infringing uses. The current reference to ''microchip-reliant'' was based on the record of relevant TPMs submitted in connection with the exemption request.[222] In particular, the Office now solicits descriptions and examples of the prevalence of TPMs that are not microchip-based verifications, and descriptions of adverse effects stemming from such TPMs.[223]

In general, the Office seeks comment on whether these proposed changes should be adopted.

Proposed Class 16: Computer Programs—Copyright License Investigation

SFC petitions for a new exemption to permit circumvention of TPMs protecting computer programs for purposes of ''(a) investigating potential copyright infringement of the computer programs; and (b) making lawful use of computer programs (*e.g.,* copying, modifying, redistributing, and updating free and open source software (FOSS)).'' [224] The proposed exemption does not appear to be limited to particular users or types of devices. SFC states that the users seeking access include:

> software authors and publishers, including the authors of FOSS computer programs (which are frequently incorporated in embedded computing devices in an infringing manner); and individual consumers who are lawful owners of embedded computing devices and licensees of the computer programs embedded therein, and who wish to make lawful use of computer programs protected by technological protection measures (*e.g.* the right granted by certain FOSS licenses to install modified versions of the FOSS computer programs).[225]

It is somewhat unclear whether the requested exemption for ''lawful use of computer programs'' would apply to *any* lawful use or seeks merely to allow licensed uses of FOSS software. To the extent the former is intended, the proposed exemption appears beyond the Librarian's authority to grant. As the Office has consistently noted, the rulemaking requires a showing of ''distinct, verifiable and measurable'' adverse impacts on noninfringing uses.[226] Such evidence ''cannot be hypothetical, theoretical, or speculative, but must be real, tangible, and concrete.'' [227] In light of that requirement, ''the Register has previously rejected broad proposed categories such as 'fair use works' or 'educational fair use works' as inappropriate.'' [228] SFC and any other proponents of this request therefore must narrow or clarify the specific uses of computer programs that the proposed exemption seeks to permit, so that participants and the Office may fairly assess whether they are likely to be noninfringing and adversely affected by the prohibition on circumvention. The Office also welcomes additional detail regarding the first subpart of SFC's intended uses ''investigating potential copyright infringement of the computer programs, including the statement ''FOSS computer programs ([ ] are frequently incorporated in embedded computing devices in an infringing manner).''

Proposed Class 17: All Works—Accessibility Uses

Multiple organizations representing persons with disabilities (''Accessibility Petitioners'') jointly filed a petition proposing ''a more comprehensive exemption to resolve the shortcomings of the current, piecemeal approach to Section 1201 exemptions for accessibility.'' [229] The proposed exemption would permit circumvention to access ''all cognizable classes of works under Section 102 (a) of the Copyright Act'' to facilitate accessibility for persons with disabilities. Accessibility Petitioners state that this

[216] 2018 Recommendation at 271–75.

[217] U.S. Copyright Office, Compendium of U.S. Copyright Office Practices sec. 807.7(A)(1) (3d ed. 2017) (''Generally, a videogame contains two major components: the audiovisual material and the computer program that runs the game.'').

[218] *See* 17 U.S.C. 107; 1201(a)(1)(C)(iv).

[219] 37 CFR 201.40(b)(14).

[220] Weinberg Class 15 Pet. at 2.

[221] *Id.*

[222] 2015 Recommendation at 376.

[223] *See Lexmark Int'l Inc.* v. *Static Control Components, Inc.,* 387 F.3d 522, 547 (6th Cir. 2004) (''Because the statute refers to 'control[ling] access to a work protected under this title,' it does not naturally apply when the 'work protected under this title' is otherwise accessible.'').

[224] SFC Class 16 Pet. at 2.

[225] *Id.*

[226] Commerce Committee Report at 37; *see also* Section 1201 Study at 119–21.

[227] Section 1201 Study at 120.

[228] 2015 Recommendation at 100 (citing 2006 Recommendation at 17–19).

[229] ACB, AFB, Ass'n of Late-Deafened Adults, ATSP, AHEAD, Benetech/Bookshare, Gallaudet U., HathiTrust, Hearing Loss Ass'n of Am., LCA, Nat'l Ass'n of the Deaf, Nat'l Fed'n of the Blind, Telecomm. for the Deaf and Hard of Hearing, Inc. (collectively ''Accessibility Petitioners'') Class 17 Pet. at 4.

exemption would allow such users, as well as "advocates[ ] and organizations that produce accessible versions of copyrighted works protected by technological protection measures[,] to press ahead on accessibility without the burden of engaging in a complex, situation-specific analysis." [230] They state that the relevant barriers to access include "(1) the access controls that inhibit accessibility and (2) failures of producers, publishers, and other rightsholders to authorize access for accessibility purposes or to produce accessible versions of their works." [231]

As presently suggested, this proposed exemption is beyond the Librarian's authority to adopt because it does not meet the statutory requirement to describe "a *particular class* of copyrighted works." [232] As discussed above, the legislative history confirms that this language is intended to refer to "a *narrow and focused subset* of the broad categories of works . . . identified in section 102 of the Copyright Act." [233] Therefore, the Office uses the section 102 categories as a starting point and refines the proposed classes by other criteria, such as the types of TPMs used or the types of uses.[234] For example, while the category of "literary works" under section 102(a)(1) "embraces both prose creations such as journals, periodicals or books, and computer programs of all kinds," Congress explained that "[i]t is exceedingly unlikely that the impact of the prohibition on circumvention of access control technologies will be the same for scientific journals as it is for computer operating systems." [235] Thus, "these two categories of works, while both 'literary works,' do not constitute a single 'particular class' for purposes of" section 1201(a)(1).[236]

Further, petitioners are required to establish "distinct, verifiable and measurable impacts" on noninfringing uses,[237] and those impacts must be caused by the statutory prohibition on circumvention.[238] While TPMs undoubtedly have such impacts with respect to many accessibility uses (as reflected by the exemptions adopted for such uses in prior rulemakings), it is not clear to what extent various TPMs are effectively applied to every category of work in section 102, some of which may not readily lend themselves to such measures (*e.g.,* sculptural works). In addition, the availability of accessible-format versions of works in the marketplace is a relevant consideration in determining adverse effects,[239] and it is not clear that that factor applies equally to all categories of works.

The Office notes its continuing discretion to decline to put forward proposals for public comment that are unlikely to yield consideration of exemptions consistent with the standards of section 1201(a)(1).[240] In light of the important public policy considerations raised by this request and past exemptions adopted with respect to facilitating accessibility uses, however, the Office is noticing this category for public comment while flagging the need to further develop and refine petitioners' request into separate proposed classes. Accordingly, Accessibility Petitioners and any other proponents in this category must provide evidence and legal analysis sufficient to enable the Office to make a particularized assessment as to each class of works for which an exemption is sought. Based on prior exemptions adopted, the Office anticipates Accessibility Petitioners to be seeking exemptions related to TPMs protecting literary works as well as motion pictures distributed electronically, and proponents should provide evidence and proposed regulatory language with respect to these and any other relevant classes, and clearly identify and propose contours for each such class. For example, the Office is not inclined to recommend an exemption for printed copies of literary works, for which no TPMs are employed. Nor is the Office empowered to recommend regulatory language that extends to sound recordings, musical works, architectural works, etc. without development of an adequate administrative record demonstrating that an exemption is appropriate for each of these classes.[241]

Accessibility Petitioners should also include, with respect to each class, evidence of an actual or likely adverse effect on accessibility uses resulting from TPMs applied to that type of work. While the Office recognizes the vital importance of ensuring accessibility for persons with disabilities, and indeed has recommended legislation to make permanent the current exemption regarding assistive technologies for electronically-distributed literary works,[242] its authority in this proceeding is bound by the provisions of the statute. Subject to these requirements, the Office invites comment on this proposed class(es).

## IV. Future Phases of the Eighth Triennial Rulemaking

As in prior rulemakings, after receipt of written comments, the Office will continue to solicit public engagement to create a comprehensive record. Described below are the future phases of the administrative process that will be employed for this rulemaking, so that parties may use this information in their planning.

### *A. Public Hearings*

The Copyright Office intends to hold public hearings in spring 2021 following the last round of written comments. The hearings will allow for participation by videoconference and will be streamed online. In addition, the Office will determine at a later date, based on applicable public health guidelines, whether in-person participation will be possible. A separate notice providing details about the hearings and how to participate will be published in the **Federal Register** at a later date. The Office will identify specific items of inquiry to be addressed during the hearings.

### *B. Post-Hearing Questions*

As with previous rulemakings, following the hearings, the Copyright Office may request additional information with respect to particular classes from rulemaking participants. The Office may rely on this process in cases where it would be useful for participants to supply missing information for the record or otherwise resolve issues that the Office believes are material to particular exemptions. Such requests for information will take the form of a letter from the Copyright Office and will be addressed to individual parties involved in the proposal as to which more information is sought. While responding to such a request will be voluntary, any response

[230] *Id.* at 5.

[231] *Id.*

[232] 17 U.S.C. 1201(a)(1)(C) (emphasis added).

[233] Commerce Committee Report at 38 (emphasis added).

[234] *See supra* Section I.

[235] House Manager's Report at 7.

[236] *Id.* As noted, the Office has repeatedly declined to recommend proposed exemptions that have failed to define the class of works to be covered with sufficient particularity. *See, e.g.,* 2018 Recommendation at 131–32; 79 FR at 73859; 2006 Recommendation at 17–19.

[237] Commerce Committee Report at 37.

[238] 17 U.S.C. 1201(a)(1)(C); *see also* Section 1201 Study at 115, 117.

[239] *See, e.g.,* 2018 Recommendation at 110 (including market check requirement in exemption for accessibility uses of audiovisual works "to prevent copies being made of works already available in accessible formats, while supporting the motion picture industry's effort to further expand the availability of accessible versions in the marketplace").

[240] 79 FR at 73859 (declining to notice three proposals for public comment).

[241] *See supra* Section I (outlining four elements to the evidentiary standard applied by the Office in evaluating requests).

[242] *See* Section 1201 Study at 84–88.

will need to be supplied by a specified deadline. After the receipt of all responses, the Office will post the questions and responses on the Office's website as part of the public record.

*C. Ex Parte Communication*

In the seventh triennial rulemaking, in response to stakeholder requests, the Office issued written guidelines under which interested non-governmental participants could request informal communications with the Office during the post-hearing phase of the proceeding. The Office expects to follow substantially the same process in this proceeding. To ensure transparency, participating parties will be required to submit a list of attendees and a written summary of any oral communications, which will be posted on the Office's website. Specific guidelines for this proceeding will be made available following the public hearings. No *ex parte* communications with the Office regarding this proceeding will be permitted prior to the post-hearing phase.

Dated: October 9, 2020.

**Regan A. Smith,**

*General Counsel and Associate Register of Copyrights.*

[FR Doc. 2020–22893 Filed 10–14–20; 8:45 am]

BILLING CODE 1410–30–P

## POSTAL SERVICE

## 39 CFR Part 20

## International Mailing Services: Proposed Product and Price Changes—CPI

**AGENCY:** Postal Service™.

**ACTION:** Proposed rule; request for comments.

**SUMMARY:** The Postal Service proposes to revise *Mailing Standards of the United States Postal Service,* International Mail Manual (IMM®), to reflect changes coincident with the recently announced mailing services price adjustments.

**DATES:** We must receive your comments on or before November 16, 2020.

**ADDRESSES:** Mail or deliver comments to the manager, Product Classification, U.S. Postal Service®, 475 L'Enfant Plaza SW, RM 4446, Washington, DC 20260–5015. You may inspect and photocopy all written comments at USPS® Headquarters Library, 475 L'Enfant Plaza SW, 11th Floor N, Washington DC by appointment only between the hours of 9 a.m. and 4 p.m., Monday through Friday by calling 1–202–268–2906 in advance. Email comments, containing the name and address of the commenter, to: *PCFederalRegister@usps.gov,* with a subject line of ''January 2021 International Mailing Services Price Change—CPI.'' Faxed comments are not accepted.

**FOR FURTHER INFORMATION CONTACT:** Kathy Frigo at 202–268–4178.

**SUPPLEMENTARY INFORMATION:**

### International Price and Service Adjustments

On October 9, 2020, the Postal Service filed a notice of mailing services price adjustments with the Postal Regulatory Commission (PRC), effective on January 24, 2021. The Postal Service proposes to revise Notice 123, *Price List,* available on Postal Explorer® at *https://pe.usps.com,* to reflect these new price changes. The new prices are or will be available under Docket Number R2021–1 on the Postal Regulatory Commission's website at *www.prc.gov.*

This proposed rule describes the price changes for the following market dominant international services:

- International extra services and fees.

*International Extra Services and Fees*

The Postal Service plans to increase prices for certain market dominant international extra services including:

- Certificate of Mailing
- Registered Mail™
- Return Receipt
- Customs Clearance and Delivery Fee
- International Business Reply™ Mail Service

CERTIFICATE OF MAILING

| | Fee |
|---|---|
| **Individual pieces** | |
| Individual article (PS Form 3817) | $1.55 |
| Duplicate copy of PS Form 3817 or PS Form 3665 (per page) | 1.55 |
| Firm mailing sheet (PS Form 3665), per piece (minimum 3), First-Class Mail International only | 0.44 |
| **Bulk quantities** | |
| For first 1,000 pieces (or fraction thereof) | $8.80 |
| Each additional 1,000 pieces (or fraction thereof) | 1.10 |
| Duplicate copy of PS Form 3606 | 1.55 |

Registered Mail

*Fee:* $16.30.

Return Receipt

*Fee:* $4.25.

Customs Clearance and Delivery

*Fee:* per piece $6.65.

International Business Reply Service

*Fee:* Cards $1.55; Envelopes up to 2 ounces $2.05

Following the completion of Docket No. R2021–1, the Postal Service will adjust the prices for products and services covered by the International Mail Manual. These prices will be on Postal Explorer at *pe.usps.com.*

Accordingly, although exempt from the notice and comment requirements of the Administrative Procedure Act (5 U.S.C. 553(b), (c)) regarding proposed rulemaking by 39 U.S.C. 410(a), the Postal Service invites public comment on the following proposed changes to *Mailing Standards of the United States Postal Service,* International Mail Manual (IMM®), which is incorporated by reference in the *Code of Federal Regulations* in accordance with 39 CFR 20.1, and to associated changes to Notice 123, *Price List.*

### List of Subjects in 39 CFR Part 20

Foreign relations, International postal services.

Accordingly, 39 CFR part 20 is proposed to be amended as follows:

## PART 20—[AMENDED]

■ 1. The authority citation for 39 CFR part 20 continues to read as follows:

**Authority:** 5 U.S.C. 552(a); 13 U.S.C. 301–307; 18 U.S.C. 1692–1737; 39 U.S.C. 101,

in its place the citation "34 CFR 668.23(b)".

■ b. In the parenthetical OMB control number at the end of the section, removing the words "control number 1840–0688" and adding in their place the words "control number 1845–0039".

■ c. Removing the parenthetical authority citation at the end of the section

**PART 691 [Removed and Reserved]**

■ 18. Under the authority of 20 U.S.C. 1221e–3, part 691 is removed and reserved.

[FR Doc. 2021–23423 Filed 10–27–21; 8:45 am]

**BILLING CODE 4000–01–P**

---

**LIBRARY OF CONGRESS**

**Copyright Office**

**37 CFR Part 201**

**[Docket No. 2020–11]**

## Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, the Librarian of Congress adopts exemptions to the provision of the Digital Millennium Copyright Act ("DMCA") that prohibits circumvention of technological measures that control access to copyrighted works. As required under the statute, the Register of Copyrights, following a public proceeding, submitted a recommendation concerning proposed exemptions to the Librarian of Congress ("Register's Recommendation"). After careful consideration, the Librarian adopts final regulations based upon the Register's Recommendation.

**DATES:** Effective October 28, 2021.

**FOR FURTHER INFORMATION CONTACT:** Kevin R. Amer, Acting General Counsel and Associate Register of Copyrights, by email at *kamer@copyright.gov,* or Mark Gray, Attorney-Advisor, by email at *mgray@copyright.gov*. Each can be contacted by telephone by calling (202) 707–8350.

**SUPPLEMENTARY INFORMATION:** The Librarian of Congress, pursuant to section 1201(a)(1) of title 17, United States Code, has determined in this eighth triennial rulemaking proceeding that the prohibition against circumvention of technological measures that effectively control access to copyrighted works shall not apply for the next three years to persons who engage in certain noninfringing uses of certain classes of such works. This determination is based upon the Register's Recommendation.

The below discussion summarizes the rulemaking proceeding and the Register's recommendations, announces the Librarian's determination, and publishes the regulatory text specifying the exempted classes of works. A more complete discussion of the rulemaking process, the evidentiary record, and the Register's analysis with respect to each proposed exemption can be found in the Register's Recommendation, which is posted at *www.copyright.gov/1201/2021/*.

### I. Background

*A. Statutory Requirements*

Congress enacted the DMCA in 1998 to implement certain provisions of the WIPO Copyright and WIPO Performances and Phonograms Treaties. Among other things, title I of the DMCA, which added a new chapter 12 to title 17 of the U.S. Code, prohibits circumvention of technological measures employed by or on behalf of copyright owners to protect access to their works. In enacting this aspect of the law, Congress observed that technological protection measures ("TPMs") can "support new ways of disseminating copyrighted materials to users, and . . . safeguard the availability of legitimate uses of those materials by individuals." [1]

Section 1201(a)(1) provides in pertinent part that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under [title 17]." Under the statute, to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." [2] A technological measure that "effectively controls access to a work" is one that "in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." [3]

Section 1201(a)(1) also includes what Congress characterized as a "fail-safe" mechanism,[4] which requires the Librarian of Congress, following a rulemaking proceeding, to exempt any class from the prohibition for a three-year period if she has determined that noninfringing uses by persons who are users of copyrighted works in that class are, or are likely to be, adversely affected by the prohibition against circumvention during that period.[5] The Librarian's determination to grant an exemption is based upon the recommendation of the Register of Copyrights, who conducts the rulemaking proceeding.[6] The Register consults with the Assistant Secretary for Communications and Information of the Department of Commerce, who oversees the National Telecommunications and Information Administration ("NTIA"), in the course of formulating her recommendations.[7]

Exemptions adopted by rule under section 1201(a)(1) apply only to the conduct of circumventing a technological measure that controls access to a copyrighted work. Other parts of section 1201 address the manufacture and provision of—or "trafficking" in—products and services designed for purposes of circumvention. Section 1201(a)(2) bars trafficking in products and services that are used to circumvent technological measures that control access to copyrighted works (for example, a password needed to open a media file),[8] while section 1201(b) bars trafficking in products and services used to circumvent technological measures that protect the exclusive rights of the copyright owner (for example, technology that prevents the work from being reproduced).[9] The Librarian has no authority to adopt exemptions for the anti-trafficking prohibitions contained in section 1201(a)(2) or (b).[10]

The statute contains certain permanent exemptions to permit specified uses. These include section 1201(d), which exempts certain activities of nonprofit libraries, archives, and educational institutions; section 1201(e), which exempts "lawfully authorized investigative, protective, information security, or intelligence activity" of a state or the federal

---

[1] Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4, 1998, at 6 (Comm. Print 1998).

[2] 17 U.S.C. 1201(a)(3)(A).

[3] 17 U.S.C. 1201(a)(3)(B).

[4] *See* H.R. Rep. No. 105–551, pt. 2, at 36 (1998).

[5] *See* 17 U.S.C. 1201(a)(1).

[6] 17 U.S.C. 1201(a)(1)(C).

[7] *Id.*

[8] 17 U.S.C. 1201(a)(2).

[9] 17 U.S.C. 1201(b).

[10] *See* 17 U.S.C. 1201(a)(1)(E) ("Neither the exception under subparagraph (B) from the applicability of the prohibition contained in subparagraph (A), nor any determination made in a rulemaking conducted under subparagraph (C), may be used as a defense in any action to enforce any provision of this title other than this paragraph.").

government; section 1201(f), which exempts certain "reverse engineering" activities to facilitate interoperability; section 1201(g), which exempts certain types of research into encryption technologies; section 1201(h), which exempts certain activities to prevent the "access of minors to material on the internet"; section 1201(i), which exempts certain activities "solely for the purpose of preventing the collection or dissemination of personally identifying information"; and section 1201(j), which exempts certain acts of "security testing" of computers and computer systems.

*B. Rulemaking Standards*

In adopting the DMCA, Congress imposed legal and evidentiary requirements for the section 1201 rulemaking proceeding, as discussed in greater detail in the Register's Recommendation [11] and the Copyright Office's 2017 policy study on section 1201.[12] The Register will recommend granting an exemption only "when the preponderance of the evidence in the record shows that the conditions for granting an exemption have been met." [13] The evidence must show "that it is more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a particular class of copyrighted works." [14]

The Librarian must assess whether the implementation of access controls impairs the ability of individuals to make noninfringing uses of copyrighted works within the meaning of section 1201(a)(1). To aid in this process, the Register develops a comprehensive administrative record using information submitted by interested members of the public, and makes recommendations to the Librarian concerning whether exemptions are warranted based on that record.

To establish the need for an exemption, proponents must show, at a minimum, (1) that uses affected by the prohibition on circumvention are or are likely to be noninfringing; and (2) that as a result of a technological measure controlling access to a copyrighted work, the prohibition is causing, or in the next three years is likely to cause, an adverse impact on those uses. In addition, the Librarian must examine the statutory factors listed in section 1201(a)(1): (1) The availability for use of copyrighted works; (2) the availability for use of works for nonprofit archival, preservation, and educational purposes; (3) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (4) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (5) such other factors as the Librarian considers appropriate.

Finally, section 1201(a)(1) specifies that any exemption adopted as part of this rulemaking must be defined based on "a particular class of works." [15] Among other things, the determination of the appropriate scope of a "class of works" recommended for exemption may take into account the adverse effects an exemption may have on the market for or value of copyrighted works. Accordingly, "it can be appropriate to refine a class by reference to the use or user in order to remedy the adverse effect of the prohibition and to limit the adverse consequences of an exemption." [16]

**II. History of the Eighth Triennial Proceeding**

The Office initiated the eighth triennial rulemaking proceeding through a Notice of Inquiry ("NOI") on June 22, 2020.[17] The NOI requested petitions for renewal of exemptions adopted in the 2018 rulemaking, petitions in opposition to renewal, and any petitions for new exemptions, including proposals to expand a current exemption. The Office received twenty-six petitions for new exemptions, including thirteen comments seeking to expand certain current exemptions.

As in the prior rulemaking, the Office employed a streamlined process for renewing existing exemptions in this proceeding, detailing the renewal process in its public notices.[18] Streamlined renewal is based upon a determination that, due to a lack of legal, marketplace, or technological changes, the factors that led the Register to recommend adoption of the exemption in the prior rulemaking are expected to continue into the forthcoming triennial period.[19] That is, the same material facts and circumstances underlying the previously-adopted regulatory exemption may be relied on to renew the exemption. Because the statute requires that exemptions be adopted upon a new determination concerning the next three-year period, the fact that the Librarian previously adopted an exemption creates no presumption that readoption is appropriate.

The Register's Recommendation provides a detailed description of the process the Office used to create a record for each renewal petition.[20] In brief, the Office first solicited renewal petitions as well as comments from participants opposing the readoption of the exemption. The Office received thirty-two renewal petitions and fifteen comments in response to those petitions. Seven comments supported renewal of a current exemption, and eight comments raised discrete concerns with specific petitions, but did not oppose readoption of the relevant exemption.[21]

On October 15, 2020, the Office issued its notice of proposed rulemaking ("NPRM") identifying the existing exemptions for which the Register intended to recommend renewal, and outlined the proposed classes for new exemptions, for which three rounds of public comments were initiated.[22] Those proposals were organized into seventeen classes of works. Six of the seventeen proposed exemptions sought

[11] Register of Copyrights, Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights (Oct. 2021), *https://cdn.loc.gov/copyright/1201/2021/2021_Section_1201_Registers_Recommendation.pdf* (Register's Recommendation").

[12] Register's Recommendation at section II.C; U.S. Copyright Office, Section 1201 of Title 17 111–12 (2017), *https://www.copyright.gov/policy/1201/section-1201-full-report.pdf* ("Section 1201 Report").

[13] Section 1201 Report at 111–12; *accord* Register of Copyrights, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 12–13 (Oct. 2018). References to the Register's recommendations in prior rulemakings are cited by the year of publication followed by "Recommendation" (*e.g.*, "2018 Recommendation"). Prior Recommendations are available on the Copyright Office website at *https://www.copyright.gov/1201/*.

[14] Section 1201 Report at 112.

[15] 17 U.S.C. 1201(a)(1)(B).

[16] 2006 Recommendation at 19.

[17] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 37399 (June 22, 2020).

[18] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 37399, 37400–02 (June 22, 2020); Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 65293, 65294–95 (Oct. 15, 2020).

[19] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 37399, 37401–02 (June 22, 2020); Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 65293, 65295 (Oct. 15, 2020).

[20] Register's Recommendation at III.D & IV.

[21] The submissions received in response to the NOI are available at *https://www.copyright.gov/1201/2021/*. References to these submissions are by party and class name (abbreviated where appropriate) followed by "Renewal Pet.," "Renewal Comment," or party name and class number followed by "Pet.," "Initial," "Opp'n," or "Reply" for comments submitted in the first, second, or third round, as applicable.

[22] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 65293, 65293 (Oct. 15, 2020).

expansions of existing exemptions, seven proposed entirely new exemptions, and four contained a combination of both expansions and new exemptions. The Office then held seven days of public hearings in which it heard testimony from numerous participants. After the hearings, the Office issued written questions to hearing participants regarding certain proposed classes.[23] Finally, the Office held several *ex parte* meetings with participants concerning ten proposed classes.[24]

As required by section 1201(a)(1), the Register consulted with NTIA during this rulemaking. NTIA provided input at various stages and participated in the virtual public hearings. NTIA formally communicated its views on each of the proposed exemptions to the Register on October 1, 2021. The Office addresses NTIA's substantive views on the proposed classes below. NTIA's recommendations can be viewed at *https://cdn.loc.gov/copyright/1201/2021/2021_NTIA_DMCA_Letter.pdf.*

## III. Summary of Register's Recommendation

### A. Renewal Recommendations

As set forth in the NPRM, the Register received petitions to renew each of the exemptions adopted pursuant to the seventh triennial rulemaking. Eight comments in response to renewal petitions raised discrete concerns with specific petitions, but none opposed the verbatim readoption of an existing regulatory exemption or disputed the reliability of the previously analyzed administrative record.[25] The Register recommends renewal of these exemptions based on the information provided in the renewal petitions and the lack of meaningful opposition, finding that the conditions that led to adoption of the exemptions are likely to continue during the next triennial period. The existing exemptions, and the bases for the recommendation to readopt each exemption in accordance with the streamlined renewal process, are discussed in detail in the Recommendation and summarized briefly below. Where noted, these exemptions serve as a baseline in considering requests for expansion.

#### 1. Audiovisual Works—Educational and Derivative Uses

Multiple individuals and organizations petitioned to renew the exemption covering the use of short portions of motion pictures for various educational and derivative uses.[26] The Office did not receive meaningful opposition to readoption of these exemptions. Petitions to renew the various subparts of the exemption are discussed below. The existing exemption and its various subparts collectively serve as the baseline in assessing whether to recommend any expansions in Class 1.

##### *a. Audiovisual Works—Criticism and Comment, Teaching, or Scholarship—Universities and K–12 Educational Institutions.*[27]

Multiple individuals and organizations petitioned to renew the exemption for motion pictures for educational purposes by college and university or K–12 faculty and students. The Office did not receive substantive opposition to readoption of this exemption. The petitions demonstrated that educators and students continue to rely on excerpts from digital media for class presentations and coursework. For example, a collective of individuals and organizations provided several examples of professors using DVD clips in the classroom. A group of individual educators and educational organizations[28] broadly suggested that the "entire field" of video essays or multimedia criticism "could not have existed in the United States without fair use and the 1201 educational exemption."[29] Petitioners demonstrated personal knowledge and experience with regard to this exemption based on their representation of thousands of digital and literacy educators and/or members supporting educators and students, combined with past participation in the section 1201 triennial rulemaking. The Register finds that petitioners demonstrated a continuing need and justification for the exemption.

##### b. Audiovisual Works—Criticism and Comment—Massive Open Online Courses ("MOOCs").[30]

A collective of individuals and organizations and Brigham Young University ("BYU") petitioned to renew the exemption for educational uses of motion pictures in MOOCs. The Office did not receive meaningful opposition to readoption of this exemption. The petitions demonstrated the continuing need and justification for the exemption, stating that instructors continue to rely on the exemption to develop, provide, and improve MOOCs, as well as to increase the number of (and therefore access to) MOOCs in the field of film and media studies.

##### c. Audiovisual Works—Criticism and Comment—Digital and Media Literacy Programs[31]

Library Copyright Alliance ("LCA") and Renee Hobbs petitioned to renew the exemption for motion pictures for educational uses in nonprofit digital and media literacy programs offered by libraries, museums, and other organizations. No oppositions were filed against readoption of this exemption. The petition stated that librarians across the country have relied on the current exemption and will continue to do so for their digital and media literacy programs, thereby demonstrating the continuing need and justification for the exemption.

##### d. Audiovisual Works—Criticism and Comment—Multimedia E-books[32]

Multiple petitioners jointly sought to renew the exemption for the use of motion picture excerpts in nonfiction multimedia e-books. The Office did not receive meaningful opposition to readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption. In addition, the petitioners demonstrated personal knowledge through Bobette Buster's continued work on an e-book series based on her lecture series, "Deconstructing Master Filmmakers: The Uses of Cinematic Enchantment," which "relies on the

[23] Participants' post-hearing letter responses are available at *https://www.copyright.gov/1201/2021/post-hearing/*.

[24] All *ex parte* letters in the eighth triennial rulemaking can be found at *https://www.copyright.gov/1201/2021/ex-parte-communications.html*.

[25] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 65293, 65295 (Oct. 15, 2020); *see also* Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 37399, 37402 (June 22, 2020) (describing "meaningful opposition" standard).

[26] *See* 37 CFR 201.40(b)(1). In the 2018 rulemaking, this recommended regulatory language was the result of consideration of one proposed class of works that grouped together five petitions. *See* 2018 Recommendation at 31–34.

[27] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.1.

[28] The individuals and organizations include Peter Decherney, Katherine Sender, John L. Jackson, Int'l Commc'n Ass'n, Soc'y for Cinema and Media Studies, Console-ing Passions, Library Copyright All., and Am. Ass'n of Univ. Professors.

[29] Joint Educators AV Educ. Renewal Pet. at 3.

[30] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.2.

[31] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.3.

[32] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.4.

availability of high-resolution video not available without circumvention of TPMs.'' [33]

e. Audiovisual Works—Criticism and Comment—Filmmaking [34]

Multiple organizations petitioned to renew the exemption for motion pictures for uses in documentary films or other films where the use is a parody or based on the work's biographical or historically significant nature. The Office did not receive meaningful opposition to readoption of this exemption. Petitioners stated that they personally know many filmmakers who have found it necessary to rely on this exemption and will continue to do so. The petitions summarized the continuing need and justification for the exemption.

f. Audiovisual Works—Criticism and Comment—Noncommercial Videos [35]

Two organizations petitioned to renew the exemption for motion pictures for uses in noncommercial videos. The Office did not receive meaningful opposition to readoption of this exemption. Petitioners stated that they had personal knowledge that video creators have relied on this exemption and anticipate needing to continue to use the exemption in the future. The Organization for Transformative Works (''OTW'') included an account from an academic who stated that footage ripped from DVDs and Blu-ray is preferred for ''vidders'' (noncommercial remix artists) because ''it is high quality enough to bear up under the transformations that vidders make to it.'' [36] The petitions therefore demonstrated the continuing need and justification for the exemption.

2. Audiovisual Works—Accessibility [37]

Multiple organizations petitioned to renew the exemption for motion pictures for the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students with disabilities. No oppositions were filed in connection with readoption of this exemption. The petitions demonstrated the continuing need and justification for the exemption, and the petitioners demonstrated personal knowledge and experience as to the exemption. For example, BYU asserted that its disability services offices ''sometimes need to create accessible versions of motion pictures'' to accommodate its students with disabilities.[38] The petitions stated that there is a need for the exemption going forward; indeed, one group of petitioners stated that ''the need is likely to increase significantly in light of the ongoing COVID–19 pandemic as many educational institutions shift to online learning and the use of digital multimedia by faculty increases.'' [39] This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 3.

3. Literary Works Distributed Electronically—Accessibility [40]

Multiple organizations petitioned to renew the exemption for literary works distributed electronically (*i.e.*, e-books), for use with assistive technologies for persons who are blind, visually impaired, or have print disabilities. No oppositions were filed against readoption of this exemption. The petitions demonstrated the continuing need and justification for the exemption, stating that individuals who are blind, visually impaired, or print disabled have difficulty obtaining accessible e-book content because TPMs interfere with the use of assistive technologies. Petitioners noted that their members frequently cite accessibility of e-books as a top priority. Finally, petitioners demonstrated personal knowledge and experience with regard to the assistive technology exemption because they are all organizations that advocate for the blind, visually impaired, and print disabled. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 8.

4. Literary Works—Medical Device Data [41]

Hugo Campos petitioned to renew the exemption covering access to patient data on networked medical devices. No oppositions were filed against readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. Mr. Campos's petition demonstrated the continuing need and justification for the exemption, stating that patients continue to need access to data output from their medical devices to manage their health. Mr. Campos demonstrated personal knowledge and experience with regard to this exemption, as he is a patient needing access to the data output from his medical device and a member of a coalition whose members research the effectiveness of networked medical devices. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 9.

5. Computer Programs—Unlocking [42]

Multiple organizations petitioned to renew the exemption for computer programs that operate cellphones, tablets, mobile hotspots, or wearable devices (*e.g.*, smartwatches) to allow connection of a new or used device to an alternative wireless network (''unlocking'').[43] No oppositions were filed against readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petitions demonstrated the continuing need and justification for the exemption, stating that consumers of the enumerated products continue to need to be able to unlock the devices so they can switch network providers. For example, the Institute of Scrap Recycling Industries, Inc. (''ISRI'') stated that its members continue to purchase or acquire donated cell phones, tablets, and other wireless devices and try to reuse them, but that wireless carriers lock devices to prevent them from being used on other carriers.[44] In addition, petitioners demonstrated personal knowledge and experience with regard to this exemption. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 10.

6. Computer Programs—Jailbreaking [45]

Multiple organizations petitioned to renew the exemptions for computer programs that operate smartphones,

[33] Bobette Buster, Authors All. & Am. Ass'n of Univ. Professors Nonfiction Multimedia E-Books Renewal Pet. at 3.

[34] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.5.

[35] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.6.

[36] OTW Noncommercial Videos Renewal Pet. at 3.

[37] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.B.

[38] BYU Captioning Renewal Pet. at 3.

[39] Accessibility Petitioners Captioning Renewal Pet. at 3.

[40] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.C.

[41] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.D.

[42] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.E.

[43] Competitive Carriers Ass'n Unlocking Renewal Pet.; Inst. of Scrap Recycling Indus., Inc. Unlocking Renewal Pet.

[44] ISRI Unlocking Renewal Pet. at 3.

[45] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.F.

tablets and other portable all-purpose mobile computing devices, smart TVs, or voice assistant devices to allow the device to interoperate with or to remove software applications ("jailbreaking"). No oppositions were filed against readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petitions demonstrated the continuing need and justification for the exemption, and that petitioners have personal knowledge and experience with regard to this exemption. For example, regarding smart TVs specifically, the Software Freedom Conservancy ("SFC") asserted that it has "reviewed the policies and product offerings of major Smart TV manufacturers (Sony, LG, Samsung, etc.) and they are substantially the same as those examined during the earlier rulemaking process." [46] The petitions stated that, absent an exemption, TPMs applied to the enumerated products would have an adverse effect on noninfringing uses, such as being able to install third-party applications on a smartphone or download third-party software on a smart TV to enable interoperability. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 11.

7. Computer Programs—Repair of Motorized Land Vehicles [47]

Multiple organizations petitioned to renew the exemption for computer programs that control motorized land vehicles, including farm equipment, for purposes of diagnosis, repair, or modification of a vehicle function. The Office did not receive meaningful opposition to readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petitions demonstrated the continuing need and justification for the exemption. For example, the Motor & Equipment Manufacturers Association ("MEMA") stated that over the past three years, its membership "has seen firsthand that the exemption is helping protect consumer choice and a competitive market, while mitigating risks to intellectual property and vehicle safety." [48] Similarly, the Auto Care Association ("ACA") stated that "[u]nless this exemption is renewed, the software measures manufacturers deploy for the purpose of controlling access to vehicle software will prevent Auto Care members from lawfully assisting consumers in the maintenance, repair, and upgrade of their vehicles." [49] The petitioners demonstrated personal knowledge and experience with regard to this exemption; each either represents or gathered information from individuals or businesses that perform vehicle service and repair. This existing exemption, as well as the existing exemption pertaining to repair of smartphones, home appliances, and home systems, serve as the baseline in assessing whether to recommend any expansions in Class 12.

8. Computer Programs—Repair of Smartphones, Home Appliances, and Home Systems [50]

Multiple organizations petitioned to renew the exemption for computer programs that control smartphones, home appliances, or home systems, for diagnosis, maintenance, or repair of the device or system. The Office did not receive meaningful opposition to readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petitions demonstrated the continuing need and justification for the exemption. For example, the Electronic Frontier Foundation ("EFF"), the Repair Association, and iFixit asserted that "[m]anufacturers of these devices continue to implement [TPMs] that inhibit lawful repairs, maintenance, and diagnostics, and they show no sign of changing course." [51] This existing exemption, as well as the existing exemption pertaining to repair of motorized land vehicles, serve as the baseline in assessing whether to recommend any expansions in Class 12.

9. Computer Programs—Security Research [52]

Multiple organizations and security researchers petitioned to renew the exemption permitting circumvention for purposes of good-faith security research. No oppositions were filed against readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petitioners demonstrated the continuing need and justification for the exemption, as well as personal knowledge and experience with regard to this exemption. For example, J. Alex Halderman, the Center for Democracy and Technology ("CDT"), and the U.S. Technology Policy Committee of the Association for Computing Machinery ("ACM") highlighted the need to find and detect vulnerabilities in voting machines and other election systems in response to increasing aggressiveness on the part of threat actors, including other nation states.[53] MEMA stated that its membership "experienced firsthand that the exemption is helping encourage innovation in the automotive industry while mitigating risks to intellectual property and vehicle safety," and opined that the current exemption strikes an "appropriate balance." [54] This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 13.

10. Computer Programs—Software Preservation [55]

The Software Preservation Network ("SPN") and LCA petitioned to renew the exemption for computer programs, other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums. No oppositions were filed against readoption of this exemption. The petition stated that libraries, archives, and museums continue to need the exemption to preserve and curate software and materials dependent on software. For example, the petition explained that researchers at the University of Virginia designed a project in order to access a collection of drawings and plans from a local Charlottesville architecture firm, and that without the exemption, the outdated Computer Aided Design software used to create many of the designs "may have remained inaccessible to researchers, rendering the designs themselves inaccessible, too." [56] In addition, petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the section 1201 triennial rulemaking relating to access controls on software, and/or representing major library associations with members who have relied on this exemption. This existing

[46] SFC Jailbreaking Renewal Pet. at 3.

[47] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.G.

[48] MEMA Vehicle Repair Renewal Pet. at 3.

[49] ACA Vehicle Repair Renewal Pet. at 3.

[50] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.H.

[51] EFF Device Repair Renewal Pet. at 3; EFF, Repair Ass'n & iFixit Device Repair Renewal Pet. at 3.

[52] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.I.

[53] J. Alex Halderman, CDT & ACM Security Research Renewal Pet. at 4.

[54] MEMA Security Research Renewal Pet. at 3.

[55] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.J.

[56] SPN & LCA Software Preservation Renewal Pet. at 3.

exemption, as well as the exemption pertaining to video game preservation, serve as the baseline in assessing whether to recommend any expansions in Class 14.

11. Computer Programs—Video Game Preservation [57]

SPN and LCA petitioned to renew the exemption for preservation of video games for which outside server support has been discontinued. No oppositions were filed against readoption of this exemption, and Consumer Reports submitted a comment in support of the renewal petition. The petition stated that libraries, archives, and museums continue to need the exemption to preserve and curate video games in playable form. For example, the petition highlighted Georgia Tech University Library's Computing Lab, retroTECH, which has made a significant collection of recovered video game consoles accessible for research and teaching uses pursuant to the exemption.[58] Petitioners demonstrated personal knowledge and experience with regard to this exemption through past participation in the section 1201 triennial rulemaking, and/or through their representation of members who have relied on this exemption. This existing exemption, as well as the above exemption pertaining to software preservation, serve as the baseline in assessing whether to recommend any expansions in Class 14.

12. Computer Programs—3D Printers [59]

Michael Weinberg petitioned to renew the exemption for computer programs that operate 3D printers to allow use of alternative feedstock. No oppositions were filed against readoption of this exemption. The petition demonstrated the continuing need and justification for the exemption, and petitioner demonstrated personal knowledge and experience regarding the exemption. Specifically, Mr. Weinberg declared that he is a member of the 3D printing community and previously participated in the section 1201 triennial rulemaking. In addition, the petition stated that manufacturers of 3D printers continue to limit the types of materials that may be used with the devices. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 15.

*B. New or Expanded Designations of Classes*

Based upon the record in this proceeding regarding proposed expansions to existing exemptions or newly proposed exemptions, the Register recommends that the Librarian determine that the following classes of works be exempt from the prohibition against circumvention of technological measures set forth in section 1201(a)(1):

1. Proposed Class 1: Audiovisual Works—Criticism and Comment [60]

Proposed Class 1 sought to expand the existing exemption that permits circumvention of access controls protecting excerpts of motion pictures on DVDs, Blu-ray discs, and digitally transmitted video for the purposes of criticism and comment, including for educational purposes by certain users. Three different petitions were filed in this class. OTW's proposed exemption sought to eliminate multiple limitations, including the requirement that a user consider whether screen capture technology is a viable alternative before circumvention. BYU's proposed exemption would permit circumvention by college or university employees or students or by K–12 educators or students acting under the direct supervision of an educator, and would significantly alter the language of the current exemption regarding the purpose of the circumvention. A group of individual educators and educational organizations ("Joint Educators") proposed an exemption that would permit circumvention by "educators and preparers of online learning materials" to be used on online learning platforms. All three proposals sought to remove the reference to screen capture from the existing exemption. OTW and Joint Educators' proposals sought to use short portions of motion pictures; the BYU proposal sought use of full-length works. The proposals addressed several uses of motion pictures that proponents contended are noninfringing and that they argued are adversely affected by TPMs. NTIA supported the proposed exemption, but proposed some amendments to the text.

Opponents argued that the proposed changes were unwarranted or unnecessary. The Motion Picture Association, the Alliance for Recorded Music, and the Entertainment Software Association (collectively, "Joint Creators") and the DVD Copy Control Association ("DVD CCA") and the Advanced Access Content System Licensing Administrator, LLC ("AACS LA") argued that screen capture technology has improved and remains an adequate alternative in some circumstances. Joint Creators also argued that the Joint Educators' proposal to expand the exemption to "educators and preparers of online learning materials" could permit circumvention by businesses and threaten the market for licensed clips. DVD CCA and AACS LA contended that expanding the exemption to cover employees of a qualifying MOOC was unnecessary for online educators to prepare materials.

For the reasons detailed in the Register's Recommendation, the Register recommended expanding the exemption to permit employees of colleges and universities to circumvent at the direction of a faculty member for the purpose of teaching a course, and also to cover similar uses by both faculty and employees acting at the direction of faculty members of accredited nonprofit educational institutions for the purposes of offering MOOCs. The Register further recommended retaining the screen capture provision in the exemption to anticipate the possibility that screen capture technology could be found to involve circumvention. The Register concluded that the exemption should not be expanded or amended to cover copying for the purpose of performing full-length motion pictures for educational purposes; to replace the phrase "short portions" with "reasonable and limited portions"; to enable circumvention by for-profit and/or unaccredited educational companies and organizations; or to cover the broadly defined "educators and preparers of online learning materials" of "online learning platforms."

2. Proposed Class 3: Audiovisual Works—Accessibility [61]

Class 3 proponents sought to expand several provisions of the current exemption for adding captions or audio description to motion pictures for the benefit of students with disabilities. Proponents requested expanding the exemption to include faculty and staff with disabilities at educational institutions as beneficiaries, explicitly permitting reuse of previously remediated materials, allowing for proactive remediation in advance of a

[57] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.K.

[58] SPN & LCA Abandoned Video Game Renewal Pet. at 3.

[59] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.L.

[60] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.A.

[61] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.C.

specific request for accessible material, and clarifying the market-check requirement to encompass only works on the market that are of ''sufficient quality.'' Joint Creators and DVD CCA & AACS LA filed oppositions. NTIA supported the proposed exemption.

For the reasons discussed in the Register's Recommendation, the Register concluded that expanding the exemption to faculty and staff with disabilities, allowing reuse of previously remediated material, and permitting proactive remediation are likely fair uses because they are directed towards adding captions or audio descriptions in compliance with disability law, the same purpose found fair in the Register's 2018 Recommendation. Additionally, the Register concluded that proponents had provided sufficient evidence that they would be adversely affected if the exemption were not expanded.

3. Proposed Class 5: Audiovisual Works—Preservation and Replacement [62]

Class 5 proponents sought to permit circumvention of TPMs on motion pictures (including television shows and videos) stored on DVDs or Blu-ray discs that are no longer reasonably available in the marketplace to enable libraries, archives, and museums to make preservation and replacement copies of those works. The proposed exemption would permit qualifying institutions to make copies of discs that are damaged or deteriorating, as well as discs that have not yet begun to deteriorate; to make physical or digital copies of the motion pictures; and to make any digital copies available outside the premises of the institution. NTIA supported the proposed exemption.

Joint Creators and DVD CCA and AACS LA opposed the exemption, arguing that it would enable institutions to space-shift [63] their film collections and launch online streaming services. Opponents contended that, should an exemption be granted, it should apply only to damaged or deteriorating discs; it should prohibit off-premises access to the copied works; and the market check should include a requirement that institutions determine if the motion picture is available for streaming through a licensed source.

For the reasons detailed in the Register's Recommendation, the Register concluded that it was likely to be a fair use for qualifying institutions to copy motion pictures from discs that are damaged or deteriorating if the motion pictures on those discs are not reasonably available in the marketplace for purchase or streaming. The Register concluded that proponents had not demonstrated that providing off-premises access to the replacement copies of motion pictures is likely to be noninfringing. The Register concluded that proponents had provided substantial evidence that granting the exemption would benefit preservation, education, and scholarship by making available motion pictures that might otherwise be lost to history and that the exemption is unlikely to adversely affect the market for or value of the motion pictures.

4. Proposed Classes 7(a): Motion Pictures and 7(b): Literary Works—Text and Data Mining [64]

Authors Alliance, the American Association of University Professors, and LCA jointly filed a petition proposing Classes 7(a) and 7(b), seeking to permit circumvention of TPMs on motion pictures and literary works stored on DVDs or Blu-ray discs or made available for digital download to enable researchers to perform text and data mining (''TDM'') techniques for the purpose of scholarly research and teaching. Proponents argued that copying literary works and motion pictures to create large collections on which to perform TDM research is a fair use, and that requirements to use security measures to protect the corpora from public access or further distribution should afford qualifying institutions flexibility to tailor the measures to the size and content of the corpus. NTIA supported the proposed exemptions.

Joint Creators and DVD CCA and AACS LA opposed the proposed exemption for class 7(a), and the American Association for Publishers (''AAP'') and the Software and Information Industry Association opposed the proposed exemption for class 7(b). They argued that TDM research would interfere with the licensing market for collections of literary works and motion pictures and that researchers' ability to view the entirety of the works in a corpus would create a risk of substitutional use. They also argued that any exemption must require specific, robust security measures.

As discussed in greater detail in the Register's Recommendation, the Register found that the prohibition on circumvention adversely affects researchers' ability to conduct TDM research projects, which are likely to be noninfringing with the addition of several limitations. Most importantly, the Register recommended requiring the institution of higher education storing or hosting a corpus of copyrighted works to implement either security measures that have been agreed upon by copyright owners and institutions of higher education, or, in the absence of such measures, those measures that the institution uses to keep its own highly confidential information secure. The Register also recommended adding a limitation that the person undertaking the circumvention view or listen to the contents of the copyrighted works in the corpus solely for the purpose of verification of the research findings, not for the works' expressive purposes. The Register concluded that existing alternatives to circumvention do not meet researchers' needs.

5. Proposed Class 8: Literary Works—Accessibility [65]

Class 8 proponents sought to modify the current exemption for e-book accessibility to align with recent changes to the Copyright Act as a result of the Marrakesh Treaty Implementation Act. Proponents requested expanding the class of beneficiaries to ''eligible persons'' as defined in section 121 of the Copyright Act, expanding the exemption to cover previously published musical works, and replacing references to a ''mainstream copy'' in the remuneration requirement with the term ''inaccessible copy.'' Proponents also sought guidance on whether import and export activity under section 121A was implicated by the prohibition on circumvention. Joint Creators stated that they did not oppose the exemption to the extent it is consistent with sections 121 and 121A. AAP filed a reply comment in support of this class, and NTIA supported the proposed exemption.

For the reasons discussed in the Register's Recommendation, the Register concluded that without the proposed modifications, print-disabled

[62] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.E.

[63] Space-shifting occurs when a work is transferred from one storage medium to another, such as from a DVD to a computer hard drive. *See* 2015 Recommendation at 107.

[64] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.G.

[65] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.H.

individuals would be adversely affected in their ability to engage in the proposed noninfringing uses. The Register also determined that replacement of the reference to a "mainstream copy" with an "inaccessible copy" is a non-substantive change. Finally, the Register declined to recommend language regarding import and export of accessible works because the record did not indicate that such activity implicates the prohibition on circumvention. Proponents and Joint Creators filed a joint post-hearing submission proposing regulatory language that excludes sound recordings of performances of musical works from the exemption, which the Register recommended including.

6. Proposed Class 9: Literary Works—Medical Device Data [66]

Class 9 proponents sought to expand several provisions of the current exemption that permits the circumvention of TPMs on medical devices to access their data outputs. Proponents filed a petition seeking to eliminate the current limitation of the exemption to "wholly or partially implanted" devices; permit authorized third parties to perform the circumvention on behalf of a patient; extend the exemption to non-passive monitoring; and remove the condition that circumvention not violate other applicable laws. ACT | The App Association opposed the proposed exemption. NTIA supported adopting the proposed exemption, with some modification.

For the reasons detailed in the Register's Recommendation, the Register concluded that accessing medical data outputs likely qualifies as a fair use and that expanding the exemption to include non-implanted medical devices and non-passive monitoring would not alter the fair use analysis. Additionally, the Register concluded that proponents set forth sufficient evidence that the "wholly or partially implanted" language and the passive monitoring limitation are causing, or are likely to cause, adverse effects on these noninfringing uses. The Register also recommended expanding the exemption to permit circumvention "by or on behalf of a patient." After consultation with the U.S. Food and Drug Administration, the Register recommended removing the language requiring compliance with other laws, and replacing it with a statement that eligibility for the exemption does not preclude liability from other applicable laws.

7. Proposed Class 10: Computer Programs—Unlocking [67]

ISRI petitioned to expand the existing exemption for unlocking to either (1) add a new device category for laptop computers or (2) remove enumerated device categories from the current exemption and permit unlocking of all wireless devices. It argued that the proposed uses are noninfringing based on the Register's previous findings that unlocking of certain types of devices is a fair use, contending that the legal analysis does not differ depending on the type of device that is unlocked. The only opposition comment was filed by MEMA, which opposed expanding the exemption to permit unlocking cellular-enabled vehicles. NTIA supported expanding the exemption to permit unlocking all lawfully-acquired devices.

For the reasons discussed in the Register's Recommendation, the Register concluded that proponents established that unlocking is likely to be a fair use regardless of the type of device involved. Proponents offered unrebutted evidence that many different types of wireless devices share the same wireless modem. Because the Register concluded that unlocking those modems is likely a fair use, she determined that users of these devices experience the same adverse effects from the prohibition on circumvention.

8. Proposed Class 11: Computer Programs—Jailbreaking [68]

Two petitions were filed for new or expanded exemptions relating to the circumvention of computer programs for jailbreaking purposes. EFF filed a petition seeking to clarify and expand the current exemption pertaining to jailbreaking smart TVs to include video streaming devices. SFC filed a petition for a new exemption to allow jailbreaking of routers and other networking devices to enable the installation of alternative firmware. ACT | The App Association, DVD CCA and AACS LA, and Joint Creators opposed this proposed class. NTIA supported adopting both proposed exemptions.

In supporting comments, EFF clarified that its proposed exemption would cover devices whose primary purpose is to run applications that stream video from the internet for display on a screen, and would not extend to DVD or Blu-ray players or video game consoles. The Register concluded that jailbreaking video streaming devices likely constitutes a fair use. Additionally, the Register concluded that the prohibition on circumvention is likely to adversely affect proponents' ability to engage in such activities. She recommended that the regulatory language contain certain limitations to address opponents' concerns over potential market harm.

With respect to SFC's petition, the Register concluded that jailbreaking routers and other networking devices is likely to qualify as a fair use. Additionally, the Register concluded that the prohibition on circumvention is likely to prevent users from installing free and open source software ("FOSS") on routers and other networking devices and that there are no viable alternatives to circumvention to accomplish that purpose.

9. Proposed Class 12: Computer Programs—Repair [69]

Several organizations submitted petitions for new or expanded exemptions relating to the diagnosis, maintenance, repair, and modification of software-enabled devices. EFF and, jointly, iFixit and the Repair Association filed petitions seeking to merge and expand the two existing exemptions to cover all devices and vehicles and permit "modification" of all devices. Opponents objected that the proposed expansion to cover all devices was overbroad and that proponents failed to develop a record demonstrating sufficient commonalities among the various types of software-enabled devices. In addition, they argued that specific types of devices for which circumvention of TPMs raises piracy and safety concerns should be excluded from the proposed class. Opponents also contended that the term "modification" is so broad that it could implicate infringing activities, including violating copyright owners' exclusive right to prepare derivative works.

Separately, Public Knowledge and iFixit jointly petitioned for an exemption to repair optical drives in video game consoles and to replace damaged hardware in such devices. They asserted that authorized repair services are inadequate, particularly for

[66] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.I.

[67] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.J.

[68] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.K.

[69] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.L.

certain legacy consoles that manufacturers no longer support. Opponents argued that the proposed exemption would create a risk of market harm for these devices and that adequate alternatives to circumvention exist.

NTIA recommended expanding the current exemptions by merging them into a single exemption that would permit circumvention for the diagnosis, maintenance, and repair of all software-enabled devices, machines, and systems. In addition, NTIA recommended allowing "lawful modification that is necessary for a repair or maintenance" and software modifications relating to device functionality.

For the reasons discussed in the Register's Recommendation, the Register recommended expanding the existing exemption for diagnosis, maintenance, and repair of certain categories of devices to cover any software-enabled device that is primarily designed for use by consumers. For video game consoles, the Register concluded that an exemption is warranted solely for the repair of optical drives.

The proposals to merge the two existing repair exemptions would also effectively broaden the existing vehicle exemption by: (1) No longer limiting the class to "motorized land vehicles"; and (2) removing other limitations in the exemption, including that users comply with other laws. Opponents did not object to including marine vessels in the vehicle exemption, but opposed removing language requiring compliance with other laws. For the reasons discussed in the Register's Recommendation, the Register recommended that the exemption for land vehicles be expanded to cover marine vessels and to remove the condition requiring compliance with other laws.

Finally, Summit Imaging, Inc. and Transtate Equipment Co., Inc. petitioned to exempt circumvention of TPMs on software-enabled medical devices and systems for purposes of diagnosis, maintenance, and repair. Petitioners also sought access to related data files stored on medical devices and systems, including manuals and servicing materials. Opponents argued that this exemption is unnecessary because adequate authorized repair services are available. They also contended that the proposed uses are commercial in nature, would harm the market for medical devices and systems, may undermine patient safety and create cybersecurity risks, and would interfere with manufacturers' regulatory compliance obligations. For the reasons discussed in the Register's Recommendation, the Register recommended a new exemption allowing circumvention of TPMs restricting access to firmware and related data files on medical devices and systems for the purposes of diagnosis, maintenance, and repair.

10. Proposed Class 13: Computer Programs—Security Research [70]

Two petitions sought to expand the current exemption that permits circumvention of TPMs on computer programs for good-faith security research. Together, the petitions sought to eliminate several limitations within the exemption and to explicitly extend the exemption to privacy research. Proponents generally argued that the limitations have chilled valuable security research, primarily by creating uncertainty about whether conducting or reporting security research could result in liability under section 1201. Six parties opposed class 13 at least in part; they argued that the existing exemption has sufficiently enabled good-faith security research and that the record did not justify removing the limitations. NTIA supported the elimination of several limitations, but did not recommend modifying the existing exemption to address privacy-related research activities explicitly.

For the reasons discussed in the Register's Recommendation, the Register concluded that because the exemption is broadly defined and is not limited to specific issues or subjects relating to security flaws or vulnerabilities, expanding it to expressly cover privacy research is unnecessary. Regarding the specific limitations, the Register recommended removing the condition that circumvention not violate "other laws" and instead clarifying that the exemption does not provide a safe harbor from liability under other laws. The Department of Justice submitted comments supporting this change. The Register declined to recommend removal of limitations pertaining to access to and use of computer programs, finding a lack of specific evidence establishing adverse effects resulting from those provisions. The Register also did not recommend removal of the requirement that devices be lawfully acquired.

[70] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.M.

11. Proposed Class 14(a): Computer Programs and 14(b) Video Games—Preservation [71]

Proposed Classes 14(a) and 14(b) seek to amend the existing exemptions permitting libraries, archives, and museums to circumvent TPMs on computer programs and video games, respectively, for the purpose of preservation activities. Specifically, proponents seek to remove the requirement that the preserved computer program or video game must not be distributed or made available outside of the physical premises of the institution. Proposed Class 14(b) would also incorporate the current eligibility requirements for the software preservation exemption into the video game preservation exemption.

Proponents argued that enabling remote access to the works is likely to be a fair use, based in part on a general federal policy favoring remote access to preservation materials, as reflected in various provisions of the Copyright Act. They also argued that the proposed uses would not affect the potential market for or value of the copyrighted works because only works that are no longer reasonably available in the commercial marketplace would be subject to the exemption. NTIA supported the removal of the premises limitation in both exemptions.

Joint Creators and the Entertainment Software Association opposed removing the premises limitation, with most arguments directed to the video game class. They expressed concern that, because the proposed exemption did not limit beneficiaries of the exemption to authenticated educators or researchers, if preserved video games were made available outside the premises of an institution, they would become accessible to the general public, thereby adversely affecting the existing market for older video games.

For the reasons discussed in the Register's Recommendation, the Register concluded that off-premises access to software as described in the proposal is likely to be noninfringing, with the limitation that the work be accessible to only one user at a time and for a limited time. With respect to video games, the Register concluded that proponents failed to carry their burden to show that the uses are likely noninfringing, and noted the greater risk of market harm in this context given the market for legacy video games. The Register therefore recommends that the Librarian amend

[71] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.N.

the exemption for Class 14(a) to address the eligibility requirements for libraries, archives, and museums, but not to remove the premises limitation. The Register recommends removing the premises limitation in the exemption for Class 14(a).

12. Proposed Class 15: Computer Programs—3D Printing [72]

Class 15 seeks to expand two provisions of the current exemption that permits the circumvention of access controls on computer programs in 3D printers to enable the use of non-manufacturer approved feedstock. Michael Weinberg filed a petition to replace the term "feedstock" with the term "material," stating that the latter is more commonly used within the industry and that the two terms are interchangeable. Additionally, Mr. Weinberg sought to eliminate the phrase "microchip-reliant" from the exemption, arguing that 3D printers may use technology other than microchips to verify 3D printing materials. Mr. Weinberg provided evidence that manufacturers are increasingly moving beyond microchip-based verification techniques, such as using optical scanners. No parties opposed proposed class 15. NTIA supported the proposed exemption.

For the reasons discussed in greater detail in the Register's Recommendation, the Register concluded that changing the word "feedstock" to "material" is not a substantive change, and found that the removal of the term "microchip-reliant" does not alter the fair use analysis because the expansion is directed at the same uses the Office previously concluded were fair.

13. Proposed Class 16: Computer Programs—Copyright License Investigation [73]

SFC petitioned for a new exemption that would permit investigating whether a particular computer program includes FOSS, and if so, whether the use of the program complies with applicable license terms. SFC, supported by the Free Software Foundation, subsequently agreed to add limitations to require that the circumvention be undertaken on a lawfully acquired device or machine; that it be solely for the purpose of investigating potential copyright infringement; that it be performed by, or at the direction of, a party that has standing to bring a breach of license claim; and that it otherwise comply with applicable law. NTIA supported the proposed exemption as modified.

Opponents—DVD CCA and AACS LA; the Equipment Dealers Association, and its regional affiliates, and Associated Equipment Distributors; Joint Creators; and Marcia Wilbur—argued that FOSS licensors could obtain the information they seek by other means. They objected to application of the proposed exemption to a broad category of devices, and requested exclusion of DVD and Blu-ray players, video game consoles, set-top boxes, and vehicles. They argued that any exemption should be limited to investigating potential violations of FOSS licenses, rather than infringement of any proprietary software, and that the investigation must be based on a good-faith, reasonable belief that the device may violate FOSS license terms. Finally, opponents expressed concerns about devices being left exposed to piracy or unauthorized access after circumvention.

For the reasons discussed in the Register's Recommendation, the Register recommended adopting an exemption with several limitations. First, the purpose of the investigation must be limited to investigating whether a computer program potentially infringes FOSS, and the user must have a good-faith, reasonable belief in the need for the investigation. Second, circumvention must be undertaken by, or at the direction of, a party that would have standing to bring either a breach of license claim or a copyright infringement claim. Third, the copy of a computer program made pursuant to the exemption, or the device or machine on which it operates, cannot be used in a manner that facilitates copyright infringement. Finally, video game consoles should be excluded from the types of devices on which TPMs may be circumvented.

14. Proposed Class 17: All Works—Accessibility Uses [74]

Petitioners, a coalition of accessibility groups, requested a new exemption to create accessible versions of any copyrighted works that are inaccessible to individuals with disabilities. They argued that the Librarian has the authority to define a class of works that share the attribute of being inaccessible to individuals with disabilities and that creating accessible versions of inaccessible works is unquestionably a fair use. Proponents argued that a broad exemption is warranted to prevent individuals with disabilities from being forced to make piecemeal requests every three years when new accessibility issues arise. NTIA supported the proposed exemption.

Joint Creators, DVD CCA and AACS LA, and AAP filed comments opposing the proposed exemption, focusing primarily on the ground that the statute does not give the Librarian the authority to adopt a class consisting of "all works" sharing a particular attribute. Joint Creators also raised concerns about the lack of limitations on the use of copies, such as prohibiting further distribution to individuals without disabilities.

As discussed in greater detail in the Register's Recommendation, although the Register supports the policy goals that underpin the proposed exemption, the statute requires proponents to provide evidence of actual or likely adverse effects resulting from the prohibition on circumvention with respect to "particular class[es]" of works. Here, the Register determined that proponents submitted insufficient evidence of such adverse effects as to most types of works. Proponents did, however, provide evidence to support an exemption to enable individuals with disabilities to use alternate input devices to play video games.

*C. Classes Considered but Not Recommended*

Based upon the record in this proceeding, the Register recommended that the Librarian determine that the following classes of works shall not be exempt during the next three-year period from the prohibition against circumvention of technological measures set forth in section 1201(a)(1):

1. Proposed Class 2: Audiovisual Works—Texting [75]

Proposed Class 2 would allow circumvention of technological measures protecting motion pictures and other audiovisual works to create short audiovisual clips for expressive purposes in text messages. Petitioner did not provide legal arguments or evidence in support of its petition and did not participate in the public hearings. Petitioner failed to explain how the proposed uses were noninfringing and why an exemption is

[72] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.O.

[73] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.P.

[74] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.Q.

[75] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.B.

necessary. NTIA recommended denying the proposed exemption. As discussed more fully in the Register's Recommendation, due to the *de minimis* showing provided by proponents, the Register does not recommend the adoption of an exemption for proposed Class 2.

2. Proposed Class 4: Audiovisual Works—Livestream Recording [76]

Proposed Class 4 would allow circumvention of HTTP Live Streaming technology for the purpose of recording audiovisual works originating as livestreams. Petitioner did not provide legal arguments or evidence to support its petition and did not participate in the public hearings. Petitioner first described the exemption as encompassing sports and other competitive events, but elsewhere stated that the class includes "any and all works" where audiovisual recordings may be made, including individual school performances. NTIA recommended denying the proposed exemption. As discussed more fully in the Register's Recommendation, the Register does not recommend the adoption of an exemption for proposed Class 4.

3. Proposed Class 6: Audiovisual Works—Space-Shifting [77]

Proposed Class 6 would allow circumvention of TPMs protecting motion pictures and other audiovisual works to engage in space-shifting. Petitioner failed to provide legal arguments or evidence to demonstrate that space-shifting is a noninfringing use. Additionally, petitioner did not participate in the public hearings to support its petition or clarify whether the proposed exemption would extend to commercial services. Opponents argued that petitioner did not provide the evidence necessary to support an exemption, citing several substantive and procedural deficiencies. NTIA recommended denying the proposed exemption. As discussed more fully in the Register's Recommendation, the Register does not recommend the adoption of an exemption for proposed Class 6.

*D. Conclusion*

Having considered the evidence in the record, the contentions of the commenting parties, and the statutory objectives, the Register of Copyrights has recommended that the Librarian of Congress publish certain classes of works, as designated above, so that the prohibition against circumvention of technological measures that effectively control access to copyrighted works shall not apply for the next three years to persons who engage in noninfringing uses of those particular classes of works.

Dated: October 20, 2021.

**Shira Perlmutter,**

*Register of Copyrights and Director of the U.S. Copyright Office.*

**Determination of the Librarian of Congress**

Having duly considered and accepted the recommendation of the Register of Copyrights, the Librarian of Congress, pursuant to 17 U.S.C. 1201(a)(1)(C) and (D), hereby publishes as a new rule the classes of copyrighted works that shall for a three-year period be subject to the exemption provided in 17 U.S.C. 1201(a)(1)(B) from the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A).

**List of Subjects in 37 CFR Part 201**

Copyright, Exemptions to prohibition against circumvention.

**Final Regulations**

For the reasons set forth in the preamble, 37 CFR part 201 is amended as follows:

**PART 201—GENERAL PROVISIONS**

■ 1. The authority citation for part 201 continues to read as follows:

**Authority:** 17 U.S.C. 702.

■ 2. Section 201.40 is amended by revising paragraph (b) to read as follows:

**§ 201.40 Exemption to prohibition against circumvention.**

* * * * *

(b) *Classes of copyrighted works.* Pursuant to the authority set forth in 17 U.S.C. 1201(a)(1)(C) and (D), and upon the recommendation of the Register of Copyrights, the Librarian has determined that the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A) shall not apply to persons who engage in noninfringing uses of the following classes of copyrighted works:

(1) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, and the person engaging in circumvention under paragraphs (b)(1)(i) and (b)(1)(ii)(A) and (B) of this section reasonably believes that non-circumventing alternatives are unable to produce the required level of high-quality content, or the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, where circumvention is undertaken solely in order to make use of short portions of the motion pictures in the following instances:

(i) For the purpose of criticism or comment:

(A) For use in documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature;

(B) For use in noncommercial videos (including videos produced for a paid commission if the commissioning entity's use is noncommercial); or

(C) For use in nonfiction multimedia e-books.

(ii) For educational purposes:

(A) By college and university faculty and students or kindergarten through twelfth-grade (K–12) educators and students (where the K–12 student is circumventing under the direct supervision of an educator), or employees acting at the direction of faculty of such educational institutions for the purpose of teaching a course, including of accredited general educational development (GED) programs, for the purpose of criticism, comment, teaching, or scholarship;

(B) By faculty of accredited nonprofit educational institutions and employees acting at the direction of faculty members of those institutions, for purposes of offering massive open online courses (MOOCs) to officially enrolled students through online platforms (which platforms themselves may be operated for profit), in film studies or other courses requiring close analysis of film and media excerpts, for the purpose of criticism or comment, where the MOOC provider through the online platform limits transmissions to the extent technologically feasible to such officially enrolled students, institutes copyright policies and provides copyright informational materials to faculty, students, and relevant staff members, and applies technological measures that reasonably

[76] The Register's analysis and conclusions for these classes, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.D.

[77] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.F.

prevent unauthorized further dissemination of a work in accessible form to others or retention of the work for longer than the course session by recipients of a transmission through the platform, as contemplated by 17 U.S.C. 110(2); or

(C) By educators and participants in nonprofit digital and media literacy programs offered by libraries, museums, and other nonprofit entities with an educational mission, in the course of face-to-face instructional activities, for the purpose of criticism or comment, except that such users may only circumvent using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted.

(2)(i) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, where:

(A) Circumvention is undertaken by a disability services office or other unit of a kindergarten through twelfth-grade educational institution, college, or university engaged in and/or responsible for the provision of accessibility services for the purpose of adding captions and/or audio description to a motion picture to create an accessible version for students, faculty, or staff with disabilities;

(B) The educational institution unit in paragraph (b)(2)(i)(A) of this section has a reasonable belief that the motion picture will be used for a specific future activity of the institution and, after a reasonable effort, has determined that an accessible version of sufficient quality cannot be obtained at a fair market price or in a timely manner, including where a copyright holder has not provided an accessible version of a motion picture that was included with a textbook; and

(C) The accessible versions are provided to students or educators and stored by the educational institution in a manner intended to reasonably prevent unauthorized further dissemination of a work.

(ii) For purposes of paragraph (b)(2) of this section,

(A) "Audio description" means an oral narration that provides an accurate rendering of the motion picture;

(B) "Accessible version of sufficient quality" means a version that in the reasonable judgment of the educational institution unit has captions and/or audio description that are sufficient to meet the accessibility needs of students, faculty, or staff with disabilities and are substantially free of errors that would materially interfere with those needs; and

(C) Accessible materials created pursuant to this exemption and stored pursuant to paragraph (b)(2)(i)(C) of this section may be reused by the educational institution unit to meet the accessibility needs of students, faculty, or staff with disabilities pursuant to paragraphs (b)(2)(i)(A) and (B) of this section.

(3)(i) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, or on a Blu-ray disc protected by the Advanced Access Content System, solely for the purpose of lawful preservation or the creation of a replacement copy of the motion picture, by an eligible library, archives, or museum, where:

(A) Such activity is carried out without any purpose of direct or indirect commercial advantage;

(B) The DVD or Blu-ray disc is damaged or deteriorating;

(C) The eligible institution, after a reasonable effort, has determined that an unused and undamaged replacement copy cannot be obtained at a fair price and that no streaming service, download service, or on-demand cable and satellite service makes the motion picture available to libraries, archives, and museums at a fair price; and

(D) The preservation or replacement copies are not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) For purposes of paragraph (b)(3)(i) of this section, a library, archives, or museum is considered "eligible" if—

(A) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(B) The library, archives, or museum has a public service mission;

(C) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(D) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(E) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by paragraph (b)(3)(i) of this section.

(4)(i) Motion pictures, as defined in 17 U.S.C. 101, where the motion picture is on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or made available for digital download where:

(A) The circumvention is undertaken by a researcher affiliated with a nonprofit institution of higher education, or by a student or information technology staff member of the institution at the direction of such researcher, solely to deploy text and data mining techniques on a corpus of motion pictures for the purpose of scholarly research and teaching;

(B) The copy of each motion picture is lawfully acquired and owned by the institution, or licensed to the institution without a time limitation on access;

(C) The person undertaking the circumvention views or listens to the contents of the motion pictures in the corpus solely for the purpose of verification of the research findings; and

(D) The institution uses effective security measures to prevent further dissemination or downloading of motion pictures in the corpus, and to limit access to only the persons identified in paragraph (b)(4)(i)(A) of this section or to researchers affiliated with other institutions of higher education solely for purposes of collaboration or replication of the research.

(ii) For purposes of paragraph (b)(4)(i) of this section:

(A) An institution of higher education is defined as one that:

(*1*) Admits regular students who have a certificate of graduation from a secondary school or the equivalent of such a certificate;

(*2*) Is legally authorized to provide a postsecondary education program;

(*3*) Awards a bachelor's degree or provides not less than a two-year program acceptable towards such a degree;

(*4*) Is a public or other nonprofit institution; and

(*5*) Is accredited by a nationally recognized accrediting agency or association.

(B) The term "effective security measures" means security measures that have been agreed to by interested copyright owners of motion pictures and institutions of higher education; or, in the absence of such measures, those measures that the institution uses to keep its own highly confidential information secure. If the institution uses the security measures it uses to protect its own highly confidential

information, it must, upon a reasonable request from a copyright owner whose work is contained in the corpus, provide information to that copyright owner regarding the nature of such measures.

(5)(i) Literary works, excluding computer programs and compilations that were compiled specifically for text and data mining purposes, distributed electronically where:

(A) The circumvention is undertaken by a researcher affiliated with a nonprofit institution of higher education, or by a student or information technology staff member of the institution at the direction of such researcher, solely to deploy text and data mining techniques on a corpus of literary works for the purpose of scholarly research and teaching;

(B) The copy of each literary work is lawfully acquired and owned by the institution, or licensed to the institution without a time limitation on access;

(C) The person undertaking the circumvention views the contents of the literary works in the corpus solely for the purpose of verification of the research findings; and

(D) The institution uses effective security measures to prevent further dissemination or downloading of literary works in the corpus, and to limit access to only the persons identified in paragraph (b)(5)(i)(A) of this section or to researchers or to researchers affiliated with other institutions of higher education solely for purposes of collaboration or replication of the research.

(ii) For purposes of paragraph (b)(5)(i) of this section:

(A) An institution of higher education is defined as one that:

(*1*) Admits regular students who have a certificate of graduation from a secondary school or the equivalent of such a certificate;

(*2*) Is legally authorized to provide a postsecondary education program;

(*3*) Awards a bachelor's degree or provides not less than a two-year program acceptable towards such a degree;

(*4*) Is a public or other nonprofit institution; and

(*5*) Is accredited by a nationally recognized accrediting agency or association.

(B) The term "effective security measures" means security measures that have been agreed to by interested copyright owners of literary works and institutions of higher education; or, in the absence of such measures, those measures that the institution uses to keep its own highly confidential information secure. If the institution uses the security measures it uses to protect its own highly confidential information, it must, upon a reasonable request from a copyright owner whose work is contained in the corpus, provide information to that copyright owner regarding the nature of such measures.

(6)(i) Literary works or previously published musical works that have been fixed in the form of text or notation, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies:

(A) When a copy or phonorecord of such a work is lawfully obtained by an eligible person, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the market price of an inaccessible copy of the work as made available to the general public through customary channels; or

(B) When such a work is lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.

(ii) For the purposes of paragraph (b)(6)(i) of this section, a "phonorecord of such a work" does not include a sound recording of a performance of a musical work unless and only to the extent the recording is included as part of an audiobook or e-book.

(7) Literary works consisting of compilations of data generated by medical devices or by their personal corresponding monitoring systems, where such circumvention is undertaken by or on behalf of a patient for the sole purpose of lawfully accessing data generated by a patient's own medical device or monitoring system. Eligibility for this exemption is not a safe harbor from, or defense to, liability under other applicable laws, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986, or regulations of the Food and Drug Administration.

(8) Computer programs that enable wireless devices to connect to a wireless telecommunications network, when circumvention is undertaken solely in order to connect to a wireless telecommunications network and such connection is authorized by the operator of such network.

(9) Computer programs that enable smartphones and portable all-purpose mobile computing devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smartphone or device, or to permit removal of software from the smartphone or device. For purposes of this paragraph (b)(9), a "portable all-purpose mobile computing device" is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is equipped with an operating system primarily designed for mobile use, and is intended to be carried or worn by an individual.

(10) Computer programs that enable smart televisions to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smart television, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For purposes of this paragraph (b)(10), "smart televisions" includes both internet-enabled televisions, as well as devices that are physically separate from a television and whose primary purpose is to run software applications that stream authorized video from the internet for display on a screen.

(11) Computer programs that enable voice assistant devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the device, or to permit removal of software from the device, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For purposes of this paragraph (b)(11), a "voice assistant device" is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is designed to take user input primarily by voice, and is designed to be installed in a home or office.

(12) Computer programs that enable routers and dedicated network devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the router or dedicated network device, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For the purposes of this paragraph (b)(12), "dedicated network device" includes switches, hubs, bridges, gateways, modems, repeaters, and access points, and excludes devices that are not lawfully owned.

(13) Computer programs that are contained in and control the functioning

of a lawfully acquired motorized land vehicle or marine vessel such as a personal automobile or boat, commercial vehicle or vessel, or mechanized agricultural vehicle or vessel, except for programs accessed through a separate subscription service, when circumvention is a necessary step to allow the diagnosis, repair, or lawful modification of a vehicle or vessel function, where such circumvention is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. Eligibility for this exemption is not a safe harbor from, or defense to, liability under other applicable laws, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency.

(14) Computer programs that are contained in and control the functioning of a lawfully acquired device that is primarily designed for use by consumers, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device, and is not accomplished for the purpose of gaining access to other copyrighted works. For purposes of this paragraph (b)(14):

(i) The ''maintenance'' of a device is the servicing of the device in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device; and

(ii) The ''repair'' of a device is the restoring of the device to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device. For video game consoles, ''repair'' is limited to repair or replacement of a console's optical drive and requires restoring any technological protection measures that were circumvented or disabled.

(15) Computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system. For purposes of this paragraph (b)(15):

(i) The ''maintenance'' of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and

(ii) The ''repair'' of a device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.

(16)(i) Computer programs, where the circumvention is undertaken on a lawfully acquired device or machine on which the computer program operates, or is undertaken on a computer, computer system, or computer network on which the computer program operates with the authorization of the owner or operator of such computer, computer system, or computer network, solely for the purpose of good-faith security research.

(ii) For purposes of paragraph (b)(16)(i) of this section, ''good-faith security research'' means accessing a computer program solely for purposes of good-faith testing, investigation, and/or correction of a security flaw or vulnerability, where such activity is carried out in an environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.

(iii) Good-faith security research that qualifies for the exemption under paragraph (b)(16)(i) of this section may nevertheless incur liability under other applicable laws, including without limitation the Computer Fraud and Abuse Act of 1986, as amended and codified in title 18, United States Code, and eligibility for that exemption is not a safe harbor from, or defense to, liability under other applicable laws.

(17)(i) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, when the copyright owner or its authorized representative has ceased to provide access to an external computer server necessary to facilitate an authentication process to enable gameplay, solely for the purpose of:

(A) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game for personal, local gameplay on a personal computer or video game console; or

(B) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game on a personal computer or video game console when necessary to allow preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, that do not require access to an external computer server for gameplay, and that are no longer reasonably available in the commercial marketplace, solely for the purpose of preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(iii) Computer programs used to operate video game consoles solely to the extent necessary for an eligible library, archives, or museum to engage in the preservation activities described in paragraph (b)(17)(i)(B) or (b)(17)(ii) of this section.

(iv) For purposes of this paragraph (b)(17), the following definitions shall apply:

(A) For purposes of paragraphs (b)(17)(i)(A) and (b)(17)(ii) of this section, ''complete games'' means video games that can be played by users without accessing or reproducing copyrightable content stored or previously stored on an external computer server.

(B) For purposes of paragraph (b)(17)(i)(B) of this section, ''complete games'' means video games that meet the definition in paragraph (b)(17)(iv)(A) of this section, or that consist of both a copy of a game intended for a personal computer or video game console and a copy of the game's code that was stored or previously stored on an external computer server.

(C) ''Ceased to provide access'' means that the copyright owner or its authorized representative has either issued an affirmative statement indicating that external server support for the video game has ended and such support is in fact no longer available or, alternatively, server support has been discontinued for a period of at least six months; provided, however, that server support has not since been restored.

(D) ''Local gameplay'' means gameplay conducted on a personal computer or video game console, or locally connected personal computers or consoles, and not through an online service or facility.

(E) A library, archives, or museum is considered ''eligible'' if—

(*1*) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(*2*) The library, archives, or museum has a public service mission;

(*3*) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(*4*) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(*5*) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by this paragraph (b)(17).

(18)(i) Computer programs, except video games, that have been lawfully acquired and that are no longer reasonably available in the commercial marketplace, solely for the purpose of lawful preservation of a computer program, or of digital materials dependent upon a computer program as a condition of access, by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage. Any electronic distribution, display, or performance made outside of the physical premises of an eligible library, archives, or museum of works preserved under this paragraph may be made to only one user at a time, for a limited time, and only where the library, archives, or museum has no notice that the copy would be used for any purpose other than private study, scholarship, or research.

(ii) For purposes of the exemption in paragraph (b)(18)(i) of this section, a library, archives, or museum is considered "eligible" if—

(A) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(B) The library, archives, or museum has a public service mission;

(C) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(D) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(E) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by this paragraph (b)(18).

(19) Computer programs that operate 3D printers that employ technological measures to limit the use of material, when circumvention is accomplished solely for the purpose of using alternative material and not for the purpose of accessing design software, design files, or proprietary data.

(20) Computer programs, solely for the purpose of investigating a potential infringement of free and open source computer programs where:

(i) The circumvention is undertaken on a lawfully acquired device or machine other than a video game console, on which the computer program operates;

(ii) The circumvention is performed by, or at the direction of, a party that has a good-faith, reasonable belief in the need for the investigation and has standing to bring a breach of license or copyright infringement claim;

(iii) Such circumvention does not constitute a violation of applicable law; and

(iv) The copy of the computer program, or the device or machine on which it operates, is not used or maintained in a manner that facilitates copyright infringement.

(21) Video games in the form of computer programs, embodied in lawfully acquired physical or downloaded formats, and operated on a general-purpose computer, where circumvention is undertaken solely for the purpose of allowing an individual with a physical disability to use software or hardware input methods other than a standard keyboard or mouse.

* * * * *

Dated: October 21, 2021.

**Carla D. Hayden,**

*Librarian of Congress.*

[FR Doc. 2021–23311 Filed 10–27–21; 8:45 am]

BILLING CODE 1410–30–P

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R04–OAR–2020–0445; FRL–8779–02–R4]**

### Air Plan Approval; SC; Revisions to Definitions

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is finalizing approval of a State Implementation Plan (SIP) revision submitted by the State of South Carolina, through the South Carolina Department of Health and Environmental Control (SC DHEC or Department), on April 24, 2020. The SIP revision updates the definition of "Spec. Oil (Specification Oil)" and makes minor updates to formatting and numbering. EPA is finalizing approval of these changes pursuant to the Clean Air Act (CAA or Act) and implementing federal regulations.

**DATES:** This rule is effective November 29, 2021.

**ADDRESSES:** EPA has established a docket for this action under Docket Identification No. EPA–R04–OAR–2020–0445. All documents in the docket are listed on the *www.regulations.gov* website. Although listed in the index, some information may not be publicly available, *i.e.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Air Regulatory Management Section, Air Planning and Implementation Branch, Air and Radiation Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW, Atlanta, Georgia 30303–8960. EPA requests that if at all possible, you contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to schedule your inspection. The Regional Office's official hours of business are Monday through Friday 8:30 a.m. to 4:30 p.m., excluding Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Andres Febres, Air Regulatory Management Section, Air Planning and Implementation Branch, Air and Radiation Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW, Atlanta, Georgia 30303–8960. The telephone number is (404) 562–8966. Mr. Febres can also be reached via electronic mail at *febres-martinez.andres@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

## I. Background

On April 24, 2020, SC DHEC submitted a SIP revision to EPA for approval that includes changes to South Carolina Regulation 61–62.1, Section I—*Definitions.*[1] First, SC DHEC's April 24,

[1] In the April 24, 2020, SIP revision SC DHEC also submitted to EPA changes to Regulations 61–62.1, Continued

**List of Subjects in 14 CFR Part 71**

Airspace, Incorporation by reference, Navigation (air).

**The Proposed Amendment**

In consideration of the foregoing, the Federal Aviation Administration proposes to amend 14 CFR part 71 as follows:

**PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS**

■ 1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

**§ 71.1 [Amended]**

■ 2. The incorporation by reference in 14 CFR 71.1 of FAA Order JO 7400.11G, Airspace Designations and Reporting Points, dated August 19, 2022, and effective September 15, 2022, is amended as follows:

*Paragraph 2006 United States Area Navigation Routes*

* * * * *

**Q–476 JAMESTOWN, NY (JHW) TO NWTON, NJ [NEW]**

| | | |
|---|---|---|
| Jamestown, NY (JHW) | VOR/DME | (Lat. 42°11′18.99″ N, long. 079°07′16.71″ W) |
| WLKES, PA | WP | (Lat. 41°16′22.57″ N, long. 075°41′21.60″ W) |
| NWTON, NJ | WP | (Lat. 40°59′45.19″ N, long. 074°52′09.21″ W) |

* * * * *

*Paragraph 6011 United States Area Navigation Routes*

* * * * *

**T–393 GAILS, MA to Burlington, VT (BTV) [Amended]**

| | | |
|---|---|---|
| GAILS, MA | WP | (Lat. 41°52′08.51″ N, long. 070°24′07.69″ W) |
| Providence, RI (PVD) | VOR/DME | (Lat. 41°43′27.63″ N, long. 071°25′46.71″ W) |
| Putnam, CT (PUT) | VOR/DME | (Lat. 41°57′19.66″ N, long. 071°50′38.74″ W) |
| Gardner, MA (GDM) | VOR/DME | (Lat. 42°32′45.32″ N, long. 072°03′29.48″ W) |
| KEYNN, NH | WP | (Lat. 42°47′39.99″ N, long. 072°17′30.35″ W) |
| LBNON, NH | WP | (Lat. 43°40′44.43″ N, long. 072°12′58.18″ W) |
| Montpelier, VT (MPV) | VOR/DME | (Lat. 44°05″07.72″N, long. 072°26′57.71″ W) |
| Burlington, VT (BTV) | VOR/DME | (Lat. 44°23′49.58″ N, long. 073°10′57.49″ W) |

* * * * *

Issued in Washington, DC, on June 28, 2023.

**Brian Konie,**

*Acting Manager, Airspace Rules and Regulations.*

[FR Doc. 2023–14107 Filed 7–3–23; 8:45 am]

BILLING CODE 4910–13–P

---

## LIBRARY OF CONGRESS

## Copyright Office

## 37 CFR Part 201

**[Docket No. 2023–5]**

## Exemptions To Permit Circumvention of Access Controls on Copyrighted Works: Notice and Request for Public Comment

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of inquiry; extension of comment period.

**SUMMARY:** The United States Copyright Office is extending the deadline for written petitions for new exemptions in connection with the ninth triennial rulemaking proceeding under the Digital Millennium Copyright Act from the original deadline identified in the Office's June 8, 2023 notice.

**DATES:** Written petitions for new exemptions must be received no later than 11:59 p.m. Eastern Time on August 25, 2023. All other deadlines imposed in the June 8, 2023 notice remain unchanged.

**ADDRESSES:** Written petitions proposing new exemptions must be completed using the form provided on the Office's website at *https://www.copyright.gov/1201/2024/new-petition.pdf.* All petitions are to be submitted electronically through *regulations.gov.* Specific instructions for submitting petitions are available on the Copyright Office website at *https://www.copyright.gov/1201/2024.* If electronic submission is not feasible, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Rhea Efthimiadis, Assistant to the General Counsel, by email at *meft@copyright.gov* or by telephone at 202–707–8350.

**SUPPLEMENTARY INFORMATION:** On June 8, 2023, the U.S. Copyright Office issued a notice of inquiry initiating the ninth triennial rulemaking proceeding under the Digital Millennium Copyright Act to consider possible temporary exemptions to the prohibition against circumvention of technological measures that control access to copyrighted works.[1] Among other things, the notice solicited proposals for new exemptions to the prohibition against circumvention and set a deadline of August 11, 2023.

To ensure that members of the public, including those represented by law school clinics, have sufficient time to submit written petitions for new exemptions, and to ensure that the Office has the benefit of a complete record, the Office is extending the deadline for the submission of written petitions for new exemptions to 11:59 p.m. Eastern Time on August 25, 2023. All other deadlines imposed in the June 8, 2023 notice of inquiry remain unchanged.

Dated: June 28, 2023.

**Suzanne V. Wilson,**

*General Counsel and Associate Register of Copyrights.*

[FR Doc. 2023–14133 Filed 7–3–23; 8:45 am]

BILLING CODE 1410–30–P

[1] 88 FR 37486 (June 8, 2023).

---

## DEPARTMENT OF VETERANS AFFAIRS

## 38 CFR Part 80

**RIN 2900–AR68**

## Veteran and Spouse Transitional Assistance Grant Program

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of Veterans Affairs (VA), as authorized under the *Johnny Isakson and David P. Roe, M.D.*

the Tribes of the project through correspondence dated May 20, 2022, and received a response from the Catawba Indian Nation in a letter dated July 7, 2022. The Catawba Indian Nation requested to be notified if Native American artifacts or human remains are located during the ground disturbance phase of the project.

### Paperwork Reduction Act

This rulemaking does not contain information collection requirements, and a submission to the Office of Management and Budget under the Paperwork Reduction Act is not required. The NPS may not conduct or sponsor and you are not required to respond to a collection of information unless it displays a currently valid OMB control number.

### National Environmental Policy Act

The NPS has prepared the EA to determine whether this rulemaking will have a significant impact on the quality of the human environment under the National Environmental Policy Act of 1969. This rulemaking would not constitute a major Federal action significantly affecting the quality of the human environment. A detailed statement under the NEPA is not required because of the FONSI. The EA contains a full description of the purpose and need for taking action, the alternatives considered, a map of the affected area, and the environmental impacts associated with the project. A copy of the EA and FONSI can be found online at the URL listed in **ADDRESSES**.

### Effects on the Energy Supply (Executive Order 13211)

This rulemaking is not a significant energy action under the definition in Executive Order 13211; the rulemaking is not likely to have a significant adverse effect on the supply, distribution, or use of energy, and the rulemaking has not otherwise been designated by the Administrator of OIRA as a significant energy action. A Statement of Energy Effects in not required.

### Clarity of This Rule

The NPS is required by Executive Orders 12866 (section 1(b)(12)) and 12988 (section 3(b)(1)(B)), and 13563 (section 1(a)), and by the Presidential Memorandum of June 1, 1998, to write all rules in plain language. This means that each rule the NPS publishes must:

(a) Be logically organized;

(b) Use the active voice to address readers directly;

(c) Use common, everyday words and clear language rather than jargon;

(d) Be divided into short sections and sentences; and

(e) Use lists and tables wherever possible.

If you feel that the NPS has not met these requirements, send us comments by one of the methods listed in the **ADDRESSES** section. To better help the NPS revise the rule, your comments should be as specific as possible. For example, you should identify the numbers of the sections or paragraphs that you find unclear, which sections or sentences are too long, the sections where you feel lists or tables would be useful, etc.

### Public Participation

It is the policy of the Department of the Interior, whenever practicable, to afford the public an opportunity to participate in the rulemaking process. Accordingly, interested persons may submit written comments regarding this proposed rule by one of the methods listed in the **ADDRESSES** section of this document.

### Public Availability of Comments

Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time.

### List of Subjects in 36 CFR Part 7

National parks, Reporting and Recordkeeping requirements.

In consideration of the foregoing, the National Park Service proposes to amend 36 CFR part 7 as set forth below:

## PART 7—SPECIAL REGULATIONS, AREAS OF THE NATIONAL PARK SYSTEM

■ 1. The authority citation for part 7 continues to read as follows:

**Authority:** 54 U.S.C. 100101, 100751, 320102; Sec. 7.96 also issued under D.C. Code 10–137 and D.C. Code 50–2201.07.

■ 2. Amend § 7.58 by adding paragraph (d) to read as follows:

**§ 7.58 Cape Hatteras National Seashore.**

* * * * *

(d) *Bicycle Use.* (1) The Superintendent may designate all or a portion of the following trails as open to bicycle use:

(i) Multi-use pathway in the Hatteras Island District (approximately 1.6 miles).

(ii) [Reserved]

(2) Maps showing the pathway as open to bicycle use will be available at Seashore visitor centers and posted on the Seashore website. The Superintendent will provide notice that the pathway is open to bicycle use in accordance with § 1.7 of this chapter, including in the superintendent's compendium (or written compilation) of discretionary actions referred to in 36 CFR 1.7(b).

(3) The Superintendent may limit, restrict, or impose conditions on bicycle use, or close any trail to bicycle use, or terminate such conditions, closures, limits, or restrictions in accordance with § 4.30 of this chapter. A violation of any such limit, restriction, condition, or closure is prohibited.

**Shannon A. Estenoz,**

*Assistant Secretary for Fish and Wildlife and Parks.*

[FR Doc. 2023–23077 Filed 10–18–23; 8:45 am]

BILLING CODE 4312–52–P

---

## LIBRARY OF CONGRESS

### Copyright Office

### 37 CFR Part 201

**[Docket No. 2023–5]**

## Exemptions To Permit Circumvention of Access Controls on Copyrighted Works

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The United States Copyright Office is conducting the ninth triennial rulemaking proceeding under the Digital Millennium Copyright Act (''DMCA''), concerning possible temporary exemptions to the DMCA's prohibition against circumvention of technological measures that control access to copyrighted works. In this proceeding, the Copyright Office is considering petitions for the renewal of exemptions that were granted during the eighth triennial rulemaking along with petitions for new exemptions to engage in activities not permitted by existing exemptions. On June 8, 2023, the Office published a Notification of Inquiry requesting petitions to renew existing exemptions and comments in response to those petitions, as well as petitions for new exemptions. Having carefully considered the renewal petitions and comments received, in this Notice of Proposed Rulemaking (''NPRM''), the Office announces its intention to recommend all but one of the existing exemptions for renewal. This NPRM also initiates three rounds of public comment on the newly proposed exemptions. Interested parties are

invited to make full legal and evidentiary submissions in support of or in opposition to the newly proposed exemptions, in accordance with the requirements set forth below.

**DATES:** Initial written comments (including documentary evidence) and multimedia evidence from proponents and other members of the public who support the adoption of a proposed exemption, as well as parties that neither support nor oppose an exemption but seek to share pertinent information, are due December 22, 2023. Written response comments (including documentary evidence) and multimedia evidence from those who oppose the adoption of a proposed exemption are due February 20, 2024. Written reply comments from supporters of particular proposals and parties that neither support nor oppose a proposal are due March 19, 2024.

**ADDRESSES:** The Copyright Office is using the *regulations.gov* system for the submission and posting of comments in this proceeding. All comments are therefore to be submitted electronically through *regulations.gov*. The Office is accepting two types of comments. First, commenters who wish briefly to express general support for or opposition to a proposed exemption may submit such comments electronically by typing into the comment field on *regulations.gov*. Second, commenters who wish to provide a fuller legal and evidentiary basis for their position may upload a Word or PDF document, but such longer submissions must be completed using the long-comment form provided on the Office's website at *https://www.copyright.gov/1201/2024*. Specific instructions for submitting comments, including multimedia evidence that cannot be uploaded through *regulations.gov*, are also available on that web page. If a commenter cannot meet a particular submission requirement, please contact the Office using the contact information below for special instructions.

**FOR FURTHER INFORMATION CONTACT:** Rhea Efthimiadis, Assistant to the General Counsel, by email at *meft@copyright.gov* or by telephone at (202) 707–8350.

**SUPPLEMENTARY INFORMATION:**

On June 8, 2023, the Office published a Notification of Inquiry (''NOI'') requesting petitions to renew current exemptions, oppositions to the renewal petitions, and petitions for newly proposed exemptions in connection with the ninth triennial section 1201 rulemaking.[1] In response, the Office received thirty-eight renewal petitions, six comments in opposition to renewal of an exemption, and two comments supporting renewal of an exemption.[2] In addition, the Office received eleven petitions for new exemptions or expansion of previously granted exemptions.

This NPRM summarizes the renewal petitions and sets forth which exemptions the Office intends to recommend for renewal without the need for petitioners to further develop the administrative record. Separately, this NPRM outlines the proposed classes for new exemptions for which the Office is initiating three rounds of public comment.

**I. Standard for Evaluating Proposed Exemptions**

As the NOI explained, before the Office can recommend a temporary exemption from the prohibition on circumvention, the record must establish that ''persons who are users of a copyrighted work are, or are likely to be in the succeeding 3-year period, adversely affected by the prohibition . . . in their ability to make noninfringing uses under [title 17] of a particular class of copyrighted works.'' [3] When defining a ''class of copyrighted works,'' the Office generally uses the categories of works in 17 U.S.C. 102 as a starting point and then refines the class by other criteria, such as the technological protection measures (''TPMs'') used, distribution platforms, and/or types of uses or users.[4]

In evaluating the evidence, the Office weighs the statutory factors in section 1201(a)(1)(C): ''(i) the availability for use of copyrighted works; (ii) the availability for use of works for nonprofit archival, preservation, and educational purposes; (iii) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (iv) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (v) such other factors as the [Office] considers appropriate.'' [5] After developing a comprehensive administrative record, the Register of Copyrights makes a recommendation to the Librarian of Congress concerning whether exemptions are warranted based on that record.

In considering whether to recommend an exemption, the Office follows the statutory text: ''*Are users of a copyrighted work adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a class of copyrighted works, or are users likely to be so adversely affected in the next three years?*'' [6] This inquiry breaks down into the following elements:

- Does the proposed class include at least some works protected by copyright?
- Are the uses at issue likely noninfringing under title 17?
- Are users currently, or likely to be, adversely affected in their ability to make such noninfringing uses during the next three years? [7]
- Is the statutory prohibition on circumventing access controls the cause of the adverse effects? [8]

To determine whether a proposed use is likely to be noninfringing, the Register considers the Copyright Act and relevant judicial precedents.[9] When

[1] *Exemptions To Permit Circumvention of Access Controls on Copyrighted Works,* 88 FR 37486 (June 8, 2023) (''2023 NOI''). On July 5, 2023, the Office issued a Notice of Inquiry extending the comment submission period for petitions for new exemptions. *Exemptions To Permit Circumvention of Access Controls on Copyrighted Works: Notice and Request for Public Comment,* 88 FR 42891 (July 5, 2023).

[2] The comments received in response to the Notification of Inquiry are available at *https://www.regulations.gov/document/COLC-2023-0004-0002/comment* and on the Copyright Office website. Renewal petitions are available at *https://www.copyright.gov/1201/2024/petitions/renewal/*, and petitions for new exemptions are available at *https://www.copyright.gov/1201/2024/petitions/proposed/*. References to renewal petitions and comments are by party name (abbreviated where appropriate) and a brief identification of the previously granted exemption, followed by either ''Renewal Pet.,'' ''Supp.'' (for comments supporting an exemption), or ''Opp.'' (for comments opposing an exemption). References to petitions for new exemptions are by party name (abbreviated where appropriate), the Office's proposed class number, and ''Pet.''

[3] 17 U.S.C. 1201(a)(1)(C).

[4] *See* U.S. Copyright Office, Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 8–9 (2021) (''2021 Recommendation''); U.S. Copyright Office, Section 1201 of Title 17, at 26, 108–10 (2017), *https://www.copyright.gov/policy/1201/section-1201-full-report.pdf* (''Section 1201 Study''); *see also* H.R. Rep. No. 105–551, pt. 2, at 38 (1998) (''Commerce Comm. Report'') (''The Committee intends that the 'particular class of copyrighted works' be a narrow and focused subset of the broad categories of works of authorship than is identified in Section 102 of the Copyright Act (17 U.S.C. 102).'').

[5] 17 U.S.C. 1201(a)(1)(C).

[6] Section 1201 Study at 114.

[7] This element is analyzed in reference to section 1201(a)(1)(C)'s five statutory factors.

[8] Section 1201 Study at 115–27.

[9] *Id.* at 115–17. While controlling precedent directly on point is not required to justify an exemption, there is no ''rule of doubt'' favoring an exemption when it is unclear that a particular use is fair or otherwise noninfringing. *See* U.S. Copyright Office, Section 1201 Rulemaking: Sixth

considering whether such uses are being adversely impacted by the prohibition on circumvention, the rulemaking focuses on "distinct, verifiable, and measurable impacts" compared to "*de minimis* impacts." [10] The Register examines the administrative record as a whole to consider whether the preponderance of the evidence shows that the conditions for granting an exemption have been met.[11]

### II. Review of Petitions To Renew Existing Exemptions

In this proceeding, the Office is again using a streamlined process for recommending the renewal of exemptions previously issued by the Librarian of Congress. As the Office explained in its 2017 policy study, the "Register must apply the same evidentiary standards in recommending the renewal of exemptions as for first-time exemption requests," and the statute requires that "a determination must be made specifically for each triennial period." [12] The Office further determined that "the statutory language appears to be broad enough to permit determinations to be based upon evidence drawn from prior proceedings, but only upon a conclusion that this evidence remains reliable to support granting an exemption in the current proceeding." [13] The Office first instituted this streamlined renewal process in the seventh triennial rulemaking, which concluded in 2018.[14] In that rulemaking, the Office received requests to renew each of the exemptions from the previous proceeding, none of which were meaningfully contested.[15] As a result, it was able to recommend renewal of all previously granted exemptions.[16] The streamlined renewal process was praised by participants during the ensuing rulemaking,[17] and the Office has employed it in subsequent rulemakings.

The Office is following the same procedure in this rulemaking. Renewal petitions must be for exemptions as they are currently formulated, without modification. Petitions should support a determination by the Office that, due to a lack of legal, marketplace, or technological changes, the factors that led it to recommend adoption of the exemption in the prior rulemaking may still be relied on to renew the exemption.[18] To the extent that any renewal petition proposes uses beyond the current exemption, the Office disregards those portions of the petition for purposes of considering the renewal of the exemption, and instead focuses on whether the petition provides sufficient information to warrant renewal of the exemption in its current form.

In response to its current NOI, the Office received petitions to renew each existing exemption, except for one.[19] Each of the thirty-eight renewal petitions received included a summary of the continuing need and justification for the exemption. In each case, petitioners also signed a declaration stating that, to the best of their personal knowledge, there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record such that renewal of the exemption would not be justified.

The Office received eight comments in response to the renewal petitions, two of which support renewal of specific exemptions. Six comments oppose certain different aspects of the renewal petitions.[20]

As detailed below, after reviewing the petitions for renewal and comments in response, the Office concludes that each petition is sufficient to renew the corresponding existing exemption, and does not find sufficient opposition to any existing exemption that supports refusing renewal. Accordingly, the Office intends to recommend that the thirty-eight existing exemptions for which renewal petitions were received be renewed in their current form.[21]

#### *A. Audiovisual Works—Criticism and Comment—Filmmaking*

Multiple organizations petition to renew the exemption for motion pictures [22] for uses in documentary films or other films where the use is a parody or for a biographical or historically significant nature (codified at 37 CFR 201.40(b)(1)(i)(A)).[23] No oppositions were filed against renewal.

The petitions for renewal summarize the continuing need and justification for the exemption, and the petitioners demonstrate personal knowledge of and

Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 15 (2015) ("2015 Recommendation"). The rulemaking also generally "is not an appropriate venue for breaking new ground in fair use jurisprudence." 2021 Recommendation at 10–11 (quoting Section 1201 Report at 116–17).

[10] Commerce Comm. Report at 37; *see also* Staff of H. Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as Passed by the United States House of Representatives on August 4th, 1998, at 6 (Comm. Print 1998) (using the equivalent phrase "substantial adverse impact"); *see also, e.g.,* Section 1201 Study at 119–21 (discussing same and citing application of this standard in five prior rulemakings).

[11] *See* 17 U.S.C. 1201(a)(1)(C) (asking whether users "*are, or are likely to be* in the succeeding 3-year period, adversely affected by the prohibition [on circumvention] in their ability to make noninfringing uses") (emphasis added); Section 1201 Study at 111–12; *see also Sea Island Broad. Corp.* v. *FCC,* 627 F.2d 240, 243 (D.C. Cir. 1980) (noting that "[t]he use of the 'preponderance of evidence' standard is the traditional standard in civil and administrative proceedings"); *Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies,* 70 FR 57526, 57528 (Oct. 3, 2005); 2021 Recommendation at 7–8; U.S. Copyright Office, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Acting Register of Copyrights 13 (2018) ("2018 Recommendation"); 2015 Recommendation at 13–14; U.S. Copyright Office, Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 6 (2012) ("2012 Recommendation"); U.S. Copyright Office, Section 1201 Rulemaking: Second Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 19–20 (2003).

[12] Section 1201 Study at 142, 145.

[13] *Id.* at 143.

[14] 2018 Recommendation at 17.

[15] *Id.* at 22.

[16] *Id.* at 19.

[17] *See, e.g., id.* at 19 n.80 (collecting transcript testimony from 2018 rulemaking).

[18] *See* Section 1201 Study at 143–44.

[19] A renewal petition was not filed for the current exemption permitting circumvention of video games in the form of computer programs for the purpose of allowing an individual with a physical disability to use alternative software or hardware input methods. *See* 37 CFR 201.40(b)(21). The Office therefore will not recommend this exemption to the Librarian for renewal.

[20] *See, e.g.,* DVD Copy Control Ass'n ("DVD CCA") & Advanced Access Content Sys. Licensing Adm'r ("AACS LA") Noncom. Videos Opp.; DVD CCA & AACS LA AV Educ. TDM Opp.; Author Services, Inc. ("Author Services") Device Repair Opp.; American Consumer Institute ("ACI") Medical Device Repair Opp.; Medical Imaging & Technology Alliance ("MITA") Medical Device Repair Opp.; Philips North America, LLC ("Philips") Medical Device Repair Opp.

[21] Because a renewal petition was not filed for the current exemption found within 37 CFR 201.40(b)(21), the Office will not renew or consider this exemption during the rulemaking proceeding. *See Exemptions to Permit Circumvention of Access Controls on Copyrighted Works,* 82 FR 29804, 29805 (June 30, 2017) ("[T]he statutory language appears to be broad enough to permit determinations to be based upon evidence drawn from prior proceedings, but only upon a conclusion that this evidence remains reliable to support granting an exemption in the current proceeding." (quoting Section 1201 Study at 142–43)); *see also id.* (requiring those seeking renewal to use the Office's form to summarize the "existence of a continuing need and justification for the exemption" and attest that "there has not been any material change in the facts, law, or other circumstances set forth in the prior rulemaking record . . . that originally demonstrated the need for the selected exemption, such that renewal of the exemption would not be justified").

[22] Unless otherwise noted, all references to motion pictures as a category include television programs and videos.

[23] International Documentary Association and Kartemquin Educational Films (collectively "Joint Filmmakers") Documentary Films Renewal Pet.; New Media Rights ("NMR") Documentary Films Renewal Pet.

experience with this exemption. For example, the International Documentary Association and Kartemquin Educational Films (collectively "Joint Filmmakers")—which represent thousands of independent filmmakers across the nation—state that TPMs such as encryption continue to prevent filmmakers from accessing needed material, and that this is "especially true for the kind of high fidelity motion picture material filmmakers need to satisfy both distributors and viewers." [24] Petitioners state that filmmakers have found it necessary to rely on this exemption and will continue to do so.[25]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*B. Audiovisual Works—Criticism and Comment—Noncommercial Videos*

Two organizations petition to renew the exemption for motion pictures for use in noncommercial videos (codified at 37 CFR 201.40(b)(1)(i)(B)).[26] The petitions argue for the continuing need and justification for the exemption, and the petitioners demonstrate personal knowledge of and experience with this exemption. For example, one of the petitioners, OTW, has advocated for the noncommercial video exemption in past triennial rulemakings, and has heard from "a number of noncommercial remix artists" who have used the exemption in the past and anticipate needing to use it in the future.[27] OTW includes an account from an academic stating that footage ripped from DVDs and Blu-ray was preferred for "vidders" (noncommercial remix artists) because "it is high quality enough to bear up under the transformations that vidders make to it—which now routinely include changes of color, speed, cropping and zooming, masking, animations and other cgi, and even explorations of the z-axis and 3D." [28] Similarly, NMR notes "a continuing need for the exemption" and a purported reliance by filmmakers to make these types of uses in the next triennial period.[29] No oppositions were filed to renewal of the exemption as currently formulated.

The Office did, however, receive opposition to OTW's renewal petition to the extent it seeks to modify the regulatory language of this exemption. Specifically, in its renewal petition, OTW proposes the Office "us[e] the relatively simple language defining the exempted class from the 2008 rulemaking," rather than the language in the current exemption, which was adopted in the 2021 rulemaking.[30] DVD CCA and AACS LA object to the proposed change in the language sought by OTW, noting that the Office's streamlined proceedings for renewals is "only" for exemptions "as they are currently written in the Code of Federal Regulations, without modification." [31] The Office agrees. OTW's proposed modifications must instead be addressed as part of the full rulemaking proceeding, and therefore this request is included as one of the proposed new classes discussed below.[32]

Based on the information provided in the renewal petitions and the lack of opposition to renewal of the exemption as it currently exists, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*C. Audiovisual Works—Criticism and Comment—Multimedia E-Books*

Authors Alliance, the American Association of University Professors ("AAUP"), and independent documentary producer and screenwriter, Bobette Buster, filed a joint petition to renew the exemption for the use of motion picture excerpts in nonfiction multimedia e-books (codified at 37 CFR 201.40(b)(1)(i)(C)).[33] No oppositions were filed against renewal.

The petition states that there is a continuing need and justification for the exemption by pointing to Professor Buster's continuing work on an e-book series titled "Deconstructing Master Filmmakers," where the "use of high-resolution video is essential" to the project and would not be available "without the circumvention of technological protection measures." [34] The petition notes that Professor Buster's project has been discussed during the three previous rulemakings and its continuation justifies renewal of the current exemption.

The Office agrees. Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period.[35] Accordingly, it intends to recommend renewal.

*D. Audiovisual Works—Criticism and Comment—Universities and K–12 Educational Institutions*

Several organizations petition to renew the exemption for motion pictures for educational purposes by college and university faculty, students, or employees acting at the direction of faculty, or K–12 educators and students (codified at 37 CFR 201.40(b)(1)(ii)(A)).[36] No oppositions were filed against renewal.

The petitions argue for the continuing need and justification for the exemption, stating that educators and students continue to rely on excerpts from digital media for class presentations and coursework. Peter Decherney, Michael Delli Carpini, Library Copyright Alliance ("LCA"), and Society for Cinema and Media Studies ("SCMS") (collectively "Joint Educators") provide several examples of professors using DVD clips in the classroom. For example, University of

[24] Joint Filmmakers Documentary Films Renewal Pet. at 3.

[25] *Id.;* NMR Documentary Films Renewal Pet. at 3.

[26] NMR Noncom. Videos Renewal Pet.; Organization for Transformative Works ("OTW") Noncom. Videos Renewal Pet.

[27] OTW Noncom. Videos Renewal Pet. at 3.

[28] *Id.*

[29] NMR Noncom. Videos Renewal Pet. at 3.

[30] OTW describes its requested change to the exemption language as "not . . . an expansion of the existing exemption, but a more understandable restatement." OTW Noncom. Videos Renewal Pet. at 4.

[31] DVD CCA & AACS LA Noncom. Videos Opp. at 2 (emphasis omitted) (quoting 2023 NOI at 37487).

[32] *See* 2023 NOI at 37487. As the Office previously noted, much of the language that has been added to the exemption since 2008 was sought by exemption proponents. *See* 2012 Recommendation at 105, 110.

[33] Buster, Authors Alliance & AAUP Nonfiction Multimedia E-Books Renewal Pet.

[34] *Id.* at 3.

[35] The Office notes that petitioners have filed highly similar renewal petitions in the 2018 and 2021 rulemaking proceedings, testifying generally that Professor Buster has continued to work on her e-book series without additional specifics about that work or progress. *See* 2018 Bobette Buster et al. Nonfiction Multimedia E-Books Renewal Pet. at 3 ("Ms. Buster continues to work on an e-book series, based on her lecture series, 'Deconstructing Master Filmmakers: The Uses of Cinematic Enchantment,' that relies on the availability of high-resolution video not available without circumvention of technological protection measures"); 2021 Bobette Buster et al. Nonfiction Multimedia E-Books Renewal Pet. at 3 ("Ms. Buster continues to work on an e-book series, based on her lecture series, 'Deconstructing Master Filmmakers: The Uses of Cinematic Enchantment,' that relies on the availability of high-resolution video not available without circumvention of technological protection measures."). If petitioners seek renewal in future proceedings, the Office suggests that they provide additional information about Professor Buster's progress or point to other individuals relying on the exemption.

[36] Decherney, Delli Carpini, Library Copyright Alliance ("LCA"), and Society for Cinema and Media Studies ("SCMS") (collectively "Joint Educators") AV Educ. Renewal Pet.; Brigham Young Univ.—Idaho Intellectual Property Office ("BYU-Idaho") AV Educ. Renewal Pet.

Pennsylvania Medieval Literature Professor David Wallace "frequently uses film and television clips to compare medieval poetry with the style of popular contemporary film" and "uses the clips to focus on historical detail." [37] In addition, co-petitioner Peter Decherney declares that he "continues to rely heavily on this exemption in teaching his course on Multimedia Criticism" where his students "produce short videos analyzing media." [38] Indeed, Joint Educators broadly suggest that the "entire field" of video essays or multimedia criticism "could not have existed in the United States without fair use and the 1201 educational exemption." [39] Similarly, BYU-Idaho assert that access to films on streaming platforms "are not available for institutions due to limited licensing agreements that limit uses to residential or personal use." [40] Through these submissions, petitioners demonstrate personal knowledge of and experience with regard to this exemption based on their representation of thousands of digital and literacy educators and/or members supporting educators and students, combined with past participation in the section 1201 triennial rulemaking.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*E. Audiovisual Works—Criticism and Comment—Massive Open Online Courses ("MOOCs")*

Peter Decherney, Michael Delli Carpini, LCA, and SCMS (collectively "Joint Educators") jointly petition to renew the exemption for motion pictures for educational uses in MOOCs (codified at 37 CFR 201.40(b)(1)(ii)(B)).[41] No oppositions were filed against renewal.

The petition cites a continuing need and justification for the exemption, stating that instructors continue to rely on the exemption to "develop, provide, and improve MOOCs," as well as increase the number of (and therefore access to) MOOCs, particularly in the field of film and media studies.[42] Specifically, Joint Educators note that Professor Decherney's History of Hollywood class "offers close readings of Hollywood classics like King Kong (1933) and Casablanca (1942) and analyzes digital special effects, sound design, and other elements of filmmaking." [43] The petition also states that the "exemption has become even more vital since the COVID–19 pandemic and the continuing shift of our education systems to include online learning," highlighting the increase in MOOCs and increased enrollment.[44]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*F. Audiovisual Works—Criticism and Comment—Digital and Media Literacy Programs*

LCA and Professor Renee Hobbs petition to renew the exemption for motion pictures for educational uses in nonprofit digital and media literacy programs offered by libraries, museums, and other nonprofits (codified at 37 CFR 201.40(b)(1)(ii)(C)).[45] No oppositions were filed against renewal.

The petition provides testimony as to the continuing need and justification for the exemption, and petitioners demonstrate personal knowledge of and experience with this exemption. For example, the petition states that librarians, museums, and other nonprofit entities across the country have relied on the current exemption and will continue to do so for their digital and media literacy programs.[46] The petition also notes that Professor Hobbs has testified in several previous rulemakings and has personal experience with the relevant standards and evidence underpinning the current exemption.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*G. Audiovisual Works—Captioning and Audio Description*

The Association of Transcribers and Speech-to-Text Providers ("ATSP") and LCA jointly petition to renew the exemption for motion pictures for the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students, faculty, or staff with disabilities (codified at 37 CFR 201.40(b)(2)).[47] No oppositions were filed against renewal.

The petition contains testimony that the exemption continues to be relied on by its beneficiaries. For example, petitioners assert that they "have used the exemption to address the requests and concerns of students with disabilities in attendance at their respective educational institutions to create equitable educational experiences," which "enables disability services offices and similar units to ensure that students with disabilities have access to the same advantages as their peers in the pursuit of education." [48] "Based on their regular interaction with those affected by the exemption," which demonstrates personal knowledge of the exemption, petitioners believe that the circumstances justifying the exemption currently exist and will persist for the next three years.[49]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*H. Audiovisual Works—Preservation or Replacement—Library, Archives, and Museum*

LCA petitions to renew the exemption for motion pictures for preservation or the creation of a replacement copy by an eligible library, archives, or museum (codified at 37 CFR 201.40(b)(3)).[50] No oppositions were filed against renewal.

The petition provides testimony as to the continuing need and justification for the exemption. For example, the petition states that "[c]ultural heritage institutions across the country have relied on the exemption . . . to make preservation and replacement copies of the motion pictures in their collections stored on DVDs and Blu-ray discs," as many motion pictures in the collections "are unavailable for purchase or streaming" or "continue to deteriorate." [51] LCA also demonstrates personal knowledge of the exemption based on its past participation with this particular exemption in the previous section 1201 triennial rulemaking.

[37] Joint Educators AV Educ. Renewal Pet. at 3.

[38] *Id.*

[39] *Id.*

[40] BYU-Idaho AV Educ. Renewal Pet. at 3.

[41] Joint Educators AV Educ. MOOCs Renewal Pet.

[42] *Id.* at 3.

[43] *Id.*

[44] *Id.*

[45] LCA & Hobbs AV Educ. Nonprofits Renewal Pet.

[46] *Id.* at 3.

[47] ATSP & LCA Captioning Renewal Pet.

[48] *Id.* at 3.

[49] *Id.*

[50] LCA Preservation Renewal Pet.

[51] *Id.* at 3.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*I. Audiovisual Works—Text and Data Mining—Scholarly Research and Teaching*

Authors Alliance, AAUP, and LCA jointly petition to renew the exemption for text and data mining of motion pictures by researchers affiliated with a nonprofit institution of higher education, or at the direction of such researchers, for the purpose of scholarly research and teaching (codified at 37 CFR 201.40(b)(4)).[52] As discussed further below, DVD CCA & AACS LA submitted a comment in opposition.

The petition argues that there is a continuing need for the exemption and includes examples of researchers actively relying on the exemption. For example, as part of ''researching depictions'' of climate changes, Professor James Lee at the University of Cincinnati, is using the exemption ''to build a corpus of . . . films to then conduct text and data mining, searching for climate change markers across those materials.'' [53] According to the petition, there is a continued need for the exemption because ''this type of research requires substantial computing resources and institutional coordination'' and, as a result, ''many of these projects are just now taking shape'' as ''a wide range of researchers . . . are actively planning projects that would rely on the TDM exemption.'' [54] The petition further states that the Office can rely on the record from the previous rulemaking because the relevant case law has not changed and there have been no developments in the market that would allow petitioners to obtain the works they need without circumvention.[55] Finally, the petition states that ''[c]ommercially licensed text and data mining products continue to be made available to research institutions, as they were at the time of the 2021 exemption and as is reflected in the existing record, but these licensed products do not allow researchers to license the full array of texts and films that are needed to engage in the research they seek to do.'' [56]

DVD CCA and AACS LA filed an objection to renewal on the grounds that the previous rulemaking record is no longer reliable. According to DVD CCA and AACS LA, during the last rulemaking petitioners ''contended that there was no evidence of the availability of licenses for motion pictures for their desired use'' and the Office's recommendation of the exemption was based on the fact that ''there [were] no [existing] large-scale libraries of digital motion pictures available for text and data mining.'' [57] DVD CCA and AACS LA argue that ''because proponents' own petition indicates they are aware of the emergence of licensed access to motion pictures for data mining purposes, then such facts should be developed in the full rulemaking as such licensing opportunities could be a reasonable alternative to circumvention.'' [58] DVD CCA and AACS LA did not, however, provide affirmative evidence of new licensing options for the text and data mining activities covered by the current exemption.

After reviewing the renewal petition, the opposition comment, and the record from the previous rulemaking for this exemption, the Office concludes that the exemption may be renewed by relying on the prior record. DVD CCA and AACS LA are correct that the **Register** concluded in 2021 that ''there are no existing large-scale libraries of digital motion pictures available for text and data mining.'' [59] Contrary to the opposition's assertion, however, the **Register** did not find that licensed text and data mining products were ''nonexistent.'' [60] Opponents of the exemption, including from DVD CCA and AACS LA, asserted in the previous rulemaking that ''[i]n fact, licenses are available'' for text and data mining.[61] For example, the Motion Picture Association, Alliance for Recorded Music, and Entertainment Software Association, filed a joint submission arguing that an exemption was unnecessary because ''copyright owners of motion pictures already license other educational uses, such as remote streaming, and could potentially license the uses at issue.'' [62] Ultimately, the Office concluded that while there may have been a ''nascent, but growing'' market for licenses,[63] proponents were unable to obtain the ''large-scale'' licenses they claimed were needed for the quantity of audiovisual works necessary to engage in text and data mining.[64] The statement in the current renewal petition that ''licensed products do not allow researchers to license the full array of texts and films that are needed to engage in the research they seek to do'' [65] is thus a summary of the previous rulemaking record; not an admission that the relevant facts have changed. For this reason, the opposition filed by DVD CCA and AACS LA does not preclude renewal of this exemption.[66]

Based on the information provided in the renewal petition and the lack of sufficient opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*J. Literary Works—Text and Data Mining—Scholarly Research and Teaching*

Authors Alliance, AAUP, and LCA also jointly petition to renew the

---

[52] Authors Alliance, AAUP & LCA AV Text and Data Mining Renewal Pet.

[53] *Id.* at 3. Additionally, the petition described how John Bell, Director of the Data Experiences and Visualizations Studio and Digital Humanities Program Manager at Dartmouth Research Computing, uses the exemption in his ''Deep Screens XR Project,'' which ''extracts video files from 800+ DVDs of commercial narrative films, stores those videos in a secure compute environment, and processes them using machine learning-based methods to establish 3D body pose data on the actors in those films.'' *Id.*

[54] *Id.*

[55] *Id.* at 4

[56] *Id.*

[57] DVD CCA & AACS LA AV Text and Data Mining Opp. at 2, 3 n.1 (quoting 2021 Recommendation at 119).

[58] *Id.* at 3.

[59] 2021 Recommendation at 119.

[60] DVD CCA & AACS LA AV Text and Data Mining Opp. at 2.

[61] 2021 DVD CCA & AACS LA Class 7 Opp. at 14–15 (pointing to testimony by Professor Lauren Tilton as ''suggesting research groups need financial resources to license [ ] works'' for text and data mining but as ''not say[ing] that licenses are not available, that rightsholders are unwilling to license the works, or even that the fees for such licenses are unreasonable'').

[62] 2021 Joint Creators Class 7 Opp. at 6.

[63] 2021 Recommendation at 112–13 (quoting 2021 Ass'n of American Publishers Class 7 Opp. at 9–10).

[64] *See id.* at 119 (''For researchers interested in studying motion pictures, there are no existing large-scale libraries of digital motion pictures available for text and data mining.''); *see also* 2021 Hearing Tr. at 415:22–416:07 (Apr. 7, 2021) (Professor David Bamman, University of California, Berkeley) (stating that ''licensing for movies'' was a problem for text and data mining because such activities could not be ''carr[ied] out if there's any single studio that doesn't allow the licenses for those terms'').

[65] Authors Alliance, AAUP & LCA AV Text and Data Mining Renewal Pet. at 4.

[66] The Office also notes that the opposition did not provide affirmative evidence of ''new legal or factual developments that implicate 'the reliability of the previously-analyzed administrative record,' '' as required by the Notice of Inquiry. 2023 NOI at 37488 (quoting *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works*, 85 FR 65293, 65295 (Oct. 15, 2020)). As the Office explained in June, ''[u]nsupported conclusory opinion and speculation'' will ''not be enough'' for the Office ''to refuse to recommend renewing an exemption it would have otherwise recommended in the absence of any opposition.'' *Id.* It is not enough to point to a single sentence offered by renewal petitioners arguing that the record remains unchanged.

exemption for text and data mining of literary works that were distributed electronically by researchers affiliated with a nonprofit institution of higher education, or at the direction of such researchers, for the purpose of scholarly research and teaching (codified at 37 CFR 201.40(b)(5)).[67] No oppositions were filed against renewal.

The petition largely echoes the same petitioners' joint petition for text and data mining of audiovisual works. Petitioners state that they ''have continued to work with researchers, . . . many of whom are now actively relying on the TDM exemption in their research or developing plans to do so in the very near future.'' [68] For example, they point to Professor Lee's use of the exemption to research depictions of climate change, where he ''build[s] a corpus of novels . . . to then conduct text and data mining, searching for climate change markers across those materials.'' [69] Because researchers are actively relying on the current exemption, and because ''there are no material changes in facts, law, technology, or other circumstances'' from the previous rulemaking, petitioners seek to renew the exemption in this cycle.[70]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*K. Literary Works—Assistive Technologies*

The American Council of the Blind (''ACB''), American Foundation for the Blind (''AFB''), HathiTrust, and LCA jointly petition to renew the exemption for literary works or previously published musical works that have been fixed in the form of text or notation, distributed electronically, whose technological measures interfere with assistive technologies (codified at 37 CFR 201.40(b)(6)).[71] No oppositions were filed against renewal.

The petition provides evidence regarding the continuing need and justification for the exemption stating that individuals who are blind, visually impaired, or print disabled are significantly disadvantaged with respect to obtaining accessible e-book content because TPMs interfere with the use of assistive technologies.[72] Specifically, petitioners assert that ''many e-books have built-in security software that prevents purchasers and other third parties from utilizing them outside of publisher-designated e-book reader platforms.'' [73] Petitioners also note that the record underpinning the exemption ''has stood and been re-established in the past seven triennial reviews dating back to 2003'' and that the ''accessibility of e-books is frequently cited as a top priority'' by its members.[74] Finally, they demonstrate personal knowledge of and experience with the assistive technology exemption, as organizations that have participated in past rulemaking proceedings regarding this exemption and advocate for individuals with print disabilities.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*L. Literary Works—Medical Device Data*

The Coalition of Medical Device Patients and Researchers petition to renew the exemption covering access to patient data on medical devices or monitoring systems (codified at 37 CFR 201.40(b)(7)).[75] No oppositions were filed against renewal.

The petition states that patients continue to need access to data output from their medical devices to manage their health and react to their medical data in real-time, which the current exemption facilitates.[76] One member of the Coalition, who has personal knowledge of and experience with this exemption through participation in past rulemakings, attests that he needed access to the data output from his medical device.[77] Another member describes how an inability to get her defibrillator interrogated by an authorized representative within a three-day window ''potentially put[ ] her health at serious risk.'' [78]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*M. Computer Programs—Unlocking*

The Institute of Scrap Recycling Industries, Inc. (''ISRI'') petitions to renew the exemption for computer programs that operate wireless devices, to allow connection of the device to an alternative wireless network (''unlocking'') (codified at 37 CFR 201.40(b)(8)).[79] No oppositions were filed against renewal.

The petition offers evidence of the continuing need and justification for the exemption by explaining that ISRI's members continue to receive wireless products that are locked to a particular wireless carrier.[80] Moreover, ISRI notes that the number of 5G-enabled devices has continued to grow since the previous rulemaking, meaning that there are more devices that may require unlocking for the reasons discussed in previous rulemakings.[81] For example, ISRI states that its members continue to purchase or acquire donated cell phones, tablets, and other wireless devices and try to reuse them, but that wireless carriers still lock devices to prevent them from being used on other carriers.[82] ISRI has personal knowledge of and experience with this exemption because it represents companies that rely on the ability to unlock cellphones and has participated in ''several cycles'' of triennial rulemakings addressing device unlocking.[83]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*N. Computer Programs—Jailbreaking*

The Office received multiple petitions to renew the four exemptions that permit enabling electronic devices to interoperate with or to remove software applications (''jailbreaking'') (codified at 37 CFR 201.40(b)(9)–(12)).[84] No oppositions were filed against renewal.

---

[67] Authors Alliance, AAUP & LCA LW Text and Data Mining Renewal Pet.

[68] *Id.* at 3.

[69] *Id.*

[70] *Id.* at 4.

[71] ACB, AFB, HathiTrust & LCA Assistive Technologies Renewal Pet.

[72] *Id.* at 3.

[73] *Id.*

[74] *Id.* at 3, 4.

[75] Coalition of Medical Device Patients and Researchers Medical Devices Renewal Pet.

[76] *Id.* at 3, 4.

[77] *Id.* at 3.

[78] *Id.*

[79] ISRI Unlocking Renewal Pet.

[80] *Id.* at 3.

[81] *Id.* The petition also notes that the increased number of devices does not implicate the reliability of the factual record, as new devices continue to use modems by a single chipset vendor—Qualcomm—which was the basis for the Office's expansion of this exemption to all wireless devices in the last rulemaking. *See* 2021 Recommendation at 161–63 (explaining that ''proponents have provided sufficient evidence for the Register to conclude that the 2015 fair use analysis applies with equal force to unlocking all types of wireless devices'' because most wireless devices in the United States use modems manufactured by Qualcomm).

[82] ISRI Unlocking Renewal Pet. at 3.

[83] *Id.*

[84] These exemptions permit circumvention for the purpose of jailbreaking (1) smartphones and other

Continued

The renewal petitions provide evidence of the continuing need and justification for the four jailbreaking exemptions. Regarding smartphones and other portable all-purpose mobile computing devices specifically, EFF asserts that they "spoke to many device users who currently rely on the jailbreaking exemption and anticipate continuing to rely on the exemption in the future" for uses such as installing an alternative operating system, keeping older devices functional, and customizing application functionality.[85] For smart TVs, SFC asserts that "the majority of Smart TV platforms ship to the consumer in 'locked' formats, which prevent users from loading third-party software to enable interoperability." [86] For voice assistant devices, EFF points to voice assistant devices, such as the Lenovo smart display, that are no longer supported but whose users wish to expand their functionality and install updated software.[87] And for routers, SFC states that based on its observations, there is a continued need to install alternative firmware and security updates to networking devices.[88]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of these exemptions are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*O. Computer Programs—Repair of Motorized Land Vehicles, Marine Vessels, or Mechanized Agricultural Vehicles or Vessels*

Both iFixit and MEMA, The Vehicle Suppliers Association ("MEMA") filed petitions to renew the exemption for computer programs that control motorized land vehicles, marine vessels, or mechanized agricultural vehicles or vessels for purposes of diagnosis, repair, or modification of the vehicle or vessel function (codified at 37 CFR 201.40(b)(13)).[89] No oppositions were filed against renewal.

Both petitions attest that the current exemption remains necessary. For example, MEMA states that "seemingly every year vehicle computer programs become more important and essential to today's motor vehicles" and that its membership "continues to see firsthand that the exemption is helping protect consumer choice and a competitive market, while mitigating risks to intellectual property and vehicle safety." [90] iFixit states "the software measures manufacturers deploy for the purpose of controlling access to vehicle software . . . prevent[s] consumers and independent repair shops from lawfully diagnosing, maintaining, repairing, and upgrading their vehicles." [91] Both petitioners have personal knowledge of and experience with this exemption; both have participated in previous rulemakings and either represent or have gathered information from individuals or professionals conducting repairs or businesses that manufacture, distribute, and sell motor vehicle parts.

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*P. Computer Programs—Repair of Devices Designed Primarily for Use by Consumers*

EFF petitions to renew the exemption for computer programs that control devices designed primarily for use by consumers for diagnosis, maintenance, or repair of the device (codified at 37 CFR 201.40(b)(14)).[92] The Office received one opposition from Author Services, discussed further below.

The petition asserts a for the continuing need and justification for the exemption, stating that "[m]anufacturers of these devices continue to implement technological protection measures that inhibit lawful repairs, maintenance, and diagnostics, and they show no sign of changing course." [93] The petition also reports that the Federal Trade Commission has identified " 'unjustified software locks, digital rights management, and technological protection measures' as one form of anticompetitive repair restriction," and that the few state laws pertaining to the right to repair "have important gaps," such as not encompassing certain devices covered by the current exemption.[94] EFF has personal knowledge of and experience with this exemption due to its prior advocacy for the exemption in past proceedings.

Author Services, an organization that represents the works of L. Ron Hubbard, filed an opposition to renewal of this exemption "in its present form." [95] While Author Services states that it has "no objection" with consumers repairing products sold "in the open market to ordinary consumers," it objects to the extent that the exemption may encompass devices that "can only be purchased and used by someone who possess[es] particular qualifications or has been specifically trained in the use of the device." [96] Author Services asserts that the Office did not consider these types of devices when granting the exemption in the previous proceeding, and contends that applying the exemption to such devices undermines manufacturers' abilities to control their software and "directly contradict[s]" negotiated licenses.[97]

After reviewing the renewal petition, the opposition comment, and the record from the previous rulemaking, the Office concludes that the exemption may be renewed by relying on the prior record. Author Services' opposition is limited to devices available "only" to individuals with qualifications and training, and they therefore would not qualify as "primarily designed for use by consumers" within the scope of the existing exemption.[98] This exemption was crafted to cover consumer devices because proponents in the previous rulemaking had shown "common characteristics such that users of the proposed exemption are likely to be similarly situated." [99] In its prior rulemaking, the Office declined to recommend an exemption covering commercial and industrial devices because it was "unclear" from the record whether they shared the same common traits.[100] The devices described

portable all-purpose computing devices, (2) smart televisions, (3) voice assistant devices, and (4) routers and dedicated networking devices. *See* Electronic Frontier Foundation ("EFF") Smartphone and Portable All-Purpose Mobile Computing Device Jailbreaking Renewal Pet.; NMR Smartphone and Portable All-Purpose Mobile Computing Device Jailbreaking Renewal Pet.; EFF Smart TVs Jailbreaking Renewal Pet.; Software Freedom Conservancy ("SFC") Smart TVs Jailbreaking Renewal Pet.; EFF Voice Assistant Devices Jailbreaking Renewal Pet.; SFC Routers and Dedicated Network Devices Jailbreaking Renewal Pet.

[85] EFF Smartphone and Portable All-Purpose Mobile Computing Device Jailbreaking Renewal Pet. at 3.

[86] SFC Smart TVs Jailbreaking Renewal Pet. at 3.

[87] EFF Voice Assistant Devices Jailbreaking Renewal Pet. at 3.

[88] SFC Routers and Dedicated Network Devices Jailbreaking Renewal Pet. at 3.

[89] iFixit Vehicle or Vessel Repair Renewal Pet.; MEMA Vehicle or Vessel Repair Renewal Pet.

[90] MEMA Vehicle or Vessel Repair Renewal Pet. at 3.

[91] iFixit Vehicle or Vessel Repair Renewal Pet. at 3.

[92] EFF Device Repair Renewal Pet.

[93] *Id.* at 3.

[94] *Id.* (quoting Federal Trade Commission, Policy Statement of the Federal Trade Commission on Repair Restrictions Imposed by Manufacturers and Sellers 1 (2021), *https://www.ftc.gov/legal-library/browse/policy-statement-federal-trade-commission-repair-restrictions-imposed-manufacturers-sellers*).

[95] Author Services Device Repair Opp. at 1.

[96] *Id.* at 1–2.

[97] *Id.* at 2.

[98] 37 CFR 201.40(b)(14) (limiting the exemption to "a lawfully acquired device that is primarily designed for use by consumers").

[99] 2021 Recommendation at 197.

[100] *Id.*

by Author Services appear to fall into the latter category, and therefore the opposition does not show that the previous rulemaking record is no longer reliable.

Based on the information provided in the renewal petition and the lack of opposition to renewal, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*Q. Computer Programs—Repair of Medical Devices and Systems*

Five organizations filed petitions to renew the exemption to access computer programs that are contained in and control the functioning of medical devices or systems, and related data files, for diagnosis, maintenance, or repair (codified at 37 CFR 201.40(b)(15)).[101] The Office received three comments opposing renewal, discussed further below.

Four of the petitions provide evidence of the continuing need and justification for the exemption.[102] For example, Avante states that "the use of TPMs in medical systems and devices is widespread among the types of systems and devices" and that manufacturers "have developed new systems that further restrict access to use of necessary software tools." [103] TTG Imaging Solutions asserts that the exemption is "crucial to ensure the availability, affordability, and timely repair of medical devices, which directly impacts patient care and healthcare accessibility." [104] And both Metropolis International and TriMedx testify that they relied on the current exemption to refurbish and repair medical systems.[105] The petitioners have personal knowledge of and experience with this exemption; each either repairs, maintains, services, or sells medical systems and devices for entities in the healthcare industry.

The Office received opposition comments from the nonprofit American Consumer Institute ("ACI"), the Medical Imaging & Technology Alliance ("MITA"),[106] and Philips North America, LLC ("Philips").[107] Opponents assert that the repair exemption "undermines the maintenance and repair standards laid out by the U.S. Food Drug Administration (FDA) for the equipment employed in patient care" because independent servicers conducting repairs are "neither regulated nor monitored" by the FDA.[108] MITA further asserts that "Congress and the FDA have announced new policies on medical device cybersecurity that directly conflict with the 2021 Exemption." [109] In addition, MITA and Philips both argue that the Supreme Court's recent decision in *Andy Warhol Found. for the Visual Arts* v. *Goldsmith* (*Warhol*) [110] constitutes a new legal development that undermines the validity of the previous rulemaking's analysis due to the Court's holding that commercial, non-transformative uses are, in general, less likely to qualify as fair.[111] As applied to medical device repair, MITA and Philips contend that because the repair services at issue can be and are commercialized, with petitioners and others similarly situated profiting from the use of manufacturers' software to repair devices, this weighs against fair use.[112] We address each of these arguments below.

Opponents' arguments concerning FDA regulation of medical devices were raised and addressed in the last rulemaking, and therefore are not evidence that the factual or legal situation justifying the exemption has changed.[113] During the last rulemaking, the FDA submitted comments in which the agency expressed no objection to the proposed exemption to allow circumvention of TPMs on medical devices for repair-related purposes.[114] In its comments, the FDA pointed to its 2018 report on independent medical device repair in which it "concluded that the continued availability of ISOs to service and repair medical devices is critical to the functioning of the healthcare system in the United States.[115] Similarly, the FDA indicated that it "does not share [opponents'] view that an exemption from liability under 17 U.S.C. 1201 for circumvention conducted solely for the purpose of diagnosis, maintenance, or repair of medical devices would necessarily and materially jeopardize the safety and effectiveness of medical devices in the United States with respect to cybersecurity." [116] Although the FDA

[101] *See* Avante Health Solutions, Avante Diagnostic Imaging, Avante Ultrasound (collectively "Avante") Medical Device Repair Renewal Pet.; Crothall Facilities Management, Inc. ("Crothall") Medical Device Repair Renewal Pet.; Metropolis Int'l Medical Device Repair Renewal Pet.; TriMedx Holdings, LLC ("TriMedx") Medical Device Repair Renewal Pet.; TTG Imaging Solutions, LLC ("TTG Imaging Solutions") Medical Device Repair Renewal Pet.

[102] A fifth petition, submitted by Crothall, did not meet the Office's requirements for renewal petitions. While the Office requires "a brief explanation summarizing the basis for claiming a continuing need and justification for the exemption," 2023 NOI at 37488, Crothall's petition contains only two brief sentences stating that is ability to service medical devices "can be impacted" by software restrictions. *See* Crothall Medical Device Repair Renewal Pet. at 3 ("Crothall's ability to service a device without using the installed software and data files can be impacted by software access. Access to software error logs is a critical function in the optimal diagnosis, maintenance, and repair of devices."). Because other petitioners provide the required information for renewal, Crothall's petition is not discussed further.

[103] Avante Medical Device Repair Renewal Pet. at 3. Avante proposed this exemption in the previous rulemaking and was referred to as "Transtate" in the Register's Recommendation. *See* 2021 Register's Recommendation at 190.

[104] TTG Imaging Solutions Medical Device Repair Renewal Pet. at 3.

[105] *See* Metropolis Int'l Medical Device Repair Renewal Pet. at 3 (testifying that it is a dealer of refurbished medical imaging systems and has faced legal threats for its repair activities); TriMedx Medical Device Repair Renewal Pet. at 3 (testifying that the current exemption "allows TRIMEDX and other third-party servicers to overcome, and in some cases, avoid the anti-competitive tactics of the [original equipment manufacturers], while ensuring third-party service organizations have the necessary access to medical devices and information to repair and maintain the equipment on behalf of hospital customers").

[106] MITA is currently challenging the original adoption of exemption for medical devices and systems repair. *See MITA* v. *Library of Congress,* 2023 WL 2387760 (D.D.C. Mar. 7, 2023). The district court granted summary judgment in favor of the Library of Congress, and the case is now on appeal before the D.C. Circuit.

[107] ACI Medical Device Repair Opp.; MITA Medical Device Repair Opp.; Philips Medical Device Repair Opp.

[108] ACI Medical Device Repair Opp. at 1–2.

[109] MITA Medical Device Repair. Opp. at 6 (citing U.S. Food & Drug Admin., Cybersecurity in Medical Devices: Quality System Considerations and Content of Premarket Submissions (Sept. 2023), *https://www.fda.gov/media/119933/download;* Consolidated Appropriations Act, 2023, sec. 3305, 136 Stat. 4459, 5832–34).

[110] 143 S. Ct. 1258 (2023).

[111] MITA Medical Device Repair Opp. at 2–6; Philips Medical Device Repair Opp. at 5–8.

[112] MITA Medical Device Repair Opp. at 5–6; Philips Medical Device Repair Opp. at 6–8; *Warhol,* 143 S. Ct. at 1275 (explaining that while "the commercial nature of the use is not dispositive," "it is relevant" and "is to be weighed against the degree to which the use has a further purpose or different character").

[113] *See* 2021 Recommendation at 228–29 (noting that opponents argued "that the potential consequences of unauthorized circumvention on patient safety should factor into if not decisively tilt the analysis against an exemption" and concluding that those concerns "while significant, do not provide a basis for denying the requested exemption").

[114] *See id.* at 229 (citing Letter from Suzanne B. Schwartz, Dir., Office of Strategic P'ships & Tech. Innovation, FDA, to Kevin R. Amer, Acting Gen. Counsel & Assoc. Register of Copyrights, U.S. Copyright Office (Aug. 13, 2021)).

[115] Letter from Suzanne B. Schwartz, Dir., Office of Strategic P'ships & Tech. Innovation, FDA, to Kevin R. Amer, Acting Gen. Counsel & Assoc. Register of Copyrights, U.S. Copyright Office at 3 (Aug. 13, 2021) (citing U.S. Food & Drug Admin., FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices 23 (May 2018), *https://www.fda.gov/media/113431/download*).

[116] Letter from Suzanne B. Schwartz, Dir., Office of Strategic P'ships & Tech. Innovation, FDA, to Kevin R. Amer, Acting Gen. Counsel & Assoc.

Continued

indicated that it was "evaluating [its] approach to cybersecurity and medical device servicing" and, as MITA points out, has since issued updated cybersecurity guidance, and although Congress has imposed additional cybersecurity requirements on medical device manufacturers, these developments do not change the Office's 1201 analysis.

The Office addressed these same concerns in the last rulemaking, stating that "the Register generally does not consider other regulatory schemes as part of the adverse effects analysis because the focus of this proceeding is on copyright-related considerations."[117] Further, a user availing themselves of the temporary exemption for medical device repair is not absolved from noncompliance with other laws and regulations, including any promulgated by the FDA. Accordingly, the Office concludes that opponents' renewed safety and cybersecurity arguments do not demonstrate that the relevant legal or factual circumstances justifying the exemption have changed.

As to the argument that the decision in *Warhol* constitutes a change in the law that supports refusal of the renewal petition, MITA and Philips point to the Court's analysis of the first fair use factor, in which it explained that the "central" question is "whether and to what extent the use at issue has a purpose or character different from the original."[118] They argue that medical device repair is not transformative under the first factor because the device's software is "not transformed—at all—during or after the maintenance or repair work" and thus has the "the exact same purpose—to enable the device to function."[119]

These fair use arguments assert are largely identical to those raised by opponents, including MITA and Philips, in the prior rulemaking.[120] They were rejected in the 2021 Register's Recommendation, which found that "opponents overstate the significance of the commercial purpose element to the fair use analysis" and that repair of medical devices and equipment, like other forms of repair, was likely transformative under the first fair use factor.[121] The Recommendation explained that repair "supports—rather than displaces—the purpose of the embedded programs that control the device."[122] In other words, the purpose of the use of software in repair is to render a non-functional device functional again, while the original purpose of the software is to operate a device that functions as designed. Because this analysis is part of the record that justified recommending the exemption in 2021, opponents must show that the decision in *Warhol* constitutes intervening legal precedent that renders the Office's prior fair use analysis no longer valid.

After reviewing the opposition comments, the record from the previous rulemaking, and the Supreme Court's decision, the Office concludes that its fair use analysis for repair of medical devices and systems remains sound. The *Warhol* decision does not, as MITA and Philips suggest, substantially change how the Office would analyze the particular uses at issue—diagnosis, maintenance, and repair of medical devices and systems—under the first factor. The opposition comments point to language in the Court's decision explaining that uses that "share the same or highly similar purposes" as the copyrighted work weigh against fair use.[123] But this statement echoes the Court's earlier finding in *Campbell* v. *Acuff-Rose Music, Inc.* that the first factor focuses on whether a use "supplant[s] the original" or "instead add something new, with a further purpose or different character."[124] It also mirrors the Court's discussion in *Google LLC* v. *Oracle America, Inc.,* where it cited *Campbell* and explained that the first factor asks whether the use "add[s] something new, with a further purpose or different character," and that "the word 'transformative' [ ] describe[s] a copying use that adds something new and important" and is therefore more likely to be fair.[125] The *Warhol* opinion did not overrule these prior decisions, but rather built upon them.[126] Nothing in the opinion changes the Office's evaluation of the differences in purpose between the uses covered by the exemption and the intended use of the software. Accordingly, the decision is not a basis to question the reliability of the 2021 rulemaking record that resulted in the exemption for repair of medical devices and systems.

Based on the information provided in the renewal petitions and the lack of evidence in the opposition comments that the factual or legal record has changed in relevant ways, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*R. Computer Programs—Security Research*

Multiple organizations and security researchers submitted four petitions to renew the exemption permitting circumvention for purposes of good-faith security research (codified at 37 CFR 201.40(b)(16)).[127] No oppositions

Register of Copyrights, U.S. Copyright Office at 3 (Aug. 13, 2021) (citing U.S. Food & Drug Admin., Cybersecurity in Medical Devices: Challenges and Opportunities (June 2021), *https://www.fda.gov/media/150144/download*).

[117] *See* 2021 Recommendation at 229; *see also id.* at 228–29 (noting that opponents argued "that the potential consequences of unauthorized circumvention on patient safety should factor into if not decisively tilt the analysis against an exemption" and concluding that those concerns "while significant, do not provide a basis for denying the requested exemption").

[118] MITA Medical Device Repair Opp. at 3–4 (quoting *Warhol,* 143 S. Ct. at 1274–75); *see also* Philips Medical Device Repair Opp. at 5–6 (quoting *Warhol,* 143 S. Ct. at 1273, where the Court held the first fair use factor focuses on "whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism").

[119] MITA Medical Device Repair Opp. at 4 (emphasis omitted).

[120] In the 2021 rulemaking, MITA argued there was "nothing transformative about an unregulated [Independent Service Organization] accessing and copying medical imaging device software and materials for a commercial purpose" (2021 MITA Class 12 Opp. at 9), and Philips argued that repair of medical devices and equipment was not fair use because it is "commercial—and thus, presumptively unfair" and because repair does "not transform the copyrighted material," such as by modifying the software contained in medical devices and systems (2021 Philips Class 12 Opp. at 8).

[121] *See* 2021 Recommendation at 208–09 (citing 2015 Recommendation at 234–35 (concluding that repair of vehicles was likely to be transformative because "proposed uses for diagnosis and repair would presumably enhance the intended use of [the embedded] computer programs")).

[122] *Id.* at 201 (quoting U.S. Copyright Office, Software-Enabled Consumer Products 40 (2016), *https://www.copyright.gov/policy/software/software-full-report.pdf*). And the Office's previous fair use analyses of repair explained, "a finding of fair use is not necessarily precluded when the new use coincides generally with the original use of a work." 2015 Recommendation at 234.

[123] MITA Medical Device Repair Opp. at 4 (quoting *Warhol,* 143 S. Ct. at 1277).

[124] 510 U.S. 569, 579 (1994). Further, to the extent to which opponents read *Campbell* to require that a new use add "new expression, meaning or message" to be considered fair, *see* MITA Medical Device Repair Opp. at 4, the Court in *Warhol* clarified that "meaning or message [i]s simply relevant to whether the new use serve[s] a purpose distinct from the original, or instead supersede[s] its objects," not determinative or required. *Warhol,* 143 S. Ct. at 1282–83 (citing *Campbell,* 510 U.S. at 579).

[125] 141 S. Ct. 1183, 1202–03 (2021) (quoting *Campbell,* 510 U.S. at 579).

[126] For this reason, the Eleventh Circuit recently denied a motion for rehearing in a case involving fair use decided prior to the *Warhol* opinion—that court concluded that the intervening Supreme Court opinion did not affect its analysis of transformativeness under the first fair use factor or the "balance of the four factors." *Apple Inc.* v. *Corellium, Inc.,* No. 21–12835, 2023 U.S. App. LEXIS 22252, at *3 (11th Cir. Aug. 23, 2023) (denying petition for rehearing and rehearing en banc).

[127] Blaze & Bellovin Security Research Renewal Pet.; Halderman & Green Security Research Renewal Pet.; MEMA Security Research Renewal Pet.; SFC Security Research Renewal Pet.

were filed against renewal, and one comment was received in support filed by "A Group of Hackers at DEF CON."[128]

The petitions include statements regarding the continuing need and justification for the exemption based on personal knowledge. For example, a petition from Professor J. Alex Halderman and Associate Professor Matthew D. Green states that security research "play[s] a vital role in [cybersecurity]," as "vulnerability disclosure and remediation are key to securing existing infrastructure."[129] The petition from Professors Matt Blaze and Steven Bellovin asserts that the exemption remains necessary because in the past three years "one of us has continued to receive threats of prospective litigation from copyright holders in connection with his security research on software in voting systems."[130] Additionally, the vehicle suppliers association MEMA states that its membership "has seen firsthand that the exemption is helping encourage innovation in the automotive industry while mitigating risks to intellectual property and vehicle safety."[131] Finally, SFC asserts that the exemption continues to be used by "privacy and security researchers who investigate and publish information about privacy flaws in computing devices; and individual consumers and hobbyists who wish to prevent their private data from being disclosed by the devices they own."[132]

Based on the information provided in the renewal petitions and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*S. Computer Programs—Video Game Preservation*

The Software Preservation Network ("SPN") and LCA jointly petition to renew the exemption for individual play by gamers and preservation of video games by a library, archives, or museum for which outside server support has been discontinued, and preservation by a library, archives, and museum, of discontinued video games that never required server support (codified at 37 CFR 201.40(b)(17)).[133] No oppositions were filed against renewal, and one individual filed a comment in support of the petition.[134]

The petition states that libraries, archives, and museums continue to need the exemption to preserve video games, which is "an ongoing [and] iterative process."[135] For example, it cites The Strong National Museum of Play, which has a "substantial number of TPM-encumbered video games in its collections that will need preservation treatment that requires circumvention in the coming years."[136] In addition, the petition asserts that video game collection librarians "report a similar ongoing need," which "has become a crucial tool in their ongoing efforts to save digital game culture before it disappears."[137] The petitioners have personal knowledge of and experience with this exemption through their past participation in the triennial rulemaking proceedings, as well as through their representation of members that have relied on this exemption.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*T. Computer Programs—Software Preservation*

SPN and LCA jointly petition to renew the exemption for computer programs, other than video games, for the preservation of computer programs and computer program-dependent materials by libraries, archives, and museums (codified at 37 CFR 201.40(b)(18)).[138] No oppositions were filed against renewal, and one individual supported the petition.[139]

Petitioners state that libraries, archives, and museums continue to need the exemption to preserve and curate software and materials dependent on software, which is "an ongoing [and] iterative process."[140] For example, a software preservation analyst found "remote access to digital collections [a]s an increasingly explicit directive to fulfill cultural heritage institutions' missions to support research, analysis, and other scholarly re-use of the historical record (and to do so equitably and inclusively)."[141] The petition also asserts that SPN's members are providing an off-site researcher with "access to born-digital materials using remote access to legacy software."[142] The petitioners have personal knowledge of and experience with this exemption through their past participation in the triennial rulemaking proceedings, as well as through their representation of members that have relied on this exemption.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*U. Computer Programs—3D Printing*

Michael Weinberg petitions to renew the exemption for computer programs that operate 3D printers to allow use of alternative material (codified at 37 CFR 201.40(b)(19)).[143] No oppositions were filed against renewal.

The petition states that there is a continuing need and justification for the exemption, and the petitioner has personal knowledge of and experience with this exemption as the individual who participated in previous rulemakings. Mr. Weinberg declares that he is a member of the 3D printing community and has been involved with this exemption request during each cycle it has been considered by the Office.[144] In addition, he states that while 3D printers "continue to use TPMs to limit the types of materials used in printers," since the last rulemaking proceeding, there has been "an expansion of third-party materials available for 3D printers" due to the current exemption.[145]

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

*V. Computer Programs—Copyright License Investigation*

SFC petitions to renew the exemption for computer programs, for the purpose of investigating potential infringement of free and open source computer

[128] A Group of Hackers at DEFCON Security Research Supp. (noting that the exemption has led to "the creation of software to fix vulnerabilities, as well as papers and presentations on security research").

[129] Halderman & Green Security Research Renewal Pet. at 3.

[130] Blaze & Bellovin Security Research Renewal Pet. at 3.

[131] MEMA Security Research Renewal Pet. at 3.

[132] SFC Security Research Renewal Pet. at 3.

[133] SPN & LCA Abandoned Video Game Renewal Pet.

[134] Burt Abandoned Video Game Supp.

[135] SPN & LCA Abandoned Video Games Renewal Pet. at 3.

[136] *Id.*

[137] *Id.*

[138] SPN & LCA Software Preservation Renewal Pet.

[139] Burt Software Preservation Supp.

[140] SPN & LCA Software Preservation Renewal Pet. at 3.

[141] *Id.*

[142] *Id.*

[143] Weinberg 3D Printers Renewal Pet.

[144] *Id.* at 3.

[145] *Id.*

programs (codified at 37 CFR 201.40(b)(20)).[146] No oppositions were filed against renewal.

The petition argues that there is a continuing need and justification for the exemption, including by discussing how technological protection measures, such as encryption, "prevent[ ] the investigation of computer programs" within various devices that use free and open source software ("FOSS") to operate.[147] The petition also evidences personal knowledge of the exemption. For example, it describes how SFC is informed of suspected non-compliance with the FOSS license, which it investigates on behalf of its members. Due to the "pervasive[ness]" of infringement through license non-compliance, however, "SFC can only pursue a fraction of the suspected infringements reported to it." [148] SFC also participated in the previous rulemaking and provided the rulemaking record that led to the Office recommending the exemption.

Based on the information provided in the renewal petition and the lack of opposition, the Office believes that the conditions that led to adoption of this exemption are likely to continue during the next triennial period. Accordingly, it intends to recommend renewal.

**III. Analysis and Classification of Proposed New or Expanded Exemptions**

In addition to petitions to renew existing exemptions, the Office received eleven petitions for new or expanded exemptions.[149] The Office has reviewed and consolidated related and/or overlapping proposed exemptions to simplify the rulemaking process and encourage joint participation among parties with common interests (although collaboration is not required).[150] This has resulted in seven proposed classes of works.

Each proposed class is briefly described below, and additional information can be found in the underlying petitions posted on the Office website. As explained in the NOI, the proposed classes represent " 'only a starting point for further consideration in the rulemaking proceeding,' and will be subject to 'further refinement based on the record.' " [151] The description of each class also includes preliminary legal and factual areas of interest that the Office hopes commenters will address in their submissions. These early observations are offered without prejudice to the Office's ability to raise other questions or concerns at later stages of the proceeding, and commenters should offer all legal arguments and evidence they believe necessary to create a complete record. Finally, the Office reminds exemption proponents that "where an exemption request resurrects legal or factual arguments that have been previously rejected, the Office will continue to rely on past reasoning to dismiss such arguments in the absence of new information." [152]

**Proposed Class 1: Audiovisual Works—Noncommercial Videos**

OTW filed a renewal petition requesting that the exemption for circumvention of access controls protecting motion pictures on DVDs, Blu-ray discs, and digitally transmitted video for purposes of criticism and comment, for use in noncommercial videos be amended to align with the language of the 2010 exemption for clarity.[153] OTW contends that "[t]he complexity of the current [exemption] provisions substantially increases the difficulty of communicating and implementing the exemptions in practice," and that reverting to the 2010 language would not expand the scope of the existing exemption, but merely help "clarify [it] for ordinary users." [154] Since 2010, the exemption has been expanded to encompass works on a Blu-ray disc or received via a digital transmission, and to clarify it includes "videos produced for a paid commission if the commissioning entity's use is noncommercial." [155]

OTW made the same request to amend the language of the exemption in the previous rulemaking.[156] The Office ultimately concluded that modification of the language was unnecessary,[157] based on statements by OTW to that effect.[158] The Office seeks comment on whether there are legal or factual circumstances that have changed and warrant altering the determination from the prior rulemaking.

*Proposed Class 2: Audiovisual Works—Online Learning*

Peter Decherney, Sarah Banet-Weiser, Shiv Gaglani, and SCMS (collectively "Joint Educators") petition to expand the existing exemption for circumvention of access controls protecting motion pictures on DVDs, Blu-ray discs, and digitally transmitted video for educational purposes in massive open online courses ("MOOCs") by faculty and employees acting at the direction of faculty of accredited nonprofit educational institutions.[159] In their petition, Joint Educators request that the exemption be extended to cover other online learning platforms that offer "supplemental education, upskilling, retraining and lifelong learning," such as Khan Academy, LinkedIn Learning, *Osmosis.org,* and *Code.org.*[160] Joint Educators propose allowing "educators and preparers of online learning materials offered by educational entities to use short excerpts of motion pictures (including television shows and videos) for the purpose of criticism, comment, illustration and explanation in offerings to registered learners of online learning platforms when use of the excerpts will contribute significantly to learning." [161] Joint Educators contend that, since the last proceeding, the demand for online learning has "continued to skyrocket," with educational institutions using a variety of online learning platforms to supplement their curricula.[162] They note that the current exemption for online learning only applies to a limited scope of learning settings (*i.e.,* MOOCs developed at accredited educational institutions).

The Office notes, that in the last two rulemakings, it received proposals to expand the existing exemption for online learning to for-profit entities (including "online learning platforms") and unaccredited educational institutions. During those rulemakings, the Office considered and ultimately recommended against these proposals.[163] The Office seeks comment on whether any changed legal or factual circumstances warrant altering that

[146] SFC Copyright License Investigation Renewal Pet.

[147] *Id.* at 3.

[148] *Id.*

[149] The Office received ten petitions for new classes. As discussed above, the Office has treated OTW's renewal petition proposing amended regulatory language as the eleventh petition.

[150] 2023 NOI at 37489.

[151] *Id.* (quoting *Exemptions to Permit Circumvention of Access Controls on Copyrighted Works,* 85 FR 37399, 37402 (June 22, 2020).

[152] Section 1201 Study at 147; *see also Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies,* 79 FR 55687, 55690 (Sept. 17, 2014).

[153] OTW Class 1 Pet. at 4 (discussing rulemaking cycle that began in 2008 and concluded in 2010).

[154] *Id.*

[155] 37 CFR 201.40(b)(1). *See* 2015 Recommendation at 103–06 (expanding the exemption to include Blu-ray and digital transmission).

[156] *See* 2021 OTW Class 1 Pet.

[157] *See* 2021 Recommendation at 40–42.

[158] *See id.* at 42 ("[W]e actually don't think that any change is necessary" to the exemption requirement that motion pictures used under the exemption be "lawfully made and acquired." (quoting 2021 Hearing Tr. at 245:21–24 (Apr. 6, 2021) (Betsy Rosenblatt, OTW))).

[159] Joint Educators Class 2 Pet.

[160] *Id.* at 2.

[161] *Id.*

[162] *Id.*

[163] *See* 2021 Recommendation at 49–52; 2018 Recommendation at 53–55.

determination and whether, or to what extent, commenters believe the proposed language should be adopted. As part of this analysis, commenters should discuss the extent to which the evidence submitted in prior rulemakings may be relied upon to support the expansion.

*Proposed Classes 3(a): Motion Pictures and 3(b): Literary Works—Text and Data Mining*

Authors Alliance, AAUP, and LCA filed two petitions to expand the exemptions for text and data mining on a corpora of motion pictures and literary works for the purpose of scholarly research and teaching.[164] Petitioners propose expanding each exemption to permit ''researchers to share corpora with researchers affiliated with different nonprofit institutions of higher education for purposes of conducting independent text data mining research and teaching, where those researchers are in compliance with the [current] exemption.'' [165] Petitioners explain that, under their petitions, all provisions of the current exemptions would remain the same with the only change being the expansion of the types of users who would have access to motion pictures and literary works.[166]

For reasons of administrative efficiency, the Office has grouped these proposals into one category that encompasses two proposed classes pertaining to motion pictures and literary works, respectively (*i.e.,* Classes 3(a) and 3(b)). Commenters addressing these proposals may submit a single comment addressing both motion pictures and literary works, but the supporting evidence must be sufficient to establish an adverse effect on noninfringing uses with respect to each. To the extent commenters believe the relevant factual and legal issues are similar as to the two classes of works, the supporting comments should describe them in detail. For example, commenters may wish to address the extent to which there is overlap with respect to the types of TPMs applied to these works, the nature of the proposed research activities, the relevant markets for the works, and the availability of potential alternatives to circumvention. Commenters may also wish to discuss whether this exemption should be analyzed as a request to engage in new circumvention activities not permitted by the current exemption or as a modification to post-circumvention limitations, and to what extent the Office's previous analysis of noninfringement and adverse effects apply to this class.

*Proposed Class 4: Computer Programs—Generative AI Research*

Jonathan Weiss proposes a new exemption to circumvent technological measures that control access to ''copyrighted generative AI models, solely for the purpose of researching biases'' within the models.[167] The proposed exemption would permit sharing the research, techniques, and methodologies that ''expose and address biases,'' and ensure, among other reasons, fairness and transparency within AI models and their development.[168] The petition does not cabin the proposed exemption to a specific set of users, only describing them as ''researchers'' and does not discuss how TPMs prohibit, or are likely to prohibit, researchers from accessing the software within the generative AI models.[169] Instead, Weiss submits three guardrails to prevent misuse of the proposed exemption: the exemption applies only where the ''primary intention is to identify and address biases, and not to exploit them;'' any research ''prioritize[s] data privacy, ensuring that no personal or sensitive data is compromised;'' and researchers should ''actively engage with AI developers and stakeholders to address discovered biases.'' [170]

In general, the Office seeks comment on whether the proposed exemption should be adopted, including any proposed regulatory language. Commenters should describe with specificity the relevant TPMs and whether their presence is adversely affecting noninfringing uses, including identifying whether eligible users may access the software through alternate channels that do not require circumvention and the legal basis for concluding that the proposed uses are likely to be noninfringing.

*Proposed Class 5: Computer Programs—Repair*

Two organizations jointly petition for an expanded exemption relating to the diagnosis, maintenance, and repair of computer programs that control devices designed primarily for use by consumers.[171] Public Knowledge and iFixit petition for an expansion to ''include commercial industrial equipment such as automated building management systems and industrial equipment (*i.e.,* soft serve ice cream machines and other industrial kitchen equipment).'' [172] The petition includes examples of how ''service passwords and digital locks'' are preventing diagnosing, maintaining, and repairing the software within the devices.[173]

The Office notes that in the last rulemaking, it declined to include commercial and industrial devices and systems within the scope of the proposed repair class due to a lack of evidence of adverse effects for such uses and because ''it [was] not apparent from the record that users of commercial and industrial systems are similarly situated to users of consumer products.'' [174] The Office invites comment on whether users of commercial and industrial equipment are similarly situated to or distinct from users of software-enabled consumer devices; whether commercial and industrial devices and systems can be the basis of an exemption for a single ''class of works;'' whether diagnosis, maintenance, and repair of such devices and systems are likely to be noninfringing uses of their firmware; and whether TPMs are adversely affecting those uses.

*Proposed Classes 6(a): Computer Programs and 6(b): Video Games—Preservation*

Three petitions seek to expand the current exemptions for preservation of software and video games, and one petition seeks a new exemption for preservation of video games.[175] As with the proposed text and data mining exemptions, the Office has grouped these petitions into a single category encompassing two proposed classes. Commenters addressing these proposals may submit a single comment addressing both computer programs and video games, but the supporting evidence must be sufficient to establish

[164] Authors Alliance, AAUP & LCA Class 3(a) Pet.; Authors Alliance, AAUP & LCA Class 3(b) Pet.

[165] Authors Alliance, AAUP & LCA Class 3(a) Pet. at 2; Authors Alliance, AAUP & LCA Class 3(b) Pet. at 2.

[166] Authors Alliance, AAUP & LCA Class 3(a) Pet. at 2–3; Authors Alliance, AAUP & LCA Class 3(b) Pet. at 2–3.

[167] Weiss Class 4 Pet.

[168] *Id.* at 2.

[169] *Id.*

[170] *Id.* at 3.

[171] Public Knowledge and iFixit Class 5 Pet.

[172] *Id.* at 2.

[173] *Id.*

[174] 2021 Recommendation at 194–98 (''Without a more developed record concerning devices designed primarily for commercial and industrial use, the Register cannot properly evaluate the purported similarities to consumer devices or analyze the claimed adverse effects.'' (citing FTC, Nixing the Fix: An FTC Report to Congress on Repair Restrictions 51 (May 2021), *https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf*)).

[175] SPN & LCA Class 6(a) Pet.; Austin Class 6(b) Pet.; SPN & LCA Class 6(b) Pet.; Sullivan Class 6(b) Pet.

the statutory requirements with respect to each category of works.

SPN and LCA filed a petition to expand the current exemption for preservation of software by eligible libraries, archives, and museums by removing the current requirement that electronic distribution, display, or performance of software be made to "only . . . one eligible user at a time." [176] SPN and LCA and Thomas Sullivan filed petitions to expand the current exemption for preservation of video games by eligible libraries, archives, and museums by removing the current requirement that video games "not be distributed or made available outside of the physical premises of an eligible [library, archives, or museum]." [177] Finally, Ken Austin petitions for a new exemption that would permit circumvention by "individual owners of video games which have DRM (digital rights management) that no longer function[ ] due to incompatibility" with modern computers' operating systems.[178] Mr. Austin provides an example of the Windows 10 operating system preventing individuals from playing an old video game because the game's technological protection measures are flagged as a security threat.[179]

The Office notes that it has previously considered and rejected many of these requests. In the last rulemaking, it rejected removing the one-user limit on software preservation out of concern with substitution risk,[180] and declined to recommend removing the on-premises limitation for video game preservation.[181] The Office therefore seeks comment on whether there have been new factual or legal developments since the last rulemaking that would support a new recommendation for the preservation exemptions. Separately, it invites comment on the proposed exemption for individuals whose video games are no longer functional due to incompatibility with their computer's operating systems. Specifically, the Office seeks comment on the relevant TPMs and whether their presence is adversely affecting noninfringing uses, including identifying whether eligible users may access the software through alternate channels that do not require circumvention and the legal basis for concluding that the proposed uses are likely to be noninfringing.

*Proposed Class 7: Computer Programs—Vehicle Operational Data*

MEMA petitions for a new exemption to "access, store, and share vehicle operational data, including diagnostic and telematics data" from "a lawfully acquired motorized land vehicle or marine vessel such as a personal automobile or boat, commercial vehicle or vessel, or mechanized agricultural vehicle or vessel." [182] The petition limits circumvention to "lawful vehicle owners and lessees, or those acting on their behalf." [183]

The Office encourages proponents to develop the legal and factual administrative record in their initial submissions, including describing with specificity the relevant TPMs and whether their presence is adversely affecting noninfringing uses, whether eligible users may access such data through alternate channels that do not require circumvention, and the legal basis for concluding that the proposed uses are likely to be noninfringing. In general, the Office seeks comment on whether the proposed exemption should be adopted, including any proposed regulatory language.

**IV. Future Phases of the Ninth Triennial Rulemaking**

As in prior rulemakings, the Office will solicit public engagement to create a comprehensive record through receipt of written comments, public hearings, post-hearing questions, and *ex parte* meetings. Each future phase of the administrative process is described below.

*A. Submission of Written Comments*

Parties wishing to address proposed exemptions in written comments should familiarize themselves with the substantive legal and evidentiary standards for the granting of an exemption under section 1201(a)(1), which are described in more detail on the Office's form for submissions of longer comments, available on its website. In addressing factual matters, commenters should be aware that the Office favors specific, "real-world" examples supported by evidence over hypothetical observations. In cases where the technology at issue is not apparent from the requested exemption, it is helpful for commenters to describe the TPM(s) that control access to the work and the method of circumvention.

Commenters' legal analysis should explain why the proposal meets or fails to meet the criteria for an exemption under section 1201(a)(1), including, without limitation, why the uses sought are or are not noninfringing as a matter of law. The legal analysis should also discuss statutory or other legal provisions that could impact the necessity for or scope of the proposed exemption. Legal assertions should be supported by statutory citations, relevant case law, and other pertinent authority. In cases where a class proposes to expand an existing exemption, participants should focus their comments on the legal and evidentiary bases for modifying the exemption, rather than the underlying exemption. As discussed above, the Office currently is inclined to recommend all but one current temporary exemption for renewal.[184]

To ensure a clear and definite record for each of the proposals, separate submissions must be submitted for each proposed class and not combined. Accordingly, the same party may submit multiple written comments on different proposals. The Office acknowledges that the requirement of separate submissions may require commenters to repeat certain information across multiple submissions, but the Office believes that the administrative benefits of creating a self-contained, separate record for each proposal justify the modest amount of added effort.

The first round of public comment is limited to submissions from proponents (*i.e.,* those parties who proposed new exemptions during the petition phase) and other members of the public who support the adoption of a proposed exemption, as well as any members of the public who neither support nor oppose an exemption but seek only to share pertinent information. Proponents of exemptions should present their complete affirmative case for an exemption during the initial round of public comment, including all legal and evidentiary support.

---

[176] SPN & LCA Class 6(a) Pet. at 2; 37 CFR 201.40(b)(18).

[177] SPN & LCA Class 6(b) Pet.; Sullivan Class 6(b) Pet.; 37 CFR 201.40(b)(17). Sullivan's petition also proposes an expansion of those permitted to engage in preservation, such as "[c]olleges, [u]niversities, . . . and any institution dedicated to the preservation of video games." Sullivan Class 6(b) Pet. at 2.

[178] Austin Class 6(b) Pet at 2.

[179] *Id.*

[180] 2021 Recommendation at 268–73, 279 ("[T]he inclusion of single user and limited time restrictions will minimize the risk of substitutional use of the software." (citing U.S. Copyright Office, Section 108 of Title 17: A Discussion Document of the Register of Copyrights 38–39 (2017), *https://www.copyright.gov/policy/section108/discussion-document.pdf*)).

[181] *See id.* at 271–275, 279; *see also* 2018 Recommendation at 271–75, 278; 2015 Recommendation at 340–44, 351–52.

[182] MEMA Class 7 Pet.

[183] *Id.* at 2.

[184] The Office will not recommend renewal of the current exemption permitting circumvention of video games in the form of computer programs for the purpose of allowing an individual with a physical disability to use alternative software or hardware input methods within 37 CFR 201.40(b)(21).

The second round of public comment seeks comments from members of the public who oppose an exemption. As with the first round, commenters during the second round should present the full legal and evidentiary basis for their opposition. Finally, the third round of public comment will be limited to supporters of particular proposals and those who neither support nor oppose a proposal, who seek to reply to points made in the earlier rounds of comments. Reply comments should not raise new issues, but should instead be limited to addressing arguments and evidence presented by others during prior rounds.

*B. Public Hearings*

After the three rounds of comments are completed, the Copyright Office will hold virtual public hearings in spring 2024. The hearings will allow for participation by videoconference and will be streamed online. A separate notice providing details about the hearings and how to participate will be published in the **Federal Register** at a later date. The Office will identify specific items of inquiry to be addressed during the hearings.

*C. Post-Hearing Questions*

As with previous rulemakings, following the hearings, the Office may request additional information with respect to particular classes from rulemaking participants, to supply missing information for the record or otherwise resolve issues that it believes are material to particular exemptions. Such requests for information will take the form of a letter from the Office, will be addressed to individual parties involved in the proposal as to which more information is sought, and will provide a deadline for submission. Responding to such a request will be voluntary. After the receipt of all responses, the Office will post the questions and responses on the Office's website as part of the public record.

*D. Ex Parte Communication*

In the last two proceedings, in response to stakeholder requests, the Office provided written guidelines under which interested non-governmental participants could request informal communications with the Office during the post-hearing phase of the proceeding. In this proceeding, the Office will permit *ex parte* communications, but participating parties will be required to follow its regulations on *ex parte* communications, codified at 37 CFR 201.1(d) and 205.24.[185] In accordance with the regulations, and similar to the last two proceedings, no *ex parte* communications with the Office regarding this proceeding will be permitted prior to the post-hearing phase.

[185] *See* 37 CFR 201.1(d), 205.24.

Dated: October 12, 2023,

**Suzanne V. Wilson,**

*General Counsel and Associate Register of Copyrights.*

[FR Doc. 2023–22949 Filed 10–18–23; 8:45 am]

BILLING CODE 1410–30–P

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 82

**[EPA–HQ–OAR–2022–0707; FRL–9603–01–OAR]**

**RIN 2060–AV65**

### Protection of Stratospheric Ozone: Updates Related to the Use of Ozone-Depleting Substances as Process Agents

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** This action proposes to establish recordkeeping and reporting requirements for uses of ozone-depleting substances as process agents and to update definitions to reflect current practice. Codified recordkeeping and reporting requirements would provide clear and consistent notice each year of information EPA collects, aggregates, and reports as a party to the Montreal Protocol on Substances that Deplete the Ozone Layer; effectively monitor these narrow uses in a more routine and consistent manner under the Clean Air Act; and enhance understanding of emissions of substances harmful to the ozone layer.

**DATES:** Comments on this notice of proposed rulemaking must be received on or before December 4, 2023. Under the Paperwork Reduction Act (PRA), comments on the proposed information collection provisions are best assured of consideration if the Office of Management and Budget (OMB) receives a copy of your comments on or before November 20, 2023. Any party requesting a public hearing must notify the contact listed below under **FOR FURTHER INFORMATION CONTACT** by 5 p.m. Eastern Time on October 24, 2023. If a public hearing is held, it will take place on or before November 3, 2023 and further information will be provided at *https://www.epa.gov/ods-phaseout.*

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA–HQ–OAR–2022–0707, by any of the following methods:

- *Federal eRulemaking Portal: https://www.regulations.gov* (our preferred method). Follow the online instructions for submitting comments.
- *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, Air and Radiation Docket, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.
- *Hand Delivery or Courier:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operations are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays).

*Instructions:* All submissions received must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov,* including any personal information provided. For further information on EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

You may find the following suggestions helpful for preparing your comments: direct your comments to specific sections of this proposed rulemaking and note where your comments may apply to future separate actions where possible; explain your views as clearly as possible; describe any assumptions that you used; provide any technical information or data you used that support your views; provide specific examples to illustrate your concerns; offer alternatives; and, make sure to submit your comments by the comment period deadline. Please provide any published studies or raw data supporting your position. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*e.g.,* on the web, cloud, or other file sharing system).

EPA recognizes that given the nature of this proposed rulemaking, potentially affected entities may wish to submit Confidential Business Information (CBI) or other confidential information. CBI should not be submitted through *https://www.regulations.gov*. For submission of confidential comments or data, please work with the person listed in the **FOR FURTHER INFORMATION CONTACT** section. For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions,

and/or the post-registration maintenance documents exhibit certain attributes that call into question whether a mark is in use in commerce in the ordinary course of trade. Among other things, these audits will focus on registration files in which it appears that a specimen accepted during examination or submitted with a section 8 or 71 affidavit or declaration was digitally altered, consistent with the parameters set forth in Examination Guide 3–19, or comprised printouts from a website determined to be a specimen farm. Under the directed audit program, the initial office action may request proof of use for all or some of the goods or services covered by the registration, in addition to other information deemed relevant to the USPTO to determine whether the mark is in use in commerce in the ordinary course of trade or whether the elements of excusable nonuse apply. The procedures will otherwise follow those for random audits.

After considering any public comments received in response to this notice, the USPTO will publish information about the program on its Post Registration Audit Program web page at *www.uspto.gov/trademarks/maintain/post-registration-audit-program*. The USPTO will likewise publish future changes to the post-registration audit program on its website.

These changes will better position the audit program to address obvious issues with registration, thus protecting the integrity of the federal trademark registration system and improving the overall accuracy of the trademark register.

**Katherine K. Vidal,**

*Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

[FR Doc. 2024–24755 Filed 10–25–24; 8:45 am]

BILLING CODE 3510–16–P

---

## LIBRARY OF CONGRESS

### Copyright Office

### 37 CFR Part 201

**[Docket No. 2023–5]**

### Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies

**AGENCY:** U.S. Copyright Office, Library of Congress.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, the Librarian of Congress adopts exemptions to the provision of the Digital Millennium Copyright Act (''DMCA'') that prohibits circumvention of technological measures that control access to copyrighted works. As required under the statute, the Register of Copyrights, following a public proceeding, submitted a recommendation to the Librarian of Congress (''Register's Recommendation'') regarding proposed exemptions. After careful consideration, the Librarian adopts final regulations based on the Register's Recommendation.

**DATE:** Effective October 28, 2024.

**FOR FURTHER INFORMATION CONTACT:** Rhea Efthimiadis, Assistant to the General Counsel, by email at *meft@copyright.gov* or telephone at 202–707–8350.

**SUPPLEMENTARY INFORMATION:** The Librarian of Congress, pursuant to section 1201(a)(1) of title 17, United States Code, has determined in this ninth triennial rulemaking proceeding that the prohibition against circumvention of technological measures that effectively control access to copyrighted works shall not apply for the next three years to persons who engage in certain noninfringing uses of specified classes of such works. This determination is based on the Register's Recommendation.

The discussion below summarizes the rulemaking proceeding and the Register's recommendations, states the Librarian's determination, and adopts the regulatory text specifying the exempted classes of works. A more complete discussion of the rulemaking process, the evidentiary record, and the Register's analysis with respect to each proposed exemption can be found in the Register's Recommendation at *www.copyright.gov/1201/2024/.*

## I. Background

### *A. Statutory Requirements*

In 1998, as part of the Digital Millenium Copyright Act (''DMCA''), Congress added section 1201 to title 17 to provide greater legal protection for copyright owners in the emerging digital environment. Section 1201 generally makes it unlawful to ''circumvent a technological measure that effectively controls access to'' a copyrighted work.[1]

Congress established a set of permanent exemptions to the prohibition on circumvention, as well a procedure to put in place limited temporary exemptions. Every three years, the Librarian of Congress, upon the recommendation of the Register of Copyrights, is authorized to adopt temporary exemptions, with respect to certain classes of copyrighted works, to remain in effect for the ensuing three-year period. Congress established this rulemaking as a '''fail-safe' mechanism'' to ensure that the prohibition on circumvention would not adversely affect the public's ability to make lawful uses of copyrighted works, including activities protected by the fair use doctrine.[2]

The triennial rulemaking occurs through a formal public process administered by the Register, who consults with the Assistant Secretary for Communications and Information of the Department of Commerce.[3] Participants must meet specific legal and evidentiary requirements in order to qualify for a temporary exemption. The Register's recommendations are based on her conclusions as to whether each proposed exemption meets those statutory requirements.[4] As prescribed by the statute, she considers whether the prohibition on circumvention is having, or is likely to have, adverse effects on users' ability to make noninfringing uses of a particular class of copyrighted works. Petitioners must provide evidence sufficient to allow the Register to draw such a conclusion.

### *B. Rulemaking Standards*

Congress has specified the legal and evidentiary requirements for the section 1201 rulemaking proceeding; these standards are discussed in greater detail in the Register's Recommendation [5] and the Copyright Office's 2017 policy study on section 1201.[6] The Register will recommend granting an exemption only ''when the preponderance of the evidence in the record shows that the conditions for granting an exemption have been met.'' [7] The evidence must

---

1 17 U.S.C. 1201(a)(1)(A).

2 *Id.* at 1201(a)(1)(B)–(D).

3 *Id.* at 1201(a)(1)(C).

4 The Office has provided detailed analyses of the statutory requirements in its 2017 policy study on section 1201 and elsewhere. *See* U.S. Copyright Office, Section 1201 of Title 17 at 105–127 (2017), *https://www.copyright.gov/policy/1201/section-1201-full-report.pdf* (''Section 1201 Report'').

5 Register of Copyrights, Section 1201 Rulemaking: Ninth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights (Oct. 2024), *https://cdn.loc.gov/copyright/1201/2024/2024_Section_1201_Registers_Recommendation.pdf* (''Register's Recommendation'').

6 Section 1201 Report at 111–12.

7 *Id.; accord* Register of Copyrights, Section 1201 Rulemaking: Seventh Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights 12–13 (Oct. 2018). References to the Register's recommendations in prior rulemakings

Continued

show "that it is more likely than not that users of a copyrighted work will, in the succeeding three-year period, be adversely affected by the prohibition on circumvention in their ability to make noninfringing uses of a particular class of copyrighted works." [8] The Register develops a comprehensive administrative record to support her recommendation.

Section 1201(a)(1) enumerates five factors that guide the Register's Recommendation and the Librarian's determination regarding proposed exemptions: (1) the availability for use of copyrighted works; (2) the availability for use of works for nonprofit archival, preservation, and educational purposes; (3) the impact that the prohibition on the circumvention of technological measures applied to copyrighted works has on criticism, comment, news reporting, teaching, scholarship, or research; (4) the effect of circumvention of technological measures on the market for or value of copyrighted works; and (5) such other factors as the Librarian considers appropriate. The statute mandates that any exemption to be defined based on "a particular class of works." [9] Among other things, the determination of the appropriate scope of a "class of works" recommended for exemption can take into account the adverse effects an exemption may have on the market for or value of copyrighted works. Accordingly, "it can be appropriate to refine a class by reference to the use or user in order to remedy the adverse effect of the prohibition and to limit the adverse consequences of an exemption." [10]

## II. History of the Ninth Triennial Proceeding

The Copyright Office initiated the ninth triennial rulemaking proceeding by issuing a notice of inquiry ("NOI") on June 8, 2023.[11] The NOI requested petitions for renewal, comments in response to petitions for renewal, and petitions for new exemptions, including proposals to expand current exemptions.[12] These public submissions were due between July 7, 2023 and August 25, 2023.[13] The Office received thirty-eight petitions for renewal of existing exemptions and eleven petitions for new and expanded exemptions. It grouped the petitions for new and expanded exemptions into seven classes.

On October 19, 2023, the Office issued a notice of proposed rulemaking ("NPRM") identifying the existing exemptions that the Register intended to recommend for renewal, and providing a description of the proposed classes for new and expanded exemptions.[14] Public submissions were due between December 22, 2023 and March 19, 2024. The Office received approximately 50 submissions in response to the NPRM.[15]

After analyzing the written comments regarding proposed new and expanded exemptions, the Office held three days of public hearings from April 16–18, 2024, via Zoom.[16] Forty-one individuals representing nineteen stakeholder groups offered their views on specific proposed exemptions, and an additional four individuals took part in an audience participation session. After the hearings, the Office issued written questions to participants regarding two of the proposed classes and received seven responses.[17] It then held three *ex parte* meetings with participants concerning three proposed classes.[18] In addition, it received three letters about the rulemaking from other federal agencies and government officials.[19]

The Register consulted with the National Telecommunications and Information Administration ("NTIA"), in the Department of Commerce, as required by section 1201(a)(1). NTIA actively participated in the rulemaking process, providing input at key stages in meetings convened by the Office, and participated in the virtual public hearings where it engaged directly by asking questions. NTIA communicated its views on each of the proposed exemptions in writing to the Register on September 24, 2024.[20] The Office summarizes NTIA's views below. NTIA's full recommendation is available at *https://cdn.loc.gov/copyright/1201/2024/2024_NTIA_DMCA_Letter.pdf.*

## III. Summary of Register's Recommendation

### A. Renewal Recommendations

The Register received petitions to renew all but one of the exemptions adopted pursuant to the eighth triennial rulemaking,[21] and recommends renewal of all exemptions for which petitions were filed.[22] She finds that the reasons

---

are cited by the year of publication followed by "Recommendation" (*e.g.,* "2018 Recommendation"). Prior Recommendations are available on the Copyright Office website at *https://www.copyright.gov/1201/.*

[8] Section 1201 Report at 112.

[9] 17 U.S.C. 1201(a)(1)(B).

[10] 2006 Recommendation at 19.

[11] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 88 FR 37486, 37487 (June 8, 2023).

[12] *Id. See* Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 82 FR 29804, 29806 (June 30, 2017) (petitions to expand a current exemption are treated as petitions for new exemptions) ("Renewal may only be sought for current exemptions as they are currently formulated, without modification. This means that if a proponent seeks to engage in any activities not currently permitted by an existing exemption, a petition for a new exemption must be submitted.").

[13] 88 FR 37486, 37486; Exemptions to Permit Circumvention of Access Controls on Copyrighted Works: Notice and Request for Public Comment, 88 FR 42891 (July 5, 2023). References to renewal petitions and comments in response are by party and class name (abbreviated where appropriate) followed by "Renewal Pet.," "Renewal Opp'n," and "Renewal Supp." References to petitions for new exemptions and comments in response are by party name and class number followed by "Pet.," "Initial," "Opp'n," or "Reply" for comments submitted in the first, second, or third round, as applicable.

[14] Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 88 FR 72013 (Oct. 19, 2023).

[15] Comments received in this rulemaking are available on the Office's website. *See Ninth Triennial Section 1201 Proceeding, 2024 Cycle,* U.S. Copyright Office, *https://www.copyright.gov/1201/2024/* (last visited Oct. 17, 2024); *see also Late Filed Comments,* U.S. Copyright Office, *https://www.copyright.gov/1201/2024/late-filings/* (last visited Oct. 17, 2024).

[16] Video recordings of these hearings are available on the Office's website and YouTube pages. *See Ninth Triennial Section 1201 Rulemaking Public Hearings,* U.S. Copyright Office, *https://www.copyright.gov/1201/2024/hearings.html* (last visited Oct. 17, 2024); U.S. Copyright Office, Youtube, *https://www.youtube.com/uscopyrightoffice/* (last visited Oct. 17, 2024). Under each proposed class, citations to hearing transcripts refer to that particular class. Hearing transcripts for each individual class are available on the Office's web page. *Transcripts of Public Hearings in the Ninth Triennial Section 1201 Rulemaking,* U.S. Copyright Office, *https://www.copyright.gov/1201/2024/hearing-transcripts/* (last visited Oct. 17, 2024).

[17] Participants' post-hearing letter responses are available on the Office's website. *Post-Hearing Questions,* U.S. Copyright Office, *https://www.copyright.gov/1201/2024/post-hearing/* (last visited Oct. 17, 2024).

[18] *Ex Parte Communications,* U.S. Copyright Office, *https://www.copyright.gov/1201/2024/ex-parte-communications/* (last visited Oct.17, 2024). The Office required participants to comply with its *ex parte* regulation, codified at 37 CFR 205.24. This regulation requires that parties submit a meeting request and summary to the Office after an *ex parte* meeting, which is substantially the same process employed in prior section 1201 rulemakings. Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 65293, 65310 (Oct. 15, 2020).

[19] The letters are available on the Office's website. *Letters Between the U.S. Copyright Office, Other Agencies, and Other Government Officials,* U.S. Copyright Office, *https://www.copyright.gov/1201/2024/USCO-letters/* (last visited Oct. 17, 2024).

[20] Letter from Alan Davidson, Assistant Sec'y for Commc'ns & Info. Adm'r, Nat'l Telecomms. & Info. Admin., U.S. Dep't of Commerce, to Shira Perlmutter, Register of Copyrights and Dir., U.S. Copyright Office (Sept. 24, 2024) ("NTIA Letter").

[21] A renewal petition was not filed for the exemption permitting circumvention of video games in the form of computer programs for the purpose of allowing an individual with a physical disability to use alternative software or hardware input methods. *See* 37 CFR 201.40(b)(21) (2023); 88 FR 72013, 72015 n.19.

[22] *See* 85 FR 65293, 65295 (describing that there was no "meaningful opposition" to renewing exemptions when the Office had "not received comments actually disputing whether there [wa]s a continued basis for any exemptions"); *see also* Exemptions to Permit Circumvention of Access Controls on Copyrighted Works, 85 FR 37399,

for the Librarian's prior adoption of the exemptions are likely to continue during the next three-year period. The existing exemptions, and the bases for the recommendation to renew each exemption in accordance with the streamlined renewal process, are summarized below.

1. Audiovisual Works—Educational and Derivative Uses

Multiple individuals and organizations petitioned to renew the exemption covering the use of short portions of motion pictures for various educational and derivative uses.[23] The Office did not receive meaningful opposition to renewal. Renewal of each of this exemption's subparts was unopposed, except for noncommercial videos, as discussed below. The existing exemption and its various subparts collectively serve as the baseline in assessing whether to recommend any expansion to Classes 1 and 2.

a. Audiovisual Works—Criticism and Comment—Filmmaking [24]

Two organizations petitioned to renew the exemption for motion pictures for uses in documentary films or other films where the use is in a parody or for the work's biographical or historically significant nature. No oppositions to the renewal were filed. Petitioners stated that they personally know many filmmakers who have found it necessary to rely on this exemption and will continue to do so. The petitions summarized the continuing need and justification for the exemption.

b. Audiovisual Works–Criticism and Comment–Noncommercial Videos [25]

Two organizations petitioned to renew the exemption for motion pictures for uses in noncommercial videos. The Office did not receive meaningful opposition to renewal of this exemption.[26] Petitioners stated that they had personal knowledge that video creators have relied on this exemption and anticipate needing to do so in the future. The Organization for Transformative Works (''OTW'') included an account from an academic who stated that footage ripped from DVDs and Blu-ray is preferred for ''vidders'' (noncommercial remix artists) because ''it is high quality enough to bear up under the transformations that vidders make to it.'' [27] The petitioners demonstrated the continuing need and justification for the exemption.

c. Audiovisual Works—Criticism and Comment—Multimedia E-books [28]

Petitioners also sought renewal of the exemption for the use of motion picture excerpts in nonfiction multimedia e-books. No oppositions were filed against renewal. The petition demonstrated the continuing need and justification for the exemption. In addition, the petitioners demonstrated personal knowledge that high-resolution video is not available without circumvention of technological protection measures (''TPMs''). They provided, as an example, Bobette Buster's continued work on an e-book series based on her lecture series, ''Deconstructing Master Filmmakers: The Uses of Cinematic Enchantment.'' [29]

d. Audiovisual Works—Criticism, Comment, Teaching, or Scholarship—Universities and K–12 Educational Institutions [30]

Multiple individuals and organizations petitioned to renew the exemption for motion pictures for educational purposes by college and university or K–12 faculty and students. No oppositions were filed against renewal. The petitions demonstrated the continuing need and justification for the exemption, indicating that educators and students continue to rely on excerpts from digital media for class presentations and coursework. For instance, a collective of individuals and organizations provided several examples of professors using DVD clips in the classroom. A group of individual educators and educational organizations [31] broadly suggested that the ''entire field'' of video essays or multimedia criticism ''could not have existed in the United States without fair use and the 1201 educational exemption.'' [32] Petitioners demonstrated personal knowledge and experience with this exemption based on their past participation in the section 1201 triennial rulemaking and the experience of their members—thousands of digital and literacy educators and other members supporting educators and students. The Register finds that petitioners demonstrated a continuing need and justification for the exemption.

e. Audiovisual Works—Criticism and Comment—Massive Open Online Courses (''MOOCs'') [33]

A collective of individuals and organizations petitioned to renew the exemption for educational uses of motion pictures in Massive Open Online Courses (''MOOCs''). No oppositions were filed against renewal. The petitions demonstrated the continuing need and justification for the exemption, stating that instructors continue to rely on the exemption to develop, provide, and improve MOOCs, as well as to increase the number of (and therefore access to) MOOCs in the field of film and media studies. As teachers and proponents of MOOCs—most of whom have advocated for this exemption in prior rulemakings—petitioners demonstrated personal experience with and knowledge of this exemption.

f. Audiovisual Works—Criticism and Comment—Digital and Media Literacy Programs [34]

The Library Copyright Alliance (''LCA'') and Renee Hobbs petitioned to renew the exemption for motion pictures for educational uses in nonprofit digital and media literacy programs offered by libraries, museums, and other organizations. No oppositions were filed against renewal. The petition stated that librarians across the country have relied on the current exemption and will continue to do so for their digital and media literacy programs, thereby demonstrating the continuing need and justification for the exemption. Petitioners have personal experience with this exemption, as they engage with institutions and individuals offering these programs.

---

37402 (June 22, 2020) (describing ''meaningful opposition'' standard).

[23] *See* 37 CFR 201.40(b)(1).

[24] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.1.

[25] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.2.

[26] Opposition to the Organization for Transformative Works' (''OTW') requested changes is addressed as Class 1 below. Commenters objected only to OTW's request for changes to the exemption, not to renewal of the exemption as-is.

[27] OTW Noncom. Videos Renewal Pet. at 3.

[28] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.3.

[29] Buster, Authors All. & Am. Ass'n of Univ. Professors (''AAUP'') Nonfiction Multimedia E-Books Renewal Pet. at 3.

[30] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.4.

[31] The individuals and organizations include Peter Decherney, Michael Delli Carpini, Library Copyright Alliance (''LCA''), and the Society for Cinema and Media Studies (''SCMS'') (collectively, ''Joint Educators I'').

[32] Joint Educators I AV Educ. Renewal Pet. at 3.

[33] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.5.

[34] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.A.6.

2. Audiovisual Works—Accessibility [35]

The Association of Transcribers and Speech-to-Text Providers (''ATSP'') and LCA petitioned to renew the exemption for motion pictures for the provision of captioning and/or audio description by disability services offices or similar units at educational institutions for students, faculty, or staff with disabilities. No oppositions were filed against renewal. The petitioners demonstrated the continuing need and justification for the exemption, and, as ''represent[atives of] disability services professionals and supporting entities collectively responsible for the regular provision of captioning and audio description services for thousands of students,'' personal knowledge and experience with the exemption.[36] Petitioners stated that the ''exemption enables disability services offices and similar units to ensure that students with disabilities have access to the same advantages as their peers in the pursuit of education.'' [37]

3. Audiovisual works—Preservation or Replacement—Library, Archives, and Museum [38]

LCA petitioned to renew the exemption for motion pictures for preservation or the creation of a replacement copy by an eligible library, archives, or museum. No oppositions were filed against renewal. LCA petitioned for the exemption's adoption in the eighth triennial rulemaking and demonstrated the continuing need and justification for the exemption.[39] For example, it asserted that institutions across the country have relied on the exemption to make preservation and replacement copies of movies in their collections, many of which are not available for purchase or streaming. LCA indicated that as DVD and Blu-ray discs deteriorate, institutions like libraries and museums will continue to need to circumvent technological protections to make such copies. LCA also demonstrated its personal knowledge of the exemption.

4. Audiovisual Works—Text and Data Mining—Scholarly Research and Teaching [40]

Multiple organizations jointly petitioned to renew the exemption for text and data mining of motion pictures by researchers affiliated with a nonprofit institution of higher education, or at the direction of such researchers, for the purpose of scholarly research and teaching. Petitioners demonstrated the continuing need for this exemption, citing researchers who rely on it, such as professors using DVD clips in their classrooms and in their research. They also demonstrated their personal experience with this exemption, having advocated for its adoption in the eighth triennial rulemaking proceeding. Although two organizations jointly objected to renewal of this exemption, the comments seemed to have misunderstood the Register's prior findings and did not demonstrate that the previous rulemaking record was no longer reliable. Petitioners asserted that there have not been any legal changes or market developments that would disturb the Office's previous analysis or materially impact the record on which the Register had relied. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 3(a).

5. Literary Works—Text and Data Mining—Scholarly Research and Teaching [41]

Multiple organizations jointly petitioned to renew the exemption for text and data mining of literary works that were distributed electronically, by researchers affiliated with a nonprofit institution of higher education, or at the direction of such researchers, for the purpose of scholarly research and teaching. No oppositions were filed against renewal. The petitions demonstrated the continuing need and justification for the exemption, highlighting various professors' ongoing and developing research projects dependent on it. Petitioners also demonstrated personal knowledge of the exemption based on their ongoing relationships with researchers using it. This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 3(b).

6. Literary Works—Text and Data Mining—Assistive Technologies [42]

Multiple organizations jointly petitioned to renew the exemption for literary works or previously published musical works that have been fixed in the form of text or notation, distributed electronically, and include access controls that interfere with assistive technologies. No oppositions were filed against renewal. The petitioners demonstrated the continuing need and justification for the exemption, stating that individuals who are blind, visually impaired, or print-disabled are significantly disadvantaged with respect to obtaining accessible e-book content because TPMs interfere with the use of assistive technologies. Additionally, they demonstrated personal knowledge and extensive experience with the assistive technology exemption, as they are all organizations that advocate for the blind, visually impaired, and print-disabled.

7. Literary Works—Medical Device Data [43]

The Coalition of Medical Device Patients and Researchers (''the Coalition'') petitioned to renew the exemption covering access to patient data on medical devices or monitoring systems. No oppositions were filed against renewal. The Coalition demonstrated the continuing need and justification for the exemption, stating that ''the exemption is vital to patients' ability to monitor the data output of medical devices that monitor and maintain their health'' and to medical research.[44] It also demonstrated personal knowledge and experience with this exemption, citing member Hugo Campos's experiences as a patient who has needed access data from his implanted defibrillator, and its research regarding medical devices.

8. Computer Programs—Unlocking [45]

The Institute of Scrap Recycling Industries, Inc. (''ISRI'') petitioned to renew the exemption for computer programs that operate wireless devices, to allow connection of a new or used device to an alternative wireless network (''unlocking''). No oppositions

[35] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.B.

[36] ATSP & LCA Captioning Renewal Pet. at 3.

[37] *Id.*

[38] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.C.

[39] LCA Preservation Renewal Pet. at 3.

[40] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.D.

[41] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.E.

[42] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.F.

[43] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.G.

[44] Coalition Medical Devices Renewal Pet. at 3.

[45] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.H.

were filed against renewal. The petition demonstrated the continuing need and justification for the exemption, stating that users "continue to purchase or acquire donated cell phones, tablets, laptops, and a variety of other wireless devices no longer needed by their original owners and try to make the best possible use of them through resale or recycling," which requires unlocking the devices so they may be used on other carriers.[46] ISRI demonstrated personal knowledge and experience with the exemption based on its involvement in previous triennial rulemakings and its representation of nearly 1,600 companies that process, broker, and consume scrap commodities.

9. Computer Programs—Jailbreaking[47]

Multiple organizations petitioned to renew the four exemptions for computer programs that enable electronic devices to interoperate with or to remove software applications ("jailbreaking"). These exemptions permit circumvention for the purpose of jailbreaking (1) smartphones and other portable all-purpose computing devices, (2) smart televisions, (3) voice assistant devices, and (4) routers and dedicated networking devices. No oppositions were filed against renewal. The petitions demonstrated the continuing need and justification for the exemption and that petitioners have personal knowledge and experience with regard to this exemption. Petitioners described how users of a variety products in each of these categories rely on this exemption to maintain functionality and security of older devices, to install alternative operation systems, and to customize software applications on electronic devices. Collectively, the petitions demonstrated that without this exemption, TPMs installed on the enumerated products would have an adverse effect on various noninfringing uses.

10. Computer Programs—Repair of Motorized Land Vehicles, Marine Vessels, or Mechanized Agricultural Vehicles or Vessels[48]

iFixit and MEMA, The Vehicle Suppliers Association ("MEMA"), petitioned to renew the exemption for computer programs that control motorized land vehicles, marine vessels, or mechanized agricultural vehicles or vessels for purposes of diagnosis, repair, or modification of a vehicle or vessel function. No oppositions were filed against renewal. The petitioners each represent or advise individuals and businesses that perform vehicle service and repair and have personal experience with this exemption through those activities. They demonstrated the continuing need and justification for the exemption. For example, MEMA stated that its membership "continues to see firsthand that the exemption is helping protect consumer choice and a competitive market, while mitigating risks to intellectual property and vehicle safety"—particularly as "every year vehicle computer programs become more important and essential to today's motor vehicles."[49] In the 2021 rulemaking, the Register concluded that the "prohibition against circumvention . . . [was] likely to adversely affect diagnosis, repair, and lawful modification of a vessel function for marine vessels," as well as functions for land vehicles, including agricultural land vehicles such as tractors.[50] The Office did not receive any evidence indicating that these categories of vehicles and vessels should be treated differently in this proceeding.

11. Computer Programs—Repairs of Devices Designed Primarily for Use by Consumers[51]

The Electronic Frontier Foundation ("EFF") petitioned to renew the exemption for computer programs that control devices designed primarily for use by consumers for diagnosis, maintenance, or repair of the device. The Office did not receive meaningful opposition to renewal.[52] The petitioners demonstrated the continuing need and justification for the exemption. For example, EFF asserted that "[m]anufacturers of these devices continue to implement technological protection measures that inhibit lawful repairs, maintenance, and diagnostics, and they show no sign of changing course."[53] EFF has personal knowledge of this exemption, as it has been involved with the section 1201 rulemaking process since its inception and has specifically advocated for device repair exemptions.

12. Computer Programs—Repair of Medical Devices and Systems[54]

Multiple organizations petitioned to renew the exemption to access computer programs that are contained in and control the functioning of medical devices or systems, and related data files, for purposes of diagnosis, maintenance, or repair. The petitioners repair, maintain, service, or sell medical systems and devices and thus have personal experience with this exemption. The petitions demonstrated the continuing need and justification for the exemption, for example stating that "the use of TPMs in medical systems and devices is widespread" and that manufacturers "have developed new systems that further restrict access to use of necessary software tools."[55] Petitioners also emphasized that this exemption makes possible device repair and maintenance services that ensure continuity and efficiency of patient care.

Three organizations submitted timely opposition comments. Opponents asserted that the exemption undermines the U.S. Food and Drug Administration's ("FDA") maintenance and repair standards for the intricate equipment used in patient care and conflicts with other congressional policies. They also argued that the Supreme Court's decision in *Andy Warhol Found. for the Visual Arts* v. *Goldsmith*[56] undermined the validity of the previous rulemaking's analysis. As in the Register's 2021 Recommendation, in this rulemaking the Register again emphasizes that the Office "generally does not consider other regulatory schemes as part of the . . . analysis because the focus of this proceeding is on copyright-related considerations,"[57] and notes that granting an exemption under section 1201 does not absolve any user from compliance with other relevant laws and regulations. The Register further concludes that the *Warhol* decision does not substantially change the Office's analysis of the uses at issue in this exemption.

[46] ISRI Unlocking Renewal Pet. at 3.

[47] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.I.

[48] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.J.

[49] MEMA Vehicle Repair Renewal Pet. at 3.

[50] 2021 Recommendation at 223.

[51] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.K.

[52] Although Author Services filed a comment opposing renewal of the exemption "in its present form," the comment only addressed devices outside the scope of the existing exemption. *See* 88 FR 72013, 72020–21.

[53] EFF Device Repair Renewal Pet. at 3.

[54] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.L.

[55] Avante Health Sols., Avante Diagnostic Imaging, and Avante Ultrasound Medical Device Repair Renewal Pet. at 5.

[56] 598 U.S. 508 (2023).

[57] 2021 Recommendation at 229.

13. Computer Programs—Security Research [58]

Multiple organizations and security researchers petitioned to renew the exemption permitting circumvention for purposes of good-faith security research. No oppositions were filed against renewal, and one group of security and policy professionals submitted a comment in support of the petition. The petitioners demonstrated the continuing need and justification for the exemption, as well as personal knowledge of and experience with this exemption. They highlighted professors' critical research regarding vulnerabilities in voting machines, devices underpinning the financial industry, smart phones, and other devices. They also stated that this exemption enables security testing that is vital to ensure device users' privacy is protected and security issues are corrected.

14. Video Games—Preservation and Abandoned Video Games [59]

The Software Preservation Network (''SPN'') and LCA jointly petitioned to renew the exemption for individual play by gamers and preservation of video games by a library, archives, or museum for which outside server support has been discontinued, and preservation by a library, archives, or museum, of discontinued video games that never required server support. No oppositions were filed against renewal, and one individual filed a comment in support. Petitioners demonstrated that there is a continuing need and justification for the exemption. They stated that video game collection librarians report an ongoing need to preserve TPM-encumbered video games in their collections and that the ''[section] 1201 exemption has become a crucial tool in their ongoing efforts to save digital game culture before it disappears.'' [60] They demonstrated personal knowledge and experience through past participation in section 1201 rulemakings and through their representation of members who have relied on this exemption.

This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 6(b).

15. Computer Programs—Preservation [61]

SPN and LCA jointly petitioned to renew the exemption for the preservation of computer programs other than video games, and computer program-dependent materials, by libraries, archives, and museums. No oppositions were filed against renewal, and one individual filed a comment in support. Petitioners demonstrated that there is a continuing need and justification for this exemption. For example, they asserted that remotely accessing preserved computer programs ''fulfill[s] cultural heritage institutions' missions to support research, analysis, and other scholarly re-use of the historical record (and to do so equitably and inclusively).'' [62] In addition, they demonstrated personal knowledge and experience through past participation in section 1201 rulemakings relating to access controls on software and through representing major library associations with members who have relied on this exemption.[63]

This existing exemption serves as the baseline in assessing whether to recommend any expansions in Class 6(a).

16. Computer Programs—3D Printers [64]

Michael Weinberg petitioned to renew the exemption for computer programs that operate 3D printers to allow use of alternative material. No oppositions were filed against renewal. The petition demonstrated the continuing need and justification for the exemption, and the petitioner demonstrated personal knowledge and experience. Specifically, Mr. Weinberg declared that he is a member of the 3D printing community and has been involved with this exemption's renewal and modification in each section 1201 rulemaking it has been considered. Additionally, he stated that while 3D printer manufacturers ''continue to use TPMs to limit the types of materials used in printers,'' since the last rulemaking proceeding, there has been ''an expansion of third-party materials available for 3D printers'' due to the current exemption, which has assured manufacturers and users that their uses would not violate section 1201.[65]

17. Computer Programs—Copyright License Investigation [66]

The Software Freedom Conservancy (''SFC'') petitioned to renew the exemption for computer programs, for the purpose of investigating potential infringement of free and open-source computer programs. No oppositions were filed against renewal. The petition demonstrated the continuing need and justification for the exemption, including through discussion of how TPMs, such as encryption, ''prevent[ ] the investigation of computer programs'' within various devices, such as laptops, IP-enabled doorbells, baby monitors, and thermostats, that use free and open source software (''FOSS'') to operate.[67] SFC indicated that barriers to investigating FOSS will ''continue to exist . . . [and would] prevent . . . users from obtaining access to the relevant copyrighted works'' without the exemption.[68] As a participant in the previous rulemaking and ''the nonprofit home for dozens of FOSS projects representing well over a thousand volunteer contributors,'' SFC demonstrated personal knowledge and experience regarding the exemption.[69]

18. Computer Programs—Videogame Accessibility [70]

In 2021, the Register found that the record ''support[ed] an exemption to enable individuals with disabilities to use alternate input devices to play video games.'' [71] The Office previously noted the strong justifications for the exemption and recommended that Congress enact a permanent exemption to enable such accessibility. It did not, however, receive a petition to renew this exemption and, given the constraints of the rulemaking process, the Register is not able to recommend renewal.

*B. New or Expanded Designations of Classes*

Based upon the record in this proceeding regarding proposed expansions to existing exemptions or newly proposed exemptions, the Register recommends that the Librarian grant the following additional

[58] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.M.

[59] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.N.

[60] SPN and LCA Abandoned Video Game Renewal Pet. at 3.

[61] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.O.

[62] SPN & LCA Software Preservation Renewal Pet. at 3.

[63] *Id.*

[64] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.P.

[65] Weinberg 3D Printers Renewal Pet. at 3.

[66] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.Q.

[67] SFC Copyright License Investigation Renewal Pet. at 3.

[68] *Id.*

[69] *Id.*

[70] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at IV.R.

[71] 2021 Recommendation at 315.

exemptions from the prohibition against circumvention of technological measures set forth in section 1201(a)(1):

1. Proposed Classes 3(a) and 3(b): Audiovisual Works and Literary Works—Text and Data Mining [72]

Authors Alliance, the American Association of University Professors (''AAUP''), and LCA petitioned to expand the existing exemptions that permit circumvention of technological protection measures on copies of copyrighted audiovisual and literary works that were lawfully acquired, to enable researchers to perform text and data mining for the purpose of scholarly research and teaching. The current exemptions permit access to the corpora to outside researchers ''solely for purposes of collaboration or replication of the research.'' [73] Petitioners stated that additional research based on text and data mining techniques is stymied by uncertainty surrounding whether and when the corpora at issue may be used by researchers at outside institutions. Proposed Classes 3(a) and 3(b) would provide an exemption to allow academic researchers to share copies of corpora with researchers affiliated with other nonprofit institutions of higher education ''for purposes of conducting independent text [and] data mining research and teaching, where those researchers are in compliance with the exemption.'' [74]

Association of American Publishers (''AAP''); Motion Picture Association (''MPA''), News Media Alliance, and the Recording Industry Association of America (''RIAA'') (collectively, ''Joint Creators III''); DVD Copy Control Association (''DVD CCA'') and the Advanced Access Content System Licensing Administrator, LLC (''AACS LA''); and the International Association of Scientific, Technical and Medical Publishers opposed the proposed expansions for classes 3(a) and 3(b). They argued that the ''proposed new language would dramatically enlarge the scope of the exemptions adopted in 2021'' and could lead to ''a wide range of potentially infringing uses'' of copyrighted works.[75] They also raised issues with the existing exemptions' security measures and viewing provisions.

As discussed in the Register's Recommendation, absent modifications to the current exemptions for text and data mining, researchers at other academic institutions will face adverse effects in their ability to make noninfringing use of copyrighted audiovisual and literary works. The Register recommends that the current exemptions be modified to permit researchers affiliated with other nonprofit institutions of higher education to access corpora solely for the purposes of text and data mining research or teaching. ''Access'' in this context means that an institution may provide outside researchers with credentials for security and authentication to use a corpus that is hosted on its servers; it does not mean that an institution or a researcher may disseminate a copy of a corpus (or copyrighted works included therein) to outside researchers or give outside researchers the ability to download, make copies of, or distribute any copyrighted works.

The Register also recommends amending the existing exemptions to clarify the security measures provisions and the viewing provisions to bring the regulatory text in line with the fair use analysis in the 2021 Recommendation. These amendments do not require a new fair use analysis. Specifically, she recommends amending the security measures provisions to: (1) include reasonable requests from trade associations; (2) permit inquiries into security measures regardless of whether they are based on individual agreements or the institution's own standards; and (3) allow those inquiries when the copyright owners *reasonably believe* that their works are in the corpus. The Register also recommends amending the viewing provision to permit researchers to view the contents of copyrighted works as part of their research, provided that viewing takes place in furtherance of research objectives (*e.g.,* processing or annotating works to prepare them for analysis) and not for the works' expressive value.

2. Proposed Class 5: Computer Programs—Repair of Commercial Industrial Equipment [76]

Public Knowledge and iFixit jointly petitioned for an expanded repair exemption that would permit circumvention for the purposes of diagnosis, maintenance, and repair of commercial and industrial equipment. The U.S. Department of Justice Antitrust Division and the Federal Trade Commission filed comments in support of the petition. Proponents asserted that that there were sufficient commonalities to support a broad class by providing four representative examples, including commercial food preparation equipment. Opponents ACT √ The App Association; Associated Equipment Distributors; Entertainment Software Association (''ESA''), MPA, and RIAA (''collectively, ''Joint Creators I''); Philips North America, LLC; and the Association of Home Appliance Manufacturers primarily argued that the scope of the class was overly broad and unsupported by the record. NTIA supported the proposed exemption.

The Register recommends adopting a new exemption covering diagnosis, maintenance, and repair of retail-level commercial food preparation equipment because proponents sufficiently showed, by a preponderance of the evidence, adverse effects on the proposed noninfringing uses of such equipment. However, she declines to recommend an exemption for a broader class of software-enabled commercial and industrial devices in the absence of a sufficient showing of adverse effects on the record presented in this rulemaking.

3. Proposed Class 7: Computer Programs—Vehicle Operational Data [77]

Class 7 proponents sought a new exemption to permit lawful owners and lessees, or those acting on their behalf, to access, store, and share vehicle operational and telematics data generated by motorized land vehicles and marine vessels. They argued that the proposed exemption would allow vehicle owners and lessees to make productive, noninfringing uses of that data, such as monitoring vehicle use and streamlining the vehicle repair process. In subsequent comments and at the public hearing, proponents agreed that any exemption should include limitations, such as the continued applicability of other laws.

Alliance for Automotive Innovation, Association of Equipment Manufacturers, National Association of Manufacturers, and the Joint Creators I opposed the exemption. They argued that consumers already have sufficient

[72] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.C.

[73] 37 CFR 201.40(b)(4)–(5).

[74] Authors All., AAUP & LCA Class 3(a) Pet. at 2; Authors All., AAUP & LCA Class 3(b) Pet. at 2.

[75] Motion Picture Association (''MPA''), News Media Alliance, and the Recording Industry Association of America (''RIAA'') (collectively, ''Joint Creators III'') Class 3(a) Opp'n at 5; *see* Ass'n of Am. Publishers (''AAP'') Class 3(b) Opp'n at 2–3; DVD Copy Control Ass'n (''DVD CCA'') and Advanced Access Content Sys. Licensing Adm'r, LLC (''AACS LA'') Class 3(a) Opp'n at 12–13, 19–20.

[76] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.E.

[77] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.G.

access under current laws and market practices, particularly the existing vehicle repair exemption found in section 37 CFR 201.40(b)(13) (''Repair Exemption''). They further contended that the proposed exemption was overbroad and would raise issues related to safety, privacy, and trade secrets.

NTIA supported the proposed exemption and recommended that it operate as a ''standalone'' exemption, separate from the Repair Exemption. In addition, NTIA recommended including the term ''analyze'' within the proposed regulatory language, as furthering the intended goals of the exemption.

For the reasons detailed in the Register's Recommendation, the Register concludes that the prohibition on circumvention adversely affects the ability of lawful owners and lessees, or those acting on their behalf, to access, store, and share operational and telematics data, which are likely to be noninfringing. She further finds that such uses would not adversely affect the market for or value of computer programs integrated into vehicles and vessels and that the purported alternatives do not sufficiently mitigate any adverse effects. She also recommends adopting regulatory provisions mirroring those within the Repair Exemption regarding the applicability of the exemption to other laws, separate subscription services, and unauthorized access to other copyrighted works.

*C. Classes Considered but Not Recommended*

Based upon the record in this proceeding, the Register recommends that the Librarian determine that the following classes of works shall not be exempt during the next three-year period from the prohibition against circumvention of technological measures set forth in section 1201(a)(1):

1. Proposed Class 1: Audiovisual Works—Noncommercial Videos [78]

Proposed Class 1 proponents sought to expand the existing exemption that permits circumvention of access controls protecting excerpts of motion pictures on DVDs, Blu-ray discs, and digitally transmitted video for the purposes of criticism and comment, including for educational purposes by certain users. The Office received one petition from OTW seeking an amendment to the language of the existing exemption.[79] Specifically, OTW proposed rewriting the text of the current exemption related to noncommercial videos, which is being renewed, by reverting to language used in the 2010 rulemaking, when the exemption was initially adopted. OTW maintained that its proposed changes would not substantively alter the exemption but would render it more understandable to users. It made essentially the same request in the 2021 proceeding, which the Register did not recommend adopting.

The Office received no comments in support of the proposal, no requests from OTW or other parties to participate in the public hearings, and no other evidence in support of the proposal. Two groups, however, filed opposition comments. These groups opposed the language changes that OTW proposed, but did not oppose renewal of the exemption as currently written. Opponents highlighted the Register's previous findings in the 2021 rulemaking that OTW's proposed changes were not warranted, as well as OTW's failure in this proceeding to submit any evidence supporting its petition. NTIA acknowledged that petitioner did not submit its request in a procedurally proper manner, but supported petitioner's proposed modifications to the class and structural alterations to the way exemptions are written in general. The Register does not recommend the expansion proposed as Class 1, which does not include substantive changes.

2. Proposed Class 2: Audiovisual Works—Online Learning [80]

Proposed Class 2 would expand the existing exemption for circumvention of access controls protecting motion pictures on DVDs, Blu-ray discs, and digitally transmitted video for educational purposes in massive open online courses (''MOOCs'') by faculty and employees acting at the direction of faculty of accredited nonprofit educational institutions. Petitioner sought to expand the scope of the exemption for ''educators . . . and preparers of online learning materials acting at the direction of educators'' of ''qualified online educational entities,'' including for-profit entities and unaccredited educational institutions, to use short portions of motion pictures ''for the purpose of teaching registered learners . . . in courses requiring close analysis of film and media excerpts when the transformative fair use of the excerpts contributes significantly to learning, for the purpose of criticism, comment, illustration, or explanation.'' [81] Proponents argued that these entities should have free and efficient ways of accessing high-quality motion picture excerpts to educate nontraditional learners. Opponents argued against the proposed expansion, contending that proponents failed to meet their evidentiary burden, including that the conduct at issue would be noninfringing. Finally, AACS LA argued that screen capture technology has improved and remains an adequate alternative in some circumstances.

NTIA supported the proposed exemption with some modifications to address opponents' concerns.

The Register finds that the record lacks support to expand the existing exemption to for-profit and/or unaccredited educational entities. She therefore does not recommend adopting the proposed exemption.

3. Proposed Class 4: Computer Programs—Generative AI Research [82]

Class 4 proponents sought an exemption for the purpose of conducting ''trustworthiness'' research on AI systems. Specifically, they sought to conduct research on harmful or undesirable outputs from generative AI systems, including content that is biased, is sexually explicit, or infringes copyrights. They asserted that section 1201 inhibits this research by prohibiting the circumvention of various safeguards on online platforms, including account authentication systems.

Opponents asserted that the proposed language was overbroad, arguing that a broad exemption could damage all software markets and sweep in a variety of systems and products, such as Blu-ray disc players. They also contended that proponents failed to provide sufficient information about the TPMs at issue and whether they would be circumvented for the proposed research. Finally, they argued that an exemption would be premature, and that the rulemaking was not the appropriate venue to establish new law, given the nascent technology involved and

[78] The Register's analysis and conclusions for this subpart, including citations to the record and relevant legal authority, can be found in the Register's Recommendation at V.A.

[79] OTW submitted a petition for renewal, which the Office construed as a request for expansion since petitioner requested alterations to the existing exemption.

[80] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at V.B.

[81] Peter Decherney, Sarah Banet-Weiser, Shiv Gaglani & SCMS (collectively, ''Joint Educators II'') Class 2 Reply at 2–3.

[82] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at V.D.

ongoing legislative and policy work on generative AI.

NTIA supported an exemption modeled after the current security research exemption,[83] but without the requirement that research be conducted on lawfully acquired devices, or with the authorization of the system owner or operator. Although NTIA concluded that section 1201 would not apply to most of the activities identified by proponents, it believed that the use of certain prompts could implicate the prohibition on circumvention. NTIA also found sufficient evidence of adverse effects, crediting statements from academic researchers describing the "chilling effect" of section 1201 on their work.

The Register recommends denying the proposed exemption. She acknowledges the importance of AI trustworthiness research as a policy matter and notes that Congress and other agencies may be best positioned to act on this emerging issue. She narrowed the proposed class to generative AI systems made available via software as a service based on the rulemaking record. She finds, however, that the adverse effects identified by proponents arise from third-party control of online platforms rather than the operation of section 1201, so that an exemption would not ameliorate their concerns.

4. Proposed Classes 6(a) and 6(b): Computer Programs and Video Games—Preservation[84]

Proposed Classes 6(a) and 6(b) would amend the existing exemptions permitting libraries, archives, and museums to circumvent TPMs on computer programs and video games, respectively, for the purpose of preservation activities. The proposed amendment to Class 6(a) would remove the limitation that a preserved computer program must be accessible to only one user at a time (the "single-user limitation"). Petitioners sought clarification of the single-user limitation, arguing that it is currently open to two different interpretations. The existing exemption, they contended, could be read to allow multiple users to access circumvented copies at once, so long as the number of users does not exceed the number of copies the institution owns; or to mean that only one user at a time may access a copy of the circumvented work regardless of how many copies the institution owns. Proposed Class 6(b) would also remove the current exemption's limitation that a video game must not be distributed or made available outside of the physical premises of the institution (the "premises limitation").

Proponents argued that researchers could make noninfringing uses of the exemption even if the single-user limitation and the premises limitation were removed. This position was based in part on their view that proposed uses would be transformative, and would not affect the potential market for or value of the copyrighted works because only works that are no longer reasonably available in the commercial marketplace would be subject to the exemption.

DVD CCA and AACS LA and Joint Creators I opposed removing the single-user limitation. They argued if a preservation institution were to allow multiple simultaneous uses of a preserved program, users' conduct would not be fair use and would cause market harm.

DVD CCA and AACS LA, Joint Creators I, and ESA opposed removing the premises limitation. They contended that there would be a significant risk that preserved video games would be used for recreational purposes. They further argued that the expanded exemption would give preservation institutions too much discretion regarding how they provide remote users access to preserved works; and that it did not contain appropriately tailored restrictions to ensure that uses would be limited to teaching, research, or scholarship uses. They believe that removing the premises limitation would also adversely affect the existing market for older video games.

NTIA supported the removal of each limitation.

The Register concludes that proponents did not show that removing the single-user limitation for preserved computer programs or permitting off-premises access to video games are likely to be noninfringing. She also notes the greater risk of market harm with removing the video game exemption's premises limitation, given the market for legacy video games. She recommends clarifying the single copy restriction language to reflect that preservation institutions can allow a copy of a computer program to be accessed by as many individuals as there are circumvented copies legally owned. This clarifying text will address the perceived ambiguity in the current exemption, while maintaining the single-user limitation's intended purpose to minimize the risk of substitutional uses of preserved computer programs.

*D. Conclusion*

Having considered the evidence in the record, the comments of proponents and opponents of the exemptions, and the objectives of section 1201, the Register recommends that the Librarian of Congress exempt for the next three years certain classes of works, as described above, from the prohibition against circumvention of technological measures that effectively control access to copyrighted works.

Dated: October 18, 2024.

**Shira Perlmutter,**

*Register of Copyrights and Director of the U.S. Copyright Office.*

**Determination of the Librarian of Congress**

Having duly considered the recommendation of the Register of Copyrights as summarized above, which recommendation is hereby incorporated by reference, the Librarian of Congress accepts that recommendation with respect to all the classes of works under consideration. The Librarian, exercising her authority pursuant to 17 U.S.C. 1201(a)(1)(C) and (D), hereby publishes as a new rule the classes of copyrighted works that shall for a three-year period be subject to the exemption found in 17 U.S.C. 1201(a)(1)(B) from the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A).

The Librarian is aware that the Register and her legal staff have invested a great deal of time over the past two years in analyzing the many issues underlying the 1201 process and proposed exemptions.

Through this work, the Register has come to believe that the issue of research on artificial intelligence security and trustworthiness warrants more general Congressional and regulatory attention. The Librarian agrees with the Register in this assessment. As a regulatory process focused on technological protection measures for copyrighted content, section 1201 is ill-suited to address fundamental policy issues with new technologies.

The Librarian is further aware of the policy and legal issues involving a generalized "right to repair" equipment with embedded software. These issues have now occupied the White House, Congress, state legislatures, federal agencies, the Copyright Office, and the general public through multiple rounds of 1201 rulemaking.

[83] 37 CFR 201.40(b)(16) (2023). The current security research exemption is being renewed during this rulemaking proceeding.

[84] The Register's analysis and conclusions for this class, including citations to the record and relevant legal authority, can be found in the Recommendation at V.F.

Copyright is but one piece in a national framework for ensuring the security, trustworthiness, and reliability of embedded software, and other copyright-protected technology that affects our daily lives. Issues such as these extend beyond the reach of 1201 and may require a broader solution, as noted by the NTIA.

The Librarian fully supports the Register in her examination of these issues and urges Congress to work with the Copyright Office and other federal agencies to consider these issues beyond the contours of this 1201 rulemaking.

**List of Subjects in 37 CFR Part 201**

Copyright, Exemptions to prohibition against circumvention.

**Final Regulations**

For the reasons set forth in the preamble, 37 CFR part 201 is amended as follows:

## PART 201—GENERAL PROVISIONS

■ 1. The authority citation for part 201 continues to read as follows:

**Authority:** 17 U.S.C. 702.

■ 2. Section 201.40 is amended by revising paragraph (b) to read as follows:

**§ 201.40 Exemption to prohibition against circumvention.**

* * * * *

(b) *Classes of copyrighted works.* Pursuant to the authority set forth in 17 U.S.C. 1201(a)(1)(C) and (D), and upon the recommendation of the Register of Copyrights, the Librarian has determined that the prohibition against circumvention of technological measures that effectively control access to copyrighted works set forth in 17 U.S.C. 1201(a)(1)(A) shall not apply to persons who engage in noninfringing uses of the following classes of copyrighted works:

(1) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully made and acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, and the person engaging in circumvention under paragraphs (b)(1)(i) and (b)(1)(ii)(A) and (B) of this section reasonably believes that non-circumventing alternatives are unable to produce the required level of high-quality content, or the circumvention is undertaken using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted, where circumvention is undertaken solely in order to make use of short portions of the motion pictures in the following instances:

(i) For the purpose of criticism or comment:

(A) For use in documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature;

(B) For use in noncommercial videos (including videos produced for a paid commission if the commissioning entity's use is noncommercial); or

(C) For use in nonfiction multimedia e-books.

(ii) For educational purposes:

(A) By college and university faculty and students or kindergarten through twelfth-grade (K–12) educators and students (where the K–12 student is circumventing under the direct supervision of an educator), or employees acting at the direction of faculty of such educational institutions for the purpose of teaching a course, including of accredited general educational development (GED) programs, for the purpose of criticism, comment, teaching, or scholarship;

(B) By faculty of accredited nonprofit educational institutions and employees acting at the direction of faculty members of those institutions, for purposes of offering massive open online courses (MOOCs) to officially enrolled students through online platforms (which platforms themselves may be operated for profit), in film studies or other courses requiring close analysis of film and media excerpts, for the purpose of criticism or comment, where the MOOC provider through the online platform limits transmissions to the extent technologically feasible to such officially enrolled students, institutes copyright policies and provides copyright informational materials to faculty, students, and relevant staff members, and applies technological measures that reasonably prevent unauthorized further dissemination of a work in accessible form to others or retention of the work for longer than the course session by recipients of a transmission through the platform, as contemplated by 17 U.S.C. 110(2); or

(C) By educators and participants in nonprofit digital and media literacy programs offered by libraries, museums, and other nonprofit entities with an educational mission, in the course of face-to-face instructional activities, for the purpose of criticism or comment, except that such users may only circumvent using screen-capture technology that appears to be offered to the public as enabling the reproduction of motion pictures after content has been lawfully acquired and decrypted.

(2)(i) Motion pictures (including television shows and videos), as defined in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or via a digital transmission protected by a technological measure, where:

(A) Circumvention is undertaken by a disability services office or other unit of a kindergarten through twelfth-grade educational institution, college, or university engaged in and/or responsible for the provision of accessibility services for the purpose of adding captions and/or audio description to a motion picture to create an accessible version for students, faculty, or staff with disabilities;

(B) The educational institution unit in paragraph (b)(2)(i)(A) of this section has a reasonable belief that the motion picture will be used for a specific future activity of the institution and, after a reasonable effort, has determined that an accessible version of sufficient quality cannot be obtained at a fair market price or in a timely manner, including where a copyright holder has not provided an accessible version of a motion picture that was included with a textbook; and

(C) The accessible versions are provided to students or educators and stored by the educational institution in a manner intended to reasonably prevent unauthorized further dissemination of a work.

(ii) For purposes of this paragraph (b)(2):

(A) "Audio description" means an oral narration that provides an accurate rendering of the motion picture;

(B) "Accessible version of sufficient quality" means a version that in the reasonable judgment of the educational institution unit has captions and/or audio description that are sufficient to meet the accessibility needs of students, faculty, or staff with disabilities and are substantially free of errors that would materially interfere with those needs; and

(C) Accessible materials created pursuant to this exemption and stored pursuant to paragraph (b)(2)(i)(C) of this section may be reused by the educational institution unit to meet the accessibility needs of students, faculty, or staff with disabilities pursuant to paragraphs (b)(2)(i)(A) and (B) of this section.

(3)(i) Motion pictures (including television shows and videos), as defined

in 17 U.S.C. 101, where the motion picture is lawfully acquired on a DVD protected by the Content Scramble System, or on a Blu-ray disc protected by the Advanced Access Content System, solely for the purpose of lawful preservation or the creation of a replacement copy of the motion picture, by an eligible library, archives, or museum, where:

(A) Such activity is carried out without any purpose of direct or indirect commercial advantage;

(B) The DVD or Blu-ray disc is damaged or deteriorating;

(C) The eligible institution, after a reasonable effort, has determined that an unused and undamaged replacement copy cannot be obtained at a fair price and that no streaming service, download service, or on-demand cable and satellite service makes the motion picture available to libraries, archives, and museums at a fair price; and

(D) The preservation or replacement copies are not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) For purposes of paragraph (b)(3)(i) of this section, a library, archives, or museum is considered ''eligible'' if—

(A) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(B) The library, archives, or museum has a public service mission;

(C) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(D) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(E) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by paragraph (b)(3)(i) of this section.

(4)(i) Motion pictures, as defined in 17 U.S.C. 101, where the motion picture is on a DVD protected by the Content Scramble System, on a Blu-ray disc protected by the Advanced Access Content System, or made available for digital download where:

(A) The circumvention is undertaken by a researcher affiliated with a nonprofit institution of higher education, or by a student or information technology staff member of the institution at the direction of such researcher, solely to deploy text and data mining techniques on a corpus of motion pictures for the purpose of scholarly research and teaching;

(B) The copy of each motion picture is lawfully acquired and owned by the institution, or licensed to the institution without a time limitation on access;

(C) The person undertaking the circumvention or conducting research or teaching under this exemption views or listens to the contents of the motion pictures in the corpus solely to conduct text and data mining research or teaching;

(D) The institution uses effective security measures to prevent dissemination or downloading of motion pictures in the corpus, and upon a reasonable request from a copyright owner who reasonably believes that their work is contained in the corpus, or a trade association representing such author, provide information to that copyright owner or trade association regarding the nature of such measures; and

(E) The institution limits access to the corpus to only the persons identified in paragraph (b)(4)(i)(A) of this section or to researchers affiliated with other nonprofit institutions of higher education, with all access provided only through secure connections and on the condition of authenticated credentials, solely for purposes of text and data mining research or teaching.

(ii) For purposes of paragraph (b)(4)(i) of this section:

(A) An institution of higher education is defined as one that:

(*1*) Admits regular students who have a certificate of graduation from a secondary school or the equivalent of such a certificate;

(*2*) Is legally authorized to provide a postsecondary education program;

(*3*) Awards a bachelor's degree or provides not less than a two-year program acceptable towards such a degree;

(*4*) Is a public or other nonprofit institution; and

(*5*) Is accredited by a nationally recognized accrediting agency or association.

(B) The term ''effective security measures'' is defined as:

(*1*) Security measures that have been agreed to by all interested copyright owners of motion pictures and institutions of higher education; or

(*2*) Security measures that the institution uses to keep its own highly confidential information secure.

(5)(i) Literary works, excluding computer programs and compilations that were compiled specifically for text and data mining purposes, distributed electronically where:

(A) The circumvention is undertaken by a researcher affiliated with a nonprofit institution of higher education, or by a student or information technology staff member of the institution at the direction of such researcher, solely to deploy text and data mining techniques on a corpus of literary works for the purpose of scholarly research and teaching;

(B) The copy of each literary work is lawfully acquired and owned by the institution, or licensed to the institution without a time limitation on access;

(C) The person undertaking the circumvention or conducting research or teaching under this exemption views the contents of the literary works in the corpus solely to conduct text and data mining research or teaching;

(D) The institution uses effective security measures to prevent dissemination or downloading of literary works in the corpus, and upon a reasonable request from a copyright owner who reasonably believes that their work is contained in the corpus, or a trade association representing such author, provide information to that copyright owner or trade association regarding the nature of such measures; and

(E) The institution limits access to the corpus to only the persons identified in paragraph (b)(5)(i)(A) of this section or to researchers affiliated with other nonprofit institutions of higher education, with all access provided only through secure connections and on the condition of authenticated credentials, solely for purposes of text and data mining research or teaching.

(ii) For purposes of paragraph (b)(5)(i) of this section:

(A) An institution of higher education is defined as one that:

(*1*) Admits regular students who have a certificate of graduation from a secondary school or the equivalent of such a certificate;

(*2*) Is legally authorized to provide a post secondary education program;

(*3*) Awards a bachelor's degree or provides not less than a two-year program acceptable towards such a degree;

(*4*) Is a public or other nonprofit institution; and

(*5*) Is accredited by a nationally recognized accrediting agency or association.

(B) The term ''effective security measures'' is defined as:

(*1*) Security measures that have been agreed to by all interested copyright owners of literary works and institutions of higher education; or

(*2*) Security measures that the institution uses to keep its own highly confidential information secure.

(6)(i) Literary works or previously published musical works that have been fixed in the form of text or notation, distributed electronically, that are protected by technological measures that either prevent the enabling of read-aloud functionality or interfere with screen readers or other applications or assistive technologies:

(A) When a copy or phonorecord of such a work is lawfully obtained by an eligible person, as such a person is defined in 17 U.S.C. 121; provided, however, that the rights owner is remunerated, as appropriate, for the market price of an inaccessible copy of the work as made available to the general public through customary channels; or

(B) When such a work is lawfully obtained and used by an authorized entity pursuant to 17 U.S.C. 121.

(ii) For the purposes of paragraph (b)(6)(i) of this section, a ''phonorecord of such a work'' does not include a sound recording of a performance of a musical work unless and only to the extent the recording is included as part of an audiobook or e-book.

(7) Literary works consisting of compilations of data generated by medical devices or by their personal corresponding monitoring systems, where such circumvention is undertaken by or on behalf of a patient for the sole purpose of lawfully accessing data generated by a patient's own medical device or monitoring system. Eligibility for this exemption is not a safe harbor from, or defense to, liability under other applicable laws, including without limitation the Health Insurance Portability and Accountability Act of 1996, the Computer Fraud and Abuse Act of 1986, or regulations of the Food and Drug Administration.

(8) Computer programs that enable wireless devices to connect to a wireless telecommunications network, when circumvention is undertaken solely in order to connect to a wireless telecommunications network and such connection is authorized by the operator of such network.

(9) Computer programs that enable smartphones and portable all-purpose mobile computing devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smartphone or device, or to permit removal of software from the smartphone or device. For purposes of this paragraph (b)(9), a ''portable all-purpose mobile computing device'' is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is equipped with an operating system primarily designed for mobile use, and is intended to be carried or worn by an individual.

(10) Computer programs that enable smart televisions to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the smart television, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For purposes of this paragraph (b)(10), ''smart televisions'' includes both internet-enabled televisions, as well as devices that are physically separate from a television and whose primary purpose is to run software applications that stream authorized video from the internet for display on a screen.

(11) Computer programs that enable voice assistant devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the device, or to permit removal of software from the device, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For purposes of this paragraph (b)(11), a ''voice assistant device'' is a device that is primarily designed to run a wide variety of programs rather than for consumption of a particular type of media content, is designed to take user input primarily by voice, and is designed to be installed in a home or office.

(12) Computer programs that enable routers and dedicated network devices to execute lawfully obtained software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications with computer programs on the router or dedicated network device, and is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. For the purposes of this paragraph (b)(12), ''dedicated network device'' includes switches, hubs, bridges, gateways, modems, repeaters, and access points, and excludes devices that are not lawfully owned.

(13) Computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle or marine vessel such as a personal automobile or boat, commercial vehicle or vessel, or mechanized agricultural vehicle or vessel, except for programs accessed through a separate subscription service, when circumvention is a necessary step to allow the diagnosis, repair, or lawful modification of a vehicle or vessel function, where such circumvention is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. Eligibility for this exemption is not a safe harbor from, or defense to, liability under other applicable laws, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency.

(14) Computer programs that are contained in and control the functioning of a lawfully acquired motorized land vehicle or marine vessel such as a personal automobile or boat, commercial vehicle or vessel, or mechanized agricultural vehicle or vessel, except for programs accessed through a separate subscription service, to allow vehicle or vessel owners and lessees, or those acting on their behalf, to access, store, and share operational data, including diagnostic and telematics data, where such circumvention is not accomplished for the purpose of gaining unauthorized access to other copyrighted works. Eligibility for this exemption is not a safe harbor from, or defense to, liability under other applicable laws, including without limitation regulations promulgated by the Department of Transportation or the Environmental Protection Agency.

(15) Computer programs that are contained in and control the functioning of a lawfully acquired device that is primarily designed for use by consumers, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device, and is not accomplished for the purpose of gaining access to other copyrighted works. For purposes of this paragraph (b)(15):

(i) The ''maintenance'' of a device is the servicing of the device in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device; and

(ii) The ''repair'' of a device is the restoring of the device to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device. For video game consoles, ''repair'' is limited to repair or replacement of a console's optical drive and requires restoring any technological protection measures that were circumvented or disabled.

(16) Computer programs that are contained in and control the functioning of lawfully acquired equipment that is

primarily designed for use in retail-level commercial food preparation when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device, and is not accomplished for the purpose of gaining access to other copyrighted works. For purposes of this paragraph (b)(16):

(i) The "maintenance" of a device is the servicing of the device in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device; and

(ii) The "repair" of a device is the restoring of the device to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device.

(17) Computer programs that are contained in and control the functioning of a lawfully acquired medical device or system, and related data files, when circumvention is a necessary step to allow the diagnosis, maintenance, or repair of such a device or system. For purposes of this paragraph (b)(17):

(i) The "maintenance" of a device or system is the servicing of the device or system in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that device or system; and

(ii) The "repair" of a device or system is the restoring of the device or system to the state of working in accordance with its original specifications and any changes to those specifications authorized for that device or system.

(18)(i) Computer programs, where the circumvention is undertaken on a lawfully acquired device or machine on which the computer program operates, or is undertaken on a computer, computer system, or computer network on which the computer program operates with the authorization of the owner or operator of such computer, computer system, or computer network, solely for the purpose of good-faith security research.

(ii) For purposes of paragraph (b)(18)(i) of this section, "good-faith security research" means accessing a computer program solely for purposes of good-faith testing, investigation, and/or correction of a security flaw or vulnerability, where such activity is carried out in an environment designed to avoid any harm to individuals or the public, and where the information derived from the activity is used primarily to promote the security or safety of the class of devices or machines on which the computer program operates, or those who use such devices or machines, and is not used or maintained in a manner that facilitates copyright infringement.

(iii) Good-faith security research that qualifies for the exemption under paragraph (b)(18)(i) of this section may nevertheless incur liability under other applicable laws, including without limitation the Computer Fraud and Abuse Act of 1986, as amended and codified in title 18, United States Code, and eligibility for that exemption is not a safe harbor from, or defense to, liability under other applicable laws.

(19)(i) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, when the copyright owner or its authorized representative has ceased to provide access to an external computer server necessary to facilitate an authentication process to enable gameplay, solely for the purpose of:

(A) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game for personal, local gameplay on a personal computer or video game console; or

(B) Permitting access to the video game to allow copying and modification of the computer program to restore access to the game on a personal computer or video game console when necessary to allow preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(ii) Video games in the form of computer programs embodied in physical or downloaded formats that have been lawfully acquired as complete games, that do not require access to an external computer server for gameplay, and that are no longer reasonably available in the commercial marketplace, solely for the purpose of preservation of the game in a playable form by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage and the video game is not distributed or made available outside of the physical premises of the eligible library, archives, or museum.

(iii) Computer programs used to operate video game consoles solely to the extent necessary for an eligible library, archives, or museum to engage in the preservation activities described in paragraph (b)(19)(i)(B) or (b)(19)(ii) of this section.

(iv) For purposes of this paragraph (b)(19), the following definitions shall apply:

(A) For purposes of paragraphs (b)(19)(i)(A) and (b)(19)(ii) of this section, "complete games" means video games that can be played by users without accessing or reproducing copyrightable content stored or previously stored on an external computer server.

(B) For purposes of paragraph (b)(19)(i)(B) of this section, "complete games" means video games that meet the definition in paragraph (b)(19)(iv)(A) of this section, or that consist of both a copy of a game intended for a personal computer or video game console and a copy of the game's code that was stored or previously stored on an external computer server.

(C) "Ceased to provide access" means that the copyright owner or its authorized representative has either issued an affirmative statement indicating that external server support for the video game has ended and such support is in fact no longer available or, alternatively, server support has been discontinued for a period of at least six months; provided, however, that server support has not since been restored.

(D) "Local gameplay" means gameplay conducted on a personal computer or video game console, or locally connected personal computers or consoles, and not through an online service or facility.

(E) A library, archives, or museum is considered "eligible" if—

(*1*) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(*2*) The library, archives, or museum has a public service mission;

(*3*) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(*4*) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(*5*) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by this paragraph (b)(19).

(20)(i) Computer programs, except video games, that have been lawfully acquired and that are no longer reasonably available in the commercial marketplace, solely for the purpose of

lawful preservation of a computer program, or of digital materials dependent upon a computer program as a condition of access, by an eligible library, archives, or museum, where such activities are carried out without any purpose of direct or indirect commercial advantage. Any electronic distribution, display, or performance made outside of the physical premises of an eligible library, archives, or museum of works preserved under this paragraph may be made to only one user at a time, for a limited time, and only where the library, archives, or museum has no notice that the copy would be used for any purpose other than private study, scholarship, or research.

(ii) For purposes of the exemption in paragraph (b)(20)(i) of this section, a library, archives, or museum is considered "eligible" if—

(A) The collections of the library, archives, or museum are open to the public and/or are routinely made available to researchers who are not affiliated with the library, archives, or museum;

(B) The library, archives, or museum has a public service mission;

(C) The library, archives, or museum's trained staff or volunteers provide professional services normally associated with libraries, archives, or museums;

(D) The collections of the library, archives, or museum are composed of lawfully acquired and/or licensed materials; and

(E) The library, archives, or museum implements reasonable digital security measures as appropriate for the activities permitted by this paragraph (b)(20).

(iii) For purposes of paragraph (b)(20) of this section, the phrase "one user at a time" means that for each copy of a work lawfully owned by an eligible library, archives, or museum and preserved under paragraph (b)(20)(i) of this section, such library, archives, or museum may make an electronic distribution, display, or performance of that work outside of its physical premises. An eligible library, archives, or museum may make each copy of such lawfully owned and preserved work available to different users simultaneously. This provision does not permit an eligible library, archives, or museum to make multiple, simultaneous copies of the same copy of a work for the purposes of providing users access to the work.

(21) Computer programs that operate 3D printers that employ technological measures to limit the use of material, when circumvention is accomplished solely for the purpose of using alternative material and not for the purpose of accessing design software, design files, or proprietary data.

(22) Computer programs, solely for the purpose of investigating a potential infringement of free and open source computer programs where:

(i) The circumvention is undertaken on a lawfully acquired device or machine other than a video game console, on which the computer program operates;

(ii) The circumvention is performed by, or at the direction of, a party that has a good-faith, reasonable belief in the need for the investigation and has standing to bring a breach of license or copyright infringement claim;

(iii) Such circumvention does not constitute a violation of applicable law; and

(iv) The copy of the computer program, or the device or machine on which it operates, is not used or maintained in a manner that facilitates copyright infringement.

* * * * *

Dated: October 18, 2024.

**Carla D. Hayden,**

*Librarian of Congress.*

[FR Doc. 2024–24563 Filed 10–25–24; 8:45 am]

BILLING CODE 1410–30–P

---

## DEPARTMENT OF TRANSPORTATION

### Federal Railroad Administration

### 49 CFR Part 225

**[Docket No. FRA–2024–0034]**

**RIN 2130–AC98**

### Federal Railroad Administration Accident/Incident Investigation Policy for Gathering Information and Consulting With Stakeholders; Correction

**AGENCY:** Federal Railroad Administration (FRA), Department of Transportation (DOT).

**ACTION:** Final rule; correction.

**SUMMARY:** On October 1, 2024, FRA published a final rule amending its Accident/Incident Regulations governing reporting, classification, and investigations to codify FRA's policy for gathering information from, and consulting with, stakeholders during an accident/incident investigation. The published final rule contains errors in the preamble text. FRA is correcting those errors so that the final rule conforms to FRA's intent.

**DATES:** Effective on November 15, 2024.

**FOR FURTHER INFORMATION CONTACT:** Senya Waas, Senior Attorney, Office of the Chief Counsel, FRA, telephone: 202–875–4158 or email: *senyaann.waas@dot.gov.*

**SUPPLEMENTARY INFORMATION:** In FR document 2024–22326 beginning on page 79767 in the **Federal Register** of October 1, 2024, make the following corrections:

1. On page 79767, in the first and second columns, correct the **DATES** section to read:

**DATES:** *Effective date:* This final rule is effective on November 15, 2024, unless FRA receives adverse, substantive comment by October 31, 2024. If no adverse, substantive comments are received, FRA will publish a notice in the **Federal Register** indicating that no adverse comment was received and confirming that the rule will become effective on November 15, 2024.

2. On page 79768, in the first column, correct the first paragraph to read:

FRA is publishing this rule without a prior proposed rule under FRA's direct final rulemaking procedures in 49 CFR 211.33 because it views this as a noncontroversial action that generally codifies FRA's current process for accident/incident investigations. Under the Administrative Procedure Act (APA), an agency may waive the normal notice and comment procedures if the action is a rule of agency organization, procedure, or practice. 5 U.S.C. 553(b)(3)(A). Additionally, under the APA, an agency may waive notice and comment procedures when the agency for good cause finds that notice and public procedure are impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. 553(b)(3)(B). As noted above, this rule would codify FRA's procedures for accident/incident investigations and FRA has already worked with stakeholders (both labor and the rail organizations) to develop the Policy Document which is posted on FRA's website. Accordingly, FRA finds that notice and comment are unnecessary and anticipates no adverse, substantive comment on any of the provisions of the rule. If FRA receives an adverse, substantive comment on any of the provisions, it will publish in the **Federal Register** a timely withdrawal, informing the public that the direct final rule will not take effect.

3. In the *Section-by-Section Analysis,* on page 79769, in the 2nd column, correct the fourth paragraph to read:

Previous paragraphs (b), (c), (d), (e), and (f) remain substantively unchanged but are being redesignated as paragraphs (a)(2) through (6).

4. Under *Regulatory Impact and Notices,* on page 79770, correct table 1 to read as follows: